# EXHIBIT A

1 | Lesley E. Weaver (SBN 191305)
Mili Desai (SBN 308858)
2 | Britt Cibulka (SBN 220957)
3 | BLEICHMAR FONTI & AULD, LLP
1999 Harrison Street, Suite 670
4 | Oakland, California 94612
Tel: (415) 445-4003
5 | Fax: (415) 445-4020
lweaver@bfalaw.com
6 | mdesai@bfalaw.com
bcibulka@bfalaw.com
7 |
8 | Robyn R. English, *pro hac vice forthcoming*
BLEICHMAR FONTI & AULD, LLP
9 | 7 Times Square, 27th Floor
New York, NY 10036
10 | Tel: (212) 789-1359
Fax: (212) 205-3970
11 | renglish@bfalaw.com

12 |

13 | *Attorneys for Plaintiff*

14 | **IN THE UNITED STATES DISTRICT COURT**

15 | **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

16 | **SAN JOSE DIVISION**

17 |

| Boardsports School LLC, individually and on behalf of all others similarly situated, | ) ) ) | Case No. |
|---|---|---|
| Plaintiff, | ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT** |
| vs. | ) ) ) | |
| Qualcomm Incorporated | ) ) | |
| Defendant. | ) ) ) | **(Jury Trial Demanded)** |

CLASS ACTION COMPLAINT

## I.    INTRODUCTION

1.      Boardsports School LLC (the "Plaintiff"), individually and on behalf of others similarly situated, brings this action against Defendant Qualcomm ("Qualcomm") for its anticompetitive conduct in acquiring and maintaining its monopoly over the baseband processor market and abusing the intellectual property rights underlying this technology, and charging an excessive and unlawful royalty on cellular phones or devices incorporating such patents, with the result that each end-user purchaser of such phones or device pays an inflated price. Plaintiff and members of the Class are purchasers of cellular telephones and other cellular devices, such as computer tablets.

2.      Each cellular phone or device includes a baseband processor. This piece of technology is a semiconductor and is also called a "chip," "chipset," or "modem." The baseband processor must meet certain standards to enable the cellular phone or device to communicate with a wireless network. Because the cellular phone or device must communicate with the network to provide customers with cellular service, the standards are essential.

3.      Given the importance of cellular technology standards to the industries common enterprise of providing cellular communication services to its customers, Standard Setting Organizations ("SSOs") composed primarily of cellular device and device component developers carefully consider what standards and underlying technology should be selected. This process is critical since a standard requires that devices utilize a specific technology, and therefore, standard-compliant devices will, in some instances, infringe on certain patents for technology that has been incorporated into the chosen standard.

4.      A patent that is implicated when complying with a standard is called a standard-essential patent ("SEP"). Because the standards are necessary for interoperability and require the use of certain technology that is covered by SEPs, the holder of an SEP wields significant power. For example, the SEP holder can charge licensing fees and royalties associated with the use of its technology. The SEP holder can also withhold such licenses from competitors for its own benefit and to the detriment of other market participants. This

power that an SEP holder has to act in its own self-interest to the detriment of other industry participants, the competitive market, and consumers, caused SSOs to require developers of the standards to agree to license their technology on fair, reasonable, and nondiscriminatory ("FRAND") terms before selecting a standard. If the patent holder will not agree to licensing on FRAND terms, then the SSOs will not incorporate its patented technology as part of the standard.

5.      Qualcomm is one of the earliest developers of cellular technology and has been the dominant supplier of baseband processors worldwide. Qualcomm created the underlying technology for a standard called Code Division Multiple Access ("CDMA"), which is used by major cellular network carriers like Verizon and Sprint.

6.      Qualcomm is the dominant producer of CDMA chipsets and holds the greatest number of standard-essential patents for the CDMA technology. These CDMA-related SEPs give Qualcomm significant benefits because companies that want to make use of this standard technology have to pay licensing fees and royalties. Having agreed to license its technology on FRAND terms, Qualcomm's technology has been incorporated into virtually every relevant cellular standard in the last several years.

7.      Qualcomm has not adhered to its FRAND promises, but has instead taken advantage of the standard-setting process to acquire and maintain monopoly control of the baseband processor market. Beginning at least as early as 2008, Qualcomm, among other things, (1) refused to license, or alternatively imposed onerous restrictions on licenses of, its SEPs to competing chipset makers; (2) conditioned the supply of its CDMA chipsets on agreeing to Qualcomm's license agreements for its entire patent portfolio; (3) entered into exclusive deals with certain cellular phone manufacturers, such as Apple, Inc. ("Apple"); and (4) most onerously, ignored the requirements of SSOs to license its SEPs to patent users on FRAND terms, instead extracting unreasonably high, unilaterally-determined royalty payments. Those payments have been passed on to consumers, according to the FTC. *Federal Trade Commission v. Qualcomm Inc.*, Case No. 17-cv-00220 (filed N.D. Cal. Jan. 17, 2017) ("FTC Compl."), at ¶ 95.

2

8.      Plaintiff, a small business, and the class of consumers it seeks to represent have been harmed by paying supracompetitive prices for the telephones they purchased. Qualcomm has now "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits.  Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips."[1]  Qualcomm admits in its Form 10-Q filed on June 29, 2016 with the Securities & Exchange Commission ("SEC") that "[r]oyalties are generally based upon a *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)."  (Emphases added).  Qualcomm typically charges makers of 3G devices—and 3G-compatible 4G models—up to 5% of their products' wholesale price—around $20 on a $400 phone.

9.      On January 17, 2017, the United States Federal Trade Commission ("FTC") took formal enforcement action against Qualcomm in this Court, challenging Qualcomm's unlawful maintenance of a monopoly in baseband processors.  The FTC Complaint explicitly states that "Qualcomm has engaged in exclusionary conduct that taxes its competitors' baseband processor sales, reduces competitors' ability and incentive to innovate, ***and raises prices paid by consumers for cell phone and tablets***."  FTC Compl. at ¶ 1 (emphasis added).

10.     Qualcomm's anticompetitive conduct has been met with condemnation by regulators around the world.  For example, the Chinese National Development & Reform Commission ("NDRC") has fined Qualcomm a significant amount—$975 million—for violating the country's Anti-Monopoly Law.  Similarly, the Korea Fair Trade Commission ("KFTC") has fined Qualcomm $854 million (the largest fine in its history) for abuse of its market dominance and anticompetitive conduct.  The Japanese Fair Trade Commission ("JFTC") issued a cease and desist order against Qualcomm due to its failure to abide by its FRAND obligations.  The European Commission ("EC") is continuing to investigate

---

[1] Don Clark, *Qualcomm's Main Profit Driver is Under Pressure*, The Wall Street Journal (Apr. 13, 2015), http://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051.

1    Qualcomm's abuse of monopoly power and has issued two Statement of Objections—one

2    concerning exclusivity payments and the other predatory pricing—to Qualcomm.

3        11.    Major industry participants have also taken issue with Qualcomm's

4    anticompetitive conduct.  A few days after the FTC filed suit, Apple brought an action against

5    Qualcomm  pursuant to contract, patent, and antitrust laws, alleging that "Qualcomm has

6    abused its business relationships with Apple and blocked competitors from selling chipsets"

7    and is now "punishing Apple for providing truthful testimony at the request of government

8    regulators."  *Apple Inc. v. Qualcomm Inc.*, 17-cv-00234 (filed SDCA Jan. 20, 2017).

9        12.    Plaintiff brings this action on behalf of itself and others similarly situated to

10   recover for their injuries resulting from Qualcomm's violations of Section 2 of the Sherman

11   Act, as well as violations of state antitrust and consumer protection laws.  Plaintiff seeks

12   monetary damages, injunctive relief, and any other available remedies to which it is entitled

13   as a result of Qualcomm's unlawful conduct.

## II.      PARTIES

### A.   Plaintiff

16       13.    Plaintiff Boardsports School LLC is a limited liability company in San

17   Francisco, California with locations in Alameda, California and San Mateo, California.  The

18   Company  partners with public entities to provide kiteboard, windsurf, and stand up paddle

19   rentals and lessons.  As a small business, Plaintiff is mindful of costs and pays particular

20   attention to overhead.  Plaintiff purchases cellular phones for its employees, and has

21   purchased at least three devices at issue in this lawsuit in San Francisco, California in the past

22   two years.

### B.   Defendant

24       14.    Defendant Qualcomm is a Delaware corporation with its principal place of

25   business in California located at 5775 Morehouse Drive, San Diego, California 92121.

26   Qualcomm develops, designs, licenses, and markets worldwide its digital communications

27   products and services, primarily through its two main business segments: Qualcomm CDMA

28   Technologies ("QCT") and Qualcomm Technology Licensing ("QTL").  QCT deals with

4

equipment sales while QTL engages in licensing of patents and technology. QCT, a wholly-owned subsidiary of Qualcomm, is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm. QTL, a third wholly-owned subsidiary of Qualcomm, grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio.

15.     Qualcomm has extensive offices and employees throughout this District, including in San Francisco, Santa Clara, and Alameda counties,[2] and regularly conducts business here. Many of Qualcomm's licensees are also located in this District.

### III.     JURISDICTION AND VENUE

16.     This action arises under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 16, for Defendant's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 3. The Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

17.     Plaintiff also brings claims under state laws. The Court has supplemental jurisdiction over these pendant state law claims under 28 U.S.C. §§ 1332(d) and 1367.

18.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here. Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

19.     Millions of cellular devices were purchased at artificially inflated rates in this District in recent years.

### IV.     INTRADISTRICT ASSIGNMENT

20.     Pursuant to the Northern District of California's Civil Local Rule 3-2(c)-(e), the intradistrict assignment should be to the San Jose Division. This action arises in Santa

---

[2] Qualcomm, *Offices & Facilities*, https://www.qualcomm.com/company/facilities/offices (last visited Jan. 16, 2017).

5

1 Clara County because a substantial part of the events giving rise to these claims occurred in

2 Santa Clara County. Qualcomm has offices in Santa Clara and San Jose. Third parties that

3 have information relevant to this action, including leading cell phone manufacturers (also

4 known as "original equipment manufacturers" or "OEMs") and Qualcomm competitors, also

5 have offices in Santa Clara County. As noted above, the FTC filed a case in the San Jose

6 Division concerning the practices at issue here.

### V. FACTUAL BACKGROUND

#### A. SSOs, SEPs, and FRAND Obligations

9     21.     Interoperability and compatibility are critical for modern electronic devices.

10 Although users may take for granted that their cellular devices will be able to connect

11 wirelessly to their cellular network and the Internet, interoperability does not happen by

12 chance. Each component of a cellular network (such as those operated by AT&T, Verizon,

13 and Sprint), and, by extension, each component of mobile wireless devices utilizing that

14 cellular network, must work with other components, regardless of which company made each

15 component.

