Jennifer Milici, D.C. Bar No. 987096
J. Alexander Ansaldo, Va. Bar No. 75870
Dana F. Abrahamsen, D.C. Bar No. 357934
Joseph R. Baker, D.C. Bar No. 490802
Wesley G. Carson, D.C. Bar No. 1009899
Kent E. Cox, Ill. Bar No. 6188944
Elizabeth A. Gillen, Cal. Bar No. 260667
Geoffrey M. Green, D.C. Bar No. 428392
Rajesh S. James, N.Y. Bar No. 4209367
Philip J. Kehl, D.C. Bar No. 1010284
Kenneth H. Merber, D.C. Bar No. 985703
Mark J. Woodward, D.C. Bar. No. 479537
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3695; (202) 326-3496 (fax)
*jmilici@ftc.gov*

Lin W. Kahn, Cal. Bar No. 261387
Federal Trade Commission
901 Market Street, Suite 570
San Francisco, CA 94103
(415) 848-5115; (415) 848-5184 (fax)
*lkahn@ftc.gov*

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

FEDERAL TRADE COMMISSION,
  Plaintiff

v.

QUALCOMM INCORPORATED, a Delaware
Corporation,
  Defendant.

Case No. 5:17-cv-00220-LHK-NMC

**FEDERAL TRADE COMMISSION'S OPPOSITION TO QUALCOMM'S MOTION TO DISMISS**

**REDACTED PUBLIC VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Date:        June 15, 2017
Time:        1:30 p.m.
Courtroom:   8, 4th Floor
Judge:       Hon. Lucy H. Koh

**Issue to Be Decided**

Whether the complaint states a claim under the Federal Trade Commission Act for monopolization, agreements in restraint of trade, and unfair methods of competition by alleging that Qualcomm uses its monopoly power over modem chips to coerce a range of exclusionary terms of dealing with customers, and refuses to license standard-essential patents to competitors in violation of its commitments to license on fair, reasonable, and non-discriminatory terms.[1]

---

[1] Acting Chairman Maureen K. Ohlhausen dissented from the filing of the complaint in this case, www.ftc.gov/system/files/documents/cases/170117qualcomm_mko_dissenting_statement_17-1-17a.pdf, and she has not changed her views.

**Table of Contents**

I.      INTRODUCTION ....................................................................................................1

II.     BACKGROUND ....................................................................................................3

III.    LEGAL STANDARD .............................................................................................5

IV.     QUALCOMM MISSTATES THE COMPLAINT'S ALLEGATIONS.............................5

V.      THE COMPLAINT STATES A CLAIM OF MONOPOLIZATION. ...............................7

        A.      The Complaint Plausibly Alleges Anticompetitive Practices. ..................8

                1.      Qualcomm's No License-No Chips Policy Raises Rivals' Costs...............9

                2.      Qualcomm's Payments in Exchange for Elevated Royalties
                        Facilitate Its Taxation of Competitors' Products. ......................................16

                3.      Qualcomm's Refusal to License Competitors on FRAND Terms Is
                        Anticompetitive................................................................................................17

                4.      Qualcomm's Exclusive Dealing Contracts with Apple Harmed
                        Competition. ......................................................................................................19

        B.      The Complaint Plausibly Alleges Anticompetitive Effects. ..................22

VI.     THE COMPLAINT STATES A CLAIM OF RESTRAINT OF TRADE. ......................23

VII.    THE COMPLAINT STATES A CLAIM OF UNFAIR METHODS OF
        COMPETITION. ..................................................................................................24

VIII.   CONCLUSION.....................................................................................................24

## Table of Authorities

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
    592 F.3d 991 (9th Cir. 2010) ........................................................................20

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) .............................. 17-18

*Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781 (9th Cir. 1996)......................................23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)....................................17

*Atl. Ref. Co. v. FTC*, 381 U.S. 357 (1965) ..............................................................24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................5

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ..........................................17, 18

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).................14, 17

*Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244 (D. Utah 1999) .................................10, 12

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
    139 F.3d 1080 (D.C. Cir. 1998)..................................................................8

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ....................................8

*Church & Dwight Co. v. Mayer Labs., Inc.*, No. C-10-4429,
    2011 WL 1225912 (N.D. Cal. July 2, 2014)..................................................15, 17

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690 (1962) ....................................21

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506 (9th Cir. 1985)....................16

*E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128 (2d Cir. 1984) ......................................24

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435 (4th Cir. 2011)...................... 19-20

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................................19

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014)........................................14

*Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015).............................................21

*Flinkote Co. v. Lysfjord*, 246 F.2d 368 (9th Cir. 1957) ...................................................18

*Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997) ...............................................9, 11

*Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171 (N.D. Cal. 2012) .......................8

*FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013)............................................................16

*FTC v. Brown Shoe Co.*, 384 U.S. 316 (1966).............................................................24

*FTC v. Cement Inst.*, 333 U.S. 683 (1948) .....................................................................8

*FTC v. Texaco, Inc.*, 393 U.S. 223 (1968) ....................................................................24

*Glen Mfg. v. Perfect Fit Indus.*, 299 F. Supp. 278, 282 (S.D.N.Y. 1969) ..................10

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ..............................24

*Lacey v. Maricopa Cnty*, 693 F.3d 896 (9th Cir. 2012)..................................................5

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)...............................................7

*Liu v. Amerco*, 677 F.3d 489 (1st Cir. 2012) ...............................................................24

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) .....................................9, 18

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015)................................9, 14, 21, 22

*Mulvey v. Samuel Goldwyn Prod'ns*, 433 F.2d 1073 (9th Cir. 1970)...........................19

*Nat'l Elec. Contractors Ass'n v. Nat'l Constructors Ass'n*,
    678 F.2d 492 (4th Cir. 1982) ............................................................................11, 15

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ...............2, 14, 15

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*,
    814 F.2d 358 (7th Cir. 1987) ................................................................... *passim*

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ....................................................18

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847,
    2014 WL 524076 (N.D. Cal. Feb. 6, 2014) ..........................................................21

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847,
    2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) .................................................. 20-21

*Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005 (9th Cir. 2012) ...........................5

*Suture Exp., Inc. v. Cardinal Health 200, LLC*,
    963 F. Supp. 2d 1212 (D. Kan. 2013)....................................................................22

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)..........................19, 20, 21

*Tele Atlas N.V. v. Navteq Corp.*, No. C-05-01673,
    2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ......................................................18

*Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184 (N.D. Cal. 2005)....................22

*Transcore, LP v. Elec. Transaction Consultants Corp.*,
    563 F.3d 1271 (Fed. Cir. 2009).............................................................................14

*United Food & Comm'l Workers Local 1776 v. Teikoku Pharma USA*,
    74 F. Supp. 3d 1052 (N.D. Cal. 2014) ................................................................. 6-7

*United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) ......................... 12-13

v

*United Shoe Mach. Corp. v. United States*, 258 U.S. 451 (1922)............................................10, 12

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) .............................14, 16, 20, 22

*United States v. Gen. Elec. Co.*, 82 F. Supp. 753 (D.N.J. 1949) ................................................12

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)......................................................................8

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc) ........................................................................ *passim*

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999)........................................ 16-17

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995)..................................................10

*Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,
    No. SA-15-CA-32, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) ......................................21

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..........................................................................................................15, 18

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)..........................................10

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)............................................ *passim*

**Statutes**

15 U.S.C. § 45............................................................................................................................ 8, 24

**Other Authorities**

ABA SECTION OF ANTITRUST LAW,
    ANTITRUST LAW DEVELOPMENTS (7th ed. 2012)....................................................................20

AREEDA & HOVENKAMP, ANTITRUST LAW (online ed., updated Sept. 2016)...........................9, 22

3 AREEDA & HOVENKAMP, ANTITRUST LAW (3d ed. 2008)...........................................................22

3 AREEDA & HOVENKAMP, ANTITRUST LAW (1996) ....................................................................23

FTC, Statement of Enforcement Principles Regarding "Unfair Methods of
    Competition" Under Section 5 of the Federal Trade Commission Act,
    80 Fed. Reg. 57,056 (Sept. 21, 2015) ..................................................................................24

Krattenmaker & Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to
    Achieve Power over Price*, 96 YALE L.J. 209 (1986) ..................................................9, 11, 13

MANKIW, PRINCIPLES OF MICROECONOMICS (7th ed. 2014) ..........................................................10

Tom et al., *Raising Rivals' Costs: the Problem of Remedies*, 12 GEO. MASON L.
    REV. 389 (2003) ...................................................................................................................13

**Other Sources and Materials**

Complaint, *United States v. Microsoft*, No. 94-1564 (SS) (D.D.C. July 27, 1994)......................10

1

Complaint for Patent Infringement, *Qualcomm Inc. v. Broadcom Corp.*, 05-cv-
1392-B-BLM (S.D. Cal. July 11, 2005)......................................................................................6

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO QUALCOMM'S MOTION TO DISMISS
Case No. 17-cv-00220-LHK-NMC

1

## I. INTRODUCTION

Antitrust law prohibits a monopolist from conditioning the supply of its product on customers' agreement to pay a "tax" when they use rivals' products. Qualcomm, a monopoly supplier of modem chips, maintains a "no license-no chips" policy under which it conditions supply of its chips on its customers' agreement to pay such a tax. The key question is whether Qualcomm can shield its conduct from antitrust scrutiny by labeling this tax—which customers pay to protect their supply of Qualcomm's *chips*—as royalties on Qualcomm's FRAND-encumbered standard-essential *patents*. It cannot. Antitrust law eschews such formal labels and instead examines market realities.

Qualcomm is entitled to negotiate royalties that reflect the value of its patents (*i.e.*, the royalties that Qualcomm would negotiate in the shadow of an infringement suit), including on rivals' chips that practice those patents. But Qualcomm's no license-no chips policy forces customers to negotiate in the shadow of Qualcomm's threat to withhold chips. Qualcomm's policy distorts license negotiations, leading customers to accept elevated patent royalties they otherwise would refuse. In some cases, Qualcomm further distorts license negotiations by paying customers to accept elevated royalties.

Qualcomm's executives recognize that its no license-no chips policy enables "██████ ████████████████████████████████████." (¶¶ 96, 98.)[2] Consistent with that recognition, Qualcomm collects far more in royalties than other licensors in the industry with comparable patent portfolios—████████████████████████████████████████. (¶ 60.) Thus the royalties Qualcomm collects include not only a legitimate royalty, but also an increment reflecting Qualcomm's monopoly power over modem chips. This increment is a tax, and hiding it in a license agreement does not reduce its anticompetitive effects or insulate it from antitrust scrutiny.

---

[2] Citations in the form ¶ __ refer to the Federal Trade Commission's Complaint for Equitable Relief, ECF No. 1, and those in the form Br. __ refer to Defendant Qualcomm Incorporated's Motion to Dismiss, ECF No. 69.

Qualcomm argues that these royalties cannot be exclusionary because they apply to both Qualcomm's and competitors' modem chips. But even uniformly elevated royalties affect Qualcomm (the tax collector) and its competitors (the indirect taxpayers) very differently. The tax harms actual and potential competitors: it diminishes their ability and incentive to enter, expand, invest, and innovate. For Qualcomm, the tax is a source of revenues and profits, part of the all-in price of its modem chips. If Qualcomm used its monopoly power to raise the price of *only* its own chips, it would promote substitution by OEMs and entry, expansion, investment, and innovation by rivals. By using its monopoly power to elevate royalties that also apply to its rivals' products, Qualcomm evades these market constraints and harms competition.

Qualcomm attempts to recast the allegations that it harmed competition through its coercive tax as a type of price squeeze claim that the Supreme Court foreclosed in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009). But *linkLine* simply holds that a vertically integrated firm need not consider its rivals' margins when setting its own prices. Contrary to Qualcomm's argument, *linkLine* does not hold that all conduct that reduces a rival's margins is *per se* lawful if the monopolist's own price remains above cost. Many anticompetitive practices that do not involve below-cost pricing—ranging from tying to exclusive dealing to sham litigation—may exclude rivals by reducing their margins. Taxing the use of rivals' products may likewise reduce rivals' margins and thereby exclude, but *linkLine* does not address, much less condone, such conduct.

Even with its anticompetitive tax in place, ███████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. (¶ 127). To stave off that threat, Qualcomm imposed exclusive dealing terms on Apple that foreclosed the most effective means of competing in the market for premium LTE modem chips, and successfully excluded competitors for five years.

Qualcomm's motion invents a requirement that plaintiffs allege substantial foreclosure quantitatively rather than qualitatively, and attempts to isolate the effects of its exclusive dealing from the effects of the tax. But case law establishes that exclusion from critical customers can

constitute substantial foreclosure, a numeric-foreclosure percentage is not a pleading requirement, and the effects of each element of an anticompetitive scheme must be viewed together.

The market reflects the effects of Qualcomm's anticompetitive scheme. Qualcomm's modem chip monopoly has remained intact, competitors have exited, and the remaining competitors are unable to constrain the high all-in prices of Qualcomm's modem chips. The complaint plausibly alleges facts showing how Qualcomm has achieved these results through anticompetitive practices. Qualcomm's motion to dismiss should be denied.

## II.      BACKGROUND

Qualcomm is a monopoly supplier of baseband processors (also known as "modem chips"), which allow handsets to communicate with cellular network equipment using industry standards like CDMA and LTE. (¶¶ 17-21.) Qualcomm's worldwide share of CDMA and premium LTE modem chip sales exceeded 80% from at least 2006 (CDMA) and 2012 (premium LTE) through 2015. (¶¶ 31, 33, 36, 44, 46.) Handset manufacturers (known as "OEMs") depend on Qualcomm's modem chips to reach customers on CDMA networks (like Verizon and Sprint), and to produce flagship handsets. (¶¶ 32-47, 80.)

Qualcomm also owns patents it has declared essential to industry standards, and licenses these standard-essential patents ("SEPs") to OEMs. (¶¶ 54-58.) Including patented technology in a standard eliminates alternative technologies and creates the risk that a participant might "hold up" standard users by demanding royalties that reflect the cost of abandoning the standard, and not its patents. (¶ 49.) To guard against hold-up, standard-setting organizations require participants to commit to license SEPs on fair, reasonable, and non-discriminatory ("FRAND") terms. (¶¶ 49-50, 53.)

Qualcomm uses its dominant position in the CDMA and premium LTE chip markets to distort license negotiations and secure elevated non-FRAND royalties. Ordinarily, SEP royalties are negotiated "in the shadow of the law," with reference to the parties' expectations about the probable outcome of infringement litigation. (¶¶ 70-73.) Because Qualcomm conditions access to its chips on acceptance of a SEP license, however, OEMs do not negotiate in the shadow of the

law. Instead, they pay elevated royalties to avoid the substantial business costs of a supply disruption. (¶¶ 61, 80, 86.) Accordingly, even though OEMs regard Qualcomm's royalties as non-FRAND, Qualcomm's royalties go unchallenged and unremedied. (¶¶ 76, 86.) Qualcomm further insulates its licensing terms from challenge by occasionally offering "█████████████" conditioned on OEMs' acceptance of the royalties and other terms that Qualcomm demands. (¶¶ 102-04.)

Qualcomm's conduct has raised its royalties above FRAND levels, so that the royalties incorporate an additional increment (or "tax") reflecting Qualcomm's chip monopoly power. (¶¶ 86-87.) █████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████ █████████████████." (¶¶ 97-98.) In 2015, █████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████ ████████████. (¶ 100.) ██████████████████████, Qualcomm garners much larger royalties than other SEP licensors with comparable portfolios—█████████ ██████████████████████████████████████ █████████████████████. (¶¶ 56, 58, 60.)

OEMs might escape the tax by purchasing licensed chips from other suppliers, because competing manufacturers do not require a supply of Qualcomm chips and thus could negotiate licenses based on the value of Qualcomm's patents rather than on its chip monopoly power. (¶ 114.) But Qualcomm refuses to license its competitors. (¶ 112.) Though Qualcomm's voluntary FRAND commitments require it to license its SEPs to its modem chip competitors, Qualcomm has refused to do so when competitors have requested licenses. (¶¶ 107, 108, 112.)

Finally, Qualcomm has excluded competitors by cutting off a critical sales opportunity—Apple. Apple is a particularly important customer because of its leading position in the premium

handset market. Apple provides its suppliers with high-volume, high-margin purchases; critical engineering engagement; technical validation; field testing; and reputational benefits. (¶ 129.)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. (¶ 127.)

In 2011 and 2013, when Apple sought to reduce its royalties, Qualcomm agreed to pay billions in incentives conditioned on Apple's exclusive use of Qualcomm chips in its new devices, an exclusivity that prevailed for Apple products launched from October 2011 until September 2016. (¶¶ 122-26.)

The market reflects Qualcomm's anticompetitive practices. By taxing competitors' chips, Qualcomm reduces existing and potential competitors' ability and incentive to enter, expand, and innovate. (¶¶ 137-38, 141.) Several former competitors of Qualcomm sold off or shuttered their businesses. (¶ 139.) And by relaxing competitive constraints, Qualcomm is able to maintain supra-competitive all-in chip prices, harming consumers. (¶¶ 137, 144.)

## III.    LEGAL STANDARD

To survive a motion to dismiss, a complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Lacey v. Maricopa Cnty*, 693 F.3d 896, 911 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)). A court must accept "all factual allegations in the complaint as true and constru[e] them in the light most favorable to the nonmoving party." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012).

## IV.    QUALCOMM MISSTATES THE COMPLAINT'S ALLEGATIONS.

Qualcomm acknowledges that the complaint's factual allegations must be accepted as true and interpreted in the light most favorable to the FTC, but repeatedly denies the existence of well pleaded facts. For example, Qualcomm argues that the complaint never alleges that the no license-no chips policy elevated royalties to above-FRAND rates. (Br. 9.) In fact, the complaint is replete with such allegations. The complaint alleges that Qualcomm's policy forces OEMs to accept royalties reflecting OEMs' need to maintain chip supply rather than the value of

1   Qualcomm's patents, (¶¶ 4, 86, 143); that the policy has "elevated" royalties above the FRAND

2   levels Qualcomm and OEMs would otherwise negotiate (¶¶ 3.a, 4, 6, 7, 143); ███████████

3   ████████████████████████████████████████████████████████████████████

4   (¶¶ 96, 98); and that ████████████████████████████████████████████

5   ████████████████████████████████████████ (¶ 100). The complaint

6   alleges that, as a result of Qualcomm's practices, Qualcomm collects royalties "███████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████. (¶ 60.) Rather than address these

9   allegations, Qualcomm simply pretends they do not exist.

10      Instead of confronting the complaint, Qualcomm improperly relies upon its own

11  assertions of "facts" outside the complaint. For example, Qualcomm states that it invented

12  technologies "fundamental to today's cellular communications," that these technologies are

13  practiced by handsets rather than modem chips, that Qualcomm owns many non-SEPs that are

14  practiced by handsets, and that Qualcomm does not assert patents against competitors. (Br. 4-5.)

15  These facts are not alleged in the complaint, and in some cases are obviously false—for example,

16  Qualcomm asserted SEPs against a since-exited competitor, Broadcom, for years.[3]

17      Qualcomm also relies on its own factual assertions to justify its no license-no chips

18  policy, arguing that its policy is necessary to avoid facilitating infringement of its SEPs. (Br. 6,

19  8, 24.) But under the doctrine of patent exhaustion, Qualcomm's modem chip customers do not

20  infringe Qualcomm's patents by using those chips as a matter of law. (¶ 66.) Qualcomm's

21  insistence on a separate license to use Qualcomm-supplied components is unique in the industry.

22  (¶¶ 65-67.) In fact, paragraph 143 of the complaint specifically alleges that Qualcomm could

23  obtain a fair return on its investment by enforcing its patent rights without its no license-no chips

24  policy, and yet Qualcomm cites that same paragraph for the opposite proposition. (Br. 24.) And

25  even if Qualcomm believes it has a legitimate business justification for its conduct, that is a

26  question of fact not susceptible to resolution at the pleading stage. *See United Food & Comm'l*

27

28

---

[3] *See* Complaint for Patent Infringement, *Qualcomm Inc. v. Broadcom Corp.*, 05-cv-1392-B-BLM (S.D. Cal. July 11, 2005) (asserting cellular SEPs against a competitor).

*Workers Local 1776 v. Teikoku Pharma USA Inc.*, 74 F. Supp. 3d 1052, 1067 & n.16 (N.D. Cal. 2014) (collecting cases).

Many of the supposed "contradictions" Qualcomm identifies in its brief flow from Qualcomm's reimagining of the complaint and not from the complaint's factual allegations. For example, Qualcomm argues that because it has "historically" charged a 5% royalty rate—without variation over time, across markets, or based on customers' use of Qualcomm chips—that rate must not reflect monopoly power over chips. (Br. 10.) But the complaint does not allege (1) any period in which Qualcomm lacked monopoly power, (2) that Qualcomm's CDMA and premium-LTE chip-supply threats are only used to elevate royalties on SEPs for those standards, or (3) that there are any significant OEMs that do not purchase Qualcomm chips. Instead, the complaint alleges that Qualcomm has long held monopoly power (¶¶ 31, 33, 44), that Qualcomm uses CDMA and premium LTE modem chip monopoly power to coerce royalties applicable to all modem chips (¶ 144), and that all OEMs serving major networks depend on Qualcomm's chips to a significant extent (¶¶ 32, 37, 38, 47). Moreover, Qualcomm assumes that if its rate was ever FRAND, it must remain FRAND today because it has not changed. But the complaint alleges that "handsets today offer a number of features" not offered by older handsets, and "many of Qualcomm's patents related to CDMA technology have expired." (¶ 77.) Thus, a 5% royalty on a 2006 phone is not economically equivalent to a 5% royalty on a 2017 smartphone.

Qualcomm's repeated attempts to ignore, revise, and supplement the complaint's allegations to fit into its own view of the world cannot provide an appropriate basis for dismissal. *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (reversing dismissal of claims where the district court's decision was "rooted in defendants' factual assertions"). The allegations actually set forth in the complaint state a plausible claim for relief, and Qualcomm's motion to dismiss should be denied.

## V.        THE COMPLAINT STATES A CLAIM OF MONOPOLIZATION.

The elements of a violation of Section 5 of the FTC Act for monopolization are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a

superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).[4] Willful maintenance of monopoly power requires anticompetitive conduct, which is "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (quoting *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008)); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001) (en banc) (willful maintenance of monopoly power occurs when a monopolist's conduct "through something other than competition on the merits, has the effect of significantly reducing usage of rivals' products and hence protecting its own … monopoly"). Although courts have developed tests for a number of frequently litigated fact patterns, a complaint need not fall into a preexisting category to state a claim. *See Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) ("'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.").

### A.  The Complaint Plausibly Alleges Anticompetitive Practices.

The complaint alleges that Qualcomm engaged in a series of anticompetitive practices that together exclude competition in the relevant markets.[5] Qualcomm treats these allegations as stating two separate claims—a tax on rivals, and an exclusive dealing claim. But the alleged conduct must be considered as a whole. *See Free Freehand*, 852 F. Supp. 2d at 1180 ("[I]t is not proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." (internal quotation marks omitted)). Qualcomm's tax, secured through threats of supply disruptions and promises of payments, diminishes the ability and incentive of competitors to enter, expand, invest, and innovate. Its refusal to license competitors in violation of its FRAND commitments helps maintain the tax. And its exclusive dealing with

---

[4] Section 5 of the Federal Trade Commission Act prohibits "[u]nfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(1). Unfair methods of competition include, among others, practices that violate the Sherman Act. *FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948).

[5] The complaint alleges two relevant markets in which Qualcomm has monopoly power, both of which are worldwide: CDMA modem chips and premium LTE modem chips. (¶¶ 131-35.) Qualcomm does not challenge these allegations.

Apple deprived its potential competitors access to a critical strategic customer whose business and technical cooperation ███████████ might strengthen rivals. Each of these practices forecloses competition on the merits, and together they have successfully maintained Qualcomm's monopoly power.

### 1. *Qualcomm's No License-No Chips Policy Raises Rivals' Costs.*

#### a. **Qualcomm Imposed an Anticompetitive Tax on Rivals' Chips.**

Under Section 2 of the Sherman Act, using monopoly power to raise rivals' costs of securing customers or critical inputs qualifies as anticompetitive conduct. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997) (citing Krattenmaker & Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 YALE L.J. 209, 235-62 (1986)). A monopolist that raises the price of *its own* products stimulates substitution by customers and "encourage[s] entry and expansion of rivals"—which tends to erode the monopolist's market power. AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 720a (online ed., updated Sept. 2016); *id.* ¶ 634a. A monopolist that raises the cost of *its rivals'* products stimulates none of these activities. Having used its market power to raise its rivals' costs, a monopolist can then raise prices to consumers while keeping rivals at bay. *See* Krattenmaker & Salop, *supra*, at 246-47.

A monopolist may raise its rivals' costs by inducing customers or suppliers not to deal with rivals at all, or to do so only on unfavorable terms. *See, e.g.*, *Lorain Journal Co. v. United States*, 342 U.S. 143, 152-53 (1951) (newspaper refused to carry advertisements from customers that also sought to advertise on a local radio station); *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) (exclusive dealing arrangements can harm competition by raising rivals' costs (citing Krattenmaker & Salop, *supra*)).

One kind of unfavorable term that a monopolist may impose is a penalty or "tax" that the monopolist's competitors or its customers must pay to the monopolist when they transact with

one another.[6] *See, e.g.*, *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 456-58 (1922) (condemning collection of "royalties" on customers' use of rivals' machines); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 139-40 (1969) (patentee commits patent misuse and may violate the Sherman Act by "using [its patent] monopoly to coerce an agreement to pay a percentage royalty on [non-infringing] merchandise"); *Glen Mfg. v. Perfect Fit Indus.*, 299 F. Supp. 278, 282 (S.D.N.Y. 1969) (license requiring "royalties on all toilet tank covers manufactured or sold by [the licensee,] whether or not [they infringe]" was "in open conflict with both the antitrust and patent laws"), *vacated and remanded*, 420 F.2d 319, 321 (2d Cir. 1970) (remanding for explicit findings on conditioning), *judgment reinstated*, 324 F. Supp. 1133 (S.D.N.Y. 1971) (making such findings).

In *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244 (D. Utah 1999), for example, the plaintiff challenged Microsoft's "per processor" licenses, which required computer OEMs to pay Microsoft a royalty on each computer that they sold, even when the OEMs installed only a rival operating system. *See id.* at 1249-50. The district court denied Microsoft's motion for summary judgment, because Microsoft's licenses, which raised OEMs' costs of dealing with rival operating-system vendors, had "the practical effect of exclusivity." *Id.* at 1250. In its own complaint challenging the same Microsoft licenses, the U.S. Department of Justice similarly alleged that the per-processor royalties acted as "a penalty, or tax" that deterred OEMs from licensing and promoting operating systems developed by Microsoft's rivals; diminished those rivals' ability to compete; and raised the cost of personal computers to consumers. Complaint ¶¶ 21, 22, 36-37, *United States v. Microsoft Corp.*, No. 94-cv-1564 (D.D.C. July 15, 1994); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1452 & 1462 (D.C. Cir. 1995) (approving consent decree that prohibited Microsoft from entering into per-processor licenses).

---

[6] Whether the tax is paid by a monopolist's rivals or by its customers makes no difference from either a legal or economic perspective. *See* MANKIW, PRINCIPLES OF MICROECONOMICS 125, 156 (7th ed. 2014) ("When a tax is levied on buyers, the demand curve shifts downward by the size of the tax; when it is levied on sellers, the supply curve shifts upward by that amount. In either case, when the tax is enacted, the price paid by buyers rises, and the price received by sellers falls.").

The Sherman Act reaches not only naked exercises of market power to raise rivals' costs, but also concealed efforts. In particular, firms cannot shield anticompetitive taxes from antitrust scrutiny by camouflaging them as compensation for complementary services. In such cases, courts look past labels to examine the process through which the payments at issue were set: Did the payments arise from a negotiation over the value of the services? Or did the monopolist use its market power to elevate payments due on rivals' sales?

For example, both the Fourth and Seventh Circuits condemned an agreement between a contractor association and a union that required *any* contractor hiring union employees—even a contractor that did not belong to the association—to contribute 1% of its gross payroll to an association-controlled fund. *See Nat'l Elec. Contractors Ass'n v. Nat'l Constructors Ass'n*, 678 F.2d 492 (4th Cir. 1982); *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358 (7th Cir. 1987).[7] The defendant association argued that the contributions simply compensated the fund for bargaining and administrative services that it supplied, but both the Fourth and Seventh Circuits rejected the argument and held that the contributions unlawfully enabled the association to "raise[] its rivals' costs, and thereby raise[] the market price to its own advantage." *Premier*, 814 F.2d at 368 (citing Krattenmaker & Salop, *supra*); *see also Nat'l*, 678 F.2d at 496-97 & 501. Writing for the Seventh Circuit, Judge Easterbrook explained that the process by which the association and union set contribution levels featured no mechanism that would align the price of the services with their value: "If the value of the services the Fund provides to firms that do not belong to the Association is .01% of their payroll, the collection of a 1% fee produces a supra-competitive profit of 0.99%, and no market force … will induce the Association to reduce it." *Premier*, 814 F.2d at 369.

Monopolists may similarly seek to disguise restrictions they impose on their rivals' dealings with suppliers or customers by virtue of their market power as exercises of their related

---

[7] Although *Premier* condemned the defendant's conduct under Section 1 of the Sherman Act, the court concluded that the conduct anticompetitively excluded the defendants' rivals, and the Ninth Circuit has relied on the Seventh Circuit's opinion in formulating Section 2 standards. *See Forsyth*, 114 F.3d at 1478 (citing *Premier*, 814 F.2d at 368, for proposition that "raising rivals' costs" is a category of exclusionary conduct).

11

patent rights. In *United States v. General Electric Co.*, 82 F. Supp. 753 (D.N.J. 1949), the court concluded that the defendant, "the only manufacturer of a full line of lamp bases," unlawfully maintained its monopoly by supplying bases only to lamp manufacturers that "sign[ed] letters in which they waived any right to a defense against an infringement suit which might be based on their use of purchased lamp parts or materials" from other suppliers. *Id.* at 801-02. The defendant was entitled to "bring[] patent-infringement suits to protect its inventions." *Id.* at 817. But it could not use its market power in lamp bases to impose exclusive-dealing arrangements on lamp manufacturers and shield those arrangements from antitrust scrutiny by disguising them as exercises of its lawful patent rights. *Id.* at 801-03.

Read together, these cases establish that using market power to tax rivals' sales is exclusionary, *see United Shoe*, 258 U.S. at 456-58; *Caldera*, 87 F. Supp. 2d at 1250, and that such taxes remain exclusionary even when disguised as compensation for complementary services, *see Premier*, 814 F.2d at 368-69.

Qualcomm's conduct falls squarely within these parameters. Qualcomm uses its monopoly power in modem chips to induce customers to transact with rival chipmakers on disadvantageous terms—terms that require OEMs to pay a tax to Qualcomm when they purchase chips from Qualcomm's rivals. (¶ 86.) Although Qualcomm labels these payments patent royalties, the manner in which Qualcomm negotiates these payments with OEMs belies that label. Manufacturers accede to these royalties not because they reflect the value of Qualcomm's patents, but because Qualcomm's no license-no chips policy places them in an untenable position: they can either accede to Qualcomm's demands or lose access to Qualcomm's chips. (¶¶ 37, 47, 61, 76-83.)

### b. Even a "Chip-Neutral" Tax Harms Competition.

Qualcomm argues that its conduct cannot harm competition so long as Qualcomm forces OEMs to pay the same elevated royalties to Qualcomm whether they use Qualcomm's or a rival's chips. (Br. 11.) When firms with market power dictate the terms on which their customers or input suppliers may deal with their rivals, however, those terms may harm competition even when the same terms apply to the firms' own dealings. *See United Mine Workers of Am. v.*

*Pennington*, 381 U.S. 657, 665-66 (1965) (large coal operators unlawfully conspired with a union "to eliminate competitors from the industry" by imposing "the same wages" on the coal operators and their smaller rivals). This is because even facially neutral terms may prove "more costly to one set of [firms] than another." *Id.* at 668.

That principle applies with special force when the ostensibly "neutral" terms set a price to be paid *to the defendant itself*. In *Premier*, for example, the association required both its members and rival contractors to make the same contributions to an association-controlled fund. 814 F.2d at 359. The Seventh Circuit held that these contributions nonetheless helped association members "eliminate a source of competition" because the contributions affected members and their rivals in very different ways. *Id.* at 368. For rivals, the contributions represented an "increase[d] … cost[] of doing business." *Id.* For members, by contrast, they represented "higher profits … both because there [was] more in the Fund, for the Association's use, and because the reduction in competition enabled the members to capture more of the market." *Id.*

Here, too, even a facially neutral tax harms competition because it affects Qualcomm (the tax collector) and Qualcomm's rivals (the indirect taxpayers) in fundamentally different ways. For rivals, the tax represents a true economic cost—a penalty that OEMs must pay *Qualcomm* each time they use *the rival's* chips. The tax depresses OEMs' demand for rivals' chips and diminishes rivals' abilities and incentives to invest and innovate. (¶ 138.) For Qualcomm, by contrast, the tax represents revenue—a component of the all-in price that OEMs pay *Qualcomm*.

In arguing that facially "neutral" taxes are exempt from antitrust scrutiny, Qualcomm suggests that a monopolist may use its market power to increase its rivals' costs, so long as it pairs those cost increases with price increases of its own. This suggestion turns the Sherman Act on its head. A monopolist raises its rivals' costs to maintain or enhance its market power (*i.e.*, its power over price). *See* Krattenmaker & Salop, *supra*, at 241-43. The monopolist may exercise the incremental market power it so acquires by raising its own price. *Id.* at 225.[8] For this reason,

---

[8] *Accord* Tom et al., *Raising Rivals' Costs: the Problem of Remedies*, 12 GEO. MASON L. REV. 389, 390 (2003) ("[A] monopolist may adopt an anticompetitive strategy, not to drive its competitors out of the market entirely, but instead to make that competitor's production or distribution more costly, thereby creating a price umbrella under which the strategizing firm can raise its prices.").

1    courts addressing exclusive dealing and other practices that raise rivals' costs regard a

2    concomitant increase in the monopolist's prices as evidence of successful monopolization, not as

3    a ground for a dismissal. *See, e.g.*, *McWane*, 783 F.3d at 832; *United States v. Dentsply Int'l,*

4    *Inc.*, 399 F.3d 181, 185-86 (3d Cir. 2005) (defendant unlawfully maintained its monopoly

5    through conduct that created "a high price umbrella," allowing "aggressive price increases,"

6    though competitors remained).

7                    c.    *linkLine* **Is Inapplicable.**

8           Contrary to Qualcomm's assertion, *linkLine* furnishes no ground for dismissal. *linkLine*

9    holds that the antitrust laws do not oblige a vertically integrated firm to price its wholesale

10   product sufficiently low and its retail product sufficiently high to afford its unintegrated retail

11   rivals a "'fair' or 'adequate' margin." *linkLine*, 555 U.S. at 448-49. But the FTC has not based its

12   claims on any such obligation. Qualcomm is free to negotiate whatever royalties prospective

13   licensees are willing to pay to avoid an infringement suit. In the case of Qualcomm's FRAND-

14   encumbered SEPs, licensees' willingness to pay will reflect the likelihood that the asserted SEPs

15   would be found valid and infringed and, if so, the FRAND royalties that a court would likely

16   award.[9] Qualcomm is also free to charge low (though not predatory) prices for its modem chips.

17   *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). What

18   Qualcomm may *not* do is use its monopoly power in modem chips to induce customers to pay it

19   a tax on the use of rivals' chips, and then shield that tax from antitrust scrutiny by labeling it a

20   patent royalty.

21          *Premier* is instructive. The electrical contractors' association there was free to charge

22   whatever price the market would bear for its upstream bargaining and administrative services.

23   The association's members were also free to charge competitive prices for their downstream

24   electrical contracting services. What the contractors could not do, and what led both the Fourth

25   and Seventh Circuits to condemn their conduct, was to use their market power for downstream

26

27   _____

28   [9] *See generally Transcore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275
     (Fed. Cir. 2009) (a patent license conveys nothing other than "freedom from suit"); *Ericsson,*
     *Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227-30 (Fed. Cir. 2014) (discussing calculation of
     reasonable royalties as damages for infringement of FRAND-encumbered SEPs).

                                          14

electrical contracting services to impose higher labor costs on their rivals. *See Premier*, 814 F.2d at 368; *Nat'l*, 678 F.2d at 501. While the association characterized the fee it imposed as fair compensation for its services, the Seventh Circuit rejected that label, instead examining the manner in which the fee was established. *See Premier*, 814 F.2d at 369.

Qualcomm advocates an expansive reading of *linkLine*, arguing that *linkLine* creates a rule of *per se* legality for any conduct that diminishes rivals' margins, so long as the monopolist's own prices remain above cost. (Br. 12-13.) But many exclusionary practices—ranging from tying to exclusive dealing to sham litigation—operate in this manner. To read *linkLine* in this fashion would mean that the Supreme Court, *sub silentio*, overruled nearly a century of its own Sherman Act precedent. *See Church & Dwight Co. v. Mayer Labs., Inc.*, No. C-10-4429, 2011 WL 1225912, at *10 (N.D. Cal. July 2, 2014) (observing that "the means of illicit exclusion that fall under the ambit of the Sherman Act are 'myriad,'" and that "[c]ourts have long recognized many forms of exclusionary conduct that do not involve below-cost pricing" (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004), and collecting cases)). Such a reading is implausible; in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 278 (3d Cir. 2012), for example, the Third Circuit explained: "Although the Supreme Court has created a safe harbor for above-cost discounting, it has not established a *per se* rule of non-liability under the antitrust laws for *all* contractual practices that involve above-cost pricing." *Id.* at 278. The court cautioned that "such an unduly simplistic and mechanical rule … would place a significant portion of anticompetitive conduct outside the reach of the antitrust laws without adequate justification." *Id.*; *accord Church & Dwight*, 2011 WL 1225912, at *10.[10]

### d.    The Complaint Alleges Above-FRAND Royalties.

Finally, Qualcomm contends that the complaint should be dismissed because it fails adequately to allege that the royalties that Qualcomm has charged are above the FRAND royalties that Qualcomm could negotiate absent the alleged anticompetitive conduct.

---

[10] In addition, *linkLine* applies only "when the defendant is under no antitrust obligation to sell its inputs to [its rivals]." 555 U.S. at 442. Qualcomm is under such a duty. *See infra* § V.A.3.

1      As discussed in Section IV, above, the complaint does allege that Qualcomm charges

2  above-FRAND royalties, including with reference to ████████████████████. (¶¶ 86,

3  96-101.) Qualcomm cites no precedent supporting the notion that the FTC's complaint, to

4  survive a motion to dismiss, must not only quantify the amount of Qualcomm's anticompetitive

5  overcharge, but quantify it with greater precision than ███████████████████.[11]

6      In any event, antitrust law does not regulate market *outcomes* but protects the competitive

7  *process. See, e.g., Microsoft*, 253 F.3d at 58. To increase its royalties, Qualcomm threatened

8  supply disruption to block access to judicial review of its patents' value, thus taxing the use of its

9  rivals' products. Those allegations more than suffice to show that Qualcomm's conduct

10  "reasonably appears capable of making a significant contribution to maintaining monopoly

11  power." *Id.* at 79 (quotation marks and emendations omitted); *see also FTC v. Actavis, Inc.*, 133

12  S. Ct. 2223, 2236-37 (2013) (anticompetitive nature of payment to avoid the risk of competition

13  may be assessed without analysis of applicable patent claims).

14          ### 2.  *Qualcomm's Payments in Exchange for Elevated Royalties Facilitate Its Taxation of Competitors' Products.*

15

16      Beyond threatening all OEMs with the "stick" of a supply disruption, Qualcomm offered

17  some OEMs the "carrot" of funds conditioned on their acceptance of inflated royalties that raise

18  rivals' costs. (¶¶ 102-06.) Qualcomm attacks the complaint's allegations respecting these funds

19  on three grounds, all without merit.

20      First, Qualcomm argues that its payments show that it lacked the power to coerce OEMs

21  into accepting anticompetitive license terms. (Br. 11, 14.) But the notion that using both carrots

22  and sticks together undermines a finding of monopoly power or anticompetitive conduct runs

23  counter to both economic logic and legal precedent. *See ZF Meritor*, 696 F.3d at 277 (defendant

24  used combination of rebates and supply threats to induce OEMs to accept long-term agreements

25  that disadvantaged rivals); *Dentsply*, 399 F.3d at 185 (defendant used combination of rebates and

26  supply threats to induce OEMs to accept exclusivity); *United States v. Microsoft Corp.*, 84 F.

27

28

---

[11] Indeed, such precision is not even required of private plaintiffs seeking treble damages. *See, e.g., Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985).

Supp. 2d 9, 59-62 (D.D.C. 1999) (Microsoft induced OEMs to comply with restrictions that disadvantaged rival web-browser developers by "threaten[ing] to terminate the Windows license of any [noncompliant] OEM" and by offering certain OEMs "discounts off the royalty price of Windows"), *aff'd in relevant part*, 253 F.3d 34.

Second, Qualcomm describes its payments as "███████████████████████" and contends that *Brooke Group*'s price-cost test precludes the Court from concluding that these funds are exclusionary. (Br. 13.) Qualcomm's description of the funds as "███████████" contradicts the complaint, which alleges that Qualcomm "conditioned [the funds] on the OEM's acceptance of Qualcomm's preferred [license] terms." (¶ 102.) As such, the price-cost test does not apply. *See ZF Meritor*, 696 F.3d at 278; *Church & Dwight*, 2011 WL 1225912, at *10.

Third, Qualcomm argues that the court cannot evaluate the competitive harm of its payments because the complaint does not specify "how many ████████ Qualcomm has provided or what portion of the alleged relevant markets is affected thereby." (Br. 14.) But Qualcomm has taxed rivals principally through its no license-no chips policy, which applies to *all* OEMs. (¶ 32, 37-38, 47, 86-87.) The payments help Qualcomm impose and maintain the tax; specific allegations about the number and scope of Qualcomm's ████████████ are not necessary to plausibly allege that Qualcomm's tax is exclusionary.

### 3. Qualcomm's Refusal to License Competitors on FRAND Terms Is Anticompetitive.

While antitrust law generally does not impose an obligation to deal with one's rivals, there are exceptions to that rule. *See, e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601, 608-11 (1985) (termination of a voluntary course of dealing violated duty to deal). In *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), the Third Circuit recognized that voluntary FRAND commitments can create an antitrust duty to deal. *Id.* at 316-17. The court observed that standard setting has "historically been subject to antitrust scrutiny," *id.* at 308 (collecting cases), and is permissible only when "'meaningful safeguards' … 'prevent the standard-setting process from being biased by members with economic interests in stifling product competition,'" *id.* at 310 (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486

U.S. 492, 501 (1988)). The court found that FRAND commitments are an important safeguard that SSOs have implemented to prevent "owners of [patents], through the exercise of their rights, to exert undue control over the implementation of industry-wide standards." *Broadcom*, 501 F.3d at 304. The court stressed that Qualcomm "voluntarily agreed to license [its] technology on FRAND terms" as part of a competitive effort to "market its … technology for inclusion in an industry-wide standard." *Id.* at 316 (emphasis added). The voluntary nature of Qualcomm's commitments, the Third Circuit found, sharply distinguished Qualcomm's circumstances from those of *Trinko*, where the defendant "would not have marketed the allegedly withheld service absent a statutory duty to do so." *Broadcom*, 501 F.3d at 316. Here, as in *Broadcom*, Qualcomm's voluntary commitment to license its SEPs to rivals, and its subsequent breach of that commitment, support the inference that Qualcomm's conduct is exclusionary.

Qualcomm argues that "a FRAND violation is not enough to make out an antitrust claim without also alleging that the purported violation caused actual harm to competition." (Br. 15 (citing *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)).) But here, the complaint does allege such harm. Were Qualcomm to license its SEPs to its rivals, those licenses would undermine Qualcomm's scheme to use above-FRAND SEP royalties as a vehicle to tax rivals' sales. Rivals do not depend on Qualcomm's modem chips, and thus could negotiate with reference to Qualcomm's likely infringement remedies instead of a threatened supply disruption. If Qualcomm licensed its rivals, OEMs could purchase licensed chips free of Qualcomm's tax. (¶¶ 113-14.)

In denying the allegations of competitive harm, Qualcomm isolates its refusal to license rival chipmakers from the remainder of its conduct. (Br. 15.) But courts "consider all of an alleged monopolist's related conduct in the aggregate," *Tele Atlas N.V. v. Navteq Corp.*, No. C-05-01673, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008), and even a refusal to deal that might be "legally protected" in other circumstances may be anticompetitive when undertaken as "part of a restrictive course of conduct incompatible with antitrust objectives." *Flinkote Co. v. Lysfjord*, 246 F.2d 368, 377 (9th Cir. 1957); *cf. Lorain Journal*, 342 U.S. at 152-53 ("surrounding circumstances are important" when assessing a monopolist's refusal to deal);

1   *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 458, 463 & n.8 (1992)

2   (condemning policy under which Kodak (1) conditioned the sale of parts on consumers'

3   purchase of Kodak's service, and (2) refused to sell parts to competing service providers, without

4   considering whether Kodak's refusal, viewed in isolation, would constitute an antitrust

5   violation). Qualcomm's refusal to license reinforces the competitive harm created by its tax.

6       Qualcomm also argues that, if Qualcomm's FRAND commitments required it to license

7   its SEPs to rival chipmakers, rivals already would have enforced that requirement in court.

8   (Br. 16.) That argument fails because it requires drawing inferences in Qualcomm's favor. Other

9   chipmakers may not wish to sue Qualcomm for a number of reasons, including fear of

10  countersuit for infringement, escalation, litigation fees, disrupted relationships with OEMs, and

11  hope that a public-enforcement solution may emerge. In any event, the availability of a private

12  right of action for breach of contract supplies no basis for dismissing a government antitrust suit

13  challenging that activity. *See generally Mulvey v. Samuel Goldwyn Prod'ns*, 433 F.2d 1073 (9th

14  Cir. 1970) ("Successful maintenance of an antitrust suit does not depend upon the availability or

15  nonavailability of a common-law remedy for that wrong.").

16          **4.   *Qualcomm's Exclusive Dealing Contracts with Apple Harmed***
17          ***Competition.***

18      The complaint alleges that Qualcomm entered a *de facto* exclusive dealing arrangement

19  with Apple, with the intent and effect of augmenting the substantial barriers to entry and

20  expansion already erected by Qualcomm's no license-no chips policy. In an exclusive-dealing

21  arrangement, a buyer promises its supplier not to purchase from competing suppliers. "[T]he law

22  is clear than an express exclusivity requirement is not necessary because *de facto* exclusive

23  dealing may be unlawful." *ZF Meritor*, 696 F.3d at 282. Exclusive dealing arrangements are

24  unlawful when they "tend to substantially foreclose competition in the relevant … market."

25  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 334 (1961). Substantial foreclosure can be

26  alleged quantitatively (through the percentage of the market foreclosed) or qualitatively (by

27  citing other market factors, such as the strategic importance of foreclosed customers). *See, e.g.*,

28  *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 & n.12 (4th Cir. 2011)

(exclusive dealing adequately alleged based on strategic importance of foreclosed customers). Moreover, exclusive dealing "that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist." *Dentsply*, 399 F.3d at 187.

Under these standards, the complaint states a claim for exclusive dealing. Qualcomm offered billions of dollars in incentive payments to induce Apple's exclusive use of Qualcomm chips—a *de facto* exclusive dealing arrangement. (¶¶ 122-26.)[12] And Qualcomm's exclusive dealing with Apple was intended to, and did, "foreclose[]a substantial share of the market for premium LTE baseband processors," given Apple's position in the market. (¶¶ 127, 129-30.)[13] ███████████████████████████████████████████████████████████████████ ████. (¶ 127.) *See, e.g.*, *Kolon*, 637 F.3d at 452 & n.12 (substantial foreclosure properly alleged where exclusive dealing arrangements "severely limited … competition for the most important customers in categories needed to gain a foothold for effective competition").

Qualcomm argues that, to state a claim, the complaint must allege the specific percentage of the market that was foreclosed. (Br. 19.) But substantial foreclosure is not simply a numerical test, and there is no minimum percentage of the market that must be foreclosed to find a violation of Section 2. *See Kolon*, 637 F.3d at 452 & n.12 (reversing dismissal of an exclusive dealing complaint that did not allege a numeric foreclosure percentage); ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 215 (7th ed. 2012) ("Since *Tampa Electric*, courts have steadily moved away from a strict focus on foreclosure percentage to a more nuanced analysis of whether the arrangement threatens to create or enhance market power and therefore lead to an anticompetitive outcome."). The cases cited by Qualcomm teach that the "percentage share of the relevant market foreclosed" is "not the exclusive or primary factor" in assessing substantial foreclosure. *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847, 2013 WL

---

[12] Qualcomm argues that *de facto* exclusive dealing was not alleged, citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010). (Br. 18.) *Allied Orthopedic Appliances* was decided at summary judgment, and held that the plaintiff there had not offered proof that the discounts at issue were exclusive in effect. 592 F.3d at 994. The complaint, by contrast, alleges that Qualcomm's conditional rebates successfully imposed exclusivity. (¶ 126.)

[13] *See, e.g.*, *Microsoft*, 253 F.3d at 59 ("[T]he intent behind the conduct of a monopolist … helps us understand the likely effect of the monopolist's conduct.").

5694452, at *11 (N.D. Cal. Oct. 18, 2013). Instead, substantial foreclosure depends on a number of factors, including the "probable immediate and future effects" on competition. *Tampa Elec.*, 365 U.S. at 329; *see also McWane*, 783 F.3d at 835 (foreclosure is a "proxy for anticompetitive harm," and is therefore "one of several factors we now examine in determining whether the conduct harmed competition").

Neither of the decisions on which Qualcomm principally relies holds that a complaint must allege substantial foreclosure numerically. The complaint in *Rheumatology* was dismissed because it lacked allegations about any of the salient features of the market, "or how competition ha[d] been harmed." *Rheumatology*, 2013 WL 5694452, at *11. Indeed, when later assessing an amended complaint, the court expressly stated that no individual item on its list of salient market features was a prerequisite: "plaintiffs do not need to provide *all* of this information to state a claim." *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847, 2014 WL 524076, at *10 (N.D. Cal. Feb. 6, 2014).

Similarly, in *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015), the court dismissed the complaint because there was a mismatch between the foreclosure alleged (a subset of Android smartphone-based internet searches) and the antitrust markets allegedly affected (all mobile internet searches and all internet searches). *Id.* at 1031-32. *Feitelson* simply holds that a plaintiff who chooses to allege substantial foreclosure by identifying a specific foreclosure percentage must do so coherently. Neither *Rheumatology* nor *Feitelson* holds that a plaintiff cannot plead substantial foreclosure by addressing qualitative factors from *Tampa Electric*.

In addition, Qualcomm's exclusive dealing with Apple is part of a broader scheme to restrict competition, which must be considered as a whole. *See Microsoft*, 253 F.3d at 72 (exclusive deals with one minor distribution channel anticompetitive because combined with other conduct that foreclosed two major distribution channels); *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. SA-15-CA-32, 2015 WL 6994438, at *6 (W.D. Tex. Oct. 15, 2015) (rejecting argument "that the anticompetitive effect of each [practice] must be considered separately" for a scheme involving both exclusive dealing and other conduct (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962))). Here, Qualcomm directly

traded one exclusionary term (reducing Apple's tax) for another (exclusive dealing),
underscoring the close relationship between those terms. (¶¶ 119, 121.)

Qualcomm next argues that the complaint had to identify by name a company with the
relevant technological capabilities that was excluded from the market. (Br. 20.) Qualcomm cites
nothing in support of this proposition, and for good reason—the requirement does not exist. *See
generally Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1190 (N.D. Cal. 2005)
(sustaining complaint that did not identify foreclosed customers but "explain[ed] how [the]
alleged scheme operate[d]"); *Suture Exp., Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d
1212, 1228 (D. Kan. 2013) (refusing to dismiss exclusive dealing claims "[a]lthough no names
[of foreclosed customers were] alleged" because it was reasonable to infer that the defendant's
discount programs caused harm). As the complaint makes clear, Apple wanted to "develop[] and
work[] with additional suppliers" (¶ 125(a)), but "████████████████████████████████████
████████████████████████████████████," (¶ 127). The most reasonable
inference from ████████████████████████████████████ is that such
competitors existed and the contracts excluded them as ████████████.

Finally, Qualcomm argues that because Intel began supplying Apple with chips in
October 2016, its agreements with Apple were not exclusive in effect. (Br. 20-21.) But the
complaint alleges that the billions of dollars in incentive payments Qualcomm made pursuant to
the agreements induced exclusivity and foreclosed access to Apple and its developmental
benefits for nascent suppliers for a period of five years, ending in September 2016. (¶¶ 126, 130.)
Qualcomm does not argue that five years of exclusive dealing is insufficient to state a claim. *See,
e.g.*, *Dentsply*, 399 F.3d at 191 (delaying competitive entry or growth harms competition);
AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1802c (online ed., updated Sept. 2016).

### B.   The Complaint Plausibly Alleges Anticompetitive Effects.

When seeking equitable relief, the FTC need merely allege that "'anticompetitive
consequences are a naturally-to-be-expected outcome of the challenged conduct.'" *McWane*, 783
F.3d at 837 (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 657a2, at 162 (3d ed. 2008)).
Here, the complaint alleges not only that Qualcomm's conduct has anticompetitive tendencies,

but also that it has produced anticompetitive effects. Qualcomm's conduct has raised all-in prices of modem chips and reduced output (¶¶ 137-38), forced competitors out of the market (¶ 139), and reduced incentives to innovate (¶ 141).

Qualcomm ignores the applicable legal standard and instead argues that, to state a claim, the complaint must identify specific sales lost by competitors (Br. 2), identify specific competitors excluded (Br. 20), and allege that Qualcomm's refusal to license excluded *all* potential competitors (Br. 15-16). That is not the law. The complaint need not identify specific business transactions and name the competitors that would have won them absent Qualcomm's conduct; it need only allege that Qualcomm's conduct tended to exclude competition on the merits and that Qualcomm successfully maintained its monopoly. *See, e.g.*, *Microsoft*, 253 F.3d at 79 ("To some degree, 'the defendant is made to suffer the uncertain consequences of its own undesirable conduct.'" (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 651c, at 78 (1996))). The complaint makes such allegations. (¶¶ 138-39.)

## VI.        THE COMPLAINT STATES A CLAIM OF RESTRAINT OF TRADE.

To establish liability under Section 1 of the Sherman Act, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was an unreasonable restraint of trade. *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996). Qualcomm's licenses to customers, agreements to pay ███████, and exclusive deals with Apple are agreements that unreasonably restrain trade. The competitive harm from Qualcomm's conduct, addressed above, is sufficient to establish that these agreements are unreasonable.

Qualcomm argues that its no license-no chips policy involves a refusal to sell, and thus no concerted action. (Br. 21.) But the complaint alleges that Qualcomm threatens to cut off chip supply to compel OEMs to agree to anticompetitive terms. (¶¶ 84-86.) Executed licenses containing coerced terms are agreements for purposes of Section 1. *See, e.g., ZF Meritor*, 696 F.3d at 262, 276 (contracts containing anticompetitive terms that defendant "essentially forced" OEMs to accept constituted agreements for purposes of Section 1).

1
2

## VII.     THE COMPLAINT STATES A CLAIM OF UNFAIR METHODS OF COMPETITION.

3       Section 5 of the FTC Act prohibits "[u]nfair methods of competition in or affecting

4   commerce." 15 U.S.C. § 45(a)(1). Section 5 declares unlawful not only practices that violate the

5   Sherman Act, but also those that "conflict with [the Sherman Act's] basic policies." *FTC v.*

6   *Brown Shoe Co.*, 384 U.S. 316, 321 (1966); *see also Liu v. Amerco*, 677 F.3d 489, 494 (1st Cir.

7   2012) (invitation to collude is an unfair method of competition); FTC, Statement of Enforcement

8   Principles Regarding "Unfair Methods of Competition" Under Section 5 of the Federal Trade

9   Commission Act, 80 Fed. Reg. 57,056 (Sept. 21, 2015) (Section 5 reaches "acts or practices that

10   are anticompetitive but may not fall within the scope of the Sherman or Clayton Act."").

11   Qualcomm's course of conduct—including its leverage of chipset supply to obtain above-

12   FRAND royalties, refusal to license its FRAND-encumbered SEPs to its competitors, and its

13   exclusive dealing arrangement with a critical customer—conflicts with these policies.

14       Although conduct judged unlawful under Section 5 need not violate the Sherman Act or

15   other laws, such conduct should ordinarily be "collusive, coercive, predatory or exclusionary in

16   character," or possess other "indicia of oppressiveness." *E.I. du Pont de Nemours & Co. v. FTC*,

17   729 F.2d 128, 138-40 (2d Cir. 1984). The conduct alleged here satisfies these criteria: a

18   dominant firm forcing its customers to deal with rivals on unfavorable terms is coercive and

19   exclusionary under Section 5. *See, e.g., FTC v. Texaco, Inc.*, 393 U.S. 223, 228-30 (1968) (oil

20   company violated Section 5 by using its "dominant economic power" to limit the extent to which

21   gas stations could market nonsponsored brands of tires, batteries, and accessories); *Atl. Ref. Co.*

22   *v. FTC*, 381 U.S. 357, 368-71 (1965) (same).

23       The complaint sufficiently alleges coercive and exclusionary conduct and an

24   economically sound theory of competitive injury. The standalone Section 5 claim should

25   therefore be sustained.

26   ## VIII.     CONCLUSION

27       Qualcomm uses its monopoly power to make OEMs pay a royalty overcharge—a tax—

28   when buying modem chips from its competitors. Qualcomm further hampers those competitors

24

by denying them the licenses it promised would be available on FRAND terms during standard-setting. And Qualcomm foreclosed its competitors from selling to a uniquely important customer, Apple, for half a decade using exclusive contracts. Separately, those allegations present a forceful antitrust case. Together, they easily surpass the plausibility threshold at the pleading stage. The Court should deny Qualcomm's motion to dismiss.

Respectfully submitted,

Dated: May 12, 2017

   */s/ Jennifer Milici*
JENNIFER MILICI
J. ALEXANDER ANSALDO
DANA F. ABRAHAMSEN
JOSEPH R. BAKER
WESLEY G. CARSON
KENT E. COX
GEOFFREY M. GREEN
RAJESH S. JAMES
LIN W. KAHN
PHILIP J. KEHL
KENNETH H. MERBER
MARK J. WOODWARD

Bureau of Competition

ELIZABETH A. GILLEN

Office of Policy Planning

*Attorneys for Plaintiff Federal Trade Commission*

25
OPPOSITION TO QUALCOMM'S MOTION TO DISMISS
Case No. 17-cv-00220-LHK-NMC