**Eamon P. Joyce (*pro hac vice* motion filed)**
ejoyce@sidley.com
**SIDLEY AUSTIN LLP**
**787 Seventh Avenue**
**New York, New York 10019**
**Telephone: +1 212 839-5300**
**Facsimile: +1 212 839-5599**

**Rahul R. Hari, SBN 313528**
rhari@sidley.com
**SIDLEY AUSTIN LLP**
**555 West Fifth Street, Suite 4000**
**Los Angeles, California 90013**
**Telephone: +1 213 896-6000**
**Facsimile: +1 213 896-6600**

Attorneys for *Amicus Curiae* ACT | The App Association

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> QUALCOMM INCORPORATED, a Delaware corporation, <br><br> Defendant. | Case No. 5:17-cv-00220-LHK <br><br> **BRIEF OF *AMICUS CURIAE* ACT \| The APP ASSOCIATION IN SUPPORT OF THE FTC RESPECTING DEFENDANT'S MOTION TO DISMISS** <br><br> Date: June 15, 2017 <br> Time: 1:30 p.m. <br> Place: Courtroom 8 <br> Judge: The Hon. Lucy Koh |

**TABLE OF CONTENTS**

Page

**I**    STATEMENT OF INTEREST ..................................................................................1

**II**   PRELIMINARY STATEMENT ..............................................................................2

**III**  A FAIR STANDARDS ECOSYSTEM IS VITAL FOR SMALL BUSINESSES...............3

    A.    FRAND Is A Critical Safeguard For Fair Competition ............................3

    B.    FRAND Abuses Are Particularly Injurious To Small Businesses ............7

**IV**  THE FTC'S ALLEGATIONS SHOULD BE HEARD AND DECIDED ON THEIR MERITS AND BASED ON A ROBUST FACTUAL RECORD ........................................8

**V**   CONCLUSION ........................................................................................................13

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Broadcom Corp. v. Qualcomm Inc.*,
 501 F.3d 297 (3d Cir. 2007) ................................................................................................. 4, 6

*CSIRO v. Cisco Sys., Inc.*,
 809 F.3d 1295 (Fed Cir. 2015) ................................................................................................ 12

*Ericsson, Inc. v. D-Link Systems, Inc.*,
 773 F.3d 1201 (Fed. Cir. 2014) ............................................................................................ 9, 12

*Garretson v. Clark*,
 111 U.S. 120 (1884) .............................................................................................................. 11, 12

*Hartford-Empire Co. v. United States*,
 324 U.S. 570 (1945) ..................................................................................................................... 10

*In the Matter of Motorola Mobility LLC and Google Inc.*, File No. 121 0120,
 Docket No. C-4410, 2013 WL 3944149 (F.T.C. July 23, 2013) ............................................... 10

*In the Matter of Robert Bosch GmbH*, 155 F.T.C. 713, 2013 WL 8364914 (F.T.C.
 Apr. 23, 2013) ............................................................................................................................. 6

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
 694 F.3d 51 (Fed. Cir. 2012) .................................................................................................... 12

*Lotes Co. LTD. v. Hon Hai Precision Indus. Co. LTD.*,
 No. 12-cv-7465, 2013 WL 2099227 (S.D.N.Y. May 14, 2013), *aff'd on other grounds*, 753 F.3d 395 (2d Cir. 2014) ......................................................................................... 6

*Microsoft Corp. v. Motorola, Inc.*,
 696 F.3d 872 (9th Cir. 2012) .................................................................................................... 10

*Microsoft Corp. v. Motorola, Inc.*,
 795 F.3d 1024 (9th Cir. 2015) ........................................................................................... *passim*

*Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*,
 540 U.S. 398 (2004) .................................................................................................................. 10

**Other Authorities**

3GPP, The Mobile Broadband Standard, *Tentative 3GPP Timeline for 5G* (Mar.
 17, 2015), *at* http://www.3gpp.org/news-events/3gpp-news/1674-timeline_5g ...................... 2

ACT | The App Association, *State of the App Economy* (Apr.20, 2017), *available at* http://actonline.org/2017/04/20/state-of-the-app-economy-report-outlines-growth-dynamism-of-the-app-ecosystem ................................................................................7

All things FRAND, *at* http://www.allthingsfrand.com ................................................................................1

William J. Baer, Assistant Attorney General for Antitrust, Remarks, 19th Annual International Bar Association Competition Conference, Florence, September 11, 2015, *available at* http://www.justice.gov/opa/speech/assistant-attorney-general-bill-baer-delivers-remarks-19th-annual-international-ba ................................7

Department of Commerce Internet Policy Task Force and Digital Leadership Team, *Fostering the Advancement of the Internet of Things* (Jan. 2017), *available at* https://www.ntia.doc.gov/files/ntia/publications/iot_green_paper_01122017.pdf ................................................................................2

ETSI Directives, *Guide on Intellectual Property Rights*, *available at* http://www.etsi.org/images/files/IPR/etsi-guide-on-ipr.pdf ................................10

ETSI, *ETSI Guidelines for Antitrust Compliance*, *available at* http://www.etsi.org/images/files/IPR/etsi%20guidelines%20for%20antitrust%20compliance.pdf ................................................................................4, 6

ETSI, *Intellectual Property Rights Policy*, *available at* http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf ................................6

European Commission, *Horizontal Guidelines* (Nov. 1, 2011), *available at* http://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX:52011XC0114%2804%29 ................................10

FTC, Brief of Amicus Curie in Support of Neither Party, *Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548 et al. (Fed. Cir. Dec. 14, 2012) ................................5

Fiona M. Scott-Morton, U.S. Department of Justice, *The Role of Standards in the Current Patent Wars* (Dec. 5, 2012), *available at* https://www.justice.gov/atr/speech/role-standards-current-patent-wars ................................5

*Full Transcript of Qualcomm's 4Q05 Conference Call-Prepared Remarks* (Nov. 16, 2005), *available at* http://seekingalpha.com/article/4317-full-transcript-of-qualcomm-s-4q05-conference-call-prepared-remarks-qcom ................................10

Renata Hesse, U.S. Department of Justice, *Antitrust: Helping Drive the Innovation Economy* (Feb. 5, 2016), *available at* https://jtlp.law.ufl.edu/article/antitrust-helping-drive-the-innovation-economy ................................5

IEEE Standards Association, *Internet of Things*, *at* http://standards.ieee.org/innovate/iot/ ................................2

Kai-Uwe Kuhn et al., *Standard Setting Organizations Can Help Solve the Standard Essential Licensing Problem* .................................................................................5

Qualcomm, *New York Analyst Meeting* (Nov. 14, 2007), http://files.shareholder.com/downloads/qcom/42381305x4115120x144394/ad9640c4-171c-4192-bb41-78bbc6c64ecf/nyanalyst_11_14_07%20final%20steve.pdf .......................................................11

Swisslog, *Smartlift*, at http://www.swisslog.com/-/media/Swisslog/Documents/WDS/03_WDS_Solutions/SmartLIFT_Brohure.pdf .................................................................................................................................4

Phil Van Wormer, *How Bobcat Used SmartLIFT Technology to Boost Warehouse Performance*, TotalTrax Inc. (Sep. 23, 2014, 6:00:00 AM) *available at* http://info.totaltraxinc.com/blog/how-bobcat-used-smartlift-technology-to-boost-warehouse-performance ...................................................................................................4

# I STATEMENT OF INTEREST

*Amicus curiae* ACT | The App Association (ACT or the "Association") respectfully submits its broader industry perspective regarding the important issues presented in this action, and encourages a full and robust adjudication of the Federal Trade Commission's ("FTC") claims against Qualcomm Incorporated ("Qualcomm") on their facts and merits.

The Association is an industry organization comprising more than 5,000 application, or app, companies and information technology firms in the mobile economy. The Association advocates for an environment that inspires and rewards innovation while providing resources to help our members leverage their intellectual assets to raise capital, create jobs, and continue innovating. Further information about the Association and its activities is available at http://actonline.org.

Members of the Association rely on, utilize and innovate from standardized technologies, including wireless communication technologies. The Association is deeply interested in ensuring a fair, efficient ecosystem for technical standards. App developers benefit from a fair standards ecosystem, which, in turn, promotes the industries in which they innovate. As one aspect of ACT's interests in this area, the Association views it as imperative that patent owners who voluntarily contribute their patented technologies for standardization, and who voluntarily promise to license their patents on fair, reasonable and non-discriminatory (FRAND) terms, fully abide by their obligations. Because the FRAND promise is designed to address the competitive problems that can occur with industry collaboration during the standardization process, the violation of a FRAND promise presents not merely contractual issues, but also significant competition law concerns.

In line with our members' core interests in this area, the Association has established an initiative known as "All Things FRAND." As part of our initiative, the Association maintains a comprehensive website and blog, accessible at http://www.allthingsfrand.com. The All Things FRAND initiative serves as an international resource and repository for information and developments involving standard essential patents ("SEPs"), including competition law issues.

As an industry association with significant experience in FRAND, SEPs and related competition law matters, the Association respectfully offers its perspective to the Court in evaluating the important issues raised in this case. Specifically, ACT addresses how the Court's resolution of the issues raised may impact small business innovators during this critical time of development and deployment for new "Fifth Generation" (5G)[1] and "Internet of things" (IoT)[2] technologies.

## II    PRELIMINARY STATEMENT

The Association and its members rely on a fair standards ecosystem. Our members develop next-generation technologies utilizing standardized, upstream technologies. Because standardization has locked our members into those upstream technologies, their business and markets are injured by SEP abuses that limit their (or their customers') ability to obtain fully licensed standardized components, or that and usrup value or technology that our members' have themselves created.

There are three behaviors alleged in the FTC Complaint in this action that do not comport with FRAND, that can injure our members' small businesses, and which may properly give rise to competition law sanction:

- Refusing to license suppliers;

---

[1] While there is no universal definition for a "fifth generation" (5G) mobile network, the term encompasses the future wave of interoperable mobile networks being driven through various technical standards bodies today. 5G networks are expected to utilize a wide range of spectrum bands, both licensed and unlicensed, through new and innovative spectrum efficiencies and spectrum sharing arrangements. Standard bodies such as the 3GPP and the Institute of Electrical and Electronics Engineers (IEEE), among many others, continue to develop the requirements by early 2017. *See* 3GPP, The Mobile Broadband Standard, *Tentative 3GPP Timeline for 5G* (Mar. 17, 2015), *at* http://www.3gpp.org/news-events/3gpp-news/1674-timeline_5g; *see also* IEEE Standards Association, *Internet of Things*, *at* http://standards.ieee.org/innovate/iot/.

[2] Similar to 5G, IoT will involve everyday products that use the internet to communicate data collected through sensors. IoT is expected to enable improved efficiencies in processes, products, and services across every sector. In key segments of the U.S. economy, from agriculture to retail to healthcare and beyond, the rise of IoT is demonstrating efficiencies unheard of even a few years ago. *See*, *e.g.*, Department of Commerce Internet Policy Task Force and Digital Leadership Team, *Fostering the Advancement of the Internet of Things* (Jan. 2017), *available at* https://www.ntia.doc.gov/files/ntia/publications/iot_green_paper_01122017.pdf.

- Demanding free cross-licenses from licensees; and
- Demanding royalties that are not based on the value of the patented technology, but instead upon downstream value created by downstream innovators.

We first address the important link between standardization, competition law, and the FRAND promise, and how breach of the FRAND promise can directly implicate competitive abuses. We then discuss each of these alleged behaviors, and how they can harm our members.

**III  A FAIR STANDARDS ECOSYSTEM IS VITAL FOR SMALL BUSINESSES**

   A.  <u>FRAND Is A Critical Safeguard For Fair Competition</u>

Preliminarily, the Association notes its appreciation for the value of intellectual property, including patents, and its role in rewarding research and ingenuity. The Association also supports and values technical standardization, and respects the important innovations that help make standards work. Technical standards are an industry's agreed-upon protocols and common infrastructure technologies, available and promulgated on reasonable terms to all who wish to use them. For example, Wi-Fi, LTE, and Bluetooth are common technical standards used in the wireless communications industry. App developers use these technical standards, and specifically the interoperability they provide, to support a wide variety of innovation and—absent abuses—to create and promote competition.

Standardization is particularly critical in today's highly digitized markets. We stand today at a key inflection point: wireless communication technologies are proliferating throughout the U.S. and international economy. Developed industries, such as medical, automotive, health, manufacturing and finance, are each evolving to implement wireless technologies as the IoT takes shape. Simultaneously, new, highly connected industries and markets implementing wireless standards are just now being created. In each of these markets, "downstream" innovative technologies utilize these "upstream" standardized communication technologies to develop a panoply of unique and diverse products, and many of the Association's members are the engine for such downstream development.

There are many examples of how downstream developers draw upon the upstream standardized technologies to create new products and spur economic efficiency. Take for

3                                               *Amicus Curiae* ACT | The App Association
                                                                 5:17-cv-00220-LHK

instance Swisslog, an app developer that utilized standardized Wi-Fi to develop its unique "Smartlift" technology. Smartlift enables an indoor, localized GPS warehousing network to aggregate data from sensors on forklifts and directional barcodes placed around a building. Born from the technical standardization process, Smartlift allows warehouse managers to access real-time inventory reports on their phones or tablets, increasing productivity by as much as thirty percent.[3]

It is expected, and indeed essential, that technical standards will incorporate patented technologies contributed by standards participants. Companies that participate in standardization by voluntarily contributing their patented technologies see reward themselves. For instance, contributors may benefit from the increased product markets or increased licensing opportunities that can accompany the proliferation of a successful standard.

But these benefits only accrue when technical standards setting processes are operating as intended. When the system is gamed, standardization processes carry significant competitive risks. *See*, *e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1030-31 (9th Cir. 2015) (standardization "creates an opportunity for companies to engage in anti-competitive behavior"). Standard setting can involve close technical collaboration between horizontal and vertical market participants.[4] From a competition law standpoint, technologies selected for inclusion in a standard might be viewed as "winners" that are collaboratively "whitelisted" by industry

---

[3] *See* Swisslog, *Smartlift*, at http://www.swisslog.com/-/media/Swisslog/Documents/WDS/03_WDS_Solutions/SmartLIFT_Brohure.pdf; Phil Van Wormer, *How Bobcat Used SmartLIFT Technology to Boost Warehouse Performance*, TotalTrax Inc. (Sep. 23, 2014, 6:00:00 AM) *available at* http://info.totaltraxinc.com/blog/how-bobcat-used-smartlift-technology-to-boost-warehouse-performance. Swisslog's customer, Bobcat, is an equipment company based in North Dakota that has deployed Swisslog's technology in its warehouse and experienced a thirty percent increase in pallets per hour "with no inventory errors." *Id.*

[4] *See*, *e.g.*, ETSI, *ETSI Guidelines for Antitrust Compliance*, §§ A-B (ETSI is "a forum in which competitors interact with each other. Therefore, the market-related rules apply to the decisions which are adopted by the Institute as a standardization body as well as with regard to the activities of Members within ETSI"; accordingly, "[t]he imposition of discriminatory and unfair conditions by the dominant company, to any categories of users, or any other company having contractual relationships with the dominant company, is abusive"), *available at* http://www.etsi.org/images/files/IPR/etsi%20guidelines%20for%20antitrust%20compliance.pdf.

participants. Conversely, technologies that are not selected might be viewed as "losers" that are collaboratively "blacklisted." *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) ("standard[ization], by definition, eliminates alternative technologies").

Accordingly, thorny competition law issues may be presented where the patented technologies of certain companies are utilized rather than those of other companies. The companies whose technologies are utilized may have unchecked and significant market power to demand excessive royalties, exclude competitors, or otherwise take advantage of an industry's collaborative *agreement* to make products in a certain way (*i.e.*, in accordance with the standard) rather than another. *See*, *e.g.*, *Microsoft*, 795 F.3d at 1030-31 (addressing "hold up" power of patents incorporated into standards); FTC, Brief of Amicus Curie in Support of Neither Party 3-4, *Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548 et al. (Fed. Cir. Dec. 14, 2012) ("[t]he problem of patent hold-up can be particularly acute in the standard-setting context, where an entire industry may be locked into a standard that cannot be avoided without infringing or obtaining a license for numerous (sometimes thousands) of standard-essential patents.").[5]

To address these competition law issues, many standard-setting organizations (SSOs) have

---

[5] *See generally*, *e.g.*, Kai-Uwe Kuhn et al., *Standard Setting Organizations Can Help Solve the Standard Essential Licensing Problem*, CPI Antitrust Chronicle (Mar. 2013) ("SSOs constrain the license terms for SEPs because of the substantial market power necessarily enjoyed by the owner of an SEP in a successful standard. Moreover, this market power is achieved through the joint action of entities—the SSO members—that might be in competition with each other outside the SSO."); Fiona M. Scott-Morton, U.S. Department of Justice, *The Role of Standards in the Current Patent Wars* (Dec. 5, 2012), *available at* https://www.justice.gov/atr/speech/role-standards-current-patent-wars ("Standard essential patents achieve their status through the collective action at the SSOs. Harm can occur when companies come together and bestow market power on each other by agreeing on a common technology. FRAND commitments are designed to reduce occurrences of opportunistic or exploitative conduct in the implementation of standards. It is these commitments, along with other things, that make competition authorities more comfortable with these collective decisions."); Renata Hesse, U.S. Department of Justice, *Antitrust: Helping Drive the Innovation Economy* (Feb. 5, 2016), *available at* https://jtlp.law.ufl.edu/article/antitrust-helping-drive-the-innovation-economy ("Standard setting involves a group of competitors getting together and deciding upon a common technical standard incorporating a patented technology, ending competition between alternative technologies. Such patents become that much more valuable after adopters are locked into the standard and cannot easily revise the standard, or use an alternative standard. Naturally, this raises antitrust concerns.").

adopted patent policies that require members to license the patents necessary for the implementation of the standard on FRAND terms. The FRAND promise—when kept—serves to minimize the competition law issues associated with standardization by providing that patent licenses will remain available to all market participants on terms that are reasonable and that promote a "level playing field" for competition.[6] In other words, while no company has an *obligation* to commit its patents to a standard, where a company chooses to do so the FRAND promise acts as a crucial constraint on the abuse of market power associated with SEPs. As the Ninth Circuit has explained, the voluntary FRAND commitment "must be construed in the public interest because it is crafted for the public interest." *Microsoft*, 795 F. 3d at 1052. After all, the FRAND commitment is designed to protect against the competitive abuses and consumer harm that standardization can otherwise enable.

The public interest function of FRAND breaks down where a company violates its obligation to license on FRAND terms. While breach of FRAND may surely give rise to contractual or similar claims by particular parties, it may also involve significant competition law problems and violations. As the FTC has noted in addressing a prior matter to enforce competition law interests in connection with SEPs:

> While not every breach of a FRAND licensing obligation will give rise to [competition law] concerns, when such a breach tends to undermine the standard-setting process and risks harming American consumers, the public interest demands action rather than inaction from the Commission.

*In the Matter of Robert Bosch GmbH*, 155 F.T.C. 713, 2013 WL 8364914, at *54 (F.T.C. Apr. 23, 2013). In other words, the practice of SEP "hold up" is also a competition law problem. *See, e.g.*, *Broadcom*, 501 F.3d at 314 (FRAND commitments serve as "important safeguards against

---

[6] ETSI, *Intellectual Property Rights Policy*, ¶ 3.1 ("[T]he ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and "others applying ETSI STANDARDS . . . , that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD . . . being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs."), *available at* http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf; ETSI, *Guidelines for Antitrust Compliance*, § B (noting that the competition interests addressed by the ETSI Policies are "aimed at allowing firms to compete on a level playing field.").

monopoly power"; "the patent holder's subsequent breach of that [FRAND] promise, is actionable anticompetitive conduct."); *Lotes Co. LTD. v. Hon Hai Precision Indus. Co. LTD.*, No. 12-cv-7465, 2013 WL 2099227, at *5 (S.D.N.Y. May 14, 2013) ("conduct that undermines the procompetitive benefits of private standard setting may … be deemed anticompetitive under antitrust law."), *aff'd on other grounds*, 753 F.3d 395 (2d Cir. 2014).[7] These anti-competition concerns have serious implications for developing industry.

B. FRAND Abuses Are Particularly Injurious To Small Businesses

The Association is committed to the protection of small businesses that innovate in technical standards (*i.e.*, our members and potential members). The app ecosystem alone contributes $143 billion to the U.S. economy, and these small business innovators created 110,000 new American jobs from May 2014 to May 2016.[8] Technical standards are central to what these small businesses do; app innovators use them as a foundation for their own innovation and for further competition.

The convergence of computing and communication technologies, driven by the app economy, is at an important moment as a diverse array of industries come together to build the IoT. As alluded above, the IoT is an encompassing technological approach where everyday products use the internet to collect, utilize and communicate data collected through standardized sensors. If its potential is fully realized, the IoT will enable improved efficiencies in processes, products, and services across every sector. The IoT's seamless interconnectivity will utilize known and yet-to-be-developed industry standards, such as 5G, Wi-Fi, LTE, Bluetooth, and countless others. As such, reasonable licensing for SEPs is a "must have" for many small companies, such as our members, their customers and suppliers, who want to have a legitimate

---

[7] *See also, e.g.,* William J. Baer, Assistant Attorney General for Antitrust, Remarks, 19th Annual International Bar Association Competition Conference, Florence, September 11, 2015, *available at* http://www.justice.gov/opa/speech/assistant-attorney-general-bill-baer-delivers-remarks-19th-annual-international-ba ("A holder of patented technologies essential to implementing a standard ('standard-essential patents' or 'SEPs') may be able to take advantage of this lock-in by demanding extra rents … [T]he bargaining power of implementers is far weaker after the standard is adopted and the patent holder's market power, if any, is increased.").

[8] ACT | The App Association, *State of the App Economy* (Apr. 20, 2017), *available at* http://actonline.org/2017/04/20/state-of-the-app-economy-report-outlines-growth-dynamism-of-the-app-ecosystem/.

7                                                                Amicus Curiae ACT | The App Association
                                                                                        5:17-cv-00220-LHK

chance to compete in the IoT's tech-driven areas.  Honoring and upholding the FRAND promise is a foundation to allow technological standards to deliver on their potential to provide immense value to consumers by promoting interoperability while advancing healthy competition between innovators at all levels of the supply chain.

Although some large corporations may be able to absorb the cost of FRAND abuses or to seek redress through litigation to prevent them, small business innovators who need reasonable access to SEPs in order to protect and defend their interests easily may find themselves financially barred from similar protections.  Indeed, the FRAND abuser almost surely will have more resources than the majority of downstream entities who rely on the standardized technology.  As a result, small business innovators faced with FRAND abuse may be forced to:

- abandon their business plans involving standards altogether;
- accept excessive royalty demands made by the SEP holders, and thus transfer the value of their own innovations to entrenched, upstream SEP holders; or
- change their product's design to avoid the standard (an impossible task for markets requiring interoperability).

The net effect of SEP unchecked abuses would be the exclusion of the tens of thousands of American small businesses, not only from established markets, but also within the emerging vertical markets for IoT and 5G technologies.  Therefore, the Association urges the court to consider the serious implications of this case for the future of industry, especially small businesses innovating in the 5G and IoT spaces.  Thorough fact-finding on the FTC's allegations provide just the opportunity for such consideration.

IV     **THE FTC'S ALLEGATIONS SHOULD BE HEARD AND DECIDED ON THEIR MERITS AND BASED ON A ROBUST FACTUAL RECORD**

The FTC's complaint alleges behaviors that the Association views as contrary to FRAND and detrimental to businesses and innovators throughout the supply chain. The Association believes that the detrimental effects will be particularly pronounced as to small and medium sized businesses.

The FTC alleges the following behaviors as part of its competition law claims:

- Refusing to license suppliers (*e.g.*, semiconductor or other component makers), *see* Compl. ¶ 147;
- Demanding free cross-licenses, including to non-SEPs (or "distinguishing technologies"), *id.* ¶ 77 (d) (alleging that cross-licensing rates "failed to adjust [the] royalty rate to account for the value of [the licensee's] cross-licensed patents"); and
- Demanding royalties that are not based on the value of the patented technology, but instead upon downstream value created by downstream innovators, *id.* ¶ 77(b).

These alleged behaviors implicate important industry and public interests that will ultimately affect the Association's members and their customers. In particular, if the behaviors described in the FTC's complaint were to be permitted, it would grievously harm industry and consumer interests in adapting current industries—and building new industries—that utilize technologies associated with 5G and IoT. Such behaviors stunt businesses that rely on—or will soon rely on—an efficient, fair and balanced approach to licensing of wireless communication standards.

*First*, the obligation to license all implementers is simply a consequence of a voluntary FRAND promise. SEP owners have long had notice—from intellectual property rights (IPR) policies, from Courts and from competition authorities—that the FRAND licensing promise entails exactly that obligation. As the Ninth Circuit has summarized: "Under these [FRAND] agreements, an SEP holder cannot refuse a license to a manufacturer who commits to paying the RAND rate"; rather, a FRAND obligation includes "requirement to negotiate licenses with all seekers." *Microsoft*, 795 F.3d at 1031; *accord Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 1230 (Fed. Cir. 2014) ("[T]he licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention [is not relevant for SEPs]. ... Because of [the SEP holders] RAND commitment ... it cannot have that kind of policy for maintaining a patent monopoly.").[9] This obligation is squarely implicated by the FTC's

---

[9] *See also*, *e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012) (FRAND commitment "admits of no limitation as to who or how many applicants could receive a license"); ETSI Directives, *Guide on Intellectual Property Rights*, § 1.4 (all ETSI members and all third

9                                    Amicus Curiae ACT | The App Association
                                                                 5:17-cv-00220-LHK

allegations that exhaustive cross-licenses were required by the defendant for its own business as a condition of accessing licenses to its FRAND-encumbered SEPs. *See* Compl. ¶ 113. Our members and their customers—many of whom have no expertise with the details of upstream wireless technologies—should have the right to obtain fully licensed components from the companies that make those components and who are thus best positioned to assess and negotiate regarding the relevant patents.

Qualcomm's assertions that SEP owners having made a FRAND commitment nonetheless have "no duty under the antitrust laws to assist [their] competitors" mistake the issue. Mot. Dismiss 3 (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)). The case cited for that premise does not address voluntary promises to license on FRAND terms, or the fundamental competition law issues that, in the first place, created the need for such a promise. Moreover, Qualcomm has repeatedly acknowledged its obligation to grant licenses to competing chipset manufacturers,[10] and its interest in acquiring exhaustive "pass

---

parties have right "to be granted licenses on fair, reasonable and non-discriminatory terms and conditions in respect of a standard"), *available at* http://www.etsi.org/images/files/IPR/etsi-guide-on-ipr.pdf; *In the Matter of Motorola Mobility LLC and Google Inc.*, File No. 121 0120, Docket No. C-4410, 2013 WL 3944149, at *30 (F.T.C. July 23, 2013) ("By making a FRAND commitment, a SEP holder voluntarily chooses to license its SEPs to *all implementers* of the standard on fair and reasonable terms.") (emphasis added); European Commission, *Horizontal Guidelines*, ¶¶ 285-287 (Nov. 1, 2011) ("In order to ensure effective access to the standard, the IPR policy would need to require participants wishing to have their IPR included in the standard to provide an irrevocable commitment in writing to offer to license their essential IPR *to all third parties* on fair, reasonable and non-discriminatory terms.") (emphasis added), *available at* http://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX:52011XC0114%2804%29. These FRAND-specific principles are consistent with the longstanding rule that a non-discriminatory licensing requirement entails that "similar licenses at uniform reasonable royalties must be available *to all who desire them*." *Hartford-Empire Co. v. United States*, 324 U.S. 570, 574 (1945) (emphasis added).

[10] *See, e.g., Full Transcript of Qualcomm's 4Q05 Conference Call-Prepared Remarks* (Nov. 16, 2005 ("We have never refused to license our essential patent to any company to supply chips, handsets, infrastructure or test equipment. The number of companies licensed by Qualcomm that are actively marketing WCDMA chips demonstrates that Qualcomm has not attempted to exclude any chip set manufacturer.") *available at* http://seekingalpha.com/article/4317-full-transcript-of-qualcomm-s-4q05-conference-call-prepared-remarks-qcom.

through" licenses for its own products.[11]

*Second*, to require—as a condition to accessing SEP licenses—cross-licenses to third party intellectual property without compensation would unfairly allow an SEP owner to access and exploit downstream and differentiating innovation. The Association's members are largely downstream innovators that develop next-generation technologies beyond the scope of patents covering the upstream, standardized level of the supply chain. It is abusive to use the market power associated with patents that were *voluntarily* committed to FRAND licensing (expressly to avoid the competition law problems otherwise applicable to standard setting) to thereafter mandate cross-licensing of valuable downstream technologies that were *never* standardized or committed to FRAND. Without a doubt, companies that utilize others' patented, standardized technologies should be obligated to pay fair and reasonable compensation to SEP holders. But the Association's members should *never* be required, as a condition to accessing industry standards, to transfer their proprietary, non-standardized and innovative advancements for free.

*Third*, the obligation to base royalties solely upon the value of the patented invention has been a fundamental precept of US law for more than a century. In *Garretson v. Clark*, for example, the Supreme Court found that only consideration of the value of "the patented feature" is appropriate in assessing patent royalties. 111 U.S. 120, 121 (1884). The Court emphasized: "The patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative …" *Id.* In other words, the value to be measured in assessing royalties "is *only* the value of the

---

[11] *See, e.g.,* Qualcomm, *New York Analyst Meeting* 14 (Nov. 14, 2007) ("Qualcomm Lowers Overall IP Cost: Reduces royalty stacking – Qualcomm has proactively acquired exhaustive licenses from its licensees and others that allow Qualcomm to pass through a significant number of 3rd party intellectual property rights to Qualcomm's chipset/software customers; This reduces potential royalty stacking for Qualcomm customers because they do not need to pay additional royalties to the 3rd parties for us of the licensed patents in devices that include Qualcomm chips/software." *available at* http://files.shareholder.com/downloads/qcom/42381305x4115120x144394/ad9640c4-171c-4192-bb41-78bbc6c64ecf/nyanalyst_11_14_07%20final%20steve.pdf.

infringing features of an accused product," *Ericsson*, 773 F.3d at 1226, because "[a]s with all patents, the royalty rate for SEPs must be apportioned to the value of the patented invention," *id.* at 1232.[12] The Federal Circuit has explained

> When dealing with SEPs, there are two special apportionment issues that arise. First, the patented feature must be apportioned from all of the unpatented features reflected in the standard. Second, the patentee's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology. These steps are necessary to ensure that the royalty award is based on the incremental value that the patented invention adds to the product, not any value added by the standardization of that technology. … Just as we apportion damages for a patent that covers a small part of a device, we must also apportion damages for SEPs that cover only a small part of a standard.

*Id.* at 1232-33. These requirements are common sense, and have been repeatedly reaffirmed. *See*, *e.g.*, *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed Cir. 2015) (reaffirming *Garretson* requirement of valuation based solely on patented invention while recognizing that various expert methodologies may be used to attain such result).

For SEPs, utilizing royalty methodologies that overstate the value of the patented invention is not simply a FRAND violation. It is an exploitation of the industry collaborations inherent in standard setting. The Association's members and their industries cannot fairly develop under those circumstances. Violating a FRAND promise in order to undermine downstream innovation and control downstream competition entails a clear and present danger to

---

[12] The Association recognizes the narrow "entire market value" exception to royalty analysis, but believes that exception to be inapplicable to the issues raised here. For the exception to apply, the patent holder must establish that an infringing component provides the basis for consumer demand for the entire apparatus. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-72 (Fed. Cir. 2012). "It is not enough to merely show that the [patented technology] is viewed as valuable, important, or even essential to the use of the [product]. Nor is it enough to show that a [product] without [the patented technology] would be commercially unviable." *Id.* Rather, the entire market value rule must not be applied absent evidence that the infringing feature "alone motivates consumers to purchase" the downstream product. *Id.* Applying the entire market value rule to collaborative industry standards violates both law and common sense; it is difficult if not impossible to imagine an applicable scenario where one single patented technology alone might be responsible for the "entire market value" of a device implementing a complex, industry-developed standard. Rather, here the implicated communications standards involve *more than one hundred thousand* patents declared to be applicable as per the ETSI database. The notion that any single patent might "alone motivate consumers to purchase" a laptop, smartphone or tablet is fanciful.

both businesses and consumers.

In short, with its action against Qualcomm, the FTC has moved to ensure that FRAND promises have meaning and protect the competitive, public interests that FRAND was designed to serve. Regardless of the action's ultimate outcome, the FTC's allegations deserve a full and fair adjudication on their merits. Resolution of this action will provide important clarity to businesses and consumers regarding the effect of a FRAND commitment and conduct that is, or is not, acceptable under the competition laws. All stakeholders impacted by SEPs—particularly the small business innovators that ACT represents—will benefit as a result.

## V     CONCLUSION

Because SEP abuse is both a contractual and competition law problem impacting companies throughout the supply chain, and which has particularly problematic effects for the small technology businesses the Association represents, ACT supports the denial of Qualcomm's motion to dismiss.

                                                                          Respectfully submitted

Dated: May 12, 2017                            SIDLEY AUSTIN LLP
                                                        Eamon P. Joyce (*pro hac vice* application pending)
                                                        Rahul R. Hari

                                                        By:    */s/ Rahul R. Hari*
                                                        Rahul R. Hari
                                                        Attorneys for *Amicus Curiae*
                                                        ACT | The App Association