1  IAN SIMMONS (*pro hac vice*)
   isimmons@omm.com
2  BENJAMIN J. HENDRICKS (Bar #288680)
   bhendricks@omm.com
3  JAMES W. CROOKS (Bar #310447)
   jcrooks@omm.com
4  O'MELVENY & MYERS LLP
   1625 Eye Street, NW
5  Washington, DC  20006-4061
   Telephone:     +1 202 383 5300
6  Facsimile:     +1 202 383 5414

7
   MICHAEL TUBACH (Bar #145955)
8  mtubach@omm.com
   O'MELVENY & MYERS LLP
9  Two Embarcadero Center, 28th Fl.
   San Francisco, CA 94111-2823
10 Telephone:     +1 415 984 8700
   Facsimile:     +1 415 984 8701
11

12 *Attorneys for* Amici Curiae
   *Samsung Electronics Co. Ltd.*
13 *Samsung Semiconductor, Inc.*

14            **UNITED STATES DISTRICT COURT**
          **NORTHERN DISTRICT OF CALIFORNIA,**
15                 **SAN JOSE DIVISION**

16 FEDERAL TRADE COMMISSION,              Case No. 5:17-cv-00220-LHK

17                 Plaintiff,             **BRIEF OF *AMICI CURIAE* SAMSUNG
                                          ELECTRONICS CO. LTD. AND
18         v.                             SAMSUNG SEMICONDUCTOR, INC.
                                          IN OPPOSITION TO QUALCOMM
19 QUALCOMM INCORPORATED, a Delaware      INCORPORATED'S MOTION TO
   corporation,                           DISMISS**
20
                 Defendant.               Date:  June 15, 2018
21                                        Time:  1:30 PM
                                          Place:  San Jose Courthouse, Courtroom 8
22                                        Judge:  Hon. Lucy Koh

23                                        **LEAVE TO FILE GRANTED MAY 15,
                                          2017 (ECF No. 96)**
24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  STATEMENT OF INTEREST ........................................................................... 1

II.  INTRODUCTION ............................................................................................. 1

III.  FRAND COMMITMENTS VINDICATE KEY ANTITRUST PRINCIPLES ................. 2

    A.  Standardization can create monopoly power ....................................... 2

    B.  FRAND commitments provide a necessary check on SEP market power ............. 3

        1.  To prevent exclusion, FRAND creates a duty to license all comers .......... 4

        2.  FRAND prohibits SEP holders from charging supracompetitive royalties ........ 6

IV.  QUALCOMM'S FRAND VIOLATIONS CONSTITUTE UNLAWFUL EXCLUSIONARY CONDUCT ........ 7

    A.  Qualcomm excludes competitors by refusing to license SEPs to make and sell licensed CDMA and premium chipsets in competition with its own chipsets ....... 7

    B.  Qualcomm violates FRAND—and excludes competitors—by imposing onerous terms on handset manufacturers, including an unreasonable per handset tax ........ 10

    C.  The Complaint does not rely on a "price squeeze" theory .................. 12

V.  CONCLUSION .................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

CASES

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) ............................................................................. 3, 5

*Apple Inc. v. Motorola, Inc.*,
    869 F. Supp. 2d 901 (N.D. Ill. 2012) *aff'd in part and rev'd in part on other*
    *grounds*, 757 F.3d 1286 (Fed. Cir. 2014) .......................................... 4

*Apple Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846, 2012 WL 1672493 (N.D. Cal. May 14, 2012) ............................. 3

*Apple Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846-LHK, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ...................... 7

*ASARCO, LLC v. Union Pac. R.R. Co.*,
    765 F.3d 999 (9th Cir. 2014) .................................................................. 8

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ............................................................................. 5

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) ............................................................ passim

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) .............................................................. 13

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ............................................................................. 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................................. 5

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ....................................................... 3, 6, 10

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948) ............................................................................. 2

*Funai Elec. Co. v. LSI Corporation*,
    No. 16-cv-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) .................... 6

*Laser Dynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) .............................................................. 10

1

## TABLE OF AUTHORITIES
### (continued)

2

Page(s)

3

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
   No. 12 Civ. 7465, 2013 WL 2099227 (S.D.N.Y. May 14, 2013) ............................................. 7

4

5

*Microsoft Corp. v. Motorola, Inc.*,
   696 F.3d 872 (9th Cir. 2012) .................................................................................................... 4

6

7

*Microsoft Corp. v. Motorola, Inc.*,
   795 F.3d 1024 (9th Cir. 2015) ........................................................................................... 3, 4, 6

8

*Microsoft Corp. v. Motorola, Inc.*,
   864 F. Supp. 2d 1023 (W.D. Wash. 2012) ............................................................................... 3

9

10

*Microsoft Corp. v. Motorola, Inc.*,
   No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ...................................... 6

11

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
   555 U.S. 438 (2009) ........................................................................................................... 12, 13

12

13

*Rambus Inc. v. FTC*,
   522 F.3d 456 (D.C. Cir. 2008) .............................................................................................. 3, 6

14

15

*Research in Motion Ltd. v. Motorola, Inc.*,
   644 F. Supp. 2d 788 (N.D. Tex. 2008) ................................................................................ 3, 4, 6

16

17

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .................................................................................................. 11

18

*Verizon Communications v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ......................................................................................................... 5, 8, 13

19

### OTHER AUTHORITIES

20

Carl Shapiro & Hal R. Varian, *Information Rules: A Strategic Guide to the
   Network Economy* (1999) .......................................................................................................... 3

21

22

Competitive Impact Statement, *United States v. Microsoft, Corp.*, No. 94-cv-1564
   (SS) (July 27, 1994), *available at* http://bit.ly/2qF6HKv ....................................................... 11

23

24

*FTC/DOJ Antitrust Guidelines For The Licensing Of Intellectual Property* ........................... 5, 12

25

Press Release, *Qualcomm and Broadcom Reach Settlement and Patent Agreement*
   (Apr. 26, 2009), *available at* http://bit.ly/2pKViIV .................................................................. 8

26

Qualcomm, Form 10K (2016), *available at* http://bit.ly/2q46u6o ............................................... 11

27

28

1

## TABLE OF AUTHORITIES
**(continued)**

2

**Page(s)**

3

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and*
    *Intellectual Property Rights: Promoting Innovation and Competition* (2007),

4

    *available at* http://bit.ly/2aBxyjR ........................................................................ 3, 4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   I.       **STATEMENT OF INTEREST**

2           *Amici curiae* Samsung Electronics Co. Ltd. ("SEC") and its subsidiary Samsung

3   Semiconductor, Inc. ("SSI") (collectively "Samsung") respectfully submit this brief in support of

4   the Federal Trade Commission's ("FTC") opposition to Qualcomm Incorporated's ("Qualcomm")

5   motion to dismiss.  SEC is one of the world's leading manufacturers of consumer electronic

6   products, including mobile handsets, such as its flagship Galaxy S-series phones.  SEC licenses

7   Qualcomm's patent portfolio at the handset level, including standard-essential patents ("SEPs")

8   that are necessary to communicate on most cellular networks.  Through SEC's subsidiaries, SSI

9   and Samsung Austin Semiconductor, LLC ("SAS"), Samsung also designs and builds

10   components for use in mobile communications devices, including baseband chipsets ("chipsets")

11   for use in Samsung handsets.[1]

12          Samsung, which employs approximately 17,000 people in the United States, is both

13   Qualcomm's customer (as a handset supplier) and Qualcomm's potential competitor (as a

14   manufacturer and potential seller of chipsets).  In both capacities, Samsung has directly

15   experienced, and been directly harmed by, the exclusionary conduct alleged in the FTC's

16   Complaint (the "Complaint"):  Qualcomm refuses to license its SEPs on fair, reasonable, and

17   non-discriminatory ("FRAND") terms so that Samsung can make and can sell licensed chipsets.

18   Given its position, Samsung is uniquely situated to assist the Court in understanding the

19   important antitrust principles at stake in this case.

20   II.      **INTRODUCTION**

21          To have its patents included in industry standards for mobile communication, Qualcomm

22   made a deal:  It promised standards-setting organizations ("SSOs") that if they adopted a standard

23   that required the use of Qualcomm patents, Qualcomm would license those patents to any willing

24   licensee for a reasonable royalty (the "FRAND" commitment).  SSOs have long required SEP

25   owners to make FRAND promises because without them the SEP holder would have enormous

26   market power from patents required to operate in the industry.  In other words, absent FRAND

27   _____

28   [1] SAS manufactures chipsets, which SSI would sell to third-parties if licensed to do so.

1  commitments, SEPs pose a serious threat to competition.

2       Because of Qualcomm's FRAND promises, SSOs adopted mobile standards that rely on

3  Qualcomm's SEPs, foregoing competing standards.  But Qualcomm has not upheld its end of the

4  bargain:  Despite declaring thousands of SEPs, Qualcomm altogether refuses to license SEPs to

5  rival chipset manufacturers, instead licensing only handset manufacturers.[2]  Qualcomm then

6  leverages and solidifies this market power by charging a "tax" to handset manufacturers that

7  further cements its monopoly power by imposing terms that significantly diminish demand for

8  competing chipsets.  And because Qualcomm does not license competitors, handset

9  manufacturers have no choice but to accept Qualcomm's onerous terms.  In short, Qualcomm

10  directly excludes competitors and harms competition.

11       This case presents a simple question:  By excluding would-be competitors from making

12  and selling licensed chipsets and cementing its market power by forcing downstream customers to

13  accept onerous licensing terms, has Qualcomm harmed competition?  As the Complaint makes

14  clear, the answer is yes—not only does this conduct violate Qualcomm's FRAND commitments,

15  but it also contravenes the Sherman Act by eliminating competition.[3]  FRAND obligations are

16  designed to limit the market power that SEP holders obtain when SSOs incorporate those holders'

17  patents into a standard.  For this reason, several courts, including the Ninth Circuit, have held that

18  when an SEP holder violates its FRAND commitments to the detriment of competition, it also

19  violates the Sherman Act.  The Complaint amply supports the FTC's contentions that Qualcomm

20  has violated the antitrust laws in this manner.  Thus, this Court should deny Qualcomm's motion

21  to dismiss.

22  **III.**   **FRAND COMMITMENTS VINDICATE KEY ANTITRUST PRINCIPLES**

23       *A.*   ***Standardization can create monopoly power***

24       Though technological standards and the SSOs that promulgate them can generate

25  enormous economic benefits, "product standards set by such associations have a serious potential

26  _____

27  [2] Qualcomm acknowledges this policy of refusing to license potential competitors.
[3] Conduct that violates the Sherman Act also violates § 5 of the Federal Trade Commission Act.
*See, e.g., FTC v. Cement Inst.*, 333 U.S. 683, 689 (1948).

28

BRIEF OF AMICI CURIAE
5:17-CV-00220-LHK

for anticompetitive harm." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988); *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1030-31 (9th Cir. 2015) ("*Microsoft II*") ("The development of standards . . . creates an opportunity for companies to engage in anti-competitive behavior.").  SEP owners act as "gatekeepers" to a standard since an implementer must practice the SEP to use the standard, *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 794 (N.D. Tex. 2008) ("*RIM*"), exposing implementers to hold-up by those refusing to license "blocking" patents.  *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014); *see also* Carl Shapiro & Hal R. Varian, *Information Rules: A Strategic Guide to the Network Economy* 241-42 (1999).  Thus, "SEP holders are in a position to demand more for a license than the patented technology, had it not been adopted by the SSO, would be worth," *Microsoft II*, 795 F.3d at 1031, because "[a] standard, by definition, eliminates alternative technologies," *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007).

For this reason, "a number of courts have recognized a legal distinction between a normal patent—to which antitrust market power is generally not conferred on the patent owner, and a patent incorporated into a standard—to which antitrust market power may be conferred on the patent owner." *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 WL 1672493, at \*6 (N.D. Cal. May 14, 2012) (Koh, J.) (citing *Broadcom*, 501 F.3d at 314); *see also Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) (finding patent holder's SEPs for computer memory technologies "g[a]ve it monopoly power in each of those markets"); U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* 34 (2007) ("DOJ/FTC IP Report"), *available at* http://bit.ly/2aBxyjR ("[C]ourts have been sensitive to antitrust issues that may arise in the context of collaboratively set standards.").

## B.   *FRAND commitments provide a necessary check on SEP market power*

SSOs mitigate these anticompetitive risks by requiring SEP holders "to license any patents essential to implementing the standard on [FRAND] terms" as a "quid pro quo for having one's technology adopted in a formal standard."  Shapiro & Varian, *supra*, at 228; *see also Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1032 (W.D. Wash. 2012) ("*Microsoft I*") (noting

1    various SSOs "will not incorporate patented technology into a standard unless [they] can obtain a

2    declaration from the patent holder agreeing to either license free of charge or on [F]RAND

3    terms"). Far from a mere contract, "FRAND commitments [are] important safeguards against

4    monopoly power." *Broadcom*, 501 F.3d at 314 (reversing dismissal of monopolization claims);

5    *see also RIM*, 644 F. Supp. 2d at 791 ("'FRAND commitments' are intended to prevent owners of

6    essential patents from acquiring too much of the market power that would otherwise be inherent

7    in owning an essential patent."). Two aspects of the FRAND commitment are vital to ensure that

8    SEP owners do not abuse the market power that flows from SEPs.

9          *1.*     *To prevent exclusion, FRAND creates a duty to license all comers*

10       The owner of a FRAND-encumbered SEP *must* license that patent to *any* prospective

11    licensee, including potential rivals. This duty to deal on fair terms to all willing licensees is the

12    hallmark of FRAND, as federal courts—including the Ninth Circuit—and the FTC have long

13    recognized. *See, e.g.*, *Microsoft II*, 795 F.3d at 1031 (FRAND prohibits SEP holders from

14    "refus[ing to] license to a manufacturer who commits to paying the [F]RAND rate" in order to

15    "mitigate the risk that a SEP holder will extract more than the fair value of its patented

16    technology"); *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012) ("[The

17    FRAND commitment] admits of no limitations as to who or how many applicants could receive a

18    license. . . ."); *Apple Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 913-14 (N.D. Ill. 2012) (Posner,

19    J., sitting by designation) ("By committing to license its patents on FRAND terms, Motorola

20    committed to license . . . to *anyone* willing to pay a FRAND royalty.") (emphasis added), *aff'd in*

21    *part and rev'd in part on other grounds*, 757 F.3d 1286, 1331-32 (Fed. Cir. 2014); *cf.* DOJ/FTC

22    IP Report, *supra*, at 36 (to mitigate hold-up, SSOs often "require SSO members to commit to

23    license any of their IP that is essential to an SSO standard on 'reasonable and nondiscriminatory'

24    ('RAND') terms"). This duty applies to competitors because otherwise "[a]ny company wishing

25    to compete with [the SEP owner] has to have its permission, giving it the power to eliminate all

26    competition." *RIM*, 644 F. Supp. 2d at 794. Thus, when an SEP owner makes FRAND promises,

27    it has "promise[d] it would allow competitors to 'pass through the gates' on FRAND terms." *Id.*

28       Because FRAND imposes a duty to deal that is "intended as a bulwark against unlawful

1    monopoly," *Broadcom*, 501 F.3d at 305, a refusal to license SEP technology to competitors is not

2    merely a contractual violation, but a "decision by a monopolist to make an important change in

3    the character of the market," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585,

4    604 (1985).  After all, in the context of an SEP, the "market" can be the patented technology

5    itself, because "[a] standard, by definition, eliminates alternative technologies." *Broadcom*, 501

6    F.3d at 314.[4]  By flouting FRAND's duty to deal, an SEP holder gains near-total power in the

7    market for standard-essential technologies and any dependent downstream market.

8        Qualcomm resists this conclusion, claiming that *Verizon Communications v. Law Offices*

9    *of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) found that it "has no duty under the antitrust laws

10   to assist its competitors."  Mot. at 3.  Yet Qualcomm overlooks *Trinko*'s observation that "[u]nder

11   certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct

12   and violate § 2." *Trinko*, 540 U.S. at 408-09 (discussing *Aspen Skiing*, 472 U.S. at 601); *see also*

13   *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting)

14   ("[A monopolist's] activities are examined through a special lens.").  Far from adopting the *per se*

15   rule that Qualcomm would prefer, the *Trinko* Court emphasized that each market must be

16   analyzed on its own terms:  "Antitrust analysis must always be attuned to the particular structure

17   and circumstances of the industry at issue." *Trinko*, 540 U.S. at 411.  Examining the specific

18   contours of the market at issue (access to local exchange carrier networks), the *Trinko* Court

19   found that the Telecommunications Act did not create an antitrust duty to deal with competitors.

20   *Id.* at 407-10.  By contrast, courts *have* recognized that FRAND obligations—including the duty

21   to license all comers—exist to prevent the unlawful exercise of monopoly power.  *See supra* pp.

22   4-6.[5]  That is, the "particular structure and circumstances of the industry" for Qualcomm's SEPs,

23

24   [4] *See also FTC/DOJ Antitrust Guidelines For The Licensing Of Intellectual Property* § 3.2.2 (the "FTC/DOJ Guidelines).

25   [5] The Court's conclusion that no duty existed in *Trinko* was the existence of a regulatory structure
26   that minimized "the additional benefit to competition provided by antitrust." *Trinko*, 540 U.S. at
412.  By contrast, no reticulated regulatory structure exists here:  SSOs are private organizations
27   and thus antitrust scrutiny plays an important role. *See Broadcom*, 501 F.3d 297, at 309; *cf.*
*Allied Tube*, 486 U.S. at 501 (finding *Noerr-Pennington* immunity does not to apply to SSOs
28   because "no official authority has been conferred on [SSOs] by any government").

1  *see Trinko*, 540 U.S. at 411, make clear that FRAND creates an antitrust duty to deal enforceable

2  under the Sherman Act.

3  　　　　　　2.　　　*FRAND prohibits SEP holders from charging supracompetitive royalties*

4  　　　　FRAND "limit[s] a patent holder to a reasonable royalty on the economic value of its

5  patented technology itself apart from the value associated with incorporation of the patented

6  technology in the standard." *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL

7  2111217, at *12 (W.D. Wash. Apr. 25, 2013) (emphases added); *see also Ericsson, Inc.*, 773 F.3d

8  at 1226-27 ("[T]he . . . royalty rate must reflect the value attributable to the infringing features of

9  the product, and no more.").

10  　　　　The reasonable royalty requirement, like the duty to deal imposed by FRAND, promotes

11  competition.  The Ninth Circuit recognized that leveraging SEPs to extract an "unduly high

12  royalty rate" is "anti-competitive behavior," and that SSOs impose FRAND obligations to

13  mitigate against that risk.  *Microsoft II*, 795 F.3d at 1030-31.  Thus, this duty is closely related to

14  FRAND's duty to license SEPs to all willing licensees because, without the reasonable royalty

15  requirement, an SEP owner could demand an exorbitant royalty from competitors, amounting to a

16  *de facto* refusal to license.  *See RIM*, 644 F. Supp. 2d at 794 (holding that licensing "only at

17  exorbitant rates" would "harm competition" by increasing prices for all products except for the

18  SEP holder's).

19  　　　　Qualcomm does not meaningfully dispute that a breach of FRAND may implicate the

20  Sherman Act, but instead argues that "alleging a FRAND violation is not enough to make out an

21  antitrust claim without also alleging that the purported violation caused actual harm to

22  competition."  Mot. at 15 (citing *Rambus v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)).  But this

23  observation is of no help to Qualcomm because, as discussed below, the Complaint alleges

24  *exactly* that:  Qualcomm not only violated FRAND but its conduct excluded potential competitors

25  (like Samsung) and harmed consumers.  The FTC's Complaint fits comfortably within the well-

26

27

28

1  established case law linking FRAND violations to the antitrust laws.[6]

2  **IV.   QUALCOMM'S FRAND VIOLATIONS CONSTITUTE UNLAWFUL**

3  **EXCLUSIONARY CONDUCT**

4  The Complaint states an antitrust claim because it plausibly alleges that Qualcomm

5  engages in two types of exclusionary conduct:  (1) Qualcomm refuses to license competitors to

6  make and sell licensed chipsets that use Qualcomm's SEPs; and (2) Qualcomm imposes a handset

7  "tax" by leveraging its SEPs to coerce handset manufacturers to accept unreasonable licensing

8  terms that reinforce its monopoly position.  On both counts, the Complaint identifies how this

9  conduct excludes rivals and harms competition in the markets for CDMA and premium chipsets.

10  *A.   Qualcomm excludes competitors by refusing to license SEPs to make and sell*

11  *licensed CDMA and premium chipsets in competition with its own chipsets*

12  The Complaint alleges that Qualcomm "refus[es] to license FRAND-encumbered patents

13  to baseband processor competitors."  Compl. ¶ 147; *see also id.* ¶¶ 3c, 59.  Indeed, the Complaint

14  lists "former and current competitors" excluded by Qualcomm's conduct.  *Id.* ¶ 112.  The FTC

15  also alleges that this exclusionary conduct "bolsters [Qualcomm's] ability to maintain elevated

16  royalties and other unreasonable license terms."  *Id.* ¶ 6.  This conduct not only violates

17  Qualcomm's FRAND commitments—which require Qualcomm to "license SEPs 'to *all*

18  applicants under terms and conditions that are reasonable and non-discriminatory," *id.* ¶ 107

19  (emphasis added)—it also violates the Sherman Act because Qualcomm has successfully

20  excluded rivals and "contribute[d] to [its] ability to tax its competitors' sales and maintain its

21  monopoly," *id.* ¶ 115; *see also id.* ¶ 134.

22
23  [6] *See, e.g., Broadcom*, 501 F.3d at 314 (reversing grant of a motion to dismiss, holding that "[a]
    patent holder's subsequent breach of [a FRAND] promise, is actionable anticompetitive
24  conduct."); *Funai Elec. Co. v. LSI Corporation*, No. 16-cv-01210-BLF, 2017 WL 1133513, at *5
    (N.D. Cal. Mar. 27, 2017); *Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12 Civ. 7465, 2013
25  WL 2099227, at *5 (S.D.N.Y. May 14, 2013) ("[C]onduct that undermines the procompetitive
    benefits of private standard setting may . . . be deemed anticompetitive under antitrust law.");
26  *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2011 WL 4948567, at *4 (N.D. Cal.
    Oct. 18, 2011) (denying defendant's motion to dismiss antitrust claim because "[c]ourts have
27  recognized that fraudulent FRAND declarations that are used to induce SSOs to adopt standards
    essential patents can be monopoly conduct for purposes of establishing a Section 2 claim.").
28

BRIEF OF AMICI CURIAE
5:17-CV-00220-LHK

1      Qualcomm does not deny the facts underlying these allegations: (1) that it made FRAND

2 commitments in consideration for the adoption of mobile standards using CDMA technology; and

3 (2) that it refuses to license SEPs to rival chipset manufacturers. *See* Mot. at 4-5. Instead,

4 Qualcomm argues that under *Trinko* it "has no duty under the antitrust laws to assist its

5 competitors." Mot. at 3. But as discussed above, *Trinko* does not support this principle because

6 FRAND commitments are "intended as a bulwark against [the] unlawful monopoly" SEP owners

7 would otherwise enjoy, *Broadcom*, 501 F.3d at 305, and the Complaint alleges Qualcomm

8 excludes rivals and overcharges its customers. Thus, *Trinko* cannot support dismissal.

9      Qualcomm also suggests that no competitor has sued it for this conduct, and that this

10 "affirmatively negate[s] any inference that [its] supposed breach of FRAND commitments caused

11 any anticompetitive effect." Mot. at 16 (emphasis omitted). Both Qualcomm's premise and

12 conclusion are wrong. First, a former chipset competitor *has* sued Qualcomm: In 2006,

13 Broadcom sued Qualcomm, alleging, *inter alia*, "that Qualcomm ignored its FRAND

14 commitment to [SSOs] . . . by demanding discriminatorily higher (i.e., non-FRAND) royalties

15 *from competitors* and customers using chipsets not manufactured by Qualcomm." *Broadcom*,

16 501 F.3d at 304 (emphasis added). This suit led to a landmark opinion in the Third Circuit—

17 which Qualcomm ignores—holding that "the patent holder's subsequent breach of that [FRAND]

18 promise[] is actionable anticompetitive conduct." *Id.* at 314. Rather than litigate, Qualcomm

19 settled with Broadcom for $891 million in an agreement that allowed Qualcomm to continue its

20 licensing practices.[7] Second, the Complaint explains why others may not have brought suit. *See*

21 Compl. ¶¶ 76-83. For example, if Samsung (a potential chipset competitor) sued, it would risk

22 losing "access to Qualcomm's baseband processors" necessary to make CDMA-compliant

23 handsets. Compl. ¶ 79. "To avoid [such] consequences, OEMs [like Samsung] have acceded to

24 royalties and other licensing terms that Qualcomm demanded even when they believed those

25 terms to be non-FRAND." *Id.* ¶ 83. Qualcomm has no response to this allegation.

26 

27 [7] Press Release, *Qualcomm and Broadcom Reach Settlement and Patent Agreement* (Apr. 26, 2009), *available at* http://bit.ly/2pKViiV. *See ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d

28 999, 1010 n.2 (9th Cir. 2014) (allowing judicial notice of public settlement information).

1    The Complaint makes clear that Qualcomm has gained control over today's CDMA and

2    premium baseband chipset markets by violating FRAND.  Indeed, "[s]everal former competitors

3    of Qualcomm have sold off or shuttered their baseband processor businesses" as a result of

4    Qualcomm's conduct.  *Id.* ¶ 139.  Similarly, the Complaint states that Qualcomm has excluded

5    competitors from entering the market.  *Id.* ¶¶ 35, 45, 138.  Qualcomm cannot deny that there is no

6    market for licensed chipsets due to its refusal to license its SEPs to competing chipset

7    manufacturers; the absence of sales of licensed chipsets is a *prima facie* output effect.

8    Qualcomm's response—that "Intel, MediaTek and Samsung continue to compete against

9    Qualcomm in the sale of modem chips without having a license," Mot. at 16,—is contradictory.

10   Without a license, these firms cannot compete without infringement risk.  None of these firms

11   (nor any other) sell licensed CDMA or premium LTE chipsets in competition with Qualcomm,

12   *see* Compl. ¶¶ 32-37, as a direct consequence of Qualcomm's refusal to license.

13   Samsung manufactures baseband chipsets for use in some of *its own* handsets because it

14   has a handset license.  As the Complaint explains, self-supply does not constitute "meaningful

15   competition."  Compl. ¶ 45.  As for Intel, the Complaint observes that it acquired Via

16   Technologies to gain access to CDMA technology, but that Via's chipsets are not "multi-mode"

17   and thus cannot compete in the premium chipset market.  *Id.* ¶ 34.  And although Apple has

18   agreed to purchase *non-CDMA* chipsets from Intel, per Qualcomm's admitted policy not to

19   license chipset manufacturers, these sales are not licensed—and, in any event, Apple has

20   disclosed that Qualcomm threatened to sue it for infringement based on these sales.  Complaint,

21   *Apple Inc. v. Qualcomm Inc.*, No. 17-cv-0108-GPC-NLS, ECF No. 1 ¶¶ 9-10 (S.D. Cal. Jan. 20,

22   2017).[8]  That Qualcomm is now embroiled in litigation with a significant handset manufacturer

23   speaks volumes about the lengths to which it will go to maintain its market dominance.  Finally,

24   the Complaint states that "MediaTek has not offered multi-mode CDMA processors suitable for

25   use in flagship handsets," Compl. ¶ 35, belying Qualcomm's suggestion that MediaTek is a

26

27   [8] Qualcomm's counterclaims allege Apple misled consumers and interfered with its business
     contracts when Apple sought to buy chipsets elsewhere.  Answer and Counterclaims, *Apple Inc.
     v. Qualcomm Inc.*, No. 17-cv-0108-GPC-NLS, ECF No. 61 (S.D. Cal. Apr. 10, 2017).

28

1    competitor in the relevant markets.  Thus, Qualcomm faces little or no direct competition in the

2    CDMA and premium LTE baseband chipset markets because its exclusionary conduct has had the

3    effect Qualcomm intended.

4    **B.      _Qualcomm violates FRAND—and excludes competitors—by imposing onerous_**

5    **_terms on handset manufacturers, including an unreasonable per handset tax_**

6    Qualcomm's exclusionary practices allow it to impose unilateral and onerous terms on

7    licensees that harm would-be competitors by erecting additional barriers to entry to the baseband

8    chipset market.  This harms handset manufacturers that must pay rents on their own innovations

9    to Qualcomm through a per handset tax; and harms end-users who pay higher prices for handsets.

10   As the Complaint alleges, Qualcomm's refusal to license rivals gives it leverage to impose its "no

11   license, no chips" policy on handset manufacturers.  *See id.* ¶ 47; ¶¶ 80-82 (alleging that without

12   Qualcomm's dominance in CDMA and premium LTE technology, an OEM could challenge

13   Qualcomm's terms "by substituting non-Qualcomm processors").  Through this policy,

14   Qualcomm coerces handset manufacturers to sign long-term licenses that disincentivize handset

15   manufacturers from seeking alternative chipset suppliers and enable Qualcomm to extract

16   monopoly profits from the full handset *whether or not the value is derived from Qualcomm's*

17   *SEPs*.  These terms (called a handset "tax" by the FTC) derive from—and reinforce—the

18   monopoly power Qualcomm gains by flouting its FRAND obligations.  *See* Compl. ¶ 87.

19   Chief among these onerous terms is Qualcomm's insistence that handset manufacturers

20   pay a royalty equal to a percentage of the price of the full handset instead of the smallest saleable

21   patent practicing unit ("SSPPU")—*i.e.*, the baseband chipset itself—as required by the Federal

22   Circuit.[9]  *See id.* ¶ 77(b).  While Qualcomm argues this practice is necessary to avoid "a finding

23   of exhaustion or implied license," Mot. at 6, Qualcomm relinquished its right to select the level of

24   production at which to exhaust its SEPs by promising to license all comers when it entered the

25   FRAND contract.  *See supra* pp. 4-6.  Qualcomm's exhaustion argument shows how its conduct

26

27   [9] *See generally Ericsson*, 773 F.3d 1201; *Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694

28   F.3d 51 (Fed. Cir. 2012).

BRIEF OF AMICI CURIAE
5:17-CV-00220-LHK

1   is interrelated with its refusal to license chipset manufacturers: If Qualcomm licensed rivals, no

2   handset manufacturer would blindly accept Qualcomm's terms because they could buy *fully*

3   *licensed* chipsets—exhausting SEPs substantially embodied in the chipset—from a competitor.[10]

4   It is precisely this choice that Qualcomm's actions have denied the market.

5         Qualcomm dismisses this charge as "hypothetical," Mot. at 9, because the FTC cannot

6   identify handset manufacturers that purchased licensed chipsets from a competitor.  But the

7   absence of a real-world comparison is ocular proof of Qualcomm's successful exclusion:  No

8   competitive royalty negotiations have occurred because Qualcomm has *altogether refused to*

9   *grant its competitors a license* and thereby a chance to compete.  *See United States v. Microsoft*

10  *Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) ("To require that § 2 liability turn on a plaintiff's ability

11  or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive

12  conduct would only encourage monopolists to take more and earlier anticompetitive action.").

13        In important respects, this case is analogous to the DOJ's lawsuit and eventual consent

14  decree condemning Microsoft's "per processor" licenses in which Microsoft sought payment

15  based on finished products whether or not they incorporated Microsoft's operating system.

16  *Compare* Compl. ¶ 87 *with* Competitive Impact Statement, *United States v. Microsoft, Corp.*, No.

17  94-cv-1564 (SS), at 13 (July 27, 1994), *available at* http://bit.ly/2qF6HKv.  The DOJ found that

18  these licenses cemented Microsoft's market power and excluded competitors because the per

19  processor "tax" eliminated OEMs' incentives to purchase a competing operating system.

20  Similarly, Qualcomm's exclusion of upstream competition gives it the power to lock down long-

21  term licenses at the handset level,[11] disincentivizing competitor chipset manufacturers from

22

23  [10] If Qualcomm owns other SEPs not embodied in the chipset, *see* Mot. at 6, it could seek a

24  separate FRAND-compliant license for those patents from the handset manufacturer (but without
    leveraging its chipset monopoly in licensing negotiations) and, assuming *arguendo* Qualcomm

25  would readily identify those patents, the handset manufacturer could undertake an evaluation as
    to whether its products practice those patents.  Given the nature of Qualcomm's SEPs, Samsung

26  does not believe a separate license would be necessary, but Qualcomm has prevented the market
    from making this determination.

27  [11] Qualcomm reports it has over 300 licensees, none of which are chipset rivals.  *See* Qualcomm,
    Form 10K, at 7 (2016), *available at* http://bit.ly/2q46u6o.

28

BRIEF OF AMICI CURIAE
5:17-CV-00220-LHK

1 │ challenging Qualcomm's handsets-level licensing policy.  This practice is unheard of among

2 │ other mobile component suppliers.  *See* Compl. ¶¶ 64-68.

3 │ 　　　　Qualcomm also forces handset manufacturers, as a precondition to obtaining a license, to

4 │ agree to cross license IP to Qualcomm and covenant not to sue other Qualcomm licensees for

5 │ infringing IP cross licensed to Qualcomm as a precondition for a handset license.  *See* Compl. ¶¶

6 │ 77(d), 111.  This further disincentivizes innovation[12] by levying a discriminatory "tax" in breach

7 │ of FRAND that raises the all-in cost of rival chipsets that are not sold with similar pass-through

8 │ rights, improperly favoring Qualcomm's chipsets.  *See Id.* ¶ 88.  This conduct, coupled with its

9 │ per handset royalty, ensures that no handset manufacturer has an incentive to buy a baseband

10 │ chipset from any firm but the entity they are already paying:  Qualcomm.[13]  In short, Qualcomm

11 │ has effectively "raise[d] OEM's costs of using baseband processors supplied by Qualcomm's

12 │ competitors," thus "reduc[ing] the ability and incentive of competitors to invest and innovate."

13 │ Compl. ¶ 87.  Qualcomm's onerous handset licensing terms not only evidence that its

14 │ exclusionary conduct has been successful—the terms themselves represent anticompetitive

15 │ conduct that reinforce Qualcomm's unlawful dominance.

16 │ 　　*C.*　　*The Complaint does not rely on a "price squeeze" theory*

17 │ 　　　　Qualcomm characterizes the FTC's allegations as a "price squeeze" and argues that it "has

18 │ no obligation to ensure that the royalty rates charged to [handset manufacturers] leave 'room' to

19 │ preserve chip suppliers' margins."  Mot. at 11-13.  But this ignores Qualcomm's FRAND

20 │ obligation to charge only a reasonable royalty rate, and that when an SEP holder violates the

21 │ FRAND commitment to exclude rivals, it violates the Sherman Act.  Thus, Qualcomm's reliance

22 │ on *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438, 457 (2009), for

23 │ the proposition that a "standalone" price squeeze theory does not state an antitrust claim is

24 │ shadow boxing:  This is not a "price squeeze."  The Complaint alleges that Qualcomm's

25 │
26 │ [12] The DOJ/FTC Guidelines recognize that grantbacks may disincentivize competition.  *See id.* § 5.6 (explaining that grantbacks can "adversely affect competition" by "substantially reduc[ing] the licensee's incentives to engage in research and development and thereby limit[s] rivalry.").

27 │ [13] Indeed, Qualcomm admits that it believes handset manufacturers must pay it "regardless of

28 │ whether the handsets include any components from Qualcomm."  Mot. at 5.

BRIEF OF AMICI CURIAE
5:17-CV-00220-LHK

1   unreasonable royalties are part of a broader course of conduct—including an outright refusal to

2   deal in violation of FRAND—that has harmed competition. *See Cont'l Ore Co. v. Union Carbide*

3   *& Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[P]laintiffs should be given the full benefit of their

4   proof without tightly compartmentalizing the various factual components and wiping the slate

5   clean after scrutiny of each."); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th

6   Cir. 1992) (evaluating unilateral conduct for a "synergistic effect").  Moreover, as it did in *Trinko*,

7   the Court in *linkLine* noted that a "unilateral refusal to deal with its rivals can give rise to antitrust

8   liability" in certain circumstances.  555 U.S. at 448.  Because the defendants in *linkLine* had no

9   antitrust duty to deal, no similar liability existed. *Id.* at 449.  By contrast, Qualcomm *does* have

10  an antitrust duty to deal with competitors and customers on fair, reasonable, and non-

11  discriminatory terms—a duty enforceable under the Sherman Act when, as here, it is necessary to

12  prevent anticompetitive and exclusionary conduct. *Supra* pp. 4-6.

13  **V.    CONCLUSION**

14           For these reasons set forth above, Samsung respectfully requests the Court deny

15  Qualcomm's motion to dismiss.

16

17  Dated:  May 15, 2017                             Respectfully submitted,

18                                                   By:  /s/ Ian Simmons

19                                                   IAN SIMMONS (*pro hac vice*)
                                                     isimmons@omm.com
20                                                   BENJAMIN J. HENDRICKS (Bar #288680)
                                                     bhendricks@omm.com
21                                                   JAMES W. CROOKS (Bar #310447)
                                                     jcrooks@omm.com
22                                                   O'MELVENY & MYERS LLP
                                                     1625 Eye Street, NW
23                                                   Washington, DC  20006-4061
                                                     Telephone:     +1 202 383 5300
24                                                   Facsimile:      +1 202 383 5414

25                                                   MICHAEL TUBACH (Bar #145955)
                                                     mtubach@omm.com
26                                                   O'MELVENY & MYERS LLP
                                                     Two Embarcadero Center, 28th Fl.
27                                                   San Francisco, CA 94111-2823
                                                     Telephone:     +1 415 984 8700
28                                                   Facsimile:      +1 415 984 8701

BRIEF OF AMICI CURIAE
5:17-CV-00220-LHK

1

2

*Attorneys for* Amici Curiae
*Samsung Electronics Co. Ltd. and Samsung Semiconductor, Inc.*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this 15th day of May, 2017, I caused the foregoing document

3   entitled Brief of *Amici Curiae* Samsung Electronics Co. Ltd. and Samsung Semiconductor, Inc. in

4   Opposition to Qualcomm Incorporated's Motion to Dismiss to be filed via the court's CM/ECF

5   system, which shall send notice to the counsel of record for the parties.

6

7   Dated: May 15, 2017                    By:    /s/ Ian Simmons

8                                                 Ian Simmons (*pro hac vice*)
                                                  O'MELVENY & MYERS LLP
9

10                                                *Attorney for* Amici Curiae
                                                  *Samsung Electronics Co. Ltd. and Samsung*
11                                                *Semiconductor, Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28