# In the Matter of:

# FTC v. Qualcomm, Inc.

*August 16, 2018*
*Benedicte Fauvarque-Cosson*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
 4   FEDERAL TRADE COMMISSION, )
 5          Plaintiff,     )
 6   vs.                   ) Case No.
 7   QUALCOMM, INCORPORATED,  ) 5:17-cv-0220-LHK-NMC
 8          Defendant.      )
 9   --------------------------)
10
11               Thursday, August 16, 2018
12
13               825 Eighth Avenue
14               New York, New York
15
16   The above-entitled matter came on for the deposition of
17   BENEDICTE FAUVARQUE-COSSON, pursuant to notice, at 9:03
18   a.m.
19
20
21
22
23
24
25
```

**2**

```
 1   APPEARANCES:
 2
 3        ON BEHALF OF THE PLAINTIFF:
 4           DAN MATHESON, ESQ.
 5           Federal Trade Commission
 6           400 7th Street, SW
 7           Washington, D.C.  20024
 8           (202) 326-2075
 9           dmatheson@ftc.gov
10
11        ON BEHALF OF THE DEFENDANT AND WITNESS:
12           WES EARNHARDT, ESQ.
13           JONATHAN MOONEY, ESQ.
14           JAMES CANNING, ESQ.
15           Cravath, Swaine & Moore, LLP
16           825 Eighth Avenue
17           New York, New York 10019
18           (212) 474-1296
19           wearnhardt@cravath.com
20
21
22   Also Present:
23        Rocco Mercurio - Videographer
24        Daniel Sherr - French interpreter
25
```

**3**

```
 1                    I N D E X
 2   WITNESS:                          EXAMINATION:
 3   BENEDICTE FAUVARQUE-COSSON          4
 4      BY MR. MATHESON
 5
 6   EXHIBITS REFERENCED                PAGE
 7   Exhibit CX0057                     5
 8   Exhibit CX7552                     114
 9   Exhibit CX57013                    147
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1              P R O C E E D I N G S
 2                  - - - - -
 3        THE VIDEOGRAPHER:  We are now going on the
 4   record.  My name is Rocco Mercurio, your videographer.
 5   Today is August 16, 2018 and the time is approximately
 6   9:03.  We are located at 825 8th Avenue, New York, New
 7   York.  This is disk one of the deposition of Professor
 8   Fauvarque-Cosson, case entitled Federal Trade
 9   Commission versus Qualcomm Incorporated, filed in the
10   United States Northern District of California, San Jose
11   Division, case number 5:17-CV-00220.
12        Will counsel please introduce themselves and
13   who they represent for the record.
14        MR. MATHESON:  Dan Matheson for the Federal
15   Trade Commission.
16        MR. EARNHARDT:  Wes Earnhardt on behalf of
17   Qualcomm.
18        MR. MOONEY:  Jonathan Mooney on behalf of
19   Qualcomm.
20        MR. CANNING:  James Canning on behalf of
21   Qualcomm.
22        THE VIDEOGRAPHER:  The court reporter, Stefanie
23   Krut, will now swear in the witness and then we can
24   proceed.
25   B E N E D I C T E  F A U V A R Q U E - C O S S O N,
```

1 (Pages 1 to 4)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                8/16/2018

---

5

1    having first been duly sworn by a Notary Public of the
2    State of New York, was examined and testified as
3    follows:
4    EXAMINATION BY
5    MR. MATHESON:
6        Q.  Good morning.  Could you state your name for
7    the record, please.
8        A.  Yes.  My name is Benedicte Fauvarque-Cosson.
9        Q.  And you're a professor?
10       A.  Yes, I am.
11       Q.  What's the appropriate honorific?  Is it
12   professor, is it doctor, how do you prefer to be
13   addressed?
14       A.  Well, professor is much better.
15       Q.  Okay.
16       A.  Because you have many doctors and not many
17   professors.
18       Q.  Okay.  And you've prepared an expert report in
19   this matter.  Correct?
20       A.  Correct.
21       Q.  And I'll hand you a document that we pre-marked
22   CX-0057.
23           (Exhibit CX-0057 was marked for the record.)
24       Q.  Is this a copy of the expert report you
25   prepared in this matter?

---

6

1        A.  Yes, it is.
2        Q.  And this report discloses all of the opinions
3    that you have reached in this matter; is that correct?
4        A.  This is correct.
5        Q.  Your report states on page 2, quote, "attached
6    as Exhibit-2 is a list of materials I have relied upon
7    in forming the opinions expressed in this report."
8            Prior to signing -- well, strike that.
9            Do you see Exhibit-2 at CX-0057-037?
10       A.  Yes.  I have it.
11       Q.  So prior to the time you signed this report,
12   did you review any deposition transcripts taken in this
13   matter that are not listed on Exhibit-2?
14       A.  No, I did not review deposition transcripts.
15       Q.  Prior to the date you signed this report, did
16   you personally review any documents produced in this
17   matter that are not listed in Exhibit-2?
18       A.  I do not remember having reviewed any other
19   documents than the one listed here for this report.
20       Q.  Prior to signing this report, did you review
21   any other expert reports produced in this matter other
22   than the ones listed in Exhibit-2?
23       A.  For this report, I did not review other expert
24   reports.
25       Q.  Prior to signing this report, did you conduct

---

7

1    any interviews relevant to this matter that are not
2    listed in Exhibit-2?
3        A.  No.  I did not conduct any interviews.
4        Q.  Prior -- that are relevant to your opinions in
5    this matter?
6            MR. EARNHARDT:  Well, objection.  What do you
7    mean by interviews?
8        A.  Yes, that's -- that's what I was asking myself.
9    What do you mean by interviews?
10       Q.  Do you have an understanding what the word
11   interview means?
12       A.  For me it's going to the TV and speaking
13   publicly or speaking to a newspaper, something which
14   goes beyond the confidentiality so I would never --
15           THE REPORTER:  Beyond the?
16       A.  -- confidentiality of what was requested, so I
17   would not have conducted an interview.
18       Q.  Did you have any conversations with individuals
19   prior to signing this report that are relevant to the
20   opinions you expressed in this report?
21       A.  This is a different question.  Yes, I did.
22       Q.  With whom did you have conversations relevant
23   to the opinions you expressed in this report prior to
24   the date you signed this report?
25       A.  I had conversation with the lawyers of --

---

8

1    Qualcomm lawyers and I also I had conversations with
2    Professor Alain Benabent.
3        Q.  I'm sorry.  Can you spell that please?
4        A.  B-E-N-A-B-E-N-T.  B-E-N-A-B-E-N-T.
5        Q.  Apart from attorneys employed by Qualcomm and
6    Professor Benabent, did you have any conversations with
7    any other individuals that are relevant to the opinions
8    you express in this report?
9        A.  No, I did not.
10       Q.  Who is Professor Benabent?
11       A.  Professor Benabent well, he used to be a
12   professor of law.  Now he's a avocat a la cour de
13   cassation et conseil d'etat.
14           THE REPORTER:  A what?
15       A.  Now he's a lawyer, avocat, from the Supreme
16   Courts and then I have worked with him previously.  And
17   he is a very well known and famous specialist of the
18   law for obligation and that's it.
19       Q.  The law of obligation, is that a term of art?
20       A.  Yes, it is.
21       Q.  What is meant by the law of obligation?
22       A.  Obligations may come from a contract, so
23   contract law.  Obligations may come from an act and
24   then it's the law of torts.  So what we mean in France
25   by the law of obligation is both contract and tort.

---

FTC v. Qualcomm, Inc.                                                    8/16/2018

---

9

1    Q. What did you discuss with Professor Benabent
2    that is relevant to the opinions you express in this
3    matter?
4    A. Not very much, though but, we had been working
5    together more than 10 years ago on the matters for
6    Qualcomm already, so we discussed the evolution in
7    French law since then because there has been a reform
8    and whether or not this have implied changes.
9    Q. What -- well, strike that.
10    When was the first time you performed work for
11    Qualcomm?
12    A. If my memory is good I think it was 2006.
13    Q. And was Professor Benabent involved at that
14    time?
15    A. Yes, he was.
16    Q. What was the issue on which you performed work
17    for Qualcomm in 2006?
18    A. The main issue was about the concept of a
19    accord de principe, and agreement to enter into a
20    contract. And the question, the main question was
21    whether there was an -- or not there was an automatic
22    license due to the FRAND commitment. And our position
23    was that there was not an automatic license, there was
24    no license contract. And one of the reasons why was
25    that the important elements such as due process had not

---

10

1    been decided. So the FRAND commitment was not
2    equivalent to a license contract. That was the main
3    issue in 2006.
4    Q. So is it fair to state that in 2006,
5    implementers of standards promulgated by ETSI claimed
6    that Qualcomm's FRAND commitment gave them an automatic
7    license to Qualcomm's intellectual property?
8    A. I don't remember well enough. I wasn't -- I'm
9    not sure whether they claim this or not. What we
10    wanted to show is that under French law, that could not
11    be an automatic license.
12    Q. Was there a specific litigation that your work
13    related to?
14    A. Yes, there was.
15    Q. Which one was that?
16    A. I don't remember.
17    Q. What was the outcome of your work? Did you
18    provide testimony, did you prepare an expert report?
19    What happened?
20    A. Yes. I provided an expert report, yes, and I
21    was deposed also.
22    Q. And what was the venue, where did this take
23    place, the deposition?
24    A. In New York.
25    Q. Was it a litigation in United States courts?

---

11

1    A. Yes, it was. I suppose so. Now it's quite a
2    while ago.
3    Q. Did it involve the International Trade
4    Commission?
5    A. I can't remember.
6    Q. Did it involve Broadcom?
7    A. Who?
8    Q. Broadcom?
9    A. I don't remember.
10    Q. Okay. What did you ask?
11    A. No. Now I remember. It involved Nokia.
12    Q. Nokia in 2006?
13    A. Yes.
14    Q. So this was the Nokia 2006 litigation?
15    A. Yes.
16    Q. Okay. Did Professor Benabent provide a
17    deposition in that action as well?
18    A. We wrote a report together. Then he was
19    deposed in Paris and later I was deposed here in New
20    York.
21    Q. What did you ask Professor Benabent in your
22    recent discussions that relate to the opinions you
23    express in the report you've produced in this matter?
24    A. Well, not very much. So far as I remember,
25    we -- we discussed the reform, the French law reform,

---

12

1    and I've only had one or two conversations with him on
2    this report and on this matter, and not very
3    substantial because, to tell you the truth, he doesn't
4    speak English so it's not that obvious I need to
5    translate all the time into French and then put it back
6    into English. And in 2006, everything was translated
7    from English to French and French to English, but this
8    time nothing was translated.
9    Q. What is the reform of French law that you're
10    referring to?
11    A. It's a reform which takes place within the
12    French CV code. The French CV code dates from 1804 and
13    it's a very important reform of the law of obligations.
14    But so far, only the part on the law of contracts has
15    been accomplished and the reform of law tort is still
16    pending. And this reform has been done in 2016 by way
17    of a decree by the Ministry of Justice. And it has
18    been slightly modified but very slightly by law in
19    2018. It's a very important reform in France because
20    all these texts went back to 1804 and for the first
21    time really there has been a major change of the good
22    CV. But as we got substance, the reform is not a
23    revolution, it doesn't change drastically the law of
24    contracts. It's rather recodification of French law
25    and a French case law that have evolved since 1804.

---

3 (Pages 9 to 12)

FTC v. Qualcomm, Inc.                                                      8/16/2018

13

1    Q.  In your discussions with Professor Benabent,
2    did he express the view that the 2016 reform was
3    relevant to the issues you address in your expert
4    report in this matter?
5    A.  This is an odd question because obviously the
6    2016 reform is relevant.  Every contract lawyer in
7    France keeps his eye on this reform.  It's the major
8    event in France in law since 1804.
9    Q.  Did -- strike that.
10       What did you tell Professor Benabent was the
11   issue you were asked to address in this report?
12   A.  Well, there was two issues:  Interpretation of
13   contract and stipulation on behalf of third parties.
14   Q.  Did he express the view to you that the 2016
15   reform changed in any way the analysis you express
16   regarding the interpretation of contract?
17   A.  No.
18   Q.  Did he express to you the view that the 2016
19   reform had no effect on the view you expressed in the
20   interpretation of contract?
21   A.  Can you repeat this question?
22   Q.  What I'm trying to get at is:  Would -- did he
23   express to you the view that the opinion you should
24   reach on interpretation of a contract should be exactly
25   the same, regardless of whether the 2016 reform had

14

1    been passed by the Ministry of Justice?
2    A.  It's been much more shorter than that.  He
3    just -- to tell you the truth, I don't really remember
4    our conversation on the interpretation of contract.  He
5    has his book and there is a new edition of his book
6    with the French contract law reform.  And I have quoted
7    his book and I think all he did -- but he didn't really
8    need to do it because I could have done it by myself is
9    point out the relevant paragraph in his book, which I
10   have quoted in his -- in my reports.
11   Q.  And where in your report does that appear?
12   A.  On page 7.  And it was -- as we got the role of
13   industry practice, I have quoted two important books.
14   One is an introduction, general introduction from
15   Pascale Deumier, and then at the bottom of Page 7, I
16   quote him.
17   Q.  What did you tell Professor Benabent was the
18   industry practice relevant to your opinions in this
19   matter?
20       MR. EARNHARDT:  Object to the form.
21   A.  Could you say that again, please?
22   Q.  Did you tell Professor Benabent any facts
23   regarding industry practice that -- during the course
24   of your discussions with him?
25   A.  We did not discuss the facts.  He did have some

15

1    knowledge of the facts of -- because he had been
2    involved previously.  So regarding industry practice, I
3    don't think we -- we discussed much.  And I -- when I
4    quote his book, that's -- you have here everything that
5    we discussed, it's in this paragraph here.
6    Q.  Prior to signing this report, did you review
7    any documents relevant to the intellectual property
8    rights policies of any standards setting organizations
9    that are not listed in Exhibit-2?
10   A.  I will return to Exhibit-2 to check.  You mean
11   other than ETSI?  I reviewed the ETSI Intellectual
12   Property Rights Policy, particularly annex 6.
13   Q.  It's fair to state you did not review, prior to
14   signing this report, the intellectual property rights
15   policies of any standards setting organization other
16   than ETSI.  Right?
17   A.  Yes, it is fair to state that.
18   Q.  Prior to signing this report, did you have
19   independent knowledge of the intellectual property
20   rights policies of any standards setting organization
21   other than ETSI?
22   A.  No, I did not.
23   Q.  Did you ask to see any documents prior to
24   signing this report that you were unable to review for
25   some reason?

16

1    A.  No, I did not.
2    Q.  Were there any discussions you would like to
3    have had in order to understand the opinions you
4    express in this report that you were unable to have?
5    A.  I'm not sure what -- discussions with -- with
6    whom, with Qualcomm's lawyers you mean or?
7    Q.  Is there anyone who you would have liked to
8    speak with prior to expressing the opinions in this
9    report that you were unable to speak with?
10   A.  No.  I don't think so, no.
11   Q.  Since the time you have signed this report,
12   have you reviewed any deposition transcripts?
13   A.  I have not.
14   Q.  Since you signed this report, have you reviewed
15   any expert reports relevant to this matter?
16   A.  No, I have not.
17   Q.  Since you signed this report, have you had any
18   discussions with anyone other than Qualcomm attorneys
19   relevant to this matter?
20   A.  No, I have not.
21   Q.  Since you signed this report, have you reached
22   any opinions relevant to this matter that are not
23   expressed in the report?
24   A.  No, I have not.
25   Q.  Have you also provided a report in connection

4 (Pages 13 to 16)

FTC v. Qualcomm, Inc.                                                      8/16/2018

---

17

1  with Qualcomm's litigation against any other parties in
2  the last two years, other than the FTC that is?
3      A. Yes, I have.
4      Q. Which litigations?
5      A. Qualcomm against Apple.
6      Q. Where did that litigation take place?
7      A. It takes place in the United States.
8      Q. Is that the litigation that's currently ongoing
9  between Qualcomm and Apple in the United States?
10     A. Yes, it is.
11     Q. Did you provide an expert report in that
12  matter?
13     A. Yes, I did.
14     Q. What materials did you review in connection
15  with the expert report you provided in the Apple
16  litigation that are not listed in Exhibit-2?
17         MR. EARNHARDT: Dan, that's an -- that's an --
18  this -- this deposition isn't going to be about the
19  Apple case. I'm -- she can not answer that question.
20     A. And actually I don't remember all of it,
21  everything, but no, I can't answer.
22     Q. When you say you can't answer, is that because
23  you don't recall any materials that you reviewed in
24  connection with the Apple case that are not listed in
25  Exhibit-2?

---

18

1      A. Partly, yes. And partly because it's not a
2  question on Apple case.
3      Q. Well, I'd like to understand which one it is,
4  if that's okay. So sitting here today, do you recall
5  reviewing any deposition transcripts in connection with
6  the opinion you offered in the Apple matter that are
7  not listed in Exhibit-2 to your report?
8      A. Deposition transcripts, I don't recall that.
9      Q. Sitting here today, do you recall reviewing any
10  documents relevant to your opinions in the Apple matter
11  that you do not disclose in Exhibit-2 to your report in
12  this matter?
13         MR. EARNHARDT: Just let me object to that
14  question. It's a completely inappropriate question.
15  It's irrelevant to this case, it's irrelevant to this
16  report, and she -- and you can answer if you remember,
17  but I -- I -- I highly object to this line of
18  questioning.
19     A. But actually now sitting here this morning, I
20  must say I don't remember.
21     Q. Sitting here this morning, do you recall
22  conducting any discussions with anyone other than
23  Qualcomm attorneys relevant to the opinions you express
24  in the Apple matter that are not listed in Exhibit-2 to
25  this report, in this matter?

---

19

1      A. May I ask you to repeat the question?
2      Q. Sitting here today, do you recall having --
3  having any discussions with any individuals other than
4  Qualcomm attorneys that you relied on for your opinions
5  in the Apple matter that are not disclosed in Exhibit-2
6  to the report you offered in this matter?
7         MR. EARNHARDT: Object to the form.
8      A. I'm -- I don't recall discussions.
9      Q. You can't recall one way or the other or you
10  don't recall -- well, strike that.
11         Is the answer to the question no, you didn't
12  have any or you cannot recall one way or the other
13  whether you had discussions relevant to the opinions
14  you express in the Apple matter that are not contained
15  in Exhibit-2 to the report you submitted in this
16  matter?
17         MR. EARNHARDT: Object -- object to the form.
18  Someone can ask that in the Apple deposition.
19     A. I'm -- I usually don't discuss the work I'm
20  doing and I think it's confidential, so I shouldn't be
21  discussing it. There is only Professor Benabent with
22  whom I was authorized to have some discussions, but as
23  I said before, since everything is in English, it's not
24  very easy and convenient and I don't recall specific
25  discussions.

---

20

1      Q. So you don't recall one way or the other if
2  there are any materials relevant to the opinions you
3  express in the Apple case that are not listed in
4  Exhibit-2 to your report in this matter. Is that fair?
5      A. That is fair.
6      Q. On page 2 of your report, I'm looking under
7  Arabic numeral three, the second sentence. Is it fair
8  to state that your opinions in this matter are limited
9  to the nature of the obligations created when a patent
10  holder makes a FRAND commitment to ETSI?
11     A. Yes. That is what I have written and it's fair
12  to state this.
13     Q. So you aren't offering any opinion about any
14  obligations created when a patent holder makes a
15  commitment to a standards setting organization other
16  than ETSI. Right?
17     A. This is correct.
18     Q. Your report states on page 2 again, quote, the
19  FTC takes the position that ETSI FRAND commitments
20  create an obligation to grant licenses to the
21  manufacturers of baseband processors, i.e. to granted
22  licenses at the component level. Do you see that?
23     A. Yes, I do see that.
24     Q. And you cite paragraph 3C of the FTC's
25  complaints against Qualcomm for that proposition.

---

FTC v. Qualcomm, Inc.                                                          8/16/2018

---

21

1    **Right?**
2        A. Right.
3        **Q. Paragraph 3C of the FTC's complaint against**
4    **Qualcomm doesn't say anything about ETSI, does it?**
5        A. I do not recall that.
6        **Q. Have you reviewed the FTC's complaint against**
7    **Qualcomm?**
8        A. I don't remember.
9        **Q. We don't need to introduce this as a --**
10       A. Thank you.
11       **Q. -- exhibit. Have you ever seen this document**
12   **before?**
13       A. I don't remember it.
14       **Q. You can't recall one way or the other? I'll**
15   **represent this is a redacted version of the FTC's**
16   **complaint against Qualcomm with the confidential**
17   **information redacted, but everything else is there.**
18       A. I can't recall.
19       **Q. Can you -- can you identify paragraph 3C of**
20   **this document?**
21       A. Three C, yes.
22       **Q. That paragraph doesn't say anything about ETSI,**
23   **does it?**
24       A. Well, it mentions Qualcomm's FRAND commitments
25   doesn't it?

---

22

1        **Q. Commitments is plural, correct?**
2        A. Correct.
3        **Q. That paragraph does not mention ETSI**
4    **specifically, does it?**
5        A. But I've only given an opinion on ETSI's and I
6    haven't reviewed all those standard organization IPR
7    policy. For me, when Qualcomm's FRAND commitments is
8    mentioned, this is linked to ETSI.
9        **Q. What is the telecommunications industry**
10   **association?**
11       A. The telecommunication industry association?
12   Well, I -- I don't know.
13       **Q. What is the Alliance for Telecommunications**
14   **Industry Solutions?**
15       A. I don't know.
16       **Q. What is the Third Generation Partnership**
17   **Projects?**
18       A. That I've heard about. I'm not too sure.
19       **Q. Does the Third Generation Partnership Project**
20   **impose a FRAND obligation on any participants in the**
21   **Third Generation Partnership Project?**
22       MR. EARNHARDT: Object to the form, outside of
23   her expertise.
24       A. I do not know.
25       **Q. Does the Alliance for Telecommunications**

---

23

1    **Industry Solutions impose a FRAND commitments on**
2    **Qualcomm?**
3        A. Again, as I told you, I haven't reviewed any of
4    these policies and I do not know.
5        **Q. You don't know one way or the other?**
6        A. One way or the other, I don't know.
7        **Q. You don't know one way or the other whether**
8    **Qualcomm made a FRAND commitment to the**
9    **Telecommunications Industry Association. Fair?**
10       A. I do not -- I have been asked to give an
11   opinion on the FRAND commitment as began ETSI.
12       **Q. So it's fair to state that you do not know one**
13   **way or the other whether Qualcomm made a FRAND**
14   **commitment to the Telecommunications Industry**
15   **Association. Right?**
16       A. It is fair to -- to -- to say this because I do
17   not know what kind of other commitments Qualcomm may
18   have made.
19       **Q. So on page 3 of your report, CX-0057-005, you**
20   **state under Arabic IV, quote, as mentioned above,**
21   **Qualcomm's FRAND commitments are governed by the ETSI**
22   **IPR policy.**
23       **Do you see that portion?**
24       A. Yes, I do.
25       **Q. Now, the only FRAND commitment you're referring**

---

24

1    to in that sentence is Qualcomm's FRAND commitment to
2    **ETSI. Right?**
3        A. This is how I have understood what I'm -- I'm
4    writing. It's only to ETSI.
5        **Q. So you are not expressing the view, in your**
6    **expert report, that Qualcomm's FRAND commitments to the**
7    **Telecommunications Industry Association are governed by**
8    **the ETSI IPR policy. Right?**
9        A. Sorry, can you repeat the question?
10       **Q. You are not expressing in your report the**
11   **expert opinion that Qualcomm's FRAND commitments to the**
12   **Telecommunications Industry Association are governed by**
13   **the ETSI IPR policy. Right?**
14       A. This is correct. It's only related to ETSI.
15       **Q. And you're not expressing the expert opinion**
16   **that Qualcomm's FRAND commitments to the Alliance for**
17   **Telecommunications Industry Solutions is governed by**
18   **the ETSI IPR policy. Right?**
19       A. This is right also.
20       **Q. You're not expressing the expert opinion that**
21   **the ETSI IPR policy is in any way relevant to**
22   **Qualcomm's FRAND commitments to the Alliance for**
23   **Telecommunications Industry Solutions. Fair?**
24       A. It depends on what you mean by "in any way
25   relevant".

---

25

1    Q.  Have you reached the view that Qualcomm's FRAND
2  commitment to ETSI is relevant to Qualcomm's FRAND
3  commitment to the Alliance for Telecommunications
4  Industry Solutions?
5    A.  No.  I have not reached this view.  But the
6  interpretation that is given of the words of the ETSI
7  IPR policy is given on the basis of the words of the
8  ETSI IPR policy.  If the words are exactly the same in
9  a different context, I will give the same
10  interpretation.  But I have not reached any such view
11  because as I told you before, I've only reviewed the
12  ETSI IPR policy and I am not familiar, in fact, I have
13  never seen the other -- the other IPR policies.
14    Q.  So you have not reached the view in this matter
15  that the ETSI IPR policy is relevant to any commitment
16  Qualcomm has made to anyone except for ETSI.  Is that
17  fair?
18    A.  This is what I was telling you but I was also
19  telling you that the interpretation of the word that I
20  have made is standing on its own because of the words
21  of ETSI.
22    Q.  So in your view, the ETSI IPR policy might be
23  relevant to a commitment Qualcomm made if the words
24  used in the commitment Qualcomm made are exactly the
25  same as the words used in the ETSI IPR commitment.  Is

26

1  that fair?
2    A.  I wouldn't say it because I haven't any idea of
3  the other IPR policy.  I could not exclude it, but I
4  couldn't say that it is.  I have not been asked to give
5  an opinion on this.
6    Q.  On page 3, the next sentence after the sentence
7  we discussed in Arabic IV reads, quote, as such,
8  Qualcomm's FRAND commitments and any claims arising out
9  of an alleged breach of those commitments are governed
10  by French law.
11    Do you see that sentence?
12    A.  I do.
13    Q.  What does Qualcomm's FRAND commitments in that
14  sentence refer to?
15    A.  In that sense, Qualcomm's FRAND commitments
16  refers to clause 6.1 of annex 6 of the IPR policy.
17    Q.  And as used in that sentence, quote, Qualcomm's
18  FRAND commitments, end quote, does not refer to any
19  other FRAND commitment Qualcomm has made to any entity
20  other than ETSI.  Fair?
21    A.  I think I have answered this question already.
22  Yes, it is fair to say this.
23    Q.  When you state, quote, any claims arising out
24  of an alleged breach of those commitments, what --
25  strike that.

27

1    When that sentence states, quote, any claims
2  arising out of an alleged breach of those commitments,
3  end quote.  What claims other than claims in contract
4  law are you referring to in that sentence?
5    A.  I will put the question a bit differently.  I
6  am referring to claims which arise from the FRAND
7  commitment.  And in order to say what claims are -- I
8  am referring to here, we have to discuss the analysis
9  under French law of the nature of the French
10  commitment.
11    Q.  What claims are you referring to there?
12    A.  I am referring to claims that may arise out
13  of what we call in French law stipulation pour autrui,
14  stipulation for the benefit of third parties.
15    Q.  When you say in this sentence, "any claims
16  arising out of an alleged breach of those commitments",
17  are you referring only to claims brought by alleged
18  third party beneficiaries of Qualcomm's FRAND
19  commitment?
20    A.  I have given an opinion in the context when
21  there was litigation with third party beneficiaries.
22  So I was referring to this context.  And in that
23  context, the claims arising out of an alleged breach of
24  the commitments are indeed the claims of third party
25  beneficiaries.

28

1    Q.  So your opinion that claims arising out of an
2  alleged breach of Qualcomm's FRAND commitments to ETSI
3  are governed by French law, is limited to claims
4  arising in the context of litigation brought by alleged
5  third party beneficiaries.  Is that fair?
6    A.  No.
7    MR. EARNHARDT:  Object to the form.
8    A.  I think that was a misunderstanding here.  What
9  is governed by French law is clearly said in clause 12
10  of annex 6 of the IPR policy.  It is also reminded in
11  the -- the annex on the declaration forms which also
12  refer to French law.  So I'm not restricting the scope
13  of French law to something which would be more limited.
14    Q.  Maybe this is an easy way to go about it.
15    In this sense when you say claims arising out
16  of an alleged breach of Qualcomm's FRAND commitments to
17  ETSI, you're not addressing antitrust claims brought
18  under U.S. law.  Right?
19    A.  I have not been asked to give an opinion on
20  anti -- antitrust law.
21    Q.  You're not addressing unfair competition claims
22  brought under any United States unfair competition law.
23  Right?
24    A.  No.  This is not the scope of my expertise.
25  I'm a contract lawyer.

7 (Pages 25 to 28)

Pauvarque-Cosson

FTC v. Qualcomm, Inc.                                                          8/16/2018

---

29

1      Q. You're not addressing claims for tortious
2   interference with prospective economic advantage
3   brought under United States law. Right?
4      A. Tortious interference with what?
5      Q. Prospective economic advantage?
6      A. No, I'm not addressing this.
7      Q. So you are not suggesting that an antitrust
8   claim based on Qualcomm's alleged breach of a FRAND
9   commitment made to ETSI is governed by French law.
10  Right?
11      MR. EARNHARDT: Object to the form.
12      A. I have not been asked to give an opinion on
13  this.
14      Q. You're not suggesting that any unfair
15  competition lawsuit based on Qualcomm's alleged breach
16  of a FRAND commitment made to ETSI is governed by
17  French law. Right?
18      A. My answer is the same again. I did not reflect
19  on this because I haven't been asked and I'm not an
20  antitrust lawyer so I would not give an opinion on
21  that.
22      Q. So it's fair that the interpretation of the
23  commitment that Qualcomm made to ETSI should, in your
24  view, be interpreted according to the principles of
25  French law, right?

---

30

1      A. Could I have the clause 12 which I mentioned?
2   I think what we need to do is stick to the wording of
3   the ETSI IPR policy and say exactly the same thing as
4   what is said about the scope of French law.
5      Q. I will hand you a documents we've marked
6   CX-7552-001. I believe this attaches -- it attaches
7   what we believe to be an accurate copy of the ETSI IPR
8   policy as of November 2011.
9      Please take whatever time you need to satisfy
10  yourself this is accurate as far as you can tell.
11      A. So I think we can stick to the meaning of the
12  clause 12, the policy shall be governed by the laws of
13  France.
14      Q. And this language appears at CX-7552-007 under
15  the Arabic numeral 12. Is that right?
16      A. This language appears here (indicating).
17      Q. You are looking at Page CX-7552-007, right?
18      A. Okay, okay. Yes.
19      Q. Okay. So you do not interpret that language to
20  mean that any antitrust claims based on Qualcomm's
21  alleged breach of this policy are governed by the laws
22  of France. Fair?
23      A. As I said before, I haven't reflected upon
24  this. What I -- my opinion is that French law governs
25  the stipulation for the benefit of third parties. When

---

31

1   you are asking me whether it goes beyond to antitrust
2   -- and antitrust claims and that, I would need more
3   time to reflect upon that.
4      Q. That's not an analysis you have conducted in
5   connection with the opinions you express in your report
6   in this matter. Fair?
7      A. That is not an analysis I have conducted, fair.
8      Q. Do you have expertise in American antitrust
9   law?
10      A. I have no expertise in American antitrust law.
11      Q. Do you have expertise in American intellectual
12  property law?
13      A. No expertise in American IPR law.
14      Q. Do you have expertise in how American courts
15  apply choice of law principles?
16      A. Not much. When I wrote my -- a long time ago
17  my thesis I did have a look at this question, but that
18  was more than 20 years ago. So I wouldn't say it's an
19  expertise which is still valid.
20      Q. And it's fair to state that in this matter, you
21  did not conduct an analysis of the body of law an
22  American court would apply to an antitrust claim based
23  on an alleged breach of ETSI's IPR policy. Right?
24      A. I'm sorry can you repeat? But I think I know
25  the answer, but to make sure.

---

32

1      Q. Sure. It's fair to state that in this matter,
2   you did not conduct an analysis of the body of law that
3   an American court would apply to an antitrust claim
4   based on an alleged breach of ETSI's IPR policy?
5      A. Yes, it's fair.
6      Q. Now you have not, in your report, cited any
7   authority supporting the proposition that a United
8   States court would apply French law when interpreting
9   the ETSI IPR policy. Is that fair?
10      A. This is fair.
11      Q. You have not cited in your report any authority
12  supporting the proposition that a Japanese court
13  sitting in Japan would apply French law to an
14  allegation that Qualcomm had breached the ETSI IPR
15  policy. Is that fair?
16      A. Yes. And I haven't said that a Chinese court
17  will apply French law. What I have said is that you
18  have in the ETSI rules of procedure a very clear
19  provision which says that the policy shall be governed
20  by the laws of France. Now, if a foreign judge wants
21  to apply another law, that's his problem, but the
22  policy says that it shall be governed by the laws of
23  France.
24      Q. When you say that that's the foreign judge's
25  problem, do you mean that a foreign judge -- strike

---

8 (Pages 29 to 32)

FTC v. Qualcomm, Inc.                                                8/16/2018

---

33

1    that.
2         When you say that's the foreign judge's
3    problem, you have not conducted an analysis of which
4    countries might apply a law other than the law of
5    France to a claim based on an alleged breach of ETSI I
6    -- ETSI's IPR policy.  Right?
7         A.  I have not conducted such an analysis.  I have
8    not been asked to do it and it's not relevant to my
9    opinion.
10        Q.  Taking a look at page one of your report, which
11   is CX-0057-003.  There is a sentence immediately
12   foll -- immediately preceding footnote one.  It says,
13   quote, licenses related to these patents form the basis
14   for the dispute at issue in the ND Cal action.
15        Do you see that sentence?
16        A.  Yes, I do.
17        Q.  What does "these patents" refer to in that
18   sentence?
19        A.  Well, I think I have said it in the sentence
20   which immediately precedes this sentence, where I say
21   what I understand that Qualcomm is the owner of many
22   patents for which it has made recent commitments, and
23   of the IPR policy of ETSI to license fair, reasonable
24   and non-discriminatory terms.  And the licenses related
25   to "these patents", refers to as many patents for which

---

34

1    it has made recent commitments.
2         Q.  How many of those patents are there?
3         A.  That, I do not know.
4         Q.  How many of those patents were filed in
5    European countries?
6         A.  I do not know.
7         Q.  How many of those patents were issued by the
8    United States Patent and Trademark Office?
9         A.  I have no idea.
10        Q.  Which of these patents did ETSI -- strike that.
11        Which patents issued by the United States
12   Patent and Trademark Office does Qualcomm own that it
13   has not committed to license on FRAND terms in
14   accordance with ETSI's IPR policy?
15        A.  This goes far beyond my expertise and I have no
16   idea.
17        Q.  Which patents referred to in the sentence we've
18   been discussing on page 1, did Qualcomm commit to
19   license on FRAND terms in accordance with the policies
20   of any standards setting organization other than ETSI?
21        A.  I do not know.
22        Q.  How many of the patents you refer to in this
23   sentence did Qualcomm commit to license in accordance
24   with the FRAND commitments it made to standards setting
25   organizations other than ETSI?

---

35

1         A.  How many patents?  I have no idea.
2         Q.  Do you know one way or the other if there are
3    any patents you refer to among, quote, these patents,
4    on page 1 of your report, that Qualcomm has not
5    committed to license in accordance with the
6    intellectual property policy of the International
7    Telecommunications Association?
8         A.  I do not know.
9         Q.  Do you know one way or the other if there are
10   any patents referred to among, quote, these patents, on
11   page 1, that Qualcomm has not committed to license in
12   accordance with the intellectual property policy of the
13   Alliance for Telecommunications Industry Solutions?
14        A.  I do not know.
15        Q.  So as far as you know, every single one of,
16   quote, these patents, you refer to on page 1 of your
17   report is also subject to a commitment that Qualcomm
18   made to a standards setting organizations other than
19   ETSI.  Right?
20        MR. EARNHARDT:  Object to the form.
21        A.  I don't understand the question.
22        Q.  Do you know one way or the other if there is a
23   single patent among, quote, these patents, you refer to
24   on page 1 of your report that Qualcomm has not also
25   committed to license on FRAND terms in accordance with

---

36

1    the intellectual property rights policy of a standards
2    setting organization other than ETSI?
3         A.  I have no idea of what Qualcomm has done
4    regarding these patents and other standard
5    telecommunication organizations.
6         Q.  That was not an analysis you felt it necessary
7    to conduct to express the opinions you have expressed
8    in your report.  Right?
9         A.  I am an expert of French contract law, so it
10   was not an analysis I felt necessary to conduct.
11        Q.  The -- the opinions you express in your report
12   are not impacted one way or the other if Qualcomm has
13   committed to license all of its patents according to
14   the intellectual property rights policies of a
15   standards setting organization other than ETSI.  Is
16   that fair?
17        A.  The opinions I -- I give in my report are based
18   on French law and they're not impacted by all these
19   questions that you have raised which I have not
20   analyzed at all.
21        MR. EARNHARDT:  We've been going about an hour.
22   Can we take a quick break?
23        MR. MATHESON:  Yes, fine with me.  Sure.  If
24   that's okay with the witness.
25        THE VIDEOGRAPHER:  We're now going off the

---

9 (Pages 33 to 36)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                    8/16/2018

---

37

1  record.  The time is 10:00 o'clock.
2       (A recess was taken.)
3       THE VIDEOGRAPHER:  We're now going back on the
4  record.  The time is 10:08.
5       Q.  Now your opinions in this matter required you
6  to develop an understanding of paragraph 6 of the ETSI
7  Intellectual Property Rights Policy.  Right?
8       A.  Right.
9       Q.  At what -- in what year was paragraph 6 of the
10 ETSI Intellectual Property Rights Policy finalized?
11      A.  You mean paragraph 6 of annex 6?
12      Q.  Correct.
13      A.  I do not know in what year it was finalized and
14 I do not know in what year ETSI rules of procedure were
15 finalized.  The version I have here is one which dates
16 from November 2011.
17      Q.  Is the version you have in front of you dated
18 November 2011 the same as the version that exists
19 today?
20      A.  I need to read it to tell you but I believe so,
21 but I will -- I will check.  (Brief review.)
22      It is the same as the one I have studied for my
23 report and I believe it is the same as the one that is
24 in force today.  I haven't checked though, but I would
25 be surprised if it were different.

---

38

1       Q.  When was the first time that the version of the
2  ETSI Intellectual Property Rights Policy paragraph 6
3  that is currently in effect came into effect?
4       A.  I do not know.
5       Q.  Was it before 2007?
6       A.  I do not know.  I couldn't answer this
7  question.
8       Q.  How many times has paragraph 6 of the ETSI
9  Intellectual Property Rights Policy been amended since
10 it first came into effect?
11      A.  Again, this is a question that I have not
12 studied and I do not know.
13      Q.  When did Qualcomm first make a FRAND commitment
14 to ETSI relevant to Qualcomm's 3G patents?
15      A.  I have no idea.
16      Q.  When did Qualcomm first make a FRAND commitment
17 to ETSI relevant to Qualcomm's LTE patent?
18      A.  Same answer. I don't know.
19      Q.  So you don't know whether the version of the
20 Qualcomm -- strike that.
21      You don't know whether paragraph 6 of ETSI's
22 Intellectual Property Rights Policy that you studied is
23 the same as that was in effect when
24 Qualcomm first made a FRAND commitment to ETSI relative
25 to its 3g patents.  Is that fair?

---

39

1       A.  That is fair.  I do not know.
2       Q.  That was not information that was necessary for
3  to you assess in order to reach the conclusions you
4  express in your report.  Right?
5       A.  I think this is fair to say that it was not a
6  decisive element.  Had it been important, I'm pretty
7  sure that Qualcomm's lawyers would have told me to look
8  and compare the different versions of article or clause
9  six.
10      Q.  It's your understanding that Qualcomm does not
11 offer licenses to its standard essential patents at the
12 component level.  Right?
13      A.  Can you repeat this please?
14      Q.  Do you understand what I mean when I say
15 component level?
16      A.  Yes, I do.
17      Q.  What do you understand that term to mean?
18      A.  The term component is a -- it's a component.
19 It's one element as opposed to a full device.
20      Q.  Is a baseband processor a component of a
21 handset?
22      A.  I -- in my report, I have something on this and
23 I think it's fair to say.  On page 2 of my report, I
24 say that the FTC takes the position that ETSI FRAND
25 commitments create an obligation to grant licenses to

---

40

1  the manufacturers of baseband processors.  And then in
2  brackets, i.e., to grant licenses at the component
3  level.  So I think the answer is there.
4       Q.  Is it your understanding that Qualcomm refuses
5  to grant licenses to its standard essential patents to
6  the manufacturers of baseband processors?
7       A.  My understanding is not exactly that one.
8       Q.  How do you understand Qualcomm's policy
9  regarding licensing of standards essential patents to
10 the manufacturers of baseband processors?
11      A.  Well, what I understand is that there is this
12 agreement on the interpretation of ETSI FRAND
13 commitment and the obligation it creates, and what I
14 cannot tell you because I haven't studied this, is
15 whether or not Qualcomm has already in the past granted
16 licenses at the component level.  I -- I think it has a
17 consistent practice not to do it but then I haven't
18 studied all the contracts.
19      Q.  So you don't know one way or the other whether
20 Qualcomm has granted licenses to its standard essential
21 patents at the component level in the past.  Right?
22      A.  This is not exactly what I said.  I know that
23 there is a consistent practice not to do it.  Now, if
24 on specific occasions and in specific contexts --
25 contexts it has or not, that I don't know.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                8/16/2018

---

41

1     Q. How do you know that it is Qualcomm's
2  consistent practice not to grant licenses to its
3  standard essential patents at the component level?
4     A. I know this because I have been told so by
5  Qualcomm's lawyers and I have used this in my report
6  when I explained the role of practices.
7     Q. What do you mean when you say you used that in
8  the report when you explained the role of practices?
9     A. Well, in my report, when in -- when I deal with
10  the first question of interpretation, subsidiarily, I
11  deal with the question of the role of parties,
12  practices, and negotiations.
13     Q. So when you reached your expert opinion
14  regarding the role of Qualcomm's practices in
15  interpreting the FRAND commitment, you assumed, based
16  on information provided to you, that it has been
17  Qualcomm's consistent practice not to grant licenses to
18  its standard essential patents at the component level.
19  Is that fair?
20     MR. EARNHARDT:  You can take time to review the
21  part of your report on industry practice if you need
22  to.  This is not a memory test.
23     A. I had a discussion with an expert whose name is
24  Bertram Huber and it's recorded in the report.
25  Actually I didn't mention it before because it wasn't a

---

42

1  discussion on law, it was a discussion on practice.
2  And in my report I quote some elements of the
3  discussion and I say it's written on page 12, that I
4  understand from my discussion with Bertram Huber that
5  there is an established practice of negotiating set
6  licenses for complete cellular devices.
7     Q. What did Mr. Huber tell you about Qualcomm's
8  consistent practice of refusing to grant licenses at
9  the component level?
10     A. No.  It's not exactly that.  He didn't tell me
11  about Qualcomm's consistent practice of refusing to
12  grant licenses at the component level.  He told me
13  about Qualcomm's consistent practice of negotiating set
14  licenses for complete cellular devices.
15     Q. What does Mr. Huber know about Qualcomm's
16  practice of negotiating complete cellular licenses?
17     A. I do not know what Mr. Huber knows about this.
18     Q. Has Mr. Huber ever negotiated a complete
19  cellular license on behalf of Qualcomm?
20     A. I do not know if he has or if he has not.
21     Q. Has Mr. Huber ever been employed by Qualcomm?
22     A. I do not think so but I do not know about Mr.
23  Huber's life.
24     Q. Has Mr. Huber ever even seen a license
25  agreement negotiated between Qualcomm and any other

---

43

1  participant in ETSI?
2     A. You ask me questions I cannot answer.  I do not
3  know.
4     Q. Other than the discussion with Mr. Huber you
5  just referred to, what other discussions have you had
6  that having informed your view on Qualcomm's practice
7  of refusing to negotiate licenses at the component
8  level?
9     A. I've had the discussion with Mr. Huber and with
10  Qualcomm's lawyers.
11     Q. You haven't spoken with anybody other than Mr.
12  Huber or attorneys from Qualcomm regarding Qualcomm's
13  practice of refusing to grant licenses at the component
14  level.  Right?
15     A. I have not.
16     Q. You didn't list the discussion with Mr. Huber
17  in Exhibit-2.  Right?
18     A. If you say so, it must be right.
19     Q. Why not?
20     MR. EARNHARDT:  Take a look at Exhibit-2.
21     A. Why not?  It's in the report.  It's not a
22  written document.  It was a discussion so that could be
23  a reason why, but by no means did I try to hide it.  I
24  mean, it's -- it's clearly in the report.
25     Q. What other discussions other than the one with

---

44

1  Mr. Huber did you have that are relevant to your
2  opinions in this matter that are not listed in
3  Exhibit-2?
4     A. I think I've just told you that apart from Mr.
5  Huber and Qualcomm's lawyers, I had no other
6  discussions that are relevant for this report on this
7  matter.
8     Q. When did Mr. Huber tell you that Qualcomm began
9  its practice of refusing to license baseband processor
10  manufacturers to its standard essential patents at the
11  component level?
12     MR. EARNHARDT:  Just to clarify that, when did
13  he tell her that or when he spoke to her, when did he
14  say what was the time it happened.
15     Q. Let's try this:  On what date did Mr. Huber
16  tell you that Qualcomm refused to license baseband
17  processor manufacturers to its standard essential
18  patents at the component level?
19     MR. EARNHARDT:  Just --
20     A. The question is odd.
21     MR. EARNHARDT:  Just to clarify because I -- I
22  still think it's ambiguous and I'm not trying to be
23  disruptive, I just want to make sure, but are you
24  asking on what date she had the conversation with Mr.
25  Huber?

---

11 (Pages 41 to 44)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                    8/16/2018

45

1    Q. About this. Your report states you had a June
2    27th, 2018 discussion with Mr. Huber, right?
3    A. I'm sorry.
4    Q. Your report states you had a discussion with
5    Dr. Huber on June 27, 2018, right?
6    A. June or July?
7    Q. Your report states June 27?
8    A. June, yes. This is -- yeah.
9    Q. Did you have any discussions with Dr. Huber
10   other than with the discussion on June 27, 2018 in your
11   entire life?
12   A. In my entire life, yes, I did.
13   Q. Did you have any discussions other than the one
14   on June 27, 2018 with Dr. Huber that are relevant to
15   the opinions you express in your report?
16   A. No, I did not. It was in a different
17   litigation and the discussions I had with Mr. Huber
18   were not relevant to this report.
19   Q. What was the different litigation in which you
20   had discussions with Mr. Huber that were not relevant
21   to this report?
22   A. It was with Ericsson. In the case with
23   Ericsson.
24   Q. When did that case occur?
25   A. Three years ago or -- roughly.

46

1    Q. How -- all right. So you were employed by
2    Qualcomm approximately 2006?
3    A. Yes.
4    Q. And again three years ago in a case with
5    Ericsson?
6    A. In?
7    Q. A case with Ericsson?
8    A. Yes.
9    Q. Other than that, other than those two examples,
10   have you been employed by Qualcomm at other times?
11   A. From -- it lasted from 2006 to 2008 perhaps, so
12   it was -- and then I don't remember having been
13   employed by Qualcomm since then.
14   Q. So 2006 to 2008 you were employed in connection
15   with the Nokia litigation?
16   A. Yes, I was.
17   Q. What was the date range in which you were
18   employed with respect to the Ericsson litigation?
19   A. I have been employed on several occasions by
20   Ericsson. The date range would be difficult for me to
21   assess but perhaps 2010 to now.
22   Q. So when have you been employed by Qualcomm
23   other than the 2006 to 2008 Nokia litigation, and the
24   current litigation with the FTC and the current
25   litigation with Apple?

47

1    A. Can you say the beginning of the question
2    again?
3    Q. When have you been employed with Qualcomm other
4    than the 2006 to 2008 Nokia litigation, the current
5    litigation with the FTC, and the current litigation
6    with Apple?
7    A. When, do you mean in between 2008 and now?
8    Q. Yes. Were you ever employed by Qualcomm?
9    MR. EARNHARDT: When you say employed by
10   Qualcomm, you mean hired by -- as an expert?
11   MR. MATHESON: Yes.
12   A. Yes, I was not an employee. And I do not
13   remember having been employed by Qualcomm but I didn't
14   check.
15   Q. Okay. So from 2008 until the litigations that
16   are currently ongoing, you did not serve as an expert
17   for Qualcomm that you can recall?
18   A. I would have preferred to check, but that's
19   what I think, yes.
20   Q. When did you -- when were you first retained by
21   Qualcomm in FTC's litigation?
22   A. In this one? When was that? I mean it was a
23   few months ago or perhaps even -- yeah.
24   Q. April perhaps?
25   A. No.

48

1    Q. May? February?
2    A. I do not remember that.
3    Q. Where were you teaching at the time you were
4    first contacted by Qualcomm to serve as an expert in
5    this matter?
6    A. Was I teaching?
7    Q. Yes. Were you actively teaching a class on the
8    day, do you recall? I'm just trying to refresh your
9    recollection.
10   A. I don't have a good memory of dates of being
11   employed by Qualcomm. Is that very important? I can
12   check if you want with the retention letters, but I
13   really don't know now.
14   Q. When did you begin work on the report you
15   prepared in this matter?
16   A. I would say a couple of months ago.
17   Q. About how many hours did you spend on the
18   report prior to the date you signed it?
19   A. Prior?
20   Q. Prior to the time you signed it.
21   A. Prior --
22   Q. So not including deposition prep or anything.
23   A. And not including --
24   Q. Prior to signing the report, about how many
25   hours did you spend?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                    8/16/2018

49

1    A. Roughly speaking between 30 and 50.
2    Q. How many discussions did you have with
3 Dr. Huber?  Was it just the one on June 27, 2018 that
4 are relevant to the opinions you express in this
5 report?
6    A. Yes.  That was this one that was relevant to
7 the opinion.
8    Q. How long did that discussion last?
9    A. An hour or so.
10    Q. Did it take place in person?
11    A. No, it did not.
12    Q. On the phone?
13    A. On the phone.
14    Q. What time of day was it?
15    A. Sorry?
16    Q. What time of day?
17    A. What time?  You mean 2:00 o'clock or 3:00
18 o'clock?
19    Q. Yeah.  Was it morning, was it the evening?
20    A. It must have been -- I can't remember.
21    Q. Were you on your cell phone?
22    A. Yes, I was.
23    Q. Where were you sitting?
24    A. In my office in my house.
25    Q. You have an office in your home?

50

1    A. Yes, I do.
2    Q. Do you remember if it was light outside?
3    A. Sorry?
4    Q. Do you remember if it was daylight outside?
5    A. I think it was.
6    Q. Where is your home office located?
7    A. Wow.  That's very private question.  But it's
8 located in Saint Cloud, France, because I know there is
9 an Saint Cloud US also.
10    Q. How do you spell that?
11    A. Saint Cloud.
12    Q. Makes it easier for us.  Is that close to
13 Paris?
14    A. Yes, it is.  It's in between Paris and
15 Versailles, west of Paris.  It's very nice.
16    Q. I'm sure it is.
17    A. You should come there.
18    Q. I would love to.  So it was daylight in Saint
19 Cloud on June 27, 2018 when you spoke with Dr. Huber?
20    A. Yes.
21    Q. You signed your report on June 28, 2018?
22    A. Yes.
23    Q. How many hours did you spend on your report
24 between the discussion you had with Dr. Huber and the
25 time you signed your report?

51

1    A. I did work on the report between that, but not
2 more than five or in between five and 10 hours.  Not --
3 perhaps a little less.  I'm -- I don't remember because
4 June is a hard month for professors because of all the
5 work we have and but I remember having kept some time
6 free for this report, a couple of days, but I wouldn't
7 know how many hours precisely.
8    Q. What time of day was it when you signed your
9 report?
10    A. Oh, I have no idea.
11    Q. Was it daylight?
12    A. I cannot tell you.
13    Q. So it's fair to say you did the majority of the
14 work you performed on this report before you spoke with
15 Dr. Huber?
16    A. Yes, it's fair to say this.  The majority of
17 the work is not on this point for me.  The majority of
18 the work is on French law.  I'm a French law expert.
19 I'm not an expert of Qualcomm's practices.
20    Q. Did Dr. Huber tell you that any other holders
21 of standard essential patents who made FRAND
22 commitments to ETSI refused to offer licenses to
23 baseband processor manufacturers for components?
24    MR. EARNHARDT:  Again, you can refer to your
25 report if you need to.  It's not a memory test.

52

1    A. It's not exactly the wording he has used.  It's
2 not the way the discussion went.  And the discussion
3 went on a more -- how do you say -- positive perhaps
4 line.  What he told me is that there is an established
5 practice of negotiating set standard essential patent
6 licenses for complete cellular devices -- complete
7 cellular devices.
8    Q. Which -- oh sorry.  I didn't mean to cut you
9 off.  I thought you were done.
10    A. Okay.  And he also told me that it is a
11 long-standing practice and that it has been used in the
12 mobile communication industry for a long time, but he
13 didn't mention other companies who use it.  But what I
14 understood from the conversation is that it's not only
15 Qualcomm who has this practice.
16    Q. Did he identify any other holder of standard
17 essential patents other than Qualcomm that has this
18 practice?
19    A. I do not remember him identifying specifically
20 another company, no.
21    Q. Did you ask him which other companies licensed
22 according to Qualcomm's practice?
23    A. I did not.  I relied on him saying it's a
24 long-standing practice in the industry.
25    Q. Did you ask him when that practice began?

13 (Pages 49 to 52)

FTC v. Qualcomm, Inc.                                                    8/16/2018

53

1    A. No, I did not.
2       Q. Did you ask him if the practice was the same
3    for CDMA standards as for standards promulgated by
4    ETSI?
5       A. No, I did not.
6       Q. Did you ask him if Ericsson licensed at the
7    component level?
8       A. No. I didn't ask him.
9       Q. Sitting here today, do you know whether
10   Ericsson licensed at the component level?
11      A. I do not know whether Ericsson licenses at the
12   component level, but what I know is that it's a -- this
13   long-standing practice of licensing only at the device
14   level is used the mobile communication industry
15   including Ericsson.
16      Q. And you know that -- strike that.
17         How do you know it includes Ericsson?
18      A. Well, I've done some expert reports for
19   Ericsson and I -- well, I wasn't really asked to opine
20   on these questions, but I remember that they agree that
21   it is a long-standing practice of licensing at this
22   device level.
23         MR. EARNHARDT: Yeah. I just want to be
24   careful that we --
25         THE WITNESS: But yeah.

54

1          MR. EARNHARDT: -- we don't ask her to disclose
2    confidential information she may have learned having
3    been employed as an expert by Ericsson.
4       Q. Do you know whether Ericsson has licensed
5    Motorola at the component level?
6       A. I do not know.
7       Q. Do you know whether Ericsson licensed Qualcomm
8    at the component level?
9       A. I do not know what kind of agreements they have
10   between Qualcomm and Ericsson.
11      Q. Do you know whether Ericsson has licensed
12   Alcatel-Lucent at the component level?
13      A. I do not know.
14      Q. Do you know whether Alcatel-Lucent has licensed
15   Ericsson at the component level?
16      A. I do not know the practice of licensing by
17   Ericsson.
18      Q. Do you know whether Motorola has licensed
19   Ericsson at the component level?
20      A. No, I do not know.
21      Q. Do you know whether Motorola has licensed
22   Qualcomm at the component level?
23      A. Again, I do not know.
24      Q. Do you know whether AT&T has licensed Qualcomm
25   at the component level?

55

1       A. No, I do not know.
2       Q. Do you know whether Samsung has licensed
3    Qualcomm at the component level?
4       A. I do not know but we could also draw a list of
5    all the cases where license has not been at the
6    component level.
7       Q. Do you know whether Qualcomm licensed Siemens
8    at the component level?
9       A. I do not know.
10      Q. Do you know whether Qualcomm licensed VLSI at
11   the component level?
12      A. Again, I do not know.
13      Q. You don't have any information regarding the
14   existence or nonexistence of a practice of licensing at
15   -- licensing at the component level other than the
16   information provided to you by Dr. Huber and Qualcomm's
17   lawyers. Right?
18      A. I think there is a misunderstanding here.
19   Dr. Huber did not say that there was never any
20   licensing at the components level. What he said is
21   what I have written in my report. There is an
22   established practice of negotiating set licenses for
23   complete cellular devices. But an established practice
24   does not mean entire full practice which would mean
25   that any other practice would be rejected.

56

1       Q. On what date did this practice become
2    established?
3       A. I did not ask Dr. Huber.
4       Q. What percentage of holders of standard
5    essential patents, in your view, would have to license
6    at the component level in order to demonstrate that
7    Dr. Huber is wrong?
8          MR. EARNHARDT: Objection.
9       A. This is not a question I can answer. I'm an
10   expert in French law.
11      Q. What did you understand Dr. Huber to mean when
12   he told you there was a, quote, established practice?
13      A. I understood established as having started some
14   time ago and being used by many actors.
15      Q. What is the latest date on which a practice
16   could be established and still qualify as having been
17   established some time ago with respect to licensing in
18   mobile communications?
19      A. It's not possible to give a latest date. An
20   established practice needs to have been going on for
21   some time, and I understood this practice has been
22   going on for some time, but no date is specified and
23   needs to be specified to establish an established
24   practice.
25      Q. You say that you understand the practice has

14 (Pages 53 to 56)

FTC v. Qualcomm, Inc.                                                      8/16/2018

---

57

1   been going on for some time, what do you mean by "some
2   time"?  How many years?
3        MR. EARNHARDT:  And again, you can look at your
4   report if you need to -- if you need to refresh your
5   recollection.
6        A.  Yes, I do need to refresh my recollection and I
7   don't remember having given a number of years.
8        MR. EARNHARDT:  He's asking you about the part
9   of industry practice.
10       MR. MATHESON:  You can stop coaching the
11  witness any time.  My question is clear, it didn't
12  refer to her report.  I referred to exactly the words
13  she used.  So please, stop coaching, stop interrupting.
14  She doesn't need your help, she's a very smart lady.
15       MR. EARNHARDT:  I understand that.  But you're
16  asking her --
17       MR. MATHESON:  All right.  Please stop talking.
18       MR. EARNHARDT:  I'm not going to stop talking.
19  You're asking her to recall about --
20       MR. MATHESON:  We're going to suspend this
21  deposition if you keep referring to her report
22  needlessly.  I didn't ask her anything about her
23  report.  I asked her what she meant when she used the
24  words "some time".
25       MR. EARNHARDT:  And that is addressed in her

---

58

1   report, Dan.  If you -- if you want her to --
2        MR. MATHESON:  Stop coaching.
3        MR. EARNHARDT:  I'm not --
4        MR. MATHESON:  Let her answer the questions.
5   All right.
6        MR. EARNHARDT:  If the question is not about
7   her report, it's not an appropriate question and if it
8   is, it's not a memory test.
9        MR. MATHESON:  Will you please read back the
10  question.
11       (The requested portion was read.)
12       A.  Once again, I do not remember having given a
13  specific number of years.  What I said that -- as I
14  said before, I understand from my discussion with
15  Bertram Huber that there is an established practice of
16  negotiating set licenses for complete cellular devices.
17  And a few lines after, I add that -- the fact that the
18  long-standing practice of licensing only at the device
19  level has been used since the mobile communications
20  industry started, is strong evidence of the intention
21  on the part of the ETSI IPR committee at the time of
22  the policies's drafting to impose the ETSI FRAND
23  commitment only at the device rather than at the
24  component level.  So it's not directly an answer to
25  your question but I think the element of time is here,

---

59

1   since the mobile communications industry started.
2        Q.  Okay.  About five minutes ago you said and I,
3   quote, I understood this practice has been going on for
4   some time.  What did you mean when you said "this
5   practice has been going on for some time"?  How many
6   years did you mean when you said "some time"?
7        A.  When -- when I said some time, perhaps it's a
8   language question.  I -- I didn't mean any amount of
9   years.  I had in mind exactly what I have read, since
10  the mobile communication industry started.
11       Q.  When did the mobile communications industry
12  start?
13       A.  And this is precisely why I can't tell you for
14  how many years because it's difficult for me.  I'm not
15  an expert on mobile communication industry.  I myself,
16  of course, use a cell phone and I sort of remember when
17  it started but when exactly is it started for
18  companies, that, I do not know.
19       Q.  But you understand that the practice you're
20  referring to started at the same time the mobile
21  communications industry started.  Right?
22       A.  Now I'm cautious that there's no
23  misunderstanding.  What I understand is that this
24  long-standing practice of licensing only at the device
25  level has been used since, indeed, this industry

---

60

1   started.
2        Q.  When you say it has been used, you mean that
3   some licensees have licensed only at the device level
4   since the industry started.  Right?
5        A.  This is not what I have written and this is not
6   what I understood from Dr. Huber.
7        Q.  You don't understand sitting here today that
8   all holders of standard essential patents have licensed
9   only at the device level since the industry started.
10  Is that fair?
11       A.  What I understood is that a majority has
12  licensed only at the diverse -- at the device level.
13       Q.  So sitting here today, it's your understanding
14  that a majority of the holders of standard essential
15  patents license only at the device level and do not
16  license at the component level with respect to their
17  standard essential patents.  Is that fair?
18       A.  I have not said this and in your question here
19  you add only.  I have not said this.  I have said that
20  it's been a long-standing practice but this does not
21  exclude completely the fact that in some situations you
22  may deviate from a practice.  A long-standing and -- or
23  an established practice does not need to be the only
24  practice.
25       Q.  Okay.  Well you said, quote, I understood that

---

15 (Pages 57 to 60)

FTC v. Qualcomm, Inc.                                               8/16/2018

---

61

1   a majority has licensed only at the device level.
2       A. Did I say only?
3       Q. Yes.
4       A. Well, then I shouldn't have said only because
5   what I mean is that this was the -- the main practice,
6   not the sole practice.
7       Q. So you understand that a majority of the
8   holders of standard essential patents license at the
9   device level, but you don't know how many of those also
10  license at the component level. Is that fair?
11      A. Yes. That is fair.
12      Q. Did you ask Dr. Huber whether the holders of
13  standard essential patents who license at the device
14  level also license at the component level?
15      A. I did not ask him because it was very clear in
16  the discussion I had with him that there was an
17  established practice which could, under French law,
18  constitute a usage or established practice and that was
19  sufficient. So I wasn't -- my role is not to
20  investigate on these points. I'm not an expert in
21  this. And I rely on Dr. Huber's assertion that there
22  is an established practice which started when the
23  mobile communication industry started. And I did not
24  ask him how many times there have been deviations from
25  this practice because it's not a matter of

---

62

1   quantification of the deviations. What is important is
2   that there is a practice that started from the very
3   beginning and it is largely followed and therefore it
4   is -- well, it can be considered a usage.
5       Q. So if Dr. Huber were to call you tomorrow and
6   change his assertion that there was an established
7   practice which started when the mobile communication
8   industry started, that would change your view regarding
9   industry practice. Right?
10      A. Regarding industry practice? You mean if
11  Dr. Huber called me and said what I've said is wrong,
12  and in fact the practice is to license at the component
13  level, I was completely wrong. And then you ask me if
14  this will change my view? I think it would change my
15  view if it completely changed his view, but it will
16  change my view only on what constitutes industry
17  practice. And it will not change my view on other
18  points which are more important that I developed in my
19  report.
20      Q. Well, industry practice is relevant to
21  understanding the intentions of parties to a contract
22  in some circumstances. Right?
23      A. In some circumstances it may be important.
24      Q. Where the language of a contract is ambiguous
25  and the parties's intent cannot be ascertained solely

---

63

1   from the language of the contract, industry practice
2   can be important. Is that fair?
3       A. Yes. Industry practice and also all the
4   elements. And so it's only one among other elements
5   that is important. And it is only important when the
6   language of the contract has some ambiguity.
7       Q. And the only information you have regarding
8   industry practice with respect to licensing at the
9   component level comes from Dr. Huber. Right?
10      A. Yes, it does.
11      Q. I've never tried a case in French court. If a
12  French judge was attempting to interpret this contract,
13  how would they go about it? Would they take live
14  testimony regarding industry practice, would they
15  accept declarations, what's the normal course if a
16  French judge is trying to resolve a dispute about the
17  meaning of the ETSI IPR policy and needed to consider
18  industry practice?
19      A. Well, I could sit here for a long and give you
20  a French law class on procedure. It's so different.
21  You can't imagine, you would be surprised. There are
22  no experts, no testimony, no oral testimony. The
23  lawyers present their conclusion and then the French
24  court will make his opinion and it's a written
25  procedure and it's not comparable at all. What I can

---

64

1   say to be more precise is that the most important and
2   foremost element would be the contract itself, and the
3   terms of the contract.
4       Q. If a French judge felt the need to understand
5   industry practice in the context of interpreting the
6   ETSI IPR policy, the French judge wouldn't take any
7   live testimony from witnesses. Is that right?
8       A. I don't think he would.
9       Q. How old a French judge determine the
10  credibility of Dr. Huber and a witness who said exactly
11  the opposite with regard to the supposed practice of
12  licensing at the component level?
13      A. Unfortunately I've never sat as a judge, and
14  this is a tough question. The only experience I have
15  from my work is that the very same question can be
16  asked as regards foreign law. When parties have to
17  bring the contents of foreign law, one party does --
18  says something, the other party says the opposite and
19  the judge has to decide by himself.
20      Q. But you don't have -- strike that.
21      What Dr. Huber told you regarding the industry
22  practice with respect to component level licensing,
23  that was based on his observations during his time at
24  ETSI, right? Things that he saw?
25      A. He didn't tell me what the basis, but it's

---

16 (Pages 61 to 64)

65

1   not only things that he saw, perhaps it's also the way
2   things have been negotiated and I don't -- I do not
3   know what is the basis of his information. All I know
4   is that he's a credible expert, he has long experience
5   and I've been told that I could trust him and it's not
6   the core of -- once again, it's not the core of my
7   opinion, not at all.
8       Q. Who told you you could trust Dr. Huber?
9       A. Well, actually it's implicit telling by
10  organizing this call so that he will give me elements
11  that I can put in my report on industry practice. I
12  mean, I couldn't imagine a Qualcomm's lawyers
13  organizing this with somebody I could not trust.
14      Q. So you trusted Dr. Huber because Qualcomm's
15  lawyers put you on the phone with him; is that right?
16      A. Because first of all, I know he is an expert on
17  these questions and a credible expert who has long
18  experience and also because it was choice of Qualcomm's
19  lawyers who choose who to trust.
20      Q. Who is Carl Himes Rosenbrook?
21      A. I think he is the expert for the FTC.
22      Q. What did he offer an expert opinion on?
23      A. I think he disagrees with Dr. Huber.
24      Q. Do you think that Carl Himes Rosenbrook has any
25  information relevant to the existence of a practice of

66

1   component level licensing?
2       A. I have no idea of the kind of information he
3   has.
4       Q. You have never spoken with Carl Himes
5   Rosenbrook?
6       A. Never.
7       Q. Never read any reports he prepared?
8       A. I didn't read the -- the report at.
9       Q. Who is Roger Tolfrey?
10      A. I do not know.
11      Q. Do you know if he participated in ETSI?
12      A. I do not know.
13      Q. Do you know whether his employer offered to
14  make licenses to its alleged standard essential patents
15  available at the component level?
16      A. His employer? Sorry, can you?
17      Q. Yeah. Do you know if his employer?
18      A. Whose employer?
19      Q. Roger Tollbrooks -- I'm sorry. Roger
20  Tollfrey's?
21      A. But I don't know who -- who is the employer of
22  this Roger.
23      Q. Who is George Graff?
24      A. I do not know.
25      Q. He was employed by Alcatel at one time. Right?

67

1       A. I do not know.
2       Q. He was also employed by SEI at one time.
3   Right?
4       A. I do not know.
5       Q. Do you know whether SEI offered to make
6   available licenses to its ETSI standard essential
7   patents available at the component level?
8       A. I do not know.
9       Q. Have you ever met Dr. Huber in person?
10      A. Yes, I have.
11      Q. Was that in 2018?
12      A. No, it wasn't.
13      Q. Have you ever asked Dr. Huber how much money
14  he's been paid by Qualcomm over the course of the year?
15      A. I would never ask such a question. It's not in
16  the French mentality.
17      Q. Isn't it relevant to your determination of his
18  credibility?
19      A. Not at all.
20      Q. Do you know if Dr. Huber has ever been
21  convicted of perjury?
22      A. What?
23      Q. Do you know if he's ever perjured himself?
24      A. No, I do not know.
25      Q. You have no idea one way or the other whether

68

1   Dr. Huber has ever made a false statement under oath?
2       A. I have no idea.
3       Q. That was not relevant to your determination of
4   whether you should credit the representations Dr. Huber
5   made to you in this matter. Right?
6       A. I have no idea of this.
7       Q. Which companies -- strike that.
8           How many people were involved in drafting the
9   ETSI IPR policy that is relevant to your opinions in
10  this matter?
11      A. That, I do not know. I believe quite a lot
12  because it's been -- well, I do not know.
13      Q. How many of those individuals have you spoken
14  with in the course of reaching your opinions in this
15  matter?
16      A. How many?
17      Q. Of those individuals --
18      A. Who drafted the policy?
19      Q. -- have you spoken with -- in the course of
20  reaching your opinions in this matter, how many
21  individuals involved in drafting the ETSI IPR policy
22  have you spoken with?
23      A. Apart from Dr. Huber, I -- I have not.
24      Q. You have not spoken with anyone who was
25  involved in drafting the ETSI IPR policy other than

17 (Pages 65 to 68)

FTC v. Qualcomm, Inc.                                                    8/16/2018

---

69

1    Dr. Huber.  Right?
2        A.  I do not remember, so to my knowledge sitting
3    here now, I would say that I have not.
4        Q.  I'm not trying to trick you.  As far as I know,
5    you've never.  Sitting here one way or the other, as
6    far as you know?
7        A.  Now I'm cautious because perhaps, you know -- I
8    don't think -- as far as I know and as far as I
9    remember, I have not.
10       Q.  How long did it take to draft the ETSI IPR
11   policy that is relevant to your opinions in this
12   matter?
13       A.  I do not know.
14       Q.  How many meetings took place over the course of
15   drafting the ETSI IPR policy that's relevant to your
16   opinions in this matter?
17       A.  I wasn't asked to look at that and I do know.
18       Q.  Dr. Huber provided you no information regarding
19   how many meetings were involved in drafting the ETSI
20   IPR policy; is that right?
21       A.  I don't remember having been provided with such
22   information by Dr. Huber.
23       Q.  One circumstance in which industry practice can
24   be relevant to determining party's intent is if a
25   dispute involves a question that is not able to be

---

70

1    resolved based on the plain language of the contract.
2    Right?
3        A.  I think this is correct.
4        Q.  And one circumstance in which a question might
5    not be able to be resolved based on the plain language
6    of the contract is if the parties to the contract had
7    no meeting of the minds regarding the term.  Right?
8        MR. EARNHARDT:  Object to the form.
9        A.  And I did not understand.  Had no meaning?
10       Q.  No meeting.  I will rephrase it.
11           The important question in interpreting a
12   contract under French law is the intent of the parties.
13   Right?
14       A.  This is right.
15       Q.  The party's intent should be given effect
16   regardless of the literal reading of the contractual
17   terms.  Right?
18       MR. EARNHARDT:  Object to the form.
19       A.  This is not right.
20       Q.  What would a French court upon French law do if
21   the parties to a contract had not anticipated a
22   particular circumstance would arise?  How would that
23   court determine what the party's intent was?
24       A.  Then he will have to interpret the intention of
25   the parties.

---

71

1        Q.  The plain language of the contract might be
2    relevant to that interpretation.  Right?
3        A.  Definitely.  The plain language of the contract
4    is very relevant.
5        Q.  What if the parties never anticipated the plain
6    language of the contract would apply to the unforeseen
7    circumstance?
8        A.  Then, as I said, there would be a question of
9    interpretation of the intention of the parties.
10       Q.  And what would form the basis to interpret the
11   intention of the parties?
12       A.  Under French law, to interpret the party's
13   intention the judge has some freedom to look at a wide
14   range of elements.  We have already mentioned industry
15   practice.  We can also mention further discussions that
16   the parties may have had, even subsequent to the
17   contract.  And also other external elements.  Perhaps
18   in order to better answer, it would be good to refer to
19   the quote again of Benabent as regard interpretation of
20   the contract.  Sorry, it takes me a little while to
21   find it.  So it's on page 5.  And under French law
22   contractual interpretation is done and I quote him now,
23   in concreto, and we sometimes call it a subjective
24   interpretation that is to say it was a search for the
25   intent that the parties themselves may have had, and

---

72

1    not in abstracto, by that which form by another
2    reasonable person in the same situation.  And therefore
3    when the judge has to search for the party's intent,
4    the -- as I said in my report, the party's negotiation
5    history is important.  And if it were an ordinary
6    contract, the French court will, for instance, look at
7    the pre-contractual documents, but it could also look
8    at other documents to clarify the party's intent.  And
9    this is well admitted by all authors.  I have quoted
10   Benabent, I have quoted also Terre, Simler, Lequette.
11   There's no discussion on this that the court may look
12   at external elements, in the context of ETSI, he -- the
13   court could look, for instance, at the general
14   assembly, the decision of the committees, or other
15   elements that it would consider relevant.
16       Q.  When you say look at the general assembly, what
17   are you referring to?
18       A.  I'm referring and I think I quote them and I
19   have them in the annex, there has been some minutes,
20   summary minutes at least, of the general assembly and
21   so this is typically the kind of elements that the
22   courts, a French court, could look at.  And in my
23   report on page 12, I mention it.  And that's also
24   footnote 42 where I refer to them, where I say that
25   ETSI's general assembly has repeatedly rejected

---

18 (Pages 69 to 72)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                             8/16/2018

73

1    proposals to impose prohibitions on particular
2    practices.
3        Q.  Other than the material you cite in footnote
4    42, what other general assembly materials have you
5    reviewed in connection with the opinion you offer in
6    this matter?
7        A.  General assembly materials?  I don't remember
8    having reviewed other than these ones.  They're quite
9    long minutes already.
10       Q.  These minutes from 2003?
11       A.  Are they all from 2003?  I'm not too sure about
12   the date.  It's not obvious to understand with the
13   references.
14       Q.  And you never listed these materials relied
15   upon.  Right?
16       A.  Sorry?
17       Q.  You never listed these in Exhibit-2, amongst
18   the materials you relied upon?
19       MR. EARNHARDT:  They're --
20       A.  Yes, I did.  I did.  Look at the last part of
21   other, I think these other materials --
22       Q.  Those are the minutes, okay.  So other than
23   these minutes, you can't recall reviewing any others
24   that were relevant to the opinions you offer in this
25   matter?

74

1        A.  I can't recall and I didn't need to because
2    this -- this was to show that under French law, it will
3    be possible for a judge to refer to elements which are
4    posterior to the contract making, to the first time
5    when the policy was drafted, in order to interpret the
6    policy.
7        Q.  Now, the significance you ascribe to these
8    minutes is that in these minutes ETSI rejected
9    proposals that would have prohibited royalty free cross
10   license, required grant backs of rights to
11   improvements, and required licensing certain regions of
12   the globe at different -- strike that.
13       I'm having trouble interpreting your footnote
14   here.  So one importance you ascribe to these minutes
15   is that they contain an indication that in 2003, ETSI
16   rejected a proposal that would have prohibited royalty
17   free cross licenses.  Right?
18       A.  Well, I quoted this minutes on this part, yes.
19       Q.  Okay.  And another importance you ascribe to
20   these minutes is that in 2003, ETSI rejected a proposal
21   that would have required grant backs of rights to
22   improvements.  Right?
23       A.  I'm -- I'm not too convenient with the
24   expression the importance I ascribe.  I don't ascribe
25   importance as such to these precise elements.  And it's

75

1    more important to look at the sentence in the plain
2    text which says that the general assembly of ETSI has
3    rejected, repeatedly, proposers to impose prohibitions
4    on particular practices.  And I quote this and there
5    may be others.  I haven't reviewed everything, but I
6    quote this as examples of the fact that ETSI general
7    assembly is reluctant to impose prohibitions on
8    particular practices.
9        Q.  So one practice that ETSI rejected a proposal
10   to prohibit is royalty free cross licensing.  Right?
11       A.  I mean, you are taking this from the footnote.
12   Yes.
13       Q.  Another proposal ETSI rejected would have
14   required grant backs of rights to improvements.  Right?
15       A.  Yes.  That is what is written.
16       Q.  And a third proposal that ETSI rejected would
17   have prohibited licensing certain regions of the globe
18   at different rates from those charged from other
19   regions.  Right?
20       A.  That is written in the footnote.
21       Q.  Other than these three practices, which
22   proposals to impose prohibitions has ETSI's general
23   assembly rejected?
24       A.  I do not know of all the proposals that have
25   been rejected.  Having looked at these minutes and only

76

1    at these minutes, I remember that there has been
2    discussion on the clause 6.1 and trying to clarify what
3    the FRAND commitment is and what it means.  And I
4    remember, but if you want me to send more I will need
5    to look at the minutes.  That these discussions were
6    quite long, there were diverging views and finally the
7    language was not changed.  What I want to say when I
8    quote this is that's ETSI's general assembly has
9    repeatedly refused to impose prohibition on particular
10   practices because it's not the purpose of ETSI to do
11   that.
12       Q.  It's not the purpose of ETSI to prohibit
13   particular practices.  Is that the opinion you're
14   expressing in this matter?
15       A.  Well, to impose new prohibition on particular
16   practices.  The purpose of ETSI, and it's not my
17   opinion, it what is said in the ETSI policy.  It's
18   clearly stated in annex 6 clause 3, the policy
19   objectives of ETSI.  And I can read it.  ETSI's
20   objective is to create standards and technical
21   specifications that are based on solutions which best
22   meet technical objectives of the European
23   telecommunications sector as defined by the general
24   assembly.  In order to further this objective, the ETSI
25   policy seeks to reduce the risk to ETSI, members and

19 (Pages 73 to 76)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                    8/16/2018

---

77

1    others applying ETSI standards and technical
2    specifications that investment in the preparation,
3    adoption, and application of standards could be wasted
4    as a result of an essential IPR being unavailable.  In
5    achieving these objectives, and I think this is
6    important, the ETSI IPR policy seeks a balance between
7    the needs of standardization for public use in the
8    field of telecommunications and the rights of the
9    owners of IPRs.
10       And then you have 3.2, IPR holders whether
11   members of ETSI and their affiliates or third parties,
12   should be adequately and fairly rewarded for the use of
13   their IPRs.
14       THE REPORTER:  Should be?
15       THE INTERPRETER:  Adequately.
16   A.  Sorry for my pronunciation.
17       Reward -- should be rewarded for the use of
18   their IPRs in the implementation of standards and
19   technical specifications.
20       The purpose of ETSI is not to interfere with
21   the commercial terms of the parties.  When I mean
22   parties, I mean parties to a license contract.
23   **Q.  So are these minutes you cite here in footnote**
24   **42 among the pre-contract documents that a court might**
25   **consider when attempting to construe the ETSI IPR**

---

78

1    **policy?**
2    A.  I don't think they are pre-contractual, I would
3    say that they come after.
4    **Q.  Which pre-contractual documents have you**
5    **reviewed that a court would consider relevant when**
6    **construing the ETSI IPR policy?**
7    A.  What do you mean by pre-contractual documents?
8    That will be before the ETSI policy is drafted?
9    **Q.  What is a pre-contractual document as you used**
10   **the term?**
11   A.  A pre-contractual document in the normal
12   contract setting, is usually a document that may be
13   used in pre-contractual negotiations between the
14   parties.  So you may have discussions, you make change
15   letters before the contract, and all this will be
16   pre-contractual.  Once the contract is signed, you are
17   in the contractual phase.  Now with ETSI, things are
18   slightly different.  It's not a typical contract
19   between two private parties that is negotiated between
20   two parties.  So things are different and I think what
21   is most relevant and what the judge will take into
22   account is what has been said subsequently to the
23   drafting of the policy and the fact that the policy has
24   not been changed or that it has been changed by the
25   general assembly is, of course, very relevant.  So it's

---

79

1    not pre-contractual in the sense that the policy had
2    been already established.
3    **Q.  So you haven't reviewed any pre-contractual**
4    **documents related to the ETSI IPR policy; is that**
5    **right?**
6    A.  I didn't know -- I didn't need to review these
7    pre-contractual documents.
8    **Q.  So the answer is no, you have not reviewed any**
9    **pre-contractual documents relevant to the IPR?**
10   A.  To my knowledge I have not, no.
11   **Q.  And the only post contractual documents you've**
12   **reviewed relevant to ETSI's IPR policy are the minutes**
13   **noted in footnote 42; is that right?**
14   A.  I think you are right, yes.  I don't remember
15   any other documents relating to ETSI's drafting of IPR
16   policy.
17   **Q.  And nothing in the documents cited in footnote**
18   **42 is relevant to the practice of licensing essential**
19   **-- standard essential patents at the component level.**
20   **Is that fair?**
21       MR. EARNHARDT:  Object to form.
22   A.  This is not the way I would put it.  Everything
23   is relevant.  Everything is relevant to what I am
24   trying to explain.  And what I am trying to explain and
25   I repeat it is that the general assembly is very

---

80

1    reluctant and rejected proposals to impose prohibitions
2    on particular practices.  One of these prohibition
3    would be to prohibit the practice of granting licenses
4    at the device level.  Or, in other words, impose a
5    practice of granting licenses only at a component
6    level.  This is the kind of thing that obviously -- and
7    this reverts from these elements that I have reviewed,
8    the general assembly would be very reluctant to do and
9    has not done to my knowledge.
10   **Q.  In the meeting minutes you cite in footnote 42,**
11   **did anyone propose that ETSI should require a practice**
12   **of granting licenses at the component level?**
13   A.  I don't know if you have seen these minutes.
14   Each of them is a couple of pages long, they are very
15   dense.  I would need to review them all over again to
16   give you the answer.
17   **Q.  So as far as -- sorry.**
18       **(Speaking at the same time.)**
19   **Q.  As far as you can recall, there is no**
20   **discussion in these meeting minutes you refer to in**
21   **footnote 42?**
22   A.  I wouldn't -- I wouldn't even say that.
23       MR. EARNHARDT:  Just don't talk over each
24   other.  Let him finish the question --
25       THE WITNESS:  Sorry.

---

20 (Pages 77 to 80)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                   8/16/2018

---

81

1        MR. EARNHARDT:  -- before you start.
2        THE WITNESS:  Sorry.
3     Q.  So as far as you can recall sitting here today,
4  nothing in those meeting minutes is relevant to a
5  proposal - strike that.
6        As far as you can recall sitting here today,
7  these meeting minutes do not explicitly address a
8  proposal to require licensing at component level.  Is
9  that fair?
10    A.  I cannot say that.  I do not recall well
11 enough.  I remember it's long, it's technical, and I
12 remember that I skipped some parts which did not seem
13 relevant, so I cannot tell you whether or not this was
14 in the minutes.
15    Q.  So you don't know one way or the other if these
16 meetings minutes explicitly address a proposal to
17 require licensing at the component level.  Is that
18 fair?
19    A.  What I know from what I remember is that it was
20 not the main and foremost topic of one of these minutes
21 because I think I would then remember that.
22    Q.  Do you know if the general assembly of ETSI has
23 ever explicitly addressed a proposal to require
24 licensing at the component level?
25    A.  I do not know.

---

82

1        MR. EARNHARDT:  Is now a good time for another
2  short break?
3        MR. MATHESON:  Sure.
4        THE VIDEOGRAPHER:  We will go off the record.
5  The time is 11:21.
6        (A recess was taken.)
7        THE VIDEOGRAPHER:  On the record.  The time is
8  11:36.
9  BY MR. MATHESON:
10    Q.  So in a disagreement over the intent of the
11 parties cannot be resolved solely based on the clear
12 and unambiguous language, external sources can be
13 helpful in discerning the intent of the parties, right?
14    A.  This is what I have written, yes.
15    Q.  One such external source can be the content to
16 pre-contractual negotiations?
17    A.  Yes, indeed.
18    Q.  And one external source could be the history of
19 the parties' negotiations?
20    A.  It should be the same as the content of the
21 pre-contractual negotiations, so, yes.
22    Q.  And another source would be the pre-contractual
23 documents, right?
24    A.  Yes, again.
25    Q.  You didn't examine any pre-contractual

---

83

1  documents to reach the opinions you offer in this
2  matter, right?
3     A.  Yes.  This is right.
4     Q.  The only information you have regarding the
5  history of the parties' pre-contractual negotiations
6  comes from your discussion with Dr. Huber; is that
7  right?
8     A.  I do not even remember my discussions with
9  Dr. Huber on the history of the pre-contractual
10 negotiations.  I didn't consider this was important in
11 this matter.
12    Q.  So you did not undertake to investigate in any
13 fashion the history of the parties' pre-contractual
14 negotiations in reaching the conclusions you offer in
15 your report, right?
16    A.  I thought it was more important to have a look
17 at the discussions as a general assembly and what I've
18 mentioned before and we've discussed that before.
19    Q.  And as we discussed before, the general
20 assembly materials you reviewed are not a history of
21 the parties' pre-contractual negotiations, right?
22    A.  I don't remember that they are a history of the
23 parties' pre-contractual negotiation because it took
24 place after.
25    Q.  So you don't have any information regarding the

---

84

1  history of the parties' pre-contractual negotiations
2  with respect to ETSI's IPR policy; is that right?
3        MR. EARNHARDT:  Object to the form.
4     A.  I didn't need it.
5     Q.  So is the answer to the question --
6     A.  Yes.  The answer is I do not have reviewed any
7  documents regarding the pre-contractual negotiations.
8     Q.  You did not undertake to investigate in any
9  fashion the history of the parties' pre-contractual
10 negotiation with respect to ETSI's IPR policy; is that
11 right?
12       MR. EARNHARDT:  Object to the form.
13    A.  I think that I have answered already the
14 question.  It did not -- it was not relevant so I did
15 not examine the parties' pre-contractual negotiation
16 prior to the drafting of the ETSI policy.
17    Q.  Now in an ordinary contractual setting if a
18 French court felt the need to interpret contractual
19 provisions based on external sources, it might rely on
20 publicity documents, right?
21    A.  That's one of the elements that are quoted in
22 the quote of Benabent, I think.
23    Q.  What does publicity documents mean in the that
24 context?
25    A.  Well, in the context of ETSI, I don't think it

---

21 (Pages 81 to 84)

FTC v. Qualcomm, Inc.                                                      8/16/2018

---

85

1  means anything.  What is meant here and it's part of
2  the, quote, that's why I haven't distorted the, quote,
3  but what is meant by publicity document is if you are a
4  company which sells products and you make publicity as
5  regard certain qualities of the products, you may be
6  bound then to sell the products in the -- conforming
7  with what you have advertised.
8        Q.  But there aren't any publicity documents as
9  used in that sense that are relevant to the
10  interpretation of ETSI's IPR policy; is that right?
11       A.  Well, I cannot think of any and, once again,
12  it's here because it's part of the quote.
13       Q.  So you've reached the opinion in this matter
14  that paragraph 6.1 of ETSI's IPR policy contains clear
15  and unambiguous language regarding Qualcomm's
16  obligation, or lack of obligation, to license at the
17  components level, right?
18       A.  I reached the opinion that part of 6.1 is
19  clear.  The language is not ambiguous and, therefore,
20  there is no need to interpret and this is the
21  conclusion I've reached.
22       Q.  And the language that is clear is the
23  definition of manufacturer and the definition of
24  equipment; is that right?
25       A.  I think the language that is clear goes beyond

---

86

1  just the definition because the definitions are not in
2  paragraph 6, it's in paragraph 15, so I reached the
3  conclusion that it's clear and not ambiguous as
4  regarding not only the definitions but also what is
5  said in paragraph 6.1 regarding the extent.
6        Q.  So just so we're clear you have reached the
7  opinion that paragraph 6.1 is clear and unambiguous
8  that holders of essential IPRs shall grant licenses at
9  least to the extent that licensees can, quote,
10  manufacture, including the right to make or have made
11  customized components and subsystems for the
12  licensees's own design for use in manufacture.  I'm
13  going to end there.
14           So that is -- it's clear that the ETSI IPR
15  policy imposes at least that obligation; is that right?
16       A.  Yes.  I think I can say that is right, yeah.
17       Q.  And the definition of manufacture is clear and
18  manufacture means, quote, manufacture shall mean
19  production of equipment.  Right?
20       A.  That is right.
21       Q.  The definition of equipment is unambiguous and
22  equipment means, quote, equipment shall mean any system
23  or device fully conforming to the standard.  Right?
24       A.  Yes.  Right.
25       Q.  Nowhere in the text of the ETSI IPR policy do

---

87

1  they define, quote, fully conforming to the standard.
2  Right?
3        A.  That is -- if it was it will be in the
4  definitions and it's not in the definitions.
5        Q.  So nowhere in the text of the ETSI IPR policy
6  is a definition provided of, quote, fully conforming to
7  the standards.  Is that fair?
8        A.  I think it is fair but I would need to review
9  the whole text to be completely satisfied but I think
10  since it's not in the definition, we can take it as
11  such.
12       Q.  And on page 11 of your report, the first full
13  paragraph beginning with the italics, you state, quote,
14  I have been informed that the drafters of the ETSI IPR
15  policy also understood that only complete devices
16  satisfied the criterion of, quote, system or device
17  fully conforming to the standard, end quote.
18       A.  Yes.
19       Q.  You were informed of that by Dr. Huber, right?
20       A.  Yes.
21       Q.  He didn't tell you the identities of the
22  drafters of the ETSI IPR policy that are referred to in
23  that sentence, did he?
24       A.  No, he did not.
25       Q.  You did not ask any other individual involved

---

88

1  in drafting the ETSI IPR policy whether they shared the
2  understanding that Dr. Huber represented to you that
3  they had; is that right?
4        A.  This is right.  I think we have discussed this
5  already previously and I told you that I relied
6  exclusively on Dr. Huber's opinion and explanations to
7  me.
8        Q.  So Dr. Huber's explanations to you were
9  necessary for you to understand the definition of
10  equipment contained in the ETSI IPR policy, right?
11          MR. EARNHARDT:  Object to the form.
12       A.  Dr. Huber's was -- rather the definition of
13  equipment is clear, it's in the definitions and the
14  clear.  It's what is fully conforming to the standards
15  is not defined and for this I needed the explanation of
16  Dr. Huber, and what I understood from what he explained
17  to me is that a main component cannot be considered as
18  fully conforming to the standard and that it was
19  intention of the policy drafters, that system or device
20  fully conforming to the standards referred only to
21  complete systems or devices.  That is to say cellular
22  handset, for instance.
23       Q.  So the key to understanding Qualcomm's
24  obligation, if any, to offer FRAND licenses, is to
25  understand the meaning of system or device fully

---

22 (Pages 85 to 88)

89

1    conforming to the standard, right?
2        A.  No.  I think the key to understand Qualcomm's
3    obligation is to go back to the contract and the words
4    of the contract and the contract, in fact, is the ETSI
5    rules of procedure, so the key to understanding it is
6    both Article 6 and the definitions that are in Article
7    15.
8        Q.  And the key to understanding the definition of
9    equipment is to understand what is the meaning of a
10   system or device fully conforming to the standard,
11   right?
12       A.  I -- I wouldn't say that.  I think you will --
13   it skips one important step.  When you read the
14   definition of equipment, it says any system or device.
15   It doesn't say any system or device or component fully
16   conforming to a standard.  And I understood that a
17   components could not be fully conforming to a standard.
18   So the key to understanding the words and the
19   obligations implied by the contract is to look at the
20   words of the contract, and particularly Article 15.4,
21   which defines equipment, by referring to system or
22   device.
23       Under French law, if a word is not in the
24   contract and the judge adds a word, while it was not in
25   the contract, it will be distorting the parties'

90

1    intention, and then he would incur being quashed by the
2    cour de cassation for having distorted the parties'
3    intent.  A judge is not allowed to add a missing word
4    which would then change the meaning of the contract.
5    And I think that we can not add the word component in
6    the definition of equipment.
7        Q.  The word device does not include component as
8    used in the definition, right?
9        A.  Can you say that again please, the word.
10       Q.  So the word component does not appear in the
11   definition of equipment, does it?
12       A.  No, it does not.
13       Q.  So your opinion --
14       A.  Yes.
15       Q.  -- regarding definition of equipment is based
16   on the proposition that a device does not include --
17   strike that.
18       Your understanding of the word equipment, on
19   which your opinion offered in this report is based, is
20   premised on the proposition that the word device does
21   not include components; is that right?
22       MR. EARNHARDT:  Object to the form.
23       A.  This is not fact.  A device includes several
24   components.  I couldn't say that.  But a component is
25   not fully conforming to a standard.  Equipment shall

91

1    mean any system or device fully conforming to a
2    standard.  So it has to be a system or a device to be
3    qualified as an equipment.  That's my opinion.
4        Q.  And a baseband processor is not a device fully
5    conforming to the standard, right?
6        A.  That is my opinion.
7        Q.  And that's based on what Dr. Huber told you,
8    right?
9        MR. EARNHARDT:  Object to the form.  Misstates
10   her prior testimony.
11       A.  Well, it is based, once again, on the
12   definition of equipment.  Is a baseband processor a
13   system, is it a device by itself fully and conforming
14   to the standard.
15       Q.  Is a baseband processor a system fully
16   conforming to a standard?
17       A.  In my opinion, but I'm not an expert of this
18   question, but what I understood is that it is not and
19   that it is a component.
20       Q.  And you understood that a baseband processor is
21   not a system fully conforming to a standard because of
22   what Dr. Huber told you, right?
23       A.  It's not -- it's not because of what Dr. Huber
24   told me, it's just a matter of definition of words.  A
25   component is an element of something wider which is a

92

1    system or a device.
2        Q.  Component is not defined in the ETSI IPR
3    policy, is it?
4        A.  It is not defined, you're right.
5        Q.  You believe that a component is necessarily
6    different from a device, as the term device is used in
7    the ETSI IPR policy, right?
8        A.  Yes, I do.  And perhaps here it's a question of
9    interpretation but a component is one part of a bigger
10   element, of a bigger offer system or device.
11       Q.  And you believe that a component is necessarily
12   different from a system as the term system is used in
13   the ETSI IPR policy, right?
14       A.  Yes, I believe that.
15       Q.  What's the definition of system in the ETSI IPR
16   policy?
17       A.  I do not remember having seen a definition of a
18   system in the IPR policy, therefore, I think we should
19   stick to the usual definition.
20       Q.  What's the usual definition of a system as it's
21   used in the IPR policy?
22       A.  I'm not an expert -- not defined the IPR
23   policy, so I think that the normal, the plain language
24   and the plain normal definition of system here will be
25   used and a system is precisely something which puts

23 (Pages 89 to 92)

93

1 together different elements. It's not just one
2 component is not a system.
3     Q. Are there different elements that are put
4 together in a baseband processor?
5     A. That I'm not too sure how baseband processors
6 are constituted but -- and it's in my report and we
7 already have discussed this, it's on page two of my
8 report. The FTC takes the position that ETSI FRAND
9 commitments creates an obligation to grant licenses to
10 the manufacturers of baseband processors, i.e., to
11 grant licenses -- licenses at the component level.
12     Q. But you're the one who said that a baseband
13 processor is the component level, right? The FTC never
14 said in its complaint that a baseband processor is a
15 component, did it?
16     MR. EARNHARDT: Object to form.
17     A. I haven't read the whole complaint of the FTC,
18 and I don't think I'm the only one to say that a
19 baseband processor is not a system or is not a device
20 fully conforming to a standard.
21     Q. Do you know what a system on a chip is?
22     A. I'm not an expert of these questions.
23     Q. Are you aware that some baseband processors
24 referred to as a system on a chip?
25     A. I am not aware of this.

94

1     Q. Are you aware that a system on a chip combines
2 an application to specific integrated circuit --
3 application integrated circuit and a baseband
4 processor?
5     A. No, I'm not aware of this but I stick to the
6 definition of an equipment which means not only a
7 system but a system fully conforming to a standard.
8     Q. Did you ask Dr. Huber whether a system on a
9 chip is capable of fully conforming to the standard, as
10 that term is used, in the ETSI IPR policy?
11     A. I haven't asked this precise question to
12 Dr. Huber, and I have in my report the account for what
13 I have been informed. And I understood that only
14 complete devices satisfy the criterion of system of
15 device fully conforming to the standard.
16     Q. Now a handset is a complete device that fully
17 conforms to a standard, right?
18     A. A handset, yes.
19     Q. Other than an application specific integrated
20 circuit, what other parts of a handset are necessary to
21 fully conform to the standard, as that term is used, in
22 the ETSI IPR policy?
23     A. Listen, I'm sorry. I'm an expert in French
24 contract law and this is going beyond my sphere of
25 competence.

95

1     Q. Is a touch screen necessary to fully conform to
2 a standard?
3     A. A touch screen on the handset?
4     Q. Yes. Is a handset required to possess a touch
5 screen to fully conform to the standard?
6     A. I do not know.
7     Q. Is a handset required to possess a keyboard to
8 fully conform to the standard?
9     A. That, again, I do not know.
10     Q. Is a handset required to possess a camera to
11 fully conform to the standard?
12     A. I will do the same answer, I do not know.
13     Q. Is a handset required to possess a battery to
14 fully conform to the standard?
15     A. I do not know.
16     Q. Can you identify any element of a handset,
17 apart from an application specific integrated circuit,
18 which is necessary to conform to a standard?
19     A. I think I've told you before, I'm not -- I have
20 not been asked to give expertise on these questions,
21 which are technical and which go far beyond French
22 contract law.
23     Q. What is infrastructure equipment?
24     A. Isn't it defined? It's not defined in the ETSI
25 rules of procedure and I prefer not to attempt to give

96

1 a definition.
2     Q. The second sentence of paragraph, first full
3 paragraph on page 11 states, "Dr. Bertram Huber
4 explained to me that it was the intention of the ETSI
5 IPR policy drafters that, quote, system or device fully
6 conforming to the standard referred only to complete
7 systems or devices such as cellular handsets or
8 infrastructure." Did I read that, right?
9     A. Yes.
10     Q. What is infrastructure as you used it in that
11 sentence of your report?
12     A. I understood it as something more complex than
13 handset but I can't define it precisely.
14     Q. Do you know what a base station is?
15     A. Yes.
16     Q. Do you know if a base station includes an
17 application specific integrated circuit?
18     A. I'm not sure.
19     Q. What is a base station?
20     A. That would be the French translation so that
21 I'm sure I -- it is.
22     THE INTERPRETER: I don't know. I'm not -- I
23 don't want to venture a guess on that. Let me see if I
24 can find something.
25     MR. EARNHARDT: Can you say the two words, base

24 (Pages 93 to 96)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                    8/16/2018

97

1  and station in French?
2       THE INTERPRETER: Yes.
3       (Words spoken in French by the interpreter).
4       THE WITNESS: Yes, but it's not stanchion
5  device. I don't think so. So I want to make sure.
6       THE INTERPRETER: Would that be equivalent,
7  wireless base station? Let me see what -- now I cannot
8  see the screen, my screen to see what it says here.
9       Q. Well, let's try to get beyond the translation
10 issue. What pieces of hardware are you aware of that
11 constitute infrastructure, as you used it in that
12 sentence of your report?
13      A. I'm -- I don't want to get into this
14 discussion. I don't think I was hired to give
15 technical explanation and I am not prepared for this.
16      Q. What did you mean by the word infrastructure?
17      A. As I said before, I meant something which is
18 not just a mobile phone, something more complex and so
19 -- but I had no -- I don't think we discussed with
20 Bertram Huber exactly the meaning of infrastructure and
21 I don't think it changes the meaning of what I wanted
22 to say, which is that the main component of, for
23 instance, a hand phone, is not a system or device fully
24 conforming to the standard, that's what I concentrated
25 on. And it's even more true with an infrastructure

98

1  because infrastructure, if you take it in the common
2  sense, an infrastructure cannot be made of just one
3  component. That's -- that was actually plain meaning
4  of current language.
5       Q. So it's your view that a single baseband
6  processor cannot constitute infrastructure as you've
7  used it in that sentence; is that right?
8       A. I've told you before that I don't want to give
9  an expertise on what baseband processor can or cannot
10 constitute. It goes beyond my sphere of expertise and
11 I am not prepared to answer that question.
12      Q. What did you do to assess the credibility of
13 Dr. Huber's representation to you that a baseband
14 processor cannot constitute infrastructure?
15      A. I don't remember having written this and I
16 don't remember during the discussion Dr. Huber saying
17 this in the precise words that you are using now, and
18 had he done so, I will have relied on his expertise.
19 You're asking me what I did to assess the credibility
20 of what he told me, but he is the expert on these
21 questions, I am not. And I am not asked to assess the
22 credibility of what Dr. Huber tells me. This would be
23 ridiculous. I have no expertise for this.
24      Q. What expert opinion did Dr. Huber convey to you
25 when you say you are not able to assess the credibility

99

1  of what he tells you?
2       A. What expert opinion did he convey to me? I
3  mean, he -- I think in my report you have here the
4  express opinion he give me. What else do you mean by
5  this question? I'm not sure I understand.
6       Q. Dr. Huber told you things he heard when the
7  ETSI IPR policy was being drafted, among other things,
8  fair?
9       A. Things he heard or I don't know where he took
10 this information from. I understand that you are sort
11 of questioning the legitimacy of Dr. Huber's opinion
12 but that's not a matter for me to take position on.
13 I've already told you that I trusted what Bertram Huber
14 has told me, that I used it in my report and that I'm
15 not as an expert on French law supports, nor asked to
16 check the voracity of what Dr. Huber told me.
17      Q. So you said in that answer that I'm questioning
18 Dr. Huber's opinion. What do you mean by his opinion?
19      A. I said that repeatedly. You ask me what I have
20 been doing to check what Dr. Huber told me. I'm not
21 saying by opinion that he's -- an opinion -- well,
22 opinion is ambiguous. So I should rather say what
23 Dr. Huber told me.
24      Q. Well, he told you things -- strike that.
25          Dr. Huber told you the conclusions he reached

100

1  based on his experience at ETSI, right?
2       A. I don't know if it's the conclusions he
3  reached. I took it more as really a consta, really
4  something that he told me as a fact, it's not a
5  conclusion he reached.
6       Q. So you said constant, right, you took it as a
7  constant?
8       THE INTERPRETER: No, C-O-N-S-T-A-T [sic], an
9  observation.
10      A. A factual observation rather than an opinion.
11 There is no subjective element, that's what I meant.
12      Q. Okay. So Dr. Huber conveyed to you factual
13 observations; is that fair?
14      A. That's how I took it, rather than opinion.
15      Q. So your opinion is predicated on Dr. Huber's
16 factual obligations?
17      A. No.
18      MR. EARNHARDT: Object to the form. Object to
19 the form.
20      A. No. This is not fair? No. My opinion is on
21 French contract law and essentially my opinion is that
22 when the terms of the contract are plain and clear,
23 there should be no interpretation because there need
24 not be, and it goes even further than that under French
25 law, and this was before in case law and it is now

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                8/16/2018

---

101

1    clarified, if a judge distorts the parties' intention
2    and adding a word in a contract may amount to
3    distortion, then he incurs being quashed by the cour de
4    cassation because he is denaturer, that's the word we
5    use, denaturer.  He is violating, in a way, the
6    parties' intention, so denaturer the contract.
7         **Q.  So you've reached the opinion that the language**
8    **of the ETSI IPR policy is plain and clear, right?**
9         A.  Well, not all the language but on the issues
10   that we are discussing now, I've reached the opinion
11   that the slang is plain and clear.
12        **Q.  What if the word equipment was not defined in**
13   **the ETSI IPR policy, would you still have the view that**
14   **the language was plain and clear?**
15        MR. EARNHARDT:  Object to the form.
16        A.  You are asking me to form an hypothesis and I
17   haven't reflected upon this.  It is defined so it's
18   important to note that the word equipment is defined.
19   Now what would it be had it not been defined, I don't
20   know.
21        **Q.  So if not for the definition of the word**
22   **equipment in the ETSI IPR policy, you don't have a view**
23   **regarding whether or not the language is unambiguous**
24   **with respect to the obligation, or lack of obligation,**
25   **to license at the component level; is that fair?**

---

102

1         A.  It's not exactly the way I would put it.  If
2    the word equipment had not been defined, and again, you
3    ask me to reflect on a hypothetical, and I find it
4    pretty uncomfortable because, of course, I haven't
5    reflected upon this hypothesis, but then a judge will
6    turn to the normal meaning of equipment, to the plain
7    everyday meaning.  And in an everyday meaning, an
8    equipment is something which normally is not -- well,
9    it's -- I don't know how to define equipment in a plain
10   meaning but you understand that it's not just one
11   little piece of something.
12        So I'm not sure it will change much, but again,
13   it's a hypothetical and I don't really want to
14   extrapolate.
15        **Q.  Is a toothpick a piece of equipment?**
16        A.  Sorry?
17        **Q.  Is a toothpick a piece of equipment?**
18        THE INTERPRETER:  Core-dent.
19        A.  A piece of equipment.  So is it an equipment,
20   you mean?
21        **Q.  Yes.  Is it an equipment?**
22        A.  Well, in French we have the word equipement, we
23   usually use it when it comes to being really well
24   prepared.  You take all your equipment, you take
25   everything with you, taking your cure-dent would not

---

103

1    really be seen as equipement.
2         **Q.  Is a dagger a piece of equipment?**
3         **(Stated in French by the interpreter.)**
4         A.  But you're asking me if it's a piece of
5    equipment or an equipment?
6         **Q.  In the ordinary meaning of the word equipment,**
7    **is a dagger equipment?**
8         A.  I would rather say that it is a piece of
9    equipment.
10        **Q.  And a toothpick is also a piece of equipment,**
11   **in the ordinary meaning of the word equipment, fair?**
12        A.  I think so, but again, we are going far beyond
13   French contract law.
14        (The interpreter said something in French.)
15        **Q.  A contact lens.  Is a contact lens a piece of**
16   **equipment in the ordinary meaning of the word**
17   **equipment?**
18        A.  I think I can make the same answer and we can
19   continue endlessly.  Yes, if you don't see well and you
20   need contact lenses and you go for an expedition and
21   you prepare your equipment, you had better take your
22   contact lenses with you and it will be a piece of your
23   equipment.
24        **Q.  Is a lever a piece of equipment in the ordinary**
25   **meaning of the word equipment?**

---

104

1         MR. EARNHARDT:  Object to the form.
2         A.  I don't know what a level is.
3         (The French word was stated by the
4    interpreter.)
5         A.  It) depends what you need to do with it but it
6    may be a piece of equipment.  I don't understand where
7    you are taking me here.
8         **Q.  Is an fulcrum a piece of equipment in the**
9    **ordinary meaning of equipment?**
10        A.  A fork?
11        **Q.  No.**
12        THE INTERPRETER:  Translated.  If I could just
13   see my screen.
14        (The French word was stated by the
15   interpreter.)
16        A.  I don't know what it is, even in French.
17        **Q.  Is a screw a piece of equipment in the normal**
18   **meaning of the word equipment?  Strike that.**
19        **Is a screw equipment in the normal meaning of**
20   **the word equipment?**
21        MR. EARNHARDT:  Object to the form.
22        A.  Can you take words like glasses or I don't
23   know, glasses.  I don't know what a screw is.
24        THE INTERPRETER:  Translated.
25        A.  I believe it is a piece of equipment.

---

26 (Pages 101 to 104)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                8/16/2018

---

105

1  Q. Is an application specific integrated circuit
2  equipment within the normal meaning of the word
3  equipment?
4      A. Equipment or piece of equipment?
5      Q. Is an application specific circuit equipment
6  within the normal meaning of the word equipment?
7      A. I think I've told you already that I can't
8  answer this question.
9      Q. So you don't know one way or the other whether
10 the ordinary use of the word equipment would include an
11 application specific integrated circuit, fair?
12     A. I -- I do not know -- what I am trying to tell
13 you is that an equipment is different from a piece of
14 equipment and I do not know whether it's merely a piece
15 of equipment or not.
16     Q. What's the distinction between a piece of
17 equipment and equipment, as you've used those terms?
18     A. As I view these terms in ordinary plain
19 meaning, and I think I've told you already, if you take
20 a screw you're not very well equipped.  You need to
21 take also a tourne-vis.
22        THE INTERPRETER:  A screwdriver.
23     A. A screwdriver.  And then you begin to have the
24 beginning of an equipment but usually you need more
25 screws and perhaps different sizes of screwdrivers.

---

106

1  This is getting ridiculous.  I am not an expert of
2  screw and screwdrivers.
3      Q. What about a dagger, you're perfectly well
4  prepared to stab somebody with only a dagger, right?
5      A. You need something to carry it.  Usually you
6  won't just go along in the street with your thing.
7        What's the point of all this?
8      Q. Well, the point of all this is you don't know
9  what equipment means as it's used in the ETSI IPR
10 policy, unless you know what a system or device fully
11 conforming to the standard means is; is that right?
12     MR. EARNHARDT:  Whoa, let me just object to the
13 form and object to the extent that you're representing
14 those hypotheticals have anything to do with equipment
15 as it's defined in the policy.  I object to this entire
16 line of questioning, but you can try and answer the
17 question that's been posed.
18     A. I do what a French judge will do.  Let's go
19 back to the words.  I know that equipment, as defined
20 in the policy, shall mean any system or device fully
21 conforming to a standard, full stop.
22     Q. And if that definition wasn't in there you
23 would not know whether an application specific
24 integrated circuit constituted equipment within the
25 meaning of the ETSI IPR policy, right?

---

107

1      A. It's -- the question is completely irrelevant.
2  The definition is in there and it is important since it
3  is in there that a French judge looks at the definition
4  that is in the ETSI rules of procedure.
5      Q. So the definition in the ETSI rules of
6  procedure is an essential input into what a French
7  judge would conclude when analyzing the ETSI IPR
8  policy, right?
9        MR. EARNHARDT:  Can you read back that
10 question, please.
11     A. What do you mean by --
12        MR. EARNHARDT:  I missed the question if you
13 can read it back.
14        (The requested portion was read.)
15     A. It's an element.
16     Q. Let's strike the question.
17        The opinion you have offered in this matter is
18 based, in part, on the definition of equipment in the
19 ETSI IPR policy, right?
20     A. The opinion is more largely based on French
21 contract law as regard interpretation, and what I say
22 is that if the words are there, and if they are clear,
23 there is no need to look at external factors and other
24 things.  And not only is there no need but the judge
25 cannot interpret the parties' intent because the

---

108

1  language is clear and if he does so, then his decision
2  will be quashed.
3      Q. You haven't considered whether or not the
4  language would be clear if there was no definition of
5  equipment in the ETSI IPR policy; is that right?
6      A. What is the point of doing so since there is a
7  definition.  A French judge would not consider whether
8  or not the definition is clear, if there was no
9  definition, because it will be wrong for a French judge
10 not to turn to the definition.
11     Q. So my question is:  You have not considered
12 whether or not the language of the ETSI IPR policy
13 would be clear if there was no definition of equipment
14 provided; is that fair?
15     A. I think I can say this is fair and, once again,
16 I think this would be a fault from a French judge not
17 to refer to the definitions.
18        MR. EARNHARDT:  So let's take like a -- well,
19 let's take a break.  Maybe we can take a break for
20 lunch.  It's about 12:25.  I have to take a break no
21 matter what so we can do lunch now or we can take a
22 five-minute break and come back but I need to take a
23 break.
24        MR. MATHESON:  I'm kind of in the middle of
25 something.  How long of a lunch break do you want to

---

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

109

1  take?
2       MR. EARNHARDT:  I'm am fine with half an hour.
3  Are you okay with half an hour?
4       THE WITNESS:  Yes, I am.
5       MR. MATHESON:  For the witness, we will take
6  half an hour.
7       THE VIDEOGRAPHER:  We are now going off the
8  record, the time is 12:42.
9       (A recess was taken.)
10      THE VIDEOGRAPHER:  We are now going back on the
11 record.  The time is 1:09.
12      Q.  Thanks for coming back.
13           So is it fair to say that the key to
14 understanding what Qualcomm -- strike that.
15           Is it fair to say that the key to understanding
16 which offers to license standard essential patents
17 Qualcomm needs to make, is to understand the meaning of
18 equipment as it's used in the ETSI IPR policy?
19      MR. EARNHARDT:  Object to the form.
20      THE VIDEOGRAPHER:  Excuse me.  Do you have your
21 mic on?
22      Q.  Is the question clear or should I --
23      A.  No, it's not clear.
24      Q.  Okay.  Is it fair to say that the key to
25 understanding which offers Qualcomm must make to be

110

1  consistent with the ETSI intellectual property policy,
2  is to understand the meaning of, quote, a system or
3  device fully conforming to the standard, i.e.,
4  equipment, end quote?
5       A.  It's not exactly the way I would put it but
6  perhaps eventually it would be the same.  I would say
7  that to understand this meaning is important to
8  understand the extent, the ampleur of the FRAND
9  obligation.
10      THE INTERPRETER:  The aim?
11      THE WITNESS:  No, no, the extent of the FRAND
12 obligation.
13      Q.  Okay.  So it would be inaccurate, in your view,
14 to state that the key to understanding which offers
15 Qualcomm must make to be consistent with the
16 intellectual property policy of ETSI, is to understand
17 the meaning of a system or device fully conforming to
18 the standard, i.e., equipment?
19      MR. EARNHARDT:  Object to the form.
20      A.  No.  I'm not saying that it will be inaccurate.
21 Can we come back to your first question because is it
22 fair to -- the first one you ask me and -- I'm a bit
23 lost.
24      Q.  Sure.  How about this:  Take a look at page 11
25 of your report, please.

111

1       A.  Yes.
2       Q.  CX0057-013.
3       A.  Yes.
4       Q.  The final sentence of the first paragraph
5  states, quote, therefore the key to understanding what
6  SEP holders must license is the meaning of a, quote,
7  system or device fully conforming to the standard,
8  i.e., equipment.
9       A.  I see it, yes.
10      Q.  Do you agree, sitting here today, that the key
11 to understanding the offers that Qualcomm must make, in
12 order to be consistent with ETSI's intellectual
13 property policy, is to understand, quote, the meaning
14 of a system or device fully conforming to the standard,
15 i.e., equipment?
16      A.  I'm a bit confused.  Can we stick to the words.
17 I agree with what I have written, so if your question
18 means the same as what I have written, it's fine.  I
19 don't see the difference.  I'm a bit lost here.
20      Q.  What did you mean when you wrote, the key to
21 understanding what SEP holders must license?
22      A.  I think what I meant is that in order to know
23 what SEP holders must license, according to clause 6.1
24 of the IPR policy, that is to say according to the
25 requirement that it's licensed on a FRAND basis, is the

112

1  meaning of a system or device fully conforming to the
2  standard.
3       Q.  Now when you say what SEP holders must license,
4  is there a distinction -- strike that.
5           You mean that license offers they must make,
6  correct, not the licenses they must take from others?
7       A.  License offers.
8       Q.  So you're using license in the sense of make an
9  offer to make a license to the SEP holders'
10 intellectual property available to others?
11      A.  Yes, I am.
12      Q.  And your understanding of the term, quote,
13 system or device fully conforming to the standard is
14 not based on any minutes of ETSI proceedings, right?
15      A.  Minutes of ETSI proceedings?  Do you refer to
16 the documents we discussed before, minutes of the
17 general assembly or --
18      Q.  Are there any minutes of any ETSI proceedings
19 of the general assembly or any other ETSI body that
20 have informed your view of the meaning of, quote,
21 system or device fully conforming to the standard?
22      A.  I don't remember having been informed on this
23 by what I have read, what you -- by the minutes of the
24 general assembly that I've read, no.
25      Q.  And you've never read any declaration from Carl

28 (Pages 109 to 112)

FTC v. Qualcomm, Inc.                                           8/16/2018

---

113

1   Himes Rosenbrook relevant to your understanding of,
2   quote, system or device fully conforming to the
3   standard, right?
4       A. Sitting here now, I do not remember having read
5   that.
6       Q. Other than -- strike that.
7       Now, Dr. Bertram Huber explained to you the
8   intention of the ETSI IPR policy drafters regarding the
9   meaning of system or device fully conforming to the
10  standard, right?
11      A. Yes, this is correct.
12      Q. He didn't identify for you the ETSI IPR policy
13  drafters to which your report refers, did he?
14      A. I don't think -- I don't remember him
15  identifying them, no.
16      Q. And you did not ask him to identify the ETSI
17  IPR policy drafters to which your report refers, right?
18      A. Right because if he gave me some names it
19  wouldn't help me very much.
20      Q. Now, a French court considering Dr. Bertram
21  Huber's explanation of the intent of the ETSI IPR
22  policy drafters, wouldn't necessarily take at face
23  value everything he says, fair?
24      A. Well, this is fair. French court is always
25  free not to take as face value something that is said

---

114

1   by lawyers or by an expert.
2       Q. A French court could consider contrary
3   evidence, if such evidence existed, that contributed
4   what Dr. Bertram Huber said was the intention of the
5   ETSI IPR policy drafters, right?
6       A. Yes. A French court could consider contrary
7   evidence if it was brought by the other party.
8       Q. And in the ordinary case, if there was
9   conflicting evidence regarding the intention of the
10  ETSI IPR policy drafters, the French court would
11  consider all the evidence, right?
12      A. It will have to take everything into account,
13  yes, and make its own mind up.
14      Q. So in order to interpret what you refer to as
15  the clear and unambiguous language of the ETSI policy,
16  you need to know what, quote, system or device fully
17  conforming to the standard means, right?
18      MR. EARNHARDT: Object to the form.
19      A. I'm -- I'm not so sure that it's necessary to
20  know in detail what fully conforming to a standard
21  means in order to interpret the policy. What is clear
22  for me, when I read the policy and when I read the
23  definition, is that the word component is not there and
24  it's not in the definition of equipment, and that's the
25  important point because, as I've said before, a judge

---

115

1   could not add a word in the contract if it was not
2   there.
3       Q. When you say it's not there, you mean the word
4   component does not appear in the definition of
5   equipment, right?
6       A. That is what I mean, indeed.
7       Q. Now, can we take a look at CX7552-003. This is
8   the ETSI policy we were discussing.
9       A. Yes.
10      Q. The intellectual rights policy.
11      So 6 point -- Clause 6.1 has four bullets,
12  right?
13      A. Yes.
14      Q. The first bullet, it's fair to say that this
15  bullet states that holders of essential IPR shall grant
16  at least the right to manufacture, including the right
17  to make or have made customized components and
18  subsystems to the licensees's own design for use in
19  manufacture, right?
20      A. This is the first bullet, yes.
21      Q. And that bullet doesn't have the word equipment
22  in it, does it?
23      A. That bullet has the word component in it.
24      Q. My question is: Does that bullet contain the
25  word equipment?

---

116

1       MR. EARNHARDT: Object to the form.
2       A. I don't see the point of this question. The
3   equipment is mentioned in the second bullet. What I
4   understand from the first bullet, which refers to the
5   manufacturer, is that it considers components in the
6   specific which, is the right to make or have
7   made customized components and subsystems to the
8   licensee's own design for use in manufacture. What is
9   important is manufacture.
10      Q. Right. It doesn't say manufactured by the
11  licensee, does it?
12      A. No, it doesn't say by the licensee.
13      Q. So under this bullet, a holder of standard
14  essential patents must grant at a minimum a right to
15  manufacture customized components designed by the
16  licensee for use in manufacture of equipment, right?
17      A. It's getting technical and it's in English,
18  which is not my native language, so I prefer to stick
19  to the language because you made it shorter. It's
20  manufacture, including the right to make or have made
21  customized components and so-so. So I would say that
22  we -- every word counts.
23      Q. Every word counts. And in this bullet it says
24  that licensees are entitled to manufacture components
25  of their own design for use in the manufacture of

---

29 (Pages 113 to 116)

FTC v. Qualcomm, Inc.                                   8/16/2018

---

117

1    equipment, right?
2         MR. EARNHARDT:  Object to the form.
3         A.  Can you say again.  Licenses are entitled to?
4         Q.  Manufacture components of their own design,
5    assuming that those components are for use in the
6    manufacture of equipment.
7         MR. EARNHARDT:  Object to the form.
8         Q.  Fair?
9         MR. EARNHARDT:  Object to the form.
10        A.  I'm not too sure.  I prefer to -- once again, I
11   prefer to stick to the language.  It says precisely
12   what is said here.  I don't know if your interpretation
13   is correct or not.
14        Q.  Did you ask Dr. Huber if that interpretation
15   was correct?
16        A.  I didn't ask Dr. Huber.
17        Q.  So there is nothing in this bullet -- or strike
18   that.
19             What is the language in 6.1 that forecloses the
20   interpretation that all licensees are entitled to make
21   customized components, as long as those components are
22   for use in the manufacture of equipment, as manufacture
23   and equipment are defined?
24        A.  This is not exactly the way I have considered
25   this bullet.  I have concentrated on the word

---

118

1    manufacture, and then I turn to the definition of
2    manufacture, which is in Clause 15, and which says it
3    shall mean production of equipment.
4         Q.  But it doesn't say that the licensee must be
5    the one who manufactures the equipment into which the
6    customized component is included, does it?
7         A.  It's not the object of this Article 6, which is
8    about availability of licenses, so it's not turned to
9    the licensee, it concentrates on the definition of the
10   scope of the FRAND obligation.
11        Q.  And the scope of the FRAND obligation, in
12   Clause 6.1, includes the obligation to offer licenses
13   to licensees who desire to manufacture customized
14   components of their own design, as long as those
15   components are for use in equipment.  Right?
16        A.  I suppose if you say that it's right but I
17   prefer, once again, to stick to the very language of
18   the bullet itself, because I'm not too sure of whether
19   the way you put it is different from the way it is
20   written here.
21        Q.  So let's say Siemens?
22        A.  Siemens.
23        Q.  Are you familiar with Siemens?
24        A.  No.
25        Q.  Have you heard of them?

---

119

1         A.  I've heard of them.
2         Q.  Are you aware that at one point in time they
3    manufactured baseband processors?
4         A.  Yes.  But I'm not very familiar with them.
5         Q.  Okay.  Is there a manufacturer of baseband
6    processors, other than Qualcomm with whom you're more
7    familiar with?
8         A.  No.
9         Q.  Let's stick with Siemens then.  So if Siemens
10   wants to manufacture customized components of its own
11   design and sell them to a handset manufacturer that
12   would then manufacture a handset that fully conforms to
13   the standard, this clause of the ETSI IPR policy says
14   that standard essential patent holders have to license
15   Siemens to do that, right?
16        MR. EARNHARDT:  Object to the form.
17        A.  Again, I'm not sure, so I prefer not to answer
18   that question.
19        Q.  What else would you have to know in order to
20   know the answer to that question?
21        A.  I will have had to reflect upon it and to have
22   more time to see it in the light of the language of the
23   ETSI policy.
24        Q.  It's not a question you've considered before
25   today?

---

120

1         A.  It's not at all.
2         Q.  It's not interpretation Dr. Huber told you was
3    one that was advanced by, quote, drafters of the ETSI
4    IPR policy; is that right?
5         A.  What is right is that explained to me -- he
6    explained to me that system of device fully conforming
7    to standard, as used in the IPR policy of ETSI, was not
8    intended to cover an isolated component, such as
9    cellular chip sets and or thin modem and that's what I
10   have put in my report.
11        Q.  Right.  And you never asked him whether this
12   bullet that says that standard essential patent holders
13   must make available at least a license to manufacture
14   customized components of a licensee's own design
15   provided those components are used in the manufacture
16   of equipment, meant that Qualcomm had to license the
17   component level, right?
18        MR. EARNHARDT:  Object to the form.
19        A.  I'm sorry but I need you to repeat the
20   question.
21             (The requested portion was read.)
22        A.  Right.  I did not ask him such a question.
23        Q.  Now, you're not 100 percent certain that a
24   French court would find that the clear and unambiguous
25   terms of the ETSI policy require a holder of standard

---

30 (Pages 117 to 120)

FTC v. Qualcomm, Inc.                                          8/16/2018

---

121

1   essential patents to license only makers of complete
2   operational devices, right?
3       A.  Well, it's difficult to be 100 percent sure of
4   what the French court would find when it comes to
5   interpreting a contract.  And its interpretation is
6   considered as a factual element and, therefore,
7   normally it's not submitted to the control of our
8   supreme private court, which is the cour de cassation,
9   precisely because it's an element of fact.  When it
10  comes to what I said before, what we call denaturacion,
11  adding a word which is not then the supreme court will
12  control and will cause a decision that is not
13  interpreting properly the parties' will.
14      So to come back to your question, I'm not 100
15  percent sure because it's not possible to be 100
16  percent sure of what the French judge will do,
17  particularly when it comes to interpretation of the
18  contract where factual elements matter and there is, of
19  course, some space for different analysis.  But having
20  said that, I am absolutely sure that if a judge was to
21  add the word component where it is not included, then
22  this would be a case where the specific control of our
23  supreme court, cour de cassation, would exerted.  And
24  this control, which was created by case law, and I
25  think I've said it before, has been codified in our new

---

122

1   civil code, so it gives it even more strength, it
2   doesn't change the law because it was there already in
3   Article 1152, if my memory is good -- no, 1192.  92.
4       MR. EARNHARDT:  Our real time has gone out
5   again.  I don't know how easy of a fix it is.
6       MR. MATHESON:  Mine's out.  You want to go off
7   real quick and see if we can get it back on?
8       MR. EARNHARDT:  Yeah.
9       THE VIDEOGRAPHER:  We are going off the record.
10  The time is 1:34.
11      (A recess was taken.)
12      THE VIDEOGRAPHER:  We are going back on the
13  record.  The time is 1:38.
14      Q.  Do you not say in your report any cases in
15  which French courts have determined that the terms of
16  the ETSI IPR policy are clear and unambiguous, do you?
17      A.  No, I don't.
18      Q.  Did you try to find any cases?
19      A.  There are no cases.
20      Q.  There are no cases in which French courts have
21  assessed whether the terms of the ETSI IPR policy are
22  clear and unambiguous, fair?
23      A.  That is fair.
24      Q.  Are there any cases in any jurisdictions that
25  assess whether the ETSI IPR policy is clear and

---

123

1   unambiguous?
2       A.  Apart from France, you mean?
3       Q.  Correct.  Are there cases in any jurisdiction,
4   including but not limited to France?
5       A.  I haven't looked apart from France, so I could
6   not tell you.  I'm not aware of any.
7       Q.  You yourself authored a report in -- that was
8   introduced in an English court regarding whether or not
9   the ETSI IPR policy is clear and unambiguous, right?
10      A.  Are you meaning the NY Planet case?
11      Q.  What was the NY Planet case?
12      A.  It was in front of an English judge, that's why
13  I think of this report, but it was more on the method
14  to determine FRAND, so I'm not sure whether that is the
15  one you are referring to or not.
16      Q.  What opinion did you offer in that case?
17      A.  My opinion was mainly concentrated on the
18  stipulation on behalf of third party and the way that a
19  FRAND commitment has to be analyzed as a stipulation on
20  behalf of a third party, and that Judge Birss, he
21  adopted this analysis.
22      Q.  Which judge was that?
23      A.  Birss, B-I-R double S.
24      Q.  Did you offer the view in that case that the
25  ETSI intellectual property rights policy was clear and

---

124

1   unambiguous?
2       A.  I don't remember having offered such a view but
3   I would need to check.  It wasn't the core subject.
4       Q.  Do you offer an opinion in litigation between
5   Apple and Qualcomm in the United Kingdom that the ETSI
6   IPR policy is clear and unambiguous?
7       A.  I offered an opinion, yes, in this litigation,
8   and now sitting here, I can't remember whether I
9   offered it on this specific point.  It was more about
10  the question -- it was a different question.  It was
11  about the definition of subsidiary.
12      Q.  Did you offer deposition testimony in that
13  case?
14      A.  Deposition testimony.  Do you mean did I go to
15  court or did -- I wasn't asked to -- I wasn't deposed.
16  I offered -- I made a report.
17      Q.  You were not deposed during the course of
18  the --
19      A.  No.
20      Q.  You did not testify in court?
21      A.  No.
22      Q.  Did you read the opinion that the judge
23  ultimately issued on May 22, 2018?
24      A.  Quickly.
25      Q.  Did the judge agree with you that the ETSI IPR

---

31 (Pages 121 to 124)

125

1   policy was clear and unambiguous?
2       A. I don't remember this precise point.  I just
3   remember that it was a French expert, had given another
4   opinion and my opinion was followed by the judge, that
5   he agreed with me rather than with Morefessis.  Now on
6   the substance, I must say I don't remember this precise
7   point.  It was more on the question of affiliate and
8   affiliated because it was a question of jurisdiction
9   that was behind it so far, as I remember.
10      Q. So you don't recall one way or the other
11  whether you offered an opinion that the ETSI IPR policy
12  was clear and unambiguous?
13      A. No, I truly don't recall.
14      Q. Now who was the other expert, Professor
15  Morefessis?
16      A. Yes.
17      Q. Are you familiar with Professor Morefessis,
18  other than in that litigation?
19      A. Yes, I am.
20      Q. Is he a French processor of French law?
21      A. Exactly.
22      Q. Is he well respected?  Is it a man or a woman?
23      A. A man.
24      Q. Is he a relatively well respected professor of
25  French law?

126

1       A. Relatively well.
2       Q. Not as highly as yourself, one assumes.
3           Did you find the opinion he offered in that
4   case well supported?
5       A. No, I didn't.
6       Q. Why not?
7       A. You're asking me to remember opinions that I
8   have been working on quite sometime ago and I don't
9   have a very clear remembrance, but I thought -- oh,
10  yes, now I remember.  He had all these developments
11  about the porte-fort, which were completely, I think,
12  useless, and other things which really did not convince
13  me and did not convince the judge either.
14          THE INTERPRETER: Porte-fort.
15      A. Porte-fort.
16      Q. And what is that?
17      A. I would need to have the translation of the
18  French civil code to tell you exactly.  It's -- it's
19  something not too far from a stipulation on behalf of
20  third party, but it's different, and it's the idea that
21  you take up on you the fact that somebody is going to
22  do something and you sort of make yourself responsible
23  for that.
24      Q. In the Apple versus Qualcomm litigation in the
25  UK, the court concluded that Qualcomm had tendered only

127

1   inadmissible evidence as to the meaning of the ETSI IPR
2   policy, right?
3           MR. EARNHARDT: Object to the form.  Do you
4   have something you want to show the witness?
5       A. I am -- I don't know.  I told you I read it
6   quickly.
7       Q. So you don't recall one way or the other --
8       A. No.
9       Q. -- whether the court concluded that your
10  opinion was inadmissible regarding the interpretation
11  of the ETSI IPR policy?
12      A. I don't remember.
13      Q. Now you're aware that Qualcomm and Ericsson
14  engaged in litigation at one point in time, right?
15      A. Qualcomm and Ericsson engaged in litigation
16  together.  I haven't been implying that.
17      Q. Are you aware one way or the other whether
18  Qualcomm has ever claimed that the ETSI IPR policy
19  obligated Ericsson to offer Qualcomm a license to
20  practice Ericsson's patents to manufacture chip sets
21  that complied with the ETSI standard?
22      A. I don't think I'm aware of that, no.
23      Q. Are you aware that Nokia has claimed that
24  Qualcomm is obligated by the ETSI IPR policy to execute
25  a chip set level license to practice Nokia standard

128

1   essential patents?
2       A. No, I'm not aware.  I'm in the -- I was in the
3   case against Nokia but I don't think it was on this
4   subject.
5       Q. So you've never investigated any litigation
6   between Qualcomm and Nokia, other than the United
7   States litigation which you were involved, fair?
8       A. That's fair.
9       Q. You never investigated any litigation between
10  Qualcomm and Ericsson that related to ETSI's
11  intellectual property rights policy, fair?
12      A. That's fair.
13      Q. And you never investigated whether Qualcomm
14  granted Broadcom a license to practice Qualcomm's ETSI
15  standard essential patents at the chip set level; is
16  that fair?
17      A. That is fair.
18      Q. Do you know if any court in the United States
19  has ever construed ETSI's intellectual property rights
20  policy?
21      A. When you mean construe you will mean interpret
22  ETSI's IPR policy typically as regard Article 6?
23      Q. Yes.  Are you aware --
24      A. Construe means interpreting?
25      Q. Yes.  Are you aware of whether or not any court

FTC v. Qualcomm, Inc.                                    8/16/2018

---

129

1    in the United States has ever interpreted Article 6 of
2    ETSI's intellectual property rights policy?
3        A.  No, I'm not aware of any interpretation given
4    by a US court.
5        Q.  If a French court were to interpret Article 6
6    of ETSI's intellectual property rights policy, would it
7    be relevant to the French court's determination if
8    courts in other jurisdictions had construed Article 6
9    one way or another?
10       A.  Not very much.  French courts are a bit
11   parochial and because it has to be construed under
12   French law, that's what is said in Article 12, French
13   law is applicable and it's applicable also for the
14   interpretation.  I don't think it will be very
15   impressed by any foreign decision interpreting the
16   policy.  And I even doubt that it will even take it
17   into account.
18       Q.  It doesn't matter to that view whether or not
19   the foreign decision purported to interpret French
20   contract law?
21       A.  I think they would consider that as French
22   judges they are much better placed to interpret French
23   law.
24       Q.  It might be relevant to the expectations of the
25   parties if courts in other jurisdictions had

---

130

1    consistently interpreted the ETSI intellectual property
2    rights policy one way or another, mightn't it?
3        MR. EARNHARDT:  Object to the form.
4        A.  First, the expectation of the parties comes as
5    a subsidiary, it's not the main criterion.  What is the
6    main criterion is the subjective interpretation and the
7    intention of the parties.  And secondly, I'm not even
8    sure that this will be a decisive factor.
9        Q.  In assessing the subjective interpretation of
10   the parties, a French court might consider positions
11   they had advanced in litigation relevant to the
12   question of their contractual interpretation, right?
13       MR. EARNHARDT:  Object to the form.
14       A.  Which parties are you talking about?
15       Q.  So I mean Qualcomm has claimed that Ericsson is
16   obligated to give them a component level license under
17   the ETSI IPR policy.  Now a French court attempting to
18   interpret the ETSI IPR policy might find that relevant,
19   right?
20       MR. EARNHARDT:  Object to the form.
21       A.  Aren't we mixing up two things, interpretation
22   of ETSI policy itself and the interpretation of the
23   contract between license or and licensee?  What are we
24   now discussing?  I'm not sure.
25       Q.  Okay.  Hypothetically, let's say a French court

---

131

1    is asked to determine whether Qualcomm is obligated to
2    offer licenses at the component level due to the ETSI
3    IPR policy, right?
4        A.  Yes.
5        Q.  French court is asked to make that decision in
6    2018.  Okay?
7        A.  Yes.
8        Q.  A French court might find it relevant that in
9    2002 Qualcomm claimed that Ericsson was obligated to
10   offer component level licenses under the ETSI IPR
11   policy, right?
12       MR. EARNHARDT:  Object to the form.
13       A.  I'm skeptical.
14       Q.  You don't think that would be relevant to a
15   French court's determination?
16       A.  No.  I think the French court will look at the
17   contract itself and the contract itself here, it's very
18   -- it's very specific.  The contract itself is, in
19   fact, the ETSI rules of procedure.
20       Q.  Well, suppose that Qualcomm and Ericsson were
21   both involved as drafters of the ETSI IPR policy.
22   Okay?  If we hypothetically suppose that both Qualcomm
23   and Ericsson were among the drafters of the ETSI IPR
24   policy, then their public statements regarding whether
25   or not the IPR policy obligated licenses to be offered

---

132

1    at the component level might be relevant to a French
2    court's interpretation of the ETSI IPR policy, right?
3        MR. EARNHARDT:  Object to the form.
4        A.  I remain skeptical.
5        Q.  So the public statements of the drafters of the
6    ETSI IPR policy would not be relevant to a French
7    court's interpretation of the IPR policy; is that
8    right?
9        A.  What I'm saying is that the contexts are
10   different.  The public statements of the drafters, when
11   it is during the drafting process, would be relevant
12   and I've said it in my report it is relevant.  It's a
13   sort of -- sort of pre-contractual negotiations in a
14   way.  But what you are mentioning here is something
15   different.  Is those parties, while members of ETSI,
16   afterwards where into a litigation together and one of
17   them says you must license at a component level.  And
18   this litigation you are asking me whether this
19   litigation will be an element that a judge will take
20   into account to interpret ETSI policy and here I am
21   saying I don't think so.
22       Q.  So the statements of parties that are made
23   after the ETSI policy is finalized would not be
24   relevant?
25       A.  I'm not saying this.  It all depends on the

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. Qualcomm, Inc.                                                8/16/2018

---

133

1    context.  If it's within the litigation between two
2    parties, one license -- licensor -- well, one patent
3    holder and one licensee or prospective licensee, I
4    don't know, it's a completely different context.  If
5    the statement is made within the context of ETSI by
6    these parties it's another thing.  What I'm saying is
7    that a French court will find it too remote to rely on
8    the statement made by Ericsson or made by Qualcomm in a
9    litigation between the two of them.  It's a very
10   different situation than a subsequent statement that
11   would be made within the context of ETSI, like during
12   the general Assembly, for instance.
13        Q.  So statements made in the context of ETSI, such
14   as statements during the general Assembly, might be
15   relevant to a French court's interpretation of the ETSI
16   IPR policy, even if those statements were made after
17   the policy was finalized; is that fair?
18        A.  What I think is fair in what you said is that
19   subsequent elements, such as general Assembly
20   decisions, might be relevant.  A mere statement by one
21   member is not very relevant.  A general Assembly
22   decision is much more relevant than a statement by one
23   member.
24        Q.  How many members does the general Assembly have
25   right now?

---

134

1        A.  I do not know but...
2        Q.  Do you know approximately, is it more than 100?
3        A.  I would tend to think that it is.
4        Q.  Are there members of the general Assembly right
5    now who are not represented in ETSI when the ETSI IP --
6    IPR policy was drafted?
7        A.  I do not know the answer but it's possible.
8        Q.  Hypothetically, let's suppose the ETSI IPR
9    policy was drafted by about 30 people.  Fair?
10       A.  Yes.
11       Q.  Hypothetically, let's suppose ETSI currently
12   has 400 members in the general Assembly.
13       A.  Yes.
14       Q.  It doesn't really matter what the 400 current
15   members of the general assembly think when we're asking
16   ourselves what the 30 drafters of the ETSI IPR policy
17   thought, does it?
18        MR. EARNHARDT:  Object to the form.
19       A.  It's -- it's not decisive but it's maybe an
20   element and along this line an element may be that the
21   members of the general Assembly have not refused to
22   incorporate Qualcomm's patents, even though Qualcomm is
23   not licensing at a component level.
24       Q.  Do you know whether ETSI's general Assembly
25   members would open themselves up to antitrust liability

---

135

1    if they were to agree amongst each other not to include
2    Qualcomm's patents?
3        MR. EARNHARDT:  Object to the form.
4        A.  That I do not know.
5        Q.  You don't know one way or the other why the
6    members of the general Assembly have decided not to
7    boycott Qualcomm's patents, right?
8        MR. EARNHARDT:  Object to the form.
9        A.  No.  The reasons behind I do not know but the
10   fact is there.
11       Q.  Do you know whether or not the antitrust
12   division of the United States Department of Justice has
13   publicly announced it would be an enforcement priority
14   if members of standard setting organizations were to
15   boycott technologies by intellectual property holders
16   who refused to honor FRAND commitments?
17        MR. EARNHARDT:  Object to the form.
18       A.  No.  This is US matters and I am an expert on
19   French contract law, again.
20       Q.  So if there are 30 people who draft the ETSI
21   IPR policy and then after that policy is drafted 370
22   more people joint general Assembly, let's assume these
23   people are all working for different companies, they're
24   just totally independent people.  Okay.  Are -- is they
25   relevant to a French court's interpretation of the ETSI

---

136

1    IPR policy how those 370 subsequent joiners of ETSI
2    interpreted the policy at the time they joined?
3        A.  Firstly, I'm not sure a French court would be
4    in a position to know how each of these 370 members
5    interpret the policy.  It will have to be very clear.
6    And so it's a very strange hypothetical in a very
7    unique situation here.  The initial drafter's intent is
8    more important than the intention of the 370 that came
9    after the policy was drafted.
10       Q.  So if the initial 30 drafters believed that the
11   ETSI I -- ETSI IPR policy did not require component
12   level licensing, if all 30 of them believed that, that
13   would control because that is the intent of the parties
14   who drafted the policy, right?
15       A.  I suppose so that would -- a judge will need
16   very strong evidence that it's no longer the parties'
17   intention and it would be rather dangerous for a judge
18   to say that in spite of this intention of the drafters
19   of the policy, in spite of the fact that the policy has
20   not been changed, yet the intention is not that one.
21       Q.  I think you jumped ahead to my next question,
22   so I just wanted to -- let's pretend we don't know what
23   the 370 subsequent joiners believe.  If we have
24   compelling evidence that all 30 of the initial drafters
25   of the ETSI IPR policy believed that it did not require

---

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                8/16/2018

---

137

1   licensing at the component level, a French court
2   interpreting a standard essential patent holders's
3   obligation would vindicate the intent -- intent of
4   those original 30 drafters and hold that component
5   level licensing is not required, right?
6       A.  Component is not required.  I really think,
7   yes, this is right because then it would consider there
8   is -- in your hypothetical there is a clear intention
9   assessed by these 30 initial drafters not to impose
10  this, so I don't see why a French court will change.
11      Q.  And it doesn't matter if all 370 subsequent
12  joiners to ETSI share that understanding or not, right?
13      A.  What would matter if -- if the policy was
14  changed?
15      Q.  Hypothetically, assume the policy -- the words
16  of the policy stay exactly the same.  370 people join
17  who do not read the policy the same way the original 30
18  intended.
19      A.  Right.  Right.  Well let's turn back to the
20  French civil code and it's more my area of expertise.
21  It says that, a contract is to be interpreted according
22  to the common intention of the parties rather than
23  stopping at the literal meaning of its terms.  And it
24  then says, where this intention cannot be discerned, a
25  contract is to be interpreted in the sense which a

---

138

1   reasonable person placed in the same situation will
2   give it.  The second sentence has been added a new
3   Article 1188.  So I think we -- I should answer your
4   question in the light of this basic principal,
5   particularly of the first sentence which is really an
6   important role that you have to interpret the contract
7   according to the common intention of the parties.  And
8   there is one common intention that's in your
9   hypothetical is clear and sure, this is the common
10  intention of the 30 initial parties and this common
11  intention and the wording will surely was not to
12  include the component in this FRAND commitment or
13  obligation.  Therefore, I think a judge will stick to
14  that.
15      Q.  What if the original 30 parties had never
16  thought about this issue?  What if they had no common
17  intention regarding whether the IPR policy imposes a
18  duty to license at the component level?
19      A.  It makes things more difficult but, again, I
20  insist on the fact that you cannot add to the wording
21  of a contract other word or add something.  The role of
22  the judge is not to remake the contract, even if it
23  seems more equitable or more fair, the judge must apply
24  the contract.  So this was not entered by the parties
25  to barter, it was not envisage.  And in the ETSI

---

139

1   context, I think that there is a solution which will be
2   to change the rule and the policy and the judge will
3   take as a very important factor the fact that the
4   policy has not been changed.
5       Q.  So a judges should neither add terms to
6   contract nor ignore terms that are in contracts, right?
7       A.  This is true, yes.
8       Q.  Under French law what happens where parties
9   have attached different meanings to the term of a
10  promise or agreement?
11      A.  Well, then you are in a situation where the
12  intention of the -- the common intention of the parties
13  cannot be assessed because there is no common
14  intention, there was different meanings attached.  And
15  this is when the judge would resort to the second
16  sentence of Article 1188 where this intention cannot be
17  discerned because there's no common intention, they
18  each had a different meaning in mind.  A contract is to
19  be interpreted in the sense which a reasonable person
20  placed in the same situation will give to it.
21      Q.  So we ask how would a reasonable person have
22  interpreted the terms that appear on the face of the
23  contract?
24      A.  Yes.  This is a more objective approach.
25      Q.  So you don't know one way or the other if the

---

140

1   folks who drafted the ETSI IPR policy ever thought
2   about whether someone might manufacture chip sets and
3   not also manufacture handsets, do you?
4       MR. EARNHARDT:  Object to form.
5       A.  It seems that you told me before that they had
6   not thought about it, didn't you?
7       Q.  Well I don't want to make representations to
8   you.  I'm asking you, do you know one way or the other
9   if it ever occurred to the draft of the ETSI IPR policy
10  that somebody might manufacture chip sets and not
11  manufacture handsets?
12      A.  I mean, who would know what occurred in the
13  mind of the 30 drafters of the policy.  It's very
14  difficult to know.
15      Q.  Because at the time the policy was drafted,
16  Ericsson manufactured both chip sets and handsets and
17  infrastructure, right?
18      A.  This is what you seem to say, so I say yes.
19      Q.  I may have already asked this, but just to make
20  sure it's clear, you don't know one way or the other
21  whether any company involved in drafting the ETSI IPR
22  policy manufactured chip sets and did not also
23  manufacture handsets and infrastructure equipment,
24  right?  I think I might have asked.
25      A.  Manufactured only chip sets?

---

35 (Pages 137 to 140)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

141

1    Q.  Correct.
2    A.  And it was involved in the drafting of the
3    policy?
4    Q.  Correct.
5    A.  And then it would not have said anything about
6    the way the policy is drafted?
7    Q.  I'm just asking, do you know way one way or the
8    other?
9    A.  No, I do not know.
10    Q.  If any company involved.
11       Do you know if at the time the ETSI IPR policy
12    was drafted, Qualcomm manufactured chip sets and also
13    handsets and also infrastructure equipment?
14    A.  I do not know.
15    Q.  When considering industry practice, what
16    products would a French judge consider involved in the
17    industry impacted by ETSI's IPR policy?
18    A.  I'm not sure I understand your question.
19    Q.  Well, so we've been discussing mobile
20    communications equipment in general?
21    A.  Uh-huh.
22    Q.  Right?  Would a French judge, attempting to
23    interpret industry practice relevant to the ETSI
24    policy, only consider industry practice involving
25    products that comply with ETSI standards, or would the

142

1    judge also consider industry practice regarding
2    products that implement other mobile communication
3    standards?
4    A.  The first thing I want to record here is that
5    the judge would not consider industry practice if he
6    was confident that the plain language of ETSI doesn't
7    need him to have recourse to industry practice to
8    interpret.
9       It's only subsidiary element because, in my
10    opinion, a French judge would consider that the
11    language is plain and clear and, therefore, industry
12    practice need not be considered.  Then having said
13    that, you asked me what the judge will consider in
14    industry practice and I think he would consider the
15    different license contracts and the practice of how
16    these contracts are drafted, rather than the products
17    themselves.
18    Q.  What I'm trying to understand is, at the time
19    the ETSI IPR policy was drafted, there were other
20    wireless communication standards, notably CDMA One.
21    Are you familiar with CDMA?
22    A.  No.
23    Q.  So CDMA One is a wireless air interface
24    standard that was not promulgated by ETSI.  Okay?  I'll
25    represent that to you.

143

1    A.  Yes.
2    Q.  Qualcomm had licensed, I will represent,
3    various companies to its CDMA One essential patents at
4    the time the ETSI IPR policy was drafted.  If we
5    hypothetically assume that's true, would the licensing
6    practices, relevant to CDMA One technology, be
7    considered part of the industry practice relevant to
8    the interpretation of the ETSI IPR policy?
9    A.  You just said that CDMA One was not within the
10    ambit of ETSI.
11    Q.  Correct.  Right.
12    A.  So I think that it would not be directly
13    relevant.  The relevant industry practice would be the
14    industry practice within the scope of ETSI.
15    Q.  What does that mean, the industry practice
16    within the scope of ETSI?
17    A.  Well, for those standards that are set by ETSI.
18    Q.  So Qualcomm's practices licensing its CDMA One
19    technology would not be considered a relevant industry
20    practice by a French judge attempting to construe the
21    ETSI IPR policy, right?
22    A.  It might not be disregarded all together but it
23    would not be the most relevant industry practice,
24    because it's not a standard set by ETSI.
25    Q.  So the practices of the participants in ETSI

144

1    standards would be more relevant than Qualcomm's
2    practices, regarding CDMA One technology.  Right?
3    A.  Can you say the question again.
4    Q.  So the practices of those companies who
5    licensed technologies relevant to the ETSI standard,
6    would be more relevant than the licensing practices of
7    patent holders who license patents relative to CDMA One
8    technology, right?
9    A.  I haven't considered this question.  There is
10    some logic in what you suggest but it's difficult for
11    me to be assertive on this point because I haven't
12    given it a thought before.
13    Q.  Because Ericsson -- strike that.
14       What if the participants in drafting the ETSI
15    policy had already been licensed by Qualcomm under its
16    CDMA One patents and, therefore, knew what Qualcomm's
17    licensing practices were.  Would that I impact the
18    relevance of Qualcomm's CDMA One licensing practices
19    one way are the other?
20    A.  Wow, I need to see that question.  It's too
21    long, too complicated.
22    Q.  Sure.  Hypothetically, lets assume there are
23    four companies who are involved in drafting the CDMA --
24    strike that.
25       Let's assume that half the companies who were

36 (Pages 141 to 144)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

145

1    involved in drafting the ETSI IPR policy had, at that
2    time, become familiar with Qualcomm's licensing
3    practices regarding the CDMA One standards.  Is that
4    hypothetical clear?
5        A. Yes, I know about Qualcomm's practices.  Okay.
6        Q. Regarding CDMA One technology?
7        A. Uh-huh.
8        Q. Would Qualcomm's practices regarding CDMA One
9    licensing be relevant to a French judge's
10   interpretation of the intent of the drafters of the
11   ETSI IPR policy?
12       A. In a very last resort.  If he had really
13   nothing else to find out about this intent, and I doubt
14   that he wouldn't have nothing else, because there is
15   the history of the negotiation of ETSI policy, which
16   would be much more directly relevant than what you
17   suggest.
18       Q. So when you say in the very last resort, you
19   mean it would not be a particularly persuasive piece of
20   evidence for the judge, if they had other indications
21   of the intent of the drafters?
22       A. I think this is what I mean, yes.
23       Q. So the fact that Qualcomm refused to license at
24   the component level for CDMA One is not relevant to the
25   interpretation of the intent of the drafters of the

146

1    ETSI IPR policy, right?
2        MR. EARNHARDT:  Objection to the form.
3    Misstates her testimony.
4        A. It's not exactly what I've said.  I've said
5    that it's not the most important element.  It will be
6    relevant if there was no more decisive element.  And I
7    believe that the history of the negotiations t ETSI
8    will be the first element that a judge would take into
9    account.  Because in France, we have this tradition, a
10   bit like when you write a law, a statute to interpret
11   the statute, the French judge will first look at what
12   we call a travaux preparatoris, preparatory work of
13   the statute, and it's a bit the same for ETSI policy.
14   The first thing that the judge will look at to assess
15   the intention of the party would be the preliminary
16   discussions and work concerning ETSI.
17       Q. But in reaching your opinions in this matter
18   you did not investigate the preliminary discussions and
19   work concerning the formation of the ETSI policy, other
20   than by talking to Mr. Huber, right?
21       A. This is -- I think we can say that because I
22   did not look at documents of the negotiation history,
23   and also because I was easily convinced that the
24   language is plain and clear and that a French judge
25   would not have to go beyond and will not have to

147

1    investigate because he would consider the language is
2    clear.
3        Q. In order to determine the language was clear,
4    you had to find out from Mr. Huber what was meant by a
5    system or device fully conforming to the standard,
6    right?
7        MR. EARNHARDT:  Object to the form.
8        A. I asked him what was meant by this but, as I
9    said before, I was more impressed by the fact that in
10   the definitions of -- by the definitions of equipment
11   and manufacture, and particularly the definition of
12   equipment, that we have already discussed.
13       Q. And you determined that the language of the
14   ETSI IPR policy was clear and unambiguous but you never
15   considered whether the first bullet of 6.1 provides
16   that standard essential patents holders must license
17   the manufacturer's components to manufacture components
18   and subsystems to the licensees's own design for the
19   use in the manufacture of equipment by folks other than
20   the licensee, right?
21       MR. EARNHARDT:  Object to the form.
22       A. This is not right.  You cannot say that I never
23   considered it because I think I've mentioned it in my
24   report.
25       Q. Where?

148

1        A. Let us see.  I considered it when I considered
2    the express language of Clause 6 on page 11, CX0057013
3    and it's the last paragraph before negotiation history.
4    I say, moreover, the ETSI policy itself draws a
5    distinction between component and equipment reenforcing
6    this point.  The policy refers to components separately
7    from equipment, Section 6.1 of the IPR policy entails
8    only the right to make or have made components for use
9    in manufacture, i.e., the production of complex
10   devices.  It does not intend the right to FRAND license
11   to sellees or otherwise dispose of components on their
12   own.  In contrast, a license regarding equipment, i.e.,
13   a complete device and tells the rights to sell, lease
14   or otherwise dispose of it.  Thus, the ETSI IPR policy
15   does not require a SEP holder to offer a license to a
16   seller of components.
17       Q. So you say in the third to last sentence,
18   Section 6.1 of the IPR policy entails only the right to
19   make or have made components for use and manufacture,
20   i.e., the production of complete devices, right?
21       A. Yes, I see that.
22       Q. So that means the ETSI IPR policy requires
23   holders of standard essential patents to license makers
24   of components to make components as long as those
25   components are for use in the manufacture of equipment,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

149

1    right?
2        A. It includes the right to make or have made
3    customized components. It does not require.
4        Q. It requires standard essential patent holders
5    to offer licenses to make components, as long as those
6    components are for use in the manufacture of equipment,
7    right?
8        MR. EARNHARDT: Object to the form. Misstates
9    her prior testimony.
10       A. I think we discussed already this sentence,
11   which is not in my native language as I said before,
12   and I think I'd prefer not distorting the words, so it
13   says what it says.
14       Q. Did you reach the opinion in this matter that
15   the ETSI IPR policy does not require Qualcomm to
16   license a maker of components to Qualcomm's standard
17   essential patents, even if that licensee wants to make
18   components for use in manufacture of equipment as
19   manufacture and equipment are defined in the ETSI IPR
20   policy?
21       A. If I had reached this conclusion, it wouldn't
22   be in contradiction with this sentence, wouldn't it?
23       Q. I'm sorry. Would you like the question
24   repeated?
25       A. So I didn't think I would have reached this

150

1    conclusion because I wouldn't have reached a conclusion
2    which would be in contradiction with what is said by
3    ETSI policy in 6.1 and it says, manufacture including
4    the right to make or have made customized components
5    and subsistence to the licensee's own design for use in
6    manufacture.
7        Q. Turning to your response to question two on
8    page 13 of your report CX0057-015.
9        A. Yes. Perhaps we can have a small break before?
10       MR. MATHESON: Sure.
11       THE VIDEOGRAPHER: We are going off the record.
12   The time is 2: 26.
13       (A recess was taken.)
14       THE VIDEOGRAPHER: We are going back on the
15   record. The time is 2:37.
16       Q. Okay. We were focused on your response to the
17   second question you pose in your report, quote, can a
18   third party beneficiary invoke the FRAND commitment to
19   challenge a license after agreeing to it. Okay? Now,
20   you're not offering the view that a United States court
21   lacks the power to invalidate a duly executed license
22   agreement between Qualcomm and a licensee as a form of
23   a injunctive relief under the antitrust laws, are you?
24       A. I don't think I am, no.
25       Q. And you're not offering the view that a United

151

1    States court could invalidate a license agreement
2    between Qualcomm and a licensee on the basis that the
3    agreement violated public policy, are you?
4        A. No, I'm not.
5        Q. And you're not offering the view that a French
6    court is powerless to invalidate a contract between
7    Qualcomm and a licensee if, hypothetically, the French
8    court were to determine that the contract violated
9    public policy, are you?
10       A. That is a different question. Now which will
11   be governed by French law. I'm not offering a view on
12   what a French court would do as we got the license
13   contract because the license contract is not governed
14   by French law.
15       Do you want to ask me the question again,
16   perhaps it will make it clearer?
17       Q. No, that's fine. You're not offering the view
18   that a United States court is powerless to hold that
19   ETSI's IPR policy violates the United States antitrust
20   laws, are you?
21       A. I'm not offering a view on antitrust law.
22       Q. You're not offering the view that a European
23   court is powerless to hold that ETSI's IPR policy
24   violates European competition law, are you?
25       A. Again, I am not giving any opinion on

152

1    competition law, neither US nor European competition
2    law.
3        Q. So you stated on CX0057-015, page 13 of your
4    report, quote, under French law a current license
5    cannot be invalidated on the basis that its terms do
6    not comply with FRAND. Right?
7        A. This is right.
8        Q. What you mean -- strike that.
9        You don't mean that under French law a current
10   license cannot be invalidated for any reason -- or
11   strike that.
12       There are reasons other than a licenses's
13   failure to comply with FRAND that would support a
14   French court invalidating a license between Qualcomm and
15   one of its licensees, right?
16       A. What I don't mean is a sentence that would be
17   just under French law. A current license cannot be
18   invalidated, full stop. That's not what I meant. I
19   meant cannot be invalidated on the basis that its terms
20   do not comply with FRAND.
21       Q. Are you familiar with the term fraud in the
22   inducement as a term of contract law?
23       A. I think you mean in US contract law or in
24   French contract law?
25       Q. I meant US and I'll ask if there's a parallel

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                    8/16/2018

---

153

1   concept in France.  So are you familiar with the
2   outlines of that concept under US law?
3       A. Sort of.
4       Q. Is there a parallel concept under French
5   contract law?
6       A. There are -- there is a concept of fraud in
7   French contract law but I don't think this is the
8   concept that you have in mind.  It will be more
9   inducement.  When you say fraud and inducement you mean
10  vitiating the content.
11      Q. What I meant was fraud in the inducement,
12  meaning that a false representation was made in order
13  to induce someone to enter a contract.
14      A. Right.
15      Q. Is there a concept under French law that would
16  support the invalidation of a contract based on a fraud
17  that caused the counterparty to enter the contract?
18      A. So I think you mean something like the English
19  would say misrepresentation?
20      Q. Yes.
21      A. We have no concept of misrepresentation under
22  French law but we have the concept of vitiating factors
23  that vitiate your consent.  It was -- it can be either
24  because you have made an error or a mistake, so we have
25  three categories.  We have mistake, we have fraud,

---

154

1   dull, which I consider as fraud, and violence.  And
2   these three categories of vitiating, of vice de
3   consentement, so they will just vitiate your consent
4   and then it can bring -- it can lead to the nullity of
5   the contract.
6       Q. Sorry.  Which one can lead to the nullity of
7   the contract?
8       A. Either one.  Either mistake or fraud or
9   violence.
10      Q. So I'll represent that under the Second
11  Restatement of Contracts in the United States there's a
12  provision that says that when parties attach different
13  meanings to a term under certain conditions neither
14  party can be bound by the meaning attached by the
15  other, even though the result is a failure of mutual
16  ascent.  Is there a parallel concept in French law
17  relating to mistake?
18      A. Mistake is -- it sounds a bit like this but the
19  consequence is different because it brings nullity of
20  the contract.
21      Q. So under French law if the parties fail to
22  attach the same meaning to a term, under some
23  circumstances it can result in nullity of the contract?
24      A. The circumstances are defined and under, as you
25  say, under some circumstances not in every case.

---

155

1       Q. What are the circumstances?
2       A. Of mistake leading -- a mistake being a cause
3   of nullity.
4       Q. Correct.  What are the circumstances under
5   which mutual mistake can lead to the nullity of a
6   contract?
7       A. It has to be a mistake on the very fundamental
8   element and it cannot be a mistake as to the price.
9       Q. So it has to be a mistake on a fundamental
10  element relating to contract performance rather than
11  compensation; is that right?
12      A. Relating to the object of the contract.  You
13  believe that you are going to buy a painting of Claude
14  Monet.  You know Monet?  And it's a painting of Manet
15  with another famous painter.
16      Q. I like Manet better.
17      A. So let's put it the other way around.  So it's
18  rather a mistake on the object.  You believe that it's
19  in gold and it's not gold or something like that.  It
20  cannot be a mistake as to the value of the contract.
21  It's very restrictive.
22      Q. Can a French court nullify a licensing
23  agreement on the basis that the royalty is
24  unconscionable?
25      A. No, it cannot.

---

156

1       Q. Can a French court nullify a contract because
2   it is a contract of adhesion?
3       A. Contract?
4       Q. Are you familiar with the term contract of
5   adhesion in US law?
6       A. Yes.  Standard form contract, as opposed to a
7   baseball contract.
8       Q. Let's -- let's say for the purpose of this
9   question we'll define a contract of adhesion as a
10  contract that one party has no choice but to accept.
11      A. Yes.
12      MR. EARNHARDT:  Just let me object to the
13  definition of that word.
14      Q. Under some circumstances, a United States court
15  might set aside a contractual obligation undertaken
16  pursuant to a contract of adhesion.  Are you familiar
17  with that concept?
18      A. Yes, I am.  It has been introduced in our new
19  law of contract, it's been the most controversial part
20  of the reform because previously we did not have it,
21  except for consumer law.  And now in our civil code
22  Article 1171, we have introduced the possibility for a
23  judge to strike out a clause in a contract of adhesion,
24  which would be manifestly excessive and this clause
25  then can be just deleted.  The contract will not be

---

39 (Pages 153 to 156)

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                8/16/2018



157

1   null or void, but the clause can go away and,
2   therefore, it cannot be something which relates to the
3   price or to the object. It has to be a clause like an
4   exemption clause or something like that. So we have
5   introduced this. It's very new, highly criticized by
6   businesses because it's introducing the power of the
7   judge into the contract.
8       Q. Could the new Article 1171 allow a judge to
9   strike a cross license from a contract of adhesion?
10      A. To strike -- it allows only the striking out of
11  a clause of one term not the cross license as a whole.
12      Q. Well, a cross license could be one term, right?
13      MR. EARNHARDT: Object to the form.
14      A. I would need to see the contract. And also, it
15  would have to be a contract concluded after the reform
16  was passed.
17      Q. And by cross license what I mean -- well,
18  strike that. It doesn't matter.
19          Does French contract law presume that every
20  contract imposes upon each party a duty of good faith
21  and fair dealing?
22      A. There is a general principle of good faith in
23  French contract law.
24      Q. Now you haven't assessed whether Qualcomm's
25  contracting principles harm consumers in any way, have

158

1   you?
2       A. No, I haven't. I haven't been asked to deal
3   with this question.
4       Q. And you haven't assessed whether Qualcomm's
5   licensing practices harm its rivals in any way, have
6   you?
7       A. No. This is not a question I have dealt with.
8       Q. You haven't assessed whether Qualcomm's
9   contracts with Apple have harmed any of Qualcomm's
10  rivals, right?
11      A. No, I have not.
12      Q. Do you know what the FTC means by Qualcomm's no
13  license no chips policy?
14      A. I remember having encountered this expression
15  but now, right now I wouldn't adventure into an
16  explanation.
17      Q. Have you reached a conclusion regarding whether
18  or not Qualcomm refuses to offer patent licenses to --
19  strike that.
20          Have you reached a conclusion regarding
21  whether or not Qualcomm refuses to supply baseband processors
22  to unlicensed manufactures of handset devices?
23      A. I have not reached a conclusion on this, nor
24  did I give an opinion on this.
25      Q. You haven't analyzed that question one way or

159

1   another?
2       A. No.
3       Q. You have no opinion whether or not that has
4   harmed Qualcomm's rivals, right?
5       A. Sorry?
6       Q. Whether or not such a policy, if it exists,
7   have harmed Qualcomm's rivals?
8       A. I have no opinion on this. I am not an
9   economist.
10      Q. You're not offering an opinion on the scope of
11  -- strike that.
12          You're not offering any opinion on the
13  injunctive relief that might be appropriate should the
14  United States court find that the antitrust law has
15  been violated, are you?
16      A. No, I am not.
17      Q. I'm not sure if we have discussed. On page two
18  of your report -- sorry page one of your report, you
19  identify testimony by deposition or at trial the expert
20  witness for Ericsson versus Samsung and Samsung versus
21  Ericsson of the US ITC. The first bullet, Ericsson
22  versus Samsung, investigation number 337-TA-862. What
23  opinion did you offer in that matter?
24      A. I think, but now I'm not sure between the two,
25  but I think it was mostly on the question of FRAND

160

1   negotiations and good faith and what is the meaning of
2   the FRAND obligation. And also the stipulation for the
3   benefit of third party, if my remember -- if I remember
4   well.
5       Q. Did you offer in that matter the expert opinion
6   that the ETSI IPR policy was clear and unambiguous,
7   regarding the meaning of FRAND?
8       A. That I don't remember whether I put it in those
9   words.
10      Q. In the second bullet, Samsung versus Ericsson,
11  investigation number 337-TA-866. In that matter, did
12  you offer the expert opinion that the ETSI IPR policy
13  was clear and unambiguous with respect to the meaning
14  of FRAND?
15      A. Again, I don't remember but it's public, isn't
16  it?
17      Q. Do you recall one way or the other having
18  formed a view, prior to your retention in this matter,
19  whether ETSI's IPR policy is clear and unambiguous with
20  respect to the meaning of FRAND?
21      A. What I remember is having often referred to
22  Article 6, which is really important, and having
23  discussed the terms of Article 6, and mainly the fact
24  that you commit yourself to be prepared to grant
25  irrevocable licenses on fair, reasonable and

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                    8/16/2018

---

161

1  nondiscriminatory terms and conditions.  That was the
2  key element of my expertise.
3      MR. MATHESON:  Thanks very much for your time.
4  Greatly appreciate it.  That's all the questions I have
5  unless there's redirect.
6      MR. EARNHARDT:  I have no questions.
7      THE VIDEOGRAPHER:  This concludes today's
8  deposition.  The time is 2:55.  We are now off the
9  record.
10     (Whereupon, at 2:55 p.m., the deposition was
11  adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

163

1              CERTIFICATE OF DEPONENT
2
3
4      I hereby certify that I have read and examined
5  the foregoing transcript, and the same is a true and
6  accurate record of the testimony given by me.
7
8
9      Any additions or corrections that I feel are
10 necessary I will attach on a separate sheet of paper to
11 the original transcript.
12
13
14     I hereby certify, under penalty of perjury,
15 that I have affixed my signature hereto on the date so
16 indicated.
17
18
19     DATED:
20
21
22
23     BENEDICTE FAUVARQUE-COSSON
24
25

---

162

1  C E R T I F I C A T I O N   O F   R E P O R T E R
2  DOCKET/FILE NUMBER: 5:17-cv-0220-LHK-NMC
3  CASE TITLE:  FTC vs. QUALCOMM, INCORPORATED
4  DEPOSITION DATE:  August 16, 2018
5
6      I HEREBY CERTIFY that the transcript contained
7  herein is a full and accurate transcript of the notes
8  taken by me at the hearing on the above cause before
9  the FEDERAL TRADE COMMISSION to the best of my
10 knowledge and belief.
11
12          DATED:  8/17/18
13
14
15          s/Stefanie Krut
16          STEFANIE KRUT
17
18
19
20
21
22
23
24
25

---

164

1  WITNESS:  BENEDICTE FAUVARQUE-COSSON
2  DATE:  AUGUST 16, 2018
3  CASE:  FTC v. QUALCOMM, INC.
4  Please note any errors and the corrections thereof on
5  this errata sheet.  The rules require a reason for any
6  change or correction.  It may be general, such as "to
7  correct stenographic error" or "to clarify the record"
8  or "to conform with the facts."
9  PAGE LINE  CORRECTION          REASON FOR CHANGE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

41 (Pages 161 to 164)