Amanda Tessar (*pro hac vice* pending)
ATessar@perkinscoie.com
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: 303.291.2357
Facsimile: 303.291.2457

Sarah E. Stahnke, California Bar #264838
SStahnke@perkinscoie.com
**PERKINS COIE LLP**
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4489
Facsimile: 650.838.4350

**ATTORNEYS FOR AMICI CURIAE
ACT | THE APP ASSOCIATION AND COMPUTER &
COMMUNICATIONS INDUSTRY ASSOCIATION**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA,
SAN JOSE DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 5:17-cv-00220-LHK |
| Plaintiff, | **BRIEF OF INDUSTRY ASSOCIATION *AMICI CURIAE* IN SUPPORT OF FTC'S MOTION FOR SUMMARY JUDGMENT ON QUALCOMM'S ESSENTIAL PATENT LICENSING COMMITMENTS** |
| v. | |
| QUALCOMM INCORPORATED, a Delaware corporation, | |
| Defendant. | Date: February 21, 2019<br>Time: 1:30 PM<br>Place: San Jose Courthouse, Courtroom 8<br>Judge: Hon. Lucy Koh |

# TABLE OF CONTENTS

Page

I. STATEMENT OF INTEREST ................................................................................................ 1

II. PRELIMINARY STATEMENT ............................................................................................. 2

III. BACKGROUND AND CONTEXT: WHY ENFORCEMENT OF THE FRAND PROMISE MATTERS TO AMICI................................................................................................ 3

IV. NEITHER THE TIA NOR THE ATIS IPR POLICY IS SUSCEPTIBLE TO AN INTERPRETATION PERMITTING REFUSALS TO LICENSE ....................................... 6

V. CONCLUSION ........................................................................................................................ 9

# TABLE OF AUTORITIES

**PAGE(S)**

**CASES**

*AIU Ins. Co. v. Superior Court*,
  51 Cal. 3d 807 (1990) ..................................................................................................9

*Apple Inc. v. Qualcomm, Inc.*,
  Case No. 3:17-cv-00108-GPC-MDD (N.D. Cal Sept. 7, 2017) ...................................8

*Apra v. Aureguy*,
  361 P.2d 897 (Cal. 1961) .............................................................................................6

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ...................................................................................8

*Gerdlund v. Elec. Dispensers Int'l*,
  190 Cal. App. 3d 263 (1987) .......................................................................................7

*GPNE Corp. v. Apple, Inc.*,
  No. 12-CV- 02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ...............3, 8

*Kerkeles v. City of San Jose*,
  243 Cal. App. 4th 88 (2015) ........................................................................................6

*Microsoft Corp. v. Motorola, Inc.*,
  696 F.3d 872 (9th Cir. 2012) .......................................................................................7

*Microsoft v. Motorola*,
  795 F. 3d 1024 (9th Cir. 2015) .................................................................................7, 8

*Nat'l Union Fire Ins. Co. v. Lynette C.*,
  228 Cal. App. 3d 1073 (1991) .....................................................................................7

*Thrifty Payless v. Mariners Miles Gateway, LLC*,
  185 Cal. App. 4th 1050 (2010) ....................................................................................7

*Turner v. Met. Life Ins. Co.*,
  56 Cal. App. 2d 862 (1943) .........................................................................................7

*Vons Cos. v. U.S. Fire Ins. Co.*,
  78 Cal. App. 4th 52 (2000) ..........................................................................................6

## I. STATEMENT OF INTEREST

*Amici curiae* (the "Industry Association Amici" or "Amici") respectfully offer their thoughts and perspectives regarding the important issues presented in this adjudication of the Federal Trade Commission's ("FTC") claims against Qualcomm Incorporated ("Qualcomm"). For the avoidance of doubt, Amici address here only the specific legal issue of contractual interpretation presented in the FTC's Motion For Partial Summary Judgment On Qualcomm's Standard Essential Patent Licensing Commitments (Dkt. 792), not the ultimate merits of the FTC's competition law claims.

Amicus ACT | The App Association ("ACT") is an industry organization comprising more than 5,000 "app" (*i.e.*, application) companies and information technology firms in the mobile economy. It advocates for an environment that inspires and rewards innovation while providing resources to help its members leverage their intellectual assets to raise capital, create jobs, and continue innovating. Further information about ACT and its activities is available at http://actonline.org. Because members of ACT rely on, utilize, and innovate on top of standardized technologies, including technologies for wireless communication, it is deeply interested in ensuring a fair, efficient ecosystem for technical standards. These issues impact small business innovators during this critical time of development and deployment for new "Fifth Generation" (5G) and "Internet of things" (IoT) technologies. In line with its members' core interests in this area, ACT has established an initiative known as "All Things FRAND." As part of this initiative, ACT maintains a comprehensive website and blog, accessible at http://www.allthingsfrand.com, publishing information and perspectives affecting the industry.

Amicus Computer & Communications Industry Association ("CCIA") is an international nonprofit association representing a broad cross-section of computer, communications, and Internet industry firms that collectively employ nearly one million workers and generate annual revenues in excess of $540 billion. CCIA believes that open and competitive markets foster innovation. CCIA's members contribute to technical standards and create innovative products that utilize those standards. CCIA believes that technical standards best foster innovation when standard-essential patent licensing is conducted in a fair and well-understood manner compliant

with the terms of the patent policy selected by the standard-setting organization.  Further information about CCIA, including a list of its members, is available at http://www.ccianet.org.

As significant industry stakeholders with experience in FRAND, SEPs, and related competition law matters, the Industry Association Amici respectfully offer their perspective to the Court in evaluating the legal issues presented by the FTC's Motion for Partial Summary Judgment.  This brief is submitted on behalf of ACT and CCIA themselves; none of ACT's or CCIA's member or sponsors authored this brief in whole or in part, nor did any member or sponsor make a monetary contribution to ACT or CCIA intended to fund the preparation of this brief.

## II.  PRELIMINARY STATEMENT

Amici create, use, and rely on robust standards for wireless communications.  Our signatories include trade associations representing businesses that collectively spend tens of billions of dollars annually on R&D, own hundreds of thousands of patent assets, generate hundreds of billions in annual revenue, and represent numerous vertical industries outside of traditional telecommunications.

Some of Amici's members participate in standards development organizations (SDOs), such as the Alliance for Telecommunications Industry Solutions (ATIS) and the Telecommunications Industry Association (TIA), working to develop innovative new standards, contributing their patented technologies to those endeavors in the process.  Some of Amici's members innovate "downstream," using the capabilities provided by standardized communication components purchased from chip and module companies.  These downstream innovators add value in novel ways, using standardized background communication capabilities in the process.  Some members participate at both levels.  Amici represent many different industries, not just traditional telecommunications, but also services, automotive, retail, manufacturing, and software. While some of Amici's members are large international companies, they also include a number of small businesses – companies that utilize standardized communications and want to ensure that their innovations will not be unfairly harmed by abuses relating to standard essential patents (SEPs).

The Industry Association Amici here care deeply about wireless communication standards because they provide a baseline of functionality around which their members innovate, develop products, engage with customers, and create value for their industries and, ultimately, for consumers. The promise to license on fair, reasonable, and non-discriminatory (FRAND) terms protects our members' interests as essential patent holders and their interests as users of standardized technologies. The FRAND promise is also designed to ensure that the value of standardization (*e.g.*, the added value created by the industry's agreement to design products in specific ways so that they remain interoperable) is not undermined by private interests.

In that vein, Amici write to support the FTC's position that the FRAND obligations set forth in the ATIS and TIA licensing policies do not exclude some market participants, such as "competing modem-chip sellers."[1] As at least four United States courts have noted, the FRAND promise does not include such hidden exclusions and does not permit a party to refuse to license some parties by virtue of their position "upstream" or "downstream" in the supply chain. Instead, the FRAND promises made here mean what they say—*i.e.*, that a FRAND promisor must license to "all applicants" (the TIA contract) and to "applicants desiring to utilize the license for the purpose of implementing the [relevant ATIS] standard" (the ATIS contract).

### III.   BACKGROUND AND CONTEXT:  WHY ENFORCEMENT OF THE FRAND PROMISE MATTERS TO AMICI

Amici's interest in this topic is straightforward: in today's economy, businesses incorporate, use, and rely on wireless communications functionality in all sorts of ways, and it is imperative to a healthy marketplace and to fair competition that licenses to those technologies remain available on FRAND terms to all market participants.

In general, Amici's members' supply chains for wireless technologies begin with the

---

[1] For the avoidance of doubt, Amici take no position in this brief on the ultimate merits of the FTC's competition law claims in this action and understand that the FTC's Motion expressly excludes such issues. Motion, at 1-2. Amici address solely the legal, contractual issue set forth in the FTC's motion regarding the "meaning of … FRAND commitments to TIA and ATIS." Motion, at 3.

modem chip manufacturers, who make and sell the components enabling and embodying standardized functionality.[2] In some cases, the chips supplied by those manufacturers may be incorporated directly into end-user devices, such as mobile handsets. But, in other situations or industries, those modem chips are combined with other components by so-called "module manufacturers" as part of standards-compliant circuit boards or as "embedded modules," providing more of a "plug-and-play" approach. Such modules themselves may then be incorporated into an end device, such as a router or "Internet of Things" application, or may be further embedded into more complex assembled devices. For example, an automotive telematics system provides users with data access for traffic, internet connectivity, and other useful applications. In turn, these more complex systems may then be further incorporated into an end device, such as a car. And, finally, services or other industry users might deploy, integrate, or build upon those end devices in various ways, such as a software company that develops applications using mobile technologies or a warehouse or retail business that uses telecommunication sensors to track inventory. Amici's members include companies at these various "upstream" (chip) and "downstream" (component, end product, software, and services) supply chain "levels."

      Amici recognize and respect that "downstream" companies may, in some cases, seek to obtain their own SEP license. There can be many reasons for this, such as a preference to negotiate terms directly or to maintain an ability to use multiple suppliers regardless of their individual license status.

      But, in many cases, it can be more reasonable and practical for a downstream customer to rely on its upstream component maker(s) to negotiate and obtain any necessary SEP licenses. For example, the modem chip market is highly concentrated, with a small number of companies comprising substantially all the output available to customers, so a few licenses among chip competitors could negate the need for individual licenses to the tens of thousands (or more)

---

[2] *See generally GPNE Corp. v. Apple, Inc.*, No. 12-CV- 02885-LHK, 2014 WL 1494247, at *13 (N.D. Cal. Apr. 16, 2014) (holding "as a matter of law that in this case [where the asserted patents were claimed to be essential to 3G and 4G cellular standards], the baseband processor is the proper smallest salable patent-practicing unit").

downstream companies that purchase and incorporate those modem chips and thereby reduce negotiation costs significantly.  Likewise, suppliers that develop, manufacture, and sell the standardized components may be in the best position to evaluate patents covering those technologies and thus to negotiate regarding their validity, essentiality, and value.  By contrast, a downstream company may have little or no expertise with the details of upstream wireless technologies and may therefore prefer to obtain fully-licensed components from their suppliers that design and manufacture those components.

The FRAND promise made as part of participation in the TIA and ATIS standard-setting process allows for both of these scenarios by requiring the promisor to provide licenses to "all applicants" and "applicants," without distinguishing, limiting, or carving out applicants who emerge from particular levels of the supply chain.

In other words, as customers (either direct or indirect) for telecommunications components, including modem chips, and also as SEP owners (or with members who are such SEP owners) that have committed to license patents on FRAND terms, Amici support FRAND's clear obligation to license an implementer that seeks a license – regardless of that licensee's position in the supply chain.  We have previously addressed these concerns, as have more than 50 industry leaders and more than 70 academic and thought leaders to the United States Department of Justice[3] and to the FTC.[4]  In short, an SEP-

---

[3] See Multi-Association Letter to AAG Delrahim (letter from six trade associations representing more than $3 trillion in GDP, noting that FRAND commitment entails that license is available to any implementer), available at http://www.ccianet.org/wp-content/uploads/2018/05/Multi-Assn-DOJ-White-Paper-053018.pdf; Industry Letter to AAG Delrahim Regarding Standards, Innovation and Licensing (letter from fifty-eight companies, academics, and SMEs noting that enforcement of obligation to license is an expected consequence of FRAND promise), available at http://www.ccianet.org/wp-content/uploads/2018/01/Industry-Letter-to-DOJ-AAG.pdf; Academic and Former Regulator Letter to AAG Delrahim Regarding Speeches on Patents and Holdup (letter from seventy-seven academics and former United States agency personnel, explaining that the "holder of a standard essential patent voluntarily chooses to license on a FRAND basis, receiving in exchange the SSO's 'seal of approval' and the potential for significantly increased volume that comes with that seal, which is well worth the FRAND promise"), available at https://www.competitionpolicyinternational.com/wp-content/uploads/2018/05/DOJ-patent-holdup-letter.pdf.

[4] See Comments of Cross-Sectoral Multi-Association Group to FTC (public comments from letter from six trade associations representing more than $3 trillion in GDP, noting that

holder's legitimate interest in obtaining FRAND compensation for its SEPs (an interest Amici recognize and support) can faithfully be upheld regardless of the identity of the licensee or its place in the supply chain. Indeed, any other reading would be inconsistent with the plain language of the FRAND promises at issue here.

### IV. NEITHER THE TIA NOR THE ATIS IPR POLICY IS SUSCEPTIBLE TO AN INTERPRETATION PERMITTING REFUSALS TO LICENSE

Turning to the plain language of the TIA and ATIS IPR policies, we concur with the FTC's view that those policies do not admit of any interpretation limiting the benefit of the FRAND licensing obligation to only some companies and not others.

For SDO participants that have submitted a FRAND undertaking, the requirements are clearly articulated at both organizations:

- TIA requires that FRAND licenses are available to "all applicants."[5] To provide even greater clarity that refusals to license "competing modem-chip sellers" are prohibited, the TIA IPR Guidelines expressly note that "[a]n example of conduct that would constitute discrimination is a willingness to license all applicants *except for competitors of the licensor*."[6]

- The ATIS IPR Policy similarly requires that licenses are available to "applicants desiring to utilize the standard,"[7] without any restrictions on the level of the supply chain in which such utilization occurs.

Amici agree that this language is clear and not susceptible to an interpretation that would permit exclusion of "competing modem-chip makers" from the benefit of the FRAND promise. A contrary read would, in effect, seek to contradict the text of the IPR policies by cropping in words and limitations that are simply not present. California law does not permit a reading that contradicts the express language of a contract.[8] The TIA and ATIS policies, on their faces,

---

FRAND commitment entails that license is available to any implementer), *available at* https://www.ftc.gov/policy/public-comments/2018/08/20/comment-ftc-2018-0055-d-0031.

[5] FTC Motion, Ex. 1 (the "TIA IPR Policy") at ¶ 3.1.1(2)(b).

[6] FTC Motion, Ex. 30 (the "TIA IPR Guidelines") at ¶ 5 (emphasis added).

[7] FTC Motion, Ex. 2 (the "ATIS IPR Policy") at ¶ 10.4.2

[8] Parol evidence cannot be admitted to contradict the plain language of an agreement. *See, e.g., Vons Cos. v. U.S. Fire Ins. Co.*, 78 Cal. App. 4th 52, 58-59 (2000) ("Our function is to determine what, in terms and substance, is contained in the contract, not to insert what has

simply do not permit an interpretation limiting the beneficiaries of the licensing promise to "*some*" applicants, but not others.[9]

This common-sense interpretation of the FRAND promise – *i.e.*, an interpretation that does not seek to impose hidden, unstated restrictions – is well supported in the applicable FRAND case law. As the Ninth Circuit has explained across multiple cases:

- "To mitigate the risk that a SEP holder will extract more than the fair value of its patented technology, many SSOs require SEP holders to agree to license their patents on 'reasonable and non-discriminatory' or 'RAND' terms. Under these agreements, ***an SEP holder cannot refuse a license to a manufacturer who commits to paying the RAND rate***."[10]

- A FRAND obligation includes a "requirement to negotiate licenses with ***all seekers***."[11]

- A FRAND promise to "grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary … ***admits of no limitations as to who or how***

---

been omitted. We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there."); *Kerkeles v. City of San Jose*, 243 Cal. App. 4th 88, 99 (2015) ("We may not add terms reflecting an understanding that is not evident in the plain language of the parties' contract.") (citing *Apra v. Aureguy*, 361 P.2d 897, 899 (Cal. 1961)).

[9] There are many California cases, in a range of different contexts, illustrating this general principle. For example, under California law, a contract providing for termination "at any time and for any reason" cannot have conditions added limiting the termination right to "any ***good*** reason." *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 273-74 (1987) (emphasis added). Likewise, a contract specifying benefits to an employee's "children" cannot reasonably be interpreted to exclude some of the employee's children (*i.e.*, the illegitimate ones). *Turner v. Met. Life Ins. Co.*, 56 Cal. App. 2d 862, 869 (1943) (where "there are no words of limitation or restriction used" in the contract, "children" must be interpreted to include all of the insured's children, including illegitimate children). The California Court of Appeals has also held, in the insurance context, that "an insured" means "any insured under the policy." *Nat'l Union Fire Ins. Co. v. Lynette C.*, 228 Cal. App. 3d 1073, 1079 (1991). Similarly, a clause providing that both "Tenant and Landlord" have a right to terminate an agreement could not be construed to mean that only the tenant had a termination right. *Thrifty Payless, Inc. v. Mariners Miles Gateway, LLC*, 185 Cal. App. 4th 1050, 1060-61 (2010). Likewise here, it would frustrate and contradict the language of the TIA IPR Policy and the ATIS IPR Policy to construe "applicants desiring to utilize the standard" or "all applicants" to mean "only some applicants."

[10] *Microsoft Corp. v. Motorola, Inc.*, 795 F. 3d 1024, 1031 (9th Cir. 2015) (emphasis added).

[11] *Id.* (emphasis added).

> *many applicants could receive a license* ....."[12]

The Federal Circuit has likewise noted, in addressing the application of *Georgia Pacific* factors in the context of SEPs:

> "[T]he licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention [is not relevant for SEPs]. [...] **Because of [the] RAND commitment [...] it cannot have that kind of policy for maintaining a patent monopoly**."[13]

And, more recently, addressing the ETSI licensing obligation that a SEP holder "be prepared to grant irrevocable licenses," Judge Curiel noted that such language "plainly states that any willing licensee is entitled to license Qualcomm's intellectual property at a FRAND rate."[14]

---

[12] *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012) (emphasis added). As the FTC motion notes (p.18), the *Microsoft* court was evaluating SDO language quite similar to the TIA policy. But the TIA IPR policy, as reflected in Exhibit 1 to the FTC motion, is even more express that "*all* applicants" (¶ 3.1.1(2)(b)) are entitled to a license than was the SDO policy addressed in *Microsoft*.

[13] *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1230 (Fed. Cir. 2014) (emphasis added).

[14] Order Denying Anti-Suit Injunction, *Apple Inc. v. Qualcomm, Inc.*, Case No. 3:17-cv-00108-GPC-MDD (N.D. Cal Sept. 7, 2017), ECF No. 141, available at https://cases.justia.com/federal/district-courts/california/casdce/3:2017cv00108/522828/141/0.pdf?ts=1504946165. A number of foreign authorities have held to the same effect. In Europe, for example, the competition authorities have noted that the FRAND obligation entails a requirement not to refuse licenses. *See, e.g.*, European Commission, C*ase AT.39985 - Motorola - Enforcement of GPRS Standard Essential Patents*, European Commission ¶ 294 (April 29, 2014), available at http://ec.europa.eu/competition/antitrust/cases/dec_docs/39985/39985_928_16.pdf ("On the basis of that [FRAND] commitment, manufacturers of GPRS-compliant products can reasonably expect that Motorola makes its SEPs available on FRAND terms and conditions to *all implementers*.") (emphasis added); European Commission, *Communication from the Commission – Guidelines on the applicability of Article 101 of the Treaty on the Functioning of the European Union to horizontal co-operation agreements*, ¶¶ 285-287, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52011XC0114(04)&from=EN ("In order to ensure effective access to the standard, the IPR policy would need to require participants wishing to have their IPR included in the standard to provide an irrevocable commitment in writing to offer to license their essential IPR to *all third parties* on fair, reasonable and non-discriminatory terms. [...] FRAND commitments can prevent IPR holders from making the implementation of a standard difficult by refusing to license ... after the industry has been locked-in to the standard.") (emphasis added). Likewise, in Korea, the competition authorities have concluded that FRAND requires that "access to and use of cellular SEPs should be guaranteed for the modem chipset manufacturers in accordance with the purposes

As in the *Microsoft, Ericsson*, and *Apple* matters, which addressed FRAND promises similar to – and in some cases, even less explicit than – the TIA and ATIS language under consideration here, the court should not interpret the TIA IPR Policy or the ATIS IPR Policy to include unstated limitations excluding some types of companies from its purview.[15] The obligation to license third parties, including "competing modem-chip manufacturers," is the plain and unambiguous consequence of the defendant's FRAND promises.[16]

## V.  CONCLUSION

The texts of the TIA IPR Policy and of the ATIS IPR Policy are clear, as is the applicable

---

of standard-setting and FRAND commitments." *See* Korea Fair Trade Commission, Decision No. 2017-0-25, *In re Alleged Abuse of Market Dominance of Qualcomm Inc.*, ¶ 235 (Jan. 20, 2017), available at http://www.theamericanconsumer.org/wp-content/uploads/2017/03/2017-01-20_KFTC-Decision_2017-0-25.pdf.

[15]  Because the language of the TIA IPR Policy and the ATIS IPR Policy is clear, there is no need to consider parol evidence. *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990). It would be misplaced here, moreover, to look to some companies' course of conduct in seeking to license OEM-level companies to prove the intent of the TIA and ATIS standards, since there is a disconnect between those two situations. Whether some companies have, at least in more recent years, chosen to focus their licensing programs at the OEM level does not establish that a FRAND promisor does not need to license to a modem-chip competitor when such a competitor requests a FRAND license; it establishes only that the promisor falls short of its obligations to competitors under its FRAND promises if it refuses to license them as previously promised.

[16]  While this matter can be decided as a matter of law based on the IPR Policy text as submitted by the FTC, Amici note that the defendant itself has previously espoused this same view in its own attested court filings, including claiming breach of FRAND based on a competing chip competitor's refusal to license Qualcomm. *See, e.g.,* Qualcomm's Counterclaims and Affirmative Defense, ¶¶ 25, 56, 61, 77, No. 05-3350 (MLC) (JJH) (D.N.J. Feb. 29, 2008) ECF No. 139 ("Qualcomm, which owns a large portion of the intellectual property covering CDMA technology, operates a pro-competitive licensing model, in which it offers licenses on fair, reasonable and non-discriminatory terms ***to any interested company***."; "Qualcomm has repeatedly offered [a competing chip manufacturer] license terms for Qualcomm's UMTS patents that comply with FRAND and are at least as favorable as the terms Qualcomm has offered to other chipset licensees.") (emphasis added); Qualcomm Opp. to Broadcom Motion to Dismiss, Strike or Summary Judgment, No. SACV05-0467-JVS (RNBx) (C.D. Cal. Jan. 20, 2009), ECF No. 1606 (asserting violation of FRAND based on competing chipset manufacturer's refusal to license Qualcomm). Indeed, in connection with prior litigation, the defendant's current President (then Vice President) publicly stated: "Saying [Qualcomm] refuse[s] to license competitors is like saying McDonald's refuses to sell hamburgers [...] It's nuts. It's crazy." *See* Gittlesohn, J., *Battle of Tech Heavyweights*, Orange County Register (5/1/07) Orange County (Cal.) Reg. 1 2007 WLNR 30244838.

precedent addressing similar FRAND undertakings, that the promise to license on FRAND terms is not restricted to some market participants, and exclusive of "competing modem-chip manufacturers." A clear and direct promise to license on FRAND terms, without restrictions, cannot reasonably be interpreted to include hidden, unstated limitations. Amici thanks the Court for its consideration of its views and perspectives.

Dated: September 17, 2017

By: /s/ Sarah E. Stahnke
Amanda Tessar (*pro hac vice* pending)
ATessar@perkinscoie.com
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone:  303.291.2357
Facsimile:  303.291.2457

Sarah E. Stahnke, California Bar #264838
SStahnke@perkinscoie.com
**PERKINS COIE LLP**
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone:  650.838.4489
Facsimile:  650.838.4350

**ATTORNEYS FOR AMICI CURIAE
ACT | THE APP ASSOCIATION AND COMPUTER
& COMMUNICATIONS INDUSTRY ASSOCIATION**