# EXHIBIT 1

RICHARD L. DONALDSON, ESQ. - 08/15/2018

1           RICHARD L. DONALDSON, ESQUIRE

2            UNITED STATES DISTRICT COURT

3           NORTHERN DISTRICT OF CALIFORNIA

4               SAN JOSE DIVISION

5      _____

6
FEDERAL TRADE COMMISSION
7
                 Plaintiff,
8                                   Case No.
       V.                           5:17-cv-00220-LHK-NMC
9
QUALCOMM INCORPORATED, a
10   Delaware corporation,

11               Defendant.

12     _____

13

14            VIDEOTAPED DEPOSITION OF

15          RICHARD L. DONALDSON, ESQUIRE

16              WASHINGTON, D.C.

17           WEDNESDAY, AUGUST 15, 2018

18                  9:00 A.M.

19

20      VIDEOTAPED DEPOSITION OF RICHARD L. DONALDSON,

21   ESQUIRE, a witness herein, taken on behalf of the

22   Defendant, at the Federal Trade Commission, Bureau of

23   Competition, 400 7th Street, Southwest, Washington,

24   D.C.

25   REPORTED BY:  MICHELE E. EDDY, RPR, CRR, CRI

| | | |
|---|---|---|
| 1 | RICHARD L. DONALDSON, ESQUIRE | |
| 2 | developing any licensing programs or strategies | 09:12:01 |
| 3 | regarding cellular wireless patents? | 09:12:05 |
| 4 | MS. GILLEN:  Object to the form. | 09:12:09 |
| 5 | A    No, I did not. | 09:12:11 |
| 6 | Q    Did you have any involvement at all, | 09:12:14 |
| 7 | when you were at Texas Instruments, in licensing | 09:12:17 |
| 8 | patents related to cellular wireless technologies? | 09:12:24 |
| 9 | MS. GILLEN:  Object to the form. | 09:12:28 |
| 10 | A    Yes, I did. | 09:12:42 |
| 11 | Q    What was that experience? | 09:12:43 |
| 12 | A    Well, there were a number of occasions. | 09:12:46 |
| 13 | I can think of a couple that would come to mind. | 09:12:49 |
| 14 | During the period of time where I was employed by | 09:12:51 |
| 15 | TI, Texas Instruments was the major supplier of | 09:12:58 |
| 16 | baseband controllers for wireless phones to Nokia, | 09:13:04 |
| 17 | Ericsson, Motorola, to name the major companies. | 09:13:08 |
| 18 | And particularly with respect to at least Nokia, | 09:13:11 |
| 19 | there was a requirement from Nokia concerning the | 09:13:17 |
| 20 | supply of the chips that Texas Instruments was | 09:13:29 |
| 21 | providing.  TI was pretty much the sole supplier. | 09:13:34 |
| 22 | And their concern was a potential disruption in | 09:13:38 |
| 23 | that supply for whatever cause. | 09:13:42 |
| 24 | And as part of that, I negotiated | 09:13:46 |
| 25 | licenses with Nokia that included a right under | 09:13:48 |

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

```
 1              RICHARD L. DONALDSON, ESQUIRE
 2  Texas Instruments' patents that related to the        09:13:57
 3  manufacture of these type of products and also        09:14:00
 4  included technical know-how and manufacturing          09:14:04
 5  processes, a complete technology package that they     09:14:09
 6  could use to go to a third party and immediately       09:14:12
 7  implement -- have them implement a manufacturing       09:14:15
 8  process to make the identical products in the          09:14:19
 9  event that TI was unable to provide these              09:14:22
10  products.  So that was a license that included not     09:14:26
11  only patents that TI had that covered these            09:14:31
12  devices, the baseband controllers, but also            09:14:34
13  know-how, copyrights, and things of that nature.       09:14:38
14      Q    So you mentioned the license that you         09:14:47
15  worked on with Nokia.                                  09:14:49
16           At the time you were at Texas                 09:14:55
17  Instruments, did you have any other involvement in     09:14:56
18  licensing patents related to cellular wireless         09:15:02
19  technology?                                            09:15:06
20      A    Certainly related to that aspect, I did       09:15:07
21  studies of patents held by InterDigital, for sure.     09:15:16
22  They were active in licensing cellular patents.        09:15:23
23  TI was manufacturing products that potentially         09:15:28
24  could be subject to those patents so I had a           09:15:31
25  complete investigation done by people in my            09:15:37
```

RICHARD L. DONALDSON, ESQ. - 08/15/2018      Page 12

```
 1               RICHARD L. DONALDSON, ESQUIRE
 2   department.                                        09:15:39
 3          And, also, we started up an analysis        09:15:41
 4   program.  I had an organization that I included    09:15:50
 5   what I called patent strategy managers from        09:15:56
 6   different patent attorneys who worked for me who   09:15:59
 7   specialized in various areas, and one of the       09:16:02
 8   areas, given the involvement that TI had in        09:16:05
 9   manufacturing baseband controllers, the fact that 09:16:09
10   companies like InterDigital, Qualcomm was in the   09:16:11
11   market of studying these industries, studying this 09:16:16
12   technology, what TI was doing, what potential      09:16:21
13   risks there were to TI in that business, what we   09:16:26
14   would need to do to obtain licenses if it came to  09:16:31
15   that.                                              09:16:33
16          So we did a pretty substantial studies      09:16:33
17   on patents related to baseband controllers in      09:16:36
18   particular.                                        09:16:43
19     Q    Let me focus my question a little bit.      09:16:43
20   So you mentioned the licensing work that you did   09:16:45
21   with respect to Nokia.                             09:16:51
22          During the time you were at Texas           09:16:58
23   Instruments, were you involved in negotiating any  09:16:59
24   other licenses for patented technology in the      09:17:05
25   cellular wireless space?                           09:17:12
```

RICHARD L. DONALDSON, ESQ. - 08/15/2018       Page 13

```
 1              RICHARD L. DONALDSON, ESQUIRE
 2         MS. GILLEN:  Object to the form.            09:17:15
 3         THE WITNESS:  Could I have that question    09:17:32
 4    back, please.                                    09:17:33
 5                  (Record read.)                     09:17:49
 6    A     Let me explain it this way.  I             09:17:58
 7    negotiated a number of licenses with various     09:18:00
 8    manufacturers in the semiconductor industry.  The 09:18:05
 9    scope of those licenses included the right to    09:18:09
10    manufacture products under any patents that they 09:18:13
11    owned that related to cellular industry, and this 09:18:17
12    involved basically all the Japanese and Korean   09:18:23
13    companies who -- and European companies who had  09:18:27
14    patents related to that.  The license agreement  09:18:34
15    was not only directed to cellular, but it        09:18:37
16    certainly was structured and discussed to include 09:18:42
17    TI's right to use any patents that they had that 09:18:46
18    TI used in manufacturing its products.           09:18:50
19    Q     Any others, beyond the licenses you just   09:18:58
20    mentioned, that TI entered into with certain     09:19:05
21    Japanese companies?                              09:19:10
22         MS. GILLEN:  Object to the form.            09:19:15
23    A     Well, actually, it's inclusive,            09:19:16
24    Japanese, European, Korean, and U.S.             09:19:18
25    manufacturers.  We had license -- I negotiated   09:19:24
```

RICHARD L. DONALDSON, ESQ. - 08/15/2018       Page 14

1              RICHARD L. DONALDSON, ESQUIRE

2  licenses with all of these companies.  And the way    09:19:27

3  we structured our licenses, we were careful to         09:19:29

4  include -- since we were doing the business with       09:19:34

5  Nokia and Motorola and Ericsson, and the fact that     09:19:37

6  this was getting to be an area where people were       09:19:43

7  asserting patents, like InterDigital was doing,        09:19:48

8  for sure, that was the topic, and that was             09:19:51

9  something that we were careful to be sure were         09:19:55

10 included in our licenses.                              09:19:58

11     Q    So these were broad licenses that             09:20:00

12 included patents related to cellular wireless          09:20:03

13 technology as well as patents in other                 09:20:08

14 technological areas.  Is that correct?                 09:20:12

15     A    That is correct, yes.                         09:20:14

16     Q    When you were at Texas Instruments, did       09:20:18

17 you negotiate any licenses that solely involved        09:20:21

18 standard essential patents in the cellular             09:20:29

19 wireless technological area?                           09:20:34

20     A    I don't recall any that were solely           09:20:52

21 limited to standard essential patents.  They were      09:20:54

22 broader, that would include other patents as well.     09:20:58

23     Q    Now, in your report you mention work in       09:21:09

24 the area of patent licensing that you did while        09:21:14

25 you were at Texas Instruments and then also work       09:21:17

1          RICHARD L. DONALDSON, ESQUIRE

2  that you've done since leaving Texas Instruments.      09:21:22

3  Correct?                                               09:21:24

4       A    That is correct.                             09:21:26

5       Q    Your work since you've left Texas            09:21:28

6  Instruments in the area of patent licensing, has       09:21:32

7  that all been as a retained expert witness in the      09:21:35

8  context of litigation?                                 09:21:39

9       A    No.                                          09:21:42

10      Q    What work have you done since leaving        09:21:43

11 Texas Instruments in the area of patent licensing      09:21:46

12 other than work as an expert witness?                  09:21:49

13      A    As a consultant for just developing          09:21:52

14 patent strategies, licensing strategies.  And with     09:21:56

15 one company I don't think I'm at liberty to give       09:21:59

16 the name of, a Canadian company -- that was            09:22:04

17 involved in standard essential patents with            09:22:07

18 respect to a particular product that is still          09:22:12

19 under development, in fact -- I developed their        09:22:14

20 patent strategies, their licensing strategies,        09:22:16

21 terms and conditions for their license, the type      09:22:19

22 of royalty that they should ask for.  And then I      09:22:22

23 have taken other engagements that -- I was trying     09:22:30

24 to think of the scope that you were -- what was       09:22:37

25 the scope that you were asking for in your            09:22:38

RICHARD L. DONALDSON, ESQ. - 08/15/2018      Page 16

1          RICHARD L. DONALDSON, ESQUIRE

2   question?                                          09:22:39

3       Q    Well, it's pretty broad.  It was just    09:22:40

4   what work have you done since leaving Texas        09:22:42

5   Instruments in the area of patent licensing other  09:22:43

6   than working as an expert witness?                 09:22:47

7       A    "Other than working as an expert."  I     09:22:55

8   have been an arbitrator in some cases.  I'm not    09:22:57

9   sure whether that would qualify as an expert       09:23:06

10  witness.  It was based upon my experience in       09:23:08

11  licensing, and companies retain me to settle some  09:23:11

12  disputes.                                          09:23:17

13      Q    Understood.                               09:23:19

14           Again, let me focus this.  Since leaving  09:23:21

15  Texas Instruments, have you done any work          09:23:23

16  negotiating patent license agreements?             09:23:29

17      A    I have.                                    09:23:32

18      Q    Could you describe your experience        09:23:35

19  negotiating patent license agreements since        09:23:37

20  leaving Texas Instruments.                         09:23:41

21      A    The one I mentioned earlier, the          09:23:43

22  Canadian company having to do with standard        09:23:45

23  essential patents, involved negotiations with      09:23:48

24  other manufacturers.  I also was involved in       09:23:51

25  negotiations with respect to fiber optics network  09:23:56

1           RICHARD L. DONALDSON, ESQUIRE

2   for connecting phone lines across the United          09:24:02

3   States.  I was involved in negotiations for some      09:24:05

4   other patents that related to manufacturing           09:24:12

5   processes that were used in semiconductor             09:24:17

6   manufacture and actually participated in the          09:24:22

7   negotiations.  That was a part of my job.             09:24:24

8       Q    Since leaving Texas Instruments, have        09:24:29

9   you been involved -- other than as an expert          09:24:31

10  witness, have you been involved in negotiating any    09:24:33

11  licenses for standard essential patents in the        09:24:41

12  cellular wireless technology area?                    09:24:47

13      A    I'm trying to think of how broad that        09:25:04

14  definition might be.  Certainly, in one of the        09:25:06

15  situations, there were standard essential patents     09:25:09

16  that were used in connection with cell phones and     09:25:12

17  actually relate to like a GSM or CDMA, but it         09:25:16

18  related to functionality of a cell phone, an          09:25:20

19  important functionality that are in smartphones,      09:25:24

20  put it that way.  So I was involved in those          09:25:27

21  actual negotiations.                                  09:25:34

22      Q    Did the patents at issue in the              09:25:35

23  negotiations you just mentioned, were those           09:25:39

24  standard essential patents?                           09:25:42

25      A    Yes.                                         09:25:43

RICHARD L. DONALDSON, ESQ. - 08/15/2018     Page 117

| | | |
|---|---|---|
| 1 | RICHARD L. DONALDSON, ESQUIRE | |
| 2 | Q    You didn't do any searches through the | 12:11:15 |
| 3 | databases or anything of that nature.  Is that | 12:11:17 |
| 4 | correct? | 12:11:19 |
| 5 | A    Through the -- I'm not sure -- | 12:11:25 |
| 6 | Q    I'm sorry.  You didn't do any review of | 12:11:27 |
| 7 | the document productions in this case or anything | 12:11:29 |
| 8 | like that other than what was provided to you by | 12:11:30 |
| 9 | counsel. | 12:11:34 |
| 10 | A    That -- | 12:11:34 |
| 11 | Q    Is that correct? | 12:11:34 |
| 12 | MS. GILLEN:  Object to the form. | 12:11:35 |
| 13 | A    Yes, that's correct. | 12:11:35 |
| 14 | Q    So if you wanted to go about a process | 12:11:44 |
| 15 | to disprove your conclusion, in other words, to | 12:11:51 |
| 16 | show that, yeah, Qualcomm's policies and tactics | 12:11:55 |
| 17 | were not the motivating factor of the licenses, | 12:12:02 |
| 18 | can you think of a way that one might do that? | 12:12:07 |
| 19 | MS. GILLEN:  Objection. | 12:12:12 |
| 20 | A    Well, you could call all these people | 12:12:13 |
| 21 | who provided sworn testimony liars.  I mean, I | 12:12:15 |
| 22 | accept they were under oath, and I accept that | 12:12:20 |
| 23 | what they testified to was true, and I don't see | 12:12:24 |
| 24 | how you then say, well, even though they said that | 12:12:32 |
| 25 | based upon this, they were forced to take a | 12:12:38 |

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

```
 1              RICHARD L. DONALDSON, ESQUIRE
 2   license, that that really didn't have an effect.
 3   I'm not sure how you get to answer your question
 4   of if I -- the only way I can do that is to
 5   discount the testimony.
 6       Q    Well, that's my question.  Can you think
 7   of any other method that one might employ to go
 8   about and try to disprove your opinion and show
 9   that this link between the royalty rates and
10   Qualcomm's chip policies does not, in fact, exist?
11            MS. GILLEN:  Object to the form.
12       A    The only thing I could think of, and I
13   don't want to do your job for you, but -- it's
14   kind of a funny question to ask -- potentially
15   there would be situations where this issue never
16   came up about disruption of chip supply or
17   something with one or more specific licensees, and
18   you could say, see, it didn't affect them.  You
19   could argue that.
20            But, on the other hand, you can't
21   discount in these situations ███████████, who
22   have offered direct testimony that it did have an
23   effect, the existence of one or more examples
24   where the question never came up does not offset
25   the testimony of what actually did happen with
```

 1              RICHARD L. DONALDSON, ESQUIRE
 2   major OEMs.                                          12:14:12
 3       Q    All right.  So one method to sort of        12:14:16
 4   test this proposition is you could look at other     12:14:18
 5   licensing negotiations beyond what you've cited.     12:14:20
 6   Correct?                                             12:14:23
 7           MS. GILLEN:  Object to the form.             12:14:25
 8       A    You could attempt that, but, as I just      12:14:27
 9   explained, that does not offset the direct sworn     12:14:29
10   testimony of these people who actually were          12:14:33
11   affected by the policy.                              12:14:36
12       Q    I understand.                               12:14:37
13           Can you think of any other method one        12:14:38
14   might employ to test your opinion and determine      12:14:40
15   whether or not Qualcomm's chip supply policies       12:14:48
16   did, in fact, drive licensing negotiations?          12:14:51
17           MS. GILLEN:  Object to the form.             12:14:58
18       A    I don't really see anything that comes      12:14:58
19   to mind.                                             12:15:00
20       Q    Again, let me ask you to assume some        12:15:05
21   facts.                                               12:15:07
22           If the head licensing negotiators from       12:15:11
23   100 other licensees came forward and said,           12:15:19
24   Qualcomm's chip supply issues had nothing to do      12:15:24
25   with the licensing negotiations and our agreement    12:15:28

# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
 2                  SAN JOSE DIVISION

 3   FEDERAL TRADE COMMISSION,§
                             §
 4          Plaintiff,       §
                             §
 5   VS.                     §     CASE NUMBER
                             §     5:17-cv-00220-LHK-NMC
 6   QUALCOMM INCORPORATED, a §
     Delaware Corporation,    §
 7                            §
            Defendant.        §
 8

 9

10

11

12

13            VIDEOTAPED ORAL DEPOSITION OF

14               JEFFREY G. ANDREWS, Ph.D.

15                    Austin, Texas

16                  August 10, 2018

17                    9:07 a.m.

18

19

20

21

22

23

24   Reported by:

25   Micheal A. Johnson, RDR, CRR
```

67

Andrews, Ph.D.

FTC v. Qualcomm, Inc.                                              8/10/2018

1       Q.      And you're not offering an opinion that

2   Qualcomm's contributions to 4G are more valuable

3   to -- than its contributions to 3G; is that correct?

4       A.      That's true, I've made no such comparison

5   or claim.

6       Q.      And no such comparison to its

7   contributions to 4G versus 2G?

8       A.      Again, 2G is somewhat vague because that

9   includes several different, quite separate

10  standards, but, yeah, I have not compared like

11  their -- you know, their quantity and quality of

12  their contributions to LTE to, say, IS-95.

13      Q.      Or any other standard?

14      A.      Or any other 2G standard or 3G standard.

15      Q.      That wasn't part of the scope of your

16  opinion you're offering in your report?

17      A.      No.

18      Q.      If I could turn your attention to

19  paragraph 8 that's on page 7 of your report.  It's

20  the first sentence that states, "Additionally, the

21  patents discussed in this report demonstrate that

22  Qualcomm's portfolio has continued to grow and

23  expand over time."

24              Do you see that?

25      A.      Yes.

68

Andrews, Ph.D.

FTC v. Qualcomm, Inc.                                          8/10/2018

1        Q.     What do you mean by "grow"?

2        A.     Simply that, you know, Qualcomm has been

3    developing new patents, you know, for each new

4    successive standard and each new successive release

5    of the standard.

6        Q.     When you use the term "grow," is this a

7    technical definition that's used in the industry?

8        A.     I think it's just the plain and ordinary

9    meaning.

10        Q.     So by "grow," you mean that Qualcomm had

11    one more patent than they had previously?

12        A.     Right.  Yes.

13        Q.     Are you offering an opinion as to the

14    relative growth of Qualcomm's portfolio compared to

15    others?

16        A.     No.

17        Q.     Is there a standard for determining under

18    what circumstances a patent portfolio is considered

19    to have grown?  Are you aware of any?

20        A.     You know, like a standard, meaning a

21    standard basis of comparison?

22        Q.     Correct.

23        A.     No.

24        Q.     What do you mean by "expand" when you say

25    that it's continued to grow and expand over time?

69

Andrews, Ph.D.

FTC v. Qualcomm, Inc.                                    8/10/2018

1        A.      Expand would kind of just simply mean the
2    total number of patents that they have, you know,
3    under ownership, you know, would be an increasing
4    number with time.
5        Q.      And how is that different than your
6    understanding of grow?
7        A.      You know, at least me looking at this
8    sentence now, you know, those two words are kind of
9    synonymous and you could eliminate one of them and
10   the sentence would still be -- have the same
11   meaning.
12       Q.      And when you state "over time,"
13   specifically what time period are you referring to?
14       A.      I'm thinking from, you know, the
15   beginning of Qualcomm's involvement in cellular
16   systems, which would be, you know, around the IS-95
17   time frame, to the present time.  I mean, obviously
18   many of the things they've been submitting lately
19   aren't actually issued as patents yet, but, you
20   know, I'm aware that they continue to innovate at a
21   very high rate and, you know, submit lots of patent
22   applications.
23       Q.      And is your opinion about the growth of
24   Qualcomm's portfolio solely based on the patents
25   that you're referencing in your report?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Andrews, Ph.D.

FTC v. Qualcomm, Inc.                                    8/10/2018

 1        A.    No.

 2        Q.    What else is it based on?

 3        A.    I mean, you know, largely it's just based

 4   on my own knowledge and experience and I visit

 5   Qualcomm, you know, not infrequently.  I've given

 6   several invited lectures there.  Their research

 7   center seems to be monotonically increasing in size,

 8   you know, working on many different things,

 9   different standards.  You know, I think I've also,

10   you know, seen various plots that show their patent

11   portfolios, size, increasing over time, but I don't

12   remember the exact numbers.

13        Q.    Did you do any independent analysis of

14   Qualcomm's patent portfolio as a whole?

15        A.    No.

16        Q.    Do you know if Qualcomm currently holds

17   more valid patents than it did 20 years ago?

18        A.    I would be extremely surprised if they

19   didn't hold a lot more valid patents now than

20   20 years ago, but I don't know the exact numbers.

21        Q.    You did not do that analysis as part of

22   your report?

23        A.    No.

24        Q.    If you turn to paragraph 223.  It's on

25   page 95.  It's I guess the only sentence in that

71

Andrews, Ph.D.

FTC v. Qualcomm, Inc.                                    8/10/2018

```
 1    paragraph.  It states, "Their leadership and
 2    initiative in this direction is a major reason that
 3    Qualcomm has an extraordinarily broad and deep
 4    portfolio of patents on carrier aggregation."
 5              Do you see that?
 6         A.    Yes.
 7         Q.    What is the basis for the statement that
 8    they have an extraordinarily broad and deep
 9    portfolio of patents on carrier aggregation?
10         A.    Well, I've looked at many of them.
11         Q.    And when you say "many of them," are you
12    just referring to the patents that appear in your
13    report?
14         A.    I've looked at others as well.
15         Q.    Okay.  And did you do an assessment of
16    those other patents to determine whether they are
17    essential to the standard?
18         A.    In some cases.
19         Q.    What was your conclusion?
20              MR. HALL:  I'm going to object to
21    that to the extent it goes beyond the stipulation on
22    expert discovery and is inquiring into drafts of
23    Dr. Andrews' report or drafts of his analyses or
24    other work product.  And instruct the witness not to
25    answer.
```

# EXHIBIT 3

1                    FEDERAL TRADE COMMISSION

2

3

4     FEDERAL TRADE COMMISSION,        )

5             Plaintiff,               )

6        vs.                           ) Case No.

7     QUALCOMM INCORPORATED, a         ) 5:17-cv-00220-LHK-NMC

8     Delaware corporation,            )

9             Defendant.               )

10

11

12

13             The videotaped deposition of DR. BERTRAM

14     HUBER, called by the Federal Trade Commission, for

15     examination, taken before Stephanie A. Battaglia, CSR

16     and Notary Public in and for the County of DuPage and

17     State of Illinois, at 191 North Wacker Drive, Suite

18     2700, Chicago, Illinois, on August 8, 2018, 9:16 a.m.

19

20

21

22

23

24

25

Huber

FTC v. Qualcomm, Inc.                                    8/8/2018

1   of additional in-between, in-between meetings with

2   very few participants to try to bridge gaps or discuss

3   specific issues, especially among those who were more

4   active in the whole discussion and debate process.  So

5   it is really many, many meetings which took place.

6         Q.    And so the communications between

7   meetings that you described, would that be on a

8   one-on-one basis or would it involve a larger group?

9         A.    Well, it was not typically one-on-one, it

10  is typically some few representatives from a few

11  companies getting together and meeting, but of course

12  it was also telephone and e-mail exchange, I think,

13  not really at that time, fax exchange rather in the

14  early times.

15               (Document identified as Exhibit CX0058 for

16                  identification.)

17  BY MS. GILLEN:

18        Q.    It would be easier to go through this in

19  writing, this has been premarked as Exhibit CX0058.

20  This is Exhibit CX0058.

21               Do you recognize this document as the

22  expert report you submitted in this case?

23        A.    Yes, it looks like my expert report.

24        Q.    So I want to focus on page -- if you

25  could turn to page 4 to start, which is CX0058-007.

Huber

FTC v. Qualcomm, Inc.                                    8/8/2018

1          A.     Yes, I have it.

2          Q.     And under item B.2. titled Participated

3     in drafting ETSI IPR Policy, the second full sentence

4     reads, "Drafting was a collaborative process,

5     involving numerous members of the Committee, guided by

6     ETSI's mission to create standards with broad and

7     general use in the interest of end-users while

8     balancing interest of IPR holders and implementers."

9     Do you see that?

10         A.     Yes.

11         Q.     And what is your basis for this

12    understanding of the ETSI mission?

13         A.     Well, the ETSI commission is described in

14    the ETSI statutes, and I am elaborating this in detail

15    in my report, and if you wish we can go directly

16    there.  And of course it is also based on my

17    experience because I was there at that time.

18         Q.     So the mission was understood by all

19    involved in drafting process?

20         A.     Well, I would assume so.

21         Q.     What do you mean by broad and general use

22    in the interest of end-users?

23         A.     Well, I mean standardization in very

24    general terms always has the overall intention that

25    there must be some positive effect out there in the

56

Huber

FTC v. Qualcomm, Inc.                                        8/8/2018

1  at to set a royalty rate.  Can you give me some
2  examples of some of the factors that you would look
3  at?
4          A.    I think I cannot.  I mean, historically I
5  could not recall any or all the details of specific
6  factors that we were looking at, and in the more
7  present context I must say have not formed any opinion
8  which factors should rather be employed or not absent
9  what I just said where I think what is reasonably
10  cannot and should not and could not be applied for
11  that history of the ETSI IPR Policy.
12          Q.    So turning to the bottom of Page 4 of
13  your report, the section titled Assignment, does this
14  section adequately or accurately describe the
15  assignment you were engaged to undertake?
16          A.    Without rereading, of course it does.
17          Q.    The second sentence of the assignment
18  section states that you were asked to respond to
19  certain statements by the FTC in its pleadings in this
20  litigation.
21          A.    Yes.
22          Q.    Have you reviewed the complaint filed by
23  the FTC?
24          A.    I have, but not in the finest detail and
25  not in all elements, but, yes, I have.

Huber

FTC v. Qualcomm, Inc.                                    8/8/2018

1          Q.      Have you reviewed any other pleadings in

2     this litigation?

3          A.      Any other pleadings would be, for

4     example?

5          Q.      Like a motion to dismiss or other

6     briefing relating to that.

7          A.      Not what I recall instantly.

8          Q.      And the sentence that starts on this page

9     and extends to the next page says that you were asked

10    to review the expert reports of Dr. Karl Shapiro,

11    Dr. Robert Akl, Mr. Richard Donaldson, Mr. Michael

12    Lasinski, and respond to certain statements therein,

13    what steps did you take to assess the approaches used

14    by the FTC's experts?

15               MR. SWEDLOW:   Objection.

16               THE WITNESS:   The positions taken by

17    these experts you just named, let me say, the majority

18    were known to me from other cases before and so it was

19    not all new to me.

20               From my background, my knowledge about

21    the ETSI IPR Policy, I was looking at these positions

22    specifically vis-a-vis the ETSI IPR Policy and from

23    the point of view of the ETSI IPR Policy and whether

24    they are matching or they are non-matching and then of

25    course beyond that whether they are convincing from an

Huber

FTC v. Qualcomm, Inc.                                   8/8/2018

1    intellectual logical point of view and, of course,

2    maybe I have to add that, also from an industry

3    practice view because likely none of these three

4    experts has abundant experience in this -- in

5    industry, except for Mr. Donaldson, of course, but

6    that was largely in a different industry and it was a

7    longer time ago.

8    BY MS. GILLEN:

9         Q.    So would it be fair to say that your

10   assessment of the FTC's experts opinions is based on

11   your understanding of the ETSI IPR Policy?

12        A.    And my industrial experience and -- I

13   mean, all I know about this subject and topic since

14   decades and I have learned over time in addition.

15   And, of course, my professional experience and

16   background.

17        Q.    Is it correct that your assessment of the

18   FTC's expert opinions is not based on any economic

19   analysis?

20        A.    It is not precisely on an economic

21   analysis because, as you know, I don't have an

22   economic background, even though I have some knowledge

23   in economics in the sense that the legal education in

24   Germany comprises some course in economics, that is

25   one point, but more importantly my experience having

Huber

FTC v. Qualcomm, Inc.                                    8/8/2018

1   worked in industry for several decades that of course

2   give me some general economic understanding but, of

3   course, I am not an economic expert.

4          Q.    Are your opinions based on any analysis

5   you have done regarding the valuation of Qualcomm's

6   patent portfolio in any way?

7          A.    I have not done any valuation of

8   Qualcomm's patent portfolio, neither from the

9   technical side nor from the commercial valuation side.

10         Q.    And have you done any analysis of

11  Qualcomm's license agreements?

12         A.    I have not gone into details of

13  Qualcomm's license agreements, no.

14         Q.    Have you reviewed any of Qualcomm's

15  license agreements?

16              MR. SWEDLOW:  I will object.

17              Do you mean for this case or --

18  BY MS. GILLEN:

19         Q.    For this case, yes or no is fine, I am

20  not asking about any discussions you have had with

21  counsel.

22              MR. SWEDLOW:  I mean, I am not trying to

23  coach him, but he is also an expert in the Apple case

24  and the disclosures were right about the same time.

25  That is the only --

# EXHIBIT 4

# STRATEGY ANALYTICS
### Research, Experts, and Analytics



**VALUE SHARE: Global Handset Revenue, ASP and Profit in Q2 2017**

**Published:  Aug 2017**

| Global Handset Revenue Share by Vendor (%) | 2014 | 2015 | 2016 |
|---|---|---|---|
| Apple | 36.3 % | 43.2 % | 39.2 % |
| Samsung | 25.2 % | 21.4 % | 20.5 % |
| Huawei | 2.7 % | 4.5 % | 6.3 % |
| OPPO | 2.2 % | 2.7 % | 4.9 % |
| vivo | 1.6 % | 1.7 % | 4.2 % |
| Xiaomi | 3.2 % | 2.8 % | 2.3 % |
| LG | 4.1 % | 3.1 % | 2.6 % |
| Lenovo-Motorola | 3.3 % | 2.2 % | 1.9 % |
| Sony | 3.4 % | 2.5 % | 1.8 % |
| ZTE (Nubia) | 1.0 % | 1.0 % | 1.3 % |
| Gionee | ~ | ~ | 1.4 % |
| Meizu | ~ | 0.7 % | 0.7 % |
| Asus | ~ | ~ | 0.7 % |
| HTC | 1.8 % | 1.0 % | 0.6 % |
| TCL-Alcatel | 1.1 % | 0.9 % | 0.8 % |
| TCL-Alcatel | 0.6 % | 0.4 % | 0.3 % |
| TCL-Alcatel | ~ | ~ | ~ |
| TCL-Alcatel | ~ | ~ | 0.5 % |
| TCL-Alcatel | 1.0 % | 0.5 % | 0.4 % |
| TCL-Alcatel | ~ | ~ | 1.0 % |
| TCL-Alcatel | 0.5 % | 0.2 % | 0.1 % |
| TCL-Alcatel | 2.9 % | 1.3 % | 0.4 % |
| TCL-Alcatel | 9.2 % | 9.8 % | 8.2 % |
| Total Industry | 100.0 % | 100.0 % | 100.2 % |

**STRATEGY ANALYTICS**
Research, Experts, and Analytics



**VALUE SHARE: Global Handset Revenue, ASP and Profit in Q2 2017**

**Published:  Aug 2017**

| Global Handset Profits by Vendor (% Share) * | 2014 | 2015 | 2016 |
|---|---|---|---|
| Apple | 73.1 % | 83.5 % | 79.0 % |
| Samsung | 22.8 % | 12.7 % | 14.6 % |
| Huawei | 0.4 % | 0.9 % | 1.6 % |
| OPPO | 0.4 % | 0.6 % | 1.5 % |
| vivo | 0.3 % | 0.4 % | 1.3 % |
| Xiaomi | 0.8 % | 0.6 % | 0.5 % |
| Gionee | ~ | ~ | 0.2 % |
| ZTE (Nubia) | 0.1 % | 0.1 % | 0.1 % |
| Sony | 0.0 % | 0.0 % | 0.0 % |
| Sharp | 0.2 % | 0.1 % | 0.2 % |
| Asus | ~ | ~ | 0.0 % |
| Microsoft | 0.0 % | 0.0 % | 0.0 % |
| Micromax | ~ | ~ | 0.0 % |
| BlackBerry | 0.0 % | 0.0 % | 0.0 % |
| HMD (Nokia) | ~ | ~ | ~ |
| TCL-Alcatel | 0.3 % | 0.2 % | 0.0 % |
| LeEco | ~ | ~ | 0.0 % |
| Coolpad | 0.1 % | 0.0 % | 0.0 % |
| Meizu | ~ | 0.1 % | 0.0 % |
| HTC | 0.0 % | 0.0 % | 0.0 % |
| LG | 0.5 % | 0.0 % | 0.0 % |
| Lenovo-Motorola | 0.0 % | 0.0 % | 0.0 % |
| Others | 0.9 % | 0.9 % | 0.9 % |
| Total Industry | 100.0 % | 100.0 % | 100.0 % |

# STRATEGY ANALYTICS
### Research, Experts, and Analytics



**VALUE SHARE: Global Handset Revenue, ASP and Profit in Q2 2017**

**Published:  Aug 2017**

| Global Handset Shipments Share by Vendor (%) | 2014 | 2015 | 2016 |
|---|---|---|---|
| Samsung | 22.1 % | 20.7 % | 19.2 % |
| Apple | 10.5 % | 12.3 % | 11.4 % |
| Huawei | 4.2 % | 5.7 % | 7.4 % |
| OPPO | 1.4 % | 2.1 % | 4.6 % |
| Xiaomi | 3.3 % | 3.8 % | 3.1 % |
| vivo | 1.4 % | 2.1 % | 3.8 % |
| LG | 4.3 % | 3.8 % | 3.7 % |
| ZTE (Nubia) | 3.0 % | 3.3 % | 3.4 % |
| Lenovo-Motorola | 5.1 % | 4.0 % | 2.7 % |
| TCL-Alcatel | 3.8 % | 3.8 % | 3.3 % |
| Gionee | ~ | ~ | 1.8 % |
| HMD (Nokia) | ~ | ~ | ~ |
| Meizu | ~ | 1.1 % | 1.2 % |
| Micromax | ~ | ~ | 1.9 % |
| Asus | ~ | ~ | 0.9 % |
| Sony | 2.2 % | 1.6 % | 0.8 % |
| Coolpad | 2.2 % | 1.2 % | 0.8 % |
| HTC | 0.9 % | 0.6 % | 0.5 % |
| LeEco | ~ | ~ | 1.1 % |
| Sharp | 0.3 % | 0.2 % | 0.2 % |
| BlackBerry | 0.4 % | 0.2 % | 0.1 % |
| Microsoft | 10.9 % | 6.4 % | 2.1 % |
| Others | 24.0 % | 27.1 % | 26.2 % |
| Total Industry | 100.0 % | 100.0 % | 100.0 % |

*Please note that Total Industry Handset Operating Profit Share in this Excel tab is calculated using realized positive industry profits in tab 6, row 80, and is based on historical exchange rates.*
*\* For vendors reporting losses, negative share estimates are reduced to zero marketshare, to represent realized profits only.*
*\* Profit is defined as operating profit, which is the profit from the core business activity.*

**Copyright © Strategy Analytics 2017**

Although great care has been taken to ensure the accuracy and completeness of this report, Strategy Analytics is unable to accept any legal responsibility for any actions taken on the basis of the information contained therein. Circulation or disclosure in whole or in part of this report outside the authorised recipient organisations is expressly forbidden without the prior written permission of Strategy Analytics.

7. Value Share

QAPPCMSD07786307.xlsx

# EXHIBIT 5

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# EXHIBIT 6

FILE PRODUCED NATIVELY

BOD Strat Plan Final 09-23-08.ppt

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC00045280
Q2017MDL1_02944278




# Strategic Plan Review

**September 15, 2008**

**QUALCOMM**

Strategic Plan Review  2008

# Impacts Starting to be Seen



HS Market Share by Vendor

3G Handset Forecast by OS

- ❑ **Nokia, Apple, and RIM (most vertically integrated OEM's) gaining share**

- ❑ **Increased competition for 3rd party OS share, which will create key leverage point for delivery of future functionality**
  - ▪ QC benefits if multiple 3rd party OS's maintain share

**QUALCOMM Privileged & Confidential**   7

# EXHIBIT 7

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# EXHIBIT 8

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# EXHIBIT 9

Cristiano Amon Volume I Highly Confidential
March 12, 2018

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FEDERAL TRADE COMMISSION                Case No.
                                        5:17-cv-00220-LHK-
    Plaintiff,                          NMC

    v.

                                        Case No.
QUALCOMM INCORPORATED, a                5:17-md-2773-LHK
Delaware corporation,

    Defendant.

_____

IN RE: QUALCOMM ANTITRUST
LITIGATION

_____

*** TRANSCRIPT MARKED HIGHLY CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF CRISTIANO AMON, VOLUME I

Monday, March 12, 2018, 8:07 a.m.

4655 Executive Drive, Suite 1500, San Diego, California

Reported by:

Harry Alan Palter

CSR No. 7708, Certified LiveNote Reporter

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

1    meeting, and we will have a list of topics to cover

2    or the topics that I want to cover -- usually some

3    actions or market updates.

4         Q    The first -- there's a set of three

5    Arabic numerals directly under 12-7-15.  And then

6    there's a couple other dates.  I just want to get

7    your understanding of -- halfway down the page,

8    there's an Arabic numeral circled.  Appears to me

9    that says, ████████████████████████████████

     ████████████████████████████████

11            Did I read that accurately?

12        A    That is correct.

13        Q    And what does it read under that?  I

14   cannot read that text on the next line.  Something,

15   ████████████████

16        A    ████████████████████████████████████

     ████████████████

18        Q    What do you understand that to mean,

19   sitting here today?

20            MR. EVEN:  Objection.  Foundation.

21            THE WITNESS:  Don't remember.  Let me

22   read more for context.

23            I don't remember.  I have a vague memory

24   they could be a note to myself about ████████████

     ████████████████████████████████████████        I

1    don't recall.

2    BY MR. MATHESON:

3        Q    Now, it looks to me that you have

4    12-7-15, Rafael synch, and then there's a line down

5    the page followed by 12-7-15, some other thing, and

6    a line, 12-8-15 and some notes, a line, and 12-9-15,

7    with some notes.  Does the process of notetaking you

8    described suggest to you, sitting here today, that

9    12-9-15, ███████████████████ -- so does that

10   suggest to you that the text that follows that are

11   notes you took on 12-9-15?

12       A    That's my --

13            MR. EVEN:  Objection.  Vague.

14            Go ahead.

15            THE WITNESS:  That's my interpretation,

16   looking at this right now.

17   BY MR. MATHESON:

18       Q    So sitting here today, what does -- what

19   does the material that follows 12-9-15 refer to?

20            MR. EVEN:  Objection.  Vague.

21            If you recall, go ahead.

22            THE WITNESS:  My interpretation, looking

23   at those notes right now, is probably my notes of █

24   ████████████████████████████████████████

25   ████████████████████████████████████

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

1   ████████████████████████████████████

2   BY MR. MATHESON:

3        Q    The first line under ██████████████

4   ████████  says, ██████████████████████████████  right?

5        A    Yes.

6        Q    Next is, ████████████████████████████████

    ██████████████████  right?

8        A    Yes.

9        Q    And those both relate to notes you took

10   pursuant to ████████████████████████  right?

11             MR. EVEN:  Objection.  Foundation.

12             THE WITNESS:  That is correct.  The way I

13   read it is, my notes of -- of their description of

14   ███████████████████████

15   BY MR. MATHESON:

16        Q    And the text that follows the Arabic

17   numeral 1, ████████████████████████████████████████████

18   ██████████████████████  also relates to notes relevant to

19   ██████████████████████████████

20             MR. EVEN:  Same objection.

21             THE WITNESS:  That is correct.  It's

22   related to ██████████████████████████

23   BY MR. MATHESON:

24        Q    And who does Eric refer to?  Is that

25   Mr. Eric Reifschneider?

1        A      That's my understanding right now.

2        Q      If you could flip to the last page of the

3    document, which is Bates-numbered -- I should have

4    said the Bate number that appears on the first page

5    of this document is Q2014FTC02874689.

6        A      4689 -- that's the first one.

7        Q      And the last page of this document is

8    Q2014FTC02874694.

9        A      Ready.

10       Q      Very end of this page reads, quote:

11   ████████████████████████████████████████████

12   █████████████████████████████████

13              Did I read that correct?

14       A      Yes.  You do read that correctly.

15       Q      Or could that be ██████████     I can't

16   tell.

17       A      ████████████

18       Q      ████████████

19              What did you mean when you wrote, quote,

20   ████████████████████████████████████████████

21   █████████████████████████████████

22              MR. EVEN:  Objection.  Foundation.

23              If you recall, go ahead.

24              THE WITNESS:  I don't recall the

25   specifics.  If it is -- if I wrote between quotes,

1    it is probably because it was to remind me that's

2    what the customer said.

3    BY MR. MATHESON:

4        Q     Do you recall being told by ███ that

5    ████████████████████████████████████████████

6    ███████████████████████████████████████████

7                MR. EVEN:  Objection.  Asked and

8    answered.

9                THE WITNESS:  I'm looking at this

10   document right now.  Here where I am, I don't have

11   that memory.  So I'm just speaking by looking at the

12   document.

13   BY MR. MATHESON:

14       Q     But it would be ordinary practice when

15   you wrote things in quotes in the notes you took to

16   yourself to be accurate in the substance of what you

17   wrote; right?

18                MR. EVEN:  Objection.

19                THE WITNESS:  Sometimes it could be from

20   ██████.  Sometimes could be somebody that had

21   represented to me it is from ██████  So I don't

22   know.  But, you know, in general, I'll write, you

23   know, notes as accurate as I -- as I know them to

24   be.

25   ///

```
1   BY MR. MATHESON:

2       Q     On the top of that page, it reads:

3   ████████████████████████████████████████████

4   ███████████████████████████████

5       A     That is correct.

6       Q     What did you mean when you wrote that in

7   your notes?

8       A     Exactly what it said.  ████████████████

9   ████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ██████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████

15      Q     ██████████████████████████████████████t

16  █████████████████████████████████

17      A     ████████████████

18      Q     ██████████████████████████████████

19  ████████████████████████████████████████████

20  ████████████

21            MR. EVEN:  Objection.  Asked and

22  answered.

23            THE WITNESS:  ███████████████████

24  ██████████████████████████████████

25  ████████████████████████████████████████
```

# EXHIBIT 10

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# EXHIBIT 11

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# EXHIBIT 12

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# EXHIBIT 13

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

| | |
|---|---|
| **From:** | Wise, David |
| **To:** | Rogers, Alex; Martin, Roger; Cianflone, David; Snyder, Mark (Corp Litigation) |
| **CC:** | Wise, David |
| **Sent:** | 12/15/2015 7:31:47 PM |
| **Subject:** | █████████████████████ |
| **Attachments:** | ████████████████████████ |

Slides from yesterday.

Dave

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL