Jennifer Milici, D.C. Bar No. 987096
Joseph R. Baker, D.C. Bar No. 490802
Elizabeth A. Gillen, Cal. Bar No. 260667
Geoffrey M. Green, D.C. Bar No. 428392
Daniel Matheson, D.C. Bar No. 502490
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3695; (202) 326-3496 (fax)
*jmilici@ftc.gov*

*Attorneys for Plaintiff Federal Trade Commission*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>QUALCOMM INCORPORATED, a Delaware corporation,<br><br>Defendant. | Case No. 5:17-cv-00220-LHK-NMC<br><br>**PLAINTIFF FEDERAL TRADE COMMISSION'S OPPOSITION TO QUALCOMM'S MOTION TO EXCLUDE EXPERT REPORTS OF RICHARD L. DONALDSON**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>DATE:    October 18, 2018<br>TIME:    1:30 p.m.<br>CTRM:    Courtroom 8<br>JUDGE:  Hon. Lucy H. Koh |

**Issue to Be Decided**

Whether the Court should strike the expert reports and prohibit trial testimony from FTC expert Mr. Richard L. Donaldson, whose opinions relate to (i) the negotiation of patent licenses, including how negotiation leverage and bargaining power may affect negotiations, and his assessment that Qualcomm's license agreements and related negotiations are atypical based on his extensive industry experience; and (ii) the feasibility of a multi-level licensing program.

# Table of Contents

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND .................................................................................................. 2

III. LEGAL STANDARD ........................................................................................... 6

IV. ARGUMENT ....................................................................................................... 7

  A. Mr. Donaldson's Opinions Are Based on his Specialized Knowledge and Extensive Experience ................................................................................ 7

  B. Mr. Donaldson's Opinions on the Viability of Component-Level Licensing Are Reliable .............................................................................. 9

  C. Qualcomm Mischaracterizes Mr. Donaldson's Extensive Review of the Record, Which Was Not Limited to Considering "Cherry Picked" Data ............. 13

  D. Mr. Donaldson Does Not Speculate Regarding Licensees' State of Mind ........... 16

V. CONCLUSION .................................................................................................. 17

# Table of Authorities

## Cases

*Adams v. Lab. Corp. of Am.*, 760 F.3d 1322 (11th Cir. 2014) ........................................................ 11

*AngioScore, Inc. v. TriReme Med., Inc.*, 87 F. Supp. 3d 986 (N.D. Cal. 2015)............................... 7

*Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012) ........................................................................................................................................... 3

*Best Buy Stores, L.P. v. Russell Constr. Co., Inc.*, 2012 WL 13018817 (S.D. Iowa July 13, 2012) ............................................................................................................................................................ 9, 10

*Brickman v. Fitbit, Inc.*, No. 3:15-CV-02077-JD, 2017 WL 6209307 (N.D. Cal. Dec. 8, 2017).... 17

*Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579, 113 S. Ct. 2786 125 L. Ed. 2d 469 (1993) .. 6

*Fierro v. Gomez*, 865 F. Supp. 1387 (N.D. Cal. 1994), aff'd, 77 F.3d 301 (9th Cir. 1996), vacated and remanded on other grounds, 519 U.S. 918, 117 S. Ct. 285, 136 L. Ed. 2d 204 (1996), modified on other grounds on remand, 147 F.3d 1158 (9th Cir. 1998) ...................................... 8

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-CV-00564 NC, 2018 WL 3126385 (N.D. Cal. June 26, 2018) ............................................................................................................... 7

*Gen. Elec. Co. v. Wilkins*, No. 1:10-CV-00674 LJO, 2012 WL 5398407 (E.D. Cal. Nov. 2, 2012) ............................................................................................................................................................ 14

*In re Arris Cable Modem Consumer Litig.*, No. 17-CV-01834-LHK, 2018 WL 3820619 (N.D. Cal. Aug. 10, 2018) ...................................................................................................................... 16, 17

*In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015)............. 18

*In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2:12-CV-07263, 2016 WL 4039329 (E.D. Pa. July 28, 2016) ............................................................................... 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................. 10

*Murray v. S. Route Maritime SA*, 870 F.3d 915 (9th Cir. 2017)................................................. 6, 7

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010), as amended (Apr. 27, 2010)........................ 7, 11

*Rigby v. Corliss*, No. C14-0340RSL, 2018 U.S. Dist. LEXIS 108561 (W.D. Wash. June 27, 2018) ............................................................................................................................................................ 8

*Sierra Club v. Talen Montana LLC*, No. CV 13-32-BLG-DLC-JCL, 2016 WL 11200732 (D. Mont. Mar. 25, 2016) .................................................................................................................... 7

*Smithkline Beecham Corp. v. E. Applicators, Inc.*, No. 99-CV-6552, 2001 WL 1526273 (E.D. Pa. Nov. 29, 2001) .................................................................................................................................. 9

*Thermolife Int'l, LLC v. Myogenix Corp.*, No. 13cv651 JLS (MDD), 2016 U.S. Dist. LEXIS 96871 (S.D. Cal. July 22, 2016) ..................................................................................................... 8

## Statutes

Fed. R. Evid. 702 ............................................................................................................................... 6

## I.    INTRODUCTION

Qualcomm's motion to exclude the expert testimony of Richard L. Donaldson (the "Motion" or "Mot.") should be denied. Mr. Donaldson's opinions are relevant, based on reliable methods, and will assist the Court in deciding the merits of this case.

Mr. Donaldson is a licensing professional with over thirty years of experience negotiating and evaluating patent license agreements, including but not limited to agreements involving FRAND-encumbered standard-essential patents ("SEPs") relating to semiconductors. Numerous courts have accepted his testimony on the subject of patent licensing and royalties. Mr. Donaldson's opinions relate to how licenses are typically negotiated, including the leverage and bargaining power brought to bear in typical negotiations. Based on his extensive experience, and an examination of the factual record, Mr. Donaldson offers opinions (1) that Qualcomm's patent license negotiations with original equipment manufacturers of cellular handsets ("OEMs") proceeded differently from typical negotiations, (2) that in particular, Qualcomm's "no license-no chips" policy provided it with enhanced leverage in negotiations with OEMs that were dependent on Qualcomm for modem chips, and (3) that as a result, Qualcomm was consistently able to obtain its preferred license terms—terms that were atypical in the industry and that it would not have been able to achieve if not for the additional leverage.

Mr. Donaldson also offers opinions relating to the feasibility of licensing both chip sellers and OEMs, in response to Qualcomm's assertion that such a multi-level licensing program would not be practicable. Based on his experience and success in implementing and managing a multi-level licensing program at a leading semiconductor company, Mr. Donaldson opines that Qualcomm's stated justifications for its refusal to license competing chip sellers do not withstand scrutiny.

Mr. Donaldson's opinions are based on his decades of experience negotiating license agreements, and his application of that experience to the factual record here. As part of his analysis, Mr. Donaldson evaluated hundreds of contemporaneous documents and sworn testimony from nearly 40 witnesses, including those from key OEMs. Accordingly, Mr. Donaldson's opinions regarding whether certain negotiation conduct and licensing terms are

typical industry practice will assist the Court in resolving the issues in this litigation.

Qualcomm's motion ignores clear precedent regarding the admissibility of expert testimony at trial, particularly with respect to the ability of experts to provide testimony based on their experience and expertise. As set out in detail below, Qualcomm's criticisms of Mr. Donaldson's opinions are properly addressed through cross-examination of Mr. Donaldson at trial and do not warrant the exclusion of his opinions where they are otherwise helpful to the Court.

## II.   BACKGROUND

The FTC engaged Mr. Donaldson in this action to provide opinions relating to the negotiation of patent licenses, generally; Qualcomm's commercial practices and the effects of such practices on Qualcomm's negotiation of patent licenses with OEMs; and Qualcomm's rationale for refusing to license competing modem chip sellers under its standard essential patents ("SEPs"). Mr. Donaldson sets forth his opinions in his initial Expert Report, submitted on May 24, 2018 (the "Report," attached as Exhibit 1 to the Declaration of Geoffrey T. Holtz in Support of the Motion, ECF No. 799-1) and a Rebuttal Report submitted on July 26, 2018 (the "Rebuttal Report," attached as Exhibit 2 to the Declaration of Geoffrey T. Holtz in Support of the Motion, ECF No. 799-1).

Mr. Donaldson worked at Texas Instruments, Inc. ("TI") for over thirty years as an executive and patent attorney, until he retired as Senior Vice President and General Patent Counsel in 2000. Report ¶ 1. At TI, Mr. Donaldson was responsible for developing global patent licensing strategies and negotiating patent licenses, including licenses that covered SEPs. Report ¶ 4. He personally negotiated hundreds of patent license agreements with nearly every major computer and semiconductor manufacturer around the world, for patents relating to computers, cell phones, and other devices. *Id*. These negotiations included both inbound and outbound patent licenses, and licenses for both component-level and system-level patents. *Id*. As TI's lead negotiator, Mr. Donaldson was responsible for assessing both the legal and business considerations relating to each agreement, and for drafting the agreements. *Id*. ¶ 6. He led TI's pioneering patent licensing program, which has been recognized as having a "profound effect on the way technology companies, and in particular semiconductor companies, utilized their patent

1    portfolios to obtain fair value for the use of their patented technology by other companies." *Id.* ¶

2    8. During this time, TI also participated in various standard-setting organizations ("SSOs"), and

3    Mr. Donaldson was involved in the licensing of SEPs at TI, which included understanding and

4    considering FRAND commitments. *Id.* ¶ 9-10.

5          Since retiring from TI, Mr. Donaldson has worked as a consultant and testifying expert on

6    matters relating to patent licensing and damages in patent infringement litigation, including cases

7    involving cellular technology and SEPs subject to FRAND commitments. *Id.* ¶ 11-12; Rebuttal

8    Report ¶¶ 15, 36, 38-40. He has been engaged in this capacity by some of the top contributors to

9    cellular standards. Rebuttal Report ¶ 36. Mr. Donaldson thus has direct and extensive experience

10   evaluating the license terms and agreements of numerous cellular wireless industry participants,

11   and has gained insight regarding the licensing programs of a broad cross section of this group.

12         Mr. Donaldson has previously been recognized as an expert in numerous other cases

13   relating to patent licensing. *See* Report ¶ 12 and Exhibit A; Rebuttal Report ¶ 15. He has also

14   been recognized as an expert by this Court in the *Apple v. Samsung* litigation, which related to

15   FRAND issues and typical license provisions in the cellular industry. *See Apple, Inc. v. Samsung*

16   *Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012). In that matter,

17   he was permitted to testify "on how particular terms are commonly understood in the industry."

18   *Id.* at *12 (finding that "such testimony is relevant under FRE 401 and an appropriate exercise of

19   Donaldson's expertise under FRE 702 and *Daubert*").

20         As a result of his experience, Mr. Donaldson is an expert in patent licensing and the

21   bargaining dynamics at play in licensing negotiations. Specifically, as set out in his reports, Mr.

22   Donaldson explains the process that occurs in a license negotiation, where each party negotiates

23   based on how the offered license terms compare to its next best alternative. He explains how

24   different factors may affect a party's assessment of the alternative to a negotiated agreement,

25   increasing or decreasing its leverage during negotiations. *See* Report Section VI.A.1. These

26   factors include a party's ability to "design around" a patent, whether SEPs are involved, the

27   expected size of a litigation award, and ongoing business relationships linked to the negotiations,

28   among others. *See id.*

FTC'S OPP'N TO MOTION TO EXCLUDE EXPERT
REPORTS OF RICHARD DONALDSON
Case No. 5:17-cv-00220-LHK-NMC

1    Armed with his direct experience negotiating license agreements, decades as a licensing

2  professional, and extensive knowledge of licensing programs in the cellular industry, Mr.

3  Donaldson undertook a review of the factual record in this case, including sworn testimony from

4  39 witnesses over 74 days, discovery responses, and hundreds of documents produced by

5  Qualcomm and third parties in this action, relating to the license agreements between Qualcomm

6  and numerous OEMs. Report Exhibit B; Rebuttal Report Appendix A. These materials include

7  contemporaneous negotiation documents as well as the resulting license agreements executed by

8  the parties. *See id*.

9    After conducting a careful review of the evidence and applying his expertise in patent

10  licensing, and the factors that may impact the bargaining power available to parties, Mr.

11  Donaldson explains in his report that Qualcomm's "no license-no chips policy" resulted in

12  enhanced leverage that Qualcomm applied on a systematic basis during negotiations with OEMs.

13  *See* Report Section VI.A.2. This leverage exists because where Qualcomm's chips are or have

14  been a commercially necessary input for OEMs in the CDMA and premium LTE market

15  segments, OEMs could not afford to lose access to those chips. *See id*. He further explains that,

16  based on his decades of work as a licensing professional, he expects that this type of leverage

17  would change the dynamics of a license negotiation whenever Qualcomm's chips were important

18  to the licensee. *See id*. Specifically, "[i]nstead of the typical situation where a licensee's

19  alternative to accepting a proposed license is the risk of litigation, Qualcomm added the loss of

20  Qualcomm modem chips as a consequence." *Id*. ¶ 88.

21    Mr. Donaldson observes a number of specific ways in which Qualcomm's "no license-no

22  chips" policy has resulted in atypical license terms. *See* Report Section VI.A.3. First, he

23  concludes, based on the record, that as a result of its ability to threaten OEMs with the loss of

24  modem chip supply, Qualcomm has been able to charge and maintain royalty rates that are higher

25  than OEMs would otherwise have agreed to, and that are disproportionate to rates charged by

26  other SEP holders. *See* Report Section VI.A.3(i). Mr. Donaldson also observes that the uniformity

27  of Qualcomm's rates over time is atypical. *Id*. ¶ 109. The value of Qualcomm's portfolio has been

28  called into question in recent years, including due to the expiration of key patents, a shift to new

4

standards in which Qualcomm's SEP position is weaker, and judicial guidance suggesting a reluctance to grant large awards for FRAND-encumbered SEPs. *See id*. Drawing on his licensing expertise, Mr. Donaldson opines that such factors ordinarily result in decreasing royalty rates over time. *See id*. ¶ 17. However, Qualcomm was consistently able to obtain its preferred license terms due to OEMs' need for Qualcomm modem chips. *See id*.

Second, Mr. Donaldson observes that ███████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████. *See* Report Section VI.A.3(ii); Rebuttal Report Section II.D. Third, Mr. Donaldson notes that the record reflects that OEMs negotiating with Qualcomm ████████████████████████████████████████████████████ ████████████████████████████████████████, and rarely resorted to litigation as an alternative to accepting Qualcomm's preferred license terms. *See id*. Section VI.A.3(iii). As a licensing professional, Mr. Donaldson opines that these negotiating dynamics and outcomes are atypical in the industry. *See id*. Section VI.A.3. He provides several illustrative examples in which, based on sworn testimony provided by OEMs in this action, Qualcomm used its "no license-no chips policy" to obtain these favorable terms in negotiations with entities such as ████████████████████████████████████████████. *See id.* Section VI.A.4.

Finally, Mr. Donaldson opines on the feasibility of "multi-level" licensing. *See* Report Section VI.B. Specifically, Qualcomm has a policy of not granting licenses to other modem chip sellers, and justifies this policy by claiming that it would not be feasible to license both chip sellers and OEMs. *See* Report ¶ 165. In Mr. Donaldson's reports, however, he explains that, based on his extensive experience, it *is* in fact possible and practical to license component-level patents to component manufacturers, while simultaneously licensing any device-level patents to device manufacturers. *See* Report ¶¶ 166-171; Rebuttal Report ¶¶ 31-36. He also explains that, based on his understanding of the industry and his review of Qualcomm's license agreements, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

1    ▮▮▮▮. *See* Report ¶¶ 172-174.

2    **III.   LEGAL STANDARD**

3         Federal Rule of Evidence 702 provides that testimony from a qualified expert relating to

4    "scientific, technical, or other specialized knowledge" is allowed if it will "help the trier of fact to

5    understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Under Rule 702,

6    expert testimony is admissible if it is both relevant and reliable. *Daubert v. Merrell Dow Pharm.*,

7    Inc., 509 U.S. 579, 589, 113 S. Ct. 2786 125 L. Ed. 2d 469 (1993). An expert witness may

8    provide opinion testimony if: (1) the testimony is based upon sufficient facts or data; (2) the

9    testimony is the product of reliable principles and methods; and (3) the expert has reliably applied

10   the principles and methods to the facts of the case. *See* Fed. R. Evid. 702.

11        In *Daubert*, the Supreme Court identified four factors that may bear on such an analysis,

12   including: (1) whether the theory can be and has been tested; (2) whether the theory has been peer

13   reviewed and published; (3) what the theory's known or potential error rate is; and (4) whether

14   the theory enjoys general acceptance in the applicable scientific community. *Murray v. S. Route*

15   *Maritime SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 593-94). The Ninth

16   Circuit has explained that these factors are not "'equally applicable (or applicable at all) in every

17   case.'" *Id*. (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

18   Instead, their applicability "'depend[s] on the nature of the issue, the expert's particular expertise,

19   and the subject of his testimony.'" *Id*. (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

20   150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The factors are not a "definitive checklist or test"

21   and the "reliability analysis remains a malleable one tied to the facts of each case." *Id*.

22        The trial court's duty to "act as a gatekeeper" is not a rigid one, and the court has "broad

23   discretion and flexibility in assessing an expert's reliability." *Fitzhenry-Russell v. Dr. Pepper*

24   *Snapple Grp., Inc.*, No. 17-CV-00564 NC, 2018 WL 3126385, at *2 (N.D. Cal. June 26, 2018).

25   The trial court's duty on a motion to exclude "is to evaluate the soundness of the expert's

26   methodology, not the correctness of the expert's conclusions." *Id*. Expert opinion is typically to

27   be "attacked by cross examination, contrary evidence, and attention to the burden of proof, not

28   exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010)

1  (citing *Daubert*, 509 U.S. at 596).

2       The "*Daubert* gatekeeping obligation is less pressing in connection with a bench trial."

3  *AngioScore, Inc. v. TriReme Med., Inc.*, 87 F. Supp. 3d 986, 1016 (N.D. Cal. 2015) (citing various

4  cases); *see also Sierra Club v. Talen Montana LLC*, No. CV 13-32-BLG-DLC-JCL, 2016 WL

5  11200732, at *3 (D. Mont. Mar. 25, 2016). Under *Daubert*, "the better approach in [a] bench trial

6  is to permit the contested expert testimony and allow vigorous cross-examination, presentation of

7  contrary evidence and careful weighing of the burden of proof." *Fierro v. Gomez*, 865 F. Supp.

8  1387, 1395 n.7 (N.D. Cal. 1994), aff'd, 77 F.3d 301 (9th Cir. 1996), vacated and remanded on

9  other grounds, 519 U.S. 918, 117 S. Ct. 285, 136 L. Ed. 2d 204 (1996), modified on other

10  grounds on remand, 147 F.3d 1158 (9th Cir. 1998) (quoting *Daubert*, 509 U.S. at 596)). In cases

11  tried without a jury, the *Daubert* decision may be deferred until after the trial is concluded. *See,*

12  *e.g., Rigby v. Corliss*, No. C14-0340RSL, 2018 U.S. Dist. LEXIS 108561, at *7 (W.D. Wash.

13  June 27, 2018) (allowing expert to testify and reserving decision on reliability and relevance);

14  *Thermolife Int'l, LLC v. Myogenix Corp.*, No. 13-cv-651 JLS (MDD), 2016 U.S. Dist. LEXIS

15  96871, at *9 (S.D. Cal. July 22, 2016) ("[G]iven that this is a bench trial, the danger of prejudice

16  is lessened" and the challenged testimony "may be stricken and disregarded, as opposed to merely

17  given less weight" after cross examination.).

18  **IV.    ARGUMENT**

19       Mr. Donaldson unquestionably possesses "specialized knowledge" regarding patent

20  license negotiations that may assist this Court's evaluation of the evidence in this matter.

21  Nonetheless, Qualcomm argues that Mr. Donaldson's opinions should be excluded on four

22  separate grounds. As set forth below, Qualcomm's criticisms are fodder for cross-examination,

23  not exclusion.

24       **A.  Mr. Donaldson's Opinions Are Based on his Specialized Knowledge and Extensive**

25           **Experience**

26       Qualcomm argues that "the Court should strike Mr. Donaldson's opinions because his

27  analysis is untethered to any reliable principles or methodology." Mot. at 9. Mr. Donaldson is a

28  licensing professional with more than thirty years of experience negotiating, reviewing, and

evaluating patent license agreements, and has expertise in patent license bargaining dynamics. Because his opinion is based on his extensive experience, and is not scientific in nature, Qualcomm's argument must fail.

Qualcomm claims that Mr. Donaldson's opinions "rest only on [his] subjective interpretations based on purported review of a discrete set of evidence." Mot. at 9. These are not valid grounds for excluding his opinions. Courts have explained that where "the proffered testimony is not scientific in nature, the methodology need not be subjected to rigorous testing for scientific foundation or peer review," and an expert opinion should not be excluded because there is no universal standard for conducting its analysis. *Smithkline Beecham Corp. v. E. Applicators, Inc.*, No. 99-CV-6552, 2001 WL 1526273, at *3 (E.D. Pa. Nov. 29, 2001) ("Consequently, there is no single standard formula for bid estimations, and the fact that both experts have maintained successful roofing businesses for many years lead to the conclusion that their estimation processes are within the realm of reasonable and acceptable methods.").

"Experience-based expert testimony," like Mr. Donaldson's here, is sufficiently reliable if the expert "explains how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Best Buy Stores, L.P. v. Russell Constr. Co., Inc.*, 2012 WL 13018817, at *6 (S.D. Iowa July 13, 2012) (quoting Notes of Advisory Committee on 2000 Amendments to Rule 702). Where an expert's testimony "relates to what conduct is generally expected of [industry professionals] . . . according to industry standards," the *Daubert* factors assessing whether the testimony is the product of a reliable methodology are not directly applicable. *See id.*; *see also Kumho Tire*, 526 U.S. at 141 ("*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.").

Here, Mr. Donaldson reviewed the record, including license agreements and negotiations that are the subject of the FTC's claims in this litigation, and offers the opinion that he has "observed a number of features of Qualcomm's license negotiations and the resulting agreements that are unusual based on my experience, and suggest that Qualcomm had significant leverage,

█████████ and infrequent litigation." Report ¶ 101. Mr. Donaldson's opinions relate to practices that are or are not typical with respect to patent licensing in the semiconductor industry. In forming these opinions, he relied on his understanding of the industry, the tenets of bargaining theory regarding acceptable alternatives in connection with patent infringement and licensing negotiations, principles of FRAND licensing, the applicable patent laws, contemporaneous documents outlining negotiation histories and goals, and sworn testimony regarding the relevant events. These methods are an "acceptable way to offer an opinion about industry standards." *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2:12-CV-07263, 2016 WL 4039329, at *5 (E.D. Pa. July 28, 2016) (allowing testimony where expert "considered all applicable regulations, relied on her understanding of the industry (as informed by her training and experience), reviewed internal company documents outlining the company's principles and credos, reviewed pertinent trade association documents, and read relevant peer-reviewed literature").

Courts regularly conclude that expert testimony, like Mr. Donaldson's, that is based on an expert's background and experience will assist the fact finder. For example, in *Primiano v. Cook*, the Ninth Circuit reversed the trial court and allowed a physician to offer an opinion regarding a prosthetic elbow that failed more quickly than he would have expected based on his experience. There, the expert's methodology consisted of a "comparison of what happened with [the defendant's] artificial elbow with what surgeons who use artificial elbows ordinarily see." *Primiano*, 598 F.3d at 567. *See also Adams v. Lab. Corp. of Am.*, 760 F.3d 1322 (11th Cir. 2014) (finding that expert's "experience and general knowledge" are sufficient to satisfy Rule 702 and *Daubert* in interpreting lab specimen where no systematic methodology was used to arrive at interpretation).

**B. Mr. Donaldson's Opinions on the Viability of Component-Level Licensing Are Reliable**

Qualcomm also contends that Mr. Donaldson's opinion that multi-level licensing is a viable business model must be excluded because it is not based on sufficient or reliable evidence. Mot. at 10. Qualcomm misrepresents Mr. Donaldson's proposed testimony and the experience

1    that it is based upon.

2           Qualcomm argues that its refusal to license its SEPs to other modem chip sellers is

3    justified because "trying to license handset makers under its handset patents and chip makers

4    under its chip patents . . . would be unworkably complex" and is also contrary to industry

5    practice. Report ¶ 165. Mr. Donaldson disagrees with Qualcomm for a number of reasons. First,

6    he opines that it is "feasible to maintain distinct licensing programs for end-user device sellers

7    and component manufacturers." *Id*. ¶ 165. Mr. Donaldson personally did so at TI by categorizing

8    TI's patent portfolio into two distinct groups for system patents and chip patents, implementing

9    separate licensing programs for each to account for the "significant differences in how patent

10   damages law calculates royalties for such patents." Report ¶ 166. He explains that the law

11   requires the apportionment of royalties to ensure that the patentee does not receive a windfall

12   based on the technical contributions of patent holders, and that it was efficient for TI to structure

13   its licensing program in this way to simplify the apportionment analysis by clarifying the

14   appropriate royalty base (the system versus the chip) from the outset. *Id*. Mr. Donaldson further

15   notes that, contrary to Qualcomm's claims, "TI's licensing program did not raise any particular

16   difficulties of administration." *Id*. In his report, he explains that in order to manage these two

17   separate but parallel licensing programs for system and chip patents, "it was necessary for TI to

18   understand which of its patents were substantially embodied in chips, and which instead read on

19   systems," and describes in detail the method that TI used to categorize its patents. Report ¶¶ 167-

20   169.

21          Mr. Donaldson further opines that Qualcomm's stated justifications for its refusal to

22   engage in multi-level licensing are pretextual for additional reasons. First, Ericsson has

23   successfully engaged in multi-level licensing in the cellular industry, including granting a 3G

24   license to Qualcomm at the chip level. Report ¶ 170. ██████████████████████████

25   ████████████████████████████████████████████████████████████████

26   ████████████████████████████████████. Report ¶¶ 172-174.

27          Qualcomm argues that because Mr. Donaldson testified at his deposition that licensing at

28   the device level is *typical* in the cellular industry, he should be precluded from offering any

testimony regarding the *feasibility* of multi-level licensing. Mot. at 10. Qualcomm

mischaracterizes Mr. Donaldson's testimony on this point. While he does not deny the prevalence

of device-level licensing in the cellular industry, Mr. Donaldson's opinions are presented for the

purpose of responding to Qualcomm's argument that a multi-level licensing program would be

impracticable or infeasible for a semiconductor company to implement or maintain. *See* Report

Section VI.B.

Qualcomm also contends that Mr. Donaldson's experience implementing a successful

multi-level licensing program at TI is insufficient to establish his expertise because he has

inadequate experience managing a patent portfolio similar to Qualcomm's in size or scope, and

"did not have responsibility for formulating corporate strategy with respect to licensing cellular

patents." Mot. at 10-11. These arguments are not well-founded.

As Mr. Donaldson explained in his reports and at his deposition, his experience at TI is

highly relevant to the industry context presented in this litigation. The semiconductor industry in

which TI participated is very similar to Qualcomm's semiconductor business and associated

licensing program, for a number of reasons, including because "both industries involve a highly

complex end-user device, made up of numerous technical components, the features of which

drive consumer demand." Rebuttal Report ¶ 33. During Mr. Donaldson's tenure at TI, certain

features such as processor speed were driving the market for end-user computer devices, similar

to Qualcomm's claim that its technology drives demand for smartphones today. *Id*. Mr.

Donaldson designed TI's licensing program to "recognize the incremental economic value that

each individual component such as a microprocessor, DRAM chip, DSP chip and North/South

Bridges added to the component (and system) functionality." *Id*. These components included

standardized technologies and industry participants sought to determine the incremental economic

value provided by such components by comparing these solutions with competing ones – similar

to the licensing of cellular SEPs. *Id*.

Finally, it is plainly incorrect that Mr. Donaldson lacks experience in the licensing of

cellular SEPs. He has been qualified as an expert and has testified on cellular SEP licensing in a

number of other matters. *See* Report ¶ 12 and Exhibit A. At his deposition, Mr. Donaldson was

asked whether he has any experience licensing patents related to cellular wireless technologies.

Mr. Donaldson testified that during his time at TI, "Texas Instruments was the major supplier of

baseband controllers [modem chips] for wireless phones to Nokia, Ericsson, Motorola, to name

the major companies" and that he negotiated licenses with Nokia, InterDigital, and others relating

to these products. Declaration of Jennifer Milici in Support of the FTC's Opposition to

Qualcomm's Motion ("Milici Decl."), Exhibit 1 (Excerpts of Deposition of Richard Donaldson)

at 10:6-17:7. He further explained that, both at TI and since leaving TI, he has negotiated and

advised on negotiations for a number of licenses, the scope of which "included the right to

manufacture products under any patents that they owned that related to cellular industry," and that

these patents included cellular SEPs. *Id*. at 17:8-25. Mr. Donaldson also started and oversaw a

program at TI in which, given TI's involvement in the market for baseband controllers, patent

strategy managers at TI studied the relevant technology and associated business risks of obtaining

licenses in this space, as well as the practices of industry players such as Qualcomm and

InterDigital. *See id*. at 12:3-18. Mr. Donaldson has more than sufficient industry experience to

draw conclusions regarding licensing cellular SEPS.[1]

---

[1] Qualcomm also contends that Mr. Donaldson's testimony regarding his practices at TI should be excluded on the grounds that they are "undisclosed fact testimony." Mot. at 11, n.3. The cases Qualcomm cites for this principle are irrelevant; they do not address the issue of an expert witness relying on his experience—and by necessity, explaining the factual circumstances surrounding that experience— but rather, general failures to disclose fact witnesses. Mr. Donaldson's opinions do not relate to the terms of the TI licenses he negotiated, despite Qualcomm's suggestion that this is a central portion of his testimony. To the contrary, the Court should not disqualify Mr. Donaldson merely because his opinions are colored by his personal experience. *See Gen. Elec. Co. v. Wilkins*, No. 1:10-CV-00674 LJO, 2012 WL 5398407, at *2 (E.D. Cal. Nov. 2, 2012) (where movant argued that expert's opinions were "purportedly based only on his personal experiences, the Court declines to disqualify Dr. Chambers as an expert on these matters. Mitsubishi and Mr. Wilkins may contest the weight that should be given to such opinions by attacking the factual basis for Dr. Chambers' opinions during cross-examination."). Qualcomm's own experts, including Dr. Huber and Dr. Andrews, propose to testify to opinions based on specific personal experiences. *See e.g.*, August 10, 2018 Deposition of Jeffrey G. Andrews at 69:23-70:23 (explaining that opinion that Qualcomm's portfolio grew over time is based only on his "own knowledge and experience and I visit Qualcomm, you know, not infrequently. I've given several invited lectures there. Their research center seems to be monotonically increasing in size, you know, working on many different things, different standards"); August 8, 2018 Deposition of Dr. Bertram Huber at 30:11-17 (explaining that his expertise in the meaning of the ETSI policy is "based on [his] experience because [he] was there at that time"); 58:9-16 (opinions are based on his "industrial experience and. . . all I know about this subject and topic since decades and I have learned over time in addition. And, of course, my professional experience and background"), attached as Exhibits 2 and 3 to Milici Decl., respectively.

**C.** **Qualcomm Mischaracterizes Mr. Donaldson's Extensive Review of the Record,**
   **Which Was Not Limited to Considering "Cherry Picked" Data**

Qualcomm mischaracterizes the depth and breadth of Mr. Donaldson's review of the record in this case by claiming that Mr. Donaldson "reviewed a limited number of documents, handpicked by the FTC and which concern negotiations with only six OEMs," and arrived at conclusions "on the basis of this limited review." Mot. at 7. Mr. Donaldson reviewed the sworn testimony of more than 50 witnesses, and hundreds of accompanying exhibits. *See* Report Exhibit B; Rebuttal Report Appendix A. He separately reviewed hundreds of documents produced in this action, as well as discovery responses, white papers, and advocacy submissions in the course of his study of Qualcomm's licensing program as a whole, including a review of the "standard" license structure Qualcomm negotiated with "several hundred" licensees. *See* Report ¶¶ 36-44. In addition to Qualcomm's "standard" licenses, Mr. Donaldson analyzed █████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████.

Mr. Donaldson's Opening Report includes detailed descriptions of ████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ Mr. Donaldson "also reviewed evidence in the record from other OEMs, at least one other modem chip maker, and Qualcomm itself, that supports the conclusion that Qualcomm's no license-no chips policy has a material impact on Qualcomm's licensing arrangements with OEMs," and his reports cite to documents and testimony relating to Apple, Pegatron, and VIA Telecom. *Id*. ¶ 162 and n.275. Mr.

---

[2] *See* Milici Decl. at Exhibit 4 (QAPPCMSD07786307, "Global Handset Revenue, ASP and Profit in Q2 2017" (Strategy Analytics)); Exhibit 5 ( Q2014FTC04150166, ███████████████████████████████████████████████████; Exhibit 6 (Q2017MDL1_02944278, "HS Market Share by Vendor").

1    Donaldson also reviewed ███████████████████████████

2    ████████████████████████████████████████████████████████

3    ██████████████████████.[3] He has also reviewed ██████████████

4    ████████████████████████████████.[4]

5         Even if Mr. Donaldson had not conducted the broad review that he did, Qualcomm's

6    arguments would fail. It is not improper for an expert disclosure to focus on illustrative examples

7    from a large data set in explaining and justifying opinions. As Qualcomm admits in its motion

8    directed at FTC expert Dr. Robert Akl, its own expert submitted a report that described a couple

9    of dozen example patents out of thousands owned by Qualcomm, without conducting any

10   analysis of Qualcomm's patent portfolio as a whole, or the comparative value of that portfolio.

11   *See* ECF No. 797.

12        Qualcomm's argument that FTC counsel "cherry-picked" the record for Mr. Donaldson to

13

14   [3] *See* Report ¶¶ 122-162; *see also, e.g.,* ██████████████████████
     ███████████[Q2017MDL1_01736777]████

15   ████████████████████████████████████████████████████

16   ██████████████████████[Q2014FTC03470494 at -0494]███

17   ████████████████████████████████████████████████

18   ███████████Deposition of Cristiano Amon at 146-151████████

19   ████████████████████████████████████████[CX6695 at

20   -001] [QNDCAL02199665]███████████████████████████

21   ████████████████████████████████████████████████

22   ███████████████████████[Q2017MDL1_02843092]███

23   █████████████ttached as Exhibits 7-11 to Milici Decl., respectively.

24   [4] *See* Report n.275, citing, *inter alia,* ████████████████████
     [Q2017MDL1_02697467]█████

25   ████████████████████████████████████████████████

26   █████████████████2014FTC03584363]████████████████

27   ████████████████████████████████████████████████

28   █████████████attached as Exhibits 12-13 to Milici Decl.,
     respectively.

1    review is unavailing. Over 18 million documents have been produced in this case. The fact that

2    counsel provided agreements for Mr. Donaldson to review—agreements that were associated with

3    the deposition testimony of witnesses in this case—is not a valid basis upon which to exclude his

4    testimony. This Court rejected a similar argument in the *In re Arris Cable Modem Consumer*

5    *Litig.* action. *See In re Arris Cable Modem Consumer Litig.*, No. 17-CV-01834-LHK, 2018 WL

6    3820619 (N.D. Cal. Aug. 10, 2018). In that case, the defendant asserted that the plaintiff's expert

7    based his opinion "on documents that were 'cherry-picked' from all of the discovery in this case

8    and 'highlighted' for him by Plaintiffs' counsel." The Court found this contention to be

9    "disingenuous" and noting there is "no authority for the proposition that an expert must

10   independently sort through all of the discovery in a case in order to determine the relevant

11   evidence." *Id.* at *21. The Court went on to explain that such a "rule would be incredibly costly

12   and time consuming for the expert, who necessarily would be duplicating the work that the

13   attorneys in the case had already performed." *Id.*

14          Further, if Qualcomm is aware of examples from the record of OEM licenses that are

15   inconsistent with or contradict Mr. Donaldson's opinions, it may identify those examples, and use

16   them to cross-examine Mr. Donaldson at trial. *See id.* (explaining that to the extent the defendant

17   believed that the plaintiff's expert "failed to consider relevant evidence of record or formed

18   opinions based on unreliable data, Defendant is free to cross-examine [Plaintiff's expert] at trial

19   on the foundation for his opinions"); *see also Brickman v. Fitbit, Inc.*, No. 3:15-CV-02077-JD,

20   2017 WL 6209307, at *4 (N.D. Cal. Dec. 8, 2017) (concluding that where Fitbit contended

21   opposing expert "cherry-picked studies that validated the position of her own publications," this

22   "may be fertile grounds for cross-examination, but it does not make [the expert's] opinions

23   inadmissible").

24          Qualcomm has identified no such persuasive examples. Qualcomm claims that there are

25   "agreements and documents reflecting hundreds of other licensing negotiations that Mr.

26   Donaldson has not considered," but does not show that these other materials cast any doubt on

27   Mr. Donaldson's conclusions. Indeed, at his deposition, Mr. Donaldson testified that learning of

28   hypothetical OEMs that perhaps were not influenced by Qualcomm's "no license no chips"

1   leverage would be unlikely to change his opinions due to the quantity and weight of the evidence

2   he has reviewed suggesting that Qualcomm's commercial policies *did* alter negotiations. *See*

3   Milici Decl. Exhibit 1 (Excerpts of Deposition of Richard Donaldson) at 118:6-119:11. Mr.

4   Donaldson emphasized the significance of the testimony he reviewed, explaining that "you can't

5   discount in these situations with ████████, who have offered direct testimony that [the no

6   license-no chips policy] did have an effect, the existence of one or more examples where the

7   question never came up does not offset the testimony of what actually did happen with major

8   OEMs." *Id.* at 118:20-119:2. He explained that examples of differing license negotiations—if

9   they exist—would "not offset the direct sworn testimony of these people who actually were

10  affected by the policy." *Id.*

11               **D.  Mr. Donaldson Does Not Speculate Regarding Licensees' State of Mind**

12        Finally, Qualcomm contends that Mr. Donaldson's opinions regarding negotiation

13  dynamics and outcomes consist of mere "speculation concerning the subjective intent and

14  motivation of certain third parties who negotiated license agreements with Qualcomm." Mot. at 4.

15  But this is not the case. First, as a general matter, Mr. Donaldson's reliance on the statements of

16  fact witnesses (*e.g.,* that an OEM acceded to Qualcomm's patent licensing demands in order to

17  secure access to Qualcomm chips) "does not automatically render his opinion or methodology

18  unreliable." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1071 (C.D.

19  Cal. 2015). It is established law that "[a]n expert is of course permitted to testify to an opinion

20  formed on the basis of information that is handed to rather than developed by him—information

21  of which he lacks first-hand knowledge and which might not be admissible in evidence no matter

22  by whom presented." *Id.* (citing *Matter of James Wilson Associates*, 965 F.2d 160, 172-73 (7th

23  Cir. 1992).

24        Second, unlike the experts in the cases cited by Qualcomm, Mr. Donaldson is not

25  speculating as to the intent or motivation of third parties negotiating licenses with Qualcomm. To

26  the contrary, to the extent that Mr. Donaldson's disclosed testimony refers to the motivations of

27  third parties in license negotiations, it is based on contemporaneous documents or sworn

28  testimony from parties to those negotiations explaining in plain terms that Qualcomm's conduct,

1   including its no license-no chips policy, *did* in fact impact their motivations. Indeed, at his

2   deposition, Mr. Donaldson explained he would consider his conclusions disproven only if "all

3   these people who provided sworn testimony [were] liars." Milici Decl. Exhibit 1 (Excerpts of

4   Deposition of Richard Donaldson) at 117:14-118:5. He went on to explain that he "accept[ed]

5   [the OEMs who provided testimony about their negotiations with Qualcomm] were under oath,

6   and I accept[ed] that what they testified to was true, and I don't see how you then say, well, even

7   though they said that based upon this, they were forced to take a license, that that really didn't

8   have an effect." *Id.*

9        Mr. Donaldson's statements regarding the inability of OEMs to negotiate effectively with

10  Qualcomm, including those enumerated in Qualcomm's Motion, are not his guesses regarding

11  "third parties' purported states of mind and intentions." Mot. at 6. Rather, these statements are

12  direct and presently uncontested testimony from the third parties actually involved in negotiating

13  with Qualcomm. That testimony, along with documentary evidence, are the factual basis for Mr.

14  Donaldson's opinions. If Qualcomm believes there are examples in which, as Qualcomm puts it,

15  the "actual circumstances of each party to the negotiation" (Mot. at 6) suggest that a particular

16  OEM was *not* in fact dependent on Qualcomm for chips and thus was not subject to Qualcomm's

17  enhanced bargaining power, it may cross-examine Mr. Donaldson with those examples at trial.

18  **V.**    **<u>CONCLUSION</u>**

19       For the foregoing reasons, the Court should deny Qualcomm's motion.

20

21

22

23

24

25

26

27

28

1   Dated: September 24, 2018

2                                          Respectfully submitted,

3                                          FEDERAL TRADE COMMISSION,

4

5                                          */s/ Jennifer Milici*
                                          Jennifer Milici

6                                          Joseph R. Baker
                                          Elizabeth A. Gillen

7                                          Geoffrey M. Green
                                          Daniel Matheson

8                                          Federal Trade Commission
                                          600 Pennsylvania Avenue, N.W.

9                                          Washington, D.C. 20580
                                          (202) 326-2912; (202) 326-3496 (fax)

10                                      jmilici@ftc.gov

11

12                                      ***Attorneys for Federal Trade Commission***

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28