CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
825 Eighth Avenue
New York, New York 10019-7475
Telephone:  (212) 474-1000
Facsimile:   (212) 474-3700

KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest, SBN 84065
rvannest@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  (415) 676-2289
Facsimile:  (415) 397-7188

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet (*pro hac vice*)
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Telephone:  (212) 309-6000
Facsimile:  (212) 309-6001

Attorneys for Defendant
QUALCOMM INCORPORATED

*Additional counsel in the signature block.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware corporation,<br><br>Defendant. | Case No. 5:17-CV-00220-LHK-NMC<br><br>**DEFENDANT QUALCOMM INCORPORATED'S OPPOSITION TO FEDERAL TRADE COMMISSION'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. EDWARD A. SNYDER**<br><br>Courtroom:  8, 4th Floor<br>Judge:   Hon. Lucy H. Koh<br>Date:  October 18, 2018 |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

I.      INTRODUCTION .................................................................................................1

II.     FACTS .................................................................................................................4

        A.      Prof. Snyder Is an Expert in Industrial Organization Economics ............................4

        B.      Prof. Snyder's Analysis of the Plaintiff's Hypothesis and Conclusions.................6

III.    LEGAL STANDARD ...........................................................................................9

IV.     ARGUMENT .......................................................................................................10

        A.      Prof. Snyder's Analysis of Factors That Drive Industry Outcomes Easily
                Satisfies Daubert. ...............................................................................................10

        B.      Prof. Snyder's Expert Analysis of Industry Performance Satisfies Daubert. ........22

V.      CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991
(9th Cir. 2010)........................................................................................................18

*Aloe Vera of Am. Inc. v. United States,* No. CV-99-01794-PHX-JAT, 2014 WL
3072981 (D. Ariz. July 7, 2014*)* .........................................................................15

*Apple, Inc. v. Samsung Elecs. Co., No.* 12-CV-00630-LHK, 2014 WL 794328
(N.D. Cal. Feb. 25, 2014)......................................................................................14

*BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-CV-01370-EJD, 2018 WL
1611835 (N.D. Cal. Apr. 3, 2018) ...........................................................................9

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) ..........................9

*Clausen v. M/V New Carissa*, 156 F. Supp. 2d 1192 (D. Or. 2001)..............................12

*FTC v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014) ...............................................10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 07-1827 SI, C 10-1064 SI,
2013 WL 124347 (N.D. Cal. Jan. 8, 2013)............................................................15

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..................................................17

*Murray v. S. Route Maritime SA*, 870 F.3d 915.............................................................9

*Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ................................................24

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) ...........................................................9

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807 (9th Cir. 2014) ........9, 10

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)...............................................18, 19

*Rent-A-Car, Inc. Avis Budget, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ........................9

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ..................................................23

*United Food & Commercial Workers Local 1776 vs. Teikoku Pharma USA*, 296
F. Supp. 3d 1187 (N.D. Cal. 2017) ........................................................................12

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc)............18, 23

**Statutes & Rules**

Fed. R. Evid. 702 ....................................................................................................9, 16

FTC Act Section 5, 15 USC §45............................................................................18

1

## I.    INTRODUCTION

2          To prevail in this case, the FTC bears the burden of proving that Qualcomm's

3    conduct caused harm to competition or the competitive process.  To try and meet that burden, the

4    FTC has proffered the opinions of Prof. Carl Shapiro, an economist.  Prof. Shapiro opined that

5    Qualcomm's conduct *could* harm competition (FTC's Motion to Exclude Expert Testimony of

6    Prof. Edward Snyder, ECF No. 788, hereinafter "Mot.", at 13) by discouraging investment and

7    encouraging exit from the modem chip business.  (*Id.*)  But in his report, Prof. Shapiro undertook

8    no analysis *at all* to try and assess whether Qualcomm's conduct actually *did* harm competition

9    or to what extent, and in his deposition he confirmed that he did not attempt to quantify the effect

10   of Qualcomm's conduct on any measure of performance (such as investment, sales, revenues or

11   profits) industry-wide or by any of Qualcomm's rival chip suppliers.  Instead, Prof. Shapiro

12   simply posited that certain industry outcomes—most specifically exit by rivals and relatively

13   high concentration in the alleged markets for modem chips—are consistent with his theory.

14          As one response to Prof. Shapiro's opinions, Qualcomm submitted the report of

15   Prof. Edward Snyder, the Dean of the Yale School of Management and a leading expert in

16   industrial organization economics, which is the field of economics that focuses on the study of

17   market structure and strategic behavior of firms, with a focus on imperfect competition—and

18   thus a particular affinity to the field of antitrust.  Prof. Snyder used well-accepted methodology

19   to perform an in-depth qualitative study of the cellular industry and, in particular, the modem

20   chip business.  Based on this study and applying fundamental industrial organization economics

21   principles, Prof. Snyder provided two core opinions that are highly relevant to the Court's task in

22   this case, as they rebut Prof. Shapiro's opinions regarding the alleged effects caused by

23   Qualcomm's conduct.  *First*, having studied the industry, Prof. Snyder opined that the industry

24   outcomes identified by Prof. Shapiro—such as exit and relatively high concentration—are

25   consistent with the general characteristics of the modem chip business, meaning that benign

26   industry factors could (and likely did) cause the outcomes observed by Prof. Shapiro.  This

27

28

opinion directly undermines Prof. Shapiro's opinion that the outcomes he observed were necessarily—or even likely—caused by Qualcomm's conduct.  *Second*, Prof. Snyder opines that the modem chip industry does not bear any of the hallmarks of an industry laboring under restrictions on the competitive process, such as stagnant growth and diminished innovation.  This opinion also undermines Prof. Shapiro's speculation about the harm to the industry caused by Qualcomm's conduct, which Prof. Shapiro posits was durable and pervasive, affecting the alleged markets for over a decade.

These two opinions are highly relevant, and go to the heart of a core premise of the FTC's antitrust claim.  They were constructed on the basis of a detailed study of the industry using the fundamental tools long recognized and used by industrial organization economists to analyze the functioning and performance of markets and of the firms that operate within them.  Yet the FTC nonetheless asks the court to exclude those two opinions, attacking Prof. Snyder's methodology; the relevance and reliability of his conclusions; and his lack of specific experience in the modem chip industry.  These criticisms are predicated on a misapprehension or misrepresentation of Prof. Snyder's opinions and of the work and expertise of industrial organization economists.  The FTC's motion should be denied for each of the following reasons.

*First,* Prof. Snyder's testimony regarding the factors responsible for failure or success in the modem chip industry is the result of generally accepted and reliable theories and methodologies regularly applied by industrial organization economists.  Prof. Snyder "conduct[ed] an in-depth analysis of the modem chip industry" (Milici Decl. Ex. 1., ECF No. 788-1, hereinafter "Rpt.", ¶ 39) to identify "[f]rom the modem chip supplier's perspective, the factors that affect the ability to be successful" (Rpt. ¶ 143).  He then tested the explanatory power of those factors by reviewing whether they can explain the successes and failures of 14 current and former modem chip suppliers.   That methodology is a reliable application of accepted principles of industrial organization economics.

*Second*, Prof. Snyder's testimony regarding the factors responsible for outcomes in the modem chip industry will be helpful to the Court, is relevant, and is reliable.  That

testimony is relevant because, as noted above, it directly undermines the FTC's assertion that industry outcomes, such as the exit of certain suppliers, must have been caused by Qualcomm's challenged conduct, rather than other competitive factors; in other words, it shows that the same developments would likely also have occurred in the industry in a "but-for" world without the challenged conduct.

The FTC's criticism that Prof. Snyder has not ruled out completely the possibility that Qualcomm's practices *also* may have contributed in some way to industry developments completely misses the point.  It is the FTC that relies on certain outcomes as supposed evidence of anticompetitive effects; Prof. Snyder's opinions, which show alternative causes for the same outcomes, refute the probative value of that evidence and the FTC's theory of causation.

The FTC's complaint that Prof. Snyder did not quantify the effect of any particular factor on observable outcomes is likewise misguided.  While Qualcomm did offer quantitative rebuttal to Prof. Shapiro through other experts, the criticism fails as to Prof. Snyder because his opinions are more than sufficiently reliable to rebut Prof. Shapiro's opinions, all of which are qualitative and "directional", rather than quantitative.  Indeed, it is notable that the FTC is attacking the reliability of Prof. Snyder's study as not sufficiently reliable even though Prof. Shapiro, on behalf of the FTC, seeks to explain the same industry outcomes without performing *any* study of the industry or of those outcomes, whether quantitative or qualitative – let alone any study as thorough and comprehensive as the one performed by Prof. Snyder.

Finally, the FTC's criticism that Prof. Snyder is not an expert on the cellular industry is a red herring; IO economists routinely study industries about which they know little to begin with, specifically to assess their structure and performance – topics on which industrial organization economists often provide testimony in antitrust cases dealing with a variety of industries.

*Third*, Prof. Snyder's opinion that "[s]tandard indicators of industry performance" (Rpt. ¶ 33) contradict the FTC's claim of anticompetitive effect is highly probative of whether Qualcomm's conduct has reduced competition.  If the FTC were correct that Qualcomm's

3

purported monopolistic conduct has inhibited competition and driven rival modem chip suppliers out of the alleged markets for well over a decade, industrial organization economists might expect to see signs of impaired competition, such as stagnating innovation, high prices, slow adoption of new technology and low benefits to consumers.  Indeed, as noted above, these effects are what Prof. Shapiro suggests are the natural consequence of his theory of liability.  But Prof. Snyder's testimony will show that the modem chip industry does not exhibit any of these characteristics undermines Prof. Shapiro's contention that the industry is suffering from the effects of anticompetitive conduct.  The FTC again faults Prof. Snyder for not conclusively ruling out the possibility that industry performance could have been even stronger without Qualcomm's challenged practices, but this again either misses the point or seeks improperly to shift the FTC's burden of proof.  In any event, this criticism is certainly not proper grounds for exclusion of expert testimony; there can be no doubt that Prof. Snyder applies widely accepted IO economics tools to examine the industry's performance, and the FTC can argue that the industry could have succeeded more, if it is so inclined, after the Court has heard from Prof. Snyder on this issue.

## II.     FACTS

### A.     Prof. Snyder Is an Expert in Industrial Organization Economics

The FTC does not challenge Prof. Snyder's extensive qualifications as an expert in economics and industrial organization, the field of economics that deals most directly with pricing and distribution of products, interactions among competitors, contracting practices and competition issues.  (*See* Mot. 2.)  "Industrial organization is concerned with the structure of industries in the economy and the behavior of firms and individuals in these industries.  The field has historically focused on how markets depart from idealized conditions of perfect competition, whether because of scale economies, transaction costs, strategic behavior, or other factors.  From an empirical perspective, this leads to questions about how competition plays out in different

markets and how it relates to industry structure".[1]  Industrial organization economics is widely

recognized as the economic field closest to the core inquiries of antitrust law and is frequently

brought to bear in antitrust cases.[2]  Industrial organization techniques and principles have been

used to explain outcomes in a wide variety of industries, including shipbuilding, airlines,

computers, oil and credit cards.[3]  Prof. Snyder himself has assessed key economic factors and

---

[1] Byars Decl. Ex. Q, Jonathan Levin and Liran Einav, "Empirical Industrial Organization: A Progress Report," *Journal of Economic Perspectives*, Vol. 24, No. 2, 146 Spring 2010.  *See also* Byars Decl. Ex. E, F.M. Scherer and David Ross, Industrial Structure and Economic Performance, Boston: Houghton Mifflin, p. 1 ("[Industrial organization economics is] concerned with how productive activities are brought into harmony with the demand for goods and services through some organizing mechanism such as a free market, and how various and imperfections in the organizing mechanism affect the success achieved in satisfying and economy's wants".)

[2] Byars Decl. Ex. S, Julian O. Von Kalinowski, 4 Antitrust Counseling and Litigation Techniques § 36.03 (Matthew Bender, Rev. Ed. 2018) ("Industrial organization is the field of economics closest in subject matter to the field of antitrust law. Industrial organization economists apply microeconomic theory to study how firms and markets are organized and behave. As an applied field of study, industrial organization economics combines economic theory with empirical analysis of actual markets, both historical and statistical."); *see also* Byars Decl. Ex. P, Jonathan B. Baker & Timothy F. Bresnahan, *Economic Evidence in Antitrust: Defining Markets and Measuring Market Power, in* Handbook of Antitrust Economics 1, 2 (2008) ("Just as antitrust has become infused with economics, industrial organization economics— the economics field most closely related to antitrust—has turned its attention to the legal system. Over the past few decades many of the issues and problems addressed in the research literature on industrial organization economists have been suggested or framed by antitrust cases.")

[3] Byars Decl. Ex. N, David S. Evans & Richard Schmalensee, Paying with Plastic: The Digital Revolution in Buying and Borrowing, at xii (2005) ("First, we examine the evolution of this industry through the lens of economics.  We are particularly interested in explaining how economic forces have combined with institutional and technological ones to shape this industry, and in showing how competition works in an industry that does not fit neatly into any of the standard models used by economists."); Byars Decl. Ex. E, F. M. Scherer & David Ross, Industrial Structure and Economic Performance 94 (1990); Byars Decl. Ex. J, Timothy F. Bresnahan & Shane Greenstein, *Technological Competition and the Structure of the Computer Industry*, 47 J. Indus. Econ. 1 (1999); Byars Decl. Ex. I, Gerald Cook, *A Review of History, Structure, and Competition in the U.S. Airline Industry*, 7 J. Aviation/Aerospace Educ. & Res. 33 (1996); Byars Decl. Ex. F, Scott E. Masten, James W. Meehan & Edward A. Snyder, *The Costs of Organization*, 7 J.L., Econ. & Org. 1 (1991).

---

QUALCOMM'S OPPOSITION TO FTC'S MOTION TO EXCLUDE
Case No. 17-cv-0220-LHK-NMC

derived the implication of those factors on competition in a number of cases involving different industries.  (Milici Decl. Ex. 1, Snyder Appendix B.)

Prof. Snyder is Dean of the Yale School of Management and William S. Beinecke Professor of Economics and Management.  He is the former Dean of the University of Chicago Booth School of Business and George Shultz Professor of Economics and former Dean of the University of the Virginia Darden School of Business and Charles C. Abbot Professor Business Administration.  Prior to his tenures at Yale, Chicago, and Virginia, Prof. Snyder was the Chair of Business Economics and Public Policy of the University of Michigan Ross School of Business.  Earlier in his professional career, Prof. Snyder served as Staff Economist to the National Commission to Review Antitrust Laws and Procedures in the Antitrust Division of the U.S. Department of Justice.  (Milici Decl. Ex. 1, Snyder Appendix A.)

In addition to his academic and professional credentials, Prof. Snyder has authored numerous articles in the fields of economics and industrial organization, including three articles on antitrust policy and enforcement written in collaboration with Thomas E. Kauper, Professor of Law Emeritus at the University of Michigan Law School and former Assistant Attorney General of the Antitrust Division, U.S. Department of Justice.  He has provided expert testimony in numerous antitrust cases involving a variety of industries, including high-tech industries such as optical disk drives, cathode ray tubes and liquid crystal displays.  He has conducted academic research on a wide array of topics, including pricing practices, distribution of products, vertical integration and contracting, and industrial organization in general.  (Milici Decl. Ex. 1, Snyder Appendix A.)

B.    **Prof. Snyder's Analysis of the Plaintiff's Hypothesis and Conclusions**

In his June 28, 2018 report, Prof. Snyder applied his expertise to assess the FTC's claim that Qualcomm's alleged conduct "deterred or precluded entry, suppressed innovation, and forced many of Qualcomm's competitors to exit the business of supplying" CDMA and LTE modem chips.  (Rpt., ¶ 7-8, Compl. ¶ 136, ECF no. 1.)  Prof. Snyder engaged in a detailed study,

relying on standard tools and assessments that are used by industrial organization economists in the ordinary course to assess the structure of markets and the conduct of the firms operating in them.  To evaluate the FTC's claim, Prof. Snyder first considered two hypotheses that might explain the industry outcomes on which the FTC relies to claim anticompetitive effect:

- The "Plaintiff's Hypothesis", which is that "Qualcomm's exclusionary conduct (i.e., as relevant here, tying of modem chips with patent licenses, refusal to provide exhaustive component-level patent licenses to modem chip suppliers, and discount agreements with Apple) reduced competition in the modem chip industry, altered industry dynamics, and allowed Qualcomm to become more successful than it otherwise would have been."  (Rpt. ¶ 21.)

- The "Industry Factors Hypothesis", which posits that "relevant industry factors, identified by an analysis of the modem chip industry and grounded in relevant industrial organization principles . . . explain the structure of the industry at any point in time, the relative success and failure of modem chip suppliers, industry changes, and observed entry and exit decisions." (Rpt. ¶ 20.)

To identify the industry factors to be used in his Industry Factors Hypothesis, Prof. Snyder applied principles of industrial organization economics to examine numerous industry characteristics that may affect the conduct of firms in the modem chip industry, including economies of scale, economies of scope, learning effects, vertical integration, transaction costs, asset specificity and product lifecycles, to analyze the competitive dynamics in the industry.  (Rpt. ¶¶ 48, 180.)  His analysis yields insights regarding how industry factors influence the overall structure of the industry and determine the success or failures of individual firms.  Thus, Prof. Snyder "identif[ies] particularly relevant industry factors and indicate[s] their overall implications on the organization of firms in the modem chip industry".  (Rpt. ¶ 46.)  For example, he opines that "[t]he combination of (a) substantial up-front costs associated with the development and design of modem chips and the required physical capital costs, and (b) low marginal costs of production results in substantial economies of scale for suppliers"; that modem chip suppliers benefit from economies of scope because "suppliers who produce multiple different modem chips can achieve efficiency in their R&D by transferring successful R&D investments in the development of one particular chip to other models"; and that "learning in

1  production, whereby costs decline with cumulative output, and product-cycle effects, whereby

2  price-cost margins on innovative products start out high but decline over time, exert downward

3  pressures on prices". (Rpt. ¶ 47.) Prof. Snyder also assesses *industry-specific* factors such as

4  "successive shifts from one generation of wireless standards to the next", which "entail

5  increasingly large investments in R&D as well as product design, the returns on which are highly

6  variable and depend in large part on the supplier's strategic foresight and efficiency in R&D".

7  (Rpt. ¶ 48.) This analysis, "grounded in relevant industrial organization principles, allowed

8  [Prof. Snyder] to identify the industry factors that potentially drive the economic activity in the

9  industry." (Rpt. ¶ 22.) In particular, he concludes that "industry analysis indicates that

10  independent of the nature of their contractual relationships, modem chip suppliers succeed or fail

11  based on their foresight, efficient investments and ability to execute". (Rpt. ¶ 31(f).)

12          After identifying these three factors as affecting firm performance in this industry,

13  Prof. Snyder analyzed the experience and performance of 14 modem chip suppliers with a

14  particular focus on "adverse outcomes such as exit and loss of customers, and on successful

15  outcomes such as new entry into the industry and successful product development", to determine

16  whether these factors alone could explain these outcomes. (Rpt. ¶ 22.) Prof. Snyder's analysis

17  not only confirmed the centrality of the industry factors he had identified, but also led him to

18  conclude that "every major success or failure experienced by modem chip suppliers can be fully

19  explained by these industry factors". (Rpt. ¶ 31(f).)

20          Prof. Snyder next considered "[s]tandard indicators of industry performance" to

21  assess the FTC's claims that Qualcomm had been impairing competition in the industry for many

22  years. (Rpt. ¶ 33.) As he explained, the FTC claims that "alleged exclusionary conduct has

23  inhibited competition and driven modem chip suppliers out of the industry, which [he] would

24  expect to lead to poor performance in the modem chip industry overall". (Rpt. ¶ 475.) Again

25  applying his IO expertise, Prof. Snyder opined that "[k]ey measures of performance include the

26  pace of innovation, quality-adjusted prices, and overall benefits to consumers". (Rpt. ¶ 476.)

27  Based on industry data, Prof. Snyder analyzed each of these metrics and concluded that "the

28

industry has exhibited impressive performance on each dimension". (Rpt. ¶ 476.) He opines that "[t]his performance is evidence against the implication of Plaintiff's Hypothesis that Qualcomm's alleged exclusionary conduct has impaired industry performance". (Rpt. ¶ 497.)

## III.    LEGAL STANDARD

"Fed. R. Evid. 702 provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1040 (9th Cir. 2014) (citing Fed. R. Evid. 702).

Under *Daubert* and its progeny, a district court's inquiry into admissibility of expert opinion evidence is flexible. *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 810 (9th Cir. 2014). "A judge is not tasked with deciding whether the expert is right or wrong" but instead "[t]he judge is supposed to screen the jury from unreliable nonsense opinions, but not to exclude opinions merely because they are impeachable." *Id.* (quoting *Alaska Rent-A-Car, Inc. Avis Budget, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013.) "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Pyramid Techs.*, 752 F.3d at 810 (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Expert testimony is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline. *Id.* Any "challenges that go to the weight of the evidence are within the province of the fact finder" and cannot be considered with regards to admissibility. *Ponoma*, 750 F.3d at 1044.

For a jury trial, "the trial judge acts as a gatekeeper by examining the full picture of the experts' methodology and preventing shoddy expert testimony and junk science from reaching the jury". *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-CV-01370-EJD, 2018 WL 1611835, at *1 (N.D. Cal. Apr. 3, 2018) (quoting *Murray v. S. Route Maritime SA*, 870 F.3d 915,

923 ((9th Cir. 2017)).  Where, as here, the court is both the gatekeeper and the fact finder, "there is less danger that a trial court will be 'unduly impressed by the expert's testimony or opinion'", *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014).  Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful".  *Pyramid Techs.,* 752 F.3d at 813 (quoting *Alaska Rent-A-Car*, 969-70.)

## IV.    ARGUMENT

Prof. Snyder should be permitted to provide the challenged opinions at trial, so as to rebut Prof. Shapiro's speculative assertion that Qualcomm's conduct could have harmed competition by some indeterminate and unquantified measure.  *First,* Prof. Snyder's methodology is sound and well accepted.  *Second*, Prof. Snyder's testimony regarding the factors responsible for outcomes in the modem chip industry will be helpful to the Court, is relevant, and is reliable.  *Third*, Prof. Snyder's opinion that "[s]tandard indicators of industry performance" contradict the FTC's claim of anticompetitive effect is highly probative of whether Qualcomm's conduct has reduced competition.  (Rpt. ¶ 33.)

###    A.    **Prof. Snyder's Analysis of Factors That Drive Industry Outcomes Easily Satisfies *Daubert*.**

####        1.    Prof. Snyder's Methodology for Identifying and Analyzing Industry Factors is Reliable and Widely Accepted in the Field of Industrial Organization Economics

Prof. Snyder's assessment of factors that drive outcomes in the modem chip industry is grounded in widely accepted principles and methodologies that are frequently used by industrial organization economists.  Prof. Snyder applied his expertise in industrial organization economics to analyze the modem chip industry.  (*See* Rpt. V.)  In doing so, he did exactly what industrial organization economists do as a matter of course—conducting an in-depth analysis of an industry to identify the factors that affect the success or failure of firms within it.  (*See infra* notes 4-7.)  To perform this analysis, Prof. Snyder proceeded from a broad set of factors

generally recognized in the industrial organization literature to a narrowed set of impact or

explanatory factors in the specific industry at hand—here, identified as "(a) foresight, (b)

efficient investment in technologies and (c) execution of strategies".  Prof. Snyder's

methodology for analyzing industry structure and characteristics to identify the main factors that

affect industry outcomes is supported by academic literature.[4]  Prof. Snyder's ultimate

identification of foresight[5], investment efficiency[6] and execution[7] as key factors explaining firm

---

[4] *See*, *e.g.*, Byars Decl. Ex. E, Scherer, F.M. and David Ross, Industrial Structure and
Economic Performance, Boston: Houghton Mifflin, 1990, pp. 1-7.

[5] Byars Decl. Ex. K, Carl Shapiro & Hal R. Varian, *Information Rules* 177 (1999) ("The
biggest winners in the information economy . . . are companies that have launched technologies
that have been propelled forward by positive feedback.  This requires patience and foresight, not
to mention a healthy dose of luck."); Byars Decl. Ex. G, Gary Hamel & C.K. Prahalad,
*Competing for the Future*, 74 Harv. Bus. Rev., July-Aug. 1994, at 128 ("Industry foresight is
based on deep insights into trends in technology, demographics, regulations, and lifestyles,
which can be harnessed to rewrite industry rules and create new competitive space. . . .  Given
that change is inevitable, the real issue for managers is whether that change will happen
belatedly, in a crisis atmosphere, or with foresight, in a calm and considered manner; whether the
transformation agenda will be set by a company's more prescient competitors or by its own point
of view; whether transformation will be spasmodic and brutal or continuous and peaceful. . . .").

[6] Byars Decl. Ex. R, Unni Pillai, *A Model of Technological Progress in the Microprocessor
Industry*, 61 J. Indus. Econ. 877, 877 (2013) (identifying a relationship between "technological
progress in the microprocessor industry" and the "repeated adoption of higher quality vintages of
capital equipment produced by the upstream semiconductor equipment industry"); Byars Decl.
Ex. H, Sharon Oster, *Modern Competitive Analysis* 289 (2d ed. 1994) ("A considerable amount
of growth is generated by firms in the high-technology area.  Indeed some have argued that
developing and fostering innovation remains our nation's prime area of comparative
advantage . . . .  In the cellular phone and microprocessor markets, for example, R&D can
amount to 25-30 percent of firm sales."); Byars Decl. Ex. N, David S. Evans & Richard
Schmalensee, *Some Economic Aspects of Antitrust Analysis in Dynamically Competitive
Industries*, *in* 2 Innovation Policy and the Economy 1, 1, 3 (Adam B. Jaffe et al., eds. 2002)
("[F]irms engage in dynamic competition *for the market*—usually through research-and-
development (R&D) . . . .  The defining feature of new-economy industries is a competitive
process dominated by efforts to create intellectual property through R&D, which often results in
rapid and disruptive technological change." (emphasis in original)).

[7] Byars Decl. Ex. O, Chad W. Autry and Stanley E. Griffis, *Supply Chain Capital: The
Impact of Structural and Relational Linkages on Firm Execution and Innovation*, Journal of
Business Logistics, Vol. 29, No. 1, 2008 ("*Execution*-oriented performance is defined as the
extent to which a firm's core processes operate efficiently and effectively to fulfill customer

performance—in this case, in the modem chip industry—is likewise supported by the academic literature.  Because Prof. Snyder applies widely accepted and reliable industrial organization principles as well as a methodology accepted among industrial organization economists, his testimony is reliable and therefore admissible.

The FTC nonetheless proffers three attacks on Prof. Snyder's opinions, claiming that (1) Prof. Snyder's "theory has not been subjected to peer review and publication" and is "not accepted by the relevant scientific community"; (2) Prof. Snyder did not subject the industry factors to quantitative tests or analyses; and (3) Prof. Snyder did not employ a testable methodology.  (Mot. 7-8, 10-12.)  All these attacks are without merit, and seem particularly misplaced given the goal of Prof. Snyder's report—to rebut Prof. Shapiro's opinions about cause and effect, which are themselves not grounded in *any* analysis, *not* tested and *not* quantified.

*First*, the FTC argues that the Court should exclude Prof. Snyder's report because his method of analysis has not been subjected to peer review or publication and is not accepted by the relevant scientific community.  (Mot. 6.)  That is simply not the case—nor is it the law. As a threshold matter, peer review is not a necessary component of reliability.  *See United Food & Commercial Workers Local 1776 vs. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1187 (N.D. Cal. 2017) (admitting expert testimony where the expert "could point to no other case where an expert has employed the exact model he employs here" because the methodology was "consistent with accepted economic theory and well-established principles"); *see also Clausen v. M/V New Carissa*, 156 F. Supp. 2d 1192, 1197 (D. Or. 2001).  But in any case, as noted above, *supra* notes 4-7, extensive literature has reported the use of Prof. Snyder's basic methodology— analyzing the industry to identify factors explaining success and failure—as well as the specific factors he has identified.  (*See also* Snyder Dep Tr. 90:1-10 (noting that the industrial

demands." (emphasis in original)); Byars Decl. Ex. D, Gary W. Dickson, "An analysis of vendor selection systems and decisions," Journal of Purchasing, Vol. 2, No. 1, 1966 (finding that, among 23 factors considered among 170 different purchasing managers, quality, delivery and performance history were the three most important criteria for firm successes).

organization literature "would reflect the importance of these factors").) This methodology has general applicability across industries, and has in fact been applied in a broad and diverse array of industries, demonstrating both its acceptance and reliability.  (*See supra* note 5.)

The FTC's criticism that Prof. Snyder could not define foresight, investment efficiency or execution is without merit.  Prof. Snyder provides clear definitions and characteristics for each factor, as well as numerous concrete examples of how individual firms' successes or failures were influenced by each factor.  Prof. Snyder defines foresight or "alignment with demand" as the ability "or good fortune, to have invested in technologies and standards that are demanded by network carriers and OEMs".  (Rpt. ¶ 143.) ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (Rpt. ¶ 409).  Prof. Snyder explains investment efficiency as "the need to invest efficiently in R&D to overcome the technical challenges in inherent in designing modem chips".  (*Id.*) ████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████ (Rpt. ¶ 409.)  Finally, Prof. Snyder defines efficiency or execution as "the ability to design and deliver modem chips that OEMs prefer over competitors' chips, whether because of their innovativeness, cost-effectiveness, or features".  (*Id*).  An example of the importance of the execution factor was ████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████ (Rpt. ¶ 388.)  And as noted above, these factors have been previously identified by countless others in the field and are therefore widely understood.  (*See supra* notes 4-7).

Despite all this, the FTC argues that the academic literature has not discussed the explanatory power of the three factors identified by Prof. Snyder *in the specific context of the*

*modem chip industry*. That is neither a requirement under the law nor a valid criticism of Prof. Snyder's methodology. *Daubert* does not limit expert testimony to analyses that have already been performed in full outside of the litigation; indeed, if that were the standard, none of the economic experts in the case (or, for that matter, in almost any case) could provide opinions to the Court. Just because the question may not have been studied before does not mean that an accepted methodology of general applicability is somehow inadequate or incapable of providing probative conclusions. Indeed, the application of valid, well-accepted methodologies to new problems is the very essence of helpful expert testimony. *See Apple, Inc. v. Samsung Elecs. Co., No*. 12-CV-00630-LHK, 2014 WL 794328, at *15 (N.D. Cal. Feb. 25, 2014) ("*Daubert* and its progeny explicitly contemplate the admission of expert opinions in new fields, as long as such opinions are rooted in a methodology generally accepted in the scientific field at issue." (citing *Daubert*, 509 U.S. at 594)). Here, Prof. Snyder applied accepted principles of industrial organization economics to identify the factors that explain outcomes in the modem chip industry. Those economic principles are well documented in the literature, as are the industry factors he identified. (*See supra* notes 4-7). His conclusion that those factors have explanatory power in this specific industry may not appear in prior publications, but *Daubert* does not require that an expert's *conclusions* already have been reached by *other* experts. Prof. Snyder's *methodology* is sound, and the FTC gives no reason to believe that fundamental industrial organization principles—applied in a variety of industries to assess firm success and failures—would not apply to the modem chip industry.

   *Second,* the FTC faults Prof. Snyder for not "applying a formula or weighting system to analyze" the industry factors or providing "metrics" or otherwise "quantifying the effect of the industry factors". (Mot. 7-8.) The FTC similarly faults Prof. Snyder for not conducting "any statistical tests" or advancing "a theoretical model" to explain "how observed marketplace outcomes fit the model". (Mot. 11.) This is a strawman argument. While Qualcomm, through other experts, has also offered a quantitative analysis rebutting Prof. Shapiro's opinions, a qualitative opinion of the sort provided by Prof. Snyder is clearly sufficient

1   to rebut the qualitative opinions of Prof. Shapiro—who, as mentioned above, has not offered *any*

2   quantitative or statistical analysis to show the existence or magnitude of any of the

3   anticompetitive effects he posits, let alone causally tying such hypothetical effects to

4   Qualcomm's conduct.  Prof. Shapiro's opinion is entirely reliant on the sort of analysis the FTC

5   condemns as "simply . . . a narrative summary of documents and deposition testimony".

6   (Mot. 10.)  Prof.Prof. Shapiro indeed admitted, for example, that he could not (1) "say

7   definitively which of these firms would not have exited if not for Qualcomm's conduct";

8   (2) "identif[y] any specific firms . . . that I can attribute the lack of entry to Qualcomm's

9   challenged conduct"; (3) identify how much more successful any chip maker would have been

10  but for Qualcomm's conduct; or (4) identify the magnitude of any decline in profits or R&D

11  investments by any competitor but for Qualcomm's conduct.[8]  (Byars Decl. Ex. C, 56:17-57:3;

12  58:12-18; 59:11-60:2; 197:10-13.)

13          Moreover, the FTC cites no law that requires quantitative analysis for admitting

14  an expert opinion; to the contrary, *Daubert* permits qualitative analysis of industry outcomes, so

15  long as it is based on a reliable methodology, which Prof. Snyder's analysis is.  *See Aloe Vera of*

16  *Am. Inc. v. United States,* No. CV-99-01794-PHX-JAT, 2014 WL 3072981, at *4-5 (D. Ariz.

17  July 7, 2014) (ruling that expert's qualitative consideration of macroeconomic factors that might

18  have contributed to plaintiff's decline in profits was sufficiently reliable under *Daubert*).  Indeed,

19  at least one court has accepted Prof. Snyder's qualitative expert opinions applying principles of

20  industrial organization to economic questions.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*,

21  Nos. M 07-1827 SI, C 10-1064 SI, 2013 WL 124347, at *1 (N.D. Cal. Jan. 8, 2013) (denying

22  motion to exclude testimony by Prof. Snyder when his report included the importance of

23  _____

24      [8] The only competitor Prof. Shapiro identifies as having been adversely effected by
    Qualcomm's conduct is Intel.  (Byars Decl. Ex. C, 57:10-58:18.)  Prof. Shapiro testified that, but

25  for Qualcomm's conduct, Intel might have started supplying Apple a year earlier than Intel did.
    As Prof. Snyder explains, however, Prof. Shapiro fails to grapple with evidence that ████████

26  ███████████████████████████████████████████████████████████████████

27                                        (Rpt. ¶¶ 545-54.)

28

innovation, product differentiation, and distribution channels for LCD products (report Dkt. No. 1178)).  Here, Prof. Snyder applied fundamental principles of industrial organization economics to identify key factors that influence industry conduct and outcomes.  Prof. Snyder then performed a thorough and probing assessment of the successes and failures of 14 modem chip suppliers to assess whether those factors explained the industry outcomes.  Prof. Snyder's methodology is more than sufficient under *Daubert*, and the Court should reject the FTC's attempt to graft a quantitative requirement onto Fed. R. Evid. 702.

*Third,* the FTC's related claim that Prof. Snyder applied no "testable" or "tested" methodology of assessing foresight, investment efficiency, and execution is likewise misplaced. (Mot. 8-9.)  This theory again seems to demand something akin to a quantification of each factor, but as noted above, such quantification is not needed under *Daubert*—or for the purposes of Prof. Snyder's opinions here.  Prof. Snyder does not rank individual modem chip suppliers on a scale on the basis of their foresight, investment efficiency or execution, so his methodology does not require him to "test" which suppliers perform a little better or a little worse on each of these factors.  Instead, based on his "analysis of the types of economic activity that occur in the industry" (Rpt. ¶ 22), Prof. Snyder identified these three factors as the key drivers of outcomes in the modem chip industry  (Rpt. ¶ 143).  He then tested the explanatory power of these industry factors by analyzing observed outcomes for 14 modem chip suppliers over the course of many years.  In that sense, Prof. Snyder's assessment of those factors against observable industry outcomes is thus entirely "testable" (and, indeed, "tested"), and is well tailored to rebut the qualitative assessments of Prof. Shapiro concerning the causes of the same observed outcomes. To the extent the FTC believes that Prof. Snyder ignored evidence relevant to these factors, the FTC is free to cross-examine Prof. Snyder on his conclusions, and thereby "test" them.

In the same vein, the FTC claims that Prof. Snyder's "technique of assessing execution" is "untested" and "untestable" because it has "no known error rate."  (Mot. 9.)  This is another strawman argument that strays from the *Daubert* standard.  As Prof. Snyder explained, "if you were to task 100 economists to assess execution in the modem chip industry", he would

QUALCOMM'S OPPOSITION TO FTC'S MOTION TO EXCLUDE
Case No. 17-cv-0220-LHK-NMC

expect the "economists . . . to recognize that execution's important and identify the instances where firms succeeded and when they did not, because that's objective" and that "it has explanatory power".[9]  (Byars Decl. Ex. B, 165:22-166:25.)  Further, Prof. Snyder testified that in considering execution, he identified the "particular set of expectations [that] have been made and set of expectations that [modem chip suppliers] have taken on" and observed whether suppliers met those expectations.  (Byars Decl. Ex. B, 164:16-165:1.)  In other words, Prof. Snyder identified specific instances where firms executed or failed to execute on specific milestones, targets or goals and assessed the explanatory power of such instances of execution on chip suppliers' successes or failures.  That methodology is testable, repeatable and thus reliable.

The FTC similarly misrepresents Prof. Snyder's deposition testimony regarding foresight and investment efficiency.  (Mot. 10.)  As to foresight, the FTC faults Dr. Snyder for "not analyz[ing] every strategic decision that each firm made" and focusing only on "big differences" among firm's investment efficiency.  (Mot. 9.)  But Dr. Snyder focused on the most impactful manifestations of the factors he examined, such as strategic decisions "that had the most influence on whether [modem chip suppliers] were able to sell particular phones to particular customers"—which, he testified, is empirical and "observable".  (Byars Decl. Ex. B, 102:25-103:6.)  The FTC points to no authority holding that *Daubert* requires Prof. Snyder to fully analyze every minute investment decision and every marginal change in investment efficiency for each and every modem chip supplier.  To the extent the FTC believes that Dr. Snyder ignored relevant decisions or other meaningful information, that is a subject for cross-examination, not a *Daubert* motion.

---

[9] An error rate is not necessarily required under *Daubert*.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999) ("[T]he test of reliability is 'flexible', and *Daubert*'s list of specific factors neither necessarily not exclusively applies to all experts or in every case.").  Nor would it be sensible to demand an "error rate" for a qualitative assessment of the type applied by industrial organization economists such as Prof. Snyder in these circumstances.

2.    <u>Prof. Snyder's Analyses of Modem Chip Suppliers are Reliable, Relevant and Helpful</u>

The FTC's argument that Prof. Snyder did not analyze whether Qualcomm's conduct affected its rivals' performance (Mot. § B) is legally and factually incorrect.  The FTC misstates the showing required to prove its claims, and conflates its own burden of proof with the reliability of an expert's methodology under *Daubert*.

The FTC alleges that Qualcomm violated Section 5 of the FTC Act, 15 USC §45, through conduct violative of Sections 1 and 2 of the Sherman Act.  To prove a violation of either Section 1 or Section 2 of the Sherman Act, the FTC is required to show causation:  that the conduct at issue caused harm to competition.  "[I]n a case under Section 1 of the Sherman Act" challenging allegedly exclusionary agreements, "the plaintiff must prove that the exclusive dealing arrangement actually foreclosed competition" in a "substantial share of the line of commerce affected".  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 & n.1 (9th Cir. 2010) (citations omitted)).  Likewise, under Section 2 of the Sherman Act, "to be condemned as exclusionary, a monopolist's act must have 'anticompetitive effect.' That is, it must harm the competitive *process . . .*"  *Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc)).  The FTC, as the plaintiff, "bears the burden of proving the anticompetitive effect of the monopolist's conduct".  *Id.*

The FTC's motion substantially understates its burden, and that infects its faulty analysis of Prof. Snyder's methodology.  By the FTC's reasoning, its economist, Prof. Shapiro, satisfies the FTC's burden by showing the "*likely* competitive effects" of Qualcomm's conduct and concluding that Qualcomm's conduct "*could* harm competition".  (Mot. at 13 (emphasis added).)  But the FTC then faults Prof. Snyder for analyzing the converse scenario—whether the outcomes alleged by the FTC to show anticompetitive effects *could* have occurred in the absence of Qualcomm's conduct.

1  That puts the burden on the wrong party.  As Prof. Shapiro acknowledged, "[a]ny

2  retrospective evaluation of the economic effects of a challenged business practice necessarily

3  requires" analyzing whether "the market outcome . . . would have arisen in the absence of the

4  challenged conduct".  (Shapiro Rebuttal Rpt. ¶ 399.)  That is the burden for the FTC and

5  Professor Shapiro to meet.  It is their burden to isolate observable outcomes such as firm exit or

6  reduced investment from the "consequence of a superior product, business acumen, or historical

7  accident".  *Rambus*, 522 F.3d at 463.  Prof. Snyder's analysis of Qualcomm's modem chip

8  competitors demonstrates all the reasons why the industry outcomes that the FTC and

9  Professor Shapiro claim are tied to Qualcomm's conduct could, and likely would, have occurred

10  even in the absence of that conduct.  Prof. Snyder's opinions are therefore powerful rebuttal

11  evidence severing the causal link between Qualcomm's conduct and outcomes like firm entry

12  and exit; put another way, they show the absence of causation of the alleged anticompetitive

13  harm, which the FTC must prove.

14  The FTC also argues that Prof. Snyder's opinions regarding the primary industry

15  factors—foresight, investment and execution—are "not helpful to the Court if those firm-level

16  factors are themselves influenced by Qualcomm's conduct".  (Mot. 14.)  As a threshold matter,

17  this argument ignores Prof. Snyder's testimony that there is "endogeneity of the firm factors";

18  meaning that he "identified the industry factors that [he] believed would not be influenced by the

19  conduct".  (Byars Decl. Ex. B, Tr. 43:9-11.)  But more fundamentally, the FTC's objection again

20  seeks to reverse the burden of proof.  It is not Prof. Snyder's burden to prove a negative—*i.e.*,

21  that Qualcomm's conduct had no effect on its rivals' performance—or to isolate Qualcomm's

22  challenged conduct from the effects of Qualcomm's superior product, business acumen or

23  historical accident.  Rather, Prof. Snyder's analysis of Qualcomm's rivals shows all the ways in

24  which *Prof. Shapiro* failed to meet the FTC's burden of establishing causation between the

25  challenged conduct and the industry outcomes he says that conduct caused.  The logical

26  implication of the FTC's argument is that to be admissible, Prof. Snyder's opinion would need to

27  definitively rule out any possibility that the FTC's allegations are correct.  *Daubert* does not

28

19

1    impose such a requirement.  Rather, Prof. Snyder's testimony serves the important function of

2    identifying major flaws in Prof. Shapiro's analysis.

3            The FTC's specific example of one of Prof. Snyder's factors illustrates its error.

4    The FTC claims, for example, that Prof. Snyder's opinion that "Firm A's failure to invest

5    efficiently led to its exit" is methodologically unsound "if Qualcomm's conduct diminished Firm

6    A's ability to invest efficiently".  (Mot. 14)  ████████████████████████████████████

7    █████████████████████████████████████████████████████████████████████████████████

8    ████████████  (*E.g.*, Snyder Rpt. ¶ 270.)  Prof. Snyder demonstrates that *Professor Shapiro's*

9    conclusion that Qualcomm hurt its rivals' ability to invest, which he reaches without controlling

10   for Intel's inefficiency, is unsound.  As Prof. Snyder testified, it is "important to not just

11   associate anticompetitive harms as alleged to the conduct", but to "pursue whether there are

12   alternative explanations" for "those outcomes".  (Byars Decl. Ex. B, Tr. 54:12-17.)

13           Thus, there is simply no basis to exclude Prof. Snyder's opinions, which go

14   directly to exposing the deficiencies in Prof. Shapiro's analysis.  Indeed, accepting the FTC's

15   argument would protect Prof. Shapiro from the very criticisms the FTC levels against

16   Prof. Snyder.  Professor Shapiro admits that he "cannot say definitively which of those firms

17   would not have exited if not for Qualcomm's conduct" (Byars Decl. Ex. C, 56:21-23); that

18   establishing a definitive causal link has "not really been the focus" of his analysis (*id.* 57:6-7);

19   that he cannot identify any case (other than Intel's allegedly delayed entry by one year due to

20   Qualcomm's agreements with Apple) for which he "can attribute the lack of entry to

21   Qualcomm's challenged conduct" (*id.* 58:8-18); has not "come up with a measure of the 'but for'

22   market share . . . or higher margins" in the counterfactual world (*id.* 59:22-24) or even

23   "quantified the effects of Qualcomm's conduct on handset prices" (*id.* Tr. 61:6-7) except to the

24   extent that "output effects would . . . tend to be very small, because the demand is so inelastic for

25   the modem chips" (*id.* 61:18-21).  Prof. Snyder's detailed analysis of modem chip firms and the

26   alternative explanations for their success and failure go to the heart of what the FTC and

27   Professor Shapiro fail to establish.

28

3.    <u>Prof. Snyder Brings His Economic Expertise to Bear and Does Not Simply Provide a Narrative.</u>

The FTC also contends that Prof. Snyder "lacks the relevant qualifications to assess modem chip supplier performance and instead summarizes factual evidence without providing any additional expert insight". (Mot. 10.)  This argument simply ignores Prof. Snyder's explanation of his analysis and his opinions.  The FTC here begins from the premise that "Prof. Snyder does not attempt to use the evidentiary record to assess an issue in which economists have expertise" (Mot. 10), but that premise is wrong.  As set forth above, Prof. Snyder began by analyzing "the types of *economic activity* that occur in the [modem chip] industry".  (Rpt. ¶ 22 (emphasis added).)  Using accepted principles of industrial organization economics, he identified three recognized factors that appeared to drive outcomes in the industry. He then reviewed the record evidence to assess the successes and failures of 14 industry participants and to test the explanatory power of the three factors he had identified on their performance.  Each of those steps required his expertise as an economist.  That is economic analysis based on Prof. Snyder's "expert insight."  Indeed, the FTC itself states that it would be proper expert testimony for Prof. Snyder to have assessed whether "a recognized model of firm behavior is consistent with observed marketplace outcomes".  (Mot. 10.)  That is very similar to what he actually did, which was to apply the well accepted theoretical principles of industrial organization economics to identify the main factors that an industrial organization economist would expect to affect outcomes in the relevant industry, and then assess whether the industry factors he identified can explain actual "observed marketplace outcomes".

For the same reason, the FTC's assertion that Prof. Snyder "is not an expert in cellular technology or the modem chip industry" (Mot. 10) is beside the point.  Prof. Snyder is unquestionably an expert in industrial organization economics, and industrial organization economists routinely study and analyze the structure and performance of industries using fundamental industrial organization principles.  And the FTC is wrong to say that Prof. Snyder "offers no opinion beyond the facts he summarizes".  (Mot. 11.)  His descriptions of modem chip

suppliers' successes and failures serve his ultimate opinion that those successes and failures can be explained by a set of factors that an industrial organization economist would expect to drive outcomes in light of the particular characteristics of the modem chip industry.  That opinion is firmly grounded in Prof. Snyder's considerable economic expertise and a well-accepted methodology.

B.    **Prof. Snyder's Expert Analysis of Industry Performance Satisfies _Daubert_.**

To test the FTC's claim that Qualcomm's conduct "excluded competitors, increased consumer prices, and suppressed innovation", Prof. Snyder also examined the long-run performance of the modem chip and mobile devices industries to determine whether there is evidence of impaired performance.  Analyzing "standard indicators such as price and quality", including industry-wide metrics of research and development spend, data speed improvements, mobile chip price trends and consumer surplus (Rpt. ¶ 22), Prof. Snyder concluded that "not only is there not an obvious impairment to competition, I think anybody would look at this and say it's excellent performance." (Byars Decl. Ex. B, 18:20-19:23.)  Because Prof. Snyder's analysis undermines one the FTC's key claims in this case—that Qualcomm's conduct harmed competition—it is relevant and helpful.

The FTC nevertheless contends again that Prof. Snyder's opinion should be excluded because of his supposed failure prove a negative—_i.e._, that the industry would not have performed _even better_ without the challenged conduct.  Besides again seeking inappropriately to shift the burden of proof, this argument misstates the significance of Prof. Snyder's testimony and the requirements under _Daubert_.  Prof. Snyder's analysis of long-run market performance provides evidence of a dynamic market that does not exhibit the characteristics that an industrial organization expert would expect to see in a market suffering from a decade-long, market-wide scheme of monopolization of the sort the FTC alleges Qualcomm has perpetuated.  Prof. Snyder's opinion therefore is highly probative and will assist the Court in assessing whether the alleged conduct has in fact stifled competition.  Prof. Snyder's supposed failure to disprove

1    completely the possibility that the industry could have been even more successful is certainly not

2    disqualifying; it is the FTC's burden to show that such further success would indeed have

3    occurred in the but-for world.  The FTC's expert, Prof. Shapiro, could have attempted to show

4    just that (but did not).  In any event, Prof. Snyder's opinion that the industry has performed

5    phenomenally well—far better than one would have expected if the FTC's allegations were

6    correct is probative, relevant, and easily meets the *Daubert* threshold.

7           For that reason, Prof. Snyder's acknowledgment that there's "a possibility that

8    industry performance without Qualcomm's conduct could have been yet more superior" is not

9    significant, let alone disqualifying.  As Prof. Snyder testified, "that's . . .  for [Prof. Shapiro] to

10   answer, or Plaintiff to make that argument".  (Byars Decl. Ex. B, 72:25-73:19.)  A simple

11   example exposes the flaw in the FTC's position.  A pharmaceutical company faced with a

12   product liability suit may wish to present evidence that its drug did not cause damage to the

13   plaintiff's red blood cells, as the lawsuit claims.  The company may hire an expert to examine the

14   plaintiff's red blood cells.  If the company's expert prepared a report opining that the plaintiff's

15   red blood cell count is within the norm and therefore does not exhibit the kind of injuries alleged

16   to be associated with the drug in question, that report would be probative in assessing the

17   plaintiff's claim that the drug caused him injury.  The plaintiff could not obtain exclusion of the

18   report by arguing that the company's expert failed to rule out the possibility that his red blood

19   cell count would have been even higher if he had not taken the drug.  That is an argument the

20   plaintiff may raise during cross-examination of the expert at trial.

21          The FTC nonetheless argues that there can be injury to competition in dynamic

22   and growing industries.  (Mot 15 n. 11 (discussing Prof. Shapiro's interpretation of *Standard Oil*

23   *Co. v. United States*, 221 U.S. 1 (1911) and *United States v. Microsoft Corp.*, 254 F.3d 34 (D.C.

24   Cir. 2001).)  That may be a ground on which the FTC may choose to cross-examine

25   Prof. Snyder, but it is not a basis for exclusion.  Prof. Snyder opines, based on his training, "if

26   *Plaintiff's Hypothesis* were correct, analysis of the modem chip industry should reveal clear

27   indications of impaired performance in terms of the ability of the industry to efficiently deliver

28

value to consumers" (Rpt. ¶ 28)  along measures such as "the pace of innovation, quality-adjusted prices, and overall benefits to consumers" (Rpt ¶ 476), and that therefore, in assessing the presence of anticompetitive effects, it is highly probative for a court to consider whether an industry is vibrant, innovative and expanding.  *See Ohio v. American Express Co.*, 138 S. Ct. 2274, 2289 (2018) (finding that plaintiffs failed to prove that defendant's business practices "stifled competition" because the industry "experienced expanding output and improved quality").  The FTC's argument also fails to grapple with Prof. Snyder's testimony that, based on his analysis of long-run performance, "not only is there not an obvious impairment to competition, I think anybody would look at this and say it's excellent performance".  (Byars Decl. Ex. B, 18:20-19:23; *see also* Rpt. ¶ 497 ("industry has performed incredibly well, delivering huge improvements in modem chips at the same time as prices continued to decline").)  That assessment undermines the FTC's claim that industry performance has been crippled by monopolistic conduct.  It is therefore relevant, helpful, and admissible.  The FTC's motion to exclude it should be denied.

## V.    CONCLUSION

For the reasons stated above, the Court should deny the FTC's motion (ECF no. 798 ) to exclude Prof. Snyder's expert testimony.


Dated: September 24, 2018                              Respectfully submitted,


*/s/Gary A. Bornstein*

Gary A. Bornstein
Yonatan Even
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Tel:  (212) 474-1000
Fax:  (212) 474-3700
gbornstein@cravath.com

yeven@cravath.com

Robert A. Van Nest
Eugene M. Paige
Justina K. Sessions
    KEKER, VAN NEST & PETERS LLP
        633 Battery Street
    San Francisco, CA 94111-1809
        Tel: (415) 676-2289
        Fax: (415) 397-7188
            rvannest@keker.com
            epaige@keker.com
            jsessions@keker.com

Richard S. Taffet
    MORGAN, LEWIS & BOCKIUS LLP
        101 Park Avenue
    New York, NY 10178-0060
        Tel: (212) 309-6000
        Fax: (212) 309-6001
                richard.taffet@morganlewis.com

Willard K. Tom
    MORGAN, LEWIS & BOCKIUS LLP
        1111 Pennsylvania Ave. NW
    Washington, DC 20004-2541
        Tel: (202) 739-3000
        Fax: (202) 739 3001
                willard.tom@morganlewis.com

Geoffrey T. Holtz
    MORGAN, LEWIS & BOCKIUS LLP
        One Market, Spear Street Tower
    San Francisco, CA 94105-1126
        Tel: (415) 442-1000
        Fax: (415) 442-1001
                geoffrey.holtz@morganlewis.com

*Attorneys for Qualcomm Incorporated*

QUALCOMM'S OPPOSITION TO FTC'S MOTION TO EXCLUDE
Case No. 17-cv-0220-LHK-NMC