# EXHIBIT B

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                    ---------------------
 4
 5   FEDERAL TRADE COMMISSION, )
 6             Plaintiff,      )
 7   vs.                       ) Case No.
 8   QUALCOMM, INCORPORATED,   ) 5:17-cv-0220-LHK-NMC
 9             Defendant.      )
10   -------------------------)
11
12                             Saturday, August 4, 2018
13
14                             825 Eighth Avenue
15                             New York, New York
16
17   The above-entitled matter came on for the deposition of
18   EDWARD SNYDER, pursuant to notice, at 9:10 a.m.
19
20
21
22
23
24
25
```

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1    trying to get at here, that it's really the second step

2    that, in my view.  Plaintiff's hypothesis should be

3    evaluated on, in addition to stating that there are

4    these particular anticompetitive harms, do they also

5    correspond to harm to competition and do they lead to

6    harm to competition.  And that -- again, that's a

7    relevant issue given the timeframe here.  This is this

8    -- this is a context where one can evaluate and take

9    that second step.

10        Q.  And what's the basis for your position that the

11    harm to competition issue is relevant for this

12    assignment?

13        A.  Separate from whether any individual claimed

14    case of harm to a competitor is anticompetitive or not,

15    my understanding as an economist is that one needs to

16    evaluate whether those harms actually end up harming

17    competition, accumulate to a point where there's an

18    impairment of overall competition.  So that's my

19    understanding.

20        Q.  Was there any other basis for your

21    understanding?

22        A.  Well, that understanding comes from, you know,

23    having worked at the antitrust division and been

24    involved in antitrust policy for a long time.  You

25    know, there -- there are many observations to make here

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

    1   in the course of competition, there are going to be
    2   winners and losers.  There's going to -- there's going
    3   to be firms that secure contracts and there are going
    4   to be firms that don't secure contracts.  One needs to,
    5   in my view as an economist, go beyond that observation
    6   or those kind of observations to get at whether those
    7   -- that winning and losing, securing contracts or not
    8   securing contracts actually leads to an effect on
    9   overall competition.
   10       Q.  Going back to that Section B of your statement
   11   in footnote 26.  How do you measure whether industry
   12   performance was impaired?
   13       A.  Well, that was one of the five major work
   14   streams that I did and that's reflected in the section
   15   on long-run industry performance.  So I evaluated
   16   things that would be indicators of impaired
   17   competition.  Those include price effects, output
   18   effects, innovation effects and investment effects, all
   19   with a focus on the long-run performance.
   20       Q.  And are these measurable metrics by which you
   21   analyze impairment to industry performance?
   22       A.  Well, one can identify metrics for industry
   23   performance, those are -- can be measured with varying
   24   degrees of accuracy, so that's empirical.  I think your
   25   question, however, went to how does one know whether

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    what you see is impaired or not, and that's -- I
2    appreciate a more difficult question.  What my analysis
3    does, clearly, is establish that there's no obvious or
4    clear basis for saying that industry performance in
5    this industry was impaired.
6            It's extraordinary.  So then the -- then the
7    question is, well could it have been yet better.  And I
8    appreciate that that is an argument that one could make
9    but what to me is relevant is that contrasts with a --
10   with the insight from an analysis of long-run
11   performance where there are indicators that the
12   industry is not performing well on any of those
13   dimensions that I identified earlier.  That would be a
14   different, different basis or different set of insights
15   from the long-run industry analysis.  In some cases,
16   long run put differently.  In some cases long-run
17   industry performance could -- you could evaluate it and
18   say, see here's a problem, there's something that
19   bothers -- should bother us in terms of investment or
20   innovation or price drenching or output.  I don't see
21   any of that here.  It still leaves --and this goes back
22   to your question -- that there's a possibility that
23   could have been yet more superior.
24   Q.  So for example, in paragraph 23 of your report,
25   you state that if your analyses indicate strong

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1   performance then the industry factors' hypothesis is
2   supported; is that correct?
3        A.  Yes.
4        Q.  So what do you mean by strong performance?
5        A.  Well, I'm just referring to my exhibits that
6   correspond to a section in my report, section five that
7   deal with output, globally handset chip-ments, the
8   number of CDM modem chip suppliers by year, indicators
9   of performance in terms of peak download data rates,
10  numbers of suppliers supporting various types of
11  technologies CDMA, WCDMA, LTE and then it continues in
12  section six, down link, up link speeds, average mobile
13  connection speeds, total traffic.  These -- these
14  indicators show that industry output has increased
15  quality of products, has increased in terms of what
16  they can do in terms of transmission speeds.  And then
17  the last slide in section six deals with average price
18  for modem chips by standard and prices are falling.
19       Q.  So is it fair to say that you're measuring
20  industry performance by these metrics that you just
21  mentioned, the number of CMA suppliers, the peak down
22  link data rates, the number of suppliers for the
23  various standards?  Basically all the metrics that are
24  represented in the exhibits to section five?
25       A.  Five and six.

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1        Q.  Five and six.

2        A.  And there may be some other things that I would

3   cite to in my report.  For example, the investments by

4   individual firms and you can total those up over time.

5   But correct, is the short answer.  The ones that you

6   just mentioned are central to that analysis.

7        Q.  And so is your position that if performance in

8   these categories is strong, then there was no harm?

9        A.  These categories, as I said earlier, the more

10  individual firm are indeed analyses I don't want to

11  leave completely behind.  But going to your question,

12  the way I think about this work stream is twofold:

13  Plaintiff's hypothesis is that there are -- that the

14  conduct causes anticompetitive harms.  What the

15  long-run performance does is allow an economist to say,

16  do those add up to bad performance overall.  And what I

17  view -- my conclusion is, the answer is nothing

18  obvious.  There's no obvious impairment of overall

19  competition.  So that's -- that's how I think about it.

20            It's also in some sense a check on the

21  Plaintiff's hypothesis.  Would you expect to see this

22  performance given the Plaintiff's claims.  I just

23  realized maybe these are two -- these two things are

24  the same.  But that's how I think about it.

25        Q.  So if -- if you conclude that there's no

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    obvious impairment of competition, does that lead you
2    to conclude that there was no competitive harm?
3        A.  Well, I think that's a fair -- that's a fair
4    question.  But not only is there not an obvious
5    impairment to competition, I think anybody would look
6    at this and say it's excellent performance and there
7    are other indicators, obviously, the success of Apple,
8    the amount of time we spend on our devices, et cetera,
9    the more connected that we are.  But it's not just
10   nothing obvious that's negative, it's anyone looking at
11   this industry would say this has been extraordinary and
12   there's no indication that there's been any slow down
13   in the movement to next generation technology, slow
14   down in releases within generation, there's no
15   indication of -- or claim as far as I'm aware of from
16   Professor Shapiro that 5G is being slowed down.  So it
17   goes beyond, I think, just no obvious impairment.  It
18   goes to very strong performance.  I think what I'm
19   trying to acknowledge though is, is this absolutely the
20   only way to rule out the Plaintiff's hypothesis, no.  I
21   think it's a legitimate point that if one acknowledges
22   that performance has been excellent, it still leaves
23   the potential for, well maybe it could have been yet
24   better.  I -- I think that's a fair point and Professor
25   Shapiro, I think, makes that point.  That's fine.  But

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    that's, again, forgive the -- forgive the long

2    answer -- that's different from saying I see something

3    that looks askew.  So I think -- I think there's a lot

4    of value in doing this but it's still, as I said,

5    leaves some room to say it could have been yet better.

6         Q.  And if your analysis of the industry show that

7    performance could have been even better what -- would

8    that change your conclusions?

9         A.  If there was an objective way to say here's how

10   it could have been better, 5G could have been earlier,

11   there could be even more value to ultimate consumers.

12   I'd want to look at that.  I don't have anything that

13   has been offered, to my knowledge, that would indicate

14   the nature of those "it could have been better claims,"

15   so I'd want to give myself the opportunity to evaluate

16   those things.

17        Q.  And if you found objective indicators that the

18   industry could have, in fact, been better, would you

19   conclude differently with respect to competitive harm?

20        MR. RYAN:  Objection to form.

21        A.  The way I would approach that would be to say

22   okay now there's some additional claims that in some

23   way industry performance could have been better.  I'd

24   want to evaluate those claims.  I'd also want to

25   connect them to the types of anticompetitive harms that

24

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    the Federal Trade Commission identified and that

2    Professor Shapiro identified and see if there's some

3    logical relationship between the two.  I acknowledge

4    that proving that increment or disapproving that

5    increment is difficult but I'd want to -- I'd want to

6    be careful to evaluate that claim before I reached any

7    conclusion.

8        Q.  So does that mean there could be a circumstance

9    where there was an objective indicator that the

10   industry performance could have been better and yet you

11   would still conclude that there was no competitive

12   harm?

13       A.  Well, I'd want to check it out.  I think the --

14   yes, if there's something that can be pointed to that

15   says here's where industry performance fell short, I

16   think it would be in support of the Plaintiff's

17   hypothesis.  I agree with that.

18           And that -- sorry for the -- I tend to give

19   long answers, feel free to cut me off.  But I think

20   that could be either in terms of well here's a

21   reduction, an output or here's a price increase that

22   indicates that increment.  Or it could have been prices

23   came down but they could have come down faster.  So I

24   would allow for both.

25           Now obviously, in this context, it's got to be

25

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    more of the second but I think your -- to be fair to

2    the testing, one has to acknowledge that this is a

3    check and for it to have any explanatory power it has

4    to be the case that there are some things that one can

5    find that leads you to say this does support the

6    Plaintiff's hypothesis.

7         Q.   In section -- excuse me, in paragraph 20 of

8    your report, you introduce the industry factor's

9    hypothesis and you state that according to the industry

10   factors' hypothesis, relevant industry factors explain

11   the structure of the industry at any point in time, the

12   relative success and failure of modem chip suppliers,

13   industry changes and observed entry and exit

14   decisions."  Do you see that?

15        A.   Yes.

16        Q.   And when you refer to relevant industry

17   factors, what specifically are you referring to?

18        A.   These are factors that come out of industrial

19   organization principals.  What I refer to when I get

20   into the industry section as neoclassical factors,

21   economies of scale or economies of scope, there's some

22   things that are, I think, more modern industrial

23   factors in this context that should be considered.  The

24   potential that suppliers who secure certain contracts,

25   get certification or reputational benefits from those

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1     contracts, what was referred to, I believe, by
2     Professor Shapiro and others as a halo effect, that's a
3     relevant industry factor.  Learning is a relevant
4     industry factor.  So when a firm has a contract and
5     they produce, they learn as they go.  Obviously, an
6     important industry factor concerns the transaction
7     costs associated with developing relevant information,
8     transferring relevant information and the -- and also
9     the transaction costs of making specific investments.
10    And those investments are made by both suppliers and
11    other industry participants, including OEMs.  So I
12    didn't give a complete list but it's -- these are
13    industry factors that come out of industrial
14    organization principals.  I became more knowledge -- as
15    I became more knowledgeable about the industry, I was
16    able to get additional insights.  For example,
17    concerning investment, which is a standard industry
18    factor and I can explain that if you want as well.
19         Q.  When you say as you became more knowledgeable
20    of the industry, are you referring to over the course
21    of your time working on this case?
22         A.  Correct.
23         Q.  Are the industry factors that you just
24    articulated encapsulated in the three factors that you
25    discuss in your report, the foresight, investment

Snyder

FTC v. Qualcomm, Inc.                              8/4/2018

1    efficiency and execution?

2       A.  That's a good question.  I wanted to do

3    something that could be distilled and tested.  These

4    factors, however, don't explain the industry overall,

5    so, for example, scale is an influence on industry

6    structure.  For example, the increase concentration at

7    the OEM level in premium mobile devices, that's another

8    factor that influences the structure of the industry.

9       Q.  Uh-huh.

10      A.  So I don't want to leave those kind of things

11   behind when understanding the industry.  That said,

12   when it comes time to test particular claims of the

13   anticompetitive harm concerning, for example, exit or

14   inability of a firm to win a particular contract, the

15   more distilled factors, foresight investment and

16   execution, are things that I can use to better

17   distinguish between the two hypotheses.

18      Q.  So if you're looking it at the overall effect

19   on the modem chip industry, how do you know what weight

20   to assign to that the firm level factors, the three

21   factors; foresight, investment and execution, versus

22   other factors?

23      A.  Well, that's a good question.  I think that if

24   I could put it in terms of the following to answer the

25   question:  There are some industry factors that are

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1     going to explain major trend.

2             We've got some noise in the background, I

3     apologize.  I'm trying to figure out what it is.

4             So, for example, I mentioned transaction costs

5     associated with specific investments and knowledge and

6     other kinds of specific investments.  As those grow,

7     you're going to tend to move in any industry, and this

8     is well-known from IO principals, you're going to tend

9     to move away from arms length kind of sales towards

10    contracting -- towards contracting in the context of

11    longer term relationships, doesn't mean they can't be

12    and but this is the -- the relational contracting view

13    to vertical integration and vertical integration has

14    some differences as well in terms of, well is it going

15    to be internal supply only, no sales outside no

16    purchases from others.  In this industry there are

17    industry dynamics that are leading firms and other

18    industry participants to organize more towards

19    long-term contracting and vertical integration with

20    especially in the context of high-end devices, both

21    high-end modem chips an high-end handsets.  So that

22    would be something that would inform the overall

23    pattern of what is the evolving industry structure, how

24    is it different between high end and low end?  I'll

25    pause there but I'm trying to give you an indication of

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    extent that the industry factors do explain the
2    outcomes then basic social science principals tells one
3    that the alternative hypothesis is not the source of
4    the explanation.  Doesn't cause the outcomes.
5        Q.  Does the statement that we just read in
6    paragraph 23 assume that the at-issue conduct doesn't
7    effect the firm level factors?
8        A.  Oh, I think I understand your question.  Are
9    there some -- is there endogeneity of the firm factors?
10   No, I identified the industry factors that I believed
11   would be not influenced by the conduct, and I can go
12   into more detail about that, but the importance of
13   investment, the importance of where to make those
14   investments, what specific investments to make in terms
15   of products and customer relationships, there are many
16   strategic forks in the road.  Those would -- all of
17   that would be present with or without the conduct.  I'm
18   giving an example.
19       Q.  Uh-huh.
20       A.  I am not giving the whole waterfront but I
21   think you're asking, am I then saying that the conduct
22   is going to influence the influential character of the
23   investment.  The short answer to that is no.
24       Q.  And what's the basis for your assumption?
25       A.  It's not an assumption.  My application of

Snyder

1    license other chip set suppliers?

2        A.   My recollection is that Professor Shapiro, when

3    he evaluate MediaTech, he focused on that.  So it's

4    very similar answer to what I gave before, that he

5    stated that that negatively effected MediaTech.  I can

6    check it if I were to find his report.  I might be able

7    to also look for reference to it in my report, if you

8    would like.

9        Q.   I guess what I'm asking is more towards your

10   methodology in approaching your assignment.  Did you

11   perform a test where you isolated just that portion of

12   the conduct at-issue, the refusal to license and looked

13   at the effects caused, if any, by that?

14       A.   No, I didn't do that because I didn't need to

15   for my analysis.  I took the anticompetitive harms that

16   Professor Shapiro claimed were the result of the

17   conduct as a whole.  In some cases he was, I think,

18   more specific in identifying which component of the

19   conduct was more relevant to that particular outcome,

20   but I -- my assignment was to then evaluate those cited

21   outcomes and I developed a weight as indicated to test

22   the validity of the claim that those were explained by

23   Plaintiff's conduct claims.  Of course, I also

24   evaluated a broader body of evidence, but with respect

25   to your question, I followed Professor Shapiro.  And it

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    wasn't necessary for my assignment to break it down.
2    To the extent that he did, you could probably draw some
3    more specific inferences, but that wasn't my assignment
4    and I'm not offering an opinion along the lines of
5    toggling particular conduct.
6        Q.  And why don't you think it was necessary to do
7    that for your assignment?
8        A.  Professor Shapiro and Plaintiff make claims
9    that the body of conduct, the set of three or four, I
10   can't remember how it was characterized in the
11   complaint, but three components led to anticompetitive
12   harms.  It's important to not just associate
13   anticompetitive harms as alleged to the conduct.  My
14   assignment, and I think it's critically important, is
15   to then pursue whether there are alternative
16   explanations for that conduct.  Excuse me, not for that
17   conduct, I meant to say those outcomes.  That's the
18   focus of what I did.
19       Q.  And when you were looking at the effects, if
20   any, of Qualcomm's conduct as a whole, you were looking
21   at the historical actual performance of the various
22   modem suppliers; is that correct?
23       A.  Could -- I might have misheard, I just want to
24   make sure I answer your question.  Could you repeat the
25   question, please?

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    establishes that the industry factors are explaining

2    outcomes.  Basic social science principals then, to me,

3    should be applied and say there's not anything to be

4    explained that's leftover could be caused by.  So that

5    conceptual exercise, to me, doesn't make sense.

6           At the more granular level, I look at the

7    implications of the two hypotheses and evaluate the

8    facts and that's another relevant test, long-run test.

9    But I think what you're asking is something else, which

10   is did I go through some exercise of turning the

11   conduct off, and conceptually Professor Shapiro did

12   that, but he didn't do what I did which was to then

13   evaluate the fact that the industry factors would still

14   be relevant.  So I did it as best as I could, given the

15   -- what Professor Shapiro had done, which was simply

16   associate conduct and outcome.

17       Q.  So you say that conceptually Professor Shapiro

18   turned the conduct off.  I'm just trying to understand

19   whether you did that, did you turn the conduct off?

20           MR. RYAN:  Objection.

21       A.  So Professor Shapiro turned the conduct off

22   conceptually but not in a way that is appropriate given

23   the need to preserve the industry factors.  So I did

24   what he did plus the second step which is, in my

25   opinion, required for a proper counterfactual.

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1        Q.  When you say you did what Professor Shapiro
2   did, are you saying that you looked at a scenario where
3   you turned off Qualcomm's conduct?
4        A.  Yes, by focusing on the explanatory power of
5   the industry factors without the -- with or without the
6   conduct.
7        Q.  But in your report, do you have a section that
8   illustrates what the outcome would have been in the
9   absence of Qualcomm's conduct?
10       A.  My opinion is that all of the cited
11  anticompetitive harms were not anticompetitive harms
12  and they would be the same with or without the conduct.
13  That's my overall conclusion.  I don't have any -- I
14  cannot identify any outcome cited by Professor Shapiro
15  that was caused by the conduct.
16       Q.  I think I understand what you're saying.  I
17  understand your conclusion that the outcomes would have
18  been the same with or without the conduct, right, is
19  that your conclusion?
20       A.  That is.  And I think your questions go to a
21  potential scenario that could have -- that I could have
22  encountered.  I could have encountered a situation
23  where, ah, I see an outcome, industry factors don't
24  explain it.  Therefore, I need to evaluate the
25  Plaintiff's hypothesis as the next logical step and

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1   then do the turning on and off that you just described.

2   So conceptually, I agree with you, if I had found

3   something like that that was not explained by the

4   industry factors' hypothesis, then at that conceptual

5   level I'd go and say well let's evaluate the

6   Plaintiff's hypothesis and do that toggling of the

7   conduct.  I didn't get to that step because in applying

8   the first step, I explained all of these outcomes that

9   were cited as anticompetitive harm.

10          MS. IKEDA:  Do you want to take a break?  Why

11   don't we take a five-minute.

12          MR. RYAN:  Yes.

13          THE WITNESS:  Great.  Thank you.

14          THE VIDEOGRAPHER:  The time is 11:27 a.m. and

15   we're going off the record.

16          (A recess was taken.)

17          THE VIDEOGRAPHER:  This begins media unit

18   number three.  The time is 11:46 a.m. and we are back

19   on record.

20      Q.  In our earlier discussion you -- you referenced

21   your findings on the explanatory power of industry

22   factors.  Did you do any empirical analysis to confirm

23   your findings on that?

24      A.  I have maybe a broader view of empirical

25   analysis.  Sometimes people mean statistical regression

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    but I think of empirical as just relating to facts, so
2    in my mind the answer is yes.  You asked questions
3    about are these observable outcomes, yes, they're
4    facts.  They're actual industry outcomes and I assess
5    them in section seven one by one in the context of my
6    critique of Professor Shapiro.
7        Q.  Did you analyze data from the various chip
8    suppliers to confirm your analyses?
9        A.  I did.  So for example, I think I provided the
10   most comprehensive data on investments and various ways
11   -- I shouldn't say in various ways.  Measured in
12   various ways.  I also conducted an empirical inquiry
13   into the number of chip suppliers and their
14   relationships to OEMs.  And again, I analyzed that in
15   different ways.  I'm putting aside the long-run
16   performance which you already asked me about, the time
17   series on various indicators of performance.
18       Q.  Did you conduct any statistical analyses?
19       A.  Only time series.  If you mean by statistical
20   test, no.  In fact, I shouldn't even put in the
21   qualification.  I'm presenting the information and I'm
22   checking it against a very basic hypothesis, do I see
23   impairment, for example, in the long-term context.  In
24   terms of the testing, a lot of the tests involve
25   particular events, which don't lend themselves to

Snyder

FTC v. Qualcomm, Inc.                          8/4/2018

1   statistical testing like an exit decision by Broadcom.

2       Q.   We talked earlier about your view that -- and

3   correct me if I'm wrong -- that Qualcomm's conduct

4   didn't effect the firm level factors.  This goes back

5   to the endogeneity of the firm level factors.  If that

6   were wrong, if -- in, in fact, Qualcomm's conduct did

7   effect the firm level factors, would that change your

8   analysis?

9            MR. RYAN:  Objection.

10      A.   I'm not aware of any claim by plaintiffs that

11  relate to that, that Qualcomm's conduct made investment

12  more or less important.  Increased the importance of

13  foresight, et cetera.  So it's hard for me to evaluate

14  that.  I don't think Professor Shapiro made that claim.

15  I don't recall anything in the complaint along those

16  lines.

17           Put differently, it was -- given industry

18  characteristics, given the industry in which this

19  conduct took place, the conduct caused particular

20  outcomes.  And I've identified what those are and so I

21  didn't have anything to go on in that front.  I would

22  be happy to analyze a claim that the conduct effected

23  industry characteristics but there are so many to say

24  -- this may go beyond what you wanted me to answer --

25  this industry analysis, to me, in compelling fashion,

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1   identifies factors that are going to be highly
2   influential.  This is one of the most challenging
3   investment environments I've ever seen, given the shift
4   from generation to generation, the convergence towards
5   a particular generation, the divergences.  The
6   potential directions that individual firms can go in
7   terms of getting to the next generation, the different
8   families that Professor Shapiro relates to the new
9   releases, the customization.  I don't see anyway on its
10  face that the conduct is going to change the degree of
11  difficulty on the investment front.  It's already
12  extremely challenging.
13          Similarly, with foresight, similarly with
14  execution, there are a lot of examples of both good and
15  bad execution in the industry given that range of
16  difference in execution ability, it's hard to see any
17  argument at all actually, there's, I think, more about
18  it that execution is going to go away.  Could it have
19  some effect?  I guess I haven't thought about it given
20  the lack of claim by Plaintiff or Professor Shapiro.
21     Q.  So separately from the question of whether
22  Qualcomm's conduct did effect these firm level factors,
23  I am asking, if it were the case that just take as a
24  give that Qualcomm's conduct did effect modem chip
25  suppliers, foresight, their investment decisions and

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1   their execution, how, if at all, would that change your
2   analysis?
3           MR. RYAN:   Objection.
4       A.   I don't have an opinion about that given I
5   haven't seen any evidence that would indicate the
6   nature of that relationship.  I don't want to repeat
7   the last question, but I'll refer back to it.  And I
8   haven't seen any claim by the Federal Trade Commission
9   or Professor Shapiro about that relationship or
10  potential relationship.  So I haven't thought about it
11  given I haven't seen it raised by plaintiff or
12  Professor Shapiro and given my assessment of the
13  industry I don't see how it would work how it would be
14  influenced.  I don't want to completely rule it out
15  because I haven't encountered an argument along those
16  lines.
17      Q.   You may have already answered this but to what
18  extent, if any, do you believe that Qualcomm's conduct
19  effected modem chip suppliers' low margins or exits?
20      A.   In each of the cases cited by Professor Shapiro
21  there's a non conduct explanation that is compelling.
22  And that's my conclusion.
23      Q.   So are you saying Qualcomm's conduct had no
24  effect on the rivals' outcomes?
25      A.   In the cases that Professor Shapiro cited where

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    he specifically cited low margins, I don't see any
2    effect of the conduct.  On what he claims are low
3    margins.  His analyses in the case of MediaTech, I
4    won't go through that again, there are obviously
5    examples of firms that have a lot of investment
6    resources, you know, turning them -- turning to them
7    where there's no apparent lack of investment resources.
8    You take Intel.  Huge investment resources, a
9    willingness to, for better or for worse, to try a lot
10   of different things.  Texas Instruments, big investment
11   capability but not particularly interested in the
12   software part.  So I don't see any, based on my
13   analysis, and in particular in the examples cited by
14   Professor Shapiro.
15       Q.  So there's no case in which you found that
16   Qualcomm's conduct had some effect but not enough to
17   make a difference?  Your conclusion is that there was
18   no effect from Qualcomm's conduct?
19       A.  Every outcome that I looked at was explained by
20   the industry factors, which would be present with or
21   without the at-issue conduct.  So that ends my
22   analysis.  As I said earlier, if I had found outcomes
23   that were not explained by the industry factors, I
24   would have gone to that next step.
25       Q.  So I understand your conclusion that the

73
Snyder
FTC v. Qualcomm, Inc.                                    8/4/2018

1    industry factors explain the outcomes.  I just want to
2    make sure that I understand your conclusion on the
3    impact of Qualcomm's conduct.  Is it -- if you were to
4    quantify it, is it zero percent attributable to
5    Qualcomm's conduct?
6         A.  In terms of reliable economic analysis, it's
7    zero.  There's no basis.  I didn't see it in Professor
8    Shapiro's reply report where he went beyond my
9    analysis, but that's really, I'd say for him to answer,
10   or Plaintiff to make that argument.  I'm not a lawyer
11   but I've presented my conclusion.  It got me to this
12   point where I see the industry factors as explaining
13   the outcomes.  If -- if Plaintiff or Professor Shapiro
14   wants to say, no, there's something left to be
15   explained, then I understand that.  I understand the
16   line of questioning but I'm trying to be clear on what
17   I did and why I didn't encounter or how I did not
18   encounter the kind of evidence that you're saying would
19   have prompted me to then take that next step.
20        Q.  And when you say the outcomes are explained by
21   the industry factors, does that -- are you just saying
22   that the outcomes are consistent with industry factors?
23        A.  No, it's stronger than that.  I think when you
24   identify execution problems by various firms, such as
25   ST-Ericsson or Broadcom, it's more than consistent

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1   with.  You cannot succeed in this business if you have
2   execution problems.  The other example I would say
3   would be Intel, that they they -- they chose to invest
4   in things such as WiMAX that did not account for --
5   well, I won't offer a judgment.  I'll just point out
6   instead that the success of those specific investments,
7   required investments by others, such as carriers.  That
8   didn't work-out.  So that's one of the issues with
9   Intel.  But going back to your question, is it just
10  saying it's consistent with.  No, it has real
11  explanatory power.  Because they focused on that,
12  because they approached their chip integration in a
13  particular way, that had consequences.  It could have
14  turned out well but it didn't and you can trace it back
15  directly to the choices that they made, which is
16  another way of capturing the influence of foresight and
17  investment.
18      Q.   Under what circumstances would you find that
19  Qualcomm's conduct did, in fact, cause rivals' low
20  margins exits?
21      A.   Yes.  So if there was a candidate supplier out
22  there who had done a good job in terms of investment,
23  and one could build that out a little bit more in terms
24  of, well, they engaged customers.  They were good at
25  getting feedback.  They were focused on investment --

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    excuse me, they focused investments in areas where
2    there was high likelihood of success, and to the extent
3    that they didn't they cut their losses quickly.
4    Essentially, made good decisions.  They exercised good
5    foresight, made good investments and developed the
6    capability to bring these to market.  They don't have
7    to be first.  They don't have to be on the leading edge
8    or the, sometimes it's called the bleeding edge.  But
9    if they had a strategy and they executed it, that may
10   have, as I indicated, different implications for what
11   margins they would get, depending on the strategy.  But
12   if they had -- if you found some firm that had done
13   these kinds of things and then say they exited despite
14   good foresight investment and execution, that would be
15   a candidate for saying looks like it's not industry
16   factors and then, exactly per your earlier questions,
17   then I would turn to what's the power of the
18   Plaintiff's hypothesis in explaining this outcome.  But
19   that's the kind of scenario where the industry factors'
20   hypothesis would fail.
21        Q.  Would they have to be good in all three
22   categories or two of the three?
23        A.  So the short answer is, yes.  You have to be
24   good in each because I think of this as starting with
25   investment.  That's how concept -- I mean, that's

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

```
 1    literally how I started the development of this
 2    hypothesis, it's an investment intensive industry.  I
 3    don't want to repeat myself about what makes this
 4    investment intensive industry so distinctive in terms
 5    of the character of the investment, the dimensions of
 6    investment, customization, particular performance
 7    features, overlapping generations, competing families,
 8    this is a -- this is a complex investment environment,
 9    industry environment, hence the foresight.  So, yeah,
10    definitely need investment.  You definitely need
11    foresight but the analysis of the industry also points
12    to if a major OEM or even a medium tier OEM is going
13    to, pardon me, entertain you as a supplier, you also
14    have to be good at execution.  It can't be just, well I
15    have enough of this to sell for some period of time but
16    I can't cover all of your needs.  I don't mean all of
17    your needs in terms of self-sourcing, but given, you
18    know, that they are documented costs of having lots of
19    different suppliers for the same socket.  In that
20    environment, all three are important.  And you cannot
21    say, well I don't want -- I don't need investment.  I
22    don't -- I don't have to have foresight.  I don't have
23    to have execution.  I do think you're right in saying
24    or asking the question, is it one out of three or two
25    out of three or three out of three.  The -- the record
```

85

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    the complexity, I thought, was striking.  So we now
2    have foresight and investment in place, in terms of the
3    development of the hypothesis.  And then the third was
4    execution and there's a lot of discussion about first
5    to market, there's also discussion around first mover
6    advantages.  Just to be clear, I'm not talking just
7    about that when I focus on execution.  It certainly
8    implicates those things but going to market, either
9    first or nearly first or even with a follower approach,
10   still requires execution and a couple of the important
11   components of execution are being able to deliver
12   sufficient quantities of a chip and another is quality.
13   So that ended up being important because, as I better
14   became aware of the -- the determinants of industry
15   success and individual firm success, it became clear
16   that execution was important from the point of view of
17   the OEM making the decision.  And exactly what
18   execution means, it depends, in part, it should be
19   answered by what does the OEM require.  So Samsung, for
20   example, they have different requirements for different
21   -- for given their broad range of products.  Apple's
22   product offerings are much more limited and much more
23   -- not much more -- clearly all high end products,
24   premium products.  So the OEM point of view has to be
25   taken into account in understanding execution.  A firm

86

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    may be able to execute for some products and not for
2    other products.  A firm may be able to execute for some
3    OEMs and not other OEMs.
4        Q.  So if I heard you correctly, did you come up
5    with this three-factor hypothesis specifically for this
6    case, as you were looking at the industry?
7        A.  Well, the industry analysis informed the
8    broader view of the industry that you had several
9    questions about it this morning in terms of what's
10   going to determine the, in the end, number of seats
11   that a particular OEM has available, or slots to be
12   more precise, and there are implications of the fact
13   that the investment efforts required are getting
14   greater in dollar value and they are there are also
15   implications that these investments have specific
16   components, meaning they're for specific products that
17   can be customized, et cetera.  So I don't want to leave
18   behind the other things that come out of the IO
19   analysis and my industry analysis, but I think I -- my
20   answers earlier in the day were intended to explain
21   that I took away from that analysis an understanding of
22   what to expect.  So would I be surprised that there's
23   greater concentration at the high end, no.  Would I be
24   surprised that over time we're seeing movement away
25   from what I described as more of the arms length to the

87

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    more vertical integration continuum, no.  But going to

2    your question, then when I went to test Professor

3    Shapiro's claims that various outcomes were

4    anticompetitive, I had the more firm level foresight

5    investment and execution as things that I would apply

6    to a particular cited outcome in terms of alleged

7    anticompetitive harm.

8         Q.  Have you applied these three firm level factors

9    to analyze outcomes in other cases?

10        A.  Certainly investment.  And I've been involved

11   in multiple high tech industries and, of course,

12   others, other experts have as well and I'm sure that

13   other experts have focused on the importance of

14   investment.  I've also understood the importance of

15   foresight in other contexts and identified that in

16   terms of choice of particular firm strategy.  When

17   firms, for example, in this -- in this age of mobility,

18   some firms understood that that was a big trend and

19   wanted to invest in that.  Others didn't have the same

20   judgment about mobility and didn't make investments

21   that reflected that judgment.  So I've seen this --

22   this role of judgment and strategy play a role in other

23   industries, including industries I've -- where I've

24   been engaged as a consultant.

25            I will say, however, going back to what I

Snyder

 1    testified just a few minutes ago, here I think the
 2    issue of judgment strategy, foresight, whatever you
 3    want to call it, is particularly important.  So whereas
 4    I've applied and paid attention to a framework that
 5    would include judgment and strategy, in this case, I
 6    single it out because it's so clear from the industry
 7    analysis that has to be accounted for.  If Intel wants
 8    to make a bet on WiMAX, that needs to be understood
 9    that that's different from making a bet on CDMA and so
10    on and so forth.  Carrier aggregation, et cetera.
11    Understanding and making investments informed by what
12    they understand to be the industry trends and where
13    they can be successful.
14        Q.  So is the modem chip industry unique in that
15    respect in how you applied these three factors?
16        A.  Well, certainly not investment, that's not
17    unique.  I think Professor Shapiro talks about -- I
18    shouldn't say I think, let me start that sentence
19    again.
20            Professor Shapiro cites investment in his
21    report.  I don't think it has the level of insight
22    about how complex the investments are.  He does,
23    however, recognize that there -- some of the
24    investments are specific in nature, so I think that's
25    clearly not specific to this industry.  With respect to

89

Snyder

FTC v. Qualcomm, Inc.                                     8/4/2018

1    foresight, as said, I've seen that play a role in other
2    industries and, in my view, what's different here is
3    not its relevance at a threshold level, but how
4    important it is in this environment with overlapping
5    generations of products, competing families,
6    divergence, uncertainty, increasing levels of
7    investment being required.  So to sum up investment,
8    that's not unique.  Foresight, no, but I think it's
9    much more pronounced here as a relevant factor.
10        Q.  And how about execution?
11        A.  That's another way of -- of really emphasizing
12   that execution is important taking into account factors
13   that come up all the time, quality and reliability.  So
14   those aren't novel.  I'm bundling that into the word
15   execution but lots of industries, quality is an issue,
16   Professor Shapiro himself has written famous paper, one
17   of my favorite papers, actually, on reputation and
18   quality.  So I -- I would say that that's a -- a single
19   word that covers factors that are relevant in a lot of
20   industries.  As I said, reliability, quality and
21   there's probably an ongoing dimension as well that
22   should be indicated which is being able to execute the
23   new releases and their specific upgrades within a
24   supplier OEM relationship.  So none of it's new, no.
25   None of it's unique.

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1       Q.   And are you aware of academic literature that
2   supports the idea that these three factors determine a
3   firm's success or failure in the modem chip industry?
4       A.   In the academic literature, I don't think the
5   academic literature has gotten to this.  Certainly a
6   lot of the citations to other commentary would reflect
7   the importance of these factors.  I'm not aware of any
8   academic literature that is focused on the modem chip
9   industry.  It's a poor reflection on academic
10  economists but...
11      Q.   Are you aware of any work conducted by your
12  peers where they've taken the same approach of applying
13  these three factors to assess firm outcomes in the
14  modem chip industry?
15      A.   When you say my peers, you mean the other
16  experts here?
17      Q.   No, sorry.  Other economists in your field.
18      A.   So you're asking about have other economists
19  applied these three factors to any industry or this
20  industry?
21      Q.   In the modem industry.
22      A.   I'm not aware one way or another.
23      Q.   And foresight, is that an economic term of art?
24      A.   Well, as I said, I think it encompasses firm
25  strategy so that's obviously a term of art.  But I

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

 1    think in the context of a dynamic industry, strategy

 2    has to take into account uncertainty and how an

 3    industry will change.  So I think of it as derivative

 4    from strategy but just emphasizing strategy in the

 5    context of a dynamic environment.

 6        Q.  And how does foresight differ from strategy?

 7        A.  Well, I'm old enough to remember talking to so

 8    many different executives, many of whom have been

 9    successful or not successful in the -- in high tech

10    industries and other industries, but it used to be that

11    sometimes you would hear senior executives talk about

12    runway.  And runway is the idea that well, I can find a

13    strategy and if it's successful then I will have some

14    runway ahead and it'll be smooth and continuous and I

15    can proceed on that path.  This is the opposite of

16    runway and I think, again, a lot of high tech

17    industries feature uncertainty.  This one features an

18    extraordinarily high degree of uncertainty.  So going

19    back to your question, I would say the following:

20    Strategy is important, when it comes to high tech

21    industries, strategy is likely to implicate making

22    adjustments.  And especially in this industry, given

23    the uncertain nature of investments and the competing

24    paths convergence, divergence it has to be recognized

25    that strategy has -- is framed in the context of a

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    dynamic environment.

2        Q.  So I think I understand now what strategy

3    refers to.  You referred earlier to foresight as a

4    derivative of strategy.  I'm just trying to understand

5    the distinction between the two terms.

6        A.  Yes.  So I'm trying to frame strategy in this

7    -- in a way that's general in the sense of strategy but

8    also suited to this industry which is high tech,

9    innovation's important and dynamic and most important

10   that, for me, is why -- in terms of why I use the term

11   foresight, there are a lot of strategic decisions again

12   and again, many different forks in the road as to how

13   firms execute -- I shouldn't use that term here --

14   fashion their investment decisions and allocate

15   resources to R&D.

16       Q.  So what strategic decisions are not

17   attributable to foresight?

18       A.   Well, strategy would indi -- could indicate

19   sort of a domain for investments but not resolve

20   exactly what to do.  So you look at a company like

21   MediaTech, their strategy was never to be at the

22   leading edge but instead to focus on lower end and over

23   time move up the hierarchy.  So that takes strategy.

24   Infineon had a strategy.  Texas Instruments had a

25   strategy.  They have particular attributes.  As I

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1    mentioned earlier, Texas Instruments is not -- they

2    don't view their strategic focus as being on software.

3    So that is -- that tells you a lot about their

4    strategic focus, what they're likely to do in terms of

5    products that they want to develop, but then there's

6    still investment decisions that require particular

7    judgments about where to invest give that overall

8    strategy and overall focus.

9        Q.  And that's where foresight comes into play?

10       A.  Yes.  It's -- it, you know, it's related to

11   investment.  It captures, of course, the need to

12   generally focus but also continually adjust and make

13   decisions about where to invest.

14       Q.  Is there a widely accepted definition of

15   foresight in your field?

16       A.  As I said, I'm -- I'm identifying that as a way

17   to emphasize the importance of strategic decisions.

18   And people don't like that, they could substitute some

19   alternative, but nobody who's really studied this

20   industry would fail to understand the importance of

21   foresight and you take examples that are clear.  Intel

22   saying I'm going to disrupt the industry with WiMAX.

23   That's their judgment based on some foresight.

24       Q.  So your report talks a lot about foresight, I

25   just wanted to make sure when we use the term we're --

94

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1    we have the same understanding.  I just want -- so my
2    question is directed toward that.  Can you point to
3    academic literature that defines the term "foresight?"
4         A.  I gave you my best answer about this obviously
5    follows from strategy.  It's tailored to this context
6    based on the industry analysis that I did.  If -- I
7    don't know what else to say.  You could -- obviously,
8    there's a vast literature on strategy and that
9    literature often times deals with decisions about
10   product development, where to invest, what customer
11   relationships to focus on, particular product
12   attributes.  So this ties into a vast literature on
13   strategic decision making by business.
14        Q.  So there's literature on strategy but not
15   necessarily for the specific prong dealing with
16   foresight; is that correct?
17        A.  No.  It's just -- this is -- people can argue
18   about whether I picked the best word but I think it,
19   based on the industry analysis, it's an apt way to
20   emphasize the dynamic aspects of strategy in this
21   context and the importance of making decisions about
22   investments that take into account where the industry
23   is going and where the firm is likely to be successful
24   with its strategy.  It's not more complicated than
25   that.

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

 1      Q.  Are there widely accepted metrics for assessing
 2  foresight?
 3      A.   Well, yes.  I mean, you know, we have courses,
 4  I think Professor Shapiro has taught courses on
 5  strategy, and voluminous amount of cases on company
 6  strategies.  There's the Strategic Management Journal.
 7  There's Harvard Business Review, Sloan Management
 8  Review.  There are all kinds of sources of information
 9  and evaluation and investment of firm strategies in
10  different contexts.  So lots of different academic and
11  more business oriented literature deals with strategy.
12      Q.  How do you assess foresight?
13      A.  It's essentially how you assess the outcomes of
14  strategic decisions in a dynamic environment.  I
15  mentioned the analogy to placing bets, and I said that
16  provides some information and insight, but it's more
17  complicated than that.
18      Q.  So is it --
19      A.  Do you --
20      Q.  -- sorry.
21      A.  Do you engage with OEMs the way MediaTech did
22  with their reference designs?  That's an aspect of
23  strategy.  That's something that you can see that they
24  did.  You can see by contrast Intel's WiMAX strategy.
25  These are -- these are observable things and you can

96

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    determine whether they were successful or not based on,
2    in part, whether they, in the case of MediaTech, led
3    them to be more successful over time, to be a fast
4    learner and gain experience, or in the case of Intel
5    and WiMAX where they had to drop it.
6         Q.  So does assessing foresight entail looking at
7    what a firm's plan was and then comparing that to what
8    actually happened later?
9         A.  Yes.  And -- and there is an -- an expectation
10   that not everything a firm will do is right but it's
11   important for an analysis of strategy to understand the
12   likelihood of success, the need for plan A and plan B
13   and timeliness in evaluating whether a particular
14   strategic initiatives are continued or not.
15        Q.  In paragraph 143 of your report you introduce
16   the factors that effect supply of modem chips, it's
17   basically introducing the three factors that we've been
18   talking about; foresight, investment and execution.
19             With respect to foresight, "You say these
20   factors are described in more detail below, but in
21   short, they reflect one.  The foresight or good fortune
22   to have invested in technologies and standards that are
23   demanded by network carriers and OEMs."  Do you see
24   that?
25        A.  I do.

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1    deposition of Ms. Evans, which is on C2 about seven --
2    yes, it's the seventh entry.  Vice president of
3    communications and devices at Intel.
4         Q.  Well, I understand that you relied on all of
5    these materials, right, in the appendix?
6         A.  Well I'm explaining Intel and if you compare,
7    for example, Project Mountain and what they're saying
8    substantively, you recognize that there's a strategic
9    shift.  That's my point.  So the third one from the
10   bottom Ms. Ketty, general manager of Next Generation
11   Standards at Intel, they're laying out -- again, I
12   don't want to shorthand it too much -- but they're
13   laying out a different set of strategic objectives.
14   They're not talking about WiMAX, they are talking about
15   becoming much more mainstream and positioning
16   themselves effectively in terms of CDMA and LTE.
17        Q.  Did you analyze strategic investments that were
18   not made in your analysis of the foresight?
19        A.  I did.  So a good example again is -- is
20   Infineon.  Another is STE-Ericsson.  Another is
21   Freescale.  My recollection is that Professor Shapiro
22   only analyzed one of those, but that's another
23   important set of insights about exactly your point,
24   investments not made.
25        Q.  And how do you know that you were able to

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    consider every single strategic decision for each firm?

2           MR. RYAN:   Objection.

3       A.   I couldn't analyze everything.  I focused on

4    the ones that had the most influence on whether they

5    were able to sell particular products to particular

6    customers.  And those things are observable.

7       Q.   I want to talk about an example, just to make

8    sure I understand your analysis of foresight.  So

9    you're aware of instances where Qualcomm invested money

10   in certain custom projects for Apple and later it

11   turned out that Apple cancelled those projects and

12   modem chips that under development weren't

13   commercialized.  Are you aware of those instances?

14      A.   I'm not sure that I can recall a specific

15   instance that matches that description.  I am aware of

16   Qualcomm making investments in some points in their

17   firm history where they didn't work out, but if there's

18   something in particular you want me to focus on.

19      Q.   Okay.  Just for an illustrative example.  So

20   let's say we have this instance where Qualcomm invests

21   in a project for Apple and Apple ultimately decides not

22   to go with that project, cancels the project.  Would

23   that be an example of bad foresight on the part of

24   Qualcomm or is it good foresight but bad luck or

25   something else?

157

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    marketplace and they ended that investment and

2    continued with their other investments.

3         Q.  So is the UMB example an example of a bad

4    investment on Qualcomm's part?

5         A.  No.  I wouldn't say that.  It had a low

6    efficiency realized but at any point in time you have

7    to recognize that a firm might try to do two things,

8    and given the convergence and divergence, kind of that

9    -- actually let me restate.

10            Given the forces that lead to convergence and

11   divergence in this kind of setting, making just one

12   investment need not be the case.  That isn't

13   necessarily the prudent approach.  So what's -- to me

14   what's important is that their other investments did

15   work and they didn't continue with this investment, if

16   you will, they cut their losses.  So this fits into an

17   overall pattern of efficient investment, in my opinion,

18   just like with MediaTech, if you analyze their -- the

19   full set of things that they did, they made mostly good

20   choices.

21        Q.  Was it a significant factor to you that

22   Qualcomm didn't just invest in UMB, it was also

23   investing in other technologies?  Is that what makes it

24   not a bad investment?

25        A.  Yes, I think that's fair.  And I'm not

158

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1   advocating that all firms should invest in all things,

2   but this -- this particular UMB technology, and I could

3   go to my report to get more information, is something

4   that they were hoping for but they also realized wasn't

5   necessarily going to be the path that others were going

6   to be on.  So I think in that context it made sense to

7   do not just the UMB, and as your question indicates,

8   that was -- that made sense.

9        Q.  How is this different from, for example,

10  Broadcom investing in both WiMAX and LTE, which I think

11  you characterized as a poor investment; is that right?

12       A.  I don't think we -- that your questions have

13  dealt well Broadcom before but...

14       Q.  Sorry, I'm referring to your report, in your

15  report -- right?

16       A.  Oh, okay.

17       Q.  You talk about the Broadcom investment in

18  WiMAX.  Paragraph 508, a good reference point.

19       A.  So you're at paragraph 508?  The main section

20  on Broadcom starts with paragraph 401 on page 265, so I

21  was going there but...

22       MR. RYAN:  Paragraph 508 refers back to that

23  when it talks about Section 5C8, that's referring back

24  to there.

25       A.  Yes.  And this is -- this is part of my

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1   rebuttal to Professor Shapiro.  And I may have lost the
2   core of your question.
3        Q.  So I'm just trying to understand the
4   distinction between Qualcomm's investment in UMB, which
5   you say is not an example of a bad investment, and
6   Broadcom's investment in WiMAX, which I believe you do
7   say is a bad investment, correct?
8        A.  Let me just be clear.  Of course, Qualcomm
9   would like to have that money back, but there is a
10  difference between ex-post and at the time.  So I am
11  making a case that at the time Qualcomm's decision
12  making was prudent and importantly they were timely in
13  deciding the effort.  In the case of Broadcom, it fits
14  into a much bigger pattern of lack of foresight
15  investment and efficiency, that's in the section
16  starting on page 265 and 401.  So if I could put this
17  into a broader perspective it might be helpful, but I
18  don't to prolong the answer.  As I said, Broadcom made
19  a lot of mistakes in terms of slowness to 3G.  WiMAX I
20  think you could say well, it's -- it wasn't a big deal
21  but I think in context it was a big deal for Broadcom.
22       If I could just add one more thing:  If
23  Broadcom had said we're going to try WiMAX but we're
24  also going to prudently invest in LTE, that would be a
25  different scenario but they didn't do that.

160

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1       Q.   Isn't that what you say they did with Beceem
2   when they acquired Beceem?
3       A.   But internally with their own investment
4   resources.
5            MS. IKEDA:   B-E-C-E-E-M.
6       Q.   I don't understand that distinction when you
7   say internally they didn't?
8       A.   Well, Broadcom, as I recall, was not well
9   diversified in terms of their customer base.  They --
10  they had Nokia and Samsung.  When they made the
11  investment in WiMAX -- this could be checked further by
12  the record, my recollection is that they did not focus
13  enough attention on 4G and LTE.  They did make the
14  acquisition but I think the section starting on page
15  265 finishes up with an extensive analysis of -- or not
16  finishes up but it includes an extensive analysis of
17  all of these issues.
18      Q.   So just so I understand the Broadcom, your
19  analysis of the Broadcom WiMAX investment decision,
20  your understanding is that Broadcom acquired Beceem in
21  October of 2010, correct?
22      A.   I'm trying to find the reference to that
23  acquisition.
24           MR. RYAN:   You might want to look at paragraph
25  405 which talks about this.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Snyder

FTC v. Qualcomm, Inc.                                        8/4/2018

1       A.  Yes.  So it's the sentence, the second full

2   sentence on page 270.  So the Beceem acquisition didn't

3   get them to that capability.  They purchased when they

4   assess Mobil in 2013.

5       Q.  And in paragraph 508 the last sentence you say,

6   "This failure was potentially related to Broadcom's

7   decision not to re-task Beceem to focus on LTE until

8   2011, having allowed it to split its expertise between

9   WiMAX and LTE prior to that," correct?

10      A.  Yes.  And in the next paragraph I refer to the

11  testimony by Apple executives that Broadcom had

12  failures in terms of the understanding of -- of

13  increased data through put, carrier aggregation and the

14  conclusion that Apple reached, according to the record,

15  and now I'm on top of 336, was that even when they got

16  to LTE -- Broadcom's, quote, Broadcom's LTE modem chips

17  were inferior to other options.

18      Q.  Sure.  But I am trying to understand the

19  distinction between Broadcom splitting its resources

20  between WiMAX and LTE and Qualcomm splitting its

21  resources between UMB and other technologies.

22      A.  Sure.  It's simply a case of if you're doing a

23  lot of things well like Qualcomm, you can -- you can

24  make an investment that doesn't work out, you cut your

25  losses.  As I said, I don't think it was bad judgment

162

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    on their part, and I'm not an expert on UMB, but I
2    believe that they had a reason for that.  But in the
3    case of Broadcom they're making mistake after mistake
4    after mistake, which I document in that section on
5    Broadcom.  And if you make a lot of mistakes, the kind
6    of mistake of investing in WiMAX is more consequential
7    for the overall performance of the firm.  So the lesson
8    is, and I think it's a good question, how do you
9    analyze this -- these kinds of mistakes.  The answer is
10   by having done the systematic analyses of who these
11   firms were and the series of decisions that they made,
12   I'm better able to assess any one decision.
13       Q.  So it's not necessarily that these two specific
14   investment decisions are that different, it's -- it's
15   the surrounding circumstances that you're looking at to
16   make your assessment of investment efficiency?
17       MR. RYAN:  Objection to form.
18       A.  The overall assessment of whether a firm is
19   exhibiting good foresight in terms of the strategic
20   decisions, investment and execution, doesn't depend on
21   any one decision.  And a firm can make a mistake or, ex
22   post, wish it had a particular chunk of money back.
23   But the application of those industry factors, over the
24   course of a firm's history, allows you to identify
25   whether it's one mistake or a series of one too many.

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    Broadcom, I don't want to pin their lack of success
2    only on this, but I do agree that you have to put this
3    in context, and Broadcom made mistake after mistake
4    after mistake.
5          MS. IKEDA:  Let's take a five-minute break.
6          THE VIDEOGRAPHER:  The time is 4:30 p.m. and we
7    are going off the record.
8          (A recess was taken.)
9          THE VIDEOGRAPHER:  This begins media unit
10   number five.  The time is 4:57 p.m. and we are back on
11   record.
12        Q.  Dr. Snyder, we talked a little built about
13   execution as one of the factors that you analyzed.  How
14   do you assess execution?
15        A.  Well, in any one context do you assess it based
16   on the ability of a supplier to develop and supply on a
17   timely basis in volumes at -- and high quality are the
18   elements of execution.  Pardon me.  And then I also
19   evaluate execution across firms and over time to
20   understand the importance of execution.
21        Q.  So is it fair to say that execution is a
22   function of timeliness and quality over time?
23        A.  It's at the -- I'm focusing on having made the
24   investment and being able to design the product.  Then
25   the issue is, can you -- the firm, can the firm ramp up

Snyder
FTC v. Qualcomm, Inc.                                    8/4/2018

1    production on a timely basis to meet OEM needs taking
2    into -- taking into account quality.
3        Q.  Are there quantifiable metrics that you use to
4    assess execution?
5        A.  Yes.  In terms of observable successes and
6    failures.  Quantifiable in terms of a -- a dial, no.
7        Q.  Couldn't you, for example, look at time to
8    market or, you know, the timeliness of supply?
9        A.  Those are things that are going to effect this
10   overall execution.  I have the -- the chart that
11   summarize the cross-sectional factors.
12       Q.  Hm-mm.
13       A.  And I also have the individual analyses where I
14   identified execution issues and some firms have limited
15   identifiable execution problems others have repeated.
16       Q.  Is there an accepted methodology for assessing
17   execution?
18       MR. RYAN:  Objection to form.
19       A.  I'm not sure what the term methodology adds.
20   You can observe whether a firm is able to execute based
21   on whatever particular set of expectations have been
22   made and the set of expectations that they have taken
23   on.  It's identifiable.  I will be able to supply these
24   chips with this quality and in this volume.  So it's
25   identifiable.  It doesn't take a methodology to figure

Snyder

FTC v. Qualcomm, Inc.                                        8/4/2018

1    out if somebody met that.

2        Q.   So would you say that all economists in your

3    field would apply the -- the same factors in assessing

4    execution?

5        A.   That's a -- that's a good question.   I think

6    that anyone studying this industry would recognize that

7    it's an important success factor.   Whether they would

8    evaluate it using that name, I don't know.   But, you

9    know, the whole analysis of supply chains has been, you

10   know, that there's numerous assessment of how firms

11   organize their supply chains and whether they do it

12   well and how they do it and in what circumstances there

13   are successes or failures.   There are also changes over

14   time.   Walmart's a good example.   But there's been a

15   huge amount of analysis of supply chains, so everyone

16   recognizes that it's an important topic and it's an

17   important element of success.   Exactly how you analyze

18   it is going to depend on the industry circumstances,

19   but it -- here I've done it over time and across firms.

20   And I focused on situations where it's a yes, they've

21   have had problems or no, they haven't.

22       Q.   And if you were to task 100 economists to

23   assess execution in the modem chip industry, would they

24   look at the same observable factors that you did to

25   determine execution?

Snyder

FTC v. Qualcomm, Inc.                                        8/4/2018

1              MR. RYAN:  Objection to form.
2         A.  I don't know if you had 100 economists whether
3    they would analyze execution in the same way or not.
4    What I would hope 100 economists would do would be to
5    recognize that execution's important and identify the
6    instances where firms succeeded and when they did not,
7    because that's objective.  And hopefully an economist
8    would recognize when associating outcomes to conduct or
9    alternative factors, that an economist would realize
10   that execution is one of those alternative factors that
11   influence success.  So I think in sum, they should look
12   at, they should realize it's important, it has
13   explanatory power.  The precise way that it's measured
14   or assessed, that, I would agree, could vary across
15   economists who take on that task.  I think I may -- I'm
16   the only one who's done it in this case, so it's a
17   little, you know, I don't have a reference to point to
18   because I've done it and as far as I can tell, no one
19   else has.
20        Q.  And when you speak about identifying successes
21   and failures, how do you determine whether an event is
22   a successor or a failure?
23        A.  You go objectively to the record and see if a
24   firm has executed, and then you can also check on
25   implications as reflected in objective data on future

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1    sales and individual supplier OEM relationships.  So a

2    firm that has had problems with execution is going to

3    lose business according to the industry factors

4    hypothesis, and that's what's observed in these

5    analyses of individual firm performance.

6        Q.  I guess, how do you assess whether a firm is

7    successful or not in terms of execution by looking at

8    whether they have problems in execution?  I don't quite

9    follow.

10       A.  Well, you know, the -- you know, not to belabor

11   the point, I mean, this really goes back to Professor

12   Shapiro.  He did not consider any alternative

13   explanations.  He's just toggling the conduct.  That's

14   clearly incorrect.  You have to realize that industry

15   factors are relevant and assess whether they are

16   alternative means of explaining the observed outcomes

17   that he has cited.  So I've taken on that burden, and

18   I've done the more complete assessment of the total

19   evidence than, of course, he has and I've documented

20   time series and cross section and I can give you

21   particular examples and counter examples that validate

22   the relevance of these factors.  There's nothing really

23   more to say about my approach to testing.  I've done

24   it, he hasn't.  I've done it in a coherent way, drawing

25   on industry -- industrial organization factors and

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    drawing on the industry analysis.  I understand the
2    questions, you're -- you're -- I understand the drift
3    of the questions, but what I'm trying to say is, I've
4    done this work, I've really applied the IO principals
5    in a systematic way.  One can pick and say well, do I
6    really measure these things correctly.  You have to
7    realize, this is in the context of Professor Shapiro
8    not doing his job.  So I know you've been asking these
9    questions a lot and I just wanted to explain.  I think
10   this is important to frame it in terms of the counter
11   factual analysis has to take these factors into
12   account.  Professor Shapiro didn't take them into
13   account.  I understand that someone might say well, I
14   don't understand why investment is important here.  We
15   can't measure return on investment precisely.  That
16   doesn't undo the need to take investment into account.
17   Nor the role of strategy and foresight and execution.
18   So, I -- I understand the overall picture.  I don't
19   have a whole lot more to say about this topic.  I
20   understand the desire for a precise methodologies that
21   others might want to seek, but when you really
22   understand this industry as I do, it's clear to me that
23   these are important factors and they have explanatory
24   power.  The events are discreet.  The events are based
25   on -- or put in the context of individual firm

Snyder

FTC v. Qualcomm, Inc.                                         8/4/2018

1    performance over time, and they're put in the context

2    of cross-sectional analysis.

3          Q.  And with respect to Qualcomm, my understanding

4    is that you conclude that Qualcomm had good execution,

5    correct?

6          A.  Yes.  For the most part.  The standard here

7    isn't perfection.

8          Q.  Uh-huh.

9          A.  Your question earlier about the UMB I thought

10   was appropriate and, as I said, ex post probably wish

11   they -- they probably hadn't done that or not probably

12   for sure.  But how firms have been able to organize

13   their investments and foresee where those investments

14   should be made, as well as execute on the supply of

15   chips, those differ a great deal across the firms.  I

16   think that's undeniable.  And Qualcomm has done very

17   well on those.  Other firms have done very well in

18   those.  And then there are differences within time

19   period as to how well firms have done.  So it's not a

20   yes or no forever.  The fact that Qualcomm has done a

21   good job up till now doesn't guarantee success.  The

22   fact that Intel had its problems doesn't mean that

23   they're out of it, especially given their resources.

24   And now a seat at the Apple table.

25         Q.  Is a shipment delay of one day something you

Snyder

FTC v. Qualcomm, Inc.                                8/4/2018

 1   would consider to be an execution failure?
 2        A.   Well, if there are people in Hong Kong waiting
 3   for the Apple iPhone, one day is important.  It depends
 4   on the context.  Certainly one day is not as big a deal
 5   as some of the other examples that I've documented
 6   where one of the chips suppliers says, well it's --
 7   it's going to happen in four months and two months from
 8   now rather than being closer, you're actually further
 9   away.  So, there are certainly degrees of -- of
10   problems on the execution front.
11        Q.   And so how do you -- where do you draw that
12   line as to what is problematic?
13        A.   Well, you need to take it into account first of
14   all.  That's undeniable.  I mean, if -- again, if you
15   know the industry you have to take it into account.
16   And then I think you focus on the record and understand
17   the fact that in some context as your question
18   indicates, there are going to be execution errors that
19   are more forgivable versus others that are not as
20   forgivable.  And that's why this is important to look
21   at in terms of the overall time series and
22   cross-sectional to understand the importance.  No one's
23   perfect.  It's a very challenging environment, but
24   certainly when you have multiple serious execution
25   problems, that's going to have consequences, that's

171

Snyder

FTC v. Qualcomm, Inc.                                     8/4/2018

1    testable, that's observable in the record.

2         Q.  And how -- how would you determine whether an

3    execution error is forgivable or not forgivable?

4         A.  You evaluate the context of it, its severity

5    and its consequences.

6         Q.  And would you agree that Qualcomm has had

7    execution errors?

8         A.  I would have to go back and review.  They have

9    had few compared to other firms such as Freescale,

10   Nokia, Infineon, Broadcom, et cetera, so it's clear

11   that in terms of major differences, Qualcomm has been

12   much stronger.  I would say the same is true for

13   MediaTech despite the problem that you asked me about

14   earlier.  They've had -- they had an identifiable

15   problem, but no one would mistake Qualcomm and

16   MediaTech on the execution front versus the other ones

17   I cited.

18        Q.  And do you recall the few examples of execution

19   errors that Qualcomm has had?

20        A.  Oh, you want to focus on Qualcomm?  Nothing

21   particular comes to mind, but I can check my report on

22   that.  Overall they've been strong on execution.

23        Q.  In assessing Qualcomm's overall execution, did

24   you consider evidence that Qualcomm made errors in its

25   demands forecasts?

172

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1          MR. RYAN:  Objection to form.

2     A.  I -- I was actually trying to answer your

3     previous question --

4     Q.  Oh, sorry.

5     A.  -- but -- but you want to move onto errors in

6     forecasts?  I'm sure there are errors in forecasts.

7     Q.  And did you consider that?

8     A.  There are always errors in forecasts in an

9     industry.

10    Q.  Okay.  And you considered that in your

11    forecasts of Qualcomm's execution?

12    A.  I would not put that in the category of

13    execution error, no.  So I didn't evaluate that in

14    terms of execution error.

15    Q.  Why wouldn't you include that as an execution

16    error?

17    A.  The expectations about volume are things that

18    industry participants develop, but whether you execute

19    or not and the degree of the failure depends on what

20    the OEM is expecting you to do at any point in time.

21    Q.  And if the error in the demand forecast

22    resulted in a supply shortage to an OEM, would you

23    count that as an execution error?

24    A.  Well, now it's at least getting to the what I

25    would focus on as a potential execution error.  But if

197

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

```
 1    C E R T I F I C A T I O N   O F   R E P O R T E R
 2    DOCKET/FILE NUMBER: 5:17-cv-0220-LHK-NMC
 3    CASE TITLE:  FTC vs. QUALCOMM, INCORPORATED
 4    DEPOSITION DATE:  August 4, 2018
 5
 6         I HEREBY CERTIFY that the transcript contained
 7    herein is a full and accurate transcript of the notes
 8    taken by me at the hearing on the above cause before
 9    the FEDERAL TRADE COMMISSION to the best of my
10    knowledge and belief.
11
12                        DATED:  8/4/18
13
14
15                        s/Stefanie Krut
16                        STEFANIE KRUT
17
18
19
20
21
22
23
24
25
```