Jennifer Milici, D.C. Bar No. 987096
J. Alexander Ansaldo, Va. Bar No. 75870
Joseph R. Baker, D.C. Bar No. 490802
Geoffrey M. Green, D.C. Bar No. 428392
Rajesh S. James, N.Y. Bar No. 4209367
Philip J. Kehl, D.C. Bar No. 1010284
Daniel Matheson, D.C. Bar No. 502490
Kenneth H. Merber, D.C. Bar No. 985703
Aaron Ross, D.C. Bar No. 1026902
Mark J. Woodward, D.C. Bar. No. 479537
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3695; (202) 326-3496 (fax)
*jmilici@ftc.gov*

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>　　　　　　Plaintiff<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware Corporation,<br>　　　　　　Defendant. | Case No. 5:17-cv-00220-LHK-NMC<br><br>**FEDERAL TRADE COMMISSION'S REPLY IN SUPPORT OF PARTIAL SUMMARY JUDGMENT ON QUALCOMM'S STANDARD ESSENTIAL PATENT LICENSING COMMITMENTS**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:　　　　October 18, 2018<br>Time:　　　　1:30 p.m.<br>Courtroom:　8, 4th Floor<br>Judge:　　　Hon. Lucy H. Koh<br><br>Trial Date:　　January 4, 2019 |

**Table of Contents**

I. INTRODUCTION .................................................................................................1

II. ARGUMENT .........................................................................................................2

    A. Modem chips are designed to support cellular standards and fall within the scope of Qualcomm's licensing commitments. ......................................................2

        1. There is no factual dispute as to the function of the modem chip. ...........3

        2. The ATIS IPR Policy's requirement that licenses be available "for the purpose of implementing the standard" plainly extends to applicants that supply modem chips to enable standard-compliant cellular communications. ........................................................................5

        3. The TIA IPR Policy requires that licenses be available for applicants "for the practice of any or all of the Normative portions" of the standard. ...............................................................................................7

        4. Qualcomm's interpretation would lead to absurd results. ........................8

    B. Parol evidence does not create ambiguity as to the meaning of Qualcomm's FRAND commitments .........................................................................9

        1. Undisputed evidence shows that chip-level licensing is common in the industry .................................................................................................10

        2. The other SSOs' IPR policies Qualcomm cites do not create any ambiguity in the policies of TIA or ATIS ................................................14

III. CONCLUSION ....................................................................................................15

**Table of Authorities**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 1141 (N.D. Cal. 2012) ................................. 3

*Apple, Inc. v. Samsung Elecs. Co.*, 877 F. Supp. 2d 838 (N.D. Cal.),
    *rev'd on other grounds,* 695 F.3d 1370 (Fed. Cir. 2012) .......................................................... 3

*Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866 (9th Cir. 1979) ......................... 10, 13

*Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015) .................................................. 9

*Microsoft Corp. v. Motorola, Inc.*, No. 10-cv-1823,
    2012 WL 4827743 (W.D. Wash. Oct. 10, 2012) ...................................................................... 9

*Oliver v. Men's Wearhouse*, No. 16-cv-01100, 2017 WL 6888490 (C.D. Cal. Dec. 6, 2017) ....... 8

*Pacific Gas & Electric Co. v. G.W. Thoma Drayage Co.*, 69 Cal.2d 33 (1968) .......................... 13

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996), *cert. denied,* 522 U.S. 808 (1997) .................. 3

*Supervalu, Inc. v. Wexford Underwriting Managers, Inc.*, 175 Cal. App. 4th 64,
    96 Cal. Rptr. 3d 316 (2009) ................................................................................................... 10

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    No. 14-341, 2017 WL 6611635 (C.D. Cal. 21, 2017) .............................................................. 9

*Webster v. Klassen*, 109 Cal. App. 2d 583 (1952) ............................................................ 10, 11, 13

**Statutes**

Cal. Civ. Code § 1643 ..................................................................................................................... 8

**References**

All references to "Mot. Ex. __" are to the exhibits attached to the Aug. 30, 2018 Declaration of Jennifer Milici in Support of the FTC's Motion for Partial Summary Judgment. (ECF No. 792-1.)

All references to "Opp. Ex. __" are to the exhibits attached to Qualcomm's Request for Judicial Notice (ECF No. 871) or to the Declaration of Geoffrey Holtz in Support of Defendant Qualcomm's Opposition to Motion for Partial Summary Judgment (ECF No. 870-1).

All references to "Reply Ex. __" are to the exhibits attached to the accompanying Declaration of Jennifer Milici in Support of the FTC's Reply in Support of Partial Summary Judgment.

## I.   INTRODUCTION

Qualcomm does not dispute any material facts relating to its relevant licensing commitments for standard essential patents ("SEPs"). Qualcomm agrees that it has committed to make licenses available to companies for the purpose of implementing ATIS and TIA standards; that it is not entitled to withhold a license from an applicant simply because that applicant competes with Qualcomm; and that modem chips "facilitate" and "support" the implementation of relevant standards, including by fully practicing the claims of Qualcomm SEPs. (Opp. at 16, 17.) All that remains is a purely legal question: whether modem chips, whose function is not disputed, fall within the scope of Qualcomm's licensing commitments. The clear language of those commitments provides that they do.

Qualcomm tries to manufacture a factual dispute by presenting detailed evidence about how cellular standards are articulated and arguing that the operation of modem chips is not fully spelled out in these standards. (Opp. at 5-7, 15-16.) But this cannot obscure that there is no dispute about the function of a modem chip: It is a core handset component supporting the implementation of cellular standards. The parties' only dispute is legal, namely, how to construe the language of the ATIS and TIA intellectual propriety rights ("IPR") policies. And this language is plain. It extends FRAND commitments to firms seeking a license "*for the purpose* of implementing" ATIS standards or "for the practice of any or all . . . *portions*" of TIA standards. Neither IPR policy requires that an applicant's product be expressly referenced in the standard or supply all standardized functionality on its own. It is thus of no consequence that a modem chip cannot by itself achieve full compliance with cellular standards. (Opp. at 16.)

Of more consequence is Qualcomm's admission that its modem-chip competitors infringe its FRAND-encumbered SEPs, coupled with its position that nothing in the ATIS or TIA IPR policies prevents Qualcomm from asserting these SEPs against competitors. Were Qualcomm's interpretation accepted, Qualcomm could seek to use its SEPs to drive competitors from the market—an absurd result contrary to a core purpose of Qualcomm's FRAND commitments.

Qualcomm also cannot inject any ambiguity into the ATIS and TIA contracts through parol evidence concerning purported "industry practice." As a matter of California law, parol

evidence of industry practice can introduce ambiguity into contractual language only when that practice is certain and uniform. The evidence on which Qualcomm relies does not meet this test. To the contrary, undisputed evidence establishes that there is no widely known, uniform practice of refusing to grant licenses to make and sell modem chips. Over 100 companies, including major SEP holders, have licensed Qualcomm itself to make and sell modem chips. Given Qualcomm's market position, this means that major SEP holders have licensed a substantial portion of relevant modem chips sold. Indeed, when Qualcomm wanted a modem-chip license from Ericsson, Qualcomm sought to enforce *the FTC's interpretation* of the TIA policy in litigation (on summary judgment), and obtained that license via settlement.

Nor do Qualcomm's arguments regarding other SSOs preclude partial summary judgment. The ANSI decision that Qualcomm cites explains that ANSI's standard IPR Policy language requires granting licenses for activities "within the field of use of the standard." This is precisely the FTC's position here—a product designed to provide standard-compliant cellular functionality is within the field of use of the standard, whether it provides all of the functionality or only a portion of it. And the ETSI IPR Policy is a separate contract that cannot modify the terms of the ATIS and TIA contracts.

## II.   ARGUMENT

### A.   Modem chips are designed to support cellular standards and fall within the scope of Qualcomm's licensing commitments.

Qualcomm's licensing commitments expressly require it to make SEP licenses available to applicants "for the purpose of implementing the standard" (ATIS) or that "practice any or all of the Normative portions of the [Standard]" (TIA). There is no dispute that modem chips are based on ATIS and TIA standards and "facilitate" implementation of those standards in cellular handsets. (Opp. at 16.) Chips with these properties are plainly supplied "for the purpose of implementing the standard" and practice at least "portions" of it, and therefore modem-chip suppliers are within the scope of Qualcomm's licensing commitments as a matter of law.

### *1.      There is no factual dispute as to the function of the modem chip.*

The parties agree that the modem chip performs many, but not all, of the functions necessary "to utilize cellular communications."[1] Qualcomm makes much of the fact that the modem chip must be incorporated into a handset before it can engage in cellular communications, but it never disputes that the modem chip is a critical component of such communications. (Opp. at 16 ("a modem chip may *facilitate* compliance with a standard"); Opp. at 7 ("modem chip[s] . . . play a role in communications between [User Equipment] and Infrastructure"); Opp. at 17 (modem chips "*support* the implementation of a standard").) Nor does Qualcomm dispute that the modem chip is the only handset component that implements certain SEPs (*compare* Mot. at 5, *with* Opp. at 17), patents that by definition are required for compliance with the standard. It necessarily follows that modem chips provide at least some of the functionality required by the standard. (Mot. at 5.)

Qualcomm criticizes "the FTC's reliance on the testimony of a single individual" (Opp. at 16) and claims it was taken out of context, but the cited testimony is entirely consistent with the testimony of other Qualcomm witnesses and Qualcomm's own characterizations of modem chips in numerous contexts.[2] For example, Qualcomm's co-founder, Dr. Irwin Jacobs, when asked where various "foundational" technologies relating to the WCDMA standard were "implemented," testified that many were implemented in Qualcomm's modem chips and accompanying software.[3]

---

[1] Mot. Ex. 7 (Deposition of Keith Kressin, Tr. 11:17–12:4, Feb. 7, 2008).

[2] As a general rule, new evidence presented in reply should not be considered without giving the non-movant an opportunity to respond. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996), *cert. denied,* 522 U.S. 808 (1997).  However, evidence is not "new" if it is "appropriately responsive to arguments and evidence raised . . . in . . . opposition papers," particularly where the evidence consists of the non-moving party's "own documents." *Apple, Inc. v. Samsung Elecs. Co.*, 877 F. Supp. 2d 838, 857 (N.D. Cal.), *rev'd on other grounds,* 695 F.3d 1370 (Fed. Cir. 2012). The evidence presented here responds to Qualcomm's surprising argument that modem chips do not implement or practice cellular standards. *Cf. Apple, Inc. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 1141, 1149 (N.D. Cal. 2012) (observing that "there [was] no dispute that the accused Apple products use[d] chips that practice the 3GPP standard").

[3] Reply Ex. 1 (Deposition of Irwin Jacobs, Tr. 391–401, Mar. 26, 2018).

And a simple glance at Qualcomm's own website confirms that modem chips are designed to implement cellular standards. Qualcomm states that its "Gigabit LTE and 5G cellular modems are designed to empower tomorrow's smartest devices with fast, efficient and reliable connections to the world's mobile networks."[4] The product comparison page highlights the "LTE Category" each modem supports, and each individual modem's webpage lists the "Supported Cellular Technologies" by standard (*e.g.*, LTE, UMTS, CDMA).[5]

Even Qualcomm's Annual Report states that the company's modem chips are "based on" cellular standards, and are designed "for the LTE standard" and "to support . . . existing 3G technologies."[6] And in court filings, Qualcomm has explained that it is "the world's leading supplier of the wireless communications ("baseband") chips that are *the heart of a cellphone*."[7] These statements confirm that the FTC's motion did not take testimony out of context; whatever portions of a standard may be implemented by other components, modem chips are "based on" cellular standards and "designed" to achieve standard-compliant cellular communications.

Qualcomm's own contracts within "the context of cellular SEP licensing" (Opp. at 17) confirm that modem chips (a type of application specific integrated circuit or "ASIC") "implement" cellular standards, or portions of them. ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[4] Reply Ex. 2 (Qualcomm, "Cellular Modems,"). As Qualcomm notes, the court may take judicial notice of easily verifiable information from web pages, especially where the FTC seeks only to rely on Qualcomm's own statements.

[5] Reply Ex. 3 (Qualcomm, "Product Finder"); *e.g.*, Reply Ex. 4 (Qualcomm, "Snapdragon X16 LTE Modem").

[6] Reply Ex. 5 (Excerpts of Qualcomm Annual Report for the Year Ended Sept. 25, 2016), at 10. Although not critical to the decision here, it is notable that modem chips can be certified for compliance with cellular standards, contrary to Qualcomm's assertions. (Opp. at 7.) The Global Certification Forum ("GCF") tests for compliance with cellular standards, including at the component level. *See* Reply Ex. 6 (GCF, "Certifiable Technologies") (identifying relevant standards as within GCF's certification regime)) and Reply Ex. 7 (GCF, "Certified Platforms," (identifying "chipsets" as certified products)).

[7] Reply Ex. 8 (Excerpts of Brief of Amicus Curiae Qualcomm Inc. in Support of Affirmance on RAND Issues, *Ericsson, Inc. v. D-Link Sys., Inc.*, No. 2013-1625 (Fed. Cir. Feb. 27, 2014) (emphasis added)).



Thus, despite Qualcomm's criticisms, it is clear that the FTC's motion did not rely on facts or testimony taken out of context, and that there is no genuine dispute that the function of a modem chip is to support the implementation of cellular standards.

### 2. The ATIS IPR Policy's requirement that licenses be available "for the purpose of implementing the standard" plainly extends to applicants that supply modem chips to enable standard-compliant cellular communications.

With no dispute over the function of a modem chip, the only dispute is a legal one: the construction of the contracts formed by Qualcomm's FRAND commitments under the terms of the ATIS and TIA IPR policies. The relevant ATIS language is plain. Qualcomm's commitments under the ATIS IPR Policy expressly require it to license applicants "for the purpose of



implementing the standard."[12] That language clearly applies to applicants that wish to design products based on the standard for the purpose of providing functions specified by the standard, even if those products do not perform every standardized function. Qualcomm argues the policy requires only making licenses available for products that are expressly referenced in the standard, which it equates with "implementing" the standard. (Opp. at 15-16.)[13] This argument ignores the phrase "*for the purpose of* implementing" as contained in the ATIS IPR Policy. The core function of a modem chip is to put cellular standards into operation when combined with other components.[14] Implementing cellular standards is the purpose that modem chips are "designed to" accomplish, and modem chips are "based on" these standards.[15] Modem chips serve no purpose at all if they fail to implement cellular standards.

Qualcomm argues that the FTC's interpretation reads the phrase "for the purpose of implementing" the standard out of its commitment. (Opp. at 18.) That is not true. The limitation ensures that a patent holder that commits to license its SEPs for the purpose of implementing one standard need not license those patents for the purpose of implementing other products. For example, a patent holder's commitment to make SEP licenses available for purposes of implementing an LTE standard does not require it to license LTE SEPs for use in CDMA-only products.[16] This is an important limitation. But the language in no way dictates that every aspect of the standard must be fully implemented in a single product before the licensing commitment

---

[12] Mot. Ex. 2 (Q2017MDL1_00024028, Operating Procedures for ATIS Forums and Committees § 10.4.1, at 10, Mar. 1, 2015).

[13] In some places, Qualcomm appears to suggest that a product only falls within the scope of its licensing commitment if "by itself, [it] practices (or implements) all of the functionality required to comply with the standard." (Opp. at 17.) If that were the standard, no applicant or product would fall within the scope of the licensing commitment, because there is no single product that implements all of the functions described in the standard—a handset does not implement cell tower functions, and vice versa.

[14] See supra § II.A.1.

[15] See supra § II.A.1.

[16] ██████████████████████████████████████████████████████████████

applies. Nor does it require that the product be expressly referenced in the standard—only that the applicant's purpose for the license is to implement the standard.

### 3. The TIA IPR Policy requires that licenses be available for applicants "for the practice of any or all of the Normative portions" of the standard.

As with ATIS, the relevant TIA contractual language is plain and may be construed as a matter of law. Qualcomm's commitments under the TIA IPR Policy require it to make licenses available to applicants desiring to obtain such licenses for the purpose of practicing "***any or all*** of the Normative ***portions*** of the [Standard] for the field of use of practice of the Standard."[17] By its express terms, this means that applicants seeking a license for the purpose of practicing "any . . . portion[]" of the relevant standard are entitled to a license.

Qualcomm argues for an interpretation that limits its license commitments to products that are expressly described in the standards, which it equates with the word "practice" in the TIA IPR Policy. (Opp. at 15-17.) But this ignores the contradictory language under which Qualcomm promised to license applicants that wished to practice "any or all . . . ***portions***" of the standard. Qualcomm's entire argument is based on the specific phrasing of the TIA IPR Policy from 2001 to March 2005, when the Policy required licenses for "applicants only and to the extent necessary for the practice of the TIA Publication."[18] Before 2001, Qualcomm submitted declarations that it would "make a patent license available to any qualified applicant upon reasonable terms and conditions that are demonstrably free of any unfair discrimination," without further qualification.[19] After 2005, it submitted numerous additional declarations that it

---

[17] Mot. Ex. 47 (QNDCAL01532503, TIA Engineering Manual, 4th Ed., Annex H, at 88, Mar. 2005 (emphasis added)). The term "Normative," refers to mandatory, optional, and alternate specifications within a TIA Standard. (Mot. 13.) This is distinct from "informative" text that explains the standard without imposing any requirements on standard-compliant products. *See, e.g.*, Mot. Ex. 47 (QNDCAL01532503, TIA Engineering Manual, 4th Ed., at 55, Mar. 2005).

[18] Mot. Ex. 39 (Q2017MDL1_01473574, TIA Engineering Manual, 3d Ed., Annex H at 87, July 1, 2002).

[19] Mot. Ex. 37 (Q2017MDL1_00013628, Letter from Louis Lupin (SVP, Proprietary Rights Counsel, Qualcomm Inc.) to TIA regarding IS-95A, Sept. 17, 1998). In addition, from 1993 to 2001, the TIA IPR Policy required licensing applicants "for the purpose of implementing" TIA Standards, just as the ATIS IPR Policy does now. *See* Mot. Ex. 32 (Q2017MDL1_0143111, at -112), TIA Advisory Note #11 re TIA Intellectual Property Rights Policy, May 18, 1993). That language had the same meaning in that version of the TIA IPR Policy, as described above in

would license all applicants "to the extent necessary for the practice of any or all . . . portions" of TIA Standards.[20] Accepting Qualcomm's position would require believing that TIA materially changed the IPR Policy in 2005, which Qualcomm concedes did not occur. (Opp. at 5 (2005 modifications were "modest[]" and not "relevant here")). But even if that strained position were accepted, summary judgment would still be appropriate with respect to Qualcomm's commitments under the 1993-2001 versions of the policy, and with respect to commitments under the current (post-2005) version of the policy.

As with the ATIS IPR Policy, the FTC's interpretation does not read any language out of the TIA IPR Policy. The limitation that licenses must be granted only for "the field of use of practice of the Standard" ensures that Qualcomm need not license patents essential to practicing the relevant standard (*i.e.* CDMA standards) to applicants that wish to implement *other* standards, but it does not limit Qualcomm's obligation to make licenses available to competitors that sell modem chips that support "any or all . . . *portions*" of the TIA standards.[21]

### 4. Qualcomm's interpretation would lead to absurd results.

Qualcomm's interpretation of its FRAND commitments would lead to absurd results in markets for modem chips. Cal. Civ. Code § 1643 ("A contract must receive such an interpretation as will make it . . . reasonable."); *Oliver v. Men's Wearhouse*, No. 16-cv-01100, 2017 WL 6888490, at *2 (C.D. Cal. Dec. 6, 2017) (explaining the purpose of § 1643 includes "to eliminate interpretations that are extraordinary or absurd") (citation omitted). Qualcomm does not dispute that it holds SEPs that modem chips infringe. (Opp. at 17.) If Qualcomm's FRAND commitments did not require it to make licenses available to competitors, they would not prevent Qualcomm from suing its competitors, seeking to enjoin their manufacture of standard-compliant modem chips and thus completely entrench the Qualcomm monopoly. This would be contrary to a core purpose of the TIA and ATIS FRAND commitments—to prevent monopolies—and

---

connection with ATIS.
[20] See Mot. at note 48 (listing example commitments).
[21] For example, a commitment to make licenses available for the purpose of practicing CDMA2000 standards would not require Qualcomm to license an LTE-only product.

8
REPLY IN SUPPORT OF FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 17-cv-00220-LHK-NMC

contrary to the non-discrimination prong of the commitments, which provides that competitors cannot be singled out for unfavorable treatment.[22] As the TIA IPR Policy Guide states: "[r]equiring reasonable and non-discriminatory (RAND) licenses to all applicants prevents the inclusion of patented technology from resulting in a patent holder securing a monopoly in any market as a result of the standardization process."[23] Qualcomm itself has recognized this principle. When Ericsson alleged that Qualcomm infringed its cellular SEPs, Qualcomm moved for summary judgment to require Ericsson to grant Qualcomm a license on FRAND terms. Qualcomm stated that the TIA IPR Policy "ensures that all industry participants will be able to develop, manufacture and sell products compliant with the relevant standard without incurring the risk that patent holders will be able to shut down those operations."[24] But Qualcomm now seeks to hollow out this basic FRAND principle by retaining the right to seek to shut down its competitors' operations through assertion of FRAND-encumbered SEPs.

> **B. Parol evidence does not create ambiguity as to the meaning of Qualcomm's FRAND commitments.**

Because Qualcomm's proposed interpretation of the ATIS and TIA IPR Policies is contradictory to their plain language, there is no need for the Court to consider the parol

---

[22] *See generally Microsoft Corp. v. Motorola, Inc.*, No. 10-cv-1823, 2012 WL 4827743, at *1 (W.D. Wash. Oct. 10, 2012) (noting IPR policies "often require or encourage members of the standards setting organization to identify patents that are essential to a proposed standard and to agree to license their essential patents on RAND terms to anyone who requests a license. Such rules help to insure that standards do not allow essential patent owners to extort their competitors or prevent them from entering the marketplace."); *see also Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1041 (9th Cir. 2015).

[23] Mot. Ex. 30 (Q2017MDL1_00025969, Guidelines to the Intellectual Property Rights Policy of the Telecommunications Industry Association, at 5, March 2005). Qualcomm argues that the TIA Guidelines are "not part of the TIA IPR Policy," but admits that courts have used IPR guidelines to interpret FRAND commitments. Opp. at 19. Indeed, in *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. 14-341, 2017 WL 6611635 (C.D. Cal. 21, 2017), the court relied on the ETSI Guide on IPRs—even though the ETSI Guide, like the TIA Guidelines, states that it provides explanatory information but does not replace the IPR Policy itself. *Id.* at *6 ("For this case, the two relevant parts of the ETSI Directives are the ETSI IPR Policy . . . and the ETSI Guide on IPRs."); Reply Ex. 13 (Excerpts of ETSI Guide on IPRs at 1). Moreover, the TIA Guidelines are expressly referenced in the TIA IPR Policy itself. *See* Mot. Ex. 47 (TIA Engineering Manual, 4th Ed., at iii).

[24] Reply Ex. 14 (Q2017MDL1_01431072, -077, Qualcomm's Motion for Partial Summary Judgment to Limit Ericsson's Requested Relief for the Alleged Infringement of the Patents-in-Suit, *Ericsson Inc, v. Qualcomm, Inc.*, No. 96-cv-183 (E.D. Tex. Oct. 6, 1998)).

evidence Qualcomm submits. *See, e.g.*, *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979) ("[E]xtrinsic evidence cannot be received for the purpose of varying the terms of the contract."); *see also Supervalu, Inc. v. Wexford Underwriting Managers, Inc.*, 175 Cal. App. 4th 64, 75, 96 Cal. Rptr. 3d 316, 325 (2009)  (affirming summary dismissal when "declarants suggest an industry definition . . . that is antithetical to the contractual language.").

Even if Qualcomm's parol evidence is considered, it is clearly insufficient to defeat summary judgment. There is no consistent and clear industry practice of SEP holders refusing to license the manufacture and sale of modem chips that can support a reading of the TIA and ATIS IPR polices that is contrary to their plain meaning, nor is there a genuine dispute as to whether such an industry practice exists. And the IPR Policies of other SSOs are either consistent with the FTC's interpretation (ANSI and ETSI) or irrelevant (ETSI).

### 1. *Undisputed evidence shows that chip-level licensing is common in the industry.*

Industry practice can only introduce ambiguity into contractual language when the practice is "certain [and] uniform." *Webster v. Klassen*, 109 Cal. App. 2d 583, 589 (1952). Even accepting the evidence that Qualcomm cites regarding industry practice, that requirement is plainly not satisfied here—chip-level licensing has not been uniformly absent across the industry. It is undisputed that Qualcomm itself has received licenses covering its modem chips from "over 120" licensors, including cellular SEP holders.[25] Qualcomm acknowledges that these



[25] [redacted]

modem-chip licenses exist, but suggests that they are distinguishable because Qualcomm did not want to be sued. (Opp. at 10, n. 3.) That argument must fail. Affording a licensee freedom from suit is the reason for every license agreement, not a basis to disregard numerous agreements that contradict Qualcomm's purported "industry practice." And given Qualcomm's position in modem chips, this means that a substantial portion of chips that have been sold have been licensed under more than 100 different companies' patents, including those companies' cellular SEPs. Qualcomm is not alone—at least ███████████████████ have entered licenses at the modem chip level under cellular SEPs according to the very sources cited by Qualcomm.[26]

Nor can Qualcomm demonstrate that a purported industry practice of handset-only licensing was "so generally known and notorious that knowledge and adoption thereof must be presumed." *Webster*, 109 Cal. App. 2d at 589. Once again, Qualcomm's own actions are sufficient to negate any genuine issue of fact. Until at least 2007, Qualcomm widely publicized its practice of entering patent-related agreements with competing modem chip companies relating to cellular SEPs.[27] Although these agreements were not exhaustive licenses, Qualcomm listed these agreements on its website under the heading "Licensing," with a sub-heading for "Component Related Products," that identified a number of prominent modem chip companies, such as Infineon and Texas Instruments.[28] Qualcomm made similar representations in presentations to carriers, such as Vodafone, ███████████████████████████████



[26] ███████████████████████████████

[27] ███████████████████████████████

[28] Reply Ex. 22 (Qualcomm "Licensing" website page, June 10, 2007, as indexed by web.archive.org).

████████████[29] Even though Qualcomm's agreements were not, in fact, exhaustive licenses, Qualcomm's highly public representations that it did grant licenses to modem chip companies are impossible to reconcile with a "generally understood" industry practice as would be required to alter the plain meaning of the TIA and ATIS IPR Policies.

Qualcomm itself, when litigating with Ericsson, argued that the TIA IPR Policy required Ericsson to grant Qualcomm a license covering modem chips. In September 1996, Ericsson filed suit against Qualcomm, alleging that Qualcomm's modem chips and other products infringed five patents that Ericsson had declared essential to 2G CDMA standards.[30] In October 1998, Qualcomm filed a motion for partial summary judgment, in which Qualcomm asserted that Ericsson's commitments to TIA required that Ericsson "license to Qualcomm, 'under reasonable terms and conditions that are demonstrably free from any unfair discrimination,' those patents, if any, essential" the relevant TIA standard.[31] Qualcomm further represented that, for three years, it had "relied on Ericsson's . . . promises and built a multi-billion dollar business based on IS-95 [2G CDMA] technology, secure in the knowledge that it could license any patents determined to be necessary for those products."[32] To establish its reliance on Ericsson's FRAND commitments, Qualcomm attached an affidavit in which its chairman, Irwin Jacobs, attested that, based on Ericsson's representations in the TIA process, Qualcomm believed that Ericsson would not "seek to prevent our production of products, if it were eventually determined that [its] patents were, in fact, essential" to the TIA standard.[33] Qualcomm's request for summary judgment on the TIA

---

[29] Reply Ex. 15 (Q2014FTC03371611, CX5840 at -015, Sept. 2005 Presentation to Vodafone).

[30] Reply Ex. 23 (Press Release, Qualcomm, Inc., "Ericsson Drops Three 'Essential' Patents from Lawsuit Against Qualcomm and Surrenders Two Others" (Oct. 20, 1998)); Reply Ex. 24 (Q2017MDL5_10628522, -525, Second Amended Complaint for Patent Infringement, Ericsson Inc. v. Qualcomm Inc., No. 2-96-cv-183, ¶ 11 (E.D. Tex. Jan. 14, 1997) (identifying Qualcomm's Baseband Analog Processor (BBA-2) and Mobile Station Modem (MSM-2) as accused products)).

[31] Reply Ex. 14 (Q2017MDL1_01431072, -091, Qualcomm's Motion for Partial Summary Judgment to Limit Ericsson's Requested Relief for the Alleged Infringement of the Patents-in-Suit, Ericsson Inc. v. Qualcomm Inc., No. 2-96-CV-183 (E.D. Tex. Oct. 6, 1998)).

[32] *Id.* at -075.

[33] *Id.* at -149, ¶ 9. At his deposition in this case, Dr. Jacobs testified that the products to which he referred were the accused products in the Ericsson litigation, which included standard-compliant modem chips. Reply Ex. 1 (Deposition of Irwin Jacobs (former Qualcomm), 116:14–118:3, Mar. 2, 2018).

IPR policy, which advanced the same interpretation as the FTC advances here, clearly shows that there was no contrary industry understanding at the time. Qualcomm eventually obtained a license from Ericsson that applied to its modem chips and sold millions of chips that were exhaustively licensed by Ericsson.[34]

Other companies, including two of the licensors that Qualcomm holds out as exemplars of a contrary understanding, also made official filings consistent with the FTC's interpretation. In 2006, both Nokia and Ericsson cited Qualcomm's attempts to terminate the patent agreement of Texas Instruments, a potential modem-chip competitor, as a "breach [of] Qualcomm's duty to license on FRAND terms."[35] Ericsson elaborated that, "[h]aving given FRAND commitments to the standard setting organisations, it is not for Qualcomm to refuse to license its essential patents on FRAND terms."[36]

In sum, Qualcomm has not identified the type of "certain, uniform and . . . generally known" trade usage that is legally capable of amending the express terms of a contract. *Webster*, 109 Cal. App. 2d at 589. Even accepting Qualcomm's proffered evidence of industry practice as true, Qualcomm cannot dispute that its own statements and licenses exist. These indisputable counter-examples preclude any material factual dispute as to whether any industry practice of refusing to license modem chips is "certain, uniform and . . . generally known." Where, as here, preliminary evidence fails to identify ambiguity in contract language, summary judgment remains appropriate. *Brobeck*, 602 F.2d at 871-72 (quoting *Pacific Gas & Electric Co. v. G.W. Thoma Drayage Co.*, 69 Cal.2d 33, 37 (1968) (if extrinsic evidence does not create a genuine textual ambiguity, "[t]he case may then be disposed of by summary judgment, because interpretation of the unambiguous contract is solely a question of law.").

---

[34] [redacted]

[35] Reply Ex. 25 (Q2017MDL1_00276794, -844 Nokia, Complaint Against Qualcomm Inc., Feb. 13, 2006).

[36] Reply Ex. 26 (Q2017MDL1_00276673, -724, Ericsson, Complaint to the European Commission, June 28, 2006).

### 2. *The other SSOs' IPR policies Qualcomm cites do not create any ambiguity in the policies of TIA or ATIS.*

#### a. **The ANSI Decision is consistent with the FTC's interpretation**

Qualcomm's reliance on a decision of the ANSI Executive Standards Council is misplaced. ANSI is an organization that accredits SSOs to develop "American National Standards." To maintain accreditation, an SSO must satisfy ANSI's "Essential Requirements," including by adopting a patent policy consistent with ANSI's Patent Policy.[37] In the matter Qualcomm cites, the council's initial decision, which its appellate panel affirmed, explained that an SSO *may* allow SEP holders to restrict the scope of their licensing commitments, provided that the SSO makes any permissible restrictions "clear in its own patent policy."[38] Neither the ATIS nor the TIA IPR Policy makes such a clear statement, and the TIA IPR Policy in fact expressly requires SEP holders to make licenses available to applicants that practice "portions" of TIA standards.

Qualcomm cites language in which the ExSC discusses whether ANSI's Patent Policy "requires licensing at the component level." (Opp. at 22.) Read in context, this language addresses whether ANSI's "Essential Requirements" mandate such an approach for all ANSI-accredited SSOs. The ExSC concluded that it did not, and that participants should instead "decide what licensing terms are appropriate in particular standards, subject to the terms of an [SSO's] patent policy."[39]

Interpreting the actual language of the ANSI policy, when adopted without modification by an SSO, the ExSC stated that the phrase "purpose of implementing," "serves to limit any assurance to *the field of use of the standard*."[40] ExSC's interpretation is entirely consistent with the FTC's position: Qualcomm's assurances to ATIS and TIA require it to make licenses available for the manufacture and sale of modem chips for the purpose of implementing the

---

[37] Opp. Ex. 1 (ExSC Decision, at 15).
[38] Opp. Ex. 1 (ExSC Decision, at 2-3, *aff'd*, *id.* at 14).
[39] Opp. Ex. 1 (ExSC Decision, at 14).
[40] Opp. Ex. 1 (ExSC Decision, at 5-6 (emphasis added)).

relevant ATIS and TIA standards, but not for other purposes (such as implementing other standards). The ExSC expressly rejected "arguments that the ANSI Patent Policy cedes unilaterally and unconditionally to patent holders the right to decide 'where in the value chain' they choose to license," concluding that this "concept" is "not reflected in the current language of the ANSI Patent Policy."[41]

### b. The ETSI IPR Policy is Irrelevant.

Qualcomm's reliance on the IPR Policy of ETSI, an SSO not at issue in this motion, is also misplaced. The FTC's decision not to seek summary judgment on the ETSI IPR commitment, a contract governed by foreign law, is not a concession that the contract is ambiguous or requires extrinsic evidence to interpret.[42] And it is certainly not a concession that separate contractual commitments under different IPR Policies are ambiguous.

Moreover, the Court need not reach a conclusion about the ETSI policy to grant summary judgment. There is no authority that says a contract should be deemed ambiguous because two industry groups expressed the view that that contract and another were "compatible" in some undefined sense. (Opp. at 23.) Qualcomm cannot contradict the express language of stand-alone commitments it made to TIA and ATIS simply because it also made additional contractual commitments under different terms.

## III. CONCLUSION

For the reasons stated above, the FTC's motion should be granted.[43]

---

[41] Opp. Ex. 1 (ExSC Decision, at 15).

[42] In its motion, the FTC expressly reserved the argument that Qualcomm's commitments under the ETSI IPR Policy unambiguously require it to make licenses available to competing modem chip suppliers. Mot. at 2 n. 5. *See generally* Reply Ex. 27 (Karl Heinz Rosenbrock, "Why the ETSI IPR Policy Requires Licensing to All" (article by former ETSI Director General addressing scope of licensing commitment)).

[43] Nokia filed a motion for leave to file an *amicus* brief in support of Qualcomm's opposition at 10:00 p.m. the night before this Reply was due. (ECF No. 888.) The FTC has not had a reasonable opportunity to respond to specific arguments in Nokia's *amicus* brief, but nothing in the brief supports denying the FTC's motion. The FTC may seek leave to file a separate response to Nokia's brief.

| | |
|---|---|
| | Respectfully submitted, |
| Dated: October 4, 2018 | */s/ Jennifer Milici*<br>JENNIFER MILICI<br>J. ALEXANDER ANSALDO<br>JOSEPH R. BAKER<br>GEOFFREY M. GREEN<br>RAJESH S. JAMES<br>PHILIP J. KEHL<br>DANIEL MATHESON<br>KENNETH H. MERBER<br>AARON ROSS<br>MARK J. WOODWARD<br><br>Bureau of Competition<br><br>*Attorneys for Plaintiff Federal Trade Commission* |