# REPLY EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FEDERAL TRADE COMMISSION

    Plaintiff,

  v.

QUALCOMM INCORPORATED, a
Delaware corporation,

    Defendant.

Case No.
5:17-cv-00220-LHK-
NMC

Case No.
5:17-md-02773-LHK

_____

IN RE: QUALCOMM ANTITRUST
LITIGATION

_____

*** TRANSCRIPT MARKED HIGHLY CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF IRWIN MARK JACOBS

VOLUME I

Friday, March 2, 2018, 9:02 a.m.

4655 Executive Drive, Suite 1500, San Diego, California

Reported by:

Harry Alan Palter

CSR No. 7708, Certified LiveNote Reporter

```
 1                    EXAMINATION
 2  BY MR. ANSALDO:
 3      Q     Good morning, Dr. Jacobs.
 4      A     Good morning.
 5      Q     My name is Ansaldo.  I'm an attorney for        09:03:26
 6  the Federal Trade Commission.  I guess I'd like to
 7  start off by asking you:  What was Qualcomm's
 8  business model when you founded the company?
 9      A     When we founded the company, it was to
10  see if we could find some interesting work to do in   09:03:41
11  wireless and in digital technologies.  Did not have
12  a product in mind.  Did not have a business plan in
13  mind.  We worked together at a previous company
14  called "Link-a-Bit," which I founded about 1968 --
15  sold, and retired, and then started Qualcomm.        09:03:58
16      Q     When did Qualcomm first consider
17  providing products or services to commercial
18  customers?
19      A     We -- the very first product was one
20  called "OmniTRACS."  And the first contract for that 09:04:16
21  was in -- I have to stop and think about decades
22  here -- I'm sorry.  1980 -- 1988.
23      Q     When did Qualcomm begin -- actually, I'd
24  like focus on Qualcomm's relationships with
25  customers or network operators for what have today   09:04:41
```

March 02, 2018

1              essential."

2      A      I see that.

3      Q      Did you believe that to be true at the

4  time?

5      A      Yes.                                                13:27:19

6      Q      Did Qualcomm make similar representations

7  during the TIA process to those that you're

8  referring to by Ericcson in this declaration?

9      A      FRAND-type, yes, and suggested a number

10  of patents that we thought were potentially            13:27:44

11  essential.  You can never tell absolutely whether

12  something's essential or not, but that we thought

13  might be.

14      Q      And what were you referring to with the

15  phrase, "seek to prevent our production of             13:28:05

16  products"?

17      A      I assume that they were trying to get an

18  injunction to we would not be able to manufacture

19  those products.

20      Q      And in 1998, Qualcomm manufactured           13:28:19

21  infrastructure equipment?

22      A      Yes.

23      Q      And handsets?

24      A      Yes.

25      Q      And ASICs?                                   13:28:30

```
 1        A      Yes.

 2        Q      And were those the three products that

 3   you're referring to in your declaration?

 4               MR. CHESLER:  Where does it say, "three

 5   products," Counsel?  Sorry.                                13:28:42

 6               MR. ANSALDO:  The three that I -- the

 7   three that I listed, and he said, "yes."

 8               MR. CHESLER:  Oh, you meant by the

 9   reference to the word "products" on line 11 was

10   referring to those three?                                  13:28:51

11               MR. ANSALDO:  Yes.

12               MR. CHESLER:  Okay.  Thank you.

13               THE WITNESS:  On line 11, too?

14               Let's see.  I'm sorry.  Repeat the

15   question.                                                  13:29:06

16   BY MR. ANSALDO:

17        Q      When you used the term "products" on

18   line 11 of CX6799, page 78, were you referring to

19   the three products:  Infrastructure, handsets, and

20   ASICs?                                                     13:29:20

21        A      I don't know if that's what they were

22   trying to enjoin.  So I was probably referring to

23   whichever products they were trying to stop us from

24   producing.

25        Q      Did you consider in 1998 -- did you            13:29:43
```

 1    consider Qualcomm ASICs to be compliant with IS-95

 2    standards?

 3        A    Yes.

 4        Q    And then the next sentence on page 78 of

 5    CX6799, which begins on line 12, you wrote, "Due in          13:30:19

 6    part to that belief, we felt secure in making a

 7    substantial investment in IS-95 products described

 8    in paragraph 6 above."  Do you see that?

 9        A    I do.

10        Q    Was it important to Qualcomm's                      13:30:36

11    investments that their products would not be

12    excluded from the market through an injunction?

13        A    I think that's a fair statement.

14        Q    You can put that aside.

15             (Brief pause)

16             Dr. Jacobs, I've handed you what's been

17    previously marked 6741.  This bears Bates number

18    Q-2017MDL5_12376711.  This is an e-mail chain in

19    which the terminal e-mail is from you to Tony

20    Thornley on May 19th, 2005.                                  13:33:46

21             (Exhibit CX6741 marked)

22    BY MR. ANSALDO:

23        Q    Is that correct?

24        A    Yes.  (Examining document).

25             MR. CHESLER:  Want to play poker?                   13:36:47

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| | |
|---|---|
| FEDERAL TRADE COMMISSION | Case No. |
| | 5:17-cv-00220-LHK- |
| Plaintiff, | NMC |
| | |
| v. | |
| | Case No. |
| QUALCOMM INCORPORATED, a | 5:17-md-02773-LHK |
| Delaware corporation, | |
| | |
| Defendant. | |

_____

IN RE: QUALCOMM ANTITRUST
LITIGATION

_____



*** TRANSCRIPT MARKED HIGHLY CONFIDENTIAL ***



VIDEOTAPED DEPOSITION OF IRWIN MARK JACOBS, VOLUME II



Monday, March 26, 2018, 9:02 a.m.



4655 Executive Drive, Suite 1500, San Diego, California



Reported by:

Harry Alan Palter

CSR No. 7708, Certified LiveNote Reporter

```
 1              THE VIDEOGRAPHER:  Going off the record.

 2    The time is 2:02 P.M.

 3              (Off the record)

 4              THE VIDEOGRAPHER:  We are back on record.

 5    The time is 2:04 P.M.

 6

 7                   FURTHER EXAMINATION

 8    BY MR. HOLTZMAN:

 9        Q    Dr. Jacobs, I just want to follow up a

10    little bit on PX148.  That's the Qualcomm

11    commonalities paper.  You got that one?

12        A    I have.

13        Q    If you could turn back to page 8 of the

14    paper.

15        A    8.

16        Q    Yeah.  This is the one that has the

17    beginning of section 2.1 on it?

18        A    Correct.

19        Q    Are you there?  Good.

20              And then going back to the numbered list

21    that starts on the bottom of page 8 and carries over

22    to page 9?

23        A    Yes.

24        Q    Are you with me?

25              I just -- I want to ask you -- so why
```

1    don't we start with number 1, "Direct-sequence

2    spread-spectrum multiple-access technology."

3    What -- what hardware is that technology implemented

4    in, or was it implemented in?

5            MR. ATKINSON:  Object to the extent this

6    calls for a legal conclusion.

7            THE WITNESS:  At different times, it's

8    implemented in different ways.  Often, it's done

9    largely in the software.

10   BY MR. HOLTZMAN:

11       Q    I was going to ask about software next.

12   Because I remember you had testified earlier in

13   deposition that patented technology is often

14   implemented in a combination of hardware and

15   software; right?

16       A    Right.

17           MR. ATKINSON:  Object to form.

18   BY MR. HOLTZMAN:

19       Q    I understand your point about software,

20   but insofar as that software is combined with

21   hardware, is there hardware in which direct sequence

22   spread spectrum multiple access is implemented?

23           MR. ATKINSON:  Same objection about legal

24   conclusion.

25           THE WITNESS:  There are digital-frequency

```
 1   synthesizers that could be used, but I -- I think in
 2   this time period, it was probably digital samples of
 3   the waveform, were being generated and then output
 4   to some device -- DA converter, RF, and so on --
 5   that -- until it was output.  So there was some
 6   combination always of some digital and analog, And
 7   that dividing line can change.  Even within the
 8   chip, sometime it might be done in the CPU,
 9   sometimes in the DSB, sometimes in some specialized
10   transistor section within the chip.
11   BY MR. HOLTZMAN:
12        Q    And what's the chip you're referring to
13   there?
14        A    Usually the one that does most of the
15   signal pro -- well, one can have a separate modem
16   chip or the modem part of a digital chip.
17        Q    So I want to make sure.  And referring to
18   the digital chip there --
19        A    Yes.
20        Q    -- what's that typically referred to as,
21   or is that -- what part -- what product is that part
22   of?
23        A    MSM or a modem.
24        Q    Okay.
25        A    SDM or something --
```

1      Q     And the software that you said -- direct-

2   sequence spread-spectrum multiple access -- may be

3   implemented in, is that software that typically is

4   delivered with the MSM product, for example?

5      A     Yes.  I believe so.

6      Q     I want to ask the same question about

7   number 2, "Orthogonal code channelization."  The

8   question is:  What is the hardware and/or software

9   that that technology is implemented in?

10      A     Essentially --

11            MR. ATKINSON:  Just one second.

12            Same objection with respect to calling

13   for a legal conclusion.

14   BY MR. HOLTZMAN:

15      Q     Sorry.  I'm not sure we got your answer.

16      A     Right.  Essentially the same that some

17   would be software and then be output to a hardware

18   device.

19      Q     And is the hardware device on that one

20   also an MSM product?

21      A     No.  The hardware would be part of the

22   "A" to -- D-to-A conversion and power amplification,

23   et cetera.

24      Q     Okay.  So I need your help on this one,

25   because I'm not nearly as technical as you are.

1      A      As I used to be.

2      Q      You still are.

3              The D-to-A conversion and power

4      amplification referred to, what product or products

5      is that delivered as part of?

6              MR. ATKINSON:  Objection to form.

7              THE WITNESS:  These days, I'm not sure

8      how the very functions are divided because one gets

9      more and more integration.  But digital to analog

10     conversion, an RF amplifier, some other filtering

11     aspects of some of those are outside the MSM or MDM

12     if that's what the modem is called.  And some are

13     more and more within.  But that line keeps changing.

14     BY MR. HOLTZMAN:

15     Q      If they are outside the MSM or the MDM,

16     what typically are they in?

17     A      Other chips.

18     Q      Can you give an example of the kind of

19     chip?

20     A      I call 'em "RF chips."  Beyond that, I'm

21     stuck.

22     Q      Okay.  So going to number 3, "Random

23     access."  What hardware and/or software was

24     random-access technology implemented in?

25              MR. ATKINSON:  I'll interpose the same

1  objection about calling for a legal conclusion.

2          THE WITNESS:  Again, that's the result

3  of -- I would say a variety of software algorithms

4  contained within the MSM or the MDM.

5  BY MR. HOLTZMAN:

6      Q    Okay.  So there are another 12 items on

7  this list.  And instead of going through them one by

8  one at the outset, let me ask you:  Of items 4

9  through 15, which of these technologies, at least as

10  of 2006, were not implemented in the MSM, or MDM, or

11  a variety of software algorithms contained within

12  the MSM or MDM?

13          MR. ATKINSON:  Objection.  Calls for a

14  legal conclusion.

15          THE WITNESS:  I would have to look.  I

16  think that as far as the MSM is concerned, that

17  those would be contained within the -- as software

18  within the MSM -- this is all communication

19  features.

20          Within the MDM, whether some of that was

21  being done with a different processor outside of the

22  MDM or not, I don't know where that dividing line

23  might be.

24  BY MR. HOLTZMAN:

25      Q    Okay.  Thank you.  That's helpful.

```
 1              I wanted to ask the same question,
 2   essentially -- if you go to the other lists in this
 3   document.  So if you go to page 23, and there's a
 4   list of ten items, that the author of the paper
 5   indicates are common to cdma2000 and WCDMA; correct?
 6        A    Yes.
 7        Q    Okay.  And so the question, again, for
 8   these ten items is:  Which, if any of these ten
 9   items, were not as of 2006, implemented in an MSM or
10   MDM or the software algorithms contained within
11   them?
12              MR. ATKINSON:  Objection to the extent it
13   calls for a legal conclusion.
14              THE WITNESS:  Again, I don't know all the
15   details.  I think the only one I would -- the one
16   I'd be least certain about -- I won't say only --
17   but the least certain about would be the downlink
18   power control which might have a loop that extends
19   out to the RF and then back again.  But, again, I'm
20   not sure of the implementation.
21   BY MR. HOLTZMAN:
22        Q    That's item number 3 on this list?
23        A    3.  Hmm-hmm.
24        Q    Okay.  So and to the extent that one may
25   go beyond the MSM or MDM, it would again be to the
```

```
 1   RF chip?  Is that right?  Is that your best sense?
 2              MR. ATKINSON:  Same objection.
 3              THE WITNESS:  Some are radiofrequency
 4   chip.
 5   BY MR. HOLTZMAN:
 6        Q    All right.  Why don't you go to --
 7        A    Again --
 8        Q    Sorry.
 9        A    -- as I said before, some of this could
10   be -- in the case of an MDM, some could be in a
11   separate processor or elsewhere, but I don't know
12   how they divide up the functions.
13        Q    Okay.  I should ask that.
14              If in that eventuality, what's the
15   processor or processors in which the functionality
16   would be implemented?
17              MR. ATKINSON:  Same objection.
18              THE WITNESS:  Usually, there's a
19   processor -- a digital chip that has processing DPU
20   -- digital processing, as well as CPU.  Might be in
21   that chip, but I'm not sure.
22   BY MR. HOLTZMAN:
23        Q    Okay.
24        A    How much -- how the functionality is
25   actively divided.
```

```
 1        Q     Got it.  Okay.  We'll go to the next
 2   list.  This one, I think, starts at the bottom of
 3   page 31.
 4              So on the bottom of page 31, carrying
 5   over to page 32, there is a list of 12 numbered
 6   items that the author describes as common to
 7   cdma2000; 1xEV-DO, Release 0; and HSDPA; is that
 8   correct?
 9        A     Yes.
10        Q     All right.  And so as for these 12
11   items, which, if any, were not as of 2006
12   implemented in the MSM, or MDM, or software
13   algorithms contained in MSM or MDM?
14              MR. ATKINSON:  Same objection.
15              THE WITNESS:  Again, the capability in
16   different CPUs, the power control might again have a
17   loop that goes out to the RF -- some RF chip -- or
18   not.  Again, I'm not sure.  Most of these look as
19   if -- well, packet scheduling -- again, hard to say
20   how these are divided.  The packet scheduling might
21   be in a different chip.
22   BY MR. HOLTZMAN:
23        Q     Okay.  So the power control you
24   mentioned, is that item number 10?
25        A     That is item number 10.
```

```
 1        Q      And then the packet scheduling is which

 2   item?

 3        A      3.

 4        Q      3.  Got it.  Okay.

 5               Why don't we go to the next list.

 6        A      Yeah.  2 may also be involved, but --

 7   with separate RF.  Again, I just -- I'm not familiar

 8   with a lot of the details here.

 9        Q      Okay.  Going to the next list, which

10   starts on page 40 --

11        A      Yes.

12        Q      -- there are five numbered items that the

13   author asserts are shared by cdma2000 1xEV-DO,

14   revision A, and HSUPA; is that correct?

15        A      Yes.

16        Q      Which, if any of these five items, were,

17   as of 2006, implemented other than in MSM or MDM or

18   software algorithms contained within the MSM or MDM?

19               MR. ATKINSON:  Same objection.

20               THE WITNESS:  I probably should have also

21   prefaced all of these remarks by saying that I left

22   in '05, and as far as details of what was in '06,

23   but --

24   BY MR. HOLTZMAN:

25        Q      I'm only asking about '06.  That's the
```

```
 1   date of this document.  But I appreciate your

 2   clarification.

 3        A     Yeah.

 4        Q     And ask you to answer my question, if you

 5   remember what it was.

 6        A     Okay.  Again, I would imagine most of

 7   this was certainly in the MDM -- I'm sorry.

 8        Q     MSM?

 9        A     MSM.  It's getting late.

10              And probably MDM except some functions

11   may be shared with the computer elsewhere.  Yeah,

12   again, the uplink channelization -- where that may

13   or may not be done -- but I suspect a good part of

14   this is, again, done in the MDM as well as the MSM.

15        Q     Okay.  The channelization you referred

16   to, that's item number 4?

17        A     Yes.

18        Q     And you referred in your answer to

19   functions being shared with the computer elsewhere.

20        A     I'm sorry.  The processor in another

21   chip -- digital chip.

22        Q     The RF chip or something else?

23        A     Digital as opposed to RF.

24        Q     Digital.  Okay.

25              One more list, I think.
```

# REPLY EXHIBIT 2



Products          Cellular Modems

# Cellular Modems

## Keeping you connected, worldwide.

Whether discrete or integrated in our mobile processors, our Gigabit LTE and 5G cellular modems are designed to empower tomorrow's smartest devices with fast, efficient and reliable connections to the world's mobile networks.

**View all cellular modems**


Home


Search


Products


Solutions


Invention

News

Company

# Snapdragon 4G LTE and 5G modems: At the heart of mobility.

Growing consumer demand for data means the right cellular modem is needed to unlock all the benefits of the latest mobile network technologies. Qualcomm® Snapdragon™ modems bring numerous connectivity benefits to you and your mobile device, including:

## Fast internet speeds

Snapdragon LTE modems are designed to maximize Internet speed and performance by providing fast download and upload times, improving access to files in cloud storage and streaming of immersive, high-resolution videos with minimal to no quality loss.

## Reliable, crystal-clear calls

Get reliable call quality with few drops and superior clarity via ultra HD voice on capable LTE networks, and extend voice coverage to any open Wi-Fi network.

## Long battery life

Engineered for maximum power efficiency, our modems can extend battery life on mobile devices allowing for long talk time, entertainment and overall productivity between charges.

**Learn more about Snapdragon Gigabit LTE speeds** ›



Qualcomm Snapdragon is a product of Qualcomm Technologies, Inc.

More


Home


Search


Products


Solutions


Invention


News


Company





## Snapdragon 4G LTE modems

Devices can do more by utilizing the advanced connectivity of Snapdragon 4G LTE cellular modems, which support the latest LTE Advanced and LTE Advanced Pro technologies, including 4x4 MIMO, 256-QAM modulation, and LAA—supporting up to Gigabit Class LTE download speeds.

## Snapdragon 5G Modems

Designed to support wider bandwidths than ever before and offer the most advanced mobile technologies yet, Snapdragon 5G modems are paving the way for future experiences.



More


Home


Search

Products

Solutions

Invention

News

Company

# Modem technologies that support next-level user experiences.

Devices can do more from almost anywhere through the advanced connectivity of Snapdragon modems.

### TruSignal antenna boost technology

Using Qualcomm® TruSignal™ antenna boost technology, Snapdragon LTE modems enhance radio performance for mobile experiences that can offer excellent network reliability, data speeds and call coverage.

### Snapdragon All Mode

Designed to deliver a superior connected experience on the network of your choosing, Snapdragon All Mode allows phones to access all major 4G+/4G/3G/2G bands and modes worldwide, and can provide call reliability, smart Wi-Fi calling and dual SIM flexibility.

...
More



Find the right cellular
modem for your needs.

**View all cellular modems**

Qualcomm TruSignal is a product of Qualcomm
Technologies, Inc.



| | | | | | |
|---|---|---|---|---|---|
| About Qualcomm | Careers | Offices | Contact Us | Support | Subscription Center |

Terms of Use    Privacy    Cookies    Site Map

©2018 Qualcomm Technologies, Inc. and/or its affiliated companies.

References to "Qualcomm"; may mean Qualcomm Incorporated, or subsidiaries or business units within the
Qualcomm corporate structure, as applicable.
Materials that are as of a specific date, including but not limited to press releases, presentations, blog posts and
webcasts, may have been superseded by subsequent events or disclosures.
Qualcomm Incorporated includes Qualcomm's licensing business, QTL, and the vast majority of its patent portfolio.
Qualcomm Technologies, Inc., a wholly-owned subsidiary of Qualcomm Incorporated, operates, along with its
subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all
of its products and services businesses. Qualcomm products referenced on this page are products of Qualcomm
Technologies, Inc. and/or its subsidiaries.

# REPLY EXHIBIT 3



Qualcomm    **Products** ⌄    **Product Finder** ⌄

🏠 Home

🔍 Search

▦ Products

☀ Solutions

💡 Invention

💬 News

👥 Company

⋯ More

# Product Finder

# 8 Products

**Add filter**

Technology Category: Cellular Modems ✕    Clear All

**Modem**

## Snapdragon X7 LTE Modem

**9x35, 9x30**

LTE Category: LTE Category 6

Peak Download Speed: 300 Mbps

Peak Upload Speed: 50 Mbps

Uplink Features: 1x20 MHz, Up to 16-QAM

Chipset: Snapdragon X7 LTE Modem

**Modem**

## Snapdragon X5 LTE Modem

**9x28, 9x25, 9x20**

LTE Category: LTE Category 4 (downlink)

Peak Download Speed: 150 Mbps

Peak Upload Speed: 50 Mbps

Uplink Features: 1x20 MHz, Uplink data compression, Up to 16-QAM

**Modem**

## Snapdragon X24 LTE Modem

LTE Category: LTE Category 20

**Modem**

## Snapdragon X20 LTE Modem

LTE Category: LTE Category 18 (downlink), LTE Category 13 (uplink)



# Qualcomm

Language ▼

About Qualcomm    Careers    Offices    Contact Us    Support    Subscription Center

Terms of Use    Privacy    Cookies    Site Map

©2018 Qualcomm Technologies, Inc. and/or its affiliated companies.

References to "Qualcomm"; may mean Qualcomm Incorporated, or subsidiaries or business units within the Qualcomm corporate structure, as applicable.
Materials that are as of a specific date, including but not limited to press releases, presentations, blog posts and webcasts, may have been superseded by subsequent events or disclosures.
Qualcomm Incorporated includes Qualcomm's licensing business, QTL, and the vast majority of its patent portfolio. Qualcomm Technologies, Inc., a wholly-owned subsidiary of Qualcomm Incorporated, operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses. Qualcomm products referenced on this page are products of Qualcomm Technologies, Inc. and/or its subsidiaries.

# REPLY EXHIBIT 4



Products          Cellular Modems          Snapdragon X16

## Snapdragon X16 LTE
Qualcomm Snapdragon modems are a product of Qualcomm Technologies, Inc.

4 / 9

# Snapdragon X16 LTE Modem

The next major advancement in mobile connectivity has arrived.
Introducing the Qualcomm® Snapdragon™ X16 LTE modem, the world's
first announced Gigabit Class LTE modem. By supporting peak download
speeds up to 10x as fast as first generation 4G LTE devices, the
Snapdragon X16 LTE modem with category 16 is more than just the
fastest 4G modem we've ever made, it also blurs the lines between
wireless and wired broadband by allowing your mobile device to connect
at fiber optic speeds — of course, without the wires.



## Pushing the possibilities.

In order to make a Gigabit Class LTE modem a reality, Qualcomm added a
suite of enhancements – built on a foundation of commercially-proven
Carrier Aggregation technology. The Snapdragon X16 LTE cellular modem
employs sophisticated digital signal processing to pack more bits per
transmission with 256-QAM, receives data on four antennas through 4x4
MIMO, and supports for up to 4x Carrier Aggregation — all of which come
together to achieve download speeds of up to 1 Gbps.



## Setting a global standard.



## More features. Less space.

Home

Search

Products

Solutions

Invention

News

Company

# Snapdragon X16 LTE Modem Specs

**Compare all modem classes**

## Cellular Modem

**Chipset**

Snapdragon X16 LTE Modem

**LTE Category**

LTE Category 16 (downlink)

LTE Category 13 (uplink)

**Downlink Features**

4x20 MHz carrier aggregation

Up to 256-QAM

Up to 4x4 MIMO on two carriers

Maximum 10 spatial streams

**Uplink Features**

Qualcomm® Snapdragon™ Upload+

2x20 MHz carrier aggregation

Up to 2x 75Mbps LTE streams

Up to 64-QAM

Uplink data compression

**Peak Download Speed**

1 Gbps

**Peak Upload Speed**

150 Mbps

**Supported Cellular Technologies**

LTE FDD

LTE TDD

LAA

LTE Broadcast

WCDMA (DB-DC-HSDPA, DC-HSUPA)

TD-SCDMA

CDMA 1x

EV-DO

GSM/EDGE

**Multi SIM**

LTE + W/G/1x Dual SIM Dual Standby (DSDS)

**Next-generation Calling Services**

VoLTE with SRVCC to 3G and 2G

HD and Ultra HD Voice (EVS)

CSFB to 3G and 2G

More

FEB 11, 2016



Qualcomm

🌐 Language ⌄

About Qualcomm    Careers    Offices    Contact Us    Support    Subscription Center

Terms of Use    Privacy    Cookies    Site Map

©2018 Qualcomm Technologies, Inc. and/or its affiliated companies.

References to "Qualcomm" may mean Qualcomm Incorporated, or subsidiaries or business units within the Qualcomm corporate structure, as applicable.
Materials that are as of a specific date, including but not limited to press releases, presentations, blog posts and webcasts, may have been superseded by subsequent events or disclosures.
Qualcomm Incorporated includes Qualcomm's licensing business, QTL, and the vast majority of its patent portfolio. Qualcomm Technologies, Inc., a wholly-owned subsidiary of Qualcomm Incorporated, operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses. Qualcomm products referenced on this page are products of Qualcomm Technologies, Inc. and/or its subsidiaries.

# REPLY EXHIBIT 15

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

(Mark one)

☑   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended September 25, 2016**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____ .**

**Commission File Number 0-19528**

# QUALCOMM Incorporated
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **95-3685934** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |
| **5775 Morehouse Dr. San Diego, California (Address of Principal Executive Offices)** | **92121-1714 (Zip Code)** |

**(858) 587-1121**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to section 12(b) of the Act:**

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common stock, $0.0001 par value | NASDAQ Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

**Operating Segments**

We conduct business primarily through two reportable segments, QCT (Qualcomm CDMA Technologies) and QTL (Qualcomm Technology Licensing), and our QSI (Qualcomm Strategic Initiatives) reportable segment makes strategic investments. Revenues in fiscal 2016, 2015 and 2014 for our reportable segments were as follows (in millions, except percentage data):

| | QCT | | QTL | | QSI | |
|---|---|---|---|---|---|---|
| **2016** | $ | 15,409 | $ | 7,664 | $ | 47 |
| *As a percent of total* | | 65% | | 33% | | — |
| **2015** | $ | 17,154 | $ | 7,947 | $ | 4 |
| *As a percent of total* | | 68% | | 31% | | — |
| **2014** | $ | 18,665 | $ | 7,569 | $ | — |
| *As a percent of total* | | 70% | | 29% | | — |

***QCT Segment.*** QCT is a leading developer and supplier of integrated circuits and system software based on CDMA, OFDMA and other technologies for use in wireless voice and data communications, networking, application processing, multimedia and global positioning system products. QCT's integrated circuit products are sold, and its system software is licensed, to manufacturers that use our products in mobile phones, tablets, laptops, data modules, handheld wireless computers and gaming devices, access points and routers, data cards and infrastructure equipment, broadband gateway equipment and other consumer electronics. Our Mobile Station Modem (MSM) integrated circuits, which include the Mobile Data Modem, Qualcomm Single Chip and Qualcomm Snapdragon processors and LTE modems, perform the core baseband modem functionality in wireless devices providing voice and data communications, as well as multimedia applications and global positioning functions. In addition, our Snapdragon processors provide advanced application and graphics processing capabilities. Because of our experience in designing and developing CDMA- and OFDMA-based products, we design both the baseband integrated circuit and the supporting system as well, including the RF (Radio Frequency), PM (Power Management) and wireless connectivity integrated circuits. This approach enables us to optimize the performance of the wireless device with improved product features and integration with the network system. Our portfolio of RF products includes QFE (Qualcomm Front End) radio frequency front-end components that are designed to simplify the RF design for LTE multimode, multiband mobile devices, reduce power consumption and improve radio performance. QCT's system software enables the other device components to interface with the integrated circuit products and is the foundation software enabling manufacturers to develop devices utilizing the functionality within the integrated circuits. We also provide support, including reference designs and tools, to assist our customers in reducing the time required to design their products and bring their products to market. We plan to add additional features and capabilities to our integrated circuit products to help our customers reduce the cost and size of their products, to simplify our customers' design processes and to support more wireless devices and services.

QCT offers a broad portfolio of products, including both wireless device and infrastructure integrated circuits, in support of CDMA2000 1X and 1xEV-DO, as well as the EV-DO Revision A/B evolutions of CDMA 2000 technology. Leveraging our expertise in CDMA, we also develop and offer integrated circuits supporting the WCDMA version of 3G for manufacturers of wireless devices. More than 80 device manufacturers have selected our WCDMA products that support GSM/GPRS, WCDMA, HSDPA (High-Speed Downlink Packet Access), HSUPA (High-Speed Uplink Packet Access) and HSPA+ for their devices. QCT also sells multimode products for the LTE standard, which are designed to support seamless backward compatibility to existing 3G technologies. Our integrated circuit products are included in a broad range of devices, from low-tier, entry-level devices for emerging regions, which may use our Qualcomm Reference Design (QRD) products, to premium-tier devices. In fiscal 2016, QCT shipped approximately 842 million MSM integrated circuits for wireless devices worldwide, compared to approximately 932 million and 861 million in fiscal 2015 and 2014, respectively.

Our modems are built to work with increasingly complex networks. They support the latest communication technologies and adapt to network conditions and user needs in real time to enable delivery of faster, smoother data and voice connections. Our 3G/4G modem roadmap delivers the latest network technologies across multiple product tiers and devices. This roadmap is the result of our years of research into emerging network standards and the development of chipsets that take advantage of these new standards, while maintaining backward compatibility with existing standards.

Each Snapdragon processor is a highly integrated, mobile optimized system on a chip incorporating our advanced technologies, including a Snapdragon modem for fast reliable mobile broadband connectivity, a high performance central processing unit (CPU), digital signal processor (DSP), graphics processing unit (GPU), image signal processor, multimedia subsystems, including high fidelity audio, high-definition video and advanced imaging capabilities, our hardware-based suite

of Qualcomm Haven Security Solutions, and accurate location positioning engines. Our CPU cores are designed to deliver high levels of compute performance at low power, allowing manufacturers to design powerful, slim and power-efficient devices. Our Qualcomm Adreno GPUs are also designed to deliver high quality graphics performance for visually rich 3D gaming and user interfaces. The heterogeneous compute architecture of our Snapdragon processors is designed to help ensure that the CPU, DSP and GPU work efficiently together, each being utilized only when needed, which enhances the processing capacity, speed and efficiency of our Snapdragon processors and the battery life of devices using our processors.

Our wireless products also consist of integrated circuits and system software for WLAN, Bluetooth, Bluetooth Smart, frequency modulation (FM) and near field communications as well as technologies that support location data and services, including GPS, GLONASS and BeiDou. Our WLAN, Bluetooth and FM products have been integrated with the Snapdragon processors to provide additional connectivity for mobile phones, tablets and consumer electronics. QCT also offers standalone WLAN, Bluetooth, Bluetooth Smart, applications processor and Ethernet products for mobile devices, consumer electronics, computers, automotive infotainment, IoT applications and other connected devices. Our networking products include WLAN, Powerline and Ethernet chips, network processors and software. These products help enable home and business networks to support the growing number of connected devices, digital media, data services and other smart home applications.

QCT currently utilizes a fabless production model, which means that we do not own or operate foundries for the production of silicon wafers from which our integrated circuits are made. Integrated circuits are die cut from silicon wafers that have completed the package assembly and test manufacturing processes. The semiconductor package supports the electrical contacts that connect the integrated circuit to a circuit board. Die cut from silicon wafers are the essential components of all of our integrated circuits and a significant portion of the total integrated circuit cost. We employ both turnkey and two-stage manufacturing models to purchase our integrated circuits. Under the turnkey model, our foundry suppliers are responsible for delivering fully assembled and tested integrated circuits. Under the two-stage manufacturing model, we purchase die in singular or wafer form from semiconductor manufacturing foundries and contract with separate third-party suppliers for manufacturing services such as wafer bump, probe, assembly and final test.

We rely on independent third-party suppliers to perform the manufacturing and assembly, and most of the testing, of our integrated circuits based primarily on our proprietary designs and test programs. Our suppliers also are responsible for the procurement of most of the raw materials used in the production of our integrated circuits. The primary foundry suppliers for our various digital, analog/mixed-signal, RF and PM integrated circuits are Global Foundries Inc., Samsung Electronics Co. Ltd., Semiconductor Manufacturing International Corporation, Taiwan Semiconductor Manufacturing Company and United Microelectronics Corporation. The primary semiconductor assembly and test suppliers are Advanced Semiconductor Engineering, Amkor Technology, Siliconware Precision Industries and STATSChipPAC. The majority of our foundry and semiconductor assembly and test suppliers are located in the Asia-Pacific region.

QCT's sales are primarily made through standard purchase orders for delivery of products. QCT generally allows customers to reschedule delivery dates within a defined time frame and to cancel orders prior to shipment with or without payment of a penalty, depending on when the order is canceled. The industry in which QCT operates is intensely competitive. QCT competes worldwide with a number of United States and international designers and manufacturers of semiconductors. As a result of global expansion by foreign and domestic competitors, technological changes, device manufacturer concentrations and the potential for further industry consolidation, we anticipate the industry to remain very competitive. We believe that the principal competitive factors for our products include performance, level of integration, quality, compliance with industry standards, price, time-to-market, system cost, design and engineering capabilities, new product innovation and customer support. QCT also competes in both single- and multi-mode environments against alternative communications technologies including, but not limited to, GSM/GPRS/EDGE and TDMA.

QCT's current competitors include, but are not limited to, companies such as Broadcom Limited, Cirrus Logic, Ericsson, HiSilicon Technologies, Intel, Marvell Technology, Maxim Integrated Products, MediaTek, Microchip Technology Inc., Nvidia, Realtek Semiconductor, Samsung Electronics, Skyworks Solutions Inc. and Spreadtrum Communications (which is controlled by Tsinghua Unigroup). QCT also faces competition from products internally developed by our customers, including some of our largest customers, and from some early-stage companies. Our competitors devote significant amounts of their financial, technical and other resources to develop and market competitive products and, in some cases, to develop and adopt competitive digital communication or signal processing technologies, and those efforts may materially and adversely affect us. Although we have attained a significant position in the industry, many of our current and potential competitors may have advantages over us that include, among others: motivation by our customers in certain circumstances to utilize their own internally-developed integrated circuit products, to use our competitors' integrated circuit products, or to choose alternative technologies; lower cost structures and/or a willingness and ability to accept lower prices and lower or negative margins for their products, particularly in China; foreign government support of other technologies or competitors;

better known brand names; ownership and control of manufacturing facilities and greater expertise in manufacturing processes; more extensive relationships with local distribution companies and original equipment manufacturers in emerging geographic regions (such as China); and/or a more established presence in certain regions.

***QTL Segment***. QTL grants licenses or otherwise provides rights to use portions of our intellectual property portfolio, which, among other rights, include certain patent rights essential to and/or used in the manufacture and sale of certain wireless products, including, without limitation, products implementing CDMA2000, WCDMA, CDMA TDD and/or LTE standards and their derivatives. Our licensees manufacture wireless products including mobile devices (also known as subscriber units, which include handsets), other consumer devices (e.g., tablets and laptops), machine-to-machine devices (e.g., telematics devices, meter reading devices), plug-in end user data modem cards, certain embedded modules for incorporation into end user products, infrastructure equipment required to establish and operate a network and equipment to test networks and subscriber units. QTL licensing revenues include license fees and royalties based on sales by licensees of products incorporating or using our intellectual property. License fees are fixed amounts paid in one or more installments. Royalties are generally based upon a percentage of the wholesale (i.e., licensee's) selling price of complete licensed products, net of certain permissible deductions (including transportation, insurance, packing costs and other items). Revenues generated from royalties are subject to quarterly and annual fluctuations. The vast majority of QTL revenues have been generated through our licensees' sales of CDMA2000- and WCDMA-based products, such as feature phones and smartphones. We have invested and continue to invest in both the acquisition and development of OFDMA technology and intellectual property and have generated the industry leading patent portfolio applicable to LTE and LTE Advanced. Nevertheless, we face competition in the development of intellectual property for future generations of digital wireless communications technologies and services.

In February 2015, we reached a resolution with the National Development and Reform Commission (NDRC) in China regarding its investigation and agreed to implement a rectification plan that modifies certain of our business practices in China. The rectification plan provides, among other things, that for licenses of only our 3G and 4G essential Chinese patents for branded devices sold for use in China starting on January 1, 2015 (and reported to us in the third quarter of fiscal 2015), we will charge running royalties at royalty rates of 5% for 3G CDMA or WCDMA devices (including multimode 3G/4G devices) and 3.5% for 4G devices that do not implement CDMA or WCDMA (including 3-mode LTE-TDD devices), in each case using a royalty base of 65% of the net selling price.

Separate and apart from licensing manufacturers of wireless devices and network equipment, we have entered into certain arrangements with competitors of our QCT segment, such as Broadcom and MediaTek. A principal purpose of these arrangements is to provide our QCT segment and the counterparties certain freedom of operation with respect to each party's integrated circuits business. In every case, these agreements expressly reserve the right for QTL to seek royalties from the customers of such integrated circuit suppliers with respect to such suppliers' customers' sales of CDMA-, WCDMA- and OFDMA-based wireless devices into which such suppliers' integrated circuits are incorporated.

Upon the initial deployment of OFDMA-based networks, the products implementing such technologies generally have been multimode and implement CDMA-based technologies. The licenses granted under our existing CDMA license agreements generally cover multimode CDMA/OFDMA (3G/4G) devices, and our licensees are obligated to pay royalties under their CDMA license agreements for such devices. Further, over 210 companies (including Huawei, LG, Microsoft, Oppo, Samsung, Sony, vivo, Xiaomi and ZTE) have royalty-bearing licenses under our patent portfolio for use in LTE or other OFDMA-based products that do not implement any CDMA-based standards.

Since our founding in 1985, we have focused heavily on technology development and innovation. These efforts have resulted in a leading intellectual property portfolio related to, among other things, wireless technology. We have an extensive portfolio of United States and foreign patents, and we continue to pursue patent applications around the world. Our patents have broad coverage in many countries, including Brazil, China, India, Japan, South Korea, Taiwan and countries in Europe and elsewhere. A substantial portion of our patents and patent applications relate to digital wireless communications technologies, including patents that are essential or may be important to the commercial implementation of CDMA2000, WCDMA (UMTS), TD-SCDMA, TD-CDMA (Time Division CDMA) and OFDMA/LTE products. Our patent portfolio is the most widely and extensively licensed in the industry, with over 330 licensees. Additionally, we have a substantial patent portfolio related to key technologies used in communications and other devices and/or related services, some of which were developed in industry standards development bodies. These include certain video codec, audio codec, wireless LAN, memory interfaces, wireless power, GPS and positioning, broadcast and streaming protocols, and short range communication functionalities, including NFC and Bluetooth. Our patents cover a wide range of technologies across the entire wireless system, including the device (handsets and tablets) and not just what is embodied in the chipsets. Over the years, a number of companies have challenged our patent position, but at this time, companies in the mobile communications industry generally

# REPLY EXHIBIT 6



Menu

About    Certification    Products    Performance    Membership    Events    News    Contact us    eSIM
                                                                                                    RSP

Login

You're here:    Homepage Certification Certifiable Technologies

Save page

# Certifiable Technologies

GCF was originally established as a certification scheme for mobile phones based on GSM technology. GCF Certification has continued to evolve in parallel with the mobile telecommunications industry. Today the scheme covers the following mobile telecommunications technologies:

- GSM
- GPRS
- EDGE
- 3G UMTS
- HSDPA, HSUPA, HSPA+
- 4G / LTE, LTE-Advanced, LTE-Advanced Pro

The adoption of LTE by many of the world's CDMA network operators was a driver in bringing CDMA device certification into GCF.

GCF will extend certification to 5G as the new technical standards are defined.

Extending GCF Certification to new technologies depends on:

- Stable core specifications
- Readiness of test specifications
- Availability of mature reference terminals for test validation
- Timely investment in test platforms from the test industry

5 steps to GCF Certification

Certification Process

Certifiable Technologies

    4G/LTE

    5G

    CDMA2000

Certified Modules

Certified Platforms

- Register
- Website user agreement
- Data Protection
- Contact us
- Disclaimer

© 2018 Global Certification Forum (GCF) Ltd. All rights reserved.          UK Company Registration
Number 6594830

Powered by Preside

# REPLY EXHIBIT 7



**Menu**

**Login**

About        Certification        Products        Performance        Membership        Events        News        Contact us

eSIM RSP

You're here:    **Homepage****Certification**Certified Platforms

# Certified Platforms

Platform Certification extends the principles of **module certification** to enabling manufacturers to design innovative new wireless products around a wider variety of previously certified functionality.

The scheme has been developed to simplify and cut the cost of certification by permitting and encouraging re-use of test results.

## What is a platform?

A platform is any hardware or software subsystem that provides defined functionality within the scope of certification scheme.

Examples of platforms include:

- Chipsets
- Core radio components
- Protocol stacks
- Applications such as MMS or SUPL
- Downloadable clients
- White label devices that are not marketed directly to end-users but are produced to be custo operator- or retailer-branded products

## How does Platform Certification work?

- The platform supplier specifies the functionality the platform is intended to deliver
- The supplier certifies the platform's functionality against all applicable GCF Certification Crite
- The supplier identifies test results that will not be impacted by the platform's integration into a product
- During the certification of the end-product, the manufacturer references and re-uses the platf certification and undertakes the necessary testing to certify any other functionality



Platform Certification allows for multiple indep platforms to be integrated into a single end-pro provided a **suitably qualified expert, recogn GCF,** has assessed the integrations to ensure are no co-existence issues.

Benefits of Platform Certification for manufacturers

5 steps to GCF Certification

- Promotes the supply of pre-certified functionality which can enhance the performance of new connected products

- Simplifies and cuts the cost of certifying products

- Makes device certification accessible to more manufacturers and for all types of mobile-conn product

- Streamlines the testing and certification phase of product development, reducing time-to-mar

- Expands the size of the market that the manufacturer can target by demonstrating that its pro work correctly on multiple networks in multiple territories

Any Manufacturer or Associate Manufacturer Member of GCF can reduce their certification testing by us certified Platforms. Information on certified platforms is available in the members' area of the GCF websi

## Benefits of Platform Certification for technology providers

- Creates a market for pre-certified functionality

Companies wishing to supply pre-certified platforms need to join GCF as a Manufacturer Member.

## Benefits of Platform Certification for operators

- Increases the penetration of GCF-certified products connecting to their networks

- Increases confidence in the quality of mobile-connected products

- Reduces risk of disruption from poorly performing devices - to operators' networks and their customers

Encouraging the use of pre-certified mobile functionality will also increase the overall quality and reliabili mobile-connected products available to consumers and business users.

# Subscribe to our Newsletter

Sign up to receive news updates from GCF

Email address

Register

- **Register**
- **Website user agreement**
- **Data Protection**
- **Contact us**
- **Disclaimer**

© 2018 Global Certification Forum (GCF) Ltd. All rights reserved.          UK Company

Registration Number 6594830

**Powered by Preside**

# REPLY EXHIBIT 8

No. 2013-1625, 2013-1631, 2013-1632, 2013-1633

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FEDERAL CIRCUIT

—————————

ERICSSON, INC. and TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees*,

v.

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC., ACER AMERICA CORPORATION and GATEWAY, INC.,

*Defendants-Appellants*,

and

DELL, INC.,

*Defendant-Appellant*,

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC. and TOSHIBA CORPORATION,

*Defendants-Appellants*,

and

INTEL CORPORATION,

*Intervenor-Appellant*,

and

BELKIN INTERNATIONAL INC.,

*Defendant*.

—————————

**On Appeal from the United States District Court for the Eastern District of Texas, Case No. 10-CV-0473, Chief Judge Leonard Davis**

—————————

**BRIEF OF *AMICUS CURIAE* QUALCOMM INCORPORATED IN SUPPORT OF AFFIRMANCE ON RAND ISSUES**

—————————

(*Counsel Listed on Inside Cover*)

Roger G. Brooks
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rgbrooks@cravath.com

*Attorneys for Amicus Curiae*
*Qualcomm Incorporated*

## INTEREST OF *AMICUS CURIAE*

Qualcomm Incorporated ("Qualcomm") submits this *amicus curiae* brief because Qualcomm has a critical interest in the proper interpretation and application of contractual commitments to license standard-essential patents ("SEPs") on reasonable and non-discriminatory ("RAND") terms, and an extensive familiarity with standard-setting organizations ("SSOs"), SEP licensing, and RAND commitments.[1]

Qualcomm stands in an unusual position with respect to this litigation and appeal. As the supplier of chips used in some of the accused products, Qualcomm indirectly participated in the defense, a Qualcomm witness appeared at trial in Appellants' case-in-chief, and Qualcomm owes certain indemnity obligations to some Appellants. Thus, Qualcomm has an indirect interest in a finding of no liability and a financial interest in minimizing any damages awarded. Qualcomm agrees unequivocally with Appellants' non-infringement and invalidity positions, and supports Appellants with respect to those issues. Qualcomm does not address those topics in this brief and

---

[1] Plaintiffs-Appellees have consented to the filing of this brief. Appellants have not. Accordingly, Qualcomm has filed a motion requesting leave to file this brief. *See* Fed. R. App. P. 29(a); Fed. Cir. R. 29(c). No party's counsel authored this brief in whole or in part. No party, party's counsel, or other person (other than Qualcomm) contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(c)(5).

does not advocate any position concerning the jury's specific award of damages. However, Qualcomm has always been clear about Qualcomm's commitment to its independent views on RAND. Whatever decision this Court reaches with respect to RAND may have profound effects on related legal and policy issues, and may support or undermine incentives to innovate and contribute new technologies in industries that depend on standards. Qualcomm must address this set of issues, even if that means that its views on RAND may align in part with those of Plaintiffs-Appellees Ericsson, Inc. and Telefonaktiebolaget LM Ericsson (collectively, "Ericsson").

Qualcomm is a leading innovator in the cellular communications industry, an industry that has grown and prospered perhaps more than any other while relying on the voluntary RAND commitments made by innovators to SSOs. Qualcomm pioneered the use of code division multiple access ("CDMA") technology for the transmission of cellular communications, the technology that came to be the basis of all so-called "3G" cellular standards. Through RAND licensing, Qualcomm has made its countless 3G innovations widely available, and in return receives royalties and other consideration from its licensees. Qualcomm has reinvested billions of dollars of its licensing revenues to research and invent newer technologies. As a result, Qualcomm has also been one of the principal

developers of the "4G" technology that forms the basis for the long term evolution ("LTE") cellular standards now being deployed.

As the pioneer of CDMA and an extensive contributor to LTE, Qualcomm has developed an industry-leading portfolio of technologies that are protected by both SEPs and non-essential patents, consisting of approximately 36,000 patents worldwide, with some 50,000 patent applications pending. This portfolio represents decades of research and development, and Qualcomm invests roughly 20 percent of its annual revenues in R&D (amounting last year to approximately $5 billion in R&D).

Throughout these endeavors, Qualcomm was a risk taker. Qualcomm risked its future on the superiority of CDMA as a fundamental technology for cellular at a time when industry experts scoffed at the idea. While investing billions of dollars in researching and developing technology that contributed to the success of 2G, 3G, and 4G cellular systems worldwide, Qualcomm contributed its intellectual property ("IP") to standards through RAND commitments, and relied heavily on the stability of the mutual promises associated with a RAND contract. Relying on the meaning of RAND as a voluntary, contractual obligation, Qualcomm has licensed its portfolio to essentially all major handset manufacturers worldwide; it now has more than 250 3G licensees and more than 90 4G licensees.

- 3 -

Licensing fees and royalties account for approximately 30 percent of Qualcomm's revenues. If those revenues did not exist or were substantially lower, Qualcomm could not have made, nor continue to make, the risky investments in R&D at anything like the levels needed to develop next-generation cellular technologies.

However, Qualcomm is not only a research and licensing company. It is also the world's leading supplier of the wireless communications ("baseband") chips that are the heart of a cellphone. As a very large technology product company, Qualcomm is also a licensee, requiring licenses from others in the industry. Qualcomm's dual position as a major licensor and major licensee gives it an unusual and balanced view into the operation of RAND commitments and licensing within standards-dependent industries.

In addition, Qualcomm has been an extremely active participant in numerous SSOs for many years, including the Institute of Electrical and Electronics Engineers ("IEEE"), the European Telecommunications Standards Institute ("ETSI"), and others. Qualcomm has actively participated in deliberation about SSO policies regarding RAND licensing commitments and the licensing of SEPs. Qualcomm has also made hundreds of voluntary commitments to various SSOs to subject its patented

inventions to the RAND obligations specified by those SSOs—including SEPs covering immensely valuable inventions that make possible faster wireless data transfer, greater network capacity, lower power consumption in mobile devices, better cellular coverage, and more.

Qualcomm—and the cellular industry worldwide—has experienced extraordinary growth and success over the last two decades under existing SSO policies and the balanced incentives created by existing RAND licensing practices. In that time, the cellular industry has transformed from serving a small elite to now serving over seven billion subscriptions worldwide, with data speeds improved 100-fold since 2006, and devices that have become both far more powerful and less expensive. Critical to this success, and as a result of existing RAND licensing policies, access to the industry has been open to all; competition among device makers is fierce and new entrants frequent.

As both a driver and a beneficiary of this extraordinary story of investment, innovation, and rapid uptake of technology by consumers, Qualcomm has an acute interest in the accurate understanding and enforcement of RAND licensing obligations—particularly with respect to ensuring a balance between innovators and implementers. Despite the success of the standardized cellular industry at all levels of the value chain,

SEPs and RAND licensing have, in recent years, become subjects of intense controversy.  Partisan advocates mix alarmist warnings with favored policy prescriptions having little to do with the terms of any SSO policy or RAND commitment.  The chorus has largely been focused on lowering returns to innovators while decreasing costs for implementers.  But losing sight of balance is unwise and inconsistent with RAND contracting.  Qualcomm is concerned that courts carefully consider a balanced view of the issues because radical changes to a system that has—in the cellular industry at least—succeeded beyond anyone's imagination are not only unsupportable as a matter of contract law, but would cause significant harm and stifle incentives for future innovation.

Accordingly, Qualcomm submits this brief to provide important context concerning the operation of voluntary RAND licensing in an important standardized industry, and to address some of the arguments made by various *amici*.

## SUMMARY OF ARGUMENT

A RAND commitment is a voluntary, contractual obligation by an SEP holder to an SSO.  As a matter of contract, under the terms of the policies of that SSO, the SEP holder agrees to make its SEPs available to industry participants on reasonable and non-discriminatory terms.  Courts

## CONCLUSION

Qualcomm respectfully requests that this Court consider the
perspectives offered above as it formulates an opinion that will likely have
significant repercussions with respect to critical innovation incentives in the
context of SSOs, SEPs, and standardized industries.


Dated:  February 27, 2014


                              Respectfully submitted,

                              CRAVATH, SWAINE & MOORE LLP

                              By:   /s/ Roger G. Brooks
                                    Roger G. Brooks
                                    Worldwide Plaza
                                    825 Eighth Avenue
                                    New York, NY 10019
                                    (212) 474-1000
                                    rgbrooks@cravath.com

                                    *Attorneys for Amicus Curiae
                                    Qualcomm Incorporated*

# REPLY EXHIBIT 9

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 10

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 11

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 12

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 13

# ETSI Guide on Intellectual Property Rights (IPRs)

# Version adopted by Board#94
# (19 September 2013)

IPR GUIDE

**Background**

The ETSI IPR Policy was adopted by the 21st General Assembly on 23 November 1994 and incorporated in the ETSI Directives as Annex 6 to the ETSI Rules of Procedure.

At a later stage a Technical Body Chairman's Guide on IPRs had been written to help Chairmen and others involved in ETSI's standardization activities to understand and implement the Institute's IPR Policy. That Chairman's Guide on IPR had not been endorsed by the General Assembly or the Board and therefore did not have the same official status as the ETSI Statutes, the Rules of Procedure or the Technical Working procedures. The Technical Body Chairman's Guide on IPRs is now replaced by the present ETSI Guide on IPRs.

In 2002 the ETSI General Assembly #40 identified the need to review the ETSI IPR Policy with a view to addressing and rectifying any uncertainties on the operation of this Policy and on any legal rules and obligations on the membership in order to avoid an incorrect implementation of the ETSI IPR Policy and in order to avoid anti-competitive actions. An ad-hoc IPR group, with a clear mandate to review the implementation of the IPR Policy but not to change the Policy itself, was consequently created and 30 recommendations on the operation of the ETSI IPR Policy where approved by the ETSI General Assembly #42. The present ETSI Guide on IPRs embodies most of these recommendations.

A revised version of the Clause 4.1 of the ETSI IPR Policy was adopted by the 46th General Assembly in November 2005. This revision was induced by the EC DG COMPETITION in its concern to generate a general awareness of the risk of "patent ambush" situation in the standard making process.  The EC DG COMPETITION rationale behind the changes is given in section 4.5 of the present Guide.

For the avoidance of any doubt, the changes to the ETSI IPR Policy with respect to software copyright introduced and approved by General Assembly #58 are not intended, and shall not be interpreted, as a shift in the ETSI IPR regime towards a preference for royalty-free licensing. The basic principle of the ETSI IPR regime remains FRAND with no specific preference for any licensing model.

**Foreword**

Intellectual property plays an important role in standardization, especially in the telecommunications and electronic communications sector. In that context, the likelihood of having Intellectual Property Rights (IPRs) incorporated into ETSI Deliverables became critical after a few years of existence of ETSI. This tension (proprietary nature of IPRs versus wide dissemination of standards) was minimized with the adoption by the ETSI membership of the ETSI IPR Policy as found in Annex 6 to the ETSI Rules of Procedure.

In the preparation of standards, IPR issues may arise. It is important for all parties involved in the ETSI standards-making process to be aware of their responsibilities and that there is good co-operation between all parties.

This guide is intended to help ETSI members and any other party involved in ETSI's standardization activities (e.g. members, Technical Body Chairmen, Secretariat, etc.) to understand and implement the Institute's IPR Policy.

This guide provides explanatory information on how to handle IPR matters in ETSI and does not replace the ETSI IPR Policy which takes precedence in all cases.

This guide has been endorsed by the Board but does not have the same official status as the Statutes, the Rules of Procedure or the Technical Working Procedures.

# REPLY EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

**FILED**
U. S. DISTRICT COURT
Eastern District of Texas

OCT 6 1998

DAVID MALAND, CLERK
By
Deputy _____

| | | |
|---|---|---|
| Ericsson Inc. and | § | |
| Telefonaktiebolaget | § | |
| LM Ericsson, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 2-96-CV183 |
| | § | JURY |
| v. | § | Judge: David Folsom |
| | § | Magistrate Judge: Harry McKee |
| Qualcomm Incorporated, | § | |
| | § | |
| Defendant. | § | |

**QUALCOMM'S MOTION FOR PARTIAL SUMMARY JUDGMENT
TO LIMIT ERICSSON'S REQUESTED RELIEF FOR THE
ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT**

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183

312760 v1/PA
6PBS01!.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591895
Q2017MDL1_01431072

CX6799-001

TABLE OF CONTENTS

PAGE

I.  INTRODUCTION .................................................................................. 1

II. STATEMENT OF UNDISPUTED FACTS ........................................... 3

    A.  The TIA Requires Participating Members To Agree To License Any
        Patents That Are Required To Implement A Standard. ...................... 3

    B.  Ericsson Repeatedly Stated During The IS-95 Standard Setting Process
        That It Would Make Its Patents Available. ....................................... 5

    C.  Ericsson Continued To Assure Qualcomm And Others That It Would
        License Any Patents Essential To IS-95 After The Issuance Of The IS-95
        Standard. .......................................................................................... 6

III. LEGAL ARGUMENT ........................................................................ 10

    A.  Summary Judgment Standard ........................................................ 10

    B.  Ericsson's Remedies Should Be Limited Under The Doctrine Of Equitable
        Estoppel To Licensing Fees Based On Reasonable Terms And Conditions
        Free Of Any Unfair Discrimination ................................................. 11

        1.  Ericsson Led Qualcomm To Reasonably Infer That Ericsson
            Would Not Seek To Prevent Qualcomm From Developing,
            Manufacturing And Marketing IS-95 Products. ....................... 14

        2.  Qualcomm Relied On Ericsson's Promises During And After The
            IS-95 Standard Setting Process .............................................. 15

        3.  Qualcomm Will Be Severely Prejudiced If Ericsson Is Now
            Allowed To Prevent Qualcomm From Developing, Manufacturing
            And Marketing IS-95 Products. ............................................... 16

    C.  Qualcomm Is Entitled To An Implied License "Under Reasonable Terms
        And Conditions That Are Demonstrably Free From Any Unfair
        Discrimination." .............................................................................. 17

IV. CONCLUSION .................................................................................. 18

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 -- Page i

312760 v1/PA
6PBS011.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591896
Q2017MDL1_01431073

CX6799-002

TO THE HONORABLE JUDGE FOLSOM:

Defendant Qualcomm Incorporated ("Qualcomm") respectfully files this motion for

partial summary judgment or, in the alternative, summary adjudication to limit the relief

requested by plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson (hereinafter

collectively "Ericsson") for the alleged infringement of the patents-in-suit.

## I.

## INTRODUCTION

> Please be assured that we [Ericsson] will honor our undertaking
> with the TIA to license any patents whose use would be required
> for compliance with IS-95 under reasonable terms and conditions
> that are demonstrably free of any unfair discrimination.
> —    Letter from Ericsson to Qualcomm dated
>        August 29, 1995

For the three years prior to the filing of this lawsuit, Ericsson repeatedly, and without

qualification, promised Qualcomm and others that it would license "under reasonable terms and

conditions that are demonstrably free from any unfair discrimination" any patents it held that

were required to develop products compliant with the "Mobile Station–Base Station Standard for

Dual-Mode Wideband Spread Spectrum Cellular System" (the "IS-95 standard"). It made that

promise to the Telecommunications Industry Association (the "TIA") and its participants,

including Qualcomm, during the standards setting process that led to the issuance of IS-95 in

July 1993. It made the same promise in separate letters to the TIA and Qualcomm more than

two years after the adoption of IS-95. Ericsson also repeated the promise publicly on a number

of additional occasions.

Furthermore, Ericsson actively participated in the TIA process that led to the adoption of

IS-95 fully aware of the fact that the TIA's internal policies prohibited the adoption of any

standard unless all participants in the standard setting process agreed to license whatever

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 1

312760 v1/PA
6PBS01I.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591897
Q2017MDL1_01431074

CX6799-003

"essential" patents they possessed under reasonable terms and conditions. In fact, a senior Ericsson official chaired the committee that drafted and proposed the TIA policy.

Remarkably, Ericsson now seeks in this lawsuit to prevent Qualcomm from developing, manufacturing or selling products which Ericsson alleges infringe ten patents (the "Alleged TIA Patents") that it believes are essential to the IS-95 standard.[1] In short, Ericsson seeks to repudiate its repeated promises upon which Qualcomm and the entire telecommunications industry relied. For three years, Qualcomm relied on Ericsson's many promises and built a multi-billion dollar business based on the IS-95 technology, secure in the knowledge that it could license any patents determined to be necessary for those products. Now that Ericsson perceives that Qualcomm's business poses a threat to Ericsson's dominant position in the worldwide marketplace, it seeks to renege on its promises and to secure a court order enjoining Qualcomm's operations. As a matter of law, however, Ericsson is estopped from doing so.

There should be no mistake: Qualcomm strenuously denies that it infringes any of Ericsson's patents that Ericsson claims are essential to IS-95. However, Qualcomm's assertions of non-infringement and invalidity do not somehow excuse Ericsson of its obligation to license those patents determined to be essential to IS-95. Ericsson did not promise that it would license its patents only if industry participants accepted, without challenge, Ericsson's representations that it possessed patents essential to the standard. Nor would such a position be consistent with

---

[1]   In its response to Interrogatory No. 1 of Qualcomm's First Set of Interrogatories [Exh. 1], Ericsson identified the following patents-in-suit as being essential to the practice of the IS-95 standard:   5,088,108; 5,109,528; 5,327,577; 5,148,485; 5,239,557; 5,282,250; 5,390,245; 5,430,760; 5,551,073; and 5,193,140.   (Ericsson has recently informed Qualcomm that it intends to dismiss with prejudice its claims relating to the 5,239,557, the 5,430,760 and the 5,148,485 patents. They remain subject to this motion pending the dismissal.)   It is unclear whether Ericsson claims that the eleventh patent-in-suit, 5,230,003, is essential to the IS-95 standard. Although Ericsson did not identify the '003 patent in response to Interrogatory No. 1, Ericsson has stated, "This case involves eleven patents owned by Ericsson, which Ericsson believes are essential patents with respect to certain standards for cellular telephony – i.e., patents that must be practiced by any person who sells equipment that will comply with these standards."   Ericsson's Motion to Compel Response to Ericsson's Third Set of Document Requests, August 3, 1998, p. 2.   To the extent, Ericsson alleges the 5,230,003 patent is essential to IS-95, it should be included as an "Alleged TIA Patent."

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 2

312760 v1/PA
6PBS011.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591898
Q2017MDL1_01431075

CX6799-004

TIA policy. Rather, by participating in the TIA process and by repeatedly promising Qualcomm and others, Ericsson has lost its ability to enjoin Qualcomm and others from practicing patents that are essential to IS-95.

Accordingly, Qualcomm respectfully requests that this Court grant partial summary judgement limiting Ericsson's relief in this action, if any, to that which is consistent with the TIA policy and Ericsson's numerous representations. Specifically, Qualcomm requests that Ericsson be estopped from seeking any injunctive relief as to its Alleged TIA Patents, that Ericsson be estopped from seeking any lost profits or other damages as to its Alleged TIA Patents other than license fees "under reasonable terms and conditions that are demonstrably free from any unfair discrimination," and that Ericsson be required to license to Qualcomm any Alleged TIA Patents that are essential to practice the IS-95 standard.

A determination that Ericsson's potential recovery is so limited will reduce the issues for trial and aid the parties in properly evaluating this case and their respective exposures. The result will be a significantly enhanced opportunity for a negotiated resolution of this litigation as well as the preservation of judicial resources.

## II.

### STATEMENT OF UNDISPUTED FACTS

**A.    The TIA Requires Participating Members To Agree To License Any Patents That Are Required To Implement A Standard.**

Over the past three decades, industry standards groups have been a driving force in the growth of many industries, including wireless communications. [*See, generally*, Exh. 2 at 1, Russell T. Wong, et al., *Legal Implications of Standard Setting Activity*, paper presented at the Second Annual Advance Patent Law Institute, sponsored by the University of Texas School of Law, Nov. 6-7, 1997.] The goal of these groups is to develop and maintain voluntary industry

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 3

312760 v1/PA
6PBS01!.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591899
Q2017MDL1_01431076

CX6799-005

standards and specifications for implementing the particular technology in question.  The results typically include improved technologies, a greater number of companies manufacturing and selling products using those technologies and greater compatibility among those products.

The Telecommunications Industry Association ("TIA"), a trade group consisting primarily of wireless equipment manufacturers, is the primary standard-setting body for the telecommunications industry in the United States. [Exh. 3, TIA Engineering Manual dated December 6, 1991, at i.]  Qualcomm and Ericsson are both members of the TIA.

Like most standards setting bodies, the TIA has declared that it will not approve a proposed standard unless any participant holding a patent that would be required for compliance with the standard agrees to license the patent without compensation or "under reasonable terms and conditions that are demonstrably free from any unfair discrimination."  This basic policy ensures that all industry participants will be able to develop, manufacture and sell products compliant with the relevant standard without incurring the risk that patent holders will be able to shut down those operations.  The TIA's Intellectual Property Rights Policy, as stated in TIA Advisory Note No. 11, provides, in part:

> (2)  Statement from the patent holder
>
> Prior to approval of such a proposed TIA Standard or Interim Standard, TIA shall receive from the patent holder (in a form approved by TIA) either:  assurance in the form of a general disclaimer to the effect that the patentee does not hold and does not anticipate holding any invention whose use would be required for compliance with the proposed TIA Standard or Interim Standard or assurance that:
>
> > (1)  A license will be made available without compensation to applicants desiring to utilize the license for the purpose of implementing the standard;
> >
> > or

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 4

312760 v1/PA
6PBS01!.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591900
Q2017MDL1_01431077

CX6799-006

(2)     A license will be made available to applicants under
        reasonable terms and conditions that are
        demonstrably free of any unfair discrimination.

The statement from the patent holder must be stated
in <u>exactly</u> the words prescribed above.  TIA will not
accept statements which are conditional or which
reveal the terms of licensing.

[Exh. 4, TIA Advisory Note 11 dated May 18, 1993.]

Interestingly, the policy was proposed and drafted in 1993 by TIA's Ad-Hoc Intellectual

Property Rights Committee, which was chaired by Barry Kratz, Ericsson's Director of Business

and Industry.

**B.     Ericsson Repeatedly Stated During The IS-95 Standard Setting Process That It
        Would Make Its Patents Available.**

In 1989, the TIA issued the IS-54 standard for digital cellular communications.  The

standard was based on TDMA technology and included substantial contributions from Ericsson.

In January 1992, the Cellular Telecommunications Industry Association ("CTIA")[2] requested the

TIA to consider a second digital cellular standard, this time largely based on Qualcomm's

CDMA technology.  In March 1992, the TIA established a new subcommittee, identified as

TR45.5, to work towards the adoption of a standard based on CDMA technology.  [Exh. 5,

Proposed "Scope" and "Charter" for TR45.5 dated March 30, 1992.]  The standard, when

adopted in July 1993, become known as IS-95.[3]  The TIA's Intellectual Property Rights Policy

was in effect at the time IS-95 was adopted.

---

[2]   The CTIA is a membership of telephone service providers.

[3]   The IS-95 standard was subsequently revised by the TIA and published as IS-95-A in May 1995.  IS-95 and IS-95A are
      referred to throughout this motion collectively as IS-95.

QUALCOMM'S MOTION FOR PARTIAL SUMMARY                                    312760 v1/PA
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR                       6PBS01I.DOC
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT                          100598
Civil Action No. 2-96-CV183 -- Page 5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM                        Q2014FTC01591901
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                               Q2017MDL1_01431078

                                                                        CX6799-007

Shortly after the adoption of the Intellectual Property Rights Policy, Ericsson informed

the TIA that it believed it had patents essential to the proposal being considered by the TR 45.5

subcommittee and that it intended to comply with the TIA's policies with regard to those patents:

> In accordance with Section 2 of the recently adopted TIA Patent
> Policy, Ericsson wishes to inform you that, in our opinion, we hold
> patents whose use would be required for compliance with PN-3118
> (IS-95).  Accordingly, <u>a license will be made available to
> applicants under reasonable terms and conditions that are
> demonstrably free of any unfair discrimination</u>.

[Exh. 6, Letter from Barry Kratz to Gerald Flynn, Chairman of TR45.5 dated April 16, 1993

(emphasis added).]  Ericsson's commitment to abide by the Intellectual Property Rights Policy

was confirmed by the TR45.5 chairman in the minutes of the April 19, 1993 subcommittee

meeting.  [Exh. 7, TR45.5 Meeting Report dated April 19, 1993.]

By letter dated May 11, 1993, Ericsson identified Patent Nos. 5,088,108 and 5,109,528 as

being "required for compliance with [IS-95]."  Again, Ericsson stated that it was "willing to

license these patents under reasonable terms and conditions that are demonstrably free of any

unfair competition." [Exh. 8, Letter from Barry Kratz to Gerald J. Flynn dated May 11, 1993.]

Two months later, the TIA issued the "Mobile Station – Base Station Standard for Dual-Mode

Wideband Spread Spectrum Cellular System" or IS-95.

C.     **Ericsson Continued To Assure Qualcomm And Others That It Would License Any
       Patents Essential To IS-95 After The Issuance Of The IS-95 Standard.**

For over two years following the adoption of IS-95, Ericsson failed to identify any

additional patents as being essential to IS-95 even though it had promised to do so in May of

1993.  [Exh 8, Letter from Barry Kratz to Gerald Flynn dated May 11, 1993.]  In May of 1995,

the TIA wrote to Ericsson requesting Ericsson to disclose any additional patents it considered

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 6

312760 v1/PA
6PBS011.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM          Q2014FTC01591902
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                 Q2017MDL1_01431079

CX6799-008

essential to the IS-95 based standard for PCS communications.[4]  [Exhibit 9, letter from Thanos
Kipreos to Barry Kratz dated May 16, 1995.]  In this letter, the TIA also reminded Ericsson that
it would not adopt a proposed standard unless participating members holding patents essential to
the standard agreed to license the patents in accordance with the Intellectual Property Rights
Policy.  [Id.]  When Ericsson failed to respond, the TIA sent another letter, again reminding
Ericsson of the policy:

> TIA and American National Standards Institutes (ANSI) IPR
> policies will not allow these standards to be published if such
> essential patent IPR are not available to others on licensing terms
> that are: (1) without compensation or (2) reasonably and
> demonstrably free of any unfair discrimination.

[Exh. 11, Letter from Thanos Kipreos to Barry Kratz dated August 3, 1995.]  Although Ericsson
remained silent, five additional patents were issued to Ericsson during this period (the 5,239,557
patent in August 1993, the 5,282,250 patent in January 1994, the 5,327,577 patent in July 1994,
the 5,390,245 patent in February 1995, and the 5,430,760 patent in July 1995) that it claims in
this lawsuit to be essential to IS-95.[5]

      During this same period, Qualcomm began to invest heavily in the development,
production and marketing of products based on the IS-95 standard.  [Exh. 12, Declaration of Dr.
Irwin M. Jacobs ("Jacobs Declaration"), at ¶ 6.]  By the end of 1995, Qualcomm had invested
nearly $400 million in the research, development, production and marketing of IS-95 compliant
products.  [Id.]  For the period from July 1993 (when the IS-95 standard was adopted) to
December 1995 (when Ericsson finally identified additional essential patents), the investment in

---

[4]  At this time, the American National Standards Institute ("ANSI"), in conjunction with the TIA, was considering J-STD-008,
a Personal Communications Services ("PCS") standard based on IS-95.  (PCS communications use spectrum in the 1800
MHz to 2000 MHz band while cellular communications use spectrum in the 800 MHz to 900 MHz band.)  ANSI has a very
similar intellectual property rights policy as the TIA.  [Exh. 10, ANSI's Procedures for the Development and Coordination of
American National Standards.]  The "upbanded" IS-95 standard was adopted in July 1996.

[5]  All of the patents-in-suit had been applied for and nine of the eleven had been issued by May 1995.

QUALCOMM'S MOTION FOR PARTIAL SUMMARY                                    312760 v1/PA
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR                       6PBS01!.DOC
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT                          I00598
Civil Action No. 2-96-CV183 ~ Page 7

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM                    Q2014FTC01591903
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                          Q2017MDL1_01431080

                                                                          CX6799-009

IS-95 products amounted to roughly $300 million [*Id.*] Qualcomm had also entered into roughly 30 licensing agreements with entities throughout the United States and the world in which it licensed its essential IS-95 patents. [*Id.*]. And that investment was beginning to pay off: in the summer of 1995, both PrimeCo and Sprint Telecommunications Venture, two major cellular providers, announced their plans to install IS-95 systems, rather than systems based on Ericsson's TDMA technology, in their service areas. [Exh 13, Sprint Telecommunications Venture Press Release dated July 21, 1995; Exh. 12, Jacobs Declaration at ¶ 6.] Qualcomm and its CDMA technology were becoming a competitive threat to Ericsson and its TDMA systems.

This threat apparently jolted Ericsson into desperate action. Despite two years of silence, Ericsson announced that it held IS-95 "blocking" patents less than one month after the Sprint announcement. On August 17, 1995, Ericsson's Chairman, Lars Ramqvist, stated in a public report to the company's shareholders:

> The selection of the CDMA technology by several PCS operators
> will not noticeably affect Ericsson, despite Ericsson having elected
> currently not to continue with the system development of CDMA
> in accordance with the newly adopted U.S. Standard IS-95 .... Our
> advanced CDMA development has resulted in a significant number
> of U.S. patents. In our opinion, several represent blocking patents
> within the USA IS-95 standard, whereby future users of this
> technology must have a license from Ericsson."

[Exh 14, Ericsson Interim Report for Six Months Ending June 30, 1995.][6]

Both Qualcomm and the TIA immediately wrote to Ericsson requesting that it identify its "blocking" patents. [Exh. 15, Letter from Louis Lupin to Lars Ramqvist dated August 21, 1995; Exh. 16, Letter from Thanos Kipreos to Barry Kratz dated August 25, 1995.] On August 29, Ericsson responded to Qualcomm by stating that it would disclose the relevant patents "in the near future" and by reassuring Qualcomm:

---

[6]  Qualcomm's stock declined by $4.63, or nearly 9 percent, shortly after the publication of Mr. Ramqvist's announcement.
QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 8

312760 v1/PA
6PBS011.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591904
Q2017MDL1_01431081

CX6799-010

> Please be assured that <u>we will honor our undertaking with the TIA
> to license any patents whose use would be required for compliance
> with IS-95 under reasonable terms and conditions that are
> demonstrably free of any unfair discrimination</u>.

[Exh. 17, Letter from Walo von Greyerz to Louis Lupin dated August 29, 1995 (emphasis

added).] On September 19, 1995, Ericsson responded to the TIA:

> Ericsson fully supports TIA's IPR policy.  <u>Ericsson will license
> applicants under reasonable terms and conditions that are
> demonstrably free of any unfair discrimination</u>.

[Exh. 18, Letter from Barry Kratz to Thanos Kipreos dated September 19, 1995 (emphasis

added).]

    On November 14, 1995, Ericsson wrote to Qualcomm and several other companies

identifying 21 patents held by Ericsson that it stated were "relevant" to IS-95. [Exh. 19, Letter

from Mans Ekelof to Harvey White dated November 14, 1995.] The letter indicated that a

"substantial number" of those 21 patents were essential to the IS-95 standard. Ericsson still

refused, however, to identify specifically its allegedly essential patents (other than the two

identified in 1993). A similar letter identifying the 21 "relevant" patents was sent to the TIA on

November 27, 1995. [Exh. 20, Letter from Barry Kratz to Thanos Kipreos dated November 27,

1995).]

    It was not until December 11, 1995, two and a half years after the adoption of IS-95 and

four months after Mr. Ramqvist's "blocking" statement, that Ericsson identified any patents in

addition to the two identified in 1993 that it asserts are essential to IS-95. [Exh. 21, Letter from

Mans Ekelof to Louis Lupin dated December 11, 1995 ][7] After disclosing these eight allegedly

---

[7]   In addition to the 5,088,108 and 5,109,528 patents disclosed in May 1993, Ericsson identified at that time the following
patents as allegedly essential to IS-95:   5,148,485; 5,239,557; 5,282,250; 5,290,245; 5,237,577; 5,430,760.   Ericsson
recently informed Qualcomm that it intends to dismiss, with prejudice, all its claims with regard to three of these patents.
See Note 1 <u>supra</u>.

QUALCOMM'S MOTION FOR PARTIAL SUMMARY               312760 v1/PA
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR    6PBS011.DOC
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT        100598
Civil Action No. 2-96-CV183 – Page 9

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM       Q2014FTC01591905
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY               Q2017MDL1_01431082

CX6799-011

essential patents, Ericsson again confirmed to Qualcomm its commitment to license such patents on a fair and non-discriminatory basis. [Exh. 22, Letter from Mans Ekelof to Louis Lupin dated January 9, 1996.] On October 15, 1996, nearly one year later, Ericsson identified the 5,193,140 patent as essential to the IS-127 standard, which has been incorporated into IS-95-A. It was not until Ericsson responded to Qualcomm's First Set of Interrogatories on July 28, 1997, that it identified the 5,551,073 patent as essential to IS-95. [Exh. 1.]

## III.

## LEGAL ARGUMENT

### A.    Summary Judgment Standard.

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. PROC. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Cyrix Corp. v. Intel Corp.*, 879 F. Supp. 666, 667-668 (E.D. Tex. 1995), *aff'd*, 77 F.3d 1381 (Fed. Cir. 1996). The Court may properly dispose of "any part" of a case by summary judgment or summary adjudication. FED. R. CIV. PROC. 56(a). As the moving party, Qualcomm has the initial burden of identifying "the materials on file that it believes demonstrate the absence of any genuine issues of material fact." FED. R. CIV. P. 56(e). Once Qualcomm satisfies this requirement, the burden shifts to Ericsson to set forth specific facts showing that there is a genuine issue of fact for trial. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987). If Ericsson cannot meet that burden, Qualcomm's motion must be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322.

Summary judgment is appropriate in this case as there is no genuine issue of material fact relating to Qualcomm's equitable estoppel defense. Furthermore, the resolution of this issue by

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 10

312760 v1/PA
6PBS01I.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591906
Q2017MDL1_01431083

CX6799-012

the Court at this time will permit the parties to better evaluate the case and perhaps lead to a

negotiated resolution.

**B.     Ericsson's Remedies Should Be Limited Under The Doctrine Of Equitable Estoppel To Licensing Fees Based On Reasonable Terms And Conditions Free Of Any Unfair Discrimination.**

While "equitable estoppel is not limited to a particular factual situation nor subject to

resolution by simple or hard and fast rules," *A.C. Aukerman Co. v. R.C. Chaides Construction*

*Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (*en banc*), the Federal Circuit has identified the

following elements of an equitable estoppel defense to patent infringement claims:

(1)     The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction, or silence where there was an obligation to speak.

(2)     The alleged infringer relied on that conduct.

(3)     Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*A. C. Aukerman*, 960 F.2d at 1028.

Several courts have applied the principle in estopping participants in industry standard-

setting committees from fully enforcing their patent rights as a result of their conduct before

those committees.  For example, in *Stambler v. Diebold, Inc.*, 11 U.S.P.Q.2d (BNA) 1709

(E.D.N.Y. 1988), *aff'd*, 11 U.S.P.Q.2d (BNA) 1715, 1716 (Fed. Cir. 1989), the defendant sought

summary judgment to preclude plaintiff-patentee from seeking damages and equitable relief

based on, among other things, equitable estoppel.  Ten years before filing his infringement

action, the patentee participated in an American National Standards Institute ("ANSI") standards

committee that was in the process of adopting the very standard the patentee ultimately alleged

was covered by his patent.  During the standards setting process the plaintiff-patentee failed to

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF EOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 11

312760 v1/PA
6PB30J!.DOC
10059B

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591907
Q2017MDL1_01431084

CX6799-013

disclose the existence of its essential patents, which the court noted "could reasonably be interpreted as an indication that plaintiff had abandoned its patent claims." *Id.* at 1715. In holding that the doctrine of equitable estoppel barred the patentee from receiving any injunctive relief, the court concluded that the patentee's conduct before the standards setting committee limited his ability to enforce his patent rights: "Plaintiff could not remain silent while an entire industry implemented the proposed standard and when the standards are adopted assert that its patent covered what manufacturers believed to be an open and available standard." *Id.*

In *Potter Instrument Co., Inc. v. Storage Tech. Corp.*, 207 U.S.P.Q. (BNA) 763, 766 (E.D. Va. 1980), *aff'd on other grounds*, 641 F.2d 190 (4th Cir. 1981), a patentee sued for infringement based on the defendant's making and selling of products compliant with a standard adopted by ANSI. The court dismissed the action holding that the patentee was equitably estopped from enforcing its patent against the defendant. Its holding was based on two critical factors. First, the ANSI standards setting committee "had a written policy, of which all members were aware, stating that when any one or more patents are to be included within a proposed industry standard, the owner of such patent must bring to the attention of the Subcommittee the existence of such patents and agree to offer licenses to members of the affected industry on reasonable and nondiscriminatory terms as a prerequisite to the adoption of the industry-wide standard." *Id.* at 766. And second, representatives of the patentee had attended one of the ANSI meetings but did not disclose its ownership of the patent. *Id.* The court concluded that "[e]quity will rarely, if ever, permit one to waive by acquiescence its alleged patent rights for a long period of time and attempt to assert them after they have been adopted as the industry standard." *Id.* at 769.

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 12

312760 v1/PA
6PBS011.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591908
Q2017MDL1_01431085

CX6799-014

In a similar standards setting context, the Federal Circuit concluded that the patentee had granted the defendant an irrevocable, royalty-free implied license under the patent as a result of its conduct. *Wang Laboratories, Inc. v. Mitsubishi Electronics Co. of America*, 103 F.3d 1571 (Fed. Cir. 1997). Among other things, the patentee encouraged the relevant standard setting body to adopt its technology as an industry standard without ever informing that body or its members of its ongoing pursuit of patents covering the technology. *Id.* at 1575. In upholding the jury's finding of an implied license, the Federal Circuit held that the license was the legal result of equitable estoppel and explained that "an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using or selling the patented invention." *Id.* at 1580.

In each of these cases, the patentees were equitably estopped from exercising <u>any</u> of their patent rights due primarily to their silence about their patent portfolios before various standards setting bodies. The defendants in each of those cases had developed, manufactured or sold products compliant with the standards (and which potentially infringed the patents) based on the belief that the standards setting process had secured their ability to do so without infringing any patents. The courts concluded rightly that the conduct of the patentees, which enforced those beliefs, estopped them from recovering any relief whatsoever from the defendants.

While the instant case is closely analogous to the cases cited above, it differs in two important aspects, both of which weigh in favor of Qualcomm's equitable estoppel claim. First, Ericsson engaged in repeated *affirmative* representations regarding its willingness to abide by the TIA's Intellectual Property Rights Policy (rather than merely remaining silent). Second, the relief sought by Qualcomm is much more *limited* than that granted by the courts in the cases discussed above. Qualcomm strenuously denies that it is infringing any of the Alleged TIA

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 — Page 13

312760 v1/PA
6PBS011.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591909
Q2017MDL1_01431086

CX6799-015

Patents.  However, if it is found to have infringed those patents, Qualcomm does not seek in this

motion to deny Ericsson the right to exercise all of its patent rights as the courts did in the cases

cited above.  Rather, this motion merely seeks a limitation of the relief sought to the recovery of

license royalties, "under reasonable terms and conditions that are demonstrably free of any unfair

discrimination," if Qualcomm is found to have infringed those patents.  That is, Qualcomm

merely seeks to hold Ericsson to the repeated promises it made to Qualcomm and others who

participated in the IS-95 standard setting process.

   As set forth below, there is no material dispute with regard to any of the three elements of

an equitable estoppel defense:  Ericsson's conduct and its many promises led Qualcomm to

reasonably infer that it could practice the IS-95 standard without fear that Ericsson would seek to

enjoin its activities; Qualcomm relied on Ericsson's conduct and promises; and, as a result of that

reliance, Qualcomm would be materially prejudiced if Ericsson were allowed to proceed with its

claims for injunctive relief and for lost profits.  Accordingly, Ericsson should be estopped from

seeking any relief other than royalties "under reasonable terms and conditions free from any

unfair discrimination."

   1.   **Ericsson Led Qualcomm To Reasonably Infer That Ericsson Would Not
        Seek To Prevent Qualcomm From Developing, Manufacturing And
        Marketing IS-95 Products.**

   In order for a patentee to be equitably estopped from fully enforcing its rights, the

patentee must have communicated to the alleged infringer that the patentee would somehow

refrain from enforcing some or all of its rights as a patent holder.  That is,

> Properly focused, the issue here is whether Aukerman's
> [Ericsson's] course of conduct reasonably gave rise to an inference
> in Chaides [Qualcomm] that Aukerman [Ericsson] was not going
> to enforce . . [its] patents against Chaides [Qualcomm].

*A.C. Aukerman*, 960 F.2d at 1043.

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 14

312760 v1/PA
6PBS01I.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591910
Q2017MDL1_01431087

CX6799-016

In *Stambler*, *Potter* and *Wang*, the course of conduct involved, among other things, silence before a standards setting committee. The inference drawn by each of the defendants was that the plaintiffs held no patents essential to the standards and, therefore, the defendants were free to practice the standard without fear of interference. In this case, the course of conduct involves Ericsson's affirmative representations made repeatedly before the TIA and directly to Qualcomm. The inference that Qualcomm reasonably inferred from that conduct was that Ericsson would not seek to prevent Qualcomm from developing, manufacturing and marketing IS-95 compliant products. [Exh 12, Jacobs Declaration at ¶ 9.] That is, if it were determined that Qualcomm (like the defendants in the cases cited above) was indeed infringing Ericsson's patent, Ericsson would be required to license those patent rights "under reasonable terms and conditions that are demonstrably free of any unfair discrimination."

There is no genuine dispute that Ericsson repeatedly assured Qualcomm and others that it would license its patents essential to the practice of the IS-95 standard. Nor is there any question that the TIA's Intellectual Property Rights Policy, drafted by a subcommittee chaired by Ericsson's own Barry Kratz, required Ericsson to honor its commitment to license any patents that it might have. Ericsson now seeks to do the very thing it promised on so many occasions that it would not do: stop Qualcomm from building and selling IS-95 based products.

**2.    Qualcomm Relied On Ericsson's Promises During And After The IS-95 Standard Setting Process.**

The essence of the reliance element of the equitable estoppel defense to a patent infringement claim is that the alleged infringer "have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security..." *Aukerman*, at 1042-1043. Qualcomm's relationship with Ericsson as participating members of the TIA standard setting process lulled Qualcomm into what turned out to be a false sense of security that it would be free

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 - Page 15

312760 v1/PA
6PBS011.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591911
Q2017MDL1_01431088

CX6799-017

to practice the standard adopted by the TIA and that it could obtain a license from Ericsson for any patents necessary to practice the adopted standard.

Qualcomm relied on both Ericsson's participation in the TIA standards setting process and on Ericsson's many representations that any patent rights held by Ericsson would be made available "under reasonable terms and conditions that are demonstrably free from any unfair discrimination." [Exh. 12, Jacobs Declaration, at ¶ 9.] Qualcomm also relied on the fact that Ericsson never even approached Qualcomm seeking to license its patents for well over two years after the IS-95 standard was adopted. It was reasonable for Qualcomm to invest huge sums of money in its IS-95 programs secure in the knowledge that the IS-95 standard could be built to without fear that Ericsson or others involved in the process that led to that standard would seek to enjoin its activities. [Id. at ¶ 6.]

### 3. Qualcomm Will Be Severely Prejudiced If Ericsson Is Now Allowed To Prevent Qualcomm From Developing, Manufacturing And Marketing IS-95 Products.

If Ericsson is not estopped from seeking relief other than reasonable license fees, Qualcomm will suffer severe prejudice. Qualcomm invested substantially in IS-95 compliant products and technologies since the adoption of the standard in 1993.[8] From July 1993 to December 1995, Qualcomm invested roughly $300 million dollars in the research, development, production and marketing of IS-95 compliant products. [Id.] In 1996, the sale of IS-95 and related products represented 73 percent of Qualcomm's total revenues. [Id. at ¶ 11.] That percentage increased to 86 percent in 1997. A ruling preventing Qualcomm from practicing some or all of the IS-95 standard would significantly impact those operations.

---

[8]    Prejudice may be established by a change in economic position in reliance on the patentee's conduct. *Auckerman,* 960 F.2d at 1043

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 16

312760 v1/PA
6PBS011.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591912
Q2017MDL1_01431089

CX6799-018

**C.   Qualcomm Is Entitled To An Implied License "Under Reasonable Terms And Conditions That Are Demonstrably Free From Any Unfair Discrimination."**

"In patent law, an implied license merely signifies a patentee's waiver of the statutory right from making, using, or selling the patented invention." *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997), *citing Spindelfrabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987.) As stated by the Supreme Court:

> No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any other conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for tort.

*De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241, 71 L. Ed. 625, 47 S. Ct. 366 (1927). An implied license may be the result of a finding of equitable estoppel. *See Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571.

In *Wang*, the court found that Wang's "entire course of conduct" toward defendant Mitsubishi led the former to "infer consent to manufacture and sell the patented products." Central to the court's finding was that Wang had proposed adoption of its patented invention (a single inline memory module ("SIMM") used in personal computers) as an industry standard without disclosing its patent. *Id.* at 1582. The court found that the only remuneration sought by Wang was the adoption of its design as an industry standard and the benefits that would flow to it from a larger market. As summarized by the court, "*Wang* consented to Mitsubishi's use of the invention, granted the right to make, use, or sell the patented SIMMs without interference from Wang, and received consideration  Therefore, we agree with the district court's determination,

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S-REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 17

312760 v1/FA
6PBS01!.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591913
Q2017MDL1_01431090

CX6799-019

reiterated in denying Wang's motion to amend the judgment, that Mitsubishi possesses an

irrevocable royalty-free license under the '513 patent." *Wang* at p. 1582.

Here, the TIA's Intellectual Property Rights Policy and Ericsson's course of conduct

during the standard setting process mandate that Qualcomm be granted an implied license to any

of the Alleged TIA Patents that are deemed necessary to the IS-95 standards "under reasonable

terms and conditions that are demonstrably free from any unfair discrimination." In light of the

TIA Intellectual Property Rights Policy, such a license is the only remuneration Ericsson could

expect to recover for such patents.

**IV.**

**CONCLUSION**

For the foregoing reasons, Qualcomm's motion for partial summary judgment to limit

Ericsson's requested relief for the alleged infringement of its Alleged TIA Patents should be

granted. Ericsson should be estopped from seeking any injunctive relief or other damages as to

its Alleged TIA Patents other than licensing fees "under reasonable terms and conditions that are

demonstrably free of any unfair discrimination," and Ericsson should be required to license to

Qualcomm, "under reasonable terms and conditions that are demonstrably free from any unfair

discrimination," those patents, if any, essential to IS-95 which the Court determines have been

infringed by Qualcomm.

Dated: October ___, 1998

Respectfully submitted,

**COOLEY GODWARD LLP**
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Tel: (650) 843-5000
Fax: (650) 857-0663

QUALCOMM'S MOTION FOR PARTIAL SUMMARY
JUDGEMENT TO LIMIT ERICSSON'S REQUESTED RELIEF FOR
THE ALLEGED INFRINGEMENT OF THE PATENTS-IN-SUIT
Civil Action No. 2-96-CV183 – Page 18

312760 v1/PA
6PBS01I.DOC
10059E

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591914
Q2017MDL1_01431091

CX6799-020

**AKIN GUMP, STRAUSS, HAUER & FELD LLP**
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201-4675
Tel:  (214) 969-2800
Fax:  (214) 969-4343

**LAW OFFICES OF CARL L. ROTH, P.C.**
P.O. Box 876
115 North Wellington Suite 200
Marshall, Texas 75670
Tel:  (903) 935-1665
Fax:  (903) 935-1797

**LAW OFFICES OF FRANK E. ROGOZIENSKI, INC.**
Coronado Professional Square
1203 Second Street
Coronado, CA 92118
Tel:  (619) 437-1878
Fax:  (619) 437-4894

**YOUNG & PICKETT**
4122 Texas Boulevard—P.O. Box 1897
Texarkana, AR-TX 75504
Tel:  (903) 794-1303 (501) 774-3206
Fax:  (903) 792-5098

By: _Damon Young_ _by permission Michael Roth_
    Damon Young, Attorney-In-Charge
    Texas State Bar ID #2217670

Attorneys for Defendant
QUALCOMM INCORPORATED

312760 v1/PA
6PBS01!.DOC
100598

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591915
Q2017MDL1_01431092

CX6799-021

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Qualcomm's Motion for Partial Summary Judgment to Limit Ericsson's Requested Relief for the Alleged Infringement of the Patents in Suit has been served on this _6th_ day of October, 1998, on plaintiffs' counsel as follows:

Jeffrey R. Bragalone               (UPS Next Day Air and Facsimile)
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas  75201


Sam Baxter                         (By Hand Delivery)
McKool Smith, P.C.
505 East Travis
Marshall, TX 75670


Franklin Jones, Jr.                (Certified Mail, Return Receipt Requested and)
Jones & Jones                          Facsimile (w/o attachments)
P.O. Drawer 1249
Marshall, TX 75671


Travis Gordon White               (UPS Next Day Air and Facsimile (w/o attachments))
Arnold, White & Durkee
750 Bering Drive
Houston, TX 77057


By: _____

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591916
Q2017MDL1_01431093

CX6799-022

# ATTACHMENTS

315399 v2/PA QUALCOMM'S MOTION FOR PARTIAL SUMMARY JUDGEMENT
INDEX OF ATTACHMENTS      Civil Action No. 2-96-CV183

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591917
Q2017MDL1_01431094

CX6799-023

### INDEX OF ATTACHMENTS

Exhibit 1:    Ericsson's Response To Qualcomm's Interrogatory No. 1

Exhibit 2:    Russell T. Wong, et al., *Legal Implications of Standard Setting Activity*, paper presented at the Second Annual Advance Patent Law Institute, sponsored by the University of Texas School of Law (Nov. 6-7, 1997).

Exhibit 3:    TIA Engineer Manual dated December 6, 1991.

Exhibit 4:    TIA Advisory Note No. 11 dated May 18, 1993.

Exhibit 5:    Proposed "Scope" and "Charter" for TR 45.5 dated March 30, 1992.

Exhibit 6:    Letter from Barry Kratz (Ericsson) to Gerard J. Flynn (TIA) dated April 16, 1993

Exhibit 7:    TIA Meeting report dated April 19, 1993.

Exhibit 8:    Letter from Barry Kratz (Ericsson) to Gerard J. Flynn (TIA) dated May 11, 1993

Exhibit 9:    Letter from Thanos Kipreos (TIA) to Barry Kratz (Ericsson) dated May 16, 1995.

Exhibit 10:   ANSI's Procedures for the Development and Coordination of American National Standards.

Exhibit 11:   Letter from Thanos Kipreos (TIA) to Barry Kratz (Ericsson) dated August 3, 1995.

Exhibit 12:   Declaration of Dr. Irwin Jacobs (Qualcomm) dated October 2, 1998.

Exhibit 13:   Sprint Press Release dated July 21, 1995.

Exhibit 14:   Ericsson Interim Report for January - June 1995.

Exhibit 15:   Letter from Louis M. Lupin (Qualcomm) to Dr. Lars Ramqvist (Ericsson) dated August 21, 1995.

Exhibit 16:   Letter from Thanos Kipreos (TIA) to Barry Kratz (Ericsson) dated August 25, 1995.

315399 v2/PA QUALCOMM'S MOTION FOR PARTIAL SUMMARY JUDGEMENT
INDEX OF ATTACHMENTS     Civil Action No. 2-96-CV183

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591918
Q2017MDL1_01431095

CX6799-024

Exhibit 17:    Letter from Walo von Greyerz (Ericsson) to Louis M. Lupin (Qualcomm) dated August 29, 1995.

Exhibit 18:    Letter from Barry Krantz (Ericsson) to Thanos Kipreos (TIA) dated September 19, 1995.

Exhibit 19:    Letter from Mans Ekelof (Ericsson) to Qualcomm, Inc. dated November 14, 1995.

Exhibit 20:    Letter from Barry Krantz (Ericsson) to TIA dated November 27, 1995.

Exhibit 21:    Letter from Mans Ekelof (Ericsson) to Louis Lupin (Qualcomm) dated December 11, 1995.

Exhibit 22:    Letter from Mans Ekelof (Ericsson) to Louis M. Lupin (Qualcomm) dated January 9, 1996.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591919
Q2017MDL1_01431096

CX6799-025

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

2

3  Ericsson Inc. and          §
   Telefonaktiebolaget        §
4  LM Ericsson,               §

5          Plaintiffs;        §        Civil Action No. 2-96-CV183
                              §        JURY
6  v.                         §        Judge: David Folsom
                              §        Magistrate Judge: Harry McKee
7  QUALCOMM Incorporated,     §

8          Defendant.         §

9

10      **DECLARATION OF IRWIN M. JACOBS IN SUPPORT OF QUALCOMM'S**
        **MOTION FOR PARTIAL SUMMARY JUDGMENT TO LIMIT ERICSSON'S**
11      **REQUESTED RELIEF FOR THE ALLEGED INFRINGEMENT OF**
        **THE PATENTS-IN-SUIT**

12

13

14      I, Dr. Irwin M. Jacobs, declare:

15      1.      I am over the age of 18 years and not a party to this action.  I make this declaration

16  in support of Qualcomm's motion for partial summary judgment against plaintiffs Ericsson, Inc.

17  and Telefonaktiebolaget LM Ericsson (collectively "Ericsson").  I have personal knowledge of the

18  facts contained in this declaration and, if called as a witness, could and would testify competently

19
    to the facts stated herein.
20

21      2.      In 1985, Dr. Andrew Viterbi, Harvey White, Klein Gilhousen, three others and I

22  founded Qualcomm, Inc. in San Diego, California.  Our goal was to create a company that would

23  help customers design and implement communications systems and deal with problems posed by

24  those customers in such areas as signal processing, communication modems, encryption systems,

25  data communications, satellite systems and ground terminal equipment.  When we started the

26  company, we had a total of eight employees.  I have served as the Chief Executive Officer and

27
    Chairman of the Board of Qualcomm since its founding.
28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF IRWIN M JACOBS IN SUPPORT OF
QUALCOMM'S MOTION FOR PARTIAL SUMMARY JUDGMENT          320803v1/PA
Civil Action No. 2-96-CV183 – Page 1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM                    Q2014FTC01591969
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                           Q2017MDL1_01431146

                                                                    CX6799-075

3.    Early in the company's history, we began work on the development of Code Division Multiple Access ("CDMA") technology. We committed substantial resources in the late 1980s and early 1990s to the development of a commercially viable digital cellular technology based on CDMA that would help relieve the overcrowding of radio bands used by cellular telephones. It was our belief based on substantial testing and study, and since substantiated, that a wireless communications system based on CDMA would boost the capacity of cellular systems dramatically while delivering increased performance to its users.

4.    In 1992, we presented our CDMA technology to the Telecommunications Industry Association ("TIA") for consideration as a wideband digital wireless standard. The TIA is a standards setting group consisting primarily of wireless equipment manufacturers and purchasers, including both Qualcomm and Ericsson, Inc., and is responsible for setting standards for the telecommunications industry in the United States. If the CDMA technology were adopted as a standard, manufacturers and service providers would be able to build and buy handsets and entire cellular systems using the technology confident of the quality and compatibility of their products. The result for consumers would be a greater number of companies building products using the CDMA technology and the lower prices that result from such increased competition. In July 1993, the TIA adopted a digital wireless standard, referred to as IS-95, which was largely based on our CDMA technology. (This standard was subsequently revised by the TIA and published as IS-95-A in May of 1995. In this declaration, IS-95 and IS-95-A are collectively referred to as "IS-95.")

5.    The TIA generally will not adopt an industry standard unless all participants holding patents that would be required to develop products compliant with the standard agree to license rights to such patents either without compensation or "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." Accordingly, when Ericsson informed the TIA and its participants during the standards setting process that it held two patents it

COOLEY GODWARD LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF IRWIN M. JACOBS IN SUPPORT OF
QUALCOMM'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Civil Action No. 2-96-CV183 – Page 2

320803v1/PA

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591970
Q2017MDL1_01431147

CX6799-076

1    believed to be essential to the IS-95 standard, it accompanied that statement with a commitment to

2    make licenses available for those patents as well as any other patents essential to IS-95 under

3    reasonable terms and conditions that are demonstrably free from any unfair discrimination.

4
          6.      To the best of my knowledge, Ericsson did not seek to enter into any licensing

5
     arrangements for its supposedly essential patents with Qualcomm for over two years after the

6
     adoption of IS-95 in July 1993.  During that two-year period, Qualcomm invested heavily in the

7

8    marketing and production of products and systems based on the IS-95 standard.  By the time

9    Ericsson identified its additional patents allegedly essential to IS-95 in late 1995, Qualcomm had

10   invested approximately $400 million in the research, development, production and marketing of

11   IS-95 compliant products, and was generally recognized as the world leader in CDMA technology.

12
     In the period from July 1993 to December 1995, that investment amounted to roughly $300

13
     million.  Consistent with TIA policy, we had also entered into approximately 30 licensing

14
     agreements in which we licensed our patents essential to the IS-95 standard to companies

15

16   interested in developing IS-95 compliant products.  The result of these efforts was that the IS-95

17   technology was beginning to make significant inroads into the digital monopoly that TDMA

18   technology supported by Ericsson had enjoyed in the United States up to that point.  In the summer

19
     of 1995, both PrimeCo and Sprint Telecommunications Venture, two major PCS service providers,

20
     announced that they planned to install CDMA rather than TDMA systems in their service areas.

21
          7.      Shortly after Sprint's announcement, Ericsson announced that it had several

22

23   "blocking" patents required to practice the IS-95 standard.  It was not until December 1995 that

24   Ericsson identified any of those patents.  Throughout this period, however, Ericsson continued to

25   assure us that it would honor its promises to the TIA and Qualcomm to license any patents whose

26   use would be required for compliance with IS-95 under reasonable terms and conditions that are

27   demonstrably free from any unfair discrimination.

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
PALO ALTO

DECLARATION OF IRWIN M. JACOBS IN SUPPORT OF
QUALCOMM'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Civil Action No. 2-96-CV183 – Page 3

320803v1/PA

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591971
Q2017MDL1_01431148

CX6799-077

8.      Qualcomm does not believe that it infringes any of the patents that Ericsson has identified as being essential to the IS-95 standard.

9.      Nevertheless, Qualcomm relied on Ericsson's statements both during the standards setting process and afterwards that they would license any patents that were determined to be essential to the IS-95 standard under reasonable terms and conditions.  During the standards setting process, we relied on Ericsson's many assurances as well as on the TIA Intellectual Property Rights Policy relating to holders of essential patents.  Although we did not think products compliant with IS-95 would infringe the two patents identified by Ericsson as essential during the TIA process, we believed as a result of Ericsson's repeated representations and its participation in the TIA process that Ericsson would not seek to prevent our production of products if it were eventually determined that their patents were in fact essential.  Due in part to that belief, we felt secure in making the substantial investment in IS-95 products described in paragraph 6 above.  If Ericsson had instead claimed in 1993 that it possessed certain patents essential to IS-95 and that it would not license its rights under those patents, Qualcomm would have sought to resolve all issues surrounding those claims as expeditiously as possible.

10.     CDMA technology implementing the IS-95 standard constitutes the core of Qualcomm's business.  IS-95 compliant products were responsible for generating 73% of Qualcomm's total revenues in 1996 and 86% of its total revenues in 1997.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2 day of October, 1998.

IRWIN M. JACOBS

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC01591972
Q2017MDL1_01431149

CX6799-078

# REPLY EXHIBIT 15

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

| | |
|---|---|
| **From:** | Abbaseh Samimi |
| **To:** | saltman@qualcomm.com; pjacobs@qualcomm.com |
| **CC:** | mblecker@qualcomm.com; llupin@qualcomm.com; jbelk@qualcomm.com; ryang@qualcomm.com; taylorc@qualcomm.com; andresl@qualcomm.com; gregl@qualcomm.com; clintm@qualcomm.com; dwise@qualcomm.com |
| **Sent:** | 9/7/2005 9:26:25 PM |
| **Subject:** | Vodafone Presentation |
| **Attachments:** | 050907-Vodafone WCDMA.ppt |

Steve,

Attached please find the revised Vodafone presentation (Slides 2 & 4 were revised, #25 an updated slide on SKT's ARPU added. Unfortunately, the quarter ended September 2004 is the most recent information available)

I would like to take this opportunity to thank everyone, Taylor Cabaniss, Ryan Gorostiza, Greg Le Beau, Andres Leyva, Clint McClellan, and Dave Wise for their input and support.

Andres will drop off a hard copy of the presentation and a soft version on a memory stick. Please let me know is you have any further questions.

Thanks,
Abbaseh

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED



CX5840-003

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED



CX5840-015



# QUALCOMM Lowers Overall IP Cost

➢ **Third Party IPR is Bundled**

❑ QUALCOMM has proactively acquired licenses from its licensees and others to manufacture and sell components

❑ Over 120 companies have provided exhaustive licenses to QUALCOMM

❑ Reduces royalty stacking for QUALCOMM component customers

➢ **No additional QUALCOMM royalty above the QUALCOMM standard WCDMA royalty**

❑ New technologies

❑ Multi-mode OFDMA – WCDMA/CDMA2000 products

Qualcomm Confidential and Proprietary

CX5840-016

# REPLY EXHIBIT 16

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 17

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 18

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 19

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 20

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 21

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

# REPLY EXHIBIT 22

http://www.qualcomm.com:80/technology/licensing/index.html   Go

20 captures
21 Feb 2006 - 23 Jun 2008

APR   **JUN**   NOV
◀   **10**   ▶
2006   **2007**   2008

About this capture



SEARCH

**TECHNOLOGY AND SOLUTIONS**

Mobile Broadband

Chipsets

**Licensing**

Voice Communications

Mobile TV

Mobile Applications

Mobile Displays

Location Based Services

Asset Management Solutions

Secure Wireless Solutions

Satellite Communications

Products A-Z

Services and Support

Home > Technology and Solutions > Licensing

## Licensing

With a licensing program that enables third parties to design, manufacture and sell products based on QUALCOMM's industry-leading wireless technology, QUALCOMM helped the wireless value chain generate more than $200 billion* in revenue in 2005 alone.

Browse below to find the names of those companies that currently make up the majority of QUALCOMM's authorized suppliers list and have rights under some or all of QUALCOMM's patent portfolio.

To learn more about QUALCOMM's licensing programs, contact us.

### Subscriber Related Products

4G Systems GmbH

Aiji Systems Co., Ltd.

AL Communications Co., Ltd.

ALBAHITH

Alps Electric Co., Ltd.

Amoi Mobile Co., Ltd.

Arasor International Group Holding Limited Company

Axesstel, Inc.

Axio Wireless, Inc.

BenQ Corporation

Cal-Comp Electronics (Thailand) Public Company Limited

Casio Computer Co., Ltd.

CEC Telecom Co., Ltd.

Compal Communications, Inc.

Continental AG

Creative Mobile Technology (CMOTECH) Co., Ltd.

Crest Glory Corporation

Dalian Daxian Group Co., Ltd.

Dalian Huanyu Mobile Technological Co., Ltd.

Datang Telecom Technology Co., Ltd.

Denso Corporation

Digibee Microsystems Inc.

Eastern Communications Co., Ltd.

Egyptian Telephone Company

ERON Technologies Corporation

ETRONICS Corporation

Flextronics International Ltd.

Foxconn International Holdings Limited

Fujitsu Limited

Garmin Corporation

Giga-Byte Technology Co., Ltd.

Glenayre Electronics, Inc.

Guangzhou Jinpeng Group Co., Ltd.

Haier Group Company

High Tech Computer Corporation



**Royalty Administration**
Extranet access for licensees

Equipment Testing and Deployment Solutions

Network Enhancement with RepeaterOne

BREW Developer Directory

Network Operators

Manufacturers

Consumers

Application Developers

Content Providers

Business / Enterprise

Government

http://www.qualcomm.com:80/technology/licensing/index.html　　Go　　APR　JUN　NOV

20 captures　　　　　　　　　　　　　　　　　　　　◀　**10**　▶

21 Feb 2006 - 23 Jun 2008　　　　　　　　　　　2006　**2007**　2008　　▼ About this capture

IQLinks Limited Liability Company

Kenwood Corporation

Koninklijke Philips Electronics N.V.

Konka Group Co., Ltd.

KTF Technologies Inc.

Kyocera Corporation

Langchao Group Co., Ltd.

LeadTek Research Inc.

Lenovo Mobile Communications Technology Ltd.

LG Electronics, Inc.

Longcheer Technology (BVI) Limited

Lucent Technologies Inc.

Maxon Telecom Co., Ltd.

Mitsubishi Electric Corporation

Mobile System Technologies, Inc.

Mobinnova Corp.

Motorola, Inc.

NEC Corporation

Ningbo Bird Co., Ltd.

NOKIA Corporation

Novatel Wireless Inc.

Option NV S.A.

Palm, Inc.

Panasonic Electronic Devices Co., Ltd.

Panasonic Mobile Communications Co., Ltd.

Pantech & Curitel Communications, Inc.

Pantech Co., Ltd.

Putian Capitel Group

QUANTA Computer Inc.

Research In Motion Limited

Rose Telecom Co., Ltd.

SAGEM Communication

Sanyo Electric Co., Ltd.

Seiko Instruments Inc.

Sendum Wireless Corporation

Shanghai Huntel Technologies Co., Ltd.

SHARP Corporation

Siemens Aktiengesellschaft

Sierra Wireless, Inc.

Sim Technology Group (BVI) Limited

SK Telecom Co., Ltd.

SOMA Networks, Inc.

Sony Corporation

Sungil Telecom Co., Ltd.

Synertek, Inc.
- Sewon Telecom Ltd.
- ZAKANG, Inc.

TCL Corporation

Techfaith Wireless Communication Technology Limited

Telefonaktiebolaget LM Ericsson

Teleion Wireless, Inc.

Telit Communications S.p.A.

Telit Wireless Solutions Co., Ltd.

Telular Corporation

Toshiba Corporation

http://www.qualcomm.com:80/technology/licensing/index.html　　[Go]　　APR　JUN　NOV

20 captures
21 Feb 2006 - 23 Jun 2008

◀　10　▶

2006　2007　2008

About this capture

UTStarcom, Inc.

Vitelcom Mobile Technology S.A.

VK Corporation

Wavecom S.A.

Westech Korea, Inc.

Wherify Wireless, Inc.

Yiso Wireless Co., Ltd.

Yulong Computer Telecommunication Scientific (Shenzhen) Co., Ltd.

ZTE Corporation

### Infrastructure Related Products

Airvana, Inc.

AirWalk Communications, Inc.

Alcatel SA

Alps Electric Co., Ltd.

Alvarion Mobile Inc

Andrew Corporation

Axio Wireless, Inc.

Cisco Systems, Inc.

Contela, Inc.

Dalian Huanyu Mobile Technological Co., Ltd.

Datang Telecom Technology Co., Ltd.

Eastern Communications Co., Ltd.

EC Telecom Inc. ^

EMS Technologies, Inc. ^

Fujitsu Limited

Great Dragon Information Technology Corporation Ltd.

Guangzhou Jinpeng Group Co., Ltd.

Hitachi, Ltd.

Huawei Technologies Co., Ltd.

LG Electronics, Inc.

Lucent Technologies Inc.

Mitsubishi Electric Corporation

Motorola, Inc.

NEC Corporation

Netgenetech Co., Ltd.

NOKIA Corporation

Nortel Networks Limited

Panasonic Mobile Communications Co., Ltd.

Putian Capitel Group

Samsung Electronics Co.

Siemens Aktiengesellschaft

SOMA Networks, Inc.

TECORE, Incorporated

Telefonaktiebolaget LM Ericsson

Tenosys, Inc.

United Computer & Telecommunication, Inc. (AnyDATA)^

Unity Wireless Corporation

UTStarcom, Inc.

Vanu, Inc.

ZTE Corporation

^ Repeaters Only

### Component Related Products

http://www.qualcomm.com:80/technology/licensing/index.html    Go

20 captures

21 Feb 2006 - 23 Jun 2008

APR   **JUN**   NOV

◀   **10**   ▶

**2006**   **2007**   **2008**

About this capture

Infineon Technologies AG

Lucent Technologies Inc.

Motorola, Inc.

NEC Corporation

Newport Media, Inc.

NXP B.V.

Renesas Technology Corp.

Texas Instruments Incorporated

VIA Telecom, Inc.

## Test Related Products

Advantest Corporation

Aeroflex Cambridge Limited

Agilent Technologies, Inc.

Ando Electric Co., Ltd.

Anritsu Corporation

Comarco Wireless Technologies, Inc.

Contela, Inc.

Dyaptive Systems, Inc.

Hewlett-Packard Company

IFR Systems, Inc.

Japan Radio Co., Ltd.

Motorola, Inc.

Panasonic Mobile Communications Co., Ltd.

Racal Instruments Wireless Solutions Limited.

Rohde & Schwarz GmbH & Co. KG

Rotadata Limited

Spirent Communications, Inc.

Tektronix, Inc.

Telefonaktiebolaget LM Ericsson

Willtek Communications GmbH


\* Combined handset, infrastructure and service revenue for 2005 based on Strategy Analytics and Gartner Group forecasts and published CDMA/WCDMA average selling price and shipment data supplied by QUALCOMM.

Was this page helpful? Tell us what you think.

↑ Top

# REPLY EXHIBIT 23



News          Press Announcements

**Press Release**



# Ericsson Drops Three "Essential" Patents from Lawsuit Against Qualcomm and Surrenders Two Others

OCT 20, 1998 | SAN DIEGO

Qualcomm products mentioned within this press release are offered by Qualcomm Technologies, Inc. and/or its subsidiaries.

SAN DIEGO - October 20, 1998 - Qualcomm Incorporated (NASDAQ: QCOM) today announced that Ericsson, Inc. and its Swedish parent Telefonaktiebolaget LM Ericsson have dismissed with prejudice all claims under three of the patents asserted against Qualcomm in the litigation brought by Ericsson in Marshall, Texas. In a further


Home


Search


Products


Solutions


Invention


News


Company

development, Ericsson, in papers filed with the United States Patent and Trademark Office, also admitted the invalidity of the claims of two other patents asserted against Qualcomm in the lawsuit, and surrendered those patents. All five patents are among the eight patents that, beginning in December 1995, Ericsson repeatedly told the telecommunications industry were "blocking" patents or were "essential" to make or use cellular products compliant with IS-95 and other cdmaOne standards.

In December 1995, Ericsson represented to the Telecommunications Industry Association and others that it held eight allegedly essential patents for IS-95. Qualcomm challenged Ericsson's representation, and Ericsson filed a patent infringement lawsuit against Qualcomm in Marshall, Texas in September 1996, eventually bringing a total of 11 patents into the case. Qualcomm counterclaimed against Ericsson for unfair competition, stating in court filings that "Ericsson has knowingly made false and unfounded claims, including the assertion that it owns or controls patents that are 'essential' to the manufacture, use or sale of products that implement the IS-95 standard" with the "inten[t] that its false claims … would have an anticompetitive effect and injure Qualcomm's business." Ericsson's dismissal or surrender of the majority of the supposedly essential patents substantiates Qualcomm's charge that Ericsson deliberately misled the industry.

"The IS-95 standard has not changed and Ericsson's patents have not changed since Ericsson first publicly contended that these five patents were essential to IS-95. In light of those facts, Ericsson's recent actions and admissions can only confirm Qualcomm's complaint that


More


Home


Search


Products


Solutions


Invention


News


Company

Ericsson wrongfully and falsely claimed essential patents," said Louis Lupin, Qualcomm's senior vice president and proprietary rights counsel. "That Ericsson waited more than two years to dismiss these meritless claims sheds light on its motives. These events show that Ericsson's statements to the industry with respect to its CDMA patent position are not believable."

Unlike Qualcomm, whose CDMA patent position has been accepted by more than 55 major telecommunications companies that have entered into royalty-bearing licenses with Qualcomm, Ericsson has yet to announce a single royalty-bearing license under any of Ericsson's alleged CDMA patents for any CDMA standard. Moreover, Ericsson has not identified any essential patents it claims to hold with respect to any proposed third generation CDMA standard, including the W-CDMA proposal it has promoted in Europe, Japan and elsewhere, despite specific requests to do so from standards-setting bodies. Consequently, it is not surprising that notwithstanding Ericsson's threatened and actual litigation against CDMA equipment manufacturers, Ericsson's claims to hold essential CDMA patents have not been accepted.

Ericsson had been contending in the Texas lawsuit that the three dismissed patents, U.S. Pat. Nos. 5,148,485, 5,239,557, and 5,430,760, covered certain features of IS-95 compatible products sold by Qualcomm, and that the two surrendered patents, U.S. Pat. Nos. 5,109,528 and 5,327,577, covered "soft handoff" in accordance with IS-95. Ericsson dropped the three patents from the lawsuit shortly before Ericsson was due to disclose in court proceedings its interpretation of the meaning and scope of the allegedly infringed claims and several months


More



before the scheduled trial date in February 1999. Ericsson's surrender of the other two patents and admissions of invalidity were made during reissue proceedings before the United States Patent Office in which Ericsson is applying for new claims which it argues avoid the invalidity problems of the surrendered claims. To date, Ericsson has not dismissed its claims against Qualcomm under the surrendered patents in the Texas litigation.

Headquartered in San Diego, Calif., Qualcomm develops, manufactures, markets, licenses and operates advanced communications systems and products based on its proprietary digital wireless technologies. The Company's primary product areas are the OmniTRACS® system (a geostationary satellite-based, mobile communications system providing two-way data and position reporting services), CDMA wireless communications systems and products and, in conjunction with others, the development of the Globalstar™ low-earth-orbit (LEO) satellite communications system. Other Company products include the Eudora Pro® electronic mail software, ASIC products, and communications equipment and systems for government and commercial customers worldwide. For more information on Qualcomm products and technologies, please visit the Company's web site at http://www.qualcomm.com/.

Except for the historical information contained herein, this news release contains forward-looking statements that are subject to risks and uncertainties, including timely product development, the Company's ability to successfully manufacture significant quantities of CDMA or other equipment on a timely and profitable basis and those related to performance guarantees, change in

economic conditions of the various markets the Company serves, as well as the other risks detailed from time to time in the Company's SEC reports, including the report on Form 10-K for the year ended September 28, 1997 and most recent Form 10-Q.

# # #

Qualcomm, OmniTRACS and Eudora are registered trademarks of Qualcomm Incorporated. The Q logo, Q phone, PdQ, QCell, CabCARD and TruckMAIL aretrademarks of Qualcomm Incorporated. Globalstar is a trademark of Loral Qualcomm Satellite Services, Incorporated. cdmaOne is a trademark of theCDMA Development Group. PalmPilot is a trademark of Palm Computing, Inc., 3Com Corporation, or its subsidiaries.

Corporate

---

Qualcomm

Language

About Qualcomm    Careers    Offices    Contact Us    Support    Subscription Center

Terms of Use    Privacy    Cookies    Site Map

©2018 Qualcomm Technologies, Inc. and/or its affiliated companies.

References to "Qualcomm"; may mean Qualcomm Incorporated, or subsidiaries or business units within the Qualcomm corporate structure, as applicable.
Materials that are as of a specific date, including but not limited to press releases, presentations, blog posts and webcasts, may have been superseded by subsequent events or disclosures.



Home

Search

Products

Solutions

Invention

News

Company

More

# REPLY EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ERICSSON INC. and | § | |
| TELEFONAKTIEBOLAGET | § | |
| LM ERICSSON, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | Civil Action No. 2-96CV183 |
| v. | § | JURY |
| | § | |
| QUALCOMM INCORPORATED, | § | |
| | § | |
| *Defendant.* | § | |

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

### PARTIES

1.     Plaintiff Ericsson Inc. is a corporation organized and existing under the laws of Delaware with a principal place of business in Richardson, Texas. Ericsson Inc. is a successor corporation of Ericsson GE Mobile Communications, Inc. and Ericsson GE Mobile Communications Holding, Inc.

2.     Plaintiff Telefonaktiebolaget LM Ericsson is a corporation organized and existing under the laws of Sweden with a principal place of business in Stockholm, Sweden.

3.     Upon information and belief, Defendant QUALCOMM Incorporated ("QUALCOMM") is a corporation organized and existing under the laws of the State of Delaware, and it has a principal place of business in San Diego, California.

1

CONFIDENTIAL BUSINESS INFORMATION

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

1392QB0884810

Q2014FTCBCM10628522
Q2017MDL5_10628522

## JURISDICTION AND VENUE

4.     This action arises under the patent laws of the United States, Title 35, United States Code.  Subject matter jurisdiction is proper under 28 U.S.C. § 1338.

5.     Upon information and belief, QUALCOMM has sufficient contacts with this District to subject it to the personal jurisdiction of this Court for this patent infringement action.  QUALCOMM conducts business on a regular basis within the State of Texas and this District.  QUALCOMM has purposefully placed numerous of its products into the stream of commerce with the expectation that they will be purchased by consumers in Texas, including this District.  Specifically, QUALCOMM's distribution network has placed its products that infringe Plaintiffs' patents within the stream of commerce, which stream is directed at Texas and this District, and QUALCOMM has committed the tort of patent infringement within Texas and this District.

6.     Venue is proper in this Court under 28 U.S.C. §§ 1400(b) and 1391(c).  The parties are actively conducting business within this District.

## PATENT INFRINGEMENT

7.     Plaintiffs manufacture and sell a variety of communication devices, including cellular telephones.

8.     The following United States patents are referred to and identified as the "Ericsson Patents in Suit":

2

CONFIDENTIAL BUSINESS INFORMATION

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

1392QB0884811

Q2014FTCBCM10628523
Q2017MDL5_10628523

| U.S. PATENT NUMBER | ENTITLED | ISSUED IN THE NAME(S) OF | ISSUE DATE |
|---|---|---|---|
| 5,088,108 | Cellular Digital Mobile Radio System and Method of Transmitting Information in a Digital Cellular Mobile Radio System | Jan E. Uddenfeldt, Vällingby; Alex K. Raith, Kista, both of Sweden | February 11, 1992 |
| 5,109,528 | Handover Method for Mobile Radio System | Jan-Erik Uddenfeldt, Vällingby, Sweden | April 28, 1992 |
| 5,148,485 | Encryption System for Digital Cellular Communications | Paul Dent, Stehag, Sweden | September 15, 1992 |
| 5,193,140 | Excitation Pulse Positioning Method in a Linear Predictive Speech Coder | Tor R. Minde, Luleå, Sweden | March 9, 1993 |
| 5,230,003 | Decoding System for Distinguishing Different Types of Convolutionally-Encoded Signals | Paul W. Dent, Stehags; Alex K. Raith, Kista, both of Sweden | July 20, 1993 |
| 5,239,557 | Discontinuous CDMA Reception | Paul W. Dent, Stehag, Spain | August 24, 1993 |
| 5,282,250 | Method of Carrying Out an Authentication Check between a Base Station and a Mobile Station in a Mobile Radio System | Paul W. Dent, Stehag; Alex K. Raith, Kista; Jan E. S. Dahlin, Järfälla, all of Sweden | January 25, 1994 |
| 5,327,577 | Handover Method for Mobile Radio System | Jan-Erik Uddenfeldt, Vällingby, Sweden | July 5, 1994 |
| 5,390,245 | Method of Carrying Out an Authentication Check between a Base Station and a Mobile Station in a Mobile Radio System | Paul W. Dent, Stehag; Alex K. Raith, Kista; Jan E. A. S. Dahlin, Järfälla, all of Sweden | February 14, 1995 |
| 5,430,760 | Random Access in Mobile Radio Telephone Systems | Paul W. Dent, Stehag, Sweden | July 4, 1995 |
| 5,551,073 | Authentication Key Entry in Cellular Radio System | Anthony J. Sammarco, Garner, N.C. | August 27, 1996 |

3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

9.     Each and every one of the Ericsson Patents in Suit were duly and legally issued by the United States Patent and Trademark Office after full and fair examination, and each and every one of them were duly and legally assigned to Plaintiffs. Plaintiffs are now (and at all relevant times have been) the owners and possessors of all rights pertaining to each and every one of the Ericsson Patents in Suit.

10.     QUALCOMM is infringing each and every one of the Ericsson Patents in Suit by making, using, selling, and/or offering for sale products, without authority, that are covered by claims of the Ericsson Patents in Suit.

11.     QUALCOMM's infringing products include (but are not limited to) the following: QCMobility system; CDMA portable phones; Base Station Transceiver Subsystem; Intelligent Base Station Controller; QCS—800 network for cellular applications; BBA—2; MSM—2; CSM; and QCP-800.

12.     QUALCOMM is actively inducing and/or contributing to infringement of the Ericsson Patents in Suit by others.

13.     QUALCOMM's infringement of the Ericsson Patents in Suit is willful and deliberate.

14.     QUALCOMM's infringement is causing immediate and irreparable injury to Plaintiffs.

15.     QUALCOMM will continue to infringe the Ericsson Patents in Suit unless enjoined by this Court.

4

CONFIDENTIAL BUSINESS INFORMATION

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

## <u>RELIEF</u>

Plaintiffs respectfully request the following relief:

A.      That the Court enter a permanent injunction against QUALCOMM's infringement of the Ericsson Patents in Suit;

B.      That the Court enter a permanent injunction against Defendants' active inducement of the infringement and/or contributing to the infringement of the Ericsson Patents in Suit by others;

C.      That the Court award damages to Plaintiffs to which they are entitled;

D.      That the Court treble the damages for willful infringement;

E.      That the Court award interest on such damages;

F.      That the Court award Plaintiffs' costs and attorney's fees incurred in this action; and

G.      That the Court award such other relief as the Court deems just and proper.

5

CONFIDENTIAL BUSINESS INFORMATION

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

1392QB0884814

Q2014FTCBCM10628526
Q2017MDL5_10628526

Respectfully submitted,

McKOOL SMITH, P.C.

SAMUEL F. BAXTER
State Bar No. 01938000

505 East Travis Street, Suite 105
Marshall, Texas  75670
(903) 927-2111
(903) 927-2622 [ Telecopier ]

JONES & JONES, INC.

FRANKLIN JONES, JR.
State Bar No. 00000055

201 West Houston
P. O. Drawer 1249
Marshall, Texas  75670
(903) 938-4395
(903) 938-3360 [ Telecopier ]

**ATTORNEYS FOR PLAINTIFFS
ERICSSON INC. AND
TELEFONAKTIEBOLAGET
LM ERICSSON**

6

CONFIDENTIAL BUSINESS INFORMATION

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

1392QB0884815

Q2014FTCBCM10628527
Q2017MDL5_10628527

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been forwarded to Kenneth R. Glaser,

David R. McAtee and Karen C. Corallo, Akin, Gump, Strauss, Hauer & Feld, L.L.P., 1700

Pacific Avenue, Suite 4100, Dallas, Texas 75201-4618 and Damon Young, Young, Kesterson &

Pickett, P.O. Box 1897, AR-TX 75504 by Certified Mail, Return Receipt Requested, on this

14th day of January, 1997.



7

CONFIDENTIAL BUSINESS INFORMATION

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

1392QB0884816

Q2014FTCBCM10628528
Q2017MDL5_10628528

# REPLY EXHIBIT 25

CONFIDENTIAL
CONTAINS BUSINESS SECRETS

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

## TO THE COMMISSION OF THE EUROPEAN COMMUNITIES
### DIRECTORATE-GENERAL COMPETITION

## COMPLAINT

against

## QUALCOMM INCORPORATED

submitted by

## NOKIA OYJ

regarding exclusionary and exploitative practices of Qualcomm infringing Article 82 EC restricting competition in the licensing of CDMA and W-CDMA standard technologies and in the supply of CDMA and W-CDMA chipsets for mobile terminal equipment.

February 13, 2006

---

THIS VERSION IS A CONFIDENTIAL VERSION FOR QUALCOMM. ITS DISCLOSURE TO THIRD PARTIES OR EVEN DISCUSSION OF FACTS REVIEWED IN THIS DOCUMENT COULD CAUSE SIGNIFICANT DAMAGE. NOKIA THEREFORE RESPECTFULLY REQUESTS THE COMMISSION TO ENSURE THAT (1) IT AND QUALCOMM TREAT THIS DOCUMENT AND ITS CONTENT AS BUSINESS CONFIDENTIAL AND ACCESSIBLE ONLY TO QUALCOMM, UNLESS AVAILABLE FROM A PUBLIC SOURCE NOT COVERED BY CONFIDENTIALITY, AND (2) QUALCOMM USES THIS DOCUMENT AND CONFIDENTIAL INFORMATION DERIVED FROM THIS DOCUMENT ONLY FOR PURPOSES OF QUALCOMM'S DEFENSE IN THESE PROCEEDINGS, AND NOT FOR ANY OTHER PURPOSE INCLUDING MARKETING, INVESTOR RELATIONS, OR PUBLICITY.

CONFIDENTIAL
CONTAINS BUSINESS SECRETS

## THE PARTIES

This Complaint is submitted by Nokia, whose address is:

Nokia Oyj
Keilalahdentie 2-4
P.O. Box 226
FIN-00045 Nokia Group
Finland


Contact details for Nokia's authorized representative:

John Temple Lang
Cleary Gottlieb Steen and Hamilton LLP
57, rue de la Loi
1040 Brussels
Belgium
Tel.: +32 2 287 20 00
Fax: +32 2 231 16 61
E-mail: jtemplelang@cgsh.com


The complaint regards the practices of Qualcomm, whose address is:

QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
USA
Tel.: +1 858 587 1121

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# TABLE OF CONTENTS

**Page**

I.   SUMMARY AND REQUESTED RELIEF ..................................................... 1

II.  FACTUAL BACKGROUND ...................................................................... 7

    A.    The Parties ......................................................................................... 7

    B.    The Evolution Of The Mobile Industry To 3G Technology ............... 8

            (1)    Three Generations Of Mobile Telephony Technology ........................ 9

            (2)    CDMA and W-CDMA Standardization Based on Qualcomm's FRAND Declarations ..................................................... 11

            (3)    CDMA and W-CDMA (UMTS) chipsets ............................... 18

    C.    The Nokia/TI/Qualcomm Relationship ......................................... 18

III. SIGNIFICANCE OF THIS CASE FOR NOKIA AND FOR THE EU MARKET ............................................................................................ 20

IV.  QUALCOMM'S DOMINANT POSITION ............................................. 21

    A.    The Relevant Markets ..................................................................... 21

            (1)    Upstream – Separate Technology Markets for CDMA2000 and W-CDMA ................................................................. 21

            (2)    Downstream – Manufacture and Sale of 3G chipsets .......................... 23

    B.    Relevant Geographic Market .......................................................... 23

            (1)    Upstream – Technology Markets ........................................... 23

            (2)    Downstream – Chipsets Markets ........................................... 23

    C.    Qualcomm's Position In The Relevant Markets ............................. 24

            (1)    Upstream – Technology Markets ........................................... 24

            (2)    Downstream – Manufacture and Sale of 3G Chipsets ........... 28

V.   QUALCOMM'S ABUSE OF DOMINANCE ........................................ 30

    A.    Abuses – general comments ........................................................... 32

            (1)    Terminology and the key exploitative abuse in this case ........ 32

            (2)    Use of dominant power in one market to commit an abuse affecting another market ...................................................... 33

            (3)    Some licensees need only W-CDMA licenses ...................... 35

            (4)    Exclusionary abuses ............................................................. 36

            (5)    The significance of FRAND obligation ................................ 37

            (6)    Qualcomm's FRAND obligations and its use of its dominance in CDMA technology ............................................................ 38

    B.    Exclusionary Practices ................................................................... 40

             (1)    Discriminatory and Exclusionary Royalty Terms ................ 40

i

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| | (2) | Qualcomm refuses to negotiate W-CDMA patent licenses separately from CDMA | 44 |
| | (3) | Qualcomm's Marketing Support Conditional on Exclusivity | 45 |
| | (4) | Royalties at the rate now imposed, on added value due to Third Parties' Innovations (CDMA and W-CDMA) | 45 |
| | (5) | Abusive Attempts To Terminate TI's License To Essential Patents | 46 |
| | (6) | Refusal to Supply Technologies and Timely Specifications | 48 |
| | (7) | Qualcomm Charges Royalties Twice on Licenses of the Same Patent, to Chipset Producers and to Handset Manufacturers Using Chipsets | 49 |
| | (8) | "Non-Assert" Clauses and "Pass-Through" Clauses | 49 |
| | (9) | Unilateral non-assert in BREW software agreements | 54 |
| | (10) | Qualcomm prevents Nokia from asserting patents by restrictive third-party contracts | 55 |
| | (11) | The Combined Foreclosure Effect of Qualcomm's Exclusionary Practices | 57 |
| C. | | Qualcomm's Exploitative Abuses – Monopoly-Level Royalties Contrary to Article 82(a) | 58 |
| | (1) | Qualcomm Obtained its Unfairly High Royalties by Using its Dominant Position for CDMA Licenses | 58 |
| | (2) | FRAND commitments for "reasonable" royalties | 59 |
| | (3) | FRAND commitments prohibit discrimination between standards. | 60 |
| | (4) | Charging the same royalties in different situations. | 61 |
| | (5) | Unfairly high royalties harm consumers by depressing demand. | 61 |
| | (6) | Comparison with competitors' royalties. | 62 |
| | (7) | Comparison with Qualcomm's own prices in a competitive market. | 62 |
| | (8) | The other main EC law tests do not help Qualcomm. | 62 |
| | (9) | Qualcomm has far fewer essential patents in W-CDMA technology. | 62 |
| | (10) | Comparison with total royalties for CDMA licenses. | 63 |
| | (11) | Total royalties would be uneconomic if other companies charged as much as Qualcomm. | 63 |
| | (12) | Qualcomm's royalties for dual mode handsets ought to correspond to its proportion of all the essential patents for those handsets. | 63 |

ii

**TABLE OF CONTENTS**
(continued)

|  |  | | Page |
|---|---|---|---|
|  |  | (13) Qualcomm took advantage of barriers to entry. | 64 |
|  |  | (14) Qualcomm's royalties are unjustified because it has little risk. | 64 |
|  |  | (15) Aggregate Harm to Users of Handsets. | 64 |
| VI. | **REMEDIES** | | **66** |
|  | A. | Remedies Requested For Exclusionary Abuses. | 66 |
|  | B. | Remedies requested for the monopoly-level royalties. | 68 |

iii

(170)    To avoid doubt, there is no objection to charging a royalty based on the price of the handset, <u>provided</u> that the rate is modified to take into account the fact that Qualcomm's patents cover functionalities that represent a small and decreasing proportion of that price.

### *(5)    Abusive Attempts To Terminate TI's License To Essential Patents*

(171)    Qualcomm has also used litigation in an attempt to force TI out of the markets for CDMA and W-CDMA chipsets.  Soon after TI announced its plans to compete with Qualcomm, Nokia understands that Qualcomm approached TI over an alleged breach of the confidentiality provision of the Patent Portfolio Agreement (PPA) and thereafter sued TI in an attempt to establish its right to terminate the contract.[79]  After those allegations were found to be without any merit and dismissed on summary judgment, Qualcomm continued to litigate.  A second claim, too, was rejected, but Qualcomm did not give up.  On October 22, 2004, it appealed the decisions of the Delaware court.  On May 25, 2005, the Delaware Supreme Court in a unanimous decision confirmed the rulings of the Court of Chancery that Qualcomm did not have any basis to terminate the PPA (publicly available, redacted versions of these court rulings are attached as <u>Exhibits C – E</u>).

(172)    These attempts were exclusionary, for several reasons:

- *First*, termination of the license would breach Qualcomm's duty to license on FRAND terms, after having induced SSOs to base the CDMA and UMTS/W-CDMA standards on Qualcomm's technology.  Qualcomm actively led the ITU and ETSI, through its unequivocal IPR commitments, to develop a standard based on its patents.  This also induced third parties to invest in the implementation of that standard in good faith reliance upon Qualcomm's commitments;

- *Second*, termination of an existing contractual relationship, reducing existing competition, is an abusive practice under the *Commercial Solvents*[80] and *Télémarketing*[81] principles stated by the ECJ.  Cutting off essential upstream supplies to an existing customer to remove it as an existing competitor from a downstream market is an abuse[82];

- *Third*, termination reduces innovation to the detriment of consumers, since TI would be prevented from offering new products or services;

- *Fourth*, Qualcomm's attempt to terminate the Agreement would be a grossly disproportionate reaction to the alleged breach of contract, even if there had been

---

[79]    Dave Mock, *The Qualcomm Equation: How a Fledgling Telecom Company Forged a New Path to Big Profits and Market*, Amacom, New York, NY, 2005, p. 180.  See the published judgments attached as <u>Exhibits C – E</u>.

[80]    Joined Cases 6-7/73, *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v Commission*, 1974 ECR 223.

[81]    Case 311/84 *CBEM v. CLT and IPB* ("*Telemarketing*") 1985 ECR 3261, para. 27 ("*an abuse within the meaning of Article 86 is committed where, without any objective necessity, an undertaking holding a dominant position on a particular market reserves to itself or to an undertaking belonging to the same group an ancillary activity which might be carried out by another undertaking as part of its activities on a neighbouring but separate market, with the possibility of eliminating all competition from such undertaking*").

[82]    *Commercial Solvents, ibid.*, para. 25.

46

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

such a breach.[83] Qualcomm's attempts to terminate the Agreement are disproportionate under all relevant criteria, given the standards environment and its FRAND commitments.[84] The FRAND duty is not merely a duty to license on reasonable terms, but also a duty not to revoke or to take steps to revoke a license without extremely strong reasons, which certainly do not exist in this case.;

- *Finally*, Qualcomm's attempt to terminate the CDMA and W-CDMA license constitutes sham litigation, with the intent and effect of discouraging potential customers from dealing with TI.[85] Qualcomm did not begin its litigation against TI until TI announced its plans to produce chipsets and later used litigation to further entrench its dominant position, by seeking the power to terminate TI's rights, even though it was apparent that there was no material breach of the agreement. Qualcomm's claims were plainly asserted to create uncertainty among TI's potential customers, and thus preclude or interfere with TI's entry into the CDMA and W-CDMA chipset business.

(173)   Nokia has a strong interest in ensuring that TI remains in the market as a supplier of chipsets. TI does not now need a license to supply Nokia because Nokia's license covers its chipset suppliers. But Nokia benefits from TI's economies of scale, and would lose this benefit if TI was supplying only Nokia under Nokia's license. Any conduct which shows that Qualcomm wishes to force TI out of that market, or which shows that Qualcomm wants

---

[83]   Case 27/76, *United Brands*, 1978 ECR 207, paras. 189-191;  Case T-65/89, *BPB Industries and British Gypsum*, 1993 ECR II-389 at p. 418;  Case T-83/91, *Tetra Pak* 1994 ECR II-755, para. 147;  Joined Cases T-24-26, 28/93, *Compagnie Maritime Belge*, 1996 ECR II-1201 at p. 1243 and 1252;  Case T-133/95, *International Express Carriers Conference*, 1998 ECR II-3645;  Case T-111/96, *ITT Promedia*, 1998 ECR II-2937, para. 60;  see also Case T-228/97, *Irish Sugar*, 1999 ECR II-2969, para. 112;  see also Case T-30/89, *Hilti*, 1991 ECR II-1439, paras. 95-119;  see also *BBI/Boosey & Hawkes*: Interim measures, Commission Decision IV/32.279 of 29 July 1987, 1987 OJ L286/36, para. 19 ("*[a] dominant undertaking may always take reasonable steps to protect its commercial interests, but such measures must be fair and proportional to the threat.*")

[84]   These criteria are established in EU as well as most national laws.  For EU case-law, see, for example, Case C-126/91, *Schutzverband gegen Unwesen in der Wirtschaft e.V. v. Yves Rocher GmbH*, 1993 ECR I-2361, para. 15 ("*Since the protection of consumers against misleading advertising is a legitimate objective from the point of view of Community law, the Court must examine, in accordance with the settled case-law, whether the national provisions are suitable for attaining the aim pursued and do not go beyond what is necessary for that purpose.*"); and Case 66/82, *Fromançais SA v Fonds d'orientation et de régularisation des marchés agricoles*, 1983 ECR 395, para. 8.  See also Craig & De Búrca, *EU Law*, (Oxford, 2ᵈ edition), 350, and Hartley, *The Foundations of European Community Law*, (Oxford, 4ʰ edition), 148.  For similar principles in national law, see, for instance, Schwarze, *European Administrative Law* (Sweet & Maxwell, 1992), 685.

[85]   See Case T-111/96 *ITT Promedia NV v. Commission* 1998 ECR II-2937, where the CFI established that litigation is abusive where (i) the action cannot be intended to assert what the Company could, at the moment of bringing the action, reasonably consider to be its rights;  and (ii) the action is part of a plan to eliminate competition.  Cf. Case T-5/97, *Industrie des Poudres Sphériques v. Commission*, 2000 ECR II-3755. The test is very similar to the one applied in the United States.  In *Professional Real Estate Investors, INC. v. Columbia Pictures Industries*, a two-part cumulative test was adopted, examining objectively whether the action is baseless, and subjectively whether an objectively baseless action is intended to interfere with a competitor's business (508 U.S. 49 (1993)).

47

to be able to force TI out of that market, is of serious concern to Nokia. In this sense Nokia is one of the principal and most direct targets for Qualcomm's practices, aimed at creating fear, uncertainty, and doubt in the minds of chipset purchasers as to TI's reliability as a chipset supplier.[86]

(174)    Nokia requests the Commission to prohibit Qualcomm from terminating its Agreement with TI. Nokia should be able to rely on TI as a supplier of W-CDMA chipsets in the future. In the absence of such an order, TI's attempts to enter the W-CDMA chipsets market will be hampered because of Qualcomm's ability to create uncertainty among TI's potential customers, including Nokia, as to TI's right to use W-CDMA essential patents and, as a result, as to TI's viability as a producer of W-CDMA chipsets. Also, there is a clear risk that, if Qualcomm's conduct is not prohibited, Nokia could be the next victim of a refusal to license or an attempt to terminate existing license agreements.

(175)    It should be clearly accepted that when a company such as Qualcomm has given FRAND commitments, it is under a contractual obligation to grant licenses to its essential patents and has normally no right to terminate the licenses which it is obliged to give, after the royalty rate is agreed. A company which is bound by a FRAND commitment given to have its patents included in a standard no longer has the same rights to rely on its patents as it had previously.

(176)    In a standardized environment where FRAND commitments are made, termination should be allowed only if the following <u>cumulative</u> conditions are met: (a) the breach cannot be cured; (b) the breach cannot be remedied through the award of financial compensation, (c) the negative impact on the plaintiff of continuing the agreement outweighs the negative impact on competition of terminating the license, and (d) a standard license for essential patents is offered on the same FRAND terms and conditions as other licensees enjoy. None of these conditions are met in this case.

### (6)    *Refusal to Supply Technologies and Timely Specifications*

(177)    Qualcomm has leveraged its dominant positions in technology and chipsets to its BREW technology, which Qualcomm in turn uses to reinforce its control over the chipset markets. BREW is a Qualcomm platform for wireless applications, enabling the downloading of ring tones and games. Qualcomm's BREW technology sits "on top" of the chips system software of the handset and has access to chip-level features, which allows it to download and run applications directly on the phone. Qualcomm's BREW technology has apparently become the exclusive wireless applications platform for many mobile phone manufacturers, particularly in their high-end products. Qualcomm exploits this dominance of its BREW technology to further control the chipset markets. Qualcomm refuses to supply, or makes the availability of BREW difficult, to handset manufacturers that use non-Qualcomm chipsets. To the extent that Qualcomm does agree to license the BREW technology to handset

---

[86]    An analyst report prepared by Deutsche Bank AG on July 28, 2003 concluded: "*Potential customers, however, may preclude purchases until the litigation is resolved—timing uncertain*" and—'*we fear that mobile phone manufacturers and CDMA operators will be reluctant to introduce a product that uses technology that is under legal dispute*" ("Next on Judge Judy – Qualcomm Involved in Texas-style Shootout," July 28, 20003, analyst report prepared by Deutsche Bank AG). Another analyst was quoted saying: '*This [lawsuit] could put a serious damper on TI's ability to enter the CDMA chipset market*" ("Qualcomm sues TI over patents," AFX UK Focus, July 26, 2004, citing analyst Peter Friedland with W.R. Hambrecht).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC00391445
Q2017MDL1_00276846

# REPLY EXHIBIT 26

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

1                              **Non-confidential version**

[Note: Text in Blue is Confidential to Ericsson.]

# COMPLAINT TO THE EUROPEAN COMMISSION

## PART 1:  INTRODUCTION AND CONCLUSIONS

### 1.1     INTRODUCTION

1.1.1     This Complaint is made by Telefonaktiebolaget LM Ericsson ("Ericsson") in respect of certain abusive practices contrary to Article 82 which have been carried on by Qualcomm during recent years.

1.1.2     Qualcomm is to the wireless telecommunications industry what Microsoft is to PC operating systems:

> *"From the time of its inception [in 1985] until today, Qualcomm has gone the full route from a completely unknown company in San Diego to a global kingpin in the wireless industry."*[1]

> *"Outside of companies like Microsoft in the area of computer operating systems, few had so effectively cornered the market on a technology…".*[2]

> *"Over the next decade, all the leading players in communications and electronics will have to come to terms with this new colossus from Southern California."*[3]

> *"The scale, breadth, and depth of the impact that Qualcomm has had on the global wireless industry is almost without comparison."*[4]

1.1.3     The market position of Qualcomm can only be understood in the context of the leading wireless technologies and standards that have been adopted in the last 10 – 15 years. A "standard" in this context is a technical specification relating to specific mobile telecommunications technology.  The organisations responsible for setting the relevant standards typically bring together a wide number of industry participants to enable them to develop a standard set of technical interface specifications to ensure that the wireless handsets, network infrastructure and systems they manufacture are fully compatible and able to interact.

---

[1]  D. Mock, *The Qualcomm Equation: How a Fledgling Telecom Company forged a new Path to Big Profits and Market Dominance*, (Amacom; 2005), p.2.

[2]  *The Qualcomm Equation*, p.167.

[3]  *The Qualcomm Equation*, p. ix.

[4]  *The Qualcomm Equation*, p. 4.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

52                                    **Non-confidential version**

worldwide sales of single- and dual-mode CDMAOne and CDMA2000 handsets would pay a lower royalty fee on handset sales in China than a licensee who does not commit to using Qualcomm's chipsets around the rest of the world.

<u>Preventing and Deterring New Entry</u>

5.3.6    Ericsson understands that Qualcomm has taken a number of steps either to deter or prevent TI from entering into the CDMA2000 (and WCDMA) chipsets markets. Qualcomm has clearly abused its dominant position in doing so.  First, in 1997 when TI sought a licence from Qualcomm for Qualcomm's essential patents to manufacture CDMA2000 chipsets Qualcomm ███████████████████████████████████████ ███████████████████████████ Ericsson understands that on 22 December 1997, Qualcomm sent a letter to TI stating:



5.3.7    Having given FRAND commitments to the standard setting organisations, it is not for Qualcomm to refuse to license its essential patents on FRAND terms.  Moreover, given Qualcomm's undoubted dominance in CDMAOne and CDMA2000 chipsets, the refusal to licence for three years was clearly contrary to its obligations as a dominant company not to undermine the structure of the CDMAOne and CDMA2000 chipsets market by stifling new entry.  It is abusive conduct for Qualcomm to seek to control the number of chipsets producers at any one time.  This refusal to supply amounted to a blatant attempt to control output of CDMA2000 chipsets.

5.3.8    Second, Ericsson understands that Qualcomm has sought to undermine TI's new entry into the CDMA2000 chipset market by starting legal proceedings against TI to undermine TI's ability to compete in CDMA2000 chipset supply.  This action is also aimed at preventing TI from competing in the WCDMA chipset market.

5.3.9    In May 2003, TI and STMicroelectronics announced that they would be competing with Qualcomm by offering standard CDMA2000 chipsets based on technology developed jointly with Nokia.  The chipsets were to be marketed by TI and STMicroelectronics to handset manufacturers for CDMA2000 1X and 1xEV-DV handsets.[124]  In reaction to TI and STMicroelectronics' entry and very quickly after their announcement, Qualcomm

---

*providing a different level of service to BA could earn the same commission rate, that is be paid the same price by BA for their air travel agency services, if their sales of BA tickets have increased by the same percentage over the previous year" (at para. 109).*

[124]  See the TI Press Release of 15 May 2003, *Texas Instruments and STMicroelectronics Enter CDMA2000® Market, Leverage Joint Development with Nokia:  Open CDMA Chipset Offers Unprecedented Choices For CDMA2000 Handset Manufacturers*' at http://www.ti.com/.

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

53                    **Non-confidential version**

started legal proceedings against TI in July 2003, alleging that TI had committed a material breach of the confidentiality provisions of the cross-licensing agreement between TI and Qualcomm and claiming as a result that it was entitled to terminate TI's rights to Qualcomm's patents under the agreement.[125]  Although Qualcomm lost its case, these proceedings are on-going as a result of Qualcomm's decision to appeal the first instance decision.[126]

5.3.10   These allegations and proceedings can be seen as an attempt by Qualcomm to dissuade potential CDMA2000 chipset customers from obtaining their supplies from TI and STMicroelectronics and to put in doubt the capability of TI to offer CDMA2000 chipsets.  One analyst is quoted as having said that the lawsuit *"could put a serious damper on TI's ability to enter the CDMA chipset market".*[127]

5.3.11   The Commission has previously stated that vexatious litigation is an abuse of a dominant position where the dominant undertaking brings an action which (i) cannot reasonably be considered as an attempt to establish its rights and serves only to harass the opposite party, and (ii) is conceived in the framework of a plan whose goal is to eliminate competition.[128]  The timing of Qualcomm's litigation, the fact that it has been unsuccessful and the fact that it is on-going provides strong evidence that Qualcomm has had as its objective the elimination of TI as a competitor.

Manipulation of Standards-Setting Environment

5.3.12   The dominance of Qualcomm in the CDMAOne and CDMA2000 standards-setting process around the world cannot be denied.  Qualcomm is the company that has the most knowledge and experience when it comes to the workings of CDMAOne and CDMA2000.  Qualcomm has been the driving force in CDMAOne and CDMA2000 standard setting around the world and has used its leadership in CDMAOne and CDMA2000 technology in the standard setting process to its own advantage.

---

[125]   See the TI Press Release of 1 July 2004, *Delaware Court Indicates TI Did Not Materially Breach Cross-License Agreement, Qualcomm Not Entitled to Terminate TI's Rights: TI Retains Rights to Qualcomm Patents,* at http://www.ti.com/corp/docs/press/company/2004/c04032.shtml.

[126]   Qualcomm SEC Form 10-K for the Year to 26 September 2004, at p. 35: *"On October 22, 2004 we filed a notice of appeal".*

[127]   See the AFX UK Focus Article, *Qualcomm sues TI over Patents,* citing analysts Peter Friedland and W.R. Hambrecht.

[128]   See the Judgment of the CFI in *ITT Promedia v. Commission* (Case T-111/96) where the Commission was of the view that *"in order to be able to determine the cases in which [bringing legal proceedings against a competitor] are an abuse ... it is necessary that the action (i) cannot reasonably be considered as an attempt to establish the rights of the undertaking concerned and can therefore only serve to harass the opposite party and (ii) it is conceived in the framework of a plan whose goal is to eliminate competition"* (at para. 55).  ITT Promedia did not challenge this view, only its application;  the CFI did not consider the appropriateness of the cumulative tests but did examine the two requirements at paras. 72 and 73.

# REPLY EXHIBIT 27

**Why the ETSI IPR Policy Requires Licensing to All**

**By KARL HEINZ ROSENBROCK**
Life-long Honorary Director-General of ETSI

As the former Director-General of the European Telecommunications Standards Institute ("ETSI"), I have followed with interest the various discussions and disputes regarding the application of the ETSI IPR Policy.  The ETSI IPR Policy was drafted, debated and finalized during my tenure, and I was closely involved in its creation and approval and have followed further discussions within ETSI.  I was therefore asked by the Fair Standards Alliance to allow publication of my views on the ETSI IPR Policy, its background and its application.

**I.      Background on My Work at ETSI**

My involvement in the telecommunications industry and in standardization began in 1969 when I started to work in the Telecommunications Centre of the German Federal Post Office (Deutsche Bundespost).  During the 1970s, I was an active delegate of the German Post Office in the standardization work of both ITU and CEPT.  In the 1980s, while working on internal projects for the German Post Office, I continued to monitor closely the related ongoing standardization work in ITU and CEPT.

In 1990, I was elected Director of ETSI.  The post of Director was renamed "Director-General" in 1995.  My activity as Director-General in ETSI ended with my retirement on 30 June 2006.

Following my retirement, I worked as consulting engineer for Hillebrand Consulting Engineers GmbH, a position I have held since October 2006.  In order to further follow the recent development of the ETSI Intellectual Property Rights ("IPR") Policy, I have continued to participate in most of the ETSI General Assembly meetings and those of the ETSI IPR Special Committee, and have closely followed the general developments within ETSI, especially those related to the ETSI IPR Policy.

**II.     ETSI's Role in Standardization**

ETSI was created in 1988 by the telecommunication administrations of the member states of what is now the European Union ("EU"). In contrast to its predecessor, the CEPT, ETSI's membership is not only composed of Telecommunications Administrations – now including Administrative Bodies and National Standards organizations - but also Network Operators (public and recognized private ones), Manufacturers, Users, Service Providers, Research Bodies, Consultancy Companies / Partnerships, and others. The European Union and the European Free Trade Association recognized ETSI as the European standard setting body (European Standards Organization or "ESO") for telecommunications.  ETSI's role – in accordance with Article 3 of its Statutes – is as follows:

> *"ETSI, the European Telecommunications Standards Institute, produces **globally-applicable** standards for Information and Communications Technologies (ICT), including fixed, mobile, radio, converged, broadcast and Internet technologies….We are a not-for-profit organization with more than 800 member organizations worldwide, drawn from 67 countries and five continents. Members include the world's leading companies and innovative R&D organizations."*[1]

> *"Founded initially to serve European needs, ETSI has become highly-respected as a producer of technical standards **for worldwide use**"*[2]

ETSI is governed by its Members, and has a defined set of rules, the ETSI Directives, which have been approved by the ETSI General Assembly.  These Directives include the ETSI IPR Policy, which was added in 1994 as Annex 6 to the Rules of Procedure.  The IPR Policy governs, amongst other things, the disclosure and licensing of essential patents.  ETSI Members are fully aware of these rules, and are repeatedly reminded of their obligations under the IPR Policy.

### III.    Short History of the ETSI IPR Policy

According to Article 3 of the ETSI IPR Policy, ETSI standards should be based on solutions that best meet technical objectives of the European telecommunications sector.  ETSI's Technical Committees ("TCs") focus solely on technical assessment and the development of specifications, irrespective of intellectual property rights.  Having to deal with IPRs in TC meetings would block or delay the process, taking into account the uncertainties inherent in determining whether a patent is valid, would be infringed and essential, which is even more difficult when specifications are still in development.  One of the reasons to develop the ETSI IPR Policy was to enable the technical work of standard development in Technical Committees ("TCs") to move forward without delay or blocking caused by IPR owners.

Since my start as ETSI Director (and later Director-General), I closely followed the development of this ETSI IPR Policy.  The process took more than five years of intensive discussions.  The process involved around 50 legal experts representing (amongst others) technology owners and manufacturers from Europe and overseas.  Manufacturers (including from the USA) participated in these discussions within ETSI (and even in its predecessor CEPT since around 1986).  The development of the ETSI IPR policy also profited from guidance from, and intensive negotiations with, the European Commission who attended most of the relevant meetings.  This participation was to ensure, amongst other things, compliance with European Union law in general and EU competition law in particular.

---

[1]     *See* http://www.etsi.org/about.

[2]     *See* ETSI, Welcome to the World of Standards (emphasis added), available at http://www.etsi.org/images/files/ETSIGenericPresentation.pdf.

Page 3

In November 1994, the ETSI General Assembly approved an "Interim ETSI IPR Policy". Three years later, in 1997, the "Interim ETSI IPR Policy" was made permanent. This was well before the adoption of the UMTS and LTE standards.

In November 2002, an ETSI ad hoc group on IPR was created and charged with analyzing how the ETSI IPR Policy was working in practice. The work was undertaken in 2003. This group submitted a series of recommendations to the ETSI General Assembly in November 2003 which were later used as a basis for the ETSI Guide on IPRs which was published in December 2004 (the "IPR Guide"). The ETSI IPR Policy and the related IPR Guide have remained stable, although there have been a few clarifications.

## IV.  Principles of the ETSI IPR Policy

Article 3 of the ETSI IPR Policy indicates, amongst other things, that

> the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

The ETSI IPR Policy maintains this balance by requiring every ETSI member to use reasonable endeavours to inform ETSI of ESSENTIAL IPRs in a timely fashion. Once an Essential IPR is identified, the IPR owner is asked to make an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory (FRAND) terms and conditions under the IPR. In order to facilitate the process of notification of Standards Essential Patents ("SEPs"), members can use General Declarations by which they make an irrevocable undertaking that they are prepared to grant licenses under FRAND terms and conditions for all their SEPs within a given standardization area.

An Essential IPR owner may refuse to give such an undertaking. If it does so in a timely manner, the TC is required to select another viable solution "*which is not blocked by that IPR and satisfies ETSI's requirements.*"[3] If no viable solution exists, the work on the standard shall cease.[4]

In practice, many Essential IPR owners issue General Declarations to license their Essential IPRs on FRAND terms.

According to the ETSI IPR Policy, if a FRAND undertaking or promise is issued, third parties are entitled to receive licenses under FRAND terms and conditions provided they agree to pay FRAND royalties. *See* Sections 3.1 and 3.3 of the ETSI IPR Policy, which make it clear that every *"potential user"* is entitled to obtain a license on FRAND terms and conditions. This includes both ETSI members and third parties who did not participate in the standard setting process.

---

[3]  *See* Section 8.1.1 ETSI IPR Policy.

[4]  *See* Section 8.1.2 ETSI IPR Policy.

## V.    Application of the FRAND Licensing Principles

The wording of the ETSI IPR Policy and the IPR Guide allows us to identify basic principles on the definition of "FRAND" and to draw conclusions about the permissibility of certain practices and license terms, apart from the application of competition law.

**1.   The ETSI IPR Policy allows every company that requests a license to obtain one, regardless of where the prospective licensee is in the chain of production and regardless of whether the prospective licensee is active upstream or downstream**.

Manufacturers of components such as chipsets are therefore entitled to a license, if they seek one.  There are various bases for this conclusion in the ETSI IPR Policy and the IPR Guide.

First, Article 6 of the IPR Policy contains a general reference to an undertaking to grant a license:  the reference in no way limits the beneficiaries of that license and does not allow the IPR owner to refuse a license to particular interested parties such as component manufacturers, so long as they are willing to agree to FRAND terms and conditions.

Second, in accordance with Article 3 of the IPR Policy,

> "the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."

If a license was unavailable to all interested parties who want to apply the ETSI standard, this goal could not be met.  This is a fundamental objective of the ETSI IPR Policy.

Third, the IPR Licensing Declaration Form makes no exception for certain categories of licensees.  It explicitly allows the IPR owner to impose conditions, specifically, reciprocity, but does not allow the IPR owner to exclude specific categories of standards implementers.  The absence of an explicit option to exclude certain categories of licensees confirms that a license must be available to all interested parties, and is consistent with the fundamental objective described above.

Fourth, a declaration under Article 6 of the IPR Policy requires the IPR Owner to *"grant irrevocable licences on fair, reasonable and <u>non-discriminatory</u> terms and conditions."* Accordingly, the IPR owner must not discriminate in the imposition of terms between different categories of licensees.  If the IPR owner cannot discriminate in that way, it certainly cannot go even further and entirely exclude specific categories of licensees from the right to seek a license.

Fifth, paragraph 1.4 of the IPR Guide  refers to *"users of standards"*, without limitation, and specifies that both members of ETSI and third parties who are *"users of ETSI standards or documentation"* have a *"right"* to a license *"at least to manufacture, sell, lease, repair, use and operate."*  Paragraph 1.4 does not limit this right to certain categories of members or users.

Page 5

Sixth, while I am not a specialist in competition law, I am aware that various policy papers and competition law principles helped to shape the ETSI IPR Rules, including the following:

- The European Commission's Horizontal Guidelines contain a detailed discussion of the application of Article 101 TFEU to standard-setting.[5]  They emphasize the need to ensure that all parties interested in obtaining a license to SEPs can get one, especially competitors of the SEP owners.  The Guidelines:

  o confirm that *"In order to ensure effective access to the standard, the IPR policy would need to require participants wishing to have their IPR included in the standard to provide an irrevocable commitment in writing to offer to **license** their essential IPR **to all third parties** on fair, reasonable and non-discriminatory terms ('FRAND commitment')*;[6]

  o reiterate that *"FRAND commitments are designed to ensure that essential IPR protected technology incorporated in a standard is accessible to the users of that standard on fair, reasonable and non-discriminatory terms and conditions."*;[7]

  o explain that *"If a company is either completely prevented from obtaining access to the result of the standard, or is only granted access on prohibitive or discriminatory terms, there is a risk of an anti-competitive effect."*;[8]

  o prohibit *"refusing to license the necessary IPR or by extracting excess rents by way of excessive royalty fees thereby preventing effective access to the standard".*[9]

- The text quoted above from para. 285 clearly indicate that by "access", the European Commission means "access through license" to "all third parties."  This principle goes back decades.  The European Commission's 1992 Green Paper on IPR and Standardization[10] already required that standards must be available to *"the widest*

---

[5]  Guidelines on the applicability of Article 101 of the Treaty on the Functioning of the European Union to horizontal co-operation agreements, OJ 2011/C 11/01, 14.1.2011 (Guidelines on Horizontal Agreements).

[6]  Guidelines on Horizontal Agreements, paragraph 285, emphasis added.

[7]  Guidelines on Horizontal Agreements , paragraph 287; *see also* paragraph 294.

[8]  Guidelines on Horizontal Agreements , paragraph 268; *see also* paragraph 264.

[9]  Guidelines on Horizontal Agreements , paragraph 269.

[10]  Communication from the Commission on Intellectual Property Rights and Standardization, COM(92) 445 final, Brussels, 27 October 1992 (1992 Communication), available at http://aei.pitt.edu/1222/1/1222.pdf.

*possible number of interested parties on fair and reasonable terms"*[11]  and to *"all interested parties"*; [12]

- The European Commission provided a comfort letter[13] with respect to the ETSI IPR Policy under Article 19(3) of Regulation 17/62 on the understanding that essential patents reading on ETSI standards would be licensed on FRAND terms to "third parties wishing to manufacture products complying with the standard" and to "potential users".

It is my opinion that for these reasons, all third parties who want to implement the standard, including manufacturers of components such as chipsets, are therefore entitled to a license, if they seek one.

**2. The obligation to license under the ETSI IPR Policy, once a FRAND undertaking is given, is not limited to end-products like handsets, but includes also components like chipsets.**

As noted above, it is a basic principle that a FRAND undertaking means that all interested parties and potential licensees must be licensed on FRAND terms and conditions.  This follows clearly from the wording of Article 6 of the IPR Policy and the relevant definitions.

Article 6 of the IPR Policy is broadly crafted.  It requires that a license must be available "*to at least the following extent:*"

- *MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;*
- *sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;*
- *repair, use, or operate EQUIPMENT; and*
- *use METHODS.*

The words "*to at least the following extent*" mean that the license may not encompass less than what is stated in Article 6.

Moreover, the reference to "*MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE*" cannot be read to exclude non-customized components.  The word "including" in that sentence means that the license must include a license to make or have made "customized components," but the requirement is not limited to that.  Simply put,

---

[11]     1992 Communication, paragraph 2.1.12.

[12]     1992 Communication, paragraph 2.3.3 and 6.3.2.

[13]     Notice pursuant to Article 19 (3) of Council Regulation No 17 concerning case No IV/35.006 — ETSI interim IPR policy OJ 95 /C 76/05, 28.3.1995.

Page 7

consistent with the FRAND policy described above, the word "including" signifies an example, but not an exhaustive list.

Indeed, the words of Article 6 indicate that the license must cover "*MANUFACTURE*" as defined in the ETSI IPR Policy.  That term is defined as the "*production of EQUIPMENT*" (Article 15.8), with "*EQUIPMENT*" being defined as *"any system, or device fully conforming to a STANDARD"* (Art 15.4).  The words *"system"* and *"device"* are not defined in the ETSI IPR Policy.  They should therefore be defined by normal parlance and plain meaning.

- The word *"device"* is commonly defined as:

    *"a thing made or adapted for a particular purpose, especially a piece of mechanical or electronic equipment"*;[14]

    *"An object or machine that has been invented to fulfill a particular purpose"*;[15]

    *"a piece of equipment or a mechanism designed to serve a special purpose or perform a special function <an electronic device>"*;[16]

    *"a piece of computer hardware that is designed for a specific function"*.[17]

- In common technical parlance, the word "*device*" is used as including reference to *"semiconductor"*, *"integrated circuit"* and a *"component"*.[18]  The Glossary of Terms of the Semiconductor Industry Association defines 'discrete device' as:

    '*A device that contains one active element, such as a transistor or diode, although a hybrid might contain more than one active element.  In comparison, an integrated circuit could contain billions of active elements on a single chip*."[19]

    It defines 'semiconductor' as:

    *"[…] the generic name for discrete devices and integrated circuits …"*.

---

[14]    Oxford: http://www.oxforddictionaries.com/us/definition/american_english/device.

[15]    Cambridge: http://dictionary.cambridge.org/us/dictionary/english/device.

[16]    Webster: http://www.merriam-webster.com/dictionary/device.

[17]    Collins: http://www.collinsdictionary.com/dictionary/english/device.

[18]    http://whatis.techtarget.com/definition/solid-state.

[19]    https://www.semiconductors.org/faq/glossary.

- The American National Standards Institute, IEC 60747 Series - Semiconductor Devices states that:

  > *'The IEC 60747 series of semiconductor standards covers discrete devices, integrated circuits, … These devices are used as the building blocks for a wide range of more complicated devices, so standardization at this level directly contributes to the standardization of levels further down the design and fabrication process."*

- JEDEC, a standards organization specializing in micro-electrics normally uses the word "*device*" to refer to a semiconductor chip.[20]

- The word "*device*" also appears in ETSI documents in reference to semiconductor chips.[21]

- Similarly, the term "*system*" means *"A set of connected things or parts forming a complex whole … A group of related hardware units or programs or both, especially*

---

[20]   Amongst the many technical examples, see for instance, the definition of "discrete device": "*A semiconductor device that is specified to perform an elementary electronic function and is not divisible into separate components functional in themselves… Diodes, transistors, rectifiers, thyristors, and multiple versions of these devices are examples" see* JEDEC, "discrete (semiconductor) device"; "*..requirements for the next generation of semiconductor device package components.."  See* JEDEC, JEDEC Publishes Revision of International Standard for Semiconductor Device Package Components (JESD30G), February 11, 2016; "*…discrete semiconductor devices and integrated circuits (hereinafter generically called semiconductor devices) used in electronic equipment…" See* JEITA, Environmental and endurance test methods for semiconductor devices, 2001; JEITA, Jeita Standards: Discrete Semiconductor Devices; JEITA, Jeita Standards: Semiconductor Device Packages; JSIA, "Semiconductor Product Technology Committee of Japan", "Activities".

[21]   I give two examples:  a 2016 document, mm-Wave Semiconductor Industry Technology – Status and Evolution, available at http://www.etsi.org/images/files/ETSIWhitePapers/etsi_wp15_mwt_semiconductor_technology.pdf, has an in-depth discussion of semiconductor devices and technologies. A 2000 document, ETSI TR 101 21 728 V1.1.1 (2000-12), available at http://www.etsi.org/deliver/etsi_tr/101700_101799/101728/01.01.01_60/tr_101728v010101p.pdf references "semiconductor device" on page 20.

*when dedicated to a single application",*[22] but this term can be and is often used for a component, like a "system on a chip".[23]

Accordingly, the words "*system*" and "*device*" in the ETSI IPR Policy cannot be interpreted in a limiting fashion but rather should be accorded their plain meaning.  This means that a license under Article 6 of the IPR Policy includes a license to make, sell and use chipsets, and not only handsets or end-user equipment.  Nothing in Article 6 can therefore be interpreted as allowing an SEP owner who has given a FRAND undertaking/promise to withhold a license to competing semiconductor manufacturers.

Finally, the already mentioned definition of "EQUIPMENT"  (*"any system, or device fully conforming to a STANDARD"*) includes chipsets that normally fully conform to the 2G, 3G and 4G standards adopted by ETSI.  The definition does not say that the device or system in itself must "implement" or "encompass" all the specifications and elements of a standard, so long as the device is designed to be used with other devices or elements in such a way that the combination fully conforms to the standard.  The words "fully conform" mean that the device must be entirely consistent with and compatible with the standard so that the use of the device or system in equipment does not break compatibility.  The ETSI IPR Policy is applicable regardless of the licensee's business model, whether as a vertically integrated supplier or a component supplier.[24]  If ETSI had wanted to carve out certain types of licensees in the chain of distribution who were not eligible for a FRAND license, it could have done so in its texts and rules, but it did not.

Never during the more than five years of work on the ETSI IPR Policy – and even later – do I recall a distinction being made with regard to the category of potential licensees (of the SEPs).  As already noted, ETSI adopted the clear and unambiguous policy of requiring that FRAND licenses be offered to all interested comers/potential licensees who provide products or services designed to be compatible with the chosen standard, irrespective of their position in the industry or a chain of distribution.

---

[22] Oxford: http://www.oxforddictionaries.com/us/definition/american_english/system; See also *"A set of connected things or devices that operate together"* (Cambridge: http://dictionary.cambridge.org/dictionary/english/system);  *"a group or combination of interrelated, interdependent, or interacting elements forming a collective entity; a methodical or coordinated assemblage of parts, facts, concepts… any assembly of electronic, electrical, or mechanical components with interdependent functions, usually forming a self-contained unit"* (Collins: http://www.collinsdictionary.com/dictionary/english/system).

[23] https://en.wikipedia.org/wiki/System_on_a_chip.

[24] One of ETSI's missions, like in all standard setting organizations, is to allow industries to reap network effects that come from the interoperability of technology. One of the primary ways this is done, is by establishing frameworks (such as the FRAND commitment for SEPs) that prevent IP issues from slowing down technological progress in standardization work.  To interpret "EQUIPMENT" to refer to end-user equipment only, excluding components, is contrary to this goal.  It would restrict FRAND protections to only the completed handset level, allowing the very issues ETSI seeks to prevent to deter competition and innovation at the component level.

For these reasons, I am of the opinion that the obligation to license under the ETSI IPR Policy, once a FRAND undertaking is given, is not limited to end products like handsets but includes also components like chipsets and others when a component manufacturer seeks a license.

**3.  The wording of Article 6 must be interpreted to entitle a manufacturer who so requests a license to "make, sell and use" the licensed product.**

It follows clearly from the wording of Article 6 of the ETSI IPR Policy that a manufacturer who requests an exhaustive license to "make, sell and use" the licensed product is entitled to such an exhaustive license.

Article 6 or the IPR Policy requires that a license must be available "*to at least the following extent:*

- *MANUFACTURE…;*
- *sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;*
- *repair, use, or operate EQUIPMENT; and*
- *use METHODS.*

The conjunctive word "*and"* before "use METHODS", rather than a disjunctive "or", means that the IPR Owner may not without the agreement of the licensee limit the license to only one or a subset of the permitted uses.  If a manufacturer wishes to have a "sell" license (which under patent law leads to exhaustion of the patent rights), or a "use" license to an essential patent subject to a FRAND declaration, so as to be able to pass that right on to its customers, Article 6 entitles it to such a license.

**4.  A "forbearance policy" is not consistent with, and does not satisfy, obligations to license on FRAND terms and conditions, once a FRAND undertaking is given.**

Article 6 of the IPR Policy entitles all interested parties explicitly to a "license," that is, an explicit authorization or permission to do certain acts (Article 6 of the IPR Policy) that the IPR owner could otherwise prohibit by invoking its IPRs.

Approaches that fall short of licensing, such as  (a) a unilateral, unwritten policy of not enforcing patents in court ("forbearance");  (b) a promise to delay litigation ("standstill");  and (c) a promise not to sue unless the equipment manufacturer does not pay and the SEP owner has exhausted its legal remedies against that equipment manufacturer ("covenant to exhaust remedies"), or an agreement not to sue a specific party (while reserving the right to sue others based on products made by that party), are not adequate under Article 6 of the IPR Policy, since they are not an explicit authorization on which the beneficiary can rely and because, most fundamentally, they are not a license.

This conclusion also follows from the requirement that the license must be "*irrevocable*" and *"on fair, reasonable and non-discriminatory terms and conditions."*  Approaches that fall short of licensing impose commercial uncertainty on the entity that seeks or would have wanted a

license but cannot get one.  In addition, it also creates uncertainty for businesses who do not ask for a license because they know that the answer will be negative.  Simply put, a mere policy, which can be revoked, and certainly a mere policy of which the "terms and conditions" are not spelled out in a way that is stable and certain enough to determine whether its terms and conditions are "fair, reasonable, and non-discriminatory" does not comply with the requirement of Article 6 of the IPR Policy. The very point of FRAND is to add clarity and predictability to the commercial realities of a marketplace.

This understanding is confirmed by Article 6.1, which refers to an "irrevocable undertaking in writing" to issue licenses.  An "undertaking" is a binding act, which the beneficiary can enforce. This principle is also reflected in the ETSI IPR Licensing Declaration Form, which requires those who execute an undertaking on behalf an IPR Declarant to certify that they have:

> "*the authority **to bind the Declarant** and/or its AFFILIATES to the representations and commitments provided in this form.*"[25]

In addition, Section 6.1bis of the ETSI IPR Policy expressly stipulates that:

> "*FRAND licensing undertakings made pursuant to Clause 6 **shall be interpreted as encumbrances that bind**" not only the Declarant but also "all successors-in-interest.*"

FRAND Declarations are subject to French law.[26] While I am neither a lawyer nor an expert in French law, I am aware from discussions within ETSI that experts in French law have confirmed that a FRAND undertaking is binding.  I refer to an opinion of Professor Laurent Aynès, who concludes that the contractual commitment to ETSI resembles what is called in French law a *"stipulation pour autrui"* or a stipulation for the benefit of a third party (also called a "third-party beneficiary clause"), that is specifically authorized under Article 1121 of the French Civil Code.[27]  Such a stipulation is formed via an exchange of consent between a promisor (the SEP owner) and a Stipulator (ETSI) where the promisor irrevocably grants a right to one or more beneficiaries.[28]  Under French law, Professor Aynès states, those who wish to implement the standard are entitled to enforce the SEP owner's promise made in its declarations submitted to

---

[25]   ETSI IPR Licensing Decl. Form, available at pages 42-43 of the ETSI Directives, https://portal.etsi.org/directives/36_directives_jun_2016.pdf  (emphasis added)

[26]   ETSI IPR Policy, section 12; ETSI Directives, v.36, June 2016, ETSI IPR Licensing Declarations forms, at 42-43, *available at* https://portal.etsi.org/directives/36_directives_jun_2016.pdf ("The construction, validity and performance of this ... licensing declaration shall be governed by the laws of France").

[27]   Declaration of Prof. Laurent Aynès, in *InterDigital v Huawei and ZTE* C.A. Delaware No. 1:13-cv-00008-RGA document 41, ¶¶ 19-22.

[28]   *Id*. ¶ 21.

ETSI pursuant to Article 6.1.[29]  I also refer to the judgment of the High Court of Justice of England and Wales in *Unwired Planet v Huawei*.[30]

Article 6 of the IPR Policy moreover requires that the undertaking must itself be "irrevocable" and "in writing."  An unwritten "policy" that is not binding and is revocable is inadequate and does not comply with Article 6 of the IPR Policy.  Similarly, neither a standstill arrangement nor a covenant to exhaust remedies are irrevocable licenses.

**5.  The cross-grant provisions in a license should be on FRAND terms and conditions for both licensor and licensee.**

Article 6 of the IPR Policy provides that "*the above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.*"  ETSI's Special Committee on IPRs continues discussions on the precise limits and scope of the "reciprocity" condition, but based on this discussion and the general principles and existing rules, including in particular the requirement of FRAND terms and conditions, we can say at least the following:

The use of the word "reciprocate" denotes a balance, in the sense that the IP owner (licensor) may, as a condition for a license, require the licensee to give the same rights to the licensor, with the same scope, and on the same terms, as the rights the licensee receives from the IP owner. The parties may, of course, deviate from that symmetry by consensus, but the IP owner inherently cannot against the licensee's will require more burdensome terms than it is willing to assume itself, or extract more extensive rights than it is willing itself to grant.

This conclusion not only follows from the very concept of "reciprocity", but is also inherent in the FRAND requirement.  A license under Article 6 of the IPR Policy should be FRAND for both licensee and licensor.  For example, demanding a royalty-free cross-grant of rights, without paying a royalty and without proportionally adjusting the royalty received to reflect the value derived from the cross-grant, would be both "unfair" and "discriminatory" and thus in breach of the FRAND provision of Article 6 of the IPR Policy.

Such demands are unfair in breach of the "FR" component of FRAND, if the licensee against its will has to *pay* for a license, but does not *get paid* for giving a cross-license regardless of the value conveyed, or gets paid a below-FRAND compensation.  FRAND terms and conditions should be fair and reasonable for both licensor and licensee.  Of course, it is possible that the licensor's patents are more valuable than those cross-licensed by the licensee, but the reverse is possible too.  Either way, the difference in value can and should be reflected in the compensation that flows back and forth between the parties. That is the very point of good faith negotiations in accordance with FRAND principles.

---

[29]     *Id.* ¶¶ 21-22.

[30]     [2017] EWHC 711 (Pat), ¶¶ 98-146; https://www.judiciary.gov.uk/wp-content/uploads/2017/04/unwired-planet-v-huawei-20170405.pdf.

Article 3.2 of the IPR Policy confirms this by stating that IPR holders – and that includes the licensee who cross-licenses SEPs – should be adequately and fairly rewarded for the use of their IPRs in the implementation of standards.  To my recollection, this objective was essential in the development of the ETSI IPR Policy and was always regarded by ETSI as a very important policy objective.  This was a constant factor throughout the discussions in which I participated and of which I was aware in my role as ETSI Director-General. It should also apply to IPR owners who are licensees and are requested to cross-license their SEPs.

An imposition of a royalty-free cross-grant of rights without compensation or adjustment, or with a below-FRAND compensation, is discriminatory in two ways.  First, a licensee with more valuable IP gives up more than a licensee who has no or very little IP to cross-license.  Second, it would be discriminatory in comparison with the licensor, who does receive FRAND royalties for its IPR.

For these reasons, I am of the opinion that a licensor of SEPs cannot against the will of the licensee refuse to compensate the licensee for the cross-license on FRAND terms and conditions, with difference in compensation proportionate to the difference in value derived from the licensed and cross-licensed patents.

## 6.   Unless both parties agree otherwise, the license must not bundle SEPs and non-SEPs

The terms and conditions of a SEP license must be fair, reasonable and non-discriminatory (FRAND). A declaration of a single SEP to ETSI is an irrevocable commitment for the IP holder to be ready to grant a license for this Essential patent (to a given standard) under FRAND terms and conditions.

The ETSI IPR Policy does not address licensing conditions for non-SEPs. Owing to this silence in the policy, there are no rules available in the IPR Policy allowing a SEP owner to impose an extra cost on a licensee by bundling licenses for SEPs and non-SEPs, unless both parties voluntarily agree otherwise.  This means that the SEP owner cannot force a licensee to pay for non-SEPs, or for SEPs reading on other standards, that the licensee does not need or does not want, or for which there are better or less expensive alternatives.

Holders of greater IP-portfolios tend to provide general declarations for their SEPs to ETSI in which they commit themselves to grant FRAND licenses for all SEPs for a specific standardization area or standard generation (like UMTS, or LTE).  For each such standardization area or generation, SEPs can be bundled.  An SEP owner cannot, however, force the licensee to take and pay for standards or generations that the licensee does not need or does not want.

# REPLY EXHIBIT 28



Home



Search

News          Press Announcements

## Press Release





Products



# ERICSSON and Qualcomm Reach Global CDMA Resolution



Solutions

MAR 25, 1999 | NEW YORK

Qualcomm products mentioned within this press release are offered by Qualcomm Technologies, Inc. and/or its subsidiaries.



Invention



News

Company

ERICSSON (Nasdaq: ERICY) and Qualcomm (Nasdaq: QCOM) today announced that they have entered into a series of definitive agreements that resolve all disputes globally between the companies relating to Code Division Multiple Access (CDMA) technology. Under the agreements, ERICSSON and Qualcomm agree to jointly support a single world CDMA standard with three optional modes for the next generation of wireless communications, to enter into cross licenses for their respective patent portfolios and to settle the existing litigation between the companies. The cross licenses are royalty bearing for CDMA subscriber units sold by either party. In addition, ERICSSON will purchase Qualcomm's terrestrial CDMA wireless infrastructure business, including

More


Home


Search


Products


Solutions


Invention


News


Company

its R&D resources, located in San Diego, Calif. and Boulder, Colo., and will assume select customer commitments, including a portion of vendor financing obligations, related assets and personnel. The agreements are subject to necessary regulatory approvals and other customary conditions.

The agreement settles the litigation between ERICSSON and Qualcomm and provides for cross licensing of Intellectual Property Rights (IPRs) for all CDMA technologies, including cdmaOne™, WCDMA and cdma2000™. Qualcomm also will receive rights to sublicense certain ERICSSON patents, including the patents asserted in the litigation, to Qualcomm's Application Specific Integrated Circuits (ASICs) customers.

The companies have also agreed to jointly support approval by the International Telecommunications Union (ITU) and other standards bodies, including the U.S. Telecommunications Industry Association (TIA) and the European Telecommunications Standards Institute (ETSI), of a single CDMA third generation (3G) standard that encompasses three optional modes of operation: 1) direct sequence FDD, 2) multi-carrier FDD, and 3) TDD. Each mode supports operation with both GSM MAP and ANSI-41 networks. Qualcomm and ERICSSON believe that rapid adoption of the single CDMA standard is in the best interests of the industry and allows each operator to select which mode of operation to deploy based on marketplace needs. As part of the agreement, the companies will each commit to the ITU and to other standards bodies to license their essential patents for a single CDMA standard or any of its modes to the rest of the industry on a fair and reasonable basis free from unfair discrimination. The companies will notify the ITU and other relevant standardization entities of the agreement to remove all IPR blocking currently in force.

The grants of licenses and the settlement of all litigation, as

• • •
More


Home


Search


Products


Solutions


Invention


News


Company

well as the commitment to standards bodies to license their essential IPRs, will become effective upon closing of the purchase of Qualcomm's terrestrial CDMA wireless infrastructure business.

"With the resolution of 3G and the cross-licensing of our patents, Qualcomm and ERICSSON have paved the way for the expansion of global CDMA-based wireless communications," said Dr. Irwin Mark Jacobs, chairman and chief executive officer of Qualcomm Incorporated. "ERICSSON's purchase of our infrastructure division underscores its commitment to CDMA, and allows ERICSSON, one of the world's leading telecommunications equipment manufacturers, to expand its CDMA capabilities. Qualcomm can now focus on its core businesses, including CDMA phones and chipsets, the Globalstar and OmniTRACS systems and new opportunities in digital cinema, wireless data and Eudora products and services."

"ERICSSON, through its agreement with Qualcomm -- a pioneer in developing CDMA technologies -- now has complete 3G competence," commented Sven-Christer Nilsson, president and chief executive officer of ERICSSON. "We are ideally positioned to support any operator anywhere in the world to migrate to 3G regardless of technology heritage or technology choice."

Qualcomm's terrestrial CDMA wireless infrastructure research and development and manufacturing division comprises infrastructure for cellular, PCS and wireless local loop. The acquisition provides ERICSSON with leading CDMA research and development, including the cdmaOne and cdma2000 product lines that ERICSSON will further develop and market. ERICSSON will establish a global CDMA center in San Diego, Calif.

"With the addition of cdmaOne and cdma2000, we will be well



... 
More


Home


Search


Products


Solutions


Invention


News


Company

positioned to serve current and future CDMA markets, including the fast growing CDMA handset market," said Mr. Nilsson. "By combining this competence with our industry-leading capabilities in WCDMA, we intend to play a leading role in the converged world of wireless data services."

Qualcomm will incur a one-time charge in connection with the transactions contemplated by the agreements, the details of which it anticipates will be available when the Company announces results for its second fiscal quarter ending March 31, 1999.

Qualcomm Incorporated (Nasdaq: QCOM) is a leader in developing and delivering innovative digital wireless communications products and services based on the Company's CDMA digital technology. The Company's major business areas include CDMA phones; integrated CDMA chipsets and system software; technology licensing, and satellite-based systems including OmniTRACS® and portions of the Globalstar™ system. Qualcomm is headquartered in San Diego, Calif. Qualcomm's fiscal 1998 revenues exceeded U.S. $3 billion. For more information please visit the Company's web site at http://www.qualcomm.com.

ERICSSON (Nasdaq: ERICY) is the leading provider in the New Telecoms World with communications solutions that combine telecommunications and data communications technologies with freedom of mobility for the user. With more than 100,000 employees in 140 countries, ERICSSON simplifies communications for its customers -- network operators, service providers, enterprises and consumers -- the world over. For further information, please visit the company's web site at http://www.Ericsson.com.

Qualcomm was advised by Lehman Brothers as financial advisers and Cooley Godward LLP as legal advisers, and ERICSSON was advised by Merrill Lynch&Co. as financial


More



Home



Search



Products



Solutions



Invention



News

Company

More

advisers and Shearman&Sterling as legal advisers.

Except for the historical information contained herein, this release contains forward-looking statements that are subject to risks and uncertainties, including the risk that the transaction contemplated by the definitive agreements will not be consummated, as well as the other risks detailed from time to time in the Company's SEC reports, including the report on Form 10-K for the year ended September 27, 1998, and the most recent Form 10-Q.

###

Qualcomm and OmniTRACS are registered trademarks of Qualcomm Incorporated. Globalstar is a trademark of Loral Qualcomm Satellite Services, Incorporated. cdmaOne is a trademark of the CDMA Development Group. Cdma2000 is a trademark of the Telecommunications Industry Association (TIA). All other company and product names are trademarks of their respective holders.






Home

Search


Products


Solutions


Invention


News

Company

About Qualcomm    Careers    Offices    Contact Us    Support    Subscription Center

Terms of Use    Privacy    Cookies    Site Map

©2018 Qualcomm Technologies, Inc. and/or its affiliated companies.

References to "Qualcomm"; may mean Qualcomm Incorporated, or subsidiaries or business units within the Qualcomm corporate structure, as applicable.
Materials that are as of a specific date, including but not limited to press releases, presentations, blog posts and webcasts, may have been superseded by subsequent events or disclosures.
Qualcomm Incorporated includes Qualcomm's licensing business, QTL, and the vast majority of its patent portfolio.
Qualcomm Technologies, Inc., a wholly-owned subsidiary of Qualcomm Incorporated, operates, along with its subsidiaries, substantially all of Qualcomm's engineering, research and development functions, and substantially all of its products and services businesses. Qualcomm products referenced on this page are products of Qualcomm Technologies, Inc. and/or its subsidiaries.

More