UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 17-CV-00220-LHK |
| Plaintiff, | **ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| QUALCOMM INCORPORATED, | Re: Dkt. No. 792 |
| Defendant. | |

Plaintiff Federal Trade Commission ("FTC") sues Defendant Qualcomm, Incorporated ("Qualcomm") for violation of § 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Before the Court is the FTC's motion for partial summary judgment on the issue of whether two industry agreements obligate Qualcomm to license its essential patents to competing modem chip suppliers. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS the FTC's motion for partial summary judgment.

## I.        BACKGROUND

### A.  Factual Background

This case presents the complicated interaction between cellular communications standards, standard essential patents ("SEPs"), and the market for baseband processors, or "modem chips."

In the Complaint, the FTC alleges that Qualcomm is a "dominant supplier" of modem chips and the holder of SEPs essential to "widely adopted cellular standards."  ECF No. 1 ("Compl.") ¶ 2. The FTC alleges that Qualcomm has harmed competition and violated § 5 of the FTCA via several interrelated policies and practices.  First, Qualcomm does not sell its modem chips unless a customer accepts a license to Qualcomm's SEPs, which the FTC alleges Qualcomm offers for "elevated royalties."  *Id.* ¶ 3a.  Second, Qualcomm refuses to license its SEPs to competitors in the modem chip supplier market, in violation of industry agreements.  *Id.* ¶ 3c.  Third, the FTC alleges that Qualcomm has entered "exclusive dealing arrangements" with Apple, an important cell phone manufacturer.  *Id.* ¶ 3d.

The parties refer interchangeably to the companies that manufacture and sell modem chips as "modem chip suppliers," "modem chip manufacturers," and "modem chip sellers."  For simplicity and consistency, the Court uses the term "modem chip suppliers" in this Order.

The FTC alleges that because of those practices, customers for Qualcomm's modem chips must pay elevated royalties while Qualcomm's refusal to license its SEPs to competing modem chip suppliers ensures that Qualcomm's customers must depend on Qualcomm for their modem chip supply.  *Id.* ¶¶ 4, 6.  The FTC further alleges that Qualcomm's exclusive arrangements with Apple preclude other modem chip suppliers from working with "a particularly important cell phone manufacturer," which harms competition.  *Id.* ¶ 8.[1]

Here, the FTC's motion for partial summary judgment concerns a discrete legal question: whether two industry agreements require Qualcomm to license its SEPs to other modem chip suppliers.  Below, the Court first discusses cellular communications standards and SEPs.  Then, the Court turns to the two specific industry agreements that the FTC contends require Qualcomm to license its SEPs to modem chip suppliers, including suppliers competing with Qualcomm.

### 1. Cellular Standard Setting Organizations

---

[1] For a more fulsome discussion of the FTC's allegations that Qualcomm's conduct harms competition, the Court refers the reader to the Court's prior Order denying Qualcomm's motion to dismiss the FTC's Complaint.  ECF No. 133; *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2017 WL 2774406, at *1–7 (N.D. Cal. June 26, 2017).

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

Cellular communications depend on widely distributed networks that implement cellular communications standards. ECF No. 870-22 ¶ 10. These standards promote "availability and interoperability of standardized products regardless of geographic boundary." *Id.* Cellular standards have evolved over generations, beginning with the "first generation" standards developed in the 1980s. *See In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 955 (N.D. Cal. 2017). Second and third generation standards followed. ECF No. 870-22 ¶¶ 8–9.

Industry groups called standard-setting organizations ("SSOs")[2] have emerged to develop and manage the relevant cellular standards. *Id.* ¶ 11. For example, the Telecommunications Industry Association ("TIA"), a SSO in the United States, "establishes engineering and technical requirements for processes, procedures, practices and methods that have been adopted by consensus." ECF No. 792-2, Ex. 1 ("TIA IPR") at 8. As work began on third generation—or "3G"—cellular communication standards, collaborations of SSOs formed to ensure global standardization. ECF No. 870-22 ¶ 9; *see also* ECF No. 792-2, Ex. 5 at 7 (collaboration working procedures characterizing the collaboration's purpose as "to prepare, approve and maintain globally applicable Technical Specifications" for cellular communications). One such collaboration is the Third Generation Partnership Project ("3GPP"). *Id.* As 4G technology emerged, 3GPP developed the 4G LTE family of standards. ECF No. 870-22 ¶ 9. Another collaboration, the Third Generation Partnership Project 2 ("3GPP2"), focused its 3G standardization efforts on the CDMA2000 standard. *Id.*

Individual member SSOs of 3GPP and 3GPP2 are known as Organizational Partners. ECF No. 792-2, Ex. 5, at 8. The Alliance for Telecommunications Industry Solutions ("ATIS"), a SSO in the United States, is an Organizational Partner of 3GPP. *Id.* at 7. As a 3GPP Organizational

---

[2] Qualcomm refers to these organizations as standards development organizations, or "SDOs." Opp. at 3. The terms SSO and SDO appear interchangeable, as both are employed in the record to refer to standards organizations. *See also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1208 (Fed. Cir. 2014) (using the term "SDO"). Consistent with the Ninth Circuit's approach, the Court refers to ATIS and TIA as standard-setting organizations, or "SSOs." *See Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 875 (9th Cir. 2012) ("*Microsoft II*") (explaining that SSOs "establish technical specifications to ensure that products from different manufacturers are compatible with each other").

Partner, ATIS has "the capability and authority to define, publish and set standards within the 3GPP scope." *Id.* at 9.  An Organizational Partner "approv[es] and main[tains] . . . the 3GPP scope" and "transpose[s]" 3GPP technical specifications into the Organizational Partner's own standards. *Id.* at 7, 10.  TIA is an Organizational Partner of 3GPP2.  ECF No. 870-22 ¶ 9.

### 2.  Standard Essential Patents

The cellular communications standards that SSOs develop and adopt may incorporate patented technology. *See* ECF No. 792-2, Ex. 2 ("ATIS IPR"), at 9 (ATIS acknowledges that "use of [a] patented invention" may be required "for purposes of adopting, complying with, or otherwise utilizing" an ATIS standard); TIA IPR at 8 (TIA states that "[t]here is no objection in principle to drafting a [TIA] Standard in terms that include the use of a patented invention").  In order to prevent the owner of a patent essential to complying with the standard—the "SEP holder"—from blocking implementation of a given standard, SSOs maintain intellectual property rights ("IPR") policies.  ECF No. 792-2, Ex. 3 at 1.  These IPR policies "requir[e] members who hold IP rights in [SEPs] to agree to license those patents to all comers on terms that are 'reasonable and nondiscriminatory,' or 'RAND.'" *Microsoft II*, 696 F.3d at 876.  The FTC and Qualcomm use the term FRAND, which stands for "fair, reasonable, and nondiscriminatory," and is "legally equivalent" to RAND. *Id.* at 877 & n.2.

### 3.  IPR Policies

At issue in the FTC's partial summary judgment motion are Qualcomm's FRAND obligations under the IPR policies of two SSOs, TIA and ATIS.  The TIA IPR policy is designed to "encourage[] holders of intellectual property to contribute their technology to TIA's standardization efforts and enable competing implementations that benefit manufacturers and ultimately consumers."  TIA IPR at 6.  Under the current TIA IPR policy, which has been in effect since 2005, TIA will approve a standard that requires the use of a SEP only if the SEP holder commits to TIA that:

> A license under any Essential Patent(s), the license rights which are held by the undersigned Patent Holder, will be made available to all applicants under terms and conditions that are reasonable and non-discriminatory . . . and only to the extent

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

necessary for the practice of any or all of the Normative portions for the field of use of practice of the Standard."

*Id.* at 8–9.  Even prior to 2005, the TIA IPR policy required SEP holders to license SEPs on "reasonable terms and conditions that are demonstrably free of unfair discrimination to applicants only and to the extent necessary for the practice of the TIA Publication."  ECF No. 793-6, Ex. 39 (2002 version of TIA manual).  The parties agree that on several occasions Qualcomm committed to TIA to license Qualcomm's SEPs pursuant to the current TIA IPR policy or to prior versions of the policy.  Mot. at 11–14; Opp. at 5.

The ATIS IPR policy provides that if "use of [a] patented invention is required for purposes of adopting, complying with, or otherwise utilizing the standard," the ATIS patent policy applies.  ATIS IPR at 9.  ATIS has adopted the patent policy of the American National Standards Institute ("ANSI").  *Id.*  Under that policy,[3] ATIS will not approve an ATIS standard that requires use of a SEP until the SEP holder provides "assurance that a license to such essential patent claim(s) will be made available to applicants desiring to utilize the license for the purpose of implementing the standard . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination."  *Id.* at 10.  The parties agree that on several occasions Qualcomm sent ATIS letters of assurance that Qualcomm would license its SEPs pursuant to the ATIS IPR policy.  Mot. at 8–10; Opp. at 4–5.

**B.  Procedural History**

The FTC sued Qualcomm in this Court on January 17, 2017, and alleged that Qualcomm's course of conduct violated § 5 of the FTCA.  Compl.

On April 3, 2017, Qualcomm moved to dismiss the Complaint.  ECF No. 69.  On May 12, 2017, the FTC opposed Qualcomm's motion.  ECF No. 85.  On May 12, 2017, ACT|The App Association ("ACT"), Samsung Electronics Co., Ltd., Intel Corporation, and the American Antitrust Institute each filed motions for leave to file amicus curiae briefs in support of the FTC's

---

[3] For simplicity, the Court refers to the patent policy as the "ATIS IPR policy," although ATIS adopted ANSI's patent policy.

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

opposition.  *See* ECF Nos. 90–95.  On May 15, 2017, the Court granted the motions for leave to file amicus curiae briefs.  ECF No. 95.  On June 2, 2017, Qualcomm filed its reply.  ECF No. 120.

Then, on June 26, 2017, the Court denied Qualcomm's motion to dismiss the Complaint.  ECF No. 133; *see Fed. Trade Comm'n v. Qualcomm Inc.*, 2017 WL 2774406.

On August 30, 2018, the FTC filed motions to (1) exclude the expert testimony of Qualcomm expert Dr. Edward Snyder and accompanying exhibits; and (2) exclude the expert testimony of Qualcomm expert Professor Aviv Nevo.  ECF Nos. 788 & 790.  That same day, the FTC filed its motion for partial summary judgment.  ECF No. 792 ("Mot.").

Also, on August 30, 2018, Qualcomm filed motions to (1) strike portions of the rebuttal expert report of FTC expert Dr. Robert Akl; and (2) exclude the expert reports of FTC expert Richard Donaldson.  ECF Nos. 797 & 799.

On September 17, 2018, ACT and the Computer & Communications Industry Association ("CCIA") filed a motion for leave to file an amicus brief in support of the FTC's motion for partial summary judgment.  ECF No. 857 ("ACT Amicus").  On September 18, 2018, the Court granted ACT and CCIA's motion for leave to file an amicus brief.  ECF No. 861.

On September 24, 2018, the FTC filed oppositions to (1) Qualcomm's motion to strike portions of the rebuttal expert report of Dr. Akl; and (2) Qualcomm's motion to exclude the expert reports of Richard Donaldson.  ECF Nos. 866 & 868.

Also, on September 24, 2018, Qualcomm filed an opposition to the FTC's motion for partial summary judgment.  ECF No. 870 ("Opp.").  Qualcomm requested that the Court take judicial notice of 39 exhibits in connection with Qualcomm's opposition to the FTC's motion for partial summary judgment.  ECF No. 871.  That same day, Qualcomm filed oppositions to (1) the FTC's motion to exclude the expert testimony of Professor Nevo; and (2) the FTC's motion to exclude the expert testimony of Dr. Snyder and accompanying exhibits.  ECF Nos. 873 & 874.

On October 3, 2018, Nokia Technologies Oy ("Nokia") filed a motion for leave to file an amicus brief in support of Qualcomm's opposition to FTC's motion for partial summary judgment.  ECF No. 888 ("Nokia Amicus").  On October 4, 2018, the Court granted Nokia's

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

1   motion for leave to file an amicus brief.  ECF No. 890.

2       Then, on October 4, 2018, the FTC filed reply briefs in support of: (1) the FTC's motion to

3   exclude the expert testimony of Professor Nevo; (2) the FTC's motion to exclude the expert

4   testimony of Dr. Snyder; and (3) the FTC's motion for partial summary judgment.  ECF Nos. 889,

5   891 & 893 ("Reply").

6       Also, on October 4, 2018, Qualcomm filed reply briefs in support of (1) Qualcomm's

7   motion to strike portions of the rebuttal expert report of Dr. Akl; and (2) Qualcomm's motion to

8   exclude the expert reports of Richard Donaldson.  ECF Nos. 894 & 896.

9       On October 11, 2018, the FTC filed a motion for leave to file a response to Nokia's amicus

10  brief.  ECF No. 897.  On October 11, 2018, pursuant to Civil Local Rule 7-3(d)(1), Qualcomm

11  filed objections to evidence submitted with the FTC's summary judgment reply brief.  ECF No.

12  898.  On October 12, 2018, the Court granted the FTC's motion for leave to file a response to

13  Nokia's amicus brief.  ECF No. 899.

14      On October 15, 2018, the parties filed a joint administrative motion to defer the Court's

15  ruling on the FTC's motion for partial summary judgment.  ECF No. 902.  That same day, the

16  Court denied the parties' joint motion.  ECF No. 903.

## II.   LEGAL STANDARD

### A.   Summary Judgment

19      Summary judgment is proper where the pleadings, discovery, and affidavits show that

20  there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as

21  a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of

22  the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a

23  material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

24  the nonmoving party.  *See id.*

25      The Court will grant summary judgment "against a party who fails to make a showing

26  sufficient to establish the existence of an element essential to that party's case, and on which that

27  party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an

28

7

United States District Court
Northern District of California

1    essential element of the nonmoving party's case necessarily renders all other facts immaterial."

2    *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial

3    burden of identifying those portions of the record that demonstrate the absence of a genuine issue

4    of material fact.  *Id.*  The burden then shifts to the nonmoving party to "go beyond the pleadings,

5    and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on

6    file, designate specific facts showing that there is a genuine issue for trial."  *See id.* at 324 (internal

7    quotations omitted).

8          For purposes of summary judgment, the Court must view the evidence in the light most

9    favorable to the nonmoving party; if the evidence produced by the moving party conflicts with

10   evidence produced by the nonmoving party, the court must assume the truth of the evidence

11   submitted by the nonmoving party.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

12   The Court's function on a summary judgment motion is not to make credibility determinations or

13   weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv. v. Pacific*

14   *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

15       **B.  Judicial Notice**

16         In connection with its opposition to the FTC's partial summary judgment motion,

17   Qualcomm requests that the Court take judicial notice of 39 exhibits, some attached to

18   Qualcomm's request for judicial notice and others attached to declarations submitted with

19   Qualcomm's opposition.  ECF No. 871.  Qualcomm groups the documents into three general

20   categories: (1) publicly available documents related to cellular standards; (2) examples of TIA and

21   ATIS standards; and (3) a decision of a foreign court and other companies' submissions to foreign

22   regulatory bodies.  *Id.* at 1–5.  The FTC does not oppose the request or dispute the authenticity of

23   any of the documents.  *See generally* Reply.

24         The Court may take judicial notice of matters that are either "generally known within the

25   trial court's territorial jurisdiction" or "can be accurately and readily determined from sources

26   whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Public records,

27   including judgments and other filed documents, are proper subjects of judicial notice.  *See, e.g.*,

28

8

United States District Court
Northern District of California

United States District Court
Northern District of California

1   *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) ("[Courts] may take notice of

2   proceedings in other courts, both within and without the federal judicial system, if those

3   proceedings have a direct relation to matters at issue.").  In addition, courts routinely take judicial

4   notice of statements or statistics that are posted on the Internet and not in dispute.  *See Matthews v.*

5   *Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1113 & n.5 (9th Cir. 2012) (taking judicial

6   notice of facts posted on the NFL's website); *see also Matera v. Google, Inc.*, No. 15-CV-04062-

7   LHK, 2016 WL 5339806, at *7 (N.D. Cal. Sept. 23, 2016) (noting that "publicly accessible

8   websites" may be proper subjects of judicial notice).

9       The Court grants Qualcomm's request for judicial notice of documents posted on the

10  public websites of several SSOs, which are included as Exhibits 1–14 to Qualcomm's request.

11  The documents include a list of partners in various SSOs, the working procedures of several SSOs,

12  and other companies' assurances to comply with the TIS and ATIS IPR policies.  *See, e.g.*, ECF

13  Nos. 871-3, 871-7, and 871-12.  The authenticity and accuracy of the documents are not in

14  dispute.  *See Matthews*, 688 F.3d at 1113; *see also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d

15  1190, 1205 (N.D. Cal. 2014) (granting request for judicial notice of information not in dispute and

16  posted on publicly accessible websites).

17      The Court also grants Qualcomm's request for judicial notice of over 20 different TIA and

18  ATIS standards, which are attached to two declarations submitted with Qualcomm's opposition to

19  the FTC's partial summary judgment motion.  *See* ECF Nos 870-19 & 870-21.  Again, the

20  authenticity of the standards is not in dispute, and other courts have taken judicial notice of SSO

21  standards.  *See McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 655 (7th Cir. 1998) (taking

22  judicial notice, of the court's own volition, of standards developed by a SSO); *see also Smart*

23  *Modular Techs., Inc. v. Netlist, Inc.*, No. 12-CV-02319-TLN-EFB, 2017 WL 3009217 (E.D. Cal.

24  July 14, 2017) (on a motion to dismiss, taking judicial notice of the full text of a SSO standard

25  quoted in part in the complaint).

26      Lastly, the Court grants Qualcomm's request for judicial notice of both a decision of the

27  United Kingdom High Court of Justice and other companies' submissions to the Korean Fair

28

1    Trade Commission ("KFTC"), which are included as Exhibits 15–20 to Qualcomm's request.  The

2    High Court's decision is a public record, which is a proper subject of judicial notice, and courts

3    have taken judicial notice of filings with government regulatory bodies like the KFTC.  *See Yuen*

4    *v. U.S. Stock Transfer Co.*, 966 F. Supp. 944, 945 n.1 (C.D. Cal. 1997) (taking judicial notice of

5    filings before a foreign court); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.

6    1991) (taking judicial notice of company's filings with the Securities and Exchange Commission).

7    Accordingly, the Court grants all of Qualcomm's requests for judicial notice.

8         In its reply brief, the FTC also suggests, in passing, that the Court may take judicial notice

9    of certain evidence cited in the FTC's reply brief, including materials posted on public websites.

10   *See* Reply at 4 n.4.  The Court addresses the FTC's request in the Discussion section below

11   because the Court must first decide whether to consider the evidence at all.  *See Provenz v. Miller*,

12   102 F.3d 1478, 1483 (9th Cir. 1996) (holding that if the movant introduces new evidence in a

13   reply, the court must generally permit the non-movant an opportunity to respond).

## III.    DISCUSSION

15        The FTC brings its Complaint against Qualcomm under § 5 of the FTCA, which prohibits

16   "[u]nfair methods of competition in or affecting commerce."  15 U.S.C. § 45(a).

17        "Unfair methods of competition" under the FTCA includes "violations of the Sherman

18   Act."  *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 691 (1948).  In addition, the FTC under

19   Section 5 may "bar incipient violations of [the Sherman Act], and conduct which, although not a

20   violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit."  *E.I.*

21   *du Pont de Nemours & Co. v. Fed. Trade Comm'n*, 729 F.2d 128, 136–37 (2d Cir. 1984) (internal

22   citations omitted); *see also Fed. Trade Comm'n v. Brown Shoe Co.*, 384 U.S. 316, 321 ("This

23   broad power of the [FTC] is particularly well established with regard to trade practices which

24   conflict with the basic policies of the Sherman and Clayton Acts even though such practices may

25   not actually violate these laws.").  "The standard of 'unfairness' under the FTCA is, by necessity,

26   an elusive one," and the precise contours of the FTC's authority under § 5 are not clearly defined.

27   *Fed. Trade Comm'n v. Indiana Fed. of Dentists*, 476 U.S. 447, 454 (1986).  However, the FTC's

28
10

United States District Court
Northern District of California

1    authority to proscribe "unfair methods of competition" under § 5 is not unbounded.  *See E.I. du*

2    *Pont de Nemours & Co.*, 729 F.2d at 137 ("When a business practice is challenged by the [FTC],

3    even though, as here, it does not violate the antitrust or other laws and is not collusive, coercive,

4    predatory or exclusionary in character, standards for determining whether it is 'unfair' within the

5    meaning of § 5 must be formulated to discriminate between normally acceptable business behavior

6    and conduct that is unreasonable or unacceptable.").

7         The FTC's instant motion for partial summary judgment does not seek to prove that

8    Qualcomm violated § 5.  Rather, the FTC seeks "a ruling that Qualcomm's voluntary FRAND

9    licensing commitments to [ATIS and TIA] . . . require Qualcomm to make licenses available to

10   competing modem-chip sellers."  Mot. at 1.  In opposition, Qualcomm contends that the TIA and

11   ATIS IPR policies only require Qualcomm to license its SEPs to applicants that supply complete

12   devices like cellular handsets, not applicants that supply components like modem chips.  Opp. at

13   14–17.  For the reasons stated below, the Court agrees with the FTC.

14   **A.  Legal Standard**

15        The parties both contend that the Court should employ California contract law to interpret

16   the terms of the TIA and ATIS IPR policies.  Mot. at 15 n.49; Opp. at 12.  After applying

17   California choice-of-law principles, the Court reaches the same conclusion.

18        Neither IPR policy includes a choice-of-law clause, or otherwise specifies which state's

19   contract law a court should apply to interpreting the policies.  *See generally* TIA IPR and ATIS

20   IPR.  To determine the applicable law, the Court applies California choice-of-law rules.  *Cf.*

21   *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009) ("In a federal question action that

22   involves supplemental jurisdiction over state law claims, [the court] appl[ies] the choice of law

23   rules of the forum state."); *see also Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061,

24   1082 (W.D. Wisc. 2012) (applying Wisconsin choice-of-law principles to determine the state law

25   applicable to a company's obligations under a different SSO policy).

26        Under California choice-of-law rules, "[a] contract is to be interpreted according to the law

27   and usage of the place where it is to be performed; or, if it does not indicate a place of

28                                                    11

United States District Court
Northern District of California

United States District Court
Northern District of California

performance, according to the law and usage of the place where it is made." Cal. Civ. Code §

1646. "When the contract does not expressly specify a place of performance . . . the place of

performance is the jurisdiction in which the circumstances indicate the parties expected or

intended the contract to be performed." *Welles v. Turner Entm't Co.*, 503 F.3d 728, 738 (9th Cir.

2007). Although neither IPR policy specifies a place of performance, the circumstances indicate

that under each IPR policy, Qualcomm was expected to perform its obligations—to provide

licenses—from its headquarters in California. *See, e.g.*, ATIS IPR at 10 (requiring Qualcomm to

assure that "a license . . . will be made available"). Alternatively, under California law, contracts

were formed in California when Qualcomm executed its commitments to comply with the ATIS

and TIA IPR policies. *See* Cal. Civ. Code § 1583 (holding that consent to contract is deemed

communicated when the accepting party sends its acceptance). Accordingly, the Court applies

California contract law to the terms of the ATIS and TIA IPR policies.

"Under California law, the fundamental goal of contract interpretation is to give effect to

the mutual intent of the parties as it existed at the time of contracting." *U.S. Cellular Inv. Co. v.*

*GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002) (citing Cal. Civ. Code § 1636).

California's rules of contract interpretation instruct courts that if "[t]he language [of a contract] is

clear and explicit, and does not involve an absurdity," the contract language must govern the

contract's interpretation. Cal. Civ. Code § 1638. Moreover, "the intention of the parties is to be

ascertained from the writing alone, if possible." Cal. Civ. Code § 1639. "Thus, if the meaning a

layperson would ascribe to contract language is not ambiguous, [the Court] appl[ies] that

meaning." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990) (in bank). "The whole of a

contract is to be taken together, so as to give effect to every part, if reasonably practicable, each

clause helping to interpret the other." Cal. Civ. Code § 1641.

When interpreting a California contract, the Court must also "engage in a preliminary

consideration of credible evidence offered to prove the intention of the parties." *U.S. Cellular*,

281 F.3d at 939; *see also First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1066

(9th Cir. 2011) ("California has long abandoned a rule that would limit the interpretation of a

12

written instrument to its four corners.").  If a preliminary consideration of that extrinsic evidence demonstrates that the evidence is "(1) 'relevant' to prove (2) 'a meaning to which the language of the instrument is reasonably susceptible,'" the extrinsic evidence is admissible.  *Id.* at 938 (citing *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968)). Relevant extrinsic evidence may "include[] testimony as to the circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . . so that the court can place itself in the same situation in which the parties found themselves at the time of contracting."  *Pac. Gas*, 69 Cal. 2d at 40 (internal quotation marks omitted).  However, extrinsic evidence cannot be used to directly contradict an express term of a written contract. *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 271 (1987).

It is appropriate for the Court to grant summary judgment "[i]f, after considering the language of the contract and any admissible extrinsic evidence, the meaning of the contract is unambiguous."  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006).  "[I]f the interpretation turns upon the credibility of conflicting extrinsic evidence, or if 'construing the evidence in the nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's position,' summary judgment is inappropriate."  *Id.* (quoting *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003)).

**B.  Nature of the Contracts**

The Court now turns to the two SSO IPR policies at issue in this motion.  The TIA IPR policy reads as follows:

> **Reasonable and Non-Discriminatory (RAND) Commitment**
> There is no objection in principle to drafting a Standard in terms that include the use of a patented invention, if it is considered that technical reasons justify this approach.
>
> Notwithstanding, with respect to any Essential Patent(s) necessary for the practice of any or all Normative portions of the Standard, the Patent Holder shall indicate its willingness to make a licensing commitment by stating either:
>
> (1) It does not hold the rights to license any Essential Patent(s) necessary for the practice of any or all of the Normative portions of the standard; or either of

13

United States District Court
Northern District of California

(2)(a) A license under any Essential Patent(s), the license rights which are held by the undersigned Patent Holder, will be made available to all applicants under terms and conditions that are reasonable and non-discriminatory . . . and only to the extent necessary for the practice of any or all of the Normative portions for the field of use of practice of the Standard; or

(2)(b) A license under any Essential Patent(s), the license rights which are held by the undersigned Patent Holder, will be made available to all applicants under terms and conditions that are reasonable and non-discriminatory, which may include monetary compensation, and only to the extent necessary for the practice of any or all of the Normative portions for the field of use of practice of the Standard.

TIA IPR at 8.  The ATIS IPR policy reads as follows:

If ATIS receives a notice that a proposed [American National Standard ("ANS")] or an approved ANS may require the use of such a patented claim, the procedures in this shall be followed.

*Statement from patent holder*

Prior to approval of such a proposed ANS, ATIS shall receive from the identified party or a party authorized to make assurances on its behalf, in written or electronic form, either:

(a) Assurance in the form of a general disclaimer that such party does not hold and does not currently intend holding any essential patent claim(s); or
(b) assurance that a license to such essential patent claim(s) will be made available to applicants desiring to utilize the license for the purpose of implementing the standard . . .
(i) under reasonable terms and conditions that are demonstrably free of any unfair discrimination; or
(ii) without compensation and under reasonable terms and conditions that are demonstrably free of any unfair discrimination.

ATIS IPR at 10.

Here, Qualcomm's written assurances to TIA and ATIS to license its SEPs on FRAND terms mirror the respective policies' language.  Qualcomm assured TIA that Qualcomm would make licenses available "under terms and conditions that are reasonable and non-discriminatory . . . and only to the extent necessary for the practice of any or all of the Normative portions . . . for the field of use of practice of the Standard."  ECF No. 796-1.  Likewise, Qualcomm assured ATIS that Qualcomm would make licenses available "under reasonable terms and conditions that are

United States District Court
Northern District of California

1   demonstrably free of any unfair discrimination to applicants desiring to utilize the license for the

2   purpose of implementing" the relevant standard.  ECF No. 793-6.

3          As an initial matter, the parties do not dispute that Qualcomm's assurances to TIA and

4   ATIS constitute binding contracts.  That position is consistent with the conclusions of several

5   courts, including the Ninth and Federal Circuits.  In *Microsoft II*, the Ninth Circuit affirmed the

6   district court's conclusion that a company's "RAND declarations to the [SSO] created a binding

7   contract."  696 F.3d at 884–85; *see also TCL Commc'n Tech. Holdings, Ltd. v.*

8   *Telefonaktiebolaget LM Ericsson*, No. 14-CV-341-JVS, 2018 WL 4488286, at *5 (C.D. Cal. Sept.

9   14, 2018) ("*TCL Commc'n*") (holding that under French law, ETSI's acceptance of a standard that

10  incorporates a SEP "forms a contract which includes the patent holder's obligation to license").

11         In *Ericsson*, the Federal Circuit affirmed that Ericsson's FRAND commitments to license

12  its SEPs under a SSO IPR policy were "binding" on Ericsson.  773 F.3d at 1209; *see also Realtek*

13  *Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1006 (N.D. Cal. 2013) (noting that the

14  parties did not dispute that a SEP holder's letters of assurance to license its patents on FRAND

15  terms created a binding obligation).

16         When other courts have interpreted SSO IPR policies, those courts have characterized the

17  applicable contract terms as "the language of [the SEP holder's] statements to the [SSOs], as well

18  as the relevant language in the [SSO] Policies."  *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp.

19  2d 1023, 1032 n.6 (W.D. Wash. 2012).  In this case, the Court need not separately consider the

20  language of Qualcomm's written assurances to comply with the TIA and ATIS IPR policies

21  because, as set forth above, Qualcomm's assurances parrot the language of the TIA and ATIS IPR

22  policies.  ECF No. 796-1; ECF No. 793-6.

23         That said, the Court must resolve one disputed issue about the applicable contract terms.

24  Here, the FTC contends that the Court should treat the published guidelines to the TIA IPR policy

25  ("TIA Guidelines") as part of the "terms of the contract" between Qualcomm and TIA.  Mot. at

26  18.  The FTC relies on *TCL Communication*, in which the district court, while interpreting a

27  different IPR policy, stated that "the two relevant parts of the ETSI Directives are the ETSI IPR

28
                                                  15

United States District Court
Northern District of California

Policy . . . and the ETSI Guide on IPRs." 2018 WL 4488286 at *6. However, the district court in *TCL Communication* did not state that the ETSI Guide was part of the IPR *policy* itself, or that the ETSI Guide was part of the agreed-upon contract terms. *Id.* Moreover, the *TCL Communication* court was applying French law, under which no "contract interpretation rules . . . are mandatory," and where it is "common to use extrinsic materials" to discover the intent of the parties. *Id.* at *5. The *TCL Communication* approach is not directly relevant to this case, which involves California contract law and different IPR policies.

Most important, the TIA Guidelines themselves establish that the TIA Guidelines are not part of the TIA IPR policy: "These guidelines serve as a companion document . . . and are not intended to substitute for the Policy itself but rather to provide a review of major changes and an explanation of the rationale behind some of these changes." ECF No. 792-2, Ex. 3 at 1 (introduction to 2014 TIA Guidelines). The Court agrees with the reasoning of the decisions limiting the contract terms to the SSO IPR policy and the SEP holder's commitment to follow the SSO IPR policy and license on FRAND terms. *See Apple, Inc. v. Motorola, Inc.*, 886 F. Supp. 2d 1061, 1083 (W.D. Wisc. 2012) (stating that the relevant terms of a company's FRAND commitment, under Wisconsin contract law, included the SSO's "policies and bylaws" and the company's written assurances to comply with those policies). As explained below, however, the TIA Guidelines are relevant extrinsic evidence of the TIA IPR policy's meaning even though the TIA Guidelines are not themselves part of the TIA IPR policy.

**C. Analysis**

Here, the Court must address the contractual scope of a SEP holder's FRAND commitments under the TIA and ATIS IPR policies. The FTC's motion for partial summary judgment asserts that both IPR policies require Qualcomm to license its SEPs to all applicants, including competing modem chip suppliers. Mot. at 17–21. For its part, Qualcomm contends the IPR policies contain limitations, such that Qualcomm is not required to license its SEPs to applicants, like modem chip suppliers, that only produce components of devices. Opp. at 14–18. Consistent with Ninth Circuit precedent, the plain text of the IPR policies, and the relevant

16

United States District Court
Northern District of California

extrinsic evidence, the Court concludes that the TIA and ATIS IPR policies require Qualcomm to license its SEPs to modem chip suppliers.

### 1. Precedent on Scope of FRAND Commitments

Ninth Circuit precedent establishes that Qualcomm's FRAND commitments include an obligation to license to all comers, including competing modem chip suppliers.  It is undisputed that SSOs like TIA and ATIS "establish technical specifications to ensure that products from different manufacturers are compatible with each other."  *Microsoft II*, 696 F.3d at 875.  "Standards provide many benefits for technology consumers, including not just interoperability but also lower product costs and increased price competition."  *Id.* at 876.  Because it may be necessary to use patented technology to practice a given standard, "standards threaten to endow holders of standard-essential patents with disproportionate market power."  *Id.*; *see also Ericsson*, 773 F.3d at 1209 ("Because the standard *requires* that devices utilize specific technology, compliant devices *necessarily* infringe certain claims in patents that cover technology incorporated into the standard.") (emphasis in original).  A single standard can implicate "perhaps hundreds, if not thousands" of patents.  *Ericsson*, 773 F.3d at 1209.  To avoid giving SEP holders the power to prevent other companies from practicing the standard, SSOs maintain IPR policies that impose on SEP holders "an obligation to license IP rights on reasonable and nondiscriminatory terms."  Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Calif. L. Rev. 1889, 1913 (2002).  SSO IPR policies "do not allow essential patent owners . . . to prevent competitors from entering the marketplace."  *Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1093 (W.D. Wash. 2012) ("*Microsoft I*") (district court order later affirmed in *Microsoft II*).

In *Microsoft II*, the Ninth Circuit first addressed the scope of a SEP holder's FRAND licensing commitments.  At the outset, the Ninth Circuit stated that "SSOs requir[e] members who hold IP rights in standard-essential patents to agree to license those patents *to all comers* on terms that are 'reasonable and nondiscriminatory, or 'RAND.'"  696 F.3d at 876 (emphasis added).  The Ninth Circuit repeated the same core principle three years later: a "SEP holder *cannot refuse* a license to a manufacturer who commits to paying the RAND rate."  *Microsoft Corp. v. Motorola*

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

1   *Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015) ("*Microsoft III*") (emphasis added).[4]

2       Qualcomm contends that despite the Ninth Circuit's clear statements about the scope of a

3   SEP holder's FRAND commitments, *Microsoft II* and *Microsoft III* are not relevant to this case

4   because the Ninth Circuit did not "consider whether any language in that Policy limited the scope

5   of the obligation to license products that actually practiced the relevant standard." Opp. at 24.

6       However, Qualcomm ignores that the Ninth Circuit in *Microsoft II* was interpreting a SSO

7   IPR policy with almost identical language as the TIA and ATIS IPR policies. Under the SSO IPR

8   policy at issue in *Microsoft II*, the SEP holder promised to "grant a license to an unrestricted

9   number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and

10  conditions to use the patented material necessary in order to manufacture, use, and/or sell

11  implementations" of the relevant standard. 696 F.3d at 876; *see also id.* at 884 (characterizing the

12  SEP holder's assurance as a promise to license to applicants "'to use the patented material

13  necessary' to practice the ITU standards"). The Ninth Circuit emphasized that such IPR policy

14  language "*admits of no limitations* as to who or how many applicants could receive a license . . .

15  or as to which country's patents would be included." *Id.* (emphasis added). As a result, the Ninth

16  Circuit concluded that the SEP holder could not refuse to license any of its SEPs, including its

17  international SEPs. *Id.* The Ninth Circuit further characterized the SEP holder's FRAND promise

18  as "sweeping." *Id.*

19      When the case returned to the Ninth Circuit in *Microsoft III*, the Ninth Circuit again

20  affirmed that the FRAND promise means that a SEP holder "cannot refuse a license to a

21  manufacturer who commits to paying the RAND rate." 795 F.3d at 1031. Those binding

22  precedents are clear: a SEP holder that commits to license its SEPs on FRAND terms must license

23  those SEPs to all applicants. Moreover, the Federal Circuit has also held that SSO IPR policies

24

25  [4] In *Microsoft II* and *Microsoft III*, the Ninth Circuit concluded that the Ninth Circuit rather than
    the Federal Circuit had jurisdiction over the appeals because the "complaint sounds in contract,"
26  *Microsoft II*, 696 F.3d at 881, and was a "straight breach of contract action." *Microsoft III*, 795
    F.3d at 1037. The Court thus applies Ninth Circuit precedent to the claim at issue in this motion,
27  which also sounds in contract. Regardless, Federal Circuit precedent on the interpretation of SSO
    IPR policies is consistent with the Ninth Circuit's decisions.

28

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

require SEP holders to grant licenses to "an unrestricted number of applicants," and that such a FRAND commitment prohibits the SEP holder from refusing to license the SEP to others who wish to use the invention. *Ericsson*, 773 F.3d at 1230. Qualcomm is unable to identify *any* court that has made a contrary statement about the scope of a SEP holder's FRAND commitments.

### a.   IPR Policy Text

The IPR policies at issue in this motion are no different. Both the TIA and ATIS IPR policies include non-discrimination provisions that prohibit Qualcomm from distinguishing between types of applicants. Under the TIA IPR policy, a SEP holder promises to license its SEPs to "all applicants" on "terms and conditions that are reasonable and non-discriminatory." TIA IPR at 8. Under the ATIS IPR policy, a SEP holder must grant a SEP license to any applicant "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." ATIS IPR at 10.

### b.   IPR Guidelines

Guidelines to the TIA IPR policy further reinforce how the Ninth Circuit's precedents compel the conclusion that Qualcomm's FRAND commitments prohibit Qualcomm from discriminating against modem chip suppliers. The TIA Guidelines "are intended to review the Policy, with an explanation of the rationale and some explanation of the intent" of the committee that drafted the TIA IPR policy. ECF No. 792-2, Ex. 3 at 2 ("TIA Guidelines"). Under California contract law, the Court must provisionally consider extrinsic evidence that "is relevant to show whether the contractual language is reasonably susceptible to a particular meaning." *Adams v. MHC Colony Park, L.P.*, 224 Cal. App. 4th 601, 620 (2014). Relevant extrinsic evidence may "include[] testimony as to the circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . . so that the court can place itself in the same situation in which the parties found themselves at the time of contracting." *Pac. Gas*, 69 Cal. 2d at 40 (internal quotation marks omitted). The TIA Guidelines, which state that the Guidelines explain the intent behind the drafting of the TIA IPR policy, are clearly relevant extrinsic evidence under the *Pacific Gas* standard.

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

1    The TIA Guidelines first explain that the TIA IPR Policy "seeks to make the IPR available

2    on a reasonable and non-discriminatory basis for *all* that would use it to fashion products

3    contemplated by the standard in question."  TIA Guidelines at 1 (emphasis added).  The TIA

4    Guidelines also state that the IPR policy's non-discrimination provision "implies a standard of

5    even-handedness."  *Id.* at 4.  Most significant, the TIA Guidelines specifically identify "a

6    willingness to license all applicants except for competitors of the licensor" as an example of

7    discriminatory conduct under the TIA IPR policy.  *Id.*  Thus, multiple provisions in the TIA

8    Guidelines demonstrate that consistent with Ninth Circuit case law, Qualcomm's FRAND

9    commitments under the instant IPR policies prohibit Qualcomm from discriminating against

10   modem chip suppliers.  Qualcomm has no response to the TIA Guidelines.

11        **c.  Stated Purposes of IPR Policies**

12   Both IPR policies include statements of purpose that emphasize the pro-competitive

13   principles behind the non-discrimination requirement, as explained by the Ninth Circuit.  The TIA

14   IPR policy is designed to "to encourage[] holders of intellectual property to contribute their

15   technology to TIA's standardization efforts and enable competing implementations that benefit

16   manufacturers and ultimately consumers."  TIA IPR at 6.  Similarly, the ATIS IPR policy aims "to

17   benefit the public while respecting the legitimate rights of intellectual property owners."  ATIS

18   IPR at 8.  The TIA Guidelines specifically explain that a SEP holder's FRAND commitment

19   "prevents the inclusion of patented technology [in a standard] from resulting in a patent holder

20   securing a monopoly in *any market* as a result of the standardization process."  TIA Guidelines at

21   1 (emphasis added).

22   If a SEP holder could discriminate against modem chip suppliers, a SEP holder could

23   embed its technology into a cellular standard and then prevent other modem chip suppliers from

24   selling modem chips to cellular handset producers.  *See* Lemley, *Intellectual Property Rights*, 90

25   Calif. L. Rev. at 1902 (stating that a company with a SEP "will effectively control the standard; its

26   patent gives it the right to enjoin anyone else from using the standard").  Such discrimination

27   would enable the SEP holder to achieve a monopoly in the modem chip market and limit

28
Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

1    competing implementations of those components, which directly contradicts the TIA IPR policy's

2    stated purpose to "enable competing implementations that benefit manufacturers and ultimately

3    consumers."  TIA IPR at 6.  *See Borg v. Transamerica Ins. Co.*, 47 Cal. App. 4th 448, 456 (1996)

4    (holding that a court may not interpret a contract in a way that contradicts the contract's plain

5    meaning).  Qualcomm never attempts to explain how discrimination against modem chip suppliers

6    is consistent with the stated purposes of the IPR policies.

7        **d.  Qualcomm's Own Practices**

8        Qualcomm's own practices also contradict its current positions that the IPR policies permit

9    Qualcomm to discriminate against component suppliers—including modem chip suppliers—and

10   that modem chip suppliers never receive SEP licenses.  Qualcomm concedes in its opposition brief

11   that another modem chip supplier received a SEP license to produce modem chips.  Opp. at 10.

12   More important, Qualcomm itself has received such licenses to supply components such as

13   modem chips, as the FTC demonstrates in evidence included with its reply brief.  Ordinarily, the

14   Court does not consider "new evidence . . . presented in a reply to a motion for summary

15   judgment," unless the non-movant has an opportunity to respond.  *Provenz*, 102 F.3d at 1483.

16   However, the FTC's evidence is not offered to support a new argument but rather to rebut the

17   claim first raised in Qualcomm's opposition that industry practice contradicts the FTC's

18   interpretation of the IPR policies, and Qualcomm cannot plausibly claim surprise or prejudice

19   from the FTC's citation to Qualcomm's own documents.  *Apple, Inc. v. Samsung Elecs. Co., Ltd.*,

20   877 F. Supp. 2d 838, 857 (N.D. Cal.), *rev'd on other grounds*, 695 F.3d 1370 (Fed. Cir. 2012)

21   (considering evidence in reply brief in part because the "vast majority of exhibits" were the non-

22   movant's "own documents").  Qualcomm assumed the risk of having its own documents cited

23   when Qualcomm took a position at odds with its own documents.

24       For example, in a Qualcomm presentation, Qualcomm stated that Qualcomm had received

25   licenses "to manufacture and sell components."  ECF No. 895-8, Ex. 15.[5]  Qualcomm received

26

27   _____

     [5] Qualcomm objects to Exhibit 15 on the basis that Qualcomm's own presentation is "irrelevant,
     confusing, and unfairly prejudicial."  ECF No. 898 at 1.  However, Qualcomm produced

28
     Case No. 17-CV-00220-LHK
     ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

"exhaustive licenses" from "[o]ver 120 companies." *Id.* In its opposition to the instant motion, Qualcomm cites testimony that the general "industry practice" is to license SEPs only to handset manufacturers, Opp. at 8–10, but none of those assertions are tethered to an interpretation of any IPR policy. Qualcomm's own extensive receipt of SEP licenses to supply modem chips rebuts any argument that a contrary industry practice is so "certain, uniform, . . . or generally known and notorious" as to be "regarded as part of the contract." *Webster v. Klassen*, 109 Cal. App. 2d 583, 589 (1952) (internal quotation marks omitted).

In addition, Qualcomm has emphasized in prior litigation that a SEP holder may not discriminate in licensing its SEPs. In that case, Ericsson sued Qualcomm for patent infringement and alleged that Qualcomm products, including two modem chips, infringed Ericsson's SEPs. ECF No. 893-2, Ex. 14 at 2.[6] Qualcomm argued in a motion for partial summary judgment that the TIA IPR policy—one of the very IPR policies at issue in this motion—requires Ericsson to license *any* patents "required to develop products compliant" with a given standard. *Id.* at 1. Qualcomm trumpeted the same non-discrimination principles it attempts to reject here, as Qualcomm argued that the TIA IPR policy "ensures that *all* industry participants will be able to develop, manufacture, and sell products compliant with the relevant standard without incurring the risk that patent holders will be able to shut down those operations." *Id.* at 4 (emphasis added). In an affidavit filed in support of that motion, Qualcomm's founder attested that Qualcomm licensed

_____

Qualcomm's presentation, which is relevant to Qualcomm's contention that industry practice contradicts the FTC's interpretation, and clearly states that Qualcomm has received licenses to produce components. Moreover, Qualcomm's claim that Exhibit 15 contradicts the FTC's argument that Qualcomm does not license its SEPs to modem chip suppliers is incorrect. Rather, the presentation shows that Qualcomm has *received* SEP licenses for Qualcomm's modem chips. The Court therefore OVERRULES Qualcomm's objection.

[6] Qualcomm objects to the FTC's inclusion of Exhibit 14 under Federal Rule of Evidence 403 and under Federal Rule of Evidence 106, which states that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction . . . of any other writing . . . that in fairness ought to be considered at the same time." ECF 898 at 2. Specifically, Qualcomm objects that the FTC "omits critical information about the posture of the case" that is contained in Ericsson's complaint. *Id.* However, the FTC included Ericsson's complaint as Exhibit 24, as Qualcomm acknowledges. *Id.* The writing is therefore available for "consider[ation] at the same time." Fed. R. Evid. 106.

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

its SEPs "to companies interested in developing [standard] compliant products" and that Ericsson assured Qualcomm that Ericsson would license "any patents whose use would be required for compliance" with the relevant standard.  ECF No. 893-2, Ex. 27 ¶¶ 6–7.  Importantly, in his deposition in the instant case, Qualcomm's founder explained that modem chips were among the products Qualcomm considered "compliant" with the relevant TIA standard.  ECF No. 893-2, Ex. 1 at 116–18.

In addition, in a filing with the European Commission, amicus Nokia alleged that Qualcomm's termination of a modem chip license agreement "after having induced SSOs to base . . . standards on Qualcomm's technology" breached "Qualcomm's duty to license on FRAND terms" based on multiple IPR policies.  ECF No. 893-2, Ex. 25 at 46.  Even though Nokia argued that Qualcomm's FRAND commitment to license to a modem chip supplier was "unequivocal," Nokia now contends that the FTC's interpretations of Qualcomm's commitments under the TIA and ATIS IPR policies are "novel and very surprising."  Nokia Amicus at 2.[7]

### e.  Nature of SEPs

Despite having SEP licenses for its own modem chips, Qualcomm argues that its FRAND obligations for SEPs extend only to device suppliers and not modem chip suppliers because only device suppliers "practice" or "implement" standards.  However, that distinction not only violates the non-discrimination obligation, but also makes little sense.  As Qualcomm's founder conceded and Qualcomm's own documents demonstrate, modem chips may be "compliant" with cellular standards.  ECF No. 893-2, Ex. 1 at 116–18.

Also, contrary to Qualcomm's argument, neither IPR policy limits a SEP holder's FRAND commitment to those applicants who themselves "practice" or "implement" whole standards.

---

[7] Qualcomm objects to Exhibit 25 as "inadmissible hearsay."  ECF No. 898 at 3.  However, the FTC does not offer Nokia's filing for the truth of whether Qualcomm breached its FRAND obligations, but rather to demonstrate that Nokia *took the position* that Qualcomm had done so. *See* ECF No. 897-1 at 1.  The Court therefore OVERRULES Qualcomm's objection.  The Court also takes judicial notice of the court filing as a public record. *See Yuen*, 966 F. Supp. at 945 n.1 (taking judicial notice of filing before foreign judicial body).

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Rather, the TIA IPR policy requires that the applicant desire to use the license "to the extent

2    *necessary* for the practice of any or all of the Normative *portions* for the field use of use of

3    practice of the Standard."  TIA IPR at 8 (emphasis added).  The TIA IPR policy expressly

4    contemplates that a TIA standard may have "portions" or "elements," and that an applicant may

5    receive a license as necessary to practice "any" portion of a TIA standard.  *Id.*  The ATIS IPR

6    policy states that a license must be "*for the purpose* of implementing" a standard.  ATIS IPR at 10

7    (emphasis added).

8         Here, Qualcomm concedes that Qualcomm owns SEPs that are infringed by typical modem

9    chips.  Opp. at 17.  Any SEP is by definition necessary to practice or for the purpose of

10   implementing a standard.  As the Federal Circuit explained in *Ericsson*, because "compliant

11   devices *necessarily* infringe certain claims in patents that cover technology incorporated into the

12   standard," practice or implementation of the standard is impossible without licenses to *all*

13   incorporated SEP technology.  773 F.3d at 1209 (emphasis in original).  Thus, if a modem chip

14   infringes a SEP, practice or implementation of the relevant standard would require a license to that

15   SEP.

16        Moreover, undisputed evidence in Qualcomm's own documents demonstrates that a

17   modem chip is a core component of the cellular handset, which only underscores how a SEP

18   license to supply modem chips is for the purpose of practicing or implementing cellular standards

19   and why Qualcomm cannot discriminate against modem chip suppliers.  In an amicus brief filed in

20   the Federal Circuit, Qualcomm characterized its own modem chips as "the heart of a cellphone."

21   ECF No. 893-2, Ex. 8.  Qualcomm's founder testified in a deposition that key cellular

22   technologies were "implemented" in modem chips.  ECF No. 893-2, Ex. 1 at 393–94.  In

23   Qualcomm's own Annual Report, Qualcomm stated that Qualcomm is a "leading developer and

24   supplier" of circuits, including modem chips, "based on" the CDMA family of cellular standards.

25   ECF No. 893-2, Ex. 5.  Qualcomm also represents that Qualcomm's modem chips "perform the

26   core modem functionality in wireless devices."  *Id.* at 10.  The foregoing evidence only reinforces

27   how important the IPR policies' non-discrimination requirement is for modem chip suppliers and

28                                          24

those who purchase modem chips.[8]

Lastly, two other items of extrinsic evidence that Qualcomm cites—an opinion of ANSI's Executive Standards Council Appeals Panel and statements about the IPR policy of the European Telecommunications Standards Institute ("ETSI")—do not satisfy the *Pacific Gas* standard for relevant extrinsic evidence. Neither is related to the "circumstances surrounding the making of the [TIA and ATIS IPR policies] . . . including the object, nature and subject matter of the writing . . . so that the court can place itself in the same situation in which the parties found themselves at the time of contracting." *Pacific Gas*, 69 Cal. 2d at 40. Regardless, the Appeals Panel rejected the argument that ANSI's patent policy "cedes unilaterally and unconditionally to patent holders the right to decide 'where on the value chain' they choose to license," which is consistent with the Ninth Circuit precedents on a SEP holder's non-discrimination obligations. ECF No. 871-1, Ex. 1 at 15.

For all of the above reasons, the Court agrees with the FTC that as a matter of law, the TIA and ATIS IPR policies both require Qualcomm to license its SEPs to modem chip suppliers. Because "after considering the language of the contract and any admissible extrinsic evidence, the meaning of the contract is unambiguous," the Court GRANTS the FTC's motion for partial summary judgment. *See Miller*, 454 F.3d at 990.

### D. Evidentiary Motions

The parties have also fully briefed four evidentiary motions: (1) the FTC's motion to exclude Dr. Edward Snyder's expert testimony; (2) the FTC's motion to exclude Professor Aviv Nevo's expert testimony; (3) Qualcomm's motion to exclude Richard Donaldson's expert reports;

---

[8] Qualcomm does not object to any of the above exhibits, or otherwise dispute their authenticity. The Court takes judicial notice of Exhibit 4, which consists of undisputed information on Qualcomm's own website. *See Perkins*, 53 F. Supp. 3d at 1204–05 (taking judicial notice of undisputed information on public website, but not taking judicial notice of disputed information on public website). In addition, the Court may take judicial notice of Qualcomm's SEC filing, which is a public record. *See Kramer*, 937 F.2d at 944 (taking judicial notice of company's SEC filing). Lastly, the Court takes judicial notice of Qualcomm's amicus brief, which is a judicial record. *Black*, 482 F.3d at 1041 (taking judicial notice of court filing).

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

and (4) Qualcomm's motion to strike portions of Dr. Richard Akl's rebuttal expert report.  None of the expert evidence the FTC and Qualcomm seek to exclude is relevant to the FTC's partial summary judgment motion.  Therefore, the Court declines to address the parties' evidentiary motions at this juncture.

IV.     **CONCLUSION**

For the foregoing reasons, the Court GRANTS the FTC's motion for partial summary judgment.

**IT IS SO ORDERED.**

Dated:  November 6, 2018

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

Case No. 17-CV-00220-LHK
ORDER GRANTING FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT