KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest (SBN 84065)
rvannest@keker.com
Eugene M. Paige (SBN 202849)
epaige@keker.com
Justina Sessions (SBN 270914)
jsessions@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile:  (415) 397-7188

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein *(pro hac vice)*
gbornstein@cravath.com
Yonatan Even *(pro hac vice)*
yeven@cravath.com
825 Eighth Avenue
New York, New York 10019-7475
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

Attorneys for Defendant
QUALCOMM INCORPORATED

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet *(pro hac vice)*
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile:  (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Willard K. Tom *(pro hac vice)*
willard.tom@morganlewis.com
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Facsimile:  (202) 739-3001

MORGAN, LEWIS & BOCKIUS LLP
Geoffrey T. Holtz (SBN 191370)
gholtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 17-cv-0220-LHK-NMC |
| Plaintiff, | **DEFENDANT QUALCOMM INCORPORATED'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON QUALCOMM'S STANDARD ESSENTIAL PATENT LICENSING COMMITMENTS** |
| vs. | |
| QUALCOMM INCORPORATED, a Delaware corporation, | |
| Defendant. | Date:     October 18, 2018<br>Time:     1:30 p.m.<br>Dept.:     Courtroom 8, 4th Floor<br>Judge:    Hon. Lucy H. Koh<br><br>Trial Date:  January 4, 2019 |

## **UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

I.  SUMMARY OF ARGUMENT .................................................................................. 1

II.  STATEMENT OF FACTS ......................................................................................... 3

    A.  The Relevant Commitments to ATIS and TIA ................................................ 4

    B.  The Content of the ATIS and TIA Standards ................................................... 5

    C.  The ANSI Essential Requirements and Patent Policy ..................................... 7

    D.  Industry Practice of Licensing Complete End-User Equipment, Not
        Components Such As Modem Chips ................................................................ 8

    E.  The Need for Compatibility Among IPR Policies of Cellular SDOs. .................. 10

III.  LEGAL STANDARD ............................................................................................... 12

    A.  Summary Judgment Must Be Denied When the Plain Language
        Interpretation or a Contractual Ambiguity May Be Resolved in the Non-
        Movant's Favor. .......................................................................................... 12

    B.  Under California Law, the Entire Contract and All Other Evidence Must
        Be Considered To Determine if a Contract Is Reasonably Susceptible to a
        Party's Proposed Interpretation. .................................................................. 12

IV.  ARGUMENT ........................................................................................................... 13

    A.  The FTC's "Plain Language" Interpretations of the ATIS and TIA IPR
        Policies Do Not Take Account of the Complete Contractual Provisions at
        Issue. ......................................................................................................... 14

        1.  The FTC Fundamentally Misreads the ATIS and TIA Policies
            Because Modem Chips Do Not Practice or Implement the Standard. ...... 14

        2.  The Non-Discrimination Commitments Do Not Compel
            Component-Level Licensing. ................................................................ 18

        3.  TIA's Licensing Guidelines Are Not Part of the TIA Contract and,
            in Any Event, Do Not Support the FTC's Reading of the TIA IPR
            Policy. ................................................................................................ 19

    B.  The Overwhelming Evidence Establishes, at the Very Least, a Genuine
        Factual Dispute Concerning the Appropriate Interpretation of the ATIS and
        TIA IPR Policies. ....................................................................................... 19

        1.  Long-Standing Industry Practice Confirms That the ATIS and TIA
            Policies Do Not Require Licensing the Manufacture and Sale of
            Modem Chips. ................................................................................... 20

        2.  ANSI Has Confirmed That Licensing at the Component Level Is
            Not Required. .................................................................................... 22

i

Defendant Qualcomm Incorporated's Opposition to Motion for Partial Summary Judgment on Qualcomm's
Standard Essential Patent Licensing Commitments
Case No. 17-cv-220-LHK-NMC

3.    The FTC Concedes the Need for Evidence Interpreting the ETSI IPR Policy, Which Must Be Consistent with the ATIS and TIA Policies. ...................................................................... 23

C.    *Amici* Misconstrue FRAND Caselaw, Which Does Not Establish That Licensing the Manufacture and Sale of Components Is Required by the TIA or ATIS IPR Policies. ....................................................................... 24

V.    CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986)..................................................................................12

*Apple v. Qualcomm,*
LEXIS 145835 (S.D. Cal Sept. 7, 2017). ...................................................25

*Bank of the West v. Superior Court,*
2 Cal. 4th 1254 (1992)..............................................................................12

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).......................................................................... 12, 18

*In the Matter of Certain Wireless Communications Equipment,*
2007 WL 1221125, USITC Inv. No. 337-TA-577 (Feb. 22, 2007)...........19

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
68 Cal. App. 4th 445 (Cal. Ct. App. 1998).................................................13

*Copart, Inc. v. Sparta Consulting, Inc.,*
277 F. Supp. 3d 1127 (E.D. Cal. 2017) ......................................................12

*Crestview Cemetery Ass'n v. Dieden,*
54 Cal. 2d 744 (1960) ........................................................................ 13, 21

*Ericsson v. D-Link Sys., Inc.,*
773 F.3d 1201 (Fed. Cir. 2014).......................................................... 24, 25

*Kennecott v. Union Oil,*
196 Cal. App. 3d 1179 (Cal. Ct. App. 1987)....................................... 13, 21

*Microsoft Corp. v. Motorola, Inc.,*
696 F.3d 872 (9th Cir. 2012)......................................................................24

*Microsoft Corp. v. Motorola, Inc.,*
795 F.3d 1024 (9th Cir. 2015)....................................................................24

*Miller v. Glenn Miller Prods., Inc.,*
454 F.3d 975 (9th Cir. 2006)......................................................................12

*Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,*
69 Cal. 2d 33 (1968) ..................................................................................13

*Phoenix Tech. Ltd. v. VMware, Inc.,*
2017 WL 1289863 (N.D. Cal. Jan. 6, 2017) .......................................passim

iii

Defendant Qualcomm Incorporated's Opposition to Motion for Partial Summary Judgment on Qualcomm's
Standard Essential Patent Licensing Commitments
Case No. 17-cv-220-LHK-NMC

*Powerine Oil Co. v. Superior Court*,
    37 Cal. 4th 377 (2005) ................................................................................12

*Public Storage v. Spring Corporation*,
    No. CV 14-2594, 2015 WL 1057923 (C.D. Cal. Mar. 9, 2015) ........................20

*Pulte Home Corp. v. American Safety Indem. Co.*,
    14 Cal. App. 5th 1086, 1128 (Cal. 2017) ...................................................12

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) .....................................................................12

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    2017 WL 6611635 (C.D. Cal. Dec. 21, 2017) ...........................................19

*Trident Center v. Connecticut General Life Ins. Co.*,
    847 F.2d 564 (9th Cir. 1988) .....................................................................13

*Turner v. Met. Life Ins. Co.*,
    56 Cal. App. 2d 862 (1943) ......................................................................18

**Statutes & Rules**

Cal. Civ. Code § 1641 .......................................................................... 12, 14, 18

Cal. Civ. Code § 1644 .............................................................................. 13, 17

Cal. Civ. Code § 1649 .................................................................................21

Cal. Civ. Proc. Code § 1861 .........................................................................13

Fed. R. Civ. Pro. 56 ....................................................................................18

**REFERENCES**

All references to "Ex. __" are to the exhibits attached to the accompanying Request for Judicial Notice (Exs. 1-20) or to the accompanying Declaration of Geoffrey Holtz (Exs. 21-36).

All References to "___ Decl." are to an accompanying Declaration.

All references to "FTC Ex. __" are to the exhibits attached to the Aug. 30, 2018 Declaration of Jennifer Milici in Support of the FTC's Motion.  (ECF No. 792-1.)

iv

Defendant Qualcomm Incorporated's Opposition to Motion for Partial Summary Judgment on Qualcomm's
Standard Essential Patent Licensing Commitments
Case No. 17-cv-220-LHK-NMC

# I.     SUMMARY OF ARGUMENT

Under the guise of seeking merely to "streamline the trial" (Mot. at 3), the FTC's Motion for Partial Summary Judgment requests a ruling that would radically reshape licensing in the cellular industry, not just for Qualcomm but for *all* cellular SEP holders that made FRAND commitments to ATIS or TIA.  The FTC contends that those SEP holders have a clear and unambiguous contractual obligation to grant licenses to manufacture and sell modem chips.  The FTC's position distorts the language of the ATIS and TIA IPR Policies, and it is starkly at odds with real-world practices.  If the FTC were correct that modem chip license agreements are required by commitments to ATIS and TIA, then such agreements should be commonplace, found throughout the industry.  But they are not.  In fact, they are anything but.  There is not a single major holder of cellular SEPs that includes modem chip licenses in its licensing program.  That is because what the FTC casts as a plain reading of the IPR Policies—which it asks the Court to adopt as a matter of law, without hearing any evidence at all—is in fact a complete reimagining of the industry, neither required by the applicable language nor supported by the overwhelming extrinsic evidence of the IPR Policies' meaning.  Rather than rebut this evidence—much of which is undisputed—the FTC asks the Court to ignore it, in conflict with basic canons of California contract law.

The FTC's Motion fails at the most basic level:  it has not shown that the text of the ATIS or TIA IPR Policy clearly and unambiguously requires SEP holders to license the manufacture and sale of modem chips.  *First*, the FTC repeatedly focuses on the portion of the IPR Policies that requires licenses to be made available to "applicants" or to "all applicants", and it simplistically argues that modem chip suppliers can be "applicants" entitled to a license.  This argument ignores key limiting language in the IPR Policies making it clear that SEP holders are not required to make licenses available to all applicants *for all purposes*.  As the FTC itself notes, the ATIS licensing commitment requires that licenses be made available only to those applicants "desiring to utilize the license for the purpose of implementing the [relevant ATIS] standard", and the TIA licensing commitment requires that licenses be made available to applicants only "to the extent necessary for the practice of [the relevant TIA standard]".  (Mot. at 2 (alterations in

1

original).)  Thus, to give effect to this limiting language, the relevant question is whether the purposes specified in the IPR Policies include manufacturing and/or selling modem chips.  The word "applicants" does not answer that question, and therefore does not compel the reading advanced by the FTC.

*Second*, the manufacture and sale of modem chips are not among the purposes for which the IPR Policies require licenses to be made available; at the very least, the Policies are ambiguous, creating an issue of fact on that point that precludes summary judgment.  Licenses must be made available to "implement" (ATIS) or "practice" (TIA) the relevant standards.  As shown by the detailed evidence Qualcomm submits together with this Opposition, both the ATIS and TIA standards describe the operation of a complete mobile device (*e.g.*, a cellular phone) and the cellular network itself (*e.g.*, the base stations and other infrastructure).  The standards do not describe the operation of modem chips or other components of a complete device.  Thus, whereas complete devices may "implement" or "practice" the ATIS or TIA standards, modem chips cannot.  The FTC's Motion provides no technical support for its assertion that modem chips implement or practice those standards.  It relies instead on statements that modem chips may practice one or more claims of Qualcomm's standard-essential *patents*.  (Mot. at 5 n.13.)  But standards are comprised of thousands of individual technologies, including many that are claimed by an SEP; the fact that a modem chip (with its attendant software) practices one or more of those patented technologies does not mean that the chip itself performs all the functions required to practice or implement "the standard", as the FTC erroneously assumes.

*Third*, the non-discrimination obligations in the IPR Policies do not support a reading that requires making licenses available for the manufacture and sale of modem chips.  On their face, the non-discrimination obligations mean only that *if* a license must be made available, such license must be on non-discriminatory "terms and conditions" (*i.e.*, that similar terms and conditions be offered to similarly situated licensees).  The non-discrimination obligations do not address the antecedent question of whether a license must be made available for any specific purpose or field of use.  The FTC's accusation that, by not licensing modem chip suppliers, Qualcomm discriminates against its competitors is baseless:  Qualcomm makes licenses available

2

Defendant Qualcomm Incorporated's Opposition to Motion for Partial Summary Judgment on Qualcomm's
Standard Essential Patent Licensing Commitments
Case No. 17-cv-220-LHK-NMC

to all applicants for the purposes specified in the IPR Policies, whether or not the applicant also competes with Qualcomm in the modem chip business.

*Fourth*, and perhaps most fundamentally, under California law, which the FTC states should govern the resolution of the FTC's Motion, all credible evidence should be considered to determine whether the IPR Policies are reasonably susceptible to Qualcomm's interpretation. Here, the evidence powerfully demonstrates that the FTC's interpretation of the IPR Policies cannot be accepted, or at minimum demonstrates a genuine issue of disputed fact that precludes summary judgment. The FTC's interpretation is contrary to the indisputable industry practice of licensing SEPs only at the device level; indeed, the FTC's own licensing expert acknowledged this practice, and the FTC does not identify *any* cellular SEP holder that grants the modem chip licenses that the FTC says the IPR Policies so clearly require. The FTC's interpretation is also contrary to a decision of the American National Standards Institute ("ANSI")—an organization that accredits American standards development organizations ("SDOs"), including ATIS and TIA. ANSI decided that its own patent policy, on which the ATIS and TIA IPR Policies are based, does not require the licensing of components such as modem chips. And the FTC's interpretation would introduce disparities between the American SDOs and the cellular SDOs in the rest of the world, even though the SDOs themselves have entered into partnerships that require their policies to be consistent with one another. Critically, the FTC's Motion *concedes* a "need for evidence regarding the meaning of Qualcomm's commitments" to ETSI (Mot. at 3); as a result, the TIA and ATIS IPR Policies, which must be consistent with ETSI's policy, cannot be interpreted differently without hearing evidence, and as a matter of law.

The FTC's effort to short-circuit the trial and foist its made-for-litigation reading of the ATIS and TIA IPR Policies on the entire cellular industry ignores key language in the IPR Policies, ignores the technical characteristics of the standards and products at issue and runs directly counter to extensive and compelling evidence demonstrating, at minimum, numerous issues of disputed fact. Partial summary judgment should be denied.

## II.    STATEMENT OF FACTS

The FTC's Complaint alleges that the IPR Policies of the European Telecommunications

3

Standards Institute ("ETSI"), which is the leading cellular SDO (Casaccia Decl. ¶ 6; Lupin Decl. ¶ 8), as well as of two United States SDOs, ATIS and TIA, require Qualcomm to provide licenses for the manufacture and sale of modem chips.  (Complaint for Equitable Relief (ECF No. 1) ¶¶ 57-59.)  The FTC's Motion asks this Court to find as a matter of law that "Qualcomm's voluntary FRAND licensing commitments to [ATIS and TIA], under the plain meaning of these SDOs' intellectual property rights ('IPR') policies, require Qualcomm to make licenses available to competing modem-chip sellers."  (Mot. at 1.)  The FTC's Motion does not seek a similar judgment concerning the ETSI IPR Policy, but rather concedes at least a "need for evidence regarding the meaning of Qualcomm's commitments" to ETSI.  (Mot. at 3.)

A.     The Relevant Commitments to ATIS and TIA

The Alliance for Telecommunications Industry Solutions ("ATIS") is the U.S. Organizational Partner of 3GPP, a global collaborative partnership of SDOs and other industry participants that develops cellular standards.  (Lupin Decl. ¶ 9.)  The Telecommunications Industry Association ("TIA") is the U.S. Organizational Partner of 3GPP2, another global collaborative partnership that has developed cellular standards.  (Mot. at 10.)[1]  3GPP and 3GPP2 develop technical specifications, which are then "transposed" (*i.e.*, republished and adopted) by their Organizational Partners (such as ATIS, TIA or ETSI) into cellular standards for the regions governed by the Organization Partner (such as North America for ATIS and TIA).  (Mot. at 7, 10.)  Each of the 3GPP and 3GPP2 IPR policies requires that each contributor of technology comply with the relevant IPR policy of the Organizational Partner of which it is a member.  (Ex. 7 at Art. 55 (3GPP Working Procedure); Ex. 8 at Art. 55 (3GPP2 Working Procedure).)

ATIS's IPR Policy states that a holder of essential patent claims may give "assurance that a license to such essential patent claim(s) will be made available to applicants desiring to utilize the license *for the purpose of implementing the standard* . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination."  (FTC Ex. 2 at 10 (ATIS Operating Procedures) (emphasis added).)    Pursuant to that policy, Qualcomm has made

---

[1] The other 3GPP Organizational Partners are ETSI (Europe), ARIB and TTC (both of Japan), CCSA (China), TSDSI (India), and TTA (Korea).  (Casaccia Decl. ¶ 7.)  The other Organizational Partners of 3GPP2 are ARIB, TTC, CCSA and TTA.  (Tiedemann Decl. ¶ 10.)

4

1  FRAND commitments to ATIS assuring that it would make licenses available to applicants "for
2  the purpose of implementing the standard."  (*Id.* at 8-10.)

3       Until 2005, the TIA IPR policy provided that SEPs "will be made available under
4  reasonable terms and conditions that are demonstrably free of any unfair discrimination to
5  applicants *only and to the extent necessary for the practice of the TIA Publication*."  (FTC
6  Ex. 39 at 87 (TIA Eng'g Manual, 2002) (emphasis added).)  A "TIA Publication" contains a
7  standard adopted by TIA.[2]  (FTC Ex. 3 at 3 (Guidelines to the TIA IPR Policy, 2014).)  In 2005,
8  the TIA IPR Policy was modestly amended, but not in any respect relevant here.  (Lupin Decl.
9  ¶ 16; *see also* Ex. 15 (*Koninklijke Philips NV v. Asustek Computer Inc.*, [2016] EWHC 2220 (Pat)
10  (UK High Court of Justice) (change served "to make it explicit that a patent that was necessarily
11  infringed by the practice of an 'optional' element of a standard was nonetheless still an 'essential'
12  patent.")).)  Qualcomm has provided TIA with commitments to make licenses available to
13  applicants "only and to the extent necessary for the practice of the" TIA standards.  (Mot. at 12-
14  14.)

15       **B.     The Content of the ATIS and TIA Standards**

16       The 3GPP (ATIS) and 3GPP2 (TIA) technical specifications that have been adopted by
17  ATIS and TIA specify with great precision the performance, interoperability and communication
18  protocols between two broad "domains" of a cellular system:  (1) Infrastructure, which comprises
19  fixed equipment such as base stations that send and receive wireless signals and relay those
20  signals over wired connections, and (2) User Equipment, an operational device such as a
21  smartphone ("UE", also referred to as the "Mobile Station" in 3GPP2).  (Casaccia Decl. ¶ 13;
22  Tiedemann Decl. ¶ 16.)  The basic domain split between the "User Equipment Domain" and the
23  "Infrastructure Domain", is shown in the figure below drawn from an ATIS standard.  (Casaccia
24  Decl. ¶¶ 12, 13.)

25
26

---

27  [2] A "Standard" is any TIA publication that establishes "engineering and technical requirements
    for processes, procedures, practices and methods that have been adopted by consensus".  (FTC
28  Ex. 1 at 8 (TIA IPR Policy).)

1

2

3

4

5

6

7

8

9

10

11

12



NOTE :   The domains identified in the figure will generally result from an evolution of existing network
infrastructures. The core network domain may result from evolutions of existing network infrastructures,
e.g., a GSM infrastructure, a N-ISDN infrastructure, a B-ISDN infrastructure or a PDN infrastructure. The
evolution of these infrastructures may be performed via the use of IWUs, hidden within the domains shown
in the figure.

**Figure 1:UMTS domains and reference points**

Cu    = Reference point between USIM and ME
Iu     = Reference point between Access and Serving Network domains
Uu    = Reference point between User Equipment and Infrastructure domains, UMTS radio interface
[Yu]  = Reference point between Serving and Transit Network domains
[Zu]  = Reference point between Serving and Home Network domains

13    As the figure demonstrates, cellular standards generally treat the internal workings of each

14 domain as a "black box".  The standards specify the actions a complete device must take (such as

15 which signals it must transmit) to operate on a cellular network.  Conversely, the standards say

16 nothing at all about the design of modem chips, antennae, power-control chips or the many other

17 components that make up a cellular device.  (Casaccia Decl. ¶ 19; Tiedemann Decl. ¶¶ 16-17, 27-

18 28, 37-46.)  They also do not define how a smartphone or Mobile Station should be constructed

19 or what components each must contain.  As such, these standards provide device manufacturers

20 (and infrastructure manufacturers) broad discretion regarding how to construct a user device or

21 infrastructure.  (Casaccia Decl. ¶ 9; Tiedemann Decl. ¶ 15.)  Indeed, the standards do not even

22 specify whether any required functions must be implemented in hardware or software.  (Casaccia

23 Decl. ¶ 9.)

24    As a representative example, the ATIS 3GPP TS 36.331 standard published by ATIS

25 defines the LTE Radio Resource Control ("RRC") protocol and relevant behaviors for

26 communication between an LTE-compatible mobile device and the base station.  (Casaccia Decl.

27 ¶ 23.)  This specification expressly provides over 350 requirements concerning an LTE-

28 compatible User Equipment (*i.e.*, "the UE shall . . ."), but does not provide *any* requirement as to

6

the internal components of the UE, including the modem chip or multiple other components that typically play a role in communications between a UE and Infrastructure (*e.g.*, an RF transmitter and receiver or an antenna).  (Casaccia Decl. ¶ 23.)

Because the ATIS and TIA standards define the functionality of the UE and its interconnectivity with the cellular network, conformance with the standards is tested and determined by analyzing the functioning of a complete operational device, not the behavior or design of any component of the UE such as modem chips.  (Casaccia Decl. ¶¶ 29-34; Tiedemann Decl. ¶¶ 35-44.)  Modem chips do not and cannot operate on a cellular network on their own, outside of a UE that has all of the hardware and software components needed to implement the standards-specified functionality.  (Tiedemann Decl. ¶ 19-34.)  Thus, whereas a UE either complies or does not comply with (and therefore implements/practices) a standard, the very same modem chip can be placed in a UE that complies and in a UE that does not comply with the standard.

### C.   The ANSI Essential Requirements and Patent Policy

In addition to being Organizational Partners of 3GPP and 3GPP2, respectively, ATIS and TIA are accredited by ANSI, a non-profit organization that oversees the development of standards in the United States.  (Mot. at 7, 10.)  To maintain ANSI accreditation, ATIS and TIA must meet certain "Essential Requirements" defined by ANSI, including maintaining IPR Policies that are consistent with ANSI's own Patent Policy.  (Ex. 2 § 4.1.1, § 4.2.1.1 (ANSI Essential Requirements).)  That ANSI Patent Policy provides for patent holders to commit that a license "will be made available to applicants desiring to utilize the license for the purpose of implementing the standard . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination".  (*Id*. § 3.1.1.)  ATIS has explicitly adopted the ANSI Patent Policy *verbatim* as its own (Mot. at 8), while TIA adopted the closely similar language discussed above.

Importantly, ANSI's Executive Standards Council ("ExSC") has expressly determined that its own Patent Policy does **not** require that accredited SDOs mandate component-level licensing:

7

Defendant Qualcomm Incorporated's Opposition to Motion for Partial Summary Judgment on Qualcomm's
Standard Essential Patent Licensing Commitments
Case No. 17-cv-220-LHK-NMC

We . . . take this opportunity to emphasize that [a prior ExSC decision] was not intended to create a "default" interpretation of the ANSI Patent Policy requiring licensing at the component level. While the ExSC determined in the IEEE case that such a requirement was not inconsistent with the ANSI Patent Policy, ***that does not mean that ANSI's Patent Policy requires licensing at the component level***. We do not wish to express or imply any such "default" interpretation and we leave it to negotiations between patent holders and implementers to decide what licensing terms are appropriate in particular standards, subject to the terms of an [SDO's] patent policy.

(Ex. 1 at 14 (February 23, 2018 Decision of the ANSI Executive Standards Council Appeals Panel at 14) (emphasis added).)  The ANSI ExSC further clarified that a commitment to license "to the extent necessary to practice wholly compliant implementations", rather than mere components, is equivalent to the ANSI Patent Policy's requirement that a license be for "the purpose of implementing the standard".  (*Id*. at 2.)

## D. Industry Practice of Licensing Complete End-User Equipment, Not Components Such As Modem Chips

It is cellular industry practice for SEP owners to make licenses available for the manufacture and sale of end-user devices, but not for the manufacture and sale of components such as modem chips.  The FTC's expert, Richard Donaldson, acknowledged this.  (Ex. 21 at 283:17-24 (Donaldson Dep.) (testifying that "the practice to date is—has been people take licenses at the device level.  That's the way it kind of grew up . . . .").)  The record shows this practice to be industry-wide and long-standing.  For example, ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  Nokia is a member of both ATIS and TIA and has given assurances to both.  (Ex. 9 at 4 (ATIS Membership Listing, Sept. 22, 2018); Ex. 10 at 4 (TIA Members List); Ex. 12 (Nokia Letters of Assurance).)

8

Defendant Qualcomm Incorporated's Opposition to Motion for Partial Summary Judgment on Qualcomm's
Standard Essential Patent Licensing Commitments
Case No. 17-cv-220-LHK-NMC

Ericsson has explained that it has a similar practice and understanding of industry norms through Christina Petersson, Vice President of IPR and Legal Affairs.  Ms. Petersson testified that when Ericsson licenses its cellular SEP portfolio, it "would be licensing the company putting its name on the fully compliant equipment and selling that on the market".  (Ex. 23 at 25:5-11 (Petersson Dep.).)  Device-level licensing had been Ericsson's practice since it became involved in cellular SEP licensing.  (*Id*. at 25:15-17.)  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  ████████████████

████████████████████████████████  Ericsson, too, is a member of both ATIS and TIA and has given assurances to both.  (Ex. 9 at 3 (ATIS Membership Listing); Ex. 10 at 2 (TIA Members List); Ex. 13 (Ericsson Letters of Assurance).)

InterDigital, another ATIS and TIA member that provided license assurances (Ex. 9 at 3 (ATIS Membership Listing); Ex. 10 at 3 (TIA Member List); Ex. 14 (InterDigital Letters of Assurance)), ████████████████████████████████

InterDigital's Ranae McElvaine testified regarding the company's licensing policy:  ████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

████████████████████████████████, too, were well aware it was industry practice to license SEPs at the device level, and not at the component or modem level.  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

9

1 █████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████ Other

4 modem chip suppliers, including ████████, Broadcom, Marvell ████████, have never entered

5 an agreement of that sort.  (Ex. 16 at 15█████████ Ex. 19 at 10█████████ (Responses of

6 ████████ Broadcom, Marvell and ████████ to Korean Fair Trade Commission Questionnaire for

7 chipset manufacturers).)  ██████████████████████████████████████████████

8 █████████████████████████████[3]

The record amply demonstrates that licensing the manufacture and sale of end-user

devices, rather than modem chips, is ubiquitous industry practice.

**E.     The Need for Compatibility Among IPR Policies of Cellular SDOs.**

The technical work of promulgating technical specifications occurs at 3GPP (and, in the

past, occurred also at 3GPP2); ATIS and TIA then "transpose" the technical specifications of

3GPP and 3GPP2 and adopt them as North American standards.  (FTC Ex. 21 (3GPP Partners);

FTC Ex. 31 at 6 (3GPP2 Partnership Project Description, 2002).)  To ensure that 3GPP and

3GPP2 specifications are subject to the same licensing requirements worldwide, the operating

rules and procedures of both 3GPP and 3GPP2 mandate, as a condition of being an organizational

partner of each SDO, that the IPR policies of each of their Organizational Partners must be

compatible with one another:

> "Organizational Partnership is open to any Standards Organization . . . *which has . . . an Intellectual Property Rights (IPR) Policy which is compatible with those of the Organizational Partners.*"[4]

In addition, each of ETSI, TIA and ATIS is an organizational partner of oneM2M, a more

---

[3] Although Qualcomm has obtained inbound cross-licenses to the cellular SEPs of its licensees, those were to ensure that its licensees cannot sign a license for rights under Qualcomm's patents and then opportunistically assert their own patents against Qualcomm.  (Ex. 29 at 209:10-210:1 (Hartogs Dep.).)  As the FTC acknowledges, as a SEP holder, Qualcomm has not sought to license its cellular SEPs for the manufacture and sale of modem chips.  (Mot. at 6.)  Nor does Qualcomm assert its cellular SEPs against modem chip manufacturers.  (Ex. 32 at 162:16-163:9 (Mar. 5, 2018 Gonell Dep.).)

[4] See FTC Ex. 5 at Art. 6 (3GPP Working Procedures) (emphasis added); Ex. 8 at Art. 6 (3GPP2 Working Procedures) (emphasis added).

10

recently formed global standards initiative for Machine to Machine Communications and the Internet of Things.  (Ex. 3 (oneM2M - Partners).)  Like 3GPP and 3GPP2, oneM2M requires that the IPR Policy of each Organizational Partner be compatible with those of the other Organizational Partners.  (Ex. 6 § 3.1 (oneM2M Partnership Agreement).)  Consequently, the IPR Policies of ATIS and TIA are required to be compatible with those of ETSI and the other Organizational Partners.  The FTC's expert, Michael Lasinski, agrees, for example, that the ATIS IPR Policy is "fundamentally similar" to ETSI's.  (Ex. 33 ¶ 52 (Lasinski Report).)

Representatives of ETSI have recognized that its IPR Policy does not require licensing the manufacture and sale of components like modem chips.  When one SDO, the Institute of Electrical and Electronics Engineers ("IEEE"), revised its policy in February 2015 to require licensing for the manufacture of components, the ETSI Secretariat confirmed that the ETSI Policy had no such requirement.  (Ex. 27 at 105:8-14 (Weiler Dep.).)  The language of the ETSI IPR Policy on its face also makes clear that it does not require component-level licensing.[5]  Clause 6.1 of the ETSI IPR Policy, which specifies the scope of the ETSI licensing commitment, clarifies that a patent holder's obligation to make licenses available is limited to rights for the production, sale, lease, disposition of, repair, use or operation of "any system, or device fully conforming to a STANDARD" or to "use METHODS".  (Ex. 11 Clause 15-8, 15-4 (ETSI IPR Policy).)  The terms "system", "device" and "fully conforming" indicate that the ETSI licensing commitment extends to end-user devices, but not to components.[6]  Indeed, industry practice at the time of the adoption of the ETSI IPR Policy in November 1994 was to license only fully compliant end-user devices, and not components; and the drafters of the ETSI IPR Policy did not intend to change normal industry practice.  (Ex. 34 at 40 (Huber Report); Ex. 28 at 189:10-190:1 (Huber Dep.).)

---

[5] (Ex. 35 at 10-11 (Fauvarque-Cosson Report); Ex. 30 at 114:14-115:2 (Fauvarque-Cosson Dep.))
[6] (Ex. 34 at 35-36 (Huber Report); Ex. 28  at 146:9-17 (Huber Dep.); Ex. 35  at 11 (Fauvarque-Cosson Report); Ex. 30 at 86:6-24 (Fauvarque-Cosson Dep.).)

### III.   LEGAL STANDARD

### A.   Summary Judgment Must Be Denied When the Plain Language Interpretation or a Contractual Ambiguity May Be Resolved in the Non-Movant's Favor.

As the moving party, the FTC has the burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The FTC's burden extends to demonstrating the absence of a fact dispute on each element of its claim, including the interpretation of the contract. *Id.* at 322-23; *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1144 (E.D. Cal. 2017). To meet its burden, the FTC "must affirmatively demonstrate that no reasonable trier of fact could find other than for [it]". *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986). "[I]f the interpretation [of a contract] turns upon the credibility of conflicting extrinsic evidence, or if 'construing the evidence in the nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's position,' summary judgment is inappropriate." *Phoenix Tech. Ltd. v. VMware, Inc.*, 2017 WL 1289863, at *3 (N.D. Cal. Jan. 6, 2017) (quoting *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006)). The FTC has not met this burden.

### B.   Under California Law, the Entire Contract and All Other Evidence Must Be Considered To Determine if a Contract Is Reasonably Susceptible to a Party's Proposed Interpretation.

The FTC's Motion asserts that the ATIS and TIA IPR Policies should be governed by the contract law of California (Mot. at 15 n.49), which for purposes of this Motion Qualcomm does not dispute. Under California law, "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Powerine Oil Co. v. Superior Court*, 37 Cal. 4th 377, 390 (2005) (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)). "The court will not impose its own interpretation at variance with the parties' intention." *Pulte Home Corp. v. American Safety Indem. Co.*, 14 Cal. App. 5th 1086, 1128 (Cal. 2017). In interpreting contractual language, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code §

12

1641; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (Cal. Ct. App. 1998).

Under California law, when terms are "used by the parties in a technical sense" or when "a special meaning is given to them by usage", courts should follow the meaning the parties have given them.  Cal. Civ. Code § 1644.  In addition, California law mandates that if there is a dispute as to the meaning of an agreement, "the court must consider extrinsic evidence of possible ambiguity."  *Trident Center v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988) (citing *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33 (1968)).  Such evidence includes "the object, nature and subject matter of the writing" and the parties' post-contractual conduct.  *Pacific Gas & Electric Co.*, 69 Cal. 2d 33 at 40; *see also Phoenix Tech. Ltd.*, 2017 WL 1289863 at *3 (courts must consider extrinsic evidence to determine if the language is "reasonably susceptible" to the interpretation urged by either party).  Indeed, "[t]he conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions.*"  Phoenix Tech.*, 2017 WL 1289863, at *3 (citing *Kennecott v. Union Oil*, 196 Cal. App. 3d 1179, 1189-90 (Cal. Ct. App. 1987)); *see also Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (1960).  And the court should consider evidence that terms "have a local, technical, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement must be construed accordingly."  Cal. Civ. Proc. Code § 1861.

**IV.  ARGUMENT**

After providing nine pages of "Background Facts" and purportedly "Undisputed Material Facts" (Mot. at 3-14), and citing 50 exhibits, the FTC's Motion asserts that the "plain language" of the ATIS and TIA IPR Policies unambiguously "requires Qualcomm to make licenses available to competing sellers of modem chips".  (Mot. at 18, 20.)  Accordingly, it asserts, the Court should not consider "extrinsic evidence" that contradicts the FTC's proposed contractual interpretation.  (Mot. at 16.)  In Part IV.A below (as well as in Part II above), Qualcomm demonstrates why the FTC cannot establish that the contractual language "clear[ly]" and "explicit[ly]" compels its interpretation as a matter of law (Mot. at 16); to the contrary, the plain

13

language supports—or at a minimum is susceptible to—the interpretation proposed by Qualcomm and accepted by the entire industry for decades.  In Part IV.B, Qualcomm describes the extensive extrinsic evidence that, under California law, should inform the Court's assessment of the range of possible interpretations.  This evidence includes a longstanding and uniform industry practice; the ANSI acceptance of the IPR Policies of ATIS and TIA as consistent with its own; and the FTC's concession that there is a "need for evidence regarding the meaning of" the IPR Policy of ETSI, an SDO whose IPR Policy *must* be interpreted consistently with those of ATIS and TIA to enable their continued participation in the 3GPP, 3GPP2 and oneM2M partnerships.  This evidence overwhelmingly contradicts the FTC's proposed interpretation and, at a minimum, creates a genuine dispute of fact that precludes summary judgment.  Finally, in Part IV.C, Qualcomm demonstrates that FRAND caselaw, including that cited by *amici*, does not address the proper interpretation of the ATIS or TIA IPR Policies.

> **A.    The FTC's "Plain Language" Interpretations of the ATIS and TIA IPR Policies Do Not Take Account of the Complete Contractual Provisions at Issue.**
>
> > **1.    The FTC Fundamentally Misreads the ATIS and TIA Policies Because Modem Chips Do Not Practice or Implement the Standard.**

The FTC argues that Qualcomm must make licenses available to modem chip suppliers based on what the FTC contends is the clear and unambiguous language of the ATIS and TIA IPR policies and Qualcomm's accompanying licensing commitments.  (Mot. at 20.)  But the specific contractual language, read in its entirety, does not support—let alone compel—the FTC's interpretation, precluding summary judgment in its favor.  *See* Cal. Civ. Code § 1641.

With respect to ATIS, the FTC acknowledges that the ATIS IPR Policy calls for licenses to be made available "to 'applicants' whose products '*implement the standard*.'"  (Mot. at 20) (emphasis added).  The FTC further recognizes that the language of Qualcomm's license assurances to ATIS limit its commitment to only those products that implement the particular standard in connection with which the specific assurance was given.  (*Id.* at 9-10.)  Similarly, the FTC acknowledges that Qualcomm's commitment to TIA was to make licenses available to applicants "that wish to 'practice' TIA standards".  (*Id.* at 18.)

The FTC's argument focuses on the IPR Policies' instruction to make licenses available to

14

"applicants", but stops there and ignores limiting language in both policies that expressly defines the purpose for which a license must be made available under each Policy.  (FTC Ex. 2 at 10 (ATIS Operating Procedures) (licenses must be granted "for the purpose of implementing the standard"); FTC Ex. 1 § 3.1.1 (TIA IPR Policy) (licenses must be granted "only to the extent necessary for the practice of any or all of the Normative portions" of the standard).)  The FTC's assertion that the ATIS and TIA licensing obligation is not "limited to applicants selling a particular type of product" (Mot. at 18) is thus incorrect.  Under both the ATIS and TIA IPR Policies, the licensing commitment extends only to the manufacture and sale of products that practice or implement the relevant standard—namely User Equipment and Infrastructure, the only products defined by the standard.  (Above Part II.B.)

In other words, when a SEP holder makes a licensing commitment to ATIS and TIA, it commits to make licenses available to all applicants, but it does not commit to license those applicants to practice its patents for any and all purposes.  For example, if a company makes both handsets and modem chips (such as Samsung or Huawei), Qualcomm agrees that its licensing commitments to ATIS and TIA (and to other SDOs) oblige it to license that company (even though it is a competitor), but *only* for its manufacture and sale of handsets.  Likewise, if a modem chip supplier like MediaTek wanted to expand its business into the manufacture and sale of handsets, the ATIS and TIA IPR Policies would require Qualcomm to grant MediaTek a license for those purposes.  But there is no requirement in the licensing commitments under either IPR Policy that a SEP holder make a license available to any applicant for its manufacture and sale of separate components—including not just modem chips, but RF chips, antennae, power management chips or software—just because those components may be put into User Equipment that implements relevant standards.  (Lupin Decl. ¶ 4.)

The FTC's contrary arguments fail to address the fact that modem chips do not themselves "implement" or "practice" an ATIS or TIA "standard".  As the Declarations of Lorenzo Casaccia and Edward Tiedemann demonstrate, the 3GPP and 3GPP2 standards define the interconnectivity and interoperability of User Equipment (ATIS)/Mobile Stations (TIA) and infrastructure equipment.  (Above Part II.B.)  The ATIS and TIA standards do not define the design of modem

15

chips (or the other components mentioned above), and modem chips cannot by themselves communicate with cellular networks.  (Casaccia Decl. ¶¶ 5, 10; Tiedemann Decl. ¶¶ 8, 19-34.) Indeed, device manufacturers are generally free to attain the functionality specified in the standard using any component or aggregation of components they deem fit.  (Casaccia Decl. ¶ 9.) In that sense, standards generally treat the end-user device as a "black box"; they do not specify how it is to be constructed, only how it must perform with respect to certain functions.  For example, only the operation and capabilities of a complete end-user device can be tested to determine if it implements a standard, and there are no such tests for components such as modem chips.  (Casaccia Decl. ¶¶ 29-34; Tiedemann Decl. ¶¶ 35-44.)  While a modem chip may *facilitate* compliance with a standard, it cannot *achieve* such compliance; implementation of the standard depends on the overall design of the complete end-user device.  (Casaccia Decl. ¶¶ 5, 8, 10; Tiedemann Decl. ¶¶ 16, 19-34.)  Thus, commitments to ATIS and TIA do not require licenses to be made available for modem chips because modem chips do not implement or practice cellular standards; only complete end-user devices (and infrastructure) can do that.

The FTC offers no proof to the contrary, only its own assertion and inapposite evidence. For example, the FTC points to deposition testimony of Keith Kressin, Qualcomm's Senior Vice President of Product Management, for the proposition that "[m]odem chips . . . are cellular handset components that implement cellular standards and allow handsets to communicate with a cellular network." (Mot. at 5 n. 12.)  Even setting aside the fact that Mr. Kressin is not involved in standard development or licensing, Mr. Kressin did not say what the FTC attributes to him; all he did was explain the functions that a baseband processor, together with other related components, typically perform.  Nowhere did Mr. Kressin state or imply that a modem chip alone can practice or implement a standard.[7]  The FTC's reliance on the testimony of a single individual

---

[7] In the cited testimony, Mr. Kressin was asked, "[W]hat functionality does the baseband processor or modem provide?"  He responded:

> What functionality does the modem provide?  The modem provides ability to utilize cellular communications, right?  The modem in combination with the AP in combination with the RF chip provide, you know -- and the power management kind of provide the core chipset, if you will.  And so modem functionality or baseband functionality is appeared to, you know, graphics and central processing and other functions.  (FTC Ex. 7 at 11:17–12:4 (Kressin Dep.).)

16

who is not involved in standards development or licensing speaks volumes.  In light of the body of evidence refuting the FTC's theory, including the testimony of multiple witnesses at multiple companies who are deeply involved in standards development and cellular SDOs, even if Mr. Kressin had said exactly what the FTC contends (which he did not), such shorthand, colloquial use outside of the context of cellular SEP licensing could hardly trump the language appearing in the standards themselves, *see* Cal. Civil Code § 1644, or negate the extensive evidence demonstrating a contrary understanding of the relevant IPR Policies by major industry participants, *see Phoenix Tech.*, 2017 WL 1289863, at *3.  At minimum, an issue of fact exists, which precludes summary judgment.

The FTC also relies on various statements regarding whether Qualcomm owns any SEPs that contain claims that are infringed by an unspecified modem chip.  (Mot. at 19, 20.)  That question is irrelevant.  Whether certain claims of Qualcomm's patents read on a typical modem chip (as some do) has no bearing on whether a modem chip "implements" or "practices" an ATIS or TIA *standard*.  These are two distinct and unrelated inquiries.  The IPR Policies specifically do not require SEP holders to license applicants for the purpose of practicing or implementing any *claim* of any *standard-essential patent*; rather, they require SEP holders to license applicants for the purpose of practicing or implementing *the standards* as a whole.  The distinction is critical.  A claim in a patent can (and often does) specify a narrow function that could be infringed by a single component such as a modem and its attendant software, a filter, an RF chip or an antenna. Each of these components may *support* the implementation of a standard by a complete handset, when combined and configured with other components.  But a standard, unlike a patent claim, specifies hundreds, if not thousands, of functions required to be carried out by complete UEs (handsets) and infrastructure equipment, each of which comprises hundreds of components. (Casaccia Decl. ¶ 23.)  The fact that a modem chip may contain one of the individual technologies that a complete UE comprised of hundreds of components working together must use does not mean that the modem chip, by itself, practices (or implements) all of the functionality required to comply with the standard.

The FTC has the burden to establish with admissible evidence that there is no dispute of

17

1   fact as to every element of its legal claim. *Celotex*, 477 U.S. at 322-23.  Because the FTC has

2   failed to prove that a modem chip "implements" or "practices" an ATIS or TIA "standard", it

3   necessarily fails to satisfy its burden.  Viewing the evidence in the light most favorable to

4   Qualcomm, as the Court must under Rule 56, there is at least a genuine factual dispute on this

5   issue that precludes summary judgment.

### 2.   The Non-Discrimination Commitments Do Not Compel Component-Level Licensing.

8        The FTC as well as *amici* ACT | the App Association ("ACT") and the Computer &

9   Communications Industry Association ("CCIA") argue that the "non-discriminatory" language in

10  the ATIS and TIA IPR Policies requires that licenses be made available to "competitors".  (Mot.

11  at 19, 20; Br. of *Amici Curiae*, ECF No. 864 ("*Amici* Br.") at 5.)  As noted above (Part IV.A.3),

12  Qualcomm has never disputed that licenses must be granted to any applicant *including*

13  competitors—but only for the specified scope and purpose.  Like the FTC, *amici* attempt to read

14  out of the Policies the critical language limiting that scope:  only for the manufacture or sale of

15  products that "implement" or "practice" "the standard"—which modem chips do not do.  As

16  stated in the case that *amici* rely on, these are "words of limitation or restriction", and they must

17  be given effect.  *Turner v. Met. Life Ins. Co.*, 56 Cal. App. 2d 862, 869 (1943); *see also* Cal. Civ.

18  Code § 1641.  The FTC and *amici* effectively ask the Court to rewrite the language of the Policies

19  to remove this critical limitation in the licensing commitment, which it may not do.

20       What the non-discrimination obligation in the Policies actually does is govern the "terms

21  and conditions" of the licenses that SEP holders commit to grant.  (FTC Ex. 2 at 10 (ATIS

22  Operating Procedures) ("reasonable terms and conditions that are demonstrably free of any unfair

23  discrimination"); FTC Ex. 1 § 3.1.1 (TIA IPR Policy) ("terms and conditions that are reasonable

24  and non-discriminatory")).)  For example, it would prohibit an SEP holder from charging one

25  licensee a 1% royalty while (all other terms being equal) charging a similarly situated licensee a

26  10% royalty.  The non-discrimination obligation does not expand the purposes for which licenses

27  must be made available to sweep in purposes other than implementing or practicing the standard.

28

3.     **TIA's Licensing Guidelines Are Not Part of the TIA Contract and, in Any Event, Do Not Support the FTC's Reading of the TIA IPR Policy.**

To support its interpretation, the FTC also turns to TIA's IPR Guidelines.  (Mot. at 18-19.)  As a threshold matter, the Guidelines are not part of the TIA IPR Policy.  Indeed, the TIA Guidelines expressly state:  "These guidelines serve as a companion document and are not intended to substitute for the Policy . . ."  (FTC Ex. 3 at 1 (Guidelines to the TIA IPR Policy.)  On their face, therefore, they are not part of the contract, and the FTC's reliance on them undermines the FTC's claim that the Court should ignore all extrinsic evidence and look only at the plain language of the IPR Policies.  The decision in *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-341, 2017 WL 6611635 (C.D. Cal. Dec. 21, 2017), cited by the FTC, is not to the contrary.  There, the court expressly stated it would consider numerous pieces of evidence *to interpret* the ETSI IPR Policy, including the ETSI guidelines and fact and expert declarations.  *Id.* at *5-6.  Nowhere did the court hold that any guidelines were *part* of the contract itself or imposed contractual obligations.  By contrast, *In the Matter of Certain Wireless Communications Equipment*, 2007 WL 1221125, at *7 USITC Inv. No. 337-TA-577 (Feb. 22, 2007) expressly addressed the status of SDO IPR guidelines and held that "the [ETSI guidelines were] not intended to be part of a binding contract to which members agreed".

In any event, the FTC's reliance on the guidelines is misplaced.  To reach the conclusion that "modem chips are clearly a product contemplated by the standards at issue here, as they are necessary to implement the standards", the FTC points to language in the TIA Guidelines that refers to "products contemplated by the standard in question".  (Mot. at 19.)  As explained in detail above, the standards do not define the operation of modem chips, and ATIS and TIA licensing commitments therefore do not require that a mere component supporting a complete device's implementation of a standard must also be separately licensed.

B.     **The Overwhelming Evidence Establishes, at the Very Least, a Genuine Factual Dispute Concerning the Appropriate Interpretation of the ATIS and TIA IPR Policies.**

Under California law, courts should consider all credible evidence concerning the contracting parties' intent when determining whether the contractual language is ambiguous, *i.e.*,

19

reasonably susceptible to a party's interpretation, including evidence that is extrinsic to the language of the contract. *Phoenix Tech.*, 2017 WL 1289863, at *3; *Public Storage v. Spring Corporation*, No. CV 14-2594, 2015 WL 1057923, at *6 (C.D. Cal. Mar. 9, 2015). But the FTC ignores extensive evidence refuting its position, including (1) consistent, decades-long industry practice of exhaustively licensing SEPs only for the manufacture and sale of complete devices (and infrastructure), and not components such as modem chips; (2) a recent interpretation by ANSI, the organization that accredits both ATIS and TIA, of its own IPR Policy, which is identical to ATIS's and consistent with TIA's; and (3) the obligation of both ATIS and TIA to maintain IPR policies that are consistent with those of the other Organizational Partners of 3GPP and 3GPP2, and the evidence that ETSI—the leading SDO at 3GPP—considered a policy requiring component-level licensing not to meet this consistency requirement. This evidence establishes, at the very least, a genuine issue of factual dispute concerning whether Qualcomm's commitments under the ATIS and TIA IPR Policies require licensing the manufacture and sale of components, including modem chips.

### 1. Long-Standing Industry Practice Confirms That the ATIS and TIA Policies Do Not Require Licensing the Manufacture and Sale of Modem Chips.

Long-standing industry practice demonstrates the error in the FTC's proffered interpretation. This evidence takes two forms—the custom and practice of licensors, and the lack of licenses taken by companies selling modem chips. The indisputable evidence shows that all major cellular licensors, including those who at some point were also suppliers of UEs, infrastructure and components, license only end-user devices, not modem chips. (Above Part II.D.) Richard Donaldson, the FTC's licensing expert, confirmed this is the long-standing practice of the cellular industry. (Ex. 21 at 283:17-24 (Donaldson Dep.).) The FTC asks the court to upend this ubiquitous industry practice, disrupting decades of cellular patent licensing— and asks that it do so as a matter of law on a motion for summary judgment, without even considering evidence outside the purportedly "plain language". However, California law requires that the Court consider this evidence, and the overwhelming evidence of a uniform industry practice weighs heavily against the FTC's proposed interpretation of the ATIS and TIA Policies,

20

precluding summary judgment.  *See Crestview Cemetery Ass'n*, 54 Cal. 2d at 754 ("[E]ven if it be

assumed that the words standing alone might mean one thing to the members of this court, where

the parties have demonstrated by their actions and performance that to them the contract meant

something quite different, the meaning and intent of the parties should be enforced."); *Phoenix

Tech.*, 2017 WL 1289863, at *3 ("The conduct of the parties after execution of the contract and

before any controversy has arisen as to its effect affords the most reliable evidence of the parties'

intentions.") (citing *Kennecott*, 196 Cal. App. 3d at 1189-90).

Equally compelling is the evidence showing that major suppliers of modem chips do not

have a practice of entering into licenses for cellular SEPs covering the manufacture or sale of

modem chips.  (Above Part II.D.)   The evidence shows that multiple current and former suppliers

of modem chips do not have a single license for cellular SEPs.  The FTC points to not a single

instance of a chip seller seeking to legally enforce its purported contractual right to obtain a SEP

license covering the manufacture and sale of modem chips from cellular SEP holders who made

licensing commitments to either ATIS or TIA (or at all).  This telling absence leads to but one

conclusion: the ATIS and TIA IPR Policies do not mandate the grant of a license for the

manufacture or sale of components.  Indeed, this point is further amplified by chip suppliers'

conduct in patent pools, where they have voted to license only device makers and have not

themselves taken a license for cellular SEPs, even from the very pool in which they participate.

(Ex. 31 at 25:2-11, 112:18-113:4, 113:14-23 (Maghame Dep.).)

These practices and Qualcomm's interactions with participants in the cellular industry

described in the accompanying Declaration of Louis Lupin (at ¶¶ 4, 5) confirm the existence of an

issue of fact concerning the interpretation of Qualcomm's licensing commitments.  *See* Cal. Civ.

Code § 1649 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be

interpreted in the sense in which the promisor believed, at the time of making it, that the promisee

understood it").

This irrefutable evidence of the custom and practice in the industry demonstrates the

unreasonableness of the FTC's interpretation—and explains its attempt to foreclose the Court

from considering this evidence.  This evidence reflects the uniform industry-wide practice and

21

Defendant Qualcomm Incorporated's Opposition to Motion for Partial Summary Judgment on Qualcomm's
Standard Essential Patent Licensing Commitments
Case No. 17-cv-220-LHK-NMC

1   intent, at ATIS, TIA and beyond, that cellular SEPs licensing commitments cover only the

2   manufacture and sale of end-user devices and network equipment, and not for the manufacture

3   and sale of modem chips.  This evidence establishes overwhelmingly the intent and meaning of

4   the terms "for the purpose of implementing the standard" and "to the extent necessary for the

5   practice of the TIA publication."  Under California law, this evidence compels the conclusion that

6   the relevant Policies do not require licensing for the manufacture and sale of modem chips—or, at

7   the very least, that a disputed issue of fact exists as to the existence of such an obligation.

8              **2.      ANSI Has Confirmed That Licensing at the Component Level Is Not
9                      Required.**

10          ATIS and TIA are both accredited as SDOs by ANSI.  (Mot. at 7, 10.)  Accordingly, both

11  ATIS and TIA are obligated to follow ANSI's Essential Requirements, which includes the ANSI

12  Patent Policy.  (Mot. at 7-10.)  As the FTC acknowledges, ATIS has done so by adopting ANSI's

13  Patent Policy verbatim as its own.  (Mot. at 7-8.)  TIA's policy, while slightly differently

14  articulated, is substantively indistinguishable from the ANSI policy.  (Mot. at 10-11.)

15          As described above (Part II.C), within the last year the ANSI Executive Standards Council

16  Appeals Panel issued a formal decision emphasizing that the requirement to license applicants

17  "for the purpose of implementing the standard" "***does not mean that ANSI's Patent Policy***

18  ***requires licensing at the component level.***"  (Ex. 1 at 14 (Feb. 23, 2018 Decision of the ANSI

19  Executive Standards Council Appeals Panel).)  It could not be correct to conclude *as a matter of*

20  *law* that two member IPR Policies—one of which is verbally identical, the other closely similar,

21  and both required to be consistent with ANSI's policy—*do* impose that very requirement.

22          Nothing in the FTC's Motion, or in the record, even suggests that either ATIS or TIA

23  have adopted policies at odds with ANSI's interpretation of its own policy, or that SEP owners

24  giving license assurances to ATIS and TIA have operated with an understanding that any such

25  distinctions exist.  Based on this evidence, the only reasonable interpretation of the ATIS and TIA

26  policies is that they ***do not*** require licensing for the manufacture and sale of modem chips.

27

28

### 3.   The FTC Concedes the Need for Evidence Interpreting the ETSI IPR Policy, Which Must Be Consistent with the ATIS and TIA Policies.

ETSI, ATIS and TIA are Organizational Partners in global collaborative standards partnerships—3GPP (ATIS and ETSI), 3GPP2 (TIA and ETSI) and oneM2M (all three).  (Ex. 3 (oneM2M - Partners); Casaccia Decl. ¶ 10; Tiedemann Decl. ¶ 10.)  To ensure that cellular specifications are subject to the same licensing requirements worldwide, the operating rules and procedures of each standards partnership *require*, as a condition of membership in each partnership, that the IPR policies of each of their Organizational Partners be compatible with that of the others.  (Casaccia Decl. ¶ 10; Tiedemann Decl. ¶ 10.)  This is to ensure the success of the global standards effort that is the mission of each of the collaborative organizations.  (FTC Ex. 5 at Art. 2 (3GPP Working Procedures); Ex. 8 at Art. 2 (3GPP2 Working Procedures); Ex. 6 at 1 (oneM2M Partnership Agreement); Lupin Decl. ¶¶ 9-10.)  Accordingly, the meaning of the ETSI IPR Policy with regard to licensing components, including modem chips, is directly relevant to the interpretation of the ATIS and TIA Policies.

The FTC, however, concedes a "need for evidence regarding the meaning" of the ETSI IPR Policy (Mot. at 3), which itself precludes its request for partial summary judgment.  If determining the meaning of the ETSI IPR Policy requires evidence, and that meaning *must* be consistent with the meaning of the ATIS and TIA IPR Policies, then it cannot be the case that those latter Policies are susceptible to interpretation as a matter of law.

Further, Qualcomm, in support of this Opposition, submits uncontroverted evidence that commitments under the ETSI IPR policy ***do not*** require that licenses be made available for the manufacture and sale of modem chips.  Put differently, as evidence in the record shows, ETSI's IPR policy does not require holders of essential IPRs to license their IPRs at the component level.  (Above Part II.E.)  This is confirmed by the long-term chair of ETSI's IPR Special Committee, Dirk Weiler.  As Mr. Weiler testified, the ETSI licensing commitment does not include an obligation to license components of cellular devices.  (Ex. 27 at 43:3-45:1 (Weiler Dep.); *see also* Ex. 23 at 21:20-25:23 (Petersson Dep.).)  It is further supported by the fact that ETSI representatives have stated that its IPR Policy is *not* consistent with the IPR Policy of IEEE, on

23

1   the ground that recent amendments to the IEEE policy *do* require component-level licensing.

2   (Ex. 27 at 11 (Draft Minutes from the ETSI General Assembly, Mar. 17-18, 2015).)

3   In the face of this strong evidence that the ATIS and TIA policies are and were

4   specifically intended to be consistent with the ETSI policy that does not require licensing of

5   components, the FTC asks this Court to declare as a matter of law that they are instead

6   *inconsistent* in a very material respect. Such a result would balkanize global standards

7   development collaborations and defeat the central goals of these global organizations to support

8   global technical specifications and broad access to that technology by promoting consistent global

9   licensing requirements. (Lupin Decl. ¶¶ 8-14.) Because the ATIS and TIA policies must be

10  harmonized with the ETSI IPR policy, and the FTC concedes a need for evidence concerning the

11  ETSI IPR Policy (Mot. at 3), summary judgment is precluded.

12      C.    ***Amici* Misconstrue FRAND Caselaw, Which Does Not Establish That Licensing the Manufacture and Sale of Components Is Required by the TIA or ATIS IPR Policies.**

13

14  *Amici* cite precedent that they contend establishes that "[t]he TIA and ATIS policies, on

15  their faces, simply do not permit an interpretation limiting the beneficiaries of the licensing

16  promise to 'some' applicants". (*Amici* Br. at 6-7.) But *amici* do not address the IPR Policies'

17  language limiting the licensing obligation to specific purposes (*i.e.*, to implement or to practice a

18  standard) and therefore miss the point. Qualcomm's interpretation, which is consistent with

19  universal cellular industry licensing practice, does not impose "hidden, unstated restrictions", as

20  *amici* suggest (*id.* at 7), but instead gives effect to express limitations in the IPR Policies that

21  *amici*'s interpretation completely ignores.

22  None of the cases relied on by *amici* establishes that ATIS or TIA licensing commitments

23  include the manufacture or sale of components, rather than only complete User Equipment or

24  Infrastructure. In both *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012), and

25  *Microsoft Corp. v. Motorola, Inc*., 795 F.3d 1024, 1031 (9th Cir. 2015), the Ninth Circuit

26  addressed the IPR Policy ("Common Patent Policy") of another SDO, known as ITU. In neither

27  case did the Court have cause to consider whether any language in that Policy limited the scope of

28  the obligation to license products that actually practiced the relevant standard. Nor could it, as

24

the ITU's Common Patent Policy does not contain any language like the language in the ATIS and TIA IPR Policies, which limits the licensing requirement to products that implement or practice *a standard*.  In *Ericsson v. D-Link Sys., Inc.*, 773 F.3d 1201, 1230 (Fed. Cir. 2014), the Federal Circuit made the unremarkable observation that a firm that had committed to license its patents on reasonable and non-discriminatory ("RAND") terms could not completely refuse to license its patents to *all* others or only on conditions intended to preserve a monopoly. Accordingly, the Federal Circuit concluded that the district court erred by instructing the jury on the *Georgia-Pacific* factor that considers whether the IP holder has sought to maintain its patent monopoly rather than licensing its patents.  *Id*. at 1235.  But the Court did not interpret the terms of any particular RAND (or FRAND) obligation, much less address whether commitments to ATIS or TIA require the granting of licenses to manufacture or sell components that do not by themselves practice the relevant standard.

Finally, *amici* rely on an Order issued in *Apple v. Qualcomm*, which is, of course, a dispute between Qualcomm and a manufacturer of handsets (*i.e.*, User Equipment), not a manufacturer of modem chips.  2017 U.S. Dist. LEXIS 145835 (S.D. Cal. Sept. 7, 2017).  In denying Qualcomm's motion for an anti-suit injunction, Judge Curiel merely observed that the dispute between Apple and Qualcomm was more than a "paradigmatic private contractual dispute" among private parties, but rather potentially implicated the interests of "any number of corporations in China, Japan, the U.K. and Taiwan that are similarly-situated to Apple", *i.e.*, that manufacture handsets, and "that are similarly entitled to benefit from Qualcomm's FRAND promise to ETSI".  *Id*. at *31-32.  The Court did not determine that modem chip suppliers fell within the class of firms that were beneficiaries of Qualcomm's FRAND commitment under the terms of the ETSI Policy it referred to, let alone under the ATIS and TIA IPR Policies at issue in this Motion, which it never mentioned.

## V.   CONCLUSION

For all of the foregoing reasons, the FTC has failed to meet its burden of establishing its interpretation of the ATIS and TIA IPR policies as a matter of law.  At minimum, genuine issues of material fact exist, and the FTC's motion should be denied.

1    September 24, 2018

2

3                                                       By:    /s/ Geoffrey T. Holtz

4                                                              Robert A. Van Nest (SBN 84065)
                                                             Eugene M. Paige (SBN 202849)
5                                                            Justina Sessions (SBN 270914)
                                                             KEKER, VAN NEST & PETERS
6                                                            LLPKEKER, VAN NEST & PETERS LLP
                                                             633 Battery Street
7                                                            San Francisco, CA 94111-1809
                                                             Telephone: (415) 391-5400
8                                                            Facsimile:  (415) 397-7188

9                                                            Gary A. Bornstein (pro hac vice)
                                                             Yonatan Even (pro hac vice)
10                                                           CRAVATH, SWAINE & MOORE LLP
                                                             Worldwide Plaza
11                                                           825 Eighth Avenue
                                                             New York, NY 10019-7475
12                                                           Tel.: (212) 474-1000
                                                             Fax: (212) 474-3700
13                                                           gbornstein@cravath.com
                                                             yeven@cravath.com

14

15                                                           Richard S. Taffet (pro hac vice)
                                                             MORGAN, LEWIS & BOCKIUS LLP
16                                                           101 Park Avenue
                                                             New York, NY 10178-0060
17                                                           Tel.: (212) 309-6000
                                                             Fax: (212) 309-6001
18                                                           richard.taffet@morganlewis.com

19                                                           Willard K. Tom (pro hac vice)
                                                             MORGAN, LEWIS & BOCKIUS LLP
20                                                           1111 Pennsylvania Avenue NW
                                                             Washington, DC 20004-2541
21                                                           Tel.: (202) 739-3000
                                                             Fax: (202) 739 3001
22                                                           willard.tom@morganlewis.com

23                                                           Geoffrey T. Holtz (SBN 191370)
                                                             MORGAN, LEWIS & BOCKIUS LLP
24                                                           One Market, Spear Street Tower
                                                             San Francisco, CA 94105-1596
25                                                           Tel.: (415) 442-1000
                                                             Fax: (415) 442-1001
26                                                           gholtz@morganlewis.com

27                                                           Attorneys for Defendant
                                                             QUALCOMM INCORPORATED

28

                                                  26