# Exhibit 23

```
 1                       UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF CALIFORNIA
 2

 3    FEDERAL TRADE COMMISSION,

 4                             Plaintiff,

 5    vs.                              No: 17-cv-00220-LHK-NMC

 6    QUALCOMM INCORPORATED,

 7                             Defendant.

 8    - - - - - - - - - - - - - - - - - - - - - - - - -

 9    In Re:
                                       No: 17-md-02773-LHK-NMC
10    QUALCOMM ANTITRUST
      LITIGATION
11
      - - - - - - - - - - - - - - - - - - - - - - - - -
12

13
                         UNITED STATES DISTRICT COURT
14                       SOUTHERN DISTRICT OF CALIFORNIA

15

16    In Re:                           No: 3:17-cv-00108-GPC-MDD

17    QUALCOMM LITIGATION

18    - - - - - - - - - - - - - - - - - - - - - - - - -
      In Re:
19    CERTAIN MOBILE ELECTRONIC
      DEVICES AND RADIO               Investigation No: 337-TA1093
20    FREQUENCY AND
      PROCESSING COMPONENTS
21    THEREOF

22    - - - - - - - - - - - - - - - - - - - - - - - - -

23           HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY

24

25
```

```
 1          A.   Yes, we have.  We take our FRAND commitment very
 2   seriously.
 3          Q.   So you mentioned a FRAND commitment.  And what is
 4   it that you understand to be your FRAND commitment, or
 5   Ericsson's FRAND commitment?
 6          A.   So when you declare patents to ETSI you commit to
 7   license on fair, reasonable and non-discriminatory terms and
 8   conditions in order with the ETSI policy.  So you would need
 9   to look at the details of the ETSI policy to be able to
10   interpret the commitment itself.
11          Q.   And is there a specific provision within the ETSI
12   policy that sets forth these requirements?
13          A.   Obviously you have to look at the full ETSI policy
14   as well as the guidelines, but the clause which stipulates
15   the FRAND commitments is I believe in section 6.1.
16          Q.   And if you wish to please refer to the exhibit that
17   we've premarked as 2776 and if you would just review that
18   and confirm whether your recollection is correct?
19          A.   Yes.
20          Q.   Now does in your understanding, or Ericsson's
21   understanding, section 6.1 of the ETSI IPR policy require
22   you to license all parties that request a license?
23          A.   All parties that request a license and that make
24   equipment in accordance with the policy.
25          Q.   And you mentioned or used the word equipment.  What
```

```
 1   is your understanding of the term equipment?
 2        A.   My understanding of the term equipment is that it
 3   is a fully compliant product that can be used by the user.
 4        Q.   And can you give us some examples what a fully
 5   compliant piece of equipment might be?
 6        A.   A base station.  A mobile phone.
 7        Q.   Would in your understanding of the ETSI policy or
 8   Nokia's -- I'm sorry, of Ericsson's understanding of the
 9   ETSI policy be that a fully compliant equipment include a
10   component that is included for example in a cellular
11   handset?
12        A.   No, that would not be my understanding.
13        Q.   And why is that?
14        A.   The component cannot be used by the consumer.  It
15   does not have all the functionalities to actually operate in
16   the network.  It cannot be tested for compliance testing as
17   well.
18        Q.   Has Ericsson in your experience always complied
19   with its obligations to license equipment manufacturers
20   under the ETSI policy?
21        A.   To my knowledge, yes, we have.
22        Q.   Let me ask you to turn to clause 3 of the ETSI
23   policy if you would, titled "Policy Objectives".  Are you
24   familiar with this clause of the policy?
25        A.   Yes, I am.
```

```
 1        Q.   What is your understanding of this clause?
 2        A.   First of all what is incorporated in the standard
 3   has to be what is the best technical solution.  There is
 4   also balance in the ETSI policy to award those that innovate
 5   at the same time as making sure that the standard can be
 6   widely spread in the market.
 7        Q.   And consistent with that second policy objective,
 8   to allow the standard to be widely spread, do you have an
 9   understanding regarding allowing all companies access to the
10   technology?
11        A.   Access, yes.  You can only license the same
12   functionality for the same product once in the value chain
13   for exhaustion purposes.  So yes everyone in the value chain
14   should get access.  Not everyone might be able to get a
15   direct license so the direct license goes to, in our case,
16   the equipment.
17        Q.   You mentioned the value chain.  To what are you
18   referring there?
19        A.   The value chain might be very spread.  So in some
20   cases, if you look at it historically, most of the handset
21   players were virtually integrated.  Nowadays it's common
22   that you buy chipsets from a chip supplier, and it might not
23   go directly from the chip supplier to the actual end device
24   manufacturer but there might be multiple steps in between.
25        Q.   So if you were to give us a -- if you were to
```

```
 1   graphically illustrate what the value chain is starting at
 2   the top, how would you define the value chain?  And
 3   I understand this is a hard question because you're not
 4   going to graphically show us but if you can orally explain
 5   what you would put on a diagram?
 6        A.   Yes.  So in a simple world -- I'm not going to go
 7   into the details -- but in a simple world you can say you
 8   have the chip supplier maybe selling its chipsets to an ODM
 9   in very often in Asia.
10        Q.   And an ODM stands for?
11        A.   The company actually producing the hardware but not
12   the company that actually brands and sells the product on
13   the market.
14        Q.   The acronym ODM stands for what?
15        A.   Original design manufacturer.
16        Q.   And from the ODM what's next in the chain?
17        A.   The OEM.
18        Q.   And OEM stands for?
19        A.   Original equipment manufacturer.
20        Q.   And would that be for example a handset maker?
21        A.   That would be a handset maker, yes.  And in our
22   vocabulary that would be the company putting its name on the
23   product and selling it on the market.
24        Q.   Apple would be an example?
25        A.   Yes, they would.
```

1    Q.   And then what's next in the value chain?
2    A.   Then you have the consumer.  You might have the
3 operator or a retailer in between but then ultimately the
4 consumer.
5    Q.   And in this value chain when you are granting
6 licenses to Ericsson's SEP, cellular SEP portfolio, who
7 would you be granting a license to?
8    A.   We would be licensing the company putting its name
9 on the fully compliant equipment and selling that on the
10 market.  So it would be Apple, Samsung and those type of
11 companies.
12   Q.   These were the companies that you identified as the
13 OEM?
14   A.   Yes.
15   Q.   And this has been Ericsson's practice since you've
16 been involved in the licensing?
17   A.   It has, yes.
18   Q.   Is this a practice that is unique to Ericsson?
19   A.   No.  As I explained earlier, the industry used to
20 be virtually integrated, so already in the '90s the licenses
21 were done between -- in those days Ericsson had licenses
22 with Nokia, with Siemens, with Philips who were also selling
23 final products on the market.
24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1  ███████████
███████████████████████████████
███████████████
████████████████
██████████████████████████████
███████████████████████
████████████████████████
███████████████████████████████
███████████████████████████████
██████████████████████████
█████████████
████████████████████████████
██████████████████████████
█████████████████
███████████████████████████████
████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
█████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
████████████████████
███████████████████████████████
████████████████████

```
 1             ████████████████████████████████████████
               ████████████████████████████████████████
               ████████████████████████████████████████
               ████████████████
               ████████████████████████████████████████
               ████████████████████████████████████████
               ████████████████████████████
               ████████████████████████████████████
               ████████████████████████████████████████
10       Q.   And would it be fair to say during that period of
11   time that those licenses related to the 2G cellular
12   technologies?
13       A.   Yes, 2G as well as other technologies.  It used to
14   be the practice to enter into very broad cross-licenses
15   where the definition of technology were more undefined than
16   it is today.
17       Q.   But it would include the 2G technology?
18       A.   It would, yes.
19       Q.   And as time moved forward did the same practice
20   apply for 3G cellular technologies?
21       A.   Yes, it did.  That's correct.
22       Q.   And even more recently did -- does the same
23   practice apply to 4G cellular technologies?
24       A.   It does, yes.
25       Q.   Based on your understanding are there reasons that
```

```
 1   collecting royalty on something that was already licensed
 2   further up in the value chain.
 3        Q.  Let me show you a document that we've marked as
 4   QX2879.
 5            (Exhibit QX2879 marked for identification.)
 6             Do you recognize this document?
 7        A.  Yes, I do.
 8        Q.  And what do you recognize it to be?
 9        A.  This is a document that we prepared for showing
10   different regulatories.  I believe it was submitted to the
11   European Commission when this debate started.  First of all
12   the debate started that the industry practice is not to
13   license on OEM level, which we certainly do not agree with
14   having been in this industry for so long, so we compiled
15   this document to try and document all the benefits that we
16   saw at that point in time.
17        Q.  So you said this was prepared at the time that the
18   debate started.  When do you recall that to be?
19        A.  I believe the debate started -- it's difficult to
20   say a particular year but it's not 10 years ago.  It is
21   probably less than 5.  I'm not going to speculate exactly
22   but I can say that 10 years ago this debate was not
23   something that you frequently heard.  That is something that
24   has popped up lately.
25        Q.  If you would just turn your attention to page 4.
```

```
 1              MR. KRESS:  Of the written submission?
 2              MR. TAFFET:  Oh yes.  I apologize.
 3   BY MR. TAFFET:
 4        Q.  Let me withdraw that question.  That's fine.  But
 5   is it fair to say that the ultimate terms that are included
 6   within a license for -- that involve granting rights to
 7   Ericsson's SEP portfolio are ultimately determined based
 8   upon the bilateral negotiations between Ericsson and the
 9   licensee?
10        A.  Yes, unless of course a court or arbitration panel
11   have stipulated the rates.
12        Q.  Okay.  And when you raised that circumstance has
13   that occurred in connection with Ericsson's licensing?
14        A.  Yes.  We've had arbitrations as well as litigation.
15        Q.  And has the court stipulated what the rates would
16   be in those circumstances?
17        A.  Yes, they have.
18        Q.  But putting those circumstances aside in
19   determining the overall license agreements, is it fair to
20   say that the terms are determined through the bilateral
21   negotiations of Ericsson and the licensee?
22              MS. BONN:  Object to form.
23        A.  Yes, you can say that.  Of course we don't -- it's
24   always a negotiation between the licensor and the licensee.
25   We would have to consider the fact that we have to be non-
```

1  discriminatory, so it cannot be all upon the request of the
2  licensee.  We would have to follow the FRAND principle from
3  our perspective.
4  BY MR. TAFFET:
5      Q.  And if you can explain that a bit more, that in
6  following the FRAND principle I think you suggested that it
7  cannot be all based on what the licensee says.  What do you
8  mean by that?
9      A.  I mean that you -- within FRAND it means you need
10 to be fair and reasonable but also non-discriminatory.
11 Non-discriminatory between similarly situated entities has
12 to be similar in nature.  So by looking at all the terms and
13 conditions and all the value that is exchanged, both from
14 the perspective of term, other agreed factors, you need to
15 ensure that your program is not discriminating certain
16 entities.
17     Q.  And how do you ensure that it is not
18 discriminatory?  What do you understand that requirement to
19 impose upon Ericsson?
20     A.  You can twist it around and say that we cannot
21 treat similarly situated entities in a totally different way
22 amongst them.  To put it simple -- of course there are a
23 number of factors that goes into discrimination and you
24 would need to look at it from a much broader perspective but
25 in simple terms you need to ensure that similarly situated

```
 1   entities are treated fairly similarly on one particular
 2   market under certain particular circumstances.
 3        Q.   With respect to the non-discriminatory factor
 4   however, does that compel the terms of each license that
 5   Ericsson grants to be the same even if a licensee is
 6   similarly situated to another licensee?  Do all the terms
 7   have to be identical?
 8        A.   If you mean by "term" all the terms in the actual
 9   agreement, I would respond no.  That would -- to explain my
10   answer, that would mean that you in all -- if you agree to
11   Swedish law as governing law which is beneficial for
12   Ericsson, you would need to enforce upon everyone to accept
13   Swedish law as the governing law.  So there are a number of
14   terms and factors in the agreement that may vary, also
15   depending on the requests from the licensee.
16        Q.   And in that regard in your view would it be
17   non-discriminatory even if the monetary terms would vary or
18   the form of payment would vary from licensee to licensee?
19        A.   That could be non-discriminatory, yes.  It could
20   be.  Because you need to at all point in time you need to
21   look at it from a much broader perspective and weigh in all
22   the factors of the agreement and all the circumstances of
23   the agreement.
24        Q.   Is your understanding of the FRAND licensing
25   process one that imposes any obligations in connection with
```

```
 1                 CERTIFICATE OF COURT REPORTER

 2

 3    I, Chanelle Malliff, an Accredited Real-time Reporter,

 4    hereby certify that the testimony of the witness

 5    Christina Petersson in the foregoing transcript, numbered

 6    pages 1 through 244, taken on this 20th day of April, 2018

 7    was recorded by me in machine shorthand and was thereafter

 8    transcribed by me; and that the foregoing transcript is a

 9    true and accurate verbatim record of the said testimony.

10

11

12    I further certify that I am not a relative, employee,

13    counsel or financially involved with any of the parties to

14    the within cause, nor am I an employee or relative of any

15    counsel for the parties, nor am I in any way interested in

16    the outcome of the within cause.

17

18                      _____

19    Signed:           [signature]

20    Name:     CHANELLE MALLIFF

21    Date:     April 23, 2018

22

23

24

25
```