Jennifer Milici, D.C. Bar No. 987096
Joseph R. Baker, D.C. Bar No. 490802
Geoffrey M. Green, D.C. Bar No. 428392
Nathaniel Hopkin, N.Y. Bar No. 5191598
Rajesh S. James, N.Y. Bar No. 4209367
Philip J. Kehl, D.C. Bar No. 1010284
Daniel Matheson, D.C. Bar No. 502490
Kenneth H. Merber, D.C. Bar No. 985703
Mark J. Woodward, D.C. Bar. No. 479537
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3695; (202) 326-3496 (fax)
*jmilici@ftc.gov*

*Attorneys for Plaintiff Federal Trade Commission*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware Corporation,<br><br>Defendant. | Case No. 5:17-cv-00220-LHK-NMC<br><br>**FEDERAL TRADE COMMISSION'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON QUALCOMM'S STANDARD ESSENTIAL PATENT LICENSING COMMITMENTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**REDACTED VERSION OF DOCUMENT SEALED PER COURT ORDER**<br><br>Date:          October 18, 2018<br>Time:          1:30 p.m.<br>Courtroom:  8, 4th Floor<br>Judge:         Hon. Lucy H. Koh |

1
2

**NOTICE OF MOTION AND MOTION**

3

To the Honorable Court, all parties, and their attorneys of record:

4

Please take notice that on October 18, 2018, at 1:30 p.m., in Courtroom 8, United States

5

Courthouse, 280 South 1st Street, San Jose, California 95113, Plaintiff Federal Trade

6

Commission will and hereby does move the Court for partial summary judgment that Defendant

7

Qualcomm Incorporated's commitments to the Alliance for Telecommunications Industry

8

Solutions ("ATIS") and the Telecommunications Industry Association ("TIA") to make licenses

9

to relevant standard-essential patents ("SEPs") available to "applicants" on fair, reasonable, and

10

non-discriminatory ("FRAND") terms require and have required Qualcomm to make such

11

licenses available to rival sellers of modem chips.

12

This motion is made pursuant to Federal Rule of Civil Procedure 56, and is based on the

13

ground that, as a matter of law, Qualcomm's contractual commitments to ATIS and TIA to make

14

licenses to relevant SEPs available to "applicants" on FRAND terms require Qualcomm to make

15

such licenses available to rival modem-chip sellers.

16

This motion is based on this Notice of Motion and the Memorandum of Points and

17

Authorities in Support filed concurrently, the pleadings and documents on file in this case, and

18

other such argument as may be presented by counsel at the hearing on this motion.

19
20

**ISSUE TO BE DECIDED**

21

Whether the Court should grant partial summary judgment that Qualcomm's

22

commitments to make licenses to covered SEPs available (1) "to applicants desiring to utilize the

23

license for the purpose of implementing the [relevant ATIS] standard . . . under reasonable terms

24

and conditions that are demonstrably free of any unfair discrimination" and (2) "to all applicants

25

under terms and conditions that are reasonable and non-discriminatory . . . to the extent

26

necessary for the practice of [the relevant TIA standard]" require Qualcomm to make such

27

licenses available to competing modem-chip sellers whose chips implement those standards.

28

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................................1

II.    BACKGROUND FACTS.............................................................................................3

    A.     Overview of Standards and SSOs in 2G, 3G, and 4G ............................................3

    B.     Modem Chips Practice Qualcomm's Cellular SEPs.................................................5

    C.     Qualcomm Does Not License Rivals That Request a License ................................5

III.   UNDISPUTED MATERIAL FACTS SUPPORTING
       PARTIAL SUMMARY JUDGMENT ........................................................................7

    A.     Qualcomm Voluntarily Committed under the ATIS IPR Policy
        to Make Available Licenses to Patents Essential to UMTS and LTE Standards.....7

    B.     Qualcomm Voluntarily Committed under the TIA IPR Policy
        to Make Available Licenses to Patents Essential to CDMA Standards................10

IV.    LEGAL STANDARD...................................................................................................14

V.     QUALCOMM'S FRAND COMMITMENTS REQUIRE IT, AS A MATTER
       OF CONTRACT LAW, TO MAKE LICENSES AVAILABLE TO
       COMPETING CHIP SELLERS ...............................................................................17

    A.     Qualcomm's FRAND Commitments Are Binding Contracts ...............................17

    B.     The Plain Language of the TIA IPR Policy Requires Qualcomm
        to Make Licenses Available to Competing Sellers of Modem Chips...................18

    C.     The Plain Language of the ATIS IPR Policy Requires Qualcomm
        to Make Licenses Available to Competing Sellers of Modem Chips...................20

VI.    CONCLUSION............................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807 (1990) ........................................................ 16, 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 15

*Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wisc. 2012) ............ 16, 17, 18

*Bank of the West v. Superior Court*, 2 Cal. 4th 1254 (1992) ........................................................ 16

*Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866 (9th Cir. 1979) ................................ 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 15

*Epiphany, Inc. v. St. Paul Fire & Marine Ins. Co.*, 590 F. Supp. 2d 1244 (N.D. Cal. 2008) ........ 15

*Galen v. Cnty. of L.A.*, 477 F.3d 652 (9th Cir. 2007) .................................................................... 15

*Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263 (1987) ................................................ 16

*GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK,
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ........................................................................ 5

*Hariri v. Reliance Standard Life Ins. Co.*, No. 15-CV-03054,
    2017 WL 3422029 (N.D. Cal. Aug. 9, 2017) ........................................................................ 15

*In re Innovatio IP Ventures, LLC Patent Litig.*, 956 F. Supp. 2d 925 (N.D. Ill. 2013) ........... 17, 18

*Lies v. Farrell Lines, Inc.*, 641 F.2d 765 (9th Cir. 1981) .............................................................. 15

*Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012) ........................................... 17, 19

*Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015) ................................................ 4

*Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993 (W.D. Wash. 2012) .............................. 16

*Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023 (W.D. Wash. 2012) ................ 16, 17, 18

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Argonaut Ins. Co.*,
    701 F.2d 95 (9th Cir. 1983) .................................................................................................. 16

*Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Riggigin Co.*, 69 Cal. 2d 33 (1968) .............. 16

*Palo Alto Town & Country Village, Inc. v. BBTC Co.*, 11 Cal. 3d 494 (1974) ............................ 16

*Paracor Fin. Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996) .............................. 15

*Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998 (N.D. Cal. 2013) .................... 17

*St. Paul Mercury Ins. Co. v. Am. Safety Indem. Co.*, No. 12-CV-05952,
    2014 WL 2120347 (N.D. Cal. May 21, 2014) .................................................................. 15, 16

*Super98, LLC, v. Delta Air Lines, Inc.*, 309 F. Supp. 3d 1368 (N.D. Ga. 2018) ...........................15

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson,*
    No. SACV 14-341, 2017 WL 6611635 (C.D. Cal. Dec. 21, 2017) ...................................17, 18

*Welles v. Turner Entm't Co.*, 503 F.3d 728 (9th Cir. 2007) ...................................................15, 16

## **Statutes**

Cal. Civ. Code § 1583 ...........................................................................................................16

Cal. Civ. Code § 1646 ...........................................................................................................15

## **Rules**

Fed. R. Civ. P. 56 ...........................................................................................................14, 15

1

2

## I.      INTRODUCTION

Qualcomm has committed to telecommunications industry standard setting organizations ("SSOs") that Qualcomm will grant licenses to the company's standard-essential patents ("SEPs") on fair, reasonable and non-discriminatory ("FRAND") terms to applicants that wish to implement cellular standards.  In breach of these contractual commitments, Qualcomm has rejected requests from modem-chip competitors to license patents essential to practicing these standards.  Together with other challenged practices, including a "no license-no chips" policy to which Qualcomm subjects its chip customers, Qualcomm's refusal to license chip competitors has significantly contributed to Qualcomm's unlawful maintenance of monopoly power in markets for CDMA and premium LTE modem chips.

Through this motion, the FTC does not seek summary judgment on the competitive effects of Qualcomm's refusal to license its competitors.  These effects must be evaluated, at trial, together with the effects of Qualcomm's other related conduct.[1]  Order Denying Motion to Dismiss (Dkt. 134), at 31.  Nor does the FTC seek through this motion to establish that Qualcomm has an antitrust duty to deal with its competitors.  Order Denying Motion to Dismiss (Dkt. 134), at 41-44 (antitrust duty to deal exists where a defendant alters a voluntary course of dealing with evidence of anticompetitive malice).  This, too, will be a subject addressed at trial.

Rather, the FTC seeks partial summary judgment on a narrow legal issue relevant to evaluation of Qualcomm's conduct under the antitrust laws:  a ruling that Qualcomm's voluntary FRAND licensing commitments to two United States-based SSOs, under the plain meaning of these SSOs' intellectual property rights ("IPR") policies, require Qualcomm to make licenses available to competing modem-chip sellers.  The two SSOs are the Telecommunications Industry Association ("TIA"), the U.S. SSO that adopted the CDMA family of standards, and the Alliance

---

[1] Evidence at trial will show that Qualcomm's refusal to license FRAND-encumbered SEPs to competitors discourages investment and works in conjunction with its no license-no chips policy to tax competitors' chip sales.  Unlike handset makers, Qualcomm's chip competitors do not depend on Qualcomm's modem chips, and thus could negotiate licenses with reference to Qualcomm's likely infringement remedies instead of a threatened supply disruption.

for Telecommunications Industry Solutions ("ATIS"), the U.S. SSO that adopted the UMTS and LTE families of standards. Because Qualcomm's FRAND commitments formed contracts with these SSOs, the Court may appropriately interpret the scope of the duty as a matter of contract law on summary judgment.

The relevant contract language is clear. TIA's IPR policy requires participants to make licenses to relevant SEPs available "to all applicants under terms and conditions that are reasonable and non-discriminatory . . . to the extent necessary for the practice of [the relevant TIA standard]." [2]  ATIS's IPR policy requires participants to make licenses to relevant SEPs available "to applicants desiring to utilize the license for the purpose of implementing the [relevant ATIS] standard . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination."[3]  Neither IPR policy permits participants to refuse licenses to certain applicants or categories of applicants.  To the contrary, official guidelines to the TIA IPR policy state:  "An example of conduct that would constitute discrimination is a willingness to license all applicants except for competitors of the licensor."[4]  As a matter of California contract law, Qualcomm's FRAND commitments under the terms of these policies mean that it must make licenses to relevant cellular SEPs available to competitors.[5]

The FTC's Complaint alleges that Qualcomm's commitments to TIA, ATIS, and other

[2] Ex. 1 (TIA Intellectual Property Rights Policy, at 8-9, Oct. 21, 2016). All exhibits are attached to the Declaration for Jennifer Milici in Support of the FTC's Motion for Partial Summary Judgment unless noted otherwise.
[3] Ex. 2 (Q2017MDL1_00024028, ATIS Operating Procedures § 10.1, at 10, Mar. 1, 2015), *also available at* https://www.atis.org/01_legal/docs/OP.pdf.
[4] Ex. 3 (Q2017MDL1_00025790, Guidelines to the Telecommunications Industry Association Intellectual Property Rights Policy, at 4, May 1, 2014), *also available at* https://www.tiaonline.org/wp-content/uploads/2018/05/Guidelines_to_the_Intellectual_Rights_Policy_of_the_Telecommunications_Industry_Association.pdf.
[5] The FTC's motion concerns Qualcomm's licensing obligations under the TIA and ATIS IPR policies.  However, the FTC does not waive any arguments that Qualcomm's numerous FRAND licensing commitments to other SSOs, including the European Telecommunication Standards Institute ("ETSI"), also require Qualcomm to license competing modem-chip sellers under the plain and unambiguous terms of the relevant IPR policies.

SSOs require it to license its SEPs to rival modem-chip sellers.  Federal Trade Commission's Complaint for Equitable Relief, ECF No. 1 ("Compl.") ¶ 108.  As the FTC also alleged, and as evidence at trial will show, Qualcomm's breach of those commitments contributed to its ability to tax its competitors' sales and maintain its monopoly in markets for modem chips.  Compl. ¶ 115.  Granting partial summary judgment on the meaning of Qualcomm's FRAND commitments to TIA and ATIS should streamline trial by obviating the need for evidence regarding the meaning of Qualcomm's commitments to a third SSO, the European Telecommunication Standards Institute ("ETSI").  Qualcomm has submitted two expert reports addressing whether the ETSI IPR Policy requires it to license competitors under French law.[6] However, to the extent that Qualcomm's commitments to TIA and ATIS require Qualcomm to license relevant cellular SEPs to modem-chip sellers, the ETSI IPR Policy is immaterial—it makes no difference under the FTC's antitrust claim whether there are additional, duplicative obligations flowing from Qualcomm's ETSI commitments.

Because the interpretation of Qualcomm's contractual FRAND commitments to TIA and ATIS involves no genuine dispute as to any material fact, the Court should grant summary judgment that Qualcomm's contractual commitments to make licenses available to "applicants" on non-discriminatory terms require Qualcomm to make such licenses available to competing modem-chip sellers.

## II.       BACKGROUND FACTS

### A.       Overview of Standards and SSOs in 2G, 3G, and 4G

Cellular telecommunications rely on standards that allow equipment made by many

---

[6] Qualcomm submitted a report from Dr. Bertram Huber concerning the meaning of ETSI's IPR policy.  Dr. Huber's proposed testimony consists principally of opinions based on his participation in the discussion and framing of the ETSI IPR Policy.  Dr. Huber offers no opinion about the meaning of the TIA or ATIS IPR policies, has no experience with TIA or ATIS, and the parol evidence provided in his report about the ETSI IPR policy is not relevant to the interpretation of the TIA or ATIS IPR policies.  Qualcomm also disclosed Bénédicte Fauvarque-Cosson as an expert on French law, but French law governs neither the TIA nor the ATIS IPR policy.

1  different companies to interoperate.  Four families of cellular standards are relevant to this case:

2  second-generation CDMA (known as "cdmaOne"), third-generation CDMA (known as

3  "CDMA2000"), third-generation Universal Mobile Telecommunications System ("UMTS"), and

4  fourth-generation Long-Term Evolution ("LTE").

5  SSOs have adopted these standards, which incorporate technology contributed by their

6  members.  TIA adopted the 2G cdmaOne family of standards.[7]  TIA is also the North American

7  organizational partner of 3GPP2, the collaboration that developed the 3G CDMA2000 family of

8  standards as an evolution of cdmaOne.[8]  ATIS is the North American organizational partner of

9  3GPP, the collaboration that developed the 3G UMTS and 4G LTE families of standards.[9]

10  The SSO members that contribute technologies to cellular standards include firms that

11  sell standard-compliant products such as modem chips, phones, infrastructure, or cellular

12  network services.  Though firms may retain patents on contributed technologies, SSOs will not

13  incorporate patented technologies into a cellular standard without assurances that the patents will

14  be available for license on FRAND terms.[10]  SSOs—including TIA and ATIS—typically set out

15  their rules regarding patent licensing assurances in an IPR Policy, which describes the purpose

16  and scope of the FRAND requirement.  *See infra* Sections III.A, III.B.  Qualcomm has made a

---

[7] Ex. 4 (Q2017MDL1_03120703, Qualcomm Response to FTC CID Specification 4, at -07-08, Aug. 15, 2016).

[8] Ex. 4 (Q2017MDL1_03120703, Qualcomm Response to FTC CID Specification 4, at -09, -014, Aug. 15, 2016).

[9] Ex. 4 (Q2017MDL1_03120703, Qualcomm Response to FTC CID Specification 4, at -08, -021, Aug. 15, 2016).

[10] *See, e.g.,* Ex. 5 (3GPP Working Procedures, art. 55, at 26) ("Individual Members should declare at the earliest opportunity, any IPRs which they believe to be essential, or potentially essential, to any work ongoing within 3GPP. . . . Organizational Partners should encourage their respective members to grant licences on fair, reasonable terms and conditions and on a non-discriminatory basis."). Some SSOs refer to "fair, reasonable, and non-discriminatory" ("FRAND") terms, while others, including TIA and ATIS, refer to "reasonable and non-discriminatory" ("RAND") terms.  This Memorandum refers to "FRAND" terms, consistent with courts' conclusion that "FRAND and RAND have the same meaning in the world of SEP licensing."  *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031 n.2 (9th Cir. 2015).

4

large number of licensing commitments to TIA, ATIS, and other SSOs relating to 2G (CDMA), 3G (UMTS and CDMA2000), and 4G (LTE) cellular standards.[11]

### B.    Modem Chips Practice Qualcomm's Cellular SEPs

Modem chips, sometimes referred to as baseband chips, are cellular-handset components that implement cellular standards and allow handsets to communicate with a cellular network.[12] Modem chips implementing CDMA, UMTS, and LTE standards practice claims of cellular SEPs owned by Qualcomm, ████████████████████████████████████████████████████████████████████████████ ████████

### C.    Qualcomm Does Not License Rivals That Request a License

As set forth below (Section III, *infra*), Qualcomm has voluntarily committed to TIA and ATIS that it will license SEPs essential to cellular standards to applicants that want to implement

---

[11] See Ex. 6 (Q2017MDL1_03120611, Exhibit 4 to Qualcomm's Response to the FTC's Civil Investigative Demand, July 20, 2016) (listing Qualcomm's relevant licensing declarations).

[12] *See, e.g.,* Ex. 7 (Deposition of Keith Kressin, Tr. 11:17–12:4, Feb. 7, 2008) (the modem, "sometimes referred to as a baseband processor," allows the handset "to utilize cellular communications").

[13] Ex. 8 (Q2017MDL1_03099915 at -918, Qualcomm Response to KFTC Supplemental Request for Information 5-4-1, at 4); Ex. 9 (Q2017MDL1_03099818, Exhibit 1-2a to Qualcomm's KFTC Response); *see also, e.g.*, Ex. 10 (Deposition of Derek Aberle Tr. at 42:15-44:2, 45:2-46:20, Mar. 27, 2018) (testifying that Qualcomm has identified certain claims of its SEPs that "would be implemented entirely within a baseband chip" and additional claims of those patents may be substantially embodied in the baseband chip); Ex. 11 (Deposition of Cristiano Amon, Tr. 398:8-399:18, Mar. 13, 2018) ("The intellectual property that come as – as the creation of new standard technologies get licensed at the device level, and QCT will then implement some of those – those technologies in its chips . . ."); Ex. 12 (Q2017MDL1_03125483, Qualcomm's Submission to the FTC on Device-Level Licensing, at 9, Dec. 2, 2016) ("Qualcomm's broad portfolio of cellular SEPs includes inventions that are practiced by modem chips."); Ex. 13 (Deposition of Marvin Blecker, Tr. 172:11-13, Feb. 22, 2018) ("[T]o do WCDMA [UMTS] and an ASIC [modem chip], you would at least have to implement Qualcomm's essential patents."). This is consistent with holdings in other cases. *See, e.g., GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *13 (N.D. Cal. Apr. 16, 2014) ("[T]he Court holds as a matter of law that in this case, the baseband processor is the proper smallest salable patent-practicing unit" [relating to certain cellular SEPs]).

1    the standards.  To resolve this motion, the Court need not determine whether Qualcomm has

2    breached its licensing commitments by refusing to license competitors.  Nonetheless, as evidence

3    at trial will show, a number of modem chip sellers have requested licenses from Qualcomm over

4    the years,[14] and Qualcomm has not granted licenses to them.[15]  The President of Qualcomm's

5    licensing business testified:  "At the current time, we don't license our portfolio to baseband chip

6    manufacturers."[16]  This has been Qualcomm's long-standing practice.  As Qualcomm stated in

7    response to an FTC investigative demand: "Qualcomm has never granted exhaustive licenses

8    under its patents with respect to modem chipsets."[17]

9

_____

10   [14] *See* Ex. 14 (Qualcomm's Responses and Objections to Plaintiffs' First Set of Requests for
     Admission, No. 136, Apr. 10, 2018) ("Admitted that Qualcomm has received requests from other
11   chipset manufacturers for exhaustive licenses to Qualcomm's SEPs that have not led to an
     agreement with those manufacturers for exhaustive licenses to Qualcomm's SEPs."); *id.* (Nos.
12   137-39) ██████████████████████████████████████████████████████████████
13   ████████████████████████████ .

     [15] Ex. 15 (QNDCAL03530643 at -643) ██████████████████████████████████████
14   ████████████████████████████████████████████████████████████████████████
15   ███████████ Ex. 14 (Qualcomm's Responses and Objections to Plaintiffs' First Set of Requests for
16   Admission, No. 135, Apr. 10, 2018) ("Admitted that Qualcomm has never exhaustively licensed
     its patents that it has disclosed as potentially essential to Cellular Communications Standards to
17   any other chipset component manufacturer."); *id.* (Nos. 137-39) ████████████████████████
18   ████████████████████████████████████████████████████████████████████
19

20   [16] Ex. 16 (Deposition of Alex Rogers, Tr. 112:7-11, Feb. 22, 2018).

21   [17] Ex. 17 (Q2017MDL1_03120294, Qualcomm's Response to FTC CID Specification 7(c), June
     30, 2016); Ex. 18 (Qualcomm's Response to Apple's Special Interrogatory No. 15, at 14, Mar.
22   10, 2018) ("Qualcomm does not separately grant exhaustive licenses for the manufacture,
     assembly, importation, use or sale of Baseband Processor Chipsets.").  Qualcomm has in the past
23   signed patent-related agreements with certain modem-chip sellers, but these agreements were not
24   licenses.  *See* Ex. 19 (Q2017MDL1_02161040 at -048) ████████████████████████████
     ████████████████████████████████████████████████
25   ████████████████████████████████████████████████████████████████████
26   Among other things, these agreements differed from conventional license agreements in that they
     purported to be "non-exhaustive," meaning that Qualcomm reserved the right to sue the
27   customers of such counterparties for infringement of Qualcomm SEPs based on the use of the
     counterparties' modem-chip products.  *See also* Ex. 18 (Qualcomm's Response to Apple's
28   Special Interrogatory No. 15, at 14, Mar. 10, 2018) ("When requested, Qualcomm has been

6

1
2

### III.     UNDISPUTED MATERIAL FACTS SUPPORTING PARTIAL SUMMARY JUDGMENT

3
4

### A.     Qualcomm Voluntarily Committed under the ATIS IPR Policy to Make Available Licenses to Patents Essential to UMTS and LTE Standards

5

3GPP, which developed UMTS and LTE standards, is a collaboration among SSOs

6

headquartered throughout the world.[18]  These SSO are known as 3GPP's "Organizational

7

Partners."[19]  3GPP's Organizational Partner from the United States is the Alliance for

8

Telecommunications Industry Solutions ("ATIS"),[20] which is accredited by the American

9

National Standards Institute ("ANSI").[21]  Once 3GPP adopts a standard, ATIS will "transpose"

10

the 3GPP standard specifications into its own ATIS standard, or "deliverable."[22]

11

Companies that are members of ATIS, such as Qualcomm, may participate in 3GPP

12

activities, subject to the ATIS IPR Policy.[23]  The ATIS IPR Policy states that "it is the intention

13

of ATIS and its Forums to benefit the public while respecting the legitimate rights of intellectual

14

property owners."[24]  With respect to patents, the policy provides that ATIS standards may refer

15
16
17
18

willing to negotiate for non-exhaustive patent agreements with Baseband Processor Chipsets manufacturers . . . .").

19

[18] Ex. 5 (3GPP Working Procedures art. 1, at 7, Oct. 20, 2016).

20

[19] *Id.* (3GPP Working Procedures art. 6, at 8–9).

21

[20] Ex. 4 (Q2017MDL1_03120703, Qualcomm Response to FTC CID Specification 4, at 5 & n.4, Aug. 15, 2016.  ETSI is 3GPP's European Organizational Partner.  *Id.*; Ex. 5 (3GPP Working Procedures art. 1, at 7, Oct. 20, 2016).

22
23

[21] Ex. 20 (ATIS, ATIS Telecom Glossary, Foreword, http://www.atis.org/glossary/foreword.aspx).

24
25

[22] Ex. 21 (3GPP website, http://www.3gpp.org/about-3gpp/partners) ("3GPP produces Technical Specifications, to be transposed by relevant Standardization Bodies (Organizational Partners) into appropriate deliverables (e.g., standards).").

26

[23] Ex. 5 (3GPP Working Procedures art. 55, at 26) ("Individual Members shall be bound by the IPR Policy of their respective Organizational Partner").

27
28

[24] Ex. 2 (Q2017MDL1_00024028, Operating Procedures for ATIS Forums and Committees § 10.1, at 8, Mar. 1, 2015).

to or require the use of patented technologies.[25]  If "use of a patented invention is required for purposes of adopting, complying with, or otherwise utilizing the standard," however, "the provisions of the ANSI Patent Policy, as adopted by ATIS . . . shall apply."[26]  Those provisions require that,

> Prior to approval of [an ATIS standard requiring use of a patented invention], ATIS shall receive . . . assurance that a license to such essential patent claim(s) will be made available to applicants desiring to utilize the license for the purpose of implementing the standard . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination.[27]

Qualcomm is a member of ATIS and has made numerous commitments under the ATIS IPR Policy.  For example, in 1999 Qualcomm informed ATIS that it would make licenses available under the ATIS IPR Policy for patents essential to UMTS and CDMA2000:[28]

> QUALCOMM and Ericsson have agreed to jointly support approval by the T1 [a related predecessor SSO] of a single CDMA third generation standard that encompasses three optional modes of operation:  (i) direct sequence FDD [UMTS], (2) multi-carrier

---

[25] *Id.* (§ 10.4.1, at 9).  The policy also encourages disclosure of relevant patent rights.  *Id.*

[26] *Id.*

[27] *Id.* (§ 10.4.2, at 10).  Other acceptable assurances, such as that the submitter owns no relevant patent rights or intends to license relevant patent rights for free, are not relevant here.  Prior versions of the ATIS Operating Procedures include the same requirement that the patent holder provide an assurance "[a] license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination."  Ex. 22 (Q2017MDL1_00021503, ATIS Operating Procedures § 10.4.2.1, at 8, Jan. 3, 2006).  ANSI, which accredits ATIS and whose patent policy ATIS has adopted, has included since at least 1997 a requirement that patent holders provide an assurance that a "license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination."  Ex. 23 (QNDCAL01669454, Guidelines for Implementation of the ANSI Patent Policy, Ex. A, § 1.2.11.1, 1997).

[28] Although ATIS was not responsible for developing the CDMA2000 standard, Qualcomm's 1999 licensing commitment refers to it. The licensing commitment also refers to TD-SCDMA, a 3G standard implemented by certain carriers in China.  Ex. 4 (Q2017MDL1_03120703, Qualcomm Response to FTC CID Specification 4, at 17, Aug. 15, 2016).

1
2
3

> FDD [CDMA2000] and (3) TDD [TD-SCDMA] . . . .
> QUALCOMM hereby commits to T1 to license its essential
> patents for such single CDMA standard or any of its modes on a
> fair and reasonable basis free from unfair discrimination.[29]

4        In 2008, with work on LTE specifications ongoing through 3GPP, Qualcomm submitted

5    a number of letters relating to ATIS standards to a variety of ATIS committees, each of which

6    states:

7
8
9
10
11

> This letter sets forth QUALCOMM's licensing
> commitment for the above-referenced contributions.
> QUALCOMM will make a license available, on the basis of
> applicant reciprocity, under reasonable terms and conditions that
> are demonstrably free of any unfair discrimination to applicants
> desiring to utilize the license for the purpose of implementing the
> transposed 3GPP-ATIS Deliverable.[30]

12       In 2012, Qualcomm once again submitted a licensing assurance to ATIS covering "ATIS

13   Input to Rec. Q.1741.8 (3GPP Release 10 Specifications)," an LTE standard.  This assurance

14

15   —————————————

16   [29] Ex. 24 (Q2017MDL1_00009588, Letter from Louis Lupin (SVP, Proprietary Rights Counsel,
17   Qualcomm Inc.) to ATIS re: Intellectual Property Rights on IMT-2000 Radio Transmission
     Technologies, June 25, 1999); *see also* Ex. 20 (ATIS, ATIS Telecom Glossary, Foreword
18   http://www.atis.org/glossary/foreword.aspx (T1 a predecessor organization sunset in 2004)).

19   [30] *See* Ex. 25 (Q2017MDL1_00009586, Letter from Thomas Rouse (VP, Chief Patent Counsel,
     Qualcomm Inc.) to ATIS re: Letter of Assurance on behalf of QUALCOMM Incorporated for ATIS
20   deliverables transposed from 3GPP specifications, Contributions made to Wireless
     Technologies and Systems Committee (WTSC) Committee (sic), July 1, 2008); Ex. 26
21   (Q2017MDL1_00009580, Letter from Thomas Rouse (VP, Chief Patent Counsel, Qualcomm
     Inc.) to ATIS re: Letter of Assurance on behalf of QUALCOMM Incorporated for ATIS
22   deliverables transposed from 3GPP specifications, Contributions made to Emergency Services
     Interconnection Forum (ESIF) Committee, July 1, 2008); Ex. 27 (Q2017MDL1_00009582,
23   Letter from Thomas Rouse (VP, Chief Patent Counsel, Qualcomm Inc.) to ATIS re: Letter of
     Assurance on behalf of QUALCOMM Incorporated for ATIS deliverables transposed from
24   3GPP specifications, Contributions made to Network Performance, Reliability and Quality of
     Service Committee (PRQC), July 1, 2008); Ex. 28 (Q2017MDL1_00009584, Letter from
25   Thomas Rouse (VP, Chief Patent Counsel, Qualcomm Inc.) to ATIS re: Letter of Assurance on
     behalf of QUALCOMM Incorporated for ATIS deliverables transposed from 3GPP
26   specifications, Contributions made to Packet Technologies and Systems Committee (PTSC)
27   Committee (sic), July 1, 2008).
28

9

provided that, with respect to several hundred pages of listed patents granted in a variety of jurisdictions around the world:

> In accordance with Section 10.4 of the ATIS Operating Procedures [Qualcomm] hereby declares . . . An irrevocable license will be made available under reasonable terms and conditions that are demonstrably free of any unfair discrimination, with compensation, to applicants desiring to utilize the license for the purpose of implementing the American National Standard or other ATIS deliverable.[31]

Thus, with inconsequential variations in language, Qualcomm has committed to license SEPs relating to the UMTS and LTE standards "to applicants desiring to utilize the license for the purpose of implementing the American National Standard" on "reasonable terms and conditions that are demonstrably free of any unfair discrimination."[32]

## B. Qualcomm Voluntarily Committed under the TIA IPR Policy to Make Available Licenses to Patents Essential to CDMA Standards

TIA, an ANSI-accredited standards developing organization, adopted the cdmaOne family of standards.[33]  TIA is also the U.S. "Organizational Partner" of 3GPP2, a partnership among SSOs that developed the CDMA2000 standard.[34]  Once 3GPP2 develops a standard, TIA will "transpose" 3GPP2's technical standard into its own standard or "deliverable."[35]

---

[31] Ex. 29 (Q2017MDL2_00006366, Letter from Thomas R. Rouse (VP, QTL Patent Counsel, Qualcomm Inc.) to ATIS, re: Patent Holder Statement on behalf of QUALCOMM Incorporated for ATIS Input to Rec. Q.1741.8 (3GPP Release 10 Specifications), at 2, July 23, 2012).

[32] The letters described here are exemplary.  For a more complete list of Qualcomm's declarations to ATIS, see Exhibit 6 (Q2017MDL1_03120611, Exhibit 4 to Qualcomm's Response to the FTC's Civil Investigative Demand, July 20, 2016) (listing Qualcomm's relevant licensing declarations).

[33] Ex. 30 (Q2017MDL1_00025969, Guidelines to the Intellectual Property Rights Policy of the Telecommunications Industry Association, at 1, March 2005); Ex. 4 (Q2017MDL1_03120703, Qualcomm Response to FTC CID Specification 4, at 4, Aug. 15, 2016).

[34] See Ex. 4 (Q2017MDL1_03120703, Qualcomm Response to FTC CID Specification 4, at 6 & n.5, Aug. 15, 2016); Ex. 31 (3GPP2 Partnership Project Description, at 3, 13, 2002).

[35] *See* Ex. 31 (3GPP2 Partnership Project Description, at 6, 2002) (3GPP2 will develop a 3G standard "to be transposed by standardization bodies (Organizational Partners) into appropriate

Companies that are members of TIA, such as Qualcomm, may participate in 3GPP2 activities, subject to the TIA IPR Policy.[36]  TIA adopted an IPR Policy in 1993 that provided that TIA standards could require the use of patented technologies if:

> Prior to approval of such a proposed TIA Standard . . . TIA shall receive from the patent holder (in a form approved by TIA) either: assurance . . . that the patentee does not hold and does not anticipate holding any invention whose use would be required for compliance with the proposed TIA Standard . . . or assurance that (1) A license will be made available without compensation to applicants desiring to utilize the license for the purpose of implementing the standard, or (2) A license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination.[37]

In accordance with this policy, Qualcomm committed to license SEPs related to 2G CDMA on May 16, 1995.[38]  Qualcomm selected the form commitment that "A license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination."[39]  Qualcomm made further commitments to TIA with respect to IS-95A and IS-95B (2G CDMA standards) in 1998 with inconsequential differences in wording.[40]

---

deliverables (e.g., standards).").

[36] See id. (3GPP2 Partnership Project Description, at 54).

[37] Ex. 32 (Q2017MDL1_0143111, at -112, TIA Advisory Note #11 re TIA Intellectual Property Rights Policy, May 18, 1993).

[38] Ex. 33 (Q2017MDL1_00014883, Submission from Steven R. Altman (VP, General Counsel, Qualcomm Inc.) to TIA re: J-STD-008, May 16, 1995); see also Ex. 34 (Q2017MDL1_00014885, Submission from Steven R. Altman (VP, General Counsel, Qualcomm Inc.) to TIA re: J-STD-009, May, 16, 1995); Ex. 35 (Q2017MDL1_00014887, Submission from Steven R. Altman (VP, General Counsel, Qualcomm Inc.) to TIA re: J-STD-010, May 16, 1995); and Ex. 36 (Q2017MDL1_00014889, Submission from Steven R. Altman (VP, General Counsel, Qualcomm Inc.) to TIA re: J-STD-011, May 16, 1995).

[39] Ex. 33 (Q2017MDL1_00014883, at -884, Submission from Steven R. Altman (VP, General Counsel, Qualcomm Inc.) to TIA re: J-STD-008, May 16, 1995).

[40] Ex. 37 (Q2017MDL1_00013628, Letter from Louis Lupin (SVP, Proprietary Rights Counsel, Qualcomm Inc.) to TIA regarding IS-95A, Sept. 17, 1998) ("QUALCOMM, Inc. hereby declares that it is prepared to make a patent license available to any qualified applicant upon reasonable terms and conditions that are demonstrably free of any unfair discrimination."); Ex. 38

1    The TIA IPR Policy underwent minor revisions in 2001 and 2002, following which

2 approval of a standard including a patented technology required assurance that:

3                A license under any Essential Patent(s) or published
4        pending patent application(s) held by the undersigned company
         will be made available under reasonable terms and conditions that
5        are demonstrably free of any unfair discrimination to applicants
         only and to the extent necessary for the practice of the TIA
6        Publication.[41]

7

8    These changes clarify that the requirement to license on FRAND terms was limited to

9 essential patents, and that licenses may be limited to implementation of the relevant TIA

10 standards, but otherwise do not change the scope of the required license commitments.

11    Qualcomm made FRAND commitments relating to 3G CDMA2000 under the 2002

12 version of the IPR Policy, using the form language quoted above.  For example, in 2004

13 Qualcomm submitted seven declarations relating to various parts of the 3G CDMA2000 standard

14 using this language.[42]

15

---

(Q2017MDL1_00013626, Letter from Louis Lupin (SVP, Proprietary Rights Counsel, Qualcomm Inc.) to TIA regarding IS-95B, July 10, 1998) (same commitment regarding IS-95B). The commitments described here and on the pages that follow are exemplary.  For a more complete list of Qualcomm's commitments to TIA, see Exhibit 6 (Q2017MDL1_03120611, Exhibit 4 to Qualcomm's Response to the FTC's Civil Investigative Demand, July 20, 2016) (listing Qualcomm's relevant licensing declarations).

[41] See Ex. 39 (Q2017MDL1_01473574, TIA Engineering Manual, 3d Ed., at iii and Annex H, July 1, 2002).  Companies could also assert that they did not own relevant SEPs or intended to license SEPs "without compensation."  These alternative assurances are not relevant here.

[42] Ex. 40 (Q2017MDL1_00013644, Letter from Sean English (VP, Legal Counsel, Qualcomm Inc.) to TIA re: Physical Layer for cdma2000 Spread Spectrum Systems, Apr. 1, 2004); *see also* Exs. 41–46, letters from Mr. English to TIA of the same date making the same commitment regarding "Analog Signaling Standard for cdma2000 Spread Spectrum Systems" (Ex. 41, Q2017MDL1_00013656); "cdma2000 High Rate Packet Data Air Interface Specification" (Ex. 42, Q2017MDL1_00013659); "Introduction to cdma2000 Spread Spectrum Systems" (Ex. 43, Q2017MDL1_00013641); "Medium Access Control (MAC) Standard for cdma2000 Spread Spectrum Systems" (Ex. 44, Q2017MDL1_00013647); "Signaling Link Access Control (LAC) Standard for cdma2000 Spread Spectrum Systems" (Ex. 45, Q2017MDL1_00013650); and "Upper Layer (Layer 3) Signaling Standard for cdma2000 Spread Spectrum Systems" (Ex. 46,

1
2
3
4
5
6
7
8

In 2005, TIA again revised its IPR Policy and issued guidelines to assist in the interpretation of the IPR Policy.  The IPR Policy reiterates that "[p]rior to approval of each such proposed Standard [that includes patented technology], TIA shall receive an effective Patent Holder Statement in the form of ANNEX H from any party identified in any manner as a Patent Holder. . . .  Where a party identified as a Patent Holder refuses to furnish a statement in the form of ANNEX H with one of the paragraphs 1, 2a, or 2b checked, the standard should be referred back to the Formulating Group for further consideration."[43]  The relevant language in form ANNEX H 2b provides:

9
10
11
12
13

> A license under any Essential Patent(s), the license rights to which are held by the undersigned Patent Holder, will be made available to all applicants under terms and conditions that are reasonable and non-discriminatory, which may include monetary compensation, and only to the extent necessary for the practice of any or all of the Normative portions of the above Reference Document for the field of use of practice of the Standard.[44]

14
15
16
17
18

This revised language emphasizes that SEPs will be available to "all" applicants, and continues to require non-discriminatory licensing.  It also uses more precise language to describe what documents and portions of the standard must be licensed (specifically, the "Normative" portions, which the manual defines to include mandatory, optional, and alternate elements of the standard).[45]

19
20
21
22

The 2005 guidelines similarly explain that IPR may be included in TIA standards only where it is "available on a reasonable and non-discriminatory basis ***for all that would use it to fashion products contemplated by the standard in question***."[46]  The guidelines further explain

23
24
25
26
27
28

Q2017MDL1_00013653).

[43] Ex. 47 (QNDCAL01532503, TIA Engineering Manual, 4th Ed., § 1.2, at iv, Mar. 2005).

[44] *Id.* (TIA Engineering Manual, 4th Ed., Annex H, at 88).

[45] *Id.* (TIA Engineering Manual, 4th Ed., at x) (providing definitions for the terms "Normative (alternate) elements," "Normative (mandatory) elements," and "Normative (optional) elements.").

[46] Ex. 30 (Q2017MDL1_00025969, Guidelines to the Intellectual Property Rights Policy of the

13

that:

> Requiring reasonable and non-discriminatory (RAND) licenses to all applicants prevents the inclusion of patented technology from resulting in a patent holder securing a monopoly in any market as a result of the standardization process.  Thus, licensing offers which defeat this intention are likely to fail the RAND test and do not comply with the Policy.

> . . .

> ***An example of conduct that would constitute discrimination is a willingness to license all applicants except for competitors of the licensor.*** [47]

Qualcomm submitted a number of declarations to TIA following issuance of these guidelines. For example, in 2008, Qualcomm submitted a declaration to TIA committing to license its CDMA2000 SEPs under the 2005 version of the IPR Policy and guidelines, using the form language from Annex H, option 2b. [48]

Thus, with minor changes in language, Qualcomm has committed to license SEPs relating to the 2G CDMA and 3G CDMA2000 standards to "to {all} applicants under terms and conditions that are reasonable and non-discriminatory" to the extent those patents are "necessary for the practice" of the standard.

## IV.     LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see*

---

Telecommunications Industry Association, at 1, March 2005) (emphasis added).

[47] *Id.* (Guidelines to the Intellectual Property Rights Policy of the Telecommunications Industry Association, at 5) (emphasis added).

[48] Ex. 48 (Q2017MDL1_00013857, Submission by Karyn Vuong (Qualcomm Inc.) to TIA, re: "cdma2000 High Rate Packet Data Air Interface Specification," May 13, 2008); *see also* Ex. 49 (Q2017MDL1_00014193, Submission by Kayla Seignious (Qualcomm Inc.) to TIA re: "cdma2000 Wireless IP Network Standard," June 11, 2010); Ex. 50 (Q2017MDL1_00014461, Submission by Gaye Ostrander (Qualcomm Inc.) to TIA re "cdma2000 Unstructured Supplementary Service Data," Dec. 10, 2012).

1    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658

2    (9th Cir. 2007).  Material facts are those "that might affect the outcome of the suit under the

3    governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Rule 56 allows a

4    court to grant summary judgment on a part of a claim or defense.  *See* Fed. R. Civ. P. 56(a) ("A

5    party may move for summary judgment, identifying each claim or defense—or the part of each

6    claim or defense—on which summary judgment is sought."); *Lies v. Farrell Lines, Inc.*, 641 F.2d

7    765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall

8    short of a final determination, even of a single claim") (internal quotation marks omitted); *see*

9    *also Hariri v. Reliance Standard Life Ins. Co.*, No. 15-CV-03054, 2017 WL 3422029, at *1

10   (N.D. Cal. Aug. 9, 2017) (granting motion for partial summary judgment on a single issue);

11   *Super98, LLC, v. Delta Air Lines, Inc.*, 309 F. Supp. 3d 1368, 1376 n.5 (N.D. Ga. 2018)

12   (granting in part motion for partial summary judgment on issues of contract interpretation and

13   noting that "[w]hile some courts used to prohibit motions for summary judgment on single issues

14   of elements that did not dispose of a claim, the 2010 Amendment to Rule 56 of the Federal Rules

15   of Civil Procedure expressly recognizes partial summary judgment.").  "The standards for partial

16   summary judgment are identical to the standards for summary judgment."  *St. Paul Mercury Ins.*

17   *Co. v. Am. Safety Indem. Co.*, No. 12-CV-05952, 2014 WL 2120347, at *6 (N.D. Cal. May 21,

18   2014) (Koh, J.) (citing *Epiphany, Inc. v. St. Paul Fire & Marine Ins. Co.*, 590 F. Supp. 2d 1244,

19   1250 (N.D. Cal. 2008)).

20         Under California law,[49] the interpretation of an unambiguous contract is a question of

---

[49] It is appropriate for the Court to analyze this question under California law.  Neither ATIS nor
TIA specifies what law governs their IPR Policies, and both organizations issue standards
applicable throughout North America.  In the analogous situation of a federal question action in
which the federal court is "exercising supplemental jurisdiction over state claims, the federal
court applies the choice-of-law rules of the forum state—in this case, California."  *Paracor Fin.*
*Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).  California choice of law
rules provide that, absent an express agreement by the parties, "[a] contract is to be interpreted
according to the law and usage of the place where it is to be performed; or, if it does not indicate
a place of performance, according to the law and usage of the place where it is made."  Cal. Civ.
Code § 1646; *Welles v. Turner Entm't Co.*, 503 F.3d 728, 738 (9th Cir. 2007).  "When the

law.  *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871-72 (9th Cir. 1979).

Summary judgment is therefore appropriate where there is no "genuine issue of material fact as

to [a] contract's proper interpretation . . . ."  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v.

Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).  Whether commitments to SSOs to license

patents on FRAND terms constitute binding contractual commitments is also a matter for

summary judgment.  *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash.

2012).

      Contracts are to be interpreted, if possible, "solely from the written provisions of the

contracts," *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990), and where contractual

language "is clear and explicit, it governs," *Bank of the West v. Superior Court*, 2 Cal. 4th 1254,

1264 (1992).  "Parol evidence is admissible to prove a meaning to which the language of the

instrument is reasonably susceptible."  *St. Paul Mercury Ins.*, 2014 WL 2120347, at *12 (citing

*Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Riggin Co.*, 69 Cal. 2d 33, 37 (1968)).

"However, extrinsic evidence cannot be used to directly contradict an express term of a written

contract."  *Id.* (citing *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 271 (1987)).

---

contract does not specify a place of performance . . . the place of performance is the jurisdiction
in which the circumstances indicate the parties expected or intended the contract to be
performed."  *Welles*, 503 F.3d at 738.  As discussed below, the relevant contracts were formed
by Qualcomm's commitments to the SSOs.  Because Qualcomm is headquartered in California,
California is both the place of performance of the contracts as well as the place where the
contracts were formed.  *See* Cal. Civ. Code § 1583 ("Consent is deemed to be fully
communicated between the parties as soon as the party accepting a proposal has put his
acceptance in the course of transmission to the proposer . . . ."); *Palo Alto Town & Country
Village, Inc. v. BBTC Co.*, 11 Cal. 3d 494, 500-01 (1974) (describing the "effective upon posting
rule").  Federal courts that have interpreted similar contracts with SSOs, in the absence of a
choice of law provision in the SSO's policy, have likewise applied the contract law of the forum
state.  *See Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1033 (W.D. Wash. 2012)
(applying Washington law to analyze contracts with IEEE and ITU); *Apple, Inc. v. Motorola
Mobility, Inc.*, 886 F. Supp. 2d 1061, 1082 (W.D. Wisc. 2012) (applying Wisconsin law to
analyze contract with IEEE).

1
2

## V.    QUALCOMM'S FRAND COMMITMENTS REQUIRE IT, AS A MATTER OF CONTRACT LAW, TO MAKE LICENSES AVAILABLE TO COMPETING CHIP SELLERS

3
4

### A.    Qualcomm's FRAND Commitments Are Binding Contracts

5

Qualcomm's commitments to ATIS and TIA formed binding contracts in which

6

Qualcomm agreed to comply with ATIS's and TIA's FRAND requirements.

7

The Ninth Circuit Court of Appeals, together with other courts, has held that SSOs' IPR

8

policies, in conjunction with patent holders' licensing commitments, create binding contracts

9

between the patent holder and the SSO.  In *Microsoft Corp. v. Motorola, Inc.*, the Ninth Circuit

10

affirmed that "Motorola's RAND declarations to the ITU created a contract." 696 F.3d 872, 884

11

(9th Cir. 2012); *see also Microsoft*, 864 F. Supp. 2d at 1031 ("[A] contract is formed through

12

Motorola's (or any essential patent holder's) commitment to the IEEE or the ITU to license

13

patents on RAND terms."); *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM*

14

*Ericsson*, No. SACV 14-341, 2017 WL 6611635, at *5 (C.D. Cal. Dec. 21, 2017) ("ETSI's

15

acceptance of a patent holder's patent as an SEP forms a contract which includes the patent

16

holder's obligation to license."); *Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998,

17

1006 (N.D. Cal. 2013) ("Similar to the situation in *Motorola*, here, defendants' are contractually

18

obligated under their Letters of Assurance to the IEEE to license . . . on RAND terms . . . .").

19

Courts in other circuits have reached similar conclusions.  *See, e.g.*, *In re Innovatio IP Ventures,*

20

*LLC Patent Litig.*, 956 F. Supp. 2d 925, 933 (N.D. Ill. 2013) ("The parties do not dispute that the

21

letters of Innovatio's predecessors in interest to the IEEE constitute binding contractual

22

commitments to the IEEE and its members."); *Apple*, 886 F.Supp.2d at 1083-84 ("[T]he

23

combination of the policies and bylaws of the standards-setting organizations, Motorola's

24

membership in those organization and Motorola's assurances that it would license its essential

25

patents on fair, reasonable and nondiscriminatory terms constitute contractual agreements.").

26

Qualcomm's commitments to ATIS and TIA thus formed binding contracts to comply with these

27

SSOs' SEP licensing requirements.

28

FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 17-cv-00220-LHK-NMC

The terms of the contract include the SSOs' IPR policies and guidelines and the terms of Qualcomm's commitments to the SSOs. *See TCL Commc'n*, 2017 WL 6611635, at *6 (interpreting Ericsson's contract with ETSI with reference to the ETSI IPR Policy and the ETSI Guide on IPRs); *Microsoft*, 864 F. Supp. 2d at 1032 n.6 ("The parties agree that the operative contract language includes the language of Motorola's statements to the IEEE and the ITU, as well as the relevant language in the IEEE and ITU Policies."); *Innovatio IP Ventures*, 956 F. Supp. 2d at 933 ("[T]he parties agreed that the terms of the RAND commitment by which Innovatio is bound are established by the current IEEE Standards Board Bylaws promulgated in 2007."); *Apple*, 886 F. Supp. 2d at 1083-85 (determining scope of Motorola's contractual obligations to ETSI with reference to ETSI IPR policy).  These contract terms are discussed below.

**B.      The Plain Language of the TIA IPR Policy Requires Qualcomm to Make Licenses Available to Competing Sellers of Modem Chips**

The language of the TIA IPR Policy and accompanying guidelines, along with Qualcomm's licensing commitments under the terms of the IPR Policy, is clear: Qualcomm must make licenses to relevant SEPs available to rival modem-chip sellers.  Because the relevant contract terms are clear, the Court need not consider parol evidence to decide the issue.  *AIU Ins. Co.*, 51 Cal. 3d at 822.

Qualcomm has variously promised to make licenses available to "applicants" and "all applicants" that wish to "practice" TIA standards, without unfair "discrimination."[50]  No language in the TIA IPR Policy suggests the term "applicants" is limited to applicants selling a particular type of product or occupying a particular level of the supply chain.  The Ninth Circuit Court of Appeals addressed similar language in another SSO's IPR Policy, which required a promise to grant licenses to "an unrestricted number of applicants."  *Microsoft*, 696 F.3d at

---

[50] *See supra* § III.

884.[51]  The court explained that "[t]his language admits of no limitations as to who or how many applicants could receive a license."  *Id.*  The same is true here, where Qualcomm promised to make licenses to relevant SEPs available to "applicants" and "all applicants."  Neither formulation admits any limitation on who is eligible to receive a license, if requested.

The language that restricts licenses to those that "practice" the standards also provides no basis to exclude modem-chip sellers.  As discussed above, Qualcomm does not dispute that it owns SEPs that are practiced by modem chips.[52]  And modem chips are the principal component used by a handset to implement cellular standards.

Moreover, the 2005 TIA guidelines explain that technology subject to intellectual property rights may be included in TIA standards only where these rights are "available on a reasonable and non-discriminatory basis *for all that would use it to fashion products contemplated by the standard in question*."[53]  Modem chips are clearly a product contemplated by the standards at issue here, as they are necessary to implement the standards.

Finally, the commitment to license without "unfair discrimination" unambiguously prohibits Qualcomm from selectively choosing not to license its competitors that, like Qualcomm, practice cellular standards via the design and sale of modem chips.  It is clearly discriminatory for Qualcomm to refuse licenses only to its competitors.  Indeed, TIA's published guidelines expressly identify the refusal to license competitors as "[a]n example of conduct that would constitute discrimination."[54]

---

[51] The licensing commitment at issue in *Microsoft* stated: "The Patent Holder will grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary in order to manufacture, use, and/or sell implementations . . . ."  *Microsoft,* 696 F.3d at 876.

[52] *See supra* § II.B.

[53] Ex. 30 (Q2017MDL1_00025969, Guidelines to the Intellectual Property Rights Policy of the Telecommunications Industry Association, at 1, March 2005) (emphasis added).

[54] *Id.* (Guidelines to the TIA IPR Policy, at 5).

FTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 17-cv-00220-LHK-NMC

1
2

### C.   The Plain Language of the ATIS IPR Policy Requires Qualcomm to Make Licenses Available to Competing Sellers of Modem Chips

3        Like the TIA IPR Policy, the ATIS IPR Policy and Qualcomm's accompanying licensing

4   commitments are clear and may be interpreted without reference to parol evidence.  The IPR

5   Policy and Qualcomm's commitments to ATIS to license applicable SEPs in accordance with the

6   terms of the Policy plainly require Qualcomm to make licenses to SEPs available to competing

7   modem-chip sellers.  As with TIA, Qualcomm's commitments apply to "applicants" whose

8   products "implement the standard."[55]  Just as with Qualcomm's sweeping commitments under

9   the TIA policy, there is no limitation on the number or identity of "applicants" eligible to receive

10  licenses.

11       The limitation to applicants that wish to "implement" ATIS standards does not exclude

12  modem-chip sellers.  Qualcomm owns SEPs that are infringed by modem chips, and these chips

13  are sold for the purpose of implementing the standard.[56]  Moreover, the IPR Policy states that it

14  applies whenever "use of the patented invention is required for purposes of adopting, complying

15  with, or otherwise utilizing the standard, guideline, or other ATIS deliverable."[57]  This broad

16  language makes clear that patent declarations under the IPR Policy are intended to facilitate any

17  form of "utilizing" the standard, which a modem chip implementing standardized cellular

18  functionality clearly does.

19       Finally, as under the TIA IPR Policy, Qualcomm has promised under the ATIS IPR

20  Policy not to discriminate in its licensing of SEPs.  These commitments do not allow Qualcomm

21  to withhold licenses from competitors that implement the standard.

22
23
24
25

26  [55] *See supra* § III.A.

27  [56] *See supra* § II.B.

28  [57] Ex. 2 (Q2017MDL1_0024028, ATIS Operating Procedures § 10.4.1, Mar. 1, 2015).

1

## VI.        CONCLUSION

2

Over the past two decades, Qualcomm has repeatedly promised to make licenses to its

3

cellular SEPs available to "applicants" on FRAND terms.  Yet during that time, Qualcomm has

4

refused to license its competitors, even when they have asked for a license.  The Court should

5

grant partial summary judgment that Qualcomm's simple, clear promises to ATIS and TIA

6

require Qualcomm to make licenses on FRAND terms available to competing modem-chip

7

sellers whose products implement or practice the relevant standards; the Court should do so both

8

to resolve a purely legal question and to streamline the trial in this matter.

9

10                                                      Respectfully submitted,

11

12                                                       _/s/ Jennifer Milici_

13     Dated: August 30, 2018                 JENNIFER MILICI
                                              JOSEPH R. BAKER
14                                            GEOFFREY M. GREEN
                                              NATHANIEL HOPKIN
15                                            RAJESH S. JAMES
                                              PHILIP J. KEHL
16                                            DANIEL MATHESON
                                              KENNETH H. MERBER
17                                            MARK J. WOODWARD

18
                                              Bureau of Competition
19

20                                            *Attorneys for Plaintiff Federal Trade*
                                              *Commission*
21

22

23

24

25

26

27

28