# EXHIBIT 1

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2               FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
 4   FEDERAL TRADE COMMISSION, )
 5             Plaintiff,      )
 6   vs.                       ) Case No.
 7   QUALCOMM, INCORPORATED,   ) 5:17-cv-0220-LHK-NMC
 8             Defendant.      )
 9   -------------------------)
10
11                            Thursday, August 16, 2018
12
13                            825 Eighth Avenue
14                            New York, New York
15
16   The above-entitled matter came on for the deposition of
17   BENEDICTE FAUVARQUE-COSSON, pursuant to notice, at 9:03
18   a.m.
19
20
21
22
23
24
25
```

2

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1   APPEARANCES:

 2

 3          ON BEHALF OF THE PLAINTIFF:

 4            DAN MATHESON, ESQ.

 5            Federal Trade Commission

 6            400 7th Street, SW

 7            Washington, D.C.  20024

 8            (202) 326-2075

 9            dmatheson@ftc.gov

10

11          ON BEHALF OF THE DEFENDANT AND WITNESS:

12            WES EARNHARDT, ESQ.

13            JONATHAN MOONEY, ESQ.

14            JAMES CANNING, ESQ.

15            Cravath, Swaine & Moore, LLP

16            825 Eighth Avenue

17            New York, New York 10019

18            (212) 474-1296

19            wearnhardt@cravath.com

20

21

22   Also Present:

23          Rocco Mercurio - Videographer

24          Daniel Sherr - French interpreter

25
```

3

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

```
 1                        I N D E X

 2    WITNESS:                              EXAMINATION:

 3    BENEDICTE FAUVARQUE-COSSON            4

 4          BY MR. MATHESON

 5

 6    EXHIBITS REFERENCED                   PAGE

 7    Exhibit CX0057                        5

 8    Exhibit CX7552                        114

 9    Exhibit CX57013                       147

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1                  P R O C E E D I N G S

2                       - - - - -

3           THE VIDEOGRAPHER:  We are now going on the

4    record.  My name is Rocco Mercurio, your videographer.

5    Today is August 16, 2018 and the time is approximately

6    9:03.  We are located at 825 8th Avenue, New York, New

7    York.  This is disk one of the deposition of Professor

8    Fauvarque-Cosson, case entitled Federal Trade

9    Commission versus Qualcomm Incorporated, filed in the

10   United States Northern District of California, San Jose

11   Division, case number 5:17-CV-00220.

12          Will counsel please introduce themselves and

13   who they represent for the record.

14          MR. MATHESON:  Dan Matheson for the Federal

15   Trade Commission.

16          MR. EARNHARDT:  Wes Earnhardt on behalf of

17   Qualcomm.

18          MR. MOONEY:  Jonathan Mooney on behalf of

19   Qualcomm.

20          MR. CANNING:  James Canning on behalf of

21   Qualcomm.

22          THE VIDEOGRAPHER:  The court reporter, Stefanie

23   Krut, will now swear in the witness and then we can

24   proceed.

25   B E N E D I C T E   F A U V A R Q U E - C O S S O N,

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1    having first been duly sworn by a Notary Public of the

2    State of New York, was examined and testified as

3    follows:

4    EXAMINATION BY

5    MR. MATHESON:

6         Q.  Good morning.  Could you state your name for

7    the record, please.

8         A.  Yes.  My name is Benedicte Fauvarque-Cosson.

9         Q.  And you're a professor?

10        A.  Yes, I am.

11        Q.  What's the appropriate honorific?  Is it

12   professor, is it doctor, how do you prefer to be

13   addressed?

14        A.  Well, professor is much better.

15        Q.  Okay.

16        A.  Because you have many doctors and not many

17   professors.

18        Q.  Okay.  And you've prepared an expert report in

19   this matter.  Correct?

20        A.  Correct.

21        Q.  And I'll hand you a document that we pre-marked

22   CX-0057.

23             (Exhibit CX-0057 was marked for the record.)

24        Q.  Is this a copy of the expert report you

25   prepared in this matter?

6

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1        A.  Yes, it is.

2        Q.  And this report discloses all of the opinions

3    that you have reached in this matter; is that correct?

4        A.  This is correct.

5        Q.  Your report states on page 2, quote, "attached

6    as Exhibit-2 is a list of materials I have relied upon

7    in forming the opinions expressed in this report."

8            Prior to signing -- well, strike that.

9            Do you see Exhibit-2 at CX-0057-037?

10       A.  Yes.  I have it.

11       Q.  So prior to the time you signed this report,

12   did you review any deposition transcripts taken in this

13   matter that are not listed on Exhibit-2?

14       A.  No, I did not review deposition transcripts.

15       Q.  Prior to the date you signed this report, did

16   you personally review any documents produced in this

17   matter that are not listed in Exhibit-2?

18       A.  I do not remember having reviewed any other

19   documents than the one listed here for this report.

20       Q.  Prior to signing this report, did you review

21   any other expert reports produced in this matter other

22   than the ones listed in Exhibit-2?

23       A.  For this report, I did not review other expert

24   reports.

25       Q.  Prior to signing this report, did you conduct

7

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    any interviews relevant to this matter that are not
2    listed in Exhibit-2?
3         A.  No.  I did not conduct any interviews.
4         Q.  Prior -- that are relevant to your opinions in
5    this matter?
6              MR. EARNHARDT:  Well, objection.  What do you
7    mean by interviews?
8         A.  Yes, that's -- that's what I was asking myself.
9    What do you mean by interviews?
10        Q.  Do you have an understanding what the word
11   interview means?
12        A.  For me it's going to the TV and speaking
13   publicly or speaking to a newspaper, something which
14   goes beyond the confidentiality so I would never --
15             THE REPORTER:  Beyond the?
16        A.  -- confidentiality of what was requested, so I
17   would not have conducted an interview.
18        Q.  Did you have any conversations with individuals
19   prior to signing this report that are relevant to the
20   opinions you expressed in this report?
21        A.  This is a different question.  Yes, I did.
22        Q.  With whom did you have conversations relevant
23   to the opinions you expressed in this report prior to
24   the date you signed this report?
25        A.  I had conversation with the lawyers of --

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1   Qualcomm lawyers and I also I had conversations with

2   Professor Alain Benabent.

3        Q.  I'm sorry.  Can you spell that please?

4        A.  B-E-N-A-B-E-N-T.  B-E-N-A-B-E-N-T.

5        Q.  Apart from attorneys employed by Qualcomm and

6   Professor Benabent, did you have any conversations with

7   any other individuals that are relevant to the opinions

8   you express in this report?

9        A.  No, I did not.

10       Q.  Who is Professor Benabent?

11       A.  Professor Benabent well, he used to be a

12  professor of law.  Now he's a avocat a la cour de

13  cassation et conseil d'etat.

14           THE REPORTER:  A what?

15       A.  Now he's a lawyer, avocat, from the Supreme

16  Courts and then I have worked with him previously.  And

17  he is a very well known and famous specialist of the

18  law for obligation and that's it.

19       Q.  The law of obligation, is that a term of art?

20       A.  Yes, it is.

21       Q.  What is meant by the law of obligation?

22       A.  Obligations may come from a contract, so

23  contract law.  Obligations may come from an act and

24  then it's the law of torts.  So what we mean in France

25  by the law of obligation is both contract and tort.

9

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.  What did you discuss with Professor Benabent
2  that is relevant to the opinions you express in this
3  matter?
4      A.  Not very much, though but, we had been working
5  together more than 10 years ago on the matters for
6  Qualcomm already, so we discussed the evolution in
7  French law since then because there has been a reform
8  and whether or not this have implied changes.
9      Q.  What -- well, strike that.
10         When was the first time you performed work for
11  Qualcomm?
12     A.  If my memory is good I think it was 2006.
13     Q.  And was Professor Benabent involved at that
14  time?
15     A.  Yes, he was.
16     Q.  What was the issue on which you performed work
17  for Qualcomm in 2006?
18     A.  The main issue was about the concept of a
19  accord de principe, and agreement to enter into a
20  contract.  And the question, the main question was
21  whether there was an -- or not there was an automatic
22  license due to the FRAND commitment.  And our position
23  was that there was not an automatic license, there was
24  no license contract.  And one of the reasons why was
25  that the important elements such as due process had not

10

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                              8/16/2018

1    been decided.  So the FRAND commitment was not

2    equivalent to a license contract.  That was the main

3    issue in 2006.

4        Q.  So is it fair to state that in 2006,

5    implementers of standards promulgated by ETSI claimed

6    that Qualcomm's FRAND commitment gave them an automatic

7    license to Qualcomm's intellectual property?

8        A.  I don't remember well enough.  I wasn't -- I'm

9    not sure whether they claim this or not.  What we

10   wanted to show is that under French law, that could not

11   be an automatic license.

12       Q.  Was there a specific litigation that your work

13   related to?

14       A.  Yes, there was.

15       Q.  Which one was that?

16       A.  I don't remember.

17       Q.  What was the outcome of your work?  Did you

18   provide testimony, did you prepare an expert report?

19   What happened?

20       A.  Yes.  I provided an expert report, yes, and I

21   was deposed also.

22       Q.  And what was the venue, where did this take

23   place, the deposition?

24       A.  In New York.

25       Q.  Was it a litigation in United States courts?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      A.  Yes, it was.  I suppose so.  Now it's quite a
2  while ago.
3      Q.  Did it involve the International Trade
4  Commission?
5      A.  I can't remember.
6      Q.  Did it involve Broadcom?
7      A.  Who?
8      Q.  Broadcom?
9      A.  I don't remember.
10      Q.  Okay.  What did you ask?
11      A.  No.  Now I remember.  It involved Nokia.
12      Q.  Nokia in 2006?
13      A.  Yes.
14      Q.  So this was the Nokia 2006 litigation?
15      A.  Yes.
16      Q.  Okay.  Did Professor Benabent provide a
17  deposition in that action as well?
18      A.  We wrote a report together.  Then he was
19  deposed in Paris and later I was deposed here in New
20  York.
21      Q.  What did you ask Professor Benabent in your
22  recent discussions that relate to the opinions you
23  express in the report you've produced in this matter?
24      A.  Well, not very much.  So far as I remember,
25  we -- we discussed the reform, the French law reform,

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    and I've only had one or two conversations with him on

2    this report and on this matter, and not very

3    substantial because, to tell you the truth, he doesn't

4    speak English so it's not that obvious I need to

5    translate all the time into French and then put it back

6    into English.  And in 2006, everything was translated

7    from English to French and French to English, but this

8    time nothing was translated.

9        Q.  What is the reform of French law that you're

10   referring to?

11       A.  It's a reform which takes place within the

12   French CV code.  The French CV code dates from 1804 and

13   it's a very important reform of the law of obligations.

14   But so far, only the part on the law of contracts has

15   been accomplished and the reform of law tort is still

16   pending.  And this reform has been done in 2016 by way

17   of a decree by the Ministry of Justice.  And it has

18   been slightly modified but very slightly by law in

19   2018.  It's a very important reform in France because

20   all these texts went back to 1804 and for the first

21   time really there has been a major change of the good

22   CV.  But as we got substance, the reform is not a

23   revolution, it doesn't change drastically the law of

24   contracts.  It's rather recodification of French law

25   and a French case law that have evolved since 1804.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.  In your discussions with Professor Benabent,
2   did he express the view that the 2016 reform was
3   relevant to the issues you address in your expert
4   report in this matter?
5      A.  This is an odd question because obviously the
6   2016 reform is relevant.  Every contract lawyer in
7   France keeps his eye on this reform.  It's the major
8   event in France in law since 1804.
9      Q.  Did -- strike that.
10         What did you tell Professor Benabent was the
11  issue you were asked to address in this report?
12     A.  Well, there was two issues:  Interpretation of
13  contract and stipulation on behalf of third parties.
14     Q.  Did he express the view to you that the 2016
15  reform changed in any way the analysis you express
16  regarding the interpretation of contract?
17     A.  No.
18     Q.  Did he express to you the view that the 2016
19  reform had no effect on the view you expressed in the
20  interpretation of contract?
21     A.  Can you repeat this question?
22     Q.  What I'm trying to get at is:  Would -- did he
23  express to you the view that the opinion you should
24  reach on interpretation of a contract should be exactly
25  the same, regardless of whether the 2016 reform had

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1   been passed by the Ministry of Justice?

2        A.   It's been much more shorter than that.  He

3   just -- to tell you the truth, I don't really remember

4   our conversation on the interpretation of contract.  He

5   has his book and there is a new edition of his book

6   with the French contract law reform.  And I have quoted

7   his book and I think all he did -- but he didn't really

8   need to do it because I could have done it by myself is

9   point out the relevant paragraph in his book, which I

10  have quoted in his -- in my reports.

11       Q.   And where in your report does that appear?

12       A.   On page 7.  And it was -- as we got the role of

13  industry practice, I have quoted two important books.

14  One is an introduction, general introduction from

15  Pascale Deumier, and then at the bottom of Page 7, I

16  quote him.

17       Q.   What did you tell Professor Benabent was the

18  industry practice relevant to your opinions in this

19  matter?

20       MR. EARNHARDT:  Object to the form.

21       A.   Could you say that again, please?

22       Q.   Did you tell Professor Benabent any facts

23  regarding industry practice that -- during the course

24  of your discussions with him?

25       A.   We did not discuss the facts.  He did have some

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    knowledge of the facts of -- because he had been
2    involved previously.  So regarding industry practice, I
3    don't think we -- we discussed much.  And I -- when I
4    quote his book, that's -- you have here everything that
5    we discussed, it's in this paragraph here.
6        Q.  Prior to signing this report, did you review
7    any documents relevant to the intellectual property
8    rights policies of any standards setting organizations
9    that are not listed in Exhibit-2?
10       A.  I will return to Exhibit-2 to check.  You mean
11   other than ETSI?  I reviewed the ETSI Intellectual
12   Property Rights Policy, particularly annex 6.
13       Q.  It's fair to state you did not review, prior to
14   signing this report, the intellectual property rights
15   policies of any standards setting organization other
16   than ETSI.  Right?
17       A.  Yes, it is fair to state that.
18       Q.  Prior to signing this report, did you have
19   independent knowledge of the intellectual property
20   rights policies of any standards setting organization
21   other than ETSI?
22       A.  No, I did not.
23       Q.  Did you ask to see any documents prior to
24   signing this report that you were unable to review for
25   some reason?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1      A.  No, I did not.

2      Q.  Were there any discussions you would like to

3  have had in order to understand the opinions you

4  express in this report that you were unable to have?

5      A.  I'm not sure what -- discussions with -- with

6  whom, with Qualcomm's lawyers you mean or?

7      Q.  Is there anyone who you would have liked to

8  speak with prior to expressing the opinions in this

9  report that you were unable to speak with?

10      A.  No.  I don't think so, no.

11      Q.  Since the time you have signed this report,

12  have you reviewed any deposition transcripts?

13      A.  I have not.

14      Q.  Since you signed this report, have you reviewed

15  any expert reports relevant to this matter?

16      A.  No, I have not.

17      Q.  Since you signed this report, have you had any

18  discussions with anyone other than Qualcomm attorneys

19  relevant to this matter?

20      A.  No, I have not.

21      Q.  Since you signed this report, have you reached

22  any opinions relevant to this matter that are not

23  expressed in the report?

24      A.  No, I have not.

25      Q.  Have you also provided a report in connection

17

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    with Qualcomm's litigation against any other parties in
2    the last two years, other than the FTC that is?
3        A.   Yes, I have.
4        Q.   Which litigations?
5        A.   Qualcomm against Apple.
6        Q.   Where did that litigation take place?
7        A.   It takes place in the United States.
8        Q.   Is that the litigation that's currently ongoing
9    between Qualcomm and Apple in the United States?
10       A.   Yes, it is.
11       Q.   Did you provide an expert report in that
12   matter?
13       A.   Yes, I did.
14       Q.   What materials did you review in connection
15   with the expert report you provided in the Apple
16   litigation that are not listed in Exhibit-2?
17            MR. EARNHARDT:   Dan, that's an -- that's an --
18   this -- this deposition isn't going to be about the
19   Apple case.   I'm -- she can not answer that question.
20       A.   And actually I don't remember all of it,
21   everything, but no, I can't answer.
22       Q.   When you say you can't answer, is that because
23   you don't recall any materials that you reviewed in
24   connection with the Apple case that are not listed in
25   Exhibit-2?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1       A.   Partly, yes.  And partly because it's not a

2   question on Apple case.

3       Q.   Well, I'd like to understand which one it is,

4   if that's okay.  So sitting here today, do you recall

5   reviewing any deposition transcripts in connection with

6   the opinion you offered in the Apple matter that are

7   not listed in Exhibit-2 to your report?

8       A.   Deposition transcripts, I don't recall that.

9       Q.   Sitting here today, do you recall reviewing any

10  documents relevant to your opinions in the Apple matter

11  that you do not disclose in Exhibit-2 to your report in

12  this matter?

13      MR. EARNHARDT:  Just let me object to that

14  question.  It's a completely inappropriate question.

15  It's irrelevant to this case, it's irrelevant to this

16  report, and she -- and you can answer if you remember,

17  but I -- I -- I highly object to this line of

18  questioning.

19      A.   But actually now sitting here this morning, I

20  must say I don't remember.

21      Q.   Sitting here this morning, do you recall

22  conducting any discussions with anyone other than

23  Qualcomm attorneys relevant to the opinions you express

24  in the Apple matter that are not listed in Exhibit-2 to

25  this report, in this matter?

19

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1        A.   May I ask you to repeat the question?

2        Q.   Sitting here today, do you recall having --

3    having any discussions with any individuals other than

4    Qualcomm attorneys that you relied on for your opinions

5    in the Apple matter that are not disclosed in Exhibit-2

6    to the report you offered in this matter?

7             MR. EARNHARDT:  Object to the form.

8        A.   I'm -- I don't recall discussions.

9        Q.   You can't recall one way or the other or you

10   don't recall -- well, strike that.

11            Is the answer to the question no, you didn't

12   have any or you cannot recall one way or the other

13   whether you had discussions relevant to the opinions

14   you express in the Apple matter that are not contained

15   in Exhibit-2 to the report you submitted in this

16   matter?

17            MR. EARNHARDT:  Object -- object to the form.

18   Someone can ask that in the Apple deposition.

19       A.   I'm -- I usually don't discuss the work I'm

20   doing and I think it's confidential, so I shouldn't be

21   discussing it.  There is only Professor Benabent with

22   whom I was authorized to have some discussions, but as

23   I said before, since everything is in English, it's not

24   very easy and convenient and I don't recall specific

25   discussions.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                         8/16/2018

1      Q.   So you don't recall one way or the other if
2   there are any materials relevant to the opinions you
3   express in the Apple case that are not listed in
4   Exhibit-2 to your report in this matter.  Is that fair?
5      A.   That is fair.
6      Q.   On page 2 of your report, I'm looking under
7   Arabic numeral three, the second sentence.  Is it fair
8   to state that your opinions in this matter are limited
9   to the nature of the obligations created when a patent
10  holder makes a FRAND commitment to ETSI?
11     A.   Yes.  That is what I have written and it's fair
12  to state this.
13     Q.   So you aren't offering any opinion about any
14  obligations created when a patent holder makes a
15  commitment to a standards setting organization other
16  than ETSI.  Right?
17     A.   This is correct.
18     Q.   Your report states on page 2 again, quote, the
19  FTC takes the position that ETSI FRAND commitments
20  create an obligation to grant licenses to the
21  manufacturers of baseband processors, i.e.  to granted
22  licenses at the component level.  Do you see that?
23     A.   Yes, I do see that.
24     Q.   And you cite paragraph 3C of the FTC's
25  complaints against Qualcomm for that proposition.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1    Right?

 2         A.   Right.

 3         Q.   Paragraph 3C of the FTC's complaint against

 4    Qualcomm doesn't say anything about ETSI, does it?

 5         A.   I do not recall that.

 6         Q.   Have you reviewed the FTC's complaint against

 7    Qualcomm?

 8         A.   I don't remember.

 9         Q.   We don't need to introduce this as a --

10         A.   Thank you.

11         Q.   -- exhibit.  Have you ever seen this document

12    before?

13         A.   I don't remember it.

14         Q.   You can't recall one way or the other?  I'll

15    represent this is a redacted version of the FTC's

16    complaint against Qualcomm with the confidential

17    information redacted, but everything else is there.

18         A.   I can't recall.

19         Q.   Can you -- can you identify paragraph 3C of

20    this document?

21         A.   Three C, yes.

22         Q.   That paragraph doesn't say anything about ETSI,

23    does it?

24         A.   Well, it mentions Qualcomm's FRAND commitments

25    doesn't it?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                              8/16/2018

1       Q.   Commitments is plural, correct?

2       A.   Correct.

3       Q.   That paragraph does not mention ETSI

4   specifically, does it?

5       A.   But I've only given an opinion on ETSI's and I

6   haven't reviewed all those standard organization IPR

7   policy.  For me, when Qualcomm's FRAND commitments is

8   mentioned, this is linked to ETSI.

9       Q.   What is the telecommunications industry

10  association?

11      A.   The telecommunication industry association?

12  Well, I -- I don't know.

13      Q.   What is the Alliance for Telecommunications

14  Industry Solutions?

15      A.   I don't know.

16      Q.   What is the Third Generation Partnership

17  Projects?

18      A.   That I've heard about.  I'm not too sure.

19      Q.   Does the Third Generation Partnership Project

20  impose a FRAND obligation on any participants in the

21  Third Generation Partnership Project?

22           MR. EARNHARDT:  Object to the form, outside of

23  her expertise.

24      A.   I do not know.

25      Q.   Does the Alliance for Telecommunications

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1    Industry Solutions impose a FRAND commitments on

2    Qualcomm?

3        A.  Again, as I told you, I haven't reviewed any of

4    these policies and I do not know.

5        Q.  You don't know one way or the other?

6        A.  One way or the other, I don't know.

7        Q.  You don't know one way or the other whether

8    Qualcomm made a FRAND commitment to the

9    Telecommunications Industry Association.  Fair?

10       A.  I do not -- I have been asked to give an

11   opinion on the FRAND commitment as began ETSI.

12       Q.  So it's fair to state that you do not know one

13   way or the other whether Qualcomm made a FRAND

14   commitment to the Telecommunications Industry

15   Association.  Right?

16       A.  It is fair to -- to -- to say this because I do

17   not know what kind of other commitments Qualcomm may

18   have made.

19       Q.  So on page 3 of your report, CX-0057-005, you

20   state under Arabic IV, quote, as mentioned above,

21   Qualcomm's FRAND commitments are governed by the ETSI

22   IPR policy.

23           Do you see that portion?

24       A.  Yes, I do.

25       Q.  Now, the only FRAND commitment you're referring

24

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1    to in that sentence is Qualcomm's FRAND commitment to
2    ETSI.  Right?
3         A.  This is how I have understood what I'm -- I'm
4    writing.  It's only to ETSI.
5         Q.  So you are not expressing the view, in your
6    expert report, that Qualcomm's FRAND commitments to the
7    Telecommunications Industry Association are governed by
8    the ETSI IPR policy.  Right?
9         A.  Sorry, can you repeat the question?
10        Q.  You are not expressing in your report the
11   expert opinion that Qualcomm's FRAND commitments to the
12   Telecommunications Industry Association are governed by
13   the ETSI IPR policy.  Right?
14        A.  This is correct.  It's only related to ETSI.
15        Q.  And you're not expressing the expert opinion
16   that Qualcomm's FRAND commitments to the Alliance for
17   Telecommunications Industry Solutions is governed by
18   the ETSI IPR policy.  Right?
19        A.  This is right also.
20        Q.  You're not expressing the expert opinion that
21   the ETSI IPR policy is in any way relevant to
22   Qualcomm's FRAND commitments to the Alliance for
23   Telecommunications Industry Solutions.  Fair?
24        A.  It depends on what you mean by "in any way
25   relevant".

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.   Have you reached the view that Qualcomm's FRAND
2   commitment to ETSI is relevant to Qualcomm's FRAND
3   commitment to the Alliance for Telecommunications
4   Industry Solutions?
5      A.   No.   I have not reached this view.   But the
6   interpretation that is given of the words of the ETSI
7   IPR policy is given on the basis of the words of the
8   ETSI IPR policy.   If the words are exactly the same in
9   a different context, I will give the same
10  interpretation.   But I have not reached any such view
11  because as I told you before, I've only reviewed the
12  ETSI IPR policy and I am not familiar, in fact, I have
13  never seen the other -- the other IPR policies.
14     Q.   So you have not reached the view in this matter
15  that the ETSI IPR policy is relevant to any commitment
16  Qualcomm has made to anyone except for ETSI.   Is that
17  fair?
18     A.   This is what I was telling you but I was also
19  telling you that the interpretation of the word that I
20  have made is standing on its own because of the words
21  of ETSI.
22     Q.   So in your view, the ETSI IPR policy might be
23  relevant to a commitment Qualcomm made if the words
24  used in the commitment Qualcomm made are exactly the
25  same as the words used in the ETSI IPR commitment.   Is

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1   that fair?

2       A.  I wouldn't say it because I haven't any idea of

3   the other IPR policy.  I could not exclude it, but I

4   couldn't say that it is.  I have not been asked to give

5   an opinion on this.

6       Q.  On page 3, the next sentence after the sentence

7   we discussed in Arabic IV reads, quote, as such,

8   Qualcomm's FRAND commitments and any claims arising out

9   of an alleged breach of those commitments are governed

10  by French law.

11          Do you see that sentence?

12      A.  I do.

13      Q.  What does Qualcomm's FRAND commitments in that

14  sentence refer to?

15      A.  In that sense, Qualcomm's FRAND commitments

16  refers to clause 6.1 of annex 6 of the IPR policy.

17      Q.  And as used in that sentence, quote, Qualcomm's

18  FRAND commitments, end quote, does not refer to any

19  other FRAND commitment Qualcomm has made to any entity

20  other than ETSI.  Fair?

21      A.  I think I have answered this question already.

22  Yes, it is fair to say this.

23      Q.  When you state, quote, any claims arising out

24  of an alleged breach of those commitments, what --

25  strike that.

27

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

 1          When that sentence states, quote, any claims
 2    arising out of an alleged breach of those commitments,
 3    end quote.  What claims other than claims in contract
 4    law are you referring to in that sentence?
 5          A.  I will put the question a bit differently.  I
 6    am referring to claims which arise from the FRAND
 7    commitment.  And in order to say what claims are -- I
 8    am referring to here, we have to discuss the analysis
 9    under French law of the nature of the French
10    commitment.
11          Q.  What claims are you referring to there?
12          A.  I am referring to the claims that may arise out
13    of what we call in French law stipulation pour autrui,
14    stipulation for the benefit of third parties.
15          Q.  When you say in this sentence, "any claims
16    arising out of an alleged breach of those commitments",
17    are you referring only to claims brought by alleged
18    third party beneficiaries of Qualcomm's FRAND
19    commitment?
20          A.  I have given an opinion in the context when
21    there was litigation with third party beneficiaries.
22    So I was referring to this context.  And in that
23    context, the claims arising out of an alleged breach of
24    the commitments are indeed the claims of third party
25    beneficiaries.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.  So your opinion that claims arising out of an
2  alleged breach of Qualcomm's FRAND commitments to ETSI
3  are governed by French law, is limited to claims
4  arising in the context of litigation brought by alleged
5  third party beneficiaries.  Is that fair?
6      A.  No.
7          MR. EARNHARDT:  Object to the form.
8      A.  I think that was a misunderstanding here.  What
9  is governed by French law is clearly said in clause 12
10  of annex 6 of the IPR policy.  It is also reminded in
11  the -- the annex on the declaration forms which also
12  refer to French law.  So I'm not restricting the scope
13  of French law to something which would be more limited.
14      Q.  Maybe this is an easy way to go about it.
15          In this sense when you say claims arising out
16  of an alleged breach of Qualcomm's FRAND commitments to
17  ETSI, you're not addressing antitrust claims brought
18  under U.S. law.  Right?
19      A.  I have not been asked to give an opinion on
20  anti -- antitrust law.
21      Q.  You're not addressing unfair competition claims
22  brought under any United States unfair competition law.
23  Right?
24      A.  No.  This is not the scope of my expertise.
25  I'm a contract lawyer.

29

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.   You're not addressing claims for tortious
2  interference with prospective economic advantage
3  brought under United States law.  Right?
4      A.   Tortious interference with what?
5      Q.   Prospective economic advantage?
6      A.   No, I'm not addressing this.
7      Q.   So you are not suggesting that an antitrust
8  claim based on Qualcomm's alleged breach of a FRAND
9  commitment made to ETSI is governed by French law.
10  Right?
11          MR. EARNHARDT:  Object to the form.
12      A.   I have not been asked to give an opinion on
13  this.
14      Q.   You're not suggesting that any unfair
15  competition lawsuit based on Qualcomm's alleged breach
16  of a FRAND commitment made to ETSI is governed by
17  French law.  Right?
18      A.   My answer is the same again.  I did not reflect
19  on this because I haven't been asked and I'm not an
20  antitrust lawyer so I would not give an opinion on
21  that.
22      Q.   So it's fair that the interpretation of the
23  commitment that Qualcomm made to ETSI should, in your
24  view, be interpreted according to the principles of
25  French law, right?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1       A.   Could I have the clause 12 which I mentioned?
 2   I think what we need to do is stick to the wording of
 3   the ETSI IPR policy and say exactly the same thing as
 4   what is said about the scope of French law.
 5       Q.   I will hand you a documents we've marked
 6   CX-7552-001.  I believe this attaches -- it attaches
 7   what we believe to be an accurate copy of the ETSI IPR
 8   policy as of November 2011.
 9            Please take whatever time you need to satisfy
10   yourself this is accurate as far as you can tell.
11       A.   So I think we can stick to the meaning of the
12   clause 12, the policy shall be governed by the laws of
13   France.
14       Q.   And this language appears at CX-7552-007 under
15   the Arabic numeral 12.  Is that right?
16       A.   This language appears here (indicating).
17       Q.   You are looking at Page CX-7552-007, right?
18       A.   Okay, okay.  Yes.
19       Q.   Okay.  So you do not interpret that language to
20   mean that any antitrust claims based on Qualcomm's
21   alleged breach of this policy are governed by the laws
22   of France.  Fair?
23       A.   As I said before, I haven't reflected upon
24   this.  What I -- my opinion is that French law governs
25   the stipulation for the benefit of third parties.  When

Fauvarque-Cosson
FTC v. Qualcomm, Inc.                                          8/16/2018

 1    you are asking me whether it goes beyond to antitrust
 2    -- and antitrust claims and that, I would need more
 3    time to reflect upon that.
 4        Q.   That's not an analysis you have conducted in
 5    connection with the opinions you express in your report
 6    in this matter.  Fair?
 7        A.   That is not an analysis I have conducted, fair.
 8        Q.   Do you have expertise in American antitrust
 9    law?
10        A.   I have no expertise in American antitrust law.
11        Q.   Do you have expertise in American intellectual
12    property law?
13        A.   No expertise in American IPR law.
14        Q.   Do you have expertise in how American courts
15    apply choice of law principles?
16        A.   Not much.  When I wrote my -- a long time ago
17    my thesis I did have a look at this question, but that
18    was more than 20 years ago.  So I wouldn't say it's an
19    expertise which is still valid.
20        Q.   And it's fair to state that in this matter, you
21    did not conduct an analysis of the body of law an
22    American court would apply to an antitrust claim based
23    on an alleged breach of ETSI's IPR policy.  Right?
24        A.   I'm sorry can you repeat?  But I think I know
25    the answer, but to make sure.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.   Sure.   It's fair to state that in this matter,
2   you did not conduct an analysis of the body of law that
3   an American court would apply to an antitrust claim
4   based on an alleged breach of ETSI's IPR policy?
5      A.   Yes, it's fair.
6      Q.   Now you have not, in your report, cited any
7   authority supporting the proposition that a United
8   States court would apply French law when interpreting
9   the ETSI IPR policy.   Is that fair?
10      A.   This is fair.
11      Q.   You have not cited in your report any authority
12   supporting the proposition that a Japanese court
13   sitting in Japan would apply French law to an
14   allegation that Qualcomm had breached the ETSI IPR
15   policy.   Is that fair?
16      A.   Yes.   And I haven't said that a Chinese court
17   will apply French law.   What I have said is that you
18   have in the ETSI rules of procedure a very clear
19   provision which says that the policy shall be governed
20   by the laws of France.   Now, if a foreign judge wants
21   to apply another law, that's his problem, but the
22   policy says that it shall be governed by the laws of
23   France.
24      Q.   When you say that that's the foreign judge's
25   problem, do you mean that a foreign judge -- strike

33

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    that.

2          When you say that's the foreign judge's

3    problem, you have not conducted an analysis of which

4    countries might apply a law other than the law of

5    France to a claim based on an alleged breach of ETSI I

6    -- ETSI's IPR policy.  Right?

7      A.   I have not conducted such an analysis.  I have

8    not been asked to do it and it's not relevant to my

9    opinion.

10     Q.   Taking a look at page one of your report, which

11   is CX-0057-003.  There is a sentence immediately

12   foll -- immediately preceding footnote one.  It says,

13   quote, licenses related to these patents form the basis

14   for the dispute at issue in the ND Cal action.

15         Do you see that sentence?

16     A.   Yes, I do.

17     Q.   What does "these patents" refer to in that

18   sentence?

19     A.   Well, I think I have said it in the sentence

20   which immediately precedes this sentence, where I say

21   what I understand that Qualcomm is the owner of many

22   patents for which it has made recent commitments, and

23   of the IPR policy of ETSI to license fair, reasonable

24   and non-discriminatory terms.  And the licenses related

25   to "these patents", refers to as many patents for which

34

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1      it has made recent commitments.

2           Q.   How many of those patents are there?

3           A.   That, I do not know.

4           Q.   How many of those patents were filed in

5      European countries?

6           A.   I do not know.

7           Q.   How many of those patents were issued by the

8      United States Patent and Trademark Office?

9           A.   I have no idea.

10          Q.   Which of these patents did ETSI -- strike that.

11               Which patents issued by the United States

12     Patent and Trademark Office does Qualcomm own that it

13     has not committed to license on FRAND terms in

14     accordance with ETSI's IPR policy?

15          A.   This goes far beyond my expertise and I have no

16     idea.

17          Q.   Which patents referred to in the sentence we've

18     been discussing on page 1, did Qualcomm commit to

19     license on FRAND terms in accordance with the policies

20     of any standards setting organization other than ETSI?

21          A.   I do not know.

22          Q.   How many of the patents you refer to in this

23     sentence did Qualcomm commit to license in accordance

24     with the FRAND commitments it made to standards setting

25     organizations other than ETSI?

35

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1          A.   How many patents?   I have no idea.

2          Q.   Do you know one way or the other if there are

3     any patents you refer to among, quote, these patents,

4     on page 1 of your report, that Qualcomm has not

5     committed to license in accordance with the

6     intellectual property policy of the International

7     Telecommunications Association?

8          A.   I do not know.

9          Q.   Do you know one way or the other if there are

10    any patents referred to among, quote, these patents, on

11    page 1, that Qualcomm has not committed to license in

12    accordance with the intellectual property policy of the

13    Alliance for Telecommunications Industry Solutions?

14         A.   I do not know.

15         Q.   So as far as you know, every single one of,

16    quote, these patents, you refer to on page 1 of your

17    report is also subject to a commitment that Qualcomm

18    made to a standards setting organizations other than

19    ETSI.   Right?

20         MR. EARNHARDT:   Object to the form.

21         A.   I don't understand the question.

22         Q.   Do you know one way or the other if there is a

23    single patent among, quote, these patents, you refer to

24    on page 1 of your report that Qualcomm has not also

25    committed to license on FRAND terms in accordance with

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    the intellectual property rights policy of a standards
2    setting organization other than ETSI?
3        A.   I have no idea of what Qualcomm has done
4    regarding these patents and other standard
5    telecommunication organizations.
6        Q.   That was not an analysis you felt it necessary
7    to conduct to express the opinions you have expressed
8    in your report.  Right?
9        A.   I am an expert of French contract law, so it
10   was not an analysis I felt necessary to conduct.
11       Q.   The -- the opinions you express in your report
12   are not impacted one way or the other if Qualcomm has
13   committed to license all of its patents according to
14   the intellectual property rights policies of a
15   standards setting organization other than ETSI.  Is
16   that fair?
17       A.   The opinions I -- I give in my report are based
18   on French law and they're not impacted by all these
19   questions that you have raised which I have not
20   analyzed at all.
21            MR. EARNHARDT:  We've been going about an hour.
22   Can we take a quick break?
23            MR. MATHESON:  Yes, fine with me.  Sure.  If
24   that's okay with the witness.
25            THE VIDEOGRAPHER:  We're now going off the

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1    record.  The time is 10:00 o'clock.

 2              (A recess was taken.)

 3              THE VIDEOGRAPHER:  We're now going back on the

 4    record.  The time is 10:08.

 5        Q.  Now your opinions in this matter required you

 6    to develop an understanding of paragraph 6 of the ETSI

 7    Intellectual Property Rights Policy.  Right?

 8        A.  Right.

 9        Q.  At what -- in what year was paragraph 6 of the

10    ETSI Intellectual Property Rights Policy finalized?

11        A.  You mean paragraph 6 of annex 6?

12        Q.  Correct.

13        A.  I do not know in what year it was finalized and

14    I do not know in what year ETSI rules of procedure were

15    finalized.  The version I have here is one which dates

16    from November 2011.

17        Q.  Is the version you have in front of you dated

18    November 2011 the same as the version that exists

19    today?

20        A.  I need to read it to tell you but I believe so,

21    but I will -- I will check.  (Brief review.)

22              It is the same as the one I have studied for my

23    report and I believe it is the same as the one that is

24    in force today.  I haven't checked though, but I would

25    be surprised if it were different.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1       Q.  When was the first time that the version of the

2   ETSI Intellectual Property Rights Policy paragraph 6

3   that is currently in effect came into effect?

4       A.  I do not know.

5       Q.  Was it before 2007?

6       A.  I do not know.  I couldn't answer this

7   question.

8       Q.  How many times has paragraph 6 of the ETSI

9   Intellectual Property Rights Policy been amended since

10  it first came into effect?

11      A.  Again, this is a question that I have not

12  studied and I do not know.

13      Q.  When did Qualcomm first make a FRAND commitment

14  to ETSI relevant to Qualcomm's 3G patents?

15      A.  I have no idea.

16      Q.  When did Qualcomm first make a FRAND commitment

17  to ETSI relevant to Qualcomm's LTE patent?

18      A.  Same answer.  I don't know.

19      Q.  So you don't know whether the version of the

20  Qualcomm -- strike that.

21          You don't know whether paragraph 6 of ETSI's

22  Intellectual Property Rights Policy that you studied is

23  the same as the version that was in effect when

24  Qualcomm first made a FRAND commitment to ETSI relative

25  to its 3g patents.  Is that fair?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

```
 1      A.  That is fair.  I do not know.
 2      Q.  That was not information that was necessary for
 3  to you assess in order to reach the conclusions you
 4  express in your report.  Right?
 5      A.  I think this is fair to say that it was not a
 6  decisive element.  Had it been important, I'm pretty
 7  sure that Qualcomm's lawyers would have told me to look
 8  and compare the different versions of article or clause
 9  six.
10      Q.  It's your understanding that Qualcomm does not
11  offer licenses to its standard essential patents at the
12  component level.  Right?
13      A.  Can you repeat this please?
14      Q.  Do you understand what I mean when I say
15  component level?
16      A.  Yes, I do.
17      Q.  What do you understand that term to mean?
18      A.  The term component is a -- it's a component.
19  It's one element as opposed to a full device.
20      Q.  Is a baseband processor a component of a
21  handset?
22      A.  I -- in my report, I have something on this and
23  I think it's fair to say.  On page 2 of my report, I
24  say that the FTC takes the position that ETSI FRAND
25  commitments create an obligation to grant licenses to
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1    the manufacturers of baseband processors.  And then in

2    brackets, i.e., to grant licenses at the component

3    level.  So I think the answer is there.

4         Q.  Is it your understanding that Qualcomm refuses

5    to grant licenses to its standard essential patents to

6    the manufacturers of baseband processors?

7         A.  My understanding is not exactly that one.

8         Q.  How do you understand Qualcomm's policy

9    regarding licensing of standards essential patents to

10   the manufacturers of baseband processors?

11        A.  Well, what I understand is that there is this

12   agreement on the interpretation of ETSI FRAND

13   commitment and the obligation it creates, and what I

14   cannot tell you because I haven't studied this, is

15   whether or not Qualcomm has already in the past granted

16   licenses at the component level.  I -- I think it has a

17   consistent practice not to do it but then I haven't

18   studied all the contracts.

19        Q.  So you don't know one way or the other whether

20   Qualcomm has granted licenses to its standard essential

21   patents at the component level in the past.  Right?

22        A.  This is not exactly what I said.  I know that

23   there is a consistent practice not to do it.  Now, if

24   on specific occasions and in specific contexts --

25   contexts it has or not, that I don't know.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                          8/16/2018

1      Q.   How do you know that it is Qualcomm's
2   consistent practice not to grant licenses to its
3   standard essential patents at the component level?
4      A.   I know this because I have been told so by
5   Qualcomm's lawyers and I have used this in my report
6   when I explained the role of practices.
7      Q.   What do you mean when you say you used that in
8   the report when you explained the role of practices?
9      A.   Well, in my report, when in -- when I deal with
10   the first question of interpretation, subsidiarily, I
11   deal with the question of the role of parties,
12   practices, and negotiations.
13      Q.   So when you reached your expert opinion
14   regarding the role of Qualcomm's practices in
15   interpreting the FRAND commitment, you assumed, based
16   on information provided to you, that it has been
17   Qualcomm's consistent practice not to grant licenses to
18   its standard essential patents at the component level.
19   Is that fair?
20           MR. EARNHARDT:  You can take time to review the
21   part of your report on industry practice if you need
22   to.  This is not a memory test.
23      A.   I had a discussion with an expert whose name is
24   Bertram Huber and it's recorded in the report.
25   Actually I didn't mention it before because it wasn't a

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    discussion on law, it was a discussion on practice.
2    And in my report I quote of some elements of the
3    discussion and I say it's written on page 12, that I
4    understand from my discussion with Bertram Huber that
5    there is an established practice of negotiating set
6    licenses for complete cellular devices.
7        Q.  What did Mr. Huber tell you about Qualcomm's
8    consistent practice of refusing to grant licenses at
9    the component level?
10       A.  No.  It's not exactly that.  He didn't tell me
11   about Qualcomm's consistent practice of refusing to
12   grant licenses at the component level.  He told me
13   about Qualcomm's consistent practice of negotiating set
14   licenses for complete cellular devices.
15       Q.  What does Mr. Huber know about Qualcomm's
16   practice of negotiating complete cellular licenses?
17       A.  I do not know what Mr. Huber knows about this.
18       Q.  Has Mr. Huber ever negotiated a complete
19   cellular license on behalf of Qualcomm?
20       A.  I do not know if he has or if he has not.
21       Q.  Has Mr. Huber ever been employed by Qualcomm?
22       A.  I do not think so but I do not know about Mr.
23   Huber's life.
24       Q.  Has Mr. Huber ever even seen a license
25   agreement negotiated between Qualcomm and any other

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                              8/16/2018

 1    participant in ETSI?

 2        A.  You ask me questions I cannot answer.  I do not

 3    know.

 4        Q.  Other than the discussion with Mr. Huber you

 5    just referred to, what other discussions have you had

 6    that having informed your view on Qualcomm's practice

 7    of refusing to negotiate licenses at the component

 8    level?

 9        A.  I've had the discussion with Mr. Huber and with

10    Qualcomm's lawyers.

11        Q.  You haven't spoken with anybody other than Mr.

12    Huber or attorneys from Qualcomm regarding Qualcomm's

13    practice of refusing to grant licenses at the component

14    level.  Right?

15        A.  I have not.

16        Q.  You didn't list the discussion with Mr. Huber

17    in Exhibit-2.  Right?

18        A.  If you say so, it must be right.

19        Q.  Why not?

20            MR. EARNHARDT:  Take a look at Exhibit-2.

21        A.  Why not?  It's in the report.  It's not a

22    written document.  It was a discussion so that could be

23    a reason why, but by no means did I try to hide it.  I

24    mean, it's -- it's clearly in the report.

25        Q.  What other discussions other than the one with

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1    Mr. Huber did you have that are relevant to your

2    opinions in this matter that are not listed in

3    Exhibit-2?

4        A.  I think I've just told you that apart from Mr.

5    Huber and Qualcomm's lawyers, I had no other

6    discussions that are relevant for this report on this

7    matter.

8        Q.  When did Mr. Huber tell you that Qualcomm began

9    its practice of refusing to license baseband processor

10   manufacturers to its standard essential patents at the

11   component level?

12        MR. EARNHARDT:  Just to clarify that, when did

13   he tell her that or when he spoke to her, when did he

14   say what was the time it happened.

15        Q.  Let's try this:  On what date did Mr. Huber

16   tell you that Qualcomm refused to license baseband

17   processor manufacturers to its standard essential

18   patents at the component level?

19        MR. EARNHARDT:  Just --

20        A.  The question is odd.

21        MR. EARNHARDT:  Just to clarify because I -- I

22   still think it's ambiguous and I'm not trying to be

23   disruptive, I just want to make sure, but are you

24   asking on what date she had the conversation with Mr.

25   Huber?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1        Q.   About this.  Your report states you had a June
 2   27th, 2018 discussion with Mr. Huber, right?
 3        A.   I'm sorry.
 4        Q.   Your report states you had a discussion with
 5   Dr. Huber on June 27, 2018, right?
 6        A.   June or July?
 7        Q.   Your report states June 27?
 8        A.   June, yes.  This is -- yeah.
 9        Q.   Did you have any discussions with Dr. Huber
10   other than with the discussion on June 27, 2018 in your
11   entire life?
12        A.   In my entire life, yes, I did.
13        Q.   Did you have any discussions other than the one
14   on June 27, 2018 with Dr. Huber that are relevant to
15   the opinions you express in your report?
16        A.   No, I did not.  It was in a different
17   litigation and the discussions I had with Mr. Huber
18   were not relevant to this report.
19        Q.   What was the different litigation in which you
20   had discussions with Mr. Huber that were not relevant
21   to this report?
22        A.   It was with Ericsson.  In the case with
23   Ericsson.
24        Q.   When did that case occur?
25        A.   Three years ago or -- roughly.
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1      Q.   How -- all right.  So you were employed by
2   Qualcomm approximately 2006?
3      A.   Yes.
4      Q.   And again three years ago in a case with
5   Ericsson?
6      A.   In?
7      Q.   A case with Ericsson?
8      A.   Yes.
9      Q.   Other than that, other than those two examples,
10   have you been employed by Qualcomm at other times?
11      A.   From -- it lasted from 2006 to 2008 perhaps, so
12   it was -- and then I don't remember having been
13   employed by Qualcomm since then.
14      Q.   So 2006 to 2008 you were employed in connection
15   with the Nokia litigation?
16      A.   Yes, I was.
17      Q.   What was the date range in which you were
18   employed with respect to the Ericsson litigation?
19      A.   I have been employed on several occasions by
20   Ericsson.  The date range would be difficult for me to
21   assess but perhaps 2010 to now.
22      Q.   So when have you been employed by Qualcomm
23   other than the 2006 to 2008 Nokia litigation, and the
24   current litigation with the FTC and the current
25   litigation with Apple?

47

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1       A.   Can you say the beginning of the question
2    again?
3       Q.   When have you been employed with Qualcomm other
4    than the 2006 to 2008 Nokia litigation, the current
5    litigation with the FTC, and the current litigation
6    with Apple?
7       A.   When, do you mean in between 2008 and now?
8       Q.   Yes.  Were you ever employed by Qualcomm?
9            MR. EARNHARDT:  When you say employed by
10   Qualcomm, you mean hired by -- as an expert?
11           MR. MATHESON:  Yes.
12      A.   Yes, I was not an employee.  And I do not
13   remember having been employed by Qualcomm but I didn't
14   check.
15      Q.   Okay.  So from 2008 until the litigations that
16   are currently ongoing, you did not serve as an expert
17   for Qualcomm that you can recall?
18      A.   I would have preferred to check, but that's
19   what I think, yes.
20      Q.   When did you -- when were you first retained by
21   Qualcomm in FTC's litigation?
22      A.   In this one?  When was that?  I mean it was a
23   few months ago or perhaps even -- yeah.
24      Q.   April perhaps?
25      A.   No.

48

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1       Q.   May?  February?

2       A.   I do not remember that.

3       Q.   Where were you teaching at the time you were

4    first contacted by Qualcomm to serve as an expert in

5    this matter?

6       A.   Was I teaching?

7       Q.   Yes.  Were you actively teaching a class on the

8    day, do you recall?  I'm just trying to refresh your

9    recollection.

10      A.   I don't have a good memory of dates of being

11   employed by Qualcomm.  Is that very important?  I can

12   check if you want with the retention letters, but I

13   really don't know now.

14      Q.   When did you begin work on the report you

15   prepared in this matter?

16      A.   I would say a couple of months ago.

17      Q.   About how many hours did you spend on the

18   report prior to the date you signed it?

19      A.   Prior?

20      Q.   Prior to the time you signed it.

21      A.   Prior --

22      Q.   So not including deposition prep or anything.

23      A.   And not including --

24      Q.   Prior to signing the report, about how many

25   hours did you spend?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1        A.  Roughly speaking between 30 and 50.

 2        Q.  How many discussions did you have with

 3   Dr. Huber?  Was it just the one on June 27, 2018 that

 4   are relevant to the opinions you express in this

 5   report?

 6        A.  Yes.  That was this one that was relevant to

 7   the opinion.

 8        Q.  How long did that discussion last?

 9        A.  An hour or so.

10        Q.  Did it take place in person?

11        A.  No, it did not.

12        Q.  On the phone?

13        A.  On the phone.

14        Q.  What time of day was it?

15        A.  Sorry?

16        Q.  What time of day?

17        A.  What time?  You mean 2:00 o'clock or 3:00

18   o'clock?

19        Q.  Yeah.  Was it morning, was it the evening?

20        A.  It must have been -- I can't remember.

21        Q.  Were you on your cell phone?

22        A.  Yes, I was.

23        Q.  Where were you sitting?

24        A.  In my office in my house.

25        Q.  You have an office in your home?
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1        A.  Yes, I do.

 2        Q.  Do you remember if it was light outside?

 3        A.  Sorry?

 4        Q.  Do you remember if it was daylight outside?

 5        A.  I think it was.

 6        Q.  Where is your home office located?

 7        A.  Wow.  That's very private question.  But it's

 8   located in Saint Cloud, France, because I know there is

 9   an Saint Cloud US also.

10        Q.  How do you spell that?

11        A.  Saint Cloud.

12        Q.  Makes it easier for us.  Is that close to

13   Paris?

14        A.  Yes, it is.  It's in between Paris and

15   Versailles, west of Paris.  It's very nice.

16        Q.  I'm sure it is.

17        A.  You should come there.

18        Q.  I would love to.  So it was daylight in Saint

19   Cloud on June 27, 2018 when you spoke with Dr. Huber?

20        A.  Yes.

21        Q.  You signed your report on June 28, 2018?

22        A.  Yes.

23        Q.  How many hours did you spend on your report

24   between the discussion you had with Dr. Huber and the

25   time you signed your report?
```

51

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1       A.  I did work on the report between that, but not
2   more than five or in between five and 10 hours.  Not --
3   perhaps a little less.  I'm -- I don't remember because
4   June is a hard month for professors because of all the
5   work we have and but I remember having kept some time
6   free for this report, a couple of days, but I wouldn't
7   know how many hours precisely.
8       Q.  What time of day was it when you signed your
9   report?
10      A.  Oh, I have no idea.
11      Q.  Was it daylight?
12      A.  I cannot tell you.
13      Q.  So it's fair to say you did the majority of the
14  work you performed on this report before you spoke with
15  Dr. Huber?
16      A.  Yes, it's fair to say this.  The majority of
17  the work is not on this point for me.  The majority of
18  the work is on French law.  I'm a French law expert.
19  I'm not an expert of Qualcomm's practices.
20      Q.  Did Dr. Huber tell you that any other holders
21  of standard essential patents who made FRAND
22  commitments to ETSI refused to offer licenses to
23  baseband processor manufacturers for components?
24          MR. EARNHARDT:  Again, you can refer to your
25  report if you need to.  It's not a memory test.

Fauvarque-Cosson
FTC v. Qualcomm, Inc.                                      8/16/2018

1       A.   It's not exactly the wording he has used.  It's
2    not the way the discussion went.  And the discussion
3    went on a more -- how do you say -- positive perhaps
4    line.  What he told me is that there is an established
5    practice of negotiating set standard essential patent
6    licenses for complete cellular devices -- complete
7    cellular devices.
8       Q.   Which -- oh sorry.  I didn't mean to cut you
9    off.  I thought you were done.
10       A.   Okay.  And he also told me that it is a
11    long-standing practice and that it has been used in the
12    mobile communication industry for a long time, but he
13    didn't mention other companies who use it.  But what I
14    understood from the conversation is that it's not only
15    Qualcomm who has this practice.
16       Q.   Did he identify any other holder of standard
17    essential patents other than Qualcomm that has this
18    practice?
19       A.   I do not remember him identifying specifically
20    another company, no.
21       Q.   Did you ask him which other companies licensed
22    according to Qualcomm's practice?
23       A.   I did not.  I relied on him saying it's a
24    long-standing practice in the industry.
25       Q.   Did you ask him when that practice began?

53

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                         8/16/2018

1        A.  No, I did not.

2        Q.  Did you ask him if the practice was the same

3    for CDMA standards as for standards promulgated by

4    ETSI?

5        A.  No, I did not.

6        Q.  Did you ask him if Ericsson licensed at the

7    component level?

8        A.  No.  I didn't ask him.

9        Q.  Sitting here today, do you know whether

10   Ericsson licensed at the component level?

11       A.  I do not know whether Ericsson licenses at the

12   component level, but what I know is that it's a -- this

13   long-standing practice of licensing only at the device

14   level is used the mobile communication industry

15   including Ericsson.

16       Q.  And you know that -- strike that.

17           How do you know it includes Ericsson?

18       A.  Well, I've done some expert reports for

19   Ericsson and I -- well, I wasn't really asked to opine

20   on these questions, but I remember that they agree that

21   it is a long-standing practice of licensing at this

22   device level.

23           MR. EARNHARDT:  Yeah.  I just want to be

24   careful that we --

25           THE WITNESS:  But yeah.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

54

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1            MR. EARNHARDT:  -- we don't ask her to disclose

2      confidential information she may have learned having

3      been employed as an expert by Ericsson.

4            Q.  Do you know whether Ericsson has licensed

5      Motorola at the component level?

6            A.  I do not know.

7            Q.  Do you know whether Ericsson licensed Qualcomm

8      at the component level?

9            A.  I do not know what kind of agreements they have

10     between Qualcomm and Ericsson.

11           Q.  Do you know whether Ericsson has licensed

12     Alcatel-Lucent at the component level?

13           A.  I do not know.

14           Q.  Do you know whether Alcatel-Lucent has licensed

15     Ericsson at the component level?

16           A.  I do not know the practice of licensing by

17     Ericsson.

18           Q.  Do you know whether Motorola has licensed

19     Ericsson at the component level?

20           A.  No, I do not know.

21           Q.  Do you know whether Motorola has licensed

22     Qualcomm at the component level?

23           A.  Again, I do not know.

24           Q.  Do you know whether AT&T has licensed Qualcomm

25     at the component level?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1       A.  No, I do not know.

2       Q.  Do you know whether Samsung has licensed

3  Qualcomm at the component level?

4       A.  I do not know but we could also draw a list of

5  all the cases where license has not been at the

6  component level.

7       Q.  Do you know whether Qualcomm licensed Siemens

8  at the component level?

9       A.  I do not know.

10       Q.  Do you know whether Qualcomm licensed VLSI at

11  the component level?

12       A.  Again, I do not know.

13       Q.  You don't have any information regarding the

14  existence or nonexistence of a practice of licensing at

15  -- licensing at the component level other than the

16  information provided to you by Dr. Huber and Qualcomm's

17  lawyers.  Right?

18       A.  I think there is a misunderstanding here.

19  Dr. Huber did not say that there was never any

20  licensing at the components level.  What he said is

21  what I have written in my report.  There is an

22  established practice of negotiating set licenses for

23  complete cellular devices.  But an established practice

24  does not mean entire full practice which would mean

25  that any other practice would be rejected.

56

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1      Q.  On what date did this practice become
2   established?
3      A.  I did not ask Dr. Huber.
4      Q.  What percentage of holders of standard
5   essential patents, in your view, would have to license
6   at the component level in order to demonstrate that
7   Dr. Huber is wrong?
8           MR. EARNHARDT:  Objection.
9      A.  This is not a question I can answer.  I'm an
10   expert in French law.
11      Q.  What did you understand Dr. Huber to mean when
12   he told you there was a, quote, established practice?
13      A.  I understood established as having started some
14   time ago and being used by many actors.
15      Q.  What is the latest date on which a practice
16   could be established and still qualify as having been
17   established some time ago with respect to licensing in
18   mobile communications?
19      A.  It's not possible to give a latest date.  An
20   established practice needs to have been going on for
21   some time, and I understood this practice has been
22   going on for some time, but no date is specified and
23   needs to be specified to establish an established
24   practice.
25      Q.  You say that you understand the practice has

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1   been going on for some time, what do you mean by "some
2   time"?  How many years?
3          MR. EARNHARDT:  And again, you can look at your
4   report if you need to -- if you need to refresh your
5   recollection.
6       A.  Yes, I do need to refresh my recollection and I
7   don't remember having given a number of years.
8          MR. EARNHARDT:  He's asking you about the part
9   of industry practice.
10         MR. MATHESON:  You can stop coaching the
11  witness any time.  My question is clear, it didn't
12  refer to her report.  I referred to exactly the words
13  she used.  So please, stop coaching, stop interrupting.
14  She doesn't need your help, she's a very smart lady.
15         MR. EARNHARDT:  I understand that.  But you're
16  asking her --
17         MR. MATHESON:  All right.  Please stop talking.
18         MR. EARNHARDT:  I'm not going to stop talking.
19  You're asking her to recall about --
20         MR. MATHESON:  We're going to suspend this
21  deposition if you keep referring to her report
22  needlessly.  I didn't ask her anything about her
23  report.  I asked her what she meant when she used the
24  words "some time".
25         MR. EARNHARDT:  And that is addressed in her

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1   report, Dan.  If you -- if you want her to --
2            MR. MATHESON:  Stop coaching.
3            MR. EARNHARDT:  I'm not --
4            MR. MATHESON:  Let her answer the questions.
5   All right.
6            MR. EARNHARDT:  If the question is not about
7   her report, it's not an appropriate question and if it
8   is, it's not a memory test.
9            MR. MATHESON:  Will you please read back the
10  question.
11           (The requested portion was read.)
12      A.   Once again, I do not remember having given a
13  specific number of years.  What I said that -- as I
14  said before, I understand from my discussion with
15  Bertram Huber that there is an established practice of
16  negotiating set licenses for complete cellular devices.
17  And a few lines after, I add that -- the fact that the
18  long-standing practice of licensing only at the device
19  level has been used since the mobile communications
20  industry started, is strong evidence of the intention
21  on the part of the ETSI IPR committee at the time of
22  the policies's drafting to impose the ETSI FRAND
23  commitment only at the device rather than at the
24  component level.  So it's not directly an answer to
25  your question but I think the element of time is here,

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1   since the mobile communications industry started.
 2       Q.   Okay.  About five minutes ago you said and I,
 3   quote, I understood this practice has been going on for
 4   some time.  What did you mean when you said "this
 5   practice has been going on for some time"?  How many
 6   years did you mean when you said "some time"?
 7       A.   When -- when I said some time, perhaps it's a
 8   language question.  I -- I didn't mean any amount of
 9   years.  I had in mind exactly what I have read, since
10   the mobile communication industry started.
11       Q.   When did the mobile communications industry
12   start?
13       A.   And this is precisely why I can't tell you for
14   how many years because it's difficult for me.  I'm not
15   an expert on mobile communication industry.  I myself,
16   of course, use a cell phone and I sort of remember when
17   it started but when exactly is it started for
18   companies, that, I do not know.
19       Q.   But you understand that the practice you're
20   referring to started at the same time the mobile
21   communications industry started.  Right?
22       A.   Now I'm cautious that there's no
23   misunderstanding.  What I understand is that this
24   long-standing practice of licensing only at the device
25   level has been used since, indeed, this industry
```

60

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1    started.

2        Q.   When you say it has been used, you mean that

3    some licensees have licensed only at the device level

4    since the industry started.   Right?

5        A.   This is not what I have written and this is not

6    what I understood from Dr. Huber.

7        Q.   You don't understand sitting here today that

8    all holders of standard essential patents have licensed

9    only at the device level since the industry started.

10   Is that fair?

11       A.   What I understood is that a majority has

12   licensed only at the diverse -- at the device level.

13       Q.   So sitting here today, it's your understanding

14   that a majority of the holders of standard essential

15   patents license only at the device level and do not

16   license at the component level with respect to their

17   standard essential patents.   Is that fair?

18       A.   I have not said this and in your question here

19   you add only.   I have not said this.   I have said that

20   it's been a long-standing practice but this does not

21   exclude completely the fact that in some situations you

22   may deviate from a practice.   A long-standing and -- or

23   an established practice does not need to be the only

24   practice.

25       Q.   Okay.   Well you said, quote, I understood that

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1    a majority has licensed only at the device level.

2        A.  Did I say only?

3        Q.  Yes.

4        A.  Well, then I shouldn't have said only because

5    what I mean is that this was the -- the main practice,

6    not the sole practice.

7        Q.  So you understand that a majority of the

8    holders of standard essential patents license at the

9    device level, but you don't know how many of those also

10   license at the component level.  Is that fair?

11       A.  Yes.  That is fair.

12       Q.  Did you ask Dr. Huber whether the holders of

13   standard essential patents who license at the device

14   level also license at the component level?

15       A.  I did not ask him because it was very clear in

16   the discussion I had with him that there was an

17   established practice which could, under French law,

18   constitute a usage or established practice and that was

19   sufficient.  So I wasn't -- my role is not to

20   investigate on these points.  I'm not an expert in

21   this.  And I rely on Dr. Huber's assertion that there

22   is an established practice which started when the

23   mobile communication industry started.  And I did not

24   ask him how many times there have been deviations from

25   this practice because it's not a matter of

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    quantification of the deviations.  What is important is
2    that there is a practice that started from the very
3    beginning and it is largely followed and therefore it
4    is -- well, it can be considered a usage.
5        Q.  So if Dr. Huber were to call you tomorrow and
6    change his assertion that there was an established
7    practice which started when the mobile communication
8    industry started, that would change your view regarding
9    industry practice.  Right?
10       A.  Regarding industry practice?  You mean if
11   Dr. Huber called me and said what I've said is wrong,
12   and in fact the practice is to license at the component
13   level, I was completely wrong.  And then you ask me if
14   this will change my view?  I think it would change my
15   view if it completely changed his view, but it will
16   change my view only on what constitutes industry
17   practice.  And it will not change my view on other
18   points which are more important that I developed in my
19   report.
20       Q.  Well, industry practice is relevant to
21   understanding the intentions of parties to a contract
22   in some circumstances.  Right?
23       A.  In some circumstances it may be important.
24       Q.  Where the language of a contract is ambiguous
25   and the parties's intent cannot be ascertained solely

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    from the language of the contract, industry practice
2    can be important.  Is that fair?
3        A.  Yes.  Industry practice and also all the
4    elements.  And so it's only one among other elements
5    that is important.  And it is only important when the
6    language of the contract has some ambiguity.
7        Q.  And the only information you have regarding
8    industry practice with respect to licensing at the
9    component level comes from Dr. Huber.  Right?
10       A.  Yes, it does.
11       Q.  I've never tried a case in French court.  If a
12   French judge was attempting to interpret this contract,
13   how would they go about it?  Would they take live
14   testimony regarding industry practice, would they
15   accept declarations, what's the normal course if a
16   French judge is trying to resolve a dispute about the
17   meaning of the ETSI IPR policy and needed to consider
18   industry practice?
19       A.  Well, I could sit here for a long and give you
20   a French law class on procedure.  It's so different.
21   You can't imagine, you would be surprised.  There are
22   no experts, no testimony, no oral testimony.  The
23   lawyers present their conclusion and then the French
24   court will make his opinion and it's a written
25   procedure and it's not comparable at all.  What I can

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    say to be more precise is that the most important and

2    foremost element would be the contract itself, and the

3    terms of the contract.

4        Q.  If a French judge felt the need to understand

5    industry practice in the context of interpreting the

6    ETSI IPR policy, the French judge wouldn't take any

7    live testimony from witnesses.  Is that right?

8        A.  I don't think he would.

9        Q.  How old a French judge determine the

10   credibility of Dr. Huber and a witness who said exactly

11   the opposite with regard to the supposed practice of

12   licensing at the component level?

13       A.  Unfortunately I've never sat as a judge, and

14   this is a tough question.  The only experience I have

15   from my work is that the very same question can be

16   asked as regards foreign law.  When parties have to

17   bring the contents of foreign law, one party does --

18   says something, the other party says the opposite and

19   the judge has to decide by himself.

20       Q.  But you don't have -- strike that.

21           What Dr. Huber told you regarding the industry

22   practice with respect to component level licensing,

23   that was based on his observations during his time at

24   ETSI, right?  Things that he saw?

25       A.  He didn't tell me what was the basis, but it's

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1    not only things that he saw, perhaps it's also the way

2    things have been negotiated and I don't -- I do not

3    know what is the basis of his information.  All I know

4    is that he's a credible expert, he has long experience

5    and I've been told that I could trust him and it's not

6    the core of -- once again, it's not the core of my

7    opinion, not at all.

8         Q.  Who told you you could trust Dr. Huber?

9         A.  Well, actually it's implicit telling by

10   organizing this call so that he will give me elements

11   that I can put in my report on industry practice.  I

12   mean, I couldn't imagine a Qualcomm's lawyers

13   organizing this with somebody I could not trust.

14        Q.  So you trusted Dr. Huber because Qualcomm's

15   lawyers put you on the phone with him; is that right?

16        A.  Because first of all, I know he is an expert on

17   these questions and a credible expert who has long

18   experience and also because it was choice of Qualcomm's

19   lawyers who choose who to trust.

20        Q.  Who is Carl Himes Rosenbrook?

21        A.  I think he is the expert for the FTC.

22        Q.  What did he offer an expert opinion on?

23        A.  I think he disagrees with Dr. Huber.

24        Q.  Do you think that Carl Himes Rosenbrook has any

25   information relevant to the existence of a practice of

66

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

```
 1    component level licensing?
 2         A.   I have no idea of the kind of information he
 3    has.
 4         Q.   You have never spoken with Carl Himes
 5    Rosenbrook?
 6         A.   Never.
 7         Q.   Never read any reports he prepared?
 8         A.   I didn't read the -- the report at.
 9         Q.   Who is Roger Tolfrey?
10         A.   I do not know.
11         Q.   Do you know if he participated in ETSI?
12         A.   I do not know.
13         Q.   Do you know whether his employer offered to
14    make licenses to its alleged standard essential patents
15    available at the component level?
16         A.   His employer?   Sorry, can you?
17         Q.   Yeah.   Do you know if his employer?
18         A.   Whose employer?
19         Q.   Roger Tollbrooks -- I'm sorry.   Roger
20    Tollfrey's?
21         A.   But I don't know who -- who is the employer of
22    this Roger.
23         Q.   Who is George Graff?
24         A.   I do not know.
25         Q.   He was employed by Alcatel at one time.   Right?
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1         A.  I do not know.

 2         Q.  He was also employed by SEI at one time.

 3  Right?

 4         A.  I do not know.

 5         Q.  Do you know whether SEI offered to make

 6  available licenses to its ETSI standard essential

 7  patents available at the component level?

 8         A.  I do not know.

 9         Q.  Have you ever met Dr. Huber in person?

10         A.  Yes, I have.

11         Q.  Was that in 2018?

12         A.  No, it wasn't.

13         Q.  Have you ever asked Dr. Huber how much money

14  he's been paid by Qualcomm over the course of the year?

15         A.  I would never ask such a question.  It's not in

16  the French mentality.

17         Q.  Isn't it relevant to your determination of his

18  credibility?

19         A.  Not at all.

20         Q.  Do you know if Dr. Huber has ever been

21  convicted of perjury?

22         A.  What?

23         Q.  Do you know if he's ever perjured himself?

24         A.  No, I do not know.

25         Q.  You have no idea one way or the other whether
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    Dr. Huber has ever made a false statement under oath?

2         A.   I have no idea.

3         Q.   That was not relevant to your determination of

4    whether you should credit the representations Dr. Huber

5    made to you in this matter.  Right?

6         A.   I have no idea of this.

7         Q.   Which companies -- strike that.

8              How many people were involved in drafting the

9    ETSI IPR policy that is relevant to your opinions in

10   this matter?

11        A.   That, I do not know.  I believe quite a lot

12   because it's been -- well, I do not know.

13        Q.   How many of those individuals have you spoken

14   with in the course of reaching your opinions in this

15   matter?

16        A.   How many?

17        Q.   Of those individuals --

18        A.   Who drafted the policy?

19        Q.   -- have you spoken with -- in the course of

20   reaching your opinions in this matter, how many

21   individuals involved in drafting the ETSI IPR policy

22   have you spoken with?

23        A.   Apart from Dr. Huber, I -- I have not.

24        Q.   You have not spoken with anyone who was

25   involved in drafting the ETSI IPR policy other than

69

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1    Dr. Huber.  Right?

2        A.  I do not remember, so to my knowledge sitting

3    here now, I would say that I have not.

4        Q.  I'm not trying to trick you.  As far as I know,

5    you've never.  Sitting here one way or the other, as

6    far as you know?

7        A.  Now I'm cautious because perhaps, you know -- I

8    don't think -- as far as I know and as far as I

9    remember, I have not.

10       Q.  How long did it take to draft the ETSI IPR

11   policy that is relevant to your opinions in this

12   matter?

13       A.  I do not know.

14       Q.  How many meetings took place over the course of

15   drafting the ETSI IPR policy that's relevant to your

16   opinions in this matter?

17       A.  I wasn't asked to look at that and I do know.

18       Q.  Dr. Huber provided you no information regarding

19   how many meetings were involved in drafting the ETSI

20   IPR policy; is that right?

21       A.  I don't remember having been provided with such

22   information by Dr. Huber.

23       Q.  One circumstance in which industry practice can

24   be relevant to determining party's intent is if a

25   dispute involves a question that is not able to be

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                          8/16/2018

1    resolved based on the plain language of the contract.
2    Right?
3        A.  I think this is correct.
4        Q.  And one circumstance in which a question might
5    not be able to be resolved based on the plain language
6    of the contract is if the parties to the contract had
7    no meeting of the minds regarding the term.  Right?
8            MR. EARNHARDT:  Object to the form.
9        A.  And I did not understand.  Had no meaning?
10       Q.  No meeting.  I will rephrase it.
11           The important question in interpreting a
12   contract under French law is the intent of the parties.
13   Right?
14       A.  This is right.
15       Q.  The party's intent should be given effect
16   regardless of the literal reading of the contractual
17   terms.  Right?
18           MR. EARNHARDT:  Object to the form.
19       A.  This is not right.
20       Q.  What would a French court upon French law do if
21   the parties to a contract had not anticipated a
22   particular circumstance would arise?  How would that
23   court determine what the party's intent was?
24       A.  Then he will have to interpret the intention of
25   the parties.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.  The plain language of the contract might be
2    relevant to that interpretation.  Right?
3      A.  Definitely.  The plain language of the contract
4    is very relevant.
5      Q.  What if the parties never anticipated the plain
6    language of the contract would apply to the unforeseen
7    circumstance?
8      A.  Then, as I said, there would be a question of
9    interpretation of the intention of the parties.
10     Q.  And what would form the basis to interpret the
11   intention of the parties?
12     A.  Under French law, to interpret the party's
13   intention the judge has some freedom to look at a wide
14   range of elements.  We have already mentioned industry
15   practice.  We can also mention further discussions that
16   the parties may have had, even subsequent to the
17   contract.  And also other external elements.  Perhaps
18   in order to better answer, it would be good to refer to
19   the quote again of Benabent as regard interpretation of
20   the contract.  Sorry, it takes me a little while to
21   find it.  So it's on page 5.  And under French law
22   contractual interpretation is done and I quote him now,
23   in concreto, and we sometimes call it a subjective
24   interpretation that is to say it was a search for the
25   intent that the parties themselves may have had, and

72

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    not in abstracto, by that which form by another
2    reasonable person in the same situation.  And therefore
3    when the judge has to search for the party's intent,
4    the -- as I said in my report, the party's negotiation
5    history is important.  And if it were an ordinary
6    contract, the French court will, for instance, look at
7    the pre-contractual documents, but it could also look
8    at other documents to clarify the party's intent.  And
9    this is well admitted by all authors.  I have quoted
10   Benabent, I have quoted also Terre, Simler, Lequette.
11   There's no discussion on this that the court may look
12   at external elements, in the context of ETSI, he -- the
13   court could look, for instance, at the general
14   assembly, the decision of the committees, or other
15   elements that it would consider relevant.
16        Q.  When you say look at the general assembly, what
17   are you referring to?
18        A.  I'm referring and I think I quote them and I
19   have them in the annex, there has been some minutes,
20   summary minutes at least, of the general assembly and
21   so this is typically the kind of elements that the
22   courts, a French court, could look at.  And in my
23   report on page 12, I mention it.  And that's also
24   footnote 42 where I refer to them, where I say that
25   ETSI's general assembly has repeatedly rejected

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    proposals to impose prohibitions on particular

2    practices.

3        Q.  Other than the material you cite in footnote

4    42, what other general assembly materials have you

5    reviewed in connection with the opinion you offer in

6    this matter?

7        A.  General assembly materials?  I don't remember

8    having reviewed other than these ones.  They're quite

9    long minutes already.

10       Q.  These minutes from 2003?

11       A.  Are they all from 2003?  I'm not too sure about

12   the date.  It's not obvious to understand with the

13   references.

14       Q.  And you never listed these materials relied

15   upon.  Right?

16       A.  Sorry?

17       Q.  You never listed these in Exhibit-2, amongst

18   the materials you relied upon?

19           MR. EARNHARDT:  They're --

20       A.  Yes, I did.  I did.  Look at the last part of

21   other, I think these other materials --

22       Q.  Those are the minutes, okay.  So other than

23   these minutes, you can't recall reviewing any others

24   that were relevant to the opinions you offer in this

25   matter?

74

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1     A.   I can't recall and I didn't need to because
2   this -- this was to show that under French law, it will
3   be possible for a judge to refer to elements which are
4   posterior to the contract making, to the first time
5   when the policy was drafted, in order to interpret the
6   policy.
7     Q.   Now, the significance you ascribe to these
8   minutes is that in these minutes ETSI rejected
9   proposals that would have prohibited royalty free cross
10  license, required grant backs of rights to
11  improvements, and required licensing certain regions of
12  the globe at different -- strike that.
13         I'm having trouble interpreting your footnote
14  here.  So one importance you ascribe to these minutes
15  is that they contain an indication that in 2003, ETSI
16  rejected a proposal that would have prohibited royalty
17  free cross licenses.  Right?
18    A.   Well, I quoted this minutes on this part, yes.
19    Q.   Okay.  And another importance you ascribe to
20  these minutes is that in 2003, ETSI rejected a proposal
21  that would have required grant backs of rights to
22  improvements.  Right?
23    A.   I'm -- I'm not too convenient with the
24  expression the importance I ascribe.  I don't ascribe
25  importance as such to these precise elements.  And it's

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1    more important to look at the sentence in the plain

 2    text which says that the general assembly of ETSI has

 3    rejected, repeatedly, proposers to impose prohibitions

 4    on particular practices.  And I quote this and there

 5    may be others.  I haven't reviewed everything, but I

 6    quote this as examples of the fact that ETSI general

 7    assembly is reluctant to impose prohibitions on

 8    particular practices.

 9        Q.  So one practice that ETSI rejected a proposal

10    to prohibit is royalty free cross licensing.  Right?

11        A.  I mean, you are taking this from the footnote.

12    Yes.

13        Q.  Another proposal ETSI rejected would have

14    required grant backs of rights to improvements.  Right?

15        A.  Yes.  That is what is written.

16        Q.  And a third proposal that ETSI rejected would

17    have prohibited licensing certain regions of the globe

18    at different rates from those charged from other

19    regions.  Right?

20        A.  That is written in the footnote.

21        Q.  Other than these three practices, which

22    proposals to impose prohibitions has ETSI's general

23    assembly rejected?

24        A.  I do not know of all the proposals that have

25    been rejected.  Having looked at these minutes and only

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1   at these minutes, I remember that there has been

2   discussion on the clause 6.1 and trying to clarify what

3   the FRAND commitment is and what it means.  And I

4   remember, but if you want me to send more I will need

5   to look at the minutes.  That these discussions were

6   quite long, there were diverging views and finally the

7   language was not changed.  What I want to say when I

8   quote this is that's ETSI's general assembly has

9   repeatedly refused to impose prohibition on particular

10  practices because it's not the purpose of ETSI to do

11  that.

12      Q.  It's not the purpose of ETSI to prohibit

13  particular practices.  Is that the opinion you're

14  expressing in this matter?

15      A.  Well, to impose new prohibition on particular

16  practices.  The purpose of ETSI, and it's not my

17  opinion, it's what is said in the ETSI policy.  It's

18  clearly stated in annex 6 clause 3, the policy

19  objectives of ETSI.  And I can read it.  ETSI's

20  objective is to create standards and technical

21  specifications that are based on solutions which best

22  meet technical objectives of the European

23  telecommunications sector as defined by the general

24  assembly.  In order to further this objective, the ETSI

25  policy seeks to reduce the risk to ETSI, members and

77

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    others applying ETSI standards and technical

2    specifications that investment in the preparation,

3    adoption, and application of standards could be wasted

4    as a result of an essential IPR being unavailable.  In

5    achieving these objectives, and I think this is

6    important, the ETSI IPR policy seeks a balance between

7    the needs of standardization for public use in the

8    field of telecommunications and the rights of the

9    owners of IPRs.

10           And then you have 3.2, IPR holders whether

11   members of ETSI and their affiliates or third parties,

12   should be adequately and fairly rewarded for the use of

13   their IPRs.

14           THE REPORTER:  Should be?

15           THE INTERPRETER:  Adequately.

16   A.  Sorry for my pronunciation.

17           Reward -- should be rewarded for the use of

18   their IPRs in the implementation of standards and

19   technical specifications.

20           The purpose of ETSI is not to interfere with

21   the commercial terms of the parties.  When I mean

22   parties, I mean parties to a license contract.

23   Q.  So are these minutes you cite here in footnote

24   42 among the pre-contract documents that a court might

25   consider when attempting to construe the ETSI IPR

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    policy?

2         A.   I don't think they are pre-contractual, I would

3    say that they come after.

4         Q.   Which pre-contractual documents have you

5    reviewed that a court would consider relevant when

6    construing the ETSI IPR policy?

7         A.   What do you mean by pre-contractual documents?

8    That will be before the ETSI policy is drafted?

9         Q.   What is a pre-contractual document as you used

10   the term?

11        A.   A pre-contractual document in the normal

12   contract setting, is usually a document that may be

13   used in pre-contractual negotiations between the

14   parties.  So you may have discussions, you make change

15   letters before the contract, and all this will be

16   pre-contractual.  Once the contract is signed, you are

17   in the contractual phase.  Now with ETSI, things are

18   slightly different.  It's not a typical contract

19   between two private parties that is negotiated between

20   two parties.  So things are different and I think what

21   is most relevant and what the judge will take into

22   account is what has been said subsequently to the

23   drafting of the policy and the fact that the policy has

24   not been changed or that it has been changed by the

25   general assembly is, of course, very relevant.  So it's

79

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                8/16/2018

1    not pre-contractual in the sense that the policy had
2    been already established.
3        Q.  So you haven't reviewed any pre-contractual
4    documents related to the ETSI IPR policy; is that
5    right?
6        A.  I didn't know -- I didn't need to review these
7    pre-contractual documents.
8        Q.  So the answer is no, you have not reviewed any
9    pre-contractual documents relevant to the IPR?
10       A.  To my knowledge I have not, no.
11       Q.  And the only post contractual documents you've
12   reviewed relevant to ETSI's IPR policy are the minutes
13   noted in footnote 42; is that right?
14       A.  I think you are right, yes.  I don't remember
15   any other documents relating to ETSI's drafting of IPR
16   policy.
17       Q.  And nothing in the documents cited in footnote
18   42 is relevant to the practice of licensing essential
19   -- standard essential patents at the component level.
20   Is that fair?
21           MR. EARNHARDT:  Object to form.
22       A.  This is not the way I would put it.  Everything
23   is relevant.  Everything is relevant to what I am
24   trying to explain.  And what I am trying to explain and
25   I repeat it is that the general assembly is very

Fauvarque-Cosson

 1    reluctant and rejected proposals to impose prohibitions

 2    on particular practices.  One of these prohibition

 3    would be to prohibit the practice of granting licenses

 4    at the device level.  Or, in other words, impose a

 5    practice of granting licenses only at a component

 6    level.  This is the kind of thing that obviously -- and

 7    this reverts from these elements that I have reviewed,

 8    the general assembly would be very reluctant to do and

 9    has not done to my knowledge.

10        Q.  In the meeting minutes you cite in footnote 42,

11    did anyone propose that ETSI should require a practice

12    of granting licenses at the component level?

13        A.  I don't know if you have seen these minutes.

14    Each of them is a couple of pages long, they are very

15    dense.  I would need to review them all over again to

16    give you the answer.

17        Q.  So as far as -- sorry.

18            (Speaking at the same time.)

19        Q.  As far as you can recall, there is no

20    discussion in these meeting minutes you refer to in

21    footnote 42?

22        A.  I wouldn't -- I wouldn't even say that.

23            MR. EARNHARDT:  Just don't talk over each

24    other.  Let him finish the question --

25            THE WITNESS:  Sorry.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1          MR. EARNHARDT:  -- before you start.

2          THE WITNESS:  Sorry.

3      Q.  So as far as you can recall sitting here today,

4  nothing in those meeting minutes is relevant to a

5  proposal - strike that.

6          As far as you can recall sitting here today,

7  these meeting minutes do not explicitly address a

8  proposal to require licensing at component level.  Is

9  that fair?

10     A.  I cannot say that.  I do not recall well

11 enough.  I remember it's long, it's technical, and I

12 remember that I skipped some parts which did not seem

13 relevant, so I cannot tell you whether or not this was

14 in the minutes.

15     Q.  So you don't know one way or the other if these

16 meetings minutes explicitly address a proposal to

17 require licensing at the component level.  Is that

18 fair?

19     A.  What I know from what I remember is that it was

20 not the main and foremost topic of one of these minutes

21 because I think I would then remember that.

22     Q.  Do you know if the general assembly of ETSI has

23 ever explicitly addressed a proposal to require

24 licensing at the component level?

25     A.  I do not know.

82

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1           MR. EARNHARDT:  Is now a good time for another

2      short break?

3           MR. MATHESON:  Sure.

4           THE VIDEOGRAPHER:  We will go off the record.

5      The time is 11:21.

6           (A recess was taken.)

7           THE VIDEOGRAPHER:  On the record.  The time is

8      11:36.

9      BY MR. MATHESON:

10          Q.  So in a disagreement over the intent of the

11     parties cannot be resolved solely based on the clear

12     and unambiguous language, external sources can be

13     helpful in discerning the intent of the parties, right?

14          A.  This is what I have written, yes.

15          Q.  One such external source can be the content to

16     pre-contractual negotiations?

17          A.  Yes, indeed.

18          Q.  And one external source could be the history of

19     the parties' negotiations?

20          A.  It should be the same as the content of the

21     pre-contractual negotiations, so, yes.

22          Q.  And another source would be the pre-contractual

23     documents, right?

24          A.  Yes, again.

25          Q.  You didn't examine any pre-contractual

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    documents to reach the opinions you offer in this

2    matter, right?

3         A.   Yes.  This is right.

4         Q.   The only information you have regarding the

5    history of the parties' pre-contractual negotiations

6    comes from your discussion with Dr. Huber; is that

7    right?

8         A.   I do not even remember my discussions with

9    Dr. Huber on the history of the pre-contractual

10   negotiations.  I didn't consider this was important in

11   this matter.

12        Q.   So you did not undertake to investigate in any

13   fashion the history of the parties' pre-contractual

14   negotiations in reaching the conclusions you offer in

15   your report, right?

16        A.   I thought it was more important to have a look

17   at the discussions as a general assembly and what I've

18   mentioned before and we've discussed that before.

19        Q.   And as we discussed before, the general

20   assembly materials you reviewed are not a history of

21   the parties' pre-contractual negotiations, right?

22        A.   I don't remember that they are a history of the

23   parties' pre-contractual negotiation because it took

24   place after.

25        Q.   So you don't have any information regarding the

Fauvarque-Cosson

1   history of the parties' pre-contractual negotiations

2   with respect to ETSI's IPR policy; is that right?

3          MR. EARNHARDT:  Object to the form.

4      A.  I didn't need it.

5      Q.  So is the answer to the question --

6      A.  Yes.  The answer is I do not have reviewed any

7   documents regarding the pre-contractual negotiations.

8      Q.  You did not undertake to investigate in any

9   fashion the history of the parties' pre-contractual

10  negotiation with respect to ETSI's IPR policy; is that

11  right?

12         MR. EARNHARDT:  Object to the form.

13     A.  I think that I have answered already the

14  question.  It did not -- it was not relevant so I did

15  not examine the parties' pre-contractual negotiation

16  prior to the drafting of the ETSI policy.

17     Q.  Now in an ordinary contractual setting if a

18  French court felt the need to interpret contractual

19  provisions based on external sources, it might rely on

20  publicity documents, right?

21     A.  That's one of the elements that are quoted in

22  the quote of Benabent, I think.

23     Q.  What does publicity documents mean in the that

24  context?

25     A.  Well, in the context of ETSI, I don't think it

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    means anything.  What is meant here and it's part of
2    the, quote, that's why I haven't distorted the, quote,
3    but what is meant by publicity document is if you are a
4    company which sells products and you make publicity as
5    regard certain qualities of the products, you may be
6    bound then to sell the products in the -- conforming
7    with what you have advertised.
8         Q.  But there aren't any publicity documents as
9    used in that sense that are relevant to the
10   interpretation of ETSI's IPR policy; is that right?
11        A.  Well, I cannot think of any and, once again,
12   it's here because it's part of the quote.
13        Q.  So you've reached the opinion in this matter
14   that paragraph 6.1 of ETSI's IPR policy contains clear
15   and unambiguous language regarding Qualcomm's
16   obligation, or lack of obligation, to license at the
17   components level, right?
18        A.  I reached the opinion that part of 6.1 is
19   clear.  The language is not ambiguous and, therefore,
20   there is no need to interpret and this is the
21   conclusion I've reached.
22        Q.  And the language that is clear is the
23   definition of manufacturer and the definition of
24   equipment; is that right?
25        A.  I think the language that is clear goes beyond

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1   just the definition because the definitions are not in

2   paragraph 6, it's in paragraph 15, so I reached the

3   conclusion that it's clear and not ambiguous as

4   regarding not only the definitions but also what is

5   said in paragraph 6.1 regarding the extent.

6       Q.  So just so we're clear you have reached the

7   opinion that paragraph 6.1 is clear and unambiguous

8   that holders of essential IPRs shall grant licenses at

9   least to the extent that licensees can, quote,

10  manufacture, including the right to make or have made

11  customized components and subsystems for the

12  licensees's own design for use in manufacture.  I'm

13  going to end there.

14      So that is -- it's clear that the ETSI IPR

15  policy imposes at least that obligation; is that right?

16      A.  Yes.  I think I can say that is right, yeah.

17      Q.  And the definition of manufacture is clear and

18  manufacture means, quote, manufacture shall mean

19  production of equipment.  Right?

20      A.  That is right.

21      Q.  The definition of equipment is unambiguous and

22  equipment means, quote, equipment shall mean any system

23  or device fully conforming to the standard.  Right?

24      A.  Yes.  Right.

25      Q.  Nowhere in the text of the ETSI IPR policy do

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1    they define, quote, fully conforming to the standard.

2    Right?

3         A.   That is -- if it was it will be in the

4    definitions and it's not in the definitions.

5         Q.   So nowhere in the text of the ETSI IPR policy

6    is a definition provided of, quote, fully conforming to

7    the standards.  Is that fair?

8         A.   I think it is fair but I would need to review

9    the whole text to be completely satisfied but I think

10   since it's not in the definition, we can take it as

11   such.

12        Q.   And on page 11 of your report, the first full

13   paragraph beginning with the italics, you state, quote,

14   I have been informed that the drafters of the ETSI IPR

15   policy also understood that only complete devices

16   satisfied the criterion of, quote, system or device

17   fully conforming to the standard, end quote.

18        A.   Yes.

19        Q.   You were informed of that by Dr. Huber, right?

20        A.   Yes.

21        Q.   He didn't tell you the identities of the

22   drafters of the ETSI IPR policy that are referred to in

23   that sentence, did he?

24        A.   No, he did not.

25        Q.   You did not ask any other individual involved

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                          8/16/2018

1    in drafting the ETSI IPR policy whether they shared the

2    understanding that Dr. Huber represented to you that

3    they had; is that right?

4        A.   This is right.  I think we have discussed this

5    already previously and I told you that I relied

6    exclusively on Dr. Huber's opinion and explanations to

7    me.

8        Q.   So Dr. Huber's explanations to you were

9    necessary for you to understand the definition of

10   equipment contained in the ETSI IPR policy, right?

11           MR. EARNHARDT:  Object to the form.

12       A.   Dr. Huber's was -- rather the definition of

13   equipment is clear, it's in the definitions and the

14   clear.  It's what is fully conforming to the standards

15   is not defined and for this I needed the explanation of

16   Dr. Huber, and what I understood from what he explained

17   to me is that a main component cannot be considered as

18   fully conforming to the standard and that it was

19   intention of the policy drafters, that system or device

20   fully conforming to the standards referred only to

21   complete systems or devices.  That is to say cellular

22   handset, for instance.

23       Q.   So the key to understanding Qualcomm's

24   obligation, if any, to offer FRAND licenses, is to

25   understand the meaning of system or device fully

89
Fauvarque-Cosson
FTC v. Qualcomm, Inc.                                            8/16/2018

1    conforming to the standard, right?

2        A.  No.  I think the key to understand Qualcomm's

3    obligation is to go back to the contract and the words

4    of the contract and the contract, in fact, is the ETSI

5    rules of procedure, so the key to understanding it is

6    both Article 6 and the definitions that are in Article

7    15.

8        Q.  And the key to understanding the definition of

9    equipment is to understand what is the meaning of a

10   system or device fully conforming to the standard,

11   right?

12       A.  I -- I wouldn't say that.  I think you will --

13   it skips one important step.  When you read the

14   definition of equipment, it says any system or device.

15   It doesn't say any system or device or component fully

16   conforming to a standard.  And I understood that a

17   components could not be fully conforming to a standard.

18   So the key to understanding the words and the

19   obligations implied by the contract is to look at the

20   words of the contract, and particularly Article 15.4,

21   which defines equipment, by referring to system or

22   device.

23           Under French law, if a word is not in the

24   contract and the judge adds a word, while it was not in

25   the contract, it will be distorting the parties'

90

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    intention, and then he would incur being quashed by the
2    cour de cassation for having distorted the parties'
3    intent.  A judge is not allowed to add a missing word
4    which would then change the meaning of the contract.
5    And I think that we can not add the word component in
6    the definition of equipment.
7        Q.   The word device does not include component as
8    used in the definition, right?
9        A.   Can you say that again please, the word.
10       Q.   So the word component does not appear in the
11   definition of equipment, does it?
12       A.   No, it does not.
13       Q.   So your opinion --
14       A.   Yes.
15       Q.   -- regarding definition of equipment is based
16   on the proposition that a device does not include --
17   strike that.
18           Your understanding of the word equipment, on
19   which your opinion offered in this report is based, is
20   premised on the proposition that the word device does
21   not include components; is that right?
22           MR. EARNHARDT:  Object to the form.
23       A.   This is not fact.  A device includes several
24   components.  I couldn't say that.  But a component is
25   not fully conforming to a standard.  Equipment shall

91

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    mean any system or device fully conforming to a
2    standard.  So it has to be a system or a device to be
3    qualified as an equipment.  That's my opinion.
4        Q.  And a baseband processor is not a device fully
5    conforming to the standard, right?
6        A.  That is my opinion.
7        Q.  And that's based on what Dr. Huber told you,
8    right?
9            MR. EARNHARDT:  Object to the form.  Misstates
10   her prior testimony.
11       A.  Well, it is based, once again, on the
12   definition of equipment.  Is a baseband processor a
13   system, is it a device by itself fully and conforming
14   to the standard.
15       Q.  Is a baseband processor a system fully
16   conforming to a standard?
17       A.  In my opinion, but I'm not an expert of this
18   question, but what I understood is that it is not and
19   that it is a component.
20       Q.  And you understood that a baseband processor is
21   not a system fully conforming to a standard because of
22   what Dr. Huber told you, right?
23       A.  It's not -- it's not because of what Dr. Huber
24   told me, it's just a matter of definition of words.  A
25   component is an element of something wider which is a

92

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    system or a device.

2        Q.   Component is not defined in the ETSI IPR

3    policy, is it?

4        A.   It is not defined, you're right.

5        Q.   You believe that a component is necessarily

6    different from a device, as the term device is used in

7    the ETSI IPR policy, right?

8        A.   Yes, I do.  And perhaps here it's a question of

9    interpretation but a component is one part of a bigger

10   element, of a bigger offer system or device.

11       Q.   And you believe that a component is necessarily

12   different from a system as the term system is used in

13   the ETSI IPR policy, right?

14       A.   Yes, I believe that.

15       Q.   What's the definition of system in the ETSI IPR

16   policy?

17       A.   I do not remember having seen a definition of a

18   system in the IPR policy, therefore, I think we should

19   stick to the usual definition.

20       Q.   What's the usual definition of a system as it's

21   used in the IPR policy?

22       A.   I'm not an expert -- not defined the IPR

23   policy, so I think that the normal, the plain language

24   and the plain normal definition of system here will be

25   used and a system is precisely something which puts

93

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1    together different elements.  It's not just one

2    component is not a system.

3         Q.  Are there different elements that are put

4    together in a baseband processor?

5         A.  That I'm not too sure how baseband processors

6    are constituted but -- and it's in my report and we

7    already have discussed this, it's on page two of my

8    report.  The FTC takes the position that ETSI FRAND

9    commitments creates an obligation to grant licenses to

10   the manufacturers of baseband processors, i.e., to

11   grant licenses -- licenses at the component level.

12        Q.  But you're the one who said that a baseband

13   processor is the component level, right?  The FTC never

14   said in its complaint that a baseband processor is a

15   component, did it?

16        MR. EARNHARDT:  Object to form.

17        A.  I haven't read the whole complaint of the FTC,

18   and I don't think I'm the only one to say that a

19   baseband processor is not a system or is not a device

20   fully conforming to a standard.

21        Q.  Do you know what a system on a chip is?

22        A.  I'm not an expert of these questions.

23        Q.  Are you aware that some baseband processors

24   referred to as a system on a chip?

25        A.  I am not aware of this.

94

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1       Q.  Are you aware that a system on a chip combines
2    an application to specific integrated circuit --
3    application integrated circuit and a baseband
4    processor?
5       A.  No, I'm not aware of this but I stick to the
6    definition of an equipment which means not only a
7    system but a system fully conforming to a standard.
8       Q.  Did you ask Dr. Huber whether a system on a
9    chip is capable of fully conforming to the standard, as
10   that term is used, in the ETSI IPR policy?
11      A.  I haven't asked this precise question to
12   Dr. Huber, and I have in my report the account for what
13   I have been informed.  And I understood that only
14   complete devices satisfy the criterion of system of
15   device fully conforming to the standard.
16      Q.  Now a handset is a complete device that fully
17   conforms to a standard, right?
18      A.  A handset, yes.
19      Q.  Other than an application specific integrated
20   circuit, what other parts of a handset are necessary to
21   fully conform to the standard, as that term is used, in
22   the ETSI IPR policy?
23      A.  Listen, I'm sorry.  I'm an expert in French
24   contract law and this is going beyond my sphere of
25   competence.

95

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1       Q.   Is a touch screen necessary to fully conform to
2   a standard?
3       A.   A touch screen on the handset?
4       Q.   Yes.  Is a handset required to possess a touch
5   screen to fully conform to the standard?
6       A.   I do not know.
7       Q.   Is a handset required to possess a keyboard to
8   fully conform to the standard?
9       A.   That, again, I do not know.
10      Q.   Is a handset required to possess a camera to
11  fully conform to the standard?
12      A.   I will do the same answer, I do not know.
13      Q.   Is a handset required to possess a battery to
14  fully conform to the standard?
15      A.   I do not know.
16      Q.   Can you identify any element of a handset,
17  apart from an application specific integrated circuit,
18  which is necessary to conform to a standard?
19      A.   I think I've told you before, I'm not -- I have
20  not been asked to give expertise on these questions,
21  which are technical and which go far beyond French
22  contract law.
23      Q.   What is infrastructure equipment?
24      A.   Isn't it defined?  It's not defined in the ETSI
25  rules of procedure and I prefer not to attempt to give

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    a definition.

2        Q.  The second sentence of paragraph, first full

3    paragraph on page 11 states, "Dr. Bertram Huber

4    explained to me that it was the intention of the ETSI

5    IPR policy drafters that, quote, system or device fully

6    conforming to the standard referred only to complete

7    systems or devices such as cellular handsets or

8    infrastructure."  Did I read that, right?

9        A.  Yes.

10       Q.  What is infrastructure as you used it in that

11   sentence of your report?

12       A.  I understood it as something more complex than

13   handset but I can't define it precisely.

14       Q.  Do you know what a base station is?

15       A.  Yes.

16       Q.  Do you know if a base station includes an

17   application specific integrated circuit?

18       A.  I'm not sure.

19       Q.  What is a base station?

20       A.  What would be the French translation so that

21   I'm sure I -- it is.

22           THE INTERPRETER:  I don't know.  I'm not -- I

23   don't want to venture a guess on that.  Let me see if I

24   can find something.

25           MR. EARNHARDT:  Can you say the two words, base

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1   and station in French?

2           THE INTERPRETER:  Yes.

3           (Words spoken in French by the interpreter).

4           THE WITNESS:  Yes, but it's not stanchion

5   device.  I don't think so.  So I want to make sure.

6           THE INTERPRETER:  Would that be equivalent,

7   wireless base station?  Let me see what -- now I cannot

8   see the screen, my screen to see what it says here.

9       Q.  Well, let's try to get beyond the translation

10  issue.  What pieces of hardware are you aware of that

11  constitute infrastructure, as you used it in that

12  sentence of your report?

13      A.  I'm -- I don't want to get into this

14  discussion.  I don't think I was hired to give

15  technical explanation and I am not prepared for this.

16      Q.  What did you mean by the word infrastructure?

17      A.  As I said before, I meant something which is

18  not just a mobile phone, something more complex and so

19  -- but I had no -- I don't think we discussed with

20  Bertram Huber exactly the meaning of infrastructure and

21  I don't think it changes the meaning of what I wanted

22  to say, which is that the main component of, for

23  instance, a hand phone, is not a system or device fully

24  conforming to the standard, that's what I concentrated

25  on.  And it's even more true with an infrastructure

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                     8/16/2018

1   because infrastructure, if you take it in the common

2   sense, an infrastructure cannot be made of just one

3   component.  That's -- that was actually plain meaning

4   of current language.

5       Q.  So it's your view that a single baseband

6   processor cannot constitute infrastructure as you've

7   used it in that sentence; is that right?

8       A.  I've told you before that I don't want to give

9   an expertise on what baseband processor can or cannot

10  constitute.  It goes beyond my sphere of expertise and

11  I am not prepared to answer that question.

12      Q.  What did you do to assess the credibility of

13  Dr. Huber's representation to you that a baseband

14  processor cannot constitute infrastructure?

15      A.  I don't remember having written this and I

16  don't remember during the discussion Dr. Huber saying

17  this in the precise words that you are using now, and

18  had he done so, I will have relied on his expertise.

19  You're asking me what I did to assess the credibility

20  of what he told me, but he is the expert on these

21  questions, I am not.  And I am not asked to assess the

22  credibility of what Dr. Huber tells me.  This would be

23  ridiculous.  I have no expertise for this.

24      Q.  What expert opinion did Dr. Huber convey to you

25  when you say you are not able to assess the credibility

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    of what he tells you?

2        A.   What expert opinion did he convey to me?  I

3    mean, he -- I think in my report you have here the

4    express opinion he give me.  What else do you mean by

5    this question?  I'm not sure I understand.

6        Q.   Dr. Huber told you things he heard when the

7    ETSI IPR policy was being drafted, among other things,

8    fair?

9        A.   Things he heard or I don't know where he took

10   this information from.  I understand that you are sort

11   of questioning the legitimacy of Dr. Huber's opinion

12   but that's not a matter for me to take position on.

13   I've already told you that I trusted what Bertram Huber

14   has told me, that I used it in my report and that I'm

15   not as an expert on French law supports, nor asked to

16   check the voracity of what Dr. Huber told me.

17       Q.   So you said in that answer that I'm questioning

18   Dr. Huber's opinion.  What do you mean by his opinion?

19       A.   I said that repeatedly.  You ask me what I have

20   been doing to check what Dr. Huber told me.  I'm am not

21   saying by opinion that he's -- an opinion -- well,

22   opinion is ambiguous.  So I should rather say what

23   Dr. Huber told me.

24       Q.   Well, he told you things -- strike that.

25            Dr. Huber told you the conclusions he reached

100

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    based on his experience at ETSI, right?

2        A.   I don't know if it's the conclusions he

3    reached.  I took it more as really a consta, really

4    something that he told me as a fact, it's not a

5    conclusion he reached.

6        Q.   So you said constant, right, you took it as a

7    constant?

8        THE INTERPRETER:  No, C-O-N-S-T-A-T [sic], an

9    observation.

10       A.   A factual observation rather than an opinion.

11   There is no subjective element, that's what I meant.

12       Q.   Okay.  So Dr. Huber conveyed to you factual

13   observations; is that fair?

14       A.   That's how I took it, rather than opinion.

15       Q.   So your opinion is predicated on Dr. Huber's

16   factual obligations?

17       A.   No.

18       MR. EARNHARDT:  Object to the form.  Object to

19   the form.

20       A.   No. This is not fair?  No.  My opinion is on

21   French contract law and essentially my opinion is that

22   when the terms of the contract are plain and clear,

23   there should be no interpretation because there need

24   not be, and it goes even further than that under French

25   law, and this was before in case law and it is now

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    clarified, if a judge distorts the parties' intention
2    and adding a word in a contract may amount to
3    distortion, then he incurs being quashed by the cour de
4    cassation because he is denaturer, that's the word we
5    use, denaturer.  He is violating, in a way, the
6    parties' intention, so denaturer the contract.
7         Q.  So you've reached the opinion that the language
8    of the ETSI IPR policy is plain and clear, right?
9         A.  Well, not all the language but on the issues
10   that we are discussing now, I've reached the opinion
11   that the slang is plain and clear.
12        Q.  What if the word equipment was not defined in
13   the ETSI IPR policy, would you still have the view that
14   the language was plain and clear?
15        MR. EARNHARDT:  Object to the form.
16        A.  You are asking me to form an hypothesis and I
17   haven't reflected upon this.  It is defined so it's
18   important to note that the word equipment is defined.
19   Now what would it be had it not been defined, I don't
20   know.
21        Q.  So if not for the definition of the word
22   equipment in the ETSI IPR policy, you don't have a view
23   regarding whether or not the language is unambiguous
24   with respect to the obligation, or lack of obligation,
25   to license at the component level; is that fair?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                           8/16/2018

1       A.   It's not exactly the way I would put it.   If
2   the word equipment had not been defined, and again, you
3   ask me to reflect on a hypothetical, and I find it
4   pretty uncomfortable because, of course, I haven't
5   reflected upon this hypothesis, but then a judge will
6   turn to the normal meaning of equipment, to the plain
7   everyday meaning.   And in an everyday meaning, an
8   equipment is something which normally is not -- well,
9   it's -- I don't know how to define equipment in a plain
10   meaning but you understand that it's not just one
11   little piece of something.
12          So I'm not sure it will change much, but again,
13   it's a hypothetical and I don't really want to
14   extrapolate.
15       Q.   Is a toothpick a piece of equipment?
16       A.   Sorry?
17       Q.   Is a toothpick a piece of equipment?
18          THE INTERPRETER:   Core-dent.
19       A.   A piece of equipment.   So is it an equipment,
20   you mean?
21       Q.   Yes.   Is it an equipment?
22       A.   Well, in French we have the word equipement, we
23   usually use it when it comes to being really well
24   prepared.   You take all your equipment, you take
25   everything with you, taking your cure-dent would not

103

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1   really be seen as equipement.

2        Q.  Is a dagger a piece of equipment?

3             (Stated in French by the interpreter.)

4        A.  But you're asking me if it's a piece of

5   equipment or an equipment?

6        Q.  In the ordinary meaning of the word equipment,

7   is a dagger equipment?

8        A.  I would rather say that it is a piece of

9   equipment.

10       Q.  And a toothpick is also a piece of equipment,

11  in the ordinary meaning of the word equipment, fair?

12       A.  I think so, but again, we are going far beyond

13  French contract law.

14            (The interpreter said something in French.)

15       Q.  A contact lens.  Is a contact lens a piece of

16  equipment in the ordinary meaning of the word

17  equipment?

18       A.  I think I can make the same answer and we can

19  continue endlessly.  Yes, if you don't see well and you

20  need contact lenses and you go for an expedition and

21  you prepare your equipment, you had better take your

22  contact lenses with you and it will be a piece of your

23  equipment.

24       Q.  Is a lever a piece of equipment in the ordinary

25  meaning of the word equipment?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                         8/16/2018

```
 1             MR. EARNHARDT:  Object to the form.
 2        A.  I don't know what a level is.
 3             (The French word was stated by the
 4   interpreter.)
 5        A.  It depends what you need to do with it but it
 6   may be a piece of equipment.  I don't understand where
 7   you are taking me here.
 8        Q.  Is a fulcrum a piece of equipment in the
 9   ordinary meaning of equipment?
10        A.  A fork?
11        Q.  No.
12             THE INTERPRETER:  Translated.  If I could just
13   see my screen.
14             (The French word was stated by the
15   interpreter.)
16        A.  I don't know what it is, even in French.
17        Q.  Is a screw a piece of equipment in the normal
18   meaning of the word equipment?  Strike that.
19             Is a screw equipment in the normal meaning of
20   the word equipment?
21             MR. EARNHARDT:  Object to the form.
22        A.  Can you take words like glasses or I don't
23   know, glasses.  I don't know what a screw is.
24             THE INTERPRETER:  Translated.
25        A.  I believe it is a piece of equipment.
```

105

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1        Q.   Is an application specific integrated circuit

2    equipment within the normal meaning of the word

3    equipment?

4        A.   Equipment or piece of equipment?

5        Q.   Is an application specific circuit equipment

6    within the normal meaning of the word equipment?

7        A.   I think I've told you already that I can't

8    answer this question.

9        Q.   So you don't know one way or the other whether

10   the ordinary use of the word equipment would include an

11   application specific integrated circuit, fair?

12       A.   I -- I do not know -- what I am trying to tell

13   you is that an equipment is different from a piece of

14   equipment and I do not know whether it's merely a piece

15   of equipment or not.

16       Q.   What's the distinction between a piece of

17   equipment and equipment, as you've used those terms?

18       A.   As I view these terms in ordinary plain

19   meaning, and I think I've told you already, if you take

20   a screw you're not very well equipped.  You need to

21   take also a tourne-vis.

22            THE INTERPRETER:  A screwdriver.

23       A.   A screwdriver.  And then you begin to have the

24   beginning of an equipment but usually you need more

25   screws and perhaps different sizes of screwdrivers.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    This is getting ridiculous.  I am not an expert of
2    screw and screwdrivers.
3        Q.  What about a dagger, you're perfectly well
4    prepared to stab somebody with only a dagger, right?
5        A.  You need something to carry it.  Usually you
6    won't just go along in the street with your thing.
7            What's the point of all this?
8        Q.  Well, the point of all this is you don't know
9    what equipment means as it's used in the ETSI IPR
10   policy, unless you know what a system or device fully
11   conforming to the standard means is; is that right?
12           MR. EARNHARDT:  Whoa, let me just object to the
13   form and object to the extent that you're representing
14   those hypotheticals have anything to do with equipment
15   as it's defined in the policy.  I object to this entire
16   line of questioning, but you can try and answer the
17   question that's been posed.
18       A.  I do what a French judge will do.  Let's go
19   back to the words.  I know that equipment, as defined
20   in the policy, shall mean any system or device fully
21   conforming to a standard, full stop.
22       Q.  And if that definition wasn't in there you
23   would not know whether an application specific
24   integrated circuit constituted equipment within the
25   meaning of the ETSI IPR policy, right?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                              8/16/2018

1       A.   It's -- the question is completely irrelevant.

2  The definition is in there and it is important since it

3  is in there that a French judge looks at the definition

4  that is in the ETSI rules of procedure.

5       Q.   So the definition in the ETSI rules of

6  procedure is an essential input into what a French

7  judge would conclude when analyzing the ETSI IPR

8  policy, right?

9            MR. EARNHARDT:  Can you read back that

10  question, please.

11       A.   What do you mean by --

12            MR. EARNHARDT:  I missed the question if you

13  can read it back.

14            (The requested portion was read.)

15       A.   It's an element.

16       Q.   Let's strike the question.

17            The opinion you have offered in this matter is

18  based, in part, on the definition of equipment in the

19  ETSI IPR policy, right?

20       A.   The opinion is more largely based on French

21  contract law as regard interpretation, and what I say

22  is that if the words are there, and if they are clear,

23  there is no need to look at external factors and other

24  things.  And not only is there no need but the judge

25  cannot interpret the parties' intent because the

Fauvarque-Cosson
FTC v. Qualcomm, Inc.                                    8/16/2018

1    language is clear and if he does so, then his decision
2    will be quashed.
3        Q.  You haven't considered whether or not the
4    language would be clear if there was no definition of
5    equipment in the ETSI IPR policy; is that right?
6        A.  What is the point of doing so since there is a
7    definition.  A French judge would not consider whether
8    or not the definition is clear, if there was no
9    definition, because it will be wrong for a French judge
10   not to turn to the definition.
11       Q.  So my question is:  You have not considered
12   whether or not the language of the ETSI IPR policy
13   would be clear if there was no definition of equipment
14   provided; is that fair?
15       A.  I think I can say this is fair and, once again,
16   I think this would be a fault from a French judge not
17   to refer to the definitions.
18           MR. EARNHARDT:  So let's take like a -- well,
19   let's take a break.  Maybe we can take a break for
20   lunch.  It's about 12:25.  I have to take a break no
21   matter what so we can do lunch now or we can take a
22   five-minute break and come back but I need to take a
23   break.
24           MR. MATHESON:  I'm kind of in the middle of
25   something.  How long of a lunch break do you want to

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1    take?
 2           MR. EARNHARDT:  I'm am fine with half an hour.
 3    Are you okay with half an hour?
 4           THE WITNESS:  Yes, I am.
 5           MR. MATHESON:  For the witness, we will take
 6    half an hour.
 7           THE VIDEOGRAPHER:  We are now going off the
 8    record, the time is 12:42.
 9           (A recess was taken.)
10           THE VIDEOGRAPHER:  We are now going back on the
11    record.  The time is 1:09.
12      Q.  Thanks for coming back.
13           So is it fair to say that the key to
14    understanding what Qualcomm -- strike that.
15           Is it fair to say that the key to understanding
16    which offers to license standard essential patents
17    Qualcomm needs to make, is to understand the meaning of
18    equipment as it's used in the ETSI IPR policy?
19           MR. EARNHARDT:  Object to the form.
20           THE VIDEOGRAPHER:  Excuse me.  Do you have your
21    mic on?
22      Q.  Is the question clear or should I --
23      A.  No, it's not clear.
24      Q.  Okay.  Is it fair to say that the key to
25    understanding which offers Qualcomm must make to be

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    consistent with the ETSI intellectual property policy,
2    is to understand the meaning of, quote, a system or
3    device fully conforming to the standard, i.e.,
4    equipment, end quote?
5        A.   It's not exactly the way I would put it but
6    perhaps eventually it would be the same.  I would say
7    that to understand this meaning is important to
8    understand the extent, the ampleur of the FRAND
9    obligation.
10            THE INTERPRETER:  The aim?
11            THE WITNESS:  No, no, the extent of the FRAND
12   obligation.
13       Q.   Okay.  So it would be inaccurate, in your view,
14   to state that the key to understanding which offers
15   Qualcomm must make to be consistent with the
16   intellectual property policy of ETSI, is to understand
17   the meaning of a system or device fully conforming to
18   the standard, i.e., equipment?
19            MR. EARNHARDT:  Object to the form.
20       A.   No.  I'm not saying that it will be inaccurate.
21   Can we come back to your first question because is it
22   fair to -- the first one you ask me and -- I'm a bit
23   lost.
24       Q.   Sure.  How about this:  Take a look at page 11
25   of your report, please.

111

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      A.  Yes.

2      Q.  CX0057-013.

3      A.  Yes.

4      Q.  The final sentence of the first paragraph

5  states, quote, therefore the key to understanding what

6  SEP holders must license is the meaning of a, quote,

7  system or device fully conforming to the standard,

8  i.e., equipment.

9      A.  I see it, yes.

10      Q.  Do you agree, sitting here today, that the key

11  to understanding the offers that Qualcomm must make, in

12  order to be consistent with ETSI's intellectual

13  property policy, is to understand, quote, the meaning

14  of a system or device fully conforming to the standard,

15  i.e., equipment?

16      A.  I'm a bit confused.  Can we stick to the words.

17  I agree with what I have written, so if your question

18  means the same as what I have written, it's fine.  I

19  don't see the difference.  I'm a bit lost here.

20      Q.  What did you mean when you wrote, the key to

21  understanding what SEP holders must license?

22      A.  I think what I meant is that in order to know

23  what SEP holders must license, according to clause 6.1

24  of the IPR policy, that is to say according to the

25  requirement that it's licensed on a FRAND basis, is the

112

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                              8/16/2018

1  meaning of a system or device fully conforming to the
2  standard.
3      Q.  Now when you say what SEP holders must license,
4  is there a distinction -- strike that.
5          You mean that license offers they must make,
6  correct, not the licenses they must take from others?
7      A.  License offers.
8      Q.  So you're using license in the sense of make an
9  offer to make a license to the SEP holders'
10 intellectual property available to others?
11     A.  Yes, I am.
12     Q.  And your understanding of the term, quote,
13 system or device fully conforming to the standard is
14 not based on any minutes of ETSI proceedings, right?
15     A.  Minutes of ETSI proceedings?  Do you refer to
16 the documents we discussed before, minutes of the
17 general assembly or --
18     Q.  Are there any minutes of any ETSI proceedings
19 of the general assembly or any other ETSI body that
20 have informed your view of the meaning of, quote,
21 system or device fully conforming to the standard?
22     A.  I don't remember having been informed on this
23 by what I have read, what you -- by the minutes of the
24 general assembly that I've read, no.
25     Q.  And you've never read any declaration from Carl

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1    Himes Rosenbrook relevant to your understanding of,
 2    quote, system or device fully conforming to the
 3    standard, right?
 4         A.  Sitting here now, I do not remember having read
 5    that.
 6         Q.  Other than -- strike that.
 7             Now, Dr. Bertram Huber explained to you the
 8    intention of the ETSI IPR policy drafters regarding the
 9    meaning of system or device fully conforming to the
10    standard, right?
11         A.  Yes, this is correct.
12         Q.  He didn't identify for you the ETSI IPR policy
13    drafters to which your report refers, did he?
14         A.  I don't think -- I don't remember him
15    identifying them, no.
16         Q.  And you did not ask him to identify the ETSI
17    IPR policy drafters to which your report refers, right?
18         A.  Right because if he gave me some names it
19    wouldn't help me very much.
20         Q.  Now, a French court considering Dr. Bertram
21    Huber's explanation of the intent of the ETSI IPR
22    policy drafters, wouldn't necessarily take at face
23    value everything he says, fair?
24         A.  Well, this is fair.  French court is always
25    free not to take as face value something that is said

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

 1   by lawyers or by an expert.

 2       Q.  A French court could consider contrary

 3   evidence, if such evidence existed, that contributed

 4   what Dr. Bertram Huber said was the intention of the

 5   ETSI IPR policy drafters, right?

 6       A.  Yes.  A French court could consider contrary

 7   evidence if it was brought by the other party.

 8       Q.  And in the ordinary case, if there was

 9   conflicting evidence regarding the intention of the

10   ETSI IPR policy drafters, the French court would

11   consider all the evidence, right?

12       A.  It will have to take everything into account,

13   yes, and make its own mind up.

14       Q.  So in order to interpret what you refer to as

15   the clear and unambiguous language of the ETSI policy,

16   you need to know what, quote, system or device fully

17   conforming to the standard means, right?

18       MR. EARNHARDT:  Object to the form.

19       A.  I'm -- I'm not so sure that it's necessary to

20   know in detail what fully conforming to a standard

21   means in order to interpret the policy.  What is clear

22   for me, when I read the policy and when I read the

23   definition, is that the word component is not there and

24   it's not in the definition of equipment, and that's the

25   important point because, as I've said before, a judge

Fauvarque-Cosson
FTC v. Qualcomm, Inc.                                    8/16/2018

1    could not add a word in the contract if it was not
2    there.
3         Q.   When you say it's not there, you mean the word
4    component does not appear in the definition of
5    equipment, right?
6         A.   That is what I mean, indeed.
7         Q.   Now, can we take a look at CX7552-003.  This is
8    the ETSI policy we were discussing.
9         A.   Yes.
10        Q.   The intellectual rights policy.
11             So 6 point -- Clause 6.1 has four bullets,
12   right?
13        A.   Yes.
14        Q.   The first bullet, it's fair to say that this
15   bullet states that holders of essential IPR shall grant
16   at least the right to manufacture, including the right
17   to make or have made customized components and
18   subsystems to the licensees's own design for use in
19   manufacture, right?
20        A.   This is the first bullet, yes.
21        Q.   And that bullet doesn't have the word equipment
22   in it, does it?
23        A.   That bullet has the word component in it.
24        Q.   My question is:  Does that bullet contain the
25   word equipment?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1          MR. EARNHARDT:  Object to the form.
 2      A.  I don't see the point of this question.  The
 3  equipment is mentioned in the second bullet.  What I
 4  understand from the first bullet, which refers to the
 5  manufacturer, is that it considers components in the
 6  specific context, which is the right to make or have
 7  made customized components and subsystems to the
 8  licensees's own design for use in manufacture.  What is
 9  important is manufacture.
10      Q.  Right.  It doesn't say manufactured by the
11  licensee, does it?
12      A.  No, it doesn't say by the licensee.
13      Q.  So under this bullet, a holder of standard
14  essential patents must grant at a minimum a right to
15  manufacture customized components designed by the
16  licensee for use in manufacture of equipment, right?
17      A.  It's getting technical and it's in English,
18  which is not my native language, so I prefer to stick
19  to the language because you made it shorter.  It's
20  manufacture, including the right to make or have made
21  customized components and so-so.  So I would say that
22  we -- every word counts.
23      Q.  Every word counts.  And in this bullet it says
24  that licensees are entitled to manufacture components
25  of their own design for use in the manufacture of
```

Fauvarque-Cosson
FTC v. Qualcomm, Inc.                                      8/16/2018

1    equipment, right?

2            MR. EARNHARDT:  Object to the form.

3        A.  Can you say again.  Licenses are entitled to?

4        Q.  Manufacture components of their own design,

5    assuming that those components are for use in the

6    manufacture of equipment.

7            MR. EARNHARDT:  Object to the form.

8        Q.  Fair?

9            MR. EARNHARDT:  Object to the form.

10       A.  I'm not too sure.  I prefer to -- once again, I

11   prefer to stick to the language.  It says precisely

12   what is said here.  I don't know if your interpretation

13   is correct or not.

14       Q.  Did you ask Dr. Huber if that interpretation

15   was correct?

16       A.  I didn't ask Dr. Huber.

17       Q.  So there is nothing in this bullet -- or strike

18   that.

19           What is the language in 6.1 that forecloses the

20   interpretation that all licensees are entitled to make

21   customized components, as long as those components are

22   for use in the manufacture of equipment, as manufacture

23   and equipment are defined?

24       A.  This is not exactly the way I have considered

25   this bullet.  I have concentrated on the word

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1    manufacture, and then I turn to the definition of

 2    manufacture, which is in Clause 15, and which says it

 3    shall mean production of equipment.

 4        Q.  But it doesn't say that the licensee must be

 5    the one who manufactures the equipment into which the

 6    customized component is included, does it?

 7        A.  It's not the object of this Article 6, which is

 8    about availability of licenses, so it's not turned to

 9    the licensee, it concentrates on the definition of the

10    scope of the FRAND obligation.

11        Q.  And the scope of the FRAND obligation, in

12    Clause 6.1, includes the obligation to offer licenses

13    to licensees who desire to manufacture customized

14    components of their own design, as long as those

15    components are for use in equipment.  Right?

16        A.  I suppose if you say that it's right but I

17    prefer, once again, to stick to the very language of

18    the bullet itself, because I'm not too sure of whether

19    the way you put it is different from the way it is

20    written here.

21        Q.  So let's say Siemens?

22        A.  Siemens.

23        Q.  Are you familiar with Siemens?

24        A.  No.

25        Q.  Have you heard of them?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1        A.   I've heard of them.

2        Q.   Are you aware that at one point in time they

3   manufactured baseband processors?

4        A.   Yes.  But I'm not very familiar with them.

5        Q.   Okay.  Is there a manufacturer of baseband

6   processors, other than Qualcomm with whom you're more

7   familiar with?

8        A.   No.

9        Q.   Let's stick with Siemens then.  So if Siemens

10  wants to manufacture customized components of its own

11  design and sell them to a handset manufacturer that

12  would then manufacture a handset that fully conforms to

13  the standard, this clause of the ETSI IPR policy says

14  that standard essential patent holders have to license

15  Siemens to do that, right?

16       MR. EARNHARDT:  Object to the form.

17       A.   Again, I'm not sure, so I prefer not to answer

18  that question.

19       Q.   What else would you have to know in order to

20  know the answer to that question?

21       A.   I will have had to reflect upon it and to have

22  more time to see it in the light of the language of the

23  ETSI policy.

24       Q.   It's not a question you've considered before

25  today?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1        A.  It's not at all.

2        Q.  It's not interpretation Dr. Huber told you was

3   one that was advanced by, quote, drafters of the ETSI

4   IPR policy; is that right?

5        A.  What is right is that explained to me -- he

6   explained to me that system of device fully conforming

7   to standard, as used in the IPR policy of ETSI, was not

8   intended to cover an isolated component, such as

9   cellular chip sets and or thin modem and that's what I

10  have put in my report.

11       Q.  Right.  And you never asked him whether this

12  bullet that says that standard essential patent holders

13  must make available at least a license to manufacture

14  customized components of a licensee's own design

15  provided those components are used in the manufacture

16  of equipment, meant that Qualcomm had to license the

17  component level, right?

18       MR. EARNHARDT:  Object to the form.

19       A.  I'm sorry but I need you to repeat the

20  question.

21       (The requested portion was read.)

22       A.  Right.  I did not ask him such a question.

23       Q.  Now, you're not 100 percent certain that a

24  French court would find that the clear and unambiguous

25  terms of the ETSI policy require a holder of standard

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1    essential patents to license only makers of complete
 2    operational devices, right?
 3        A.   Well, it's difficult to be 100 percent sure of
 4    what the French court would find when it comes to
 5    interpreting a contract.  And its interpretation is
 6    considered as a factual element and, therefore,
 7    normally it's not submitted to the control of our
 8    supreme private court, which is the cour de cassation,
 9    precisely because it's an element of fact.  But when it
10    comes to what I said before, what we call denaturacion,
11    adding a word which is not then the supreme court will
12    control and will cause a decision that is not
13    interpreting properly the parties' will.
14            So to come back to your question, I'm not 100
15    percent sure because it's not possible to be 100
16    percent sure of what the French judge will do,
17    particularly when it comes to interpretation of the
18    contract where factual elements matter and there is, of
19    course, some space for different analysis.  But having
20    said that, I am absolutely sure that if a judge was to
21    add the word component where it is not included, then
22    this would be a case where the specific control of our
23    supreme court, cour de cassation, would exerted.  And
24    this control, which was created by case law, and I
25    think I've said it before, has been codified in our new
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    civil code, so it gives it even more strength, it
2    doesn't change the law because it was there already in
3    Article 1152, if my memory is good -- no, 1192.  92.
4         MR. EARNHARDT:  Our real time has gone out
5    again.  I don't know how easy of a fix it is.
6         MR. MATHESON:  Mine's out.  You want to go off
7    real quick and see if we can get it back on?
8         MR. EARNHARDT:  Yeah.
9         THE VIDEOGRAPHER:  We are going off the record.
10   The time is 1:34.
11        (A recess was taken.)
12        THE VIDEOGRAPHER:  We are going back on the
13   record.  The time is 1:38.
14        Q.  Do you not say in your report any cases in
15   which French courts have determined that the terms of
16   the ETSI IPR policy are clear and unambiguous, do you?
17        A.  No, I don't.
18        Q.  Did you try to find any cases?
19        A.  There are no cases.
20        Q.  There are no cases in which French courts have
21   assessed whether the terms of the ETSI IPR policy are
22   clear and unambiguous, fair?
23        A.  That is fair.
24        Q.  Are there any cases in any jurisdictions that
25   assess whether the ETSI IPR policy is clear and

123
Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

```
 1   unambiguous?
 2        A.   Apart from France, you mean?
 3        Q.   Correct.  Are there cases in any jurisdiction,
 4   including but not limited to France?
 5        A.   I haven't looked apart from France, so I could
 6   not tell you.  I'm not aware of any.
 7        Q.   You yourself authored a report in -- that was
 8   introduced in an English court regarding whether or not
 9   the ETSI IPR policy is clear and unambiguous, right?
10        A.   Are you meaning the NY Planet case?
11        Q.   What was the NY Planet case?
12        A.   It was in front of an English judge, that's why
13   I think of this report, but it was more on the method
14   to determine FRAND, so I'm not sure whether that is the
15   one you are referring to or not.
16        Q.   What opinion did you offer in that case?
17        A.   My opinion was mainly concentrated on the
18   stipulation on behalf of third party and the way that a
19   FRAND commitment has to be analyzed as a stipulation on
20   behalf of a third party, and that Judge Birss, he
21   adopted this analysis.
22        Q.   Which judge was that?
23        A.   Birss, B-I-R double S.
24        Q.   Did you offer the view in that case that the
25   ETSI intellectual property rights policy was clear and
```

124

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    unambiguous?

2        A.   I don't remember having offered such a view but

3    I would need to check.  It wasn't the core subject.

4        Q.   Do you offer an opinion in litigation between

5    Apple and Qualcomm in the United Kingdom that the ETSI

6    IPR policy is clear and unambiguous?

7        A.   I offered an opinion, yes, in this litigation,

8    and now sitting here, I can't remember whether I

9    offered it on this specific point.  It was more about

10   the question -- it was a different question.  It was

11   about the definition of subsidiary.

12       Q.   Did you offer deposition testimony in that

13   case?

14       A.   Deposition testimony.  Do you mean did I go to

15   court or did -- I wasn't asked to -- I wasn't deposed.

16   I offered -- I made a report.

17       Q.   You were not deposed during the course of

18   the --

19       A.   No.

20       Q.   You did not testify in court?

21       A.   No.

22       Q.   Did you read the opinion that the judge

23   ultimately issued on May 22, 2018?

24       A.   Quickly.

25       Q.   Did the judge agree with you that the ETSI IPR

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                8/16/2018

1    policy was clear and unambiguous?

2        A.   I don't remember this precise point.  I just

3    remember that it was a French expert, had given another

4    opinion and my opinion was followed by the judge, that

5    he agreed with me rather than with Morefessis.  Now on

6    the substance, I must say I don't remember this precise

7    point.  It was more on the question of affiliate and

8    affiliated because it was a question of jurisdiction

9    that was behind it so far, as I remember.

10       Q.   So you don't recall one way or the other

11   whether you offered an opinion that the ETSI IPR policy

12   was clear and unambiguous?

13       A.   No, I truly don't recall.

14       Q.   Now who was the other expert, Professor

15   Morefessis?

16       A.   Yes.

17       Q.   Are you familiar with Professor Morefessis,

18   other than in that litigation?

19       A.   Yes, I am.

20       Q.   Is he a French processor of French law?

21       A.   Exactly.

22       Q.   Is he well respected?  Is it a man or a woman?

23       A.   A man.

24       Q.   Is he a relatively well respected professor of

25   French law?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1        A.  Relatively well.

2        Q.  Not as highly as yourself, one assumes.

3            Did you find the opinion he offered in that

4    case well supported?

5        A.  No, I didn't.

6        Q.  Why not?

7        A.  You're asking me to remember opinions that I

8    have been working on quite sometime ago and I don't

9    have a very clear remembrance, but I thought -- oh,

10   yes, now I remember.  He had all these developments

11   about the porte-fort, which were completely, I think,

12   useless, and other things which really did not convince

13   me and did not convince the judge either.

14           THE INTERPRETER:  Porte-fort.

15       A.  Porte-fort.

16       Q.  And what is that?

17       A.  I would need to have the translation of the

18   French civil code to tell you exactly.  It's -- it's

19   something not too far from a stipulation on behalf of

20   third party, but it's different, and it's the idea that

21   you take up on you the fact that somebody is going to

22   do something and you sort of make yourself responsible

23   for that.

24       Q.  In the Apple versus Qualcomm litigation in the

25   UK, the court concluded that Qualcomm had tendered only

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1    inadmissible evidence as to the meaning of the ETSI IPR
2    policy, right?
3            MR. EARNHARDT:  Object to the form.  Do you
4    have something you want to show the witness?
5        A.  I am -- I don't know.  I told you I read it
6    quickly.
7        Q.  So you don't recall one way or the other --
8        A.  No.
9        Q.  -- whether the court concluded that your
10   opinion was inadmissible regarding the interpretation
11   of the ETSI IPR policy?
12       A.  I don't remember.
13       Q.  Now you're aware that Qualcomm and Ericsson
14   engaged in litigation at one point in time, right?
15       A.  Qualcomm and Ericsson engaged in litigation
16   together.  I haven't been implying that.
17       Q.  Are you aware one way or the other whether
18   Qualcomm has ever claimed that the ETSI IPR policy
19   obligated Ericsson to offer Qualcomm a license to
20   practice Ericsson's patents to manufacture chip sets
21   that complied with the ETSI standard?
22       A.  I don't think I'm aware of that, no.
23       Q.  Are you aware that Nokia has claimed that
24   Qualcomm is obligated by the ETSI IPR policy to execute
25   a chip set level license to practice Nokia standard

128

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

1    essential patents?

2         A.   No, I'm not aware.   I'm in the -- I was in the

3    case against Nokia but I don't think it was on this

4    subject.

5         Q.   So you've never investigated any litigation

6    between Qualcomm and Nokia, other than the United

7    States litigation which you were involved, fair?

8         A.   That's fair.

9         Q.   You never investigated any litigation between

10   Qualcomm and Ericsson that related to ETSI's

11   intellectual property rights policy, fair?

12        A.   That's fair.

13        Q.   And you never investigated whether Qualcomm

14   granted Broadcom a license to practice Qualcomm's ETSI

15   standard essential patents at the chip set level; is

16   that fair?

17        A.   That is fair.

18        Q.   Do you know if any court in the United States

19   has ever construed ETSI's intellectual property rights

20   policy?

21        A.   When you mean construe you will mean interpret

22   ETSI's IPR policy typically as regard Article 6?

23        Q.   Yes.   Are you aware --

24        A.   Construe means interpreting?

25        Q.   Yes.   Are you aware of whether or not any court

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    in the United States has ever interpreted Article 6 of

2    ETSI's intellectual property rights policy?

3         A.  No, I'm not aware of any interpretation given

4    by a US court.

5         Q.  If a French court were to interpret Article 6

6    of ETSI's intellectual property rights policy, would it

7    be relevant to the French court's determination if

8    courts in other jurisdictions had construed Article 6

9    one way or another?

10        A.  Not very much.  French courts are a bit

11   parochial and because it has to be construed under

12   French law, that's what is said in Article 12, French

13   law is applicable and it's applicable also for the

14   interpretation.  I don't think it will be very

15   impressed by any foreign decision interpreting the

16   policy.  And I even doubt that it will even take it

17   into account.

18        Q.  It doesn't matter to that view whether or not

19   the foreign decision purported to interpret French

20   contract law?

21        A.  I think they would consider that as French

22   judges they are much better placed to interpret French

23   law.

24        Q.  It might be relevant to the expectations of the

25   parties if courts in other jurisdictions had

130

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    consistently interpreted the ETSI intellectual property

2    rights policy one way or another, mightn't it?

3         MR. EARNHARDT:  Object to the form.

4    A.   First, the expectation of the parties comes as

5    a subsidiary, it's not the main criterion.  What is the

6    main criterion is the subjective interpretation and the

7    intention of the parties.  And secondly, I'm not even

8    sure that this will be a decisive factor.

9    Q.   In assessing the subjective interpretation of

10   the parties, a French court might consider positions

11   they had advanced in litigation relevant to the

12   question of their contractual interpretation, right?

13        MR. EARNHARDT:  Object to the form.

14   A.   Which parties are you talking about?

15   Q.   So I mean Qualcomm has claimed that Ericsson is

16   obligated to give them a component level license under

17   the ETSI IPR policy.  Now a French court attempting to

18   interpret the ETSI IPR policy might find that relevant,

19   right?

20        MR. EARNHARDT:  Object to the form.

21   A.   Aren't we mixing up two things, interpretation

22   of ETSI policy itself and the interpretation of the

23   contract between license or and licensee?  What are we

24   now discussing?  I'm not sure.

25   Q.   Okay.  Hypothetically, let's say a French court

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1    is asked to determine whether Qualcomm is obligated to
 2    offer licenses at the component level due to the ETSI
 3    IPR policy, right?
 4         A.  Yes.
 5         Q.  French court is asked to make that decision in
 6    2018.  Okay?
 7         A.  Yes.
 8         Q.  A French court might find it relevant that in
 9    2002 Qualcomm claimed that Ericsson was obligated to
10    offer component level licenses under the ETSI IPR
11    policy, right?
12              MR. EARNHARDT:  Object to the form.
13         A.  I'm skeptical.
14         Q.  You don't think that would be relevant to a
15    French court's determination?
16         A.  No.  I think the French court will look at the
17    contract itself and the contract itself here, it's very
18    -- it's very specific.  The contract itself is, in
19    fact, the ETSI rules of procedure.
20         Q.  Well, suppose that Qualcomm and Ericsson were
21    both involved as drafters of the ETSI IPR policy.
22    Okay?  If we hypothetically suppose that both Qualcomm
23    and Ericsson were among the drafters of the ETSI IPR
24    policy, then their public statements regarding whether
25    or not the IPR policy obligated licenses to be offered
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    at the component level might be relevant to a French

2    court's interpretation of the ETSI IPR policy, right?

3         MR. EARNHARDT:  Object to the form.

4         A.  I remain skeptical.

5         Q.  So the public statements of the drafters of the

6    ETSI IPR policy would not be relevant to a French

7    court's interpretation of the IPR policy; is that

8    right?

9         A.  What I'm saying is that the contexts are

10   different.  The public statements of the drafters, when

11   it is during the drafting process, would be relevant

12   and I've said it in my report it is relevant.  It's a

13   sort of -- sort of pre-contractual negotiations in a

14   way.  But what you are mentioning here is something

15   different.  Is those parties, while members of ETSI,

16   afterwards where into a litigation together and one of

17   them says you must license at a component level.  And

18   this litigation you are asking me whether this

19   litigation will be an element that a judge will take

20   into account to interpret ETSI policy and here I am

21   saying I don't think so.

22        Q.  So the statements of parties that are made

23   after the ETSI policy is finalized would not be

24   relevant?

25        A.  I'm not saying this.  It all depends on the

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1    context.  If it's within the litigation between two
 2    parties, one license -- licensor -- well, one patent
 3    holder and one licensee or prospective licensee, I
 4    don't know, it's a completely different context.  If
 5    the statement is made within the context of ETSI by
 6    these parties it's another thing.  What I'm saying is
 7    that a French court will find it too remote to rely on
 8    the statement made by Ericsson or made by Qualcomm in a
 9    litigation between the two of them.  It's a very
10    different situation than a subsequent statement that
11    would be made within the context of ETSI, like during
12    the general Assembly, for instance.
13        Q.  So statements made in the context of ETSI, such
14    as statements during the general Assembly, might be
15    relevant to a French court's interpretation of the ETSI
16    IPR policy, even if those statements were made after
17    the policy was finalized; is that fair?
18        A.  What I think is fair in what you said is that
19    subsequent elements, such as general Assembly
20    decisions, might be relevant.  A mere statement by one
21    member is not very relevant.  A general Assembly
22    decision is much more relevant than a statement by one
23    member.
24        Q.  How many members does the general Assembly have
25    right now?
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1          A.   I do not know but...

2          Q.   Do you know approximately, is it more than 100?

3          A.   I would tend to think that it is.

4          Q.   Are there members of the general Assembly right

5     now who are not represented in ETSI when the ETSI IP --

6     IPR policy was drafted?

7          A.   I do not know the answer but it's possible.

8          Q.   Hypothetically, let's suppose the ETSI IPR

9     policy was drafted by about 30 people.  Fair?

10         A.   Yes.

11         Q.   Hypothetically, let's suppose ETSI currently

12    has 400 members in the general Assembly.

13         A.   Yes.

14         Q.   It doesn't really matter what the 400 current

15    members of the general assembly think when we're asking

16    ourselves what the 30 drafters of the ETSI IPR policy

17    thought, does it?

18         MR. EARNHARDT:  Object to the form.

19         A.   It's -- it's not decisive but it's maybe an

20    element and along this line an element may be that the

21    members of the general Assembly have not refused to

22    incorporate Qualcomm's patents, even though Qualcomm is

23    not licensing at a component level.

24         Q.   Do you know whether ETSI's general Assembly

25    members would open themselves up to antitrust liability

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1   if they were to agree amongst each other not to include
 2   Qualcomm's patents?
 3          MR. EARNHARDT:  Object to the form.
 4      A.  That I do not know.
 5      Q.  You don't know one way or the other why the
 6   members of the general Assembly have decided not to
 7   boycott Qualcomm's patents, right?
 8          MR. EARNHARDT:  Object to the form.
 9      A.  No.  The reasons behind I do not know but the
10   fact is there.
11      Q.  Do you know whether or not the antitrust
12   division of the United States Department of Justice has
13   publicly announced it would be an enforcement priority
14   if members of standard setting organizations were to
15   boycott technologies by intellectual property holders
16   who refused to honor FRAND commitments?
17          MR. EARNHARDT:  Object to the form.
18      A.  No.  This is US matters and I am an expert on
19   French contract law, again.
20      Q.  So if there are 30 people who draft the ETSI
21   IPR policy and then after that policy is drafted 370
22   more people joint general Assembly, let's assume these
23   people are all working for different companies, they're
24   just totally independent people.  Okay.  Are -- is it
25   relevant to a French court's interpretation of the ETSI
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    IPR policy how those 370 subsequent joiners of ETSI
2    interpreted the policy at the time they joined?
3         A.   Firstly, I'm not sure a French court would be
4    in a position to know how each of these 370 members
5    interpret the policy.  It will have to be very clear.
6    And so it's a very strange hypothetical in a very
7    unique situation here.  The initial drafter's intent is
8    more important than the intention of the 370 that came
9    after the policy was drafted.
10        Q.   So if the initial 30 drafters believed that the
11   ETSI I -- ETSI IPR policy did not require component
12   level licensing, if all 30 of them believed that, that
13   would control because that is the intent of the parties
14   who drafted the policy, right?
15        A.   I suppose so that would -- a judge will need
16   very strong evidence that it's no longer the parties'
17   intention and it would be rather dangerous for a judge
18   to say that in spite of this intention of the drafters
19   of the policy, in spite of the fact that the policy has
20   not been changed, yet the intention is not that one.
21        Q.   I think you jumped ahead to my next question,
22   so I just wanted to -- let's pretend we don't know what
23   the 370 subsequent joiners believe.  If we have
24   compelling evidence that all 30 of the initial drafters
25   of the ETSI IPR policy believed that it did not require

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    licensing at the component level, a French court

2    interpreting a standard essential patent holders's

3    obligation would vindicate the intent -- intent of

4    those original 30 drafters and hold that component

5    level licensing is not required, right?

6         A.   Component is not required.  I really think,

7    yes, this is right because then it would consider there

8    is -- in your hypothetical there is a clear intention

9    assessed by these 30 initial drafters not to impose

10   this, so I don't see why a French court will change.

11        Q.   And it doesn't matter if all 370 subsequent

12   joiners to ETSI share that understanding or not, right?

13        A.   What would matter if -- if the policy was

14   changed?

15        Q.   Hypothetically, assume the policy -- the words

16   of the policy stay exactly the same.  370 people join

17   who do not read the policy the same way the original 30

18   intended.

19        A.   Right.  Right.  Well let's turn back to the

20   French civil code and it's more my area of expertise.

21   It says that, a contract is to be interpreted according

22   to the common intention of the parties rather than

23   stopping at the literal meaning of its terms.  And it

24   then says, where this intention cannot be discerned, a

25   contract is to be interpreted in the sense which a

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

```
 1    reasonable person placed in the same situation will
 2    give it.  The second sentence has been added a new
 3    Article 1188.  So I think we -- I should answer your
 4    question in the light of this basic principal,
 5    particularly of the first sentence which is really an
 6    important role that you have to interpret the contract
 7    according to the common intention of the parties.  And
 8    there is one common intention that's in your
 9    hypothetical is clear and sure, this is the common
10    intention of the 30 initial parties and this common
11    intention and the wording will surely was not to
12    include the component in this FRAND commitment or
13    obligation.  Therefore, I think a judge will stick to
14    that.
15         Q.  What if the original 30 parties had never
16    thought about this issue?  What if they had no common
17    intention regarding whether the IPR policy imposes a
18    duty to license at the component level?
19         A.  It makes things more difficult but, again, I
20    insist on the fact that you cannot add to the wording
21    of a contract other word or add something.  The role of
22    the judge is not to remake the contract, even if it
23    seems more equitable or more fair, the judge must apply
24    the contract.  So this was not entered by the parties
25    to barter, it was not envisage.  And in the ETSI
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    context, I think that there is a solution which will be

2    to change the rule and the policy and the judge will

3    take as a very important factor the fact that the

4    policy has not been changed.

5         Q.  So a judges should neither add terms to

6    contract nor ignore terms that are in contracts, right?

7         A.  This is true, yes.

8         Q.  Under French law what happens where parties

9    have attached different meanings to the term of a

10   promise or agreement?

11        A.  Well, then you are in a situation where the

12   intention of the -- the common intention of the parties

13   cannot be assessed because there is no common

14   intention, there was different meanings attached.  And

15   this is when the judge would resort to the second

16   sentence of Article 1188 where this intention cannot be

17   discerned because there's no common intention, they

18   each had a different meaning in mind.  A contract is to

19   be interpreted in the sense which a reasonable person

20   placed in the same situation will give to it.

21        Q.  So we ask how would a reasonable person have

22   interpreted the terms that appear on the face of the

23   contract?

24        A.  Yes.  This is a more objective approach.

25        Q.  So you don't know one way or the other if the

Fauvarque-Cosson
FTC v. Qualcomm, Inc.                                    8/16/2018

 1    folks who drafted the ETSI IPR policy ever thought
 2    about whether someone might manufacture chip sets and
 3    not also manufacture handsets, do you?
 4             MR. EARNHARDT:  Object to form.
 5        A.  It seems that you told me before that they had
 6    not thought about it, didn't you?
 7        Q.  Well I don't want to make representations to
 8    you.  I'm asking you, do you know one way or the other
 9    if it ever occurred to the draft of the ETSI IPR policy
10    that somebody might manufacture chip sets and not
11    manufacture handsets?
12        A.  I mean, who would know what occurred in the
13    mind of the 30 drafters of the policy.  It's very
14    difficult to know.
15        Q.  Because at the time the policy was drafted,
16    Ericsson manufactured both chip sets and handsets and
17    infrastructure, right?
18        A.  This is what you seem to say, so I say yes.
19        Q.  I may have already asked this, but just to make
20    sure it's clear, you don't know one way or the other
21    whether any company involved in drafting the ETSI IPR
22    policy manufactured chip sets and did not also
23    manufacture handsets and infrastructure equipment,
24    right?  I think I might have asked.
25        A.  Manufactured only chip sets?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.   Correct.

2      A.   And it was involved in the drafting of the

3   policy?

4      Q.   Correct.

5      A.   And then it would not have said anything about

6   the way the policy is drafted?

7      Q.   I'm just asking, do you know way one way or the

8   other?

9      A.   No, I do not know.

10      Q.   If any company involved.

11          Do you know if at the time the ETSI IPR policy

12   was drafted, Qualcomm manufactured chip sets and also

13   handsets and also infrastructure equipment?

14      A.   I do not know.

15      Q.   When considering industry practice, what

16   products would a French judge consider involved in the

17   industry impacted by ETSI's IPR policy?

18      A.   I'm not sure I understand your question.

19      Q.   Well, so we've been discussing mobile

20   communications equipment in general?

21      A.   Uh-huh.

22      Q.   Right?  Would a French judge, attempting to

23   interpret industry practice relevant to the ETSI

24   policy, only consider industry practice involving

25   products that comply with ETSI standards, or would the

142

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    judge also consider industry practice regarding

2    products that implement other mobile communication

3    standards?

4        A.   The first thing I want to record here is that

5    the judge would not consider industry practice if he

6    was confident that the plain language of ETSI doesn't

7    need him to have recourse to industry practice to

8    interpret.

9            It's only subsidiary element because, in my

10   opinion, a French judge would consider that the

11   language is plain and clear and, therefore, industry

12   practice need not be considered.  Then having said

13   that, you asked me what the judge will consider in

14   industry practice and I think he would consider the

15   different license contracts and the practice of how

16   these contracts are drafted, rather than the products

17   themselves.

18       Q.   What I'm trying to understand is, at the time

19   the ETSI IPR policy was drafted, there were other

20   wireless communication standards, notably CDMA One.

21   Are you familiar with CDMA?

22       A.   No.

23       Q.   So CDMA One is a wireless air interface

24   standard that was not promulgated by ETSI.  Okay?  I'll

25   represent that to you.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1          A.   Yes.

2          Q.   Qualcomm had licensed, I will represent,

3     various companies to its CDMA One essential patents at

4     the time the ETSI IPR policy was drafted.  If we

5     hypothetically assume that's true, would the licensing

6     practices, relevant to CDMA One technology, be

7     considered part of the industry practice relevant to

8     the interpretation of the ETSI IPR policy?

9          A.   You just said that CDMA One was not within the

10    ambit of ETSI.

11         Q.   Correct.  Right.

12         A.   So I think that it would not be directly

13    relevant.  The relevant industry practice would be the

14    industry practice within the scope of ETSI.

15         Q.   What does that mean, the industry practice

16    within the scope of ETSI?

17         A.   Well, for those standards that are set by ETSI.

18         Q.   So Qualcomm's practices licensing its CDMA One

19    technology would not be considered a relevant industry

20    practice by a French judge attempting to construe the

21    ETSI IPR policy, right?

22         A.   It might not be disregarded all together but it

23    would not be the most relevant industry practice,

24    because it's not a standard set by ETSI.

25         Q.   So the practices of the participants in ETSI

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1    standards would be more relevant than Qualcomm's
 2    practices, regarding CDMA One technology.  Right?
 3         A.  Can you say the question again.
 4         Q.  So the practices of those companies who
 5    licensed technologies relevant to the ETSI standard,
 6    would be more relevant than the licensing practices of
 7    patent holders who license patents relative to CDMA One
 8    technology, right?
 9         A.  I haven't considered this question.  There is
10    some logic in what you suggest but it's difficult for
11    me to be assertive on this point because I haven't
12    given it a thought before.
13         Q.  Because Ericsson -- strike that.
14              What if the participants in drafting the ETSI
15    policy had already been licensed by Qualcomm under its
16    CDMA One patents and, therefore, knew what Qualcomm's
17    licensing practices were.  Would that I impact the
18    relevance of Qualcomm's CDMA One licensing practices
19    one way are the other?
20         A.  Wow, I need to see that question.  It's too
21    long, too complicated.
22         Q.  Sure.  Hypothetically, lets assume there are
23    four companies who are involved in drafting the CDMA --
24    strike that.
25              Let's assume that half the companies who were

145

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1    involved in drafting the ETSI IPR policy had, at that
2    time, become familiar with Qualcomm's licensing
3    practices regarding the CDMA One standards.  Is that
4    hypothetical clear?
5         A.  Yes, I know about Qualcomm's practices.  Okay.
6         Q.  Regarding CDMA One technology?
7         A.  Uh-huh.
8         Q.  Would Qualcomm's practices regarding CDMA One
9    licensing be relevant to a French judge's
10   interpretation of the intent of the drafters of the
11   ETSI IPR policy?
12        A.  In a very last resort.  If he had really
13   nothing else to find out about this intent, and I doubt
14   that he wouldn't have nothing else, because there is
15   the history of the negotiation of ETSI policy, which
16   would be much more directly relevant than what you
17   suggest.
18        Q.  So when you say in the very last resort, you
19   mean it would not be a particularly persuasive piece of
20   evidence for the judge, if they had other indications
21   of the intent of the drafters?
22        A.  I think this is what I mean, yes.
23        Q.  So the fact that Qualcomm refused to license at
24   the component level for CDMA One is not relevant to the
25   interpretation of the intent of the drafters of the

146

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    ETSI IPR policy, right?

2         MR. EARNHARDT:  Objection to the form.

3    Misstates her testimony.

4         A.  It's not exactly what I've said.  I've said

5    that it's not the most important element.  It will be

6    relevant if there was no more decisive element.  And I

7    believe that the history of the negotiations t ETSI

8    will be the first element that a judge would take into

9    account.  Because in France, we have this tradition, a

10   bit like when you write a law, a statute to interpret

11   the statute, the French judge will first look at what

12   we call a travaux preparatoires, preparatory work of

13   the statute, and it's a bit the same for ETSI policy.

14   The first thing that the judge will look at to assess

15   the intention of the party would be the preliminary

16   discussions and work concerning ETSI.

17        Q.  But in reaching your opinions in this matter

18   you did not investigate the preliminary discussions and

19   work concerning the formation of the ETSI policy, other

20   than by talking to Mr. Huber, right?

21        A.  This is -- I think we can say that because I

22   did not look at documents of the negotiation history,

23   and also because I was easily convinced that the

24   language is plain and clear and that a French judge

25   would not have to go beyond and will not have to

147

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    investigate because he would consider the language is
2    clear.
3         Q.   In order to determine the language was clear,
4    you had to find out from Mr. Huber what was meant by a
5    system or device fully conforming to the standard,
6    right?
7              MR. EARNHARDT:   Object to the form.
8         A.   I asked him what was meant by this but, as I
9    said before, I was more impressed by the fact that in
10   the definitions of -- by the definitions of equipment
11   and manufacture, and particularly the definition of
12   equipment, that we have already discussed.
13        Q.   And you determined that the language of the
14   ETSI IPR policy was clear and unambiguous but you never
15   considered whether the first bullet of 6.1 provides
16   that standard essential patents holders must license
17   the manufacturer's components to manufacture components
18   and subsystems to the licensees's own design for the
19   use in the manufacture of equipment by folks other than
20   the licensee, right?
21             MR. EARNHARDT:   Object to the form.
22        A.   This is not right.  You cannot say that I never
23   considered it because I think I've mentioned it in my
24   report.
25        Q.   Where?

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1        A.   Let us see.   I considered it when I considered

2   the express language of Clause 6 on page 11, CX0057013

3   and it's the last paragraph before negotiation history.

4   I say, moreover, the ETSI policy itself draws a

5   distinction between component and equipment reenforcing

6   this point.   The policy refers to components separately

7   from equipment, Section 6.1 of the IPR policy entails

8   only the right to make or have made components for use

9   in manufacture, i.e., the production of complex

10  devices.   It does not intend the right to FRAND license

11  to sellees or otherwise dispose of components on their

12  own.   In contrast, a license regarding equipment, i.e.,

13  a complete device and tells the rights to sell, lease

14  or otherwise dispose of it.   Thus, the ETSI IPR policy

15  does not require a SEP holder to offer a license to a

16  seller of components.

17       Q.   So you say in the third to last sentence,

18  Section 6.1 of the IPR policy entails only the right to

19  make or have made components for use and manufacture,

20  i.e., the production of complete devices, right?

21       A.   Yes, I see that.

22       Q.   So that means the ETSI IPR policy requires

23  holders of standard essential patents to license makers

24  of components to make components as long as those

25  components are for use in the manufacture of equipment,

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1    right?

2        A.   It includes the right to make or have made

3    customized components.   It does not require.

4        Q.   It requires standard essential patent holders

5    to offer licenses to make components, as long as those

6    components are for use in the manufacture of equipment,

7    right?

8            MR. EARNHARDT:   Object to the form.   Misstates

9    her prior testimony.

10       A.   I think we discussed already this sentence,

11   which is not in my native language as I said before,

12   and I think I'd prefer not distorting the words, so it

13   says what it says.

14       Q.   Did you reach the opinion in this matter that

15   the ETSI IPR policy does not require Qualcomm to

16   license a maker of components to Qualcomm's standard

17   essential patents, even if that licensee wants to make

18   components for use in manufacture of equipment as

19   manufacture and equipment are defined in the ETSI IPR

20   policy?

21       A.   If I had reached this conclusion, it wouldn't

22   be in contradiction with this sentence, wouldn't it?

23       Q.   I'm sorry.   Would you like the question

24   repeated?

25       A.   So I didn't think I would have reached this

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                          8/16/2018

1    conclusion because I wouldn't have reached a conclusion

2    which would be in contradiction with what is said by

3    ETSI policy in 6.1 and it says, manufacture including

4    the right to make or have made customized components

5    and subsistence to the licensee's own design for use in

6    manufacture.

7         Q.   Turning to your response to question two on

8    page 13 of your report CX0057-015.

9         A.   Yes.  Perhaps we can have a small break before?

10             MR. MATHESON:  Sure.

11             THE VIDEOGRAPHER:  We are going off the record.

12   The time is 2:  26.

13             (A recess was taken.)

14             THE VIDEOGRAPHER:  We are going back on the

15   record.  The time is 2:37.

16        Q.   Okay.  We were focused on your response to the

17   second question you pose in your report, quote, can a

18   third party beneficiary invoke the FRAND commitment to

19   challenge a license after agreeing to it.  Okay?  Now,

20   you're not offering the view that a United States court

21   lacks the power to invalidate a duly executed license

22   agreement between Qualcomm and a licensee as a form of

23   a injunctive relief under the antitrust laws, are you?

24        A.   I don't think I am, no.

25        Q.   And you're not offering the view that a United

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1   States court could invalidate a license agreement
2   between Qualcomm and a licensee on the basis that the
3   agreement violated public policy, are you?
4        A.  No, I'm not.
5        Q.  And you're not offering the view that a French
6   court is powerless to invalidate a contract between
7   Qualcomm and a licensee if, hypothetically, the French
8   court were to determine that the contract violated
9   public policy, are you?
10       A.  That is a different question.  Now which will
11  be governed by French law.  I'm not offering a view on
12  what a French court would do as we got the license
13  contract because the license contract is not governed
14  by French law.
15           Do you want to ask me the question again,
16  perhaps it will make it clearer?
17       Q.  No, that's fine.  You're not offering the view
18  that a United States court is powerless to hold that
19  ETSI's IPR policy violates the United States antitrust
20  laws, are you?
21       A.  I'm not offering a view on antitrust law.
22       Q.  You're not offering the view that a European
23  court is powerless to hold that ETSI's IPR policy
24  violates European competition law, are you?
25       A.  Again, I am not giving any opinion on

152

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                              8/16/2018

1    competition law, neither US nor European competition
2    law.
3        Q.  So you stated on CX0057-015, page 13 of your
4    report, quote, under French law a current license
5    cannot be invalidated on the basis that its terms do
6    not comply with FRAND.  Right?
7        A.  This is right.
8        Q.  What you mean -- strike that.
9            You don't mean that under French law a current
10   license cannot be invalidated for any reason -- or
11   strike that.
12           There are reasons other than a licenses's
13   failure to comply with FRAND that would support a
14   French court invalidating a license between Qualcomm
15   and one of its licensees, right?
16       A.  What I don't mean is a sentence that would be
17   just under French law.  A current license cannot be
18   invalidated, full stop.  That's not what I meant.  I
19   meant cannot be invalidated on the basis that its terms
20   do not comply with FRAND.
21       Q.  Are you familiar with the term fraud in the
22   inducement as a term of contract law?
23       A.  I think you mean in US contract law or in
24   French contract law?
25       Q.  I meant US and I'll ask if there's a parallel

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                          8/16/2018

```
 1    concept in France.  So are you familiar with the
 2    outlines of that concept under US law?
 3        A.  Sort of.
 4        Q.  Is there a parallel concept under French
 5    contract law?
 6        A.  There are -- there is a concept of fraud in
 7    French contract law but I don't think this is the
 8    concept that you have in mind.  It will be more
 9    inducement.  When you say fraud and inducement you mean
10    vitiating the content.
11        Q.  What I meant was fraud in the inducement,
12    meaning that a false representation was made in order
13    to induce someone to enter a contract.
14        A.  Right.
15        Q.  Is there a concept under French law that would
16    support the invalidation of a contract based on a fraud
17    that caused the counterparty to enter the contract?
18        A.  So I think you mean something like the English
19    would say misrepresentation?
20        Q.  Yes.
21        A.  We have no concept of misrepresentation under
22    French law but we have the concept of vitiating factors
23    that vitiate your constant.  It was -- it can be either
24    because you have made an error or a mistake, so we have
25    three categories.  We have mistake, we have fraud,
```

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

 1    dull, which I consider as fraud, and violence.  And
 2    these three categories of vitiating, of vice de
 3    consentement, so they will just vitiate your consent
 4    and then it can bring -- it can lead to the nullity of
 5    the contract.
 6         Q.  Sorry.  Which one can lead to the nullity of
 7    the contract?
 8         A.  Either one.  Either mistake or fraud or
 9    violence.
10         Q.  So I'll represent that under the Second
11    Restatement of Contracts in the United States there's a
12    provision that says that when parties attach different
13    meanings to a term under certain conditions neither
14    party can be bound by the meaning attached by the
15    other, even though the result is a failure of mutual
16    ascent.  Is there a parallel concept in French law
17    relating to mistake?
18         A.  Mistake is -- it sounds a bit like this but the
19    consequence is different because it brings nullity of
20    the contract.
21         Q.  So under French law if the parties fail to
22    attach the same meaning to a term, under some
23    circumstances it can result in nullity of the contract?
24         A.  The circumstances are defined and under, as you
25    say, under some circumstances not in every case.

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1       Q.   What are the circumstances?

2       A.   Of mistake leading -- a mistake being a cause

3    of nullity.

4       Q.   Correct.  What are the circumstances under

5    which mutual mistake can lead to the nullity of a

6    contract?

7       A.   It has to be a mistake on the very fundamental

8    element and it cannot be a mistake as to the price.

9       Q.   So it has to be a mistake on a fundamental

10   element relating to contract performance rather than

11   compensation; is that right?

12      A.   Relating to the object of the contract.  You

13   believe that you are going to buy a painting of Claude

14   Monet.  You know Monet?  And it's a painting of Manet

15   with another famous painter.

16      Q.   I like Manet better.

17      A.   So let's put it the other way around.  So it's

18   rather a mistake on the object.  You believe that it's

19   in gold and it's not gold or something like that.  It

20   cannot be a mistake as to the value of the contract.

21   It's very restrictive.

22      Q.   Can a French court nullify a licensing

23   agreement on the basis that the royalty is

24   unconscionable?

25      A.   No, it cannot.

156

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1      Q.   Can a French court nullify a contract because
2    it is a contract of adhesion?

3      A.   Contract?

4      Q.   Are you familiar with the term contract of
5    adhesion in US law?

6      A.   Yes.   Standard form contract, as opposed to a
7    baseball contract.

8      Q.   Let's -- let's say for the purpose of this
9    question we'll define a contract of adhesion as a
10   contract that one party has no choice but to accept.

11     A.   Yes.

12          MR. EARNHARDT:   Just let me object to the
13   definition of that word.

14     Q.   Under some circumstances, a United States court
15   might set aside a contractual obligation undertaken
16   pursuant to a contract of adhesion.   Are you familiar
17   with that concept?

18     A.   Yes, I am.   It has been introduced in our new
19   law of contract, it's been the most controversial part
20   of the reform because previously we did not have it,
21   except for consumer law.   And now in our civil code
22   Article 1171, we have introduced the possibility for a
23   judge to strike out a clause in a contract of adhesion,
24   which would be manifestly excessive and this clause
25   then can be just deleted.   The contract will not be

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1   null or void, but the clause can go away and,

2   therefore, it cannot be something which relates to the

3   price or to the object.  It has to be a clause like an

4   exemption clause or something like that.  So we have

5   introduced this.  It's very new, highly criticized by

6   businesses because it's introducing the power of the

7   judge into the contract.

8       Q.  Could the new Article 1171 allow a judge to

9   strike a cross license from a contract of adhesion?

10      A.  To strike -- it allows only the striking out of

11  a clause of one term not the cross license as a whole.

12      Q.  Well, a cross license could be one term, right?

13          MR. EARNHARDT:  Object to the form.

14      A.  I would need to see the contract.  And also, it

15  would have to be a contract concluded after the reform

16  was passed.

17      Q.  And by cross license what I mean -- well,

18  strike that.  It doesn't matter.

19          Does French contract law presume that every

20  contract imposes upon each party a duty of good faith

21  and fair dealing?

22      A.  There is a general principle of good faith in

23  French contract law.

24      Q.  Now you haven't assessed whether Qualcomm's

25  contracting principles harm consumers in any way, have

158

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                        8/16/2018

1    you?

2        A.  No, I haven't.  I haven't been asked to deal

3    with this question.

4        Q.  And you haven't assessed whether Qualcomm's

5    licensing practices harm its rivals in any way, have

6    you?

7        A.  No.  This is not a question I have dealt with.

8        Q.  You haven't assessed whether Qualcomm's

9    contracts with Apple have harmed any of Qualcomm's

10   rivals, right?

11       A.  No, I have not.

12       Q.  Do you know what the FTC means by Qualcomm's no

13   license no chips policy?

14       A.  I remember having encountered this expression

15   but now, right now I wouldn't adventure into an

16   explanation.

17       Q.  Have you reached a conclusion regarding whether

18   or not Qualcomm refuses to offer patent licenses to --

19   strike that.

20           Have you reached a conclusion regarding whether

21   or not Qualcomm refuses to supply baseband processors

22   to unlicensed manufactures of handset devices?

23       A.  I have not reached a conclusion on this, nor

24   did I give an opinion on this.

25       Q.  You haven't analyzed that question one way or

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                       8/16/2018

1    another?

2         A.  No.

3         Q.  You have no opinion whether or not that has

4    harmed Qualcomm's rivals, right?

5         A.  Sorry?

6         Q.  Whether or not such a policy, if it exists,

7    have harmed Qualcomm's rivals?

8         A.  I have no opinion on this.  I am not an

9    economist.

10        Q.  You're not offering an opinion on the scope of

11   -- strike that.

12             You're not offering any opinion on the

13   injunctive relief that might be appropriate should the

14   United States court find that the antitrust law has

15   been violated, are you?

16        A.  No, I am not.

17        Q.  I'm not sure if we have discussed.  On page two

18   of your report -- sorry page one of your report, you

19   identify testimony by deposition or at trial the expert

20   witness of Ericsson versus Samsung and Samsung versus

21   Ericsson of the US ITC.  The first bullet, Ericsson

22   versus Samsung, investigation number 337-TA-862.  What

23   opinion did you offer in that matter?

24        A.  I think, but now I'm not sure between the two,

25   but I think it was mostly on the question of FRAND

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                      8/16/2018

1    negotiations and good faith and what is the meaning of

2    the FRAND obligation.  And also the stipulation for the

3    benefit of third party, if my remember -- if I remember

4    well.

5        Q.  Did you offer in that matter the expert opinion

6    that the ETSI IPR policy was clear and unambiguous,

7    regarding the meaning of FRAND?

8        A.  That I don't remember whether I put it in those

9    words.

10       Q.  In the second bullet, Samsung versus Ericsson,

11   investigation number 337-TA-866.  In that matter, did

12   you offer the expert opinion that the ETSI IPR policy

13   was clear and unambiguous with respect to the meaning

14   of FRAND?

15       A.  Again, I don't remember but it's public, isn't

16   it?

17       Q.  Do you recall one way or the other having

18   formed a view, prior to your retention in this matter,

19   whether ETSI's IPR policy is clear and unambiguous with

20   respect to the meaning of FRAND?

21       A.  What I remember is having often referred to

22   Article 6, which is really important, and having

23   discussed the terms of Article 6, and mainly the fact

24   that you commit yourself to be prepared to grant

25   irrevocable licenses on fair, reasonable and

161

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                    8/16/2018

1    nondiscriminatory terms and conditions.  That was the

2    key element of my expertise.

3          MR. MATHESON:  Thanks very much for your time.

4    Greatly appreciate it.  That's all the questions I have

5    unless there's redirect.

6          MR. EARNHARDT:  I have no questions.

7          THE VIDEOGRAPHER:  This concludes today's

8    deposition.  The time is 2:55.  We are now off the

9    record.

10          (Whereupon, at 2:55 p.m., the deposition was

11    adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

162

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                                        8/16/2018

1    C E R T I F I C A T I O N   O F   R E P O R T E R

2    DOCKET/FILE NUMBER: 5:17-cv-0220-LHK-NMC

3    CASE TITLE:  FTC vs. QUALCOMM, INCORPORATED

4    DEPOSITION DATE:  August 16, 2018

5

6         I HEREBY CERTIFY that the transcript contained

7    herein is a full and accurate transcript of the notes

8    taken by me at the hearing on the above cause before

9    the FEDERAL TRADE COMMISSION to the best of my

10   knowledge and belief.

11

12                              DATED:  8/17/18

13

14

15                              s/Stefanie Krut

16                              STEFANIE KRUT

17

18

19

20

21

22

23

24

25

163

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                              8/16/2018

1                    CERTIFICATE OF DEPONENT

2

3

4          I hereby certify that I have read and examined

5     the foregoing transcript, and the same is a true and

6     accurate record of the testimony given by me.

7

8

9          Any additions or corrections that I feel are

10    necessary I will attach on a separate sheet of paper to

11    the original transcript.

12

13

14         I hereby certify, under penalty of perjury,

15    that I have affixed my signature hereto on the date so

16    indicated.

17

18

19                    DATED:

20

21

22

23                    BENEDICTE FAUVARQUE-COSSON

24

25

164

Fauvarque-Cosson

FTC v. Qualcomm, Inc.                                              8/16/2018

1    WITNESS:  BENEDICTE FAUVARQUE-COSSON

2    DATE:  AUGUST 16, 2018

3    CASE:  FTC v. QUALCOMM, INC.

4    Please note any errors and the corrections thereof on

5    this errata sheet.  The rules require a reason for any

6    change or correction.  It may be general, such as "to

7    correct stenographic error" or "to clarify the record"

8    or "to conform with the facts."

9    PAGE LINE  CORRECTION            REASON FOR CHANGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555