# EXHIBIT 2

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    ---------------------

 4

 5   FEDERAL TRADE COMMISSION, )

 6             Plaintiff,      )

 7   vs.                       ) Case No.

 8   QUALCOMM, INCORPORATED,   ) 5:17-cv-0220-LHK-NMC

 9             Defendant.      )

10   -------------------------)

11

12                            Saturday, August 4, 2018

13

14                       825 Eighth Avenue

15                       New York, New York

16

17   The above-entitled matter came on for the deposition of

18   EDWARD SNYDER, pursuant to notice, at 9:10 a.m.

19

20

21

22

23

24

25
```

6

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    matter?

2        A.   Yes.

3        Q.   And is there anything that you'd like to change

4    or correct in your report?

5        A.   No.

6        Q.   What areas do you consider yourself to be an

7    expert in?

8        A.   I'm an economist.  Within economics my

9    specialty is industrial organization, and I can say

10   more about that if you'd like, what I consider to be my

11   expertise within industrial organizations.  I also am

12   an expert on applying various empirical techniques to

13   questions involving industrial organization.

14       Q.   And when you say "empirical techniques," what

15   do you mean by that?

16       A.   Organizing data.  That also extends to various

17   non regression techniques, as well as regression

18   techniques, tests of statistical significance.

19       Q.   And you're not a lawyer; is that right?

20       A.   Correct.

21       Q.   So you're not an expert in patents, I take it?

22       A.   I am not.

23       Q.   Do you consider yourself to be an expert in

24   cellular technology?

25       A.   No.  I have good familiarity with the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

7

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

```
 1    technology and the products but it's much more from the

 2    point of view taking the industrial organization

 3    principals that I use in various cases, and when I

 4    apply them, I, as indicated, do work to understand the

 5    context.  So I've become familiar with the technology

 6    and the products but that's not, in my view, expertise

 7    in the products themselves.

 8        Q.  Do you consider yourself to be an expert in the

 9    modem chip industry, specifically?

10        A.  Very similar answer, no.  I've become familiar

11    because of my assignment here and applying industrial

12    organization principals that I've applied to lots of

13    different industries, but even after I've become

14    familiar with those products and those industries, that

15    application of IO principles does not lead me to

16    consider myself to be an expert.

17        Q.  In this case, you were asked to evaluate

18    professor Carl Shapiro's opinions regarding the

19    competitive effects of Qualcomm's alleged exclusionary

20    conduct; is that right?

21        A.  Yes.  I think I stated it in paragraph seven of

22    my report.  My assignment, which focused on his claims

23    that the at-conduct would cause various anticompetitive

24    harms.  So I focused on that.

25        Q.  And in paragraph seven of your report you
```

8

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1    state, "To be clear, I do not address Plaintiff's
2    specific allegations of the at-issue conduct."  Is that
3    correct?
4        A.  Correct.
5        Q.  What did you mean by that?
6        A.  I'm clarifying the following:  My assignment is
7    to understand the Plaintiff's claims and related
8    Professor Shapiro's claims that the at-issue conduct
9    deterred entry or caused exit, suppressed innovation
10   and various other anticompetitive harms.  I do not
11   valuate the underlying conduct but rather focus on
12   those anticompetitive harms, and Professor Shapiro's
13   explanation and identification of them as
14   anticompetitive harms.
15           Another way to put this -- forgive me for the
16   pause -- is it's as if I'm taking the at-issue conduct
17   and focusing on the predictions that Professor Shapiro
18   makes about them and the proofs that he's -- that he's
19   offering.
20       Q.  And you're not offering an opinion on market
21   definition issues in this case; is that right?
22       A.  Correct.
23       Q.  And you're not offering an opinion on whether
24   Qualcomm has monopoly power?
25       A.  That's correct, I'm not.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

14

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    that that conduct reduced the ability of non Qualcomm

2    rivals to get that business, so that would be a deeper

3    dive.

4        Q.   Is your understanding of the Plaintiff's

5    hypothesis based on anything beyond the complaint or

6    Shapiro's report?

7        A.   It's informed by my understanding, generally,

8    about the nature of these claims, that, for example,

9    the claim that in effect Qualcomm was engaging in

10   exclusive dealing practices, but there's nothing --

11   there's no other immediate basis to which I turned when

12   I identified the Plaintiff's hypothesis.

13       Q.   In footnote 26 of your report, that's on page

14   nine, you state that "Plaintiff's hypothesis requires

15   that the failure or exit of certain modem chip

16   suppliers would not have occurred absent Qualcomm's

17   alleged exclusionary conduct."  Do you see that?

18       A.   Yes.

19       Q.   Is it your position that the Plaintiff's

20   hypothesis requires a showing of but-for causation?

21           MR. RYAN:  Objection to form.

22       A.   The short answer to that is yes.  I think

23   that's my understanding as an economist that the

24   hypothesis should be evaluated in terms of, one, the

25   at-issue conduct is in place versus the at-issue

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

15

Snyder

FTC v. Qualcomm, Inc.                              8/4/2018

1    conduct is not in place but other relevant industry

2    factors remain.  So I think your question went to

3    understanding that if you take away the conduct and go

4    to a but-for world that you would get different

5    outcomes and those different outcomes would, according

6    to the Plaintiff's hypothesis, reflect causation.

7        Q.  And is this but-for standard, which you just

8    articulated, the standard by which you analyzed whether

9    there was a causal link between Qualcomm's conduct and

10   its rival successes or failures?

11       MR. RYAN:  Objection to form.

12       A.  Yes.  I -- as you know.  And everyone familiar

13   with these kind of claims can appreciate, is that the

14   but-for world is an important step in the analysis of

15   causation.  And in my opinion, it's important to do two

16   things when you focus on the but-for world.  One is to

17   identify and take out the conduct and its immediate

18   effects.  Second, leave in other industry factors that

19   would not be influenced by the conduct.  For example,

20   investment.  The investment imperative, that would be

21   in the but-for world that, of course, doesn't get taken

22   out.

23       Q.  In that same footnote 26 you also state that

24   "Plaintiff's hypothesis requires that the failures of

25   modem chip suppliers have impaired the performance of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

19

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    what you see is impaired or not, and that's -- I
2    appreciate a more difficult question.  What my analysis
3    does, clearly, is establish that there's no obvious or
4    clear basis for saying that industry performance in
5    this industry was impaired.
6          It's extraordinary.  So then the -- then the
7    question is, well could it have been yet better.  And I
8    appreciate that that is an argument that one could make
9    but what to me is relevant is that contrasts with a --
10   with the insight from an analysis of long-run
11   performance where there are indicators that the
12   industry is not performing well on any of those
13   dimensions that I identified earlier.  That would be a
14   different, different basis or different set of insights
15   from the long-run industry analysis.  In some cases,
16   long run put differently.  In some cases long-run
17   industry performance could -- you could evaluate it and
18   say, see here's a problem, there's something that
19   bothers -- should bother us in terms of investment or
20   innovation or price drenching or output.  I don't see
21   any of that here.  It still leaves --and this goes back
22   to your question -- that there's a possibility that
23   could have been yet more superior.
24       Q.  So for example, in paragraph 23 of your report,
25   you state that if your analyses indicate strong

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

23

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1  that's, again, forgive the -- forgive the long

2  answer -- that's different from saying I see something

3  that looks askew.  So I think -- I think there's a lot

4  of value in doing this but it's still, as I said,

5  leaves some room to say it could have been yet better.

6       Q.  And if your analysis of the industry show that

7  performance could have been even better what -- would

8  that change your conclusions?

9       A.  If there was an objective way to say here's how

10  it could have been better, 5G could have been earlier,

11  there could be even more value to ultimate consumers.

12  I'd want to look at that.  I don't have anything that

13  has been offered, to my knowledge, that would indicate

14  the nature of those "it could have been better claims,"

15  so I'd want to give myself the opportunity to evaluate

16  those things.

17       Q.  And if you found objective indicators that the

18  industry could have, in fact, been better, would you

19  conclude differently with respect to competitive harm?

20       MR. RYAN:  Objection to form.

21       A.  The way I would approach that would be to say

22  okay now there's some additional claims that in some

23  way industry performance could have been better.  I'd

24  want to evaluate those claims.  I'd also want to

25  connect them to the types of anticompetitive harms that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

27

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1   efficiency and execution?

2       A.  That's a good question.  I wanted to do

3   something that could be distilled and tested.  These

4   factors, however, don't explain the industry overall,

5   so, for example, scale is an influence on industry

6   structure.  For example, the increase concentration at

7   the OEM level in premium mobile devices, that's another

8   factor that influences the structure of the industry.

9       Q.  Uh-huh.

10      A.  So I don't want to leave those kind of things

11  behind when understanding the industry.  That said,

12  when it comes time to test particular claims of the

13  anticompetitive harm concerning, for example, exit or

14  inability of a firm to win a particular contract, the

15  more distilled factors, foresight investment and

16  execution, are things that I can use to better

17  distinguish between the two hypotheses.

18      Q.  So if you're looking it at the overall effect

19  on the modem chip industry, how do you know what weight

20  to assign to that the firm level factors, the three

21  factors; foresight, investment and execution, versus

22  other factors?

23      A.  Well, that's a good question.  I think that if

24  I could put it in terms of the following to answer the

25  question:  There are some industry factors that are

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

28

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    going to explain major trend.

2              We've got some noise in the background, I

3    apologize.  I'm trying to figure out what it is.

4              So, for example, I mentioned transaction costs

5    associated with specific investments and knowledge and

6    other kinds of specific investments.  As those grow,

7    you're going to tend to move in any industry, and this

8    is well-known from IO principals, you're going to tend

9    to move away from arms length kind of sales towards

10   contracting -- towards contracting in the context of

11   longer term relationships, doesn't mean they can't be

12   and but this is the -- the relational contracting view

13   to vertical integration and vertical integration has

14   some differences as well in terms of, well is it going

15   to be internal supply only, no sales outside no

16   purchases from others.  In this industry there are

17   industry dynamics that are leading firms and other

18   industry participants to organize more towards

19   long-term contracting and vertical integration with

20   especially in the context of high-end devices, both

21   high-end modem chips an high-end handsets.  So that

22   would be something that would inform the overall

23   pattern of what is the evolving industry structure, how

24   is it different between high end and low end?  I'll

25   pause there but I'm trying to give you an indication of

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    how general industry practice -- factors rather, will

2    effect something that I see.  Then conditional on that,

3    as you indicated, the more specific firm level factors

4    can be evaluated to say okay, for a very high-end OEM

5    for certain products, they may only have two seats at

6    the table for their suppliers.  That may be different

7    for lower ends products, they might have four seats at

8    the table.  But then the specific firm factors help

9    evaluate which firms are going to succeed or not,

10   according to the industry factors' hypothesis.

11       Q.  Is there a certain algorithm that you apply, is

12   there a formula for how much weight to give to the

13   macro level factors versus the firm specific factors?

14       A.  Well, I can give an example that might inform

15   and help answer the question.  By studying the

16   industry, and evaluating the testimony and

17   understanding the relevance of IO principals related to

18   specific investment and so forth one learns that a

19   supplier like Qualcomm engages with Apple in a very

20   comprehensive way.  There's, you know, ample testimony

21   in the record that indicates that to compete for

22   Apple's business, there's going to be multiple

23   requirements for suppliers in terms of timeliness,

24   capabilities, engagement.  And the timeliness has to do

25   with when Apple is going to launch products as well as

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

30

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    when they're going to decide on suppliers.  That it --
2    that tells you, tells me about the number of seats at
3    the table that are potentially available.  Professor
4    Shapiro then says there's conduct that explains
5    multiple firms exits and the payoff to this kind of
6    analysis, is that by taking into account the broader
7    factors you understand what the potential is for the
8    conduct and how to evaluate it compared to this counter
9    factual.
10       Q.  So when you looked at the firm specific factors
11   for any particular firm, and you also looked at the
12   macro industry level factors at play, did you apply a
13   formula for weighting the various factors?
14       A.  Not a formula.  I think I took insights from
15   both.  I mean, for example, you take Professor
16   Shapiro's claim that Apple -- Apple and Qualcomm's
17   contract led to the exit of ST-Ericsson, Broadcom and
18   harmed Intel.  The broader industry factors tells me
19   all three of those things can't be true.  You can't
20   have conduct saying you're going to -- that's going to
21   lead to three firms being harmed when only there would
22   have been at most one seat at the table.  So the -- the
23   more -- the broad industry factors, as they relate to
24   Apple's decision making for premium products, that's
25   going to tell me something about the validity of that

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

31

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    claim.  Going to the industry -- going, excuse me, from
2    the broad industry factors to then evaluating well, why
3    -- why did Broadcom exit.  Why did ST-Ericsson exit.
4    Beyond the broader industry factors, there are
5    opportunities to apply the industry factors test and
6    focus on did they have foresight when they were making
7    their big investments.  And condition on getting to the
8    point where they would have been capable of producing
9    next generation products could they execute on that,
10   because the industry tells us that -- industry analysis
11   tells us that being first to market requires, in
12   addition to having the product, be able to supply it in
13   volume.  So I view it as two levels that are both
14   relevant to assessing the particular claim that, for
15   example, Broadcom was forced out because of the
16   contract, while in summary I'm skeptical of that
17   because you can't have that alongside ST-Ericsson was
18   forced out an Intel would have gotten that seat.  At
19   most there was only one seat, so those can't all be
20   true.  And then evaluating in particular why was
21   Broadcom or ST-Ericsson not successful.  I go to the
22   foresight investment execution.
23       Q.  So is the approach -- in your approach then to
24   look at the industry factors first and then look at the
25   firm level factors?

32

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1       A.   I just focused on what Professor Shapiro did

2   keeping both in mind.

3       Q.   So if you had a situation where a particular

4   firm would have made decision A, based on your analysis

5   of the firm level factors, but there were other

6   industry level factors at play, which would have caused

7   the firm to make decision B, which decision would you

8   conclude that that firm would make?

9       A.   I'm not sure I can answer that.  I gave that

10  example because I thought it was informative about how

11  I applied both the general insight and the firm level

12  insights to a particular claim that Professor Shapiro

13  made and it's both.  You asked me about sequence it's

14  not sequential.  So I guess I need another example from

15  what I've actually done.

16      Q.   Is there no uniform weighting system, I guess

17  is what I'm asking, that you apply between the firm

18  level factors and the industry level factors?

19          MR. RYAN:  Objection to form.

20      A.   That's a good question.  The short answer is

21  no, there is not a uniform weighting.  So you take --

22  again, if I could use an example, would that be

23  helpful?

24      Q.   Uh-huh.

25  ████████████████████████████████████████████████████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

33

Snyder

FTC v. Qualcomm, Inc.                                        8/4/2018

1     ██████████████████████████     They had the halo effect.
2     They had the learning benefits.  What led them not to
3     continue to be successful?  For them I would not turn
4     to industry factors because they were in the incumbent
5     position with Apple.  In that -- for that analysis, I
6     would go to what was it about Infineon, their
7     investment, their -- their strategy and I would not
8     need to go to, or see value in going to, the broader
9     industry factors.  I hope that's instructive.
10         Q.  When you talk about the broader industry
11    factors, would you consider Qualcomm's conduct to be a
12    relevant industry factor?
13         A.  The way I have constructed this test is no.
14         Q.  Why not?
15         A.  Because I want to distinguish between the
16    claims of anticompetitive harm versus what are the
17    insights from industrial organization with respect to
18    industry conditions broadly and these specific factors.
19    Those don't go away in the but-for world, so getting at
20    how do I test, taking into account the conduct is it's
21    basically a two-step approach.  One is to take away the
22    at-issue conduct, recognize that the industry factors
23    would still be influential.
24         Q.  Would you consider Qualcomm to be an industry
25    participant?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

35

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    the outset, I viewed that as very much in parallel with
2    what the Federal Trade Commission is claiming with
3    respect to anticompetitive harms.  So I don't look at
4    the interactions broadly, I look at the, if you will,
5    the candidate anticompetitive harms.
6         MS. IKEDA:  Why don't we take a five minute
7    break.
8         MR. RYAN:  Sure.
9         THE VIDEOGRAPHER:  The time is 10:11 a.m. and
10   we're going off the record.
11        (A recess was taken.)
12        THE VIDEOGRAPHER:  This begins media unit
13   number two.  The time is 10:22 a.m. and we are back on
14   record.
15        Q.  In paragraph 19 of your report you refer to the
16   industry factors hypothesis and the Plaintiff's
17   hypothesis as alternative hypotheses.  Are you saying
18   that these are mutually exclusive hypotheses?
19        A.  No.  What I'm saying here is that I'm going to
20   approach my work by analyzing these two alternative
21   hypotheses and it could be that by applying the, for
22   example, the industry factors hypothesis, I find it has
23   some explanatory power but there are other things I
24   can't explain, in which case it would lead to what you
25   refer to in your question, which is not mutually

43

Snyder

FTC v. Qualcomm, Inc.                                              8/4/2018

1    extent that the industry factors do explain the

2    outcomes then basic social science principals tells one

3    that the alternative hypothesis is not the source of

4    the explanation.  Doesn't cause the outcomes.

5        Q.  Does the statement that we just read in

6    paragraph 23 assume that the at-issue conduct doesn't

7    effect the firm level factors?

8        A.  Oh, I think I understand your question.  Are

9    there some -- is there endogeneity of the firm factors?

10   No, I identified the industry factors that I believed

11   would be not influenced by the conduct, and I can go

12   into more detail about that, but the importance of

13   investment, the importance of where to make those

14   investments, what specific investments to make in terms

15   of products and customer relationships, there are many

16   strategic forks in the road.  Those would -- all of

17   that would be present with or without the conduct.  I'm

18   giving an example.

19       Q.  Uh-huh.

20       A.  I am not giving the whole waterfront but I

21   think you're asking, am I then saying that the conduct

22   is going to influence the influential character of the

23   investment.  The short answer to that is no.

24       Q.  And what's the basis for your assumption?

25       A.  It's not an assumption.  My application of

44

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    industrial organization principals identified that
2    investment, that's really why where I first -- first
3    major insight I -- I developed and there are many
4    treatises in industrial organization that, and
5    particular academic works, that identify investment as
6    being important in the industries, with or without
7    particular conduct.  So my industry analysis
8    illustrates the importance of that general industrial
9    organization principal but I think it also added in the
10   insight around foresight.  Some industries it's just
11   you put up the money and it's pretty clear what -- how
12   much money you need to put up and you're going to get a
13   certain outcome.  In this industry, that's not the case
14   at all.  So that -- that indicated that judgment or
15   foresight in making those investments was also
16   important.
17          But going back to your question, this came out
18   of the application of industrial organization
19   principals, informed by academic literature and then
20   guided by a deeper industry analysis, which gave me the
21   additional insight around foresight.
22      Q.  Is there academic literature that espouses the
23   view that a firm's conduct doesn't effect these three
24   factors of foresight investment and execution?
25          MR. RYAN:  Objection to form.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

45

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1      A.   Well, certainly the Plaintiff's hypothesis is

2   that the conduct did effect the amounts of investment

3   that individual firms made and were willing to make and

4   related that it effected the exit and entry decisions.

5   But what the main insight from industrial organization

6   and from various applications of industrial

7   organization principals, is that these factors are

8   relevant with or without particular conduct in

9   industries like this industry.

10     Q.   And is that found in the academic literature on

11  industrial organization?

12     A.   Yes.

13     Q.   Can you cite to me an example?

14     A.   Well, the -- I think I -- there's a lot to

15  cite.  I mean, the -- I cited the textbook that's so

16  famous by Scherer.  He did a lot of work on investments

17  and industries.  Again, going to, I think the line of

18  your question, what's the role of conduct.  His work

19  and that well cited text simply emphasizes that in

20  certain industries they are investment intensive and

21  it's a central component of firm strategy and how --

22  how the industry will evolve and how it will be

23  structured at any time point in time.  There are -- my

24  predecessor at Yale, Sharon Auster, she's written

25  papers on the importance of investment.  My own paper

46

Snyder

FTC v. Qualcomm, Inc.                                        8/4/2018

1    with Scott Maston, United Shoe, even though that's a

2    long ago example, United Shoe was, believe it or not,

3    as I recall from the paper, the second largest investor

4    in R&D in the -- in the last -- in the first half of

5    the last century.  There are papers by Dick -- excuse

6    me, Richard Schmalensee on investment intensive

7    industries.

8         So those things come out of the industrial

9    organization literature independent of conduct and

10   that's the guidance that I followed in establishing and

11   identifying the industry factors hypothesis which the

12   cornerstone of that is investment.

13       Q.  So I understand there's a body of academic

14   literature that discusses the importance of investments

15   and that certain industries are investment intensive.

16   What I'm trying to understand is whether the academic

17   literature affirmatively says that conduct does not

18   effect the investment decisions made by firms.

19       MR. RYAN:  Objection to form.

20       A.  No.  I think that's correct.  That there is --

21   there is literature that would allow for that but

22   that's why I have the two hypotheses.

23       Q.  I'm sorry.  There is literature that would

24   allow for what?

25       A.  That conduct could effect investment.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

47

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1      Q.  Oh.  What literature would that be?

2      A.  Professor Shapiro cites various literature.

3   The most, I think, on point examples are the papers

4   that deal with the potential anticompetitive effects of

5   contracts on rivals not making investments, not

6   entering, not reaching scale.

7      Q.  And did you consider that academic literature

8   in your analysis of whether the conduct effected firms'

9   investment decisions?

10     A.  I did so in -- in the following way:  I

11   entertained the Plaintiff's hypothesis, which is

12   exactly along those lines.  And of course I also kept

13   that in mind, as I indicated when I was evaluating

14   particular examples, like the MediaTech example.  I

15   also -- I believe I provided the most comprehensive

16   information on investments by individual firms and,

17   therefore, in the aggregate.  I also tested that by

18   evaluating the long-run performance of the industry.

19   So I setup these two hypotheses carefully, but in terms

20   of testing, I do allow for that insofar as I evaluate

21   the explanatory power of the Plaintiff's hypothesis.  I

22   understand that's exactly what plaintiffs claim.

23   Excuse me, I shouldn't say plaintiffs.  The Federal

24   Trade Commission claims.

25     Q.  And you said it's in literature that supports

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

67

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1   then do the turning on and off that you just described.
2   So conceptually, I agree with you, if I had found
3   something like that that was not explained by the
4   industry factors' hypothesis, then at that conceptual
5   level I'd go and say well let's evaluate the
6   Plaintiff's hypothesis and do that toggling of the
7   conduct.  I didn't get to that step because in applying
8   the first step, I explained all of these outcomes that
9   were cited as anticompetitive harm.
10          MS. IKEDA:  Do you want to take a break?  Why
11   don't we take a five-minute.
12          MR. RYAN:  Yes.
13          THE WITNESS:  Great.  Thank you.
14          THE VIDEOGRAPHER:  The time is 11:27 a.m. and
15   we're going off the record.
16          (A recess was taken.)
17          THE VIDEOGRAPHER:  This begins media unit
18   number three.  The time is 11:46 a.m. and we are back
19   on record.
20      Q.  In our earlier discussion you -- you referenced
21   your findings on the explanatory power of industry
22   factors.  Did you do any empirical analysis to confirm
23   your findings on that?
24      A.  I have maybe a broader view of empirical
25   analysis.  Sometimes people mean statistical regression

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

68

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    but I think of empirical as just relating to facts, so
2    in my mind the answer is yes.  You asked questions
3    about are these observable outcomes, yes, they're
4    facts.  They're actual industry outcomes and I assess
5    them in section seven one by one in the context of my
6    critique of Professor Shapiro.
7        Q.  Did you analyze data from the various chip
8    suppliers to confirm your analyses?
9        A.  I did.  So for example, I think I provided the
10   most comprehensive data on investments and various ways
11   -- I shouldn't say in various ways.  Measured in
12   various ways.  I also conducted an empirical inquiry
13   into the number of chip suppliers and their
14   relationships to OEMs.  And again, I analyzed that in
15   different ways.  I'm putting aside the long-run
16   performance which you already asked me about, the time
17   series on various indicators of performance.
18       Q.  Did you conduct any statistical analyses?
19       A.  Only time series.  If you mean by statistical
20   test, no.  In fact, I shouldn't even put in the
21   qualification.  I'm presenting the information and I'm
22   checking it against a very basic hypothesis, do I see
23   impairment, for example, in the long-term context.  In
24   terms of the testing, a lot of the tests involve
25   particular events, which don't lend themselves to

69

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

 1   statistical testing like an exit decision by Broadcom.
 2       Q.  We talked earlier about your view that -- and
 3   correct me if I'm wrong -- that Qualcomm's conduct
 4   didn't effect the firm level factors.  This goes back
 5   to the endogeneity of the firm level factors.  If that
 6   were wrong, if -- in, in fact, Qualcomm's conduct did
 7   effect the firm level factors, would that change your
 8   analysis?
 9       MR. RYAN:  Objection.
10       A.  I'm not aware of any claim by plaintiffs that
11   relate to that, that Qualcomm's conduct made investment
12   more or less important.  Increased the importance of
13   foresight, et cetera.  So it's hard for me to evaluate
14   that.  I don't think Professor Shapiro made that claim.
15   I don't recall anything in the complaint along those
16   lines.
17       Put differently, it was -- given industry
18   characteristics, given the industry in which this
19   conduct took place, the conduct caused particular
20   outcomes.  And I've identified what those are and so I
21   didn't have anything to go on in that front.  I would
22   be happy to analyze a claim that the conduct effected
23   industry characteristics but there are so many to say
24   -- this may go beyond what you wanted me to answer --
25   this industry analysis, to me, in compelling fashion,

70

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    identifies factors that are going to be highly
2    influential.  This is one of the most challenging
3    investment environments I've ever seen, given the shift
4    from generation to generation, the convergence towards
5    a particular generation, the divergences.  The
6    potential directions that individual firms can go in
7    terms of getting to the next generation, the different
8    families that Professor Shapiro relates to the new
9    releases, the customization.  I don't see anyway on its
10   face that the conduct is going to change the degree of
11   difficulty on the investment front.  It's already
12   extremely challenging.
13        Similarly, with foresight, similarly with
14   execution, there are a lot of examples of both good and
15   bad execution in the industry given that range of
16   difference in execution ability, it's hard to see any
17   argument at all actually, there's, I think, more about
18   it that execution is going to go away.  Could it have
19   some effect?  I guess I haven't thought about it given
20   the lack of claim by Plaintiff or Professor Shapiro.
21   Q.  So separately from the question of whether
22   Qualcomm's conduct did effect these firm level factors,
23   I am asking, if it were the case that just take as a
24   give that Qualcomm's conduct did effect modem chip
25   suppliers, foresight, their investment decisions and

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

71

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    their execution, how, if at all, would that change your

2    analysis?

3          MR. RYAN:   Objection.

4      A.   I don't have an opinion about that given I

5    haven't seen any evidence that would indicate the

6    nature of that relationship.  I don't want to repeat

7    the last question, but I'll refer back to it.  And I

8    haven't seen any claim by the Federal Trade Commission

9    or Professor Shapiro about that relationship or

10   potential relationship.  So I haven't thought about it

11   given I haven't seen it raised by plaintiff or

12   Professor Shapiro and given my assessment of the

13   industry I don't see how it would work how it would be

14   influenced.  I don't want to completely rule it out

15   because I haven't encountered an argument along those

16   lines.

17     Q.   You may have already answered this but to what

18   extent, if any, do you believe that Qualcomm's conduct

19   effected modem chip suppliers' low margins or exits?

20     A.   In each of the cases cited by Professor Shapiro

21   there's a non conduct explanation that is compelling.

22   And that's my conclusion.

23     Q.   So are you saying Qualcomm's conduct had no

24   effect on the rivals' outcomes?

25     A.   In the cases that Professor Shapiro cited where

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

73

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    industry factors explain the outcomes.  I just want to
2    make sure that I understand your conclusion on the
3    impact of Qualcomm's conduct.  Is it -- if you were to
4    quantify it, is it zero percent attributable to
5    Qualcomm's conduct?
6        A.   In terms of reliable economic analysis, it's
7    zero.  There's no basis.  I didn't see it in Professor
8    Shapiro's reply report where he went beyond my
9    analysis, but that's really, I'd say for him to answer,
10   or Plaintiff to make that argument.  I'm not a lawyer
11   but I've presented my conclusion.  It got me to this
12   point where I see the industry factors as explaining
13   the outcomes.  If -- if Plaintiff or Professor Shapiro
14   wants to say, no, there's something left to be
15   explained, then I understand that.  I understand the
16   line of questioning but I'm trying to be clear on what
17   I did and why I didn't encounter or how I did not
18   encounter the kind of evidence that you're saying would
19   have prompted me to then take that next step.
20       Q.   And when you say the outcomes are explained by
21   the industry factors, does that -- are you just saying
22   that the outcomes are consistent with industry factors?
23       A.   No, it's stronger than that.  I think when you
24   identify execution problems by various firms, such as
25   ST-Ericsson or Broadcom, it's more than consistent

90

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1      Q.  And are you aware of academic literature that
2   supports the idea that these three factors determine a
3   firm's success or failure in the modem chip industry?
4      A.  In the academic literature, I don't think the
5   academic literature has gotten to this.  Certainly a
6   lot of the citations to other commentary would reflect
7   the importance of these factors.  I'm not aware of any
8   academic literature that is focused on the modem chip
9   industry.  It's a poor reflection on academic
10  economists but...
11     Q.  Are you aware of any work conducted by your
12  peers where they've taken the same approach of applying
13  these three factors to assess firm outcomes in the
14  modem chip industry?
15     A.  When you say my peers, you mean the other
16  experts here?
17     Q.  No, sorry.  Other economists in your field.
18     A.  So you're asking about have other economists
19  applied these three factors to any industry or this
20  industry?
21     Q.  In the modem industry.
22     A.  I'm not aware one way or another.
23     Q.  And foresight, is that an economic term of art?
24     A.  Well, as I said, I think it encompasses firm
25  strategy so that's obviously a term of art.  But I

93

Snyder

FTC v. Qualcomm, Inc.                                        8/4/2018

1    mentioned earlier, Texas Instruments is not -- they
2    don't view their strategic focus as being on software.
3    So that is -- that tells you a lot about their
4    strategic focus, what they're likely to do in terms of
5    products that they want to develop, but then there's
6    still investment decisions that require particular
7    judgments about where to invest give that overall
8    strategy and overall focus.
9         Q.   And that's where foresight comes into play?
10        A.   Yes.   It's -- it, you know, it's related to
11   investment.   It captures, of course, the need to
12   generally focus but also continually adjust and make
13   decisions about where to invest.
14        Q.   Is there a widely accepted definition of
15   foresight in your field?
16        A.   As I said, I'm -- I'm identifying that as a way
17   to emphasize the importance of strategic decisions.
18   And people don't like that, they could substitute some
19   alternative, but nobody who's really studied this
20   industry would fail to understand the importance of
21   foresight and you take examples that are clear.   Intel
22   saying I'm going to disrupt the industry with WiMAX.
23   That's their judgment based on some foresight.
24        Q.   So your report talks a lot about foresight, I
25   just wanted to make sure when we use the term we're --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

95

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1       Q.   Are there widely accepted metrics for assessing

2   foresight?

3       A.   Well, yes.  I mean, you know, we have courses,

4   I think Professor Shapiro has taught courses on

5   strategy, and voluminous amount of cases on company

6   strategies.  There's the Strategic Management Journal.

7   There's Harvard Business Review, Sloan Management

8   Review.  There are all kinds of sources of information

9   and evaluation and investment of firm strategies in

10  different contexts.  So lots of different academic and

11  more business oriented literature deals with strategy.

12      Q.   How do you assess foresight?

13      A.   It's essentially how you assess the outcomes of

14  strategic decisions in a dynamic environment.  I

15  mentioned the analogy to placing bets, and I said that

16  provides some information and insight, but it's more

17  complicated than that.

18      Q.   So is it --

19      A.   Do you --

20      Q.   -- sorry.

21      A.   Do you engage with OEMs the way MediaTech did

22  with their reference designs?  That's an aspect of

23  strategy.  That's something that you can see that they

24  did.  You can see by contrast Intel's WiMAX strategy.

25  These are -- these are observable things and you can

Snyder

FTC v. Qualcomm, Inc.                                     8/4/2018

1        Q.  Are foresight and good fortune synonymous?

2        A.  No.  That's why I said "or."

3        Q.  So what's the difference?

4        A.   Well, this is -- it's important to understand

5    that a firm may do something that ends of working out

6    or not working out.  It's not always a perfect look

7    back to say that was based on their judgment or whether

8    they were either lucky or unlucky.  That said, when you

9    look at a firm's decision making over time, you can

10   evaluate the consistency of their decisions and

11   timeliness and when you look across firms you can also

12   do the same.  But what I'm allowing for here is, of

13   course, in a dynamic environment, one doesn't know and

14   one cannot always claim that a bad outcome is due to

15   bad luck or a good outcome is due to good luck.  So

16   that in the real world evaluation of this element of

17   strategy, foresight, needs to be put into a context

18   where it's not certain and so inferences can be made

19   but you have to keep in mind, just like an error term

20   in a regression, that there may be something else that

21   explains a particular outcome.  That said, by taking

22   time series, by looking at more -- looking across OEMs,

23   I looked at 14, Professor Shapiro identified 6, as I

24   recall for anticompetitive harm allegations, I can get

25   insights as to the roll of foresight, especially when

99

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1   in terms of what evidence to look at was where
2   Professor Shapiro made specific claims with respect to
3   anticompetitive outcomes.  Those two are different.  My
4   recollection is that putting Qualcomm aside my analysis
5   deals with eight -- not exclusively -- but it includes
6   eight individual suppliers that were in the top five at
7   one point in their history.  Professor Shapiro's
8   analysis deals with four of them but not the other
9   four.  So broad -- broader set of evidence, including
10  more decisions and more outcomes.
11      Q.  So just taking any one of these for instance,
12  like Intel as an example, when you're assigning them a
13  grade for foresight, did you look at every single
14  strategic decision they made during the life of the
15  firm or did you select certain occasions?
16      A.   Well, I'm sorry.  No one can look at every
17  decision that they made.  I'm focusing on the decisions
18  that concern investment in technology and that -- that
19  implicates their decisions with respect to particular
20  product standards and competing families of standards,
21  et cetera.  I'm not sure if I'm answering your
22  question.  I can go into more detail about Intel if you
23  want.
24      Q.  I know about the example with WiMAX that you
25  discuss but were there other specific investment

102

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

17        Q.  Did you analyze strategic investments that were
18    not made in your analysis of the foresight?
19        A.  I did.  So a good example again is -- is
20    Infineon.  Another is STE-Ericsson.  Another is
21    Freescale.  My recollection is that Professor Shapiro
22    only analyzed one of those, but that's another
23    important set of insights about exactly your point,
24    investments not made.
25        Q.  And how do you know that you were able to

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    consider every single strategic decision for each firm?

2              MR. RYAN:   Objection.

3         A.   I couldn't analyze everything.  I focused on

4    the ones that had the most influence on whether they

5    were able to sell particular products to particular

6    customers.  And those things are observable.

7         Q.   I want to talk about an example, just to make

8    sure I understand your analysis of foresight.  So

9    you're aware of instances where Qualcomm invested money

10   in certain custom projects for Apple and later it

11   turned out that Apple cancelled those projects and

12   modem chips that under development weren't

13   commercialized.  Are you aware of those instances?

14        A.   I'm not sure that I can recall a specific

15   instance that matches that description.  I am aware of

16   Qualcomm making investments in some points in their

17   firm history where they didn't work out, but if there's

18   something in particular you want me to focus on.

19        Q.   Okay.  Just for an illustrative example.  So

20   let's say we have this instance where Qualcomm invests

21   in a project for Apple and Apple ultimately decides not

22   to go with that project, cancels the project.  Would

23   that be an example of bad foresight on the part of

24   Qualcomm or is it good foresight but bad luck or

25   something else?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

112

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

```
 1      Q.  I guess I'm just trying to understand if there
 2   were any -- if there is an objective way to know that
 3   you captured every relevant strategic decision in your
 4   foresight analysis.
 5      A.  Well, my -- my assignment is to evaluate
 6   Professor Shapiro's claims, so I don't feel like I've
 7   missed anything.  I've got beyond his analysis.  Are
 8   there some things -- I think this is a legitimate
 9   question -- are there some things where it is not
10   possible to get enough insight into a particular set of
11   decisions?  Or maybe not enough or not as much as I
12   would like?  Yes.  I can give you an example.  Samsung.
13   Not analyzed by Professor Shapiro despite the fact that
14   they're in the top five.  Not analyzed by Professor
15   Shapiro, despite the fact that they are one of the top
16   two in premium handsets in the world.  He does not
17   analyze them as a mobile chip supplier but I do.  But
18   can I see everything that they did?  No.  But I can
19   identify that they reached CDMA capability, for
20   example, and I can see that they've invested in the
21   capability to supply chips for much of their product
22   offerings.  I didn't have to, however, go beyond that
23   for my analysis because I reached the judgment that
24   they had focused on things that were important and they
25   had succeeded.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

125

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    that is by, as I recall, Bain who was brought in and

2    evaluated their investment efforts.  That analysis

3    included cross-firm analyses that indicated different

4    levels of efficiency associated with investments by

5    different firms.

6        Q.  Is there an accepted definition of the term

7    investment efficiency?

8        A.  There are but for purposes here, the big

9    differences of the types that I was talking about are

10   what I focused on.

11       Q.  And what's that?

12   ███████████████████████████████████████████████████

13   ███████████████████████████████████████████████████

14   ███████████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ████

17       Q.  I think we --

18       A.  -- more specific would require information that

19   my understanding would be only available with more

20   discovery and even then it may be the firms don't track

21   particular investments and then provide a return on

22   investment figure.  But they're -- in theory there are

23   more precise ways to measure efficiency.

24       Q.  So you're saying there are several ways to

25   measure investment efficiency?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

127

Snyder

FTC v. Qualcomm, Inc.                                            8/4/2018

1   other ways to evaluate efficiency that may or may not
2   require a particular dollar percent returns.  Again,
3   you look over time and you find the pattern and you can
4   assess efficiency of the investment.  I think the Bain
5   analyses, and my recollection is that there are
6   multiple ones, use particular metrics that confirm that
7   efficiency is important.  I don't remember sitting here
8   right now exactly what those were.  I might have them
9   in my report if you want me to take a look.
10      Q.  You're saying you don't remember the actual
11  formula they used to calculate efficiency?
12      A.  I can't provide that off the top of my head.  I
13  recall the Bain analyses that I believe were sound and
14  provided insight that would be valuable.  I don't know
15  if I -- I think I have it in my report, some reference
16  to it if you would like me to take a look.
17      Q.  I think I have a document that we can use later
18  to get to the Bain analysis.  Before we do that, did
19  you apply whatever the measure was that Bain used to
20  measure efficiency in your analyses?
21      A.  No, I viewed that as confirming that efficiency
22  of investment differed and was important.  I also put
23  it in the context of my 14 evaluations of chip
24  suppliers, I also put it in the context of my time
25  series documentation of investment levels.  And as I

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

128

Snyder

FTC v. Qualcomm, Inc.                                      8/4/2018

1    indicated, those investment levels differ and they
2    don't correlate anywhere near to a factor of one with
3    measures of industry success.
4         Q.   So you didn't take the Bain analysis and
5    reapply it to 14 modem supplier investments?
6         A.   No, I did not.   Correct.   I did what I just
7    said.
8         Q.   Is there a more commonly used measure of
9    efficiency in the field of economics?
10            MR. RYAN:   Objection to form.
11        A.   For industry settings where you have the right
12   information and the types of projects are more
13   discreet, financial accounting would generate percent
14   return on investment or return on capital as variable
15   measures of investment efficiency.   Whether those are
16   risk adjusted, et cetera, you get into finer points.
17   That kind of information is not available here and that
18   -- to what extent that information exists, I would say
19   probably varies across the firms, but given my
20   understanding of the industry context, it's unlikely
21   that any firm is able to track its investments, measure
22   that investment effort in such a clear discreet way,
23   which itself is a step in coming up with a percentage
24   return on investment.
25        Q.   So when you refer to return on investment, is

130

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    I can give you more reasons why you wouldn't expect it

2    in this context.

3        Q.  Are are there other ones that you can think of

4    now?

5        A.  Sure.  I mean one would be, okay, I realize

6    this value of information that I think I've gained from

7    this particular engagement but the realized value of

8    that information, in fact, depends on whether I've been

9    able to transfer to another project.  Well, that's a

10   hard be measurement also.  How -- how good was my team

11   in transferring that information.  How valuable was the

12   transfer as an increment to what they already knew, the

13   next team or it's the same team in the next setting.

14   This is not an easy even conceptual problem.  So that's

15   why I say you're not going to get precise measures of

16   return on investment in this kind of setting, hence,

17   going to the analyses that I did.

18       Q.  And what was the formula that you used to

19   calculate investment efficiency for each firm?

20           MR. RYAN:  Objection.

21       A.  There wasn't a single formula because the, in

22   some cases, the investments were in the category of not

23   successful, not pursued, abandoned.  I don't want to

24   repeat myself about what I did do in terms of tracking

25   investments and valuating that relationship to firm

131
Snyder
FTC v. Qualcomm, Inc.                                    8/4/2018

1    success.  I can go into more detail on that if you'd
2    like.
3         Q.  So are you saying that in this case investment
4    efficiency is not a quantifiable metric?
5             MR. RYAN:  Objection to form.
6         A.  No, I'm not.  I'm saying you can get reliable
7    indicators of differences, important differences among
8    firms on that dimension.
9         Q.  And can you assign a value to the efficiency of
10   each firm?
11        A.  In terms of an arbitrary, like, ranking in lieu
12   of return on investment, no.  But you can clearly
13   identify major differences where you say MediaTech is
14   more efficient than Intel and that's borne out by clear
15   evidence on their spend during certain periods of time
16   and what business they got.
17        Q.  And so for each firm did you take into account
18   the same factors in your investment efficiency
19   analysis?
20        A.  I used the same approach as part of the overall
21   hypothesis testing.  The same information isn't
22   available in each case.  Different types of
23   information.  For example, starting a project
24   abandoning it, the timeliness of that, the spend, and
25   then the indications of how the investment led to

143

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018

1    and if they're not there, that means I didn't have the
2    data.  And I indicated in the notes -- I did some
3    various prorations, if that's the right term,
4    prorations of the numbers to develop these time series.
5         Q.  We talked earlier about the Bain presentation
6    that was in -- referenced in paragraph 165.
7         A.  Yes.
8         Q.  You don't recall what the specific methodology
9    was used in that presentation?
10            MR. RYAN:  Objection.
11        A.  You're saying it's in paragraph 165?
12        Q.  Yes.  Footnote 327.
13        A.  Okay.  And I apologize.  I'm just finding this
14   and locating this.  What is your question about this,
15   did I recall the specific methodology without looking?
16        Q.  Right.  I thought you said this earlier but I'm
17   just confirming, today right now, you don't recall the
18   specific methodology that was used, correct?
19        A.  No, and I didn't -- just to be clear, I think
20   you asked me did I take that methodology and apply it.
21   I did not.  I would be happy to look at the document
22   again.
23        Q.  Did you assess the methodology or did you just
24   accept the findings for purposes of your report?
25            MR. RYAN:  Objection.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

144

Snyder

FTC v. Qualcomm, Inc.                                          8/4/2018



149

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    could come from multiple customers.  And I just wanted
2    to include that in my answer.  And that's, you know,
3    Professor Shapiro and I agree on that.
4        Q.  Turning to paragraph 167, you identify the
5    speed with which a modem chip supplier can make its
6    innovations available to OEMs as a factor that effects
7    efficiency of R&D spending; is that right?
8        A.  Yes.
9        Q.  And how, if at all, is that different from the
10   concept of execution that you discuss elsewhere in your
11   report?
12       A.  Execution involves that timeliness and speed,
13   but I think you're capturing also the timeliness of the
14   investment, and then condition on that, the capability
15   of bringing that product to market.  So I'm not sure if
16   I -- I should listen better to your question.
17       Q.  Well, when you talk about speed with which a
18   modem chip supplier makes its innovations available, is
19   there some overlap in this factor with what you're
20   considering under the execution factor?
21       A.  Yes.  Yes.  And also with the investment factor
22   because when -- when the firm makes the investment,
23   also will effect the timing that the supplier can make
24   its innovations -- I'm now quoting -- can, quote, make
25   its innovations available to OEMs.  So timeliness of

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

150

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    investment and speed of execution are things that will

2    effect that ability to make innovations available.

3        Q.  So if a chip supplier didn't have access to

4    buyers of its chips, would that supplier by definition

5    have inefficient R&D investment?

6            MR. RYAN:  Objection.

7        A.  No, because the efficiency of the R&D depends

8    on how they do going forward.  And your previous

9    question elicited two dimensions of ways you can get

10   more efficient investment having more sales to a given

11   customer and having more sales by selling to greater

12   numbers of OEMs.  There's no starting point where you

13   say not having a customer means low efficiency.  It

14   depends on how they do going forward.  Conversely,

15   having a customer, as indicated by Freescale,

16   ST-Ericsson, Infineon, doesn't guarantee efficiency of

17   investment by itself.

18       Q.  I guess what I'm saying is if speed to market

19   is a factor that you consider in investment --

20   investment efficiency, then if a chip supplier never

21   brings its chips to market, does that by definition

22   mean it is inefficient?

23       A.  But you're saying they make the investment,

24   right?

25       Q.  Uh-huh.

164

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1   production on a timely basis to meet OEM needs taking

2   into -- taking into account quality.

3       Q.  Are there quantifiable metrics that you use to

4   assess execution?

5       A.  Yes.  In terms of observable successes and

6   failures.  Quantifiable in terms of a -- a dial, no.

7       Q.  Couldn't you, for example, look at time to

8   market or, you know, the timeliness of supply?

9       A.  Those are things that are going to effect this

10  overall execution.  I have the -- the chart that

11  summarize the cross-sectional factors.

12      Q.  Hm-mm.

13      A.  And I also have the individual analyses where I

14  identified execution issues and some firms have limited

15  identifiable execution problems others have repeated.

16      Q.  Is there an accepted methodology for assessing

17  execution?

18          MR. RYAN:  Objection to form.

19      A.  I'm not sure what the term methodology adds.

20  You can observe whether a firm is able to execute based

21  on whatever particular set of expectations have been

22  made and the set of expectations that they have taken

23  on.  It's identifiable.  I will be able to supply these

24  chips with this quality and in this volume.  So it's

25  identifiable.  It doesn't take a methodology to figure

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

165

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

```
 1    out if somebody met that.
 2         Q.  So would you say that all economists in your
 3    field would apply the -- the same factors in assessing
 4    execution?
 5         A.  That's a -- that's a good question.  I think
 6    that anyone studying this industry would recognize that
 7    it's an important success factor.  Whether they would
 8    evaluate it using that name, I don't know.  But, you
 9    know, the whole analysis of supply chains has been, you
10    know, that there's numerous assessment of how firms
11    organize their supply chains and whether they do it
12    well and how they do it and in what circumstances there
13    are successes or failures.  There are also changes over
14    time.  Walmart's a good example.  But there's been a
15    huge amount of analysis of supply chains, so everyone
16    recognizes that it's an important topic and it's an
17    important element of success.  Exactly how you analyze
18    it is going to depend on the industry circumstances,
19    but it -- here I've done it over time and across firms.
20    And I focused on situations where it's a yes, they've
21    have had problems or no, they haven't.
22         Q.  And if you were to task 100 economists to
23    assess execution in the modem chip industry, would they
24    look at the same observable factors that you did to
25    determine execution?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

166

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1          MR. RYAN:  Objection to form.
2     A.  I don't know if you had 100 economists whether
3  they would analyze execution in the same way or not.
4  What I would hope 100 economists would do would be to
5  recognize that execution's important and identify the
6  instances where firms succeeded and when they did not,
7  because that's objective.  And hopefully an economist
8  would recognize when associating outcomes to conduct or
9  alternative factors, that an economist would realize
10  that execution is one of those alternative factors that
11  influence success.  So I think in sum, they should look
12  at, they should realize it's important, it has
13  explanatory power.  The precise way that it's measured
14  or assessed, that, I would agree, could vary across
15  economists who take on that task.  I think I may -- I'm
16  the only one who's done it in this case, so it's a
17  little, you know, I don't have a reference to point to
18  because I've done it and as far as I can tell, no one
19  else has.
20     Q.  And when you speak about identifying successes
21  and failures, how do you determine whether an event is
22  a successor or a failure?
23     A.  You go objectively to the record and see if a
24  firm has executed, and then you can also check on
25  implications as reflected in objective data on future

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

167

Snyder

FTC v. Qualcomm, Inc.                                    8/4/2018

1    sales and individual supplier OEM relationships.  So a

2    firm that has had problems with execution is going to

3    lose business according to the industry factors

4    hypothesis, and that's what's observed in these

5    analyses of individual firm performance.

6         Q.  I guess, how do you assess whether a firm is

7    successful or not in terms of execution by looking at

8    whether they have problems in execution?  I don't quite

9    follow.

10        A.  Well, you know, the -- you know, not to belabor

11   the point, I mean, this really goes back to Professor

12   Shapiro.  He did not consider any alternative

13   explanations.  He's just toggling the conduct.  That's

14   clearly incorrect.  You have to realize that industry

15   factors are relevant and assess whether they are

16   alternative means of explaining the observed outcomes

17   that he has cited.  So I've taken on that burden, and

18   I've done the more complete assessment of the total

19   evidence than, of course, he has and I've documented

20   time series and cross section and I can give you

21   particular examples and counter examples that validate

22   the relevance of these factors.  There's nothing really

23   more to say about my approach to testing.  I've done

24   it, he hasn't.  I've done it in a coherent way, drawing

25   on industry -- industrial organization factors and