# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware Corporation,<br><br>Defendant. | Case No. 17-CV-00220-LHK |

# EXPERT REPORT OF CARL SHAPIRO

## 24 May 2018

Contains Protected Material Designated by Qualcomm and Non-Parties
Pursuant to Protective Order(s) entered in FTC v. Qualcomm Incorporated,
Case No. 17-cv-00220 (N.D. Cal.)

Expert Report of Carl Shapiro

(5) I have considerable experience with the application of economics for the purpose of enforcing the antitrust laws. I served during 1995–1996 and again during 2009–2011 as the Deputy Assistant Attorney General for Economics in the Antitrust Division of the U.S. Department of Justice. I have also served on several occasions as an expert witness or consultant to the Antitrust Division or the U.S. Federal Trade Commission. I have also consulted or served as an expert witness on numerous antitrust matters for private companies in the technology sector, as well as many other industries. A list of cases in which I have testified during the past four years is attached as Appendix B.

(6) I am being compensated for my work on this case at a rate of $880 per hour. This compensation is unrelated to the outcome of this matter. My work in this case has been supported by Bates White, LLC, an economic consulting firm. I also receive compensation from Bates White based on Bates White's staff billings on this case.

## I.B. Assignment

(7) I have been asked by the Federal Trade Commission (FTC) to provide an economic analysis of the likely competitive effects of Qualcomm's commercial practices that are the subject of the FTC's complaint in this case. The FTC also asked me to define the relevant markets applicable to the analysis of this conduct and to assess whether Qualcomm possesses monopoly power in any of these markets.

(8) A list of the materials that my staff and I relied upon in preparing this report is provided in Appendix C. Discovery in this matter is ongoing. I may amend and update my analysis and my opinions based on information that becomes available too late for inclusion in this report or in the future, and based on the reports submitted by Qualcomm's experts.

---

E. Kwoka, Jr. and Lawrence J. White eds. (Oxford University Press, 2003); Shapiro, Carl, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting," *Innovation Policy and the Economy* 1 (2000): 119–150; Carl Shapiro, "Setting Compatibility Standards: Cooperation or Collusion," *Expanding the Boundaries of Intellectual Property* 81 (2001): 97–101; Richard Gilbert, Carl Shapiro, Louis Kaplow, and Robert Gertner, "Antitrust Issues in the Licensing of Intellectual Property: The Nine No-No's Meet the Nineties," *Brookings Papers on Economic Activity: Microeconomics* (1997): 283–349; Richard J. Gilbert and Carl Shapiro, "An Economic Analysis of Unilateral Refusals to License Intellectual Property," *Proceedings of the National Academy of Sciences* 93, no. 23 (1996): 12749–12755.

Page 2

**Contains Protected Material Designated by Qualcomm and Non-Parties
Pursuant to Protective Order(s) entered in FTC v. Qualcomm Incorporated,
Case No. 17-cv-00220 (N.D. Cal.)**

Expert Report of Carl Shapiro

## II. Summary of Conclusions

(9) At this time, I have reached the following conclusions:

- There is a relevant antitrust product market for "CDMA Modem Chips." These are modem chips that comply with CDMA standards, that is, with CDMA 2G or 3G capabilities. From the perspective of a manufacturer of handsets purchasing modem chips, a modem chip that does not comply with CDMA standards is not a good substitute for a CDMA Modem Chip. My conclusion that CDMA Modem Chips are a relevant market is based in part on my implementation of the Hypothetical Monopolist Test, the standard method employed by antitrust economists for over 35 years to define relevant antitrust markets. The geographic scope of this product market is worldwide.

- Qualcomm had monopoly power in the market for CDMA Modem Chips from 2006 through at least 2016.

- There is a relevant antitrust market for "Premium LTE Modem Chips." These are modem chips that comply with the LTE standard and are used in premium handsets, as that term is used by Qualcomm. From the perspective of a manufacturer of handsets purchasing modem chips, other modem chips are not good substitutes for Premium LTE Modem Chips. In particular, modem chips with fewer capabilities that are not used in premium handsets are not a good substitute for Premium LTE Modem Chips. My conclusion that Premium LTE Modem Chips are a relevant market is in part based on my implementation of the Hypothetical Monopolist Test. The geographic scope of this product market is worldwide.

- Qualcomm had monopoly power in the market for Premium LTE Modem Chips from the launch of LTE handsets in 2011 through at least 2016.

- Qualcomm has employed a "no-license/no-chips" policy for many years. Under this policy, Qualcomm will not supply its modem chips to a handset manufacturer that has not signed a patent license with Qualcomm covering Qualcomm's cellular standard-essential patents (SEPs). Through use of this policy, Qualcomm has brought its bargaining leverage based on its monopoly power over modem chips to bear on its patent licensing negotiations with handset manufacturers.

- As a result of Qualcomm's no-license/no-chips policy, Qualcomm has been able to obtain unreasonably high royalties for its cellular SEPs, notwithstanding Qualcomm's commitment to license its cellular SEPs on fair, reasonable, and non-discriminatory (FRAND) terms.

Page 3

**Contains Protected Material Designated by Qualcomm and Non-Parties
Pursuant to Protective Order(s) entered in FTC v. Qualcomm Incorporated,
Case No. 17-cv-00220 (N.D. Cal.)**

Expert Report of Carl Shapiro

this reallocation weakens and excludes Qualcomm's rivals by reducing the demand for their modem chips.[578]

(298) The central competition problem is that Qualcomm is using the market power associated with its modem chips to induce OEMs to agree to pay a per-handset royalty in excess of a reasonable level when purchasing modem chips from any of Qualcomm's rivals. This excess per-handset royalty charge ($x$ in my notation) has the effect of raising the cost to the OEM of purchasing a modem chip from Qualcomm's rivals, by exactly the amount of Qualcomm's excess royalties, $x$. This higher cost in turn depresses the demand for modem chips sold by Qualcomm's rivals. Put simply, an OEM's demand for a rival modem chip is reduced if the OEM must pay the excess royalty $x$ when it uses a rival modem chip.

(299) Equivalently, one can think of the excess royalty $x$ as an extra cost that Qualcomm imposes on its rivals when they sell modem chips. This would literally be true if the rival were the entity paying the SEP royalties directly to Qualcomm. However, the underlying economics are identical, whether the *OEM* pays an extra amount $x$ to Qualcomm when using a rival chip, or whether the *rival* pays that extra amount directly to Qualcomm. In the first case, the license fee is a strict complement to the rival's modem chip. In the second case, the license fee is an unavoidable cost borne by the rival. These are economically equivalent.[579] Qualcomm's no-license/no-chips policy is an example of how a monopolist can use its monopoly power to raise the costs incurred by its rivals, which weakens or excludes them, and thereby fortifies its monopoly position.[580]

(300) This excess royalty is economically equivalent to a "tax" imposed by Qualcomm on the OEM's use of rival modem chips. By raising the cost on rival modem chips, this excess royalty inevitably and predictably raises the all-in price of rival chipsets and reduces the quantity of those chipsets sold, for

---

[578] *See*, for example, Philippe Aghion and Patrick Bolton, "Contracts as a Barrier to Entry," *American Economic Review* 77, no. 3 (1987): 388–401; Kathryn E. Spier and Michael D. Whinston, "On the Efficiency of Privately Stipulated Damages for Breach of Contract: Entry Barriers, Reliance, and Renegotiation," *RAND Journal of Economics* 26, no. 2 (1995): 180–202; Eric B. Rasmusen, J. Mark Ramseyer, and John S. Wiley Jr., "Naked Exclusion," *American Economic Review* 81, no. 5 (1991): 1137–1145; Ilya R. Segal and Michael D. Whinston, "Naked Exclusion: Comment," *American Economic Review* 90, no. 1 (2000): 296–309; John Asker and Heski Bar-Isaac, "Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals," *American Economic Review* 104, no. 2 (2014): 672–86.

[579] The economic impact of the excess royalty is the same as that of a sales tax. It is a well-established economic principle that the effect of a tax is identical regardless of whether the consumer or producer of a good pays that tax: *see*, *e.g.*, Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 7th ed., 335–336 (Upper Saddle River, NJ: Pearson Prentice Hall, 2007).

[580] There is an extensive economics literature on "Raising Rivals' Costs," which addresses business practices that weaken or exclude rivals by raising their costs. *See, e.g.*, Steven C. Salop and David T. Scheffman, "Raising Rivals' costs," *American Economic Review* 73, no. 2 (1983): 267–271; Elizabeth Granitz and Benjamin Klein, "Monopolization by 'Raising Rivals' Costs': The Standard Oil Case," *Journal of Law and Economics* 39, no. 1 (1996): 1–47; Nicholas Economides, "The Incentive for Non-Price Discrimination by an Input Monopolist," *International Journal of Industrial Organization* 16, no. 3 (1998): 271–284; Justine S. Hastings and Richard J. Gilbert, "Market Power, Vertical Integration and the Wholesale Price of Gasoline," *Journal of Industrial Economics* 53, no. 4 (2005): 469–492; Hans-Theo Normann, "Vertical Integration, Raising Rivals' Costs and Upstream Collusion," *European Economic Review* 53, no. 4 (2009): 461–480.

Contains Protected Material Designated by Qualcomm and Non-Parties
Pursuant to Protective Order(s) entered in FTC v. Qualcomm Incorporated,
Case No. 17-cv-00220 (N.D. Cal.)

Expert Report of Carl Shapiro

a given all-in price charged by Qualcomm. This excess royalty also inevitably and predictably reduces the operating income that any rivals can earn from selling chipsets, which can be expected to reduce the investments these rivals make in modem chips. This is turn leads to longer-term anti-competitive effects on innovation.

(301) For all of these reasons, this excess royalty excludes rival modem-chip suppliers. In the short run, that exclusion takes the form of reducing the competitive constraint that the rivals impose on Qualcomm, which leads to reduced output of rival modem chips and a higher all-in price for rival modem chips. This is an example of the general economic principle that when a good is taxed, its price goes up and the quantity of that good sold goes down. In the long run, that exclusion also takes the form of reduced investments by rival modem chip suppliers, leading those rivals to offer lower quality modem chips and/or to have reduced capacity. In time, the excess royalty can induce exit from the market altogether.

(302) While it is difficult to isolate the effect of Qualcomm's conduct on its modem chip rivals, we do know, as discussed above in Section VIII.C, that Texas Instruments, Broadcom, Marvell, Nvidia, and ST-Ericsson all stopped selling modem chips between 2012 and 2015.[581] These companies were unable to make sufficient sales at margins that would justify continuing to make the substantial R&D investments needed to remain competitive in the sale of Premium LTE Modem Chips.

(303) There is evidence from the exited rivals that depressed margins in the sale of modem chips contributed to their exit. Broadcom's Rango described the margins that Broadcom's modem chip business earned as "not attractive" and below Broadcom's gross margin target of 50%.[582] A Broadcom Board of Directors presentation from 2011 identified the "[a]bility to resource the opportunities" as a key "Risk/Challenge" in the sales of modem chips.[583] With respect to Marvell, former Marvell Vice President Vivek Chhabra testified that Marvell's gross margins were 14% prior to exiting the modem chip business, much lower than Marvell's 40% to 50% gross margin targets.[584] Nvidia likewise earned lower margins on its modem chips than it did on other chips it sold, and the poor return on investment was a factor in Nvidia's decision to wind down its business.[585]

(304) Additionally, as MediaTek has attempted to move from lower tiers to the premium tier, it has found that the margins it earns on its more premium products are unsustainable. MediaTek's Moynihan

---

[581] *See* ¶ (251) and note 525.

[582] Deposition of Robert Rango (Broadcom), 249:2–252:20, Feb. 13, 2018 (discussing Broadcom, "Mobile and Wireless" (presentation, Nov. 12, 2013), 14–15 (BRCM000173 at -186–187).

[583] Broadcom, "3YP Phase V: Mobile and Wireless Group: BOD Presentation" (presentation, 2011), 2 (BRCM000026, -028).

[584] Deposition of Vivek Chhabra (Marvell), 174:21–179:2, Mar. 9, 2018.

[585] Deposition of Deepu Talla (Nvidia), 117:14–118:2, Mar. 23, 2018; *see also* Deposition of Deepu Talla (Nvidia), 206:6–206:22, Mar. 23, 2018 ("[W]e felt that the return on investment—we could invest our resources in other markets where the growth opportunity is better . . . .").

Page 115

**Contains Protected Material Designated by Qualcomm and Non-Parties
Pursuant to Protective Order(s) entered in FTC v. Qualcomm Incorporated,
Case No. 17-cv-00220 (N.D. Cal.)**

Expert Report of Carl Shapiro

directly harms those rivals and weakens them as competitors to Qualcomm by eliminating a valuable option that would otherwise be available to them.

(327) Qualcomm's refusal to license its modem chip rivals further harms competition to the extent that rivals' inability to obtain a license from Qualcomm on reasonable terms discourages investment. For example, in 2011, Samsung and several other companies negotiated to form a joint venture called "Dragonfly" that would have developed and sold modem chips to third parties. One of the key conditions for that joint venture was that it obtain a license from Qualcomm to sell modem chips. ███████████████████████████████████████████████████████████████████████████████████████.[607]

(328) Beyond these harms, the exclusionary effect of Qualcomm's refusal to license rival modem-chip makers depends on the per-handset royalties that OEMs pay for Qualcomm's SEPs. If OEMs were able to enter into SEP licenses with Qualcomm at the same per-handset royalty of $\bar{r}$ that rivals could obtain in the counterfactual, then the effects of Qualcomm's refusal to license to its modem-chip rivals might be relatively minor. However, as shown above, that is not the case: due to Qualcomm's no-license/no-chips policy, OEMs pay royalties for Qualcomm's SEPs that the exceed the reasonable per handset royalties of $\bar{r}$.

(329) Qualcomm's practices have limited the ability and incentives of its modem-chip rivals to counter these harms. I understand that in 2015 the Ninth Circuit held that a manufacturer of standard-compliant products could file a breach-of-contract action to enforce a SEP holder's FRAND commitments, whereas the ability to bring such an action had previously been unclear.[608] ███████████████████████████████████████████████████████████████████████████████

(330) Since 2015, although Qualcomm's modem-chip rivals may now have the *ability* to file actions to compel Qualcomm to comply with its FRAND commitments, Qualcomm's practices have reduced those rivals' *incentive* to file such actions.

(331) First, a modem-chip rival may reasonably fear that Qualcomm would retaliate if it took legal action to enforce Qualcomm's obligation to license its SEPs on reasonable terms. As noted above, Qualcomm has informed modem-chip rivals that have sought exhaustive licenses that it does not grant exhaustive licenses to modem-chip suppliers.[609] Qualcomm has informed some rivals that granting an exhaustive

---

[607] *See* Deposition of Andrew Hong (Samsung), 169:4–176:16, 139:23–140:5, Mar. 7, 2018; CX2628 (SFT-0036382); Yiwan Wong (Samsung), memo, "S.LSI Strategy Growth Development (SGD) Weekly Highlights," Mar. 24, 2012, 2 (SFT-0036334 at -335) ██████████████████████████████████████████████████ Email from Yiwan Wong, Samsung, to Samsung executives, Mar. 26, 2012, 2 (SFT-0908806 at - 807).

[608] *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1056–57 (9th Cir. 2015) (affirming judgment in breach of contract action brought by Microsoft to enforce Motorola's FRAND commitments).

[609] *See* Section V.D above.

Page 121

Contains Protected Material Designated by Qualcomm and Non-Parties
Pursuant to Protective Order(s) entered in FTC v. Qualcomm Incorporated,
Case No. 17-cv-00220 (N.D. Cal.)