Jennifer Milici, D.C. Bar No. 987096
J. Alexander Ansaldo, Va. Bar No. 75870
Joseph R. Baker, D.C. Bar No. 490802
Wesley G. Carson, D.C. Bar No. 1009899
Kent Cox, Ill. Bar No. 6188944
Elizabeth A. Gillen, Cal. Bar No. 260667
Geoffrey M. Green, D.C. Bar No. 428392
Nathaniel M. Hopkin, N.Y. Bar No. 5191598
Mika Ikeda, D.C. Bar. No. 983431
Rajesh S. James, N.Y. Bar No. 4209367
Philip J. Kehl, D.C. Bar No. 1010284
Daniel Matheson, D.C. Bar No. 502490
Kenneth H. Merber, D.C. Bar No. 985703
Aaron Ross, D.C. Bar No. 1026902
Connor Shively, Wash. Bar No. 44043
Mark J. Woodward, D.C. Bar. No. 479537
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3695; (202) 326-3496 (fax)
*jmilici@ftc.gov*

*Attorneys for Plaintiff Federal Trade Commission*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware Corporation,<br><br>Defendant. | Case No. 5:17-cv-00220-LHK-NMC<br><br>**FEDERAL TRADE COMMISSION'S PRETRIAL BRIEF**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:     January 4, 2019<br>Time:    9:00 a.m.<br>Courtroom: 7, 4th Floor<br>Judge:   Hon. Lucy H. Koh |

TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................1

II.     LEGAL FRAMEWORK...........................................................................2

III.    QUALCOMM POSSESES MONOPOLY POWER IN THE MARKETS
        FOR CDMA AND PREMIUM LTE MODEM CHIPS......................................4

        A.      CDMA Modem Chips.................................................................5

        B.      Premium LTE Modem Chips ........................................................7

IV.     QUALCOMM ENGAGED IN ANTICOMPETITIVE CONDUCT .................9

        A.      Qualcomm's no license-no chips policy and use of incentive funds
                have dramatically impacted the terms of Qualcomm's patent
                license agreements ....................................................................9

                1.      No license-no chips is a matter of Qualcomm corporate
                        policy...........................................................................9

                2.      OEMs were heavily dependent on Qualcomm's CDMA and
                        Premium LTE modem chips during license negotiations .........10

                3.      Qualcomm used incentive funds to secure OEMs'
                        acceptance of licensing terms ........................................10

                4.      Qualcomm's chip leverage in license negotiations raises
                        royalties.....................................................................10

                5.      Qualcomm's contention that its long-standing practices
                        have no effect on royalties is implausible ...........................13

                6.      Qualcomm's royalty surcharge raises rivals' costs and
                        harms competition........................................................14

        B.      Qualcomm's refusal to license rivals bolsters its high royalties............15

        C.      Qualcomm's elevated royalties led to contracts with Apple that
                contributed to Qualcomm's monopoly power ..................................18

        D.      Modem-chip markets reflect the consequences of Qualcomm's
                anticompetitive conduct ............................................................20

V.      INJUNCTIVE RELIEF IS WARRANTED...............................................21

VI.     CONCLUSION......................................................................................22

1

TABLE OF AUTHORITIES

2

**Cases**

3

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ..................................... 3

4

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) .................................... 16

5

*Amarel v. Connell*, 102 F.3d 1494 (9th Cir. 1996) ........................................................... 3

6

*Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404 (9th Cir. 1991) ................................................ 3

7

*Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297 (3d Cir. 2007) ............................................. 16

8

*Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244 (D. Utah 1999) ...................................... 14

9

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979)..................................................................... 21

10

*CFTC v. Yu*, No. 12-CV-3921-YGR, 2012 WL 3283430 (N.D. Cal. Aug. 10, 2012)................. 21

11

*E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128 (2d Cir. 1984) ......................................... 3

12

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435 (4th Cir. 2011).......................... 18

13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................................ 3

14

*Free FreeHand Corp. v. Adobe Sys., Inc.*, 852 F. Supp. 2d 1171 (N.D. Cal. 2012)................. 4, 9

15

*FTC v. Brown Shoe Co.*, 384 U.S. 316 (1966) ...............................................................2-3

16

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ............................................................ 21

17

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986)................................................................... 2

18

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ................................................................ 4

19

*Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015)............................................. 16

20

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358 (7th Cir. 1987) ........ 14

21

*Realcomp II, Ltd. v. FTC*, 635 F.3d 815 (6th Cir. 2011) .............................................................. 3

22

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ............................................. 4

23

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)................................... 3, 4, 20, 22

24

*United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968)............................................... 22

25

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ............................................................... 21

26

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012).............................................. 3, 9

27

28

**Statutes**

15 U.S.C. § 1 .............................................................................................................. 3

15 U.S.C. § 2 .............................................................................................................. 3

15 U.S.C. § 45(a) ....................................................................................................... 2

**Treatises**

3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (1996 ed.) ......................... 4

iii

## I.   INTRODUCTION

For over a decade, Qualcomm has been the dominant supplier of modem chips that allow cellular handsets to communicate with wireless networks. Over the same period, Qualcomm has collected royalties for its cellular standard essential patents ("SEPs") that far exceed the royalties collected by holders of comparable SEP portfolios. These phenomena are not unrelated. Qualcomm requires cell phone manufacturers ("OEMs") to enter and maintain licenses to its cellular SEPs in order to retain access to Qualcomm's modem chips—"no license, no chips." This strategy, which sets Qualcomm apart from both other semiconductor suppliers and other SEP licensors, allows Qualcomm to use its market power in modem chips to extract a "surcharge" on top of its legitimate patent royalties.

Normally, SEP holders negotiate royalties and other license terms in the "shadow of the law," *i.e.*, against a backdrop of a judicial determination of fair, reasonable, and non-discriminatory ("FRAND") royalties. Qualcomm, in contrast, has not negotiated in the shadow of the law. The evidence at trial will show that Qualcomm's no license-no chips policy substantially diminishes OEMs' ability and incentive to challenge Qualcomm's royalty demands. Unable to negotiate licenses in the shadow of the law, and instead threatened with loss of access to critical modem chips, OEMs have accepted Qualcomm's unreasonable royalty demands, which require OEMs to pay Qualcomm a surcharge on their use of competitors' chips. Qualcomm enhances its ability to collect a surcharge through related conduct, including through payments of funds designed to induce OEMs to accept Qualcomm's preferred royalty terms.

In other words, in order to maintain access to Qualcomm modem chips—which OEMs have required for certain handsets, including their flagship phones—OEMs must pay Qualcomm a surcharge even when they do not use Qualcomm chips. By wielding market power to collect a fee when customers use its competitors' products, Qualcomm raises its rivals' costs, thereby harming competition and consumers.

Qualcomm also forecloses an avenue that its customers might otherwise employ to avoid Qualcomm's required surcharge. Although Qualcomm promised standard-setting organizations that it would make cellular-SEP licenses available to competing modem chip suppliers,

Qualcomm has repeatedly refused to do so. The evidence will show that Qualcomm recognized that making licenses available to its competitors would have hindered Qualcomm's ability to collect elevated royalties from OEMs. Qualcomm's breach of its FRAND commitments further weakened competitors by making their chips less attractive and by deterring entry and investment.

In addition to using elevated royalties to raise its rivals' costs, Qualcomm also used those royalties to secure exclusivity commitments from Apple, an OEM otherwise uniquely capable of sponsoring modem-chip entry. These exclusivity commitments further hindered and delayed rivals from entering and expanding their presence in relevant modem-chip markets.

Qualcomm's exclusionary conduct has contributed to the maintenance of its monopoly in the sale of modem chips that OEMs need to make CDMA-enabled handsets and premium LTE-enabled handsets. By raising its rivals' costs, Qualcomm has weakened rivals, forestalled entry and expansion, and harmed competition. A number of Qualcomm's competitors have exited the relevant modem-chip markets, and Qualcomm's exclusionary conduct has vitiated the threat that its remaining competitors would otherwise pose to its modem-chip monopoly.

As the industry shifts to 5G cellular communications, a significant danger exists that Qualcomm's ongoing anticompetitive conduct will entrench its dominant position in a new generation of modem chips. Despite years of worldwide law enforcement and regulatory scrutiny, Qualcomm continues to engage in the anticompetitive practices challenged in this case. Trial will establish the harm this has caused to competition and consumers and the injury it threatens to cause in the future. The Court should therefore enjoin Qualcomm's anticompetitive sales and licensing practices.

## II.    LEGAL FRAMEWORK

Qualcomm's conduct violates Section 5 of the Federal Trade Commission Act ("FTC Act"). Section 5 prohibits "[u]nfair methods of competition." 15 U.S.C. § 45(a). "Unfair methods of competition" under the FTC Act include violations of the Sherman Act, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454-55 (1986), and also conduct that, although not a violation of the letter of the Sherman Act, conflicts with that Act's basic policies. *See FTC v. Brown Shoe Co.*,

2

384 U.S. 316, 321 (1966); *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 138-40 (2d Cir. 1984) (conduct may be an unfair method of competition if it is "collusive, coercive, predatory or exclusionary in character" or possesses other "indicia of oppressiveness").

Section 2 of the Sherman Act prohibits monopolization, which consists of (1) the possession of monopoly power in a relevant market; and (2) anticompetitive conduct—"the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992); *see also* 15 U.S.C. § 2. Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Thus, proof of a Section 1 violation requires evidence (1) of the existence of an agreement, *i.e.*, concerted action; and (2) that the agreement unreasonably restrained competition. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016). An agreement is *prima facie* "unreasonable" if (1) a defendant has market power in the relevant market; and (2) the challenged agreement tends to harm competition. *See Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827 (6th Cir. 2011).

The legal analysis of Qualcomm's conduct under Sections 1 and 2 of the Sherman Act is similar. *Cf. United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001). Section 1, however, requires an agreement among two or more firms.[1] In addition, a lesser showing is required to establish market power for Section 1 purposes than to establish monopoly power for Section 2 purposes. *See Eastman Kodak*, 504 U.S. at 481; *Amarel v. Connell*, 102 F.3d 1494, 1522 (9th Cir. 1996).[2]

---

[1] Agreements coerced or "essentially forced" by a defendant nonetheless constitute concerted action under Section 1. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 277 (3d Cir. 2012).

[2] In addition, exclusive dealing by a monopolist may violate Section 2 even if the relevant contracts foreclose less than the roughly 40% to 50% of the relevant market typically deemed "substantial" and thus anticompetitive for Section 1 purposes. *See, e.g., Microsoft*, 253 F.3d at 70; *infra* IV.C.

Under the Sherman Act, conduct that "harm[s] the competitive *process,* and thereby harm[s] consumers" is anticompetitive. *McWane, Inc. v. FTC*, 783 F.3d 814, 835-36 (11th Cir. 2015) (quoting *Microsoft*, 253 F.3d at 58). A government plaintiff need not, however, "reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct." *Microsoft*, 253 F.3d at 79 (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651c, at 78 (1996 ed.)). Rather, a government plaintiff must show that the "defendant has engaged in anticompetitive conduct that "reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power." *Id.; accord McWane*, 783 F.3d at 833; *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). When a defendant has engaged in multiple acts or practices that may be anticompetitive, a court must consider their interactions and combined effects. *Free FreeHand Corp. v. Adobe Sys., Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012).

## III.   QUALCOMM POSSESES MONOPOLY POWER IN THE MARKETS FOR CDMA AND PREMIUM LTE MODEM CHIPS

Qualcomm's anticompetitive conduct has entrenched and prolonged Qualcomm's monopoly power in two markets: (1) the market for "CDMA modem chips," *i.e.*, modem chips that comply with 2G or 3G CDMA standards,[3] and (2) the market for "premium LTE modem chips," LTE-compliant modem chips that OEMs deploy in premium handsets.

At trial, the FTC will present evidence demonstrating that these markets constitute relevant antitrust product markets, and that Qualcomm possessed monopoly power in the market for CDMA modem chips from 2006 through 2016 and in the market for premium LTE modem chips from 2011 through 2016.

Evidence at trial will show that these markets exhibit practical indicia of relevant antitrust product markets. In addition, the FTC's economic expert, Professor Carl Shapiro, will testify regarding the hypothetical monopolist test ("HMT"), the standard methodology that antitrust

---

[3] CDMA modem chips include modem chips that comply with other cellular communications standards, such as UMTS and LTE, in addition to CDMA.

4

economists employ to identify relevant markets. Professor Shapiro will explain that his implementation of the HMT confirms that CDMA modem chips and premium LTE modem chips constitute relevant antitrust markets. Professor Shapiro will further testify that Qualcomm's high shares in these antitrust markets, in combination with other evidence, support the conclusion that Qualcomm possessed monopoly power in the market for CDMA modem chips from 2006 through 2016 and in the market for premium LTE modem chips from 2011 through 2016.

### A. CDMA Modem Chips

Evidence at trial will demonstrate that OEMs selecting chips to deploy in their handsets do not consider other modem chips to be reasonable substitutes for CDMA modem chips. Wireless carriers around the world, including Verizon, Sprint, KDDI of Japan, and China Telecom, developed communications networks that require the use of handsets that comply with CDMA standards. OEMs need CDMA modem chips to supply handsets that meet these carriers' requirements. While an OEM could in theory abandon the business of supplying CDMA-capable handsets, testimony presented at trial will show that major OEMs have not viewed this as a commercially viable option.

Qualcomm has dominated the sale of CDMA modem chips. Between 2008 and 2014, Qualcomm's only competitor was Via Telecom, which never accounted for more than 10% of the CDMA modem chips sold in a given year. MediaTek, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ began supplying CDMA modem chips for use in handsets sold in China in 2015 and for use in handsets sold in the United States in 2016.

Qualcomm, like other industry participants, recognizes CDMA modem chips as a distinct industry segment and ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆ Qualcomm and its OEM customers refer to the premium that Qualcomm's CDMA modem chips command over similar non-CDMA chips as Qualcomm's "CDMA Adder." ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Qualcomm and its OEM customers recognize that the size of the "CDMA Adder" reflects the anemic competitive conditions in the market for CDMA modem chips. ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Professor Shapiro will testify, based on his investigation of Qualcomm's "CDMA Adder," that the market for CDMA modem chips satisfies the HMT and constitutes a relevant antitrust market.

Evidence at trial will show that Qualcomm possessed monopoly power in the market for CDMA modem chips in the period from 2006 through 2016. Professor Shapiro will testify that Qualcomm maintained a share exceeding 90% of the market for CDMA modem chips in each year from 2008 through 2014 and exceeding 80% in 2015, on both a unit and revenue basis; in 2016, Professor Shapiro will testify that Qualcomm's share exceeded 60% on a unit basis and 74% on revenue basis. ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

Evidence that OEMs lacked acceptable alternatives to Qualcomm's CDMA modem chips further supports the conclusion that Qualcomm possessed monopoly power in the relevant market. Via Telecom was the only alternative to Qualcomm from 2008 through 2014. Via Telecom's modem chips lagged behind Qualcomm's, however, and lacked complementary functionality, such as LTE capability. ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████

Considerable barriers have limited entry into the market for CDMA modem chips. Potential entrants face technical barriers to entry. Moreover, participation in the market for

CDMA modem chips requires developing complementary multimode technology; thus, entry requires considerable time and commitment of R&D resources. While MediaTek ████████ ███████████████████████████, it did not sell modem chips for use in handsets sold in China until 2015 and for use in handsets sold in the United States until October 2016. Finally, the Qualcomm practices that the FTC has challenged have created additional barriers to entry into the market for CDMA modem chips.

### B. Premium LTE Modem Chips

Evidence at trial will also show that, from 2011 (when LTE modem chips were first sold in commercial quantities) through 2016, Qualcomm maintained monopoly power in a relevant antitrust market for premium LTE modem chips.

Qualcomm and other industry participants recognize that premium LTE modem chips, which are LTE-compliant modem chips used in premium handsets, constitute a distinct economic segment. Premium LTE modem chips support features—including advanced carrier aggregation and multiple in-multiple out—that modem chips used in lower-tier LTE handsets do not support.

OEMs do not consider other modem chips to be reasonable substitutes for premium LTE modem chips. ████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████

The market for premium LTE modem chips is subject to distinct competitive conditions. ████████████████████████████████████████████████████ ██████████████████████████████

Different competitive conditions translate into different pricing. ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████

1    Professor Shapiro will testify that the HMT confirms that premium LTE modem chips

2    constitute a relevant antitrust market. To implement the HMT (and assess Qualcomm's share of

3    the premium LTE market), Professor Shapiro adopted Qualcomm's own definition of a premium

4    handset ███████████████████████████████████████████████████████████████

5    and defined a modem chip as a premium LTE modem chip if it appeared in a premium handset.

6    This approach is consistent with industry participants' understanding that premium LTE modem

7    chips correspond to LTE-compliant modem chips used in premium handsets. By analyzing

8    Qualcomm's forecasts of the impact ██████████████████████████████████

9    ██████████████████████████████ Professor Shapiro concluded that a candidate market

10   for premium LTE modem chips satisfies the HMT.

11   Professor Shapiro will also explain that Qualcomm possessed monopoly power in the

12   market for premium LTE modem chips from 2011 through 2016. Professor Shapiro will testify at

13   trial that he calculated that Qualcomm maintained market shares exceeding 80% from 2011

14   through 2015, on both a unit and revenue basis, and market shares of 57% on a unit basis and

15   63% on a revenue basis in 2016. ██████████████████████████████████

16   ████████████████████████████████████████████████████

17   ██████████████████████████████████████████████

18   Professor Shapiro's conclusion that Qualcomm possessed monopoly power in the market

19   for premium LTE modem chips is corroborated by evidence that OEMs lacked acceptable

20   alternatives to Qualcomm's premium LTE modem chips. For example, ████████████████

21   ██████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████

23   Substantial barriers hinder entry into the market for premium LTE modem chips.

24   Developing premium LTE modem chips requires large, ongoing R&D expenditures, upward of a

25   billion dollars a year. And entry into the market takes several years. Given the critical role that

26   OEMs play in "maturing" a modem-chip supplier's technology, establishing relationships with

27   major OEMs is a critical step in entering the market for premium LTE modem chips. And

28   Qualcomm's challenged business practices have created additional barriers to entry by denying

8

rivals such relationships.

## IV.   QUALCOMM ENGAGED IN ANTICOMPETITIVE CONDUCT

Qualcomm has used several interrelated practices to maintain its monopoly over CDMA and premium LTE modem chips. The "combined effect" of these practices has been to weaken Qualcomm's rivals and entrench its monopoly. *Free FreeHand Corp.*, 852 F. Supp. 2d at 1180.

### A.   Qualcomm's no license-no chips policy and use of incentive funds have dramatically impacted the terms of Qualcomm's patent license agreements

#### *1.   No license-no chips is a matter of Qualcomm corporate policy*

As evidence at trial will show, Qualcomm's practice of conditioning the sale of modem chips on its customers' entry into and maintenance of a separate patent license with Qualcomm ("no license-no chips") is admitted, long-standing, and implemented as a matter of corporate policy. Current and former Qualcomm executives acknowledge the policy. And Qualcomm implements the policy through component supply agreements that govern modem chip sales. For example, Qualcomm's supply agreement with ███████████████████████████ ████████████████████████████████████████████████████[4] Other supply agreements contain similar terms.

The supply risk to OEMs is clear enough from their supply agreements. But the evidence will show also that Qualcomm expressly advises OEMs of its no license-no chips policy in license negotiations. ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████

---

[4] █████████████████████████████████████████████████████.
[5] The license agreements that Qualcomm executed in reliance on its no license-no chips policy are concerted action for purposes of Section 1 of the Sherman Act. *See, e.g.*, *ZF Meritor*, 696 F.3d at 277.

1

2

**2.** ***OEMs were heavily dependent on Qualcomm's CDMA and Premium LTE modem chips during license negotiations***

3

4

5

6

7

8

Consistent with Qualcomm's monopoly power in relevant modem-chip markets, evidence at trial will show that major OEMs were heavily dependent on Qualcomm for CDMA and premium LTE modem chips when they negotiated license agreements or extensions with Qualcomm. For example, ████████████████████████████████████████, it was purchasing all of its CDMA chips from Qualcomm, because it could not find a suitable alternative. ████████████████████████████████████████████

9

10

11

████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████.

12

13

**3.** ***Qualcomm used incentive funds to secure OEMs' acceptance of licensing terms***

14

15

16

17

Evidence at trial will show that, in some cases, Qualcomm used incentive funds to secure acceptance of its patent licensing terms. Qualcomm paid these incentive funds through strategic and marketing fund agreements entered on the same day as patent license agreements, with funds often accruing through rebates on future purchases of Qualcomm chips. As the Court will hear,

18

19

20

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

21

22

23

Although Qualcomm may argue that some of these funds served other purposes, ████████████████████████████████████████████
████████████████████████████

24

**4.** ***Qualcomm's chip leverage in license negotiations raises royalties***

25

26

27

28

At trial, the court will hear testimony from a number of OEMs, including ██████████
██████████████████████, that their dependence on Qualcomm for modem chip supply heavily influenced license negotiations and led to elevated effective royalties. For example, ████████████████████████████████████████████████

10

Other OEMs will also testify that they accepted unreasonable license terms to ensure access to Qualcomm's modem chips.

Evidence at trial will also show that Qualcomm's executives recognized the effectiveness of its no license-no chips policy.

The FTC's experts will explain how and why Qualcomm's no license-no chips policy allows it to secure elevated royalties from OEMs that are dependent on Qualcomm modem chips. The FTC's licensing expert, Mr. Richard Donaldson, has decades of experience negotiating patent licenses in the semiconductor industry. Mr. Donaldson will explain that real-world license negotiations typically focus on patent value, with an eye toward the legal remedies available for patent infringement (as OEMs confirm). But when outside business interests—such as an OEM's need for Qualcomm chips—are injected into license negotiations, the focus of negotiations shifts from patent value to overall business considerations. Because negotiations are driven by a comparison of the proposed license terms to potential alternatives, Qualcomm's no license-no chips policy provided Qualcomm with substantial leverage, as OEMs dependent on Qualcomm's chips faced the immediate and certain loss of lines of business as the alternative to accepting Qualcomm's proposed license terms.

Professor Shapiro will provide an economic analysis of Qualcomm's leverage. Professor Shapiro will explain that, absent its no license-no chips policy, Qualcomm would negotiate licenses as other cellular-SEP holder do—in the shadow of the law. A potential licensee that failed to reach agreement with Qualcomm would face the prospect of paying litigation costs and court-ordered reasonable royalties, but would not face the prospect of a modem-chip supply disruption. In that setting, negotiations would lead to royalties close to those that the negotiating parties expect a court would impose, especially if litigation costs are small relative to the royalty payments at stake.

Qualcomm's no license-no chips policy fundamentally alters the bargaining dynamic. Qualcomm's monopoly power in premium CDMA and premium LTE modem chips means that OEMs would find losing the ability to purchase modem chips from Qualcomm extremely costly. In this setting, basic bargaining theory predicts that Qualcomm's no license-no chips policy, by allowing Qualcomm to bring leverage from its market power in modem chips to bear on license negotiations, will lead to royalties that exceed the reasonable royalties that Qualcomm would otherwise obtain.

The FTC's patent valuation expert, Mr. Michael Lasinski, will explain that OEMs' testimony and economic theory are borne out by quantitative analysis: Qualcomm's royalties are disproportionate to the value of its patent portfolio. Mr. Lasinski studied license agreements between major OEMs and major cellular SEP licensors other than Qualcomm, and compared the effective royalty rates in those agreements to Qualcomm's royalty rates with those same OEMs. After accounting for variations in portfolio strength utilizing metrics used in industry negotiations and by courts adjudicating FRAND disputes, Mr. Lasinski found that Qualcomm's rates significantly exceed the range of potential FRAND royalties.

### 5.   *Qualcomm's contention that its long-standing practices have no effect on royalties is implausible*

Despite evidence from its own documents, its customers, and the FTC's experts, Qualcomm contends that its long-standing policy has had no effect on its negotiated royalties. To support this contention, Qualcomm cites royalty rates in license agreements dating from the early 1990s (for CDMA) and from the early 2000s (for UMTS). Licenses from that era do not provide a valid benchmark for assessing Qualcomm's royalty rates over a 28-year period. As the FTC's experts will explain, the cellular industry has changed dramatically since those early licenses were executed: smartphones, which offer cameras, touch-screen displays, and applications and graphics processors, have supplanted feature phones, which offered only cellular connectivity to support voice calls and text messages; fundamental Qualcomm CDMA patents have expired; and new standards have been implemented (with Qualcomm holding a smaller share of essential patents). Qualcomm's ability to sustain its handset-based royalty rates in the face of these

developments—which would have been expected to lower those rates—is evidence of its success in using modem-chip leverage to elevate its royalties.

To the extent Qualcomm argues that the relative stability of its royalty rates is evidence that those rates are unaffected by modem-chip leverage, this argument ignores both the multifaceted character of Qualcomm's license negotiations and Qualcomm's strong incentives to maintain a consistent headline royalty rate. Qualcomm's negotiations with OEMs are not limited to a single, headline royalty rate; they encompass other license terms and incentive funds, among other things. Moreover, maintaining a consistent headline royalty rate allowed Qualcomm to ████████████████████████████████████████████████████████ proffer that rate as a benchmark in future license negotiations. Accordingly, Qualcomm typically has not negotiated its headline royalty rates, as Mr. Donaldson will explain based on his analysis of Qualcomm's negotiations. Instead, if necessary, Qualcomm has negotiated over other business terms, such as incentive funds. As a result of these factors, the stability of Qualcomm's royalty rates does not support Qualcomm's argument.

### 6. *Qualcomm's royalty surcharge raises rivals' costs and harms competition*

Qualcomm's imposition of a royalty surcharge raises its rivals' costs and harms competition. By bringing leverage from Qualcomm's modem-chip monopoly to bear on license negotiations, Qualcomm has been able to negotiate royalties that exceed the reasonable royalties that Qualcomm would otherwise have negotiated in the shadow of judicial enforcement of its FRAND commitments (*supra* § IV.A.4). As a result, the royalties that OEMs pay effectively consist of two components: a reasonable royalty reflecting the value of Qualcomm's cellular SEPs, and an added surcharge that OEMs pay Qualcomm to maintain access to Qualcomm chips. Imposition of a surcharge of this nature is anticompetitive. *See Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 368 (7th Cir. 1987) (association fee applied to members and non-member contractors raised non-members' costs and harmed competition); *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244, 1249-50 (D. Utah 1999) ("per-processor" royalty charged on all computers, including those on which OEMs installed rival operating systems, was exclusionary); ECF 134 at 33. Professor Shapiro will testify at trial that this surcharge weakens

14

1    rival chipmakers and allows Qualcomm to raise prices paid by OEMs.

2        Professor Shapiro will testify that, to analyze the economic effects of Qualcomm's

3    conduct on an OEM's modem-chip selection, it is important to consider a modem chip's "all-in

4    price," which is the modem-chip price plus the per-handset royalty. Qualcomm controls both

5    components of its own all-in price, and it makes no economic difference how Qualcomm

6    allocates the all-in price of its own chips between the chip price and royalty. But Qualcomm also

7    controls a component of its rivals' all-in price—the royalty that the OEM must pay Qualcomm

8    when using a rival's chip. Thus, leveraging its modem-chip monopoly power to raise the royalty

9    that applies to rivals' chips allows Qualcomm to raise rivals' all-in prices in an economically

10   meaningful way.

11       Professor Shapiro will testify that raising the royalties paid by rivals' customers through

12   the no license-no chips policy and incentive funds is economically equivalent to raising the costs

13   of rivals themselves by the same amount. As Professor Shapiro will explain, in the short run,

14   Qualcomm's conduct depresses the profits that rivals can make from selling modem chips and

15   thereby reduces output of rival modem chips. At the same time, rather than reducing OEMs'

16   costs of using modem chips, Qualcomm conduct produces higher all-in modem-chip prices,

17   thereby reducing overall output. In the long run, Qualcomm's exclusionary conduct also reduces

18   investments by rival modem chip suppliers, leading those rivals to offer lower quality modem

19   chips and/or to have reduced capacity to serve customers. In time, the excess royalty can induce

20   exit from the market altogether and discourage potential entrants.

21           **B.   Qualcomm's refusal to license rivals bolsters its high royalties**

22       As the Court held on summary judgment, Qualcomm's FRAND commitments to U.S.

23   standard-setting organizations require Qualcomm to make SEP licenses available on FRAND

24   terms to modem-chip suppliers that request them. ECF 931 at 25. Yet as Qualcomm

25   acknowledges, ████████████████████████████████████████████████

26   ████████████████████████   As the evidence at trial will show, this is not because rivals have

27   never requested licenses. To the contrary, ████████████████████████████████

28   ████████████████████████████████████████████████

15

█████████████████████████████████████████████████████

████████████████████████████████████████

While private standard-setting can offer significant, procompetitive benefits, the realization of these benefits depends on the institution and observance of "meaningful safeguards" that prevent subversion of the standard-setting process "by members with economic interests in stifling product competition." *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 309-10 (3d Cir. 2007) (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988)); *see Broadcom*, 501 F.3d at 313 (identifying FRAND commitments as among these safeguards); *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031, 1041 (9th Cir. 2015) (same). Conduct that breaches or circumvents these safeguards can form a basis for antitrust liability when such conduct involves an agreement that unreasonably restrains trade, *e.g.*, *Allied Tube*, 486 U.S. at 501, or contributes to the acquisition or maintenance of monopoly power, *e.g.*, *Broadcom*, 501 F.3d at 313-14; *see also* ECF 134 at 41-46 (concluding that the voluntary nature of Qualcomm's FRAND commitments and the administrability of a judicial remedy, among other factors, distinguish Qualcomm's breach of its FRAND commitments from refusals to deal outside the standard-setting context).

Evidence at trial will show that Qualcomm's refusal to make licenses available to its competitors, in breach of its FRAND commitments, contributes to the maintenance of Qualcomm's modem-chip monopolies by preserving Qualcomm's royalties, which include its anticompetitive surcharge. Professor Shapiro will testify that, if Qualcomm made licenses on FRAND terms available to its competitors, which do not rely on Qualcomm for modem-chip supply, those licenses would hamper Qualcomm's ability to employ modem-chip leverage to impose an anticompetitive surcharge on OEMs.

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

FTC'S PRETRIAL BRIEF
Case No. 17-cv-00220-LHK-NMC

Evidence will show that Qualcomm's refusal to make licenses available to modem-chip suppliers also disadvantaged its competitors in other ways. Qualcomm's refusal to make licenses available to its competitors has exposed those competitors to business uncertainty.

When Qualcomm's modem-chip rivals requested patent licenses from Qualcomm, Qualcomm used to respond by offering them patent agreements (which were not licenses) that offered rivals limited protections in exchange for onerous conditions that weakened rivals' ability to compete. For example,

Qualcomm's refusal to make licenses available to competitors also harmed competition

17

1   in other ways. ███████████████████████████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████

**C. Qualcomm's elevated royalties led to contracts with Apple that contributed to Qualcomm's monopoly power**

In the case of Apple, a particularly significant OEM, Qualcomm leveraged its elevated royalties into contract terms that effectively required Apple to use only Qualcomm modem chips in new handsets. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ In combination with Qualcomm's royalty surcharge and refusal to license rivals, Qualcomm's agreements with Apple further impaired competition by foreclosing rival modem-chip suppliers' access to a key customer. *See E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 (4th Cir. 2011) (exclusive dealing harmful where it "severely limit[s] . . . competition for the most important customers" that potential entrants "need[] to gain a foothold for effective competition").

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

1

2

3

4

5 *See* ECF 134 at 47 (rebates conditioned on a promise of exclusivity or on purchase of a specified

6 quantity or market share of the seller's goods or services may be understood as *de facto*

7 exclusive dealing contracts).

8      The Court will hear testimony from Apple COO Jeff Williams that Apple understood the

9 2011 Transition Agreement to be exclusive, and

10                                             The same was true of the 2013 First

11 Amended Transition Agreement. The Court will hear from Apple witnesses that Apple had an

12 interest in working with multiple suppliers of modem chips; that Apple was intensively engaged

13 with Intel during 2012 to develop modem chips for possible use in Apple products in 2014

14 and/or 2015; and that Apple suspended that engagement in early 2013 as a result of its entry into

15 the First Amended Transition Agreement and the related Business Cooperation and Patent

16 Agreement.

17      Qualcomm recognized, and through these agreements successfully neutralized, Apple's

18 potential to strengthen rivals. Before signing the Transition Agreement, Qualcomm's strategic

19 plans stated that

20

21

22

23             The evidence will show that Apple requires its suppliers to meet rigorous technical

24 requirements, and engagement with Apple helps modem-chip suppliers improve the quality of

25 their products. Other handset OEMs, recognizing the rigorous standards to which Apple holds its

26 suppliers, regard a modem-chip supplier's engagement with Apple as an indicator of its product

27 quality.

28

19

1

2

3

4

5

6

7

8

9

10

11

12 ███████████████ Its exclusive deals with Apple kept competitors from

13 working with this key OEM for a critical period.

14      Qualcomm's exclusive-dealing agreements with Apple succeeded in entrenching and

15 prolonging Qualcomm's monopoly power. In the years surrounding Qualcomm and Apple's

16 entry into the First Amended Transition Agreement, Apple purchased between 48% and 50% of

17 premium LTE modem chips. *See, e.g., Microsoft*, 253 F.3d at 70 (foreclosure of 40% to 50% of

18 relevant market substantial for Sherman Act purposes).

19

20

21

22

23

24

25      **D.  Modem-chip markets reflect the consequences of Qualcomm's
            anticompetitive conduct**

26

27      Market structure reflects the harmful impact of Qualcomm's course of conduct. A

28 number of Qualcomm's former modem-chip competitors—including Broadcom, Texas

20

Instruments, Nvidia (Icera), Marvell, and ST-Ericsson—have shuttered their businesses, citing insufficient scale and inadequate margins. And Qualcomm's remaining competitors operate at margins well below those needed to sustain a viable modem-chip business. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████

Though Qualcomm may posit "alternative" explanations for the difficulties faced by its rivals, Qualcomm's arguments confuse cause and effect. As Professor Shapiro will explain, Qualcomm's practices reduced rivals' sales and margins, reduced their investment incentives, and reduced OEMs' incentives to engage with rivals; Qualcomm's practices thereby predictably tend to weaken rivals' product features and overall competitiveness. Qualcomm therefore cannot point to its rivals' financial difficulties or deficiencies in their product roadmaps as "alternative" causes of their market exits—these are precisely the *effects* that Qualcomm's challenged conduct is calculated to achieve.

## V.   INJUNCTIVE RELIEF IS WARRANTED

As the Court has explained, "[i]njunctive relief should be granted if 'there exists some cognizable danger of recurrent violation.'" ECF 997 at 5 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). "In a case governed by the Federal Trade Commission Act . . . , 'an injunction will issue only if the wrongs are ongoing or likely to recur.'" *Id.* (quoting *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985)). In addition, "regardless of whether any unlawful conduct is presently occurring, evidence of Qualcomm's past conduct is sufficient to show whether any violations are 'likely to recur.' *Id.* at 7 (quoting *Evans Prods. Co.*, 775 F.2d at 1087); *see also, e.g., CFTC v. Yu*, No. 12-CV-3921-YGR, 2012 WL 3283430, at *4 (N.D. Cal. Aug. 10, 2012) (past unlawful conduct is "highly suggestive of the likelihood of future violations" (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979))).

Evidence at trial will show that Qualcomm's conduct is ongoing. Despite law enforcement and regulatory scrutiny in several jurisdictions worldwide, including injunctive orders, Qualcomm maintains its policy of conditioning the sale of modem chips on entry and maintenance of a patent license, and continues to withhold licenses from modem-chip suppliers.

Qualcomm argues that the FTC cannot prove that it will have market power in the future. The proof that Qualcomm appears to demand is not required by law. Even so, evidence at trial will show that there is a cognizable danger that Qualcomm will have market power in the supply of 5G modem chips. In early 2018, Qualcomm publicly stated that it is "12-24 months ahead of our merchant competitors in the transition to 5G." (CX8198.) ██████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ OEMs are concerned that a new technology gap is forming that will, once again, put Qualcomm in a dominant position.

In addition, equitable relief is required to redress the ongoing harmful effects of Qualcomm's past conduct. ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████ A number of these agreements extend well into the future, some perpetually. Absent equitable relief, Qualcomm will continue to enjoy "the fruits of its statutory violation," contrary to law. *See Microsoft*, 253 F.3d at 103 (an antitrust remedy must "terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future" (quoting *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)) (internal quotation marks omitted)).

## VI.    CONCLUSION

Qualcomm is entitled to seek fair compensation for use of its intellectual property. It is also entitled to market-based returns, even premium returns, on sales of its modem chips when it wins those returns through competition on the merits. But maintaining a monopoly in relevant modem-chip markets through anticompetitive conduct is unlawful. Trial will establish that Qualcomm has engaged in unlawful conduct. A remedy that ends Qualcomm's unfair methods of

competition and requires it to negotiate license terms with customers and competitors based on the strength of its patents is warranted.

Respectfully submitted,

Dated: December 28, 2018

*/s/ Jennifer Milici*
Jennifer Milici
J. Alexander Ansaldo
Joseph R. Baker
Wesley G. Carson
Kent Cox
Elizabeth A. Gillen
Geoffrey M. Green
Nathaniel M. Hopkin
Mika Ikeda
Rajesh S. James
Philip J. Kehl
Daniel Matheson
Kenneth H. Merber
Aaron Ross
Connor Shively
Mark J. Woodward
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2912; (202) 326-3496 (fax)
jmilici@ftc.gov

***Attorneys for Federal Trade Commission***