Case Clip(s) Detailed Report

# Qualcomm

Saturday, January 05, 2019, 10:22:48 PM

Case Clip(s) Detailed Report
Saturday, January 05, 2019, 10:22:48 PM

**Qualcomm**

 **Blumberg, Ira (Vol. 01) - 04/20/2018**　　　　　　　　　　　　　　　**1 CLIP  (RUNNING 00:54:55.293)**

 ATTORNEYS' EYES ONLY*** ...

　　　IB　　　　　　　38 SEGMENTS  (RUNNING 00:54:55.293)　　　　　　　

**1.  PAGE 13:06 TO 13:13  (RUNNING 00:00:15.459)**

```
       06  BY MR. HOLTZ:
       07       Q.   Good morning.  We met briefly before the
       08  deposition started.  So first of all, could you just
       09  state your name for the record.
       10       A.   Ira Blumberg.
       11       Q.   And you're an attorney, correct,
       12  Mr. Blumberg?
       13       A.   I am.
```

**2.  PAGE 15:23 TO 16:17  (RUNNING 00:01:12.315)**

```
       23       Q.   Could you briefly describe your job
       24  functions and responsibilities with Lenovo?
       25       A.   Sure.  When I was hired, and up until
  00016:01  about six months ago, I was the vice president of
       02  intellectual property, which included responsibility
       03  for patents, copyrights, trade secrets.  At some
       04  points during my tenure, trademarks as well; at other
       05  points we had other attorneys responsible for
       06  trademarks.
       07            But putting trademarks aside, I was
       08  responsible for overseeing prosecution, maintenance,
       09  and -- and management of our patent portfolio, of
       10  copyrights, of trade secrets, and also for all
       11  licensing engagements around those forms of
       12  intellectual property, as well as giving advice to
       13  both business clients and business attorneys on
       14  intellectual property matters.
       15            About six months ago, in addition to those
       16  responsibilities, I took over responsibility for
       17  intellectual property litigation as well.
```

**3.  PAGE 29:14 TO 30:07  (RUNNING 00:01:14.250)**

```
       14       Q.   And what do you recall discussing at this
       15  meeting with the FTC regarding pricing, as it relates
       16  to Qualcomm's patent licensing?
       17       A.   I don't remember anything specifically,
       18  other than talking about the -- the pricing that --
       19  that we had been negotiating.
       20       Q.   When you use the term "pricing," are you
       21  talking about royalty rates?
       22       A.   Yes.
       23       Q.   Okay.  Did you offer any views or opinions
       24  about the pricing or the royalty rates that Qualcomm
       25  was requesting?
  00030:01       A.   I don't recall specifically, but I may
       02  have expressed the view that I thought they were --
       03  the rates were high.
       04       Q.   Why did you think the rates were high?
       05       A.   Probably because of my experience in the
       06  industry and various judicial decisions that had been
       07  handed down over the -- the last several years.
```

**4.  PAGE 30:18 TO 31:12  (RUNNING 00:01:05.618)**

```
       18       Q.   And regarding your experience in the
```

```
         19   industry, what is it about that experience that led
         20   you to let the FTC know you thought Qualcomm's
         21   royalty rates were high?
         22        A.   Various aspects of the -- the licenses
         23   that Qualcomm negotiates, including long-term
         24   licenses that don't take into account changes in the
         25   size of their portfolio but fix the royalty rates,
00031:01   and fix those royalty rates at a level higher than
         02   most of the other licensors in -- in the field.
         03        Q.   So do you believe that Qualcomm's royalty
         04   rates are higher than other licensors in the field?
         05        A.   Yes, I do.
         06        Q.   Are they higher than all other licensors
         07   in the field?
         08        A.   I don't know what all other licensors in
         09   the field charge, but the ones that I do know of
         10   are -- are lower.
         11        Q.   Which ones do you know of that are lower?
         12        A.   Nokia, Ericsson, InterDigital.
```

**5. PAGE 42:06 TO 42:12 (RUNNING 00:00:17.971)**

```
         06             Do you know if Qualcomm's portfolio of
         07   2G and 3G patents has either grown or gotten smaller
         08   since the time the agreement you have in mind was
         09   signed?
         10        A.   Since I'm not even sure when that
         11   agreement was signed, no, I don't have a -- a good
         12   sense of it.
```

**6. PAGE 44:07 TO 45:16 (RUNNING 00:01:50.728)**

```
         07        Q.   Okay.  Has -- has Lenovo claimed in
         08   negotiations with Qualcomm that this agreement
         09   constitutes patent misuse?
         10        A.   I don't have a specific recollection, but
         11   I would guess probably so.
         12        Q.   But -- but you don't know with any
         13   certainty?
         14        A.   Again, I can't pinpoint the meeting, but I
         15   believe I probably have expressed that view to at
         16   least one of Qualcomm's representatives over time.
         17        Q.   Do you recall what the response of
         18   Qualcomm's representative to your expressing that
         19   view was?
         20        A.   Not specifically, but my recollection is
         21   that they did not express a lot of concern that we
         22   were going to challenge them.
         23        Q.   If you believe that this license
         24   constitutes patent misuse, why have you not brought a
         25   legal challenge?
00045:01        A.   My understanding is that Qualcomm has in
         02   the past retaliated against customers who have
         03   attempted to challenge its legal terms, by either
         04   delaying or cutting off supply of chips.
         05        Q.   What's the basis for that understanding?
         06        A.   Two things.  One, when we acquired
         07   Motorola, I had conversations with the Motorola legal
         08   team where they described having that experience
         09   directly.  And the second is when we objected to some
         10   of the other terms in this license and suggested we
         11   were contemplating terminating it, the response we
         12   got from Qualcomm was, "Feel free, but then we won't
         13   sell you any more chips."
         14        Q.   So Qualcomm told you if you terminated the
         15   license, it wouldn't sell Lenovo any more chips?
         16        A.   That's correct.
```

## Qualcomm

**7. PAGE 45:17 TO 45:21  (RUNNING 00:00:14.637)**

```
17        Q.   Did Qualcomm ever say, if Lenovo brings a
18   challenge to the license, claiming patent misuse, it
19   would terminate -- or it would refuse to sell Lenovo
20   any chips?
21        A.   I don't recall that specifically.
```

**8. PAGE 70:24 TO 72:08  (RUNNING 00:02:01.745)**

```
         24        Q.   Sure.  So you mentioned that there were
         25   some negotiations that resulted in an amendment to
00071:01   the licensing agreement between Lenovo and Qualcomm,
         02   correct?
         03        A.   Yes.
         04        Q.   When was that amendment, or whatever form
         05   it took, signed?
         06        A.   There were a series of amendments that
         07   were negotiated between 2013 and 2016.  I don't
         08   recall the date that the last one was signed.
         09        Q.   During those negotiations, did Lenovo ever
         10   say or propose that it would just go buy its chips
         11   somewhere else unless Qualcomm agreed to lower its
         12   licensing rates?
         13        A.   Not to the best of my knowledge, but I
         14   wasn't involved in all of the negotiations.
         15        Q.   Okay.  Did you ever make that point known
         16   to Qualcomm?
         17        A.   Not that I recall.
         18        Q.   Why not?
         19        A.   My understanding from our business
         20   colleagues was that at least with respect to high-end
         21   phones, at the time that we're talking about,
         22   Qualcomm had the best chipset available and that it
         23   would be difficult to convince consumers and carriers
         24   to spend for a high-end phone if it did not have
         25   the -- the features, functions, and -- and
00072:01   performance that the Qualcomm chip provided.
         02        Q.   Did the business personnel who told you
         03   this tell you that there was absolutely no
         04   alternative?  If we didn't use Qualcomm's chip, we
         05   couldn't market a phone?
         06        A.   I believe at least on one occasion I did
         07   have that impression from the business people, at
         08   least with respect to the high end of the market.
```

**9. PAGE 83:08 TO 84:03  (RUNNING 00:01:17.609)**

```
         08        Q.   Sure.  Has anybody within Lenovo or
         09   Motorola ever said to you, since the signing of this
         10   amendment, "You can't terminate that agreement
         11   because we need Qualcomm's chips"?
         12        A.   Yes.
         13        Q.   Who?  Who said that to you?
         14        A.   Two individuals that I can recall
         15   specifically.  One is Christian Eigen, who is CFO of
         16   one of our subsidiaries, Medion, and also for Lenovo,
         17   the head of strategic alliances.
         18             The other individual was Amar -- I can
         19   never pronounce his last name.  He was the previous
         20   head of the mobile business group, and he served in
         21   that role until the -- the end of last year.
         22        Q.   Do you recall what Motorola chips either
         23   Mr. Eigen or Amar told you Lenovo or Motorola needed
         24   from Qualcomm?
         25        A.   They didn't mention specific chips.  They
00084:01   simply said they could not risk the supply disruption
         02   that would result very likely from terminating the
```

```
        03   agreement.
```

**10. PAGE 92:08 TO 92:19 (RUNNING 00:00:44.070)**

```
        08            Let me ask you this:  During any of your
        09   negotiations with Qualcomm -- by "your," I mean
        10   Lenovo's and Motorola's -- has Qualcomm ever said, to
        11   your knowledge, "You either need to buy all your
        12   chips from us or we're not selling you any chips"?
        13        A.   No, I don't have a knowledge of such a
        14   communication.
        15            I will say that in the course of
        16   negotiating some of these amendments, Qualcomm
        17   offered what appeared to be substantial financial
        18   incentives for either exclusivity or near
        19   exclusivity.
```

**11. PAGE 92:20 TO 93:01 (RUNNING 00:00:16.771)**

```
        20        Q.   But no agreement was ever signed that
        21   included such a term, correct?
        22        A.   No.
        23        Q.   Sorry.  Just to make sure, because I got a
        24   double negative in there:  Was any agreement ever
        25   signed that included such a term?
  00093:01        A.   Not to my knowledge.
```

**12. PAGE 130:23 TO 132:07 (RUNNING 00:01:43.340)**

```
        23        Q.   Now, you mentioned earlier when we were
        24   discussing that at least in your view, the proper
        25   royalty base for standard-essential patents would be
  00131:01   the cost of the modem chip; did I get that right?
        02        A.   Or the smallest saleable patent practicing
        03   unit, as the case may be.
        04        Q.   Understood.  And in your view, in a cell
        05   phone, what is the smallest saleable practice --
        06   patent practicing unit?
        07        A.   With respect to standard-essential
        08   patents, I believe it is either the modem chip or the
        09   modem and the CPU together.
        10        Q.   Which one?
        11        A.   Depends on the patent.
        12        Q.   Now, in your view, is there anything
        13   improper -- improper or inappropriate or contrary to
        14   a FRAND obligation for a standard-essential patent
        15   holder to only license its patents to cellular device
        16   makers, rather than to chip makers?
        17            MR. KEHL:  Object to the form of the
        18        question.
        19            THE WITNESS:  My interpretation of FRAND
        20        obligations does suggest that the licensor has
        21        an obligation to license any company that
        22        requests a license, whether it is a chip
        23        company, an end device company, or anything in
        24        between.
        25
  00132:01   BY MR. HOLTZ:
        02        Q.   What's that understanding based on?
        03        A.   My experience in the industry and my
        04   reading of the rules.
        05        Q.   Which rules?
        06        A.   The various organizations like ETSI, IEEE,
        07   and so on.
```

**13. PAGE 132:08 TO 132:10 (RUNNING 00:00:06.579)**

```
        08        Q.   All right.  Do IEEE and ETSI have
        09   identical rules with respect to that?
```

```
          10      A.   No, they don't.
```

**14. PAGE 145:23 TO 146:08  (RUNNING 00:00:23.592)**

```
          23           If we could just start by circling back to
          24   some of your background information.  Would it be
          25   fair to say that you've been involved in -- in
   00146:01   licensing negotiations for at least the past 20 years
          02   of your career?
          03      A.   Yes.
          04      Q.   And approximately how many licensing
          05   negotiations would you estimate that you've been
          06   involved in?
          07      A.   I've lost count, but certainly more
          08   than 100.
```

**15. PAGE 148:25 TO 149:13  (RUNNING 00:00:37.759)**

```
          25           Do you think the running royalty rate that
   00149:01   Lenovo pays to Qualcomm is compliant with Qualcomm's
          02   FRAND obligations?
          03           MR. HOLTZ:  Objection.  Calls for a legal
          04      conclusion.
          05           THE WITNESS:  I -- I don't, based on -- as
          06      I mentioned this morning -- just the royalty
          07      demands, not even accounting for the actual
          08      royalty deals that other patent holders in the
          09      space have.  Based on the negotiations I've had
          10      with companies like Nokia, Ericsson,
          11      InterDigital, and other significant patent
          12      holders, Qualcomm's rates are substantially
          13      higher.
```

**16. PAGE 150:13 TO 150:19  (RUNNING 00:00:15.413)**

```
          13      Q.   Was there ever a time during your
          14   employment at Lenovo that you did not hold the view
          15   that the running royalty rate that Lenovo pays to
          16   Qualcomm was inappropriate?
          17      A.   No.  As far as I can remember, from the
          18   moment I discovered what it was through today, I felt
          19   it was excessive.
```

**17. PAGE 155:12 TO 156:11  (RUNNING 00:01:30.639)**

```
          12      Q.   Earlier today you discussed your
          13   understanding that Lenovo requires Qualcomm modem
          14   chips for Lenovo's high-end phones; is that correct?
          15      A.   Yes.
          16      Q.   Has there ever been a time, since you've
          17   been employed at Lenovo, when you had a different
          18   understanding?
          19      A.   Not that I can recall.
          20      Q.   Mr. Blumberg, sitting here today, can you
          21   think of any options for Lenovo to negotiate a
          22   royalty with Qualcomm that Lenovo feels is -- is
          23   appropriate, while Lenovo requires Qualcomm's modem
          24   chips?
          25           MR. HOLTZ:  Objection.  Calls for expert
   00156:01      opinion.
          02           THE WITNESS:  Not offhand.  Again, it's my
          03      understanding that at this point, Motorola is --
          04      is focused on high-end phones, and that Motorola
          05      continues to believe that the only viable path
          06      to a high-end phone is a Qualcomm chipset.
          07           And while that's the case, we do not feel
          08      comfortable terminating the license.  In the
          09      absence of the ability to terminate the license,
          10      we don't feel we have much negotiating power to
```

```
           11     set new terms with Qualcomm.
```

**18. PAGE 156:13 TO 156:14 (RUNNING 00:00:06.454)**

```
           13      Q.   Mr. Blumberg, if I could refer you back
           14  to QX3655.
```

**19. PAGE 156:16 TO 158:09 (RUNNING 00:02:25.537)**

```
           16      Q.   And this is the June 28th, 2013, amendment
           17  to the subscriber unit license agreement between
           18  Qualcomm and Lenovo; is that right?
           19      A.   Yes.
           20      Q.   And I believe you testified earlier today
           21  that this agreement was signed in the context of the
           22  negotiation in which you were told that if Lenovo did
           23  not have a license, it would be unable to purchase
           24  modem chips from Qualcomm; is that correct?
           25      A.   Yes.
  00157:01      Q.   Could you please tell me everything you
           02  recall about what you were told regarding Lenovo's
           03  ability to purchase Qualcomm modem chips without a
           04  license?
           05      A.   My direct involvement in the negotiation
           06  was an initial meeting with Eric Reifschneider, who
           07  at that time Qualcomm's head of licensing.  At that
           08  initial meeting, we explained that we were
           09  contemplating terminating the license through
           10  whatever mechanism we thought was applicable.  And
           11  Mr. Reifschneider was very calm about it, and said
           12  that we should feel free to do that, but if we did,
           13  we would no longer be able to purchase Qualcomm
           14  chips.
           15           I don't remember the exact conversation
           16  that followed, but I did -- because I was so
           17  surprised by that assertion, I did ask some follow-up
           18  questions and -- and was assured that he really meant
           19  it, and that it was Qualcomm's policy not to sell
           20  chips unless you had a then-in-force patent license.
           21           Subsequent to that meeting, my colleague,
           22  Ms. Tsirigotis, engaged in much more substantive
           23  negotiations, which I believe led to this amendment
           24  and the subsequent amendments.  And she engaged with
           25  members of Mr. Reifschneider's licensing department.
  00158:01  And it's my understanding from Ms. Tsirigotis that
           02  that same assertion was repeated numerous times
           03  during the negotiation of these amendments by the
           04  licensing staff at Qualcomm.
           05      Q.   And so this meeting with Mr. Reifschneider
           06  would have taken place sometime before June 28th,
           07  2013?
           08      A.   It was in the spring of 2013, but I don't
           09  remember the exact date.
```

**20. PAGE 158:21 TO 161:21 (RUNNING 00:04:12.571)**

```
           21      Q.   And how did Mr. Reifschneider's statement,
           22  that Lenovo would be unable to purchase Qualcomm
           23  modem chips without a license, impact your assessment
           24  of Lenovo's options in the licensing negotiation?
           25      A.   After checking with our business people
  00159:01  and confirming that they definitely needed access to
           02  Qualcomm chips, it was clear that terminating the
           03  agreement and risking lack of supply was not an
           04  option.  And so we had to negotiate basically with
           05  one hand tied behind our back, because we did not
           06  have the option to walk away from the deal, which is
           07  why we were unable to get any movement on pricing,
```

```
            08   and we felt reasonably lucky to be able to at least
            09   hold the line on which patents got licensed back to
            10   Qualcomm.
            11          Q.   And when you say much movement on pricing,
            12   you're referring to the running royalty rate to
            13   Qualcomm?
            14          A.   That's correct.
            15          Q.   Is it your experience in licensing
            16   negotiations with licensors other than Qualcomm that
            17   there is movement on pricing in licensing
            18   negotiations?
            19          A.   Absolutely.  In the absence of the
            20   exercise of extralegal market power, when you're in a
            21   patent licensing negotiation, if one of the parties
            22   disagrees on a major term, like pricing, the parties
            23   have the ability to walk away and settle the matter
            24   in any number of other ways, including agreeing to
            25   disagree and -- and not engaging further, mediation,
   00160:01   arbitration, or litigation, all of which may result
            02   in significant changes to the terms the parties are
            03   entitled to.
            04               But in the absence of any reasonable
            05   dispute resolution alternatives, you can't negotiate
            06   very effectively, because the alternatives are agree
            07   or you're out of that business.
            08          Q.   To be clear, when you -- when you just
            09   said agree or you're out of the business, are you
            10   referring to --
            11          A.   I'm referring to the fact that in the
            12   Qualcomm situation, if we couldn't have access to the
            13   Qualcomm chips, then the market segment that required
            14   high-end phone chips for high-end phones would be
            15   foreclosed.
            16          Q.   And referring back to QX3655, on page 2,
            17   there's a section titled "Termination," at 13.5.1.
            18   Do you see that?
            19          A.   I do.
            20          Q.   And is this the -- the termination for
            21   provision convenience that you've referred to in your
            22   testimony throughout the day?
            23          A.   It is.
            24          Q.   And you've testified that Lenovo has never
            25   exercised the termination for convenience provision
   00161:01   in its license with Qualcomm; is that correct?
            02          A.   That is correct.
            03          Q.   And why has Lenovo never exercised the
            04   termination for convenience provision in its license
            05   with Qualcomm?
            06          A.   As I mentioned, I think earlier today, on
            07   those occasions when it was discussed or considered,
            08   the response from our business was always, we can't
            09   risk the supply.  So it's not a viable option,
            10   because we don't know whether Qualcomm would follow
            11   through on their threat to cut off supply, but we
            12   can't take that risk.
            13          Q.   And sitting here today, can you think of
            14   any point when it would have been a viable option to
            15   take the risk to terminate the Qualcomm license?
            16               MR. HOLTZ:  Objection.  Lacks foundation.
            17               THE WITNESS:  Not to the best of my
            18      recollection.  I believe that either Lenovo or
            19      Motorola, or both, were sufficiently dependent
            20      on Qualcomm chips that it was not a viable
            21      alternative.
```

**Case Clip(s) Detailed Report**
**Saturday, January 05, 2019, 10:22:48 PM**

## Qualcomm

**21. PAGE 166:15 TO 167:01 (RUNNING 00:00:48.942)**

```
          15        Q.   And CX2093 bears Bates
          16   MOTO-QUALSUB-01102003.  And I'd like to refer you to
          17   the first e-mail in the -- in the chain, so the last
          18   e-mail as it appears in the document, which is from
          19   Mr. Offer, dated December 16th, 2015.  Do you see
          20   that?
          21        A.   Yes, it looks like it spans from the first
          22   page to the -- or does it?  I'm trying to see where
          23   it starts.
          24             Ah.  The very beginning is just at the
          25   bottom of page 1, and then it continues on page 2.
   00167:01   Yes.
```

**22. PAGE 169:07 TO 170:16 (RUNNING 00:01:48.851)**

```
          07        Q.   And so CX2093 reflects discussion of a
          08   call involving you, Ms. Tsirigotis, Mr. Offer, and an
          09   Eric, regarding the CPLA; is that right?
          10        A.   And that would have been Eric
          11   Reifschneider.
          12        Q.   That's my next question.  Thank you.
          13             And in -- in item 3, the -- the text goes
          14   on to read:  "On that call, Mr. Reifschneider once
          15   more made another threat about continued chip supply
          16   if we do not have a license."
          17             Do you see that?
          18        A.   I do.
          19        Q.   Do you recall Mr. Reifschneider making a
          20   threat about continued chip supply if Lenovo does not
          21   have a license in the December 2015 time frame?
          22        A.   I can't say specifically that I do
          23   remember it.  He -- he certainly made that threat to
          24   me more than once, so this could have been one of
          25   those occasions, but I don't recall.
   00170:01        Q.   And on how many occasions are -- withdraw
          02   the question.
          03             About how many occasions do you recall
          04   Mr. Reifschneider making a threat about continued
          05   chip supply if Lenovo did not have a license?
          06        A.   I'd say at least two or three.
          07             And -- and just a little bit more on this
          08   point, I think, again -- it's a little bit hazy, but
          09   I think this may have been specifically in the
          10   context of pressuring us to sign the China license.
          11             We were one of the last Qualcomm customers
          12   to sign the China license, because we had additional
          13   terms that we were insisting on.  And I think, again,
          14   this threat to supply was used to -- to push us
          15   towards caving on some terms and signing the China
          16   license.
```

**23. PAGE 171:12 TO 175:03 (RUNNING 00:04:54.129)**

```
          12             (Exhibit CX2079 was marked for identification.)
          13   BY MR. KEHL:
          14        Q.   And CX2079 bears Bates
          15   LENOVO-QUALSUB-00013373.
          16             And I'd like to refer you to an e-mail
          17   from you, that begins on the bottom of page 4 of the
          18   exhibit and carries over to page 5.  Do you see that?
          19        A.   I do.
          20        Q.   And in this e-mail, you write that -- in
          21   the second sentence -- "Lenovo's strongest leverage
          22   in discussions with Qualcomm is Lenovo's threat to
          23   terminate the license with Qualcomm and cease paying
          24   Qualcomm any royalties."
```

**Qualcomm**

```
         25            Do you see that?
00172:01         A.    Yes.
      02         Q.    And your e-mail goes on to say, "However,
      03   there is a concern.  Qualcomm has threatened to stop
      04   selling its chips to Lenovo if Lenovo terminates the
      05   license."
      06               Do you see that?
      07         A.    Yes.
      08         Q.    Do you understand that to be a reference
      09   to the threat that Mr. Reifschneider has made that
      10   you discussed earlier today?
      11         A.    I do.
      12         Q.    And then the last sentence of your
      13   e-mail -- last sentence of this paragraph in your
      14   e-mail reads:  "Thus, before Lenovo terminates its
      15   license with Qualcomm, we must ensure that Lenovo has
      16   a safe supply of chips necessary for its ongoing
      17   phone production."
      18               Do you see that?
      19         A.    Yes.
      20         Q.    Do you recall advising Mr. Eigen and
      21   others at Lenovo of the need for assurance of safe
      22   supply of modem chips before terminating the license
      23   with Qualcomm?
      24         A.    This e-mail certainly refreshes my
      25   recollection on that point, yes.
00173:01         Q.    And -- and were you giving that advice for
      02   the same reasons you've testified to earlier today?
      03         A.    Yes.  I -- I believe that Qualcomm would
      04   make good on their threat, and therefore, I didn't
      05   want to be in a position of -- of advocating a
      06   position that would ultimately leave our business
      07   without necessary supply.
      08         Q.    And then I'd like to refer you to another
      09   e-mail from you, Mr. Blumberg, on page 2 of this
      10   e-mail.
      11         A.    Yes.
      12         Q.    And in the last paragraph, you have a
      13   sentence that begins, "In particular, what would
      14   Lenovo do if Qualcomm and/or MediaTek experienced a
      15   natural disaster that prevented it from delivering
      16   chips for three-plus months?  The legal situation
      17   Lenovo is facing is quite similar, as there is a risk
      18   Lenovo could lose its supply of chips for a
      19   substantial period of time."
      20               Do you see that?
      21         A.    I do.
      22         Q.    Could you please just describe what you
      23   meant by that?
      24         A.    I think, in this context, I was trying to
      25   communicate to our procurement department the risk of
00174:01   losing our supply, and the fact that even if we took
      02   the most drastic legal action possible, and were
      03   successful, it could be at least three months before
      04   we could legally force Qualcomm or another supplier
      05   to continue supplying chips to us.
      06               And so I was trying to put it in the
      07   context of a similar situation with a natural
      08   disaster, like an earthquake, that would shut down a
      09   supplier's factory.
      10         Q.    You also reference MediaTek in your
      11   e-mail.  Do you see that?
      12         A.    I do.
      13         Q.    Do you recall how MediaTek factored into
      14   these discussions in -- in the 2013 time frame?
      15         A.    I believe it was my understanding at the
      16   time that Qualcomm had actually provided a patent
```

**Case Clip(s) Detailed Report**
**Saturday, January 05, 2019, 10:22:48 PM**

## Qualcomm

```
           17   license to MediaTek.  I don't remember what the
           18   financial terms were, but one of the more interesting
           19   terms of that license that Qualcomm -- patent license
           20   that Qualcomm had granted to MediaTek was the
           21   requirement that MediaTek was only authorized to sell
           22   chips to those companies that had a license with
           23   Qualcomm.
           24           And I believe it was our expectation that
           25   if we terminated our license with Qualcomm, not only
  00175:01   would Qualcomm cut off our supply, but Qualcomm would
           02   also exercise its right basically to enjoin MediaTek
           03   from supplying us as well.
```

**24.  PAGE 175:23 TO 177:07  (RUNNING 00:01:58.949)**

```
           23       Q.   And just with respect to MediaTek
           24   generally, as a supplier, did you ever hear from the
           25   business people with whom you've interfaced that
  00176:01   MediaTek would be an option for Lenovo to replace
           02   Qualcomm for modem chips in high-end phones?
           03       A.   No.  And -- and clearly the issue here
           04   was, we were worried not only about losing access to
           05   Qualcomm chips for high end, we were also worried
           06   about losing access to MediaTek for midrange and
           07   low-end phones.
           08       Q.   And to be clear, the -- the concern about
           09   losing access to MediaTek chips for low-end phones
           10   was animated by your understanding of an agreement
           11   between Qualcomm and MediaTek.  Is that right?
           12       A.   That's correct.
           13       Q.   And then -- I'm just referring back to
           14   your e-mail that begins on page 4 of CX2079.
           15       A.   Yes.
           16       Q.   And your sentence that reads:  "Further,
           17   Qualcomm has threatened to force its chip licensees,
           18   including MediaTek, to stop selling mobile phone
           19   chips to Lenovo if Lenovo terminates its license."
           20            Do you see that?
           21       A.   I do.
           22       Q.   Could you please tell me everything that
           23   you recall about that threat?
           24       A.   I believe it was in the same conversation
           25   with -- with Eric Reifschneider, where he said not
  00177:01   only would -- would Qualcomm no longer sell us chips,
           02   but none of Qualcomm's chip licensees would sell us
           03   chips, either, and that included MediaTek.
           04       Q.   And are -- are you referring to the -- the
           05   conversation that would have taken place in the
           06   spring of 2013?
           07       A.   Yes.
```

**25.  PAGE 177:20 TO 179:18  (RUNNING 00:02:42.976)**

```
           20       Q.   And Mr. Reifschneider provides a summary
           21   of a -- a proposal for a strategic fund agreement in
           22   his e-mail in CX2079.  Do you see that?
           23       A.   Yes.
           24       Q.   And do you understand that proposed
           25   strategic fund agreement to be the same proposal that
  00178:01   we -- we were discussing earlier, in the context of
           02   Mr. Offer's December 2015 meeting summary?
           03       A.   It's the same concept.  The -- the
           04   specifics evolve quite substantially over the -- the
           05   several years that this discussion went along.
           06       Q.   And what's your high-level understanding
           07   of the -- the concept embodied in the proposed
           08   strategic fund agreement?
           09       A.   Basically it was an incentive to use
```

```
        10  exclusively, or nearly exclusively, Qualcomm chips,
        11  by providing discounts, either on the royalties or on
        12  the price of the chips themselves, in relation to
        13  the -- the percentage of Qualcomm parts as
        14  presented -- overall parts in our mobile phones.
        15       Q.   And on page 7 of CX2079, at the bottom of
        16  the e-mail, Mr. Reifschneider identifies certain
        17  conditions for Qualcomm to enter into the strategic
        18  fund agreement.  Do you see that section?
        19       A.   I do.
        20       Q.   And so the -- the first condition is that
        21  Lenovo would need to enter into a 4G SULA covering
        22  both the FDD and TDD modes of LTE with Qualcomm that
        23  is generally on Qualcomm standard terms, including
        24  royalties of 4 percent of the net selling price of
        25  the license subscriber devices, and accept that the
00179:01  royalty rates in effect under the current 3G SULA
    02  will not be changed.  Do you see that?
    03       A.   Yes.
    04       Q.   What do you understand a "4G SULA" to be
    05  in reference to?
    06       A.   I don't remember what the "SU" stands for,
    07  but it's the license agreement of -- of some --
    08  patent license agreement of some flavor.
    09       Q.   Covering LTE cellular patents?
    10       A.   Yes.  And -- and specifically what he's
    11  saying is for phones that don't have 3G, the royalty
    12  rate would be 4 percent; for phones that have 3G
    13  and 4G, then the 3G rates, which are 5 percent, would
    14  apply.
    15       Q.   And did you understand Lenovo's entering
    16  into a 4G SULA with Qualcomm to be a condition on
    17  Qualcomm's strategic fund offer?
    18       A.   At this point, yes, I did.
```

**26. PAGE 179:19 TO 179:23 (RUNNING 00:00:13.096)**

```
    19       Q.   And was there ever a time when that was
    20  not a condition on the strategic fund offer?
    21       A.   I don't remember how the strategic fund
    22  negotiations went, so I can't say whether it was or
    23  was not always a requirement.
```

**27. PAGE 180:09 TO 180:14 (RUNNING 00:00:19.279)**

```
    09       Q.   And what is your understanding of how
    10  accepting Qualcomm's offered strategic fund would
    11  impact Lenovo's modem chip selection?
    12       A.   Would have given very strong financial
    13  incentive to increase the use of Qualcomm chips
    14  versus competing chips.
```

**28. PAGE 187:23 TO 189:24 (RUNNING 00:02:54.538)**

```
    23       Q.   And in your experience, do parties to
    24  licensing negotiations assess the anticipated outcome
    25  of any litigation when evaluating their position in
00188:01  the -- in the negotiation?
    02       A.   I can't speak to everyone, but certainly
    03  that's the number one thing I use to assess whether I
    04  want to sign a license, is a careful analysis of
    05  whether litigation and the likely outcome of
    06  litigation, plus the expense, taking into account the
    07  time value of money and so on, is ultimately greater
    08  than or less than the negotiated alternative.
    09            And I'm very pragmatic; when the
    10  negotiated alternative is clearly less expensive, I'm
    11  happy to take a license.  When the negotiated
```

```
        12  alternative is equal to or greater than the likely
        13  litigation outcome, I'm not ready to sign, and I'm
        14  ready to keep negotiating and/or litigating as
        15  necessary.  That's certainly been my -- my
        16  experience, not only for myself, but at least for the
        17  more successful licensing folks that I've dealt with
        18  over the years.
        19       Q.   And how, if at all, does that assessment
        20  differ vis-a-vis Qualcomm?
        21       A.   Well, as I've said, when the dispute
        22  resolution is either keep talking or use some legal
        23  means like going to court and letting a judge decide
        24  for you, it's relatively easy to assess and figure
        25  out where you stand.
00189:01            But unless you're facing someone who's got
    02  100 patents, all of which have been just been
    03  litigated 12 times successfully, the odds are
    04  litigation is not that sure an outcome, so you -- you
    05  have some basis to negotiate.
    06            When you're facing, as we've discussed, a
    07  dispute resolution that says either you agree or you
    08  can't get any more key supplies, it certainly changes
    09  the balance of negotiating capabilities, and
    10  basically makes you say, "Do I still want to be in
    11  this business?  Because I'm taking the risk that I
    12  will be shut out immediately if I don't agree."
    13            And realistically, as I said before, even
    14  if you were wildly successful, the quickest legal
    15  resolution to that -- at least in the US -- you're
    16  looking at months and months, if not a year or more,
    17  without supply, which would be, if not fatal, then
    18  nearly fatal to almost any company in this business.
    19       Q.   And just to be clear for the record, when
    20  you're referring to negotiating with a -- with a
    21  counterparty that could remove supply, you're
    22  referring to Qualcomm; is that right?
    23       A.   In this case, that was our -- that was the
    24  threat we received, and one we took seriously, yes.
```

**29. PAGE 190:03 TO 191:12 (RUNNING 00:01:48.131)**

```
        03            Have you noticed any differences in the
        04  level of technical information provided by licensors
        05  other than Qualcomm, as compared to Qualcomm?
        06       A.   Yes and no.  We were in sort of an unusual
        07  situation with Qualcomm, as I said, because the
        08  license already existed at the time that I got
        09  involved with the engagement.
        10            Typically, you'll see technical engagement
        11  in a licensing scenario before there is a license, as
        12  part of the licensor's practice to convince the
        13  licensee why they need a license.
        14            So in circumstances like that, you
        15  typically have lots of claim charts outlining the
        16  licensor's best patents, how they cover the
        17  licensee's products, arguments, or at least
        18  presentations about how there's no alternative, and
        19  so on.
        20            But of course if you already have a
        21  license, at least arguably there's no point in going
        22  through that, because you're already past that point.
        23            In this case where we -- we're
        24  contemplating termination, in the absence of the
        25  ability to cut off supply, we might have gone through
00191:01  that same kind of arrangement where Qualcomm would
    02  have been incented to give us technical and legal
    03  presentations to explain why it would be a bad idea
```

```
04  to terminate, why litigation might result in a worse
05  outcome than the license we already had.
06          But we never got to those discussions,
07  because Qualcomm didn't feel they needed to.  They
08  basically said, "If you don't need our chips
09  anymore" -- and like the earlier e-mail said, "if you
10  don't need MediaTek's chips anymore, go ahead and
11  terminate.  But if you do, then, you know, why would
12  we waste our time with a technical discussion?"
```

**30.  PAGE 197:02 TO 199:11  (RUNNING 00:02:51.208)**

```
02          (Exhibit Apple Blumberg 1 was marked for
03  identification.)
04  BY MR. RENNER:
05      Q.  Apple Exhibit 1, for the record, bears the
06  Bates stamp LENOVO-QUALSUB-00013080.
07          Can you identify this exhibit for me, sir,
08  as an e-mail chain, copying yourself and others at
09  Lenovo, in November of 2013?
10      A.  That's what it appears to be.
11      Q.  And I'd like to ask you a few questions
12  about the e-mail from a Jay Clemens; that's at the
13  bottom of the first page of the exhibit.
14      A.  Yes.
15      Q.  In the first paragraph of the e-mail,
16  Mr. Clemens writes, at the third sentence, quote:
17  "YY expressed frustration over the fact that we have
18  been paying too much (particularly in China) and
19  questioned why we have not yet concluded a better
20  deal with Qualcomm."
21          Do you see that?
22      A.  I do.
23      Q.  Do you have any understanding as to what
24  that means?
25      A.  Generally.  Is there any particular thing
00198:01  you'd like me to talk about?
02      Q.  Who is YY?
03      A.  Our CEO.
04      Q.  And then at the bottom of this e-mail --
05  still on the first page, at the bottom of the first
06  page -- paragraph begins, quote, "By the way, I think
07  the team should be commended for putting us in the
08  position to negotiate a new deal.  We had a horrible
09  contract of indefinite duration, but now we have the
10  opportunity to significantly improve the company's
11  financial position."
12          Do you have any understanding as to which
13  contract of indefinite duration is being referred to
14  here?
15      A.  I believe it was the original underlying
16  rest-of-world license agreement that came out of
17  Legend.
18      Q.  And did you have discussions with others
19  at Lenovo about the fact that that agreement was, in
20  sum or substance, a horrible deal for Lenovo?
21      A.  Yes.
22      Q.  And Mr. Clemens expresses the view that
23  Lenovo now has, quote, "the opportunity to
24  significantly improve the company's financial
25  position."
00199:01          Do you see that?
02      A.  Yes.
03      Q.  Did that ever happen with respect to this
04  horrible original SULA with Qualcomm?
05      A.  Basically my -- my recollection is that he
06  was talking about the fact that we had negotiated a
```

**Qualcomm**

```
       07   termination right as giving us some leverage.  But as
       08   I've discussed earlier, we -- we never seriously
       09   contemplated using that, and we never threatened to
       10   use it in any meaningful way, once we learned of
       11   Qualcomm's intent to cut off our supply if we did.
```

**31. PAGE 213:06 TO 214:01 (RUNNING 00:01:11.598)**

```
       06            (Exhibit Apple Blumberg 4 was marked for
       07   identification.)
       08   BY MR. RENNER:
       09        Q.   Showing you a document that I've marked as
       10   Apple Blumberg Exhibit 4.  Apple Blumberg Exhibit 4
       11   is, I believe, a PowerPoint that bears the Bates
       12   stamp MOTO-QUAL-01830543.
       13        A.   Yes.
       14        Q.   And it's captioned "Qualcomm Update."  Do
       15   you see that?
       16        A.   I do.
       17        Q.   I understand that this document was
       18   produced from your custodial files.  Taking a look at
       19   the contents of the slide, can you tell me if you
       20   believe you would have seen this document before?
       21        A.   Probably.  Yes, it's likely that I did see
       22   it.
       23        Q.   Do you have any understanding as to the
       24   context in which the document was created?
       25        A.   I'm going to need a couple minutes, just
00214:01   to read through it.
```

**32. PAGE 214:03 TO 215:05 (RUNNING 00:01:14.198)**

```
       03        A.   I have refreshed my recollection probably
       04   about as far as it's going to get.
       05        Q.   So what, if anything, can you recall,
       06   sitting here today, sir, about the context in which
       07   the document was created?
       08        A.   I think it was probably created by one of
       09   the Motorola attorneys for at least internal
       10   discussion within the legal department, possibly
       11   presentation to some of the senior execs, to talk
       12   about possible strategies to use in our dealings with
       13   Qualcomm.
       14        Q.   In looking at slide 3, again navigating by
       15   the slides -- by the numbers embedded on the bottom
       16   left --
       17        A.   Yes.
       18        Q.   -- slide captioned "Negotiation Progress"?
       19        A.   Yes.
       20        Q.   Third bullet reads, quote, "QC says they
       21   want to be partners, but we see no sign of reducing
       22   royalties without a fight, due to QC monopoly power."
       23             Do you see that?
       24        A.   Yes.
       25        Q.   Do you recall any discussions about
00215:01   Qualcomm's monopoly power at Lenovo?
       02        A.   I believe this comes out of the same
       03   notion, particularly on the Motorola side, that there
       04   were no viable alternatives for high-end phones
       05   beyond the Qualcomm chipset.
```

**33. PAGE 215:12 TO 218:24 (RUNNING 00:04:09.559)**

```
       12            (Exhibit Apple Blumberg 5 was marked for
       13   identification.)
       14   BY MR. RENNER:
       15        Q.   Apple Exhibit 5 bears the Bates stamp
       16   MOTO-QUAL-01935722.  Can you identify this document
```

```
         17  for me, sir, as notes of a meeting between on the one
         18  hand Lenovo and Motorola, and on the other hand
         19  representatives of Qualcomm?
         20       A.   It's what the -- the top couple of lines
         21  would certainly indicate.
         22       Q.   And you're identified as an attendee on
         23  the Lenovo side of the ledger; is that right?
         24       A.   Yes.
         25       Q.   Take as much time as you need to refresh
00216:01  your recollection, or orient yourself in -- in the
         02  document, and I'll tell you that the document looks
         03  as if one of the things that's being discussed is the
         04  China license.  But you can take the time you need.
         05            I'm going to ask you a set of questions
         06  about the last paragraph on the first page.  So I can
         07  get started with that, and you can tell me if you
         08  need to read more, or you can read the document and
         09  then let me know we you're ready to talk.  Whatever
         10  is best for you.
         11       A.   Why don't you start with your questions,
         12  and I'll see how much more I need to review.
         13       Q.   Fair enough, sir.
         14            Last paragraph on the first page of Apple
         15  Exhibit 5 reads, quote, "When asked for feedback on
         16  considerations to achieve a competitive rate, they
         17  responded that QTL has sums of money available for a
         18  strategic fund."
         19            Do you see that?
         20       A.   Yes.
         21       Q.   First question -- well, first, can you
         22  tell me how -- what you understand this sentence to
         23  mean?
         24       A.   As we discussed earlier today, Qualcomm,
         25  as part of the negotiations, had suggested the idea
00217:01  of what they called a strategic fund that would be
         02  money Qualcomm would pay back to Lenovo to be used
         03  for marketing, product development, and other related
         04  activities, as an incentive to use Qualcomm chips,
         05  and also as an incentive to sign up for some of these
         06  licensing deals.
         07       Q.   Was there a gap between the rate that
         08  Qualcomm was interested in charging in this
         09  negotiation and the royalty that Motorola was -- that
         10  Motorola and Lenovo were seeking?
         11       A.   Yes.  There was -- in fact to this day --
         12  a gap between what we feel would be reasonable and
         13  what Qualcomm is charging.
         14       Q.   And did Qualcomm propose in this meeting a
         15  strategic fund to help close that gap?
         16       A.   Yes.  Not only in this meeting, but
         17  through many of the discussions that we had over the
         18  years.
         19       Q.   In many of the discussions that you've had
         20  over the years with Qualcomm, Qualcomm has proposed
         21  strategic funds to help close the gap between Lenovo
         22  on the one hand and Qualcomm on the other with
         23  respect to the royalty rate?
         24            MR. HOLTZ:  Objection.  Calls for
         25       speculation.
00218:01            THE WITNESS:  Yes.  In -- in general, the
         02       way that Christian, who is typically the
         03       negotiator on the financial terms, would discuss
         04       it with Qualcomm was effectively a total cost of
         05       using Qualcomm:  Cost of chips, cost of
         06       royalties, and so on.
         07            And so Qualcomm was basically saying,
         08       "Well, we can address the total cost through
```

```
           09         this strategic fund by doing things that will
           10         make it effectively less expensive."
           11   BY MR. RENNER:
           12         Q.   And counsel for Qualcomm suggested that
           13   we're speculating.  Are we speculating here, or is
           14   this something that Qualcomm actually said in
           15   meetings, that this was a way to close the gap
           16   between Lenovo and Qualcomm with respect to the
           17   royalty rate?
           18              MR. HOLTZ:  Objection.  Vague.  Calls for
           19         speculation.
           20              THE WITNESS:  In meetings that I attended,
           21         Qualcomm did discuss the strategic fund as a way
           22         to make the deal more economically palatable to
           23         Lenovo, both for the license and for use of
           24         Qualcomm chips overall.
```

**34. PAGE 228:20 TO 230:07 (RUNNING 00:01:36.469)**

```
           20         Q.   Is it correct that you used to work at
           21   Intellectual Ventures?
           22         A.   Yes.
           23         Q.   Is Intellectual Ventures a patent
           24   licensing company?
           25         A.   It is.
   00229:01         Q.   Did you negotiate patent licensing
           02   agreements on behalf of Intellectual Ventures as the
           03   licensor?
           04         A.   Yes.
           05         Q.   Based on your experience, could you
           06   compare the relative leverages that Intellectual
           07   Ventures had in licensing negotiations with the
           08   leverage that Qualcomm has in licensing negotiations?
           09         A.   IV had far less leverage, because their
           10   only recourse in case of a -- an uncooperative or a
           11   resistant licensee was ultimately the threat of
           12   litigation.  Whereas, as I've said repeatedly,
           13   Qualcomm not only had that, but also the threat of
           14   cutting off vital supply.
           15         Q.   Is it your -- do you think that it is this
           16   additional leverage that Qualcomm has that is a
           17   primary source of the royalties that Qualcomm is able
           18   to negotiate, rather than the underlying strength of
           19   Qualcomm's patent portfolio?
           20              MR. HOLTZ:  Objection.  Calls for
           21         speculation and also calls for expert opinion.
           22              THE WITNESS:  Unquestionably.  In my
           23         experience, not only was I responsible for
           24         patent licensing at Intellectual Ventures, but I
           25         spent more than five years at Rambus, where I
   00230:01         was the VP of licensing, and signed agreements
           02         totaling in excess of more than $1.5 billion.
           03              And I will tell you that Qualcomm has a
           04         much easier time of negotiating very high
           05         royalties because they have this extralegal
           06         remedy that was never available to me in any of
           07         my licensing capacities.
```

**35. PAGE 271:23 TO 273:17 (RUNNING 00:02:24.509)**

```
           23         Q.   Here's what I'm trying to get at:  You've
           24   testified that you think Lenovo has agreed to higher
           25   rates than it -- higher royalty rates in its patent
   00272:01   licenses with Qualcomm than it otherwise would agree
           02   to, because of the chip supply threat; is that fair
           03   to say?
           04         A.   Yes.
           05         Q.   So how could Qualcomm -- let me just ask
```

```
              06   it open-ended:  What could Qualcomm provide to you,
              07   as much or as little as you think would suffice, to
              08   demonstrate what a true FRAND royalty rate would be?
              09        A.   If I understand one of the underlying
              10   premises of this question and the preceding question,
              11   you seem to be suggesting that if Qualcomm
              12   demonstrated that everybody else had signed up to
              13   similar terms, then that would demonstrate that
              14   Qualcomm had not used market power in the chipset
              15   arena to achieve these high royalty rates.  I'd argue
              16   just the opposite, that they had been wildly
              17   successful in their illegal activity, because they
              18   had gotten everyone to submit to this threat.
              19             But putting that interpretation aside,
              20   what would it take, an ironclad guarantee from
              21   Qualcomm that whether we have a license or not, they
              22   will continue to sell us chips at prices no less
              23   favorable than they sell to their most favored
              24   customers.
              25        Q.   If Qualcomm were to show you a licensing
     00273:01   agreement that it had entered into with a cell phone
              02   manufacturer who never once bought Qualcomm's chips,
              03   would that at least be relevant to you, that the
              04   terms under that agreement probably have nothing to
              05   do with any chip supply threat?
              06             MR. KEHL:  Object to the form of the
              07        question.
              08             THE WITNESS:  No, for the following
              09        reason.  One of the things that courts will look
              10        to in assessing the reasonableness of a license
              11        is other licenses.  Because I believe Qualcomm's
              12        licensing results are so thoroughly tainted by
              13        its improper behavior, threatening supply, it
              14        has established a very good track record of
              15        excessive royalty rates the court might
              16        otherwise take to be an indication of the true
              17        value of that portfolio.
```

**36. PAGE 275:18 TO 276:12 (RUNNING 00:00:54.422)**

```
              18        Q.   Do you know why Lenovo has not gone to the
              19   contract manufacturing model, if it appears that it
              20   results in a pretty substantial reduction in the
              21   royalty rate?
              22        A.   Until we acquired Motorola, we hadn't
              23   realized that was a possibility.  Also, until around
              24   the time we were acquiring Motorola, we didn't have
              25   the ability to terminate the Qualcomm license, and
     00276:01   the Qualcomm license in place with Lenovo does not
              02   permit the contract manufacturing alternative.
              03             So unless we terminated the license with
              04   Qualcomm, went to the contract manufacturing route,
              05   and risked our entire relationship with Qualcomm, we
              06   couldn't get there.
              07        Q.   What do you mean, risked your entire
              08   relationship with Qualcomm?
              09        A.   Qualcomm at various points during the
              10   negotiation made it clear they would take our
              11   termination as a hostile act and would not receive
              12   that kindly.
```

**37. PAGE 276:13 TO 277:01 (RUNNING 00:00:35.964)**

```
              13        Q.   All right.  But Qualcomm has not insisted
              14   that Motorola take out a direct license, correct?
              15        A.   That's correct, to the best of my
              16   knowledge.  They did threaten repeatedly, as I
              17   mentioned, to close the ability to continue using
```

**Qualcomm**

```
           18   contract manufacturing.
           19        Q.   But they've never done that, correct?
           20        A.   Not as far as I know.
           21        Q.   And I think you testified earlier -- but
           22   let's just make sure it's in the record -- that to
           23   your knowledge, Qualcomm has never told Lenovo or
           24   Motorola, "Motorola, either sign a direct license or
           25   we're cutting off your chips," correct?
00277:01        A.   I don't recall such a conversation.
```

**38.  PAGE 280:06 TO 280:19  (RUNNING 00:00:35.418)**

```
           06        Q.   Do you think that licensing agreements
           07   that Qualcomm entered into in the early '90s are a
           08   relevant comparison for the -- the reasonableness of
           09   licensing terms that Qualcomm demands between 2013
           10   and 2018?
           11        A.   No.
           12        Q.   Why not?
           13        A.   The patent landscape as well as the
           14   technology landscape has evolved immensely since
           15   then, and my -- my impression, though I haven't
           16   looked at this extensively recently, is that
           17   Qualcomm's holdings relative to other participants in
           18   the industry of relevant patents has decreased on a
           19   percentage basis rather dramatically.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:54:55.293)**