# REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

1

2

3

4

5

6

7

8

Jennifer Milici, D.C. Bar No. 987096
J. Alexander Ansaldo, Va. Bar No. 75870
Joseph R. Baker, D.C. Bar No. 490802
Geoffrey M. Green, D.C. Bar No. 428392
Nathaniel Hopkin, New York Bar No. 5191598
Daniel Matheson, D.C. Bar No. 502490
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3695; (202) 326-3496 (fax)
*jmilici@ftc.gov*
*Attorneys for Plaintiff Federal Trade Commission*

9

10

11

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

12

13

14

15

16

17

18

19

20

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>                              Plaintiff<br><br>                    v.<br><br><br>QUALCOMM INCORPORATED, a Delaware<br>Corporation,<br>                              Defendant. | Case No. 5:17-cv-00220-LHK-NMC<br><br>**FEDERAL TRADE COMMISSION'S<br>MOTION TO EXCLUDE EXPERT<br>TESTIMONY OF PROFESSOR AVIV<br>NEVO**<br><br>**REDACTED VERSION OF<br>DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:           October 18, 2018<br>Time:          1:30 p.m.<br>Courtroom:  8, 4th Floor<br>Judge:        Hon. Lucy H. Koh |

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

To the Honorable Court, all parties, and their attorneys of record:

Please take notice that on October 18, 2018, at 1:30 p.m., in Courtroom 8, United States Courthouse, 280 South 1st Street, San Jose, California 95113, Plaintiff Federal Trade Commission will and hereby does move the Court for an order excluding the testimony of Professor Aviv Nevo, designated by Defendant Qualcomm Incorporated ("Qualcomm") as an expert witness in this matter, concerning Qualcomm licenses that were not produced during discovery. The FTC's motion is based on the authorities and evidence set forth here, the accompanying declaration and exhibits, oral argument to be presented to the Court, and such other matters as the Court may consider.

The FTC seeks to exclude, under Federal Rule of Evidence 403, portions of Prof. Nevo's testimony that are based on documents produced months after the close of fact discovery.

## STATEMENT OF ISSUE TO BE DECIDED

Whether certain opinions offered by Professor Aviv Nevo, in reliance on documents produced by Qualcomm after the close of fact discovery, should be excluded under Federal Rule of Evidence 403.

I.     **INTRODUCTION**

Qualcomm's expert witness, Professor Aviv Nevo, submitted a report disclosing his opinions regarding the economic effects of Qualcomm's conduct at issue in this case. Rebuttal Report of Professor Aviv Nevo, June 28, 2018 ["Nevo Report"]. Prof. Nevo based some of his opinions on selected patent licenses that Qualcomm produced for the first time months after the close of fact discovery. Those opinions must be excluded under Federal Rule of Evidence 403 to avoid unfair prejudice to the FTC. The FTC had no opportunity to conduct discovery into these agreements or the negotiation thereof, and no opportunity to develop evidence to test or rebut Prof. Nevo's conclusions. The FTC will suffer prejudice if Prof. Nevo's opinions formed in reliance on materials produced after the close of discovery are admitted at trial.

II.    **FACTUAL AND PROCEDURAL BACKGROUND**

A.     **Discovery Deadlines in the Case**

Nearly a year ago, the Parties agreed "that Qualcomm would substantially complete its production of documents by November 28, 2017." ECF No. 286 at 1. After proposing a limited refresh collection, Qualcomm was required to complete production of additional documents by December 18, 2017. ECF No. 389 at 1. Fact discovery closed on March 30, 2018, and this Court has granted only limited requests for specific forms of out of time discovery. *See* ECF No. 783 at 2 (reviewing history of discovery deadlines and denying Qualcomm's request for three more out-of-time depositions).

B.     **Prof. Nevo's Opinions Based on Late-Produced Materials**

Qualcomm offers Prof. Nevo's testimony to address the FTC's allegations that Qualcomm's alleged conduct, including its no license-no chips policy and its refusal to license rival chip makers, allowed Qualcomm to obtain elevated royalties for its cellular SEPs that tax rivals' sales, with exclusionary effects. *See* Exhibit 1 (Nevo Report) at ¶¶ 5-7.[1] Prof. Nevo opines

---

[1] All exhibits are attached to the Declaration of Jennifer Milici in Support of the Federal Trade Commission's Motion to Exclude Expert Testimony of Professor Aviv Nevo.

that Qualcomm's royalties cannot be above FRAND levels because "industry participants were aware of Qualcomm's licensing terms" prior to the adoption of the relevant standards. *Id.* (Nevo Report) at ¶ 94.[2] Prof. Nevo states that "Qualcomm recently announced licensing terms for its 5G SEPs" and "[n]otably, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *Id.*

Prof. Nevo critiques FTC expert Prof. Shapiro for failing to consider "current evidence," including Qualcomm's "5G licenses," and FTC expert Mr. Lasinski for "ignoring" Qualcomm's "5G licenses." *Id.* (Nevo Report) at ¶¶ 291 -297.[3] As a result, he argues, the FTC's evidence "cannot justify or support the request for prospective relief" made in the FTC's complaint. *Id.* (Nevo Report) ¶ 297.

---

[2] Prof. Nevo cites unilateral announcements made by Qualcomm shortly before the adoption of WCDMA and LTE to establish that industry participants were "aware" of Qualcomm's licensing terms prior to adoption of those standards. Exhibit 1 (Nevo Report) ¶ 94. Prof. Nevo does not know how long after the announcements the standards were adopted or whether it was technically possible to alter the standards to exclude Qualcomm's technology at the time of the announcements. Exhibit 2 (Nevo Deposition, Aug. 10, 2018, ["Nevo Depo."] at 89:5-14; 247:12-248:20.

[3] Although Prof. Nevo refers to the agreements as "5G licenses" the late-produced licenses also contain terms concerning █████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

FEDERAL TRADE COMMISSION'S MOTION TO EXCLUDE
EXPERT TESTIMONY OF PROFESSOR AVIV NEVO
Case No. 17-cv-00220-LHK-NMC
REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

1    Prof. Nevo's opinions are based on two agreements that Qualcomm produced after fact

2    discovery had closed and the deadline for the submission of the FTC's expert reports had passed.

3    *Id.* (Nevo Report) ¶ 94 & n.179. According to the Nevo Report, the licenses ███████████

4    ████████████████████ *Id.* But Qualcomm did not produce the agreements until June 22, 2018

5    and June 28, 2018, respectively.[4]

## III.    LEGAL STANDARD FOR UNFAIR PREJUDICE

7    Federal Rule of Evidence 403 provides that the Court may exclude relevant evidence if

8    its probative value is substantially outweighed by a danger of unfair prejudice, confusing the

9    issues, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid.

10   403. The Court also has "broad discretion to manage the conduct of a trial and the evidence

11   presented by the parties" to avoid unfair prejudice, pursuant to its inherent authority. *Apple Inc.*

12   *v. Samsung Elecs. Co.*, No. 11-cv-01846-LHK, 2018 WL 1586276, at *18 (N.D. Cal. Apr. 2,

13   2018).

## IV.    ARGUMENT

15   Core to the FTC's theory is Qualcomm's ability to leverage its modem chip monopoly

16   power in licensing negotiations to obtain elevated royalties. Federal Trade Commission's

17   Complaint for Equitable Relief, ECF No. 1 ¶¶ 2-5; Order Denying Motion to Dismiss 8, ECF

18   No. 134 at 8 ("FTC alleges that Qualcomm used its dominance in the supply of CDMA and

19   premium LTE modem chips to skew SEP licensing negotiations toward outcomes that benefit

20   Qualcomm and harm Qualcomm's modem chip competitors."). Prof. Nevo seeks to rebut that

21   allegation and points to two "5G license agreements" as evidence that certain royalty rates

22   unilaterally announced by Qualcomm in November 2017 are consistent with FRAND and

23   unaffected by Qualcomm's monopoly power.

---

[4] These agreements were produced initially to plaintiffs in *In re Qualcomm Litigation*, No. 3:17-cv-00108-GPC-MDD, (S.D. Cal.) and copied to the FTC pursuant to the Joint Stipulation and Discovery Coordination Order, Jan. 24, 2018, ECF No. 513.  Qualcomm did not produce any documents relating to the negotiation of the two licenses.

1

2

3

4

5

6

7

    The FTC had no opportunity to conduct discovery regarding the two licenses cited by
Prof. Nevo because Qualcomm did not produce these licenses until three months after discovery
ended. On April 20, 2018, the FTC even asked Qualcomm, through its corporate representative
Fabian Gonell, whether there were any "data points" confirming that Qualcomm's unilaterally
announced royalty rates for 5G were reasonable. Mr. Gonell made no mention of the licenses or
negotiations, even though one had already been executed. Exhibit 8 (Qualcomm 30(b)(6)
Deposition (Gonell), Apr. 20, 2018 "Gonell Depo.")) at 267:11-268:5.[5]

8

9

10

11

12

13

14

15

    Thus, the FTC's ability to rebut Prof. Nevo's opinions regarding the two purported 5G
licenses has been substantially hampered, resulting in unfair prejudice should he testify
concerning those licenses or any opinion informed by those licenses. *See Apple v. Samsung*, No.
11-cv-01846-LHK, 2018 WL 1586276, at *23 (N.D. Cal. Apr. 2, 2018) (excluding expert
testimony based on data that was produced "hours before fact discovery closed" to avoid undue
prejudice under Rule 403 and pursuant to the court's inherent authority). Similar to the plaintiffs
in *Apple v. Samsung*, the FTC received these licenses after completing fact depositions, after
serving opening expert reports, and with no opportunity to explore their origin. *Id.*

16

17

18

19

20

21

    Qualcomm's expert witnesses, including Prof. Nevo, have had the opportunity to
interview Qualcomm's licensing executives after the close of fact discovery. *See* Exhibit 1 (Nevo
Report) at App'x C (disclosing "Phone Interview with Fabian Gonell (Senior Vice President of
Licensing Strategy and Legal Counsel at QTL), June 26, 2018" as among the materials
considered in his report). But the FTC has not had the opportunity to question fact witness about
the two licenses and was unable to obtain any answers from Prof. Nevo about his post-discovery

22

23

24

25

26

27

28

---

[5] Mr. Gonell's testimony as Qualcomm's corporate representative also refutes any notion that the
two licenses entered in January and June of 2018 establish that Qualcomm's unilaterally
announced 5G royalty rate is consistent with its FRAND commitment. *See* Exhibit 8 (Gonell
Depo.) at 266:14-267:1 ("Q. Has Qualcomm done any analysis of whether the rates and caps it
has announced for 5G are FRAND?  A. Any analysis of the FRAND-ness of that? … No. I don't
think that analysis is possible yet because you don't have the essential patents yet so you don't
have any – you don't have products yet so you don't have the – you know, you don't have the
underlying information you need.").

witness interview. *See* Exhibit 2 (Nevo Depo.) at 27:9-29:23 (testifying that he had no general or specific recollection of the interview with Mr. Gonell and had no records of the interview). And Prof. Nevo could not remember whether he had reviewed documents concerning the negotiation of the "5G licenses," and could not recall whether Qualcomm had threatened the chip supply of the licensees or whether Qualcomm offered financial incentives to induce the licensees to accept its royalty rates.[6]

Because Qualcomm did not produce the two licenses until after the end of fact discovery, and months after one had been executed, the FTC has been deprived of the opportunity to take discovery regarding the licenses and their negotiation, including but not limited to discovery concerning: whether Qualcomm leveraged its 3G or 4G market power to coerce the licensees to accept its terms; whether Qualcomm offered financial incentives to induce the acceptance of its terms; whether Qualcomm conditioned a reduction in its 3G and 4G royalty rates on the licensees' acceptance of Qualcomm's preferred 5G terms; whether these proceedings affected the negotiations or their outcomes; and, whether the terms are representative of other in-progress or concluded 5G license negotiations. Qualcomm should not be permitted to circumvent the

---

[6] Exhibit 2 (Nevo Depo.) at 256:13-257:23. ("Q. Okay. You mentioned ███████████ that signed onto 5G licenses?  A. Yes, I did.   Q. Do those licenses also change the terms for 3G and 4G?  A. I don't remember off the top of my head.   Q. Have you seen any negotiation documents about those licenses?  A. You know, those were fairly recent and I'm -- I can't remember. As I said, I've looked at so many --so many documents I can't remember specifically if I looked at those.   Q. Do you know whether there was any discussion about the chip supply in the negotiations of those licenses?  A. Again, I don't -- I don't remember one way or the other as I sit here today.   Q. Do you know whether you ever knew that information?  A. Again, I can't remember right now.   Q. So you don't know whether there were any suggestion that chip supply would be interrupted, do you?  A. I did not look at the specifics of -- so I can't -- as I sit here today -- sorry let me just -- as I sit here today I can't recall any of those details.   Q. Do you know whether Qualcomm entered any other commercial arrangements with either company?  A. As I sit here today, I can't answer one way or the other.   Q. So you don't know whether any financial incentives were offered to those companies, do you?  MR. EVEN: Objection. Vague as to the term financial incentives.   A. As I said, as I sit here today, I don't recall the specific details.").

discovery deadlines by offering expert opinions formed in reliance on cherry-picked and late-produced documents.

While "[v]igorous cross-examination [and] presentation of contrary evidence … are the traditional and appropriate means of attacking shaky but admissible" expert testimony, in this case the FTC is prejudiced because it has been denied the opportunity to discover "contrary evidence" with which to conduct such "[v]igorous cross-examination." *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596 (1993). The Court should exclude any opinion testimony of Prof. Nevo that relies on Qualcomm's "5G licenses" under Rule 403 and the Court's inherent authority, in order to avoid unfair prejudice to the FTC. If the Court were to permit introduction of these opinions and documents, the FTC would seek leave for out-of-time discovery, which would create significant and unnecessary delay.

## V.    CONCLUSION

For the reasons explained above, the Court should prohibit Qualcomm from offering expert testimony or opinion of Professor Aviv Nevo based upon or concerning licenses that were not produced during the discovery period.

Respectfully submitted,

Dated: August 30, 2018

   */s/ Jennifer Milici*
JENNIFER MILICI
J. ALEXANDER ANSALDO
JOSEPH R. BAKER
NATHANIEL HOPKIN
GEOFFREY M. GREEN
DANIEL MATHESON

Bureau of Competition

*Attorneys for Plaintiff Federal Trade Commission*

FEDERAL TRADE COMMISSION'S MOTION TO EXCLUDE
EXPERT TESTIMONY OF PROFESSOR AVIV NEVO
Case No. 17-cv-00220-LHK-NMC
REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Jennifer Milici, D.C. Bar No. 987096
Joseph R. Baker, D.C. Bar No. 490802
Geoffrey M. Green, D.C. Bar No. 428392
Philip J. Kehl, D.C. Bar No. 1010284
Daniel Matheson, D.C. Bar No. 502490
Kenneth H. Merber, D.C. Bar. No. 985703
Mark J. Woodward, D.C. Bar. No. 479537
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3695; (202) 326-3496 (fax)
*jmilici@ftc.gov*

*Attorneys for Plaintiff Federal Trade Commission*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware Corporation,<br>Defendant. | Case No. 5:17-cv-00220-LHK-NMC<br><br>**DECLARATION OF JENNIFER MILICI IN SUPPORT OF FEDERAL TRADE COMMISSION'S MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR AVIV NEVO**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:        October 18, 2018<br>Time:        1:30 p.m.<br>Courtroom:   8, 4th Floor<br>Judge:       Hon. Lucy H. Koh |

1

I, Jennifer Milici, do hereby declare and state as follows:

1.      I am an attorney employed by the U.S. Federal Trade Commission ("FTC"). I am one of the attorneys of record in this matter for the FTC. I have personal knowledge of the matters set forth in this declaration, and if called upon as a witness I could and would testify competently.

2.      I respectfully submit this declaration in support of the FTC's motion to exclude expert testimony of Professor Aviv Nevo.

3.      Attached as Exhibit 1 is a true and correct copy of excerpts from the Rebuttal Report of Professor Aviv Nevo, Ph.D., dated June 28, 2018, and designated Highly Confidential—Attorneys' Eyes Only by Qualcomm.

4.      Attached as Exhibit 2 is a true and correct copy of excerpts from the deposition of Aviv Nevo, which took place on August 10, 2018, and was designated Highly Confidential—Attorneys' Eyes Only by Qualcomm.

5.      Attached as Exhibit 3 is a true and correct copy of QAPPCMSD10051179, ███████████████████████████████████████████████████████ ██████████████████████████████████, designated Highly Confidential—Attorneys' Eyes Only by Qualcomm and produced to the Federal Trade Commission on June 22, 2018.

6.      Attached as Exhibit 4 is a true and correct copy of QAPPCMSD00009236, ███████████████████████████████████████████████████████ ██████████████████████████████████, and designated Highly Confidential—Attorneys' Eyes Only by Qualcomm.

7.      Attached as Exhibit 5 is a true and correct copy of QAPPCMSD10052189, ███████████████████████████████████████████████████████ ██████████████████████████████████, designated Highly Confidential—Attorneys' Eyes Only by Qualcomm and produced to the Federal Trade Commission on June 28, 2018.

DECLARATION OF JENNIFER MILICI
Case No. 17-cv-00220-LHK-NMC
REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

8.      Attached as Exhibit 6 is a true and correct copy of Q2017MDL1_03114062, "OFDMA Subscriber Unit License Agreement," between Qualcomm Inc. and TCL Corporation, effective March 6, 2013, and designated Highly Confidential—Attorneys' Eyes Only by Qualcomm.

9.      Attached as Exhibit 7 is a true and correct copy of Q2017MDL1_02929368, ("License of Certain Technology for the Manufacturing and Sale of Certain CDMA Subscriber Units," between Qualcomm Inc. and TCL Holdings Co., effective October 8, 2001, and designated Highly Confidential—Attorneys' Eyes Only by Qualcomm.

10.     Attached as Exhibit 8 is a true and correct copy of excerpts from the Rule 30(b)(6) deposition of Qualcomm, through Fabian Gonell of Qualcomm, which took place on April 20, 2018, and was designated Highly Confidential—Attorneys' Eyes Only by Qualcomm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of August, 2018, in Washington, DC.


_/s/ Jennifer Milici_
JENNIFER MILICI

DECLARATION OF JENNIFER MILICI
Case No. 17-cv-00220-LHK-NMC
REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# EXHIBIT 1

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

FEDERAL TRADE COMMISSION,

Plaintiff,

v.                                                    Case No. 17-CV-00220-LHK

QUALCOMM INCORPORATED, a
Delaware Corporation,

Defendant.

Rebuttal Report of Professor Aviv Nevo, Ph.D.

June 28, 2018

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

**2.**      **Allegations and Assignment**

5.      The Federal Trade Commission ("FTC") alleges that Defendant Qualcomm Incorporated ("Qualcomm") has engaged in conduct that allegedly harms competition in baseband modem processors ("chips") and raises prices paid by consumers for cell phones ("handsets") and tablets.[1] Counsel for Qualcomm has asked me to address certain of these allegations.

6.      The FTC claims that Qualcomm used its alleged market power in certain alleged chip markets to obtain elevated royalties on its cellular standard-essential patents ("SEPs") from Original Equipment Manufacturers ("OEMs") (firms that manufacture handsets and tablets). Although most of Qualcomm's license agreements cover both cellular SEPs and multiple other patents, the FTC claims the royalties charged by Qualcomm violated Qualcomm's commitment to license its SEPs (but not its other patents) on terms that were fair, reasonable, and non-discriminatory ("FRAND"). The FTC alleges that Qualcomm obtained these elevated royalties by using a combination of several practices, including:

- not selling chips to OEMs unless they first enter into license agreements with Qualcomm, allegedly on terms preferred by Qualcomm, which the FTC refers to as "no license-no chips";[2]

- using payments referred to as strategic and marketing funds as a "carrot" to induce acceptance of non-FRAND licensing terms;[3]

- refusing to license its cellular SEPs on FRAND terms to rival chip makers;[4]

7.      The FTC further claims that these allegedly elevated royalties collected by Qualcomm acted as a "tax" on OEMs' use of rival chip makers' chips, resulting in foreclosed competition in chips and harm to consumers.

8.      As part of my analysis of the above claims, I have been asked to assess whether the Qualcomm practices at issue have procompetitive business justifications.

9.      Finally, I have also been asked to review and respond to the economic analyses and opinions offered by the FTC's experts, Professor Carl Shapiro, Mr. Michael Lasinski, and Mr. Richard Donaldson, to the extent they relate to my assignment described above.[5]

---

[1] Federal Trade Commission's Complaint for Equitable Relief, *Federal Trade Commission v. Qualcomm Incorporated*, N.D. Cal., January 17, 2017 ("Complaint").
[2] Complaint, ¶¶3.a, 84–86.
[3] Complaint, ¶¶3.b, 102–106.
[4] Complaint, ¶¶3.c, 114.
[5] Expert Report of Carl Shapiro, May 24, 2018 ("Shapiro Report"); Expert Report of Michael J. Lasinski, May 24, 2018 ("Lasinski Report"); Expert Report of Richard Donaldson, May 24, 2018 ("Donaldson Report").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

10.     I have not been asked to address and therefore offer no opinion on any of the FTC's other allegations. Specifically, I do not offer an opinion on allegations related to the terms of Qualcomm's chip-related agreements with Apple. Furthermore, I do not address the FTC's allegations related to market definition and market power.

11.     The documents and materials I relied upon in forming my opinions are listed in Appendix C. I reserve the right to update my opinions as more information becomes available and to address Plaintiffs' expert analysis when it becomes available.

12.     I am being compensated at my standard billing rate of $1,000 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

should not ignore the standardization process, and should consider the options available to all sides. In particular, it should consider the long-run incentives of the technology developer to develop technology and to allow it to choose whether to be part of the standard. The FTC and Professor Shapiro have failed to explain how Qualcomm's royalty terms are inconsistent with either of these definitions of FRAND.

94.     Qualcomm entered CDMA license agreements with major OEMs, including AT&T, Motorola, and Nokia, prior to the adoption of the CDMA standard. These agreements literally satisfy the *ex ante* framework. Moreover, there are several facts that suggest that industry participants were aware of Qualcomm's licensing terms for WCDMA, LTE, and 5G prior to adoption of these standards.

- Qualcomm's royalty rates have stayed relatively constant since it began licensing its technology in the early 1990s and did not increase after the adoption of the relevant standards.

- Qualcomm stated in a September 1999 investor presentation (prior to the first commercial release of WCDMA in December 1999) that a number of "companies have licensed Qualcomm patents for Third Generation CDMA Systems, including multi-carrier and direct spread CDMA."[175] The presentation further noted, "Royalties paid by these licensees for Third Generation are equal to the royalties that these licensees pay for Second Generation."[176]

- Prior to the launch of LTE as a 4G protocol Qualcomm announced its standard rates and practices to the industry.[177]

- Finally, Qualcomm recently announced licensing terms for its 5G SEPs. These terms include royalty rates of 3.25 percent for 5G multi-mode handsets and 2.275 percent for 5G single-mode handsets, and a reaffirmation that "[c]onsistent with Qualcomm's Fair, Reasonable and Non- Discriminatory (FRAND) commitments, European Telecommunications Standards Institute (ETSI) Intellectual Property Right (IPR) policy

---

[175] Qualcomm 1999 New York Analyst Meeting Presentation, "Analyst Meeting," September 15, 1999, Q2014FTC04845624. See also Response to Specifications 4 and 24, p. 13 ("12/1999 -First 3GPP release of UMTS (including WCDMA)")

[176] Qualcomm 1999 New York Analyst Meeting Presentation, "Analyst Meeting," September 15, 1999, Q2014FTC04845624.

[177] Erik Stasik, "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards," *les Nouvelles* 3, September 2010, pp. 114–119 at p. 116 ("Qualcomm 'expects that it will charge royalties for a license under its standards essential LTE… patent portfolio…of approximately 3.25 percent of the wholesale selling price…'")

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

and industry practice, Qualcomm's cellular standard essential patent licensing program is based upon licensing *mobile handsets* that fully conform to the 3GPP Standards."[178]



[179]

95.     The FTC and Professor Shapiro have failed to explain how their claim that Qualcomm's rates are not FRAND is consistent with (1) the wide held view that a FRAND rate is based what is known *ex ante* and (2) the evidence that industry participants were aware of Qualcomm's licensing practices and royalty terms prior to adopting certain standards (i.e., that these terms were known *ex ante*). Moreover, they fail to explain why SDOs would have continued to incorporate Qualcomm's technology into standards if Qualcomm's standard royalty terms, which have been widely known and relatively constant for over two decades, were supra-FRAND.

### 5.2. Professor Shapiro's Simplistic Theory Is Incomplete and Ignores Many Complex Realities That Call into Question Its Predictions

#### 5.2.1. Professor Shapiro's Theoretical Arguments Do Not Properly Consider the Many Factors That Enter into the Negotiation Process and That Could Drive the Ultimate Outcomes

96.     Professor Shapiro claims that Qualcomm's royalties must be above FRAND because of the leverage Qualcomm gets from its chip-supply practice, noting, "The fact that Qualcomm applies this leverage … tells us the Qualcomm's per unit royalty rate *r* exceeds the rate that would be negotiated separately …"[180] He continues, "[i]f not, there would be no need for Qualcomm to impose this conditionality."[181] This circular inference is incorrect. First, as a matter of logic it is incorrect to simply assume that Qualcomm applies this leverage and that the only reason this practice exists is to support the theoretical assumption Professor Shapiro makes. Second, real-world negotiations are messy, and their outcomes will depend on a variety of factors. The outcomes of real-world negotiations depend on the business strategy, bargaining

---

[178] "Qualcomm 5G NR Royalty Terms Statement", *Qualcomm,* available at https://www.qualcomm.com/media/documents/files/qualcomm-5g-nr-royalty-terms-statement.pdf, accessed on June 25, 2018 (emphasis added)

[179]

[180] Shapiro Report, ¶275.
[181] Shapiro Report, ¶275.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

### 6.4.1.3.   Professor Shapiro's Analysis Ignores Current Evidence, Is Speculative, and Cannot Support Prospective Relief

291.    I understand that the FTC seeks prospective relief to prevent Qualcomm from using its challenged business and licensing practices in the future. Professor Shapiro's analysis, however, is backward-looking, which does not provide meaningful support to justify forward-looking relief. His claims that Qualcomm may obtain market power in 5G chips or that Qualcomm might misuse this future market power to exclude its rivals are entirely speculative.

292.    In his backward-looking analysis, Professor Shapiro relies on evidence through 2016, which is now outdated, and does not consider available evidence from 2017 and 2018. In a dynamic and innovative industry it is crucial to use the most up-to-date data in order to even attempt to make predictions about the future. Professor Shapiro does not use the most recently available data. This is an important shortcoming. For example, he argues that Qualcomm has "monopoly power" in an alleged "premium" LTE market, but his analysis is based on data that end in 2016.[506] ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████[507] The decrease in Qualcomm's share is expected to continue in 2018 because of, among other things, Apple's decision not to use Qualcomm's chips in its new 2018 devices.[508]

293.    As I showed throughout this report, Professor Shapiro has not presented a complete theory and the necessary empirical evidence to support the FTC's allegations that Qualcomm was able to use its market power in chips to obtain preferred royalty terms and exclude its rivals.[509] Even if Qualcomm previously used its alleged market power to exclude rivals (which I demonstrate that it did not), Professor Shapiro cannot conclude on that basis that it will be able to do so in the future.

294.    First, Professor Shapiro asserts that Qualcomm will have market power in 5G, presumably because of his allegation that Qualcomm had market power in standards for previous

---

[506] Shapiro Report, ¶223.
[507] Shapiro Report, Figure 9.
[508] Deposition of Jeff Williams (Chief Operating Officer at Apple), March 15, 2018 ("Williams (Chief Operating Officer of Apple) Deposition"), 34:14–35:2 ("Q. Does Apple plan to utilize Qualcomm modems for any new product releases in 2018? A. Unfortunately not.")
[509] On the contrary, I found no evidence that Qualcomm used its alleged market power market to obtain preferred royalty terms or that Qualcomm's conduct caused any anticompetitive effect.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

chips. Past evidence contradicts this: he alleges that Qualcomm had market power in CDMA chips but not in WCDMA, which shows that even according to his own allegations of past behavior Qualcomm need not have market power in 5G. In fact, rival chip makers, including Intel, Samsung, HiSilicon (Huawei), and MediaTek all announced the development of 5G chips.[510]

295.    Second, Professor Shapiro does not claim that Qualcomm's potential advantage in 5G will be obtained through any illegal conduct. As I discussed in this section, obtaining a competitive advantage through technological leadership due to innovation is not in itself anticompetitive. Nonetheless, Professor Shapiro speculates that Qualcomm's innovation and market leadership in 5G may allow it to engage in future anticompetitive behavior.[511] He provided no evidence that Qualcomm will be able to use any hypothesized future market power to exclude its rivals.

296.    Third, as I mentioned in Section 4.2.2, Qualcomm recently announced its new licensing terms for its 5G SEPs,[512] and despite the fact that Qualcomm does not have any alleged market power in 5G, ███████████████████████████████████████████████████ ██████████.[513] Neither Professor Shapiro nor the other FTC experts have made any attempt to evaluate whether Qualcomm's 5G rates are not FRAND or include any "tax." This is particularly inconsistent with Mr. Lasinski's analysis that is based on calculating standard-specific "reasonable royalties" and his claim that negotiations are "focus[ed] almost exclusively on … the primary standard embodied in the handset," in this case 5G.[514]

---

[510] "Intel Introduces Portfolio of Commercial 5G New Radio Modems, Extends LTE Roadmap with Intel XMM 7660 Modem," *Intel Newsroom*, November 16, 2017, available at https://newsroom.intel.com/news/intel-introduces-portfolio-new-commercial-5g-new-radio-modem-family/, accessed on June 25, 2018; "Exynos 9820 and 5G RF Chips Already in Development," *GSM Arena*, April 4, 2018, available at
https://www.gsmarena.com/exynos_9820_5g_rf_chips_development-news-30411.php, accessed on June 25, 2018;
"Huawei Unveils Balong 5G01 5G Cellular Modem Chip, and 5G Routers," *CNXSoft*, February 26, 2018, available at https://www.cnx-software.com/2018/02/26/huawei-unveils-balong-5g01-5g-cellular-modem-chip-and-5g-routers/, accessed on June 25, 2018; "MediaTek Announces Its First 5G Modem Chipset Helio M70, To Be Ready For Commercial Use in 2019," *Tech2*, June 6, 2018, available at https://www.firstpost.com/tech/news-analysis/mediatek-announces-its-first-5g-modem-chipset-helio-m70-to-be-ready-for-commercial-use-in-2019-4498783 html, accessed on June 25, 2018.
[511] Shapiro Report, ¶¶313–315.
[512] "Qualcomm 5G NR Royalty Terms Statement," *Qualcomm*, November 19, 2017, available at https://www.qualcomm.com/media/documents/files/qualcomm-5g-nr-royalty-terms-statement.pdf, accessed on May 10, 2018.
[513]



                    APPCMSD10052189–296.
[514] Lasinski Report, ¶85.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

297.     For the all the reasons mentioned above, it is my opinion that Professor Shapiro's theory, which is not supported by the market outcomes, and speculations about future market conditions cannot justify or support the request for prospective relief.

### 6.4.2.  Professor Shapiro Has Not Demonstrated That the Alleged "Tax" Prevented Rivals from Operating Profitably or Precluded Innovation and Entry by Rivals

298.     Professor Shapiro does not claim that Qualcomm priced its chips below its costs;[515] consequently, an equally efficient competitor could operate profitably even if the outcome of short-run competition under the alleged "tax" was a decrease in chip prices. Professor Shapiro has also not demonstrated empirically that Qualcomm's CDMA or "premium" LTE chip prices were below any relevant cost measure. I understand that Dr. Chipty has shown that Qualcomm historically earned positive margins on its chip sales, in particular its CDMA and "premium" LTE chip sales. Professor Shapiro has not explained how these positive margins are inconsistent with any allegation that Qualcomm lowered its short-run chip prices below its cost with the intention to exclude competitors.

299.     Professor Shapiro's own analysis yields a similar conclusion. Professor Shapiro relies on WCDMA as a competitive benchmark to which he compares CDMA chip pricing.[516] His conclusion that margins ███████████████████████████████████ benchmark is inconsistent with his theory of exclusion,[517] which relies on Qualcomm's conduct leading to suppressed margins for rival chip makers.[518] His claim is that rivals were hurt by suppressed margins, yet he does not reconcile this with the fact that margins are higher in the market where the alleged conduct allegedly occurred. Furthermore, an equally efficient competitor could have successfully entered and competed. Indeed, Professor Shapiro acknowledges that entry into the alleged markets has occurred.[519]

---

[515] Professor Shapiro claims that Qualcomm sold chips to Apple for use in iPad models at below-cost prices. I understand that this claim will be addressed by Dr. Chipty. I note that even if that claim were true, I understand the volumes involved to be a small share of Qualcomm's chip sales to Apple. Therefore, they would not affect my overall analysis of Professor Shapiro's theory. Shapiro Report, Section XI.D.

[516] Shapiro Report, ¶¶154–155.

[517] Professor Shapiro argues that ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████ See Shapiro Report, ¶165.

[518] See, e.g., Shapiro Report, ¶263 ("If Qualcomm were unable to leverage its modem-chip market power to raise the royalty that it charges for its cellular SEPs, the price Qualcomm could charge for its modem chips would be limited…because high modem chip prices would encourage increased supply, investment, and entry by rival modem-chip suppliers.")

[519] Shapiro Report, ¶¶157, 183. See also Shapiro Report Figure 5 and Figure 9.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# Materials Relied Upon

## Academic Articles

- Alexander Galetovic et al., "An Empirical Examination of Patent Holdup," Journal of Competition Law and Economics 11(3), 2015, pp. 549–578.
- Anne Layne-Farrar, "The Practicalities and Pitfalls of the Smallest Saleable Patent Practicing Unit Doctrine: A Review of Teece and Sherry," *les Nouvelles – Journal of the Licensing Executives Society* 51(4), February 18, 2016, pp. 234–238.
- Ariel Pakes, "A Reconsideration of Hedonic Price Indexes with an Application to PC's," *American Economic Review* 93(5), 2003, pp.1578-1596.
- Ariel Rubinstein, "Perfect Equilibrium in a Bargaining Model," *Econometrica* 50(1), 1982, pp. 97–109.
- Dan Saugstrup and Anders Henten, "3G Standards: The battle between WCDMA and CDMA2000," *Info* 8(4), 2006, pp. 10–20.
- Daniel G. Swanson and William J. Baumol, "Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power," *Antitrust Law Journal* 73(1), 2005, pp. 1–58.
- David J. Teece and Edward F. Sherry, "On the 'Smallest Saleable Patent Practicing Unit' Doctrine: An Economic and Public Policy Analysis," *Tusher Center for the Management of Intellectual Capital*, Working Paper Series No. 11, January 20, 2016, at pp. 1–33.
- David J. Teece and Edward F. Sherry, "Standards Setting, Standards Development and Division of the Gains from Standardization," *Competition Policy International*, September 2016.
- David M. Byrne and Carol A. Corrado, "Prices for Communications Equipment: Rewriting the Record," *Finance and Economics Discussion Series 2015-069*, Washington: Board of Governors of the Federal Reserve System, 2015, pp. 9–10.
- E. Glen Weyl and Michal Fabinger, "Pass-Through as an Economic Tool: Principles of Incidence under Imperfect Competition," *Journal of Political Economy*, 121(3), June, 2013, pp. 528–583.
- Erik Stasik, "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards," *les Nouvelles* 3, September 2010, pp. 114–119.
- Ernst R. Berndt et al., "Econometric estimates of price indexes for personal computers in the 1990's." Journal of Econometrics 68(1), 1995, pp. 243-268.
- Frank H. Easterbrook, "When Is It Worthwhile to Use Courts to Search for Exclusionary Conduct?" *Columbia Business Law Review*, 345(2), 2003, pp. 345–358.
- Jack E. Triplett, "Handbook on Hedonic Indexes and Quality Adjustments in Price Indexes: Special Application to Information Technology Products," *OECD Science, Technology and Industry Working Papers*, 2004, available at http://dx.doi.org/10.1787/643587187107, accessed on June 28, 2018.
- John F. Nash, Jr., "The Bargaining Problem," *Econometrica* 18(2), 1950, pp. 155–162.
- Joseph Farrell and Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," *The B.E. Journal of Theoretical Economics*, 10(1), 2010.
- Joseph Farrell and Carl Shapiro, "Recapture, Pass-Through, and Market Definition," *Antitrust Law Journal*, 76, pp. 585–604.

- Deposition of Seung Ho Ahn (Head of IP Center at Samsung), March 28, 2018.
- Deposition of Steve Mollenkopf (Chief Executive Officer of Qualcomm), March 21–22, 2018.
- Deposition of Taraneh Maghame (Senior Director of Wireless Programs and Corporate Development at Via Licensing, Former Senior Counsel at Apple), March 14, 2018.
- Deposition of Todd Madderom (Director of Procurement at Motorola), March 16, 2018.
- Deposition of Tony Blevins (Former Director of Corporate Procurement at Apple), March 13, 2018.
- Deposition of William Bernard Wyatt IV (Vice President of Finance at QCT), January 16, 2018.
- Deposition of William Bernard Wyatt IV (Vice President of Finance at QCT), May 4, 2018.
- Phone Interview with Fabian Gonell (Senior Vice President of Licensing Strategy and Legal Counsel at QTL), June 26, 2018.

**Expert Reports**

- Expert Report of Carl Shapiro, May 24, 2018.
- Expert Report of Michael J. Lasinski, May 24. 2018.
- Expert Report of Richard Donaldson, May 24, 2018.

**Legal Documents**

- Apple Inc.'s First Supplemental Responses to Interrogatory Nos. 1, 6, 7, 11, and 21 of Qualcomm Incorporated's First Set of Interrogatories, *Apple Inc. v. Qualcomm Incorporated*, January 5, 2018.
- Complaint for Patent Infringement and Declaratory Judgment, *Nokia Corporation v. Apple Inc.*, October 22, 2009.
- Federal Trade Commission's Complaint for Equitable Relief, *Federal Trade Commission v. Qualcomm Incorporated*, January 17, 2017.
- Federal Trade Commission's Opposition to Qualcomm's Motion to Dismiss, *Federal Trade Commission v. Qualcomm Incorporation*, May 12, 2017
- Findings of Fact and Conclusion of Law, *Microsoft Corporation v. Motorola, Inc., et al.,; Motorola Mobility, Inc., et al., v. Microsoft Corporation*, April 25, 2013.
- Joint Stipulation Regarding Final Award, *BlackBerry Limited v. Qualcomm Incorporated*, May 25, 2017, QNDCAL03517938–41.
- Memorandum of Findings of Fact and Conclusions of Law, *TCL Communication Technology Holdings, Ltd., et al., v. Telefonaktiebolaget LM Ericsson, et al.; Ericsson Inc., et al., v. TCL Communication Technology Holdings, Ltd., et al.*, November 8, 2017
- Memorandum Opinion, *United States of America v. AT&T Inc., et al.*, June 12, 2018.
- *Nokia Corporation v. Apple Inc.*, 1:09-cv-00791-GMS (D. Delaware).
- Plaintiff Federal Trade Commission's Amended Objections and Response to Defendant Qualcomm's Interrogatory No. 13, *Federal Trade Commission v. Qualcomm Incorporated*, March 23, 2018.
- Plaintiff Federal Trade Commission's First Amended Objections and Responses to Defendant Qualcomm's First Set of Interrogatories, *Federal Trade Commission v. Qualcomm Incorporated*, January 8, 2018.
- Plaintiff Federal Trade Commission's First Supplemental Objections and Reponses to Defendant Qualcomm's Interrogatory Nos. Fourteen and Fifteen, *Federal Trade Commission v. Qualcomm Incorporated*, May 24, 2018.
- Plaintiff Federal Trade Commission's Objections and Responses to Defendant Qualcomm's First Set of

# EXHIBIT 2

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                   ---------------------

 4   FEDERAL TRADE COMMISSION, )

 5           Plaintiff,        )

 6   vs.                       ) Case No.

 7   QUALCOMM, INCORPORATED,   ) 5:17-cv-0220-LHK-NMC

 8           Defendant.        )

 9   -------------------------)

10

11                            Friday, August 10, 2018

12

13                            825 Eighth Avenue

14                            New York, New York

15

16   The above-entitled matter came on for the deposition of

17   AVIV NEVO, pursuant to notice, at 9:07 a.m.

18

19

20

21

22

23

24

25
```

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Nevo - Highly Confidential

```
 1   that we cite in the report.
 2        Q.   So if you look at appendix C, page 21 --
 3        A.   Yeah.
 4        Q.   -- Page 21 --
 5        A.   Okay.
 6        Q.   -- and it's the last bullet before the
 7   subheading "expert reports".
 8        A.   Yes.
 9        Q.   And you see there that you've identified a
10   phone interview with Fabian Gannel?
11        A.   Yes, that's correct.
12        Q.   Is that phone interview cited in your report?
13        A.   I believe it is and if it's not, it's something
14   that we thought, you know, should we disclose something
15   that I relied upon, because we did have that phone
16   interview.
17        Q.   Right.  Tell me about that phone interview.
18        A.   I'd have to go back and see exactly what it was
19   but there was some issue about Qualcomm's licensing
20   that I wanted clarification about.
21        Q.   What was it about Qualcomm's licensing?
22        A.   I'd have to -- I'd have to look an see exactly
23   where I cited.  I don't remember the exact, the exact
24   details of that conversation but wherever it is that we
25   cite, it was some detail that we wanted to understand
```

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Nevo - Highly Confidential

FTC v. Qualcomm, Inc.                                        8/10/2018

1    about the licensing practices that we wanted to get

2    clarification from Fabian.

3        Q.  If you wanted to understand what it was that

4    you discussed with Mr. Gannel in that interview, where

5    would you check?

6        A.  Well, I would check where it was actually

7    cited.

8        Q.  Let's assume that it's not cited in the report.

9    What would you check?

10            MR. EVEN:  Objection.

11        Q.  To find out whether -- whether -- what the

12    content of that interview was?

13            MR. EVEN:  Objection.  Are you representing to

14    him that it's not cited or are you asking him to assume

15    that it's not cited or?

16            MS. MILICI:  I am representing that I was

17    unable to find the citation in the report.  If you --

18    if you can point me to it then that would be great, but

19    I was unable to find it.

20        A.  Okay.  I can look through it now but it will

21    take me a long time, so.

22        Q.  I'm asking -- that's why I'm suggesting that

23    instead of doing that, let's assume that it's not in

24    there.  Where would you look to find out what the

25    content of that report -- of that interview was and

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

29

Nevo - Highly Confidential

FTC v. Qualcomm, Inc.                                          8/10/2018

1     what it was you relied upon it for?

2              MR. EVEN:  Objection.  Asked and answered.

3          A.  I will look in the report.  If it's not in the

4     report I don't have notes of that phone call, so.

5          Q.  So you had an interview with Fabian Gannel, you

6     relied upon it for something, but you're not sure what

7     it was and there's not a record that would tell you

8     what you -- what it was?

9          A.  Well, it -- whatever -- whatever was discussed

10    to the extent that it was relied upon in the report,

11    you know, if it was relied upon in the report it should

12    be cited in the report.  And I can't, you know, as I

13    sit here today, I mean, it's a long report with a lot

14    of footnotes.  I can't put the exact -- put exactly

15    where it is, but I can look for it.

16         Q.  So you don't have any recollection of what that

17    phone interview was about other than generally

18    licensing practices?

19         A.  I don't remember specifically as I sit here

20    today.

21         Q.  Do you -- do you remember generally?

22         A.  Not on a level that I'm -- beyond what I've

23    just said, no.

24         Q.  So you -- this -- this list is the materials

25    that are cited in your report, is your testimony?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Nevo - Highly Confidential

FTC v. Qualcomm, Inc.                                    8/10/2018

1    what it is for 2G and generally there's this

2    announcement that the rates have stayed the same.  So

3    that would form a reasonable expectation as to what

4    Qualcomm's demands will be.

5        Q.  Do you know how -- how long after this

6    announcement in September 1999 the WCDMA standard was

7    adopted?

8        A.  I can't certainly now, but I'm sure we can look

9    it in the exhibit, because it's there.

10       Q.  Have you done any investigation to determine if

11   it was technically possible to alter the WCDMA standard

12   after September of 1999 to exclude Qualcomm's

13   inventions?

14       A.  I have -- I have not, no.

15       Q.  So I believe you testified that the ex ante

16   announcement important, and why is that?  If the rate

17   was too high, what is it that -- that should have

18   happened?

19       A.  Well, there's a variety of things that could

20   have happened.  Some could have been through the

21   setting standard developing organization, considered a

22   standard setting organization to try to find a work

23   around.  That's one thing and even if it can't be, you

24   know, in that particular standard, again, I don't know

25   that particular date could have actually been okay, we

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Nevo - Highly Confidential

FTC v. Qualcomm, Inc.                                8/10/2018

1    got to move forward maybe and, you know, this next --

2    the next version we might be -- we might try to go and

3    see what is our next best alternative, is there

4    something that we could turn to.

5        Q.  In your report, in the background section of

6    your report, I believe that you represent that the

7    WCDMA standard is based on Qualcomm's fundamental 2G

8    CDMA technology.  Is that -- is that a fair statement?

9        A.  I don't know if based is exactly the right

10   word.  I think that it builds a lot of the, let me call

11   ideas, that were developed by Qualcomm and CDMA, yes.

12       Q.  Would excluding Qualcomm's technology from

13   WCDMA fundamentally alter the standard?

14       A.  Again, I don't know.  We'd have to ask, you

15   know, the engineers would go into it, but that might

16   indeed be the case, yes.

17       Q.  So would that affect your opinion that this

18   announcement that some people are saying is the same

19   rate for 2G and for 3G is relevant to what the FRAND

20   rate is?

21       A.  No.

22           MR. EVEN:  Objection.  Go ahead.

23       A.  No.  I mean, it seems to me that knowing this

24   information prior to the adoption was something, again,

25   that was known and fits into exactly this idea of

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Nevo - Highly Confidential

FTC v. Qualcomm, Inc.                                      8/10/2018

1       Q.  I'm just going to go back to my question.  You
2   are not saying that because it was announced ex ante
3   it's a fair and reasonable rate?
4       A.  And I'll repeat the same answer as before.
5       Q.  Well that's a yes or no question.  Are you
6   saying that because it was known ex ante, it is a fair
7   and reasonable rate?
8           MR. EVEN:  Objection.  Mischaracterizes
9   testimony and I think asked and answered like four
10   times now.
11      A.  I can't offer an opinion one way or the other.
12   I'm saying this was known.
13      Q.  Okay.  You mentioned ███████████████ that
14   signed onto 5G licenses?
15      A.  Yes, I did.
16      Q.  Do those licenses also change the terms for 3G
17   and 4G?
18      A.  I don't remember off the top of my head.
19      Q.  Have you seen any negotiation documents about
20   those licenses?
21      A.  You know, those were fairly recent and I'm -- I
22   can't remember.  As I said, I've looked at so many --
23   so many documents I can't remember specifically if I
24   looked at those.
25      Q.  Do you know whether there was any discussion

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

257

Nevo - Highly Confidential

FTC v. Qualcomm, Inc.                                    8/10/2018

1    about the chip supply in the negotiations of those
2    licenses?
3         A.   Again, I don't -- I don't remember one way or
4    the other as I sit here today.
5         Q.   Do you know whether you ever knew that
6    information?
7         A.   Again, I can't remember right now.
8         Q.   So you don't know whether there were any
9    suggestion that chip supply would be interrupted, do
10   you?
11        A.   I did not look at the specifics of -- so I
12   can't -- as I sit here today -- sorry let me just -- as
13   I sit here today I can't recall any of those details.
14        Q.   Do you know whether Qualcomm ████████████████
15   ██████████████████████████████████████?
16        A.   As I sit here today, I can't answer one way or
17   the other.
18        Q.   So you don't know whether any financial
19   incentives were offered to those companies, do you?
20             MR. EVEN:   Objection.  Vague as to the term
21   financial incentives.
22        A.   As I said, as I sit here today, I don't recall
23   the specific details.
24        Q.   Can you look at paragraph 167 of your report.
25        A.   Sure.

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# EXHIBIT 3

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# EXHIBIT 4

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# EXHIBIT 5

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# EXHIBIT 6

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# EXHIBIT 7

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# FILED UNDER SEAL

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# EXHIBIT 8

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


FEDERAL TRADE COMMISSION,          Case No.
                                    5:17-cv-00220-LHK-
      Plaintiff,                NMC

      v.
                                      Case No.
QUALCOMM INCORPORATED, a        5:17-md-02773-LHK
Delaware corporation,

      Defendant.
_____

IN RE: QUALCOMM ANTITRUST
LITIGATION
_____


*** TRANSCRIPT DESIGNATED HIGHLY CONFIDENTIAL UNDER THE

PROTECTIVE ORDER ***


VIDEOTAPED DEPOSITION OF FABIAN GONELL


Friday, April 20, 2018, 9:05 a.m.


4655 Executive Drive, Suite 1500, San Diego, California


Reported by:

Harry Alan Palter

CSR No. 7708, Certified LiveNote Reporter

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Fabian Gonell   Highly Confidential Under The Protective Order
April 20, 2018

```
 1    of a deal that included a bunch of things from --
```
Fabian Gonell   Highly Confidential Under The Protective Order
April 20, 2018
```
 2    from them as well, including large up-front payments

 3    in both cases.

 4        Q     And what about Microsoft?

 5        A     Microsoft is a successor-in-interest to          17:49:32

 6    the Nokia agreements.  It's the same thing.

 7        Q     On the next page of this, CX7286-006 --

 8        A     Yes.

 9        Q     -- this has a messaging to external

10    audience at the top -- the bullet under the title.         17:49:50

11    And in the second sub-bullet from the bottom, says,

12    "Rates and caps for 5G are FRAND."  Do you see that?

13        A     Yes.

14        Q     Has Qualcomm done any analysis of whether

15    the rates and caps it has announced for 5G are             17:50:09

16    FRAND?

17        A     Any analysis of the FRAND-ness of that?

18              MR. BORNSTEIN:  So exclude from your

19    answer any litigation or legal analysis that the

20    question might call for -- if there is any.                17:50:29

21              THE WITNESS:  No.  I don't think that

22    analysis is possible yet because you don't have the

23    essential patents yet so you don't have any -- you

24    don't have products yet so you don't have the -- you
```
```
25    know, you don't have the underlying information you         17:50:42
```

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Fabian Gonell   Highly Confidential Under The Protective Order
April 20, 2018

1   need.

Fabian Gonell   Highly Confidential Under The Protective Order
April 20, 2018

2   BY MS. MILICI:

3      Q      Is there any way to evaluate at this

4   point whether the rate Qualcomm has announced for 5G

5   is FRAND?                                                          17:51:00

6      A      There's -- there's some data points you

7   can use.  And there's reasons why we think it's --

8   why we think it's FRAND.  But I don't know that you

9   can do an actual analysis without having products at

10  least.                                                            17:51:21

11     Q      Okay.  And what -- what are the data

12  points that you could use that are available now?

13     A      So we have existing -- we have existing

14  licenses for other technologies -- and, in

15  particular, 4G-related technologies.                              17:51:41

16            5G foundationally is going to be based on

17  a lot of the same stuff that 4G is based on.  So

18  there's going to be a lot of overlap, particularly

19  in the beginning.  And the applications -- use cases

20  are going to be largely the same.  Maybe there are    17:51:59

21  going to be some improved use cases but they're

22  going to be largely the same in many cases.  So

23  those factors point to 4G rates being a good proxy

24  for 5G rates.

25            It's not certain, of course, but those    17:52:21

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Fabian Gonell  Highly Confidential Under The Protective Order
April 20, 2018

```
 1   are -- that's information that's relevant.
```
Fabian Gonell  Highly Confidential Under The Protective Order
April 20, 2018
```
 2        Q     Are there other data points one could

 3   look at now to determine whether the announced 5G

 4   rates are FRAND?

 5        A     Not that I can think of offhand.              17:52:37

 6        Q     Okay.  And when you said earlier that you

 7   couldn't do a full analysis based on the information

 8   that's available now, what was the full analysis you

 9   were referring to?

10        A     Well, you know -- FRAND rates need to be     17:52:58

11   based on the value of the patented technologies to

12   the product.  If you don't have products to analyze,

13   you can't do that analysis.  That's -- it's -- yeah,

14   that's pretty much just what I meant.

15        Q     When you say the, "FRAND rates need to be    17:53:21

16   based on the value of the patented technologies to

17   the product," how is it that you base a royalty rate

18   on the value of the patented technology to the

19   product?

20        A     Um, through market forces and negotiation    17:53:34

21   mainly; right?  So you have information that you

22   think is relevant, and you say:  Okay.  So I think

23   the price should be "X." -- the other side has their

24   information -- the prices rely, and the people talk

25   about it, and they agree or disagree.  And if they    17:53:55
```

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
825 Eighth Avenue
New York, New York 10019-7475
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700

KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest (SBN 84065)
rvannest@keker.com
Eugene M. Paige (SBN 202849)
epaige@keker.com
Justina K. Sessions (SBN 270914)
jsessions@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Defendant
QUALCOMM INCORPORATED

MORGAN LEWIS & BOCKIUS LLP
Richard S. Taffet (*pro hac vice*)
richard.taffet@morganlewis.com
101 Park Avenue
New York, New York 10178-0060
Tel: (212) 309-6000
Fax: (212) 309-6001

MORGAN LEWIS & BOCKIUS LLP
Willard K. Tom (*pro hac vice*)
willard.tom@morganlewis.com
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Facsimile:  (202) 739-3001

MORGAN LEWIS & BOCKIUS LLP
Geoffrey T. Holtz (SBN 191370)
geoffrey.holtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>QUALCOMM INCORPORATED, a Delaware corporation,<br><br>Defendant. | Case No. 5:17-cv-00220-LHK-NMC<br><br>**DEFENDANT QUALCOMM INCORPORATED'S OPPOSITION TO FEDERAL TRADE COMMISSION'S MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR AVIV NEVO**<br><br>Date:  October 18, 2018<br>Time:  1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Judge:  Hon. Lucy H. Koh |

### **INTRODUCTION**

Based on an incorrect assertion that certain documents were improperly withheld by Qualcomm during fact discovery, the FTC seeks to exclude highly relevant opinions offered by Qualcomm's expert economist, Prof. Aviv Nevo, in direct response to opinions stated by the FTC's expert.  In particular, the FTC asks the Court to exclude Prof. Nevo's opinions based on two executed license agreements relating to fifth-generation ("5G") cellular technology that the FTC incorrectly contends were "late-produced".  (Mot. at 1, 6.)  In fact, neither agreement was reached—and therefore neither agreement was executed or in existence—until after fact discovery ended.  Qualcomm did not improperly withhold the agreements, and the FTC's suggestion of discovery misconduct has no basis.

The FTC's motion is therefore not aimed at striking opinions based on belatedly produced documents; it is aimed at limiting the ability of Qualcomm's expert to opine about current market conditions and to assess their likely effect on prospective events—even though the FTC is asking the Court to impose prospective injunctive relief.  The FTC's economic expert, Prof. Carl Shapiro, raised 5G licensing in his opening report, providing several opinions about the hypothesized future effects of Qualcomm's conduct on 5G technology.  Prof. Shapiro offered these opinions to support the FTC's claim that forward-looking injunctive relief is necessary to restore competition in modem chip markets.  In responding to Prof. Shapiro's opinions, Prof. Nevo observed in his rebuttal report that neither the FTC nor Prof. Shapiro had attempted to evaluate whether Qualcomm's announced 5G licensing terms are consistent with Qualcomm's FRAND commitments or include any alleged anticompetitive "tax".  To support that point, Prof. Nevo noted that several companies—including those that have entered into the license agreements at issue on this motion—have agreed to Qualcomm's 5G terms, at a time when Qualcomm does not sell 5G chips and thus cannot have any 5G market power, and at a time when Prof. Shapiro does not opine that Qualcomm has monopoly power in *any* relevant market.

Thus, the FTC brought 5G licensing into the case, and Prof. Nevo responded by referring in part to recent events that are directly relevant to—and refute—the FTC's argument.  The FTC

Qualcomm's Opposition to FTC's Motion to
Exclude Testimony of Prof. Aviv Nevo
Case No. 5:17-cv-00220-LHK-NMC

1  now asks the Court to prohibit Prof. Nevo from relying on these recent events and instead require

2  him to respond to Prof. Shapiro's hypotheses about 5G as if these events had never occurred.

3  There simply is no reason why Qualcomm's expert should be forced to opine about these issues—

4  which the FTC has raised to support a request for prospective injunctive relief—without the

5  benefit of real-world facts.  Neither Prof. Nevo nor, eventually, the Court should have to

6  speculate about events that already have transpired.

7        Prof. Nevo's opinions would cause no unfair prejudice to the FTC, let alone unfair

8  prejudice that substantially outweighs the probative value of his opinions.  The FTC's argument

9  that it did not have the opportunity to "test or rebut Prof. Nevo's conclusions" regarding these

10  agreements is incorrect.  (Mot. at 1.)  Qualcomm produced the agreements nearly one month

11  before the FTC served its rebuttal expert reports, giving the FTC and its experts ample

12  opportunity to respond to Prof. Nevo's opinions.  By the time of Prof. Shapiro's rebuttal report,

13  the FTC and Prof. Shapiro were fully aware of the two 5G agreements at issue and of Prof.

14  Nevo's opinions based on them, but simply did not address them.  Nor did the FTC raise any

15  contemporaneous objection to the production of the 5G agreements, but instead waited and raised

16  the issue for the first time in this motion.

17        To the extent the FTC advocates a blanket rule prohibiting an expert from opining about

18  events occurring after the close of fact discovery, that is contrary to law, and especially so in a

19  case seeking prospective injunctive relief—which must necessarily take into account current

20  conditions near the time any prospective remedy would be ordered.  Because the FTC has failed

21  to prove that the probative value of Prof. Nevo's opinions is substantially outweighed by any

22  unfair prejudice, the FTC's motion should be denied.

23                    **STATEMENT OF FACTS**

24  **A.    The License Agreements Were Reached After the Close of Fact Discovery.**

25  ███████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████

27  (Declaration of J. Milici in Support of FTC's Motion ("Milici Decl.") Ex. 3), and the █████████

28

████████████████████████████████████████████████████

██████████████████████████████ (Milici Decl. Ex. 5).  The FTC's

Motion asserts that, "[a]ccording to the [Rebuttal Report of Prof. Aviv Nevo ("Nevo Report")],

████████████████████████████████████████████████████,

respectively.  (Mot. at 3.)  Prof. Nevo's Report, however, refers to the *effective* dates of the

agreements, not to their dates of execution.  As explained in the Declaration of Fabian Gonell

accompanying this brief, it is not uncommon for parties to agree that the effective date of a

license agreement, █████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████ (Gonell Decl. ¶ 7.)

On its face, the ████████████████████████████████

████████████████████████.  (Milici Decl. Ex. 5; *see also* Gonell Decl.

¶ 6.)[1] ██████████████████████████████████████████████

██████████████████████████████.  (Gonell Decl. ¶ 4.)  Accordingly,

Qualcomm could not have produced the agreements prior to the close of fact discovery or prior to

the deposition of Qualcomm's Rule 30(b)(6) designee on certain licensing topics (Mr. Gonell)

because ██████████████████████████████.  Had the FTC asked Qualcomm why the

agreements were produced after the close of fact discovery, Qualcomm could and would have

provided information about ████████████████—but the FTC did not do so.  It first registered

an objection to what it now alleges were "late-produced" agreements by bringing the instant

motion.  (Mot. at 6.)  Similarly, the FTC's allegation that at deposition Mr. Gonell improperly

"made no mention of the licenses or negotiations, even though one had already been ████████"

(Mot. at 4) is incorrect; ████████████████████████████ by the date of the deposition (Gonell

Decl. ¶¶ 4, 6), and the FTC did not ask Mr. Gonell any questions to which information about the

---

[1] Indeed, at one point, the FTC's motion acknowledges that the ██████████████████████
██████████████████████ as the motion elsewhere suggests, but repeats the
FTC's erroneous assumption that the ██████████████████████████████████████.
(Mot. at 4 n.5.)

Qualcomm's Opposition to FTC's Motion to
Exclude Testimony of Prof. Aviv Nevo
Case No. 5:17-cv-00220-LHK-NMC

1 | negotiations of these agreements would have been responsive.

2 |      The FTC contends that the two at-issue license agreements were produced "after . . . the

3 | deadline for the submission of the FTC's expert reports had passed."  (Mot. at 3.)  But the ███

4 | ███████████████ was produced on June 22, 2018, and the ████████████ was

5 | produced on June 28, 2018, four weeks before the FTC's deadline for service of rebuttal expert

6 | reports, on July 26, 2018.  (Declaration of M. Brent Byars in Support of Qualcomm's Opposition

7 | ("Byars Decl.") ¶¶ 2, 3.)  Because the ████████████████████ and Prof. Nevo's

8 | opinions based on them were disclosed in Prof. Nevo's report, which Prof. Shapiro responded to

9 | in his rebuttal report, Prof. Shapiro knew about and had access to those two 5G license

10 | agreements when preparing his rebuttal report.  And in his rebuttal report, Prof. Shapiro

11 | specifically addressed 5G, claiming that he "would expect the anticompetitive effects from the

12 | Qualcomm policies at issue in this case to continue into the future", including in licenses for the

13 | 5G standard.  (Byars Decl. Ex. 2 (Rebuttal Report of Prof. Carl Shapiro ("Shapiro Rebuttal

14 | Report")) ¶ 113.)  The fact that Prof. Shapiro decided not to consider or address the ████████

15 | ███████████████ is therefore the result of the FTC's tactical decision to ignore real-

16 | world evidence of 5G licensing, have Prof. Shapiro opine about future 5G licensing as if that

17 | evidence did not exist, and then seek to exclude Prof. Nevo's opinions that take actual 5G

18 | agreements into account.

19 |     **B.**    **The License Agreements Are Highly Relevant to Opinions Proffered by the**

20 |             **FTC's and Qualcomm's Economists.**

21 |      Because the FTC seeks prospective injunctive relief that would cover 5G licensing,

22 | Prof. Nevo's opinions about recently executed 5G license agreements are highly relevant.  In its

23 | Complaint, the FTC requests that Qualcomm be "permanently enjoined from engaging in similar

24 | and related conduct in the future".  (Compl. Prayer for Relief ¶ 3.)  To support this request,

25 | Prof. Shapiro's opening report offers the opinion that although "recent erosion of Qualcomm's

26 | monopoly power" in the relevant chipset markets "might eventually diminish" Qualcomm's

27 | ability to engage in the alleged anticompetitive conduct, "the industry's imminent transition to 5G

28 |

Qualcomm's Opposition to FTC's Motion to
Exclude Testimony of Prof. Aviv Nevo
Case No. 5:17-cv-00220-LHK-NMC

1   standards may afford Qualcomm an opportunity to renew and fortify that ability".  (Byars Decl.

2   Ex. 1 (Opening Report of Prof. Carl Shapiro ("Shapiro Opening Report")) ¶ 313.)  In support of

3   this opinion, Prof. Shapiro cited a document dating back to 2016 concerning then-current

4   assessments of the future of 5G and of Qualcomm's 5G chips.  (*Id.* ¶ 314 n.595.)  In Prof. Nevo's

5   rebuttal report, which Qualcomm timely served on June 28, 2018, Prof. Nevo responded to those

6   opinions by explaining that Qualcomm had publicly announced its 5G licensing rates in

7   November 2017, during a time when Qualcomm is not alleged to have any market power in 5G

8   chips (or in any other chips) that it could bring to bear.[2]  (Ex. 1 to Milici Decl. (Nevo Report)

9   ¶ 296.)  Prof. Nevo further explained that ███████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ████████████████████████████████.[3]  (*Id.*)  Prof. Nevo provided these

12  explanations in support of his opinion that "[n]either Professor Shapiro nor the other FTC experts

13  have made any attempt to evaluate whether Qualcomm's 5G rates are not FRAND or include any

14  'tax.'"  (*Id.*)

15  **ARGUMENT**

16          The Court should exclude relevant evidence under Federal Rule of Evidence 403 only "if

17  its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the

18  issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

19  evidence".  Fed. R. Evid. 403.  "'Unfair prejudice' within its context means an undue tendency to

20  suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

21  Fed. R. Evid. 403 Notes of Advisory Committee on Proposed Rules.  Rule 403 is designed

22  primarily to prevent a jury from being inappropriately influenced by relevant but unfairly

23

24  [2] Prof. Shapiro is not offering an opinion that Qualcomm has monopoly power in *any* relevant

25  chip market—3G, 4G or 5G—at any point after 2016.  (Byars Decl. Ex. 3 (Deposition of Carl Shapiro) at 135:18-21.)

26  [3] The FTC's Complaint alleges that Qualcomm had monopoly and market power only with respect to CDMA baseband processors and "premium LTE" baseband processors.  (Compl.

27  ¶ 131.)  The FTC does not allege power in 5G baseband processors.  Nor could it, because such 5G baseband processors are not yet commercially available.

28

5

Qualcomm's Opposition to FTC's Motion to<br>Exclude Testimony of Prof. Aviv Nevo<br>Case No. 5:17-cv-00220-LHK-NMC

1    prejudicial evidence; in bench trials, where the fact-finder is less likely to be improperly

2    influenced, Rule 403 does not perform as significant a function.  *See EEOC v. Farmer Bros. Co.*,

3    31 F.3d 891, 898 (9th Cir. 1994) ("[I]n a bench trial, the risk that a verdict will be affected

4    unfairly and substantially by the admission of irrelevant evidence is far less than in a jury trial.").

5           The FTC does not argue that Prof. Nevo's opinions are irrelevant.  As the FTC's motion

6    explains, "[c]ore to the FTC's theory is Qualcomm's ability to leverage its modem chip monopoly

7    power in licensing negotiations to obtain elevated royalties."  (Mot. at 3.)  Therefore,

8    Prof. Nevo's opinion that neither the FTC nor Prof. Shapiro had evaluated whether Qualcomm

9    could engage in the alleged conduct (*i.e.*, "leverag[ing] its modem chip monopoly power in

10   licensing negotiations to obtain elevated royalties") in the context of 5G licensing is highly

11   relevant to the FTC's claim for prospective injunctive relief and to the assessment of

12   Prof. Shapiro's opinions.  Prof. Nevo observed that Qualcomm had publicly announced 5G

13   licensing terms and █████████████████████████████████████████████████

14   ███████████████████████████████████████ that the FTC acknowledges is

15   core to its theory of the case.  (Mot. at 3.)

16          Because a decision on whether to grant prospective relief must consider current conditions

17   near the time of trial, such evidence is of critical importance.  *See, e.g.*, *FTC v. Evans Prods. Co.*,

18   775 F.2d 1084, 1087 (9th Cir. 1985) (stating that preliminary injunctive relief was precluded

19   where the conduct was neither ongoing nor likely to recur, even if the defendant had engaged in

20   anticompetitive conduct in the past); *FTC v. AbbVie Inc.*, No. 14-5151, 2018 WL 3830533, at *35

21   (E.D. Pa. June 29, 2018) (denying the FTC's request for injunctive relief because there was no

22   basis to conclude defendants' misconduct was likely to recur where, despite their liability for past

23   violations, "the FTC has presented no evidence that defendants are currently violating antitrust

24   laws or about to violate antitrust laws"); *FTC v. Merch. Servs. Direct, LLC*, No. 13-CV-0279-

25   TOR, 2013 WL 4094394, at *3 (E.D. Wash. Aug. 13, 2013) (declining to enter temporary

26   injunctive relief in a Section 5 case because the FTC's evidence about the defendant's conduct

27   was two years old and the FTC did not present evidence of likely "*future* violations of the FTC

28

Qualcomm's Opposition to FTC's Motion to
Exclude Testimony of Prof. Aviv Nevo
Case No. 5:17-cv-00220-LHK-NMC

Act"). Indeed, to the extent that the FTC contends that neither party's expert can rely on *any* evidence that is created after the close of fact discovery, such a rule is flatly inconsistent with the law governing requests for injunctive relief in FTC cases. For example, if recent news reports that the Apple iPhones released this month do not contain any Qualcomm chips are accurate (*see, e.g.*, Byars Decl. Ex. 4), that is information the Court should have in deciding whether Qualcomm has market power that it could exercise in the future.

Further, the FTC has cited no law suggesting that the Court must disregard highly probative evidence because it did not exist until after the end of fact discovery, as the FTC's motion suggests—and it certainly has not cited any case law suggesting that highly probative evidence should be altogether excluded in an injunctive relief case, such that the parties' experts must ignore its existence. *Cf. Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 933 (9th Cir. 2002) (reversing district court exclusion of evidence obtained after discovery cutoff). In this Court's *Apple v. Samsung* decision on which the FTC relies almost exclusively, the Court was confronted with a very different situation—belated production of old evidence, rather than consideration of new (and timely produced) evidence. There, the Court found that although an affiliate of Samsung had compiled data during the discovery period on which Samsung's expert later relied, Samsung improperly failed to disclose that data until "hours before the discovery cutoff", after Apple had completed fact depositions. *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2018 WL 1586276, at *24 (N.D. Cal. Apr. 2, 2018). Further, the Court found that Samsung had not disclosed the existence of its affiliate or the custodian of the data in its interrogatory responses, and that Samsung further represented to Apple that the data's custodian "did not have any additional discoverable information"—even though Samsung's expert continued to speak to the custodian regarding the data. *Id.* This conduct, the Court found, prevented Apple from "conducting any inquiry into the reliability of the SDC data", which would unduly prejudice Apple's case in front of the jury hearing the parties' dispute concerning damages. *Id.*

Unlike in *Apple v. Samsung*, there was no sandbagging here. Qualcomm did not

Qualcomm's Opposition to FTC's Motion to
Exclude Testimony of Prof. Aviv Nevo
Case No. 5:17-cv-00220-LHK-NMC

1   improperly delay producing agreements that existed during fact discovery; the agreements did not

2   exist until after fact discovery had closed and the FTC had completed fact depositions.

3   Qualcomm timely disclosed and produced the agreements and its expert's reliance on them once

4   they came into existence, weeks prior to the deadline for service of the FTC's rebuttal expert

5   reports. (Byars Decl. ¶¶ 2,3.) Prof. Shapiro was aware of the ███████████████████████

6   ███████████ and of Prof. Nevo's opinions based on them; yet, he chose not to address them.

7   Contrary to the FTC's suggestion that Qualcomm has "cherry-picked" these two agreements

8   (Mot. at 6), denying the FTC the opportunity to determine "whether the terms are representative

9   of other in-progress or concluded 5G license negotiations" (Mot. at 5), Qualcomm has continued

10  producing other concluded 5G agreements, many before the FTC filed this motion—and the FTC

11  could have reviewed those productions to assess whether those agreements are consistent with the

12  ███████████████████████████████. (Byars Decl. ¶ 4.)

13         And, unlike in a dispute over damages between private parties, such as *Apple v. Samsung*,

14  the FTC's request for prospective injunctive relief makes evidence concerning Qualcomm's

15  contemporaneous conduct and contemporaneous market conditions critical to the Court's

16  decision, which cannot be made on a stale record.

17         Further, the FTC argues that it "had no opportunity to conduct discovery regarding the

18  two licenses cited by Prof. Nevo" (Mot. at 4), but the FTC never requested such discovery. As

19  discussed above, in *Apple v. Samsung*, unlike here, through representations that Samsung lacked

20  additional discoverable information, Samsung affirmatively denied Apple the opportunity to

21  obtain information about the excluded data. *See Apple*, 2018 WL 1586276, at *24. Qualcomm

22  made no such representations. In fact, Qualcomm alerted the FTC as early as November 2017

23  that it believed "the Parties should have the mutual opportunity to conduct a limited update of

24  document and deposition discovery closer to the time of trial to ensure that the record contains

25  contemporaneous evidence bearing on the elements of the FTC's claims . . . and whether the FTC

26  is entitled to forward-looking injunctive relief." (*See* Dec. 8, 2017 Suppl. Joint Case

27  Management Statement, ECF No. 378 at 5.) Although the FTC "disagree[d] that, based on the

28

8

Qualcomm's Opposition to FTC's Motion to
Exclude Testimony of Prof. Aviv Nevo
Case No. 5:17-cv-00220-LHK-NMC

1   allegations in its Complaint, it will inevitably be necessary to reopen discovery", it acknowledged

2   that whether discovery would be reopened closer to the time of trial "will depend on the relevance

3   of the additional discovery, the time to trial, and whether a party will be prejudiced, among other

4   factors."  (*Id.* at 5-6.)

5         Given the need for the Court to consider current conditions before it may issue

6   prospective injunctive relief, a rigid rule excluding all expert opinions based on events occurring

7   after the close of fact discovery—a rule that would require experts to ignore available evidence

8   about current market conditions—would improperly deprive the Court of critical evidence.  If the

9   FTC believed it needed discovery to assess the reliability of Prof. Nevo's opinions based on the

10   5G agreements, it should have raised its need for such discovery with Qualcomm (as expected

11   when discovery disputes arise (*see* Civ. L.R. 37-1)), rather than simply moving, without prior

12   discussion, to exclude the opinions under Rule 403.

13                   **<u>CONCLUSION</u>**

14         For the foregoing reasons, Qualcomm respectfully requests that the Court deny the FTC's

15   motion to exclude the expert testimony and opinions of Prof. Aviv Nevo based upon or

16   concerning the ███████████████████████████ .

17   Dated:  September 24, 2018

18                         Respectfully submitted,

19                         CRAVATH, SWAINE & MOORE LLP,

20

21                           /s/ *Gary A. Bornstein*

22                             Gary A. Bornstein
                                Yonatan Even

23                         Worldwide Plaza

24                         825 Eighth Avenue
                         New York, NY 10019

25                         Tel: (212) 474-1000
                         Fax: (212) 474-3700

26                            gbornstein@cravath.com
                            yeven@cravath.com

27

28

Robert A. Van Nest
Eugene M. Paige
Justina K. Sessions
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Tel: (415) 391-5400
Fax: (415) 397-7188
rvannest@keker.com
epaige@keker.com
jsessions@keker.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Tel: (212) 309-6000
Fax: (212) 309-6001
richard.taffet@morganlewis.com

Willard K. Tom
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Tel: (202) 739-3000
Fax: (202) 739 3001
willard.tom@morganlewis.com

Geoffrey T. Holtz
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: (415) 442-1000
Fax: (415) 442-1001
geoffrey.holtz@morganlewis.com

*Attorneys for Qualcomm Incorporated*

Qualcomm's Opposition to FTC's Motion to
Exclude Testimony of Prof. Aviv Nevo
Case No. 5:17-cv-00220-LHK-NMC

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
825 Eighth Avenue
New York, NY 10019-7475
Telephone:   (212) 474-1000
Facsimile:   (212) 474-3700

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet (*pro hac vice*)
richard.taffet@morganlewis.com
Willard K. Tom (*pro hac vice*)
willard.tom@morganlewis.com
Donn P. Pickett (SBN 72257)
donn.pickett@morganlewis.com
Geoffrey T. Holtz (SBN 191370)
geoffrey.holtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone:  (415) 442-1000
Facsimile:  (415) 442-1001

KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest (SBN 84065)
rvannest@keker.com
Eugene M. Paige (SBN 202849)
epaige@keker.com
Justina K. Sessions (SBN 270914)
jsessions@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Defendant
QUALCOMM INCORPORATED

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware corporation,<br><br>Defendant. | Case No. 5:17-CV-00220-LHK-NMC<br><br>**DECLARATION OF M. BRENT BYARS IN SUPPORT OF QUALCOMM'S OPPOSITION TO FEDERAL TRADE COMMISSION'S MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR AVIV NEVO**<br><br>Courtroom:  8, 4th Floor<br>Judge:  Hon. Lucy H. Koh |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF M. BRENT BYARS

I, M. Brent Byars, hereby declare as follows:

1.      I am an associate at Cravath, Swaine & Moore LLP, counsel of record for Defendant Qualcomm Incorporated ("Qualcomm") in *Federal Trade Commission v. Qualcomm Incorporated*, Case No. 17-cv-00220-LHK-NMC.  I submit this declaration in support of Qualcomm's Opposition to Federal Trade Commission's Motion to Exclude Expert Testimony of Professor Aviv Nevo (the "Opposition").  I have personal knowledge of the facts set forth herein, or my knowledge is based upon my review of records of this case.  If called upon as a witness in this action, I could and would testify competently thereto.

2.      The ███████████████████████████████ ████████████████████████ was produced bearing Bates number QAPPCMSD10051179 on June 22, 2018.

3.      The ███████████████████████████████ ████████████████████████ was produced bearing Bates number QAPPCMSD10052189 on June 28, 2018.

4.      Qualcomm has continued producing other concluded license agreements covering the fifth-generation ("5G") standard, including many license agreements covering the 5G standard that were produced prior to August 30, 2018.

5.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the Expert Report of Professor Carl Shapiro, dated May 24, 2018.  Portions of Exhibit 1 that contain or reference information designated as "Highly Confidential—Attorneys' Eyes Only" by Apple Inc. and that are not relevant to the Opposition have been redacted.

6.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the Rebuttal Report of Professor Carl Shapiro, dated July 26, 2018.

Declaration of  M. Brent Byars
Case No. 5:17-cv-00220-LHK-NMC

7.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the deposition of Professor Carl Shapiro, which took place on August 16, 2018.

8.      Attached hereto as Exhibit 4 is a true and correct copy of the article found at https://www.news18.com/news/tech/as-new-iphones-go-on-sale-studies-reveal-chips-from-intel-and-toshiba-1886845.html, accessed on September 24, 2018.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this day, September 24, 2018, in New York, New York.

_____
M. Brent Byars

Declaration of M. Brent Byars
Case No. 5:17-cv-00220-LHK-NMC

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
825 Eighth Avenue
New York, NY 10019-7475
Telephone:  (212) 474-1000
Facsimile:   (212) 474-3700

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet (*pro hac vice*)
richard.taffet@morganlewis.com
Willard K. Tom (*pro hac vice*)
willard.tom@morganlewis.com
Donn P. Pickett (SBN 72257)
donn.pickett@morganlewis.com
Geoffrey T. Holtz (SBN 191370)
geoffrey.holtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone:  (415) 442-1000
Facsimile:  (415) 442-1001

Attorneys for Defendant
QUALCOMM INCORPORATED

KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest (SBN 84065)
rvannest@keker.com
Eugene M. Paige (SBN 202849)
epaige@keker.com
Justina Sessions (SBN 270914)
jsessions@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware corporation,<br><br>Defendant. | Case No. 5:17-CV-00220-LHK-NMC<br><br>**DECLARATION OF FABIAN D. GONELL IN SUPPORT OF QUALCOMM'S OPPOSITION TO FEDERAL TRADE COMMISSION'S MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR AVIV NEVO**<br><br>Courtroom:  8, 4th Floor<br>Judge:  Hon. Lucy H. Koh |

1

## <u>DECLARATION OF FABIAN D. GONELL</u>

2      I, Fabian D. Gonell, hereby declare as follows:

3      1.      I am Senior Vice President of Licensing Strategy and Legal Counsel at

4  Qualcomm Incorporated ("Qualcomm").

5      2.      I respectfully submit this declaration in support of Qualcomm's

6  Opposition to Federal Trade Commission's Motion to Exclude Expert Testimony of

7  Professor Aviv Nevo.

8      3.      I was involved in negotiating on behalf of Qualcomm the ███████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████, which was produced bearing Bates

11 number QAPPCMSD10051179.

12     4.      ████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ██████████████████████████████████████████████

16 ████████████████████████████

17     5.      I also was involved, to a lesser extent, in ████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ██████ which was produced bearing Bates number QAPPCMSD10052189.

21     6.      ████████████████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████

25 ██████████████████████████████████.

26

27                        Declaration of  Fabian D. Gonell
                         Case No. 5:17-cv-00220-LHK-NMC
28

7.   It is not uncommon for ████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this day, September 21, 2018, in San Diego, California.

_____
Fabian D. Gonell

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-CV-00220-LHK** |
| **QUALCOMM INCORPORATED, a Delaware Corporation,** | |
| **Defendant.** | |

**EXPERT REPORT OF CARL SHAPIRO**

**24 May 2018**

**HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY**

who purchase handsets.[592] These harms to consumers can be magnified over time as rival modem chip suppliers reduce their investments or exit the market.

(309)    Qualcomm's conduct also enables Qualcomm to profitably raise the all-in price for Qualcomm's own modem chips. This causes further harm to consumers. Qualcomm's conduct allows Qualcomm to profitably raise its all-in modem chip prices for two reasons.

(310)    First, as the all-in price of Qualcomm's rivals goes up, Qualcomm faces a weakened competitive constraint on its modem chip pricing from those rivals. This causes Qualcomm's profit-maximizing all-in price for its modem chips to go up.

(311)    Second, because Qualcomm's conduct causes rivals to pay an extra $x$ to Qualcomm in royalties for every modem chip they sell, Qualcomm's conduct also causes Qualcomm's opportunity cost of selling a modem chip to go up.[593] This higher cost makes it profitable for Qualcomm to raise its all-in price, given the elevated per-unit royalty.

(312)    In sum, Qualcomm's no-license/no-chips policy has fortified and prolonged Qualcomm's monopoly power in the market for CDMA Modem Chips and in the market for Premium LTE Modem Chips.

(313)    Though recent erosion of Qualcomm's monopoly power in those markets might eventually diminish Qualcomm's ability to implement its no-license/no-chips policy, the industry's imminent transition to 5G standards may afford Qualcomm an opportunity to renew and fortify that ability. Qualcomm's Willenegger has testified that transitions of this kind—from one generation of cellular standards to the another—represent "discontinuities" and that modem-chip suppliers' "ability . . . to sustain their business[es] . . . heavily depends on [their] ability to navigate that transition."[594]

(314)    Qualcomm's customers and rivals have expressed concern that Qualcomm may replicate its dominance in the sale of Premium LTE Modem Chips in the sale of 5G modem chips. ███████████
████████████████████████████████████████████████████████████████████████

---

[592]    *See* Investigative testimony of Jeff Williams (Apple), 19:25–20, Sep. 16, 2016 ("Q. Once Apple has established a bill of materials target for an iPhone, what's the consequence of a particular item on the bill of materials coming in above the target cost? A. The cost of components affects the total cost for Apple to produce and run its operations . . . And so as the cost of the component goes up, it challenges the model of delivering value to the shareholder at a price that's great for customers . . . Q. So if a given component is coming in at a higher cost, is it possible that Apple would, as a result of that cost increase, pass the increased cost on to consumers? A. Correct. Q. Is it also possible that Apple would eliminate other features from the bill of materials to keep the overall bill of materials cost at target? A. Not likely. Apple tends to – we focus on making the best phones possible for our customers.").

[593]    This opportunity cost includes the foregone SEP licensing revenue from the rival on all chips diverted to Qualcomm from the rival when Qualcomm sells additional modem chips. The opportunity cost is the aggregate diversion ratio from all of the rivals multiplied by the per-unit SEP royalty paid by those rivals.

[594]    Deposition of Serge Willenegger (Qualcomm), 77:17–78:5, 80:6–80:21, Feb. 9, 2018 (explaining that a modem-chip supplier's competitive position rests on how it "structure[s] its product offering relative to [such a] technology transition").



598

(315)   On similar lines, a November 2015 presentation delivered by consultants from the Boston Consulting Group (BCG) to Qualcomm's board of directors[599] observed that Qualcomm's competitive advantage over other modem-chip suppliers has been "strongest at the onset of a standard."[600] The consultants observed that this strength had implications for the "enablement stick" that Qualcomm deploys to enforce compliance with QTL's licensing program: namely, when QCT "has a far superior product, OEMs want to purchase their products, and will comply in order to gain access to these chips."[601] The BCG consultants observed that, though Qualcomm's ability to wield the enablement stick had diminished as competitors narrowed the gap between their chips and Qualcomm's,[602] Qualcomm would have an opportunity to "revive" the stick as the industry transitioned to 5G.[603]

## IX.F. Business Justifications

(316)   I have considered possible business justifications for Qualcomm's no-license/no-chips policy. Qualcomm has offered three such business justifications that I address here.

(317)   First, Qualcomm has stated: "Qualcomm is not and should not be required to assist in the infringement of its own patents by selling modem chips to infringers."[604] However, selling modem chips to an OEM at Qualcomm's chosen all-in price does not "assist in the infringement of its own

---

595   Email from Todd Madderom, Motorola, to Hui Lv, Lenovo, May 18, 2016 (MOTO-QUALSUB-01147200).

596   Deposition of Todd Madderom (Motorola), 236:7–237:3, Mar. 16, 2018.

597   Deposition of John Finbarr Moynihan (MediaTek), 350:20–353:9, Mar. 13, 2018.

598   Deposition of John Finbarr Moynihan (MediaTek), 97:10–98:10, Mar. 12, 2018.

599   *See* ¶ (291) for more background on Project Phoenix and the context in which this presentation was delivered.

600   Boston Consulting Group, "Project Phoenix: Considerations for Alternative Corporate Structure(s)" (draft presentation, Nov. 9, 2015), 11 (BCG00014896, -4910).

601   Boston Consulting Group, "Project Phoenix: Considerations for Alternative Corporate Structure(s)" (draft presentation, Nov. 9, 2015), 17 (BCG00014896, -4916).

602   Boston Consulting Group, "Project Phoenix: Considerations for Alternative Corporate Structure(s)" (draft presentation, Nov. 9, 2015), 17 (BCG00014896, -4916).

603   Boston Consulting Group, "Project Phoenix: Considerations for Alternative Corporate Structure(s)" (draft presentation, Nov. 9, 2015), 17 (BCG00014896, -4916).

604   Submission of Qualcomm Incorporated to the Federal Trade Commission Regarding Qualcomm's Chip Supply Practice, Dec. 2, 2016, 20, footnote omitted.

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

**FEDERAL TRADE COMMISSION,**

        **Plaintiff,**

**v.**

**QUALCOMM INCORPORATED, a**
**Delaware Corporation,**


        **Defendant.**

**Case No. 17-CV-00220-LHK**

**REBUTTAL REPORT OF CARL SHAPIRO**

**26 July 2018**

**Contains Protected Material Designated by Qualcomm and Non-Parties**
**Pursuant to Protective Order(s) entered in FTC v. Qualcomm Incorporated,**
**Case No. 17-cv-00220 (N.D. Cal.)**

Rebuttal Report of Carl Shapiro

data and other evidence, nor into the future, but that does not affect the anti-competitive nature of Qualcomm's course of conduct.

(112)  In addition, my initial report cited recent developments that show there is good reason to be concerned about the continuing impact of Qualcomm's course of conduct. For example, Qualcomm reports that it has a significant lead over competitors in the development of 5G-compliant chips.[115] The head of Qualcomm's chip business has similarly cited a Qualcomm "first mover advantage" in 5G.[116] Predicting that strong position in 5G a November 2015 presentation delivered by consultants from the Boston Consulting Group (BCG) to Qualcomm's board of directors[117] observed that Qualcomm's competitive advantage over other modem-chip suppliers has been "strongest at the onset of a standard."[118]

(113)  5G-compliant chips are not being incorporated into commercial handsets until 2019. It is thus not possible reliably to analyze the market for 5G chips at this time. But if the 5G lead that Qualcomm expects materializes, and OEMs are as reliant on Qualcomm for 5G chips as they have been in the past for CDMA and premium LTE chips, then I would expect the anticompetitive effects from the Qualcomm policies at issue in this case to continue into the future.

---

[115]  Shapiro Report, ¶ 66; *see also* Statement of Qualcomm CEO Steven M. Mollenkopf during April 25, 2018 Qualcomm earnings call, *available at* https://seekingalpha.com/article/4165969-qualcomm-qcom-q2-2018-results-earnings-call-transcript (discussing market transition to 5G and stating that "[o]ur modem leadership continues")

[116]  Mike Dano, "Qualcomm touts 5G momentum amid battles with Intel, Broadcom," *FierceWireless*, Feb. 8, 2018, https://www.fiercewireless.com/5g/qualcomm-touts-5g-momentum-amid-battles-intel-broadcom. *See also* Qualcomm, "Making 5G NR a Commercial Reality," at 17, *available at* https://www.qualcomm.com/media/.../files/making-5g-nr-a-commercial-reality.pdf (referencing Qualcomm's "industry-leading 5G NR interoperability testing").

[117]  *See* Shapiro Report, ¶¶ 290–291 for more background on Project Phoenix and the context in which this presentation was delivered.

[118]  Boston Consulting Group, "Project Phoenix: Considerations for Alternative Corporate Structure(s)" (draft presentation, Nov. 9, 2015), 11 (BCG00014896, -4910).

Contains Protected Material Designated by Qualcomm and Non-Parties
Pursuant to Protective Order(s) entered in FTC v. Qualcomm Incorporated,
Case No. 17-cv-00220 (N.D. Cal.)                                      Page 39