# CX5391

# REVISED REDACTED VERSION

| | |
|---|---|
| From: | Lederer, Jim |
| To: | Amon, Cristiano; Mollenkopf, Steven |
| Sent: | 4/16/2013 12:46:19 AM |
| Subject: | FW: Final Accounting Memo: Q2FY13 Apple Incentive Agreements |
| Attachments: | Apple Incentive offers - Q2FY13.doc.docx |

Nice, easy read detailing our agreements with Apple......

**From:** Dill, Roel
**Sent:** Wednesday, April 10, 2013 4:50 PM
**To:** Aberle, Derek; Reifschneider, Eric; Abadeer, Peter; Griffith, Larry; Cianflone, David; Gonell, Fabian; Mehta, Sanjay; Chivetta, Charles; Frizzell, Kevin; McCloskey, Marc; Sullivan, Ammon; Wyatt, Will
**Cc:** Henson, Jamie; Polek, Erin; Ford, Joyce; Mersy, Dustin; Thomas, Chris; Bono, Sal; Gardner, Steve; Wapner, Beth; Wagner, Heidi; Schneck, Howard; Sadulsky, Robert; 'taxprov.memos@sharepoint.qualcomm.com'; peter.g.wieghaus@us.pwc.com
**Subject:** Final Accounting Memo: Q2FY13 Apple Incentive Agreements

The attached accounting memo has been reviewed and approved by Jamie Henson (for Corporate Accounting). The memo has also been read by PwC as part of their quarterly review or annual audit procedures.

Regards,

Roel Dill
Accounting Practices and Reporting
Qualcomm Incorporated
Phone: 858-651-0830
Fax: 858-651-5983
Email: rdill@qualcomm.com

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02755000
Q2017MDL1_02588048

CX5391-001

## QUALCOMM Incorporated
Accounting Memo

To: Corporate Accounting File
Prepared by: Roel Dill
Date: March 11, 2013
Subject: Q2FY13 Apple Incentive Agreements

---

On February 28, 2013 Qualcomm Incorporated ("Qualcomm") and Apple Inc. ("Apple") executed the following agreements (collectively referred to as the "Agreements"):

- Business Cooperation and Patent Agreement (the "BCPA Agreement"), effective January 1, 2013
- First Amendment to Transition Agreement (the "Amendment"), effective January 1, 2013[1]
- Amended and Restated Strategic Terms Agreement (the "ST Agreement"), effective February 28, 2013
- Statement of Work for Qualcomm Chipsets (the "SOW"), effective February 28, 2013

The following matters are summarized below solely for accounting purposes, and the text below should not be considered a substitute for or an interpretation of the full text of the Agreements. Refer to the respective Agreement for definitions of capitalized terms in this memo.

We consider whether the Agreements shall be evaluated as a single arrangement. The Accounting Standards Codification (ASC) provides guidance in ASC 605-25-25-3 *"Revenue Recognition – Multiple Element Arrangements – Units of Accounting"* which states: *"In applying the guidance in this Subtopic, separate contracts with the same entity or related parties that are entered into at or near the same time are presumed to have been negotiated as a package and shall, therefore, be evaluated as a single arrangement in considering whether there are one or more units of accounting. That presumption may be overcome if there is sufficient evidence to the contrary."*

Since the Agreements were negotiated at the same time and there is not sufficient evidence to show that they are separable, the presumption in ASC 605-25-25-3 has not been overcome, and the Agreements will be evaluated as a single arrangement.

### Summary of the BCPA Agreement

*Term and Conditions*
- The Term of the BCPA Agreement is from January 1, 2013 through December 31, 2016. Either Party may terminate the BCPA Agreement for no reason, effective 21 months after written notice to the other Party of such termination. Such termination notice cannot be provided prior to December 31, 2014.[2]
- Through December 31, 2015, Apple will include one or more CDMA Standards in all Apple Phones it markets and sells.
- Through December 31, 2015, Apple will market and sell at least one model of an Apple Phone that includes a CDMA2000 Standard in the United States, Japan and China.
- During the Term, Apple will include one or more WCDMA Standards in at least one model of an Apple Tablet it markets and sells.
- Apple will work with Qualcomm to address certain Bluetooth matters in support of certain of Qualcomm's products as further discussed in the BCPA Agreement.
- Apple senior executives will meet at least semi-annually with Qualcomm senior executives to review Qualcomm Products and industry trends and to consider new technology opportunities that may be of mutual benefit. Apple shall consider in good faith the adoption of any such Qualcomm Products and technologies, including Qualcomm's display technologies; however, each Party will have absolute discretion over its products and technology roadmaps.

---

[1] Qualcomm CDMA technologies Asia-Pacific Pte. Ltd. (QCTAP) is also a party to the Amendment. QCTAP and Qualcomm Incorporated are together referred to as "Qualcomm" in the discussion under the heading **Summary of the Amendment**.
[2] Either party may terminate the BCPA Agreement at any time for cause, see the BCPA Agreement for further details.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02755001
Q2017MDL1_02588049

CX5391-002

Q2FY13 Apple Incentive Agreements
Page 2 of 8

- Apple shall not Assert (and shall ensure none of its Affiliates Asserts) any Apple Patent against any Qualcomm Party or Qualcomm Supplier for:

    I. making (or having made) Qualcomm Components during the Term;
    II. using Qualcomm Components during the Term; or
    III. importing Qualcomm Components during the Term.

- Qualcomm will have the option to designate as ineligible for Injunctive Relief up to 5 Apple Patents that have been asserted by an Apple Party during the Term and that such Apple Party claims are infringed by a product containing a Qualcomm Component wherein the apparatus or functionality identified by such Apple Party as the basis for such claim of infringement is provided in whole or in part by such Qualcomm Component.
- Apple shall increase Qualcomm Labs Inc.'s device limit via the iOS Provisioning Portal to 500 devices.
- If Qualcomm wishes to distribute an iOS app through Apple's App Store, Apple will not discriminate against Qualcomm relative to other developers with respect to requirements related to Apple's iOS Developer Program when applying its APP Store Review Guidelines.

*Business Cooperation and Patent Payment ("BCP Payment")*
For each calendar quarter during the Term, Qualcomm will pay Apple:

- The difference between the total royalties actually paid to Qualcomm for all Sales of Apple Phones by Qualcomm Licensees to Apple or an Apple Authorized Purchaser (the "Apple Phone Royalties") and the Phone Incentive Reference Amount which is the number of Apple Phones sold to Apple or an Apple Authorized Purchaser ▮▮▮▮▮
- The difference between the total royalties actually paid to Qualcomm for all Sales of Apple Tablets by Qualcomm Licensees to Apple or an Apple Authorized Purchaser (the "Apple Tablet Royalties") and the Tablet Incentive Reference Amount which is the number of Apple Tablets sold to Apple or an Apple Authorized Purchaser ▮▮▮▮▮

For clarity, if the total Apple Phone Royalties for a particular quarter are less than the total Phone Incentive Reference amount for that quarter, then no amount will be owed to Apple. Similarly, if the total Apple Tablet Royalties for a particular quarter are less than the total Tablet Incentive Reference Amount for that quarter, then no amounts will be owed to Apple.

No later than 45 days after the end of each calendar quarter, Apple shall report to Qualcomm (the "Apple Report") the quantity of each model of Apple Devices purchased by Apple and its Authorized Purchasers from each Qualcomm Licensee during such calendar quarter.

For each calendar quarter, no later than 30 days after receiving both the Apple Report and either i) all royalties due for Apple Devices from all Qualcomm Licensees that Sold Apple Devices to Apple and/or any Apple Authorized Purchasers during such calendar quarter or ii) a portion of all such royalties due from all such Qualcomm Licensees and notification that one or more third parties have received the remaining portion of such royalties on Qualcomm's behalf,[3] Qualcomm shall pay the BCP Payment for such calendar quarter.[4]

**Accounting Treatment**
*ASC 605-50-45-2 "Revenue Recognition- Customer Payments and Incentives"* states, *"Cash consideration given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and should be characterized as a reduction of revenue when recognized in the vendor's income statement. That presumption is overcome and the consideration should be characterized as a cost incurred if, and to the extent that, both of the following conditions are met: (a) the vendor receives, or will receive, an identifiable benefit (goods or services) in exchange for the consideration; and (b) the vendor can reasonably estimate the fair value of the benefit identified under the preceding condition."*

- Qualcomm will record the BCP Payments as a reduction to the royalty revenue that Qualcomm receives as a result of the sale of Apple Phones and Tablets by Qualcomm licensees to Apple because the fair value of the benefits received under the BCPA cannot be reasonably estimated, as defined in ASC 605-50-45-2.

---

[3] For example, withholding tax paid to a foreign tax authority as evidenced by a tax certificate issued by such foreign authority.
[4] The terms of the BCPA only require Qualcomm to make a payment to Apple once all royalties due are received. However, in the event not all royalties are paid on the applicable Apple Phones or Apple Tablets, Qualcomm plans to pay Apple based on the percent of royalties received (e.g. if Qualcomm receives 70% of all royalties due, Qualcomm will pay Apple 70% of the marketing incentive).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02755002
Q2017MDL1_02588050

CX5391-003

Q2FY13 Apple Incentive Agreements
Page 3 of 8

- This incentive will be allocated 100% to QTL as the incentive deal was initiated by QTL for the specific QTL benefits contained in the BCPA.[5]

*ASC 605-50-25-3 "Revenue Recognition- Customer Payments and Incentives" states, "a sales incentive offered voluntarily by a vendor and without charge to customers that can be used or that becomes exercisable by a customer as a result of a single exchange transaction, and that will not result in a loss on the sale of a product or service, a vendor shall recognize the "cost" of the sales incentive at the later of the following: (a) the date at which the related revenue is recognized by the vendor; or (b) the date at which the sales incentive is offered."*

- QTL recognizes revenue on an "as reported" basis and will recognize the BCP Payments on the same basis to match the cost of the incentive with the revenue.

The Marketing Development Funds (MDF) Master Incentive Agreement Memo, dated October 29, 2008 (revised October 10, 2011) (the "MDF Master Incentive Memo") and the Non-Recurring Engineering (NRE) Master Incentive Agreement Memo, dated October 29, 2008 (revised October 10, 2011) (the "NRE Master Incentive Memo") provide further details on the accounting for incentives.

### Summary of the Amendment

The Amendment provides for marketing incentives to be paid by Qualcomm to Apple to help drive demand for global Sales of Apple Phones and Apple Tablets[6] through a Marketing Fund. In addition, the Amendment provides for additional volume-based incentives under the Variable Incentive Fund.[7]

*Term & Conditions:*[8]
- The term of the Amendment starts on January 1, 2013 and continues until the earlier of (i) December 31, 2016 or (ii) the date that the ST Agreement (see below) is terminated.
- The Amendment will terminate if, during the term, Apple or any of its Affiliates sells a Non-QC Device[9] commercially (i.e. more than 1,000 units) and Qualcomm shall not be obligated to make any of the payments that are due and payable after the date of such sale.[10]
- If, during calendar year 2013, Apple or any of its Affiliates sells any Apple product commercially that contains a non-Qualcomm cellular baseband modem, Apple shall (i) promptly notify Qualcomm and reimburse any amounts paid by Qualcomm for the second installment of the Transition Fund and the second Variable Incentive Fund payment.[11]
- If, during calendar years 2013 or 2014, Apple or any of its affiliates sells a Non-QC Device commercially, Apple shall (i) promptly notify Qualcomm and reimburse any Marketing Fund amounts paid by Qualcomm with respect to Apple Phones and Apple Tablets purchased after the Amendment effective date but before January 1, 2015.
- If, during calendar year 2015, Apple or any of its affiliates sells a Non-QC Device commercially (i.e. more than 1,000 units), Apple shall (i) promptly notify Qualcomm and reimburse any Marketing Funds paid by Qualcomm during the 15 months immediately preceding such sale.
- If, during calendar year 2015, Apple or any of its affiliates sells a Non-QC Device commercially, Apple shall (i) promptly notify Qualcomm and reimburse any Variable Incentive Fund amount paid with regards to the First Payment (see below).
- If, during calendar year 2016, Apple or any of its affiliates sells a Non-QC Device commercially, Apple shall (i) promptly notify Qualcomm and reimburse any Variable Incentive Fund amount paid with regard to the Second Payment (see below.

---

[5] The 100% allocation of incentive deals initiated by QTL for specific QTL benefit is documented in the Q4FY11 QCT/ QTL Shared Incentives Allocations memo (and matrix), dated September 29, 2011.

[6] Note that the definitions of an Apple Phone and an Apple Tablet are not the same in the BCPA Agreement and the Amendment; see the respective agreement for the definitions. There is no accounting impact from this difference in definition.

[7] See the See the Q2FY11 Maverick Transition Agreement memo, dated March 1, 2011 (the "2011 memo") for further details on the Variable Incentive Fund that was established pursuant to the Transition Agreement dated February 11, 2011. Section 3 (Term) of the Transition Agreement dated February 11, 2011, was deleted in its entirety and replaced as summarized in this memo.

[8] The conditions do not apply to continued sales of the Apple iPhone 4 that incorporates a non-Qualcomm cellular baseband modem which Apple was selling commercially as of October 1, 2011 and minor modifications thereto.

[9] A Non-QC Device is any Apple product that incorporates a non-Qualcomm cellular baseband modem and is either a Wireless Telephone or Personal Tablet Computer.

[10] As of the date of this memo, Qualcomm expects that Apple will continue to use Qualcomm cellular baseband modems throughout the term such that Apple will earn all incentives described in this memo.

[11] See the 2011 Memo for further details on these payments.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02755003
Q2017MDL1_02588051

CX5391-004

Q2FY13 Apple Incentive Agreements
Page 4 of 8

- The Amendment does not require Apple to provide documentation of marketing spend to Qualcomm.
- No later than 45 days after the end of each calendar quarter, Apple shall report to Qualcomm the quantity and sales price of each model of Apple Phones and Apple Tablets purchased by Apple and its Affiliates from an Authorized Purchaser during such quarter.

*Marketing Fund*
The Marketing Fund consists of the Apple Phone Marketing Fund and the Apple Tablet Marketing Fund:

*Apple Phone Marketing Fund*
For each Apple Phone purchased[12] during a calendar quarter with a sales price that equals or exceeds [REDACTED] Qualcomm shall accrue [REDACTED] provided, however, that if the average of the sales prices of all Apple Phones purchased during such calendar quarter is equal to or greater than [REDACTED], then the foregoing sales price requirement shall be deemed to be satisfied as to all Apple Phones purchased during such calendar quarter.

For any calendar quarter in which the average of the sales prices for all Apple Phones is less than [REDACTED], Apple shall have, at its option, the right to make a lump sum payment to Qualcomm to compensate Qualcomm for any difference between the revenue that Qualcomm received from Authorized Purchasers for sales of Apple Phones in such quarter and the amount that Qualcomm would have received for such sales if the average sales price of all Apple Phones had been [REDACTED]. In the event Apple makes such payment within 30 days after the close of such quarter, Apple shall be deemed to have satisfied the sales price requirement set out in the preceding paragraph. If the average of the sales prices for all Apple Phones in any such quarter is less than [REDACTED] and Apple does not opt to make such payment, Apple will not be entitled to the incentive.

*Apple Tablet Marketing Fund*
For each Apple Tablet purchased during a calendar quarter with a sales price that equals or exceeds [REDACTED], Qualcomm shall accrue [REDACTED] provided, however, that if the average of the sales prices of all Apple Tablets purchased during such calendar quarter is equal to or greater than [REDACTED], then the foregoing sales price requirement shall be deemed to be satisfied as to all Apple Tablets purchased during such calendar quarter.

For any calendar quarter in which the average of the sales prices for all Apple Tablets is less than [REDACTED], Apple shall have, at its option, the right to make a lump sum payment to Qualcomm to compensate Qualcomm for any difference between the revenue that Qualcomm received from Authorized Purchasers for sales of Apple Tablets in such quarter and the amount that Qualcomm would have received for such sales if the average sales price of all Apple Tablets had been [REDACTED]. In the event Apple makes such payment within 30 days after the close of such quarter, then Apple shall be deemed to have satisfied the sales price requirement set out in the preceding paragraph. If the average of the sales prices for all Apple Tablets in any such quarter is less than [REDACTED] and Apple does not opt to make such payment, Apple will not be entitled to the incentive.

The accrued Marketing Fund is due and payable 45 days after the end of each calendar year during the term of the Amendment, provided that Apple reports the quantity and sales price of each model of Apple Phones and Tablets purchased by Apple and its Affiliates from an Authorized Purchaser during such quarter.

**Accounting Treatment**
- As Apple will not provide documentation of the marketing spend to Qualcomm, the presumption in ASC 605-50-45-2 (see citation on page 2 above) is not overcome, and Qualcomm will record the Marketing Fund incentives as a reduction to revenue.
- Apple Phones and Apple Tablets use the exact same chipset; at the time of shipment, Qualcomm will not be able to estimate what portion of the chipsets will be used in a phone and what portion will be used in a tablet. In accordance with the QCT Master Device Incentive Agreement Memo, last revised on December 7, 2012, Qualcomm will accrue the maximum possible liability upon shipment (i.e. [REDACTED] and true up the accrual upon Apple reporting the quantity and sales price of each model of Apple Phones and Apple Tablets purchased.
- The [REDACTED] for Apple Phones and the [REDACTED] for Apple Tablets were included in the Amendment to incentivize Apple to continue to focus on high-end Phones and Tablets. Qualcomm wants Apple to focus on its high-end Phones and Tablets volume for strategic reasons because Qualcomm expects that high-end Apple Phones and Tablets will use high-end (more expensive) chipsets as compared to mid- or low tier Phones and Tablets. The

---

[12] Purchased means purchased by Apple or its affiliates from an Authorized Purchaser that is a Qualcomm Licensee and reported to Qualcomm by such Authorized Purchaser as sold to Apple or its Affiliates in accordance such Authorized Purchaser's Qualcomm License Agreement.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02755004
Q2017MDL1_02588052

CX5391-005

Q2FY13 Apple Incentive Agreements
Page 5 of 8

- current average sales prices for Apple Phones and Apple Tablets are in excess of the aforementioned floors and are expected to remain in excess of those floors for the foreseeable future, unless Apple starts selling mid- or low tier Apple Phones or Tablets.
- The *Terms and Conditions* described above benefit QCT by incentivizing Apple to use QCT chipsets in Apple Phones and Tablets for the term of the Amendment.[13] Furthermore, this is a QCT Pricing Deal, and Qualcomm's policy is to allocate such deals 100% to QCT;[14] 100% of the Marketing Fund incentive will be allocated to QCT.

The previous Marketing Fund Development obligations as documented in the 2011 Memo were not triggered by the volume of QCT chipset sales to an Authorized Purchaser or Apple device purchases. During Q2FY13 (before the Amendment was executed), the offer to Apple was revised from a per unit amount based on QCT chipsets sold to an Authorized Purchaser to a per unit amount based on Apple's device purchases from an Authorized Purchaser. Note that QCT will recognize the per unit incentive concurrent with QCT revenue recognition even though the incentive obligation is triggered by the subsequent sale of the Apple Phone or Apple Tablet to Apple by the Authorized Purchaser. As of the last day of Q1 FY13 (December 30, 2012), QCT had shipped approximately ▮▮▮ chipsets to Authorized Purchasers that had not yet been sold through in a device to Apple. Based on the final terms of the Amendment, Qualcomm recorded the additional contra revenue on those units in Q2FY13; the Q2FY13 device sales related to these units are expected to be reported in Q3FY13.[15]

*Variable Incentive Fund (VIF)*
The Transition Agreement described in the 2011 Memo provides for a VIF for 4 annual periods starting with October 1, 2011, with a $600M cap for the 4-year period. The Amendment adds the following additional chipset volume-based incentives:

(i) First Payment - The payment amount set forth below for the applicable Annual Volume[16] is due and payable 45 days after October 1, 2015:

| Payment Amount | Annual Volume |
|---|---|
| US$200,000,000 | ▮▮▮ |
| US$150,000,000 | ▮▮▮ |
| US$100,000,000 | ▮▮▮ |
| no payment | ▮▮▮ |

Note that while the Amendment stipulates that this payment is in addition to any payments due pursuant to the Transition Agreement dated February 11, 2011, Qualcomm expects that no payments will be due under the Transition Agreement dated February 11, 2011 as the VIF therein includes a cap of $600M, and Qualcomm expects that the cap will be reached prior to the start of the annual period that ends on October 1, 2015.

---

[13] Note that QTL would not be impacted by Apple violating the *Terms and Conditions* as QTL royalties are not dependent on whether QCT's chipsets are included in Apple Phones or Apple Tablets. Additionally, the average sales price floors were not intended to specifically benefit QTL.
[14] The allocation of QCT Pricing Deals is documented in the Q4FY11 QCT/ QTL Shared Incentives Allocations memo (and matrix), dated September 29, 2011.
[15] The Amendment was negotiated together with the other arrangements described in this memo. As of the Q1FY13 earnings release on January 30, 2013, Qualcomm was unable to determine that is was probable that the Amendment would be executed with the terms and conditions that existed in draft form at the time as negotiations continued on substantive unresolved items in the various arrangements. As such, no incremental liability for these units was accrued in Q1FY13.
[16] Annual Volume has the same meaning for purposes of the VIF in the Amendment and the VIF described in the 2011 Memo.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02755005
Q2017MDL1_02588053

CX5391-006

Q2FY13 Apple Incentive Agreements
Page 6 of 8

Second Payment - The payment amount set forth below for the applicable Annual Volume is due and payable 45 days after October 1, 2016:

| Payment Amount | Annual Volume |
|---|---|
| US$200,000,000 | ███ |
| US$150,000,000 | ███ |
| US$100,000,000 | ███ |
| no payment | ███ |

**Accounting Treatment**
Consistent with the accounting for the VIF described in the 2011 Memo, Qualcomm will accrue an average per unit incentive amount quarterly, based on forecasted yearly shipments. See the 2011 Memo and the QCT Master Device Incentive Agreement Memo, last revised June 13, 2012, for further details regarding this accounting treatment.

The VIF is a QCT chipset volume-based incentive. QCT volume-based incentives (pricing deals) are allocated 100% to QCT.[17]

**Summary of the ST Agreement**

The ST Agreement amends and restates the Strategic Terms Agreement dated December 16, 2009 between the parties.

*Term*[18]
- The term of the ST Agreement starts on February 28, 2013 and will continue in effect unless it is terminated.
- Either party may terminate the ST Agreement upon 18 months prior written notice. However, for each Apple Product referenced by its code name in an SOW executed prior to the date of the termination notice (an "Existing Product"), the ST Agreement shall not be deemed to be terminated as to such Existing Product until ███████████████████████████████████████
- If Apple or any of its Affiliates initiates any action or litigation for infringement against Qualcomm, its Affiliates, or its foundries for making, having made, importing, using, selling, or otherwise distributing Qualcomm Components (the "Infringement Action"), Qualcomm may provide notice to Apple that it intends to terminate the ST Agreement.[19]

*ST Agreement Components*
The ST Agreement addresses the following items:

- Software delivery – The terms of software delivery are subject to a separate AMSS Software Agreement,[20] for which the accounting is described in the AMSS/DMSS/QMSS Software Revenue Recognition Master Memo, dated September 24, 2009 (revised September 18, 2012).
- Pricing – Rebates that would be due Apple if ████████████████████████████████████████

---

[17] The allocation of QCT Pricing Deals is documented in the Q4FY11 QCT/ QTL Shared Incentives Allocations memo (and matrix), dated September 29, 2011.
[18] Either party may terminate the ST Agreement for cause, see the ST Agreement for further details.
[19] See the ST Agreement for further details. As of the date of this memo, the likelihood of such litigation being initiated is considered remote. The accounting described in this memo will be reevaluated in an addendum to this memo if such litigation becomes probable.
[20] AMSS software agreements are usually executed in advance of the SOWs. No AMSS software agreements were executed concurrently with the Agreements.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02755006
Q2017MDL1_02588054

CX5391-007

Q2FY13 Apple Incentive Agreements
Page 7 of 8

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ are not addressed in a master accounting memo, rather they would be addressed in an addendum to this memo when and if triggered or when likely to be triggered. According to Marc McCloskey, Senior Manager, QCT Finance, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. We will prepare an addendum to this memo if and when this clause in the ST Agreement is triggered.[18] We also note that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

- Product warranty ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ – The accounting for these provisions will follow the guidance provided in the Original Warranty Periods Master Memo dated March 4, 2011 and the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ dated February 23, 2011.
- Excess chipsets – At the EOL date,[21] Qualcomm will use reasonable efforts to sell or otherwise divert the use of Qualcomm Chipsets that have been or are being manufactured to meet confirmed Forecasts and Forecast Upside no earlier than required by the applicable Lead Times, but have not been purchased by Authorized Purchasers as of the EOL date ("Excess Chipsets"). However ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ According to Marc McCloskey, ▓▓▓ of such price is expected to be above the cost of the chipset. We will prepare an addendum to this memo if and when this clause in the ST Agreement is triggered or if ▓▓▓ of such price is expected to be below cost.[22]
- Engineering support – Qualcomm will provide on-site project management support and engineering support. The details of such support will be addressed in separate Statements of Work with respect to particular Qualcomm ASICs or Qualcomm Chipsets. Attachment 4 to the ST Agreement describes the support to be provided under the SOW described below.
- Various other matters such as product delivery, forecasts, continuity of supply, product modifications, third party infringement claims, compliance review and other general terms and conditions that do not require consideration in an accounting memo.

### Summary of the SOW

The SOW identifies three chipsets that will be used in Apple Products, the Mav 7/8 Chipset, the Mav 10 Chipset, and the Mav 13 Chipset (each a "Project" and collectively referred to as "Chipsets" or "Projects") and sets forth the terms and conditions for these Projects under and subject to the ST Agreement as follows:[23]

- The terms and conditions of the ST Agreement are incorporated by reference into the SOW.
- Upon Apple's request, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
- Qualcomm will provide Apple with training materials.
- Qualcomm will provide Apple with engineering support for each Project as follows:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

According to Marc McCloskey, Senior Manager, QCT Finance, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

- The SOW provides an Adder for certain Mav 10 Chipsets. Mav 10 Chipsets will be included in Apple Products that are expected to be activated on networks that support Carrier Aggregation (CA) and on networks that don't support CA.[24] Products that are activated on a network that support CA require greater chipset functionality (a "High-Tier Activation") than products that are activated on networks that don't (a "Low Tier Activation"). Mav 10 Chipsets will be shipped based on prices that we will calculated in accordance with Section 5 of the STA, and these prices shall not exceed the pricing set forth in Attachment 1 to the SOW. The Adder requires Apple to pay an additional amount for High-Tier Activation Mav 10

---

[21] For a particular Qualcomm Chipset, the date Apple no longer offers the last Apple Product that incorporates such Qualcomm Chipset for sale commercially.
[22] If required by Qualcomm's Guidelines for Use of Accounting Memos policy.
[23] Only Terms and Conditions with a possible accounting impact are discussed herein.
[24] Carrier Aggregation allows for faster and more efficient data traffic.

Q2FY13 Apple Incentive Agreements
Page 8 of 8

Chipsets. This is similar to a typical incentive arrangement whereby Qualcomm will pay a rebate for qualifying units as further discussed in the QCT Master Device Incentive Agreement Memo, last revised June 13, 2012 ▮▮▮▮ The SOW requires that Apple submit a monthly Activation Report to Qualcomm within 20 days after the end of each month that requires Apple to report all High-Tier Activations.
- The SOW includes not-to-exceed (NTE) prices for certain chipsets.
- Various other matters, such as compliance review, ▮▮▮ lead time, sourcing plan, forecasts and WIP reporting that do not require consideration in an accounting memo.

**Accounting Treatment**
- The ▮▮▮ is subject to the accounting treatment described in the Supply Balance Master Memo, dated January 3, 2011.
- The training materials have an insignificant value. ▮▮▮ According to Marc McCloskey, the Mav 7/8 Chipsets are expected to begin shipping in Q2FY13, the Mav 10 Chipsets are expected to begin shipping in Q2FY14 and the Mav 13 Chipsets are expected to begin shipping in Q2FY15. The training materials and each of the engineering support components represent separate deliverables pursuant to ASC 605-50 *Revenue Recognition – Multiple Element Arrangements* and are considered separate units of accounting as each of the delivered items has value to Apple on a standalone basis. The training materials and the engineering support are expected to be delivered prior to the commercial release of the respective chipset.

  According to Mark McCloskey, Qualcomm expects to have sales in excess of ▮▮▮ for each of the Projects. The fair value of the training materials, the testing and certification credit and the engineering support represents approximately ▮▮▮ or less of the anticipated chipset sales for each Project and the training materials and engineering services as well as the testing and certification ▮▮▮ will be delivered in a 6 month period preceding the first commercial sale for the respective Project.

  The ST Agreement provides that training materials and engineering support will be provided ▮▮▮▮▮▮▮▮▮▮▮▮

  At the time of delivering the training materials and engineering services, the revenues related to these delivered items are contingent upon chipset sales and not fixed and determinable under a relative fair value allocation model. Therefore, such revenues cannot be recognized upon delivering the training materials and engineering services. An argument can be made to allocate the revenue from the first quarter of each Project's chipset sales to training materials and engineering services based on a relative fair value model, However, such allocation would accelerate the timing of revenue that would be contingent on future chipset sales.[25] An argument could also be made that the relative fair value should be based on the total (estimated) chipset sales for a Project. However, that would involve accounting that is not cost beneficial considering that the revenue that would be allocated to training materials and engineering services is a fraction (< ▮▮▮ of each Project's expected chipset revenue. Therefore, ▮▮▮

- Upon shipment of a Mav 10 Chipset, Qualcomm will recognize revenue based upon the agreed upon price for a Low-Tier Activation. Upon receiving the Activation Report, Qualcomm will recognize the additional revenue for High-Tier Activations as the per chipset amount subject to the Adder is fixed and determinable at that time. Note that this is accounting treatment is consistent with the treatment of incentives based on qualifying units as described above.
- If the price paid by an Authorized Purchaser for a chipset that is incorporated into a qualifying Apple device exceeds the NTE price as defined in the SOW, Qualcomm will provide an additional per unit rebate to Apple. The accounting for such rebates is described in the QCT Master Device Incentive Agreement Memo, last revised June 13, 2012.

---

[25] We also note that equipment and services revenues are not presented separately on Qualcomm's income statement.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02755008
Q2017MDL1_02588056

CX5391-009