# CX5425

# REVISED REDACTED VERSION

| | |
|---|---|
| From: | Dill, Roel |
| To: | Frizzell, Kevin; Lederer, Jim; Mehta, Sanjay; Wyatt, Will; Griffith, Larry; Chivetta, Charles |
| CC: | Ford, Joyce; Polek, Erin; Henson, Jamie; Dill, Roel; Johnson, Adam; Thomas, Chris; Conrado, Michelle; Barrie, Rosie; Gardner, Steve; Wapner, Beth; Plein, Kimberly; peter.g.wieghaus@us.pwc.com |
| Sent: | 4/19/2011 11:53:31 PM |
| Subject: | Final Accounting Memo: Q2FY11 Maverick Transition Agreement |
| Attachments: | Maverick Incentive offers - FINAL.doc |

The attached accounting memo has been reviewed and approved by Jamie Henson (for Corporate Accounting). The memo has also been read by PwC as part of their quarterly review or annual audit procedures.

Regards,

*Roel Dill*
*Accounting Practices and Reporting*
*Qualcomm Incorporated*
*Phone: 858-651-0830*
*Fax: 858-651-5983*
*Email: rdill@qualcomm.com*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Q2014FTC02717839
Q2017MDL1_02550896

CX5425-001

## QUALCOMM Incorporated
### Accounting Memo

To: Corporate Accounting File
Prepared by: Roel Dill
Date: March 1, 2011
Subject: Q2FY11 Maverick Transition Agreement

---

On February 23, 2011, Qualcomm CDMA Technologies Asia-Pacific Pte Ltd. (QCTAP) and Qualcomm Inc. (Qualcomm), together referred to as Qualcomm in this memo, and Maverick[1] executed a Transition Agreement that is effective February 11, 2011. Through the Transition Agreement (the Agreement), Qualcomm provides Maverick with three separate incentives related to Maverick's transition to using Qualcomm chipsets in Maverick products.

*Term & Conditions:*
The term of the Agreement is Q2FY11 through Q4FY15. The Agreement will terminate if the Strategic Terms Agreement[2] (STA) is terminated. The STA's term commenced on December 16, 2009 and continues until:

   a. It is terminated upon written notice by either party if Maverick fails to launch and commercially sell a Maverick product (that incorporates a Qualcomm chipset) by December 31, 2011[3].
   b. It is terminated upon 18 months written notice by either party provided that (i) such notice can only be given after the initial Maverick product has been sold commercially and (ii) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The Agreement will terminate if Maverick or any of its affiliates initiates an action or litigation against Qualcomm or its affiliates or its foundries which includes any claim for intellectual property infringement for making, having made, importing, using, selling, or otherwise distributing Qualcomm components. Qualcomm shall not be obligated to make any of the payments described below that are due and payable after the date of the initiation of such litigation[4].

---

[1] Maverick is a code name for a customer.
[2] The STA is made between Maverick and Qualcomm Inc. The STA addresses:
   - software delivery - the terms of software delivery are subject to a separate AMSS Software Agreement, for which the accounting is described in the AMSS & DMSS Software Revenue Recognition Master Memo, dated September 24, 2009.
   - pricing – rebates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   - product warranty ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – The STA provides for a ▮▮▮▮▮▮ standard warranty period, see the Original Warranty Periods Master Memo dated March 4, 2011 for further details on product warranty accounting ▮▮▮▮▮  for further details on accounting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
   - various other matters such as hardware and product delivery, engineering support, product modifications, third party infringement claims, a special termination provision, compliance review and other general terms and conditions that do not require consideration in an accounting memo.

[3] This option is no longer available as Maverick has commercially sold a product containing a Qualcomm chipset.
[4] As of the date of this memo, the likelihood of such litigation being initiated is considered remote. The accounting described in this memo will be reevaluated in an addendum to this memo if such litigation becomes probable.

Maverick Transition Agreement
Page 2 of 9

The Agreement will also terminate if, after October 1, 2011, Maverick sells a Maverick product that incorporates a non-Qualcomm cellular baseband modem, and Qualcomm shall not be obligated to make any of the payments described below that are due and payable after the date of such sale[5].

**Incentives included in the Agreement:**

**Transition Fund - $250,000,000**

*Objective:*
To compensate Maverick for its resource investment associated with transitioning from non-Qualcomm chipsets to Qualcomm chipsets in Maverick products.

*Payments:*
Payments are due in two $125 million installments. The first $125 million installment is due on March 31, 2012; the second $125 million installment is due on March 31, 2013.

*Conditions[6]:*

- To retain funding, Maverick must purchase a minimum of ▮▮▮ per quarter during calendar 2011 and a minimum of ▮▮▮ per quarter thereafter through the remainder of the term.

  For each calendar 2011 quarter in which Maverick does not meet the minimum purchase requirement, Qualcomm may reduce the first installment payment by (▮▮▮ provided, however, that if the sum of the quarterly purchases for calendar 2011 is at least ▮▮▮, the first installment payment will remain $125,000,000.

  For each quarter in calendar 2012 in which Maverick does not meet the minimum purchase requirement, Qualcomm may reduce the second installment payment by (▮▮▮)

  For each quarter beyond calendar 2012 in which Maverick does not meet the minimum purchase requirement, Maverick will reimburse Qualcomm an amount equal to (▮▮▮ Any reimbursements due Qualcomm will be paid 45 days after the first calendar quarter of 2014.

- Qualcomm is not obligated to make any payments if Maverick does not commercially launch at least one product to multiple UMTS carriers that incorporates a Qualcomm chipset.

- If, after October 1, 2011, Maverick sells a commercial product that incorporates a non- Qualcomm baseband modem, Qualcomm shall not be obligated to make any of the payments that are due after the date of such sale. If, during calendar 2013, Maverick sells such a commercial product, Maverick shall reimburse Qualcomm for the second installment payment.

*Background information:*

- Maverick is commercially selling two products as of the date of the memo to one UMTS carrier. Based on current projections, product sales to a minimum of two UMTS carrier are expected to commence in August 2011.

- ▮▮▮ have shipped to Maverick to date in Q2FY11, and ▮▮▮ are on order for March shipment. The Q3FY11 shipment forecast is ▮▮▮ (based on the January 2011 outlook).

---

[5] As of the date of this memo it is considered reasonably possible that Maverick will use Qualcomm cellular baseband modems throughout the term of the agreement such that Maverick will earn all incentives described in this memo.
[6] In addition to the conditions described under *Terms and Conditions* above.
[7] The 2011 applicable chipsets include those that implement CDMA, UMTS and/or LTE. Only one Qualcomm chipset per Maverick product may be counted towards the purchase requirement.
[8] The 2012 and beyond applicable chipsets include those that implement UMTS, including, for example, UMTS with GSM, and/or LTE, but not including any Qualcomm chipsets for the purpose of implementing UMTS and CDMA in a Maverick product. Only one Qualcomm chipset per Maverick product may be counted towards the purchase requirement.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Q2014FTC02717841
Q2017MDL1_02550898

CX5425-003

Maverick Transition Agreement
Page 3 of 9

- Considering that historical sales of Maverick products going forward will use Qualcomm chipsets, FY11-to-date actual sales and forecasts of future sales of Maverick products, Qualcomm expects that Maverick will earn the full amount of the Transition Fund, unless Maverick decides to sell commercial product that incorporates a non-Qualcomm baseband modem[5].

**Accounting Treatment**
The primary benefits of the Transition Fund to Qualcomm are the volume requirements as well as the exclusivity provision described above.
Qualcomm will amortize this $250M incentive over the thirteen quarters during which the incentive is (expected to be) earned by Maverick. ASC 605-50-25-7 states *"A vendor may offer a customer a rebate or refund of a specified amount of that is redeemable only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period. The vendor shall recognize the rebate or refund obligation as a reduction of revenue based on* **a systematic and rational allocation** *of the cost of honoring rebates or* **refunds earned** *and claimed to each of the underlying revenue transactions that result in progress by the customer toward earning the rebate or refund..."*

The Agreement includes volume-based purchase requirements for each of the thirteen quarters of the term of the transition fund, irrespective of when payments are made. It is expected that Maverick will meet the minimum purchase requirements each quarter and as such the expense will be recognized as follows (in millions):

|  | Q2 FY11 | Q3 FY11 | Q4 FY11 | Q1 FY12 | Q2 FY12 | Q3 FY12 | Q4 FY12 | Q1 FY13 | Q2 FY13 | Q3 FY12 | Q4 FY13 | Q1 FY14 | Q2 FY14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expense | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 | 19.23 |
| Payment | - | - | - | - | (125) | - | - | - | (125) | - | - | - | - |
| Liability (Asset) at end of qrtr | 19.23 | 38.46 | 57.69 | 76.92 | (28.85) | (9.62) | 9.62 | 28.85 | (76.92) | (57.69) | (38.46) | (19.23) | - |

Total expense: $19.2308 *13 = $250,000,000

The quarterly expense is calculated straight line over the term based on our expectation that Maverick will meet the minimum purchase requirements each quarter (see *Background information* above). The minimum purchase requirement for each quarter is considered a substantive performance obligation that makes the payment contingent. Straight line expense recognition is consistent with the requirements of ASC 605-50-25-7.

As indicated in the table above, straight line expense recognition and the timing of the two payments results in an asset position for six of the thirteen quarters. The asset balance during any quarter would be recoverable if Maverick does not meet the minimum purchase requirements: As described under the *Conditions* heading above, the Agreement provides for a potential reduction of the second payment of $19.23M per quarter x 4 = $76.92M if quarterly volume is zero during the calendar 2012 quarters. Furthermore, the Agreement provides for Maverick to reimburse Qualcomm $19.23M per quarter x 5 = $96.55M if quarterly volume is zero during the calendar quarters of 2013 and the first calendar quarter of 2014. Note that these are the extreme scenarios of potential Transition Fund reductions/ reimbursements; if Maverick unexpectedly does not meet the minimum purchase requirements in a given quarter, it is more likely that the reduction/ reimbursement would be less than the maximum based on the applicable formula described under the *Conditions* heading above. Under this more likely scenario there also would be an expense, albeit less that the $19.23M straight line amount, that would reduce the asset balance.

An alternate view is that the first $125,000,000 payment will be earned by Maverick during calendar 2011 as long as Maverick purchases ▮▮▮▮▮▮▮▮ in calendar 2011 as the Agreement stipulates that "... *if the sum of the quarterly purchases for calendar 2011 is at least* ▮▮▮▮▮▮▮▮ *the first installment* **payment** *will remain* $125,000,000."

However, this alternate view ignores the intent of the Transition Fund which is for Maverick to earn the Transition Fund over its term in exchange for (1) not selling a commercial product with a non-Qualcomm baseband modem and (ii) in exchange for meeting the minimum purchase requirements. The alternate view would result in accounting that is driven by the amount and timing of the first payment, which does not result in a rational, systematic allocation as required by ASC 605-50-25-7. This view effectively would result in a bifurcation of the Transition Fund into two funds, as Qualcomm would expense a disproportionate portion of the Transition Fund, $125,000,000, in the first 4 quarters and expense the other $125,000,000 over the remaining nine quarters. Furthermore, the reduction/ reimbursement provisions described above result in potential reductions/ reimbursements of exactly $19.23 million per quarter, the exact amount of the straight line quarterly expense calculated under the accounting treatment applied by Qualcomm; if the reduction/ reimbursement scenarios arise, the combined effect could be such that the combined amount of reduction and reimbursement would exceed the second payment; a further indication that the intent of the Agreement is not for Maverick to earn the first $125,000,000 in

Maverick Transition Agreement
Page 4 of 9

the first four quarters. Further, we note that the quarterly expense under the proposed accounting treatment is equal to the maximum quarterly reduction/ repayment possible. Recognizing the expense straight line is a systematic, rational allocation; the potential quarterly reductions and reimbursements provided for in the Agreement indicate that straight line recognition is consistent with the intent and the economics of the arrangement which is for Maverick to earn the Transition Fund over term of the Transition Fund.

In respect to Qualcomm's ability to recover amounts that are "prepaid" as a result of the second payment, we also note that we believe that such amounts would be recoverable from Maverick, and in fact, we have enforced a similar "claw back mechanism" against a customer in the past[9].

An alternate view would be the expense should be recognized over the term of the Agreement, or from Q2FY11 to Q4FY15 (19 quarters). This alternate view would result in deferring charges to income beyond the period in which Maverick earns the incentive as (i) Maverick does not have to meet any minimum purchase requirements beyond Q2FY14, and (ii) the arrangement does not provide for any claw back opportunities related to the Transition Fund beyond Q2FY14. In other words, Maverick does not have any performance obligations beyond Q2FY14 and has a legal right to keep all amounts paid under the Transition Fund after Q2FY14.

The proposed accounting is consistent with Qualcomm's accounting for other incentive arrangements in that Qualcomm takes a conservative approach when accounting for incentives. For example, Qualcomm's general policy is to accrue the maximum incentive when (a) the amount is not known (i.e. not based on current quarter chip purchases) or (b) the customer does not provide an estimate of the amount that will be earned because the revenue potentially subject to incentive is not fixed or determinable. The proposed recognition of the expense over 13 quarters is conservative compared to recognizing the expense over 19 quarters. We also note that recognition over 19 quarters (approximately $13.2M per quarter) would not result in an expense that is materially different in any fiscal period (approximately $6M difference per quarter and approximately $24M per fiscal year).

The incentive will be recorded as a reduction of revenue. This accounting treatment is consistent with the accounting described in the QCT Master Handset (Subscriber Unit) Incentive Agreement Memo dated July 12, 2005 (Revised April 29, 2008) (Revised September 22, 2010) for volume-based incentives. Please refer to that memo for other accounting treatment considerations.

We will prepare an addendum to this memo in which we will reassess the proposed accounting treatment if and when it becomes probable that Maverick will not meet the quarterly minimum purchase requirements and/or if and when it becomes probable that Maverick will sell a commercial product that incorporates a non- Qualcomm baseband modem (see footnote 5 above).

**Marketing Development Fund - $150,000,000**

*Objective:*
To contribute to Maverick's marketing costs to drive global sales of Maverick products that incorporate Qualcomm UMTS chipsets.

*Payments:*
Payments are due in six $25 million quarterly installments. Each installment is due before the end of each of six consecutive calendar quarters, beginning with the third calendar quarter of 2011(Qualcomm's Q4FY11), payable within 45 days of such due date.

*Condition*[6]*:*
- If Maverick does not commercially launch at least one product with a UMTS carrier that incorporates a UMTS chipset by December 2012, Maverick shall return all previously paid installments. The likelihood of Maverick not meeting this condition is considered remote, see *background information* below.
- If, after October 1, 2011, Maverick sells a commercial product that incorporates a non- Qualcomm baseband modem, Qualcomm shall not be obligated to make any of the payments that are due and payable after the date of such sale. This provision is pursuant to section 1.5 of the Agreement.

*Background information:*
- Maverick is expected to start commercially selling at least one product to one UMTS carrier in August 2011.
- The Agreement does not require Maverick to provide documentation of marketing spend to Qualcomm.

**Accounting Treatment**

---

[9] See the Motorola – Amendment to Components Supply Agreement (CSA) memo, dated December 18, 2006. In Q2FY08, we recovered ▮▮▮ from Motorola when they did not meet a specified level of cumulative chipset purchases.

Maverick Transition Agreement
Page 5 of 9

Per ASC 650-50-25-7: *"A vendor may offer a customer a rebate or refund of a specified amount of cash consideration that is redeemable only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period. The vendor shall recognize the rebate or refund obligation as a reduction of revenue based on a systematic and rational allocation of the cost of honoring rebates or refunds earned and claimed to each of the underlying revenue transactions that result in progress by the customer toward earning the rebate or refund....."*

While the objective of the Marketing Development Fund is to contribute to Maverick's marketing costs, the Agreement terminates if Maverick sells a Maverick product that incorporates a non-Qualcomm cellular baseband modem, and Qualcomm shall not be obligated to make any further payments if Maverick sells such a product. Thus, Qualcomm is only willing to contribute to Maverick's marketing costs as long as its products contain only Qualcomm cellular baseband modems.

The purpose of the Marketing Development Fund is to contribute to Maverick's marketing costs associated with a new UMTS-based product that is expected to be launched in August 2011. The product is expected to launch with multiple carriers in various geographies worldwide. The term of the Marketing Development Fund (6 quarters) is consistent with the time it would likely take Maverick to launch a next generation product and/or engage in marketing activities associated with a product that is expected to be launched in August 2011[10].

The Agreement's provisions related to the Marketing Fund do not provide for a substantive claw back of any amounts paid to Maverick[10]. Therefore, we do not deem it appropriate to recognize the cost of the incentive over the life of the agreement as that would result in recording an asset for amortization, without having the ability to monetize that asset if the Agreement were to be terminated due to Maverick selling a product with a non-Qualcomm cellular baseband modem. The fact that the parties agreed to substantive claw back mechanisms on the other two deal components (i.e., the Transition Fund and the Variable Incentive Fund) is consistent with the intent that this component is a reimbursement for marketing activities within a specific timeframe.

As (a) there is no provision for a claw back[11] of any payment made to Maverick and (b) there is no obligation to make the initial payment to Maverick if the Agreement terminates prior to the obligation to make such payment, Maverick will earn the Marketing Development Funds as marketing activities take place and payments become due. The first payment becomes due in Q4FY11. Qualcomm understands that Maverick will spend these funds on marketing activities for Maverick products that contain Qualcomm chipsets in the periods that payments are due; the primary benefit to Qualcomm is the sale of chipsets as a result of Maverick's marketing activities. As at least one product with a UMTS carrier that incorporates a UMTS is expected to be launched in August 2011, marketing activities are expected to commence around product launch, in Q4FY11.

As Maverick is not required to demonstrate proof of marketing spend and as Qualcomm will not be able to assess whether the funds from the Marketing Development Fund were indeed used by Maverick for the intended marketing activities, an alternate view is that the exclusivity condition listed above is the primary benefit to Qualcomm. Regardless of the benefit to Qualcomm, Qualcomm ceases to benefit after the last payment is made as the terms and conditions of the Marketing Development Fund do not allow for claw back of any amounts paid if Maverick violates the exclusivity condition. Under this alternate view, the period of benefit would start when the exclusivity condition kicks in, Q1FY12, and would end six quarters later after the last payment has been made.

A second alternate view would be to recognize the cost over the term of the Agreement once a UMTS-based product is launched. Accordingly, the $150 million would be amortized over 17 quarters if the product launch occurs in Q4FY11.

While we recognize the alternate views, we believe that the proposed accounting treatment is a systematic and rational allocation of the cost associated with the Marketing Development Fund, that is consistent with the intent of the Agreement. The proposed accounting treatment commences cost recognition in the period in which Maverick is expected to commence marketing activities[12] and ceases cost recognition when marketing activities associated with the new product can reasonably be expected to have stopped as a next generation product likely would be available at that time, based on Maverick's historic pattern of launching a next generation product. The proposed treatment provides for a better matching of cost and revenues as compared to either alternate view as we will

---

[10] While we have no direct knowledge of Maverick's planned product launches, it is reasonable to assume based on Maverick's product launch patterns in the past, that the launch of the product will be staggered, where the product will be launched first in certain geographies followed by later launches in other geographies.
[11] Other than a claw back if Maverick does not commercially launch at least one product with a UMTS carrier that contains a UMTS chipset by December 2012. It is expected that this condition will be met prior to making the first payment.
[12] We will reevaluate the accounting if a product is not launched as expected (i.e. if product launch is delayed three months or more from the expected August 2011 launch).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Q2014FTC02717844
Q2017MDL1_02550901

CX5425-006

Maverick Transition Agreement
Page 6 of 9

start earning revenue in the quarter that the product is launched and cease earning revenue associated with this incentive once the next generation product can reasonably expected to launch Furthermore, there is no possibility for claw back once the last payment has been made; Maverick does not have any performance obligations after the last payment and has a legal right to keep all amounts paid under the Marketing Development Fund. Also, Qualcomm will not have an obligation to make the first payment if exclusivity is breached prior to the due date. The proposed treatment is conservative compared to the treatment under the second alternate view for the same reasons described above under the Transition Fund.

Qualcomm will recognize the incentive on a quarterly basis starting in Q4FY11[13]. As Maverick will not provide any documentation of the marketing spend, Qualcomm does not receive a separate and identifiable benefit; the incentive will be recorded as a reduction of revenue. See the Marketing Development Funds (MDF) Master Incentive Agreement Memo, dated October 29, 2008 for additional background on the accounting treatment.

**Variable Incentive Fund – $600,000,000**

*Objective:*
In consideration of Maverick's use of Qualcomm chipsets in Maverick products, Qualcomm has agreed to pay Maverick up to $600 million in additional volume-based incentives.

*Payments:*
Maverick can earn volume-based incentives as described below. There are four annual periods; the first period starts on October 1, 2011. The total amount due Maverick in this four-year period is capped at $600 million, with annual caps of $200 million. Failure to qualify for any payment in an individual annual period has no impact on prior year payments or the eligibility and amounts paid in subsequent years.

(i) First Payment. The payment amount set forth below for the applicable Annual Volume[14] is due and payable 45 days after October 1, 2012:



| Payment Amount | Annual Volume |
|---|---|
| US$200,000,000 | |
| US$150,000,000 | |
| US$100,000,000 | |
| no payment | |

(ii) Second Payment. The payment amount set forth below for the applicable Annual Volume is due and payable 45 days after October 1, 2013:

---

[13] We will reconsider the accounting treatment if product launch is delayed three months or more from the expected August 2011 launch.

[14] Annual Volume means the sum of all Qualcomm Chipsets (regardless of whether such chipsets, as utilized in Maverick products, implement UMTS) (i) purchased by Authorized Purchasers for delivery from a Sales Subsidiary during the 12 months preceding the applicable October 1st date (the "Applicable Period") for incorporation into Maverick products, and (ii) forecasted by Maverick and subject to a Purchase Order accepted by a Sales Subsidiary in accordance with the STA for delivery during such Applicable Period, but not purchased because the Sales Subsidiary failed to deliver such Qualcomm Chipsets due to a supply constraint as described in Section 4.3 of the STA (the "Supply Constrained VIF Units"). To the extent that any Supply Constrained VIF Units are delivered to an Authorized Purchaser in any subsequent 12-month period, such Supply Constrained VIF Units shall be excluded from all future Annual Volume calculations (i.e., the Supply Constrained VIF Units shall not be included in more than one Annual Volume calculation).

Maverick Transition Agreement
Page 7 of 9

| Payment Amount | Annual Volume |
|---|---|
| US$200,000,000 | ▮ |
| US$150,000,000 | ▮ |
| US$100,000,000 | ▮ |
| no payment | ▮ |

(iii) <u>Third Payment</u>. The payment amount set forth below for the applicable Annual Volume is due and payable 45 days after October 1, 2014:

| Payment Amount | Annual Volume |
|---|---|
| US$200,000,000 | ▮ |
| US$150,000,000 | ▮ |
| US$100,000,000 | ▮ |
| no payment | ▮ |

(iv) <u>Fourth Payment</u>. The payment shall be the lesser of (i) the unpaid balance of the Variable Incentive Fund, or (ii) the payment amount set forth below for the applicable Annual Volume. The applicable payment amount is due and payable 45 days after October 1, 2015.

| Payment Amount | Annual Volume |
|---|---|
| US$200,000,000 | ▮ |
| US$150,000,000 | ▮ |
| US$100,000,000 | ▮ |
| no payment | ▮ |

*Conditions*[6]:
- If, after October 1, 2011, Maverick sells a commercial product that incorporates a non- Qualcomm baseband modem, Qualcomm shall not be obligated to make any of the payments that are due after he date of such sale. If, during calendar 2013, Maverick sells such a commercial product, Maverick sell reimburse Qualcomm for the second annual payment (e.g. payment made for the period ended October 1, 2013).

**Accounting Treatment**
Qualcomm will accrue an average per unit incentive amount quarterly, based on forecasted yearly shipments. For example, for the fourth payment, if the annual volume forecast is ▮ units, we will accrue ▮. When determining the cost per unit we will also consider whether it makes economic sense for Maverick to order units in excess of their forecast. For example, if the forecast indicates an annual volume of ▮ units, it makes economic sense for Maverick to order an additional 1M units, regardless of whether they need those or not as explained by the following example:

Maverick Transition Agreement
Page 8 of 9

Average Sales Price (ASP)[15] for 2015[13] is ▮▮▮▮ Maverick's costs for ordering ▮▮▮▮ units would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As it makes economic sense for Maverick to order ▮▮▮▮▮▮▮ even if they only need ▮▮▮▮▮▮▮ we would accrue ▮▮▮▮▮▮▮▮▮▮▮▮ er unit instead of ▮▮▮▮▮▮▮▮.

An alternative view would be to accrue the cost based on the low end of the range. Using the same example as above, one could argue that Maverick earns its incentive on the firs ▮▮▮▮▮▮▮▮▮▮ nd the cost would be $▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and that their would be no cost associated with units ▮▮▮▮▮▮▮▮▮▮▮▮▮. We recognize that there is an alternate view that Maverick could "earn" the maximum annual incentive in less than a full year if they purchase the required annual volume in, for example, three quarters. In this example, one might argue that the maximum incentive should be accrued over the first three quarters. Furthermore, this alternate view fails to consider that Maverick does not have a legal right to be paid for an annual incentive until they have met all the conditions of the Variable Incentive Fund, which include a requirement to not launch any product with any non-Qualcomm based modems during each annual period. Accordingly, Qualcomm does not have a legal obligation to pay Maverick until each of the annual periods has concluded.

The proposed treatment matches the charges to income with the contractual period over which the incentive is earned. The proposed treatment as compared to the alternate view, results in a better match of the cost of the incentive with the related revenue earned throughout the rebate period, based on actual (expected) volume.
While the incentive structure here was not exactly contemplated in the QCT Master Handset (Subscriber Unit) Incentive Agreement Memo (the Master Memo) dated July 12, 2005 (Revised April 29, 2008) (Revised September 22, 2010), we believe the proposed accounting treatment is consistent with the volume-based incentive accounting treatment described in that Master Memo:

*"For incentive where certain volume milestone(s) must be met over a period of time that exceeds one quarter before the incentive is earned (e.g. upon 100th chipset shipment earn* ▮▮▮▮ *upon 200th chipset shipment earn* ▮▮▮▮ *upon 300th chipset shipment earn* ▮▮▮▮ *etc.), a forecast report will be used to determine whether the customer is expected to meet the milestone(s).* **An average incentive per unit (e.g.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **will be applied to the number of units** ▮▮▮▮▮▮▮▮ **expected to be subject to incentives throughout the rebate period.**"

Please refer to the Master Memo for other accounting treatment considerations. The incentive will be recorded as a reduction of revenue.

The accounting treatment assumes that Maverick will use Qualcomm baseband modems (see footnote 5) such that they will earn the Variable Incentive Fund as described above. We will prepare an addendum to this memo in which we will reassess the proposed accounting treatment if and when it becomes probable that Maverick will sell a commercial product that incorporates a non-Qualcomm baseband modem.

**Section 1.5 of the Agreement**

Section 1.5 of the Agreement provides that "…..if during calendar year 2013 Maverick sells a Maverick product commercially that incorporates a non-Qualcomm cellular baseband modem, Maverick shall reimburse Qualcomm the amounts actually paid by Qualcomm for the second installment of the Transition Fund (as described above)…… and for the Variable Incentive Fund payment …(as described above), without interest; such reimbursement to Qualcomm shall be due and payable forty-five (45) days after the launch of such device that incorporates a non-Qualcomm cellular baseband modem."

We do not believe these potential repayments should impact the timing of the charges to earnings because it is not probable that any amounts will be repaid. As discussed above, we expect Maverick to reach the volume thresholds of the Transition Fund and Variable Incentive Fund, respectively, such that the entire amount of each Fund will be earned by Maverick. Deferring charges to earnings until after calendar year 2013 has expired (and it is certain that Maverick has not sold product commercially that incorporates a non-Qualcomm cellular baseband modem), would result in potentially deferring $125 million of the Transition Fund charges until Q2FY14 as no expense would be recognized until calendar Q1 2014, and would potentially result in deferring up to $600M of Variable Fund charges as it is theoretically possible for Maverick to earn all of the Transition Fund before calendar 2013 expires.

The proposed accounting for the Transition Fund and Incentive Fund, respectively, matches the charges to revenues with the recognition of the related revenues.

---

[15] See Appendix B for forecasted ASPs.

Maverick Transition Agreement
Page 9 of 9

**Segment Allocation of the Incentives Described herein Between QCT/ QTL**
Maverick purchases limited quantities of chipsets from QCT for R&D purposes and purchases complete subscriber units incorporating Qualcomm's chipsets from its Authorized Purchasers that are Qualcomm's subscriber unit licensees. Although Qualcomm has certain other agreements with Maverick unrelated to these chipset purchases, Maverick is not and never has been a QTL licensee. Based on Maverick's purchases of chipsets from QCT for R&D purposes and the purchase of chipsets from QCT and payment of royalties to QTL by Maverick's Authorized Purchasers, ASC Topic 605, *Customer Payments and Incentives*, is applicable to payments that Qualcomm makes to Maverick.

The Variable Incentive Fund is a chipset volume-based incentive. Chipset volume-based, or pricing, incentives are allocated 100% to the QCT segment.

QCT enters into other types of pricing incentive arrangements (including MDF, NRE and others) that may be allocated 100% to QCT. In particular, an arrangement (a) that is initiated by QCT as an alternate type of pricing incentive and not for the purpose of benefiting QTL, (b) that does not provide any benefit to QTL because it relates to a product that is not royalty bearing, or (c) that does not benefit QTL for other reasons will be allocated 100% to QCT. If the arrangement is determined to benefit QTL, the incentive amount is generally shared by QCT and QTL based on their relative gross profit percentages for existing market products and based on their relative operating profit percentages for new market products.[16] The Transition Fund and MDF incentives provided under the Agreement will not be allocated to both QCT and QTL throughout the term of the Agreement because these incentives were initiated by QCT as pricing incentives[17]; however, the Agreement does provide benefit to QTL during an initial period from the effective date through December 2012. This benefit relates to a separate Marketing Incentive Agreement with Maverick that has been in effect since January 8, 2007 (the "2007 Agreement"). Under the 2007 Agreement, Qualcomm pays a marketing incentive amount to Maverick for each eligible device purchased by Maverick or a purchaser authorized by Maverick through December 31, 2012. These amounts have been allocated 100% to QTL. On February 18, 2011, as a result of negotiations on the Agreement, Qualcomm and Maverick executed a letter agreement that limited the types of devices that would be eligible for a marketing incentive amount under the 2007 Agreement. Such letter agreement was necessary to ensure that Qualcomm did not pay two separate incentive amounts on certain devices as a result of the Agreement. As a result of the letter agreement, certain amounts that, without the letter agreement, may have been payable under the 2007 Agreement will not be payable under the 2007 Agreement. The precise amount of the benefit to QTL will depend upon the percentage of certain Maverick devices that implement both CDMA2000 and WCDMA versus CDMA-only devices that are launched by Maverick worldwide with CDMA carriers. However, QTL estimates that the amount saved by QTL as a result of the letter agreement could range from approximately [REDACTED]. In consideration of this benefit to QTL, the Transition Fund and the Marketing Development Fund obligations will be allocated to both QCT and QTL through December 31, 2012. The shared obligation will be allocated using a blended rate of [REDACTED]. The blended rate was calculated based on the estimated volume mix between Maverick handsets (existing product market segment) and Maverick tablets (new product market segment). (See Exhibit A). This allocation approximates the savings that QTL has estimated. Thereafter, remaining amounts owed under the Agreement will be allocated 100% to QCT.

While the Transition Fund contains a volume-based performance obligation, we note that the amount payable is not variable once the minimum volume has been met. In addition, the Transition Fund's exclusivity provision provides another benefit unrelated to volume. Accordingly, both QCT and QTL will record their respective shares of amounts owed under the Transition fund in the same fiscal quarter, i.e. recognition by QTL will not lag by one quarter as is typical with volume-based incentives. The MDF incentive will also be recorded by both QCT and QTL in the same fiscal quarter as the incentive is not volume-based.

---

[16] For agreements entered into in fiscal 2011, the relative gross profit percentages are [REDACTED] and the relative operating profit percentages are [REDACTED]. Relative operating profit percentages are used for new product market incentives because new products may require a significant amount of R&D investment by QCT that is incremental to QCT roadmaps. See the "Q4 FY2010 QCT/QTL Shared Incentive Allocations" accounting memo dated October 4, 2010. Going forward, definitions of new product and existing product market segments may evolve as significant incremental R&D investment by QCT may not be the only factor considered, and certain new products may become existing products over time. Any future changes to the definitions will be documented in an accounting memo when they occur.

[17] We also note that Section 1.5 of the Agreement provides benefits to QCT beyond those historically included in incentive deals that have been shared by the QCT and QTL operating segments.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Q2014FTC02717848
Q2017MDL1_02550905

CX5425-010