1   KEKER, VAN NEST & PETERS LLP
    Robert A. Van Nest - # 84065
2   rvannest@keker.com
    Eugene M. Paige - # 202849
3   epaige@keker.com
    Justina Sessions - # 270914
4   jsessions@keker.com
    633 Battery Street
5   San Francisco, CA 94111-1809
    Telephone:    415 391 5400
6   Facsimile:    415 397 7188

7   CRAVATH, SWAINE & MOORE LLP
    Gary A. Bornstein (pro hac vice)
8   gbornstein@cravath.com
    Yonatan Even (pro hac vice)
9   yeven@cravath.com
    825 Eighth Avenue
10  New York, New York 10019-7475
    Telephone: (212) 474-1000
11  Facsimile:  (212) 474-3700

12  Attorneys for Defendant
    QUALCOMM INCORPORATED

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet (pro hac vice)
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Willard K. Tom (pro hac vice)
willard.tom@morganlewis.com
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Facsimile:  (202) 739-3001

MORGAN, LEWIS & BOCKIUS LLP
Geoffrey T. Holtz (SBN 191370)
gholtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

13

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                    SAN JOSE DIVISION

17  FEDERAL TRADE COMMISSION,                    Case No. 17-cv-0220-LHK-NMC

18                   Plaintiff,                  **DEFENDANT QUALCOMM
                                                 INCORPORATED'S PROPOSED
19          vs.                                  FINDINGS OF FACT AND
                                                 CONCLUSIONS OF LAW**
20  QUALCOMM INCORPORATED, a Delaware
    corporation,                                 **UNREDACTED VERSION OF
21                                               DOCUMENT SOUGHT TO BE
                     Defendant.                  SEALED**
22
                                                 Date:        January 4, 2019
23                                               Time:        9:00 a.m.
                                                 Dept.:       Courtroom 8, 4th Floor
24                                               Judge:       Hon. Lucy H. Koh
                                                 Trial Date:  January 4, 2019
25

26

27

28

# TABLE OF CONTENTS

**Page**

FINDINGS OF FACT ........................................................................................... 1

I. THE PARTIES ......................................................................................... 1

II. THE MOBILE COMMUNICATIONS INDUSTRY AND THE HISTORY OF QUALCOMM ............................................................................................. 1

III. QUALCOMM'S LICENSE AGREEMENTS AND TERMS ........................... 4

    A. Qualcomm's Early CDMA Licenses Before It Even Had A Chip Business ......... 5

        1. 2G CDMA Licenses ................................................................. 5

        2. CDMA License Agreements to Korean OEMs ...................................... 7

    B. The Founding of Qualcomm's CDMA Chip Business ............................ 7

    C. Qualcomm's WCDMA Licenses Were Similarly Executed Before WCDMA Was Standardized and Before Qualcomm Sold WCDMA Chips .......... 8

    D. Chinese Framework Agreements .................................................. 9

    E. Qualcomm's LTE Agreements ................................................... 10

    F. Qualcomm's 5G Agreements ..................................................... 12

    G. Caps On Royalties ................................................................ 13

    H. Specific OEM Licensing Negotiations ........................................... 14

    I. Qualcomm's Practice of Not Selling Chips to Unlicensed Companies Has Valid Business Justifications .................................................... 33

    J. Qualcomm's Use of Strategic Funds ............................................ 35

IV. QUALCOMM'S DEVELOPMENT OF CELLULAR TECHNOLOGIES .................. 37

    A. Cellular Standards and Standardization ......................................... 37

    B. Modem Chips and Cellular Devices ............................................. 42

    C. Qualcomm's Development, Standardization and Commercialization of Key Technologies .................................................................... 43

        1. Qualcomm's Research Approach and Investment in Innovation ......... 43

        2. Qualcomm's Role in Creation of Ubiquitous High Speed Cellular Data ...................................................................... 47

        3. Qualcomm's Role in Pioneering 4G ........................................ 50

        4. Qualcomm's Role Leading the Way to 5G .................................. 53

V. QUALCOMM'S PRACTICE OF LICENSING AT THE DEVICE LEVEL ............... 57

    A. Qualcomm's Commitments to ETSI .............................................. 57

    B. Qualcomm's Commitments to ATIS AND TIA .................................. 59

    C. The Content of the Relevant 3GPP and 3GPP2 Standards ..................... 61

    D. Industry Practice of Device-Level Licensing ................................... 62

    E. Qualcomm's Licensing Practices with Respect to Chipmakers ............... 66

VI. APPLE'S CHIP RELATIONSHIP WITH QUALCOMM ................................ 67

VII. COMPETITION IN THE MOBILE COMMUNICATIONS INDUSTRY .................. 76

    A. The Mobile Handset Industry Is Thriving ...................................... 76

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

B.   Relevant Market Definition............................................................... 77

C.   Qualcomm's Success In Winning Chip Sockets Is Earned................... 81

D.   Competition Among Chip Makers Is Dynamic .................................. 83

E.   Chip Prices Are Declining ................................................................. 88

F.   Baseband Processor Quality Is Improving......................................... 90

VIII.   QUALCOMM PLAYS A SUBSTANTIAL ROLE IN EVOLVING WIRELESS
TECHNOLOGIES THAT PROMOTE THE PUBLIC INTEREST................. 91

CONCLUSIONS OF LAW........................................................................................ 95

IX.   LEGAL STANDARDS GOVERNING THE FTC'S CLAIMS ..................................... 95

X.   THE FTC FAILS TO PROVE THAT THE CHALLENGED CONDUCT
CAUSED HARM TO COMPETITION, WHICH IS FATAL TO EACH OF THE
THEORIES UNDERLYING THE FTC'S SECTION 5 CLAIM................................... 99

A.   The FTC Must Establish That Challenged Conduct Caused Harm to
Competition And It Must Make That Showing Based on Objective and
Reliable Evidence.......................................................................... 99

B.   The FTC Has Failed to Prove Its Theory of Anticompetitive Effects ............... 102

1.   The FTC Has Failed To Establish That Qualcomm Has
Monopoly Power In The Alleged Relevant Markets ....................... 104

2.   The FTC Has Failed to Establish That Qualcomm's Chip Supply
Practices Harmed Competition in the Alleged Relevant Markets...... 111

3.   The FTC Has Not Met Its Burden to Show that Qualcomm's
Practice of Device-Level Licensing Has Harmed Competition......... 120

4.   The FTC has Failed to Meet its Burden to Show that "Strategic
Funds" Provisions in Qualcomm's Agreements with OEMs have
Harmed Competition ...................................................................... 122

5.   The FTC has Failed to Meet its Burden of Showing that
Qualcomm's Agreements with Apple Harmed Competition ............. 123

XI.   THE FTC HAS FAILED TO PROVE ADDITIONAL ELEMENTS OF A
SECTION 2 VIOLATION....................................................................................... 126

A.   Declining to Sell CDMA or "Premium" LTE Modem Chips to Unlicensed
Companies Is Not Exclusionary Conduct .......................................... 126

B.   Declining to Grant Exhaustive Licenses for the Manufacture of CDMA or
"Premium" LTE Modem Chips Is Not Exclusionary Conduct..................... 128

C.   Use of Strategic Funds Provisions Did Not Exclude any Sellers of CDMA
or "Premium" LTE Modem Chips .................................................... 129

D.   Conditioning Incentive Payments In Order to Enable Customer-Specific
Investments to be Made Is Not Exclusionary Conduct....................... 129

E.   On the Record in this Case, linkLine Forecloses the Argument that
Qualcomm's Chip Supply Practice, Alone or in Combination with Other
Conduct, Constitutes Exclusionary Conduct....................................... 131

1.   The FTC Has Not Established an Antitrust Duty to Deal ................. 132

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

TABLE OF CONTENTS
(continued)

Page

2.      The FTC has not Established that Qualcomm's "Course of Conduct," Considered Together, Constitutes Unlawful Exclusionary Conduct .................................................................. 135

XII.    THE FTC HAS NOT PROVED THE ELEMENTS OF A SECTION 1 VIOLATION .................................................................................... 137

A.      The FTC has not Proved a Contract, Combination, or Conspiracy Intended to Restrain or Harm Trade ............................................... 137

B.      The FTC has not Proved that the License Agreements with OEMs or Qualcomm's Agreements with Apple were Unreasonable Restraints of Trade ................................................................................... 138

XIII.   THE FTC HAS NOT ESTABLISHED THE REQUIREMENTS OF A CLAIM UNDER THE "UNFAIR METHODS OF COMPETITION" PRONG OF SECTION 5 .................................................................................... 138

XIV.    THE FTC HAS FAILED TO ESTABLISH THAT IT IS ENTITLED TO INJUNCTIVE RELIEF ...................................................................... 139

A.      The FTC Has Not Demonstrated that an Injunction Is Needed To Remedy Ongoing Anticompetitive Harm ........................................ 141

1.      The FTC has failed to prove any injunctive relief is needed under relevant case law .................................................... 141

2.      The FTC has failed to prove any of its specific requested relief is needed to solve ongoing anticompetitive harms ................. 143

B.      In the Alternative, the FTC's Requested Relief is not Narrowly Tailored to the Markets or Harms at Issue in this Case .......................... 144

1.      Any relief requested by the FTC must be narrowly tailored ............. 144

2.      Each of the specific injunctions requested by the FTC is overbroad and not properly tailored, and in some cases, impermissibly vague .......................................................... 146

C.      The FTC Has Not Demonstrated that Equity Warrants a Permanent Injunction ...................................................................... 148

XV.     CONCLUSION .................................................................................... 151

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

Qualcomm Incorporated ("Qualcomm") submits the following proposed findings of fact and conclusions of law with respect to the trial of this action.

**FINDINGS OF FACT**

**I.      THE PARTIES**

1.      Defendant Qualcomm Incorporated, founded in 1985, is a Delaware corporation with its principal place of business in San Diego, California.  Qualcomm engages in the development and commercialization of foundational techniques and products used in mobile devices and other cellular products.  Qualcomm's operating segment relating to its chip and software business is called Qualcomm CDMA Technologies ("QCT"). Qualcomm's operating segment relating to the licensing of its patents is called Qualcomm Technology Licensing ("QTL").

2.      Plaintiff Federal Trade Commission is a federal administrative agency with its principal office in Washington, D.C.

**II.     THE MOBILE COMMUNICATIONS INDUSTRY AND THE HISTORY OF QUALCOMM**

3.      The cellular industry is a relatively young industry.  It includes participants that contribute to the industry at one or more of a number of different levels.  Some firms innovate, inventing the cellular technologies that make mobile communications and efficient use of spectrum possible.  Some firms implement, manufacturing the user devices (e.g. handsets and tablets) that people use and the network equipment (e.g. base stations) that network operators such as carriers use.  And, some firms manufacture components specified by implementers, such as power supplies and batteries for infrastructure equipment and modem chips, batteries, touchscreens, etc. for user devices.

4.      Qualcomm is an innovation company that makes its innovations available to other members of the industry by contributing them to technical specifications developed and approved by industry participants in global collaborative standards development partnerships, and licensing them for use in devices that implement cellular communications standards.  Qualcomm also designs and supplies modem chips and other components of cellular devices.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

5.      Qualcomm was founded in July 1985 by Irwin Jacobs, Harvey White, Andrew Viterbi, Klein Gilhousen, Franklin Antonio, Dee Coffman and Andy Cohen, with each founder contributing roughly $1500 to start the new company.

6.      Cellular standards are often viewed as generational.  The second generation of wireless standards is referred to as "2G," the third generation as "3G," the fourth generation as "4G" and the fifth generation as "5G."

7.      At the time Qualcomm was founded in 1985, technology development in the cellular industry was moving from analog 1G systems introduced in the early 1980's to digital 2G systems.  2G technology was developed, in part, to address the issue of how to improve the efficiency of use of cellular spectrum for voice communications, as available spectrum for cellular communications is limited and expensive.

8.      In Europe, GSM (Global System for Mobile), a standard based on TDMA (Time Division Multiple Access) technology, was being developed at that time.  Qualcomm advocated a different approach to solving the problem of spectrum efficiency.  That approach involved the use of CDMA (Code Division Multiple Access) technology.

9.      CDMA systems differ from TDMA systems in a number of advantageous ways. First, CDMA uses spreading codes, and not frequency, to separate channels.  Each CDMA cell uses the same frequencies, avoiding the need for complicated and inefficient frequency planning in deploying cells (as happened in GSM networks).  Second, CDMA spreads the signal to a much wider bandwidth, which makes the system more resistant to interference at a particular frequency. Third, CDMA enables soft-handoff in which the mobile device can communicate with two base stations simultaneously, reducing dropped calls and increasing signal quality by allowing the mobile device to aggregate signals sent over different paths.

10.      The industry was skeptical when Qualcomm first proposed CDMA.  Starting in 1989, Qualcomm faced a negative response from many industry participants who took the view that CDMA technology was technologically impossible or would not be cost-effective in a competitive cellular marketplace.

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

11.     Qualcomm then began the work of convincing the industry otherwise through advocacy and demonstrations.

12.     There were no manufacturers willing to make CDMA equipment (handsets or infrastructure equipment) because they did not believe that it was going to be successful technically or commercially.  As a first step, Qualcomm had to invest millions of dollars to build prototypes to demonstrate the system could be successful.  This required Qualcomm to raise capital for investment.

13.     After early successful demonstrations, in the early 1990's, six operators and equipment manufacturers, including AT&T, NYNEX Mobile, Ameritech Mobile Communications, Motorola, OKI Electric and PacTel Cellular, agreed to invest in Qualcomm's research and development on CDMA.  It was at this time that Motorola and AT&T entered into the first licensing agreements with Qualcomm, each contributing $12 million to Qualcomm for further development of CDMA technology.

14.     In July 1993, a standard based on Qualcomm's CDMA technology was adopted by a North American standards development organization as IS-95.

15.     In order to continue to convince a skeptical industry to commercialize CDMA on a wide scale, Qualcomm entered the product business, in large part to demonstrate the value of its technology.  In 1994, Qualcomm and Sony Electronics Inc. formed a joint venture general partnership named Qualcomm Personal Electronics (QPE), with 51% ownership by Qualcomm, to design, manufacture and sell cellular portable phones.

16.     Similarly, in December 1994, Qualcomm and Northern Telecom entered into an agreement to jointly manufacture CDMA infrastructure equipment complying with the IS-95 standard.

17.     In October 1995, Qualcomm formed the Qualcomm CDMA ASIC division (later known as QCT) to continue the development and production of CDMA chips and attendant software.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

18. In October 1995, Hutchinson Telecom in Hong Kong launched the first commercial CDMA system.

19. By December 1998, the number of cdmaOne subscribers worldwide reached 23 million. With its cellular technology gaining broader acceptance in the industry, Qualcomm began divesting most of its product businesses.

20. In March of 1999, Qualcomm and Ericsson settled ongoing patent litigation. As part of the settlement, in a complex commercial deal, Qualcomm sold its infrastructure business to Ericsson and granted Ericsson a license for the manufacture and sale of handsets and infrastructure equipment practicing Qualcomm's patents.

21. In late 1999, Qualcomm agreed to sell to Kyocera Wireless Corp. substantially all the assets of its wireless portable phone business. This left Qualcomm with two main business lines: (a) the continued development of fundamental cellular technology, and (b) the supply of modem chips and other components for cellular devices.

22. By 2000, and through the standardization of WCDMA and CDMA2000, CDMA became the multiple access technique for the air interface of 3G cellular networks around the world.

23. These developments, in particular the adoption of WCDMA as the 3G standard on networks that had used GSM for 2G communication, reflected the recognition of the cellular industry, including historic proponents of GSM, that Qualcomm's CDMA technology was superior to TDMA for the efficient use of spectrum, including for the purpose of sending and receiving large amounts of data over a cellular network.

## III. QUALCOMM'S LICENSE AGREEMENTS AND TERMS

24. Historically, many major participants in the cellular industry, including firms such as Nokia, Motorola and Ericsson, were vertically integrated and participated at multiple levels in the industry – including as developers and suppliers of technology, handsets, chips and infrastructure equipment. As a result, they had incentives to maximize margins at the product supply level, even if at the expense of reduced royalty revenue opportunities.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

25.     Many major participants in the cellular industry today are primarily implementers of technology that make and sell user devices such as cellular handsets, and network equipment such as infrastructure equipment.  Implementers also have incentives to maximize margins at the product supply level.

26.     Qualcomm, by contrast, as an innovation firm, has different incentives. Qualcomm and other innovation firms have incentives to promote competition that results in thriving downstream user device and network equipment sales market-wide.

**A.**     **<u>Qualcomm's Early CDMA Licenses Before It Even Had A Chip Business</u>**

**1.**     **2G CDMA Licenses**

27.     Qualcomm's first business in cellular communications was developing and licensing its patented technologies.  This is because Qualcomm has always sought to propagate its cellular technologies broadly, rather than keep them as proprietary.  For this reason, Qualcomm has always sought to earn a return on its R&D efforts by obtaining patents on its inventions and making those inventions available to the industry though licensing those patents to others.

28.     Qualcomm entered into five license agreements before the first CDMA standard (IS-95) was finalized in 1995.

29.     Qualcomm entered into its first license agreement that licensed its CDMA technology ("CDMA License Agreement") with AT&T in July 1990.

30.     Qualcomm entered into its second CDMA License Agreement on September 26, 1990 with Motorola.

31.     These agreements provided for a royalty rate of 4% of the Net Selling Price (as defined in the agreements) of an end-user product to be paid to Qualcomm, and that the royalty rate payable by AT&T and Motorola would not exceed 80% of the rate contained in any license agreement with a third party to CDMA technology.

32.     AT&T and Motorola each also provided $12 million in funds to support Qualcomm's development and early trials of CDMA-based systems.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

33.     At the time these first license agreements were entered into, Qualcomm held only nine patents.  Qualcomm's overall patent portfolio has had a compound annual growth rate of 31% for the last twenty years.  In 1999, the year that the WCDMA standard was adopted, Qualcomm received 510 patents.  In 2015 alone, Qualcomm obtained nearly 9,000 new patents.

34.     After concluding the AT&T and Motorola agreements, Qualcomm began to negotiate and enter into license agreements for the use of its CDMA technology with handset manufacturers around the world.  These agreements were generally titled Subscriber Unit License Agreement ("SULA"), and offered broad licenses to both SEPs and non-essential patents. Qualcomm entered into early SULAs with, among others, Nokia on April 9, 1992; Oki Electric Industry Co., on July 26, 1993; and Matsushita Communication Industrial Co., Ltd., on December 20, 1993.

35.     The vast majority of the SULAs had the same general structure.  The SULAs generally provided a license to certain Qualcomm patent rights to "make and have made, import, use, sell, offer to sell and otherwise dispose" of "Subscriber Units," generally defined as complete end-user devices that implement one or more air interface standards (e.g. CDMA or WCDMA) identified in the agreement.  The grant from Qualcomm generally covered both patents that are essential to the specified standards (referred to in the SULAs as "Technically Necessary IPR") and patents that are not essential but are commercially valuable (referred to in the early SULAs as "Commercially Necessary IPR" and later as "Other IPR.")

36.     In exchange for a license to Qualcomm's patents, Qualcomm's SULAs provided for monetary and non-monetary consideration from the licensee.  The monetary value generally took two forms – ███████████████████████████████  The non-monetary consideration generally included ███████████████████████████████.

37.     The 2G SULAs generally called for payment to Qualcomm of a running royalty at a rate of 6.5% to 5%, on a sliding scale, based on volume of licensed handsets sold.  The running royalties are calculated ████████████████████████████████████████ ███████████████████████

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

38.     The patents included in the grant from Qualcomm and the cross-grant from the licensee were sometimes limited to those filed or acquired during a defined capture period or improvement period, meaning that only patents filed or acquired prior to the improvement or capture period are included in the grant, while patents filed or acquired after the improvement or capture period ends are not.  In other cases, cellular SEPs related to the products implementing one or more of the licensed air interface standards were not subject to a capture or improvement period.

## 2.     CDMA License Agreements to Korean OEMs

39.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

40.     ██████████████████████████████████████████████████████████████████████████████████████████ The purpose of the lower rates for handsets sold in Korea was to promote the deployment in Korea of the world's first CDMA large-scale commercial networks.

## B.     <u>The Founding of Qualcomm's CDMA Chip Business</u>

41.     Qualcomm's chip business began in October 1995 when it formed its CDMA ASIC Products Unit.

42.     Before Qualcomm had a chip business, Qualcomm already had SULAs with the following 16 OEMs, which include all major OEMs of the period but for Ericsson: AT&T Corp., Motorola Inc., OKI Electric Industry Co., Ltd., Nokia Corp., Alps Electric Co., Ltd. Alpine Electronics Inc., ███████████████ Maxon Telecom Co., Ltd., Samsung Electronics Co., Ltd., Panasonic Mobile Communications Co., LTD., NEC Corp., Mitsubishi Electric Corp., Toshiba Corporation, Hyundai, Sanyo Electric Co., Ltd. and Fujitsu Limited.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

43.     Qualcomm's typical royalty rates of 6.5-5% were established based on negotiations conducted at a time when Qualcomm was a new company, with untested technology that had not yet been standardized and before Qualcomm began to sell chips.

44.     When Qualcomm started its CDMA chip business, the licensing business was already established as the mechanism for Qualcomm to obtain return on its R&D investments. Qualcomm therefore had no reason to price the value of its intellectual property (IP) into its chips, and never did so.  With the highly competitive modem chip marketplace and the fact that Qualcomm's modem chip competitors can follow and leverage technology developed by Qualcomm and others without incurring any R&D expenses to develop it, it is not practicable today for Qualcomm to price its IP into the cost of the modem chip.

45.     Qualcomm's first CDMA modem chip was shipped by QCT in 1996.

46.     There is no economically meaningful difference in the CDMA royalty rates in Qualcomm's SULAs entered into prior to the time Professor Shapiro alleges Qualcomm gained monopoly power in the alleged market for CDMA modem chips, and those entered into after that date.

## C.   Qualcomm's WCDMA Licenses Were Similarly Executed Before WCDMA Was Standardized and Before Qualcomm Sold WCDMA Chips

47.     Qualcomm concluded a WCDMA patent license agreement with Philips Electronics N.V. ("Philips") on February 26, 1998, almost two years before the approval of the WCDMA standard in 3GPP.

48.     ███████████████████████████████████████████████
████████████████████████████████████████████████████████
███████

49.     In 1999, before 3G was standardized, Qualcomm publicly stated that its 3G rates would be the same as its CDMA 2G rates.

50.     Qualcomm entered into 16 WCDMA-only licenses before the approval of the WCDMA standard.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    51.    Qualcomm continued to enter into SULAs specifically including licenses to

2    practice patents essential to the 3G CDMA2000 and WCDMA standards in early 2000.  As

3    Qualcomm had announced they would, the 3G agreements reflected comparable terms to the

4    preceding 2G agreements.

5    52.    Qualcomm shipped its first WCDMA modem chip in October 2001.  This chip

6    was not successful commercially due to its lack of support for backward compatibility with the

7    GSM standard.

8    53.    It was not until 2004 that Qualcomm commercially shipped its first WCDMA

9    modem chip that integrated backwards compatibility with GSM.

10    54.    Qualcomm entered into 22 licenses covering WCDMA before it shipped a viable

11    WCDMA/GSM chip.

12    55.    There is no economically meaningful difference between Qualcomm's WCDMA

13    royalty rates, where it is not even alleged to have market power, and its CDMA royalty rates.

14    56.    There is no economically meaningful difference between the WCDMA royalty

15    rates in Qualcomm's SULAs entered into prior to the time that Qualcomm began selling

16    WCDMA modem chips and those entered into after that date.

17    **D.    Chinese Framework Agreements**

18    57.    The Chinese government did not permit Qualcomm to enter its first license

19    agreement with a Chinese company until after it executed a "Framework Agreement for CDMA

20    Intellectual Property" (the "F/A"), dated January 28, 2000, with wireless operator China Unicom

21    acting as a proxy for the Chinese government, and after a Memorandum of Understanding was

22    negotiated and signed with the Chinese Ministry of Information Industry.

23    58.    In 2001, Qualcomm began entering into CDMA license agreements with Chinese

24    licensees selected by the Chinese government.

25    59.    ███████████████████████████████

26    ███████████████████████████████

27    ███████████████████████████████

28

9

1  ███████████████████████████████████████████████████████

2  ██████████████████████████████████████

3      **E.      Qualcomm's LTE Agreements**

4      60.    Qualcomm entered into the first license for use of its 4G patents in non-3G

5  subscriber units on February 23, 2006, with SOMA Networks, Inc.

6      61.    In December 2008, LTE Release 8 was frozen.

7      62.    Prior to the adoption of the LTE standard in December 2008, Qualcomm

8  announced that for subscriber units that implement LTE but do not implement any 3G CDMA

9  standard, it expected it would charge royalties under its SEPs through LTE Release 8 of

10  approximately 3.25% of wholesale selling price.

11      63.    Qualcomm entered six LTE-only licenses effective before the date LTE Release 8

12  was frozen – SOMA Networks, Inc., ████, ██, Exoteq Aps, LeadTek Research Inc., United

13  Computer & Telecommunication, Inc.  In 2010, Qualcomm produced its first LTE modem chips.

14      64.    ████████████████████████████████████ enter a separate license to practice

15  Qualcomm's patents essential to the 4G standard in multimode subscriber units that include a 3G

16  mode of operation. ████████████████████████ 4G SEPs ███████████████████████████

17  multimode subscriber units ████████████████ 3G SULAs. ████████████████████████

18  ████████████████████████████████ 4G standard ████████████████ 4G products that do not also

19  include a CDMA or WCDMA mode of operation.

20      65.    Prior to the introduction of its first LTE chips in 2010, Qualcomm entered into 68

21  WCDMA-only agreements, and 69 before 2011, the date Qualcomm is alleged to have obtained

22  market power in what the FTC defines as "premium" LTE modem chips.  The royalty rates of

23  these agreements were not, and could not have been, influenced or impacted by purchases of, or

24  potential purchases of, Qualcomm CDMA or "premium" LTE modem chips.

25      66.    There is no economically meaningful difference between the royalty terms in

26  WCDMA-only agreements that were entered into prior to 2011 and those entered after that date.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

67.     From 2011-2018, Qualcomm did not sell any modem chips for handsets that supported only LTE capabilities.  Rather, all LTE modem chips sold by Qualcomm were multi-mode chips, supporting both 2G and 3G capabilities in addition to LTE capabilities.

68.     Qualcomm's 2G and 3G licensees were, as a result, able to buy multi-mode LTE/3G/2G modem chips from Qualcomm and did not need to enter into single mode LTE licenses in order to buy LTE modem chips from Qualcomm.

69.     Qualcomm has entered into 312 LTE-only licenses, and does not yet sell modem chips for handsets that support only LTE capabilities.  The royalty rates of these licenses were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

70.     There is no economically meaningful difference between the LTE royalty rates in Qualcomm's agreements with licensees, based on the number of Qualcomm's modem chips that a licensee uses, if any.

71.     The royalty rates of the single mode LTE licensing agreements were not influenced or impacted by purchases of, or potential purchases of, Qualcomm CDMA or "premium" LTE modem chips.

72.     The royalty rates of multimode license agreements that included both a CDMA standard and LTE were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

73.     In 2015, after China's National Development and Reform Commission ("NDRC") concluded its investigation of Qualcomm, Qualcomm offered and entered into license agreements for complete end-user devices known as Chinese Patent License Agreements ("CPLAs"), pursuant to a Rectification Plan approved by the NDRC.

74.     The CPLAs provide a license only to Qualcomm's Chinese patents that are essential to a specified cellular standard only for devices made and sold for use in China or made in China and sold for use in a jurisdiction in which Qualcomm does not own patents.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

75.     The CPLAs provide for a royalty rate for LTE devices of 3.5% of the Net Selling Price for non-branded devices or 3.5% of the Adjusted Net Selling Price (defined as 65% of Net Selling Price) for branded devices.  The CPLAs provide a royalty rate for CDMA devices of 5% of the Net Selling Price for non-branded devices or 5% of the Adjusted Net Selling Price (defined as 65% of Net Selling Price) for branded devices.

76.     Some CPLAs are titled Complete Terminal Chinese Patent License Agreement ("CTCPLA").

77.     The Rectification Plan provides that with respect to Chinese manufacturers that purchase modem chips from Qualcomm under a chip sales agreement, Qualcomm will not terminate the chip sales agreement or the supply of chips under that agreement based on a good faith dispute over the customer's CPLA.  The Rectification Plan further provides that Qualcomm will not terminate the customer's supply of chips due to a breach of the CPLA without first obtaining a determination by a third party adjudicator that the breach is material, and if such breach is determined to be material, Qualcomm will give the customer at least 60 days to cure the breach.

78.     The Rectification Plan also provides that Qualcomm is not required to sell chips to entities that are not Qualcomm licensees.

79.     In 2015, Qualcomm revised the agreement it typically uses as a starting point for negotiations and renamed that template the "Complete Terminal Patent License Agreement" or "CTPLA" in place of the term "SULA" used previously.

80.     Through the CTPLA, Qualcomm grants rights to both essential and non-essential patents worldwide, excluding Chinese patents which are now typically covered by the CPLAs described above.

**F.    Qualcomm's 5G Agreements**

81.     In November 2017, Qualcomm announced royalty terms for 5G: an effective running royalty rate for an SEP-only license of 3.25% of the selling price for branded multi-mode (3G/4G/5G) handsets and 2.275% for branded single-mode handsets, and royalty rates for

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

portfolio licenses including both SEPs and NEPs (non-essential patents) of 4% of the selling price for branded single mode handsets and 5% for branded multimode handsets.

82.     The 5G standard in Release 15 was approved in December 2017.

83.     In 2018, Qualcomm entered into agreements covering patents essential to the 5G standard and including the announced 5G running royalty rates with Chinese OEMs Xiaomi, Meizu and TCL, and a number of additional OEMs including ███████████, ASUStek and Sharp.  In total, as of November 2018,██ such agreements were entered in 2018.

84.     ████████████████████████████████████████

## G.     Caps On Royalties

85.     For more than 20 years, Qualcomm has negotiated and agreed to include in license agreements a maximum royalty provision that capped the royalty payable on handsets to a maximum amount, regardless of the selling price of the handset.  Such a cap, in the amount of ██, was included in the Sharp SULA entered into April 30, 1997.

86.     Over the years, Qualcomm has also, on a voluntary basis and based on its monitoring of market conditions and discussions with licensees, conducted a voluntary royalty cap program that limits the royalty payable on handsets to a maximum amount, regardless of the selling price of the handset.  That cap was for many years ██ per handset.

87.     In early 2018, Qualcomm modified its voluntary royalty cap program for handsets to provide for a maximum handset selling price against which the royalty rate will be calculated, instead of capping the royalty itself.  As of April 2018, the maximum handset selling price (generally the licensee's wholesale selling price net of certain permissible deductions such as transportation, insurance, packing costs and other items), used for purposes of calculating the royalty owed to Qualcomm, is $400.  Applying the $400 maximum handset selling price for royalty cap purposes, no handset subject to a 5% royalty rate yields payment of a royalty in excess of $20, and handsets subject to lower royalty rates have lower maximum royalty payments.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

**H.**     **Specific OEM Licensing Negotiations**

**1.**     **Motorola/Lenovo**

88.     Qualcomm and Motorola Inc. entered into a CDMA licensing agreement on September 26, 1990, five years before Qualcomm began selling modem chips.  The agreement specified a 4% royalty on subscriber units (a rate that had been discussed by the parties as early as May 1, 1990) an upfront payment by Motorola of $12 million, and a cross-grant of Motorola's patents to Qualcomm.

89.     At the time Motorola executed its agreement, Qualcomm was not selling CDMA chips.  Thus, the royalty rates in the 1990 CDMA licensing agreement were not influenced or impacted by purchases of, or potential purchases of, Qualcomm CDMA or "premium" LTE modem chips.

90.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████

91.     The royalty rates in the 2003 WCDMA licensing agreement were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

92.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████

93.     The royalty rates in the 2003 license agreement were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

94.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████

14

95.     The royalty rates in the 2007 license agreement amendment were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

96.     ███████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

97.     In 2013, Lenovo used Qualcomm modem chips in ████████ of its devices and used MediaTek's and others' modem chips in ████ of its devices.

98.     In 2014, Google, which had acquired Motorola Mobility three years earlier, sold it to Lenovo.

99.     In a letter dated June 5, 2014 from Eric Reifschneider and Cristiano Amon, Qualcomm provided Lenovo with assurances that its chip supply would not be interrupted, notwithstanding licensing disputes.

100.    ██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████.

101.    The royalty rates in the 2016 license agreement were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

102.    ████████████████████████████████████████
████████████████████████████████████████████

103.    ████████████████████████████████████
████████████████████████████████████████████

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ██████████

7    104.    The royalty rates in the 2018 license agreements with Lenovo and Motorola

8 Mobility were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's

9 CDMA or "premium" LTE modem chips.

10    105.    Cristiano Amon, current President of Qualcomm Incorporated, assured

11 Lenovo/Motorola Mobility at a December 2015 meeting that its chip supply would never be cut

12 due to licensing negotiations.  Neither Lenovo's nor Motorola's modem chip supply has ever

13 been cut.

14    106.    ████████████████████████████████████

15 ██████████████████████████████████████████

16 ████████████████████████████████████████

17 ██████████████████████

18    107.    ████████████████████████████████████

19 ██████████████████████████████████████████

20 ██████████████████████████████████████████

21 ████████████████████████████████████████

22    108.    ██████████████████████████████████████

23 ██████████████████████████████████████

24    **2.    Blackberry**

25    109.    Qualcomm and BlackBerry entered into a Subscriber Unit License Agreement for

26 CDMA technology on March 22, 2000.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    110.    The 2000 Subscriber Unit License Agreement included a ████████ upfront fee

2    and had a royalty rate of ████████████████████████ .

3    111.    BlackBerry did not report a royalty bearing sale of a handset with a Qualcomm

4    modem chip under its license agreement ████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████

6    ████████████████ .

7    112.    Qualcomm and BlackBerry signed an Amendment to the Subscriber Unit License

8    to cover worldwide handset sales and WCDMA technology on March 21, 2001, before

9    Qualcomm shipped its first WCDMA modem chip.

10   113.    The royalty rates in the 2000 CDMA Subscriber Unit License Agreement and

11   2001 WCDMA Amendment were not influenced or impacted by purchases of, or potential

12   purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

13   114.    Qualcomm and BlackBerry signed another Amendment to the Subscriber Unit

14   License Agreement for CDMA and WCDMA technology on January 26, 2011, effective as of

15   October 1, 2010.

16   115.    The 2010 Subscriber Unit License Agreement Amendment ("2010 Blackberry

17   SULA Amendment") included a ███████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████ and included a fixed term that would expire

20   December 31, 2013 if the agreement was not earlier terminated by one of the parties.  That date

21   was later extended to December 31, 2016 in an amendment executed on December 31, 2012.

22   116.    The 2000 and 2001 agreements had no termination date.  Blackberry could have

23   continued under those earlier agreements rather than enter into the 2010 Blackberry SULA

24   Amendment, and it resumed operation under those earlier agreements upon conclusion of the

25   term of the 2010 Amendment.

26   117.    ████████████████████████████ reported by Blackberry under its agreements with

27   Qualcomm at the time the 2010 Amendment was entered into used a Qualcomm modem chip, and

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1  ███████████ of the device sales █████████████████████████████████

2  █████ used a Qualcomm modem chip.

3       118.   ████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████████████

5  ████████████████████████████████

6       119.   John Grubbs, Senior Director of IP Transactions of Blackberry, admits he was

7  aware of no threat ever made by Qualcomm to withhold software support or stop modem chip

8  deliveries.

9       120.   The royalty rates in the 2010 Subscriber Unit License Agreement Amendment

10 were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA

11 or "premium" LTE modem chips.

12            **3.    Huawei**

13      121.   Huawei entered into a standard Chinese framework agreement covering CDMA

14 patents (IS-95, CDMA and CDMA2000 Subscriber Units) with Qualcomm in 2003.

15      122.   The 2003 Subscriber Unit License Agreement was patterned on a framework

16 agreement negotiated between Qualcomm and the Chinese government.

17      123.   █████████████████████████████████████████████████████

18 ██████████

19      124.   HiSilicon is wholly owned by Huawei and designs chips internally to reduce the

20 costs of hardware design and to serve as a chip supplier to Huawei's outside vendors.

21      125.   ██████████████████████████████████████████████

22      126.   In a Memorandum of Understanding, dated July 21, 2004, Qualcomm and Huawei

23 agreed upon terms to govern commercialization by Huawei of products compliant with the

24 WCDMA standards.

25      127.   ███████████████████████████████████████████████████████

26 █████████████████████

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

128.   Huawei did not need a WCDMA license to buy either LTE or CDMA modem chips from Qualcomm.

129.   The royalty rates in the 2003 CDMA Subscriber Unit License Agreement and 2004 WCDMA Memorandum of Understanding were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

130.   ███████████████████████████████████
██████████████████████████████████████████████
████████████████

131.   Huawei manufactured its own CDMA modem chips in-house with HiSilicon since at least 2016.

132.   ████████████████████████████████
████████████████████████████████████
███████

133.   █████████████████████████████████
████████████████████

134.   By December 2014, Huawei was producing its own "high-end" LTE modem chips via HiSilicon to incorporate into its handsets.

135.   Huawei entered into a Subscriber Unit License Agreement covering patents essential to the LTE and WCDMA standards with Qualcomm in December 2014, effective July 1, 2014.

136.   ████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
███████

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

137. █████████████████████████████████

████████████████████████████████████████

██████████████████████

138. ████████████████████████████████████

████████████████████████████████████████

139.     The royalty rates in the 2013 CDMA license extension and 2014 LTE and WCDMA license agreement were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

140. ████████████████████████████████████

█████████████████████

141. ██████████████████████████████████

████████████████████████

142. ████████████████████████████████████

█████████████████████

143. ███████████████████████████████████

████████████████████████████████████████████

██████████████████

144. ███████████████████████████████████

██████████████████

**4.     Nokia**

145.     Qualcomm and Nokia entered into a Subscriber Unit License Agreement for CDMA subscriber units on April 9, 1992 ("1992 Nokia Agreement").

146.     The 1992 Nokia Agreement provided a cross-grant to Qualcomm for Nokia's Technically Necessary Patents.

147.     As of April 9, 1992, Qualcomm did not sell CDMA chips.

20

148.    The royalty rates in the 1992 Nokia Agreement were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

149.    On July 2, 2001, the 1992 Nokia Agreement was amended and restated ("2001 Nokia Agreement.").

150.    █████████████████████████████████████████████████████████████████████████████████████████████████████

151.    As of July 2001, Qualcomm did not yet have a WCDMA modem chip on the market.

152.    The royalty rates in the 2001 Nokia Agreement were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

153.    █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

154.    █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

155.    The LTE terms in the 2008 Nokia Agreement were accepted prior to the standardization of LTE, and before Qualcomm ever sold any LTE modem chip, let alone a "premium" LTE chip.

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

156.    As part of the 2008 Nokia Agreement, ███████████████████████

███████████████████████████████████

157.    Nokia first reported the sale of handsets incorporating Qualcomm modem chips in

█████████, when it reported handsets including a Qualcomm modem chip ███████████████

██████████████████████████

158.    The royalty rates in the 2008 Nokia Agreement were not influenced or impacted

by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem

chips.

**5.    Sony Corp.**

159.    ████████████████████████████████████████

██████████████████████████

160.    ████████████████████████████████████████

████████████████████████████████████████████

161.    In 1999, Sony began purchasing CDMA modem chips from Qualcomm.

162.    ████████████████████████████████████████

████████████████████████████████████████████

163.    Between October 2001 and February 2012, Sony operated a joint venture with

Ericsson called Sony Ericsson Mobile Communications (SEMC), for its handset business.

164.    ███████████████████████████████████

███████████████████████████

165.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

166. ███████████████████████████

███████████████████████████████

██████████████████████████████

████████████████████

167.    After the joint venture was dissolved in February 2012, ██████████████

█████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████████████████

█████████████

168. ███████████████████████████

██████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████

█████████████████

169.    Qualcomm and Sony Mobile executed an interim Subscriber Unit License Agreement on May 3, 2012, effective as of February 16, 2012 (February 2012 Interim SULA), that would remain in force until the end of September 2012.

170.    The February 2012 Interim SULA had a royalty rate of 5% of Net Selling Price. Qualcomm and Sony agreed that a portion of the royalty rate, up to 3.25% of the Net Selling Price, was subject to retroactive adjustment if Qualcomm and Sony subsequently agreed to a royalty rate of less than 5%.

171.    The February 2012 Interim SULA provided that in the event the parties could not agree on the royalty rate, the issue would be determined by a neutral third party.

172. ████████████████████████

████████████████████████████

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1 ██████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████

6  173. ████████████████████████████████████

7 ██████████████████████████

8  174. ████████████████████████████████████████████

9 ██████████████████

10  175. ████████████████████████████████████████████

11 ████████████████

12  176.  As of October 2012, Sony Mobile was an important modem chip customer of

13 Qualcomm, and generated ███████████ in chip revenue for the previous 12 months.

14  177.  Qualcomm and Sony Mobile entered into a Subscriber Unit License Agreement for

15 CDMA and WCDMA technologies on November 12, 2012, effective as of October 1, 2012.

16  178.  The November 2012 SULA had a three year term and included a royalty rate of

17 5% the Net Selling Price.

18  179. ████████████████████████████████████

19 █████████████████████████████

20  180. ████████████████████████████████████

21 ███████████████████████████████████

22 ████████

23  181. ████████████████████████████████████

24 ███████████████████████████████████

25  182. ████████████████████████████████████████

26 ████████████████████████████████████████

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1  ██████████████████████████████████████████████████████

2  ██████████████████████████

3  183.  ███████████████████████████████████████

4  ████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ███████████████████████████████████████████████

7  ███████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ██████████████████████████████████████████████

10  ██████████████████████████

11  184.  ████████████████████████████████████████

12  █████████████

13  185.  █████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████

16  **6.    Panasonic**

17  186.    Qualcomm and Matsushita Communication Industrial Co., Ltd. ("MCI"), a

18  subsidiary of Matsushita Electric Industrial Co., Ltd., entered into a Subscriber Unit License

19  Agreement with Qualcomm in December 1993.

20  187.  █████████████████████████████████████████

21  ████████████████████████████████████████

22  ███████████████████████████████████████

23  188.    The royalty rates in the 1993 Agreement were not influenced or impacted by

24  purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

25  189.    In March 2001, after more than 18 months of negotiations, Qualcomm and MCI

26  (which subsequently changed its name to Panasonic Mobile Communications Co., Ltd. ("PMC"))

27

28

25

1   signed an Amendment to the Subscriber Unit License Agreement to cover 3G technologies not

2   included in the original agreement.

3       190.   ████████████████████████████████████████████

4   ████████████

5       191.   The lengthy negotiations leading to the 2001 amendment resulted in a number of

6   terms that differed from the terms Qualcomm generally sought in a SULA.  The cross-grant

7   included only patents owned by PMC or patents otherwise originating with employees or agents

8   of PMC that were owned by other Panasonic companies – not any other patents owned by the

9   parent company Panasonic Corp. or other affiliates of Panasonic Corp.

10      192.   The royalty rates in the 2001 Panasonic Amendment were not influenced or

11  impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE

12  modem chips.

13      193.   In November 2002, Panasonic submitted a demand for arbitration after receiving a

14  letter from Qualcomm ██████████████████████████████.

15      194.   In September 2003, the arbitrator entered an interim order ███████████

16  ████████████████████████████████████████

17  ██████████

18      195.   ████████████████████████████████████

19  ██████████████████████████████████████████

20  ████████████████████████████

21      196.   ████████████████████████████████████

22  ████████████████████████

23      197.   The royalty rates in the 2004 Panasonic Amendment were not influenced or

24  impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE

25  modem chips.

26      198.   In August 2009, Panasonic submitted a demand for arbitration, seeking a

27  declaration ████████████████████████████████████.

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

199. ████████████████████████████████████
████████████████████████████████████████████
██████████████████

200. ██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████

201.    In 2010 and 2011, Panasonic reported sales under its license agreements of handsets including modem chips purchased from Qualcomm as representing ████████ of its reported handset sales.

202.    The royalty rates in the 2011 Panasonic Amendment were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

**7.    ZTE**

203. ██████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████

204. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

205. ██████████████████████████████████████
were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

206. ██████████████████████████████████████
████████████████████████████████████████████
████████

27

207.    ZTE did not need the LTE-only Agreement to buy any Qualcomm modem chips because Qualcomm has never sold an LTE-only modem chip.

208.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

209.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

210.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮

211.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

212.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

8.      Samsung

213.    Qualcomm and Samsung entered into an Infrastructure and Subscriber Unit License and Technical Assistance Agreement for CDMA subscriber units on August 31, 1993 ("1993 Samsung Agreement.")  The terms of the 1993 Samsung Agreement were determined

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   under the supervision of the Korean government, with the same terms also offered to other

2   Korean OEMs designated by the Korean government – Maxon, Hyundai and ████████

3   ████████████

4        214.   ██████████████████████████████████████████████████

5   █████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████

7        215.   The royalty rates in the 1993 Samsung Agreement were not influenced or

8   impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE

9   modem chips.

10        216.   On March 29, 2004, Samsung and Qualcomm amended the 1993 Samsung

11   Agreement, ████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ██████████████████████████████████████████

14   ██████████████████████   The 2004 Samsung Amendment had a term of two

15   years, with a unilateral right for Samsung to extend it.

16        217.   During the negotiation of the 2004 Samsung Amendment, Samsung was already

17   licensed under the 1993 Samsung Agreement, and did not need the 2004 Samsung Amendment to

18   be able to purchase modem chips from Qualcomm. █████████████████████

19   ████████████████████████████████████████████████

20   ████████████████████

21        218.   The royalty rates in the 2004 Samsung Amendment were not influenced or

22   impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE

23   modem chips.

24        219.   Samsung exercised its right to extend the term of the 2004 Amendment.

25        220.   Qualcomm and Samsung further amended the 1993 Samsung Agreement effective

26   January 1, 2009 ("2009 Samsung Amendment").

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1  221.  ████████████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████████████████████████████

4  ████████████████████████████████████████████

5  ███████████████████████████████████████

6  ████████████████████████████████████████████

7  ██████████████████████████████████

8  222.  ████████████████████████████████████████████

9  ███████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████████████████

13  223.  Samsung was already licensed under the 1993 Samsung Agreement and 2004

14 Samsung Amendment, and did not need the 2009 Samsung Amendment to be able to purchase

15 modem chips from Qualcomm.  ████████████████████████████

16 ████████████████████████████████████

17 ████████████████████████

18  224.  Samsung and Qualcomm exchanged claim charts as part of the 2008 contract

19 negotiations.  Samsung's chief negotiator Injung Lee admitted that the 2009 Amendment was

20 negotiated in good faith, and that Qualcomm made no ultimatums.

21  225.  During their 2008 negotiations leading to the 2009 Amendment, Qualcomm

22 assured Samsung that the negotiations would not affect chip supply.  ██████████████████

23 ████████████████████████

24  226.  The royalty rates in the 2009 Samsung Amendment were not influenced or

25 impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE

26 modem chips.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

227.    On January 30, 2018, Qualcomm and Samsung entered into an amendment to the 1993 Samsung Agreement ("2018 Samsung Amendment.")  The 2018 Samsung Amendment includes various cross grant terms, for which Qualcomm has agreed to pay ███████████  ██████  The Amendment does not change the royalty rates from the 2009 Samsung Amendment, although ████████████████████████████████████████████  ████████████████████████████.

228.    By the end of 2017, Samsung (through related corporate entities) had been manufacturing its own modem chips for several years.  It made its own multimode LTE chips for its flagship phones, and its chips included CDMA capabilities.  ███████████████  █████████████████████████████████████████████████████  ██████████████████████████████████████████████████████  ████████████████████████████████████████████████  █████████████████████████

229.    The royalty rates in the 2018 Samsung Amendment were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

**9.     LG**

230.    ████████████████████████████████████  ████████████████████████████████████████████████  █████████████████████████████

231.    ████████████████████████████████████  █████████████████████████████████████████████  ██████████████████████████████████████████████████  ████████████████████████████

232.    The royalty rates in the 1993 LG Agreement were not influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    233.    On July 11, 2004, Qualcomm and LG amended the 1993 LG Agreement ("2004

2    LG Amendment").

3    234.    ████████████████████████████████████████████

4    ██████████████████████████████████████████████████████

5    ██████████████████████████████████████████████

6    ██████    Qualcomm submitted this dispute to arbitration and expressed to LG that it would

7    meet all of LG's modem chip supply requirements during the course of the arbitration.

8    235.    ████████████████████████████████████████████

9    ██████████████████████████████████████████████████████

10   ████████████████████████████████████████████

11   236.    ████████████████████████████████████████████

12   ██████████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ██████████████████████████████████████████

15   237.    The 2004 LG Amendment agreed upon by the parties lowered the royalty rate to

16   5% for subscriber units sold outside Korea that used a Qualcomm modem chip, lowered the

17   royalty cap for handsets to $20 for subscriber units that used a Qualcomm modem chip, and

18   changed the cross licenses to covenants not to assert.

19   238.    The royalty rates in the 2004 LG Amendment were not influenced or impacted by

20   purchases of, or potential purchases of, Qualcomm's CDMA or "premium" LTE modem chips.

21   239.    ████████████████████████████████████████████

22   ██████████████████████████████████████████████████████

23   ████████████████████████████████████

24   240.    Qualcomm did not sell any LTE modem chips until 2010, and has never sold

25   single-mode LTE modem chips.  The royalty rates in the 2007 LG Amendment were not

26   influenced or impacted by purchases of, or potential purchases of, Qualcomm's CDMA or

27   "premium" LTE modem chips.

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

241. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

**I.** **Qualcomm's Practice of Not Selling Chips to Unlicensed Companies Has Valid Business Justifications**

242. Qualcomm does not charge for the value of Qualcomm's patented innovations in the price of the modem chips it sells. Qualcomm charges for the use of those innovations by OEMs through the device-level royalty it collects under its license agreements.

243. Since it first began selling chips in the mid-1990s, Qualcomm has had a practice of not supplying commercial quantities of its baseband chips to device manufacturers that make standard-compliant devices without an appropriate license from Qualcomm authorizing them to make and sell such devices.

244. Qualcomm's chip sales practices are well known in the industry, and were well known to participants in SDOs before they adopted Qualcomm's technologies into standards. Many of the participants in SDOs are Qualcomm's licensees and chip customers.

245. Qualcomm's practice of not selling chips to unlicensed OEMs is based on the following considerations:

(a) To promote equal treatment and ensure fair competition among handset OEMs. This practice ensures that OEMs are treated fairly and equitably because unlicensed OEMs would otherwise have a cost advantage over OEMs who took an SEP license rather than violate Qualcomm's patent rights. Qualcomm's licensees have complained to Qualcomm about the competitive disadvantage they face from unlicensed OEMs manufacturing phones.

(b) To avoid legal risks and uncertainties, such as claims of exhaustion or implied licenses.

1          (c)      To avoid helping companies who do not respect intellectual property rights.

2          (d)      To promote customer relations.  Qualcomm does not want to be forced to

3                    bring infringement actions against its chip customers.

4          (e)      To ensure that Qualcomm can recover a return on its investments in

5                    fundamental systems-level R&D even while selling its chips at market

6                    prices, which do not reflect the value of Qualcomm's systems-level

7                    technology.

8      246.      These business practices have not led Qualcomm to obtain supra-FRAND royalty

9 terms from OEMs.

10      247.      As explained, Qualcomm's typical licensing terms for 2G, 3G, 4G and 5G have

11 been agreed to by multiple licensees before standardization of the relevant generation of cellular

12 technologies and before Qualcomm sold any modem chips that support implementation of each

13 standard by devices.  Qualcomm has never raised its rate once its technology was adopted into a

14 standard or Qualcomm began selling modem chips supporting the implementation of that

15 technology by devices.

16      248.      The royalty rates of Qualcomm's licensees do not vary based on the proportion of

17 modem chips purchased from Qualcomm.

18      249.      Some licensees do not purchase modem chips from Qualcomm.  There are 36

19 licensees who entered into patent license agreements with Qualcomm, extending to sales of

20 complete terminals, who never purchased baseband processor products from Qualcomm to

21 incorporate into complete terminal units.  The royalty rates of these licenses could not have been

22 influenced or impacted by purchases of Qualcomm modem chips.

23      250.      Many licensees purchase only a small proportion of their modem chips from

24 Qualcomm.

25      251.      Some licensees, such as Huawei and Samsung, are capable of, and engage in, self-

26 supply of modem chips.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    252.    Qualcomm has never interrupted the commercial supply of modem chips to a

2    licensee in good standing during negotiations to amend, renew or otherwise revise an existing

3    license agreement.

4    253.    Qualcomm has never interrupted the modem chip supply of a licensee in good

5    standing for anything other than failure to pay for the chips.

6    254.    Under Qualcomm's license agreements with OEMs, the royalty rate payable to

7    Qualcomm is the same regardless of the source of chips used by the OEM in any particular

8    royalty bearing device.

9    **J.      Qualcomm's Use of Strategic Funds**

10    255.    Qualcomm sometimes enters into agreements to establish strategic funds or market

11    development funds with OEMs for the mutual benefit of Qualcomm and the OEMs.

12    256.    Strategic funds are not royalty rebates or discounts.  Rather, the funds are subject

13    to various conditions and are only disbursed for the mutual benefit of both parties.

14    257.    A typical agreement providing for creation of a strategic fund or market

15    development fund provides for Qualcomm and the OEM to pay money into a fund that is jointly

16    administered by Qualcomm and the OEM to be spent on mutually beneficial marketing,

17    promotions or technology and product development initiatives.

18    258.    Strategic or market development funds of this type are commonly used in the

19    cellular and other industries. █████████████████████████

20    ████████████████████████████████████████████████

21    ████

22    259.    ██████████████████████████████████

23    ████████████████████

24    260.    ███████████████████████

25    ████████████████████████████████████████

26    █████████████████████

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    261.    Agreements providing for strategic funds or market development funds are of

2    importance to Qualcomm because they can increase its brand recognition.  Qualcomm does not

3    have as large a marketing reach as many OEMs.

4    262.    ████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████████████████████████

7    ████████████████████████████████████████

8    263.    ████████████████████████████████

9    ████████████████████████████████████████████

10   ██████████████████████████████████████████████

11   ██████

12   264.    ████████████████████████████████

13   ██████████████████████████████████

14   265.    Of the approximately ████ current and past handset licensees to Qualcomm's

15   cellular patents, Qualcomm has entered into a strategic or a market development fund that was

16   negotiated contemporaneously with a licensing agreement with only ████████: Blackberry, ████

17   OPPO, ██████████████████████, ████████████████████████, Vivo, Xiaomi,

18   Yulong and ████.

19   266.    Eight of these ██████████████████████ purchased ████████████████████

20   ████████████████████████████████████████████

21   ██████████████

22   267.    ████████████████████████████████████

23   ████████████████████████████████████

24   ██████████████

25

26

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

IV.     **QUALCOMM'S DEVELOPMENT OF CELLULAR TECHNOLOGIES**

A.     **Cellular Standards and Standardization**

268.    The various industry participants, including innovators, OEMs, infrastructure vendors, vertically integrated firms and wireless carriers (e.g. Verizon, AT&T) come together to develop standards for the cellular industry through their membership and participation in regional Standards Development Organizations ("SDOs"), such as the European Telecommunications Standards Institute ("ETSI") in Europe, the Alliance for Telecommunications Industry Solutions ("ATIS") and the Telecommunications Industry Association ("TIA") in the U.S.

269.    Beginning with 3G standards, the members of SDOs have developed the Technical Specifications underlying 3G, 4G and now 5G standards through global collaborative standards development partnerships, such as the Third Generation Partnership Project ("3GPP") (which developed the Technical Specifications for the 3G WCDMA, 4G Long Term Evolution ("LTE"), and now 5G New Radio ("NR") standards) and 3GPP2 (which developed the Technical Specifications for the CDMA2000 standard).

270.    3GPP and 3GPP2 are global collaborative partnerships of SDOs and other industry participants that develop cellular standards.  The organizational partners of 3GPP are seven regional SDOs: ETSI, which is the leading cellular SDO; ATIS, the U.S. SDO; ARIB and TTC (both of Japan); CCSA (China); TSDSI (India); and TTA (Korea).  The organizational partners of 3GPP2 are the TIA from the U.S., and ARIB, TTC, CCSA and TTA.

271.    Firms participate in these global partnership projects through their membership in one or more of the SDOs that serve as "organizational partners" in the partnership project.

272.    The technical work of promulgating technical specifications occurs at 3GPP, and in the past, occurred also at 3GPP2.  ETSI and the other regional SDOs then "transpose" (i.e. republish and adopt) the technical specifications of 3GPP and 3GPP2 and adopt them as standards in their respective jurisdictions.

273.    The working procedures of both 3GPP and 3GPP2 provide that each contributor of technology is to comply with the relevant IPR policy of the organizational partner of which it is a

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1  member.  Many of the technologies included in cellular communications standards are patented.

2  SDOs – including each of the organizational partners in 3GPP and 3GPP2 – have adopted IPR

3  policies that are intended to ensure that patents do not prevent implementers from practicing the

4  standard.

5          274.    To ensure that 3GPP and 3GPP2 specifications are subject to the same licensing

6  requirements worldwide, the operating rules and procedures of both 3GPP and 3GPP2 mandate,

7  as a condition of being an organizational partner of each SDO, that the IPR policies of each of

8  their organizational partners must be compatible with one another.

9          275.    Cellular standards specify the way that user equipment (such as a handset)

10 operates within the network and communicates with infrastructure equipment.  Cellular standards

11 do not specify the operation of particular components within a handset or other user equipment.

12         276.    The process of developing standards begins with performance requirements

13 expressed in terms of system-level performance objectives.  For example, performance

14 requirements have focused on issues such as desired higher download and upload data rates,

15 lower latency, and improved data services in available spectrum.

16         277.    2G cellular standards include the Global System for Mobile ("GSM") and

17 cdmaOne (also sometimes called "TIA/EIA/IS-95" or "IS-95.")

18         278.    ETSI released the first version of GSM in 1990.  GSM uses time division multiple

19 access ("TDMA") technology.

20         279.    Qualcomm invented commercial CDMA technologies, and originally authored the

21 very first standard that included a CDMA air interface, and called it cdmaOne.

22         280.    TIA adopted cdmaOne as a cellular standard in 1993.  TIA also adopted IS-95A

23 and IS-95B as improvements to cdmaOne.  These are considered 2G standards.  cdmaOne uses

24 code division multiple access ("CDMA") technology.

25         281.    3G cellular standards include the Universal Mobile Telecommunications System

26 ("UMTS") and CDMA2000, both of which use CDMA technology.  The first UMTS standard

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    was finalized in 1999 by 3GPP and the first CDMA2000 standard was finalized by 3GPP2 in

2    2000.

3        282.    3GPP develops cellular technical specifications in "Releases" with new Releases

4    being finalized approximately every 12-24 months.  Each new Release contains new capabilities

5    or features over earlier Releases.  When a Release is finalized, all new features are functionally

6    frozen and ready for implementation.  Each 3GPP Release is self-contained, meaning that one can

7    build a cellular system based on the set of frozen specifications in that Release.  As such,

8    Releases build upon and incorporate previous Releases, while adding new features.

9        283.    UMTS is an umbrella term for several CDMA-based 3G cellular air interfaces

10    standardized within 3GPP: UTRA-FDD, commonly called Wideband CDMA ("WCDMA"), used

11    worldwide; UTRA-TDD High Chip Rate, having little deployment; and UTRA-TDD Low Chip

12    Rate, commonly called Time Division-Synchronous CDMA ("TD-SCDMA"), used primarily in

13    China.  Since the first release in 1999, 3GPP has standardized several improvements to the

14    original WCDMA release, including: (1) High-Speed Downlink Packet Access ("HSDPA"),

15    which refers to certain additional UMTS features included in Release 5; (2) High-Speed Uplink

16    Packet Access ("HSUPA"), which refers to certain additional UMTS features included in

17    Release 6; and (3) the combination of HSDPA and HSUPA, commonly called High-Speed Packet

18    Access ("HSPA" and "HSPA/HSPA+"), which refers to certain additional UMTS features

19    included in Release 7 and beyond.

20        284.    CDMA2000 was standardized by 3GPP2.  Included within the CDMA2000 family

21    of standards are CDMA2000 1x, often called 1xRTT, and High Rate Packet Data, often called

22    1xEV-DO or EV-DO.  Qualcomm proposed what became EV-DO in March of 2000.  3GPP2

23    released EV-DO as TIA/EIA IS-856 in January 2002.

24        285.    In the United States, AT&T and T-Mobile operated GSM and WCDMA networks.

25    Verizon and Sprint operated cdmaOne and CDMA2000 networks.  Verizon has announced that it

26    will retire its CDMA networks at the end of 2019.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

286.     All four major U.S. carriers (Verizon, AT&T, T-Mobile and Sprint) operate LTE networks, (which also encompasses the LTE Advanced, or "LTE-A," standard), as their 4G standard.  LTE uses Orthogonal Frequency Division Multiple Access ("OFDMA") technology for downlink transmissions and single-carrier frequency division multiple access ("SC-FDMA") technology for its uplink transmission.  The LTE standard was standardized by 3GPP.  The first iteration of the LTE standard was adopted in 2008 via 3GPP Release 8.

287.     The 5G NR standard is being standardized within 3GPP.  The first iteration of the 5G NR standard, Release 15, was frozen in 2018.

288.     In addition to introducing new technologies, each wireless standard has relied on, and often built upon, technologies developed in prior standards.  For example, the air interface for the WCDMA design was inspired by the success of IS-95 and incorporates its basic features.  As another example, innovations originally standardized in CDMA2000, such as Carrier Aggregation, were also relied on in the development of later releases of WCDMA as well as LTE and 5G NR.

289.     The bulk of 3GPP standardization work is done through working groups, which are charged with developing Technical Specifications.  In advance of 3GPP working group meetings, companies submit documents known as TDocs.  At the meetings, those TDocs are discussed.  There are many types of TDocs.  In some, but not all, cases, an "outcome" or "status" of the TDoc may be recorded.  The use of "outcome" or "status" labels has varied by working group and over time.  The FTC's proposed expert, Michael Lasinski relies on these "outcome" or "status" labels to consider certain TDocs to be "approved contributions."

290.     The 3GPP working group TDoc submission and review process, including "outcome" or "status" labels, was designed to facilitate written exchanges by industry participants with the goal of reaching a collaborative consensus as to standards.  It was not designed to measure the quantity or quality of any company's actual technical contributions to the standard.  Use of the submission or approval process as a proxy for quantity or quality may both undercount a company's substantive contributions and overcount their non-substantive contributions.  There

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

is also no correlation between these counts and the extent a company has participated in generating the technical concepts incorporated into a standard, or the strength or weakness of a company's patent portfolio.

291.    The substantive work of defining the requirements, features, capabilities and protocols of a new Release is completed over a roughly two-year timeframe.  During this period of substantive work, many companies submit a large number of TDocs.  The scope and level-of-detail in the TDocs submitted during this substantive work varies.  Some of the TDocs contain detailed cellular system designs based on years of R&D and include algorithms, descriptions, testing results and simulation descriptions.  Other TDocs are administrative documents that contain no innovation at all.

292.    The "author" of a contribution often does not accurately depict the origination of a technical concept or solution.  For example, a company may take another company's TDoc, list itself as the "source" and resubmit the revised TDoc, or a company may require that it be listed first as the source on a TDoc as a condition for supporting the underlying concepts during working group discussions.  As a result, author status is determined more by a need for inclusiveness and reaching a consensus than an accurate depiction of the source of the technical contributions a TDoc may contain.

293.    During this period of substantive work, an Editor or Rapporteur within each working group may be charged with compiling concepts from various TDocs into a Technical Specification based on the consensus of the group.  This does not involve any formal votes.  Even if an  Editor or Rapporteur takes text from a TDoc and places it in the Technical Specification, that TDoc is not usually given an "outcome" or "status" label reflecting approval.  Rather, the TDoc may be marked, for example, "Noted," "Treated," "Discussed," or not marked at all.  Mr. Lasinski's analysis does not count TDocs bearing such statuses as "approved contributions."  At the end of this approximately two-year period, a Technical Specification is deemed "stable."

294.    Once a Technical Specification is "stable," the document enters a phase called "change control" where members may submit a form of TDoc known as a change request or

1   "CR."  Example categories of CRs include corrections and editorial modifications.  CRs

2   submitted during the change control phase are discussed and then either approved or rejected

3   based on the consensus of the group.  "Change control" requires closely tracking any changes to

4   the "stable" Technical Specification.  Therefore, it is necessary to formally note the status of

5   approved CR TDocs with an "outcome" label such as "Agreed."  Mr. Lasinski's analysis counts

6   CRs bearing such statuses as "approved contributions."  While the change control process is a

7   necessary administrative task, it occurs after the majority of the substantive development for a

8   Technical Specification has been completed.  Accordingly, CRs submitted during change control

9   have little or no relationship to most of the innovations found in a Technical Specification.

10  Moreover, sometimes a single type of contribution may be submitted in multiple CRs—for

11  example, each one proposing the same change to a different portion of the Technical

12  Specification.  In that case, each of the CR's will be separately credited as an "approved

13  contribution" under Mr. Lasinski's analysis.

14          295.    In the course of standards development, SDOs often require members to disclose

15  and commit to offer licenses to certain patents to companies willing to accept a license on Fair,

16  Reasonable and Non-Discriminatory ("FRAND") terms to practice the standard.  The scope of

17  these disclosures and commitments to license often relate to a concept known as "essentiality."

18  As an example, ETSI's IPR policy in section 15.6 defines "essential" as follows:

19              **"ESSENTIAL"** as applied to IPR means that it is not possible on technical
                (but not commercial) grounds, taking into account normal technical practice
20              and the state of the art generally available at the time of standardization, to
                make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT
21              or METHODS which comply with a STANDARD without infringing that
                IPR. For the avoidance of doubt in exceptional cases where a STANDARD
22              can only be implemented by technical solutions, all of which are
                infringements of IPRs, all such IPRs shall be considered ESSENTIAL.
23

24          296.    As used above, "'**STANDARD**' shall mean any standard adopted by ETSI

25  including options therein or amended versions …."

26          **B.      Modem Chips and Cellular Devices**

27          297.    A modem (modulator/demodulator) chip, also referred to as a baseband chip, is

28  one of several components in a mobile device that may enable cellular connectivity.  The modem

chip supports modulation, the process of altering a signal so that it can be transmitted over a carrier frequency, and demodulation, which allows the signal to be extracted after transmission.

298.    A modem chipset (as distinct from a modem chip) is conventionally a set of chips that includes a modem together with an RF (radio frequency) chip and a PMIC (power management integrated circuit).

299.    The modem may also be included as a part of an integrated chip that includes additional elements such as an applications processor ("AP") and a graphics processing unit ("GPU").  When the modem is combined with an application processor in a single integrated chip, that chip is typically called a system on a chip ("SoC").

300.    A standalone baseband processor that does not include the AP, GPU or other functionality that is found in an SoC is referred to as a thin modem.

301.    Modem chips are used in devices, including feature phones, smartphones, and cellular-connected tablets that require cellular connectivity.

302.    The 3GPP and 3GPP2 cellular standards do not define how a user equipment such as a handset is constructed, whether particular functions are implemented in hardware or software, or even the components of a user equipment.  Instead, these standards provide user device manufacturers broad discretion regarding how to construct a user device.

**C.    Qualcomm's Development, Standardization and Commercialization of Key Technologies**

**1.    Qualcomm's Research Approach and Investment in Innovation**

303.    Qualcomm invests in fundamental, early stage research, with a six to ten-year horizon before commercialization.  This is high risk R&D that leads to valuable system level inventions and concepts that change the way cellular communications work.  Qualcomm is able to remain ahead of its peers in the industry because it identifies future needs and challenges.

304.    Since the mid-90's, Qualcomm has contributed and continues to contribute its breakthrough technologies to standards development, at the outset to contribute to the definition of next generation projects, and throughout as the generational standards evolve.  Qualcomm has

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    been at the forefront of the technology development for CDMA, WCDMA, including all major

2    releases, LTE, and now 5G.

3         305.    Qualcomm later devotes significant resources to researching and developing

4    chipsets that support cellular communications.  Qualcomm's technologies are designed to further

5    cellular communications; thus, the fundamental technologies developed by Qualcomm are widely

6    commercialized by others in the wireless industry that implement Qualcomm's standardized

7    inventions – such as device and infrastructure manufacturers.

8         306.    Since it was founded, Qualcomm has made large investments in research and

9    development.  In total, it has invested over $50 billion in developing cellular communications

10   technologies and chip solutions.

11        307.    Qualcomm's investment in R&D increased from $340 million in 2000 to more

12   than $1 billion in 2005, and to nearly ██████████████████████████████████████████

13   ██████████████████████████████████ .

14        308.    As of November 2018, Qualcomm had approximately 140,000 patents and

15   pending patent applications. ████████████████████████████████████████████████

16   █████████████████████████████████████████

17        309.    Qualcomm takes an end-to-end systems engineering approach to research.  This

18   end-to-end approach addresses the core network, base station, air interface and user equipment

19   (such as a handset).  Qualcomm identifies future applications and performance capabilities of

20   wireless systems, develops technology required to meet identified future needs and then defines

21   system requirements and architectures.  Qualcomm's research efforts include full-system level

22   design work and development of prototypes.  Such prototypes typically involve development of

23   both infrastructure equipment and mobile devices to confirm and demonstrate developed

24   concepts, and these prototypes are developed years before the chipsets are used in mass marketed

25   devices.

26

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

310.    By developing full system prototypes, Qualcomm has been able to present test results and provide demonstrations that have influenced the industry and led to the industry adopting technologies developed by Qualcomm.

311.    Based, in part, on this full system approach, Qualcomm has made many valuable submissions to 3GPP to advance 3G, 4G and 5G, proposing broad, system-level solutions to 3GPP early in the standardization process.  Qualcomm's standards contributions have covered a diverse range of areas relevant to device makers that is unmatched by other large 3GPP participants.

312.    Qualcomm has often conducted "world's first" demonstrations at the annual Mobile World Congress.  Notable recent Qualcomm Mobile Word Congress demonstrations include: FLASH OFDM (2006), HSPA Multicarrier Demo (2008), LTE Full Compliance and Interoperability (2009), LTE-A Demo (including seamless forward handoff) (2010), Heterogeneous Network ("HetNet") Trials with Operators in Full OTA Systems (2012), Licensed Assisted Access ("LAA") (2013), Low Density Parity Check ("LPDC") (2016), Gigabit LTE, 4x4 MIMO and Millimeter Wave (2017).

313.    Qualcomm's research efforts have generally been organized into projects under various code names.  A project typically begins with a focus in a general area and evolves towards the standardization of innovations.  For example, Project YODA began in 2001 with a focus on developing an OFDMA-based system.  YODA eventually evolved to focus specifically on an OFDMA system to be standardized in 3GPP2 known as UMB.

314.    While organized within projects, Qualcomm's research teams collaborated across projects to cross-pollinate ideas and develop the most promising concepts.  For example, at the same time as Project YODA, Qualcomm was also engaged in Project Espresso focused on developing an OFDMA-based system to be standardized in 3GPP known as LTE.  The YODA and Espresso teams met frequently, with the best ideas from both projects being contributed to both standards.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

315.     Qualcomm has obtained patents covering various concepts developed by Qualcomm researchers.

316.     All patents declared potentially essential to a standard are not equally valuable. All patents essential to a standard are not equally valuable.  The total number of patents declared potentially essential to a standard by a company does not necessarily provide an indication of the number or magnitude of important or foundational patents held by that company.  Likewise, the total number of patents essential to a standard owned by a company does not necessarily provide an indication of the number or magnitude of important or foundational patents owned by that company.

317.     Qualcomm has a broad patent portfolio with patents covering a large range of areas relevant to device makers for each of cdma2000, WCDMA, LTE and 5G NR, as well as non-standard essential patented technology.

318.     Qualcomm's patented inventions relevant to WCDMA include important features that have advanced the state of wireless, for example, such as power control, soft handover, hybrid ARQ, fast link adaptation, discontinuous transmission and reception, quick paging, inter-RAT handover, MIMO and multi-carrier.

319.     Qualcomm's patented inventions relevant to LTE include fundamental features, for example, such as uplink Single-Carrier Frequency Division Multiple Access ("SC-FDMA") waveform and control channel structure, downlink OFDMA, LTE cell acquisition, carrier aggregation, MIMO, hybrid ARQ, fast link adaptation, discontinuous transmission and reception, interference cancellation, HetNets, VoLTE optimization, inter-RAT handover, circuit-switched fallback and LTE in unlicensed spectrum.

320.     Qualcomm's patented inventions relevant to 5G NR include features, for example, directed to new 5G features such as scalable OFDM, flexible slot-based framework, LDPC channel coding, massive MIMO and mobile millimeter wave, as well as continued advances in areas such as OFDM and SC-FDMA waveforms, carrier aggregation, handover, MIMO, fast link adaptation, hybrid ARQ, use of unlicensed spectrum and HetNets.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

321.     Qualcomm's patent portfolio has not diminished as some of Qualcomm's older patents developed in connection with 2G and early 3G cellular systems have expired over time. Rather, through its research and development efforts, Qualcomm has obtained new, fundamental patents on basic advanced concepts that address new challenges in advanced 3G, 4G and 5G cellular systems.

322.     As an example, similar to Qualcomm's now expired patents directed to CDMA cellular waveforms and power control techniques, Qualcomm has continued to develop patented technologies covering the uplink waveform in LTE – a technology known as SC-FDMA – as well as the basic control channel structure that makes up the uplink 4G LTE and 5G NR waveform. Qualcomm also developed patented technologies covering the downlink broadcast channel structure and accompanying cell search used in 4G LTE and 5G NR.  Qualcomm's newer patents also cover concepts and areas that did not exist in prior generations of cellular technology.  As an example, Qualcomm has developed patented technologies behind advanced 3G, 4G and 5G deployments of Carrier Aggregation, MIMO, cellular access in unlicensed spectrum and HetNets, all of which play a large role in achieving the performance goals of LTE-A and 5G NR.

**2.      Qualcomm's Role in Creation of Ubiquitous High Speed Cellular Data**

323.     **Shared High-Capacity Data Channel**.  In 1996, state of the art cellular systems were primarily focused on voice transmissions.  Qualcomm took the view that data was the future of cellular and sought to re-examine cellular from scratch.  In November 1996, Qualcomm's Dr. Roberto Padovani wrote a white paper entitled "A System Design for High Speed Packet Data," recommending a complete re-design of cellular systems to support internet packet data instead of voice signals.  Dr. Padovani recognized that a single high-speed data channel that was time multiplexed among active users was a much better fit for data than multiple lower-capacity channels dedicated to users.  Dr. Padovani concluded based on analyzing the type of traffic likely to make up future cellular systems:

> What this is telling us is that you are better off applying the whole channel (frequency, time, and power) to a single user, on a temporary basis, rather than sharing the channel among several simultaneous users at lower rates.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

That is if the application allows to do that. Obviously, for voice services, that is not feasible but for packet data it is.

324.     The concept developed by Dr. Padovani and behind Qualcomm project HDR are known today as a "common data channel" or "shared high-capacity data channel."

325.     Qualcomm initially assigned a team of senior engineers to further develop the concepts described in Dr. Padovani's paper and build a prototype to test the feasibility of implementing Dr. Padovani's concepts.  This research team evolved into a Qualcomm project referred to internally as "WARP" and "HDR" (for "high data rate").  On September 23, 1998, Qualcomm demonstrated HDR technology at the PCS '98 show in Orlando, Florida and shortly thereafter conducted further live demonstrations showing data speeds of 2.4 Mbps, which was the level of DSL lines used for home internet service at the time, and 300 times faster than state-of-the-art cellular data systems.

326.     3GPP2 standardized Qualcomm's HDR technology as an evolution of CDMA2000 known as CDMA2000-1X-EVDO (*EV*olution, *D*ata *O*ptimized or "EV-DO.")  EV-DO introduced the first shared high-capacity data channel.  This channel was designed to exist alongside existing CDMA2000 low-capacity dedicated channels.   EV-DO also provided data at a lower cost per megabyte of data than existing 3G services.  In UMTS Release 5, 3GPP likewise standardized an upgrade to WCDMA, introducing a high-speed downlink data channel shared among all users to exist alongside Release 99 low-capacity dedicated channels.  This channel, the HSDPA channel, gives UMTS Release 5 its name.  The first deployment of EV-DO occurred in 2002, three years ahead of the first deployment of HSDPA.

327.     4G LTE and 5G NR continue to use the shared high-capacity data channel introduced by Qualcomm.  Unlike in EV-DO and HSDPA in which the shared high-capacity data channel co-exists with low-capacity dedicated channels, in 4G LTE and 5G NR the shared high-capacity data channel is responsible for substantially all downlink connected mode user traffic.

328.     Since development of the HDR concept, Qualcomm has continued to research improvements to operation of the shared high-capacity data channel, for example, as part of Project Espresso.  Through this research, Qualcomm has further advanced the shared high-

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CASE NO. 17-CV-220-LHK-NMC

1  capacity data channel model to improve battery life and adapt to modern traffic such as Voice

2  Over IP (VoIP) data packets.

3      329.   **Discontinuous Reception in Connected Mode (DRX) and Semi-Persistent**

4  **Scheduling (SPS).**  Two Qualcomm-developed technologies, Discontinuous Reception in

5  Connected Mode ("DRX") and Semi-Persistent Scheduling ("SPS"), substantially improve

6  battery life and enable use of a shared high-capacity data channel to support VoIP for a large

7  number of users.  VoIP support is necessary to facilitate the decommissioning of 2G and 3G

8  networks because the original release of LTE did not support voice calls, and instead relied on

9  backward capability in 2G or 3G networks to support voice calls.  This is known as circuit-

10  switched fallback.  Later versions of LTE support voice communications through a technique

11  known as Voice over LTE (VoLTE), in which voice information is sent as VoIP packet data over

12  the shared high-capacity data channel.

13      330.   Qualcomm's DRX technology improves battery life – by 60 to 70% in some cases.

14  The technology allows a mobile device to remain in "connected mode" but still power down the

15  receiving circuitry at times.  Before this technology, a mobile device in active communication (a

16  connected mode) receiving a shared high-capacity data channel was required to listen to a

17  scheduling channel every subframe, draining the battery.

18      331.   Qualcomm's proposal faced substantial opposition within 3GPP because

19  conventional wisdom was that a base station should schedule data for a mobile device on the

20  shared high-capacity data channel as soon as it arrived at the base station.  DRX in connected

21  mode went against this conventional wisdom and forced the base station to wait.  Based on

22  Qualcomm's system engineering approach, Qualcomm was able to demonstrate that DRX in

23  connected mode did not materially impact overall system performance, while still improving

24  battery life.

25      332.   Qualcomm's SPS technology addresses another disadvantage of existing shared

26  high-capacity data channels, as it related to VoIP in particular, which was that the scheduling

27  channel had limited capacity.  When transmitting small pieces of data, such as VoIP packets, the

28

49

1  scheduling channel could not schedule enough simultaneous users to use the available data

2  capacity.  Rather than expand the scheduling channel and decrease available data capacity,

3  Qualcomm developed SPS, which uses a single scheduling message to give a recurring data

4  assignment.  While eliminating some signaling, SPS also supports more high quality voice

5  communications by allowing scheduling messages for quick retransmissions of packets originally

6  sent without a scheduling message that were received with errors.

7      333.    Qualcomm submitted DRX and SPS for standardization both as part of UMTS

8  Release 7 and the original LTE release, Release 8.  3GPP adopted the concepts in both.  DRX and

9  SPS have also been standardized as part of the initial 5G NR release, Release 15.

10      334.    Qualcomm's patent portfolio includes patents directed to the basic DRX and SPS

11  concepts that are essential to each of UMTS Release 7, LTE Release 8, and 5G NR Release 15,

12  and all subsequent releases of each.

13          **3.      Qualcomm's Role in Pioneering 4G**

14      335.    Qualcomm has conducted research and development in multiple access techniques

15  other than CDMA for many years.  While 3G standards were still being developed, Qualcomm

16  and Flarion Technologies (Flarion) (which became part of Qualcomm in 2006) were actively

17  researching new multiple access techniques for cellular systems based on OFDMA and SC-

18  FDMA waveforms.  Qualcomm recognized the potential of these techniques early and developed

19  key technologies related to them.  Around 2001, Qualcomm invested in research and development

20  related to the use of OFDMA in Project YODA.

21      336.    Project YODA ultimately evolved into standardization of UMB, a proposed 4G

22  standard that shares a number of technical characteristics with LTE.  Qualcomm developed a

23  complete UMB prototype that was shown at the CTIA Wireless 2007 convention over a year

24  before the LTE specification was completed.  As discussed above, the Project YODA and Project

25  Espresso teams met frequently, with the best ideas from both projects being contributed to both

26  UMB and LTE standardization efforts.  Many of the concepts from Project YODA were also

27  standardized in LTE Release 8.

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

337.    In 2004, and in parallel with its 3GPP2 efforts, Qualcomm focused on the development of the next generation 3GPP standard.  These internal projects included Projects Espresso and Frappuccino.  Leveraging and improving Dr. Padovani's HDR system, Qualcomm developed a complete cellular system and proposed various innovations found in LTE Release 8.  Qualcomm's 4G development efforts included the development of a full LTE prototype known as "Slimcat."  Qualcomm demonstrated the first LTE-compliant system at the 2009 Mobile World Congress Convention using Slimcat.

338.    In addition to contributions to LTE Release 8, several key concepts from Project YODA and Project Frappuccino are defining features in LTE-A in Releases 10, 11 and 12, including Carrier Aggregation, MIMO, cellular access in unlicensed spectrum and HetNets.

339.    **SC-FDMA Waveform.** The 4G LTE standard, starting in Release 8, adopts two new waveforms: SC-FDMA for uplink communication from the mobile device to the base station, and OFDMA for downlink communication from the base station to the mobile device.

340.    The use of SC-FDMA, as opposed to OFDMA, for the uplink greatly decreases the consumption of battery power by the mobile device and obviates the need for expensive power amplifiers or larger batteries, both of which help make LTE technically and commercially viable, as well as increasing the handset range and performance in manageable form factor.  LTE cell phones cannot transmit data or voice signals using LTE without continuously using Qualcomm's SC-FDMA invention.

341.    Qualcomm's patent portfolio includes patented inventions directed to the basic structure of the SC-FDMA waveform as implemented in LTE.  These patents are essential to LTE Release 8 and all subsequent releases.

342.    5G NR deployments will continue to use Qualcomm's fundamental SC-FDMA technology, while also providing support for regular OFDMA waveforms for the uplink transmissions based on the type of uplink grant and resource allocation types.

343.    **LTE Cell Acquisition.**  A basic problem in any cellular system is how a mobile device initially detects and synchronizes with a base station.  This is called "cell acquisition."

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   Unlike UMTS, where every cell uses signals of the same bandwidth, LTE supports many

2   different bandwidths and gives rise to fundamentally different challenges.

3       344.    Qualcomm designed a set of synch and broadcast channels enabling efficient cell

4   acquisition and reducing the time and power consumption required for the user device to obtain

5   necessary information about the base station, including cell ID and system bandwidth.

6   Qualcomm developed these concepts as part of Project Espresso.  Qualcomm submitted

7   contributions to 3GPP broadly defining several channels, including the structure of the synch and

8   broadcast channels used for cell acquisition/identification.  3GPP ultimately incorporated the

9   features of these contributions in standardizing LTE Release 8.

10      345.    Qualcomm's patent portfolio includes inventions covering the basic structure of

11  the LTE synch and broadcast channels and the cell acquisition procedure.  These patents are

12  essential to LTE Release 8 and all subsequent releases.

13      346.    **LTE Control Channels.**  Well-designed and efficient feedback mechanisms are a

14  distinguishing feature of LTE that allow many user devices to communicate vital information to

15  the base station in a timely manner using only a small amount of uplink time-frequency resources.

16  The Physical Uplink Control Channel ("PUCCH") carries uplink control information.  Every

17  resource block that the PUCCH uses is one less that can be used for transmitting data.  Thus, it is

18  very important that the PUCCH be as efficient and compact as possible while ensuring a high

19  level of reliability for the crucial control information.

20      347.    The PUCCH consists of several different formats.  In particular, there are Formats

21  1, 1a, 1b, 2, 2a, 2b and 3.  Each format transmits various types and amounts of control

22  information, supporting basic features such as power control and error retransmission, as well as

23  advanced features such as MIMO and Carrier Aggregation.

24      348.    The PUCCH design is a novel aspect of LTE and is based on spread

25  spectrum/CDMA concepts, as well as SC-FDMA.  Qualcomm invented the PUCCH structure and

26  design, including all the different PUCCH Formats (including the later Format 3).

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

349.     Qualcomm's patent portfolio includes patented inventions covering the basic PUCCH structure and design, including various patents directed to each PUCCH Format (Formats 1, 1a, 1b, 2, 2a, 2b and 3).  These patents are essential to LTE Release 8 and all subsequent releases.

### 4.     Qualcomm's Role Leading the Way to 5G

350.     Many of Qualcomm's innovations from HDR, Espresso, YODA, Frappuccino, Coconut (another Qualcomm R&D project), and several other projects laid the foundation for 5G and LTE-A.  In 2012, Qualcomm began transitioning resources to Project Pentari to develop the next generation cellular system.  Project Pentari continues today developing a complete 5G solution.  In addition to Project Pentari, Qualcomm continues to produce innovations relevant to 5G through its work in Project Skyber for mmWave and Project Meridian for further developing use of unlicensed spectrum.

351.     **Carrier Aggregation.**  The original LTE Release, Release 8, did not meet the performance goals set for 4G cellular known as International Mobile Telecommunications-Advanced ("IMT-Advanced") set by the International Telecommunications Union Radiocommunication Sector ("ITU-R.")  It was not until LTE Release 10 (LTE-A) that additional standardized features allowed LTE to meet the performance goals.  3GPP submitted LTE Release 10 to ITU-R as its IMT-Advanced candidate.  Carrier aggregation is a critical feature of LTE-A and is a major reason for the higher data rates available in newer releases of the LTE standard.

352.     Carrier aggregation enables a single user to transmit data packets to or receive data packets from a base station using more than one carrier frequency (called a "carrier.")  A user whose device uses two carrier frequencies can achieve roughly double the data rate compared with a user device that uses a single carrier frequency.  In addition, because carrier aggregation allows the same user to simultaneously receive and transmit signals even on widely spaced frequency bands, network operators can more effectively use the bands allocated to them, even if those bands are not contiguous.

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1

2

3

4

5

6

7

8



9    353.    Network operators must make the most efficient use of limited resources.

10  Network operators often need to bid billions of dollars for licenses to particular frequency

11  allocations.  Due to their cost and the segmented nature of spectrum license bidding, operators are

12  often unable to secure spectrum "real estate" holdings that are in the proverbial best

13  neighborhoods or on contiguous properties.  To use those scattered and sometimes less desirable

14  spectrum holdings in the most efficient way possible, operators rely on carrier aggregation

15  technology.

16    354.    Qualcomm was on the leading edge of developing carrier aggregation technologies

17  prior to their deployment in modern networks.  As one example, carrier aggregation in LTE is

18  rooted in the "Multi-carrier technology" found in EV-DO Rev. B.  Qualcomm has developed

19  Carrier Aggregation technology as part of Projects WARP, Wizard, YODA, Espresso and

20  Frappuccino.

21    355.    The prevalence and importance of carrier aggregation is expected to continue

22  quickly expanding as existing LTE network deployments mature and network operators deploy

23  next generation (i.e., 5G) networks with more spectrum, including in unlicensed bands (e.g., 5

24  GHz), bands with hybrid licensing (e.g., 3.5 GHz), and millimeter wave bands (e.g., 28 GHz and

25  above).

26    356.    Carrier Aggregation concepts developed by Qualcomm are a key organizing

27  principle for 5G systems: the user device will have access to and commonly use multiple bands in

28

54

1  both directions to achieve high capacity and reliable coverage, while efficiently utilizing the

2  cellular networks' diverse spectral holdings.

3       357.    Qualcomm's patent portfolio includes patented inventions directed to the basic

4  Carrier Aggregation concept, as well as the control signaling, agility and mobility, and power

5  control concepts necessary to implement Carrier Aggregation.  These patents are essential to LTE

6  Release 10 and all subsequent releases.

7       358.    **Use of Unlicensed Spectrum and HetNets.**  In 2006, Qualcomm created Project

8  Coconut to investigate using unused television spectrum.  In 2012, Qualcomm revisited these

9  concepts and began investigating using carrier aggregation in unlicensed spectrum, i.e., the same

10 frequencies used by Wi-Fi, baby monitors, and cordless phones.  By 2013, Qualcomm

11 demonstrated carrier aggregation in unlicensed spectrum at Mobile World Congress.  The

12 industry was skeptical about using cellular in unlicensed spectrum because of fear that it would

13 interfere with existing communications in those frequency bands.  To address this skepticism,

14 Qualcomm created a test environment that isolated multiple Wi-Fi devices, as well as Qualcomm

15 prototypes together to show that, with proper protocols, the Qualcomm prototypes did not hurt the

16 performance of the Wi-Fi devices.  Qualcomm developed a complete protocol for using

17 unlicensed spectrum, initially named LTE-Unlicensed ("LTE-U"), that was later standardized as

18 Licensed Assisted Access ("LAA.")  LAA allows gigabit LTE speeds and provided an

19 opportunity for carriers to offer higher data rates without the expense of buying scarce licensed

20 spectrum from the FCC.

21      359.    HetNet is a term used to describe a cellular network that incorporates both

22 traditional macrocells and smaller cells.  Traditional cellular networks consist of a network of

23 base stations whose coverage areas are known as cells.  These base stations are generally tower

24 mounted with high-gain antenna arrays and large transmission power (e.g., 40 Watts), and are

25 thus capable of covering large areas.  These "macrocells," as they are known, are positioned at

26 relatively large distances to cover the needed geographical area.  Network operators are

27 increasingly looking to densify their networks by adding additional cells. Depending on their size

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

and power level, these cells may include "macrocells," "microcells" and "femtocells."  As shown in the figure below, macro and microcells are usually deployed by the network operators in a planned fashion while femtocells are usually deployed in an ad hoc fashion by end users in residential environments.  Because microcells and femtocells are much smaller and lower power, the hurdles and costs associated with these types of base stations are considerably less.



360.    Adding small cells to the network requires addressing potential complications. Each added cell can have a substantial effect on the overall network, both with the increased capacity it brings, as well as the interference it generates.  This effect is even larger when the ultra-dense small networks being envisioned for the future are considered.  Interference, if not addressed, will drastically reduce the capacity benefits of deploying small cells.

361.    Qualcomm has been a leading researcher in the area of HetNets.  As part of Project YODA, Qualcomm developed protocols to manage service and user connections between adjacent cellular base stations with overlapping coverage areas.  Adapting HetNet techniques for LTE was also a focus of Project Frappuccino between 2008 and 2012.  Qualcomm was the first company to successfully demonstrate HetNets at Mobile World Congress 2011, followed by full-system demonstrations with network operators in 2012.  Qualcomm continues to research HetNets today.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

362.    5G deployments will continue the ongoing trend from LTE and become increasingly heterogeneous, including through the introduction of mobile mmWave technologies. 5G NR designs will not only enable the use of higher frequencies in mid-band spectrum for macro/small cell deployments, but it will also bring new mmWave opportunities at spectrum bands above 24 GHz for mobile broadband.  These mmWave deployments are expected to proliferate the number of small cells (since mmWave signals have shorter range) and as a result, will rely increasingly on Qualcomm's HetNet innovations to provide technical solutions to interference issues that will be encountered when combining traditional macrocells and 5G small cells.

363.    Qualcomm's patent portfolio includes patented inventions directed to LAA channel arrangements and HetNet technologies such as basic interference coordination concepts. These patents are essential to later releases of LTE that standardized LAA and HetNets.

## V.    QUALCOMM'S PRACTICE OF LICENSING AT THE DEVICE LEVEL

364.    Qualcomm has made commitments to license its SEPs essential to 3GPP and 3GPP2 cellular standards on FRAND terms and conditions.  These commitments were made pursuant to, among others, the respective IPR policies for ETSI, ATIS and TIA.  These IPR policies govern the scope of the commitments.

365.    The supply chain for products implementing cellular standards, along with end user sales, reaches across many jurisdictions, and SEP holders are located all over the world and own SEPs issued by many different jurisdictions.

### A.    Qualcomm's Commitments to ETSI

366.    ETSI's IPR policy in section 6.1 states:

When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:
-       MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
- repair, use, or operate EQUIPMENT; and
- use METHODS.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

367.     The ETSI IPR policy also states that "MEMBERS shall use one of the ETSI IPR Licensing Declaration forms at the Appendix to this ETSI IPR Policy to make their IPR licensing declarations." That form, in accordance with section 6.1, states:

To the extent that the IPR(s) disclosed in the attached IPR Information Statement Annex are or become, and remain ESSENTIAL in respect of the ETSI Work Item, STANDARD and/or TECHNICAL SPECIFICATION identified in the attached IPR Information Statement Annex, the Declarant and/or its AFFILIATES are (1) prepared to grant irrevocable licences under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy; and (2) will comply with Clause 6.1bis of the ETSI IPR Policy.

368.     The definitions in section 15 of the ETSI IPR policy clarify that the commitment to license applies to makers of complete operational devices, such as cellular handsets or tablets. In particular, the ETSI IPR policy states that "'MANUFACTURE', shall mean production of EQUIPMENT," " 'EQUIPMENT' shall mean any system, or device fully conforming to a STANDARD," and " 'METHODS' shall mean any method or operation fully conforming to a STANDARD."

369.     Pursuant to the ETSI IPR Policy, Qualcomm made FRAND commitments to ETSI assuring it would make SEP licenses available to applicants in accordance with Clause 6.1 of the ETSI IPR Policy.

370.     At the time of the adoption of the ETSI IPR Policy in November 1994, the drafters of the ETSI IPR Policy in 1994 did not intend to change the prevailing normal industry practice, which was to license only manufacturers of fully compliant end-user devices (device level licensing), and not component manufacturers.

371.     ████████████████████████████████████████████████████████

██████████████████████████████████████████████

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CASE NO. 17-CV-220-LHK-NMC

372. ████████████████████████████████████████

████████████████████████████████████ In 2003, efforts to define bad or unreasonable practices under FRAND caused "major divergences," and since a consensus was not achieved, "it was decided that the [IPR ad hoc group] would simply provide an information on the two extreme views and opinions expressed on them by individual members of the ad hoc group." In 2012, Apple renewed efforts before ETSI to change the FRAND definition and the royalty base for a FRAND license under the ETSI IPR Policy, but Apple's requests were rejected with no changes to the Policy made.

373. ETSI and ATIS have fundamentally similar IPR policies.  ETSI compared its IPR Policy with that of TIA because of their joint oneM2M membership and found it compatible. ETSI, ATIS and TIA are all members of oneM2M, which requires such IPR policy compatibility among its members.

**B.    Qualcomm's Commitments to ATIS AND TIA**

374. The ATIS IPR Policy states that a holder of essential patent claims may give "assurance that a license to such essential patent claim(s) will be made available to applicants desiring to utilize the license for the purpose of implementing the standard . . .  under reasonable terms and conditions that are demonstrably free of any unfair discrimination."

375. Pursuant to the ATIS IPR Policy, Qualcomm has made FRAND commitments to ATIS assuring that it would make SEP licenses available to applicants "for the purpose of implementing" the standard.

376. Prior to 2001, the TIA IPR Policy required licensing applicants "for the purpose of implementing" TIA standards.

377. From 2001 to 2005, the TIA IPR Policy provided that SEPs "will be made available under reasonable terms and conditions that are demonstrably free of any unfair discrimination to applicants only and to the extent necessary for the practice of" TIA standards.

378. In 2005, the IPR Policy was amended to read that SEPs:

> will be made available to all applicants under terms and conditions that are reasonable   and   non-discriminatory,   which   may   include   monetary

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

compensation, and only to the extent necessary for the practice of any or all of the Normative portions of the above Reference Document for the field of use of practice of the Standard.

379.    The change in the language served to make it explicit that a patent that was necessarily infringed by the practice of an "optional" element of a standard was nonetheless still an "essential" patent and subject to the licensing commitment.  It made no change in the scope of the applicants to whom the licensing commitment applied, which remained limited to the field of use of practice of the standard.

380.    Pursuant to the TIA IPR Policy, Qualcomm has provided TIA with FRAND commitments to make SEP licenses available to applicants "only and to the extent necessary for the practice of the" TIA standards.

381.    ATIS and TIA are accredited by ANSI, a non-profit organization that oversees the development of standards in the United States.  To maintain ANSI accreditation, ATIS and TIA must meet certain "Essential Requirements" defined by ANSI, including maintaining IPR Policies that are consistent with ANSI's own Patent Policy.

382.    The ANSI Patent Policy provides for patent holders to commit that a license "will be made available to applicants desiring to utilize the license for the purpose of implementing the standard . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination."

383.    The ATIS IPR Policy is identical to the ANSI Patent Policy, while the TIA IPR Policy has closely similar language.

384.    ANSI's Executive Standards Council ("ExSC") has stated:

> We . . .  take this opportunity to emphasize that [a prior ExSC decision] was not intended to create a "default" interpretation of the ANSI Patent Policy requiring licensing at the component level.  While the ExSC determined in the IEEE case that such a requirement was not inconsistent with the ANSI Patent Policy, that does not mean that ANSI's Patent Policy requires licensing at the component level.  We do not wish to express or imply any such "default" interpretation and we leave it to negotiations between patent holders and implementers to decide what licensing terms are appropriate in particular standards, subject to the terms of an [SDO's] patent policy.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

385. The ANSI ExSC further clarified that a commitment to license "to the extent necessary to practice wholly compliant implementations," rather than mere components, is equivalent to the ANSI Patent Policy's requirement that a license be for "the purpose of implementing the standard."

**C.      The Content of the Relevant 3GPP and 3GPP2 Standards**

386. Cellular networks include the "core network," "radio access network," and "user equipment," each of which are referred to as "domains" or "entities."  The core network includes the switching equipment that routes communications between the radio access network and the Internet or telephone network.  The radio access network includes base stations that use wireless channels in the spectrum to communicate with user equipment.  Examples of user equipment includes smart phones, cell phones, and the like.

387. The 3GPP and 3GPP2 standards that are subject to the ETSI, ATIS and TIA IPR Policies at issue in this case address performance, interoperability and communication protocols between the broad "domains" of a cellular system: (1) Infrastructure, which comprises fixed equipment such as base stations that send and receive wireless signals and relay those, and (2) User Equipment ("UE" – the 3GPP term, sometimes referred to above and below as a "user device") or Mobile Station (the 3GPP2 term), an operational user device such as a handset.

388. 3GPP and 3GPP2 standards generally treat the internal workings of the "Infrastructure" and "UE" or "Mobile Station" domain as a "black box." The standards specify the actions that complete infrastructure equipment or user devices must take (such as which signals it must transmit) to operate on a cellular network.

389. These cellular standards do not define how a user device is constructed or how the components of a user device operate.  Rather, they provide OEMs broad discretion regarding how to construct a user device or infrastructure.  These standards also say nothing about the design of modem chips, antennae, power-control chips or the many other components that make up infrastructure equipment or user devices and do not specify whether any required functions must be carried out by hardware or software.  They do not describe or define modem chips.

390.     Conformance with the standards is tested and determined by analyzing the functioning of a complete operational device, not the behavior or design of any component of the device such as modem chips.  There are published compliance testing protocols for devices, but none for modem chips.

391.     Modem chips do not and cannot operate on a cellular network on their own, outside of a complete user device that has all of the hardware and software components needed to implement the standards-specified functionality.  The same model of modem chip can be placed in a user device that practices a standard and a user device that does not practice a standard.

**D.     Industry Practice of Device-Level Licensing**

392.     It is cellular industry practice for SEP owners to make licenses available for the manufacture and sale of end-user devices, but not for the manufacture and sale of components such as baseband chips.

393.     Device-level licensing was standard industry practice before Qualcomm built its licensing program.

394.     Qualcomm followed this established industry practice when it launched its licensing program in the 1990s.  Its understanding and intent at all relevant times with respect to its licensing commitments made to ETSI, ATIS and TIA was that it was committing to make licenses available at the device level in accordance with industry practice.

395.

396.



63

401.    Via Licensing also manages a WCDMA (3G) patent pool that licenses the WCDMA SEPs owned by AT&T, Fujitsu, KDDI, Koninklijke KPN, Mitsubishi Electric, NEC, NTT DoCoMo, Sharp, Siemens, SK Telecom Co., Technology InAriscale and Toshiba.  Via Licensing licenses its WCDMA patent pool only at the device level.

402.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

403.    Modem chip suppliers are also aware of industry practice to license SEPs at the device level, and not at the component or modem level.

404.    MediaTek's General Manager, Corporate Sales, John Finbarr Moynihan, testified that during a negotiation, Nokia "went out of their way to make it absolutely clear that they were not licensing to the chipset company."  He testified further that it was his "general[] underst[anding]" that "all essential IPR is typically licensed by the IPR holders to the end device manufacturer."

405.    █████████████████████████████████████████████████████████████

406.    ████████████████████████████████████████████

407.    Intel claims to have entered only one agreement to cellular SEPs for the purpose of manufacturing chips.  ████████████████████████████████████████████████████████████████████

408.    Samsung's chip division did not have exhaustive licenses from major SEP holders. Samsung has requested such licenses, but no major cellular patent holder has granted a license in response to its requests.  Nor does Samsung license its own SEPs to chip sellers.  Samsung has not licensed MediaTek.

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

409.    Samsung has sought to license its own cellular SEPs at the device level, using the device as the rate base. ████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████

410.    Via Licensing grants patent agreements at the device level. █████████████

███████████████████████████████████████████████████████████

███████████████████

411.    ████████████████████████████████████████████████████████

███████████████████████

412.    ████████████████████████████████████████████████████████

████████████████

413.    ████████████████████████████████████████████████████████

████████████████████

414.    ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████

415.    Blackberry licenses its SEPs at the device level.

416.    Qualcomm has received inbound chip level cross-licenses to the cellular SEPs of its device maker licensees.  These cross-licenses are designed to prevent a device maker from signing a license for rights under Qualcomm's patents and then opportunistically asserting their own patents against Qualcomm.

417.    Qualcomm's cross-licenses are negotiated terms that are not addressed by any obligation arising under an SDO IPR policy.

418.    Qualcomm does not seek SEP licenses covering the manufacture or sale of chips outside the context of cross licenses.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

**E.      Qualcomm's Licensing Practices with Respect to Chipmakers**

419.    Qualcomm makes licenses to its cellular SEPs available to any willing licensee for the manufacture and sale of end-user devices, including chipmakers (to the extent they are manufacturing and selling end-user devices.)  Qualcomm has licensed Samsung and Huawei — who are both chip makers and user device makers – to use Qualcomm's SEPs in their user devices.

420.    Qualcomm does not seek to prevent others from practicing its cellular SEPs to manufacture or sell components of end-user devices; it neither asserts its SEPs against competing chip makers nor seeks to collect royalties from them.

421.    Qualcomm does not grant exhaustive licenses to manufacture or sell components of end-user devices, such as modem chips.  Nor has it granted exhaustive licenses to chipmakers in the past.

422.    Competing modem chip manufacturers make and sell modem chips without any patent license agreement with, or royalties payable to, Qualcomm.

423.    Since 2006, Qualcomm has never asserted any SEP against any chip manufacturer.

424.    Qualcomm has negotiated to provide competing chip manufacturers with other types of non-exhaustive contractual assurances.

425.    Qualcomm has in the past entered into non-exhaustive patent licenses granting chipmakers rights to make and sell modem chips.  ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

426.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1

2

3      427.    On January 30, 2018, Qualcomm entered into a "Cellular Modem Component

4  Patent Commitment Agreement" with Samsung.  Under the agreement, Qualcomm agreed not to

5  assert its cellular SEPs against Samsung, in connection with Samsung's manufacture and sale of

6  modem chips, unless it first offers Samsung a license to make and sell chips on terms that are fair,

7  reasonable and non-discriminatory.

8

9

10

11

12      428.    No chipmaker has sued Qualcomm in more than a decade seeking a license on the

13  grounds that Qualcomm was obligated by its licensing declarations to SDOs to license at the

14  component level.

15      429.    Chip manufacturers have no need for a separate license and are not blocked from

16  access to SEPs in any way.  The technology is broadly available as a result of the standardization

17  process, and                                                        .  Nor does

18  Qualcomm have any incentive to do so.  Instead, when chip suppliers have sought contractual

19  assurances that Qualcomm will not assert its SEPs against them, Qualcomm has been willing to

20  negotiate such agreements on a non-exhaustive basis.

21  **VI.     APPLE'S CHIP RELATIONSHIP WITH QUALCOMM**

22      430.    From 2007 to January 2011, Apple exclusively used in its iPhones modem chipsets

23  from Infineon, which was acquired by Intel in 2011.

24      431.

25

26

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

432.    In 2009, Apple awarded Qualcomm the socket for the CDMA version of the iPhone 4, which was released in February 2011.  Apple continued to use an Infineon chip for the WCDMA version of the iPhone 4.

433.    ██████████████████████████████████████████████ ███████████████████████████████████████████ but would not do so unless Qualcomm paid Apple a substantial amount of money ██████████████████████████████████ ████████████████████████████.

434.    ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████.

435.    Qualcomm had to undertake substantial relationship-specific investments in order to sell modem chips to Apple.

436.    Apple has developed and uses its own proprietary application processor (AP), and Apple devices – unlike the devices of other OEMs – require a "thin modem" chip that could be integrated with Apple's own AP.

437.    While Qualcomm offered thin modem solutions at the time it negotiated with Apple about supplying it with modem chips, ████████████████████████████████ ████████████████████████████████ The chips developed for Apple differed from those other modem-only products because the Apple thin modems required extensive customization, engineering, and support, including the software and other interfaces that allow these chips to work with Apple's proprietary APs and operating system.

438.    The investment that was necessary to meet Apple's requirements was one of several risks Qualcomm faced in negotiating a chip supply agreement with Apple.  These risks included:

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CASE NO. 17-CV-220-LHK-NMC

(a)      Apple demanded a schedule of large incentive payments to be made early in the engagement.

(b)      Qualcomm would have to undertake significant R&D investments – well in excess of $1 billion between 2011 and 2017 – in its thin modem line, including costs associated with customizing thin modems for Apple.  █████████████████████████████████████

███████████████████████████████

(c)      Qualcomm needed to incur these significant R&D investments, and to make many of the payments under the Apple Agreements, in advance of selling significant volumes to, or receiving revenue from, Apple.  Therefore, these substantial costs could potentially never be recovered from Apple.

(d)      █████████████████████████████████████
██████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████████
██████████████████████████████

(e)      Unlike its other modem chip products, Qualcomm's thin modem sales were concentrated in Apple – meaning there were limited opportunities to sell the thin modems customized for Apple to other OEMs.

(f)      Because Qualcomm does not own fabrication facilities, █████████████████
███████████████████████████████████
███████████████████████████████████████
███████████

439.    To address the foregoing risks in addition to Apple's refusal to provide any purchase volume commitments to Qualcomm, and to give Qualcomm reasonable assurances that it would have a chance to recoup its large up-front payments to Apple, Qualcomm and Apple

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    agreed to place conditions on three types of incentive payments from Qualcomm to Apple in the

2    February 2011 Transition Agreement:

3         440.    Transition Fund ($250 Million): Qualcomm agreed to pay Apple $250 million in

4    two installments of $125 million each, on March 31, 2012 and March 31, 2013. ███████████

5    ████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████████

7    ████████████████████ Apple also agreed to achieve certain volume thresholds of purchases

8    from Qualcomm to qualify for the full amount of each payment.  If Apple launched a device with

9    a non-Qualcomm modem chip in 2013, Apple agreed to repay the second installment of the

10   Transition Fund.

11        441.    Marketing Development Fund ($150 Million): Qualcomm agreed to pay Apple six

12   quarterly payments of $25 million each, beginning in the third quarter of 2011, for marketing

13   efforts to drive demand for global sales of products that contained WCDMA chips. ███████████

14   ███████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████████

16        442.    Variable Incentive Fund (up to $600 Million): Qualcomm agreed to pay Apple an

17   annual payment of up to $200 million, capped at $600 million total, within 45 days of October 1st

18   of each year from 2012 to 2015.  Each year's payment was based on a volume schedule, and

19   ████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████ Apple

21   reached the cap of $600 million ████████████████ after receiving the maximum payment of $200

22   million in ████████████████.

23        443.  ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████

27

28

1   444.   █████████████████████████████████████████████

2   █████████████████████████

3   445.   ████████████████████████████████████████ and

4   negotiate the large incentive payments as part of the 2011 Transition Agreement.

5   446.   ████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ███████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ██████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████████

12  447.   Qualcomm and Apple entered into the First Amendment to the Transition

13  Agreement on February 28, 2013, effective January 1, 2013.  This agreement established two

14  types of new incentive payments from Qualcomm to Apple:

15  448.   Marketing Fund: For Apple products sold between January 1, 2013 and December

16  31, 2016, Qualcomm agreed to pay Apple ████████████████████████████████████████,

17  and ██████████████████████████████████████, if those devices contained

18  a Qualcomm modem chip.  Apple demanded and Qualcomm agreed that these sums would begin

19  to accrue on January 1, 2013, long before Qualcomm would find out if Apple would purchase

20  chips from Qualcomm for its 2015 and 2016 devices.

21  449.   Additional Variable Incentive Fund:  Qualcomm agreed to pay Apple up to ████

22  █████████████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████

24  ███████████████████.

25  450.   In negotiating the Transition Agreement, Apple sought an exclusive supplier.

26

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

451.     During the time the Transition Agreement and First Amendment to Transition Agreement were in effect, Apple engaged other suppliers. ██████████████████████ ████████████████████████████

452.     During the time the Transition Agreement and First Amendment to the Transition Agreement were in effect, ███████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████

453.     The 2011 Transition Agreement did not prevent or foreclose any modem chip supplier with a chip that could meet Apple's performance and scheduling requirements from supplying Apple.

454.     ████████████████████████████████████ ███████████████████████████████████████ ██████████████

455.     ███████████████████████████████████████████ ███████████████████████████████████████

456.     ████████████████ Apple ████████████████████████ ██████████████ issued a "man on the moon" challenge that required Qualcomm to accelerate development of its ████████████ multimode modem chip that better fit its size and power preferences by 12 months. ██████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ███████████████████████████████████████████ ██████████████

457.     ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC



DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC



DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

469. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

470. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████

471.     In 2016 Apple invoked its choice to purchase from alternative suppliers, electing to purchase modem chips for the iPhone 7 from Intel in addition to Qualcomm, and awarding a substantial portion of its total purchases to Intel.  Apple did this while the First Amendment to the Transition Agreement was still in effect.  The collaborative work between Apple and Intel for the iPhone 7 model incorporating an Intel modem chip began in 2014.

472.     Apple incorporated Intel modem chips into certain models of the iPhone 7 released in October 2016, and the iPhone 8 and iPhone X released in September 2017, even though the performance of the available Intel modem chips was inferior to that of the Qualcomm modem chips used in other models of the 2016 and 2017 iPhones.

473.     Apple uses Intel modem chips exclusively in the iPhone models released in September and October 2018.

474.     From 2011 to 2016, Apple purchased the majority of Qualcomm's thin modems. Other OEMs used predominantly SoCs in their handsets.  Intel did not sell high-end SoCs, and it

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   currently does not have any SoC in development, having abandoned such development to focus

2   on thin modems for Apple.

3        475.    The 2013 First Amendment to the Transition Agreement terminated on December

4   31, 2016.

5        476.    The 2013 First Amendment to the Transition Agreement did not foreclose any

6   modem chip supplier with a chip that could meet Apple's performance and scheduling

7   requirements from supplying Apple.

8        477.    Apple's share of LTE-enabled handsets never exceeded 41% in any year from

9   2011 to 2017, and it was less than 25% from 2015 onward, declining to 16% in 2017.

10  **VII.    COMPETITION IN THE MOBILE COMMUNICATIONS INDUSTRY**

11       **A.    The Mobile Handset Industry Is Thriving**

12       478.    The average price of handsets before the introduction of smartphones declined

13  from over $500 in 1994 to slightly over $100 in 2005.

14       479.    The average smartphone price fell nearly 34% between 2010 and 2017, from

15  approximately $427 in 2010 to $283 in 2016, before increasing in 2017 to $314, primarily

16  because of the launch of the iPhone X, which sold for at least $999.

17       480.    Between 2008 and 2017 worldwide smartphone sales increased nearly tenfold,

18  from 151 million to 1.46 billion.

19       481.    In 2007, Nokia led the cellular handset industry worldwide.  After Apple

20  introduced the iPhone in 2007, it became a leading supplier, accounting for 14.8% of global

21  smartphone sales in 2017.  Samsung, which accounted for less than 5 percent of global

22  smartphone sales until 2009, accounted for 21.7% in 2017, while the share of Nokia had fallen to

23  less than 1% in 2017.  The next four largest smartphone OEMs in terms of global unit sales in

24  2017 – Huawei, OPPO, TCL and Vivo – are all new entrants that did not even begin supplying

25  smartphones until 2009 or later.

26

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1

### B.   Relevant Market Definition

2        482.    Network operators, even in large markets like the U.S., had not fully rolled-out

3   their LTE networks prior to 2014.  In 2010, there was virtually no LTE roll-out.  By 2011, the

4   share of the population that resided in countries where LTE had already rolled out was about

5   8.6%.  By 2012, that share of the population was about 12%.  In 2012, while Verizon's LTE

6   network covered around 80% of the U.S. population, AT&T's LTE network covered less than

7   50% of the U.S. population.  Until 2014, the majority of the world would not have been able to

8   use an LTE-enabled handset.

9        483.    The first commercial handset launches with modem chips that supported LTE

10  occurred in 2011.  At least until 2013, Samsung concurrently offered versions of its flagship

11  handsets in both 3G and LTE versions: Galaxy S2 (introduced in 2011), Galaxy S3 (introduced in

12  2012), and Galaxy S4 and Galaxy Note (both in 2013.)  Samsung viewed Apple's 3G iPhone to

13  be competing with Samsung's flagship LTE Galaxy S series handsets.

14       484.    Apple first included LTE-capable modem chips in the iPhone 5, released in

15  September 2012.  The iPhone 4, released in June 2010, and iPhone 4S, released in October 2011,

16  incorporated modem chips with only 3G capabilities.  Samsung began manufacturing its own

17  LTE modem chips in 2013, which have since been included in Samsung phones selling for more

18  than $400.

19       485.    Huawei, through its HiSilicon subsidiary, began manufacturing its own LTE

20  modem chips in 2011, which have since been included in Huawei phones selling for more than

21  $400.

22       486.    Professor Shapiro provided no opinion regarding modem chip market shares or

23  market power after December 2016.

24       487.    Apple used no Qualcomm modem chips in its iPhone models released in 2018 –

25  the iPhone XS (priced at $999 to $1,349), iPhone XS Max (priced at $1099 to $1,449) and iPhone

26  XR (priced at $749 to $899.)  2018 iPhone models all use modem chips from Intel, and Apple

27  plans to use only Intel modem chips in all of its 2019 iPhone models.

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

488.   Apple continues to sell the iPhone 7 (priced at $449 to $549) and iPhone 7 Plus (priced at $569 to $669.)  Apple dual-sources the modem chips for the iPhone 7 and 7 Plus from Intel and Qualcomm.  The Intel XMM7360 modem used in certain models supports LTE Cat. 10 with a maximum downlink/uplink speed of 450/50 Mbps.

489.   A number of modem chips, such as the Intel XMM7160 and the Samsung CMC220, that are not included in the FTC's proposed relevant market of "Premium LTE Modem Chips" were incorporated into handsets that cost more than $300 before 2013 and more than $400 after 2013.

490.   A number of modem chips that the FTC includes in its proposed relevant market of "Premium LTE Modem Chips" were incorporated into handsets that cost less than $300 before 2013 and less than $400 from 2013 onward.

491.   The FTC has made no specific allegations about the existence of a WCDMA modem chip market, and it has not alleged that Qualcomm has monopoly power in such a market.

492.   In amended responses to interrogatories dated February 7, 2018, the FTC identified all modem chips that it claimed to be "premium" LTE modem chips.  In his expert report dated May 24, 2018, Dr. Shapiro identified all modem chips that he claimed to be "premium" LTE modem chips.  The FTC's list of asserted "premium" LTE modem chips differs from Dr. Shapiro's list of asserted "premium" LTE modem chips:

FTC's and Professor Shapiro's Lists of "Premium LTE" Modem Chipsets

| Supplier | Modem Chipset | "Premium LTE" Modem Chipsets Identified by: | |
|---|---|---|---|
| | | FTC | Professor Shapiro |
| Broadcom | 7373 | X | |
| HiSilicon | BALONG V9R1 | | X |
| HiSilicon | K3V2 | | X |
| HiSilicon | KIRIN 659 | | X |
| HiSilicon | KIRIN 910 | X | |
| HiSilicon | KIRIN 920 | X | |
| HiSilicon | KIRIN 925 | X | X |
| HiSilicon | KIRIN 928 | X | |
| HiSilicon | KIRIN 930 | X | |
| HiSilicon | KIRIN 935 | X | X |
| HiSilicon | KIRIN 950 | X | X |
| HiSilicon | KIRIN 955 | X | X |
| HiSilicon | KIRIN 960 | X | X |

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CASE NO. 17-CV-220-LHK-NMC

| | | | |
|---|---|:---:|:---:|
| HiSilicon | KIRIN 970 | X | X |
| Intel | XGOLD716 | X | |
| Intel | XGOLD726 | X | X |
| Intel | XGOLD736 | X | X |
| Intel | XGOLD748 | X | X |
| MediaTek | 6589 | | X |
| MediaTek | 6595 | | X |
| MediaTek | 6750 | | X |
| MediaTek | 6752 | | X |
| MediaTek | 6753 | | X |
| MediaTek | 6755 | | X |
| MediaTek | 6757 | | X |
| MediaTek | 6795 | | X |
| MediaTek | 6797 | | X |
| MediaTek | 6799 | | X |
| MediaTek | 8392 | | X |
| MediaTek | 8735 | | X |
| Motorola | T6VP0XBG | | X |
| Qualcomm | MDM9200 | X | X |
| Qualcomm | MDM9215 | X | |
| Qualcomm | MDM9215M | X* | X |
| Qualcomm | MDM9225 | X | |
| Qualcomm | MDM9230 | X | |
| Qualcomm | MDM9235 | X | |
| Qualcomm | MDM9235M | X* | X |
| Qualcomm | MDM9240 | X | |
| Qualcomm | MDM9250 | X | |
| Qualcomm | MDM9320 | X | |
| Qualcomm | MDM9330 | X | |
| Qualcomm | MDM9340 | X | |
| Qualcomm | MDM9350 | X | |
| Qualcomm | MDM9600 | X | |
| Qualcomm | MDM9615 | X | |
| Qualcomm | MDM9615M | X* | X |
| Qualcomm | MDM9625 | X | |
| Qualcomm | MDM9625M | X* | X |
| Qualcomm | MDM9630 | X | |
| Qualcomm | MDM9635 | X | |
| Qualcomm | MDM9635M | X* | X |
| Qualcomm | MDM9640 | X | |
| Qualcomm | MDM9645 | X | X |
| Qualcomm | MDM9650 | X | |
| Qualcomm | MDM9655 | X | X |
| Qualcomm | MSM8916 | | X |
| Qualcomm | MSM8930 | | X |
| Qualcomm | MSM8939 | | X |
| Qualcomm | MSM8952 | | X |

79

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

| | | | |
|---|---|---|---|
| Qualcomm | MSM8953 | | X |
| Qualcomm | MSM8956 | | X |
| Qualcomm | MSM8960 | X | X |
| Qualcomm | MSM8974 | X | X |
| Qualcomm | MSM8976 | | X |
| Qualcomm | MSM8992 | X | X |
| Qualcomm | MSM8994 | X | X |
| Qualcomm | MSM8996 | X | X |
| Qualcomm | MSM8998 | X | X |
| Samsung | CARMEN | X | |
| Samsung | CARMEN PLUS | | X |
| Samsung | CMC221D | X | |
| Samsung | CMC222M | X | |
| Samsung | CMC303 | X | X |
| Samsung | EXYNOS 8890 | X | X |
| Samsung | EXYNOS 8895 | X | X |
| Samsung | S333 2CA | | X |
| Samsung | S333 3CA | X | X |
| Samsung | S5E7880 | | X |
| Samsung | SA5333D | | X |
| Total | | 53 | 54 |
| Number of chips only in FTC's list: | | | 26 |
| Number of chips only in Professor Shapiro's list: | | | 27 |
| Number of chips common across both lists: | | | 27 |

493.    Modem chips gain in speed and functionality with each new product cycle. ▮

▮▮▮

▮▮▮

494.    There are modem chips omitted from the FTC's listing of chips in the asserted "premium" category that are included in cell phones selling for more than $400 (or more than $300 before 2013), such that under Prof. Shapiro's definition such chips should have been included.  There are modem chips included in the FTC's listing of such chips in the asserted "premium" category that were included in cell phones selling for less than $400 (or less than $300 before 2013).  OEMs considered additional modem chips, not included in the FTC's listing, for use in handsets that cost more than $300 before 2013 and more than $400 after 2013.

495.    ▮▮▮

▮▮▮

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

496. ███████████████████████████████████████████

███████████████████████████████████████

497.     As of 2018, only one major carrier in the U.S. (Sprint) and carriers in China require handsets to be CDMA-enabled to be activated on their networks.  Other major CDMA carriers – Verizon Wireless (in the U.S.) and KDDI (in Japan) – have leveraged VoLTE capabilities such that their subscribers are no longer required to use phones with CDMA capability.  Verizon now certifies and sells phones without CDMA support, including HTC's 2017 flagship phone, the HTC U11, the LG Exalt LTE, and the Asus ZenFone V.

498. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

### C.     Qualcomm's Success In Winning Chip Sockets Is Earned

499.     Qualcomm wins modem chip sockets against its many competitors by offering a technically superior product or by competing on price.  Qualcomm's integrated solutions simplify handset design and reduce cost.

500.     Qualcomm achieves success by focusing on developing modem chips with differentiating features that support the latest set of standardized capabilities.  It works on a chip's design for two to three years before bringing the chip to market, leveraging R&D that has been ongoing for years prior.

501.     Qualcomm has repeatedly been the first to market with leading edge cellular features.  Many of those firsts have been described in section IV above.  Additional examples include:

    (a)     In February 2000, Qualcomm delivered the MSM5000, the world's first CDMA2000 chipset which supported communications that exceeded the ITU's 3G data rate requirement of 144kbps, providing 154kbps on both the uplink and downlink.

1          (b)     In 2003-2004, Qualcomm introduced the world's first HSPA and

2                    WCDMA/GSM multi-mode chipset, the MSM6275.

3          (c)     In July 2008, in a prototype using its newly-introduced MSM8200 chipset,

4                    Qualcomm completed the world's first HSPA+ data call, achieving a

5                    download data rate of 28Mbps in a 5MHz carrier.

6          (d)     In late 2010, Qualcomm introduced the industry's first chip that supported

7                    LTE, 2G and 3G communications, allowing phones to receive high-speed

8                    service where available, but still function in areas served by legacy towers.

9          (e)     In November 2013, Qualcomm announced the first cellular modem built on

10                  20nm technology.  This chip supports carrier aggregation up to 40MHz and

11                  allows download speeds of up to 300Mbps, and using it, in January 2014,

12                  Qualcomm achieved the first 300Mbps data "call."

13          (f)     In October 2016, Qualcomm was the first to announce a commercial

14                  modem chipset for supporting 5G with the X50 modem, and in October

15                  2017 announced the first data connection using smartphone-sized chips

16                  over millimeter wave frequencies, a prerequisite to 5G data

17                  communications.

18      502.   ██████████████████████████████

19   ████████████████████████████████████████

20   ██████████████████████████████████████

21   ████████████████████

22      503.   ███████████████████████████████████

23   ██████████████████████████████████

24      504.   Infineon, later acquired by Intel, and Broadcom have also employed a "fast

25  follower" model.

26

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

### D.    Competition Among Chip Makers Is Dynamic

505.    In the mid-to-late 1990s, many chip makers were heavily invested in GSM and chose not to develop CDMA modem chips and devices.

506.    In the late 1990s and early 2000s, as CDMA gained traction, some chip makers began producing CDMA modem chips, including VIA, DSPC (later acquired by Intel and then Marvell), Motorola and Texas Instruments.

507.    Because of the relatively small footprint of CDMA, most chip makers ceased manufacturing CDMA modem chips and focused on WCDMA, which quickly became the commercially dominant standard, leaving CDMA accounting for about 5 percent outside of China.

508.    Nonetheless, OEMs always had alternative suppliers for CDMA modem chips in the mid-2000s, primarily VIA and Texas Instruments (which supplied all of Nokia's CDMA needs).

509.    In the late 2000s, Texas Instruments decided to leave the CDMA space, leaving only Qualcomm and VIA as CDMA suppliers.  Other chip makers were reluctant to enter CDMA at that stage, viewing the technology as dying and expecting it to be quickly replaced by VoLTE.

510.    █████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████████████████

511.    In 2015, China Telecom and China Unicom advocated for a six-mode (GSM, CDMA, WCDMA, TD-SCDMA, TDD-LTE, FDD-LTE) handset national standard in China.  In April 2016, the Chinese government mandated that six-mode standard for interoperability across all three major Chinese carriers (China Telecom, China Unicom, and China Mobile).  This imposed a requirement whereby all phones sold in China would need to support six different standards, including CDMA.  The mandating of this national standard caused demand for CDMA-compatible modem chips to increase and renewed the interest of chip makers in adding CDMA capabilities to their modem chips.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

512.    MediaTek released its first CDMA-capable LTE multimode modem chip in 2015. Today all of MediaTek's modem chips support CDMA (among other standards).

513.    In 2016, HiSilicon began providing Huawei with multimode LTE modem chips that support CDMA.

514.    In 2018, Samsung released a multimode LTE modem chip that supports CDMA.

515.    In 2018, Intel – which ultimately acquired VIA in 2015 – released a multimode LTE thin modem that supports CDMA.  All Apple 2018 devices sold for activation on carriers requiring CDMA support use an Intel thin modem with CDMA support.

516.    MediaTek gained about a 15% share of the FTC's asserted CDMA market in 2015, which grew to over 35% in 2016.

517.    As a result of carriers' pace in rolling out LTE networks and handset makers' interest in continuing to sell non-LTE handsets between 2011 and 2013, Qualcomm's LTE baseband processor business competed with non-LTE baseband processor suppliers.

518.    By 2011, Qualcomm internally identified Samsung, ST-Ericsson, GCT (partnering with LGE), Huawei, Altair, Nvidia (succeeding Icera) and Intel (succeeding Infineon) as posing significant potential competition for LTE baseband processors, and noted MediaTek, Broadcom and Motorola as other LTE baseband processor suppliers to consider.

519.    After being first to market a multimode LTE modem chip in 2009, starting in 2014 Qualcomm's share of sales of LTE baseband processors has rapidly declined as Intel, Samsung, MediaTek and HiSilicon released competitive LTE modem chips and gained share of sales over time.

520.    MediaTek launched its first LTE baseband processors in 2014.

521.    By 2016, Dr. Shapiro calculates that Qualcomm's share of what he defines as the "premium" LTE baseband processor market dropped to 57% under one definition of the market, and to below 50% under another definition of the market, even while not accounting for HiSilicon's sales.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

522.    For 2017, Dr. Shapiro does not calculate what he defines as the "premium" LTE baseband processor market share for Qualcomm or Qualcomm's competitors, while Dr. Chipty calculates that Qualcomm's share in what Dr. Shapiro defines as the "premium" LTE baseband processor market dropped further to 49.2%, and that competitors MediaTek, Intel, Samsung and HiSilicon increased their combined share to 50.8%.

523.    Samsung multi-sourced baseband processors from more than one vendor, including from Qualcomm, Samsung LSI, Intel, ST-Ericsson, Broadcom, MediaTek and Spreadtrum, to secure price competitiveness.

524.    █████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
████████████

525.    ████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████

526.    Vivo previously used a Qualcomm baseband processor for its 2014 X5 Max device, but switched to MediaTek's baseband processor for its subsequent 2015 X5 Max+ and X6 devices.

527.    ████████████████████████████████████████████
█████████████████████████████████████████
███████████████████████

528.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

529.    From 2008 to 2010, Apple single-sourced baseband processors from Infineon, which was acquired by Intel in 2011.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

530. ███████████████████████████

███████████████████████████████

531.     From 2011 to 2013, Apple sourced baseband processors for new iPhones from only Qualcomm, and it continued to source baseband processors for its legacy devices from Intel.

532. ████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████

533.     Apple single-sourced from Qualcomm for devices launched in 2014 and 2015, and then began to dual-source baseband processors from Qualcomm and Intel for the iPhones released in 2016 and 2017, sourcing approximately 50% from each in 2017. Apple single-sourced from Intel for the iPhones released in 2018.

534. █████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████

535.     Apple and Intel worked together on the Intel modem chip used in the 2016 iPhone 7 starting in 2014.

536. ████████████████████████████████

██████████████████████████████████████

██████████████████████████████

███████████████████████████████████████

█████████████████

537. ████████████████████████████████████

███████████████████████████

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

538. ████████████████████████████████████████████████

539.    Broadcom was initially successful in supplying 2G and 3G modem chips to large customers such as Nokia and Samsung, but ultimately exited the modem chip market.  It did not produce any LTE modem chips until February 12, 2013.  Broadcom eventually was unsuccessful in its LTE endeavor, forcing it to cease supplying modem chips.  The exit was due to several factors, including its decision not to focus on producing 4G modem chips until 2010 and loss of large customers Nokia and Samsung.  Other factors contributing to its demise were rapidly declining ASPs of 2G and 3G phones and an insufficient number of engineers.

540.    Broadcom attempted to make up for its late arrival to 4G by acquiring Renesas, but this approach did not allow it to successfully enter the 4G market.

541.    Texas Instruments was successful in the 1990s and early 2000s, but with the market decline of its largest customer, Nokia, it was unable to maintain its success and ultimately exited the modem chip market.  Low cost competitors like MediaTek, Spreadtrum, and Infineon overtook Texas Instruments in the market for 2G devices.  Texas Instruments' WCDMA modem chip design, in collaboration with NTT DoCoMo, never went into final production because it had miscalculated modem chip demand in Japan.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

542. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████

543. ████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

544.    Since 2010, a number of chip suppliers have introduced modem chips with LTE capabilities, while other chip suppliers have left the market:

**Timeline of Suppliers of LTE-Enabling Modem Chipset Shipments, by Supplier 2010 – 2017**

| Chipset Supplier | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|
| Qualcomm |  |  |  |  |  |  |  |  |
| Samsung |  |  |  |  |  |  |  |  |
| ST-Ericsson / Ericsson |  |  |  |  |  |  |  |  |
| GCT |  |  |  |  |  |  |  |  |
| Altair (Sony) |  |  |  |  |  |  |  |  |
| HiSilicon |  |  |  |  |  |  |  |  |
| Motorola |  |  |  |  |  |  |  |  |
| Sequans |  |  |  |  |  |  |  |  |
| Icera (NVIDIA) |  |  |  |  |  |  |  |  |
| Spreadtrum (Tsinghua Unigroup) |  |  |  |  |  |  |  |  |
| Broadcom / Renesas |  |  |  |  |  |  |  |  |
| Intel |  |  |  |  |  |  |  |  |
| Marvell |  |  |  |  |  |  |  |  |
| Leadcore |  |  |  |  |  |  |  |  |
| MediaTek |  |  |  |  |  |  |  |  |

545.    Many competitors have already announced 5G modem chips, including Intel and Samsung.

**E.    Chip Prices Are Declining**

546.    The average selling price ("ASP") of Qualcomm's LTE baseband processors has declined by 44% from 2012 to 2018:

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

| Year | LTE Baseband ASP (US$) |
|------|------------------------|
| 2012 | $23.74 |
| 2013 | $22.29 |
| 2014 | $19.72 |
| 2015 | $15.55 |
| 2016 | $14.25 |
| 2017 | $14.02 |
| Q2 2018 | $13.37 |

547.    Prices of modem chips Professor Shapiro contends are "premium LTE" have also

declined.

548.    The average ASP for 3G modem chips has fallen from around $14 in 2008 to

about $5 in 2018.

549.    The average ASP for 2G modem chips has fallen from around $5 in 2008 to under

$2 in 2018.

550.    Qualcomm felt pressure on its LTE baseband processor pricing and margins from

competitors MediaTek, Intel, and Samsung, and responded to new offerings by these competitors

by lowering the prices of its "premium"- LTE baseband processors (as that term is defined by

Shapiro).

551.    Prof. Shapiro recognized that after MediaTek entered in 2015 with a modem chip

supporting LTE/CDMA multi-mode capability, Qualcomm had to lower the price of its

equivalent offering.

552.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

553.    ██████████████████████████████████████████
██████████████████████████████████

554.    ████████████████████████████████████
████████████████████████████████████████████

1   ███████████████████████████████████████████████████████████████

2   ████████████████████

3        555.   When negotiating the terms of Qualcomm supplying baseband processors for

4   Apple devices, ███████████████████████████████████████████████████████

5   ████████████

6        556.   When negotiating the terms of supplying baseband processors for Apple devices,

7   Qualcomm considered potential competitive threats, including MediaTek, Broadcom, and Intel.

8        **F.    Baseband Processor Quality Is Improving**

9        557.   Qualcomm's R&D investment drives the pace of innovation.  From at least 2006

10  to the present, Qualcomm has spent at least ████ of its revenue on R&D, including ████ of its

11  revenue in 2016.

12       558.   MediaTek increased its R&D expenditure from 10.5% of its revenue in 2006 to

13  20.2% of its revenue in 2016.

14       559.   Intel increased its R&D expenditure from 16.6% of its revenue in 2006 to 21.5%

15  of its revenue in 2016.

16       560.   Huawei increased its R&D expenditure from 8.5% of its revenue in 2008 to 14.6%

17  of its revenue in 2016.

18       561.   Samsung increased its R&D expenditure from 6.7% of its revenue in 2006 to 7.3%

19  of its revenue in 2016.

20       562.   After Qualcomm introduced carrier aggregation capability in its baseband

21  processors in 2013, Intel introduced carrier aggregation capability in its XMM7260 baseband

22  processor in 2014, HiSilicon in its Kirin 920 baseband processor in 2014, Samsung in its Exynos

23  Modem 303 baseband processor in 2014, and MediaTek in its MT6797 baseband processor in

24  2016.

25       563.   After Qualcomm introduced LTE/CDMA multimode capability in its baseband

26  processors, MediaTek introduced LTE/CDMA multimode capability in its MT6753 baseband

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

processor in 2015, HiSilicon in its Kirin 960 baseband processors in 2016, Samsung in its Exynos 9 Series 9810 baseband processor in 2018 and Intel in its XMM7560 baseband processor 2018.

564.    LTE baseband processor data transfer speeds increased more than 6-fold from 2013-2017, and continue to increase.  LTE baseband processors released in 2018 now have downlink speeds meeting or exceeding 1 gigabit per second ("Gbps"), and Qualcomm's baseband processors have a maximum downlink speed exceeding 2 Gbps.

565.    The global cost of data per megabyte decreased from approximately $8.00 per megabyte in 2006 to approximately $0.10 per megabyte in 2013, and further decreased to approximately $0.01 per megabyte in 2016.

566.    Advances in modem chip technology in the products offered by the five largest modem chip suppliers from 2013-2018 are summarized as follows:

**Timeline of Advances in LTE Modem Chip Technology, by Supplier**
**2013 – 2018**

| Chipset Supplier | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Qualcomm | MSM8974 | MDM9635 | MSM8994 | MSM8996 | MSM8998 | SDX24* |
| LTE DL Category | 4 | 6 | 9 | 12 | 16 | 20 |
| Max DL Speed (Mbps) | 150 | 300 | 450 | 600 | 1,000 | 2,000 |
| DL Carrier Aggregation | 2x10 MHz | 2x20 MHz | 3x20 MHz | 3x20 MHz | 4x20 MHz | 7x20 MHz |
| LTE/CDMA Multimode? | Yes | Yes | Yes | Yes | Yes | Yes |
| Technology Node (nm) | 28 | 20 | 20 | 14 | 10 | 7 |
| Intel | XMM7160 | XMM7260 | XMM7262 | XMM7360 | XMM7480 | XMM7560* |
| LTE DL Category | 4 | 6 | 6 | 10 | 12 | 16 |
| Max DL Speed (Mbps) | 150 | 300 | 300 | 450 | 600 | 1,000 |
| DL Carrier Aggregation | No | 2x20 MHz | 2x20 MHz | 3x20 MHz | 4x CA | 5x20 MHz |
| LTE/CDMA Multimode? | No | No | No | No | No | Yes |
| Technology Node (nm) | 40 | 28 | 28 | 28 | Unknown | 14 |
| Samsung | Carmen | Exynos Modem 303 | Exynos Modem 333 | Exynos 8 Octa 8890 | Exynos 9 Series 8895 | Exynos 9 Series 9810 |
| LTE DL Category | 4 | 6 | 10 | 12 | 16 | 18 |
| Max DL Speed (Mbps) | 150 | 300 | 450 | 600 | 1,000 | 1,200 |
| DL Carrier Aggregation | No | 2x20 MHz | 3x20 MHz | 3x CA | 5x CA | 6x20 MHz |
| LTE/CDMA Multimode? | No | No | No | No | No | Yes |
| Technology Node (nm) | 32 | 28 | 28 | 14 | 10 | 10 |
| HiSilicon | Balong 710 | Kirin 920 | Kirin 950 | Kirin 960 | Kirin 970 | 2018 Chipset Not Identified |
| LTE DL Category | 4 | 6 | 6 | 12 | 18 | |
| Max DL Speed (Mbps) | 150 | 300 | 300 | 600 | 1,200 | |
| DL Carrier Aggregation | Unknown | CA | 2x20 MHz | 4x20 MHz | 5x20 MHz | |
| LTE/CDMA Multimode? | No | No | No | Yes | Yes | |
| Technology Node (nm) | 40 | 28 | 16 | 16 | 10 | |

## VIII.   QUALCOMM PLAYS A SUBSTANTIAL ROLE IN EVOLVING WIRELESS TECHNOLOGIES THAT PROMOTE THE PUBLIC INTEREST

567.    Qualcomm is the only U.S.-based company that engages in significant, early stage R&D to conceive, standardize, and commercialize cellular wireless technology.  Its R&D efforts are conducted with a five- to ten-year horizon before commercial realization of the technology

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    could be achieved.  Such a long-term R&D investment strategy carries a high level of risk for its

2    investments.

3         568.    For example, Qualcomm started focusing R&D efforts on 5G in early 2014.

4    Qualcomm made the initial contributions to 3GPP of a broad 5G framework.  In 2015, 3GPP

5    commenced a formal study of potential 5G requirements, which identified more than 70 different

6    use cases, categorized into different groups: massive Internet of Things, Critical

7    Communications, enhanced Mobile Broadband and Network Operation.  In June 2016, the 3GPP

8    Technical Specifications Groups (TSG#72) agreed on a detailed workplan for the first 5G release,

9    Release 15.  5G NR Release 15 was frozen in 2018, and work on 5G NR Release 16 is ongoing.

10   The first phase of 5G is focused on use of 5G technology for smartphones.  The second phase is

11   focused on use of 5G in vertical use cases such as automobiles, industrial IoT, medical, and

12   others, which is more complex and requires additional R&D to, for example, determine the best

13   solution to replace cables in factories with cellular interconnectivity.

14        569.    For each generation of cellular standards, Qualcomm's R&D efforts support basic,

15   early stage R&D that leads to the introduction of technologies to the development of standards,

16   and which address technical features that are sought by users of standards – e.g., device and

17   infrastructure manufacturers, and carriers.  Qualcomm's R&D and technical contributions to

18   standards development continues as standards evolve toward approval and beyond.  For example,

19   Qualcomm pioneered mmWave and channel coding technologies, two fundamental components

20   of 5G, and it continues to devote resources to improving these technologies.

21        570.    Licensees have stopped paying royalties when there have been disputes regarding

22   their license agreements with Qualcomm, regardless of the nature of the dispute. This arises in

23   relation to direct disputes with Qualcomm and regulatory decisions they interpret as relating to

24   their obligations under their agreements.

25        571.    ████████████████████████████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1

2

3

4        572.    Qualcomm has been investing in R&D related to 5G-specific technologies since

5 March 2014.  Qualcomm is the only U.S.-based entity with a leading role in 5G standards

6 development.  Much of the technology Qualcomm developed for 4G and 3G technologies has

7 been incorporated into 5G.  Around the 2014/2015 period, Qualcomm's executives made the

8 decision to ramp up R&D in 5G.

9        573.    With a finite amount of R&D funding available, the determination of where to

10 devote R&D efforts is a zero sum game.  5G is a strategic priority for Qualcomm.  Due to

11 complexity, the transition from 4G to 5G is far more difficult and expensive than the transition

12 from 3G to 4G, and it thus requires a greater proportion of the available funding for "core" R&D.

13

14

15

16        574.    Huawei, a Chinese company, is the next most significant leader in 5G

17 development after Qualcomm.  Huawei is the only company in the world that is involved in every

18 segment of the cellular wireless sector – standards, modems, devices and infrastructure.

19        575.    On September 26, the Federal Communications Commission voted to approve a

20 declaratory ruling and report and order that preempts local authority over 5G wireless facility

21 deployment and management of local rights-of-way.  The FCC expressly cited the "national

22 strategy to promote the timely buildout of this new infrastructure across the country by

23 eliminating regulatory impediments that unnecessarily add delays and costs to bringing advanced

24 wireless services to the public."

25        576.    The U.S. Treasury's Committee on Foreign Investment in the United States

26 (CFIUS) issued a letter regarding Broadcom's attempt to acquire Qualcomm, in which it stated

27 that a significant "risk to the national security of the United States" could arise from changing

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    Qualcomm's assets innovation-focused business model as a result of acquisition by a foreign

2    entity.

3        577.    CFIUS stated that Qualcomm is a "global leader in the development and

4    commercialization of foundational technologies and products used in mobile devices," that

5    Qualcomm "led the mobile revolution in digital communications technologies," and that

6    "Qualcomm's technological success and innovation is driven by its unmatched expertise and

7    research and development," which "drive[s] U.S. leadership in key-standard setting bodies."

8    CFIUS concluded that the "weakening of Qualcomm's technological leadership" (including

9    limiting R&D expenditures) and "disrupt[ing] … Qualcomm's capabilities as a supplier of

10   products" to the U.S. government "could pose a risk to the national security of the United States."

11       578.    The CFIUS Letter also stated that "[r]eduction in Qualcomm's long-term

12   technological competitiveness and influence in standard-setting would significantly impact U.S.

13   national security.  This is in large part because a weakening of Qualcomm's position would leave

14   an opening for China to expand its influence on the 5G standard-setting process."

15       579.    The CFIUS Letter specifically referenced the "detrimental impact on national

16   security" that could result from a limitation or cessation of supply of Qualcomm products or

17   services, such as the work Qualcomm is doing in partnership with the United States government

18   to address cybersecurity in connection with the Internet of Things.

19       580.    CFIUS further stated that "Qualcomm's current business model . . . relies on the

20   licensing business to fund the company's large R&D expenditures."  Qualcomm's chip business

21   operates in a highly competitive environment, and is a low margin business that could not

22   generate sufficient profits to replace the profits from the licensing business.  An injunction that

23   would result in significantly reduced licensing revenues, thus significantly impairing Qualcomm's

24   R&D efforts and capabilities, would likely result in hindering Qualcomm's ability to lead the 5G

25   standard-setting process and enabling Huawei and Chinese interests to assume the leadership in

26   5G standardization.  Such a result would significantly impact U.S. interests, including

27   "substantial negative national security consequences for the United States."

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1

**CONCLUSIONS OF LAW**

2

**IX.    LEGAL STANDARDS GOVERNING THE FTC'S CLAIMS**

3          581.    Section 13(b) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C.

4   §53(b), permits the FTC to bring a case in federal district court to enjoin conduct that "is

5   violating, or is about to violate" Section 5 of the FTC Act, 15 U.S.C. §45.

6          582.    In this case, the FTC alleges that Qualcomm's conduct violates Section 5 because

7   it violates both Section 1 and Section 2 of the Sherman Act.  (Complaint ¶147).  The FTC also

8   alleges that, even if Qualcomm's conduct does not violate either Section 1 or Section 2 of the

9   Sherman Act, Qualcomm's conduct nonetheless "constitute[s] unfair methods of competition in

10  violation of [Section 5] of the [FTC Act]."  (Complaint ¶147).

11         583.    Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or

12  conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. §1.  To show

13  a violation of Section 1, the FTC must "prove 'three elements: (1) an agreement or conspiracy

14  among two or more persons or distinct business entities; (2) by which the persons or entities

15  intend to harm or restrain competition; and (3) which actually restrains competition.'" *City of*

16  *Vernon v. Southern Cal. Edison Co.,* 955 F.2d 1361, 1365 (9th Cir.), *cert. denied*, 506 U.S. 908

17  (1992) (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1488 (9th

18  Cir. 1991) (citation and quotations omitted)); *see also Amarel v. Connell,* 102 F.3d 1494, 1522

19  (9th Cir. 1996); *Name Space, Inc. v. Internet Corp. for Assigned Names & Nos.,* 795 F.3d 1124,

20  1129 (9th Cir. 2015).   Only "unreasonable" restraints of trade are unlawful.  *Leegin Creative*

21  *Leather Prod., Inc. v. PSKS, Inc.,* 551 U.S. 877, 885 (2007).   The FTC does not allege that any

22  agreement it challenges here is *per se* unlawful, nor could it as it does not challenge any

23  "horizontal" agreement between competitors or other agreement that falls within the narrow

24  category that the Supreme Court has found to be *per se* unlawful.  *See Ohio v. Am. Express Co.*,

25  138 S. Ct. 2274, 2283-84 (2018).  Therefore, the FTC's Section 1 claim is subject to analysis

26  under the "rule of reason," under which the FTC must prove that the challenged agreements are

27  "restraints with anticompetitive effect that are harmful to the consumer" rather than "restraints

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    stimulating competition that are in the consumer's best interest."[1]  *Id.* at 2284 (quoting *Leegin*,

2    551 U.S. at 886); *see also Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 843 (9th Cir. 1996) (under

3    rule of reason analysis, "the factfinder weighs all of the circumstances of a case in deciding

4    whether a restrictive practice should be prohibited as imposing an unreasonable restraint on

5    competition" (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)).  "The

6    rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects."

7    *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003).  Under the rule of

8    reason governing challenges to vertical agreements, as here, the plaintiff must prove the

9    defendant had market power in a properly defined market.  *See Am. Express*, 138 S. Ct. at 2283 &

10   n.7 (noting that "[v]ertical restraints often pose no risk to competition unless the entity imposing

11   them has market power, which cannot be evaluated unless the Court first defines the relevant

12   market").  The plaintiff must also "prove that the challenged restraint has a substantial

13   anticompetitive effect that harms consumers in the relevant market."  *Id.* at 2284.  The FTC

14   alleges that Qualcomm's license and other agreements with OEMs and alleged "exclusive

15   dealing" arrangements with Apple violate Section 1 of the Sherman Act.  (Complaint ¶147; FTC

16   Response to Interrogatory No. 2).

17       584.    A claim under Section 2 of the Sherman Act "has two elements: (1) the possession

18   of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that

19   power as distinguished from growth or development as a consequence of a superior product,

20   business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71

21   (1966).  "To be condemned as exclusionary, a monopolist's act must have an 'anticompetitive

22   effect.'  That is, it must harm the competitive process and thereby harm consumers.  In contrast,

23   harm to one or more competitors will not suffice." *United States v. Microsoft Corp.,* 253 F.3d 34,

24   58 (D.C. Cir. 2001); *In re eBay Seller Antitrust Litig.* 545 F. Supp. 2d 1027, 1032 (N.D. Cal.

25   2008) (plaintiff must establish "harm to the competitive process as distinct from the … harm to

26   _____

27   [1]  The "consumers" at issue are consumers in the relevant market, or, in this case, consumers of
     modem chips, *e.g.*, OEMs.  *See Ohio v. Am. Express Co.*, 138 S. Ct. at 2284 ("[T]he plaintiff has
     the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that

28   harms *consumers in the relevant market.*" (emphasis added)).

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   one or more competitors") (citing *Microsoft*, 253 F.3d at 34).   The FTC must also show that the

2   harm resulting from the allegedly anticompetitive conduct occurred in the alleged relevant

3   market.  *Beulter Sheetmetal Works. v. McMorgan & Co.*, 616 F. Supp. 453, 455 (N.D. Cal. 1985)

4   (citing *Fine v. Barry and Enright Prod.*, 731 F.2d 1394, 1399 (9th Cir.), *cert. denied*, 469, U.S.

5   881, (1984)).  "When a legitimate business justification supports a monopolist's exclusionary

6   conduct, that conduct does not violate § 2 of the Sherman Act."  *Image Tech. Servs., Inc. v.*

7   *Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997).  The FTC alleges that Qualcomm's

8   practice of refusing to sell modem chips to unlicensed OEMs, granting exhaustive licenses to its

9   cellular SEPs at the device level, and entering into strategic fund agreements with certain OEMs,

10   as well as alleged "exclusive dealing" arrangements with Apple, underlie its claim under Section

11   2 of the Sherman Act.  (Complaint ¶ 147).

12       585.    A Section 5 claim alleging that a particular practice constitutes an "unfair method

13   of competition in or affecting commerce," 15 U.S.C. § 45(a)(1), as FTC brings here, requires a

14   showing of harm to competition similar to that required by the Sherman Act.  *See FTC v.*

15   *Raladam Co.*, 283 U.S. 643, 647-48 (1931); *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d

16   128, 137 (2d Cir. 1984); *Boise Cascade Corp. v. FTC,* 637 F.2d 573, 579-81 (9th Cir. 1980).  The

17   FTC has recognized that Section 5 claims under the "unfair method of competition" prong of the

18   statute should be "evaluated under a framework similar to the rule of reason, that is, an act or

19   practice challenged by the Commission must cause, or be likely to cause, harm to competition or

20   the competitive process, taking into account any associated cognizable efficiencies and business

21   justifications."  Fed. Trade Comm'n, Statement of Enforcement Principles Regarding "Unfair

22   Methods of Competition" Under Section 5 of the FTC Act at 1.  The FTC must prove that the

23   challenged conduct is "collusive, coercive, predatory, or exclusionary," or that it has an

24   "anticompetitive purpose or cannot be supported by an independent legitimate reason."  *E.I. du*

25   *Pont de Nemours & Co.*, 729 F.2d at 140.

26       586.    The FTC bears the burden of showing the requisite anticompetitive effect for

27   purposes of proving a claim under Section 1 and Section 2 of the Sherman Act, and under Section

28

97

5 of the FTC Act.  If the FTC establishes a prima facie case by demonstrating anticompetitive effect, then Qualcomm may proffer a procompetitive justification for its conduct.  If Qualcomm offers "a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to [the FTC] to rebut that claim," and if "the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit."  *Microsoft,* 253 F.3d at 59 (claim under Section 2); *see also County of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1159 (9th Cir. 2001) (claim under Section 1).

587.    This burden-shifting framework is commonly referred to as the "rule of reason," the purpose of which is to distinguish between conduct that actually harms competition and conduct that in fact promotes competition.  *Leegin,* 551 U.S. at 885-86 (the rule of reason is the "accepted standard" for testing whether challenged conduct (other than conduct that is "per se" unlawful) harms competition in violation of the Sherman Act); *see also Microsoft,* 253 F.3d at 58-59; Areeda & Hovenkamp, Law: An Analysis of Antitrust Principles and Their Application ("Areeda & Hovenkamp") ¶¶ 1500, 1512.  Under the rule of reason, the factfinder "weighs all of the circumstances of a case" in determining whether challenged conduct in fact harms competition in violation of the Sherman Act.  *Leegin,* 551 U.S. at 885 (quoting *Cont'l T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977)).

588.    If the FTC successfully proves a violation of Section 5 of the FTC Act, it must also establish that permanent injunctive relief is warranted under Section 13(b).  Section 13(b) authorizes the FTC to pursue permanent injunctive relief in federal court only "in proper cases … and after proper proof."  15 U.S.C. § 53(b).  The statute explains that the FTC must prove an ongoing or likely future violation of the antitrust laws and that injunctive relief will not only remedy that harm but also "be in the interest of the public."  *Id.* § 53(b)(1)–(2).

589.    The Ninth Circuit has recognized that, even if proven, "past wrongs are not enough for the grant of an injunction;" in a case governed by the FTC Act, "an injunction will issue only

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CASE NO. 17-CV-220-LHK-NMC

if the wrongs are ongoing or likely to recur."  *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985); *see also FTC v. AbbVie Inc.*, 329 F. Supp. 3d 98, 145 (E.D. Pa. 2018) (FTC must prove that defendant "is currently violating antitrust laws or is about to violate antitrust laws"). This showing must be made based on evidence of current market conditions and practices at the time a remedy is sought.  *See id.* (denying a permanent injunction because the record contained "no basis to conclude that" antitrust violations are "likely to reoccur"); *FTC v. Merch. Servs. Direct, LLC*, No. 13-CV-0279-TOR, 2013 WL 4094394, at *3 (E.D. Wash. Aug. 13, 2013) (concluding that, after "stale" evidence regarding past alleged violations was "excised," "there is little to suggest that the violations . . . are likely to recur" and denying preliminary injunction).

590.    The FTC bears the burden of proof on each element of its claims by a preponderance of the evidence.  *FTC v. DIRECTV, Inc.*, No. 15-cv-01129-HSG, 2018 WL 3911196, at *2 (N.D. Cal. Aug. 16, 2018).

## X.    THE FTC FAILS TO PROVE THAT THE CHALLENGED CONDUCT CAUSED HARM TO COMPETITION, WHICH IS FATAL TO EACH OF THE THEORIES UNDERLYING THE FTC'S SECTION 5 CLAIM

### A.    The FTC Must Establish That Challenged Conduct Caused Harm to Competition And It Must Make That Showing Based on Objective and Reliable Evidence.

591.    A showing of harm to competition is a required element of claims under Sections 1 and 2 of the Sherman Act and any claim under Section 5 of the FTC Act.  *See, e.g.*, *Amarel,* 102 F.3d at 1522 (showing of actual harm to competition is required element of claim under Section 1 of the Sherman Act); *Microsoft,* 253 F.3d at 58-59 (showing that challenged conduct "indeed has the requisite anticompetitive effect," and has "harmed competition, not just a competitor" is required element of claim under Section 2 of the Sherman Act); *Boise Cascade,* 637 F.2d at 579-81 (claim under the "unfair methods of competition" prong of Section 5 claim requires a showing of harm to competition similar to that required by the Sherman Act).

592.    Moreover, the FTC must establish a causal link between the challenged conduct and actual harm to competition.  *See, e.g.*, *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1     monopoly power will not be found unlawful unless it is accompanied by an element of

2     anticompetitive *conduct*); *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008) (alleged

3     deceptive conduct in standards development organization did not constitute unlawful

4     monopolization where FTC failed to establish causal link between that conduct and

5     anticompetitive harm).

6          593.   For purposes of a Section 2 claim, therefore, acquiring a large market share by out-

7     competing competitors is not improper monopolization.  "A firm may acquire a monopoly simply

8     by virtue of being a better competitor.  For example, a firm may have better production methods

9     or be more innovative than its past and prospective competitors." *Alaska Airlines, Inc. v. United*

10    *Airlines, Inc.,* 948 F.2d 536, 547 (9th Cir. 1991) (a touchstone of antitrust law is that a firm that

11    succeeds based on its superior skills, foresight, and industry, is competing, not harming

12    competition, even if its success is to the detriment of its rivals); *see also Paladin Assocs., Inc. v.*

13    *Mont. Power Co.,* 328 F.3d 1145 (9th Cir. 2003) (affirming summary judgment for defendant and

14    noting that "[i]n competition, there are winners and losers.  Even viewing the evidence in the light

15    most favorable to [plaintiff], we must conclude that [defendant], because of its superior skills,

16    foresight, and industry, made six sales that [plaintiff] did not," and doing so did not violate the

17    Sherman Act.)  Thus, to prove its Section 2 claim, the FTC must prove that Qualcomm acquired

18    or maintained a monopoly through actions other than competition on the merits, i.e., improper

19    conduct that harmed the competitive process and did not allow others to compete on the merits.

20    *Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging

21    of monopoly prices, is not only not unlawful; it is an important element of the free-market

22    system.  The opportunity to charge monopoly prices—at least for a short period—is what attract

23    'business acumen' in the first place; it induces risk taking that produces innovation and economic

24    growth.").

25         594.   To establish causation, the FTC must also "rule out alternative market-based

26    explanations" for the defendant's competitive success.  *It's My Party, Inc. v. Live Nation, Inc.,*

27    811 F.3d 676, 685-86 (4th Cir. 2016) (plaintiff failed to rule out market-based explanations why

28

DEFENDANT'S PROPOSED FINDINGS OF
                                   FACT AND CONCLUSIONS OF LAW
                                   CASE NO. 17-CV-220-LHK-NMC

1   consumers might prefer defendant's alleged bundled venue and promotion services – including

2   superiority of the defendant's venue).  Only by ruling out such alternative explanations can a

3   plaintiff establish the causation necessary to establish cognizable harm to competition.  *Id.*  With

4   specific respect to conduct concerning FRAND commitments and standards development, a

5   plaintiff must show that the alleged harm to competition would not have occurred but for the

6   challenged conduct.  *Rambus,* 522 F.3d at 466-67 (FTC failed to show that defendant's

7   technology would not have been adopted into the standard but for the defendant's alleged failure

8   to disclose its SEPs, and thus FTC failed to establish that challenged conduct harmed competition

9   from alternative technologies).

10        595.    For this reason, showing that a defendant raised prices or otherwise increased costs

11  to customers (or charged more than it would have absent monopoly power) is insufficient.  *See*

12  *NYNEX Corp v. Discon, Inc.* 525 U.S. 128, 136-37 (1998) (absent showing that telephone service

13  company's conduct harmed competitive process, fact that conduct resulted in higher prices to

14  consumers did not suffice to support antitrust claims – higher prices resulted from defendant's

15  lawful monopoly and its deception of regulatory agency, not from a less competitive market);

16  *Forsyth v. Humana, Inc.* 114 F.3d 1467, 1477-78 (9th Cir. 1997), *overruled on other grounds by*

17  *Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012)  (mere fact that plaintiffs' co-payments

18  increased as a result of defendant's alleged kick-back scheme did not support antitrust claim

19  because evidence did not "explain how the scheme reduced competition in the relevant market.")

20  Even in cases where the defendant is alleged to charge higher prices than it would absent alleged

21  monopoly power, the FTC must still establish that the challenged conduct caused harm to

22  competition by "impair[ing] rivals in a manner tending to bring about or protect a defendant's

23  monopoly power."  *Rambus Inc. v. FTC*, 522 F.3d at 464.  A showing that a defendant engaged in

24  unsavory conduct is insufficient unless that conduct actually harmed the competitive process.  *Id.;*

25  *see also Trinko,* 540 U.S. at 407.

26        596.    Evidence of increasingly competitive conditions in the alleged relevant markets

27  also weighs heavily against a finding that there has been harm to competition.  *Omega Envtl, Inc.*

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    *v. Gilbarco, Inc.,* 127 F.3d 1157, 1164 (9th Cir. 1997) (evidence that a competitor had "built a

2    substantial distribution network" and that its "market share ha[d] increased since its entry by at

3    least one third (from approximately 6% to 8%), while industry output in the … market []

4    expanded substantially" precluded a finding that challenged conduct was a barrier to entry where

5    plaintiff had produced no credible evidence that the challenged conduct had deterred its entry)*;*

6    *see also R.W. Int'l Corp. v. Welch Food, Inc.,* 13 F.3d 478, 487–88 (1st Cir. 1994) (fact that the

7    distributor "successfully entered the market during the relevant period of time … indicat[ed] a

8    lack of injury to competition" from terminating the distributor even if the distributor had

9    "suffered economic consequences from [the] decision to terminate").

10         **B.      The FTC Has Failed to Prove Its Theory of Anticompetitive Effects**

11         597.    The FTC's theory of harm to competition is that Qualcomm has monopoly power

12   in alleged markets for CDMA and "premium" LTE modem chips, and that it has leveraged these

13   alleged modem chip monopolies in licensing negotiations with OEMs to obtain licensing terms

14   for its cellular SEPs that are above FRAND.  The FTC further alleges that these "supra-FRAND"

15   rates impose a tax on its rival modem chip suppliers, which then reduces competition in the

16   alleged relevant markets by reducing competitors' sales and margins and thereby reducing the

17   ability and incentive of Qualcomm's competitors to invest and innovate.  (Complaint ¶¶ 31-32;

18   44-45; 76-94).  To prove this theory, the FTC must prove that (a) the alleged markets, for CDMA

19   and "premium" LTE modem chips, are properly defined, (b) that Qualcomm has market power in

20   those markets, (c) that Qualcomm used that market power to cause OEMs to agree to royalty

21   terms that were higher than "fair and reasonable," and (d) that but for these increased royalties,

22   the prices of Qualcomm's modem chips would have been higher, resulting in competitors in the

23   alleged markets having sufficiently more sales at higher margins, that the alleged markets would

24   have been meaningfully more competitive, and that Qualcomm's competitors would have

25   invested more and become more effective competitors against Qualcomm.

26         598.    The FTC has failed to prove this theory based on objective and reliable evidence.

27   *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,* 836 F.3d 1171, 1175 (9th Cir. 2016) (holding that

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    plaintiff's antitrust claims failed for lack of evidence of harm to competition, and noting that

2    "[t]his case serves as a reminder that anecdotal speculation and supposition are not a substitute for

3    evidence, and that evidence decoupled from harm to competition – the bellwether of antitrust – is

4    insufficient"); s*ee also Cal. Dental Ass'n v. FTC,* 224 F.3d 942, 957 (9th Cir. 2000) (dismissing

5    FTC's challenge to advertising restrictions where FTC "never quantified any increase in price or

6    reduction in output of dental services resulting from" challenged restrictions, whereas defendant

7    had produced strong, empirical evidence of procompetitive effects supported by expert testimony

8    and statements from individual dentists); *United States v. AT&T, Inc.,* 310 F. Supp. 3d 161, 211-

9    12 (D.D.C. 2018) (government failed to offer any reliable, objective evidence of harm to

10   competition to support challenge to proposed merger – statements by defendants were taken out

11   of context, statements by third-party competitors likely reflected "self-interest rather than genuine

12   concerns about harm to competition," and expert witness relied on inputs that were not supported

13   by evidence); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1167-68 (N.D. Cal. 2004)

14   (finding testimony from customers about competitive conditions in market unreliable and

15   unpersuasive, as testimony was only "small sample" of "heterogeneous customer market" and

16   "the most persuasive testimony from customers is not what they say in court, but what they do in

17   the market," and actual data showed broader competition than alleged); Areeda & Hovenkamp ¶

18   538b (stating that "'subjective' testimony by customers" constitutes the "[l]east reliable

19   [evidence]" and that "[t]hough not irrelevant, such statements are often unreliable").

20       599.    The FTC cannot meet its burden of proof by providing only "a theory of the likely

21   effect of" the challenged conduct. *Boise Cascade* 637 F.2d at 578.  Speculation based "on general

22   economic theory" or "academic suppositions" on what could or would happen but for the

23   challenged conduct also do not constitute actual evidence of adverse effects. *Military Servs.*

24   *Realty, Inc. v. Realty Consultants of Va., Ltd.,* 823 F.2d 829, 832 (4th Cir. 1987) (granting

25   summary judgment where expert based his conclusion on general economic theory and did not

26   conduct any quantitative analysis to determine the actual effect the challenged conduct had on

27   competition); *see also Procaps S.A., Inc. v. Patheon, Inc.*, 845 F.3d 1072, 1085 (11th Cir. 2016)

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   (experts' conclusions regarding the "theoretical" and "hypothetical" effects on competition were

2   insufficient to establish harm to competition); *Brooke Group Ltd. v. Brown & Williamson*

3   *Tobacco Corp.* 509 U.S. 209, 233-34 (1993) (rejecting unsupported speculation that competition

4   would have increased even more absent challenged conduct – in light of evidence showing that

5   output expanded following alleged predation, plaintiff's theory relied on speculation that output

6   expanded at a slower rate than it would have absent the challenged conduct, which was not an

7   inference supported by concrete evidence).

8             **1.**       **The FTC Has Failed To Establish That Qualcomm Has Monopoly**

9                             **Power In The Alleged Relevant Markets.**

10         600.    As a first step, the FTC must prove that Qualcomm has monopoly power in both

11   alleged relevant markets: (a) the alleged market for CDMA modem chips; and (b) the alleged

12   market for "premium" LTE modem chips.  This requires, first, defining the relevant markets.  *See*

13   *Ohio v. Am. Express*, 138 S. Ct. 2274, 2285 & n.7 (2018) (in a case alleging vertical restraints

14   under Section 1 of the Sherman Act, the court cannot assess whether the conduct has

15   anticompetitive effects without first defining the relevant market and measuring market power.)

16   Second, the FTC must prove that Qualcomm has monopoly power in each market.

17         601.    Monopoly power is "the power to control prices or exclude competition." *Grinnell,*

18   384 U.S. at 571 (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391

19   (1956)).

20         602.    Although "high market share" may potentially be "evidence from which the

21   existence of monopoly power may be inferred … market share alone does not prove monopoly

22   power." *United States v. Syufy Enterprises*, 712 F. Supp. 1386, 1401 (N.D. Cal. 1989) (citing

23   *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980), *cert. denied*,

24   450 U.S. 921 (1981)).  A "high market share cannot be inferred as creating actual or potential

25   monopoly power where a given market has low entry barriers and other market factors rendering

26   monopoly power unlikely."  *United States v. AMR Corp.*, 140 F. Supp. 2d 1141, 1209 (D. Kan.

27   2001) (citation omitted).  "Because untapped potential provides a mouth-watering incentive for

28   vigorous competition, it is axiomatic that monopoly power is unlikely to arise in dynamic

104

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    industries marked by a rapidly expanding volume of demand and low barriers to entry." *Metro*

2    *Mobile CTS, Inc. v. NewVector Commc'ns, Inc.*, 892 F.2d 62, 63 (9th Cir. 1989).

3         603.   Assuming a relevant market has been properly defined, courts consider "structural

4    characteristics of markets in determining whether or not a firm has monopoly power, including

5    the relevant size and strength of competitors, … probable development of the industry, [and]

6    potential competition." Antitrust Law Developments 236 (8th ed.); *see also Reazin v. Blue Cross*

7    *and Blue Shield of Kan., Inc.*, 899 F.2d 951, 967 (10th Cir. 1990) ("Power over price and power

8    over competition … depend on various market characteristics, including … market trends,

9    number and strength of other competitors, and entry barriers." (citation omitted)).

10        604.   Strong competition and trends toward even stronger competition indicate a lack of

11   monopoly power.  *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366 (9th Cir.

12   1988) (even a high market share does not support finding of monopoly power "in a market with

13   low entry barriers *or other evidence of a defendant's inability to control prices or exclude*

14   *competitors*" (emphasis added)).

15        605.   In assessing market power, a court must also consider the extent to which the

16   conduct of even a seller with a large market share is disciplined by powerful buyers.  *United*

17   *States v. Archer-Daniels-Midland Co.,* 781 F. Supp. 1400, 1416–18 (S.D. Iowa 1991) (existence

18   of large, powerful buyers limited ability of sellers to raise prices in market for high fructose corn

19   syrup).  Buyers can reduce or discipline a firm's market power by, for example, sponsoring entry

20   by competitors or engaging in self-supply.  *See FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34,

21   58-60 (D.D.C. 1998).

22              a.    **The FTC Has Not Established That Qualcomm Has Monopoly**
                     **Power in the Alleged Market for CDMA Modem Chips.**
23

24        606.   The evidence shows that Qualcomm was unable to exercise sustained, meaningful

25   market power in CDMA modem chips.  In the cellular industry, a relatively small number of

26   powerful OEMs, each of which buys far larger quantities of non-CDMA modem chips than

27   CDMA modem chips, and together provide a substantial portion of Qualcomm's chip revenue,

28   could easily retaliate in the much larger non-CDMA segments against any effort by Qualcomm to

                                                    105

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   exercise monopoly power in the far smaller CDMA segment. ████████████

2   ██████████████████████████████████████████████ *See United*

3   *States v. Archer-Daniels-Midland Co.,* 781 F. Supp. at 1416–18.

4       607.   The evidence further shows that there were no significant barriers to entry that

5   prevented chipmakers with existing GSM, WCDMA, and LTE modem chips, including Intel,

6   MediaTek, Samsung, and Huawei, from quickly developing and marketing CDMA multimode

7   modem chips when they have decided to do so.  The evidence also shows that OEMs have been

8   able to sponsor entry into the CDMA segment.

9       608.   The evidence further shows that to the extent a market for CDMA modem chips

10   was ever meaningful, such a market ceased to have competitive significance with Verizon's

11   certification of non-CDMA phones.  The FTC alleged that CDMA capability was particularly

12   important because it was necessary to sell phones into the U.S. market.  But CDMA capability is

13   not necessary to sell phones compatible with three of the four major cellular network providers in

14   the United States.  CDMA capability has never been necessary to sell phones compatible with

15   European cellular networks and many Asian cellular networks.

16       609.   This evidence of lack of entry barriers, diminishing competitive import, and

17   increasingly competitive conditions precludes any finding of monopoly power in the alleged

18   market for CDMA modem chips.  *Oahu Gas Service, Inc.*, 838 F.2d at 366; *see also United States*

19   *v. Int'l Harvester Co.*, 274 U.S. 693, 708–09 (1927) (pointing to evidence of increasingly strong

20   competitors with greater "competitive efficiency" and a decrease in the defendant's market share

21   as evidence against a finding of antitrust violation); *United States v. U.S. Steel Corp.*, 251 U.S.

22   417, 439 n.1 (1920) (pointing to decrease in defendant's market share over ten-year period from

23   "50.1 percent to 40.9 percent," and competitors' increase in business by percentage that

24   outstripped the defendant's increase in business as "indicat[ing] that . . . [the] power of the

25   corporation [is] not sufficient to retard prosperous growth of efficient competitors"); *United*

26   *States v. Syufy Enters.*, 903 F.2d 659, 665–67 (9th Cir. 1990) (concluding that defendant had no

27   market power because new entrant reduced market share from 93% to 75% over four years—a

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    much smaller and slower decline than the decline of Qualcomm's share of sales of CDMA-

2    compatible modem chips).

3          610.    The FTC's monopolization claim fails for an additional reason: lack of current

4    evidence.  The only evidence of market conditions after 2016 submitted at trial shows

5    increasingly competitive conditions, including declining prices, new entry by rival chipmakers,

6    and a continuing decline in Qualcomm's global share of baseband modem chip units sold in every

7    relevant segment, including CDMA modem chips.  The FTC's expert did not examine any

8    evidence concerning market conditions in the alleged relevant market for CDMA modem chips

9    after 2016, and offered no opinion about whether Qualcomm has had or is likely to obtain

10   monopoly power in that alleged market at any time after 2016.  Thus, all Dr. Shapiro could do

11   was speculate as to Qualcomm's current or future monopoly power.  Expert opinions based on

12   speculation rather than on reliable evidence do not suffice to establish monopoly power.  *United*

13   *States v. AT&T, Inc.* 310 F. Supp. 3d 161, 212 (D.D.C. 2018) (expert witness relied on

14   speculation and inputs that were not supported by evidence).  Thus, the FTC has failed to meet its

15   burden to prove that Qualcomm currently has, or is about to obtain, monopoly power in CDMA

16   modem chips.

17         611.    The FTC's failure to meet its burden of establishing that Qualcomm has monopoly

18   power in CDMA modem chips defeats its claim of monopoly maintenance in CDMA modem

19   chips.

20                      **b.      The FTC Has Not Established That the Alleged Market for**
                                 **"Premium" LTE Modem Chips Is Properly Defined, or that**
21                               **Qualcomm Has Monopoly Power in that Alleged Market.**

22         612.    The FTC has failed to establish that the alleged market for "premium" LTE

23   modem chips" is properly defined, or that Qualcomm has monopoly power in such alleged market

24   if it had been properly defined.

25         613.    "The U.S. Supreme Court has said that in analyzing the relevant product market,

26   the appraisal is one of cross-elasticity of demand; that is, the reasonable interchangeability of

27   commodities." *In re Super Premium Ice Cream Distribution Antitrust Litig.,* 691 F. Supp. 1262,

28

DEFENDANT'S PROPOSED FINDINGS OF
                                              FACT AND CONCLUSIONS OF LAW
                                              CASE NO. 17-CV-220-LHK-NMC

1   1268 (N.D. Cal. 1988), citing *United States v. DuPont & Co.,* 351 U.S. 377, 394-95 (1956);

2   *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962).  A properly defined market must take

3   into account the commercial realities of competition.  *See, e.g.*, *Balaklaw v. Lovell*, 14 F.3d 793,

4   799 (2d Cir. 1994).

5         614.    The FTC has shifted its definition of the alleged market for "premium" LTE

6   modem chips.  Initially, it defined this market as including LTE baseband processors that

7   "support[] advanced LTE functionality" and have the "latest features" (Complaint ¶ 42) or

8   processors that "implement the most advanced currently deployed LTE technology, and/or are

9   suitable for use in a premium handset at a given point in time" (FTC's 2nd Am. Resp. to

10  Qualcomm's First Set of Interrogatories, Response to Interrogatory No. 4, at 18).   Later, its

11  expert, Dr. Shapiro defined the market as including "those LTE-compatible chips that OEMs have

12  deployed in premium-tier handsets," where "premium-tier handsets" are handsets that cost more

13  than $300 before 2013 and more than $400 after 2013.  Alternatively, the FTC's expert defined

14  the market as including "only those chips explicitly identified by Qualcomm in its internal

15  documents as 'premium,' rather than by the phones within which they are used."

16        615.    With respect to the FTC's initial market definition, the FTC acknowledged that it

17  could not identify the "minimum features that would be necessary, at any particular moment in

18  time, for an LTE baseband processor to be included in the market for premium LTE baseband

19  processors."  (Response to Interrogatory No. 4, at 19.)

20        616.    With respect to the FTC's expert's market definition, based on LTE modem chips

21  actually used in "premium-tier handsets" as defined by specific price thresholds, "[m]arket

22  definitions based on price levels . . . have not found favor with courts" because products in one

23  alleged price band often are found to compete with products in another.  *Casey v. Diet Ctr., Inc.*,

24  509 F. Supp. 1561, 1568 (N.D. Cal. 1984) (citing *Brown* Shoe, 370 U.S. at 326; *United States v.*

25  *Jos. Schlitz Brewing Co.*, 253 F. Supp. 129 (N.D. Cal. 1966)); *see also Premium Ice Cream*, 691

26  F. Supp. at 1268 ("Such distinctions are economically meaningless where the differences are

27  actually a *spectrum* of price and quality differences").

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

617.    Moreover, the FTC's definition of the market based on modem chips that were actually used in certain handsets does not take into account the degree of and potential for ex-ante competition for those sockets.  At a minimum, modem chips that OEMs considered, but ultimately rejected, for use in "premium tier handsets" are part of the market because they literally provided competition for the chips that OEMs ultimately selected.

618.    The evidence here shows that modem chips included within the proposed definition compete against and are interchangeable with chips that fall outside the definition.   For example, a number of modem chips that the FTC excluded from its proposed relevant market of "premium" LTE modem chips were incorporated into handsets that cost more than $300 before 2013 and more than $400 after 2013, and therefore were substitutes for modem chips that the FTC did include in its proposed relevant market.  Similarly, a number of modem chips that the FTC included in its proposed relevant market of "premium" LTE modem chips were incorporated into handsets that cost less than $300 before 2013 and less than $400 after 2013.  Further, OEMs considered additional modem chips for use in handsets that cost more than $300 before 2013 and more than $400 after 2013.  This evidence is inconsistent with the FTC's expert's proposed definition of a relevant market for "premium" LTE modem chips.  *See, e.g., United States v. H&R Block, Inc.,* 833 F. Supp. 2d 36, 83 (D.D.C. 2011) (rejecting a market definition that sought to distinguish between "premium" and "value" segments for the do-it-yourself tax preparation services market because evidence showed that competitors in each segment competed directly on price and features); *Creston Electronics, Inc. v. Cyber Sound & Sec. Inc.,* No. 11-3492 (FSH)(MAH), 2012 U.S. Dist. LEXIS 16132, at *12–*16 (D.N.J. Feb. 9, 2012) (rejecting plaintiff's market definition of "high-end residential automation and control systems" costing $25,000 or more because "it does not allege which products or components that make up these control systems are interchangeable with one another functionally and/or economically" and for failing to allege products costing below $25,000 "do not compete" with these "high-end" systems"); *Premium Ice Cream,* 691 F. Supp. at 1268 (rejecting a market definition for "super premium" ice cream because of a lack of "sufficient facts" that customers of such ice creams "do

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    not buy others which are lower in the spectrum of price or quality" and because of "significant

2    overlap among the various grades and brands").

3         619.    Even if the proposed market of so-called "premium" LTE modem chips had been

4    properly defined, the FTC has failed to establish that Qualcomm has monopoly power in that or

5    any other segment of the market for LTE modem chips.

6         620.    The FTC's expert acknowledged that Qualcomm's share of "premium" LTE

7    modem chips sales was reduced between 2014 and 2016 by the entry of Samsung, Intel, and

8    MediaTek as competitors.  During that time period, according to the FTC's expert, Qualcomm's

9    share of "premium" LTE modem chip sales fell sharply from ███ in 2014 to ███ in 2016.

10   Under the FTC's expert's "alternative" definition of the market, Qualcomm's share fell below

11   ███.

12        621.    The evidence that Qualcomm submitted at trial concerning current market

13   conditions shows increasingly competitive conditions, including declining prices, new entry by

14   rival chipmakers, increasing self-supply by OEMs, and a continuing decline in Qualcomm's

15   global share of baseband chip units sold in every relevant segment, including alleged "premium"

16   LTE chips.  Moreover, today, the evidence shows that each of the top three major global OEMs –

17   Samsung, Huawei and Apple – is not dependent on Qualcomm for either so-called "premium"

18   LTE modem chips or modem chips that support CDMA: Samsung and Huawei self-supply chips

19   for their respective flagship phones, both also have available self-supply of multi-mode LTE

20   modem chips that support CDMA, and Apple is sourcing exclusively from Intel for all its 2018

21   devices, including those sold for activation on carriers requiring CDMA support.

22        622.    The evidence also shows Qualcomm was unable to exercise market power in the

23   alleged market for "premium" LTE modem chips because powerful OEMs, which buy far larger

24   quantities of non-LTE and "non-premium" LTE modem chips than "premium" LTE modem

25   chips, could easily retaliate in the much larger non-"premium" LTE segments against any effort

26   by Qualcomm to exercise monopoly power in the far smaller alleged "premium" LTE segment.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
                                           FACT AND CONCLUSIONS OF LAW
                                           CASE NO. 17-CV-220-LHK-NMC

623.     This evidence of increasingly competitive conditions precludes a finding of monopoly power in the alleged market for "premium" LTE modem chips.  *Oahu Gas Service, Inc.*, 838 F.2d at 366; *Int'l Harvester Co.*, 274 U.S. at 708–09; *U.S. Steel Corp.*, 251 U.S. at 439 n.1; *Syufy Enters.*, 903 F.2d at 665–66.

624.     The FTC submitted no evidence of market conditions in the alleged relevant markets after 2016.  Thus, the FTC has failed to prove that Qualcomm has, or is about to have, monopoly power in "premium" LTE modem chips.  This is another, independent, reason that the FTC's claim fails.

625.     The FTC's failure to meet its burden of establishing that Qualcomm has monopoly power in an alleged market for "premium" LTE modem chips defeats its claim of monopoly maintenance in "premium" LTE modem chips.

### 2.     The FTC Has Failed to Establish That Qualcomm's Chip Supply Practices Harmed Competition in the Alleged Relevant Markets.

626.     The FTC alleges that Qualcomm's practice of selling chipsets only to licensed handset manufacturers (i) "coerced" licensees to enter into licenses for Qualcomm's patents on terms to which they would not have agreed but-for the need for Qualcomm's CDMA or "premium" LTE modem chips, which resulted in "supra-FRAND" royalties, (ii) that such royalties, in turn, imposed a "tax" on competing chipmakers, and (iii) that the tax forced competitors to exit, deterred entry, made competitors invest less and become weaker competitors, and resulted in improper monopoly maintenance.

### a.     The FTC has not Established that Qualcomm "Coerced" OEMs to Enter into Licenses That Resulted in Supra-FRAND Royalties.

627.     The first step of the FTC's theory challenging Qualcomm's chip supply practices is that Qualcomm "coerced" OEMs to enter into licenses that resulted in supra-FRAND royalties because OEMs purportedly could not obtain Qualcomm's modem chips without agreeing to such terms, and OEMs could not afford to forgo buying such modem chips because Qualcomm's monopoly power in alleged relevant markets for CDMA and "premium" LTE modem chips prevented the OEMs from sourcing such modem chips from rival suppliers.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

628.     The FTC's theory fails because the FTC has not proven with reliable evidence that the licensing terms charged by Qualcomm for licenses to its cellular SEPs include a "supra-FRAND" component that was coerced by Qualcomm's purported monopoly power in the CDMA or "premium" LTE modem chip markets.

629.     If it were true that Qualcomm's prevailing license terms included unfair and unreasonable royalties or other terms as a result of withholding or threatening to withhold chip supply, one would expect to find that any OEM who did not need Qualcomm's CDMA or "premium" LTE modem chips would not have entered into a license with Qualcomm having its prevailing royalty terms, including royalty rates.  In other words, such an OEM would have negotiated for royalty terms that did not include the purportedly unfair or unreasonable royalty terms.  For this reason, the evidence is inconsistent with the FTC's theory.

630.     Thirty-six licensees signed license agreements with Qualcomm extending to sales of complete terminals (*i.e.,* cell phones), who have never bought any modem chips at all from Qualcomm to incorporate into complete terminal units.  Necessarily, these licensees could not have been "coerced" by either the "need" for Qualcomm's CDMA or "premium" LTE modem chips, or Qualcomm's purported market power in these alleged markets, into entering into a license by any need for Qualcomm's modem chips.

631.     Fifteen licensees entered into CDMA patent license agreements with Qualcomm before Qualcomm even established its chip business.  Necessarily, these licensees could not have been "coerced" into entering into a license by any need for Qualcomm's CDMA or "premium" LTE modem chips, because of course, such chips didn't even exist (let alone market power).

632.     The situation with WCDMA is similar.  As an initial matter, the FTC has not alleged or established that Qualcomm held or exercised market power in WCDMA modem chips.  Instead, FTC argues that Qualcomm's WCDMA agreements entered into during the period where Qualcomm purportedly had market power in "premium" LTE modem chips, contain a "supra-FRAND" component generated from a fear that "premium" LTE modem chip supply would be interrupted.  But Qualcomm entered into 68 WCDMA-only license agreements before Qualcomm

1    sold any LTE modem chips at all.  Necessarily, these licensees could not have been "coerced"

2    into entering into a WCDMA license containing a "supra-FRAND" component generated from a

3    fear that "premium" LTE modem chip supply would be interrupted because Qualcomm did not

4    yet sell "premium" LTE modem chips at the time the licenses were entered into.

5            633.    Qualcomm's licenses covering LTE-only devices are similarly free from any

6    "supra-FRAND" component generated from a fear that "premium" LTE modem chip supply

7    would be interrupted.  An LTE-only license agreement provides for royalty payments on sales of

8    handsets that are compatible with the LTE standard and that contain a single-mode LTE-only

9    modem chip.  Qualcomm has never sold an LTE-only modem chip for handsets; rather, the only

10   LTE modem chips it has sold for use in handsets are multi-mode chips that also support cellular

11   communication using a 3G standard.  Qualcomm will sell a multi-mode chip to any OEM that has

12   a license for any of the 3G modes for which the modem chip is compatible, even if the customer

13   does not have a license agreement covering LTE products.  For example, Qualcomm will sell a

14   multi-mode WCDMA/LTE chip to any OEM who has a WCDMA license.  Qualcomm entered

15   into 312 LTE-only licenses despite the fact that Qualcomm has never sold LTE-only chips for use

16   in handsets.  Necessarily, these licensees could not have been "coerced" into entering into an

17   LTE-only license by any need for Qualcomm's CDMA or "premium" LTE modem chips because

18   the licensees did not need an LTE-only license to buy modem chips being sold by Qualcomm at

19   the time the licenses were entered into.  Thus, the royalty terms for such LTE-only agreements

20   are free from any possible "coercion" based upon the fear that "premium" LTE modem chip

21   supply would be interrupted.

22           634.    Qualcomm entered into 29 5G licenses in 2018, before it sold any 5G modem

23   chips.  Necessarily, these licensees could not have been "coerced" into entering into a license by

24   any need for Qualcomm's modem chips.

25           635.    Further, the FTC's theory does not apply to licensees who had no near-term need

26   for Qualcomm's chips.  Companies that entered into licenses with Qualcomm two or more years

27   before they began buying CDMA or "premium" LTE modem chips from Qualcomm could not

28

113

1    have been deterred from bringing a legal challenge to Qualcomm's licensing terms for fear of

2    losing access to chips because those companies had plenty of time to do so before they bought

3    such chips.  Thus, the conclusion that Qualcomm's purported market power in CDMA or

4    "premium" LTE modem chips coerced these licensees to enter licenses containing a "supra-

5    FRAND" component because of fear that chip supply would be interrupted is not sustainable.

6         636.    The FTC's theory likewise does not apply to licenses that were negotiated under

7    the supervision of, and approved by, a licensee's home government, such as China or Korea.

8    Such licenses could not have been the product of some undue coercion by Qualcomm.

9         637.    Under the FTC's theory, if even a single OEM was not "coerced" into entering

10   into a Qualcomm license by the need for Qualcomm's CDMA or "premium" LTE modem chips,

11   that licensee could have challenged Qualcomm's licensing rates and would have if they were

12   unfair or excessive, and, if the challenge were successful, Qualcomm would have thus been

13   forced to lower its rates for all licensees.  This is because, according to the FTC, the "non-

14   discriminatory" component of the FRAND requirement, combined with "most favored royalty

15   rate" clauses in numerous Qualcomm licenses, means that a more favorable royalty rate for one

16   OEM would result in the more favorable royalty rate for all OEMs.  (FTC response to Interrog.

17   No. 6).  Because hundreds of licensees have entered into a Qualcomm license without being

18   "coerced" by a fear that Qualcomm would interrupt supply of CDMA or "premium" LTE modem

19   chips, the FTC's proof necessarily fails.

20        638.    In addition, if it were true that Qualcomm received an unfair and unreasonable

21   "supra-FRAND" component to the royalties it charges by threatening to withhold CDMA or

22   "premium" LTE modem chip supply, one would expect that Qualcomm's royalty terms in license

23   agreements entered with purchasers of the allegedly monopolized chips during periods of alleged

24   monopolization would be higher than in license agreements entered when Qualcomm did not

25   have a chip business.  The evidence showed that this was not the case.

26        639.    If the FTC's theory were true, one would also expect that Qualcomm's royalty

27   terms for purchasers of the allegedly monopolized CDMA and "premium" LTE modem chips

28

114

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    would be higher than for licensees purchasing only modem chips as to which the FTC does not

2    allege that Qualcomm ever had a monopoly, such as WCDMA modem chips.  The evidence

3    showed that this was not the case either.

4        640.    One would also expect that royalty terms in license agreements entered during

5    periods of alleged monopolization of CDMA or "premium" LTE modem chips would be higher

6    than in license agreements entered when Qualcomm had a non-monopoly share of the alleged

7    relevant markets (e.g., less than 50%, leaving aside the fact that shares exceeding 50% can be

8    non-monopoly shares in the face of low entry barriers or other factors).  This, too, was not the

9    case.

10       641.    The FTC also cannot reconcile that Qualcomm's licensing practices have been

11   consistent and well-known since it began licensing more than two decades ago.  As noted above,

12   the evidence shows that Qualcomm's royalty rates have been consistent between the periods

13   during which Qualcomm allegedly held monopoly power in the alleged markets and when it did

14   not.  In other words, Qualcomm charged virtually identical rates in licenses executed in periods

15   where Qualcomm did not have any market power to those licenses executed during periods where

16   Qualcomm purportedly did have market power (and according to the FTC include a "supra-

17   FRAND" rate component).  Thus, this evidence shows that Qualcomm could not possibly have

18   used alleged monopoly power in chip markets as leverage, given that the purportedly affected

19   license agreements are not different.  Without difference in rates, the FTC's theory fails as a

20   matter of law.

21       642.    In addition, during the time that Qualcomm has maintained its consistent and well-

22   known licensing practices, its technology has repeatedly been included in multiple generations of

23   standards, including in numerous releases within each standard.  Implementers substantially

24   outnumber innovators in the standards development organizations that have issued those

25   standards, and decisions on standards are reached by consensus, which may mean something less

26   than unanimity, but means more than a simple majority.  The FTC did not provide an explanation

27   why, if Qualcomm's licensing practices were in breach of its FRAND commitments, Standards

28

115

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    Development Organizations ("SDOs")—which were populated by meaningful numbers of

2    representatives of Qualcomm licensees, all of whom were aware of Qualcomm's licensing

3    practices and license terms—continued to include Qualcomm's technology in their standards.

4    This is further evidence that the market does not view that Qualcomm's practices create a "supra-

5    FRAND" rate component that imparts anticompetitive harm to the market.

6           643.    The evidence further shows that handset makers engaged in multi-sourcing and

7    had access to alternative sources of modem chip supply.  The FTC failed to explain why handset

8    makers could not turn to these alternative sources of supply to neutralize Qualcomm's alleged

9    threat of withholding its own modem chip supply.

10          644.    The FTC's theory fails for the additional reason that it has not demonstrated that

11   any particular license – let alone all of Qualcomm's licenses – contain a supra-FRAND royalty

12   component that was caused by Qualcomm coercing such supra-FRAND component by virtue of

13   threatening to interrupt chip supply.  The FTC relies on the opinion of its expert,

14   Michael Lasinski, but Mr. Lasinski's opinion is neither reliable nor supported in fact.

15   Mr. Lasinski also fails to make the causal connection required.  It is not enough for the FTC to

16   argue that Qualcomm's rates are "supra-FRAND" in the abstract.  The FTC has to directly link

17   any purported "supra-FRAND" component to the alleged monopoly power, which neither

18   Mr. Lasinski nor Dr. Shapiro does.  The FTC's case fails because it falls well-short of proving

19   that Qualcomm's purported market power in CDMA or "premium" LTE modem chips caused the

20   effect of a "supra-FRAND" component to Qualcomm's royalty rates.  Nor is there any evidence

21   that Mr. Lasinski's "portfolio strength" metric is reliable and representative of the actual value of

22   Qualcomm's portfolio.

23          645.    Accordingly, the FTC's multi-step theory that Qualcomm's practice of not selling

24   modem chipsets to unlicensed companies was anticompetitive fails at its first step, because the

25   FTC has not shown that the practice resulted in "supra-FRAND" royalties.

26

27

28

DEFENDANT'S PROPOSED FINDINGS OF
                          FACT AND CONCLUSIONS OF LAW
                          CASE NO. 17-CV-220-LHK-NMC

**b.    The FTC has not Established that Qualcomm's Royalties Imposed a "Tax" on Competing Chipmakers.**

646.    Had the FTC established the first step of its theory, that Qualcomm's practice of not selling CDMA or "premium" LTE modem chips to unlicensed customers "coerced" OEMs to sign license agreements with a "supra-FRAND" component to its royalties, it would also have to show that the "supra-FRAND" component somehow harmed competition in the alleged relevant modem chip markets.  This is because a mere increase in the costs borne by OEMs, regardless of the modem chip they used, whether from Qualcomm or a competitor, is not evidence of harm to competition sufficient to support an antitrust claim, regardless of the means by which such increase in price or cost was imposed on OEMs.  *See NYNEX Corp v. Discon*, 525 U.S. 128, 136-37 (1998) (absent showing that telephone service company's conduct harmed competitive process, fact that conduct resulted in higher prices to consumers did not suffice to support antitrust claims; higher prices resulted from defendant's lawful monopoly and its deception of regulatory agency, not from a less competitive market.); *Forsyth v. Humana, Inc.* 114 F.3d 1467, 1477-78 (9th Cir. 1997) (mere fact that plaintiffs' co-payments increased as a result of defendant's alleged kick-back scheme did not support antitrust claim because evidence did not "explain how the scheme reduced competition in the relevant market."); *see also Rambus Inc. v. FTC*, 522 F.3d 456, 464, 466 (D.C. Cir. 2008) (ruling, in the specific context of alleged supra-FRAND royalties, that even if deceptively failing to disclose patents or applications to the SDO enabled Rambus to charge higher royalties than it otherwise could have charged, such conduct would not constitute illegal monopolization, because the FTC had not shown that the failure to disclose harmed competition by "impair[ing] rivals in a manner tending to bring about or protect a defendant's monopoly power").

647.    According to the FTC's theory and the FTC's economist, the effect of any excess royalty would depend on: (i) its magnitude; (ii) its effect on Qualcomm's chip pricing – i.e., whether it allowed Qualcomm to price its modem chips lower than it otherwise would; (iii) the response by competing chipmakers to changes in Qualcomm's chip pricing; (iv) the elasticity of demand for modem chips generally, and for each supplier's chips specifically, as well as on the

117

1  elasticity of demand for phones (which affects demand for modem chips); and (v) the ability of

2  OEMs to pass through any surcharge to consumers.

3      648.   The FTC failed to provide any evidence that any "tax"—let alone a meaningful tax

4  sufficient to bring about exclusion—was imposed on any competitor, or that any competitor

5  exited, did not enter, or reduced its investments in developing modem chips due to Qualcomm's

6  conduct.

7      649.   As to Qualcomm's chip pricing, there is no dispute that, even if one were to

8  assume that Qualcomm was able to lower its chip prices as a result of the supposed "tax," the

9  resulting chip prices were still above cost.  The law strongly disfavors theories of anticompetitive

10 harm based on lower prices unless the prices are below cost. *Weyerhaeuser Co. v. Ross-Simmons*

11 *Hardwood Lumber Co.,* 549 U.S. 312, 319 (2007) (to "allow plaintiffs to recover for above-cost

12 price cutting" "perversely, chill[s] legitimate price cutting, which directly benefits consumers,"

13 and would therefore "not constitute sound antitrust policy") (quoting *Brooke Group Ltd. v. Brown*

14 *& Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993)).

15     650.   As to the response by competing chipmakers, the evidence demonstrated that

16 multiple chip makers – including Intel and ▮▮▮▮▮▮▮ – increased their investments in order to

17 compete in the alleged relevant markets.  Competitors entered and expanded, and Qualcomm's

18 market share fell.  While there was exit as well as entry, as one would expect in a dynamic

19 market, the FTC presented no evidence that exit in the CDMA or "premium" LTE modem chip

20 markets resulted from Qualcomm's practice of not selling CDMA or "premium" LTE modem

21 chips to non-licensees, and the FTC cannot point to any evidence showing a causal link between

22 this challenged conduct and any exit in the alleged relevant markets.  Conversely, Qualcomm

23 introduced evidence that those exits were the result of normal competition and those firms' own

24 shortcomings, and not the result of any of the challenged conduct.  *See Ortho Diagnostic Sys.,*

25 *Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 465 (S.D.N.Y. 1996) ("competitors being driven out

26 of business" as a "natural product of legitimate competition" is "tolerated" when "an exit" "is the

27 product of an inability compete efficiently on the merits"); *Package Shop, Inc. v. Anheuser-*

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    *Busch, Inc.*, 675 F. Supp 894, 944 n.20 (D.N.J. 1987) (citing as support of finding "intense

2    interbrand competition in the brewing industry" an economic report stating that the "extent of

3    exits from brewing in the last decade indicate that this is hardly an industry in which an

4    inefficient producer is protected from the chilling winds of competition"); *FTC v. Occidental*

5    *Petroleum Corp.*, No. 86-900, 1986 U.S. Dist. LEXIS 26138, at *28 (D.D.C. Apr. 29, 1986)

6    (finding no possibility of harm to competition as "vigorous competition continues in an industry

7    in which there has been entry, exit, and realignment among PVC producers"); *United States v.*

8    *Hughes Tool Co.*, 415 F. Supp. 637, 643–44 (C.D. Cal. 1976) ("substantial entry and exit rates in

9    firms and products" indicates that "entrance is relatively easy and that healthy competition is

10   present" in the relevant markets).

11       651.    The FTC has likewise put forward no evidence attempting to assess the extent to

12   which market shares, sales, profits, or R&D expenditures of competitors in either alleged market

13   would have been different but for the challenged conduct.

14              **c.     The FTC has not Established that the Alleged "Tax" Resulted**
15              **in Improper Monopoly Maintenance.**

16       652.    The final step of the FTC's theory of harm to competition from not selling CDMA

17   and "premium" LTE modem chips to unlicensed customers requires it to show that the alleged

18   "tax" in fact harmed competition by allowing Qualcomm to maintain its alleged monopoly in the

19   alleged relevant markets for CDMA and "premium" LTE modem chips.

20       653.    This final step of the FTC's theory is inconsistent with the evidence.  Rival

21   chipmakers, instead of being foreclosed by the alleged "tax," have thrived:  there has been new

22   entry, rival chipmakers have competed vigorously, and they have gained shares of modem chip

23   sales in every relevant segment, while Qualcomm's shares have rapidly declined.  *See Omega*

24   *Envtl.*, 127 F.3d at 1164; *R.W. Int'l Corp.,* 13 F.3d at 487–88.

25       654.    The evidence shows that Qualcomm has had to compete hard even to maintain its

26   declining share, making large investments in innovation, leading to better products at ever-

27   decreasing prices.  The evidence also shows that Qualcomm's LTE modem chip prices have

28   declined considerably each year since 2012.  Prices have also declined considering only the

119

1    alleged "premium" LTE modem chips as defined by Professor Shapiro.  Such behavior is

2    inconsistent with the conduct of a monopolist enjoying artificial entry barriers.  *Laurence J.*

3    *Gordon, Inc. v. Brandt, Inc.*, 554 F. Supp. 1144, 1156 (W.D. Wash. 1983) (rejecting plaintiff's

4    attempt to prove defendant's monopoly power as "inadequate" because of evidence of declining

5    market share and defendant's "vigorous competition" with competitors).

6          655.    The evidence also shows that where Qualcomm was able to successfully compete

7    in the relevant modem chip markets, that result was due to Qualcomm's investment in R&D,

8    superior products, and business acumen.  *See Grinnell*, 384 U.S. at 571 (1966); *see also*

9    *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 694–95 (9th Cir. 1998) (finding that

10   defendant's ability to attract a rival's customers by providing equipment "at little or no cost to

11   customers as part of a system in which customers also purchase spare and replacement pans from

12   Defendant at profitable prices" is not predatory but an act of "beat[ing] a competitor's prices,"

13   which is "good business and normal business").

14         656.    The evidence also shows that to the extent competing chipmakers struggled or

15   exited the relevant modem chip markets, this was the result of factors other than Qualcomm's

16   conduct, such as the rival's failure to provide competitive solutions.  *See Image Tech. Servs., Inc.*

17   *v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) (finding that evidence did not

18   support a finding of antitrust injury and damage award to competitor because competitor's "exit

19   was caused by factors other than [defendant's] conduct").

20         657.    In sum, the FTC has failed to meet its burden of establishing that Qualcomm's

21   practice of refusing to sell modem chips to unlicensed OEMs causes any harm to competition.

22                **3.**    **The FTC Has Not Met Its Burden to Show that Qualcomm's Practice**
                          **of Device-Level Licensing Has Harmed Competition.**
23

24         658.    The FTC alleges that Qualcomm practice of licensing only at the device level, not

25   at the component level, exacerbates the effects of its practice of not selling CDMA or "premium"

26   LTE modem chips to non-licensees, because, if chipmakers were licensed, they could purportedly

27   challenge Qualcomm's royalty rates without concern over access to Qualcomm's chips.

28   (Complaint ¶¶ 107-15).

DEFENDANT'S PROPOSED FINDINGS OF
                                                          FACT AND CONCLUSIONS OF LAW
                                                          CASE NO. 17-CV-220-LHK-NMC

659.    But the facts do not support the FTC's contention.  If rival chipmakers had truly felt restrained by Qualcomm's practice of licensing only at the device level, and if they believed that Qualcomm had committed to providing them with such licenses, they could easily have sued Qualcomm for breach of its FRAND commitment, seeking a FRAND license covering CDMA or "premium" LTE modem chips.  Indeed, the predicate for the FTC's theory is that chipmakers would have no qualms about suing Qualcomm to vindicate their rights under Qualcomm's commitments to license under FRAND terms, because they do not require access to Qualcomm's chips; but they have not in fact brought any suit against Qualcomm seeking licenses at the component level.  Moreover, the data discussed above, showing increased investment by competing chipmakers, undermines the FTC's theory; Intel, MediaTek, and Samsung would not pour billions into their modem chip businesses had they truly believed Qualcomm could stop that business in its tracks by asserting its SEPs against them.

660.    Competing chipmakers are not constrained in their ability to compete by the lack of a license from Qualcomm, as evidenced by new entry by rival chipmakers and by Qualcomm's decreasing share of chip sales and increasing shares by leading competitors.

661.    Competition in the cellular communications industry has thrived under the device-level licensing practice followed by Qualcomm and all other major SEP holders, and in the corresponding absence of licenses covering CDMA or "premium" LTE modem chips.   At the modem chip level, there has been new entry, and Qualcomm's share of sales has decreased in these alleged markets.

662.    This evidence contradicts the FTC's assertion that Qualcomm's practice of not offering licenses to sellers of CDMA or "premium" LTE modem chips has harmed competition. *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 2001 (9th Cir. 2010) (competitor's increase in market share and defendant's decrease in market share indicated that the competitor was "effectively competing"); *see also* Areeda & Hovenkamp ¶ 807f (there can be no "dangerous probability" that a defendant will acquire monopoly power when "the challenged conduct has been in place for at least two years and the remaining market remains

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   robustly competitive, as evidenced by ongoing entry, profitability of rivals, and stability of their

2   aggregate market share.").

3       663.    The FTC has failed to meet its burden to establish that Qualcomm's practice of not

4   offering licenses to sellers of CDMA or "premium" LTE modem chips has caused any harm to

5   competition.

6           **4.    The FTC has Failed to Meet its Burden to Show that "Strategic
               Funds" Provisions in Qualcomm's Agreements with OEMs have
7              Harmed Competition.**

8       664.    The FTC also asserts that "[o]n some occasions, Qualcomm has induced certain

9   OEMs to accept its preferred license terms using both the 'stick' of threatened [modem chip]

10  supply disruption and the 'carrot' of [strategic] funds conditioned on the OEM's acceptance of

11  Qualcomm's preferred [SEP licensing] terms."  (Complaint ¶102).

12      665.    The FTC alleges that these strategic funds have helped Qualcomm "close the gap"

13  with OEMs that resist Qualcomm's preferred terms, helping Qualcomm "to maintain high

14  royalties on handsets that use competitors' [modem chips]." (*Id.*).

15      666.    Out of the more than 345 current and past handset licensees to Qualcomm's

16  cellular patents, Qualcomm has entered into strategic funds that were negotiated

17  contemporaneously with a licensing agreement with only nine counterparties.  ████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ██████████████████████████

22      667.    The strategic funds furthered Qualcomm's legitimate interests in developing the

23  market for new products, products implementing new releases of standards, and other new

24  technologies.  Any inference that the purpose or effect of these funds was anticompetitive is not

25  supported by the evidence.

26

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

5.       **The FTC has Failed to Meet its Burden of Showing that Qualcomm's Agreements with Apple Harmed Competition.**

668.     The FTC also alleges that a competing chipmaker—specifically Intel—was foreclosed from competing to supply five iPad models with its "premium" LTE modem chips by agreements that Qualcomm entered into with Apple in 2013.  (Complaint ¶¶ 116-31).

669.     Because "there are well-recognized economic benefits to exclusive dealing arrangements," in order to establish that these agreements have harmed competition, the FTC must prove that they foreclosed "competition in a substantial share of the line of commerce affected." *Allied Orthopedic Appliances,* 592 F.3d at 996–97 (internal quotation marks omitted) (quoting *Omega Envtl.*, 127 F.3d at 1162); *see also E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n., Inc.,* 357 F.3d 1, 8 (1st Cir. 2004) ("[I]t is widely recognized that in many circumstances [exclusive arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all."); *Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1234 n.17 (8th Cir. 1987) (explaining that exclusive dealing contracts can help prevent dealer free-riding on manufacturer-supplied investments to promote rival's products); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.,* 614 F.3d 57, 83 (3d Cir. 2010) (competition to be an exclusive supplier may constitute "a vital form of rivalry," which the antitrust laws should encourage.)

670.     The FTC's own jurisprudence recognizes that "a proper analysis of exclusive dealing arrangements should take into account market definition, the amount of foreclosure in the relevant markets, the duration of the contracts, the extent to which entry is deterred, and the reasonable justifications, if any, for the exclusivity."  *In re Beltone Elecs. Corp.,* 100 F.T.C. 68, 92 (1982).  Similarly, the Supreme Court has stated that "to determine substantiality [of the share of the alleged market foreclosed by an exclusive dealing arrangement] in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1  have on effective competition therein." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320,

2  329 (1961).

3      671.    To satisfy the requirement that an exclusive dealing arrangement result in

4  foreclosure of competition in a "substantial share" of the alleged market, the FTC must prove a

5  foreclosure of a large percentage of the market.  *See, e.g.*, *Microsoft*, 253 F.3d at 70; *see also Stop*

6  *& Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004)

7  ("For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than

8  30 or 40 percent.").  Here, the evidence shows that the five iPad models represented an

9  insubstantial aspect of the "premium" LTE modem chip market.

10     672.    The FTC has defined the relevant market with respect to the Apple agreements as

11  "premium" LTE modem chips, but it has failed to establish what share of that market was

12  allegedly foreclosed by the specific iPad products or modem chips from which the FTC claims

13  Intel was foreclosed.  As a result, the FTC has not established such a share to be "substantial."  *In*

14  *re Beltone Elecs. Corp.,* 100 F.T.C. at 92.  Even assuming the Qualcomm-Apple agreements

15  completely foreclosed this alleged "premium" LTE segment, that is not a sufficiently substantial

16  share to raise antitrust concerns in light of the evidence showing that Apple's share of sales of

17  LTE-enabled handsets never exceeded 41% in any year from 2011 to 2017, was less than 25%

18  from 2015 onward, and declined to 16% in 2016.  Therefore Apple bought only a commensurate

19  share of LTE modem chips in each year.  *See Microsoft*, 253 F.3d at 70; *Stop & Shop*, 373 F.3d at

20  68.

21     673.    The fact that many other OEMs were potential and actual purchasers of

22  "premium" LTE modem chips during the same period covered by the Qualcomm-Apple

23  agreements, including Samsung, LG, Sony, Huawei, HTC, OPPO, vivo, Xiaomi, and ZTE,

24  further confirms that there was no substantial foreclosure.

25     674.    ████████████████████████████████████

26  ████████████████████████████████████████████

27  ████████████████████████████████████████████

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1 ██████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████████████████

4      675.     The evidence also establishes that Intel was able to develop the capability to

5 supply modem chips for iPhones in 2016 without first supplying Apple iPads, which is

6 inconsistent with the FTC's theory that Intel was foreclosed from iPhones by its inability to

7 supply chips for iPads.

8      676.     The evidence also establishes that ██████ HiSilicon, and Samsung LSI were

9 able to develop "premium" LTE modem chips – including LTE modem chips that the FTC

10 considers "premium" – without ever selling to Apple, which is also inconsistent with the FTC's

11 theory of foreclosure. *See W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974,

12 976-77 (9th Cir. 1999) (pointing to increased competition in the relevant market in affirming

13 summary judgment on claim that alleged exclusive dealing contracts created high barriers to

14 entry).

15      677.     Finally, the evidence shows that in 2016, Apple elected to purchase modem chips

16 for the iPhone7 from Intel in addition to Qualcomm, and awarded a substantial portion of its total

17 purchases to Intel.  Apple did this even while the alleged exclusivity provisions of the 2013

18 agreement were still in effect.

19      678.     Subsequently, Apple purchased approximately 50% of the modem chips for its

20 iPhones from Intel in 2017, and will purchase 100% of its modem chips for iPhones and iPads

21 from Intel in 2018 and 2019.

22      679.     The evidence further establishes that Intel's failure to make meaningful sales to

23 customers other than Apple had nothing to do with the challenged agreements between Apple and

24 Qualcomm.  Intel was unable to make such sales because Intel was unable to develop an

25 integrated system-on-a-chip ("SoC") and instead chose to focus on thin modems, which are not

26 purchased in large quantities by any handset supplier other than Apple.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

680.    In light of this evidence, the FTC has not established that the Apple agreements resulted in "substantial foreclosure" that harmed competition in the alleged relevant market for "premium" LTE modem chips.

*                    *                    *

681.    In sum, the FTC has failed to make the required showing of harm to competition with respect to any of the challenged conduct.

## XI.    THE FTC HAS FAILED TO PROVE ADDITIONAL ELEMENTS OF A SECTION 2 VIOLATION

682.    The FTC has further failed to prove that Qualcomm willfully maintained any monopoly power in a relevant market.  *Microsoft,* 253 F.3d at 58.

683.    To establish that Qualcomm "willfully" maintained monopoly power, the FTC had to show that Qualcomm's conduct was unlawful and exclusionary, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Id.*; *Trinko*, 540 U.S. at 407; *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458 (1993).

### A.    Declining to Sell CDMA or "Premium" LTE Modem Chips to Unlicensed Companies Is Not Exclusionary Conduct.

684.    The FTC has failed to establish that Qualcomm's practice of not selling CDMA or "premium" LTE modem chips to unlicensed OEMs was "exclusionary"—conduct that makes sense only as a means to exclude CDMA or "premium" LTE competitors on some basis other than the merits, rather than as legitimate competition.  *Aerotech Int'l, Inc. v. Honeywell Int'l, Inc.,* 836 F.3d 1171, 1184 (9th Cir. 2016) ("[T]here is no duty to deal under the terms and conditions preferred by a competitor's rivals; there is only a duty not to refrain from dealing where the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition."  (citation  omitted) (internal quotation marks omitted); *see also SOLIDFX, LLC v. Jeppesen Sanderson, Inc.,* 841 F.3d 827, 841–43 (10th Cir. 2016) (defendant's decision to refuse to license its copyrighted work was a presumptively lawful "legitimate business justification," and not "irrational but for its anticompetitive effect," thus exercising that right could not be deemed unlawful), *cert. denied*, 138 S. Ct. 75 (2017); *Novell,*

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CASE NO. 17-CV-220-LHK-NMC

1  *Inc. v. Microsoft Corp.,* 731 F.3d 1064, 1075 (10th Cir. 2013) (monopolist's refusal to deal and

2  even forgoing of short-term profits may be consistent with perfectly legitimate business reasons

3  and even procompetitive ends, like pursuing "an innovative replacement product").

4         685.    The evidence shows that the practice in question reduces transaction costs, aligns

5  royalties with the value of the licensed patents, minimizes disputes, and is efficient.

6         686.    The FTC failed to disprove this legitimate, alternative explanation for Qualcomm's

7  practice.  This dooms the FTC's claim.  *Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518,

8  522–23 (5th Cir. 1999) (only conduct that is "economically irrational" when "examined without

9  reference to its effects on competitors" provides a "strong inference that it was taken for the

10  purpose of harming competitors rather than otherwise advancing the monopolist's business"); *see*

11  *also SOLIDFX, LLC,* 841 F.3d at 841–43 (no liability for antitrust damages where defendant

12  "established a valid business justification"); *Novell, Inc.,* 731 F.3d at 1075 (requiring "a showing

13  that the monopolist's refusal to deal was part of a larger anticompetitive enterprise" in addition to

14  proof that the monopolist forsook short-term profits); *In re Citric Acid Litig.,* 191 F.3d 1090,

15  1100–01 (9th Cir. 1999) ("firms must have broad discretion to make decisions based on their

16  judgments of what is best for them and [those] business judgments should not be second-guessed

17  even where the evidence concerning the rationality of the challenged activities might be subject to

18  reasonable dispute") (citing *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d

19  37, 49–53 (7th Cir. 1992); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 662 (7th

20  Cir. 1987)).

21         687.    At a minimum, the evidence fails to show that Qualcomm's decision not to supply

22  modem chips to unlicensed OEMs was only rational as a sacrifice of short-term benefits of such

23  modem chip sales in order to obtain higher profits in the long run by excluding competition in the

24  alleged modem chip markets.  *See Aerotec Int'l*, 836 F.3d at 1184.

25         688.    The "evidence must tend to exclude the possibility" that a firm's conduct is a

26  legitimate means to compete for business and not an "economically senseless" scheme to harm

27  competition. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 597–98

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1 (1986) (quoting *Monsanto Co v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *see also It's*

2 *My Party, Inc. v. Live Nation, Inc.,* 811 F.3d 676, 685-86 (4th Cir. 2016) (plaintiff failed to rule

3 out market-based explanations why consumers might prefer defendant's alleged bundled venue

4 and promotion services – including superiority of the defendant's venue).  The FTC has not

5 submitted evidence that excludes the possibility that Qualcomm's chip supply practice is the

6 result of a legitimate and justified business decision rather than a scheme to harm competition.

7 Moreover, the fact that Qualcomm follows the same practice with respect to its supply of

8 WCDMA and non-"premium" LTE modem chips further confirms that the practice is a legitimate

9 and justified business decision, and not an "economically senseless" scheme to harm competition.

10     689.     Accordingly, the FTC has not met its burden of showing that Qualcomm's chip

11 supply practices are exclusionary.

12 **B.**     **Declining to Grant Exhaustive Licenses for the Manufacture of CDMA or**
13 **"Premium" LTE Modem Chips Is Not Exclusionary Conduct.**

14     690.     The FTC has also failed to meet its burden of proving that Qualcomm's practice of

15 not granting licenses to sellers of CDMA or "premium" LTE modem chips constitutes

16 exclusionary conduct.

17     691.     The evidence shows instead that Qualcomm's device-level licensing became the

18 standard industry practice, and was adopted by Qualcomm, because it reduces transaction costs,

19 aligns royalties with the value of the licensed patents, and is much more efficient than the multi-

20 level licensing that would be required if Qualcomm and other innovators licensed other than at

21 the device level.

22     692.     The FTC has not ruled out this more plausible explanation for Qualcomm's

23 practice of not licensing at the component level, and has failed to establish that Qualcomm's

24 licensing practices are "irrational" but for their alleged anticompetitive effect.  *SOLIDFX,* 841

25 F.3d at 841-43; *Novell,* 731 F.3d at 1075.

26     693.     As shown in Part IIIE below, the FTC has also failed to establish that Qualcomm's

27 licensing practices breached an antitrust duty to deal.

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

694.    In sum, the FTC has failed to establish that Qualcomm's device-level licensing practices are exclusionary conduct.

**C.    Use of Strategic Funds Provisions Did Not Exclude any Sellers of CDMA or "Premium" LTE Modem Chips.**

695.    As discussed in Part IIB(4) above, the FTC also challenges strategic funds provisions included in agreements with certain OEMs.

696.    The evidence shows that the strategic funds, where they were used, furthered Qualcomm's legitimate interests in promoting its brand, and in developing the market for both new products and products implementing new releases of standards and other new technologies.

697.    This evidence is consistent with the explanation that the strategic funds provisions are legitimate marketing funds rather than exclusionary conduct, and that they are justified by the value they confer on Qualcomm's business.  *Western Parcel Express v. United Parcel Service of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999) (volume discounts that did not prevent customers from using competitors' services were procompetitive and lawful under antitrust law) (citing *Fedway Assocs. v. U.S. Treasury*, 976 F.2d 1416, 1418 (D.C. Cir. 1992)).

698.    In sum, the FTC has failed to establish that the challenged strategic funds provisions are "irrational" but for their alleged anticompetitive effect.    *SOLIDFX,* 841 F.3d at 841-43; *Novell,* 731 F.3d at 1075.

**D.    Conditioning Incentive Payments In Order to Enable Customer-Specific Investments to be Made Is Not Exclusionary Conduct.**

699.    The FTC also challenges conditional incentive payments in agreements Qualcomm entered into with Apple in 2013 as unlawful "exclusive dealing" under Section 2.  (Complaint ¶¶ 116-31).

700.    "Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (citation omitted).  It "is widely recognized that in many circumstances [exclusive dealing contracts] may be highly efficient – to assure supply, price stability, outlets, investment, best efforts or the like – and pose no competitive threat at all."

1   *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, *Inc.,* 357 F.3d 1, 8 (1st Cir.

2   2004); (citing Hovenkamp & Areeda ¶¶ 1810–14).  In particular, exclusive dealing contracts can

3   help promote interbrand competition by preventing downstream "free riding" on investments

4   made by a manufacturer. *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 n.17 (8th Cir. 1987);

5   *see also* Areeda & Hovenkamp, ¶¶ 1812a, 1814a.

6   701.    The FTC's own jurisprudence recognizes that "a proper analysis of exclusive

7   dealing arrangements should take into account market definition, the amount of foreclosure in the

8   relevant markets, the duration of the contracts, the extent to which entry is deterred, *and the*

9   *reasonable justifications,* if any, for the exclusivity." *In re Beltone Elecs. Corp.,* 100 F.T.C. 68,

10   92 (1982) (emphasis added).

11   702.   ███████████████████████████████████████████████

12   █████████████████████████████████████████████████████████

13   █████████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████████

18   █████████████████████████████████████████████████████████

19   █████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ███████████████████████████████████████████████

22   ███████████████████████████

23   703.   █████████████████████████████████████████████

24   █████████████████████████████████████████████████

25   704.    The FTC does not dispute that Qualcomm had a legitimate need to protect its

26   relationship-specific investment.  The FTC speculates instead that the challenged provisions may

27   not have been necessary to protect that investment, and that the parties could have used a less

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   restrictive alternative to mitigate Qualcomm's risks.  Such speculation does not suffice to satisfy

2   the FTC's burden of showing that the provisions are unlawful exclusionary conduct, particularly

3   in light of the evidence showing that ███████████████████████████████████████████

4   ████████████████████████████████████████ but also demanded $1 billion from

5   Qualcomm, ████████████████████████████████████████████████████████

6   ████████████████████████    The rule of reason does not require that a defendant use "the least

7   restrictive means" to achieve a legitimate end.  *See Am. Motor Inns v. Holiday Inns, Inc*., 521

8   F.2d 1230, 1248-50 (3rd Cir. 1975) ("Although relevant to ascertaining the reasonableness of the

9   [exclusivity] clause, it is not determinative that the Holidex system could, as the district court

10  found, be protected adequately' by less restrictive alternatives. In a rule of reason case, the test is

11  not whether the defendant deployed the least restrictive alternative. Rather the issue is whether

12  the restriction actually implemented is 'fairly necessary' in the circumstances of the particular

13  case, or the whether the restriction 'exceed[s] the outer limits of restrain reasonably necessary to

14  protect the defendant.'").

15      705.    The FTC also ignores the procompetitive benefits Apple enjoyed under the Apple

16  Agreements, including reduction of expenses, and assurance of a stable and continuous modem

17  chip supply from Qualcomm to meet Apple's unique and demanding needs.  *See ZF Meritor, LLC

18  v. Eaton Corp.,* 696 F.3d 254, 270 (3d Cir. 2012).

19      706.    In sum, the FTC has failed to establish that the challenged provisions in the Apple

20  agreements are "irrational" but for their alleged anticompetitive effect.  *SOLIDFX,* 841 F.3d at

21  841-43; *Novell,* 731 F.3d at 1075.

22      **E.     On the Record in this Case, *linkLine* Forecloses the Argument that
        Qualcomm's Chip Supply Practice, Alone or in Combination with Other
23      Conduct, Constitutes Exclusionary Conduct.**

24      707.    In addition to the FTC's failure to establish that any of the four types of conduct it

25  challenged constitutes exclusionary conduct, the FTC failed to overcome the hurdle posed by the

26  Supreme Court's decision in *linkLine.  Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S.

27  438, 450 (2009).  On Qualcomm's Motion to Dismiss, this Court ruled that *linkLine* did not

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1  foreclose the FTC's *theory* that Qualcomm maintained its monopoly power by charging

2  unreasonably high royalties and unreasonably low modem chip prices, because the FTC had

3  adequately alleged that Qualcomm violated a duty to deal in refusing to license its FRAND-

4  encumbered SEPs to its modem chips competitors.  (Decision at 36-38.)  This Court further ruled

5  that the FTC had adequately pleaded an "overarching anticompetitive scheme."  (*Id.*)

6          708.    The record in this case, however, does not establish that Qualcomm had an

7  antitrust duty to deal with its competitors to license its SEPs on FRAND terms to modem chip

8  rivals to sell CDMA or "premium" LTE modem chips.  Nor did it establish the existence of any

9  "overarching anticompetitive scheme."

10                     **1.    The FTC Has Not Established an Antitrust Duty to Deal.**

11         709.    The record demonstrates that Qualcomm did not have a contractual obligation to

12  license at the component level under the IPR Policy of the European Telecommunications

13  Standards Institute ("ETSI"), the leading SDO to which Qualcomm provided licensing

14  declarations.  This is confirmed by decades of industry practice and understanding of licensing

15  obligations under the ETSI IPR Policy, and by the plain language of the ETSI IPR Policy and

16  Qualcomm's licensing declarations under that Policy.

17         710.    Qualcomm has preserved for appeal its challenge to the Court's determination that

18  Qualcomm has a contractual duty to license at the component level under the IPR policies of two

19  other SDOs, the Telecommunications Industry Association ("TIA") and the Alliance for

20  Telecommunications Industry Solutions ("ATIS").

21         711.    Even if a contractual obligation had existed under the ETSI IPR Policy or under

22  the IPR policies of other SDOs, including TIA and ATIS, not every voluntary agreement or

23  contractual obligation creates an *antitrust* duty to deal.  *See In re Adderall XR Antitrust Litig.*, 754

24  F.3d 128, 135 (2d Cir. 2014) (affirming dismissal of claim that patent holder's breach of supply

25  agreement with generic manufacturers breached an antitrust duty to deal, as "[t]he mere existence

26  of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal'");

27  *SOLIDFX*, 841 F.3d at 843 (defendant's breach of agreement to grant access to toolkit for

28

                                        DEFENDANT'S PROPOSED FINDINGS OF
                                        FACT AND CONCLUSIONS OF LAW
                                        CASE NO. 17-CV-220-LHK-NMC

1   creation of iPad app did not give rise to liability under antitrust law); *Intergraph*, 195 F.3d 1346,

2   1354–55 (Fed. Cir. 1999) (Intel's withdrawal of special benefits it had previously provided to

3   Intergraph, including pursuant to contract, was not an antitrust violation, as "the Sherman Act

4   does not convert all harsh commercial actions into antitrust violations. Unilateral conduct that

5   may adversely affect another's business situation, but is not intended to monopolize that business,

6   does not violate the Sherman Act.").  Even a duty imposed by federal regulation, standing alone,

7   does not suffice to create an antitrust duty to deal.  *linkLine,* 555 U.S. at 447-48 (duty to provide

8   interconnection services arising under FCC regulations did not give rise to antitrust duty to deal).

9        712.    Although the Supreme Court in *Aspen Skiing* recognized that an antitrust duty to

10   deal could arise when a defendant terminates a long-standing, voluntary and procompetitive

11   course of conduct, the Court has subsequently explained that the *Aspen* antitrust duty to deal is

12   *"at or near the outer boundary of § 2 liability"*; and as such, the Supreme Court has "been very

13   cautious in recognizing … exceptions" to the general right to refuse to deal with competitors (and

14   has cautioned other courts about usurping that right), due in part to the "uncertain virtue of forced

15   sharing." *Trinko,* 540 U.S. at 408–09 (2004) (emphasis added).

16        713.    An antitrust duty to deal only arises under *Aspen Skiing* when the plaintiff proves

17   that the defendant made "a decision to alter a voluntary course of dealing together with evidence

18   of anticompetitive malice," *SmithKlineBeecham Corp. v. Abbott Labs.*, No. C 07-5702 CW, 2014

19   WL 6664226, at *4 (N.D. Cal. Nov. 24, 2014), and that recognition of an antitrust duty to deal

20   will not raise "concern[s] about the administrability of a judicial remedy," *MetroNet Servs. Corp.*

21   *v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004).

22        714.    Those circumstances that would give rise to an antitrust duty to deal under *Aspen*

23   *Skiing* are not present here.

24        715.    First, to establish a "voluntary course of dealing," the FTC would have to show

25   that Qualcomm has engaged in an actual course of dealing of exhaustive licensing to CDMA or

26   "premium" LTE modem chip makers.  Neither Qualcomm's participation in standard setting, nor

27   Qualcomm's contribution of technologies to the standard and its declarations to ETSI, TIA,

28

133

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    ATIS, or any other SDO constitute a "voluntary course of dealing" that involves offering

2    exhaustive licenses of its cellular SEPs to such rival chipmakers.  Even if Qualcomm's

3    declarations had included a *commitment* to offer to license such rival chipmakers to sell CDMA

4    or "premium" LTE modem chips, a commitment to make licensing offers is not the same thing as

5    actually entering into exhaustive license agreements with chip makers. *See Adderall XR*, 754 F.3d

6    at 135 (concluding that settlement agreement as a contract to supply goods does not give rise to

7    an antitrust duty to deal because "[the defendant] did not terminate any prior course of dealing—

8    let alone a 'presumably profitable' one").  It is undisputed that Qualcomm never licensed CDMA

9    or "premium" LTE modem chip competitors exhaustively at the modem chip level, and it

10   therefore cannot be shown to have discontinued a voluntary and profitable course of conduct that

11   it never engaged in.

12        716.    Second, the FTC must show evidence that Qualcomm altered its supposed

13   preexisting voluntary course of dealing with rival chipmakers for reasons of "anticompetitive

14   malice." *SmithKlineBeecham Corp.*, 2014 WL 6664226, at *4.  The evidence fails to show this.

15   Qualcomm cannot be found to have acted for reasons of "anticompetitive malice" by adopting a

16   practice followed by the entire industry, including SEP holders that are not competitors in the

17   alleged relevant markets.

18        717.    Third, finding that Qualcomm has an antitrust duty to engage in component-level

19   licensing would raise the "judicial administrability" concerns noted by the Supreme Court in

20   *Trinko* that such a duty would require "antitrust courts to act as central planners, identifying the

21   proper price, quantity, and other terms of dealing-a role for which they are ill suited." *Trinko*, 549

22   U.S. at 408; *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004).

23   This is because if Qualcomm were found to have an antitrust duty to license at the component

24   level, the result would be a multi-level licensing regime that would give rise to endless disputes

25   about which entities should be paying what proportion of the royalties on any given product at

26   any given time.  This would be different in kind from the role courts play now in determining

27   reasonable FRAND rates; it would involve not only determinations of those rates, but also

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    complicated determinations of the proportion of such rates that should be paid by licensees at

2    different levels of the supply chain.  This is the sort of undertaking that *Trinko* cautions courts

3    should avoid.

4          718.    In sum, the FTC has not established that Qualcomm's refusal to license its rival

5    sellers of CDMA or "premium" LTE modem chips breached any antitrust duty to deal.

6              **2.    The FTC has not Established that Qualcomm's "Course of Conduct,"
                       Considered Together, Constitutes Unlawful Exclusionary Conduct.**
7

8          719.    Having failed to establish that either Qualcomm's chip supply practices, its device-

9    level licensing practices, its strategic funds provisions, or its agreements with Apple

10   independently constitutes unlawful exclusionary conduct, the FTC cannot combine them to

11   sustain its claim.

12         720.    Separate claims that do not independently rise to the level of a Sherman Act

13   violation on their own cannot be analyzed together to create an antitrust violation.  *Intergraph*

14   *Corp. v. Intel Corp.*, 195 F.3d 1346, 1366-67 (Fed. Cir. 1999) (rejecting plaintiff's contention that

15   its "various theories of antitrust liability" should "not be viewed separately but" instead "taken

16   together," and that "[e]ach legal theory" must instead be separately examined for "sufficiency and

17   applicability").  For instance, in *City of Groton v. Conn. Light & Power Co.,* 662 F.2d 921 (2d

18   Cir. 1981), the Second Circuit held that multiple antitrust claims, each of which amounted to just

19   a fraction of a violation, cannot add up to a whole violation of Section 2.  662 F.2d at 928–29

20   ("Even though many of the issues the municipalities raise are interrelated and interdependent,

21   however, we must … analyze the various issues individually.  Moreover, we reject the notion that

22   if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or

23   more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act.").

24         721.    Similarly, the Federal Circuit in *Intergraph* required analysis of the validity of

25   each antitrust claim in that case separately.  195 F.3d at 1366–67.  Specifically discussing

26   *Continental Ore*'s admonition to consider all of the facts in an antitrust claim together, the

27   Federal Circuit explained that in *Continental Ore* the Supreme Court held only that the "*factual*

28   *components* of a case should be viewed together, *not the pieces of the legal theory.*" *Id.* at 1366

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   (emphasis added) citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690,

2   698–99 (1962).  Thus, "*Continental Ore* did not hold … that the degrees of support for each legal

3   theory should be added up. Each legal theory must be examined for its sufficiency and

4   applicability, on the entirety of the relevant facts." *Id.* at 1366–67.

5        722.    The Supreme Court applied this rule in *linkLine,* refusing to combine a fraction of

6   a duty-to-deal claim and a fraction of a predatory-pricing claim (*i.e.*, independently meritless

7   claims) to create an antitrust violation in that case. *linkLine*, 555 U.S. at 450 (citing *Trinko*, 540

8   U.S. at 410).  Specifically, the Supreme Court in *linkLine* held that the alleged high wholesale and

9   low retail prices *could not* be evaluated together under a "monopoly broth theory," despite their

10  necessary connection in the plaintiff's theory of harm.  555 U.S. at 452.  Not only was there no

11  monopoly broth exception in *linkLine*, but the Supreme Court held that the plaintiff's "price-

12  squeeze claim, looking to the relation between retail and wholesale prices, [was] nothing more

13  than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale

14  level." *Id.*  The Supreme Court held that if neither of these pricing decisions was unlawful on its

15  own, "then a firm is certainly not required to price both of these services in a manner that

16  preserves its rivals' profit margins." *Id.*  Thus, the Court's reasoning relied on the assumption

17  that two independently lawful acts (or meritless claims) could not combine for an antitrust

18  violation.

19       723.    The FTC's theory here is very similar to the theory in *linkLine.*  The FTC has not

20  alleged that the alleged lowered price of modem chips constitutes predatory pricing.   And it has

21  not established Qualcomm's chip supply practice or device-level licensing breached any antitrust

22  duty to deal as explained above.  As a result, it has failed to establish unlawful exclusionary

23  conduct sufficient to sustain a claim under Section 2.

24       724.    In sum, the FTC has failed to establish that Qualcomm's "course of conduct,"

25  considered as a whole, constitutes unlawful exclusionary conduct that has caused any harm to

26  competition in the alleged relevant markets.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

## XII.   THE FTC HAS NOT PROVED THE ELEMENTS OF A SECTION 1 VIOLATION

### A.   The FTC has not Proved a Contract, Combination, or Conspiracy Intended to Restrain or Harm Trade.

725.   The FTC challenges under Section 1 the terms of Qualcomm's license agreements with OEMs, as well as certain other agreements including baseband processor supply agreements, strategic development agreements, and alleged "exclusive dealing" agreements with Apple. However, the FTC has not provided direct or circumstantial evidence that reasonably tends to prove that Qualcomm and the OEMs "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 768 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir. 1980). The fact that OEMs agreed to license agreements does not mean that "they agreed to use" the terms "to restrain trade," particularly trade in the alleged chip markets the FTC relies upon in which those OEMs did not participate. *Toscano v. PGA,* 258 F.3d 978, 984 (9th Cir. 2001) (sponsors entering into PGA sponsorship agreements committing to operate tournaments in accordance with PGA rules showed "only that the local sponsors accepted the fact that the tournaments would be operated according" to those rules and regulations, "not that they agreed to use those rules to restrain trade").

726.   In some circumstances a plaintiff may also establish the first element of a Section 1 claim – *i.e.,* concerted action -  by showing that a defendant with market power coerced a counterparty to enter into an agreement that constitutes an unreasonable restraint on trade. *See Cargill Inc. v. Budine,* No. CV-F-07-349-LJO-SMS, 2007 WL 4207908, at *3 (E.D. Cal. Nov. 27, 2007) (holding that a contract between a buyer and seller satisfied the concerted action element of Section 1 of the Sherman Act where the seller coerced the buyer's acquiescence in a tying arrangement imposed by the seller) (citing *Systemcare, Inc. v. Wang Laboratories Corp.,* 117 F.3d 1137, 1142-43 (10th Cir. 1997)). As discussed in Part IIB2(a) above, the FTC has not established that any OEMs were coerced to enter license agreements with Qualcomm.

727.   The FTC has failed to show that Qualcomm possesses market power in a properly defined relevant market, that it coerced a counterparty to enter into a license agreement, or that

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

any license agreement unreasonably restrained trade – *i.e.,* caused an adverse competitive effect (*see* Part II *supra*, and Part IV.B *infra*).  As such, the FTC has failed to prove the first element of a Section 1 claim based on the license agreements with device manufacturers.  *Monsanto,* 465 U.S. at 768.

728.    The same is true of Qualcomm's agreements with Apple.  The FTC has not provided direct or circumstantial evidence that reasonably tends to prove that Qualcomm and Apple "had a conscious commitment to a common scheme designed to" foreclose competition in the alleged modem chip markets, or that Apple was coerced to enter the agreements, and those agreements cannot support a claim under Section 1.  *Monsanto,* 465 U.S. at 768.

**B.    The FTC has not Proved that the License Agreements with OEMs or Qualcomm's Agreements with Apple were Unreasonable Restraints of Trade.**

729.    For the reasons set forth in Part IIB above, the FTC has failed to establish that Qualcomm's license agreements with OEMs or its agreements with Apple have caused any harm to competition, and they therefore do not constitute unreasonable restraints of trade under Section 1 of the Sherman Act.  *Nat'l Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, 104 (1984) (the criterion to be used in determining an unreasonable restraint on trade "is its impact on competition.")

**XIII.   THE FTC HAS NOT ESTABLISHED THE REQUIREMENTS OF A CLAIM UNDER THE "UNFAIR METHODS OF COMPETITION" PRONG OF SECTION 5**

730.    The FTC has also failed to offer proof sufficient to establish a claim under the "unfair methods of competition" prong of Section 5 of the FTC Act.

731.    To prevail on a standalone alone claim under Section 5, the FTC must meet its burden of showing harm to competition.  *See Boise Cascade Corp. v. FTC,* 637 F.2d 573, 579, 581 (9th Cir. 1980) (standalone claim under Section 5 failed where there was insufficient evidence to support a finding of anticompetitive effect).  It has not done so.  *See* Part IIB *supra.*

732.    In addition, the FTC must prove that the challenged conduct is "collusive, coercive, predatory, or exclusionary," or that it has an "anticompetitive purpose or cannot be supported by an independent legitimate reason." *E.I. du Pont de Nemours & Co. v. FTC,* 729

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CASE NO. 17-CV-220-LHK-NMC

1    F.2d 128, 140 (2d Cir. 1984).  For the reasons explained above, the FTC has failed to put forward

2    evidence sufficient to establish that Qualcomm's conduct was "collusive, coercive, predatory, or

3    exclusionary," or that it lacked legitimate reasons and so must have had an anticompetitive

4    purpose.

5           733.    In addition, when the FTC seeks a permanent injunction in federal court under

6    Section 13(b) and is not seeking a preliminary injunction, it lacks the authority to expand the

7    boundaries of prohibited conduct under Section 5 beyond those that are already well-established.

8    *See* S. Rep. 93-151, at 30-31 (1973) (Congress authorized the FTC to seek a permanent injunction

9    when a court is reluctant to grant a temporary injunction because it cannot be assured of an early

10   hearing on the merits, as well as in routine cases "in which it does not desire to further expand

11   upon the prohibitions of the [FTC Act]" through administrative adjudication).

12          734.    The FTC, however, has failed to establish that there has been harm to competition

13   as a result of any of the challenged conduct, or that the challenged conduct violates established

14   standards of competition law, and the FTC has therefore failed to prove a standalone claim under

15   Section 5 of the FTC Act.  *See* Parts II-IV, *supra.*

16   **XIV.   THE FTC HAS FAILED TO ESTABLISH THAT IT IS ENTITLED TO
             INJUNCTIVE RELIEF**

17

18          735.    Section 13(b) authorizes the court to enter a permanent injunction only "in proper

19   cases … and after proper proof."  15 U.S.C. § 53(b).

20          736.    Permanent injunctions cannot be awarded under Section 13(b) based on a past

21   antitrust law violation.  *See* 15 U.S.C. § 53(b)(1) (to obtain injunction, FTC must prove that

22   defendant "is violating, or is about to violate" the FTC Act); *FTC v. Evans Prods. Co.*, 775 F.2d

23   1084, 1087 (9th Cir. 1985) ("past wrongs are not enough for the grant of an injunction . . . . an

24   injunction will issue only if the wrongs are ongoing or likely to recur"); *see also FTC v. AbbVie

25   Inc.,* No. CV 14-5151, 2018 WL 3830533, at *35 (E.D. Pa. June 29, 2018) (FTC must prove that

26   defendant "is currently violating antitrust laws or is about to violate antitrust laws"); *see also

27   TRW, Inc. v. FTC,* 647 F.2d 942, 954 (9th Cir. 1981) (reversing a cease and desist order because

28   the FTC had not proved a "cognizable danger of recurrent violation" to justify prospective relief)

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).  The FTC must prove that

2   prospective relief is truly necessary—either to stop an *ongoing* violation of the antitrust laws or to

3   prevent a likely *future* violation of the antitrust laws.

4          737.    Accordingly, in considering a request for a permanent injunction pursuant to

5   Section 13(b), the Court cannot rely upon "stale" evidence concerning past conduct, but must

6   determine if the FTC has adduced proof that Qualcomm "is currently violating antitrust laws or is

7   about to violate antitrust laws."  *FTC v. AbbVie Inc.*, 2018 WL 3830533, at *35 (E.D. Pa. June 29,

8   2018); *FTC v. Merch. Servs. Direct, LLC*, No. 13-CV-079 TOR, 2013 WL 4094394, at *3

9   (E.D. Wash. Aug. 13, 2013) (denying preliminary injunction after excising "stale" evidence and

10  finding little to suggest that violations were likely to recur); *see also FTC v. Amazon.com, Inc.*,

11  No. C14-1038-JCC, 2016 WL 10654030, at *4-6 (W.D. Wash. July 22, 2016) (denying

12  permanent injunction where a violation of FTC Act was identified as still occurring but harm was

13  not likely to continue into future and so violation unlikely to recur).

14         738.    The FTC must prove each injunction it seeks is narrowly tailored to the specific

15  conduct and the specific antitrust harms at issue in the case, and should not interfere with

16  legitimate business conduct.  *See United States v. Grinnell Corp.*, 384 U.S. 563, 577–80 (1966)

17  (noting the parties' objections to what they had described as "broad and generalized" equitable

18  relief, and "suggest[ing]" to the lower court on remand to narrowly tailor its injunction to "the

19  precise practices found to have violated the [Sherman Act]"); *see also Lamb-Weston, Inc. v.*

20  *McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

21         739.    In accordance with the text of the statute and traditional equitable factors, the FTC

22  cannot obtain an injunction without proving that the balance of hardships warrants equitable

23  relief, and the public interest would not be disserved by the permanent injunction.  *See* 15 U.S.C.

24  § 53(b).

25         740.    When an injunction would be contrary to the public interest in national security,

26  that factor can outweigh all other factors, and the Court should refuse an injunction even if the

27  plaintiff has otherwise proved future harm.  *Winter v. N.R.D.C.,* 555 U.S. 7, 23–25 (2008).

28

741.    Furthermore, though Section 13(b) relieves the FTC of having to prove irreparable injury to obtain a *preliminary* injunction, *see, e.g., FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999), Section 13(b) does not similarly relieve the FTC of having to prove irreparable injury to obtain a *permanent* injunction.  To obtain an injunction for a statutory violation, a plaintiff must prove *all* traditional equitable factors, including irreparable injury, unless the statute explicitly says otherwise.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391–92 (2006).

742.    The FTC is not entitled to the injunctive relief it has requested.  *First,* the FTC has failed to prove that each injunction it seeks (including prohibiting Qualcomm's practice of selling chips only to licensed OEMs, requiring licensing SEPs to competitors, prohibiting strategic funds, and prohibiting "exclusive dealing" provisions in its chip supply agreements) is necessary to remedy current or future anticompetitive effects in the CDMA and "premium" LTE markets, or that there is a present need to enjoin exclusivity arrangements in the future based on conduct that is ongoing or likely to recur.  *Second,* the FTC has failed to prove that each injunction it seeks is sufficiently narrowly tailored and specific with respect to the alleged bases for liability in this case, to the markets at issue, and to the alleged harms.  *Third*, the FTC has failed to establish that the requested relief is warranted under applicable equitable factors, including that it would serve the public interest.

**A.    The FTC Has Not Demonstrated that an Injunction Is Needed To Remedy Ongoing Anticompetitive Harm.**

**1.    The FTC has failed to prove any injunctive relief is needed under relevant case law.**

743.    Injunctions are forward-looking remedies.  Thus, the FTC is required to show that a permanent injunction is necessary—because harm to competition is ongoing or likely to recur (in which case the injunction will stop it).  *See FTC v. Evans Prods.*, 775 F.2d at 1087 ("As a general rule, '[p]ast wrongs are not enough for the grant of an injunction'; an injunction will issue only if the wrongs are ongoing or likely to recur."); *see also TRW, Inc. v. FTC*, 647 F.2d at 954 (it is the FTC's burden to demonstrate the wrongs are ongoing or likely to recur); *FTC v.*

1    *DiscountMetalBrokers, Inc.*, 2017 WL 4442998, at *5–6 (C.D. Cal. Oct. 4, 2017) (same); *FTC v.*

2    *Kutzner*, 2017 WL 4685065, at *2 (C.D. Cal. Sept. 21, 2017) (same).

3           744.    It is not enough for the FTC to prove that Qualcomm's *conduct* remains

4    unchanged or is likely to recur in the future, for in an antitrust case, the question is whether a

5    *violation* is likely to recur—and whether conduct is violative of the antitrust laws depends on the

6    context and market conditions; the same conduct may be violative under certain circumstances

7    and benign under different circumstances.  In other words, evidence establishing that conduct had

8    anticompetitive effects in the past does not necessarily establish that the same conduct presently

9    has or will have anticompetitive effects in the future, if relevant market conditions have changed.

10   In this case, therefore, the FTC must prove not only that Qualcomm committed a violation of the

11   antitrust laws and that violation is continuing or likely to recur, but also that Qualcomm has or

12   will have market power, such that the challenged conduct underlying the violation will exclude

13   competitors, harm competition, and thus violate the antitrust laws in the future.  *See FTC v.*

14   *AbbVie*, 2018 WL 3830533, at *35 (shrunken market share and impending patent expiration

15   weigh against conclusion that violation is likely to recur).

16          745.    All of the FTC's evidence concerns competition in the CDMA or "premium" LTE

17   modem chip markets in periods ending in late 2016, over two years ago.  That evidence is stale,

18   does not concern current or future market conditions, and therefore does not meet the FTC's

19   burden to obtain a permanent injunction.  *See Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL

20   2527044, at *3 (N.D. Cal. July 2, 2012) (J. Koh); *see also Mercexchange, LLC v. eBay, Inc.*, 467

21   F. Supp. 2d 608, 611 (E.D. Va. 2006).

22          746.    The FTC's principal expert on market conditions, for example, did not examine

23   any evidence of market conditions in the CDMA or "premium" LTE markets after 2016, and

24   offered no opinion concerning whether Qualcomm has had monopoly power in the relevant

25   markets at any time since 2016, except as to opine that Qualcomm's alleged market power has

26   declined in 2017.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
                                                       FACT AND CONCLUSIONS OF LAW
                                                       CASE NO. 17-CV-220-LHK-NMC

1    747.    The evidence of market conditions in the CDMA or "premium" LTE markets since

2    2016 submitted by Qualcomm shows competitive conditions that are inconsistent with a

3    conclusion that Qualcomm currently has entrenched monopoly power in the alleged relevant

4    markets.

5    748.    Major OEMs have substantially reduced their purchases or even ceased purchasing

6    modem chips from Qualcomm in the CDMA and "premium" LTE markets alleged by the FTC.

7    Apple, for example, now sources modem chips exclusively from Intel, and not from Qualcomm,

8    for all of its 2018 iPhone models.  Qualcomm lacks market power and cannot exercise monopoly

9    leverage to enter supra-FRAND agreements, including as evidenced by the more than 30 5G

10   agreements that Qualcomm has recently entered with OEMs.

**2.    The FTC has failed to prove any of its specific requested relief is
needed to solve ongoing anticompetitive harms.**

13   749.    The FTC has not established that there is any current need for an injunction

14   prohibiting Qualcomm "from conditioning the supply of modem chips on a customer's patent-

15   license status."  (Joint Pretrial Statement at 2; FTC Interrogatory Response at 5.)  Under the

16   FTC's theory, this policy of not selling products to unlicensed customers is not anticompetitive

17   unless Qualcomm has sufficient market power to "leverage" OEMs in license negotiations.  But

18   the FTC has failed to prove Qualcomm currently has such power, and current evidence

19   demonstrates that it does not.

20   750.    The FTC has failed to prove that there is any current need for an order requiring

21   "Qualcomm to make exhaustive SEP licenses available to modem-chip suppliers on fair,

22   reasonable, and non-discriminatory terms and to submit, as necessary, to arbitral or judicial

23   dispute resolution to determine such terms."  (Joint Pretrial Statement at 2-3; FTC Interrogatory

24   Response at 6.)  Again, given the FTC's failure to prove Qualcomm currently exercises monopoly

25   power such that the combination of its monopoly leverage over OEMs and refusal to license for

26   the manufacture of components creates a "tax" on competitor margins—and the fact that current

27   market evidence demonstrates the opposite—there is no current anticompetitive harm caused by

28   these practices that could justify these injunctions.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1      751.   For much the same reason, the FTC has failed to prove that an injunction

2   prohibiting Qualcomm from using incentive payments (Joint Pretrial Statement at 2-3; FTC

3   Interrogatory Response at 6) in licensing negotiations is needed to remedy present or ongoing

4   anticompetitive harms in the CDMA or "premium" LTE markets.

5      752.   Nor has the FTC proven that an injunction prohibiting Qualcomm "from entering

6   express or *de facto* exclusive-dealing agreements for the supply of modem chips" is necessary

7   based on current conditions in the CDMA or "premium" LTE markets.  (Joint Pretrial Statement

8   at 2-3; FTC Interrogatory Response at 6.)  Any alleged exclusive dealing with Apple has ceased,

9   and the FTC has presented no evidence it will likely recur.  The alleged effects of the purported

10  Apple-exclusive agreements—*i.e.*, foreclosure of "premium" LTE modem chip supply

11  competitors to sell to Apple—no longer exist because Apple now purchases Intel chips and began

12  to do so even before Qualcomm's agreements with Apple ended in 2016.

13     753.   And the FTC has failed to demonstrate any need for this Court to enjoin

14  Qualcomm "from engaging in similar and related conduct" to the conduct that the FTC alleges is

15  anticompetitive (FTC Interrogatory Response at 5 (citing Complaint)), or for this Court to

16  "[r]equire Qualcomm to submit to compliance and monitoring procedures."  (Joint Pretrial

17  Statement at 3.)  Of course, the FTC must put on evidence both that specific conduct has caused

18  specific anticompetitive harms, and that those harms persist such that an injunction is required.

19  But it has failed to make those showings.

20     **B.**   **In the Alternative, the FTC's Requested Relief is not Narrowly Tailored to**
21           **the Markets or Harms at Issue in this Case.**

22           **1.**   **Any relief requested by the FTC must be narrowly tailored.**

23     754.   Permanent injunctions must be "tailored to remedy the specific harm alleged."

24  *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (citing *Aviation*

25  *Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)).  In other words, an

26  injunction cannot "enjoin all possible breaches of the law."  *Price v. City of Stockton*, 390 F.3d

27  1105, 1117 (9th Cir. 2004) (citing *Zepeda v. INS*, 753 F.2d 719, 728 n.90 (9th Cir. 1983)).  It

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1   must be tailored to the precise conduct that has "been found to violate [the] law." *Skydive*

2   *Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012).

3       755.    Antitrust remedies may not enjoin more conduct than is necessary to remedy the

4   anticompetitive harms.  The FTC must "establish that [the scope of the equitable relief sought] is

5   necessary to preserve effective relief for injured consumers." *Merch. Servs. Direct*, 2013 WL

6   4094394, at *4.  *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 784–85 (N.D. Cal.

7   2017) (Koh, J.) (injunctions must be "narrowly tailored to correct the legal violations at issue and

8   [should not be] overbroad.").

9       756.    Here, the FTC's requested relief is overbroad and unnecessary to correct the

10   anticompetitive harms it has alleged.  The FTC's proposed injunctions are overbroad because

11   they are not limited to the alleged relevant markets the FTC's experts analyzed.

12       757.    Specifically, the FTC's theory is that Qualcomm has used its alleged monopoly

13   power in the alleged relevant markets for CDMA and "premium" LTE modem chips to obtain

14   royalty rates that contain a supra-FRAND component.  But Qualcomm's license agreements are

15   standard-specific.  Accordingly, any monopoly power Qualcomm may have had in the alleged

16   markets for CDMA and "premium" LTE modem chips could not have been used to coerce supra-

17   FRAND royalties in license agreements for other standardized technologies, such as WCDMA.

18       758.    Moreover, the FTC does not allege that Qualcomm has monopoly power with

19   respect to WCDMA modem chips, or in any modem chip markets other than in the alleged

20   relevant markets for CDMA and "premium" LTE modem chips.

21       759.    Indeed, the FTC has put on no evidence about the market for WCDMA modem

22   chips (a much larger segment than CDMA modem chips) or non-"premium" LTE modem chips

23   (also a much larger segment than "premium," as the FTC has defined it).

24       760.    Without any evidence, or even allegations, that this relief extending beyond the

25   alleged relevant markets is necessary to address the anticompetitive harms alleged by the FTC,

26   this Court cannot issue an injunction against Qualcomm's conduct in those unaddressed markets.

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

761.   Such an overbroad injunction would go beyond the "specific harm alleged," and would be unnecessarily burdensome on Qualcomm given the evidence (and lack of evidence) showing harm to competition.  *Lamb-Weston*, 941 F.2d at 974; *Grinnell*, 384 U.S. at 579–80; *see also Cramer Prod., Inc. v. Int'l Comfort Prod., Ltd.*, 931 F.2d 900 (Table), at *4 (10th Cir. 1991) (upholding limitation of injunction prohibiting breach of distributor agreement to domestic markets based on the evidence presented by the plaintiff, recognizing that injunctive relief must be narrowly tailored to the relevant market).

### 2.   Each of the specific injunctions requested by the FTC is overbroad and not properly tailored, and in some cases, impermissibly vague.

762.   Despite that the FTC limited both its allegations and its evidence to the CDMA and "premium" LTE markets, the FTC failed to limit its proposed injunctions to those markets.

763.   Specifically, the FTC proposes enjoining Qualcomm from "conditioning the supply of modem chips on a customer's patent-license status" in *all markets*, and requiring Qualcomm to allow renegotiations with respect to all chip sales and patent licenses, including, for example, WCDMA modem chips and WCDMA licenses, and non-"premium" LTE chips and non-"premium" LTE licenses.  (Joint Pretrial Statement at 2; FTC Interrogatory Response at 5–6.)

764.   The FTC also seeks to compel Qualcomm to license *all* SEPs to all rival chip makers, not just SEPs with respect to CDMA and "premium" LTE markets. (Joint Pretrial Statement at 2-3; FTC Interrogatory Response at 6.)  And the FTC would have this Court prohibit incentive payments and express or *de facto* exclusive dealing contracts—again—in *all* markets, and not just the ones about which the FTC has adduced any evidence.  (Joint Pretrial Statement at 2-3; FTC Interrogatory Response at 6).

765.   Moreover, the FTC seeks an order requiring Qualcomm to "renegotiate . . . license terms" with *all* OEM licensees.  (Joint Pretrial Statement at 2; FTC Interrogatory Response at 6.) Not only would such an injunction require renegotiation in markets where Qualcomm is not even alleged to have market power, such as WCDMA or non-"premium" LTE, but it is also overbroad insofar as it requires renegotiation of agreements no matter what the terms and no matter whether any anticompetitive harms caused or resulted from those agreements.  Such an injunction would

146

1    be tailored neither to the markets nor harms at issue, including because it would apply to

2    agreements entered into outside the 2011-2016 timeframe for which the FTC has presented

3    evidence.

4         766.    The requested relief also is not tailored to specific agreements or commerce that

5    falls within the reach of the FTC Act.  Section 5 of the FTC Act explains that the Section does

6    "not apply to unfair methods of competition involving commerce with foreign nations (other than

7    import commerce) unless" those "methods of competition have a direct, substantial, and

8    reasonably foreseeable effect" on U.S. commerce and "such effect gives rise to" the FTC Act

9    claim.  15 U.S.C. § 45(a)(3); *see also* 15 U.S.C. § 6a (applying same rule to Sherman Act

10   claims).  To the extent that any of the injunctions would affect purely foreign commerce that does

11   not cause anticompetitive harm in the United States, that extraterritorial effect is also

12   overbroad.  *See, e.g.*, *United States v. LSL Biotechnologies*, 379 F.3d 672, 681-83 (9th Cir. 2004).

13        767.    Such an overbroad order requiring renegotiations also should fail for lack of

14   specificity.  Any injunction "must … state its terms specifically" and "describe in reasonable

15   detail … the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  This command applies

16   to antitrust injunctions, which are "unenforceable" if they "do[] not enjoin a specific act or

17   practice."  *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1237 (11th Cir. 2018).  But the FTC's

18   requirement that Qualcomm renegotiate all contracts and licenses "free from the threat of lack of

19   access to modem chip supply or associated technical, software, or other support," begs the

20   questions of what is prohibited, how this will be determined, how parties will determine if such

21   amorphous conditions are present, and others.   (Joint Pretrial Statement at 2).

22        768.    The FTC's additional catchall request to enjoin Qualcomm from engaging in any

23   "similar and related conduct in the future" also fails as non-specific.  (Interrogatory Response at 5

24   (citing Complaint)).  "Similar and related" are not specific terms and give *no* detail as to what

25   acts are restrained, as required under Rule 65(d)(1).  It is also unclear whether these "similar and

26   related" actions will be prohibited in all markets or just the markets at issue in this case—if the

27

28

147

former, this command is also impermissibly untethered from the harms and products at issue in this case.

769.    In sum, the injunctive relief sought by the FTC is not "tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).  It may not be granted.

**C.    The FTC Has Not Demonstrated that Equity Warrants a Permanent Injunction.**

770.    The FTC failed to prove the necessary equitable factors for imposing the permanent injunction the FTC seeks.

771.    *First*, the balance of equities weighs against an injunction in this case. Competition in the alleged CDMA and "premium" LTE markets is robust and only increasing. The unnecessary and overbroad injunctive relief sought by the FTC will harm competition in this expanding and dynamic industry, and it will put Qualcomm at a competitive disadvantage by changing the rules of the game after Qualcomm invested billions of dollars into system-level innovation shared with the industry through standard-setting, in reliance on the way that the modem chip industry has evolved organically over the past 30 years.

772.    *Second*, the public interest weighs against granting the FTC's requested injunctions.  Due to their overbreadth, those injunctions represent over-enforcement of the antitrust laws and will limit Qualcomm's leading role in innovation by prohibiting actions not recognized as violating the antitrust laws, will undermine U.S. competitiveness in the fast-paced and dynamic modem chip industry by hampering Qualcomm's ability to continue its leading innovation in that industry, and will interfere with important national security interests. *See Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227 (1st Cir. 1983) (efforts to stop anticompetitive conduct should not discourage legitimate competition); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 (1986) ("Mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect.").

773.    The U.S. Treasury's Committee on Foreign Investment in the United States (CFIUS) recently recognized the significant "risk to the national security of the United States"

DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CASE NO. 17-CV-220-LHK-NMC

1  that could arise from changing Qualcomm's innovation-focused business model as a result of

2  acquisition by a foreign entity.  *See* CFIUS March 5, 2018 Letter at 1–2.

3      774.   CFIUS explained that Qualcomm is a "global leader in the development and

4  commercialization of foundational technologies and products used in mobile devices," that

5  Qualcomm "led the mobile revolution in digital communications technologies," and that

6  "Qualcomm's technological success and innovation is driven by its unmatched expertise and

7  research and development," which "drive[s] U.S. leadership in key-standard setting bodies."  *Id.*

8  at 2.  As such, CFIUS concluded that the "weakening of Qualcomm's technological leadership"

9  (including limiting R&D expenditures) and "disrupt[ing] … Qualcomm's capabilities as a

10  supplier of products" to the U.S. government would pose serious national security risks to the

11  United States.  *Id.* at 2–3.

12      775.   CFIUS further explained that "Qualcomm's current business model . . . currently

13  relies on the licensing business to fund the company's large R&D expenditures."  *Id.* at 3.

14  Important, legitimate aspects of this business model include selling modem chips only to licensed

15  OEMs and licensing exhaustively only at the device level.

16      776.   The public interest favors the dynamic and competitive innovation in modem chip

17  technology—including as driven by Qualcomm's innovation and industry—which have improved

18  technology and lives around the nation.  The national security public interest also favors

19  Qualcomm's R&D and business model, which the FTC's requested overbroad injunctions would

20  significantly impede.  The Supreme Court in *Winter v. N.R.D.C.*, recognized the immense public

21  interest attendant in national security concerns—which can even outweigh other *eBay* factors.

22  555 U.S. 7, 23–25 (2008); *id.* at 20 (noting it is the plaintiff's burden to demonstrate the public

23  interest would be served by the injunctions); *see also Internet Specialties W., Inc. v. Milon-*

24  *DiGiorgio Enters., Inc.*, 559 F.3d 985, 994 (9th Cir. 2009) (noting *Winter* held "that the public

25  interest in national security defeated [the requested] injunction"); *Def. Distributed v. U.S. Dep't of*

26  *State*, 838 F.3d 451, 459–60 (5th Cir. 2016) (explaining in preliminary injunction case that "the

27

28

1   public interest in national defense and national security is stronger" than admittedly strong

2   interests in protecting against potential violation of constitutional rights pending trial).

3        777.   *Third*, the FTC failed to prove irreparable harm from Qualcomm's conduct.

4   Indeed, the FTC failed to adduce evidence of *any* current or future harm to competition or the

5   CDMA or "premium" LTE modem chip marketplaces that cannot be remedied but for the

6   injunctions the FTC seeks.  And it pointed to no monopoly maintenance by Qualcomm that can

7   be rectified only by injunctive relief.  Even if the FTC could show that Qualcomm had monopoly

8   power at one point, it has lost that power and has not caused any harms to competition that would

9   be fixed (let alone need be fixed) by these injunctions.

10        778.   Opinions holding that the FTC need not prove irreparable harm to obtain

11   *preliminary* injunctive relief predate the Supreme Court's holding in *eBay Inc. v. MercExchange,*

12   *LLC*, 547 U.S. 388, 391–92 (2006), that plaintiffs seeking a permanent injunction under a federal

13   statute (the Patent Act in that case) must prove *all* traditional equitable factors for injunction,

14   including irreparable harm, unless Congress specifically indicates some other test should apply.

15   *Id.*  Section 13(b) bears no indication that Congress intended a different test to apply to permanent

16   injunctions in antitrust cases; on the contrary, the statute conspicuously fails to require proof of

17   irreparable injury *for preliminary injunctions* then notes that *permanent injunctions* can be issued

18   only in "proper cases" after the FTC puts on "proper proof."  15 U.S.C. § 53(b)  *See eBay*, 547

19   U.S. at 391-92; *see also Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987) ("[A]n

20   injunction is an equitable remedy that does not issue as of course."); *Weinberger v. Romero-*

21   *Barcelo*, 456 U.S. 305, 313 (1982) ("The grant of jurisdiction to ensure compliance with a statute

22   hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge

23   sitting as chancellor is not mechanically obligated to grant an injunction for every violation of

24   law. . . . Of course, Congress may intervene and guide or control the exercise of the courts'

25   discretion, but we do not lightly assume that Congress has intended to depart from established

26   principles.").

27

28

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

779. Here, the FTC has failed its burden to prove irreparable harm, the balance of the equities, or the public interest necessary to impose its requested injunctions. That relief thus must be denied.

## XV. <u>CONCLUSION</u>

780. The FTC has failed to meet its burden of showing: (1) that there has been any harm to competition in the alleged relevant markets; (2) the elements of a Section 2 claim; (3) the elements of a Section 1 claim; (4) the elements of a standalone claim under Section 5 of the FTC Act; and (5) that the FTC is entitled to injunctive relief, and specifically that: (i) there is a significant possibility of future harm to competition that would warrant injunctive relief; (ii) the remedy the FTC seeks is appropriately tailored to any proven harm; and (iii) that the remedy the FTC seeks is in the public interest.

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC

1    Dated: December 6, 2018                          KEKER, VAN NEST & PETERS

2

3                                             By:  */s/ Robert A. Van Nest*
                                                   ROBERT A. VAN NEST
4                                                  EUGENE M. PAIGE
                                                   JUSTINA SESSIONS
5
                                                   Gary A. Bornstein *(pro hac vice)*
6                                                  Yonatan Even *(pro hac vice)*
                                                   CRAVATH, SWAINE & MOORE LLP
7                                                  Worldwide Plaza
                                                   825 Eighth Avenue
8                                                  New York, NY 10019-7475
                                                   Tel.: (212) 474-1000
9                                                  Fax: (212) 474-3700
                                                   gbornstein@cravath.com
10                                                 yeven@cravath.com

11                                                 Richard S. Taffet *(pro hac vice)*
                                                   MORGAN, LEWIS & BOCKIUS LLP
12                                                 101 Park Avenue
                                                   New York, NY 10178-0060
13                                                 Tel.: (212) 309-6000
                                                   Fax: (212) 309-6001
14                                                 richard.taffet@morganlewis.com

15                                                 Willard K. Tom *(pro hac vice)*
                                                   MORGAN, LEWIS & BOCKIUS LLP
16                                                 1111 Pennsylvania Avenue NW
                                                   Washington, DC 20004-2541
17                                                 Tel.: (202) 739-3000
                                                   Fax: (202) 739 3001
18                                                 willard.tom@morganlewis.com

19                                                 Geoffrey T. Holtz (SBN 191370)
                                                   MORGAN, LEWIS & BOCKIUS LLP
20                                                 One Market, Spear Street Tower
                                                   San Francisco, CA 94105-1596
21                                                 Tel.: (415) 442-1000
                                                   Fax: (415) 442-1001
22                                                 gholtz@morganlewis.com

23                                                 Attorneys for Defendant
                                                   QUALCOMM
24

25

26

27

28

                                    152        DEFENDANT'S PROPOSED FINDINGS OF
                                               FACT AND CONCLUSIONS OF LAW
                                               CASE NO. 17-CV-220-LHK-NMC

**FILER'S ATTESTATION**

I, Geoffrey T. Holtz, am the ECF user whose identification and password are being used to file this Stipulation. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatories on this document have concurred in this filing.

*s/ Geoffrey T. Holtz*
Geoffrey T. Holtz

DEFENDANT'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 17-CV-220-LHK-NMC