# QX2778

# REDACTED VERSION

| | |
|---|---|
| **From:** | Hoffman, Alan (Nokia - US) <alan.hoffman@nokia.com> |
| **Sent:** | Monday, January 16, 2017 5:24 PM |
| **To:** | Feinstein, Deborah L. <dfeinstein@ftc.gov>; Green, Geoffrey <GGREEN@ftc gov>; Woodward, Mark <mwoodward@ftc.gov>; Nathan, Jon J. <jnathan@ftc.gov>; Devlin, Alan <adevlin@ftc.gov>; O'Dea, Brian A. <bodea@ftc.gov> |
| **Subject:** | Civil Investigative Demand – FTC File No 141-0199 – Qualcomm |
| **Attach:** | Nokia Narrative Response to Qualcomm CID 11042016_highligted pp 10-13.pdf; Nokia submission to KFTC in Qualcomm case.pdf |

Dear Ms. Feinstein and Messrs. Green, Woodward, Nathan, Devlin and O'Dea:

On November 4, 2016, Nokia's counsel Alston & Bird submitted the attached narrative response to the FTC's CID in the above matter relating to an investigation of Qualcomm. I am writing also to make available the attached submission Nokia made to the Korean FTC in a parallel Qualcomm investigation. Pages 10-13 of our response to the CID (highlighted in the attachment) and our KFTC paper both address a very significant issue raised by these cases relating to the product level at which the licensing of standard-essential patents should take place.

Nokia's long-standing practice in its own FRAND SEP licensing program is to enter into a license agreement with the company in the value chain that sells the end product, and consequently not to charge royalties at other levels in the value chain, including vendors of components and other intermediate products, such as chipsets. This way the entire final product of the relevant value chain is covered by the license, and the component vendors and other members of the relevant value chain all have access to the SEPs they require through the "have made" rights granted to the seller of the end product without needing individual licenses. This approach corresponds with other industry players' practices, and in Nokia's view most efficiently ensures the proper fulfillment of the licensing commitments made to standards setting organizations to make SEPs available on FRAND terms.

Some stakeholders have promoted a "chip level" licensing approach to undermine the true SEP value for the unjust benefit of implementers who have not invested in the R&D resulting in the relevant standardized technology. Such short-term opportunistic reasoning should be put in proper context against a long-standing industry practice and true motivation behind the FRAND principles whose purpose is to incentivize continued efficient allocation of investment and re-investment into the development of new technologies for the benefit of consumers. Diluting SEP value unjustly would only serve to divert investment away from standards technologies, with the risk that fragmented or closed proprietary solutions would take their place, competition would be harmed and costs for the consumer would increase.

Thank you in advance for taking into account this information about the dynamics of our industry, in particular how changes in the prevailing licensing practices could negatively affect competition and consumer welfare. Please let me know if we can answer any questions you may have about this aspect of the case.

> Best regards,
> Alan Hoffman

**ALAN HOFFMAN**
Senior Group Antitrust Counsel
Nokia Corporation | Legal and Compliance
Tel: +1 202 394 7538
alan.hoffman@nokia.com
Washington, D.C. Virtual Office
4038 N. Stuart St., Arlington, VA 22207 USA

Exhibit QX2779
Wit Weiler
R. Alossi, RPR, CCRR, CSR 13497

# ALSTON&BIRD L.L.P

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

404-881-7000
Fax: 404-253-8518
www.alston.com

Scott M. Jarvis                     Direct Dial: 404-881-7438                     Email: scott.jarvis@alston.com

November 4, 2016

CONFIDENTIAL FOIA EXEMPTION REQUESTED

Stephanie Langley
Federal Trade Commission
400 Seventh St. S.W.,
Washington, D.C. 20024

Re:    *Civil Investigative Demand – FTC File No. 141-0199*

Nokia USA Inc. ("Nokia") submits these responses to the Specifications set forth in the Civil Investigative Demand ("CID") served by the Federal Trade Commission ("FTC") on Nokia.

## A. Response to Specifications:

After conducting a reasonably diligent search of information and documents in Nokia's possession, custody, and control, Nokia provides the following responses to the CID's Specifications as narrowed by letter from the FTC staff dated September 23, 2016.

**Specification No. 1.**  *For each Standard Setting Organization to which the Company has made a commitment to License Relevant SEPs on FRAND terms, summarize the Company's understanding, and the reasons for that understanding, of the scope and meaning of such commitments including:*

      *a.*    *whether the commitment is to License on FRAND terms to any Person that seeks a FRAND License;*

      *b.*    *the stage(s) of production or distribution (e.g., R&D, making and sale of Relevant Products or other components, making and sale of Cellular Communications Equipment) at which the commitment to License applies;*

      *c.*    *the meaning of "fair," "reasonable," and "non-discriminatory";*

      *d.*    *the scope, meaning, and purpose of any reciprocal cross-Licensing condition to which the commitment is subject; and*

Atlanta • Beijing • Brussels • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Washington, D.C.

**FTC-NOKIA-0000001**

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

CX4321-001

QX2778C

November 4, 2016
Page 2

    e.    *the purpose of the commitment requirement under the respective SSO policy.*

## Nokia Response to Specification No. 1.

Nokia's understanding of commitments to License Relevant SEPs on FRAND terms is derived in the first instance from the language of the intellectual property rights ("IPR") policies of the relevant Standard Setting Organizations

With regard to Relevant SEPs, the two main Standard Setting Organizations are 3GPP and 3GPP2. Both 3GPP and 3GPP2 are effectively "standard setting organizations of standard setting organizations." Their membership is comprised of other Standard Setting Organizations from around the world. For both 3GPP and 3GPP2, commitments to License Relevant SEPs on FRAND terms are made by companies not to 3GPP or to 3GPP2 directly but to one of the Standards Setting Organizations that is a member of 3GPP or 3GPP2. In Nokia's case, Nokia typically makes commitments to License Relevant SEPs on FRAND terms for 3GPP standards through ETSI in accordance with ETSI's IPR Policy. With regard to 3GPP2, Nokia has typically made commitments to License Relevant SEPs for 3GPP standards on FRAND terms through ARIB in accordance with ARIB's IPR Policy. As a result, Nokia's understanding of what may be required with regard to commitments to License Relevant SEPs is primarily based on the IPR policies of these two organizations.

With regard to ETSI, the IPR INFORMATION STATEMENT AND LICENSING DECLARATION form required by the ETSI IPR Policy for making a commitment to License on FRAND terms states as follows:

> To the extent that the IPR(s) disclosed in the attached IPR Information Statement Annex are or become, and remain ESSENTIAL in respect of the ETSI Work Item, STANDARD and/or TECHNICAL SPECIFICATION identified in the attached IPR Information Statement Annex, the Declarant and/or its AFFILIATES are (1) prepared to grant irrevocable licences under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy . . . .

Clause 6.1 of the ETSI IPR Policy in turn states that ETSI should seek from an IPR owner that discloses a patent to ETSI:

> an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:

FTC-NOKIA-0000002

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-002

November 4, 2016
Page 3

> • MANUFACTURE, including the right to make or have made
> customized components and sub-systems to the licensee's own
> design for use in MANUFACTURE;
>
> • sell, lease, or otherwise dispose of EQUIPMENT so
> MANUFACTURED;
>
> • repair, use, or operate EQUIPMENT; and
>
> • use METHODS

The above undertaking may be made subject to the condition that those
who seek licences agree to reciprocate.

"MANUFACTURE" is defined in the ETSI IPR Policy to mean production of
EQUIPMENT.

"EQUIPMENT" is, in turn, defined in the ETSI IPR Policy to mean any system,
or device fully conforming to a STANDARD.

The ETSI IPR Policy sets out the following explicit policy objectives in Clause 3

> 3 1  It is ETSI's objective to create STANDARDS and TECHNICAL
> SPECIFICATIONS that are based on solutions which best meet the
> technical objectives of the European telecommunications sector, as
> defined by the General Assembly. In order to further this objective the
> ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and
> others applying ETSI STANDARDS and TECHNICAL
> SPECIFICATIONS, that investment in the preparation, adoption and
> application of STANDARDS could be wasted as a result of an
> ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION
> being unavailable. In achieving this objective, the ETSI IPR POLICY
> seeks a balance between the needs of standardization for public use in the
> field of telecommunications and the rights of the owners of IPRs.
>
> 3.2  IPR holders whether members of ETSI and their AFFILIATES or
> third parties, should be adequately and fairly rewarded for the use of their
> IPRs in the implementation of STANDARDS and TECHNICAL
> SPECIFICATIONS.

Nokia's understanding of the ETSI IPR Policy with regard to Specifications 1.a.
and b. is that the commitment to License on FRAND terms is given for the activities
identified in Section 6.1 in relation to EQUIPMENT as that term is defined in the ETSI
IPR Policy  All of the licensing commitments that Nokia has provided to ETSI have been
made with this understanding of the ETSI IPR Policy

**FTC-NOKIA-0000003**

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

CX4321-003

QX2778C

November 4, 2016
Page 4

With regard to Specification 1 c., the terms "fair," "reasonable," and "non-discriminatory" are not defined in the ETSI IPR Policy.  In accordance with Nokia's FRAND commitments, Nokia has for years operated established licensing programs and has made its SEPs available to third parties in return for FRAND compensation, and subject to reciprocity. Indeed, Nokia Corporation's (now Nokia Technologies) SEP licensing program was established in 2001 - at the time when Nokia Corporation had already become one of the largest handset manufacturers and also one of the major users of standardized technologies - and the key elements of the licensing program continue to be the same even today. Numerous international companies operating in the mobile industry have chosen to benefit from Nokia Technologies' FRAND licensing programs and have taken licenses to Nokia Technologies' SEPs.

Key principles of Nokia Technologies' licensing policy include: (i) the commitment to allow other companies to practice the standards developed by the patent holders in return for the right to a FRAND compensation for the patent holders; and (ii) market driven bilateral licensing negotiations conducted in good faith within the framework of FRAND.

Generally, Nokia Technologies considers the concept of FRAND to consist not only of the appropriate FRAND valuation of SEPs but also of a fair process to conclude a license. This means that both parties must exhibit good faith intentions to negotiate and commitment to conclude a license in a timely manner.

For Specification 1.d., the ETSI IPR Policy does not elaborate further on what is meant by the statement that "the above undertaking may be made subject to the condition that those who seek licences agree to reciprocate." In general, Nokia Technologies has understood that language to mean that an IPR owner is not obligated to license its SEP's for the relevant standard to a party on FRAND terms if the counterparty is unwilling to likewise license its relevant SEPs back to the IPR owner on consistent FRAND terms as well. Under its licensing program, Nokia Technologies has offered licenses subject to reciprocity from the counterparty on a standard by standard basis.

For Specification 1.e, Nokia's understanding is that the purpose of commitments to license Relevant SEPs on FRAND terms under commitments made to ETSI is reflected in the policy objectives of the ETSI IPR Policy quoted above.  Nokia likewise understands that Standard Setting Organization IPR policies in general and commitments to license on FRAND terms in particular are designed both to· (i) ensure that IPR owners are properly incentivized and rewarded for participating in standards setting and developing technologies that contribute to the technical merits and success of the standard; and (ii) contributing to the success of the standard by ensuring that standards-compliant products are widely available. In this regard, the focus is not simply on developing the lowest cost product but a product that implements the best available technology, which may require substantial investment in research and development by standards participants. In Nokia's experience, FRAND commitments have worked well   The cellular telecommunications standards have been some of the most successful and widely adopted standards in the

FTC-NOKIA-0000004

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-004

November 4, 2016
Page 5

history of standards setting with consumers receiving significant value from standards-compliant devices, as well as follow innovations  Open standards have enabled fast data transfers that have enabled the whole digital economy around modern 4th generation mobile telephony.  And these standards have significantly lowered barriers to entry to product markets for companies like Apple that have entered with little original investment in the standards and been extremely successful.  In fact, Apple is an example of a company that would not be where it is today without availing itself of standardized technologies  In the cellular telecommunications industry, many manufacturers have entered into mutually agreed licenses with owners of Relevant SEP's on terms that have been satisfactory to both sides.  In Nokia's view, one of the larger challenges to the purposes and policies behind FRAND commitments has been one of free-riding (or "hold out") by manufacturers who have entered the market for standards-compliant devices and are unwilling to compensate owners of Relevant SEPs in a manner that appropriately rewards and encourages further investment in standardized technologies. This free-riding has been possible as companies can commercially deploy products without first taking licenses from SEP owners and a fair amount of new entrant companies have used a strategy of avoiding taking licenses as long as possible.

With regard to ARIB, the ARIB IPR Policy provides IPR owners declaring IPR to ARIB with three different options with regard to licensing commitments.  Nokia Technologies understands Option 2 to be the option for commitments to License Relevant SEPs on FRAND terms.  Under the ARIB IPR Policy, an IPR owner that elects Option 2 "agrees to grant a non-exclusive and nondiscriminatory license to the use of such Essential IPR on reasonable terms and conditions to *anyone who uses such an ARIB Standard.*"

Nokia's understanding of the ARIB IPR Policy with regard to Specifications 1 a. and b. is that the commitment to License Relevant SEPs extends to "users" of an ARIB Standard  The ARIB IPR Policy does not expressly dictate at which stage of production or distribution IPR should or must be licensed. Nokia's approach to licensing IPR subject to an ARIB commitment and the reasons for that approach are discussed in response to Specification 2

With regard to Specification 1.c., the terms "reasonable," and "non-discriminatory" are not defined in the ARIB IPR Policy.  Nokia's licensing approach with regard to IPR subject to ARIB commitments does not differ in any material respect from Nokia's licensing approach for IPR subject to ETSI commitments.

For specification 1.d., the ARIB IPR Policy states that "if anyone who uses such an ARIB Standard owns any other Essential IPR which covers any or all parts of the contents of the provisions of such an ARIB Standard, and lays claims thereto, such a user may be excluded from the application of aforesaid [licensing] provision by the Right Holder." The ARIB IPR Policy does not elaborate further on this possible exclusion.

**FTC-NOKIA-0000005**

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

CX4321-005

November 4, 2016
Page 6

For specification 1.e., Nokia's understanding of the purpose of the ARIB IPR Policy's commitment to license Relevant SEPs on RAND terms is not materially different than the purpose underlying the ETSI IPR Policy's commitment.

Nokia Solutions and Networks' understanding of the relevant IPR policies is the same

Alcatel-Lucent's understanding of the relevant IPR policies is the same.

**Specification No. 2.**   *Summarize the Company's policies and practices for Licensing its Relevant SEPs, including:*

> a.   *the fees and royalty rate(s) charged by the Company with respect to Licenses and Non-Exhaustive Grants to Relevant SEPs, including any Price Adjustments, and the Company's methodology for determining such amounts;*
>
> b.   *whether and why (or why not) the Company has been willing to grant Licenses under its Relevant SEPs to Relevant Product Suppliers to make, use, sell, offer to sell, or import Relevant Products or other Cellular Communications Equipment components;*
>
> c.   *whether the Company has been willing to grant Licenses to discrete subsets of its Patents (e.g., Relevant SEPs only, or Relevant SEPs limited to a particular Relevant Standard Group); and*
>
> d.   *whether and why (or why not) the Company has required, as a condition of its agreement to provide a License or Non-Exhaustive Grant to its Relevant SEPs, a cross-License or Non-Exhaustive Grant to Relevant SEPs and/or other Patents owned or controlled by the counterparty, including the Company's policies and practices relating to the valuation of such rights.*

**Nokia Response to Specification No. 2.**

Nokia has an established cellular SEP licensing program that has been operated since 2001. Due to historical and operative business reasons there are currently three different legal entities with cellular SEP portfolios in the Nokia Group (Nokia Technologies which continues the Nokia Corporation patent licensing program, former Nokia Siemens Networks, now Nokia Solutions and Networks, which was established as a joint venture company in 2007 and built its own patent portfolio and licensing program as well as Alcatel Lucent which was recently acquired). While there currently is an integration process on-going subsequent to the recent acquisition by Nokia Corporation of Alcatel Lucent, licensing has taken place independently in each of the legal entities. The licensing practices of the three Nokia entities will be described separately below with the focus on

**FTC-NOKIA-0000006**

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

November 4, 2016
Page 7

Nokia Technologies' cellular SEP licensing program. Nokia Technologies is a fully owned subsidiary of Nokia Corporation and, as of 1 January 2015, the owner of the patent portfolio that was previously held and licensed by Nokia Corporation.

*Nokia Technologies*

Nokia Technologies' patent portfolio consists largely of patents created while Nokia was still active in its mobile Devices & Services business (which was divested to Microsoft in 2014) as well as of patents resulting from continuous R&D activities and innovation carried out in Nokia Technologies subsequently  The patent portfolio owned today by Nokia Technologies results from a long history of innovation and significant R&D investments (in the tens of billions of Euros) in mobile communications made during the past 25 years. Nokia has been one of the major contributors to various cellular standards, for example, and in this framework, ever since the early 1990s, Nokia has also been one of the key developers of the F/RAND licensing concept. Nokia has extensive experience of F/RAND licensing and litigation both as a SEP holder and as a major SEP user (licensee).

In accordance with its F/RAND commitments, Nokia (now Nokia Technologies) has for years operated established licensing programs and has made its SEPs available to third parties in return for F/RAND compensation, and subject to reciprocity.

Nokia Technologies has established licensing programs for its cellular SEPs described in more detail below. The program rates offered reflect Nokia's approach to F/RAND  In terms of valuation the main rule is that royalty requests must always be put in a broader context. The underlying thinking in Nokia Technologies' licensing programs has been that while Nokia has one of the most valuable portfolios in the industry, SEPs are also held by other companies and Nokia would need to take a license to those. In fact, Nokia set its rates for its cellular standard essential patents at a time when it was the leading mobile phone manufacturer in the world at a level it was prepared to pay others for a similar portfolio. Nokia's program rates for cellular SEPs have been broadly accepted in the industry and are consistently implemented in Nokia's existing license agreements many of which also include valuable grant backs to Nokia's businesses.

It is Nokia's established practice to offer to license its SEPs separately from other patents  In other words, Nokia Technologies makes a license available for Nokia Technologies' SEPs without requiring the other party to take a license for Nokia non-SEP patents or to grant a license to Nokia for non-SEP patents of the counterparty. Nokia also offers to license its SEPs only to the standards that the licensee requests or needs. Accordingly, the vast majority of Nokia's outbound patent licenses are limited to cellular SEPs only, and some are limited to particular cellular standards, such as GSM  In terms of reciprocity, Nokia Technologies may seek a grant back from a counterparty for SEPs in accordance with the reciprocity conditions of any relevant Standard Setting Organization IPR policy  The value of any such grant back is determined on a case-by-case basis. It becomes a point of negotiation between the parties as to the effect and value for Nokia of

FTC-NOKIA-0000007

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-007

QX2778C

November 4, 2016
Page 8

any grant back on a balancing payment between the parties. The final value of the grant back is often dependent on future developments (e.g., impacting Nokia's relevant businesses, which can be forecasted only with some accuracy at the time the license is signed).

In keeping with licensing practices well-established over the past decades, Nokia also consistently licenses its patents for complete end-user products, such as handsets and other terminals, and correspondingly refrains from charging royalties at other levels in the value chain, including intermediate products such as chipsets. This approach has been Nokia's practice from the very beginning and it corresponds with the industry practice. This practice is explained in more detail below.



*Nokia Technologies' Program Rates for its Cellular SEPs*

Nokia Technologies negotiates royalty payments and other license terms for its SEPs in good faith with each prospective licensee, taking into account the required scope of each license in terms of covered products and patents, as well as potential unique circumstances or preferences of each licensee, while also ensuring that similarly situated licensees are treated in a non-discriminatory matter. Examples of such unique circumstances can include the value of a possible reciprocal SEP grant-back

---

¹ Nokia Technologies' program rates for cellular SEPs apply only for the portfolio of Nokia Technologies and do not include patents of Nokia Solutions & Networks BV and affiliates of Nokia Solutions & Networks BV or patents of Alcatel-Lucent and affiliates of Alcatel-Lucent.

FTC-NOKIA-0000008

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-008

November 4, 2016
Page 9

to Nokia; willingness of the licensee to voluntarily grant licenses to Nokia under its
non-SEP patents; willingness to make pre-payments for royalties thereby securing
payments, or willingness to assign some other rights, benefits or value (such as
sublicensing rights) to Nokia. Despite these possibilities for specific arrangements in
the form that the value granted back to Nokia takes, Nokia Technologies always
makes licenses to its SEPs available based on running royalties and subject to
reciprocity. In other words, while the value of each license is established in arms-
length negotiations based on the actual scope and terms of the individual license (that
may differ from one relationship to another), Nokia routinely makes certain terms
available to licensees.



*LTLO Rates and Terms for Cellular SEPs*

When Nokia and Qualcomm settled their worldwide patent dispute in 2008, as part
of the settlement Nokia ███████████████████████████ but was
required by Qualcomm to ██████████████████████████████ for
their ████████████████████████████████ under the terms of
the ████ ████████████ The ████ had particular ████ terms,
namely ████████████ for CDMA2000 and ████ for UMTS or LTE
(OFDM). Importantly, these ████ for subscriber terminals and modem cards are ██
of ████████ by ████ to the ████████ (not limited to reciprocal
licenses to the same standards), and are based on the licensee promptly entering into
████████████ agreement rather than a more typical shorter term. Exceptionally, these
████████ also include ████████████████████ and
as of ████ also those of ██████ Also the counterparty ████ a
████ its ████████ to these companies.

The ████ is only available for each licensee for a limited time  Nokia has offered
the ████ to most handset vendors in the industry  The ████ can no longer be made
available once expired.

*Nokia Solutions & Networks*

The Nokia Solutions & Networks patent portfolio consists of patents created as part of the
networks business operated first by Nokia and Siemens respectively, then by Nokia and
Siemens in a joint venture and now, again by Nokia Solutions & Networks as a wholly
owned subsidiary of Nokia Corporation. Nokia Solutions & Networks licenses its cellular
SEPs in accordance with SSO IPR rules and policies that it has committed to. Accordingly,
Nokia Solutions & Networks adheres to F/RAND licensing principles as applicable,
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

FTC-NOKIA-0000009

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-009

November 4, 2016
Page 10

███████████████████████

### *Alcatel-Lucent*

With regard to Alcatel-Lucent, since the merger of Lucent Technologies Inc. and Alcatel SA on November 30, 2006, Alcatel-Lucent has been a member of many SSOs and has contributed to the development of various standards, including and most importantly various cellular communication standards (such as GSM, UMTS, LTE etc.). Prior to the merger, both Lucent Technologies Inc. and Alcatel SA were active members that participated in many SSOs and the same applies for Alcatel-Lucent today.

Alcatel-Lucent has a portfolio of patents essential to the various cellular standards, GSM, WCDMA and LTE These patents have been declared as essential through the relevant procedures of the relevant SSOs. Alcatel-Lucent has always shown willingness, pursuant to the relevant rules or policies of the applicable standards body, to grant licenses for its SEPs upon (fair), reasonable and non-discriminatory ("F/RAND") terms and conditions. Likewise, Alcatel-Lucent's predecessor companies, Alcatel and Lucent. made commitments to standards bodies such as ETSI and the International Telecommunications Union (ITU) to offer F/RAND licenses subject to reciprocity to the patents impacted by adoption of the contributions as part of a standard.

Alcatel-Lucent has not historically actively licensed out its cellular SEPs in the form of a stand-alone program  The patents have typically been licensed as part of broader cross license agreements covering a defined grant scope such as handsets or infrastructure. As a consequence, every license negotiation has been a market driven bilateral process that results in a specific set of licensing terms mutually agreed upon between the parties. Balancing royalty payments under each respective agreement have typically not been determined specifically for any category of patents but rather based on the individual negotiations and specific circumstances related thereto and as a function of a variety of factors such as relative strength of each party's patent portfolio, the scope of the licenses, grant areas, including scope of grant back, payment terms and other terms and conditions.



### *Specifically on Licensing Relevant SEPs in the product value chain*

With regard to Specification 2.b., over the years Nokia has consistently and in keeping with prevailing licensing practices made its SEPs available in accordance with FRAND principles by following a one-point-of-license practice. That is to say, Nokia concludes a single license with one company at the end of the value chain (i.e. at the final

FTC-NOKIA-0000010

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-010

November 4, 2016
Page 11

end user product level). This one license extends over the entire value chain for the licensee's devices through the express grant of "have made" rights for components used in such devices - meaning that every link in the value chain for the licensee's devices has access without needing a separate individual license. This practice has permitted Nokia to conclude one license and avoid the complexity of negotiating and concluding multiple and potentially overlapping licenses with each and every company or link in the value chain. The final end-user products are also the only products in the value chain that implement the fullest scope of Nokia's Relevant SEPs. This is because these end user products are comprised of hundreds or even thousands of hardware and software components from a very large number of suppliers. The degree to which such components implement Nokia's Relevant SEPs varies greatly, and it is even fairly common for several components to implement the same Nokia Relevant SEPs. Licensing final end-user products is the only way to efficiently deal with such immense complexity and also avoids repeated payments by different component suppliers for the same Nokia Relevant SEPs ultimately embodied in the final end-user product Another important advantage with the approach is that, if a company engaged in the product business, such as Nokia, would license component vendors higher up in the value chain, it would then, through the doctrine of patent exhaustion, expose itself in an uncontrollable asymmetric manner to the SEPs of its peer product companies. Put differently, Nokia could no longer clear patents with its peer product companies, as has been done over the past decades. Such peer companies could then seek to impose unreasonable costs or even to enjoin Nokia's product business with their patents while enjoying asymmetric one-way access to Nokia's patents through licensed component suppliers. Further, such one-point-of-license practice lowers transaction costs and speeds up the entire value chain's access to the SEPs in question and provides visibility to which products in the market are licensed and thereby also eliminates the possibility of license overlaps. In short this is the most efficient mode of licensing and for this reason is the prevailing licensing practice in the industry

Nokia's decision in the early 2000's to choose to license on the final end user product level was influenced by the wording of the ETSI IPR policy discussed in Specification 1 above. The ETSI IPR Policy expressly contemplates that IPR owners would commit to grant licenses for the manufacture, sale, and use of EQUIPMENT – that is "*systems or devices*" that *fully* conform to the entirety of a STANDARD. There is no indication in the ETSI IPR Policy that the IPR owner's FRAND-licensing commitment would extend to manufacturers of constituent components of a "system or device" or items like components that may not fully conform to the relevant STANDARD.

There were also other reasons that led to Nokia choosing to collect royalties at the final end user product level. The complete end product is, for a number of reasons, simply the most rational point of license in the value chain.

First, it is a fundamental principle of patent law that the protected invention is defined by the scope of the claims in the patent. In the case of SEPs that are essential for a given cellular standard, the claims vary in scope and cover a wide range of patented inventions. Customarily, only the end product implements all the inventions claimed in a

FTC-NOKIA-0000011

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-011

November 4, 2016
Page 12

large portfolio of SEPs. That is generally not the case for components or other intermediate products incorporated in the end product. Consequently, if a component manufacturer was granted a license it could not necessarily pass all the necessary rights through to its customer, the end product manufacturer, meaning the end product would be unlicensed. In line with this, also the ETSI rules cited to above refer to systems and devices that *fully* conform to a Standard. Furthermore, one component vendor usually provides components to multiple customers, thus serving multiple value chains, oftentimes through additional layers of distributors, which would increase the complexity even more. The component vendor would be unlikely even to know which SEPs would be needed for which value chain. This would necessitate further license agreements to be made with the end product companies of those value chains in any case, which would increase transaction costs and reduce efficiency and promptness and therefore ultimately harm the consumer. It would potentially also result in double licensing (double dipping) across the value chain. A single point of license at the end product level avoids all such problems. It is efficient and transparent and, above all, fair to all – and it has been the industry practice for many years.

Second, reverting to the fundamental principles of patent law mentioned above, the end product is the level – and the only level – where the value of all the patented inventions is manifest. Consequently, the price paid by the purchaser of the end product is the best indicator of the value basis of such inventions across the entire value chain. By contrast, the manufacturer of a component may not even know in which end products its components will be used and for what purpose and therefore cannot know the value that the respective intellectual property provides to the value chain. In practice this is clearly observable in the pricing of the relevant components, e.g. silicon chips in the handsets, which is often based only on the raw material and manufacturing costs, and does not take into account the value that intellectual property brings to the value chain.

For the foregoing reasons, Nokia's long-standing practice in its own FRAND SEP licensing program is to enter into a license agreement with the company in the value chain that sells the end product, and consequently refrain from charging royalties at other levels in the value chain, including vendors of components and other intermediate products, such as chipsets. This way the entire final product of the relevant value chain is covered by the license, and the component vendors and other members of the relevant value chain all have access to the SEPs they require through the "have made" rights granted to the seller of the end product without needing individual licenses. The end product manufacturer in turn has a chance to negotiate the license agreements by itself and obtains freedom of action – also in choosing its supplier. This is something Nokia considered important for its once very large device business. This approach corresponds with other industry players' practices, and in Nokia's view most efficiently ensures the proper fulfillment of the licensing commitments made to standards setting organizations to make SEPs available on FRAND terms.

Finally, it should be noted that some stakeholders have promoted a 'chip level' licensing approach to undermine the true SEP value for the unjust benefit of implementers who have not invested in the R&D resulting in the relevant standardized technology. Such

FTC-NOKIA-0000012

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-012

short-term opportunistic reasoning should be put in proper context against a long-standing industry practice and the true motivation behind the FRAND principles whose purpose is to motivate continued efficient allocation of investment and re-investment into the development of new technologies for the benefit of consumers. Diluting SEP value unjustly would only serve to divert investment away from standards technologies, with the risk that fragmented or closed proprietary solutions would take their place and cost for the consumer would increase. Similarly, forcing product companies such as Nokia to deviate from the licensing practices having prevailed over the past decades would prevent them from being able to clear patents with their peer product companies.

Nokia Solutions and Networks and Alcatel-Lucent have had the same view with regard to Specification 2.b during the period after their respective acquisitions by Nokia.

With regard to Specifications 2.c. and 2 d , Nokia Technologies, Nokia Solutions and Networks, and Alcatel-Lucent's practices are as described above

**Specification No. 3.** *Identify each Licensee of the Company's Relevant SEPs. For each Agreement, including amendments, in effect on or after July 1, 2006, between the Company and a Major Implementer or Relevant Product Supplier that contains a License or Non-Exhaustive Grant relating to Relevant SEPs, provide a summary of the major terms of such Agreement, including:*

a. *the parties to the Agreement;*

b. *the term of the Agreement;*

c. *a description of any Licenses or Non-Exhaustive Grants granted by the Company under the Agreement;*

d. *a description of any Licenses or Non-Exhaustive Grants granted to the Company or its customers under the Agreement;*

e. *the consideration (including lump sum payments, running royalties, royalty caps, or other terms) for any Licenses or Non-Exhaustive Grants granted under the Agreement;*

f. *for any Agreement containing a royalty-free cross-License or cross-Non-Exhaustive Grant, the value, if any, attributed by the Company to such License or Non-Exhaustive Grant in the course of negotiation of the Agreement;*

g. *indication of whether any Agreement relating to the purchase of any product was negotiated or entered into in connection with or contemporaneously with the Agreement; and*

November 4, 2016
Page 14

> h.   *indication of whether the Agreement contains any provisions limiting the*
> *initiation of or participation in litigation, government investigations, or*
> *other proceedings (including FRAND determinations).*

## Nokia Response to Specification No. 3.

Nokia is producing the responsive information for Nokia Corporation and Nokia Technologies licenses in effect on or after January 1, 2010 in a separate attachment, attached hereto as Exhibit A. As discussed with the FTC staff, Nokia will produce a list of license agreements in effect on or after January 1, 2010 for Alcatel-Lucent and is willing, upon request from FTC staff, to provide further information on such license agreements that may be of interest.

**Specification No. 4.**   *For each Agreement between the Company and Qualcomm under which the Company or Qualcomm is granted a License, including (1) the July 22, 2008, Subscriber Equipment and Infrastructure Equipment License Agreement between the Company and Qualcomm and (2) any Agreement identified in response to Specification 3, summarize and submit Documents sufficient to show the Company's rationale for entering into such Agreement, including the impact, if any, of actual or anticipated supply of Relevant Products from Qualcomm on the Company's rationale for entering into such Agreement.*

## Nokia Response to Specification No. 4.

Nokia's rationale for entering into the July 22, 2008 Subscriber Equipment and Infrastructure Equipment License Agreement ("SULA") was to put an end to a worldwide dispute comprising over 20 lawsuits, arbitrations, and other proceedings and enter into a license agreement with Qualcomm for Qualcomm's Relevant SEPs. The litigation was costly and distracting to Nokia's management and was putting Nokia's entire business at risk. Moreover, in 2008, Nokia was the largest manufacturer of cellular handsets in the world and sold products that implemented a number of different cellular standards. Qualcomm had declared Relevant SEPs to a number of these standards and Nokia, acting in good faith, decided it should take a license from Qualcomm. Nokia was also actively looking for ways to expand its sales of mobile phones and purchase of Relevant Products from Qualcomm also had a material impact on Nokia's decision to enter into the 2008 SULA. Based on discussions with the FTC staff, Nokia has undertaken a reasonable effort to identify any slide decks or similar presentation materials discussing solely the business reasons for entering into the 2008 SULA (as opposed to legal or litigation reasons), and Nokia has not identified any such materials. Nokia's Devices and Services business, which was the business licensed under the 2008 SULA, was divested to Microsoft on April 26, 2014 along with the personnel and records related to that business.

**FTC-NOKIA-0000014**

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

CX4321-014

November 4, 2016
Page 15

Nokia Solutions and Networks does not have a separate license agreement with Qualcomm but is instead covered under Nokia Corporation's 2008 SULA

Alcatel-Lucent's predecessor entities – Alcatel and Lucent Technologies – both entered into a series of license agreements with Qualcomm over an extended period (as has Alcatel-Lucent after the merger of the two entities in 2006). From the date Nokia acquired control of Alcatel-Lucent, Alcatel-Lucent has only had an existing small cell license agreement in place with Qualcomm that pre-dated Alcatel-Lucent's acquisition by Nokia.

**Specification No. 5.** *Identify each litigation or arbitration proceeding in which the Company sought to enforce its cellular Patents (including by counterclaim or in defense of any declaratory judgment action), and for each such proceeding state:*

        *a. the tribunal, initiation date, and docket number of the proceeding;*

        *b. the party and products against which the Company sought to enforce its Patents;*

        *c. the number of Patents the Company sought to enforce in the proceeding;*

        *d. the number of Relevant SEPs the Company sought to enforce in the proceeding;*

        *e. the date and terms of any judgment, settlement, or other termination of the proceeding; and the cost to the Company of the proceeding.*

**Nokia Response to Specification No. 5.**

Nokia is producing the responsive information in a separate attachment, attached hereto as Exhibit B.

With respect to litigation costs, Nokia estimated its costs for the type of case filed in each respective jurisdiction. Specifically, for cases filed in European courts, Nokia estimates that it costs ▮▮▮▮▮▮▮▮ per patent to pursue a claim  For cases filed in German courts, the cost estimate is ▮▮▮▮▮ to ▮▮▮▮▮▮ per patent  The disparity in cost is generally a representation of the complexity of the case and a product of the value of the patent, as less attorney time is typically required for lower value cases, and in German courts, court costs are based upon the value of the dispute. Similarly, when high value cases are settled, the remaining un-tried countersuits are terminated, thus creating an imbalance in costs for varying cases.

With respect to cases filed in China and Japan, Nokia estimates each Chinese case costs around ▮▮▮▮▮▮▮▮ to pursue, while the Japanese cases have historically

**FTC-NOKIA-0000015**

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

Case 5:17-cv-00220-LHK   Document 1414   Filed 01/24/19   Page 18 of 21

QX2778C

November 4, 2016
Page 16

been less given that they were withdrawn in the early stages of litigation. The Japanese cases cost less than ████ per patent.

Finally, the cases filed in the United States generally cost between ████ to ████ per patent for implementation, whereas SEP cases generally cost between ████ to ████ per SEP due to the additional time and effort expended to assert these claims. Litigation in the United States is more costly in part because of broader and more costly discovery.

**Specification No. 6.** *State whether the Company sells Cellular Communications Equipment (including infrastructure) or any other products that practice Company Patents, and whether it has a policy or practice to supply or commit to supply such products only to Licensees of the Company, and*

> a.  *if the Company has such a policy, summarize the policy including its rationale and the products to which it applies; or,*

> b.  *if the Company does not have such a policy, explain the factors that the Company has or would consider in weighing whether to adopt such a policy, including as to infrastructure equipment*

**Nokia Response to Specification No. 6.**

Nokia Technologies does not currently sell any Cellular Communications Equipment.  Nokia Solutions and Networks and Alcatel-Lucent both sell cellular infrastructure equipment.  None of the companies has a policy or practice to supply or commit to supply such products only to Licensees of the Company.  Nokia Solutions and Networks and Alcatel-Lucent are not currently aware of factors that they would consider in weighing whether to adopt such a policy because they have not contemplated adopting such a policy. .  Nokia (in the past) and Nokia Solutions and Networks and Alcatel-Lucent currently have separate business operations that are responsible for negotiations over patent licenses on the one hand and product sales on the other hand and each area works independently of the other.

**Specification No. 7.** *Identify each supplier of any product that has at any time, to the Company's knowledge, required as a condition of supply that its customers first agree separately to License such supplier's Patents.*

**Nokia Response to Specification No. 7.**

Nokia had a series of patent license agreements in place with Qualcomm through April 2007.  In 2007 and 2008, at a time before Nokia and Qualcomm executed the 2008 SULA, Nokia believed that it would likely need to take a License under Qualcomm's patents when it negotiated to purchase WCDMA chipsets from Qualcomm.  After the execution of the 2008 SULA, Nokia became Qualcomm's chipset customer.  That

FTC-NOKIA-0000016

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-016

QX2778C

November 4, 2016
Page 17

relationship lasted until 2014 when Nokia divested its devices and services business to Microsoft

Under supply agreements entered into between Alcatel-Lucent and Qualcomm for components, such supply agreements have prohibited Alcatel-Lucent's sale or use of Qualcomm components if Alcatel-Lucent does not possess a license for all applicable patents.

**Specification No. 8.**  *Summarize the Company's practices regarding provision of Patent lists, evaluations, reports, analyses, or claim charts to actual or potential Licensees in connection with the Licensing or potential Licensing of the Company's Patents, including how these practices have changed over time, if at all, and provide representative examples of such materials as provided by the Company to actual or potential Licensees.*

**Nokia Response to Specification No. 8.**

Nokia in many negotiations provides a list of the SEPs that it has declared to Standards Setting Organizations for various standards (even though such information is often publically available to licensees through the Standards Setting Organization). Depending upon the circumstances of the negotiation with a given counterparty, Nokia may also provide technical analysis or claims charts to the counterparty. In some instances, Nokia provides such materials without a request from the counterparty  In other instances, Nokia may provide such materials in response to a request from the counterparty  Nokia's practices regarding such materials have not changed over time but have always been driven by the needs of individual license negotiations and the materials that the counterparty wishes to receive and consider. Nokia has produced representative examples of the types of materials it provides to counterparties in license negotiations.

The practices of Alcatel-Lucent and Nokia Solutions and Networks have not been materially different.

**Specification No. 9.**  *Identify each instance, if any, in which the Company has exited the business of researching, developing, manufacturing, or selling any Relevant Product. For each such instance, summarize and submit Documents sufficient to show the Company's rationale for exit.*

**Nokia Response to Specification No. 9.**

In the past, Nokia Corporation created reference designs for chipsets and wireless modems used in handsets manufactured by Nokia. These reference designs were fabricated into chipsets and modems pursuant to an agreement with Texas Instruments. Nokia ceased developing its own chipset and wireless modem reference designs and ultimately transferred a portion of the personnel and assets involved in researching and designing such chipset and wireless modem reference designs to ST Microelectronics in 2007 and the remaining personnel and assets involved in such work to Renesas Electronics Corporation

**FTC-NOKIA-0000017**

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

CX4321-017

November 4, 2016
Page 18

in November 2010. The personnel and records related to Nokia's former chipset and wireless modem reference design business were transferred to the acquirers. Based on the information available to Nokia at this time, the rationale for Nokia's exit from the business of researching and designing its own chipset reference designs was that it was costly to maintain the relevant development efforts (especially since there were not economies of scale from the designs being used by multiple handset manufacturers) and buying chipsets designed by others became a more cost-effective solution.

**Specification No. 10.** *Submit all documents submitted by the Company to any court, tribunal, or government enforcement or regulatory agency, other than the Federal Trade Commission, in connection with any antitrust or competition-related review of or inquiry into Qualcomm's business practices.*

**Nokia Response to Specification No. 10.**

Nokia has produced responsive, substantive materials that Nokia itself submitted (and excluding joint submissions made with other parties) that Nokia has been able to identify through a reasonable inquiry. Responsive substantive materials from Alcatel-Lucent that Alcatel-Lucent has been able to identify through a reasonable inquiry have also been produced. Nokia Solutions and Networks has not been able to identify any responsive substantive materials as a result of its reasonable inquiry.

**Specification No. 11.** *Submit a Data Set providing, for each quarter and year from January 1, 2010 to the present, for each Licensee, indirect Licensee, and other counterparty, by Cellular Communications Equipment model or component, intended geographic region of use, and any other category for which the Company keeps revenue, cost, margin, or profitability records related to Licenses or Non-Exhaustive Grants to Company Patents:*

    *a.  the Company's gross revenue, in dollars, from running royalties accrued on the basis of sales of Cellular Communications Equipment devices or components (including Relevant Products) during such period (regardless of when such royalties were invoiced or paid);*

    *b.  the Company's net revenue, in dollars, after taking into account any other payments or credits issued or received by the Company at any time (including any lump sum fees, prepayments, or Price Adjustments) attributable to sales of Cellular Communications Equipment or components during such period, identifying each such payment or credit (and separately indicating any lump sum fees, prepayments, or Price Adjustments received during such period but not attributable to sales of Cellular Communications Equipment or components);*

    *c.  the number of units of Cellular Communications Equipment or components to which such revenue relates; and*

**FTC-NOKIA-0000018**

**HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY**

CX4321-018

QX2778C

November 4, 2016
Page 19

    d.  *the average sale price of the Cellular Communications Equipment or components to which such revenue relates.*

**Nokia Response to Specification No. 11.**

Nokia Technologies will provide information regarding royalties in a separate submission

**Specification No. 12.**  *Submit a Data Set providing, for each quarter and year from January 1, 2010 to the present, for each Licensor and other counterparty, including but not limited to Qualcomm, by Cellular Communications Equipment model or component, intended geographic region of use, and any other category for which the Company keeps royalty records related to Licenses or Non-Exhaustive Grants to non-Company Patents, the Company's royalty obligations including any basis for calculating such obligations and any discounts, rebates, or allowances.*

**Nokia Response to Specification No. 12.**

Nokia Technologies and Nokia Solutions and Networks are producing the responsive information for payments it made for royalties pertaining to Cellular Communications Equipment in a separate attachment, attached hereto as Exhibit D.

LEGAL02 36767300v1

FTC-NOKIA-0000019

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CX4321-019