# EXHIBIT 1

PUBLIC VERSION OF DKT. 1411-4 PURSUANT TO COURT'S JANUARY 24, 2019 ORDER (DKT. 1427)

## MULTI-PRODUCT LICENSE AGREEMENT

This Multi-Product License Agreement (the "Agreement") is entered into on March 24, 1999 by and between QUALCOMM Incorporated, a Delaware corporation, having its executive offices at 6455 Lusk Boulevard, San Diego, California, U.S.A., 92121 (hereinafter referred to as "Q") and TELEFONAKTIEBOLAGET LM ERICSSON (PUBL), a Swedish corporation having its executive offices at S-126 25 Stockholm, Sweden (hereinafter referred to as "E"), with respect to the following facts:

### RECITALS

WHEREAS, Q and E are parties in the civil action entitled "Ericsson Inc. et al. v. QUALCOMM Inc. et al." (the "Litigation") and by entering into this Agreement, a settlement agreement and a subscriber unit license agreement agree to settle and resolve the Litigation and to release all existing claims relating thereto;

WHEREAS, contemporaneously with the execution of this Agreement Q and E have entered into an Asset Purchase Agreement, dated as of the date hereof (the "Asset Purchase Agreement") pursuant to which E has agreed to purchase and Q has agreed to sell certain assets and liabilities of Q's infrastructure business;

WHEREAS, Q and E each own patents that are essential to make, use and sell products which comply with the standards based on cdmaOne, cdma2000 and WCDMA; and

WHEREAS, as part of the settlement of the Litigation, each Party has agreed to grant the other Party a license under the respective Essential Patent portfolio and such other patents as may be designated under this Agreement for use in CDMA Applications, including but not limited to cdmaOne, cdma2000 and W-CDMA, effective upon the Closing (as defined in the Asset Purchase Agreement) (the "Effective Date").

NOW, THEREFORE, for valuable consideration, receipt of which is hereby acknowledged, the Parties hereby agree as follows:

1. Headings and Definitions.

All headings used in this Agreement are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement or any clause. For purposes of this Agreement, the following definitions apply:

"Affiliate" of a Party means a company or other legal entity which controls, is controlled by, or is under common control with such Party, but any such company or other legal entity shall be deemed to be an Affiliate only as long as such control exists, and for the purposes of this definition, "control" means direct or indirect ownership of at least fifty percent (50%) of

NYDOCS02 456953 2

**CONFIDENTIAL**
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000262
ERC-CID-00000262
CX4132-001
JX0008-001

2

the voting power of the shares or other securities for election of directors (or other managing authority) of the controlled or commonly controlled entity.

"ASICs" means individual integrated circuit chips and integrated circuit chipsets (including the hardware, firmware and/or associated software that runs on the ASIC) which are custom designed to perform a particular function or functions.

"CDMA Applications" means all communications applications (regardless of the transmission medium) which operate using code division multiple access ("CDMA") technology, whether or not based on IS-95 Related Systems, cdma2000 or W-CDMA, and irrespective of frequency band.

"CDMA Modules" means modules, chip(s), chipsets (whether or not mounted on circuit cards) and circuit cards (for example, but not limited to, PCMCIA cards) that provide communication capabilities (regardless of the transmission medium) for use in user terminals (for example, PC's, vending machines and play stations), if sold separately (i.e., not incorporated into a user terminal). The CDMA Module must perform at least all the functionality necessary for all CDMA and RF modulation and demodulation.

"E" means Telefonaktiebolaget LM Ericsson (publ), a Swedish corporation.

"E's Licensed Patents" means E's (and its Affiliates') Essential Patents, and any non-Essential Patent selected by Q in accordance with either Section 2.3 or Section 3.3. The term "E's Licensed Patents" also includes the Patents In Suit.

"Essential Patents" means those Patents (in any country of the world) as to which it is, or is claimed by the patent owner to be, not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of adoption or publication of the relevant Standard, to make, sell, lease, otherwise dispose of, repair, use or operate equipment or methods which comply with such Standard without infringing such patent.

"E's Essential Patents" or "Q's Essential Patents" means Essential Patents owned or sublicensable by E (or by any of E's Affiliates), or by Q (or by any of Q's Affiliates), respectively. If such Essential Patents are not owned by a Party or its Affiliates and are sublicensable by such Party or its Affiliates only with payment of additional royalty or consideration to a third party, or subject to obligations imposed as a condition of granting sublicenses, then such patents are included within the Patents being licensed hereunder only to the extent that the Party receiving such license agrees to pay any such additional royalty or consideration and agrees to be bound by such obligations in connection with such Party's use of such Patents.

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000263
ERC-CID-00000263

CX4132-002
JX0008-002

3

"Have Made" means the right to have a third party make a product for CDMA Applications for the use and benefit of the party exercising the have made right, provided that:

(i) the party exercising the have made right owns and supplies the designs, or specifications, or working drawings to such third party (except with respect to ASICs as to which a Party must own and design only the overall architecture thereof);

(ii) such designs, specifications, and working drawings (in the case of ASICs, as to the overall architecture) are in sufficient detail that no substantial additional design by such third party is required;

(iii) such third party is not allowed to sell such product to other third parties; and

(iv) each such product sold by the Party exercising the have made right, or its Affiliate or Manufacturing Licensees shall bear the trademarks, trade names, or other commercial indicia of such party or its Affiliate or Manufacturing Licensee, although such products may be co-branded with the trademarks, trade names, or other commercial indicia of the reseller or distributor of such products. The requirements of this subparagraph (iv) shall not apply where a customer requires that the product bear only such customer's trademarks, trade names, or other commercial indicia.

"Infrastructure Equipment" means network equipment, including but not limited to equipment in the mobile switching center and cell sites. The term "Infrastructure Equipment" does not include Subscriber Units or ASICs (other than those ASICs incorporated and sold in E's Infrastructure Equipment).

"IS-95 Related Systems" means IS-95 and any single carrier system with a spreading bandwidth not greater than 1.25 MHz and based on or derived from IS-95.

"Litigation" means all litigation pending as of the Effective Date between E and Q (and/or their Affiliates) in the United States District Court for the Eastern District of Texas.

"Manufacturing Licensees" means a local entity that manufactures and sells the products to which the Party is licensed hereunder only in a certain limited geographic country or continent other than North America (the limited geographic country or continent is hereafter referred to as the "Limited Geographic Territory"). A sublicensed Manufacturing Licensee shall have the right to manufacture and sell only those products licensed hereunder which have been designed by employees of the sublicensing Party or its Affiliates or their consultants (but such consultants may not be the Manufacturing Licensee or its employees). A Party shall not be

NYDOCS02 456953.2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000264
ERC-CID-00000264

CX4132-003
JX0008-003

4

entitled to sublicense more than two Manufacturing Licensees per country except that a Party may sublicense additional Manufacturing Licensees in any country so long as such Party owns at least 33% of the equity of each such additional Manufacturing Licensee.

"Multi-Mode" means Licensed Products having the capability to operate utilizing a CDMA air interface and an air interface in accordance with one or more non-CDMA standards.

"Party" means Q and E individually, and the term "Parties" means Q and E collectively.

"Patent" means all patents (including utility models) and like statutory rights other than design patents, issued at any time before, on or after the Effective Date anywhere in the world:

(i) which are owned, exclusively or jointly, or controlled by either Party or any of its Affiliates at any time, or

(ii) with respect to which, and to the extent to which, either Party or any of its Affiliates shall have the right to grant the licenses and rights herein granted.

"Patents In Suit" means the eleven patents asserted in the Litigation, U.S. Pat. Nos. 5,088,108 (RE 36,017), 5,209,528 (RE 36,079), 5,148,485, 5,193,140, 5,230,003, 5,239,557, 5,282,250, 5,327,577 (RE 36,078), 5,390,245, 5,430,760 and 5,551,073, and their foreign counterparts, reissuances, divisionals, continuations and continuations in part.

"Q" means QUALCOMM Incorporated, a Delaware corporation.

"Q's ASICs" means ASICs Sold by Q, the overall architecture of which has been designed by Q, although the functional blocks of such ASICs may be designed by others (e.g., as in the MSM 2300 and MSM 3000 ASICs).

"Q's Licensed Patents" means Q's (and its Affiliates') Essential Patents and any non-Essential Patent selected by E in accordance with either Section 2.3 or Section 3.3.

"Sold," "Sale," "Sell" means put into use, sold, leased or otherwise transferred and a sale shall be deemed to have occurred upon first use by a third party, shipment or invoicing, whichever shall first occur.

"Standards" means those standards which are applicable to CDMA Applications.

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000265
ERC-CID-00000265

CX4132-004
JX0008-004

5

"Subscriber Units" means (a) complete user terminals which can be used without any additional equipment or components being attached thereto to initiate or receive wireless transmissions and (b) CDMA Modules. The term "Subscriber Units" does not include Infrastructure Equipment or ASICs (other than those ASICs incorporated and sold in a Party's Subscriber Units).

2. License Grant By E.

2.1 License Grant. E hereby grants to Q, effective as of the Effective Date, a world-wide, nontransferable, non-exclusive license under E's Licensed Patents to make and Have Made, use, sell, offer for sale, lease or otherwise dispose of, and import Q's ASICs, test equipment and Globalstar gateway equipment (collectively, the "Q Licensed Products") for CDMA Applications. The license further includes (a) the right for the Q Licensed Products to be Multi-Mode (however, it is explicitly agreed and understood that no rights and licenses are granted for or may be extended under patents that apply only to the portion of a Multi-Mode product that implements an air interface other than CDMA or analog, e.g. no rights and licenses are granted for or may be extended under patents that apply to, inter alia, the GSM part of a GSM/CDMA Multi-Mode ASIC) and (b) to make and use solely by Q (but not to sell, lease or otherwise dispose of to third parties) instrumentalities for the development and manufacture of the Q Licensed Products.

2.2 Royalties. The license to Q in Section 2.1 shall be ▮▮▮▮▮▮▮▮▮▮▮▮. For the avoidance of doubt, the Sale by Q to a third party for use in a wireless telephone of a chip or chipset (whether or not mounted on a circuit card provided that such circuit card is not a finished product, e.g. a PCMCIA card) that meets the definition of Q's ASICs shall be treated under this Agreement as an ASIC Sale and not as a Subscriber Unit Sale.

2.3 Inclusion of Other Patents. At any time and from time to time, Q can cause any of E's non-Essential Patents to be included in E's Licensed Patents for CDMA Applications by notifying E, in which case E shall have the right to cause an equal number of Q's non-Essential Patents to be included in Q's Licensed Patents for CDMA Applications. The patents so included by Q or by E shall be deemed to have been so included as of the Effective Date of this Agreement. In the event that Q causes the same non-Essential Patent of E to be included in E's Licensed Patents under this Agreement and under the subscriber unit license agreement of even date herewith, E shall have the right to cause only a single Patent of Q's non-Essential Patents to be included in Q's Licensed Patents for use under both agreements.

2.4 Right to Sublicense. Other than to Manufacturing Licensees as set forth below and as set forth in Section 2.5, Q shall have the right to grant sublicenses of the rights set forth in Section 2.1 above only to Affiliates of Q. In the event that tender requirements or regulatory requirements or identifiable market requirements in a country so reasonably necessitate, Q, or Affiliates of Q, may also grant sublicenses to a Manufacturing Licensee(s) to

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000266
ERC-CID-00000266
CX4132-005
JX0008-005

6

manufacture and supply products designed and developed by Q or by any of its Affiliates only in the Limited Geographic Territory and only for so long as it remains a Manufacturing Licensee. Any sublicensed Affiliate shall agree to be subject in all respects to all of the obligations contained in this Agreement. Any sublicensed Manufacturing Licensee shall agree in writing to a sublicense containing terms and conditions not inconsistent with this Agreement, except that such Manufacturing Licensee shall not be obligated to grant corresponding patent licenses to E. Any sublicense granted to a Manufacturing Licensee shall continue only so long as such Manufacturing Licensee does not assert, either in litigation or by a direct communication to E, E's Affiliates, E's Manufacturing Licensees or customers for E Licensed Products, any Essential Patents for CDMA Applications against E Licensed Products. If such Manufacturing Licensee asserts non-Essential Patents against E, E's Affiliates, E's Manufacturing Licensees or customers for E Licensed Products, Q shall use reasonable efforts to cause such Manufacturing Licensee to withdraw such assertion. Q, in addition to any such sublicensed Affiliate and Manufacturing Licensee, shall be responsible for failure of any such sublicensed Affiliate and Manufacturing Licensee to comply with such obligations and provisions. Any such sublicense shall terminate immediately if such Affiliate ceases to be an Affiliate of Q or such Manufacturing Licensee ceases to be a Manufacturing Licensee. Any sublicense to an Affiliate shall be effective retroactively as of the later of the Effective Date or the date such Affiliate became an Affiliate. Any sublicense to a Manufacturing Licensee shall be effective as of the date Q notifies E of such sublicense being granted in accordance with 2.4.1 below.

        2.4.1   Manufacturing Licensee. Not less than thirty (30) days prior to commencement of sublicensed operations of any entity which Q desires to sublicense as a Manufacturing Licensee, Q shall deliver written notice to E specifying such entity, the nature and percentage of Q's ownership, and the Limited Geographic Territory in which such Manufacturing Licensee shall manufacture and sell products and such other information as may be reasonably requested by E. Q shall ensure that each Manufacturing Licensee exercises the rights it receives by virtue of becoming a Manufacturing Licensee only in the Limited Geographic Territory and that each Manufacturing Licensee complies in all respects with the terms and conditions of this Agreement and any breach of this Agreement by any Manufacturing Licensee shall be deemed to be a breach of this Agreement by Q.

    2.5   Rights for Q's ASIC Customers.

        2.5.1   Licensed Patents Within Q's ASIC. Q shall have the right to grant sublicenses for CDMA Applications to any third party that purchases Q's ASICs under all of E's Licensed Patents which, but for the licenses granted under this Agreement, would be infringed by the use of Q's ASICs for their intended purposes, to make (and Have Made), use, sell, offer for sale, lease or otherwise dispose of, and import equipment into which Q's ASICs are incorporated. Q shall give notice to E of the identity of each such sublicensed third party within a reasonable time after each such grant. For the purposes of this Agreement only, E claims that

NYDOCS02 456953.2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000267
ERC-CID-00000267

CX4132-006
JX0008-006

7

all of the Patents In Suit would be infringed by the use of Q's MSM 2300 and MSM 3000 ASICs for their intended purposes and, solely with respect to the rights of Q and Q's ASIC customers under this Agreement, E agrees not to claim otherwise and not to claim that any of the Patents In Suit are not Essential Patents to IS-95 Rev. A and B.

 2.5.2 <u>Essential Patents Not Within Q's ASIC</u>. Q shall have the right to grant sublicenses to any third party that purchases Q's ASICs under any of E's Essential Patents which are, or are claimed by E to be, essential to IS-95 Rev A or Rev B , to make (and Have Made), use, sell, offer for sale, lease or otherwise dispose of, and import equipment which incorporates Q's ASICs and which is used in IS-95 Related Systems, whether or not such Essential Patents are infringed by the use of Q's ASICs. Q shall give notice to E of the identity of each such sublicensed third party within a reasonable time after each such grant.

 2.5.3 <u>Non-assertion Against E</u>. Any sublicense granted to any ASIC customer of Q under Section 2.5.1 or 2.5.2 shall continue only so long as such ASIC customer does not assert, either in litigation or by a direct communication to E, E's Affiliates, Manufacturing Licensees or customers for E's Licensed Products, any Essential Patents for CDMA Applications against E's Licensed Products and such ASIC customer does not dismiss such litigation or withdraw such assertion or offer a royalty-free license under such patents within thirty (30) days after Q's receipt of notice from E of such litigation or communication .

 2.5.4 <u>Royalty Rates for Q's ASIC Customers</u>. E agrees to offer to Q's ASIC customers, on fair and reasonable terms and conditions that are demonstrably free from unfair discrimination, non-exclusive licenses under E's Essential Patents (which have not been sublicensed in Sections 2.5.1 and 2.5.2 above) to make and have made, use, sell, offer for sale, lease or otherwise dispose of, and import, equipment incorporating Q's ASICs and used in CDMA Applications other than IS-95 Related Systems. The licenses may be limited to making and having made, using, selling, offering for sale, leasing or otherwise disposing of, and importing equipment compliant with such Standard(s) for which such E's patent(s) is/are essential, or is/are claimed by E to be essential, to practice said Standard(s).  E's offer to any of Q's ASIC customers may be conditional upon such customer's offering a cross license under its Essential Patents on fair and

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
ERC-CID-00000268
ERC-CID-00000268
CX4132-007
JX0008-007

8

reasonable terms and conditions demonstrably free from unfair discrimination, and such cross license shall be for CDMA Applications regardless of the standard(s) under which the customer's products are being used.

2.6  No Implied License. The license granted to Q in Section 2.1 and the sublicenses granted to Q's Affiliates and Manufacturing Licensees in Section 2.4 above specifically exclude, other than as set forth in Sections 2.5.1 and 2.5.2 above, any and all rights to use or sell Q Licensed Products under circumstances or in a manner which conveys or purports to convey, whether explicitly, by principles of implied license, patent exhaustion or otherwise, to any third party user or purchaser of such Q Licensed Products any rights or licenses under any of E's patents which would not be infringed by the use for their intended purposes of such Q Licensed Products.

3.  Grant of License from Q to E.

3.1  License Grant. Q hereby grants to E, effective as of the Effective Date, a world-wide, non-transferable, non-exclusive license under Q's Licensed Patents to make and Have Made, use, sell, offer for sale, lease or otherwise dispose of, and import Infrastructure Equipment for terrestrial-based CDMA Applications and for satellite-based CDMA Applications to the extent that Q is not contractually prohibited from granting such license as of the Effective Date of this Agreement (but should Q on a later date become entitled to license any additional rights for satellite based CDMA such rights shall be deemed to be licensed hereunder as of such date conditioned upon E then being willing to grant a reciprocal license to Q for gateway equipment for satellite applications) and test equipment for CDMA Applications (collectively, the "E Licensed Products") and the right to Have Made ASICs for incorporation into E Licensed Products. Q hereby also grants to E, effective as of the Effective Date, a world-wide, non-transferable, non-exclusive license to make and Have Made, use, sell, offer for sale, lease or otherwise dispose of, and import Infrastructure Equipment and test equipment for terrestrial-based CDMA Applications under any of Q's patents or patent applications which exist on the Effective Date and are utilized in the terrestrial-based infrastructure products/systems used or sold by Q's infrastructure business, and in future generations of such infrastructure products/systems developed, used or sold by E. The license further includes (a) the right for the E Licensed Products to be Multi-Mode (however, it is explicitly agreed and understood that no rights and licenses are granted for or may be extended under patents that apply only to the portion of a Multi-Mode product that implements an air interface other than CDMA or analog, e.g. no rights and licenses are granted for or may be extended under patents that apply to, inter alia, the GSM part of a GSM/CDMA Multi-Mode infrastructure product) and (b) to make and use solely by E (but not to sell, lease or otherwise dispose of to third parties) instrumentalities for the development, manufacture and repair of the E Licensed Products.

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000269
ERC-CID-00000269

CX4132-008
JX0008-008

9

3.2 ██████████████████████████████████████████████

3.3 <u>Inclusion of Other Patents</u>. At any time and from time to time, E can cause any of Q's non-Essential Patents to be included in Q's Licensed Patents for CDMA Applications by notifying Q, in which case Q shall have the right to cause an equal number of E's non-Essential Patents to be included in E's Licensed Patents for CDMA Applications. The patents so included by E or by Q shall be deemed to have been so included as of the Effective Date of this Agreement. In the event that E causes the same non-Essential Patent of Q to be included in Q's Licensed Patents under this Agreement and under the subscriber unit license agreement of even date herewith, Q shall have the right to cause only a single Patent of E's non-Essential Patents to be included in E's Licensed Patents for use under both agreements.

3.4 <u>Right to Sublicense</u>. Other than to Manufacturing Licensees as set forth below, E shall have the right to grant sublicenses of the rights set forth in Section 3.1 above only to Affiliates of E. In the event that tender requirements or regulatory requirements or identifiable market requirements in a country so reasonably necessitate, E, or its Affiliates, may also grant sublicenses to a Manufacturing Licensee(s) to manufacture and supply products designed and developed by E or by any of its Affiliates only in the Limited Geographic Territory and only for so long as it remains a Manufacturing Licensee. Any sublicensed Affiliate shall agree to be subject in all respects to all of the obligations contained in this Agreement. Any sublicensed Manufacturing Licensee shall agree in writing to a sublicense containing terms and conditions not inconsistent with this Agreement, except that such Manufacturing Licensee shall not be obligated to grant corresponding patent licenses to Q. Any sublicense granted to a Manufacturing Licensee shall continue only so long as such Manufacturing Licensee does not assert, either in litigation or by a direct communication to Q, Q's Affiliates, Q's Manufacturing Licensees or customers for Q Licensed Products, any Essential Patents for CDMA Applications against Q Licensed Products. If such Manufacturing Licensee asserts non-Essential Patents against Q, Q's Affiliates, Q's Manufacturing Licensees or customers for Q Licensed Products, E shall use reasonable efforts to cause such Manufacturing Licensee to withdraw such assertion. E, in addition to any such sublicensed Affiliate and Manufacturing Licensee, shall be responsible for failure of any such sublicensed Affiliate and Manufacturing Licensee to comply with such obligations and provisions. Any such sublicense shall terminate immediately if such Affiliate ceases to be an Affiliate of E or such Manufacturing Licensee ceases to be a Manufacturing Licensee. Any sublicense to an Affiliate shall be effective retroactively as of the later of the Effective Date or the date such Affiliate became an Affiliate. Any sublicense to a Manufacturing Licensee shall be effective as of the date E notifies Q of such sublicense being granted in accordance with 3.4.1 below.

3.4.1 <u>Manufacturing Licensee</u>. Not less than thirty (30) days prior to commencement of sublicensed operations of any entity which E desires to sublicense as a

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000270
ERC-CID-00000270

CX4132-009
JX0008-009

10

Manufacturing Licensee. E shall deliver written notice to Q specifying such entity, the nature and percentage of E's ownership, and the Limited Geographic Territory in which such Manufacturing Licensee shall manufacture and sell products and such other information as may be reasonably requested by Q. E shall ensure that each Manufacturing Licensee exercises the rights it receives by virtue of becoming a Manufacturing Licensee only in the Limited Geographic Territory and that each Manufacturing Licensee complies in all respects with the terms and conditions of this Agreement and any breach of this Agreement by any Manufacturing Licensee shall be deemed to be a breach of this Agreement by E.

3.5    No Implied License.    The license granted to E in Section 3.1 and the sublicenses granted to E's Affiliates and Manufacturing Licensees under Section 3.4 above specifically exclude any and all rights to use or sell E Licensed Products under circumstances or in a manner which conveys or purports to convey, whether explicitly, by principles of implied license, patent exhaustion or otherwise, to any third party user or purchaser of such E Licensed Products any rights or licenses under any of Q's patents which would be infringed by the use for their intended purposes of such E Licensed Products.   OBS

4.    Limitations on License Grants.

4.1    Jointly Owned Patents.   With respect to Patents herein licensed which are owned by a Party jointly with others, the Parties recognize that there are countries which require the express consent of all inventors or their assignees to the grant of licenses or rights under patents issued in such countries for such jointly owned inventions. Each Party hereby expressly gives such consent, shall obtain such consent from its Affiliates and shall use all reasonable efforts to obtain such consent from its employees and its Affiliates' employees, and from other third parties, as required to make full and effective any such licenses and rights granted to the grantee hereunder by such Party and by another licensor of such grantee.

If, in spite of such efforts, a Party is unable to obtain such consents from any such employees or third parties, the resulting inability of such Party to make full and effective its purported grant of such licenses and rights shall not be considered to be a breach of this agreement. For the avoidance of doubt, in such case, the licenses and rights shall be considered granted by each Party to the maximum extent possible, and, consequently, if the other Party acquires a corresponding license from the employee or third party, such other Party shall be deemed licensed under the patent.

4.2    Obligations to Third Parties.    In the event the exercise of a license hereunder exposes the grantor or any of its Affiliates to any obligation to make a payment to a third party (other than payments between a Party and its Affiliates and its or their employees), or if the license to the grantor imposes additional obligations on the grantor, the grantee shall, at the request of the grantor, compensate the grantor for such payment and undertake such additional

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ERC-CID-00000271
ERC-CID-00000271
CX4132-010
JX0008-010

11

obligations, or refrain from exercising the license without undue delay after such request. Each Party represents that there is, at the date of this Agreement, no such obligation to make payments in respect of any property licensed hereunder.

5. Release. Subject to settlement of the Litigation, each Party for itself and its present Affiliates, hereby releases the other Party and the other Party's present Affiliates and all customers of such other Party and such other Party's present Affiliates who have purchased or used products herein licensed to the other Party, from all claims, demands and rights of action which the first mentioned Party or any of its present Affiliates may have on account of any act of infringement or alleged infringement of any Licensed Patent prior to the Effective Date, provided such act would be licensed under this Agreement if it had occurred subsequent to the Effective Date.

6. Forbearance. Unless the rights of either Party would be prejudiced thereby, E and Q agree (to the extent feasible and permitted by law), to forbear for a reasonable period (not to exceed six months from when each dispute arises) from bringing (or further actively pursuing) any administrative or court proceeding contesting the grant or validity of any patent licensed hereunder and agree to discuss in good faith the resolution of any such dispute. Nothing in or associated with this Agreement shall be construed as hindering either Party in any way from challenging the validity of any patent or other intellectual property right and any such challenge shall not be construed a breach of this Agreement.

7. Term of Agreement. This Agreement shall commence on the Effective Date hereof and, except as provided in Section 8, continue until the last Licensed Patent hereunder shall have expired.

8. Termination.

8.1 Termination for Breach. If either Party (as the "Defaulting Party") shall at any time commit any material breach of any material covenant contained herein and shall fail to remedy any such breach within sixty (60) days after written notice specifying such breach by the other Party, the non-defaulting Party may, at its option, terminate all licenses and rights granted herein to the Defaulting Party. All licenses granted to the Party terminating the other Party's licenses would survive but only as to Patents issued prior to the date of termination.

8.2 Change of Control. In the event that a third party active in a material way in the field of telecommunications or data communications acquires 50% or more of the voting securities of a Party, all licenses granted herein to such Party shall only be exercisable in manufacturing facilities where and to like degree previously exercised by such Party and shall not extend to the operations of such owning or controlling entity without the express consent of the other Party but the other Party shall have no right to select patents of the acquiring party in accordance with Section 2.3 or 3.3.

NYDOCS02/456933 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
ERC-CID-00000272
ERC-CID-00000272
CX4132-011
JX0008-011

9.   Miscellaneous Provisions.

   9.1   Representations and Disclaimers:

   9.1.1. Representations. Each Party represents and warrants that it has the right and power to enter into this Agreement and the right to and authority to grant to the other Party the licenses and rights granted herein.

   9.1.2. Disclaimers. Nothing contained in this Agreement shall be construed as:

   (a)   a warranty or representation that any manufacture, sale, lease, use or importation will be free from infringement of patents, copyrights or other property of third parties;

   (b)   an agreement to bring or prosecute actions or suits against third parties for infringement;

   (c)   an obligation to furnish any manufacturing or technical information or assistance;

   (d)   conferring any right to use, in advertising, publicity or otherwise, any name, trade name or trademark, or any contraction, abbreviation or simulation thereof; and

   (e)   an obligation upon either Party to make any determination as to the applicability of any patent to any product of the other Party.

Neither Party makes any representations, extends any warranties of any kind and assumes no responsibility whatever with respect to the manufacture, sale, lease, use or importation of any product, or part thereof, by the other Party or any of its Affiliates or any of its Manufacturing Licensees or any direct or indirect supplier or vendee or other transferee of the other Party or its Affiliates.

   9.2   No Waiver. No waiver of the terms and conditions of this Agreement, or the failure of either Party strictly to enforce any such term or condition on one or more occasions

NYDOCS02-456952.2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY              ERC-CID-00000273

13

shall be construed as a waiver of the same or of any other term or condition of this Agreement on any other occasion.

      9.3    Assignment. Neither this Agreement nor any license or rights hereunder, in whole or in part, shall be assignable or otherwise transferable by any Party without the written consent of the other Party.

      9.4    Severability. If any term, clause, or provision of this Agreement shall be judged to be invalid or unenforceable, the validity or enforceability of any other term, clause or provision, shall not be affected; and such invalid or unenforceable term, clause, or provision shall be deemed deleted from this Agreement, and this Agreement shall continue in force, and in the event such invalid or unenforceable provision is considered a material element of this Agreement, the Parties shall promptly negotiate a replacement provision in good faith that best meets the intent of the Parties.

      9.5    Notice. Any notice, request or information shall be deemed to be sufficiently given to the addressee when forwarded by prepaid, registered or certified first class mail or by facsimile transmission or hand delivery to the following addressee:

| If to Q: | If to E: |
|---|---|
| QUALCOMM Incorporated<br>6455 Lusk Boulevard<br>San Diego, CA  92121 | Telefonaktiebolaget LM Ericsson<br>S-126 25 Stockholm<br>SWEDEN |
| Facsimile No.: (619) 658-2500<br>Attention: President | Facsimile No.: 011-46-8-719-9527<br>Attention: General Counsel |
| with a copy to: General Counsel | |

The above addresses can be changed by providing notice to the other Party in accordance with this Section.

      9.6    Publication of Agreement. Except as may otherwise be required by law or as reasonably necessary for performance hereunder, each Party shall keep the provisions of this Agreement confidential, and shall not disclose its provisions without first obtaining the written consent of the other Party. The confidentiality obligations hereunder do not apply to the existence of this Agreement and Q may disclose the existence and the extent to which it has been granted the right to sublicense Q's ASIC customers in accordance with Section 2.

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
ERC-CID-00000274
ERC-CID-00000274
CX4132-013
JX0008-013

14

9.7   **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Parties as to the subject matter hereof, and merges all prior discussions between them, and no Party hereto shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to such subject matter other than as expressly provided herein, or as duly set forth on or subsequent to the date hereof in writing and by duly authorized officers of the Parties.

9.8   **Dispute Resolution.**

9.8.1 **Governing Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of New York, U.S.A.

9.8.2 **Resolution Procedures.** In the event of any alleged breach of the Agreement or any dispute between the Parties arising under this Agreement, the Parties shall adopt the following procedures for resolution of the matter:

9.8.2.1 **Negotiated Resolution.** The Parties shall first attempt to resolve the matter by a meeting between executive level managers of both parties to review a presentation by each Party concerning the alleged breach or matter in dispute. Only if the executive level managers are unable to resolve the alleged breach or dispute within thirty (30) days of the meeting shall either Party be free to proceed under Section 9.1 or to institute a claim or action under Section 9.8.2.2.

9.8.2.2 **Arbitration.** Any controversy or claim arising out of or relating to this Agreement, its interpretation, performance, or termination, or the breach thereof that has not been resolved under Section 9.8.2.1 shall be settled by arbitration conducted in accordance with the Rules of Arbitration of the International Chamber of Commerce then in effect on the date of such controversy or claim. Any such arbitration shall take place in the City of New York and shall be conducted before a panel of three arbitrators appointed in accordance with such Rules (each Party shall select one impartial arbitrator who shall together select the third arbitrator) and the decision of the selected arbitrators shall be binding and conclusive upon the parties, their successors and assigns, who shall comply with such decision in good faith as if it were a final decision of a court of competent jurisdiction. Judgment upon the arbitrators' award may be entered in any court of competent jurisdiction.

9.9   **No Rights Against Infringers.**   There may be countries in which a Party hereto may have, as a consequence of this agreement, rights against infringers of the other Party's patents licensed hereunder. Each Party hereby waives any such right it may have by reason of any third party's infringement or alleged infringement of any such patents.

NYDOCS02 456953 2

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
ERC-CID-00000275
ERC-CID-00000275
CX4132-014
JX0008-014


15

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above. This Agreement may be signed in counterpart.

QUALCOMM Incorporated                                  Telefonaktiebolaget LM Ericsson (publ)

BY: _/s/ Richard Snipzer_____                        BY: _/s/ [signature]_____
Title:                                                  Title:

                                                       BY: _/s/ [signature]_____
                                                       Title:

NYDOCS02 456953 2

CONFIDENTIAL                                                   ERC-CID-00000276
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                     ERC-CID-00000276

CX4132-015
JX0008-015