REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT A

# CX6786-R

Meeting
- 07/27/2012

```
 1
 2
 3
 4
 5
 6
 7
 8
 9                    7-27-12 MEETING
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CX6786-R-001

```
1          AUDIO RECORDING:  Now attending.

2          MR. CUTLIP:  Bob Cutlip.

3      (Pause)

4          AUDIO RECORDING:  Now attending.

5          MR. CUTLIP:  Hello, this is Bob Cutlip.

6          MR. SCHNECK:  We're just getting started Bob.

7          MR. CUTLIP:  Pardon?

8          MR. SCHNECK:  Yeah, we're just getting started, so --

9          MR. CUTLIP:  Oh, okay.

10          MR. SCHNECK:  Can you hear us okay?

11          MR. CUTLIP:  Very good, thank you.

12      (Background speaking)

13          MR. SCHNECK:  Okay, so maybe I'll just start things

14   off.

15          For those of you who don't know me, I'm Howard

16   Schneck.  And I am director of tax dealing with the IRS.

17          I think maybe I'll just start with just a quick

18   agenda, and then maybe we can go around the room and just

19   introduce ourselves to everyone.

20          So the purpose of the meeting as you all know is to

21   talk about the royalty.  And the service has wanted to ask

22   questions of our QTL executives.  So Mariko Killion, who is

23   the IRS economist, will conduct those interviews.  And then we

24   want to follow up that with trying to get some agreement on

25   both sides on the facts in the case.  And Lee Gilbert has
```

 1  prepared a draft stipulation just listing out the facts.  And
 2  we're hoping to get feedback and comments and a true
 3  collaborative effort to work towards an overall agreement on a
 4  set of facts that we can go forward and look at the issues.
 5  So with that maybe we can just do some quick introductions.
 6       MR. GILBERT:  Okay.  Lee Gilbert, currently finance
 7  director, formerly Qualcomm China controller, and then prior
 8  to that international tax director.
 9       MR. REIFSCHNEIDER:  Hi.  Eric Reifschneider, general
10  manager of QTL starting in April.  Before that I was outside
11  counsel to Qualcomm for many years working on their licensing
12  deals among other things.
13       MR. BLECKER:  Marv Blecker.  I've been with Qualcomm
14  since 1992.  I started in the licensing area in '96 and I
15  advanced to general manager, Eric's current job.  And then
16  president of QTL from 2005 to 2008 when I kind of semi-
17  retired.  And I come into the office now three days a week
18  sort of working in support of QTL.  I call myself an inside
19  consultant.
20       MR. REIFSCHNEIDER:  He's my mentor to make sure I run
21  this job correctly.
22       MR. GARDNER:  Hello, I'm Steve Gardner, VP of tax.
23       MS. WEINBERG:  Jessica Weinberg, senior manager of
24  tax in the international group.
25       MR. ROECKER:  Patrick Roecker, international team

1  manager, IRS.

2          MR. JUDICE:  Curtis Judice, international issues

3  specialist.

4          MS. PADEN:  Pat Paden, international team manager.

5          I have a 2011 article and Patrick has a 2012.

6          MR. HOWELL:  Brent Howell, tax law specialist.

7          MS. KILLION:  Mariko Killion, economist.

8          MS. NARAYANAN:  Savi Narayanan, BB Comm (ph.).

9          MS. RISSER:  Lisa Risser, account coordinator.

10         And Bob's on the line.

11         MR. SCHNECK:  Oh, we have on the phone Bob Cutlip

12  from -- chief counsel, correct?

13         MR. CUTLIP:  Yes, that's right.

14         MR. SCHNECK:  So I would just want to reemphasize to

15  everyone that today's meeting is being recorded, and so I

16  would just encourage everyone to speak in a loud, clear voice.

17  And to the extent that it's helpful when you're talking, if

18  you want to identify who you are at whatever time might be

19  relevant, that might be helpful if we have to do a transcript

20  afterwards.  And then I would just encourage people not to

21  talk over each other, so that if we are transcribing this we

22  can get a clear record of what everybody's saying.

23         MR. BLECKER:  Now that I know it's recorded, I

24  retract the part about lots of history.  Just kidding.

25         MS. KILLION:  So has the recording started already?

1        MR. SCHNECK:  Yeah, I believe so, from the time that

2   we dialed in it should be going.

3        MS. KILLION:  Oh, okay.  Oh, okay.  So this is the

4   microphone then?

5        MR. SCHNECK:  Yes.  So there's one here right by me,

6   one in the center, and one at the end.

7        MS. KILLION:  Okay.  Okay.

8        MR. SCHNECK:  So we can just let you begin with your

9   questions unless there's anything in terms of just general

10  background that you'd like us to provide.

11       MS. KILLION:  Okay.  Lisa has some intro to kind of

12  organize the rules.

13       MS. RISSER:  Thank you.  No, I just wanted to, you

14  know, Mariko had just asked that there'd be a Q&A session with

15  her and the two, Marv and Eric.  And if anybody has any

16  comments that they feel are relevant then you said you'd

17  prefer people not to jump in, but if it's pertinent then to

18  feel free to jump in, but Mariko, that was it.  It's just more

19  to be -- to get an information gathering since we have you at

20  the table for the time.

21       MS. KILLION:  Right, yeah.  Thank you.

22       So, yeah, this is hopefully -- I'll have some

23  questions and then each, Eric and Marv, will be providing some

24  answers.  And it's not meant to be like a group discussion,

25  that comes later, but I would like to just hear what you have

 1  to say from your point of view.  And it's not meant to be, you

 2  know, like you can't say, you know -- but perhaps, you know,

 3  we can encourage the interviewees to speak up before anybody

 4  else.

 5          And with that, the original request of mine was to

 6  speak to someone who could tell us something about how your

 7  third-party licensing and how the royalty rates work, and how

 8  that relates to how this CDMA technology was quickly adopted

 9  in the market, now it's one of the most dominant technology

10  when it comes to the cell phone network protocol.

11          So basically just wanted to get an idea of where that

12  idea came from, and how that evolved over time.  And I

13  understand the royalty right, especially with the third-party

14  licensee chipmakers are now down to zero.  So that sort of

15  history and background, you know, we just wanted to hear about

16  that.

17          MR. GONELL:  Sorry I'm late.

18          MR. SCHNECK:  Introduce --

19          MS. KILLION:  Oh, yeah.  I'm Mariko, by the way, the

20  economist.  I was just talking about --

21          MR. GONELL:  Fabian Gonell.

22          MS. KILLION:  Fabian, hi.

23          MR. GONELL:  Hi.

24          MR. SCHNECK:  Fabian works for Eric and he's one of

25  our lead QTL attorneys, I guess.

1          MS. KILLION:  Okay.  So, I'm sorry, so you're not in

2    the licensing --

3          MR. GONELL:  I am in the licensing team.

4          MS. KILLION:  Oh, you are --

5          MR. GONELL:  Yes.

6          MS. KILLION:  Oh, okay, so all three of you.

7          MR. GONELL:  Yes.

8          MS. KILLION:  Oh, okay.  So if that's the case I

9    guess perhaps you could just speak yourself.  I guess

10   originally we thought that we were interviewing two of you,

11   but since you're in the licensing group as well, or do you

12   deal with the third-party licensing?

13         MR. GONELL:  Yeah.

14         MS. KILLION:  Okay, you do.  Okay.  So you have some

15   insight.

16         Okay.  So I'll just start out with some basic

17   questions.

18         I got your name and job positions.  Can like perhaps

19   just one-by-one give us some general job descriptions?  Start

20   with Eric I guess.

21         MR. REIFSCHNEIDER:  Well, again, I'm the general

22   manager of QTL, which means I'm responsible for all of QTL.

23   So I oversee the QTL business, and the license agreements, and

24   the other functions within the QTL organization, which include

25   a business development team, a finance team, and an audit and

CX6786-R-007

1   compliance team.

2          MS. KILLION:  Okay.  This is just like basic

3   background information, but can you tell us like how many

4   people report to you and who you report to?

5          MR. REIFSCHNEIDER:  Sure.  So I report to Derek

6   Aberle.  Derek is group president and responsible for QTL and

7   several other business units.  Derek has been the president of

8   QTL and before that the general manager of QTL.  Know the

9   history correctly.

10          MR. BLECKER:  And Derek has been the president of QTL

11   since 2008 until now where he's also taken on the group

12   president position.

13          MS. KILLION:  Okay.

14          MR. BLECKER:  and before that he was general manager

15   of QTL 2005 to 20 --

16          MS. KILLION:  What was his last name again?  Can you

17   spell his last name?

18          MR. REIFSCHNEIDER:  Aberle, A-B-E-R-L-E.

19          MS. KILLION:  Oh, okay.  Thank you.

20          MR. REIFSCHNEIDER:  So my direct reports are all of

21   the QTL lawyers, including Fabian.  And there are -- make sure

22   I count correctly -- seven QTL lawyers altogether.  And then

23   also -- I'm sorry, eight, eight QTL lawyers altogether.  And

24   then the leads of the other three functions I described, so

25   the head of business development, the head of audit and

 1  compliance, and -- the audit and compliance, right, and the

 2  head of finance.  I have eleven direct reports.

 3          MS. KILLION:  Okay.  Okay.  And I'll just kind of

 4  repeat the same question to you Marv.

 5          MR. BLECKER:  So as I said, 2008 I started working on

 6  a reduced schedule.  And I report to Derek Aberle.  And I have

 7  no one reporting to me.  I'm an internal consultant helping

 8  Eric, helping Eric on any projects that they want me to help

 9  them on, but no firm responsibility.  Anymore.  Anymore.

10          I used to have everything Eric talked about.

11          MS. KILLION:  Okay.  So Fabian?

12          MR. GONELL:  I'm one of the attorneys.  I negotiate

13  license agreements.  I provide legal advice related to license

14  agreements.  And part of my job is working on standards

15  compliance.  I have two people reporting to me, including -- I

16  think the only attorney who doesn't directly report to Eric,

17  there are actually ten attorneys, and I report to Eric.

18          MS. KILLION:  Okay.  This is just, again, general

19  background information.

20          Do you work with foreign entities?  Do you have

21  counterparts overseas?

22          MR. REIFSCHNEIDER:  You mean within Qualcomm or --

23          MR. GONELL:  Yeah, Qualcomm entities?

24          MR. BLECKER:  We have Qualcomm counterparts in

25  several countries.  There's Qualcomm Korea, Qualcomm Japan,

CX6786-R-009

1    Qualcomm China.

2           MR. GONELL:  Not in the licensing business

3    necessarily.

4           MR. BLECKER:  Right.  They assist us at times in

5    gaining entry into companies in those countries, but they

6    don't conduct licensing negotiations or participate in

7    compliance and contract issues directly.  They just assist us

8    mainly in contact and other, you know, when some of the QTL

9    people are overseas they assist in accommodations and setting

10   up meetings.

11          MR. GONELL:  And there's one business development

12   person in China that does some license negotiations.

13          MR. BLECKER:  But he's actually in QTL.

14          MR. GONELL:  Yeah, right.  That's just one.

15          MR. BLECKER:  So we have one QTL in China.

16          MR. REIFSCHNEIDER:  A couple of QTL lawyers in

17   Europe.

18          MR. GONELL:  Yeah, they don't really do licensing

19   though.

20          MR. REIFSCHNEIDER:  They're not part of the

21   negotiations.

22          MR. BLECKER:  They're primarily involved in

23   standards, development activity.

24          MR. GONELL:  Right.

25          MR. BLECKER:  See it takes three of us to get

CX6786-R-010

1  everything --

2         MS. KILLION:  Okay, that's fine.

3         MR. SCHNECK:  Bob, are you able to hear everybody on

4  the phone okay?

5         MR. CUTLIP:  Yes, I appreciate your asking, thank

6  you.

7         MR. SCHNECK:  Okay.

8         MS. KILLION:  Okay.  So you mentioned that you have

9  somebody in China that's also in QTL and he's actively

10  involved in the licensing negotiation?

11         MR. BLECKER:  Yeah.

12         MS. KILLION:  Can you tell me how that works with you

13  and this person?  Actually, does this person have a name?

14         MR. GONELL:  Yes.  Although I don't -- my general set

15  doesn't include China so much so I don't know his name

16  offhand.

17         MR. BLECKER:  Rob Anh.

18         MR. GONELL:  Robert Ana (sic), that's right.

19         MS. KILLION:  Robert --

20         MALE SPEAKER:  A-N-H.

21         MS. KILLION:  You probably know him --

22         MALE SPEAKER:  I know him.

23         MS. KILLION:  He just came from China.

24         MR. BLECKER:  So how it works is he contacts

25  companies in China who are interested in making -- selling

CX6786-R-011

1    CDMA-base products or all CDMA-based products, and describes

2    to them our licensing program and gets them interested in our

3    licensing program.  And then the final contract negotiations

4    he involves one of the San Diego attorneys in the system.

5             MS. KILLION:  Oh, okay.  Interface for the customers

6    in China.

7             MR. BLECKER:  Business development.

8             MS. KILLION:  Right, okay.  Okay.  And how often do

9    you, yourself, get in touch with this person?  Not really? If

10   it's not your thing it's fine, it's just the background

11   information.

12            MR. REIFSCHNEIDER:  Yeah, I mean, in the four months

13   I've been here I've spoken to him once or twice maybe.

14            MS. KILLION:  Okay.

15            MR. BLECKER:  Yeah, he comes to San Diego

16   periodically, maybe every two months or something like that

17   he'll come to our staff meetings and various other meetings,

18   and we'll talk.  But generally he's working through one of

19   Eric's direct reports.

20            MR. REIFSCHNEIDER:  Yeah, his activity is supervised

21   by the head of our business development group who return

22   reports to me.  And his job is just to find potential

23   licensees in China and get -- as Marv said get them

24   interested, get them to realize they need a license, a patent

25   portfolio, you know, get our development license agreement in

 1   their hands to the extent they want to negotiate it then the

 2   negotiations would be maybe involved with an interface, but

 3   the negotiations would be conducted by people here in San

 4   Diego.

 5           MS. KILLION:  Okay.  Okay.  Okay.  Okay.  So then

 6   that was all great for the background information.  Now I'll

 7   just move on to the main portion of the questions.

 8           Can you -- what is your licensing or royalty pricing

 9   policy for third-party licensees?  We have general idea from

10   talking to Steve and Lee and Howard in the last few months,

11   but can you describe yourself, you know, from your point of

12   view how that works?  Perhaps, you know, starting from the

13   negotiation and how the contract is drafted, how it's signed

14   and how the royalty is decided, that sort of thing.

15           And, by the way, I --

16           MR. BLECKER:  I was going to start by saying, first

17   of all, you need to understand that there are several

18   different types of license agreements that we enter into.

19   It's subscriber equipment, or subscriber unit license

20   agreements, which basically cover what Eric has in his hand

21   right now, that you have in front of you.  It also covers

22   modules that go into -- into M2M equipment.  I should say it

23   can also cover modules that go into M2M equipment, modules

24   that go into other kinds of devices besides handheld phones.

25   But anyway, that's our subscriber equipment license

 1  agreements.  Then we have infrastructure equipment license

 2  agreements, which cover the cell site equipment.  So they

 3  cover the base stations, channel units within the base

 4  stations.  We then have test equipment license agreements,

 5  which cover equipment used to test the networks primarily, in

 6  some cases test subscriber units.  And then the fourth

 7  category, which you're most familiar with I think, is the ASIC

 8  license, ASIC patent.  And we try and be careful to call them

 9  ASIC patent agreements because they are not license agreements

10  in reality.  They do not grant the full license.  So we have

11  those four categories of agreements.  And when you ask, you

12  know, how do they --

13        MR. REIFSCHNEIDER:  Well, let me -- and across each

14  category.  There are different technical standards, 3G

15  standards, 4G standards, different 3G standards in different

16  parts of the world and so, you know, you can think of it as a

17  matrix.  And so there are, you know, ultimately many different

18  types of licenses available depending on what kind of product

19  the potential licensee is planning to make and sell or is

20  already making and selling, depending on which technical

21  standards they're implementing in those products.

22        You know, you asked about preparation and negotiation

23  of the agreements, you also asked about the pricing.  You

24  know, we have a standard form agreement for almost all of

25  those categories.  I'm not sure if we have anything we

 1   consider a standard form at the ASIC level.  Right now we have

 2   a standard approach that we take, I don't know if we have a

 3   standard form, per se.  ASIC is chip set.

 4        MR. BLECKER:  And that's been evolving, which is why

 5   we don't have a standard form right now.

 6        MR. REIFSCHNEIDER:  Right.

 7        We only collect royalties and license fees at the

 8   level of subscriber units, infrastructure equipment, and in

 9   some cases modems or modules and test equipment.  We don't

10   collect license fees or royalties at -- for chip sets, and we

11   haven't done so for some time now.  And the reasons for that

12   include the risk under patent exhaustion law as it has evolved

13   and as it currently stands, that if we attempted to license

14   and collect royalties on chip sets it would undermine our

15   ability to collect license fees and royalties for the products

16   they go into, which are all the other things we just described

17   and we don't want to take that risk.

18        MS. KILLION:  Right.

19        MR. BLECKER:  So you ask how negotiation begins and I

20   can get into that.  So as Eric said with the standard form

21   agreements.  Let's say somebody wants to get into this

22   business, we have a standard form agreement, which includes

23   the pricing, which, you know, basically the standard pricing

24   is applied, you know, for many years and many, many licensees.

25   And we provide that standard form agreement to the potential

 1  licensee who's interested in a license.

 2          Infrequently, I'll just say fine and sign it, but

 3  usually there's a negotiation over the terms of that license.

 4  And sometimes those negotiations are months and sometimes they

 5  can be years depending on the complexity of the business model

 6  of the potential licensee, some of the value he may bring to

 7  the deal, some of the value he's looking for, getting out of

 8  the deal.  So --

 9          MR. CUTLIP:  Excuse me.  Marv?

10          MR. BLECKER:  Yes.

11          MR. CUTLIP:  At the end of certain clauses like just

12  before I interrupted, are you turning your head away from the

13  microphone or something, because --

14          MR. BLECKER:  Oh.

15          MR. CUTLIP:  -- we're losing some of the words, and

16  I'm concerned that they won't be in the recording if the

17  recording's going through these same mics.

18          MR. BLECKER:  Okay.  I think I have a tendency to

19  drop my voice at the end of a phrase, so okay.  I'll try not

20  to do that.

21          MR. CUTLIP:  Thank you.

22          MR. BLECKER:  So what I was saying is that we would

23  provide this standard form agreement, which includes pricing.

24  It includes a whole bunch of other terms that are important,

25  usually to both parties, and some potential licensees may just

 1  sign it.  Very few of them will do that.  Some will, and the

 2  rest will enter into a negotiation over the terms of the

 3  agreement.  Some of those negotiations can be short, as little

 4  as a month or two.  Some of them have extended into years, and

 5  it's taken us years to finalize an agreement in some cases.

 6          So there's no set pattern for how this thing happens

 7  other than we have a starting point, which is our form

 8  agreement, form standard agreement.

 9          MS. NARAYANAN:  I have a --

10          MALE SPEAKER:  Do you want to answer this?

11          MS. NARAYANAN:  I have a question.  These standard

12  agreements, these standard forms, do they -- do you revise

13  them from time to time, or are they the same over some period

14  of time?

15          MR. BLECKER:  We do revise portions of them from time

16  to time.

17          MS. NARAYANAN:  With the pricing in the last one?

18          MR. GONELL:  The pricing hasn't -- the pricing in the

19  forms has not been modified in many years.

20          MS. NARAYANAN:  Okay.  Many years meaning, like, ten

21  years?  Fifteen years?

22          MR. BLECKER:  No, our standard pricing -- our

23  standard pricing has been -- for subscriber equipment and for

24  infrastructure equipment, which are the main categories that

25  we're talking about where our revenue is generated, the

1   pricing for those has been consistent since I've been in

2   licensing, which is 1996.

3          And I want to point out also, because this relates

4   to, sort of, a general question that Mariko was posing, how do

5   we benefit the industry?  Our pricing hasn't -- our royalty

6   rate, our standard royalty rate and the base that it's

7   computed against, hasn't gone up, although the technology that

8   we license has increased greatly over the years.  So all of

9   our new patents that flow into the licensee do not result in

10  an increase in their royalty rate, and usually our agreements

11  cover all essential patents forever and nonessential patents,

12  or what we call commercially necessary patents, up to some

13  capture period, which is generally -- it may be the term of

14  the -- the date of the agreement, but sometimes it's into the

15  future.

16          But none of those additional patents, as they become

17  available to the licensee, increase the royalty rate.  So the

18  royalty rate, the licensee knows he has a fixed royalty rate

19  basis to go on.  He knows what his royalties will be going

20  forward.

21          MR. REIFSCHNEIDER:  When we use terms like essential

22  patents, should we explain those?

23          MS. KILLION:  Sure.

24          MR. REIFSCHNEIDER:  Do you understand those or should

25  we --

1          MS. KILLION:  No, I don't.

2          FEMALE SPEAKER:  I don't.

3          MR. REIFSCHNEIDER:  Okay.

4          MS. KILLION:  Assume we don't understand anything, or

5    I don't understand anything, so --

6          MR. REIFSCHNEIDER:  Right.  So when we say essential

7    patent we mean a patent that is necessary to implement a

8    technical standard.  Remember a few minutes ago I referred to

9    how technical standards are implemented by our licensees?

10   They're the technical standards that enable the wireless

11   communication, and, you know, you -- there's a need for

12   industry-wide standards so that the company who's making the

13   handsets, you know, using the same standards and technology

14   and protocols as the company who's making the base stations,

15   because they all have to literally talk to each other.  So --

16          And those standards are developed by groups of

17   companies coming together and working together to, you know,

18   agree on just what the specifications and protocols, you know,

19   will be that they're all then going to use.  And, you know,

20   Qualcomm is one of the companies that has participated over

21   the years in the development of standards that make cell

22   phones and other long-range wireless devices work.

23          Qualcomm has contributed its technology heavily into

24   those standards, and so Qualcomm has many patents that are

25   necessary to use those standards, and those are what we call

1  essential patents.  If you're making a cell phone or the base

2  station on the other side that uses CDMA as the wireless

3  communication protocol, then you are necessarily practicing

4  many of Qualcomm's patents, and those are the essential

5  patents.

6         And when we enter into license agreements we license

7  not only all of our existing essential patents, but also all

8  of our future essential patents to that particular standard.

9  We don't --

10         MR. BLECKER:  Because the standards are evolving and

11  growing over time, so as they evolve and grow additional

12  essential patents additional patents become essential patents,

13  and they add additional technologies.

14         MR. REIFSCHNEIDER:  But we also have thousands of

15  patents that are not essential to a particular technical

16  standard but could still be very useful or relevant to, you

17  know, other elements of the products in question:  cell phone,

18  base station, etcetera.  And we license our nonessential

19  patents as well.  It's generally a license of our entire

20  patent portfolio, but with respect to the nonessential

21  patents, we normally don't include all of our future

22  nonessential patents.  We normally include some sort of date

23  cutoff, which we call a capture period, that limits, from a

24  time perspective, which essential -- which nonessential

25  patents our licensees get a license to.

1          MR. BLECKER:  Just as an example of a nonessential

2   patent, for instance, a patent on an antenna design would be a

3   nonessential patent, because that's not required by the

4   standard.  You can use whatever antenna design you like.  The

5   standard doesn't care.  That would be a nonessential patent,

6   just as an example.

7          MS. KILLION:  And you're talking about the same

8   license that would include all essential patents current and

9   future, but the same license also includes a nonessential

10  patent within the same license but with that kind of

11  expiration date, capture period?

12         MR. BLECKER:  Correct.

13         MS. KILLION:  Okay.  So we are talking about the same

14  license then?

15         MR. REIFSCHNEIDER:  All in one agreement.

16         MS. KILLION:  All in one --

17         MR. REIFSCHNEIDER:  Yes.

18         MS. KILLION:  -- one agreement with this scope.

19         MR. BLECKER:  And we've been talking about subscriber

20  equipment licenses.

21         MS. KILLION:  Right, so that was the question.

22         MR. BLECKER:  The same thing pretty much applies for

23  infrastructure equipment licenses.  And pretty much the same

24  thing applies for test equipment licenses.

25         When it comes to the ASIC agreements, and again, I'm

CX6786-R-021

1   not going to call them licenses, and we'll discuss what kind

2   of forms we use there, but in the case of the ASIC agreements,

3   for quite some time we'd limited it to our essential patents

4   only, with, you know, there's always an exception.  There's

5   always a company where you license your entire portfolio in

6   return for their entire portfolio.  So there are exceptions,

7   but, in general, for quite some time we limited it to our

8   technically necessary or essential patents.

9          More recently, we've gone to the model of more of the

10  patent portfolio coverage, but again, it's not a license.

11  It's a different kind of structure.  I hope that doesn't

12  confuse you.

13         MR. GONELL:  Well, then the ASIC agreements are also

14  an exception to what Marv said earlier about the royalty

15  structure staying the same --

16         MR. BLECKER:  Yeah.

17         MR. GONELL:  -- from time immemorial.  The ASIC

18  structure, at one point there were royalties charged.  The

19  standard form for ASICS was a license, and royalties were

20  charged.  That was a limited license, but royalties were

21  charged, and that changed some years ago so that it is now no

22  longer a license and there are no royalties charged.

23         MR. BLECKER:  Maybe it's worthwhile just to talk

24  about the various forms of ASIC agreements we've had over the

25  years.  Is that worthwhile?

1          MS. KILLION:  Yes.

2          MALE SPEAKER:  Yeah, absolutely.

3          MR. BLECKER:  So initially we started out with what

4     we called a license to make and sell but not use.

5          MR. REIFSCHNEIDER:  Oh.

6          MR. BLECKER:  And we clearly stated in there that,

7     you know, the licensee has no right to use the patents in the

8     chips that it's selling, and its customers have no right to

9     use the patents in the chips that it's selling, so we said

10    it's a non -- and this was all in the contract, that it's a

11    nonexhaustive license and that the customer has to have a

12    patent license from Qualcomm in order to use those chips that

13    it's buying from the ASIC company.

14         MR. REIFSCHNEIDER:  Okay.

15         MR. BLECKER:  Did I say something wrong?

16         MR. REIFSCHNEIDER:  No, you didn't say anything

17    wrong.

18         MR. BLECKER:  Okay.

19         MR. REIFSCHNEIDER:  I'm just wondering, this will all

20    make a lot more sense if you understand the basics of patent

21    exhaustion, and I'm wondering if I should take a minute to try

22    to explain that.

23         MALE SPEAKER:  Sure.

24         MALE SPEAKER:  Sure.  I'd --

25         MS. KILLION:  Sure.  We'd like to hear that anyway,

CX6786-R-023

 1  so why not.  Thanks for the offer.

 2         MR. REIFSCHNEIDER:  So patent exhaustion is a

 3  judicial doctrine.  It's an element of the law that emanates

 4  from case law and not from statutory law, and it goes back

 5  many decades now.  It goes back to Supreme Court decisions in

 6  the 1930s, maybe earlier.

 7         And I'm going to generalize and oversimplify here,

 8  but the basic idea is, you know, if you have a patent on an

 9  invention, and you make a product that embodies that

10  invention, and you sell the product to somebody, and you do

11  nothing more other than sell it to them and get money in

12  return, then you're not allowed afterwards to go sue the

13  customer you just sold your product to and say aha, gotcha.

14  You're infringing my patents, because you're using this

15  product.  It embodies my patented invention.

16         The idea is that you were able to capture the value

17  of the invention, the return on the investment you made in

18  creating the invention, by selling the product and getting a

19  price for the product.  And, you know, as a matter of public

20  policy the Supreme Court decided, you know, we don't want

21  customers constantly being surprised by buying something and

22  then turning around and realizing they have to pay more in the

23  form of the patent license.

24         So the way the doctrine evolved over the years, it

25  became articulated as an authorized sale of a product that

CX6786-R-024

 1   substantially embodies the invention claimed in the patent,

 2   exhausts the patent rights with respect to that particular

 3   product, all right?

 4           So now there are two ways an authorized -- or at

 5   least two ways an authorized sale can occur.  One is if I own

 6   the patent, and I sell the product, it's an authorized sale.

 7   Another way is I own the patent, and I give Marv a license to

 8   sell the product, so he is authorized to sell the product.

 9   And I can collect a royalty from him, or I cannot.  That's

10   between him and me.  But if I give him a license, an

11   unconditional license to sell a product that contains the

12   invention in my patent, and he makes that authorized sale,

13   then that also exhausts my patent rights in that particular

14   product, okay?  And, you know, there have been many twists and

15   turns in the case law over the years in terms of the nuances

16   of that, but that's the basic idea.

17           The, you know, the concern that we've had all along,

18   and as the case law's evolved it's become clear that certain

19   approaches for trying to avoid exhaustion don't really work,

20   you know, things that you --

21           MR. BLECKER:  May not work.

22           MR. REIFSCHNEIDER:  May not work.

23           MR. BLECKER:  Well --

24           MR. GONELL:  No, some of them just flat out do not

25   work.

```
 1          MR. REIFSCHNEIDER:  Some of them flat out do not
 2   work, we know now, but, you know, so things that ten, fifteen
 3   years ago people thought maybe would work in terms of avoiding
 4   exhaustion, you know, we now know don't work, or we think
 5   there's a very good chance they don't work, and so you try
 6   different things.  But the concern all along has been that,
 7   you know, if we license somebody to make a chip, and that chip
 8   contains the inventions in our patents, when they sell that
 9   chip to somebody who's going to put the chip in a cell phone,
10   okay, the licensee's sale of that chip will exhaust our rights
11   in our patents and then we won't be able to collect a royalty
12   on that patent from the guy who makes the cell phone.  And
13   that would be a very bad thing, because we collect a royalty
14   on a cell phone that's based on the price of the cell phone,
15   and that's a lot higher than the price of a chip.  So given a
16   choice, you're always going to want to collect a royalty on
17   the cell phone, not on the chip.  And that's, in fact, what we
18   do.
19          MR. BLECKER:  So the way our agreements have evolved,
20   let me just add to what Eric just said.  When he licenses me,
21   there are several components of what I might be able to do
22   using that patent.  And the law says he can license me for any
23   of those components or all of those components, and those
24   components are things like make, sell, import, use the product
25   that embodies the patent.
```

1           And our initial approach was that we would license

2    ASIC suppliers to make and sell but not to use, and that we

3    would reserve the use right for their customers and license

4    them in a separate license agreement.  This was our way of

5    saying okay, all of the rights have not been exhausted by this

6    sale and that we are entitled to still collect from the ASIC

7    supplier's customer.  That was our initial approach.

8           I don't know whether it completely doesn't work or we

9    became concerned that it didn't work, but that's what we

10   started using in 1990.  And we charged a royalty for that.  We

11   charged the ASIC person a royalty, and we charged their

12   customer a royalty.

13          MR. REIFSCHNEIDER:  And the idea was that you can't,

14   through a license, pass along.  The licensee cannot pass along

15   more rights than it has itself, so if it doesn't have a right

16   to use, it cannot pass along a right to use.

17          MS. KILLION:  Right.

18          MR. REIFSCHNEIDER:  That was the idea.

19          MR. BLECKER:  And if we partition the rights, we have

20   the ability to charge for each of the rights that we're

21   licensing.  So if we partition them to do two different

22   entities, we could charge each of those entities for its

23   rights that it's getting.

24          MR. REIFSCHNEIDER:  The different rights that you

25   have when you get a patent, and this is spelled out in the

CX6786-R-027

 1  patent statutes, so these are statutory rights, but they are

 2  the rights to exclude others from making your invention, from

 3  selling a product that contains your invention, from using a

 4  product that contains your invention, and as of fifteen to

 5  twenty years ago, from importing into the United States a

 6  product that contains your invention.

 7           So when Marv talks about you can split up these

 8  rights and you can license certain rights and not others,

 9  that's what he means.  You can license the right to make and

10  not the right to use, and for a while that was the approach we

11  took to try to get around this exhaustion problem and make

12  sure that in those days when we licensed somebody to make and

13  sell a chip, we weren't undermining our ability to also

14  license and collect a royalty on a person making and selling

15  the cell phone that contains the chip.  But we changed that

16  practice.

17           MR. BLECKER:  Right.  So when we became concerned

18  that there might be some issues with that practice, we moved

19  to what we call nonexhaustive covenants not to assert.

20           You are better at describing what those things are

21  than me, but --

22           MR. REIFSCHNEIDER:  Okay.  So --

23           MR. BLECKER:  Do you want to take it?

24           MR. REIFSCHNEIDER:  Yeah.  I'll take this.  So -- and

25  there have been multiple steps in the evolution of our

 1  approach to this problem and, you know, it's probably still an

 2  ongoing evolution to some extent, but there was a period of

 3  time when a lot of people involved in patent licensing felt

 4  that there was a difference between granting a license versus

 5  granting a promise, a covenant not to sue for infringement, in

 6  that a license would authorize the licensee to make a sale,

 7  and therefore trigger patent exhaustion, whereas a promise not

 8  to sue for infringement wouldn't.  And so the way to get

 9  around patent exhaustion was rather than grant a license,

10  grant a promise or a covenant not to sue.  And so we tried

11  that.

12          MR. BLECKER:  And coincident with that approach,

13  since we were no longer partitioning these rights, that's

14  around the time when we stopped collecting royalties for ASICs

15  because, again, we were not giving any rights to sell or

16  licenses to the ASIC supplier.  We were just promising not to

17  sue them and --

18          MR. GONELL:  Well, the timing's a -- the timing's a

19  little fuzzy, because there were -- there were some agreements

20  that were -- there was a time when we had entered into a

21  covenant agreement called portfolio exchange, and at the same

22  time we were still doing the other royalty --

23          MR. BLECKER:  Right.  When we --

24          MR. GONELL:  -- same thing.

25          MR. BLECKER:  When we switched.

 1          MR. GONELL:  And they eventually only covered

 2    our -- what changed over.

 3          MR. BLECKER:  When we changed over completely that

 4    was around the time when we stopped asking for royalties on

 5    the ASIC agreements.  And what Fabian's referring to is we had

 6    an early agreement with a major ASIC supplier who claimed to

 7    have very strong patents and negotiated cross-rights without

 8    any royalties.  And that was at a time when we were collecting

 9    royalties from other suppliers.

10          MR. GONELL:  Yeah.

11          MR. BLECKER:  That's what you were referring to.  But

12    when we generally switched over is about the time when we

13    switched from a royalty to zero royalties.

14          MR. REIFSCHNEIDER:  And part of the thinking for

15    that, as I understand it, is that -- remember patent

16    exhaustion is rooted in public policy considerations, right?

17    It's a judicially adopted doctrine based on public policy

18    concerns, which include a notion that, and this isn't, like,

19    iron clad and absolute, but remember, the idea is you

20    shouldn't be able to sell your product and capture the price

21    of the product and then also turn around and sue your customer

22    for patent infringement and say you have to pay me more, all

23    right?  So the notion of, you know, not getting multiple

24    streams of revenue from, you know, the same patent, the same

25    invention.  And, you know, that's not the doctrine per se, but

 1  that was some of the thinking underlying the early cases where

 2  the doctrine originated and evolved over the years.

 3          And so, and there's been a, you know, a general

 4  trend, certainly over the last ten years, in the case law on

 5  patents generally, you know, to make things harder for

 6  patentees, not easier for licensors.  And --

 7          MR. BLECKER:  But in particular with regards to

 8  exhaustion issues.

 9          MR. REIFSCHNEIDER:  With regard to exhaustion --

10          MR. BLECKER:  In double --

11          MR. REIFSCHNEIDER:  And in several other ways too.

12          MR. BLECKER:  In double royalties.

13          MR. REIFSCHNEIDER:  Yeah.  Willful infringement and

14  injunctive relief and you name it.

15          And so if you're worried about people claiming that

16  you've exhausted your patents in various ways, you know,

17  people have a powerful incentive to do that, because they'd

18  like to pay you less royalties than what they're currently

19  paying.  You know, you want to take as many, sort of, arrows

20  away from them as you can, and, you know, if they could point

21  to you and say well, look.  You're getting license fees and

22  royalties, you know, from the guy who sells the chip, and then

23  you're also trying to get license fees and royalties from me,

24  you know, that's double dipping.  That's exactly what patent

25  exhaustion law was supposed to prevent you from doing.

CX6786-R-031

1           Now, I would argue, no, that's not quite right.  But,

2    you know, the whole point is you don't want to have those

3    arguments, especially when the general sentiment among, you

4    know, judges out there is not really blowing in your

5    direction.

6           MR. BLECKER:  And when ninety-five percent of the

7    royalties come from manufacturers of these things, and I don't

8    know what the percentage was when we were collecting

9    royalties, but it had to be well less than one percent came

10   from component suppliers.  You don't want to have that

11   argument.  You don't want to fight to preserve the component

12   royalty and risk ninety-five percent of your royalty section

13   (sic).

14          MR. REIFSCHNEIDER:  So we'd gotten to the point where

15   we decided you know what?  We're not even going to try to

16   collect license fees and royalties from guys who make chips.

17   We'd just as soon not have any agreement with them at all.  We

18   will just leave them alone as long as they leave us alone, and

19   we will concentrate our licensing program and our licensing

20   negotiations on the guys who make the cell phones and the base

21   stations and the test equipment, because that's where the real

22   money is, so to speak.

23          Now, there are times when other chip suppliers will

24   come to us and say we're worried you might sue us for patent

25   infringement, and we'd like to have an agreement with you

 1  where we know that won't happen.  And for various reasons, you

 2  know, including the fact that when you participate in a

 3  standard setting process, as I explained earlier, and you

 4  contribute your technology to the standard, as part of that

 5  you often have to make commitments that you will, you know,

 6  make that technology available to people who want to make

 7  products that practice the standard.

 8          And so to, you know, and, you know, we would take the

 9  position that that doesn't mean you have to grant a license,

10  you know, to everybody at every step in the supply chain.

11  But, you know, to tell somebody no, we're sorry, we won't

12  enter any kind of agreement with you at all, and, yes, in

13  theory, you know, you have to just live with this risk that we

14  could sue you for patent infringement, it's not a great, you

15  know, position to be in in terms of defending yourself

16  against, you know, claims that you've broken those promises to

17  make the technology available.

18          You know, we also have a big chipset business, you

19  know, of our own, and we're also interested in protecting

20  that, right?  Chipset suppliers have, you know, information

21  that can be, you know, useful to us in terms of who they're

22  selling their chips to, so we can make sure that, you know, we

23  know where the chips are going, and we can get our royalty on

24  the product that contains the chips.

25          So, you know, when pressed, although it's not our

CX6786-R-033

```
 1  preference, you know, we have over the last -- I don't know
 2  how many years it is -- been willing to enter into agreements
 3  with other chip companies, where at first, you know, the
 4  approach was just to give them a covenant not to sue, a
 5  promise that we wouldn't sue them for infringement.  Then
 6  after a Federal Circuit decision called TransCore, we started
 7  to think well, even that doesn't work to avoid patent
 8  exhaustion.
 9          MR. BLECKER:  May not work.  Just --
10          MR. GONELL:  May not work.
11          MR. REIFSCHNEIDER:  May not work.  The Federal
12  Circuit didn't seem to leave a whole lot of doubt about it in
13  that opinion.
14          MR. BLECKER:  We do still have some of those
15  agreements in place.
16          MR. REIFSCHNEIDER:  Well, the case speaks for itself.
17          MR. GONELL:  Yeah, it really does.
18          MR. REIFSCHNEIDER:  I'm paraphrasing here, right, an
19  absolute, you know, unconditional covenant not to sue.  You
20  know, according to the Federal Circuit, you know, it would
21  seem to trigger exhaustion.
22          MALE SPEAKER:  That can't be added enough.
23          MR. BLECKER:  It at least gave us enough concern to
24  look at changing our --
25          MR. REIFSCHNEIDER:  Right.
```

```
 1          MR. BLECKER:  Our procedure.

 2          MR. REIFSCHNEIDER:  Right.  So --

 3          MS. KILLION:  I'm sorry.  What was that case again?

 4  Federal Circuit --

 5          MR. REIFSCHNEIDER:  TransCore.

 6          MS. KILLION:  TransCore.

 7          MR. REIFSCHNEIDER:  T-R-A-N-S-C-O-R-E.  It came

 8  down --

 9          FEMALE SPEAKER:  That's a recent decision, right?

10          MR. REIFSCHNEIDER:  Yeah, 2009.

11          FEMALE SPEAKER:  Yeah.

12          MR. REIFSCHNEIDER:  2009.  And so then we shifted to,

13  and this is what we currently do, an agreement where the

14  promise we give to the chip company is that we will not sue

15  them for patent infringement until and unless we have sued

16  their customers and exhausted our remedies to collect

17  royalties and damages from their customers, and only if we've

18  done that and won on the merits but been unable to collect for

19  some reason, like the customer's bankrupt, or judgment proof

20  in some country where we can't get at their assets, or

21  whatever the case may be, can we then sue the chip company?

22  Which there isn't now -- don't think there's any case I'm

23  aware of, at least, you know, where a court has decided

24  whether that works or not in terms of triggering patent

25  exhaustion, but that's what we do now.
```

1            And the thinking behind it is, you know, we're not

2    licensing you.  We're not giving you an absolute promise we'll

3    never sue you, because the Federal Circuit in TransCore would,

4    you know, say that that's equivalent of a license.  That's

5    also authorizing them to sell, you know.  We're just saying

6    before we sue you, we're going to go try to get our royalty

7    here.  And we're free to make that choice.  You know, we're

8    free to, you know, collect our royalties on our patents at

9    whatever step in the supply chain we want.  That's, I think,

10   become clear over the many decades of case law in this area as

11   well.  So if we're choosing to do it here, you know, we can

12   basically promise you that yeah, we're going to go here first

13   before we look at you.

14           So that's what we do now when we have to.

15           MR. BLECKER:  A little more than you wanted to know

16   about patent exhaustion and ASIC licensing, but --

17           MS. KILLION:  It's all great to just finally --

18           FEMALE SPEAKER:  Yes.

19           MS. KILLION:  -- to hear that.  It's something that

20   we heard here -- now and then, here and there, so it's very

21   educational, so thank you.

22           But I'm kind of interested -- so how you described

23   with the ASIC manufacturers.  So it's no longer a licensing

24   agreement, but it's really a promise or a covenant not to sue,

25   but --

CX6786-R-036

 1        MR. REIFSCHNEIDER:  It's currently a covenant to sue
 2   somebody else first.
 3        MS. KILLION:  Right.
 4        MR. BLECKER:  But only if we're unsuccessful in
 5   collecting from somebody else would we ever be able to sue.
 6        MS. KILLION:  Right.  Right.  The documentation that
 7   we asked and looked at were actually, indeed, license
 8   agreements with these ASIC chip manufacturers and, of course,
 9   the way we asked was please give us a copy of license
10   agreements.  So we didn't know that much about how that was
11   actually not really a term that you're using.  So I'm just
12   wondering about these licenses that we got a hold of, you
13   know.  Are they still in effect but just referred to as
14   covenant? Is that what that is?
15        MR. REIFSCHNEIDER:  I'm not sure which agreements
16   you're --
17        MS. KILLION:  Okay.  So the latest one we got was --
18        MR. GONELL:  MediaTek?
19        MS. KILLION:  MediaTek, yes.
20        MR. GONELL:  Yeah, that's the latest one really.
21        MS. KILLION:  So okay.
22        MR. GONELL:  I believe you have everything --
23        MS. KILLION:  Oh, yeah.
24        MR. GONELL:  -- despite the way you asked.
25        MS. KILLION:  Okay.

CX6786-R-037

1          MR. BLECKER:  But I don't think, you know, that

2    MediaTek is a license.  It's not in the form of a license.

3          MR. GONELL:  No, it's not, but I think -- I

4    think -- were you asking us do you have all of our ASIC

5    agreements despite that you asked for licenses?

6          MS. KILLION:  Well, no, it's kind of like what you

7    just said.  Yeah, so MediaTek license, for example, so that is

8    still a license agreement that the --

9          MR. GONELL:  No.

10         MS. KILLION:  But it's not just really considered a

11   license agreement.

12         MR. GONELL:  It's called a patent agreement.

13         MS. KILLION:  Oh, okay.

14         MR. GONELL:  The MediaTek Agreement, it's called a

15   patent agreement.

16         MS. KILLION:  Oh, okay.

17         MR. BLECKER:  I don't remember whether that's in the

18   form of a covenant not to assert or whether it's a covenant to

19   exhaust remedies.  Do you remember?

20         MR. REIFSCHNEIDER:  I think it's exhaust remedies,

21   but --

22         MR. GONELL:  Yes.  MediaTek, I believe, is exhaust

23   remedies.

24         MR. BLECKER:  Okay.  It's definitely not a license.

25   It's one of the covenants, and these guys have better memories

1  than I do, so they say it's a covenant to exhaust remedies,

2  which is the last thing that Eric was talking about.

3        MS. KILLION:  Okay.  So what about the ASIC

4  manufacturers that you have signed the license agreement in

5  the agreement in the past?  Have they all been revised to

6  become the covenant, or are they still the way they are?

7        MR. BLECKER:  They still are the way they are except

8  that we've eliminated the royalty payments.

9        MS. KILLION:  Right.

10        MR. BLECKER:  They've been revised to eliminate the

11  royalty payments.

12        MS. KILLION:  So all the terms of agreement stay the

13  same.  It's just that that is -- it's there's no royalty

14  collected.

15        MR. BLECKER:  Yeah.  I wouldn't say all the -- I

16  wouldn't say all the terms of each of those agreements stayed

17  the same.

18        MS. KILLION:  No.

19        MR. BLECKER:  There have been amendments over the

20  years, but we haven't changed the basic form of the

21  agreements.

22        MR. REIFSCHNEIDER:  If an opportunity comes along to

23  renegotiate one of the those agreements and put a new

24  agreement in place, you know, we would do that, and we would

25  use the new approach of giving a covenant to exhaust remedies

CX6786-R-039

 1   rather than give a license.  But, you know, it takes two

 2   parties to agree to something, right, and, you know, as long

 3   as there's peace, as long as there's no actual problem, no one

 4   making an exhaustion claim, no counterparty to an agreement

 5   raising an issue of some sort, then we let them be and let

 6   them, you know, expire, let the patents covered by those

 7   agreements become expired or, you know, I mean, at some point

 8   they just become --

 9        MR. BLECKER:  I don't know whether, you know, how

10   effective they would be, but we do have some protections in

11   those agreements where if they're found to be exhaustive, or

12   if the other party claims they're exhaustive, we generally

13   have rights to terminate the agreements or to sit down and

14   replace whatever provision is found to be exhaustive with a

15   new provision that preserves the intent of the parties that

16   they not be exhaustive.  So they do have some remedies within

17   themselves because the intent of both parties was that they

18   not be exhaustive, that their customers would be required to

19   pay royalties.

20        MS. KILLION:  Okay.

21        MR. BLECKER:  The question is whether those remedies

22   will hold up in court or not, but we do have contractual

23   remedies for that.

24        MS. NARAYANAN:  Yeah, these chip manufacturers, they

25   manufacture chips for different companies or only for

 1   Qualcomm?  These chip manufacture are third parties, right?

 2         MR. BLECKER:  Yeah, what we're talking about is chip

 3   manufacturers who sell primarily to handset suppliers.  So

 4   they either manufacturer their own chips or they buy chips

 5   from a foundry just like Qualcomm does.

 6         MS. NARAYANAN:  Um-hum.

 7         MR. BLECKER:  But they don't manufacture for Qualcomm

 8   or buy chips from Qualcomm.  They're -- they're Qualcomm

 9   competitors.  They're chip competitors.

10         MR. REIFSCHNEIDER:  Chip competitors.  Yeah, so their

11   customers would be Samsung, Nokia, Motorola.

12         MS. NARAYANAN:  And would this be a standard practice

13   with Samsung, Nokia?  I mean, as far as you know, would they

14   have the same kind of relationship with these manufacturers in

15   terms of licensing patents?

16         MR. GONELL:  No. Generally speaking, no.

17         MR. BLECKER:  There might be some companies that are

18   ASIC suppliers and also have a patent licensing program, but

19   generally speaking it's not the case.

20         MR. GONELL:  So I've been -- I've been told by my

21   counterparts at Nokia they do not license ASIC suppliers.

22   I've been told by my counterparts at Ericsson that they do not

23   license ASIC suppliers or do not have any agreements with ASIC

24   suppliers at all.

25         MR. BLECKER:  I thought the question was the other

1  way.

2          MS. NARAYANAN:  They do not.

3          MR. GONELL:  No.

4          MS. NARAYANAN:  Okay.

5          MR. REIFSCHNEIDER:  Ericsson and Nokia are two

6  companies that also license their patents and collect

7  royalties on cellphones.

8          MS. KILLION:  Oh, okay.

9          MS. NARAYANAN:  So this is something like a standard

10  practice in the industry?

11          MR. REIFSCHNEIDER:  They're -- if you have a

12  licensing program like ours -- and to some extent Nokia and

13  Ericsson do -- they were also companies who participated in

14  the development of wireless technology in the '90s and in

15  the -- the 2000 decade, and they have large patent portfolios,

16  and they also claim to have many patents that are -- that are

17  essential to those technical standards, and so they

18  also -- following our lead I might say -- you know, decided

19  hey, we can license these patents and make money by doing it

20  and we can make more money licensing this than licensing the

21  chip.  So like us they licensed the cell phone, not the chip.

22          And -- and what Fabian was saying a minute ago is

23  that his counterparts at those two companies just told him

24  flat out they don't license chip suppliers.  You know, if you

25  want to take an even kind of bigger view --

CX6786-R-042

 1          MR. BLECKER:  I know that Motorola doesn't either.

 2   So --

 3          MR. REIFSCHNEIDER:  Motorola also has a licensing

 4   program, and it was also one of those companies involved in

 5   the early years in developing wireless technology.

 6          You know, if you want to look at the semiconductor

 7   industry on a broader basis, not just chips that go in your

 8   cellphones, but chips that go into anything, you know, Intel,

 9   AMD, who make microprocessors for personal computers, you

10   know, and so on, you know, there was -- there was a long

11   period of time where -- and now I'm speaking on the basis of

12   my experience and knowledge just as, you know, a lawyer in

13   Silicon Valley for many years, you know, 1996 to April of this

14   year, you know, working with not just Qualcomm but a variety

15   of other companies too, including many companies in the

16   semiconductor industry -- that, you know, their patent

17   portfolios were used really for defensive purposes, you know,

18   kind of like a patent detente so to speak.  You know:  I've

19   got a big patent portfolio so don't sue me cause I'll sue you

20   back.

21          And you know, and so a lot of times, you know, for

22   the most part, you know, big companies leave each other alone.

23   Every once in a while they would sort of memorialize that

24   peace treaty, if you will, by entering into, you know, an

25   agreement where they would promise not to sue each other for

 1  patent infringement on a portfolio-wide basis or something

 2  close to it.  No money would change hands, it was just, you

 3  know, documenting a peace treaty, you know

 4        And so there was a -- a pretty prevalent practice in

 5  the semiconductor industry generally that chip companies

 6  wouldn't sue each other for patent infringement.  And you

 7  know, for the most part when they were being sued for patent

 8  infringement it was by what has come to be known as a

 9  nonpracticing entity or, you know, in pejorative terms, a

10  troll, somebody who has patents but doesn't have any product

11  and therefore isn't afraid of being countersued, you know.

12  And so they had to deal with those kinds of patent

13  infringement lawsuits, but they really weren't suing each

14  other.

15        MS. KILLION:  Where'd you work in Silicon Valley

16  before you came here in April?

17        MR. REIFSCHNEIDER:  From 1996 to 2009 I was at a law

18  firm called Cooley Godward, C-O-O-L-E-Y  G-O-D-W-A-R-D, a

19  large Bay-area based firm, with offices across the country,

20  but --

21        MS. KILLION:  Okay.

22        MR. REIFSCHNEIDER:  -- the majority of the lawyers

23  are in the San Francisco Bay area.

24        MR. BLECKER:  And amongst their clients was Qualcomm.

25        MS. KILLION:  Oh.

1              MR. BLECKER:  Qualcomm.

2              MS. KILLION:  Okay.

3              MR. REIFSCHNEIDER:  Right.  And -- and then from 2009

4    up until April of this year when I joined Qualcomm I was at a

5    firm called Dewey & Leboeuf, the less said the better.

6              You laugh so you must know.

7              MS. KILLION:  I was just laughing, that's all.

8              Okay.  I was just curious if you worked for a large

9    manufacturer, but I do remember you said that you worked for a

10   law firm.  Excuse me, okay.

11             MR. REIFSCHNEIDER:  From 1995 to the summer of 1996,

12   for a year and a half, I worked for Motorola.

13             MS. KILLION:  Oh, okay. As a corporate attorney?

14             MR. REIFSCHNEIDER:  I was in their contracts

15   department.

16             MS. KILLION:  Okay.  Okay.  That's good. With this,

17   what used to be a license agreement and now is a

18   covenant -- covenant to exhaust remedies -- that's the general

19   term, now, I guess -- does -- does this require -- like we

20   were hearing before that the way this royalty scheme works, it

21   may be royalty-free when it comes to dealing with the chip

22   manufacturers, however, they are licensed to sell or they are

23   required to sell to only certain handset manufacturers who

24   would eventually pay royalty to Qualcomm.

25             So this covenant would include some kind of clause

1  like that, like who their customers have to be, who they can

2  sell to?

3          MR. REIFSCHNEIDER:  Not necessarily.  You know, the

4  basic idea, you know, of what we do now is we say we won't sue

5  you, Mr. Chip Supplier, for patent infringement until we have

6  first, for whatever particular chip we're talking about, sued

7  your customer and try to collect damages or royalties from

8  them.

9          MS. KILLION:  Um-hum.

10         MR. REIFSCHNEIDER:  Now, there are two ways we could

11 get -- notice I said damages or royalties, you know.  We could

12 get, you know, monetary compensation, you know, from their

13 customer.  You know, one way is their customer is already a

14 licensee of ours, obligated under a license agreement to pay

15 us royalties, and if they don't, they're in breach of contract

16 and we would sue them on that basis or maybe terminate their

17 agreement and make them -- for nonpayment, and make them

18 unlicensed, and then sue them for infringement as well.  We'd

19 have a variety of ways to go after them if they weren't paying

20 us.

21         The other scenario is the chip supplier's customer is

22 not a licensee of ours, in which case our only option would be

23 to sue them for infringement.  But we would have that option;

24 and that's what we -- that's what we would have to do.  If

25 they -- if they refuse to take a license from us and we wanted

CX6786-R-046

```
 1  them to pay us money for using our technology in their

 2  products we have to sue them for patent infringement.

 3          MR. BLECKER:  Having said that, though --

 4          MR. GONELL:  Some of our agreements have that

 5  provision.

 6          MR. BLECKER:  -- a good number of our agreements do

 7  require that the ASIC supplier sell to a Qualcomm licensee,

 8  only sell to a Qualcomm licensee.

 9          MS. KILLION:  Okay.  Oh, okay, right.

10          MR. BLECKER:  Eric is giving you the general

11  description of the covenant to exhaust remedies, which may or

12  may not have that restriction; but a good number of our

13  agreements, our existing agreements, do have that restriction.

14          MS. KILLION:  Okay.

15          MR. GONELL:  Particularly the ones that are older.

16          MS. KILLION:  So as they evolve into what you call

17  this covenant, that term will still be effect, or is it more

18  like something that's --

19          MR. BLECKER:  It may or may not be.  It depends on

20  how that agreement gets negotiated.  It doesn't -- as Eric

21  said, it doesn't have to be, but it could -- it could remain

22  in there.

23          MS. KILLION:  Okay.

24          MR. REIFSCHNEIDER:  And -- and again, part of

25  the --what permeates our thinking in all of this, as I'm sure
```

 1  you can tell by now, is, you know, the fear of the risk of
 2  patent exhaustion, you know.  And so the more we can
 3  circumscribe, you know, whatever type of rights we're giving
 4  to another chip supplier, from that standpoint, the better off
 5  we are.  Yeah.
 6          MR. BLECKER:  So if that limitation is in there, it
 7  can only help us in that if we -- if we've been seen to
 8  authorize the sale in some way, at least it's been limited to
 9  sales to our subscriber/licensees who are obligated to pay us
10  royalties.
11          MS. KILLION:  Right.
12          MR. BLECKER:  So we have some contractual arguments
13  that -- that we should still be able to collect a royalty.
14          MS. KILLION:  Right, right.
15          MR. REIFSCHNEIDER:  Because no court to date has
16  ruled and said, you know, this approach, this covenant-to-
17  exhaust-remedies approach, works and that it doesn't trigger
18  patent exhaustion.
19          MS. KILLION:  Oh, okay.
20          MR. REIFSCHNEIDER:  I think it would.  I think it
21  should.  And I'll be willing to make all those arguments, you
22  know, if ever called upon to do so; but we can't point to a
23  case and say we know for sure this works.
24          MR. GONELL:  Yeah.  So just to be clear, there's
25  three -- there's three possibilities in the way this can work.

CX6786-R-048

1   One, it can be a covenant, but there can be --  it can just

2   apply regardless of what the sales are -- sales are, who the

3   sales go to.  And if it's a licensee that's one way, and if

4   it's not a licensee the covenant still applies, we still have

5   to go after that.  That's one possibility.

6           Another possibility is that the covenant only applies

7   for sales to licensees.  But there's no contractual

8   restriction on what the ASIC supplier can otherwise do.

9           A third way that is present in some agreements is

10  that the ASIC supplier affirmatively agrees that they will not

11  sell to non licensees.

12          MS. KILLION:  Okay.

13          MS. NARAYANAN:  What are the circumstances in which

14  you'll enter into the second type of agreement where the ASIC

15  supplier is able to sell to nonlicensees?

16          MR. GONELL:  Well they're always able to.  I mean, as

17  Eric said, we prefer not to have any agreement with them at

18  all, so they can sell it to who they want and we will -- we

19  will address licensing with people who make handsets and so

20  forth and so on.  So everyone's always able to sell to

21  anything -- to anyone unless they explicitly agree not to.

22  That's why I just tried to make these three possibilities

23  clearer, because it's only in the third possibility, it's only

24  in the third thing that I said where people are actually

25  affirmatively agreeing not to sell to a set of customers or a

CX6786-R-049

 1  set of potential customers.

 2          MR. BLECKER:  But I think the question was why would

 3  we agree to anything other than the third possibility?

 4          MS. NARAYANAN:  Yes, exactly.

 5          MR. BLECKER:  Because license negotiation is a true

 6  negotiation, and you can't always get the strongest terms that

 7  you'd like to, because the other side may have good arguments

 8  and may have good value that it's bringing.  For instance,

 9  just as an example, we're giving these exhaust-remedy

10  covenants, well we want to get them for our chip business

11  also.  We want to get at least that for our chip business.  We

12  may want to get something stronger than that for our chip

13  business.  If we can negotiate to get something for our chip

14  business, but we have to give up that third possibility and go

15  to the second possibility, that might be worth it, right?  So

16  it's a negotiation.

17          MS. KILLION:  So as we speak there are chip

18  manufacturers -- ASIC chip manufacturers out there that are

19  free to sell to anybody, licensed or otherwise, by any handset

20  manufacturers.

21          MR. REIFSCHNEIDER:  Well, so to get an accurate, you

22  know, picture of things -- and tell me if I'm wrong about

23  this, but my impression is that there are more chip

24  manufacturers with whom we do not have an agreement at all

25  than there are those with whom we do have any kind of

CX6786-R-050

1   agreement.  And all of the ones who have no agreement with us,

2   of course, from a contractual standpoint, can sell to anybody

3   they want.  And we could sue them for patent infringement, but

4   we choose not to.

5           MR. BLECKER:  Those are companies like Nvidia, for

6   example, who we have no -- no agreement with.

7           MR. REIFSCHNEIDER:  Right.

8           MS. KILLION:  Right, um-hum.

9           MR. REIFSCHNEIDER:  Very good example. Yeah.

10          MR. BLECKER:  There are some companies that we do

11  have agreements with whose agreements do not restrict who they

12  can sell to.

13          MS. KILLION:  And I'm assuming when it comes to the

14  majority of the handset manufacturers, Qualcomm perhaps have

15  already had some kind of licensing agreement in place anyways?

16          MR. BLECKER:  Right.

17          MR. GONELL:  The handset manufacturers?

18          MS. KILLION:  Right.

19          MR. GONELL:  Yes, the vast majority.

20          MS. KILLION:  Yeah.

21          MR. BLECKER:  So we have --

22          MS. KILLION:  So you're pretty much --

23          MR. BLECKER:  -- over --

24          MR. GONELL:  The overwhelming majority.

25          MS. KILLION:  Yeah.

1        MR. BLECKER:  We have over 200 license agreements

2   with handset manufacturers including, I think it's probably

3   over 100 now in China and 100 elsewhere.  So Japan and the

4   U.S.  We have all of the major manufacturers, and now we're

5   getting a lot of the little small Chinese manufacturers that

6   pop up in China as licensees.

7        MS. NARAYANAN:  Yeah, that is going to be my

8   question.  Maybe it's a dumb question, but how do you find out

9   who has your chips?  Suppose it is some company in China or

10  someplace else that is manufacturing with your chips and then

11  selling them, how do you know that that's happening?

12       MR. BLECKER:  Let me correct the premise first.

13       MS. NARAYANAN:  Okay.

14       MR. BLECKER:  So if they're making a CDMA or an

15  OFDMA-based handset, regardless of whose chip is in it,

16  they're using Qualcomm's patent technology, and they need a

17  license from us to do that.  So it doesn't matter whether

18  they're using our chip or a Nvidia chip or a TI chip or an

19  Intel chip.  Every one of those cases, they're using

20  Qualcomm's patented technology, and as the licensing division,

21  we would go tell them you're using our patented technology and

22  you need a license; it's a royalty-bearing license, and here's

23  our terms.  And we start the negotiation.

24       So the way we find out is we monitor the market.  So

25  we have people here to get information from Sino MR in China

CX6786-R-052

 1  as to what handsets are being sold and who's making them.  If

 2  we see some that are being sold from a manufacturer that we

 3  don't recognize or with a brand name we don't recognize we

 4  start to investigate, and we dig in, and we try to find out

 5  who that is.  And if we find out who it is then we'll send

 6  Robert Anh or somebody else to go talk to them.  It's

 7  a -- it's a painstaking process, but that's what we do.

 8          MS. KILLION:  So again, but if that's the chip maker

 9  that's infringing your patented technology, you sort of decide

10  to leave them alone and go after the handset manufacturers

11  instead?

12          MR. BLECKER:  Yeah.

13          MS. KILLION:  Okay.  Was that the idea --

14          MR. BLECKER:  Now -- now, also, if they're using our

15  chips, of course, it's easier for us to find them because we

16  know -- most of the time we know who's buying our chips. Also

17  some of these chip agreements we have require reporting of who

18  they sold their chips to.  So that helps us go find people

19  that are using our technology and making the handsets as well.

20  But for the most part it's, like I said before, it's watching

21  the marketplace and seeing what's out there.

22          MR. REIFSCHNEIDER:  Of course, when we sell our

23  chips, we know who we're selling them to.

24          MR. BLECKER:  Right.

25          MS. KILLION:  Right.

1            MR. REIFSCHNEIDER:  And in most cases we're selling

2      them, you know, directly to --

3            MR. BLECKER:  Licensees.

4            MR. REIFSCHNEIDER:  -- a licensed --

5            MS. KILLION:  Right.  Handset --

6            MR. REIFSCHNEIDER:  We have a policy of not -- you

7      know, we won't sell a chip to somebody who isn't a licensee,

8      you know.  And their license agreement -- you know, we'll

9      require them to use a chip, you know, in a -- in a subscriber

10     unit that they make.  They're not licensed to turn around and

11     sell the chip by itself to somebody else.

12           MR. BLECKER:  Well, actually it's -- the component

13     supply agreement that requires them to use that chip in a

14     product --

15           MR. REIFSCHNEIDER:  That's --

16           MR. BLECKER:  -- under their license agreement and

17     that --it also says that they can't resell the chip as a

18     standalone chip.

19           MR. REIFSCHNEIDER:  It's actually --

20           MR. BLECKER:  And it's --

21           MS. KILLION:  Well, going back to just a few

22     sentences ago, you said chip makers licensees or that having

23     this formal relationship with Qualcomm, they are required to

24     report to Qualcomm who they sell to?

25           MR. BLECKER:  Some of the chip makers who have that

```
 1  relationship with us --
 2          MS. KILLION:  Right.
 3          MR. BLECKER:  -- have a requirement in their
 4  agreement to provide reports to Qualcomm --
 5          MS. KILLION:  Right.
 6          MR. BLECKER:  -- as to how many chips they sold to
 7  our customers.
 8          MS. KILLION:  Okay.  But not all of them?
 9          MR. BLECKER:  Not all.
10          MS. NARAYANAN:  What would be the percentage of
11  roughly how many chip makers would you require them?
12          MR. BLECKER:  I don't know.
13          MR. REIFSCHNEIDER:  You're probably struggling to
14  answer that because, again, you know, the agreements or the
15  set of agreements you're talking about, it spans, you know,
16  multiple years.  And at different points in time there were
17  different types of agreements with different terms at the
18  starting point and then negotiated differently, so.
19          MR. BLECKER:  I don't know, but if it's important to
20  you, we could find out and check.
21          MS. NARAYANAN:  No, no.  My question is that why
22  would you require that kind of an agreement from some but not
23  the others?  I mean, what is the -- what is the rationale
24  behind that?
25          MR. BLECKER:  Again, it's -- these agreements are
```

CX6786-R-055

 1  highly negotiated --

 2            MS. NARAYANAN:  Um-hum.

 3            MR. BLECKER:  -- some, particularly some of the

 4  larger companies with greater strengths, greater intellectual

 5  property, patent portfolios, negotiate hard and refuse to do

 6  certain things that we'd like to do. We would like to get that

 7  information from every one of them so we know where these

 8  chips are going, and we can make sure that the people who are

 9  using the chips are licensees and paying the royalty to us on

10  the handset.

11            But there are some companies that just simply refuse

12  to give it to us.  So we have a choice:  do we enter into an

13  agreement with them or do we just walk away?  And what we've

14  done in the past with those companies is we've negotiated a

15  compromise agreement, and it turned out that that particular

16  provision didn't survive the negotiation.

17            MS. NARAYANAN:  Okay.

18            MR. REIFSCHNEIDER:  Remember, these companies, almost

19  by definition, are competitors of our chipsets.  So you can

20  understand why they wouldn't want to be telling us exactly who

21  their customers are and require by a unit volume.

22            MR. BLECKER:  So even in those agreements where we

23  have that provision, I would say, you know, frequently at

24  least, there's a provision also that says that that

25  information will remain with QTL and not be provided to our

 1   chip division, to QCT personnel, because they're very

 2   concerned about that because they're competitors.

 3           MS. NARAYANAN:  Um-hum.

 4           MR. BLECKER:  They don't even want QCT to even know

 5   who their customers are.  Right?

 6           MS. KILLION:  Okay.  Are you involved with the

 7   licensing agreements with QGTP, or are you exclusively dealing

 8   with third-party licensees?

 9           MR. BLECKER:  Over the years we've been involved to

10   some extent with the QGT license agreement. I don't think

11   we've been the primary, but we've been asked to participate

12   and review the agreements and provide comments --

13           MALE SPEAKER:  Revised work.  Right.

14           MS. KILLION:  Yeah.

15           MR. BLECKER:  So when it was, we were asked to

16   provide comment.

17           MR. GARDNER:  Well, the first one was 2000.  I wasn't

18   even here then.  So I -- but you can tell that it had a lot of

19   licensing influence, I think, in that agreement.

20           MR. BLECKER:  So QTL, like I say, we didn't -- I

21   don't think they prepared the drafts, but they reviewed and

22   commented on them over the years.  I think I commented on the

23   revisions.

24           Lee probably knows something about it.

25           MR. GILBERT:  Yeah.  I think we had some discussions

CX6786-R-057

1  back around the 2000 time frame when we were setting this

2  whole structure up.

3          MR. BLECKER:  And then in the revision also.

4          MR. GILBERT:  And then in -- in the revision.

5          MR. BLECKER:  I don't remember the 2000 one, but I

6  remember the revision.  We probably did talk in 2000 as well,

7  but you also worked with Mike Hartogs --

8          MR. GILBERT:  That's right, yeah.

9          MARV BLECKER: -- who's not here anymore.

10         MR. GILBERT:  Right.

11         MR. BLECKER:  Mike Hartogs used to be our QTL

12 division counsel.  He -- I think he participated in then.

13         MR. GILBERT:  I think Derek was even in a meeting or

14 two back then, yeah.

15         MR. BLECKER:  So there's been involvement, you know,

16 but --

17         MARIKO KILLION: Okay.  And the cost share agreement

18 too, did you review or --

19         MR. BLECKER:  Not so much.  Not so much.

20         MS. KILLION:  -- more like just license agreements?

21 Okay.  Okay, so would you be able to describe some of the

22 similarities and differences between your agreements with the

23 ASIC manufacturers and the one with QGT, or is that something

24 out of your scope in terms of your job description?

25         MR. BLECKER:  I wouldn't trust my memory to do it.  I

```
 1   mean, it's not something I've focused on, so it's hard for me
 2   to trust my memory to do that.  I could certainly take a look
 3   at them and come up with the differences between them or the
 4   similarities.  I mean, in both cases we simply provide certain
 5   rights to make and sell ASICS.  In the case -- as I recall,
 6   they're pretty naked in both cases; they're simply rights
 7   under our patents to make and sell ASICS, but --
 8           MS. KILLION:  I do remember the language "to make and
 9   sell."
10           MR. GONELL:  Yeah.
11           MS. KILLION:  So --
12           MR. REIFSCHNEIDER:  Whenever --
13           MR. BLECKER:  It's -- it's comparable to what we were
14   talking about as our first version --
15           MS. KILLION:  Right.
16           MR. BLECKER:  -- a basic agreement where it's just
17   make and sell but not to use.  The ability to use it is not
18   included in the license though.
19           I'm sorry, you go ahead.
20           MR. REIFSCHNEIDER:  I was going to say whatever
21   agreement there is I'm guessing it's pretty old because, you
22   know, we wouldn't do an agreement where --
23           MR. GARDNER: Yeah, there's a huge difference in this
24   agreement from the standpoint of not only is it that like
25   the -- not only is it the license of the patent, but it
```

 1  included originally our buy-in, right.  So there's no

 2  equivalent from that standpoint in that it's both our -- both

 3  the buy-in to the existing technology, not even including

 4  patents, right, and also to the patents.

 5          So there could be one that could be, say, oh, that's

 6  very similar, but there's also a whole 'nother transfer --

 7          MR. BLECKER:  Yeah, I was thinking just about the

 8  license terms  -

 9          MR. GARDNER:  that it was hard to see the -- you

10  know, which ones -- you know, here's what you pay and here's

11  what's getting transferred and which one is which, right.  It

12  doesn't break it into like two components.  We could break it

13  into two components.

14          MR. REIFSCHNEIDER:  Anyway, when I say we wouldn't do

15  an agreement with them now, I meant, you know, any sort of

16  agreement where we're giving them any kind of license or

17  covenant, you know, like to sell chips.  We're willing to

18  leave third parties alone.  We're certainly going to leave our

19  own subsidiary alone that way.

20          MS. KILLION:  Okay.  Okay, so your discussion kind of

21  centered around that idea of patent exhaustion; but did you

22  have in mind that that would include -- that would encourage

23  the adaption of CDMA-based technologies where there's

24  other --just a few years ago, there's a lot of other competing

25  technologies out there.  So, for example, you take -- you take

CX6786-R-060

 1   your phone to another country and you can't use it because
 2   they use different protocol and that sort of thing.  But now
 3   it's just CDMA, it's really -- it has become dominant.  And I
 4   know it's evolving into another one, another form or another.
 5   But did you have in mind when you revised that licensing
 6   scheme and with general royalty that that would encourage a
 7   market expansion, or that was not in your --
 8           MR. GONELL:  No, that was after -- that was
 9   after -- that was after the decision by the industry to go to
10   CDMA first for 3G, and that meant that all 3G was essentially
11   going to be CDMA at that point.  And by the time we made that
12   decision, that was -- it was already clear that was the
13   direction it was going, so it would not have been necessary.
14           MS. KILLION:  Okay.  Okay.
15           MR. BLECKER:  And the growth of the whole CDMA
16   market, we believe, was greatly influenced by our licensing
17   program for handsets.  The licensing program for handsets took
18   essentially all of our -- all of our essential patents and
19   essentially the rest of our patent portfolio and licensed them
20   to many manufacturers.
21           And then if you took our technical solution along
22   with that patent license, our ASIC and software, the time to
23   market for a new handset, for a new entry into -- a new
24   company entering the marketplace, the time to get a product to
25   market, was greatly reduced from what used to be a year and a

 1   half to two years down to six months; because they had a

 2   turnkey solution in terms of the software and the chip.

 3          They didn't have to do all the R&D that we had

 4   already done for them in developing all that initial

 5   technology that was embodied in our patents.  They could

 6   essentially buy that by taking the license.  And that just

 7   opened up the market.  The number of handset suppliers in the

 8   early 2000s to the mid- and late 2000s grew tremendously

 9   versus -- you talked about the old GSM technology in Europe.

10   There were a handful of handset suppliers.  It grew to, I

11   would say, nearly a hundred handset suppliers with the CDMA

12   technologies.

13          So we believe that it was our licensing program for

14   the handsets that really helped open that up.  I'm not saying

15   it was the only thing that opened it up, but it really helped

16   open up that market.

17          And the fact that our royalties didn't go up as we

18   developed new technologies and made it available, and the

19   royalty rates stayed the same, that helped to drive down the

20   price because new technologies could get introduced without

21   paying more royalties.  So there was, you know, a tremendous

22   growth in the CDMA market, as you pointed out, but it really

23   had nothing to do with chipset royalty.

24          Chipset, even when we were charging a royalty, that

25   was so miniscule in the scheme of things, that it wouldn't

 1  have impacted the growth.  And getting rid of it didn't in any

 2  way impact it.

 3          And as Fabian said-said it was after much of the

 4  growth had already developed -- much of the market growth that

 5  had already happened.

 6          MS. KILLION:  Okay.

 7          MR. GARDNER:  So just one clarifier.  CDMA is still

 8  not the predominant technology, is it?  There's still

 9  more -- in terms of handset sales, GSMs or even dollar

10  amounts, isn't it?

11          MR. REIFSCHNEIDER:  No.

12          MR. BLECKER:  No.

13          MR. GONELL:  No, I don't think so, now.

14          MR. GARDNER:  It's about --

15          MR. BLECKER:  I think it may have turned around.

16          MR. GONELL:  Certainly in terms of revenue -- in

17  terms of revenue, CDMA has -- has surpassed GSM.

18          MR. BLECKER:  But if you look at the growth rate of

19  the CDMA technologies --

20          MR. GONELL:  Yeah.

21          MR. BLECKER:  -- versus the growth rate of GSM in the

22  same -- at the same time of development of the two

23  technologies, the same -- the growth rate of the WC -- of the

24  CDMA technology has just tremendously outpaced the growth rate

25  of GSM

CX6786-R-063

1          MR. GONELL:  You have to -- you have to think about

2     how you -- how you count it, too, because you know -- you

3     know, most of the vast, vast, vast majority of UMTS phones are

4     dual mode UMTS/GSM, so -- and in fact, a lot of CDMA 2000

5     phones are now GSM-capable as well.  So you can get into

6     counting problems, depending on how you -- how you look at

7     things.

8          MR. REIFSCHNEIDER:  You know, there are -- there was

9     2G second generation cell phones back in the -- ten or fifteen

10    years ago.

11         MALE SPEAKER:  No, 3G -- 3G was later, in 2000.

12         MR. REIFSCHNEIDER:  2000, yeah.  Okay.

13         MR. BLECKER:  '96 was the beginning of CDMA2000

14    phones, and GSM started in the early 90 s. So 2G

15    phones -- digital phones started with GSM in '96 with

16    CDMA2000 -- not CDMA2000, cdmaOne.

17         MR. REIFSCHNEIDER:  So you know, at the 2G level

18    there was CDMA and there was GSM, just two different things.

19    When then migration to 3G occurred, CDMA ended up being

20    adopted basically into everything, right.  And that was the

21    big breakthrough in '99 with that, and the settlement and deal

22    with Ericsson, right.  And so --

23         MR. BLECKER:  It took some time for that to happen,

24    but, yeah.

25         MR. REIFSCHNEIDER:  Right, and so -- so even the 2G

CX6786-R-064

 1  technology that didn't include CDMA, when -- when it got

 2  migrated to 3G, it started using CDMA.  And then the 2G

 3  version of CDMA, of course, continued to, and so by the time

 4  you got 3G sort of fully developed and fully deployed, CDMA

 5  was pretty much everywhere, and that's been the case for quite

 6  a while.

 7          MR. GONELL:  Certainly in the developed world.

 8          MR. REIFSCHNEIDER:  Yeah.

 9          MS. KILLION:  Right, because the developing countries

10  are still using somewhat outdated technology, so --

11          MR. GONELL:  In some cases.  In some cases.  In some

12  cases no.

13          MR. BLECKER:  China and India are catching up fast.

14          MR. REIFSCHNEIDER:  Um-hum.

15          MR. BLECKER:  Latin America is a little slower.

16          MS. KILLION:  Okay.  Okay, I wanted to ask

17  something -- some additional questions about the difference

18  between some language found in our -- the licensing agreement

19  with QGT and cost-share agreements.  But you wouldn't be

20  familiar with that much details anyway perhaps.

21          MR. BLECKER:  If you show us the language maybe we

22  can --

23          MS. KILLION:  For --

24          MR. BLECKER:  The cost-share agreements?

25          MS. KILLION:  For example, the licensing agreement

CX6786-R-065

 1  with QGT the way it stands, it really limits the -- the

 2  technology license to really just CDMA-based technology.  And

 3  so knowing your types -- your technology actually encompasses

 4  beyond CDMA, and you do have a lot of different kinds of

 5  technology that are involved at the component level in

 6  handsets, but the language of that, that license itself, is

 7  just -- it limits the CDMA-based technology, whereas, the

 8  cost-share agreement doesn't have that kind of limitation.

 9          Are you -- were you involved in that drafting of

10  these different languages.

11          MR. BLECKER:  We were involved in drafting the cost-

12  sharing agreement.  The limitation to CDMA technology in the

13  license agreement is historical.  At the time it was written

14  that's all there was, it was 2000.

15          MS. KILLION:  Yeah. Um-hum.

16          MR. BLECKER:  But as Eric said, today I don't know,

17  for instance, that we would do a license agreement like that

18  with QGT for OFDMA chips, for example, or for any of the

19  Atheros products.

20          MR. REIFSCHNEIDER:  We wouldn't, if I had anything to

21  say about it.

22          MR. BLECKER:  Okay.  So I know that we would not do a

23  license agreement like that.  I handed the baton over.  So I

24  know that we would not do it --

25          MR. REIFSCHNEIDER:  So there it is.

```
 1          MS. KILLION:  But the agreement still stands, I
 2   guess.
 3          MR. BLECKER:  I was trying to be nice.  But so -- so
 4   it's not surprising to me that we haven't updated it to
 5   include OFDMA or any of the Atheros products or any other
 6   chips we may have other than CDMA, because it's not our
 7   preference to do that kind of an agreement anymore.
 8          MS. KILLION:  Okay.  So if it was to be written now
 9   perhaps it would be more like a patent agreement or, you know,
10   some kind of promissory notes or something like that.
11          MR. REIFSCHNEIDER:  I'm not sure how a promissory
12   note would come into to play here.
13          MS. KILLION:  Maybe not.
14          MR. GONELL:  But our preference would be not to
15   do -- not to do an agreement at all. So probably we would need
16   to understand the underlying purpose to really figure out how
17   we would approach it.  But our preference would be not to have
18   it at all.
19          If it had to happen, then yes, I would think it would
20   be more like --
21          MALE SPEAKER:  An exhaust remedies --
22          MR. GONELL:  -- an exhaust-remedies type of
23   provision.
24          MS. KILLION:  Right, right.
25          MR. GONELL:  But even that, only if it actually had
```

CX6786-R-067

 1  to happen.  Because we --

 2          MR. BLECKER:  It kind of -- you know, when you talk

 3  about rights -- patent rights to a Qualcomm subsidiary, it

 4  kind of almost doesn't make much sense to say you need an

 5  agreement, because it's unlikely that Qualcomm's going to sue

 6  its own subsidiary for use of its patent.

 7          MS. KILLION:  Right.

 8          MR. BLECKER:  Right?  So why put an agreement in

 9  place that could come back to hurt us?  That's the thinking as

10  we're sitting at the table today.

11          MS. KILLION:  Right.

12          MR. GARDNER:  I don't know.  I think that we -- that

13  we haven't told them this yet, right?  We mentioned today at

14  our meeting that we're going to have new agreements with

15  Mitosis, so with this new structure.  The decision has been

16  made, I think -- maybe it's not final -- to terminate the

17  license agreement and not -- and not replace it with a three-

18  party agreement.

19          MS. KILLION:  Okay.  Yeah, that was my next question

20  too, with the upcoming restructuring.

21          MR. GARDNER:  I think we've had discussions just this

22  week, right, yeah, with the law firm about whether we could do

23  that and --

24          MS. KILLION:  Yeah.  I understand this is beyond the

25  scope of this exam at this point anyways, but when the time

1  comes and the restructuring is complete, maybe what we just

2  heard will be part of your consideration in rewriting the

3  licensing agreements?

4           MALE SPEAKER:  We're not having this --

5           MR. GARDNER:  We're going to terminate it -- not

6  having to terminate it.

7           MS. KILLION:  That's what I meant, yeah.  So back

8  to -- okay.

9           Okay, so I guess that's about it for me.

10          MR. HOWELL:  Was Qualcomm actually ever sued or

11  threatened under this exhaustion theory, the patent exhaustion

12  theory, or was it just because of the prior court case in the

13  past kind of shaped your concern about --

14          MR. REIFSCHNEIDER:  I don't know about an actual

15  lawsuit, But --

16          MR. GONELL:  Yeah.

17          MR. REIFSCHNEIDER:  -- did it come up in the Broadcom

18  case?

19          MR. GONELL:  Yeah.  Yeah, there was -- there was an

20  actual lawsuit not quite with the exact fact pattern that

21  we're talking about.

22          MALE SPEAKER:  Broadcom actually

23          MR. GONELL:  That's exactly right, yeah; that's

24  exactly right.

25          MR. REIFSCHNEIDER:  Okay.

CX6786-R-069

 1          MR. GONELL:  And so the arguments -- arguments along

 2     these lines were made in -- by Broadcom in litigation, by

 3     Nokia in litigation against us.  All of those cases settled

 4     before anything really happened with those arguments.

 5          MR. BLECKER:  There were no --  there were no court

 6     decisions.

 7          MR. GONELL:  There were no -- yeah, there were no

 8     decisions.  Well that's not true; there were some German

 9     decisions that weighed in our favor. Yes, in Mannheim -- in

10     Mannheim there were Nokia exhaustion decisions that went in

11     our favor.  But -- but you know, they were subject to appeal,

12     they were appealed.  The cases eventually settled.  So there's

13     never been any final, final determination as to any of our

14     agreements on the exhaustion question.

15          MR. REIFSCHNEIDER:  But to this day, licensees, you

16     know, will make those arguments to us in the course of

17     negotiating, you know, license terms or audit findings, you

18     know.  Anytime there's an issue about how much money they have

19     to pay us, it's one of the things they're likely to trot out

20     and argue about, threaten us with,  to some extent.  It

21     remains a very real issue for us.

22          MR. HOWELL:  Okay.  So it sounds like since you can

23     only collect the royalty at one -- on one point in this line,

24     how it was a business decision to opt to collect it at the

25     handset level, because it was worth a lot more at the time or

 1  still is.  How --

 2          MR. BLECKER:  Oh, it's more than that, it's more than

 3  that.  That's an understatement.

 4          MR. HOWELL:  Okay.

 5          MR. BLECKER:  Because it had the potential of

 6  threatening our entire revenue stream at the handset level.

 7          MR. HOWELL:  Okay.

 8          MR. BLECKER:  Right?  There was a potential that

 9  depending on how this thing all turned out and courts ruled on

10  it, et cetera, et cetera, our entire handset revenue stream

11  could have been threatened.

12          MR. HOWELL:  Okay.

13          MR. BLECKER:  So, you know, the ninety-five percent

14  of our royalty revenues that you guys gladly take taxes on in

15  the United States could have disappeared, and we could have

16  been left with this chip royalty revenue.  That's the real

17  threat.

18          MR. GONELL:  But having -- having to choose between

19  one or the other then you're right, obviously the handset is

20  humongously more --

21          MR. HOWELL:  Yeah.

22          MR. GONELL:  -- lucrative for a bunch of -- a bunch

23  of reasons.

24          MR. HOWELL:  Right.  So you could come up if you

25  wanted to, just charge -- charge the royalty on the chipset

```
 1   but you would be --

 2            MR. REIFSCHNEIDER:  No. No, practically you can't.

 3            MR. HOWELL:  -- completely out of the handset

 4   royalty, is that not right?

 5            MR. REIFSCHNEIDER:  Oh, yeah.  Now, that's the

 6   concern.

 7            MR. BLECKER:  That's the concern.

 8            MR. GONELL:  Right.

 9            MR. HOWELL:  But I'm just saying --

10            MR. REIFSCHNEIDER:  So I thought you were saying you

11   could -- you know, could you charge the same amount of royalty

12   that you -- that would never work.

13            MR. HOWELL:  No, I'm saying if you went after the

14   chipset-only royalty you would have to give up the --

15            MR. GONELL:  As a practical matter, you're right.

16            MR. HOWELL:   -- handset royalty, how you can't do

17   both.  And so it was a business --

18            MR. GONELL:  Right.

19            MR. HOWELL:  -- decision obviously to --

20            MR. BLECKER:  If you want to call it a decision --

21            MR. HOWELL:  -- to pursue -- no, no, I mean --

22            MR. BLECKER:  -- I mean, it's a no-brainer.

23            MR. HOWELL:  Yeah. Yeah. Right.

24            MR. GONELL:  Right  As a matter -- as a matter of

25   economic theory people should be -- companies should be
```

 1   indifferent as to whether their chip costs 2X --

 2           MR. HOWELL:  Um-hum.

 3           MR. GONELL:  -- and they pay no royalty or the chip

 4   costs 1X,  and then they pay 1X -- they pay 1X as royalty as a

 5   matter of economic theory.

 6           MR. HOWELL:  Yeah.

 7           MR. GONELL:  But in reality, the practicality of that

 8   is not workable.

 9           MR. HOWELL:  Yeah.

10           MR. BLECKER:  Yeah, but if I would average royalty on

11   all the handsets that we collect royalties on -- I don't

12   remember what it is anymore, I used to know the number -- but

13   if -- if it were ten dollars, for example, you couldn't charge

14   a ten-dollar royalty on a chipset that cost five dollars, or

15   six dollars, or seven dollars.

16           MR. GONELL:  Theoretically you could --

17           MR. BLECKER:  You could.

18           MR. GONELL:  -- but as a practical matter you can't.

19   As a practical matter it's hard.

20           MR. BLECKER:  Yeah, and it would be hard to convince

21   a court that that was a fair royalty also.

22           MR. GONELL:  Well, I know courts look at the

23   economist, and the economist will tell you the company should

24   be indifferent between those things

25           MR. HOWELL:  Right.  No, we're your silent partner.

1   We want for you to make a lot of money, for that to happen.

2            MR. BLECKER:  But it's on the handset is where the

3   money is.

4            MR. HOWELL:  So on these third-party licensing

5   agreements, there is some sort of a -- of a limitation,

6   because you had mentioned this -- this capture period, right?

7   And so it's the nonessential patents, I guess it was called.

8            MALE SPEAKER:  Um-hum.

9            MR. HOWELL:  And so that the -- that the third

10  parties are somewhat limited, I guess, to that technology

11  anyway.  Not the --

12           MR. BLECKER:  Yeah, they're limited in the --

13           MR. HOWELL:  -- the essential patterns, but the

14  nonessential ones --

15           MR. BLECKER:  We've done that in the past with our

16  old formulations.  With the new exhaust-remedies are we still

17  doing that?  I don't think we are.

18           MR. REIFSCHNEIDER:  Well, perhaps not, especially if,

19  you know, it's a mutual agreement and were getting rights to

20  protect our chipset --

21           MR. BLECKER:  I think with the new exhaust-remedies

22  we're essentially -- we're licensing patent portfolios without

23  time limitations -- not licensing, I'm sorry.  We're

24  covenanting to exhaust remedies --

25           MR. REIFSCHNEIDER:  Yes.

CX6786-R-074

1          MR. BLECKER:  -- with respect to patent portfolios

2     without time limitations.

3          MR. HOWELL:  Okay.

4          MR. REIFSCHNEIDER:  Having said that, the use of

5     capture period is, you know, a common, you know, practice as

6     it goes to -- you know, for as long as patent licensing has

7     been around, I think, you know.  And that -- you know,

8     essential patents to some extent, you know, have a different

9     set of rules around them because of the promises you make when

10    you contribute technology to the standard.  But apart from

11    that, you know, companies are licensing patents back and forth

12    on a portfolio basis and you're always a little bit nervous

13    about, you know, they don't know what -- they know what they

14    have now, but they don't what they're going to have in the

15    future, you know.

16          And, you know, so there's often a time limit, you

17    know -- often a time limit when they sign the agreement or

18    maybe a year out, some cases five years out, but --

19          MR. BLECKER:  And in particular, that's true with our

20    subscriber license agreements, our infrastructure license

21    agreements, our test equipment license agreements that the

22    nonessential patents have a time limit.  As Eric said, some

23    often have the date of the agreement and sometimes it's a

24    number of years beyond the date of the agreement.

25          MR. REIFSCHNEIDER:  Right.  But the point is, the use

 1  of capture periods is not a practice that's, you know, unique

 2  to Qualcomm, it's not something Qualcomm, you know,

 3  originated, you know.  It's been, you know, out there, you

 4  know, for a long time for the reasons I was trying to explain

 5  and that, you know, companies get nervous about licensing

 6  stuff in the future they don't even know yet what they're

 7  going to have.

 8          MR. BLECKER:  But as we go to these exhaust-remedies

 9  agreements or ASICs, I think we're going with no time limit

10  which is, I think, the same as the QGT agreement, which has no

11  time limit on the patents.

12          MR. GONELL:  As a -- as a practical matter, in

13  reality, capture periods have had almost no relevant effect.

14  We don't go after people for patents outside the capture

15  period.  If they're paying us royalties according to an

16  agreement, to their agreement, we don't say, ah-hah, but you

17  don't have these five patents, so you owe us more money.  We

18  just don't do that, and we haven't done that so far, that's

19  not our -- that's not our practice.  There would have be

20  something else going on for it -- for it to even come up.

21          MR. BLECKER:  And with ASIC agreements, especially

22  with zero royalty, there'd be absolutely no reason for us to

23  say, you know, you're using patents outside the capture

24  period, we're asserting against you.  We don't want to pick a

25  fight with ASIC suppliers; we don't want to get into

CX6786-R-076

 1  that -- into that negotiation or that dispute.

 2          MR. HOWELL:  Do these licensees have -- have access

 3  to your engineers somehow -- I'm not an engineer. I don't know

 4  anything about how these chips are, you know, designed or

 5  anything -- but any access to –

 6          MR. BLECKER:  Are you talking about the ASIC

 7  agreements?

 8          MR. HOWELL:  Yes.

 9          MR. GONELL:  No.

10          MR. BLECKER:  No.  I don't think there's anything in

11  an ASIC agreement that provided any kind of technical support.

12          MR. HOWELL:  Okay.

13          MR. BLECKER:  I'm just trying to go through the whole

14  list and I don't think there's ever been one that provided --

15          MR. GONELL:  But the subscriber units licensees that

16  are our chip customers have access to engineering support, but

17  in connection with their purchase of our chips.

18          MR. BLECKER:  Yeah.

19          MR. GONELL:  That's a -- that's a different thing.

20  That's not related to their license --

21          MR. BLECKER:  The early --

22          MR. GONELL:  -- that's the earliest ones, yes.

23          MR. BLECKER:  -- the early subscriber unit license

24  agreements were often combined technical support and patent

25  license agreements, and we also provided some

CX6786-R-077

 1  documentation -- this is in the early days of CDMA -- we

 2  provided technical documentation, some reference designs for

 3  handsets.  We provided a certain number of hours of technical

 4  support, then they can buy additional technical support beyond

 5  that.

 6          But there was a bright line -- and I don't remember

 7  exactly when it was -- cut-off, when we got rid of all of that

 8  out of our license agreements for handsets and just went to

 9  straight patent license agreements.

10          MR. GONELL:  Yeah, that was a long time ago.

11          MR. BLECKER:  It was a long time ago.

12          MR. SCHNECK:  Are you trying to -- to draw a contrast

13  between what you believe is QGT having access to Qualcomm

14  technical experts or anything like --

15          MR. HOWELL:  Right, exactly.  And so I would presume

16  that QGT would -- would have access, full access, to whatever

17  engineers and everything, whereas, the third parties would

18  not.

19          MR. BLECKER:  As I -- as I recall, the QGT license

20  agreement itself, I don't think provided any such technical

21  support.  Now, I think they may have access under other

22  agreements, cost sharing --

23          MALE SPEAKER:  Cost sharing.

24          MR. BLECKER:  -- but as I remember the license

25  agreement itself, I don't think there's provisions for

CX6786-R-078

 1    engineering support or -- but I could be wrong with my memory.

 2              MR. HOWELL:  Okay.

 3              MR. BLECKER:  You guys may know better than me.  Am I

 4    right?  I don't remember it having that kind of provision

 5              MR. GILBERT:  Yeah.  Those provisions are under cost

 6    share where the parties agree to cooperate to further develop

 7    unexplored technologies.

 8              MR. BLECKER:  But that's what my memory is.

 9              MS. KILLION:  Anybody have any other questions?

10              Okay.  I think this is it for the interview.

11              MR. HOWELL:  We really appreciate your time.

12              MS. KILLION:   We really, really appreciate your

13    time.  It's been extremely educational.

14              MR. HOWELL:  Very informative, thank you very much.

15              MS. KILLION:  Very informative.  Thank you so much.

16    Thank you.

17              MR. SCHNECK:  Maybe we could take a five- or ten-

18    minute break and then --

19              MS. KILLION:  Right.

20              MR. SCHNECK:  -- continue on with going over the

21    facts and.  And Eric and Marvin and Fabian, I don't -- I don't

22    know if you want to participate in that or -- or can,

23    timewise, but you're obviously more than welcome to --

24              MR. GONELL:  I cannot, but --

25              MR. BLECKER:  I'd -- I'd be willing to stay.  I think

CX6786-R-079

1   I helped you get some of those facts right.

2          MR. REIFSCHNEIDER:  Yeah, yeah.  You can add a lot

3   of --

4          MR. BLECKER:  Yeah.  I think it's fine.

5          MR. REIFSCHNEIDER:  I have some things I need to go

6   do.

7          MR. BLECKER:  I think I'm fine.

8          MR. SCHNECK:  Are we okay to put the phone on mute

9   for five or ten minutes and then just -- and regroup?

10         MS. KILLION:  Sure.

11         MR. SCHNECK:  Maybe not, or we can turn it --

12     (Pause in meeting from 1:59:38 to 2:11:24)

13         MR. SCHNECK:  Okay.  We are back and just resuming

14  the second half of our meeting, going over the draft

15  stipulation of Facts.  I don't know if the best way would be

16  if would lead off, if we just start going item by item if that

17  works well.

18         MR. GARDNER:  Yeah.  Well, I think I'll lead off by

19  saying it doesn't have to be this kind of format, right.  So

20  we haven't had any discussion yet about like is this how we

21  should actually do it, or you know, what -- what the

22  methodology is.

23         MR. SCHNECK:  Um-hum.

24         MR. GARDNER:  It's just that we're trying to prevent

25  having, okay, we write up and you know -- assuming that I

CX6786-R-080

1  think this was -- assuming that it goes further up, that we

2  have some agreement on here's what the facts are, here's what

3  we've agreed on and here's where we interpret things

4  differently.

5          But what -- it doesn't necessarily have to be in the

6  format here --

7          MR. SCHNECK:  Yeah.

8          MR. GARDNER:  -- so there can either be additions to

9  the facts or clarifications.  But so I think we can kind of

10  ignore that for now, but we can maybe just go through each of

11  them and I think, especially use the time with Marv here, you

12  know, to clarify things.

13          It may go a little bit to some of your question

14  about, well, what's in one agreement, what's in another

15  agreement, right?  And I don't even know if anybody has copies

16  of the agreements with them.

17          MR. GILBERT:  I do, yeah.

18          MR. GARDNER:  But, you know, if we need to actually

19  go reference them, that we can somehow do that.

20          MR. SCHNECK:  Just to his point, I did try to make

21  that clear in my transmittal e-mail, so --

22          MS. RISSER:  Yeah, you did. You did. Yeah.

23          MR. SCHNECK:  Yeah, I just wanted that expectation.

24          MS. RISSER:  No. No.  You have to start somewhere.

25          MR. SCHNECK:  Okay.  Does that work?  We'll just go

CX6786-R-081

```
 1   item by item, and if it generates discussion we can.  If it's
 2   something that's simple and we could just say yes, that's a
 3   no-brainer or something like that, then great.  But if we need
 4   to, or if needs to be revised, stricken, whatever, we agree
 5   to, I guess --
 6              MS. KILLION:  I wonder, since there's so many items
 7   and I think we all had a chance to kind of read it over on
 8   this side, I wouldn't mind just jumping right to a few items
 9   that we had some questions about, and we can just -- yeah,
10   instead of going one by one --
11              MR. SCHNECK:  Okay.
12              MS. KILLION:  -- to cover all twenty-five items.
13              MR. SCHNECK:  Likewise, if there's anything that
14   you've looked at and you are in full agreement that it doesn't
15   need discussion in that respect, let us know, too; or if you
16   have any additional facts of your own that you'd like to see
17   added also.
18              MS. KILLION:  Okay.
19              MR. HOWELL:  For number one, can we say a ███████
20   ███████ perpetual royalty or would you rather not?  What's
21   your thought process on that?
22              MS. KILLION:  Patent royalty?
23              MR. HOWELL:  And also I was wondering if we could
24   maybe -- can we be more specific as far as U.S. patents
25   rights, or would you rather just leave it?  Just ideas I'm
```

1   throwing out there.

2          MALE SPEAKER:  Yeah, I don't think that says U.S.

3   patents, it's just with QC U.S., which is the U.S. entity,

4   right, the taxpayer --

5          MR. HOWELL:  Okay.

6          MALE SPEAKER:  -- for patent rights.

7          MALE SPEAKER:  So that one is the U.S. patent.

8          MR. HOWELL:  Okay.

9          MR. GARDNER:  So the word -- the world "perpetual", I

10  don't know if it's actually in the agreement or not in the

11  agreement, but I think we've often explained it as being a

12  perpetual royalty.

13         MR. HOWELL:  Right, right, right.  Exactly, the

14  option.  I know in the actual TLA, how it says something about

15  after some date or something how it's going to be -- be ███

16  ███  or something like that.  And that's probably what

17  I'm --

18         MALE SPEAKER:  That wasn't (indiscernible) exactly.

19         MR. HOWELL:  -- we probably explained it as

20  perpetuals because of that language probably.

21         MR. GARDNER:  So I -- so I think that -- I mean, I

22  hear your point.  I think it -- you know, you're saying the

23  original agreement was written that this royalty would last

24  forever --

25         MR. HOWELL:  Um-hum.

```
 1            MR. GARDNER:  -- if it were perpetual, right?
 2            MR. HOWELL:  Right.
 3            MR. GARDNER:  And we're now saying that it's -- that
 4    it's not lasting forever, and -- well, it's also not at ████
 5    ██████, right?  It's also --
 6            MR. HOWELL:  That's true, too.
 7            MR. GARDNER:  -- and it's also not on the same base
 8    that it used to be.  But --
 9            MR. BLECKER:  This was -- this was trying to describe
10    the terms that were effective as of January 3rd, 2000.
11            MALE SPEAKER: Exactly.
12            MR. BLECKER:  So at that time it was a ██████████
13    perpetual royalty.  I think we can agree --
14            MALE SPEAKER:  Yeah.
15            MR. BLECKER:  -- that's what it was.
16            MR. GARDNER:  So then the second point, because I
17    don't think he was making the point that -- it applies
18    to -- it applies for all patents, right?  It's not just U.S.
19    patents?
20            MR. HOWELL:  Pretty much all patents, yeah.
21            MR. GARDNER:  All, yeah.
22            MR. HOWELL:   Okay.
23            MS. KILLION:  Could we -- oh, you have some other
24    ones reviewing one and five.  You go ahead.
25            MR. HOWELL:  Oh do I?  I'm not even sure I can --
```

 1          MS. KILLION:  I don't know what it is.

 2          MR. HOWELL:  Oh, okay.  On number four -- does

 3   anybody else have any comments on those?  It said something

 4   about -- it said something about Qualcomm U.S. has the right

 5   to sublicense the third-party patent rights to Qualcomm U.S.

 6   affiliates.  And also I was reading in the agreement that QGT

 7   can also sublicense with the approval of Qualcomm U.S.; is

 8   that right?

 9          MR. GILBERT:  Have to let Marv comment on that, but I

10   don't think QGT has the right to sublicense Qualcomm's

11   patents.

12          MR. BLECKER:  We generally have --Qualcomm U.S. or

13   Qualcomm generally has the right to sublicense the third-

14   party patents to its affiliates.  That's generally in our --

15          MR. GILBERT:  Okay.

16          MR. BLECKER:  --in our cross licenses from our other

17   license -- from our licensees.  But our affiliates don't have

18   any further rights to sublicense.

19          MR. HOWELL:  Okay.  I guess I was just confused

20   because in the licensing agreement, it says:  "QGT shall have

21   the right to grant the sublicenses only to majority-owned

22   subsidiaries of QGT with respect to any rights conferred upon

23   QGT under this agreement."

24          MR. BLECKER:  Well, but the third-party patent rights

25   wouldn't be conferred to QGT under this agreement.  It would

CX6786-R-085

 1  be a sublicense from Qualcomm to QGT as its affiliate and it

 2  has nothing to do with this technology license.

 3          MR. HOWELL:  Okay.

 4          MR. GARDNER:  So -- and this is kind of looking

 5  forward -- in the past we didn't -- we didn't make those

 6  sublicenses.  Marv, I don't think that we -- we are as part of

 7  Mitosis, specifically sublicensing those to --

 8          MR. BLECKER:  We are?

 9          MR. GARDNER:  -- to first QTI and then to QTT.

10          MR. BLECKER:  I'm not familiar with the Mitosis

11  changes.  But -- but the point here is we get these third-

12  party patent rights from -- primarily from our handset

13  subscriber licensees, which grant licenses to us to make and

14  sell chips. We have rights to sublicense those licenses to our

15  affiliates, but we don't have rights for our affiliates to

16  sublicense to anybody else.

17          MR. HOWELL:  Okay.  Okay.  I was confused by the

18  wording in that, but okay.

19          MR. GARDNER:  Yeah, but -- but isn't what you're

20  reading the right to sublicense it to another affiliate, not

21  to a -- not to a third-party.

22          MR. HOWELL:  Right, exactly, and that's what --

23          MR. GARDNER:  To another Qualcomm affiliate

24          MR. BLECKER:  It doesn't have the right.

25          MR. HOWELL:  Right.

CX6786-R-086

1              MR. BLECKER:  Qualcomm would have to do it. Qualcomm

2    would have to do it.

3              MR. GARDNER:  And Qualcomm can't grant that right to

4    QGT?

5              MALE SPEAKER:  Okay.

6              MS. KILLION:  And number 5, Qualcomm provided most

7    favored royalty rate -- it simply says that this is a

8    lower -- lower royalty rate provided to third-party licensees,

9    then and that is made available to QGT as well?

10             MR. BLECKER:  I think in the QGT agreement there is a

11   most favored provision.

12             MS. KILLION:  Right.  Well QGT agreement, yeah.

13             MR. BLECKER:  Is that what you're asking?  Am I not

14   answering --

15             MS. KILLION:  Right, number 5.  Well, I was just

16   rephrasing what was written here.  And then -- and the point

17   that I wanted to make was that the same Article 3.5(c) also

18   provides exceptions, so that -- that's kind of how I read it.

19   So that that percentage doesn't go below ███████████ or

20   whatever the percentage that was specified by that document.

21             I think it's the top of next page you see that

22   exception.

23             MR. HOWELL:  Yeah.  The above paragraph shall not

24   apply to --

25             MS. KILLION:  So, again, we're just pointing out some

```
 1  things, you know.
 2          MR. BLECKER:  Okay, but I don't see -- you said
 3  something about not going below ██████████.  I don't see
 4  where --
 5          MS. KILLION:  It doesn't say ████████, but I
 6  think it was outside (indiscernible) that it doesn't go lower
 7  than the percentage that was already specified.
 8          MR. BLECKER:  No.  I don't see that.  Where -- it
 9  doesn't apply retroactively.  It doesn't entitle QGT --
10          MS. KILLION:  Sub-item here, (a), parentheses a,
11  reduction in royalty rates below the rates provided in this
12  agreement.
13          MR. BLECKER:  No, no, no, you've got to read the
14  whole provision.
15          MS. KILLION:  Right, yeah, the whole --
16          MR. BLECKER:  The above paragraph --
17          MS. KILLION:  -- the whole paragraph --
18          MR. BLECKER:  -- shall not apply with respect to any
19  license -- any license granted -- number (III), right, Roman
20  numeral III.  Any license granted by Qualcomm, the
21  consideration for which consists in whole or in part of patent
22  rights or other rights of such substantial value as in the
23  reasonable judgment of Qualcomm to warrant a reduction of
24  royalty rates below the rates provided in this agreement or
25  the acceptance of such rights in lieu of royalties.
```

```
 1            So that -- for example, someone comes in and pays us
 2    a billion dollars and says, we don't want to pay any
 3    royalties, so we don't have to offer zero royalty under this
 4    provision to QGT in that case, because this exception would
 5    apply.  They've granted us something of such substantial
 6    value, as in our judgment, to warrant a reduction in royalty
 7    rates below the rates provided in this agreement.  That's what
 8    this says.
 9            MS. KILLION:  Okay. So it's saying that Qualcomm
10    doesn't have to lower the rate.
11            MR. BLECKER:  Only if we get such substantial other
12    value that it justifies a lower royalty rate.  So some
13    third -- this is pretty standard in almost every
14    provisions -- if some third party comes in, supposing the
15    licensee who has the most favored provision, like in this
16    case, has a ▬▬▬▬▬▬ royalty rate -- some other party
17    comes in and says, look, instead of paying you ▬▬▬▬▬▬▬
18    on every unit, I'll pay you a billion dollars up front for a
19    paid-up license, zero royalty rate.
20            Well, they've given us substantial value, which
21    justifies a lower royalty rate than the ▬▬▬▬▬▬, right?
22    So that's what this provision says.  If you get substantial
23    value of that sort -- it doesn't have to be money; it could be
24    property, it could be patents, they could offer us a ton of
25    patents that are worth a lot of money.  I mean, Google bought
```

```
1    Motorola for their patents for twelve-and-a-half million
2    dollars.  Nortel patents went for fourteen-and-a-half billion
3    dollars.  So if they give us patents worth a billion dollars
4    or two billion dollars, we could say:  in return for those
5    patents we're going to give you a royalty rate of ███████
6    or ████.  And we wouldn't have -- under this exception, we
7    wouldn't have to offer that under the most favored Provision.
8             MS. KILLION:  Okay.
9             MR. BLECKER:  That's all that's saying
10            MS. KILLION:  Right, right.  Okay.
11            MR. BLECKER:  But if we get nothing then and we give
12   them a lower royalty rate then we have to offer it.
13            MS. KILLION:  Okay.
14            MR. BLECKER:  Okay?
15            MS. KILLION:  Okay.  So, okay, just this item, if it
16   includes such exceptions, I'd be -- you know, this item 5
17   would be okay.
18            MR. HOWELL:  And so how would we apply that, then, to
19   the situations like a QGT then?  Would you say that QGT gave
20   something substantially to Qualcomm U.S., then?
21            MR. GILBERT:  No.  I -- I think what -- what we've
22   been saying is that the most favored royalty rate provision
23   does apply, because those royalty rates have been offered to
24   other third parties.
25            MR. BLECKER:  So we gave -- we changed VIA's rate
```

 1  from whatever it was to zero percent, right?  We didn't get

 2  anything substantial in return for doing that.  So as a

 3  result, we have to offer QGT the zero percent rate.  That's

 4  how this provision applies.

 5          If VIA had given us a billion dollars in order to

 6  reduce its royalty rate to zero, then we wouldn't have to

 7  offer it under this most-favored provision.

 8          MR. HOWELL:  Okay.

 9          MS. RISSER:  Do the other ASIC licensees have similar

10  MFRR provisions, so they would have been in the same boat as

11  QGT where if we went to VIA, offered them-- you know,

12  everybody would have been on par, because, I mean, they had

13  the same clause?  So it wasn't something specific to QGT if

14  that was --

15          MR. BLECKER:  Yeah.  At a certain point we entered

16  into a zero royalty agreement and we had to offer it to VIA

17  and a few others

18          MR. SCHNECK:  So you're saying that you want to add

19  language regarding the additional language in the agreement to

20  our facts.

21          MS. KILLION:  Well, yeah, if this is meant to be a

22  living document, then I'd suggest that -- that you add some

23  exceptions such as that.

24          MR. SCHNECK:  Okay.

25          MS. KILLION:  Is this what it's meant to be, though?

1   This is -- I know we're going over these facts and it's meant

2   to be revised over and over.

3           MR. SCHNECK:  Absolutely, a working --

4           MS. KILLION:  Okay.

5           MR. SCHNECK:  -- document to -- this is just a start

6   and -- and to get your comments, input, additions, deletions,

7   everything.

8           MS. KILLION:  Okay.  Okay.

9           MR. BLECKER:  Maybe we could say:  subject to certain

10  exceptions, and then put a footnote in with some exceptions in

11  the footnote, and see if we copy all of this; but however you

12  want to do it.

13          MR. SCHNECK:  Or you have:  subject to the exceptions

14  in Section 3.5(c), whatever, of the agreement.

15          MS. KILLION:  I think we can put it that way, but it

16  sounds like we're drafting another contract, if you know what

17  I'm saying?

18          MR. SCHNECK:  All right, we'll we're all --

19          MS. KILLION:  It's yeah --

20          MR. SCHNECK:  -- and whatever will be cleanest and

21  work better, but --

22          MS. KILLION:  Yeah, we just don't want to be trapped

23  in something that we supposedly agreed and then that later

24  turned out to be not true and but we've already agreed, you

25  know, with this.  And we just don't want to -- avoid some

1  misunderstanding at this stage.  So, you know, yeah, it's fine

2  if you want to include it that way, you know.

3          MR. HOWARD:  Obviously, the agreement itself is a

4  source document, right, so that's going to control, anyway.

5  Regardless --

6          MS. KILLION:  Yeah.

7          MR. HOWARD:  -- of what we say about it in here,

8  there's still going to be whatever other provisions you might

9  need to refer to outside of a specific fact that we set out

10  here.

11          MS. KILLION:  Right.  Right.

12          MR. HOWELL:  So item number 8 there, it says QGT, the

13  clustering payments of ███████████████████ --

14          MR. HOWARD:  There are also amounts going the other

15  way, where Qualcomm U.S. reimburses QGT for some --

16          MR. HOWELL:  Contract R&D or something like that?

17  Isn't there --

18          MR. HOWARD:  So if you look at the 5471 on the

19  schedule on the Schedule M -- and you'll see a number at the

20  top and the bottom -- and one is paid, and one is received.

21  And I -- I didn't bring the latest return.

22          MR. GARDNER:  I agree with that.  I don't know if

23  you --

24          MS. KILLION:  I have the terms.

25          MR. GARDNER:  -- have the terms, but I think he's

```
 1   looking it up.  Yeah, so it's true.  Let's say we have three
 2   billion of total R&D and QCT that maybe -- I'm making these
 3   numbers up, right -- that maybe QGT paid a billion and
 4   Qualcomm paid two billion.  So we'd add the three billion
 5   together, split it -- and let's say it was
 6   fifty/fifty -- split it in half.
 7            MALE SPEAKER:  Okay.
 8            MR. GARDNER:  And then based on those numbers that we
 9   filed with it, QGT would owe Qualcomm 500 billion, right?  So
10   if the total was three billion, they were half, and they paid
11   a billion on their own and two billion was paid by Qualcomm.
12   But you have that exact number there, so --
13            MALE SPEAKER:  Oh, I think we could -- we could
14   change --
15            MR. GARDNER:  -- it's not clear to me what this
16   number is.  Is this number -- this is --
17            MALE SPEAKER:  Yeah, this is net.
18            MR. GARDNER:  -- let's say the --
19            MALE SPEAKER:  This is the net cost share.
20            MALE SPEAKER:  That's the net cost share.
21            MALE SPEAKER:  Okay.
22            MR. GILBERT:  Yeah, so I think what we could do is
23   reword it to say, rather than say made payments of this,
24   shared this much of the development cost.
25            MR. GARDNER:  Why don't we say all three of those?
```

1   In my example, why don't we say there's one billion -- one

2   billion of our -- in my example, one billion of R&D was paid

3   by QGT, two billion was paid by Qualcomm.  The split was

4   50/50, therefore there was a payment made from QGT to Qualcomm

5   of 500 million.  And we're using the actual -- whatever the

6   actual --

7           MALE SPEAKER:  Yeah, I would --

8           MR. GARDNER:  But in that one, the ███ is the

9   payment?

10          MALE SPEAKER:  That was the net cost share by QGT.

11          FEMALE SPEAKER:  But yeah, the payment came --

12          MALE SPEAKER:  Yeah, okay, payment.

13          MR. GILBERT:  So it's not necessarily QGT paying

14   Qualcomm, but it's putting all those costs in a bucket --

15          MR. GARDNER:  Okay.

16          MR. GILBERT:  -- that QGT share.

17          MR. GARDNER:  Yeah, but it doesn't subtract out

18   what -- really, to come to the payment, you've got to take

19   this ███ less whatever QGT incurred itself, and then --

20          MALE SPEAKER:  Right.

21          MR. GARDNER:  -- payment's the difference, right?

22          MR. GILBERT:  Right, so that's why we can either

23   record it to say this is the amount of the net cost share, or

24   we could break out the payments discretely.

25          MR. BLECKER:  I think they'd prefer to break it out

1  with this one.

2           MR. GILBERT:  Okay.

3           MR. HOWELL:  I'd prefer that.  I mean, if we could,

4  it would be more clear, I think.

5           MR. GARDNER:  Okay.  It's just like any other -- it's

6  kind of a funny fact in there, like -- right, I mean, I

7  guess -- well, why is that fact in there?  I think we're just

8  saying, well, there's a lot of consideration paid by QGT

9  for --

10          MALE SPEAKER:  Yeah.

11          MR. GARDNER:  -- technology besides what they pay

12  royalty, right?

13          MALE SPEAKER:  Yeah, fair enough.

14          MR. GARDNER:  That's all that point's really trying

15  to --

16          MALE SPEAKER:  That's fair.

17          MR. GARDNER:  But we can make it clear.

18          MR. HOWELL:  What's your next one?  (Indiscernible).

19  Something bothered me on number 12.  It says QGT and the

20  third-party ASIC suppliers compete for the same customers and

21  the same markets.  So my concern there was QGT, I guess, only

22  sells outside of the U.S., right, whereas maybe a third-party

23  ASIC supplier could probably sell inside the U.S. and outside

24  of the U.S.?

25          MR. BLECKER:  Who makes handsets in Europe?

1        MR. HOWELL:  I have no idea.  I've got to be honest

2  with you, I don't know.

3        MR. BLECKER:  I just don't think there are any,

4  but --

5        MR. HOWELL:  Oh, and you're probably right about

6  that.

7        MR. GARDNER:  Well, it's a good point, though, still.

8  There is a restriction on QGT market to be non-U.S.

9        MALE SPEAKER:  Right.

10        MALE SPEAKER:  And we just say --

11        MALE SPEAKER:  It's all just, practically, that there

12  is no U.S. handset manufacturers, but --

13        MR. BLECKER:  But you're saying the same non-U.S.

14  markets; that's the thing.

15        MALE SPEAKER:  Anyway --

16        MALE SPEAKER:  Okay.

17        MR. HOWARD:  Can't we just say in the same non-U.S.

18  markets?

19        MR. HOWELL:  Yeah, that's a nice one.

20        MALE SPEAKER:  Saying non-U.S. markets would

21  be -- yeah, that's fine.

22        MS. KILLION:  QGT and third-party ASIC suppliers face

23  similar risks.  If it's similar, but not the same, I wouldn't

24  say that that they're really the same risks.  And -- and if

25  you're saying similar, but not the same, that's kind of okay.

CX6786-R-097

1    I think there are risks that the QGT is not really undertaking

2    as much as other independent chip suppliers, just, basically

3    because QGT has the Qualcomm parents' protection, so to speak.

4    So it's --

5            MR. BLECKER:  Like a financing risk?

6            MS. KILLION:  Financing or market risk, operation.

7    It's -- I wouldn't say that the risks are the same, but I do

8    realize that the use is similar.  So the degree of similarity

9    is in question, but if it's -- if we can agree that the risks

10   are not the same, then I'm okay.

11           MR. GILBERT:  I think different companies face

12   different risks even if they're in the same industry by the

13   nature of their organizational structure and the industries

14   that they're in, right?

15           MR. BLECKER:  But pricing risk, they're all competing

16   with each other on pricing.  QGT's pricing is no more stable

17   than their competitors in video and --

18           MS. KILLION:  Right.

19           MR. BLECKER:  Well, how about if --

20           MS. KILLION:  Whereas QGT's pricing scheme may

21   involve more consultation with Qualcomm parent here, so it's

22   not as if QGT's independently operating as a business outside

23   the U.S.  So their risks --

24           MR. BLECKER:  The risk is that it's pricing too high

25   compared to its competitor, right?

1          MS. KILLION:  Right.

2          MR. BLECKER:  That risk exists just like its

3    competitors have that risk.

4          MS. KILLION:  Right.  So as a Qualcomm in general,

5    that risk is very much there.

6          MALE SPEAKER:  And we --

7          MR. GILBERT:  And it's the same risk that, say,

8    MediaTek would face if both MediaTek and QGT are trying to

9    sell chipsets into Huawei or ZTE, very price sensitive, right?

10   They're beating us up as much as they're beating MediaTek up

11   for their price target, so we'd be subject to that equally as

12   say MediaTek or VIA Telecom.

13         MS. KILLION:  Right.  You are subject to that, yes.

14         MR. GILBERT:  QGT would be -- I mean, it's same

15   market risk with respect to price and competing for the same

16   customer.

17         MS. KILLION:  Right.

18         MR. BLECKER:  Inventory risk, we're living through

19   right now.

20         MS. KILLION:  Right.

21         MR. BLECKER:  We don't have a big inventory.

22         MS. KILLION:  Right.  Yeah, we heard that at the

23   earnings call.

24         MR. HOWARD:  I was just going to say if the risks

25   that we are setting out as examples in here that if you're

 1  okay or agree that they are similar, can we just -- and just

 2  in terms of language, right, being more specific and saying

 3  the following risks are similar for QGT and ASIC suppliers and

 4  list those?  And then whatever is excluded won't be included

 5  in this factual statement.

 6          So I'm just saying we can be more specific as to the

 7  risks that we're identifying as similar and -- which leaves

 8  open the fact that there may be other risks --

 9          MS. KILLION:  I think the language itself is fine.

10  Again, you're saying similar, but not the same, so the

11  language is -- I'm fine by that, and I'm actually thinking

12  that maybe I could even issue an IDR based on your statement

13  here, and then you could provide us more details in writing

14  aside from this document.  So that may be more education to us

15  as well.

16          MR. HOWARD:  Okay.  Because I guess -- I'm just

17  concerned down the road if we -- if it is vague --

18          MS. KILLION:  Right, right.

19          MR. HOWARD:  -- and similar --

20          MS. KILLION:  We don't want that.

21          MS. KILLION:  -- is a vague term, does that just

22  leave things down the road to dispute or --

23          MS. KILLION:  Yeah, I think if we find a new idea, we

24  can avoid that as well because that'll be your chance to

25  avoid -- provide more details as well.  So we have the written

 1  record that way.

 2          MR. HOWARD:  Sure.

 3          MS. KILLION:  So again, the way that this item reads,

 4  I don't have a problem with that.

 5          MR. HOWELL:  Do you agree with these design risks,

 6  because it seems like -- and I'm not an engineer, right -- but

 7  wouldn't QGT have some sort of advantage over a third-party --

 8          MR. GILBERT:  I think what I intended when I wrote

 9  that was that the company has to make a decision on the

10  architecture of its chip --

11          MR. HOWELL:  Um-hum.

12          MR. GILBERT:  -- prior to it going to market.  And

13  so they put resources into designing a certain architecture.

14  And if that architecture ultimately does not win out in the

15  marketplace, they bear a risk of having made a bad decision on

16  how to implement a certain process in the silicon.

17          MS. KILLION:  But that designing process is taking

18  place mostly at this Qualcomm U.S. side.

19          MR. GARDNER:  The design is happening.  It's who has

20  the risk of it being bad, of it --

21          MR. GILBERT:  Yeah, and QGT is making the cost-share

22  payments for that, and it ultimately makes these payments.

23  And that design turns out to not be acceptable or accepted by

24  the marketplace, other competitors gain traction with their

25  designs.

1        MR. BLECKER:  So I think that's -- you had a great

2   idea.  I mean, that would be the explanation that you would

3   give to your IDR, right?  Just left it in this way, and you

4   issued an IDR for these things --

5        MR. GILBERT:  Sure.

6        MR. BLECKER:  -- give that explanation?

7        MR. GILBERT:  Yeah.

8        MS. KILLION:  Yeah.

9        MALE SPEAKER:  I'm just kind of listening in, but I'm

10  still getting acquainted with a lot of this.  But are we kind

11  of saying really that QGP receives the benefit that ASIC

12  suppliers don't because they have access to the resources

13  within Qualcomm, where an ASIC supplier doesn't necessarily

14  have unlimited access to resources at Qualcomm and therefore,

15  they have that added benefit just because they're affiliated

16  with?

17       MR. BLECKER:  But an ASIC supplier -- another ASIC

18  supplier has its own technical resources.

19       MALE SPEAKER:  Yeah.

20       MR. BLECKER:  STI has an infinite technical resource.

21  Intel has tremendous technical resources.  I mean, even Nvidia

22  has in-house technical resources that it has access to.

23       MALE SPEAKER:  Um-hum.

24       MR. BLECKER:  So I mean, how do you balance those?  I

25  don't know.  And also there's the cost sharing where QGT pays

1  for those technical resources.  So I mean, you can't just say

2  that the ASIC suppliers don't have access to Qualcomm's

3  technical resources, but ignore their own technical resources,

4  whether they do or not.

5         MALE SPEAKER:  Um-hum.

6         MR. HOWARD:  I think that's a key point to keep in

7  mind, like -- as Marge (ph.) said, the payments to the cost

8  sharing agreement (indiscernible).

9         MR. GILBERT:  Well, if you'd like to follow up with

10  an IDR, or we could --

11        MS. KILLION:  Yeah, I'll --

12        MALE SPEAKER:  Mediation, yeah.  Separate, yeah.

13        MS. KILLION:  Yeah, so --

14        MALE SPEAKER:  The risks or whatever.

15        MS. KILLION:  -- why don't we do that?  Yeah, this

16  item kind of piqued my curiosity and interest, so I'll issue

17  an IDR offering (indiscernible).

18        MR. BLECKER:  I'm glad we spent the time explaining

19  patent exhaustion.

20        MS. KILLION:  Yeah, yeah.  Can we hear that again?

21        MR. BLECKER:  Play back the tape.

22        MS. KILLION:  Yeah.  I'm okay with the next one,

23  so -- I think -- yeah, I don't -- number 19 has been -- the

24  information has been updated.

25        MALE SPEAKER:  Nineteen?

1        FEMALE SPEAKER:  Yeah, that was --

2        MR. HOWARD:  You had issued an affected IDR or --

3        MS. KILLION:  Yeah, I did already, so -- and then you

4    responded.  So --

5        MR. BLECKER:  So, I'm sorry, but just going back to

6    your question, so HiSilicon has had access to all the finance

7    and all of Huawei's technology people, right (indiscernible).

8    Huawei's a major technology implementer, as well as they file

9    tons of patents related to (indiscernible) and all

10    (indiscernible).  So there's a good example of what I was

11    talking about.

12        MR. GILBERT:  I would even take that a step further

13    in that Huawei is also a chipset customer of Qualcomm when

14    Qualcomm provides Huawei significant technical engineering

15    resources through our QGT chipsets -- through QGT, the

16    customer engineering for applications, hardware, and software

17    engineering services.  So they learn a lot from that process.

18        MALE SPEAKER:  Um-hum.

19        MR. HOWELL:  On item number 17, I guess I sort of

20    have an issue with it just because it directly addresses a

21    carve-out, and I wasn't sure at this point in time that we

22    were ready to approach that or to speak to that.

23        MR. GILBERT:  I think where this is going is more of

24    a mathematical impact to the QGT model, where, if QGT's

25    benefitting from third-party patent rights, the benefits would

1   be measured financially, raising its profit, therefore it

2   would absorb more cost than the cost shares.  It's just a

3   mathematical scale.

4         MR. HOWELL:  I know we had discussed that a little

5   more (indiscernible) and see what we want to -- I mean, I see

6   what you're saying --

7         MR. BLECKER:  I don't understand the accounting part

8   of this.  But going back just to the theory of what these

9   third-party patent rights could accomplish for anybody, right,

10  how could QGT benefit from the third-party patent rights?

11  They might be able to raise their price if these third-party

12  patent rights are worth anything to the customers.  Maybe they

13  could raise their price, or they might get new customers.  And

14  I think what Lee is saying, in each case, that would flow

15  into -- into their sales.

16        MALE SPEAKER:  Yeah.

17        MR. BLECKER:  But those are the only ways that those

18  patent rights would benefit -- could possibly benefit.  Okay.

19        MS. KILLION:  Yeah, we or I still have some questions

20  about cost-share arrangement and cost-share methodology.  So

21  (indiscernible) some IDR as well (indiscernible) say that for

22  now.  So --

23        MR. HOWELL:  On 20 -- let me see here -- there's

24  something written down here about, basically, an agreement not

25  to sue each other, right, whenever you have these AS1C

1  agreements?

2        MR. BLECKER:  That's what number 1 was talking about.

3  Number 1:  reciprocal patent rights with respect to ASIC.

4        MR. HOWELL:  Okay.

5        MR. BLECKER:  That's the agreement not to sue each

6  other or to exhaust remedies, however it's written.

7        MALE SPEAKER:  Okay.  Do you have any other issues on

8  20?

9        MS. KILLION:  Yeah.  No (indiscernible).

10        MALE SPEAKER:  Okay.

11        MS. KILLION:  I'm okay for now.

12        MR. HOWELL:  21, I mean, I really -- I really hate

13  that.

14        MS. KILLION:  That's a strong thing to say.

15        MR. HOWELL:  That's the one I'm just going to say,

16  man, I do not like that sentence because it says all third-

17  party CDAs (ph.) in at least -- and then it says suppliers

18  infringe, at least all of Q-U.S.'s standards, essential

19  patents, and all do not pay a royalty to Q-U.S.

20        MR. GILBERT:  I think there's a typo in there.

21        MR. HOWELL:  I can live --

22        MR. GILBERT:  At least --

23        MR. BLECKER:  You can live with?

24        MR. HOWELL:  I really feel like 25 essentially says

25  the same thing, which I can certainly live with.  But the 21

1  gave me heartburn.

2        MS. KILLION:  And I do have a question about 25, by

3  the way, so --

4        MALE SPEAKER:  Well, I can't -- I don't think --

5        MR. BLECKER:  Yeah.  I mean, we have patents that are

6  essential to the standard.  You can't implement the standard

7  without infringing.  That's what that means.  So if an ASIC

8  supplier is making a CDMA ASIC, he has to infringe Qualcomm's

9  standard essential patents.

10        MR. GARDNER:  So why don't we get the second part of

11  the sentence off, because we don't need the "and do not pay"

12  because it's down there, right?  So at least get rid of that.

13        MALE SPEAKER:  We can talk about it when we get

14  there.

15        MR. GARDNER:  -- and we don't have to say it in the

16  same sentence if we already say it in 25.

17        MR. HOWELL:  Yeah, I mean, I felt like 25 essentially

18  said pretty much the same thing.

19        MR. GARDNER:  Well, but it doesn't say that all

20  third-party ASIC suppliers infringe all of Qualcomm's standard

21  essential --

22        MR. HOWELL:  Oh, okay.

23        MR. GARDNER:  And I think the reason for the word "at

24  least" is because it's saying it could also infringe

25  nonessential patents.

1              MALE SPEAKER:  Right.  We don't need that.

2              MR. GARDNER:  Maybe it's better to spell that out, so

3    all third-party ASIC infringe all --

4              FEMALE SPEAKER:  Okay.

5              MR. GARDNER:  -- instead of saying at least all, why

6    don't we say all of Qualcomm U.S. and may infringe --

7              MR. BLECKER:  May infringe on the patents.

8              MR. GARDNER:  And may infringe on the patents.

9              MS. KILLION:  On the patents?

10             MALE SPEAKER:  Okay.

11             MS. KILLION:  That makes more sense now that you said

12   that.

13             MR. GARDNER:  And then get rid of the second part,

14   because it's already stated at number 25.

15             MR. BLECKER:  My suggestion  --

16             MALE SPEAKER:  Move the order around?

17             MR. BLECKER:  Well, my suggestion -- it's just a

18   minor suggestion -- but each third-party CDMA ASIC supplier

19   infringes --

20             MALE SPEAKER:  Okay.

21             MR. BLECKER:  -- all of Qualcomm U.S. standard

22   essential patents --

23             MALE SPEAKER:  Okay.

24             MR. BLECKER:  -- and may infringe other Qualcomm U.S.

25   patents.

1          MR. HOWELL:  Do you have anything else?

2          MS. KILLION:  Just the last item, yeah.

3          MR. HOWELL:  Okay.

4          MS. KILLION:  Just kind of pointing out this

5     sentence, it stuck out.  I know we have spent hours talking

6     about zero royalty from -- that you're no longer collecting

7     royalty from manufacturers.  But in reading these

8     licenses -- license agreements, we noted a few places where

9     you're actually collecting some dollar amounts in the name of

10    renewal fees or license fees or -- it's not a royalty.  I'm

11    just pointing out that the royalty rate may be --

12         MALE SPEAKER:  ASIC Agreement?

13         MS. KILLION:  Yeah, there are a few places where the

14    monies are actually exchanged and a few million dollars

15    collected by Qualcomm.  I'm saying a few million dollars; I

16    can't remember how much that --

17         MR. BLECKER:  Years ago.

18         MS. KILLION:  It was in your original agreement.

19         MR. BLECKER:  Right, many years ago.

20         MS. KILLION:  And I don't know about the amendments.

21    And it sounded as though that was still -- well, I think there

22    was some amendments to that.  It looks like there was some

23    dollar amounts collected, but I know you're not calling it

24    royalties.

25         MR. BLECKER:  Since January 2010, I can assure you we

1    did not collect any up-front license fees or --

2           MS. KILLION:  Okay.

3           MR. BLECKER:  -- royalties from ASIC supplier.

4           MS. KILLION:  Okay.  So that -- the statement since

5    January 2010, no royalties or fees --

6           MR. BLECKER:  Or fees.

7           MS. KILLION:  -- collect -- okay.

8           MR. BLECKER:  Royalty rates have been reduced to

9    zero, and no other fees have been collected.

10          MS. KILLION:  Well, if you're saying since January

11   2010, I can look back into those licenses myself, but I can

12   believe it.  They may have been a few years back --

13          MR. BLECKER:  Right.

14          MS. KILLION:  -- perhaps 2007 or '8.  But I just

15   noted that the -- whereas the royalty rate may be zero,

16   there's still some money collected.  So --

17          MR. BLECKER:  Not since January 2010.

18          MS. KILLION:  Okay.  Yeah, so long as the date is

19   there.  Again, I need to verify it myself, but I'll go back

20   and see that myself.

21          MR. BLECKER:  Okay.

22          MR. GILBERT:  So should I add some language

23   that -- "and no other fees have been assessed on the third-

24   party"?

25          MS. KILLION:  You can, but I would still go back

 1  myself and verify it anyways.  So, you know --

 2        MR. GILBERT:  Okay.

 3        MS. KILLION:  -- again, this is -- if it's a living

 4  document, and you feel you want to keep revising, if you're

 5  going to add that, that's fine, too.

 6        MR. BLECKER:  And the statement is true either way.

 7  Whether you add that or not, the statement is true.

 8        MS. KILLION:  Right, yeah.  Um-hum.  And it doesn't

 9  change the fact that I'll go back and study those exciting

10  license agreements myself.  So --

11        MR. HOWARD:  So we can send revisions based on what

12  we've discussed here in redline so you can see.  And then, I

13  guess I will just ask, are there any facts that you have from

14  your perspective that you would like to see added to this?  Or

15  at -- you don't have to have them right here and now.  But at

16  some point, are your anticipating then that you would be

17  adding your own?

18        MR. HOWELL:  We may have some stuff I think to add or

19  whatever on there.

20        MS. KILLION:  We may, but I personally -- it doesn't

21  matter if it's in this form or IDR.  If I have some

22  information in writing -- I'm thinking that aside from this,

23  just like item number 13, I'll be issuing IDRs to ask for

24  additional information besides this document anyway, so

25  however you want to do it.  I mean, I'm speaking for myself.

 1  If you want to keep revising it and if you want to share that

 2  with us, that's totally cool.  You know, more stuff for us to

 3  look at.  So -- but on top of that, I'll be independently

 4  asking for more information in the form of IDRs.

 5          So -- and that may or may not be related to these

 6  facts.  And as that evolves, you may want to add those facts

 7  to your list or not, you know, however you want to do it.

 8  Whether this is a list of -- it's -- a list of facts, or it's

 9  in the form of IDRS forms, you know, so long as we have

10  something in writing, just so long as we can go back to it.  I

11  don't really, you know, have any opinions either way.

12          MR. HOWARD:  And like Steve alluded to -- sorry, just

13  real quick, at the beginning, give us some feedback on -- I

14  know you've had some time to kind of go through and see the

15  format and even have counsel involved.  So is this acceptable

16  to you where we can all indicate our agreement and sign off on

17  it at some point and have -- I know we're not in litigation

18  here, so it's not anything that's going to be entered into

19  evidence or anything like that.  But just so we have -- I

20  mean, I think the intent -- when Sehilla (ph.) mentioned at

21  the beginning coming up with a stipulation of facts or an

22  agreement to the facts, was that we would do something of this

23  nature.  So I think it will just be good to kind of get the

24  services view.  Is this something that we're going to have as

25  a controlling set of facts and will be signed off, formally,

1   or how do you foresee that going?

2          MS. RISSER:  I think one of the options is -- I have

3   been speaking with Bob Cutlip about this -- is maybe just also

4   just incorporating this table into the 886-A, which is the

5   886-A with the NOPA.  So either -- I don't have a definite

6   whether or not this -- we can go this route, but it's a

7   possibility.  But if not, it would definitely be incorporated

8   into the 886-A.

9          MR. BLECKER:  You're getting out of my area of

10  comfort zone --

11         MS. RISSER:  Oh, sorry.

12         MR. BLECKER:  -- so may I just excuse myself?  I

13  think we're done with my --

14         MS. RISSER:  I don't have a definite response, but --

15         MS. KILLION:  Thank you.

16         MS. RISSER:  -- I still need to --

17         MR. BLECKER:  Nice meeting you.

18         MALE SPEAKER:  I appreciate it.

19         FEMALE SPEAKER:  Nice meeting you, Mark (ph.)

20         MS. RISSER:  I still need to pursue that, and I need

21  to discuss it with Alania (ph.).  So I don't have a definite

22  answer for you.

23         MR. GILBERT:  Okay.  Why don't we -- I'll take the

24  action item, to redraft this based on our comments here, and

25  then we'll get it back out in the redline version.  And you

1   can review that.  And if you're okay with these

2   changes -- except the IDR you're going to issue, right?

3           MS. KILLION:  Sure, yeah.  Well, yeah.

4           MR. GILBERT:  And at least we can agree that these

5   are the --

6           MR. GARDNER:  By the way, I like that answer, Howard.

7   So if they both put in their 886, and we put the same thing in

8   whatever we write and say, okay, here's --

9           FEMALE SPEAKER:  Yeah.

10          MR. GARDNER:  As long as we're writing the same

11  facts, right -- one guy writes one fact, and another guy

12  writes another fact, and it's like --

13          MR. HOWARD:  Right.  I just don't want this to be for

14  nothing.

15          MS. RISSER:  No, no, no.  My thought was we would

16  take this --

17          MR. GARDNER:  If this -- if these facts get put into

18  their facts, and it gets put into our -- that's perfect.

19          MS. RISSER:  My thinking is it would be just to take

20  this table -- this is a great table -- and just to take

21  exactly what you did here and put it within the 886-A.

22          MR. GARDNER:  Yeah, as we agree and modify --

23          MS. RISSER:  Yeah.  That's --

24          MR. GARDNER:  -- add things, right?

25          MALE SPEAKER:  Yeah.  The only thing is, make sure

1   they agree on the facts.

2           MS. RISSER:  No.

3           MALE SPEAKER:  I think the caution is like what kind

4   of signing it and what --

5           MS. RISSER:  Right.

6           MALE SPEAKER:  Do we have a --

7           MALE SPEAKER:  Yeah.

8           MALE SPEAKER:  Who has the authority --

9           MS. RISSER:  Right.

10          MALE SPEAKER:  -- to sign a document that has a --

11          MS. RISSER:  No, and which is why I've been speaking

12   to counsel.

13          MALE SPEAKER:  -- (indiscernible) --

14          MS. RISSER:  Right.

15          MALE SPEAKER:  -- (indiscernible) --

16          MS. RISSER:  Right.

17          MALE SPEAKER:  -- (indiscernible) if things change.

18          MS. RISSER:  But no, this is a great table.  The

19   table would be incorporated into the 886-A.

20          MR. HOWARD:  Okay.  Yeah, we're just kind of looking

21   for feedback and trying to get to a consensus so that -- I

22   just said --

23          Ms. RISSER:

24          MR. HOWARD:  -- at least we have an underlying

25   foundation to agree on facts and then --

1          MS. RISSER:  Um-hum.

2          MR. HOWARD:  -- then we can look at the issues and

3    get to the heart of the matter.  So --

4          MS. RISSER:  Right.  I think that --

5          MR. GARDNER:  So Lee, I think I would modify it for

6    that way, right, that --

7          FEMALE SPEAKER:  I think that was our original idea,

8    that we would try to agree as to the facts in the event that

9    it went forward to appeal, that we don't need like a closing

10   agreement.  I don't think that was our intention.

11         MR. GILBERT:  But if we bake it into the 886, we

12   accomplish essentially the same purpose, right?

13         FEMALE SPEAKER:  Right.

14         MALE SPEAKER:  You had stipulated to it; it's in your

15   document.  It's in our --

16         MS. RISSER:  And that's right, because the 886-A will

17   also include Qualcomm's position, the government's position.

18   And then you -- the notebook, the note which is attached to

19   it, you either agree or you don't agree.  And yeah, so it

20   accomplishes the same thing.  Okay.

21         MR. HOWARD:  Okay.  So are we concluded for --

22         MS. RISSER:  Great.

23         MALE SPEAKER:  Present your side.

24         MALE SPEAKER:  Thank you.

25         MS. RISSER:  Thank you.

CX6786-R-116

1          MR. HOWARD:  I think, for concluding comments after a

2     long day of meetings, it was a very productive day

3     (indiscernible) and I think we accomplished a lot, at least

4     from my perspective.  And I hope you guys would agree.

5          MS. KILLION:  It was very much informational, and it

6     was wonderful.

7          MS. RISSER:  And Howard, thank you for bringing the

8     QTL to the table.  Very beneficial.

9          Thank you so much.  Thank you.

10     (Proceedings concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3          I, Esther Accardi, the court approved transcriber, do

4     hereby certify the foregoing is a true and correct transcript

5     from the official electronic sound recording of the

6     proceedings in the above-entitled matter.

7

8

9

10

11          *[signature]*                       January 22, 2019

12     _____          _____

13     ESTHER ACCARDI                           DATE

14     AAERT Certified Electronic Transcriber CET-485

15

16

17

18

19

20

21

22

23

24

25

**(**

**(a)**
  88:10

**-**

**--in**
  85:16

**--it**
  54:17

**--just**
  60:24

**--qualcomm**
  85:12

**--what**
  47:25

**1**

**1**
  106:2,3

**1.32**
  93:13 95:8,19

**100**
  52:3

**12**
  96:19

**13**
  111:23

**17**
  104:19

**19**
  103:23

**1930s**
  24:6

**1990**
  27:10

**1992**
  3:14

**1995**
  45:11

**1996**
  18:2 43:13 44:17 45:11

**1:59:38**
  80:12

**1X**
  73:4

**2**

**20**
  8:15 105:23 106:8

**200**
  52:1

**2000**
  42:15 57:17 58:1,5,6
  64:4,11,12 66:14 84:10

**2000s**
  62:8

**2005**
  3:16 8:15

**2007**
  110:14

**2008**
  3:16 8:11 9:5

**2009**
  35:10,12 44:17 45:3

**2010**
  109:25 110:5,11,17

**2011**
  4:5

**2012**
  4:5

**21**
  106:12,25

**25**
  106:24 107:2,16,17
  108:14

**2:11:24**
  80:12

**2G**
  64:9,14,17,25 65:2

**2X**
  73:1

**3**

**3.5(c)**

**87:17 92:14**

**3G**
  14:14,15 61:10 64:11,
  19 65:2,4

**3rd**
  84:10

**4**

**4G**
  14:15

**5**

**5**
  87:6,15 90:16

**50/50**
  95:4

**500**
  94:9 95:5

**5471**
  93:18

**8**

**8**
  93:12 110:14

**9**

**90**
  64:14

**90s**
  42:14

**96**
  3:14 64:13,15

**99**
  64:21

**A**

**A-B-E-R-L-E**
  8:18

**A-N-H**
  11:20

**Aberle**

**8:6,18 9:6**

**ability**
  15:15 27:20 28:13
  59:17

**able**
  11:3 24:16 26:11,21
  30:20 37:5 48:13 49:15,
  16,20 58:21 105:11

**absolute**
  30:19 34:19 36:2

**absolutely**
  23:2 76:22 92:3

**absorb**
  105:2

**acceptable**
  101:23 112:15

**acceptance**
  88:25

**accepted**
  101:23

**access**
  77:2,5,16 78:13,16,21
  102:12,14,22 103:2
  104:6

**accommodations**
  10:9

**accomplish**
  105:9

**account**
  4:9

**accounting**
  105:7

**accurate**
  50:21

**acquainted**
  102:10

**actively**
  11:9

**activity**
  10:23 12:20

**actual**
  40:3 69:14,20 83:14
  95:5,6

**adaption**
  60:23

**add**
20:13 26:20 80:2 91:18,
22 94:4 110:22 111:5,7,
18 112:6

**added**
34:22 82:17 102:15
111:14

**adding**
111:17

**additional**
18:16 20:11,12,13
65:17 78:4 82:16 91:19
111:24

**additions**
81:8 92:6

**address**
49:19

**addresses**
104:20

**adopted**
6:8 30:17 64:20

**advanced**
3:15

**advantage**
101:7

**advice**
9:13

**affiliate**
86:1,20,23

**affiliated**
102:15

**affiliates**
85:6,14,17 86:15

**affirmatively**
49:10,25

**afraid**
44:11

**agenda**
2:18

**ago**
19:8 22:21 26:3 28:5
42:22 54:22 60:24
64:10 78:10,11 109:17,
19

**agree**
19:18 40:2 49:21 50:3

**agreed**
79:6 82:4 84:13 93:22
98:9 100:1 101:5

**agreed**
81:3 92:23,24

**agreeing**
49:25

**agreement**
2:24 3:3 12:25 14:24
15:22,25 16:23 17:3,5,8
18:14 21:15,18 27:4
29:21 30:6 32:17,25
33:12 35:13 36:24 38:8,
11,12,14,15 39:4,5,12,
24 40:4 43:25 45:17
46:14,17 47:20 49:14,
17 50:24 51:1,6,15
54:8,13,16 55:4,22
56:13,15 57:10,19
58:17 59:16,21,22,24
60:15,16 65:18,25 66:8,
12,13,17,23 67:1,7,9,15
68:5,8,17,18 74:19
75:17,23,24 76:10,16
77:11 78:20,25 81:2,14,
15 82:14 83:10,11,23
85:6,20,23,25 87:10,12
88:12,24 89:7 91:16,19
92:14 93:3 103:8
105:24 106:5 109:12,18
112:16,22

**agreements**
7:23 9:13,14 13:18,20
14:1,2,4,9,11,23 15:21
17:12 18:10 20:6 21:25
22:2,13,24 26:19 29:19
30:5 34:2,15 37:8,10,15
38:5 39:16,21,23 40:7,
11,13 41:23 47:4,6,13
49:9 51:11 52:1 53:17
55:14,15,17,25 56:22
57:7,12 58:20,22 65:19,
24 68:14 69:3 70:14
74:5 75:20,21 76:9,21
77:7,24,25 78:8,9,22
81:16 106:1 109:8
111:10

**agrees**
49:10

**ah-hah**
76:16

**aha**
24:13

**ahead**
59:19 84:24

**allowed**
24:12

**alluded**
112:12

**altogether**
8:22,23

**AMD**
43:9

**amendments**
39:19 109:20,22

**America**
65:15

**amount**
72:11 95:23

**amounts**
63:10 93:14 109:9,23

**Ana**
11:18

**Anh**
11:17 53:6

**answer**
17:10 55:14

**answering**
87:14

**answers**
5:24

**antenna**
21:2,4

**anticipating**
111:16

**anybody**
5:15 6:3 50:19 51:2
79:9 81:15 85:3 86:16
105:9

**anymore**
9:9 58:9 67:7 73:12

**Anytime**
70:18

**anyway**
13:25 23:25 60:14
65:20 74:11 93:4 97:15
111:24

**anyways**
51:15 68:25 111:1

**apart**
75:10

**appeal**
70:11

**appealed**
70:12

**applications**
104:16

**applied**
15:24

**applies**
21:22,24 49:4,6 84:17,
18 91:4

**apply**
49:2 87:24 88:9,18 89:5
90:18,23

**appreciate**
11:5 79:11,12

**approach**
15:2 27:1,7 28:10 29:1,
12 34:4 39:25 48:16,17
67:17 104:22

**approaches**
25:19

**approval**
85:7

**April**
3:10 43:13 44:16 45:4

**architecture**
101:10,13,14

**area**
3:14 36:10 44:23

**argue**
32:1 70:20

**argument**
32:11

**arguments**
32:3 48:12,21 50:7
70:1,4,16

**arrangement**
105:20

**arrows**
31:19

**article**
4:5 87:17

**articulated**
24:25

**AS1C**
105:25

**ASIC**
14:7,8,9 15:1,3 21:25
22:2,13,17,24 23:13
27:2,6,11 29:16 30:5,6
36:16,23 37:8 38:4 39:3
41:18,21,23 47:7 49:8,
10,14 50:18 58:23
61:22 76:21,25 77:6,11
91:9 96:20,23 97:22
100:3 102:11,13,17
103:2 106:3 107:7,8,20
108:3,18 109:12 110:3

**ASICS**
22:19 29:14 59:5,7 76:9

**aside**
100:14 111:22

**asked**
5:14 14:22,23 37:7,9,24
38:5 57:11,15

**asking**
11:5 30:4 38:4 87:13
112:4

**assert**
28:19 38:18

**asserting**
76:24

**assessed**
110:23

**assets**
35:20

**assist**
10:4,7,9

**Assume**
19:4

**assuming**
51:13 80:25 81:1

**assure**
109:25

**Atheros**
66:19 67:5

**attempted**
15:13

**attending**
2:1,4

**attorney**
9:16 45:13

**attorneys**
6:25 9:12,17 12:4

**AUDIO**
2:1,4

**audit**
7:25 8:25 9:1 70:17

**authorize**
29:6 48:8

**authorized**
24:25 25:4,5,6,8,12

**authorizing**
36:5

**available**
14:18 18:17 33:6,17
62:18 87:9

**average**
73:10

**avoid**
25:19 34:7 92:25
100:24,25

**avoiding**
26:3

**aware**
35:23

---

**B**

**back**
24:4,5 43:20 54:21
58:1,14 64:9 68:9 69:7
75:11 80:13 103:21
104:5 105:8 110:11,12,
19,25 111:9 112:10

**background**
2:12 5:10 6:15 8:3 9:19
12:10 13:6

**bad**
26:13 101:15,20

**balance**
102:24

**bankrupt**
35:19

**base**
14:3 18:6 19:14 20:1,18
32:20 84:7

**based**
26:14 30:17 44:19 94:8
100:12 111:11

**basic**
7:16 8:2 24:8 25:16
39:20 46:4 59:16

**basically**
6:11 13:20 15:23 36:12
64:20 98:2 105:24

**basics**
23:20

**basis**
18:19 43:7,11 44:1
46:16 75:12

**baton**
66:23

**Bay**
44:23

**Bay-area**
44:19

**BB**
4:8

**bear**
101:15

**beating**
99:10

**beginning**
64:13 112:13,21

**begins**
15:19

**believe**
5:1 37:22 38:22 61:16
62:13 78:13 110:12

**benefit**
18:5 102:11,15 105:10,
18

**benefits**
104:25

**benefitting**
104:25

**best**
80:15

**better**
28:20 38:25 45:5 48:4
79:3 92:21 108:2

**beyond**
66:4 68:24 75:24 78:4

**big**
33:18 43:19,22 64:21
99:21

**bigger**
42:25

**billion**
89:2,18 90:2,3,4 91:5
93:13 94:2,3,4,9,10,11
95:1,2,3

**bit**
75:12 81:13

**Blecker**
3:13 4:23 8:10,14 9:5,
24 10:4,13,15,22,25
11:11,17,24 12:7,15
13:16 15:4,19 16:10,14,
18,22 17:15,22 20:10
21:1,12,19,22 22:16,23
23:3,6,15,18 25:21,23
26:19 27:19 28:17,23
29:12,23,25 30:3,11
31:7,10,12 32:6 34:9,
14,23 35:1 36:15 37:4
38:1,17,24 39:7,10,15,
19 40:9,21 41:2,7,17,25
43:1 44:24 45:1 47:3,6,
10,19 48:6,12 50:2,5
51:5,10,16,21,23 52:1,
12,14 53:12,14,24 54:3,
12,16,20,25 55:3,6,9,
12,19,25 56:3,22 57:4,
9,15,20 58:3,5,9,11,15,
19,25 59:13,16 60:7
61:15 63:12,15,18,21
64:13,23 65:13,15,21,
24 66:11,16,22 67:3
68:2,8 70:5 71:2,5,8,13
72:7,20,22 73:10,17,20
74:2,12,15,21 75:1,19
76:8,21 77:6,10,13,18,
21,23 78:11,19,24 79:3,
8,25 80:4,7 84:9,12,15
85:12,16,24 86:8,10,24
87:1,10,13 88:2,8,13,
16,18 89:11 90:9,11,14,

25 91:15 92:9 95:25
96:25 97:3,13 98:5,15,
19,24 99:2,18,21 102:1,
6,17,20,24 103:18,21
104:5 105:7,17 106:2,5,
23 107:5 108:7,15,17,
21,24 109:17,19,25
110:3,6,8,13,17,21
111:6

**blowing**
32:4

**boat**
91:10

**Bob**
2:2,5,6 4:11 11:3

**Bob's**
4:10

**bothered**
96:19

**bottom**
93:20

**bought**
89:25

**brand**
53:3

**breach**
46:15

**break**
60:12 79:18 95:24,25

**breakthrough**
64:21

**Brent**
4:6

**bright**
78:6

**bring**
16:6 93:21

**bringing**
50:8

**Broadcom**
69:17,22 70:2

**broader**
43:7

**broken**
33:16

**bucket**
95:14

**bunch**
16:24 71:22

**business**
7:23,25 8:7,25 10:2,11
12:7,21 15:22 16:5
33:18 50:10,11,13,14
70:24 72:17 98:22

**buy**
41:4,8 62:6 78:4

**buy-in**
60:1,3

**buying**
23:13 24:21 53:16

---

**C**

**C-O-O-L-E-Y**
44:18

**call**
3:18 14:8 18:12 19:25
20:23 22:1 28:19 47:16
72:20 99:23

**called**
23:4 29:21 34:6 38:12,
14 44:18 45:5 48:22
74:7

**calling**
109:23

**can't**
6:2 27:13 34:22 35:20
48:22 50:6 54:17 61:1
72:2,16 73:18 87:3
97:17 103:1 107:4,6
109:16

**capture**
18:13 20:23 21:11
24:16 30:20 74:6 75:5
76:1,13,14,23

**care**
21:5

**careful**
14:8

**carve-out**
104:21

**case**

2:25 7:8 22:2 24:4
25:15,18 31:4 34:16
35:3,21,22 36:10 41:19
46:22 48:23 59:5 65:5
69:12,18 89:4,16
105:14

**cases**
14:6 15:9 17:5 31:1
52:19 54:1 59:4,6
65:11,12 70:3,12 75:18

**catching**
65:13

**categories**
14:11,25 17:24

**category**
14:7,14

**cause**
43:19

**CDAS**
106:17

**CDMA**
6:8 20:2 52:14 61:3,10,
11,15 62:11,22 63:7,17,
19,24 64:4,18,19 65:1,
2,3,4 66:4,12 67:6 78:1
107:8 108:18

**CDMA-BASE**
12:1

**CDMA-BASED**
12:1 60:23 66:2,7

**CDMA2000**
64:13,16

**cdmaone**
64:16

**cell**
6:10 14:2 19:21 20:1,17
26:9,12,14,17 28:15
32:20 42:21 64:9

**cellphones**
42:7 43:8

**center**
5:6

**centered**
60:21

**certain**
16:11 25:18 28:8 45:23
56:6 59:4 78:3 91:15

92:9 101:13,16

**certainly**
31:4 59:2 60:18 63:16
65:7 106:25

**cetera**
71:10

**chain**
33:10 36:9

**chance**
26:5 82:7 100:24

**change**
44:2 94:14 111:9

**changed**
22:21 28:15 30:2,3
39:20 90:25

**changes**
86:11

**changing**
34:24

**channel**
14:3

**charge**
27:20,22 71:25 72:11
73:13

**charged**
22:18,20,21,22 27:10,
11

**charging**
62:24

**check**
55:20

**chief**
4:12

**China**
3:7 10:1,12,15 11:9,15,
23,25 12:6,23 52:3,6,9,
25 65:13

**Chinese**
52:5

**chip**
15:3,10,14 26:7,9,10,
15,17 28:13,15 31:22
32:23 34:3 35:14,21
37:8 40:24 41:1,2,9,10
42:21,24 44:5 45:21
46:5,6,21 48:4 50:10,

11,12,13,17,18,23
52:15,18,19 53:8,17
54:7,9,11,13,17,18,22,
25 55:11 57:1 62:2
71:16 73:1,3 77:16 98:2
101:10

**chipmakers**
6:14

**chips**
23:8,9,12 32:16 33:22,
23,24 40:25 41:4,8
43:7,8 52:9,10 53:15,
16,18,23 55:6 56:8,9
60:17 66:18 67:6 77:4,
17 86:14

**chipset**
33:18,20 62:23,24
71:25 73:14 74:20
104:13

**chipset-only**
72:14

**chipsets**
56:19 99:9 104:15

**choice**
26:16 36:7 56:12

**choose**
51:4 71:18

**choosing**
36:11

**Circuit**
34:6,12,20 35:4 36:3

**circumscribe**
48:3

**circumstances**
49:13

**clad**
30:19

**claim**
40:4 42:16

**claimed**
25:1 30:6

**claiming**
31:15

**claims**
33:16 40:12

**clarifications**

81:9

**clarifier**
63:7

**clarify**
81:12

**clause**
45:25 91:13

**clauses**
16:11

**cleanest**
92:20

**clear**
4:16,22 25:18 36:10
48:24 61:12 81:21
94:15 96:4,17

**clearer**
49:23

**clearly**
23:6

**clients**
44:24

**close**
44:2

**clustering**
93:13

**coincident**
29:12

**collaborative**
3:3

**collect**
15:7,10,14,15 25:9
26:11,13,16 27:6 28:14
32:16 35:16,18 36:8
42:6 46:7 48:13 70:23,
24 73:11 110:1,7

**collected**
39:14 109:15,23 110:9,
16

**collecting**
29:14 30:8 32:8 37:5
109:6,9

**combined**
77:24

**come**
3:17 12:17 32:7,24 44:8
59:3 67:12 68:9 69:17

71:24 76:20 95:18

**comes**
5:25 6:10 12:15 21:25
39:22 45:21 51:13 69:1
89:1,14,17

**coming**
19:17 112:21

**Comm**
4:8

**comment**
57:16 85:9

**commented**
57:22

**comments**
3:2 5:16 57:12 85:3
92:6

**commercially**
18:12

**commitments**
33:5

**common**
75:5

**communication**
19:11 20:3

**companies**
10:5 11:25 19:17,20
34:3 40:25 41:17 42:6,
13,23 43:4,15,22 44:5
51:5,10 56:4,11,14,18
72:25 75:11 76:5 98:11

**company**
19:12,14 22:5 23:13
35:14,21 52:9 61:24
73:23 101:9

**comparable**
59:13

**compared**
98:25

**compensation**
46:12

**compete**
96:20

**competing**
60:24 98:15 99:15

**competitor**
98:25

**competitors**
41:9,10 56:19 57:2
98:17 99:3 101:24

**complete**
69:1

**completely**
27:8 30:3 72:3

**complexity**
16:5

**compliance**
8:1 9:1,15 10:7

**component**
32:10,11 54:12 66:5

**components**
26:21,23,24 60:12,13

**compromise**
56:15

**computed**
18:7

**computers**
43:9

**concentrate**
32:19

**concern**
25:17 26:6 34:23 69:13
72:6,7 96:21

**concerned**
16:16 27:9 28:17 57:2
100:17

**concerns**
30:18

**conduct**
2:23 10:6

**conducted**
13:3

**conferred**
85:22,25

**confuse**
22:12

**confused**
85:19 86:17

**connection**
77:17

**consider**
15:1

consideration
69:2 88:21 96:8

considerations
30:16

considered
38:10

consistent
18:1

consists
88:21

constantly
24:21

consultant
3:19 9:7

consultation
98:21

contact
10:8

contacts
11:24

contains
25:11 26:8 28:3,4,6,15
33:24

continue
79:20

continued
65:3

contract
10:7 12:3 13:13 23:10
46:15 92:16 93:16

contracts
45:14

contractual
40:22 48:12 49:7 51:2

contrast
78:12

contribute
33:4 75:10

contributed
19:23

control
93:4

controller
3:7

controlling
112:25

convince
73:20

cool
112:2

Cooley
44:18

cooperate
79:6

coordinator
4:9

copies
81:15

copy
37:9 92:11

corporate
45:13

correct
4:12 21:12 52:12

correctly
3:21 8:9,22

cost
58:17 73:14 78:22,23
79:5 94:19,20,24 95:10,
23 102:25 103:7 105:2

cost-
66:11

cost-share
65:19,24 66:8 101:21
105:20

costs
73:1,4 95:14

couldn't
73:13

counsel
3:11 4:12 58:12 112:15

count
8:22 64:2

counterparts
9:21,24 41:21,22 42:23

counterparty
40:4

countersued
44:11

counting
64:6

countries
9:25 10:5 65:9

country
35:20 44:19 61:1

couple
10:16

course
37:8 51:2 53:15,22 65:3
70:16

court
24:5,20 35:23 40:22
48:15 69:12 70:5 73:21

courts
71:9 73:22

covenant
29:5,10,21 34:4,19
36:24 37:1,14 38:18
39:1,6,25 45:18,25
47:11,17 49:1,4,6 60:17

covenant-to-
48:16

covenanting
74:24

covenants
28:19 38:25 50:10

cover
13:20,23 14:2,3,5 18:11
82:12

coverage
22:10

covered
30:1 40:6

covers
13:21

creating
24:18

cross
85:16

cross-rights
30:7

curiosity
103:16

curious

45:8

current
3:15 21:8

currently
3:6 15:13 31:18 35:13
37:1

Curtis
4:2

customer
23:11 24:13 27:7,12
30:21 46:7,13,21 99:16
104:13,16

customer's
35:19

customers
12:5 23:8 24:21 27:3
35:16,17 40:18 41:11
46:1 49:25 50:1 55:7
56:21 57:5 77:16 96:20
105:12,13

cut-off
78:7

Cutlip
2:2,5,7,9,11 4:11,13
11:5 16:9,11,15,21

cutoff
20:23


D

damages
35:17 46:7,11

date
18:14 20:22 21:11
48:15 75:23,24 83:15
110:18

day
70:15

days
3:17 28:12 78:1

deal
7:12 16:7,8 44:12 64:21

dealing
2:16 45:21 57:7

deals
3:12

**decade**
42:15

**decades**
24:5 36:10

**decide**
53:9

**decided**
13:14 24:20 32:15
35:23 42:18

**decision**
34:6 35:9 61:9,12 68:15
70:24 72:19,20 101:9,
15

**decisions**
24:5 70:6,8,9,10

**defending**
33:15

**defensive**
43:17

**definitely**
38:24

**definition**
56:19

**degree**
98:8

**deletions**
92:6

**department**
45:15

**depending**
14:18,20 16:5 64:6 71:9

**depends**
47:19

**deployed**
65:4

**Derek**
8:5,6,7,10 9:6 58:13

**describe**
13:11 58:21 84:9

**described**
8:24 15:16 36:22

**describes**
12:1

**describing**
28:20

**description**
47:11 58:24

**descriptions**
7:19

**design**
21:2,4 101:5,19,23

**designed**
77:4

**designing**
101:13,17

**designs**
78:2 101:25

**despite**
37:24 38:5

**details**
65:20 100:13,25

**detente**
43:18

**determination**
70:13

**develop**
79:6

**developed**
19:16 62:18 63:4 65:4,7

**developing**
43:5 62:4 65:9

**development**
7:25 8:25 10:11,23
12:7,21,25 19:21 42:14
63:22 94:24

**devices**
13:24 19:22

**Dewey**
45:5

**dialed**
5:2

**didn't**
23:16 27:9 34:12 37:10
56:16 57:20 62:3,17
63:1 65:1 86:5 91:1
93:21

**Diego**
12:4,15 13:4

**difference**
29:4 59:23 65:17 95:21

**differences**
58:22 59:3

**different**
13:18 14:14,15,17
22:11 26:6 27:21,24
40:25 55:16,17 61:2
64:18 66:4,10 75:8
77:19 98:11,12

**differently**
55:18 81:4

**dig**
53:4

**digital**
64:15

**dipping**
31:24

**direct**
8:20 9:2 12:19

**direction**
32:5 61:13

**directly**
9:16 10:7 54:2 104:20

**director**
2:16 3:7,8

**disappeared**
71:15

**discretely**
95:24

**discuss**
22:1

**discussed**
105:4 111:12

**discussion**
5:24 60:20 80:20 82:1,
15

**discussions**
57:25 68:21

**dispute**
77:1 100:22

**division**
52:20 57:1 58:12

**doctrine**
24:3,24 30:17,25 31:2

**document**
87:20 91:22 92:5 93:4

100:14 111:4,24

**documentation**
37:6 78:1,2

**documenting**
44:3

**doesn't**
9:16 11:15 21:5 22:11
27:8,15 33:9 34:7 43:1
44:10 47:20,21 48:17
52:17 60:12 66:8 68:4
80:19 81:5 82:14 86:24
87:19 88:5,6,9 89:10,23
95:17 102:13 107:19
111:8,20

**doing**
29:22 31:25 42:19
74:17 91:2

**dollar**
63:9 109:9,23

**dollars**
73:13,14,15 89:2,18
90:2,3,4 91:5 93:13
109:14,15

**dominant**
6:9 61:3

**don't**
2:15 10:6,18 11:14,15
15:2,5,9,17 19:1,2,4,5
20:9,21 24:20 25:19
26:4,5 27:8 32:2,7,10,
11 34:1 35:22 38:1,17
40:9 41:7 42:24 43:19
46:15 53:3 55:12,19
57:4,10,21 58:5 63:13
66:16 68:12 69:14
73:11 74:17 75:13,14
76:6,14,16,17,18,24,25
77:3,10,14 78:6,20,25
79:4,21 80:15 81:15
83:2,10 84:17 85:1,10,
17 86:6,15 88:2,3,8
89:2,3 92:22,25 93:22
94:25 95:1 97:2,3 99:21
100:20 101:4 102:12,25
103:2,15,23 105:7
107:4,10,11,15 108:1,6
109:20 111:15 112:11

**double**
31:10,12,24

**doubt**

34:12

**draft**
3:1 80:14

**drafted**
13:13

**drafting**
66:9,11 92:16

**drafts**
57:21

**draw**
78:12

**drive**
62:19

**drop**
16:19

**dual**
64:4

**dumb**
52:8

---

**E**

**e-mail**
81:21

**earlier**
22:14 24:6 33:3

**earliest**
77:22

**early**
30:6 31:1 43:5 62:8
64:14 77:21,23 78:1

**earnings**
99:23

**easier**
31:6 53:15

**economic**
72:25 73:5

**economist**
2:23 4:7 6:20 73:23

**education**
100:14

**educational**
36:21 79:13

**effect**
37:13 47:17 76:13

**effective**
40:10 84:10

**effort**
3:3

**eight**
8:23

**either**
41:4 43:1 81:8 95:22
111:6 112:11

**element**
24:3

**elements**
20:17

**eleven**
9:2

**eliminate**
39:10

**eliminated**
39:8

**emanates**
24:3

**embodied**
62:5

**embodies**
24:9,15 25:1 26:25

**enable**
19:10

**encompasses**
66:3

**encourage**
4:16,20 6:3 60:22 61:6

**ended**
64:19

**engineer**
77:3 101:6

**engineering**
77:16 79:1 104:14,16,
17

**engineers**
77:3 78:17

**enter**
13:18 17:2 20:6 33:12
34:2 49:14 56:12

**entered**
29:20 91:15 112:18

**entering**
43:24 61:24

**entire**
20:19 22:5,6 71:6,10

**entities**
9:20,23 27:22

**entitle**
88:9

**entitled**
27:6

**entity**
44:9 83:3

**entry**
10:5 61:23

**equally**
99:11

**equipment**
13:19,22,23,25 14:1,2,
4,5 15:8,9 17:23,24
21:20,23,24 32:21
75:21

**equivalent**
36:4 60:2

**Eric**
3:9 5:15,23 6:24 7:20
9:8,10,16,17 13:20
15:20 26:20 39:2 47:10,
20 49:17 66:16 75:22
79:21

**Eric's**
3:15 12:19

**Ericsson**
41:22 42:5,13 64:22

**especially**
6:13 32:3 74:18 76:21
81:11

**essential**
18:11,21 19:6 20:1,4,7,
8,12,15,24 21:8 22:3,8
42:17 61:18 74:13 75:8
106:18 107:6,9,21
108:22

**essentially**
61:10,18,19 62:6 74:22
106:24 107:17

**et**
71:10

**etcetera**
20:18

**Europe**
10:17 62:9 96:25

**eventually**
30:1 45:24 70:12

**everybody**
11:3 33:10 91:12

**everybody's**
4:22

**everyone's**
49:20

**evidence**
112:19

**evolution**
28:25 29:2

**evolve**
20:11 47:16

**evolved**
6:12 15:12 24:24 25:18
26:19 31:2

**evolves**
112:6

**evolving**
15:4 20:10 61:4

**exact**
69:20 94:12

**exactly**
31:24 50:4 56:20 69:23,
24 78:7,15 83:13,18
84:11 86:22

**exam**
68:25

**example**
21:1,6 38:7 50:9 51:6,9
60:25 65:25 66:18
73:13 89:1 95:1,2
104:10

**examples**
99:25

**exception**
22:4,14 87:22 89:4 90:6

**exceptions**
22:6 87:18 90:16 91:23
92:10,13

exchange
29:21

exchanged
109:14

exciting
111:9

exclude
28:2

excluded
100:4

exclusively
57:7

Excuse
16:9 45:10

executives
2:22

exhaust
26:10 38:19,20,22 39:1,
25 45:18 47:11 67:21
74:24 106:6

exhaust-remedies
48:17 67:22 74:16,21
76:8

exhaust-remedy
50:9

exhausted
27:5 31:16 35:16

exhaustion
15:12 23:21 24:2 25:19
26:4 28:11 29:7,9 30:16
31:8,9,25 34:8,21 35:25
36:16 40:4 48:2,18
60:21 69:11 70:10,14
103:19

exhaustive
40:11,12,14,16,18

exhausts
25:2,13

existing
20:7 47:13 60:3

exists
99:2

expansion
61:7

expectation
81:23

experience
43:12

experts
78:14

expiration
21:11

expire
40:6

expired
40:7

explain
18:22 23:22 76:4

explained
33:3 83:11,19

explaining
103:18

explanation
102:2,6

explicitly
49:21

extended
17:4

extent
4:17 13:1 29:2 42:12
57:10 70:20 75:8

extremely
79:13

**F**

Fabian
6:21,22,24 8:21 9:11
42:22 63:3 79:21

Fabian's
30:5

face
97:22 98:11 99:8

fact
26:17 33:2 62:17 64:4
69:20 93:9 96:6,7 100:8
111:9

facts
2:25 3:1,4 79:21 80:1,
15 81:2,9 82:16 91:20
92:1 111:13 112:6,8,21,
22,25

factual
100:5

fair
73:21 96:13,16

familiar
14:7 65:20 86:10

far
41:13 76:18 82:24

fast
65:13

favor
70:9,11

favored
87:7,11 89:15 90:7,22

fear
48:1

Federal
34:6,11,20 35:4 36:3

feedback
3:2 112:13

feel
5:16,18 106:24 111:4

fees
15:7,10,15 31:21,23
32:16 109:10 110:1,5,6,
9,23

felt
29:3 107:17

FEMALE
19:2 35:9,11 36:18
95:11 104:1 108:4

fifteen
17:21 26:2 28:4 64:9

fifty/fifty
94:6

fight
32:11 76:25

figure
67:16

file
104:8

filed
94:9

final
12:3 68:16 70:13

finalize
17:5

finally
36:17

finance
3:6 7:25 9:2 104:6

financially
105:1

financing
98:5,6

find
12:22 52:8,24 53:4,5,
15,18 55:20 100:23

findings
70:17

fine
11:2 12:10 16:2 80:4,7
93:1 97:21 100:9,11
111:5

firm
9:9 44:18,19 45:5,10
68:22

first
13:16 34:3 36:12 37:2
46:6 52:12 57:17 59:14
61:10 86:9

five
73:14 75:18 76:17 80:9
84:24

five-
79:17

fixed
18:18

flat
25:24 26:1 42:24

flow
18:9 105:14

focused
59:1

follow
2:24 103:9

following
42:18 100:3

footnote
92:10,11

**foreign**
9:20

**forever**
18:11 83:24 84:4

**form**
14:24 15:1,3,5,20,22,25
16:23 17:7,8 22:19
24:23 38:2,18 39:20
61:4 111:21 112:4,9

**formal**
54:23

**formally**
112:25

**format**
80:19 81:6 112:15

**formerly**
3:7

**forms**
17:12,19 22:2,24 112:9

**formulations**
74:16

**forth**
49:20 75:11

**forward**
3:4 18:20 86:5

**found**
40:11,14 65:18

**foundry**
41:5

**four**
12:12 14:11 85:2

**fourteen-and-a-half**
90:2

**fourth**
14:6

**frame**
58:1

**Francisco**
44:23

**free**
5:18 36:7,8 50:19

**frequently**
56:23

**front**
13:21 89:18

**full**
14:10 78:16 82:14

**fully**
65:4

**functions**
7:24 8:24

**funny**
96:6

**further**
79:6 81:1 85:18 104:12

**future**
18:15 20:8,21 21:9
75:15 76:6

**fuzzy**
29:19

---

**G**

**G-O-D-W-A-R-D**
44:18

**gain**
101:24

**gaining**
10:5

**Gardner**
3:22 57:17 59:23 60:9
63:7,14 68:12,21 69:5
80:18,24 81:8,18 83:9,
21 84:1,3,7,16,21 86:4,
9,19,23 87:3 93:22,25
94:8,15,18,25 95:8,15,
17,21 96:5,11,14,17
97:7 101:19 107:10,15,
19,23 108:2,5,8,13

**gathering**
5:19

**general**
3:9,15 5:9 7:19,21 8:8,
14 9:18 11:14 13:9 18:4
22:7 31:3 32:3 45:18
47:10 61:6 99:4

**generalize**
24:7

**generally**
12:18 18:13 20:19
30:12 31:5 40:12 41:16,
19 44:5 85:12,13,14

**generated**
17:25

**generates**
82:1

**generation**
64:9

**German**
70:8

**getting**
2:6,8 16:7 24:18 27:23
30:23 31:21 52:5 60:11
63:1 74:19 102:10

**Gilbert**
2:25 3:6 57:25 58:4,8,
10,13 79:5 81:17 85:9,
15 90:21 94:22 95:13,
16,22 96:2 98:11 99:7,
14 101:8,12,21 102:5,7
103:9 104:12,23
106:20,22 110:22 111:2

**give**
7:19 25:7,10 34:4 35:14
37:9 40:1 50:14 56:12
72:14 90:3,5,11 102:3,6
112:13

**given**
26:15 89:20 91:5

**giving**
29:15 36:2 39:25 47:10
48:3 50:9 60:16

**glad**
103:18

**gladly**
71:14

**go**
2:18 3:4 13:22,23,24
15:16 18:19 24:12 36:6,
12 43:7,8 46:19 49:3,5
50:14 52:21 53:6,10,18
59:19 61:9 62:17 76:8,
14 77:13 80:5 81:10,13,
19,25 84:24 87:19 88:6
110:19,25 111:9
112:10,14

**Godward**
44:18

**goes**
24:4,5 75:6 81:1

**going**
5:2 13:16 16:17 18:19
19:19 22:1 24:7 26:9,16
32:15 33:23 36:6,12
52:7 54:21 56:8 59:20
60:18 61:11,13 68:5,14
69:5 75:14 76:7,9,20
79:20 80:14,16 82:10
83:15 88:3 90:5 92:1
93:4,8,14 99:24 101:12
104:5,23 105:8 106:15
111:5 112:18,24

**Gonell**
6:17,21,23 7:3,5,7,13
9:12,23 10:2,11,14,18,
24 11:14,18 17:18
22:13,17 25:24 29:18,
24 30:1,10 34:10,17
37:18,20,22,24 38:3,9,
12,14,22 41:16,20 42:3
47:4,15 48:24 49:16
51:17,19,24 59:10 61:8
63:13,16,20 64:1 65:7,
11 67:14,22,25 69:16,
19,23 70:1,7 71:18,22
72:8,15,18,24 73:3,7,
16,18,22 76:12 77:9,15,
19,22 78:10 79:24

**good**
2:11 26:5 45:16 47:6,12
50:7,8 51:9 97:7 104:10
112:23

**Google**
89:25

**gotcha**
24:13

**gotten**
32:14

**grant**
14:10 29:9,10 33:9
85:21 86:13 87:3

**granted**
88:19,20 89:5

**granting**
29:4,5

**great**
13:6 33:14 36:17 82:3
102:1

**greater**
56:4

CX6786-R-128

**greatly**
18:8 61:16,25

**grew**
62:8,10

**group**
3:24 5:24 7:11 8:6,11
12:21

**groups**
19:16

**grow**
20:11

**growing**
20:11

**growth**
61:15 62:22 63:1,4,18,
21,23,24

**GSM**
62:9 63:17,21,25 64:14,
15,18

**GSM-CAPABLE**
64:5

**GSMS**
63:9

**guess**
6:25 7:9,20 45:19 67:2
69:9 74:7,10 82:5 85:19
96:7,21 100:16 104:19
111:13

**guessing**
59:21

**guy**
26:12 31:22

**guys**
32:16,20 38:25 71:14
79:3

---
**H**
---

**half**
45:12 62:1 80:14 94:6,
10

**hand**
13:20

**handed**
66:23

**handful**

62:10

**handheld**
13:24

**hands**
13:1 44:2

**handset**
41:3 45:23 50:19 51:14,
17 52:2,15 53:10 54:5
56:10 61:23 62:7,10,11
63:9 70:25 71:6,10,19
72:3,16 74:2 86:12
97:12

**handsets**
19:13 49:19 53:1,19
61:17 62:14 66:6 73:11
78:3,8 96:25

**happen**
33:1 64:23 67:19 68:1
74:1

**happened**
63:5 70:4

**happening**
52:11 101:19

**happens**
17:6

**hard**
56:5 59:1 60:9 73:19,20

**harder**
31:5

**hardware**
104:16

**Hartogs**
58:7,11

**hasn't**
17:18 18:5,7

**hate**
106:12

**haven't**
15:11 39:20 67:4 68:13
76:18 80:20

**he'll**
12:17

**he's**
3:20 6:24 8:11 10:13
11:9 12:18 16:7 93:25

**head**
8:25 9:2 12:21 16:12

**hear**
2:10 5:25 6:15 11:3
23:25 36:19 83:22
103:20

**heard**
36:20 69:2 99:22

**hearing**
45:20

**heartburn**
107:1

**heavily**
19:23

**Hello**
2:5 3:22

**help**
9:8 48:7

**helped**
62:14,15,19 80:1

**helpful**
4:17,19

**helping**
9:7,8

**helps**
53:18

**here's**
52:22 60:10 81:2,3

**hey**
42:19

**hi**
3:9 6:22,23

**high**
98:24

**higher**
26:15

**highly**
56:1

**Hisilicon**
104:6

**historical**
66:13

**history**
4:24 6:15 8:9

**hold**
37:12 40:22

**honest**
97:1

**hope**
22:11

**hopefully**
5:22

**hoping**
3:2

**hours**
78:3 109:5

**Howard**
2:15 13:10 93:3,7,14,18
97:17 99:24 100:16,19
101:2 103:6 104:2
111:11 112:12

**Howell**
4:6 69:10 70:22 71:4,7,
12,21,24 72:3,9,13,16,
19,21,23 73:2,6,9,25
74:4,9,13 75:3 77:2,8,
12 78:15 79:2,11,14
82:19,23 83:5,8,13,19,
25 84:2,6,20,22,25
85:2,19 86:3,17,22,25
87:23 90:18 91:8 93:12,
16 96:3,18 97:1,5,19
101:5,11 104:19 105:4,
23 106:4,12,15,21,24
107:17,22 109:1,3
111:18

**Huawei**
99:9 104:13,14

**Huawei's**
104:7,8

**huge**
59:23

**humongously**
71:20

**hundred**
62:11

**hurt**
68:9

---
**I**
---

**I'D**

23:24 79:25 90:16
91:22 96:3

**I'LL**
2:13,17 5:22 7:16 9:3
13:6 16:2,19 28:24
43:19 48:21 80:18
89:18 103:11,16 110:19
111:9,23 112:3

**I'M**
2:15 3:22 6:17,19 7:1,
21,22 8:23 9:7,12 14:25
16:16 21:25 23:19,21
24:7 34:18 35:3,22
36:22 37:11,15 43:11
47:25 50:22 51:13
59:19,21 62:14 67:11
72:9,13 74:23 77:3,13
80:7 82:25 83:17 84:25
86:10 92:17 94:2 98:10
100:6,11,16 101:6
102:9 103:18,22 104:5
106:11,15 109:10,15
111:22,25

**I'VE**
3:13 12:13 18:1 41:20,
22 43:18 59:1 97:1

**idea**
6:11,12 13:9 24:8,16
25:16 27:13,18 30:19
46:4 53:13 60:21 97:1
100:23 102:2

**ideas**
82:25

**identify**
4:18

**identifying**
100:7

**IDR**
100:12 102:3,4 103:10,
17 104:2 105:21 111:21

**IDRS**
111:23 112:4,9

**ignore**
81:10 103:3

**III**
88:19,20

**immemorial**
22:17

**impact**
63:2 104:24

**impacted**
63:1

**implement**
19:7 101:16 107:6

**implemented**
19:9

**implementer**
104:8

**implementing**
14:21

**import**
26:24

**important**
16:24 55:19

**importing**
28:5

**impression**
50:23

**in-house**
102:22

**incentive**
31:17

**include**
7:24 11:15 15:12 20:21,
22 21:8 30:18 45:25
60:22 65:1 67:5 93:2

**included**
59:18 60:1 100:4

**includes**
15:22 16:23,24 21:9
90:16

**including**
8:21 9:15 33:2 43:15
52:2 60:3

**increase**
18:10,17

**increased**
18:8

**incurred**
95:19

**independent**
98:2

**independently**
98:22 112:3

**India**
65:13

**indicate**
112:16

**indifferent**
73:1,24

**indiscernible**
83:18 88:6 96:18 103:8,
17 104:7,9,10 105:5,21
106:9

**industries**
98:13

**industry**
18:5 42:10 43:7,16 44:5
61:9 98:12

**industry-wide**
19:12

**infinite**
102:20

**influence**
57:19

**influenced**
61:16

**information**
5:19 8:3 9:19 12:11
13:6 33:20 52:25 56:7,
25 103:24 111:22,24
112:4

**informative**
79:14,15

**infrastructure**
14:1 15:8 17:24 21:23
75:20

**Infrequently**
16:2

**infringe**
106:18 107:8,20,24
108:3,6,7,8,24

**infringement**
29:5,8 30:22 31:13
32:25 33:14 34:5 35:15
44:1,6,8,13 46:5,18,23
47:2 51:3

**infringes**

**108:19**

**infringing**
24:14 53:9 107:7

**initial**
27:1,7 62:4

**initially**
23:3

**injunctive**
31:14

**input**
92:6

**inside**
3:18 96:23

**insight**
7:15

**instance**
21:2 50:8 66:17

**Intel**
43:8 52:19 102:21

**intellectual**
56:4

**intended**
101:8

**intent**
40:15,17 112:20

**interest**
103:16

**interested**
11:25 12:2,24 16:1
33:19 36:22

**interface**
12:5 13:2

**internal**
9:7

**international**
3:8,24,25 4:2,4

**interpret**
81:3

**interrupted**
16:12

**interview**
79:10

**interviewees**
6:3

interviewing
7:10

interviews
2:23

intro
5:11

introduce
2:19 6:18

introduced
62:20

introductions
3:5

invention
24:9,10,15,17,18 25:1,
12 28:2,3,4,6 30:25

inventions
26:8

inventory
99:18,21

investigate
53:4

investment
24:17

involve
98:21

involved
10:22 11:10 13:2 29:3
43:4 57:6,9 66:5,9,11
112:15

involvement
58:15

involves
12:4

iron
30:19

IRS
2:16,23 4:1

isn't
30:18 35:22 44:11 54:7
63:10 86:19 93:17

issue
40:5 70:18,21 100:12
103:16 104:20

issued
102:4 104:2

issues
3:4 4:2 10:7 28:18 31:8
106:7

issuing
111:23

it's
4:17,23 5:17,18,24 6:1,
9 12:10 13:13,19 17:5
18:6,14 20:19 22:10,11,
23 23:8,9,10,13 24:3
25:6,18 27:23 29:1
30:17 33:14,25 36:17,
19,20,23,24 37:1 38:2,
3,6,10,12,14,18,20,24,
25 39:1,13 41:19 48:8
49:3,4,23 50:8,16 52:2,
8,22 53:6,7,15,20
54:12,19,20 55:19,25
59:1,13,16,21 60:2
61:3,4 63:14 67:4,6
68:5,16 70:19 71:2
72:22 73:19 74:2,7,19
75:23 76:2,3 79:13
80:4,24 82:1 83:3,10,15
84:3,4,5,7,18 87:21
89:9 91:25 92:1,19 93:1
94:1,15 95:13,14 96:5
97:7,11,23 98:4,7,9,21,
24 99:7,14 101:19
105:2 106:6 107:12,24
108:2,14,17 109:10
111:3,21 112:8,18

item
80:16 82:1 90:15,16
93:12 101:3 103:16
104:19 109:2 111:23

items
82:6,8,12

its
19:23 23:8 27:22 68:6
85:14 86:1 91:6 98:25
99:2 101:10 102:18
105:1

_____

J

January
84:10 109:25 110:5,10,
17

Japan
9:25 52:3

Jessica
3:23

job
3:15,21 7:18,19 9:14
12:22 58:24

joined
45:4

judges
32:4

judgment
35:19 88:23 89:6

Judice
4:2

judicial
24:3

judicially
30:17

jump
5:17,18

jumping
82:8

justifies
89:12,21

_____

K

keep
103:6 111:4 112:1

key
103:6

kidding
4:24

Killion
2:22 4:7,25 5:3,7,11,21
6:19,22 7:1,4,6,8,14
8:2,13,16,19 9:3,11,18
11:2,8,12,19,21,23
12:5,8,14 13:5 15:18
18:23 19:1,4 21:7,13,
16,18,21 23:1,25 27:17
35:3,6 36:17,19 37:3,6,
17,19,21,23,25 38:6,10,
13,16 39:3,9,12,18
40:20 42:8 44:15,21,25
45:2,7,13,16 46:9 47:9,
14,16,23 48:11,14,19
49:12 50:17 51:8,13,18,
20,22,25 53:8,13,25

54:5,21 55:2,5,8 57:6,
14 58:17,20 59:8,11,15
60:20 61:14 63:6 65:9,
16,23,25 66:15 67:1,8,
13,24 68:7,11,19,24
69:7 79:9,12,15,19
80:10 82:6,12,18,22
84:23 85:1 87:6,12,15,
25 88:5,10,15,17 89:9
90:8,10,13,15 91:21,25
92:4,8,15,19,22 93:6,
11,24 97:22 98:6,18,20
99:1,4,13,17,20,22
100:9,18,20,21,23
101:3,17 102:8 103:11,
13,15,20,22 104:3
105:19 106:9,11,14
107:2 108:9,11 109:2,4,
13,18,20 110:2,4,7,10,
14,18,25 111:3,8,20

kind
3:16 5:11 9:3 14:18
21:10 22:1,11 33:12
36:22 38:6 41:14 42:25
43:18 45:25 50:25
51:15 55:22 60:16,20
66:8 67:7,10 68:2,4
69:13 77:11 79:4 80:19
81:9 82:7 86:4 87:18
96:6 97:25 102:9,10
103:16 109:4 112:14,23

kinds
13:24 44:12 66:4

know
2:15,20 4:23 5:14 6:2,
15 8:8 10:8 11:15,21,22
12:25 13:11,12 14:12,
16,17,22,24 15:2,23,24
19:11,13,17,18,19
20:17 22:4 23:7 24:8,
19,20 25:14,17,20 26:2,
4,7 27:8 29:1 30:23,24,
25 31:3,5,16,19,20,22,
24 32:2,4,8,15 33:1,2,5,
8,10,11,13,15,16,18,19,
20,21,22,23,25 34:1,3,
19,20 35:23 36:1,4,5,7,
8,11,15 37:10,13 38:1
39:24 40:1,2,6,7,9
41:13 42:18,24 43:1,6,
8,10,12,13,14,16,17,18,
21,22,24 44:3,7,9,11
45:6 46:3,4,11,12,13
48:1,2,3,16,22,23 50:22

CX6786-R-131

52:11 53:16,23 54:2,7,
8,9 55:12,14,15,19
56:7,23 57:4 58:15
59:22 60:10,15,17 61:4
62:21 64:2,3,8,17
66:16,22,24 67:9 68:2,
12 69:14 70:11,16,17,
18 71:13 72:11 73:12,
22 74:19 75:5,6,7,8,11,
13,15,16,17 76:1,2,3,4,
5,6,23 77:3,4 79:3,22
80:15,21,25 81:12,15,
18 82:15 83:10,14,22
85:1 88:1 90:16 91:11
92:1,16,25 93:1,2,22
97:2 102:25 105:4
109:5,20,23 111:1
112:2,7,9,11,14,17

**knowing**
66:3

**knowledge**
43:12

**known**
44:8

**knows**
18:18,19 57:24

**Korea**
9:25

---

**L**

---

**language**
59:8 65:18,21 66:6
83:20 91:19 100:2,9,11
110:22

**languages**
66:10

**large**
42:15 44:19 45:8

**larger**
56:4

**lasting**
84:4

**late**
6:17 62:8

**latest**
37:17,20 93:21

**Latin**

65:15

**laugh**
45:6

**laughing**
45:7

**law**
4:6 15:12 24:3,4 25:15
26:22 31:4,25 36:10
44:17 45:10 68:22

**law's**
25:18

**lawsuit**
69:15,20

**lawsuits**
44:13

**lawyer**
43:12

**lawyers**
8:21,22,23 10:16 44:22

**lead**
6:25 42:18 80:16,18

**leads**
8:24

**learn**
104:17

**leave**
32:18 34:12 43:22
53:10 60:18 82:25
100:22

**leaves**
100:7

**Leboeuf**
45:5

**Lee**
2:25 3:6 13:10 57:24
105:14

**left**
71:16 102:3

**legal**
9:13

**let's**
15:21 94:1,5,18

**level**
15:1,8 64:17 66:5 70:25
71:6

**license**
7:23 9:13 10:12 12:24,
25 13:18,19,25 14:1,4,
8,9,10 15:7,10,13,15
16:1,3 18:8 20:6,18,19,
25 21:8,9,10,14 22:5,
10,19,20,22 23:4,11,12
24:23 25:7,10,11 26:7,
22 27:1,3,4,14 28:8,9,
14 29:4,6,9 31:21,23
32:16 33:9 36:4 37:7,9
38:2,7,8,11,24 39:4
40:1 41:21,23 42:6,19,
24 45:17 46:14,25 50:5
52:1,17,22 54:8,16
57:10 58:20 59:18,25
60:8,16 61:22 62:6
66:2,6,13,17,23 68:17
70:17 75:20,21 77:20,
23,25 78:8,9,19,24
85:17 86:2 88:19,20
89:19 109:8,10 110:1
111:10

**licensed**
28:12 42:21 45:22
50:19 54:4,10 61:19

**licensee**
6:14 14:19 16:1,6 18:9,
17,18 23:7 27:14 29:6
46:14,22 47:7,8 49:3,4
54:7 89:15

**licensee's**
26:10

**licensees**
12:23 13:9 15:24 16:25
19:9 20:25 49:7,11 52:6
54:3,22 56:9 57:8 70:15
77:2,15 85:17 86:13
87:8 91:9

**licenses**
14:18 21:20,23,24 22:1
26:20 29:16 37:12 38:5
85:16 86:13,14 109:8
110:11

**licensing**
3:11,14 6:7 7:2,3,11,12
10:2,6,18 11:10 12:2,3
13:8 18:2 27:21 29:3
32:19 36:2,16,23 41:15,
18 42:12,20 43:3 49:19
51:15 52:20 57:7,19
61:5,16,17 62:13 65:18,

25 69:3 74:4,22,23
75:6,11 76:5 85:20

**licensors**
31:6

**lieu**
88:25

**Likewise**
82:13

**limit**
75:16,17,22 76:9,11

**limitation**
48:6 66:8,12 74:5

**limitations**
74:23 75:2

**limited**
22:3,7,20 48:8 74:10,12

**limits**
20:23 66:1,7

**line**
4:10 70:23 78:6

**lines**
70:2

**Lisa**
4:9 5:11

**list**
77:14 100:4 112:7,8

**listening**
102:9

**listing**
3:1

**literally**
19:15

**litigation**
70:2,3 112:17

**little**
17:3 29:19 36:15 52:5
65:15 75:12 81:13
105:4

**live**
33:13 106:21,23,25

**living**
91:22 99:18 111:3

**long**
32:18 40:2,3 43:10 75:6
76:4 78:10,11 110:18

CX6786-R-132

112:9,10

**long-range**
19:22

**longer**
22:22 29:13 36:23
109:6

**look**
3:4 31:21 34:24 36:13
43:6 59:2 63:18 64:6
73:22 89:17 93:18
110:11 112:3

**looked**
37:7 82:14

**looking**
16:7 86:4 94:1

**looks**
109:22

**losing**
16:15

**lot**
23:20 26:15 29:3 34:12
43:21 52:5 57:18 60:24
64:4 66:4 70:25 74:1
80:2 89:25 96:8 102:10
104:17

**lots**
4:24

**loud**
4:16

**lower**
87:8 88:6 89:10,12,21
90:12

**lucrative**
71:22

---

**M**

**M2m**
13:22,23

**main**
13:7 17:24

**major**
30:6 52:4 104:8

**majority**
44:22 51:14,19,24 64:3

**majority-owned**

85:21

**maker**
53:8

**makers**
54:22,25 55:11

**making**
11:25 14:20 19:12,14
20:1 28:2,14 40:4 52:14
53:1,19 84:17 94:2
101:21 107:8

**MALE**
11:20,22 17:10 23:2,23,
24 34:22 57:13 64:11
67:21 69:4,22 74:8
78:23 83:2,6,7,18
84:11,14 87:5 94:7,13,
17,19,20,21 95:7,10,12,
20 96:10,13,16 97:9,10,
11,15,16,20 99:6 102:9,
19,23 103:5,12,14,25
104:18 105:16 106:7,10
107:4,13 108:1,10,16,
20,23 109:12

**man**
106:16

**manager**
3:10,15,23 4:1,4 7:22
8:8,14

**Mannheim**
70:9,10

**manufacture**
40:25 41:1,7

**manufacturer**
41:4 45:9 53:2

**manufacturers**
32:7 36:23 37:8 39:4
40:24 41:3,14 45:22,23
50:18,20,24 51:14,17
52:2,4,5 53:10 58:23
61:20 97:12 109:7

**manufacturing**
52:10

**Marge**
103:7

**Mariko**
2:22 4:7 5:14,18 6:19
18:4 58:17

**market**

6:9 52:24 61:7,16,23,25
62:7,16,22 63:4 97:8
98:6 99:15 101:12

**marketplace**
53:21 61:24 101:15,24

**markets**
96:21 97:14,18,20

**Marv**
3:13 5:15,23 9:4 12:23
16:9 22:14 25:7 28:7
58:9 81:11 85:9 86:6

**Marvin**
79:21

**mathematical**
104:24 105:3

**matrix**
14:17

**matter**
24:19 52:17 72:15,24
73:5,18,19 76:12
111:21

**mean**
9:22 12:12 19:7 33:9
40:7 41:13 49:16 55:23
59:1,4 72:21,22 83:21
89:25 91:12 96:3,6
99:14 102:2,21,24
103:1 105:5 106:12
107:5,17 111:25 112:20

**meaning**
17:20

**means**
7:22 28:9 107:7

**meant**
5:24 6:1 60:15 61:10
69:7 91:21,25 92:1

**measured**
105:1

**Mediatek**
37:18,19 38:2,7,14,22
99:8,10,12

**Mediation**
103:12

**meeting**
2:20 4:15 58:13 68:14
80:12,14

**meetings**
10:10 12:17

**memorialize**
43:23

**memories**
38:25

**memory**
58:25 59:2 79:1,8

**mentioned**
11:8 68:13 74:6 112:20

**mentor**
3:20

**merits**
35:18

**methodology**
80:22 105:20

**MFRR**
91:10

**microphone**
5:4 16:13

**microprocessors**
43:9

**mics**
16:17

**mid-**
62:8

**migrated**
65:2

**migration**
64:19

**Mike**
58:7,11

**million**
90:1 95:5 109:14,15

**mind**
60:22 61:5 82:8 103:7

**mine**
6:5

**miniscule**
62:25

**minor**
108:18

**minute**
23:21 42:22 79:18

CX6786-R-133

**minutes**
19:8 80:9

**misunderstanding**
93:1

**Mitosis**
68:15 86:7,10

**mode**
64:4

**model**
16:5 22:9 104:24

**modems**
15:9

**modified**
17:19

**modules**
13:22,23 15:9

**monetary**
46:12

**money**
24:11 32:22 42:19,20
44:2 47:1 70:18 74:1,3
76:17 89:23,25 110:16

**monies**
109:14

**monitor**
52:24

**month**
17:4

**months**
12:12,16 13:10 16:4
62:1

**most-favored**
91:7

**Motorola**
41:11 43:1,3 45:12 90:1

**move**
13:7 108:16

**moved**
28:18

**multiple**
28:25 30:23 55:16

**mute**
80:8

**mutual**
74:19

**N**

**naked**
59:6

**name**
7:18 8:16,17 11:13,15
31:14 53:3 109:9

**Narayanan**
4:8 17:9,11,17,20 40:24
41:6,12 42:2,4,9 49:13
50:4 52:7,13 55:10,21
56:2,17 57:3

**nature**
98:13 112:23

**nearly**
62:11

**necessarily**
10:3 20:3 46:3 81:5
95:13 102:13

**necessary**
18:12 19:7,25 22:8
61:13

**need**
12:24 13:17 19:11
52:16,22 67:15 68:4
80:5 81:18 82:3,15 93:9
107:11 108:1 110:19

**needs**
82:4

**negotiate**
9:12 13:1 50:13 56:5

**negotiated**
30:7 47:20 55:18 56:1,
14

**negotiating**
70:17

**negotiation**
11:10 13:13 14:22
15:19 16:3 17:2 50:5,6,
16 52:23 56:16 77:1

**negotiations**
10:6,12,21 12:3 13:2,3
16:4 17:3 32:20

**nervous**
75:12 76:5

**net**

94:17,19,20 95:10,23

**network**
6:10

**networks**
14:5

**never**
36:3 70:13 72:12

**new**
18:9 39:23,25 40:15
61:23 62:18,20 68:14,
15 74:16,21 100:23
105:13

**nice**
67:3 97:19

**Nineteen**
103:25

**ninety-five**
32:6,12 71:13

**no-brainer**
72:22 82:3

**Nokia**
41:11,13,21 42:5,12
70:3,10

**non**
23:10 49:11

**non-u.s.**
97:8,13,17,20

**nonessential**
18:11 20:18,20,22,24
21:1,3,5,9 74:7,14
75:22 107:25

**nonexhaustive**
23:11 28:19

**nonlicensees**
49:15

**nonpayment**
46:17

**nonpracticing**
44:9

**normally**
20:21,22

**Nortel**
90:2

**note**
67:12

**noted**
109:8 110:15

**notes**
67:10

**nother**
60:6

**notice**
46:11

**notion**
30:18,23

**nuances**
25:15

**number**
47:6,12 62:7 73:12
75:24 78:3 82:19 85:2
87:6,15 88:19 93:12,19
94:12,16 96:19 103:23
104:19 106:2,3 108:14
111:23

**numbers**
94:3,8

**numeral**
88:20

**Nvidia**
51:5 52:18 102:21

**O**

**obligated**
46:14 48:9

**obviously**
71:19 72:19 79:23 93:3

**occur**
25:5

**occurred**
64:19

**OFDMA**
66:18 67:5

**OFDMA-BASED**
52:15

**offer**
24:1 89:3,24 90:7,12
91:3,7,16

**offered**
90:23 91:11

**offering**
103:17

**offhand**
11:16

**office**
3:17

**offices**
44:19

**oh**
2:9 4:11 5:3 6:19 7:4,6,
8 8:19 12:5 16:14 23:5
37:23 38:13,16 42:8
44:25 45:13 47:9 48:19
60:5 71:2 72:5 84:23,25
85:2 94:13 97:5 107:22

**okay**
2:9,10,13 3:6 5:3,7,11
7:1,6,8,14,16 8:2,13,19
9:3,11,18 11:2,4,7,8
12:5,8,14 13:5 16:18,19
17:20 19:3 21:13 23:14,
18 25:14 26:10 27:5
28:22 37:17,21,25
38:13,16,24 39:3 40:20
42:4,8 44:21 45:2,8,10,
13,16 47:9,14,23 48:19
49:12 52:13 53:13 55:8
56:17 57:6 58:17,21
60:20 61:14 63:6 64:12
65:16 66:22 67:8 68:19
69:8,9,25 70:22 71:4,7,
12 75:3 77:12 79:2,10
80:8,13,25 81:25 82:11,
18 83:5,8 84:22 85:2,
15,19 86:3,17,18 87:5
88:2 89:9 90:8,10,13,
14,15,17 91:8,24 92:4,8
94:7,21 95:12,15 96:2,5
97:16,25 98:10 100:1,
16 103:22 105:18
106:4,7,10,11 107:22
108:4,10,20,23 109:3
110:2,4,7,18,21 111:2

**old**
59:21 62:9 74:16

**older**
47:15

**once**
12:13 43:23

**one-by-one**
7:19

**ones**
47:15 51:1 60:10 74:14
77:22 84:24

**ongoing**
29:2

**open**
62:14,16 100:8

**opened**
62:7,15

**operating**
98:22

**operation**
98:6

**opinion**
34:13

**opinions**
112:11

**opportunity**
39:22

**opt**
70:24

**option**
46:22,23 83:14

**order**
23:12 91:5 108:16

**organization**
7:24

**organizational**
98:13

**organize**
5:12

**original**
6:5 83:23 109:18

**originally**
7:10 60:1

**originated**
31:2 76:3

**outdated**
65:10

**outpaced**
63:24

**outside**
3:10 76:14,23 88:6 93:9
96:22,23 98:22

**overall**
3:3

**overseas**
9:21 10:9

**oversee**
7:23

**oversimplify**
24:7

**overwhelming**
51:24

**owe**
76:17 94:9

---

**P**

**Paden**
4:4

**page**
87:21

**paid**
93:20 94:3,4,10,11
95:2,3 96:8

**paid-up**
89:19

**painstaking**
53:7

**par**
91:12

**paragraph**
87:23 88:16,17

**paraphrasing**
34:18

**Pardon**
2:7

**parent**
98:21

**parentheses**
88:10

**parents'**
98:3

**part**
4:24 9:14 10:20 30:14
33:4 43:22 44:7 47:24
53:20 69:2 86:6 88:21
105:7 107:10 108:13

**participate**
10:6 33:2 57:11 79:22

**participated**
19:20 42:13 58:12

**particular**
20:8,15 25:2,13 31:7
46:6 56:15 75:19

**particularly**
47:15 56:3

**parties**
16:25 40:2,15,17 41:1
60:18 74:10 78:17 79:6
90:24

**partition**
27:19,21

**partitioning**
29:13

**partner**
73:25

**parts**
14:16

**party**
40:12 68:18 86:12
89:14,16 106:17 110:24

**pass**
27:14,16

**Pat**
4:4

**patent**
12:24 14:8,9 15:12 19:7
20:20 21:2,3,5,10 22:10
23:12,20 24:2,8,23
25:1,2,6,7,12,13 26:12,
22,25 27:25 28:1 29:3,
7,9 30:15,22,24 31:24
32:24 33:14 34:7 35:15,
24 36:16 38:12,15
41:18 42:15 43:16,18,
19 44:1,6,7,12 46:5
47:2 48:2,18 51:3 52:16
56:5 59:25 60:21 61:19,
22 67:9 68:3,6 69:11
74:22 75:1,6 77:24 78:9
82:22 83:6,7 85:5,24
86:12 88:21 103:19
104:25 105:9,10,12,18
106:3

**patented**
24:15 52:20,21 53:9

CX6786-R-135

patentees
31:6

patents
18:9,11,12,16,22 19:24
20:1,4,5,7,8,12,15,19,
21,22,25 21:8 22:3,8
23:7,9 24:14 26:8,11
30:7 31:5,16 36:8 40:6
41:15 42:6,16,19 44:10
59:7 60:4 61:18 62:5
74:7 75:8,11,22 76:11,
14,17,23 82:24 83:3
84:18,19,20 85:11,14
89:24,25 90:1,2,3,5
104:9 106:19 107:5,9,
25 108:7,8,9,22,25

Patrick
3:25 4:5

pattern
17:6 69:20

patterns
74:13

pause
2:3 80:12

pay
24:22 30:22 31:18
40:19 45:24 46:14 47:1
48:9 60:10 70:19 73:3,4
89:2,18 96:11 106:19
107:11

paying
31:19 46:19 56:9 62:21
76:15 89:17 95:13

payment
95:4,9,11,12,18

payment's
95:21

payments
39:8,11 93:13 94:23
95:24 101:22 103:7

pays
89:1 102:25

peace
40:3 43:24 44:3

pejorative
44:9

people
4:20 5:17 8:4 9:15 10:9

13:3 26:3 29:3 31:15,17
33:6 49:19,24 52:25
53:18 56:8 72:25 76:14
104:7

percent
32:6,9,12 71:13 82:20
83:16 84:5,12 87:19
88:3,5 89:16,17,21 90:5
91:1,3

percentage
32:8 55:10 87:19,20
88:7

period
17:13 18:13 20:23
21:11 29:2 43:11 74:6
75:5 76:15,24

periodically
12:16

periods
76:1,13

permeates
47:25

perpetual
82:20 83:9,12 84:1,13

perpetuals
83:20

person
10:12 11:13 12:9 27:11
28:14

personal
43:9

personally
111:20

personnel
57:1

perspective
20:24 111:14

pertinent
5:17

ph
4:8 103:7 106:17
112:20

phone
4:11 6:10 11:4 20:1,17
26:9,12,14,17 28:15
42:21 61:1 80:8

phones
13:24 19:22 32:20 64:3,
5,9,14,15

phrase
16:19

pick
76:24

picture
50:22

piqued
103:16

place
34:15 39:24 51:15 68:9
101:18

places
109:8,13

planning
14:19

play
67:12 103:21

please
37:9

point
6:1 13:11 17:7 18:3
22:18 31:20 32:2,14
40:7 48:22 55:18 61:11
68:25 70:23 75:25
81:20 83:22 84:16,17
86:17 87:16 91:15 97:7
103:6 104:21 111:16
112:17

point's
96:14

pointed
62:22

pointing
87:25 109:4,11

points
55:16

policy
13:9 24:20 30:16,17
54:6

pop
52:6

portfolio
12:25 20:20 22:5,6,10

29:21 43:19 61:19
75:12

portfolio-wide
44:1

portfolios
42:15 43:17 56:5 74:22
75:1

portion
13:7

portions
17:15

posing
18:4

position
8:12 33:9,15

positions
7:18

possibilities
48:25 49:22

possibility
49:5,6,23 50:3,14,15

possibly
105:18

potential
12:22 14:19 15:25 16:6,
25 50:1 71:5,8

powerful
31:17

practical
72:15 73:18,19 76:12

practicality
73:7

practically
72:2 97:11

practice
28:16,18 33:7 41:12
42:10 44:4 75:5 76:1,19

practicing
20:3

predominant
63:8

prefer
5:17 49:17 95:25 96:3

preference
34:1 67:7,14,17

premise
52:12

preparation
14:22

prepared
3:1 57:21

present
49:9

preserve
32:11

preserves
40:15

president
3:16 8:6,7,10,12

pressed
33:25

presume
78:15

pretty
21:22,23 44:4 51:22
59:6,21 65:5 84:20
89:13 107:18

prevalent
44:4

prevent
31:25 80:24

price
24:19 26:14,15 30:20
62:20 99:9,11,15
105:11,13

pricing
13:8 14:23 15:23 16:23
17:17,18,22,23 18:1,5
98:15,16,20,24

primarily
10:22 14:5 41:3 86:12

primary
57:11

prior
3:7 69:12 101:12

probably
11:21 29:1 52:2 55:13
57:24 58:6 67:15 83:16,
19,20 96:23 97:5

problem
28:11 29:1 40:3 101:4

problems
64:6

procedure
35:1

process
33:3 53:7 82:21 101:16,
17 104:17

product
14:18 24:9,10,13,15,18,
19,25 25:3,6,8,11,14
26:24 28:3,4,6 30:20,21
33:24 44:10 54:14
61:24

products
12:1 14:21 15:15 20:17
33:7 47:2 66:19 67:5

profit
105:1

program
12:2,3 32:19 41:18
42:12 43:4 61:17 62:13

projects
9:8

promise
29:5,7,10 34:5 35:14
36:2,12,24 43:25

promises
33:16 75:9

promising
29:16

promissory
67:10,11

proof
35:19

property
56:5 89:24

protect
74:20

protecting
33:19

protection
98:3

protections
40:10

protocol
6:10 20:3 61:2

protocols
19:14,18

provide
5:10 9:13 15:25 16:23
55:4 57:12,16 59:4
100:13,25

provided
56:25 77:11,14,25 78:2,
3,20 87:6,8 88:11,24
89:7

provides
87:18 104:14

providing
5:23

provision
40:14,15 47:5 56:16,23,
24 67:23 79:4 87:11
88:14 89:4,15,22 90:7,
22 91:4,7

provisions
78:25 79:5 89:14 91:10
93:8

public
24:19 30:16,17

purchase
77:17

purpose
2:20 67:16

purposes
43:17

pursue
72:21

put
26:9 39:23 68:8 80:8
92:10,15 101:13

putting
95:14

—————————————

Q

Q&a
5:14

Q-U.S.
106:19

Q-U.S.'s
106:18

QC
83:3

QCT
57:1,4 94:2

QGP
102:11

QGT
57:10 58:23 65:19 66:1,
18 76:10 78:13,16,19
85:6,10,20,22,23,25
86:1 87:4,9,10,12 88:9
89:4 90:19 91:3,11,13
93:12,15 94:3,9 95:3,4,
10,13,16,19 96:8,19,21
97:8,22 98:1,3 99:8,14
100:3 101:7,21 102:25
104:15,24 105:10

QGT's
98:16,20,22 104:24

QGTP
57:7

QTI
86:9

QTL
2:22 3:10,16,18 6:25
7:22,23,24 8:6,8,10,15,
21,22,23 10:8,13,15,16
11:9 56:25 57:20 58:11

QTT
86:9

Qualcomm
3:7,11,13 9:22,23,24,25
10:1 19:20,23,24 23:12
41:1,5,7,8 43:14 44:24
45:1,4,24 47:7,8 51:14
54:23,24 55:4 68:3
69:10 76:2 78:13 85:4,
5,7,13 86:1,23 87:1,3,6
88:20,23 89:9 90:20
93:15 94:4,9,11 95:3,4,
14 98:3,21 99:4 101:18
102:13,14 104:13,14
108:6,21,24 109:15

Qualcomm's
20:4 52:16,20 68:5
85:10 103:2 107:8,20

question
9:4 17:11 18:4 20:17
21:21 40:21 41:25 50:2
52:8 55:21 68:19 70:14

81:13 98:9 104:6 107:2

**questions**
2:22 5:9,23 7:17 13:7
65:17 79:9 82:9 105:19

**quick**
2:17 3:5 112:13

**quickly**
6:8

**quite**
22:3,7 32:1 65:5 69:20

---

R

**R&d**
62:3 93:16 94:2 95:2

**raise**
105:11,13

**raising**
40:5 105:1

**rate**
18:6,10,17,18 63:18,21,
23,24 87:7,8 89:10,12,
16,19,21 90:5,12,22,25
91:3,6 109:11 110:15

**rates**
6:7 62:19 88:11,24 89:7
90:23 110:8

**rationale**
55:23

**read**
82:7 87:18 88:13

**reading**
85:6 86:20 109:7

**reads**
101:3

**ready**
104:22

**real**
32:21 70:21 71:16
112:13

**reality**
14:10 73:7 76:13

**realize**
12:24 98:8

**realizing**
24:22

**really**
10:18 12:9 25:19 32:4
34:17 36:24 37:11,20
38:10 43:17 44:13 61:3
62:14,15,22 66:1,2
67:16 70:4 79:11,12
95:18 96:14 97:24 98:1
102:11 106:12,24
112:11

**reason**
35:19 76:22 107:23

**reasonable**
88:23

**reasons**
15:11 33:1 71:23 76:4

**recall**
59:5 78:19

**received**
93:20

**receives**
102:11

**reciprocal**
106:3

**recognize**
53:3

**record**
4:22 95:23 101:1

**recorded**
4:15,23

**recording**
2:1,4 4:25 16:16

**recording's**
16:17

**redline**
111:12

**reduce**
91:6

**reduced**
9:6 61:25 110:8

**reduction**
88:11,23 89:6

**reemphasize**
4:14

**refer**
93:9

**reference**
78:2 81:19

**referred**
19:8 37:13

**referring**
30:5,11

**refuse**
46:25 56:5,11

**regard**
31:9

**regarding**
91:19

**regardless**
49:2 52:15 93:5

**regards**
31:7

**regroup**
80:9

**Reifschneider**
3:9,20 7:21 8:5,18,20
9:22 10:16,20 12:12,20
14:13 15:6 18:21,24
19:3,6 20:14 21:15,17
23:5,14,16,19 24:2
25:22 26:1 27:13,18,24
28:22,24 30:14 31:9,11,
13 32:14 34:11,16,18,
25 35:2,5,7,10,12 37:1,
15 38:20 39:22 41:10
42:5,11 43:3 44:17,22
45:3,11,14 46:3,10
47:24 48:15,20 50:21
51:7,9 53:22 54:1,4,6,
15,19 55:13 56:18
59:12,20 60:14 63:11
64:8,12,17,25 65:8,14
66:20,25 67:11 69:14,
17,25 70:15 72:2,5,10
74:18,25 75:4,25 80:2,5

**reimburses**
93:15

**related**
9:13 77:20 104:9 112:5

**relates**
6:8 18:3

**relationship**
41:14 54:23 55:1

**relevant**

4:19 5:16 20:16 76:13

**relief**
31:14

**remain**
47:21 56:25

**remains**
70:21

**remedies**
35:16 38:19,20,23 39:1,
25 40:16,21,23 45:18
47:11 67:21 74:24
106:6

**remember**
19:8 30:15,19 38:17,19
45:9 56:18 58:5,6 59:8
73:12 78:6,24 79:4
109:16

**renegotiate**
39:23

**renewal**
109:10

**repeat**
9:4

**rephrasing**
87:16

**replace**
40:14 68:17

**report**
8:4,5 9:6,16,17 54:24

**reporting**
9:7,15 53:17

**reports**
8:20 9:2 12:19,22 55:4

**request**
6:5

**require**
45:19 47:7 53:17 54:9
55:11,22 56:21

**required**
21:3 40:18 45:23 54:23

**requirement**
55:3

**requires**
54:13

**resell**

**54:17**

**reserve**
27:3

**resource**
102:20

**resources**
101:13 102:12,14,18,
21,22 103:1,3 104:15

**respect**
20:20 25:2 75:1 82:15
85:22 88:18 99:15
106:3

**responded**
104:4

**responsibility**
9:9

**responsible**
7:22 8:6

**rest**
17:2 61:19

**restrict**
51:11

**restriction**
47:12,13 49:8 97:8

**restructuring**
68:20 69:1

**result**
18:9 91:3

**resuming**
80:13

**retired**
3:17

**retract**
4:24

**retroactively**
88:9

**return**
12:21 22:6 24:12,17
90:4 91:2 93:21

**revenue**
17:25 30:24 63:16,17
71:6,10,16

**revenues**
71:14

**review**
57:12 58:18

**reviewed**
57:21

**reviewing**
84:24

**revise**
17:12,15

**revised**
39:5,10 57:13 61:5 82:4
92:2

**revising**
111:4 112:1

**revision**
58:3,4,6

**revisions**
57:23 111:11

**reword**
94:23

**rewriting**
69:2

**rid**
63:1 78:7 107:12
108:13

**right**
4:13 5:5,21 6:13 9:1
10:4,14,24 11:18 12:8
13:21 15:1,5,6,18 19:6
21:21 23:7,8 25:3 27:3,
15,16,17 28:9,10,17
29:23 30:16,23 32:1
33:20 34:18,25 35:2,9
37:3,6 39:9 40:2 41:1
45:3 47:9 48:11,14
50:15 51:7,8,16,18
53:24,25 54:5 55:2,5
57:5,13 58:8,10 59:15
60:1,4,11 64:20,22,25
65:9 67:24 68:7,8,11,
13,22 69:23,24 71:8,19,
24 72:4,8,15,18,23,24
73:25 74:6 75:25 78:15
79:4,19 80:1,19 81:15
82:8 83:4,13 84:1,2,5,
18 85:4,8,10,13,21
86:20,22,24,25 87:3,12,
15 88:15,19 89:21
90:10 91:1 92:18 93:4,
11 94:3,9 95:20,21,22
96:6,12,22 97:5,9

98:14,18,25 99:1,4,9,
13,17,19,20,22 100:2,
18 101:6 102:3 104:7
105:9,25 107:12 108:1
109:19 110:13 111:8,15

**rights**
25:2,13 26:10 27:5,15,
19,20,23,24 28:1,2,8
29:13,15 40:13 48:3
59:5,6 68:3 74:19 82:25
83:6 85:5,18,22,24
86:12,14,15 88:22,25
104:25 105:9,10,12,18
106:3

**risk**
15:12,17 32:12 33:13
48:1 98:5,6,15,24 99:2,
3,5,7,15,18 101:15,20

**risks**
97:23,24 98:1,7,9,12,23
99:24 100:3,7,8 101:5
103:14

**Risser**
4:9 5:13 81:22,24 91:9

**road**
100:17,22

**Rob**
11:17

**Robert**
11:18,19 53:6

**Roecker**
3:25

**Roman**
88:19

**room**
2:18

**rooted**
30:16

**roughly**
55:11

**royalties**
15:7,10,14,15 18:19
22:18,19,20,22 29:14
30:4,8,9,13 31:12,18,
22,23 32:7,9,16 35:17
36:8 40:19 42:7 46:7,
11,15 48:10 62:17,21
73:11 76:15 88:25 89:3
109:24 110:3,5

**royalty**
2:21 6:7,13 13:8,14
18:5,6,10,17,18 22:14
25:9 26:11,13,16 27:10,
11,12 28:14 29:22
30:13 32:12 33:23 36:6
39:8,11,13 45:20,24
48:13 56:9 61:6 62:19,
23,24 70:23 71:14,16,
25 72:4,11,14,16 73:3,
4,10,14,21 76:22 82:20,
22 83:12,23 84:13 87:7,
8 88:11,24 89:3,6,12,
16,19,21 90:5,12,22,23
91:6,16 96:12 106:19
109:6,7,10,11 110:8,15

**royalty-bearing**
52:22

**royalty-free**
45:21

**ruled**
48:16 71:9

**rules**
5:12 75:9

**run**
3:20

---

**S**

**said-said**
63:3

**sale**
24:25 25:5,6,12 26:10
27:6 29:6 48:8

**sales**
48:9 49:2,3,7 63:9
105:15

**Samsung**
41:11,13

**San**
12:4,15 13:3 44:23

**Savi**
4:8

**saying**
4:22 13:16 16:22 27:5
36:5 42:22 62:14 72:9,
10,13 80:19 83:22 84:3
89:9 90:9,22 91:18
92:17 96:8 97:13,20,25

Meeting
- 07/27/2012                                   i22

100:2,6,10 102:11
105:6,14 107:24 108:5
109:15 110:10

**says**
26:22 54:17 56:24 83:2,
14 85:20 87:7 89:2,8,
17,22 93:12 96:19
106:16,17,24

**scale**
105:3

**scenario**
46:21

**schedule**
9:6 93:19

**scheme**
45:20 61:6 62:25 98:20

**Schneck**
2:6,8,10,13,16 4:11,14
5:1,5,8 6:18,24 11:3,7
78:12 79:17,20 80:8,11,
13,23 81:7,20,23,25
82:11,13 91:18,24 92:3,
5,13,18,20

**scope**
21:18 58:24 68:25

**se**
15:3 30:25

**second**
49:14 50:15 64:9 80:14
84:16 107:10 108:13

**section**
32:12 92:14

**see**
10:25 53:2 60:9 82:16
87:21 88:2,3,8 92:11
93:19 105:5,23 110:20
111:12,14 112:14

**seeing**
53:21

**seen**
48:7

**Sehilla**
112:20

**sell**
14:19 23:4 24:10,11
25:6,8,11 26:8,24 27:2
28:13 29:15 30:20 36:5

41:3 45:22,23 46:2
47:7,8 49:11,15,18,20,
25 50:19 51:2,12 53:22
54:7,11,24 59:5,7,9,17
60:17 86:14 96:23 99:9

**selling**
11:25 14:20 23:8,9
24:18 28:3,14 33:22
52:11 53:23 54:1

**sells**
31:22 96:22

**semi-**
3:16

**semiconductor**
43:6,16 44:5

**send**
53:5 111:11

**senior**
3:23

**sense**
23:20 68:4 108:11

**sensitive**
99:9

**sentence**
106:16 107:11,16 109:5

**sentences**
54:22

**sentiment**
32:3

**separate**
27:4 103:12

**service**
2:21

**services**
104:17 112:24

**session**
5:14

**set**
3:4 11:14 15:3 17:6
49:25 50:1 55:15 75:9
93:9 112:25

**sets**
15:10,14

**setting**
10:9 33:3 58:1 99:25

**settled**
70:3,12

**settlement**
64:21

**seven**
8:22 73:15

**shaped**
69:13

**share**
58:17 79:6 94:19,20
95:10,16,23 112:1

**shared**
94:24

**shares**
105:2

**sharing**
66:12 78:22,23 102:25
103:8

**shifted**
35:12

**short**
17:3

**shouldn't**
30:20

**show**
65:21

**sic**
11:18 32:13

**side**
20:2 50:7 82:8 101:18

**sides**
2:25

**sign**
16:2 17:1 75:17 112:16

**signed**
13:13 39:4 112:25

**significant**
104:14

**silent**
73:25

**silicon**
43:13 44:15 101:16

**similar**
60:6 91:9 97:23,25 98:8
100:1,3,7,10,19

**similarities**
58:22 59:4

**similarity**
98:8

**simple**
82:2

**simply**
56:11 59:4,6 87:7

**Sino**
52:25

**sit**
40:13

**site**
14:2

**sitting**
68:10

**situations**
90:19

**six**
62:1 73:15

**slower**
65:15

**small**
52:5

**software**
61:22 62:2 104:16

**sold**
24:13 53:1,2,18 55:6

**solution**
61:21 62:2

**somebody**
11:9 15:21 24:10 26:7,9
28:12 33:11 37:2,5
44:10 53:6 54:7,11

**someplace**
52:10

**somewhat**
65:10 74:10

**soon**
32:17

**sorry**
6:17 7:1 8:23 33:11
35:3 59:19 74:23 104:5
112:12

**sort**
3:18 6:14 13:14 18:4
20:22 31:19 40:5 43:23
53:9 60:15 61:2 65:4
74:5 89:23 101:7
104:19

**sounded**
109:21

**sounds**
70:22 92:16

**source**
93:4

**spans**
55:15

**speak**
4:16 6:3,6 7:9 32:22
43:18 50:17 98:3
104:22

**SPEAKER**
11:20,22 17:10 19:2
23:2,23,24 34:22 35:9,
11 36:18 57:13 64:11
67:21 69:4,22 74:8
78:23 83:2,6,7,18
84:11,14 87:5 94:7,13,
17,19,20,21 95:7,10,11,
12,20 96:10,13,16 97:9,
10,11,15,16,20 99:6
102:9,19,23 103:5,12,
14,25 104:1,18 105:16
106:7,10 107:4,13
108:1,4,10,16,20,23
109:12

**speaking**
2:12 41:16,19 43:11
111:25

**speaks**
34:16

**specialist**
4:3,6

**specific**
82:24 91:13 93:9 100:2,
6

**specifically**
86:7

**specifications**
19:18

**specified**
87:20 88:7

**spell**
8:17 108:2

**spelled**
27:25

**spent**
103:18 109:5

**split**
28:7 94:5,6 95:3

**spoken**
12:13

**stable**
98:16

**staff**
12:17

**stage**
93:1

**standalone**
54:18

**standard**
14:24 15:1,2,3,5,20,22,
23,25 16:23 17:8,11,12,
22,23 18:6 19:8 20:8,16
21:4,5 22:19 33:3,4,7
41:12 42:9 75:10 89:13
107:6,9,20 108:21

**standards**
9:14 10:23 14:14,15,21
19:9,10,12,13,16,21,24,
25 20:10 42:17 106:18

**standpoint**
48:4 51:2 59:24 60:2

**stands**
15:13 66:1 67:1

**start**
2:13,17 7:16,19 13:16
52:23 53:4 80:16 81:24
92:5

**started**
2:6,8 3:14 4:25 9:5 23:3
27:10 34:6 64:14,15
65:2

**starting**
3:10 13:12 17:7 55:18

**stated**
23:6 108:14

**statement**

100:5,12 110:4 111:6,7

**States**
28:5 71:15

**station**
20:2,18

**stations**
14:3,4 19:14 32:21

**statutes**
28:1

**statutory**
24:4 28:1

**stay**
39:12 79:25

**stayed**
39:16 62:19

**staying**
22:15

**step**
33:10 36:9 104:12

**steps**
28:25

**Steve**
3:22 13:10 112:12

**STI**
102:20

**stipulation**
3:1 80:15 112:21

**stopped**
29:14 30:4

**straight**
78:9

**stream**
71:6,10

**streams**
30:24

**strengths**
56:4

**stricken**
82:4

**strong**
30:7 106:14

**stronger**
50:12

**strongest**
50:6

**structure**
22:11,15,18 58:2 68:15
98:13

**struggling**
55:13

**stuck**
109:5

**study**
111:9

**stuff**
76:6 111:18 112:2

**Sub-item**
88:10

**subject**
70:11 92:9,13 99:11,13

**sublicense**
85:5,7,10,13,18 86:1,
14,16,20

**sublicenses**
85:21 86:6

**sublicensing**
86:7

**subscriber**
13:19,25 14:6 15:8
17:23 21:19 54:9 75:20
77:15,23 86:13

**subscriber/licensees**
48:9

**subsidiaries**
85:22

**subsidiary**
60:19 68:3,6

**substantial**
88:22 89:5,11,20,22
91:2

**substantially**
25:1 90:20

**subtract**
95:17

**sue**
24:12 29:5,8,10,17
30:21 32:24 33:14 34:4,
5,19 35:14,21 36:3,6,24
37:1,5 43:19,25 44:6

46:4,16,18,23 47:2 51:3
68:5 105:25 106:5

**sued**
35:15 44:7 46:6 69:10

**suggest**
91:22

**suggestion**
108:15,17,18

**suing**
44:13

**summer**
45:11

**supervised**
12:20

**supplier**
29:16 30:6 46:5 47:7
48:4 49:8,10,15 96:23
102:13,17,18 107:8
108:18 110:3

**supplier's**
27:7 46:21

**suppliers**
27:2 30:9 32:10,23
33:20 41:3,18,21,23,24
42:24 62:7,10,11 76:25
96:20 97:22 98:2 100:3
102:12 103:2 106:17
107:20

**supply**
33:10 36:9 54:13

**support**
3:18 77:11,16,24 78:4,
21 79:1

**Suppose**
52:9

**supposed**
31:25

**supposedly**
92:23

**supposing**
89:14

**Supreme**
24:5,20

**sure**
3:20 8:5,21 14:25 18:23
23:23,24,25 28:12

33:22 37:15 47:25
48:23 56:8 67:11 80:10
84:25 101:2 102:5
104:21

**surpassed**
63:17

**surprised**
24:21

**surprising**
67:4

**survive**
56:16

**switched**
29:25 30:12,13

**system**
12:4

---

**T**

**T-R-A-N-S-C-O-R-E**
35:7

**table**
5:20 68:10

**take**
15:2,17 23:21 28:23,24
31:19 33:8 42:25 46:25
59:2 60:25 71:14 79:17
95:18 104:12

**taken**
8:11 17:5

**takes**
10:25 40:1

**talk**
2:21 4:21 12:18 19:15
22:23 53:6 58:6 68:2
107:13

**talked**
9:10 62:9

**talking**
4:17 6:20 13:10 17:25
21:7,13,19 39:2 41:2
46:6 55:15 59:14 69:21
77:6 104:11 106:2
109:5

**talks**
28:7

**tape**
103:21

**target**
99:11

**tax**
2:16 3:8,22,24 4:6

**taxes**
71:14

**taxpayer**
83:4

**team**
3:25 4:4 7:3,25 8:1

**technical**
14:14,20 19:8,9,10
20:15 42:17 61:21
77:11,24 78:2,3,4,14,20
102:18,20,21,22 103:1,
3 104:14

**technically**
22:8

**technologies**
20:13 60:23,25 62:12,
18,20 63:19,23 79:7

**technology**
6:8,9 18:7 19:13,23
33:4,6,17 42:14 43:5
47:1 52:16,20,21 53:9,
19 60:3 62:5,9 63:8,24
65:1,10 66:2,3,5,7,12
74:10 75:10 86:2 96:11
104:7,8

**Telecom**
99:12

**tell**
6:6 8:3 11:12 33:11
48:1 50:22 52:21 57:18
73:23

**telling**
56:20

**ten**
9:17 17:20 26:2 31:4
64:9 73:13 80:9

**ten-**
79:17

**ten-dollar**
73:14

**tendency**
16:18

**term**
18:13 37:11 45:19
47:17 100:21

**terminate**
40:13 46:16 68:16 69:5,
6

**terms**
5:9 16:3,24 17:2 18:21
25:15 26:3 33:15,21
35:24 39:12,16 41:15
44:9 50:6 52:23 55:17
58:24 60:8 62:2 63:9,
16,17 70:17 84:10
93:24,25 100:2

**test**
14:4,5,6 15:9 21:24
32:21 75:21

**thank**
2:11 5:13,21 8:19 11:5
16:21 36:21 79:14,15,
16

**Thanks**
24:1

**that'll**
100:24

**them--**
91:11

**Theoretically**
73:16

**theory**
33:13 69:11,12 72:25
73:5 105:8

**there'd**
5:14 76:22

**there's**
5:5,9 9:25 10:11 16:3
17:6 19:11 22:4 26:5
31:3 35:22 39:13 40:3
48:24,25 49:7 56:24
58:15 59:23 60:1,6,23,
24 63:8 70:12,18 75:16
77:10,14 78:25 82:6,13
93:8 95:1 96:8 102:25
104:10 105:23 106:20
110:16

**they'd**
31:17 95:25

CX6786-R-142

Meeting
- 07/27/2012

i25

they're
10:20,22 14:21 19:10,
19 31:18 33:21 40:11,
12 41:8,9 42:11 46:15
49:16 52:14,16,18,19
53:14 54:10 57:1,2 59:6
70:19 74:12 75:14 76:6,
15 97:24 98:12,14,15
99:10 102:15

they've
39:10 89:5,20

thing
12:10 13:14 17:6 21:22,
24 26:13 29:24 39:2
49:24 61:2 62:15 71:9
77:19 97:14 106:14,25
107:18

things
2:13 3:12 15:16 25:20
26:2,6,24 28:20 31:5
32:7 50:22 56:6 62:25
64:7,18 70:19 73:24
80:5 81:3,12 88:1
100:22 102:4

think
2:17 9:16 14:7,16 16:18
26:4 34:7 35:22 36:9
38:1,3,4,20 48:20 50:2
52:2 57:10,19,21,22,25
58:12,13 63:13,15 64:1
67:19 68:12,16,21
74:17,21 75:7 76:9,10
77:10,14 78:20,21,25
79:10,25 80:4,7,18
81:1,9,11 82:7 83:2,11,
21,22 84:13,17 85:10
86:6 87:10,21 88:6
90:21 92:15 93:25
94:13,22 95:25 96:4,7
97:3 98:1,11 100:9,23
101:8 102:1 103:6,23
104:23 105:14 106:20
107:4,23 109:21 111:18
112:20,23

thinking
30:14 31:1 36:1 47:25
60:7 68:9 100:11
111:22

third
41:1 49:9,23,24 50:3,14
60:18 74:9 78:17 89:13,
14 90:24

third-
86:11 106:16 110:23

third-party
6:7,13 7:12 13:9 57:8
74:4 85:5,13,24 86:21
87:8 96:20,22 97:22
101:7 104:25 105:9,10,
11 107:20 108:3,18

thought
7:10 26:3 41:25 72:10
82:21

thousands
20:14

threat
71:17

threaten
70:20

threatened
69:11 71:11

threatening
71:6

three
3:17 7:6 8:24 10:25
48:25 49:22 82:19
83:15 84:4,12 87:19
88:3,5 89:16,17,21
94:1,4,10,25

three-
68:17

throwing
83:1

TI
52:18

time
4:18 5:1,20 6:12 15:11
17:13,14,15,16 20:11,
24 22:3,7,17 29:3,14,
20,22 30:4,8,12 43:11
53:16 55:16 58:1 61:11,
22,24 63:22 64:23 65:3
66:13 68:25 70:25
74:23 75:2,16,17,22
76:4,9,11 78:10,11
79:11,13 81:11 84:12
103:18 104:21 112:14

times
10:4 32:23 43:21

timewise

79:23

timing's
29:18

TLA
83:14

today
66:16 68:10,13

today's
4:15

told
41:20,22 42:23 68:13

ton
89:24

tons
104:9

top
87:21 93:20 112:3

total
94:2,10

totally
112:2

touch
12:9

traction
101:24

Transcore
34:6 35:5,6 36:3

transcribing
4:21

transcript
4:19

transfer
60:6

transferred
60:11

transmittal
81:21

trapped
92:22

treaty
43:24 44:3

tremendous
62:21 102:21

tremendously
62:8 63:24

trend
31:4

tried
29:10 49:22

trigger
29:7 34:21 48:17

triggering
35:24

troll
44:10

trot
70:19

true
3:2 50:5 70:8 75:19
84:6 92:24 94:1 111:6,7

trust
58:25 59:2

try
14:8 16:19 23:21 26:5
28:11 32:15 36:6 46:7
53:4 81:20

trying
2:24 25:19 31:23 67:3
76:4 77:13 78:12 80:24
84:9 96:14 99:8

turn
30:21 54:10 80:11

turned
56:15 63:15 71:9 92:24

turning
16:12 24:22

turnkey
62:2

turns
25:15 101:23

twelve-and-a-half
90:1

twenty
28:5

twenty-five
82:12

twice
12:13

**twists**
25:14

**two**
5:15 7:10 9:15 12:16
17:4 25:4,5 27:21 40:1
42:5,23 46:10 58:14
60:12,13 62:1 63:22
64:18 90:4 94:4,11 95:3

**type**
48:3 49:14 67:22

**types**
13:18 14:18 55:17 66:3

**typo**
106:20

---

**U**

**U.S.**
52:4 82:24 83:2,3,7
84:18 85:4,5,7,12 90:20
93:15 96:22,23,24
97:12 98:23 101:18
108:6,21,24

**ultimately**
14:17 101:14,22

**um-hum**
41:6 46:9 51:8 56:2
57:3 65:14 66:15 73:2
74:8 80:23 83:25
101:11 102:23 103:5
104:18 111:8

**UMTS**
64:3

**UMTS/GSM**
64:4

**unable**
35:18

**unconditional**
25:11 34:19

**underlying**
31:1 67:16

**undermine**
15:14

**undermining**
28:13

**understand**
6:13 13:17 18:24 19:4,5

23:20 30:15 56:20
67:16 68:24 105:7

**understatement**
71:3

**undertaking**
98:1

**unexplored**
79:7

**unique**
76:1

**unit**
13:19 54:10 56:21
77:23 89:18

**United**
28:5 71:15

**units**
8:7 14:3,6 15:8 77:15

**unlicensed**
46:18

**unlimited**
102:14

**unsuccessful**
37:4

**up-front**
110:1

**upcoming**
68:20

**updated**
67:4 103:24

**use**
18:21 19:19,25 21:4
22:2 23:4,7,9,12 26:24
27:2,3,16 28:10 39:25
54:9,13 59:17 61:1,2
68:6 75:4,25 81:11 98:8

**useful**
20:16 33:21

**uses**
20:2

**usually**
16:3,25 18:10

---

**V**

**vague**
100:17,21

**Valley**
43:13 44:15

**value**
16:6,7 24:16 50:8 88:22
89:6,12,20,23

**variety**
43:14 46:19

**various**
12:17 22:24 31:16 33:1

**vast**
51:19 64:3

**verify**
110:19 111:1

**version**
59:14 65:3

**versus**
29:4 62:9 63:21

**VIA's**
90:25

**video**
98:17

**view**
6:1 13:12 42:25 112:24

**voice**
4:16 16:19

**volume**
56:21

**VP**
3:22

---

**W**

**walk**
56:13

**want**
2:24 4:14,18 9:8 13:1
15:17 17:10 18:3 24:20
26:16 28:23 31:19 32:2,
10,11 33:6 36:9 42:25
43:6 49:18 50:10,11,12
51:3 56:20 57:4 72:20
74:1 76:24,25 79:22
89:2 91:18 92:12,22,25
93:2 100:20 105:5
111:4,25 112:1,6,7

**wanted**
2:21 5:13 6:11,15 36:15

46:25 65:16 71:25
81:23 87:17

**wants**
15:21

**warrant**
88:23 89:6

**wasn't**
57:17 83:18 91:13
104:21

**watching**
53:20

**way**
6:19 13:15 24:24 25:7
26:19 27:4 29:8 37:9,24
39:6,7 42:1 45:20 46:13
48:8,25 49:3,9 52:24
60:19 63:2 66:1 80:15
92:15 93:2,15 101:1,3
102:3 107:3 111:6
112:11

**ways**
25:4,5 31:11,16 46:10,
19 105:17

**WC**
63:23

**we'd**
22:3 23:25 32:14,17,25
46:18 56:6 94:4 99:11

**we'll**
12:18 22:1 36:2 53:5
54:8 81:25 92:18

**we're**
2:6,8 3:2 16:15 17:25
27:20 32:15,24 33:11,
19 36:1,2,5,6,7,11,12
37:4 41:2 46:6 48:3
50:9 52:4 53:23 54:1
60:16,17,18 68:10,14
69:4,5,21 73:25 74:22,
23 76:9,24 80:24 84:3
87:25 90:5 92:1,16,18
95:5 96:7 99:18 100:7
112:17,24

**we've**
21:19 22:9,24 25:17
35:17 39:8 48:7 56:13,
14 57:9,11 68:21 74:15
81:3 83:11 90:21 92:24
111:12

**week**
3:17 68:22

**weighed**
70:9

**Weinberg**
3:23

**welcome**
79:23

**went**
70:10 72:13 78:8 90:2
91:11

**weren't**
28:13 44:13 46:19

**what's**
53:21 60:11 81:14
82:20 96:18

**Where'd**
44:15

**who's**
16:1 19:12,14 26:9
53:1,16 58:9

**Willful**
31:13

**willing**
34:2 48:21 60:17 79:25

**win**
101:14

**wireless**
19:10,22 20:2 42:14
43:5

**won**
35:18

**won't**
16:16 26:11 33:1,11
46:4 54:7 100:4

**wonder**
82:6

**wondering**
23:19,21 37:12 82:23

**word**
83:9 107:23

**wording**
86:18

**words**
16:15

**work**
3:3 6:7 9:20 19:22
25:19,21,22,25 26:2,3,
4,5 27:8,9 34:7,9,10,11
44:15 48:25 57:13
72:12 81:25 92:21

**workable**
73:8

**worked**
45:8,9,12 58:7

**working**
3:11,18 9:5,14 12:18
19:17 43:14 92:3

**works**
6:24 11:12,24 13:12
35:24 45:20 48:17,23
80:17

**world**
14:16 65:7 83:9

**worried**
31:15 32:24

**worth**
50:15 70:25 89:25 90:3
105:12

**worthwhile**
22:23,25

**wouldn't**
29:8 34:5 39:15,16 44:6
56:20 58:25 59:22
60:14 62:25 65:19
66:20 82:8 85:25 90:6,7
91:6 97:23 98:7 101:7

**write**
80:25

**writing**
100:13 111:22 112:10

**written**
66:13 67:8 83:23 87:16
100:25 105:24 106:6

**wrong**
23:15,17 50:22 79:1

**wrote**
101:8

---

**Y**

**yeah**

2:8 5:1,21,22 6:19 7:13
9:23 10:14,18 11:11
12:12,15,20 22:16 23:2
28:24 30:10 31:13
34:17 35:10,11 36:12
37:20,23 38:7 39:15
40:24 41:2,10 48:5,24
51:9,20,25 52:7 53:12
57:14,25 58:8,14 59:10,
23 60:7 63:20 64:12,24
65:8 66:15 68:19,22,24
69:7,16,19,23 70:7
71:21 72:5,23 73:6,9,
10,20 74:12 77:18
78:10 79:5 80:2,4,18
81:7,17,22,23 82:9 83:2
84:14,20,21 86:19
87:12,23 88:15 91:15,
21 92:19,22 93:1,6
94:1,17,22 95:7,11,12,
17 96:10,13 97:19,21
99:22 100:23 101:21
102:7,8,19 103:11,12,
13,15,20,22,23 104:1,3
105:16,19 106:9 107:5,
17 109:2,13 110:18
111:8

**year**
43:14 45:4,12 61:25
75:18

**years**
3:11 15:24 16:5 17:4,5,
19,20,21 18:8 19:21
22:21,25 24:24 25:15
26:3 28:5 31:2,4 34:2
39:20 43:5,13 55:16
57:9,22 60:24 62:1
64:10 75:18,24 109:17,
19 110:12

**you'd**
5:10,16 50:7 82:16
103:9

**you'll**
49:14 93:19

**you're**
4:17 7:1,11 14:7 20:1
21:7 24:12,14 26:16
31:15,21,23 37:11,16
51:22 52:21 55:13,15
71:19 72:15 75:12
76:23 79:23 83:22
86:19 87:13 91:18 97:5,
13,25 99:25 100:10

105:6 109:6,9,23
110:10 111:4

**you've**
31:16 33:16 82:14
88:13 95:18 112:14

---

**Z**

**zero**
6:14 30:13 76:22 89:3,
19 90:6 91:1,3,6,16
109:6 110:9,15

**ZTE**
99:9