# Exhibit A

[Translation]

Case No. 2010 (Han) No. 1

Decision

5775 Morehouse Drive, San Diego, California 92121 USA

   The Respondent: Qualcomm Incorporated
   Representatives:  Steve M. Mollenkopf
   Attorneys for the Respondent:
      Harumi Kojo
      Kimitoshi Yabuki
      Yoshihito Shibata
   Subagent attorneys for the Respondent:
      Atsushi Yamada
      Takahiko Ito
      Tomohiko Makino
      Atsushi Nishitani
      Aya Takahashi
      Ken Kawai
      Sayuri Tago
      Izumi Katayama

The Japan Fair Trade Commission, with respect to the Cease and Desist Order case against the above the Respondent based on the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Act No. 54 of 1947) (hereinafter, the "Anti-Monopoly Act (AMA)") prior to the amendment by the provision of Article 2 of the Supplementary Provision of the Act for the Partial Revision of the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Act No. 100 of 2013) that shall remain applicable based on said Act for the Partial Revision of the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade, investigated the Draft Decision submitted by Mitsuhiro Saito, Chief Hearing Examiner, pursuant to Article 73 of the Rules on Hearings by the Fair Trade Commission (Fair Trade Commission Rules No. 8 of 2005) (hereinafter, the "Rules") prior to the abolishment by the Rules for Establishment of the JFTC Relevant Rules upon Enforcement of the Act for the Partial Revision of the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Fair Trade Commission Rules No. 2 of 2015), attached hereto as an attachment, and renders its decision as follows.

[Translation]

## Main Text

The JFTC hereby renders its decision that the Cease and Desist Order dated September 28, 2009 (2009 (Measure) No. 22) shall be revoked.

## Grounds

1    The facts, evidence, decision and application of laws as found by the Commission are identical to those provided in Parts I. to VII. of the Grounds for the Draft Decision, attached hereto as an attachment, and are thus incorporated herein as reference.

Of the terms used in the cited draft decision, the terms listed in the "terms" section of Attachment 1 of the Draft Decision shall have the meanings ascribed to them in the "definition" section thereof.

2    In the present case, the Cease and Desist Order had been issued on grounds of violation of Article 19 of the AMA, as conduct constituting trading with restrictive conditions as stipulated in Article 2 (9) (iv) of the AMA prior to the 2009 amendment and Former General Designation Paragraph 13.

Based on the evidence ( Shin 1 to 3, 13, 19, 20, 79, 221, 275, 276) and based on the status of how the Respondent owns industrial properties essential for the 3G wireless mobile communication standard (Draft Decision Part III.2.(4)B), it could be inferred that the Respondent held an influential position in the market for the technology concerning CDMA Subscriber Units, etc. (hereinafter, "the Subject Market Under Consideration in this case"), and in the course of such a process in which the Respondent entered into the License Agreements with Domestic Manufacturers/Sellers of Handsets, etc., it is believed that there could have been room to find some sort of conduct of the Respondent that should be regulated in some way under the AMA. However, as described in Part VI.1 of the Draft Decision, there is not enough evidence to find that the Respondent's having entered into the License Agreements which included No-Compensation License Provisions, etc. with the Domestic Manufacturers/Sellers of Handsets, etc., constituted trading with restrictive conditions as described in the Cease and Desist Order, thus having the tendency to impede fair competition.

Consequently, the violating acts of this case by the Respondent cannot be found to constitute trading with restrictive conditions as stipulated in Article 2 (9) (iv) of the AMA prior to the 2009 amendment and Former General Designation Paragraph 13, or to be in violation of Article 19 of the AMA, and a Cease and Desist Order may not be issued against the Respondent on the grounds of these provisions.

3    Therefore, pursuant to Article 66 (3) of the AMA and Article 78 (1) of the Rules, a decision is rendered as provided in the main text.

[Translation]

March 13, 2019

Japan Fair Trade Commission

| | |
|---|---|
| Chairman | Kazuyuki Sugimoto |
| Commissioner | Akiko Mimura |
| Commissioner | Reiko Aoki |
| Commissioner | Yoshiharu Ojima |

[Translation]

Attachment

Case No. 2010 (Han) No. 1

Draft Decision

5775 Morehouse Drive, San Diego, California 92121 USA

The Respondent: Qualcomm Incorporated

Representatives: Steve M. Mollenkopf

Attorneys for the Respondent:

Harumi Kojo

Kimitoshi Yabuki

Yoshihito Shibata

Subagent attorneys for the Respondent:

Atsushi Yamada

Takahiko Ito

Tomohiko Makino

Atsushi Nishitani

Aya Takahashi

Ken Kawai

Sayuri Tago

Izumi Katayama

With respect to the Cease and Desist Order trial case against the above Respondent based on the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Act No. 54 of 1947) (hereinafter, the "Anti-Monopoly Act (AMA)") prior to the amendment by the provision of Article 2 of the Supplementary Provision of the Act for the Partial Revision of the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Act No. 100 of 2013) that shall remain applicable based on said Act for the Partial Revision of the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade, we, who had been appointed by the Japan Fair Trade Commission (hereinafter, "JFTC") as Hearing Examiners in accordance with Article 56 (1) of the AMA as well as the provision of Article 12(1) of the Rules on Hearings by the Fair Trade Commission (Fair Trade Commission Rules No. 8 of 2005) (hereinafter, the "Rules") prior to the abolishment by the Rules for Establishment of the JFTC Relevant Rules upon Enforcement of the Act for the Partial Revision of the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade, having examined the matter and on the belief that the following decision is appropriate, hereby prepare this Draft Decision in accordance with the provisions of Article 73 and Article 74 of the Rules.

1

[Translation]

The terms listed in Attachment 1 shall have the meanings ascribed to them in the "Definition" section thereof.

Main text

The JFTC hereby renders its decision that the Cease and Desist Order dated September 28, 2009 (2009 (Measure) No. 22) shall be revoked.

Grounds

Part I    Purpose of the Appeal

Refer to the main text.

Part II    Overview of the Case (facts not disputed by the Parties and facts that are publicly known)

1. The JFTC held that, the Respondent, in entering into agreements granting licenses, etc. to the portfolio of intellectual property rights for CDMA Mobile Wireless Communications owned by or to be owned by the Respondent, etc. to the Domestic Manufacturers and/or Sellers of Handsets, etc. (hereinafter, "DMSHs"), forced the DMSHs, etc. to grant licenses, etc. to the intellectual property rights owned by or to be owned by the DMSHs, etc. for no compensation, as well as to make a pledge not to assert its rights based on the intellectual property rights owned by or to be owned by the DMSHs, and this means that the Respondent is transacting with the DMSHs by attaching conditions that unfairly restrict the business activities of the DMSHs, which falls under Article 2 (9) (iv) of the AMA prior to the amendment by the Act for the Partial Revision of the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Act No. 51 of 2009, the "2009 Amendment") (Paragraph 13 of the Designation of Unfair Trade Practices prior to the amendment by Fair Trade Commission Public Notice No. 18 of 2009 [Fair Trade Commission Public Notice No. 15 of 1982] [the "Former General Designation Paragraph 13"]), and is in violation with the provision of Article 19 of the AMA, and issued the Cease and Desist Order to the Respondent (2009 (So) No. 22.; this order is hereinafter referred to as the "CDO," and the Respondent's acts found to be violation in this Order are hereinafter referred to as the "Violating Acts of this case").

The copy of the order concerning the CDO was served upon the Respondent on September 30, 2009.

2. The Respondent made a demand for a hearing seeking revocation of the CDO in its entirety on November 24, 2009.

[Translation]

Part III  Assumed Facts (The facts with evidence number in the parenthesis at the end of each Paragraph are the facts found based on such evidence, and the other facts are the facts that are not contested between the parties or are publicly known. Evidence numbers are referenced simply as "Sa XX" or "Shin XX," omitting "No." or "Exhibit.")

1. Concerning the Respondent

The Respondent has its head office at the address stated above and engages in research and development concerning mobile wireless communications (as described in 2 (1) below), licensing of intellectual property rights concerning mobile wireless communications, and manufacturing, sales, etc. of semiconductor integrated circuits (hereinafter also referred to as "Chips") used in Subscriber Units or Wireless Telephone Base Stations.

2. Concerning 3G Mobile Wireless Communications

(1) Overview of Mobile Wireless Communications

Mobile Wireless Communications means such wireless communications defined in Article 3 (1) of the Rules on Applications for Radio Equipment (Radio Regulatory Committee Rules No. 18 of 1950) and/or similar wireless communications that are currently or will be stipulated in foreign laws and regulations, the purpose of which is to conduct telecommunications activities, and refers to wireless communications, etc. between land mobile stations that are established to be used by mobile devices, and base stations that are established telecommunication purposes.

(2) Standards of Mobile Wireless Communications and their transitions

The mobile wireless communications system is stipulated as a "standard" by the International Telecommunication Union ("ITU") and other standards organizations in different countries and regions. (Sa 2)

International standards of Mobile Wireless Communications have been established and revised in accordance with the development of communication technologies, and these standards are distinguished in the order that they were put to practice, as first generation (1G), second generation (2G), third generation (3G), etc. (hereinafter, equipment conforming to Mobile Wireless Communication Standards shall, for example, in the case of third-generation Mobile Wireless Communication Standards, Subscriber Units conforming to said standard shall be referred to as "3G Subscriber Units" and Base Stations shall be referred to as "3G Base Stations," etc.).

In Japan, services utilizing the 1G Mobile Wireless Communications started in 1979, which eventually transitioned to services utilizing the 2G Mobile Wireless Communications around 1994, and after 2001, services utilizing CDMA Mobile Wireless Communications, which is the 3G Mobile Wireless Communications through Code Division Multiple Access ("CDMA") were provided. (Sa 4)

3

[Translation]

Third generation Mobile Wireless Communications enables higher-speed data communications compared to Mobile Wireless Communications of the second generation and is able to provide a variety of multimedia communication services including phone calls with high-quality sound, video streaming, video telephone function, etc.

(3) The historical background, etc. of 3G Mobile Wireless Communications Standards
A. Establishment of the 3G Mobile Wireless Communications Standards by ITU

In May 2000, the ITU approved a total of five standards concerning 3G Mobile Wireless Communications including "DS-CDMA (Direct Spread-SDMA)" and "MC-CDMA (Multi Carrier-CDMA)" as the international standard called "IMT-2000."

The former is a standard conforming to the W-CDMA system proposed by Japan and the EU and the latter is a standard conforming to the CDMA2000 system proposed by the U.S.

(Sa 2, Sa 6 through Sa 8)

B. Establishment of the 3G Mobile Wireless Communications Standards in Japan

In March 2000, the Standards Assembly ("Standards Assembly") established in the Association of Radio Industries and Businesses ("ARIB," which became a general incorporated association as of April 1, 2011) approved two standards concerning 3G Mobile Wireless Communications in Japan including the "IMT-2000 DS-CDMA System ARIB Standard (ARIB STD-T63 Ver. 1.00) ("ARIB-STD-T63 Ver. 1.00")" and the "IMT-2000 MC-CDMA System ARIB Standard ("ARIB STD-T64 Ver. 1.00")" (these standards and any revision thereof are hereinafter referred to as the "3G Mobile Wireless Communications Standards"). The former is a standard conforming to the W-CDMA system proposed by Japan and the EU to the ITU, and the latter is a standard conforming to the CDMA2000 system proposed by the U.S. (Sa 2)

(4) Treatment of Industrial Property Rights in connection with the ARIB Standard
A. Basic Guidelines for Treatment of Industrial Property Rights in connection with the ARIB Standard

4

[Translation]

(A) The Standards Assembly established the "Basic Guidelines for Treatment of Industrial Property Rights in connection with the ARIB Standard" (approved at the 1st Standards Assembly Meeting on September 5, 1995; the "ARIB Guidelines") regarding the treatment of Industrial Property Rights that are essential to all or part of the ARIB Standard (Industrial Property Rights refer to patent rights, utility model rights and design rights, and includes those that are pending. Essential Industrial Property Right refers to any Industrial Property Right that makes it technically impossible to manufacture, sell or use devices, equipment, systems or software in compliance with ARIB standards without infringing the same; hereinafter, "Essential Industrial Property Rights" except for the descriptions in this Paragraph and the following (b) which explains the contents of the ARIB standard). (Sa 2, Sa 10)

(B) The ARIB Guidelines set forth the following:
a. The Standards Assembly shall, in a case in which all or a portion of the content stipulated by the ARIB Standard is included in the scope of an Essential Industrial Property Right, where the holder of such Essential Industrial Property Rights (hereinafter, "Right Holder") opts for the treatment of option 1 or option 2 below, deem such right as being subject to the ARIB Guidelines, and where said Rights Holder opts for the treatment of option 3, deem such right as not being subject to the ARIB Guidelines. (ARIB Guidelines 1.1)
Option 1: The Right Holder grants a license for the use of said Essential Industrial Property Rights to anyone who uses such an ARIB Standard without conditions and without asserting any rights whatsoever.
Option 2:The Right Holder, upon disclosing the contents and the terms of such Essential Industrial Property Rights, grants a non-exclusive and nondiscriminatory license for the use of such Essential Industrial Property Rights under appropriate terms to an entity that uses said ARIB Standard.
Option 3: The Right Holders does not engage in either of the aforesaid treatments referred to in option 1 or option 2.

b. The Standards Assembly is not responsible for confirming whether all or a portion of the content stipulated by the ARIB Standard is included in the scope of an Essential Industrial Property Right, nor is it liable for any disputes regarding Industrial Property Rights. (ARIB Guidelines 1.2)

c. In the event that all or a portion of the contents of the provisions of a particular ARIB Standard are included in the scope of an Essential Industrial Property Rights, and when the Right Holder opts for option 2 of section a. above, the Right Holder shall, upon specifying the title of the ARIB Standard, the subject Industrial Property Right (TEIPRs), and the terms such as the consideration, etc. for using said Essential Industrial Property Rights, submit to the chairman of the Standards Assembly the "Attached Form No. 2: Confirmation Forms relating to a license for the use of Essential Industrial Property Rights" confirming that the Right Holder opts for the treatment described in option 2 of section a. above relating to the Essential Industrial Property Right ("Confirmation Forms"). (ARIB Guidelines 2.1, Attached Form No. 2)
(Sa 10)

[Translation]

B. Submission of Confirmation Form, etc. by the Respondent

(A) The Respondent elected the treatment described in Option 2, A (b) a. above and submitted the Confirmation Form to the chairman of the Standards Assembly on January 21, 2000, prior to the establishment of the ARIB Standards (3G Mobile Wireless Communications Standards) in the Standards Assembly. The Confirmation Form submitted by the Respondent stated 63 Industrial Property Rights concerning the "ARIB STD-T63 Ver. 1.00" standard and 64 Industrial Property Rights concerning the "ARIB STD-T64 Ver. 1.00" standard as the TEIPRs owned by the Respondent. (Sa 2, Sa 11)

(B) Similar to the Respondent, some of the DMSHs also submitted the Confirmation Forms to the chairman of the Standards Assembly stating the Industrial Property Rights that they claimed to be essential for the 3G Mobile Wireless Communications Standards.

   With respect to the "ARIB STD-T63 Ver. 1.00" standard, Matsushita Electric Industrial Co., Ltd. (currently, Panasonic Corporation, "Panasonic") listed 31 relevant Industrial Property Rights, Hitachi, Ltd. ("Hitachi") listed 26 relevant Industrial Property Rights, Fujitsu Limited ("Fujitsu") listed 21 relevant Industrial Property Rights, NEC Corporation ("NEC") listed 21 relevant Industrial Property Rights, and Toshiba Corporation ("Toshiba") listed 7 relevant Industrial Property Rights in their respective Confirmation Forms as TEIPRs owned by each of the DMSHs. With respect to the "ARIB STD-T64 Ver. 1.00" standard, Hitachi listed 19 relevant Industrial Property Rights, Panasonic listed 8 relevant Industrial Property Rights, Fujitsu listed 8 relevant Industrial Property Rights, NEC listed 6 relevant Industrial Property Rights and Mitsubishi Electric Corporation ("Mitsubishi Electric") listed 5 relevant Industrial Property Rights in their respective Confirmation Forms as TEIPRs owned by each of the DMSHs.

   (Sa 11)

[Translation]

(C) In the Confirmation Forms submitted to the chairman of the Standards Assembly, the total number of relevant Industrial Property Rights (TEIPRs) listed as those concerning the "ARIB STD-T63 Ver. 1.00" standard was 350 and those concerning the "ARIB STD-T64 Ver. 1.00" standard was 233. (Sa 2, Sa 11)

3. Concerning technology transactions relating to CDMA Mobile Wireless Communications

(1) Intellectual property rights for technology relating to CDMA Mobile Wireless Communications

Among the intellectual property rights ("IPRs") that are used to manufacture and sell subscriber units (the "CDMA Subscriber Units"), base stations (the "CDMA Base Stations"), semiconductor integrated circuits (chips), and other parts for the CDMA Base Stations (hereinafter referred to as the "CDMA Parts," and the CDMA Subscriber Units and the CDMA Base Stations shall be collectively referred to as the "CDMA Subscriber Units, etc.") to be used for conducting CDMA Mobile Wireless Communications, there are the technically essential intellectual property rights (the "TEIPRs") for the CDMA Mobile Wireless Communications, and although not falling under these categories, there are IPRs that provide competitive advantages to the apparatus, device, system, or software or those that enable functions or provide other features that are reasonably in demand by the market ("commercially essential intellectual property rights," "CEIPRs"). (Sa 22)

The TEIPRs to the CDMA Mobile Wireless Communications are loaded on the chips that process signals for the CDMA Mobile Wireless Communications which are then built into the CDMA Subscriber Units, etc., but recently, with regard to these chips that are used in subscriber units, the trend has been to consolidate into one chip such functions as the function to save power consumption of the Subscriber Units, the audio-visual function to play music and display video, and the function to process signals, and in terms of the manufacturing, selling, etc. of these integrated chips that have these diverse functions, there are cases in which not only TEIPRs but also CEIPRs to CDMA Mobile Wireless Communications are being used.

[Translation]

(2)  The types of transactions involving IPRs for technology relating to CDMA Mobile Wireless Communications

The transactions for the IPRs to technology for the CDMA Mobile Wireless Communications take the form of individual license agreements between the IPR holder and the IPR user (including cross-license agreements where the licensor and the licensee mutually grant license for the rights held respectively) or the granting of licenses through a patent pool.

4. Concerning the License Agreements between the DMSHs and the Respondent

(1) The DMSHs

The major DMSHs that manufactured and sold the CDMA Subscriber Units, etc. in Japan between 2000 and 2009 were Casio Computer Co., Ltd. (which transferred its subscriber unit business to its subsidiary, Casio Hitachi Mobile Communications Co., Ltd. ("Casio Hitachi") on April 1, 2004, hereinafter, referred to as "Casio"), Kyocera Corporation ("Kyocera"), SANYO Electric Co., Ltd. (which transferred its subscriber unit business to Kyocera on April 1, 2008, hereinafter "SANYO"), Sharp Corporation ("Sharp"), Toshiba, NEC, Panasonic Mobile Communications Co., Ltd. (which changed its trade name from Matsushita Communication Industrial Co., Ltd. on January 1, 2003, hereinafter "Panasonic Mobile"), Hitachi, Ltd. (which transferred its subscriber unit business to Casio Hitachi on April 1, 2004), Fujitsu, and Mitsubishi Electric Corporation (which announced that it would cease its subscriber unit business on March 3, 2008).

Of these, NEC, Panasonic Mobile, Hitachi, Fujitsu and Mitsubishi Electric Corporation were also engaged in the manufacture and sale of CDMA Base Stations. Furthermore, NEC, Panasonic Mobile, and Fujitsu, etc. were also manufacturing chips to be used in the CDMA Subscriber Units, etc. either themselves or through their affiliates.

(2)  Overview of the circumstances that lead to the execution of the License Agreements between the DMSHs and the Respondent

A. Since 1995, the DMSHs and the Respondent executed license agreements for the 2G Subscriber Units and/or the license agreements for the 2G Base Stations for the DMSHs to receive licenses from the Respondent for the IPRs to the 2G Mobile Wireless Communications Standards held or to be held by the Respondent.

[Translation]

B. Around 1999, it was necessary for the DMSHs to receive licenses from other holders of the TEIPRs to the CDMA Mobile Wireless Communications in order to manufacture and sell CDMA Subscriber Units, etc. because the telecommunication carriers such as NTT Docomo, Inc. ("NTT Docomo") and KDDI Corporation ("KDDI") were preparing to change their services to those which use mobile wireless communications that conform to the 3G Mobile Wireless Communications Standards, and, as stated in above 2(3)B, because the Standards Assembly officially established the 3G Mobile Wireless Communications Standards in Japan in March 2000. (Investigation Officials' Evidence Nos. 3, 37).

Meanwhile, the Respondent, as stated in above 2(4)B, submitted to the chairman of the Standards Assembly the Confirmation Form identifying multiple TEIPRs to the 3G Mobile Wireless Communications Standards held by it, and from around August 1999, it asserted to the DMSHs that it holds numerous TEIPRs to the CDMA Mobile Wireless Communications and demanded that they obtain licenses for the IPRs held by the Respondent if they wished to manufacture and sell CDMA Subscriber Units, etc.

As such, the Respondent, from around March 2000 to March 2001, based on the license agreements for the 2G Subscriber Units and/or the license agreements for the 2G Base Stations, and by revising these agreements, executed with the DMSHs as indicated in the attachment (The attachment includes a summary of the license agreements executed between the Respondent and the DMSHs to the extent needed to make judgments, but the agreements that were actually executed included more details on the scope of IPRs subject to the license and other matters.), the license agreements for the 3G Subscriber Units and/or the license agreements for the 3G Base Stations pursuant to which the Respondent granted licenses for the IPRs to the CDMA Mobile Wireless Communications held by the Respondent that are necessary to manufacture and sell the CDMA Subscriber Units, etc. (The agreements executed between the Respondent and DMSHs during the above period pursuant to which the Respondent granted licenses for the IPRs to the CDMA Mobile Wireless Communications held or to be held by the Respondent shall be referred to as the "License Agreements.").

The history of the negotiations that were held to execute the License Agreements between the Respondent with each of NEC, Panasonic Mobile, Toshiba, Mitsubishi Electric Corporation, and Fujitsu is set forth in Attachment 2.

[Translation]

(3) Overview of the License Agreements

    With respect to the contents of the License Agreements, the contents for the Subscriber Units are stipulated in the agreements, etc. entitled "Subscriber Unit License Agreement" and their revised agreements entitled "Amendment to Subscriber Unit License Agreement," and the contents for the Base Stations are stipulated in the agreements entitled "Infrastructure Equipment License Agreement," and their revised agreements entitled "Amendment to Infrastructure Equipment License Agreement," respectively. The summary of the License Agreements are as follows (The contents of the License Agreements are as indicated in the exhibit. Furthermore, although there are differences in the contents of agreements among each of the DMSHs, in the below, those minor differences that do not affect the decision in this case shall be abstracted and the facts shall be indicated.).

A. The Respondent shall grant to the DMSHs a personal (nontransferable), worldwide, and nonexclusive license for the IPRs concerning the CDMA Wireless Communications that are held or to be held by the Respondent, etc. that are specified in the License Agreements as the subjects of the license in order for the DMSHs, etc. to manufacture and sell the CDMA Subscriber Units, etc. (Shin 52)

B. The DMSHs shall pay the Respondent a certain sum (the "Lump Sum License Fee") at the time of execution and revision of the agreements, and they shall also pay on each calendar quarterly basis, a prescribed ratio of the amount obtained by multiplying the units of contracted products sold by the DMSHs during said period by the net sales price per unit of the contracted product (the "Royalty"). The prescribed ratio of the amount of the net sales price per unit of the contracted product (the "Royalty Rate") approximately range from 5% to 6.5% depending on the number of units of the contracted product sold under the license.

[Translation]

C. The DMSHs, as indicated in the attachment, shall grant to the Respondent, a personal (nontransferable), worldwide, and nonexclusive license for the IPRs that are held or to be held by the DMSHs, etc. that are specified in the License Agreements as the subjects of the license in order for the Respondent, etc. to manufacture and sell the CDMA Subscriber Units, etc. (The Investigation Officials view this provision as a no-compensation license provision and the Respondent views this as a cross-license provision. From the view of analyzing the fairness of the Investigation Officials' assertion, this provision shall be referred to as the "No-Compensation License Provision" in this Draft Decision. The License Provision means, as stated above, the grant of license for IPRs in order for the Respondent to manufacture and sell, etc. the CDMA Subscriber Units and CDMA Parts. However, because the Respondent already ceased its business of manufacturing and selling, etc. the CDMA Subscriber Units at the time License Agreements were executed, unless otherwise noted, the License Provision shall herein mean the manufacture and sale, etc. of CDMA Parts by the Respondent.)

D. As indicated in the attachment, among the DMSHs, NEC, Panasonic Mobile and Mitsubishi Electric Corporation, pledge that they will not assert their IPRs held or to be held by them that are specified as the subjects of the license in the License Agreements against the Respondent, etc. for manufacturing and selling, etc. the CDMA Parts, and/or to the Respondent's customers that purchased the CDMA Parts from the Respondent (the "the Respondent's Customers") and incorporated these in their products (The Investigation Officials view this provision as a non-assertion provision against the Respondent, etc. and the Respondent views this provision as a cross-covenant provision. From the view of analyzing the fairness of the Investigation Officials' assertion, this provision shall be referred to as the "Non-Assertion Provision against the Respondent, etc." in this Draft Decision.).

E. The DMSHs pledge not assert their IPRs held or to be held by the DMSHs, etc. that are specified as the subjects of the license in the License Agreements towards the Respondent's licensees for the manufacture and sale, etc. of the CDMA Subscriber Units, etc. by such the Respondent's licensees.

[Translation]

(The Investigation Officials view this provision as a non-assertion provision against the licensees and the Respondent views this provision as a non-assertion provision. From the view of analyzing the fairness of the Investigation Officials' assertion, this provision shall be referred to as the "Non-Assertion Provision against the Respondent's Licensees" in this Draft Decision. Furthermore, the No-Compensation License Provision, Non-Assertion Provision against the Respondent, etc. and the Non-Assertion Provision against the Respondent's Licensees shall collectively referred to as the "No-Compensation License Provisions, etc.")

With respect to the Non-Assertion Provision against the Respondent's Licensees, the DMSHs may freely choose whether or not to stipulate to this and if this provision is stipulated, this provision applies only to other of the Respondent's licensees who similarly stipulated this provision.

F. There are no fixed terms for the License Agreements.

Part IV   Issues in Dispute

1. Whether the execution of the License Agreements that include the No-Compensation License Provisions, etc. fall within the scope of Former General Designation Paragraph 13 by restricting the business operation of the DMSHs with a tendency to impede fair competition ("a tendency to impede fair competition ") (Issue 1).

2. Whether the scope of application of the CDO violates international law regarding regulatory jurisdictional rights and international comity (Issue 2).

3. Whether the CDO violates Articles 20 and 21 of the AMA and Article 31 of the Constitution (Issue 3).

Part V   Assertions of the Parties

1. Concerning Issue 1
(1) The Investigation Officials' Assertions

A. The Violating Acts of this case

The Respondent, upon executing the License Agreements, and through the No-Compensation License Provisions, etc. stipulated therein, forced the DMSHs, etc. to grant licenses to the IPRs held or to be held by the DMSHs for no compensation and forced the DMSHs, etc. to pledge that they will not assert any rights based on the IPRs held or to be held by the DMSHs (the "Violating Acts of this case").

B. The tendency to impede fair competition

12

[Translation]

In view of the fact that the degree and the contents of restriction of the No-Compensation License Provisions, etc. are unreasonable to such degree where it could be presumed that these have the tendency to impede the research and development incentive of the DMSHs, and because there was no possibility for the DMSHs to compensate for or to avoid the disadvantages caused by such restrictions, the Violating Acts of this case have the tendency to impede the research and development incentive of the DMSHs, enhance the influential position of the Respondent, and adversely affect the fair competition order, it could be found that the Violating Acts of this case have the tendency to impede fair competition.

C. The tendency to impede the research and development incentive of the DMSHs

(A) The degree and the contents of restriction of the No-Compensation License Provisions, etc. are unreasonable to a degree where it could be presumed that these have the tendency to impede the research and development incentive of the DMSHs

a. The scope of restriction on the assertion of rights by the No-Compensation License Provisions, etc. is overly broad

(a) The scope of rights subject to restriction on assertion

The scope of rights that the DMSHs would be restricted from asserting by the No-Compensation License Provisions, etc. extends not only to the TEIPRs to the CDMA Mobile Wireless Communications that is a leading technology but also to CEIPRs (The scope of rights subject to restriction on assertion pursuant to the Non-Assertion Provision against the Respondent's Licensees are only TEIPRs) and the scope is overly broad.

(b) The time period in which the rights subject to restriction on assertion were acquired

The time period in which the rights subject to the granting of licenses and subject to the pledge of non-assertion pursuant to the No-Compensation License Provisions, etc. can be acquired (improvement period) is indefinite for most of the TEIPRs, and the scope of restriction on non-assertion is broad.

On the other hand, with respect to CEIPRs, many of them have a stipulated improvement period of up to January 1, 2002.

However, the technology innovation of CDMA Mobile Wireless Communications evolves very fast and the No-Compensation License Provisions, etc. will prevent the DMSHs from quickly engaging in research and development and from freely using the fruits of their research and development at the right time in the market for the technology for the CDMA Subscriber Units, etc. for which the market was expected to grow. Furthermore, even if the improvement period was stipulated, if the DMSHs manufacture and sell Subscriber Units, etc. that conform to the 3G Mobile Wireless Communication Standards without obtaining licenses for the IPRs to be developed or acquired by the Respondent after the improvement period has lapsed, they may face consequences of infringing the IPRs held by the Respondent and be sued by the Respondent for injunction, etc. For this reason, the DMSHs have no choice but to accept if the Respondent demands an extension

13

[Translation]

of the improvement period. Even if the Respondent does not demand an extension of the improvement period, and the improvement period is not extended by any provision of the License Agreements, if the DMSHs assert their IPRs developed or acquired by the DMSHs after the improvement period towards the Respondent, the Respondent will counter such assertion with the IPRs similarly developed or acquired after the improvement period, or the DMSHs might be prevented from asserting their rights by the Respondent's spin-off of its semiconductor business. As such, the IPRs to be developed or acquired after the improvement period are excluded merely as a matter of formality from the subjects of the No-Compensation License Provisions, etc. but they are substantially subject to those provisions, and based on the fact that all IPRs to the CDMA Mobile Wireless Communications acquired or developed by the DMSHs during the period of the License Agreements could become subject to the No-Compensation License Provisions, etc., the scope of restriction on assertion is overly broad.

(c) The counterparties for whom assertion is restricted

There are at least 100 counterparties for which the DMSHs are restricted from asserting their rights pursuant to the No-Compensation License Provisions, etc. and Non-Assertion Provision against the Respondent, etc. that are comprised of the Respondent and the Respondent's Customers, etc. around the world with which the DMSHs compete in the market for the products for the CDMA Subscriber Units, etc.

Furthermore, there are at least 130 counterparties for which the DMSHs are restricted from asserting their rights pursuant to the Non-Assertion Provision against the Respondent's Licensees that are comprised of the other licensees of the Respondent that stipulated similar provisions.

(d) The period during which assertion is restricted

[Translation]

The License Agreements do not stipulate the contract period of the agreements, nor does it specifically stipulate the period during which rights cannot be asserted under the No-Compensation License Provisions, etc., which means that the DMSHs may not assert their rights as long as the No-Compensation License Provisions, etc. are effective.

(e) Brief summary

As explained above, the scope of application of the No-Compensation License Provisions, etc. is broad both in terms of the scope of rights and acquisition period subject to restriction on assertion and also in terms of the counterparty and period subject to restriction on assertion by these provisions, and these provisions broadly restrict the DMSHs from asserting their rights with respect to the technology currently held by the DMSHs and the technology and the rights with respect to the technology for the CDMA Mobile Subscriber Units, etc. to be developed by the DMSHs in the future.

b. Having the nature of a no-compensation license

As can be seen from the fact that with respect to the No-Compensation License Provisions, etc. it is indicated in the License Agreements that they are "fully-paid and royalty free license[s]" (no-compensation license), the DMSHs may not receive any compensation from the Respondent for licenses granted to the Respondent with respect to their portfolio of IPRs held or to be held by them, or for promising non-assertion, etc.

Furthermore, the Respondent unilaterally presented to the DMSHs its draft License Agreements that include the No-Compensation License Provisions, etc. at a stage when the details of the IPRs subject to license are still unclear and the value thereof had not yet been considered or evaluated. In addition, even when the DMSHs requested adjustments of the license terms presented to them in said draft such as the Royalty Rate, etc. as these being unfair and not appropriately reflecting the value of the mutual portfolio of IPRs, the Respondent expressly maintained that the Respondent would not evaluate the value of the IPRs held by the DMSHs and refused to accept the requests for adjustments from the DMSHs.

In view of the contents of the No-Compensation License Provisions, etc. and the manner in which the No-Compensation License Provisions, etc. were stipulated as described above, the No-Compensation License Provisions, etc. did not adjust the Royalty Rate and other contractual terms based on the result of reviewing and evaluating the value of the portfolio of IPRs held by the DMSHs subject to the agreement, and thus these provisions can be said to have the nature of a no-compensation license.

[Translation]

c. The No-Compensation License Provisions, etc. are imbalanced

Based on the No-Compensation License Provisions, etc., the DMSHs were obligated to grant to the Respondent, the Respondent's Customers, and licensees, free license to the broad portfolio of IPRs that the DMSHs develop through massive investment and efforts and were obligated to pay Royalties based on the Royalty Rate unilaterally decided by the Respondent. On the other hand, because it became possible for the Respondent to use a very broad scope of IPRs to the CDMA Subscriber Units, etc. held or to be held by the DMSHs, etc. without paying any compensation, and because it also became possible for the Respondent to supply its customers with the CDMA Parts under highly stable conditions of not being subject to the assertion of rights such as an injunction as a result of a filing of a suit for patent infringement or the like, it could be said that the No-Compensation License Provisions, etc. created an imbalance between the DMSHs and the Respondent.

In addition, the No-Compensation License Provisions, etc. substantially discriminated against each of the DMSHs by not taking into consideration the value of the IPRs of the DMSHs where ownership in IPRs differed among each of the DMSHs, and thus these provisions created an imbalance among the DMSHs as well.

d. Summary

Based on a through c above, the No-Compensation License Provisions, etc. place restrictions on the DMSHs to substantially grant free licenses for a broad scope of IPRs to the technology invented or to be invented in the future by the DMSHs, etc. for a long period of time to the Respondent and the Respondent's Customers worldwide that compete with the DMSHs in the markets of the products for the CDMA Subscriber Units, etc.

The degree and content of the restrictions that are imposed by the No-Compensation License Provisions, etc. prevent the DMSHs from utilizing their broad scope of IPRs to the technology invented or to be invented in the future by the DMSHs by monetizing them in the form of license fees to be received corresponding to the value of their IPRs even if they are used by the Respondent or the Respondent's Customers for a long period of time, and this would result in many cases where the DMSHs would not be able to receive compensation no matter how valuable a technology they developed.

[Translation]

Furthermore, the counterparties against which the DMSHs are restricted from asserting rights based on the No-Compensation License Provisions, etc. include many competitors in the markets of the product of the CDMA Subscriber Units, etc., and this presents the risk of creating difficulties for the DMSHs in differentiating their CDMA Subscriber Units, etc.

In addition, the No-Compensation License Provisions, etc. create an imbalance between the Respondent and the DMSHs, as well as among each of the DMSHs, and the more IPRs held by the DMSHs as a result of developing valuable technology, the more the degree of this imbalance expands.

Therefore, the degree and content of the restriction of the No-Compensation License Provisions, etc. not only restricts the free use of the technology or the IPRs in the technology that are the fruits of the research and development by the DMSHs that should be freely available to the right holder of these IPRs to use in whatever way they choose, but it is also unreasonable to the degree that it could be presumed that these restrictions have the tendency to impede the research and development incentives of the DMSHs that are licensees.

(b) The DMSHs were unable to compensate for or avoid the disadvantages that they might suffer from the No-Compensation License Provisions, etc.

Even if the degree and content of the restrictions of the No-Compensation License Provisions, etc. were unreasonable to the degree that it could be presumed that these restrictions have the tendency to impede the research and development incentives of the DMSHs, if the DMSHs were able to compensate for or avoid the disadvantages from the No-Compensation License Provisions, etc. during the course of negotiations for the License Agreements, then it would not be found that there are facts to support that these restrictions have the tendency to impede the research and development incentive.

In this regard, given the fact that the DMSHs had business with telecommunication business operators such as NTT Docomo and KDDI that were planning to adopt the 3G Mobile Wireless Communications Standards that were adopted by the standards body such as the ARIB, and the fact that the DMSHs were preparing to manufacture and sell the CDMA Subscriber Units, etc. by making huge investments, it was substantially difficult for the DMSHs to withdraw from manufacture and sale of the CDMA Subscriber Units at the time they executed the License Agreements. For this reason, it was essential for the DMSHs to obtain licenses for the TEIPRs held by the Respondent that submitted a Confirmation Form to the standards body such as the ARIB stating that the Respondent holds numerous TEIPRs to the 3G Mobile Wireless Communications Standards, and the DMSHs had no other practical option other than to accept the License Agreements that stipulated the No-Compensation License Provisions, etc..

[Translation]

On the other hand, the Respondent, under these circumstances, had no intention of revising the contractual terms of the License Agreements upon request from the DMSHs, and the Respondent intentionally restricted the opportunity for the DMSHs to conduct negotiations or their method of conducting negotiations by means such as unilaterally setting the negotiation period, notifying the plans for a spin-off of its semiconductor business, and implying that the Respondent would not hesitate to file a suit seeking injunction for the sale of the 3G Base Stations, and urged the DMSHs to quickly execute the License Agreements that stipulated the No-Compensation License Provisions, etc.

Having to negotiate with the Respondent having the stance as described above, the DMSHs had no realistic chance of requesting an adjustment of the Royalty Rate demanded by the Respondent to an appropriate rate reflecting the value of the portfolio of IPRs that were subject to the No-Compensation License Provisions, etc. or of requesting the deletion of No-Compensation License Provisions, etc., and therefore, the DMSHs were unable to compensate for or avoid the disadvantages that they risked suffering from the No-Compensation License Provisions, etc.

As explained above, as the DMSHs were unable to compensate for or avoid the disadvantages that they risked suffering from the No-Compensation License Provisions, etc., the fact that supports that the No-Compensation License Provisions, etc. have the tendency to impede the research and development incentives of the DMSHs cannot be denied.

(c) The concrete effect of the No-Compensation License Provisions, etc. could be found, and therefore, the tendency to impede the research and development incentives of the DMSHs is concretely proven

a. The fact that reinvestment in research and development activities for new technology is being prevented

Even though the DMSHs actually had broad and leading IPRs including the TEIPRs to which they could demand commensurate royalties of other business operators, due to the restrictions imposed by the No-Compensation License Provisions, etc., the DMSHs were prevented from demanding royalties of the Respondent that used those IPRs. Furthermore, because the Respondent refused to adjust the contractual terms such as the Royalty Rate based on an evaluation of the value of the IPRs that are subject to the No-Compensation License Provisions, etc. and the results of such evaluation, the DMSHs were not granted adjustments on the Royalty Rate corresponding to the value of the IPRs held by the DMSHs that are subject to the No-Compensation License Provisions, etc.

18

[Translation]

Also, due to the restrictions imposed by the No-Compensation License Provisions, etc., the DMSHs were also prevented from asserting their IPRs towards the customers that purchase semiconductor products from the Respondent, and towards other of the Respondent's licensees that also stipulated a Non-Assertion Provision against the Respondent's Licensees in their License Agreements with the Respondent, and thus, the DMSHs were denied the opportunity to gain economic benefits such as royalty income.

In addition, because it would be difficult for the DMSHs to differentiate their products from the competitors' products due to the No-Compensation License Provisions, etc., even if they made large investments in research and development for the IPRs to the CDMA Subscriber Units, etc. in order to compete with their competitors' products, it is getting difficult for the DMSHs to gain any economic benefit by expanding their sales through differentiation.

As such, the DMSHs are prevented by the No-Compensation License Provisions, etc. from asserting their broad and leading IPRs including the TEIPRs held by the DMSHs for a broad scope and long period of time, they are losing the opportunity to gain economic benefits such as royalty income, and they are prevented from reinvesting in research and development for new technology.

b. The DMSHs have no choice but to engage in research and development based on the recognition that the content of the restriction is broad, for a long period of time, and imbalanced

Because the DMSHs inevitably have to engage in research and development with the recognition that (i) the DMSHs cannot use the fruits of their IPRs held by them to differentiate their products, to gain profit such as by granting licenses to other companies, or to include these as subjects of a license when executing a cross-license agreement with other companies including the Respondent and thereby reduce royalties payable to other companies, (ii) the No-Compensation License Provisions, etc. enable the Respondent to gain considerably larger profits than the DMSHs from research and development, (iii) the Royalty Rate payable to the Respondent is the same regardless of whether or not there are IPRs held or to be held by the DMSHs, and that (iv) as long as the Respondent holds IPRs that are indispensable to continuing business relating to the CDMA Subscriber Units, etc., there is no choice but to revise the License Agreements or to execute new agreements with the Respondent in the future, and in such case, as they must inevitably accept standard license terms including the No-Compensation License Provisions, etc. at that time, the DMSHs are losing incentive to proactively expand their research and development activity.

[Translation]

c. Brief summary

As shown above, because it is found that as a concrete effect of the No-Compensation License Provisions, etc., the DMSHs are prevented from reinvesting in research and development activities for new technology, and, furthermore, that they must engage in research and development activities with the recognition that the content of the restriction is broad, for a long period of time, and imbalanced, it is concretely proven that there is a tendency to impede the research and development incentives of the DMSHs.

D. The tendency to enhance the influential position of the Respondent

The Respondent submitted a Confirmation Form to the Standards Assembly declaring that it holds numerous TEIPRs to the 3G Mobile Wireless Communications Standards, and the Respondent in fact holds numerous TEIPRs to the 3G Mobile Wireless Communications Standards. Furthermore, from the fact that it was essential for the DMSHs to receive license for the IPRs held by the Respondent, etc. in order to manufacture and sell CDMA Subscriber Units, etc., it could be found that the Respondent held an influential position in the market for technology for the CDMA Subscriber Units, etc. (the "Subject Market Under Consideration in this case").

Also, as stated in C above, as a result of the DMSHs being forced to execute the License Agreements that include the No-Compensation License Provisions, etc. due to the Respondent's Violating Acts of this case, there was a tendency to impede the research and development incentives for technology relating to the CDMA Subscriber Units, etc., and therefore, the position of the DMSHs in the Subject Market Under Consideration in this case would decline while the Respondent's influential position would be relatively enhanced. In addition, while the Respondent would be saved from spending on technology held by the DMSHs, etc. that the Respondent would be using, the Respondent would receive continuous and steady income based on the Royalty Rate that the Respondent unilaterally stipulated for technology held by the Respondent, etc. Furthermore, the Respondent would be able secure profit from selling to its customers semiconductor chips under stable conditions without the possibility of being sued for patent infringement, etc.

[Translation]

As such, the Violating Acts of this case enable the Respondent to accumulate necessary resources for research and development under more advantageous conditions than other business operators including the DMSHs, and by appropriating those resources to its research and development activity, the Respondent will be able to build a strong portfolio of IPRs, which would enable it to further enhance its influential position.

E. Adverse effects on the fair competition order

While the Subject Market Under Consideration in this case is the market for technology for the CDMA Subscriber Units, etc. (the Subject Market Under Consideration in this case), when taking into account that the DMSHs and the Respondent compete with each other in the Subject Market Under Consideration in this case, and that the DMSHs are the leading business operators in the Subject Market that holds the technology for the CDMA Subscriber Units, etc., it could be said that the No-Compensation License Provisions, etc. that have the tendency to impede the research and development incentive of the DMSHs will prevent the emergence of technology and products relating to such technology for the CDMA Subscriber Units, etc. that compete with the Respondent's technology for the CDMA Subscriber Units, etc., and thus have the tendency to impede competition in the Subject Market Under Consideration in this case, and thereby adversely affects the competition order in the Subject Market Under Consideration in this case.

Also, if the Respondent, through the No-Compensation License Provisions, etc., engages in its research and development activities under conditions that are more advantageous than the DMSHs that are the leading competitors, and thereby were to accumulate leading technology, the DMSHs would not be able to avoid using the portfolio of IPRs held by the Respondent. As such, the Respondent's superior position would be enhanced in the license negotiation which may enable the Respondent to arbitrarily set license terms for future transactions for technology in the Subject Market Under Consideration in this case, thereby adversely affecting competition in this market.

F. Non-existence of justifiable grounds

21

[Translation]

As for what constitutes unfair trade practices, each of the items in Article 2, Paragraph 9 of the AMA stipulates the criteria for such acts, and as long as the outward facts that show that there is "a tendency to impede fair competition" can be proven, such act in principle satisfies the elements of Article 19 of the AMA. As an exception, however, if it is found that it cannot be said that such an act would not have the tendency to adversely affect the fair competition order from the standpoint of the existence and degree of necessity and reasonableness in light of the purpose of that act and the method of achieving that purpose (justifiable grounds), then it would be judged that such an act does not have a tendency to impede fair competition.

On this point, the Respondent asserts that the No-Compensation License Provisions, etc. have a pro-competitive effect, and therefore, there are justifiable grounds for the Violating Acts of this case, and there is no tendency to impede fair competition.

However, even if a certain act has a pro-competitive effect, if there are other methods that are less restrictive in achieving the same purpose, then such act is not justified (the "LRA Standards"). Because the pro-competitive effect that is asserted by the Respondent could be sufficiently realized by a method that does not have the tendency to impede fair competition such as by evaluating the value of the IPRs held by the DMSHs upon execution of the License Agreements instead of the DMSHs granting free licenses for the IPRs held by the DMSHs, the Respondent's Violating Acts of this case cannot be justified.

(2) The Respondent's assertion

A. It is not proven that the provisions of the License Agreements have the tendency to impede fair competition

The Investigation Officials assert concerning the License Agreements that (i) the provisions that license the IPRs held by the DMSHs themselves are unreasonable, and because (ii) the DMSHs were forced to execute agreements that stipulated such provision, (iii) the DMSHs suffered reduced royalty income, (iv) the research and development incentives of the DMSHs were undermined, (v) the Respondent's position was enhanced, and (vi) competition will thus be reduced. However, not only are the Investigation Officials' findings of the basic facts arbitrary, but the causal effects the Investigation Officials found are also merely speculation, and the actual qualitative and quantitative effects that must be taken into account pursuant to Article 19 of the AMA and Former General Designation Paragraph 13 are not taken into account.

[Translation]

Furthermore, the Investigation Officials did not prove the tendency to impede fair competition which is required to start with, unilaterally found for there to have been "unreasonableness" and "forced" circumstances that are not even factors for consideration under the criteria of Article 19 of the AMA and Former General Designation Paragraph 13, and simply asserted the causal relationship described above in an attempt to unjustly mitigate its burden of proof.

Furthermore, in order to assert a violation of Former General Designation Paragraph 13, it is necessary to give concrete facts and economic evidence that supports that the act in question is an unfair trade practice with the counterparty that unreasonably restrains the business activity of the counterparty and has the tendency to impede fair competition. In particular, in view of the fact that the provision under which the DMSHs grant licenses to the Respondent for the IPRs and the provision under which the DMSHs pledge not to assert their IPRs towards the Respondent's licensee, both of which the Investigation Officials claim as being No-Compensation License Provisions, etc. (No-Compensation License Provision, etc.) are typical license terms that generally have a pro-competitive effect, when reviewing whether the License Agreements that stipulate these provisions have the tendency to impede fair competition, the pro-competitive effect and the effect of reducing competition must be comprehensively reviewed, and it is absolutely necessary to conduct an analysis based on objective facts and economic evidence. However, in this case, most of the evidence used by the Investigation Officials are the written statements of the DMSHs that are interested parties in this case prepared for purposes of this case, and no objective evidence that supports the tendency to impede fair competition has been presented.

In addition, the judgement on the tendency to impede fair competition must be made through an objective and independently verifiable method of the substantial criteria ("unjustly"), and as a precondition, it is necessary to define the market based on expert opinion. However, the Investigation Officials did not appropriately define the market whatsoever through such objective method and the appropriate geographic scope of the market or the perimeter of the market participants are vague, and it cannot be said that the tendency to impede fair competition has been proven.

B. The provisions stipulated in the License Agreements do not have the tendency to impede the research and development incentive of the DMSHs

The Investigation Officials assert that the provisions stipulated in the License Agreements have the tendency to impede the research and development incentive of the DMSHs and that the Violating Acts of this case have the tendency to impede fair competition. However, as stated below, the provisions stipulated in the License Agreements do not have the tendency to impede the research and development incentive of the DMSHs.

[Translation]

(a) The provisions stipulated in the License Agreements are not unreasonable

a. The provisions stipulated in the License Agreements are reasonable

In comprehensive cross-license agreements such as the License Agreements, as the parties mutually license broad and relevant IPRs, it is natural for the parties to mutually set certain restrictions on the assertion of their own IPRs.

Also, under the License Agreements, the DMSHs are obtaining the great benefit of being able to use the valuable portfolio of IPRs held by the Respondent, etc. in exchange for restrictions on the assertion of their own IPRs, or the portfolio of IPRs of the other licensees of the Respondent who have executed License Agreements that stipulate a Non-Assertion Provision against the Respondent's Licensees.

Notwithstanding the above, the Investigation Officials only focus on the restriction on assertion placed on the DMSHs by the provision that requires the DMSHs to grant licenses to the Respondent, etc. for their IPRs and the provision that requires the DMSHs to pledge not to assert their IPRs against the Respondent's other licensees (the No-Compensation License Provision, etc.) and asserts that these provisions broadly restrict the DMSHs from asserting their IPRs currently held or to be developed in the future and held by the DMSHs, etc. However, the Investigation Officials ignore the benefits that the DMSHs gain from the License Agreements which is a mistake as a method of analyzing the effect on competition of a comprehensive cross-license agreement such as the License Agreements.

The provision under which the DMSHs grant licenses to the Respondent, etc. on their IPRs is reasonable given that (i) the licenses for the IPRs are non-exclusive licenses and the scope of application of the IPRs of the DMSHs' for pass-through to the Respondent's chipset customers is narrow, (ii) the scope of the subject IPRs could be adjusted through negotiation between the parties and such adjustments were indeed made in many cases, (iii) the scope of the subject IPRs is limited by the capture period (improvement period) that is set through negotiation, (iv) the scope of the subject IPRs under the provision and the scope of IPRs subject to license from the Respondent are of content that is mutually balanced, and (v) the License Agreements that stipulate this provision reflect the appropriate price that is determined through normal commercial negotiations.

[Translation]

b. The scope of the application of the provision under which the DMSHs grant licenses to the Respondent, etc. for their IPRs is not broad

(a) The scope of IPRs subject to restriction on assertion

As stated in a above, the Investigation Officials' assertion focuses only on the restriction on assertion placed on the DMSHs by the provision that requires the DMSHs to grant licenses to the Respondent, etc. for their IPRs and ignores the benefits that the DMSHs could gain from the License Agreements.

Furthermore, the scope of the IPRs that are subject to each of the above provisions are limited to a reasonable and necessary scope to achieve the objectives, and because such scope was agreed on through negotiation between the Respondent and the DMSHs, it cannot be said that the restrictions based on each of these provisions are unjustly broad.

(b) The time period in which the IPRs subject to restriction on assertion were acquired

The Investigation Officials assert that the time period in which of acquisition of the TEIPRs (The Respondent asserts these IPRs as "Technically Necessary IPRs" from the terms and definitions used in the License Agreements. The term TEIPRs  appearing in the Respondent's assertion below in this Draft Decision shall mean the "Technically Necessary IPRs" referred to above.) that are subject to the provision that requires the DMSHs to grant licenses to the Respondent, etc. for their IPRs and the provision that requires the DMSHs to pledge that they will not assert their IPRs towards the Respondent's other licensees (the No-Compensation License Provisions, etc.) is indefinite in most of the License Agreements. However, the number of License Agreements that stipulate an indefinite improvement period for the TEIPRs is less than half.

[Translation]

Furthermore, nearly all of the License Agreements executed with the DMSHs in which the DMSHs assert that they held the TEIPRs at the time of execution of the License Agreements stipulate a very short and fixed improvement period for the TEIPRs. On the other hand, for the DMSHs that did not assert that they held the TEIPRs at the time of execution of the License Agreements, the improvement period is not set for a short period because it would be advantageous to the DMSHs not to limit the improvement period rather than limiting the improvement period which also stipulates the time of acquisition of the Respondent's TEIPRs.

The Investigation Officials assert that even in cases where the License Agreements stipulate a short improvement period, the IPRs that the DMSHs will develop or acquire after the improvement period are not subject to licensing as a matter of formality only and that these IPRs are also substantially subject to the provisions of a granting of a license to the Respondent, etc. from DMSHs, and that the scope of such restriction is overly broad. However, this assertion is not supported by any evidence, and in fact, the improvement period stipulated in the License Agreements could not be changed unless through mutual agreement between the parties, and most of the improvement periods were never changed.

(c) The counterparties against whom assertion is restricted

The scope of counterparties to which the DMSHs are restricted from asserting their rights pursuant to the provision that requires the DMSHs to grant to the Respondent, etc. licenses for their IPRs and the provision that requires the DMSHs to pledge that they will not assert their IPRs towards the   Respondent's other licensees (the No-Compensation License Provisions, etc.) is limited to a reasonable and necessary scope to achieve the objectives.

Furthermore, among the DMSHs, Panasonic Mobile and NEC, etc. requested that the Respondent set a restriction on the scope of the parties that could gain the benefits based on the exhaustion of rights doctrine under the provision in which the DMSHs grant licenses to the Respondent for licenses to their IPRs, and that restriction was granted.

26

[Translation]

The Investigation Officials assert that the provision under which the DMSHs pledge not to assert their IPRs against the other Respondent licensees (the Non-Assertion Provision against the Respondent's Licensees) applies to all other licensees that have made the same pledge, and that therefore, the scope of the application is broad. However, to begin with, the restriction under this provision does not apply whatsoever to the DMSHs that did not voluntarily choose to stipulate that provision in the License Agreements.

(d) The period during which assertion is restricted

Whether or not the newly developed IPRs become subject to the provision that requires the DMSHs to grant license to the Respondent, etc. for their IPRs and the provision that requires the DMSHs to pledge not to assert their IPRs against the Respondent's other licensees (the No-Compensation License Provisions, etc.) depends on the improvement period and not on the period of the License Agreements.

Furthermore, because the relationship between the Respondent and the DMSHs is reciprocal under the License Agreements, if the provision that requires the DMSHs to grant license to the Respondent, etc. for their IPRs continues indefinitely, the DMSHs would be able to continuously gain the benefits from the licenses received from the Respondent.

In addition, some of the DMSHs have a right to terminate the License Agreements "for any reason" and if such a DMSH were to decide that it is not sufficiently benefitting from the license received from the Respondent, it may terminate the agreement by exercising this termination right.

c. The characteristics of a no-compensation license have not been found

  (a) The structure of the License Agreements overall (the nature of the consideration)

[Translation]

Based on the fact that the DMSHs are granted licenses for the IPRs held by the Respondent, etc. under the License Agreements in consideration of (1) the lump-sum fee payment; (2) the royalty payment; and (3) the granting of licenses to, or   the pledge not to assert rights of, certain IPRs held by the DMSHs, etc., there is a relationship of consideration overall between the obligations borne by the DMSHs and the obligations borne by the Respondent, and it cannot be said that the licenses for the IPRs granted by the DMSHs to the Respondent, etc. is for no compensation.

Further, in regard to the pledge not to assert rights against the other licensees of the Respondent made by the DMSHs (Non-Assertion Provision against the Respondent's Licensees), consideration clearly exists from the fact that the DMSHs are to be granted licenses for relevant IPRs held by the other licensees of the Respondent that agreed to the provisions, in consideration of the agreement to such provision.

(b) Stipulations under the License Agreements

It is stipulated under the License Agreements that the licenses to IPRs made by the DMSHs to the Respondent, etc. are "fully paid and royalty free." As such, the consideration in regard to this provision has already been paid, and royalties are thus not be paid under the License Agreements.

Also, in the preamble of the License Agreements of certain DMSHs, it is clearly written that the stipulations including the above provisions, as a whole, constitute a part of the consideration for the Respondent's granting of licenses for IPRs.

Thus, it is clear also from the stipulations under the License Agreements that the above provisions are not for no compensation.

(c) Negotiation history of the License Agreements

In the negotiation minutes and internal documents of the DMSHs, there are statements which suggest that the DMSHs fully recognized the fact that they received consideration for the licenses of IPRs granted by the DMSHs to the Respondent, etc.

[Translation]

(d) Adjustment of the contractual provisions under the License Agreements

In regard to the licenses for IPRs granted by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent   (No-Compensation License Provisions, etc.), Investigation Officials assert that considering the content of the provision and the history thereof, the Respondent did not examine and evaluate the value of the patent portfolios of the DMSHs, and did not adjust the royalty rates and other contractual terms based on such results, and that they therefore have the nature of a no-compensation license.

However, in the negotiations of the License Agreements for the IPRs, it is unrealistic to examine and evaluate the value of intellectual property and to make adjustment based on those results, and the assertion by the Investigation Officials is based on particular standards contradicting the general doctrine in regard to the evaluation of consideration in commercial transactions pertaining to license agreements.

Moreover, based on the fact that the DMSHs did not have IPRs that are valuable and significant enough for adjusting the royalty rates, and that among the DMSHs listed in the Appendix, only three companies (Panasonic Mobile, NEC Corporation and Toshiba) offered concrete IPRs and requested the evaluation of such rights for the purpose of adjusting the contractual terms based on the result of such evaluation, while the other 11 companies did not make such a request, it cannot be said that it was necessary for the Respondent to evaluate the IPRs held by the DMSHs and make adjustments, etc.

Furthermore, in the negotiations leading up to the execution of the License Agreements, the Respondent did respond to those DMSHs who presented certain concrete IPRs and requested an evaluation and adjustment (the three companies above) by conducting such evaluation, and although the Respondent judged based on such evaluation that it was not worth adjusting the royalty rates, the Respondent nonetheless substantially amended the contractual terms under the License Agreements in response to the request from the three companies above.

[Translation]

In addition, the pledge not to assert rights against the other licensees of the Respondent made by the DMSHs (Non-Assertion Provision against the Respondent's Licensees) is completely optional and does not benefit the Respondent, and thus, there is no reason for the Respondent to examine and evaluate the contents of the subject IPRs and make adjustments based on the results.

Therefore, the assertion by the Investigation Officials that the above provisions have a nature of a no-compensation license is groundless.

d. The provisions are not unbalanced

The Investigation Officials assert that the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledge not to assert rights against the other licensees of the Respondent made by the DMSHs (No-Compensation License Provisions, etc.) are imbalanced between the Respondent and the DMSHs. However, this assertion relies on the wrong premise that each of the provisions are for no compensation and that the extent of the limitation of asserting rights is unreasonably broad, and thus the assertion is unreasonable.

The Investigation Officials also assert that the above provisions lack balance among each of the DMSHs, but based on the fact that there was no meaningful difference between the values of the patent portfolios held by each of the DMSHs, it cannot be said that the provisions lack balance among each of the DMSHs.

(B) That the DMSHs were not forced to enter into the License Agreements (even if there was a risk of being at a disadvantage due to the No-Compensation License Provisions, etc., it was possible to compensate for or avoid such disadvantage)

a. In regards to the assertion by the Investigation Officials that the DMSHs were "forced," this is not addressed in the provisions of the AMA under Article 19 and the Former General Designation Paragraph 13, and thus, it is not a factor for judging whether there is a tendency to impede fair competition in trading with restrictive conditions.

b. Next, the four acts of the Respondent which were identified in the CDO as problems ((1) not disclosing on a timely basis the information relevant to the IPRs; (2) suggesting to gradually increase the amount of money (lump-sum fee) to be paid at the time of entering into the agreement; (3) suggesting that an injunction will be sought by filing a lawsuit; and (4) announcing the possibility of separating the chipset business from the licensing business) were conducted as lawful business negotiations, and these types of actions of the Respondent cannot be used as grounds evaluating that the DMSHs were forced to enter into the License Agreements.

[Translation]

Also, the DMSHs had alternative methods to entering into the License Agreements, such as electing not to enter into a license agreement with the Respondent or refusing to enter into such agreement, filing a patent litigation against the Respondent, or asserting breach of the FRAND obligations (breach of the right holder's obligation to grant licenses to Essential Industrial Property Rights under appropriate conditions in a non-exclusive and non-discriminatory manner to those using the standard) against the patent litigation or injunction demand from the Respondent. In fact, the Respondent offered an option to Panasonic Mobile and NEC Corporation to enter into an agreement not including the cross-license provisions at all, but Panasonic Mobile and NEC Corporation did not accept this offer.

In addition, considering the fact that the company size of the DMSHs was larger than that of the Respondent, and that the employees and others of the DMSHs negotiating with the Respondent had highly intelligent backgrounds as well as thorough knowledge of the Respondent's technology and the existing license agreements with the Respondent, it is not possible that the DMSHs were forced to enter into License Agreements that included the granting of licenses for IPRs by the DMSHs to the Respondent, etc., and a pledge for the DMSHs not to assert rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.).

(C) The tendency to impede the incentives of the DMSHs to engage in research and development has not been proven in concrete terms

a. Reinvestment in research and development activities for new technology is not impeded

The Investigation Officials assert that the DMSHs are impeded from reinvesting in research and development activities as they have lost the opportunity to acquire economic profit due to the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.).

[Translation]

However, the assertion by the Investigation Officials relies on the premise that the DMSHs at the time of entering into the License Agreements had beneficial IPRs, but there is no evidence that proves this premise. Rather, according to the evidence submitted by the Respondent, it has been found that the DMSHs did not have technically essential IPRs that have high value or importance.

Moreover, there is no evidence proving that the DMSHs planned to acquire profit by granting license of the IPRs they hold. In fact, it is not confirmed either that because each of the above provisions existed, the DMSHs were impeded from exercising rights against the Respondent's customers and others, and that as a result, they lost the opportunity to acquire economic profits such as royalty income.

Furthermore, according to the objective history for more than ten years, the DMSHs expanded their manufacture and sale of CDMA Subscriber Units, etc. under the License Agreements and their revenues increased, and they invest the profits to further research and development activities.

In addition, the IPRs necessary to differentiate products from others are commercially essential IPRs (The Respondent asserts, based on terms and definitions under the License Agreements, that they are "commercially necessary IPRs," and the term CEIPRs as used in the Respondent's assertion in this Draft Decision hereinafter means the "commercially necessary IPRs" referred to above.). In the License Agreements, the improvement period of the commercially essential IPRs ends in a short period of time, and the DMSHs differentiated their products from others by commercially essential IPRs applied or acquired after the end of the improvement period and were able to increase their sales.

Therefore, there is no fact that the DMSHs were impeded from reinvesting in research and development activities by entering into the License Agreements having each of the above provisions.

[Translation]

b. That research and development had to be carried out with the recognition that the content of the restrictions is broad, for a long period of time, and unbalanced

The assertion by the Investigation Officials is based on the wrong premises that the restrictions on the exercising of rights by the DMSHs is broad due to the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.), that each of the provisions has the nature of a no-compensation license, and that the contents of each of the provisions is unbalanced.

Moreover, in fact, there is no objective evidence proving that the DMSHs scaled down their research and development as a result of the License Agreements and changed their direction. Rather, according to the evidence, right after entering into the License Agreements, the number of patent applications by the DMSHs in regard to subscriber units, communication devices and infrastructure devices has substantially increased, and it is confirmed that the DMSHs have maintained and improved their incentives to engage in research and development.

C. The Respondent's influential position has not been enhanced by the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent

Even if, as the Investigation Officials assert, the Respondent's influential position was enhanced after entering into the License Agreements having the grant of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.), it was a result of the investment by the Respondent itself or its efforts to win the competition in the market, or it can be attributed to the business strategy of the Respondent and the DMSHs, and thus, the Respondent's success in the market and the decline in the status of the DMSHs are irrelevant to the execution of the License Agreements.

33

[Translation]

D. The licensing of IPRs granted by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent do not adversely affect the fair competition order

(A) The market is not appropriately defined, and the analysis is insufficient

In order to judge the tendency to impede fair competition, as a premise, it is necessary to define the market based on expert opinion. Nevertheless, the Investigation Officials did not appropriately define the market by an objective method, and they without presenting any grounds set forth that the Subject Market Under Consideration in this case is "the market related to technology for CDMA Subscriber Units and others," making an arbitrary and convenient definition of the market.

Also, in order to accurately analyze the incentives for engaging in research and development in the technology market, it is necessary to examine the business activities of companies in the product market where the technology is used to begin with. In this case as well, it is necessary to appropriately define the market taking into consideration not only the market related to the technology for CDMA Subscriber Units and others, but also the downstream product market. Nevertheless, the Investigation Officials regard only the technology market as the Subject Market Under Consideration in this case, and they wrongly define the market in this regard as well.

Moreover, even if the market pertaining to the manufacture and sale of the final products of CDMA Subscriber Units, etc. is limited to within Japan, there is worldwide competition in regards to the development of the technology, and based on the fact that worldwide competition affects the competition within Japan, it is necessary to examine the positions of companies abroad in addition to the Respondent in the market. Nevertheless, the Investigation Officials exclusively focus on the relationship between the Respondent and the DMSHs as the subject of their analysis, while presenting companies abroad such as Nokia Corporation as examples of participants in the Subject Market Under Consideration in this case (supplier of technology). Thus, it cannot be said that they are appropriately defining the market or conducting an accurate analysis.

(B) Competitive or alternative technology does not exist in the market asserted by the Investigation Officials

The technically essential IPRs included in the Subject Market Under Consideration in this case asserted by the Investigation Officials, by definition, have a complementary relationship with other technically essential IPRs and they are not in a competitive or alternative relationship. Thus, even if the DMSHs, etc. have technically essential IPRs in regards to CDMA Subscriber Units, there is no competitive or alternative relationship between those technically essential IPRs and those held by the Respondent, etc.

34

[Translation]

Also, the Investigation Officials in the Subject Market Under Consideration in this case have not conducted an analysis or been able to prove at all the competition existing among several technically essential IPRs, or between technically essential IPRs and commercially essential IPRs.

(C) The tendency to impede fair competition has not been proven

The Investigation Officials have not offered any evidence proving the concrete adverse effect on competition brought by the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.), and have not proven the tendency to impede fair competition.

(D) The licensing of IPRs granted by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent have a pro-competitive effect

In this case, based on the fact that trading with restrictive conditions, which is not a type of act that is illegal in principle, is at issue, and that the procompetitive effect of patent peace that is rendered by each of the above provisions is inherently involved in each of those provisions, a judgement as to whether or not the effect of inhibiting competition exists should not be simply made based on the outward appearance of the act, but should rather be made based on a framework which squarely considers the pro-competitive effect as well in determining whether there is a tendency to impede fair competition.

Moreover, each of the above provisions have a pro-competitive effect, such as (1) promoting new entry to the subscriber unit market; (2) reducing the transaction cost for manufacturers including the DMSHs; and (3) reducing the risk of facing a lawsuit, all of which are factors that negate the formation itself of the requirements for the tendency to impede fair competition. Also, in actuality, according to the evidence, License Agreements having each of these provisions have been found to promote competition related to the CDMA Subscriber Units, and therefore, executing License Agreements having each of these provisions cannot be found to impede fair competition.

[Translation]

E. Justifiable grounds

(A) Even if there is an anticompetitive effect in the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.), if it can be confirmed that these acts do not substantially violate the ultimate objective of the AMA to "secure profits of general customers and promote democratic and sound development of the country's economy," considering their purpose and means, it should be said that there are justifiable grounds, and that the tendency to impede fair competition cannot be found.

Moreover, as trading with restrictive conditions is not a type of act that is illegal in principle and each of the above provisions has a pro-competitive effect, the judgment as to whether or not it is justifiable should be made not on the basis of strict standards such as the LRA standards but based on the standard of whether or not it can be said to be within a reasonably necessary scope necessary for achieving a legitimate objective.

(B) The licensing provisions for IPRs granted by the DMSHs to the Respondent, etc. is to allow the Respondent to sell CDMA components without being exposed to the risk of patent litigation, and for licensor to request of the licensee cross-licenses and other rights for this purpose, and such provisions are used generally and broadly. As such, the purpose of these provisions is legitimate.

In addition, based on facts such as that (1) the range of rights of the DMSHs not being able to exercise rights against the Respondent's customers by the exhaustion of rights doctrine has been narrowly adjusted; (2) this range can be adjusted by negotiation between the parties, and it actually was adjusted; (3) the scope of cross-licensed rights has been restricted by the improvement period that was decided upon as a result of negotiation; (4) the scope of the IPRs which are covered by the grant of license by the Respondent, and the scope of the IPRs which are covered by the cross-licenses or cross-covenants by the DMSHs are reciprocal and balanced in content; and (5) the License Agreements are appropriate as they were decided upon through normal commercial negotiations between sophisticated large corporations that are knowledgeable about the business environment of the industry, it can be said that the granting of licenses for IPRs by the DMSHs to the Respondent, etc. was within a reasonable scope for achieving the purpose.

[Translation]

(C) The provision under which the DMSHs pledge not to assert rights against the other licensees of the Respondent (Non-Assertion Provision against the Respondent's Licensees) has a legitimate purpose of maintaining a patent peace among the licensees who have agreed to the provision and improving the competitiveness of the DMSHs.

Moreover, based on the fact that (1) the adoption of the above provisions is completely optional for the licensee; (2) the subject range of the provisions is limited to the technically essential IPRs; (3) the Respondent itself has not directly received profit from the provisions; and (4) all of the licensees who have agreed to the provisions are granted the same rights as other licensees who have agreed to the provisions, it can be said that the provisions are within a reasonable scope for achieving the purpose.

(D) As explained above, even if the Violating Acts of this case as asserted by the Investigation Officials have an anticompetitive effect, the purpose of the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.) can be said to be legitimate, and the Violating Acts of this case can be said to be within the a range reasonably necessary for achieving this. Therefore, there reasons are justifiable, and a tendency to impede fair competition cannot be found.

2. Issue 2

(1) Assertions by the Investigation Officials

A. The legal jurisdiction in Japan is affirmed in regard to the CDO

The Violating Acts of this case by the Respondent which are identified as being problematic in the CDO are the acts of the Respondent that force the DMSHs to enter into License Agreements that have provisions such as the No-Compensation License Provisions, etc.

[Translation]

In regards to this point, first, the negotiations of the License Agreements between the Respondent and the DMSHs were conducted by methods such as face-to-face negotiations at the headquarters of each of the DMSHs located in Japan and the Respondent's headquarters located at the address on their letterhead, and by remote negotiation by facsimile, email or other method, and the Respondent's acts such as the notification on their spin-off plan, warnings of filing a suit seeking injunction, etc. have been conducted within Japan. As such, the act of the Respondent of forcing the execution the License Agreements that include No-Compensation License Provisions, etc. can be said to have actually been conducted within the territories of Japan.

Moreover, in this case, the tendency to impede the incentives of the DMSHs to engage in research and development and the tendency to enhance the influential position of the Respondent due to the Violating Acts of this case has arisen, as has the tendency to impede fair competition, in the Subject Market Under Consideration in this case in which the DMSHs are consumers.

As explained above, in this case, the Violating Acts of this case by the Respondent have actually taken place within the territories of Japan, and as such, the tendency to impede fair competition has also arisen within the territories of Japan. Thus, based on the territoriality principle which is the principle of jurisdiction that is adopted mutually among countries, Japan can be recognized as having legal jurisdiction in the matter of the CDO.

B. The exercising of legal jurisdiction is not restricted by international comity

International comity under international law is not a legal obligation or mandate recognized under international law, but is rather a way to handle matters simply for political convenience or in consideration of customs and formalities between nations, and it is distinguished from issues relating to rights and obligations under international law.

Therefore, the exercise of legal jurisdiction is never restricted by international comity.

(2) Assertions by the Respondent

A. Legal jurisdiction and international comity

In the area of competition law, the scope of legal jurisdiction may be expanded to cover acts that are the subject of regulation but which are carried out beyond the borders of the regulating country, but this is limited to cases in which such acts have a direct and substantial influence on the competition in the regulating country, and in such cases, it is necessary for such legal jurisdiction to be exercised in consideration of the effects that it may have on the interests of other countries.

38

[Translation]

On the other hand, international comity refers to when it is reasonable for a certain country to extraterritorially exercise its legal jurisdiction, but in cases in which the interests of another country is greater than said country, before taking measures that could infringe on the sovereign powers of another country, said country makes a request to entrust the matter to the other country and its measures.

B. The applicable scope of the CDO is in conflict with legal jurisdiction and international comity

The CDO places restrictions on the IPRs held by the Respondent, etc. and their licensees which were granted under the legal jurisdiction of another country based on another country's laws by subjecting them to the laws of Japan. As this is unreasonable and is in conflict with legal jurisdiction and international comity, the CDO should be revoked, or at the very least, limited.

3. Issue 3

(1) Assertions of the Investigation Officials

The assertion by the Respondent that the contents of the CDO violates the AMA Articles 20 and 21 and the Constitution Article 31 is groundless as follows.

A. The assertion by the Respondent that the main text of the CDO is unreasonably vague and unclear

The "act of forcing" in Paragraph 2 of the main text of the CDO, as it literally suggests, is an act which gives rise to a situation where any other option such as having provisions similar to the No-Compensation License Provisions, etc. are withheld from the DMSHs, such that the DMSHs cannot avoid accepting such provisions. As such, the assertion by the Respondent that the main text of the CDO is unreasonably vague and unclear is incorrect.

B. The assertion by the Respondent that the order to abandon the No-Compensation License Provisions, etc. exceeds the scope of discretion of the Fair Trade Commission

The abandonment of the No-Compensation License Provisions, etc. ordered to the Respondent in the CDO was ordered pursuant to the provisions of the AMA Article 20 as a necessary measure to eliminate the illegal acts of the Respondent, and as it ordered the abandonment of the No-Compensation License Provisions, etc. regardless of the will of the counterparties, the Respondent's assertion that it is impossible to unilaterally abandon the provisions is unreasonable as the premise itself for their argument is wrong. Even if there were to be a counterparty that objected to the abandonment of the No-Compensation License Provisions, etc., it would suffice to abandon the No-Compensation License Provisions, etc. while, at the same time, newly agree to the same content as the No-Compensation License Provisions, etc., and no substantial problems would arise from the abandonment.

39

[Translation]

Also, the Respondent asserts that the License Agreements are balanced with the current contents, and to abandon them would actually make them unbalanced. However, based on the fact that the contractual terms such as the royalty rate corresponding to the value of the IPRs held by the DMSHs, etc. which are the subject of the No-Compensation License Provisions, etc. are not adjusted, it cannot be said in the first place that the contents of the License Agreements are balanced. The above assertion by the Respondent disregards that the Violating Acts of this case are unbalanced and that they have the tendency to impede fair competition.

Therefore, it cannot be said that the order to abandon the No-Compensation License Provisions, etc. exceeds the scope of discretion of the Fair Trade Commission.

C. The assertion by the Respondent that the CDO violates Article 21 of the AMA

Article 21 of the AMA provides that the AMA shall not be applied to acts which are recognized as being an exercise of rights under the Copyright Act, etc. This provision means exactly what it states which is that the provisions of the AMA shall not be applied to acts which are recognized to be an exercise of rights under the Copyright Act, etc., and the provision is construed to have been established for confirming that, even if an act seems to be an exercise of rights under the Copyright Act, etc., if said act is found to deviate from the intent of or be in conflict with the objectives of the intellectual property rights system, taking into consideration the objective, form, and influence on competition and the like of said act, then such act would not be evaluated as "an act found to be an exercise of rights" as provided under said Article, and the AMA would become applicable (Japan Fair Trade Commission, August 1, 2001 Decision, Fair Trade Commission Decisions Volume 48, page 3 <Case against Sony Computer Entertainment>).

On this point, the Violating Acts of this case by the Respondent deviates from the intent of, and contradicts the objectives of the intellectual property rights system, and therefore, are clearly not "acts found to be an exercise of rights" as set forth in this Article.

Therefore, the CDO does not violate Article 21 of the AMA.

D. The assertion by the Respondent that the CDO usurps the rights of the Respondent's licensees and customers without giving them the right to due process set forth in Article 31 of the Constitution

[Translation]

In the first place, the guarantee of due process set forth in Article 31 of the Constitution directly relates to criminal proceedings, and the question as to whether it is necessary to provide the opportunity of due process to counterparties under administrative disposition is, in itself, a point of legal dispute (*See* Supreme Court, July 1, 1992 Judgment, Civil Procedure Casebook Vol. 46-5, p. 437).

Also, the CDO does not address the Respondent's customers and licensees by name, nor does it directly impose any obligations on them whatsoever. Even if the CDO were to somehow influence the Respondent's customers and licensees, it merely is an indirect influence arising from the abandonment of the No-Compensation License Provisions, etc. included in the License Agreements between the Respondent and the DMSHs which were concluded without their involved, and thus, the guarantee of due process set forth in Article 31 of the Constitution is not an issue that would concern them.

Therefore, the CDO is in no way illegal in lacking the guarantee to due process set forth in Article 31 of the Constitution.

(2) Assertions of the Respondent

The contents of the CDO violate Articles 20 and 21 of the AMA and Article 31 of the Constitution as follows.

A. The main text of the CDO is unreasonably vague and unclear

Paragraph 2 of the main text of the CDO prohibits the Respondent from engaging in "acts that force" the DMSHs to grant no-compensation license for their IPRs and not assert their intellectual property rights, but it does not indicate whatsoever what the objective standard is that would categorize an act as "an act of forcing." The contents of the CDO are so abstract that the Respondent who was issued said CDO does not know specifically what it needs to do in order to satisfy the CDO, and also, because it is impossible or significantly difficult to satisfy said CDO (Tokyo High Court, July 17, 1971 Judgment, Japan Fair Trade Commission Decisions Vol. 18, page 167 >Case seeking to rescind a trial decision, filed by Meiji Shoji Kabushiki Kaisha>), the measures that are ordered under the CDO are unreasonably vague and unclear, thus making the CDO illegal.

B. It is outside the scope of discretion of the Japan Fair Trade Commission to order the abandonment of the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the making of pledges not to assert their intellectual property rights against the other licensees of the Respondent

[Translation]

The main text of the CDO obliges the Respondent to abandon the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert their rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.), but in order to remove or amend certain provisions from the License Agreements, the Respondent needs to acquire consent from the counterparties of each agreement, and it is impossible for the Respondent to unilaterally abandon the provisions of the License Agreements. In particular, the pledges made by the DMSHs not to assert their rights against the other licensees of the Respondent (Non-Assertion Provision against the Respondent's Licensees) was provided to bring profits to the licensee's business activities and it is unlikely that a licensee who provided this would agree to its removal. Therefore, the order the abandonment each of these provisions would mean ordering the Respondent to do something that is impossible or significantly difficult, and would be outside the scope of the discretion of the Fair Trade Commission.

Moreover, each of the provisions of the License Agreements are provided as a result of negotiations, and they mutually relate to each other and are balanced. If these provisions were to be abandoned, for example, the Respondent and its customers as well as the other licensees of the Respondent who agreed to the non-assertion provision would be obliged to grant licenses to their intellectual property to the DMSHs, but on the other hand, they would lose their rights pertaining to the intellectual property of the DMSHs that were subject to the provisions, which would give rise to an extreme imbalance. The Fair Trade Commission does not have the authority to order such measures to private companies, and thus, the order to abandon each of these provisions is outside the scope of authority of the Japan Fair Trade Commission.

C. The CDO violates Article 21 of the AMA

The negotiation and agreement by the Respondent to enter into the License Agreements which include the granting of licenses for IPRs by the DMSHs to the Respondent, etc., and the request by the Respondent to include in said License Agreements a provision under which the DMSHs pledge not to assert their rights against the other licensees of the Respondent (Non-Assertion Provision against the Respondent's Licensees) are a legitimate exercise of rights granted to the Respondent under the Patent Act.

[Translation]

Therefore, under Article 21 of the AMA which sets forth that "the provisions under this Act do not apply to acts that are recognized as an exercise of rights under the Copyright Act, Patent Act, Utility Model Act, Design Act and Trademark Act," the Act does not apply to the Violating Acts of this case asserted by the Investigation Officials.

D. The CDO usurps the rights of the Respondent's licensee and its customers to the guarantee of due process as provided under Article 31 of the Constitution Article 31

If the granting of licenses for IPRs by the DMSHs to the Respondent, etc. and the pledges made by the DMSHs not to assert their rights against the other licensees of the Respondent (No-Compensation License Provisions, etc.) were to be abandoned in accordance with the CDO, the Respondent's licensees and customers would be unfairly usurped of their right to be protected from patent infringement claims being brought against them by the DMSHs without compensation or legal recourse, and thus, the CDO is in violation of the guarantee of due process as set forth under Article 31 of the Constitution.

VI. The Hearing Examiners' Decision

1. Regarding Issue 1

(1) Practice which falls within the scope of trading with unfair restrictive conditions

A. Article 19 of the AMA provides that "an enterprise must not employ unfair trade practices," and Article 2, Paragraph 9, item 4 of the AMA before the amendment by the Amended Act of 2009 lists acts falling within the scope of unfair trade practices, one of which is an act of trading on terms unjustly restricting the business activities of another party which tends to impede fair competition and which is designated by the Fair Trade Commission. The Former General Designation Paragraph 13 referred to therein identifies the act of "attaching conditions that unjustly restricts the business activities of the counterparty on transactions between a counterparty and the counterparty to that transaction, and engaging in transactions with said counterparty."

B. The requirement for "unjustly" provided in Former General Designation Paragraph 13 is interpreted as meaning that there is "a tendency to impede fair competition" as defined under Article 2, Paragraph 9 of the AMA before the amendment by the Amended Act of 2009.

43

[Translation]

The reason why the AMA regulates trading on unjustly restrictive conditions is that an act of imposing restrictions which has a direct impact on competition involves an aspect of artificially impeding competition, which otherwise should be achieved by another party's provision of goods and services of low price and high quality in said party's business activities. Since the details of trading with restrictive conditions vary, in determining whether or not an act falls within the scope of trading on unjustly restrictive conditions, the tendency to impede fair competition should be judged on a case by case basis taking into consideration the form of trading and the extent of the restrictions. The act should be considered as falling within the scope of trading on terms which "unjustly" restrict another party's business activities only if and when it is found to tend to have an adverse effect on the fair competition order (*See* Supreme Court Judgment of December 18, 1998, Civil Procedure Casebook Vol.52, No.9 at 1866, JFTC Decision Review Vol.45 at p. 461 <Appeal case of seeking declaratory judgment to confirm the status filed by Yugen Gaisha Egawa Kikaku>).

In addition, in order to determine whether or not an act falls within the scope of trading on unjustly restrictive conditions, it is not a requirement that the act has a specific adverse effect on competition, and it is sufficient if it is found that there is some degree of risk that there will be an adverse effect on competition. However, it should not be interpreted as being sufficient if the act is vaguely likely to have an adverse effect on competition. It is required to determine whether or not the act tends to impede fair competition by examining the individual quantitative or qualitative impact thereof on competition (*See* JFTC Decision of September 16, 2008, JFTC Decision Review Vol.55 at p. 380 <Case against Microsoft Corporation>).

C. According to the Investigation Officials, the No-Compensation License Provisions, etc. provide that the DMSHs shall grant to the Respondent a license of IPRs owned or to be owned by them, or shall pledge not to assert their rights against the Respondent and the Respondent's customers and other licensees, and thus those provisions fall within the scope of the terms which restrict the business activities of DMSHs.

Accordingly, in order to determine whether or not the Violating Acts of this case fall within the scope of Former General Designation Paragraph 13, it is necessary to determine whether or not it can be said the inclusion of the No-Compensation License Provisions, etc. in the License Agreements between the Respondent and DMSHs, thereby restricting the business activities of DMSHs, causes a tendency to impede fair competition.

[Translation]

(2) The License Agreements and facts related thereto (undisputed facts, background facts, and facts found by these and evidence described at the end of the relevant Paragraphs)

A. Regarding the content of the License Agreements

(A) Overview

The License Agreements generally provide, on one hand, that the Respondent shall grant the DMSHs a personal (non-transferrable), worldwide and non-exclusive license to IPRs to CDMA Mobile Wireless Communications owned or to be owned by the Respondent which are identified as covered by the License Agreements to allow DMSHs, etc. to manufacture and sell CDMA subscriber Units, CDMA components (limited to those incorporated in CDMA subscriber Units of DMSHs) and CDMA base stations and, on the other hand, that the DMSHs shall not only pay royalties to the Respondent, but also (i) grant the Respondent a personal (non-transferrable), worldwide and non-exclusive license to IPRs owned or to be owned by the DMSHs, etc. which are identified as covered by the License Agreements to allow the Respondent, etc. to manufacture and sell CDMA Subscriber Units and CDMA components (No-Compensation License Provisions, etc.), and (ii) pledge not to assert their intellectual property rights regarding CDMA Mobile Wireless Communications owned or to be owned by the DMSHs which are identified as covered by the License Agreements against the Respondent, etc. or in addition thereto, against the Respondent's customers for the Respondent's manufacture or sale of CDMA components or, in addition thereto, for the Respondent's customers' incorporation of the Respondent's CDMA components in their products (Non-Assertion Provision against the Respondent, etc.), and (iii) with respect to the DMSHs that agreed to the Non-Assertion Provision against the Respondent's licensees, pledge not to assert their intellectual property rights owned or to be owned by the DMSHs, etc. which are identified as covered by the License Agreements against the Respondent's licensees that agreed to similar provisions for such licensees' manufacture, use and sale of CDMA Subscriber Units and (or) CDMA components.

[Translation]

(As stated in III 4 (3) above, although the content of the License Agreements varies depending on DMSHs, the following sections will only address facts, and any variations/differences that do not affect the judgment in this case will be discarded. While the Respondent uses the phrase "technically necessary IPRs" for "technically essential IPRs" covered by the License Agreements, and similarly the phrase "commercially necessary IPRs" for "commercially essential IPRs," respectively, based on the terms and definitions used in the License Agreements, IPRs covered by the License Agreements are hereinafter referred to simply as "TEIPRs" or "CEIPRs" as the case may be. In addition, when the terms "TEIPRs" and "CEIPRs" are used as referring to those subject to the relevant provisions of the License Agreements, unless otherwise specified, they refer to those that are identified as covered by the License Agreements.)

(B) Licensing of IPRs by the Respondent to the DMSHs

a. Overview

The Respondent grants the DMSHs a personal (non-transferrable), worldwide and non-exclusive license of IPRs to CDMA Mobile Wireless Communications owned or to be owned by the Respondent which are identified as covered by the License Agreements to allow DMSHs, etc. to manufacture and sell CDMA Subscriber Units, CDMA components (limited to those incorporated in CDMA Subscriber Units of DMSHs) and CDMA base stations.

b. Scope of IPRs licensed by the Respondent

IPRs licensed by the Respondent to the DMSHs under the License Agreements are TEIPRs and CEIPRs to CDMA Mobile Wireless Communications, which include both those developed (or for which a patent application has been filed; the same applies hereinafter) or acquired by the Respondent, etc. on or before the effective date of the License Agreements, and the improvement technology to be developed or acquired by the Respondent, etc. during the improvement period specified in the License Agreements.

46

[Translation]

This means that under the License Agreements, the Respondent grants to the DMSHs a license of not only TEIPRs and CEIPRs developed or acquired by the Respondent, etc. on or before the effective date of the License Agreements but also TEIPRs and CEIPRs to be developed or acquired by the Respondent, etc. during the improvement period.

c. Timeframe of IPRs licensed by the Respondent (improvement period)

As stated in b. above, IPRs which the Respondent licenses to the DMSHs under the License Agreements include those to be developed or acquired after the effective date of the License Agreements, and the scope is limited according to the improvement period specified in the License Agreements (as shown in "Expiry Date of Improvement Period" section in Appendix (Chart), the improvement period varies depending on DMSHs).

Many of the License Agreements have different improvement periods for TEIPRs and CEIPRs. For TEIPRs, the License Agreements with 8 out of 14 DMSHs listed in Appendix (Chart) have an unlimited improvement period (in the case of Mitsubishi Electric, only the base station agreement has an unlimited period, and in the case of Hitachi, an unlimited period applies only to IPRs owned by specific business divisions), and the License Agreements with the other 6 DMSHs have an improvement period of between several months and two years from the effective date thereof (in the case of Sanyo Electric, the improvement period was later amended to be unlimited). In the meanwhile, for CEIPRs, none of the License Agreements with the above-mentioned 14 DMSHs have an unlimited improvement period. Instead, they have an improvement period of between several months and three years from the effective date thereof (see "Expiry Date of Improvement Period" section in Appendix (Chart)).

It is noted that the improvement period used as the criteria for limiting the scope of IPRs licensed by the Respondent to the DMSHs under the License Agreements is the same as the improvement period used as the criteria for limiting the scope of IPRs licensed by the DMSHs to the Respondent under No-Compensation License Provisions, etc.

[Translation]

d. Scope of other parties against whom the Respondent cannot assert its rights

The Respondent licenses IPRs falling within the scope described in a. and b. above to the DMSHs under the License Agreements, the effect of which prevents the Respondent from asserting its rights against not only DMSHs but also other parties who purchase Subscriber Units manufactured using the aforementioned IPRs from DMSHs even if such Subscriber Units, etc. infringe such IPRs.

e. Period during which the Respondent licenses IPRs (license period)

The License Agreements between the Respondent and DMSHs do not specify the license period.

f. Restrictions on the Respondent asserting its IPRs

As long as the License Agreements remain effective, the grant of a license of IPRs referred to in b. above which are developed or acquired by the Respondent, etc. before the effective date of the License Agreements as well as IPRs referred to in b. above which are to be developed or acquired by the Respondent, etc. during the improvement period to the DMSHs under the License Agreements prevents the Respondent from seeking an injunction or damages or otherwise asserting its rights against infringement of the aforementioned IPRs by the DMSHs and those that purchase their products.

On the contrary, the Respondent can, after the termination of the License Agreements, assert its rights if any product subsequently manufactured or sold by the DMSHs, etc. infringes the Respondent's IPRs covered by the License Agreements, and also can, even before the termination of the License Agreements, seek an injunction or damages or otherwise assert its rights against the DMSHs and those that purchase their products if they infringe any IPR developed or acquired by the Respondent, etc. after the expiry of the improvement period.

Looking at this from the viewpoint of the DMSHs, as long as the License Agreements remain effective, the payment of royalties to the Respondent under the License Agreement protects the DMSHs from an injunction or damages sought by or other right asserted by the Respondent even if they infringe any IPR developed or acquired by the Respondent, etc. before the effective date of the License Agreements or any IPR developed or acquired by the Respondent, etc. during the improvement period.

[Translation]

Meanwhile, the DMSHs may, after the termination of the License Agreements, be subject to an injunction or damages sought by or other right asserted by the Respondent if any product subsequently manufactured or sold by the DMSHs infringes any IPR of the Respondent, etc. covered by the License Agreements, and may also, even before the termination of the License Agreements, be subject to an injunction or damages sought by or other right asserted by the Respondent if they infringe any IPR developed or acquired by the Respondent, etc. after the expiry of the improvement period.

(C) Royalty payment and licensing of IPRs by the DMSHs to the Respondent

a. Payment of money (royalty)

The DMSHs shall pay to the Respondent a certain up-front fee when entering into and extending the agreement, and in addition, pay the amount calculated by multiplying the number of contracted product sold by the DMSHs, etc. who are the licensees during such period and the pre-determined percentage of the net selling price per contracted product every quarter of a calendar year. The pre-determined percentage of the net selling price per contracted product is determined depending on the number of contracted products sold by the licensees, and falls in within the approximate range of 5% to 6.5%.

It is noted that in the License Agreements between the Respondent and DMSHs, the royalty rate is not adjusted according to the value of IPRs owned by the DMSHs, etc. (Sa 116, Sa 161, Shin 88).

Furthermore, the License Agreements do not provide that the Respondent shall pay any particular money to the DMSHs.

b. Licensing of IPRs by way of No-Compensation License Provisions, etc.

(a) Overview

The DMSHs grant to the Respondent a personal (non-transferrable), worldwide and non-exclusive license of IPRs owned or to be owned by the DMSHs, etc. which are identified as covered by the License Agreement to allow the Respondent, etc. to manufacture and sell CDMA Subscriber Units and CDMA components.

49

[Translation]

(b) Scope of IPRs licensed by the DMSHs

The IPRs licensed by the DMSHs under the No-Compensation License Provisions, etc. are TEIPRs to CDMA Mobile Wireless Communications (which mean "IPRs" (i) for which DMSHs have the right to grant a license to the Respondent without paying royalty or other consideration to other third parties, and (ii) which are essential in manufacturing, using or selling "Subscriber Units" and (or) "Components" compliant with the common air interface (including IS-95 standard and substantially similar standard as well as other standards related to CDMA Mobile Wireless Communications; the "CAI"); the same generally applies with respect to No-Compensation License Provisions, etc. unless otherwise specifically indicated) and CEIPRs (which mean "IPRs" (i) for which the DMSHs have the right to grant a license to the Respondent without paying royalty or other consideration to other third parties, (ii) which are not essential in manufacturing, using or selling "Subscriber Units" and (or) "Components" compliant with the CAI, and (iii) which provide "Subscriber Units" and (or) "Components" with competitive advantage (e.g., cost, lead time or quality advantage) or add a feature or other characteristic which may be reasonably required by the market; the same generally applies with respect to the No-Compensation License Provisions, etc. unless otherwise specifically indicated; it is noted that what the No-Compensation License Provisions, etc. require Panasonic Mobile and NEC to license is limited to TEIPRs), which include both those developed or acquired by the DMSHs, etc. before the effective date of the License Agreements and the improvement technology to be developed or acquired by the DMSHs, etc. during the improvement period.

[Translation]

This means that under the No-Compensation License Provisions, etc., the DMSHs grant the Respondent a license of not only TEIPRs and CEIPRs developed or acquired by the DMSHs, etc. before the effective date of the License Agreements but also TEIPRs and CEIPRs to be developed or acquired by the DMSHs, etc. during the improvement period.

As shown in the appended table attachment, the No-Compensation License Provisions, etc. are contained in the License Agreements between the Respondent and all of the DMSHs who entered into the License Agreements. While most of the DMSHs granted a license for both TEIPRs and CEIPRs to the Respondent, Panasonic Mobile and NEC requested that the Respondent narrow down the scope of other parties against whom they would not be able to assert their rights under the licenses for the IPRs. As a result, as described above, they do not grant to the Respondent a license of CEIPRs to allow the Respondent, etc. to manufacture and sell "Components," and instead agree on the Non-Assertion Provision against the Respondent, etc. – i.e., a pledge not to assert their rights against certain parties. Also, Panasonic Mobile does not grant a license of TEIPRs for the sale, etc. of particular "Components" to third parties, and the scope of the license granted by Panasonic Mobile is partially limited.

(c) Timeframe of IPRs licensed by the DMSHs (improvement period)

As stated in (b) above, IPRs that the DMSHs license under the License Agreements include those to be developed or acquired by the DMSHs, etc. after the effective date of the License Agreements, and the scope is limited according to the improvement period specified in the License Agreements (as shown in the "Expiry Date of Improvement Period" section in the appended table, the improvement period varies depending on DMSHs).

It is noted that the improvement period used as the criteria for limiting the scope of IPRs licensed by the DMSHs to the Respondent under the No-Compensation License Provisions, etc. is the same as the improvement period (described in (b) c. above) used as the criteria for limiting the scope of IPRs licensed by the Respondent to the DMSHs.

[Translation]

(d) Scope of other parties against whom the DMSHs cannot assert their rights

The DMSHs license IPRs falling within the scope described in (b) and (c) above to the Respondent under the No-Compensation License Provisions, etc., the effect of which is that the DMSHs are prevented from asserting their rights against not only the Respondent, etc. but also the Respondent's customers even if a CDMA Component purchased by any the Respondent's customer infringes such IPRs.

It is noted that DMSHs are restricted from asserting their rights against the Respondent's customers only for infringement by the CDMA Component purchased by such customers from the Respondent, etc. of their IPRs. Therefore, DMSHs can seek an infringement or damages against the Respondent's customers not only if a product in which the CDMA Component purchased from the Respondent, etc. is not incorporated infringes their IPRs, but also if, where the CDMA Component purchased from the Respondent, etc. is incorporated in a product of the Respondent's customer, any portion or function other than such CDMA Component of the relevant product infringes their IPR.

(e) Period during which DMSHs license IPRs

As stated in (B) e above, the License Agreements between the Respondent and the DMSHs neither specify the license period, nor specifically identify the effective period of the No-Compensation License Provisions, etc.

(f) Restriction on the DMSHs asserting their IPRs

As long as the License Agreements remain effective, the grant of a license to IPRs referred to in (b) above which are developed or acquired by the DMSHs before the effective date of the License Agreements as well as IPRs referred to in (b) above which are to be developed or acquired by the DMSHs during the improvement period (or only TEIPRs in the case of Panasonic Mobile and NEC) to the Respondent under the No-Compensation License Provisions, etc. prevents the DMSHs from seeking an injunction or damages or otherwise asserting their rights against infringement of the aforementioned IPRs by the Respondent, etc. and the Respondent's customers.

[Translation]

Meanwhile, DMSHs can, after the termination of the License Agreements, seek an injunction or damages or otherwise assert their rights against the Respondent, etc. and the Respondent's customers if any product subsequently manufactured or sold by the Respondent, etc. infringes their IPRs covered by the No-Compensation License Provisions, etc., and may also, even before the termination of the License Agreements, assert their rights against the Respondent, etc. and the Respondent's customers if any IPR developed or acquired by the DMSHs after the expiry of the improvement period is infringed, and assert their rights against the Respondent's customers even if any product of the Respondent's customers in which a CDMA Component manufactured or sold by the Respondent, etc. is incorporated infringes IPRs of DMSHs as long as the infringement is not caused by such CDMA Component.

(g) Description in the agreement

The License Agreements executed by the DMSHs contain the wording "fully-paid and royalty free license" with respect to the No-Compensation License Provisions, etc., and the License Agreements executed by some of the DMSHs specify, in their preamble, that the provisions including the No-Compensation License Provisions, etc. as a whole form a part of the consideration for a license of IPRs by the Respondent (Shin 50-64-1, Shin 50-72-1, Shin 51-64-1, etc.).

c. Pledge not to assert rights against the Respondent, etc. by way of the Non-Assertion Provision

(a) Overview

Among the DMSHs, Panasonic Mobile, Mitsubishi Electric and NEC, who entered into the License Agreements containing the Non-Assertion Provision against the Respondent, etc. pledge not to assert their rights based on IPRs to CDMA Mobile Wireless Communications owned or to be owned by the DMSHs which are identified as covered by the License Agreements against the Respondent, etc. or in addition thereto, against the Respondent's customers, for the Respondent's manufacture or sale of CDMA components or, in addition thereto, for the Respondent's customers' incorporation of the Respondent's CDMA components in their products.

[Translation]

As stated in b (a) above, the No-Compensation License Provisions, etc. grant a license of IPRs by the DMSHs to the Respondent, and as stated in b (d) above, the effect thereof prevents DMSHs from asserting some of their rights against both the Respondent, etc. and the Respondent's customers. Unlike the No-Compensation License Provisions, etc., the Non-Assertion Provision against the Respondent, etc. does not require the DMSHs to grant a license of IPRs to the Respondent, but constitutes a pledge not to assert rights – principally regarding CEIPRs - against other parties specified in the agreement.

NEC and Panasonic Mobile, as described in 1 and 2 of Attachment 2, were initially requested by the Respondent to agree on the No-Compensation License Provisions, etc.. Through negotiations, however, they agreed to make mainly CEIPRs the subject of the Non-Assertion Provision against the Respondent, etc., or in addition thereto against the Respondent's customers, instead of licensing the CEIPRs to the Respondent. (In the case of Mitsubishi Electric, although the Non-Assertion Provision against the Respondent, etc. regarding TEIPRs in the former license agreement executed with the Respondent in 1995 remains in the License Agreement, the License Agreement separately specifies the No-Compensation License Provisions, etc., thereby making the Non-Assertion Provision substantially meaningless. Therefore, the following sections will address the Non-Assertion Provision against the Respondent, etc. to which Panasonic Mobile and NEC agreed.)

[Translation]

(Sa 67-1 through 67-4, Sa 70-1 through 70-4, Sa 71-1 through 71-4, Sa 189, Sa 189-2, Shin 52, Shin 73, Shin 73-2)

(b) Scope of IPRs the DMSHs made a pledge not to assert

The IPRs that Panasonic Mobile made a pledge not to assert under the Non-Assertion Provision against the Respondent, etc. are TEIPRs and CEIPRs to CDMA Mobile Wireless Communications, and the IPRs that NEC made a pledge not to assert against the Respondent, etc. are CEIPRs to CDMA Mobile Wireless Communications. These TEIPRs and CEIPRs include both those developed or acquired by the DMSHs, etc. before the effective date of the License Agreements and the improved technology to be developed or acquired by the DMSHs, etc. during the improvement period, respectively (Sa 67-1 through 67-4, Sa 70-1 through 70-4, Sa 189, Sa 189-2, Shin 52, Shin 73, Shin 73-2).

(c) Timeframe of IPRs DMSHs made a pledge not to assert (improvement period)

As stated in (b) above, the IPRs for which Panasonic Mobile and NEC made a pledge not to assert include those to be developed or acquired by the DMSHs, etc. after the effective date of the License Agreements, and the scope is classified according to the improvement period specified in the License Agreements (as shown in "Expiry Date of Improvement Period" section in Appendix (Chart), the improvement period varies depending on the DMSHs).

It is noted that the improvement period used as the criteria for classifying the scope of IPRs for which Panasonic Mobile and NEC cannot assert against the Respondent, etc. and the Respondent's customers due to the Non-Assertion Provision against the Respondent, etc. is in common with the improvement period (described in (b) c. above) used as the criteria for classifying the scope of TEIPRs and CEIPRs licensed by the Respondent to the DMSHs.

[Translation]

(Sa 67-1 through 67-4, Sa 70-1 through 70-4, Sa 189, Sa 189-2, Shin 52, Shin 73, Shin 73-2)

(d) Scope of other parties against whom the DMSHs cannot assert their rights

The other parties against whom the Non-Assertion Provision against the Respondent, etc. prevents DMSHs from asserting their rights are limited to those specified in the agreement. Specifically, Panasonic Mobile made a pledge not to assert its rights only against infringement caused by the manufacture and sale of "Component" by the Respondent, etc. and the incorporation of "Customer Components" (which is defined as narrower than "Component") purchased from the Respondent, etc. in customer products. Also, since the License Agreement provides that Panasonic Mobile can assert its rights against infringement caused by the combination of "Customer Components" and other products, other parties against whom Panasonic Mobile cannot assert its rights are the Respondent, etc. and customers who purchase the Respondent's "Customer Components" from the Respondent, etc. and incorporate the same in their products (excluding customers whose infringement is caused by the combination of "Customer Components" and other products).

On the other hand, since NEC made a pledge not to assert its rights against [infringement caused by] the manufacture and sale, etc. by the Respondent, etc., other parties against whom NEC cannot assert its rights are the Respondent, etc.

(Sa 67-1 through 67-4, Sa 70-1 through 70-4, Sa 189, Sa 189-2, Shin 52, Shin 73, Shin 73-2)

(e) Period during which DMSHs cannot assert IPRs

As stated in (b) e above, the License Agreements between the Respondent and the DMSHs neither specify the license period, nor specifically identify the effective period of the Non-Assertion Provision against the Respondent, etc.

(f) Restriction on DMSHs asserting their IPRs

As long as the License Agreements remain effective, the Non-Assertion Provision against the Respondent, etc. prevents Panasonic Mobile and NEC who entered into the License Agreements containing the Non-Assertion Provision against the Respondent, etc. from seeking an injunction or damages or otherwise asserting their rights against infringement by other parties against whom they made a pledge not to assert their rights of IPRs referred to in (b) above which are developed or acquired before the effective date of the License Agreements as well as IPRs referred to in (b) above which are to be developed or acquired during the improvement period.

[Translation]

However, Panasonic Mobile and NEC can, after the termination of the License Agreements, assert their rights against IPR infringement as described above, and may also, even before the termination of the License Agreements, assert their rights against other parties who made a pledge not to assert their rights by way of the Non-Assertion Provision against the Respondent, etc. for any infringement of IPRs developed or acquired after the expiry of the improvement period.

The Non-Assertion Provision against the Respondent, etc. prevents Panasonic Mobile from asserting its rights against not only the Respondent, etc. but also against the Respondent's customers who purchase the Respondent's "Customer Component" from the Respondent, etc. and incorporate it in their products. However, since the Non-Assertion Provision prevents Panasonic Mobile from asserting its rights only against infringement caused by the "Customer Component," Panasonic Mobile can seek an injunction or damages or otherwise assert its rights against the Respondent's customers who purchase the Respondent's "Customer Component" and incorporate it in their products not only if their products in which a "Customer Component" is not incorporated infringe its IPR, but also if their products in which a "Customer Component" is incorporated infringe its IPR and such infringement is caused by a portion or function other than the "Customer Component" or if any product manufactured from combination of CDMA component of the Respondent, etc. and their product infringes its IPR.

On the other hand, the Non-Assertion Provision against the Respondent, etc. prevents NEC from asserting its rights against the Respondent, etc. while it does not restrict NEC from asserting its rights against the Respondent's customers.

d. Pledge not to assert rights against the Respondent's licensees by way of the Non-Assertion Provision

(a) Overview

[Translation]

The DMSHs who entered into the License Agreements containing the Non-Assertion Provision against the Respondent's licensees made a pledge not to assert their rights based on IPRs owned or to be owned by the DMSHs, etc. which are identified as covered by the License Agreements against other the Respondent's licensees who agreed on the similar provisions for those licensees' manufacture, use or sale of CDMA Subscriber Units and (or) CDMA components.

Thus, although DMSHs who agreed on the Non-Assertion Provision against the Respondent's licensees in the License Agreements are restricted, to a certain extent, from asserting their rights against other of the Respondent's licensees who agreed on the similar provisions, they are protected from the Respondent's other licensees asserting their rights even if their manufacture, use or sale of CDMA Subscriber Units and (or) CDMA Components infringes TEIPRs owned by the other the Respondent's licensees who agreed on the similar provisions. Therefore, those DMSHs who agreed on the Non-Assertion Provision against the Respondent's licensees and the Respondent's other licensees who agreed on the similar provisions are free to use each other's IPRs without paying or receiving any money.

For the record, the decision to include the Non-Assertion Provision in the License Agreements is at the option of the DMSHs, and among the 14 DMSHs listed in Appendix (Chart), 11 companies other than Panasonic Mobile, NEC and Hitachi agreed to include the Non-Assertion Provision against the Respondent's licensees in the License Agreements.

(b) Scope of IPRs DMSHs made a pledge not to assert

IPRs that DMSHs made a pledge not to assert against the Respondent's licensees who agreed on the similar provisions are limited to TEIPRs to CDMA Mobile Wireless Communications. These TEIPRs include both those developed or acquired by the DMSHs, etc. before the effective date of the License Agreements and the improved technology to be developed or acquired by the DMSHs, etc. during the improvement period.

[Translation]

(c) Timeframe of IPRs DMSHs made a pledge not to assert (improvement period)

As stated in (b) above, TEIPRs which DMSHs who agreed on the Non-Assertion Provision against the Respondent's licensees made a pledge not to assert against the Respondent's other licensees who agreed on the similar provisions include those to be developed or acquired by the DMSHs, etc. after the effective date of the License Agreements, and the scope thereof is divided according to the improvement period specified in the License Agreements (as shown in "Expiry Date of Improvement Period" section in Appendix (Chart), the improvement period varies depending on the DMSHs).

(d) Scope of other parties against whom the DMSHs cannot assert their rights

Other parties against whom the Non-Assertion Provision against the Respondent's licensees prevents DMSHs from asserting their rights are limited to other the Respondent's licensees who agreed on the similar provisions.

(e) Period during which the DMSHs cannot assert IPRs

As stated in (b) e above, the License Agreements between the Respondent and DMSHs neither specify the license period, nor specifically identify the effective period of the Non-Assertion Provision against the Respondent's licensees.

(f) Restrictions on DMSHs asserting IPRs

As long as the License Agreements remain effective, the Non-Assertion Provision against the Respondent's licensees prevents DMSHs who agree on the Non-Assertion Provision against the Respondent's licensees from seeking an injunction or damages or otherwise asserting their rights against infringement by other the Respondent's licensees who agreed to similar provisions for TEIPRs developed or acquired by the DMSHs, etc. before the effective date of the License Agreements and TEIPRs to be developed or acquired by the DMSHs, etc. during the improvement period.

[Translation]

However, those DMSHs who agreed on the Non-Assertion Provision against the Respondent's licensees may, after the termination of the License Agreements, assert their rights against IPR infringement described above, and may also, even before the termination of the License Agreements, assert their rights against the Respondent's other licensees who agreed on the similar provisions for any infringement of IPRs developed or acquired after the expiry of the improvement period.

(g) No compensation

The License Agreements do not provide that the DMSHs who agreed on the Non-Assertion Provision against the Respondent's licensees are to pay or receive certain monies to or from other the Respondent's licensees who agreed to the similar provisions.

B. Other

(A) At the time of negotiating the License Agreements, among the 14 DMSHs listed in the appended table, Hitachi, Fujitsu, NEC, Toshiba and Mitsubishi Electric submitted Confirmation Forms regarding the technology for 3G Mobile Wireless Communications Standards. 9 companies other than the 5 companies named above did not submit Confirmation Forms (Although Panasonic Mobile did not submit them, Panasonic did. *See* III, 2 (4) B (B)), and 5 companies (i.e., Sanyo Electric, Casio, Kenwood Corporation ("Kenwood"), Alps Electric Co., Ltd. ("Alps") and Kyocera) out of them did not actually own TEIPRs to CDMA Mobile Wireless Communications at the time of executing the License Agreements (Sa 181 through Sa 183, Sa 207, Sa 265).

(B) Among the 14 DMSHs listed in the appended table, 11 companies other than NEC, Panasonic Mobile and Toshiba did not disclose IPRs owned by them, or request the Respondent to examine or evaluate them to adjust license terms while negotiating the License Agreements with the Respondent.

(3) Whether the execution of the License Agreements that sets forth the No-Compensation License Provisions, etc. has a tendency to impede fair competition by restricting business activities

[Translation]

A. Tendency to impede fair competition asserted by the Investigation Officials

(A) The Guidelines for the Use of Intellectual Property under the AMA (hereinafter, "IP Guidelines") provides in Part 4, (5) (vi) that, when a licensor imposes on licensees "an obligation to refrain from exercising, in whole or in part, the rights owned or to be acquired by them against the licensor or any entrepreneurs designated by the licensor" or "an obligation to license the licensor or any entrepreneur designated by the licensor to use the patents and other rights owned or to be acquired by licensees in whole or in part," this obligation could result in enhancing the influential position of the licensor in a product or technology market or could impede the licensee's incentive to engage in research and development, thereby impeding the development of new technologies by restricting the exercise of the licensee's rights, etc. It therefore is an unfair trade practice if it tends to impede fair competition.

(B) The Investigation Officials assert that, in light of the viewpoint of the IP Guidelines stated in (A) above, as the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development and as it was not possible to supplement or avoid the disadvantages caused by such restrictions, it is likely to strengthen the Respondent's dominant position, and thus, the Violating Acts of this case of providing the No-Compensation License Provisions, etc. in the License Agreements and restricting the business activities of the DMSHs are found to be likely to have an adverse impact on the order of fair competition.

(C) In this respect, as stated in (1) above, to judge whether a transaction falls under the trading on unfair restrictive conditions, it is not necessary that specific adverse effect on competition actually occur, and it is sufficient if it is found that there is a possibility of an occurrence of adverse effect on competition. However, it should not be understood concerning the degree of the "possibility" that a vague possibility that adverse effect on competition may occur would be sufficient.

Further, when comprehensively considering the relations of rights and duties under the License

[Translation]

Agreements that set forth the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. based on the facts found in (2) above, under the License Agreements, the Respondent grants the DMSHs the license for the IPRs to CDMA Mobile Wireless Communications, while the DMSHs pay a lump sum license fee and continuous royalties, grant the Respondent and its customers the license for the IPRs to CDMA Mobile Wireless Communications (No-Compensation License Provisions, etc.) or makes a pledge not to assert its rights based on the IPRs against the Respondent or its customers (Non-Assertion Provision against the Respondent, etc.), and the basic structure of the License Agreements have the nature of cross-license agreements in which the Respondent grants the license to its own IPRs, and the DMSHs also grant nonexclusive licenses to their own IPRs (including those who pledged not to assert their rights concerning part of their patent rights; the same shall apply hereinafter) (although the Respondent is not obliged to pay any money and only the DMSHs are obliged to pay money, this type of agreement is not atypical as a cross-license agreement, nor can the amount of the money be found to affect the nature of the agreement.). In addition, the Non-Assertion Provision against the Licensees is also a provision by which the DMSHs and the other Respondent's licensees that provided the same provision made a pledge not to assert their rights based on their own IPRs against each other for no compensation and allows one another to use the other party's own IPRs, which should be acknowledged as being similar in nature to cross-license agreements. Here, entering into a cross-license agreement is not found to have a tendency to impair fair competition (The descriptions in Part 1 (1), Part 4 (5) (vi) and (ix) of the IP Guidelines are also understood to be based on the same thinking.).

As such, in order to have the License Agreements providing the No-Compensation License Provisions, etc. which has a nature of a cross-license agreement to be found to be likely to have an adverse impact on the order of fair competition by impeding the incentives of the DMSHs to engage in research and development, specific proof would be necessary based on evidence, etc. concerning the following points.

[Translation]

The following section further discusses these points.

B. Whether the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development

(A) The Investigation Officials' assertions

First, the Investigation Officials assert that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development, and as grounds for that, stated that (1) the scope of application of the No-Compensation License Provisions, etc. is broad, (2) the No-Compensation License Provisions, etc. have nature of a no-compensation license and that (3) the No-Compensation License Provisions, etc. are imbalanced.

(B) The scope of application of the No-Compensation License Provisions, etc. is broad

a. The Investigation Officials assert that the scope of application of the No-Compensation License Provisions, etc. is broad with respect to both the range and the time of acquisition of IPRs as well as the counterparty and the period concerning which the rights cannot be exercised in accordance with said Provisions, etc. and the provisions restrict the exercising of rights by the DMSHs to a great extent, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

b. (a) However, as explained in A. (c) above, the License Agreements containing the No-Compensation License Provisions, etc. have the nature of a cross-license agreement, and due to the nature of the agreement, it is natural that the exercising of IPRs by both parties is restricted, and focusing only on the restriction of exercise of IPRs owned by the DMSHs, etc. and discussing their wide scope of application are not appropriate.

(b) According to (2) above, the IPRs owned by the DMSHs for which licenses are granted that include the No-Compensation License Provisions, etc. or a pledge not to assert their rights include

[Translation]

TEIPRs and CEIPRs to the CDMA Mobile Wireless Communications Standards for manufacture, sales, etc. of CDMA Subscriber Units, etc. (the Respondent's Non-Assertion Provision against the Licensees is provided only for TEIPRs), and there is no evidence sufficient to demonstrate that the scope of those IPRs is different from those provided in normal agreements and are particularly broad in scope in terms of the IPRs that are the subject of the license agreements or cross-license agreements for the manufacture, sale, etc. of Handsets and Base Stations for Mobile Wireless Communications as well as components to be used therein. Furthermore, considering the fact that the DMSHs, on the one hand, grant licenses for the IPRs that they own or make a pledge not to assert their rights to the Respondent, etc., while being granted licenses to TEIPRs and CEIPRs for CDMA Mobile Wireless Communications owned by the Respondent, etc. and the other Respondent's licensees do not assert their rights to the DMSHs, it is difficult to find that the scope of the IPRs that are the subject of the No-Compensation License Provisions, etc. and based on which the DMSHs are restricted from the exercising of their rights is broad and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

(c) Next, the IPR owned by the DMSHs to which licenses are granted under the No-Compensation License Provisions, etc. include not only those developed or obtained on or before the Effective Date of the License Agreements, but also those to be developed or obtained within the Improvement Period set forth in the License Agreements.

In this respect, as stated in the appended table, although in the License Agreements with 9 of the 14 DMSHs listed in the appended table, the Improvement Period of the TEIPRs are set forth as unlimited, to begin with, the TEIPRs comprise the ARIB Standard (3G Mobile Wireless Communications Standards) and the Standards Assembly provides that the Rights Holder to which

[Translation]

the ARIB Standards apply agrees not to assert their rights and to grant a license unconditionally or to grant a non-exclusive and nondiscriminatory license on reasonable terms and conditions, and thus, it cannot be a differentiation factor for products such as CDMA Subscriber Units, etc. Furthermore, the Improvement Period that limits the scope of the IPRs concerning which the Respondent grants licenses to the DMSHs is the same as the Improvement Period that limits the scope of the IPRs for which the DMSHs grant licenses to the Respondent, and if the Improvement Period is not fixed (or stated as being indefinite), the Respondent also grants licenses to the IPRs to be developed or obtained during the unlimited period from the Effective Date of the License Agreements. Therefore, it cannot be found that, for the reason that the Improvement Period of the TEIPRs is stated as being unlimited, the scope is broad and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

Further, as stated in the appended table, in the License Agreements with 5 of the 14 DMSHs, the Improvement Period of the TEIPRs are provided to be several months to two years from the Effective Date, and concerning CEIPRs, in the License Agreements with all 14 DMSHs, the Improvement Period is not set to be unlimited and they are several months to three years from the Effective Date of the License Agreements, and these Improvement Periods are the same as those of the TEIPRs and CEIPRs to which the Respondent grants licenses to the DMSHs. Therefore, it cannot be found that, on the grounds that the IPRs for which the DMSHs grants licenses based on the No-Compensation License Provisions, etc. or makes a pledge not to assert

[Translation]

their rights include not only those developed or obtained on or before the Effective Date of the License Agreements, but also those to be developed or obtained within the Improvement Period set forth in the License Agreements, and that the scope of the IPRs is so broad that it establishes that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

(d)  As stated in (2) A. (C) b (d), the counterparties against which the DMSHs are restricted from exercising its rights by granting the Respondent licenses to its IPRs include the Respondent, etc. and any person who purchases CDMA components from the Respondent (the Respondent's customers), but in actuality, the one time that the DMSHs cannot actually exercise their rights against the Respondent's customers is when the Respondent's customer infringes upon the IPRs owned by the DMSHs with the IPRs used in the Respondent, etc.'s CDMA components. If the DMSHs' IPRs are infringed upon by any part or function that does not contain the Respondent, etc.'s CDMA component, the DMSHs are not restricted from the exercising of their rights. It is normal in general license agreements or cross-license agreements that a person who grants a license of its IPRs is restricted from exercising its rights against a person who purchases a product manufactured by using the IPRs for the infringement of the IPRs by the product. Further, as explained in A (c) above, the License Agreements that include the No-Compensation License Provisions, etc. have the nature of a cross-license agreement, and while, on the one hand, as described above, the DMSHs are restricted from the exercising their rights against the Respondent's customers based on the No-Compensation License Provisions, etc. to some extent, on the other hand, the DMSHs have the benefit of not being subjected to the exercising of rights by the Respondent in connection with an infringement of the Respondent's IPRs in products manufactured by the customers of the DMSHs that purchased such products if the products were manufactured by using the Respondent, etc.'s IPRs whose license was granted based on the License Agreements. Based on this, it cannot be said that the scope of the parties against whom the DMSHs cannot exercise their rights based on the No-Compensation License Provisions, etc. is broad, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

[Translation]

According to (2) A. (C) c (a) above, the Non-Assertion Provision against the Respondent, etc. does not stipulate that the DMSHs grant the Respondent licenses of their IPRs, but rather, individually sets forth the scope of the parties against whom the DMSHs cannot exercise their rights. The Non-Assertion Provision against the Respondent, etc. was provided, concerning part of the IPRs developed or obtained or to be developed or obtained by the DMSHs, etc., in order to avoid making them subject of the No-Compensation License Provisions, etc. and to set forth the specific scope of the restriction on the exercising of rights by the DMSHs, and thus, with respect to the Non-Assertion Provision against the Respondent, etc. for which the scope of the counterparties concerning which exercise of rights is restricted is set to be narrower than the No-Compensation License Provisions, etc., it cannot be found that the scope is broad and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

Likewise, according to (2) A (C) d (d) above, with respect to the Non-Assertion Provision against the Licensees of the Respondent, considering that the scope of the counterparties against whom the exercising of rights is restricted is limited only to the other licensees of the Respondent that provided the same provision in their License Agreements, which corresponds with the scope of the counterparties against whom rights cannot be exercised, it cannot be found that the scope of the counterparties against which exercise of rights is restricted is broad or that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

(e) The License Agreements between the Respondent and the DMSHs do not specify the contract period of the agreement, but this only means that the period is not fixed during which the licensing of the IPRs that are the subject of the License Agreements and the No-Compensation License Provisions, etc. are granted or the rights based thereon cannot be exercised, and it does not mean that the period is not fixed during which No-Compensation License Provisions, etc. grant licenses to the Respondent, etc. or cannot exercise their rights based on their own IPRs. In other words, regardless of the term of the License Agreements, the DMSHs may separately exercise their IPRs to be developed or obtained after the expiry of the Improvement Period, and thus, it cannot be said that because the term of the License Agreement is unlimited or for a long period, the scope of the IPRs that the DMSHs cannot exercise is broad.

[Translation]

Although the term of the License Agreements being unlimited or for a long term means that the period during which the DMSHs are restricted from exercising their IPRs to which they grant licenses, etc. based on the No-Compensation License Provisions, etc. is unlimited or for a long term, this period corresponds with the period in which the Respondent grants licenses of its own IPRs to the DMSHs and it is not that only the period in which the DMSHs cannot assert their rights is unlimited or for a long term in a unilateral manner, and thus, as stated above, it does not change the fact that the DMSHs may separately exercise their IPRs to be developed or obtained after the expiry of the Improvement Period.

Accordingly, it cannot be found that the term of the License Agreements being unlimited or for a long term indicates that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

(f) Based on the above arguments, the Investigation Officials' assertions that the scope of application of the No-Compensation License Provisions, etc. (the scope in which the DMSHs are restricted from the exercising of their rights) is broad, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development cannot be accepted.

[Translation]

c. (a) In response to this, the Investigation Officials firstly assert concerning the scope of the IPRs based on which the DMSHs are restricted from the exercising of their rights by the No-Compensation License Provisions, etc., that, even if the No-Compensation License Provisions, etc. set forth the Improvement Period, the DMSHs have to obtain licenses of the TEIPRs to be owned by the Respondent, etc. after the expiry of the Improvement Period, and therefore, if the Respondent demands an extension of the Improvement Period, they have no choice but to accept the demand, and even if the Respondent does not demand an extension of the Improvement Period, the Respondent may assert against an exercise of rights after the expiry of the Improvement Period, and thus, the No-Compensation License Provisions, etc. could practically be applied to all the IPRs concerning CDMA Subscriber Units, etc. to be obtained by the DMSHs, etc. during the term of the License Agreement.

However, based on the facts that the License Agreement that sets forth the No-Compensation License Provisions, etc. has the nature of a cross-license agreement, and that the Improvement Periods are common that define the time during which rights cannot be exercised by the Respondent or the DMSHs based on the pledge due to the granting of licenses or the pledge not to assert their rights, an extension of the Improvement Period means not only an extension of the IPRs licensed, etc. by the DMSHs, but also an extension of the IPRs licensed by the Respondent to the DMSHs. Therefore, even if the Respondent or the DMSHs are highly likely to extend the Improvement Period in order to use the IPRs to be developed or obtained by the other party after the expiry of the Improvement Period as asserted by the Investigation Officials, it cannot be said that the scope of the IPRs concerning which the DMSHs are restricted from the exercising of their rights is unlimited by focusing only on the IPRs concerning which the DMSHs are restricted from the exercising of their rights.

Moreover, it is common for license agreements that limit the scope of relevant IPRs to a certain period of time to have a possibility of an extension of the IPRs concerning which the exercising of rights is restricted as asserted by the Investigation Officials, and even if there is a possibility of an extension of the time period defining the scope the IPRs to be covered by such an agreement, that cannot be grounds to allege that the period provided in the agreement is practically unlimited.

69

[Translation]

Likewise, with respect to the License Agreements that sets forth the No-Compensation License Provisions, etc., whether the Improvement Periods are extended is determined based on the number and content of the IPRs developed by the Respondent and the DMSHs after the expiry of the Improvement Period and other business judgments, and even if there is a high possibility of an extension, it cannot be judged based on such uncertain facts that the IPRs to be developed or obtained by the DMSHs, etc. after the expiry of the Improvement Period are also unlimitedly captured. Furthermore, this is not a matter that would be affected just because there was actually a case in which an improvement period was actually extended.

Based on the above, the Investigation Officials' assertion that the No-Compensation License Provisions, etc. could be practically applied to all the IPRs concerning CDMA Subscriber Units, etc. to be obtained by the DMSHs during the term of the License Agreement cannot be accepted, and it cannot be found that the scope of the IPRs which the DMSHs are restricted from the exercising of their rights under the No-Compensation License Provisions, etc. is broad and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

(b) Next, the Investigation Officials assert that, in the present circumstances in which the single-chip project is being developed, which integrates various functions such as the power-saving function by which the power consumption of subscriber units can be reduced, and/or the audio and visual functions which enable the playing of music and movie display, etc. with the signal processing concerning CDMA Mobile Wireless Communications into a single semiconductor integrated circuit (Part 3, 3 (1) above), it cannot be said that the scope of the IPRs concerning which the DMSHs, etc. would be restricted from the exercising of their rights by the No-Compensation License Provisions, etc. is narrow, considering the facts that as such technologies owned by the DMSHs are also used in the Respondent's chips, many CEIPRs as well as TEIPRs could be the subject of the exhaustion of rights doctrine, and that the Respondent has at least 100 customers.

70

[Translation]

However, it is natural due to the nature of the license of the IPRs that the DMSHs, etc. are restricted from the exercising of their rights concerning the CDMA Components, etc. manufactured and sold by the Respondent through the use of the IPRs owned and licensed by the DMSHs based on the No-Compensation License Provisions, etc. (it is also natural that they are restricted from the exercising of their rights against the Respondent's customers of certain scope in accordance with the Non-Assertion Provision against the Respondent, etc.). On the other hand, the DMSHs are also licensed by the Respondent to use the Respondent's IPRs and the number of customers who purchase products that utilize the single-chip project asserted by the Investigation Officials and the licensed IPRs increases, and thus, the scope for which the Respondent cannot exercise its rights also becomes broader, and therefore, it cannot be unilaterally said that only the scope of IPRs concerning which the DMSHs cannot exercise their rights due to the No-Compensation License Provisions, etc. is broad. It seems that the Investigation Officials assert that the scope of restriction of the rights of the DMSHs is broad for the reason that the Respondent has a large number of customers. However, the scope of the IPRs that the DMSHs should grant the Respondent and the scope of the IPRs that the Respondent should grant the DMSHs are basically the same, and it is unreasonable to discuss the breadth and narrowness of the scope of the restriction based on the number of IPRs owned by each party, and likewise, it is unreasonable to discuss the breadth and narrowness of the scope of restrictions based on the number of products manufactured by using the license and the number of customers. Therefore, the Investigation Officials' assertion cannot be accepted.

Consequently, even based on the above assertion by the Investigation Officials, it cannot be found that the scope of the IPRs based on which the DMSHs are restricted from the exercising of their rights under the No-Compensation License Provisions, etc. is broad, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

[Translation]

(c) The Investigation Officials further assert that the scope of the IPRs concerning which the DMSHs cannot exercise their rights due to the No-Compensation License Provisions, etc. can be easily extended because, if the Respondent's customers want to benefit from non-assertion of rights by the DMSHs, it would be possible to expand the scope of the products against which the DMSHs cannot exercise their rights by incorporating the semiconductor integrated circuit or other CDMA products manufactured by the Respondent into CDMA Subscriber Units, etc.

However, as stated in (b) above, it is natural based on the nature of IPR licensing that, concerning an infringement of the IPRs by the CDMA Components manufactured and sold by the Respondent through the use of the IPRs owned and licensed by the DMSHs, the exercising of rights against the Respondent's customers who purchased the relevant CDMA Components is restricted and that the exercising of rights against certain of the Respondent's customers is restricted in accordance with the Non-Assertion Provision against the Respondent, etc. In this regard, it is the same situation as that in which concerning an infringement of the IPRs by the Subscriber Units manufactured and sold by the DMSHs through the use of the IPRs owned and licensed by the Respondent, the exercising of rights against the customers of the DMSHs who purchased the relevant Subscriber Units is restricted.

Furthermore, the restriction on the exercising of rights by the DMSHs against the Respondent, etc. pursuant to the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. is limited to the infringement of the IPRs by the CDMA Components of the Respondent, etc., and if the IPR owned by the DMSHs are infringed by any components or functions other than the relevant components of the products loaded with the components, etc. of the Respondent, etc., the DMSHs can exercise their rights. Even if it becomes difficult to exercise their rights against the customers who used CDMA Components manufactured by the Respondent, etc. due to the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc., it is a common issue with license agreements in general, and even if the DMSHs could not actually exercise their rights or had no choice but to give up exercising their rights, it cannot be said based on such a fact that the scope of the IPRs concerning which the DMSHs may exercise their rights is broad or that it could be expanded.

72

[Translation]

Therefore, even based on the above assertion by the Investigation Officials, it cannot be found that the scope of the IPRs based on which the DMSHs are restricted from the exercising of their rights under the No-Compensation License Provisions, etc. is broad and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

d. Based on the above, it cannot be found that the scope of the IPRs based on which the DMSHs are restricted from the exercising of their rights under the No-Compensation License Provisions, etc. is broad and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

(C) Having the nature of a no-compensation license

a. The Investigation Officials assert that the No-Compensation License Provisions, etc. have the nature of a no-compensation license, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

b. (a) In this respect, in discussing the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc., it is certain that, as stated in (2) A. (c) a above, while the License Agreement provides that the DMSHs shall pay royalties to the Respondent, it contains the term "royalty free license" in the No-Compensation License Provisions, etc., and that the Respondent is not obliged to pay certain monies to the DMSHs.

(b) However, as explained in A. (c) above, the License Agreement providing the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. is found to have the nature of a cross-license agreement in which the Respondent and the DMSHs license their own IPRs to each other, and it is appropriate to understand that, because of the nature of the agreement, such an agreement usually sets forth the obligations of both parties thereunder, which relate to each other, and therefore, it is not appropriate to focus only on a portion of the obligations of one party to make a judgment.

73

[Translation]

Further, under the License Agreement, on the one hand, the DMSHs grant license of the IPRs owned or to be owned by the DMSHs, etc. to the Respondent in accordance with the No-Compensation License Provisions, etc. or pledge not to assert their rights against certain scope of the counterparties, and pay moneys such as the lump sum license fee and royalties, but on the other hand, they obtain the license of the IPRs owned or to be owned by the Respondent, etc. Therefore, it is not an appropriate interpretation of the License Agreement to focus only on the No-Compensation License Provisions, etc. in which the DMSHs license certain IPRs or pledge not to assert their rights against certain counterparties and thereby construe that the DMSHs are forced to provide such provisions without obtaining any compensation, and this cannot be the basis on which to determine that the No-Compensation License Provisions, etc. are free of compensation and provides no consideration to the DMSHs.

Even if, as a result of examining the contents of the License Agreement in a substantial manner, it is found that the lump sum license fee and royalties and the benefit of being licensed concerning the IPRs owned by the DMSHs, etc. to be obtained by the Respondent and the benefit of being licensed concerning the IPRs owned by the Respondent to be obtained by the DMSHs are not equal (the benefit to be obtained by the DMSHs is smaller), based on the abovementioned nature of the License Agreement providing the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. as well as the fact that the License Agreement was entered into as a result of the negotiations between the Respondent and the DMSHs, it is difficult to judge that part of the provisions set forth in the License Agreement are free of compensation and provides no consideration.

[Translation]

Even putting aside this point, with respect to the License Agreements, it is difficult to prove based on evidence the specific number and contents of the IPR licenses that the Respondent and the DMSHs grant each other, how they are evaluated in terms of monetary value, whether the Respondent needs to pay royalties to the DMSHs, and what royalty rate would be appropriate, and these are actually not clear based on the evidence of this case, either. Therefore, with respect to the License Agreements, it cannot be recognized that the benefit to be obtained by the Respondent and the benefit to be obtained by the DMSHs are not equal or that the obligations that the DMSHs are imposed by the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. are free of compensation.

In addition, while as stated in (2) A. (C) b (g) above, the License Agreement contains the term "royalty free" concerning the No-Compensation License Provisions, etc., and that payment of money is not required, as well as the term "fully-paid," and the preamble of the License Agreement with some of the DMSHs contains a statement indicating that the provisions including the No-Compensation License Provisions, etc. as a whole comprises part of the consideration concerning the license of the IPRs by the Respondent. Therefore, it cannot be recognized based on the language of the License Agreements that the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. are free of consideration.

Consequently, it cannot be recognized that the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. have the nature of a no-compensation license.

(c) In response to this, the Investigation Officials assert that, considering the interpretation of the term "royalty free," the fact that the Respondent is not obliged to pay money to the DMSHs, the understanding of the DMSHs concerning the contractual language of the No-Compensation License Provisions, etc., and the fact that the Respondent refused an adjustment process of

75

[Translation]

contractual terms and conditions such as royalty rates in accordance with the value of the licensees' IPRs that are the subject of the No-Compensation License Provisions, etc., the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. are not the result of examination and evaluation of the value of patent portfolios owned by the DMSHs and adjustment of royalty rates and other contractual terms based on the result of the examination and evaluation, and thus, they have the nature of a no-compensation license.

However, it cannot be judged that the obligations of the DMSHs under the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. are for no compensation on the grounds that the License Agreements contain the term "fully paid and royalty free" concerning the No-Compensation License Provisions, etc. and that the Respondent is not obliged to pay money to the DMSHs as explained in (b) above, and the judgment would not be affected by only the understanding of the DMSHs concerning the contractual languages of the No-Compensation License Provisions, etc.

Next, it is understood that the Investigation Officials assert that, even if the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. cannot be immediately construed as being for no compensation based on the structure of the License Agreements and that it is difficult to evaluate them as being for no compensation by objectively evaluating the values of the IPRs owned by the Respondent, etc. and the DMSHs, etc., it is possible to find that the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. are essentially free of compensation based on the negotiation process between the Respondent and the DMSHs (in which the Respondent refused an adjustment process of the royalty rate or other contractual terms in accordance with the value of the licensees' IPRs that are the subject of the No-Compensation License Provisions, etc.).

In this respect, it is possible to presume based on the evidence that, some of the DMSHs owned certain IPRs concerning CDMA Mobile Wireless Communications technologies, setting aside the value or importance thereof, and that according to the negotiation process described in Attachment

[Translation]

2, the Respondent was requested by some of the DMSHs to reduce the royalty (reduction of the royalty rates) based on the IPRs owned by the relevant DMSHs but refused the request and basically set the royalty rates in the License Agreements uniformly among the DMSHs as stated in (2) A. (C) a. above, and that therefore, it is certain that the Respondent did not adjust royalty rates in consideration of the contents of the IPRs owned by the DMSHs, etc. as asserted by the Investigation Officials.

However, the License Agreements that provide the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. have the nature of a cross-license agreement in which both parties assume certain obligations. Moreover, the License Agreements were entered into through certain negotiations between the Respondent and the DMSHs. Therefore, even if there were problems with the Respondent's negotiation attitude such as not sufficiently examining the IPRs owned by the DMSHs, etc. or not adjusting royalty rates, or taking a negative attitude towards reducing the royalties, it is difficult to determine that the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. are free of compensation based on such facts. (Likewise, even if there were such facts that the Respondent's response to the request from the DMSHs for disclosure of IPRs was insufficient in terms of timing or content, or that the DMSHs were forced to enter into the License Agreement providing the No-Compensation License Provisions, etc. with the Respondent, which presumably have a significant number of TEIPRs, it cannot be found that the No-Compensation License Provisions, etc. have the nature of a no-compensation license based on the abovementioned facts in the process of entering into the License Agreements providing the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc.).

Furthermore, even putting aside the abovementioned point, as stated in (2) B., 9 of the 14 DMSHs listed in the appended table except for Hitachi, Fujitsu, NEC, Toshiba and Mitsubishi Electronics have not submitted Confirmation Forms concerning their technologies of 3G Mobile Wireless Communications Standards (Panasonic Mobile did not submit the documents, but Panasonic did.). Further, 5 of the above 9 companies (Sanyo, Casio, Kenwood, Alps Electronic and Kyocera) did not actually own TEIPRs concerning CDMA.

[Translation]

In the negotiations for the License Agreements, 11 of 14 DMSHs listed in the appended table except for NEC, Panasonic Mobile and Toshiba did not specifically present their own IPRs and ask for examination, evaluation and adjustment, and that, with respect to the License Agreements with at least said 11 companies, it would not have been unreasonable even if the Respondent had not considered or evaluated the value of their patent portfolios that are the subject of the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. or did not adjust the royalty rates and other contractual terms based on the result of the consideration and examination. Therefore, it cannot be found that the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. provided in the License Agreements with the above 11 companies have the nature of a no-compensation license on the grounds that the Respondent did not carry out such consideration, examination or adjustment. Moreover, even if the abovementioned 11 companies assumed based on the Respondent's attitude that the reduction of royalties would not be accepted and gave up negotiating, as long as these 11 companies did not specifically present their own IPRs and ask for consideration, evaluation or adjustment, the above judgment would not be affected.

On the other hand, according to the negotiation process described in Attachment 2, the three companies including NEC, Panasonic Mobile and Toshiba presented specific IPRs they owned and negotiated with the Respondent, and although the Respondent did not adjust the royalty rates of the License Agreements with these three companies, it did adjust the contractual terms of the License Agreements that contains the No-Compensation License Provisions, etc. by making the CEIPRs subject to the Non-Assertion Provision against the Respondent, etc. instead of licensing based on the No-Compensation License Provisions, etc., allowing the DMSHs to exercise their rights in the event that the Respondent's customers assert their rights against the DMSHs, or if the chips manufactured by the Respondent and a third party's products are combined, limiting the definition of "Components" and "customer's components" that stipulates the scope of the pledge not to exercise rights as set forth in the Non-Assertion Provision against the Respondent, etc., excluding the Respondent's customers from the subject parties against which rights are not exercised in accordance with the Non-Assertion Provision against the Respondent, etc., and reducing the fixed fee to be collected at the time of execution of the agreement (lump sum license fee) to be paid upon conclusion of the agreement.

[Translation]

Therefore, with respect to the above three companies, it cannot be found that the Respondent did not consider or evaluate the value of their patent portfolios that are the subject of the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. or adjust the royalty rates and other contractual terms based thereon, and at least the assertion by the Investigation Officials that the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. have the nature of a no-compensation license on the grounds that such adjustment was not made lacks its premise, and it cannot be determined that the No-Compensation License Provisions, etc. are essentially free on the grounds that royalty rates were not adjusted, either.

Furthermore, although the negotiation process described in the Attachment 2 and evidence show that some of the DMSHs were dissatisfied that royalty rates were not reduced (Sa 172, etc.), there is no evidence sufficient to prove that the royalty rates were unreasonable, and even if it could be said that the dissatisfaction of the DMSHs concerning the royalty rates was understandable, that cannot be a reason to say that the No-Compensation License Provisions, etc. in the License Agreements have the nature of a no-compensation license.

Based on the above, the assertion by the Investigation Officials that the No-Compensation License Provisions, etc. and the Non-Assertion Provision against the Respondent, etc. have the nature of a no-compensation license on the grounds that they are not the result of consideration and evaluation of the value of patent portfolios owned by the DMSHs which are the subject of said provisions as well as adjustment of the royalty rates and other contractual terms based on the result of such consideration and evaluation cannot be accepted.

[Translation]

c. Next, in considering the Non-Assertion Provision against the Respondent's Licensees, this is a provision under which the Respondent's licensees that provided similar provisions in the License Agreements with the Respondent pledge not to assert their rights based on the IPRs owned or to be owned by them against the other licensees, and from a practical viewpoint, it is a provision that aims to allow the Respondent's licensees to mutually utilize the IPRs owned or to be owned by such licensees.

As such, the Non-Assertion Provision against the Respondent's Licensees provides the DMSHs with the compensation of access to the IPRs owned by the other the Respondent's licensees that provided the same provision as the Non-Assertion Provision against the Licensees, and therefore, it cannot be said that the Non-Assertion Provision against the Respondent's Licensees has the nature of a no-compensation license.

Further, because the Non-Assertion Provision against the Respondent's Licensees does not cause a direct relationship between the DMSHs and the Respondent, it cannot be said that the Non-Assertion Provision against the Respondent's Licensees has the nature of a no-compensation license on the grounds that the Respondent did not consider or evaluate the value of the patent portfolios owned by the DMSHs that are the subject of these provisions and adjust royalty rates and other contractual terms based on the result of such consideration or evaluation.

d. Based on the above, the Investigation Officials' assertion that the No-Compensation License Provisions, etc. have the nature of a no-compensation license, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development, cannot be accepted.

(D) Concerning the point that the provisions are imbalanced

a. The Investigation Officials firstly assert that the provisions are imbalanced between the DMSHs

[Translation]

and the Respondent because, under the No-Compensation License Provisions, etc., while the DMSHs grant licenses for no compensation to their broad patent portfolio that the DMSHs, etc. developed having invested a large amount of cost and labor and/or pledge not to assert their rights against the Respondent, the Respondent's customers and other licensees and are obliged to pay the royalties based on the royalty rates unilaterally determined by the Respondent, while the Respondent is allowed to use an extremely broad range of IPRs for CDMA Subscriber Units, etc. without paying any compensation and to provide CDMA components to customers in a stable environment of not being exposed to the exercising of rights such as the filing of a patent infringement suit, etc. seeking an injunction.

However, as stated in A. (C) above, while the License Agreements that contain the No-Compensation License Provisions, etc. have the nature of a cross-license agreement, the Investigation Officials' assertion only considers the obligations assumed by the DMSHs and the rights obtained by the Respondent concerning certain provisions of the License Agreement that contain the No-Compensation License Provisions, etc. and does not consider the rights obtained by the DMSHs and the obligations assumed by the Respondent, which cannot be considered an appropriate way to examine the imbalance of the No-Compensation License Provisions, etc. of the License Agreements.

Even putting the above point aside, the Investigation Officials' assertion is based on the premise that the DMSHs granted licenses to their own IPRs to the Respondent for no compensation, but as explained in (c) above, it cannot be found that the No-Compensation License Provisions, etc. have the nature of a no-compensation license, and therefore, the Investigation Officials' assertion lacks premise.

The reason why it appears that there is an imbalance between the parties is because the DMSHs unilaterally assume the obligations to pay a lump sum license fee and royalties to the Respondent. However, to begin with, in a cross-license agreement, it is not always agreed that the values of the IPRs concerning which both parties grant licenses to each other are equivalent, and if there is any difference between them, it is not unreasonable at all that an agreement is made that a party pays money to the other party in addition to granting licenses to their IPRs. Therefore, naturally it cannot be said that the cross-license agreement is imbalanced because of the agreement of the payment of money by one party in such a cross-license agreement.

[Translation]

Further, based on the circumstances leading to the conclusion of the License Agreements and the number of the IPRs stated in the Confirmation Forms, the Respondent presumably owned IPRs of higher value as a whole than each of the DMSHs that entered into the License Agreements, and thus, the License Agreement, under which the DMSHs grant licenses to IPRs owned or to be owned by the DMSHs, etc. and pledge not to exercise their rights and pay royalties, etc. to the Respondent, cannot be said to obviously be imbalanced. In addition, the DMSHs, on the one hand, grant licenses to IPRs owned by the DMSHs, etc. or pledge not to assert their rights against the Respondent, etc., and on the other hand, they receive licenses to IPRs owned by the Respondent, etc., and that the other the Respondent's licensees will not assert their rights concerning TEIPRs owned by them against the DMSHs, and thus, even though there are differences in that the scope to which the DMSHs are licensed with the TEIPRs and the CEIPRs concerning the CDMA Mobile Wireless Communications owned by the Respondent, etc. is limited to those incorporated in CDMA subscriber Units of DMSHs, as explained in (C) b (b) above, it has to be said that, as long as the number, contents or evaluation of the IPRs to which both parties grant licenses in the License Agreement that include the No-Compensation License Provisions, etc. or pledge not to exercise their rights are not clear, there is no evidence sufficient to acknowledge that the granting of licenses to the IPRs by the Respondent to the DMSHs and the payment of the lump sum license fee and royalties as well as the granting of licenses to IPRs and the pledge not to assert their rights by the DMSHs to the Respondent are imbalanced.

[Translation]

Based on the above, it cannot be found that the profits obtained and obligations assumed by the Respondent and the DMSHs respectively are imbalanced, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development.

b. Next, the Investigation Officials assert that the No-Compensation License Provisions, etc. treat the DMSHs essentially in a discriminatory manner in that they do not consider the differences in the values of the IPRs owned by the DMSHs, and that therefore, there is an imbalance among the DMSHs.

However, although it is certain that the values of the IPRs owned by the DMSHs cannot be exactly the same, whether the differences in the values of the IPRs are large enough to warrant any differences in the provisions of the License Agreements that contain the No-Compensation License Provisions, etc. is not clear based on the evidence, and it cannot be said that not having established any differences in the contractual terms among the DMSHs indicates that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development. Furthermore, even if there was no difference in royalty rates as stated in Attachment 2, considering the fact that the provision of the Improvement Periods, scope of rights covered, the amount of lump sum license fees, etc. stipulated in the No-Compensation License Provisions, etc. are partly different, it cannot be said that the Respondent does not consider the value of IPRs owned by the DMSHs or treats each of the DMSHs in an essentially discriminatory manner.

c. Based on the above, the Investigation Officials' assertion that the No-Compensation License Provisions, etc. are imbalanced, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development cannot be accepted.

(E) Whether the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs.

[Translation]

a. The Investigation Officials assert on the grounds that (1) the scope of application of the No-Compensation License Provisions, etc. is broad, (2) the Compensation No-Compensation License Provisions, etc. have the nature of a no-compensation license, and (3) the No-Compensation License Provisions, etc. is imbalanced, that the degree and content of the restrictions of the No-Compensation License Provisions, etc. impede the incentives of the DMSHs to engage in research and development in a competitive manner because there will be many cases where, even if the DMSHs develop valuable technology, they cannot receive compensation, that the counterparties against which they cannot exercise their rights include many competitors, which makes it difficult to differentiate products such as CDMA Subscriber Units, etc., and that the more the DMSHs develop valuable technologies and come to own IPRs for such technologies, the greater the imbalance will be between the Respondent and the DMSHs or among the DMSHs.

b. However, as already explained in (b) above, it cannot be said that the scope of the IPRs for which the DMSHs grant licenses to the Respondent or pledge not to exercise their rights against the Respondent, etc. or the Respondent's licensees is broad, and that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development. In particular, in terms of impeding innovative incentives concerning the IPRs in the License Agreements, among the IPRs for which the contracting party grants licenses or pledges not to exercise its rights in the License Agreement of the relevant IPR, the scope of the IPRs to be developed or obtained by the party thereafter (rather than those already owned at the time of the agreement) becomes an issue. With respect to the License Agreements, the Improvement Period of the TEIPRs in many of the License Agreements and the CEIPRs in all of them are set to be several months to three years at most, and even though some of them provide for the Improvement Period of the CEIPRs to be unlimited, as explained in (B) b (c) above, the TEIPRs comprise the ARIB Standard (3G Mobile Wireless Communications Standards) and the Standards Assembly provides that the Right Holder to which the ARIB Standards apply agrees not to assert their rights and to grant a license unconditionally or to grant a non-exclusive and nondiscriminatory license on reasonable terms and conditions in the first place, which is not a differentiating factor for products such as CDMA Subscriber Units, etc. Therefore, it cannot be found that, among the IPRs to which the DMSHs, which are contracting parties, grant licenses or pledge not to exercise their rights in the License Agreements containing the No-Compensation License Provisions, etc., the scope of the IPRs to be developed or obtained after the conclusion of the agreement is different from the normal contractual provisions and is broad enough to impede the incentives of the DMSHs, etc. to engage in research and development.

[Translation]

Further, as explained in (c) above, it cannot be found that the No-Compensation License Provisions, etc. have the nature of a no-compensation license, and even if part of the provisions have the nature of a no-compensation license, that is not sufficient to directly support a finding that the provisions impede the incentives of the DMSHs to engage in research and development.

In addition, as explained in (d) above, there is no evidence sufficient to find that the License Agreements that set forth the No-Compensation License Provisions, etc. are imbalanced, and even if part of the provisions have the nature of a no-compensation license, that is not sufficient to directly support a finding that the provisions impede the incentives of the DMSHs to engage in research and development.

Therefore, the Investigation Officials' assertion that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development lacks grounds.

c. Even if the content and nature of the License Agreements that contain the No-Compensation License Provisions, etc. as well as the factors asserted by the Investigation Officials such as the broad scope and nature of a no-compensation license, and imbalance are comprehensively considered, it still has to be said that there is no evidence to find that the contents of the License Agreements, which contain the No-Compensation License Provisions, etc. that basically have the nature of a cross-license agreement of granting non-exclusive licenses to IPRs, are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development, in comparison to general cross-license agreements that are believed to have no tendency to impede fair competition.

[Translation]

Although in the License Agreements that contain the No-Compensation License Provisions, etc., the Respondent is not obliged to pay money to the DMSHs and only the DMSHs are obliged to pay money to the Respondent, it is nothing special in cross-license agreements that only one of the parties assumes an obligation to pay money, and in this respect, there is no evidence to find that these provisions are unreasonable enough to presume that they have a tendency to impede the innovation incentives of the party obliged pay the money, and as explained in (d) above, there is no evidence sufficient to acknowledge that the granting of licenses to the IPRs by the Respondent to the DMSHs and the payment of the lump sum license fee and royalties as well as the granting of licenses to IPRs and the pledge not to assert their rights by the DMSHs against the Respondent are imbalanced.

d. The Investigation Officials further assert that the parties for whom the exercising of rights is restricted under the No-Compensation License Provisions, etc. include many competitors of the DMSHs, which makes it difficult to differentiate products such as CDMA Subscriber Units, etc., and thereby impedes the innovation incentives of the DMSHs. However, even if the parties against whom the DMSHs are restricted from exercising their rights include many competitors, with respect to the CEIPRs, which is important for the differentiation of their products from those of their competitors, relatively short Improvement Periods are provided, which are several months to approximately three years, and the DMSHs, etc. are able to exercise their rights concerning the IPRs developed or obtained after the expiry of the Improvement Period. Evidence (Shin 30 through Shin 49, Shin 239, Shin 253 through Shin 273) also shows that the DMSHs have actually actively engaged in technological development and filed patent applications in the field of mobile wireless communications after the conclusion of the License Agreements, and considering these facts, it cannot be found that the License Agreements that include the No-Compensation License Provisions, etc. make it difficult for the DMSHs to conduct research and development for differentiating their products in the field of Subscriber Units, etc. or that they are unreasonable enough to presume that they have a tendency to impede the innovation incentives of the DMSHs.

[Translation]

e. The Investigation Officials further assert that, under the No-Compensation License Provisions, etc., the more the DMSHs develop valuable technologies and own IPRs concerning such technologies, the further the imbalance between the Respondent and the DMSHs or among the DMSHs extend, and thereby the innovation incentives of the DMSHs would be reduced. However, in addition to the matters explained in b. through d. above, especially the DMSHs, on the one hand, grant licenses of the IPRs developed or obtained by the DMSHs, etc. during the Improvement Period or pledge not to assert their rights against the Respondent, etc., and on the other hand, they receive grant of licenses of TEIPRs and CEIPRs concerning the CDMA Mobile Wireless Communications developed or owned by the Respondent, etc. during the same Improvement Period, and therefore, the Investigation Officials' assertion that, under License Agreements that contain the No-Compensation License Provisions, etc., the more the DMSHs develop valuable technologies and own IPRs concerning such technologies, the further the imbalance between the Respondent and the DMSHs or among the DMSHs extend cannot be accepted.

f. Even if there is a fact that the DMSHs were forced to enter into the License Agreement that sets forth the No-Compensation License Provisions, etc., whether they were "being forced" is a different matter from whether the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development, and does not support such assertion, either.

g. Based on the above, the Investigation Officials' assertion that the degree and content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development misinterprets the License Agreement that sets forth the No-Compensation License Provisions, etc., and thus, cannot be accepted.

[Translation]

C. The Investigation Officials' assertion that the DMSHs were unable to compensate or avoid any possible disadvantages suffered by them as a result of No-Compensation License Provisions, etc.

The Investigation Officials assert that, even if the degree and the content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development, if the DMSHs could have compensated or avoided any possible disadvantages suffered by them as a result of No-Compensation License Provisions, etc., no facts would be found to establish a tendency to impede the innovation incentives, but in this case, the DMSHs were "forced" to enter into the License Agreements that set forth the No-Compensation License Provisions, etc. and they could not have compensated or avoided any possible disadvantages suffered by them as a result of No-Compensation License Provisions, etc.

In this respect, firstly, the CDO does not state that the Respondent is in a dominant bargaining position and has abused such position to force the DMSHs to include the No-Compensation License Provisions, etc. in the License Agreements that is unfairly disadvantageous to the DMSHs. While it states that the Violating Acts of this case fall under the trading with restrictive conditions regulated by Former General Designation Paragraph 13, whether the Respondent "forced" the DMSHs to agree to the trading with restrictive conditions is not a direct factor for falling under the trading with restrictive conditions.

The Investigation Officials further assert, based on the premise that the degree and the content of the restrictions of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs to engage in research and development, that because the DMSHs were unable to compensate or avoid any possible disadvantages suffered by them as a result of No-Compensation License Provisions, etc., the facts supporting the tendency to impede the incentives of the DMSHs to engage in research and development can be found. However, as explained in B. above, it cannot be found that the degree and the content of the restriction of the No-Compensation License Provisions, etc. are unreasonable enough to presume that they have a tendency to impede the incentives of the DMSHs. to engage in research and development. Therefore, the Investigation Officials' assertion that the DMSHs. were unable to compensate or avoid any possible disadvantages suffered by them as a result of No-Compensation License Provisions, etc. lacks its premise, and thus, need not be considered or judged.

[Translation]

D. Concerning the Investigation Officials' assertion that concrete effect of the No-Compensation License Provisions, etc. can be recognized, and that it is concretely proven that these provisions have a tendency to impede the research and development incentives of the DMSHs

(a) The Investigation Officials' assertions

The Investigation Officials assert as a concrete effect of the No-Compensation License Provisions, etc., etc. that these provisions prevent the DMSHs from reinvesting in their research and development activities for new technology, and because the DMSHs must engage in research and development recognizing that the content of the restrictions is broad, for a long period of time, and imbalanced, it is concretely proven that these provisions have a tendency to undermine the research and development incentives of the DMSHs.

In this respect, it could be understood that the Investigation Officials' above assertion assumes, with respect to the tendency to impede fair competition of the License Agreements that include the No-Compensation License Provisions, etc., etc., that it is unnecessary to go as far as to assert and prove that the provisions actually undermine the research and development incentives of the DMSHs and impede the development of new technology, and that proof of their tendency to impede research and development incentive is sufficient, and that they are attempting to indirectly prove that the No-Compensation License Provisions, etc. have the tendency to impede the research and development incentive by asserting and showing that the No-Compensation License Provisions, etc. have actually undermined the research and development incentive of the DMSHs.

The following is an analysis of these arguments.

(b) Concerning the assertion that the DMSHs are being prevented from reinvesting in research and development activities for new technology

a. The Investigation Officials assert that the No-Compensation License Provisions, etc. prevent the DMSHs from asserting their IPRs, and because the DMSHs were deprived of the opportunity to gain economic benefit that they should have gained otherwise, the DMSHs were prevented from reinvesting in research and development activities for new technology, and their research and development incentive was undermined.

b. However, to begin with, the License Agreements that include the No-Compensation License Provisions, etc. have the nature of a cross-license agreement, and by that nature, it is natural that each party to the contract is restricted from asserting their IPRs for which it granted licenses, and the opportunity to receive compensation from separate grants of license would be reduced. Therefore, it is not possible to jump straight to the conclusion that the DMSHs were deprived of the opportunity to gain economic benefit that they could have gained otherwise because the No-Compensation License Provisions, etc. limited the opportunity to assert their IPRs.

[Translation]

Furthermore, with respect to the assertion that the DMSHs were unable to receive royalties from the Respondent, etc. or the Respondent's Customers, or were not granted adjustments to the royalty rate that the DMSHs were to pay the Respondent under the License Agreements, as stated in above B(d), since there is no evidence sufficient to support a finding that there was an imbalance between the granting of licenses by the Respondent to the DMSHs for the IPRs held by the Respondent, and the payment of the Lump Sum License Fee and Royalty, and the granting of licenses to the IPRs or the pledge to not assert the IPRs by the DMSHs to the Respondent, it cannot be found that the DMSHs were deprived of the opportunity to gain economic benefit due to the License Agreements that include the No-Compensation License Provisions, etc.

Additionally, as to the CEIPRs that are necessary to differentiate products from those of other business operators, based on the fact that the improvement period was set from several months to approximately three (3) years and that the DMSHs, etc. could assert their IPRs developed or acquired after the lapse of the improvement period, it should be said that there is no evidence sufficient to support the finding that it actually became difficult for the DMSHs to differentiate their products due to the License Agreements that include the No-Compensation License Provisions, etc.

In addition, the Investigation Officials' assertion is based on the assumption that the DMSHs earn licensing income from their IPRs and reinvest this income in research and development activities. However, licensing income from IPRs is not the only source of income for the DMSHs. The DMSHs could, through the License Agreements that include the No-Compensation License Provisions, etc., and in exchange for the non-assertion of the IPRs held by them, use the IPRs of the Respondent, etc. without being asserted the rights of the Respondent, etc. (and also from other the Respondent's licensees if the License Agreements stipulated a Non-Assertion Provision against the Respondent's Licensees) to manufacture and sell Subscriber Units, etc. by using the IPRs held by these parties and earn income. Therefore, it should be said that there is not sufficient evidence to find that the DMSHs were deprived of the opportunity to gain economic benefit to reinvest in research and development because of the No-Compensation License Provisions, etc. or that those provisions actually undermined the research and development incentives of the DMSHs.

[Translation]

In this regard, if there is any business operator among the DMSHs that reinvests its license income into research and development, that is a matter of business strategy of the DMSHs, and the existence of such a business operator does not support a finding that the No-Compensation License Provisions, etc. ordinarily cause shortages in funds for research and development, and that the No-Compensation License Provisions, etc. undermine research and development incentive.

Moreover, because the No-Compensation License Provisions, etc. do not require the DMSHs to grant exclusive licenses to the Respondent for their IPRs, the DMSHs may charge license fees for their IPRs to business operators other than the Respondent, etc. and the Respondent's Customers, and because the IPRs that are the subject of restriction on assertion against the Respondent, etc., the Respondent's Customers, and the Respondent's licensees are limited just to the IPRs developed or acquired by the DMSHs before the effective date of the License Agreements and the IPRs developed or acquired by the DMSHs, etc. during the improvement period, the DMSHs, etc. may assert their IPRs developed or acquired after the lapse of the improvement period and charge license fees to the Respondent, etc., the Respondent's Customers, and to other the Respondent's licensee for those IPRs. And, according to the evidence (Investigation Officials' Evidence Nos. 24 to 28, 45 to 47, and 50 to 54), based on the fact that some of the DMSHs actually executed license agreements with leading business operators, and that Fujitsu, Mitsubishi Electric Corporation, NEC, Sharp, Panasonic, and Toshiba participated, as of September, 2009, in the "W-CDMA Patent Licensing Programme" which is a patent pool established in 2003 for W-CDMA platform which is the 3G Mobile Wireless Communications Standard, and each received license fees, even if assuming that the DMSHs were deprived of the opportunity to gain a certain economic benefit due to the No-Compensation License Provisions, etc., it cannot be said that there is sufficient proof that it actually undermined the research and development incentive of the DMSHs.

[Translation]

c. The Investigation Officials also submitted a report on the number of patent applications filed around 2000 to 2001 when the License Agreements were executed and thereafter (Shin 255) as evidence that the No-Compensation License Provisions, etc. prevented proactive expansion of research and development investments by the DMSHs (Shin 255).

However, the number of patent applications filed is affected by various factors (the timespan of research and development, market conditions, etc.), and it is difficult to isolate and directly prove the effect on the number of patent applications caused by the No-Compensation License Provisions, etc. Similar to there being insufficient evidence to find that the patent application activities of the DMSHs were maintained or activated as asserted by the Respondent, there is insufficient proof to find that the No-Compensation License Provisions, etc. caused a reduction in the patent applications by the DMSHs even with the Investigation Officials' report on the number of patent applications (Shin 255).

Therefore, it cannot be found from the number of patent applications filed by the DMSHs that the License Agreements that include the No-Compensation License Provisions, etc. have the tendency to undermine the research and development incentive of the DMSHs.

d. The Investigation Officials also assert that there were actual cases where the DMSHs lost the opportunity to assert their IPRs due to the No-Compensation License Provisions, etc. However, to begin with, it is a natural consequence that the DMSHs who executed the License Agreements that have the nature of a cross-license agreement become restricted from asserting their IPRs within a certain scope. It cannot be understood from the existence of a case where assertion of the IPRs was prevented that the degree and content of the No-Compensation License Provisions, etc. are so unreasonable that it could be presumed that they have the tendency to undermine the research and development incentives of the DMSHs.

[Translation]

Moreover, looking at the specific statements by the employees of the DMSHs alleging that the DMSHs were prevented from asserting their rights (Investigation Officials' Evidence Nos. 16, 24 to 28, 30, 31, 34, 45 to 47, 55, 248, 251, 281-1 and 2), there are several cases where the DMSHs were actually capable of asserting their rights despite the No-Compensation License Provisions, etc., but the counterparty refused due to the No-Compensation License Provisions, etc. and the DMSHs gave up without filing suit, or compromised on the terms, which is, in sum, a case in which the assertion of rights was not possible due to unsuccessful negotiations rather than the DMSHs being barred from asserting their IPRS due to the legal effect of the No-Compensation License Provisions, etc. It cannot be said that these cases resulted from the restriction on the assertion of rights based on the No-Compensation License Provisions, etc., and even assuming that the research and development incentives of the DMSHs were undermined, it cannot be said that the License Agreements that include the No-Compensation License Provisions, etc. undermined the research and development incentives, nor does it establish that the No-Compensation License Provisions, etc. have the tendency to impede fair competition.

e. Even if the employees of the DMSHs that were in charge stated that the DMSHs were unable to use their IPRs as they intended and were unable to gain economic benefit which they could otherwise have gained because it entered into the License Agreements that include the No-Compensation License Provisions, etc. (Sa 15, 16, 33, 35, etc.), to begin with, an entity that develops an IPR is not necessarily guaranteed to gain profit from that IPR as it may anticipate, and the statements of the employees of the DMSHs who are interested parties in this case are insufficient to prove that the DMSHs lost the opportunity to gain economic benefit which they could have reinvested because of the License Agreements that include the No-Compensation License Provisions, etc.

f. From the foregoing, the Investigation Officials' assertion that the DMSHs were prevented from reinvesting in research and development and that their research and development incentive was undermined because they were restricted from asserting their IPRs due to the No-Compensation License Provisions, etc. cannot be accepted.

[Translation]

(c) Concerning the assertion that the DMSHs had to engage in research and development recognizing that the content of restrictions of the No-Compensation License Provisions, etc. is broad, for a long period of time, and imbalanced

The Investigation Officials give the disadvantages that the DMSHs would have been aware of from the restrictions imposed by the No-Compensation License Provisions, etc. (*See* above Part V, 1(1)C(c)b(i) to (iv)) and asserts that this leads to the undermining of the incentive of the DMSHs to proactively engage in research and development.

However, as explained in above B, it cannot be found that the No-Compensation License Provisions, etc., by their nature, are so unreasonable that it could be presumed that these provisions have the tendency to undermine the research and development incentive of the DMSHs. The Investigation Officials' above assertion is merely an expression of this from the viewpoint of the DMSHs, and this assertion is not a novel assertion of the Investigation Official.

Furthermore, while the employees of Panasonic and the employees of Mitsubishi Electric who are DMSHs gave a statement as if their research and development incentive was actually undermined by the No-Compensation License Provisions, etc. (Investigation Officials' Evidence Nos. 23, 35), as explained in above B(b) to (d), there are still no evidence sufficient to allow a finding that the No-Compensation License Provisions, etc., in itself, are overly broad, lacking compensation, imbalanced, and so unreasonable that it could be presumed that they have the tendency to impede research and development incentive of the DMSHs. The written statements of the employees of the DMSHs who are interested parties in this case is not sufficient to find that the License Agreements that include the No-Compensation License Provisions, etc. are so unreasonable that it could be presumed that they have a tendency to undermine the research and development incentive of the DMSHs.

Accordingly, the Investigation Officials' above assertion cannot be accepted.

(d) Summary

As shown above, the Investigation Officials' assertion that concrete effects of the No-Compensation License Provisions, etc. can be found and that the tendency for these provisions to undermine the research and development incentive of the DMSHs is concretely proven cannot be accepted.

E. The tendency to enhance the dominant position of the Respondent

(a) The Investigation Officials, on the assumption that the Respondent held a dominant position in the Subject Market, assert that as a consequence of being forced by the Respondent to execute the License Agreements that include the No-Compensation License Provisions, etc., there is a tendency for the research and development incentives of the DMSHs to be undermined and that while the position of the DMSHs falls as a result, the dominant position of the Respondent is relatively enhanced.

94

[Translation]

The Investigation Officials also assert that the Respondent will be saved from expenditures when using technology owned by the DMSHs while receiving continuous income from royalties and will earn stable profit from its sale of semiconductor integrated circuits, obtain funds for its research and development activities under advantageous conditions, and by appropriating those funds to its research and development activities, it will be able to build a strong IPR portfolio, which would enable it to enhance its dominant position.

(b) However, as the Investigation Officials assert, even if the Respondent holds a dominant position in the market for the CDMA Subscriber Units, etc. due to the fact that it submitted Confirmation Forms to the Standardization Assembly declaring that it holds numerous TEIPRs for the 3G Mobile Wireless Communications Standards, and the Respondent in fact holds these IPRs, as stated in above B and D, since the License Agreements that include the No-Compensation License Provisions, etc. cannot be found to be so unreasonable as to presume that they have a tendency to undermine the research and development incentives of the DMSHs for technology related to CDMA subscriber Units, etc., the Investigation Officials' assertion that the License Agreements that include the No-Compensation License Provisions, etc. have the tendency to undermine the research and development incentive of the DMSHs which would cause the position of the DMSHs to fall and further enhance the dominant position of the Respondent lacks grounds.

The Investigation Officials also assert that the Respondent would be relieved from expenditures when using the technology held by the DMSHs, etc. However, the License Agreements that include the No-Compensation License Provisions, etc. basically have the nature of a cross-license agreement, where the Respondent on the one hand receives royalty payments and the benefit of a license or non-assertion to the IPRs held by the DMSHs, etc., and the DMSHs, on the other hand, also receive licenses to the IPRs held by the Respondent, and because there is no evidence that sufficiently proves that there is an imbalance between the granting of the licenses to IPRs by the Respondent to the DMSHs, and the payment of a Lump Sum License Fee and Royalty by the DMSHs to the Respondent and the DMSHs' granting of licenses to their IPRs or making of a pledge not to assert their IPRs on the other hand, it cannot be found that the License Agreements or the No-Compensation License Provisions, etc. unilaterally enhance the dominant position of the Respondent beyond the scope of the IPRs held by the Respondent.

(c) Therefore, the Investigation Officials' assertion that the License Agreements that include the No-Compensation License Provisions, etc. enhance the dominant position of the Respondent cannot be accepted.

(4) Adverse effect on the fair competition order

As stated in (3) above, because it cannot be found that the No-Compensation License Provisions, etc. have a tendency to undermine the research and development incentive of the DMSHs, or to enhance the dominant position of the Respondent, it cannot be said that the No-Compensation License Provisions, etc. have an adverse effect on the fair competition order in the Subject Market.

The Investigation Officials assert that the No-Compensation License Provisions, etc. enable the Respondent to engage in research and development activities under advantageous conditions, and by the Respondent accumulating leading technology, the Respondent's dominant negotiation position would be enhanced, thus enabling the Respondent to arbitrarily set license terms. However,

[Translation]

those are merely abstract possibilities, and because there is no evidence that supports any adverse effect on the competition order, the Investigation Officials' assertion cannot be accepted.

2. Conclusion

As stated in 1 above, because it cannot be said that the No-Compensation License Provisions, etc. have the tendency to impede fair competition, without the need to decide the remaining issues, it cannot be said that the Violating Acts of this case as asserted by the Investigation Officials violate Article 19 of the AMA as falling under Article 2, Paragraph 9, Item (iv) of the AMA before its amendment of 2009 and Paragraph 13 of the Former General Designation.

Part VII Application of the Law

For the above reasons, the Request by the Respondent is reasonable and, therefore, the revocation of the CDO as stated in the Main Text is appropriate pursuant to Article 66, Paragraph 3 of the AMA.

[Translation]

December 4, 2018

Fair Trade Commission General Secretariat

Chief Hearing Examiner Mitsuhiro Saito

Hearing Examiner Satoru Horiuchi and Hearing Examiner Akiko Watanabe are unable to sign and seal because they were transferred.

Chief Hearing Examiner Mitsuhiro Saito

[Translation]

Attachment 1

| No. | Term / Phrase | Definition |
|---|---|---|
| 1 | Respondent, etc. | The Respondent and those defined in the License Agreements (*See* III 4 (3) of the Draft Decision) respectively as the Respondent's affiliates and successors of their business relating to the manufacture, sales etc. of semiconductor integrated circuits. |
| 2 | CDMA Mobile Wireless Communications | Of all forms of Mobile Wireless Communications (see III 2 (1) of the Draft Decision), mobile wireless communications stipulated in Article 3 (3) of the Rules on Applications for Radio Equipment (Radio Regulatory Committee Rules No. 18 of 1950) and which meet the 3G Mobile Wireless Communications Standards, those mobile wireless communications stipulated in Article 3 (4) and (4-2) of said Rules, and other similar mobile wireless communications which are or will be stipulated in foreign laws and regulations, etc. |
| 3 | Intellectual Property Rights ["IPRs"] | Intellectual property rights stipulated in Article 2 (2) of the Intellectual Property Basic Act (Act No. 122 of 2002) and any similar rights protected under foreign laws and regulations. |
| 4 | Domestic Manufacturers/Sellers of Handsets, etc. ["DMSHs"] | Domestic Manufacturers/Sellers of Handsets, etc. (as defined in No.6 below) or Wireless Telephone Base Stations (as defined in No.7 below). |
| 5 | Domestic Manufacturers/Sellers etc. of Handsets, etc. ["DMSHs, etc."] | Domestic Manufacturers/Sellers of Handsets, etc., their parent companies and those defined in the License Agreements (*See* III 4 (3) of the Draft Decision), respectively, as affiliates of the Domestic Manufacturers/Sellers of Handsets, etc. |
| 6 | Subscriber Units | Equipment which is used or is to be used as land mobile stations as stipulated in Article 4, Item 1 (12) of the Ordinance for the Enforcement of Radio Law (Radio Regulatory Committee Rules No. 14 of 1950), or equipment which has equivalent functions thereto which is used or is to be used in foreign countries (including not only mobile phones but also modem cards and communication modules used for data communication on personal computers and other electronic devices). |
| 7 | Wireless Telephone Base Stations | Equipment which is used as or is to be used as, or is used with or is to be used with, the base stations stipulated in Article 4, Item 1 (6) of the Ordinance for the Enforcement of Radio Law (Radio Regulatory Committee Rules No. 14 of 1950), or other equipment which have equivalent functions and is used or is to be used in foreign countries. |

[Translation]

Attachment  2

History of Negotiations between the Respondent and Major DMSHs

1.   NEC
   (1)      NEC and the Respondent entered into the license agreement for 2G subscriber units
      ["SULA"] on December 15, 1994 and the license agreement for 2G infrastructure
      equipment ["IELA"] on June 2, 1995.
   (2)      At the August 26, 1999 meeting, the Respondent proposed to NEC the execution of a
      license agreement for 3G mobile wireless communications. On that occasion, the
      Respondent explained to NEC its strategy concerning 3G mobile phone wireless
      communications standards and the status of its IPRs. With respect to the 3G license
      agreement, the Respondent proposed to NEC certain terms, including that it would be
      based on the license agreements for the 2G mobile phone wireless communication, and
      revised to allow for the development, manufacture, and sale of products compatible with
      the 3G mobile phone wireless communications standards by expanding the scope of
      covered patents, that the royalty rates may not be modified and that certain fixed fees
      would be collected upon execution of the agreement (Sa 14, Sa 99-1 and 99-2)
   (3)      On February 3, 2000, the Respondent notified NEC that the validity of the license terms
      proposed by the Respondent on August 26, 1999 could not be guaranteed from March 26,
      2000 onward, and that the Respondent reserved the right to raise the fee depending on
      market conditions.
         On February 10, 2000, the Respondent also notified NEC that if NEC executed the
      agreement by March 25, 2000, payment of the fixed fee to be collected at the execution
      of the agreement could be postponed by several months and installment payments would
      be permitted.
   (4)      On February 22, 2000, NEC responded to the Respondent, stating that considering that
      NEC possessed an important IP portfolio of W-CDMA technologies and that the
      Respondent was planning to provide W-CDMA compatible semiconductor integrated
      circuits for manufacturers, an arrangement whereby NEC unilaterally paid royalties to the
      Respondent for 3G Subscriber Units, etc. would be inappropriate, and therefore, NEC
      could not accept the license terms proposed by the Respondent at the August 26, 1999
      meeting. NEC also sent a list of patents and patent applications held by NEC concerning
      3G mobile phone wireless communications standards and of patents and patent
      applications held by NEC which they believed were being used in the semiconductor
      integrated circuits manufactured and sold by the Respondent (including patent/patent
      application numbers, application dates, and application countries), to which the
      Respondent did not make any response until about August 2000.

[Translation]

(5)    On August 9, 2000, the Respondent explained to NEC that the Respondent's business of manufacturing and selling semiconductor integrated circuits would be spun off to a separate corporation called Spinco, and that some of the Respondent's patents concerning CDMA mobile wireless communication standards would be assigned to Spinco, and stated that due to the possibility that those patents might be assigned to Spinco, the form in which the licensing would take place after October 2000 was unclear.

In addition, on August 12, 2000, the Respondent informed NEC that as long as it was before the initial public offering of Spinco shares, it was guaranteed that the Respondent could, by means of a single agreement, grant a license to NEC for the patents held by the Respondent and the patents to be assigned by the Respondent to Spinco, but that the form of licensing and fees, etc. after the initial public offering of Spinco shares were unclear and that following completion of the spin-off of the semiconductor business, the Respondent would have little or no need to receive a cross-license from NEC (Sa 103-1 and 103-2, Sa 104-1 and 104-2).

(6)    On August 28, 2000, NEC again sent the Respondent a list of relevant patents and patent applications held by NEC (the list sent on February 22, 2000 with new patents added) and requested a meeting to negotiate on the license terms.

On August 31, 2000, the Respondent explained to NEC the outline of the semiconductor business spin-off plan and the form of licensing, etc. following the spin-off. The Respondent also stated to NEC that the Respondent's patent team concluded, after closely examining whether or not the Respondent would need a license of the patents presented by NEC on February 22, 2000 for the Respondent's application specific integrated circuit business, that it would be unnecessary for the Respondent to obtain the license; that the Respondent would have its patent team evaluate the latest patents that NEC believed might be used in Spinco's application specific integrated circuits; that in any case, as a result of the spin-off of the semiconductor business, the Respondent believed that it would be unnecessary for the Respondent to obtain such cross-license from NEC; that if NEC had no intention of granting the cross-license for semiconductor integrated circuits to Spinco, the Respondent would have to exclude the relevant patents and patent applications which were pending assignment to Spinco from those licensed by the Respondent to NEC; and at the same time that NEC would need to expand the current license agreements if NEC were to use important patents applied for on or after July 1, 1995 including W-CDMA related patents.

[Translation]

The Respondent further indicated that if NEC did not enter into the license agreements for 3G mobile wireless communications by September 30, 2000, starting on October 1, 2000, the fixed fee to be collected at the execution of the agreement would double from $2.5 million to $5 million with respect to the SULA and would double from $5 million to $10 million with respect to the IELA, and prompted NEC to execute 3G license agreements by September 30, 2000 (Sa 106-1 and 106-2).

(7)    On September 5, 2000, NEC sent the Respondent a claim chart for some of the patents held by NEC that were included in the list sent from NEC on August 28, 2000 for the meeting scheduled for September 8.

(8)    On September 6, 2000, the Respondent sent NEC the draft license agreements for 3G mobile wireless communications (the "September 6, 2000 Draft Agreements") in advance of the September 8 meeting between the Respondent and NEC.

The September 6, 2000 Draft Agreements included the provisions under which NEC patents would be licensed. Like the license agreements for 2G mobile wireless communications, such provisions covered patents for licensee's TEIPRs. However, with respect to "Components," the provisions did not limit the scope of the coverage to instances where the relevant "Components" are incorporated into Subscriber Units, etc. by the Respondent and used as a part of the Respondent's Subscriber Units or Base Stations by the Respondent, but rather allowed the Respondent to sell "Components" to third parties.

(9)    At the September 8, 2000 meeting with NEC, the Respondent explained the September 6, 2000 Draft Agreements and stated that the Respondent would not need to obtain a cross-license for the NEC patents as of October 1, 2000, and explained that while negotiations would continue, the fixed fee to be collected at the execution of the agreement would be doubled from October 1, 2000 onward as provided in the draft agreements

In response, NEC protested against the deadline suddenly imposed by the Respondent while NEC was waiting for a response from the Respondent after sending the list of its patents and patent applications to the Respondent in February 2000 and requesting the Respondent to engage in discussions concerning the patents held by NEC.

[Translation]

As a result, NEC and the Respondent scheduled a meeting to be held at the Respondent's head office in the United States on September 28, 2000, where a technical explanation was to be provided on the patents held by NEC with the attendance of engineers from both sides.
(Sa 109-1 and 109-2)

(10)   On September 11, 2000, the Respondent made a request to NEC to postpone the meeting scheduled for September 28 until late-October.

(11)   On or about September 28, 2000, Tetsuzo Matsumoto, President of QUALCOMM Japan which is a subsidiary of the Respondent and engages in marketing business for the Respondent's business, pointed to a news release announcing NEC's delivery of W-CDMA Base Stations, and told NEC that depending on the circumstances, they might have to take legal action including seeking an injunction preventing shipment and that the Respondent had no intention of discussing patents, which was why the Respondent postponed the meeting until late October. (Sa 111)

(12)   On September 29, 2000, NEC requested that the Respondent extend the negotiation deadline for the license agreements for 3G mobile wireless communications without the doubling of the fixed fee to be collected at the execution of the agreement by a maximum of four weeks, and the Respondent agreed to extend the negotiation deadline until October 31, 2000.

(13)   On October 5, 2000, NEC requested a meeting with the Respondent for licensing negotiations, and on October 11, NEC held a meeting with the Respondent and conducted negotiations based on the September 6, 2000 Draft Agreements. At the meeting, NEC requested the Respondent to reduce the royalty rates considering the patents held by NEC, but the Respondent did not accommodate this request. At the meeting, however, it was agreed that the provisions proposed in the draft agreements to the effect that NEC would license its TEIPRs for the Respondent's manufacture and sale of "Components" should be changed to provisions under which NEC would make a pledge not to assert its rights against Spinco and Spinco's customers as long as Spinco and Spinco's customers did not attack NEC in the area of wireless communications patents (Non-Assertion Provision against the Respondent, etc.). (Sa 115)

(14)   On October 23, 2000, NEC had a meeting with the Respondent, where NEC explained the strength of its IP portfolio to the Respondent and again requested that the royalty rates be reduced, but the Respondent refused this request. NEC and the Respondent also confirmed that, as agreed at the October 11 meeting, the provisions enabling the Respondent to manufacture and sell "Components" would not be provisions under which NEC would license its patents to the Respondent, but would be a Non-Assertion Provision against the Respondent, etc. The Respondent was to prepare revised draft agreements and send them to NEC.

[Translation]

(15)   Following the October 23, 2000 meeting, the Respondent sent to NEC the revised draft license agreements for 3G mobile wireless communications.

In response, NEC protested to the Respondent on the same day that the Non-Assertion Provision against the Respondent, etc. in the aforementioned revised draft agreements were far different from the content agreed upon at the meeting on that day, and asserted that the scope of patents subject to the Non-Assertion Provision should be limited to NEC's TEIPRs as agreed at the meeting, and that the scope of subject products should be limited to "Components" manufactured by the Respondent or Spinco and sold to their customers. NEC also sent revised drafts reflecting these assertions.

(16)   On October 24, 2000, the Respondent told NEC that the Respondent could not   agree to limit the scope of patents subject to the Non-Assertion Provision against the Respondent, etc. to NEC's TEIPRs, and sent the following two options and two versions of the draft agreements reflecting these options regarding the Non-Assertion Provision:

A.   Option 1
NEC's Non-Assertion Provision regarding "Components" would be deleted. In exchange, however, all of Spinco's patents would be excluded from the scope of the Respondent's license to NEC.

B.   Option 2
Only NEC's TEIPRs would be subject to the Non-Assertion Provision, while only Spinco's TEIPRs would be licensed to NEC. However, for a period of three years after Spinco ceases to be affiliated with the Respondent, all of NEC's patents would be subject to the Non-Assertion Provision and all of Spinco's patents would be subject to the Respondent's license to NEC.

(Sa 119-1 and 119-2)

(17)   On October 25, 2000, NEC protested to the Respondent that the content of the two versions of the draft agreements described in (16) above was far different from the details discussed at the October 23 meeting by the two companies and also from the September 6, 2000 Draft Agreements that the Respondent initially proposed. NEC sent counter-draft agreements that contained the provisions (which were based on the provisions in the September 6, 2000 Draft Agreements under which NEC's patents would be licensed) specifying that if a Respondent's customer asserted TEIPRs against NEC's mobile wireless communication devices, the provisions would be terminated with respect to that customer only.

[Translation]

In response, on October 25, 2000, the Respondent stated to NEC that the limitation of the scope of NEC's license to TEIPRs in the September 6, 2000 Draft Agreements was a "mistake on our part," and sent to NEC a revised draft agreements that included, by adding to the draft NEC proposed, a Non-Assertion Provision whereby NEC makes a pledge not to assert its rights against the Respondent, etc. (excluding the Respondent's customers) with respect to the "licensee's (in this case, NEC's) pledge patents" (i.e., all NEC patents and patent applications included in "the licensee's IPRs" other than "TEIPRs" subject to the license provisions), in addition to the provisions under which the licensee's TEIPRs would be licensed.

(Sa 121-1 and 121-2)

(18) On October 31, 2000, NEC entered into the License Agreements with the Respondent. The main contents of the No-Compensation License Provisions, etc. and other provisions in the License Agreements are described in the appended chart. Specifically, (1) CEIPRs held by NEC shall not be subject to the No-Compensation License Provisions, etc., but subject to the Non-Assertion Provision against the Respondent, etc., and NEC shall make a pledge not to assert its CEIPRs against the Respondent and its affiliates, contracted manufacturers, and sellers only (excluding the Respondent's customers) with respect to the Respondent's manufacturing and selling of components, and (2) if a customer of the Respondent asserts its TEIPRs against NEC, the license of NEC's TEIPRs to that customer for the use of the Respondent's components shall be terminated for such customer with respect to the components sold after April 1, 2001.

(Sa 67-2, Sa 67-4, Shin 50-67-2, Shin 51-67-2-2, Shin 78)

(19) On July 24, 2001, the Respondent announced that it was cancelling the spin-off of its business for the manufacture and sale of semiconductor integrated circuits. The Respondent also announced that the corporate split was intended to provide its integrated circuit manufacturing and sales business with reasonable access as a separate company to third-party IPRs, and following announcement of the spin-off, the Respondent has executed or revised license agreements with approximately 40 businesses including NEC, Fujitsu, and Panasonic Mobile, and as a result, the Respondent had obtained the rights necessary to supply semiconductor integrated circuits. Further, the Respondent announced that it may consider a new spin-off in the future if there arise disputes that have an adverse impact on its business activities.

104

[Translation]

2. Panasonic Mobile

    (1)    On December 20, 1993, Panasonic Mobile executed SULAs with the Respondent (the "Original Agreement"). The Respondent's technologies covered by the Original Agreement were 2G CDMA standards known as IS-95 and other CDMA standards, which were described as standards that had the potential of being adopted by standardization organizations and the de facto CDMA standards, and included 3G CDMA standards such as W-CDMA and CDMA-2000. The Original Agreement contained the provisions under which TEIPRs of the licensee, i.e., Panasonic Mobile would be licensed to the Respondent.

    (2)    On December 5, 1997, the Respondent proposed revisions of the Original Agreement to include the Non-Assertion Provision, etc. against the Respondent's licensees by listing names of the companies that had agreed to include the Non-Assertion Provision against the Respondent's licensees in their original agreements, and informed NEC that the Respondent would not discuss or accept the reduction of royalty rates. (Sa 142-1 and142-2)

    (3)    In and around 1997 to 1998, Panasonic Mobile was considering entering the business of manufacturing and sales of the Base Stations and other infrastructure facilities and field testing equipment compatible with the W-CDMA standards, which are 3G Mobile Wireless Communications Standards, for NTT DOCOMO (Sa 12).

    Therefore, on August 5, 1998, Panasonic Mobile notified the Respondent that Panasonic Mobile was interested in entering into a license agreement for the 3G Base Stations and testing equipment compatible with the CDMA standards and requested the Respondent to hold a meeting to discuss the possibility of concluding such an agreement. Panasonic Mobile also notified that it was still discussing internally about adding to the Original Agreement the Non-Assertion Provision against the Respondent's licensees.

    (4)    On August 13, 1998, the Respondent agreed to Panasonic Mobile's proposal for a meeting, and sent Panasonic Mobile the latest list of companies that had agreed to the Non-Assertion Provision against the Respondent's licensees in the SULAs, indicating at the meeting that the Respondent would like to ask about the conclusion of Panasonic Mobile's internal consideration regarding the Respondent's proposal to include the Non-Assertion Provision against the Respondent's licensees in the revised agreement of the Original Agreement.

[Translation]

(5)     Subsequently, on the belief that the Respondent announced to European standards organizations and such with respect to development of the CDMA Mobile Wireless Communications Standards its policy of not granting licenses to TEIPRs for the W-CDMA standards, Panasonic Mobile concluded that even if it continued negotiating with the Respondent, it could not anticipate that the Respondent would license essential patents for Base Stations and testing equipment for the W-CDMA standards to it in the near future, and made a request to the Respondent to postpone the negotiations. (Sa 12)

(6)     At the August 23, 1999 meeting, approximately one year after the negotiations were postponed, the Respondent explained to Panasonic Mobile its strategy concerning 3G Mobile Wireless Communications Standards and the status of its IPRs. Indicating licensing terms such as that it would be based on the Original Agreement, expanding the scope of covered patents, thereby enabling development, manufacture and sale of products compatible with the 3G Mobile Wireless Communications Standards, not modifying the royalty rates and the collection of an upfront fee, the Respondent proposed amendments to the Original Agreement and execution of the license agreement for 3G Base Stations and testing equipment.

(7)     On September 16, 1999, Panasonic Mobile notified the Respondent that Panasonic Mobile was looking into the Respondent's proposals made on August 23, 1999 and that Panasonic Mobile was conducting assessment work with respect to its patents and technologies which would be of interest and value to the Respondent so they could be incorporated into the revised agreement and that it would notify the Respondent as soon as the assessment is completed.

(8)     On December 27, 1999, Panasonic Mobile notified the Respondent that its patent assessments were nearly completed and the assessment results could be presented to the Respondent. Panasonic Mobile also proposed discussing the extension or revision of the Original Agreement while it provided explanation to its patents, and stated that Panasonic Mobile's patents included patents that would be of interest and value to the Respondent (Sa 147-1 and 147-2).

106

[Translation]

(9)     On December 28, 1999, the Respondent replied to Panasonic Mobile that the Respondent would agree to have a meeting with Panasonic Mobile to discuss the extension or revision of the Original Agreement. The Respondent further indicated that the Respondent might be interested in Panasonic Mobile's patents, but would need more detailed information concerning the technologies that could be achieved by those patents, and that the Respondent had sold its base station business and had also announced that it would sell its subscriber units business, and therefore, that the focus of the Respondent's product sales would be narrowed down substantially. (Sa 148-1 and 148-2)

(10)    On February 3, 2000, the Respondent notified Panasonic Mobile that the validity of the licensing terms proposed by the Respondent at the August 23, 1999 meeting could not be guaranteed from March 26, 2000 onward, and that the Respondent reserved the right to raise the charges depending on market conditions. Further, the Respondent told Panasonic Mobile to contact the Respondent immediately if Panasonic Mobile was interested in entering into a license agreement for 3G mobile wireless communications.

(11)    On February 11, 2000, the Respondent sent Panasonic Mobile a draft license agreement for 3G Base Stations and testing equipment, in advance of the meeting scheduled for February 18, 2000. The draft agreement contained provisions under which the "Licensee's IPRs" would be licensed, and the "Licensee's IPRs" included the TEIPRs and CEIPRs held by Panasonic's "Affiliates" (including Panasonic, Panasonic Mobile's parent company). In addition, the draft agreement contained the Non-Assertion Provision against the Respondent's licensees.

(12)    On February 18, 2000, Panasonic Mobile had a meeting with the Respondent, where Panasonic Mobile discussed revisions of the Original Agreement and the details of the license agreement for 3G Base Stations and testing equipment and concluded that the improvement period needed to be extended to December 31, 2000. Panasonic Mobile also stated that if Panasonic Mobile's and Panasonic's patents necessary for the manufacture and sale of "Components" by the Respondent were licensed to the Respondent for no compensation, this would essentially be the same as licensing patents held by Panasonic Mobile and Panasonic to subscriber units manufacturers that purchase the "Components" manufactured by the Respondent from the Respondent, and stated that Panasonic Mobile's and Panasonic's patents could not be licensed to the Respondent for no compensation.

In response, the Respondent indicated that it could understand the concerns that licensing the patents held by Panasonic Mobile and Panasonic for the Respondent to the Respondent for the manufacture and sale of the "Components" would amount to licensing those patents to Panasonic Mobile's competitors and proposed that Panasonic Mobile provide a pledge not to assert their rights against the Respondent as an alternative measure.

[Translation]

At that time, the Respondent rejected the revisions to the royalty rates requested by Panasonic Mobile and stated that if the Respondent could not obtain the patent licenses necessary for the Respondent to manufacture and sell the "Components" from Panasonic Mobile and Panasonic, the Respondent had no intention of licensing patents that it developed during the extended improvement period to Panasonic Mobile.

Panasonic Mobile then disclosed a list of Panasonic Mobile's or Panasonic's patents related to 3G Mobile Wireless Communications Standards, and furthermore, made a proposal to the Respondent that it would disclose to the Respondent specific patents relating to MPEG4 standards.

In response, the Respondent stated that it would evaluate the patents held by Panasonic Mobile and Panasonic and promised to disclose to Panasonic Mobile on a later date the patents that it developed after the improvement period of the Original Agreement.

Panasonic Mobile also pointed out that the draft license agreement for 3G Base Stations proposed by the Respondent on February 11, 2000 had issues including that the patents held by Panasonic, Panasonic Mobile's parent company, were included in the scope of the no-compensation license to the Respondent.

(Sa 151, Sa 152)

(13)   On April 4, 2000, the Respondent requested that Panasonic Mobile provide additional information concerning patents held by Panasonic Mobile or Panasonic.

In response to the request for additional information, on April 13, Panasonic Mobile provided the Respondent with additional information concerning patents held by Panasonic Mobile or Panasonic.

(14)   On April 18, 2000, Panasonic Mobile informed the Respondent that Panasonic Mobile had sent the Respondent a list of patents related to 3G Mobile Wireless Communications Standards and patents related to MPEG4 standards in accordance with the agreement made at the February 18, 2000 meeting but had not received the Respondent's patent list, and prompted the Respondent to send its list of patents developed or acquired by the Respondent after the improvement period stipulated in the Original Agreement in accordance with the agreement reached at that meeting.

[Translation]

(15)   On May 16, 2000, the Respondent instructed Panasonic Mobile to refer to the list of essential patents in connection with 3G Mobile Wireless Communications Standards published by ARIB ("ARIB List," which lists patent owners, title of patents, patent application numbers as well as countries of application with respect to patents on which Declaration of Essential Patents has been made).

However, since the ARIB List which Panasonic Mobile was instructed by the Respondent to refer to was not a list of patents developed or acquired by the Respondent after the improvement period in the Original Agreement and the Respondent did not provide information regarding characteristics of the patent inventions described in the ARIB List or the construction of the claim elements, Panasonic Mobile was not able to properly assess whether or not the Respondent had significant TEIPRs.
(Sa 194)

(16)   On August 17, 2000, the Respondent explained to Panasonic Mobile that the Respondent's business of manufacturing and selling semiconductor integrated circuits would be spun off to a separate corporation called Spinco and that some of the Respondent's patents for CDMA Mobile Wireless Communications Standards would be assigned to Spinco. With respect to its impact on the license agreement between the Respondent and Panasonic Mobile, the Respondent indicated that after the initial public offering of Spinco shares, Panasonic Mobile would need to pay royalties not only to the Respondent but also to Spinco, and that the Respondent would no longer need to receive patent licenses from Panasonic Mobile. (Sa 12, Sa 155)

(17)   On September 8, 2000, the Respondent explained to Panasonic Mobile the outline of the spin-off plan for the semiconductor business and the forms of licensing, etc. following the spin-off, and informed them that as a result of the spin-off of the semiconductor business, the Respondent would have almost no need to receive licenses of IPRs held by Panasonic Mobile, but that Panasonic Mobile would need to expand the current license agreement so that Panasonic Mobile would be able to use the important patents for which applications were filed on or after July 26, 1995. The Respondent further indicated that if Panasonic Mobile did not enter into the license agreement for 3G Mobile Wireless Communications by September 30, 2000, starting on October 1, 2000, the fixed fee to be collected at the execution of the agreement would be doubled from $2.5 million to $5 million, and prompted Panasonic Mobile to execute the license agreement for 3G Mobile Wireless Communications by September 30, 2000.

[Translation]

(18)   On September 12, 2000, Panasonic Mobile stated that the draft agreement the Respondent sent on February 11 of that year was substantially different from the Original Agreement and that Panasonic Mobile was having difficulty obtaining internal approval, and therefore requested that the Respondent expand the Original Agreement by adding Base Stations and testing equipment to the licensed products as an alternative measure.

(19)   On September 21, 2000, the Respondent sent to Panasonic Mobile the following two proposals concerning the addition of Base Stations and testing equipment to the licensed products under the Original Agreement with an effective period ending October 1, 2000 and a list of the Respondent's patent numbers:

   A.   Option 1
        The improvement period would be extended. In this case, the upfront fee would be $4.5 million (the territory for the base station would be limited to Japan). The revisions would include the Respondent's standard "no compensation cross-license for components."

   B.   Option 2
        The improvement period would not be extended. In this case, the upfront fee would be $3.3 million (the territory for the base station would be limited to Japan). These revisions would also include the Respondent's standard "no compensation cross-license for components."
        (Sa 12, Sa 154-1 and 154-2)

(20)   On September 29, 2000, Panasonic Mobile expressed its opinions to the Respondent on the history of negotiations to date for the License Agreement, stating that the explanation regarding the effect of the Spin-Off is confusing to Panasonic Mobile, and expressed concerns regarding the time limit imposed by the Respondent with their suggestion that the fixed fee to be collected at the execution of the agreement would be doubled if Panasonic Mobile did not enter into the License Agreement for the 3G Mobile Wireless Communications by September 30, 2000, even though it would require significant time for Panasonic Mobile to evaluate the list of patent numbers received from the Respondent on September 21, 2000. [Panasonic Mobile] also requested that the Respondent expand the scope of the current License Agreement for subscriber units to also cover the licenses for the Base Stations and testing device.

[Translation]

Panasonic Mobile also indicated that while it was still considering the two proposals presented by the Respondent on September 21, 2000, it believes that a draft agreement expanding the improvement period as indicated in "Option 1" would be the better solution for both parties.

With respect to the provision requiring Panasonic Mobile to grant license to the Respondent for its patents as requested by the Respondent, Panasonic Mobile responded that it cannot accept a situation where the Respondent or the SpinCo would sell application specific integrated circuits to customers, and enable those customers to use the patents developed by Panasonic Mobile, and that such an arrangement between the Respondent and Panasonic Mobile is unfair and would create serious difficulties in conducting transactions with other companies. Panasonic Mobile also commented that it understood that this issue was appropriately resolved at the meeting held on February 18, 2000 when the Respondent suggested that Panasonic Mobile make a pledge that it will assume non-assertion obligations towards the Respondent as an alternative plan for the provision requiring the Respondent to grant license for its patents. (Sa 159-1, Sa 159-2)

(21)   On October 2, 2000, the Respondent told Panasonic Mobile that the Respondent's position has changed since the meeting of February 18, 2000 concerning the provision requiring Panasonic Mobile to grant license for its patents and suggested that they hold a meeting again to discuss the revision of the Original Agreement and licenses for the Base Stations and testing device.

(22)   At the meetings held between the parties on October 18 and 19, 2000, Panasonic Mobile demanded explanation from the Respondent on its position, pointing out that the Respondent keeps changing its proposal each time in their communication.

To this, the Respondent stated, "We have a right to change our proposal because the business environment changes," or that "Nothing was decided at the meeting held in February," and refused to reduce the royalty requested by Panasonic Mobile by stating, "The Respondent does not make various decisions based on evaluation of patents."

As a compromising proposal with respect to the provision requiring Panasonic Mobile to grant license for its patents, instead of that provision, ,Panasonic Mobile proposed with respect to the "Components" that are the subject products, that on condition that the subject parts be limited to "Components" that are specific to the CDMA standards ("Specific to CAI"), Panasonic Mobile will accept non-assertion obligation barring it from assertion of its IPR against the Respondent and its customers that purchased the "Components" from the Respondent for the IPR held by it. (Sa 12, Sa 161)

Meanwhile, the Respondent proposed an arrangement where if the Respondent's customer asserts any rights against Panasonic Mobile, then Panasonic Mobile may assert its rights against such the Respondent's customer.

[Translation]

(23)   On October 23, 2000, the Respondent presented Panasonic Mobile with a revised draft of the Basic Agreement and the Original Agreement (hereinafter collectively referred to as the "October 23, 2000 Drafts") and requested that Panasonic Mobile sign the Basic Agreement by October 31, 2000.

The Basic Agreement presented by the Respondent stipulated as agreed matters that the parties shall negotiate in good faith to sign the revised agreement which is substantially the same as the October 23, 2000 Drafts by November 30, 2000, and that the revised agreement shall not include a provision that changes the Royalty Rate under the Original Agreement, that the revised agreement shall include a provision substantially the same as the conditions of "Non-Assertion Provision against the Respondent, etc." (Article 8.1) in the October 23, 2000 Drafts, and that the parties shall continue to hold discussions in good faith with regard to further amendment of the agreement after execution of the revised agreement, provided that the Respondent shall not be obligated to agree to a revision of the Royalty Rate.

Furthermore, while the October 23, 2000 Drafts stipulated that Panasonic Mobile shall not assert its "Pledge Patents" against the Respondent and its successors, and against the customer's "CDMA Multi-Mode Products" that incorporate the "Components" purchased from the Respondent and its successors, there were no restrictions on the CDMA standards in relation to the definition of the "Components" discussed at the meetings held on October 18 and 19, 2000. It was also set forth that the "Pledge Patents" include the patents that were applied for and issued by the end of the improvement period and the pending patent applications, and in addition, it was agreed that Panasonic Mobile's "Pledge Patents" that are the subjects of the non-assertion provision also include patents invented by the employees, etc. of Panasonic Mobile even if the ownership of those patents was transferred to the parent company, Panasonic. Furthermore, the drafts also stipulated that Panasonic Mobile's non-assertion provision shall survive as long as the Respondent's customer does not assert its IPRs to Panasonic Mobile pursuant to the "Pledge Patents."

[Translation]

(24)   On October 26, 2000, Panasonic Mobile contacted the Respondent and pointed out that the October 23, 2000 Drafts contain proposals which greatly deviate from the Respondent's proposal made on October 18 and 19, 2000, and that Panasonic Mobile requires time to the consider the October 23, 2000 Drafts.

(25)   On November 14, 2000, Panasonic Mobile contacted the Respondent and once again conveyed its serious concern towards the Royalty Rate imposed by the Respondent, but expressed understanding of the Respondent's situation that it cannot comply with the request for change of the Royalty Rate which would result in adversely affecting its entire licensing program, notified them that it will agree to withdrawing its request for a reduction of the Royalty Rate on condition that the Respondent represents that other companies are not given more preferential treatment than Panasonic Mobile on the Royalty Rate, and sent a revised draft license agreement (the "November 14, 2000 Revisions").

The November 14, 2000 Revisions included revisions such as limiting the "Components" that are subject to the non-assertion provision to ASIC (application specific integrated circuits) to implement the CDMA technology and to ASIC, etc. that processes CDMA signals for use in subscriber units, the addition of a provision that the Respondent shall not assert its IPRs when Panasonic Mobile or Panasonic manufactures and sells, etc. the "Components," and exempting US$500,000 from the fixed fee to be collected at the execution of the agreement that extends of the improvement period.

(Sa 12, Sa 164-1, Sa 164-2)

(26)   On November 21, 2000, the Respondent responded to Panasonic Mobile concerning the November 14, 2000 Revisions, stating that it cannot accept a reduction of the fixed fee to be collected at the execution of the agreement and the Respondent's non-assertion pledge concerning Panasonic Mobile's sale of the "Components," and sent draft revisions to the November 14, 2000 Revisions.

The above draft revisions from the Respondent revised the definition of "Components" by changing the limitation of "CDMA" proposed by Panasonic Mobile to "wireless communications," making components to be used in communications under the GSM standard, which is a 2G wireless communications standard, to be included in the "Components," and included that Panasonic Mobile would assume a non-assertion obligation towards the Respondent and the Respondent's customers for the manufacture and sale, etc. of such "Components."

(Sa 165-1, Sa 165-2)

[Translation]

(27)   On January 15, 2001, Qualcomm Japan Kabushiki Kaisha notified Panasonic Mobile that Panasonic Mobile's commencement of shipment of the Base Stations to NTT Docomo will result in a patent dispute if it persisted.
(Sa 12)

(28)   On January 16, 2001, Panasonic Mobile questioned the Respondent, stating that regardless of the most-favored provision stipulated in the Original Agreement, there is a suspicion that the Respondent has granted a Chinese company a royalty rate that is more advantageous than that which was extended to Panasonic Mobile.

In response, on the same day, the Respondent responded to Panasonic Mobile's question concerning the royalty rate to a Chinese company, and that the Respondent wishes to promptly execute a license agreement for the 3G Mobile Wireless Communications to enable Panasonic Mobile to commence shipment of the Base Stations that conform to the CDMA standards.

(29)   On March 28, 2001, Panasonic Mobile executed the License Agreement with the Respondent.

The main contents of the No-Compensation License Provisions, etc. in the License Agreement are as set forth in the attached chart, and they specifically provide as follows: (i) The subject TEIPRs include conceived inventions, creations, or other form of rights relating to the resulting IPRs developed by the employees or representatives of Panasonic Mobile whether in whole or in part, regardless of whether those TEIPRs are held by Panasonic Mobile, or shall be transferred to Panasonic or to an affiliate of Panasonic Mobile or Panasonic; (ii) the "Components" shall be limited to the components that are designed to implement the CDMA technology and components that are involved in the signal processing circuit for wireless communication signals, but shall exclude batteries, displays, key boards, antenna or parts for which the main purpose is to save battery consumption; (iii) with respect to the customer's parts that are subject to the Non-Assertion Provision against the Respondent, etc. (the right granted to the Respondent's customer), those "Components" shall include the components that are designed to implement the CDMA technology and components relating to the signal processing circuit for wireless communication signals (above (ii)), and with respect to the latter components, among the wireless communication signals, these shall be further limited to the components relating to the signal processing circuit for CDMA wireless communication; (iv) Panasonic Mobile shall have the right to sue the Respondent's customers for patent infringement for combining the Respondent's chip with a third party's products, regardless of whether or not the patent in question is included in the cross-license provision, etc. granted to the Respondent; and that (v) Panasonic Mobile's pledge not to assert its IPRs towards the Respondent's customers shall survive only when the customer does not asserts its own TEIPRs and CEIPRs with respect to Panasonic Mobile's CDMA Subscriber Units, etc. products, or when Panasonic Mobile has not first asserted its patents after the lapse of the improvement period towards the Respondent's customers, that the customer does not assert its patents after the lapse of the improvement period towards Panasonic Mobile's CDMA Subscriber Units, etc. product.

(Sa 70-2, Sa 70-4, Shin 50-70-2, Shin 51-70-2, Shin 51-70-2-2, Shin 428)

[Translation]

(30) As stated in above 1(19), the Respondent publicly announced on July 24, 2001 the withdrawal of its plans for spin-off of its semiconductor business.

3. Toshiba

(1)    On July 12, 1995, Toshiba executed a license agreement for 2G Subscriber Units with the Respondent.

(2)    On August 26, 1999, the Respondent gave an explanation to Toshiba on the license agreement for the 3G Subscriber Units.

(3)    On March 24, 2000, Toshiba asserted to the Respondent that Toshiba had made significant technical contributions to the Respondent, gave concrete explanations concerning the list of patents held by or currently being applied for by Toshiba and its achievement on the number of Subscriber Units sold, indicated that the Royalty Rate stipulated in the license agreement for the 2G Subscriber Units has become outdated, and requested a reduction of the Royalty Rate and the fixed fee to be collected at the execution of the agreement for the license agreement for the 3G Subscriber Units.
(Sa 199, Sa 152-2)

(4)    On May 10, 2000, the Respondent indicated to Toshiba that the structure of the Respondent's Royalty Rate does not impede the development of the CDMA industry and that there are many business operators that consent to this kind of industry-standard rate with respect to the license for the 3G Subscriber Units, and notified Toshiba that it might consider adjusting the fixed fee to be collected at the execution of the agreement if before the end of June 2000.
(Sa 199, Shin 153)

[Translation]

(5)    On June 21, 2000, Toshiba requested that the Respondent reduce the fixed fee to be collected at the execution of the agreement by US$500,000, and the Respondent accepted this reduction.

(6)    On June 23, 2000, Toshiba requested that the Respondent give them an opportunity to hold discussions again concerning the Royalty Rate after execution of the license agreement for the 3G Subscriber Units, and executed the License Agreement on June 26, 2000.

## 4. Mitsubishi Electric

(1)    On February 22, 1995, Mitsubishi Electric executed the license agreement for the 2G Subscriber Units with the Respondent. This agreement stipulates a provision requiring Mitsubishi Electric to grant the Respondent with licenses to its patents, a non-assertion provision against the Respondent's customers, and a Non-Assertion Provision against the Respondent's Licensees. However, the patents subject to the above provisions granting patent licenses were limited to the TEIPRs.

(2)    At the meeting held on August 26, 1999, the Respondent proposed to Mitsubishi Electric to execute a license agreement for the 3G Mobile Wireless Communications. The Respondent explained the strategy and situation of IPRs for the 3G Mobile Wireless Communications Standards, and presented license terms such as to expand the scope of subject patents on the basis of the license agreement for the 2G Mobile Wireless Communication to enable the development, manufacture, and sale of the products that conform to the 3G Mobile Wireless Communications Standards, to make no change to the Royalty Rate, and to require the payment of a fixed fee to be collected at the execution of the agreement.

(3)    On February 3, 2000, the Respondent notified Mitsubishi Electric that the Respondent could not guarantee that the license terms proposed by the Respondent at the meeting held on August 26, 1999 would be effective even after March 26, 2000, and that the Respondent reserved the right to increase the sum depending on market conditions. Also, on February 10, 2000, the Respondent notified Mitsubishi Electric that if Mitsubishi Electric executes the agreement by March 25, 2000, the payment of the fixed fee to be collected at the execution of the agreement may be deferred for several months and be paid in installments.

116

[Translation]

(4)     On March 17, 2000, Mitsubishi Electric notified the Respondent that the Royalty Rate proposed by the Respondent was not commercially feasible in the 3G communication industry and was unreasonably high, and that it could not accept the Respondent's license terms for the license agreement for the 3G Mobile Wireless Communications, and that because the Respondent had not given a clear explanation on the relationship between the patents held by the Respondent and the 3G Mobile Wireless Communications Standards, it could not decide whether it was necessary to obtain licenses from the Respondent.

(5)     On April 7, 2000, the Respondent asserted to Mitsubishi Electric, showing the URL of the ITU web page that describes the list of patents relating to the 3G Mobile Wireless Communications Standards that the Respondent notified to ARIB, that it could be proven that the Respondent's patents are valid and essential by the fact that numerous international telecommunication manufacturers revised their license agreement for the 2G Mobile Wireless Communications and executed a license agreement for the 3G Mobile Wireless Communications.
(Sa 127-1 and Sa 127-2)

(6)     On June 2, 2000, the Respondent sent to Mitsubishi Electric a draft license agreement for the 3G Mobile Wireless Communications.

In the above draft agreement, while the patents subject to the provision requiring Mitsubishi Electric to grant licenses for its patents were expanded to include the TEIPRs and CEIPRs, the Royalty Rate was not reduced as requested by Mitsubishi Electric. The Respondent also presented a list of business operators that it claimed to have executed license agreements with for the 3G Mobile Wireless Communications, and asserted that those business operators recognized the value of the Respondent's portfolio of IPRs and accepted the Royalty Rate for the 3G products that is the same as for the 2G products. Furthermore, the Respondent pressed Mitsubishi Electric to immediately send its comments to the Respondent if it is interested in executing the license agreement for the 3G Mobile Wireless Communications, and stated that if Mitsubishi Electric executed the license agreement for the 3G Mobile Wireless Communications by the end of the same month, the Respondent might consider reducing the fixed fee to be collected at the execution of the agreement.

(7)     On August 9, 2000, the Respondent contacted Mitsubishi Electric and explained that the Respondent intended to spin-off its business for the manufacture and sale, etc. of semiconductor integrated circuits to a separate entity called SpinCo, that the Respondent would be transferring part of the patents for the CDMA Mobile Wireless Communications held by it to SpinCo, and that after SpinCo completes its public offering of shares, it might become necessary to execute a separate license agreement also with SpinCo, and that in that case, the license terms might change from the terms when executing the agreement before SpinCo's public offering, but that if the agreement were to be executed before SpinCo's public offering, it would suffice to execute the agreement only with the Respondent, and presented the draft agreement to Mitsubishi Electric.

[Translation]

(8)    On August 11, 2000, the Respondent notified Mitsubishi Electric that if they executed an agreement before the public offering of SpinCo's shares, the Respondent could guarantee the granting of a license to Mitsubishi Electric with just one agreement for the patents held by the Respondent and the patents held by the Respondent to be transferred to SpinCo, but that it was uncertain how the form of licensing or the license fee would be after the public offering of SpinCo's shares, also stating that there would be little or no need for the Respondent to receive a cross-license from Mitsubishi Electric after the spin-off of the Respondent's semiconductor business.

(9)    On August 31, 2000, the Respondent provided Mitsubishi Electric with an overview of plans for the spin-off of the Respondent's semiconductor business and the form of licensing after the spin-off, and explained that the Respondent would no longer require receiving licenses for most of the IPRs held by Mitsubishi Electric after the spin-off, but that on the other hand, it would be necessary to expand the current license agreement in order for Mitsubishi Electric to receive license from the Respondent for important patents that the Respondent applied for after July 26, 1995 for the W-CDMA system and to use those patents, stating that if Mitsubishi Electric did not execute the license agreement for the 3G Mobile Wireless Communications by September 30, 2000, the Respondent would charge from October 1, 2000 a fixed fee to be collected at the execution of the agreement would increase to double from US$2,500,000 to US$5,000,000 for the license to Subscriber Units and the fixed fee to be collected at the execution of the agreement would increase to double from US$5,000,000 to US$10,000,000 for the license for the Base Stations, pressing Mitsubishi Electric to execute the license agreement for the 3G Mobile Wireless Communications by September 30, 2000, and presenting a revised version of the license agreement for the 3G Mobile Wireless Communications reflecting the above increased amounts of the fixed fees collected at the execution of the agreements.

(10)    On September 12, 2000, the Respondent explained to Mitsubishi Electric its spin-off plan and the changes that would be made to the license policy following the spin-off.

Mitsubishi Electric asserted that the Respondent's Royalty Rate was unjustly high but the Respondent explained that the Respondent's products were its patents and the Royalty Rate was reasonable.

(Sa 133)

[Translation]

(11)   On September 18, 2000, Mitsubishi Electric notified the Respondent that the Respondent's suggestion to increase the fixed fee to be collected at the execution of the agreement by double if Mitsubishi Electric did not execute the license agreement for the 3G Mobile Wireless Communications by September 30, 2000 at the current stage in which Mitsubishi Electric does not manufacture and sell 3G Subscriber Units and when there has not occurred any patent infringement could only be viewed as unreasonable pressure by the Respondent towards Mitsubishi Electric and that it was unacceptable to straightforwardly accept the Respondent's offer, and requested that the Respondent provide information concerning the patents that are truly essential to implement the 3G Mobile Communications Standards among the patents and patents currently being applied for by the Respondent and the contract terms if only licenses to those essential patents were to be received because Mitsubishi Electric must confirm all of the elements of the license agreement for the 3G Mobile Wireless Communications before executing this agreement.

(12)   On September 21, 2000, the Respondent responded to Mitsubishi Electric that excluding the overlaps in the patents applied for in each country, the list of patents held by the Respondent includes approximately 110 independent patents and patents in the process of application, and because the standard concerning the CDMA Mobile Wireless Communications is not fixed yet, it is too soon to delete any of the above patents or patents in process of application from the list of the Respondent's essential patents, and that even if the subjects of the licenses are for both TEIPRs and CEIPRs, or only TEIPRs, the Royalty Rate and the fixed fee to be collected at the execution of the agreement will not change, and that even if the subjects of licenses are only limited to patents and excludes know-how, the Respondent has no intentions of reducing the Royalty Rate.

(13)   On September 29, 2000, Mitsubishi Electric requested that the Respondent extend the effective period of the currently proposed fixed fee to be collected at the execution of the agreement until October 31, 2000 and the Respondent agreed.

(14)   On October 30, 2000, Mitsubishi Electric requested of the Respondent a grace period of one year until execution of the agreement in exchange for Mitsubishi Electric's immediately paying the currently proposed fixed fee to be collected at the execution of the agreement of US$2,500,000 but the Respondent refused and notified Mitsubishi Electric that unless Mitsubishi Electric responds by the deadline of the already extended period, the Respondent will increase the fixed fee to be collected at the execution of the agreement by double as of November 1, 2000.

[Translation]

(15)   Because Mitsubishi Electric did not respond by the deadline, on November 1, 2000, the Respondent, from concern that Mitsubishi Electric misunderstood the Respondent's intentions and that consequently it would be required to pay unnecessary sums, pressed Mitsubishi Electric to consider executing the license agreement for the 3G Mobile Wireless Communications stating that it was the only major DMSHs that was in such a situation. (Sa 141-1, Sa 141-2)

(16)   On November 2, 2000, Mitsubishi Electric indicated that the Royalty Rate proposed by the Respondent was outrageously high compared to other standards and requested a reduction of the Royalty Rate.

(17)   On November 3, 2000, the Respondent notified Mitsubishi Electric that CDMA is the de facto the standard for the 3G Mobile Wireless Communications Standards and that if Mitsubishi Electric intended to participate in 3G Mobile Wireless Communications, then it would be necessary for it to expand the scope of its licenses for the    W-CDMA system and the CDMA 2000 system. It also indicated that Mitsubishi Electric was the only major DMSHs that had not executed the license agreement for 3G Mobile Wireless Communications with the Respondent, and because the deadline for the increase of the fixed fee to be collected at the execution of the agreement which was set for October 31, 2000 had lapsed, the fixed fee to be collected at the execution of the agreement would be increased from US$2,500,000 to US$5,000,000, and, furthermore, that if NTT Docomo commenced commercial services for the 3G Mobile Wireless Communications Standards, then the Respondent might again change the license terms. On the basis of the above, the Respondent proposed that if Mitsubishi Electric signed the license agreement for the 3G Mobile Wireless Communications Standards by November 10, 2000, then the Respondent would retroactively apply the contract terms it proposed to Mitsubishi Electric that were set to be effective only until October 31, 2000. (Sa 141-1, Sa 141-2)

(18)   On November 14, 2000, Mitsubishi Electric concretely asserted to the Respondent that Mitsubishi Electric had important patents for the cryptographic technology included in the 3G Mobile Wireless Communications Standards and the MPEG4 technology and demanded the Respondent revise the license terms to take into account the portfolio of IPRs held by the Respondent and Mitsubishi Electric but the Respondent refused. Mitsubishi Electric also indicated that it believed that the license agreement for the 3G Mobile Wireless Communication would create issues under the AMA but the Respondent denied this. (Sa 13, Sa 293, Shin 122)

[Translation]

(19)    On November 30, 2000, Mitsubishi Electric executed the license agreement for the 3G Subscriber Units and executed the License Agreement for the 3G Subscriber Units with the Respondent on September 30, 2000 which was the deadline for negotiations initially set by the Respondent.

(20)    On March 30, 2001, Mitsubishi Electric executed the License Agreement for the 3G Base Stations with the Respondent.

(21)    Thereafter, as indicated in 1(19) above, the Respondent publicly announced on July 24, 2001 the withdrawal of its plans for spinning off its semiconductor business.

5. Fujitsu

(1)    Fujitsu entered into the license agreement for 2G Subscriber Units on July 24, 1995 and the license agreement for 2G Base Stations on September 11, 1995.

The license agreement for 2G Subscriber Units and the license agreement for 2G Base Stations included a provision to license the patents owned by Fujitsu and a Non-Assertion Provision against the Licensees. The provision to license the above patents in the license agreement for 2G mobile wireless communications was applicable to both TEIPRs and CEIPRs, and granted licenses to the Respondent for Subscriber Units, Base Stations and their components, namely, the manufacture, sales, etc. of semiconductor integrated circuits, etc.

(2)    The Respondent proposed to Fujitsu on August 28, 1999, that both parties enter into a license agreement for 3G mobile wireless communications. Upon making the proposal, the Respondent explained its strategy and the status of its IPRs concerning 3G mobile wireless communications, and presented licensing terms that were based on their license agreement for 2G mobile communications, with the scope of applicable patents being expanded and the royalty rate remaining unchanged, adding certain amounts of upfront fees to be collected, and stating that the Non-Assertion Provision against the Licensees of the Respondent cannot be forced to be entered into and that there were licensees that decided not to include said provision in their license agreements.

In response, Fujitsu requested an adjustment of the royalty rates on the grounds that, not only the Respondent, but also other multiple business enterprises including Fujitsu owned patents for 3G Mobile Wireless Communications Standards.

However, the Respondent refused to make an adjustment of the royalty rates on the grounds that, concerning 3G Mobile Wireless Communications Standards, it was unreasonable that the DMSHs that did not accept the Respondent's claim that CDMA2000 system should be adopted, and instead promoted W-CDMA system, which was not technically superior, requests a reduction of royalty rates, and that the Respondent did not have a reason to accept such a request.

(Sa 167)

121

[Translation]

(3)     The Respondent notified Fujitsu on February 3, 2000 that it was not guaranteed that the license terms presented by the Respondent on August 27, 1999 would remain valid as of March 26, 2000 forward, that the Respondent reserved its right to increase the royalties in accordance with market conditions, and requested Fujitsu to immediately notify the Respondent if Fujitsu was interested in entering into the license agreement concerning 3G mobile wireless communications.

(4)     The Respondent notified Fujitsu on February 10, 2000 that if Fujitsu entered into the agreement by March 26, 2000, the amount of upfront fees to be paid upon execution of the agreement could be postponed for several months and split into installments. ( Sa 169-1 and Sa 169-2)

(5)     Fujitsu responded to the Respondent on March 24, 2000 that it was pointed out in internal discussions at Fujitsu that an important point to consider was that not only the Respondent but many business enterprises (including Fujitsu) were believed to own patents essential to 3G Mobile Wireless Communications Standards, and requested that the Respondent make the license agreement mutually satisfactory to both parties. (Sa 170-1 and Sa 170-2)

(6)     The Respondent presented Fujitsu on June 2, 2000 the draft license agreement concerning 3G mobile wireless communications.

    In the draft license agreement, the Royalty Rate provided in the license agreement for 2G mobile wireless communications, which Fujitsu requested to be reduced, was not adjusted.

(7)     The Respondent explained to Fujitsu in their meeting on August 11, 2000 its decision to spin off its business of manufacturing, sales, etc. of semiconductor integrated circuits, etc. to a separate company called SpinCo, that part of the patents concerning CDMA Mobile Wireless Communications Standards owned by the Respondent would be transferred to SpinCo, and that therefore, there was the possibility that the license terms could be changed thereafter. The Respondent further explained that the Respondent could take responsibility for the licensing terms only if Fujitsu signed the license agreement concerning 3G mobile wireless communications before the public offering of shares of SpinCo, and presented a draft agreement based on the establishment of SpinCo. (Sa 58, Sa 172 through Sa 174-2)

    Fujitsu requested that the Respondent adjust the royalty rates, etc. again on the grounds that multiple business enterprises including Fujitsu also owned IPRs relating to 3G Mobile Wireless Communications Standards and the situation is different from that of the license agreements for 2G mobile wireless communications in which the Respondent was probably the only holder of the IPRs, and that while in the license agreement for 2G mobile wireless communications, patents as well as know-how were licensed, in the license agreement for 3G mobile wireless communications, know-how does not need to be licensed.

    However, the Respondent strongly rejected making any changes to the Royalty Rates, etc.

(Sa 58, Sa 172)

[Translation]

(8)     The Respondent notified Fujitsu again on August 12, 2000 that, prior to the public offering of shares of SpinCo, the Respondent guaranteed that the patents owned by the Respondent and the patents transferred to SpinCo are licensed to Fujitsu by a single agreement, but that after the public offering of shares of SpinCo, it was not clear as to what the form of licensing or fees, etc. would be, that after the completion of the spin-off of its semiconductor business, the Respondent would have little or no need to receive a cross-license from Fujitsu, etc. (Sa 175-1 and Sa 175-2)

(9)     The Respondent gave Fujitsu on August 31, 2000 an overview of the spin-off plan of its semiconductor business and licensing forms after the spin-off, etc. and notified Fujitsu that the Respondent will have little need to be cross-licensed by Fujitsu after the spin-off, but that on the other hand, in order to make important patents applied for on or after July 26, 1995 including the patents concerning the W-CDMA system owned by the Respondent available to Fujitsu, Fujitsu needed to expand the current license agreement, etc. and that if Fujitsu does not enter into the license agreement for 3G mobile wireless communications by September 30, 2000, the amount of upfront fees to be paid upon conclusion of the agreement will be doubled from $2.5 million to $5 million for the license for subscriber units and from $5 million to $10 million for the license for base stations, respectively, and thereby urged Fujitsu to enter into the license agreement for 3G mobile wireless communications by September 30, 2000. (Sa 176-1 and Sa 176-2)

(10)     The Respondent presented to Fujitsu on September 8, 2000 a draft license agreement for 3G mobile wireless communications that added a provision that, as of October 1, 2000, the amount of upfront fees to be paid upon execution of the agreement shall be doubled. (Sa 177-1 and 2, Sa 178-1 and 2)

123

[Translation]

(11)   Subsequently, after several communications including meetings, Fujitsu entered into the License Agreement with the Respondent on September 27, 2000.

Fujitsu requested that the Respondent (1) limit the scope of "Components" covered by the license to the same extent as those of the license agreement for 2G mobile wireless communications and (2) split the upfront fees to be paid upon conclusion of the agreement into two installments.

In response to these Fujitsu requests, in the License Agreements, (1) the definition of "Components" was limited to the definition of "components" in other normal license agreements "that uses at least one mode of operation related to CDMA applications" and excluded four kinds of products from the definition of "Components," those being devices for processing optical signals, SAW filters, dielectric filters, and liquid crystal displays, and (2) a provision was added to split the payment of upfront fees into two installments. (Sa 197)

(12)   The Respondent announced, as stated in 1 (19) above, on July 24, 2001, its withdrawal of the spin-off plan of its semiconductor business.

End

[Translation]

Attachment

List of provisions, etc. ordered to be abolished under the CDO

| No. | DMSHs | Subject of License, etc. | IPRs | No-Compensation License Provisions, etc. | Non-Assertion Provision against the Respondent, etc. | Non-Assertion Provision against the Licensees | Expiry date of Improvement Period | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | License Agreement (Effective Date) | Amendment thereof (Effective Date) |
| 1 | Sanyo Electric Co., Ltd. | Subscriber Units and Components | Technical | Yes | - | Yes | January 1, 2002 (June 30, 2000) | Indefinite (October 8, 2003) |
| | | | Commercial | Yes | - | - | | January 1, 2004 (October 8, 2003) |
| 2 | Panasonic Mobile Communications Co., Ltd. | Subscriber Units and Components | Technical | Yes (Components are only for those used in Subscriber Units) | Yes (Components only) | - | January 1, 2002 (March 28, 2001) | - |
| | | | Commercial | - | Yes (Components only) | - | | |
| 3 | Mitsubishi Electronic | Subscriber Units and Components | Technical | Yes | Yes | Yes | January 1, 2002 (September 30, 2000) | - |
| | | | Commercial | Yes (Components only) | - | - | | |
| | | Base Stations and Components | Technical | Yes | - | Yes | Indefinite (March 30, 2001) | - |
| | | | Commercial | Yes | - | - | March 30, 2001 (March 30, 2001) | - |
| 4 | NEC Corporation | Subscriber Units and Components | Technical | Yes | - | - | January 1, 2002 (October 31, 2000) | - |
| | | | Commercial | - | Yes (Components only) | - | | |
| | | Base Stations and Components | Technical | Yes | - | - | January 1, 2002 (October 31, 2000) | - |
| | | | Commercial | - | Yes (Components only) | - | | |

[Translation]

| No. | DMSHs | Subject of License, etc. | IPRs | No-Compensation License Provisions, etc. | Non-Assertion Provision against the Respondent, etc. | Non-Assertion Provision against the Licensees | Expiry date of Improvement Period — License Agreement (Effective Date) | Amendment thereof (Effective Date) |
|---|---|---|---|---|---|---|---|---|
| 5 | Hitachi, Ltd. | Subscriber Units and Components | Technical | Yes | - | - | Indefinite for "patents owned by IID (Hitachi's Information Image Media Department) and "patents sublicensed by other departments." For other patents, September 12, 1997 (September 12, 1997) | - |
| | | | Commercial | Yes | - | - | January 1, 2000 (September 12, 1997) | - |
| | | Base Stations and Components | Technical | Yes | - | - | Indefinite for "patents owned by HTD (Hitachi's Information Communication Department) and "patents sublicensed by other departments." For other patents, December 5, 1996 (December 5, 1996) | - |
| | | | Commercial | Yes | - | - | Earlier of 5 years from "the first manufacturing date" or 7 years from the provision of "manufacturing and test technology information" (March 12, 1997) | - |
| 6 | Fujitsu Limited | Subscriber Units and Components | Technical | Yes | - | Yes | January 1, 2002 (September 27, 2000) | - |
| | | | Commercial | Yes | - | - | | - |
| | | Base Stations and Components | Technical | Yes | - | - | January 1, 2002 (September 27, 2000) | - |
| | | | Commercial | Yes | - | - | | - |

[Translation]

| No. | DMSHs | Subject of License, etc. | IPRs | No-Compensation License Provisions, etc. | Non-Assertion Provision against the Respondent, etc. | Non-Assertion Provision against the Licensees | Expiry date of Improvement Period | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | License Agreement (Effective Date) | Amendment thereof (Effective Date) |
| 7 | Sharp Corporation | Subscriber Units and Components | Technical | Yes | - | Yes | Indefinite (April 30, 1997 or Approval Date by the Japanese Government, whichever comes later) | - |
| | | | Commercial | Yes | - | - | January 1, 2001 (September 22, 2000) | - |
| 8 | Casio Computer, Co., Ltd. | Subscriber Units and Components | Technical | Yes | - | Yes | Indefinite (March 24, 1998) | - |
| | | | Commercial | Yes | - | - | January 1, 2000 (March 24, 1998) | - |
| 9 | Kyocera Corporation | Subscriber Units and Components | Technical | Yes | - | Yes | Indefinite (August 31, 1996) | - |
| | | | Commercial | Yes | - | - | January 1, 2002 (September 29, 2000) | - |
| 10 | Toshiba Corporation | Subscriber Units and Components | Technical | Yes | - | Yes | December 31, 2001 (June 26, 2000) | December 31, 2002 (November 12, 2002) |
| | | | Commercial | Yes | - | - | | |
| 11 | Kenwood Corporation | Subscriber Units and Components | Technical | Yes | - | Yes | Indefinite (June 28, 1998) | - |
| | | | Commercial | Yes | - | - | January 1, 2002 (November 30, 2000) | - |
| 12 | Alps Electronic Co., Ltd. | Subscriber Units and Components | Technical | Yes | - | Yes | January 1, 2002 (November 20, 2001) | - |
| | | | Commercial | Yes | - | - | | |
| 13 | Seiko Instruments Inc. | Subscriber Units and Components | Technical | Yes | - | Yes | Indefinite (January 3, 2000) | - |
| | | | Commercial | Yes | - | - | June 10, 2003 (June 10, 2003) | October 1, 2007 (October 1, 2007) |

[Translation]

| No. | DMSHs | Subject of License, etc. | IPRs | No-Compensation License Provisions, etc. | Non-Assertion Provision against the Respondent, etc. | Non-Assertion Provision against the Licensees | Expiry date of Improvement Period | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | License Agreement (Effective Date) | Amendment thereof (Effective Date) |
| 14 | Denso Corporation | Subscriber Units and Components | Technical | Yes | - | Yes | Indefinite (August 9, 2002) | - |
| | | | Commercial | Yes | - | - | August 9, 2002 (August 9, 2002) | |

(Definition of the terms used in this table)

Subscriber Units: CDMA Subscriber Units

Base Stations: CDMA Base Stations

Components: CDMA Components

Technical: TEIPRs

Commercial: CEIPRs

[Translation]

This is a certified copy.

March 13, 2019

Secretariat of the Japan Fair Trade Commission [seal]

Official of the Cabinet Office, Kinya Enomoto [seal]



## Translation Certification

I, Madoka Murakami, am fluent in the English and Japanese languages and am competent to translate from Japanese into English, and certify that the accompanying translation of the Japan Fair Trade Commission Decision in Case No. 2010 (Han) No. 1 represents an accurate and faithful rendition of the original text to the best of my knowledge and belief.

Madoka Murakami

Sworn to before me this 28th day of March, 2019

_____

Notary Public

State of _FLORIDA_
County of _PALM BEACH_

The foregoing instrument was acknowledged before me this _28_ day of _MARCH_, 20 _19_ by _MADOKA MURAKAMI_.
_✓_ Personally known or ___ produced _____ as identification.

EUGENE SONG
State of Florida-Notary Public
Commission # GG 159523
My Commission Expires
November 13, 2021

8 Richmond Drive
Old Greenwich, CT 06870
(203) 637-4628