1

KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest - # 84065
rvannest@keker.com
Eugene M. Paige - # 202849
epaige@keker.com
Cody S. Harris - #255302
charris@keker.com
Justina Sessions - # 270914
jsessions@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     (415) 391 5400
Facsimile:     (415) 397 7188

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein (pro hac vice)
gbornstein@cravath.com
Yonatan Even (pro hac vice)
yeven@cravath.com
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet (pro hac vice)
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile:  (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Willard K. Tom (pro hac vice)
willard.tom@morganlewis.com
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

MORGAN, LEWIS & BOCKIUS LLP
Geoffrey T. Holtz (SBN 191370)
gholtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

Attorneys for Defendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>Plaintiff,<br><br>vs.<br><br>QUALCOMM INCORPORATED,<br>a Delaware corporation<br><br>Defendant. | Case No. 5:17-cv-00220-LHK<br><br>**DEFENDANT QUALCOMM INCORPORATED'S MOTION FOR STAY PENDING APPEAL**<br><br>Dept.:     Courtroom 8, 4th Floor<br>Judge:    Hon. Lucy H. Koh |

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendant Qualcomm Incorporated shall and hereby does move the Court, pursuant to Rule 62(d) of the Federal Rules of Civil Procedure and Rule 8(a)(1) of the Federal Rules of Appellate Procedure, to stay and suspend its May 21, 2019 Order pending appeal, or, in the alternative, pending a decision by the Ninth Circuit Court of Appeals on a motion for stay pending appeal.  This motion is based on this notice of motion and supporting memorandum and declarations, and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.  Qualcomm also respectfully seeks an expedited hearing on this motion, and is filing a motion to shorten time under Civil Local Rule 6-3(a)(4) alongside this Motion.[1]

## ISSUE TO BE DECIDED

Whether the Court should stay its May 21, 2019 Order pending Qualcomm's appeal of the Order to the Ninth Circuit, or, in the alternative, pending a decision by the Ninth Circuit on a motion for stay pending appeal, which Qualcomm will file within seven days of this Court's ruling on this motion.  *See* Ninth Circuit Rule 27-2.

---

[1] In all quotations contained in this brief, internal citations, punctuation and footnotes have been omitted, and any emphasis was added unless otherwise noted.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On May 21, 2019, the Court issued Findings of Fact and Conclusions of Law (Dkt. 1490, the "Order") that contained an injunction requiring fundamental changes to the way Qualcomm conducts business.  The injunction "will require Qualcomm to renegotiate many [existing] licenses" and to offer exhaustive licenses to Qualcomm's standard-essential patents ("SEPs") for the manufacture of modem chips (Order at 229)—something that neither Qualcomm nor any other major SEP holder does outside the narrow context of cross-licensing arrangements. Accordingly, to comply with the Order, Qualcomm would have to negotiate, re-negotiate and enter into new license agreements with OEMs and with competing chip makers, creating a web of new agreements and business relationships that Qualcomm would not have formed but for the Order.

Qualcomm strongly disagrees with the Court's Order and intends to appeal it.  But any new agreements that Qualcomm is compelled to enter while the appeal is pending would remain effective even if Qualcomm ultimately prevails before the Ninth Circuit.  This would not only irreparably harm Qualcomm, but also would deny Qualcomm its right to effective appellate review.  Moreover, the Order's implications extend far beyond Qualcomm:  by condemning the practice of licensing only complete cellular devices (which all major cellular SEP-holders have employed for decades), the Order threatens to upend the entire wireless communications industry (including the licensing practices of other major SEP holders like Ericsson, Nokia and InterDigital) and undermine incentives to contribute the foundational technology underlying cellular standards and systems.  Accordingly, Qualcomm respectfully asks the Court to stay its Order pending Qualcomm's appeal to the Ninth Circuit.

A stay is warranted for three reasons.  ***First***, as noted above, the harm the Order would cause Qualcomm absent a stay is both obvious and irreparable.  Unless the Order is stayed pending appeal, Qualcomm must immediately begin to change its longstanding licensing and sales practices, renegotiate many of its existing licenses, offer exhaustive licenses to competing chip makers, and begin selling modem chips to unlicensed OEMs that are unwilling to pay

Qualcomm anything for the use of its standards-essential patented technologies.  If the Ninth

Circuit ultimately reverses or narrows the Court's Order, none of those harms will be reversible

or reparable.  After radically restructuring its business relationships, Qualcomm will not be able

to return to its pre-injunction business in an orderly fashion.  Nor will it be able to unwind

licensing agreements it has renegotiated in the shadow of an Order that is later overturned.

(Rogers Decl. ¶ 8.)  And it will not be able to unwind the legal impact of selling modem chips to

unlicensed OEMs, who will claim that such sales exhaust Qualcomm's rights to seek patent

royalties.  (Rogers Decl. ¶ 6.)  Irreparable harms this stark strongly support a stay pending appeal.

   *Second*, the Court's Order raises "serious legal questions" on which Qualcomm has a "fair

prospect of success".  *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011).  Indeed, this

Court noted during trial that "the legal issues" in this case "are complex".  Trial Tr. 2026:4-6.

The Ninth Circuit will doubtless agree.  This case presents serious legal questions concerning the

FTC's power to seek and obtain injunctive relief, the proper standard of proof required for

granting such relief, and the proper scope of any injunction.  Qualcomm understands, of course,

that this Court has formed a view on these issues, as reflected in the Order.  That view

notwithstanding, Qualcomm respectfully submits that the Court's rulings on issues such as the

scope of Qualcomm's FRAND obligations, the proof required to find breach of an antitrust duty

to deal, the viability of the FTC's "tax" (or "surcharge") theory of competitive harm, the FTC's

burden in proving anticompetitive harm and causation, the type and weight of evidence that can

support a finding that patent royalties are "too high", the use of Federal Circuit law on damages-

related evidence to support the Court's conclusion that royalties for worldwide portfolio licensing

are unreasonably high, and the FTC's burden in proving likely recurrence of an antitrust

violation, raise questions that, standing alone, would each suffice to justify a stay.  Taken

together, these questions overwhelmingly require leaving the status quo in place while Qualcomm

pursues its appeal.

   *Third*, staying the injunction pending appeal will not impair the public interest should the

Order be upheld on appeal.  On the contrary, *refusing* to stay the Order will impair that interest.

Competition in the CDMA and "premium" LTE chip markets—and more broadly, the cellular

communications industry as a whole—has been very dynamic, with chip makers entering and expanding share in both the CDMA and premium segments in recent years.  There is no reason to believe that those markets' trajectories will change if the Court stays its Order.  Indeed, Qualcomm's practices have been in place for decades, during which the industry has indisputably thrived; the public interest will not be materially harmed if that conduct is addressed once Qualcomm's appeal is resolved.  And, of course, should Qualcomm prevail on appeal, the public interest will greatly benefit from a stay.  Indeed, Qualcomm believes—and will argue on appeal—that its business model is procompetitive and that its technology forms the foundation of the nation's—and much of the world's— cellular communications infrastructure.  Consequently, a judicial order that impairs the business model that generated the investments necessary to create that technology places the cellular industry as a whole, and the United States' technological leadership in this critical industry specifically, in peril.  As the U.S. Treasury's Committee on Foreign Investment in the United States ("CFIUS") has stated, a threat to Qualcomm's business model and leadership position, which the Order surely represents, creates attendant national security risks.  (Rogers Decl. Ex. A.)  The U.S. Department of Justice has also cautioned that a broad injunction—like the one the Court issued—could "reduce competition and innovation in markets for 5G technology and downstream applications that rely on that technology", thereby harming consumers.  (Dkt. 1487 at 5.)

Put simply, the stakes are high, and the readily foreseeable harms to Qualcomm and the public interest are neither academic nor hypothetical.  By contrast, leaving the status quo in place while Qualcomm pursues its appeal with all due haste would not substantially harm the public interest or competition.  If the Court's Order is affirmed on appeal, then the very same remedies can be implemented to the same effect.  But if the Ninth Circuit reverses or narrows the Court's Order, absent a stay it will be impossible for Qualcomm to resume the relationships it would have maintained absent the Order.  Under such circumstances, the Court should stay its Order pending Qualcomm's appeal—or, at the very least, pending the Ninth Circuit's decision on a stay.

## II.    BACKGROUND

On January 17, 2017, the FTC brought suit against Qualcomm, alleging violations of the

4

1   FTC Act, 15 U.S.C. § 45(a), and seeking permanent injunctive relief.  The FTC argued that

2   Qualcomm was violating Section 5 of the FTC Act by contravening Sections 1 and 2 of the

3   Sherman Act. 15 U.S.C. §§ 1, 2.  Qualcomm moved to dismiss the lawsuit, arguing among other

4   things that the FTC's entire theory of antitrust liability was flawed and legally unsupportable.

5   (Dkt. 69.)  The Court denied that motion.  (Dkt. 134.)  Before trial, Qualcomm sought permission

6   to introduce evidence regarding current market conditions, relating to licensing and competition

7   among chipset suppliers, which post-dated the March 2018 discovery cut-off.  (Dkt. 929, 933.)

8   The Court denied that request and subsequently rejected Qualcomm's offer of proof on that

9   subject.  (Dkt. 997, 1431.)

10          The Court held an 11-day trial that began on January 4, 2019 and concluded on

11  January 29, 2019.  On May 2, 2019, the United States Department of Justice filed a Statement of

12  Interest asking the Court, "in the event that the Court finds liability on any of the FTC's claims,

13  [to] order additional briefing and hold a hearing on issues related to a remedy."  (Dkt. 1487 at 2.)

14  Rejecting that request, the Court issued its Findings of Fact and Conclusions of Law on May 21,

15  2019, along with a Judgment in the FTC's favor.  (Dkt. 1490, 1492.)  The Court issued a broad,

16  five-part injunction:

17          1.     Forbidding Qualcomm from "condition[ing] the supply of modem chips on a

18  customer's patent license status", and requiring Qualcomm to "negotiate or renegotiate license

19  terms with customers in good faith under conditions free from the threat of lack of access to or

20  discriminatory provision of modem chip supply or associated technical support or access to

21  software."  (Order at 227.)

22          2.     Ordering Qualcomm to license its SEPs on an "exhaustive" basis to modem-chip

23  suppliers on fair, reasonable and non-discriminatory ("FRAND") terms, and to "submit, as

24  necessary, to arbitral or judicial dispute resolution to determine such terms".  (Order at 229.)

25          3.     Forbidding Qualcomm from "enter[ing] express or de facto exclusive dealing

26  agreements for the supply of modem chips."  (Order at 230.)

27

28

4. Forbidding Qualcomm from interfering with any customer's ability "to communicate with a government agency about a potential law enforcement or regulatory matter". (Order at 231.)

5. Requiring Qualcomm "to submit to compliance and monitoring procedures for a period of seven (7) years", specifically by making annual reports to the FTC regarding its compliance with the Court's Order.  (Order at 232-33.)

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) vests this Court with broad discretion to stay a judgment granting an injunction pending appeal, and courts take a "flexible approach" to deciding whether a stay is appropriate.  *Leiva-Perez*, 640 F.3d at 966; *see also* Fed. R. Civ. P. 62(d).  The four factors drawn from *Nken v. Holder*, 556 U.S. 418 (2009), as the Ninth Circuit has interpreted and applied them, guide the analysis.  "Courts need not give equal weight to each of the four factors, and courts have used the sliding scale approach to decide motions for stay."  *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 2017 WL 8186903, at *3 (C.D. Cal. June 6, 2017).

First, the movant must show a "probability of irreparable injury if the stay is not granted".  *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012).  In the context of a stay pending appeal, an irreparable injury is one that the movant will likely suffer during the appeal that cannot be redressed by reversing or dissolving the injunction after appeal.  *See Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017).  This factor requires the Court to "anticipate what would happen as a practical matter following the denial of a stay".  *Lair*, 697 F.3d at 1214.  In making this determination, the Court "focus[es] on the individualized nature of irreparable harm and not whether it is categorically irreparable".  *Id.*

Second, the movant must demonstrate a "substantial case for relief on the merits".  *Leiva-Perez*, 640 F.3d at 968.  Importantly, the movant need not show that he is "more likely than not" to prevail on the merits.  *Lair*, 697 F.3d at 1204.  Rather, a stay is merited if the case "raises serious legal questions, or has a . . . fair prospect of success" on appeal.  *Leiva-Perez*, 640 F.3d at 971.  Under the Ninth Circuit's "continuum" or "sliding scale" approach, a "substantial case on the merits" coupled with a showing of likely irreparable harm justifies a stay.  *Id.* at 964, 970.

The third and fourth factors—"assessing how a stay would affect the opposing party and the interest of the public"—merge when the government is the opposing party. *Id*. When the government opposes a stay motion, it "is obliged to bring circumstances concerning the public interest to the attention of the court"; "assumptions and blithe assertions" will not do. *Id*.

## IV. ARGUMENT

All four factors weigh in favor of staying the Court's Order pending the Ninth Circuit's consideration of the issues to be raised on appeal. Qualcomm begins its argument with irreparable injury given the indisputable gravity and irreversibility of the harm the Court's injunction will inflict upon Qualcomm absent a stay. Qualcomm will then address the remaining factors. In addressing these latter factors, Qualcomm will refrain from pointing out its extensive disagreements with the Order, and instead focus—as noted above—on the weight, novelty and significance of some of the complex legal questions this case raises, and on the lack of any meaningful harm to the public interest from a relatively brief stay of the Order pending Qualcomm's appeal, even if the Order is ultimately upheld.

### A. Qualcomm faces irreparable harm absent a stay.

If not stayed, the injunctive relief the Court has ordered will cause Qualcomm irreparable harm that cannot be resolved following a reversal on appeal. Where, as here, a permanent injunction disrupts a settled status quo, a stay is warranted when the injunction could "throw a previously stable system into chaos" and cause "untold, irreversible consequences". *Lair*, 697 F.3d at 1214–15. Here, several forms of irreparable injury are readily and immediately apparent. These harms include: fundamentally disrupting Qualcomm's business; undoing many existing licensing agreements; and forcing Qualcomm to enter into new agreements and make sales of modem chips under a radically reshaped business model—agreements and sales that would likely be impossible to unwind if this judgment is reversed. (Rogers Decl. ¶¶ 5-9.) Any one of these harms suffices to justify a stay pending appeal and, taken together, they overwhelmingly support that relief.

1.    **Absent a stay, the injunction will force Qualcomm to fundamentally change the way it does business.**

There is little question that the Order is intended to require Qualcomm to fundamentally restructure the very nature of its business, ending or changing practices that Qualcomm has employed for decades.  (*See* Order at 227–29.)  "[M]ajor disruption of a business can be as harmful as its termination and thereby constitute irreparable injury."  *Mahroom v. Best W. Int'l, Inc.*, 2009 WL 248262, at *3 (N.D. Cal. Feb. 2, 2009); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (finding irreparable harm where movant showed that an order would "disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone"); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (affirming a stay pending appeal where a business's "current form" would be disrupted absent a stay).

The Court's Order targets the heart of Qualcomm's business structure by ordering Qualcomm to (a) end its practice of selling modem chips only to licensed OEMs, and (b) begin offering exhaustive SEP licenses at the component level.  (Order at 227–29.)  These aspects of the Court's Order would work a fundamental change in the way Qualcomm has operated since it began licensing in the 1990s.  *See* Trial Tr. at 1418:24–1423:19 (Gonell).

If Qualcomm must sell chips to OEMs that become unlicensed while the appeal is pending, then those OEMs will certainly claim that such sales exhaust Qualcomm's rights to seek royalties for its SEPs, creating a significant risk that Qualcomm would not receive the royalties it would have otherwise earned from the use of its patents with respect to such sales.  (Rogers Decl. ¶ 6.)  If the Ninth Circuit reverses or even narrows the Court's Order some months hence, Qualcomm would not then be able to un-sell the modem chips this Court's injunction forced it to sell exhaustively to unlicensed OEMs in the meantime.

Even more fundamentally, Qualcomm does not license its SEPs exhaustively to chip makers.  In the past, Qualcomm only licensed chip makers on a non-exhaustive basis when that was viable under then-current law.  Indeed, the indisputable record evidence is that no other major holder of cellular SEPs licenses exhaustively at the chip level outside of the narrow context

8

of cross licenses.  Thus, Nokia, Ericsson and Interdigital all license only device makers, and
MediaTek, Intel, Broadcom and others have no SEP licenses from any of the major licensors in
the industry.  The evidence shows that Qualcomm—like other SEP holders—believes that
licensing exhaustively only at the device level is significantly more efficient (and therefore better
reflects the fair value of its intellectual property) than exhaustively licensing its patents at
multiple levels of the industry and that the FRAND "contract" does not compel licensing at the
component level so long as there is no denial of access to standardized technology.  While the
Court seemingly disagrees with this conclusion and the sufficiency of this justification for
Qualcomm's business model, Qualcomm should be allowed to test on appeal the Court's
conclusions.  Once Qualcomm restructures its business in response to the Court's Order, it will
not be able to return to the pre-Order status quo if the Ninth Circuit reverses the Court's Order on
this point.  This is a quintessential case calling for a stay pending appeal.

> **2.      Absent a stay, the injunction will disrupt "many" of Qualcomm's licensing agreements.**

The Court has also ordered Qualcomm to "negotiate or renegotiate license terms with
customers"—an injunction that the Order acknowledges "does not merely proscribe future
Qualcomm conduct, and will require Qualcomm to renegotiate many licenses".  (Order at 227-
29.)

When existing contracts will be disrupted pending appeal, a stay is warranted.  *See NCAA
v. Regents of Univ. of Okla.*, 463 U.S. 1311, 1313–14 (1983) (staying, pending appeal, antitrust
injunction that would void network contracts to broadcast college football games).  That is the
precise harm the Order inflicts; the Court-ordered renegotiations will irreparably harm
Qualcomm.  Any renegotiation will be held in the injunction's shadow, enabling licensees to
demand that Qualcomm accept terms it would not otherwise agree to, as the Order expressly
contemplates.  (Rogers Decl. ¶ 7.)  Agreements that will be renegotiated and/or newly entered
into as a result of the Order cannot later simply be unwound, re-renegotiated or abandoned even if
Qualcomm prevails on appeal.  (Rogers Decl. ¶ 8.)  Despite the fact that Qualcomm has
negotiated scores of agreements in the recent past, Qualcomm will not be able to recover the

9

benefit of these recent and other long-standing bargains once they are renegotiated; the renegotiated agreements will stand and the prior agreements will be replaced—even if the Order is reversed on appeal.  Qualcomm's negotiation position going forward will be significantly prejudiced by the Court's statements regarding the facts and the law, and the consequences cannot be remedied if a court of appeal later disagrees.  *See Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996) (granting stay pending review of FCC rules because it would prove "extremely difficult . . . to recreate the atmosphere of free negotiations that would have existed in the absence of" the rules under review).[2]

The exact scope of revenue loss that could flow from the injunction is impossible to determine at this point, as Qualcomm is still assessing the Order's reach.  But licensees undoubtedly will be opportunistic.  That is hardly idle speculation; it is the predictable and likely result of a judicial order holding that many of Qualcomm's licensing agreements are the result of improper conduct.  When the Chinese antitrust authority issued an order requiring Qualcomm to renegotiate, many licensees stopped paying royalties under valid contracts during the renegotiations.  (Rogers Decl. ¶ 9.)  Other licensees may seize on the opportunity to stop payment, even if temporarily.  Expecting just these phenomena, the market dropped Qualcomm's market capitalization by approximately 15% or over $14 billion since the Order was made public.  (Rogers Decl. ¶ 10.)

These are only some of the irreparable harms that flow from the Court's Order. An order resolving a case "of this magnitude", Trial Tr. 2181:25, will have countless other unexpected and unintended effects, which itself justifies a stay pending appeal.  *See Lair*, 697 F.3d at 1214–15. The above-mentioned harms, taken alone or together, support a stay pending appeal, and the Court should grant one.

### B.     The Court's Order raises serious legal questions.

The Court's Order raises serious legal questions, any one of which suffices to justify a

---

[2] For example, given the Court's statement concerning the relevance of certain Federal Circuit law, about which there exists a divergence of views.  *Compare* Order at 172-173 *with* Findings of Fact and Conclusions of Law (ECF No. 538), *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, No. 6:18-cv-00243 (E.D. Tex. May 23, 2019).

1    stay pending appeal.  Although this Court has ruled on each of the following issues, Qualcomm

2    respectfully submits that at least a "fair prospect" exists that the Ninth Circuit will take a different

3    view on one or more of them.  *Leiva-Perez*, 640 F.3d at 971.  These are "serious legal questions",

4    *id.*, relating to:  (1) the Court's power to enter injunctive relief in the absence of any evidence of

5    *current* market power; (2) the viability of the FTC's novel "tax" theory of antitrust liability;

6    (3) whether Qualcomm had an antitrust duty to deal with rival chipmakers; and (4) whether the

7    Court properly applied the rule-of-reason burden-shifting framework in this case.  Although any

8    one of these questions alone supports a stay, taken together they provide more than adequate

9    justification for granting the motion.

10               **1.    The Court's Order raises serious questions regarding the proper legal**
                 **standard for awarding injunctive relief under the FTC Act.**
11

12          Section 13(b) of the FTC Act authorizes the Court to issue permanent injunctive relief

13   only in a "proper case" and upon "proper proof".  15 U.S.C. § 53(b); *see also id.* (authorizing the

14   FTC to seek an injunction against anyone who "is violating, or is about to violate, any provision

15   of law enforced by the [FTC]").  The Court's Order raises serious—and in some instances,

16   novel—questions regarding whether this is a proper case for injunctive relief, what type and

17   quantum of proof is required to support the injunctive relief this Court has ordered, and whether

18   the remedies ordered are narrowly tailored to the harm and the evidence presented.

19          ***First***, the Court's Order presents a straightforward legal question regarding the propriety

20   of issuing an injunction in the absence of any evidence of current market conditions.  (*See* Order

21   at 216 (reaffirming prior holding that the Court need not "consider post-discovery evidence of

22   current market power before issuing an injunction").)  The United States Supreme Court has held

23   that the factfinder in an antitrust action cannot blind itself to the "realities of the market" as they

24   exist "at the time of trial".  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S.

25   209, 236, 243 (1993).  The Ninth Circuit has likewise held that, when it comes to "evaluating

26   monopoly power, it is not market share that counts, but the ability to *maintain* market share",

27   meaning that the Court must consider evidence of market realities right up to the moment the

28   "case c[omes] to trial".  *United States v. Syufy Enters.*, 903 F.2d 659, 665–66 (9th Cir. 1990).

1    Here, however, the FTC presented market shares and expert analysis only through 2016, and the

2    Court limited the record to pre-March 2018 evidence.  Thus, the Court had no evidence or

3    analysis before it regarding Qualcomm's current or recent market shares, nor about Qualcomm's

4    post-March 2018 licensing negotiations—constituting virtually the entirety of Qualcomm's new

5    5G SEP-only licensing program.  Trial Tr. at 1978:17-1979:1, 1980:10-1981:6 (Rogers).

6    Qualcomm submits that was error, and it could hardly be harmless:  the evidence shows that

7    Qualcomm's market share in both of the alleged relevant markets began *falling* in 2015 and

8    declined through 2017.  Trial Tr. at 1718:6–1719:1 (Chipty), 1176:8–1178:12, 2064:2–8

9    (Shapiro).  The record evidence also supports a prediction that Qualcomm's market share would

10   continue falling in 2018 and beyond, with alternative suppliers of CDMA succeeding, especially

11   in China, and Qualcomm's loss of Apple business.  *See* Trial Tr. at 1719:15–1720:5, 1725:18–

12   1726:3 (Chipty), 2064:9–12 (Shapiro).  No record evidence demonstrates that Qualcomm

13   *currently* possesses (or recently possessed) monopoly power or the ability to maintain monopoly

14   power in either a CDMA or "premium" LTE modem chip market, let alone in the sale of 5G

15   modem chips—a segment that was never alleged to constitute a relevant antitrust market, let

16   alone one in which Qualcomm possesses market power.  Qualcomm will argue on appeal that the

17   absence of such evidence precludes any injunctive relief to the FTC.

18        ***Second***, the Court's Order acknowledges that for the FTC to be entitled to an injunction, it

19   must prove that a past violation is "likely to recur".  (Order at 216 (citing *Fed. Trade Comm'n v.*

20   *Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985).)  To meet this burden, however, the

21   Court found that the FTC needed to show only that certain alleged *conduct* was likely to continue

22   in the future, without a concurrent need to prove future market power and anticompetitive harm.

23   (Order at 216.)  Qualcomm submits this is error.  In this Circuit, the question is whether the

24   "alleged *violations* have completely ceased", and whether those violations "are likely to recur".

25   *Evans Prods.*, 775 F.2d. at 1088; *see also* 15 U.S.C. § 53(b) (authorizing the FTC to seek an

26   injunction against anyone who "is violating, or is about to violate, any provision of law enforced

27   by the [FTC]").  Critically, under the rule of reason (which applies here), a firm's unilateral

28   conduct cannot constitute an antitrust "violation" absent market power and resulting

anticompetitive harm.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (in the absence of direct anticompetitive effects, not alleged here, "[i]ndirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition").  It is therefore not enough for the FTC to prove that certain *conduct* is ongoing or likely to recur.  If that conduct had no anticompetitive effects in the market—because, for example, the entity engaging in those actions lacked market power—then there would be no antitrust *violation* to enjoin.  This point is particularly salient here, given that the FTC acknowledged that Qualcomm's licensing policies persisted for decades across all modem chip markets, yet it never even *alleged* that Qualcomm gained or ever had monopoly power in several chip markets (*e.g.*, WCDMA and non-premium LTE chips).

Nor is injunctive relief appropriate based on the mere risk that Qualcomm's practices could affect a purportedly nascent 5G chip market.  The FTC has never defined a 5G chip market, and for good reason—such market did not exist at the time of trial and the uptake of 5G-enabled devices is a small fraction of the overall handset market.  Moreover, this is, and has always been, a monopoly *maintenance* case.  (*See* Order at 204 ("[T]he Court need only conclude that Qualcomm's conduct made a significant contribution to Qualcomm's *maintenance* of monopoly power.").)  Yet, when it comes to 5G, the Court transforms the case into one about monopoly acquisition—an antitrust violation nowhere alleged and for which no evidence was provided.[3] (*See* Order at 221.)  Qualcomm contends that was error.

A recent Third Circuit opinion underscores both the seriousness of this question and Qualcomm's likelihood of prevailing on it.  In *FTC v. ShireViroPharma, Inc.*, the FTC argued that Shire's past conduct in certain monopolized markets justified enjoining Shire from engaging in the same conduct in some other, future market.  917 F.3d 147, 159 (3d Cir. 2019).  Rejecting that argument, the Third Circuit concluded that because the FTC Act's plain text requires proof that "a *violation* of the law 'is' occurring or 'is about to' occur", an injunction may not issue based merely on past conduct and the opportunity to affect a future market.  *Id.*  Yet the FTC

---

[3] Indeed, there is no evidence whatsoever in the record as to what a supra-FRAND rate would be for 5G, and no expert undertook such an effort to define such a rate.

1   made precisely that argument here; it suggested—without any proof—that Qualcomm's

2   challenged licensing practices were "likely to harm competition in 5G"—a nascent segment that

3   has not been defined as a relevant market and that doesn't even exist yet.  *See* Trial Tr. 2102:13–

4   15.  The Court accepted the FTC's argument, finding that "Qualcomm is likely to replicate its

5   market dominance during the transition to 5G."  (Order at 221.)  That alleged risk provides no

6   basis for injunctive relief, especially when the FTC's own economic expert disclaimed the ability

7   to reliably analyze the 5G market.  Trial Tr. at 1180:13–1182:6 (Shapiro).

8          ***Third***, the Court's Order raises an unsettled but important question regarding how to

9   harmonize the FTC Act's standards for injunctive relief with the Supreme Court's holding

10  regarding permanent injunctions in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)

11  (holding that a plaintiff seeking an injunction must satisfy the traditional four-factor test for

12  equitable relief).  While the Court is correct that Qualcomm did not cite an FTC Act case

13  addressing this issue (Order at 217), the FTC has cited no case relieving it of the necessity of

14  satisfying the traditional factors in light of *eBay*.  The *eBay* Court made clear that "a major

15  departure from the long tradition of equity practice should not be lightly implied" and courts must

16  exercise their discretion "consistent with traditional principles of equity" unless Congress has

17  indicated otherwise.  547 U.S. at 391, 394.  If the Ninth Circuit ultimately holds that the

18  traditional four factors apply to the FTC Act, this could have a major effect on the Court's Order;

19  the FTC failed to even acknowledge any burden under the four-factor test and failed to offer any

20  evidence of—let alone prove—irreparable harm absent an injunction or that the balance of

21  hardships favors the injunction it sought.

22              **2.      The Court's Order raises serious questions regarding the FTC's novel
                  and unprecedented "tax" or "surcharge" theory of antitrust liability.**
23

24         Another serious question concerns whether the FTC's novel "tax" theory—which

25  undergirds the entire case, but which the Order addresses in only three pages—is a viable antitrust

26  theory and, even if it is, whether the FTC met its burden of proof on the theory and its effects.

27         The Order makes short shrift of this theory, relying not on the FTC's expert economist

28  (Prof. Shapiro), but instead on its own interpretation of case law and an economics textbook to

conclude that "Qualcomm has 'raised its rivals' costs, and thereby raised the market price to its own advantage." (Order at 184-185.)  But even if Qualcomm's conduct could be viewed this way (despite the fact that Qualcomm does *not* charge any royalty to its rivals, and thus does not directly affect their costs), this hardly shows competitive harm.  The Order does not contain any findings as to the magnitude of the surcharge Qualcomm supposedly imposed on OEMs, let alone of what portion of that surcharge supposedly was absorbed by competing chip makers.  And for good reason:  Mr. Lasinski, the FTC's sole expert on valuation of Qualcomm's FRAND rate, employed methodologies that the Court found unreliable.  (Order at 182.)  And Prof. Shapiro, the FTC expert charged with explaining the effects of the supposed royalty surcharge on competitors, admitted that he had done nothing to assess the magnitude of the surcharge, to assess which entities absorb what portion of it, or to evaluate whether, in fact, the alleged surcharge impeded rivals in their efforts to compete by causing them to spend less on research and development or by affecting their pricing, sales or share of any market.  Trial Tr. at 1210:9-16, 1205:18-1206:9 (Shapiro).  Absent expert testimony, the court simply relied on anecdotal evidence and generalized conclusions regarding appropriate royalties.  A stay in light of these circumstances is particularly salient here because Qualcomm is aware of no court that has found antitrust liability based on such a complex causal theory of anticompetitive harm, and the novelty of the FTC's theory weighs in favor of a stay—especially in a dynamic and innovative industry, where the erroneous over-enforcement of the antitrust laws can have massive and negative effects.  *See, e.g.*, *Pac. Bell Telephone Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 451-52 (2009) (stating that "[w]e have repeatedly emphasized the importance of clear rules in antitrust law" and firms have "no obligation to deal under terms and conditions favorable to its competitors"); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 235 (1st Cir. 1983) (Breyer, J.); *Novell Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.).

3.      **The Court's Order raises serious legal questions regarding an antitrust duty to deal in the standards-setting context.**

The Court's Order also raises serious and novel questions regarding the existence of a duty to deal in the standards-setting context and its application in this case.  (*See* Order at 134–

37.)  One court in this district has concluded that the "refusal to deal doctrine of antitrust is wholly inapplicable in the standards arena". *Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 340 F. Supp. 3d 934, 951 (N.D. Cal. 2018).  The United States Department of Justice has taken the same view.  *See* Assistant Attorney General Makan Delrahim Remarks at the IAM Patent Licensing Conference (September 18, 2018) ("An antitrust duty to license on FRAND terms would also contravene the patent laws' policy of promoting innovation by offering incentives for holders of valid patents to seek the greatest rewards possible for their inventions."). In finding that Qualcomm has an antitrust duty to exhaustively license its SEPs to rival chipmakers, this Court has created an intra-district split that the Ninth Circuit should resolve. A stay is sensible under such circumstances.

In addition, by concluding that Qualcomm has an antitrust duty to license SEPs to its rivals, the Court has entered a thicket of complicated and highly contestable law regarding when a court might properly apply an "exception to the general 'no duty-to-deal' rule". *MetroNet Svcs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004).  Because *Aspen Skiing*, the case on which the Court relies in this context, lies "at or near the outer boundary of § 2 liability", *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 409 (2004), the Ninth Circuit has previously warned courts to exercise "considerable caution in recognizing exceptions to th[e] broad principle" that a business has the right to decide with whom it will deal and on what terms. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016).  The Tenth Circuit has similarly adopted a stringent duty-to-deal standard under Section 2 of the Sherman Act, holding that so long as the refusal to deal serves a legitimate business purpose, such as an increase in revenues, it cannot give rise to antitrust liability.  *Novell*, 731 F.3d at 1075 (Gorsuch, J.).  Both the United States Department of Justice and the FTC itself have taken similar positions. *See* Br. of the United States as Amicus Curiae at 6, *Viamedia, Inc. v. Comcast Corp.*, No. 18-2852 (7th Cir. Nov. 8, 2018) (arguing that a refusal to deal violates Section 2 only if "it *would make no economic sense* for the defendant but for its tendency to eliminate or lessen competition"); Br. for the United States and the FTC as Amici Curiae Supporting Petitioner at 15, *Trinko*, 540 U.S. 398 (2004) (No. 02-682) ("[C]onduct is not exclusionary or predatory *unless* it would make no

1   economic sense for the defendant but for its tendency to eliminate or lessen competition.")

2   (emphasis in original).

3          Here, the undisputed evidence demonstrated that Qualcomm has legitimate business

4   reasons for exhaustively licensing only at the device level, most notably its belief that such a

5   licensing structure enables the success of Qualcomm's *licensing* business, not to obtain or

6   entrench any chip monopoly.  *See, e.g.*, Trial Tr. at 805:7–15 (Mollenkopf), 1339:15–22 &

7   1439:15–23 (Gonell).[4]  Because it makes economic sense for Qualcomm to engage exclusively in

8   exhaustively licensing at the device level, regardless of the supposed effect of such licensing on

9   competing chip makers, this case "does not fit within the limited exception [*Aspen Skiing*]

10  recognized" to the general no-duty-to-deal rule—a proposition with which there is a fair prospect

11  that the Ninth Circuit will agree.  *'Trinko*, 540 U.S. at 409; *see also Aerotec*, 836 F.3d at 1184.

12         What's more, the Court's other findings in this context likewise lack factual support.  For

13  example, the Court found that Qualcomm terminated "a voluntary and profitable course of

14  conduct" with "anticompetitive malice".  (Order at 137 (citing *MetroNet Svcs. Corp.*, 383 F.3d at

15  1132).)  Even if that were the correct test, the undisputed evidence confirms that Qualcomm never

16  *exhaustively* licensed its SEPs at the chip level, and instead followed the widespread and

17  consistent industry practice of licensing its patents at the device level.  *See, e.g.*, Trial Tr. 355:15–

18  22 (Moynihan); 992:15–19 (Donaldson); 1432:12–15, 1436:3–8 (Gonell); 1670:14–1674:17

19  (Weiler).  Taking the contrary view, the Court pointed to evidence that Qualcomm offered

20  "limited"—non-exhaustive—licenses to chipmakers as far back as 1999 (at the birth of the

21  cellular communications industry).  (*See* Order at 127.)  A history of offering limited non-

22  exhaustive rights is a far cry from establishing a profitable course of conduct in which Qualcomm

23

24

25

---

26  [4] Qualcomm has argued that, absent a duty to deal, the Supreme Court's opinion in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009), foreclosed the FTC's

27  liability theory that Qualcomm "squeezed" its rivals' margins by raising its royalties and lowering its chip prices—the very "raising rivals' cost" theory the Order adopted. Qualcomm will not

28  repeat those arguments here, as the Order does not address them.

1   *exhaustively* licensed its SEPs at the component level.[5]   It is well known in the industry that the

2   former practice does *not* involve the same inefficiencies and difficulties as exhaustively licensing

3   at multiple points in the value chain.   (*E.g.*, Petersson Dep. at 37:5-38:12.)   In short, the evidence

4   adduced at trial fails to give rise to an antitrust duty to deal, and Qualcomm has a fair prospect of

5   persuading the Ninth Circuit to so hold.

6                    **4.      The Court's Order raises serious questions regarding the correct
                               application of the rule-of-reason burden-shifting framework.**

7            This is a rule of reason case.   (*See* Order at 20.)   That means that the FTC had "the initial

8   burden to prove that the challenged restraint *has a substantial anticompetitive effect*" in the

9   relevant market.   *Am. Express Co.*, 138 S. Ct. at 2284.   The FTC staked its case on proving that

10  Qualcomm had set up "roadblocks" that "slow[ed] its competitors down" or "made it hard for

11  rivals to catch up".   Trial Tr. 2102:8–12, 2109:21–2110:1, 2134:21-2135:2, 2178:8–10.   But a

12  company (even one holding monopoly power) "has no general duty to help its competitors" by

13  "pulling its competitive punches".   *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d

14  370, 375 (7th Cir. 1986); *see also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547

15  (9th Cir. 1991) ("A monopolist, no less than any other competitor, is permitted and indeed

16  encouraged to compete aggressively on the merits.").   Accordingly, even accepting the Court's

17  conclusions that Qualcomm structured its business practices to maximize licensing revenues (*e.g.*,

18  Order at 128, 139), those conclusions cannot substitute for evidence that those practices harmed

19  competition in any relevant *chip* market.

20           The FTC could have met its burden in any number of ways (had the evidence allowed it).

21  Citing *American Express*, the Order correctly notes that the FTC could have met its initial burden

22  through "direct" or "indirect" evidence.   (Order at 41.)   Direct evidence would have been a

23  showing that Qualcomm's conduct resulted in "reduced output, increased prices, or decreased

24  quality in the relevant market", *Am. Express Co.*, 138 S. Ct. at 2284.   None of that happened, of

---

[5] As to 5G SEPs, the Court has *no evidence* as to the scope of the FRAND commitments that Qualcomm has made (*e.g.*, whether Qualcomm has made any FRAND commitments to ATIS or TIA) or the applicable standards organizations' IPR policies, and thus to the extent the Order applies to 5G SEPs, it is a naked compulsory license based on the Court's antitrust duty to deal theory.

1  course:  the evidence at trial showed that, in the relevant markets, prices are lower, output is

2  higher, the industry is "characterized by dynamic competition in a rapidly changing marketplace",

3  the pace of innovation is "rapid", uplink and downlink speeds have "increased dramatically", and

4  "annual mobile data traffic … increased by a factor of 14" from 2011 to 2016.  Trial Tr. 1695:20–

5  1696:7 (Chipty); 1797:6–1800:23 (Snyder); 2031:16–24, 2062:20–2064:23 (Shapiro).  These

6  undisputed facts strongly undercut any assertion of anticompetitive harm.  *Am. Express Co.*, 138

7  S. Ct. at 2289 (finding no anticompetitive effects where the "credit-card market experienced

8  expanding output and improved quality" despite the challenged conduct).

9       Nor did the FTC present any other direct evidence of actual anticompetitive effects.

10  Although the FTC feinted at an argument that Qualcomm's licensing practices somehow

11  prevented rival chipmakers from investing in R&D or innovating, the Ninth Circuit has never

12  accepted such a theory of anticompetitive harm, and in any event, no evidence supports it.  Rival

13  chipmakers are and have been free to invest and innovate to their hearts' content—the evidence at

14  trial revealed that, historically, they failed to do so as efficiently or as effectively as Qualcomm.

15  For example, Martin Zander of ST-Ericsson testified that:  (a) his company's inefficiency had

16  nothing to do with Qualcomm ("lack of processes, organizational structure, the management

17  team, the decision-making"); (b) resource availability was "not [a] major issue" contributing to

18  ST-Ericsson's failures; and (c) making "additional investments" in the company would have been

19  *counter*productive.  Zander Dep. Tr. at 171:18-172:11 (ECF No. 1372-07 at 3); *see also, e.g.*,

20  QX0092 at Intel-QCOM007957508; QX0123A at 2; Trial Tr. 601:22–602:7 (Evans), 1846:7–17

21  (Johnson).

22       That left the Court with the indirect evidence standard—"proof of market power plus

23  some evidence that the challenged restraint harms competition".  *Am. Express*, 138 S. Ct. at 2284.

24  Nothing in that standard relieves the FTC of its burden to point to actual competitive harm.

25       The Court held that it "may infer causation where a defendant has maintained monopoly

26  power and the defendant's anticompetitive conduct 'reasonably appears capable' of maintaining

27  monopoly power".  (Order at 43.)  The Court then concluded that "Qualcomm's unreasonably

28  high royalty rates impose an artificial and anticompetitive surcharge on the price of rivals'

modem chips".  (Order at 45.)  Even assuming the correctness of the Court's conclusion regarding Qualcomm's royalty rates (with which Qualcomm disagrees), Qualcomm submits that the Court impermissibly relieved the FTC of its burden to show that high royalty rates have exclusionary effect in any relevant chip market.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008) (holding that conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim" and that price-raising conduct "normally has no particular tendency to exclude rivals and thus to diminish competition").  Further, the Court's conclusion conflicts with the Supreme Court's instruction that the Court determine whether Qualcomm's success is the result of exclusionary conduct "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident".  *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  Indeed, Qualcomm submits that applying this standard here is particularly problematic given the indisputable and undisputed evidence that Qualcomm repeatedly offered the best modem chips in the market.  Trial Tr. at 1192:8-1193:9 (Shapiro).

The Court's Order thus raises a serious question regarding the proper interpretation and application of the rule-of-reason burden-shifting framework.  That question, whose answer is foundational to the Court's ruling, justifies a stay pending the Ninth Circuit's review.

**C.    Even if the Order is upheld, a stay will neither cause substantial harm nor meaningfully impair the public interest.**

In contrast to the irreparable harm Qualcomm will suffer absent a stay, a stay of the injunction pending appeal will neither cause significant injury nor meaningfully impair the public interest, even accepting the Court's findings as true.  On the contrary, a stay would promote the public interest while allowing effective appellate review.

**1.    A stay will not substantially harm competition.**

Even accepting all of the Court's findings as true, a stay will not substantially harm competition.  The enjoined practices have been in place for decades, have been used in markets that the FTC never asserted were monopolized, and have not prevented the phenomenal success of the cellular industry.  This is not a case in which the FTC sought an injunction to address a recent event or change that is having immediate and meaningful effects on the relevant markets.

1    In fact, the Court's opinion is based in many places on evidence that is more than one, and in

2    some instances two decades old.  Rather, the injunction seeks to fundamentally change a stable

3    status quo that (even accepting the Court's findings) has not meaningfully impeded the growth of

4    an industry that all parties agree is now dynamic and robust, and that Qualcomm submits has in

5    fact promoted the industry's success.  *See* Trial Tr. 343:10–24 (Moynihan), 1695:20–23 (Chipty),

6    1179:21–1180:6 (Shapiro).  Competition in both the CDMA and "premium" LTE chip markets

7    has grown in recent years, and the FTC offered no evidence suggesting this trend would change if

8    the injunction is stayed pending an appeal.  *See* Trial Tr. 1718:6–1720:16, 1724:21–1726:3

9    (Chipty); 1176:21–1177:24 (Shapiro).

10        Nor will a stay harm rival chipmakers.  These companies have never received exhaustive

11   licenses from Qualcomm (or any other cellular SEP-holders, for that matter).  *See*, *e.g.*, Trial

12   Tr. 360:22–361:19 (Moynihan); McElvaine Dep. at 30:19-31:15; Petersson Dep. at 42:25–44:2.

13   Moreover, consistent with its commitments to the Taiwanese government and as agreed with

14   Samsung in early 2018, Qualcomm's current practice with respect to chip competitors is to

15   provide written assurances to chipmakers (when asked) that it would refrain from asserting its

16   cellular SEPs against a rival chip manufacturer without first offering the competitor an exhaustive

17   FRAND license.  Trial Tr. at 1988:22–1989:10 (Rogers).  An order that compels Qualcomm to

18   assert patents against rivals is an order that compels imposing costs directly on rivals and,

19   effectively, creates the probability of litigation and disruption.  But, Qualcomm's chip rivals are

20   and will remain free to compete on the merits for modem chip sales if the injunction is stayed.  In

21   fact, chipmakers have competed aggressively in the CDMA and "premium" LTE chip markets, as

22   well as in other chip markets where the FTC neither alleged nor proved that Qualcomm ever held

23   monopoly power.  Competition likely will be fierce also in the nascent 5G chip arena:  all of

24   Qualcomm's major competitors—including MediaTek, Samsung and Huawei—have developed

25   or announced 5G products.  Trial Tr. 348:15–19 (Moynihan); 839:5–840:23 (Mollenkopf);

26   2015:24–2016:4 (Rogers).  Should the Order be upheld, a stay pending a prompt appeal of the

27   Order will have little or no effect on those efforts.

28

## 2.    A stay will not materially harm the public interest.

The current competitive conditions discussed above make clear that a stay also will not materially harm the public interest, even if the Court's findings are accepted as true.  The risk of anticompetitive effects absent a stay is minimal.  This fact alone meets the bar for issuing a stay in light of the irreparable harm Qualcomm will undoubtedly suffer and the serious questions of law that Qualcomm will raise on appeal.  *See Leiva-Perez*, 640 F.3d at 970.

And, of course, if Qualcomm prevails on its appeal, a stay will greatly *benefit* the public interest.  As the United States' flagship cellular technology company, Qualcomm is crucial to our nation's efforts to maintain and advance American leadership in the development of cellular systems and 5G standard-setting, and to protect our national security when it comes to the cellular technology that will permeate and undergird the world's economic, communications and information systems.  These national security interests strongly favor a stay.  Indeed, the Supreme Court has recognized the immense public interest attendant in national security concerns, which can outweigh other *eBay* factors.  *Winter v. N.R.D.C.*, 555 U.S. 7, 23–25 (2008); *see also Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 994 (9th Cir. 2009) (noting *Winter* held "that the public interest in national security defeated [the requested] injunction").

The United States government has articulated this public interest, not Qualcomm.  The head of the National Telecommunications and Information Administration has identified 5G leadership as critical for the U.S. economy and national security.[6]  And the U.S. Treasury's Committee on Foreign Investment in the United States ("CFIUS") has specifically identified Qualcomm as being vital "to the national security of the United States" because of Qualcomm's 5G leadership.  (Rogers Decl. ¶ 11, Ex. A (CFIUS March 5, 2018 Letter at 1–2).)

In sum, the benefits of staying the injunction pending appeal outweigh any conceivable harms from issuing a stay.  We respectfully urge the Court to favor the public interest by allowing Qualcomm an effective appeal, by not risking grave and irreparable harms that Qualcomm will

---

[6] *See* Remarks of David J. Redl, Assistant Sec'y of Commerce for Commc'ns and Information, CTIA's Race to 5G Summit (Apr. 19, 2018), https://tinyurl.com/y4ja7oqn; Remarks of David J. Redl, White House 5G Summit (Sep. 28, 2018), https://tinyurl.com/y5gmf6vz.

1   suffer absent a stay, and by recognizing the serious questions of law that will be raised on appeal.

2   **V.      CONCLUSION**

3            For the foregoing reasons, the Court should stay the May 21, 2019 Order pending appeal.

4   If the Court is disinclined to stay its Order, however, then Qualcomm requests in the alternative

5   that the Court stay its Order pending the Ninth Circuit's ruling on a motion for stay pending

6   appeal.  *See* Fed. R. App. P. 8(a)(2).  Consistent with Ninth Circuit Rule 27-2, Qualcomm would

7   seek a stay from the Ninth Circuit within seven days of the Court's ruling on this Motion.

8

9                                         Respectfully submitted,

10   Dated:  May 28, 2019                  CRAVATH, SWAINE & MOORE LLP

11

12                                         *s/ Gary A. Bornstein*
                                           Gary A. Bornstein
13                                         Yonatan Even
                                              Worldwide Plaza
14                                              825 Eighth Avenue
                                              New York, NY 10019-7475
15                                              Telephone: (212) 474-1000
                                              Facsimile: (212) 474-3700
16                                                gbornstein@cravath.com
                                                  yeven@cravath.com
17
                                           Robert A. Van Nest
18                                         Eugene M. Paige
                                           Cody S. Harris
19                                         Justina Sessions
                                           KEKER, VAN NEST & PETERS LLP
20                                            633 Battery Street
                                              San Francisco, CA 94111-1809
21                                              Telephone:  (415) 676-2289
                                              Facsimile:  (415) 397-7188
22                                                rvannest@keker.com
                                                  epaige@keker.com
23                                                charris@keker.com
                                                  jsessions@keker.com
24
                                           Richard S. Taffet
25                                         MORGAN, LEWIS & BOCKIUS LLP
                                              101 Park Avenue
26                                              New York, NY 10178-0060
                                                Telephone:  (212) 369-6000
27                                              Facsimile:  (212) 309-6001
                                                  richard.taffet@morganlewis.com
28

                                           23

1

2

3

4

Willard K. Tom
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Telephone:  (202) 739-3000
Facsimile:  (202) 739 3001
willard.tom@morganlewis.com

5

6

7

8

Geoffrey T. Holtz
MORGAN, LEWIS & BOCKIUS LLP
One Market Plaza, Spear Street Tower
San Francisco, CA 94105-1596
Telephone:  (415) 442-1000
Facsimile:  (415) 442-1001
gholtz@morganlewis.com

9

*Attorneys for Qualcomm Incorporated*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR STAY PENDING APPEAL
Case No. 5:17-cv-00220-LHK