KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest (SBN 84065)
rvannest@keker.com
Eugene M. Paige (SBN 202849)
epaige@keker.com
Cody S. Harris (SBN 255302)
charris@keker.com
Justina Sessions (SBN 270914)
jsessions@keker.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:  (415) 391-5400
Facsimile:   (415) 397-7188

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein *(pro hac vice)*
gbornstein@cravath.com
Yonatan Even *(pro hac vice)*
yeven@cravath.com
825 Eighth Avenue
New York, NY  10019-7475
Telephone:  (212) 474-1000
Facsimile:   (212) 474-3700

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet *(pro hac vice)*
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY  10178-0060
Telephone:  (212) 309-6000
Facsimile:   (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Willard K. Tom *(pro hac vice)*
willard.tom@morganlewis.com
1111 Pennsylvania Avenue, NW
Washington, DC  20004-2541
Telephone:  (202) 739-3000
Facsimile:   (202) 739-3001

MORGAN, LEWIS & BOCKIUS LLP
Geoffrey T. Holtz (SBN 191370)
gholtz@morganlewis.com
One Market Plaza, Spear Street Tower
San Francisco, CA  94105-1596
Telephone:  (415) 442-1000
Facsimile:   (415) 442-1001

Attorneys for Defendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware Corporation,<br><br>Defendant. | Case No. 5:17-cv-00220-LHK-NMC<br><br>**DECLARATION OF ALEX ROGERS IN SUPPORT OF MOTION TO STAY**<br><br>Dept:    Courtroom 8, 4th Floor<br>Judge:  Hon. Lucy H. Koh<br><br>Date Filed: January 17, 2017<br><br>Trial Date: January 4, 2019 |

## DECLARATION OF ALEX ROGERS

I, Alex Rogers, declare and state that:

1. I am President of Qualcomm Technology Licensing ("QTL"), an operating segment of Defendant Qualcomm Incorporated ("Qualcomm"). I submit this declaration in support of Qualcomm's Motion to Stay. I have personal knowledge of the facts set forth herein. If called upon as a witness in this action, I could and would testify competently thereto.

2. I am responsible for the general management of Qualcomm's intellectual property licensing business. In addition to my general management and oversight responsibilities, I have personally participated in intellectual property licensing negotiations on behalf of Qualcomm.

3. I have reviewed the Court's Findings of Fact and Conclusions of Law ("Order") and Judgment issued on May 21, 2019.

4. Qualcomm has been licensing for approximately three decades. The Court's Order requires Qualcomm to license its intellectual property in a way that it has not done before: exhaustively licensing Qualcomm's cellular standard-essential patents ("SEPs") for the purpose of making and selling components such as cellular modem chips.

5. Should the Court's Order not be stayed, Qualcomm could be required to enter into a number of new licenses that would differ significantly from the licenses entered into by Qualcomm in the past, as well as from those entered into by the other major cellular SEP holders of which I am aware. Compelling exhaustive licensing of cellular standard essential patents at the component level will create a multi-level licensing regime in which Qualcomm and other cellular SEP holders need to license some patents to component makers and other patents to handset makers. Significant inefficiencies and hurdles to concluding license agreements will result. Component makers will contend that only certain SEPs, and even certain claims within particular patents, are practiced at the component level and, therefore, a component supplier need only license a subset of SEP claims while OEMs (e.g., handset makers) are responsible for the remainder. OEMs will contend that all or nearly all cellular SEP claims are practiced or exhausted at the component level and that Qualcomm must, under this Order, first license at the component level. Such circumstances will cause delay and disagreement among multiple parties

as Qualcomm seeks to license the same portfolio of patents on an exhaustive basis to participants on different levels of the supply chain. Delays, inefficiencies and disputes will undermine Qualcomm's ability to obtain fair value for its intellectual property relating to cellular standards.

6. The Order also requires Qualcomm to sell modem chips to OEMs that are or become unlicensed. If Qualcomm is forced to sell modem chips to unlicensed OEMs while the Order is reviewed on appeal, those unlicensed OEMs will claim that such sales exhaust Qualcomm's right to seek royalties for Qualcomm's handset-level and system-level innovation reflected in its cellular SEPs. Qualcomm will not be able to unwind such sales, even if the Order is modified or reversed on appeal.

7. The Court also ordered Qualcomm to "negotiate or renegotiate license terms with customers"—an injunction that "does not merely proscribe future Qualcomm conduct, and will require Qualcomm to renegotiate many licenses." Order at 229. Renegotiation of Qualcomm's license agreements would be a very significant undertaking. Any renegotiation of Qualcomm's existing licenses would be held in the injunction's shadow, including the Court's findings and conclusions that are stated in the Order but subject to appeal. This means that Qualcomm will be faced with demands that it accept licensing terms that it would not otherwise accede to if the Court's view of the facts or the law were deemed incorrect and the Order overturned by a court of appeals.

8. It would be extremely difficult, if not impossible, to unwind new license agreements that Qualcomm was required to negotiate in the shadow of the injunction and Order, even if the injunction and Order are overturned or modified on appeal. Qualcomm's license agreements typically last for terms of five years or more. Once Qualcomm enters into new multi-year agreements following this Order, simply reverting back to the prior agreements is not realistic. Qualcomm will likely have to wait years to negotiate new agreements, and licenses entered into pursuant to the Order and injunction will remain in place even if they contain unfavorable terms that would not have otherwise occurred but for the Order.

9. I am personally aware of situations in which licensees have stopped royalty payments to Qualcomm based on prior events similar to this Order. For example, when the Chinese National

Development and Reform Commission ("NDRC") issued an order requiring Qualcomm to renegotiate licenses that included Chinese patents and were for devices made and sold for use in China, significant licensees stopped paying royalties while they renegotiated agreements.

10. I am generally aware of Qualcomm's market capitalization. Qualcomm's market capitalization has dropped approximately 15% (roughly $14 billion) following the Order in just a few trading days following its issuance.

11. Attached hereto as Exhibit A is a true and correct copy of a letter from the Committee on Foreign Investment in the United States, which reflects the judgment of that Committee that a reduction in the amount of R&D spending on the technology developed by Qualcomm and in Qualcomm's influence on standard-setting could be detrimental "to the national security of the United States."

12. For the reasons stated above, should the injunction and Order motivate licensees to stop paying, as has happened in the past, should a multi-level licensing regime undermine Qualcomm's ability to efficiently and effectively license its intellectual property, or should the factual and legal conclusions set out in the Order undermine Qualcomm's ability to negotiate or renegotiate agreements for fair value of its intellectual property, then Qualcomm's ability to conduct fundamental research and development underlying cellular technology in the 5G era will be impaired.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28th day of May, 2019, in San Diego, California.

By: /s/ Alex Rogers
Alex Rogers