1    Jennifer Milici, D.C. Bar No. 987096
     Joseph R. Baker, D.C. Bar No. 490802
2    Geoffrey M. Green, D.C. Bar No. 428392
     Rajesh S. James, N.Y. Bar No. 4209367
3    Daniel Matheson, D.C. Bar No. 502490
     Kenneth H. Merber, D.C. Bar No. 985703
4    Mark J. Woodward, D.C. Bar. No. 479537
     Federal Trade Commission
5    600 Pennsylvania Avenue, N.W.
     Washington, D.C. 20580
6    (202) 326-3695; (202) 326-3496 (fax)
     *jmilici@ftc.gov*

7

   *Attorneys for Plaintiff Federal Trade Commission*

8

9

## UNITED STATES DISTRICT COURT

10

## NORTHERN DISTRICT OF CALIFORNIA

11

## SAN JOSE DIVISION

12

| | |
|---|---|
| 13    FEDERAL TRADE COMMISSION,<br>           Plaintiff | Case No. 5:17-cv-00220-LHK |
| 14 | **FEDERAL TRADE COMMISSION'S** |
| | **OPPOSITION TO QUALCOMM** |
| 15        v. | **INCORPORATED'S MOTION FOR STAY** |
| | **PENDING APPEAL** |
| 16 | |
| 17    QUALCOMM INCORPORATED, a Delaware<br>   Corporation, | |
| 18                Defendant. | Courtroom:   8, 4th Floor<br>Judge:        Hon. Lucy H. Koh |

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................2

III. LEGAL STANDARD.........................................................................................3

IV.  ARGUMENT......................................................................................................4

    A.  Qualcomm fails to show irreparable harm..................................................4

        1.  Qualcomm fails to show irreparable harm arising
           from cessation of its no license, no chips policy. ..............................5

        2.  Qualcomm fails to show irreparable harm from making licenses
           to its SEPs available to its modem-chip competitors on FRAND terms. .....................6

        3.  Qualcomm's claim of irreparable harm suffers additional, fatal flaws. .......................7

    B.  Prompt enforcement of the Court's order is in the public interest.......................8

    C.  Qualcomm fails to show a strong likelihood of success on appeal..................11

        1.  Qualcomm's arguments on irreparable harm undermine its arguments
           on the merits of its appeal. ..............................................................11

        2.  Qualcomm challenges rulings of the Court that are owed considerable
           deference on appeal...........................................................................12

        3.  Qualcomm fails to identify any conclusion of law that the appeals
           court is likely to reverse. ..................................................................13

V.   CONCLUSION..................................................................................................16

i

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

# TABLE OF AUTHORITIES

## Cases

*Allied Tube v. Indian Head, Inc.*, 486 U.S. 492 (1988) ................................................. 15

*Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901 (N.D. Ill. 2012) ............................. 6

*Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) .................... 6

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ...................... 14, 15

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) .................... 13

*Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244 (D. Utah 1999) .................................... 14

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) ............................... 14

*Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) .................................... 14

*FTC v. Publ'g Clearing House*, CV-S-94-623-PMP, 1995 WL 792074 (D. Nev. July 13, 1995) ............................................................... 4

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) .................... 4

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ....................................................................... 3

*Huawei Technologies Co. v. Samsung Electronics Co.*, 340 F. Supp. 3d 934 (N.D. Cal. 2018) ............................................................... 14

*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012) .............................................................. 4

*Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322 (1955) ............................................... 8

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ........................................... 3, 4, 11

*Malarkey v. Texaco, Inc.*, 794 F. Supp. 1248 (S.D.N.Y. 1992) ...................................... 10

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) .................................................... 15

*Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015) ................................ 15

*Navellier v. Sletten*, 262 F.3d 923 (9th Cir. 2001) ......................................................... 12

*NCAA v. Regents of Univ. of Okla.*, 463 U.S. 1311 (1983) ............................................. 4

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................................. 3

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ......................................................... 15

*Overstreet v. Thomas Davis Med. Ctrs., P.C.*, 978 F. Supp. 1313 (D. Ariz. 1997) .................... 3

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358 (7th Cir. 1987) ............................................................... 14

*Qualcomm Inc. v. Compal Elecs., Inc.*, 283 F. Supp. 3d 905 (S.D. Cal. 2017) .......................... 6

ii

*Sablan v. Dep't of Fin. of Com. of N. Mariana Islands*, 856 F.2d 1317 (9th Cir. 1988)............12

*United Shoe Mach. Corp. v. United States*, 258 U.S. 451 (1922)................................................14

*United States v. Apple Inc.*, 992 F. Supp. 2d 263 (S.D.N.Y. 2014)...............................................8

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ............................................15

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)................................................................15

*United States v. Hearst*, 563 F.2d 1331 (9th Cir. 1977) ............................................................12

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) ...............................15

*United States v. Nutri-Cology, Inc.*, 982 F.2d 394 (9th Cir. 1992)............................................10

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ....................................................13

*Va. Pet. Jobbers Ass'n v. Fed. Power Comm'n,*
    259 F.2d 921 (D.C. Cir. 1958) (per curiam) ...........................................................................3

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
    559 F.2d 841 (D.C. Cir. 1977)................................................................................................4

*Winding Creek Solar LLC v. Peevey*, No. 13-CV-04934-JD,
    2018 WL 1912136 (N.D. Cal. Apr. 23, 2018) ........................................................................3

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008)............................................10

**Treatises**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651b5
    (3rd & 4th eds. 2010–2018)...................................................................................................14

3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651c (1996 ed.)...........................15

11 Charles Alan Wright, Arthur R. Miller, Mary K. Kane et al.,
    Federal Practice and Procedure § 2904 (3d ed. Apr. 2019 update) .......................................3

## I.      INTRODUCTION

Following a hard-fought trial on the merits and an exhaustive review of the evidence, this Court concluded that Qualcomm has engaged in a course of anticompetitive conduct over many years, resulting in harm to competition, market participants, and consumers. The Court entered an injunction to put an end to Qualcomm's unlawful conduct and to restore competition. Qualcomm now seeks a stay of the injunction that would allow it to maintain its longstanding anticompetitive practices during the pendency of its appeal. But Qualcomm fails to justify such extraordinary relief. Qualcomm's claims of irreparable harm are general, speculative, and contrary to both governing legal principles and the evidence presented at trial. Among other things, the trial evidence shows that Qualcomm has tools available to it to limit any potential consequences of agreements it negotiates during the pendency of the appeal in the unlikely event that it ultimately prevails.

Qualcomm's OEM customers, its modem-chip rivals, and cellular-handset purchasers are not so fortunate. Should the Court stay enforcement of its order, Qualcomm will "perpetuate its artificial surcharge on rivals' chips, which harms rivals, OEMs, and consumers" (FOFCOL at 228)[1] throughout the pendency of the appeal and beyond. Licenses can take months to negotiate, and should the Court stay its order, negotiations free from anticompetitive practices will not *begin* until Qualcomm's appeal has run its course. This would adversely affect competition at a critical time, just as the cellular industry is transitioning to 5G technology.

Qualcomm also fails to show any serious prospect of reversal on appeal. The legal foundations of the Court's order are supplied by decisions of the U.S. Supreme Court, the Ninth Circuit, and other courts of appeals. Many of Qualcomm's asserted appellate arguments challenge the Court's factual findings, evidentiary rulings, and trial-management decisions—all

---

[1] References to "FOFCOL" are to the Court's May 21, 2019 Findings of Fact and Conclusions of Law, ECF Nos. 1490, 1491.

FTC'S OPPOSITION TO
QUALCOMM'S MOTION TO STAY
Case No. 17-cv-00220-LHK

matters as to which the Court of Appeals owes the Court considerable deference. Moreover, Qualcomm's argument that it will suffer irreparable harm if enjoined from bringing chip leverage to bear in license negotiations cannot be reconciled with its repeated representations during this litigation that chip leverage has no material impact on Qualcomm's licensing revenues.

The Court should deny Qualcomm's motion.

## II.        BACKGROUND

Following a bench trial in January 2019, the Court on May 21, 2019, concluded that Qualcomm had violated the antitrust laws and entered a permanent injunction. (FOFCOL at 216-233.)

The Court's injunction consists of five provisions: First, Qualcomm must refrain from implementing its no license, no chips policy and must "negotiate or renegotiate license terms with customers in good faith under conditions free from the threat of lack of access to or discriminatory provision of modem chip supply." (FOFCOL at 227.) Second, Qualcomm must "make exhaustive SEP licenses available to modem-chip suppliers on fair, reasonable, and non-discriminatory ('FRAND') terms and to submit, as necessary, to arbitral or judicial dispute resolution to determine such terms." (FOFCOL at 229.) The remaining provisions prohibit Qualcomm from entering into express or de facto exclusive dealing agreements for the supply of modem chips; prohibit Qualcomm from interfering with its customers' ability to communicate with government agencies about law enforcement or regulatory matters; and require Qualcomm to submit to certain compliance and monitoring procedures. (FOFCOL at 230–33.)

On May 28, 2019, Qualcomm filed a motion to stay enforcement of the Court's injunction pending Qualcomm's appeal of the judgment. (ECF No. 1495 ("Mot.").) A three-page declaration of Alex Rogers, President of Qualcomm Technology Licensing accompanied Qualcomm's motion. (ECF No. 1495-1 (the "Rogers Declaration").)

2

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   LEGAL STANDARD

Courts may, in the exercise of their discretion, suspend or modify an injunction during the pendency of an appeal. Fed. R. Civ. P. 62(c). Mindful that a "stay is an 'intrusion into the ordinary processes of administration and judicial review,'" courts do not exercise this discretion lightly. *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quoting *Va. Pet. Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam)). The stay applicant "bears the burden of showing that the circumstances justify an exercise of [the court's] discretion," *id.* at 433–34, and as this burden "is a heavy one, more commonly stay requests will not meet this standard and will be denied." 11 Charles Alan Wright, Arthur R. Miller, Mary K. Kane et al., Federal Practice and Procedure § 2904 (3d ed. Apr. 2019 update).

In assessing a stay application, courts consider: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding . . . ; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The third and fourth factors merge where, as here, the government is the opposing party. *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011).

Of the stay factors, irreparable harm is the most important: If an applicant fails to make a "threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the [applicant]'s proof regarding the other stay factors." *Id.* at 965. To meet the threshold, the stay applicant must demonstrate harm that is both substantial and irreversible. An applicant cannot meet the threshold simply by showing that an order, unless stayed, would require the applicant to modify its contracts or business practices. *See, e.g.*, *Winding Creek Solar LLC v. Peevey*, No. 13-CV-04934-JD, 2018 WL 1912136, at *1 (N.D. Cal. Apr. 23, 2018) (no irreparable harm where defendant had a "sound alternative" to the contracting practices enjoined); *Overstreet v. Thomas Davis Med. Ctrs., P.C.*, 978 F. Supp. 1313, 1315 (D. Ariz. 1997) (defendant failed to establish

3

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

irreparable harm by arguing that the court's order, unless stayed, would necessitate "extensive changes to its methods of operation").[2]

To support a showing of irreparable harm, the applicant must proffer "specific facts or supporting factual data." *FTC v. Publ'g Clearing House*, No. CV-S-94-623-PMP, 1995 WL 792074, at *7 (D. Nev. July 13, 1995). "[U]nsupported and conclusory statements regarding harm" will not suffice. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (internal quotation marks omitted).

If an applicant shows that irreparable harm is probable, courts in the Ninth Circuit consider the remaining stay factors in tandem. *Leiva-Perez*, 640 F.3d at 965. The applicant must also show either: "(a) a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; or (b) a substantial case on the merits and that the balance of hardships tips sharply in the [applicant's] favor." *Id.* at 970.

## IV.      ARGUMENT

### A.      Qualcomm fails to show irreparable harm.

Although Qualcomm seeks to stay the Court's injunction in its entirety, neither Qualcomm's motion nor the Rogers Declaration identifies any harm traceable to implementation of three of the injunction's five provisions. (Mot. at 5–6 (citing provisions pertaining to exclusive dealing, interference with communications with government agencies, and compliance and monitoring procedures, but not contending that any irreparable harm would flow from

---

[2] The decisions on which Qualcomm relies do not hold otherwise. The injunctions at issue in those cases required the applicant to do more than renegotiate contracts and modify business practices. They concerned injunctions that, unless stayed, would, respectively, "destr[oy] the defendant] in its current form," *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); eliminate a state's campaign-contribution laws on the eve of general elections, *Lair v. Bullock*, 697 F.3d 1200, 1214–15 (9th Cir. 2012); and place "the entire 1983 [intercollegiate football] season . . . at risk not only for [the defendant] but for many, if not most, of the schools which it represent[ed]." *NCAA v. Regents of Univ. of Okla.*, 463 U.S. 1311, 1313 (1983).

4

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

implementation of these provisions).) As to the two provisions that it does address, Qualcomm fails to show irreparable harm.

### 1.   *Qualcomm fails to show irreparable harm arising from cessation of its no license, no chips policy.*

The first provision of the Court's injunction prohibits Qualcomm from maintaining its no license, no chips policy. Qualcomm asserts that implementation of this provision would cause it irreparable harm in the form of "revenue loss." (Mot. at 10.) The challenged provision, however, permits Qualcomm to collect all revenues to which Qualcomm has a legitimate claim. Specifically, the provision permits Qualcomm to negotiate (i) royalties that "reflect the fair value of Qualcomm's patents" (FOFCOL at 227–29), and (ii) chip prices that reflect the market-based value of its modem chips (*id.*; *see also id.* at 42).

Qualcomm proffers two arguments to explain how the first provision of the Court's injunction might cause irreparable harm. Both arguments lack evidentiary and legal foundation.

First, Qualcomm speculates that it might sell modem chips to OEMs that become unlicensed while the appeal is pending. (Mot. at 8; Rogers Decl. ¶ 6.) The Rogers Declaration asserts that if Qualcomm "sell[s] modem chips to unlicensed OEMs while the Order is reviewed on appeal, those unlicensed OEMs will claim that such sales exhaust" certain of Qualcomm's patents, and that "Qualcomm will not be able to unwind such sales." (Rogers Decl. ¶ 6.) The Rogers Declaration fails to explain how, if at all, exhaustive modem-chip sales would harm Qualcomm. Like any other supplier of handset components, Qualcomm can price its modem chips to reflect the value of its patents substantially embodied in those chips. (FOFCOL at 44, 46, 56, 62, 69, 77, 83, 113, 163–64 (finding that Qualcomm's no license, no chips policy is unique within the industry); *see also id.* at 88, 113, 162–64 (finding that Qualcomm's policy is also unique within Qualcomm, as it sells components other than modem chips exhaustively).) And like any other patent holder, Qualcomm can negotiate licenses covering any patents that are not substantially embodied in its modem chips, *i.e.*, that would not be exhausted by their sale.

5

Second, Qualcomm speculates that enforcement of the Court's order pending appeal might prompt certain unidentified OEMs to cease paying any royalties to Qualcomm even as they continue to practice Qualcomm's patents. (Mot. at 10; Rogers Decl. ¶¶ 9–10.) Neither Qualcomm's motion nor the Rogers Declaration explains why an order that allows OEMs to negotiate royalties that "reflect the fair value of Qualcomm's patents" (FOFCOL at 228–29) would deprive Qualcomm of reasonable royalties. *Cf. Qualcomm Inc. v. Compal Elecs., Inc.*, 283 F. Supp. 3d 905, 918–19 (S.D. Cal. 2017) (rejecting Qualcomm's contention that the defendants' alleged breach of their license agreements would "cause irreparable harm by emboldening other licensees to improperly seek to breach or renegotiate their license agreements" and dismissing assertions contained in the supporting declaration of Alex Rogers as "remarkably general and speculative"). Nor does Qualcomm explain how harm arising from any suspension of royalty payments would prove *irreparable*, given that Qualcomm retains its right to seek reasonable royalties for its patents, including damages for any past infringement. (FOFCOL at 228 ("Qualcomm and OEMs can negotiate patent license terms that reflect the fair value of Qualcomm's patents, rather than terms that reflect Qualcomm's monopoly power in modem chips").) *See generally Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 915 (N.D. Ill. 2012) (Posner, J.) (Apple's alleged infringement of a Motorola patent did not irreparably harm Motorola because a "FRAND royalty would provide all the relief to which Motorola would be entitled if it proved infringement of the . . . patent"), *aff'd in part and rev'd in part*, 757 F.3d 1286, 1332 (Fed. Cir. 2014) (agreeing with the district court that "Motorola's FRAND commitments . . . strongly suggest that money damages are adequate to fully compensate Motorola for any infringement"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).

> **2.     *Qualcomm fails to show irreparable harm from making licenses to its SEPs available to its modem-chip competitors on FRAND terms.***

Qualcomm also claims that it will suffer irreparable harm if it makes SEP licenses

6

available to its modem-chip competitors on fair and reasonable terms. (Mot. at 8–9.) Qualcomm's claim rests on two premises: (i) an assertion that licensing competitors is significantly less efficient than licensing handset manufacturers (Mot. at 9; Rogers Decl. ¶ 5), and (ii) an assumption that Qualcomm's modem-chip competitors, notwithstanding this asserted inefficiency, will nonetheless insist on taking SEP licenses from Qualcomm. Qualcomm fails to substantiate either premise.

Qualcomm's motion and the Rogers Declaration simply repeat conclusory assertions about the inefficiency of licensing competitors, assertions that the Court has already—and justifiably—dismissed as pretextual and not credible. (FOFCOL at 132–34.) Qualcomm provides no basis for second-guessing the Court's findings.

Qualcomm also fails to substantiate or explain its implicit assumption that, even if licensing modem-chip suppliers *were* significantly less efficient than licensing handset OEMs, chip suppliers would nonetheless insist on licensing Qualcomm patents that their OEM customers could license more efficiently. This assumption is facially implausible.

### 3. *Qualcomm's claim of irreparable harm suffers additional, fatal flaws.*

The harms that Qualcomm asserts depend critically on the Rogers Declaration's assumption that any license agreements that Qualcomm concludes during the pendency of the appeal would be long-term agreements, extending "five years or more," and assertion that these agreements would prove "difficult, if not impossible, to unwind . . . even if the injunction and Order [were] overturned or modified on appeal." (Rogers Decl. ¶ 8.)

These statements are unsubstantiated and contrary to evidence presented at trial. That evidence demonstrates that Qualcomm and its counsel are entirely capable of negotiating (i) short-term or "interim" licenses and (ii) contractual provisions that would mitigate or eliminate any long-term adverse consequences to Qualcomm of a license agreement concluded during the pendency of its appeal. (*E.g.*, FOFCOL at 54 (describing "temporary" and "interim" license agreements that Qualcomm negotiated with one OEM in 2012); JX0087 at -002 (2013

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

1    amendment to license agreement between Qualcomm and another OEM, providing each party

2    the "right to terminate this Agreement for convenience at any time, by providing at least thirty

3    (30) days' prior written notice").)

4           Finally, to the extent Qualcomm argues that certain harm will flow not from the

5    injunction, but from industry participants' awareness of the Court's public factual findings and

6    legal conclusions (*see* Mot. at 9–10; *cf. id.* at 2 (claiming harm to "other major SEP holders" not

7    subject to the injunction)), that putative harm is not an appropriate basis for a stay. It stems from

8    the persuasive authority of the Court's findings and analysis, which will stand regardless of

9    whether the Court's injunction is stayed pending appeal.

10          **B.      Prompt enforcement of the Court's order is in the public interest.**

11          The Court's opinion details how Qualcomm's practices have "strangled competition in

12   the CDMA and premium LTE modem chip markets for years." (FOFCOL at 215.) In its stay

13   motion, Qualcomm disputes the Court's findings, reasserts arguments the Court has rejected, and

14   simply asserts that if it continues its unlawful practices, "[t]he risk of anticompetitive effects

15   absent a stay is minimal." (Mot. at 20-22.) The Court's opinion establishes otherwise. And

16   "'[t]he public interest in vigilant enforcement of the antitrust laws' is indisputable." *United*

17   *States v. Apple Inc.*, 992 F. Supp. 2d 263, 290 (S.D.N.Y. 2014) (quoting *Lawlor v. Nat'l Screen*

18   *Serv. Corp.*, 349 U.S. 322, 329 (1955), and denying motion for stay pending appeal).

19          Were the Court's order stayed, Qualcomm could "continue to charge unreasonably high

20   royalty rates," rates that "would perpetuate its artificial surcharge on rivals' chips, which harms

21   rivals, OEMs, and consumers, and would enable Qualcomm to continue to reap the fruits of its

22   Sherman Act violation." (FOFCOL at 228.) The appellate process could easily extend through

23   the initial rollout of 5G technology (*see* CX8198 at -004 (Qualcomm letter to shareholders

24   stating that 5G to launch globally in 2019)), and a stay would allow Qualcomm time to use

25

26

27

28

8

anticompetitive practices to entrench its monopoly power in modem-chip markets during this critical period (FOFCOL at 221).[3] These further competitive consequences would prove difficult to reverse following a Ninth Circuit decision affirming this Court's judgment.

A stay would also permit Qualcomm to use modem-chip leverage to impose other anticompetitive terms on new licensees and OEMs whose licenses expire during the stay. Qualcomm's past licenses contained provisions restricting licensees' ability to communicate with antitrust authorities. (FOFCOL at 232.) A stay would permit Qualcomm to continue to use these and other tactics to thwart law enforcement and frustrate the efficacy of the Court's remedy. (FOFCOL at 231 (addressing provisions that Qualcomm secured in an agreement post-dating the January 2017 Korea Fair Trade Commission order).)

Qualcomm argues that a stay would not harm competition because the "industry . . . is now dynamic and robust" and Qualcomm's practices have not harmed its modem-chip rivals in any event. (Mot. at 21.) Both arguments simply repeat claims presented at trial and properly rejected by the Court. As the Court found, Qualcomm's practices have reduced competition and contributed to the exit of several competitors and hobbled those that remain. (FOFCOL at 202–08.) Qualcomm presents no basis to conclude that those harms would abate during a stay.[4]

Nor does the longstanding nature of Qualcomm's conduct justify a stay. (Mot. at 20–21.) The Court found that Qualcomm's practices have significantly contributed to its long-term maintenance of monopoly power in the relevant markets. (FOFCOL at 204.) A long-term

---

[3] Qualcomm notes that some of its competitors have announced 5G products in development (Mot. at 21), but as the Court found, the evidence presented at trial demonstrated that "Qualcomm is likely to replicate its market dominance during the transition to 5G" (FOFCOL at 221).

[4] In the midst of this argument, Qualcomm suggests that the Court's order should be stayed because it would "compel[] Qualcomm to assert patents against rivals," which is a mischaracterization of the Order. The Court ordered Qualcomm to "make exhaustive SEP licenses available to modem-chip suppliers," but did not order Qualcomm to sue rivals in the event that they fail to seek a license. (FOFCOL at 229.)

9

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

1    monopoly buttressed by anticompetitive practices may be a "stable status quo" (Mot. at 21), but

2    allowing that status quo to persist would run counter to the public interest in enforcement of the

3    antitrust laws. Indeed, a stay would have the unfortunate effect of "mak[ing] this Court an

4    instrument for further frustrating instead of promoting the aim of the [antitrust laws]." *Malarkey*

5    *v. Texaco, Inc.*, 794 F. Supp. 1248, 1251 (S.D.N.Y. 1992) (declining to grant a stay despite

6    significant duration of pre-judgment status quo).

7            Finally, Qualcomm vaguely argues that enforcement of the Court's order, by diminishing

8    Qualcomm's corporate profits, may harm national security. Qualcomm cites no trial evidence

9    linking its corporate profits to national security. Instead, Qualcomm's argument rests entirely on

10   a letter attached to the Rogers Declaration; the letter, from the Treasury Department, blocks a

11   company headquartered overseas from acquiring Qualcomm, citing the potential acquirer's plans

12   to reduce research and development in 5G systems. (ECF No. 1495-2.) The letter does not

13   endorse, or even mention, the Qualcomm practices the Court has enjoined. Nor does the letter

14   address how an injunction that preserves Qualcomm's ability to license its patents on terms that

15   reflect "fair value" could harm Qualcomm's investment incentives or implicate national security.

16   Qualcomm's argument that anything that diminishes its corporate profits would necessarily

17   threaten national security is absurdly overbroad and contrary to Congress's determination, in

18   enacting the Sherman Act, that competition furthers the public interest. *See United States v.*

19   *Nutri-Cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992) ("[P]assage of the statute is itself an

20   implied finding by Congress that violations will harm the public.").

21           The only case that Qualcomm cites as an instance of national security trumping other

22   equitable considerations is readily distinguishable. In *Winter v. Natural Resources Defense*

23   *Council*, 555 U.S. 7 (2008), the U.S. Supreme Court vacated a preliminary injunction against

24   certain naval exercises after officers of the U.S. Navy submitted numerous affidavits detailing

25   how the preliminary injunction would "hinder efforts to train sonar operators under realistic

26   conditions, ultimately leaving strike groups more vulnerable to enemy submarines." *Id.* at 23–25.

27

28

10

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

Qualcomm's reliance on such an inapposite precedent serves only to highlight the weakness of its claims.

### C.   Qualcomm fails to show a strong likelihood of success on appeal.

Given that the balance of other factors weighs in favor of enforcement of the Court's order, Qualcomm would have to show a strong likelihood of success on appeal to obtain a stay. Qualcomm has not made, and cannot make, such a showing. In fact, given the Court's thorough consideration of the record and the law, Qualcomm cannot even show "a substantial case on the merits." *Leiva-Perez*, 640 F.3d at 967–68 (internal quotation marks omitted). Qualcomm's arguments on the merits are all arguments that the Court carefully considered and properly rejected.

### 1.   *Qualcomm's arguments on irreparable harm undermine its arguments on the merits of its appeal.*

Qualcomm's arguments on irreparable harm are in considerable tension with its arguments on the merits, and undercut Qualcomm's assertions regarding its likelihood of success on appeal. First, Qualcomm plans to dispute the Court's conclusion that the company used its modem-chip leverage to collect from OEMs a material surcharge over and above the reasonable royalties that Qualcomm would otherwise negotiate. (Mot. at 15.) Qualcomm's position on irreparable harm, however, strongly suggests that the company's no license, no chips policy *has* imposed a surcharge, and a substantial one. Qualcomm asserts that, should the Court's order prohibit it from employing chip-supply leverage in license negotiations, Qualcomm will suffer a substantial and irreparable loss of revenue. Indeed, Qualcomm suggests that that the loss may amount to billions of dollars. (Mot. at 10.)

Second, Qualcomm argues on the merits that higher royalties, paid in the first instance by handset OEMs, do not harm Qualcomm's rivals, who presently are able to practice Qualcomm's patents without paying Qualcomm royalties. (Mot. at 15, 21.) Were Qualcomm's merits analysis correct, rivals would have little incentive to exchange a regime in which they practice

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

Qualcomm's patents free of charge for one in which they pay Qualcomm reasonable royalties. In claiming irreparable harm, however, Qualcomm asserts the opposite: should the injunction become effective, rivals will prove eager to conclude licenses with Qualcomm. (Rogers Decl. ¶ 5 (contending that these licenses will create a "multi-level licensing regime").) Qualcomm's own arguments again demonstrate that it is not likely to succeed on appeal.

### 2. *Qualcomm challenges rulings of the Court that are owed considerable deference on appeal.*

Several of Qualcomm's prospective appellate arguments challenge the Court's case-management decisions, evidentiary rulings, and factual findings, all of which will receive considerable deference on appeal. For example, Qualcomm challenges the Court's rejection of Qualcomm's proposal, first presented to the Court in October 2018, to introduce evidence of events post-dating the March 30, 2018 close of fact discovery. (Mot. at 11–12.) The Court determined that introduction of such evidence would require reopening discovery and postponing trial in order to avoid unfair prejudice, and declined to modify its scheduling order or to admit post-discovery evidence. (Order Denying Qualcomm's Request to Introduce Evidence of Post-Discovery Events, ECF No. 997.) To rule otherwise, the Court observed, would require an endless cycle of additional discovery and trial delays. (*Id.* at 10 ("By necessity, the evidence at trial will never be fully up-to-date following the cutoff for discovery.").) These case management and evidentiary rulings are entirely reasonable and entitled to considerable deference on appeal. *See Navellier v. Sletten*, 262 F.3d 923, 941–42 (9th Cir. 2001) (trial management and evidentiary rulings reviewed for abuse of discretion); *Sablan v. Dep't of Fin. of Com. of N. Mariana Islands*, 856 F.2d 1317, 1321 (9th Cir. 1988) ("Broad discretion is vested in the trial court to permit or deny discovery . . . ."); *United States v. Hearst*, 563 F.2d 1331, 1349 (9th Cir. 1977) (rules confer "broad discretion on the trial judge to exclude evidence on any of the grounds specified in Rule 403").

Qualcomm also challenges—or disregards—factual findings that are subject to deference

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

on appeal. For instance, Qualcomm argues that the Court improperly failed to consider current and future market conditions (while conceding that Qualcomm's conduct would continue). (Mot. at 12–13.) In addition to advancing an erroneous legal standard,[5] this argument ignores the Court's findings as to present and likely future market power. The Court found, supported by substantial evidence, that many of Qualcomm's rivals have exited modem-chip markets, that those that remain have been "hobbled by Qualcomm's practices," and that Qualcomm has exercised "continued dominance." (FOFCOL at 206–08.)[6] The Court further found, based on Qualcomm admissions and other substantial evidence in the record, that there is "a significant risk that Qualcomm will be dominant in 5G." (FOFCOL at 224.) These factual findings as to current and future market power are well supported by the record and subject to deferential review.

### 3. *Qualcomm fails to identify any conclusion of law that the appeals court is likely to reverse.*

Qualcomm's remaining arguments likewise fail to establish a strong likelihood of success on appeal. *First*, Qualcomm contends that the Court's order "raises serious questions regarding the FTC's novel and unprecedented 'tax' or 'surcharge' theory of antitrust liability." (Mot. at 14.) The Ninth Circuit and other circuit courts of appeals, however, have expressly endorsed

---

[5] According to Qualcomm, the FTC may only obtain an injunction based on evidence of market power "right up to the moment the case comes to trial." (Mot. at 11 (citation and internal quotation marks omitted).) If the case law imposed such a requirement, it would mandate the cycle of never-ending discovery and trial delays that the Court sought to avoid. But the cases that Qualcomm cites say nothing of the sort. In *United States v. Syufy Enterprises*, 903 F.2d 659, 664 (9th Cir. 1990), the district court held that market power had not been established at any point in time. The issue of purportedly stale evidence in support of an injunction simply never arose. In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), a private lawsuit, the Court never addressed the standard for an injunction at all, and certainly did not fashion a requirement for consideration of post-discovery evidence.

[6] *See also* CX8191 at -089 (Qualcomm strategic planning document for fiscal year 2018 depicting Qualcomm as the only merchant supplier of premium-tier SOCs); Moynihan (MediaTek) Tr. 365:1–4 (Mediatek has "not closed the gap" in premium-tier and high-tier modem chips).

13

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

raising rivals' costs as a valid antitrust theory. *See, e.g.*, *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896, 925 (9th Cir. 2012); *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 368 (7th Cir. 1987); *see also* Phillip E. Areeda  & Herbert Hovenkamp, Antitrust Law ¶651b5 (3rd & 4th eds. 2010–2018). And there is little question that a monopolist's conditioning product sales on its customers' agreement to pay a penalty or surcharge on their purchases from the monopolist's rivals is anticompetitive. *See United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 456–58 (1922); *Premier*, 814 F.2d at 368–69; *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244, 1250 (D. Utah 1999). Qualcomm's effort to camouflage its surcharge as a patent royalty does not materially alter the straightforward antitrust analysis. *See, e.g.*, *Premier*, 814 F.2d at 368–71 (surcharge imposed by defendant on rival contractors anticompetitive though labeled as a payment for administrative services). *See generally Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466–67 (1992) (antitrust law favors "market realities" over "formalistic distinctions").

*Second*, the Court's decision does not create an "intra-district split" (Mot. at 15), nor will affirming the Court's order require the Ninth Circuit to probe the outer limits of duty-to-deal principles under the Sherman Act. The opinion that purportedly creates a "split," *Huawei Technologies Co. v. Samsung Electronics Co.*, 340 F. Supp. 3d 934 (N.D. Cal. 2018), expressly referred to and distinguished this case. The district court accepted Huawei's contention that, unlike the FTC here, Samsung had offered no evidence that Huawei acquired or maintained monopoly power in any relevant market through exclusionary conduct. *See id.* at 952 (distinguishing this Court's order denying Qualcomm's motion to dismiss).

Nor does this case present an unwarranted extension of duty-to-deal jurisprudence. Federal appellate precedents have recognized the importance of FRAND commitments and other "meaningful safeguards" that prevent subversion of the standard-setting process "by members with economic interests in stifling product competition." *Broadcom Corp. v. Qualcomm Inc.*, 501

14

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK

F.3d 297, 309–10 (3d Cir. 2007) (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988)); *see Broadcom*, 501 F.3d at 313 (identifying FRAND commitments as among these safeguards); *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031, 1041 (9th Cir. 2015) (same). They have also recognized that conduct that breaches or circumvents these safeguards can form a basis for antitrust liability when such conduct unreasonably restrains trade, *e.g.*, *Allied Tube*, 486 U.S. at 501, or contributes to the acquisition or maintenance of monopoly power, *e.g.*, *Broadcom*, 501 F.3d at 313–14; *see also* Order Denying Motion to Dismiss, ECF No. 134 at 41–46 (concluding that the voluntary nature of Qualcomm's FRAND commitments and the administrability of a judicial remedy, among other factors, distinguished Qualcomm's breach of its FRAND commitments from refusals to deal outside the standard-setting context).

*Third*, Qualcomm fails to show a strong likelihood of success on appeal based on the Court's application of the rule-of-reason burden-shifting framework. The burden-shifting framework applied by the Court, including its analysis of causation standards applicable to a government antitrust case, has been applied by numerous federal appellate courts and endorsed by the leading antitrust treatise. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc) (courts should "infer 'causation' from the fact that a defendant has engaged in anticompetitive conduct that 'reasonably appear[s] capable of making a significant contribution to … maintaining monopoly power'") (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651c, at 78 (1996 ed.)); *see also McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005); *cf. Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (explaining that an antitrust plaintiff may show anticompetitive effects "indirectly," that is, by supplying "proof of market power plus some evidence that the challenged restraint harms competition"). Qualcomm does not even attempt to explain how *Microsoft* and other appellate precedents are inconsistent with *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) (Mot. at 20), or other Supreme Court precedent. On this point, too, Qualcomm has not established any likelihood of success on appeal.

15

## V.        CONCLUSION

For the foregoing reasons, the Court should not stay its Order.

Respectfully submitted,

Dated: June 11, 2019

*/s/ Jennifer Milici*
JENNIFER MILICI
JOSEPH R. BAKER
GEOFFREY M. GREEN
RAJESH S. JAMES
DANIEL MATHESON
KENNETH H. MERBER
MARK J. WOODWARD

Bureau of Competition

*Attorneys for Plaintiff Federal Trade Commission*

16

FTC's Opposition to
Qualcomm's Motion to Stay
Case No. 17-cv-00220-LHK