1   Amanda Tessar (admitted *pro hac vice*)
    ATessar@perkinscoie.com
2   **PERKINS COIE LLP**
    1900 Sixteenth Street, Suite 1400
3   Denver, CO 80202-5255
    Telephone: 303.291.2357
4   Facsimile: 303.291.2457

5   Sarah E. Fowler, California Bar #264838
    SFowler@perkinscoie.com
6   **PERKINS COIE LLP**
    3150 Porter Drive
7   Palo Alto, CA 94304-1212
    Telephone: 650.838.4489
8   Facsimile: 650.838.4350

9   **ATTORNEYS FOR AMICUS CURIAE**
    **ACT | THE APP ASSOCIATION**

10

11

12              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA,**
13                  **SAN JOSE DIVISION**

14   FEDERAL TRADE COMMISSION,          Case No. 5:17-cv-00220-LHK

15                  Plaintiff,          **BRIEF OF *AMICUS CURIAE* ACT |**
                                        **THE APP ASSOCIATION IN**
16          v.                          **OPPOSITION TO QUALCOMM'S**
                                        **MOTION FOR STAY PENDING**
17   QUALCOMM INCORPORATED, a Delaware  **APPEAL**
     corporation,
18                                      Dept.: San Jose Courthouse, Courtroom 8
                    Defendant.          Judge: Hon. Lucy Koh
19

20

21

22

23

24

25

26

27

28

1   **I.      STATEMENT OF INTEREST**

2        *Amicus curiae* ACT | The App Association (the "Association") respectfully offers its

3   thoughts and perspectives regarding Qualcomm Incorporated's ("Qualcomm's") Motion for Stay

4   Pending Appeal.  The Association represents more than 5,000 small business technology

5   development companies that create leading software and hardware solutions in both the consumer

6   and enterprise context.  Today, the ecosystem the Association represents is valued at

7   approximately $950 billion and is responsible for 4.7 million American jobs.[1]  Alongside the

8   world's rapid embrace of mobile technology, our members are responsible for countless

9   innovative hardware and software technology solutions that power the growth of the Internet of

10  Things ("IoT").[2]  On behalf of its members, the Association advocates for an environment that

11  inspires and rewards innovation while providing resources to help our members leverage their

12  intellectual assets to raise capital, create jobs, and continue innovating.  Further information about

13  the Association and its activities is available at http://actonline.org.

14       Because Members of the Association develop, rely on, use, and innovate to take

15  advantage of standardized technologies, including technologies for wireless communication, we

16  are deeply interested in ensuring a fair, efficient ecosystem for technical standards.  SEP licensing

17  (and, ultimately, the ability to efficiently and reliably access and use technical standards)

18  significantly impacts small business innovators, particularly during this critical time of

19  development and deployment for new "Fifth Generation" ("5G") cellular and IoT technologies.

20  As the leading global representative for the small business innovator community on SEP law and

21  policy and related competition law matters, the Association respectfully offers its perspective to

22  the Court in evaluating matters relating to Qualcomm's Motion for Stay Pending Appeal.

---

23  [1]  Roya Stephens & Adarsh Mahesh, *State of the App Economy*, ACT | THE APP ASSOCIATION
24  (2018), *available at* https://actonline.org/wp-content/uploads/ACT_2018-State-of-the-App-
    Economy-Report_4.pdf.
25
    [2]  The IoT involves everyday products that use the internet (and cellular systems specifically) to
26  communicate data that the products collect.  In every segment of the U.S. economy, from
    agriculture to retail to healthcare and beyond, the rise of IoT is creating efficiencies unheard
27  of even a few years ago.  *See, e.g.*, Dep't of Commerce Internet Policy Task Force & Dig.
    Leadership Team, *Fostering the Advancement of the Internet of Things* (Jan. 2017), *available*
28  *at* https://www.ntia.doc.gov/files/ntia/publications/iot_green_paper_01122017.pdf.

ACT | The App Association *Amicus Brief*
5:17-cv-00220-LHK

## II.    PRELIMINARY STATEMENT

The Association submits this brief to address the severe harm to our industry, the wireless ecosystem (including the growing consumer and enterprise verticals we represent), and the public interest if the injunction in the Court's May 21, 2019 Findings of Fact and Conclusions of Law, Dkt. 1491 (the "Order") were stayed pending appeal.  The Court's 233-page Order meticulously documents the practices held to be illegal, as well as how those practices have harmed competition in the CDMA and 4G markets, successfully removing a series of potential rivals (*i.e*., alternative sources of supply for the Association's members' innovations and industry ecosystems) from the modem chip business.  The Court also addressed the potential harm to competition in 5G markets were the conduct held to be illegal permitted to continue during the market's transition from 4G to 5G standards.  In particular, the Order notes, Qualcomm's practices of refusing to license rivals and its "no-license no-chips" policy were viewed by Qualcomm as integral to its efforts to dominate emerging 5G market.  CX 5913-001.  To avoid substantial harm to development and deployment of 5G devices, to promote innovation in 5G markets, and to avoid severe harm to consumer and public interests if the practices addressed in the Order were to continue unabated just as the 5G era is poised to explode, the Association respectfully requests that Qualcomm's Motion to Stay be denied.

## III.    BACKGROUND AND CONTEXT:  FRAND'S CRITICAL ROLE IN PROTECTING THE TRANSITION TO 5G MARKETS

The Association's interest in promoting a competitive FRAND standards ecosystem is straightforward:  in today's economy, businesses incorporate, use, and rely on wireless communications functionality in all sorts of ways, and it is imperative to a healthy marketplace and to fair competition that licenses to those technologies remain available on FRAND terms to all market participants.  As an Association representing customers (either direct or indirect) for telecommunications components, including modem chips; technology developers that need access to key technical standards for communication and interoperability that will support new cutting-edge solutions; and also as a representative of patent owners, the Association supports a fair and competitive ecosystem for standardized technologies.

The Association's views on these issues are mainstream and have been supported by an extensive array of industry, government, and academic stakeholders.  For example, we joined more than fifty industry leaders and more than seventy governmental and academic thought leaders in voicing our support for FRAND practices to the United States Department of Justice,[3] the FTC,[4] the Department of Commerce, and the USPTO.[5]  Further, together with another leading industry association, we recently co-sponsored a CEN-CENELEC Workshop bringing together more than fifty small and large industry companies to document Core Principles and Approaches for SEP Licensing, particularly for 5G applications and industries.[6]  The voices supporting a fair

---

[3]   *See* Multi-Ass'n Letter to AAG Delrahim, *Standards, Licensing, and Innovation: A Response to DOJ AAG's Comments on Antitrust Law and Standard-Setting* (letter from six trade associations representing more than $3 trillion in GDP, noting that FRAND commitment entails that license is available to any implementer) (May 2018), *available at* http://www.ccianet.org/wp-content/uploads/2018/05/Multi-Assn-DOJ-White-Paper-053018.pdf; *see also Industry Letter to DOJ Regarding Standards, Innovation and Licensing* (letter from fifty-eight companies, academics, and SMEs noting that enforcement of obligation to license is an expected consequence of FRAND promise) (Jan. 24, 2018), *available at* http://www.ccianet.org/wp-content/uploads/2018/01/Industry-Letter-to-DOJ-AAG.pdf; Academic and Former Regulator Letter to AAG Delarahim, *Speeches on Patents and Holdup* (letter from seventy-seven academics and former United States agency personnel, explaining that the "holder of a standard essential patent voluntarily chooses to license on a FRAND basis, receiving in exchange the SSO's 'seal of approval' and the potential for significantly increased volume that comes with that seal, which is well worth the FRAND promise") (May 17, 2018), *available at* https://www.competitionpolicyinternational.com/wp-content/uploads/2018/05/DOJ-patent-holdup-letter.pdf.

[4]   *See* Fed. Trade Comm'n, *The Role of Intellectual Property and Competition Policy in Promoting Innovation #FTC-2018-005-D-0031*, (Aug. 20, 2018), comments of Cross-Sectoral Multi-Association Group to FTC (public comments from letter from six trade associations representing more than $3 trillion in GDP, noting that FRAND commitment entails that license is available to any implementer), *available at* https://www.ftc.gov/policy/public-comments/2018/08/20/comment-ftc-2018-0055-d-0031.

[5]   *See* Comments of Cross-Sectoral Multi-Stakeholder Group to Department of Commerce and USPTO, *Sustainable American Innovation and Standards Policy; Established US Law & Policy Supporting Innovation; Concerns with December 7, 2018 DOJ AAG Statements,* (letter from trade associations and industry stakeholders opposing SEP abuses) (Apr. 22, 2019), *available at* http://actonline.org/wp-content/uploads/Multi-Stakeholder-Letter-re-DOJ-USPTO-Policy-Statement-042219.pdf.

[6]   CEN-CENELEC comprises two of the three officially recognized European Standardization Organizations.  The CWA2 Workshop Agreement is available at https://www.cencenelec.eu/news/workshops/Pages/WS-2019-014.aspx.

ACT | The App Association *Amicus Brief*
5:17-cv-00220-LHK

and accessible standards system come not just from technology industries, but from other sectors of the economy that are being harmed by SEP abuse, including automotive and retail.  As noted in our most recent (April 2019) letter to the Department of Commerce, the companies and associations that have joined us in efforts to curtail SEP abuses such as those addressed in the Order collectively represent over $100B annually in R&D spending across a range of industries, own hundreds of thousands of patents including numerous SEPs, employ more than 50 million Americans, and contribute trillions of dollars to annual United States GDP.[7]

Ensuring FRAND behaviors is particularly time-sensitive as the industry is evolving toward implementation of these next-generation 5G networks and devices.  As explained in the CEN-CENELEC Workshop Agreement that the Association co-sponsored:

> A new generation of technological development through the development of various technologies associated with [5G] is dawning.  According to recent European Patent Office estimates, some 25-30 billion devices in the home and workplace will be equipped with sensors, processors and embedded software.  Connecting these devices together with one another … will foster automation of business processes.  Part of this development is the harnessing of standardized technologies for the first time across new market segments, including outside of traditional telecommunications and wireless industries. … ***For proper market functioning as the connected economy develops, it will be critical to all market actors that FRAND licensing practices are followed and that abusive assertions are prevented.***  The proliferation of standardized technologies outside of the traditional ICT sector warrants a fair and balanced approach to the licensing of standardized technologies, including consideration of the dynamic markets interests that constitute the IoT and other advanced communication protocols.[8]

(Emphasis added.)  As industry—including countless verticals outside of traditional telecommunication businesses—stands on the precipice of this critical transition, protecting fair

---

[7] *See* Comments of Cross-Sectoral Multi-Stakeholder Group to Department of Commerce and USPTO, *Sustainable American Innovation and Standards Policy; Established US Law & Policy Supporting Innovation; Concerns with December 7, 2018 DOJ AAG Statements,* (Apr. 22, 2019), *available at* http://actonline.org/wp-content/uploads/Multi-Stakeholder-Letter-re-DOJ-USPTO-Policy-Statement-042219.pdf.

[8] *Core Principles and Approaches for Licensing of Standard Essential Patents*, CEN-CENELEC CWA 9500 (Jan. 2019), *available at* https://www.cencenelec.eu/news/workshops/Pages/WS-2019-014.aspx.

competition in the 5G marketplace is an immediate imperative.  If SEP abuses are permitted to distort competition at this critical juncture, even for a matter of months, associated market distortions will persist for many years to come.

**IV.    HARM TO THE MARKET IF THE ORDER WERE STAYED SUBSTANTIALLY OUTWEIGHS (DUBIOUS) ALLEGATIONS OF HARM TO ONE COMPETITOR**

    *A.    The Order Protects Existing 4G and Emerging 5G Markets at a Critical Transition*

The Court's Order carefully considered the likely effects on 5G markets if the enjoined conduct were permitted to continue.  For example, referencing 5G, the Court concluded that "[w]ith QCT's monopoly power, though, QTL retains a strong presence in the standards."  Order, at 201.  And, further, that "[b]y harming rivals' standing with industry participants, Qualcomm suppresses rivals' ability to generate additional business, develop new products, and win the race to market.  Instead, Qualcomm wins these opportunities, which further entrenches Qualcomm's monopoly chip power."  *Id*. at 202.  The Court noted that Qualcomm seeks to "replicate its market dominance during the transition to 5G, the next generation of modem chips."  *Id.* at 221.  And the Court explained that its remedies were, in part, designed to protect against the extension of monopolistic behaviors into 5G markets, stating:

> The evidence showed a sufficient risk that Qualcomm will have market power in 5G modem chips and could exercise its dominance to extract unreasonably high royalties.  Therefore, prohibiting Qualcomm from cutting off OEMs' chip supply, technical support, and access to software helps "ensure that there are no practices likely to result in monopolization in the future."

*Id.* at 228 (quoting *United States v. Microsoft Corp.,* 253 F.3d 34, 50 (D.C. Cir. 2001).  The Association agrees that entrenchment of monopoly power, and the market distortions that SEP abuse engenders, threaten to irreparably harm the marketplace at this critical stage when 5G markets are just now developing.

    *B.    Qualcomm's Allegations of Harm Are Substantially Overstated*

Qualcomm's allegations about potential harms to its individual business absent a stay do not withstand scrutiny.  *See* Defendant Qualcomm Incorporated's Motion for Stay Pending Appeal, Dkt. 1495 ("Motion").  Indeed, its entire approach of reducing the multi-faceted four-part

1    stay test to focusing primarily on Qualcomm's own supposed harm, sometimes to the near-

2    exclusion of other factors (such as harm to the marketplace of staying the injunction just as 5G is

3    ascending), is misguided.[9]  On balance, the established harm to competition from Qualcomm's

4    behaviors, as documented in the Order, far outweighs the alleged harm to Qualcomm if the

5    Motion is denied.

6          Qualcomm argues, for example, that a stay is required to "maintain and advance American

7    leadership in the development of cellular systems and 5G standard-setting," but offers little

8    substantive explanation for this position.  Motion, at 22.  While the Court has adjudicated that

9    Qualcomm is a monopolist in the modem chip **product** market, and while Qualcomm is

10   undoubtedly an important player in telecommunications development, the suggestion that

11   Qualcomm is the only US company situated to develop and promote 5G is, at best, overstatement.

12   5G development is and has been exceedingly collaborative, with hundreds of American and

13   foreign companies working together at industry organizations to develop and share their

14   technologies.  That development will continue (and will continue to include Qualcomm)

15   regardless of the Order's requirements as to Qualcomm's licensing practices during the course of

16   an appeal.  Indeed, in addressing similar claims by Qualcomm, a recent U.S. International Trade

17   Commission ruling found that protecting and promoting competition around 5G was the much

18   greater national security interest.  As the decision stated, "competition is necessary for quality,

19   innovation, competitive pricing, and, in this case, the preservation of a strong U.S. presence in the

20   development of 5G and thus the national security of the United States," and, furthermore, there is

---

9    The case primarily relied upon by Qualcomm in support of this approach, *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011), does not mandate or even approve Qualcomm's elevation of the irreparable harm factor.  Instead, that case stands for the proposition that Qualcomm's **burden** of proving its irreparable harm is **higher** than its burden on the other factors (*id.* at 968), not for the proposition that the harm factor singlehandedly drives the stay decision.

Similarly, Qualcomm's claim that the third (balancing of interests) and fourth (public interest) factors here "merge" into a single factor under *Leiva-Perez* also cannot be correct.  That case, which related to removal of an illegal alien from the US, has nothing to do with antitrust law.  Here, where the injunction is primarily designed to protect the 5G market and the competitors and customers in it, those entities should not be minimized in the way Qualcomm attempts.

ACT | The App Association *Amicus Brief*
5:17-cv-00220-LHK

"a real and palpable likelihood the National Security interests will be jeopardized" if Qualcomm's competitors are forced to exit the market.[10]

More importantly, none of Qualcomm's assertions about 5G are tied to Qualcomm's alleged need for a stay. Nothing in the Court's Order restricts Qualcomm from developing 5G technology, selling its 5G devices for a fair price, or licensing its 5G patents on FRAND terms. Qualcomm's premise that compliance with the Order would somehow prevent Qualcomm's participation in the 5G marketplace is simply false. Qualcomm would remain free to compete, develop, and invent. Indeed, given the Court's factual findings that Qualcomm and other SEP holders regularly and repeatedly negotiated exhaustive cross-licenses with component makers until more recently changing their licensing practices, Order at 128-130, requiring Qualcomm to grant such exhaustive licenses would be unlikely to cause undue harm even in the unlikely event that the injunction is overturned in full on appeal.[11]

Qualcomm also (incorrectly) argues that ceasing the activities found to be illegal in the Order would require that Qualcomm "creat[e] a web of new agreements and business

---

[10]  *In re Certain Mobile Elec. Devices and Radio Frequency and Processing Components Thereof*, Inv. No. 337-TA-1065, (Oct. 30, 2018) Initial Determination and Recommended Determination at 195-196; *see also* J. Kattan, *The Qualcomm Case and U.S. National Security*, at 6-8, *available at* https://actonline.org/wp-content/uploads/The-Qualcomm-Case-and-National-Security_Final.pdf (discussing and disputing Qualcomm's "National Security Canard").

[11]  In the Association's September 17, 2018 *amicus* brief to the Court, various of Qualcomm's prior public statements on this topic were noted. Dkt. 857-2, n.16, *citing* Qualcomm's Counterclaims and Affirmative Defense in Case No. 05-3350 (MLC) (JJH) (D.N.J. Feb. 29, 2008), at ¶¶ 25, 56, 61, 77 ("Qualcomm, which owns a large portion of the intellectual property covering CDMA technology, operates a pro-competitive licensing model, in which it offers licenses on fair, reasonable and non-discriminatory terms *to any interested company*."; "Qualcomm has repeatedly offered [a competing chip manufacturer] license terms for Qualcomm's UMTS patents that comply with FRAND and are at least as favorable as the terms Qualcomm has offered to other chipset licensees.") (emphasis added); Qualcomm Opp. to Broadcom Motion to Dismiss, Strike or Summary Judgment, Case No. SACV05-0467-JVS (RNBx) (C.D. Cal. Jan. 20, 2009), ECF No. 1606 (asserting violation of FRAND based on competing chipset manufacturer's refusal to license Qualcomm). Indeed, in connection with prior litigation, the defendant's current President (then Vice President) publicly stated: "*Saying [Qualcomm] refuse[s] to license competitors is like saying McDonald's refuses to sell hamburgers [...] It's nuts. It's crazy*." *See* Gittlesohn, J., *Battle of Tech Heavyweights*, Orange County Register (5/1/07) Orange County (Cal.) Reg. 1 2007 WLNR 30244838.)") (emphasis added).

relationships" and that "any new agreements that Qualcomm is compelled to enter while the appeal is pending would remain effective even if Qualcomm ultimately prevails before the Ninth Circuit."  Motion, at 2.  But the Order does not require that Qualcomm enter into permanent or even long-term relationships during the pendency of an appeal, whether based on new licenses or re-negotiation of existing licenses.  Rather, Qualcomm could avoid these self-styled harms by structuring any new "arrangements" or agreements so as to terminate in the event that the Order is overturned (or, for existing licensees, to revert to current licensing terms).  In this way, Qualcomm could comply with the Order while still ensuring that its business relationships could return to the *status quo ante* in the event the Order is overturned.  The alleged hardship of compliance with the Order is not nearly so onerous as Qualcomm's Motion suggests, and any harm can be mitigated by Qualcomm's ability to negotiate appropriate termination provisions into any new or revised agreements.

Qualcomm's suggestion that the Order requires it to parse through its patent portfolio at a granular level, including sometimes the claims within each individual patent, to determine which claims must be licensed at the component level and which must be licensed at the OEM level is similarly hyperbolic and incorrect.  Motion, at 7; Declaration of Alex Rogers in Support of Motion to Stay, Dkt. 1495-1 ("Rogers Dec.") at ¶5.  In fact, the Order requires no such thing, either explicitly or implicitly.  Cellular standards are implemented at the chip level,[12] and the Order addresses patents that Qualcomm itself has declared essential to the LTE and other cellular standards.  There is therefore no need for Qualcomm to go through the machinations that Qualcomm postulates.  Regardless of whether some Qualcomm's patents are drafted at a system or network-level, Qualcomm still can grant exhaustive licensing to rival chipmakers for its entire SEP portfolio.  This is demonstrated, for example, by the exhaustive cross-licenses to Qualcomm's own chip business that Qualcomm requires from its own licensees.  It never has been the law, and even Qualcomm does not appear to claim otherwise, that only *directly*

---

[12]  *See, e.g., GPNE Corp. v. Apple, Inc.*, No. 12-CV- 02885-LHK, 2014 WL 1494247, at *13 (N.D. Cal. Apr. 16, 2014) (holding "as a matter of law that in this case [where the asserted patents were claimed to be essential to 3G and 4G cellular standards], the baseband processor is the proper smallest salable patent-practicing unit").

8

*infringing* devices may become licensed; an exhaustive license to any system or network-level SEPs in Qualcomm's portfolio would protect rival chipmakers from claims of indirect infringement.  The Association respectfully suggests that Qualcomm's argument on this issue should be expressly rejected so as to clarify that it would be a violation of the Order to refuse to license some companies to some portion of Qualcomm's SEPs based on inaccurate positions regarding the "level" of some of Qualcomm's patent claims.

In a show of concern for other third parties who are not bound by the Order, Qualcomm argues that the Order could upend the licensing practices of those third parties.  Motion, at 2.  But the Order does ***not*** apply to third parties—and Qualcomm certainly cannot rely on alleged (but unproven) harm to third parties to establish that the Order will irreparably harm Qualcomm itself. While third parties could (and hopefully, for the sake of the marketplace and the public interest, would) take direction from the Court's findings and cease practices that the Court found to be illegal, nothing in the Order binds third parties.  Likewise, nothing about a stay of the Order would alter the Court's findings or guidance; the Court's Order "condemns" (in Qualcomm's words) certain misbehaviors relating to SEPs, and such condemnation will continue to apply regardless of whether the resulting remedies ordered against Qualcomm are stayed.  In other words, third parties will continue to have the choice whether to follow the Court's guidance or not irrespective of whether a stay applies.[13]  Qualcomm's suggestion that failing to stay an order applicable only to Qualcomm might force third parties involuntarily to alter their practices is incorrect and illogical.

Finally, Qualcomm argues that exhaustive chip sales could not be "unwound."  Motion, at 3.  But nothing in the Order precludes Qualcomm from pricing its chips at fair prices during the course of an appeal, including compensation for its patent rights (just as nothing requires Qualcomm to repay its licensees for years of illegally-demanded overpayments).  While exhaustion may apply for any chips sold during the course of an appeal, it is unclear what harm

---

[13]   None of the third parties that Qualcomm's Motion references (Nokia, Ericsson, or InterDigital) are chip makers with monopoly power over supply of 3G or 4G modem chips— one of the predicate findings underlying the Court's rulings.

ACT | The App Association *Amicus Brief*
5:17-cv-00220-LHK

1   would thereby befall Qualcomm, given that the Order permits it to obtain full and fair

2   compensation for its products and technologies.  And, in the event the Order is overturned,

3   Qualcomm could simply revert to its prior practices for any sales thereafter.

4          In short, under the Order, Qualcomm retains the right and ability to seek and obtain

5   FRAND compensation for its inventions and to price its chips fairly to obtain their full value.

6   Even Qualcomm does not argue that it will not be able to "return to its pre-injunction business"—

7   only that it would be difficult for Qualcomm to do so "in an orderly fashion."  Motion, at 3.

8   Qualcomm's alleged interest in an "orderly" transition of its licensing practices does not

9   overcome the substantial public interest in protecting competition during this critical time for 4G

10  and 5G markets.

11  **V.    CONCLUSION**

12         The Court's Order protects fair competition at a crucial time of industry development.

13  The harm to the marketplace and consumers associated with SEP abuse far outweighs any

14  asserted risks to one competitor.  The Association thanks the Court for its consideration of its

15  views and perspectives.

16                                              Dated: June 11, 2019

17

18                                              By: */s/ Amanda Tessar*

19                                              Amanda Tessar (admitted *pro hac vice*)
                                                ATessar@perkinscoie.com
20                                              **PERKINS COIE LLP**
                                                1900 Sixteenth Street, Suite 1400
21                                              Denver, CO 80202-5255
                                                Telephone:  303.291.2357
22                                              Facsimile:  303.291.2457

23                                              Sarah E. Fowler, California Bar #264838
                                                SFowler@perkinscoie.com
24                                              **PERKINS COIE LLP**
                                                3150 Porter Drive
25                                              Palo Alto, CA 94304-1212
                                                Telephone:  650.838.4489
26                                              Facsimile:  650.838.4350

27                                              **ATTORNEYS FOR AMICUS CURIAE**
                                                **ACT | THE APP ASSOCIATION**
28

ACT | The App Association *Amicus Brief*
                                                                                5:17-cv-00220-LHK