KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest - # 84065
rvannest@keker.com
Eugene M. Paige - # 202849
epaige@keker.com
Cody S. Harris - #255302
charris@keker.com
Justina Sessions - # 270914
jsessions@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     (415) 391 5400
Facsimile:     (415) 397 7188

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein *(pro hac vice)*
gbornstein@cravath.com
Yonatan Even *(pro hac vice)*
yeven@cravath.com
825 Eighth Avenue
New York, New York 10019-7475
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet *(pro hac vice)*
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile:  (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Willard K. Tom *(pro hac vice)*
willard.tom@morganlewis.com
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Facsimile:  (202) 739-3001

MORGAN, LEWIS & BOCKIUS LLP
Geoffrey T. Holtz (SBN 191370)
gholtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

Attorneys for Defendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>Plaintiff,<br><br>vs.<br><br>QUALCOMM INCORPORATED,<br>a Delaware corporation<br><br>Defendant. | Case No. 5:17-cv-00220-LHK<br><br>**DEFENDANT QUALCOMM INCORPORATED'S REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL**<br><br>Dept.:     Courtroom 8, 4th Floor<br>Judge:    Hon. Lucy H. Koh |

In its Motion For Stay Pending Appeal (ECF No. 1495, the "Mot."), Qualcomm demonstrated that, absent a stay, the Order would cause Qualcomm irreparable harm, that Qualcomm's appeal raises serious questions on which Qualcomm has a fair prospect of success, and that staying the injunction pending appeal will not impair but rather further the public interest. On June 11, 2019, the Federal Trade Commission ("FTC") filed its Opposition. (ECF No. 1500, the "Opp.".) The FTC's Opposition does nothing to undermine the strong justification for a stay of the Order pending appeal; all of the factors applied by the Ninth Circuit strongly weigh in favor of a stay.

Qualcomm focuses its Reply on the irreparable harm prong of the stay test, and specifically on certain fundamental errors in the FTC's discussion of that factor, which mischaracterizes Qualcomm's business and the cellular industry. Qualcomm only briefly discusses the other two prongs of the stay test and some of the many misstatements in the *amicus* briefs from LG Electronics ("LGE") and ACT The App Association ("ACT").

**A.      Qualcomm Has Shown That It Will Be Irreparably Harmed Absent a Stay.**

Absent a stay, Qualcomm will suffer irreparable harm from implementing each of the first two provisions of the injunction,[1] which require Qualcomm to (1) negotiate new agreements with many licensees; (2) sell chips to unlicensed customers; and (3) grant exhaustive licenses to chip makers. (Mot. at 7-10; ECF No. 1495-1 ("Rogers Decl.") ¶¶ 5-9.)

**1.      Qualcomm will suffer irreparable harm if it is compelled to negotiate new agreements with many OEMs in view of the Order.**

Qualcomm showed in its Motion that if it is required to enter into new license agreements during an appeal, there is no practical way to undo those agreements if Qualcomm prevails on appeal, causing irreparable harm. (Mot. at 9-10; Rogers Decl. ¶ 8.) In response, the FTC makes two misplaced assertions. *First*, the FTC asserts that Qualcomm would not be harmed because the Order allows it to obtain "fair value" for its SEPs. (Opp. at 6.) This response is a red herring.

---

[1] Should the Court determine that the irreparable harm Qualcomm would suffer as a result of provisions (1) and (2) of the injunction does not warrant a stay of the entire Order, Qualcomm respectfully submits that the Court should enter a partial stay of only provisions (1) and (2) of the injunction.

The FTC's main goal in this case was to lower Qualcomm's royalty rates; the Court concluded—and the Order states—that Qualcomm's rates are "unreasonably high" (Order at 157). Any negotiation or renegotiation that would take place in the shadow of the Order (absent a stay) would thus prejudice Qualcomm, not because of the loss of any purported leverage based on Qualcomm's chip supply, but because of the need to negotiate in the shadow of an Order that declares—erroneously, in Qualcomm's view—that Qualcomm's typical licensing terms are unreasonable. (Mot. at 9; Rogers Decl. ¶ 7.) Licensees in these negotiations are likely to use tactics to further harm Qualcomm, such as stopping payment of royalties under valid contracts, even if temporarily. (*See* Mot. at 10; Rogers Decl. ¶ 9; Han Decl. ¶ 8.) For example, Huawei stopped paying royalties to Qualcomm for a period of time during ongoing licensing negotiations—even though it has an active license agreement—resulting in significant lost royalty revenue to date. (Han Decl. ¶ 8.)

The FTC's further assertion that Qualcomm could, upon prevailing on appeal, seek "damages for any past infringement" to overcome the suspension of royalty payments is likewise erroneous. (Opp. at 6.) In this payment suspension case, the licensee still retains its license. But it is hornbook law that a license is a defense to a patent infringement claim. 35 U.S.C. § 271(a) ("Except as otherwise provided in this title, *whoever without authority* makes, uses, offers to sell, or sells any patented invention . . . infringes the patent") (emphasis added); *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 242 (1927). Thus, the FTC's proposed solution completely lacks merit. And absent a stay, if Qualcomm were forced to agree to a license with reduced royalties, Qualcomm could not recover its lost royalty revenue if it prevailed on appeal. (Han Decl. ¶ 6.) This irrecoverable loss of revenue constitutes irreparable harm.

Moreover, any royalty concessions to one licensee can cause irreparable harm to Qualcomm as a result of the effect on other licensees because of the non-discrimination provision of Qualcomm's FRAND commitment or "most favored" provisions in some of Qualcomm's license agreements. And this reduced royalty effect would become further entrenched beyond the appeal because licensing negotiations are often conducted by reference to comparable licenses; licensees would therefore seek to use unjustifiably reduced royalty terms negotiated in the

shadow of the Order as a benchmark for their agreements, artificially lowering the royalties Qualcomm receives below a reasonable royalty. (*Id.* ¶ 7; *see also* Trial Tr. at 1876:7-1877:3 (Nevo) (explaining that Qualcomm's most-favored royalty rate provisions and non-discrimination obligations under its FRAND commitments could drive Qualcomm's royalties to the "lowest common denominator").)

*Second*, the FTC asserts that any harm to Qualcomm is avoidable if Qualcomm negotiates "short-term or interim licenses", and that Qualcomm is free to negotiate "contractual provisions that would mitigate or eliminate any long-term adverse consequences to Qualcomm". (Opp. at 7.) This response is entirely impracticable and does nothing to address or mitigate the irreparable harm Qualcomm will suffer.

The FTC's response presupposes that licensees will simply accept "interim licenses" and contractual provisions that would mitigate lasting harm to Qualcomm; however, nothing in the Order mandates licensees to accept the interim license agreements and the damage-mitigating provisions the FTC hypothesizes. (Han Decl. ¶¶ 4-5.) Qualcomm's experience from past licensing negotiations is that licensees value the stability and certainty of long-term agreements. (*Id.* ¶ 5.) Licensees are unlikely to accept provisions that create uncertainty, such as contingent future payment of additional royalties for devices that already have been manufactured and sold, simply to benefit Qualcomm. (*Id.*) And even if some licensees would be open to *negotiating* such provisions, such provisions will not be agreed to for free—licensees would demand concessions on other license terms, including reduced royalty rates. (*Id.*) These concessions would themselves cause irreparable harm to Qualcomm, as there would be no way for Qualcomm to recover royalty revenue lost during the pendency of the appeal or to undo other licensing terms and their effects once the appeal is decided. (*Id.* ¶ 6.) And the FTC proposes no way—because none exists—to restore existing license agreements entered into prior to the interim agreements if Qualcomm prevails on appeal. (*See* Mot. at 9; Rogers Decl. ¶ 8.)

The cases on which the FTC relies for the proposition that there would be no harm from negotiating and renegotiating many new license agreements (Opp. at 3) are nonprecedential and inapposite. In *Winding Creek Solar LLC v. Peevy*, 2018 WL 1912136, at *1 (N.D. Cal. Apr. 23,

2018), the court concluded that an order that a utility commission use a "readily available" standard form contract rather than another form contract adjudged illegal, to accomplish the same result and with the same counterparties, did not cause irreparable harm.  Unlike in *Winding Creek*, the Order does not permit Qualcomm to comply by using an available and easily implementable alternative to accomplish the same result, and the contract in that case did not potentially affect many other contracts through mechanisms like Qualcomm's FRAND commitment or "most favored" contractual provisions.  Here, Qualcomm would be forced to radically reshape its licensing business in a way that is unprecedented in the cellular industry, undo many existing license agreements, and negotiate many new agreements with new counterparties and make exhaustive modem chip sales.  (*See* Trial Tr. at 1418:24-1423:16 (Gonell); Rogers Decl. ¶¶ 5-8.)  None of the damage resulting from these activities could be remedied if the Order is reversed.  And in *Overstreet v. Thomas David Medical Centers., P.C.*, 978 F. Supp. 1313, 1315 (D. Ariz. 1997), the court concluded only that the movant's claims of expense and extensive business changes were not proven, not that they would not constitute irreparable harm had they been established.

LGE's submission (ECF No. 1501) provides no support for the FTC's position.  Notably, LGE acknowledges that it currently is in "continuing negotiations over the next set of *long-term* agreements".  (ECF No. 1501-1 at 3 (emphasis added).)  The current interim agreement between Qualcomm and LGE was negotiated prior to and free from any effect of the Court's Order, and entered into after the parties had already reached a mutual understanding of the material terms of a future long-term agreement.  (Han Decl. ¶ 13.)  This agreement is exceptional and is nothing like the short-term agreements with undefined mitigation provisions that the FTC postulates.  (*Id.* ¶ 16.)

Moreover, LGE's submission (supported by a declaration of an attorney not involved in the license negotiations) misstates the facts, demonstrating the opportunistic use of the Order by

1  licensees to gain leverage in licensing negotiations with Qualcomm.[2]  Indeed, LGE's public

2  statements directly contradict its submission to this Court:  since filing its *amicus* brief, LGE has

3  publicly stated that "[t]here will be no disruption of supplies from Qualcomm".  (Byars Decl. Ex.

4  B.)  And indeed, contrary to LGE's insinuation (Lee Decl. (ECF No. 1501-2) ¶ 8), Qualcomm

5  continuously supplied chips to LGE, without any interruption, throughout the negotiations.  (Han

6  Decl. ¶ 15.)  Moreover, Qualcomm made a written offer to enter into binding FRAND arbitration

7  with LGE to try and resolve the dispute, which included an express guarantee of chip supply

8  during the pendency of the arbitration, but LGE declined that offer.  (Han Decl. ¶ 17.)

### 2. Qualcomm will suffer irreparable harm if it is compelled to sell chips to unlicensed OEMs.

Qualcomm also demonstrated in its Motion that it will face irreparable harm if it must sell modem chips to unlicensed OEMs while the appeal is pending.  (Mot. at 8-9.)  OEMs would claim that such sales exhaust Qualcomm's rights to seek royalties for its SEPs, and as a result Qualcomm would be unable to recover the fair value of its patents from them.  (Mot. at 8; *see* Rogers Decl. ¶ 6.)  The FTC asserts that Qualcomm can avoid this harm if it "price[s] its modem chips to reflect the fair value of its patents".  (Opp. at 5.)

But the FTC's argument fails to recognize that, at least so long as other chip makers are not licensed and thus do not price into their chip offerings the cost of Qualcomm's patents, this would leave Qualcomm in the untenable position of either charging much more for its chips than do its competitors (and therefore likely losing the sales), or reducing its chip prices so that, once again, they do not reflect the fair value of Qualcomm's patents.  Whether it is losing chip sales or the ability to recover for the value of its SEPs, Qualcomm is irreparably harmed.

---

[2] Qualcomm objects to the *amicus* submission by LGE based on LGE's refusal to seek Qualcomm's consent before filing and LGE's refusal to participate in meaningful discovery or to be cross-examined by Qualcomm in this case.  (*See* Qualcomm's pre-trial Motion in Limine concerning LGE (ECF No. 944).)  LGE should not be permitted to make self-serving statements under the guise of an *amicus* submission while it used its presence outside the United States to shield itself from discovery and prevent Qualcomm from making a record.

In addition to the discussion here, the accompanying declaration of John Han corrects the record as to other assertions in LGE's submission.

### 3. Qualcomm will suffer irreparable harm from being required to grant exhaustive licenses to chip makers.

Qualcomm also demonstrated in its Motion that, absent a stay, it will suffer irreparable harm from the requirement in the injunction to grant exhaustive licenses to chip makers as a result of the substantial difficulties inherent in multi-level licensing. (Mot. at 8-9.) Qualcomm has maintained throughout the case that its practice of licensing only at the device level is industry standard and is justified because it is much more efficient than licensing at multiple levels in the supply chain. (*See* Trial Tr. at 355:15-22 (Moynihan), 805:4-15 (Mollenkopf), 992:15-19 (Donaldson), 1432:12-24, 1436:3-8, 1439:15-23 (Gonell), 1670:14-1674:17 (Weiler).) The FTC asserts that if Qualcomm's position is correct, it is "implausible" to believe that "chip suppliers would nonetheless insist on licensing Qualcomm patents that their OEM customers could license more efficiently". (Opp. at 7.) The FTC ignores basic motivations. The self-interest of chip makers is not to promote fair, quick and efficient collection of royalties by Qualcomm, but rather to delay and minimize the payment of royalties from those chip makers. Multi-level licensing would facilitate obstruction and delay. The OEMs would point to the chip makers and assert that most of Qualcomm's valuable patents are substantially embodied in the modem chips, such that chip makers should have to pay the bulk of the royalty. Conversely, the chip makers would point to the OEMs and assert that most of Qualcomm's valuable patents are substantially embodied in the complete devices as they communicate with the cellular network, such that OEMs should have to pay the bulk of the royalty (a claim they could make even if Qualcomm were to try and license to them its entire SEP portfolio, as the ACT brief proposes). (*See* Rogers Decl. ¶ 5.) This would force Qualcomm into negotiations over *which* portion of Qualcomm's patent portfolio each licensee needs to license—and inevitably disputes over that question—before Qualcomm was even in a position to begin addressing the value of those patents. (Trial Tr. at 1432:25-1434:21 (Gonell).) Licensing at only one level of the supply chain allows Qualcomm to avoid this "delay and disagreement among multiple parties", which "undermine Qualcomm's ability to obtain fair

1  value for its intellectual property". (Rogers Decl. ¶ 5.)[3]

2      The serious difficulties in multi-level licensing set forth in the Rogers Declaration are confirmed by the brief of *amicus* ACT, which asserts that "[c]ellular standards are implemented at the chip level" and, as a result, Qualcomm will not need to license cellular SEPs to OEMs. (ECF No. 1503-2 at 8.) ACT's bald assertion is entirely unsupported by any technical evidence; there is no evidence that all cellular SEPs are practiced by modem chips. To the contrary, Qualcomm submitted evidence that cellular standards describe the functionality of complete cellular devices, not modem chips. (*See* ECF No. 912 (Decl. of Lorenzo Casaccia) ¶¶ 5, 8, 10, 19-35).) ACT is an organization aligned with the interests of powerful OEMs such as Apple and Samsung, *see* https://allthingsfrand.com/about/ (an ACT website listing its members), and its brief illustrates the finger-pointing that would inevitably occur under a multi-level licensing regime.

    ACT further claims that its "views on these issues are mainstream and have been supported by an extensive array of industry . . . stakeholders", and as support cites a "Core Principles and Approaches for SEP Licensing" proposal that ACT (and others, including Apple and Lenovo) submitted to a CEN-CENELEC Workshop. (ECF No. 1503-2 at 3-4.) But many of the ideas espoused in that document were specifically and opportunistically used by OEMs to "devalue SEPs".[4] And ACT is not presenting the Court with the whole story. Rather, ACT omits the competing proposal submitted at the same CEN-CENELEC Workshop by many other industry participants (including Qualcomm) that contradicted ACT's positions and argued that "licensing a product or service at a single point in the supply chain is an efficient approach" to ensuring that SEP owners "allow access to [standard-essential] patented technology for

---

[3] The FTC miscites Paragraph 5 of the Declaration of Alex Rogers for the proposition that "Qualcomm asserts" that "should the injunction become effective, rivals will prove eager to conclude licenses with Qualcomm". (Opp. at 12.) Mr. Rogers made no such assertion in Paragraph 5 of his Declaration or anywhere else. To the contrary: he declares that "OEMs will contend that all or nearly all cellular SEP claims are practiced or exhausted at the component level and that Qualcomm must, under [the] Order, first license at the component level", causing "delay and disagreement among multiple parties". (Rogers Decl. ¶ 5.)

[4] (*See, e.g.*, Byars Decl. Ex. F at 7 (internal Apple document listing strategies to "[d]evalue SEPs", including by setting the royalty base as the "smallest priceable component" and "build[ing] favorable, arms-length 'comp' licenses").)

1  implementing and using the standard". (Byars Decl. Ex. A at 7.) ACT's *amicus* submission itself
2  represents an effort to use arguments about where cellular SEPs are practiced to make it
3  substantially more difficult for Qualcomm (and other SEP holders) to license its SEPs and obtain
4  fair value for its patents.
5       The irreparable harm is exacerbated by the prospect of inconsistencies between the Order
6  and foreign regulators. The Taiwan Fair Trade Commission ("TFTC") and the Chinese National
7  Development and Reform Commission ("NDRC") each recently investigated the same set of
8  Qualcomm practices and concluded their investigations without ordering Qualcomm to license
9  component makers. (*See, e.g.*, Byars Decl. Ex. C, Ex. D, Ex. E at 2 (TFTC settlement providing
10 that "Qualcomm will not assert any SEP claim against a [chip maker] without first offering them
11 a license to such claim on [FRAND] terms and conditions"); Trial Tr. 1982:23-1983:13 (Rogers)
12 (Rectification Plan with NDRC does not require Qualcomm to sell chips to unlicensed companies
13 or to license at the component level).) Many chip makers (and OEMs) are based in Taiwan or
14 China. These deliberate decisions by foreign governments that it is in their respective national
15 interests not to impose the requirements in this Court's Order are entitled to adjudicative comity.
16 *See Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014).
17      The irreparable harm facing Qualcomm warrants a stay, and nothing in the FTC's
18 Opposition or the *amicus* briefs undermines that fact.
19      **B.**     **Qualcomm's Appeal Presents a Substantial Case on the Merits.**
20      Qualcomm demonstrated that its appeal presents a "substantial case on the merits", which
21 means "serious questions" or questions on which Qualcomm has a "fair prospect of success".
22 (Mot. at 6.) None of the FTC's arguments casts any doubt on the seriousness of the issues
23 Qualcomm intends to raise on appeal or its prospect of success. In the interest of space,
24 Qualcomm responds here only to the FTC's misstatements of the legal standards.
25      As an initial matter, the FTC asserts that Qualcomm "would have to show a strong
26 likelihood of success on appeal to obtain a stay". (Opp. at 11.) Qualcomm has easily made that
27 showing. However, the standard on this motion for a stay is lower, namely "a substantial case on
28 the merits". *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).

The FTC also asserts that Qualcomm's argument on appeal that the record lacks the necessary evidence of current market conditions justifying an injunction is a "case-management decision" "entitled to considerable deference on appeal". (Opp. at 12.) But the Ninth Circuit has held that evidence that a violation that is "ongoing or likely to recur" is a *necessary element* of the FTC's request for injunctive relief. *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985); *see also FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 158 (3d Cir. 2019) ("a court uses [the likelihood of recurrence standard] to determine the FTC's entitlement to an injunction"); *FTC v. AbbVie Inc.*, 329 F. Supp. 3d 98, 145 (E.D. Pa. 2018) (denying a permanent injunction because the record contained "no basis to conclude that" antitrust violations are "likely to reoccur"); *FTC v. Merch. Servs. Direct, LLC*, 2013 WL 4094394, at *3 (E.D. Wash. Aug. 13, 2013) (concluding that, after "stale" evidence regarding past alleged violations was "excised", "there is little to suggest that the violations . . . are likely to recur" and denying preliminary injunction).

This Court should find that Qualcomm's appeal presents a substantial case for relief on the merits.

### C. Staying the Order Pending Appeal Is in the Public Interest.

All witnesses at trial agreed that chip markets are characterized by falling prices, increased output and dynamic innovation. (Mot. at 3-4, 18-19; Trial Tr. at 1695:20-1696:7 (Chipty), 1797:6-1800:23 (Snyder), 2031:16-24, 2062:20-2064:22 (Shapiro).)

Nevertheless, the FTC asserts that this motion should be denied because of an alleged threat to future modem chip markets, including 5G. (Opp. at 8-9.) There is no record evidence, however, supporting the FTC's contention that 5G modem chips are, or are about to become, a properly defined antitrust market, or that Qualcomm will have monopoly power in that market once the sale of 5G modem chips begins. Nor has the FTC presented any evidence that should Qualcomm gain a leadership position in 5G, such position would be based on anything but a legitimate time-to-market advantage or superior chips. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (distinguishing between exclusionary conduct and "growth or development as a consequence of a superior product, business acumen, or historic accident").

The FTC also asserts that Qualcomm has not shown that allowing the injunction altering its business practices threatens harm to its technology leadership and therefore the national security of the United States.  The FTC acknowledges that the Committee on Foreign Investment in the United States ("CFIUS") blocked a foreign acquisition of Qualcomm by Broadcom, but asserts that CFIUS's letter "does not endorse, or even mention, the Qualcomm practices the Court has enjoined".  (Opp. at 10.)  That is incorrect.  The CFIUS letter states explicitly that CFIUS considered Broadcom's criticisms of Qualcomm's "licensing structure" and Broadcom's statement that it would "reset [Qualcomm's] business model".  (ECF No. 1495-2 at 3.)  CFIUS concluded that "[c]hanges to Qualcomm's business model would likely negatively impact the core R&D expenditures of national security concern".  (*Id*.)  And CFIUS identified Qualcomm as the "current leading company in 5G technology development and standard setting".  (*Id*. at 2.)  Thus, the CFIUS letter supports the public interest in maintaining the structure of Qualcomm's licensing business pending appeal.

A stay pending appeal would not harm competition but would protect the national security of the United States.  It is therefore in the public interest.

## CONCLUSION

For the foregoing reasons, and the reasons in Qualcomm's Motion, the Court should stay the Order pending appeal or, in the alternative, stay its Order while Qualcomm seeks a stay from the Court of Appeals for the Ninth Circuit.

Dated: June 18, 2019

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,


<u>     /s/ *Yonatan Even*     </u>
Gary A. Bornstein
Yonatan Even

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
gbornstein@cravath.com
yeven@cravath.com

Robert A. Van Nest
Eugene M. Paige
Justina K. Sessions
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Tel: (415) 391-5400
Fax: (415) 397-7188
rvannest@keker.com
epaige@keker.com
jsessions@keker.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Tel: (212) 309-6000
Fax: (212) 309-6001
richard.taffet@morganlewis.com

Willard K. Tom
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
Tel: (202) 739-3000
Fax: (202) 739 3001
willard.tom@morganlewis.com

Geoffrey T. Holtz
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: (415) 442-1000
Fax: (415) 442-1001
geoffrey.holtz@morganlewis.com

*Attorneys for Qualcomm Incorporated*