1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5

   FEDERAL TRADE COMMISSION,          )  C-17-00220 LHK
6                                     )
                  PLAINTIFF,          )  SAN JOSE, CALIFORNIA
7                                     )
            VS.                       )  JANUARY 4, 2019
8                                     )
   QUALCOMM INCORPORATED, A           )  VOLUME 1
9  DELAWARE CORPORATION,              )
                                      )  PAGES 1-159
10                DEFENDANT.          )
   _____   )

11

12

13            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
14           UNITED STATES DISTRICT JUDGE

15  A P P E A R A N C E S:

16  FOR THE PLAINTIFF:   FEDERAL TRADE COMMISSION
                         BY:  JENNIFER MILICI
17                            DANIEL J. MATHESON
                              WESLEY G. CARSON
18                            KENT COX
                              NATHANIEL M. HOPKIN
19                            PHILIP J. KEHL
                         600 PENNSYLVANIA AVENUE, NW
20                       WASHINGTON, D.C.  20580

21            APPEARANCES CONTINUED ON NEXT PAGE

22  OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, CRR, RMR
                                CERTIFICATE NUMBER 8074
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

```
 1

 2      APPEARANCES (CONTINUED)

 3

 4      FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                                BY:  ROBERT A. VAN NEST
 5                                   JUSTINA K. SESSIONS
                                     EUGENE M. PAIGE
 6                                   CHRISTINA BLAIS
                                     MATAN SHACHAM
 7                                   CODY HARRIS
                                     KRISTIN HUCEK
 8                              633 BATTERY STREET
                                SAN FRANCISCO, CALIFORNIA  94111
 9

10                              CRAVATH, SWAINE & MOORE
                                BY:  GARY A. BORNSTEIN
11                                   MICHAEL BRENT BYARS
                                     YONATAN EVEN
12                                   JORDAN D. PETERSON
                                     MING-TOY TAYLOR
13                                   DEREK SUTTON
                                     ANDREW HUYNH
14                              825 EIGHTH AVENUE
                                NEW YORK, NEW YORK  10019
15

16      ALSO PRESENT:           MARK SNYDER

17

18

19

20

21

22

23

24

25
```

1

2                            INDEX OF PROCEEDINGS

3

4    OPENING STATEMENT BY MS. MILICI1              P. 6

5    OPENING STATEMENT BY MR. VAN NEST             P. 27

6

7

8                            INDEX OF WITNESSES

9    PLAINTIFF'S

10   ERIC REIFSCHNEIDER
          VIDEOTAPED DEPOSITION                    P. 48
11

12   IRA BLUMBERG
          VIDEOTAPED DEPOSITION                    P. 59
13

14   PAUL JACOBS
          VIDEOTAPED DEPOSITION                    P. 77
15

16   DAVID WISE
          DIRECT EXAM BY MR. MATHESON              P. 83
17        CROSS-EXAM BY MS. SESSIONS               P. 112
          REDIRECT EXAM BY MR. MATHESON            P. 129
18        RECROSS-EXAM BY MS. SESSIONS             P. 134

19   NANFEN YU
          VIDEOTAPED DEPOSITION                    P. 139
20

21

22

23

24

25

```
 1                          INDEX OF EXHIBITS

 2                                      MARKED      ADMITTED

 3        PLAINTIFF'S

 4        6548, 5186, 6534, 6528,                  48
               5211, 5210, 6491,
 5             5179, 6500, 6516,
               6522, 6530, 8300,
 6             8297
          2093, 2079, 2120, 2121,                  58
 7             2122
          7041, 7224, 7042, 6605,                  77
 8             7279, 7234, 7035
          5248                                     84
 9        6837                                     87
          8299                                     90
10        3755                                     95
          5417                                     104
11        7251                                     105
          5953                                     106
12        5419                                     130
          1000, 1006, 1009, 1101                   138
13

14

15        JOINT

16        0087                                     58
          36, 45                                   76
17        0022, 0027, 0097, 0098                   138

18

19

20

21

22

23

24

25
```

```
 1     SAN JOSE, CALIFORNIA                    JANUARY 4, 2019

 2                    P R O C E E D I N G S

 3         (COURT CONVENED AT 9:04 A.M.)

 4              THE COURT:  GOOD MORNING, WELCOME.  PLEASE TAKE A

 5     SEAT.

 6              MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

 7              THE CLERK:  CALLING CASE NUMBER 17-220, FEDERAL TRADE

 8     COMMISSION VERSUS QUALCOMM, INCORPORATED.

 9              THE COURT:  OKAY.  PLEASE STATE YOUR APPEARANCES.

10              MS. MILICI:  JENNIFER MILICI FOR THE FEDERAL TRADE

11     COMMISSION.

12              MR. MATHESON:  DAN MATHESON FOR THE FEDERAL TRADE

13     COMMISSION.

14              MR. HOPKIN:  NATE HOPKIN FOR THE FEDERAL TRADE

15     COMMISSION.

16              MR. CARSON:  WES CARSON FOR THE FEDERAL TRADE

17     COMMISSION.

18              THE COURT:  OKAY.  GOOD MORNING, WELCOME.

19              MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

20         BOB VAN NEST FROM KEKER, VAN NEST & PETERS FOR QUALCOMM.

21     I'M HERE WITH EUGENE PAIGE, JUSTINA SESSIONS, CHRISTINA BLAIS,

22     AND IN THE FRONT ROW, MATAN SHACHAM, CODY HARRIS, AND

23     KRISTIN HUCEK.

24         AND OUR REPRESENTATIVE FROM QUALCOMM FOR TRIAL IS

25     MARK SNYDER, YOUR HONOR, THE HEAD OF QUALCOMM'S LITIGATION,
```

```
 1            WHO'S SITTING RIGHT HERE.

 2                 THE COURT:  OKAY.  WELCOME.

 3                 MR. BORNSTEIN:  AND GOOD MORNING, YOUR HONOR.

 4            GARY BORNSTEIN FROM CRAVATH, ALSO FOR QUALCOMM.  I'M

 5       JOINED BY SOME OF MY COLLEAGUES, YONATAN EVEN, AND OVER AT THE

 6       TABLE HERE, BRENT BYARS.

 7            AND DURING THE COURSE OF THE TRIAL, YOU'LL BE HEARING FROM

 8       A FEW OTHER FOLKS FROM CRAVATH, MR. JORDAN PETERSON, WHO'S

 9       SITTING IN THE GALLERY, AND THERE ARE A FEW OTHERS,

10       MING-TOY TAYLOR, DEREK SUTTON, AND WAY IN THE BACK IS

11       ANDREW HUYNH.

12                 THE COURT:  ALL RIGHT.  GOOD MORNING AND WELCOME.

13                 MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

14                 THE COURT:  OKAY.  SO LET'S START WITH OPENING

15       STATEMENTS.  EACH SIDE HAS HALF AN HOUR.  SO I'M JUST GOING TO

16       GO OFF OF THE CLOCK THAT'S ON THE REAL TIME TRANSCRIPT, SO IT'S

17       9:06.

18            ARE YOU READY, OR DO YOU WANT A LITTLE TIME TO GET

19       PREPARED?

20                 MS. MILICI:  I'M READY.

21                 THE COURT:  ALL RIGHT.  9:06.  GO AHEAD, PLEASE.

22            **(MS. MILICI GAVE HER OPENING STATEMENT ON BEHALF OF THE**

23       **FEDERAL TRADE COMMISSION.)**

24                 MS. MILICI:  GOOD MORNING, YOUR HONOR.

25       JENNIFER MILICI REPRESENTING THE FEDERAL TRADE COMMISSION.
```

1          THIS CASE CONCERNS QUALCOMM'S LONG-STANDING CORPORATE

2     POLICIES TO HARM COMPETITION AND CONSUMERS.  UNDER THOSE

3     POLICIES, QUALCOMM WILL NOT SELL MODEM CHIPS TO A CUSTOMER

4     UNLESS THE CUSTOMER TAKES A SEPARATE LICENSE TO QUALCOMM'S

5     STANDARD ESSENTIAL PATHS.

6          THE EVIDENCE WILL SHOW THAT DEVICE MANUFACTURERS AGREED TO

7     THE LICENSE TERMS NOT BECAUSE THE ROYALTY RATES REPRESENT THE

8     FAIR VALUE OF QUALCOMM'S PATENTS, BUT BECAUSE THEY NEED ACCESS

9     TO QUALCOMM'S MODEM CHIPS.

10         TO BUY QUALCOMM'S MODEM CHIPS, DEVICE MANUFACTURERS HAVE

11    TO AGREE TO PAY QUALCOMM'S ELEVATED ROYALTIES, WHICH ARE

12    EFFECTIVELY A SURCHARGE FOR ACCESS TO QUALCOMM'S CHIPS, EVEN

13    WHEN THEY USE CHIPS MADE BY QUALCOMM'S COMPETITORS.

14         AS A MATTER OF TEXTBOOK ECONOMICS, IF A MONOPOLIST DEMANDS

15    A SUBSTANTIAL PAYMENT EVERY TIME A CUSTOMER BUYS FROM SOMEONE

16    ELSE, THAT PAYMENT HARMS COMPETITION AND CONTRIBUTES TO THE

17    MAINTENANCE OF THE MONOPOLIST'S MARKET POWER.

18         UNDER THE FTC ACT, THAT CONDUCT IS UNLAWFUL AND WARRANTS

19    INJUNCTIVE RELIEF.

20         THE FACT THAT QUALCOMM'S SURCHARGE HAPPENS TO BE

21    CAMOUFLAGED IN A SEPARATE LICENSE AGREEMENT DOES NOT CHANGE THE

22    HARM TO COMPETITION OR GIVE QUALCOMM A FREE PASS FROM THE LAWS

23    THAT APPLY TO EVERYONE ELSE.

24         WE ARE ASKING THE COURT TO ENFORCE THOSE LAWS.

25              THE COURT:  I'M SORRY TO INTERRUPT YOU.  IT'S 9:08.

OPENING STATEMENT BY MS. MILICI

1    CAN EVERYONE SQUEEZE IN.  I THINK WE'RE GOING TO HAVE SOME

2    PEOPLE ARRIVING LATE, AND I WOULD LIKE EVERYONE TO BE ABLE TO

3    HAVE A SEAT.  I APOLOGIZE FOR INTERRUPTING YOU.

4         CAN EVERYONE ON EVERY SIDE SQUEEZE IN?  ALL RIGHT.  THANK

5    YOU.

6         IF SOMEONE ELSE COMES IN, IF YOU WOULD ALL PLEASE --

7    UNFORTUNATELY, WE DON'T HAVE ANY EXTRA COURTROOMS BECAUSE OF

8    ALL OF THE RENOVATION GOING ON IN THE BUILDING FOR THE HVAC.

9         ALL RIGHT.  THANK YOU.  I APOLOGIZE.  GO AHEAD.

10        MS. MILICI:  SURE.

11        OKAY.  THERE ARE FOUR INTERRELATED PRACTICES THAT

12   REENFORCE EACH OTHER AND COLLECTIVELY ALLOW QUALCOMM TO IMPOSE

13   A SURCHARGE, EXTEND ITS MONOPOLY POWER, AND HARM COMPETITION.

14        FIRST IS NO LICENSE, NO CHIPS.  AS THE COURT IS AWARE,

15   QUALCOMM AS HAS ADMITTED ITS LONGSTANDING CORPORATE POLICY OF

16   REFUSING TO SELL MODEM CHIPS TO MANUFACTURERS UNLESS THE

17   MANUFACTURER TAKES A SEPARATE LICENSE.

18        SECOND IS INCENTIVE PAYMENTS.  THE EVIDENCE WILL SHOW THAT

19   QUALCOMM HAS A PRACTICE OF OFFERING TO PAY INCENTIVES TO

20   MANUFACTURES TO INDUCE THEM TO ACCEPT HIGH ROYALTIES.

21        THIRD IS QUALCOMM'S REFUSAL TO LICENSE RIVALS.  QUALCOMM

22   HAS AN ADMITTED CORPORATE POLICY OF REFUSING TO OFFER

23   EXHAUSTIVE LICENSES TO ITS COMPETITORS TO MAKE AND SELL MODEM

24   CHIPS.

25        FINALLY, THE EVIDENCE WILL SHOW THAT QUALCOMM ENTERED DE

1      FACTO EXCLUSIVE DEALS WITH APPLE THAT FORECLOSED AN IMPORTANT

2      POINT OF ENTRY FOR RIVALS.

3              THESE FOUR PRACTICES WORK TOGETHER, AND HERE'S HOW.

4              NO LICENSE, NO CHIPS WOULDN'T BE AS EFFECTIVE IF QUALCOMM

5      LICENSED RIVAL CHIP MAKERS.

6              BECAUSE NO LICENSE, NO CHIPS IS SO EFFECTIVE, QUALCOMM IS

7      ABLE TO OBTAIN ELEVATED ROYALTIES WHICH THEN WEAKENS RIVALS.

8              THE ELEVATED ROYALTIES ALLOW QUALCOMM TO OFFER INCENTIVE

9      PAYMENTS AND EXCLUSIVE DEALS AS FORMS OF ROYALTY RELIEF THAT

10     DISCRIMINATE AGAINST RIVALS AND INCREASE QUALCOMM'S MARKET

11     POWER.

12             THAT MARKET POWER ALLOWS QUALCOMM TO CONTINUE TO USE NO

13     LICENSE, NO CHIPS.

14             QUALCOMM'S HIGH ROYALTIES WEAKEN ITS RIVALS AND WEAKENED

15     RIVALS ALLOW IT TO CONTINUE EXERCISING MARKET POWER TO OBTAIN

16     HIGH ROYALTIES.

17             HERE ON THIS SLIDE YOU SEE THAT QUALCOMM ADMITS ITS NO

18     LICENSE, NO CHIPS POLICY.  THERE IS NO DISPUTE IN THIS CASE

19     ABOUT THE EXISTENCE OF THE POLICY.  UNDER THAT POLICY, QUALCOMM

20     REQUIRED LICENSES FOR THE PURCHASE OF CDMA CHIPS, A MARKET THAT

21     THE EVIDENCE WILL SHOW THAT IT HAS DOMINATED SINCE THE 1990S,

22     AND UNDER THAT POLICY, QUALCOMM REQUIRES LICENSES FOR PREMIUM

23     LTE CHIPS WHEN THEY WERE INTRODUCED IN 2011 AND WHICH QUALCOMM

24     HAD MONOPOLY POWER.

25             ALL OF THE WITNESSES WHO WILL TESTIFY, QUALCOMM WITNESSES

1    AND THIRD PARTIES, WILL TESTIFY THAT QUALCOMM'S POLICY IS

2    UNIQUE AMONGST COMPONENT MANUFACTURERS, AND ALSO THAT THE

3    POLICY IS UNIQUE WITHIN QUALCOMM.

4         QUALCOMM SELLS OTHER COMPONENTS EXHAUSTIVELY, INCLUDING

5    WI-FI CHIPS.  THE DIFFERENCE IS THAT IN WI-FI CHIPS, QUALCOMM

6    DOES NOT HAVE MARKET POWER.

7         THE LICENSES THAT QUALCOMM REQUIRES AS A CONDITION OF

8    PURCHASING MODEM CHIPS IS CALLED A SUBSCRIBER UNIT LICENSE

9    AGREEMENT, OR SULA.

10        THESE ARE THE LICENSES THAT WE WILL SHOW ARE ILLEGAL UNDER

11   THE ANTITRUST LAWS.

12        NOW, QUALCOMM WITNESSES WILL CLAIM THAT NO LICENSE, NO

13   CHIPS IS JUSTIFIED BY ITS NEED TO AVOID CLAIMS OF PATENT

14   EXHAUSTION FOR THE MODEM CHIPS IT SELLS.  IT IS NOT

15   PROCOMPETITIVE TO AVOID THE DOCTRINE OF PATENT EXHAUSTION, THAT

16   QUALCOMM HAS SUCCESSFULLY MANAGED TO EMPLOY A BUSINESS MODEL

17   DESIGNED TO AVOID THE RULES THAT APPLY TO EVERYONE ELSE IS

18   EVIDENCE OF.  ITS MARKET POWER, NOT A JUSTIFICATION FOR ITS

19   CONDUCT.

20        AS SLIDE 5 SHOWS, THE NO LICENSE, NO CHIPS POLICY IS

21   ACTUALLY WRITTEN INTO QUALCOMM'S SUPPLY AGREEMENTS.  AS

22   QUALCOMM SAID IN RESPONSE TO INTERROGATORIES, IT HAS THE RIGHT

23   TO TERMINATE ITS COMPONENT SUPPLY AGREEMENT, WHICH IT CALLS, IS

24   SOMETIMES CALLED CSA'S, IF THE BUYER STOPS COMPLYING WITH ITS

25   LICENSE.

 1          UNDER THOSE CONTRACTS, QUALCOMM ALSO HAS THE RIGHT TO

 2   TERMINATE SUPPLY IF THE BUYER BECOMES UNLICENSED.

 3          QUALCOMM STATES IN ITS TRIAL BRIEF THAT IT HAS, AND I WILL

 4   QUOTE HERE BECAUSE QUALCOMM WAS OBVIOUSLY VERY CAREFUL ABOUT

 5   THE PHRASING -- BUT IT SAYS THAT IT HAS NEVER CUT OFF

 6   COMMERCIAL SUPPLY OF CHIPS TO AN EXISTING CUSTOMER AND NEVER

 7   THREATENED TO INTERRUPT CHIP SUPPLY TO A LICENSEE IN GOOD

 8   STANDING JUST BECAUSE THE LICENSEE SOUGHT TO RENEGOTIATE OR

 9   CHALLENGE AN EXISTING OR EXPIRING AGREEMENT.

10          AND I EXPECT DURING THIS TRIAL WE WILL HEAR QUALCOMM'S

11   EXECUTIVES OFFER SIMILARLY CAREFULLY CRAFTED TESTIMONY ABOUT NO

12   LICENSE, NO CHIPS AND HOW IT WORKS.

13          BUT NO AMOUNT OF WORDSMITHING CAN CHANGE THE BOTTOM LINE:

14   THAT QUALCOMM DOES NOT SELL CHIPS TO UNLICENSED CUSTOMERS, THAT

15   IT HAS WRITTEN THAT POLICY INTO ITS CONTRACTS AND THREATENS

16   BUYERS DURING LICENSE NEGOTIATIONS THAT IT WILL CUT OFF MODEM

17   CHIP SUPPLY IF THEY DO NOT REACH AN AGREEMENT ON LICENSE TERMS.

18          AND EVEN IF IT WERE TRUE THAT QUALCOMM HAD NEVER CUT OFF

19   CHIP SUPPLY, THAT WOULD BE A TESTAMENT TO THE EFFECTIVENESS OF

20   ITS THREATS TO DO SO, NOT EVIDENCE THAT ITS LICENSES WERE

21   FAIRLY NEGOTIATED.

22          SLIDE 6 IS AN ACTUAL PRESENTATION TO THE QUALCOMM BOARD

23   MADE IN 2012.  QUALCOMM ACKNOWLEDGED THAT IF IT CEASES SUPPLY

24   OF CHIPS TO CURRENT CUSTOMERS, THEY MAY ASSERT ANTITRUST CLAIMS

25   SEEKING DAMAGES, FINES, AND CONTINUED SUPPLY.

1      BUT THE STRATEGY RECOMMENDED BY QUALCOMM EXECUTIVES TO THE

2  BOARD WAS NOT TO CEASE THE UNLAWFUL CONDUCT, BUT TO DEVELOP A

3  PLAN OF COMMUNICATION/ACTION THAT MAXIMIZES OUR ABILITY TO

4  DEFEND AGAINST AN ANTITRUST CLAIM WHILE CEASING SUPPLY WHEN

5  NECESSARY.

6      AND WITNESSES FROM MULTIPLE MAJOR MANUFACTURERS WILL

7  TESTIFY DURING THE TRIAL ABOUT SPECIFIC THREATS THAT QUALCOMM

8  MADE DURING LICENSE NEGOTIATIONS.  AND THOSE THREATS WORKED.

9  CUSTOMERS ENTERED NEW LICENSES WITH ROYALTY RATES THAT THEY

10  CONSIDERED UNFAIR AFTER BEING THREATENED.

11      FOR EXAMPLE, NANFEN YU OF HUAWEI WILL TESTIFY THAT

12  QUALCOMM EXPRESSED, BOTH ORALLY AND IN WRITING, THAT IT WOULD

13  STOP CHIP SUPPLY IF HUAWEI FAILED TO EXTEND ITS LICENSE.

14      HUAWEI THEN EXTENDED ITS LICENSE ON TERMS THAT IT BELIEVED

15  WERE UNREASONABLE BECAUSE, AS MS. YU WILL TESTIFY, IT NEEDED

16  QUALCOMM'S CHIPS.

17      MR. IRA BLUMBERG FROM LENOVO WILL LIKEWISE TESTIFY THAT

18  QUALCOMM TOLD HIM THAT IF LENOVO EXERCISED ITS RIGHT TO

19  TERMINATE A LICENSE WITH TERMS THAT IT CONSIDERED UNFAIR,

20  QUALCOMM WOULDN'T SELL LENOVO ANY MORE MODEM CHIPS.

21      AS A RESULT OF THE THREATS, LENOVO DID NOT EXERCISE ITS

22  RIGHT TO TERMINATE, BUT CONTINUED OPERATING THE LICENSE THAT --

23  OPERATING UNDER THE LICENSE THAT REQUIRED IT TO PAY EXCESSIVE

24  ROYALTIES TO QUALCOMM, EVEN WHEN IT USED COMPETITOR'S CHIPS.

25      COMPANY AFTER COMPANY WILL TESTIFY IN THIS CASE AND WHAT

1    WILL BE SO STRIKING IS THAT THEY WILL ALL SAY THE SAME THING

2    ABOUT QUALCOMM'S BUSINESS PRACTICES AND THE EFFECT THAT THEY

3    HAD.

4         IN RESPONSE, QUALCOMM WITNESSES WILL TESTIFY THAT QUALCOMM

5    HAS VALUABLE PATENTS AND HAS INVENTED TECHNOLOGY THAT IS

6    FUNDAMENTAL TO CELLULAR COMMUNICATIONS.

7         IF THAT IS TRUE, THEN QUALCOMM SHOULD NOT BE AFRAID TO

8    PROVE THE VALUE OF ITS STANDARD ESSENTIAL PATENTS IN PATENT

9    LITIGATION.  THE FTC DOES NOT DISPUTE THAT QUALCOMM HAS PATENTS

10   OF VALUE OR THAT IT IS FREE TO SEEK REASONABLE ROYALTIES FROM

11   INFRINGING MANUFACTURERS.

12        BUT THIS IS AN ANTITRUST CASE ABOUT WHETHER QUALCOMM CAN

13   USE A POLICY OF PRODUCT HOLDUP TO INFLATE ROYALTIES AND TO

14   AVOID PATENT LITIGATION IN WHICH A DEVICE MANUFACTURER COULD

15   CHALLENGE THE VALIDITY OR INFRINGEMENT OF QUALCOMM'S PATENTS

16   AND THE REASONABLENESS OF ITS ROYALTY DEMANDS.

17        MAKING VALUABLE TECHNOLOGY DOES NOT -- DOES NOT EXEMPT A

18   COMPANY FROM THE ANTITRUST LAWS.  NO ONE EVER ACCUSED MICROSOFT

19   OF FAILING TO MAKE VALUABLE TECHNOLOGY.

20        IN FACT, DURING THE PERIOD OF MICROSOFT'S MONOPOLIZATION

21   OF THE MARKETS FOR DESKTOP OPERATING SYSTEMS, PRICES DECLINED

22   AND FEATURES EXPANDED.

23        THE LAW STILL APPLIED TO MICROSOFT, JUST LIKE IT STILL

24   APPLIES TO QUALCOMM.

25        AND SLIDE 9 IS ONE OF QUALCOMM'S INTERNAL DOCUMENTS.  THIS

1       DOCUMENT CONFIRMS THAT QUALCOMM HAS A CORPORATE STRATEGY OF

2       USING POTENTIAL PRODUCT HOLDS ON CHIP SHIPMENTS, ON CHIP

3       SHIPMENTS AS STICKS AND LICENSE NEGOTIATIONS.  QUALCOMM ALSO

4       USES AS CARROTS PAYMENTS IN THE FORM OF STRATEGIC FUND, MDF, OR

5       MARKET DEVELOPMENT FUNDS, AND CHIP REBATES TO INDUCE

6       MANUFACTURERS TO SIGN LICENSES WITH HIGH ROYALTY RATES.

7           THOSE FUNDS ARE OFFERED IN EXCHANGE FOR AGREEMENTS ON

8       LICENSE TERMS, BUT THE PAYMENTS ACCRUE ON PURCHASES OF CHIPS

9       FROM QUALCOMM.

10          THE EVIDENCE WILL SHOW THAT QUALCOMM USED THE RATES THAT

11      IT OBTAINED THROUGH AN APPLICATION OF BOTH CARROTS AND STICKS

12      AS BENCHMARKS IN NEGOTIATIONS WITH OTHER CUSTOMERS, CLAIMING

13      THESE LICENSES PROVE THE REASONABLENESS OF ITS RUNNING ROYALTY

14      RATES.

15          QUALCOMM HAS LONG RECOGNIZED THAT THE LEVERAGE IT HAS OVER

16      DEVICE MANUFACTURERS AS A RESULT OF SELLING MUST-HAVE CHIPS

17      ALLOW IT IS TO OBTAIN HIGHER ROYALTIES FOR ITS LICENSING

18      BUSINESS THAN IT WOULD IF IT WAS FORCED TO NEGOTIATE ON THE

19      STRENGTH OF ITS PATENTS ALONE AS EVERY OTHER LICENSOR DOES.

20          AT VARIOUS POINTS IN ITS HISTORY, QUALCOMM HAS CONSIDERED

21      SPLITTING ITS CHIP BUSINESS, OFTEN REFERRED TO AS QCT, FROM ITS

22      LICENSING BUSINESS, REFERRED TO AS QTL.  IN 2007, THE POTENTIAL

23      SPINOFF OF THE CHIP BUSINESS WAS GIVEN THE CODE NAME BERLIN.

24          SLIDE 10 IS AN INTERNAL DOCUMENT IN WHICH QUALCOMM

25      CONSIDERED THE ARGUMENTS FOR AND AGAINST SPIN, AND ONE OF THE

1    RECOGNIZED ARGUMENTS AGAINST SPIN WAS THAT IT COULD HURT QTL'S

2    LEVERAGE TO NEGOTIATE 3G RENEWALS AND 4G LICENSING DEALS.

3         IN FACT, QUALCOMM DECIDED NOT TO GO FORWARD WITH BERLIN

4    BECAUSE AS STEVE ALTMAN, THEN THE PRESIDENT OF QUALCOMM,

5    EXPLAINED IN THIS E-MAIL, THE COMBINATION OF QCT GREATLY

6    ENHANCES QTL'S SUCCESS.  QUALCOMM ANTICIPATED THAT OEM'S WOULD

7    REMAIN RELIANT ON IT FOR CONTINUED SUPPLY OF CDMA CHIPS AND, AS

8    A RESULT, WOULD NEED TO MAINTAIN POSITIVE RELATIONSHIPS WITH

9    QUALCOMM.  BECAUSE THEY NEEDED QUALCOMM CHIPS, THEY WOULD NOT

10   CHALLENGE QTL'S LICENSE DEMANDS.

11        IN 2015, QUALCOMM AGAIN CONSIDERED SPLITTING QTL AND QCT

12   INTO SEPARATE BUSINESSES AND NAMED IT PROJECT PHOENIX.  AND,

13   AGAIN, QUALCOMM DETERMINED THAT A SEPARATION FROM THE CHIP

14   BUSINESS WOULD DEPRIVE QUALCOMM OF WHAT IT REFERRED TO AS ITS

15   PRODUCT STICK, LEAVING IT WITH FEWER NEGOTIATING LEVERS AND

16   EXPOSING QTL TO INCREASED NEGOTIATION AND PATENT LITIGATION

17   FROM OEM'S.

18        AND IN PROJECT PHOENIX, QUALCOMM SPECIFICALLY RECOGNIZED

19   THAT SPLITTING QTL FROM QCT WOULD REDUCE QUALCOMM'S ABILITY TO

20   OBTAIN THE SAME HIGH ROYALTIES IN 5G AS IT DID IN 3G AND 4G.

21        QUALCOMM'S PRODUCT STICK HAS BEEN EFFECTIVE BECAUSE OF ITS

22   MARKET POWER.  AS QUALCOMM'S OWN DOCUMENTS SHOW, QUALCOMM HAD A

23   VERY HIGH SHARE OF CDMA CAPABLE MODEM CHIPS THROUGHOUT MUCH OF

24   THE RELEVANT TIME PERIOD.

25        AND MARKET PARTICIPANTS WILL TESTIFY THAT THERE WERE NO

1    VIABLE COMMERCIAL ALTERNATIVES TO QUALCOMM'S CDMA CAPABLE

2    CHIPS.

3         QUALCOMM ALSO DOMINATED THE MARKET FOR PREMIUM LTE CHIPS

4    AND DEVICE MANUFACTURERS WILL TESTIFY THAT THEY HAD NO VIABLE

5    COMMERCIAL ALTERNATIVE TO QUALCOMM'S PREMIUM LTE MODEM CHIPS

6    AND QUALCOMM'S DOCUMENTS AND THE RELEVANT DATA ESTABLISH

7    QUALCOMM'S HIGH MARKET SHARE.

8         DEVICE MANUFACTURERS WILL TESTIFY THAT THEIR DEPENDENCE

9    UPON QUALCOMM FOR MODEM CHIPS GAVE QUALCOMM MUCH STRONGER

10   LEVERAGE AND SKEWED PATENT LICENSE NEGOTIATION OUTCOMES.

11        THE HIGHER ROYALTIES RAISED THE COST OF USING COMPETITOR

12   CHIPS, DETERRING ENTRY AND INVESTMENT OF COMPETITORS.

13        QUALCOMM IS COMMITTED TO LICENSE ITS STANDARD ESSENTIAL

14   PATENTS ON FAIR, REASONABLE, AND NON-DISCRIMINATORY TERMS.  BUT

15   EVEN BEFORE DOING MARKET COMPARISON, WE KNOW THAT THE LICENSE

16   RATES CHARGED BY QUALCOMM ARE TOO HIGH AND ABOVE FRAND BECAUSE

17   QUALCOMM USES ITS CHIP POWER TO REQUIRE A LICENSE.

18        QUALCOMM SAYS, YOU WILL PAY OUR RATES IF YOU WANT TO BUY

19   OUR CHIPS.

20        THE ONLY WAY TO ACHIEVE A MARKET RATE IS TO NEGOTIATE

21   WITHOUT THAT THREAT.  YOU CANNOT TIE A MONOPOLY IN CHIPS TO A

22   ROYALTY RATE AND GET AN ACTUAL MARKET RATE.

23        THE PROCESS OF TIEING THE SALE OF CHIPS TO LICENSING

24   POISONS THE NEGOTIATION OF A FRAND RATE.

25        NOW, WITHOUT A THREAT TO CHIP SUPPLY, A PARTY FACED WITH A

1    DEMAND FOR UNREASONABLE ROYALTIES FOR STANDARD ESSENTIAL

2    PATENTS CAN CHALLENGE THAT DEMAND IN COURT, EITHER AS A

3    DEFENDANT IN PATENT LITIGATION, OR A PLAINTIFF IN A FRAND

4    DETERMINATION ACTION.

5         QUALCOMM'S POLICIES PREVENT OEM'S FROM NEGOTIATING IN THE

6    SHADOW OF THE LAW.  INSTEAD, THEY NEGOTIATE IN THE SHADOW OF A

7    POTENTIALLY DEVASTATING DISRUPTION IN CHIP SUPPLY.

8         QUALCOMM IS ABLE TO USE ITS PRODUCT MARKET POWER TO DEMAND

9    HIGH ROYALTIES BECAUSE IT REFUSES TO EXHAUSTIVELY LICENSE CHIP

10   MAKERS WHO REQUEST A LICENSE, WHICH IS A VIOLATION OF ITS FRAND

11   COMMITMENTS.  AS MR. ABERLE TESTIFIED IN HIS DEPOSITION, SHOWN

12   ON THIS SLIDE, MANY CHIP MAKERS HAVE REQUESTED EXHAUSTIVE

13   LICENSES FROM QUALCOMM.

14        NOW, QUALCOMM WILL PRESENT EVIDENCE PURPORTING TO

15   ESTABLISH THAT REFUSING TO LICENSE CHIP MAKERS IS STANDARD

16   PRACTICE IN THE INDUSTRY.

17        BUT QUALCOMM HAS INSISTED ON OBTAINING EXHAUSTIVE LICENSES

18   FOR ITS OWN CHIP BUSINESS FROM OTHER PATENT HOLDERS, INCLUDING

19   COMPANIES WITH SIGNIFICANT SET PORTFOLIOS.

20        AND QUALCOMM HAS BEEN THE DOMINANT SUPPLIER OF CHIPS FOR

21   OVER A DECADE.  SO, IN FACT, A SIGNIFICANT PORTION OF THE

22   WORLDWIDE SALES OF MODEM CHIPS HAVE BEEN EXHAUSTIVE AS TO THE

23   SEP -- AS TO THE PATENTS OF OTHER SEP HOLDERS.  BUT NONE CONVEY

24   QUALCOMM'S PATENT RIGHTS, AND THAT'S WHAT ALLOWS QUALCOMM TO

25   CONTINUE TO USE THREATS OF PRODUCT HOLDUP TO COLLECT HIGH

1    ROYALTIES.

2          QUALCOMM ALSO DETERRED ENTRY AND INVESTMENT BY MODEM CHIP

3    MAKERS BY ENTERING INTO EXCLUSIVE DEALS WITH APPLE.  QUALCOMM

4    RECOGNIZED THAT IT FACED POTENTIAL COMPETITION FROM THE PREMIUM

5    MODEMS UNDER DEVELOPMENT BY OTHER MANUFACTURERS AND DETERMINED

6    THAT AN EXCLUSIVE DEAL WITH APPLE WOULD HAVE SIGNIFICANT

7    STRATEGIC BENEFITS, BECAUSE WITHOUT APPLE'S BUSINESS, THERE

8    WOULD NOT BE ENOUGH VOLUME FOR A COMPETITOR TO ENTER THE

9    MARKET.

10         QUALCOMM ENTERED AGREEMENTS WITH APPLE IN 2011 AND 2013

11   THAT PROVIDED PARTIAL ROYALTY RELIEF TO APPLE ON THE CONDITION

12   THAT IT AGREE TO FINANCIAL PENALTIES IF IT USED ANY

13   NON-QUALCOMM CHIPS.

14         THE PENALTIES WERE SUBSTANTIAL.  BILLIONS OF DOLLARS WERE

15   AT RISK IF APPLE USED A COMPETITOR CHIP IN A NEW PRODUCT.

16         THE PURPOSE AND EFFECT OF THE CONTRACTS WAS TO EXCLUDE

17   COMPETITORS FROM A SIGNIFICANT PORTION OF THE MARKET AND TO

18   FORECLOSE AN IMPORTANT AVENUE OF ENTRY AND EXPANSION.

19         NOW, QUALCOMM WITNESSES WILL TESTIFY THAT THE EXCLUSIVE

20   AGREEMENTS HAD NO COMPETITIVE EFFECT BECAUSE NO OTHER

21   MANUFACTURER WAS CAPABLE OF MEETING APPLE'S NEEDS DURING THE

22   TIME OF THE EXCLUSIVITY.

23         BUT QUALCOMM RELIES ON EVIDENCE FROM THE WORLD IN WHICH

24   QUALCOMM HAS BEEN ENGAGING IN ANTICOMPETITIVE PRACTICES FOR

25   YEARS AND YEARS.  IT IGNORES THE OPPORTUNITIES THAT WOULD HAVE

1    BEEN AVAILABLE TO COMPETITORS YEARS EARLIER IF QUALCOMM HAD

2    COMPETED ON THE MERITS.

3         AND AS THE EVIDENCE WILL DEMONSTRATE, EVEN IN THE WORLD

4    REFLECTING QUALCOMM'S EXCLUSIONARY CONDUCT, APPLE CONSIDERED

5    OTHER CHIPS, INCLUDING INTEL'S CHIPS, AND EVEN WITH NO LICENSE,

6    NO CHIPS, AND WITHOUT A QUALCOMM LICENSE, INTEL WAS A CAPABLE

7    POTENTIAL SUPPLIER.

8         BUT QUALCOMM'S EXCLUSIVE AGREEMENTS CLOSED THE DOOR ON

9    APPLE'S ENGAGEMENT WITH INTEL -- WITH -- INTEL'S ENGAGEMENT

10   WITH APPLE AT A KEY POINT IN TIME.

11        AND IT IS TRUE THAT INTEL SUPPLIES MODEM CHIPS TO APPLE

12   TODAY, BUT THE EXCLUSIVE DEALS DELAYED INTEL'S DEVELOPMENT AS A

13   COMPETITOR AND THIS DELAY HAD REAL CONSEQUENCES FOR INTEL.

14        QUALCOMM'S OWN DOCUMENTS ALSO ADMIT THAT IT ENTERED THE

15   AGREEMENTS WITH APPLE NOT BECAUSE IT HAD NO COMPETITORS, OR

16   BECAUSE IT HAD THE BEST TECHNOLOGY, BUT BECAUSE IT NEEDED TO

17   STOP FUTURE COMPETITION.

18        QUALCOMM WILL SHOW YOU DOCUMENTS THAT IN SOME YEARS

19   COMPETITORS WERE NOT READY.  THOSE DOCUMENTS ARE PART OF THE

20   EVIDENCE OF QUALCOMM'S CHIPSET MARKET POWER IN THOSE YEARS.

21        QUALCOMM USED THAT MARKET POWER NOT TO WIN ONE YEAR OR ONE

22   PRODUCT CYCLE WITH A SOLE SOURCE CONTRACT, BUT TO COMPEL

23   EXCLUSIVITY FOR MANY YEARS AND TO STOP FUTURE COMPETITION.

24        NOW, WITH THIS BACKDROP IN MIND, I WOULD LIKE TO PREVIEW

25   THE EVIDENCE THAT THE COURT WILL HEAR OVER THE NEXT FEW DAYS OF

1        TRIAL.

2             AS THE COURT IS AWARE FROM OUR BRIEFING ON THIS ISSUE, THE

3        FTC WILL UNFORTUNATELY HAVE TO PRESENT SOME TESTIMONY FROM

4        FORMER QUALCOMM EXECUTIVES BY VIDEO TODAY THAT IT HAD HOPED TO

5        PRESENT LIVE.

6             THE COURT WILL HEAR THE VIDEOTAPED TESTIMONY OF

7        ERIC REIFSCHNEIDER.  MR. REIFSCHNEIDER WAS OUTSIDE COUNSEL FOR

8        QUALCOMM FOR SEVERAL YEARS BEFORE SERVING AS THE GENERAL

9        MANAGER OF QTL FROM 2012 TO 2016.

10            THE FTC IS PLAYING MR. REIFSCHNEIDER'S VIDEO TO INTRODUCE

11       IMPORTANT NEGOTIATION DOCUMENTS.  THESE DOCUMENTS SHOW

12       QUALCOMM'S SUPPLY THREATS AND EFFORT -- AND OFFERS OF FINANCIAL

13       INDUCEMENTS.

14            MR. REIFSCHNEIDER WILL TRY TO EXPLAIN AWAY THE DOCUMENTS.

15       THE DOCUMENTS SPEAK FOR THEMSELVES.

16            THE FTC WILL ALSO CALL BY VIDEO DR. PAUL JACOBS.

17       DR. JACOBS IS QUALCOMM'S FORMER CEO AND BOARD CHAIRMAN.

18            THE FTC IS PLAYING DR. JACOBS'S VIDEO IN ORDER TO

19       INTRODUCE KEY DOCUMENTS REGARDING PROJECT BERLIN AND OTHER

20       TOPICS.

21            DR. JACOBS WILL TRY TO PUT A POSITIVE SPIN ON THE

22       CONTEMPORANEOUS DOCUMENTS THAT SHOW THAT QUALCOMM KEPT THE

23       COMPANY TOGETHER IN ORDER TO CONTINUE TO EXPLOIT OEMS' NEED FOR

24       QUALCOMM CDMA MODEM CHIPS TO OBTAIN HIGHER ROYALTIES.

25            DR. JACOBS'S SPIN IS DIFFERENT THAN WHAT THE DOCUMENTS

1        SAID AT THE TIME AND CONTRARY TO THE OTHER EVIDENCE THE COURT

2        WILL HEAR.

3            THE COURT WILL ALSO HEAR THE VIDEOTAPED TESTIMONY OF

4        HUAWEI AND LENOVO EXECUTIVES.  BOTH WITNESSES WILL TESTIFY

5        ABOUT SPECIFIC THREATS MADE BY ERIC REIFSCHNEIDER AND OTHER

6        QUALCOMM EXECUTIVES DURING LICENSE NEGOTIATIONS AND THE EFFECT

7        OF THOSE THREATS ON NEGOTIATION OUTCOMES.

8            THE FTC WILL ALSO CALL MR. DAVID WISE LIVE TODAY.

9        MR. WISE IS THE SENIOR VICE PRESIDENT OF FINANCE FOR QUALCOMM.

10       MR. WISE WAS INTIMATELY INVOLVED IN PROJECT PHOENIX, DURING

11       WHICH QUALCOMM AGAIN CHOSE TO KEEP THE COMPANY TOGETHER TO

12       ALLOW IT TO CONTINUE TO USE CHIP LEVERAGE TO OBTAIN SURCHARGES

13       IN THE FORM OF UNREASONABLE ROYALTIES FROM DEVICE

14       MANUFACTURERS.

15           ON MONDAY, THE FTC WILL CALL THE TWO FORMER EXECUTIVES

16       THAT WERE SERVED TRIAL SUBPOENAS BY MAIL PURSUANT TO THE

17       COURT'S ORDER, NEITHER OF WHOM ARE AVAILABLE TODAY DUE TO

18       PREEXISTING VACATION PLANS.

19           THOSE EXECUTIVES ARE MR. STEVE ALTMAN, THE FORMER

20       PRESIDENT AND VICE CHAIRMAN OF QUALCOMM AND THE ARCHITECTURE OF

21       ITS LICENSING PROGRAM; AND MR. DEREK ABERLE, THE FORMER

22       PRESIDENT OF QTL AND FORMER PRESIDENT OF QUALCOMM.

23           THE FTC WILL ALSO CALL LIVE MR. FINBARR MOYNIHAN FROM

24       MEDIATEK, A RIVAL CHIP MAKER.  MR. MOYNIHAN WILL TESTIFY THAT

25       MEDIATEK'S ABILITY TO COMPETE WAS INHIBITED BY QUALCOMM'S

1    ANTICOMPETITIVE CONDUCT.  QUALCOMM INITIALLY DELAYED AND

2    RESISTED MEDIATEK'S REQUEST FOR LICENSE, REFUSED TO GRANT AN

3    EXHAUSTIVE LICENSE, PLACED ARTIFICIAL LIMITATIONS ON THE

4    CUSTOMERS MEDIATEK COULD SERVE, AND FORECLOSED MEDIATEK FROM

5    CERTAIN KEY OEM'S SELLING HANDSETS IN THE UNITED STATES.

6         DESPITE HAVING SOME SUCCESS IN LOW MARGIN, LOW TIER

7    PRODUCTS, MEDIATEK HAS NOT BEEN ABLE TO COMPETE IN A PREMIUM

8    TIER.

9         OVER THE NEXT DAYS OF TRIAL, THE FTC WILL CALL A NUMBER OF

10   OTHER OEM'S AND CHIP MANUFACTURERS LIVE AND BY VIDEO.  EVERY

11   OEM WILL TESTIFY THAT QUALCOMM'S ROYALTY RATES ARE NOT FRAND

12   AND THAT THE NEGOTIATIONS WERE SKEWED BY IMPLICIT AND EXPLICIT

13   THREATS TO SUPPLY.

14        EVERY RIVAL AND POTENTIAL RIVAL WILL TESTIFY THAT QUALCOMM

15   REFUSED TO PROVIDE A REQUESTED EXHAUSTIVE LICENSE, AND THAT

16   QUALCOMM'S CONDUCT IMPAIRED THEIR ABILITY TO COMPETE

17   EFFECTIVELY.

18        AFTER PRESENTING THE TESTIMONY OF FACT WITNESSES, THE FTC

19   WILL CALL THREE EXPERTS IN ITS CASE-IN-CHIEF.

20        MR. DONALDSON WILL TESTIFY THAT PATENT LICENSE

21   NEGOTIATIONS TYPICALLY TAKE PLACE WITH AN EYE TOWARD THE

22   CONTROLLING LAW ON THE REMEDIES AVAILABLE FOR PATENT

23   INFRINGEMENT.  WHERE STANDARD ESSENTIAL PATENTS ARE INVOLVED,

24   THE ROYALTIES NEGOTIATED BY THE PARTIES SHOULD APPROXIMATE THE

25   ROYALTIES THAT WOULD BE AWARDED BY A COURT SHOULD NEGOTIATIONS

OPENING STATEMENT BY MS. MILICI

1    FAIL, INCLUDING IN LIGHT OF FRAND COMMITMENTS.

2          AS MR. DONALDSON WILL EXPLAIN QUALCOMM'S PRACTICES,

3    INCLUDING NO LICENSE, NO CHIPS, SKEWED NEGOTIATIONS TOWARDS THE

4    OUTCOMES THAT FAVOR QUALCOMM AND LEAD TO HIGHER ROYALTIES.

5          MR. MICHAEL LASINSKI COMPARED THE ROYALTY RATES RECEIVED

6    BY QUALCOMM TO THE FRAND RATES THAT ORDER -- THAT -- TO THE

7    RANGE OF FRAND RATES THAT ORDINARILY WOULD FORM THE BOUNDARIES

8    OF A NEGOTIATION.  THESE ARE THE RATES THAT COULD BE CALCULATED

9    USING ANY COMBINATION OF A NUMBER OF WIDELY ACCEPTED

10   METHODOLOGIES AND WIDELY ACCEPTED INDICATORS OF PORTFOLIO

11   STRENGTH.

12         MR. LASINSKI'S EXPERT OPINION, BASED ON THESE RELIABILITY

13   METHODOLOGIES, IS THAT QUALCOMM'S ROYALTY RATES ARE FAR ABOVE

14   ANY INDICATORS OF FAIR AND REASONABLE RATES.

15         NOW, QUALCOMM WILL ATTACK THE METHODOLOGIES USED BY

16   MR. LASINSKI.  BUT AS MR. LASINSKI WILL EXPLAIN, HE CALCULATED

17   A RANGE OF RATES USING METHODS THAT HAVE BEEN USED BY COURTS

18   WHEN DETERMINING FRAND RATES, AND BY PARTIES TO FRAND

19   NEGOTIATIONS.  UNDER NO COMBINATION OF ACCEPTED METHODS OR

20   MEASURES ARE QUALCOMM'S ROYALTIES WITHIN THE RANGE OF RATES

21   THAT A COURT WOULD CONSIDER FRAND OR THAT THE PARTIES WOULD

22   ANTICIPATE IF THEY WERE NEGOTIATING IN THE SHADOW OF A JUDICIAL

23   DETERMINATION.

24         QUALCOMM WILL NOT PROVIDE THE COURT WITH ANY ALTERNATIVE

25   ESTIMATE OF WHAT A COURT WOULD AWARD IN FRAND LITIGATION.

OPENING STATEMENT BY MS. MILICI

1          INSTEAD, QUALCOMM WILL POINT TO LICENSE AGREEMENTS THAT

2     ARE NEARLY 30 YEARS OLD AS EVIDENCE OF THE REASONABLENESS OF

3     ITS ROYALTY RATES.  EVEN THOUGH MANY OF THE PATENTS THAT IT

4     LICENSED IN THE EARLY 1990S EXPIRED A LONG TIME AGO, AND EVEN

5     THOUGH QUALCOMM WITNESSES WILL TESTIFY THAT THE CELLULAR

6     INDUSTRY HAS BEEN CHARACTERIZED BY RAPID CHANGE.

7          IN QUALCOMM'S VIEW, THE ONLY THING THAT HASN'T CHANGED IN

8     THE CELLULAR INDUSTRY IN THE LAST 30 YEARS IS THE ROYALTY RATE

9     THAT IT IS ENTITLED TO CHARGE.

10          BUT THE COURT WILL HEAR FROM ALL OF QUALCOMM'S LARGEST

11     CUSTOMERS, INCLUDING SAMSUNG, HUAWEI, LG, LENOVO, PEGATRON,

12     WISTRON AND APPLE, THAT THE ROYALTY RATES ARE NOT FRAND AND

13     THAT QUALCOMM WAS ONLY ABLE TO OBTAIN THOSE RATES BY EXERCISING

14     ITS CHIP LEVERAGE.

15          FINALLY, THE COURT WILL HEAR TESTIMONY FROM PROFESSOR

16     CARL SHAPIRO.  PROFESSOR SHAPIRO HAS STUDIED ANTITRUST,

17     INNOVATION, AND COMPETITIVE STRATEGY FOR OVER 30 YEARS.  HE HAS

18     TWICE SERVICED AS THE DEPUTY ASSISTANT ATTORNEY GENERAL FOR

19     ECONOMICS IN THE ANTITRUST DIVISION.  HE HAS WRITTEN NUMEROUS

20     PAPERS RELATING TO THE ANTITRUST ANALYSIS OF PATENTS AND PATENT

21     LICENSING, STANDARD ESSENTIAL PATENTS, AND FRAND COMMITMENTS.

22          PROFESSOR SHAPIRO WILL TESTIFY THAT QUALCOMM HAS MONOPOLY

23     POWER IN MARKETS FOR CDMA COMPATIBLE AND PREMIUM LTE MODEM

24     CHIPS AND THAT BOTH MARKETS SATISFY THE HYPOTHETICAL MONOPOLIST

25     TEST, WHICH THE PARTIES AGREE IS THE PROPER TEST TO DEFINE THE

OPENING STATEMENT BY MS. MILICI

1      ANTITRUST PRODUCT MARKET.

2          PROFESSOR SHAPIRO WILL ALSO EXPLAIN HOW QUALCOMM'S CONDUCT

3      HARMS COMPETITION IN MODEM CHIP MARKETS.  AS PROFESSOR SHAPIRO

4      WILL TESTIFY, WHEN QUALCOMM IS ABLE TO ARTIFICIALLY RAISE

5      ROYALTIES ON HANDSETS USING RIVAL CHIPS, ITS CONDUCT WEAKENS

6      THE COMPETITIVE STRENGTH IMPOSED BY RIVALS AND EXTENDS ITS OWN

7      MONOPOLY POWER.

8          AND AS PROFESSOR SHAPIRO WILL TESTIFY, WHAT QUALCOMM CALLS

9      PROCOMPETITIVE JUSTIFICATIONS FOR ITS CONDUCT ARE REALLY JUST

10     DIFFERENT WAYS QUALCOMM IS SAYING THAT IT IS ENTITLED TO AVOID

11     THE PATENT LITIGATION SYSTEM THAT APPLIES TO EVERY OTHER

12     LICENSOR.

13         FOR EXAMPLE, QUALCOMM JUSTIFIES ITS CONDUCT AS NECESSARY

14     TO AVOID LEGAL RISKS OF PATENT EXHAUSTION AND IMPLIED LICENSE

15     CLAIMS, MEANING THAT IT RECOGNIZES THAT WITHOUT NO LICENSE, NO

16     CHIPS, OEM'S WOULD BE LIKELY TO BRING LEGAL CLAIMS THAT MIGHT

17     REDUCE ITS LICENSING REVENUE.

18         QUALCOMM ALSO ASSERTS THAT NO LICENSE, NO CHIPS IS

19     JUSTIFIED BECAUSE SOME COMPANIES DO NOT RESPECT INTELLECTUAL

20     PROPERTY.

21         BUT EVERY OTHER PATENT HOLDER HAS TO ADDRESS THOSE ISSUES

22     IN PATENT LITIGATION.

23         QUALCOMM'S SELF-HELP IS NOT PROCOMPETITIVE.

24     DISSATISFACTION WITH THE LEGAL REMEDIES AVAILABLE TO PATENT

25     HOLDERS DOES NOT GIVE QUALCOMM THE RIGHT TO VIOLATE THE

1    ANTITRUST LAWS.

2         SO THE EVIDENCE THAT THE COURT WILL SEE OVER THE NEXT TEN

3    DAYS WILL SHOW THAT QUALCOMM HAS ENGAGED IN A COURSE OF CONDUCT

4    LASTING AT LEAST A DECADE THAT EXTENDED ITS MONOPOLY POWER IN

5    MODEM CHIP MARKETS, HARMED COMPETITION AND CONSUMERS, AND

6    VIOLATES THE FTC ACT.

7         THE CONDUCT ALLEGED IN THIS CASE IS ONGOING.  IT WAS NOT

8    SHORT TERM OR SPORADIC.  IT WAS AND IS ENTRENCHED CORPORATE

9    POLICY THAT HAS NEVER BEEN DISAVOWED BY QUALCOMM.

10        QUALCOMM'S INTERNAL DOCUMENTS SUGGEST ITS INTENT TO USE

11   THE SAME CONDUCT TO OBTAIN THE SAME RESULTS IN 5G.

12        AT THE END OF THE TRIAL, THE FTC WILL ASK THE COURT TO

13   ORDER EQUITABLE RELIEF TO PREVENT QUALCOMM FROM CONTINUING TO

14   ENGAGE IN ITS ANTICOMPETITIVE CONDUCT, INCLUDING BY ENJOINING

15   QUALCOMM FROM NO LICENSE, NO CHIPS AND RELATED CONDUCT.  THE

16   ANTITRUST LAWS APPLY TO ALL COMPANIES, INCLUDING QUALCOMM.

17        THANK YOU, YOUR HONOR.

18             THE COURT:  ALL RIGHT.  TIME IS 9:37.

19             MR. VAN NEST:  IF I CAN HAVE A MINUTE, YOUR HONOR --

20             THE COURT:  GO AHEAD, PLEASE.

21             MR. VAN NEST:  -- TO HAND OUT MY SLIDES?

22             THE COURT:  YES.

23        (PAUSE IN PROCEEDINGS.)

24             MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

25             THE COURT:  ARE YOU READY?

```
 1                  MR. VAN NEST:  IT'S A PRIVILEGE TO BE HERE.

 2            (MR. VAN NEST GAVE HIS OPENING STATEMENT ON BEHALF OF

 3      QUALCOMM.)

 4                  MR. VAN NEST:  BOB VAN NEST ON BEHALF OF QUALCOMM.

 5                  THE COURT:  9:38.  GO AHEAD, PLEASE.

 6                  MR. VAN NEST:  QUALCOMM HAS BECOME ONE OF THE MOST

 7      SUCCESSFUL TECHNOLOGY COMPANIES IN THE WORLD, YOUR HONOR,

 8      THROUGH PIONEERING INNOVATION, SUPERIOR ENGINEERING, AND BETTER

 9      PRODUCTS.

10            QUALCOMM STARTED OUT WITH A VERY SIMPLE FORMULA AS A

11      STARTUP, FOCUS ONLY ON COMMUNICATIONS TECHNOLOGY, THAT'S WHERE

12      THE NAME COMES FROM, QUALCOMM IS SHORT FOR QUALITY

13      COMMUNICATIONS; INVEST HEAVILY IN BASIC R&D THAT LOOKS YEARS

14      AHEAD WITHOUT ANY PROSPECT OF AN IMMEDIATE PAYOFF; DEVELOP

15      ENTIRE SYSTEMS TO CARRY THE COMMUNICATIONS BUSINESS FORWARD BY

16      GENERATIONS; AND THEN MAKE THAT TECHNOLOGY AVAILABLE TO THE

17      INDUSTRY THROUGH LICENSING AND STANDARDS.

18            SO FROM THE VERY BEGINNING, YOUR HONOR, QUALCOMM HAS

19      SOUGHT TO RECOUP THE VALUE OF ITS INTELLECTUAL PROPERTY AND ITS

20      RESEARCH AND DEVELOPMENT BY LICENSING THAT TECHNOLOGY TO OTHERS

21      AND CHARGING A ROYALTY, NOT THROUGH PRODUCT SALES.

22            AND SO THE LICENSING PROGRAM THAT'S AT ISSUE IN THIS

23      TRIAL, WHICH BEGAN SOME 30 YEARS AGO, INCLUDING THE ROUGHLY 5

24      PERCENT ROYALTY RATE THAT THE FTC NOW ATTACKS, THAT CAME INTO

25      EXISTENCE BEFORE QUALCOMM'S TECHNOLOGY WAS IN ANY STANDARD AND
```

```
1       YEARS BEFORE QUALCOMM HAD ANY CHIP BUSINESS AT ALL.

2            LICENSEE, AND THERE ARE HUNDREDS OF THEM, HAVE SIGNED

3       LICENSES AT THESE BASIC RATES BASED ON THE VALUE OF QUALCOMM'S

4       TECHNOLOGY AND THE STRENGTH OF ITS PATENT PORTFOLIO, NOT BASED

5       ON THREATS OR COERCION DURING NEGOTIATIONS.

6            NOW, THE FTC IS CHALLENGING SOME OF QUALCOMM'S LICENSING

7       PRACTICES THAT HAVE BEEN AROUND FOR YEARS.

8            BUT THE EVIDENCE IS NOT GOING TO SUPPORT THEIR CLAIMS.

9       INSTEAD, YOUR HONOR, THE EVIDENCE IS GOING TO SHOW THAT

10      LICENSING PATENTS AT THE HANDSET LEVEL HAS BEEN STANDARD

11      PRACTICE IN THIS INDUSTRY SINCE BEFORE QUALCOMM, AND IT IS SO

12      BECAUSE THAT'S THE MOST EFFICIENT WAY TO DO IT, AND IT MAKES

13      GOOD BUSINESS SENSE.

14           CHIPMAKERS, LIKE INTEL, MEDIATEK, AND OTHERS, THEY HAVE

15      THRIVED WITHOUT ANY LICENSE FROM QUALCOMM AND WITHOUT PAYING

16      QUALCOMM ANY ROYALTIES AT ALL.

17           QUALCOMM'S AGREEMENTS WITH APPLE WERE MUTUALLY BENEFICIAL

18      TO BOTH COMPANIES.  THEY DIDN'T HURT ANYBODY.

19           AND PROBABLY MOST IMPORTANT, YOUR HONOR, NONE OF THESE

20      PRACTICES HAVE HAD ANY ANTICOMPETITIVE EFFECTS IN ANY MARKET.

21      IN FACT, IT IS HARD TO FIND AN INDUSTRY IN THE U.S. OR ANYWHERE

22      ELSE THAT'S SEEN AS MUCH INNOVATION AND AS MUCH CHANGE, AS MUCH

23      BENEFIT, AS MOBILE COMMUNICATIONS AND SMARTPHONES.  THEY HAVE

24      CHANGED EVERYTHING.

25           AND NOT ONLY HAS INNOVATION BEEN HIGH, BUT THE
```

OPENING STATEMENT BY MR. VAN NEST

1    PARTICIPANTS IN THIS MARKET ARE ABSOLUTELY THRIVING.  APPLE AND

2    SAMSUNG ARE TWO OF THE MOST VALUABLE COMPANIES IN THE WORLD

3    NOW.  INTEL IS SUPPLYING 100 PERCENT OF THE MODEM CHIPS FOR THE

4    NEW APPLE PHONES.

5         CONSUMERS ARE BENEFITING, TOO.  OUR SMARTPHONES GET BETTER

6    AND BETTER EVERY YEAR.  THE AVERAGE PRICE GOES DOWN AND CHANGE

7    IS ALL THE TIME.

8         SO MY MAIN POINT IS THAT THESE THEORIES ARE JUST THAT.

9    THEY ARE NOT SUPPORTED BY THE EVIDENCE.

10        AND I WANT TO START, YOUR HONOR, BY SHOWING WHAT EVIDENCE

11   WE'RE GOING TO PRESENT THAT QUALCOMM EARNED ITS PLACE IN THE

12   MARKET THROUGH INNOVATION AND BETTER PRODUCTS.

13        QUALCOMM WAS FOUNDED BACK IN 1985 IN SAN DIEGO AS A

14   STARTUP, AND THE PRINCIPAL FOUNDER, DR. IRWIN JACOBS, HAD BEEN

15   A CELEBRATED PROFESSOR BACK AT M.I.T.  HE WROTE THE TEXTBOOK ON

16   MOBILE COMMUNICATIONS.

17        IN THE '80S, CELLULAR TECHNOLOGY WAS BASED ON GSM -- WE'RE

18   GOING TO GET THAT GLOSSARY TO YOU MONDAY -- GLOBAL SYSTEM FOR

19   MOBILE COMMUNICATIONS.  THAT USED TIME DIVISION MULTIPLE ACCESS

20   TECHNOLOGY, TDMA.

21        YOU CAN THINK OF A ROOM FULL OF 20 PEOPLE, YOUR HONOR, AND

22   THEY ALL HAVE TO SPEAK ONE AT A TIME IN A DESIGNATED TIME SLOT.

23        WHAT DR. JACOBS AND OTHERS CAME UP WITH WAS USING CDMA,

24   CODE DIVISION MULTIPLE ACCESS, FOR MOBILE COMMUNICATIONS.  THAT

25   SAME ROOM OF 20 PEOPLE COULD CARRY ON MULTIPLE CONVERSATIONS AT

1      THE SAME TIME AND GET A LOT DONE.

2          NOW, THIS PICTURE SHOWS SOMETHING THAT QUALCOMM HAS DONE

3      OVER AND OVER.  NOBODY BELIEVED THAT CDMA WOULD WORK, SO TIME

4      AND AGAIN QUALCOMM HAS TO BUILD THE PROTOTYPES, BASEBAND

5      STATION, HANDSET, NETWORKS, THE WHOLE SHEBANG.  IN THIS

6      PICTURE, THE HANDSET IS THE VAN.  YOU CAN SEE INSIDE THE VAN,

7      THAT'S DR. JACOBS AND SOME OF HIS COLLEAGUES.  THEY ARE DRIVING

8      AROUND SAN DIEGO AND MANHATTAN PROVING THAT CDMA TECHNOLOGY

9      WILL WORK EVERYONE IN A BIG CITY WITH LOTS OF SKYSCRAPERS, AND

10     THEY'VE DONE THAT ON THEIR OWN TIME AND TIME AGAIN.

11         NOW, IT IS NOT THE CASE THAT CDMA WAS THE LAST GOOD THING

12     QUALCOMM INVENTED, NOT BY A LONG SHOT.

13         THEIR PORTFOLIO HAS GOTTEN MORE VALUABLE, NOT LESS,

14     BECAUSE THEY ARE STILL INVENTING FUNDAMENTAL BASIC INDUSTRY

15     TECHNOLOGIES LIKE THESE.  YOUR HONOR WILL HEAR SOME EXAMPLES

16     FROM OUR WITNESSES.

17         HIGH-SPEED PACKET CHANNEL DESIGN, THAT'S THE BASIC

18     TECHNOLOGY FOR HIGH SPEED DATE, WHY OUR PHONES CAN DO SO MUCH

19     NOW.

20         MOBILIZING OFDMA.  THAT'S THE FOUNDATIONAL WAVEFORM AND

21     TECHNOLOGY FOR LTE, 4G AS WE ALL KNOW IT.

22         CARRIER AGGREGATION, THAT WAS A HUGE BREAKTHROUGH.  IT

23     ALLOWS THE CARRIERS, LIKE VERIZON AND AT&T, TO COMBINE SPECTRUM

24     AND GET US MORE DATA FASTER.

25         AND CELLULAR IN UNLICENSED SPECTRUM, ALSO A BIG DEAL.

1      THAT'S CARRYING US INTO 4G AND 5G BECAUSE CARRIERS CAN NOW USE

2      FREE UNLICENSED SPECTRUM, AND THAT'S BROUGHT DATA RATES DOWN.

3              NOW, THIS IS ONLY POSSIBLE BY SPENDING A LOT OF MONEY ON

4      WHAT I'LL CALL BLUE SKY R&D.  QUALCOMM HAS SPENT BILLIONS OF

5      DOLLARS, YOUR HONOR, TO DEVELOP THESE TECHNOLOGIES, AND THEY

6      ARE TYPICALLY THE ONE OUT IN FRONT.

7              NOT ONLY HAVE THEY INVENTED THE BASIC TECHNOLOGY, THEIR

8      PRODUCT BUSINESS HAS BEEN PHENOMENAL, TOO.  MANY, MANY FIRSTS

9      BECAUSE QUALCOMM, TIME AND AGAIN, IS THE COMPANY THAT TURNS THE

10     IDEAS INTO THE PRODUCT BEFORE ANYBODY ELSE DOES.  THAT IS WHY

11     THEIR PEERS IN THE INDUSTRY, THE STANDARD SETTING

12     ORGANIZATIONS, THAT'S THEIR PEERS, THEIR COMPETITORS, THAT'S

13     WHY THEY'RE CHOOSING QUALCOMM TECHNOLOGY, BECAUSE THEY KNOW

14     IT'S NOT JUST AN IDEA ON A WHITE BOARD, IT'S GOING TO BE A

15     PRODUCT THAT WORKS WELL.

16             AND IT ALSO EXPLAINS ANOTHER THING.  WHY IS QUALCOMM WAY

17     AHEAD OF EVERYBODY ELSE IN EACH GENERATION?  BECAUSE THEY'RE

18     THE ONES RESPONSIBLE FOR THE FUNDAMENTAL INVENTION AND THEIR

19     ENGINEERS TURN IT INTO PRODUCTS FASTER THAN ANYBODY ELSE DOES.

20             NOW, THEIR INVENTIONS ARE NOT LIMITED TO THE CELLULAR

21     MODEM.  THEY READ ALL OVER THE HANDSET.  ONLY ABOUT 20 PERCENT

22     OF THE PORTFOLIO IS IN CELLULAR STANDARD ESSENTIAL PATENTS,

23     YOUR HONOR.  AND WHAT I MEAN BY THAT IS MOST OF THESE HANDSET

24     MAKERS WANT TO TAKE A FULL PORTFOLIO LICENSE, AND THEY HAVE.

25     AND THAT INCLUDES STANDARD ESSENTIAL NONCELLULAR PATENTS FOR

1    THINGS LIKE YOUR AUDIO, YOUR VIDEO, YOUR GPS, AND YOUR CAMERA;

2    AND NONSTANDARD ESSENTIAL PATENTS FOR THINGS LIKE YOUR TOUCH

3    SCREEN, YOUR USER INTERFACE, YOUR POWER MANAGEMENT, YOUR MULTI

4    MEDIA.  ALL OF THESE THINGS ARE IN THE QUALCOMM PORTFOLIO WHEN

5    A HANDSET MAKER TAKES A PORTFOLIO LICENSE.

6        ANOTHER THING, YOUR HONOR, THAT'S CHANGED EVERYTHING.

7    QUALCOMM HAS BEEN THE ONE TO TAKE ALL OF THESE TECHNOLOGIES AND

8    PUT THEM ON A CHIP.  THE APPLICATIONS PROCESSOR IS NOW

9    SOMETHING, WITH THE MODEM, CALLED AN SOC.  THAT'S BE IN OUR

10    GLOSSARY SURELY MONDAY, YOUR HONOR.  SOC IS SYSTEM ON A CHIP.

11        SO THE MODEM CHIP, MORE AND MORE, IS BEING COMBINED WITH

12    PROCESSORS TO PROVIDE ALL THIS TECHNOLOGY AT ONCE, WHICH MAKES

13    IT EASIER FOR SMARTPHONE MAKERS TO ENTER THE MARKET BECAUSE

14    THEY'RE DEALING WITH A SIMPLER STRUCTURE WHERE EVERYTHING IS

15    PROVIDED FOR THEM.

16        NOW, HERE'S A SLIDE FROM INTEL RIGHT IN THE RELEVANT TIME

17    PERIOD.  IT'S NOT JUST QUALCOMM BRAGGING.  YOU'LL SEE PLENTY OF

18    THIS, YOUR HONOR.  OUR RIVALS RECOGNIZED THAT QUALCOMM HAS BEEN

19    THE LEADER.  THIS IS AN INTEL SLIDE FROM 2012.  QUALCOMM R&D

20    INVESTMENT DRIVES THE PACE OF INNOVATION, AND JUST BELOW THAT

21    ON THE RIGHT, TIME TO MARKET LEADERSHIP.  QUALCOMM IS IN THE

22    LEAD CONSISTENTLY.

23        THEY HAVE BEEN THE AGENT OF CHANGE.  TO THE EXTENT THIS

24    INDUSTRY HAS BEEN SUBJECT TO CHANGE, AND IT HAS, THEY'VE BEEN

25    THE AGENT OF THAT.

1         NOW, HERE ARE THE WITNESSES THAT YOU'LL HEAR FROM ON

2    TECHNOLOGY, YOUR HONOR, FROM QUALCOMM.  IRWIN JACOBS I

3    MENTIONED; JIM THOMPSON IS OUR CHIEF TECHNOLOGY OFFICER;

4    DURGA MALLADI IS ONE OF OUR TOP INVENTORS AND OUR VICE

5    PRESIDENT OF ENGINEERS; AND LORENZO CASACCIA IS THE ONE THAT

6    DEALS WITH STANDARDS SETTING ORGANIZATIONS.

7         NOW, MY SECOND POINT IS THAT THE ROYALTIES WE'RE TALKING

8    ABOUT HAVE RESULTED FROM ARM'S LENGTH TRANSACTIONS AND

9    NEGOTIATIONS WITH LARGE SOPHISTICATED COMPANIES, NOT THROUGH

10   CHIP LEVERAGE OR PRESSURE.

11        THIS PROGRAM GOES BACK TO THE '90S, AND I WANT TO START

12   THERE BECAUSE AT THE VERY BEGINNING, YOUR HONOR, YEARS BEFORE

13   ANY QUALCOMM TECHNOLOGY WAS IN A STANDARD, YEARS BEFORE THERE

14   WAS ANY CHIP BUSINESS, QUALCOMM WENT OUT TO THE MARKET TO RAISE

15   MONEY TO DO THIS INVENTIVE WORK, AND THEY WENT TO AT&T AND

16   MOTOROLA AND NOKIA, AND HERE'S AN EXAMPLE OF NOKIA LICENSE.

17   IT'S AT THE 5 PERCENT RATE FOR VOLUME SALES.  THERE'S A CAP OF

18   $35 ON THE ROYALTY.  THAT CAP HAS COME DOWN OVER TIME.

19        AND I WANT TO STRESS THAT THIS AGREEMENT WAS ENTERED INTO

20   IN THE SHADOW OF THE LAW, AS THE FTC SAYS.  THERE WASN'T A CHIP

21   BUSINESS AT THE TIME.  THE TECHNOLOGY HADN'T BEEN ADOPTED INTO

22   A STANDARD.  AND IF THESE FOLKS FELT THAT THESE RATES WERE

23   UNFAIR, THEY HAD YEARS TO DEAL WITH IT.

24        MY NEXT SLIDE SHOWS SOMETHING YOU'LL SEE FROM PROFESSOR

25   NEVO.  AVIV NEVO WAS A SENIOR ECONOMIST AT THE DEPARTMENT OF

1    JUSTICE, AND HE'S NOW AT THE UNIVERSITY OF PENNSYLVANIA.  THE

2    TIMELINE IS KEY, YOUR HONOR, BECAUSE YOU'LL SEE ON THE RIGHT

3    QUALCOMM DIDN'T BEGIN SELLING CHIPS UNTIL '95, THAT'S ABOUT

4    WHEN THE STANDARD WAS FINALLY APPROVED.  BUT LOOK AT THE BIG

5    NAMES TO THE LEFT OF THAT.  ALL THESE FOLKS TOOK LICENSES AT OR

6    ABOUT THIS RATE, NEGOTIATED AT ARM'S LENGTH.  AGAIN, IF THEY

7    HAD A PROBLEM, THEY HAD THE FREEDOM TO GO TO COURT.  THEY WERE

8    OPERATING IN THE SHADOW OF THE LAW.  THERE WAS NO CHIP BUSINESS

9    WHATSOEVER.

10       THIS NEXT SLIDE GIVES YOU A BIGGER PICTURE FROM PROFESSOR

11   NEVO OF OUR CDMA LICENSING PROGRAM.  IT SHOWS TWO IMPORTANT

12   THINGS.  THERE ARE HUNDREDS OF LICENSEES, EACH BLUE DOT IS A

13   LICENSE.  THE RATES DIDN'T GO UP WHEN QUALCOMM STARTED SELLING

14   CHIPS.  THEY DIDN'T GO UP WHEN QUALCOMM'S TECHNOLOGY WAS IN THE

15   STANDARD.  THEY REMAINED THE SAME.  QUALCOMM HAS HAD THE SAME

16   FORMULA FOR YEARS:  TAKES AN UPFRONT PAYMENT TO HELP WITH

17   RESEARCH; GET A RUNNING ROYALTY.  IT'S BEEN DONE IN THAT SAME

18   WAY FOR YEARS AND YEARS.

19       NOW, THIS NEXT SLIDE, YOUR HONOR, LOOKS SIMILAR, BUT IT

20   MAKES AN ENTIRELY DIFFERENT AND A KEY POINT.  THIS IS A

21   DIFFERENT PRODUCT, WCDMA IS 3G TECHNOLOGY USED BY THE GSM

22   SYSTEM WHEN THEY DISCOVERED THEY NEEDED SOMETHING BETTER THAN

23   TDMA.  THERE'S NO CLAIM THAT QUALCOMM HAS ANY MARKET POWER IN

24   THIS MARKET, AT LEAST NOT BEFORE LTE CAME IN IN 2011, NO CLAIM

25   BY ANYONE.

1          AND TAKE A LOOK AT THE CHART.  IN A PERIOD WHEN EVERYONE

2     ACKNOWLEDGES THAT THERE WAS ABSOLUTELY NO LEVERAGE, ABSOLUTELY

3     NO MARKET POWER, NOT EVEN A CLAIM OF IT, THE LICENSEES ARE

4     SIGNING UP AT ROUGHLY THE SAME RATES TO GET A DIFFERENT

5     TECHNOLOGY.  THEY ALL HAD CDMA LICENSES.  THEY DIDN'T NEED

6     ANYTHING ELSE FROM QUALCOMM.  BUT THEY WANTED THIS TECHNOLOGY.

7          WHY?  THEY RECOGNIZED THE STRENGTH OF THE TECHNOLOGY AND

8     THE STRENGTH OF THE PORTFOLIO.

9          THIS IS THE BUT FOR WORLD THAT WE LOOK FOR IN THESE CASES.

10          AND, YOUR HONOR, I WANT TO STRESS THAT IN CONTRAST TO THIS

11     EVIDENCE, WHICH IS WHAT HAPPENED IN THE MARKET, THEIR ONLY

12     EVIDENCE THAT QUALCOMM'S RATES ARE SUPER-FRAND, OTHER THAN THE

13     COMPLAINTS FROM LICENSEES, IS FROM AN EXPERT, MICHAEL LASINSKI,

14     WHO HAS A VERY SIMPLISTIC PROGRAM THAT'S NEVER BEEN USED

15     OUTSIDE OF LITIGATION.  HE SIMPLY SAYS THERE'S AN ARBITRARY CAP

16     ON ALL SEP'S.

17          THAT IS BASED ON WHAT PEOPLE OTHER THAN QUALCOMM HAVE

18     SAID, AND IT'S NEVER SOMETHING QUALCOMM OR ANYBODY ELSE HAS

19     ENDORSED.

20          AND HE'S USING A SIMPLISTIC MODEL OF COUNTING PATENTS AND

21     COUNTING CONTRIBUTIONS RATHER THAN DOING ANY ANALYSIS AT ALL OF

22     THE VALUE OF THE TECHNOLOGY, WHO'S ACCEPTING IT, OR WHAT'S

23     HAPPENING IN THE ACTUAL MARKET.

24          NOW, I'LL SAY ONE OTHER THING ABOUT MR. LASINSKI.  HE'S

25     NOT HERE AS A NEUTRAL, INDEPENDENT PERSON.  HE IS CONNECTED

1    CLOSELY WITH HUAWEI.  HE TESTIFIES AS AN EXPERT REGULARLY FOR

2    HUAWEI, ONE OF QUALCOMM'S LARGEST COMPETITORS, AND HIS COMPANY

3    ADVISES HUAWEI IN LICENSING NEGOTIATIONS WITH QUALCOMM.  SO

4    HE'S HARDLY AN INDEPENDENT PERSON.

5         NOW, QUALCOMM LICENSES AT THE HANDSET LEVEL.  THIS IS

6    THEIR EXPERT, YOUR HONOR, CONCEDING, AS WE SAY, THAT THIS MODEL

7    HAS BEEN STANDARD IN THE INDUSTRY FOR YEARS BEFORE QUALCOMM GOT

8    THERE.

9         NOW, THIS IS IMPORTANT BECAUSE EVERYBODY LICENSES AT THE

10   HANDSET LEVEL, EVEN PEOPLE WITH NO CHIP BUSINESS AT ALL.

11   THEY'RE CLAIMING THAT QUALCOMM HAS CHOSEN THIS MODEL TO PROTECT

12   ITS MONOPOLY IN CHIPS.

13        WELL, NOKIA, ERICSSON, INTER DIGITAL, OTHER PARTICIPANTS

14   WITHOUT ANY CHIP BUSINESS, THEY LICENSE AT THE HANDSET LEVEL.

15        WHY?  BECAUSE THE HANDSET LEVEL IS WHERE THE BENEFIT IS,

16   IS TRANSLATING IN THIS MARKET.  THAT'S WHAT PRACTICES THESE

17   FULL PORTFOLIOS, AND WHEN YOU HAVE MULTIPLE, MULTIPLE COMPONENT

18   MAKERS, IT'S THE MOST EFFICIENT THING TO DO.  THAT'S WHY IT'S

19   BEEN INDUSTRY STANDARD.

20        AND IT'S ALSO THE CASE, YOUR HONOR, THAT QUALCOMM SELLS

21   CHIPS ONLY TO LICENSED OEM'S.

22        WHY?  BECAUSE WE BEGAN AS A TECHNOLOGY COMPANY WHERE THE

23   VALUE OF OUR INTELLECTUAL PROPERTY AND R&D WAS RECOUPED IN

24   LICENSE AGREEMENTS, NOT THROUGH PRODUCT SALES.  SO THE VALUE OF

25   THE INTELLECTUAL PROPERTY IS NOT PRICED INTO THE CHIPS.

1    QUALCOMM'S GOT A SEPARATE TECHNOLOGY BUSINESS AND A SEPARATE

2    CHIP BUSINESS.

3         AND THIS PRACTICE HAS BEEN PROCOMPETITIVE.  IT'S ALLOWED

4    QUALCOMM TO RECOVER REASONABLE VALUE; IT'S ALLOWED HANDSET

5    MAKERS THE FREEDOM TO CHOOSE FROM CHIP MAKERS, EVERYBODY IS

6    PAYING THE SAME ROYALTY, THEY'RE ON A LEVEL PLAYING FIELD, AND

7    THEY DON'T HAVE TO BUY QUALCOMM CHIPS, AND THEY DON'T PAY MORE

8    OR LESS IF THEY DO.

9         IT ALLOWS CHIP MAKERS TO COMPETE WITHOUT PAYING ANY MONEY

10   TO QUALCOMM, SO THE CHIP MAKERS ARE, IN EFFECT, FREE RIDING.

11   THEY'RE NOT TAKING A LICENSE.  THEY'RE ALSO NOT PAYING ANY

12   ROYALTIES.

13        LET'S HAVE OUR NEXT SLIDE.  YOU HEARD MUCH FROM THE FTC

14   ABOUT THREATS OF CHIP SUPPLY AND THE LIKE.  NONE OF THAT HAS

15   HAD ANY EFFECT ON THE MARKET, EVEN IF IT HAPPENED, AND MOST OF

16   IT DID NOT, AS I'LL SHOW YOU IN A MINUTE.

17        FIRST OF ALL, YOUR HONOR, QUALCOMM HAS NEVER DISRUPTED

18   CHIP SUPPLY IN ANY NEGOTIATION WITH ANY LICENSEE, EVER.

19        WHEN LICENSEES ASK FOR IT, THEY GOT AN ASSURANCE OF

20   CONTINUED SUPPLY, OFTEN IN WRITING, AND THAT PROMISE WAS KEPT

21   EVERY SINGLE TIME.

22        THIRD, ALL THE FOLKS WE'RE TALKING ABOUT, SAMSUNG, LENOVO,

23   HUAWEI, THEY'RE LARGE, SOPHISTICATED COMPANIES THAT THROW THEIR

24   OWN WEIGHT AROUND.  THERE'S A BIG DIFFERENCE BETWEEN HARD

25   BARGAINING AND THREATS AND COERCION.

1              LET ME GIVE TWO EXAMPLES.  LET'S LOOK AT LENOVO.  YOU

2     HEARD SOMETHING ABOUT NANCY YU.  SHE'S A LAWYER -- EXCUSE ME --

3     ABOUT IRA BLUMBERG.  HE'S AN ATTORNEY AT LENOVO THAT SAYS HE

4     WAS REPEATEDLY THREATENED.

5              WELL, NUMBER ONE, QUALCOMM GAVE LENOVO AN EXPLICIT WRITTEN

6     COMMITMENT NOT TO AFFECT SUPPLY.  THAT'S WHAT'S IN THE QUOTE

7     THERE AT THE BOTTOM OF THE PAGE.

8              THE LENOVO REPRESENTATIVE THAT ACTUALLY ATTENDED THESE

9     MEETINGS, NOT MR. BLUMBERG, HAS TESTIFIED THAT SUPPLY WAS A

10    PASSING CONCERN, UNQUOTE, AND THAT AS SOON AS IT WAS RAISED,

11    QUALCOMM EXPLICITLY ASSURED THEM THAT SUPPLY WOULD CONTINUE,

12    AND NO SUPPLY WAS EVER INTERFERED WITH.  LICENSE NEGOTIATIONS

13    WENT ON FOR MONTHS.

14             LET'S GO TO ANOTHER EXAMPLE, HUAWEI, THAT'S MS. YU.  SHE'S

15    ALSO A LAWYER.  YOU'LL HEAR FROM HER ON VIDEOTAPE APPARENTLY

16    TODAY.

17             WELL, HUAWEI HAD AN EXTREMELY FAVORABLE LICENSE TO BEGIN

18    WITH, SPONSORED, IN EFFECT, BY THE CHINESE GOVERNMENT.  THEY

19    DIDN'T SUFFER ANY RISK OF DISRUPTION OF SUPPLY AT ANY TIME.  NO

20    SUPPLY WAS INTERRUPTED, AND THEIR NEGOTIATIONS WENT ON FOR

21    MONTHS.  IN FACT, QUALCOMM SAID, IF YOU'RE WORRIED, LET'S JUST

22    EXTEND THE AGREEMENT AND IF YOU DON'T GET TO AN AGREEMENT THAT

23    YOU LIKE, I CAN TERMINATE IT.

24             THEY EXTENDED THE AGREEMENT, NOBODY WAS OPERATING UNDER

25    ANY PRESSURE AT ALL.

1            AND YOU'RE GOING TO HEAR ABOUT OUR LICENSING PRACTICES AT

2    QUALCOMM FROM MR. GONELL, WHO WILL BE HERE NEXT WEEK;

3    MIKE HARTOGS IS PROBABLY THE FOLLOWING WEEK; AND ALEX ROGERS, I

4    HATE TO SAY IT, YOUR HONOR, BUT MAYBE THE WEEK AFTER THAT.

5            NOW, MY THIRD MAJOR POINT IS THAT NONE OF THESE PRACTICES

6    REDUCED OR FORECLOSED COMPETITION.

7            IT'S VERY NOTEWORTHY, I WANT TO SPEAK ABOUT THE LEGAL

8    STANDARD FOR JUST A MINUTE.

9            THE FTC PERSISTS IN AN EFFORT TO LOWER THE LEGAL STANDARD

10   THEY NEED TO MEET TO ESTABLISH THE VIOLATION.  THEIR BRIEF

11   CLAIMS THAT ALL THEY HAVE TO SHOW IS CONDUCT THAT TENDS TO

12   IMPACT COMPETITION, OR REASONABLY APPEARS CAPABLE OF IT.

13           THAT IS NOT THE LAW.  THAT IS NOT THE STANDARD.

14           LAST YEAR THE SUPREME COURT, IN A CASE SIMILAR TO OURS,

15   MADE VERY CLEAR THAT A GOVERNMENT PLAINTIFF HAS TO PROVE THAT

16   QUALCOMM'S CONDUCT HAS AN ANTICOMPETITIVE EFFECT ON THE MARKET,

17   AND IT MUST BE SUBSTANTIAL.  THAT'S THE AMERICAN EXPRESS CASE.

18           THE STANDARD THEY'RE CITING TO YOU IN THEIR BRIEFS WAS

19   REPEATEDLY DISCUSSED BY THE DISSENT AND REJECTED BY THE

20   MAJORITY, WHICH SAID IT'S NOT ENOUGH TO SHOW TENDENCY, IT'S NOT

21   ENOUGH TO SHOW A CAPABILITY.  YOU MUST SHOW THAT THERE'S BEEN A

22   SUBSTANTIAL ANTICOMPETITIVE EFFECT.

23           THEIR EVIDENCE WON'T COME CLOSE TO THAT, AND THEIR EFFORT

24   TO CONTINUE TO LOWER THE BAR SHOWS THEY KNOW IT, TOO.

25           A RELATED POINT.  YOUR HONOR RECOGNIZES THAT IN MOST

1    INSTANCES, THERE'S NO DUTY TO HELP YOUR COMPETITORS.  YOU'VE

2    IDENTIFIED TWO POSSIBLE EXCEPTIONS THAT MIGHT APPLY HERE BASED

3    ON THE PLEADINGS.

4         BUT, AGAIN, THE EVIDENCE WON'T SUPPORT A FINDING UNDER

5    EITHER ONE.

6         THERE'S NO EVIDENCE THAT QUALCOMM UNILATERALLY TERMINATED

7    SOME VOLUNTARY COURSE OF DEALING.  QUALCOMM HAS ALWAYS LICENSED

8    AT THE HANDSET LEVEL.  AND IT HAS ALWAYS SAID WE ARE NOT GOING

9    TO LICENSE CHIP MAKERS EXHAUSTIVELY.  THAT'S BEEN TRUE SINCE

10   DAY ONE.  THERE HASN'T BEEN ANY CHANGE IN CONDUCT.

11        AND SECONDLY, THERE'S NO EVIDENCE THAT THIS APPROACH

12   EITHER LACKS A BUSINESS PURPOSE OR HAS SOME -- SHOWS SOME

13   ANTICOMPETITIVE MALICE.

14        DEVICE LEVEL LICENSING IS STANDARD AND CUSTOMARY AND HAS

15   BEEN AROUND FOR YEARS, EVEN BY COMPANIES WITH NO CHIP BUSINESS

16   AT ALL.  IT'S THE MOST EFFICIENT WAY TO LICENSE, AS YOU'RE

17   GOING TO HEAR.  AND, AGAIN, IT ALLOWS THE CHIP MAKERS TO USE

18   QUALCOMM'S TECHNOLOGY WITHOUT PAYING A ROYALTY.

19        WHAT'S THE RESULT BEEN?  THE RESULT HAS BEEN VERY HARSH,

20   ROUGH COMPETITION ON THE MERITS.

21        THIS NEXT SLIDE I CAN'T SHOW YOUR HONOR.  IT'S 17 IN YOUR

22   DECK.  ONE OF THE THIRD PARTIES HAS OBJECTED TO IT.  BUT WHAT

23   IT SHOWS FROM THEIR OWN EXPERT IS QUALCOMM'S SHARE, HOWEVER YOU

24   WANT TO VALUE IT, OR EVALUATE IT, HAS FALLEN DRAMATICALLY.

25        ON THE LEFT, THAT'S THE CDMA MARKET THAT DR. SHAPIRO,

1    MR. SHAPIRO DEFINES; AND ON THE RIGHT, THAT'S THE PREMIUM LTE

2    MARKET.  THAT'S FROM THEIR EXPERT.  IT'S FALLEN.

3         WHY?  THREE OF QUALCOMM'S BIGGEST CUSTOMERS ARE MOVING

4    AWAY FROM QUALCOMM.  ON THE LEFT, INTEL IS NOW SUPPLYING 100

5    PERCENT OF THE MODEMS IN THE NEW IPHONES.  SAMSUNG IS SUPPLYING

6    HALF OF ITS OWN CHIPS AND BUYING CHIPS FROM OTHERS.  HUAWEI IS

7    SUPPLYING ALMOST HALF OF ITS OWN CHIPS.

8         YOUR HONOR, IN 2017, QUALCOMM SUPPLIED ONLY 34 PERCENT OF

9    THE TOTAL MODEM CHIPS WORLDWIDE.

10        NOW, THE FTC SAYS, WELL, THIS ISN'T BASED ON COMPETITION.

11   THESE GUYS GOT THERE LATE.  THEY COULDN'T GET THERE SOONER

12   BECAUSE QUALCOMM'S SUPER-FRAND ROYALTIES IMPOSED A TAX THAT

13   KEPT THEM FROM INNOVATING.

14        THAT'S BALONEY, TOO.

15        THIS NEXT SLIDE, DR. TASNEEM CHIPTY WILL PRESENT SOME

16   MARKET DATA.  TAKE A LOOK.  THESE ARE R&D EXPENDITURES ACROSS

17   THE BOARD, NOT JUST MOBILE.  BUT QUALCOMM IS THE LITTLE ONE IN

18   THE BLUE.  INTEL AND SAMSUNG ARE THE TOWERS IN GREY AND GREEN.

19   HUAWEI HAS GROWN CONSISTENTLY OVER THE YEARS.  ALL THESE FOLKS

20   ARE OUT SPENDING QUALCOMM, SOMETIMES THREE TO ONE.

21        THE IDEA THAT THEY DIDN'T HAVE THE RESOURCES IS ABSOLUTELY

22   NUTS.

23        AND DR. SHAPIRO DIDN'T EVEN LOOK AT THIS.  THESE FOLKS HAD

24   ALL THE RESOURCES IN THE WORLD.  THEY THEMSELVES LOOKED TO SEE

25   WHY THEY WEREN'T DOING AS WELL.

1          THIS NEXT SLIDE IS AN INTEL SLIDE DEVELOPED FOR THEM BY

2     BAIN.  INTEL SAID, HOW COME WE'RE NOT DOING AS WELL AS

3     QUALCOMM, EVEN THOUGH WE'RE SPENDING THE SAME MONEY?  BAIN SAID

4     BECAUSE YOU'RE NOT AS EFFICIENT.  QUALCOMM IS LOOKING AT THE

5     MOBILE MARKET AND THEIR OUTPUT IS TWO TO THREE TIMES YOURS.

6     YOUR PRODUCTIVITY IS LESS THAN HALF OF WHAT QUALCOMM DOES ON

7     THE SAME MONEY.

8          NOW, GUESS WHAT?  BASED ON THIS -- EXCUSE ME.  I'M GOING

9     TO STEP FORWARD JUST A BIT.

10         A SIMILAR POINT ON APPLE EXCLUSIVITY, SO-CALLED.

11    REMEMBER, YOUR HONOR, BEFORE THE DEAL BETWEEN QUALCOMM AND

12    APPLE, APPLE WAS SINGLE SOURCING FROM INFINEON.  SO THEY WERE

13    SOLE SOURCING BEFORE QUALCOMM CAME ALONG.  AND WHAT THEY SAID

14    TO QUALCOMM WAS, WE WANT TO REPLACE INFINEON WITH YOU, YOU'RE

15    BETTER, BUT GIVE US A BILLION DOLLARS TO DO IT.

16         THEY WOULDN'T MAKE ANY MINIMUM GUARANTEE OF VOLUME.  THEY

17    HAD LOTS OF PRODUCT REQUIREMENTS.  THEY EXPECTED QUALCOMM TO

18    SPEND A BUNCH OF MONEY AND GIVE THEM A BILLION DOLLARS.  THAT

19    WAS THE DEAL.

20         WE CALLED IT EXCLUSIVE, BUT APPLE ALWAYS HAD THE RIGHT TO

21    SELECT A SECOND VENDOR, AND THEY DID.  FINALLY, INTEL WAS READY

22    TO GO AND IN 2016, INTEL BEGAN SELLING CHIPS TO APPLE DURING

23    THE PERIOD OF EXCLUSIVITY.  THE PENALTY WAS THE MONEY THAT YOU

24    GOT, SOME OF IT, WE HAVE TO PAY BACK.

25         THAT WAS MUTUALLY BENEFICIAL FOR BOTH PARTIES, AND AS

1      YOU'LL SEE IN A MINUTE, NOBODY ELSE WAS READY TO PROVIDE WHAT

2      APPLE NEEDED.

3           LET'S LOOK AT THE NEXT SLIDE.

4           THIS IS INTEL IN 2011 EVALUATING THEIR POSITION, YOUR

5      HONOR, IN THE MARKET VIS-A-VIS QUALCOMM AND ST ERICSSON.

6      THEY'RE BEHIND.  THERE'S A GAP.

7           THIS IS INTEL RECOGNIZING THAT THEY ARE NOT KEEPING UP

8      WITH QUALCOMM.  AS A RESULT OF THIS RECOGNITION, INTEL DECIDED

9      TO LEAVE THE CDMA MARKET AND FOCUS THEIR EFFORTS ELSEWHERE.

10     THEY ACTUALLY MADE A DECISION TO DO THAT MOVE AND MOVE TO OTHER

11     TECHNOLOGIES.

12          SO WHAT HAPPENED NEXT?  WHEN APPLE NEEDED THEM IN CDMA,

13     THEY WEREN'T READY.  HERE AS AN APPLE SLIDE FROM 2013.  AGAIN,

14     APPLE IS STILL SEARCHING FOR A SECOND SOURCE.

15          APPLE DETERMINES THAT NEITHER BROADCOM NOR INTEL COULD

16     COMPETE WITH EUREKA.  EUREKA, YOUR HONOR, IS APPLE'S CODE FOR

17     QUALCOMM.  EUREKA, I'VE FOUND IT.  THAT'S THEIR CODE FOR

18     QUALCOMM.  THEY'RE DETERMINING, INTERNALLY AT APPLE, THESE GUYS

19     AREN'T READY FOR PRIME TIME, WE CAN'T DO IT.

20          AND THE IDEA THAT INCENTIVE PAYMENTS ARE THE CAUSE OF THIS

21     MAKES NO ECONOMIC SENSE.  THE INCENTIVE PAYMENTS THAT QUALCOMM

22     AGREED TO GIVE TO PEOPLE TO BUY THEIR CHIPS REDUCED THE PRICE

23     THEY PAID FOR CHIPS.  THAT'S PROCOMPETITIVE.

24          IF QUALCOMM HAD THE MARKET POWER TO DEMAND A FIXED PRICE,

25     TAKE IT OR LEAVE IT, WHY IN THE WORLD WOULD THEY PAY HUNDREDS

 1    OF MILLIONS IN INCENTIVES TO INCENTIVIZE PEOPLE TO BUY THEIR

 2    CHIPS?

 3         THIS PROVES WHAT WE'RE SAYING, THAT THESE NEGOTIATIONS

 4    WERE AT ARM'S LENGTH ON A LEVEL PLAYING FIELD, NOT SOME SCHEME

 5    TO SKEW THE MARKET.

 6         AND MY FINAL POINT, YOUR HONOR, IS THAT THE SMARTPHONE

 7    INDUSTRY IS THRIVING AND HIGHLY COMPETITIVE.  PRICES HAVE COME

 8    DOWN.  I KNOW THE IPHONE IS EXPENSIVE, BUT AVERAGE PRICES HAVE

 9    FALLEN.

10         NOTE, YOUR HONOR, THAT THE LITTLE SPIKE THERE AT THE END,

11    THE HOCKEY STICK 314, THAT'S APPLE'S NEW PRICING ON THE IPHONE

12    AT A TIME WHEN THEY'RE PAYING NO ROYALTIES TO QUALCOMM, NO

13    ROYALTIES.  THEY'VE CEASED ALL ROYALTY PAYMENTS, AND YET THE

14    PRICE IS GOING UP.

15         THE COST OF DATA, AS I MENTIONED EARLIER, HAS PLUMMETED,

16    LARGELY DUE TO TECHNOLOGY ADVANCES BY QUALCOMM.  SO THE DATA

17    THAT WE PAY FOR TO THE CARRIERS, THAT'S BECOME CHEAPER AND

18    CHEAPER.

19         MORE COMPANIES ARE ENTERING THE MARKET.  THIS IS FROM

20    DR. CHIPTY'S ANALYSIS.  MORE COMPANIES ARE ENTERING THE MARKET,

21    INCLUDING MEDIATEK, AND MEDIATEK HAS SOME PREMIUM CHIPS, TOO.

22         AND YOU CAN SEE FROM THE GREEN TILES THAT AS TIME HAS GONE

23    ON, MORE AND MORE COMPANIES HAVE COME INTO THE MARKET, WHICH IS

24    ANOTHER SIGN, ALONG WITH FALLING PRICES, INCREASING QUALITY,

25    INCREASING COMPETITION, THE LOWER MARKET SHARE FOR QUALCOMM,

1     ALL OF THESE THINGS SHOW A HEALTHY, THRIVING, COMPETITIVE

2     MARKET.

3          SO BASED ON THAT, YOUR HONOR, WE DON'T BELIEVE THE FTC

4     WILL BE ABLE TO SHOW A VIOLATION AT ALL.

5          BUT IF YOUR HONOR CONCLUDES OTHERWISE, YOU'LL BE FACED

6     WITH THE TASK OF FINDING AN APPROPRIATE REMEDY.

7          THE REMEDY THEY WANT IS EXTRAORDINARY AND BROAD.  THEY

8     HAVEN'T DEMONSTRATED A NEED FOR IT OR EVIDENCE TO SUPPORT IT OR

9     ANY PROOF THAT IT'LL IMPROVE THINGS.

10         THEY WOULD REQUIRE A WHOLESALE CHANGE IN HOW LICENSING IS

11    DONE IN THE MOBILE SPACE, NOT JUST BY QUALCOMM, BUT EVERYBODY

12    ELSE.

13         AND THERE SIMPLY WON'T BE ANY EVIDENCE THAT THIS WILL

14    IMPROVE THINGS FOR INNOVATION, COMPETITION, OR THAT IT WILL

15    BENEFIT CONSUMERS IN THE LEAST.

16         AND SO, YOUR HONOR, WE BELIEVE THE FTC'S EVIDENCE IS GOING

17    TO FALL FAR SHORT OF WHAT YOU'VE SEEN IN THE PLEADINGS AND THE

18    COMPLAINT TO DATE, AND AS A RESULT OF THAT, YOU WILL NOT FIND

19    ANY VIOLATION OF SECTION 5 OR THE SHERMAN ACT AT ALL.  AND

20    WE'RE VERY MUCH LOOKING FORWARD NOW TO GETTING TO THE EVIDENCE

21    AND PRESENTING TO YOUR HONOR WHAT HAPPENED OUT IN THE MARKET

22    PLACE.

23         THANK YOU VERY MUCH.

24          THE COURT:  OKAY.  TIME IS 10:07.

25         OKAY.  CALL YOUR FIRST WITNESS, PLEASE.

```
 1              MR. HOPKIN:  NATE HOPKIN, THAT'S N-A-T-E, HOPKIN WITH
 2      NO S.
 3              GOOD MORNING, YOUR HONOR.  MAY IT PLEASE THE COURT.  MY
 4      NAME IS NATE HOPKIN ON BEHALF OF FEDERAL TRADE COMMISSION.
 5              THE FTC'S FIRST WITNESS, MR. ERIC REIFSCHNEIDER, AS
 6      PREVIEWED, IS UNAVAILABLE TO TESTIFY TODAY, AND SO THE FTC WILL
 7      BE PRESENTING HIS TESTIMONY THIS MORNING BY VIDEO DEPOSITION.
 8              MR. REIFSCHNEIDER WAS FORMERLY OUTSIDE COUNSEL FOR
 9      QUALCOMM AND THEN BECAME GENERAL MANAGER OF QUALCOMM'S
10      TECHNOLOGY LICENSING DIVISION AND NEGOTIATED SOME OF THE
11      CELLULAR PATENT LICENSES AND INCENTIVE AGREEMENTS AT ISSUE IN
12      THIS CASE.
13              MR. REIFSCHNEIDER WAS DEPOSED ON FEBRUARY 22ND AND 23RD,
14      2018.
15              WE'VE PREPARED A BINDER OF DOCUMENTS FOR
16      MR. REIFSCHNEIDER'S TESTIMONY.
17              MAY I APPROACH WITH THE BINDERS?
18              THE COURT:  YES.
19              HAVE YOU ALREADY PROVIDED THOSE?
20              MR. HOPKIN:  NOT FOR THIS WITNESS, YOUR HONOR.
21              THE COURT:  OH, OKAY.
22              CAN WE MAKE ROOM FOR THE GENTLEMAN IN THE BACK, PLEASE.
23      IF SOMEONE COULD SCOOT FURTHER OVER?  THANK YOU.  SORRY IT'S A
24      LITTLE BIT TIGHT IN HERE.
25              SO YOU HAVE WITNESS SPECIFIC BINDERS?
```

```
 1              (PAUSE IN PROCEEDINGS.)

 2              MR. HOPKIN:  SO THE BINDER INCLUDES THE FULL

 3     DEPOSITION TRANSCRIPT FROM MR. REIFSCHNEIDER'S DEPOSITION, WITH

 4      COLOR CODED HIGHLIGHTING INDICATING EACH PARTY'S DESIGNATIONS.

 5              THE FTC HAS DESIGNATED TESTIMONY HAS HIGHLIGHTED IN BLUE

 6      AND QUALCOMM'S COMPLETENESS DESIGNATIONS ARE HIGHLIGHTED IN

 7      YELLOW.

 8              THE BINDER ALSO INCLUDES EXHIBITS THAT WILL BE DISCUSSED

 9      IN MR. REIFSCHNEIDER'S TESTIMONY THAT ARE ON THE FTC'S EXHIBIT

10      LIST.

11              THESE EXHIBITS ARE ARRANGED IN THE BINDER IN THE ORDER

12      THAT THEY WILL APPEAR IN THE VIDEO.

13              EACH BINDER TAB IDENTIFIES AN EXHIBIT NUMBER WHICH HAVE A

14      CX PREFIX FOR FTC EXHIBITS, OR THE DEPOSITION EXHIBIT NUMBERS

15      DIFFER FROM TRIAL EXHIBIT NUMBERS, THE TAB SHOWS THE DEPOSITION

16      EXHIBIT NUMBER AS REFERENCED IN THE TESTIMONY, WITH THE

17      CORRESPONDING TRIAL EXHIBIT NUMBER IN PARENTHESES.  THERE'S

18      ALSO A TABLE CROSS-REFERENCING THE EXHIBIT AND TRIAL EXHIBIT

19      NUMBERS IN THE FRONT OF THE BINDER.

20              AND, YOUR HONOR, BEFORE PLAYING THE VIDEO AT THIS TIME,

21      THE FTC MOVES TO ADMIT INTO EVIDENCE THE FOLLOWING EXHIBITS

22      FROM MR. REIFSCHNEIDER'S DEPOSITION.

23              THE COURT:  OKAY.  WAIT A MINUTE.  I NEED TO START

24      CHARGING YOUR TIME BECAUSE YOU'RE -- I'M NOT SURE, WHAT IS ALL

25      THIS PREFATORY EXPLANATION?  IS THAT WHAT THIS IS SO FAR?
```

```
 1              (PAUSE IN PROCEEDINGS.)

 2                   MR. HOPKIN:  AS SOON AS YOU'RE READY, YOUR HONOR.

 3                   THE COURT:  ALL RIGHT.  TIME IS 10:11.

 4                   MR. HOPKIN:  THE FTC MOVES TO ADMIT INTO EVIDENCE THE

 5       FOLLOWING EXHIBITS, 14 IN TOTAL:  CX 6548, 5186, 6534, 6528,

 6       5211, 5210, 6491, 5179, 6500, 6516, 6522, 6530, 8300, AND 8297.

 7              THE TOTAL RUN TIME OF MR. REIFSCHNEIDER'S VIDEO TESTIMONY

 8       IS APPROXIMATELY ONE HOUR, AND ABOUT ONE MINUTE OF THAT

 9       CONSISTS OF QUALCOMM'S COMPLETENESS DESIGNATIONS.

10                   THE COURT:  ALL RIGHT.  ANY OBJECTION TO THE

11       ADMISSION OF THE EXHIBITS?

12                   MR. BORNSTEIN:  NO OBJECTION TO THE EXHIBITS, YOUR

13       HONOR.

14                   THE COURT:  THEY'RE ALL ADMITTED.

15              (PLAINTIFF'S EXHIBITS 6548, 5186, 6534, 6528, 5211, 5210,

16       6491, 5179, 6500, 6516, 6522, 6530, 8300, AND 8297 WERE

17       ADMITTED IN EVIDENCE.)

18                   THE COURT:  GO AHEAD, PLEASE.

19                   MR. HOPKIN:  THANK YOU.

20              MS. HILL, COULD YOU PLEASE BEGIN THE VIDEO.

21              **(THE VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER WAS**

22       **PLAYED IN OPEN COURT OFF THE RECORD.)**

23                   MR. HOPKIN:  MS. HILL, CAN YOU PLEASE PAUSE THE

24       VIDEO?

25                   THE COURT:  TIME IS 10:14.
```

```
 1              MR. BORNSTEIN:  CAN WE PAUSE IT?

 2              THE COURT:  IS THERE A PROBLEM?

 3              MR. HOPKIN:  WE'RE HAVING A TECHNICAL VIDEO ISSUE,

 4      YOUR HONOR.

 5              THE COURT:  OH, OKAY.

 6              MR. BORNSTEIN:  YOUR HONOR, WHILE WE'VE PAUSED, I

 7      DIDN'T WANT TO INTERRUPT THE PRESENTATION, BUT THERE'S A

 8      PORTION OF THE TESTIMONY THAT THE FTC HAD AGREED TO PLAY THAT

 9      WAS NOT INCLUDED IN THE CLIP, AND I'M NOT SURE WHY.  IT WAS AN

10      OBJECTION THEY HAD RAISED, AND THEN THEY DROPPED IT DURING THE

11      MEET AND CONFER AND AGREED TO PLAY IT, AND IT WAS NOT INCLUDED

12      IN WHAT WAS JUST PLAYED.  WE DIDN'T RECEIVE THE CLIPS UNTIL

13      VERY, VERY LATE LAST NIGHT AND THIS WASN'T IN THERE.

14          SO I'M NOT -- WE CAN READ THE TESTIMONY.  YOUR HONOR HAS

15      THE TRANSCRIPT.  I JUST WANT TO MAKE SURE THAT THE THINGS THAT

16      THEY AGREED TO HAVE PLAYED ACTUALLY GET PLAYED FOR US.

17              THE COURT:  OKAY.  BUT I DON'T WANT THIS TO BECOME AN

18      EFFORT TO JUST USE UP THEIR TIME WITH YOUR EVIDENCE.

19              MR. BORNSTEIN:  WELL, YOUR HONOR --

20              THE COURT:  SO THAT'S WHY I -- ANYWAY.  SO WHAT IS

21      THE PORTION?  IS IT INCLUDED OR NOT INCLUDED?

22              MR. HOPKIN:  IT WAS INTENDED TO BE INCLUDED.  ITS

23      EXCLUSION WAS INADVERTENT, YOUR HONOR, FROM THE VIDEO.

24              THE COURT:  OH, OKAY.  AND WHAT IS THE PAGE OR LINE

25      NUMBER?
```

1        MR. BORNSTEIN:  IT'S PAGE 24, YOUR HONOR, LINE 21,

2    RUNNING THROUGH PAGE 25, LINE 4.

3        AND THE COMPLETENESS TESTIMONY, YOUR HONOR, JUST FOR

4    CLARITY, IS TESTIMONY THAT WE'VE AGREED SHOULD COME OUT OF OUR

5    TIME.  WE'RE NOT SAYING THEY SHOULD BE CHARGED.  IT WAS

6    SOMETHING THAT WAS INTENDED TO BE PLAYING.  I WASN'T INTENDING

7    TO INTERRUPT THE PROCEEDING, BUT I THOUGHT --

8        THE COURT:  I THINK IT WOULD BE BEST, IF THERE ARE

9    THINGS THAT YOU WANT TO PLAY ON YOUR TIME, THAT YOU PLAY THEM

10   ON YOUR TIME.  NO ONE TOLD ME THAT I WOULD BE DEDUCTING THIS

11   TIME FROM THE FTC'S TIME, EVEN IF IT HAD BEEN PLAYED.

12       MR. BORNSTEIN:  YOUR HONOR, WE HAD WORKED THIS OUT.

13   AS MR. HOPKIN EXPLAINED AT THE BEGINNING, THERE WAS A CERTAIN

14   AMOUNT OF TIME THAT WAS OURS FOR THE COMPLETENESS DESIGNATIONS.

15   WE WERE DEDUCTING THE TIME.

16       THE COURT:  YOU DIDN'T TELL ME THE TIME.  WHAT IS THE

17   TIME FOR THIS EXCERPT?

18       MR. HOPKIN:  THE TOTAL TIME FOR ALL OF QUALCOMM'S

19   EXCERPTS IS ONE MINUTE, YOUR HONOR.

20       THE COURT:  OKAY, FOR MR. REIFSCHNEIDER.  AND IF YOU

21   TOLD ME, I APOLOGIZE, I MISSED IT.

22       HOW DO YOU WANT TO DO THAT?  DO YOU WANT TO JUST READ IT?

23       MR. BORNSTEIN:  SURE, THAT'S FINE, YOUR HONOR.

24       THE COURT:  OKAY.  DO YOU WANT TO READ THAT PORTION

25   NOW?  BECAUSE I ASSUME YOU'VE ALREADY SHOWN THE --

```
 1              MR. BORNSTEIN:  YES, YOUR HONOR, THAT PORTION HAS

 2     PASSED IN THE CHRONOLOGICAL PART OF THE VIDEO.  I CAN READ IT

 3     OR MR. HOPKIN CAN READ.  I AM HAPPY TO TAKE CARE OF IT.

 4              THE COURT:  OKAY.  WHY DON'T YOU READ IT, YOUR HONOR.

 5              MR. BORNSTEIN:  OKAY.  THANK YOU, YOUR HONOR.

 6          "QUESTION:  SO FOR THE SUBSCRIBER DEVICES, CAN YOU THINK

 7     OF ANY LICENSEE WHO DID NOT OR WAS NOT A CURRENT MODEM CHIP

 8     CUSTOMER?

 9          "ANSWER:  THERE'S A CHINESE COMPANY CALLED MEIZU THAT I

10     REMEMBER THAT WE WERE NEGOTIATING WITH TOWARD THE END OF MY

11     TIME AS GENERAL MANAGER.  I DID NOT PERSONALLY PARTICIPATE IN

12     NEGOTIATIONS WITH THEM.  BUT I WAS PART OF THE INTERNAL

13     DISCUSSIONS ABOUT HOW TO NEGOTIATE WITH THEM."

14          AND FOR CLARITY, YOUR HONOR, GOING FORWARD, THE PARTIES

15     WILL BE CAREFUL TO MAKE SURE YOUR HONOR KNOWS HOW MUCH TIME

16     COMES OUT OF EACH SIDE'S DESIGNATIONS.  WE'VE MADE AN EFFORT TO

17     DO THAT, AND WE WILL CONTINUE TO MAKE AN EFFORT TO DO THAT FOR

18     THE COURT'S TIMEKEEPING.

19              THE COURT:  ALL RIGHT.  THANK YOU.

20          OKAY.  BUT THAT DOESN'T SAY THEY WERE LICENSED, IT JUST

21     SAYS I REMEMBER THEY WERE NEGOTIATING.

22          AND THEN THE NEXT QUESTION IS, CAN YOU THINK OF ANY

23     COMPANY THAT YOU NEGOTIATED WITH FOR A SULA LICENSE THAT WAS

24     NOT A CURRENT CUSTOMER BUYING MODEM CHIPS FROM QUALCOMM.

25          AND HE SAYS, NOT AS I SIT HERE RIGHT NOW.
```

REIFSCHNEIDER DEPOSITION

```
 1              MR. BORNSTEIN:  THAT'S RIGHT.  THE POINT IS, YOUR

 2   HONOR, THAT HE WAS NEGOTIATING WITH SOMEONE WHO WASN'T LICENSED

 3   AND WHO QUALCOMM HAD TO BRING LITIGATION AGAINST AND BRING A

 4   LICENSE.

 5              THE COURT:  ALL RIGHT.  THAT'S NOT IN THE TRANSCRIPT

 6   THAT YOU JUST READ.

 7              MR. BORNSTEIN:  THAT'S CORRECT.  WE'LL GET THAT.

 8              THE COURT:  OKAY.  HAVE YOU WORKED OUT YOUR TECHNICAL

 9   ISSUE, OR --

10        WHAT IS THE PROBLEM?  YOU WANT TO SHOW THE ACTUAL EXHIBIT

11   ON A SPLIT SCREEN?  IS THAT -- WHAT'S THE TECHNICAL ISSUE?

12              MR. HOPKIN:  THAT'S EXACTLY IT, YOUR HONOR.

13              THE COURT:  OKAY.  WELL, IF WE CAN'T HAVE THAT

14   HAPPEN, I DON'T MIND JUST LOOKING AT THE DOCUMENT ITSELF.  I

15   MEAN, IT'S LESS HELPFUL, BUT I -- YOU KNOW, WE'RE ON A TIGHT

16   TIMEFRAME TO GET THIS CASE TRIED IN TEN DAYS, SO WHAT DO YOU

17   RECOMMEND.

18              MR. HOPKIN:  UNDERSTOOD.  IF YOU'D LIKE TO CONTINUE,

19   WE CAN DO THAT AND THEN MAYBE HOPEFULLY RESOLVE THIS ON THE

20   FIRST BREAK.

21              THE COURT:  OKAY.  AND WHAT IS -- IT WAS 64 -- 6548

22   THAT WE SHOULD BE LOOKING AT.  IS THAT RIGHT?

23              MR. HOPKIN:  CORRECT.

24              THE COURT:  OKAY.  I MEAN, HOW MUCH MORE TIME WOULD

25   YOU NEED TO FIX THIS?  WE COULD TAKE OUR BREAK EARLY.  WE
```

```
 1        NORMALLY TAKE A BREAK AT 10:30.  WE COULD TAKE IT NOW IF THAT'S

 2        HELPFUL.

 3               MR. HOPKIN:  I THINK IT WOULD BE HELPFUL TO TAKE A

 4        BREAK NOW, YOUR HONOR.

 5               THE COURT:  OKAY.  LET'S GO AHEAD -- WE TAKE ONE

 6        BREAK IN THE MORNING OF 15 MINUTES.

 7          IT'S 10:20.  LET'S TAKE A BREAK TO 10:35.

 8               MR. HOPKIN:  THANK YOU, YOUR HONOR.

 9               THE COURT:  ALL RIGHT.  THANK YOU.

10               THE CLERK:  COURT IS IN RECESS.

11          (RECESS FROM 10:20 A.M. UNTIL 10:36 A.M.)

12               THE COURT:  GOOD MORNING.  WELCOME BACK.

13          WE'RE WORKING ON HIGH PRIORITY OBJECTIONS RIGHT NOW.

14          PLEASE TAKE A SEAT.

15          QUALCOMM, YOU SUBMITTED THE DEPOSITION TRANSCRIPTS OF

16        GEORGE DAVIS, BUT THE HIGH PRIORITY OBJECTIONS ARE AS TO

17        MARK DAVIS, SO COULD YOU HAVE SOMEONE ON YOUR TEAM SUBMIT THE

18        CORRECT DEPO TRANSCRIPTS SO WE CAN TRY TO RULE ON THOSE?

19               MR. VAN NEST:  WE WILL, YOUR HONOR.

20               THE COURT:  OKAY.  THANK YOU.

21          OKAY.  DID YOU WORK OUT YOUR TECHNOLOGY ISSUE, I HOPE?

22               MR. HOPKIN:  YOUR HONOR, AT THIS TIME I PROPOSE THAT

23        WE PROCEED WITH PLAYING THE VIDEO AND REVIEWING THE HARD

24        COPIES.  WE HAVEN'T BEEN ABLE TO FIGURE OUT HOW TO SHOW THEM

25        BOTH ON THE SCREEN FOR TODAY.
```

```
 1                THE COURT:  OH, OKAY.  AND DID -- I GUESS WE DIDN'T

 2      HAVE JACKSON -- WE SHOULD PROBABLY HAVE JACKSON COME MAYBE

 3      DURING LUNCH TO SEE IF HE CAN HELP.

 4           I DON'T KNOW.  THIS IS ALL YOUR EQUIPMENT; IS THAT

 5      CORRECT?

 6                MS. MILICI:  I BELIEVE QUALCOMM ACTUALLY INSTALLED

 7      THE EQUIPMENT, BUT WE'RE JUST DOING THE BEST WE CAN.  WE'LL TRY

 8      TO FIGURE IT OUT.

 9                THE COURT:  OKAY.  AND QUALCOMM DOESN'T HAVE ANYONE

10      WHO CAN ASSIST IN USING YOUR EQUIPMENT?

11                MR. VAN NEST:  I DON'T THINK IT'S AN EQUIPMENT

12      PROBLEM, YOUR HONOR.

13                MS. MILICI:  IT MIGHT NOT BE.  WE'LL WORK ON IT AT

14      LUNCH AND HOPEFULLY RESOLVE IT BY THEN.

15                THE COURT:  OKAY.  AND THEN I'M GOING TO ASK

16      MS. GARCIA IF WE CAN HAVE JACKSON COME PERHAPS DURING THE LUNCH

17      BREAK AND SEE IF HE CAN -- THIS IS NOT HIS SYSTEM, BUT HE MIGHT

18      BE OF SOME ASSISTANCE.

19                MR. HOPKIN:  THANK YOU, YOUR HONOR.

20                THE COURT:  OKAY.

21           YOU KNOW WHAT MIGHT BE EASIER?  HOW LONG IS THIS

22      TRANSCRIPT EXCERPT?  IT MIGHT BE EASIER IF I KEEP THE TIME THAT

23      WAY.

24                MR. HOPKIN:  THE WHOLE VIDEO IS APPROXIMATELY ONE

25      HOUR.
```

```
 1              THE COURT:  OH, IT'S ONE HOUR.  OKAY.  DO YOU WANT ME

 2    TO JUST TIME IT THAT WAY?  WOULD THAT BE EASIER?  WHAT'S THE

 3    EXACT TIMING?  IT'S AN HOUR?  60 MINUTES?

 4              MR. HOPKIN:  I BELIEVE WE CAN GET YOU THE EXACT

 5    TIMING --

 6              THE COURT:  OKAY.

 7              MR. HOPKIN:  -- DOWN TO THE SECOND.

 8              THE COURT:  OKAY.  THAT MIGHT BE AN EASIER WAY TO DO

 9    IT.

10         OKAY.  GO AHEAD, PLEASE.

11              MR. HOPKIN:  THANK YOU.

12              THE COURT:  IT'S 10:38.

13              MR. HOPKIN:  AND WE'LL BE BEGINNING WITH CX 68 --

14    6548.

15         (PAUSE IN PROCEEDINGS.)

16         (THE VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER WAS

17    PLAYED IN OPEN COURT OFF THE RECORD.)

18              THE COURT:  CAN YOU INCREASE THE VOLUME, PLEASE?

19    THANK YOU.

20         (THE VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER WAS

21    PLAYED IN OPEN COURT OFF THE RECORD.)

22              THE COURT:  YOU HAVEN'T INTRODUCED THIS EXHIBIT,

23    RIGHT, AS PART OF THIS PACKAGE?

24              MR. HOPKIN:  THAT'S CORRECT, YOUR HONOR.

25         (THE VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER WAS
```

1        **PLAYED IN OPEN COURT OFF THE RECORD.)**

2                   THE COURT:  ARE WE ON EXHIBIT 6500?

3                   MR. HOPKIN:  YES, YOUR HONOR.

4                   THE COURT:  THANK YOU.

5          **(THE VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER WAS**

6        **PLAYED IN OPEN COURT OFF THE RECORD.)**

7                   THE COURT:  WHAT NUMBER IS THIS, PLEASE?

8                   MR. HOPKIN:  YOUR HONOR, WE'RE NOT MOVING TO ADMIT

9        THIS EXHIBIT.

10                  THE COURT:  OH.  THANK YOU.

11         **(THE VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER WAS**

12       **PLAYED IN OPEN COURT OFF THE RECORD.)**

13                  MR. HOPKIN:  FOR CLARITY, WE ARE NOT SEEKING

14       ADMISSION OF THIS EXHIBIT, EITHER.

15         **(THE VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER WAS**

16       **PLAYED IN OPEN COURT OFF THE RECORD.)**

17                  MR. HOPKIN:  THANK YOU, YOUR HONOR.  THAT CONCLUDES

18       THE FTC'S DESIGNATIONS FOR MR. REIFSCHNEIDER.

19                  THE COURT:  ALL RIGHT.  THANKS.

20            WHAT IS THE TIME NOW, PLEASE, ON THE TRANSCRIPT?

21                  THE REPORTER:  11:39.

22                  THE COURT:  11:39.  OKAY.  THANK YOU.

23            ALL RIGHT.  WHO IS YOUR NEXT WITNESS, PLEASE?

24                  MR. KEHL:  PHIL KEHL ON BEHALF OF THE FTC.

25            YOUR HONOR, THE FTC WILL NOW PLAY THE VIDEO DEPOSITION OF

1    IRA BLUMBERG WHO YOU HEARD ABOUT EARLIER THIS MORNING, WHICH

2    WAS TAKEN ON APRIL 20TH, 2018.

3            THE COURT:  AND DO YOU HAVE A SEPARATE BINDER OF

4    EXHIBITS FOR THAT WITNESS?

5            MR. KEHL:  YES.

6            THE COURT:  OKAY.

7            MR. KEHL:  HERE ARE TWO COPIES FOR THE COURT

8    (HANDING).

9        AND, YOUR HONOR, EXHIBITS WITHIN THIS BINDER WERE SEALED

10   BY COURT ORDER YESTERDAY, SO IN LIGHT OF THAT ORDER AND OUR

11   TECHNICAL DIFFICULTY, WE WON'T BE PROJECTING THEM ON THE

12   MONITOR.

13       LENOVO DID NOT SEEK TO SEAL THE COURTROOM IN PLAYING THE

14   VIDEO TESTIMONY, SO WE'LL PLAY THE VIDEO TESTIMONY.

15           THE COURT:  OH, OKAY.  AND ARE YOU MOVING TO ADMIT

16   THESE EXHIBITS?

17           MR. KEHL:  YES, YOUR HONOR.  WE MOVE TO ADMIT

18   JX 0087.

19           THE COURT:  OKAY.  GIVE ME JUST ONE --

20           MR. KEHL:  SURE.

21           THE COURT:  ONE MINUTE, PLEASE.

22       OKAY.  TIME IS 11:40.

23       YOU SAID JX WHAT AGAIN, PLEASE?

24           MR. KEHL:  0087.

25           THE COURT:  OKAY.

```
 1              MR. KEHL:  CX 2093.

 2              THE COURT:  OKAY.

 3              MR. KEHL:  CX 2079.

 4              THE COURT:  YES.

 5              MR. KEHL:  CX 2120.

 6              THE COURT:  YES.

 7              MR. KEHL:  CX 2121, AND CX 2122.

 8              THE COURT:  AND WHICH OF THESE ARE SEALED, PLEASE?

 9              MR. KEHL:  EVERY EXHIBIT EXCEPT FOR JX 0087.

10              THE COURT:  OKAY.  THEY'RE ALL SEALED.

11         ALL RIGHT.  ANY OBJECTION TO ADMITTING THESE EXHIBITS?

12              MR. BORNSTEIN:  NONE, YOUR HONOR.

13              THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

14         (JOINT EXHIBIT 0087 WAS ADMITTED IN EVIDENCE.)

15         (PLAINTIFF'S EXHIBITS 2093, 2079, 2120, 2121, AND 2122

16    WERE ADMITTED IN EVIDENCE.)

17              MR. KEHL:  YOUR HONOR, THE RUNTIME FOR THE VIDEO, THE

18    FTC'S DESIGNATIONS RUN 53 MINUTES AND 10 SECONDS; AND

19    QUALCOMM'S COMPLETENESS DESIGNATIONS RUN 1 MINUTE AND 45

20    SECONDS.

21              THE COURT:  OKAY.  ALL RIGHT.  AND THE 53 MINUTES IS

22    NOT INCLUDED -- IS NOT INCLUDING THE 2 MINUTES FOR QUALCOMM;

23    RIGHT?

24              MR. KEHL:  THE 53 MINUTES DOES NOT INCLUDE THE --

25              MR. VAN NEST:  IT'S ONLY 45, YOUR HONOR.
```

1          THE COURT:  I KNOW.  I WROTE IT DOWN AS 1 MINUTE, 45.

2     I GUESS -- I JUST WANT TO MAKE SURE I DEDUCT THAT.

3          ALL RIGHT.  GO AHEAD, PLEASE.

4          MR. KEHL:  ALL RIGHT.

5          MS. HILL, PLEASE PLAY THE VIDEO.

6          **(THE VIDEOTAPED DEPOSITION OF IRA BLUMBERG WAS PLAYED IN**

7     **OPEN COURT OFF THE RECORD.)**

8          THE COURT:  EXCUSE ME.  I'M SORRY TO INTERRUPT.  IT'S

9     12:01.  I'D LIKE US TO GO AHEAD AND TAKE OUR LUNCH BREAK NOW.

10         SO I'M SORRY TO INTERRUPT.  WE'LL RESUME THAT WHEN WE

11    RETURN.

12         WE'LL TAKE A ONE HOUR BREAK.

13         WHAT I'D LIKE YOU TO DO, FOR DEPOSITION EXCERPTS THAT ARE

14    NOT SEALED, I'D LIKE YOU TO FILE THEM ON THE DOCKET.  BUT I'D

15    ALSO LIKE YOU TO GIVE A HARD COPY TO MS. GARCIA FOR LODGING.

16         MR. KEHL:  OKAY.

17         THE COURT:  FOR DOCUMENTS THAT WILL REQUIRE ANY

18    SEALING, TO AVOID A LOT OF UNNECESSARY SEALING MOTIONS, WHICH

19    WE'RE ALREADY DEALING WITH MANY LATE AT NIGHT, CAN YOU PLEASE

20    JUST LODGE THOSE WITH MS. GARCIA?  FOR PURPOSES OF ANY APPEAL

21    OR IF WE HAVE TO RETRY THIS, WE NEED TO HAVE ALL OF THE RECORD

22    OF WHAT WAS PLAYED SINCE THE COURT REPORTERS ARE NOT

23    TRANSCRIBING THE DEPOSITION TESTIMONY.  OKAY?

24         SO IF YOU COULD GO AHEAD AND FILE BOTH MR. REIFSCHNEIDER'S

25    AND MR. BLUMBERG SINCE NEITHER OF THOSE TRANSCRIPTS THEMSELVES

```
 1   ARE SEALED; CORRECT?

 2             MR. KEHL:  WELL, TO CLARIFY FOR MR. BLUMBERG, LENOVO

 3   SOUGHT TO SEAL THE TRIAL TRANSCRIPT OF CERTAIN PORTIONS OF THE

 4   DEPOSITION, BUT NOT SEALING THE PLAYING OF THE VIDEO IN THE

 5   COURTROOM.

 6             THE COURT:  RIGHT.  SO ALL -- I DON'T WANT YOU TO DO

 7   THE ENTIRE TRANSCRIPT.  WHAT IS IN EVIDENCE IS ONLY WHAT'S

 8   BEING PLAYED.  SO WHAT I WANT IS A TRANSCRIPT OF THE EXCERPTS

 9   THAT YOU ARE PLAYING.

10             MR. KEHL:  OKAY.

11             THE COURT:  THAT'S WHAT SHOULD BE FILED AND THAT'S

12   WHAT SHOULD BE LODGED.

13             MR. KEHL:  AND PRESUMABLY WE'LL REDACT THE PORTIONS

14   THAT THEY SOUGHT TO SEAL FROM THE TRIAL TRANSCRIPT.

15             THE COURT:  I'M SORRY.  IS THERE ANY PORTION OF

16   MR. BLUMBERG'S DEPOSITION EXCERPT THAT'S GOING TO BE SEALED?

17             MR. KEHL:  SO THEY WANT TO SEAL EXCERPTS FROM THE

18   TRIAL TRANSCRIPT.

19             THE COURT:  WHAT'S THE TRIAL TRANSCRIPT?  WHAT IS

20   THAT?

21        I'M JUST TALKING ABOUT THE DEPOSITION EXCERPT THAT YOU'RE

22   PLAYING.  IS THERE ANYTHING IN WHAT YOU'RE INTENDING TO PLAY

23   THAT WILL REQUIRE ME TO EMPTY THIS COURTROOM OF ANYONE WHO'S

24   NOT A PARTY IN THE CASE?

25             MS. MILICI:  IN THE MOTION THAT LENOVO FILED, THEY
```

1       SAID THAT THEY DID WANT THIS REDACTED FROM ANY TRANSCRIPT OF

2       THESE PROCEEDINGS.

3               THE COURT:  I CAN'T DO THAT.  THERE'S A LOT OF

4       MEMBERS OF THE PUBLIC AND THE PRESS IN HERE.  ONCE IT'S PLAYED,

5       IT IS NOW PART OF THE PUBLIC DOMAIN.  I AM NOT GOING TO

6       RETROACTIVELY, AFTER EVERYONE IN THE PUBLIC HAS HEARD THIS,

7       THEN GO AHEAD AND SEAL THIS TRANSCRIPT.

8           THE EXCERPT IS NOT EVEN BEING TRANSCRIBED.

9               MS. MILICI:  OKAY.

10              THE COURT:  DO YOU UNDERSTAND WHAT I'M SAYING?

11              MS. MILICI:  I DO.

12              THE COURT:  THE COURT REPORTERS ARE NOT TRANSCRIBING

13      ANY OF THESE VIDEO PLAYINGS.  DO YOU UNDERSTAND THAT?

14          SO THAT'S WHY THE RECORD OF WHAT IS BEING SAID HERE WILL

15      BE THE TRANSCRIPT THAT YOU FILE ON THE DOCKET AND THAT YOU

16      LODGE WITH THE COURT REPORTER.

17              MS. MILICI:  OKAY.  AND MY UNDERSTANDING OF LENOVO'S

18      POSITION WAS THAT IT HAD NO OBJECTION TO THIS BEING PLAYED IN

19      THE COURTROOM, WHICH IS WHY WE PLAYED IT IN THE COURTROOM.

20          BUT THEY DID ASK FOR THE, FOR THE TRANSCRIPT, WHATEVER

21      THAT TRANSCRIPT IS, TO BE SEALED.

22              THE COURT:  RIGHT.  BUT THIS IS A PUBLIC INSTITUTION.

23              MS. MILICI:  I UNDERSTAND.

24              THE COURT:  AND IF THEY PLAY IT, THERE ARE MEMBERS OF

25      THE PUBLIC HERE AND THERE'S MEDIA HERE.  SO ONCE THAT BELL IS

```
1     RUNG, I CAN'T UNRING THAT BELL.

2          I HEARD NOTHING TODAY THAT WOULD BE CONFIDENTIAL THAT I

3     WOULD SEAL.  IT DOESN'T EVEN MEET THE GOOD CAUSE STANDARD FOR

4     SEALING, EVERYTHING I'VE HEARD TODAY.

5          NOW, I DON'T KNOW WHAT ELSE HE'S GOING TO TESTIFY TO, IF

6     HE'S GOING TO GET INTO ANYTHING SPECIFIC.  IS THERE GOING TO BE

7     ANYTHING SPECIFIC IN THE REST OF THE PORTION THAT YOU'RE

8     PLAYING?

9               MR. KEHL:  YOUR HONOR, WE OPPOSED THIS MOTION BECAUSE

10    WE THOUGHT, AS YOU SAID, THE MATERIAL DID NOT MEET THE

11    STANDARD.

12         BUT THE COURT DID GRANT THE MOTION AS STYLED, SO THAT'S

13    WHY WE RAISED THIS ISSUE.

14              THE COURT:  OH.  WELL, THEN, THAT WAS OUR MISTAKE,

15    NOT -- MY MISTAKE NOT TO CLARIFY, BECAUSE WHEN IT WAS TOLD TO

16    ME THAT THAT WAS LENOVO'S REQUEST, I SAID NO, BECAUSE ONCE IT'S

17    PLAYED, THERE ARE MEMBERS OF THE PUBLIC -- I'M SORRY.  I'M

18    REPEATING MYSELF.

19         IT'S PUBLIC NOW.  ANYTHING THAT'S PLAYED IN THIS

20    COURTROOM, IN OPEN COURT, UNLESS I SEAL THE COURTROOM AND ASK

21    EVERYONE TO STEP OUTSIDE WHO'S NOT PART OF THE CASE, IT'S NOW

22    PART OF THE PUBLIC DOMAIN.

23         YOU KNOW WHAT?  I WILL FILE A CLARIFYING ORDER IF THAT

24    WASN'T CLEAR, THAT THAT PARTICULAR REQUEST OF LENOVO'S IS

25    REJECTED.
```

```
1              MS. MILICI:  OKAY.  SO WHEN WE RETURN AFTER LUNCH, DO

2       YOU WANT US TO PLAY THE REST OF THIS IN A SEALED COURTROOM?

3              THE COURT:  I'M SORRY.  I MAY NEED TO GO BACK AND

4       LOOK AT THIS.

5           LET ME JUST SEE THE SEALING ORDER.

6           (PAUSE IN PROCEEDINGS.)

7              THE COURT:  WHAT PORTIONS HAVE ALREADY BEEN PLAYED OF

8       THE BLUMBERG DEPOSITION?

9              MR. KEHL:  SO WE'RE IN THE MIDST OF PAGE 158 THROUGH

10      161.

11             THE COURT:  ALL RIGHT.  WELL, I'M SORRY THEN.  SO

12      YOU'VE ALREADY PLAYED THE EXCERPTS 44, LINE 23, THROUGH 156,

13      LINE 11?

14             MR. KEHL:  THAT'S CORRECT.

15             THE COURT:  ALL RIGHT.  WELL, I APOLOGIZE THEN.  I

16      THINK THOSE ARE WRONG SEALING RULINGS AND I'M GOING TO CHANGE

17      THEM.  OKAY?  THOSE ARE GOING TO BE DENIED.

18          LET ME GO BACK AND LOOK AT THE BLUMBERG DEPOSITION AND

19      SEE.  IF THERE ARE ANY PORTIONS THAT DO REQUIRE SEALING, THEN I

20      AM GOING TO HAVE TO ASK EVERYONE TO STEP OUT.

21             MS. MILICI:  UNDERSTOOD.

22             THE COURT:  OKAY.  THAT'S MY MISTAKE.  I APOLOGIZE.

23          OKAY.  WELL, THEN, WHY DON'T YOU HOLD ON THE TRANSCRIPT

24      BECAUSE I NEED TO GO BACK AND REVIEW THAT.

25             MR. KEHL:  OKAY.
```

```
 1              THE COURT:  I HAVEN'T HEARD ANYTHING TODAY THAT I

 2     THOUGHT WOULD BE SEALED FROM HIS TESTIMONY, OR SHOULD BE

 3     SEALED.

 4              ALL RIGHT.  SO DURING LUNCH, I WOULD LIKE -- YOU KNOW,

 5     THERE WERE ABOUT 15 I.T. PEOPLE HERE YESTERDAY, SO I KNOW YOU

 6     HAVE THEM HERE.  THEY MAY NOT BE IN THIS COURTROOM, BUT I NEED

 7     THEM TO COME AT LUNCH TO FIX WHATEVER NEEDS TO BE FIXED.

 8              IT IS A HINDRANCE NOT TO BE ABLE TO SEE WHAT ACTUAL

 9     DOCUMENT IS BEING DISCUSSED WHILE THE TESTIMONY IS BEING

10     PLAYED.

11              COULD WE HAVE JACKSON COME AS WELL?

12              THIS MONITOR HAS NOT BEEN WORKING FOR THE LAST HOUR AND A

13     HALF, SO IT'S OKAY BECAUSE I CAN LOOK AT THE SCREEN AND I'M

14     MOSTLY LOOKING AT DOCUMENTS.

15              BUT IT WOULD BE HELPFUL IF WE CAN GET ALL THESE KINKS

16     WORKED OUT.  SO IF YOU COULD PLEASE HAVE YOUR FOLKS TO COME

17     DURING LUNCH TO TRY TO WORK THIS OUT, PLEASE?

18              MS. MILICI:  YOUR HONOR, WE'LL DO OUR BEST.  TO BE

19     CLEAR, THESE WERE NOT OUR I.T. PEOPLE.  BUT WE WILL DO OUR BEST

20     TO SEE IF WE CAN FIGURE THIS OUT.

21              THE COURT:  WELL, IF THIS SYSTEM DOESN'T WORK, THEN I

22     WANT ALL THE QUALCOMM STUFF OUT, AND OVER THE WEEKEND, I WANT

23     YOUR PEOPLE TO COME.

24              THIS IS NOT WORKING FOR ME, AND IT'S NOT WORKING FOR YOU,

25     AND OUR AUDIENCE CAN'T SEE ANYTHING ABOUT THE DOCUMENTS.  I
```

```
 1        WANT ALL THIS REMOVED.

 2                  MR. BORNSTEIN:  YOUR HONOR, TO BE CLEAR, THIS IS NOT

 3        A SYSTEM ISSUE.  THIS IS A QUESTION OF WHAT'S ON THE COMPUTER

 4        AND WHAT'S ON THE VIDEO.  WE'RE HAPPY TO WORK WITH THE FTC TO

 5        MAKE SURE THINGS ARE OPERATING PROPERLY, BUT IT'S NOT A

 6        SYSTEM -- IT'S NOT A SYSTEM ISSUE.

 7                  THE COURT:  OKAY.  WELL, YOU HAD A TON OF PEOPLE IN

 8        HERE YESTERDAY.  I SAW THEM ALL.

 9                  MR. BORNSTEIN:  YES.

10                  THE COURT:  THEY NEED TO COME IN DURING LUNCH AND TRY

11        TO ASSIST.  IF THIS DOESN'T WORK, I WANT ALL THIS EQUIPMENT

12        REMOVED AND I WANT ANOTHER SYSTEM PUT IN.

13                  MR. BORNSTEIN:  YOUR HONOR, MR. DAHM IS HERE, WHO CAN

14        ASSIST WITH THE COMPUTER.  IT'S JUST A COMPUTER.  WE'RE HAPPY

15        TO HELP THE FTC ON THIS.

16                  MR. VAN NEST:  IT'S NOT THE SYSTEM OVERALL.  THAT'S

17        THE POINT, YOUR HONOR.  THEY HAVE A COMPUTER, WE HAVE A

18        COMPUTER.  IT'S THEIR COMPUTER THAT'S NOT WORKING.  OUR

19        COMPUTER IS WORKING FINE.  IT'S NOT THE OVERALL SYSTEM.

20                  THE COURT:  OKAY.  WELL, FOLKS WERE IN HERE -- I'M

21        SORRY TO INTERRUPT YOU.  FOLKS WERE IN HERE FOR A REALLY LONG

22        TIME YESTERDAY.  I GUESS NO ONE TRIED THIS OUT.

23                  MS. MILICI:  I THINK WE DID TRY IT OUT, AND I'M

24        NOT -- FRANKLY, I'M NOT SURE WHAT THE TECHNICAL ISSUE RIGHT NOW

25        IS.  I WAS JUST MAKING CLEAR THAT THE FTC DOES NOT HAVE I.T.
```

```
1    PEOPLE HERE.

2        BUT WE WILL PUT OUR HEADS TOGETHER AND SEE WHAT WE CAN

3    FIGURE OUT.

4        THE COURT:  OKAY.  WELL, IT'S HURTING THE

5    PRESENTATION OF YOUR CASE.  MAYBE YOU NEED TO HAVE SOMEONE COME

6    OUT OR HIRE SOMEONE LOCALLY ON A CONTRACT BASIS.  I DON'T KNOW.

7        BUT I DO THINK IT'S A HINDRANCE NOT TO BE ABLE TO SEE THE

8    DOCUMENTS.  I'M DOING THE BEST I CAN, BUT IT WOULD BE

9    MARGINALLY HELPFUL IF YOU COULD TAKE CARE OF THIS.  OKAY?

10       MS. MILICI:  ABSOLUTELY.  WE WILL DO EVERYTHING IN

11   OUR POWER.

12       THE COURT:  OKAY.  SO -- I MEAN, AND WE CAN TALK

13   ABOUT THE REST OF THE ISSUES LATER.  BUT WE DO NEED A DUE DATE

14   FOR THE POST-TRIAL BRIEFS.  I DON'T THINK WE ACTUALLY SET ONE.

15   SO IF YOU CAN THINK ABOUT THAT AND WE CAN TALK ABOUT THAT AT

16   THE END OF THE DAY AT 4:30.

17       MR. VAN NEST:  THANK YOU, YOUR HONOR.

18       THE COURT:  AND WE'LL TALK -- AND CAN QUALCOMM

19   PROVIDE YOUR EXHIBIT LIST ON 8 AND A HALF BY 11, DOUBLE-SIDED,

20   PLEASE.  CAN YOU DO THAT?

21       MR. VAN NEST:  SURE.

22       THE COURT:  THANK YOU.

23   OKAY.  THEN WE'LL TALK ABOUT THE OTHER -- I'D ALSO LIKE A

24   LIST OF ALL THE LAWYERS WHO ARE GOING TO BE PRESENTING DURING

25   THE TRIAL ON BOTH SIDES.  IF YOU COULD FILE THAT, PLEASE.
```

1          OKAY.  THANK YOU VERY MUCH.

2                MR. VAN NEST:  THANK YOU, YOUR HONOR.

3                THE COURT:  THANK YOU.

4                MS. MILICI:  THANK YOU, YOUR HONOR.

5          (THE LUNCH RECESS WAS TAKEN FROM 12:10 P.M. UNTIL

6     1:08 P.M.)

7                THE COURT:  OKAY.  GOOD AFTERNOON AND WELCOME.

8     PLEASE TAKE A SEAT.

9                MR. VAN NEST:  THANK YOU, YOUR HONOR.

10               THE COURT:  SO I'VE LOOKED BACK -- I APOLOGIZE.  I'VE

11    LOOKED BACK OVER MR. BLUMBERG.

12         I THINK, ESPECIALLY WITH THE TESTIMONY OF

13    MR. REIFSCHNEIDER, WHO'S ALREADY TESTIFIED THAT THERE WAS A

14    QUALCOMM PRACTICE OF NOT SUPPLYING CHIPS TO ANYONE WHO WAS NOT

15    LICENSED TO QUALCOMM PATENTS, AND HIS EXHIBITS WHERE THEY'RE

16    THREATENING TO CUT OFF PEOPLE'S CHIP SUPPLY IF THEY DON'T RENEW

17    THEIR LICENSE, I THINK THAT'S NOW PART OF THE PUBLIC DOMAIN.

18         I DON'T THINK ANYTHING IN THE TESTIMONY OF MR. BLUMBERG

19    NEEDS TO BE SEALED, BUT HIS EXHIBITS DO NEED TO BE SEALED.

20         NOW, I GUESS THE QUESTION IS, WITH REGARD TO MS. YU, SHE'S

21    ONE OF YOUR WITNESSES TODAY -- AND WE'LL NEED TO WORK OUT A

22    SYSTEM -- THE PROBLEM IS THE THIRD PARTIES ARE FILING THEIR

23    SEALING MOTIONS THE DAY BEFORE, AND SO IT'S REALLY A TIGHT

24    TIMEFRAME TO GO THROUGH ALL THE HIGH PRIORITY OBJECTIONS AND

25    ALL THE THIRD PARTY SEALING MOTIONS, YOU KNOW, IN ONE DAY, AS

```
 1        WELL AS THE PARTIES' SEALING MOTIONS.

 2             WHAT'S YOUR SUGGESTION ABOUT HOW WE CAN -- I MEAN, I'M

 3        HOPING WE'LL HAVE A SMOOTHER PROCESS GOING FORWARD AND TODAY

 4        WE'RE GOING TO SEE ALL THE HICCUPS THAT WE NEED TO FIX.

 5             WHAT DO YOU THINK?

 6             MS. MILICI:  I THINK THAT'S MY HOPE, TOO.

 7             THE COURT:  YEAH.

 8             MS. MILICI:  BUT ONE ANSWER IS THAT ON MS. YU, MY

 9        UNDERSTANDING IS THAT HUAWEI HAS WAIVED ITS CONFIDENTIALITY

10        REQUEST DURING THE BREAK --

11             THE COURT:  THEY DID?

12             MS. MILICI:  -- AND IS NO LONGER SEEKING TO SEAL THAT

13        DEPOSITION.

14             THE COURT:  OH, OKAY.  BUT IS THERE SOMEONE HERE -- I

15        MEAN, YOU'RE AN OFFICER OF THE COURT, I DON'T DOUBT YOUR --

16             MS. MILICI:  I BELIEVE HE'S HERE.

17             THE COURT:  OKAY.  THANK YOU.

18         IF YOU COULD STATE YOUR PRESENCE ON THE RECORD.  I

19        CERTAINLY DON'T WANT TO DO ANYTHING TO YOUR CLIENT'S DETRIMENT

20        WITHOUT HAVING YOU ON THE RECORD.

21             MR. GIARDINA:  CERTAINLY, YOUR HONOR.

22             THE COURT:  IF YOU WOULD STATE YOUR APPEARANCE FOR

23        THE RECORD.

24             MR. GIARDINA:  DAVID GIARDINA, G-I-A-R-D-I-N-A, WITH

25        SIDLEY AUSTIN FOR HUAWEI DEVICE.
```

1          AND, YOUR HONOR, THE FINAL VERSION OF THE DESIGNATIONS OF

2     MS. YU'S DEPOSITION WERE MORE NARROW THAN WHAT WE HAD FILED OUR

3     MOTION TO SEAL ON AND THAT YOU RULED ON.

4          IN LIGHT OF THE NARROWING OF THE DESIGNATIONS, WE'RE

5     CONTENT TO ALLOW THE DESIGNATIONS TO BE PLAYED IN OPEN COURT

6     AND HAVE WITHDRAWN OUR CLAIMS OF CONFIDENTIALITY WITH RESPECT

7     TO THE TESTIMONY THAT'S GOING TO BE PLAYED.

8          YOUR HONOR GRANTED OUR MOTION WITH RESPECT TO CERTAIN

9     EXHIBITS.  WE WOULD MAINTAIN THAT THOSE -- OUR CLAIM OF

10    CONFIDENTIALITY OVER THOSE EXHIBITS, AND I UNDERSTAND THAT

11    THOSE WILL NOT BE DISPLAYED PUBLICLY DURING THE PLAYING OF THE

12    DESIGNATIONS.

13             MS. MILICI:  THAT'S CORRECT.

14             THE COURT:  THEY WILL NOT BE DISPLAYED; CORRECT?

15             MR. GIARDINA:  YES.

16             THE COURT:  OKAY.  THANK YOU.  THANK YOU.  THAT MAKES

17     IT SIMPLER.

18          NOW, I HAVEN'T HAD A CHANCE TO GO ALL OF THE OTHER -- THE

19     CHONG DEPOSITION SEALING REQUEST IS DENIED, SO THAT'S NOT AN

20     ISSUE.

21          WHO ELSE DO WE HAVE THAT I WOULD NEED TO RULE ON TODAY?

22             MS. MILICI:  I'M NOT SURE WHO ELSE NEEDS TO BE RULED

23     ON TODAY.

24             THE COURT:  OKAY.

25             MS. MILICI:  TODAY OUR ONLY REMAINING VIDEOS ARE

1    MS. YU, WHO WE JUST TALKED ABOUT, AND DR. PAUL JACOBS, A FORMER

2    QUALCOMM EMPLOYEE, AND THERE ARE NOT SEALING REQUESTS.

3              THE COURT:  OKAY.  ALL RIGHT.  GOOD.

4         BUT I WOULD APPRECIATE IT IF WE COULD THINK ABOUT, IF IT'S

5    POSSIBLE FOR ME TO GET THE SEALING REQUESTS FROM THIRD PARTIES

6    BEFORE THE DAY BEFORE, IF IT'S POSSIBLE.  I DON'T KNOW IF

7    THAT'S -- LET'S THINK ABOUT IT.

8              MS. MILICI:  OKAY.

9              THE COURT:  BUT IF WE COULD PERHAPS WORK OUT THIS

10   SYSTEM WHERE DOCUMENTS ARE SEALED, BUT IF THE PARTIES ARE

11   WILLING TO HAVE THE EXCERPTS THAT'LL BE PLAYED PUBLICLY

12   DISPLAYED, THAT WILL CERTAINLY HELP.

13             MS. MILICI:  ABSOLUTELY.

14             THE COURT:  OKAY.

15             MS. MILICI:  WE WILL CONFER WITH OUR OPPONENTS THERE

16   AND SEE WHAT WE CAN FIGURE OUT.

17        ALSO, I MIGHT HAVE BEEN WRONG ABOUT OUR VIDEOS.  WE MIGHT

18   ALSO GET TO JOHN GRUBBS THIS AFTERNOON --

19             THE COURT:  OKAY.

20             MS. MILICI:  -- FROM BLACKBERRY.  I THINK MOST LIKELY

21   WE WON'T GET THERE TODAY.

22             THE COURT:  OKAY.

23             MS. MILICI:  BUT THERE IS A CHANCE THAT IF WE FINISH

24   EARLY, WE WOULD GET TO JOHN GRUBBS.

25             THE COURT:  ALL RIGHT.  I GUESS DURING THE TWO BREAKS

1    I'LL TRY TO LOOK VERY QUICKLY AT HIS TESTIMONY.

2         JUST SO YOU KNOW, I THINK THE DESIGNATIONS OF JUST SEALING

3    ALL LICENSING NEGOTIATIONS IS OVERBROAD AND THAT'S MY MISTAKE.

4         THE ONLY THING THAT I WOULD PROBABLY SEAL WOULD BE ACTUAL

5    ROYALTY RATES, UNLESS IT'S SOMETHING PUBLIC.  LIKE THIS

6    5 PERCENT SEEMS TO BE A PUBLIC DOMAIN PIECE OF INFORMATION, SO

7    I WOULDN'T SEAL THAT.

8         BUT, YOU KNOW, SOMETIMES IF THERE'S A DIFFERENT RATE FOR

9    DOMESTIC VERSUS FOREIGN SALES -- I DON'T KNOW, IS THAT PUBLIC

10   INFORMATION OR NOT?

11        MS. MILICI:  I THINK A LOT OF THE TIMES IT IS PUBLIC

12   INFORMATION, BUT IT WOULD DEPEND ON THE SPECIFIC CONTEXT.

13        THE COURT:  RIGHT.  OKAY.  IT WOULD BE HELPFUL IF, IN

14   THE SEALING DOCUMENTS, IT WAS -- IF YOU COULD SPECIFY WHAT IS

15   PART OF THE PUBLIC DOMAIN OR NOT.  THAT WOULD BE VERY HELPFUL,

16   BECAUSE IF IT IS, I'M OBVIOUSLY NOT GOING TO SEAL IT.

17        MS. MILICI:  OKAY.

18        THE COURT:  BUT GENERALLY, ACTUAL SALES NUMBERS,

19   ACTUAL ROYALTY RATES, ASSUMING THEY'RE NOT PUBLIC, AND ACTUAL

20   ROYALTY PAYMENTS WHICH WOULD GIVE YOU AN INDICATION OF THE

21   ROYALTY BASE, I.E., THE SALES NUMBER, I'M LIKELY TO SEAL THAT,

22   BUT NOT THIS SORT OF GENERAL DISCUSSION.

23        I'M CERTAINLY NOT GOING TO SEAL -- IN THE PRETRIAL

24   STATEMENT, THE PARTIES TRIED TO SEAL EVERY -- YOU KNOW, ON

25   AUGUST 22ND, 2013, HUAWEI AND QUALCOMM SIGNED AND EXECUTED A

1      LICENSE AGREEMENT.

2           THAT'S REALLY NOT SEALABLE.  YOUR PRETRIAL STATEMENT

3      SEALING IS WAY OVERBROAD.

4           SO I'M GOING TO ASK YOU -- I'LL TRY TO COME UP WITH A

5      UNIVERSE OF DOCUMENTS THAT I'M GOING TO DENY THE SEALING

6      REQUEST WITHOUT PREJUDICE AND HAVE YOU COME BACK.

7           NOW, AS WE'RE SORT OF FINE TUNING WHAT SEALING WE'RE

8      ACTUALLY GOING TO DO, I'D LIKE YOU TO DO A MORE NARROWED

9      REQUEST BECAUSE, I MEAN, LITERALLY THERE WERE, LIKE, 15 PAGES

10     OF JUST DATES OF WHEN LICENSE AGREEMENTS WERE EXECUTED.  NO

11     INFORMATION ABOUT WHAT WAS IN THE AGREEMENT.  THAT'S ALL SEALED

12     IN THE PRETRIAL STATEMENT.

13          THAT'S WAY OVERBROAD.

14               MS. MILICI:  UNDERSTOOD, YOUR HONOR.

15               THE COURT:  OKAY.  WELL, THEN, LET'S GO AHEAD,

16     PLEASE, WITH MR. BLUMBERG'S TESTIMONY.

17               MR. KEHL:  MS. HILL, PLEASE PLAY THE VIDEO.

18          **(THE VIDEOTAPED DEPOSITION OF IRA BLUMBERG WAS PLAYED IN**

19     **OPEN COURT OFF THE RECORD.)**

20               THE COURT:  I'M SORRY.  ISN'T THIS SEALED?

21               MR. KEHL:  THIS DOCUMENT IS NOT SEALED.

22               THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  SORRY FOR

23     THE INTERRUPTION.  THIS DOCUMENT IS NOT SEALED.

24          **(THE VIDEOTAPED DEPOSITION OF IRA BLUMBERG WAS PLAYED IN**

25     **OPEN COURT OFF THE RECORD.)**

```
1              THE COURT:  IS THAT THE END?

2              MR. KEHL:  NO, YOUR HONOR.  WE'RE JUST TRYING TO TAKE

3    THE DOCUMENT DOWN TO DISPLAY THE TESTIMONY.

4              THE COURT:  OH, OKAY.

5         WHAT WAS THE LAST EXHIBIT NUMBER, PLEASE?

6              MR. KEHL:  CX 2079.

7              THE COURT:  OKAY.  BUT THERE WAS AN ADDITIONAL

8    PAGE --

9              MR. KEHL:  AND THE EXHIBIT PRECEDING THAT WAS

10   CX 2093.

11             THE COURT:  RIGHT.  SO I HAVE -- I'VE HIGHLIGHTED

12   WHAT WAS ON PAGES 4 AND 5 OF CX 2079.

13        WHAT WAS THE PAGE THAT THEY WERE TALKING ABOUT IT WOULD

14   TAKE THREE MONTHS TO FIND ANOTHER SOURCE OF SUPPLY?  WAS THAT

15   ON PAGE 7?

16             MR. KEHL:  THAT WAS ON PAGES -- IT STARTS ON PAGE 4

17   AND CARRIES OVER TO PAGE 5.  IT'S THE E-MAIL FROM MR. BLUMBERG

18   DATED NOVEMBER 2ND, 2013.

19             THE COURT:  OH.  I JUST DIDN'T SEE THE THREE MONTHS

20   IN THERE.  I DON'T KNOW WHAT HE WAS TALKING ABOUT.

21             MR. KEHL:  OH.  THEN WE'RE GETTING INTO ANOTHER

22   PARAGRAPH, ANOTHER E-MAIL IN THE CHAIN --

23             THE COURT:  OKAY.

24             MR. KEHL:  -- WHICH IS ON PAGE 2.

25             THE COURT:  OH, OKAY.  I WAS LOST THERE.
```

```
1              OH, I SEE, OKAY.  OKAY, ON PAGE 2.

2              OKAY.  ALL RIGHT.

3              ALL RIGHT.  THANK YOU.  I THINK I'M CAUGHT UP NOW.

4                   MR. KEHL:  CAN WE PROCEED WITH THE VIDEO?

5                   THE COURT:  YES.

6              SO I DON'T HAVE -- I JUST WANTED TO MAKE SURE THAT AS FAR

7         AS HIS EXHIBITS, BECAUSE ALL OF THE SEALING WAS GRANTED AS TO

8         THE EXHIBITS TO MR. BLUMBERG'S DEPOSITION -- I'M JUST GOING TO

9         DEFER TO YOU THAT WE'RE MAKING SURE THAT WHATEVER WAS SEALED IS

10        NOT GOING TO APPEAR ON THE SCREEN.

11                  MR. KEHL:  THAT'S CORRECT.

12                  THE COURT:  OKAY.  THANK YOU.

13             GO AHEAD THEN.

14             (THE VIDEOTAPED DEPOSITION OF IRA BLUMBERG WAS PLAYED IN

15        OPEN COURT OFF THE RECORD.)

16                  THE COURT:  I'M SORRY, CAN I STOP YOU ONE MINUTE.

17             WHAT'S THE TIME NOW, PLEASE?

18                  THE REPORTER:  1:33.

19                  THE COURT:  OKAY.  THIS SECTION WAS ALL SEALED, SO

20        I'M NOT SURE WHY IT'S UP.

21                  MS. MILICI:  IT'S -- YOUR HONOR, IT'S ONLY UP ON YOUR

22        SCREEN.

23                  THE COURT:  OH, I SEE.

24                  MS. MILICI:  IT'S NOT UP ON THE PUBLIC SCREEN.

25                  THE COURT:  I SEE.  I'M SORRY.  I APOLOGIZE.
```

```
 1              MS. MILICI:  WE'VE BEEN USING A CARDBOARD TO BLOCK

 2     OFF THE PUBLIC SCREEN WHEN THERE'S ONLY THINGS THAT YOU CAN

 3     SEE.

 4              THE COURT:  I SEE.  SO THAT'S WHAT YOU'RE GOING TO

 5     DO.

 6          ALL RIGHT.  THAT'S FINE.  THANK YOU.  I APOLOGIZE.

 7              (THE VIDEOTAPED DEPOSITION OF IRA BLUMBERG WAS PLAYED IN

 8     OPEN COURT OFF THE RECORD.)

 9              MR. KEHL:  YOUR HONOR, THIS CONCLUDES THE TESTIMONY

10     OF MR. BLUMBERG.

11              THE COURT:  OKAY.  IT'S 1:55.

12          (PAUSE IN PROCEEDINGS.)

13              THE COURT:  OKAY.  WHO'S YOUR NEXT WITNESS?

14              MR. HOPKIN:  THE FTC WILL NOW PRESENT THE VIDEOTAPED

15     TESTIMONY OF DR. PAUL JACOBS, THE FORMER CEO AND EXECUTIVE

16     CHAIRMAN OF QUALCOMM.

17              THE COURT:  AND IS THERE ANY TIME THAT SHOULD BE

18     DEDUCTED TO QUALCOMM?

19              MR. HOPKIN:  SO THE RUNTIME FOR THE VIDEO IS 32

20     MINUTES, 41 SECONDS FOR THE FTC, AND 1 MINUTE FOR QUALCOMM.

21              MR. BORNSTEIN:  AND TO BE CLEAR ON THE TIMING, YOUR

22     HONOR, IT'S NOT INCLUSIVE OF EACH OTHER'S.  IT'S 32 MINUTES,

23     PLUS 1.  THERE'S NO DEDUCTION.

24              THE COURT:  VERY GOOD.  THANK YOU.

25              MR. BORNSTEIN:  THAT'S FOR ALL OF THEM, THE TIME FOR
```

1    TODAY.

2              THE COURT:  ALL RIGHT.  THANK YOU.

3              MR. HOPKIN:  AND WE'VE PREPARED BINDERS FOR

4    MR. JACOBS AS WELL, DR. JACOBS (HANDING).

5              THE COURT:  OKAY.  THANK YOU.

6         WHAT WAS -- THE TOTAL RUNTIME FOR MR. BLUMBERG WAS 53

7    MINUTES, MINUS THE 1. -- 1 MINUTE AND 45 SECONDS.

8              MR. BORNSTEIN:  IT'S INCREMENTAL, YOUR HONOR.

9              THE COURT:  IT'S EXCLUSIVE.

10             MR. BORNSTEIN:  IT'S 53 MINUTES FOR THE FTC, AND THEN

11   IT WAS 1 MINUTE AND 45 SECONDS THAT MR. VAN NEST CAREFULLY

12   IDENTIFIED FOR OUR SIDE.

13             THE COURT:  OKAY.  THANK YOU.  THANK YOU FOR

14   CLARIFYING THAT.

15        AND ARE YOU SEEKING TO ADMIT ANY EXHIBITS THROUGH THIS

16   DEPOSITION?

17             MR. HOPKIN:  YES, YOUR HONOR.

18        THE FTC MOVES TO ADMIT THE FOLLOWING EXHIBITS:  JOINT

19   EXHIBITS JX 36 AND JX 45; AND FTC EXHIBITS CX 7041, CX 7224,

20   CX 7042, CX 6605, CX 7279, CX 7234, AND CX 7035.

21             THE COURT:  ALL RIGHT.  ANY OBJECTION TO THOSE

22   EXHIBITS?

23             MS. SESSIONS:  NONE, YOUR HONOR.

24             THE COURT:  OKAY.  THEY'RE ADMITTED.

25        (JOINT EXHIBITS 36 AND 45 WERE ADMITTED IN EVIDENCE.)

1              (PLAINTIFF'S EXHIBITS 7041, 7224, 7042, 6605, 7279, 7234,

2      AND 7035 WERE ADMITTED IN EVIDENCE.)

3              MR. HOPKIN:  THANK YOU, YOUR HONOR.

4              THE COURT:  GO AHEAD, PLEASE.

5              MR. HOPKIN:  MS. HILL, PLEASE PROCEED.

6              **(THE VIDEOTAPED DEPOSITION OF PAUL JACOBS WAS PLAYED IN**

7      **OPEN COURT OFF THE RECORD.)**

8              THE COURT:  IS THIS THE END?  IT'S 2:32.

9              MR. HOPKIN:  YES, YOUR HONOR.

10             THE COURT:  OKAY.  LET'S TAKE OUR BREAK NOW.  WE'LL

11     TAKE A TEN MINUTE BREAK.

12         LET ME ASK YOU, ARE THERE ANY SEALING REQUESTS THAT I

13     SHOULD REVIEW OVER THE BREAK?  IT SOUNDS LIKE WE'RE OKAY WITH

14     MS. YU FROM HUAWEI.

15         ARE WE OKAY ON -- YOUR NEXT WITNESS IS GOING TO BE

16     MR. WISE; CORRECT?  THAT'S FINE?  DO YOU NEED ME TO LOOK AT

17     MR. GRUBBS' SEALING AGAIN?

18             MR. HOPKIN:  YES, YOUR HONOR --

19             THE COURT:  OKAY.

20             MR. HOPKIN:  -- IN CASE WE HAVE TIME TO PLAY IT THIS

21     AFTERNOON.

22             THE COURT:  OKAY.  IS THERE ANYONE FROM BLACKBERRY

23     HERE?  ARE THEY GOING TO MAKE A SIMILAR AGREEMENT THAT, THE

24     TRANSCRIPT IS OKAY TO PLAY PUBLICLY, BUT THE DOCUMENT SHOULD

25     REMAIN SEALED?  IS THERE ANYONE HERE FROM BLACKBERRY?  NO?

1         OKAY.

2               ALL RIGHT.  THANK YOU.  LET'S TAKE A BREAK NOW.

3               (RECESS FROM 2:33 P.M. UNTIL 2:50 P.M.)

4                 THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

5               SO WE'RE FILING A REVISED ORDER ON MR., IS IT GRUBBS,

6    DEPOSITION TESTIMONY.  THE EXHIBITS WILL REMAIN PER THE PRIOR

7    SEALING ORDER.

8               I'M JUST UNCLEAR.  WHEN ARE THE RATES PUBLIC AND WHEN ARE

9    THEY NOT PUBLIC?  IS 5 PERCENT PUBLIC, ANYTHING THAT DEVIATES

10   FROM 5 PERCENT IS NOT PUBLIC?

11              WHAT'S THE --

12                MR. VAN NEST:  GO AHEAD.

13                MS. MILICI:  I WAS GOING TO SUGGEST THAT --

14                MR. VAN NEST:  YOUR HONOR, IT DEPENDS.  OBVIOUSLY THE

15   MORE CURRENT RATES ARE MORE LIKELY TO BE NOT PUBLIC.

16                THE COURT:  UM-HUM.

17                MR. VAN NEST:  BUT THE GENERAL 5 PERCENT RATE IS

18   PUBLIC AND WE'RE NOT ASKING TO SEAL THAT.

19              BUT EACH LICENSE NEGOTIATION IS DIFFERENT.  SOMETIMES

20   LICENSEES PAY MONEY UPFRONT TO GET A REDUCED RATE.

21                THE COURT:  UH-HUH.

22                MR. VAN NEST:  SOMETIMES LICENSEES ASK FOR OTHER

23   ACCOMMODATIONS AND THE RATE CHANGES A LITTLE BIT.

24              SO IT'S -- THERE'S NO -- THERE'S NO CLEAR ANSWER TO THAT.

25                THE COURT:  OKAY.

```
 1            MR. VAN NEST:  IT IS STILL LICENSE BY LICENSE.  AND I
 2    SUSPECT MOST OF THE OEM'S COMING IN HERE WANT TO HAVE THEIR
 3    RATES CONFIDENTIAL, AND THAT'S PROBABLY WHAT YOU'RE SEEING IN
 4    THE SEALING.
 5            THE COURT:  WELL, THE DIFFICULTY IS, LIKE, WE HAD
 6    FIVE THIRD PARTIES FILE SEALING MOTIONS YESTERDAY MORNING, IN
 7    ADDITION WITH THE HIRE PRIORITY OBJECTIONS, AND WE ARE TRYING
 8    TO KEEP OTHER CIVIL AND CRIMINAL CASES GOING.  I HAVE OTHER
 9    COURT WEDNESDAY MORNING AND AFTERNOON THIS WEEK AND THURSDAY
10    AFTERNOON.  SO IT'S A LITTLE BIT CHALLENGING.
11         IS THERE ANY WAY THAT WHEN A THIRD PARTY FILES A SEALING
12    MOTION, YOU ALL COULD LET US KNOW WHAT IS PUBLIC AND WHAT IS
13    NOT PUBLIC OF WHAT THEY'VE REQUESTED VERSUS, LIKE, WE JUST KNOW
14    YOU OPPOSE IT?  THAT DOESN'T REALLY HELP US IN UNDERSTANDING
15    WHY YOU OPPOSE IT, EXACTLY WHAT PIECES DO YOU OPPOSE SEALING.
16            MR. VAN NEST:  I THINK WE COULD DO THAT, YOUR HONOR.
17    WE WOULD NEED TIME.  I MEAN, WE HAVE THE SAME PROBLEM YOU DO.
18            THE COURT:  YEAH.
19            MR. VAN NEST:  WE GAVE THESE PEOPLE NOTICE AS EARLY
20    AS WE COULD, AND SO DID THE FTC.  BUT THEN THEY WAIT AND THEY
21    DELAY.
22            THE COURT:  YEAH.
23            MR. VAN NEST:  BUT WE CAN TRY TO DO THAT.  AND I
24    THINK IT'LL GET BETTER AS WE GO ALONG.
25            THE COURT:  SURE, I THINK SO.
```

```
1            MR. VAN NEST:  BECAUSE WE'LL HAVE FEWER DISPUTES.

2            THE COURT:  SURE.

3            MR. VAN NEST:  BUT JUST IN GENERAL, THINGS LIKE YOU

4    MENTIONED THIS MORNING, RATES --

5            THE COURT:  YES.

6            MR. VAN NEST:  -- AND PAYMENTS, YES, THOSE ARE

7    GENERALLY NOT PUBLIC, ESPECIALLY IF THEY'RE CURRENT.

8         AND SO OUR GENERAL LICENSING PROGRAM --

9            THE COURT:  BUT HOW DO YOU DEFINE "CURRENT"?  I'M

10   SORRY TO INTERRUPT YOU.  IS IT 16 ON, OR -- I DON'T EVEN

11   KNOW --

12           MR. VAN NEST:  WE'VE AGREED THAT ANYTHING MORE THAN

13   THREE YEARS OLD GENERALLY CAN BE PUBLIC, EXCEPT FOR THINGS LIKE

14   RATES AND PAYMENTS.  THOSE THINGS STAY CONFIDENTIAL FOR MUCH

15   LONGER.

16           THE COURT:  OKAY.

17           MR. VAN NEST:  WHAT SOMEONE IS PAYING AND WHAT THE

18   RATE IS.

19           THE COURT:  OKAY.

20           MR. VAN NEST:  BUT APART FROM THAT TYPE OF THING.

21           THE COURT:  YES.

22           MR. VAN NEST:  THESE E-MAILS THAT WE SHOWED IN THE

23   OPENING THIS MORNING, INTERNAL APPLE OR INTEL, I MEAN, AFTER

24   THREE YEARS, PEOPLE'S STRATEGY, IT'S EVOLVED IN THE MARKET.

25           THE COURT:  IT'S UPDATED.
```

```
 1              MR. VAN NEST:  IT'S UPDATED, YEAH.

 2              THE COURT:  SO THIS IS WHAT -- I'M SORRY, IS IT

 3      MR. CHUBS?

 4              MS. MILICI:  GRUBBS.

 5              THE COURT:  GRUBBS.  SO ANYTHING RELATED TO

 6      ANTICIPATED SALES NUMBERS, ANYTHING RELATED TO THE RATES THEY

 7      WANTED, THE RATES THEY GOT, ANYTHING RELATED TO INCENTIVE

 8      PAYMENTS, TOTAL NUMBER, WHATEVER, IS SEALED.

 9              MR. VAN NEST:  FINE.

10              THE COURT:  OKAY?  AND FOR HIM, THAT'S MOST OF WHAT

11      YOU WANT FROM HIM, SO I SUSPECT WHEN HIS TESTIMONY IS PLAYED,

12      I'M JUST GOING TO HAVE TO EMPTY THE COURTROOM BECAUSE I DON'T

13      SEE ANY OTHER WAY.  TO WASTE TIME HAVING PEOPLE COME IN FOR A

14      MINUTE AND THEN STEP OUT FOR TWO MINUTES AND THAT KIND OF SWISS

15      CHEESE IN AND OUT WILL NOT BE REALLY HELPFUL.

16              MR. VAN NEST:  IT'S NOT CONVENIENT AND BENEFICIAL.

17      VERY WELL.

18              MS. MILICI:  SURE.

19              THE COURT:  OKAY.  SO FOR HIM, WE MAY JUST HAVE TO

20      SEAL THE COURTROOM.

21              MS. MILICI:  OKAY.

22              THE COURT:  OKAY?

23          ALL RIGHT.  OKAY.  BUT IF THERE IS -- AND THERE WON'T BE A

24      SOLUTION TODAY.  BUT IF WE COULD TRY TO WORK OUT -- DO YOU

25      THINK OTHER DAYS WILL HAVE THIS MANY THIRD PARTIES?
```

```
 1              MS. MILICI:  I DON'T THINK -- WE FRONT LOAD THE
 2    VIDEOS FOR A NUMBER OF REASONS OF NOT BEING ABLE TO GET THE
 3    LIVE WITNESSES HERE GIVEN THE HOLIDAY WEEK.
 4              THE COURT:  UH-HUH.
 5              MS. MILICI:  SO I THINK THAT THIS IS GOING TO SLOW
 6    DOWN JUST BY NATURE OF WE'RE GOING TO HAVE MORE LIVE WITNESSES
 7    HERE WHO HAVE HAD SOMEWHAT MORE NOTICE.  SO I DO THINK IT IS
 8    GOING TO SLOW DOWN QUITE A BIT.
 9              THE COURT:  OH, OKAY.  ALL RIGHT.  WELL, WE'RE NOT
10    GOING TO SOLVE THIS TODAY, BUT IF YOU COULD SORT OF THINK ABOUT
11    WHAT IS A WAY THAT WE COULD PERHAPS HEAR FROM THIRD PARTIES
12    SOONER, AND HAVE YOU GIVE US SOME GUIDANCE ON WHAT YOU THINK IS
13    PUBLIC OF WHAT THEY'RE SEEKING TO SEAL, AND THEY COULD DISAGREE
14    WITH YOU, I DON'T KNOW.
15         THAT WOULD BE GREAT.
16              MR. VAN NEST:  WE CAN TRY TO DO THAT, YOUR HONOR.
17              MS. MILICI:  SURE.
18              MR. VAN NEST:  AND WE WILL.
19              MS. MILICI:  THANK YOU, YOUR HONOR.
20              THE COURT:  ALL RIGHT.  OKAY.  BUT YOU WILL BE
21    GETTING ANOTHER AMENDED RULING AS TO THE LAST WITNESS WHOSE
22    TESTIMONY MAY BE PLAYED TODAY.  OKAY?
23         AND THEN I HAVE SOME HOUSEKEEPING THINGS TO DO WITH YOU,
24    BUT I'D LIKE TO WAIT UNTIL 4:30.
25         SO CALL YOUR NEXT WITNESS, PLEASE.
```

```
 1              MR. MATHESON:  THANK YOU, YOUR HONOR.

 2         DAN MATHESON FOR THE FTC.

 3         WE CALL MR. DAVID WISE.

 4              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

 5         (PLAINTIFF'S WITNESS, DAVID WISE, WAS SWORN.)

 6              THE WITNESS:  YES.

 7              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

 8         WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

 9    NAME FOR THE RECORD.

10              THE WITNESS:  DAVID WISE.  W-I-S-E.

11              MR. MATHESON:  YOUR HONOR, MAY I APPROACH TO PROVIDE

12    A BINDER OF DOCUMENTS I'M GOING TO USE WITH THE WITNESS TO YOUR

13    CLERK?

14              THE COURT:  YES.  THANK YOU.

15              MR. MATHESON:  (HANDING.)

16         (PAUSE IN PROCEEDINGS.)

17              THE COURT:  THE TIME IS 2:57.  GO AHEAD, PLEASE.

18              MR. MATHESON:  THANK YOU, YOUR HONOR.

19                        DIRECT EXAMINATION

20    BY MR. MATHESON:

21    Q.   SIR, YOU'RE PRESENTLY THE SENIOR VP OF FINANCE AND

22    TREASURER AT QUALCOMM; IS THAT CORRECT?

23    A.   YES.

24    Q.   AND YOU'VE BEEN EMPLOYED BY QUALCOMM SINCE 1997; IS THAT

25    CORRECT?
```

1    A.   YES.

2    Q.   AND PRIOR TO BECOMING YOUR SVP AND TREASURER, YOU WERE

3    SENIOR VICE PRESIDENT STRATEGY AND FINANCE FOR QUALCOMM; RIGHT?

4    A.   YES.

5    Q.   COULD YOU PLEASE OPEN YOUR BINDER TO TAB 1, SIR.  IT'S A

6    DOCUMENT MARKED CX 5248.

7    A.   I'M SORRY.  WHICH NUMBER?

8    Q.   IT'S TAB 1.

9    A.   5248, YEAH.

10   Q.   THIS DOCUMENT IS MARKED CX 5248.

11        YOU WERE COPIED ON THIS E-MAIL ATTACHING A DECK TITLED 5G

12   CONSORTIUM DISCUSSION, AND YOU RECEIVED THE E-MAIL ON JUNE 8TH,

13   2015; IS THAT RIGHT?

14   A.   YES.

15             MR. MATHESON:  YOUR HONOR, I MOVE TO ADMIT CX 5248

16   INTO EVIDENCE.

17             THE COURT:  ANY OBJECTION?

18             MS. SESSIONS:  NO, YOUR HONOR.

19             THE COURT:  IT'S ADMITTED.

20        (PLAINTIFF'S EXHIBIT CX 5248 WAS ADMITTED IN EVIDENCE.)

21             THE COURT:  GO AHEAD, PLEASE.

22   BY MR. MATHESON:

23   Q.   NOW, YOU WERE SENIOR VICE PRESIDENT OF STRATEGY AND

24   FINANCE AT THE TIME YOU RECEIVED THIS E-MAIL IN JUNE 2015;

25   RIGHT?

WISE DIRECT BY MR. MATHESON

1    A.   YES.

2    Q.   TAKING A LOOK AT THE COVER E-MAIL, THE END OF THE FIRST

3    LINE STATES, "THIS VERSION IS VERY SIMILAR TO THE DRAFT WE

4    SHARED WITH ERIC."

5         DO YOU SEE THAT, SIR?

6    A.   YES.

7    Q.   AND ERIC THERE REFERS TO MR. ERIC REIFSCHNEIDER; IS THAT

8    CORRECT?

9    A.   I BELIEVE SO, YES.

10   Q.   AND TURNING YOUR ATTENTION TO THE LAST SENTENCE OF THAT

11   COVER E-MAIL, IT REFERS TO A SESSION SCHEDULED FOR 8:30 A.M. AS

12   A FINAL PREP BEFORE THE DEREK MEETING TOMORROW.

13        NOW, DOES THAT REFER TO MR. DEREK ABERLE?

14   A.   YES.

15   Q.   AND IT'S A TRUE STATEMENT YOU MET WITH BOTH

16   MR. REIFSCHNEIDER AND MR. ABERLE AND DISCUSSED THESE SLIDES;

17   CORRECT?

18   A.   I BELIEVE SO.

19   Q.   NOW, YOU'D SAY YOU WERE THE THOUGHT LEADER ON THIS 5G

20   CONSORTIUM DISCUSSION DECK; IS THAT FAIR?

21   A.   YES.

22   Q.   COULD YOU TURN YOUR ATTENTION, SIR, TO CX 5248-013.  THIS

23   IS TITLED CONVINCING CARRIERS TO PAY:  CARROT/STICK.

24        DO YOU SEE THAT AT THE TOP OF THE SLIDE, SIR?

25   A.   YES.

1    Q.   TURNING YOUR ATTENTION TO THE MATERIAL UNDER NEW BUSINESS

2    TERMS.  DO YOU SEE THE TEXT, SIR, THAT SAYS NO INFRASTRUCTURE

3    PRODUCT SALE WITHOUT A LICENSE (GIVE/GET)?

4    A.   YES.

5    Q.   AND UNDERNEATH THE BULLET THERE READS QCT EMPLOYS THIS

6    STRATEGY TODAY (NOT SELL CHIPSET INTO UNLICENSED DEVICE).

7         DO YOU SEE THAT, SIR?

8    A.   YES.

9    Q.   AND THAT'S A TRUE STATEMENT THAT ACCURATELY DESCRIBES

10   QCT'S PRACTICE DURING YOUR TENURE AT QUALCOMM; IS THAT FAIR?

11   A.   YES, WE DON'T SELL TO SOMEBODY THAT DOESN'T HAVE A

12   LICENSE.

13   Q.   AND WITHOUT GETTING INTO THE DETAILS OF THE 5G CONSORTIUM

14   PROPOSED IN THIS DECK, IT'S FAIR TO SAY THAT THESE BULLETS

15   INDICATE THAT A PRACTICE OF SELLING PRODUCTS ONLY TO PURCHASERS

16   WHO TAKE A LICENSE CREATES A GIVE/GET EXCHANGE?  IS THAT A FAIR

17   CHARACTERIZATION?

18   A.   I'M NOT SURE THAT'S WHAT I MEANT BY GIVE/GET.

19   Q.   WELL, SIR, WHEN YOU TESTIFIED AT YOUR DEPOSITION WHAT YOU

20   MEANT BY GIVE/GET WAS AN ORDINARY COMMERCIAL RELATIONSHIP; IS

21   THAT CORRECT?

22   A.   YES.

23   Q.   AND AN ORDINARY COMMERCIAL RELATIONSHIP IS ONE IN WHICH

24   THE SELLER PROVIDES A PRODUCT AND THE SELLER RECEIVES A PRICE;

25   IS THAT FAIR?

1    A.    YES.

2    Q.    AND THAT'S A GIVE/GET AS YOU USED IT IN THESE SLIDES; IS

3    THAT RIGHT?

4    A.    THAT'S THE CONCEPT, YES.

5    Q.    COULD YOU TURN YOUR ATTENTION TO THE NEXT TAB IN YOUR

6    BINDER, SIR, TAB 2, WHICH IS CX 6837.  TURN YOUR ATTENTION,

7    SIR, TO THE THIRD PAGE, CX 6837-003.  THIS IS A -- APPEARS TO

8    BE AN ATTENDANCE LIST FOR A BOARD OF DIRECTORS MEETING.

9         IS THAT ACCURATE, SIR?

10   A.    SORRY.  UH -- YES.

11   Q.    AND YOU'RE LISTED IN THE BOTTOM LOWER LEFT CORNER THERE,

12   DAVID WISE, SVP FINANCE AND STRATEGY QUALCOMM?

13   A.    YES.

14   Q.    YOU, IN FACT, ATTENDED THIS MEETING; RIGHT, SIR?

15   A.    YES.

16        MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6837.

17        THE COURT:  ANY OBJECTION.

18        MR. MATHESON:  NONE, YOUR HONOR.

19        THE COURT:  IT'S ADMITTED.

20   (PLAINTIFF'S EXHIBIT CX 6837 WAS ADMITTED IN EVIDENCE.)

21        THE COURT:  GO AHEAD, PLEASE.

22   BY MR. MATHESON:

23   Q.    PLEASE TURN YOUR ATTENTION, SIR, CX 6837-062.

24   A.    YES.

25   Q.    THIS SLIDE DEALS WITH PROJECT PHOENIX; CORRECT?

WISE DIRECT BY MR. MATHESON

1    A.   YES.

2    Q.   IT'S FAIR TO SAY THAT YOU PERSONALLY WERE VERY INVOLVED IN

3    LEADING THE ANALYSIS OF PROJECT PHOENIX; RIGHT?

4    A.   YES.

5    Q.   AND IT'S FAIR TO SAY THAT IN PROJECT PHOENIX, AMONG OTHER

6    OPTIONS, THE COMPANY CONSIDERED WHETHER TO SEPARATE ITS

7    LICENSING BUSINESS FROM ITS COMPONENT SALES BUSINESS; RIGHT?

8    A.   YES.

9    Q.   NOW, CX 6837-064, WHICH IS A FEW SLIDES AHEAD, THIS

10   PRESENTS A TIMELINE FOR PROJECT PHOENIX; RIGHT?

11   A.   YES.

12   Q.   AND THIS TIMELINE INDICATES THAT IN OCTOBER, WHEN THIS

13   BOARD MEETING TOOK PLACE, THAT'S THE MIDDLE OF THE TIMELINE,

14   AND THEN A FINAL REVIEW AND RECOMMENDATION WAS TO TAKE PLACE IN

15   DECEMBER 2015; IS THAT FAIR?

16   A.   THAT'S CORRECT.

17   Q.   AND THAT FINAL REVIEW AND RECOMMENDATION, IN FACT, TOOK

18   PLACE IN DECEMBER 2019; RIGHT?

19   A.   YES.

20   Q.   AND DURING THE PROJECT PHOENIX PROCESS IN THE FALL AND

21   WINTER OF 2015, THERE WERE AT LEAST TWO FULL BOARD MEETINGS

22   THAT ADDRESSED PROJECT PHOENIX; RIGHT?

23   A.   YES, I BELIEVE SO.

24   Q.   AND THERE WAS A SPECIAL COMMITTEE OF THE BOARD OF

25   DIRECTORS RESPONSIBLE FOR PROJECT PHOENIX; RIGHT?

1    A.   YES.

2    Q.   IT'S FAIR TO SAY THEY MET EVERY TWO OR THREE WEEKS, EITHER

3    IN PERSON OR VIA TELEPHONE?

4    A.   CORRECT.

5    Q.   COULD YOU TURN YOUR ATTENTION, SIR, A FEW SLIDES EARLIER

6    TO CX 6837-039.

7    A.   OKAY.

8    Q.   THE TITLE OF THIS SLIDE, SIR, IS QCT TIER SUMMARY:

9    REVENUE AND GROSS MARGIN.

10        WOULD YOU TURN YOUR ATTENTION, SIR, TO THE RIGHT-HAND

11   CHART?

12        NOW, DOES THAT CHART INDICATE THE GROSS MARGIN PERCENTAGE

13   ON THE RIGHT-HAND SIDE OF THE SLIDE UNDER GM PERCENTAGE?

14   A.   YES, I BELIEVE SO.

15   Q.   AND THIS DESCRIBES TIERS OF THIN MODEM, PREMIUM, MID/HIGH

16   AND LOW/ENTRY; IS THAT FAIR?

17   A.   YES.

18   Q.   AND FOR 2014 THIN MODEM GROSS MARGIN IS 50 PERCENT; RIGHT?

19   A.   YES.

20   Q.   AND THAT'S HIGHER THAN THE SLOW/ENTRY GROSS MARGIN OF 34

21   PERCENT; RIGHT?

22   A.   YES, THAT'S WHAT IT SAYS ON THE PAGE, YES.

23   Q.   THE PREMIUM TIER MARGIN OF 34 PERCENT IS LIKEWISE HIGHER

24   THAN THE LOW/ENTRY MARGIN; IS THAT RIGHT?

25   A.   YES.

1   Q.   TURN YOUR ATTENTION TO THE NEXT TAB IN YOUR BINDER, SIR,

2   WHICH IS TAB 3, THE BATES NUMBER IS -- OR THE EXHIBIT IS

3   QX 8299.

4        CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL YOU SENT ON

5   OCTOBER 29TH, 2015, TITLED PHOENIX THINKING, EVOLUTION?

6   A.   YES.

7             MR. MATHESON:  YOUR HONOR, I MOVE TO ADMIT CX 8299.

8             THE COURT:  ANY OBJECTION?

9             MR. MATHESON:  NO, YOUR HONOR.

10            THE COURT:  IT'S ADMITTED.

11       (PLAINTIFF'S EXHIBIT CX 8299 WAS ADMITTED IN EVIDENCE.)

12            THE COURT:  GO AHEAD, PLEASE.

13  BY MR. MATHESON:

14  Q.   SO TURNING YOUR ATTENTION TO THE SECOND PARAGRAPH THAT

15  BEGINS, "A SUMMARY OF MY THINKING."  IT'S FAIR TO STATE THAT

16  THIS E-MAIL REPRESENTS A SUMMARY OF YOUR THINKING ON THE

17  COMPANY'S STRATEGIES -- STRATEGY AS RELATED TO THE PHOENIX

18  PROCESS AT THE END OF OCTOBER 2015; RIGHT?

19  A.   SUMMARY OF MY THINKING, MY PERSONAL THINKING, YEAH.

20  Q.   TAKING A LOOK AT -- THERE'S A DASH AND THEN A FIRST MAJOR

21  BULLET, QCT, THE SECOND SENTENCE, SIR, CAN I DIRECT YOUR

22  ATTENTION TO "GIVEN QCT'S COST STRUCTURE AND DEPENDENCE ON

23  PREMIUM TIER FOR PROFITABILITY."

24       NOW, WHEN YOU REFERRED TO QCT'S DEPENDENCE ON PREMIUM TIER

25  FOR PROFITABILITY, YOU MEANT THE SALE OF PREMIUM TIER MODEM

1    CHIPSETS; RIGHT?

2    A.   PREMIUM TIER CHIPSETS, YES.

3    Q.   TURNING YOUR ATTENTION TO THE SECOND DASH ON THE PAGE THAT

4    BEGINS, "I BELIEVE THE QTL BUSINESS MODEL RISK IS OUR BIGGEST,

5    IN ALL CAPS, ISSUE.

6         DO YOU SEE THAT, SIR?

7    A.   YES.

8    Q.   NOW, THE SECOND REASON YOU EXPRESS IN THIS PARAGRAPH IS

9    THAT QTL REPRESENTS THE VAST MAJORITY OF OUR VALUE, AND THAT'S

10   THE REASON YOU BELIEVED THIS WAS THE BIGGEST ISSUE, OR ONE

11   REASON YOU BELIEVED THIS WAS THE BIGGEST ISSUE FACING QUALCOMM;

12   RIGHT?

13   A.   ONE OF THE REASONS.

14   Q.   AND HISTORICALLY IT'S BEEN TRUE THAT QTL, THE LICENSING

15   BUSINESS, HAS REPRESENTED AT LEAST TWO THIRDS OF THE VALUE OF

16   QUALCOMM; CORRECT?

17   A.   GENERALLY SPEAKING.

18   Q.   THE NEXT SENTENCE WRITES, STATES, NOTE THAT 1 POINT OF

19   ROYALTY IS $16-$20B IN VALUE.

20        NOW, THAT'S 16 TO 20 BILLION DOLLARS IN VALUE; RIGHT?

21   A.   CORRECT.

22   Q.   AND I WANT TO UNDERSTAND WHAT YOU MEAN BY 1 POINT OF

23   ROYALTY.

24        SO HYPOTHETICALLY, IF IT WAS THE CASE THAT IN OCTOBER

25   2015, QTL WAS CHARGING ITS HANDSET LICENSEES A ROYALTY RATE OF

1    4 PERCENT OF THE AVERAGE SELLING PRICE OF HANDSET -- IS THAT

2    HYPOTHETICAL CLEAR?

3    A.   GOTCHA.

4    Q.   THAT 1 POINT OF ROYALTY YOU'RE REFERRING TO WOULD BE A

5    REDUCTION FROM 4 PERCENT OF THE PRICE OF HANDSET TO 3 PERCENT

6    OF THE PRICE OF HANDSET; RIGHT?

7    A.   NOT EXACTLY.  IF I CAN EXPLAIN?

8    Q.   PLEASE DO.

9    A.   SO WHEN I'M TALKING ABOUT ROYALTY RATE, GENERALLY WHAT WE

10   WOULD LOOK AT, OR WHAT I WOULD LOOK AT, IS WHAT WE WOULD CALL

11   THE EXTERNALLY IMPLIED ROYALTY RATE, WHICH IS WHAT INVESTORS

12   WOULD LOOK AT AS A METRIC OF OUR QTL REVENUES RELATIVE TO

13   HANDSET REVENUES.  SO IT WOULD BE SORT OF A BLENDED AVERAGE OF

14   SORT OF ALL RATES.

15   Q.   AND IF THAT RATE DECLINED FROM 4 PERCENT TO 3 PERCENT --

16   A.   YES.

17   Q.   THAT'S THE 1 POINT OF ROYALTY YOU'RE REFERRING TO; IS THAT

18   CORRECT?

19   A.   CORRECT.

20   Q.   TURNING YOUR ATTENTION A LITTLE FURTHER DOWN, SIR, YOU

21   WRITE, TWO BULLETS DOWN, THE THIRD SENTENCE, THE FUNDAMENTAL

22   PROBLEM WITH QTL'S BUSINESS MODEL IS THAT THERE IS A LACK OF AN

23   ONGOING GIVE/GET RELATIONSHIP WITH LICENSEES THAT CREATES AN

24   ONGOING DEPENDENCE ON QTL.

25        DO YOU SEE THAT, SIR?

1    A.    YES.

2    Q.    SO YOU'RE CONTRASTING HERE QTL'S RELATIONSHIP WITH

3    STANDARDS IMPLEMENTERS WITH AN ORDINARY BUSINESS RELATIONSHIP

4    THAT WOULD SUPPLY PRODUCT OR SERVICES; IS THAT FAIR?

5    A.    YES.  THE -- THE QTL BUSINESS MODEL IS DIFFERENT THAN A

6    TYPICAL PRODUCT OR SERVICE TYPE RELATIONSHIP.

7    Q.    AND YOU EXPRESS THAT THE REASON THE BUSINESS MODEL IS

8    DIFFERENT IS THAT THE INTELLECTUAL PROPERTY GOES INTO THE

9    STANDARDS BODY WELL IN ADVANCE OF COLLECTING ROYALTIES.  IF WE

10   HAVE A DISPUTE OVER ROYALTY PRICING, WE CANNOT SIMPLY PULL THE

11   TECHNOLOGY BACK UNTIL WE AGREE TO PRICE, AS YOU WOULD IN ANY

12   OTHER BUSINESS RELATIONSHIP.  SO THE ONLY RECOURSE IN A PRICING

13   DISPUTE IS LEGAL CHANNELS.

14        NOW, WHEN YOU USE PRICING THERE, YOU'RE REFERRING TO A

15   DISPUTE OVER ROYALTY RATES.  FAIR?

16   A.    ROYALTY RATES.

17   Q.    AND DIRECTING YOUR ATTENTION TO THE FINAL BULLET ON THIS

18   PAGE, YOU WRITE, WE ARE SEEING IN THE MARKET TODAY THERE'S A

19   HIGH CORRELATION BETWEEN OUR MODEM CHIP SHARE AND THE LICENSING

20   COMPLIANCE AND ROYALTY RATE SUSTAINABILITY.  WHERE WE HAVE LOW

21   CHIP SHARE, WE ARE SEEING CHALLENGES WITH COMPLIANCE AND

22   MAINTAINING THE ROYALTY RATE.

23        AND WHEN YOU SAY LOW CHIP SHARE, ARE YOU REFERRING TO

24   QCT'S SHARE OF A SALE OF MODEM CHIPS; RIGHT?

25   A.    CORRECT.

1    Q.   AND YOU WRITE, SO IN A SENSE, QCT HAS PROVIDED THE

2    GIVE/GET RELATIONSHIP HIGHLIGHTED IN THE LAST POINT.

3         AND WHAT YOU MEAN THERE IS THAT QCT HAS AN ORDINARY

4    COMMERCIAL RELATIONSHIP WITH ITS CUSTOMERS, UNLIKE QTL?  THAT'S

5    FAIR; RIGHT?

6    A.   WHAT I MEANT IS, YEAH, QCT PROVIDES ONGOING YEAR IN, YEAR

7    OUT RELATIONSHIP AND VALUE WITH THE OEM'S, OR THE LICENSEES.

8    Q.   AND --

9    A.   SO THEY'RE MORE ACTIVELY INVOLVED ON A REGULAR BASIS WITH

10   THE CUSTOMERS.

11   Q.   AND QCT ALSO PROVIDES TO OEM'S A PRODUCT THAT THEY CAN

12   HOLD BACK IN THE EVENT OF A COMMERCIAL DISPUTE, UNLIKE QTL?

13   THAT'S THE DISTINCTION YOU'RE DRAWING; RIGHT?

14   A.   NO, I'M NOT DRAWING A DISTINCTION THAT --

15   Q.   OKAY.  LET'S MOVE ON, SIR.  WE'LL GET BACK TO GIVEN/GET.

16        CAN I TURN YOUR ATTENTION TO THE NEXT TAB, SIR.  SORRY,

17   TAB 5, SO WE'LL SKIP A TAB.  THIS IS CX 3755.

18        NOW, AT YOUR DEPOSITION, YOU IDENTIFIED THIS AS THE

19   ANALYSIS THAT BCG PRESENTED TO THE SPECIAL COMMITTEE OF

20   QUALCOMM'S BOARD OF DIRECTORS AS PART OF PROJECT PHOENIX.

21        DO YOU RECALL THAT, SIR?

22   A.   YES.

23             MR. MATHESON:  YOUR HONOR, I MOVE TO ADMIT CX 3755.

24             THE COURT:  ANY OBJECTION?

25             MR. MATHESON:  YES, YOUR HONOR.  AS WE BRIEFED IN THE

1      MOTION IN LIMINE, QUALCOMM HAS A HEARSAY OBJECTION TO THE BCG

2      DOCUMENTS.  WE UNDERSTAND YOUR RULING ON THE MOTION IN LIMINE,

3      BUT ARE PRESERVING OUR OBJECTION FOR THE RECORD.

4              THE COURT:  ALL RIGHT.  THANK YOU.

5          IT'S ADMITTED.

6          (PLAINTIFF'S EXHIBIT CX 3755 WAS ADMITTED IN EVIDENCE.)

7              THE COURT:  GO AHEAD, PLEASE.

8      BY MR. MATHESON:

9      Q.  NOW, IT'S FAIR TO SAY YOU PERSONALLY HAD DISCUSSIONS WITH

10     BCG ABOUT THIS DOCUMENT AS IT WAS PUT TOGETHER; RIGHT?

11     A.  LIMITED DISCUSSIONS.

12     Q.  AND YOU WERE PRESENT WHEN BCG PRESENTED THIS DOCUMENT TO

13     THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS; IS THAT RIGHT?

14     A.  YES.

15     Q.  COULD YOU TAKE A LOOK, SIR, AT CX 3755-003?

16     A.  YES.

17     Q.  THE FOURTH BOLDED BULLET READS, THE LONG-TERM VALUE

18     CREATION BENEFITS FROM SEPARATION ARE LOWER THAN DOWNSIDE

19     RISKS.

20          NOW, SEPARATION THERE REFERS TO THE POSSIBILITY OF

21     SEPARATING QCT AND QTL; IS THAT FAIR?

22     A.  CORRECT.

23     Q.  NOW, LET'S LOOK AT THE SECOND BULLET THAT READS,

24     SEPARATION COULD WEAKEN TULANE IN RATE NEGOTIATIONS WITH MAJOR

25     CUSTOMERS, SIMILAR TO OTHER COMMERCIAL PRECEDENTS.

1          NOW, TULANE WAS THE CODE WORD FOR QTL; RIGHT?

2     A.   CORRECT.

3     Q.   AND BCG ULTIMATELY CONCLUDED THAT A STANDALONE QTL WOULD

4     BE MORE CHALLENGED THAN RATE NEGOTIATIONS; RIGHT?

5     A.   BCG CONCLUDED, YEAH.

6     Q.   AND BCG ALSO ADVISED THE SPECIAL COMMITTEE THAT SEPARATION

7     COULD WEAKEN TULANE, THAT IS, QTL, IN RATE NEGOTIATIONS WITH

8     MAJOR CUSTOMERS; RIGHT?

9     A.   BASED ON WHAT THEY SAID HERE, YEAH.

10    Q.   TURN YOUR ATTENTION, SIR, TO CX 3755-014.  I'D LIKE TO

11    DIRECT YOUR ATTENTION TO SPEAKER'S NOTES JUST TO UNDERSTAND

12    WHAT THESE TERMS MEAN.

13         THE TOP LINE, UNDER LHS READ, CALTECH HAS ENJOYED TTM

14    ADVANTAGE IN LAST TWO GENERATIONS.

15         DO YOU SEE THAT, SIR?

16    A.   I'M SORRY.  WHICH PAGE ARE YOU ON?

17    Q.   CX 3755-014.  LOOK AT THE SPEAKER'S NOTES UNDERNEATH THIS

18    MAJOR SLIDE, SIR.

19    A.   OH, THE SPEAKER NOTES, OKAY.

20    Q.   NOW, CALTECH WAS THE CODE NAME FOR QCT; RIGHT?

21    A.   CALTECH WAS QCT, YES.

22    Q.   TTM ADVANTAGE MEANS TIME TO MARKET ADVANTAGE; RIGHT?

23    A.   YES.

24    Q.   AND THE LAST TWO GENERATIONS, WHEN THIS SLIDE WAS WRITTEN,

25    REFERS TO 4G AND 3G; RIGHT?

1    A.   I BELIEVE SO.

2    Q.   TURN TO THE NEXT PAGE, SIR, CX 3755-015.

3    A.   UM-HUM.

4    Q.   THE SECOND PARAGRAPH IN THE SPEAKER'S NOTES BEGINS, QUOTE,

5    4G/3G/2G INTEGRATED SOLUTION.

6         DO YOU SEE THAT, SIR?

7    A.   YES.

8    Q.   NOW, THAT REFERS TO A MODEM CHIPSET THAT SUPPORTS LTE, 3G,

9    AND 2G STANDARDS; RIGHT?

10   A.   YEAH, BCG'S NOTES.  BUT, YES, I BELIEVE THAT'S WHAT

11   THEY'RE REFERENCING TO.

12   Q.   THE NEXT SENTENCE READS, CALTECH HAD BEEN THE ONLY ONE

13   WITH SUCH PRODUCT SO OEM'S HAD TO USE CALTECH'S CHIPS,

14   (OTHERWISE ENDING UP WITH MORE NUMBER OF CHIPS IN A PHONE,

15   WHICH IS BAD IN TERMS OF COST, POWER, DESIGN ).

16        DO YOU SEE THAT, SIR.

17   A.   YES.

18   Q.   IT'S A TRUE STATEMENT THAT FOR SOME TIME QCT WAS THE ONLY

19   SUPPLIER OF LTE CHIPS; RIGHT?

20   A.   I'M NOT SURE.

21   Q.   SIR, IF YOU COULD TURN YOUR ATTENTION TO YOUR DEPOSITION

22   TRANSCRIPT.

23   A.   UM-HUM.

24   Q.   PAGE 135 TO 136.  IF YOU READ THE -- LOOK AT THAT, SIR,

25   AND REFRESH YOUR RECOLLECTION.

1    A.   I'M SORRY.  WHICH PAGE?

2    Q.   PAGE 1365, LINE 19, TO 136, LINE 5.  TURNING YOUR

3    ATTENTION IN PARTICULAR TO 136:14.

4         YOU WERE ASKED AT YOUR DEPOSITION, SIR -- WELL, I'LL LET

5    YOU READ IT AND REFRESH YOUR RECOLLECTION.

6    A.   OKAY.

7    Q.   IT'S A TRUE STATEMENT YOU TESTIFIED AT YOUR DEPOSITION,

8    SIR, WE WERE THE FIRST TO MARKET WITH LTE AND FOR A WHILE WE

9    WERE THE ONLY SUPPLIER; CORRECT?

10   A.   YES.

11   Q.   AND THAT'S A TRUE STATEMENT SITTING HERE TODAY?  FOR A

12   WHILE, QCT WAS THE ONLY SUPPLIER OF LTE CHIPS; ISN'T THAT

13   RIGHT?

14   A.   I THINK THAT MIGHT HAVE BEEN, YEAH.

15   Q.   IT'S ALSO A TRUE STATEMENT THAT FOR SOME PERIOD OF TIME

16   QCT WAS THE ONLY SUPPLIER OF INTEGRATED SOLUTIONS, THAT IS, 3G,

17   4G CHIPS; IS THAT CORRECT?

18   A.   I'M NOT SURE, BUT I THINK SO.

19   Q.   TURN YOUR ATTENTION, SIR, TO LINE 1 -- PAGE 136, LINES 6

20   TO 11.  YOU WERE ASKED THE QUESTION, WERE YOU THE ONLY SUPPLIER

21   OF INTEGRATED SOLUTIONS AT THIS TIME AS WELL?

22        YOU RESPONDED IN THE AFFIRMATIVE; IS THAT CORRECT, SIR?

23   A.   I DID.

24   Q.   TRUE STATEMENT TODAY, TOO, SIR, THAT QCT WAS, FOR SOME

25   PERIOD OF TIME, THE ONLY SUPPLIER OF INTEGRATED 3G, 4G

1    SOLUTIONS?

2    A.   I'M NOT TOTALLY SURE, BUT I BELIEVE SO.

3    Q.   NOW, THE TOP OF THIS SLIDE, IF WE CAN TAKE A LOOK AT THE

4    MAJOR MATERIAL, THE MAJOR SLIDE, THE GREY BOX STRETCHING FROM

5    WHAT LOOKS LIKE YEARS -- IT READS SIGNIFICANT TTM ADVANTAGE IN

6    EARLY STAGE OF A NEW STANDARD.

7         DO YOU SEE THAT GREY BOX, SIR?

8    A.   YES.

9    Q.   AND THAT EXPRESSES THAT QCT HAS A SIGNIFICANT TIME TO

10   MARKET ADVANTAGE IN THE EARLY STAGES OF EACH STANDARD; IS THAT

11   RIGHT?

12   A.   YES.

13   Q.   AND THAT'S BEEN TRUE IN YOUR EXPERIENCE; RIGHT?

14   A.   GENERALLY TRUE.

15   Q.   TURN YOUR ATTENTION, SIR, TO CX 021 -- CX 3755-021.

16        AND AGAIN TURNING OUR ATTENTION TO THE SPEAKER'S NOTES

17   UNDERNEATH THE SLIDE, IT READS, TWO DIFFERENT CALTECH STICKS IN

18   THE HISTORY.  AND TRANSLATING SOME TERMS IN THE FIRST ONE.

19        THE FIRST QUOTATION READS, ENABLEMENT STICK.  WHEN CALTECH

20   HAS A FAR SUPERIOR PRODUCT, OEM'S WANT TO PURCHASE THEIR

21   PRODUCTS, AND WILL COMPLY IN ORDER TO GAIN ACCESS TO THESE

22   CHIPS (I.E., CALTECH WAS ABLE TO SAY YOU CAN BUY THESE CHIPS IF

23   YOU COMPLY IN FULL).

24        NOW, CALTECH MEANS QCT; RIGHT?

25   A.   CALTECH IS QCT.

1    Q.   AND WHEN IT SAYS CALTECH WAS ABLE TO SAY YOU CAN BUY THESE

2    CHIPS, THAT REFERS TO THE FACT THAT CALTECH WAS ABLE TO EXPRESS

3    TO OEM'S THAT THEY COULD PURCHASE QCT'S CHIPS ONLY IF THEY

4    COMPLIED WITH THE ROYALTY REQUESTS FROM QTL; RIGHT?

5    A.   THAT'S WHAT IT SAYS.  IT'S BCG'S WORDS.

6    Q.   BCG'S WORDS WERE PRESENTED TO THE BOARD OF DIRECTORS WHEN

7    YOU WERE THERE; RIGHT?

8    A.   YEAH.  I DON'T KNOW IF THEY SAID EXACTLY THIS OR NOT.

9    Q.   FAIR ENOUGH.  IT'S BEEN TRUE -- SO TURNING OUR ATTENTION

10   AGAIN UP TO THE MAJOR SLIDE, AGAIN, WE HAVE A TIMELINE AND IT

11   APPEARS THAT BETWEEN 2010 AND 2013, THERE IS MATERIAL THAT

12   READS ENABLEMENT STICK, OEM'S COMPLY TO BUY TECHNOLOGY

13   ADVANTAGED CALTECH CHIPS.

14        DO YOU SEE THAT, SIR?

15   A.   I SEE THAT.

16   Q.   AND THIS SLIDE WAS PRESENTED TO THE BOARD; RIGHT?

17   A.   YEAH.

18   Q.   NOW, IT'S FAIR TO SAY THAT AT THIS TIME, IN ORDER TO

19   PURCHASE QCT CHIPS, OEM'S HAD TO BE LICENSED BY QTL; RIGHT?

20   A.   YEAH, WE SELL TO PEOPLE THAT HAVE A LICENSE TO THE

21   TECHNOLOGY WE DEVELOP.

22   Q.   AND IT'S FAIR TO SAY THAT ABSENT QCT'S STRATEGY OF NOT

23   SELLING CHIPSETS INTO UNLICENSED DEVICES, QTL WOULD HAVE FOUND

24   IT MORE DIFFICULT TO SIGN NEW LICENSE AGREEMENTS WITH OEM'S ON

25   TERMS THAT QTL REQUESTED; RIGHT?

1    A.   I DON'T THINK THAT'S WHAT THIS CHART IS REFERRING TO.

2    Q.   I DIDN'T ASK IF THIS CHART WAS REFERRING TO IT, SIR.

3         IS IT A TRUE STATEMENT THAT AT THIS TIME, IT IS FAIR TO

4    SAY THAT ABSENT QCT'S STRATEGY OF NOT SELLING CHIPSETS INTO

5    UNLICENSED DEVICES, QTL WOULD HAVE FOUND IT MORE DIFFICULT TO

6    SIGN NEW LICENSE AGREEMENTS WITH OEM'S ON TERMS THAT QTL

7    REQUESTED?

8    A.   I DON'T KNOW IF I BELIEVE THAT TO BE TRUE.

9    Q.   DO YOU BELIEVE -- WELL, STRIKE THAT.

10        IT'S TRUE THAT YOU BELIEVE THAT THE FACT THAT QCT HAD A

11   STRATEGY OF NOT SELLING CHIPSETS INTO UNLICENSED DEVICES

12   PROVIDED MOTIVATION FOR OEM'S TO SIGN NEW LICENSE AGREEMENTS ON

13   TERMS THAT QTL REQUESTED; RIGHT?

14   A.   NO, I THINK I SAID THAT WE'VE HAD THAT POLICY OF NOT

15   SELLING TO SOMEBODY THAT HASN'T SIGNED A LICENSE AGREEMENT AND

16   IS PAYING US FOR THE TECHNOLOGY WE DEVELOPED.

17   Q.   I'M NOT SURE I UNDERSTOOD YOUR ANSWER, SIR.

18        MY QUESTION IS, IT'S FAIR TO SAY THAT QCT'S NO LICENSE, NO

19   CHIPS POLICY PROVIDED THE MOTIVATION FOR OEM'S TO SIGN LICENSE

20   AGREEMENTS ON TERMS THAT QTL REQUESTED; RIGHT?

21   A.   NOT NECESSARILY.

22   Q.   COULD YOU TURN YOUR ATTENTION, SIR, TO YOUR DEPOSITION

23   TRANSCRIPT TO PAGE 206.

24        SO TURNING YOUR ATTENTION, SIR, TO LINES 6 TO 10 ON PAGE

25   206, YOU SAID AT YOUR DEPOSITION, SIR, LIKE IN CHINA WHERE WE

1    DIDN'T SELL OUR CHIPS UNTIL PEOPLE HAD SIGNED UP, QCT'S CHIPS

2    ARE DESIRED.  HOPEFULLY THAT WAS MOTIVATION FOR PEOPLE TO SIGN

3    UP TO THE TERMS THAT NDRC HAD NEGOTIATED.

4         IT'S A TRUE STATEMENT THAT AT YOUR DEPOSITION, YOU THOUGHT

5    QCT'S NO LICENSE, NO CHIPS POLICY PROVIDED OEM'S WITH A

6    MOTIVATION TO SIGN UP TO ROYALTY AGREEMENTS ON THE TERMS QTL

7    REQUESTED; ISN'T THAT RIGHT?

8         MS. SESSIONS:  YOUR HONOR, THIS IS IMPROPER

9    IMPEACHMENT.  THAT ISN'T THE QUESTION THAT WAS ASKED AT THE

10   DEPOSITION.

11        THE COURT:  OVERRULED.

12        THE WITNESS:  I SAID THAT IN THE DEPOSITION.

13   BY MR. MATHESON:

14   Q.   AND IT'S A SENSIBLE STATEMENT TO MAKE AS A MATTER OF BASIC

15   ECONOMICS THAT WHEN QCT HAS HIGHLY DESIRABLE CHIPSET, THE NO

16   LICENSE, NO CHIPS POLICY PROVIDES OEM'S WITH THE MOTIVATION TO

17   AGREE TO THE ROYALTY TERMS THAT QTL REQUESTS; RIGHT?

18   A.   POTENTIALLY.

19   Q.   IN FACT, YOU'VE SEEN ANALYSES THAT ARE NOT PREPARED BY

20   BCG, BUT ARE PREPARED BY QUALCOMM MANAGEMENT THAT LIKEWISE

21   INDICATE THAT QCT'S NO LICENSE, NO CHIPS POLICY MAKES IT EASIER

22   FOR QTL TO NEGOTIATE NEW LICENSE AGREEMENTS WITH OEM'S; RIGHT?

23   A.   I DON'T BELIEVE SO.

24   Q.   TURN YOUR ATTENTION TO THE NEXT TAB IN YOUR BINDER, SIR,

25   WHICH IS TAB 6.  THIS IS CX 7200.

1          CAN YOU IDENTIFY THIS, SIR, AND LOOK AT THE E-MAIL IN THE

2     CENTER OF THE PAGE.  YOU ARE IN THE "TO" LINE FOR THE

3     RIGHT-HAND SIDE.

4          IT'S CORRECT THAT YOU RECEIVED IN E-MAIL IN OCTOBER OF

5     2007 IN WITH PROJECT BERLIN; IS THAT RIGHT, SIR?

6     A.   CORRECT.

7               MR. MATHESON:  YOUR HONOR, I MOVE TO ADMIT CX 7200.

8               MS. SESSIONS:  NO OBJECTION.

9               THE COURT:  IT'S ADMITTED.

10         (PLAINTIFF'S EXHIBIT 7200 WAS ADMITTED IN EVIDENCE.)

11              THE COURT:  GO AHEAD, PLEASE.

12    BY MR. MATHESON:

13    Q.   NOW, IT'S FAIR TO SAY THAT YOU PERSONALLY LED A LOT OF THE

14    PROJECT ANALYSIS IN PROJECT BERLIN; FAIR?

15    A.   I WAS INVOLVED, YES.

16    Q.   WELL, YOU LED THE ANALYSIS.  THAT'S A FAIR STATEMENT;

17    RIGHT?

18    A.   YES.

19    Q.   AND IT'S FAIR TO SAY THAT IN PROJECT BERLIN, AS IN PROJECT

20    PHOENIX, THE COMPANY CONSIDERED WHETHER TO SEPARATE ITS

21    LICENSING BUSINESS FROM ITS COMPONENT SALES BUSINESS; RIGHT?

22    A.   CORRECT.

23    Q.   COULD YOU TURN, SIR, TO CX 7200-018.  LOOKING AT THE

24    FOURTH MAJOR BULLET DOWN THAT BEGINS, CHINESE LICENSEES MAY

25    CEASE COMPLYING WITH THEIR EXISTING LICENSE AGREEMENTS.

```
1            DO YOU SEE THAT, SIR?

2    A.   YES.

3    Q.   IT'S FAIR TO SAY THAT THIS SLIDE PRESENTS SOME OF THE

4    POTENTIAL DOWNSIDES OF A SEPARATION OF QCT AND QTL; RIGHT?

5    A.   YES.

6    Q.   AND LOOKING AT THE LAST SENTENCE IN THAT SAME BULLET, ONE

7    OF THE DOWNSIDES HIGHLIGHTED IS IT WILL ALSO BE VERY DIFFICULT

8    TO SIGN NEW OFDMA AGREEMENTS WITH THE CHINESE COMPANIES.

9            DO YOU SEE THAT SENTENCE, SIR?

10   A.   YES.

11   Q.   OFDMA REFERS TO LTE TECHNOLOGY; RIGHT?

12   A.   TECHNOLOGY USED IN LTE, CORRECT.

13   Q.   LET'S TURN TO TAB 8 IN YOUR BINDER, SIR.  WE'RE TURNING TO

14   PROJECT PHOENIX.  THIS IS AN E-MAIL YOU SENT TO MR. DEREK

15   ABERLE ON OCTOBER 23RD, 2015; IS THAT RIGHT?

16   A.   YES.

17            MR. MATHESON:  YOUR HONOR, MOVER TO ADMIT CX 5417.

18            MS. SESSIONS:  NO OBJECTION, YOUR HONOR.

19            THE COURT:  IT'S ADMITTED.

20   (PLAINTIFF'S EXHIBIT 5417 WAS ADMITTED IN EVIDENCE.)

21            THE COURT:  GO AHEAD, PLEASE.

22   BY MR. MATHESON:

23   Q.   NOW, JANA PARTNERS IS AN ACTIVIST FUND THAT TOOK A

24   POSITION IN QUALCOMM PRIOR TO PROJECT PHOENIX; RIGHT?

25   A.   CORRECT.
```

1    Q.   AND THEIR THESIS WAS THAT BY SEPARATING QCT AND QTL, THEY

2    MIGHT CREATE MORE SHAREHOLDER VALUE; RIGHT?

3    A.   CORRECT.

4    Q.   IF YOU TURN YOUR ATTENTION TO THE BOTTOM E-MAIL ON THIS

5    PAGE FROM SCOTT OSTFELD, HE WAS AT JANA PARTNERS ACCORDING TO

6    THE E-MAIL ADDRESS; IS THAT FAIR?

7    A.   THAT'S RIGHT.

8    Q.   OKAY.  HE WRITES, WE WANTED TO SHARE FEEDBACK ON QUALCOMM

9    AND THE RELATIONSHIP BETWEEN QCT/QTL FROM A FORMER LONG-TIME

10   EXECUTIVE OF ERICSSON.

11        DO YOU SEE THAT, SIR?

12   A.   YES.

13   Q.   NOW, TURNING TO YOUR E-MAIL AT THE TOP OF THE PAGE, YOU

14   WRITE TO MR. ABERLE, WHILE SPINNING AND QTL OPERATING AS AN NPE

15   IS NOT THE RIGHT ANSWER, I AGREE WITH THE VIEWPOINT THAT AS

16   LONG AS QCT HAS A VERY HIGH SHARE, THEY ARE BENEFICIAL TO QTL.

17        IN THAT SENTENCE NPE STANDS FOR NONPRACTICING ENTITY;

18   CORRECT?

19   A.   CORRECT.

20   Q.   TURN YOUR ATTENTION TO THE NEXT -- TO THE NEXT TAB, SIR,

21   WHICH IS TAB 9, CX 7251.

22        YOUR HONOR, WE MOVE TO ADMIT CX 7251.

23        MS. SESSIONS:  NO OBJECTION.

24        THE COURT:  IT'S ADMITTED.

25        (PLAINTIFF'S EXHIBIT 7251 WAS ADMITTED IN EVIDENCE.)

```
 1              THE COURT:  GO AHEAD, PLEASE.

 2      BY MR. MATHESON:

 3      Q.   THIS IS A SET OF TALKING POINTS PREPARED FOR EXECUTIVE

 4      ATTENTION TO USE DURING THE PUBLIC ANNOUNCEMENT OF THE RESULTS

 5      OF THE PROJECT PHOENIX REVIEW; IS THAT RIGHT?

 6      A.   YES, I BELIEVE SO.

 7      Q.   PLEASE TURN TO THE NEXT TAB IN YOUR BINDER, SIR, TAB 10.

 8      THIS IS CX 5953.  THIS IS AN E-MAIL FROM YOURSELF TO EXECUTIVES

 9      AT QUALCOMM; IS THAT CORRECT?

10      A.   TO MEMBERS OF THE QTL TEAM FOR THE MOST PART.

11      Q.   AND YOU WERE THE PRIMARY AUTHOR OF THE SLIDES ATTACHED TO

12      THIS E-MAIL; IS THAT RIGHT?

13      A.   YES.

14              MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 5953.

15              MS. SESSIONS:  NO OBJECTION, YOUR HONOR.

16              THE COURT:  IT'S ADMITTED.

17      (PLAINTIFF'S EXHIBIT CX 5953 WAS ADMITTED IN EVIDENCE.)

18              THE COURT:  GO AHEAD, PLEASE.

19      BY MR. MATHESON:

20      Q.   TURN YOUR ATTENTION TO CX 5953-004.

21          NOW, YOU SENT THIS E-MAIL ON DECEMBER 15TH, 2015; RIGHT?

22      YOU HAVE TO LOOK AT THE FIRST PAGE TO SEE THAT.

23      A.   YEAH.

24      Q.   THAT'S THE SAME DATE AS --

25      A.   DECEMBER --
```

1    Q.    SORRY.  I DIDN'T MEAN TO TALK OVER YOU, SIR.

2    A.    DECEMBER 15TH, YES.

3    Q.    AND THAT'S THE SAME DATE AS THE PUBLIC ANNOUNCEMENT OF

4    PROJECT PHOENIX WE JUST DISCUSSED; RIGHT?

5    A.    I'M NOT SURE, BUT IT WAS AROUND THAT TIME, YEAH.

6    Q.    OKAY.  LOOKING AT CX 5953-004, TWO MAJOR BULLETS UP FROM

7    THE BOTTOM READS, THE QTL BUSINESS MODEL RISK IS OUR BIGGEST,

8    IN ALL CAPS, ISSUE.

9          DO YOU SEE THAT, SIR?

10   A.    YES.

11   Q.    AND THEN LOOKING DOWN TWO MAJOR BULLETS AND ONE MINOR

12   BULLET, 1 POINT OF ROYALTY IS 16 TO 20 BILLION IN VALUE.

13         DO YOU SEE THAT, SIR?

14   A.    YES.

15   Q.    IT'S FAIR TO SAY THESE ARE ESSENTIALLY CONSISTENT WITH THE

16   POINTS THAT YOU MADE IN THE E-MAIL YOU WROTE OCTOBER 29TH,

17   2015, IN CONNECTION WITH PROJECT PHOENIX; RIGHT?

18   A.    CORRECT.

19   Q.    TURN YOUR ATTENTION TO THE NEXT SLIDE, SIR, THE -- NOW,

20   THIS SLIDE READS OVERALL LOGIC FOR A CHANGE IN STRATEGY.

21         I DON'T WANT TO GET INTO WHAT THE CHANGE IN STRATEGY YOU

22   HAD IN MIND.

23         BUT IF WE COULD TAKE A LOOK AT THE FIRST MAJOR BULLET AND

24   THE FIRST MINOR BULLET UNDER IT READS, QTL, ON ITS OWN, LACKS

25   AN ONGOING GIVE/GET RELATIONSHIP WITH LICENSEE THAT IS CREATES

1    ONGOING DEPENDENCE ON QTL.

2        NOW, THIS IS THE SAME CHALLENGE YOU HIGHLIGHTED IN OCTOBER

3    IN CONNECTION WITH YOUR PROJECT PHOENIX E-MAIL; RIGHT?

4    A.   CORRECT.

5    Q.   AND LOOKING -- THE NEXT MAJOR BULLET DOWN READS, TO DATE,

6    QCT HAS HELPED MAINTAIN THE GIVE/GET NECESSARY TO DEFEND THE

7    ROYALTY RATE.

8        DO YOU SEE THAT, SIR?

9    A.   YES.

10   Q.   AND AGAIN, THE GIVE/GET NECESSARY TO DEFEND THE ROYALTY

11   RATE THAT QCT PROVIDES IS THAT THEY ARE IN AN ORDINARY

12   COMMERCIAL RELATIONSHIP WHERE THEY SUPPLY A PRODUCT TO OEM'S;

13   RIGHT?

14   A.   THAT THEY POSITION THE COMPANY AS AN ONGOING TECHNOLOGY

15   PARTNER TO THE OEM'S AND LICENSEES IN SELLING PRODUCT.

16   Q.   SIR, GIVE/GET RELATIONSHIP REFERS TO AN ORDINARY

17   COMMERCIAL RELATIONSHIP IN WHICH SOMEONE PROVIDES A PRODUCT AND

18   RECEIVES A PRICE?  THAT'S FAIR; RIGHT?

19   A.   YEAH.  IN THIS INSTANCE, I'M REFERRING TO THE POSITIONING

20   THAT QCT GIVES US --

21   Q.   THANK YOU, SIR.

22   A.   -- WITH THE CUSTOMERS.

23   Q.   CAN WE MOVE FORWARD TO CX 5953-011.  AGAIN, WHY STRATEGY

24   MAKES SENSE, HIGH MODEM SHARES -- THE TITLE OF THIS SLIDE IS

25   WHY STRATEGY MAKES SENSE.  WE DON'T NEED TO EXPLORE IN DETAIL

1      WHAT THE STRATEGY WAS, SIR.

2           BUT I DO WANT TO ADDRESS THE FIRST MAJOR BULLET, ADDRESSES

3      QTL COMPLIANCE CHALLENGES AND SUSTAINABILITY OF LONG-TERM

4      ROYALTY RATE, WITHOUT RISKY LITIGATION.  DO YOU SEE THAT, SIR?

5      A.   YES.

6      Q.   IT'S A TRUE STATEMENT THAT IT WOULD BENEFIT QUALCOMM'S

7      LICENSING BUSINESS IF IT COULD AVOID RISKY LITIGATION; RIGHT?

8      A.   YES.

9      Q.   LEAVING ASIDE ALL OF THE OTHER DOWNSIDES TO LITIGATION, IT

10     IS A TRUE STATEMENT THAT ONE COMPONENT OF RISKY LITIGATION IS A

11     RISK THAT QUALCOMM MIGHT NOT RECEIVE THE ROYALTY RATE IT SOUGHT

12     IF IT INITIATED LITIGATION AGAINST AN OEM WHO WASN'T LICENSED;

13     RIGHT?

14     A.   NO.  THAT -- WHEN I TALK ABOUT RISKY LITIGATION, ANY OF

15     THE LITIGATION THAT TAKES TWO OR THREE YEARS TO REVOLVE CREATES

16     UNCERTAINTY.  THAT CREATES UNCERTAINTY FOR OUR INVESTORS, WHICH

17     IS NOT A GOOD THING FROM A VALUATION STANDPOINT.

18     Q.   SITTING HERE TODAY, IT'S YOUR TESTIMONY, SIR, THAT IT IS

19     NOT ONE COMPONENT OF LITIGATION RISK THAT QUALCOMM MIGHT

20     RECEIVE, IF INITIATING LITIGATION AGAINST AN OEM WHO WASN'T

21     LICENSED, A LOWER ROYALTY RATE THAN QUALCOMM SOUGHT?  IS THAT

22     YOUR TESTIMONY, SIR?

23     A.   MY TESTIMONY IS THERE IS UNCERTAINTY, WHICH COULD RESULT

24     IN A BAD OUTCOME OR A GOOD OUTCOME.  BUT THERE'S UNCERTAINTY.

25     Q.   I UNDERSTAND THAT, SIR.  BUT ONE COMPONENT OF RISKY

WISE DIRECT BY MR. MATHESON

1    LITIGATION IS THE RISK THAT QUALCOMM DOESN'T GET THE ROYALTY

2    RATE IT SEEKS?  ISN'T THAT FAIR?

3    A.   YOU COULD END UP WITH NOT GETTING THE ROYALTY RATE YOU

4    THINK YOU DESERVE, SURE.

5    Q.   NOW, THE NEXT FINAL MINOR BULLET READS REDUCES DEPENDENCE

6    ON LEGAL AND REGULATORY STRUCTURES TO SUSTAIN ROYALTY RATES.

7         DO YOU SEE THAT, SIR?

8    A.   YES.

9    Q.   NOW, FOR AN EXTENDED PERIOD OF TIME IT'S FAIR TO SAY THAT

10   QUALCOMM RELIED ON LEGAL AND REGULATORY STRUCTURES; CORRECT?

11   A.   YEAH, THEY'VE ALWAYS BEEN A PART OF THE LICENSING

12   BUSINESS.

13   Q.   AND IT'S ALSO TRUE THAT QUALCOMM HAS SOUGHT, OR SOUGHT IN

14   2015, WAYS TO REDUCE ITS DEPENDENCE ON LEGAL AND REGULATORY

15   STRUCTURES; RIGHT?

16   A.   I WAS EXPLORING THAT.

17   Q.   AND TURN YOUR ATTENTION, SIR, TO CX 5953-014, SECOND MAJOR

18   BULLET READS, ONGOING DEPENDENCE ON LEGAL AND REGULATORY

19   CONSTRUCTS WILL BE COMPLETELY INSUFFICIENT TO SUSTAIN THE

20   BUSINESS MODEL LONGER TERM.

21        YOU'RE REFERRING TO THE QTL BUSINESS MODEL; RIGHT?

22   A.   QTL.

23   Q.   TURNING YOUR ATTENTION, SIR, BACK TO CX 7200, WHICH IS TAB

24   6 OF YOUR BINDER.

25        IF YOU LOOK, SIR, AT CX 7200-005.

1           NOW, SPIN RATIONALE:  SUMMARY OF REASONS IS THE TITLE OF

2      THIS SLIDE.

3           SPIN REFERS TO A SEPARATION OF QCT AND QTL; RIGHT?

4      A.   YES.

5      Q.   NOW, THE VERY FINAL SENTENCE OF THE SECOND BULLET READS,

6      QCT'S COMPETITORS ROUTINELY ENTER INTO ROYALTY FREE

7      CROSS-LICENSES WITH OTHER COMPANIES (INCLUDING SOME OF THOSE

8      COMPANIES THAT ARE TODAY ATTACKING QUALCOMM) THEREBY ALLOWING

9      THESE COMPETITORS TO DESIGN NEW TECHNOLOGIES INTO THEIR CHIPS

10     WITH LESS PATENT INFRINGEMENT RISK.

11          ONE OF THE COMPANIES ATTACKING QUALCOMM AT THE TIME THIS

12     SLIDE WAS WRITTEN WAS BROADCOM; ISN'T THAT RIGHT?

13     A.   BROADCOM WAS, YES.

14     Q.   BROADCOM MANUFACTURES ASICS, OR AT THE TIME THIS SLIDE WAS

15     WRITTEN BROADCOM MANUFACTURED ASICS IN COMPETITION WITH

16     QUALCOMM; ISN'T THAT RIGHT?

17     A.   I'M SORRY.  SAY THAT AGAIN.

18     Q.   AT THE TIME THIS SLIDE WAS WRITTEN, BROADCOM MANUFACTURED

19     APPLICATION SPECIFIC INTEGRATED CIRCUITS, INCLUDING MODEM

20     CHIPS, IN COMPETITION WITH QUALCOMM; ISN'T THAT RIGHT?

21     A.   I'M NOT EXACTLY SURE.  I KNOW AT ONE POINT THEY WERE.

22     Q.   BUT DO YOU KNOW THAT BROADCOM HAS BEEN A MODEM CHIP

23     COMPETITOR OF QUALCOMM?  YOU'RE JUST NOT SURE IF THIS WAS THE

24     CASE WHEN THIS SLIDE WAS WRITTEN; RIGHT?

25     A.   AT ONE POINT THEY WERE TRYING TO MAKE CHIPS, YES.

1           MR. MATHESON:  NO FURTHER QUESTIONS AT THIS TIME,

2    YOUR HONOR.  PASS THE WITNESS.  OBVIOUSLY WE RESERVE REDIRECT

3    IF APPLICABLE, YOUR HONOR.

4           THE COURT:  OF COURSE.  3:35.

5        GO AHEAD, PLEASE.

6        (PAUSE IN PROCEEDINGS.)

7           THE COURT:  GO AHEAD, PLEASE.  3:36.

8           MS. SESSIONS:  THANK YOU, YOUR HONOR.  GOOD

9    AFTERNOON.  JUSTINA SESSIONS OF KEKER, VAN NEST AND APPEARING

10   HERE FOR QUALCOMM.

                          **CROSS-EXAMINATION**

12   BY MS. SESSIONS:

13   Q.   GOOD AFTERNOON, MR. WISE.

14   A.   GOOD AFTERNOON.

15   Q.   MR. WISE, HOW LONG HAVE YOU WORKED AT QUALCOMM?

16   A.   ABOUT 22 YEARS.

17   Q.   AND YOUR CURRENT JOB TITLE IS?

18   A.   SENIOR VICE PRESIDENT AND TREASURER.

19   Q.   OKAY.  WHEN DID YOU BECOME SENIOR VICE PRESIDENT AND

20   TREASURER?

21   A.   AROUND JANUARY OF 2016.

22   Q.   WHAT WAS YOUR ROLE BEFORE YOU BECAME SENIOR VICE PRESIDENT

23   AND TREASURER?

24   A.   SENIOR VICE PRESIDENT OF FINANCE AND STRATEGY.

25   Q.   WHAT WERE YOUR RESPONSIBILITIES AS SENIOR VICE PRESIDENT

1     OF FINANCE AND STRATEGY?

2     A.   I WAS INVOLVED IN A NUMBER OF OUR BIGGER CORPORATE

3     PROJECTS; ALSO HAD RESPONSIBILITY FOR FINANCE AND STRATEGY OF A

4     NUMBER OF OUR EMERGING BUSINESSES, SMALLER EMERGING BUSINESSES

5     OF OUTSIDE OF QTL AND QTL.

6     Q.   WERE YOU IN THAT ROLE IN THE YEAR 2015?

7     A.   YES.

8     Q.   MR. WISE, WHAT, IF ANY, HAS BEEN YOUR INVOLVEMENT WITH

9     PATENT LICENSING DURING YOUR TIME AT QUALCOMM?

10    A.   NONE.

11    Q.   WHAT, IF ANY, HAS BEEN YOUR INVOLVEMENT IN CHIP

12    DEVELOPMENT OR CHIP SALES DURING YOUR TIME AT QUALCOMM?

13    A.   NONE.

14    Q.   AND WHAT, IF ANY, HAS BEEN YOUR INVOLVEMENT WITH STANDARDS

15    DEVELOPMENT OR STANDARDS ORGANIZATION PARTICIPATION AT

16    QUALCOMM?

17    A.   NONE.

18    Q.   MR. WISE, TURNING YOUR ATTENTION BACK TO PROJECT PHOENIX,

19    COULD YOU JUST PROVIDE A BRIEF TIMELINE OF THE COMPANY'S

20    CONSIDERATION OF PROJECT PHOENIX ISSUES?

21    A.   SURE.

22         SO WE, WE FIRST LOOKED AT A SEPARATION OF THE CHIP AND

23    LICENSING BUSINESS IN EARLY 2015.  WE PRESENTED OUR FINDINGS TO

24    THE BOARD IN MAY OF 2015, THEY INDICATED WE SHOULD NOT SPLIT

25    THE COMPANY UP AT THAT TIME.

1          AND THEN JANA PARTNERS OWNED SHARES IN QUALCOMM, AND ONE

2     OF THEIR PIECES WAS TO SPLIT THE COMPANY.

3          AND WE AGREED AT ONE POINT TO RELOOK AT THAT QUESTION WITH

4     THEM, AND WE STARTED THAT OVER AGAIN IN AUGUST OF 2015 AS

5     PROJECT PHOENIX, AND WE CONCLUDED THAT PROCESS WITH THE FINAL

6     RECOMMENDATIONS IN EARLY DECEMBER 2015.

7     Q.   WHO AT QUALCOMM WAS INVOLVED IN PROJECT PHOENIX?

8     A.   MYSELF, MY TEAM, EXECUTIVE MANAGEMENT, THE BOARD, AND A

9     COMMERCIAL COMMITTEE OF THE BOARD.

10    Q.   WHAT WAS THE MAKEUP OF THE COMMERCIAL COMMITTEE?

11    A.   THE SPECIAL COMMITTEE HAD PAUL JACOBS, OUR CHAIRMAN; AND

12    THEN I WOULD SAY MAYBE FIVE OR SO INDEPENDENT DIRECTORS.

13    Q.   AT THE TIME THAT MANAGEMENT WAS CONSIDERING THE

14    PROJECT PHOENIX ISSUES, WERE THERE ANY PARTICULAR BUSINESS

15    CHALLENGES FACING THE COMPANY AT THE TIME?

16    A.   YEAH, A NUMBER OF THINGS.

17         WE WERE JUST COMING OFF THE BACK OF THE NDRC REVIEW OF OUR

18    LICENSING PROGRAM IN CHINA.  CHINA WAS BECOMING A VERY, VERY

19    BIG PART OF OUR BUSINESS AS THE CHINESE HANDSET MANUFACTURERS

20    GAINED SHARE NOT ONLY IN CHINA, BUT ALSO GLOBALLY.  THEY WERE

21    BECOMING A MUCH BIGGER PART OF OUR BUSINESS, BOTH QCT AND QTL.

22         AND WE WERE HAVING COMPLIANCE ISSUES WITH THE CHINESE

23    OEM'S ON THE BACK OF THE NDRC SETTLEMENT WITH THEM PAYING FULL

24    ROYALTIES OR, YOU KNOW, ON ALL THE DEVICES, ALL THEIR UNITS

25    THAT THEY WERE SHIPPING.

WISE CROSS BY MS. SESSIONS

1           AND THEN WE WERE ALSO SIGNIFICANTLY CONCERNED ABOUT

2    VERTICALIZATION OF SOME OF THE BIGGER OEM'S, AND BY THAT I MEAN

3    SOME OF THE LARGER OEM'S STARTING TO DO THEIR OWN CHIPSETS,

4    BRINGING THAT IN-HOUSE, AND, YOU KNOW, MOVING AWAY FROM

5    QUALCOMM.

6    Q.   MR. WISE, COULD YOU TURN IN YOUR BINDER TO CX 6837,

7    PLEASE.  I BELIEVE IT'S TAB NUMBER 2.

8    A.   YES.

9    Q.   DO YOU RECOGNIZE THIS DOCUMENT, MR. WISE?

10   A.   YES.

11   Q.   WHAT IS IT?

12   A.   A BOARD PACKAGE FOR OUR OCTOBER 5TH BOARD MEETING.

13   Q.   AND I BELIEVE THAT YOU PREVIOUSLY TESTIFIED THAT YOU

14   ATTENDED THE OCTOBER 5TH BOARD MEETING; IS THAT RIGHT?

15   A.   YES.

16   Q.   DID MANAGEMENT MAKE A RECOMMENDATION REGARDING

17   PROJECT PHOENIX AT THIS MEETING?

18   A.   YES.

19   Q.   WHAT WAS MANAGEMENT'S RECOMMENDATION AT THE OCTOBER 5TH

20   BOARD MEETING?

21   A.   THAT WE SHOULD NOT SPLIT THE CHIP AND LICENSING

22   BUSINESSES.

23   Q.   AT A HIGH LEVEL, WHY DID MANAGEMENT RECOMMEND NOT

24   SPLITTING UP THE BUSINESSES?

25   A.   A NUMBER OF REASONS.  THERE WERE FINANCIAL REASONS, COST

1    DYSSYNERGIES OF DUPLICATING COSTS OF SEPARATING THE BUSINESSES,

2    TAX DYSSYNERGIES.  THERE WERE ALSO REASONS UNRELATED TO

3    BUSINESS.  QUALCOMM HAS BEEN SUCCESSFUL IN GETTING ITS

4    TECHNOLOGIES ADOPTED INTO THE STANDARDS BODIES BY THE FACT THAT

5    WE HAVE THE COMBINED CAPABILITIES OF QCT AND QTL AND WE'RE ABLE

6    TO INVEST AND DEVELOP GOOD TECHNOLOGY AND ABLE TO DEMONSTRATE

7    THAT THE TECHNOLOGY FUNCTIONS, WE DEVELOP LIVE SYSTEMS TO BE

8    ABLE TO SHOW AND DEMONSTRATE OUR INNOVATIONS CAN PERFORM AS

9    PROMISED.

10        AND WE, THROUGH QCT, HAVE A LARGE ABILITY TO IMPLEMENT THE

11   STANDARDS ON THE DEVICE SIDE THROUGH CHIPS, WHICH POSITIONS US

12   AS A VERY GOOD PARTNER FOR INFRASTRUCTURE VENDORS AND OTHER

13   IMPORTANT PARTIES IN THE STANDARDS BODIES THAT ALLOW US TO HAVE

14   GOOD PARTNERSHIPS AND SUCCESS IN GETTING FOLKS TO, YOU KNOW,

15   ADOPT OUR TECHNOLOGY.

16   Q.   COULD YOU PLEASE TURN TO PAGE CX 6837-062.

17   A.   YES.

18   Q.   MR. WISE, DO YOU RECOGNIZE THE PRESENTATION THAT BEGINS ON

19   PAGE 62 OF CX 6837?

20   A.   YES.

21   Q.   WHAT IS IT?

22   A.   IT'S THE PROJECT PHOENIX SLIDES FROM THE OCTOBER 5TH BOARD

23   MEETING.

24   Q.   WHOSE PROJECT PHOENIX SLIDES?

25   A.   MINE.

1    Q.   DID THESE SLIDES ACCURATELY REFLECT YOUR ANALYSIS AND

2    CONCLUSIONS REGARDING THE PROJECT PHOENIX CONSIDERATIONS AT

3    THAT TIME?

4    A.   YES, REFLECTED MANAGEMENT'S RECOMMENDATIONS.

5              MR. MATHESON:  OBJECTION, YOUR HONOR.  LACKS --

6    PORTIONS OF THIS DOCUMENT WERE REDACTED FROM PREJUDICE.  MANY

7    OF THESE SLIDES, OR SEVERAL OF THESE SLIDES WERE REDACTED FOR

8    PRIVILEGE.  IF MR. WISE PREPARED THEM, WE WOULD LIKE TO

9    UNDERSTAND WHAT HE MEANS WHEN THESE ARE HIS ANALYSIS OR WE'D

10   LIKE TO HAVE THE SLIDE PRODUCED AND WE CAN EXPLORE HIS ANALYSIS

11   IN FULL.

12   BY MS. SESSIONS:

13   Q.   MR. WISE, DID YOU SEEK OR RECEIVE ANY LEGAL ADVICE IN THE

14   COURSE OF PREPARING YOUR ANALYSES AS PART OF PROJECT PHOENIX?

15   A.   YES.

16             MS. SESSIONS:  I BELIEVE, YOUR HONOR, THAT THE

17   REDACTED PORTIONS OF THESE SLIDES REFLECT THE LEGAL ADVICE THAT

18   MR. WISE SOUGHT OR RECEIVED OVER THE COURSE OF HIS ANALYSIS OF

19   PROJECT PHOENIX.

20             THE COURT:  WHY DOESN'T HE TESTIFY TO THAT?

21             MS. SESSIONS:  OKAY.

22   Q.   WELL, MR. WISE, CAN YOU -- IF YOU CAN TURN TO, I GUESS

23   IT'S PAGE 067 IS THE FIRST ONE?

24             THE COURT:  NO, IT'S ON 063 IS THE FIRST IT LOOKS

25   LIKE.  THE SECOND PAGE OF THE DOCUMENT.  THE TITLE PAGE DOESN'T

```
1     HAVE REDACTIONS, BUT THE SECOND PAGE DOES.

2     BY MS. SESSIONS:

3     Q.   MR. WISE, DO YOU SEE THE, THE REDACTED FOR PRIVILEGE BOXES

4     IN THE SECOND BULLET --

5     A.   UM-HUM.

6     Q.   -- IN THAT SLIDE DECK?

7     A.   YES.

8     Q.   DO YOU RECALL SEEKING OR OBTAINING LEGAL ADVICE RELATING

9     TO THE SUBJECT CONTAINED IN THAT BULLET?

10    A.   YES.

11    Q.   DO YOU RECALL WHO YOU MIGHT HAVE SOUGHT OR RECEIVED THAT

12    LEGAL ADVICE FROM?

13    A.   LIKELY QTL LAWYERS.

14    Q.   MR. WISE, IF YOU COULD TURN TO PAGE 067 OF THE DECK, AND I

15    KNOW IT'S DIFFICULT, BUT FROM THE CONTEXT, THE PRECEDING, OR

16    SUCCEEDING SLIDES, CAN YOU TELL US WHETHER YOU SOUGHT OR

17    RECEIVED LEGAL ADVICE RELATING TO THE SUBJECT MATTER OF SLIDE

18    NUMBER 67?

19    A.   YEAH, HARD TO REMEMBER WHAT EACH OF THESE SLIDES WERE, BUT

20    I BELIEVE SO.

21    Q.   BUT --

22         MR. MATHESON:  YOUR HONOR, CAN I BE HEARD?  I HAVE NO

23    DESIRE TO WASTE YOUR TIME FORCING YOU TO WALK THROUGH THESE

24    SLIDES.

25         I THINK OUR LARGER POINT IS IF THESE ARE BUSINESS
```

1      COMMUNICATIONS MADE BY A BUSINESS PERSON TO THE BOARD, IN WHAT

2      SENSE CAN THESE BE PRIVILEGED?

3              MS. SESSIONS:  YOUR HONOR, A BUSINESS IS ENTITLED TO

4      SEEK AND RECEIVE LEGAL ADVICE WHEN CONSIDERING STRUCTURAL

5      ISSUES, TAX IMPLICATIONS, ALL KINDS OF THINGS THAT MIGHT HAVE

6      AN EFFECT ON THE BUSINESS, AND MR. WISE DID TESTIFY THAT HE

7      BELIEVES HE SOUGHT AND RECEIVED LEGAL ADVICE REGARDING THESE

8      PROJECT PHOENIX ISSUES.  AND PROJECT PHOENIX DID INVOLVE A LOT

9      OF LEGAL QUESTIONS BECAUSE THE COMPANY WAS CONSIDERING NEW, YOU

10     KNOW, STRUCTURES OF THE BUSINESS, TAX ISSUES, AND THINGS LIKE

11     THAT.

12          SO I THINK IT'S ENTIRELY APPROPRIATE THAT THESE SLIDES

13     MIGHT HAVE CONTAINED SOME PRIVILEGED MATTERS.

14          AND THE BOARD IS, BOARD AND MANAGEMENT ARE ENTITLED TO

15     SEEK AND OBTAIN LEGAL ADVICE, EVEN ON BUSINESS MATTERS, FROM

16     THE COMPANY'S LAWYERS.

17              THE COURT:  YOU -- I HAD A QUESTION.  IN THE OPENING

18     SLIDES FOR QUALCOMM, THE FEBRUARY 23RD, 2012, SONY SAYS IT'S

19     THE QC LEGAL TEAM THAT ORDERED THE HOLD OF SHIPMENTS OF MODEM

20     CHIPS DUE TO NON-EXISTENCE OF A QTL LICENSE AGREEMENT.

21          SO WHAT IF IT'S ACTUALLY THE LEGAL TEAM THAT IS ACTUALLY

22     THE ONE THAT IS ENFORCING THE NO LICENSE, NO CHIPS POLICY?  AT

23     WHAT POINT DO THEY BECOME, IN FACT, THE ACTORS, THE BUSINESS

24     ACTORS VERSUS JUST GIVING LEGAL ADVICE?

25              THAT DID DISTURB ME.  I'M LOOKING AT PAGE 14 OF THE SLIDE.

1            MR. VAN NEST:  WHICH PAGE, YOUR HONOR?

2            THE COURT:  PAGE 14.  IT'S A QUOTE FROM BOB ISHIDA.

3    IT SAYS, QUOTE, QC LEGAL TEAM ORDERED TO YOUR SALES TO HOLD ANY

4    SHIPMENT TO SOMC, WHICH IS SONY, DUE TO NON-EXISTENCE OF QTL

5    LICENSE AGREEMENT, DOT, DOT, DOT.  ARE YOU AWARE OF THAT?

6            IF IT'S THE LEGAL TEAM THAT IS THEN ORDERING THIS NO

7    LICENSE, NO CHIPS POLICY ENFORCEMENT, WHAT DOES THAT MEAN?  WHY

8    SHOULD THAT BE PRIVILEGED?  IS THAT PRIVILEGED?

9            MS. SESSIONS:  SO, YOUR HONOR, I DON'T BELIEVE THAT

10   WE ASSERTED PRIVILEGE -- I MEAN, WE CERTAINLY DIDN'T ASSERT

11   PRIVILEGE OVER THAT COMMUNICATION.

12           THE COURT:  UM-HUM.  SO HOW ARE YOU DRAWING THE LINE?

13           MR. VAN NEST:  EXCUSE ME, YOUR HONOR.

14           THE COURT:  WHERE ARE YOU DRAWING THE LINE?

15           MR. VAN NEST:  JUST TO CLARIFY, THE -- THE STATEMENT

16   YOU'RE REFERRING TO IS THE STATEMENT FROM SONY.  IT'S NOT

17   CORRECT.  BUT THAT'S NOT SOMETHING WE SAID.

18           THE STATEMENT FROM QUALCOMM IS FROM OUR CEO,

19   MR. MOLLENKOPF.  I'M NOT SURE WHAT MR. ISHIDA IS REFERRING TO.

20           THE COURT:  OKAY.

21           MR. VAN NEST:  BUT THAT'S NOT OUR STATEMENT.

22           THE COURT:  OKAY.  BUT LET ME HEAR, YOU'RE SAYING IF

23   THE LEGAL TEAM IS ORDERING IT, YOU WOULD NOT WAIVE -- YOU WOULD

24   WAIVE PRIVILEGE AS TO THAT.  BUT NOT AS TO BUSINESS STRATEGY?

25   I WASN'T SURE, HOW ARE YOU DIVIDING THE LINE -- DRAWING THE

1       LINE HERE IN WHAT YOU JUST SAID?  YOU SAID WE WAIVE PRIVILEGE

2       AS TO THAT --

3               MS. SESSIONS:  NO, YOUR HONOR.

4               THE COURT:  BUT NOT AS TO ANYTHING ELSE.

5               MS. SESSIONS:  SORRY, YOUR HONOR, I DIDN'T INTEND TO

6       SAY THAT WE WAIVED PRIVILEGE OVER ANYTHING.  I JUST MEANT TO

7       SAY THAT I DIDN'T BELIEVE THAT WE HAD ASSERTED PRIVILEGE OVER

8       THE SONY COMMUNICATION THAT YOU ALL WERE JUST DISCUSSING.

9           BUT I -- I DON'T -- I THINK I FAILED TO SEE THE

10      CONNECTION.  I MEAN, IF YOU'RE ASKING IN GENERAL OF THE NATURE

11      OF THE PRIVILEGE DETERMINATIONS THAT WERE MADE IN THIS CASE, I

12      CAN TELL YOU THAT THEY WERE VERY HEAVILY LITIGATED AND WE WENT

13      BACK AND FORTH MANY TIMES AND, YOU KNOW, DID REDUCE SOME OF THE

14      PRIVILEGE CALLS THAT WE MADE WHEN THERE WAS A DISPUTE ABOUT

15      WHETHER SOMETHING WAS BUSINESS ADVICE OR LEGAL ADVICE.

16          BUT WE SPENT A LOT OF TIME REALLY TRYING TO SEPARATE THOSE

17      TWO THINGS OUT, AND I BELIEVE MAGISTRATE JUDGE COUSINS, YOU

18      KNOW, HEARD A NUMBER OF DISPUTES ON THOSE ISSUES AND DID RULE

19      UPON THEM.

20              THE COURT:  UM-HUM.

21              MR. MATHESON:  YOUR HONOR, I HAVE NO WISH TO DERAIL

22      THE EXAMINATION.  OUR POINT IS THE ONLY THING THAT CAN BE

23      PRIVILEGED IN THIS CIRCUIT IS A CONFIDENTIAL COMMUNICATION

24      BETWEEN AN ATTORNEY AND A CLIENT.

25          THE SIMPLE FACT THAT HE SOUGHT AND RECEIVED LEGAL ADVICE

1    DOESN'T MATTER UNLESS HE IS TRANSMITTING THE CONTENT OF A

2    COMMUNICATION BETWEEN AN ATTORNEY AND A CLIENT.

3         I DON'T WANT TO USE OUR POWER ON THIS ONE.  I HAVE NO IDEA

4    WHAT THESE SLIDES SAY.  THERE WILL BE A MEMO CALLED THE

5    COMPETITIVE RESPONSE MEMO IN CONNECTION WITH THE PROJECT BERLIN

6    THAT THEY HAVE REDACTED.

7              THE COURT:  WELL, WHY DON'T I REVIEW THESE TO SEE IF

8    THE PRIVILEGE IS APPROPRIATELY ASSERTED?  I MEAN, JUDGE COUSINS

9    HAD THOUSANDS AND THOUSANDS.  WHY DON'T I REVIEW THESE TO SEE

10   IF THE PRIVILEGE IS APPROPRIATELY ASSERTED?

11             MR. MATHESON:  ANOTHER ONE WE'D SUBMIT, YOUR HONOR,

12   IS THE COMPETITIVE RESPONSE WHITE MEMO THAT'S ATTACHED TO

13   PROJECT BERLIN WHICH HAS ALSO BEEN REDACTED.  AGAIN, IT'S HARD

14   TO SEE HOW A COMPETITIVE RESPONSE CAN BE AN ENTIRELY PRIVILEGED

15   MATTER WHEN THE QUESTION ADDRESSED IS THE COMPETITIVE RESPONSE

16   OF QUALCOMM'S COMPETITORS TO A SPIN BETWEEN PROJECT BERLIN --

17   BETWEEN QCT AND --

18             THE COURT:  WHAT'S THE EXHIBIT ON THAT?  I'D LIKE TO

19   SEE CX 6837 AND I'LL JUDGE FOR MYSELF WHETHER THE REDACTIONS

20   ARE APPROPRIATE.

21        WHAT'S THE OTHER ONE, PLEASE?

22             MR. MATHESON:  I BELIEVE IT'S 7234, YOUR HONOR.  I'M

23   CHECKING ON THAT.

24             MR. VAN NEST:  YOUR HONOR, WE'D LIKE AN OPPORTUNITY,

25   AT MINIMUM, TO BRIEF THIS OVERNIGHT.  THESE ISSUES -- THIS IS A

1       DOCUMENT THE GOVERNMENT INTRODUCED, THEY'VE HAD IT, THEY'VE HAD

2       IT FOR A LONG TIME, THEY PUT THIS INTO EVIDENCE IN ITS CURRENT

3       FORM.

4           ALL THESE PRIVILEGE ISSUES WERE LITIGATED BEFORE

5       JUDGE COUSINS, AND I WOULD LIKE AN OPPORTUNITY TO BRING THAT TO

6       THE COURT'S ATTENTION IF --

7               THE COURT:  YOU'RE NOT GOING TO LET ME SEE IT IN

8       CAMERA?

9               MR. VAN NEST:  WELL, I'D LIKE AN OPPORTUNITY TO BRIEF

10      THAT BEFORE I DO, BECAUSE ALL THESE ISSUES WERE HANDLED IN

11      FRONT OF JUDGE COUSINS --

12              THE COURT:  YOU'RE TELLING ME -- I CAN CHECK WITH

13      JUDGE COUSINS -- THAT HE LOOKED AT CX 6837 SPECIFICALLY?

14              MR. EVEN:  SO I -- I'LL NEED TO SEE THE EXACT ONE,

15      YOUR HONOR, BECAUSE WE HAVE ARGUED THIS OBVIOUSLY FOR QUITE

16      DIFFERENT --

17              THE COURT:  BUT HE DID NOT REVIEW EVERYTHING IN

18      CAMERA.  IT WAS DONE IN A VERY BIG, WHOLESALE WAY.

19              MR. EVEN:  NO.  I THINK WHAT HE DID IS HE GAVE A

20      GENERAL RULING AS TO HOW TO APPLY THE PRIMARY PURPOSE RULE AS

21      TO THE, AS TO THE PRIVILEGE, PRIMARY PURPOSE OF THE

22      COMMUNICATION.

23          HE DID LOOK IN CAMERA AT QUITE A FEW DOCUMENTS, I DON'T

24      REMEMBER THE EXACT NUMBER, BUT MORE THAN A HANDFUL.

25              HE DID SEND US BACK TO LOOK.  THEY'VE REVIEWED SOME OF IT

 1      AND OFFERED OBJECTIONS ON THAT, BOTH THE FTC AND THE MDL

 2      PLAINTIFFS IN THE OTHER CASE.

 3           JUDGE COUSINS LOOKED AT THAT AND ASKED THEM TO CHOOSE THE

 4      ONES THAT THEY THINK ARE MOST HIGH PRIORITY FOR THEM, AND HE

 5      LOOKED AT SOME OF THOSE.

 6           AND SO THIS IS A, A LONG BACK AND FORTH THAT HAS GONE ON

 7      FOR A WHILE.  IT INCLUDED MANY OF THE DOCUMENTS SPECIFICALLY.

 8           MR. VAN NEST:  AND ALSO, I'M ASKING A PROCESS POINT,

 9      YOUR HONOR.  THIS IS A DOCUMENT THEY PUT INTO EVIDENCE.  WE'RE

10      NOT TRYING TO SPONSOR IT.  WE'RE ON REDIRECT OF A WITNESS WHO

11      WAS ASKED QUESTIONS ABOUT THIS DOCUMENT BY THE GOVERNMENT.

12           THE COURT:  THEN HE SAID THIS IS HIS DOCUMENT THAT HE

13      CREATED WITH HIS ANALYSIS.

14           MR. VAN NEST:  HE DID, EXACTLY.  BUT THAT DOESN'T

15      MEAN THERE ISN'T PRIVILEGED MATERIAL.  MY POINT IS THEY, THEY

16      OFFERED IT, THE GOVERNMENT DID, WE DIDN'T OBJECT TO IT, THEY

17      OFFERED IT IN ITS CURRENT FORM, AND WE'RE UP HERE DOING A FEW

18      MINUTES OF REDIRECT AND ALL OF A SUDDEN THEY'RE UP ASKING THAT

19      THE WHOLE THING BE UNREDACTED.

20           THAT IS NOT PROTOCOL OR PROCESS.  IT'S THEIR -- IF THEY

21      HAD THIS ISSUE, THEY SHOULD HAVE RAISED IT WITH YOUR HONOR

22      BEFOREHAND THEN THROWING ON ALL THIS IN THE MIDDLE OF TRIAL.

23           THE COURT:  ALL RIGHT.  LET'S KEEP GOING.

24           MR. VAN NEST:  THIS IS NOT AN ISSUE THAT WE BROUGHT

25      UP.

```
1              MR. MATHESON:  YOUR HONOR, MAY I ADDRESS ONE ISSUE?
2    CX 7200-55 IS THE COMPETITIVE RESPONSE WHITE PAPER WHICH HAS
3    BEEN COMPLETELY REDACTED FROM PROJECT BERLIN, EVEN THOUGH IT
4    ADDRESSES ISSUES THAT ARE CLEARLY RELATED TO BUSINESS
5    COMPETITION AS WE'LL DEMONSTRATE DURING MR. ALTMAN'S EXAM
6    TOMORROW.  THEY REDACTED THE MEMO.  THEY LET ONE SLIDE THROUGH
7    THAT SUMMARIZES THE CONTENTS.  IT'S ALL ABOUT BUSINESS
8    POSITIONING AS FAR AS WE CAN TELL WITHOUT LOOKING AT IT.
9    THAT'S CX 7200-055.
10             MR. VAN NEST:  HAS THAT BEEN BEFORE THIS WITNESS?
11             MR. MATHESON:  IT IS INDEED, SIR.  IT WAS TAB 6.
12             MR. VAN NEST:  OKAY.  THEY PUT EVIDENCE IN ITS
13   CURRENT FORM, YOUR HONOR.  WE HAVEN'T ASKED A SINGLE QUESTION
14   ABOUT IT.  BUT IF THEY -- IF WHAT WE'RE GOING TO DO IS PROCEED
15   WITH THE GOVERNMENT PUTTING IN EXHIBITS AND THEN LATER
16   COMPLAINING ABOUT THE FORM OF THEM, WE'LL NEVER GET THROUGH THE
17   TRIAL.  ALL OF THIS STUFF SHOULD HAVE BEEN LITIGATED PRETRIAL
18   WITH JUDGE COUSINS.  MOST OF IT WAS.  AND I THINK THIS IS
19   HIGHLY IMPROPER.  I WOULD LIKE -- IF YOUR HONOR IS GOING TO
20   ENTERTAIN THIS TYPE OF THING MID-TRIAL, I'D LIKE AN OPPORTUNITY
21   TO BRIEF IT.
22             THE COURT:  ALL RIGHT.  LET'S KEEP GOING, PLEASE.
23   BY MS. SESSIONS:
24   Q.  MR. WISE, COULD YOU TURN TO PAGE 78 OF CX 6837.
25   A.  YES.
```

```
1    Q.   MR. WISE, ON PAGE 78 OF CX 6837, THERE'S A COMPLIANCE

2    CONCERN REFERENCE.

3         DO YOU SEE THAT?

4    A.   YES.

5    Q.   WHAT WAS THE COMPLIANCE CONCERN AT THIS TIME?

6    A.   SO THE FACT THAT QCT, WHEN QCT SELLS CHIPS TO CHINESE

7    OEM'S, THAT GIVES US A GOOD SENSE OF THE UNIT VOLUMES THAT

8    THOSE OEM'S WERE LIKELY TO BE SHIPPING, WHICH GIVES US A GOOD

9    UNDERSTANDING OF WHAT WE SHOULD EXPECT TO SEE IN TERMS OF

10   ROYALTY PAYING UNITS.

11        AND IF WE DID NOT HAVE QCT ANY LONGER, WE WOULD LOSE THAT

12   VISIBILITY AND AN ABILITY TO ADDRESS NONCOMPLIANCE WITH THE

13   LICENSEES.

14   Q.   MR. WISE, STEPPING BACK A MOMENT TO PROJECT PHOENIX MORE

15   GENERALLY, WHAT WAS BCG'S ROLE IN PROJECT PHOENIX?

16   A.   SO BCG WAS HIRED BY THE SPECIAL COMMITTEE FAIRLY LATE IN

17   THE PROCESS TO OFFER A SECOND OPINION ON TOP OF MANAGEMENT'S

18   FIRST OPINION, WHICH WAS OUR RECOMMENDATION THAT WE NOT

19   SEPARATE THE CHIP AND LICENSING BUSINESS.

20   Q.   WHAT ROLE, IF ANY, DID YOU HAVE IN BCG'S ANALYSIS?

21   A.   VERY LIMITED.  WE WERE TOLD IT WAS A SECOND OPINION, IT

22   WAS BEING DONE FOR THE SPECIAL COMMITTEE OF THE BOARD.  SO WE

23   WERE TOLD TO LARGELY BE HANDS OFF.  WE PROVIDED SOME DATA THAT

24   THEY COULD USE FOR THEIR ANALYSIS.  THEY MET WITH SOME OF THE

25   MANAGEMENT TEAMS FOR BACKGROUND.
```

1    Q.   DID MANAGEMENT BASE ITS PROJECT PHOENIX RECOMMENDATIONS ON

2    ANY INPUT OR RECOMMENDATIONS FROM BCG?

3    A.   NO.

4    Q.   MR. WISE, IF YOU COULD TURN TO CX 3755, WHICH IS TAB 5 OF

5    YOUR BINDER.

6    A.   YES.

7    Q.   MR. WISE, BEFORE THIS LITIGATION STARTED, HAD YOU SEEN A

8    VERSION OF BCG'S PRESENTATION WITH THE SPEAKER NOTES IN IT?

9    A.   NO.

10   Q.   DO YOU -- DO YOU KNOW WHETHER BCG PRESENTED THE

11   INFORMATION IN THE SPEAKER'S NOTES TO ANYONE AT QUALCOMM?

12   A.   I DON'T BELIEVE THEY EVER PRESENTED IT TO THEM, NO.

13   Q.   MR. WISE, IF YOU COULD TURN TO CX 5417, PLEASE.

14   A.   OKAY.

15   Q.   MR. WISE, THIS E-MAIL MENTIONS MODEM LICENSING.  WHAT IS

16   MODEM LICENSING?

17   A.   SO MODEM LICENSING WAS A CONCEPT THAT I WAS EXPLORING WITH

18   RESPECT TO A CHANGE IN THE APPROACH TO THE QTL BUSINESS WHERE

19   WE WOULD BUNDLE SEMICONDUCTOR MODEM DESIGNS WITH OUR PATENT

20   LICENSE.

21   Q.   WHOSE IDEA WAS THE MODEM LICENSING?

22   A.   IT WAS MINE.

23   Q.   ARE MODEM LICENSE -- MODEM DESIGNS DIFFERENT FROM PATENTS?

24   A.   YES.  THEY'RE SEMICONDUCTOR DESIGNS.

25   Q.   SO HOW, IF AT ALL, DID YOUR MODEM LICENSING IDEA DIFFER

```
 1        FROM QTL'S EXISTING BUSINESS MODEL?

 2        A.   SO THE MODEM LICENSE IDEA WOULD BE WE WOULD BUNDLE THE

 3        DESIGNS IN WITH THE PATENT LICENSE SO THAT THERE WOULD BE

 4        BASICALLY A BUNDLE OF BOTH PATENTS AND MODEM DESIGNS THAT WOULD

 5        GO TO THE OEM'S AS OPPOSED TO JUST A PURE PATENT LICENSE.

 6             SO IN SOME WAY IT WAS A LITTLE BIT MORE LIKE WHAT ARM

 7        HOLDINGS DOES, A-R-M, HOLDINGS, DOES IN THE INDUSTRY.

 8        Q.   AND IN THIS E-MAIL YOU WROTE, I AGREE WITH THE VIEWPOINT

 9        THAT AS LONG AS QTL HAS A VERY HIGH SHARE, THEY ARE BENEFICIAL

10        TO QTL.

11             WHAT DID YOU MEAN BY THAT?

12        A.   A COUPLE OF THINGS.  ONE, AS I MENTIONED, IN CHINA WE WERE

13        HAVING COMPLIANCE ISSUES.  QCT SHIPPING CHIPS TO HANDSET OEM'S

14        WOULD GIVE US MORE VISIBILITY INTO THE NUMBER OF LICENSING

15        UNITS THAT WE SHOULD BE SEEING ROYALTIES PAID ON IN ORDER TO

16        ADDRESS NONCOMPLIANCE ISSUES IN CHINA.

17             AND THEN ALSO MORE BROADLY, AS I SAID BEFORE, THE -- THE

18        ABILITY FOR US TO CONTINUE TO PROVIDE ONGOING YEAR IN, YEAR OUT

19        SUPPORT FOR THE OEM'S THROUGH THE DELIVERY OF CHIPS AND

20        SUPPORTING THEIR ABILITY TO SELL PRODUCTS BASED ON OUR CHIPS

21        WOULD POSITION US AS A STRONG PARTNER AND AN ENABLER TO THE

22        HANDSET OEM'S BEYOND JUST THE TECHNOLOGY WE'RE CONTRIBUTING TO

23        THE STANDARDS.

24        Q.   AND WHAT DID YOU MEAN WHEN YOU WROTE, WE WOULD THEN CREATE

25        THE GIVE/GET THAT COULD CREATE NEW AVENUES OF LEVERAGE IN ANY
```

1    ROYALTY NEGOTIATIONS?

2    A.   SO IN THE MODEM DESIGN -- MODEM DESIGN LICENSES CONCEPT,

3    THE MODEM DESIGNS WOULD BE SOMETHING THAT WOULD BE PART OF THE,

4    PART OF THE PACKAGE, AND IF YOU DIDN'T HAVE A LICENSE, YOU

5    WOULDN'T GET THE MODEM DESIGNS.

6    Q.   COULD YOU PLEASE TURN TO TAB 10, WHICH IS CX 5953.

7    A.   OKAY.

8    Q.   WHEN YOU WERE DISCUSSING THIS EXHIBIT WITH COUNSEL FOR THE

9    FTC, I THINK HE SAID THAT WE DIDN'T NEED TO ADDRESS THE

10   STRATEGY REFLECTED IN THESE SLIDES.

11        WHAT WAS THE STRATEGY REFLECTED IN THESE SLIDES?

12   A.   MODEM LICENSING STRATEGY.

13        MS. SESSIONS:  THANK YOU, MR. WISE.  I HAVE NO MORE

14   QUESTIONS.

15        THE COURT:  OKAY.  IT'S 4:02.  GO AHEAD, PLEASE.  DO

16   YOU HAVE ANY REDIRECT?

17        MR. MATHESON:  I DO, YOUR HONOR.

18    (PAUSE IN PROCEEDINGS.)

19        MR. MATHESON:  WITH YOUR HONOR'S PERMISSION?

20        THE COURT:  GO AHEAD.  IT'S STILL 4:02.

21                    **REDIRECT EXAMINATION**

22   BY MR. MATHESON:

23   Q.   YOU MENTIONED THAT BCG WAS BROUGHT ON LATE IN THE

24   PROJECT PHOENIX PROCESS; IS THAT CORRECT?

25   A.   CORRECT.

1    Q.   WOULD YOU TURN YOUR ATTENTION, SIR, TO TAB 4 IN YOUR

2    BINDER, WHICH IS CX 5419.

3    A.   YES.

4    Q.   CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL YOU WROTE TO

5    EXECUTIVES AT QUALCOMM, INCLUDING THE CEO, STEVE MOLLENKOPF, ON

6    NOVEMBER 5TH, 2015?

7    A.   YES.

8            MR. MATHESON:  YOUR HONOR, I MOVE TO ADMIT CX 5419.

9            THE COURT:  ANY OBJECTION?

10           MS. SESSIONS:  NO, YOUR HONOR.

11           THE COURT:  IT'S ADMITTED.

12       (PLAINTIFF'S EXHIBIT CX 5419 WAS ADMITTED IN EVIDENCE.)

13   BY MR. MATHESON:

14   Q.   TURN YOUR ATTENTION TO THE BOTTOM OF THE E-MAIL YOU WROTE

15   TO MR. MOLLENKOPF AND OTHERS ON NOVEMBER 5TH, 2015.  YOU WROTE,

16   QUOTE, WE DO NOT PLAN TO HAVE BCG PRESENT THEIR SLIDES AT THE

17   MEETING, IN THE INTEREST OF TIME.  WE CAN HIT THE HIGHLIGHTS.

18   THEIR ANALYSIS AND CONCLUSIONS ARE IN LINE WITH MANAGEMENT'S

19   ASSESSMENT.

20           NOW, THEIR ANALYSIS AND CONCLUSIONS MEANS BCG'S ANALYSIS

21   AND CONCLUSIONS, RIGHT, SIR?

22   A.   THEIR GENERAL CONCLUSION THAT WE SHOULD NOT SEPARATE THE

23   LICENSING AND CHIP BUSINESS.

24   Q.   WELL, AND ALSO THEIR ANALYSIS, SIR?  YOU WROTE THEIR

25   ANALYSIS AND CONCLUSIONS.  YOU MEANT BCG'S ANALYSIS AND BCG'S

1    CONCLUSIONS, RIGHT, SIR?

2    A.   THAT LED TO THE GEM CONCLUSION OF NOT SEPARATING THE CHIP

3    AND LICENSING BUSINESS.

4    Q.   THANK YOU.

5         COULD YOU TURN YOUR ATTENTION, SIR, TO CX 7251, WHICH IS

6    TAB 9 OF YOUR BINDER, PAGE 006.

7         AND AGAIN, SIR, THESE ARE THE TALKING POINTS PREPARED FOR

8    THE PUBLIC ANNOUNCEMENT OF THE RESOLUTION OF PROJECT PHOENIX ON

9    DECEMBER 15TH, 2015; CORRECT?

10   A.   CORRECT.

11   Q.   AND THESE WERE PREPARED TO ADDRESS QUESTIONS FROM

12   INVESTORS AND OTHERS?

13   A.   I BELIEVE SO, YES.

14   Q.   TURN YOUR ATTENTION TO 006 -- OH, SORRY.  YEAH.  SORRY

15   ABOUT THAT.  WRONG PAGE.

16        TURNING YOUR ATTENTION TO PAGE -- YEAH, 006, ARABIC

17   NUMERAL 7, HOW CAN WE BE SURE THAT PROCESS WAS ROBUST?  DO YOU

18   SEE THAT, SIR?

19   A.   YES.

20   Q.   THE FINAL BULLET READS, WE HAD A LOT OF EXTERNAL ADVICE ON

21   ALL THESE TOPICS, AND THE FIRST BULLET IS THE BOSTON CONSULTING

22   GROUP.

23        NOW, QUALCOMM'S MANAGEMENT TOLD INVESTORS THAT ONE REASON

24   INVESTORS COULD HAVE CONFIDENCE IN THE OUTCOME OF

25   PROJECT PHOENIX WAS ADVICE FROM THE BOSTON CONSULTING GROUP;

1    ISN'T THAT RIGHT?

2    A.   THEY PROVIDED A SECOND OPINION TO THE COMMITTEE.

3    MANAGEMENT'S OPINION WAS PROVIDED BEFORE THAT.

4    Q.   AND THAT'S ONE REASON THAT THE BOARD OF DIRECTORS AND THE

5    MANAGEMENT OF QUALCOMM TOLD INVESTORS THEY COULD HAVE

6    CONFIDENCE IN THE OUTCOME OF PROJECT PHOENIX, ONE COMPONENT OF

7    THAT WAS THE ADVICE PROVIDED BY THE BOSTON CONSULTING GROUP.

8    FAIR?

9    A.   A SECOND OPINION.

10   Q.   YOU MENTIONED COMPLIANCE AS AN ISSUE OF OEM'S ABIDING BY

11   THE TERMS OF THE AGREEMENTS THEY HAD SIGNED WITH QTL; RIGHT?

12   A.   YES.

13   Q.   THAT'S ONE COMPONENT OF COMPLIANCE?

14   A.   THAT'S COMPLIANCE.

15   Q.   YOU'VE ALSO PREVIOUSLY CHARACTERIZED COMPLIANCE AS

16   INCLUDING PEOPLE NOT SIGNING UP TO LICENSES; ISN'T THAT RIGHT?

17   A.   MAY BE RELATED TO THE CHINA SITUATION COMING OFF THE BACK

18   END OF THE NDRC.

19   Q.   SO IT'S FAIR TO SAY THAT ONE COMPONENT OF COMPLIANCE IS

20   OEM'S NOT SIGNING UP TO LICENSES WITH QTL; RIGHT?

21   A.   THE MAIN COMPONENT IS NOT COMPLYING WITH AGREEMENTS.

22   Q.   MY QUESTION WASN'T ABOUT THE RELATIVE SIZE OF THE

23   COMPONENTS, SIR.  MY QUESTION WAS, ONE COMPONENT OF COMPLIANCE,

24   AS YOU USE THAT TERM IS OEM'S REFUSING TO SIGN UP TO LICENSE

25   AGREEMENTS WITH QTL.  FAIR?

1     A.   MIGHT NOT HAVE BEEN THE BEST USE OF WORDS.  COMPLIANCE IN

2     GENERAL, WHEN WE TALK ABOUT COMPLIANCE IN QTL, IT IS COMPLIANCE

3     WITH EXISTING AGREEMENTS.

4     Q.   OKAY.  BUT ONE COMPONENT, SIR, OF COMPLIANCE, AS YOU USED

5     THAT TERM IN THE PAST, IS OEM'S NOT SIGNING UP TO LICENSES;

6     RIGHT?

7     A.   I DON'T KNOW WHAT YOU'RE REFERRING TO THERE, BUT --

8     Q.   I'M NOT REFERRING TO ANYTHING, SIR.

9     A.   GENERALLY IT'S COMPLIANCE WITH THE EXISTING AGREEMENTS.

10    Q.   OKAY.  I DIDN'T ASK YOU WHAT IT WAS GENERAL.  I'M NOT

11    REFERRING TO ANYTHING.

12         SITTING HERE TODAY, SIR, IT'S FAIR TO SAY THAT YOU

13    PERSONALLY HAVE SAID THAT ONE COMPONENT OF COMPLIANCE IS OEM'S

14    NOT SIGNING UP TO LICENSES; RIGHT?

15    A.   I DON'T KNOW IF I SAID THAT OR NOT.  IF IT'S IN HERE, WE

16    CAN LOOK AT IT.  BUT YEAH.

17    Q.   I'M SORRY, SIR.  I DIDN'T CATCH YOUR ANSWER.  IS IT A FAIR

18    STATEMENT THAT ONE COMPONENT OF COMPLIANCE IS OEM'S NOT SIGNING

19    LICENSES WITH QTL?

20    A.   COMPLIANCE IS GENERALLY REFERRED TO AND CONSIDERED AS

21    WHETHER PEOPLE ARE COMPLYING WITH THE EXISTING AGREEMENTS.

22    Q.   TURNING YOUR ATTENTION, SIR, TO YOUR DEPOSITION

23    TRANSCRIPT, PAGE 410, LINES 22 TO 23, SIR.

24    A.   UM-HUM.

25    Q.   CAN YOU REFRESH YOUR RECOLLECTION REGARDING HOW YOU HAVE

```
 1    USED THE TERM COMPLIANCE ISSUES IN THE PAST?

 2    A.   SORRY.  WHICH LINES?

 3    Q.   LINES 22 AND 23, PAGE 410 OF YOUR DEPOSITION.

 4         (PAUSE IN PROCEEDINGS.)

 5    BY MR. MATHESON:

 6    Q.   IT'S A TRUE STATEMENT, SIR, THAT YOU HAVE -- THAT YOU

 7    CHARACTERIZED AT YOUR DEPOSITION AS A COMPLIANCE ISSUE, PEOPLE

 8    NOT SIGNING UP TO LICENSES?  IS THAT FAIR?

 9    A.   YEAH, THAT'S IN THERE, YES.

10         MR. MATHESON:  THANK YOU, SIR.  NO FURTHER QUESTIONS.

11         THE COURT:  ALL RIGHT.  THE TIME IS 4:08.  IS THERE

12    ANY FURTHER CROSS?

13         MS. SESSIONS:  YES, YOUR HONOR, JUST BRIEFLY.

14         THE COURT:  OKAY.  GO AHEAD, PLEASE.

15                        RECROSS-EXAMINATION

16    BY MS. SESSIONS:

17    Q.   MR. WISE, IN THE COLLOQUY YOU JUST HAD WITH COUNSEL FOR

18    THE FTC, THE FULL SENTENCE OF YOUR DEPOSITION -- DO YOU STILL

19    HAVE YOUR DEPOSITION TESTIMONY THERE?

20    A.   OH.  4?

21    Q.   PAGE 410 OF YOUR DEPOSITION.

22         MR. MATHESON:  OBJECTION, YOUR HONOR.  IS THIS

23    REFRESHING RECOLLECTION OR READING DEPOSITION?

24         MS. SESSIONS:  WELL, THERE WAS PURPORTED IMPEACHMENT

25    OF THE WITNESS AND -- WITH AN INCOMPLETE PORTION OF HIS
```

```
 1        DEPOSITION TESTIMONY.  SO I'M GOING TO ATTEMPT TO --

 2              THE COURT:  THAT'S FINE.

 3              MR. VAN NEST:  -- HAVE THE WITNESS EXPLAIN HIS

 4        TESTIMONY.

 5              THE COURT:  SIT DOWN, PLEASE.

 6           GO AHEAD, PLEASE.

 7        BY MS. SESSIONS:

 8        Q.  SO THE FULL SENTENCE THAT COUNSEL FOR THE FTC DID NOT READ

 9        WAS YOU COULD SEE, I THINK YOU COULD AT TIMES SEE COMPLIANCE

10        AND COMPLIANCE ISSUES IN TERMS OF PEOPLE NOT SIGNING UP TO

11        LICENSES, LIKE THE LOW END IN CHINA.

12           WHAT WERE YOU REFERRING TO WHEN YOU MADE THIS STATEMENT?

13        A.  SO IN CHINA, I BELIEVE THIS IS REFERRING TO AFTER THE NDRC

14        RESOLUTION AND AGREEMENT ON LICENSING TERMS WITH THE NDRC,

15        THERE WERE MANY, AT THE TIME, LITERALLY HUNDREDS OF NEW HANDSET

16        OEM'S IN CHINA, MANY SERVING THE LOW END OF THE DOMESTIC CHINA

17        MARKET WHO HAD NOT SIGNED UP TO LICENSE AGREEMENTS UNDER THE

18        TERMS AGREED TO BY NDRC.

19              MS. SESSIONS:  THANK YOU, MR. WISE.

20           NO FURTHER QUESTIONS.

21              THE COURT:  OKAY.  THE TIME IS 4:10.

22           IS THERE ANY FURTHER REDIRECT?  OR RE-REDIRECT, I SHOULD

23        SAY?

24              MR. MATHESON:  NO, YOUR HONOR.  THANK YOU.

25              THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED?  AND
```

1    I FAILED TO ASK -- WELL, FIRST LET'S ASK FOR MR. WISE, IS HE

2    SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

3              MR. MATHESON:  NOT FOR US, YOUR HONOR.

4              MS. SESSIONS:  WE ARE NOT GOING TO RECALL HIM, YOUR

5    HONOR.

6              THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

7    TESTIMONY AND YOU'RE FREE TO LEAVE.

8         DID I ASK AS TO THE THREE DEPOSITION WITNESSES?  ARE THEY

9    SUBJECT TO RECALL, OR NOT?

10             MR. MATHESON:  YOUR HONOR, WE WILL NOT CALL THEM AS

11   WE HAVE ALREADY CALLED THEM.

12        I BELIEVE IT'S QUALCOMM'S POSITION THAT THEY RESERVE THE

13   RIGHT TO DO SO.

14             MR. VAN NEST:  THAT'S RIGHT, YOUR HONOR.

15             THE COURT:  SO THOSE ARE ALL SUBJECT TO RECALL.

16             MR. VAN NEST:  SUBJECT TO RECALL AND/OR COUNTERS FROM

17   THEIR DEPOSITION.

18             THE COURT:  ALL RIGHT.  THAT'S FINE.  I'LL JUST MARK

19   IT AS A YES.

20        BUT YOU'RE FREE TO STEP DOWN AND LEAVE, SIR.  YOU'VE

21   COMPLETED YOUR TESTIMONY.

22             THE WITNESS:  THANK YOU.

23             THE COURT:  WHO'S YOUR NEXT WITNESS?  THE VIDEOTAPE,

24   OR DO YOU HAVE A WITNESS?

25             MR. COX:  MAY IT PLEASE THE COURT, MY NAME IS

```
1        KENT COX WITH THE FEDERAL TRADE COMMISSION.

2             OUR NEXT WITNESS IS NANFEN YU, WHO IS SENIOR LEGAL COUNSEL

3    AT HUAWEI.  SHE LIVES AND WORKS IN CHEN CHEN, CHINA, AND WE

4    WILL BE PRESENTING HER TESTIMONY BY VIDEO DEPOSITION.

5             THE COURT:  OKAY.

6             MR. COX:  AND I HAVE TIME TOTALS.

7             THE COURT:  ARE YOU GOING TO MOVE HER EXHIBITS INTO

8    EVIDENCE?

9             MR. COX:  YES, WE WOULD LIKE TO, YOUR HONOR.

10            THE COURT:  OKAY.  FOR THAT I NEED TO CHARGE YOU TIME

11   FOR ADMISSION OF EXHIBITS.  SO --

12            MR. COX:  BY OUR COUNT, THE FTC --

13            THE COURT:  ALL RIGHT.  IT'S 4: --

14            MR. COX:  -- DESIGNATIONS.

15            THE COURT:  OKAY.  GIVE ME ONE MINUTE, PLEASE.  OKAY.

16   TIME IS 4:11.  GO AHEAD WITH YOUR EXHIBITS, PLEASE.

17            MR. COX:  SURE.  MAY I APPROACH, YOUR HONOR?

18            THE COURT:  YES.  WHAT ARE THE NUMBERS?

19            MR. COX:  YES.  I WOULD LIKE TO MOVE INTO EVIDENCE

20   CX 1 -- EXCUSE ME, CX 1000.

21            THE COURT:  OKAY.

22            MR. COX:  CX 1006, CX 1009, CX 1101.

23            THE COURT:  OKAY.

24            MR. COX:  AND JX 0022, JX 0027, JX 0097, AND JX 0098.

25            THE COURT:  ALL RIGHT.  IS THERE ANY OBJECTION TO THE
```

```
 1      ADMISSION OF THESE DOCUMENTS?

 2              MR. BORNSTEIN:  I DIDN'T CATCH ALL OF THE JX'S, YOUR

 3      HONOR.  IF THEY'RE JX'S, WE DON'T HAVE ANY OBJECTION.  WE DON'T

 4      HAVE ANY OBJECTION TO THE CX'S THAT MR. COX IDENTIFIED.

 5              THE COURT:  ALL RIGHT.  I THINK IT'S 22, 27, 97, AND

 6      98 WERE THE FOUR JX'S.

 7              MR. BORNSTEIN:  WE'RE CLEAR, YOUR HONOR.  NO

 8      OBJECTION.

 9              THE COURT:  OKAY.  ALL RIGHT.  THEN THOSE ARE

10      ADMITTED.

11          (PLAINTIFF'S EXHIBITS CX 1000, CX 1006, CX 1009, CX 1101

12      AND JX 0022, JX 0027, JX 0097, AND JX 0098 WERE ADMITTED IN

13      EVIDENCE.)

14              THE COURT:  DO YOU NEED TIME TO SET UP, OR ARE YOU

15      READY TO GO?

16              MR. COX:  ONE MOMENT, YOUR HONOR.  AND LET ME NOTE

17      THAT THE LAST FIVE DOCUMENTS THAT ARE IDENTIFIED WILL BE FILED

18      AND ARE UNDER SEAL, OR ARE UNDER SEAL.

19              THE COURT:  OKAY.  SO THAT'S THE FOUR JX'S AND

20      CX 1101 ARE SEALED.

21              MR. COX:  YES.

22              THE COURT:  OKAY, GREAT.  THOSE ARE ALL SEALED, AND

23      WE'LL TALK ABOUT THE EXHIBIT LIST LATER.

24          OKAY.  THANK YOU.

25          GO AHEAD, PLEASE.
```

```
1           MR. COX:  YOUR HONOR, I HAVE PROVIDED BINDERS TO THE

2    COURT AND TO COUNSEL.

3           THE COURT:  THANK YOU.

4           MR. COX:  AND THESE BINDERS ARE ORGANIZED IN A

5    SIMILAR FASHION TO THE BINDERS THAT WE PROVIDED EARLIER FOR THE

6    VIDEO TESTIMONY THIS MORNING.

7           THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

8        I'M STILL CHARGING YOU TIME.  I'D SUGGEST YOU PLAY THE

9    VIDEO.

10         (THE VIDEOTAPED DEPOSITION OF NANFEN YU WAS PLAYED IN OPEN

11   COURT OFF THE RECORD.)

12          THE COURT:  I'M SORRY TO INTERRUPT, BUT I THINK IT'S

13   4:35, AND WE SHOULD PROBABLY END FOR TODAY.  SO WE CAN RESUME

14   WITH RIGHT HERE ON MONDAY.

15       OKAY.  THANK YOU.

16       ALL RIGHT.  THANK YOU TO EVERYBODY.

17       I HAVE SOME HOUSEKEEPING MATTERS THAT I'D LIKE TO DISCUSS

18   WITH THE PARTIES.

19       SO THE COURT'S HAVE MONEY THROUGH JANUARY 11TH.  I DO NOT

20   KNOW IF THE SHUTDOWN CONTINUES EXACTLY WHAT THE STATUS OF THIS

21   COURT IS GOING TO BE.  I'M ASSUMING WE CAN CONTINUE WITH TRIAL.

22   WE'RE WAITING FURTHER INSTRUCTIONS.  I WILL LET YOU KNOW AS

23   SOON AS I GET ANY FURTHER INFORMATION.

24       SO I APOLOGIZE FOR THAT, FOR THAT UNCERTAINTY.

25          MR. VAN NEST:  DID YOU SAY JANUARY 11TH, YOUR HONOR?
```

1           THE COURT:  JANUARY 11TH IS WHEN THE COURT -- THE

2     COURT HAS FUNDING TO FUND ITSELF THROUGH NEXT FRIDAY.

3           MR. VAN NEST:  OKAY.

4           THE COURT:  A WEEK FROM TODAY.

5        I'M ASSUMING THAT WE WILL BE ABLE TO CONTINUE THIS TRIAL,

6     BUT I -- I DON'T HAVE CONFIRMATION AT THIS POINT.

7           MR. VAN NEST:  OKAY.  THANK YOU.

8           THE COURT:  I THINK WE SHOULD -- AND I REALLY

9     APOLOGIZE, THIS IS VERY EMBARRASSING.

10        BUT I WILL LET YOU KNOW AS SOON AS I KNOW ANYTHING.  I

11    THINK WE SHOULD JUST ASSUME THAT WE'RE GOING TO CONTINUE.

12          MR. VAN NEST:  WE WILL.

13          THE COURT:  OKAY?  ALL RIGHT.

14          MR. VAN NEST:  YES.

15          THE COURT:  ALL RIGHT.  NOW, WHAT ABOUT THE DUE DATE

16    ON THE POST-TRIAL BRIEFS?  I FORGOT TO SET THAT AT THE PRETRIAL

17    CONFERENCE, BUT I THINK WE SHOULD PROBABLY SET A DATE.  WHAT

18    DATE MAKES SENSE?

19          MR. VAN NEST:  I THINK THAT'S FINE.  IS YOUR HONOR

20    CONTEMPLATING SIMULTANEOUS BRIEFING FOLLOWED BY SHORT REPLIES?

21    OR WHAT DID YOU HAVE IN MIND?  WE COULD CERTAINLY DO IT THAT

22    WAY.

23        OR WE COULD OPEN, OPPOSE, AND REPLY.  BUT --

24          THE COURT:  NO.

25          MR. VAN NEST:  IT SEEMS LIKE --

```
 1                    THE COURT:  I MEAN, I DON'T THINK THAT'S NECESSARY.

 2                    MR. VAN NEST:  IF -- IF WE WERE GOING TO DO

 3        SIMULTANEOUS BRIEFS --

 4                    THE COURT:  YES.

 5                    MR. VAN NEST:  -- THEN I WOULD REQUEST THAT WE HAVE

 6        30 DAYS TO DO THAT, AND THEN A SHORTER PERIOD TO DO SHORT

 7        REPLIES TO EACH OTHER, LIKE 15 DAYS.

 8                    MS. MILICI:  YOUR HONOR --

 9                    THE COURT:  NO.  I MEAN, THIS IS IN LIEU OF -- I

10        COULD JUST HAVE YOU DO CLOSING ORAL ARGUMENT.  I MEAN, THAT'S

11        THE OTHER OPTION AS WELL, AND I COULD PUT A TIME LIMIT ON IT.

12            YOU KNOW, THE -- THE FINDINGS OF FACT AND CONCLUSIONS OF

13        LAW QUALCOMM FILED WAS OVER 150 PAGES.  THAT'S IN ADDITION TO

14        THE PRETRIAL BRIEFS.  THAT'S IN ADDITION TO THE JOINT PRETRIAL

15        STATEMENT.  THERE'S BEEN QUITE A BIT THAT'S FILED HERE.  I'M

16        NOT EAGER TO HAVE A WHOLE OTHER SET OF BRIEFING, AND THE LONGER

17        THIS WAITS AFTER THE TRIAL, UNFORTUNATELY, THE EVIDENCE IS

18        GOING TO BE LESS CLEAR BECAUSE WE'RE GOING TO HAVE TO KEEP

19        WORKING ON OUR OTHER CASES.

20                    MR. VAN NEST:  WHAT DID YOU HAVE IN MIND?  MY ONLY

21        THOUGHT IS THAT --

22                    THE COURT:  YEAH.

23                    MR. VAN NEST:  -- WE'LL HAVE A RECORD OF PROBABLY

24        FAIRLY SIGNIFICANT EXTENT WITH MANY EXHIBITS.

25                    THE COURT:  UM-HUM.
```

```
 1                MR. VAN NEST:  AND THE TEAM WILL TAKE A LITTLE TIME

 2    TO GET THEM -- TO GET THEM ORGANIZED.  WE HAVE TO DO IT IN 35

 3    PAGES.  WE KNOW THAT.

 4                MS. MILICI:  YOUR HONOR --

 5                MR. VAN NEST:  I'M THINKING THAT SOMETHING IN THE

 6    BALLPARK OF 30 PAGES IS NOT UNREALISTIC -- EXCUSE ME, 30 DAYS

 7    IS NOT UNREALISTIC.

 8                THE COURT:  WHY DON'T WE JUST DO CLOSING ARGUMENT, DO

 9    THIS LIKE A REAL TRIAL.

10                MS. MILICI:  WE CAN DO CLOSING ARGUMENT.  THE FTC WAS

11    GOING TO COUNTER PROPOSE 14 DAYS FROM THE CLOSE OF TRIAL, BUT

12    WE'RE HAPPY TO DO CLOSING ARGUMENTS IF THE COURT WOULD PREFER.

13    WE'RE HAPPY TO DO 14 DAYS OR SHORTER IF A BRIEF IS WHAT THE

14    COURT WANTS.

15                MR. VAN NEST:  WE CAN DO IT IN 14 DAYS IF THAT'S WHAT

16    THE COURT WISHES.  I'M OPEN EITHER WAY.

17                THE COURT:  OKAY.  I MEAN, THERE'S CERTAINLY BEEN A

18    LOT OF BRIEFING ALREADY, AND I JUST DON'T WANT TO BE BURIED IN

19    FURTHER.

20         I WOULD BE OKAY WITH JUST DOING ORAL ARGUMENT, TOO.

21                MS. MILICI:  THAT'S FINE WITH US.

22                MR. VAN NEST:  I THINK WE'D PREFER TO HAVE A CHANCE

23    TO BRIEF ON THE RECORD, YOUR HONOR.

24                THE COURT:  I'LL HAVE YOU DO ORAL ARGUMENT.

25                MR. VAN NEST:  WOULD WE GET AN ADDITIONAL DAY, THEN,
```

1    FOR THAT?

2              THE COURT:  WELL, I DON'T THINK THAT WE WILL HAVE A

3    FULL DAY ON OUR LAST DAY.  THE WAY I'VE CALCULATED IT IN TERMS

4    OF TIME, I THINK WE'LL ONLY NEED A VERY LITTLE BIT OF TIME FOR

5    EVIDENCE ON THAT VERY LAST DAY.

6              MR. VAN NEST:  I AM NOT SURE THAT'S RIGHT, BUT I'LL

7    CERTAINLY LOOK AT THE NUMBERS.

8              THE COURT:  WELL, OKAY.  YOU KNOW WHAT?  WHY DON'T WE

9    DO THIS.  LET ME THINK ABOUT THIS.

10             MR. VAN NEST:  WE'D LIKE TO THINK ABOUT IT, TOO, YOUR

11   HONOR.  I STILL THINK -- AND I'M VERY FLEXIBLE ON TIMING, BUT I

12   STILL THINK YOUR HONOR SET SOME PAGE LIMITS ON THE BRIEFING, I

13   STILL THINK THAT'S A GOOD IDEA.  I THINK IT'LL HELP FOCUS THE

14   ARGUMENTS THROUGH THE HEARING.

15         AND WE CAN DO IT ON SHORTER NOTICE IF THAT'S BETTER FOR

16   THE COURT.

17             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  LET ME

18   THINK ABOUT THIS FURTHER.

19             MR. VAN NEST:  THANK YOU.

20             THE COURT:  AND WE CAN TALK AGAIN.

21             MR. VAN NEST:  SURE.

22             THE COURT:  OKAY.  SO THAT'S ONE ISSUE THAT WE'LL

23   HAVE TO CONTINUE TO TALK ABOUT.

24         SO I WOULD LIKE US, EVERY DAY -- I DIDN'T KNOW WHICH

25   EXACTLY WITNESSES WERE GOING TO BE CALLED TODAY.  COULD WE

1    HAVE, EVERY DAY, THE DAY BEFORE A TRIAL DAY, YOU FILE A LIST OF

2    WHICH WITNESSES YOU INTEND TO CALL THAT DAY?  CAN WE DO THIS?

3    WHAT TIME, BY WHAT TIME CAN YOU DO IT?

4              MS. MILICI:  YOU'D LIKE IT THE DAY BEFORE?

5              THE COURT:  YES.

6              MS. MILICI:  I THINK THAT WE'RE EXCHANGING LISTS WITH

7    EACH OTHER.  IT'S -- IT'S MORE THAN 48 HOURS BEFORE, SO

8    CERTAINLY WE CAN GIVE IT TO YOU 48 HOURS.

9              THE COURT:  OH, OKAY.  IS YOUR TIME -- OKAY, THAT'S

10   FINE.  THAT'S FINE.  SO YOU'RE NOT SHIFTING, YOU'RE NOT

11   CHANGING.  SO THAT'S FINE.  IF YOU COULD FILE IT 48 HOURS,

12   WHATEVER YOU EXCHANGE WITH EACH OTHER, IF YOU COULD JUST FILE

13   SO WE KNOW, THAT WOULD BE GREAT.

14             MR. VAN NEST:  WE CAN DO THAT.

15             MS. MILICI:  AND IF THE DAY BEFORE GOES LONGER THAN

16   WE EXPECTED, LIKE TODAY WE HAD HOPED TO FINISH ONE MORE VIDEO,

17   WE MIGHT SPILL OVER.

18             THE COURT:  SURE, THAT'S FINE.

19             MS. MILICI:  WE CAN CERTAINLY GIVE YOU THE ORDER THAT

20   WE EXPECT TO CALL.

21             THE COURT:  THAT'S FINE.  IT DOESN'T HAVE TO BE

22   EXACT.  IT JUST HELPS IN TERMS OF ORDER OF PRIORITIZATION OF

23   SEALING AND HIGH PRIORITY OBJECTIONS TO MAKE SURE THAT THAT'S

24   GETTING DONE FIRST.  OKAY.  THAT WOULD BE GREAT.

25         AND I WOULD LIKE, EVERY DAY, FOR YOU TO FILE A JOINT

```
1    EXHIBIT LIST OF EVERYTHING THAT WAS ADMITTED ON THAT DAY OF

2    TRIAL.  NOW, IT'S FRIDAY, SO OBVIOUSLY YOU DON'T HAVE TO DO IT

3    TODAY.  BUT COULD YOU PERHAPS BY MONDAY MORNING FILE A JOINT

4    EXHIBIT LIST THAT LISTS EVERYTHING THAT WAS ADMITTED TODAY, AND

5    IF YOU HAVE A COLUMN THAT ALSO PROVIDES NOTIFICATION OF WHICH

6    ONES ARE SEALED SO WE JUST DON'T GET THAT CONFUSED.

7              MR. VAN NEST:  WE CAN DO THAT.

8              MS. MILICI:  ABSOLUTELY.

9              MR. VAN NEST:  SO EACH DAY WE WOULD GIVE YOU THAT

10   LIST THE NEXT MORNING.

11             THE COURT:  I WOULD PREFER IT -- I'M SAYING, BECAUSE

12   IT'S THE WEEKEND, MONDAY MORNING IS FINE.  I WOULD LIKE IT

13   MONDAY NIGHT, IF YOU DON'T MIND, SO I HAVE IT FOR TUESDAY.

14             MR. VAN NEST:  SOMETIME LATER IN THE EVENING.

15             THE COURT:  IS THAT DOABLE?

16             MR. VAN NEST:  I THINK IT IS.

17             THE COURT:  DO YOU WANT THE NEXT MORNING?  THAT'S

18   FINE.

19             MR. VAN NEST:  THAT WOULD BE A LOT BETTER.

20             THE COURT:  THAT'S FINE.  SO LET'S JUST SAY -- WHAT

21   TIME THE NEXT MORNING?

22             MR. VAN NEST:  8:00 A.M. WOULD BE FINE, YOUR HONOR.

23             THE COURT:  OKAY.  THAT'S FINE.  AND I'D LIKE THAT TO

24   BE JOINT, AND IF YOU HAVE ANY DISPUTES, LET ME KNOW.  I DOUBT

25   THERE WOULD BE, BUT IF THERE ARE ANY, LET ME KNOW.
```

```
 1            OKAY.  SO THAT'S THE JOINT EXHIBIT LIST.  THAT'S THE

 2    WITNESS LIST.

 3            ON THE HIGH PRIORITY OBJECTIONS, IT WOULD BE HELPFUL IF

 4    THERE WAS CLEARER DESIGNATION OF EXACTLY WHAT DEPOSITION

 5    EXCERPTS ARE BEING DISPUTED, BECAUSE YOU KIND OF HAVE TO SORT

 6    OF SEARCH FOR IT IN MANY PARAGRAPHS.  WHEN YOU JUST SORT OF

 7    IDENTIFY EACH OBJECTION, IT WOULD BE CLEAR AS TO EITHER WHICH

 8    EXHIBIT NUMBER OR WHICH PAGE AND LINE NUMBER YOU'RE OBJECTING

 9    TO, THAT WOULD BE HELPFUL.  COULD WE JUST HAVE MORE CLEAR

10    DESIGNATIONS?

11            MR. VAN NEST:  CERTAINLY.

12            MS. MILICI:  ABSOLUTELY, YOUR HONOR.

13            MR. VAN NEST:  CERTAINLY.

14            THE COURT:  OKAY.  THAT WOULD BE GREAT.

15            GO AHEAD AND FILE -- ALL OF THE DEPOSITION EXCERPTS THAT

16    WERE PLAYED TODAY WERE ALL UNSEALED; CORRECT?

17            MS. MILICI:  THAT'S CORRECT.

18            THE COURT:  OKAY.  SO I'D ASK YOU THEN TO JUST GO

19    AHEAD AND FILE THEM ON THE DOCKET.

20            MS. MILICI:  SURE.

21            THE COURT:  IT'LL BE EASIER IF I HAVE TO RETRY THIS

22    TWO OR THREE YEARS FROM NOW TO FIND VARIOUS THINGS IF IT'S ON

23    THE DOCKET.

24            I WOULD ALSO ASK YOU -- LET ME ASK MS. GARCIA, DO YOU

25    THINK WE ALSO NEED TO LODGE A COPY?  OR IS IT OKAY TO ONLY HAVE
```

1    THE ONES THAT ARE UNDER SEAL LODGED?  FOR EXAMPLE, THE

2    BLACKBERRY ONE IS GOING TO HAVE TO BE UNDER SEAL.  WHAT DO YOU

3    THINK?  WOULD IT BE WEIRD TO HAVE TWO SYSTEMS, ONE FOR SEALED

4    AND ONE FOR UNSEALED, OR --

5                THE CLERK:  FOR THE DEPOSITION TRANSCRIPTS?

6                THE COURT:  YES.

7                THE CLERK:  WE CAN LODGE EVERYTHING IF YOU'D LIKE.

8                THE COURT:  YEAH, MAYBE WE SHOULD JUST LODGE

9    EVERYTHING SO THAT, YOU KNOW, IF IN THE FUTURE WE NEED TO FIND

10   SOMETHING.

11        SO IF YOU WOULD PLEASE LODGE A COPY OF ALL THE DEPOSITION

12   EXCERPTS WITH MS. GARCIA, BUT THEN ALSO FILE THE UNSEALED ONES

13   ON THE DOCKET.

14                MS. MILICI:  SURE.

15                THE COURT:  OKAY?  ALL RIGHT.

16                MR. VAN NEST:  SO THE ONES WE LODGE ARE THE ONES THAT

17   HAVE BEEN SEALED.  THE ONES THAT WE FILE ARE THE ONES THAT

18   ARE --

19                THE COURT:  THAT ARE PUBLIC.

20                MR. VAN NEST:  YEAH.

21                THE COURT:  BUT ACTUALLY, I THINK WE'RE ACTUALLY

22   GOING TO HAVE EVERYTHING LODGED JUST SO THAT THE LODGED COPY IS

23   COMPLETE.

24                MR. VAN NEST:  OKAY.

25                THE COURT:  OKAY?  SO LODGE EVERYTHING, BUT FILE ONLY

```
1     PUBLIC VERSIONS.

2               MR. VAN NEST:  OKAY.

3               THE COURT:  OKAY.

4               MS. MILICI:  ABSOLUTELY.

5               THE COURT:  ALL RIGHT.  NOW, YOU'RE GOING TO GIVE ME

6     A LIST OF ALL OF THE LAWYERS WHO ARE PRESENTING DURING TRIAL.

7     WHEN CAN YOU DO THAT?  MONDAY MORNING?

8               MR. VAN NEST:  SURE.

9               THE COURT:  OKAY.  AND IF IT'S TOO COMPLICATED TO DO

10    A JOINT LIST, JUST GIVE ME SEPARATE LISTS, PLEASE.  I JUST WANT

11    TO MAKE SURE I'M GETTING EVERYBODY'S NAME CORRECT.

12              MR. VAN NEST:  THANK YOU.  WE APPRECIATE THAT.

13              MS. MILICI:  SURE.

14              THE COURT:  ALL RIGHT.  IF YOU WOULD FILE THAT,

15    PLEASE, MONDAY BY 8:00.  AND IN CHAMBERS COPIES IF YOU'D PLEASE

16    MAKE IT DOUBLE-SIDED BECAUSE WE'RE GETTING SHORT ON SPACE HERE.

17         I'M TRYING TO THINK IF THERE WAS ANYTHING ELSE.

18         OH, THE GLOSSARY, CAN YOU INCLUDE ACRONYMS LIKE NDRC?

19              MR. VAN NEST:  SURE.

20              THE COURT:  I KNOW THAT HAS SOMETHING RELATING TO --

21    I DON'T KNOW IF THAT'S THE CHINESE GOVERNMENT.

22              MR. VAN NEST:  IT'S THE CHINESE COMPETITION

23    AUTHORITY, YES.

24              THE COURT:  OH, OKAY.

25              MR. VAN NEST:  WE CAN DO THAT.
```

1          THE COURT:  SO THERE WERE SOME ACRONYMS THAT ARE

2     COMING UP THAT I HAVE A SENSE OF WHAT THEY REPRESENT, BUT I

3     DON'T KNOW EXACTLY WHAT THEY ARE.  SO IF YOU CAN INCLUDE THAT

4     IN THE GLOSSARY.

5          MR. VAN NEST:  WE WILL.

6          THE COURT:  AND ANY OTHER ACRONYMS THAT MIGHT COMING

7     UP GOING FORWARD.

8          MR. VAN NEST:  WE WILL.

9          THE COURT:  OKAY.  THANK YOU.

10    AND THEN I WAS GOING TO ASK, AND MAYBE I ALREADY HAVE, BUT

11    I GUESS YOU WILL PROVIDE SOME SENSE OF WHAT ROYALTY RATES ARE

12    PUBLIC IN YOUR SEALING DOCUMENTS.

13    ARE YOU ACTUALLY -- CAN WE HAVE YOU FILE SOMETHING WHEN

14    THE THIRD PARTIES FILE THEIR SEALING REQUESTS THAT GIVES

15    GUIDANCE AS TO WHAT MIGHT ALREADY BE IN THE PUBLIC DOMAIN?

16         MS. MILICI:  SO THE ISSUE FOR THE FTC IS WE DON'T

17    NECESSARILY KNOW WHAT'S IN THE PUBLIC DOMAIN.

18         THE COURT:  UH-HUH.

19         MS. MILICI:  YOU KNOW, WE CAN TRY TO GOOGLE IT AND

20    SEE.

21         THE COURT:  YEAH.

22         MS. MILICI:  BUT WE ARE NOT IN A POSITION TO BE

23    JUDGING WHAT IT IS THAT QUALCOMM HAS PREVIOUSLY MADE PUBLIC OR

24    WHAT IT IS THAT A THIRD PARTY HAS PREVIOUSLY MADE PUBLIC.

25         THE COURT:  I SEE.  THEN WHY ARE YOU OBJECTING TO

```
 1          SOME OF THE THIRD PARTY SEALING REQUESTS THEN?

 2                  MS. MILICI:  I THINK WE'VE BEEN OBJECTING TO SOME OF

 3          THE THIRD PARTY SEALING REQUESTS BECAUSE THEY'VE BEEN BROAD AND

 4          COVERING THINGS BEYOND JUST ROYALTY RATES AND IN SOME INSTANCES

 5          PROBABLY ROYALTY RATES THAT WE DO KNOW ARE PUBLIC.

 6                  THE COURT:  OKAY.

 7                  MR. VAN NEST:  I -- I THINK, YOUR HONOR, THERE'S SORT

 8          OF A BRIGHT LINE IN THIS RESPECT:  THERE ARE SOME PUBLISHED

 9          QUALCOMM PROGRAM RATES.

10                  THE COURT:  OKAY.

11                  MR. VAN NEST:  THOSE ARE PUBLISHED AND EVERYBODY

12          KNOWS WHAT THEY ARE.

13              THEN THERE ARE INDIVIDUAL RATES THAT LICENSEES NEGOTIATE

14          AS, AGAIN, EACH LICENSE MIGHT BE DIFFERENT.

15                  THE COURT:  OKAY.

16                  MR. VAN NEST:  SOMEONE MIGHT WANT TO PAY MORE MONEY

17          UPFRONT, GET A LOWER RATE.  SOMEONE MIGHT WANT TO PAY LESS

18          MONEY UPFRONT.  SOME HAVE MORE VOLUME IN MIND, LESS VOLUME.

19                  THE COURT:  SURE.

20                  MR. VAN NEST:  THERE'S ALL SORTS OF THINGS.  SO I

21          THINK IN GENERAL, INDIVIDUAL RATES AND PAYMENTS, KIND OF LIKE

22          YOU SAID EARLIER TODAY, WHERE AN INDIVIDUAL COMPANY IS PAYING

23          AN INDIVIDUAL RATE THAT THEY HAVE, THAT IS APPROPRIATE TO SEAL.

24                  THE COURT:  OKAY.

25                  MR. VAN NEST:  THE PROGRAM RATES THAT QUALCOMM
```

```
 1        PUBLISHES FOR EVERYBODY --

 2                THE COURT:  OKAY.

 3                MR. VAN NEST:  -- TODAY'S VERSION OF THE 5 PERCENT

 4        RATE THAT I SPOKE ABOUT THIS MORNING.

 5                THE COURT:  OKAY.

 6                MR. VAN NEST:  AND THERE ARE VARIOUS OF THEM FOR

 7        VARIOUS FLAVORS OF LICENSES.

 8                THE COURT:  OKAY.  IS THERE ANY WAY -- BECAUSE IT

 9        WOULD BE HELPFUL, BECAUSE SOMETIMES IN THESE DEPOSITION

10        TRANSCRIPTS THEY'RE KIND OF USING THE 5 PERCENT AS, IT SEEMS

11        LIKE SORT OF LIKE A MARKER.

12                MR. VAN NEST:  RIGHT.

13                THE COURT:  AND IT'S UNCLEAR -- I MEAN, IF I KNEW

14        THAT THAT WAS JUST A PUBLISHED RATE, THAT ANY TIME WHEN THEY'RE

15        KIND OF TALKING ABOUT THAT, THEN I WOULD KNOW, NO, THAT DOESN'T

16        NEED TO BE SEALED.

17                MR. VAN NEST:  I THINK THAT'S FAIR.  THAT'S RIGHT.

18                THE COURT:  ALL RIGHT.

19                MR. VAN NEST:  IF THEY'RE TALKING ABOUT THAT RATE AS

20        A 5 PERCENT RATE, I DON'T THINK YOU NEED TO SEAL THAT.

21                THE COURT:  OKAY.

22                MR. VAN NEST:  IF THEY'RE TALKING ABOUT A

23        PARTICULARLY NEGOTIATED RATE THAT THEY GOT --

24                THE COURT:  SURE.

25                MR. VAN NEST:  -- THAT'S UNIQUE TO THEM, THEN WE
```

1      WOULD AGREE WITH WHAT YOUR HONOR SAID EARLIER TODAY.

2              THE COURT:  YES.  I'LL DEFINITELY SEAL ANYTHING THAT

3      WILL GIVE AWAY THE SALES NUMBERS.

4              MR. VAN NEST:  THE RATE.

5              THE COURT:  REVENUES, PROFITS, RATES, ROYALTY BASE,

6      WE'LL SEAL.

7              MS. MILICI:  BUT I THINK THAT THERE ARE A NUMBER OF

8      CONTRACTS THAT ARE NO LONGER IN EFFECT, WHICH PROBABLY DON'T

9      NEED THE RATES SEALED.

10             THE COURT:  WHICH ONES?  I MEAN, IS THERE ANY WAY

11     THAT YOU CAN -- I DON'T KNOW, PERHAPS FILE SOMETHING.  OR MAYBE

12     YOU DON'T WANT TO FILE IT -- THAT WOULD JUST LET ME KNOW WHAT

13     ARE THE THINGS THAT ARE NO LONGER SEAL WORTHY?  AND IT WOULD

14     JUST HELP FACILITATE --

15             MR. VAN NEST:  MAYBE THE EASIER THING WOULD BE LET'S

16     SEE WHAT THE SEALING REQUESTS ARE COMING UP.

17             THE COURT:  OKAY.

18             MR. VAN NEST:  AND IF WE CAN PROVIDE GUIDANCE TO THE

19     COURT, WE WILL.  IF WE SEE SOMETHING OBVIOUSLY THAT'S A

20     PUBLISHED PROGRAM RATE --

21             THE COURT:  UM-HUM.

22             MR. VAN NEST:  -- WE CAN GIVE YOU NOTICE OF THAT AS

23     SOON AS WE POSSIBLY CAN.

24             THE COURT:  WELL, BUT I STILL HAVE OTHER SEALING

25     REQUESTS OUTSTANDING ON THE PRETRIAL STATEMENT AND OTHER THINGS

1    THAT WERE NOT COMPLETED.  MOST OF THE PRETRIAL CONFERENCE

2    SEALING WAS DONE.

3              MR. VAN NEST:  RIGHT.

4              THE COURT:  BUT WE STILL HAVE SOME STUFF OUTSTANDING,

5    SO IT WOULD BE JUST HELPFUL TO KNOW.

6        UNLESS YOU WANT TO JUST REDO THOSE SEALING REQUESTS IN

7    LINE WITH THE WAY THE RULINGS HAVE BEEN SORT OF MORE REFINED

8    AFTER ONE DAY OF TRIAL.

9              MS. MILICI:  I MEAN, I THINK OUR POSITION IS THAT

10   WE'RE -- WE ARE NOT REQUESTING THAT ANYTHING IS SEALED.  WE

11   ARE, YOU KNOW, THIRD PARTIES AND QUALCOMM ARE REQUESTING THAT

12   THINGS BE SEALED.

13             THE COURT:  UM-HUM.

14             MS. MILICI:  SO WE DON'T HAVE AN INDEPENDENT INTEREST

15   IN KEEPING ANYTHING CONFIDENTIAL.

16             THE COURT:  UM-HUM.

17             MR. VAN NEST:  QUALCOMM HASN'T ACTUALLY REQUESTED

18   MUCH.  I THINK WE'RE IN LINE WITH YOUR HONOR'S APPROACH,

19   THOUGH, EXACTLY AS YOU STATED IT.

20             THE COURT:  UM-HUM.

21             MR. VAN NEST:  AND I THINK IT SHOULD BE APPARENT FROM

22   WHAT PEOPLE FILE.  THEY SHOULDN'T BE FILING ANYTHING REQUESTING

23   SEALING UNLESS IT IS AN INDIVIDUAL RATE FOR THEM OR THEIR

24   PROFITS OR THEIR SALES UNIT AND STUFF LIKE THAT.

25             THE COURT:  YEAH.

```
 1              MR. VAN NEST:  AND THAT'S THE ONLY THING WE WOULD
 2     SEEK TO SEAL ON QUALCOMM'S PART, TOO.
 3              THE COURT:  OKAY.  BUT AS I SAID, LIKE THE PRETRIAL
 4     STATEMENT HAS PAGES AND PAGES THAT ONLY SAY A CERTAIN
 5     AGREEMENT -- A SULA WAS EXECUTED ON JUNE 3RD OF 2013 BETWEEN
 6     THESE TWO COMPANIES, AND THAT'S ALL REDACTED.  SO IT'S
 7     OVERBROAD.
 8              MR. VAN NEST:  OKAY.  THAT'S THIRD PARTIES THAT HAVE
 9     DONE THAT, YEAH.  THAT'S THIRD PARTIES THAT ARE INSISTING ON
10     THAT, NOT QUALCOMM.
11              THE COURT:  OKAY.
12         OKAY.  FINAL REQUEST, AND THAT IS -- AND I APOLOGIZE FOR
13     MAKING THIS REQUEST -- BUT I'M GOING TO NEED SOME CARTS.  THESE
14     ARE, UNFORTUNATELY, THAT'S ALL THE COURT HAD AND THEY DON'T
15     EVEN FIT THE BINDERS VERTICALLY.
16         I'M WONDERING IF THE PARTIES COULD PROVIDE SOME CARTS,
17     BECAUSE I THINK THE NUMBER OF BINDERS IS GOING TO EXPAND
18     BECAUSE YOU HAVE WITNESS BINDERS FOR EVERY WITNESS AND
19     SOMETIMES YOU HAVE SEPARATE DEPOSITION BINDERS FOR EACH
20     WITNESS, NOT INCLUDING WHAT YOU'VE ALREADY GIVEN ME.
21         IS THAT POSSIBLE TO GET PERHAPS ON MONDAY?
22              MS. MILICI:  I'M NOT SURE THAT THE FTC IS CAPABLE OF
23     DOING IT.  WE'RE IN THE SAME SITUATION THE COURT IS ABOUT TO BE
24     IN AND NOT -- BUT I CAN TRY.
25              THE COURT:  OKAY.  WELL, COULD --
```

1          MR. VAN NEST:  HOW MANY DO YOU WANT, YOUR HONOR?  HOW

2     MANY DO YOU WANT?

3          THE COURT:  WELL, THIS IS NOT MY CHAMBERS OR MY

4     COURTROOM, AND IT'S VERY TIGHT UP HERE.  I THINK TWO IS ALL I

5     CAN FIT.

6          MR. VAN NEST:  TWO MORE CARTS, UNLIKE WHAT YOU HAVE.

7          THE COURT:  I'M ACTUALLY GOING TO DO AWAY WITH THESE

8     BECAUSE I CAN'T FIT FOUR BINDERS BECAUSE THEY'RE TOO SHORT.

9          MR. VAN NEST:  WE'LL BE HAPPY TO DO THAT, AND OUR

10    STAFF WITH WORK WITH MS. GARCIA TO GET WHERE YOU WANT THEM.

11         THE COURT:  THANK YOU.  I APOLOGIZE FOR MAKING THIS

12    REQUEST.

13         MR. VAN NEST:  WE'LL BRING THEM WITH US ON MONDAY.

14         THE COURT:  THANK YOU.  THAT WOULD BE MUCH, MUCH

15    APPRECIATED.

16       OKAY.  I DON'T THINK I HAVE ANYTHING ELSE THAT WE NEEDED

17    TO WORK OUT TODAY.  I DO OWE YOU THE HIGH PRIORITY OBJECTION

18    RULINGS.

19       ANYTHING ELSE?  DO YOU ANTICIPATE ANY THIRD PARTY SEALING

20    NEEDING TO BE DONE BEFORE MONDAY MORNING?  ANYTHING NEW?

21         MS. MILICI:  I'M NOT SURE WHAT'S BEEN FILED AND WHAT

22    HASN'T AT THIS TIME.

23         THE COURT:  OKAY.

24       OKAY.

25         MR. VAN NEST:  THANK YOU, YOUR HONOR.

```
 1                    THE COURT:  ALL RIGHT.  THANK YOU.

 2                    MS. MILICI:  YOUR HONOR --

 3                    THE COURT:  THANK YOU ALL VERY MUCH.

 4                    MS. MILICI:  YOUR HONOR, WE JUST HAVE A QUESTION

 5          ABOUT TIME.

 6                    THE COURT:  YES.

 7                    MS. MILICI:  AND WHAT THE TIME IS TODAY.

 8                    THE COURT:  OKAY.  SO LET ME DO THIS.  SO I AM

 9          KEEPING TRACK -- ANY TIME YOU'RE INTRODUCING EVIDENCE FOR

10          ADMISSION, THAT REALLY NEEDS TO COUNT TOWARD YOUR TIME.  SO I'M

11          ACTUALLY KEEPING -- I'M NOT JUST USING -- I'M ACTUALLY NOT

12          USING AT ALL WHAT YOU'RE SAYING THE AMOUNT OF TIME IT TAKES

13          BECAUSE I'M STARTING THE CLOCK WHEN YOU START INTRODUCING

14          EXHIBITS AND JUST COUNTING THE TIME UNTIL THAT DEPOSITION ENDS.

15          THAT'S THE SAME WAY THAT I'M COUNTING TIME FOR LIVE WITNESSES,

16          SO I'M NOT GOING TO DO SOMETHING DIFFERENT AND I'M NOT GOING TO

17          GET INTO SECOND CALCULATIONS.  THAT'S NOT HOW WE DO LIVE

18          WITNESSES SO I'M NOT GOING TO HAVE A DIFFERENT RULE, A SEPARATE

19          RULE FOR DEPO EXCERPTS.  SO I'M COUNTING TIME FROM THE

20          BEGINNING.

21                    AND IT'S SAME FOR QUALCOMM.  I'M NOT GOING TO START DOING

22          45 SECONDS VERSUS 37 SECONDS.  NO.  I MEAN, EVERY WITNESS

23          SHOULD BE THE SAME.  I DON'T DO A SECOND CALCULATION BASED ON

24          LIVE WITNESSES.

25                    MS. MILICI:  SURE.
```

```
 1              THE COURT:  SO I'M JUST GOING TO DO THE TIME -- YOU
 2    KNOW, WHEN THE TIME CLOCK STARTS, WHETHER IT'S 4:52 AND 10
 3    SECONDS OR 57 SECONDS, IT'S 4:52, OKAY?
 4         SO SO FAR TODAY THE FTC HAS USED -- AND YOU CAN TAKE A
 5    SEAT -- 3 HOURS AND 55 MINUTES.
 6         I MEAN, IF YOU WANT A FURTHER BREAKDOWN, IT WAS 66 MINUTES
 7    FOR MR. REIFSCHNEIDER; 62 MINUTES FOR MR. BLUMBERG, AND IT
 8    COUNTED IN GETTING EXHIBITS IN; 36 MINUTES FOR THE JACOBS
 9    VIDEO; MR. WISE WAS 46 MINUTES; AND THIS LAST, MS. YU, THIS
10    LAST WITNESS, WAS 25 MINUTES.
11         SO THAT'S MY CALCULATION.
12         YEAH, SO ALMOST FOUR HOURS.
13         OKAY.  AND FOR QUALCOMM IT'S 34 MINUTES.
14         OKAY.  ANYTHING ELSE?
15              MR. MATHESON:  YOUR HONOR, ON THE VIDEOS, SOME OF
16    WHAT WE PLAYED WAS DESIGNATED BY QUALCOMM AND WE HAD AN
17    AGREEMENT WITH THEM THAT THOSE COMPLETENESS DESIGNATIONS WOULD
18    COUNT AGAINST THEIR TIME.
19              THE COURT:  OH.
20              MS. MILICI:  SO WE DO HAVE A RECORD OF WHAT THOSE
21    ARE, AND WE'RE HAPPY TO GIVE IT TO THE COURT.
22              THE COURT:  ALL RIGHT.  THAT IS -- THAT'S FAIR.
23              MS. MILICI:  OKAY.
24              THE COURT:  BUT THAT WOULD JUST REDUCE IT BY FOUR
25    MINUTES.
```

1          MS. MILICI:  I -- I'M NOT SURE THAT WE GAVE YOU THE

2     NUMBER FOR THE LAST TAPE, BUT THAT ONE IS NOT DONE.  BUT WE'RE

3     HAPPY TO GIVE IT TO YOU IN WRITING.

4          THE COURT:  OH, YOU MEAN FOR MS. YU?  THAT'S RIGHT,

5     YOU HAVEN'T GIVEN IT.

6          MR. VAN NEST:  I SHOW 1 MINUTE ON MR. JACOBS; 1:45 ON

7     MR. BLUMBERG.  I DON'T HAVE THE NUMBER ON MS. YU.

8          THE COURT:  MR. REIFSCHNEIDER WAS 1 MINUTE AS WELL.

9          MR. VAN NEST:  OKAY.

10          THE COURT:  BUT I DON'T HAVE IT FOR MS. YU.  WHAT IS

11     IT FOR MS. YU?

12          MS. MILICI:  I'M NOT SURE.  I'M HEARING THAT IT'S

13     BETWEEN A MINUTE AND TWO MINUTES.  BUT I CAN CHECK.

14          THE COURT:  OKAY.  THAT IT'S 15 MINUTES AND 2

15     MINUTES?

16          MS. MILICI:  NO, BETWEEN ONE AND TWO MINUTES.

17          THE COURT:  OH, I SEE.  OKAY.  SO WHY DON'T YOU -- I

18     WILL MAKE A NOTE THAT ON MONDAY WE NEED TO SUBTRACT THE ONE OR

19     TWO MINUTES FROM MS. YU.

20          THE COURT:  AND YOU'LL LET ME KNOW HOW MUCH TIME IT

21     WAS.  I THINK THE FTC'S COUNSEL WAS TRYING TO TELL ME, AND I

22     MAY HAVE INTERRUPTED HIM SO I APOLOGIZE.  I THINK HE WAS GOING

23     TO TELL ME HOW MUCH IT WAS.

24          MR. COX:  YES, YOUR HONOR.

25          THE COURT:  HOW MUCH IS IT?

1          MR. COX:  A MINUTE AND 35 SECONDS.

2          THE COURT:  ALL RIGHT.  ANYTHING ELSE FOR TODAY?

3          MR. VAN NEST:  NO, YOUR HONOR.  THANK YOU.

4          MS. MILICI:  NO, YOUR HONOR.

5          THE COURT:  NO?  OKAY.  THANK YOU.

6      (THE EVENING RECESS WAS TAKEN AT 4:55 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8      UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9      CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10     HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12     A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13     ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076

17

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  JANUARY 4, 2019

22

23

24

25