1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5

    FEDERAL TRADE COMMISSION,        )  C-17-00220 LHK
6                                    )
                    PLAINTIFF,       )  SAN JOSE, CALIFORNIA
7                                    )
            VS.                      )  JANUARY 7, 2019
8                                    )
    QUALCOMM INCORPORATED, A         )  VOLUME 2
9   DELAWARE CORPORATION,            )
                                     )  PAGES 160-407
10                  DEFENDANT.       )
    _____ )  **SEALED PAGES 368 - 407**
11

12

13                   TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE LUCY H. KOH
14                UNITED STATES DISTRICT JUDGE

15  A P P E A R A N C E S:

16  FOR THE PLAINTIFF:   FEDERAL TRADE COMMISSION
                         BY:  JENNIFER MILICI
17                            DANIEL J. MATHESON
                              WESLEY G. CARSON
18                            KENT COX
                              NATHANIEL M. HOPKIN
19                            PHILIP J. KEHL
                         600 PENNSYLVANIA AVENUE, NW
20                       WASHINGTON, D.C.  20580

21                 APPEARANCES CONTINUED ON NEXT PAGE

22  OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, CRR, RMR
                                CERTIFICATE NUMBER 8074
24
                 PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                               BY:  ROBERT A. VAN NEST
5                                   JUSTINA K. SESSIONS
                                    EUGENE M. PAIGE
6                                   CHRISTINA BLAIS
                                    MATAN SHACHAM
7                                   CODY HARRIS
                                    KRISTIN HUCEK
8                              633 BATTERY STREET
                               SAN FRANCISCO, CALIFORNIA  94111
9

10                             CRAVATH, SWAINE & MOORE
                               BY:  GARY A. BORNSTEIN
11                                  MICHAEL BRENT BYARS
                                    YONATAN EVEN
12                                  JORDAN D. PETERSON
                                    MING-TOY TAYLOR
13                                  DEREK SUTTON
                                    ANDREW HUYNH
14                             825 EIGHTH AVENUE
                               NEW YORK, NEW YORK  10019
15

16     ALSO PRESENT:           MARK SNYDER
                               JEFF DAHM
17                             KEN KOTARSKI

18

19

20

21

22

23

24

25

162

1

2                          INDEX OF WITNESSES

3      PLAINTIFF'S

4      NANFEN YU

5           VIDEOTAPED DEPOSITION                    P. 175

6      STEVEN ALTMAN

7           DIRECT EXAM BY MR. MATHESON              P. 177
            CROSS-EXAM BY MR. BORNSTEIN              P. 210
            REDIRECT EXAM BY MR. MATHESON            P. 242
8
       DEREK ABERLE
9           DIRECT EXAM BY MS. MILICI                P. 248
            CROSS-EXAM BY MR. BORNSTEIN              P. 283
10          REDIRECT EXAM BY MS. MILICI              P. 309

11     JOHN MOYNIHAN
            DIRECT EXAM BY MR. KEHL                  P. 321
12          CROSS-EXAM BY MR. SHACHAM                P. 343
            REDIRECT EXAM BY MR. KEHL                P. 364
13          RECROSS-EXAM BY MR. SHACHAM              P. 381
            FURTHER REDIRECT EXAM BY MR. KEHL        P. 387
14

15

16

17

18

19

20

21

22

23

24

25

1

2                        INDEX OF EXHIBITS

3                                    MARKED      ADMITTED

4        PLAINTIFF'S

5        8206                                    182
         6983                                    184
6        6729                                    186
         8281                                    189
7        7141                                    193
         6987                                    194
8        6979                                    195
         7799                                    196
9        8177                                    197
         7580                                    198
10       6663                                    199
         6992                                    199
11       7886                                    207
         6469                                    249
12       7650                                    251
         6974                                    257
13       6998                                    258
         5231                                    263
14       6658                                    273
         7105                                    276
15       7556                                    279
         3542                                    372
16       3551                                    375
         3264, 3283 & 3255                       391
17
         DEFENDANT'S
18
         9278                                    225
19       9262                                    226
         9210                                    292
20       9212                                    294
         9214                                    301
21       219                                     357

22

23

24

25

```
1                          INDEX OF EXHIBITS

2                                      MARKED      ADMITTED

3        JOINT

4        0003                                      180
         0030                                      191
5        0001                                      215
         0003                                      219
6        0004                                      220
         0005                                      223
7        0006                                      228
         0063                                      254
8        0072                                      256
         0093                                      266
9        0050                                      332
         0051                                      338
10       0094 & 0062                               391

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    SAN JOSE, CALIFORNIA                    JANUARY 7, 2019

 2                    P R O C E E D I N G S

 3        (COURT CONVENED AT 9:04 A.M.)

 4            THE COURT:  GOOD MORNING, WELCOME.

 5            MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

 6            THE CLERK:  PLEASE BE SEATED.

 7            THE COURT:  ALL RIGHT.  LET'S RESUME THE PLAYING OF

 8    THE DEPOSITION OF MS. YU, PLEASE.

 9            MR. VAN NEST:  YOUR HONOR?

10            THE COURT:  YES.

11            MR. VAN NEST:  COULD I ADDRESS THE COURT BRIEFLY ON

12    THE SEALING MOTION?  IT'S NOT RELEVANT TO MS. YU, BUT IT WOULD

13    BE RELEVANT TO --

14            THE COURT:  IT'S COUNTING TOWARDS YOUR TIME.  IT'S

15    9:04.

16        GO AHEAD, PLEASE.

17            MR. VAN NEST:  I JUST WANTED TO EXPLAIN THE FILING

18    LAST EVENING AND SUGGEST TO THE COURT A SIMPLER WAY TO DO THIS.

19        WHAT HAPPENED IS ON THURSDAY NIGHT -- WE FILED WITH THE

20    COURT A JOINT STATEMENT THAT INDICATED WHAT THE SEALING

21    PARAMETERS WERE.  IF IT'S OLDER THAN THREE YEARS, IT'S

22    PRESUMPTIVELY NOT SEALABLE UNLESS IT'S A SPECIFIC LICENSING

23    TERM FOR SOMETHING VERY CONFIDENTIAL.  SO THAT'S BEEN THE

24    PARTIES' PARAMETERS.

25        AND THEN YOU AND I HAD A DISCUSSION FRIDAY WHERE WE GOT A
```

1    LITTLE MORE GUIDANCE ABOUT WHAT YOU FELT WAS SEALABLE AND WHAT

2    WASN'T.

3         ON THURSDAY NIGHT, THE FTC DISCLOSED 103 EXHIBITS FOR

4    TODAY AND WE ASKED THEM TO NARROW THAT, ASSUMING THAT THEY

5    WOULDN'T ACTUALLY USE ALL 103.  THEY DID THAT SATURDAY

6    AFTERNOON, AND I SAID AT THAT TIME TO MY TEAM, I THINK WE

7    SHOULD LET JUDGE JUDGE KOH KNOW WHAT THE BODY IS THAT MIGHT BE

8    INTRODUCED, AND OUT OF AN ABUNDANCE OF CAUTION, FILE A SEALING

9    MOTION ON THE EXHIBITS THAT WE CONSIDER CONFIDENTIAL, AND THERE

10   WERE 35 OF THEM.

11        UNFORTUNATELY, THERE'S A LARGE VOLUME.

12        THE COURT:  IT'S 943 PAGES THAT YOU FILED ON SUNDAY

13   NIGHT --

14        MR. VAN NEST:  THAT'S RIGHT.

15        THE COURT:  -- TO BE USED MONDAY AT TRIAL.

16        MR. VAN NEST:  WE DIDN'T KNOW UNTIL SATURDAY WHAT THE

17   REAL BODY WAS.

18        I DIDN'T WANT TO FILE EARLIER BECAUSE THERE WOULD THEN

19   HAVE BEEN A LOT MORE VOLUME.

20        WHAT I'M SUGGESTING, AND WHAT I'VE SUGGESTED TO THE FTC,

21   CONSISTENT WITH THE GUIDANCE YOU GAVE US FRIDAY, WAS PROCEED

22   WITH THE EXAM, THE EXAMS TODAY.  THEY KNOW WHAT WE CONSIDER

23   CONFIDENTIAL FROM THE JOINT FILING THAT WE MADE.

24        THIS EVENING, AFTER WE KNOW HOW MANY OF THE 88 REMAINING

25   EXHIBITS HAVE BEEN ADMITTED, WE'LL PARE DOWN THE MOTION, FILE

```
 1        IT BASED ONLY ON WHAT WAS ACTUALLY ADMITTED.  I THINK YOU'LL
 2        FIND THAT WE USED THE FILTER THAT YOUR HONOR DISCUSSED WITH ME
 3        FRIDAY TO FILTER THESE OUT.  WE'RE DOWN TO SPECIFIC LICENSING
 4        TERMS AND SALES DATA AS YOU AND I DISCUSSED FRIDAY.
 5             BUT I DO OBJECT, AS I HAVE IN THE PAST, TO THEIR SEEKING
 6        LICENSING TERMS INCONSISTENT WITH OUR JOINT FILING IN OPEN
 7        COURT.
 8             WE DON'T HAVE TO CLOSE THE COURTROOM.  WE HAVE OUR -- WE
 9        HAVE OUR PUBLIC MONITOR WE CAN TURN OFF AND THE WITNESS AND THE
10        COURT WILL HAVE ALL THE RELEVANT INFO.
11             BUT I DIDN'T WANT TO SIMPLY LET THESE DOCUMENTS COME IN
12        AND HAVE TO DO IT ON THE FLY IN THE COURTROOM.  THAT'S WHY I
13        FILED --AND I APOLOGIZE THAT IT WAS SO LENGTHY.
14             WHAT I THINK MAKES A LOT MORE SENSE IS WE'LL LET THEM KNOW
15        WHAT DOCUMENTS WE CONSIDER CONFIDENTIAL AHEAD OF TIME, I THINK
16        THEY KNOW BASED ON WHAT WE'VE SAID.  WE WILL WAIT TO FILE
17        ANYTHING UNTIL WE KNOW WHAT WAS ACTUALLY IN EVIDENCE; NO
18        EXHIBITS WILL BE FILED ON THE PUBLIC RECORD UNTIL YOU'VE HAVE A
19        CHANCE TO LOOK AT THE MOTION, GRANT IT OR DENY IT; AND WE'LL
20        FILE A REDACTED VERSION AS APPROPRIATE.
21             I THINK THAT WILL MAKE THINGS GO A LOT MORE SMOOTHLY.
22             THE COURT:  I DON'T UNDERSTAND WHY THIRD PARTIES ARE
23        ABLE TO FILE THEIR MOTIONS TIMELY.  THEY'RE MAKING FILINGS ON
24        SATURDAY, THEY'RE MAKING THEIR FILINGS ON FRIDAY, AND QUALCOMM,
25        WITH -- HOW MANY LAW FIRMS DO YOU HAVE IN THIS CASE?  FIVE?
```

1    YOU HAVE NORTON, ROSE, FULBRIGHT, RIGHT?  YOU'VE GOT QUINN,

2    EMANUEL; YOU'VE GOT MORGAN, LEWIS & BOCKIUS; YOU'VE GOT KEKER

3    VAN NEST; YOU'VE GOT CRAVATH, SWAINE MOORE.  HOW MANY FIRMS ARE

4    REPRESENTING QUALCOMM?

5         I DON'T UNDERSTAND WHY YOUR FILINGS ARE LATE, HALF AN HOUR

6    LATE ON FRIDAY.  YOU'RE FILING THE WRONG DEPOSITION.  YOU'RE

7    GIVING ME THE TRANSCRIPTS FOR GEORGE DAVIS WHEN THE WITNESS IS

8    MARK DAVIS.

9         I DON'T UNDERSTAND WHAT'S GOING ON, WHY THE THIRD PARTIES

10   CAN GET THEIR FILINGS ON TIME, EVEN THOUGH THEY'RE TRYING TO DO

11   THE BEST WE CAN ON SHORT NOTICE, AND QUALCOMM IS ASKING US TO

12   REVIEW A THOUSAND PAGES ON SUNDAY MIGHT BEFORE MONDAY TRIAL.

13             MR. VAN NEST:  WHAT I --

14             THE COURT:  HOW MANY LAWYERS DO YOU HAVE WORKING ON

15   THIS TRIAL?  HOW MANY?  I WANT THE FULL NUMBER, NOT JUST WHO'S

16   HERE IN COURT.  ARE YOU GUYS AT THE FAIRMONT OR ARE YOU AT THE

17   MARRIOTT?  HOW MANY LAWYERS DO YOU HAVE CHURNING ON THIS CASE?

18        I DON'T UNDERSTAND WHY THIRD PARTIES CAN DO IT AND

19   QUALCOMM CANNOT.

20             MR. VAN NEST:  IT'S A QUESTION OF VOLUME.  THE THIRD

21   PARTIES --

22             THE COURT:  WHAT I DIDN'T APPRECIATE IS YOU FILED

23   THIS ON SUNDAY NIGHT SAYING WE DON'T KNOW REALLY WHICH ONE

24   WE'RE GOING TO USE.  JUST GO AHEAD AND GIVE US A RULING ON

25   ABOUT A THOUSAND PAGES AND THEN WE'LL FIGURE OUT TOMORROW WHICH

1    ONES WE THINK WILL BE INTRODUCED.

2         MR. VAN NEST:  NOT US.  EXCUSE ME, YOUR HONOR.

3    WE DON'T KNOW WHICH ONES THEY'RE GOING TO INTRODUCE.

4    THEY'RE THE ONES THAT FILED, AND WE DIDN'T KNOW UNTIL LATE

5    SATURDAY.

6         THE COURT:  YOU SAID YOU KNEW SATURDAY AFTERNOON.

7    WHAT TIME DID YOU LET THEM KNOW?

8         MS. MILICI:  YOUR HONOR, WE HAD MOVED UP THE H.P.O.

9    BRIEFING PROCESS, SO WE GAVE A THEM BROADER LIST ON THURSDAY

10   NIGHT THAT HAD ABOUT 100 DOCUMENTS.

11        AND I WOULD SAY THESE ARE QUALCOMM'S OWN DOCUMENTS.  THEY

12   HAVE HAD OUR EXHIBIT LIST OF 400 DOCUMENTS NOW FOR QUITE A

13   WHILE.  WE'VE BEEN ASKING THEM SINCE MID-DECEMBER TO PLEASE

14   TELL US WHICH DOCUMENTS THEY WERE GOING TO SEEK TO SEAL FROM

15   THAT UNIVERSE OF 400, THINKING THAT AT LEAST THE SEVERAL WEEKS

16   BEFORE TRIAL WOULD BE ENOUGH TIME TO DO THAT.

17        AND THEN WE IDENTIFIED THE 100, AND THEN AS A MATTER OF

18   COURTESY, WE ARE NARROWED THE LIST FURTHER ON SATURDAY.

19        BUT THEY HAVE KNOWN THAT THERE IS A UNIVERSE OF 400 SINCE

20   MID-DECEMBER, AND THEN A UNIVERSE OF 100 FOR TODAY SINCE

21   THURSDAY, AND THEN IT WAS DROPPED TO LOWER THAN THAT ON

22   SATURDAY AFTERNOON.

23        MR. VAN NEST:  BUT I THINK WE DISCUSSED THIS AT THE

24   PRETRIAL, YOUR HONOR, AND WE ALL AGREED IT DIDN'T MAKE SENSE TO

25   HAVE PEOPLE FILE ON EXHIBITS THAT WERE NEVER GOING TO SEE THE

```
1    LIGHT OF DAY ANYWAY.

2         THE BIG DIFFERENCE BETWEEN US AND THE THIRD PARTIES IS THE

3    THIRD PARTIES ARE GETTING NOTICE OF A VERY LIMITED NUMBER OF

4    DOCUMENTS, AND THE NUMBER OF DOCUMENTS FOR QUALCOMM IS MUCH

5    BIGGER.

6         I APOLOGIZE FOR THE VOLUME, BUT I HONESTLY THINK --

7              THE COURT:  I AM THE ONE WHO'S BEEN WANTING TO LIMIT

8    THE NUMBER OF EXHIBITS FROM THE BEGINNING BECAUSE I KNEW THIS

9    WOULD HAPPEN, THERE WERE GOING TO BE A LOT OF FIGHTS ON THINGS

10   THAT YOU ULTIMATELY WEREN'T GOING TO USE, AND YOU FOUGHT ME

11   TOOTH AND NAIL ABOUT ALL OF THESE LIMITS, TOOTH AND NAIL, AND

12   WE'VE HAD FLEA MARKET NEGOTIATIONS OF THE NUMBERS UP AND DOWN,

13   20 EXHIBITS, 30 EXHIBITS, 50 EXHIBITS.

14        I KNEW THIS WAS GOING TO HAPPEN.  THAT'S WHY I ALWAYS LIKE

15   A MORE NARROWED CASE BECAUSE YOU HAVE A LOT OF FIGHTS ON WHAT I

16   KNOW ULTIMATELY WILL NEVER COME INTO THIS TRIAL.

17        SO I WOULD LOVE IT IF YOU WANT TO LIMIT THE NUMBER OF

18   EXHIBITS FURTHER.  I WOULD SAY LET'S DO IT TODAY.  THEN I DON'T

19   HAVE TO GET FILINGS ON SUNDAY NIGHT ASKING ME TO REVIEW

20   1,000 -- I JUST FILED THE BROADCOM ORDER.

21        I'M JUST REVIEWING THE SAMSUNG ORDER, AND THEN QUALCOMM

22   FILES ITS SAMSUNG OBJECTIONS, OR REQUESTS FOR SEALING, SUNDAY

23   NIGHT AS WELL.  SO I'M ALMOST THROUGH ALL OF THAT.  I'M ON THE

24   LAST DOCUMENT, EXHIBIT 122.  I'M HOPING TO GET THAT DONE DURING

25   THE BREAK OR DURING LUNCH.
```

```
 1              MR. VAN NEST:  WONDERFUL.

 2              THE COURT:  BUT, LIKE, IT'S NOT REASONABLE WHAT

 3    YOU'RE EXPECTING US TO DO.

 4         AND SAMSUNG WAS ABLE TO FILE FRIDAY AND SATURDAY.

 5    BROADCOM FILED SOMETHING RESPONDING TO AN ORDER FILED AT 5:00

 6    O'CLOCK YESTERDAY.  THEY RESPONDED, LIKE, WITHIN AN HOUR.

 7    OKAY?

 8         SO THIRD PARTIES ARE HUSTLING TO GET US THINGS TIMELY, AND

 9    QUALCOMM IS WAITING -- LIKE, WHY COULDN'T YOU -- YOU KNOW,

10    SAMSUNG FILED ON FRIDAY SAYING HERE IS OUR LICENSE WITH

11    QUALCOMM, THIS IS WHAT WE WANT SEALED, THIS IS WHAT WE THINK

12    QUALCOMM MAY WANT TO SEAL.

13         QUALCOMM DOESN'T EVEN FILE ITS REQUEST TO SEAL ITS LICENSE

14    WITH SAMSUNG UNTIL SUNDAY AT LIKE 5:00 OR 6:00 O'CLOCK.  WHY IS

15    THAT HAPPENING?  SAMSUNG FILED ON FRIDAY AND THEY DID YOU THE

16    COURTESY OF SAYING THIS IS NOT WHAT WE WANT TO REDACT, BUT WE

17    THINK QUALCOMM MIGHT WANT TO REDACT THIS, AND THEY WENT AHEAD

18    AND REDACTED.

19         WHY DON'T I GET QUALCOMM'S ORDER BEFORE SUNDAY AT 5:00

20    O'CLOCK.  WHY?

21              MR. VAN NEST:  THE REASON FOR THE SAMSUNG SITUATION,

22    YOUR HONOR, IS THEY DIDN'T UNDERSTAND WHAT WAS ACTUALLY IN THE

23    EXHIBIT.  ALL THEY DID WAS IDENTIFY THE SULA ITSELF.  IF TURNS

24    OUT THERE WERE HUNDREDS OF PAGES OF DOCUMENTS, EXHIBITS,

25    ATTACHED TO THAT THAT THEY DIDN'T REALIZE WERE GOING TO BE MADE
```

```
1    PUBLIC AS PART OF THE EXHIBIT.

2         SO AS SOON AS WE REALIZED THAT --

3              THE COURT:  NO, WAIT A MINUTE.  YOU ALL DIDN'T EVEN

4    GIVE ME QUALCOMM'S VIEW ON THE SULA TERMS UNTIL 5:00 O'CLOCK ON

5    SUNDAY.  WHY IS THAT?  SAMSUNG FILED ON FRIDAY MORNING, OKAY?

6    THIS IS YOUR SULA.  I ASSUME IT'S FAIRLY STANDARD IN MANY

7    RESPECTS.

8         THE EXHIBITS ARE, LIKE, HERE ARE THE PATENT POOLS OF

9    WHAT'S IN ALL THESE STANDARDS FOR PATENTS THAT HAVE ALREADY

10   BEEN ISSUED.  THAT'S EXHIBITS 1 AND 2.  THEN EXHIBITS 3 AND 4,

11   THESE ARE THE POOLS OF PATENTS THAT ARE PENDING.

12        I MEAN, THIS IS PRETTY STANDARD, I WOULD THINK, FOR

13   QUALCOMM WHOM, FOR WHOM LICENSING IS THE BREAD AND BUTTER OF

14   ITS BUSINESS.

15        SO WHY DID I NOT GET QUALCOMM'S SEALING REQUEST UNTIL

16   SUNDAY AT 5:00 O'CLOCK FOR SOMETHING SAMSUNG FILED ON FRIDAY

17   MORNING?

18             MR. VAN NEST:  I BELIEVE THAT IT WASN'T UNTIL LATER

19   IN THE PROCESS ON SATURDAY THAT WE REALIZED THAT THEY HADN'T

20   SOUGHT TO SEAL ANYTHING OTHER THAN THE SULA, AND THERE WERE

21   MANY OTHER ATTACHMENTS.

22        THAT'S WHY WE SAID TO THEM, WE'LL GO AHEAD AND FILE

23   SOMETHING AS SOON AS WE CAN ON EVERYTHING ELSE AND HOPEFULLY

24   YOU CAN JUST JOIN, YOU WON'T HAVE TO DO ANYTHING.

25             SO WE DID THAT TO COVER THE OTHER DOCUMENTS THAT THEY WERE
```

1    NOT AWARE WERE PART OF THE EXHIBIT.  THAT'S WHAT HAPPENED WITH

2    SAMSUNG.

3         THAT'S A SNAFU THAT I DIDN'T REALIZE WAS HAPPENING UNTIL

4    LATE IN THE DAY SATURDAY WHEN WE, WHEN WE UNDERSTOOD FROM

5    SAMSUNG.

6         THEN THEY SAID, WELL, WAIT A MINUTE, WE'VE GOT TO TALK TO

7    KOREA.  THERE WAS SOME BACK AND FORTH FRIDAY NIGHT ABOUT TIME

8    AND SO ON AND SO FORTH.  YOU GAVE MORE TIME, UNTIL SATURDAY AT

9    NOON.

10        WHEN THEY FILED SATURDAY, THEY DIDN'T COVER ALL THE

11   DOCUMENTS IN THE EXHIBIT, AND THAT'S WHEN WE REALIZED WE NEEDED

12   TO FILE SOMETHING BECAUSE IT WAS TOO LATE IN KOREA.

13            THE COURT:  NO, THAT'S NOT TRUE.

14        WHAT THEY FILED ON FRIDAY SAID, HERE IS EVERYTHING THAT WE

15   WANT SEALED.  WE'RE GOING AHEAD AND REDACTING EVERYTHING ELSE

16   THAT WE THINK QUALCOMM MIGHT WANT TO SEAL, BUT THEY NEED TO

17   FILE SOMETHING.

18        SO WHEN WE WERE RULING ON THIS ON SUNDAY AFTERNOON, THERE

19   WAS NO DECLARATION FROM QUALCOMM.  THERE WAS NO MOTION TO SEAL

20   FROM QUALCOMM.

21        SO THAT'S WHY THE ORDER ON SUNDAY AFTERNOON JUST ADDRESSED

22   WHAT SAMSUNG WANTED TO SEAL BECAUSE WE DIDN'T HAVE ANY WORD

23   FROM QUALCOMM AT ALL AS TO ALL OF THE PORTIONS THAT SAMSUNG

24   DESIGNATED AS POTENTIALLY SEALABLE BY QUALCOMM.

25            ANYWAY --

```
 1              MR. VAN NEST:  I APOLOGIZE FOR THAT.
 2              THE COURT:  I AM GOING TO SUBTRACT TIME FROM
 3    QUALCOMM'S TRIAL EVIDENCE, AND I'M GOING TO REVIEW PAGE-BY-PAGE
 4    AND LINE-BY-LINE ANY DOCUMENT THAT HAS NOT YET BEEN SEALED THAT
 5    YOU WANT TO SEAL, AND WE'RE JUST GOING TO DO IT THIS WAY.
 6        OKAY?
 7              MR. VAN NEST:  THANK YOU, YOUR HONOR.  WE'LL FILE A,
 8    A NARROWED FILING THIS EVENING FOLLOWING WHAT GETS ADMITTED IN
 9    COURT TODAY.
10        I WILL ALSO LET THE COURT KNOW --
11              THE COURT:  NO, NO, NO.  WE'RE GOING TO DO THE
12    SEALING IN COURT BECAUSE I NEED TO KNOW WHETHER I NEED TO
13    EXCUSE EVERYBODY AND ASK THEM TO STEP OUTSIDE.
14              MR. VAN NEST:  OKAY.
15              THE COURT:  WE'RE GOING TO DO IT IN COURT AND WE'RE
16    GOING TO DO IT ON TRIAL TIME.  THAT'S THE WAY IT'S GOING TO BE
17    DONE.
18              MR. VAN NEST:  WE'LL BE FILING ALSO TODAY THE
19    STATEMENT YOU ASKED FOR ON FRIDAY ON WHAT LICENSING PROGRAMS
20    ARE PUBLIC AND WHAT ARE NOT.  SO WE'LL TRY TO GET THAT IN
21    SOMETIME DURING THE TRIAL DAY.
22              THE COURT:  ALL RIGHT.  YOU'RE NOT GOING TO HAVE US
23    BE DOING SEALING TONIGHT.  WE'RE GOING TO BE DOING SEALING
24    WHILE YOUR WITNESS IS ON THE WITNESS STAND AND I'LL BE
25    REVIEWING THE DOCUMENTS AND YOU CAN LET ME KNOW WHAT YOU WANT
```

1    SEALED AND I'LL MAKE A RULING BECAUSE I NEED TO KNOW WHETHER I

2    NEED TO EXCUSE EVERYBODY AND ASK THEM TO STEP OUTSIDE.

3               MR. VAN NEST:  THANK YOU, YOUR HONOR.

4               THE COURT:  ALL RIGHT.  TIME IS 9:15.

5               MR. COX:  GOOD MORNING, YOUR HONOR.  KENT COX AGAIN

6    FOR THE FTC.

7         WHEN WE ENDED ON FRIDAY, MS. YU WAS TESTIFYING ABOUT

8    CX 1006.

9         MR. KOTARSKI, WOULD YOU PLEASE PLAY THE VIDEO?

10              THE COURT:  TIME IS 9:15.

11           **(THE VIDEOTAPED DEPOSITION OF NANFEN YU WAS PLAYED IN OPEN**

12    **COURT OFF THE RECORD.)**

13              THE COURT:  WHAT'S THE TIME, PLEASE, MS. SHORTRIDGE?

14              THE REPORTER:  9:42.

15              THE COURT:  9:42?  OKAY.  THANK YOU.

16         OKAY.  WHO'S YOUR NEXT WITNESS?

17              MR. MATHESON:  YOUR HONOR, THE FTC CALLS

18    STEVEN ALTMAN.

19         DAN MATHESON FOR THE FTC, YOUR HONOR.

20              THE COURT:  I DIDN'T SEE THIS MORNING THAT YOU ALL

21    FILED THE JOINT EXHIBIT LIST OR THE LIST OF ATTORNEYS.  IT

22    WASN'T FILED BEFORE I CAME OUT ON THE BENCH.

23              MS. GILLEN:  YOUR HONOR, ELIZABETH GILLEN FOR THE

24    FTC.

25         WE FILED THOSE MATERIALS LAST NIGHT.

```
1              THE COURT:  HMM.

2              MS. GILLEN:  I CAN REFER YOU TO THE DOCKET ENTRIES IN

3      A MINUTE.

4              THE COURT:  LET ME ASK, MAYBE MS. GARCIA CAN PULL

5      THEM UP FOR ME.

6         THANK YOU.

7         NOW, IS MS. YU, IS SHE SUBJECT TO RECALL OR NOT?

8              MR. MATHESON:  NOT FROM THE FTC, YOUR HONOR.

9              MR. VAN NEST:  MS. YU?

10             THE COURT:  YES.

11             MR. VAN NEST:  NO, YOUR HONOR.

12             THE COURT:  OKAY.  SO SHE'S THEN EXCUSED.  OKAY.

13     THANK YOU.

14        OKAY.  PLEASE COME FORWARD.

15             THE CLERK:  PLEASE TAKE A SEAT.

16        PLEASE RAISE YOUR RIGHT HAND.

17        (PLAINTIFF'S WITNESS, STEVEN ALTMAN, WAS SWORN.)

18             THE WITNESS:  YES.

19             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

20        PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

21     THE RECORD.

22             THE WITNESS:  STEVEN RUSSELL ALTMAN.  A-L-T-M-A-N.

23             MR. MATHESON:  MAY I APPROACH THE WITNESS AND HAND

24     HIM A BINDER, YOUR HONOR.

25             THE COURT:  YES.
```

```
 1              AND IS STEVEN SPELLED WITH A V OR WITH A P-H?

 2                   THE WITNESS:  WITH A V, YOUR HONOR.

 3                   THE COURT:  OKAY.  THANK YOU.

 4                   MR. MATHESON:  HERE ARE SOME TRANSCRIPTS AND

 5       DOCUMENTS.

 6              DEPOSITION TRANSCRIPTS FOR THE COURT (HANDING).

 7              THANK YOU VERY MUCH.

 8              (PAUSE IN PROCEEDINGS.)

 9                   MR. MATHESON:  YOUR HONOR, MAY I PROCEED?

10                   THE COURT:  YES.  IS THERE A BINDER OF EXHIBITS?  I

11       ONLY HAVE THE TWO DEPOSITION TRANSCRIPTS.

12                   MR. MATHESON:  MAY I APPROACH, YOUR HONOR?

13                   THE COURT:  YES, PLEASE.

14                   MR. MATHESON:  (HANDING.)

15                   THE COURT:  THANK YOU.

16              OKAY.  TIME IS 9:45.  GO AHEAD, PLEASE.

17                           DIRECT EXAMINATION

18       BY MR. MATHESON:

19       Q.   GOOD MORNING, SIR.

20       A.   GOOD MORNING.

21       Q.   IT'S FAIR TO SAY THAT YOU HAVE BEEN DESCRIBED AS THE

22       ARCHITECT OF QUALCOMM'S LICENSING PROGRAM.

23              IS THAT A FAIR STATEMENT?

24       A.   YEAH, PEOPLE HAVE SAID THAT.  BUT IT WAS A WHOLE TEAM OF

25       PEOPLE THAT I WORKED WITH.
```

1    Q.   TO THE BEST OF YOUR KNOWLEDGE, IT'S FAIR TO DESCRIBE

2    QUALCOMM'S BUSINESS MODEL AS UNIQUE AMONGST MODEM CHIP

3    SUPPLIERS; IS THAT FAIR?

4    A.   I THINK IT'S REASONABLY UNIQUE, YES.

5    Q.   YOU'RE NOT AWARE OF ANY OTHER CHIP SUPPLIERS THAT HAVE A

6    LICENSING PROGRAM LIKE QUALCOMM'S; IS THAT FAIR?

7    A.   OVER -- YOU MEAN PRESENTLY, OR OVER THE COURSE OF MY

8    CAREER?  I MEAN, BECAUSE THERE WERE COMPANIES.

9    Q.   WELL, SIR, DIRECTING YOUR ATTENTION TO THE DEPOSITION

10   TRANSCRIPT, PAGE 336, COULD YOU REFER TO LINES -- DON'T PUT IT

11   UP YET --

12   A.   PAGE WHAT?

13   Q.   PAGE 336, LINES 20 TO 21.  DOES THAT REFRESH YOUR

14   RECOLLECTION THAT AT LEAST AS OF THE TIME OF YOUR DEPOSITION,

15   YOU DID NOT KNOW OF ANY OTHER CHIP SUPPLIERS THAT ALSO HAVE A

16   LICENSING PROGRAM LIKE QUALCOMM'S?

17   A.   I WAS THINKING OF MOTOROLA WHEN YOU ASKED THAT QUESTION,

18   AND IT LOOKS LIKE I WAS THINKING ABOUT MOTOROLA ON THIS PAGE AS

19   WELL.

20   Q.   ALL RIGHT.  I'LL MOVE ON.

21        IT'S CORRECT YOU JOINED QUALCOMM IN 1989; RIGHT?

22   A.   YES.

23   Q.   YOU WERE EMPLOYED BY QUALCOMM UNTIL 2014?

24   A.   YES.

25   Q.   YOU WERE AT ONE POINT PRESIDENT OF THE LICENSING BUSINESS?

ALTMAN DIRECT BY MR. MATHESON

1    A.   THAT'S CORRECT.

2    Q.   AND THEN YOU BECAME PRESIDENT OF THE COMPANY IN

3    APPROXIMATELY 2004; IS THAT RIGHT?

4    A.   I'LL -- I'M BAD WITH DATES, BUT I BECAME PRESIDENT AT SOME

5    POINT.  2004 IS PROBABLY ABOUT RIGHT.

6    Q.   AND IN 2011, YOU BECAME VICE CHAIRMAN?

7    A.   THAT SOUNDS RIGHT AS WELL, YES.

8    Q.   AND WHEN YOU BECAME VICE CHAIRMAN, THE LICENSING DIVISION

9    BEGAN TO REPORT TO MR. DEREK ABERLE; IS THAT RIGHT?

10   A.   IT SEEMS LIKE IT REPORTED TO DEREK BEFORE THAT.  WHEN I

11   WAS PRESIDENT, I THINK THE LICENSING BUSINESS REPORTED TO

12   DEREK, AND THEN DEREK REPORTED TO ME.

13   Q.   WHEN YOU WERE PRESIDENT OF THE COMPANY, SIR, AT YOUR

14   DEPOSITION YOU TESTIFIED THAT THE LICENSING DIVISION REPORTED

15   TO YOU.

16        WAS MR. ABERLE THE PRESIDENT OF THE LICENSING DIVISION AT

17   THAT POINT?

18   A.   I THINK SO.  I THINK SO.  OR IT MIGHT HAVE BEEN

19   MARK BLECKER.

20   Q.   SO AT THE TIME YOU JOINED QUALCOMM, QUALCOMM HAD NOT YET

21   LICENSED ITS CDMA TECHNOLOGY TO OTHERS FOR USE IN CELLULAR

22   COMMUNICATIONS; IS THAT RIGHT?

23   A.   THAT'S CORRECT.

24   Q.   IT'S FAIR TO SAY YOU NEGOTIATED QUALCOMM'S FIRST CDMA

25   RELATED PATENT LICENSES WITH AT&T AND WITH MOTOROLA?

1    A.    YES.

2    Q.    CAN YOU TURN YOUR ATTENTION, SIR, TO THE THIRD TAB OF YOUR

3    BINDER, TAB 3.

4          YOUR HONOR, I MOVE TO ADMIT JX 0003.

5              THE COURT:  ANY OBJECTION?

6              MR. BORNSTEIN:  NO, YOUR HONOR.

7              THE COURT:  IT'S ADMITTED.

8          (JOINT EXHIBIT JX 0003 WAS ADMITTED IN EVIDENCE.)

9              THE COURT:  GO AHEAD, PLEASE.

10   BY MR. MATHESON:

11   Q.    SIR, CAN YOU IDENTIFY THIS AS A PATENT LICENSE AGREEMENT

12   BETWEEN QUALCOMM AND MOTOROLA?

13   A.    YES.

14   Q.    DIRECTING YOUR ATTENTION TO THE FIFTH PAGE OF THE

15   DOCUMENT, SIR, JX 0003-005, THE LETTER B STATES, "THE ROYALTY

16   PAYABLE BY MOTOROLA TO QUALCOMM"; IS THAT FAIR?

17   A.    YES.

18   Q.    AND THE ROYALTY ON SUBSCRIBER UNITS, CHANNEL UNITS, AND

19   DS-CDMA ENABLED INFRASTRUCTURE IS EITHER 0 OR 4 PERCENT,

20   DEPENDING ON OUR TERMS IN THE CONTRACT; IS THAT RIGHT?

21   A.    YES, UNDER THIS AGREEMENT, YES.

22   Q.    AND UNDER THAT IS COMPONENTS, AND THE RATE FOR COMPONENTS

23   IS 0; IS THAT RIGHT?

24   A.    YES.

25   Q.    LET'S MOVE UP THE PAGE A LITTLE BIT.  AT THE TOP OF THE

1     PAGE, THIS STATES THE ROYALTY PAYABLE BY QUALCOMM TO MOTOROLA

2     UNDER THIS AGREEMENT; RIGHT?

3     A.   I'M SORRY.  ARE YOU ON THE NEXT PAGE?

4     Q.   NO, TOP OF THE SAME PAGE, SIR.  JX 0003-0005.  DOES THAT

5     STATE THE ROYALTY PAYABLE BY QUALCOMM TO MOTOROLA UNDER THIS

6     AGREEMENT?

7     A.   OH, YES.

8     Q.   AND QUALCOMM PAYS MOTOROLA, ON SUBSCRIBER UNITS AND

9     CHANNEL UNITS, A ROYALTY OF EITHER 0 OR 2 PERCENT, DEPENDING ON

10    OTHER TERMS IN THE CONTRACT; RIGHT?

11    A.   YES.

12    Q.   AND IT'S A TRUE STATEMENT THAT IN THE 1990S, QUALCOMM SOLD

13    SUBSCRIBER UNITS; RIGHT?

14    A.   IN THE 1990S?

15    Q.   YES.

16    A.   YEAH, I THINK SO, DURING THAT TIME.

17    Q.   AND QUALCOMM ALSO HAD AN INFRASTRUCTURE BUSINESS IN THE

18    1990S; RIGHT?

19    A.   YES.

20    Q.   CAN YOU TURN, SIR, TO -- AND THERE'S ALSO COMPONENTS UNDER

21    QUALCOMM, DO YOU SEE THAT, AND THE ROYALTY THAT QUALCOMM PAYS

22    MOTOROLA ON COMPONENTS IS 0; CORRECT?

23    A.   YES.

24    Q.   JUST LIKE THE ROYALTY MOTOROLA PAYS QUALCOMM ON

25    COMPONENTS?

1      A.   YES.

2      Q.   WOULD YOU TURN, SIR, TO PAGE JX 0003-014?

3           THIS IS THE TECHNICAL DEFINITION SECTION AS IT SAYS ON THE

4      PREVIOUS PAGE.

5           THE FIRST THREE WORDS ON THIS PAGE ARE "COMPONENTS MEANS

6      ASICS"; RIGHT?

7      A.   YES.

8      Q.   IT'S A TRUE STATEMENT THAT IN 1990, QUALCOMM GAVE MOTOROLA

9      A LICENSE TO MAKE CDMA COMPLIANT ASICS; ISN'T THAT RIGHT?

10     ISN'T THAT RIGHT?

11     A.   YES.

12     Q.   IF YOU TURN, SIR, TO TAB 5 IN YOUR BINDER.  CAN YOU

13     IDENTIFY THIS, SIR, AS AN E-MAIL THAT YOU SENT IRWIN JACOBS AND

14     ANOTHER QUALCOMM EXECUTIVE IN 1998?

15     A.   YES.

16               MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 8206.

17               MR. BORNSTEIN:  THERE'S NO OBJECTION, YOUR HONOR.

18               THE COURT:  IT'S ADMITTED.

19          (PLAINTIFF'S EXHIBIT CX 8206 WAS ADMITTED IN EVIDENCE.)

20               THE COURT:  GO AHEAD, PLEASE.

21     BY MR. MATHESON:

22     Q.   YOU FORWARDED TO MR. JACOBS AN E-MAIL SENT TO YOU BY

23     MR. BLECKER; IS THAT RIGHT?

24     A.   YEP.

25     Q.   MR. BLECKER'S E-MAIL TO YOU ADDRESSES THE POSSIBILITY OF

1    REDUCING ROYALTIES ON CERTAIN QUALCOMM ASIC SALES; RIGHT?

2    A.   CAN I READ IT REAL QUICK?

3    Q.   PLEASE, SIR.

4         (PAUSE IN PROCEEDINGS.)

5              THE WITNESS:  OKAY.

6    BY MR. MATHESON:

7    Q.   AND IT STATES IN THE SECOND PARAGRAPH, "BASICALLY BY

8    REDUCING ROYALTY, WE ARE DOING NOTHING MORE THAN COMPETING ON

9    PRICE WITH OUR ASIC COMPETITORS, THAT IS, IF THE REDUCED OR

10   ZERO ROYALTY IS THE INCENTIVE TO BUY Q ASICS, THEN THE SAME

11   EFFECT CAN BE ACHIEVED BY SIMPLY REDUCING PRICE ON OUR ASICS BY

12   THAT SAME AMOUNT."

13        DO YOU SEE THAT, SIR?

14   A.   YES.

15   Q.   NOW, DID YOU NOT AGREE, AND YOU WROTE TO MR. JACOBS, "HIS

16   ARGUMENT IS NOT ENTIRELY TRUE GIVEN THAT WE SHARE ROYALTIES,

17   BUT DO NOT SHARE ASIC PROFIT."

18        NOW, WHAT YOU MEANT THERE IS YOU SHARE ROYALTIES WITH

19   MOTOROLA UNDER THE TERMS OF THE 1990 AGREEMENT; IS THAT RIGHT?

20   A.   I BELIEVE THAT'S WHAT I MEANT.

21        ALSO WITH AT&T.

22   Q.   I WAS GOING TO ASK THAT QUESTION NEXT.  IT'S ALSO TRUE

23   THAT THE INITIAL CDMA AGREEMENT WITH AT&T PROVIDED THAT

24   QUALCOMM SHARED THE ROYALTIES IT COLLECTED FROM OTHER LICENSEES

25   WITH AT&T; RIGHT?

ALTMAN DIRECT BY MR. MATHESON

1    A.   THAT'S TRUE.

2    Q.   TURN TO THE NEXT TAB IN YOUR BINDER, SIR, CX 6983.  IT'S

3    TAB 6 IN YOUR BINDER.

4    A.   CAN I -- ONE CAVEAT TO THAT LAST ONE.

5         I DON'T KNOW FROM A TIMING STANDPOINT BECAUSE WE, WE

6    NEGOTIATED WITH AT&T AND GOT A LIMITED ROYALTY SHARE.  I DON'T

7    KNOW IF IT WAS AFTER THIS OR BEFORE THIS.  SO --

8    Q.   THANK YOU, SIR.

9         NEXT TAB IN YOUR BINDER IS TAB 6, CX 6983.  CAN YOU

10   IDENTIFY THIS AS AN E-MAIL THAT YOU FORWARDED TO

11   MR. DEREK ABERLE IN 2004?

12   A.   YES.

13           MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6983.

14           MR. BORNSTEIN:  NO OBJECTION, YOUR HONOR.

15           THE COURT:  IT'S ADMITTED.

16       (PLAINTIFF'S EXHIBIT CX 6983 WAS ADMITTED IN EVIDENCE.)

17           THE COURT:  GO AHEAD, PLEASE.

18   BY MR. MATHESON:

19   Q.   TURNING TO THE SECOND PAGE OF THE DOCUMENT, ARABIC NUMERAL

20   3 -- STRIKE THAT.

21        YOU FORWARDED TO MR. ABERLE AN E-MAIL THAT YOU HAD WRITTEN

22   TO MR. KEITH BAIN OF MOTOROLA; IS THAT RIGHT?

23   A.   YES.

24   Q.   OKAY.  TURNING TO THE SECOND PAGE OF THE DOCUMENT, ARABIC

25   NUMERAL 3 BEGINS "ROYALTY SHARING IN ANY CASE ENDS IN SEPTEMBER

1    2005."

2         DO YOU SEE THAT, SIR?

3    A.   YES.

4    Q.   SO YOU TOLD MOTOROLA -- OR IT'S A TRUE STATEMENT THAT THE

5    ROYALTY SHARING AGREED TO BETWEEN QUALCOMM AND MOTOROLA LASTED

6    FROM 1990 UNTIL 2005 UNDER THE TERMS OF THE ORIGINAL CDMA

7    LICENSE THAT YOU NEGOTIATED WITH MOTOROLA; IS THAT RIGHT?

8    A.   MY RECOLLECTION IS THAT IT, IT -- THAT IS WHEN IT ENDED.

9    I'M JUST -- I DON'T REMEMBER --

10   Q.   THANK YOU, SIR.

11   A.   -- TERMINATED IT EARLIER OR NOT, BUT I DON'T THINK SO.

12   Q.   NOW, STEPPING BACK FOR A MINUTE, DURING YOUR TIME AT

13   QUALCOMM, IT'S FAIR TO SAY THAT QUALCOMM'S POLICY WAS TO NOT

14   PROVIDE CHIPSETS TO NON-LICENSEES; RIGHT?

15   A.   YES.

16   Q.   AND IT'S FAIR TO SAY ON SOME OCCASIONS QUALCOMM REMINDED

17   ITS LICENSEES THAT IF THEY DIDN'T ABIDE BY THEIR LICENSING

18   AGREEMENTS, THERE WAS A RISK THAT THEIR CHIPSET SUPPLY WOULD BE

19   IMPACTED; RIGHT?

20   A.   YES.

21   Q.   WOULD YOU PLEASE TURN TO THE NEXT TAB IN YOUR BINDER, SIR,

22   TAB 7.  THIS IS CX 6729.

23        CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL THAT YOU WERE

24   COPIED ON, SENT BY MR. IRWIN MARK JACOBS TO A SAMSUNG EXECUTIVE

25   IN 2001?

1           THE WITNESS:  YES.

2           MR. MATHESON:  MOVE TO ADMIT, YOUR HONOR, CX 6729.

3           MR. BORNSTEIN:  NO OBJECTION.

4           THE COURT:  IT'S ADMITTED.

5       (PLAINTIFF'S EXHIBIT CX 6729 WAS ADMITTED.)

6           THE COURT:  GO AHEAD, PLEASE.

7    BY MR. MATHESON:

8    Q.   NOW, MR. JACOBS WROTE THIS LETTER, OR E-MAIL, TO SAMSUNG

9    IN THE CONTEXT OF A LICENSING DISPUTE BETWEEN QUALCOMM AND

10   SAMSUNG; RIGHT?

11   A.   YES.

12   Q.   COULD YOU TAKE A LOOK AT THE THIRD PARAGRAPH THAT BEGINS,

13   "HOWEVER, IT HAS BEEN BROUGHT TO MY ATTENTION THAT OUR AUDITORS

14   DISCOVERED THAT SAMSUNG HAS PURPOSEFULLY NOT REPORTED ROYALTIES

15   PAYABLE UNDER OUR AGREEMENT FOR SAMSUNG'S SALES OF CDMA 2000 1X

16   INFRASTRUCTURE AND SUBSCRIBER EQUIPMENT DURING THE FIRST

17   CALENDAR QUARTER OF 2001.  APPARENTLY SAMSUNG IS TAKING THE

18   POSITION THAT 1X IS NOT PART OF SAMSUNG'S EXISTING LICENSE

19   AGREEMENT."

20        DO YOU SEE THAT, SIR?

21   A.   YES.

22   Q.   NOW, CDMA 1X -- CDMA 2000 1X IS A 3G STANDARD; IS THAT

23   RIGHT, SIR?

24   A.   YES, I BELIEVE IT WAS CONSIDERED 3G.

25   Q.   NOW, SAMSUNG TOOK THE POSITION THAT ITS EXISTING CDMA

ALTMAN DIRECT BY MR. MATHESON

1     LICENSE AGREEMENT DID NOT APPLY TO ITS SALES OF 3G

2     INFRASTRUCTURE AND SUBSCRIBER EQUIPMENT; RIGHT?

3     A.   THAT'S WHAT I THINK THIS IS SAYING, YES.

4     Q.   CAN YOU TURN TO THE NEXT PAGE OF THE DOCUMENT, SIR.  THE

5     FIRST PARAGRAPH ON THIS PAGE, THE LAST TWO SENTENCES READ,

6     "THUS, IF SAMSUNG PERSISTS IN TAKING THE POSITION THAT ITS

7     LICENSE AGREEMENT DOES NOT COVER 1X AND DOES PAY QUALCOMM THE

8     1X ROYALTIES DUE UNDER THE AGREEMENT, WE WILL HAVE NO CHOICE

9     BUT TO TAKE ALL ACTION NECESSARY TO ENFORCE THE TERMS OF OUR

10    LICENSE AGREEMENT, INCLUDING POSSIBLE TERMINATION.  UNDER OUR

11    AGREEMENTS, WE DO NOT SHIP ASICS TO NON-LICENSEES OR TO

12    LICENSEES WHO ARE NOT PERFORMING THEIR OBLIGATIONS."

13         NOW, IN THAT CONTEXT, 1X MEANS CDMA 2000 3G; CORRECT?

14    A.   YEAH.  I MEAN, CDMA 2000 1X, YEAH.

15    Q.   SO, MR. JACOBS, IN EFFECT, TOLD SAMSUNG, YOU HAVE TO AGREE

16    THAT THE EXISTING LICENSE COVERS BOTH 2G AND 3G OR ELSE

17    QUALCOMM WOULD TAKE ALL ACTION NECESSARY, INCLUDING POSSIBLE

18    TERMINATION OF THE LICENSE; RIGHT?

19    A.   THE AGREEMENT COVERS CDMA, AND THEY WERE TAKING THE

20    POSITION THAT THEY WEREN'T GOING TO PAY ROYALTIES FOR A NEW

21    REVISION OF CDMA.

22    Q.   WHEN YOU SAY "NEW REVISION OF," MY QUESTION, SIR, IS

23    SAMSUNG TOOK THE POSITION THEIR EXISTING LICENSE DID NOT COVER

24    3G CDMA; IS THAT CORRECT?

25    A.   WELL, THEY STOPPED -- YEAH, THEY STOPPED REPORTING

1      ROYALTIES AND REFUSED TO PAY.

2      Q.   AND MR. JACOBS INFORMED THEM THAT THEIR LICENSE AGREEMENT

3      WOULD BE TERMINATED IF THEY MAINTAINED THAT POSITION; RIGHT?

4      A.   YEAH.

5      Q.   OR COULD BE TERMINATED?

6      A.   TAKE ALL ACTION NECESSARY TO ENFORCE THE TERMS, INCLUDING

7      POSSIBLE TERMINATION.

8      Q.   NOW, THAT WOULD HAVE TERMINATED THEIR LICENSE TO BOTH 2G

9      CDMA TECHNOLOGY AND TO 3G CDMA TECHNOLOGY; RIGHT?

10     A.   AND TO WCDMA.  I MEAN, THEY WERE LICENSED FOR OUR

11     TECHNOLOGIES FOR ALL CDMA APPLICATIONS.  SO WHEN THEY STOPPED

12     REPORTING AND WERE IN BREACH, WE, WE TOLD THEM WE WOULD HAVE TO

13     ENFORCE THE TERMS OF OUR AGREEMENT.

14     Q.   AND IF QUALCOMM HAD TERMINATED THE EXISTING LICENSE

15     AGREEMENT, QUALCOMM WOULD HAVE STOPPED SHIPPING ASICS FOR ALL

16     TECHNOLOGIES COVERED BY THAT LICENSING AGREEMENT; CORRECT?

17     A.   WELL, NONE OF THAT HAPPENED.  BUT IF -- OUR POLICY IS WE

18     WOULD ONLY SHIP TO LICENSEES, SO, YOU KNOW, I BELIEVE THAT IF

19     SOMEBODY BLATANTLY VIOLATED THE AGREEMENT AND STOPPED PAYING US

20     ROYALTIES AND WE HAD TO ENFORCE AND WE ENDED UP EVENTUALLY

21     TERMINATING BECAUSE OF THEIR MATERIAL BREACH, THEN THAT WOULD

22     TERMINATE THE WHOLE -- THE ENTIRE RELATIONSHIP.

23     Q.   AND WHEN YOU SAY TERMINATE THE ENTIRE RELATIONSHIP, THAT

24     MEANS IF A LICENSE AGREEMENT COVERS BOTH 2G CDMA AND WCDMA AND

25     THAT LICENSE AGREEMENT IS TERMINATED, QUALCOMM WILL NOT SHIP

ALTMAN DIRECT BY MR. MATHESON

1    THAT FORMER LICENSEE CHIPS RELATED TO EITHER 2G CDMA OR WCDMA;

2    RIGHT?

3    A.   AGAIN, NONE OF THIS HAS EVER HAPPENED.

4         BUT IF, IF A COMPANY WOULD HAVE MATERIALLY BREACHED THEIR

5    AGREEMENT REQUIRING US TO ENFORCE AND TERMINATE, SO THEY

6    WEREN'T HONORING OUR I.P., THEN WE WOULD NOT SHIP OUR CHIPS TO

7    THEM AND THAT WOULD BE THE CASE IF THEY JUST DECIDED THEY WERE

8    GOING TO BREACH WITH RESPECT TO CDMA 2000 OR CDMA 1X OR IS 95.

9    Q.   RIGHT.  IF THEY BREACHED WITH RESPECT TO --

10   A.   CDMA 1, I GUESS.

11   Q.   -- CDMA 2000, QUALCOMM WOULD NOT SHIP THEM CDMA 1 CHIPS?

12   A.   AGAIN, THIS IS ALL SPECULATION BECAUSE I DON'T THINK THIS

13   EVER HAPPENED, BUT --

14   Q.   FAIR STATEMENT, SIR.  I'M JUST TRYING TO UNDERSTAND THE

15   POLICY.

16        OKAY.  TURN TO TAB 10 OF YOUR BINDER, SIR.  SORRY.  TAB 9

17   IN YOUR BINDER.  THIS IS CX 8281.

18        CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL EXCHANGE IN WHICH

19   YOU WERE INVOLVED IN 2004?

20   A.   YES.

21             MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 8281.

22             MR. BORNSTEIN:  NO OBJECTION, YOUR HONOR.

23             THE COURT:  IT'S ADMITTED.

24        (PLAINTIFF'S EXHIBIT CX 8281 WAS ADMITTED IN EVIDENCE.)

25             THE COURT:  GO AHEAD, PLEASE.

1    BY MR. MATHESON:

2    Q.   TURN TO THE BOTTOM OF PAGE 2.  THERE'S AN E-MAIL FROM

3    MR. HUANG OF BENQ.  DO YOU SEE THAT E-MAIL, SIR?

4    A.   YES.

5    Q.   AND THAT E-MAIL IS ADDRESSED TO AN EXECUTIVE AT QUALCOMM,

6    MR. KANG?

7    A.   I WOULDN'T CALL HIM AN EXECUTIVE.  HE WAS SOMEBODY THAT

8    WAS MID-LEVEL, I GUESS.

9    Q.   AND BENQ INFORMED THE QUALCOMM EMPLOYEE THAT -- TURNING

10   YOUR ATTENTION TO THE DISCOUNT TABLE AT THE TOP OF PAGE 3,

11   CX 8281-003, FAIR TO SAY THAT BENQ WAS REQUESTING A ROYALTY

12   DISCOUNT BASED ON THE SELLING PRICE OF ITS HANDSETS AT THIS

13   TIME?  IS THAT FAIR?

14   A.   I DON'T REMEMBER BENQ, BUT THAT'S WHAT THIS LOOKS TO BE

15   DOING.

16   Q.   OKAY.  TURNING YOUR ATTENTION TO THE FIRST PAGE OF THIS

17   DOCUMENT, SIR, THIS E-MAIL IS FORWARDED TO YOURSELF, YOU

18   FORWARD IT ON.  CX 8281-001.

19        YOU FORWARD IT ON TO OTHERS, THAT PORTION HAS BEEN

20   REDACTED.

21        MR. JACOBS WRITES -- MR. JEFF JACOBS WRITES, "CERTAINLY

22   SEND WAVES AROUND THE INDUSTRY IF THEY LOSE THEIR LICENSE AS

23   THEY HAVE MADE A VISIBLE COMMITMENT TO CDMA AND WCDMA."

24        HE'S REFERRING TO BENQ WHEN HE SAYS "THEY;" IS THAT

25   CORRECT?

1    A.   I DON'T KNOW.  PROBABLY.

2    Q.   AND THEN MR. THORNLEY WRITES NEXT, "A SITUATION WE SHOULD

3    WORK HARD TO FIX RATHER THAN TERMINATE.  HOWEVER, THE THREAT

4    MAY BE WHAT IS NEEDED."

5         NOW, MR. THORNLEY STARTED AS THE CFO OF QUALCOMM AND THEN

6    BECAME ITS PRESIDENT; IS THAT RIGHT?

7    A.   YES.

8    Q.   AND THEN YOU RESPOND IN YOUR SECOND SENTENCE OF YOUR

9    E-MAIL, YOU WROTE, "WE HAVE MADE THE THREAT.  HOPEFULLY THEY

10   WILL RESPOND POSITIVELY.  IF THEY DON'T RESPOND, I WILL TRY TO

11   HOLD OFF ANY TERMINATION UNTIL AFTER WE RECEIVE THE TERMINALS."

12        WHEN YOU SAID "WE HAVE MADE THE THREAT," YOU MEANT

13   QUALCOMM HAD THREATENED TO TERMINATE BENQ'S LICENSE; RIGHT?

14   A.   IS THAT IN THE BODY OF THIS?  I DON'T KNOW WHAT THE -- IT

15   MIGHT HAVE BEEN TO TERMINATE THE LICENSE.  IT MIGHT HAVE BEEN

16   DEALING WITH CHIPS.  I DON'T KNOW.

17   Q.   YOU WROTE THAT E-MAIL ON OCTOBER 6TH OF 2004; CORRECT,

18   SIR?

19   A.   YES.

20   Q.   CAN YOU TURN TO THE NEXT TAB.

21        YOUR HONOR, I MOVE TO ADMIT JX 0030.

22        MR. BORNSTEIN:  THERE'S NO OBJECTION, YOUR HONOR.

23        THE COURT:  IT'S ADMITTED.

24   (JOINT EXHIBIT JX 0030 WAS ADMITTED IN EVIDENCE.)

25        THE COURT:  GO AHEAD, PLEASE.

1    BY MR. MATHESON:

2    Q.   THIS IS SUBSCRIBER UNIT LICENSE AGREEMENT ENTERED INTO ON

3    JANUARY 6TH, 2005, BETWEEN QUALCOMM AND BENQ; RIGHT?

4    A.   YES.

5    Q.   THAT'S THREE MONTHS AFTER THE E-MAIL WE JUST DISCUSSED;

6    RIGHT?

7    A.   YES.

8    Q.   TURN TO THE NEXT TAB IN YOUR BINDER, SIR, WHICH IS TAB 11,

9    CX 7141.

10        CAN YOU IDENTIFY THIS AS AN E-MAIL EXCHANGE BETWEEN

11   YOURSELF AND MR. DEREK ABERLE?

12   A.   CAN I -- I'M SORRY.  ONE QUICK THING.  WHEN YOU WERE

13   ASKING ME ABOUT WHETHER IT WAS A THREAT TO TERMINATE THEIR

14   LICENSE, AND THEN YOU SHOW ME A LICENSE THAT IS MONTHS LATER,

15   SO I DON'T KNOW, MAYBE IT WASN'T A THREAT TO TERMINATE A

16   LICENSE.

17   Q.   OR MAYBE YOU THREATENED TO TERMINATE THEIR LICENSE AND

18   THEY SIGNED A NEW LICENSE THREE MONTHS LATER.  THAT'S ENTIRELY

19   PLAUSIBLE; ISN'T THAT RIGHT?

20   A.   I DON'T KNOW.  I DON'T REMEMBER.

21   Q.   OKAY.  CAN YOU TURN TO THE NEXT TAB IN YOUR BINDER, SIR,

22   TAB 11, WHICH IS CX 7141.  CAN YOU IDENTIFY THIS AS AN E-MAIL

23   EXCHANGE BETWEEN YOURSELF AND MR. DEREK ABERLE IN DECEMBER OF

24   2004?

25   A.   YES.

1    Q.   NOW, AT THIS TIME THERE WAS A LICENSE IN PLACE BETWEEN

2    QUALCOMM AND NOKIA THAT WOULD EXPIRE IN 2007 UNLESS NOKIA

3    ENTERED -- EXERCISED AN OPTION TO EXTEND.

4         IS THAT CORRECT, SIR?

5    A.   YEAH, THAT'S THE WAY I RECALL IT.  THEY HAD AN OPTION TO

6    KEEP THE AGREEMENT GOING IF THEY WANTED TO.

7              MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7141 INTO

8    EVIDENCE.

9              MR. BORNSTEIN:  NO OBJECTION.

10             THE COURT:  IT'S ADMITTED.

11        (PLAINTIFF'S EXHIBIT CX 7141 WAS ADMITTED IN EVIDENCE.)

12             THE COURT:  GO AHEAD, PLEASE.

13   BY MR. MATHESON:

14   Q.   NOW, MR. ABERLE WRITES TO YOU IN THE THIRD SENTENCE OF HIS

15   E-MAIL THAT "I THINK WE SHOULD DO ALL WE CAN TO GET NOKIA TO

16   DESIGN OUR DO CHIPS INTO THEIR PRODUCTS (AS OPPOSED TO NOKIA

17   JUST BUYING DO DEVICES FROM OUR OEM LICENSEES).  IF NOKIA

18   REFUSES TO EXERCISE THE OPTION IN 2007, WE WOULD HAVE THE RIGHT

19   TO CUT OFF THEIR DO CHIPS.  THIS MAY BE ENOUGH TO KEEP THEM

20   FROM STRINGING US OUT UNTIL 2008 WHEN THE OPTION EXPIRES."

21        NOW, WHEN MR. ABERLE REFERS TO THE OPTION, HE'S REFERRING

22   TO NOKIA'S 2007 OPTION TO EXTEND ITS LICENSE WITH QUALCOMM;

23   RIGHT?

24   A.   YES.

25   Q.   AND YOU WRITE TO HIM, IT IS THE EXACT THOUGHT THAT I HAVE

1    HAD; RIGHT?

2    A.   YES.

3    Q.   AND WHEN YOU SAID IT IS THE EXACT THOUGHT HE HAS HAD, YOU

4    MEANT IT WOULD BE BENEFICIAL TO QUALCOMM IF NOKIA DESIGNED

5    QUALCOMM'S CHIPS INTO THEIR PRODUCTS; RIGHT?

6    A.   I THINK IT WOULD HAVE BEEN -- IT WOULD HAVE BEEN

7    BENEFICIAL FOR QUALCOMM AND NOKIA IF THEY HAD DONE THAT.  THEY

8    MIGHT HAVE SUCCEEDED IN SELLING DO HANDSETS.

9    Q.   TURN TO THE NEXT TAB IN YOUR BINDER, SIR, WHICH IS TAB 12,

10   CX 6987.

11         CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL EXCHANGE IN WHICH

12   YOU WERE INVOLVED IN MAY OF 2005?

13   A.   YES.

14         MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6987.

15         MR. BORNSTEIN:  NO OBJECTION.

16         THE COURT:  IT'S ADMITTED.

17     (PLAINTIFF'S EXHIBIT CX 6987 WAS ADMITTED.)

18         THE COURT:  GO AHEAD, PLEASE.

19   BY MR. MATHESON:

20   Q.   IN THE LAST E-MAIL AT THE BOTTOM OF THIS PAGE,

21   MR. IRWIN JACOBS WRITES, "NOT SURE IF STEVE TOLD YOU, BUT I

22   HAVE COME AROUND TO YOUR POSITION ON NOKIA."

23         DO YOU SEE THAT, SIR?

24   A.   YES.

25   Q.   AND THEN YOU RESPOND, "AS FAR AS A GAP FILLER FOR THEM,

1    SALE OF DO CHIPS EITHER DIRECTLY OR THROUGH AN ODM, I WOULD

2    STAY FIRM ON A POSITION THAT WE WILL SELL THEM OR AN ODM THE

3    CHIPS AND THE LATEST VERSIONS WE HAVE, BUT ONLY AS LONG AS THEY

4    PAY US THE CURRENT ROYALTIES WITH NO RECOURSE, AND AS SOON AS

5    THEY STOP PAYING ROYALTIES, WE STOP SHIPPING."

6         NOW, "THEY" REFERRED TO NOKIA IN THAT SENTENCE, DOESN'T

7    IT?

8    A.   YES, I BELIEVE SO.

9    Q.   TURN TO THE NEXT TAB IN YOUR BINDER, SIR, WHICH IS TAB 13,

10   CX 6979.

11        CAN YOU IDENTIFY THIS, SIR, AS E-MAIL CORRESPONDENCE FROM

12   2005 IN WHICH YOU WERE INVOLVED?

13   A.   DEFINITELY I WAS, YEAH, AN E-MAIL THAT I WAS INVOLVED.

14             MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6979.

15             MR. BORNSTEIN:  NO OBJECTION.

16             THE COURT:  IT'S ADMITTED.

17        (PLAINTIFF'S EXHIBIT CX 6979 WAS ADMITTED IN EVIDENCE.)

18             THE COURT:  GO AHEAD, PLEASE.

19   BY MR. MATHESON:

20   Q.   COULD YOU TURN TO CX 6979-006.  ON THE FIRST FULL

21   PARAGRAPH AFTER A BUNCH OF CARETS, THE FIRST SENTENCE READS,

22   "AS WE EXPLAINED DURING OUR MEETING, QUALCOMM'S LONGSTANDING

23   POLICY IS THAT WE DO NOT SELL COMMERCIAL QUANTITIES OF CHIPS TO

24   SOMEONE THAT IS NOT LICENSED TO USE THOSE CHIPS."

25        SIR, DO YOU RECALL IDENTIFYING THOSE WORDS AS WRITTEN BY

196

```
 1       YOURSELF TO NOKIA DURING YOUR DEPOSITION?

 2            I CAN REFRESH YOUR RECOLLECTION, SIR.  PAGE 115 OF YOUR

 3       DEPOSITION TRANSCRIPT, LINES 22, THROUGH 116, LINE 4.

 4            DOES THAT REFRESH YOUR RECOLLECTION THAT AT YOUR

 5       DEPOSITION YOU TESTIFIED THAT YOU WROTE, "AS WE EXPLAINED

 6       DURING OUR MEETING, QUALCOMM'S LONGSTANDING POLICY IS THAT WE

 7       DO NOT SELL COMMERCIAL QUANTITIES OF CHIPS TO SOMEONE THAT IS

 8       NOT LICENSED TO USE" THAT -- "THOSE CHIPS."

 9       A.   YEAH.  I DON'T KNOW -- IT DOESN'T REFRESH MY RECOLLECTION,

10       BUT I PROBABLY HAD MORE TIME AT THE DEPO TO KIND OF READ AND

11       SEE THAT IT CAME FROM ME.

12       Q.   SITTING HERE TODAY, SIR, DO YOU BELIEVE THAT YOU WROTE

13       THOSE WORDS?

14       A.   I THINK SO.

15       Q.   THANK YOU.

16            MOVE TO THE NEXT TAB IN YOUR BINDER, SIR, WHICH IS

17       CX 7799.  CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL YOU WROTE IN

18       2000?

19       A.   YES.

20            MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7799.

21            MR. BORNSTEIN:  NO OBJECTION.

22            THE COURT:  IT'S ADMITTED.

23       (PLAINTIFF'S EXHIBIT CX 7799 WAS ADMITTED IN EVIDENCE.)

24            THE COURT:  GO AHEAD, PLEASE.

25       BY MR. MATHESON:
```

1    Q.   YOU WROTE THIS E-MAIL TO AN EXECUTIVE AT MOTOROLA; IS THAT

2    CORRECT?

3    A.   YES.

4    Q.   THE THIRD SENTENCE OF THE E-MAIL READS, "NOW, WHEN WE

5    INQUIRE ABOUT THE LICENSE AND MOTOROLA'S COMMITMENT TO THE

6    INDUSTRY TO LICENSE ITS ESSENTIAL PATENTS, MOTOROLA'S RESPONSE

7    IS THAT IT DOESN'T GRANT SUCH LICENSES."

8         NOW, JUST FOCUSSING ON THAT PART OF THE SENTENCE, WHEN YOU

9    WROTE "MOTOROLA'S COMMITMENT TO THE INDUSTRY TO LICENSE ITS

10   ESSENTIAL PATENTS," YOU WERE REFERRING TO MOTOROLA'S FRAND

11   COMMITMENTS TO STANDARD SETTING ORGANIZATIONS; IS THAT FAIR?

12   A.   I BELIEVE SO.

13   Q.   TURN YOUR ATTENTION, SIR, TO THE NEXT TAB IN YOUR BINDER,

14   TAB 15, WHICH IS CX 8177.

15        CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL YOU WROTE IN 1999

16   TO MR. LUPIN AND MR. BLECKER?

17   A.   YES.

18   Q.   TURNING YOUR ATTENTION TO THE FINAL TWO SENTENCES ON THE

19   FIRST PAGE AND THE FIRST SENTENCE ON THE SECOND PAGE --

20        OH, YOUR HONOR, MOVE TO ADMIT CX 8177?

21             MR. BORNSTEIN:  THERE'S NO OBJECTION.

22             THE COURT:  IT'S ADMITTED.

23        (PLAINTIFF'S EXHIBIT CX 8177 WAS ADMITTED IN EVIDENCE.)

24             THE COURT:  GO AHEAD, PLEASE.

25   BY MR. MATHESON:

1    Q.   THE FINAL FULL SENTENCE ON THE FIRST PAGE READS, "THEY

2    HAVE POINTED OUT TO US THAT WE MADE A COMMITMENT IN A 1994

3    AGREEMENT THAT WE WOULD LICENSE THEM ON TERMS TO BE NEGOTIATED.

4    THAT COMBINED WITH OUR COMMITMENT TO THE INDUSTRY TO LICENSE ON

5    FAIR AND REASONABLE TERMS FREE FROM UNFAIR DISCRIMINATION WOULD

6    MAKE IT DIFFICULT TO ARGUE THAT WE HAVE THE RIGHT TO REFUSE TO

7    LICENSE THEM."

8         "THEM" REFERS TO INTEL IN THAT EXCHANGE; IS THAT CORRECT,

9    SIR?

10   A.   THAT'S THE WAY I READ IT.

11   Q.   TURN YOUR ATTENTION, SIR, TO TAB 16 IN YOUR BINDER, WHICH

12   IS CX 7580.

13        CAN YOU IDENTIFY THIS AS AN E-MAIL THAT YOU FORWARDED TO

14   MR. ABERLE AND OTHERS IN 2004?

15   A.   YES.

16             MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7580.

17             MR. BORNSTEIN:  NO OBJECTION.

18             THE COURT:  IT'S ADMITTED.

19        (PLAINTIFF'S EXHIBIT CX 7580 WAS ADMITTED IN EVIDENCE.)

20             THE COURT:  GO AHEAD, PLEASE.

21   BY MR. MATHESON:

22   Q.   TURN TO THE NEXT TAB IN YOUR BINDER, TAB 17.  THIS IS

23   CX 6663.

24        CAN YOU IDENTIFY THIS AS AN E-MAIL THAT YOU -- AN E-MAIL

25   EXCHANGE IN WHICH YOU WERE INVOLVED WITH PAUL JACOBS AND OTHER

1    QUALCOMM EXECUTIVES IN 2009?

2    A.   YES.

3             MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6663.

4             MR. BORNSTEIN:  NO OBJECTION.

5             THE COURT:  IT'S ADMITTED.

6        (PLAINTIFF'S EXHIBIT CX 6663 WAS ADMITTED IN EVIDENCE.)

7             THE COURT:  GO AHEAD, PLEASE.

8    BY MR. MATHESON:

9    Q.   PLEASE TURN TO THE NEXT TAB IN YOUR BINDER, WHICH IS TAB

10   18.  THIS IS CX 6992.

11        CAN YOU IDENTIFY THIS, SIR, AS AM E-MAIL THAT YOU

12   RECEIVED, TURNING YOUR ATTENTION TO THE CENTER OF THE PAGE, IN

13   DECEMBER OF 2007?

14   A.   YES.

15            MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6992.

16            MR. BORNSTEIN:  NO OBJECTION.

17            THE COURT:  IT'S ADMITTED.

18        (PLAINTIFF'S EXHIBIT CX 6992 WAS ADMITTED IN EVIDENCE.)

19   BY MR. MATHESON:

20   Q.   CAN YOU TURN YOUR ATTENTION TO 6992-002, THE FIRST PAGE OF

21   A SLIDE DECK.

22        NOW, THIS IS A DECK THAT DEALS WITH PROJECT BERLIN; IS

23   THAT CORRECT?

24   A.   YES.

25   Q.   TURNING YOUR ATTENTION TO THE SECOND, THIRD, AND FOURTH

1       BULLETS ALL HAVE STEVE A IN PARENTHESES BEHIND THEM.

2            DO YOU SEE THAT?

3       A.   YES.

4       Q.   AND THAT REFERS TO YOU; CORRECT?

5       A.   YES.

6       Q.   THE SECOND BULLET READS "COMPETITIVE RESPONSE, STEVE A."

7            THAT IS A SECTION OF THIS AGREEMENT FOR WHICH YOU HAD SOME

8       RESPONSIBILITY; IS THAT RIGHT?

9            SORRY.  STRIKE THAT.

10           THAT IS A SECTION OF THIS DECK IN WHICH YOU HAD SOME

11      INVOLVEMENT; IS THAT RIGHT?

12      A.   THAT'S HOW I WOULD READ THIS, YEAH.

13      Q.   AND TURNING YOUR ATTENTION TO THE FINAL BULLET ON THE

14      PAGE, OR SECOND TO FINAL BULLET, IT READS "LEGAL -- DEVELOP

15      SUMMARY POINTS FOR COMPETITIVE RESPONSE DISCUSSION, WHITE PAPER

16      TO BE INCLUDED IN APPENDIX," AND IT INDICATES YOURSELF AND

17      PAUL SYROWIK AS ASSOCIATED WITH THAT ITEM.

18           DO YOU SEE THAT, SIR?

19      A.   YEAH, SIR.

20      Q.   TURN YOUR ATTENTION, SIR, TO CX 6022-035.

21      A.   IS THAT THE SAME EXHIBIT?  I'M SORRY.

22      Q.   YEAH.  6992-035.  YES, SIR.  SAME EXHIBIT, PAGE 35.

23      A.   PAGE 35.

24      Q.   IT READS AT THE TOP, "COMPETITIVE RESPONSE TO POTENTIAL

25      RESTRUCTURE."

1    A.   YEAH.

2    Q.   DO YOU SEE THAT?

3    A.   YES.

4    Q.   NOW, THIS IS THE PORTION, OR A PORTION OF THE DECK THAT

5    YOU'RE ASSOCIATED WITH ACCORDING TO THE SLIDE WE JUST LOOKED

6    AT; IS THAT CORRECT?  THE COMPETITIVE RESPONSE?

7    A.   YEAH, I THINK SO, YEAH.

8    Q.   THE FIRST BULLET ON THE SLIDE READS, "OTHER LICENSEES."

9    AND THE FIRST SUB BULLET READS, "POST SPIN, MANY CURRENT QCT

10   CUSTOMERS MAY AGGRESSIVELY" -- "MAY MORE AGGRESSIVELY SEEK TO

11   CHALLENGE CERTAIN ASPECTS OF OUR LICENSING BUSINESS AND/OR

12   THEIR AGREEMENTS WITH QUALCOMM."

13        DO YOU SEE THAT, SIR?

14   A.   YES.

15   Q.   NOW, SPIN, AS IT'S USED IN THAT BULLET, REFERS TO THE

16   PROPOSAL TO SEPARATE QUALCOMM'S CHIPSET OPERATIONS AND THE

17   LICENSING OPERATIONS; IS THAT FAIR?

18   A.   YES.

19   Q.   AND THE CONCERN THIS BULLET -- OR STRIKE THAT.

20        THIS BULLET SUGGESTS THAT COMPANIES THAT ARE PURCHASING

21   CHIPSETS FROM QUALCOMM -- FROM QCT WOULD BE MORE LIKELY TO

22   CHALLENGE THEIR AGREEMENTS WITH QTL POST SPIN THAN THOSE SAME

23   COMPANIES WOULD BE TO CHALLENGE THEIR AGREEMENTS PRE SPIN?

24        THAT'S FAIR; RIGHT?

25   A.   YEAH.  I MEAN, BASICALLY WE HAD VERY STRONG RELATIONSHIPS

1        WITH THESE COMPANIES THROUGH OUR CHIP BUSINESS, PROVIDING THEM

2        THE LATEST SOFTWARE, THE LATEST INNOVATION.

3            AND COMPANIES -- THE LICENSEES, YOU KNOW, THEY WOULD SIGN

4        AN AGREEMENT ONE DAY AND THE NEXT DAY TRY TO FIGURE OUT HOW TO

5        NOT PAY THE ROYALTIES THAT THEY AGREED TO PAY.

6            SO IF YOU TAKE THE TWO BUSINESSES AND SEPARATE THEM AND

7        QTL BECOMES JUST SOLELY A, YOU KNOW, PATENT LICENSING COMPANY,

8        THEN THE THOUGHT WAS THAT EVERY COMPANY WOULD BE MUCH MORE

9        AGGRESSIVE IN JUST TRYING TO MAKE WHATEVER ARGUMENTS THEY CAN

10       TO TRY TO NOT PAY THE ROYALTIES THAT THEY'D AGREED TO PAY.

11       Q.  ONE ARGUMENT THAT'S AVAILABLE TO COMPANIES TRYING TO NOT

12       PAY ROYALTIES THAT THEY AGREED TO PAY WOULD BE TO BRING A CLAIM

13       THAT QUALCOMM'S ROYALTIES DID NOT COMPORT WITH QUALCOMM'S FRAND

14       COMMITMENTS; ISN'T THAT RIGHT?

15       A.   THEY WOULD TRY THAT.  THEY WOULD TRY MOST FAVORED

16       ARGUMENTS, THEY WOULD -- THEY WOULD SAY THEY'RE NOT LICENSED

17       FOR STUFF THAT THEY WERE OBVIOUSLY LICENSED FOR.

18           THEY WOULD HIDE ROYALTIES THAT THEY WERE REQUIRED TO PAY

19       THROUGH THE AUDIT PROCESS.

20           I MEAN, THEY -- LICENSEES WOULD BE VERY AGGRESSIVE IN

21       TRYING NOT TO PAY ROYALTIES.

22       Q.   AND JUST -- MY QUESTION WAS QUITE LIMITED, SIR.  ONE

23       AVAILABLE ALTERNATIVE TO COMPANIES SEEKING TO REDUCE THE

24       ROYALTIES THEY'D AGREED TO PAY QUALCOMM WOULD BE TO PURSUE A

25       FRAND CLAIM; IS THAT FAIR?

1    A.   THEY COULD PURSUE WHATEVER THEY WANTED TO; RIGHT?  THAT

2    WOULD BE ONE OF THE THINGS THEY COULD PURSUE.  AND THEY COULD

3    PURSUE IT AS ONE COMPANY AS WELL.

4    Q.   LET'S MOVE ON TO THE NEXT BULLET, SIR.  THE NEXT BULLET

5    READS, "SOME CONCERN THAT A QCT SPIN COULD CAUSE SEVERAL OF OUR

6    CHINESE LICENSEES TO STOP PAYING ROYALTIES OR OTHERWISE CONTEST

7    THE TERMS OF THEIR LICENSE AGREEMENTS."

8         DO YOU SEE THAT, SIR?

9    A.   YES.

10   Q.   NOW, QUALCOMM WOULD BE BETTER ABLE TO ADDRESS THE ISSUE OF

11   CHINESE LICENSEES WHO STOPPED PAYING ROYALTIES PRE SPIN THAN IT

12   WOULD BE POST SPIN BECAUSE AS ONE COMPANY, IF A CHINESE COMPANY

13   JUST STOPPED PAYING ROYALTIES, QUALCOMM COULD TERMINATE ITS

14   LICENSE AND NOT SELL THEM CHIPS; RIGHT?

15   A.   YEAH.  YOU'RE KIND OF NARROWLY FOCUSSING.

16   Q.   CAN I DIRECT YOU TO PAGE 187 OF YOUR DEPOSITION

17   TRANSCRIPT, SIR, LINES 2 TO 13.

18   A.   WHAT PAGE?

19   Q.   PAGE 187, LINES 2 TO 13.

20        DIRECTING YOUR ATTENTION TO THAT PORTION OF YOUR

21   DEPOSITION TRANSCRIPT, IT'S A TRUE STATEMENT THAT AS ONE

22   COMPANY, IF A CHINESE COMPANY JUST STOPPED PAYING ROYALTIES,

23   THEN QUALCOMM COULD TERMINATE THEIR LICENSE AND NOT SELL THEM

24   CHIPS?

25        IS THAT A TRUE STATEMENT, SIR?

```
 1    A.   YES.  BUT -- CAN I ANSWER --

 2    Q.   NOW, LET'S FOCUS -- SIR, CAN I FOCUS --

 3    A.   OKAY.

 4    Q.   -- ON THE SECOND CONCERN HIGHLIGHTED IN THIS BULLET.

 5         MR. BORNSTEIN:  YOUR HONOR, CAN THE WITNESS BE

 6    PERMITTED TO FINISH HIS ANSWER, PLEASE?

 7         MR. MATHESON:  YOUR HONOR --

 8         THE COURT:  HE CAN DO THAT ON REDIRECT.  OR CROSS.

 9    GO AHEAD, PLEASE.

10         MR. MATHESON:  THANK YOU, YOUR HONOR.

11    Q.   NOW, LET'S FOCUS ON THE SECOND CONCERN HIGHLIGHTED IN THIS

12    BULLET, WHICH IS "AS OPPOSED TO JUST STOP PAYING ROYALTY,

13    CHINESE LICENSEES MIGHT OTHERWISE CONTEST THE TERMS OF THEIR

14    LICENSE AGREEMENT."

15         NOW, ANOTHER WAY, OTHER THAN PAYING ROYALTIES, THAT THEY

16    MIGHT CONTEST THE TERMS OF THEIR LICENSE AGREEMENT IS TO BRING

17    A FRAND CLAIM ALLEGING THAT QUALCOMM'S ROYALTIES DID NOT

18    COMPORT WITH ITS FRAND OBLIGATIONS.

19         IS THAT FAIR?

20    A.   YEAH.  LIKE I SAID, I THINK COMPANIES CAN DO THAT IF WE

21    SPUN, IF WE DIDN'T SPIN.  THEY COULD CERTAINLY DO IT -- --

22    Q.   BUT THERE'S CERTAINLY A CONCERN, HIGHLIGHTED IN THE FIRST

23    BULLET, THAT POST SPIN CUSTOMERS WHO ARE CURRENTLY BUYING FROM

24    QCT WOULD MORE AGGRESSIVELY BRING CHALLENGES, SUCH AS FRAND

25    CHALLENGES.
```

1           THAT'S A FAIR READING OF THAT FIRST POINT, RIGHT?

2      A.   MAY MORE AGGRESSIVELY.  NOT WOULD.

3      Q.   NOW, THESE CONCERNS ALL HAVE TO DO WITH CURRENT CUSTOMERS

4      OF QCT, AND THOSE ARE ALL NECESSARILY CURRENT LICENSEES; RIGHT?

5      A.   YES.

6      Q.   NOW, QUALCOMM ALSO RECOGNIZED AT THIS TIME A SEPARATE

7      CONCERN THAT A SPIN WOULD MAKE IT MORE DIFFICULT TO SIGN NEW

8      LICENSE AGREEMENTS WITH COMPANIES THAT WERE NOT CURRENTLY

9      LICENSED; IS THAT FAIR?

10     A.   I THINK -- I THINK IT'S -- I THINK IT'S REASONABLY FAIR,

11     YEAH.

12     Q.   IN FACT, TURN YOUR ATTENTION, SIR --

13     A.   I THINK MOST COMPANIES WERE PROBABLY LICENSED AT THIS

14     POINT, BUT --

15     Q.   WELL, QUALCOMM RECOGNIZED A CONCERN IT WOULD NOT -- IT

16     WOULD BE MORE DIFFICULT TO SIGN 4G LICENSES WITH COMPANIES WHO

17     WERE NOT CURRENTLY LICENSED UNDER 4G AT THE TIME THIS DECK WAS

18     WRITTEN IN OCTOBER OF 2007; RIGHT?

19     A.   YEAH.  I THINK IF WE WERE JUST STRICTLY -- IF WE HAD SPUN

20     AND WE WERE STRICTLY A PATENT COMPANY, AND WE WEREN'T OFFERING,

21     YOU KNOW, INNOVATION AND CONTINUED R&D INVESTMENTS AND SO

22     FORTH, THEN I THINK IT WOULD HAVE BEEN MORE -- YOU KNOW, YOU

23     PROBABLY HAD TO USE THE COURTS, YOU HAD TO GO INTO CHINA TO TRY

24     TO ENFORCE RIGHTS THERE.  IT WOULD HAVE BEEN MORE DIFFICULT.

25     Q.   NOW, ANY KIND OF LITIGATION OR USE OF THE COURTS BRINGS

1    SOME RISK; IS THAT A FAIR STATEMENT?

2    A.   I THINK THAT'S A FAIR STATEMENT, YEAH.

3    Q.   AND ONE COMPONENT OF THE RISK WOULD BE THAT QUALCOMM MIGHT

4    NOT ACHIEVE THE ROYALTIES IT SOUGHT?  IS THAT A FAIR STATEMENT?

5    A.   I THINK THAT'S A FAIR STATEMENT.

6         AND I ALSO THINK THAT, HAD WE SPUN, I BELIEVE THAT WE

7    COULD HAVE BEEN ABLE TO INCREASE OUR ROYALTY RATE.

8    Q.   NOW, IT'S BEEN YOUR -- IT'S BEEN TRUE IN YOUR EXPERIENCE

9    THAT SOME OEM'S HAVE BEEN PROVIDED WITH A MOTIVATION TO AGREE

10   TO THE -- TO QUALCOMM'S LICENSE TERMS IN ORDER TO PURCHASE

11   QUALCOMM'S MODEM CHIPSETS; IS THAT RIGHT?

12   A.   COULD YOU -- I'M SORRY.  SAY THAT AGAIN.

13   Q.   IT'S BEEN TRUE IN YOUR EXPERIENCE THAT SOME OEM'S HAVE

14   BEEN PROVIDED WITH A MOTIVATION TO AGREE TO QUALCOMM'S LICENSE

15   TERMS IN ORDER TO PURCHASE QUALCOMM'S MODEM CHIPSETS?  IS THAT

16   FAIR?

17   A.   I THINK IT'S FAIRER TO SAY THAT QUALCOMM PROVIDES ONGOING

18   VALUE IN A VARIETY OF DIFFERENT FORMS.  THE LATEST, YOU KNOW,

19   CHIPS HAVE THE LATEST TECHNOLOGY, BUT THE ONGOING R&D, THE

20   IMPROVEMENTS TO THE STANDARDS AND SO FORTH.

21        AND SO A LICENSEE GETS ACCESS TO ALL THAT.

22   Q.   AND LICENSEES DESIRE -- STRIKE THAT.

23        LET'S TALK ABOUT PEOPLE WHO CURRENTLY ARE NOT LICENSED,

24   OKAY, AS OPPOSED TO LICENSEES.

25        IT'S A TRUE STATEMENT THAT SOME OEM'S HAVE BEEN PROVIDED

ALTMAN DIRECT BY MR. MATHESON

1    WITH A MOTIVATION TO TAKE A LICENSE ON THE TERMS QUALCOMM

2    REQUESTED BECAUSE THE OEM WANTED TO LAUNCH A PRODUCT THAT

3    INCLUDED A QUALCOMM CHIPSET?  IS THAT A FAIR STATEMENT?

4    A.   A MOTIVATION?  THERE ARE OTHER CHIP SUPPLIERS.  THEY WOULD

5    HAVE TO TAKE A LICENSE EVEN IF THEY USED SOMEBODY ELSE'S CHIP.

6        SO I --

7    Q.   I MEAN, IS IT A FAIR STATEMENT, SIR, THAT IN YOUR

8    EXPERIENCE, SOME OEM'S HAVE BEEN PROVIDED WITH A MOTIVATION TO

9    AGREE TO THE LICENSE TERMS QUALCOMM REQUESTED IN ORDER TO

10   LAUNCH A PRODUCT BASED ON A QUALCOMM CHIPSET?

11   A.   NOBODY COMES TO MIND.

12   Q.   TURN YOUR ATTENTION TO THE NEXT TAB, SIR.

13   A.   I DO THINK THERE'S TECHNOLOGY WE PROVIDE.

14   Q.   CAN YOU TURN YOUR ATTENTION TO THE NEXT TAB IN YOUR

15   BINDER, SIR, WHICH IS CX 7886.

16       CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL EXCHANGE BETWEEN

17   YOURSELF AND MR. JEFF JACOBS IN OCTOBER OF 2004?

18   A.   YES.

19           MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7886.

20           MR. BORNSTEIN:  THERE'S NO OBJECTION.

21           THE COURT:  IT'S ADMITTED.

22       (PLAINTIFF'S EXHIBIT CX 7886 WAS ADMITTED IN EVIDENCE.)

23           THE COURT:  GO AHEAD, PLEASE.

24   BY MR. MATHESON:

25   Q.   YOUR E-MAIL TO MR. JACOBS STATES, "JING IS EXACTLY RIGHT."

1     THOSE ARE THE FIRST FOUR WORDS; RIGHT?

2     A.   YES.

3     Q.   AND YOU'RE REFERRING TO THE E-MAIL LOWER DOWN ON THE PAGE

4     FROM JING WANG TO EXECUTIVES AT QUALCOMM; IS THAT RIGHT?

5     A.   I THINK SO.

6     Q.   NOW, TURNING YOUR ATTENTION TO MR. JING WANG'S E-MAIL,

7     THERE'S A SENTENCE HALFWAY DOWN THAT BEGINS, "THE REASON HUAWEI

8     SIGNED INTERIM AGREEMENT ON WCDMA IPR WITH QC TWO MONTHS AGO ON

9     STANDARD TERMS WAS NOT BECAUSE OF THEIR DESIRE TO COUNTER MII

10    POLITICALLY, NOT BECAUSE OF THEIR FEAR OF OUR LAWSUIT, BUT

11    BECAUSE OF THEIR HOPE TO QUICKLY DEVELOP UMTS TERMINALS BASED

12    ON OUR MSM 6250 IN ORDER TO SELL TO VF," AND OTHERS.

13         THE MSM 6250 REFERS TO A QUALCOMM CHIPSET; IS THAT RIGHT?

14    A.   YES.  COULD YOU TELL ME WHERE YOU WERE READING FROM?

15    Q.   IT'S -- IT SHOULD BE HIGHLIGHTED ON YOUR SCREEN, SIR.

16    A.   OKAY.  THAT'S WHAT I SHOULD BE LOOKING AT.

17    Q.   NOW, IT'S FAIR TO SAY THAT MR. WANG REPORTED TO OTHERS

18    THAT HUAWEI'S DESIRE TO LAUNCH A PRODUCT BASED ON AN MSM 6250

19    PROVIDED A MOTIVATION TO SIGN A WCDMA LICENSE ON QUALCOMM'S

20    STANDARD TERMS?  THAT'S FAIR; RIGHT?

21    A.   THAT'S, THAT'S WHAT IT SEEMS LIKE JING IS SAYING.  BUT

22    IT'S SOME SORT OF INTERIM AGREEMENT THAT I DON'T REMEMBER.

23    Q.   CAN YOU TURN YOUR ATTENTION TO THE NEXT PAGE OF THE

24    DOCUMENT, SIR, CX 7886-002.

25         TURNING YOUR ATTENTION TO THE MATERIAL NEAR THE BOTTOM OF

ALTMAN DIRECT BY MR. MATHESON

1    THE PAGE, THIS STATES JING WANG WROTE, THERE IS A NUMBER OF

2    CARET, TURN YOUR ATTENTION, SIR, TO A STATEMENT.  WELL, IT'S

3    FAIR TO SAY THAT THIS PORTION OF THE DOCUMENT RELAYS A

4    COMMUNICATION FROM THE -- THAT JING WANG HAD WITH HUAWEI;

5    RIGHT?

6    A.   YES.

7    Q.   AND WHAT HE REPORTS IS, STARTING WITH "IF WE COULD NOT

8    RESOLVE THESE ISSUES TIMELY, HUAWEI COULD BE LURED TO USE EMP'S

9    UMTS CHIP AND WE COULD LOSE A HUGE LEVERAGE (I.E. MSM 6250 CHIP

10   SUPPLY) IN PUSHING HUAWEI TO SIGN THE DEFINITIVE AGREEMENT WITH

11   US."

12        NOW, EMP UMTS CHIP REFERS TO A COMPETING CHIP OFFERED AT

13   THIS TIME; RIGHT?

14   A.   YES.

15        MR. MATHESON:  THANK YOU, SIR.  I DON'T HAVE ANY MORE

16   QUESTIONS AT THIS TIME.  I RESERVE FOR REDIRECT, YOUR HONOR.

17        THE COURT:  ALL RIGHT.  TIME IS NOW 10:28.

18        MR. BORNSTEIN:  WOULD YOUR HONOR LIKE TO PROCEED NOW

19   OR TAKE THE MORNING BREAK?

20        THE COURT:  LET'S GO 5 MINUTES SINCE WE STARTED A

21   LITTLE BIT LATE, AND THEN WE'LL TAKE A 15 MINUTE BREAK AFTER

22   THAT.

23        THANK YOU.

24        MR. BORNSTEIN:  YOUR HONOR, MAY MR. DEL NIDO

25   APPROACH?

ALTMAN CROSS BY MR. BORNSTEIN

```
 1            THE COURT:  PLEASE, YES.  TIME IS 10:29.  JEEZ.

 2            MR. BORNSTEIN:  DOES YOUR HONOR HAVE THE BINDER YET?

 3            THE COURT:  YES.  THANK YOU.

 4                        CROSS-EXAMINATION

 5    BY MR. BORNSTEIN:

 6    Q.   MR. ALTMAN, GOOD MORNING.

 7    A.   GOOD MORNING.

 8    Q.   LET ME JUST START WITH THE VERY DOCUMENT THAT YOU WERE

 9    LOOKING AT AT THE END THERE.  IT'S TAB 19 IN THE FTC'S BINDER?

10    A.   IS IT GOING TO SHOW UP HERE ON THE SCREEN, TOO?

11    Q.   I --

12    A.   ALL RIGHT.

13    Q.   WE CAN GET IT ON THE SCREEN.  IT'S 7886.  CX 7886.

14         AND CAN YOU TELL ME WHAT THE DATE OF THIS DOCUMENT IS?

15    A.   OCTOBER 1, 2004.

16    Q.   WOULD IT BE EASIER IF WE GOT YOU A COPY OF THAT BINDER

17    BACK?

18    A.   IT MIGHT BE.  JUST AS LONG AS YOU GO SLOW ENOUGH I CAN

19    FIND IT ON HERE.

20    Q.   OKAY.  SO I'M AT TAB 19 OF THE FTC'S BINDER.

21    A.   TAB 19, OKAY.  OKAY.

22    Q.   AND COUNSEL FOR THE FTC DIRECTED YOU TO THE BOTTOM OF THE

23    FIRST PAGE, TO LANGUAGE THAT REFERRED TO "THEIR HOPE TO QUICKLY

24    DEVELOP UMTS TERMINALS BASED ON OUR MSM 6250."

25    A.   YES.
```

ALTMAN CROSS BY MR. BORNSTEIN

```
1    Q.   DO YOU SEE THAT?

2         CAN YOU TELL US WHAT UMTS MEANS?

3    A.   WCDMA.

4    Q.   OKAY.  AND IN 2004, WHAT POSITION DID QUALCOMM HAVE IN

5    TERMS OF WCDMA CHIP SALES?

6    A.   I'M BAD WITH DATES, BUT I DON'T THINK THAT WE HAD MUCH OF

7    A POSITION AT ALL.

8    Q.   AND IF YOU TURN TO PAGE 2 OF THE DOCUMENT, I'LL DIRECT YOU

9    TO SOMETHING ELSE THAT COUNSEL FOR THE FTC POINTED YOU TO DOWN

10   NEAR THE BOTTOM WHERE IT READ, "IF WE COULD NOT RESOLVE THESE

11   ISSUES TIMELY, HUAWEI COULD BE LURED TO USE EMP'S UMTS CHIP AND

12   WE COULD LOSE A HUGE LEVERAGE."

13        DO YOU SEE THAT?

14   A.   YES.

15   Q.   AT THIS POINT IN TIME, WAS EMP A COMPETITOR OF QUALCOMM'S

16   IN THE SALE OF UMTS CHIPS?

17   A.   YES.

18   Q.   DID QUALCOMM BELIEVE THAT UMTS WAS A GENUINE THREAT TO WIN

19   HUAWEI'S BUSINESS AT THIS POINT IN TIME?

20   A.   YES.

21   Q.   DID YOU BELIEVE THAT EMP WAS A VIABLE ALTERNATIVE FOR

22   HUAWEI FOR A UMTS PRODUCT?

23   A.   YES.

24   Q.   LET'S GO BACK JUST A BIT TO THE HISTORY AND THE

25   BACKGROUND.
```

ALTMAN CROSS BY MR. BORNSTEIN

1          WHEN DID YOU JOIN THE COMPANY, SIR?

2    A.   IN OCTOBER OF 1989.

3    Q.   AND WHAT WAS YOUR ROLE AT THAT TIME?

4    A.   I WAS MANAGER OF LICENSING AND CONTRACTS AND CORPORATE

5    COUNSEL.

6    Q.   AND WHEN DID YOU LEAVE THE COMPANY, SIR?

7    A.   JANUARY 2014.

8    Q.   WHEN YOU JOINED BACK IN OCTOBER OF 1989, WHAT WAS THE

9    COMPANY'S BUSINESS?

10   A.   WE -- OUR MAIN BUSINESS WAS A PRODUCT CALLED OMNITRACS,

11   WHICH WAS A TWO-WAY DATA COMMUNICATION OVER SATELLITE FOR THE

12   TRUCKING INDUSTRY.  BUT WE HAD JUST ANNOUNCED THAT WE WERE

13   WORKING ON CDMA, AND WE WERE ABOUT TO DEMO IT TO SOME

14   CHARACTERS.

15   Q.   WAS CDMA AT THAT POINT ADOPTED AS A CELLULAR STANDARD BY

16   ANY SDO?

17   A.   NO.  AND THE ENTIRE INDUSTRY WAS GOING IN I BELIEVE THE

18   OPPOSITE DIRECTION.

19   Q.   WHAT WAS THE OPPOSITE DIRECTION YOU'RE REFERRING TO?

20   A.   IT WAS -- SO THE INDUSTRY WAS ANALOG AND THEY -- THE U.S.

21   INDUSTRY WANTED TO GO DIGITAL, AND THEY DECIDED TO GO WITH

22   SOMETHING CALLED TIME DIVISION MULTIPLE ACCESS, WHICH IS

23   DIFFERENT FROM CDMA.  IT WAS SORT OF SIMILAR TO GSM.

24   Q.   WHEN YOU SAY THE OTHER INDUSTRY WAS GOING IN THE OTHER

25   DIRECTION, WHICH COMPANIES ARE YOU REFERRING TO?

ALTMAN CROSS BY MR. BORNSTEIN

1    A.   BASICALLY EVERYBODY BUT US.

2    Q.   AND AT THIS POINT IN TIME, WHAT WAS THE STATE OF

3    QUALCOMM'S CDMA LICENSING BUSINESS?

4    A.   THERE WAS NO CDMA LICENSING BUSINESS.

5    Q.   WELL, HOW DID THERE COME TO BE A CDMA LICENSING BUSINESS

6    AT QUALCOMM?

7    A.   WE, WE WERE ABLE TO GAIN SOME INTEREST FROM FIRST ONE

8    CELLULAR OPERATOR, WHO THEN GOT TWO OTHER CELLULAR OPERATORS

9    INTERESTED.  THEY PROVIDED US SOME INITIAL FUNDING.  WE DID

10   SOME DEMOS FOR THEM AND FOR SOME OTHER PEOPLE IN THE PUBLIC,

11   AND THAT GOT THE CARRIERS INTERESTED, AND THEY PROVIDED US SOME

12   MORE FUNDING, AND THEN INTRODUCED US TO AT&T AND MOTOROLA.

13   Q.   WHEN YOU SAY THEY INTRODUCED YOU TO AT&T, EXCUSE ME, AND

14   MOTOROLA, CAN YOU EXPLAIN WHAT YOU MEAN BY THAT, PLEASE?

15   A.   WELL, AS THEIR INTEREST IN CDMA GREW, THEY STARTED

16   THINKING ABOUT IF, YOU KNOW, AS WE CONTINUED TO PROGRESS, IF

17   THEY WANTED TO COMMERCIALLY DEPLOY THIS TECHNOLOGY.  THEY

18   DIDN'T WANT TO HAVE US BE THE SUPPLIER.  THEY WANTED TO HAVE

19   MAJOR COMPANIES BY THE SUPPLIER.

20       AND MOTOROLA AND AT&T WERE TWO OF THEIR VENDORS FOR THEIR

21   INFRASTRUCTURE AND HANDSETS.

22   Q.   AND SO WAS THERE SOME SORT OF ENCOURAGEMENT FOR QUALCOMM

23   TO LICENSE THESE COMPANIES?

24   A.   THEY, THEY ACTUALLY PUT INTO THE -- I REMEMBER THERE WAS,

25   I THINK, AN INTERIM FUNDING AGREEMENT, A FURTHER FUNDING

1    AGREEMENT.  BUT IN ONE OF THOSE AGREEMENTS, THEY PUT A

2    PROVISION THAT REQUIRED US TO LICENSE TO, I THINK, AT LEAST TWO

3    OR FOUR COMPANIES OR SOMETHING LIKE THAT.

4    Q.   AND DID QUALCOMM COMPLY WITH THAT PROVISION AND ACTUALLY

5    LICENSE THE COMPANIES?

6    A.   YEAH.  WE WANTED TO DO THAT AS WELL.

7    Q.   DID YOU PLAY ANY ROLE IN THOSE NEGOTIATIONS?

8    A.   YEAH, I WAS VERY INVOLVED.

9    Q.   WHAT EXPERIENCE HAD YOU PREVIOUSLY HAD IN NEGOTIATING

10   LICENSE AGREEMENTS?

11   A.   SO I -- I CAME OUT OF LAW SCHOOL AND I WAS -- I SPENT

12   THREE YEARS AT A FIRM CALLED GRAY, CARY, AMES & FRYE, AND IT

13   LATER BECAME, AFTER MANY MERGERS, DLA PIPER.

14        AND IN THAT THREE YEARS, I DID SOME LICENSING, MOSTLY

15   TRADEMARK STUFF, AND IT WAS SORT OF ABOUT THE TIME THE STOCK

16   MARKET CRASHED, AND THERE WASN'T A TREMENDOUS AMOUNT OF WORK

17   GOING ON.

18        SO I LEFT AFTER THREE YEARS AND WENT TO QUALCOMM.

19             THE COURT:  EXCUSE ME.  I'M REALLY SORRY TO

20   INTERRUPT.  LET'S GO AHEAD AND TAKE OUR BREAK NOW IF THAT'S

21   OKAY.

22             MR. BORNSTEIN:  OF COURSE, YOUR HONOR.

23             THE COURT:  IT'S 10:35.  WE'LL TAKE A 15 MINUTE

24   BREAK.  THANK YOU FOR YOUR PATIENCE AND WE'LL BE BACK IN 15

25   MINUTES.  THANK YOU.

ALTMAN CROSS BY MR. BORNSTEIN

```
1          (RECESS FROM 10:36 A.M. UNTIL 10:54 A.M.)

2              THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

3              MR. BORNSTEIN:  MAY I PROCEED, YOUR HONOR.

4              THE COURT:  YES, PLEASE.  10:54.  GO AHEAD, PLEASE.

5     BY MR. BORNSTEIN:

6     Q.   MR. ALTMAN, I'M GOING TO BE REFERRING YOU TO SOME THINGS

7     IN THE BOOK THAT I GAVE YOU, AND ALSO SOME THINGS IN THE BOOK

8     THAT THE FTC GAVE YOU.  BUT I'LL START WITH MINE.  KEEP THEM

9     BOTH IN HAND, PLEASE.

10    A.   OKAY.

11    Q.   CAN I ASK YOU TO TURN, PLEASE, TO JX 001.

12         CAN YOU IDENTIFY THIS DOCUMENT FOR US, PLEASE?

13    A.   IT'S A CDMA TECHNOLOGY AGREEMENT WITH AT&T.

14    Q.   AND DID YOU HAVE ANY ROLE IN THE NEGOTIATION OF THIS

15    AGREEMENT?

16    A.   YES.

17             MR. BORNSTEIN:  YOUR HONOR, I MOVE THE ADMISSION OF

18    JX 0001.

19             THE COURT:  ANY OBJECTION?

20             MR. MATHESON:  NO OBJECTION, YOUR HONOR.

21             THE COURT:  IT'S ADMITTED.

22         (JOINT EXHIBIT JX 0001 WAS ADMITTED IN EVIDENCE.)

23             THE COURT:  GO AHEAD, PLEASE.

24    BY MR. BORNSTEIN:

25    Q.   WAS THIS THE FIRST CDMA LICENSE AGREEMENT THAT QUALCOMM
```

ALTMAN CROSS BY MR. BORNSTEIN

1    EXECUTED?

2    A.   YES.

3    Q.   AND CAN I ASK YOU TO TURN TO PAGE 019 OF THE AGREEMENT.

4    AND YOU SEE THAT UNDER THE HEADING, NUMBER 15, LICENSES OF

5    INTELLECTUAL PROPERTY?

6    A.   YES.

7    Q.   AND CAN YOU IDENTIFY IN THERE THE ROYALTY TERMS ON WHICH

8    QUALCOMM AGREED TO LICENSE ITS CDMA TECHNOLOGY TO AT&T?

9    A.   YES.

10   Q.   AND THEY WERE WHAT?

11   A.   4 PERCENT.

12   Q.   AND THERE IS A PROVISO THAT FOLLOWS ALONG A LITTLE BIT

13   LATER SAYING, "PROVIDED, HOWEVER, AT&T'S RATE HEREUNDER FOR

14   CHANNEL UNITS, CDMA ENABLING INFRASTRUCTURE EQUIPMENT AND

15   TERMINALS, AS APPLIED SEPARATELY, SHALL NEVER EXCEED 80 PERCENT

16   OF THE APPLICABLE FEE RATE, DETERMINED SEPARATELY, CHARGED BY

17   QUALCOMM PURSUANT TO," ANOTHER CLAUSE LATER ON DOWN BELOW.

18        CAN YOU EXPLAIN WHAT THE MEANING OF THAT PROVISION WAS,

19   PLEASE?

20   A.   AT&T, AND MOTOROLA, BUT UNDER THIS AGREEMENT, AT&T WAS THE

21   FIRST LICENSEE AND TOOK A LOT OF RISK ALONG WITH US, AND

22   THEY -- AND AS PART OF THAT, WE AGREED THAT THEY WOULD HAVE

23   THE -- A FAVORABLE RATE, AT LEAST 20 PERCENT MORE FAVORABLE

24   THAN OTHERS.

25   Q.   AND SO THE -- AS A RESULT OF THIS 4 PERCENT RATE AND THE

1    80 PERCENT PROVISO, WHAT RATE DID QUALCOMM EXPECT TO NEGOTIATE

2    WITH FUTURE LICENSEES FOR ITS CDMA TECHNOLOGY?

3    A.   OUTSIDE OF MOTOROLA, WHICH ALSO GOT THIS, 5 PERCENT.

4    Q.   AND HOW WAS THAT ROYALTY RATE ARRIVED AT WITH AT&T?

5    A.   IT -- THEY WERE EXTENSIVELY NEGOTIATED.  MY RECOLLECTION

6    IS WE STARTED HIGHER AND THEY STARTED LOWER, AND WE TALKED

7    ABOUT THE VARIOUS VALUE THAT EACH SIDE IS BRINGING.

8    Q.   AND WHAT WAS THE ROYALTY BASE ON WHICH THE RATE THAT WE

9    JUST DISCUSSED WAS CALCULATED?

10   A.   WELL, THERE'S THREE AREAS.  SO THE --

11   Q.   LET'S FOCUS ON THE TERMINALS, PLEASE.  ARE THE TERMINALS

12   THE HANDSETS?

13   A.   YES.

14   Q.   OKAY.  LET'S FOCUS ON THE TERMINALS, PLEASE.

15       WHAT WAS THE ROYALTY BASE FOR THE TERMINALS?

16   A.   IT WAS THE SELLING PRICE, NET SELLING PRICE OF THE

17   FINISHED PRODUCT, THE TERMINAL.

18   Q.   AND HOW WAS THAT ROYALTY BASE AGREED UPON BY THE TWO

19   COMPANIES?

20   A.   THAT WASN'T -- I DON'T THINK THAT WAS EVEN REALLY

21   EXTENSIVELY NEGOTIATED.  THAT'S THE WAY THE INDUSTRY DID IT.

22   Q.   AND AT THE TIME THIS AGREEMENT WAS NEGOTIATED, WHAT

23   LEVERAGE WAS QUALCOMM ABLE TO BRING AGAINST AT&T TO GET THESE

24   RATES?

25   A.   WE REALLY DIDN'T HAVE -- I MEAN, WE -- WE WERE -- WE WOULD

1    STICK OUR CHEST OUT, BUT -- THEY WERE A LARGE COMPANY, AND WE

2    WERE VERY SMALL.

3    Q.   WAS QUALCOMM SELLING ANY MODEM CHIPS AT THIS POINT IN

4    TIME?

5    A.   NO.   WE WERE STILL TRYING TO VALIDATE THE TECHNOLOGY.

6    Q.   HAD CDMA YET BEEN INCORPORATED INTO ANY ADOPTED CELLULAR

7    STANDARD AT THIS POINT IN 1990?

8    A.   NO.

9    Q.   WERE THERE ANY CDMA NETWORKS DEPLOYED ANYWHERE IN THE

10   WORLD AT THIS POINT?

11   A.   NO.

12   Q.   DO YOU KNOW ABOUT HOW MANY PATENTS QUALCOMM OWNED AT THIS

13   POINT?

14   A.   I -- I DON'T.   I WOULD THINK LESS THAN A HUNDRED.

15   PROBABLY SIGNIFICANTLY LESS THAN THAT, BUT --

16   Q.   CAN I ASK YOU TO TAKE A LOOK AT JX 0002 IN YOUR BINDER,

17   PLEASE.   AND CAN YOU IDENTIFY THIS DOCUMENT FOR US?

18   A.   THAT'S THE PATENT LICENSE AGREEMENT BETWEEN QUALCOMM AND

19   AT&T.

20   Q.   AND WERE YOU INVOLVED IN NEGOTIATING THIS AGREEMENT?

21   A.   YES.

22           MR. BORNSTEIN:   YOUR HONOR, I MOVE THE ADMISSION OF

23   JX 0002.

24           THE COURT:   ANY OBJECTION?

25           MR. MATHESON:   NO OBJECTION, YOUR HONOR.

ALTMAN CROSS BY MR. BORNSTEIN

1          THE COURT:  AND IS THERE ANY SEALING TO ANY OF THESE

2     LICENSE AGREEMENTS.

3          MR. BORNSTEIN:  THERE IS NOT.  THANK YOU FOR ASKING,

4     YOUR HONOR.

5          THE COURT:  OKAY.  GO AHEAD, PLEASE.

6     BY MR. BORNSTEIN:

7     Q.   CAN YOU EXPLAIN, PLEASE --

8          THE COURT:  IT'S ADMITTED, YES.

9          (JOINT EXHIBIT JX 0002 WAS ADMITTED IN EVIDENCE.)

10    BY MR. BORNSTEIN:

11    Q.   CAN YOU EXPLAIN THE RELATIONSHIP BETWEEN THE FIRST AT&T

12    AGREEMENT WE JUST DISCUSSED AND THIS SECOND AGREEMENT, JX 0002?

13    A.   THEY'RE REALLY COMPANION AGREEMENTS.  THE FIRST AGREEMENT

14    WE TALKED ABOUT COVERS NON-PATENT, OTHER TECHNOLOGY, AND THIS

15    AGREEMENT COVERS JUST PATENTS.

16    Q.   SO WHAT DO YOU MEAN BY NON-PATENTS?  WHAT OTHER

17    TECHNOLOGY --

18    A.   SOFTWARE KNOW-HOW, TRADE SECRET, ALL THAT STUFF.

19    Q.   LET ME ASK YOU TO TURN THEN TO JX 0003 AND ASK THAT YOU

20    IDENTIFY THIS AGREEMENT, PLEASE.

21    A.   THIS IS A PATENT LICENSE AGREEMENT BETWEEN QUALCOMM AND

22    MOTOROLA.

23    Q.   AND THIS IS AN AGREEMENT THAT I BELIEVE IS ALREADY IN

24    EVIDENCE AND WAS SHOWN TO YOU BY COUNSEL FOR THE FTC; CORRECT?

25    A.   I THINK SO, YES.

1    Q.   OKAY.  AND THEN TURN TO JX 0004 AND IDENTIFY THAT ONE FOR

2    US, PLEASE.

3    A.   THAT IS A DS CDMA TECHNOLOGY AGREEMENT BETWEEN QUALCOMM

4    AND MOTOROLA.

5    Q.   OKAY.  AND WHAT IS THE RELATIONSHIP BETWEEN THOSE TWO

6    MOTOROLA AGREEMENTS?

7    A.   AGAIN, THE CDMA TECHNOLOGY AGREEMENT COVERS EVERYTHING

8    OTHER -- IPR OTHER THAN PATENTS, AND THEN THE PATENT LICENSE

9    AGREEMENT COVERS PATENTS.

10        MR. BORNSTEIN:  YOUR HONOR, I'D MOVE THE ADMISSION OF

11   JX 0004.

12        MR. MATHESON:  NO OBJECTION.

13        THE COURT:  IT'S ADMITTED.

14   (JOINT EXHIBIT JX 0004 WAS ADMITTED IN EVIDENCE.)

15        THE COURT:  GO AHEAD, PLEASE.

16        MR. BORNSTEIN:  THANK YOU.

17   Q.   AND ARE THE GENERAL STRUCTURE OF THE AT&T AND MOTOROLA

18   AGREEMENTS THE SAME ACROSS THE TWO?

19   A.   GENERAL STRUCTURE.  THE ONE BIG THING THAT SORT OF JUMPS

20   OUT TO ME IS THE WHOLE ROYALTY SHARING CONCEPT.

21   Q.   OKAY.  I WILL ASK YOU A FEW QUESTIONS ABOUT THAT.

22        BEFORE WE GET TO THE ROYALTY SHARING, WHAT WAS THE ROYALTY

23   RATE PAYABLE TO QUALCOMM UNDER THIS AGREEMENT BY MOTOROLA?

24   A.   4 PERCENT.

25   Q.   AND IT ALSO HAD THAT 80 PERCENT PROVISO; IS THAT CORRECT?

ALTMAN CROSS BY MR. BORNSTEIN

1    A.   YES.

2    Q.   AND WHAT LEVERAGE WAS QUALCOMM ABLE TO BRING TO BEAR

3    AGAINST MOTOROLA TO GET THESE RATES?

4    A.   WE -- I WOULD HAVE ACTUALLY THOUGHT WE WERE IN A LITTLE

5    BETTER POSITION BECAUSE WE HAD SIGNED AT&T, BUT WE NEEDED

6    MOTOROLA IN A BIG WAY, AND THAT'S WHY THE WHOLE ROYALTY SHARING

7    THING CAME UP.

8    Q.   AND SO THIS, THIS AGREEMENT NOW IS A FEW MONTHS AFTER THE

9    AT&T AGREEMENTS.

10        WAS QUALCOMM SELLING MODEM CHIPS YET?

11   A.   NO.

12   Q.   AND WAS THERE ANY CDMA NETWORK DEPLOYED ANYWHERE IN THE

13   WORLD AT THIS POINT IN TIME?

14   A.   NO.

15   Q.   ON THE SUBJECT OF THE ROYALTY SHARING, IS ROYALTY SHARING

16   A FEATURE OF ANY OTHER LICENSE AGREEMENT THAT QUALCOMM SIGNED

17   AFTER THIS MOTOROLA AGREEMENT?

18   A.   NO.

19   Q.   SO LET ME DIRECT YOU THEN TO A PIECE OF THE MOTOROLA

20   AGREEMENT THAT COUNSEL FOR THE FTC IDENTIFIED.

21        THIS IS JX 0003.  AND THERE IS A DISCUSSION THAT YOU HAD

22   WITH COUNSEL FOR THE FTC ABOUT THE LICENSING OF COMPONENTS

23   UNDER THAT AGREEMENT.

24        DO YOU RECALL THAT?

25   A.   YES.

1    Q.   DO YOU RECALL TO WHOM MOTOROLA WAS LICENSED TO SELL

2    COMPONENTS UNDER THIS AGREEMENT?

3    A.   THEY COULD ONLY SELL TO WHAT I THINK WAS CALLED AUTHORIZED

4    PURCHASERS.

5    Q.   AND WHAT ARE THOSE?

6    A.   LICENSEES, OTHER LICENSEES.

7    Q.   LICENSEES OF QUALCOMM?

8    A.   OF QUALCOMM.

9    Q.   WAS THE LICENSE THAT WAS GRANTED UNDER THIS AGREEMENT FOR

10   COMPONENTS AN EXHAUSTIVE LICENSE ENABLING SALES TO THIRD

11   PARTIES?

12   A.   NO.  NO.

13   Q.   HAS QUALCOMM EVER GRANTED AN EXHAUSTIVE LICENSE FOR

14   COMPONENTS FOR THE SALE TO UNAFFILIATED THIRD PARTIES?

15   A.   NO.  NOT SINCE I WAS THERE ANYWAY.

16   Q.   FAIR CLARIFICATION.  THANK YOU.

17        LET ME DIRECT YOU THEN TO A LITTLE BIT FURTHER IN TIME.

18        ABOUT HOW MANY LICENSE AGREEMENTS WOULD YOU SAY QUALCOMM

19   HAD NEGOTIATED AND EXECUTED BY 1995?

20   A.   I'M GOING TO -- 10, 15 PROBABLY.

21   Q.   WELL, LET ME SHOW YOU ONE.  IT'S JX 0005.  AND I'LL ASK

22   THAT YOU IDENTIFY THAT FOR US, PLEASE.

23   A.   THAT WAS A SUBSCRIBER UNIT LICENSE AGREEMENT WITH NOKIA.

24   Q.   OKAY.  WERE YOU INVOLVED IN NEGOTIATING THIS AGREEMENT?

25   A.   YES.

```
 1                    MR. BORNSTEIN:  YOUR HONOR, I'D MOVE JX 0005 INTO

 2       EVIDENCE, PLEASE.

 3                    MR. MATHESON:  NO OBJECTION, YOUR HONOR.

 4                    THE COURT:  IT'S ADMITTED.

 5            (JOINT EXHIBIT JX 0005 WAS ADMITTED IN EVIDENCE.)

 6                    THE COURT:  GO AHEAD, PLEASE.

 7       BY MR. BORNSTEIN:

 8       Q.   AND NOW LET'S LOOK AT THE CLAUSE OF THIS AGREEMENT IN

 9       WHICH THE LICENSE IS GRANTED.  IT'S ON PAGE 011, SECTION 5.1.

10       A.   OKAY.

11       Q.   DO YOU SEE THAT THIS AGREEMENT HAS A LICENSE THAT RELATES

12       TO COMPONENTS IN LITTLE 2, ROMAN II?

13       A.   YES.

14       Q.   AND DID THIS AGREEMENT AUTHORIZE NOKIA TO SELL COMPONENTS

15       TO THIRD PARTIES?

16       A.   NO.

17       Q.   DID QUALCOMM HAVE A COMPONENT MODEM CHIP BUSINESS AT THIS

18       POINT IN TIME?  IN 1992?

19       A.   IN '92?  I DON'T -- I DON'T THINK SO.  I DON'T THINK THE

20       STANDARD CAME UNTIL LATER.

21       Q.   WHAT -- WAS THE INTENT OF THIS PROVISION TO LIMIT OTHER

22       CHIP SUPPLIERS' ABILITY TO SELL MODEM CHIPS?

23                    MR. MATHESON:  OBJECTION, YOUR HONOR.  LEADING.

24                    THE WITNESS:  THEY COULD MAKE THEIR OWN CHIP.

25                    THE COURT:  EXCUSE ME.  WAIT ONE MINUTE, PLEASE.
```

ALTMAN CROSS BY MR. BORNSTEIN

```
 1      SUSTAINED.  THE QUESTION IS STRICKEN.

 2      BY MR. BORNSTEIN:

 3      Q.   TAKE A LOOK, SIR, AT SECTION 5.2, WHICH BEGINS ON THE SAME

 4      PAGE.

 5           WHAT ARE THE -- DO YOU SEE THERE'S A, AT THE TOP OF PAGE

 6      012, THERE'S A LIST OF ROYALTY PERCENTAGES.

 7      A.   YES.

 8      Q.   OKAY.  CAN YOU EXPLAIN WHAT THE ROYALTY RATES WERE THAT

 9      NOKIA AGREED TO IN THIS 1992 AGREEMENT FOR HANDSETS?

10      A.   YEAH.  IT WAS A, SORT OF A STAGGERED ROYALTY RATE BASED ON

11      VOLUME.  STARTING AT 6 AND A HALF PERCENT.  AND THEN IF THEY

12      SOLD MORE THAN A HUNDRED THOUSAND UNITS IN A QUARTER, THEN ALL

13      THE UNITS WOULD BE AT A 5 PERCENT RATE.

14      Q.   OKAY.  AND HOW WAS THIS ROYALTY RATE ARRIVED AT WITH

15      NOKIA?

16      A.   THROUGH EXTENSIVE NEGOTIATIONS WITH NOKIA.

17      Q.   DID QUALCOMM HAVE ANY LEVERAGE OVER NOKIA AT THIS POINT IN

18      TERMS OF THE SUPPLY OF COMPONENTS?

19      A.   NO.

20      Q.   LET ME DIRECT YOU TO JUST A COUPLE OF OTHER AGREEMENTS

21      EXECUTED IN THE SAME TIMEFRAME.  TAKE A LOOK AT JX 0006,

22      PLEASE.  I APOLOGIZE.  I'M GOING TO DIRECT YOU TO QX 9278,

23      WHICH IS FURTHER TO THE BACK OF YOUR BINDER.

24      A.   OKAY.

25      Q.   CAN YOU IDENTIFY THAT DOCUMENT FOR US, PLEASE.
```

```
 1        A.    YEAH.  IT'S A SUBSCRIBER UNIT LICENSE AGREEMENT BETWEEN

 2    QUALCOMM AND OKI ELECTRIC.

 3        Q.    AND WERE YOU INVOLVED IN THE NEGOTIATION OF THIS

 4    AGREEMENT?

 5        A.    YES.

 6              MR. BORNSTEIN:  YOUR HONOR I'D MOVE QX 9278 INTO

 7    EVIDENCE.

 8              MR. MATHESON:  NO OBJECTION.

 9              THE COURT:  IT'S ADMITTED.

10        (DEFENDANT'S EXHIBIT QX 9278 WAS ADMITTED IN EVIDENCE.)

11              THE COURT:  GO AHEAD, PLEASE.

12    BY MR. BORNSTEIN:

13        Q.    TAKE A LOOK, SIR, ALSO AT QX 9262, WHICH IS THE PRIOR

14    DOCUMENT IN YOUR BINDER, AND IDENTIFY THAT FOR US?

15        A.    CDMA TECHNOLOGY LICENSE AGREEMENT BETWEEN ALPS ELECTRIC

16    AND -- AND BOTH A U.S. AND A JAPANESE CORPORATION, TWO

17    DIFFERENT COMPANIES, AND ALPINE.

18        Q.    IS THIS AN AGREEMENT THAT YOU WERE INVOLVED IN

19    NEGOTIATING?

20        A.    YES.

21              MR. BORNSTEIN:  YOUR HONOR, I'D MOVE QX 9262 INTO

22    EVIDENCE AS WELL.

23              THE COURT:  IT'S ADMITTED.

24        (DEFENDANT'S EXHIBIT QX 9262 WAS ADMITTED IN EVIDENCE.)

25              THE COURT:  GO AHEAD, PLEASE.
```

```
 1        BY MR. BORNSTEIN:

 2        Q.   IN 1993, WERE YOU INVOLVED IN THE NEGOTIATION OF ANY

 3        AGREEMENTS WITH KOREAN MANUFACTURERS?

 4        A.   YES.

 5        Q.   AND DO YOU RECALL HOW THOSE NEGOTIATIONS CAME TO START?

 6        A.   WE SIGNED A JOINT DEVELOPMENT AGREEMENT WITH AN

 7        ORGANIZATION CALLED ETRI, WHICH WAS THE KOREAN GOVERNMENT'S

 8        SORT OF R&D ARM.  I THINK IT WAS ELECTRONICS TELECOMMUNICATIONS

 9        RESEARCH INSTITUTE.

10             AND THEY WERE VERY INTERESTED IN CDMA AND THEY FUNDED --

11        IT WAS PROBABLY AT THAT POINT ONE OF OUR BIGGEST CONTRACTS, $17

12        MILLION -- I BELIEVE IT WAS $17 MILLION, A JOINT DEVELOPMENT

13        AGREEMENT.

14             AND AS PART OF THAT, THEY HAD THE RIGHT TO DESIGNATE I

15        THINK FOUR, WE CALLED THEM DESIGNATED MANUFACTURERS, DM'S, AND

16        THEY DESIGNATED SAMSUNG, HYUNDAI, LG, AND I THINK MAXON,

17        M-A-X-O-N.

18        Q.   AND ETRI DESIGNATED THESE MANUFACTURERS FOR WHAT PURPOSE?

19        A.   TO BE ABLE TO GET COMMERCIAL LICENSES SO THAT THEY, YOU

20        KNOW, ONCE THE TECHNOLOGY WAS FULLY COMMERCIALIZED, THEY COULD

21        SELL.

22        Q.   COMMERCIAL LICENSES FOR WHAT TYPE OF PRODUCT?

23        A.   I THINK SAMSUNG -- SAMSUNG AND LG, I THINK, AND MAYBE

24        HYUNDAI, HAD BOTH INFRASTRUCTURE AND SUBSCRIBER UNIT, AND I

25        THINK MAXON WAS JUST SUBSCRIBER UNIT.
```

1    Q.   DID ETRI DESIGNATE ANY MANUFACTURERS FOR A LICENSE TO

2    COMPONENTS?

3    A.   NO.

4    Q.   AND WHAT ROLE DID THE KOREAN GOVERNMENT PLAY IN

5    ESTABLISHING THE TERMS OF THE AGREEMENTS WITH THE DESIGNATED

6    MANUFACTURERS?

7    A.   I THINK WE, IN THE JOINT DEVELOPMENT AGREEMENT, AS PART OF

8    OUR COMMITMENT TO LICENSE MANUFACTURERS THEY DESIGNATED, WE --

9    THERE WERE SOME PROVISIONS IN THERE RELATIVE TO THE, SORT OF

10   SOME OF THE MATERIAL TERMS THAT WE WOULD INCLUDE IN THOSE

11   AGREEMENTS.

12   Q.   DO YOU RECALL GENERALLY WHAT TYPE OF TERMS YOU HAD IN

13   MIND?

14   A.   I THINK THERE WERE ROYALTY RATES; I THINK UPFRONT FEES;

15   MAYBE SOME DELIVERABLES.

16   Q.   I'D ASK YOU TO LOOK AT JX 0006, PLEASE.  IT SHOULD BE JUST

17   BEFORE THE AGREEMENT YOU HAD BEEN LOOKING AT.

18   A.   OKAY.

19   Q.   AND CAN YOU IDENTIFY THIS DOCUMENT FOR US?

20   A.   THIS IS AN INFRASTRUCTURE AND SUBSCRIBER UNIT LICENSE

21   BETWEEN SAMSUNG AND QUALCOMM.

22   Q.   AND IS THIS ONE OF THE AGREEMENTS THAT AROSE FROM THIS

23   DESIGNATED MANUFACTURER PROCESS?

24   A.   YEAH.  YOU CAN SEE IN THE SECOND WHEREAS CLAUSE, IT SAYS

25   THAT THEY'VE BEEN SELECTED BY ETRI TO OBTAIN A LICENSE.

1    Q.   THANK YOU.

2         YOUR HONOR, I'D MOVE JX 0006 INTO EVIDENCE.

3              MR. MATHESON:  NO OBJECTION.

4              THE COURT:  IT'S ADMITTED.

5         (JOINT EXHIBIT JX 0006 WAS ADMITTED IN EVIDENCE.)

6              THE COURT:  GO AHEAD, PLEASE.

7    BY MR. BORNSTEIN:

8    Q.   AND I'M GOING TO ASK YOU A FEW QUESTIONS ABOUT PROVISIONS

9    OF THIS AGREEMENT THAT RELATE TO ROYALTIES WHICH THE COURT HAS

10   ORDERED SEALED ALREADY PURSUANT TO A MOTION FROM SAMSUNG, AND

11   SO I'D ASK THAT --

12             THE COURT:  ONLY --

13             MR. BORNSTEIN:  YES.

14   Q.   WHEN WE DISCUSS THE ROYALTY TERMS, SIR, I'LL ASK YOU NOT

15   TO SAY ANY OF THE FINANCIAL TERMS OUT LOUD, AND I'LL TRY AND

16   PHRASE MY QUESTIONS APPROPRIATELY AS WELL.

17   A.   OKAY.

18   Q.   SO IF YOU COULD TURN TO PAGE 012 OF THE EXHIBIT, PLEASE.

19   A.   OKAY.

20   Q.   DO YOU SEE PROVISION 5.2.1?

21   A.   YES.

22   Q.   AND DOES THIS PROVISION REFLECT THE ROYALTY TERMS THAT

23   SAMSUNG AGREED TO PAY QUALCOMM FOR HANDSETS?

24   A.   YES.

25   Q.   AND WERE THESE THE ROYALTY TERMS THAT WERE ESTABLISHED

ALTMAN CROSS BY MR. BORNSTEIN

```
1    THROUGH COMMUNICATION WITH THE KOREAN GOVERNMENT?

2    A.   I BELIEVE SO.

3    Q.   OKAY.  WERE THE TERMS OF THE AGREEMENTS WITH THE OTHER

4    DESIGNATED MANUFACTURERS THE SAME AS THE AGREEMENT WITH

5    SAMSUNG?

6    A.   I BELIEVE SO, YES.

7    Q.   AND AT THE TIME THAT THESE AGREEMENTS WERE SIGNED, WAS

8    QUALCOMM SELLING CDMA MODEM CHIPS?

9    A.   I DON'T BELIEVE SO.

10   Q.   WHAT LEVERAGE DID QUALCOMM HAVE OVER THE DESIGNATED

11   MANUFACTURERS IN NEGOTIATING THESE AGREEMENTS?

12   A.   I MEAN, IT -- AGAIN, WE WERE THE PIONEERS OF CDMA.  THEY

13   WERE INTERESTED IN CDMA.  BUT, YOU KNOW, WHEN YOU -- IF YOU

14   THINK ABOUT IT IN TERMS OF RELATIVE SIZE AND SO FORTH, I MEAN,

15   THAT $17 MILLION WE GOT FROM ETRI FUNDED A VERY BIG CHUNK OF

16   OUR PAYROLL.

17   Q.   I WANT TO ASK YOU QUESTIONS ABOUT LG.  I THINK YOU SAID

18   THEY WERE ONE OF THE DESIGNATED MANUFACTURERS AS WELL.

19   A.   YES.

20   Q.   WAS THERE A DISPUTE THAT TOOK PLACE LATER ON AS TO THE

21   SCOPE OF LG'S LICENSE AND WHAT PRODUCTS IT COVERED?

22   A.   YES, I THINK SO.

23   Q.   OKAY.  CAN YOU TELL ME WHAT YOU REMEMBER THE NATURE OF THE

24   DISPUTE TO HAVE BEEN, IF YOU DO?

25   A.   I BELIEVE THAT THEY -- IF I'M THINKING OF THE RIGHT
```

1    TIMEFRAME, THEY LATER CLAIMED THAT WCDMA WASN'T COVERED, I

2    THINK, UNDER THEIR EXISTING AGREEMENT.

3    Q.   AND WAS THAT A DISPUTE THAT WAS EASILY RESOLVED BETWEEN

4    QUALCOMM AND LG?

5    A.   EASILY RESOLVED?  I MEAN, IT -- I GUESS IT DEPENDS IF

6    YOU'RE SITTING IN THE ROOM HAVING TO NEGOTIATE AND ADDRESS THE

7    ISSUES.

8    Q.   WAS THERE ANY -- APOLOGIES.

9         WAS THERE ANY KIND OF DISPUTE RESOLUTION PROCEEDING THAT

10   WAS INITIATED, LITIGATION OR ARBITRATION?

11   A.   I THINK -- I THINK WE FILED -- MY RECOLLECTION IS WE FILED

12   AN ARBITRATION, BUT I THINK WE SETTLED.  WE HAD -- WITH MANY

13   LICENSEES, YOU KNOW, THEY WOULD RAISE ISSUES, AND WE WOULD TRY

14   TO WORK TO ADDRESS THEM, AND LG WAS ONE OF THEM.

15   Q.   WERE THERE ANY COMMUNICATIONS THAT WERE MADE AT THE TIME

16   THIS ARBITRATION BEGAN ABOUT CHIP SUPPLY TO LG?

17   A.   I DON'T THINK SO.

18        MR. BORNSTEIN:  YOUR HONOR, I'D LIKE TO APPROACH --

19        THE WITNESS:  OH, I'M SORRY, AT THE TIME OF THE

20   ARBITRATION.

21   BY MR. BORNSTEIN:

22   Q.   AT THE TIME OF THE ARBITRATION, YES.

23   A.   THERE MIGHT HAVE BEEN.

24   Q.   DO YOU REMEMBER, ONE WAY OR THE OTHER, WHETHER YOU

25   COMMITTED ANYTHING ABOUT CHIP SUPPLY TO LG AT THE TIME OF THE

ALTMAN CROSS BY MR. BORNSTEIN

1    ARBITRATION?

2    A.    I THINK -- I THINK WE TRIED -- THEY WERE AN IMPORTANT

3    CUSTOMER, AND I THINK WE TRIED TO -- YOU KNOW, WE HAD AN ISSUE

4    WE WEREN'T MAKING PROGRESS ON.  I THINK WE FILED FOR

5    ARBITRATION.

6        BUT I THINK WE ASSURED THEM THAT, YOU KNOW, WE WOULD

7    CONTINUE TO SUPPLY.

8    Q.    AND HOW WAS THAT ASSURANCE MADE?  DO YOU KNOW?

9    A.    ONE OF THE EXECUTIVES PROBABLY.  IT MIGHT HAVE BEEN ME OR

10   IRWIN OR SOMEBODY PROBABLY.

11   Q.    OKAY.  OKAY.

12       YOUR HONOR, I'D LIKE TO APPROACH THE WITNESS IF I CAN TO

13   TRY TO REFRESH HIS RECOLLECTION.

14           THE COURT:  PLEASE, GO AHEAD.

15           MR. BORNSTEIN:  THANK YOU.

16       WOULD YOUR HONOR LIKE ONE, OR NO?

17           THE COURT:  YES, PLEASE.  THANK YOU.

18           MR. BORNSTEIN:  (HANDING.)

19   Q.    MR. ALTMAN, IF I COULD ASK YOU TO JUST READ TO YOURSELF

20   THE FIRST PAGE OF THE DOCUMENT, AND REALLY JUST THE "TO" AND

21   THE "FROM" ON THE E-MAIL, AND THE BOTTOM BIG PARAGRAPH THERE

22   NEAR THE END.  THERE'S A SENTENCE THAT BEGINS WITH THE WORDS

23   "WE DO NOT INTEND."

24       JUST READ THAT TO YOURSELF, PLEASE.

25       (PAUSE IN PROCEEDINGS.)

```
1              THE WITNESS:  OKAY.

2    BY MR. BORNSTEIN:

3    Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION IN ANY WAY

4    ABOUT COMMUNICATIONS THAT WERE MADE BY QUALCOMM TO LG AT THE

5    TIME THIS ARBITRATION BEGAN RELATING TO CHIP SUPPLY?

6    A.   YEAH.

7    Q.   OKAY.  TELL ME WHAT YOU RECALL, PLEASE.

8    A.   THAT WE FELT LIKE WE COULD TRY TO RESOLVE THE WCDMA ISSUE

9    THROUGH ARBITRATION BUT WANTED TO MAKE SURE THAT THEY

10   UNDERSTOOD THAT WE DIDN'T WANT THIS TO AFFECT THE -- I MEAN, IT

11   WAS JUST -- SOMETIMES YOU JUST CAN'T REACH AN AGREEMENT; RIGHT?

12       SO WE WANTED TO TRY TO REACH THE AGREEMENT THROUGH A THIRD

13   PARTY MAKING THE DECISION, BUT CONTINUE THE, THE GOOD

14   RELATIONSHIPS WE HAD WITH THEM IN TERMS OF CDMA 2000.

15   Q.   LET ME ASK YOU TO TURN, SIR, BACK TO THE BINDER THAT THE

16   FTC PROVIDED YOU.  AND I'LL DIRECT YOU TO TAB 7 OF THE BINDER.

17   THIS IS CX 6729 WHICH THE COURT ADMITTED INTO EVIDENCE.

18       DO YOU REMEMBER BEING QUESTIONED ON THIS DOCUMENT WHICH

19   RELATES TO COMMUNICATIONS WITH SAMSUNG IN 2001.

20   A.   YES.

21   Q.   OKAY.  AT THE TIME OF THIS COMMUNICATION, WAS SAMSUNG

22   PAYING ITS ROYALTIES THAT WERE REQUIRED UNDER THE AGREEMENT

23   WITH QUALCOMM?

24   A.   NO.

25   Q.   IF SAMSUNG HAD CONTINUED TO PAY, BUT RAISED THE QUESTION
```

ALTMAN CROSS BY MR. BORNSTEIN

```
 1      AS TO THE SCOPE OF ITS AGREEMENT, WOULD QUALCOMM HAVE CONTINUED

 2      TO SHIP CHIPS?

 3      A.   ABSOLUTELY.

 4      Q.   ARE THERE STEPS THAT QUALCOMM HAS TYPICALLY TAKEN WHEN A

 5      CUSTOMER OR LICENSEE STOPS PAYING TO AVOID THE CESSATION OF

 6      CHIP SUPPLY?

 7      A.   I MEAN, WE -- WE COMMUNICATE WITH THEM AND TRY TO

 8      DETERMINE WHAT THE ISSUE IS, WHY IT'S AN ISSUE, NEGOTIATE, TAKE

 9      IT UP MANY LEVELS.  I MEAN, IT'S -- IT'S VERY -- IT'S ALWAYS

10      BEEN VERY IMPORTANT TO US TO TRY TO MAINTAIN VERY STRONG

11      RELATIONSHIPS WITH OUR LICENSEES.

12      Q.   ARE THERE ANY WAYS IN WHICH TERMINATING CHIP SUPPLY

13      PRESENTS RISK TO QUALCOMM?

14      A.   A TON OF WAYS, YEAH.

15      Q.   CAN YOU EXPLAIN WHAT THEY ARE?

16      A.   NOT ONLY WOULD DOING SO IMPACT THE VIEWS AND ATTITUDES OF

17      OUR OTHER CHIP CUSTOMERS, BUT ALSO VERY IMPORTANTLY, IT WOULD

18      IMPACT THE VIEWS OF OUR CARRIERS, YOU KNOW, THE CARRIERS THAT

19      WE DEPLOY TO.

20           SO IF YOU THINK BACK TO THE FUNDING AGREEMENT THAT I

21      TALKED ABOUT EARLIER WITH -- THAT WAS WITH PAC TEL AND NYNEX

22      TECH, WHO BECAME VERIZON, IF THEY WERE DEPENDING -- IF CARRIERS

23      ARE DEPENDING ON A CERTAIN HANDSET THAT USES OUR CHIPS AND WE

24      HAVE TO STOP SHIPPING BECAUSE THE LICENSEE IS NOT HONORING THE

25      AGREEMENT, IT HAS REPERCUSSIONS TO THOSE COMPANIES AS WELL.
```

ALTMAN CROSS BY MR. BORNSTEIN

1          AND THOSE COMPANIES MAKE DECISIONS ALL THE TIME ABOUT THE

2     NEXT TECHNOLOGY THAT THEY'RE GOING TO DEPLOY.  SO WITH SOMEBODY

3     LIKE VERIZON, THEY DEPLOY CDMA, YOU KNOW, IS 95, OR CDMA 1.  WE

4     WANT THEM TO GO WITH CDMA 2000, YOU KNOW, THEY'RE GOING TO MAKE

5     DECISIONS ON THIRD GENERATION, ON FOURTH GENERATION, ON FIFTH

6     GENERATION.

7          SO IT'S VERY IMPORTANT THAT WE MAINTAIN VERY STRONG

8     RELATIONSHIPS.

9     Q.   LET ME ASK YOU TO LOOK, SIR, AT ANOTHER DOCUMENT IN THE

10    FTC'S BINDER.  THIS IS TAB 11, CX 7141, WHICH HAS BEEN ADMITTED

11    INTO EVIDENCE.

12         DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS

13    COMMUNICATION REGARDING NOKIA --

14    A.   YES.

15    Q.   -- IN 2005?  2004, I APOLOGIZE.

16         AT THIS POINT IN TIME WAS NOKIA A QUALCOMM LICENSEE?

17    A.   YES.

18    Q.   AND WAS QUALCOMM -- EXCUSE ME.

19         WAS NOKIA ELIGIBLE TO PURCHASE CHIPS FROM QUALCOMM AT THIS

20    POINT IN TIME?

21    A.   YES.

22    Q.   WAS NOKIA, IN 2004, A QUALCOMM CHIP CUSTOMER?

23    A.   I DON'T BELIEVE SO.

24    Q.   DO YOU KNOW WHOSE CHIPS THEY WERE USING?

25    A.   I -- I -- I'M NOT EVEN SURE WHETHER THEY WERE SELLING CDMA

ALTMAN CROSS BY MR. BORNSTEIN

1    BACK THEN.

2    Q.    OKAY.  WERE THEY A LARGE CUSTOMER OR SMALL -- EXCUSE ME.

3          A LARGE OEM OR A SMALL OEM?

4    A.    THEY WERE A VERY LARGE OEM.

5    Q.    OKAY.  AND I BELIEVE YOU SAID IN RESPONSE TO A QUESTION

6    FROM THE FTC'S COUNSEL THAT THERE WAS A RENEWAL OPTION OF

7    THIS -- FOR THIS AGREEMENT; IS THAT CORRECT?

8    A.    YES.

9    Q.    AND WAS THAT A UNILATERAL RENEWED OPTION, OR DID THEY

10   REQUIRE QUALCOMM'S CONSENT TO RENEW?

11   A.    IT WAS -- MY RECOLLECTION IT WAS THEIR UNILATERAL OPTION.

12   Q.    DID THEY EXERCISE THAT OPTION?

13   A.    I THINK THEY LET IT LAPSE.

14   Q.    AND WHAT HAPPENED THEN?

15   A.    I MEAN, WE ENDED UP IN LITIGATION WITH THEM AND IT SETTLED

16   BEFORE IT ACTUALLY --

17   Q.    LET ME DIRECT YOU THEN TO TAB 14 IN THE BINDER.  THIS IS

18   CX 7799.

19         THIS IS IN EVIDENCE, YOUR HONOR.

20         DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS

21   COMMUNICATION YOU HAD WITH MOTOROLA IN 2000?

22   A.    YES.

23   Q.    AT THE -- AT THE TIME OF THIS E-MAIL, WHAT WAS MOTOROLA'S

24   GENERAL PRACTICE AS TO WHETHER OR NOT IT LICENSED EXHAUSTIVELY

25   AT THE COMPONENT LEVEL?

1    A.   IT DIDN'T.  IT DIDN'T LICENSE EXHAUSTIVELY AT THE

2    COMPONENT LEVEL.

3    Q.   AND WHAT HAD MOTOROLA SAID, IF ANYTHING, ABOUT WHETHER

4    QUALCOMM NEEDED TO HAVE A GSM LICENSE FOR QUALCOMM'S CHIPS?

5    A.   WE HAD A, I WOULD SAY, A ROCKY RELATIONSHIP WITH MOTOROLA.

6    THEY HAD, THEY CAME OUT, I BELIEVE, AND SAID -- AND IT SAYS

7    HERE THEY CONTACTED THE STOCK ANALYSTS.

8         THEY BASICALLY PUBLICLY SAID THAT WE WOULDN'T BE ABLE TO

9    PROCEED WITH MULTI MODE GSM CDMA BECAUSE THEY HAD PATENTS AND

10   WE WEREN'T -- THEY WEREN'T GOING TO LICENSE THEM TO US.

11   Q.   AND PRIOR TO THAT STATEMENT BY MOTOROLA, HAD QUALCOMM

12   SOUGHT A GSM LICENSE FROM MOTOROLA?

13   A.   WE HAD.  I THINK WE HAD SOME RIGHTS UNDER THE PREEXISTING

14   AGREEMENT.  BUT WE DIDN'T HAVE -- IF WE DID, IF I'M RECALLING

15   IT CORRECTLY, WE DIDN'T HAVE ALL OF THEM.  AND WE DIDN'T SEEK

16   IT.

17   Q.   WHY DID YOU NOT SEEK ADDITIONAL RIGHTS PRIOR TO THIS

18   STATEMENT?

19   A.   I BELIEVE IT'S BECAUSE THEY DIDN'T -- THEY DON'T LICENSE

20   FOR ASICS.  THEY DEAL -- THEY LICENSE DIRECTLY TO THE DEVICE

21   MANUFACTURERS, AND WE COULD SELL OUR CHIPS TO THE DEVICE

22   MANUFACTURERS AND THEY WOULD THEN ENTER INTO WHATEVER

23   AGREEMENTS THEY HAD TO ENTER INTO WITH MOTOROLA.

24   Q.   AND SO WHY, AFTER MOTOROLA MADE THIS STATEMENT ABOUT

25   QUALCOMM'S PARTICIPATION IN GSM SALES, DID QUALCOMM NOW CHANGE

```
 1      ITS MIND AND SEEK SOME SORT OF AGREEMENT?

 2      A.   BECAUSE MOTOROLA, IF I RECALL THIS CORRECTLY, MADE A

 3      PUBLIC STATEMENT THAT THEY WERE GOING TO PRECLUDE US FROM

 4      SELLING MULTI MODE CHIPS.

 5      Q.   LET ME ASK YOU TO TURN TO TAB 15, WHICH IS CX 8177.

 6           IT'S ALREADY IN EVIDENCE, YOUR HONOR.

 7      A.   I'M SORRY, I'M ON TAB 15 -- OH, NO.

 8           15, OKAY.

 9      Q.   DO YOU RECALL BEING ASKED A FEW QUESTIONS ABOUT THIS

10      DOCUMENT AS WELL?

11      A.   YES.

12      Q.   AND YOU WERE DIRECTED TO THE BOTTOM OF THE FIRST PAGE,

13      001, WHERE YOU WROTE THAT THEY HAVE, "THEY" BEING INTEL;

14      CORRECT?

15      A.   YES.

16      Q.   OKAY.  "THEY HAVE POINTED OUT TO US THAT WE MADE A

17      COMMITMENT IN A 1994 AGREEMENT THAT WE WOULD LICENSE THEM ON

18      TERMS TO BE NEGOTIATED.  THAT COMBINED WITH OUR COMMITMENT TO

19      THE INDUSTRY TO LICENSE ON FAIR AND REASONABLE TERMS, FREE FROM

20      UNFAIR DISCRIMINATION, WOULD MAKE IT DIFFICULT TO ARGUE THAT WE

21      HAVE THE RIGHT TO REFUSE TO LICENSE THEM."

22           DO YOU SEE THAT?

23      A.   YES.

24      Q.   AT THIS POINT IN TIME, DID YOU UNDERSTAND QUALCOMM TO BE

25      REQUIRED, BY ITS FRAND COMMITMENT, TO GRANT A LICENSE TO A CHIP
```

1    MAKER THAT WAS EXHAUSTIVE?

2    A.   NO.

3    Q.   OKAY.  HAS QUALCOMM EVER GRANTED A LICENSE TO A CHIP MAKER

4    THAT WAS EXHAUSTIVE?

5    A.   NO.

6    Q.   WHAT COMPANY --

7    A.   NOT DURING THE TIME I WAS THERE.

8    Q.   THANK YOU.

9         AND WHAT KIND OF AGREEMENT WERE YOU ACTUALLY TALKING ABOUT

10   HERE IN THIS EXHIBIT?

11   A.   I -- I'M SURE IT WAS A NON-EXHAUSTIVE AGREEMENT.

12   Q.   THERE WERE A FEW QUESTIONS THAT YOU WERE ASKED BY THE

13   FTC'S COUNSEL ABOUT THE POSSIBILITY OF SPLITTING THE COMPANY

14   INTO TWO PIECES.

15        DO YOU REMEMBER THOSE?

16   A.   YES.

17   Q.   SOMETHING RELATED TO PROJECT BERLIN?

18   A.   YES.

19   Q.   IF IT WERE YOUR DECISION, SIR, YOU AND YOU ALONE BACK AT

20   THE TIME OF BERLIN, WOULD YOU HAVE DECIDED TO SPLIT THE COMPANY

21   IN TWO?

22   A.   I WOULD HAVE SPLIT THE COMPANY IN TWO BACK IN 2000 WHEN WE

23   FIRST LOOKED AT IT, AND I WOULD HAVE DONE IT AGAIN IN 2008.

24   I -- THE COMPANY KNOWS THAT I HAVE ALWAYS BEEN AN ADVOCATE OF

25   DOING THAT.

ALTMAN CROSS BY MR. BORNSTEIN

1    Q.   OKAY.  CAN YOU EXPLAIN YOUR RATIONALE FOR WHY YOU ARE AN

2    ADVOCATE OF SPLITTING -- OR HAD BEEN AN ADVOCATE OF SPLITTING

3    THE COMPANY?

4    A.   BECAUSE I WAS OF THE BELIEF THAT THE TWO BUSINESSES WOULD

5    PERFORM OPTIMALLY INDEPENDENTLY.

6         FROM THE CHIP POINT OF VIEW, I FELT THAT -- I MEAN,

7    THERE'S NO DOUBT, A COMPANY -- LICENSEES, EVEN THOSE -- EVEN

8    THE ONES THAT RESPECT OUR INTELLECTUAL PROPERTY, PREFER NOT TO

9    PAY ROYALTIES AND WOULD LOOK FOR WAYS NOT TO PAY ROYALTIES.

10        ON THE CHIP SIDE, THEY, LICENSEES, WOULD COME TO THE CHIP

11   BUSINESS AND SAY, YOU KNOW, WE'RE PAYING ALL THESE ROYALTIES,

12   WE WANT YOU TO REDUCE OUR CHIP PRICES OR WE'RE NOT GOING TO USE

13   YOUR CHIP, WE'RE GOING TO USE SOMEBODY'S ELSE CHIPS, THOSE

14   KINDS OF THINGS.

15        OR THEY WOULD SAY WE'RE GOING TO ASSERT PATENTS AGAINST

16   YOUR CHIP PRODUCTS.

17        ALL THOSE SORTS OF THINGS CAUSED PRESSURE ON BOTH

18   BUSINESSES TO MAKE COMPROMISES, TO REDUCE ROYALTIES, TO REDUCE,

19   YOU KNOW, CHIP PRICING, TO DO THOSE -- TO PROVIDE INCENTIVE

20   AGREEMENTS, DO THOSE KINDS OF THINGS, THAT I THINK AS SEPARATE

21   COMPANIES WE WOULDN'T HAVE TO DO.

22        AND A LICENSING COMPANY, EVEN THOUGH EARLIER I TALKED

23   ABOUT A PATENT LICENSING COMPANY WOULD HAVE TO -- YOU KNOW,

24   THERE WOULD BE SOME ISSUES IN TERMS OF HAVING TO GO ENFORCE AND

25   SO FORTH, IT WOULDN'T NEED A CROSS-LICENSE TO ITS PRODUCTS

ALTMAN CROSS BY MR. BORNSTEIN

1   BECAUSE IT WOULDN'T BE SELLING PRODUCTS.  IT HAD -- IN MY VIEW,

2   WE HAD A VERY BROAD PATENT PORTFOLIO THAT HAD BEEN LICENSED

3   TIME AND TIME AGAIN AND SO THERE WAS A, A VERY CLEAR VALUE FOR

4   THAT PORTFOLIO.

5        AND WHEN, WHEN YOU TAKE OUT THE NEED FOR CROSS-LICENSES,

6   WHEN YOU TAKE OUT THE, YOU KNOW, THE OTHER ISSUES THAT YOU GET

7   FACED WITH AS ONE COMPANY, I BELIEVED THAT WE COULD POTENTIALLY

8   GET MORE ROYALTY INCOME FOR INNOVATION THAT WE CONTINUED TO

9   PRODUCE.

10  Q.   OKAY.  CAN I ASK YOU TO TAKE A LOOK AT ONE MORE DOCUMENT,

11   IT'S IN THE FTC'S BINDER.  IT'S TAB 20, CX 7035.

12        AND, YOUR HONOR, THIS WAS ADMITTED INTO EVIDENCE ON

13  FRIDAY.

14        IS THIS AN E-MAIL, SIR, THAT YOU WROTE IN 2008 TO

15  PAUL JACOBS?

16  A.   YES.

17  Q.   AND WHAT'S THE GENERAL SUBJECT MATTER OF THIS E-MAIL?

18  A.   THE GENERAL SUBJECT MATTER IS PUTTING FORTH A RATIONALE

19   FOR NOT SPINNING.

20  Q.   OKAY.  AND IN THE VERY FIRST -- THE VERY FIRST LINE OF THE

21   E-MAIL YOU SAY, "HERE IS THE WAY ONE COULD VIEW THE CHINA

22   SITUATION AS HAVING CAUSED A CHANGE IN OUR THINKING."

23        DO YOU SEE THAT?

24  A.   YES.

25  Q.   COULD YOU EXPLAIN WHAT YOU MEANT BY THAT AND WHAT YOU WERE

```
1    DOING HERE?
2    A.   MY RECOLLECTION IS THAT PAUL, WHO WAS -- I MEAN, THIS WAS
3    A TOUGH DECISION.  THERE WERE -- THERE'S PRO'S AND CON'S FOR
4    SPINNING FOR SURE.
5        HE HAD BEEN IN FAVOR OF IT, AND THEN HAD DECIDED THAT HE
6    DIDN'T WANT TO GO FORWARD WITH IT.
7        SO --
8    Q.   "IT" BEING THE SPIN, YOU MEAN?
9    A.   YEAH.  AND THIS SETS FORTH SOMETHING THAT HAD HAPPENED
10   THAT GIVES US A RATIONALE FOR, ANOTHER REASON, ANOTHER PRO, I
11   GUESS, FOR NOT SPINNING.
12   Q.   AND AT THE TIME YOU WROTE THIS WERE YOU STILL AN ADVOCATE,
13   HOWEVER, OF KEEPING -- FOR SPLITTING THE COMPANY APART?
14   A.   I'VE ALWAYS BEEN AN ADVOCATE FOR DOING THAT.
15           MR. BORNSTEIN:  THANK YOU.  I HAVE NOTHING FURTHER,
16   YOUR HONOR.
17           THE COURT:  ALL RIGHT.  LET ME RETURN TO YOU THE
18   REFRESHING RECOLLECTION DOCUMENT.  AND OTHER THAN JX 006, ARE
19   THERE ANY OTHER EXHIBITS THAT HAVE COME IN THROUGH MR. ALTMAN
20   THAT REQUIRE SEALING?
21           MR. BORNSTEIN:  NO, YOUR HONOR.  AND JX 006 I
22   BELIEVE, YOUR HONOR, HAS ALREADY SEALED.
23           THE COURT:  RIGHT.  I JUST WANT THE JOINT EXHIBIT
24   LIST TO SPECIFY WHETHER A DOCUMENT IS BEING SEALED IN ITS
25   ENTIRETY OR PORTIONS, BUT I WILL MENTION THAT LATER TO THE
```

1    PARTIES.

2         OKAY.  THANK YOU.

3              MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

4              THE COURT:  OKAY.  IT'S 11:30.  DO YOU HAVE ANY

5    REDIRECT, OR NOT?

6              MR. MATHESON:  YES, YOUR HONOR.

7              THE COURT:  OKAY.

8         (PAUSE IN PROCEEDINGS.)

9              MR. MATHESON:  MAY I PROCEED, YOUR HONOR?

10             THE COURT:  GO AHEAD.  TIME IS 11:31.  GO AHEAD,

11   PLEASE.

12                    **REDIRECT EXAMINATION**

13   BY MR. MATHESON:

14   Q.   SIR, COULD YOU DIRECT YOUR ATTENTION TO JX 005, PLEASE.

15   A.   WHICH BINDER?

16   Q.   THIS IS THE NOKIA LICENSE AGREEMENT WE PREVIOUSLY

17   DISCUSSED?

18   A.   I'M SORRY.  I'VE GOT TWO BINDERS.  WHICH BINDER ARE YOU

19   LOOKING AT?

20   Q.   THE BINDER YOUR --

21   A.   THIS ONE (INDICATING)?

22   Q.   -- QUALCOMM'S COUNSEL.

23        SIR, YOU STATED AT THE TIME YOU NEGOTIATED THE NOKIA

24   LICENSE AGREEMENT, CDMA HAD NOT YET BEEN STANDARDIZED; IS THAT

25   TRUE?  YOU SAID PREVIOUSLY THE STANDARD HAD NOT YET ISSUED AT

1    THE TIME YOU NEGOTIATED THE NOKIA LICENSE?

2    A.   I BELIEVE THAT'S TRUE.

3    Q.   SO QUALCOMM HAD NOT MADE ANY FRAND COMMITMENTS REGARDING

4    CDMA TO STANDARD SETTING BODIES AT THE TIME YOU NEGOTIATED THE

5    NOKIA LICENSE; RIGHT?

6    A.   I DON'T KNOW.  BECAUSE THERE'S A PERIOD OF TIME WHERE -- I

7    DON'T KNOW THE DATES OF WHEN WE CONTRIBUTED TO THE STANDARDS

8    BODY AND THEN WHEN IT ULTIMATELY CAME OUT AS A STANDARD.

9    Q.   DO YOU KNOW ONE WAY OR THE OTHER --

10   A.   WHEN WE MADE CONTRIBUTIONS, I BELIEVE THAT WE WERE MAKING

11   THEM AS WELL, BUT I JUST DON'T KNOW THE TIME.

12   Q.   DO YOU KNOW IF YOU MADE A FRAND COMMITMENT TO ANY STANDARD

13   SETTING ORGANIZATION AT THE TIME YOU NEGOTIATED THE LICENSE

14   WITH NOKIA?

15   A.   I DON'T KNOW ONE WAY OR THE OTHER.

16   Q.   NOKIA SUBSEQUENTLY CLAIMED THAT LICENSE DID NOT COMPORT

17   WITH FRAND COMMITMENTS THAT QUALCOMM MADE; ISN'T THAT RIGHT?

18   A.   YEAH, WE HAD -- LIKE I SAID BEFORE, WE HAD LITIGATION WITH

19   THEM, AND I THINK THAT WAS ONE OF THEIR ARGUMENTS.

20   Q.   AND QUALCOMM WAS NOT IN A POSITION TO CUT OFF CHIPSET

21   SUPPLY TO NOKIA WHEN NOKIA BROUGHT THOSE CLAIMS BECAUSE NOKIA

22   WASN'T BUYING ANY CHIPS FROM QUALCOMM AT THAT TIME; RIGHT?

23   A.   I BELIEVE THAT'S RIGHT.

24   Q.   DIRECT YOUR ATTENTION, SIR, TO TAB 26, OR SORRY, TAB 22 IN

25   THE BINDER I HANDED YOU.  IT'S CX 7234.

```
 1            THIS DOCUMENT HAS BEEN PREVIOUSLY ADMITTED, YOUR HONOR.

 2     A.    TAB -- WHICH TAB?

 3     Q.    I BELIEVE IT'S TAB 22.  CX 7234.

 4     A.    OKAY.  WHAT PAGE?

 5     Q.    DO YOU RECOGNIZE THIS DOCUMENT AS A JANUARY 11TH, 2008,

 6     BERLIN DECK?

 7     A.    YES.

 8     Q.    NOW, YOU STATED YOU SAW SOME UPSIDE INTO SEPARATING QTL

 9     FROM QCT; RIGHT?

10     A.    YES.

11     Q.    AND ONE POTENTIAL UPSIDE WOULD BE THAT QTL COULD LICENSE

12     COMPETITORS TO QCT IN THE CHIP SPACE; RIGHT?

13     A.    WE COULD LICENSE IN BOTH CASES, BUT WE WOULD BE ABLE TO DO

14     SO IN A SPIN SCENARIO AS WELL AS A NON-SPIN SCENARIO.

15     Q.    BUT IF QTL WAS NO LONGER CONCERNED WITH PROTECTING THE

16     COMPETITIVE POSITION OF QCT, IT WOULD HAVE A FINANCIAL

17     INCENTIVE TO ENABLE COMPETITORS TO QCT; ISN'T THAT RIGHT?

18     A.    I WOULD SAY WE WOULD HAVE STILL NO INCENTIVE TO LICENSE

19     EXHAUSTIVELY, AND WE WOULD NOT HAVE LICENSED EXHAUSTIVELY.

20     Q.    THAT WASN'T MY QUESTION, SIR.

21            IF QTL WAS NOT CONCERNED WITH THE GOVERNMENT ABILITY OF

22     QCT, IT WOULD HAVE AN INCENTIVE TO ENCOURAGE COMPETITORS TO QCT

23     TO ENTER THE CHIP SPACE; RIGHT?

24     A.    IF WE DIDN'T CARE ABOUT QCT'S -- WE CARE ABOUT ALL OF

25     OUR -- WE WANT ALL OF OUR LICENSEES TO DO WELL.  SO IF WE HAD
```

1    SPUN, QCT WAS THEN LICENSED TO SELL CHIPS, WE'D WANT THEM TO

2    SELL CHIPS TO DEVICE MANUFACTURERS BECAUSE THE DEVICE

3    MANUFACTURERS WOULD PAY US ROYALTIES.

4         WE WOULD NOT HAVE GONE OUT AND LICENSED CHIP COMPANIES AT

5    THAT POINT AND COLLECTED MORE ROYALTIES ON THE SALE OF CHIPS

6    BECAUSE OUR BUSINESS WAS COLLECTING -- FROM LICENSING WAS

7    COLLECTING ROYALTIES ON THE HANDSETS.

8         SO IT WOULD HAVE -- I THINK IT'S FAIR TO SAY WE WOULD HAVE

9    BEEN AMBIVALENT WHO WAS SELLING THE CHIPS, AS LONG AS THE CHIPS

10   WERE BEING SOLD, AND WE WOULD BEEN VERY HAPPY THAT QCT WOULD

11   HAVE BEEN SELLING THEM.

12   Q.   BUT YOU WOULD HAVE BEEN EQUALLY HAPPY IF COMPETITORS TO

13   QCT WOULD HAVE ENTERED THE SPACE AND SOLD CHIPS IN COMPETITION

14   WITH QCT; RIGHT?

15   A.   AS A SEPARATE, INDEPENDENT LICENSING COMPANY, WE WOULD

16   HAVE BEEN FOCUSSED ON COLLECTING ROYALTIES FOR OUR I.P.

17   REGARDLESS OF WHO SOLD THE CHIPS.

18   Q.   TURN YOUR ATTENTION TO CX 7234-015.  THIS SLIDE IS TITLED

19   "SPIN RATIONALE:  INABILITY TO ADDRESS BUSINESS CONFLICTS AS

20   ONE COMPANY."

21        DO YOU SEE THAT, SIR?

22   A.   YES.

23   Q.   TURN YOUR ATTENTION -- DO YOU SEE THE FINAL BOTTOM OF THE

24   PAGE THE ROW READS, "ABILITY TO CONTINUE TO SELL QUALCOMM I.P.

25   AND TECHNOLOGY"?

1    A.   YES.

2    Q.   NOW, THE RATIONALE, THE POSSIBLE MITIGATING ACTION WOULD

3    BE TO ENABLE COMPETITION TO QCT BY PROVIDING DESIGNS AND/OR

4    FINANCIAL INCENTIVES; RIGHT?

5    A.   YES.

6    Q.   HALFWAY UP THE PAGE, THERE'S -- DO YOU SEE BROADCOM/NOKIA

7    DISPUTES?  IT'S BEEN REDACTED FOR PRIVILEGE?

8    A.   I DON'T SEE IT.

9    Q.   YOU CAN LOOK ON YOUR SCREEN, SIR.

10   A.   ON THIS SIDE?  YEAH.

11   Q.   AT THE TIME QUALCOMM HAD ONGOING DISPUTES WITH NOKIA IN

12   WHICH NOKIA ARGUED THAT QUALCOMM'S LICENSING PRACTICES DID NOT

13   COMPORT WITH ITS FRAND OBLIGATIONS; CORRECT?

14   A.   I BELIEVE SO.

15   Q.   BROAD --

16   A.   THAT WAS AT LEAST ONE OF THEIR ARGUMENTS.

17   Q.   BROADCOM, LIKEWISE, HAD AN ONGOING LITIGATION DISPUTE WITH

18   QUALCOMM AT THIS TIME; RIGHT?

19   A.   I THINK SO, YES.

20   Q.   ONE OF THE THINGS THAT BROADCOM SOUGHT FROM QUALCOMM WAS

21   AN EXHAUSTIVE LICENSE; IS THAT RIGHT?

22   A.   THEY DID SEEK IT, YES.

23   Q.   AND YOU DIDN'T WANT TO GIVE THEM AN EXHAUSTIVE LICENSE

24   BECAUSE THAT COULD HAVE A NEGATIVE EFFECT ON QUALCOMM'S

25   LICENSING BUSINESS; RIGHT?

```
1        A.    THAT'S CORRECT.

2                  MR. MATHESON:  NO FURTHER REDIRECT, YOUR HONOR.

3                  THE COURT:  ALL RIGHT.  TIME IS 11:37.

4            IS THERE ANY RECROSS?

5                  MR. BORNSTEIN:  THERE IS NOT, YOUR HONOR.

6                  THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

7        SUBJECT TO RECALL OR NOT SUBJECT TO RECALL FROM BOTH SIDES?

8                  MR. MATHESON:  YES, YOUR HONOR, EXCUSED NOT SUBJECT

9        TO RECALL.

10                 MR. BORNSTEIN:  SAME FROM OUR PERSPECTIVE, YOUR

11       HONOR.

12                 THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

13       TESTIMONY.

14                 THE WITNESS:  THANK YOU.

15                 THE COURT:  OKAY.  SO THAT'S NOT SUBJECT TO RECALL.

16                 MS. MILICI:  YOUR HONOR, THE FTC CALLS DEREK ABERLE.

17            (PAUSE IN PROCEEDINGS.)

18                 THE CLERK:  PLEASE STAND.  WOULD YOU PLEASE RAISE

19       YOUR RIGHT HAND.

20            **(PLAINTIFF'S WITNESS, DEREK ABERLE, WAS SWORN.)**

21                 THE WITNESS:  YES.

22                 THE CLERK:  THANK YOU.  PLEASE BE SEATED.

23            PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

24       THE RECORD.

25                 THE WITNESS:  DEREK ABERLE.  A-B-E-R-L-E.
```

1          THE COURT:  OKAY.  ONE MINUTE.

2       DO YOU HAVE -- DOES THAT HAVE DEPO TRANSCRIPTS AS WELL?

3          THE CLERK:  YES.

4          THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

5       OKAY.  TIME IS 11:39.  GO AHEAD, PLEASE.

6                          **DIRECT EXAMINATION**

7    BY MS. MILICI:

8    Q.   GOOD MORNING, MR. ABERLE.  I'M JENNIFER MILICI FROM THE

9    FEDERAL TRADE COMMISSION.

10       YOU ARE THE FORMER PRESIDENT OF QUALCOMM; CORRECT?

11   A.   CORRECT.

12   Q.   AND YOU WORKED IN QTL FROM 2000 TO 2014, AND THEN WERE

13   PRESIDENT OF QUALCOMM UNTIL YOU LEFT THE COMPANY IN JANUARY

14   2018; IS THAT CORRECT?

15   A.   YES.

16   Q.   AND AFTER YOU LEFT THE COMPANY IN JANUARY 2018, YOU HAD A

17   CONSULTING CONTRACT THAT LASTED FOR A COUPLE OF MONTHS AFTER

18   THAT; CORRECT?

19   A.   YES.

20   Q.   AND WHILE YOU WERE EMPLOYED BY QUALCOMM, QUALCOMM HAD A

21   POLICY OF NOT SELLING CHIPS TO OEM'S THAT DID NOT HAVE A

22   LICENSE FOR THE PRODUCTS TO WHICH THE CHIPS WERE INTENDED TO

23   GO; CORRECT?

24   A.   YES, THAT WAS THE GENERAL POLICY.

25   Q.   AND QUALCOMM DID NOT CHANGE ITS POLICY AT ANY TIME WHILE

ABERLE DIRECT BY MS. MILICI

1     YOU WERE EMPLOYED THERE?

2     A.   NO.

3     Q.   AND YOU ARE NOT AWARE OF ANY OTHER BUSINESS THAT SELLS

4     PRODUCTS AND REQUIRES, AS A CONDITION OF SALE, THAT THE

5     PURCHASER ENTER A SEPARATE LICENSE AGREEMENT; IS THAT CORRECT?

6     A.   I THINK THERE ARE SOME OTHERS THAT DO THAT, YES.

7     Q.   AND AT YOUR DEPOSITION IN MARCH OF THIS YEAR, DO YOU

8     RECALL TESTIFYING THAT YOU WERE UNAWARE OF ANYBODY WHO HAD A

9     SIGNIFICANT LICENSING BUSINESS AND SOLD PRODUCTS AND DEVICES

10    THAT ARE LICENSED?

11    A.   YEAH, I'M SORRY.  I JUST -- I'M AWARE THAT THERE ARE, I

12    THINK, AT LEAST A COUPLE OTHER COMPANIES, OR ONE, THAT HAS A

13    PRACTICE OF NOT SELLING PRODUCTS TO A COMPANY THAT DOESN'T HAVE

14    A LICENSE.  I DON'T KNOW WHETHER THEY HAVE A SIGNIFICANT

15    LICENSING BUSINESS, SO...

16    Q.   DURING YOUR DEPOSITION WHEN I ASKED YOU THAT QUESTION, YOU

17    DIDN'T IDENTIFY ANY SUCH COMPANIES, DID YOU?

18    A.   I DON'T RECALL.

19    Q.   COULD YOU PLEASE TURN TO TAB 1 IN YOUR BINDER?

20         AND CAN YOU IDENTIFY THIS DOCUMENT AS AN E-MAIL FROM

21    MARV BLECKER, JANUARY 2002, AND IT'S TO AN INDIVIDUAL FROM

22    CURITEL AND COPIED TO YOU AND OTHERS.

23    A.   YES.

24         MS. MILICI:  AND I MOVE TO ADMIT CX 6469.

25         MR. BORNSTEIN:  THERE'S NO OBJECTION.

ABERLE DIRECT BY MS. MILICI

```
1            THE COURT:  IT'S ADMITTED.

2            (PLAINTIFF'S EXHIBIT CX 6469 WAS ADMITTED IN EVIDENCE.)

3            THE COURT:  GO AHEAD, PLEASE.

4     BY MS. MILICI:

5     Q.  IF YOU LOOK AT THE LAST PARAGRAPH OF THIS E-MAIL FROM

6     MARV BLECKER HE WRITES, "FOR YOUR INFORMATION, I'M ASKING OUR

7     QCT DIVISION TO HOLD ALL SALES AND SHIPMENTS OF CDMA ASICS TO

8     CURITEL UNTIL THIS AGREEMENT IS EXECUTED BECAUSE QUALCOMM DOES

9     NOT SELL CDMA ASICS TO NON-LICENSEES."

10           MARV BLECKER WAS THE SENIOR VICE PRESIDENT OF QTL AT THE

11    TIME?

12    A.  YES.

13    Q.  AND THIS IS AN ACCURATE STATEMENT OF QUALCOMM'S POLICY?

14    A.  I'M NOT SURE.  I MEAN, THE DOCUMENT SAYS WHAT YOU READ.

15    Q.  OKAY.  IS THE STATEMENT THAT QUALCOMM DOES NOT SELL CDMA

16    ASICS TO NON-LICENSEES AN ACCURATE STATEMENT ABOUT THE POLICY?

17    A.  YES.

18    Q.  COULD YOU PLEASE TURN TO TAB 2 IN YOUR BINDER.  AND CAN

19    YOU IDENTIFY THIS AS AN E-MAIL EXCHANGE -- THIS IS CX 7650 --

20    AS AN E-MAIL EXCHANGE THAT YOU PARTICIPATED IN IN FEBRUARY OF

21    2012?

22    A.  YES.

23           MS. MILICI:  YOUR HONOR, I MOVE TO ADMIT CX 7650.

24           MR. BORNSTEIN:  NO OBJECTION.

25           THE COURT:  IT'S ADMITTED.
```

1          (PLAINTIFF'S EXHIBIT CX 7650 WAS ADMITTED IN EVIDENCE.)

2              THE COURT:  GO AHEAD, PLEASE.

3      BY MS. MILICI:

4      Q.   AND IF WE TURN TO THE FIRST E-MAIL IN THE CHAIN, IT'S

5      DATED FEBRUARY 16TH, 2012.  THERE'S AN E-MAIL FROM

6      ERIC REIFSCHNEIDER TO JONATHAN PEARL THAT SAYS, "HERE IS A

7      DRAFT OF THE CDMA SULA AS WE DISCUSSED LAST WEEK."

8          DO YOU SEE THAT?

9          AND A SULA IS A SUBSCRIBER UNIT LICENSE AGREEMENT?

10     A.   YES.

11     Q.   AND A CDMA SULA IS A SUBSCRIBER UNIT LICENSE AGREEMENT

12     THAT APPLIES TO CDMA; CORRECT?

13     A.   YES.

14     Q.   AND ERIC REIFSCHNEIDER WAS OUTSIDE COUNSEL FOR QUALCOMM AT

15     THE TIME?

16     A.   YES, I BELIEVE SO BASED ON THE E-MAIL.

17     Q.   AND JONATHAN PEARL WAS AN EMPLOYEE OF SONY?

18     A.   I THINK HE WOULD HAVE BEEN AT SONY ERICSSON, WHICH BECAME

19     SONY MOBILE.

20     Q.   AND MR. PEARL RESPONDED TO ERIC REIFSCHNEIDER, AND IN HIS

21     E-MAIL HE SAYS, "I SEE IT REFERS TO 5 PERCENT, AND AS I SAID IN

22     OUR MEETING, WE ARE NOT EXPECTING TO PAY AT THAT LEVEL."

23         DO YOU SEE THAT?

24     A.   YES.

25     Q.   AND SO 5 PERCENT WAS QUALCOMM'S STANDARD ROYALTY RATE AT

1    THE TIME?

2    A.   FOR A 3G LICENSE FOR SUBSCRIBER UNITS, 5 PERCENT WOULD

3    HAVE BEEN THE TYPICAL RUNNING ROYALTY AT THE TIME.

4    Q.   AND SONY WAS NOT EXPECTING TO PAY AT THAT LEVEL; CORRECT?

5    A.   THAT'S WHAT MR. PEARL WAS COMMUNICATING.  I DON'T KNOW

6    WHAT THEY ACTUALLY EXPECTED.

7    Q.   AND THEN IF YOU LOOK UP TO THE NEXT E-MAIL FROM

8    ERIC REIFSCHNEIDER HE WROTE, IN THE FIRST PARAGRAPH, "AS WE

9    DISCUSSED IN NEW YORK, WE NEED TO GET A NEW LICENSE AGREEMENT

10   IN PLACE QUICKLY SO WE CAN AVOID ANY DISRUPTION IN SUPPLY."

11        DO YOU SEE THAT?

12   A.   YES, I SEE THAT.

13   Q.   AND THEN AT THE END OF HIS E-MAIL HE SAYS, "I UNDERSTAND

14   THAT THERE ARE SEVERAL CHIPSET ORDERS SCHEDULED TO CHIP THIS

15   WEEK, SO WE NEED TO MOVE QUICKLY ON THAT."

16        DO YOU SEE THAT?

17   A.   YES.

18   Q.   AND MR. REIFSCHNEIDER WAS STILL OUTSIDE COUNSEL AND YOU

19   WERE COPIED ON THIS E-MAIL; CORRECT?

20   A.   YES.

21   Q.   CAN YOU PLEASE TURN TO TAB 3.  THIS IS CX 6522, WHICH WAS

22   ADMITTED ON FRIDAY.

23        AND PLEASE TURN TO PAGE 004 OF THE DOCUMENT.  AND AT THE

24   BOTTOM OF PAGE 004 THERE'S AN E-MAIL FROM YOU TO

25   ENRICO SALVATORI AND OTHERS.

ABERLE DIRECT BY MS. MILICI                                              253

```
 1            DO YOU SEE THAT?

 2     A.    YES.

 3     Q.    AND WHO IS MR. SALVATORI?

 4     A.    HE WAS BASICALLY THE HEAD OF OUR EUROPEAN OPERATION --

 5     Q.    AND --

 6     A.    -- AT THE TIME.

 7     Q.    THANK YOU.  SORRY FOR SPEAKING OVER YOU.

 8            AND YOU WROTE IN THIS E-MAIL AT THE BOTTOM OF THE FIRST

 9     PARAGRAPH, "HE CONFIRMED THEY UNDERSTOOD THAT THE ERICSSON

10     LICENSE WOULD NOT CONTINUE AND THAT THEY WOULD NEED TO CONCLUDE

11     A NEW LICENSE IN ORDER TO AVOID A DISRUPTION IN SUPPLY."

12            DO YOU SEE THAT?

13     A.    YES.

14     Q.    AND SO YOU WERE REPORTING TO MR. SALVATORI AND OTHERS THAT

15     YOU HAD TOLD SONY MOBILE THAT THEY WOULD NEED TO CONCLUDE A NEW

16     LICENSE IN ORDER TO AVOID A DISRUPTION IN SUPPLY; CORRECT?

17     A.    YES.

18     Q.    AND THEN IN THE LAST PARAGRAPH OF YOUR E-MAIL YOU WROTE,

19     "TO MY KNOWLEDGE, WE HAVE NEVER SHIPPED COMMERCIAL QUANTITIES

20     OF CHIPS TO A COMPANY WITHOUT A LICENSE.  WE CAN'T DO THAT HERE

21     EITHER.  SINCE MY UNDERSTANDING IS THAT WE STILL HAVE A CSA IN

22     PLACE THAT PROHIBITS SONY MOBILE FROM USING THE CHIPS WE SELL

23     THEM IN SUBSCRIBER UNITS THAT ARE NOT LICENSED."

24            DO YOU SEE THAT?

25     A.    YES.
```

1    Q.   AND THE CSA THAT YOU'RE REFERRING TO THERE IS A COMPONENT

2    SUPPLY AGREEMENT?

3    A.   YES.

4    Q.   AND IT'S YOUR UNDERSTANDING THAT THE COMPONENT SUPPLY

5    AGREEMENT PROHIBITS LICENSEES FROM USING CHIPS IN SUBSCRIBER

6    UNITS THAT ARE NOT LICENSED BY QUALCOMM?

7    A.   I THINK GENERALLY THAT'S THE CASE, YES.

8    Q.   LET'S TURN TO TAB 4, PLEASE.  THIS IS JX 00063.

9         I MOVE TO ADMIT THIS DOCUMENT.

10             MR. BORNSTEIN:  THERE'S NO OBJECTION, YOUR HONOR.

11             THE COURT:  IT'S ADMITTED.

12        (JOINT EXHIBIT JX 0063 WAS ADMITTED IN EVIDENCE.)

13             THE COURT:  GO AHEAD, PLEASE.

14   BY MS. MILICI:

15   Q.   MR. ABERLE, DO YOU RECOGNIZE THIS DOCUMENT?

16   A.   YES.

17   Q.   OKAY.  IS THIS A SUBSCRIBER UNIT LICENSE AGREEMENT ENTERED

18   BETWEEN SONY AND QUALCOMM IN MAY OF 2012?

19   A.   BETWEEN SONY MOBILE AND QUALCOMM, YES.

20   Q.   OKAY.  AND COULD YOU PLEASE TURN TO PAGE 015.

21        AND DO YOU SEE UNDER THE NUMBER 4 IT SAYS ROYALTIES?

22   A.   YES.

23   Q.   AND UNDER NUMBER 4.1 IT SAYS ROYALTIES FOR SUBSCRIBER

24   UNITS?

25        DO YOU SEE THAT?

1    A.    YES.

2    Q.    AND THE LICENSE PROVIDES FOR A RUNNING ROYALTY RATE OF

3    5 PERCENT OF THE NET SELLING PRICE.

4         DO YOU SEE THAT?

5    A.    I SEE THAT IN THE FIRST PARAGRAPH, YES.

6         BUT THERE WAS -- ACTUALLY IT WAS SUBJECT TO ADJUSTMENT,

7    POTENTIALLY SUBJECT TO ADJUSTMENT LATER.

8    Q.    BUT IT DOES PROVIDE FOR A 5 PERCENT RUNNING ROYALTY RATE

9    IF THERE'S NO ADJUSTMENT; CORRECT?

10   A.    YES.  SO THE IDEA WAS IT WOULD BE PAID --

11   Q.    THANK YOU.

12   A.    -- DURING THE INTERIM PERIOD, AND THEN IT COULD BE SUBJECT

13   TO ADJUSTMENT LATER.

14   Q.    WHEN DID THIS AGREEMENT TERMINATE?

15   A.    I DON'T REMEMBER.  I BELIEVE IT WAS A SHORT-TERM

16   AGREEMENT, SOMEWHERE BETWEEN NINE MONTHS AND A YEAR I THINK.

17   Q.    CAN YOU PLEASE TURN TO PAGE 12.  IT SAYS TERM OF

18   AGREEMENT.  DO YOU SEE THAT IT SAYS THAT THE AGREEMENT WILL

19   TERMINATE ON SEPTEMBER 30TH, 2012?

20   A.    YES, I SEE THAT.

21   Q.    DOES THAT REFRESH YOUR RECOLLECTION THAT THIS -- THE

22   DURATION OF THIS AGREEMENT WAS FOR FOUR MONTHS?

23   A.    WELL, IT WAS FROM FEBRUARY UNTIL SEPTEMBER.

24   Q.    BUT IT WAS SIGNED IN MAY; CORRECT?

25   A.    OH, I DIDN'T SEE THAT.

ABERLE DIRECT BY MS. MILICI

1      Q.   WE CAN MOVE ON.

2           CAN YOU PLEASE LOOK AT THE NEXT TAB, WHICH IS TAB 5.  THIS

3      IS JX 0072.

4           AND, YOUR HONOR, I MOVE TO ADMIT JX 0072.

5              MR. BORNSTEIN:  NO OBJECTION, YOUR HONOR.

6              THE COURT:  IT'S ADMITTED.

7           (JOINT EXHIBIT JX 0072 WAS ADMITTED IN EVIDENCE.)

8              THE COURT:  THIS APPEARS TO BE A SUBSCRIBER UNIT

9      PATENT LICENSE AGREEMENT DATED OCTOBER 1ST, 2012.

10          DO YOU SEE THAT?

11     A.   YES.

12     Q.   AND THEN LET'S TURN TO PAGE 23.  AND UNDER ROYALTIES IT

13     PROVIDES A RUNNING ROYALTY RATE OF THE NET SELLING PRICE OF

14     5 PERCENT.

15          DO YOU SEE THAT?

16     A.   YES.

17     Q.   OKAY.  AND THAT 5 PERCENT IS NOT SUBJECT TO ADJUSTMENT?

18     A.   I DON'T BELIEVE SO.  I DON'T SEE ANYTHING IN IT.

19     Q.   OKAY.  AND THAT 5 PERCENT IS THE SAME ROYALTY RATE THAT

20     JONATHAN PEARL SAID IN FEBRUARY THAT SONY WAS NOT EXPECTING TO

21     PAY; CORRECT?

22     A.   I BELIEVE THE E-MAIL YOU SHOWED ME SAID THEY WERE NOT

23     EXPECTING TO PAY 5 PERCENT.

24     Q.   RIGHT.

25          CAN WE PLEASE TURN TO TAB 7.  THIS IS CX 6974.

```
1              CAN YOU IDENTIFY THIS AS A PACKAGE OF BOARD MATERIALS THAT

2     WENT TO THE BOARD IN JULY OF 2012?

3              THE COURT:  WAS THIS PREVIOUSLY ADMITTED?

4              MS. MILICI:  I DO NOT BELIEVE SO.

5              THE COURT:  OKAY.

6              THE WITNESS:  FROM THE E-MAIL, IT LOOKS LIKE THAT'S

7     WHAT IT IS.

8     BY MS. MILICI:

9     Q.   OKAY.  SO -- AND YOU WERE ON THE EXECUTIVE COMMITTEE AT

10    THE TIME?

11    A.   YES.

12    Q.   PLEASE TURN TO -- DID I JUST MOVE TO ADMIT CX 6974, OR NO?

13             THE COURT:  YOU HADN'T YET.

14             MS. MILICI:  THANK YOU.  I MOVE TO ADMIT CX 6974,

15    PLEASE.

16             MR. BORNSTEIN:  I DO NOT OBJECT.

17             THE COURT:  IT'S ADMITTED.

18         (PLAINTIFF'S EXHIBIT CX 6974 WAS ADMITTED IN EVIDENCE.)

19             THE COURT:  GO AHEAD, PLEASE.

20             MS. MILICI:  THANK YOU.

21    Q.   CAN WE PLEASE TURN TO PAGE 64.

22         AND THIS PAGE 64 IS THE BEGINNING OF A STRATEGIC PLAN

23    REVIEW.

24         DO YOU SEE THAT?

25    A.   YES.
```

```
 1    Q.   AND DO YOU RECALL SUBMITTING SLIDES FOR THIS STRATEGIC

 2    PLAN REVIEW?

 3    A.   NOT SPECIFICALLY, BUT WE DID IT KIND OF ON AN ANNUAL

 4    CADENCE, AND IT LOOKS LIKE THAT'S WHAT THIS IS.

 5    Q.   AND YOU WOULD HAVE PROPOSED SLIDES FOR THIS SECTION OF THE

 6    BOARD DECK; RIGHT?

 7    A.   IN 2012?  IT PROBABLY WOULD HAVE BEEN A COMBINATION OF

 8    MR. REIFSCHNEIDER AND MYSELF.

 9    Q.   COULD YOU PLEASE TURN BACK IN YOUR BINDER TO TAB 6,

10    PLEASE.  AND THIS IS CX 6998.

11    A.   YEP.

12    Q.   AND CAN YOU IDENTIFY THIS AS AN E-MAIL FROM YOU TO

13    PAUL JACOBS DATED JULY 2ND, 2012?

14    A.   YES.

15              MS. MILICI:  I MOVE TO ADMIT CX 6998.

16              MR. BORNSTEIN:  NO OBJECTION.

17              THE COURT:  IT'S ADMITTED.

18         (PLAINTIFF'S EXHIBIT CX 6998 WAS ADMITTED IN EVIDENCE.)

19              THE COURT:  GO AHEAD, PLEASE.

20    BY MS. MILICI:

21    Q.   AND IN THIS E-MAIL, YOU SAY "HERE ARE MY SUGGESTED QTL

22    SLIDES."

23         DO YOU SEE THAT?

24    A.   YES.

25    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU PROPOSED THE
```

1      SLIDES THAT WENT INTO THE BOARD DECK?

2      A.   YEAH, IT LOOKS LIKE I SENT THEM ALONG.  ALL I WAS SAYING

3      IS IT WAS PROBABLY DONE COLLABORATIVELY BETWEEN

4      MR. REIFSCHNEIDER AND THE OTHERS.

5      Q.   BUT YOUR E-MAIL SAYS HERE ARE MY SUGGESTED QTL SLIDES;

6      CORRECT?

7      A.   YES.

8      Q.   AND THEN IF WE CAN TURN BACK TO TAB 7, AND LET'S TURN TO

9      PAGE 068, PLEASE.

10          AND ON THIS SLIDE IT SAYS STANDARD ESSENTIAL PATENTS, AND

11     THEN UNDER STRATEGY, THE FIRST, THE FIRST SMALL BULLET SAYS,

12     "SIGNIFICANT PORTION OF VALUE OF LICENSING PROGRAM DERIVES FROM

13     STANDARD-ESSENTIAL PATENTS."

14          DO YOU SEE THAT?

15     A.   YES.

16     Q.   AND THAT WAS A TRUE STATEMENT IN JULY OF 2012?

17     A.   YES.

18     Q.   COULD YOU PLEASE TURN TO PAGE 70.  AND THIS PAGE CONCERNS

19     AN ISSUE THAT WAS RAISED IN THE QTL STRATEGIC PLAN THAT WAS

20     SUBMITTED TO THE BOARD, AND IT'S ABOUT THE SALE OF CHIPSETS TO

21     UNLICENSED ENTITIES OR ENTITIES CLAIMING EXHAUSTION.

22          DO YOU SEE THAT?

23     A.   YES.

24     Q.   AND THIS IS ONE OF THE SLIDES THAT YOU SUGGESTED TO

25     PAUL JACOBS?

ABERLE DIRECT BY MS. MILICI                                                       260

1     A.   IT LOOKS LIKE IT WAS IN THE DECK THAT I SENT, YES.

2     Q.   AND THIS REFERS TO SLIDES TO -- SALES TO UNLICENSED

3     ENTITIES OR THOSE CLAIMING EXHAUSTION, DESPITE THE TERMS OF OUR

4     SUPPLY AND LICENSE AGREEMENTS.

5          DO YOU SEE THAT?

6     A.   YES.

7     Q.   AND IS IT YOUR UNDERSTANDING THAT THE TERMS OF THE SUPPLY

8     AND LICENSE AGREEMENTS ARE DESIGNED TO AVOID CLAIMS OF

9     EXHAUSTION?

10    A.   YES.

11    Q.   AND UNDER THE FIRST BULLET IT SAYS, "SUCH CLAIMS --" --

12    "SUCH SALES PRESENT THE RISK OF A FINDING OF PATENT EXHAUSTION

13    IN THE EVENT OF A DISPUTE OVER ROYALTIES."

14         DO YOU SEE THAT?

15    A.   I SEE THAT.

16    Q.   AND THAT ISSUE WAS A CONCERN TO QTL AT THE TIME?

17    A.   I THINK THROUGHOUT THE LICENSING PROGRAM WE HAD

18    SIGNIFICANT CONCERNS ABOUT SELLING CHIPS TO A COMPANY THAT DID

19    NOT HAVE A LICENSE BECAUSE THEY COULD CLAIM EXHAUSTION AND, IN

20    FACT, MANY OF THEM DID FROM TIME TO TIME.

21    Q.   BUT -- THANK YOU.

22         AND IN THE NEXT BULLET IT SAYS, "IF WE CEASE SUPPLY OF

23    CHIPS TO CURRENT CUSTOMERS THEY MAY ASSERT ANTITRUST CLAIMS

24    SEEKING DAMAGES/FINES AND CONTINUED SUPPLY."

25         DO YOU SEE THAT?

1   A.   YES.

2   Q.   AND THAT WAS A STATEMENT THAT WAS MADE TO THE BOARD IN

3   JULY 2012?

4   A.   WELL, IT WAS IN THESE MATERIALS THAT WERE PRESENTED TO THE

5   BOARD, YES.

6   Q.   THANK YOU.

7        UNDER STRATEGY, IT SAYS, "DEVELOP A PLAN OF

8   COMMUNICATION/ACTION THAT MAXIMIZES OUR ABILITY TO DEFEND

9   AGAINST THE ABOVE CLAIMS WHILE CEASING SUPPLY WHEN NECESSARY."

10       DO YOU SEE THAT?

11  A.   YES.

12  Q.   AND THIS WAS A STRATEGY THAT WAS COMMUNICATED TO THE BOARD

13  IN JULY OF 2012?

14  A.   I THINK WHAT WE WERE COMMUNICATING WAS THAT RATHER THAN

15  HAVE TO JUST REACT WHEN THESE SITUATIONS AROSE, WE WANTED TO

16  COME UP WITH A PROACTIVE PLAN TO MAKE SURE WE COULD GET OUT

17  AHEAD OF SITUATIONS WHERE THERE MAY BE A DISPUTE OR A LICENSE

18  RENEWAL THAT NEEDED TO HAPPEN AND SOMEBODY WAS BUYING CHIPS

19  FROM US.

20  Q.   SIR, CAN YOU PLEASE TURN TO PAGE 218, LINE 7 OF YOUR

21  DEPOSITION, WHICH SHOULD BE SITTING UP RIGHT NEXT TO YOU.

22  A.   I'M SORRY, WHAT PAGE?

23  Q.   218, LINE 7.

24       NOW, AT YOUR DEPOSITION -- I'M SORRY.  HAVE YOU FOUND IT

25  YET?

```
 1          NOW, AT YOUR DEPOSITION I ASKED YOU:  DID QUALCOMM COME UP

 2   WITH A PLAN OF COMMUNICATION THAT WOULD MAXIMIZE ITS ABILITY TO

 3   DEFEND AGAINST EXHAUSTION CLAIMS WHILE BEING ABLE TO CEASE

 4   SUPPLY WHEN NECESSARY?"

 5          DO YOU SEE THAT?

 6   A.   YES.

 7   Q.   AND YOUR ANSWER WAS, "ACTUALLY, AS I READ THAT, I DON'T

 8   RECALL IT.  I DON'T ACTUALLY KNOW WHAT IT MEANS."

 9          SO IS IT YOUR TESTIMONY THAT TODAY YOU DO KNOW WHAT IT

10   MEANS AND IN MARCH YOU DID NOT KNOW WHAT IT MEANS?

11   A.   I'M GIVING YOU MY RECOLLECTION AS I SIT HERE, AND MY

12   RECOLLECTION IS THAT WE WERE COMMUNICATING TO THE BOARD THAT WE

13   WANTED TO WORK ON A PLAN TO PROACTIVELY DEAL WITH THESE

14   SITUATIONS WHEN THEY AROSE.

15   Q.   BUT AT YOUR DEPOSITION --

16   A.   AND AT MY DEPOSITION THAT'S WHAT I SAID, YES.

17   Q.   AT YOUR DEPOSITION IN MARCH YOU SAID, "I DON'T RECALL SUCH

18   A PLAN."

19          CORRECT.

20   A.   YES, THAT'S WHAT IT SAYS.

21   Q.   THANK YOU.  AND YOU HAVEN'T BEEN EMPLOYED BY QUALCOMM

22   SINCE YOUR DEPOSITION; CORRECT?

23   A.   NO.

24   Q.   LET'S TURN TO TAB 8, PLEASE, IN YOUR BINDER.  AND THIS IS

25   CX 53 -- I'M SORRY.  CX 5231.
```

ABERLE DIRECT BY MS. MILICI

```
1              CAN YOU IDENTIFY THAT AS AN E-MAIL EXCHANGE BETWEEN

2     YOURSELF AND STEVE MOLLENKOPF IN MAY OF 2013?

3     A.   YES.

4              MS. MILICI:  MOVE TO ADMIT CX 5231.

5              MR. BORNSTEIN:  NO OBJECTION.

6              THE COURT:  AND I'D LIKE TO TAKE OUR BREAK NOW, IF

7     THAT'S OKAY.

8              MS. MILICI:  SURE.

9              THE COURT:  ALL RIGHT.  IT'S 12:02.  12:02 AND 8

10    SECONDS.  WE'LL GO AHEAD AND END IT.

11          OKAY.  WE'LL TAKE A BREAK UNTIL 1:05.  THANK YOU.

12              THE REPORTER:  IS THAT EXHIBIT ADMITTED?

13              THE COURT:  YES, THAT EXHIBIT IS ADMITTED.

14          (PLAINTIFF'S EXHIBIT CX 5231 WAS ADMITTED IN EVIDENCE.)

15              THE CLERK:  COURT IS IN RECESS.

16          (THE LUNCH RECESS WAS TAKEN FROM 12:02 P.M. UNTIL 1:07

17    P.M.)

18

19

20

21

22

23

24

25
```

```
1              AFTERNOON SESSION

2        (COURT CONVENED AT 1:07 P.M.)

3             THE COURT:  GOOD AFTERNOON.  WELCOME BACK.

4             MR. VAN NEST:  GOOD AFTERNOON, YOUR HONOR.

5             THE COURT:  ON THE JOINT -- PLEASE TAKE A SEAT.

6        ON THE JOINT EXHIBIT LIST, I REALIZED IF YOU START PUTTING

7    IN YOUR DESCRIPTION, YOU'LL FILE A BUNCH OF SEALING MOTIONS AS

8    TO EVERY DRAFT JOINT EXHIBIT LIST.  SO I THINK THAT'S -- I

9    THINK YOU'VE BEEN OVERBROAD IN YOUR REQUESTS TO SEAL YOUR

10   EXHIBIT LISTS, AS MY ORDER YESTERDAY SAID, AND I THINK YOU HAVE

11   UNTIL THE 14TH TO FILE RENEWED MOTIONS ON THAT.

12        BUT TO AVOID UNNECESSARY SEALING MOTIONS, I WILL ASK YOU

13   TO HOLD OFF ON PUTTING IN THE DESCRIPTIONS UNTIL THE END, OR AT

14   LEAST UNTIL AFTER I'VE RULED ON YOUR JANUARY 14 FILING BECAUSE

15   HOPEFULLY THAT'LL GIVE YOU SOME GUIDANCE AND THAT CAN MINIMIZE

16   UNNECESSARY SEALING MOTIONS.

17        OKAY.

18             MR. VAN NEST:  THANK YOU, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  LET'S GO AHEAD, PLEASE,

20   AND -- WHAT'S THE TIME NOW, PLEASE?

21             THE REPORTER:  1:08.

22             THE COURT:  1:08.  GO AHEAD, PLEASE.

23   BY MS. MILICI:

24   Q.   WELCOME BACK, MR. ABERLE.

25   A.   THANK YOU.
```

1    Q.   RIGHT BEFORE THE BREAK WE WERE LOOKING AT CX 5231, WHICH

2    HAD JUST BEEN ADMITTED, AND THIS IS AN E-MAIL EXCHANGE BETWEEN

3    YOURSELF AND STEVE MOLLENKOPF; CORRECT?

4    A.   YES.

5    Q.   AND STEVE MOLLENKOPF WAS THE CEO?

6    A.   NO, NOT AT THIS TIME.  HE WAS, I THINK, THE PRESIDENT.

7    Q.   OKAY.  AND ON YOUR E-MAIL THAT'S MAY 20TH, 2013, THAT'S

8    HIGHLIGHTED ON THE SCREEN RIGHT NOW, YOU WROTE TO

9    MR. MOLLENKOPF, "I SUGGEST THAT YOU MAKE THE FOLLOWING POINTS

10   TO HUAWEI'S CEO."

11        DO YOU SEE THAT?

12   A.   YES.

13   Q.   AND THEN YOUR LAST POINT THERE IS, "IF THEY DON'T EXTEND

14   WE WILL HAVE ISSUES RE CONTINUED CHIP SUPPLY ON C2K.  NOTE THAT

15   HUAWEI HAS BEEN CLAIMING PATENT EXHAUSTION BASED ON THEIR

16   PURCHASE OF CHIPS FROM QC DESPITE THE TERMS OF OUR SUPPLY

17   AGREEMENT."

18        DO YOU SEE THAT?

19   A.   YES.

20   Q.   AND THE SUPPLY AGREEMENT YOU WERE REFERRING TO THERE IS A

21   COMPONENT SUPPLY AGREEMENT?

22   A.   I BELIEVE SO.

23   Q.   AND THE SUPPLY AGREEMENT BETWEEN QUALCOMM AND HUAWEI

24   SPECIFIED THAT THE SALE OF MODEM CHIPS TO HUAWEI WOULD NOT

25   CONVEY ANY INTELLECTUAL PROPERTY RIGHTS TO HUAWEI?

ABERLE DIRECT BY MS. MILICI

1      A.   I'M SORRY.  COULD YOU REPEAT THAT?

2      Q.   SURE.  THE SUPPLY AGREEMENT BETWEEN QUALCOMM AND HUAWEI

3      SPECIFIED THAT THE SALE OF MODEM CHIPS WOULD NOT CONVEY ANY

4      INTELLECTUAL PROPERTY RIGHTS?

5      A.   I BELIEVE SO.

6      Q.   AND WHEN YOU SUGGESTED TO MR. MOLLENKOPF THAT HE MAKE THE

7      POINT TO THE CEO OF HUAWEI THAT QUALCOMM WILL HAVE ISSUES

8      REGARDING CONTINUED SUPPLY, HE RESPONDED, "I GOT IT.  THANKS."

9           DO YOU SEE THAT?

10     A.   YES.

11     Q.   LET'S TURN TO TAB 9.  THIS IS JX 93.

12          YOUR HONOR, I MOVE TO ADMIT JX 93.

13               MR. BORNSTEIN:  NO OBJECTION, YOUR HONOR.

14               THE COURT:  IT'S ADMITTED.

15          (JOINT EXHIBIT JX 93 WAS ADMITTED IN EVIDENCE.)

16               THE COURT:  GO AHEAD, PLEASE.

17     BY MS. MILICI:

18     Q.   AND THIS IS A -- APPEARS TO BE A SERIES OF AGREEMENTS

19     BETWEEN QUALCOMM AND RESEARCH IN MOTION.

20          I WANTED TO LOOK AT THE AGREEMENT THAT STARTS AT PAGE 116.

21     THAT'S DASH 116.

22          NOW, THIS IS A SUPPLY AGREEMENT.

23          DO YOU SEE THAT?

24     A.   I'M SORRY.  WHICH PAGE WAS IT?

25     Q.   DASH 116.

1    A.   OH, 116.

2              MR. BORNSTEIN:  YOUR HONOR, WHILE MR. ABERLE IS

3    REVIEWING THE DOCUMENT, I'D LIKE TO ASK THAT WE JUST TAKE THIS

4    ONE, SINCE IT'S AN ACTIVE AGREEMENT, DOWN OFF THE SCREEN.

5              MS. MILICI:  (INDICATING).

6              MR. BORNSTEIN:  THANK YOU.

7              THE COURT:  OKAY.  ARE YOU GOING TO BE REQUESTING

8    SEALING ON THIS DOCUMENT?

9              MR. BORNSTEIN:  WE MIGHT.  I'LL HAVE TO CONSULT WITH

10   THE CLIENT WHETHER WE'LL BE REQUESTING SEALING.  I DIDN'T WANT

11   TO INTERRUPT THE EXAMINATION.  IF WE TAKE IT DOWN OFF THE

12   SCREEN, I THINK IT'S OKAY.

13             THE COURT:  NO.  WE'RE GOING TO HANDLE THE SEALING

14   RIGHT NOW.  WHAT'S THE TIME?  THE TIME IS 1:11.

15        THE CLIENT DOESN'T KNOW WHETHER YOU WANT THIS AGREEMENT

16   SEALED OR NOT?  WHY DON'T YOU MAKE THE CONSULTATION.

17             MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

18             THE COURT:  UM-HUM.  THE TIME IS 1:11.

19        (PAUSE IN PROCEEDINGS.)

20             MR. BORNSTEIN:  OKAY, YOUR HONOR.

21             THE COURT:  ALL RIGHT.  WHAT WOULD YOU LIKE TO SEAL?

22             MR. BORNSTEIN:  I'M ON PAGE 019 OF THE DOCUMENT, YOUR

23   HONOR.

24             THE COURT:  OKAY.

25             MR. BORNSTEIN:  AND YOU'LL SEE THERE ARE A NUMBER OF

ABERLE DIRECT BY MS. MILICI

```
 1     NUMBERS.
 2              THE COURT:  THAT'S FINE.  SO YOU WANT TO SEAL --
 3              MR. BORNSTEIN:  JUST THE NUMBERS THERE.
 4              THE COURT:  DO YOU WANT TO JUST SEAL 3.1.1?
 5              MR. BORNSTEIN:  YES, PLEASE.  AND SUBSECTION A,
 6     CARRYING OVER TO THE FOLLOWING PAGE, AND THEN SUBSECTION B,
 7     YOUR HONOR WILL SEE THERE ARE SOME NUMBERS THERE AS WELL.
 8              THE COURT:  OKAY.  YOU'RE ONLY SEEKING TO SEAL THE
 9     NUMBERS, OR DO YOU WANT THE WHOLE SECTION?
10              MR. BORNSTEIN:  IF WE CAN SEAL THE WHOLE SECTION,
11     THAT WOULD BE BETTER.
12              THE COURT:  I THINK THE WAY I'VE DONE THE SAMSUNG AND
13     THE BROADCOM IS THE NUMBERS.
14              MR. BORNSTEIN:  OKAY.  THAT'S FINE, YOUR HONOR.
15              THE COURT:  ALL RIGHT.
16              MR. BORNSTEIN:  I'LL JUST NOTE THAT THE NUMBERS ARE
17     WRITTEN TWO WAYS, THE NUMERALS AND ALSO WRITTEN OUT IN WORDS.
18              THE COURT:  THAT'S FINE.  THEY'LL BOTH BE SEALED.
19              MR. BORNSTEIN:  AND THEN ALSO THERE'S SOME ADDITIONAL
20     INFORMATION, YOUR HONOR, ON PAGE 022.  AND YOU'LL SEE THAT
21     3.1.2.2 HAS A BUNCH OF NUMBERS ON PAGES 022 AND 023 THAT WE
22     WOULD ASK TO BE SEALED.
23              THE COURT:  ALL THOSE NUMBERS WILL BE SEALED.
24              MR. BORNSTEIN:  GREAT.  THANK YOU, YOUR HONOR.
25         I APOLOGIZE FOR THE INTERRUPTION.
```

```
 1                  THE COURT:  NOT A PROBLEM.  3.1.2.2.

 2                  MR. BORNSTEIN:  I THINK IT MIGHT BE 3.1.2.2, AND THE

 3       COURT IS ALSO CORRECT ABOUT 3.1.2.

 4                  THE COURT:  .3.

 5                  MR. BORNSTEIN:  TO BOTH SECTIONS.

 6                  THE COURT:  THE NUMBERS IN ALL OF THOSE SECTIONS,

 7       THOSE TWO SECTIONS WILL BE SEALED.

 8                  MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

 9                  THE COURT:  GO AHEAD, PLEASE.  SO I'LL NOTE THAT THIS

10       IS FOR SEALING PURPOSES THAT PORTIONS HAVE BEEN SEALED.  OKAY.

11                  MS. MILICI:  AND TO THE EXTENT THAT I'M SHOWING THE

12       SUPPLY AGREEMENT, THAT CAN STILL BE PUBLIC; CORRECT?

13                  MR. BORNSTEIN:  YES.

14                  MS. MILICI:  OKAY.

15                  THE COURT:  OKAY.  TIME IS 1:14.  GO AHEAD.  IT'S

16       YOUR TIME.

17       BY MS. MILICI:

18       Q.   OKAY.  SO LOOKING AT THE SUPPLY AGREEMENT, COULD YOU

19       PLEASE LOOK AT SECTION 14, WHICH IS ON PAGE 120.

20                  AND THIS SAYS, "EXCEPT AS EXPRESSLY PROVIDED IN PARAGRAPH

21       11, THE SALE OF PRODUCT AND LICENSE OF SOFTWARE TO BUYER DOES

22       NOT CONVEY TO BUYER ANY INTELLECTUAL PROPERTY RIGHTS IN SUCH

23       PRODUCT OR SOFTWARE."

24                  DO YOU SEE THAT?

25       A.   YES.
```

ABERLE DIRECT BY MS. MILICI

1    Q.   AND IS THAT THE PROVISION OF THE COMPONENT SUPPLY

2    AGREEMENT THAT YOU REFERENCED IN SOME OF THESE OTHER DOCUMENTS

3    AS PREVENTING CLAIMS OF EXHAUSTION?

4    A.   I DON'T KNOW WHETHER IT SPECIFICALLY WAS THIS LANGUAGE.

5    IT ACTUALLY WAS, FROM OUR PERSPECTIVE, THE COMBINATION OF THE

6    LANGUAGE IN THE SUPPLY AGREEMENT, AS WELL AS THE LICENSE

7    AGREEMENT WITH THE CUSTOMER TOGETHER THAT WE BELIEVED PROTECTED

8    AGAINST THE EXHAUSTION CLAIM.

9    Q.   CAN WE LOOK AT THE NEXT PAGE, WHICH IS .16 IT SAYS TERM

10   AND TERMINATION, AND IT SAYS THAT THE AGREEMENT WILL BE

11   TERMINATED IF, AND THE LAST POINT IS, "BUYER IS IN DEFAULT

12   UNDER THE LICENSE AGREEMENT."

13        DO YOU UNDERSTAND THAT QUALCOMM'S SUPPLY AGREEMENT WOULD

14   BE -- COULD BE TERMINATED IF THE BUYER WAS IN DEFAULT UNDER A

15   LICENSE AGREEMENT?

16   A.   I DON'T KNOW WHETHER ALL THE SUPPLY AGREEMENTS HAVE THAT

17   LANGUAGE.  THIS LANGUAGE SAYS THAT, THAT QUALCOMM WOULD HAVE A

18   RIGHT TO DO IT IF THEY'RE IN DEFAULT.

19   Q.   OKAY.  DO YOU RECALL TESTIFYING IN YOUR DEPOSITION THAT

20   THE SUPPLY AGREEMENTS ARE ESSENTIALLY A FORM AGREEMENT?

21   A.   WELL, I MEAN, WE START WITH A FORM.  BUT THEY -- YOU KNOW,

22   THEY GET NEGOTIATED.

23   Q.   AND IS THAT -- DOES THE FORM AGREEMENT CONTAIN A SIMILAR

24   PROVISION TO THE ONE WE'RE LOOKING AT RIGHT HERE?

25   A.   I BELIEVE SO, BECAUSE I THINK THIS IS THE FORM THAT YOU

ABERLE DIRECT BY MS. MILICI

1    SHOWED ME.

2    Q.   THANK YOU.

3         COULD WE PLEASE LOOK AT TAB 10, WHICH IS CX 6658.

4              THE COURT:  WAIT A MINUTE.  ON JANUARY 6TH, 2019, I

5    HAD SEALED VARIOUS PAGES OF JX 93, WHICH IS WHAT WE'RE TALKING

6    ABOUT RIGHT NOW.

7         SO I'M A LITTLE BIT UNCLEAR.  DO YOU HAVE ECF 1135 IN

8    FRONT OF YOU?

9              MS. MILICI:  I DO NOT.

10             THE COURT:  SO YOU'RE NOT CHECKING TO SEE IF YOU ARE

11   APPROPRIATELY SEALING --

12             MS. MILICI:  YOUR HONOR, I --

13             THE COURT:  -- THIS AGREEMENT?  YOU SAID --

14             MS. MILICI:  YOUR HONOR, I BELIEVE THAT WE ARE.  BUT

15   I WAS NOT PERSONALLY DOING IT.

16             THE COURT:  OKAY.  WELL, HAS ANYONE ON YOUR TEAM

17   CHECKED ECF 1135 TO MAKE SURE YOU ARE NOT PUBLISHING PORTIONS

18   THAT HAVE BEEN SEALED?

19             MS. MILICI:  I'M -- I -- I'M NOT SURE ABOUT THAT

20   SPECIFIC ECF NUMBER.

21             THE COURT:  OKAY.  WELL, IT LOOKS LIKE WHAT WAS

22   GRANTED OF JX 93 WAS PORTIONS OF PAGES 18 THROUGH 20, 22

23   THROUGH 23, 27 THROUGH 28, 31 THROUGH 35.

24        AND I DON'T KNOW WHICH -- WELL, WHICH PAGE ARE YOU MOVING

25   ONTO NOW?

```
1                MS. MILICI:  I WAS MOVING ONTO ANOTHER DOCUMENT.

2                THE COURT:  OKAY.

3                MS. MILICI:  MY QUESTIONS WERE ONLY ABOUT THE

4     ATTACHED SUPPLY AGREEMENT, WHICH I DO NOT BELIEVE HAS EVER BEEN

5     THE SUBJECT OF A SEALING MOTION.

6                THE COURT:  ALL RIGHT.  IS IT PART OF JX 93?  OR NOT?

7                MS. MILICI:  IT IS ATTACHED TO THE AGREEMENT IN

8     JX 93, YES.

9                THE COURT:  WHAT'S THE BATES NUMBER?

10               MS. MILICI:  IT IS BB FTC 00075179.

11               THE COURT:  75 -- WHAT'S THE JX 93 NUMBER?

12               MS. MILICI:  I'M SORRY.  THAT IS THE JX 93 NUMBER.

13               THE COURT:  NO.  YOU HAVE JX 93-056 OR --

14               MS. MILICI:  OH, YOU MEAN THE PAGE NUMBER.

15               THE COURT:  THAT'S HOW THE SEALING WAS DONE.

16               MS. MILICI:  CERTAINLY.  OKAY.  IT WAS JX 116 ON.  IT

17    WAS JX 93-116 ONTO THE END OF THE DOCUMENT.

18               THE COURT:  OKAY.  SO SEALING WAS GRANTED AS TO THE

19    PORTIONS ON 114 AND 118 THROUGH 119.

20               MS. MILICI:  OKAY.  THAT WAS OUR MISTAKE THEN.

21               THE COURT:  SO --

22               MS. MILICI:  I DID NOT SHOW ANY OF THE -- I DID NOT

23    SHOW THOSE PAGES ON THE SCREEN.

24               THE COURT:  OKAY.

25               MS. MILICI:  AND I APOLOGIZE TO THE COURT AND
```

1     CERTAINLY WILL BE MORE CAREFUL IN THE FUTURE.

2           THE COURT:  OKAY.  GO AHEAD THEN.

3     BY MS. MILICI:

4     Q.   CAN WE MOVE ON, PLEASE, TO TAB 10, WHICH IS CX 6658, AND

5     CAN YOU IDENTIFY THIS AS A SERIES OF E-MAILS IN WHICH YOU

6     PARTICIPATED IN APRIL 2011 REGARDING THE NEGOTIATIONS WITH ZTE?

7     A.   YES.

8     Q.   OKAY.

9           YOUR HONOR, I MOVE TO ADMIT CX 6658.

10          MR. BORNSTEIN:  NO OBJECTION, YOUR HONOR.

11          THE COURT:  CX WHICH ONE AGAIN?

12          MS. MILICI:  6658.

13          THE COURT:  6658.  OKAY.  IT'S ADMITTED.

14     (PLAINTIFF'S EXHIBIT CX 6658 WAS ADMITTED IN EVIDENCE.)

15    BY MS. MILICI:

16    Q.   OKAY.  IF YOU COULD TURN TO PAGE 005, PLEASE.  AND THERE'S

17    AN E-MAIL ON THIS PAGE FROM DEREK ABERLE TO JING WANG AND

18    OTHERS.

19          DO YOU SEE THAT?

20    A.   YES.

21    Q.   AND YOU WROTE IN THAT E-MAIL TO JING WANG, "HERE ARE THE

22    ITEMS I THINK YOU SHOULD FOCUS ON DURING YOUR MEETINGS WITH

23    ZTE."

24          DO YOU RECALL THAT?

25    A.   I MEAN, I GENERALLY REMEMBER THIS NEGOTIATION AND THIS

ABERLE DIRECT BY MS. MILICI

1      EXCHANGE.  THAT'S WHAT THE E-MAIL SAYS, SO...

2      Q.   OKAY.  AND UNDER SUBSCRIBER AGREEMENT, YOU WROTE, "NEEDS

3      TO COVER CDMA 2000.  WCDMA AND SINGLE-MODE OFDMA."

4           DO YOU SEE THAT?

5      A.   YES.

6      Q.   AND THAT WAS ONE OF THE POINTS THAT YOU TOLD JING WANG

7      THAT YOU SHOULD TRY TO GET AGREEMENT ON; CORRECT?

8      A.   YES.

9      Q.   OKAY.  AND THEN IN THE -- FURTHER DOWN IN THAT DOCUMENT IT

10     REFERS TO A STRATEGIC FUND AGREEMENT.

11          DO YOU SEE THAT?

12     A.   YES.

13     Q.   AND YOU WROTE THAT "STARTING IN THE QUARTER IN WHICH WE

14     SIGN WE HAVE PROPOSED," AND YOU GIVE PERCENTAGES OF QCT CHIPSET

15     PURCHASES.

16          DO YOU SEE THAT?

17     A.   YES.

18     Q.   AND THEN YOU WROTE, "TO CLOSE THE DEAL, I WOULD BE WILLING

19     TO INCREASE THE 2011 PERCENTAGE."

20          DO YOU SEE THAT?

21     A.   YES.

22     Q.   AND THE DEAL THAT YOU WERE REFERRING TO THERE WAS THE

23     LICENSE AGREEMENT; CORRECT?

24     A.   WELL, IT WAS A SERIES OF LICENSE AGREEMENTS, BOTH ON

25     SUBSCRIBER AND INFRASTRUCTURE, AS WELL AS AUDIT DISPUTES AND A

ABERLE DIRECT BY MS. MILICI

1    NUMBER OF OTHER ISSUES BACK AND FORTH THAT WE WERE NEGOTIATING.

2    Q.   SO THE LICENSE AGREEMENT WAS ONE PART OF THE DEAL THAT YOU

3    WERE WILLING TO CONSIDER INCREASING THE PERCENTAGE OF THE

4    STRATEGIC FUND IN ORDER TO CLOSE; CORRECT?

5    A.   YEAH, THE LICENSE AGREEMENT WAS PART OF THE OVERALL

6    PACKAGE THAT WE WERE DISCUSSING.

7    Q.   OKAY.  AND YOU SUGGESTED ON THE NEXT PAGE, YOU -- IN THE

8    SECOND TO LAST PARAGRAPH OF THIS E-MAIL YOU WROTE, "THEY SHOULD

9    ALSO CONSIDER THE IMPACT ON THEIR BUSINESS IN THE U.S. (E.G.,

10   WITH VZW."

11       IS THAT VERIZON?

12   A.   YES.

13   Q.   "IF WE ARE FORCED TO SUE THEM FOR PATENT INFRINGEMENT."

14       AND THEN YOU WROTE, "FINALLY, THEY SHOULD BE REMINDED THAT

15   WE DO NOT SUPPLY CHIPS TO COMPANIES THAT ARE NOT LICENSED."

16       DO YOU SEE THAT?

17   A.   YES.

18   Q.   AND YOU WERE SUGGESTING THAT ZTE BE REMINDED OF THE

19   POTENTIAL LOSS OF CHIP SUPPLY DURING THE NEGOTIATIONS OVER THE

20   TERMS OF A NEW LICENSE; CORRECT?

21   A.   I THINK WHAT I WAS SAYING WAS THEY SHOULD BE REMINDED THAT

22   THAT IS A POTENTIAL CONSEQUENCE IF WE CAN'T CONCLUDE A NEW

23   LICENSE AGREEMENT.

24   Q.   OKAY.  AND THE NEW LICENSE AGREEMENT THAT WAS UNDER

25   DISCUSSION WAS ONE THAT WOULD APPLY TO CDMA, WCDMA, AND OFDMA;

ABERLE DIRECT BY MS. MILICI

1    CORRECT?

2    A.   YES, THAT WAS UNDER DISCUSSION.

3         BUT I DON'T BELIEVE AT THIS TIME PERIOD THEY WERE BUYING

4    ANY OFDMA OR 4G CHIPS.

5    Q.   COULD YOU PLEASE TURN TO TAB 11 IN YOUR BINDER.  THAT'S

6    CX 7105.

7         AND CAN YOU IDENTIFY THIS AS AN E-MAIL EXCHANGE BETWEEN

8    YOU AND A MR. LEE AND OTHERS IN JANUARY 2007 ABOUT LGE?

9         AND, SIR, TO BE CLEAR, THESE ARE THE SAME DOCUMENTS THAT

10   WE SENT TO YOUR COUNSEL TWO DAYS AGO.

11   A.   SO WAS YOUR QUESTION IS THIS AN E-MAIL EXCHANGE BETWEEN

12   MYSELF AND OTHERS AND H.J. LEE?

13   Q.   YES.

14   A.   YES.

15        MS. MILICI:  I MOVE TO ADMIT CX 7105.

16        MR. BORNSTEIN:  NO OBJECTION.

17        THE COURT:  IT'S ADMITTED.

18   (PLAINTIFF'S EXHIBIT CX 7105 WAS ADMITTED IN EVIDENCE.)

19        THE COURT:  LET ME JUST ASK, SO WHEN FTC HAS BEEN

20   MOVING TO ADMIT DOCUMENTS, I'VE BEEN RELYING ON YOU TO LET ME

21   KNOW, AND YOUR CO-COUNSEL, WHETHER ANY OF THESE DOCUMENTS HAVE

22   BEEN SEALED.

23        SO WHAT I'M HEARING FROM YOU IS YOU ALL ARE NOT PAYING

24   ATTENTION TO THAT AND ARE NOT IDENTIFYING ANY DOCUMENT THAT'S

25   BEEN SEALED WHEN YOU'RE MOVING TO ADMIT THEM; IS THAT RIGHT?

```
 1                MS. MILICI:  I BELIEVE THAT WE HAVE BEEN.  OBVIOUSLY

 2    WE MADE A MISTAKE ON THAT ONE DOCUMENT TODAY.  BUT I DO THINK

 3    THAT IT HAS BEEN PART OF OUR PROCESS.

 4                THE COURT:  OKAY.

 5                MS. MILICI:  I'M SORRY AGAIN FOR THE MISTAKE ON THE

 6    OTHER DOCUMENT.

 7                THE COURT:  OKAY.  ALL RIGHT.  GO AHEAD, PLEASE.

 8    BY MS. MILICI:

 9    Q.   MR. LEE WAS SOMEONE WHO WORKS IN THE QUALCOMM KOREA

10    OFFICE; IS THAT CORRECT?

11    A.   YES.

12    Q.   AND IN THE THIRD FULL PARAGRAPH ON 003, IN THE THIRD FULL

13    PARAGRAPH OF AN E-MAIL FROM HIM ABOUT THE NEGOTIATION WITH LG

14    HE WROTE, "THE CEO CLEARLY UNDERSTANDS THAT THE MAIN EXCHANGE

15    ITEMS OF THIS DEAL ARE OFDMA VERSUS FUNDS."

16         DO YOU SEE THAT?

17         SIR, IT'S HIGHLIGHTED ON THE SCREEN.  DO YOU SEE THAT?

18    A.   YEAH, I SEE IT.

19    Q.   AND DO YOU AGREE THAT ONE OF THE MAIN EXCHANGE ITEMS IN A

20    DEAL THAT WAS UNDER DISCUSSION AT THE TIME WAS LG TAKING AN

21    OFDMA LICENSE AND QUALCOMM PROVIDING FUNDS?

22    A.   YEAH, THOSE WERE TWO IMPORTANT ELEMENTS OF THE OVERALL

23    DEAL THAT WE WERE, THAT WE WERE DISCUSSING.

24    Q.   AND IF YOU LOOK AT PAGE 1, THERE'S AN E-MAIL FROM YOU, AND

25    IT'S NOT CLEAR WHO IT'S TO, BUT IT'S IN THE MIDDLE OF PAGE.  IT
```

1    SAYS AT 2:51 P.M.

2         DO YOU SEE THAT?

3         AND YOU WROTE, "I THINK TO GET THIS BACK ON TRACK, WE WILL

4    NEED TO DO SOME CONVINCING -- SOME WORK CONVINCING LGE THAT

5    THEY WILL NEED TO TAKE A SINGLE MODE LICENSE FROM US IN ANY

6    EVENT AND THAT THE AMOUNT OF ROYALTIES THAT THEY WILL PAY TO US

7    FOR SINGLE MODE OFDM PRODUCTS IS LIKELY TO BE SMALL FOR A

8    NUMBER OF YEARS."

9         DO YOU SEE THAT?

10   A.   YES.

11   Q.   SO IN OTHER WORDS, QUALCOMM WAS WILLING TO PROVIDE FUNDS

12   IN EXCHANGE FOR AN OFDM AGREEMENT THAT IT DID NOT EXPECT WOULD

13   GENERATE ANY ROYALTIES FOR A NUMBER OF YEARS; IS THAT CORRECT?

14   A.   MY RECOLLECTION IS THAT THERE WERE A NUMBER OF ELEMENTS OF

15   CONSIDERATION GOING BACK AND FORTH, ONE OF WHICH WAS QUALCOMM

16   WAS TRYING TO ESTABLISH -- WE WERE TRYING TO ESTABLISH THE 4G

17   LICENSING PROGRAM AT THAT TIME.  SO THAT WAS AN IMPORTANT ASK

18   FOR US IN THE DEAL.

19        AND, YES, THERE WERE FUNDS AND OTHER CONSIDERATION GOING

20   TO LG AS PART OF THAT.

21   Q.   OKAY.  WHEN YOU SAY "ESTABLISH THE 4G LICENSING PROGRAM,"

22   ARE YOU REFERRING TO THE FACT THAT LG WAS THE FIRST MAJOR

23   MANUFACTURER TO TAKE A 4G LICENSE FROM QUALCOMM?

24   A.   AND JUST TO BE CLEAR, A 4G LICENSE IS SOMETHING THAT WOULD

25   APPLY TO A PRODUCT THAT ONLY HAS 4G.

1    Q.    AND --

2    A.    ALL OF THE 3G AGREEMENTS COVERED MULTI.

3    Q.    AND LG WAS THE FIRST MAJOR COMPANY TO ACCEPT THAT LICENSE?

4    A.    I BELIEVE THAT IS CORRECT.

5    Q.    AND THE NEGOTIATION LEADING TO LG ACCEPTING SUCH A LICENSE

6    INVOLVED THE PAYMENT OF SUBSTANTIAL STRATEGIC FUNDS TO LG; IS

7    THAT CORRECT?

8    A.    THAT WAS ANOTHER ELEMENT OF THE DEAL.

9    Q.    THANK YOU.

10   A.    BUT THERE WERE CONSIDERATIONS FOR THE MONEY THAT WAS PAID.

11   Q.    COULD WE PLEASE TURN TO TAB 12, WHICH IS CX 7556.

12         AND CAN YOU IDENTIFY THIS AS AN ACCOUNTING MEMO PREPARED

13   REGARDING THE LG STRATEGIC FUND AGREEMENT AND LICENSE?

14   A.    THAT'S WHAT IT LOOKS LIKE, YES.

15              MS. MILICI:  OKAY.  THE FTC MOVES TO ADMIT CX 7556.

16              MR. BORNSTEIN:  NO OBJECTION, YOUR HONOR.

17              THE COURT:  IT'S ADMITTED.

18         (PLAINTIFF'S EXHIBIT 7556 WAS ADMITTED IN EVIDENCE.)

19              THE COURT:  GO AHEAD, PLEASE.

20   BY MS. MILICI:

21   Q.    AND YOU WERE INVOLVED IN NEGOTIATING THIS STRATEGIC FUND

22   AS PART OF THIS MEMO AND IN THE LAST E-MAIL WE WERE DISCUSSING?

23   A.    I WAS INVOLVED IN NEGOTIATING THIS STRATEGIC FUND WITH LG,

24   YES.

25   Q.    OKAY.  AND THE STRATEGIC FUND WAS USED AS A WAY TO

ABERLE DIRECT BY MS. MILICI

1    EXCHANGE VALUE WITH LG AS OPPOSED TO OFFERING A ROYALTY

2    REDUCTION; CORRECT?

3    A.   NO.

4    Q.   SIR, DO YOU -- WAS LG SEEKING A LOWER ROYALTY RATE IN

5    THESE NEGOTIATIONS?

6    A.   THEY WERE SEEKING LOWER ROYALTIES; THEY WERE SEEKING

7    ADDITIONAL LICENSES FOR NEW PRODUCTS; THEY WERE SEEKING

8    ADDITIONAL LICENSES FOR NEW PATENTS.

9         THERE WAS A -- IT WAS A VERY LARGE SCOPE LICENSE

10   NEGOTIATION.

11        BUT THE FUNDS WERE NOT PAID FOR NOTHING.  THERE WAS --

12   THERE WAS CONSIDERATION EXCHANGED IN TERMS OF --

13   Q.   SIR.

14   A.   -- STRATEGIC ACTIVITY THAT WAS TAKING PLACE.

15   Q.   CAN I ASK YOU TO LOOK AT YOUR DEPOSITION AT -- ACTUALLY,

16   YOUR INVESTIGATIONAL HEARING AT PAGE 397:4 TO 18.

17   A.   COULD YOU GIVE ME THE PAGE NUMBERS AGAIN, PLEASE.

18   Q.   ACTUALLY, I'M GOING TO SKIP THAT JUST FOR TIME REASONS.

19   THANK YOU.

20        OKAY.  IF WE LOOK BACK AT THE DOCUMENT, PLEASE, CX 6556,

21   PAGE 004, AT THE TOP IN THE FIRST SUB BULLET, IT SAYS, "QC AND

22   LGE ALSO ENTERED INTO AN OFDM SUBSCRIBER LICENSE."

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   AND THEN AT THE END OF THAT PARAGRAPH IT SAYS, "FROM AN

1    ACCOUNTING VIEWPOINT, THE STRATEGIC FUND CANNOT BE VIEWED

2    INDEPENDENTLY OF THE AGREEMENT"?

3    A.   YES.

4    Q.   AND YOU REVIEWED ACCOUNT AGREEMENTS BEFORE THEY WERE

5    FINAL, DIDN'T YOU?

6    A.   I DID FROM TIME TO TIME.  I DON'T KNOW WHETHER I REVIEWED

7    THIS ONE.

8    Q.   THANK YOU.  AND ON PAGE 005 IN THE LAST PARAGRAPH, IT

9    SAYS, AT THE END, "QTL IS DEEMED TO BE THE PRIMARY BENEFICIARY

10   OF THE ELEMENTS OF THOSE AGREEMENTS, INCLUDING THE EXPECTED

11   ROYALTY STREAM RESULTING FROM QC'S FIRST OFDM SUBSCRIBER DEVICE

12   LICENSE WITH A MAJOR HANDSET MANUFACTURER."

13       DO YOU SEE THAT?

14   A.   YES.

15   Q.   AND THEN IT CONCLUDES, "THE AMOUNTS UNDER THESE AGREEMENTS

16   WILL BE RECORDED IN A QTL BUSINESS UNIT."

17       DO YOU SEE THAT?

18   A.   YES.

19   Q.   AND THE AMOUNTS THAT WERE BEING RECORDED IN THE QTL

20   BUSINESS UNIT WERE BEING ACCRUED ON CHIP PURCHASES FROM QCT;

21   CORRECT?

22   A.   YOU'D HAVE TO REFRESH ME ON THAT.  I'M NOT 100 PERCENT

23   SURE ABOUT THAT.

24       I THINK THERE WERE CERTAIN PORTIONS OF IT THAT WERE

25   CALCULATED THAT WAY.  I JUST DON'T KNOW WHETHER ALL OF THE

1    FUNDS WERE CALCULATED THAT WAY.

2    Q.  SIR, CAN YOU LOOK BACK AT PAGE 002 OF THIS DOCUMENT UNDER

3    STRATEGIC FUND.

4         DO YOU SEE THAT THE STRATEGIC FUND IS ACCRUING ON CHIPSET

5    PURCHASES?

6    A.  YES.  LIKE I SAID, I KNOW THAT PORTIONS OF IT ACCRUED THAT

7    WAY.  I JUST DON'T REMEMBER IF ALL OF IT --

8    Q.  DOES IT REFER TO ANY FUND ACCRUING ON ANYTHING BESIDES

9    CHIPSET PURCHASES?

10   A.  I THOUGHT THERE WAS AN INITIAL AMOUNT OF MONEY DEPOSITED

11   INTO THE FUND THAT WAS JUST A FIXED AMOUNT.  BUT I -- YOU'D

12   HAVE TO SHOW ME THE AGREEMENT.

13        MS. MILICI:  OKAY.  THANK YOU, SIR.  I HAVE NO MORE

14   QUESTIONS.

15        THE COURT:  OKAY.  TIME IS 1:33.

16      (PAUSE IN PROCEEDINGS.)

17        MR. BORNSTEIN:  MAY MR. PETERSON APPROACH, YOUR

18   HONOR?

19        THE COURT:  YES, PLEASE.  SORRY, I CAN'T SEE HIM

20   BEHIND.

21        THE WITNESS:  DONE WITH THESE FOR NOW (INDICATING)?

22        MR. BORNSTEIN:  KEEP THAT ONE.

23        THE COURT:  ALL RIGHT.  ARE YOU READY, MR. BORNSTEIN?

24        MR. BORNSTEIN:  YES.  THANK YOU, YOUR HONOR.  THE

25   WITNESS BINDER IS GOING UP TO THE WITNESS.

```
1            THE COURT:  OKAY.  1:34.  GO AHEAD, PLEASE.

2                        CROSS-EXAMINATION

3    BY MR. BORNSTEIN:

4    Q.   GOOD AFTERNOON, MR. ABERLE.

5    A.   GOOD AFTERNOON.

6    Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT THE FTC'S

7    COUNSEL ABOUT QUALCOMM'S PRACTICES NOT SELLING CHIPS UNLESS THE

8    CUSTOMER HAS A LICENSE.

9         DO YOU REMEMBER THAT SUBJECT?

10   A.   YES.

11   Q.   ARE YOU FAMILIAR WITH CHINESE OEM'S CALLED OPPO AND VIVO?

12   A.   YES.

13   Q.   THEY'RE NOT GOING TO BE U.S. HOUSEHOLD NAMES, BUT WHO ARE

14   THEY?

15   A.   WELL, THEY'RE STARTING TO BECOME A LITTLE MORE KNOWN IN

16   THE U.S.

17        THEY'RE LARGE HANDSET MANUFACTURERS THAT FIRST FOCUSSED

18   THEIR BUSINESS IN CHINA, BUT NOW SELL MANY PLACES IN THE WORLD,

19   AND I THINK THEY'RE AMONG THE TOP 10 HANDSET SUPPLIERS

20   WORLDWIDE NOW.

21   Q.   AND WHEN YOU WERE AT THE COMPANY, WERE OPPO AND VIVO

22   LICENSED BY QUALCOMM?

23   A.   YES.

24   Q.   WAS THERE A POINT IN TIME WHERE THERE WAS A DISPUTE ABOUT

25   WHETHER THEY WERE ACTUALLY LICENSED BY QUALCOMM?
```

ABERLE CROSS BY MR. BORNSTEIN

1    A.    YES.

2    Q.    CAN YOU TELL ME WHAT THE DISPUTE WAS ABOUT?

3    A.    YEAH.  WE HAD AN ANTITRUST INVESTIGATION BY THE CHINESE

4    GOVERNMENT THAT WE RESOLVED SOMETIME IN I THINK MID-2015.  AND

5    AS PART OF THAT, WE COMMITTED TO BASICALLY GO OUT AND OFFER A

6    SET OF NEW LICENSING TERMS FOR THE CHINA, CHINA MARKET TO ALL

7    OF THE LICENSEES THAT WE HAD, INCLUDING OPPO AND VIVO.

8         AND FROM OUR PERSPECTIVE, THEY BASICALLY HAD AN OPTION

9    EITHER TO KEEP THEIR EXISTING AGREEMENT OR TO ACCEPT THE NEW

10   TERMS.

11        BUT THEY TOOK THE POSITION THAT AS A RESULT OF THE NDRC

12   RESOLUTION, THAT THEIR AGREEMENT WAS NO LONGER IN EFFECT AND

13   THEY EFFECTIVELY DIDN'T HAVE A LICENSE.

14   Q.    AND WHEN WAS THIS, APPROXIMATELY?

15   A.    IT WAS SOMETIME IN MID-2015 I WOULD GUESS.

16   Q.    AND DID THEY -- HOW DID THEY ACT IN TERMS OF THEIR -- WHAT

17   DID THEY DO BECAUSE THEY CONCLUDED THAT THEY WERE NOT LICENSED?

18   A.    THEY BASICALLY STOPPED REPORTING AND PAYING ROYALTIES TO

19   QUALCOMM ENTIRELY.

20   Q.    OKAY.  AND WHEN THEY STOPPED REPORTING AND PAYING

21   ROYALTIES, DID QUALCOMM STOP SHIPPING THEM CHIPS?

22   A.    NO.

23   Q.    OKAY.  WHY NOT?

24   A.    I THINK THERE WERE A VARIETY OF REASONS FOR THAT.  ONE IS

25   THAT, YOU KNOW, ALTHOUGH THEY WERE DIFFICULT DISCUSSIONS, WE

1    BELIEVED THAT, YOU KNOW, WE WERE IN GOOD FAITH DISCUSSIONS AND

2    WE WERE MAKING PROGRESS TOWARDS GETTING A NEW AGREEMENT IN

3    PLACE.

4         WE ALSO FELT VERY STRONGLY THAT THE LICENSES REMAINED

5    VALID AND ENFORCEABLE, AND IF WE ULTIMATELY COULD NOT REACH AN

6    AGREEMENT, WE WOULD BE ABLE TO COLLECT ROYALTIES UNDER, UNDER

7    THE AGREEMENTS THAT EXISTED.

8    Q.    DID YOU CONSIDER THERE TO BE ANY RISK TO QUALCOMM FROM

9    CONTINUING TO SHIP CHIPS TO OPPO AND VIVO WHILE THEY WERE

10   REFUSING TO REPORT AND PAY?

11   A.    YES.    IT WAS NOT AN EASY DECISION FOR US BECAUSE THEY WERE

12   TAKING A VERY AGGRESSIVE POSITION.    AND, IN FACT, MY

13   RECOLLECTION IS THAT AS PART OF THE RESOLUTION WITH THE CHINESE

14   GOVERNMENT, THE CHINESE GOVERNMENT SAID IF LICENSEES REFUSE TO

15   REPORT AND PAY, YOU CAN CEASE SUPPLYING CHIPS TO THEM.

16        SO THEY HAD EFFECTIVELY ALREADY GIVEN US, YOU KNOW, THE

17   GREEN LIGHT TO DO THAT, AND WE DECIDED NOT TO DO IT.

18   Q.    DID OPPO AND VIVO'S FAILURE TO REPORT AND PAY UNDER THEIR

19   AGREEMENT HAVE ANY IMPACT ON YOUR RELATIONSHIP WITH OTHER

20   CHINESE LICENSEES?

21   A.    YES.

22   Q.    HOW SO?

23   A.    THERE WERE STILL COMPANIES WE WERE NEGOTIATING WITH, BUT

24   THERE WERE A NUMBER OF COMPANIES THAT PRETTY QUICKLY SIGNED NEW

25   AGREEMENTS AFTER THE NDRC RESOLUTION, KIND OF CONSISTENT WITH

ABERLE CROSS BY MR. BORNSTEIN

1    THE INTENT OF THAT, AND THEY WERE PAYING, CONTINUED TO PAY AND

2    BE GOOD LICENSEES.  AND THEY WERE ASKING, WHY ARE YOU

3    CONTINUING TO SUPPORT OPPO AND VIVO AND THEY'RE NOT COMPLYING

4    WITH THEIR AGREEMENTS.

5    Q.   AND HOW DID YOU RESPOND TO THAT?

6    A.   WE BASICALLY -- I MEAN, IT WAS A DIFFICULT SITUATION.  WE

7    WERE TRYING TO BALANCE THE INTERESTS ON BOTH SIDES.  AND, YOU

8    KNOW, WE TOLD THEM THAT WE BELIEVED WE WERE MAKING PROGRESS IN

9    THE DISCUSSIONS AND WE'RE GOING TO GET TO AN AGREEMENT, AND

10   ONCE THERE'S A NEW AGREEMENT, THEY'LL OWE THE ROYALTIES FOR THE

11   PAST AS WELL.

12   Q.   DID YOU ULTIMATELY SIGN ANY LICENSE AGREEMENTS WITH OPPO

13   AND VIVO WHILE YOU WERE STILL AT THE COMPANY?

14   A.   YES.

15   Q.   ABOUT HOW LONG DID THIS PERIOD OF NONREPORTING AND

16   NONPAYMENT GO ON WITH EACH OF THEM?

17   A.   SOMEWHERE AROUND A YEAR, MAYBE A LITTLE BIT MORE THAN

18   THAT.

19   Q.   OKAY.  AND AT ANY POINT DURING THE COURSE OF THAT

20   APPROXIMATELY ONE YEAR, DID QUALCOMM INDICATE TO OPPO AND VIVO

21   THAT THEY WERE GOING TO STOP THE SUPPLY OF CHIPS?

22   A.   I DON'T BELIEVE SO, NO.

23   Q.   WAS THERE EVER A DISPUTE THAT QUALCOMM HAD WITH BLACKBERRY

24   UNDER WHICH BLACKBERRY WAS NOT PAYING THE FULL ROYALTIES THAT

25   IT WAS DUE UNDER ITS AGREEMENT?

1    A.   YES.

2    Q.   CAN YOU DESCRIBE WHAT THAT SITUATION WAS?

3    A.   I DON'T REMEMBER SPECIFICALLY THE DATE, BUT MAYBE IT WAS

4    AROUND 2009-ISH, 2008.  THEY BASICALLY TOOK THE POSITION THAT

5    THEIR AGREEMENT DID NOT COVER WCDMA, WHICH IS ONE OF THE FORMS

6    OF 3G, AND INSTEAD OF PAYING THE FULL ROYALTY THAT WE BELIEVED

7    WAS OWED UNDER THE AGREEMENT, THEY KIND OF UNILATERALLY STARTED

8    PAYING LESS AND CONTINUED TO TAKE THE POSITION THAT THE

9    LICENSE -- THAT THEY WERE UNLICENSED FOR WCDMA PRODUCTS.

10   Q.   AND TO TRY TO AVOID ANY CONFIDENTIALITY ISSUES HERE, I'M

11   GOING TO ASK YOU NOT TO SAY A SPECIFIC ROYALTY RATE, BUT DO

12   HAVE A SENSE OF ORDER OF MAGNITUDE OF HOW MUCH LESS THEY WERE

13   PAYING THAN WHAT WAS DUE TO QUALCOMM?

14   A.   I THINK IT WAS LESS THAN HALF.

15   Q.   OKAY.  DID QUALCOMM CONTINUE SHIPPING CHIPS TO BLACKBERRY

16   WHILE IT WAS PAYING LESS THAN HALF OF WHAT IT OWED UNDER THE

17   AGREEMENT?

18   A.   YES, WE DID.

19   Q.   OKAY.  AND DID YOU ULTIMATELY REACH AN AGREEMENT WITH

20   BLACKBERRY?

21   A.   YES.  IT TOOK QUITE A WHILE TO NEGOTIATE THAT, BUT I THINK

22   EVENTUALLY WE DID REACH AN AGREEMENT.

23   Q.   AND AT ANY POINT DURING THAT NEGOTIATION, DID QUALCOMM

24   INDICATE TO BLACKBERRY THAT IT WOULD CEASE SUPPLYING CHIPS

25   BECAUSE OF ITS FAILURE TO PAY FULL ROYALTIES?

1    A.   NO.

2    Q.   AND WAS THE AGREEMENT THAT QUALCOMM REACHED AT THE END OF

3    THIS NEGOTIATION WITH BLACKBERRY AN AGREEMENT ON QUALCOMM'S

4    TYPICAL ROYALTY TERMS?

5    A.   NO.  I THINK IT WAS -- THE AGREEMENT ACTUALLY THAT WAS

6    JUST SHOWN TO ME, IT WAS QUITE DIFFERENT THAN WHAT WE WOULD

7    CONSIDER OUR TYPICAL AGREEMENT.

8    Q.   OKAY.  AND FOR THE RECORD, YOU'RE REFERRING TO JX 0093, I

9    BELIEVE, IN THE BINDER THAT THE FTC GAVE YOU?

10   A.   YES.

11   Q.   AND WITHOUT, AGAIN, GETTING INTO DETAILS, COULD YOU SPEAK

12   AT A HIGH LEVEL ABOUT HOW THAT AGREEMENT WAS DIFFERENT FROM A

13   TYPICAL AGREEMENT?

14   A.   YEAH.  I MEAN, WE COULDN'T REACH AN AGREEMENT EFFECTIVELY

15   ON, ON WHAT THE RUNNING ROYALTY STRUCTURE SHOULD BE, AND SO WE

16   CAME UP WITH A COMPROMISE, WHICH WAS VERY DIFFERENT THAN WE HAD

17   DONE WITH ANYBODY ELSE, WHERE EFFECTIVELY THEY PREPAID THE

18   ROYALTIES FOR THE RIGHT TO SELL A CERTAIN NUMBER OF UNITS

19   WITHIN A TIME PERIOD.

20   Q.   OKAY.

21   A.   AND SO, YOU KNOW, THE IDEA WAS THAT IF A -- IF THEY SOLD

22   ALL OF THOSE UNITS, THAT WOULD BE BETTER THAN WHAT THEY HAD IN

23   THE ORIGINAL AGREEMENT.

24        BUT IF THEY DIDN'T SELL AS MANY UNITS, IT POTENTIALLY

25   COULD BE BETTER FOR QUALCOMM.  SO THERE WAS SORT OF A RISK

ABERLE CROSS BY MR. BORNSTEIN

1    SHARING APPROACH TO IT.

2    Q.   HAVE THERE BEEN LICENSEES WHO HAVE COME TO QUALCOMM TO

3    SEEK TO RENEGOTIATE THEIR AGREEMENTS BEFORE AN EXPIRATION OR

4    TERMINATION OF THE EXISTING CONTRACT?

5    A.   YEAH, THAT WAS FAIRLY FREQUENT.

6    Q.   OKAY.  IS QUALCOMM'S PRACTICE, WHICH LICENSEES SEEK TO

7    RENEGOTIATE, TO TELL THEM THAT QUALCOMM WILL NOT, UNDER ANY

8    CIRCUMSTANCES, RENEGOTIATE THEIR DEAL?

9    A.   NO.

10   Q.   IS QUALCOMM'S PRACTICE TO TELL LICENSEES WHO SEEK TO

11   RENEGOTIATE AN EXISTING AGREEMENT, THAT QUALCOMM WILL SHUT OFF

12   THE SUPPLY OF CHIPS TO THOSE LICENSEES IF THEY WISH TO

13   RENEGOTIATE?

14   A.   NO.

15   Q.   WHAT DOES -- WHAT DOES QUALCOMM, IN FACT, DO WHEN IT

16   RECEIVES A REQUEST FROM AN EXISTING LICENSEE TO RENEGOTIATE?

17   A.   YOU KNOW, OUR TYPICAL PRACTICE IS WE WOULD ENTER INTO

18   DISCUSSIONS AND NEGOTIATE IN GOOD FAITH.  WE WOULD TRY TO

19   UNDERSTAND WHAT CONCERNS THEY HAD ABOUT THEIR EXISTING

20   AGREEMENT.

21       OFTENTIMES MAYBE THERE WERE NEW PRODUCTS THEY WERE GOING

22   TO BRING TO MARKET AND THEY WERE TELLING US THAT THE EXISTING

23   ROYALTY STRUCTURE DID NOT FIT WELL WITH THESE NEW PRODUCTS THAT

24   MAYBE THEY DIDN'T CONTEMPLATE WHEN THEY SIGNED THE AGREEMENT.

25       SOMETIMES WE WOULD HAVE, YOU KNOW, GO IN AND AUDIT TO MAKE

1    SURE WE WERE GETTING PAID ROYALTIES.  ISSUES WOULD ARISE ABOUT

2    THE TERMS OF THE AGREEMENT.  WE WOULD NEGOTIATE THOSE.  THAT

3    WAS VERY FREQUENT.

4         SO THERE ARE A NUMBER OF DIFFERENT TIMES AND REASONS WE

5    WOULD RENEGOTIATE A LICENSE.

6    Q.   IS SAMSUNG ONE OF THE COMPANIES THAT HAS SOUGHT TO

7    RENEGOTIATE ITS AGREEMENT WITH QUALCOMM?

8    A.   MANY TIMES.

9    Q.   DID IT DO THAT IN 2008?

10   A.   YES.

11   Q.   AND WHO RAISED THE PROSPECT OF NEGOTIATIONS, SAMSUNG OR

12   QUALCOMM?

13   A.   I BELIEVE SAMSUNG RAISED IT INITIALLY.

14   Q.   AND DID QUALCOMM RESPOND BY THREATENING TO CUT OFF THE

15   SUPPLY OF CHIPS TO SAMSUNG?

16   A.   NO.

17   Q.   DID YOU PARTICIPATE IN NEGOTIATIONS WITH SAMSUNG IN

18   RESPONSE TO THIS REQUEST IN 2008?

19   A.   YES.

20   Q.   AND AT THIS POINT IN TIME WAS SAMSUNG'S LICENSE DUE TO

21   EXPIRE AT ANY POINT IN THE NEAR FUTURE?

22   A.   NO.

23   Q.   WAS SAMSUNG LICENSED AT THAT POINT FOR CDMA PRODUCTS?

24   A.   YES.

25   Q.   AND WAS SAMSUNG LICENSED AT THAT POINT FOR WCDMA PRODUCTS?

ABERLE CROSS BY MR. BORNSTEIN

```
1    A.   YES.

2    Q.   WAS SAMSUNG GENERALLY COMPLYING WITH ITS AGREEMENT AND

3    PAYING THE ROYALTIES THAT WERE DUE?

4    A.   YEAH.  LIKE I SAID, WE WOULD TYPICALLY HAVE ISSUES ARISE

5    AROUND AUDITS AND DEDUCTIONS AND THINGS LIKE THAT.  BUT THEY

6    WERE GENERALLY IN COMPLIANCE WITH THEIR AGREEMENT.

7    Q.   AND WAS QUALCOMM'S WILLINGNESS TO SELL MODEM CHIPS TO

8    SAMSUNG AT THIS POINT IN TIME IN ANY WAY IN QUESTION?

9    A.   I DON'T BELIEVE SO, NO.

10   Q.   OKAY.  DID THE SUBJECT OF CHIP SUPPLY, CONTINUED CHIP

11   SUPPLY TO SAMSUNG, COME UP DURING THESE NEGOTIATIONS?

12   A.   I THINK TO MY RECOLLECTION, ONLY ONE TIME AT THE, SORT OF

13   AT THE OUTSET.

14   Q.   OKAY.  LET ME ASK YOU TO LOOK -- IT'S IN THE BINDER THAT

15   WE HANDED YOU -- QX 9210.

16        AND CAN YOU IDENTIFY THIS DOCUMENT FOR US, PLEASE?

17   A.   IT'S AN E-MAIL EXCHANGE BETWEEN MYSELF AND ONE OF THE

18   SAMSUNG NEGOTIATORS.

19             MR. BORNSTEIN:  YOUR HONOR, I'D MOVE QX 9210 INTO

20   EVIDENCE, YOUR HONOR.

21             MS. MILICI:  NO OBJECTION.

22             THE COURT:  I'M SORRY.  I COULDN'T HEAR YOU.

23             MS. MILICI:  NO OBJECTION.

24             THE COURT:  IT'S ADMITTED.

25        (DEFENDANT'S EXHIBIT QX 9210 WAS ADMITTED IN EVIDENCE.)
```

1          THE COURT:  GO AHEAD, PLEASE.

2          MR. BORNSTEIN:  THANK YOU.

3     Q.  IF YOU TURN TO THE BACK OF THE DOCUMENT, I'M LOOKING AT

4     THE PAGE BATES STAMPED 6150 IN THE BOTTOM RIGHT CORNER.

5          AND THERE'S AN E-MAIL HERE THAT AT THE TOP IS FROM YOU TO

6     THIS GENTLEMAN AT SAMSUNG; CORRECT?

7     A.  YES.

8     Q.  OKAY.  AND IT LOOKS LIKE YOU ARE RESPONDING TO SOMETHING

9     THAT HE WROTE TO YOU; IS THAT RIGHT?

10    A.  YES.

11    Q.  OKAY.  AND DID YOU GO THROUGH AND PUT YOUR RESPONSES TO

12    WHAT HE ASKED YOU IN THE TEXT OF HIS E-MAIL?

13    A.  YEAH.  WHERE IT INDICATES QC RESPONSE, THAT WAS OUR

14    RESPONSE.  THAT WAS MY RESPONSE.

15    Q.  OKAY.  SO CAN I ASK YOU TO TURN TO THE LAST PAGE OF THE

16    EXHIBIT AND WHERE THERE'S A NUMERAL 4.  AND THIS IS THE SAMSUNG

17    PERSON WRITING TO YOU.  IT SAYS, "THE NEGOTIATION PROCESS WILL

18    NOT IN ANY WAY ADVERSELY AFFECT QUALCOMM'S CHIPSET SUPPLY AND

19    TECHNICAL SUPPORT TO SAMSUNG."

20         DO YOU SEE THAT?

21    A.  YES.

22    Q.  AND WHAT WAS YOUR RESPONSE TO HIM?

23    A.  WELL, IT'S RIGHT HERE IN THE DOCUMENT.  DO YOU WANT ME TO

24    READ IT?

25    Q.  WELL, DID YOU TELL HIM THAT THERE WAS A RISK THAT YOU

1    ACTUALLY WOULD CUT OFF CHIP SUPPLY IF YOU COULDN'T REACH AN

2    AGREEMENT?

3    A.   NO.  I SAID THE OPPOSITE.

4    Q.   AFTER YOU WROTE THIS E-MAIL AND SAID WHAT'S HERE, DID YOU

5    GET A RESPONSE FROM SAMSUNG OF ANY SORT ASKING FOR MORE

6    INFORMATION OR CLARIFICATION ABOUT YOUR POSITION?

7    A.   I DON'T BELIEVE SO.  I THINK THAT WAS THE ONLY EXCHANGE ON

8    THAT, ON THAT ISSUE THAT WE HAD.

9    Q.   DID ANYBODY RAISE IT ORALLY OR IN WRITING AT ALL TO SAY,

10   YOU HAVEN'T GIVEN US A CLEAR ENOUGH ASSURANCE?

11   A.   NO.

12   Q.   DID SAMSUNG CONTINUE TO RECEIVE CHIPS FROM QUALCOMM DURING

13   THE COURSE OF THIS NEGOTIATION?

14   A.   YEAH, AND I BELIEVE THE NEGOTIATION LASTED, LIKE, TWO

15   YEARS.

16   Q.   AND WAS THE AGREEMENT THAT WAS SIGNED AT THE END OF THAT

17   NEGOTIATION A TYPICAL QUALCOMM LICENSING TERMS AGREEMENT?  OR

18   WAS IT HIGHLY NEGOTIATED AND INDIVIDUALIZED?

19   A.   THE LATTER.

20   Q.   OKAY.  LET ME ASK YOU TO TAKE A LOOK, SIR, AT A DIFFERENT

21   DOCUMENT IN THE BINDER THAT WE GAVE YOU.  IT'S QX 9212.

22        AND CAN YOU IDENTIFY THIS DOCUMENT FOR US, PLEASE?

23   A.   WELL, THE FIRST PART OF IT IS AN EXCHANGE BETWEEN MYSELF

24   AND BRUCE SEWELL, WHO USED TO BE THE GENERAL COUNSEL AT APPLE.

25   AND THEN IT LOOKS LIKE I FORWARDED IT ON INTERNALLY TO A FEW

ABERLE CROSS BY MR. BORNSTEIN

```
1     PEOPLE.
2           MR. BORNSTEIN:  YOUR HONOR, I'D MOVE THE ADMISSION OF
3     QX 9212.
4           MS. MILICI:  NO OBJECTION.
5           THE COURT:  IT'S ADMITTED.
6       (DEFENDANT'S EXHIBIT 9212 WAS ADMITTED IN EVIDENCE.)
7           THE COURT:  GO AHEAD, PLEASE.
8     BY MR. BORNSTEIN:
9     Q.  CAN YOU EXPLAIN, MR. ABERLE, IN WHICH THE CONTEXT WAS IN
10    WHICH YOU WERE CORRESPONDING WITH MR. SEWELL OF APPLE HERE?
11    A.   SO I THINK THE CONTEXT WAS, YOU KNOW, APPLE AND QUALCOMM
12    KNEW THAT WE HAD DIFFERENT VIEWS ON THE AMOUNT OF ROYALTIES
13    THAT SHOULD BE PAID TO QUALCOMM ON APPLE PRODUCTS.
14         AT THE SAME TIME, YOU KNOW, WE HAD A VERY EXTENSIVE SUPPLY
15    RELATIONSHIP BETWEEN THE TWO COMPANIES.
16         AND SO WE KIND OF KNEW THAT THERE MAY BE A SITUATION
17    BREWING WHERE WE END UP IN A DISPUTE OVER LICENSING, BUT WE
18    WANTED TO TRY TO NEGOTIATE AN AGREEMENT THAT WOULD GIVE AN
19    ASSURANCE OF SUPPLY TO APPLE EVEN IF SUCH DISPUTE WAS ONGOING.
20         AND WHEN WE STARTED, ONE OF THE BASIC PREMISES WAS, ALL
21    RIGHT, WE'RE GOING TO TRY TO COME UP WITH AN AGREEMENT THAT
22    DOESN'T ADVANTAGE OR DISADVANTAGE EITHER SIDE IN THE EVENT OF A
23    LICENSING DISPUTE.
24         AND SO WE SPENT A LOT OF TIME TRYING TO GET TO -- TO GET
25    TO THAT PLACE.  AND IT LOOKS LIKE THIS WAS ONE OF THE LATER
```

ABERLE CROSS BY MR. BORNSTEIN

1    ISSUES THAT WE WERE TRYING TO RESOLVE.

2    Q.   WELL, WHY WOULD A, AN ASSURANCE OF SUPPLY FROM QUALCOMM TO

3    APPLE, OR APPLE'S MANUFACTURERS, HAVE THE POTENTIAL TO PUT

4    QUALCOMM IN A WORSE POSITION THAN IT OTHERWISE WOULD BE IN?

5    A.   WELL, I MEAN, THAT'S WHAT WE WERE TRYING TO AVOID WITH

6    THIS AGREEMENT.

7        WHAT APPLE ORIGINALLY ASKED FOR WAS JUST SORT OF A BLANKET

8    COMMITMENT THAT QUALCOMM WOULD CONTINUE TO SUPPLY CHIPS, I

9    THINK IT WAS FOR THREE YEARS, YOU KNOW, AT THE EXISTING PRICING

10   THAT HAD BEEN AGREED, EVEN IF THE CONTRACT MANUFACTURERS

11   STOPPED PAYING ROYALTIES OR SOUGHT TO TERMINATE THEIR AGREEMENT

12   OR CHALLENGE THE AGREEMENTS.

13       AND WE THOUGHT THAT WOULD ACTUALLY PUT QUALCOMM IN A WORSE

14   POSITION BECAUSE AT THE SAME TIME APPLE WANTED TO PRESERVE THE

15   ABILITY TO ARGUE THAT QUALCOMM'S CONTINUED SHIPMENT OF CHIPS

16   UNDER THAT SUPPLY COMMITMENT WOULD EXHAUST THE QUALCOMM PATENT

17   PORTFOLIO, AND, THEREFORE, THEY COULD AVOID PAYING ROYALTIES.

18   Q.   SO LET ME DIRECT YOU TO THE BOTTOM OF THE FIRST PAGE OF

19   THE EXHIBIT.  IT'S 6680.

20       AND THE BOTTOM PARAGRAPH THERE YOU WROTE THAT "IN OTHER

21   WORDS, THIS IS NOT AN ARGUMENT ABOUT THE VALUE OF QUALCOMM'S

22   PATENTS, BUT RATHER AN ARGUMENT ABOUT WHETHER QUALCOMM SHOULD

23   RECEIVE LESS THAN THE VALUE OF ITS PATENTS IN TERMS OF

24   ROYALTIES BECAUSE IT HAS AGREED TO THE SUPPLY ASSURANCE TERMS

25   QUALCOMM -- APPLE IS REQUESTING."

1          DO YOU SEE THAT?

2     A.   YES.

3     Q.   CAN YOU EXPLAIN WHAT YOU MEANT BY THAT?

4     A.   YEAH.  I THINK WHAT WE WERE, WHAT WE WERE TRYING TO CONEY

5     IS, YOU KNOW, IF QUALCOMM WAS NOT SELLING ANY CHIPS TO APPLE

6     AND WE HAD A DISPUTE OVER THE VALUE OF THE INTELLECTUAL

7     PROPERTY, THEN THAT WOULD GET DECIDED AS TO WHAT THE

8     APPROPRIATE VALUE IS, AND WE WERE PERFECTLY WILLING AND HAPPY

9     TO ENGAGE IN THAT DISCUSSION OR HAVE THAT DETERMINATION MADE.

10          FOR EXAMPLE, IF THEY WERE BUYING FROM INTEL, THEY WOULD

11     HAVE NO ARGUMENT THAT THEY WOULD GET RIGHTS TO QUALCOMM PATENTS

12     WHEN THEY BUY THE CHIPS.

13          BUT THE WAY THAT THEY WERE SETTING UP THE SUPPLY TERM,

14     THEY WERE PUTTING THEMSELVES IN A POSITION, FROM OUR

15     PERSPECTIVE, TO ARGUE IF WE BUY FROM QUALCOMM, THAT WE, IN

16     FACT, DO GET, YOU KNOW, A CHUNK OF THE QUALCOMM PORTFOLIO

17     EFFECTIVELY FOR FREE BECAUSE THE PRICING OF THE CHIPS THAT HAD

18     BEEN AGREED SPECIFICALLY DID NOT INCLUDE ANY VALUE FOR THE

19     PATENTS.

20     Q.   AND SO AT THE END OF THAT PARAGRAPH WHEN YOU SAY "SO WE

21     THINK IT IS UNFAIR FOR APPLE TO LOCK IN PRICING THAT EXPRESSLY

22     EXCLUDES THE VALUE OF QUALCOMM IPR AND THEN OBTAIN A WINDFALL

23     IF IT SUCCEEDS IN ATTACKING THE FOUNDATION OF THAT PRICING," IS

24     THAT THE DYNAMIC YOU'RE TALKING ABOUT?

25     A.   YEAH.  SO EFFECTIVELY WE WERE SAYING IF THIS HAPPENS, WE

1    HAVE TO TALK ABOUT PRICING.  WE HAVE TO HAVE A NEW DISCUSSION

2    AROUND PRICING FOR THE CHIPS, WHICH IS WHAT THEY DIDN'T WANT TO

3    DO.

4    Q.   YOU WERE ASKED SOME QUESTIONS BY COUNSEL FOR THE FTC ABOUT

5    A STRATEGIC FUND WITH LG.

6         DO YOU RECALL THAT?

7    A.   YES.

8    Q.   WHAT WAS THE CONSIDERATION THAT YOU HAD SAID A COUPLE OF

9    TIMES DURING THE FTC'S COUNSEL'S EXAMINATION, WHAT WAS THE

10   CONSIDERATION THAT QUALCOMM FELT THAT IT RECEIVED FOR THE

11   STRATEGIC FUND WHICH YOU DIDN'T GET A CHANCE TO EXPLAIN?

12   A.   SO THE WAY THE STRATEGIC FUND WAS STRUCTURED WAS BASICALLY

13   QUALCOMM AGREED TO CONTRIBUTE DOLLARS TO A FUND THAT WOULD BE

14   USED TO CO-INVEST WITH LG.  SO THEY HAD TO PUT AN EQUAL AMOUNT

15   OF MONEY UP TO FUND WHAT WE REFERRED TO AS STRATEGIC

16   INITIATIVES THAT WOULD BE MUTUALLY BENEFICIAL TO THE COMPANIES.

17        AND AT THE OUTSET WE IDENTIFIED A FEW.  AND THEN WE HAD A

18   PROCESS THAT WAS PUT IN PLACE WHERE REPRESENTATIVES FROM THE

19   COMPANY MET QUARTERLY, THEY DISCUSSED POTENTIAL INITIATIVES,

20   THEY AGREED ON THEM, THEY TALKED ABOUT HOW MUCH FUNDING WOULD

21   BE COMMITTED, AND, YOU KNOW, THAT PROCESS WENT ON FOR MANY

22   YEARS UNDER THE AGREEMENT.

23   Q.   AND LET ME DIRECT YOU TO AN E-MAIL -- EXCUSE ME -- THAT

24   COUNSEL FOR THE FTC SHOWED YOU.  IT'S IN THEIR BINDER, I THINK

25   IT'S TAB 11, CX 7105 WHICH IS IN EVIDENCE.

ABERLE CROSS BY MR. BORNSTEIN

```
1            DO YOU HAVE THAT DOCUMENT?

2    A.    7105?

3    Q.    YES.

4    A.    YES.

5    Q.    OKAY.  AT THE VERY BOTTOM OF THE DOCUMENT ON THE FIRST

6    PAGE YOU SAY, "RATHER THAN GIVE ANY ADDITIONAL MONEY, I THINK

7    WE SHOULD AGREE TO REDUCE THE OFDM RATE SLIGHTLY (MAYBE TO 4

8    PERCENT), LOWER THE CAP AND LOOK AT FURTHER STRENGTHENING THE

9    MFR FOR OFDM."

10            LET ME TRY NOT TO WADE INTO ALL OF THE INITIALS HERE, BUT

11    WHAT DID YOU MEAN WHEN YOU TALKED ABOUT "RATHER THAN GIVE ANY

12    ADDITIONAL MONEY, I THINK WE SHOULD AGREE TO REDUCE THE OFDM

13    RATE"?

14    A.    WELL, AGAIN, MY RECOLLECTION IS WE WERE NEGOTIATING A

15    NUMBER OF DIFFERENT TERMS, BOTH IN EXISTING LICENSE AGREEMENT,

16    THIS NEW OFDM AGREEMENT, THE STRATEGIC FUND.  I BELIEVE THERE

17    WERE SOME AUDIT CLAIMS.

18            SO BOTH SIDES WERE POSITIONING FOR WHAT VALUE WAS COMING

19    EACH WAY.

20    Q.    SO AT THE OUTSET OF THIS NEGOTIATION, WAS QUALCOMM AT 4

21    PERCENT OR WAS IT AT A HIGHER NUMBER FOR THE OFDM RATE?

22    A.    I THINK WE WERE AT A HIGHER NUMBER.

23    Q.    SO WHY DID YOU COME DOWN TO A LOWER NUMBER DURING THE

24    NEGOTIATION?

25    A.    IT WAS A CONCESSION WE DECIDED TO MAKE TO TRY TO GET THE
```

ABERLE CROSS BY MR. BORNSTEIN

1    AGREEMENT DONE.

2    Q.   HAVE YOU EVER BEEN INVOLVED IN DISCUSSIONS WITH SAMSUNG

3    OVER A LICENSE AT THE CHIP LEVEL?

4    A.   YES.

5    Q.   OKAY.  AND HOW DID THOSE DISCUSSIONS START?

6    A.   WELL, ACTUALLY, THE DISCUSSIONS WEREN'T OVER A LICENSE.

7    Q.   OKAY.

8    A.   THEY WERE -- THEY WERE -- IT WAS A REQUEST THAT CAME IN

9    FROM SAMSUNG THAT THEY WANTED TO BASICALLY NEGOTIATE A

10   NON-EXHAUSTIVE PATENT AGREEMENT BETWEEN THE COMPANIES COVERING

11   THEIR MODEM CHIPS.

12   Q.   AND WAS QUALCOMM WILLING TO NEGOTIATE SUCH AN AGREEMENT?

13   A.   YES.

14   Q.   DID YOU ULTIMATELY REACH AN AGREEMENT WITH SAMSUNG ON CHIP

15   LEVEL TERMS?

16   A.   NO, WE WERE NOT ABLE TO REACH AN AGREEMENT.

17   Q.   WHILE YOU WERE AT THE COMPANY?

18   A.   CORRECT.

19   Q.   WHY DID YOU NOT REACH A DEAL DURING THESE NEGOTIATIONS?

20   A.   WELL, I MEAN, THE MAIN REASON WAS WE PROPOSED A STRUCTURE

21   THAT WE BELIEVED WOULD IMPLEMENT THE PARTIES' INTENT TO HAVE A

22   NON-EXHAUSTIVE PATENT AGREEMENT, AND, YOU KNOW, ONE OF THE

23   ISSUES WITH NEGOTIATING AND IMPLEMENTING THAT IS THAT THE

24   UNDERLYING CASE LAW IN THE U.S. AND OTHER PLACES WAS EVOLVING.

25        AND SO, YOU KNOW, WE HAD TO CHANGE THE STRUCTURE WE USED

1    SEVERAL TIMES.

2         AND HALFWAY THROUGH, OR ACTUALLY PROBABLY TOWARDS THE

3    LATER STAGES OF THE NEGOTIATIONS WITH SAMSUNG THERE WAS A CASE

4    THAT CAME DOWN IN THE U.S. SOMEWHERE, I DON'T REMEMBER WHERE,

5    THAT CAUSED US TO BECOME CONCERNED THAT THE STRUCTURE WE WERE

6    PROPOSING TO THEM ACTUALLY WOULD NOT HOLD UP AND BE

7    NON-EXHAUSTIVE.

8         SO WE HAD TO GO BACK AND THINK OF A DIFFERENT APPROACH IN

9    LIGHT OF THE NEW CASE TO TRY TO IMPLEMENT WHAT THE PARTIES WERE

10   TRYING TO ACHIEVE.

11   Q.   AND WHEN YOU DID THAT, WHAT WAS SAMSUNG'S REACTION?

12   A.   I THINK THEY -- YOU KNOW, WE HAD SPENT A LOT OF TIME ON

13   THE OTHER STRUCTURE AND -- YOU KNOW, I SHOULD HAVE MENTIONED AT

14   THE BEGINNING THAT THIS ISSUE CAME UP FROM THEIR SIDE BECAUSE

15   THEIR MANAGEMENT TEAM HAD KIND OF MISINTERPRETED SOME

16   STATEMENTS IN THE PRESS THINKING THAT WE WERE OUT GRANTING

17   THESE TYPES OF AGREEMENTS ROUTINELY.

18        AND I THINK THE I.P. DEPARTMENT ACTUALLY KNEW THEY DIDN'T

19   NEED IT, BUT HAVING SPENT THIS MUCH TIME ON IT, I THINK THEY

20   DIDN'T WANT TO INVEST MORE RESOURCES AND THEN TRY AND NEGOTIATE

21   A NEW STRUCTURE THE NEXT TIME AROUND.

22        AND THERE WERE ELEMENTS IN THE ORIGINAL 2009/2010

23   AGREEMENT WHICH BASICALLY GAVE THEM, YOU KNOW, PROTECTIONS

24   AGAINST US ASSERTING AGAINST THEIR CHIP BUSINESS ANYWAY.  SO I

25   THINK THEY JUST SAID, YOU KNOW, THAT'S SUFFICIENT.

```
1   Q.   OKAY.  DID YOU EVER SAY TO SAMSUNG, HEY, GUYS, YOU REALLY

2   DON'T NEED THIS AGREEMENT?

3   A.   YES.

4   Q.   TO WHOM DID YOU SAY THAT?

5   A.   I THINK IT WAS INJUNG LEE.  HE WAS THE ONE THAT REACHED

6   OUT TO ME INITIALLY AND EXPLAINED HIS MANAGEMENT TEAM WAS KIND

7   OF PUSHING FOR THIS.

8   Q.   LET ME TURN TO THE END OF THESE NEGOTIATIONS AND ASK YOU

9   TO LOOK AT QX 9214 AND PLEASE IDENTIFY THAT.  IT'S IN THE

10  BINDER THAT WE GAVE YOU.

11  A.   YES.  IT LOOKS LIKE AN E-MAIL BETWEEN MYSELF AND DR. AHN

12  AT SAMSUNG.

13         MR. BORNSTEIN:  OKAY.  YOUR HONOR, I MOVE THE

14  ADMISSION OF QX 9214, PLEASE.

15         MS. MILICI:  NO OBJECTION.

16         THE COURT:  IT'S ADMITTED.

17  (DEFENDANT'S EXHIBIT QX 9214 WAS ADMITTED IN EVIDENCE.)

18         THE COURT:  GO AHEAD, PLEASE.

19  BY MR. BORNSTEIN:

20  Q.   CAN YOU EXPLAIN THE PURPOSE OF YOUR E-MAIL TO DR. AHN

21  HERE.

22  A.   YEAH.  I THINK -- SO I THINK THIS WAS AFTER THE CASE CAME

23  DOWN AND WE TOLD THEM THAT WE HAD TO GO TO THIS NEW STRUCTURE,

24  AND HE SENT ME AN E-MAIL SAYING, HEY, WE SPENT SO MUCH TIME ON

25  THE LAST STRUCTURE, DO WE REALLY NEED TO CHANGE IT?
```

```
 1              AND I WAS RESPONDING TO THAT.

 2      Q.   OKAY.  I'LL DIRECT YOU TO THE SECOND PAGE OF THE E-MAIL

 3      NEAR THE END OF YOUR, YOUR -- THE SECOND PAGE OF THE EXHIBIT

 4      NEAR THE END OF YOUR E-MAIL, THE FIRST FULL PARAGRAPH.

 5              IT ENDS WITH YOUR SAYING, "LET ME REPEAT THAT OUR GOAL IS

 6      THE SAME AS YOURS:  TO GET THE AGREEMENT DONE AS SOON AS

 7      POSSIBLE.  I BELIEVE THAT WE CAN DO THAT BY THE END OF JULY."

 8              WAS THAT ACTUALLY QUALCOMM'S GOAL AT THE TIME, TO GET THE

 9      AGREEMENT DONE?

10      A.   YES, I BELIEVE IT WAS.  I THINK BOTH SIDES HAD SPENT A LOT

11      OF TIME ON THIS AND WE WANTED TO GET IT DONE AND MOVE ON.

12      Q.   AND AFTER YOU SENT THIS E-MAIL TO DR. AHN, DID SAMSUNG GET

13      BACK TO YOU AT ALL?

14      A.   I DON'T RECALL.  I DON'T THINK THEY DID.

15      Q.   HAVE YOU EVER HEARD OF SOMETHING CALLED PROJECT DRAGONFLY?

16      A.   I HAVE A VAGUE RECOLLECTION OF THAT.

17      Q.   WHAT'S YOUR VAGUE RECOLLECTION?

18      A.   THERE WAS SOME EFFORT BY A NUMBER OF COMPANIES, INCLUDING

19      DOCOMO, WHICH IS AN OPERATOR IN JAPAN, AND SOME OTHER JAPANESE

20      COMPANIES, I THINK SAMSUNG WAS INVOLVED IN THAT AS WELL,

21      BASICALLY THEY WERE GOING TO COME TOGETHER AND FORM A JOINT

22      VENTURE TO DO MODEM CHIPS.  I DON'T REMEMBER WHETHER IT WAS FOR

23      WCDMA OR SOMETHING ELSE.

24              AND I THINK THEY APPROACHED QUALCOMM AND ASKED IF THERE

25      WAS A CHIP LEVEL PATENT AGREEMENT THAT COULD BE PUT IN PLACE.
```

```
 1    Q.   AND DID QUALCOMM ENTER INTO A CHIP LEVEL PATENT AGREEMENT
 2    WITH THIS JOINT VENTURE?
 3    A.   NO.  I THINK WHAT HAPPENED WAS THE JOINT VENTURE BASICALLY
 4    DECIDED -- THEY COULDN'T AGREE AMONGST THEMSELVES ON HOW TO SET
 5    IT UP OR WHAT THE TERMS WERE GOING TO BE, SO THEY KIND OF
 6    ABANDONED IT.  AND SO THEY CALLED OFF THE DISCUSSION.
 7    Q.   LET ME ASK YOU TO LOOK AT ONE OF THE DOCUMENTS IN THE
 8    FTC'S BINDER.  IT'S TAB 3, PLEASE.  TAB 3 IS JX 0063, WHICH IS
 9    ALREADY IN EVIDENCE.
10         AND THIS IS AN AGREEMENT THAT YOU WERE ASKED ABOUT BY THE
11    FTC'S COUNSEL; CORRECT?
12    A.   I'M SORRY.  WHICH TAB ARE WE AT?
13    Q.   I'M SORRY.  IT'S TAB -- OH, I SHOULD BE AT TAB 4.
14    APOLOGIES.  JX 0063?
15    A.   YEAH, I SEE IT.
16    Q.   OKAY.  SO THIS IS AN AGREEMENT WITH SONY MOBILE THAT YOU
17    WERE ASKED ABOUT BY COUNSEL FOR THE FTC?
18    A.   YES.
19    Q.   AND COUNSEL FOR THE FTC HAD DIRECTED YOU TO PAGE 015 OF
20    THE AGREEMENT, THE PROVISION REGARDING ROYALTIES.
21    A.   YES.
22    Q.   AND SHE HAD ASKED YOU SOME QUESTIONS ABOUT THE 5 PERCENT
23    FIGURE IN THE TOP PARAGRAPH OF THAT PROVISION AND YOU HAD
24    WANTED TO SAY SOMETHING ABOUT, OR HAD STARTED TO SAY SOMETHING
25    ABOUT THE TRUE UP THAT FOLLOWED.
```

ABERLE CROSS BY MR. BORNSTEIN

1          CAN YOU GIVE THE ANSWER THAT YOU HAD STARTED TO GIVE

2     DURING HER EXAMINATION?  EXPLAIN WHAT THAT IS.

3     A.    YEAH.  SO THE PRE -- THE PREDECESSOR TO SONY MOBILE WAS

4     CALLED SONY ERICSSON, WHICH WAS A JOINT VENTURE BETWEEN SONY

5     AND ERICSSON.  AND THEY WERE OPERATING, WHEN THEY WERE A JOINT

6     VENTURE, UNDER THE ERICSSON AGREEMENT.

7          AND ONCE ERICSSON DIVESTED ITS INTEREST TO SONY AND IT

8     BECAME SONY MOBILE, EFFECTIVELY THEY COULD NO LONGER BE

9     LICENSED UNDER THE ERICSSON AGREEMENT.

10         SO WE HAD NEGOTIATED AN AGREEMENT WITH ERICSSON THAT COULD

11    BE OFFERED TO SONY MOBILE, WHICH IS WHAT THE EARLIER E-MAIL

12    EXCHANGE THAT FTC COUNSEL ASKED ME ABOUT WAS ABOUT.

13         WE WERE NOT ABLE TO CONVERGE QUICKLY, SO WE CAME ON TO

14    THIS PATH OF AN INTERIM AGREEMENT TO -- BASICALLY THAT THEY

15    WOULD HAVE AN ABILITY TO NEGOTIATE WHILE WE CONTINUED TO HAVE A

16    LICENSE IN PLACE FOR WHATEVER NUMBER OF MONTHS IT WAS.

17         AND AT THE END OF THAT THERE BASICALLY WOULD BE A TRUE UP

18    IN TERMS OF WHATEVER THE GO FORWARD ROYALTY RATE WOULD BE WOULD

19    BE APPLIED RETROACTIVELY TO WHAT WAS PAID UNDER THIS INTERIM

20    AGREEMENT.

21    Q.    AND LET ME DIRECT YOU TO THE -- NEAR THE BOTTOM OF THE

22    SECOND PARAGRAPH THAT'S ON THE GREEN RIGHT NOW.  IT BEGINS WITH

23    THE WORD "SUBJECT."

24         IT REFERS TO A FINAL, NON-APPEALABLE RULING BY A COURT OF

25    COMPETENT JURISDICTION OR IN ANOTHER MUTUALLY AGREED DISPUTE

1          RESOLUTION FORUM THAT IS BINDING ON BOTH QUALCOMM AND SMC.

2               DO YOU SEE THAT?

3          A.   YES.

4          Q.   CAN YOU EXPLAIN WHAT THE RELEVANCE OF A POTENTIAL COURT

5          RULING OR OTHER DISPUTE RESOLUTION RULING WAS IN CONNECTION

6          WITH THIS AGREEMENT?

7          A.   I THINK THE IDEA WAS THAT IF THE PARTIES COULDN'T AGREE,

8          WE WERE GOING TO SUBMIT IT TO A THIRD PARTY FOR A

9          DETERMINATION, AND THEN BOTH SIDES WOULD LIVE WITH WHATEVER

10         THAT DETERMINATION WAS.

11         Q.   AND IF QUALCOMM COULDN'T AGREE WITH SONY MOBILE ON A

12         ROYALTY RATE AT THIS POINT IN TIME, WAS QUALCOMM WILLING TO

13         LIVE WITH WHATEVER A COURT OR ANOTHER DISPUTE RESOLUTION

14         PROCESS PRODUCED?

15         A.   YES.

16         Q.   TURN BACK ONE DOCUMENT IN THE BINDER, PLEASE, TO TAB 3.

17         THIS IS CX 6552 ALREADY IN EVIDENCE.

18              AND COUNSEL FOR THE FTC ASKED YOU ABOUT SOMETHING THAT YOU

19         WROTE ON PAGE 005.

20              AND THE SENTENCE THAT COUNSEL DIRECTED YOU TO IS IN THAT

21         SECOND PARAGRAPH OF PAGE 005.

22              I THINK WE HAVE THE WRONG DOCUMENT ON THE SCREEN.

23              DO YOU HAVE THE RIGHT DOCUMENT IN FRONT OF YOU.  IT'S AN

24         E-MAIL.

25         A.   YEAH.

```
 1    Q.   IT SAYS, "TO MY KNOWLEDGE, WE HAVE NEVER SHIPPED

 2    COMMERCIAL QUANTITIES OF CHIPS TO A COMPANY WITHOUT A LICENSE."

 3         DO YOU SEE THAT?

 4    A.   YES.

 5    Q.   AND YOU SAID AT THIS POINT THAT WAS A CORRECT STATEMENT.

 6         HAS, FOLLOWING THIS E-MAIL, QUALCOMM EVER SHIPPED

 7    COMMERCIAL QUANTITIES OF CHIPS TO A COMPANY WITHOUT A LICENSE?

 8    A.   I DON'T BELIEVE SO.

 9    Q.   DID QUALCOMM SHIP COMMERCIAL QUANTITIES OF CHIPS TO SONY

10    MOBILE AT ANY POINT DURING THESE NEGOTIATIONS WITHOUT A

11    LICENSE?

12    A.   I CAN'T RECALL SPECIFICALLY.  I THINK -- I THINK THERE MAY

13    HAVE BEEN, LIKE, A DAY OR TWO WHERE WE THOUGHT WE WERE GOING TO

14    GET THE AGREEMENT DONE, BUT WE WERE WAITING FOR SIGNATURES AND

15    WE MAY HAVE SHIPPED A COUPLE OF SHIPMENTS IN THERE JUST TO MAKE

16    SURE THERE WASN'T A DISRUPTION.

17    Q.   OKAY.  LET ME ASK YOU TO LOOK AT ONE LAST DOCUMENT.  IT'S

18    TAB 8 IN THE FTC BINDER.  THE EXHIBIT NUMBER --

19         THE COURT:  I'M SORRY, JUST FOR THE TRANSCRIPT, I

20    THINK YOU SAID 6552, BUT IT'S 6522 FOR TAB 3.

21         MR. BORNSTEIN:  OH, YOU'RE RIGHT.  THANK YOU, YOUR

22    HONOR.

23         THE COURT:  SO LET'S CLEAN UP THE TRANSCRIPT.  THANK

24    YOU.

25         MR. BORNSTEIN:  THE PROBLEM OF HAVING SO MANY
```

```
1    EXHIBITS.

2              THE COURT:  AS I'VE SAID, YOU ALL SHOULD HAVE LIMITED

3    IT.

4         (LAUGHTER.)

5              THE COURT:  I WAS ASKING.

6              MR. BORNSTEIN:  I -- I'M ACKNOWLEDGING YOUR HONOR'S

7    WISDOM.  CAN WE TAKE --

8              THE COURT:  WELL, I'M HAPPY TO REDUCE THE NUMBER

9    TOMORROW.  I'LL GIVE YOU AN OPPORTUNITY TO PICK THE NUMBER.

10        (LAUGHTER.)

11   BY MR. BORNSTEIN:

12   Q.   LET'S TAKE A LOOK AT CX 5231.  IT WILL BE MY LAST EXHIBIT.

13   IT'S TAB 8 IN THE FTC'S BINDER.

14   A.   OKAY.

15   Q.   YOU W.

16        ERE ASKED BY COUNSEL FOR THE FTC ABOUT A SENTENCE AT THE

17   VERY BOTTOM OF THE FIRST PAGE THAT YOU WROTE WHERE YOU SAID,

18   "NOTE THAT HUAWEI HAS BEEN CLAIMING PATENT EXHAUSTION BASED ON

19   THEIR PURCHASE OF CHIPS FROM QC DESPITE THE TERMS OF OUR SUPPLY

20   AGREEMENT."

21        DO YOU SEE THAT?

22   A.   YES.

23   Q.   WHY DID YOU MAKE THE POINT TO MR. MOLLENKOPF THAT HUAWEI

24   HAD BEEN CLAIMING PATENT EXHAUSTION?

25   A.   I WAS TRYING TO EMPHASIZE THAT IT WASN'T A THEORETICAL
```

1      RISK, YOU KNOW, IF WE SHIPPED TO THEM.

2          WHEN WE STARTED THE DISCUSSION ABOUT ASKING THEM IF THEY

3      WERE GOING TO EXTEND THE CDMA LICENSE, THEY SAID, OH, THE TERMS

4      NEED TO BE RENEGOTIATED.  AND ONE OF THE BASES FOR SAYING THEY

5      SHOULD PAY WAS EVEN THOUGH WE HAD A LICENSE AGREEMENT AND THE

6      SUPPLY AGREEMENT IN PLACE WITH THE PROVISIONS THAT WERE

7      SUPPOSED TO BE NON-EXHAUSTIVE, THEY WERE CLAIMING THAT WHEN WE

8      SOLD THEM CHIPS, THERE WAS EXHAUSTION UNDER CHINESE PATENT LAW,

9      AND, THEREFORE, THAT SHOULD RESULT IN SOME REDUCTION OF THE

10     ROYALTIES THEY PAID.

11         SO CERTAINLY IF THERE WAS NO LICENSE, YOU KNOW, THEY WOULD

12     HAVE TAKEN AN EVEN STRONGER POSITION ON THAT ISSUE.  SO I WAS

13     HIGHLIGHTING THEY'D ALREADY RAISED THIS WITH US.  IT WASN'T A

14     THEORY.

15         MR. BORNSTEIN:  THANK YOU.  I HAVE NO FURTHER

16     QUESTIONS RIGHT NOW.

17         MR. VAN NEST:  YOUR HONOR, MAY I HAVE JUST A MOMENT

18     WITH COUNSEL?

19         THE COURT:  YES, GO AHEAD, PLEASE.

20     (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

21         MR. BORNSTEIN:  ALL RIGHT.  THANK YOU, YOUR HONOR.

22         THE COURT:  OKAY.  TIME IS 2:08.

23     DO YOU HAVE ANY RECROSS?

24         MS. MILICI:  I DO.

25         THE COURT:  OR REDIRECT I SHOULD SAY.

1            MS. MILICI:  I DO.

2        (PAUSE IN PROCEEDINGS.)

3                    **REDIRECT EXAMINATION**

4    BY MS. MILICI:

5    Q.   SIR, YOU JUST TESTIFIED THAT -- ABOUT A DISPUTE WITH OPPO

6    AND VIVO.  DO YOU RECALL THAT?

7    A.   YES.

8    Q.   AND YOU SUGGESTED THAT QUALCOMM CONTINUED TO SHIP THEM

9    CHIPS WHEN THEY TOOK THE POSITION THAT THEY WERE UNLICENSED?

10   A.   YES.

11   Q.   AND -- BUT QUALCOMM'S POSITION WAS THAT THEY WERE

12   LICENSED; CORRECT?

13   A.   YES.

14   Q.   AND WHAT KIND OF CHIPS WERE THEY BUYING?

15   A.   MY RECOLLECTION IS THAT THEY WERE BUYING STUFF KIND OF

16   ACROSS THE WHOLE ROADMAP OF THEIR, THEIR PRODUCTS.  BUT A LOT

17   OF STUFF IN THE MID-TIER.

18   Q.   OKAY.  QUALCOMM'S COUNSEL ASKED YOU A COUPLE OF QUESTIONS

19   ABOUT THE LG NEGOTIATION THAT I HAD RAISED WITH YOU.

20        DO YOU RECALL THAT?

21   A.   YES.

22   Q.   AND THERE WAS DISCUSSION ABOUT YOUR WILLINGNESS TO REDUCE

23   THE ROYALTY RATE?

24   A.   FOR THE OFDM LICENSE, YES.

25   Q.   FOR THE OFDM LICENSE.  DOES QUALCOMM HAVE A STANDARD

1    ROYALTY RATE FOR OFDM?

2    A.   I DON'T KNOW WHAT IT HAS NOW.

3    Q.   DID IT HAVE A STANDARD ROYALTY RATE FOR OFDM WHEN YOU WERE

4    THERE?

5    A.   WE DID, BUT AT THAT TIME THAT WAS THE FIRST AGREEMENT WE

6    WERE NEGOTIATING, SO WE WERE BASICALLY ESTABLISHING A RATE AT

7    THAT TIME IN THE LG DISCUSSION.

8    Q.   SO IN THE LG DISCUSSION, YOU WERE ESTABLISHING A RATE?

9    YOU WEREN'T OFFERING THEM A LOWER RATE THAN THEY HAD PREVIOUSLY

10   HAD OR A LOWER RATE THAN SOMEBODY ELSE HAD; CORRECT?

11   A.   WELL, WE WERE OFFERING THEM A LOWER RATE THAN WHAT WE

12   ORIGINALLY PROPOSED IN THE NEGOTIATION, SO WE WERE MAKING A

13   CONCESSION.

14   Q.   OKAY.  AND YOUR -- IT IS YOUR UNDERSTANDING THAT QUALCOMM

15   HAD A STANDARD ROYALTY RATE FOR 2G AND 3G THAT WAS 5 PERCENT;

16   CORRECT?

17   A.   A TYPICAL RATE WAS 5 PERCENT FOR 2G AND 3G.

18   Q.   AND THE BLACKBERRY AGREEMENT THAT YOU TESTIFIED ABOUT THAT

19   WAS STRUCTURED DIFFERENTLY, DID QUALCOMM UNDERSTAND THAT

20   AGREEMENT TO BE EQUIVALENT TO AN AGREEMENT THAT HAD A 5 PERCENT

21   RUNNING ROYALTY RATE?

22   A.   IT WAS NOT -- YOU COULDN'T DETERMINE THAT AT THE

23   BEGINNING, RIGHT?  IT DEPENDED ON HOW MANY DEVICES WERE SOLD AT

24   WHAT SELLING PRICE DURING THE PERIOD OF TIME COVERED BY THAT

25   PREPAYMENT.

1    Q.   SIR, I'M ASKING YOU WHETHER QUALCOMM CONSIDERED IT

2    EQUIVALENT TO A 5 PERCENT RUNNING ROYALTY RATE?

3    A.   NO.  IT WAS DIFFERENT.

4         CAN I CLARIFY SOMETHING?  WHEN I SAY "DIFFERENT," IT COULD

5    HAVE BEEN LOWER, IT COULD HAVE BEEN HIGHER, IT COULD HAVE BEEN

6    THE SAME.  IT DEPENDED ON HOW THEIR BUSINESS PERFORMED ON A

7    GOING FORWARD BASIS.

8    Q.   BUT WHEN QUALCOMM WAS DECIDING TO GO FORWARD WITH THE

9    AGREEMENT THAT WAS STRUCTURED THE WAY THAT THE BLACKBERRY

10   AGREEMENT, IT WAS BECAUSE IT BELIEVED THAT THE RETURNS TO

11   QUALCOMM WOULD BE EQUIVALENT TO A 5 PERCENT RUNNING ROYALTY

12   RATE; CORRECT?

13   A.   NO.  BOTH SIDES WERE TAKING A RISK.

14   Q.   OKAY.  NOW, YOU MENTIONED IN YOUR TESTIMONY A FEW MINUTES

15   AGO THAT, THAT APPLE WOULDN'T HAVE AN ARGUMENT THAT THEY HAD

16   OBTAINED EXHAUSTIVE RIGHTS WHEN PURCHASING FROM INTEL.

17        DO YOU RECALL SAYING THAT?

18   A.   YES, TO QUALCOMM PATENTS.

19   Q.   TO QUALCOMM PATENTS.

20        YET, THAT'S BECAUSE QUALCOMM WON'T LICENSE INTEL; ISN'T

21   THAT CORRECT?

22   A.   THAT'S BECAUSE THERE'S NO AGREEMENT IN PLACE GRANTING ANY

23   RIGHTS TO INTEL.

24   Q.   BUT QUALCOMM COULD GRANT THOSE RIGHTS TO INTEL, COULDN'T

25   IT?

1    A.    THEORETICALLY IT COULD, YES.

2    Q.    OKAY.  AND IF QUALCOMM DID GRANT THOSE RIGHTS TO INTEL,

3    THEN APPLE'S ARGUMENT ABOUT EXHAUSTION WOULD BE THE SAME

4    WHETHER THEY PURCHASED FROM QUALCOMM OR FROM INTEL; CORRECT?

5    A.    DEPENDS.  I MEAN, IT DEPENDS ON WHAT THE TERMS OF THAT

6    AGREEMENT WOULD BE.

7    Q.    LET'S SAY QUALCOMM GRANTED INTEL A FULLY EXHAUSTIVE

8    LICENSE.  APPLE'S EXHAUSTION ARGUMENT WOULD BE THE SAME NO

9    MATTER WHO THEY PURCHASED FROM; CORRECT?

10   A.    I STILL THINK THERE'S DIFFERENCES IN TERMS OF WHAT'S IN

11   EACH CHIP AND WHAT PATENTS ARE LICENSED BY THE AGREEMENT.  SO I

12   CAN'T ANSWER IT THAT WAY.

13   Q.    OKAY.  NOW, YOU TESTIFIED EARLIER THAT -- ABOUT SAMSUNG

14   AND NEGOTIATIONS ABOUT A CHIP LEVEL LICENSE.

15         DO YOU RECALL THAT?

16   A.    YES.

17   Q.    AND IS IT YOUR TESTIMONY THAT SAMSUNG WAS NOT SEEKING AN

18   EXHAUSTIVE LICENSE?

19   A.    YES.

20   Q.    OKAY.  COULD YOU PLEASE TURN TO PAGE 105 OF YOUR

21   DEPOSITION.

22   A.    YEAH.  LET ME CLARIFY THAT FIRST.  THE TIME PERIOD IN

23   WHICH MR. BORNSTEIN ASKED ABOUT, THEY WERE ASKING ONLY FOR A

24   NON-EXHAUSTIVE AGREEMENT.

25   Q.    YES.

1    A.   LATER, AFTER THE KFTC DECISION CAME DOWN, THEY CAME BACK

2    AND THAT'S NOT THE DISCUSSION I WAS REFERRING TO.

3    Q.   OKAY.  SO IT IS YOUR TESTIMONY THAT SAMSUNG HAS INDEED

4    SOUGHT AN EXHAUSTIVE LICENSE FOR ITS CHIPSETS; CORRECT?

5    A.   I'M NOT 100 PERCENT SURE.  IT WAS HAPPENING AROUND THE

6    TIME I LEFT THE COMPANY.  SO IT'S POSSIBLE THEY DID ASK FOR IT.

7    I JUST DON'T -- AS I SIT HERE, I THINK THEY DID, BUT I'M NOT

8    100 PERCENT SURE.

9    Q.   CAN YOU PLEASE TURN TO PAGE 105 OF YOUR DEPOSITION?

10   A.   115.

11   Q.   105.

12   A.   YES.

13   Q.   105, LINE 20.  DO YOU SEE WHERE I ASKED YOU, "HAVE ASIC

14   MANUFACTURERS REQUESTED EXHAUSTIVE LICENSES FROM QUALCOMM?"

15        DO YOU SEE THAT?

16   A.   YES.

17   Q.   AND THEN YOU SAID -- YOUR ANSWER WAS, "I THINK AT ONE

18   POINT, INTEL DID.  BROADCOM.  MEDIATEK.  SAMSUNG."

19        AND YOU THOUGHT HUAWEI AS WELL.

20        DO YOU SEE THAT?

21   A.   YES.

22   Q.   OKAY.  SO IS IT YOUR TESTIMONY TODAY THAT THOSE COMPANIES

23   HAVE ALL ASKED -- SOUGHT EXHAUSTIVE LICENSES FROM QUALCOMM?

24   A.   YEAH, I BELIEVE SO.

25   Q.   OKAY.  AND QUALCOMM'S COUNSEL WAS ASKING YOU QUESTIONS

ABERLE REDIRECT BY MS. MILICI

1      ABOUT JX 0063.

2          DO YOU RECALL THAT?

3      A.   CAN YOU TELL ME WHICH TAB THAT'S AT?

4      Q.   THAT IS IN THE BINDER I GAVE YOU AT TAB 4.  IT'S THE SONY

5      AGREEMENT.

6      A.   OKAY.

7      Q.   AND YOU'LL RECALL THAT WHEN WE LOOKED AT THIS AGREEMENT

8      TOGETHER, WE AGREED THAT THE AGREEMENT EXPIRED IN OCTOBER OF

9      2012; CORRECT?

10     A.   LET ME JUST CONFIRM, BUT I THINK THAT'S THE DATE THAT YOU

11     TOLD ME OR THAT WE LOOKED AT.

12     Q.   AND SONY NEVER GOT A TRUE UP ON ANY ROYALTIES THAT IT PAID

13     UNDER THIS AGREEMENT, DID IT?

14     A.   I THINK THE PARTIES EVENTUALLY ENTERED INTO A NEW

15     AGREEMENT THAT CAME INTO EFFECT AFTER THIS, AND I THINK IT WAS

16     AT THE 5 PERCENT ROYALTY.

17     Q.   SO IN THIS NEGOTIATION, SONY ASKED FOR LOWER, FOR A LOWER

18     RATE THAN 5 PERCENT, GOT AN INTERIM AGREEMENT AT 5 PERCENT, AND

19     THEN THEY GOT A FINAL AGREEMENT AT 5 PERCENT; CORRECT?

20     A.   I BELIEVE THAT'S RIGHT.

21     Q.   OKAY.  AND AT SEVERAL POINTS THROUGH THE COURSE OF THOSE

22     NEGOTIATIONS, ERIC REIFSCHNEIDER AND OTHERS REMINDED SONY THAT

23     IF THEY DID NOT REACH AN AGREEMENT, THAT THEY WOULD BE UNABLE

24     TO PURCHASE CHIPS; IS THAT CORRECT?

25     A.   I REMEMBER YOU SHOWING ME PASSAGES FROM E-MAILS WHERE THAT

1    WAS COMMUNICATED.

2    Q.   DO YOU RECALL THAT -- THOSE THINGS BEING COMMUNICATED AT

3    THE TIME?

4    A.   YES.

5    Q.   AND YOU WERE THE PRESIDENT OF QCT AT THE TIME; CORRECT?

6    A.   I'M NOT 100 PERCENT -- EITHER PRESIDENT OR GROUP

7    PRESIDENT.  BUT I HAD OVERALL RESPONSIBILITY FOR THE BUSINESS

8    AT THE TIME.

9    Q.   AND THERE WERE REMINDERS TO SONY ABOUT ITS INABILITY TO

10   BUY CHIPS IF IT BECAME UNLICENSED MULTIPLE TIMES THROUGH THOSE

11   NEGOTIATIONS; CORRECT?

12   A.   YEAH.  I THINK WE KEPT HAVING TO COME BACK TO IT BECAUSE

13   THE NEGOTIATIONS WERE NOT -- YOU KNOW, WERE STALLING AND WE

14   FELT THEY WERE PUSHING US CLOSE TO THE LINE.  AND SO WE HAD TO

15   KEEP TELLING THEM, WE'VE GOT TO GET SOMETHING DONE SO THAT THIS

16   DOESN'T BECOME A PROBLEM.

17   Q.   TO --

18   A.   WE WERE TRYING TO AVOID THE PROBLEM, NOT CREATE IT.

19   Q.   DID QUALCOMM EVER OFFER A LOWER ROYALTY RATE THAN

20   5 PERCENT?

21   A.   THERE WERE A NUMBER OF DISCUSSIONS AROUND AN EXCHANGE OF

22   VALUE, AND WE EXPRESSED AN OPENNESS TO DISCUSS A DIFFERENT RATE

23   IF THERE WAS VALUE THAT COULD COME BACK, AND I DO REMEMBER

24   DISCUSSIONS AROUND A CROSS-LICENSE FROM SONY MOBILE.  WE HAD

25   SUGGESTED THEY ACTUALLY, IF THEY COULD PUT SONY PATENTS ON THE

1    TABLE AS OPPOSED TO SONY MOBILE, THAT COULD HELP MOVE THE DEAL.

2        BUT I THINK ULTIMATELY THEY WEREN'T ABLE OR WILLING TO DO

3    THAT, SO WE ENDED UP AT THE 5 PERCENT RATE.

4    Q.   SO YOUR TESTIMONY IS THAT QUALCOMM MADE OFFERS TO SONY OF

5    LOWERING A ROYALTY RATE IF SONY GAVE IT SOMETHING OF VALUE;

6    CORRECT?

7    A.   WE SAID WE WERE WILLING TO DISCUSS A DIFFERENT RATE, BUT

8    THERE HAD TO BE VALUE ASSOCIATED WITH THAT IS MY RECOLLECTION,

9    AND THEY WERE UNWILLING OR UNABLE TO PUT ANY MEANINGFUL VALUE

10   ON THE TABLE.

11   Q.   AND THE VALUE ASSOCIATED WITH THAT WOULD BE VALUE BEING

12   PROVIDED FROM SONY TO QUALCOMM IN ORDER TO GET A LOWER ROYALTY

13   RATE THAN 5 PERCENT; CORRECT?

14   A.   THAT'S MY RECOLLECTION.

15        MS. MILICI:  THANK YOU.  NO MORE QUESTIONS.

16        THE COURT:  OKAY.  TIME IS 2:18.

17   DO YOU HAVE ANY FURTHER QUESTIONS?

18        MR. BORNSTEIN:  NO FURTHER QUESTIONS, YOUR HONOR.

19        THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED, AND

20   IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

21        MS. MILICI:  NOT SUBJECT TO RECALL.

22        MR. BORNSTEIN:  FREE TO GO, YOUR HONOR, NOT SUBJECT

23   TO RECALL.

24        THE COURT:  OKAY.  THEN YOU'VE COMPLETED YOUR TRIAL

25   TESTIMONY.  YOU'RE FREE TO LEAVE.

```
1              THE WITNESS:  THANK YOU, YOUR HONOR.

2              THE COURT:  DO YOU WANT TO TAKE A FIVE MINUTE BREAK

3     NOW AND THEN TAKE A LONGER BREAK AT -- WE CAN TAKE A TEN MINUTE

4     BREAK NOW TO 2:30.

5          OKAY.  THANK YOU FOR YOUR PATIENCE.  WE'LL SEE YOU BACK IN

6     TEN MINUTES.

7          WE'RE IN RECESS.

8          (RECESS FROM 2:19 P.M. UNTIL 2:32 P.M.)

9              THE COURT:  GOOD AFTERNOON AND WELCOME BACK.

10             MR. VAN NEST:  THANK YOU, YOUR HONOR.

11             THE COURT:  CALL YOUR NEXT WITNESS, PLEASE.

12             MR. KEHL:  PHIL KEHL FROM THE FTC.

13         THE FTC CALLS FINBARR MOYNIHAN.

14         MAY I APPROACH WITH BINDERS FOR THE COURT?

15             THE COURT:  YES, PLEASE.  THANK YOU.

16         (PAUSE IN PROCEEDINGS.)

17             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

18         (PLAINTIFF'S WITNESS, JOHN MOYNIHAN, WAS SWORN.)

19             THE WITNESS:  I DO.

20             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

21             MR. KEHL:  YOUR HONOR, IF I COULD NOTE AT THE OUTSET,

22    THERE ARE THREE MEDIATEK DOCUMENTS THAT WERE SUBJECT TO A

23    SEALING MOTION, AND SO THAT'S BEEN NOTED IN THE BINDER.

24         AND MEDIATEK HAS ALSO SOUGHT TO SEAL TESTIMONY, AND THE

25    FTC DOES NOT OPPOSE THAT MOTION, AND WE BELIEVE WE CAN CONDUCT
```

```
 1        A SEALED EXAMINATION WITH A LIMITED NUMBER OF QUESTIONS TOWARDS

 2        THE END OF OUR EXAM, BUT WOULD APPRECIATE GUIDANCE FROM THE

 3        COURT.

 4               MR. SHACHAM:  YOUR HONOR, IF I MAY?  MATAN SHACHAM

 5        FOR QUALCOMM.

 6           IF I MAY SPEAK ON THE SEALING POINT?  I BELIEVE YOUR HONOR

 7        ALREADY DEALT WITH THAT IN THE ORDER YOU ISSUED LAST NIGHT.

 8        YOU CONSIDERED THE REQUEST TO SEAL THE DOCUMENT AND THE

 9        DOCUMENTS AND YOU ORDERED ONLY THE DOCUMENTS BE SEALED.  I

10        THINK THE EASIEST WAY TO GO IS WHAT WE'VE DONE UP UNTIL NOW,

11        WHICH IS WE WON'T DISPLAY THE SEALED DOCUMENTS OR GET INTO

12        THOSE.  I THINK IT WOULD NOT BE A GOOD IDEA TO SEAL THE COURT

13        AND HAVE PEOPLE MARCHING IN AND OUT.  I BELIEVE IT'S DOCKET

14        1140, YOUR HONOR.

15               THE COURT:  1140 JUST DEALT WITH THE THREE DOCUMENTS.

16               MR. SHACHAM:  RIGHT.  BUT THE MOTION THAT THEY FILED

17        ASKED FOR BOTH THE COURTROOM AND THE DOCUMENTS TO BE SEALED.

18               THE COURT:  RIGHT.  BUT THERE WEREN'T ANY PARTICULAR

19        TRANSCRIPT EXCERPTS; CORRECT?

20               MR. KEHL:  THAT'S CORRECT, YOUR HONOR.

21           SO WE INTERPRETED THE ORDER AS JUST ADDRESSING THE

22        DOCUMENTS, WHICH IS WHY I RAISED THE ISSUE NOW.

23               THE COURT:  OKAY.  IS THERE ANYONE FROM MEDIATEK

24        HERE, OR REPRESENTING MEDIATEK?

25               MR. KEHL:  I BELIEVE THERE IS, YOUR HONOR.
```

```
 1                THE COURT:  I'M UNCLEAR.  I ONLY RULED ON WHAT YOU

 2      OBJECTED TO, WHICH IS CX -- ACTUALLY, IT'S OKAY.  THEY'RE IN

 3      ECF NUMBER 1140.

 4                MR. KEHL:  I'M JUST LOOKING FOR GUIDANCE FROM THE

 5      COURT ON HOW TO APPROACH THE QUESTIONS ONCE WE GET TO THE

 6      PORTION OF TESTIMONY THAT WOULD IMPLICATE TOPICS COVERED BY

 7      MEDIATEK'S MOTION.

 8                THE COURT:  I'M SORRY.  DID I NOT RULE ON THOSE?  I

 9      HAVEN'T RULED ON THOSE EXCERPTS YET?

10                MR. KEHL:  THERE'S NOT YET TESTIMONIAL EXCERPTS.

11      WE'RE GOING TO BE ASKING MR. MOYNIHAN QUESTIONS THAT ADDRESS

12      TOPICS RAISED IN THEIR MOTION.

13                THE COURT:  THAT ARE SEPARATE FROM THE THREE EXHIBITS

14      THAT THEY SPECIFICALLY SOUGHT TO SEAL?

15                MR. KEHL:  WELL, THE TESTIMONY WILL TOUCH ON, OR THE

16      QUESTIONS WILL TOUCH ON THE DOCUMENTS, BUT WILL CONTAIN

17      ADDITIONAL INFORMATION.

18                THE COURT:  I THINK WHEN WE GET TO THE TOPIC OF THESE

19      THREE EXHIBITS, WE SHOULD SEAL THE COURTROOM.

20           SO HOW MUCH DO YOU HAVE THAT'S ON THESE?  BECAUSE I DON'T

21      KNOW HOW YOU CAN HAVE A CONVERSATION ABOUT THOSE PARTICULAR

22      ITEMS WITHOUT SEALING.

23                MR. KEHL:  THAT'S FINE WITH US, YOUR HONOR.

24                THE COURT:  OKAY.  SO WHAT DO YOU HAVE OUTSIDE OF

25      THESE THREE EXHIBITS?
```

 1            MR. KEHL:  I PROBABLY, I'D ESTIMATE THAT WE HAVE

 2      ABOUT 25 MINUTES BEFORE WE GET TO THE SEALED EXHIBITS.

 3            THE COURT:  OH, OKAY.  ALL RIGHT.  NOW, IS THERE A

 4      SEGMENTATION OF YOUR CROSS THAT CAN BE DONE?

 5            MR. SHACHAM:  YOUR HONOR, I BELIEVE THAT I CAN DO MY

 6      CROSS IN A WAY THAT WE'VE DONE EXAMINATIONS UP UNTIL NOW, WHICH

 7      IS TO NOT REFER TO THE DETAILS OF THE DOCUMENT, I'LL SHOW THE

 8      DOCUMENT TO THE WITNESS, I'LL CLOSE THE PUBLIC MONITOR, AND

 9      I'LL ASK ABOUT THEM IN A WAY THAT I THINK DOESN'T ELICIT THE

10      DETAILS.

11         I WOULD IMAGINE THAT THE FTC COULD DO THE SAME THING.  IN

12      FACT, AT LEAST WE SHOULD TRY THAT AND THAT WOULD BE THE MOST

13      EFFICIENT --

14            THE COURT:  NO, I'M NOT GOING TO DO THAT BECAUSE THE

15      CONTENT OF THIS IS A LITTLE DIFFERENT THAN JUST TALKING ABOUT A

16      ROYALTY RATE WITHOUT GIVING THE NUMBER.  THESE ARE SPECIFIC

17      CONCEPTS THAT HAVE BEEN SEALED, SO I THINK THAT'S MORE

18      PROBLEMATIC IN THIS CASE.  IT'S NOT AS CLEARLY BIFURCATED AS IN

19      JUST TALKING ABOUT A ROYALTY RATE IN GENERAL.

20         SO DO YOU HAVE A PART THAT IS NOT GOING TO TOUCH UPON

21      THESE THREE EXHIBITS?

22            MR. SHACHAM:  I DO.  I DO, YOUR HONOR, AND I CAN DO

23      THAT FIRST AND TRY TO DO THE PART --

24            THE COURT:  OKAY.  WE'LL HAVE BOTH PARTIES DO THEIR

25      UNSEALED PORTIONS AND THEN WE'LL ASK EVERYONE WHO'S NOT A PARTY

```
 1      TO STEP OUTSIDE AND THEN WE'LL DO THE SEALED PORTIONS FOR BOTH

 2      PARTIES.  OKAY?

 3              MR. SHACHAM:  YES, I THINK THAT WORKS.

 4              THE COURT:  OKAY.  ALL RIGHT.  GO AHEAD, PLEASE.

 5      TIME IS 2:37.

 6              THE CLERK:  WOULD YOU STATE YOUR FULL NAME AND SPELL

 7      YOUR LAST NAME FOR THE RECORD.

 8              THE WITNESS:  SURE.  JOHN FINBARR MOYNIHAN.

 9      M-O-Y-N-I-H-A-N.

10              THE COURT:  2:11.  GO AHEAD.

11                          DIRECT EXAMINATION

12      BY MR. KEHL:

13      Q.   GOOD AFTERNOON, MR. MOYNIHAN.

14      A.   GOOD AFTERNOON.

15      Q.   COULD YOU PLEASE INTRODUCE YOURSELF?

16      A.   MY NAME IS FINBARR MOYNIHAN.

17      Q.   WHAT IS YOUR CURRENT EMPLOYER?

18      A.   MEDIA.

19      Q.   WHEN DID YOU BEGIN WORKING AT MEDIATEK?

20      A.   JANUARY 2008.

21      Q.   WHAT'S YOUR CURRENT ROLE AT MEDIATEK?

22      A.   I'M THE GENERAL MANAGER FOR A TEAM THAT WE CALL CORPORATE

23      SALES AND BUSINESS DEVELOPMENT FOR THE AMERICAS AND EUROPE.

24              THE COURT:  CAN YOU ADJUST THE MICROPHONE.

25              THE WITNESS:  SORRY.  DO YOU WANT IT CLOSER?
```

```
 1                    THE COURT:  YES, PLEASE.

 2        BY MR. KEHL:

 3        Q.    WHAT ARE YOUR RESPONSIBILITIES?

 4        A.    MY TEAM MANAGES OUR CUSTOMER AND BUSINESS PARTNER

 5        INTERFACES, RELATIONSHIPS IN THE AMERICAS AND EUROPE.

 6        Q.    FOR WHICH PRODUCTS DO YOU -- ARE YOU INVOLVED?

 7        A.    ALL OF MEDIATEK PRODUCTS.

 8        Q.    COULD YOU GIVE EXAMPLES OF SOME OF THE PRODUCTS FOR WHICH

 9        YOU'RE RESPONSIBLE?

10        A.    SURE.  HOME ELECTRONIC, WI-FI, CONSUMER ELECTRONICS

11        PRODUCTS, SMARTPHONES, FEATURE PHONES.

12        Q.    WHEN YOU SAY SMARTPHONE, ARE YOU REFERENCING MODEM CHIPS?

13        A.    CHIPSETS FOR SMARTPHONES MORE PRECISELY.

14        Q.    COULD YOU PLEASE GIVE A BRIEF SUMMARY OF YOUR ROLES ON

15        ASSOCIATED PRODUCTS BEFORE YOUR CURRENT ROLE?

16        A.    SO I JOINED MEDIATEK IN 2008.  I WORKED IN A FEW DIFFERENT

17        PRODUCT MARKETING ROLES FOR A WHILE.

18              IN 2000 -- LATE 2011, EARLY 2012, I MOVED INTO MORE OF A

19        BUSINESS DEVELOPMENT ROLE AND OVER THE INTERVENING YEARS, IT'S

20        BASICALLY BEEN SIMILAR CORPORATE SALES, BUSINESS DEVELOPMENT

21        ROLES, AND DIFFERENT REGIONAL RESPONSIBILITIES.

22        Q.    HAVE YOU BEEN RESPONSIBLE FOR MODEM CHIP SALES DURING THIS

23        TIME?

24        A.    YES.

25        Q.    WHERE WERE YOU EMPLOYED BEFORE MEDIATEK?
```

MOYNIHAN DIRECT BY MR. KEHL

1    A.   I WAS EMPLOYED AT ANALOG DEVICES.

2    Q.   AND WHAT'S ANALOG DEVICES?

3    A.   IT'S ANOTHER SEMICONDUCTOR COMPANY, U.S. COMPANY

4    HEADQUARTERED IN MASSACHUSETTS.

5    Q.   WAS ANALOG DEVICES ACQUIRED BY MEDIATEK?

6    A.   MORE ACCURATELY, THE BUSINESS UNIT, THE WIRELESS BUSINESS

7    UNIT THAT I WORKED FOR WAS ACQUIRED BY MEDIATEK.  NOT THE WHOLE

8    COMPANY.

9    Q.   WHAT IS YOUR UNDERSTANDING OF THE RATIONALE FOR THE

10   MEDIATEK ACQUISITION OF THE WIRELESS ANALOG DEVICES?

11   A.   WHAT WAS EXPLAINED TO US AT THE TIME WAS MEDIATEK WAS

12   LOOKING TO ACQUIRE A FOOTPRINT, R&D TEAMS, SALES AND BUSINESS

13   DEVELOPMENT TEAMS, IN THE U.S. AND EUROPE PREDOMINANTLY WITH A

14   FOCUS OF GOING AFTER MORE TIER 1 WIRELESS BUSINESS.

15   Q.   AND AGAIN, WHEN YOU REFER TO WIRELESS BUSINESS, ARE YOU

16   REFERRING TO CELLULAR MODEMS?

17   A.   YEAH, MODEMS AND CHIPSETS FOR FEATURE PHONES OR

18   SMARTPHONES PREDOMINANTLY.

19   Q.   NOW, MR. MOYNIHAN, WE'RE GOING TO BE DISCUSSING THE

20   INDUSTRY THROUGHOUT THE DAY.  PER COURT ORDER, THE INTRODUCTION

21   OF EVIDENCE FROM AFTER MARCH 2018 HAS BEEN EXCLUDED.

22       SO COULD YOU PLEASE REFRAIN FROM IDENTIFYING OR MAKING

23   REFERENCE TO SPECIFIC EVENTS THAT HAPPENED AFTER THAT DATE.

24   A.   SURE, I'LL DO THE BEST I CAN.

25   Q.   MR. MOYNIHAN, WHICH FIRMS MAKE MODEM CHIPS?

1      A.   TODAY, QUALCOMM, MEDIATEK, CERTAINLY HISILICON AND

2   SAMSUNG, AND THERE'S ANOTHER COMPANY NOW CALLED UNISOC THAT

3   USED TO BE CALLED SPECTRUM IN CHINA THAT ALSO MAKES SOME FLAVOR

4   OF CHIPS.

5      Q.   HOW HAS THIS CHANGED OVER TIME, IF AT ALL?

6      A.   THERE ARE PROBABLY LESS PRODUCERS TODAY THAN THERE WERE

7   YEARS AGO.

8      Q.   COULD YOU GIVE ME SOME EXAMPLES?

9      A.   SO THERE'S A NUMBER OF COMPANIES THAT I CAN THINK OF,

10   BROADCOM, MARVEL, NVIDIA, ST ERICSSON, TI, FREE SCALE, PERHAPS

11   OTHERS, RENASIS IS ANOTHER ONE I CAN THINK OF THAT HAS STOPPED

12   DEVELOPING CELLULAR MODEMS.

13      Q.   AND, MR. MOYNIHAN, WHY IN TERMS OF MARKET POSITION HAS

14   MEDIATEK BEEN SUCCESSFUL AT SELLING MODEM CHIPS?

15      A.   I WOULD SAY MOSTLY IN THE LOWER TIERS OF THE MARKET, SO

16   EITHER 2G FEATURE PHONES OR ENTRY 3G, ENTRY 4G PHONES TODAY.

17      Q.   HOW HAS THIS CHANGED OVER TIME, IF AT ALL?

18      A.   PROBABLY DEPENDS A LITTLE BIT ON THE YEAR.  BUT I THINK

19   OUR STRENGTH HAS MOSTLY BEEN, OUR MARKET SHARE HAS MOSTLY BEEN

20   IN THOSE KIND OF TIERS REALLY FROM 2G ALL THE WAY TO TODAY.

21   YOU KNOW, IT'S PROBABLY, IT'S PROBABLY RISEN UP A LITTLE BIT

22   OVER THE YEARS AND SOME YEARS A LITTLE BETTER THAN OTHERS.  BUT

23   GENERALLY THE STRENGTH, THE VOLUME COMES FROM THE ENTRY TIERS.

24      Q.   WHERE HAS MEDIATEK BEEN SUCCESSFUL?

25      A.   WE HAVEN'T REALLY PENETRATED EVER WHAT I WOULD CALL THE

1     PREMIER TIERS IN THE MARKET, THE HIGH TIERS, THE HIGHEST TIERS

2     OF THE MARKET.

3     Q.   YOU MENTIONED THE HIGHEST TIERS OF THE MARKET.  WHAT ARE

4     THE CHARACTERISTICS OF MODEM CHIPS IN THAT TIER?

5     A.   GENERALLY THOSE TEND TO BE, YOU KNOW, THE HIGHEST PRICED

6     DEVICES.  THEY TEND TO BE THE ONES WITH THE LATEST FEATURES,

7     THE HIGHEST SPECS ON THE CELLULAR MODEM.

8         IT PROBABLY TRANSLATES INTO A LOT OF VERY TECHNICAL

9     FEATURES, BUT PREDOMINANTLY IT KIND OF RELATES TODAY I THINK TO

10    DATA SPEED, WIRELESS MOBILE BROADBAND DATA SPEEDS THAT THE

11    MODEMS CAN ACHIEVE, THEY TEND TO BE HIGHER.

12    Q.   AND WHAT IS YOUR VIEW AS TO WHETHER A CUSTOMER WHO WANTS A

13    PREMIUM MODEM, WHETHER THAT CUSTOMER COULD USE A NON-PREMIUM

14    MODEM INSTEAD?

15    A.   AGAIN, IT PROBABLY DEPENDS ON THE CUSTOMER AND THE MARKET.

16    BUT IF YOU -- YOU KNOW, A LOT OF THESE ARE, LET'S SAY IN THE

17    U.S. MARKET, THEY TEND TO BE THE HIGHER PRICED DEVICES.  THEY

18    TEND TO BE SOURCED BY THE OPERATOR, THE CARRIERS HERE.

19        THE CARRIERS TEND TO GENERATE RFQ'S, YOU KNOW, THAT

20    REQUIRE CERTAIN FEATURE SETS.  SO GENERALLY THOSE THINGS ARE

21    NOT NEGOTIABLE.  THEY'RE LOOKING FOR CERTAIN FEATURE SETS IN

22    THOSE PRICE POINTS AT THOSE TIERS.  SO GENERALLY NOT

23    SUBSTITUTABLE.

24    Q.   AGAINST WHICH PRODUCTS DOES MEDIATEK BENCHMARK ITS MODEM

25    CHIPS?

1    A.    MOSTLY I WOULD SAY AGAINST QUALCOMM'S.

2    Q.    ARE THERE PARTICULAR QUALCOMM MODEM CHIPS THAT YOU USE FOR

3    BENCHMARKING?

4    A.    I MEAN, OBVIOUSLY THE THINGS LIKE THE SNAPDRAGON 800

5    FAMILY FROM, FROM QUALCOMM TENDS TO BE AT THE LEADING EDGE,

6    THAT TENDS TO BE THE MOST ADVANCED FEATURE SET.  BUT THERE ARE

7    OTHER TIERS OF PRODUCTS, SO WE'RE TALKING ABOUT AN ENTRY

8    SEGMENT, WE MIGHT BENCHMARK AGAINST A DIFFERENT TIER OF

9    PRODUCTS, LIKE A SNAPDRAGON 400 SERIES.

10   Q.    IS THERE A SNAPDRAGON 600 SERIES IN BETWEEN THE 800 AND

11   THE 400?

12   A.    YES, THERE IS.

13   Q.    COULD YOU PLEASE GIVE AN EXAMPLE OF THE DEVICES SERVED BY

14   THE SNAPDRAGON 800 SERIES?

15   A.    I THINK IT'S BEEN TRUE FOR A COUPLE OF YEARS THAT MOSTLY

16   IT'S THE HIGH END, HIGH TIER, LIKE I CALL THEM THE PREMIUM OR

17   SOMETIMES PEOPLE WOULD SAY FLAGSHIP DEVICES.  THESE TEND TO BE

18   THE HIGHEST TIER PRODUCTS THAT ARE PUT OUT THERE BY THE VARIOUS

19   SMARTPHONE OEM AGENCY, SAMSUNG, LG, ET CETERA.

20   Q.    WHO SERVES THE PREMIUM SEGMENT OF THE MARKET?

21   A.    THE PHONE MANUFACTURERS OR THE CHIPSETS?

22   Q.    LET ME CLARIFY.  IN TERMS OF MODEM CHIP SALES, WHO SERVES

23   THE PREMIUM SEGMENT OF THE MARKET?

24   A.    IT DEPENDS I GUESS ON THE OEM.  BUT QUALCOMM'S SNAPDRAGON

25   800 TENDS TO BE THE DOMINANT ONE.  COMPANIES LIKE SAMSUNG AND

1    HUAWEI HAVE IN-HOUSE SILICON CAPABILITY THAT SERVES THAT.

2    APPLE USES A -- HAS USED A MIXTURE OF SUPPLIERS, QUALCOMM AND

3    INTEL OVER THE YEARS FOR THE MODEM.

4    Q.   YOU MENTIONED SAMSUNG'S IN-HOUSE SUPPLY.  DOES THAT FIRM

5    HAVE A DISTINCT NAME?

6    A.   I TEND TO THINK OF IT AS SAMSUNG LSI, THE SEMICONDUCTOR

7    DIVISION OF SAMSUNG.

8    Q.   AND DOES HUAWEI'S CHIP DIVISION LIKEWISE HAVE A NAME?

9    A.   YES, HISILICON.

10   Q.   HAVE YOU EVER CHANGED A MEDIATEK PRICE IN RESPONSE TO

11   COMPETITION FROM SLSI AT AN OEM OTHER THAN SAMSUNG?

12   A.   NOT THAT I CAN THINK OF, NO.

13   Q.   WHY NOT?

14   A.   WE DON'T TEND TO SEE SAMSUNG LSI AS A SUPPLIER MUCH

15   OUTSIDE OF SAMSUNG'S OWN PHONES.

16   Q.   AND HAVE YOU EVER CHANGED MEDIATEK PRICING IN RESPONSE TO

17   COMPETITION FROM HISILICON AT AN OEM OTHER THAN HUAWEI?

18   A.   NO, NOT THAT I'M AWARE OF.

19   Q.   AND WHY IS THAT?

20   A.   SAME REASON.  I THINK EVEN MORE SO WE ONLY SEE HISILICON

21   IN HUAWEI PHONES.

22   Q.   MR. MOYNIHAN, WHAT IS A CDMA MODEM?

23   A.   CDMA MORE SPECIFICALLY, I GUESS CDMA 2000 IS WHAT IT'S

24   BEEN CALLED, IS A 3G STANDARD.  SO THE CDMA MODEM WOULD BE A

25   MODEM CHIP THAT IMPLEMENTS THAT STANDARD, I GUESS.

1    Q.   FOR WHICH CELLULAR NETWORKS IS CDMA REQUIRED?

2    A.   IT'S CHANGED OVER THE YEARS, BUT TODAY IT'S, IT'S -- IN

3    THE U.S. IT'S SPRINT AND VERIZON'S NETWORK, ALTHOUGH THE NEED

4    OF VERIZON IS PROBABLY DIMINISHING A LITTLE BIT NOW.

5         ALSO IN CHINA IT'S REQUIRED.  THERE MAY BE SOME OTHER

6    SMALL PLACES AS WELL.

7    Q.   WHERE ELSE HAS CDMA BEEN REQUIRED?

8    A.   OVER THE YEARS IT WAS REQUIRED IN SMALLER -- INDONESIA,

9    INDIA, BRAZIL, SOME OTHER COUNTRIES.  JAPAN AND KOREA IN THE

10   PAST AS WELL.

11   Q.   DOES MEDIATEK SELL MODEM CHIPS WITH CDMA CAPABILITIES?

12   A.   YES, WE DO.

13   Q.   WHEN DID MEDIATEK FIRST COMMERCIALIZE A MODEM CHIP WITH

14   CDMA?

15   A.   THE FIRST -- THE FIRST COMMERCIAL PRODUCT WAS LAUNCHED IN

16   2015.

17   Q.   WHEN DID MEDIATEK FIRST COMMERCIALIZE THE CDMA CHIP ON

18   VERIZON'S CELLULAR NETWORK?

19   A.   THAT WOULD HAVE BEEN LATER, SO PROBABLY LATE, LATE 2016.

20   Q.   AND SAME QUESTION FOR SPRINT.

21   A.   VERY MUCH IN THE SAME TIMEFRAME, WITHIN A MONTH OR TWO OF

22   EACH OTHER.

23   Q.   HOW DID MEDIATEK DEVELOP THE MODEM CHIP COMPLIANT WITH

24   CDMA?

25   A.   WE LICENSED IN THE PHYSICAL I.P. FROM ANOTHER COMPANY.

1    Q.   WHICH COMPANY WAS THAT?

2    A.   IT WAS A COMPANY CALLED VIA TELECOM.

3    Q.   WHEN DID MEDIATEK ACQUIRE A LICENSE TO VIA TELECOM'S I.P.?

4    A.   PROBABLY AROUND 2013.  IT WOULD HAVE TAKEN SOME TIME TO

5    INTEGRATE THAT INTO A CHIPSET AND PRODUCE IT, SO ABOUT 2013

6    TIMEFRAME.

7    Q.   WHAT ADDITIONAL ACCOUNTS, IF ANY, DID MEDIATEK WIN AFTER

8    DEVELOPING A CDMA MODEM CHIP?

9    A.   SO FOR ONE, WE SUCCEEDED IN WINNING SOME DESIGNS WITH LG

10   FOR THE U.S. MARKET, SO WE MENTIONED SPRINT AND VERIZON.  THEY

11   LAUNCHED MODELS WITH US BOTH AT SPRINT AND VERIZON IN LATE

12   2016, SO THAT WAS NEW BUSINESS FOR US BECAUSE WE DIDN'T HAVE

13   CDMA BEFORE.

14        IT PROBABLY ALSO HELPED A LOT IN CHINA.  IT'S BECOME MORE

15   AND MORE A REQUIRED FEATURE IN THE CHINA MARKET.  SO HAVING IT

16   WAS IMPORTANT IN THE CHINA MARKET OVER THE LAST COUPLE OF YEARS

17   AS WELL.

18   Q.   WILL MEDIATEK CUSTOMERS WHO WANT TO PURCHASE A CDMA MODEM

19   BE ABLE TO USE A NON-CDMA MODEM INSTEAD?

20   A.   MAYBE, TO BE MORE PRECISE, WE DON'T PRODUCE TODAY A

21   STANDALONE CDMA MODEM.  IT'S A MODEM MODE THAT'S ENABLED IN OUR

22   MODEM CHIPS WITH LTE TO BE MORE PRECISE.

23        BUT, NO, IF SOMEBODY NEEDS TO SUPPORT CDMA FOR A SPECIFIC

24   NETWORK, LIKE VERIZON OR SPRINT OR THE CHINESE OPERATORS, THERE

25   ISN'T AN ALTERNATIVE TO THAT.  IT'S A STANDARD TECHNOLOGY.

1    Q.    HAVE YOU HEARD THE TERM MULTIMODE MODEM?

2    A.    YES.

3    Q.    WHAT IS A MULTIMODE MODEM?

4    A.    GENERALLY IT'S, IT'S MEANT TO DESCRIBE THE MODEM

5    CAPABILITY IS CAPABLE OF SUPPORTING DIFFERENT NETWORKS.  SO,

6    FOR EXAMPLE, 4G LTE, CDMA, 3G UMTS, 2G, DIFFERENT STANDARDS,

7    DIFFERENT, QUOTE-UNQUOTE, "MODES."

8    Q.    WOULD A MODEM THAT SUPPORTS BOTH UMTS AND CDMA BE AN

9    EXAMPLE OF A MULTIMODE MODEM?

10   A.    YES, IN MY DEFINITION, YES.

11   Q.    WHAT IS A TWO-CHIP SOLUTION?

12   A.    I GUESS I, I TEND TO INTERPRET THAT AS SOMETHING THAT HAS

13   SOME FUNCTIONALITY IMPLEMENTED ACROSS TWO DIFFERENT PIECES OF

14   SILICON OR TWO DIFFERENT CHIPS RATHER THAN ONE.

15   Q.    IF UMTS WERE ON ONE CHIP AND CDMA WERE ON A SEPARATE CHIP,

16   WOULD THAT BE A TWO-CHIP SOLUTION?

17   A.    YES, I'D AGREE WITH THAT.

18   Q.    IN YOUR VIEW, IS A TWO-CHIP SOLUTION AN ALTERNATIVE TO A

19   MULTIMODE MODEM?

20   A.    I MEAN, FUNCTIONALLY IT CAN BE.  IT MAY NOT BE VERY

21   OPTIMAL, BUT IT CAN BE.

22   Q.    WHAT ARE THE TRADEOFFS ASSOCIATED WITH IT?

23   A.    IN GENERAL, IT PROBABLY TAKES UP MORE SPACE IN THE PHONE.

24   YOU KNOW, SPACE IS A PREMIUM FACTOR IN THE DESIGN OF PHONES

25   THESE DAYS.

1    SOMETIMES THERE HAS TO BE ADDITIONAL SUPPORTING CIRCUITRY,

2    POWER MANAGEMENT, MEMORIES THAT SUPPORT EACH OF THOSE CHIPS

3    PERHAPS DEPENDING ON HOW IT'S ARCHITECTED, AND THERE MAY BE

4    HIGHER POWER CONSUMPTION.  PROBABLY A NUMBER OF DISADVANTAGES I

5    WOULD SAY.

6    Q.   AND HAVE YOU HEARD THE TERM BACKWARDS COMPATIBILITY IN THE

7    CONTEXT OF MODEM CHIPS?

8    A.   YES, I HAVE.

9    Q.   WHAT DOES THAT TERM MEAN?

10   A.   I INTERPRET IT TO MEAN THAT THE MULTIMODE MODEM IS CAPABLE

11   OF RUNNING AT PREVIOUS GENERATIONS OF THE STANDARDS.  SO A 4G

12   MODEM CAN FALL BACK TO A 3G NETWORK IF THERE IS NO 4G NETWORK

13   WHERE THE PHONE IS PRESENT OR WHERE THE MODEM IS PRESENT.

14   Q.   IS BACKWARDS COMPATIBILITY IMPORTANT FOR 4G PHONES?

15   A.   YES, FOR -- AGAIN, IT DEPENDS ON THE OPERATOR, IT DEPENDS

16   ONE THE REGION.  BUT FOR THE VAST MAJORITY OF CASES, YES.

17   Q.   BEFORE MEDIATEK COMMERCIALIZED A MODEM CHIP COMPLIANT WITH

18   THE CDMA STANDARD, WHICH OTHER FIRMS OFFERED CDMA MODEM CHIPS?

19   A.   QUALCOMM FOR SURE.  OF COURSE VIA TELECOM, THE COMPANY I

20   MENTIONED, THEY ALSO HAD A BUSINESS ACTUALLY SELLING CHIPS AT

21   ONE POINT IN TIME AS WELL.  I CAN'T THINK OF ANY OTHERS.

22   Q.   SO BETWEEN 2008 WHEN YOU JOINED MEDIATEK AND 2015 WHEN

23   MEDIATEK FIRST LAUNCHED A CDMA CHIP IN CERTAIN REGIONS, CAN YOU

24   THINK OF ANY OTHER FIRMS WHO HAD CDMA MODEM CHIPS?

25   A.   THERE MAY HAVE BEEN ONE OR TWO SMALLER KOREAN COMPANIES

1    THAT I THINK WERE EITHER OUT OF BUSINESS OR GETTING OUT OF

2    BUSINESS AROUND THE 2008 TIMEFRAME.  CERTAINLY NOT SIGNIFICANT.

3        BUT, NO, I CAN'T THINK OF ANY OTHERS.

4    Q.   AND, MR. MOYNIHAN, I'D LIKE TO REFER YOU TO A DOCUMENT IN

5    THE BINDER OF EXHIBITS IN FRONT OF YOU THAT'S LABELED JX 0050.

6    A.   THE SMALLER BINDER?

7    Q.   YES.

8    A.   JX 50?

9    Q.   YES.

10   A.   OKAY.

11   Q.   WHAT IS THIS DOCUMENT, MR. MOYNIHAN?

12   A.   IT'S A CONTRACT OR AN AGREEMENT.  IT'S ENTITLED

13   "NON-EXHAUSTIVE CDMA ASIC AGREEMENT."

14   Q.   ARE YOU FAMILIAR WITH THIS AGREEMENT?

15   A.   YES, I'VE SEEN IT BEFORE.

16   Q.   HOW DID YOU BECOME FAMILIAR WITH THE AGREEMENT?

17   A.   I WAS ASKED TO REVIEW IT AS PART OF MY ROLE AT MEDIATEK

18   SOMETIME AFTER IT WAS SIGNED IN 2009.

19        MR. KEHL:  YOUR HONOR, WE MOVE TO ADMIT JX 0050 INTO

20   EVIDENCE.

21        MR. SHACHAM:  NO OBJECTION, YOUR HONOR.

22        THE COURT:  IT'S ADMITTED.

23   (JOINT EXHIBIT JX 0050 WAS ADMITTED IN EVIDENCE.)

24        THE COURT:  GO AHEAD, PLEASE.

25   BY MR. KEHL:

1    Q.   MR. MOYNIHAN, I'D LIKE TO REFER YOU TO PAGE 43 OF JX 0050?

2    A.   YEP, I'M THERE.

3    Q.   AND DO YOU SEE THERE'S A SECTION 8 HERE TITLED

4    NON-AUTHORIZED MANUFACTURERS?

5    A.   YES, I SEE THAT.

6    Q.   WHAT IS A NON-AUTHORIZED PURCHASER?

7    A.   WE HAD SOME TRAINING ON THIS AFTER THE AGREEMENT WAS

8    SIGNED.

9         I RECALL IT MEANT AN ENTITY THAT WE WERE NOT ALLOWED TO

10   SELL 3G CHIPSETS TO UNDER THE TERMS OF THE AGREEMENT.

11   Q.   AND SO WHAT IS AN AUTHORIZED PURCHASER?

12   A.   I GUESS THE OPPOSITE.  I BELIEVE THERE WAS A LIST OF NAMES

13   THAT WERE PROVIDED ON A REGULAR BASIS OR IN SOME KIND OF

14   FASHION FROM QUALCOMM TO MEDIATEK TO LIST COMPANIES THAT WERE,

15   QUOTE-UNQUOTE, "AUTHORIZED PURCHASERS."

16   Q.   AND WHO DID YOU UNDERSTAND THE AUTHORIZED PURCHASERS TO

17   BE?

18   A.   I UNDERSTOOD IT TO BE COMPANIES THAT HAD A LICENSE

19   AGREEMENT IN PLACE WITH QUALCOMM.

20   Q.   AND WHO DID YOU UNDERSTAND THE NON-AUTHORIZED PURCHASERS

21   TO BE?

22   A.   I GUESS THE OPPOSITE, PEOPLE WHO DON'T, COMPANIES WHO

23   DON'T.

24   Q.   WHAT WAS MEDIATEK REQUIRED TO DO PURSUANT TO THIS

25   AUTHORIZED PURCHASER REQUIREMENT?

1      A.   WE WERE, AS I RECALL, WE WERE ONLY ALLOWED TO SELL 3G

2      CHIPSETS TO THE LIST OF NAMES THAT WERE ON THE AUTHORIZED

3      PURCHASERS.

4           I BELIEVE THERE WERE ALSO SOME OTHER CONDITIONS WHEREBY WE

5      HAD TO NOTIFY QUALCOMM IF A NON -- SOMEBODY ELSE, OR SOMEBODY

6      WHO WASN'T ON THE LIST CAME TO TRY TO PURCHASE 3G CHIPS FROM

7      US.  SO WE HAD SOME NOTIFICATION PROCEDURES I BELIEVE.

8      Q.   AFTER YOU NOTIFIED QUALCOMM, WERE YOU REQUIRED TO WAIT AT

9      ALL BEFORE SELLING THAT FIRM MODEM CHIPS?

10     A.   I BELIEVE WE WOULDN'T HAVE BEEN ABLE TO SELL THEM CHIPS

11     UNLESS THEY HAD BECOME A, QUOTE-UNQUOTE, "AUTHORIZED PURCHASER"

12     AT SOME POINT IN THE FUTURE.

13     Q.   WAS MEDIATEK REQUIRED TO DO ANYTHING ELSE PURSUANT TO THE

14     AUTHORIZED PURCHASER REQUIREMENT?

15     A.   YES, WE HAD SOME REPORTING OBLIGATIONS TO QUALCOMM PER THE

16     TERMS OF THE AGREEMENT.

17     Q.   REPORTING WHAT?

18     A.   WE HAD TO REPORT SPECIFIC QUANTITIES OF 3G CHIPSETS THAT

19     WE WOULD HAVE SOLD TO EACH INDIVIDUAL NAME OR EACH INDIVIDUAL

20     CUSTOMER ON THE LIST.

21     Q.   HOW, IF AT ALL, DID THE AUTHORIZED PURCHASER REQUIREMENT

22     IMPACT MEDIATEK'S SALES OF MODEM CHIPS?

23     A.   I THINK IT HAD A, SORT OF A HEADWIND KIND OF AN EFFECT.

24     IT BECAME PRETTY CLEAR AFTER THE AGREEMENT WAS SIGNED THAT WE

25     SEEMED TO BE THE ONLY COMPETITOR IN THE INDUSTRY THAT WAS

1       OPERATING WITH THIS CONDITION, OR AT LEAST WE DIDN'T GET THE

2       SENSE THAT OTHER OF OUR COMPETITOR, BESIDES QUALCOMM, OF

3       COURSE, BUT OTHER COMPETITORS WERE OPERATING WITH A SIMILAR

4       KIND OF CONDITION.

5           SO IT BECAME SOMEWHAT OF A HEADWIND TO OUR BUSINESS, I

6       BELIEVE.

7       Q.   WHEN DID MEDIATEK FIRST START SHIPPING COMMERCIAL

8       QUANTITIES OF 3G MODEM CHIPS?

9       A.   IT WOULD HAVE BEEN AFTER THIS AGREEMENT WAS SIGNED, SO

10      VERY LATE 2009, EARLY 2010 MORE LIKELY.

11      Q.   WAS THAT MODEM CHIP THE 6268?

12      A.   YEAH, THAT WAS OUR FIRST 3G WIDE BAND CDMA CHIP.

13      Q.   AND WHEN YOU SAY "WIDE BAND CDMA," YOU MEAN THAT CHIP IS

14      COMBINED WITH UMTS, BUT NOT CDMA?  IS THAT CORRECT?

15      A.   YEAH, THAT'S PROBABLY A FAIR DEFINITION.  WIDE BAND CDMA

16      IS LIKE ONE, FIRST STEP IN THE UMTS STANDARD IS HOW I THINK

17      ABOUT IT.  BUT IT'S DIFFERENT TO THE CDMA WE WERE TALKING ABOUT

18      EARLIER.

19      Q.   AND WHAT ROLE DID YOU PLAY IN MEDIATEK'S EFFORT TO SELL

20      THE 6268?

21      A.   SO AFTER I JOINED MEDIATEK IN JANUARY OF 2008, MY ROLE WAS

22      MOSTLY FOCUSSED ON PLANNING OUR MOBILE CHIPSET ROADMAP, SO THAT

23      INCLUDED THE 3G PRODUCTS.  IN FACT, THAT WAS A BIG PART OF THE

24      FOCUS.

25          SO DURING KIND OF 2008, 2009, EVEN A LITTLE LATER, I WAS

1    CERTAINLY ENGAGED WITH INTERNAL TEAMS, PLANNING THAT, DOING

2    SOME COMPETITIVE ANALYSIS.

3        AND ALSO ENGAGING WITH MOSTLY I WOULD SAY WHAT WE WOULD

4    HAVE CALLED INTERNATIONAL, NON-CHINA CUSTOMERS TO PROMOTE OUR

5    ROADMAP, UNDERSTAND WHAT THEIR REQUIREMENTS ARE, TRY TO MAKE

6    SURE THAT OUR ROADMAP WOULD ADDRESS THOSE REQUIREMENTS.

7    Q.   WHEN WAS THE 6268 READY TO ENGAGE WITH CUSTOMERS?

8    A.   I MEAN, PROBABLY IN DIFFERENT STAGES, BUT IT WOULD HAVE

9    PROBABLY BEEN READY EARLY FIRST HALF 2009.

10   Q.   WHAT DID YOU LEARN FROM CUSTOMERS ABOUT THEIR DESIRE TO

11   SOURCE THE 6268 FROM MEDIATEK IN THE FIRST HALF OF 2009.

12   A.   IN GENERAL, DURING THAT PERIOD, 2008 INTO 2009, AND EVEN

13   INTO 2009, THE KIND OF PREVAILING MESSAGE FROM ALL OF THE

14   CUSTOMERS I ENGAGED WITH WAS THAT THEY EXPECTED US TO HAVE A

15   LICENSE AGREEMENT WITH QUALCOMM BEFORE THEY WOULD CONSIDER

16   PURCHASING 3G CHIPSETS FROM MEDIATEK.

17   Q.   AND HOW DID THIS IMPACT THE TIMING OF SALES OF 6268?

18   A.   WELL, AT THE TIME WE DIDN'T HAVE A LICENSE AGREEMENT WITH

19   QUALCOMM.  WE DIDN'T HAVE ANY AGREEMENT WITH QUALCOMM.  SO IT

20   SORT OF STALLED THE PROGRESS I WOULD SAY.

21   Q.   DID MEDIATEK DO ANYTHING TO ALLEVIATE THESE CUSTOMER

22   CONCERNS?

23   A.   I DON'T -- I PERSONALLY DIDN'T, BUT I KNOW SOMEBODY IN THE

24   COMPANY REACHED OUT AT SOME POINT TO SEEK A LICENSE AGREEMENT

25   FROM QUALCOMM.

1    Q.   DID YOU AT ANY TIME FORM AN UNDERSTANDING AS TO THE PACE

2    OF THESE NEGOTIATIONS WITH QUALCOMM?

3    A.   I WASN'T PERSONALLY INVOLVED IN THE NEGOTIATIONS.  I WAS

4    MORE INVOLVED IN THE PRODUCT PLANNING.  BUT CERTAINLY FOR, YOU

5    KNOW, SOME OF THIS TIME I WAS TRAVELLING BACK AND FORTH TO, TO

6    TAIWAN HEADQUARTERS A LOT.

7         THERE WAS A GENERAL SENSE I THINK THAT THEY WERE GOING

8    SLOW.  THEY WOULD HAVE LIKED TO HAVE -- WE WOULD HAVE LIKED IF

9    THEY HAD GONE FASTER.  WE FELT LIKE THEY WERE SORT OF MAYBE

10   BEING SLOW.

11   Q.   DO YOU KNOW WHAT AGREEMENT WAS ULTIMATELY REACHED, IF ANY?

12   A.   I BELIEVE IT WAS SOMETHING CALLED A COVENANT NOT TO ASSERT

13   AGREEMENT.

14   Q.   IS THAT A DIFFERENT AGREEMENT THAN THE ONE REFLECTED IN

15   JX 0050?

16   A.   I BELIEVE THERE WERE TWO AGREEMENTS SIGNED AT THE SAME

17   TIME.

18   Q.   IF I COULD REFER YOU TO JX 0051.

19   A.   YEAH, THAT'S THE SECOND ONE.

20   Q.   IS THIS THE SECOND AGREEMENT?

21   A.   YES.

22        MR. KEHL:  YOUR HONOR, WE MOVE TO ADMIT JX 0051 INTO

23   EVIDENCE.

24        MR. SHACHAM:  NO OBJECTION, YOUR HONOR.

25        THE COURT:  IT'S ADMITTED.

1          (JOINT EXHIBIT JX 0051 WAS ADMITTED IN EVIDENCE.)

2               THE COURT:  GO AHEAD, PLEASE.

3     BY MR. KEHL:

4     Q.   HOW DID THE 6268 PERFORM IN THE MARKET?

5     A.   NOT VERY WELL I WOULD SAY.

6     Q.   TO WHAT DO YOU ATTRIBUTE THAT?

7     A.   MOSTLY I THINK IT WAS SORT OF COMING INTO THE MARKET LATE.

8     IT WAS -- YOU KNOW, THESE THINGS TEND TO HAVE A SHELF LIFE.

9     THE PACE OF INNOVATION MOVES PRETTY QUICKLY.

10         BY THE TIME WE WERE REALLY PUSHING IT THE MARKET, THE

11    REQUIREMENTS HAD MOVED ON FROM WHAT FEATURES THE 6268 COULD

12    DELIVER.

13    Q.   WAS THE 6268 BETTER POSITIONED IN EARLY 2009?

14    A.   PROBABLY, YES.

15    Q.   WHEN DID MEDIATEK FIND SUCCESS SELLING 3G MODEM CHIPS?

16    A.   THE NEXT WAVE OF 3G PRODUCTS WENT TO MARKET THE SECOND

17    HALF OF 2011.

18    Q.   AND HOW, IF AT ALL, DID THE TIMING OF MEDIATEK'S SUCCESS

19    IN 3G EFFECT THE ENTRY INTO 4G?

20    A.   WE WERE CERTAINLY NOT EARLY INTO 3G.  WE WERE WORKING HARD

21    TO CATCH UP.  YOU KNOW, SOME OF THESE THINGS WITH THE

22    AGREEMENTS AND THE NEGOTIATIONS TENDED TO DELAY OUR ENTRY.

23         SO I THINK THE, THE POINT IN TIME WHERE WE SAW REVENUE IN

24    3G, WE HAD ALSO SEEN A DECLINE IN OUR 2G BUSINESS IN 2009/'10.

25         IT WAS PRETTY TOUGH TIME.  THE REVENUE PROFITS WERE UNDER

1    PRESSURE.

2         SO NOT BEING ABLE TO GENERATE PROFIT REVENUE ON 3G I THINK

3    IMPACTED OUR ABILITY TO INVEST IN 4G.

4    Q.   EARLIER TODAY, MR. MOYNIHAN, YOU MENTIONED I BELIEVE

5    TIER 1 OEM'S.

6         DO YOU RECALL THAT?

7    A.   YES, I PROBABLY USED THAT TERM.

8    Q.   WHAT BENEFITS, IF ANY, ACCRUED TO A MODEM CHIP SUPPLIER

9    THAT SELLS TO TIER 1 OEM'S?

10   A.   I MEAN, SO TIER 1 OEM'S, BY VIRTUE OF THE NAME, I GUESS,

11   ARE KIND OF THE TOP TIER SUPPLIERS.  THEY TEND TO BE THE

12   COMPANIES THAT HAVE, YOU KNOW, THE ADOPTION OF THE LATEST

13   TECHNOLOGIES.  THEY TEND TO BE THE ONES THAT ARE DOING THE,

14   MAYBE THE MOST PRESTIGIOUS, MORE VISIBLE BUSINESS.  THEY TEND

15   TO HAVE, YOU KNOW, VERY STRONG INTERNAL R&D TEAMS.  THEY GOT

16   THERE FOR A REASON.

17        SO I THINK WORKING WITH THOSE KIND OF COMPANIES MAKES US,

18   AS A SUPPLIER, A BETTER SUPPLIER.

19   Q.   ARE THERE ANY PARTICULAR POINTS IN TIME WHEN THE BENEFITS

20   OF WORKING WITH A TIER 1 OEM ARE MORE OR LESS IMPORTANT?

21   A.   I MEAN, YES.  I THINK IT'S ALWAYS IMPORTANT, BUT I THINK

22   POINTS OF INDUSTRY TRANSITION, SO FROM FEATURE PHONES TO

23   SMARTPHONES OR FROM 2G TO 3G OR 3G TO 4G CAN BE QUITE CRITICAL

24   TIMES BECAUSE THERE'S NEW NETWORKS ROLLING OUT, A LOT OF

25   REQUIREMENTS.

1            THE TIER 1S ARE OFTEN THE FIRST SUPPLIERS INTO THOSE NEW

2     MARKETS OR THOSE TRANSITIONS.  SO I THINK AS A SUPPLIER, WE

3     TEND TO THINK THAT THEY CAN HELP US AS A SUPPLIER AND NAVIGATE

4     SOME OF THOSE TRANSITIONS WITHOUT FALLING DOWN.

5     Q.   CAN YOU THINK OF ANY PARTICULAR EXAMPLES OF THIS?

6     A.   SURE, YEAH.

7     Q.   CAN YOU PLEASE GIVE US ONE?

8     A.   I MEAN, ONE EXAMPLE I THINK OF IS WHEN WE WERE TRYING TO

9     TRANSITION FROM 3G TO 4G AT AT&T IN THE U.S., WE HAD HAD SOME

10    SUCCESS IN 3G WITH AT&T, OR ONE OF OUR CUSTOMERS HAD SOME

11    SUCCESS, I SHOULD SAY, WITH AT&T IN 3G.  SO WE WERE OBVIOUSLY

12    TRYING TO TRANSLATE THAT INTO 4G SUCCESS.

13           IT TURNS OUT AT THE TIME WE HAD BUILT A VERY INDUSTRY

14    STANDARD, OR PER THE SPEC, 4G MODEM.

15           AT&T'S NETWORK WAS A LITTLE -- OR HAD SOME UNIQUE

16    REQUIREMENTS.  THEY WEREN'T IN THE STANDARD, BUT THEY WERE

17    OBVIOUSLY REQUIRED FOR AT&T.  EVEN AT THE ENTRY TIER THEY WERE

18    REQUIRED.

19           OUR CHIPSET HADN'T THE FEATURE, WE DIDN'T HAVE THAT

20    CAPABILITY TO SUPPORT THAT.  SO IT KIND OF, I THINK, BLOCKED US

21    FROM -- OR OUR CUSTOMERS FROM USING US TO SUPPORT PHONES ON

22    AT&T'S NETWORK FOR MANY YEARS.

23    Q.   AT THE TIME MEDIATEK WAS MAKING THIS TRANSITION FROM 3G TO

24    4G, HOW WOULD YOU DESCRIBE ITS COMMERCIAL RELATIONSHIPS WITH

25    TIER 1 OEM'S?

MOYNIHAN DIRECT BY MR. KEHL

1    A.   IT WAS -- I THINK IT WAS GROWING.  WE HAD, I THINK, MADE

2    SOME SUCCESS IN THE PREVIOUS YEARS IN TRANSLATING, YOU KNOW,

3    SOME OF OUR SUCCESS IN 2G INTO NEW BUSINESS AT 3G, AND STARTED

4    TO PENETRATE NEW OEM'S THAT WE HADN'T SUPPLIED IN 2G.

5    Q.   MR. MOYNIHAN, IN MEDIATEK'S SALES OF 4G MODEM CHIPS, ARE

6    THERE ANY PARTICULAR BUSINESS CHALLENGES THAT THE FIRM FACES?

7    A.   I MEAN, I THINK THE CHALLENGES ARE SIMILAR DEPENDING ON

8    THE SEGMENT, NOT RELATING TO 3G.  I THINK 3G, 4G IS SIMILAR

9    CHALLENGES, I THINK.

10   Q.   WHAT ARE THE TYPICAL COMPETITIVE CRITERIA IN THE SALE OF

11   MODEM CHIPS?

12   A.   I MEAN, OBVIOUSLY WE TALKED A LITTLE BIT EARLIER ABOUT IT

13   DEPENDS ON THE TIER OF PHONE THAT YOU'RE TARGETING, THE

14   FEATURES.  BUT IN ANY TIER THE FEATURES ARE IMPORTANT.  YOU

15   HAVE TO SUPPORT A CERTAIN MODEM FEATURE SET, LTE, CDMA,

16   WHATEVER.  YOU HAVE TO SUPPORT CERTAIN FREQUENCY BANDS.  IF

17   IT'S SOMETHING THAT'S GOING INTO THE U.S. MARKET, IT HAS TO

18   SUPPORT THE FREQUENCY BANDS THAT THE U.S. CARRIERS ARE

19   ADOPTING.

20        SO FEATURES ARE ALWAYS IMPORTANT.

21        YOU KNOW, SIZE AND POWER CONSUMPTION ARE ALWAYS CRITICAL,

22   AND I GUESS PRICE IS ALWAYS A FACTOR.

23   Q.   DO YOU PERCEIVE THERE TO BE ANY ADDITIONAL FACTORS AT

24   ISSUE IN COMPETITION WITH QUALCOMM?

25   A.   IT CERTAINLY FEELS LIKE THAT SOME DAYS, YES.

1    Q.   WHAT ARE THOSE FACTORS?

2    A.   WELL, WE ALL KNOW THAT, YOU KNOW, QUALCOMM HAS THIS

3    LICENSING BUSINESS THAT SORT OF TENDS TO GIVE THEM A LARGE

4    FINANCIAL TRANSACTION BETWEEN THE SAME COMPANY THAT THEY'RE

5    SUPPLYING CHIPS TO.

6         YOU KNOW, WE SOMETIMES FEEL, IN THE COMPETITION

7    ENVIRONMENT, IT'S A LITTLE BIT LIKE COMPETING WITH ONE HAND

8    TIED BEHIND YOUR BACK.  THERE ARE SORT OF OTHER FINANCIAL

9    CONSIDERATIONS, OTHER INCENTIVES THAT WHEN THE OEM LOOKS AT THE

10   PICTURE, THE TOTAL COST OF OWNERSHIP IS SOMETHING THAT'S VERY

11   HARD FOR US TO COMPETE WITH SOMETIMES.

12        MR. KEHL:  YOUR HONOR, AT THIS TIME WE'RE GOING TO

13   MOVE TO THE DOCUMENTS THAT WERE SUBJECT TO THE COURT'S SEALING

14   ORDER.

15        THE COURT:  OKAY.  SO WHY DON'T WE ALSO HANDLE THE

16   PUBLIC PORTION OF THE CROSS.  IT'S 3:05.

17        MR. SHACHAM:  MY NAME IS MATAN SHACHAM FROM QUALCOMM.

18   MAY I HAVE A MOMENT TO PASS OUT BINDERS, PLEASE?

19        THE COURT:  YES.

20   (PAUSE IN PROCEEDINGS.)

21        MR. SHACHAM:  YOUR HONOR, WHAT I'VE HANDED YOU IS THE

22   ONE EXHIBIT, AND THE WHITE BINDER IS THE DEPOSITION TRANSCRIPTS

23   FOR EASE OF REFERENCE.

24        THE COURT:  OKAY.  THANK YOU.

25        IT'S 3:07.  GO AHEAD, PLEASE.

```
 1                        CROSS-EXAMINATION

 2    BY MR. SHACHAM:

 3    Q.   GOOD AFTERNOON, MR. MOYNIHAN.

 4    A.   GOOD AFTERNOON.

 5    Q.   MEDIATEK STARTED COMMERCIAL SALES OF ITS CDMA CHIPS AROUND

 6    2010; CORRECT?

 7    A.   THAT'S CORRECT.

 8    Q.   AND THAT CHIP WAS CALLED THE MT 6268; RIGHT?

 9    A.   THAT'S CORRECT.

10    Q.   IN 2010, COMPETITION IN THE SMARTPHONE INDUSTRY WAS VERY

11    HIGH; IS THAT FAIR TO SAY?

12    A.   THERE WERE CERTAINLY MULTIPLE SUPPLIERS, YES.

13    Q.   WOULD YOU SAY IT'S FAIR TO SAY THAT COMPETITION WAS VERY

14    HIGH AT THAT POINT?

15    A.   I THINK SO, YES.

16    Q.   IN 2010, THERE WAS ALSO VERY HIGH COMPETITION IN THE

17    SMARTPHONE CHIP VENDOR MARKET; IS THAT FAIR TO SAY?

18    A.   I'M SORRY.  WHAT TIMEFRAME?

19    Q.   IN 2010.

20    A.   THERE WERE ALSO A NUMBER OF SUPPLIERS OF CHIPSETS FOR

21    SMARTPHONES, YES.

22    Q.   SO COMPETITION IN 2010 IN THE CHIP VENDOR MARKET WAS VERY

23    HIGH; CORRECT?

24    A.   YES, THERE WERE A NUMBER OF SUPPLIERS, YES.

25    Q.   SO MEDIATEK HAD TO COMPETE WITH QUALCOMM WHEN IT ENTERED
```

```
1      THE WCDMA MARKET; RIGHT?

2      A.   YES.

3      Q.   IT HAD TO COMPETE WITH INFINEON?

4      A.   YES, I BELIEVE THEY WERE STILL ACTIVE THEN, YES.

5      Q.   ALSO HAD TO COMPETE WITH ERICSSON?

6      A.   THE NAME MIGHT HAVE CHANGED A LITTLE, BUT ERICSSON EMP,

7      YES.

8      Q.   IN FACT, YOU TESTIFIED PREVIOUSLY THAT THERE WERE POSSIBLY

9      OTHER WCDMA COMPETITORS AT THAT TIME AS WELL; CORRECT?

10     A.   2010?  YES, THERE PROBABLY STILL -- YEAH, THERE WERE

11     OTHERS AT THE TIME, YES.

12     Q.   MEDIATEK FIRST INTRODUCED AN LTE CHIP IN 2014; IS THAT

13     RIGHT?

14     A.   YES, THAT'S CORRECT.

15     Q.   AND BY 2016, MEDIATEK'S SHARE OF THE OVERALL LTE CHIP

16     MARKET HAD INCREASED SIGNIFICANTLY?  IS THAT FAIR TO SAY?

17     A.   FROM NOTHING IN 2014, I THINK THAT'S PROBABLY FAIR.

18     Q.   IN FACT, BY MARCH 2016, MEDIATEK WAS THE NUMBER TWO CHIP

19     SUPPLIER IN THE WORLD FOR SMARTPHONES BY VOLUME, WASN'T IT?

20     A.   BY VOLUME IN 2016, YEAH, THAT WOULD BE PROBABLY CORRECT.

21     Q.   AND THAT REMAINED THE CASE AS OF MARCH 2018 WHEN YOU WERE

22     DEPOSED IN THIS CASE; RIGHT?

23     A.   YEAH, THAT WOULDN'T SURPRISE ME.

24     Q.   SO MEDIATEK HAS SIGNIFICANTLY IMPROVED ITS COMPETITIVE

25     POSITION IN THE SMARTPHONE CHIP VENDOR MARKET SINCE 2010;
```

1    CORRECT?

2    A.   I MEAN, SINCE WE SHIPPED NOTHING IN SMARTPHONES IN 2010, I

3    THINK THAT'S FAIR.  I THINK WE'RE SHIPPING MORE NOW, YES.

4    Q.   SO IT'S SIGNIFICANTLY IMPROVED ITS POSITION?

5    A.   FROM ZERO, SURE.

6    Q.   AND THAT'S TRUE IN TERMS OF BOTH MARKET SHARE AND REVENUE;

7    RIGHT?

8    A.   YEAH.  BY REVENUE IT WOULD BE SMALLER, BUT BY MARKET

9    SHARE, YEAH.

10   Q.   SO IT'S IMPROVED IN BOTH OF THOSE AREAS?

11   A.   AGAIN, WE'RE COMING FROM A BASE OF ZERO IN 2010 IN

12   SMARTPHONES.  IT'S ALL RELATIVE I GUESS.

13   Q.   SINCE 2010, MEDIATEK HAS ALSO SUBSTANTIALLY CLOSED ANY GAP

14   BETWEEN WHERE IT'S SITUATED FROM A TECHNICAL STANDPOINT AND

15   WHERE OTHERS IN THE INDUSTRY ARE.  IS THAT FAIR TO SAY?

16   A.   I THINK THAT DEPENDS ON WHAT DIMENSION OF TECHNOLOGY

17   YOU'RE TALKING ABOUT.  IT'S TOO BROAD TO LUMP INTO ONE.

18   Q.   DO YOU RECALL BEING DEPOSED IN MARCH OF 2018?

19   A.   YES.

20   Q.   AND YOU WERE UNDER OATH AT THAT TIME?

21   A.   YES.

22   Q.   I'D LIKE TO PLAY A CLIP FROM YOUR DEPOSITION.  IT'S

23   PAGE 36, LINE 25, THROUGH 11, LINE 8.

24        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

25   BY MR. SHACHAM:

1    Q.   YOU GAVE THAT -- YOU WERE ASKED THAT QUESTION AND YOU GAVE

2    THAT ANSWER; CORRECT, SIR?

3    A.   SURE.

4    Q.   AND YOU STAND BY THAT TESTIMONY TODAY?

5    A.   YES.

6    Q.   AND YOU ATTRIBUTE MEDIATEK'S SUCCESS IN THE MARKET OVER

7    THE PAST EIGHT YEARS TO THE FACT THAT MEDIATEK MAKES AND SELLS

8    HIGH QUALITY PRODUCTS; IS THAT CORRECT?

9    A.   YES, I THINK THAT'S FAIR.

10   Q.   YOU TESTIFIED EARLIER THAT MEDIATEK OBTAINED CDMA

11   CAPABILITY AROUND 2012 OR 2013; IS THAT RIGHT?

12   A.   YEAH, I -- I DON'T REMEMBER THE EXACT DATE.  I THOUGHT IT

13   WAS AROUND 2013.

14   Q.   AND IT DID SO BY LICENSING CDMA TECHNOLOGY FROM A COMPANY

15   CALLED VIA TELECOM; IS THAT RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   MEDIATEK CONSIDERED LICENSING VIA'S CDMA TECHNOLOGY AS

18   EARLY AS 2008; RIGHT?

19   A.   UM, I DON'T KNOW SPECIFICALLY IF WE CONSIDERED LICENSING

20   VIA.  I KNOW WE CONSIDERED LICENSING CDMA I.P. BACK IN 2008,

21   AROUND THAT TIMEFRAME, YES.

22   Q.   BUT MEDIATEK MADE A BUSINESS DECISION TO WAIT; RIGHT?

23   A.   I WASN'T INVOLVED IN THE DECISION.  BUT WE DIDN'T LICENSE

24   IT AT THE TIME.

25   Q.   DO YOU RECALL GIVING TESTIMONY IN AN INVESTIGATIVE HEARING

MOYNIHAN CROSS BY MR. SHACHAM

1      IN THIS MATTER AROUND SEPTEMBER 2016, SIR?

2      A.   VAGUELY.

3      Q.   COULD YOU PLEASE TURN TO THE BINDER IN FRONT OF YOU, IT'S

4      THE WHITE ONE.

5      A.   THIS ONE?  OH, THE WHITE ONE.

6      Q.   THE WHITE ONE, PLEASE.

7      A.   YEP.

8      Q.   AND THERE'S A TAB IN THERE FOR I.H. TRANSCRIPT.

9      A.   YEP.

10     Q.   CAN YOU PLEASE TURN, SIR, TO PAGE 204 OF THAT TRANSCRIPT.

11     A.   YEP.

12     Q.   AND DO YOU SEE THERE, YOU WERE ASKED THE QUESTION, "SO IF

13     ENABLING CDMA ALLOWED MEDIATEK TO POTENTIALLY ADDRESS UP TO 70

14     PERCENT OF THE U.S. MARKET, WHY DIDN'T MEDIATEK CONSIDER

15     LICENSING VIA CDMA TECHNOLOGY EARLIER IN TIME?"

16          AND YOU START YOUR ANSWER, "WE DID ACTUALLY -- SO IT WAS

17     FAR BACK AS 2008."  AND THEN YOU CONTINUE AT LINE 14, "I THINK

18     ULTIMATELY WE DECIDED THAT IT WASN'T THE RIGHT TIME TO DO IT

19     BECAUSE WE WERE STILL TRYING TO, YOU KNOW, GET INTO 3G, YOU

20     KNOW, FIGHT THAT FIRE, STABILIZE THAT.

21          "SO THE DECISION I THINK BECAME ONE OF A BUSINESS

22     DECISION.  IN MANY CASES, IT'S A MAKE-OR-BUY KIND OF DECISION."

23          DO YOU STAND BY THAT TESTIMONY TODAY?

24     A.   YEAH.  I THINK I WAS EXTRAPOLATING WHAT THE DECISION WAS.

25     I WASN'T INVOLVED.

1    Q.   BUT YOUR UNDERSTANDING IS THAT IT WAS A BUSINESS DECISION?

2    A.   IT WAS A DECISION NOT TO LICENSE IT AT THE TIME, YES.

3    Q.   AND MEDIATEK MADE THAT BUSINESS DECISION BECAUSE IT WANTED

4    TO FOCUS ON OTHER 3G TECHNOLOGY FIRST; RIGHT?

5    A.   YEAH, I THINK THAT'S FAIR.  WE WERE CERTAINLY PUTTING

6    PRIORITY ON WIDE BAND CDMA AT THE TIME.

7    Q.   MEDIATEK HAD THE CAPABILITY IN-HOUSE TO DESIGN AND DEVELOP

8    ITS OWN MODEM TO IMPLEMENT THE CDMA FUNCTION; CORRECT?

9    A.   YEAH, I BELIEVE WE COULD HAVE, YES.

10   Q.   BUT MEDIATEK DECIDED THAT IT WOULD BE MORE EXPEDIENT TO

11   TAKE THE VIA LICENSE THAN TO DEVELOP ITS OWN CDMA MODEM; RIGHT?

12   A.   YEAH.  I BELIEVE ULTIMATELY THAT THE DECISION WAS MADE

13   THAT IT WAS PROBABLY FASTER TO LICENSE ON THE PHYSICAL I.P.

14   FROM ANOTHER COMPANY THAT HAD SOME PROVEN RECORD.

15   Q.   AS OF MARCH 2018, MEDIATEK WAS WORKING TO DEVELOP 5G MODEM

16   CHIPS; RIGHT?

17   A.   BY MARCH 2018 YOU SAID?

18   Q.   YES, SIR.

19   A.   YES, THAT'S CORRECT.

20   Q.   MR. MOYNIHAN, YOU TESTIFIED EARLIER ABOUT THE AGREEMENT

21   THAT QUALCOMM AND MEDIATEK ENTERED INTO IN 2009, OR I GUESS IT

22   WAS TWO AGREEMENTS; RIGHT?

23   A.   YEAH, I BELIEVE THERE WERE TWO, YES.

24   Q.   YOU WERE NOT INVOLVED IN ANY WAY IN THE NEGOTIATION OF

25   THAT AGREEMENT; RIGHT?

```
1    A.   NO, I WAS NOT.

2    Q.   YOU WERE NOT INVOLVED IN DISCUSSIONS OF ANY KIND WITH

3    ANYBODY FROM QUALCOMM LEADING UP TO THAT 2009 AGREEMENT?

4    A.   NO, I WAS NOT.

5    Q.   YOU WERE NOT ASKED TO PROVIDE ANY SORT OF BUSINESS ADVICE

6    TO OTHERS AT MEDIATEK AS PART OF NEGOTIATION OF THAT AGREEMENT?

7    A.   NOTHING THAT I CAN -- NOT THAT I CAN REMEMBER, NO.

8    Q.   AND YOU WERE NOT ASKED TO REVIEW ANY DRAFTS OF THAT

9    AGREEMENT BEFORE IT WAS SIGNED; RIGHT?

10   A.   NO, I WAS NOT.

11   Q.   SO YOU DIDN'T EVEN READ THAT AGREEMENT UNTIL AFTER IT WAS

12   SIGNED; RIGHT?

13   A.   THAT'S CORRECT.

14   Q.   PROBABLY ONE OR TWO YEARS AFTER IT WAS SIGNED; IS THAT

15   RIGHT?

16   A.   2010, MAYBE EARLY 2011, SOMETHING LIKE THAT.

17   Q.   THAT'S ABOUT ONE OR TWO YEARS?

18   A.   YEAH.

19   Q.   THE PERSON WHO LED THOSE NEGOTIATIONS FOR MEDIATEK WAS A

20   GENTLEMAN NAMED DAVID CHANG; IS THAT RIGHT?

21   A.   THAT'S MY UNDERSTANDING, YES.

22   Q.   AND YOU'RE AWARE THAT SHORTLY BEFORE THAT DEAL WAS SIGNED,

23   MR. CHANG SAID THE DEAL WAS DEFINITELY A WIN-WIN CASE FOR BOTH

24   COMPANIES; CORRECT?

25   A.   HE MAY HAVE, YES.
```

1    Q.   AND YOU'RE AWARE OF THAT?

2    A.   I THINK SO.  I THINK I MAY HAVE SEEN AN E-MAIL SOMEWHERE

3    ALONG THE WAY.

4    Q.   BUT YEARS AFTER MR. CHANG DECLARED THAT THE 2009 AGREEMENT

5    WAS A WIN-WIN DEAL, YOU DECIDED THAT THIS WAS ACTUALLY A BAD

6    DEAL FOR MEDIATEK; RIGHT?

7    A.   YEAH, I THINK I HAD A DIFFERENT OPINION.

8    Q.   AND SPECIFICALLY, YOU TESTIFIED EARLIER THAT YOU BELIEVED

9    THAT THE AGREEMENT BURDENED MEDIATEK BECAUSE IT CONTAINED AN

10   AUTHORIZED PURCHASER PROVISION; IS THAT RIGHT?

11   A.   AMONG OTHER THINGS, YES.

12   Q.   AND ACCORDING TO YOU, THERE MAY HAVE BEEN CUSTOMERS

13   INTERESTED IN PURSUING 3G DESIGNS THAT WERE NOT ON THE

14   AUTHORIZED PURCHASER LIST; IS THAT RIGHT?

15   A.   THE INDUSTRY CONTEXT I THINK IS IMPORTANT.  IT WAS THE

16   POINT IN TIME WHERE I THINK A LOT OF OUR LEGACY 2G FEATURE

17   PHONE CUSTOMERS WERE PROBABLY EXPLORING ENTRY INTO THE 3G

18   MARKET.

19   Q.   SO THERE MAY HAVE BEEN CUSTOMERS THAT WERE INTERESTED IN

20   PURSUING 3G DESIGNS THAT WERE NOT ON THE AUTHORIZED PURCHASER

21   LIST?

22   A.   YES, THERE WERE, YES.

23   Q.   AND THOSE HYPOTHETICAL CUSTOMERS WOULD HAVE BEEN OEM'S

24   THAT DID NOT HAVE A LICENSE AGREEMENT WITH QUALCOMM; CORRECT?

25   A.   I THINK PER THE DEFINITION, YES.

1    Q.    FAIR TO SAY THAT ANY SUCH UNLICENSED OEM'S WERE TYPICALLY

2    SMALLER COMPANIES IN CHINA OR OTHER DEVELOPING COUNTRIES?

3    A.    YEAH, I THINK THAT'S A REASONABLE EXTRAPOLATION.

4    Q.    QUALCOMM AND MEDIATEK ENTERED INTO A NEW AGREEMENT IN

5    2013; CORRECT?

6    A.    YES.

7    Q.    AND THAT AGREEMENT REMOVED THE AUTHORIZED PURCHASER

8    PROVISION COMPLETELY; RIGHT?

9    A.    YES, I BELIEVE SO.

10    Q.    BUT AS OF THE TIME OF YOUR DEPOSITION, YOU COULDN'T

11    IDENTIFY ANY NEW OEM'S THAT MEDIATEK WAS ABLE TO SELL TO ONCE

12    THAT PROVISION WAS REMOVED; CORRECT?

13    A.    THAT COULD BE TRUE.

14         BY 2013, I WAS LIVING BACK IN THE U.S.  I WASN'T SO

15    ACTIVELY INVOLVED IN THE DIRECT SALES TO OEM'S IN THE MOBILE

16    BUSINESS.  MY ROLE WAS A LITTLE DIFFERENT.

17    Q.    SO YOU COULDN'T IDENTIFY ANY NEW OEM'S THAT MEDIATEK WAS

18    ABLE TO SELL TO ONCE THE AUTHORIZED PURCHASER PROVISION WAS

19    REMOVED; CORRECT?

20    A.    PERHAPS NOT, NO.

21    Q.    AND YOU DIDN'T KNOW ONE WAY OR THE OTHER WHETHER MEDIATEK

22    BEGAN TO SELL TO ANY OEM'S WHO WERE NOT ON THE AUTHORIZED

23    PURCHASER LIST AFTER THE NEW AGREEMENT WAS SIGNED; CORRECT?

24    A.    NO.  I KNOW OUR BUSINESS IN 3G IMPROVED IN THAT TIMEFRAME.

25         BUT AS I SAID, I WASN'T SO DIRECTLY -- MOST OF THOSE SALES

```
 1      WOULD HAVE BEEN HANDLED BY OUR CHINA SALES TEAM.  I DIDN'T HAVE

 2      A ROLE IN THAT TEAM, SO I WASN'T SO DIRECTLY INVOLVED.

 3      Q.   SO YOU DIDN'T KNOW ONE WAY OR THE OTHER WHETHER MEDIATEK

 4      BEGAN TO SELL TO ANY OEM'S THAT WERE NOT ON THE AUTHORIZED

 5      PURCHASER LIST?

 6      A.   I NEVER CHECKED OR CROSS-CHECKED.

 7      Q.   SO YOU HAVE NO KNOWLEDGE?

 8      A.   NO KNOWLEDGE.

 9      Q.   YOU ALSO TESTIFIED THAT YOU BELIEVE THAT THE 2009

10      AGREEMENT BURDENED MEDIATEK BECAUSE OF A CUSTOMER-BY-CUSTOMER

11      SALES REPORTING PROVISION; IS THAT RIGHT?

12      A.   YES.

13      Q.   AND THAT PROVISION REQUIRED MEDIATEK TO REPORT THE NUMBER

14      OF CHIPS IT SOLD TO EACH AUTHORIZED PURCHASER?

15      A.   YES.

16      Q.   IT'S TRUE, IS IT NOT, THAT THAT INFORMATION IS SOMETHING

17      THAT MEDIATEK ALREADY MAINTAINED AT THE TIME IN THE ORDINARY

18      COURSE OF BUSINESS?

19      A.   YEAH, IT'S CERTAINLY INFORMATION WE WOULD KNOW WHO WE

20      SHIPPED PRODUCTS TO, YES.

21      Q.   AND IT'S ALSO TRUE THAT NO CUSTOMER EVER TOLD YOU THAT

22      THEY CARED ABOUT MEDIATEK REPORTING THAT INFORMATION TO

23      QUALCOMM; RIGHT?

24      A.   I DON'T RECALL ANY OF THEM SAYING THAT TO ME PERSONALLY,

25      NO.
```

1    Q.   AND THE NEW AGREEMENT IN 2013 REMOVED THAT

2    CUSTOMER-BY-CUSTOMER REPORTING PROVISION, TOO; CORRECT?

3    A.   YES, AND I THINK IT REPLACED IT WITH SOME KIND OF

4    AGGREGATE REPORTING REQUIREMENT.

5    Q.   BUT THE CUSTOMER-BY-CUSTOMER PORTION WAS GONE; RIGHT?

6    A.   YEAH, IT WAS AGGREGATED BY CHIPSET.

7    Q.   MR. MOYNIHAN, BOTH THE 2009 AGREEMENT AND THE 2013

8    AGREEMENT HAVE NOW EXPIRED; RIGHT?

9    A.   THAT'S MY UNDERSTANDING, YES.

10   Q.   AND AS OF MARCH 2018 WHEN YOU WERE DEPOSED, YOU COULDN'T

11   POINT TO ANY EFFECT THAT THE EXPIRATION OF THOSE AGREEMENTS HAD

12   HAD ON MEDIATEK'S BUSINESS; CORRECT?

13   A.   I DON'T THINK SO.

14   Q.   YOU COULD NOT POINT TO ANY SUCH EFFECT; CORRECT?

15   A.   I DON'T THINK SO.  2018, YOU SAID?

16   Q.   AS OF 2018.

17   A.   MARCH?  YEAH.  I MEAN, I THINK THERE WERE, LIKE I SAID,

18   POINTS IN TIME WHERE OUR 3G BUSINESS DEFINITELY SAW SOME GROWTH

19   AFTER THE FIRST AGREEMENT EXPIRED.  I DON'T KNOW THAT THEY WERE

20   NECESSARILY CLOSELY RELATED, BUT THERE WAS SOME EFFECT.

21   Q.   I'D LIKE TO PLAY PAGE 242, LINES 17 THROUGH 21, PLEASE.

22        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

23   BY MR. SHACHAM:

24   Q.   YOU WERE ASKED THAT QUESTION AND YOU GAVE THAT ANSWER;

25   CORRECT?

1    A.   CORRECT.

2    Q.   AND YOU STAND BY THAT TESTIMONY TODAY?

3    A.   SURE.

4    Q.   YOU ALSO TESTIFIED THAT YOU THOUGHT THE NEGOTIATIONS FOR

5    THE 2009 AGREEMENT TOOK TOO LONG; RIGHT?

6    A.   THAT'S THE PERCEPTION I HAD FROM INTERNAL DISCUSSIONS AT

7    THE TIME, YES.

8    Q.   AND YOU BELIEVE THAT THE LENGTH OF THE NEGOTIATIONS

9    DELAYED MEDIATEK'S ABILITY TO SELL ITS FIRST WCDMA CHIP, THE

10   MT 6268; RIGHT?

11   A.   WHAT I BELIEVE IS OUR CUSTOMERS WERE NOT WILLING TO BUY A

12   CHIP, A 3G CHIPSET FROM MEDIATEK UNTIL WE HAD A, IN THEIR

13   WORDS, A LICENSE AGREEMENT WITH QUALCOMM.

14   Q.   BUT, AGAIN, YOU WEREN'T INVOLVED IN ANY WAY IN THOSE

15   NEGOTIATIONS; RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   AND IT'S TRUE, IS IT NOT, THAT THERE WERE INTERNAL DELAYS

18   IN THE DEVELOPMENT OF THE MT 6268 CHIPSET THAT HAD NOTHING TO

19   DO WITH QUALCOMM'S LICENSING NEGOTIATIONS?

20   A.   THERE WERE CERTAINLY -- I MEAN, IT'S OUR FIRST 3G PRODUCT.

21   IT'S A COMPLEX TECHNOLOGY.  I WOULDN'T BE SURPRISED IF THERE

22   WERE DELAYS, OTHER ISSUES WITH THE PROJECT AS WELL.

23   Q.   AND THOSE WERE DELAYS THAT HAD NOTHING TO DO WITH ANY

24   NEGOTIATIONS WITH QUALCOMM; RIGHT?

25   A.   YEAH, THOSE WOULD HAVE BEEN SEPARATE.

1    Q.   FOR EXAMPLE, THE INTEGRATION OF THE ADI OTHELLO RF

2    TRANSCEIVER RESULTED IN A DELAY IN THE DEVELOPMENT SCHEDULE FOR

3    THE MT 6268; ISN'T THAT RIGHT?

4    A.   I'D CHARACTERIZE IT A LITTLE DIFFERENTLY.  THIS IS A

5    DECISION THAT WAS MADE AFTER THE ACQUISITION OF THE ANALOG

6    DEVICES TEAM.  THE DECISION WAS MADE SOMETIME IN 2008 TO ADOPT

7    THE TRANSCEIVER THAT WAS ACQUIRED WITH THE ADI ACQUISITION.

8    THAT, BY ITSELF, WOULD HAVE NECESSITATED SOME CHANGE IN THE

9    PRODUCT, REWORKING OF THINGS.  THAT WOULD HAVE TAKEN SOME TIME.

10   Q.   AND THAT CAUSED SOME DELAY; RIGHT?

11   A.   IT CERTAINLY WOULD HAVE TAKEN TIME, YES.

12   Q.   AND THAT DELAY HAD NOTHING TO DO WITH ANY QUALCOMM

13   NEGOTIATIONS?

14   A.   NO.  THAT DECISION WAS INDEPENDENT OF QUALCOMM.

15   Q.   AS OF MARCH 2018, MR. MOYNIHAN, IT WAS YOUR UNDERSTANDING

16   THAT ALL STANDARD ESSENTIAL PATENTS ARE TYPICALLY LICENSED BY

17   THE PATENT HOLDERS TO THE HANDSET MANUFACTURERS; CORRECT?

18   A.   YES.  FOR THE CELLULAR INDUSTRY, I THINK THAT'S BEEN THE

19   COMMON PRACTICE FOR A WHILE.

20   Q.   THAT WAS INDUSTRY PRACTICE?

21   A.   YEAH, COMMON PRACTICE FOR THE -- JUST FOR THE CELLULAR

22   INDUSTRY, YES.

23   Q.   FOR EXAMPLE, WHEN YOU NEGOTIATED WITH NOKIA, THEY WENT OUT

24   OF THEIR WAY TO MAKE IT ABSOLUTELY CLEAR THAT THEY WERE NOT

25   LICENSING THEIR ESSENTIAL PATENTS TO YOU AT THE CHIPSET LEVEL;

MOYNIHAN CROSS BY MR. SHACHAM

```
 1        ISN'T THAT RIGHT?

 2        A.   THE NEGOTIATIONS I THINK YOU'RE REFERRING TO WITH NOKIA

 3        WERE A MASTER PURCHASE AGREEMENT.  IT WASN'T A LICENSING

 4        AGREEMENT DISCUSSION.

 5             BUT I DO RECALL, BY NECESSITY OF THE MASTER PURCHASE

 6        AGREEMENT, THERE ARE CERTAIN TERMS DEALING WITH I.P.

 7             I DO RECALL NOKIA SPECIFICALLY ADDING LANGUAGE TO MAKE IT

 8        CLEAR THAT THIS WAS NOT A, AN ESSENTIAL PATENT LICENSE TO

 9        MEDIATEK AT THE TIME.

10        Q.   SO WHEN YOU NEGOTIATED WITH NOKIA, THEY WENT OUT OF THEIR

11        WAY TO MAKE IT ABSOLUTELY CLEAR THAT THEY WERE NOT LICENSING

12        THEIR ESSENTIAL PATENTS TO YOU AT THE CHIPSET LEVEL; ISN'T THAT

13        RIGHT?

14        A.   YEAH, I THINK THAT'S WHAT I SAID, YEAH.

15        Q.   AS OF MARCH 2018, IT WAS YOUR UNDERSTANDING THAT

16        RESPONSIBILITY FOR GETTING THE NECESSARY LICENSING FOR

17        ESSENTIAL PATENTS RESTED WITH THE HANDSET MANUFACTURER;

18        CORRECT?

19        A.   I THINK THAT'S HOW I UNDERSTOOD THE INDUSTRY OPERATED IN

20        THE CELLULAR SPACE, YES.

21        Q.   SO THAT WAS AN INDUSTRY PRACTICE?

22        A.   I THINK THAT'S HOW IT WAS OPERATING, YES.

23        Q.   AND, IN FACT --

24        A.   IS -- I THINK I SAID HOW IT WAS, OR IS OPERATING.  SORRY.

25        Q.   THAT'S HOW IT IS OPERATING STILL?
```

1    A.   I BELIEVE SO, YES.

2    Q.   AND, IN FACT, YOU RELAYED THESE UNDERSTANDS THAT YOU HAD

3    ABOUT THE INDUSTRY TO YOUR TEAM IN AN E-MAIL CHAIN IN 2014.

4         DO YOU RECALL THAT?

5    A.   YES, VAGUELY.

6    Q.   OKAY.  PLEASE TAKE A LOOK, PLEASE, SIR, AT THE BLACK

7    BINDER, THE VERY SMALL ONE.  AND YOU'LL FIND IN THERE A SINGLE

8    DOCUMENT THAT'S BEEN MARKED QX 219.

9    A.   YES, I SEE IT.

10   Q.   THIS IS AN E-MAIL THAT YOU SENT TO YOUR TEAM ON MAY 8,

11   2014; CORRECT?

12   A.   JUST TO BE 100 PERCENT CORRECT, NOT EVERYBODY IS ON MY

13   TEAM, OR WAS ON MY TEAM.  BUT SOME OF THEM WERE.

14   Q.   SO THIS IS AN E-MAIL THAT YOU SENT TO MEMBERS OF YOUR TEAM

15   ON MAY 8TH, 2014; RIGHT?

16   A.   AND SOME ADDITIONAL PEOPLE, YES.

17        MR. SHACHAM:  YOUR HONOR, I'D LIKE TO MOVE QX 219

18   INTO EVIDENCE.

19        THE COURT:  ANY OBJECTION?

20        MR. KEHL:  NO OBJECTION, YOUR HONOR.

21        THE COURT:  IT'S ADMITTED.

22   (DEFENDANT'S EXHIBIT QX 219 WAS ADMITTED IN EVIDENCE.)

23        THE COURT:  GO AHEAD, PLEASE.

24   BY MR. SHACHAM:

25   Q.   MR. MOYNIHAN, WOULD YOU PLEASE TURN TO THE E-MAIL DATED

1    MARCH 6TH, 2014, AT 9:15 P.M. FROM RAYMOND KIM TO YOU AND

2    OTHERS.  IT'S TOWARDS THE BACK.

3    A.   MARCH 6TH, YOU SAID 9:15?

4    Q.   YES, SIR.

5    A.   YEAH, I HAVE IT.

6    Q.   AND MR. KIM IS A MEMBER OF YOUR TEAM IN THE U.S.; IS THAT

7    RIGHT?

8    A.   HE IS, AND HE WAS AT THE TIME, YES.

9    Q.   MR. KIM WAS REPORTING ON A CALL THAT HE HAD HAD WITH ZTE

10   ABOUT MEDIATEK POTENTIALLY SUPPLYING CHIPS TO ZTE FOR A PHONE

11   ON THE T-MOBILE NETWORK; IS THAT RIGHT?

12   A.   YEAH, THAT SEEMS CORRECT.

13   Q.   AND MR. KIM REPORTED THAT ZTE SAID T-MOBILE HAD CONCERNS

14   ABOUT THE INTELLECTUAL PROPERTY IMPLICATIONS OF USING MEDIATEK

15   CHIPS; RIGHT?

16   A.   YEAH, I SEE THAT.

17   Q.   AND YOU RESPONDED TO MR. KIM THAT YOU THINK T-MOBILE

18   SHOULD NOT HAVE THOSE CONCERNS.  IS THAT FAIR TO SAY?

19   A.   I THINK THAT'S WHAT I WAS TRYING TO TEASE OUT, YES.

20   Q.   OKAY.  WELL, TURN BACK TO THE NEXT E-MAIL IN TIME, WHICH

21   IS ON THE PRIOR PAGE, THE E-MAIL YOU SENT DATED MARCH 7, 2014,

22   AT 7:58.

23   A.   OKAY, SORRY.  YEAH, I SEE IT.

24   Q.   AND SO YOU WROTE THERE AT THE TOP OF THE E-MAIL, "RAYMOND,

25   THANKS.  IF YOU ARE IN THE OFFICE TODAY, GIVE ME A CALL ON THIS

MOYNIHAN CROSS BY MR. SHACHAM

1    IPR TOPIC, I'D LIKE TO UNDERSTAND MORE.  OBVIOUSLY IT'S A

2    NUANCED POSITION, BUT HERE'S HOW I PARSE IT."

3         AND THEN YOU SEE THERE'S SEVERAL POINTS BELOW THAT?

4    A.   YEAH, I SEE THAT.

5    Q.   SO THEN YOU WROTE IN POINT NUMBER 1, "WHEN IT COMES TO

6    ESSENTIAL IPR AS RELATES TO DECLARED IPR FOR STANDARDS (E.G.,

7    UMTS, HSPA, LTE, GSM, H.265, ET CETERA), WE ARE NOT IN A

8    POSITION TO OFFER ANY INDEMNIFICATION/COVERAGE SINCE WE ARE NOT

9    THE SPECIAL PATENT HOLDERS -- HOWEVER THE KEY POINT IS THAT

10   RESPONSIBILITY FOR THE NECESSARY LICENSES FOR THESE SPECIAL

11   PATENTS RESTS WITH THE OEM/ODM/BRAND AND SHOULD BE INDEPENDENT

12   OF WHATEVER CHIPSET IS INCLUDED."

13        THAT WAS AN ACCURATE STATEMENT OF YOUR UNDERSTANDING AT

14   THE TIME; CORRECT?

15   A.   YEAH.  I THINK I WAS TRYING TO REFLECT MY UNDERSTANDING OF

16   HOW THE CELLULAR INDUSTRY WORKED IN THIS REGARD.

17   Q.   AND THEN IN PARAGRAPH NUMBER 4, TOWARDS THE BOTTOM OF

18   PAGE, YOU WROTE, "OUR POSITION SHOULD BE THAT ZTE SHOULD HAVE

19   THE NECESSARY LICENSES TO PATENTS (ESSENTIAL AND NON-ESSENTIAL)

20   IN PLACE ALREADY TO ENABLE THEM TO SELL MOBILE DEVICES TO

21   T-MOBILE IN THE U.S."

22        THAT ACCURATELY CAPTURES WHAT YOU THOUGHT YOUR POSITION

23   SHOULD BE AT THAT TIME; CORRECT?

24   A.   YEAH.  I THINK I WAS TRYING TO HELP MY TEAMMATE NAVIGATE

25   THIS QUESTION ON THE IPR ISSUE FROM THE OPERATOR AT THE TIME,

1    YES.

2    Q.   AND THEN ON THE PAGE IN SUBPARAGRAPH A, YOU WROTE, "MY

3    ASSUMPTION HERE IS THAT ZTE WOULD PAY A ROYALTY TO QUALCOMM FOR

4    EVERY 3G OR LTE DEVICE SHIPPED -- INDEPENDENT OF WHETHER IT IS

5    A MEDIATEK OR QUALCOMM CHIP -- THAT IS FOR THE USE OF ANY/ALL

6    QUALCOMM I.P."

7         DO YOU SEE THAT?

8    A.   YES, I SEE THAT.

9    Q.   THAT ACCURATELY STATES WHAT YOUR ASSUMPTION WAS IN 2014;

10   CORRECT?

11   A.   YEAH, I THINK THAT'S FAIR.

12   Q.   AND THAT REMAINED YOUR ASSUMPTION AS OF YOUR DEPOSITION;

13   RIGHT?

14   A.   YEAH, I THINK SO.

15   Q.   AND IT WAS ALSO YOUR UNDERSTANDING THAT THE SAME PRINCIPLE

16   SHOULD HOLD TRUE FOR ANY OTHER NECESSARY I.P. HOLDERS BESIDES

17   QUALCOMM; RIGHT?

18   A.   YEAH, I THINK THAT WAS THE ASSUMPTION, YES.

19   Q.   MR. MOYNIHAN, PLEASE TURN TO THE LAST E-MAIL IN TIME IN

20   THIS CHAIN.  THAT'S THE ONE DATED MAY 8, 2014, AT 9:13 P.M.

21   A.   YEP, I SEE IT.

22   Q.   IF YOU LOOK AT THE PARAGRAPH NUMBER 2, YOU WROTE THERE, "A

23   FEW YEARS AGO THERE WAS SOME LAWSUITS, I RECALL THE KEY CASE

24   WAS INVOLVING LG, INTEL AND QUANTUM, THAT ESTABLISHED THE

25   CONCEPT OF PATENT EXHAUSTION, I.E., IF THE IPR IS LICENSED AT

1    THE CHIPSET AND IT BECAME EXHAUSTED, THEN THE IPR HOLDER CAN NO

2    LONGER CLAIM ROYALTIES FROM ANYONE ELSE IN THE CHAIN."

3         DO YOU SEE THAT?

4    A.   YES, I DO.

5    Q.   AND THEN YOU WROTE, "I BELIEVE THESE RULINGS CAUSED MANY

6    OF THE IPR HOLDERS TO REWORK THEIR LICENSE AGREEMENTS AND

7    POLICIES AND IN MY EXPERIENCE THEY NOW GO OUT OF THEIR WAY TO

8    MAKE IT ABSOLUTELY CLEAR THAT THEY ARE NOT LICENSING TO THE

9    CHIPSET COMPANY."

10        THAT STATEMENT ACCURATELY REFLECTS YOUR UNDERSTANDING OF

11   THE INDUSTRY IN 2014; CORRECT?

12   A.   CORRECT.

13   Q.   AND THEN YOU WROTE, "FOR EXAMPLE I WORKED ON THE MPA

14   AGREEMENT WITH NOKIA AND THERE IS LANGUAGE IN THERE WRITTEN

15   OVER AND OVER THAT NOTHING IN THE AGREEMENTS GIVES MEDIATEK ANY

16   RIGHTS TO THE NOKIA IPR."

17        AND THEN YOU ADDED, "BUT IT IS EXTREMELY IMPORTANT FOR

18   THEM THAT THEIR IPR IS NOT SEEN TO BE LICENSED TO THE CHIPSET

19   COMPANIES."

20        THAT ACCURATELY REFLECTS THE POSITION THAT NOKIA TOOK IN

21   THEIR NEGOTIATIONS WITH YOU; CORRECT?

22   A.   YEAH.  I'M BEING DRAMATIC, YES.

23   Q.   FURTHER DOWN ON THE PAGE IN THE FIRST BULLET POINT, YOU

24   WROTE, "ALL ESSENTIAL IPR IS TYPICALLY LICENSED BY IPR HOLDERS

25   TO THE END DEVICE MANUFACTURER."

```
 1              THAT STATEMENT ACCURATELY REFLECTS YOUR UNDERSTANDING OF
 2     THE INDUSTRY IN 2014 AS WELL; CORRECT?
 3     A.   YEAH, FOR CELLULAR STUFF, CELLULAR INDUSTRY, YES, THAT'S
 4     MY UNDERSTANDING.
 5     Q.   AND THE LAST BULLET POINT ON THAT PAGE, YOU WROTE, "THERE
 6     ARE OTHER LEGAL STRUCTURES THAT CAN BE USED BETWEEN
 7     SEMICONDUCTOR COMPANIES, E.G. COVENANT NOT TO SUE -- BASICALLY
 8     AN AGREEMENT THAT MEANS THE COMPANIES AGREE NOT TO SUE EACH
 9     OTHER ON PATENTS."
10              DO YOU SEE THAT LANGUAGE?
11     A.   YES, I DO.
12     Q.   AND IT'S YOUR UNDERSTANDING THAT THAT IS THE TYPE OF
13     AGREEMENT THAT WAS IN PLACE IN 2009 AND FOR SOME YEARS
14     THEREAFTER BETWEEN QUALCOMM AND MEDIATEK; CORRECT?
15     A.   CORRECT.
16     Q.   MR. MOYNIHAN, MEDIATEK HAS MADE INCENTIVE PAYMENTS TO
17     OEM'S FROM TIME TO TIME; RIGHT?
18     A.   YES.
19     Q.   THOSE INCENTIVE PAYMENTS ARE SOMETIMES CALLED MARKET
20     DEVELOPMENT FUNDS, OR MDF'S?
21     A.   CORRECT.
22     Q.   FOR EXAMPLE, IN 2016, MEDIATEK ENTERED INTO AN MDF
23     ARRANGEMENT WITH SONY; RIGHT?
24     A.   PERHAPS.  I DON'T KNOW.  I DON'T REMEMBER THE EXACT
25     TIMEFRAME.
```

1    Q.   AND THAT ARRANGEMENT WAS FOR OVER A MILLION DOLLARS;

2    CORRECT?

3    A.   COULD BE, YEAH.

4    Q.   IN 2016, MEDIATEK ALSO OFFERED AN MDF TO MOTOROLA;

5    CORRECT?

6    A.   WOULDN'T SURPRISE ME, BUT YES.

7    Q.   A MEMBER OF YOUR TEAM PROPOSED THAT THIS OFFER TO MOTOROLA

8    BE FOR $10 MILLION; CORRECT?

9    A.   CAN YOU REMIND ME OF THE TIMEFRAME?

10   Q.   AROUND 2016.

11   A.   YEAH, ABOUT --

12   Q.   EXCUSE ME.  2015.

13   A.   2015.  YEAH, COULD BE.

14        MR. SHACHAM:  YOUR HONOR, I BELIEVE THE REMAINDER OF

15   MY QUESTIONS WOULD BE ONES THAT ARE SAFER PUT INTO THE CLOSED

16   PORTION.

17        THE COURT:  OKAY.  IT'S 3:32.

18        MR. KEHL:  YOUR HONOR, I HAVE A FEW MINUTES OF PUBLIC

19   REDIRECT IF IT WOULD BE MORE EFFICIENT.

20        THE COURT:  OH, THAT'S FINE.

21      GO AHEAD.  LET ME KNOW WHEN YOU'RE READY.

22      (PAUSE IN PROCEEDINGS.)

23        MR. KEHL:  I'M READY, YOUR HONOR.

24        THE COURT:  OKAY.  GO AHEAD.  3:33.

25

```
 1                        REDIRECT EXAMINATION

 2      BY MR. KEHL:

 3      Q.   MR. MOYNIHAN, COUNSEL FOR QUALCOMM WAS ASKING YOU ABOUT

 4      GAPS.

 5           DO YOU RECALL THAT?

 6      A.   GAPS IN?

 7      Q.   GAPS -- TECHNOLOGICAL GAPS BETWEEN MEDIATEK AND QUALCOMM?

 8      A.   SURE, YEAH.

 9      Q.   WHERE IN TERMS OF TECHNOLOGY HAS MEDIATEK CLOSED THE GAP

10      IN TECHNOLOGY WITH QUALCOMM?

11      A.   I THINK IN CERTAIN ASPECTS OF THE SMARTPHONE PRODUCTS WE

12      HAVE.  WE HAD A FAIRLY INTENSIVE PROGRAM AT ONE POINT IN TIME

13      TO TRY TO CLOSE THE GAPS.

14           I THINK IN TERMS OF CAMERA ISP, WI-FI TECHNOLOGY, POWER

15      CONSUMPTION, RF, CPU, SOME OTHER DIMENSIONS I THINK WE'VE

16      CLOSED IT SIGNIFICANTLY.

17      Q.   AND WHERE HAS MEDIATEK NOT CLOSED THE GAP WITH QUALCOMM?

18      A.   PREDOMINANTLY I WOULD SAY ON THE MODEM TECHNOLOGY.

19      Q.   WHERE IN TERMS OF MARKET SEGMENTS HAS MEDIATEK CLOSED THE

20      GAP WITH QUALCOMM?

21      A.   YOU KNOW, I THINK IN, IN -- CERTAINLY IN THE ENTRY PARTS

22      OF THE 4G MARKET, I THINK WE'RE QUITE COMPETITIVE NOW.

23           YOU KNOW, THAT ALSO APPLIES MAYBE TO SOME GEOGRAPHY,

24      EMERGING MARKETS, CHINA, WHERE WE PROBABLY ARE MORE COMPETITIVE

25      IN THE MODEM FEATURES TODAY.
```

1    Q.   AND WHERE HAS MEDIATEK NOT CLOSED THE GAP IN TERMS OF

2    MARKET SEGMENTS?

3    A.   HIGHER TIER, PREMIUM TIER.  WE TALKED ABOUT IT EARLIER,

4    THE HIGHER TIERS OF THE SMARTPHONE MARKET.

5    Q.   AND IS THERE A GEOGRAPHICAL COMPONENT TO THE REMAINING GAP

6    AS WELL?

7    A.   YEAH, THOSE FEATURES TEND TO BE IMPORTANT IN MARKETS LIKE

8    THE U.S., SOME OTHERS, JAPAN, KOREA, MAYBE AT THE HIGH END OF

9    THE EUROPEAN MARKET AS WELL.

10    Q.   TO WHAT DO YOU ATTRIBUTE THESE REMAINING GAPS?

11    A.   PROBABLY A LOT OF FACTORS, BUT, YOU KNOW, CERTAINLY WE

12    HAVEN'T BEEN ABLE TO INVEST ENOUGH I THINK IN THE MODEM

13    TECHNOLOGY AND DEPLOY IT FAST ENOUGH TO MARKET.

14    Q.   COUNSEL FOR QUALCOMM ALSO REFERRED YOU TO SOME TESTIMONY

15    FROM YOUR INVESTIGATIONAL HEARING IN WHICH YOU REFERRED TO

16    TRYING TO STABILIZE THE MODEM.

17    DO YOU RECALL THAT?

18    A.   YES, I BELIEVE SO.

19    Q.   WHAT DOES IT MEAN TO STABILIZE A MODEM?

20    A.   FOR ME WHAT IT MEANS IS, YOU KNOW, IF YOU'RE LAUNCHING A

21    NEW MODEM GENERATION INTO THE MARKET, IT TAKES CERTAINLY SOME

22    TIME TO GET IT INTO PRODUCTION, LAUNCH IT WITH MULTIPLE OEM'S

23    INTO MULTIPLE OPERATOR NETWORKS AND OPERATORS, NETWORK

24    OPERATORS, AND IRON OUT ANY OF THE ISSUES, THE BUGS THAT IT

25    MIGHT FIND IN THE FIELD.  SO THAT TAKES SOME TIME.

```
1           SO I CALL THAT SORT OF IRONING OUT OR HARDENING OF THE
2    MODEM.
3    Q.   AND COUNSEL FOR QUALCOMM ALSO ASKED YOU ABOUT CERTAIN MDF
4    AGREEMENTS THAT MEDIATEK HAS; IS THAT CORRECT?
5    A.   CORRECT.
6    Q.   DOES MEDIATEK REQUIRE A LICENSE FOR AN MDF AGREEMENT?
7    A.   WE PROBABLY PUT SOME KIND OF MARKETING AGREEMENT IN PLACE.
8    I'M NOT SURE IT WOULD BE A LICENSE TECHNICALLY, BUT THERE MIGHT
9    BE SOME KIND OF AGREEMENT, YES.
10   Q.   DOES THAT LICENSE IMPLICATE STANDARD ESSENTIAL PATENTS OR
11   ANY OTHER PATENT RIGHTS?
12   A.   NO.  IT MOSTLY TALKS ABOUT, LIKE, MARKETING ACTIVITIES
13   THAT THE BRAND IS GOING TO DO.
14           MR. KEHL:  ALL RIGHT.  NOTHING FURTHER ON PUBLIC
15   REDIRECT, YOUR HONOR.
16           THE COURT:  ALL RIGHT.  THE TIME IS 3:36.
17       DO YOU WANT ANY PUBLIC RECROSS?
18           MR. SHACHAM:  NO, YOUR HONOR.
19           THE COURT:  OKAY.
20       ALL RIGHT.  AND AFTER MR. MOYNIHAN, THE OTHER TWO
21   WITNESSES WILL BE BY DEPOSITION AND THOSE ARE ALSO SEALED; IS
22   THAT RIGHT?
23           MS. MILICI:  THAT'S CORRECT, YOUR HONOR.
24           THE COURT:  OKAY.  SO THEN WHY DON'T WE GO AHEAD AND
25   TAKE A, JUST -- SINCE WE TOOK A LONGER BREAK AT 2:18, LET'S
```

MOYNIHAN CROSS BY MR. SHACHAM

1      JUST TAKE A FIVE MINUTE BREAK THEN AND THEN WE'LL END AT 4:30.

2          AND I THINK WE CAN SAY GOOD-BYE TO ALL OF OUR GUESTS

3    BECAUSE THE REST OF THE PROCEEDINGS TODAY WILL BE SEALED.

4          OKAY.  THANK YOU.

5          LET'S TAKE A FIVE MINUTE BREAK AND WE'LL EMPTY OUT THE

6    COURTROOM.  THANK YOU.

7                THE WITNESS:  DO I STAY HERE?

8                THE COURT:  NO.  YOU CAN STEP DOWN.

9                THE WITNESS:  THANKS.

10        (RECESS FROM 3:37 P.M. UNTIL 3:45 P.M.)

11        **(PROCEEDINGS UNDER SEAL FROM PAGES 368 TO 407.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076

17

18

19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595

20

21        DATED:  JANUARY 7, 2019

22

23

24

25