16     22.     "Mobile wireless telephony" is the general term for describing the technology

17 and equipment used in the operation of cellular telephones. A cellular telephone contains a

18 baseband processor – the core electronic unit that allow sit to transmit and receive information

19 (either telephone calls or data) to and from the wireless network. Specifically, these chipsets

20 transmit information, via radio waves, to cellular base stations. Base stations, in turn, transmit

21 information to and from telephone and computer networks. It is essential that all components

22 involved in this transmission of information be able to communicate seamlessly with one

23 another.

24     23.     Because of the multitude of devices, device designers, component

25 manufacturers, and others must agree to uniform standards to ensure the smooth operation of

26 the cellular network and the cellular devices that connect to it. To achieve this, cellular

27 network carriers, chipset manufacturers, cellular device manufacturers, and others have SSOs,

28 such as the European Telecommunications Standard Institute ("ETSI"), the International

CLASS ACTION COMPLAINT

Telecommunications Union ("ITU"), and the Institute of Electrical and Electronic Engineers ("IEEE").

24.     SSOs create standards and technical specifications and in doing so also declare patents that might be essential to those standards.  The technology incorporated into a standard is typically chosen from among different options.  Once incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because the use of that technology is necessary to comply with the agreed-upon standard. Once the standard is adopted, competition within that technology market is eliminated, as competing technologies are no longer available as alternative means of implementing the standard.  Additionally, to implement a technological standard, devices often need to incorporate a patented invention on which the standard is based.  These are the SEPs discussed previously.  Holders of patents essential to technology incorporated into a standard declare their patents as SEPs.  Consequently, manufacturers of products containing the patented technology generally need to license the SEP to be compliant with the applicable standard.

25.     Antitrust law recognizes that under certain circumstances, collaboration by industry participants can increase competition, innovation, product quality, and consumer choice.  For example, in this context, collaboration allows consumers to have confidence that cellular devices bought from different manufacturers will operate with each other and with the cellular network that they choose.  Similarly, common standards allow component manufacturers, carriers, and others in the industry to invest in technological advancement with confidence that their products will work with wireless networks.

26.     Standards, however, can pose challenges to OEMs and can involve tradeoffs for consumers.  For example, a company implementing standards in a product must use certain mandated technologies, even where many viable and perhaps even superior alternatives exist.  Once a standard is adopted, participants begin to make investments tied to the implementation of the standard.  Because these participants may face substantial switching

CLASS ACTION COMPLAINT

1    costs in abandoning initial designs and substituting a different technology, an entire industry

2    can become "locked in" to a standard.

3         27.    The adoption of SEPs into technological standards also enhances the potential

4    for abuse by the patent owner.  "Patent hold-up" occurs when the holder of a SEP demands

5    excessive royalties after companies are locked into using a standard.  Where standardized

6    technologies are covered by patents, companies that choose to implement a standard have

7    no choice but to license those patents (and accept the licensor's terms) or face a lawsuit if

8    they use the technology without a license.  "Royalty stacking" arises when a standard

9    implicates numerous patents.  These royalty payments "stack" on top of each other and, in

10   turn, inflate the cost of the product to the consumer.  Royalty stacking can be a significant

11   concern:

12        The data show that royalty stacking is not merely a theoretical concern.
         Indeed, …we estimate potential patent royalties in excess of $120 on a
13        hypothetical $400 smartphone—which is almost equal to the cost of
         device's components.  Thus, the smartphone royalty stack across
14        standardized and non-standardized technology is significant, and those
         costs may be undermining industry profitability—and, in turn,
15        diminishing incentives to invest and compete.[3]

16

17        28.    To help alleviate these potential concerns, before agreeing to a particular

18   standard, SSOs seek certain assurances from patent owners.  Specifically, SSOs ask SEP

19   holders agreed to license their patents on fair, reasonable, and non-discriminatory terms,

20   referred to as a SEP holder's FRAND obligations.  For example, the IEEE asks SEP owners

21   to pledge that they will grant licenses to an unrestricted number of applicants on "reasonable,

22   and nondiscriminatory" (or "RAND") terms.  If a patent holder does not choose to make

23   this promise, the SSOs design a standard without using the patented technology.

24        29.    FRAND obligations are designed to, among other things, prevent SEP holders

25   from wielding control over essential technology and restricting competition, development,

26

27   [3] Joseph J. Mueller & Timothy D. Syrett, *The Smartphone Royalty Stack: Surveying Royalty
     Demands for the Components within Modern Smartphones* (May 29, 2014),
28   https://www.wilmerhale.com/pages/publicationsandnewsdetail.aspx?NewsPubId=171798724
     41.

8

and research related to the standard. SEP holders generally agree to FRAND terms because SSOs may exclude technologies from the standard when a patent holder does not agree to FRAND terms. SEP holders also benefit from license fees and royalties they gain from cooperating with the SSO.

30. As the United States Court of Appeals for the Third Circuit has noted in one suit against Qualcomm:

> [A] standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard. Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's [intellectual property rights], if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

31. When a SEP holder makes a FRAND promise to an SSO, implementers of the standard at issue and their customers are third-party beneficiaries of that promise. FRAND obligations are more than a matter of a private contract between owners of technology, on the one hand, and SSOs and their other members (and implementers of the standard as intended third party beneficiaries), on the other. Instead, they are a critical precondition for antitrust tolerance of the industry collaboration on which standard-setting depends.

CLASS ACTION COMPLAINT

**B.  The Cellular Industry and Qualcomm's Dominance and Abuse of Power.**

32.     Wireless standards have evolved in distinct generations, as consumers demanded more features and the industry responded by developing new innovations.  The following graphic, created by Qualcomm, shows the evolution of this technology[4]:



33.     Following the first generation of cellular technology, the cellular industry developed second generation ("2G") cellular technology, from which two primary technology paths, or families of standards, emerged: (1) "CDMA," which stands for "Code Division Multiple Access"; and (2) "GSM," which stands for "global system for mobility."  CDMA is a channel access method used by various radio communication technologies.  It provides multiple access, where several transmitters can send information simultaneously over a single communication channel.  CDMA is used as the access method in many mobile phone standards.  GSM is another digital mobile telephony system that is widely used in Europe and much of Asia, other than Japan and South Korea.  It utilizes a variation of time division multiple access.  Cellular telephone service providers operated under one or the other path, with, for example, Verizon and Sprint operating CDMA-path networks, and AT&T (formerly Cingular) and T-Mobile operating GSM-path networks.  The CDMA and GSM technology paths are not interoperable; in other words, equipment and technologies designed to be compatible with one standard cannot be used for the other standard.

---

[4] Qualcomm, *The Evolution of Mobile Technologies-1g-2g-3g-4g-lte*, (June 2014), https://www.qualcomm.com/media/documents/files/the-evolution-of-mobile-technologies-1g-to-2g-to-3g-to-4g-lte.pdf.

10

34.    Mobile devices are configured for a particular carrier, like AT&T or Verizon, and thus chipsets designed for a particular wireless device must conform to the standard technology chosen for the carrier's associated network.  In other words, CDMA-based networks demand chipsets that conform to the CDMA standard, and GSM networks require chipsets that conform to the GSM standard.  As a result, chipsets that comply with a given standard are not substitutes for chipsets that comply with other standards.  These chipsets likewise have different price and demand characteristics.  Downstream consumers purchase cell phones that include chipsets configured to operate using the standards chosen for a particular network, and once purchased, those consumers are inextricably tied to that standard for use of that device.

35.    Qualcomm pioneered the development of CDMA technology.  As a result, it controlled, and continues to control, the market for such technology, initially selling 90% of the chipsets that go into CDMA-compatible phones and continuing to control over 80% of the market.  Additionally, Qualcomm amassed many patents related to this standard.  Consequently, virtually any company that makes CDMA products—be they chipsets, phones, or infrastructure gear—has to obtain a license from Qualcomm.  Licensees pay a one-time fee for access to the patent portfolio and then royalties based on the final product sold by the licensee (*e.g.*, a smartphone).  Nearly all wireless companies have signed patent licenses with Qualcomm.

36.    Qualcomm's royalty stream has continued in the technologies standardized in third generation ("3G") cellular technology.  As with the prior generation of cellular technology, 3G evolved into two competing standards—but this time, *both* major standards were based on CDMA.  While an improved version of CDMA technology was developed, the "Universal Mobile Telecommunications Service" ("UMTS") standard was also developed. UTMS uses radio technology called WCDMA, which stands for "Wideband Code Division Multiple Access."  WCDMA technology allows for even further increased data speed and capacity.

37.     The UMTS standard was adopted by the ITU, ETSI, IEEE, and other SSOs in the United States and elsewhere after evaluating alternative available equipment and technologies. Qualcomm supplies some of the essential technology that the ETSI included in the UMTS standard and holds intellectual property rights ("IPRs"), such as patents, in this technology. Qualcomm has declared over 30,000 global patents to be essential IPR under ETSI's protocol.  Among others, Qualcomm owns the "essential" patents for the WCDMA standard.  It is worth noting that no objective third party has tested whether these patents are actually essential.

38.     CDMA-based technology has been adopted for *all* 3G wireless telephony and broadband standards throughout the world.  As a result, Qualcomm has reaped more than $50 billion in licensing revenues since 2000.  Indeed, Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips.

39.     ETSI and other SSOs required a commitment from vendors whose technologies are included in the CDMA and other CDMA-based standards to license their technologies on FRAND terms.  Qualcomm voluntarily and publicly agreed to accept FRAND obligations.

40.     Indeed, in 2008, Qualcomm noted that it "has had a long standing policy of broadly offering to license its standards essential patents for CDMA-based telecommunications standards on terms and conditions that are fair, reasonable, and free from unfair discrimination (FRAND), subject to reciprocity."[5]  But in that same press release, Qualcomm publicly stated that "FRAND embodies a flexible approach that allows individual licensors and licensees to negotiate the terms and conditions that are best suited to address their respective commercial objectives" and "FRAND does not, and never has, prescribed formulas for imposing cumulative royalty caps or proportional allocations of such royalty caps."  This public statement was false. By the time it released that statement in 2008, Qualcomm had licensed its patent portfolios to more than 155 companies, making its portfolio

---

[5] Qualcomm, *LTE/WiMax PATENT LICENSING STATEMENT* (Dec. 2008), https://www.qualcomm.com/documents/ltewimax-patent-licensing-statement.

the most widely licensed in the industry.  As regulatory actions in multiple countries have confirmed, Qualcomm has not abided by FRAND principles and its interpretation of FRAND is not consistent with the obligations imposed on it by SSOs.  Qualcomm's promises to comply with its FRAND obligations induced the SSOs to adopt its technology in the cellular technology standards relevant to this action. That conduct constituted deceit and fraud on the SSOs and has injured Plaintiff and others that have paid unreasonably high prices for cellular devices as a result of Qualcomm's royalty demands.

41.     Qualcomm has abused its power over SEPs and the chipset supply to increase its own dominance in these markets and charge exorbitant royalties.  Simply put, it has abused its involvement in the SSOs, which set standards around Qualcomm technology and gave it the means to be as powerful as it has become.  Qualcomm's manipulation this unique position is confirmed by multiple investigations of its conduct by trade and competition agencies around the world, as discussed below.

42.     The fourth generation of cellular technology ("4G") brought with it the "LTE" standard, which stands for Long Term Evolution of UMTS.  Nearly all cellular-enabled devices sold today support LTE for 4G service.  LTE is an "orthogonal frequency division multiple access" or "OFDMA"-based technology.  The LTE standard does not implement CDMA-based technologies.

43.     But like the UMTS technology before it, the arrival of LTE has not significantly impacted Qualcomm's control over the chipset market or the power of its licensing business.  Qualcomm holds a leading and valuable patent portfolio that applies to LTE technologies, including OFDMA, and over 90 companies (including LG, Nokia, and Samsung) have royalty-bearing licenses under Qualcomm's patent portfolio for use in OFDMA products (which do not implement any CDMA-based standards).  Additionally, many of the 4G-based cellular devices still implement CDMA technology to be backwards-compatible with CDMA-based technologies that are still in use today.  Qualcomm exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.

CLASS ACTION COMPLAINT

44.     Consequently, with its power over CMDA technology, Qualcomm can and does use this as leverage to gain a greater share of the LTE-chipset market.  The following chart, prepared by the KFTC[6], demonstrates how Qualcomm has used control over CDMA-based technologies to acquire more power and control over the LTE chipset market.

### \<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)\>

|  | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|---|---|---|---|---|---|---|---|---|
| LTE | - | - | 34.2% | 58.8% | 94.5% | 96.0% | 84.8% | 69.4% |
| CDMA | 98.4% | 97.6% | 96.4% | 94.3% | 92.4% | 93.1% | 91.6% | 83.1% |
| WCDMA | 38.8% | 47.4% | 45.7% | 55.0% | 50.4% | 53.9% | 48.8% | 32.3% |

\* Source: Strategy Analytics

45.     In sum, Qualcomm holds a dominant position in the supply of chipsets that support CDMA, on which devices sold by Verizon and Sprint continue to depend.  It also holds a dominant position over the LTE-chipset supply.  Qualcomm has had at least a share of 80% or more of CDMA chipsets for many years, and Qualcomm's share of LTE chipsets sold was above 90% between 2012 and 2014, and remains above 60% percent today.  Qualcomm has leveraged its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements.  In other words, because these companies need CDMA- and LTE-based chipsets (controlled by Qualcomm) to be able to operate with CDMA- and LTE-based networks, device manufacturers have to accept unreasonable license terms as dictated by Qualcomm.  As one commentator noted: "Qualcomm's status as both a chipset and IP vendor provides them with unparalleled leverage to collect licensing fees at a lower cost, simply by denying physical delivery of the chipsets until all fees are paid."[7]

---

[6] Qualcomm has provided an unofficial translation of the KFTC's press release on its website. *See* KFTC Issued Press Release Dated December 28, 2016 – Unofficial English Translation, https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation (last visited Jan. 15, 2017).

[7] Richard A. Taddonio, *Long – Qualcomm (NASDAQ: QCOM) - $68.42*, Columbia Business School 2015, https://www8.gsb.columbia.edu/valueinvesting/sites/valueinvesting/files/Taddonio_Richard-QCOM_0.pdf (last visited Jan. 16, 2017).

14

46.     Qualcomm also holds a dominant position in the SEP licensing market for its intellectual property relating to the baseband processor. Qualcomm has declared thousands of patents as essential to CDMA, UMTS (WCDMA), and LTE standards.  Consequently, OEMs are highly reliant on Qualcomm's SEP portfolio, because each CDMA-, UMTS-, and/or LTE-related SEP is indispensable and irreplaceable for such manufacturers.  Qualcomm thus controls the licensing market for SEPs for CDMA, UMTS (WCDMA), and LTE technologies because manufacturers could not produce 3G and 4G devices without risking Qualcomm's initiating patent infringement lawsuits or seeking injunctions.  Qualcomm uses its SEPs to require OEMs and others to license its entire patent portfolio, which includes non-SEPs as well.  Non-SEPs refer to the patents that are either not essential to the realization of the standard or replaceable in their functionalities through design-around or avoidance design. There is no requirement that non-SEPs be licensed on FRAND terms.  By putting both SEPs and non-SEPs into one license, Qualcomm avoids its obligation to set license terms on a FRAND basis.  In doing so, Qualcomm can charge excessive and unfairly high royalties to any licensees that were forced to accept the packaged patent licenses.

47.     Qualcomm's licensing division brings in the vast majority of its profits, as illustrated in the graph below.  As such, it is critical for Qualcomm to maintain its licensing and related terms which have made it so profitable.



CLASS ACTION COMPLAINT

48.     Qualcomm has structured its business to maintain that licensing power.  In 2007, Qualcomm claimed publicly that any manufacturers using CDMA and UMTS/WCDMA technology "ha[s] to take out a license from Qualcomm" and that Qualcomm had been "pretty consistent in that model."[8]

49.     Again in 2007, Qualcomm filed an *amicus* brief to the United States Supreme Court in which it described its licensing business model as follows:[9]

> Qualcomm has provided chipmakers nontransferable, worldwide, nonexclusive, restricted licenses to its portfolio of technically necessary patents through licensing agreements called ASIC [Application Specific Integrated Circuits] Patent License Agreements ("APLAs").  Chipmaker licensees typically pay Qualcomm an up-front license fee and a running royalty (paid quarterly) that is an agreed upon percentage of the defined Net Selling Price of the chips produced by the licensee. . . .  An APLA provides the chipmaker-licensee with a license to *make* (or have made) its own ASICs.  An APLA also provides the chipmaker-licensee with a restricted license to *sell* ASICs, but only to handset makers that the APLA defines to be an "Authorized Purchaser" for incorporation into fully assembled handsets.  Authorized Purchasers are those handset makers that themselves have a license from Qualcomm through their own Subscriber Unit License Agreement ("SULA") to make, use and sell fully assembled handsets that, in the absence of a SULA, would infringe Qualcomm's patents.  Importantly, by their express terms, APLAs do *not* grant a license to the chipmaker to *use* the ASICs—i.e., licensed chipmakers may not themselves use or  pass on to others the right to use the chipmaker's ASICs to make, operate or sell handsets or any other product.  APLAs explicitly state that the rights to use the ASICs to make, operate or sell handsets are only conferred by licensing agreements between Qualcomm and Authorized Purchasers (i.e., by SULAs).  APLAs also expressly state that the license granted is only for the limited scope laid out, that no other license is granted or implied and that if the chipmaker-licensee sells ASICs to entities that are not Authorized Purchasers, the licensee has materially breached the APLA, which gives Qualcomm the right to terminate the agreement, including the license granted.
>
> As previously mentioned, producers of chips that are licensed through APLAs are granted, *inter alia*, a license to sell such chips only to handset makers that have entered into a SULA with Qualcomm.  The standard terms of the SULAs have granted handset makers a

---

[8] Qualcomm, Inc. at Jefferies Technology Conference (Oct. 2, 2007), at 5.

[9] Br. of Qualcomm Inc. as Amicus Curiae Supporting Respondent, *Quanta Comp., Inc. v. LG Elecs., Inc*., 533 U.S. 617 (2008) (No. 06-937), at 7-9.

CLASS ACTION COMPLAINT

nontransferable, worldwide, nonexclusive, unrestricted license to Qualcomm's patents to *make* (and have made), import and *use* handsets, and to *sell* (and offer to sell) completed handsets. SULAs typically provide for an up-front licensing fee to be paid to Qualcomm, along with a running royalty (paid quarterly) that is set as a percentage of the Net Selling Price of the handsets sold.

50. Even where Qualcomm sells its own chips, it requires purchasers to agree to its license agreements—which include the royalty rate based on the selling price of the device. As Qualcomm explained in its *amicus* brief:

Qualcomm is also in the business of developing and selling its own chips and software for wireless handsets. Qualcomm typically sells chips only to those handset manufacturers that are licensed to Qualcomm's patents under a SULA. Such chip sales are pursuant to Components Supply Agreements, in which handset makers agree to pay Qualcomm an agreed upon price for the chips sold by Qualcomm. Components Supply Agreements provide that the buyer-handset makers may only incorporate the chips purchased from Qualcomm into fully assembled handsets that are the subject of the SULA.

Essentially, cellular devices today are unable to connect to their network without paying a royalty (between 3%-5% of the price of the entire device) to Qualcomm.[10] For example, the royalties that Apple pays Qualcomm is an order of magnitude higher than the royalties it pays to any other patent holder, and is more than Apple pays to all other cellular patent holders combined.

51. In short, the KFTC correctly identified three abusive and anticompetitive practices by Qualcomm. *First*, Qualcomm did not provide SEP licenses to competing chipset companies; instead, Qualcomm threatened to sue competitors under those patents if they competed against Qualcomm in the sale of chipsets. *Second*, in selling baseband processors to OEMs like cellular phone makers, Qualcomm demanded the execution and performance of its license agreements, thus leveraging its SEPs improperly. And as a result, *third*, QTL coerced cellular phone makers to accept unilateral onerous terms.

---

[10] *See also* Subscriber Unit License Agreement, SEC.gov, https://www.sec.gov/Archives/edgar/data/1092492/000119312504140764/dex103.htm (last visited Jan. 16, 2017).

52.    The KFTC depicted this conduct in the graphic below[11]:



53.    Qualcomm's policy of not licensing SEPs to competing chipset makers while insisting on licensing from cellular device manufacturers has entrenched its market power.

54.    Additionally, as OEMs cannot purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, to avoid such royalties, in some cases OEMs and other mobile device suppliers agree to deal exclusively or near-exclusively with Qualcomm on the purchase of chipsets.  This royalty relief is offered in exchange for exclusionary and anticompetitive contract terms that further cement Qualcomm's monopoly power for baseband processors.  As the FTC explained in its complaint, since 2007, Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial relief from Qualcomm's standard royalties.  Samsung has also entered into a similar exclusive dealing arrangement with Qualcomm. [12]  These agreements contained clauses which prohibited Apple from bringing various legal actions against Qualcomm, including any action in which Apple claimed Qualcomm failed to offer a license to its SEPs on FRAND terms.

---

[11] *See supra* note 6.

[12] Joel Hruska, *Qualcomm may have inked exclusive deal to put Snapdragon 820 in Samsung hardware*, ExtremeTech.com (Dec. 21, 2015) https://www.extremetech.com/mobile/219791-qualcomm-may-have-inked-exclusive-deal-to-put-snapdragon-820-in-samsung-hardware.

55.     Qualcomm's exclusive supply arrangement with these OEMs denies other baseband processor suppliers the benefits of working with a particularly important cell phone manufacturers and hampers their development into effective competitors.

56.     As the KFTC explained, the size of the baseband processor market doubled since 2008, but Qualcomm's licensing practices caused no significant competitor to enter the market and rather caused many existing competitors to exit it[13]:



<Market Growth Trend in the Modem Chipset Market and Market Exit by Major Chipset Companies>

| Modem Chipset Maker | Exit (Imminent) Time |
| --- | --- |
| NXP | August 2008 |
| TI | October 2008 |
| Freescale | October 2008 |
| ST Micro | February 2012 |
| NEC | February 2014 |
| Broadcom | June 2014 |
| Ericsson | September 2014 |
| Nvidia | May 2015 |
| Marvell | September 2015 |

57.     The result has been a steady increase in Qualcomm's share of the chipset market[14]:



---

[13] *See supra* note 6.

[14] *Id.*

58.     This dominance in the chipset market, coupled with its ownership of critical SEPs built into several of the standards adopted by various SSOs, allowed Qualcomm to impose onerous license terms on cellular device manufacturers, including exorbitant royalties that were not the result of the FRAND process.

59.     Qualcomm's royalty rates of 5% for most CDMA products and 3.25% for more recent LTE based products are significantly higher than others in the industry. The following chart demonstrates this in the LTE context:

| Company | Announced LTE Rates | No. of Essential LTE Patents |
|---|---|---|
| 1. Qualcomm | 3.3% | 350 |
| 2. Huawei | 1.5% | 182 |
| 3. Ericsson | 1.5% | 146 |
| 4. Nokia | 1.5% | 142 |
| 5. Nortel | 1.0% | 46 |
| 6. Siemens | 0.8% | 32 |
| 7. Motorola | 2.3% | 16 |
| 8. Alcatel | 2.0% | 9 |
| **Source:** Stasik, Eric, "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards," *les Nouvelles*, September 2010, p. 116. | | |

60.     Qualcomm's rate base is also part of what makes Qualcomm's royalties so abusive.  Qualcomm admits that its "[r]oyalties are generally based upon a *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)." (Emphases added).  Using the entire value of an end product is not a reasonable basis for calculating SEP-based royalties.  Indeed, on or around February 8, 2015, the IEEE and its Standards Association updated their licensing policy, stating that a reasonable royalty should be the value attributable to a SEP, excluding the value of that SEP's inclusion in an IEEE standard, and that a factor to consider when determining the reasonable rate is the value of the relevant functionality of the smallest salable compliant implementation that practices the essential patent claim.  Qualcomm's power and leverage allows it force licensees to pay excessive rates on an unreasonable rate basis, which results in a royalty divorced from the actual value attributable to its technologies and intellectual property.

61. Qualcomm realizes the benefits of maintaining its licensing business and chipset business in one company, rejecting a push from an activist investor hedge fund to split the businesses into two companies. "The strategic benefits of the current structure will best fuel Qualcomm's growth as we move through the upcoming technology transitions and extend our technologies into new user experiences, services and industries," said Qualcomm's CEO, Steve Mollenkopf.[15]

## C. Regulators Investigate and Penalize Qualcomm's Abusive Conduct

62. Qualcomm's abusive and unfair licensing practices have not gone unnoticed. Rather, a numbers of foreign regulatory agencies and the FTC have sought to curb Qualcomm's anticompetitive practices that enabled it to rake in billions of dollars in undeserved profits. In the last few years, Qualcomm's royalty calculations and licensing practices have come under the scrutiny of competition regulators in China, South Korea, Japan, Taiwan, Europe, and the United States. These competition law enforcement authorities have or are about to conclude that Qualcomm's conduct as alleged herein is anticompetitive, unfair, and injurious to consumers.

63. Qualcomm has resisted and challenged these proceedings. Indeed, Apple alleges that Qualcomm withheld nearly $1 billion of royalty rebates on the basis of Apple's cooperation with various international antitrust authorities, and offered to remit payment only if Apple would recant its testimony about Qualcomm's anticompetitive behavior and instead provide false testimony more favorable to Qualcomm.

### 1. China's National Development and Reform Commission ("NDRC")

64. In November 2013, China's NDRC began to investigate Qualcomm's SEP licensing practices.[16] The investigation focused on suspected abuses of dominance, in two

---

[15] Mike Freeman, *Qualcomm Rejects Breakup Plan*, Los Angeles Times (Dec. 15, 2015) http://www.latimes.com/business/la-fi-qualcomm-20151215-story.html.

[16] H. Stephen Harris, Jr., *An Overview of the NDRC Decision in the Qualcomm Investigation July 2015*, CPI Antitrust Chronicle (July 2015), available at http://www.winston.com/en/thought-leadership/an-overview-of-the-ndrc-decision-in-the-qualcomm-investigation.html.

1  different markets, that violated China's Anti-Monopoly Law. The two markets were: (1) the

2  licensing market for standard essential patents for CDMA, WCDMA, and LTE wireless

3  communications (the "Licensing Market"); and (2) the market for sales of baseband chips for

4  CDMA, WCDMA, and LTE wireless communications (the "Baseband Chip Market").

5       65.    On February 10, 2015, the NDRC found Qualcomm (1) controlled both the

6  Licensing Market and the Baseband Chip Market, and (2) abused its dominance by, among

7  other things, charging excessive and unfairly high royalties to any licensees that were

8  "forced" to accept the packaged patent licenses, the royalty rates of which were based on the

9  wholesale net selling prices of smart phones. The NDRC found Qualcomm's conduct

10  violated China's Anti-Monopoly Law and, among other things, imposed a fine of eight

11  percent of Qualcomm's annual revenue within the territory of China for 2013—a $975 million

12  fine.[17] It also ordered Qualcomm to materially lower the effective royalty by calculating its

13  royalty not based on the total wholesale price of the device, but by calculating its royalty at 65

14  percent (65%) of the net selling price.[18]

15            **2.**       **Korea Federal Trade Commission ("KFTC")**

16       66.    In 2009, the KFTC fined Qualcomm for abusing its dominant share of the

17  chipset market and the SEP license market.[19] The approximately $208 million fine was the

18  largest the KFTC had then ever imposed on a company. Undeterred by this fine, Qualcomm

19  doubled down on its unlawful conduct. In December of 2016, the KFTC said in a statement

20  that that "Qualcomm, a holder of standard-essential patents as well as a monopolistic service

21  provider of modem chips from manufacturing to sales, has violated its agreement to license

22

23

---

24  [17] Qualcomm Press Release, *Qualcomm and China's National Development and Reform*

25  *Commission Reach Resolution* (Feb. 9, 2015),
   https://www.qualcomm.com/news/releases/2015/02/09/qualcomm-and-chinas-national-
   development-and-reform-commission-reach.

26

27  [18] *See supra* note 16.

28  [19] *See* Yoonhee Kim & Hui-Jin Yang, *A Brief Overview of Qualcomm v. Korea Fair Trade*
   *Commission*, CPI Antitrust Chronicle, (Mar. 2015)
   https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf.

1   patents on fair reasonable and non-discriminatory terms, known as FRAND."[20] During the

2   same month, the KFTC issued a decision imposing its largest fine for Qualcomm's

3   monopolistic conduct, and to mandate changes to Qualcomm's business model. Among other

4   things, the KFTC found that Qualcomm had coerced patent license agreements from handset

5   companies while holding hostage the supply of chipsets. In other words, "Qualcomm actually

6   used the threat of terminating the supply of modem chipsets as **negotiation leverage** in the

7   process of license negotiations with handset companies." (Emphases in original).[21] The

8   KFTC found Qualcomm's control over the chipset market "is a structure under which handset

9   companies have to bite the bullet and accept Qualcomm's license terms, even if they are

10   unfair, because if the modem chipset supply is suspended, handset companies would face the

11   **risk** of their **entire business** shutting down." (Emphases original).

12           **3.      Japan Fair Trade Commission ("JFTC")**

13        67.    On September 30, 2009, the JFTC issued a cease and desist order against

14   Qualcomm after finding that the Company violated Article 19 of the Antimonopoly Act. The

15   JFTC found that even though Qualcomm expressed that it would grant licenses on fair terms,

16   the Company had coerced Japanese Manufacturers into entering licensing agreements that

17   were neither fair nor reasonable. JFTC pointed to the following provisions as particularly

18   concerning, in light of Qualcomm's assurances:

19      •  "For the manufacture, sale, etc., of semiconductor integrated circuits etc. used in
20        CDMA subscriber units or CDMA base stations, QUALCOMM shall be granted
        royalty-free license for the intellectual property rights of the Japanese Manufacturers,
21        etc.";

22      •  "Regarding the manufacture, sale, use, etc., of semiconductor integrated circuits etc.
23        used in CDMA subscriber units and CDMA base stations, the Japanese Manufacturers
        agree not to assert their intellectual property rights against QUALCOMM, etc. and the
24        Customers of QUALCOMM";

25      •  "Regarding the manufacture, sale, etc., of CDMA subscriber units, CDMA base
26        stations and semiconductor integrated circuits used therein, the Japanese

---

27  [20] Jungah Lee and Ian King, *Qualcomm Fined $853 Million by South Korean Antitrust
Agency, Bloomberg* (Dec. 2016)
28  [21] *See supra* note 8.

Manufacturers, etc. agree not to assert their intellectual property rights against QUALCOMM's Licensees."[22]

The Tokyo High Court has stayed enforcement of the cease and desist order until JFTC completes a full evidentiary hearing.

### 4. Taiwan's Fair Trade Commission

68.     In December 2015, the Taiwan Fair Trade Commission ("TFTC") notified Qualcomm of its investigation into the company's licensing behavior and among other things, whether Qualcomm's royalty charges are unreasonable.  More recently, in June 2016, the TFTC again expressed apprehension about Qualcomm's practices when its spokesperson stated that the commission is concerned about whether Qualcomm "hampers market competition by abusing its dominance" through its patent licensing practices.[23]

### 5. European Commission ("EC")

69.     In July 2015, the European Commission ("EC") opened two formal antitrust investigations against Qualcomm to evaluate concerns that the Company may have abused its dominant position in the area of baseband chipsets.  A few months later, in December 2015, the EC issued a press releases announcing that the "Commission has informed Qualcomm of its preliminary conclusions that the chipset company illegally paid a major customer for exclusively using Qualcomm chipsets and sold chipsets below costs with the aim of forcing its competitor Icera out of the market."[24]  The EC has sent Qualcomm two Statements of Objection—one concerning exclusivity payment and the other predatory pricing—in two separate investigations.  These Statements of Objection outline the EU's preliminary view that Qualcomm has abused its dominant position in the worldwide markets for 3G UMTS and LTE baseband chipsets in violation of EU antitrust laws.

---

[22] JFTC –Press Release, Cease and Desist Order against QUALCOMM Incorporated, (Sept. 30, 2009) (internal citations omitted).
[23] Lisa Wang, *Qualcomm Defends Licensing Fees*, Taipei Times (June 2016), http://www.taipeitimes.com/News/biz/archives/2016/06/24/2003649305
[24] European Commission—Press Release, *Antitrust: Commission sends two Statements of Objections on exclusivity payments and predatory pricing to Qualcomm* (Dec. 8, 2015)

### 6. Federal Trade Commission ("FTC")

70. Most recently, the FTC on January 17, 2017, filed an enforcement action in this Court seeking a permanent injunction against defendant Qualcomm Incorporated to undo and prevent its unfair methods of competition in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). The FTC alleges, among other things, that (1) Qualcomm withholds its baseband processors unless a customer accepts a license to SEPs on terms preferred by Qualcomm, including elevated royalties; (2) Qualcomm has consistently refused to license its cellular SEPs to its competitors, in violation of Qualcomm's FRAND commitments; and (3) Qualcomm entered into exclusive dealing arrangements with Apple Inc., which denied other baseband processor suppliers the benefits of working with a particularly important cell phone manufacturer and hampered their development into effective competitors.

### D. Consumers are Harmed as a Direct Result of Qualcomm's Conduct

71. Qualcomm has abused its monopoly power to force device manufacturers and other licensees to pay excessively high royalties, among other things, which has directly resulted in harm to Plaintiff and the Class because it resulted in them paying higher prices for their cellular devices than they would have in the absence of Qualcomm's conduct.

72. Cellular devices are commodity products that consumers purchase as standalone products. Consumers buy cellular devices either from the direct purchaser device manufacturers such as Samsung, or through their network carriers, such as Verizon and Sprint.

73. Device manufacturers and network carriers are subject to vigorous price competition. As a result, they do not absorb Qualcomm's unlawful royalties which are a percentage of the wholesale cost of the device itself. Rather they pass along some, or all, of the excessive royalty to consumers. For instance, chipsets, or baseband processers, cost as little as $10 to $13, but royalty demands associated with this component approach $60 for a $400 smartphone.[25] This disparity between royalty demands and component costs results in

---

[25] *See supra* note 2; *see also* Nomura 2012 Smartphone Guide

CLASS ACTION COMPLAINT

1   an increased cost for the cellular device, which is directly passed on to the consumer.  *See*

2   FTC Complaint at ¶¶ 1, 63, 87 95.

3          74.     Ultimately, Qualcomm and Plaintiff are all participants in the cellular device

4   market.  Plaintiff is a consumer of such devices.  Qualcomm licenses technology essential to

5   the operation of cellular devices and obtains monopoly rents tied directly to the entire

6   wholesale price of the cellular devices at issue in this litigation. As a result, Qualcomm's

7   anticompetitive acts, as alleged herein, directly distorted the price of the cellular devices paid

8   by Plaintiff.  Indeed, Plaintiff may not use the cellular devices at issue in this litigation

9   without the licenses provided by Qualcomm.  In the absence of the licenses, as recognized by

10  federal courts, Qualcomm has standing to sue any indirect users—not just direct infringers—

11  of cellular devices infringing on its patent rights.

12         75.     As noted above, Qualcomm admits that "[r]oyalties are generally based upon a

13  *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net

14  of certain permissible deductions (including transportation, insurance, packing costs and other

15  items)."  (Emphases added).[26]  The patent rights owned by Qualcomm are thus inextricably

16  intertwined with the cellular devices themselves—and the effect of the anticompetitive

17  conduct at issue in this case is targeted at the cellular device as a whole and not components

18  thereof, as reflected by the royalty's derivation from the price of the cellular device as a

19  whole.

20         76.     The Federal Trade Commission has found that the cellphone manufacturers

21  pay a higher all-in price for baseband processors, regardless of whether they are supplied by

22  Qualcomm, due to Qualcomm's licensing conditions.  Qualcomm conditions access to its

23  baseband processors on the acceptance of a license to Qualcomm's SEPs on its preferred

24  ———————————————

25  http://www.patentoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf (last visited Jan. 15, 2017),

26  [26] Calculating a royalty rate for a product component based on the price of the product as a
    whole is particularly inappropriate and unfair.  *E.g.*, *Laser Dynamics, Inc. v. Quanta Comput.,*
27  *Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("[w]here small elements of multi-component products
    are accused of infringement, calculating a royalty on the entire product carries a considerable
28  risk that the patentee will be improperly compensated for non-infringing components of that
    product.").

1  terms, including the payment of substantial royalties on sales of handsets that use a baseband

2  processors when the handset was purchased from a Qualcomm competitor.  These incremental

3  royalties act as a "tax" that raise OEM costs when using baseband processors supplied by

4  Qualcomm's competitors.  This tax reduces demand for competitors' processors and is passed

5  on in the form of higher handset prices paid by end consumers.

6        77.     An important consideration for OEMs in evaluating handset designs is the all-

7  in cost of the baseband processor, which includes any patent royalties that the OEM must pay

8  to use that processor.  Qualcomm's tax increases OEMs' all-in cost for using a competitor's

9  baseband processor, and therefore diminishes the demand for those processors and reduces

10  competitors' sales and margins.  These reduced sales and margins limit the ability of

11  competitors to invest and innovate, hamstringing their ability to effectively compete against

12  Qualcomm and solidifying Qualcomm's monopoly position.  The imposition of this "tax,"

13  which OEMs must pay regardless of whether the baseband processor they use is supplied by

14  Qualcomm, enables Qualcomm to raise the all-in prices of processors without the threat of

15  substitution or entry to the market.  OEMs pass these higher prices on to consumers, like

16  small businesses, in the form of higher handset prices or reduced handset features.

17        78.     Plaintiff and members of the Class have been forced to pay supracompetitive

18  prices for cellular devices.  As Qualcomm licenses base its royalties on "a percentage of the

19  wholesale . . . selling price of a complete licensed product," purchasers of cellular devices are

20  only one level removed from the unlawful overcharge at issue here.  Accordingly, this case

21  will not involve complicated pass-through analysis in multiple and complex distribution

22  chains.  *Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1098 (N.D. Cal.

23  2007).

24        79.     The economic and legal literature has recognized that unlawful overcharges in

25  a component normally result in such instances.  Two antitrust scholars--Professors Robert G.

26  Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the

27  Haas School of Business at the University of California at Berkeley) and the late Lawrence A.

28  Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the

CLASS ACTION COMPLAINT

Handbook of the Law of Antitrust) – have observed that "in a multiple- level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[27]

80.     Similarly,  Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Certification), an economist who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said:

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers… This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

81.     If Qualcomm were forced to stop abusing its monopoly power and charge a fair and reasonable royalty, consumers would receive better prices when purchasing cellular devices.

82.     The precise amount of the overcharge impacting the prices of cellular devices purchased by consumers is measurable through commonly accepted statistical and regression modeling.

## VI.     MARKET DEFINITION

83.     The relevant geographic market for purposes of this action is the United States and its territories.

84.     The relevant product markets are: (1) the market for CDMA and premium LTE modem chipsets (the "Baseband Processor Market"), which allow cellular devices to communicate with carrier networks and (2) intellectual property rights associated with SEPs ("SEP Licensing Market").  These two products will be referred to collectively as the "Cellular Device Components."

85.     Qualcomm directly participates in the market for the sale of cellular devices to Plaintiff and Class members by encumbering cellular devices through its licenses (and related

---

[27] RG Harris & LA Sullivan, *Passing-On the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 269, 276 (1979).

1    excessive royalties).  Specifically, Qualcomm's royalty payments are calculated as a

2    percentage of the wholesale price of the cellular devices, which in turn increase the retail

3    price of those devices.

4         86.    Plaintiff purchased the Cellular Device Components when it bought a cellular

5    device.  Plaintiff's injuries are inextricably intertwined with Qualcomm's anticompetitive

6    conduct with respect to baseband processors and abuse of patent rights because it has

7    increased the cost to them of buying cellular devices by, among other things, (1) eliminating

8    competition, allowing Qualcomm to charge supracompetitive prices for its chipsets and

9    licenses; and (2) forcing device manufacturers to agree to onerous licensing terms, including

10   excessive royalties.

11              **VII.    CLASS ACTION ALLEGATIONS**

12        87.    Plaintiff brings this action on behalf of itself and as a class action under Rule

13   23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable, injunctive relief

14   and monetary relief under California law on behalf of the following class (the "Nationwide

15   Class"):

16        All persons and entities in the United States who purchased, paid and/or
          provided reimbursement for some or all of the purchase price for
17        CDMA- and/or premium LTE cellular devices ("Relevant Cellular
          Devices") from January 17, 2013 through the present.  This class
18        excludes:  (a) Defendant, its officers, directors, management,
          employees, subsidiaries, and affiliates; (b) all federal and state
19        governmental entities except for those who have purchased Relevant
          Cellular Devices; (c) all persons or entities who purchased Relevant
20        Cellular Devices for purposes of resale or directly from Defendant; (d)
          any judges or justices involved in this action and any members of their
21        immediate families or their staff.

22

23        88.    Alternatively to the claim for nationwide monetary relief under California law,

24   Plaintiff also brings this action on behalf of themselves and as a class action under Rule 23(a)

25   and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief

26   pursuant to the common law of unjust enrichment and individual state antitrust, unfair

27

28

CLASS ACTION COMPLAINT

competition, and consumer protection laws for each of the states listed below (the "Indirect Purchaser States")[28] on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA-, and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

89. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

90. While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believe there are millions of members in each Class.

91. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Qualcomm's conduct to acquire and maintain monopoly power, which was and is generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

92. Whether Qualcomm possessed monopoly power over the Cellular Device Components in the United States from January 17, 2013 to the present (the "Class Period");

93. Whether Qualcomm willfully acquired or maintained monopoly power over the Cellular Device Components in the United States during the Class Period;

---

[28] The "Indirect Purchaser States" consist of Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

94. Whether Qualcomm possessed monopoly power in the Baseband Processor Market (underlying the Cellular Device Components) in the United States during the Class Period.

95. Whether Qualcomm attempted to possess monopoly power in the Baseband Processor Market (a critical market underlying the Cellular Device Components) in the United States during the Class Period.

96. Whether Qualcomm possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period.

97. Whether Qualcomm attempted to possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period.

98. Whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs).

99. Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs.

100. Whether Qualcomm's acquisition and maintenance of its monopoly in the Cellular Device Components violated the Sherman Act, as alleged in the First Claim for Relief;

101. Whether Qualcomm's acquisition and maintenance of its monopoly in the power in the Baseband Processor Markets violated the Sherman Act, as alleged in the First Claim for Relief;

102. Whether Qualcomm's acquisition and maintenance of its monopoly in the SEP Licensing Market (for licenses critical to the technology underlying cellular device market) violated the Sherman Act, as alleged in the First Claim for Relief;

103. Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq*., as alleged in the Second Claim for Relief.

104.    Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Claims;

105.    Whether the Qualcomm unjustly enriched itself to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Fifth Claim for Relief;

106.    Whether the conduct of the Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

107.    The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

108.    The appropriate injunctive and related equitable relief for the Nationwide Class; and

109.    The appropriate class-wide measure of damages for the Damages Class.

110.    Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid artificially inflated prices for purchased indirectly from Qualcomm.

111.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

112.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

113.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and

expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

114. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## VIII. CLAIMS AND PRAYER FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Monopolization in Violation of Section 2 of the Sherman Act

115. Plaintiff repeats the allegations set forth above as if fully set forth herein.

116. Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

117. General antitrust principles apply to conduct involving intellectual property is the same way that they apply to conduct involving any other form of property.

118. Market power is the ability profitably to maintain prices above, or output below, competitive levels for a significant period of time. Monopoly power is the ability to control prices and exclude competition in a given market. If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power.

Qualcomm has monopoly power in the Baseband Processor Market. First, it has maintained high and durable market shares in this market. Qualcomm controls the CDMA chipset supply, historically controlling over 90% of the CDMA modem chipset market and at the lowest point still controlling 83% of this market. Qualcomm also controls the Baseband Processor Market, controlling at relevant times up to 90% of the market, and today over 60% of the market. Qualcomm still exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA. Second, there are substantial barriers to entry. CDMA- and

premium LTE- based technology is not interchangeable with or substitutable for other technologies, and adherents of this technology have become locked-in. The time and cost of product development, including significant outlays in technological research and development and necessary real-world testing, pose high hurdles for potential new entrants. Relatedly, Qualcomm controls the patents or SEPs underlying CDMA technology, and Qualcomm maintained this monopoly by, among other things, refusing to license to competitors and requiring purchasers of its chipsets to agree to its licenses for its patent portfolio.

119. Third, and relatedly, Qualcomm's monopoly power is shown by Qualcomm's demonstrated ability to repeatedly force device manufacturers to accept one-sided, unreasonable supply terms. Among other things, Qualcomm has used its control over the CDMA chipset supply to require purchasers to agree to its license agreements and related terms, including excessively high royalty terms on an equal footing.

120. Qualcomm also has monopoly power over the SEP Licensing Market. SSOs have selected standards based on technology for which Qualcomm owns the patents (based on the condition that Qualcomm would supply its technology on FRAND terms). As to market share, Qualcomm holds virtually all of the SEPS—the essential patents—for CDMA standard-based technologies, which underlie virtually all 3G devices and 4G-LTE devices which are 3G-compatible. Qualcomm has licensed its patent portfolio for 3G cellular devices to more than 200 licensees. As these patents are "essential" to the CDMA standard, other patents and patented technology cannot replace or serve as an alternative for Qualcomm's patents. Qualcomm's market power over the SEP Licensing Market is further demonstrated Qualcomm's ability to leverage its control of its patents to force OEMs to agree to unfair and unreasonable license agreements and terms, including excessive royalties. Because OEMs need to use Qualcomm's technology for their devices to communicate with the major carrier networks, they are forced to agree to Qualcomm's unfair and unreasonable licensing terms.

121. As indicated, Qualcomm has acquired and maintained of its market power in the Cellular Device Components described above through anticompetitive means—among other things, excluding competitors and forcing OEMs to agree to non-FRAND terms.

CLASS ACTION COMPLAINT

122.    Qualcomm holds market power over the Cellular Device Components because it can encumber Relevant Cellular Devices with a royalty of its choice without other firms competing to drive down these prices.  Specifically, Qualcomm's control over the Cellular Device Components has allowed it to force license agreements on its competitors and OEMs, and its license agreements allow Qualcomm to charge a licensing fee plus ongoing royalties of between three to five percent (3-5%) of the wholesale price of the completed device.  In other words, each Relevant Cellular Device sold with or based on Qualcomm technology is also encumbered by Qualcomm's excessive royalties, which in turn increase the cost of the device for consumers like Plaintiff.

123.    There is no procompetitive justification for the anticompetitive conduct in which Qualcomm has engaged.  Qualcomm induced SSOs to use its technology and related patents in setting their standards on the promise that it would adhere to FRAND obligations.  In doing so, other alternative (and potentially superior) technologies were not utilized by SSOs.  But Qualcomm has not met its FRAND obligations, and instead, has abused its monopoly power in the Cellular Device Components to force OEMs into licenses with unfair and unreasonable terms, including, but not limited to, excessively high royalty rates based on the selling price of the completed device rather than the value of Qualcomm's contribution to that device.  Qualcomm's acts have likely harmed the development of cellular technologies, as it forced out competitors, thus reducing innovation and competitive pricing.

124.    Plaintiff and the class were harmed as a direct result of Qualcomm's conduct, which increased the purchase price of their relevant cellular devices.  Additionally, Qualcomm's conduct harmed innovation and competition, which harmed Plaintiff in the quality and price of their relevant cellular devices.

## SECOND CLAIM FOR RELIEF

### Nationwide Claim For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*

125.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

126.     During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq.*  While Section 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. That is what happened here.  Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

127.     Qualcomm established a unlawful scheme by which it acquired and maintained monopoly power in the Baseband Processor Market and SEP Licensing Market through anticompetitive means, including by excluding competition.

128.     The Relevant Cellular Devices are commodities.

129.     As a direct result of Qualcomm's unlawful conduct, Plaintiff and the Class were overcharged when they purchased their Relevant Cellular Devices.

130.     It is appropriate to apply California antitrust law to the Nationwide Class. Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as OEMs that reside and do business in California to its unlawful conduct.  In doing so, Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from companies doing business in California.  Additionally, California is the most populous state in the country, for which it was foreseeable that substantial number of California consumers would be impacted by Qualcomm's unlawful behavior.

## THIRD CLAIM FOR RELIEF

**Nationwide Claim For Violations of Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

131.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

132.     Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., which protects consumers from illegal, fraudulent and unfair business practices.

133.     Plaintiff brings this claim on behalf of themselves, the Damages Class, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

134.     As discussed above, Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act.  As such, Qualcomm's acts constitute unlawful conduct under section 17200.  Qualcomm unlawfully acquired and maintained its monopoly over the Baseband Processor Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio.

135.     Qualcomm's conduct was deceptive because it induces SSOs to use its technology on the promise it would comply with FRAND.  But after SSOs selected Qualcomm's technology for their standards, Qualcomm refused to comply with its FRAND promises.

136.     Qualcomm's conduct is unfair to Plaintiff and members of the class because as a direct result of its acts described above, Plaintiff was charged more for its Relevant Cellular Devices than it would have been but for Qualcomm's conduct.

137.     Plaintiff and the Class seek and are entitled to all forms of relief available under California's Unfair Competition Law. Pursuant to Cal. Bus. & Prof. Code  § 17203, Plaintiff and the Damages Class seek from Qualcomm restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of Business & Professions Code § 17200 et seq.

138.     It is appropriate to apply California antitrust law to the Nationwide Class. Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as handset companies that reside in California to its unlawful conduct.  In doing so, Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from companies

37

1 doing business in California. Additionally, California is the most populous state in the
2 country, for which it was foreseeable that substantial number of California consumers would
3 be impacted by Qualcomm's unlawful behavior.

4     139.     Pursuant to Business & Professions Code § 17204, Plaintiff and the Damages
5 Class seek an order of this Court enjoining Qualcomm from continuing to engage in the acts
6 as set forth in this Complaint, which acts constitute violations of Business & Professions
7 Code § 17200 *et seq*. Plaintiff, the Class, and the public will be irreparably harmed if such an
8 order is not granted.

### FOURTH CLAIM FOR RELIEF

### Violations of State Antitrust and Restraint of Trade Laws

11     140.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

12     141.     In the event that the Court does not apply California law on a nationwide basis,
13 Plaintiff alleges the following violations of state antitrust and restraint of trade laws in the
14 alternative.

15     142.     Defendant Qualcomm's anticompetitive acts described above were knowing,
16 willful, and constitute violations or flagrant violations of the following state antitrust statutes.

17     143.     <u>Arizona</u>: Qualcomm's monopolization and anticompetitive conduct has
18 restrained trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*. During the Class
19 Period, Qualcomm's illegal conduct substantially affected Arizona commerce. As a direct
20 and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the
21 Damages Class have been injured in their business and property and are threatened with
22 further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in
23 violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*. Accordingly, Plaintiff and members of the
24 Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

25     144.     <u>California</u>: During the Class Period, Qualcomm engaged in monopolistic and
26 anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of
27 California Business and Professions Code sections 16700, *et seq*. While Section 16700 does
28 not reach solely unilateral conduct by a monopolist, it encompasses agreements between a

CLASS ACTION COMPLAINT

1    monopolist and its customers where the monopolist effectively coerces the customer to accede

2    to the restraint in order to obtain the good or service that is the subject of the agreement. That

3    is what happened here. Despite its FRAND obligations, Qualcomm unilaterally imposed

4    royalty rates that were unreasonable and exceeded what it could have obtained in a true

5    FRAND negotiation. This conduct constitutes a "combination" under the Cartwright Act.

6          145.    Qualcomm established a unlawful scheme by which it acquired and maintained

7    monopoly power in the Baseband Processor Market and SEP Licensing Market through

8    anticompetitive means, including by excluding competition.

9          146.    The Relevant Cellular Devices are commodities.

10         147.    As a direct result of Qualcomm's unlawful conduct, Plaintiff and the Class

11   were overcharged when they purchased their Relevant Cellular Devices.

12         148.    District of Columbia: Qualcomm's monopolization and anticompetitive

13   conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501,

14   et seq. During the Class Period, Qualcomm's illegal conduct substantially affected District of

15   Columbia commerce. As a direct and proximate result of Qualcomm's unlawful conduct,

16   Plaintiff and members of the Damages Class have been injured in their business and property

17   and are threatened with further injury. By reason of the foregoing, Qualcomm has

18   monopolized in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501,

19   et seq. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief

20   available under District of Columbia Code Ann. §§ 28-4501, et seq.

21         149.    Illinois: Qualcomm's monopolization and anticompetitive conduct has

22   restrained trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1,

23   et seq.). During the Class Period, Qualcomm's illegal conduct substantially affected Illinois

24   commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and

25   members of the Damages Class have been injured in their business and property and are

26   threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in

27   restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1,

28   et seq.). Accordingly, Plaintiff and members of the Damages Class seek all forms of relief

CLASS ACTION COMPLAINT

1    available under District of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et*

2    *seq.*).

3        150.    <u>Iowa</u>: Qualcomm's monopolization and anticompetitive conduct has restrained

4    trade in violation of Iowa Code §§ 553.1, *et seq.*  During the Class Period, Qualcomm's

5    illegal conduct substantially affected Illinois commerce.  As a direct and proximate result of

6    Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been

7    injured in their business and property and are threatened with further injury.  By reason of the

8    foregoing, Qualcomm has monopolized in restraint of trade in violation of Iowa Code §§

9    553.1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of

10   relief available under Iowa Code §§ 553, *et seq.*

11       151.    <u>Kansas</u>: Qualcomm's monopolization and anticompetitive conduct has

12   restrained trade in violation of Defendant has entered into an unlawful agreement in restraint

13   of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq.*  During the Class

14   Period, Qualcomm's illegal conduct substantially affected Kansas commerce.  As a direct and

15   proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages

16   Class have been injured in their business and property and are threatened with further injury.

17   By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of

18   Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiff and members of the Damages

19   Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

20       152.    <u>Maine</u>: Qualcomm's monopolization and anticompetitive conduct has

21   restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et*

22   *seq.*).  During the Class Period, Qualcomm's illegal conduct substantially affected Maine

23   commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and

24   members of the Damages Class have been injured in their business and property and are

25   threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

26   restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly,

27   Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat.

28   Ann. 10, §§ 1101, *et seq.*

CLASS ACTION COMPLAINT

153. <u>Michigan</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

154. <u>Minnesota</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

155. <u>Mississippi</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

156. <u>Nebraska</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Nebraska commerce. As a direct

CLASS ACTION COMPLAINT

and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

157. <u>Nevada</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

158. <u>New Hampshire</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

159. <u>New Mexico</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the

42

1   Damages Class have been injured in their business and property and are threatened with

2   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

3   violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiff and members of

4   the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

5       160.   New York: Qualcomm's monopolization and anticompetitive conduct has

6   restrained trade in violation of New York General Business Laws §§ 340, *et seq.*  During the

7   Class Period, Qualcomm's illegal conduct substantially affected New York commerce.  As a

8   direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the

9   Damages Class have been injured in their business and property and are threatened with

10  further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

11  violation of the New York Donnelly Act, §§ 340, *et seq.*  Accordingly, Plaintiff and members

12  of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

13      161.   North Carolina: Qualcomm's monopolization and anticompetitive conduct has

14  restrained trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*  During

15  the Class Period, Qualcomm's illegal conduct substantially affected North Carolina

16  commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and

17  members of the Damages Class have been injured in their business and property and are

18  threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

19  restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*  Accordingly,

20  Plaintiff and members of the Damages Class seek all relief available under North Carolina

21  Gen. Stat. §§ 75-1, *et. seq.*

22      162.   North Dakota: Qualcomm's monopolization and anticompetitive conduct has

23  restrained trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq.*  During the

24  Class Period, Qualcomm's illegal conduct substantially affected North Dakota commerce.  As

25  a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the

26  Damages Class have been injured in their business and property and are threatened with

27  further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

28  violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiff and

CLASS ACTION COMPLAINT

1    members of the Damages Class seek all relief available under North Dakota Cent. Code §§

2    51-08.1-01, *et seq.*

3        163.    Oregon: Qualcomm's monopolization and anticompetitive conduct has

4    restrained trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*  During the Class

5    Period, Qualcomm's illegal conduct substantially affected Oregon commerce.  As a direct and

6    proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages

7    Class have been injured in their business and property and are threatened with further injury.

8    By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of

9    Oregon Revised Statutes §§ 646.705, *et seq.*  Accordingly, Plaintiff and members of the

10   Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

11       164.    South Dakota: Qualcomm's monopolization and anticompetitive conduct has

12   restrained trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq.* During the

13   Class Period, Qualcomm's illegal conduct substantially affected South Dakota commerce.  As

14   a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the

15   Damages Class have been injured in their business and property and are threatened with

16   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

17   violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*  Accordingly, Plaintiff and

18   members of the Damages Class seek all relief available under South Dakota Codified Laws

19   Ann. §§ 37-1, *et seq.*

20       165.    Tennessee: Qualcomm's monopolization and anticompetitive conduct has

21   restrained trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.*  During the

22   Class Period, Qualcomm's illegal conduct substantially affected Tennessee commerce.  As a

23   direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the

24   Damages Class have been injured in their business and property and are threatened with

25   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

26   violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiff and members

27   of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et*

28   *seq.*

166.     Utah: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Utah commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

167.     Vermont: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Vermont commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

168.     West Virginia: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of West Virginia Code §§ 47-18-1, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected West Virginia commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*  Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

169.     Wisconsin: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Wisconsin Statutes §§ 133.01, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Wisconsin commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiff and members of the Damages

1    Class have been injured in their business and property and are threatened with further injury.

2    By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of

3    Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and members of the Damages Class

4    seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

5          170.    Plaintiff and members of the Damages Class in each of the above states have

6    been injured in their business and property by reason of Defendant's unlawful

7    monopolization.  Plaintiff and members of the Damages Class have paid more for Relevant

8    Cellular Devices than they otherwise would have paid in the absence of Defendant's unlawful

9    conduct.  This injury is of the type the antitrust laws of the above states were designed to

10    prevent and flows from that which makes Defendant's conduct unlawful.

11          171.    In addition, Defendant has profited significantly from the aforesaid

12    monopolization.  Defendant's profits derived from their anticompetitive conduct come at the

13    expense and detriment of Plaintiff and members of the Damages Class.

14          172.    Accordingly, Plaintiff and members of the Damages Class in each of the above

15    jurisdictions seek damages (including statutory damages where applicable), to be trebled or

16    otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

17    including reasonable attorneys' fees, to the extent permitted by the above state laws.

18    <center>**FIFTH CLAIM FOR RELIEF**</center>

19    <center>**Violation of State Consumer Protection Statutes**</center>

20          173.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

21          174.    In the event that the Court does not apply California law on a nationwide basis,

22    Plaintiff alleges the following violations of state antitrust and restraint of trade laws in the

23    alternative.

24          175.    Defendant Qualcomm engaged in unfair competition or unfair,

25    unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer

26    protection and unfair competition statutes listed below.

27          176.    <u>Arkansas</u>: Defendant has monopolized through unfair, unconscionable, and/or

28    deceptive practices in violation of the Arkansas Code Annotated, § 4-88-101, et. seq.

1    Defendant knowingly agreed to, and did in fact, act in restraint of trade or commerce by

2    affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated

3    levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in

4    Arkansas and took efforts to conceal their agreements from Plaintiff and members of the

5    Damages Class. The aforementioned conduct on the part of the Defendant constituted

6    "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated,

7    § 4-88-107(a)(10). Defendant's unlawful conduct had the following effects: (1) Relevant

8    Cellular Devices price competition was restrained, suppressed, and eliminated throughout

9    Arkansas; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized

10   at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Damages

11   Class were deprived of free and open competition; and (4) Plaintiff and members of the

12   Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular

13   Devices. During the Class Period, Defendant's illegal conduct substantially affected Arkansas

14   commerce and consumers. As a direct and proximate result of the unlawful conduct of the

15   Defendant, Plaintiff and members of the Damages Class have been injured in their business

16   and property and are threatened with further injury. Defendant has engaged in unfair

17   competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated,

18   § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Damages Class seek all

19   relief available under that statute.

20          177.    California: Defendant has engaged in unfair competition or unfair,

21   unconscionable, deceptive or fraudulent acts or practices in violation of California Business

22   and Professions Code § 17200, et seq.  During the Class Period, Defendant manufactured,

23   marketed, sold, or distributed Relevant Cellular Devices in California, and committed and

24   continue to commit acts of unfair competition, as defined by Sections 17200, et seq. of the

25   California Business and Professions Code, by engaging in the acts and practices specified

26   above. This claim is instituted pursuant to Sections 17203 and 17204 of the California

27   Business and Professions Code, to obtain restitution from these Defendant for acts, as alleged

28   herein, that violated Section 17200 of the California Business and Professions Code,

47

commonly known as the Unfair Competition Law. The Defendant's conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, et seq., including, but not limited to, the following:  (1) the violations of Section 2 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendant's acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendant's acts or practices are unfair to purchasers of  Relevant Cellular Devices in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendant's acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendant will not continue such activity into the future. The unlawful and unfair business practices of Defendant, and each of them, as described above, have caused and continue to cause Plaintiff and members of the Damages Class to pay supracompetitive and artificially-inflated prices for Relevant Cellular Devices. Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendant as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendant has been unjustly enriched as a result of its wrongful conduct and by Defendant's unfair competition. Plaintiff and members of the Damages Class are accordingly entitled to equitable relief including

restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

178.　District of Columbia:　Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Damages Class were not aware of Defendant's illegal conduct and were therefore unaware that they was being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendant for Relevant Cellular Devices. Defendant had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing Relevant Cellular Devices because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendant's conduct with regard to sales of Relevant Cellular Devices, including their illegal conduct with respect to fixing the price of Relevant Cellular Devices at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendant at the expense of Plaintiff and the public.　Defendant took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendant's conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the Relevant Cellular Devices. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout the District of Columbia;

(2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices. As a direct and proximate result of the Defendant's conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

179. <u>Florida</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout Florida; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices. During the Class Period, Defendant's illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

180. <u>Missouri</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.* Plaintiff and members of the Damages Class purchased Relevant Cellular Devices for personal or family purposes. Defendant engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices in trade

50

1   or commerce in a market that includes Missouri. Defendant agreed to, and did in fact affect,

2   fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which

3   Relevant Cellular Devices were sold, distributed, or obtained in Missouri, which conduct

4   constituted unfair practices in that it was unlawful under federal and state law, violated public

5   policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff

6   and members of the Damages Class. Defendant concealed, suppressed, and omitted to

7   disclose material facts to Plaintiff and members of the Damages Class concerning

8   Defendant's unlawful activities and artificially inflated prices for Relevant Cellular Devices.

9   The concealed, suppressed, and omitted facts would have been important to Plaintiff and

10  members of the Damages Class as they related to the cost of Relevant Cellular Devices they

11  purchased. Defendant misrepresented the real cause of price increases and/or the absence of

12  price reductions in Relevant Cellular Devices by making public statements that were not in

13  accord with the facts.  Defendant's statements and conduct concerning the price of Relevant

14  Cellular Devices were deceptive as they had the tendency or capacity to mislead Plaintiff and

15  members of the Damages Class to believe that they were purchasing Relevant Cellular

16  Devices at prices established by a free and fair market. Defendant's unlawful conduct had the

17  following effects: (1) Relevant Cellular Devices  price competition was restrained,

18  suppressed, and eliminated throughout Missouri; (2) Relevant Cellular Devices prices were

19  raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3)

20  Plaintiff and members of the Damages Class were deprived of free and open competition; and

21  (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated

22  prices for the Relevant Cellular Devices. The foregoing acts and practices constituted

23  unlawful practices in violation of the Missouri Merchandising Practices Act.  As a direct and

24  proximate result of the above-described unlawful practices, Plaintiff and members of the

25  Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and

26  members of the Damages Class seek all relief available under Missouri's Merchandising

27  Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or

28  employment by any person of any deception, fraud, false pretense, false promise,

CLASS ACTION COMPLAINT

1   misrepresentation, unfair practice or the concealment, suppression, or omission of any

2   material fact in connection with the sale or advertisement of any merchandise in trade or

3   commerce…,” as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-

4   7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. §

5   407.025, which provides for the relief sought in this count.

6       181.   <u>Montana</u>: Defendant has engaged in unfair competition or unfair,

7   unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade

8   Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*., and §§

9   30-14-201, *et. seq*. Defendant's unlawful conduct had the following effects:  (1) Relevant

10   Cellular Devices price competition was restrained, suppressed, and eliminated throughout

11   Montana; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized

12   at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages

13   Class were deprived of free and open competition; and (4) Plaintiff and members of the

14   Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular

15   Devices. During the Class Period, Defendant marketed, sold, or distributed Relevant Cellular

16   Devices in Montana, and Defendant's illegal conduct substantially affected Montana

17   commerce and consumers. As a direct and proximate result of Defendant's unlawful conduct,

18   Plaintiff and members of the Damages Class have been injured and are threatened with further

19   injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in

20   violation of Mont. Code, §§ 30-14-103, et seq., and §§ 30-14-201, et. seq., and, accordingly,

21   Plaintiff and members of the Damages Class seek all relief available under that statute.

22       182.   <u>New Mexico</u>: Defendant has engaged in unfair competition or unfair,

23   unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1,

24   *et seq*. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting,

25   fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the

26   prices at which Relevant Cellular Devices were sold, distributed or obtained in New Mexico

27   and took efforts to conceal their agreements from Plaintiff and members of the Damages

28   Class. The aforementioned conduct on the part of the Defendant constituted "unconscionable

1    trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia,

2    resulted in a gross disparity between the value received by Plaintiff and members of the

3    Damages Class and the prices paid by them for Relevant Cellular Devices as set forth in

4    N.M.S.A., § 57-12-2E.  Plaintiff and members of the Damages Class were not aware of

5    Defendant's illegal conduct and were therefore unaware that they were being unfairly and

6    illegally overcharged.  There was a gross disparity of bargaining power between the parties

7    with respect to the price charged by Defendant for the Relevant Cellular Devices. Defendant

8    had the sole power to set that price and Plaintiff and members of the Damages Class had no

9    power to negotiate a lower price.  Moreover, Plaintiff and members of the Damages Class

10   lacked any meaningful choice in purchasing Relevant Cellular Devices because they were

11   unaware of the unlawful overcharge and there was no alternative source of supply through

12   which Plaintiff and members of the Damages Class could avoid the overcharges. Defendant's

13   conduct with regard to sales of Relevant Cellular Devices, including their illegal conduct to

14   fix the price of Relevant Cellular Devices at supracompetitive levels and overcharge

15   consumers, was substantively unconscionable because it was one-sided and unfairly benefited

16   Defendant at the expense of Plaintiff and the public.  Defendant took grossly unfair advantage

17   of Plaintiff and members of the Damages Class. The suppression of competition that has

18   resulted from Defendant's conduct has ultimately resulted in unconscionably higher prices for

19   consumers so that there was a gross disparity between the price paid and the value received

20   for the Relevant Cellular Devices. Defendant's unlawful conduct had the following effects:

21   (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated

22   throughout New Mexico; (2) Relevant Cellular Devices prices were raised, fixed, maintained,

23   and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of

24   the Damages Class were deprived of free and open competition; and (4) Plaintiff and

25   members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant

26   Cellular Devices . During the Class Period, Defendant's illegal conduct substantially affected

27   New Mexico commerce and consumers. As a direct and proximate result of the unlawful

28   conduct of the Defendant, Plaintiff and members of the Damages Class have been injured and

CLASS ACTION COMPLAINT

1    are threatened with further injury. Defendant has engaged in unfair competition or unfair or

2    deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and,

3    accordingly, Plaintiff and members of the Damages Class seek all relief available under that

4    statute.

5         183.    <u>New York</u>: Defendant has engaged in unfair competition or unfair,

6    unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et*

7    *seq*. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting,

8    fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at

9    which Relevant Cellular Devices were sold, distributed or obtained in New York and took

10   efforts to conceal their agreements from Plaintiff and members of the Damages Class.

11   Defendant made public statements about the prices of Relevant Cellular Devices that omitted

12   material information that rendered the statements that they made materially misleading; and

13   Defendant alone possessed material information that was relevant to consumers, but failed to

14   provide the information. Because of Defendant's unlawful trade practices in the State of New

15   York, New York class members who indirectly purchased Relevant Cellular Devices were

16   misled to believe that they were paying a fair price for Relevant Cellular Devices or the price

17   increases for Relevant Cellular Devices were for valid business reasons; and similarly situated

18   consumers were potentially affected by Defendant's conduct. Defendant knew that their

19   unlawful trade practices with respect to pricing Relevant Cellular Devices would have an

20   impact on New York consumers and not just the Defendant's direct customers. Defendant

21   knew that their unlawful trade practices with respect to pricing Relevant Cellular Devices

22   would have a broad impact, causing consumer class members who indirectly purchased

23   Relevant Cellular Devices to be injured by paying more for Relevant Cellular Devices than

24   they would have paid in the absence of Defendant's unlawful trade acts and practices. The

25   conduct of the Defendant described herein constitutes consumer-oriented deceptive acts or

26   practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury

27   and broad adverse impact on the public at large, and harmed the public interest of New York

28   State in an honest marketplace in which economic activity is conducted in a competitive

manner. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout New York; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices. During the Class Period, Defendant marketed, sold, or distributed Relevant Cellular Devices in New York, and Defendant's illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Relevant Cellular Devices in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

184.     North Carolina: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendant agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendant's conduct could not have succeeded absent deceptive conduct by Defendant to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendant's illegal activity. Defendant committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Damages Class could not possibly have been aware. Defendant's public statements concerning the price of Relevant Cellular Devices created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendant's illegal conduct. The conduct of the Defendant described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in

55

an honest marketplace in which economic activity is conducted in a competitive manner. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices. During the Class Period, Defendant marketed, sold, or distributed Relevant Cellular Devices in North Carolina, and Defendant's illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Relevant Cellular Devices in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

185. <u>Rhode Island</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq*.) Members of this Damages Class purchased Relevant Cellular Devices for personal, family, or household purposes. Defendant agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in Rhode Island. Defendant deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendant's unlawful activities and artificially inflated prices for Relevant Cellular Devices. Defendant owed a duty to disclose such facts, and considering the relative lack of sophistication of the average non-

CLASS ACTION COMPLAINT

business purchaser, Defendant breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendant's Relevant Cellular Devices prices were competitive and fair. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices . As a direct and proximate result of the Defendant's violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendant's use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendant's willful and deceptive conduct, as described herein. Defendant's deception, including their affirmative misrepresentations and omissions concerning the price of the Relevant Cellular Devices, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Relevant Cellular Devices at prices set by a free and fair market. Defendant's affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Relevant Cellular Devices they purchased. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

186. <u>South Carolina</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, et seq.) Defendant's monopolization had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for the Relevant Cellular Devices during the Class Period, Defendant's illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

187. <u>Vermont</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*. Defendant agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in Vermont. Defendant deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendant's unlawful activities and artificially inflated prices for the Relevant Cellular Devices. Defendant owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendant breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendant's Relevant Cellular Devices prices were competitive and fair. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for the Relevant Cellular Devices. As a direct and proximate result of the Defendant's violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendant's use or employment of unconscionable and deceptive commercial practices as

58

1   set forth above. That loss was caused by Defendant's willful and deceptive conduct, as

2   described herein. Defendant's deception, including their affirmative misrepresentations and

3   omissions concerning the price of Relevant Cellular Devices, likely misled all purchasers

4   acting reasonably under the circumstances to believe that they were purchasing Relevant

5   Cellular Devices at prices set by a free and fair market. Defendant's misleading conduct and

6   unconscionable activities constitutes unfair competition or unfair or deceptive acts or

7   practices in violation of 9 Vermont § 2451, *et seq*., and, accordingly, Plaintiff and members of

8   the Damages Class seek all relief available under that statute.

9                   **SIXTH CLAIM FOR RELIEF**

10                      **Unjust Enrichment**

11          188.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

12          189.    As a result of its unlawful conduct described above, Defendant Qualcomm has

13   and will continue to be unjustly enriched. Defendant has been unjustly enriched by the

14   receipt of, at a minimum, unlawfully inflated prices and unlawful profits related to the

15   Relevant Cellular Devices.

16          190.    Defendant has benefited from its unlawful acts and it would be inequitable for

17   it to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices and

18   the overpayments made by Plaintiff and members of the Damages Class for Relevant Cellular

19   Devices during the Class Period.

20          191.    Plaintiff and members of the Damages Class are entitled to the amount of

21   Defendant's ill-gotten gains resulting from its unlawful, unjust, and inequitable

22   conduct. Plaintiff and members of the Damages Class are entitled to the establishment of a

23   constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the

24   Damages Class may make claims on a pro rata basis.

25                      **PRAYER FOR RELIEF**

26          WHEREFORE, Plaintiff demand judgment that:

27          1.      The Court determine that this action may be maintained as a class

28   action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct

59

that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

     2.     That the unlawful conduct alleged herein constituted a violation of Section 2 of the Sherman Act, and the state antitrust and consumer protection laws set forth herein;

     3.     Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such state antitrust and consumer protection laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendant in an amount to be trebled to the extent such laws permit;

     4.     Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

     5.     Defendant, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from committing any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

     6.     Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendant obtained as a result of their acts of unfair competition and acts of unjust enrichment;

     7.     Plaintiff and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

     8.     Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

CLASS ACTION COMPLAINT

9.      Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: January 25, 2017               Respectfully submitted,


By: _/s/ Lesley E. Weaver_

Lesley E. Weaver (SBN 191305)
Mili Desai (SBN 308858)
Britt Cibulka (SBN 220957)
**BLEICHMAR FONTI & AULD, LLP**
1999 Harrison Street, Suite 670
Oakland, California 94612
Tel: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
mdesai@bfalaw.com
bcibulka@bfalaw.com

Robyn R. English, *pro hac vice forthcoming*
**BLEICHMAR FONTI & AULD, LLP**
7 Times Square, 27th Floor
New York, NY 10036
Tel: (212) 789-1359
Fax: (212) 205-3970
renglish@bfalaw.com


*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT