```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                         SAN JOSE DIVISION

 4

 5
        FEDERAL TRADE COMMISSION,        )  C-17-00220 LHK
 6                                       )
                         PLAINTIFF,      )  SAN JOSE, CALIFORNIA
 7                                       )
                    VS.                  )  JANUARY 8, 2019
 8                                       )
        QUALCOMM INCORPORATED, A         )  VOLUME 3
 9      DELAWARE CORPORATION,            )
                                         )  PAGES 408-636
10                       DEFENDANT.      )
        _____ )  SEALED PAGES 414 - 419
11

12
                       TRANSCRIPT OF PROCEEDINGS
13                 BEFORE THE HONORABLE LUCY H. KOH
                    UNITED STATES DISTRICT JUDGE
14
        A P P E A R A N C E S:
15
        FOR THE PLAINTIFF:    FEDERAL TRADE COMMISSION
16                            BY:  JENNIFER MILICI
                                   DANIEL J. MATHESON
17                                 WESLEY G. CARSON
                                   KENT COX
18                                 NATHANIEL M. HOPKIN
                                   PHILIP J. KEHL
19                                 MIKA IKEDA
                              600 PENNSYLVANIA AVENUE, NW
20                            WASHINGTON, D.C.  20580

21                 APPEARANCES CONTINUED ON NEXT PAGE

22      OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                     CERTIFICATE NUMBER 9595
23                                   IRENE RODRIGUEZ, CSR, CRR, RMR
                                     CERTIFICATE NUMBER 8074
24
                 PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                 TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1

 2      APPEARANCES (CONTINUED)

 3

 4      FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                                BY:  ROBERT A. VAN NEST
 5                                   JUSTINA K. SESSIONS
                                     EUGENE M. PAIGE
 6                                   CHRISTINA BLAIS
                                     MATAN SHACHAM
 7                                   CODY HARRIS
                                     KRISTIN HUCEK
 8                              633 BATTERY STREET
                                SAN FRANCISCO, CALIFORNIA  94111
 9

10                              CRAVATH, SWAINE & MOORE
                                BY:  GARY A. BORNSTEIN
11                                   MICHAEL BRENT BYARS
                                     YONATAN EVEN
12                                   JORDAN D. PETERSON
                                     MING-TOY TAYLOR
13                                   DEREK SUTTON
                                     ANDREW HUYNH
14                                   ANTONY RYAN
                                825 EIGHTH AVENUE
15                              NEW YORK, NEW YORK  10019

16

17      ALSO PRESENT:          MARK SNYDER
                                JEFF DAHM
18                              KEN KOTARSKI

19

20

21

22

23

24

25
```

1

2

3                          INDEX OF WITNESSES

4        PLAINTIFF'S

5        JOHN GRUBBS
              VIDEOTAPED DEPOSITION (SEALED)          P. 415
6

7        SCOTT MCGREGOR
              VIDEOTAPED DEPOSITION (SEALED)          P. 417
8

9        ANDREW HONG
              VIDEOTAPED DEPOSITION                   P. 421
10

11       WILLIAM WYATT
              DIRECT EXAM BY MS. IKEDA                P. 427
12            CROSS-EXAM BY MR. EVEN                   P. 447
              REDIRECT EXAM BY MS. IKEDA              P. 467
13
         CRISTIANO AMON
14            DIRECT EXAM BY MR. MATHESON             P. 478
              CROSS-EXAM BY MS. SESSIONS              P. 513
15            REDIRECT EXAM BY MR. MATHESON           P. 544

16       AICHATOU (AICHA) EVANS
              DIRECT EXAM BY MR. CARSON               P. 551
17            CROSS-EXAM BY MR. RYAN                   P. 590

18

19

20

21

22

23

24

25

```
 1
 2                         INDEX OF EXHIBITS
 3                                   MARKED      ADMITTED
 4         PLAINTIFF'S
 5         2628                                    421
           5800                                    429
 6         7591                                    431
           5551                                    434
 7         8291                                    435
           5809                                    439
 8         5767                                    441
           8292                                    444
 9         8257                                    480
           5393                                    482
10         5294                                    484
           5279                                    485
11         6839                                    488
           6840                                    490
12         8276                                    492
           7606                                    493
13         7607                                    494
           7644                                    503
14         8256                                    506
           5321                                    507
15         5053                                    511
           7024                                    511
16         1599                                    578
           1598                                    583
17
18
19
20
21
22
23
24
25
```

412

1

2                          INDEX OF EXHIBITS

3                                  MARKED        ADMITTED

4

      DEFENDANT'S
5

      9250                                       546
6     9312                                       466
      9225                                       536
7     76                                         595
      92                                         601
8     89                                         607
      94                                         615

9

      JOINT
10

      0095                                       417
11    0122                                       421
      0096                                       504
12    0096                                       504

13

14

15

16

17

18

19

20

21

22

23

24

25

413

```
1    SAN JOSE, CALIFORNIA                    JANUARY 8, 2019

2                    P R O C E E D I N G S

3         (COURT CONVENED AT 9:06 A.M.)

4              THE COURT:  GOOD MORNING, WELCOME BACK.

5              MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

6              THE COURT:  PLEASE TAKE A SEAT.

7         WE DO NEED TO KEEP THE ROOM SEALED, CORRECT, TO FINISH THE

8    TRANSCRIPT?

9              MS. MILICI:  THAT'S CORRECT.

10             THE COURT:  ARE THE PARTIES SATISFIED WITH WHO'S IN

11   HERE?

12             MR. CARSON:  I THINK THERE MAY BE GREATER THAN THE --

13             THE COURT:  I'M SORRY, IF YOU COULD WAIT IN THE

14   ATTORNEY'S LOUNGE, WE'LL LET YOU KNOW AS SOON AS THIS IS DONE.

15        THANK YOU.  I APOLOGIZE FOR THE INCONVENIENCE.

16        (PROCEEDINGS UNDER SEAL FROM PAGES 414 TO 419.)

17

18

19

20

21

22

23

24

25
```

420

```
 1          (IN OPEN COURT.)

 2              THE COURT:  ALL RIGHT.  WHO'S YOUR NEXT WITNESS?

 3              MS. IKEDA:  MIKA IKEDA FOR THE FTC.

 4          NEXT THE FTC WILL PLAY THE VIDEOTAPED DEPOSITION TESTIMONY

 5      OF ANDREW HONG.  HE IS AN ATTORNEY IN THE GLOBAL LEGAL AFFAIRS

 6      GROUP AT SAMSUNG AND HE'S WORKED AT SAMSUNG SINCE 2003.

 7              THE COURT:  OKAY.

 8              MS. IKEDA:  MAY I APPROACH WITH WITNESS BINDERS?

 9              THE COURT:  YES.

10              MS. IKEDA:  AND 28 SECONDS OF THE VIDEO IS

11      DEFENDANT'S COMPLETENESS DESIGNATION.

12              THE COURT:  OKAY.  THAT'LL COUNT AS A MINUTE.

13          WAS THERE ANYTHING THAT NEEDED TO BE ATTRIBUTED TO

14      QUALCOMM FOR MR. MCGREGOR'S VIDEO?

15              MR. CARSON:  I DON'T BELIEVE SO, YOUR HONOR.

16              MR. BORNSTEIN:  THERE WAS NOT, YOUR HONOR.

17              THE COURT:  OKAY.  ALL RIGHT.

18              MS. IKEDA:  YOUR HONOR, AT THIS TIME THE FTC MOVES TO

19      ADMIT CX 26 --

20              THE COURT:  OKAY, WAIT A SECOND.  I'VE GOT TO CHARGE

21      YOU TIME.

22          OKAY.  9:47.  GO AHEAD.  WHAT EXHIBIT DO YOU WANT TO

23      ADMIT?

24              MS. IKEDA:  WE MOVE TO ADMIT CX 2628 AND JX 0122.

25              THE COURT:  YOU SAID TX OR CX?
```

```
 1                  MS. IKEDA:  CX.

 2                  THE COURT:  OKAY.  CX 2628 AND JX 0122.

 3          ANY OBJECTION?

 4                  MR. VAN NEST:  GIVE ME A MOMENT, YOUR HONOR.

 5          (PAUSE IN PROCEEDINGS.)

 6                  THE COURT:  I ASSUME YOU DON'T OBJECT TO A JOINT

 7      EXHIBIT.

 8                  MR. VAN NEST:  NOT THE JX.

 9                  THE COURT:  THAT WOULD BE UNREASONABLE.

10                  MR. VAN NEST:  NOT ON THE JX.

11          NO OBJECTION, YOUR HONOR.

12                  THE COURT:  IT'S ADMITTED.

13          GO AHEAD, PLEASE.

14                  MS. IKEDA:  THANK YOU.

15          (PLAINTIFF'S EXHIBIT CX 2628 AND JOINT EXHIBIT JX 0122

16      WERE ADMITTED INTO EVIDENCE.)

17          **(THE VIDEOTAPED DEPOSITION OF ANDREW HONG WAS PLAYED IN**

18      **OPEN COURT OFF THE RECORD.)**

19                  MR. EVEN:  YOUR HONOR, WE BELIEVE THAT THIS EXHIBIT

20      IS SUPPOSED TO BE SEALED.

21                  THE COURT:  IT'S 10:01.

22                  MS. IKEDA:  YOUR HONOR, MAY I BE HEARD?

23          THE SEALING ORDERS THAT THE COURT ISSUED DID NOT APPLY TO

24      THIS -- THESE PORTIONS OF THE DOCUMENT.

25                  THE COURT:  ARE WE ON JX 122?
```

```
 1                  MS. IKEDA:  YES.

 2                  THE COURT:  OKAY.  THIS IS A SETTLEMENT AGREEMENT.

 3      IT IS NOT -- I DIDN'T SEAL THE WHOLE THING.  I UNSEALED A LOT

 4      OF IT.  SO I DON'T KNOW, WHAT'S YOUR OBJECTION?  I REMEMBER

 5      WHAT I SEALED ON THIS DOCUMENT.  SO -- THEY'RE NOT GOING TO

 6      HIDE THE WHOLE SETTLEMENT BETWEEN SAMSUNG AND QUALCOMM.

 7                  MR. EVEN:  I FULLY UNDERSTAND AND APPRECIATE THAT,

 8      YOUR HONOR.

 9                  THE COURT:  THAT'S NOT HAPPENING.

10                  MR. EVEN:  THIS IS -- IF THE FTC IS MAINTAINING THAT

11      IT'S ONLY SHOWING ON THE SCREEN THE PORTIONS THAT HAVE NOT BEEN

12      SEALED, THEN WE HAVE NO OBJECTION.

13          I JUST WANTED TO MAKE SURE THAT WE'RE NOT SHOWING

14      SOMETHING THAT HAS BEEN SEALED.

15                  MS. IKEDA:  THAT'S CORRECT.

16                  THE COURT:  YES.  AND I MAY UNSEAL MORE.  AS I'M

17      WATCHING, I MAY UNSEAL MORE.

18          BUT I'M SURE THAT THEY WILL FOLLOW TO BE CONSISTENT WITH

19      THE ORDER.

20                  MR. EVEN:  THANK YOU, YOUR HONOR.

21                  THE COURT:  OKAY.  10:02.

22          **(THE VIDEOTAPED DEPOSITION OF ANDREW HONG WAS PLAYED IN**

23      **OPEN COURT OFF THE RECORD.)**

24                  THE COURT:  10:08.

25          IS THIS WITNESS SUBJECT TO RECALL, OR NOT?
```

1              MS. IKEDA:  YES, YOUR HONOR.

2              THE COURT:  AND WHAT ABOUT MCGREGOR?  SUBJECT TO

3      RECALL, OR NOT?

4              MR. ANSALDO:  YES, YOUR HONOR.

5              MR. VAN NEST:  AND BOTH, YOUR HONOR, ARE SUBJECT TO

6      COUNTERS FROM QUALCOMM.

7              THE COURT:  YOU DON'T NEED TO KEEP SAYING THAT.  I

8      UNDERSTAND.

9              MR. VAN NEST:  OKAY.  THANK YOU.

10             THE COURT:  10:008.

11        OKAY.  WHO'S YOUR NEXT WITNESS?

12             MS. IKEDA:  YOUR HONOR, THE FTC CALLS WILL WYATT AS

13     ITS NEXT WITNESS.

14             THE COURT:  OKAY.

15             MS. IKEDA:  MAY WE APPROACH WITH SOME DEPOSITION AND

16     EXHIBIT BINDERS?

17             THE COURT:  YES.

18        (PAUSE IN PROCEEDINGS.)

19             MS. IKEDA:  YOUR HONOR, I UNDERSTAND FROM AN E-MAIL

20     RECEIVED LAST NIGHT THAT QUALCOMM MIGHT SEEK TO SEAL CONCERN

21     DOCUMENTS IN THIS EXAMINATION.

22             THE COURT:  IT'LL BE ON THEIR TIME.  IT'LL BE ON

23     THEIR TRIAL TIME.

24             MS. IKEDA:  SHOULD WE ADDRESS THOSE AS THEY ARISE?

25             THE COURT:  I'M SORRY?

```
1              MS. IKEDA:  SHOULD WE ADDRESS THOSE AS THEY ARISE?

2              THE COURT:  OR I GUESS WE COULD DO IT RIGHT NOW WHILE

3    THEIR WITNESS IS SITTING HERE.

4         GO AHEAD.  IT'S 10:10.  WHAT DO YOU WANT TO SEAL?

5              MR. EVEN:  YOUR HONOR, I DON'T KNOW WHICH DOCUMENTS

6    FTC COUNSEL INTENDS TO USE.  MAYBE IT'S EASIER AS WE GO.

7              MS. IKEDA:  I LISTED -- I CAN ADDRESS THE ONES THAT

8    WERE ON YOUR LIST THAT I'M GOING TO USE TODAY.

9         CX 7591.

10             THE COURT:  OKAY.  WHAT PAGES OF THAT DOCUMENT DO YOU

11   WANT SEALED?

12             MR. EVEN:  CX 7591-010.

13             THE COURT:  OKAY.  THAT'S GRANTED.

14             MR. EVEN:  012.

15             THE COURT:  OKAY.  LET ME MAKE A NOTE.

16        7591, PAGES 010, 012, THAT'S GRANTED.

17             MR. EVEN:  012 THROUGH 015, THAT'S ALL PRICING

18   INFORMATION.

19             THE COURT:  THAT'S GRANTED.

20             MR. EVEN:  AND 018 THROUGH 021.

21             THE COURT:  THAT'S GRANTED.

22             MR. EVEN:  025.

23             THE COURT:  THAT'S GRANTED.

24             MR. EVEN:  032 AND 33.

25             THE COURT:  THIS IS AN OBSOLETE -- WE'RE TALKING
```

1    ABOUT 2014 AND 2015.

2              MR. EVEN:  IT IS, YOUR HONOR.  IT DOES TALK ABOUT

3    THAT.  IT HAS PRICING AND COST.  MY UNDERSTANDING IS THAT

4    PRICE, WHEN PRICING MOVES, COST DOESN'T MOVE THAT MUCH, AND

5    THAT'S AN ISSUE FOR OUR CLIENT.

6              THE COURT:  I DON'T SEE COST ON PAGE 032.

7              MR. EVEN:  NO.  THE COST IS IN 33 I BELIEVE.

8              THE COURT:  RIGHT.  SO WHY ARE WE SEALING 032?  I'M

9    SURE THESE PRODUCTS ARE END OF LIFE IF THEY'RE FOUR YEARS OLD,

10   FIVE YEARS OLD.

11             MR. EVEN:  OKAY, YOUR HONOR.  I THINK SAMSUNG MAY

12   FEEL DIFFERENTLY ABOUT THAT, BUT FROM OUR PERSPECTIVE 033 WILL

13   SUFFICE.

14             THE COURT:  OKAY.

15             MR. EVEN:  AND 037, IT'S THE SAME KIND OF PRICING

16   LIST.

17             THE COURT:  THAT'S FINE.  037 IS GRANTED.

18        OKAY.  ANY OTHERS?

19             MS. IKEDA:  CX 5551.

20             MR. EVEN:  SO THAT'S AT 045 AND 046.

21             THE COURT:  45 IS GRANTED.  46 IS GRANTED.  THAT'S

22   FINE.

23        ARE YOU PLANNING TO USE ANYTHING ELSE?

24             MS. IKEDA:  YES.

25             MR. EVEN:  ANYTHING ELSE HERE THAT'S ON THE LIST?

```
1          CX 8254.

2                 THE COURT:  OKAY.  WHICH PAGES, PLEASE?

3                 MR. EVEN:  025.

4                 THE COURT:  GRANTED.

5                 MR. EVEN:  029 AND 30.

6                 THE COURT:  29 IS GRANTED.  30 IS GRANTED.

7                 MR. EVEN:  AND 33.

8                 THE COURT:  THAT'S GRANTED.

9                 MR. EVEN:  I BELIEVE THAT'S IT, YOUR HONOR.

10                THE COURT:  ALL RIGHT.  THANK YOU.

11                MR. EVEN:  THANK YOU.

12                THE COURT:  THANK YOU VERY MUCH.

13         OKAY.  TIME IS 10:15.

14         HAVE WE SWORN IN THE WITNESS?

15                THE CLERK:  NO.

16                THE COURT:  I'M SORRY, I DON'T THINK WE'VE DONE THAT.

17    OKAY.

18                THE CLERK:  PLEASE STAND.

19         PLEASE RAISE YOUR RIGHT HAND.

20         (PLAINTIFF'S WITNESS, WILLIAM WYATT, WAS SWORN.)

21                THE WITNESS:  I DO.

22                THE CLERK:  THANK YOU.  YOU CAN BE SEATED.

23         PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

24    THE RECORD.

25                THE WITNESS:  WILLIAM BERNARD WYATT.  MY LAST NAME IS
```

```
1    SPELLED W-Y-A-T-T.
2           THE COURT:  ALL RIGHT.  TIME IS 10:15.  GO AHEAD,
3    PLEASE.
```

**DIRECT EXAMINATION**

```
5    BY MR. IKEDA:
6    Q.   GOOD MORNING, SIR.
7    A.   GOOD MORNING.
8    Q.   YOU ARE CURRENTLY VICE PRESIDENT OF FINANCE AT QUALCOMM?
9    A.   THAT'S CORRECT.
10   Q.   AND YOU STARTED WORKING AT QUALCOMM IN 2005?
11   A.   DID I.
12   Q.   YOUR FIRST POSITION WAS DIRECTOR OF OPERATION EXPENSES;
13   CORRECT?
14   A.   IT WAS.
15   Q.   AND AFTER THAT YOU BECAME THE COMMERCIAL AND PRICING LEAD
16   WITHIN THE FINANCE TEAM?
17   A.   THAT'S CORRECT.
18   Q.   AND AS COMMERCIAL LEAD, YOU WERE RESPONSIBLE FOR SETTING
19   QUALCOMM'S PRICING PRACTICE AND MANAGING THE INCENTIVES AROUND
20   QUALCOMM'S PRICING; CORRECT?
21   A.   YES.
22   Q.   YOU ALSO WORKED ON FINANCIAL OUTLOOKS AND STRATEGIC PLANS?
23   A.   I DID.
24   Q.   AND NOW YOU'RE THE FINANCIAL LEAD FOR QUALCOMM'S MOBILE
25   CHIP DIVISION; CORRECT?
```

WYATT DIRECT BY MS. IKEDA

1      A.   THAT'S CORRECT.

2      Q.   YOU'VE LOOKED AT THE VARIOUS DRIVERS THAT AFFECT

3      QUALCOMM'S PRICING DECISIONS; CORRECT?

4      A.   YES.

5      Q.   AND YOU WOULD AGREE THAT QUALCOMM'S POSITION RELATIVE TO

6      ITS COMPETITORS IS FAR AND AWAY THE LARGEST DRIVER OF ITS

7      PRICING DECISIONS, WOULDN'T YOU?

8      A.   I WOULD NOT.

9      Q.   WOULD YOU TURN YOUR ATTENTION TO YOUR DEPOSITION PAGE 37,

10     IT'S THE FIRST TAB IN YOUR DEPOSITION BINDER, LINES 20 TO PAGE

11     38:1?

12     A.   I'M SORRY, PAGE 37?

13     Q.   PAGE 37, LINE 20 TO 38:1.

14          IT'S A TRUE STATEMENT, SIR, THAT YOU SAID OUR COMPETITIVE

15     POSITION RELATIVE TO OUR COMPETITORS IS -- IS FAR AND AWAY THE

16     LARGEST DRIVER IN TERMS OF OUR PRICING DECISIONS; CORRECT?

17     A.   SO WHAT I READ IS IT SAYS THERE'S ONE OF THESE ON THIS

18     PAGE, SO I NEED TO MAYBE TAKE A LOOK AT WHAT THIS PAGE WAS

19     REFERRING TO.

20     Q.   IS IT A CORRECT STATEMENT THAT YOU STATED AT YOUR

21     DEPOSITION, UNDER OATH, THAT YOUR COMPETITIVE POSITION RELATIVE

22     TO YOUR COMPETITORS IS FAR AND AWAY THE LARGEST DRIVER IN TERMS

23     OF YOUR PRICING DECISIONS?

24     A.   SO THAT'S A CORRECT STATEMENT THAT I SAID THAT.

25     Q.   THANK YOU.

1           QUALCOMM SELLS MODEM CHIPS WITH CDMA CAPABILITY; CORRECT?

2      A.   WE DO.

3      Q.   AND QUALCOMM CHIPS THAT HAVE CDMA HAVE HAD HIGHER

4      PROFITABILITY AND HIGHER PRICE POINTS VERSUS PRODUCTS THAT

5      DON'T HAVE CDMA; CORRECT?

6      A.   WE HAVE.

7      Q.   I'D LIKE YOU TO TURN TO TAB 1 IN YOUR BINDER, THAT'S

8      QX 5800.

9           DO YOU IDENTIFY THIS, SIR, AS AN E-MAIL SENT BY YOU TO

10     SANJAY MEHTA IN AUGUST OF 2015?

11     A.   YES.

12              MS. IKEDA:  MOVE TO ADMIT CX 5800.

13              THE COURT:  ANY OBJECTION?

14              MR. EVEN:  NO OBJECTION, YOUR HONOR.

15              THE COURT:  IT'S ADMITTED.

16       (PLAINTIFF'S EXHIBIT CX 5800 WAS ADMITTED IN EVIDENCE.)

17              THE COURT:  GO AHEAD, PLEASE.

18     BY MS. IKEDA:

19     Q.   IN YOUR E-MAIL TO SANJAY MEHTA, YOU HIGHLIGHT AN EARLIER

20     E-MAIL FROM CRISTIANO AMON; CORRECT?

21     A.   YES.

22     Q.   AND HE WAS PRESIDENT AT THE TIME OF THIS E-MAIL?

23     A.   HE WAS.

24     Q.   AND YOUR EXCERPT FROM MR. AMON'S E-MAIL SAYS, "USUALLY

25     PREMIUM ERODES WHEN ALTERNATIVE SOLUTION DEFINES NEW ASP."

1    CORRECT?

2    A.   YES, IT SAYS THAT.

3    Q.   AND THEN YOU HIGHLIGHTED, "CONTINUES TO BE TRUE FOR CDMA

4    PREMIUM OUTSIDE CHINA, WHERE CDMA PREMIUM IN CHINA IS

5    DISAPPEARING DUE TO THE MTK INTEGRATED SOLUTION."

6         DO YOU SEE THAT?

7    A.   I DO.

8    Q.   AND MTK HERE REFERS TO MEDIATEK; RIGHT?

9    A.   IT DOES.

10   Q.   AND, IN FACT, QUALCOMM WITNESSED LOWER CDMA CHIPSET PRICES

11   FOLLOWING MEDIATEK'S INTRODUCTION OF -- FOLLOWING MEDIATEK

12   INTRODUCTION OF AN INTEGRATED CDMA LTE CHIP?

13   A.   SORRY.  CAN YOU REPEAT THE QUESTION?

14   Q.   QUALCOMM WITNESSED LOWER CDMA CHIPSET PRICES AFTER

15   MEDIATEK'S INTRODUCTION OF AN INTEGRATED CDMA LTE CHIP?

16   A.   WE DID.

17   Q.   YOU'VE BEEN INVOLVED IN DEFINING QUALCOMM'S PRICE POINTS

18   WORKING WITH QCT'S SALES TEAM?

19   A.   I HAVE.

20   Q.   COULD YOU TURN TO TAB 2 OF YOUR BINDER.  SIR, THIS IS AN

21   E-MAIL FROM MARK DRAGICEVICH TO YOU FROM DECEMBER 2014;

22   CORRECT?

23   A.   IT IS.

24   Q.   AND MR. DRAGICEVICH WAS A QUALCOMM EMPLOYEE AT THE TIME?

25   A.   HE WAS.

```
 1              MS. IKEDA:  MOVE TO ADMIT CX 7591.

 2              MR. EVEN:  NO OBJECTION.

 3              THE COURT:  IT'S ADMITTED.

 4         (PLAINTIFF'S EXHIBIT CX 7591 WAS ADMITTED IN EVIDENCE.)

 5              THE COURT:  GO AHEAD, PLEASE.

 6    BY MS. IKEDA:

 7    Q.   MR. DRAGICEVICH ATTACHES A SLIDE TO HIS E-MAIL.

 8         DO YOU SEE THAT?

 9    A.   YES.

10    Q.   AND IN THE LAST LINE OF HIS E-MAIL HE SAYS "THE ATTACHED

11    CONTAINS THIS SLIDE AND THE PRIOR SLIDES PRESENTED TO CA/MR."

12    DO YOU SEE THAT?

13    A.   I DO.

14    Q.   AND C.A. IS CRISTIANO AMON?

15    A.   THAT'S CORRECT.

16    Q.   AND M.R. IS MURTHY RENDUCHINTALA?

17    A.   YES, THAT'S CORRECT.

18    Q.   AND THE ATTACHED SLIDE DECK WAS SOME SORT OF STRATEGY

19    DOCUMENT?

20    A.   THE SUBJECT OF THE TITLE, OF THE E-MAIL IS 8939 8916 AND

21    8909 BUDGET IMPACT ANALYSIS.  SO I THINK WE WERE TAKING A LOOK

22    AT THE IMPACT OF COMPETITION AND THE PRICE MOVE RELATIVE TO THE

23    BUDGET AT THIS POINT IN TIME.

24    Q.   DIRECT YOUR ATTENTION TO PAGE 11 OF CX 7591.

25         THIS IS A SLIDE TITLED BUT THE GET PRICING VERSUS PROPOSED
```

1        PRICING MOVES, WITH A LINE GRAPH.

2            DO YOU SEE THAT?

3        A.   I DO.

4        Q.   AND IN THE TOP RIGHT-HAND CORNER OF THE SLIDE THERE'S A

5        LEGEND INDICATING THAT THE SOLID DARK GREEN LINE REFERS TO

6        QUALCOMM'S BUDGET PRICING.

7            DO YOU SEE THAT?

8        A.   I DO.

9        Q.   AND THE DOTTED YELLOW LINE INDICATES QUALCOMM'S PROPOSED

10       PRICING; CORRECT?

11       A.   YES.

12       Q.   AND THE SOLID GREEN LINE, IF YOU ZOOM OUT, AT THE TOP, IT

13       SHOWS THAT THE BUDGET PRICING FOR QUALCOMM'S 8939 CHIP WAS

14       19.95 IN THE FOURTH QUARTER OF 2014; CORRECT?

15       A.   YES, IN THE PHYSICAL QUARTER.

16       Q.   AND IN THE FIRST QUARTER OF 2015, THE BUDGET PRICING FOR

17       QUALCOMM'S 1839 CHIP WAS 17.21?

18       A.   THAT'S THE BUDGET PRICE, YES.

19       Q.   AND TOWARD THE END OF THE FOURTH QUARTER, IN 2014, THERE'S

20       A RED BOX LABELED MTK 6752, AND THAT REFERS TO THE INTRODUCTION

21       OF MEDIATEK'S 6752 CHIPSET; CORRECT?

22       A.   THAT'S CORRECT.

23       Q.   AND FROM THAT BOX, THERE IS A YELLOW DOTTED LINE SHOWING

24       THAT THE PROPOSED PRICING FOR QUALCOMM'S 8939 CHIP WAS $15 IN

25       THE FIRST QUARTER OF 2015; CORRECT?

1    A.   YES.

2    Q.   SO THIS SHOWS THAT QUALCOMM WAS PROPOSING TO REDUCE THE

3    PRICE OF ITS MSN 8939 CHIP BY $2.21 FOLLOWING MEDIATEK'S

4    INTRODUCTION OF THE 6752 CHIP?

5    A.   THAT'S CORRECT.

6    Q.   ARE YOU FAMILIAR WITH SOMEONE BY THE NAME OF THE

7    PETE ROSEN AT QUALCOMM?

8    A.   YES.

9    Q.   AND HE REPORTED TO YOU IN YOUR ROLE AS COMMERCIAL AND

10   PRICING LEAD; RIGHT?

11   A.   HE DID.

12   Q.   MR. ROSEN SUPPORTED QUALCOMM'S PREMIUM TIER CHIPSET

13   BUSINESS; CORRECT?

14   A.   I BELIEVE THAT WAS ONE OF THE ASPECTS THAT HE SUPPORTED,

15   WHICH IS OUR SNAPDRAGON 800 SERIES.

16   Q.   THE SNAPDRAGON 800 IS AN EXAMPLE OF WHAT YOU'D CALL A

17   PREMIUM TIER CHIPSET?

18   A.   IN TERMS OF QUALCOMM'S CHIPSETS, IT IS.

19   Q.   AND GENERALLY SPEAKING, PREMIUM TIER CHIPSETS CAN BE

20   DEFINED AS THOSE CHIPS THAT WOULD BE USED IN PREMIUM TIER

21   PHONES SOLD AT THE TIME; CORRECT?

22   A.   THAT DEPENDS ON THE SPECIFIC CUSTOMER SITUATION.

23   Q.   BUT IN GENERAL, PREMIUM TIER CHIPSETS ARE DEFINED AS THOSE

24   THAT WOULD BE USED IN PREMIUM TIER PHONES SOLD AT THE TIME;

25   CORRECT?

1    A.    THAT CAN BE THE CASE.

2    Q.    AND THE IDENTITIES OF PARTICULAR CHIPS THAT QUALIFY AS

3    PREMIUM TIER CHIPSETS TYPICALLY CHANGE EVERY YEAR; CORRECT?

4    A.    YES.

5    Q.    PREMIUM TIER CHIPSETS TYPICALLY HAVE A HIGHER PRODUCT COST

6    AND MORE FUNCTIONALITY; CORRECT?

7    A.    THAT'S CORRECT.

8    Q.    CAN YOU TURN TO TAB 3 IN YOUR BINDER.

9          THIS IS AN E-MAIL SENT BY TAYLOR CABANISS TO YOU ENCLOSING

10   A 2016 STRATEGIC PLAN FINANCIAL FORECAST SLIDE DECK IN APRIL

11   2014; CORRECT.

12   A.    YES.

13            MS. IKEDA:  MOVIE TO ADMIT CX 5551.

14            THE COURT:  ANY OBJECTION?

15            MR. EVEN:  NO OBJECTION, YOUR HONOR.

16   BY MS. IKEDA:

17   Q.    DIRECTING YOUR ATTENTION TO PAGE 13 OF CX 5551.

18            THE REPORTER:  IS THAT ADMITTED?

19            THE COURT:  YES, IT'S ADMITTED.

20        (PLAINTIFF'S EXHIBIT CX 5551 WAS ADMITTED IN EVIDENCE.)

21   BY MS. IKEDA:

22   Q.    THIS IS A SLIDE TITLED PROFIT BY TIER.

23        DO YOU SEE THAT?

24   A.    I DO.

25   Q.    SO THIS SLIDE IS SHOWING QCT'S FORECASTED REVENUE AND

1    MARGINS BY TIER; CORRECT?

2    A.    IT IS.

3    Q.    AND SPECIFICALLY, IT'S SHOWING PROJECTED MARGINS FOR

4    FISCAL YEARS 16 AND 17?

5    A.    THIS WAS ONE VIEW OF WHAT THE REVENUE AND MARGIN WOULD

6    LOOK LIKE FROM A BASELINE PERSPECTIVE.

7    Q.    FOR FISCAL YEARS 16 AND 17; CORRECT?

8    A.    CORRECT.  THIS WAS, I DON'T BELIEVE, A FINAL PLAN.  BUT

9    THERE WAS ONE PRELIMINARY VIEW.

10   Q.    AND IS IT FAIR TO SAY THAT THIS SLIDE SHOWS THAT QCT WAS

11   PROJECTING HIGHER MARGINS FOR THE PREMIUM TIER AS COMPARED TO

12   ITS MID AND LOW TIER CHIPSETS; CORRECT?

13   A.    THAT'S CORRECT.

14   Q.    TURN TO PAGE -- SORRY, TAB 4 IN YOUR BINDER.  THIS IS

15   QX 8291.

16        THIS IS AN E-MAIL FROM YOU TO JACOB MAGDALENO AND

17   KATIE ARNER FROM MAY 2016?

18   A.    YES.

19            MS. IKEDA:  MOVE TO ADMIT CX 8291.

20            THE COURT:  ANY OBJECTION?

21            MR. EVEN:  NO OBJECTION.

22            THE COURT:  IT'S ADMITTED.

23        (PLAINTIFF'S EXHIBIT CX 8291 WAS ADMITTED IN EVIDENCE.)

24            THE COURT:  GO AHEAD, PLEASE.

25   BY MS. IKEDA:

WYATT DIRECT BY MS. IKEDA

1    Q.    MR. MAGDALENO AND MS. ARNER REPORTED TO YOU IN MAY OF

2    2016; CORRECT?

3    A.    THEY DID.

4    Q.    AND IN YOUR E-MAIL YOU ATTACH A POWERPOINT PRESENTATION

5    ENTITLED QTL LOWER TIER MDF PROGRAM?

6         DO YOU SEE THAT?

7    A.    I DO.

8    Q.    AND THIS IS A PRESENTATION THAT WAS CREATED BY SOMEONE AT

9    QUALCOMM?

10   A.    YES.

11   Q.    DIRECT YOUR ATTENTION TO PAGE 4 OF CX 8291.  THIS SLIDE IS

12   TITLED STRATEGIC CHALLENGES QUALCOMM FACES IN 4G ARE

13   INTERRELATED.

14        DO YOU SEE THAT?

15   A.    I DO.

16   Q.    AND AT THE TOP RIGHT IT SAYS "SOME CUSTOMERS PERCEIVE QCT

17   CHIPS TO BE MORE EXPENSIVE DUE TO LINKAGE AND LICENSING COSTS."

18        DO YOU SEE THAT?

19   A.    I DO.

20   Q.    QUALCOMM HAS A LICENSE TO CERTAIN PATENTS HELD BY ARM;

21   CORRECT?

22   A.    WE DO.

23   Q.    AND QUALCOMM PAYS A ROYALTY TO ARM?

24   A.    WE DO.

25   Q.    AND QUALCOMM FACTORS THAT ROYALTY INTO THE COST OF

1     PRODUCING ITS CHIPS; CORRECT?

2     A.   WE DO.

3     Q.   IS IT FAIR TO SAY THAT QUALCOMM, QCT, CAPTURED LARGER CHIP

4     SHARE WITH OEM'S THAT COMPLIED WITH THEIR ROYALTY OBLIGATIONS?

5     AS COMPARED TO THOSE WHO DID NOT COMPLY?

6     A.   I WOULD SAY THAT, THAT FOR OEM'S THAT QCT SOLD CHIPS TO,

7     THERE WAS A GREATER VISIBILITY IN TERMS OF WHAT THOSE CHIPS

8     WERE THAT WE WERE SELLING, AND, THUS, IT LED TO HIGHER

9     COMPLIANCE RATES.

10    Q.   THAT'S A DIFFERENT QUESTION.

11         IS IT FAIR TO SAY THAT QCT CAPTURED LARGER SHARE IN

12    GENERAL WITH COMPLIANT OEM'S AS OPPOSED TO NONCOMPLIANT ONES?

13    A.   I THINK IT'S POSSIBLE.  BUT I'D HAVE TO TAKE A LOOK AT --

14    Q.   TAKE A LOOK AT YOUR DEPOSITION, PAGE 95, LINES 14 TO 17.

15    IT'S A TRUE STATEMENT, SIR, YOU WERE ASKED THIS VERY QUESTION

16    IN YOUR DEPOSITION AND YOU SAID, UNDER OATH, YOU SAID "I WOULD

17    AGREE WITH THAT STATEMENT"; CORRECT?

18    A.   YES.

19    Q.   IN 2016, QCT CREATED SEVERAL NEW INCENTIVE DEALS TO TRY TO

20    SOLVE THEIR QTL COMPLIANCE ISSUES; CORRECT?

21    A.   I WOULD HAVE TO LOOK AT THE SPECIFIC PROPOSAL.

22    Q.   YOU RECALL THAT QCT CREATED SOME INCENTIVE DEALS TO SOLVE

23    THEIR COMPLIANCE ISSUES?

24    A.   ONCE AGAIN, I'D HAVE TO LOOK AT THAT PROPOSAL.

25         THIS PARTICULAR PAGE THAT WE WERE JUST ON IS AN EXAMPLE OF

```
1    A PROPOSAL THAT WE HAD WORKED ON --

2    Q.   I'M NOT TALKING ABOUT A SPECIFIC PROPOSAL.  I'M SAYING IN

3    GENERAL, IN 2016, QCT CREATED INCENTIVE DEALS TO TRY TO SOLVE

4    THEIR COMPLIANCE ISSUES AT QTL?

5    A.   I DON'T RECALL SPECIFICALLY.  I'D HAVE TO LOOK AT THE

6    SPECIFIC --

7    Q.   TAKE A LOOK AT YOUR DEPOSITION, PAGE 163.  LINES 16 TO 18.

8         SORRY.  LINES 22 TO 24.

9         IT'S A TRUE STATEMENT, SIR, THAT YOU SAID QTL WAS TRYING

10   TO SOLVE THEIR COMPLIANCE ISSUE AND QTL WAS CREATED NEW

11   INCENTIVES OR DISCOUNTS FOR DIFFERENT CUSTOMERS; CORRECT?

12   A.   YES, I SEE THAT WITH THIS CONTEXT.

13   Q.   AND THESE NEW INCENTIVE DEALS WERE FUNDED BY QTL EVEN

14   THOUGH THEY WERE OFFERED BY QTC; CORRECT?  QCT, SORRY.

15   A.   YES.  THESE SEALS WERE, WERE CREATED BY QTL.

16   Q.   AND QTL MANAGES BETWEEN 10 AND 30 INCENTIVE AGREEMENTS

17   THAT ARE PARTIALLY OR ENTIRELY FUNDED BY QTL; CORRECT?

18   A.   THIS SPECIFIC SET OF DEALS WERE, YES.

19   Q.   AND QCT SOMETIMES WITHHELD RELATES WHEN OEM'S DIDN'T

20   COMPLY WITH ROYALTY OBLIGATIONS; CORRECT?

21   A.   ON OCCASION THAT WOULD HAPPEN, YES.

22   Q.   TURN TO TAB 5 IN YOUR BINDER.  THIS IS CX 5809.  THIS IS

23   AN E-MAIL FROM JEREMY BLAIR TO SANJAY MEHTA COPYING YOU AND

24   SOME OTHER QUALCOMM EMPLOYEES; CORRECT?

25   A.   I DON'T SEE THAT IN MY BINDER.
```

1    Q.   5809?

2    A.   I DON'T SEE THAT.

3    Q.   I CAN GIVE YOU A COPY.

4         MAY I APPROACH?

5              THE COURT:  YES, GO AHEAD, PLEASE.

6    BY MS. IKEDA:

7    Q.   THIS IS AN E-MAIL FROM YOU TO -- EXCUSE ME, FROM

8    JEREMY BLAIR TO SANJAY MEHTA COPYING YOU?

9    A.   YES.

10             MS. IKEDA:  MOVE TO ADMIT CX 5809.

11             THE COURT:  ANY OBJECTION?

12             MR. EVEN:  NO OBJECTION.

13             THE COURT:  IT'S ADMITTED.

14        (PLAINTIFF'S EXHIBIT CX 5809 WAS ADMITTED IN EVIDENCE.)

15             THE COURT:  GO AHEAD, PLEASE.

16   BY MS. IKEDA:

17   Q.   AND MR. BLAIR ATTACHES A POWERPOINT PRESENTATION ENTITLED

18   PRC MEETING NOVEMBER 23RD, 2009.  DO YOU SEE THAT?

19   A.   I DO.

20   Q.   PRC REFERS TO PRYING REVIEW COMMITTEE; CORRECT?

21   A.   CORRECT.

22   Q.   DIRECTING YOUR ATTENTION TO PAGE 41 OF CX 5809, THIS IS

23   ENTITLED STRATEGY RECOMMENDATIONS, FIRST STRATEGY

24   RECOMMENDATIONS AT THE TOP LEFT, MAKE SURE MTK CAN ONLY GO

25   AFTER CUSTOMERS WITH WCDMA SULA.

WYATT DIRECT BY MS. IKEDA

```
1           DO YOU SEE THAT?

2    A.    I DO.

3    Q.    AND FROM THAT RECOMMENDATION THERE'S AN ARROW POINTING TO

4    THE RIGHT TO ANOTHER TEXT BOX THAT SAYS REDUCE NUMBER OF MTK'S

5    3G CUSTOMERS TO AROUND 50; CORRECT?

6    A.    YES.

7    Q.    AND THEN THE NEXT STRATEGY RECOMMENDATION AFTER THAT SAYS

8    FORMULATE AND EXECUTE A GSM/GPRS STRATEGY TO DESTROY MTK'S 2G

9    MARGIN AND PROFIT.

10          DO YOU SEE THAT?

11   A.    I DO.

12   Q.    AND FROM THERE -- THERE'S AN ARROW POINTING TO ANOTHER

13   TEXT BOX THAT SAYS TAKE AWAY THE DOLLAR SIGN, DOLLAR SIGN THAT

14   MTK CAN INVEST IN 3G.

15          DO YOU SEE THAT?

16   A.    YES, I DO.

17   Q.    AND DOLLAR SIGN, DOLLAR SIGN REFERS TO MONEY?

18   A.    YES.

19   Q.    COULD YOU TURN TO TAB 6 IN YOUR BINDER.  THIS IS CX 5767.

20          THIS IS AN E-MAIL FROM YOU TO SANJAY MEHTA AND OTHERS

21   DATED JUNE 19TH, 2015; CORRECT?

22   A.    THAT'S CORRECT.

23              MS. IKEDA:  MOVE TO ADMIT CX 5767.

24              THE COURT:  ANY OBJECTION?

25              MR. EVEN:  NO OBJECTION.
```

441

```
 1            THE COURT:  IT'S ADMITTED.

 2         (PLAINTIFF'S EXHIBIT CX 5767 WAS ADMITTED IN EVIDENCE.)

 3            THE COURT:  GO AHEAD, PLEASE.

 4    BY MS. IKEDA:

 5    Q.   SUBJECT OF YOUR E-MAIL IS "READ THIS MAV, WHAT IF?"

 6         DO YOU SEE THAT?

 7    A.   I DO.

 8    Q.   AND MAV WAS THE CODE NAME FOR APPLE?

 9    A.   YES.

10    Q.   IN THE FIRST LINE OF YOUR E-MAIL, YOU WERE FOLLOWING UP

11    WITH SOME FOLKS TO GET THE LATEST INSIGHT ON AN INTEL IPAD

12    LAUNCH.

13         DO YOU SEE THAT?

14    A.   YES.

15    Q.   AND IN YOUR E-MAIL YOU REFERRED TO A GOOD SUMMARY FROM

16    MAJID.

17         DO YOU SEE THAT?

18    A.   YES.

19    Q.   AND MAJID WAS A QUALCOMM EMPLOYEE?

20    A.   YES.

21    Q.   TURNING TO PAGE 3 OF THE DOCUMENT NEAR THE TOP, SECOND

22    FULL PARAGRAPH, MAJID SAYS, "IT SEEMS REASONABLE THAT MAV WOULD

23    USE AN INTEL BASED IPAD AS A PIPE CLEANER BEFORE LAUNCHING A

24    PHONE WITH THEM.

25         DO YOU SEE THAT?
```

  
1    A.   YES.

2    Q.   AND PIPE CLEANER IN THIS CONTEXT MEANS USING INTEL CHIP IN

3    AN IPAD AS A TEST RUN BEFORE USING IT IN AN IPHONE; CORRECT?

4    A.   YES.

5    Q.   AND RETURNING TO THE FIRST PAGE OF THIS DOCUMENT, THE

6    SECOND BULLET POINT OF YOUR E-MAIL TO MR. MEHTA SAYS, "IF MAV

7    WERE TO LAUNCH IN SEPTEMBER OF 2015, WE WOULD GET BACK 200M IN

8    VIF AND 445 IN MDF FOR A TOTAL OF 645M IN FYQ 415.

9         DO YOU SEE THAT?

10   A.   I DO.

11   Q.   AND YOU WERE REFERRING TO THE CONTRACTUAL TIMING OF WHEN

12   QUALCOMM WOULD OWE APPLE CERTAIN INCENTIVE PAYMENTS; CORRECT?

13   A.   YES.  I WAS REFERRING TO THE FACT THAT IF APPLE LAUNCHED

14   SOMEONE ELSE'S MODEM, THEN THEY WOULD NOT HAVE RECEIVED THAT

15   INCENTIVE.

16   Q.   RIGHT.  AND YOUR POINT WAS THAT BASED ON THAT CONTRACT, IF

17   APPLE WERE TO LAUNCH A COMPETITOR MODEM AT A CERTAIN POINT IN

18   TIME, THEN THEY WOULD NOT BE ELIGIBLE FOR CERTAIN PAYMENTS PER

19   THE CONTRACT; CORRECT?

20   A.   THAT'S CORRECT.

21   Q.   AND IN THE LAST SENTENCE OF THAT SAME BULLET POINT IN YOUR

22   E-MAIL YOU STATE, MAV ALSO WILL KNOW THE MATH WILL -- STRIKE

23   THAT.

24        "MAV ALSO WILL KNOW HOW THE MATH WILL WORK AND LIKELY

25   WON'T LAUNCH UNTIL AFTER FEBRUARY 15TH OF 2016."

```
 1              DO YOU SEE THAT?

 2    A.   I DO.

 3    Q.   AND YOU MADE THAT STATEMENT IN CONNECTION WITH A POTENTIAL

 4    LAUNCH BY APPLE OF AN INTEL IPAD; CORRECT?

 5    A.   YES.

 6    Q.   YOU WOULD AGREE THAT IN THE MODEM CHIP BUSINESS THE LARGER

 7    YOUR REVENUE BASE IS, THE MORE IT ALLOWS YOU -- THE MORE IT

 8    ALLOWS TO YOU MAKE R&D INVESTMENTS TO SUPPORT CUSTOMERS AND

 9    DEVELOP TECHNOLOGY?

10    A.   YES, THAT CAN BE HELPFUL.

11    Q.   AND IN GENERAL, WINNING ONE DESIGN WITH AN OEM CAN IMPROVE

12    THAT CHIP SUPPLIER'S CHANCES OF WINNING BUSINESS WITH THE OEM

13    IN THE FUTURE; CORRECT?

14    A.   IT DEPENDS IF THEY DO A GOOD JOB.

15    Q.   BUT IN GENERAL, THAT'S A TRUE STATEMENT; CORRECT?

16    A.   IF THEY PERFORM, YES.

17    Q.   TURNING TO TAB 7 IN YOUR BINDER.  THIS IS QX 8292.

18         CX 8292 IS AN E-MAIL FROM YOU TO MEG KEDROWSKI CADET AND

19    MATTHEW KROPP IN FEBRUARY OF 2016; CORRECT.

20    A.   YES.

21    Q.   AND MS. KEDROWSKI AND MR. KROPP WERE CONSULTANTS AT BCG AT

22    THE TIME?

23    A.   YES, THEY WERE.

24              MS. IKEDA:  MOVE TO ADMIT CX 8292.

25              THE COURT:  ANY OBJECTION?
```

```
1              MR. EVEN:  NO OBJECTION.

2              THE COURT:  IT'S ADMITTED.

3         (PLAINTIFF'S EXHIBIT CX 8292 WAS ADMITTED IN EVIDENCE.)

4              THE COURT:  GO AHEAD, PLEASE.

5    BY MS. IKEDA:

6    Q.   YOU ATTACHED A SLIDE DECK CALLED FQ 16 STRAT PRICING:

7    KEY THEMES.

8         DO YOU SEE THAT?

9    A.   YES, I DO.

10   Q.   AND YOU WERE INVOLVED IN CREATING THIS PRESENTATION?

11   A.   YES.

12   Q.   AND THIS WAS PUT TOGETHER BY YOU AND PEOPLE UNDER YOUR

13   SUPERVISION?

14   A.   YES, IT WAS.

15   Q.   AND IT WAS SHARED WITH OTHER QUALCOMM EXECUTIVES; CORRECT?

16   A.   IT WAS.

17   Q.   DIRECTING YOUR ATTENTION TO PAGE 3 OF 8292, THE FIRST

18   HEADING UNDER AGENDA SAYS "WINNER TAKE ALL IN THE MOBILE

19   SILICON SPACE."

20        DO YOU SEE THAT?

21   A.   YES.

22   Q.   AND UNDERNEATH THAT, IT SAYS, "IT'S VERY SIMPLE:  IF YOU

23   ARE FIRST," ARROW, "YOU WIN.  IF YOU ARE LATE," ARROW, "YOU

24   LOSE."

25        DO YOU SEE THAT?
```

1       A.   I DO.

2       Q.   AND YOU WOULD AGREE THAT IN THE SEMICONDUCTOR SPACE, BEING

3       EARLY IN TERMS OF NEW TECHNOLOGY IS VERY HELPFUL IN TERMS OF

4       BEING SUCCESSFUL; CORRECT?

5       A.   YES.  YOU NEED TO WIN EACH OF THE SPECIFIC MODEM SOCKET

6       DESIGNS, AND THEY TURN OVER VERY QUICKLY.

7       Q.   DIRECTING YOUR ATTENTION TO PAGE 6 OF CX 8292, THIS IS THE

8       SLIDE TITLED WINNER TAKE ALL, TOTAL APPS PROCESSORS AND

9       BASEBAND MARKET SHARE IN REVENUE.

10           DO YOU SEE THAT?

11      A.   YES.

12      Q.   THIS SLIDE IS SHOWING THAT QUALCOMM STEADILY INCREASED ITS

13      MARKET SHARE FROM 2006 TO 2014; CORRECT?

14      A.   YES.

15      Q.   I'D LIKE TO TURN TO PAGE 24 OF CX 8292.  THIS IS TITLED

16      WINNER TAKE ALL, TOP 5 MARKET SHARE IN REVENUE.

17           DO YOU SEE THAT?

18      A.   I DO.

19      Q.   AND AT THE BOTTOM OF THIS SLIDE, THERE'S AN ARROW WITH TWO

20      TOMBSTONES ON THE END THAT SAY R.I.P.

21           DO YOU SEE THAT?

22      A.   I DO.

23      Q.   R.I.P. STANDS FOR REST IN PEACE?

24      A.   YES.

25      Q.   AND ALONG THAT ROW, IT LISTS FREE SCALE, ST ERICSSON,

WYATT DIRECT BY MS. IKEDA

```
 1        TEXAS INSTRUMENTS, BROADCOM, AND NVIDIA; CORRECT?

 2        A.   YES.

 3        Q.   AND THESE ARE ALL COMPANIES THAT EXITED THE MODEM

 4        BUSINESS?

 5        A.   THEY DID.

 6        Q.   AND ALONG THE LEFT-HAND SIDE OF THE SLIDE, THERE'S A

 7        COLUMN LABELED MARKET RANKING.

 8             DO YOU SEE THAT?

 9        A.   I DO.

10        Q.   AND IT SHOWS THAT THE MARKET SHARE RANKING OF VARIOUS

11        COMPANIES, INCLUDING QUALCOMM, WHAT THEY ARE FROM 2006 TO 2014;

12        CORRECT?

13        A.   YES.

14        Q.   AND THIS CHART SHOWS THAT QUALCOMM HELD THE NUMBER 2

15        POSITION IN 2006 AND 2007; CORRECT?

16        A.   YES.

17        Q.   AND THEN QUALCOMM MOVED UP TO THE NUMBER 1 POSITION IN

18        2008; RIGHT?

19        A.   YES.

20        Q.   AND QUALCOMM MAINTAIN THAT HAD NUMBER 1 POSITION FROM 2008

21        TO 2014; CORRECT?

22        A.   YES.

23        Q.   AND IN THAT SAME TIME PERIOD, AT LEAST FIVE OTHER MODEM

24        CHIP SUPPLIERS FELL INTO THE REST IN PEACE SLOT; CORRECT?

25        A.   YES.  IT'S A VERY COMPETITIVE MARKET.
```

1          MS. IKEDA:  NO FURTHER QUESTIONS.  THANK YOU.

2          THE COURT:  ALL RIGHT.  IT'S 10:39.  LET'S GO AHEAD

3    AND GO TO 10:45, AND THEN WE'LL TAKE A 15 MINUTE BREAK AT THAT

4    TIME.

5          (PAUSE IN PROCEEDINGS.)

6          MR. EVEN:  GOOD MORNING, YOUR HONOR.

7          THE COURT:  ARE YOU READY?

8          MR. EVEN:  YONATAN EVEN FOR QUALCOMM.

9          THE COURT:  OKAY.  10:40.

10   GO AHEAD, PLEASE.

11                        **CROSS-EXAMINATION**

12   BY MR. EVEN:

13   Q.   GOOD MORNING, MR. WYATT.

14   A.   GOOD MORNING.

15   Q.   I'D LIKE YOU TO TURN BACK TO CX 5767, WHICH I BELIEVE IS

16   TAB 6.

17        DO YOU REMEMBER YOU WERE ASKED SOME QUESTIONS ABOUT THIS?

18   A.   YES.

19   Q.   THE DISCUSSION HERE IN YOUR COMMENT SPEAKS TO WHETHER

20   APPLE IS MORE LIKELY TO LAUNCH WITH INTEL IN OCTOBER, NOVEMBER,

21   DECEMBER OF 2015 VERSUS FEBRUARY OF 2016; IS THAT RIGHT?

22   A.   YES.

23   Q.   DOES QCT BUCKETIZE ITS CHIPS INTO TIERS?

24   A.   WE DO.

25   Q.   AND WHAT DOES QCT REFER TO AS A PREMIUM CHIP?

1    A.   WE REFER TO OUR PREMIUM TIER CHIP AS OUR SNAPDRAGON 800.

2    Q.   AND DO YOU BUCKETIZE YOUR OTHER SERIES OF SNAPDRAGON INTO

3    TIERS?

4    A.   YES, WE DO.

5    Q.   AND WHAT TIERS ARE THOSE?

6    A.   SO OUR OTHER TIERS OF PARTS ARE THE SNAPDRAGON 600, THE

7    SNAPDRAGON 400, THE SNAPDRAGON 200, AND THEN WE ALSO HAVE MDM

8    SERIES FOR THIN MODEMS.

9    Q.   AND DO YOU GIVE NAMES TO THESE TIERS FOR THESE OTHER

10   SERIES OF SNAPDRAGON?

11   A.   YES.

12   Q.   AND WHAT ARE THOSE?

13   A.   SO FOR THE SNAPDRAGON 600, THAT'S OUR HIGH SERIES.  FOR

14   OUR SNAPDRAGON 400, IT'S OUR MID SERIES.

15        AND FOR OUR SNAPDRAGON 200, IT'S OUR LOW SERIES.

16   Q.   AND WHAT IS THE DIFFERENCE BETWEEN A PREMIUM 800

17   SNAPDRAGON AND A HIGH 600 SNAPDRAGON?

18   A.   SO OUR SNAPDRAGON 800 SERIES CHIPS HAS OUR LATEST AND

19   GREATEST TECHNOLOGIES.  AND OUR TOP TECH PRODUCTS IN EACH OF

20   THE TIERS RELATIVE TO THE SNAPDRAGON 600 TIER.

21   Q.   SO THE 600 DOES NOT FEATURE QCT'S LATEST AND GREATEST

22   TECHNOLOGY IN A GIVEN YEAR?

23   A.   NO, IT DOES NOT.

24   Q.   WHEN ASSESSING THE COMPETITIVE LANDSCAPE, DO YOU TRY TO

25   BUCKETIZE COMPETITOR'S CHIPS INTO TIERS TO SEE WHERE THEY

WYATT CROSS BY MR. EVEN

1     COMPETE WITH YOU?

2     A.    YES, WE DO.

3     Q.    AND WHAT ARE THE PRIMARY FACTORS THAT YOU CONSIDER WHEN

4     COMPARING COMPETITORS' CHIPS WITH QCT'S?

5     A.    SO WE TAKE A LOOK AT THE COMPETITOR'S FEATURE SETS S AND

6     BASED ON THE COMPETITION'S FEATURE SETS, WE ALIGN THOSE FEATURE

7     SETS RELATIVE TO THE SNAPDRAGON LINEUP.

8     Q.    AND WHEN YOU DO THAT, DO THE COMPETING CHIPSETS HAVE TO

9     HAVE THE SAME EXACT SPECIFICATION TO COMPETE WITH BOTH?

10    A.    NO, THEY DO NOT.

11    Q.    WHY NOT?

12    A.    CUSTOMERS WILL TAKE A LOOK AT THE RELATIVE VALUE OF A

13    COMPETITOR SOLUTION AND WHAT THEIR DIFFERENT FEATURE SETS ARE

14    IN TERMS OF THE DIFFERENT TECHNOLOGIES.  MOST OFTEN THAN NOT,

15    OR ALMOST ALWAYS, THEY'RE NOT IDENTICAL.

16          AND SO CUSTOMERS ARE TAKING A LOOK AT THE OVERALL VALUE OF

17    THE QUALCOMM SOLUTION AND WHAT TECHNOLOGY AND THE CAPABILITIES

18    WE OFFER RELATIVE TO THE PRICE AND THE VALUE AND THE

19    TECHNOLOGIES THAT THE COMPETITIVE SOLUTION OFFERS IN EACH GIVEN

20    TIER.

21    Q.    I'D LIKE TO SHOW YOU A SLIDE AND A DOCUMENT MARKED

22    QX 9312.

23          WHAT IS THIS DOCUMENT?

24    A.    THIS WAS A COMPETITIVE ANALYSIS DONE IN Q3 OF 2015.

25    Q.    AND -- CAN WE GIVE A COPY TO --

```
1              THE COURT:  IS THAT ADMITTED?

2              MR. EVEN:  THAT HAS NOT YET BEEN ADMITTED, YOUR

3    HONOR.

4         CAN WE GET A COPY.

5              THE COURT:  OKAY.  LET'S ADMIT IT BEFORE WE PUBLISH

6    IT.

7         BUT THAT'S FINE.  YOU SAID 9312.

8              MR. EVEN:  IF WE CAN GIVE A COPY TO THE COURT,

9    PLEASE.

10             THE COURT:  IT'S NOT IN YOUR WITNESS BINDER?

11             MR. EVEN:  IT IS NOT.

12             THE COURT:  OKAY.

13             MR. HUYNH:  MAY MR. HUYNH APPROACH?

14             THE COURT:  YES, PLEASE.

15        WHY DON'T YOU GIVE A COPY TO THE FTC IF THEY DON'T HAVE

16   ONE.

17             MR. HUYNH:  ANDREW HUYNH.  THEY SHOULD.

18             THE COURT:  GIVE A COPY TO THE FTC.

19        THANK YOU.  IS THERE A REASON WHY THIS WASN'T IN YOUR

20   WITNESS BINDER?

21             MR. EVEN:  I APOLOGIZE, YOUR HONOR.  THIS WAS ONE OF

22   THE DOCUMENTS ACTUALLY THAT THE QCT SAID THEY MIGHT USE, AND I

23   DIDN'T REALIZE THEY WERE NOT GOING TO USE IT.  I SHOULD HAVE

24   PROBABLY PUT IT IN YOUR BINDER AND DIDN'T.

25             THE COURT:  DOES THE WITNESS HAVE A COPY?
```

```
1              DO YOU HAVE A COPY OF THIS?

2                   THE WITNESS:  I DO NOT.

3                   MR. EVEN:  DOES THE WITNESS HAVE A COPY?

4                   THE COURT:  AND THEN ONE FOR FTC, TOO, PLEASE.  THANK

5       YOU.  I DON'T KNOW.

6              DO YOU HAVE ONE NOW?

7                   MR. CARSON:  WE DO NOT.

8                   MR. EVEN:  I'LL JUST MOVE ON.

9       Q.   HOW OFTEN DO YOU CONDUCT COMPETITIVE COMPARISONS BETWEEN

10      CHIPSETS, YOUR CHIPSETS AND COMPETITORS?

11      A.   EVERY DAY.

12      Q.   NOW, IN QUALCOMM'S STRATEGIC PLANS DO YOU ALSO SOMETIMES

13      LOOK AT HANDSET DEALS?

14      A.   WE DO.

15      Q.   AND DO PREMIUM HANDSET ALWAYS USE PREMIUM TIER CHIPS AND

16      VICE-VERSA?

17      A.   THEY DO NOT.

18      Q.   CAN YOU PROVIDE AN EXAMPLE IN WHICH A CHIP THAT QCT WOULD

19      CALL PREMIUM, THE SNAPDRAGON 800, WOULD BE IN A DEVICE THAT IS

20      SELLING FOR -- AT A PRICE RANGE THAT IS IN A KNOWN PREMIUM

21      HANDSET PRICE RANGE?

22      A.   YES.  SO AS AN EXAMPLE ONE OF OUR LARGEST CUSTOMERS IS

23      CALLED XIAOMI.  X-I-A-O-M-I.

24             AND SO XIAOMI, THEY USE OUR -- THEY'RE ACTUALLY OUR NUMBER

25      TWO SNAPDRAGON 800 TIER CUSTOMER, AND XIAOMI USES OUR
```

1    SNAPDRAGON 800 TIER CHIP IN A DEVICE THAT THEY'LL PRICE AS LOW

2    AS 2,000 RMB, SO THAT'S ROUGHLY $300 U.S., AND THEY'RE OUR

3    NUMBER 2 SNAPDRAGON 800 TIER CUSTOMER.

4    Q.   AND HOW ABOUT THE REVERSE?  CAN YOU GIVE AN EXAMPLE OF A

5    600 GRADE CHIP IN HANDSETS SELLING FOR ABOVE $400?

6    A.   YES.  SO TWO OF OUR OTHER LARGEST CUSTOMERS IN CHINA, ONE

7    IS CALLED OPPO, O-P-P-O, AND THE OTHER IS CALLED VIVO, V-I-V-O,

8    AND SO THOSE TWO CUSTOMERS ARE VERY LARGE CUSTOMERS.  THEY SELL

9    OVER A HUNDRED MILLION HANDSETS PER YEAR, AND THEY WILL USE OUR

10   SNAPDRAGON 600 SERIES, AND THEY WILL SELL THAT IN A DEVICE THAT

11   IS OVER 3,000 RMB.  3,000 RMB AND 37 RMB.  SO IT'S IN THE

12   NEIGHBORHOOD OF 4- TO 500 U.S. DOLLARS.

13   Q.   THANK YOU.

14        IF YOU CAN TURN TO THE BINDER THAT YOU GOT FROM US, THE

15   SMALL BINDER, AND TURN TO TAB MARKED DEMONSTRATIVE.

16        DOES THE WITNESS HAVE A BINDER?

17             THE COURT:  IT'S 10:48.  I APOLOGIZE FOR

18   INTERRUPTING.  LET'S GO AHEAD AND TAKE OUR BREAK NOW.

19             MR. EVEN:  YES.  THANK YOU, YOUR HONOR.

20             THE COURT:  WE'LL TAKE A BREAK UNTIL 11:00 O'CLOCK.

21   SO THANK YOU FOR YOUR PATIENCE, AND WE'LL SEE YOU BACK.

22        WE'RE IN RECESS THANK YOU.

23        (RECESS FROM 10:49 A.M. UNTIL 11:02 A.M.)

24             THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

25        IT'S NOW 11:02.

1          GO AHEAD, PLEASE.

2              MR. EVEN:  THANK YOU, YOUR HONOR.

3     Q.   MR. WYATT, IF YOU CAN TURN TO THE TAB IN YOUR BINDER

4     SHOWING THE DEMONSTRATIVES.

5          CAN YOU FIND THAT?

6     A.   YES.

7     Q.   IN QX 9343, IT SHOWS A LIST OF CHIPS THAT THE FTC

8     IDENTIFIED AS PREMIUM LTE CHIPS.

9          ARE ALL OF THE CHIPS ON THIS LIST SNAPDRAGON 800 PREMIUM

10    TIER CHIPS?

11    A.   THEY ARE NOT.

12    Q.   LET'S GO OVER A FEW OF THOSE.

13         TURN TO MSM 8976.

14         WHAT IS THIS CHIP?

15    A.   MSM 8976 IS A SNAPDRAGON 600 SERIES CHIP.

16    Q.   AND SO THAT'S NOT A PREMIUM CHIP?

17    A.   NO, IT'S NOT.

18    Q.   AND IT WOULDN'T HAVE THE LATEST AND GREATEST TECHNOLOGY AS

19    OF THE YEAR IT CAME OUT?

20    A.   NO, IT WOULD NOT.

21    Q.   ANY OTHER CHIPS --

22             MS. IKEDA:  OBJECTION, YOUR HONOR.  LEADING.

23             THE COURT:  SUSTAINED.  THAT'S STRICKEN.

24    BY MR. EVEN:

25    Q.   ANY OTHER CHIPS ON THE LIST THAT ARE HIGH TIER SNAPDRAGON

1        600 CHIPS?

2        A.   YES.   SNAPDRAGON -- OR EXCUSE ME.   MSM 8956, MSM 8953, MSM

3        8952, MSM 8939, AND MSM 8930.

4             SO THE SECOND CHIP DOWN TO THE SIXTH CHIP.

5        Q.   OKAY.   HOW MANY OF THOSE CHIPS THAT YOU JUST LISTED WOULD

6        HAVE HAD THE LATEST AND GREATEST TECHNOLOGY WHEN THEY CAME OUT?

7        A.   SO NONE OF THOSE CHIPS WOULD HAVE HAD OUR LATEST AND

8        GREATEST TECHNOLOGY.   THEY'RE NOT OUR SNAPDRAGON 800 SERIES

9        CHIPS.

10       Q.   TURNING TO THE MSM 8916, WHAT IS THAT CHIP?

11       A.   SO THAT IS OUR SNAPDRAGON 400 SERIES CHIP.   IT'S SOLD IN

12       THE MID-TIER.

13       Q.   BASED ON YOUR EXPERIENCE AT THE -- AT QUALCOMM, DO YOU

14       HAVE AN EXPLANATION HOW COME ALL THESE NON-PREMIUM CHIPS WERE

15       SOLD IN PHONES SELLING FOR MORE THAN $400?

16       A.   SO AS WE DISCUSSED BEFORE, CERTAIN OEM'S HAVE THE ABILITY

17       TO SELL IN THIS CASE EVEN A SNAPDRAGON MID-TIER, OUR 400 SERIES

18       CHIP, FROM TIME TO TIME IN A DEVICE THAT'S OVER $400 IN THE

19       CASE OF THAT MID-TIER.

20            AS WE TALKED ABOUT, THERE'S OTHER CASES WHERE OUR

21       SNAPDRAGON 600 SERIES CAN BE SOLD FOR OVER 600 U.S. DOLLARS IN

22       A SIGNIFICANT NUMBER OF CASES.

23       Q.   OKAY.   DOES QUALCOMM FACE COMPETITION IN THE SALE OF ITS

24       SNAPDRAGON 800 AND 600 CHIPSETS?

25       A.   WE DO.

1    Q.    DOES QUALCOMM FACE COMPETITION IN THE SALE OF CDMA CHIPS?

2    A.    WE DO.

3    Q.    AND HOW HAS THAT COMPETITION EVOLVED OVER TIME?

4    A.    OVER TIME THE COMPETITION AND THE COMPETITORS, IT'S BEEN

5    MUCH MORE AGGRESSIVE, AND THEY'VE BECOME MUCH MORE COMPETITIVE.

6    Q.    SO IF YOU TURN TO THE TAB MARKED EXHIBITS IN YOUR BINDER,

7    TURN TO QX 9250.  YOU'LL SEE THIS IS AN E-MAIL WITH AN

8    ATTACHMENT CALLED PRICING.

9    A.    YES.

10   Q.    WHAT IS THIS ATTACHMENT?

11   A.    SO THIS WAS AN ANALYSIS, OR A SUMMARY THAT WAS BEING PUT

12   TOGETHER FOR BOARD OF DIREC PRICING SUMMARY.  BOARD OF

13   DIRECTORS.

14   Q.    AND WHO WOULD HAVE PREPARED THIS?

15   A.    THIS WOULD HAVE BEEN PREPARED BY MY TEAM.

16         MR. EVEN:  YOUR HONOR, I'D LIKE TO MOVE QX 9250 INTO

17   EVIDENCE.

18         THE COURT:  ANY OBJECTION?

19         MS. IKEDA:  NO OBJECTION.

20         THE COURT:  IT'S ADMITTED.

21   (DEFENDANT'S EXHIBIT QX 9250 WAS ADMITTED IN EVIDENCE.)

22         THE COURT:  GO AHEAD, PLEASE.

23   BY MR. EVEN:

24   Q.    CAN YOU TURN TO THE PAGE ENDING IN BATES NUMBER 008.

25   A.    OKAY.

1    Q.    WHAT'S DEPICTED ON THIS SLIDE?

2    A.    SO WHAT THIS SLIDE IS TAKING A LOOK AT IS ON THE LEFT-HAND

3    SIDE QUALCOMM AND OUR DIFFERENT CHIPSETS THAT WE HAVE.  SO ON

4    THE VERY TOP IT'S OUR MSM 8960, WHICH IS OUR SNAPDRAGON 800

5    EQUIVALENT, ALL THE WAY DOWN TO OUR SNAPDRAGON 200 EQUIVALENT

6    ON THE BOTTOM LEFT, WHICH IS OUR SNAPDRAGON QSC 6240 AND 6270.

7         AND WE'RE TAKING A LOOK AT EACH OF THE DIFFERENT

8    COMPETITORS THAT WE FACE FOR EACH OF THOSE DIFFERENT TIERS OF

9    CHIPS.

10   Q.    AND BASED ON THE E-MAIL AT THE BEGINNING OF THIS DOCUMENT,

11   THIS IS A PICTURE OF THE COMPETITIVE LANDSCAPE AT WHAT TIME?

12   A.    SO THIS WAS AROUND THE 2010/2011 TIMEFRAME.

13   Q.    AND WHY DID YOU USE TANKS IN THIS PICTURE?

14   A.    SO TANKS, THEY WERE JUST A COLORFUL REPRESENTATION OF THE

15   LEVEL OF COMPETITIVENESS THAT WE FACED IN EACH OF THESE

16   DIFFERENT TIERS.

17   Q.    CAN YOU TURN TO THE NEXT PAGE.  IT'S MARKED CDMA

18   BATTLEFIELD.

19        WHAT DOES THIS SLIDE DEPICT?

20   A.    SO THIS IS A SIMILAR TYPE SLIDE TAKING A LOOK AT OUR CDMA

21   COMPETITION THAT WE HAD IN EACH OF THE DIFFERENT TIERS.  AT THE

22   TOP ONCE AGAIN IT'S OUR SNAPDRAGON 800 SERIES, ALL THE WAY DOWN

23   TO THE BOTTOM LEFT OF THE SLIDE, WHICH IS OUR SNAPDRAGON

24   EQUIVALENT 200 SERIES ON THE CDMA SLIDE.

25        AND WE WERE TAKING A LOOK AT THE COMPETITORS THAT WE GAVE

WYATT CROSS BY MR. EVEN

```
 1        ON THE RIGHT-HAND SIDE.
 2        Q.   AND SO AT THE TOP TIERS, YOU SEE VIA, TOGETHER WITH
 3        SAMSUNG OR TI.
 4             WHAT DOES THAT MEAN?
 5        A.   SO WHAT -- WHAT OUR OEM'S WERE LOOKING TO DO WAS TAKE AN
 6        AP, SO TEXAS INSTRUMENTS AP OR A SAMSUNG AP, AND THEN THEY
 7        WOULD COMBINE THAT WITH A VIA MODEM.  SO WE WOULD FACE THAT
 8        COMBINATION -- OR WE ALSO HAVE FUSION TYPE PARTS IN A SIMILAR
 9        WAY.
10             SO WE WOULD FACE THAT FUSION TYPE SOLUTION FROM OUR
11        COMPETITORS.
12        Q.   AND WERE THERE OEM'S THAT USED FUSION TYPE, AS YOU CALLED
13        IT, SOLUTION IN THEIR DEVICES FROM VIA?
14        A.   YES.
15        Q.   CAN YOU GIVE AN EXAMPLE OF ONE?
16        A.   ONE THAT I REMEMBER IS HUAWEI ON THE HIGH END USING BOTH
17        VIA PLUS TEXAS INSTRUMENTS.
18        Q.   AND DID VIA APPLY PRICING PRESSURE TO QUALCOMM?
19        A.   THEY DID.
20        Q.   WERE OEM'S ABLE -- YOU CAN PUT THIS DOWN.
21             WERE OEM'S ABLE TO LEVERAGE THEIR DEMAND FOR WCDMA CHIPS
22        TO OBTAIN BETTER PRICING FOR CDMA CHIPS?
23        A.   YES.  OEM'S WOULD PUT PRESSURE ON QCT BY STATING THAT THEY
24        WOULD NOT PURCHASE OUR WCDMA CHIPS UNLESS WE LOWERED OUR CDMA
25        CHIP PRICE.
```

1    Q.   MOVING FORWARD FROM 2010 TO MORE RECENT TIMES.  OVER THE

2    PAST TWO, THREE YEARS UP TO EARLY 2018, WHAT COMPANIES HAVE

3    BEEN QCT'S MAIN COMPETITORS IN LTE?

4    A.   SO IN LTE OUR MAIN COMPETITORS HAVE BEEN MEDIATEK; EXYNOS,

5    SO THAT'S SAMSUNG EXYNOS, E-X-Y-N-O-S; HISILICON FROM HUAWEI;

6    INTEL; AND SPREADTRUM.

7    Q.   AND WHICH OF THESE COMPETITORS OFFER CDMA CAPABLE CHIPS?

8    A.   ALL OF THOSE COMPETITORS OFFER CDMA CAPABLE CHIPS.

9    Q.   SO LET'S BREAK THAT DOWN BY CUSTOMER GROUPS.

10        AS OF EARLY 2018, WHO WERE THE THREE LARGEST SMARTPHONE

11   MAKERS?

12   A.   SO THE LARGEST SMARTPHONE MAKERS IN THE WORLD ARE APPLE,

13   SAMSUNG, AND HUAWEI.

14   Q.   AND OF THE PREMIUM HANDSET TIER, WHAT PORTION DID THESE

15   THREE OEM'S REPRESENT?

16   A.   SO BETWEEN THE THREE OF THEM, THEY REPRESENT OVER 90

17   PERCENT OF THE PREMIUM TIER HANDSET TIER.

18   Q.   AND WHAT HAS BEEN THE GENERAL TREND OF QCT'S COMPETITIVE

19   POSITION IN THESE THREE LARGE OEM'S?

20   A.   QCT HAS BEEN IN SIGNIFICANT DECLINE AT THOSE OEM'S.

21   Q.   LET'S WORK DOWN THAT LIST.

22        FIRST WE'LL START WITH SAMSUNG.  WHAT'S BEEN THE TREND OF

23   QCT'S SHARE AT SAMSUNG FOR PREMIUM HANDSETS?

24   A.   SO OUR TREND HAS BEEN DOWN.  OVER THE LAST FEW YEARS OUR

25   SHARE AT SAMSUNG IN TERMS OF THEIR PREMIUM TIER CHIPSETS HAS

1    BEEN 35 PERCENT.

2    Q.   AND WHAT'S THE COMPETITION THAT QCT FACES, OR FACED, AT

3    SAMSUNG FOR PREMIUM HANDSETS?

4    A.   SO WE FACED VERY HEAVY COMPETITION FROM THE SAMSUNG EXYNOS

5    CHIPSET SOLUTION.

6    Q.   AND WHAT PORTION OF QCT'S SNAPDRAGON 800 SALES GO TO

7    SAMSUNG?

8    A.   SO QUALCOMM'S CHIPS, ROUGHLY HALF, A LITTLE LESS THAN HALF

9    OF OUR SNAPDRAGON 800 TIER CHIPS TO SAMSUNG.

10   Q.   TURNING TO HUAWEI, WHAT'S BEEN THE TREND OF QCT'S SHARE AT

11   HUAWEI FOR PREMIUM DEVICES?

12   A.   SO AT HUAWEI, OUR TREND HAS BEEN SIGNIFICANTLY DOWN.

13   HUAWEI HAS INTRODUCED THEIR OWN HISILICON CHIPSET SOLUTION.

14   AND SO ONCE HUAWEI INTRODUCED THEIR OWN HISILICON SOLUTION

15   CHIPSET SOLUTION, IT'S TAKEN OUR, OUR SHARE AT HUAWEI DOWN TO

16   ZERO.

17   Q.   SO WHEN IS THE LAST TIME QUALCOMM SOLD A SNAPDRAGON 800

18   CHIP TO HUAWEI?

19   A.   IT WAS A NUMBER OF YEARS AGO.  I WANT TO SAY IT WAS OVER

20   FOUR YEARS AGO.

21   Q.   WHAT HAS BEEN QCT'S SHARE TREND AT APPLE?

22   A.   AT APPLE, OUR SHARE TREND HAS ALSO BEEN DOWN.  STARTING IN

23   2016, APPLE INTRODUCED THEIR 2016 DESIGN WITH BOTH QUALCOMM AND

24   INTEL.

25        IN 2017, THEY INTRODUCED WITH BOTH QUALCOMM AND INTEL.

1           AND THEN IT'S GONE DOWN FURTHER FROM THERE.

2    Q.   AND AS OF EARLY 2018, WHAT WAS YOUR FORECAST FOR YOUR

3    SHARE AT APPLE?

4    A.   SO OUR FORECAST OF OUR SHARE OF APPLE IN 2018, WE HAD A

5    COUPLE DIFFERENT SCENARIOS.  BUT AT THAT POINT IN TIME, OUR

6    EXPECTATION WAS THAT WE WERE NOT WIN A SHARE AT APPLE.  SO IT

7    WOULD BE ZERO FOR THE UPCOMING DESIGN.

8    Q.   TURNING TO SMALLER COMPETITORS, YOU MENTIONED XIAOMI,

9    OPPO, AND VIVO.

10          WHAT COMPETITION DOES QUALCOMM FACE AT THOSE OEM'S.

11   A.   SO WE FACE VERY HEAVY COMPETITION FROM BOTH MEDIATEK, AND

12   WE ALSO FACE COMPETITION FROM EXYNOS.

13   Q.   THERE WAS SOME TESTIMONY IN THIS CASE ABOUT SOMETHING

14   CALLED TD-SCDMA 3 MODE CHIPS?  WHAT IS TD-SCDMA?

15   A.   TD-SCDMA IS THE CHINESE STANDARD, PRIMARILY USED BY THE

16   CHINESE CARRIER, CHINA MOBILE.

17   Q.   AND WHO ARE THE BIGGEST SELLERS OF CHIPS FOR TD-SCDMA?

18   A.   THE BIG DECEMBER SELLERS OF CHIPS WOULD BE MEDIATEK AND

19   SPREADTRUM.

20   Q.   AND WHAT WAS QCT'S SHARE OF TD-SCDMA?

21   A.   IT WAS VERY SMALL.  I WANT TO SAY IT WAS LESS THAN

22   5 PERCENT.

23   Q.   YOU WERE ASKED SOME QUESTIONS ABOUT QUALCOMM PRICING.

24   DOES QUALCOMM HAVE A BODY OR COMMITTEE THAT DEALS WITH PRICING?

25   A.   WE DO.

WYATT CROSS BY MR. EVEN

```
1      Q.   WHAT'S THE NAME OF IT?

2      A.   IT'S CALLED OUR PRC, OR PRICE REVIEW COMMITTEE.

3      Q.   AND WHO'S IN CHARGE OF THE PRC?

4      A.   I LEAD THE PRC.

5      Q.   WHAT PRICING DOES THE PRC SET?

6      A.   SO WE WILL SET OUR INITIAL PRICE INDICATIONS FOR A NEW

7      CHIPSET THAT'S COMING OUT, AND WE ALSO SET PRICING FOR PRICE

8      REQUESTS THAT COME FROM OUR SALES TEAM FOR LOWER PRICING AT

9      THEIR CUSTOMERS.

10     Q.   WHEN YOU GET SUCH REQUESTS FOR LOWER PRICING, ARE THOSE --

11     AND THE PRC DISCUSSES THOSE, DOES THE PRC LOWER THE PRICE

12     ACROSS THE BOARD OR DOES IT LOWER IT TO A SPECIFIC CUSTOMER?

13     A.   IT'S TYPICALLY DONE AT A PARTICULAR CUSTOMER.  ON OCCASION

14     WE MAY SEE THE SAME TYPE OF REQUEST COMING IN FROM MANY

15     CUSTOMERS, AND IN THAT CASE WE MAY LOWER IT ACROSS THE BOARD.

16     BUT IT'S TYPICALLY ON A CUSTOMER-BY-CUSTOMER BASIS.

17     Q.   WHY DOES QUALCOMM NEED TO MOVE ITS PRICE DOWNWARD?  WHY

18     CAN'T QUALCOMM JUST SELL AT THE INDICATED PRICE?

19     A.   SO IF WE KEPT OUR PRICE AT OUR ORIGINAL PRICE INDICATION,

20     WHAT WOULD HAPPEN IS OUR COMPETITORS WOULD COME IN AT A LOWER

21     PRICE THAN US AND THEY WOULD WIN ALL OF THE DESIGN SOCKETS AND

22     ALL OF THE SHARE.  SO WE WOULD HAVE VIRTUALLY NO SHARE IF WE

23     DIDN'T REACT TO THE COMPETITIVE MARKET THAT WE FACE.

24     Q.   FAIR TO SAY THAT QUALCOMM'S PRICE INDICATIONS ARE

25     TYPICALLY HIGHER THAN COMPETITOR'S PRICING?
```

WYATT CROSS BY MR. EVEN

```
1      A.    THEY TYPICALLY ARE, YES.

2      Q.    DO LICENSING PASS THROUGH RIGHTS AFFECT THE PRICE OF

3   CHIPS?

4      A.    NO.

5      Q.    ARE THEY TYPICALLY DISCUSSED AT THE PRC?

6      A.    NO, THEY'RE NOT.

7      Q.    DO ROYALTIES AFFECT CHIP PRICING?

8      A.    NO.

9      Q.    SO, FOR EXAMPLE, YOU HAVE TWO OEM'S, ONE IS PAYING

10  5 PERCENT, ONE IS PAYING 3 PERCENT ROYALTY.  HOW WOULD THAT

11  AFFECT THE PRICING OF CHIPS FOR THEM?

12     A.    IT DOESN'T COME INTO PLAY, OR IT'S NOT SOMETHING THAT WE

13  LOOK AT OR WE FACTOR IN WHEN WE'RE MAKING ANY PRICING

14  DECISIONS.

15     Q.    DOES QTL HAVE A REPRESENTATIVE ATTENDING PRC DISCUSSIONS?

16     A.    THEY DO NOT.

17     Q.    SO IF QTL WERE GONE TOMORROW, IF IT WAS SHUT DOWN, SPUN

18  OFF, ANYTHING LIKE THAT, HOW WOULD THAT AFFECT YOUR FUNCTIONING

19  AT THE PRC?

20     A.    IT WOULDN'T IMPACT OUR PRC PROCESS OR IMPACT THE OUTCOMES.

21     Q.    HOW MANY TIMES A YEAR DOES QCT QUOTE CHIP PRICING FOR EACH

22  CUSTOMER?

23     A.    WE HAVE THOUSANDS OF QUOTES THAT GO OUT OVER THE COURSE OF

24  A YEAR.

25     Q.    ARE YOU INVOLVED IN LICENSING NEGOTIATIONS?
```

1    A.   I'M NOT.

2    Q.   WHO DO YOU TYPICALLY DEAL WITH AT OEM'S?

3    A.   SO WE TYPICALLY DEAL WITH THE PROCUREMENT LEAD OR THE

4    PRODUCT LEADS AT OEM'S.

5    Q.   DO YOU EVER DEAL WITH A CUSTOMER'S I.P. DEPARTMENT?

6    A.   I DO NOT.

7    Q.   QCT HAS ITS OWN R&D DEPARTMENT THAT DEVELOPS ITS PRODUCTS;

8    CORRECT?

9    A.   WE DO.

10   Q.   FOR QCT CHIPS RELEASED UP TO MARCH 2018, HOW DID QCT FUND

11   ITS R&D?

12   A.   SO WE FUND OUR R&D THROUGH OUR GROSS MARGIN AND THE

13   PROFITS WITHIN QCT.

14   Q.   AND HOW MUCH DID QTL CONTRIBUTE TO THE R&D THAT WENT INTO

15   DEVELOPING THESE CHIPS?

16   A.   THEY DID NOT CONTRIBUTE.

17   Q.   I'D LIKE YOU TO GO BACK TO QX 5809 IN THE FTC'S BINDER.

18   A.   OKAY.

19   Q.   THAT'S 041.

20        DO YOU REMEMBER THAT SLIDE?

21   A.   I DO.

22   Q.   AND YOU WERE ASKED SOME QUESTIONS ABOUT THE FIRST BULLET.

23   WHAT IS THE ISSUE THAT THIS BULLET IS ADDRESSING?

24   A.   SO WHAT THIS BULLET IS ADDRESSING IS THAT THE NUMBER OF

25   CUSTOMERS THAT QCT WAS ABLE TO SELL TO WAS LIMITED BECAUSE

1    THERE WERE MANY CUSTOMERS THAT DID NOT HAVE A QTL LICENSE.  AND

2    MTK WAS ABLE TO SELL TO CUSTOMERS THAT DID NOT HAVE A QCT

3    LICENSE.  SO THEY HAD A MUCH LARGER BASE OF CUSTOMERS THAT THEY

4    COULD SELL TO VERSUS QCT.  SO WE WERE IN AN UNCOMPETITIVE

5    SITUATION RELATIVE TO MTK BECAUSE OF THE LICENSING SITUATION.

6    Q.   AND WAS QCT ABLE TO COMPETE ON A LEVEL PLAYING FIELD WITH

7    MEDIATEK WITH THESE UNLICENSED OEM'S?

8    A.   NO, WE WERE NOT BECAUSE QCT WAS NOT ABLE TO SELL TO THOSE

9    UNLICENSED OEM'S.

10   Q.   AND IF YOU GO BACK TO TAB 4 IN THE FTC'S BINDER, QX 8291,

11   GO TO 004.  AND IF YOU CAN FOCUS ON THE SAME, THE SAME BLOWOUT

12   THAT THE FTC SHOWED YOU, IT SAYS "SOME CUSTOMERS PERCEIVE QCT

13   CHIPS TO BE MORE EXPENSIVE, DUE TO LINKAGE TO LICENSING COSTS."

14   A.   YES.

15   Q.   IS THAT THE SAME PROBLEM THAT YOU JUST MENTIONED?

16   A.   YES.  SO WHAT THE SITUATION WAS HERE IS THAT IF CUSTOMERS

17   WERE BUYING QCT CHIPS, THEN CUSTOMERS -- QTL WOULD BE ABLE TO

18   SEE THE QCT CHIPS THAT WE WERE SELLING.

19        AND SO THERE WAS A HIGHER LIKELIHOOD THAT, THAT THEY WOULD

20   BE PAYING ROYALTIES BECAUSE QTL WOULD BE ABLE TO SEE THE CHIPS

21   THAT WERE SOLD TO THEM.

22        SO IF THEY WERE ABLE TO BUY MTK OR SPREADTRUM CHIPS, THEN

23   THEY WOULDN'T HAVE THAT VISIBILITY, WHICH MEANS THAT THEY WOULD

24   HAVE AN ADVANTAGE RELATIVE TO OUR QCT CHIPS.

25   Q.   AND WHEN YOU SAY THEY HAD AN ADVANTAGE, YOU MEAN THEY

1    COULD ESSENTIALLY FLY UNDER THE RADAR AND NOT PAY ANY

2    ROYALTIES?

3    A.   THAT'S CORRECT.

4    Q.   DID YOU GET ANY COMPLAINTS FROM CUSTOMERS ABOUT THE FACT

5    THAT SOME PEOPLE ARE ABLE TO AVOID QTL ROYALTIES?

6    A.   I DID.  CUSTOMERS COMPLAINED TO ME THAT IT WAS NOT AN

7    EQUAL PLAYING FIELD WHERE SOME CUSTOMERS WERE GOOD CITIZENS AND

8    THEY WERE PAYING THEIR CONTRACTUAL ROYALTIES, WHERE OTHERS WERE

9    NOT.  AND THOSE CUSTOMERS THAT WERE NOT WERE BUYING MTK AND

10   SPREADTRUM CHIPS.

11   Q.   TO YOUR KNOWLEDGE DID THERE EVER COME A TIME WHEN MEDIATEK

12   STOPPED SELLING ITS CHIPS TO UNLICENSED OEM'S?

13   A.   NO.  FROM MY PERSPECTIVE, I NEVER SAW THAT MTK

14   DIFFERENTIATED BETWEEN WHO THEY SOLD TO.

15   Q.   IS THE CONCERN LOST -- IF WE GO BACK TO 5809-41, IS THE

16   CONCERN REFLECTED IN THIS FIRST BULLET ABOUT THE LOSS OF

17   LICENSING REVENUE OR IS IT ABOUT THE LOSS OF CHIP SALE

18   OPPORTUNITIES?

19   A.   SO THIS IS SPECIFICALLY AROUND CHIP SALE OPPORTUNITIES AS

20   WE'VE BEEN DISCUSSING.

21   Q.   TURNING TO THE SECOND BULLET, YOU WERE ASKED ABOUT THAT

22   ONE AS WELL?

23   A.   YES.

24   Q.   WHAT IS THE ISSUE THAT'S ADDRESSED IN THIS BULLET?

25   A.   SO WHAT WE WERE CONSIDERING AT THE TIME WAS CREATING A GSM

1     PART IN ORDER TO COMPETE AGAINST MTK ON THE GSM AND GPRS FRONT.

2     THERE WAS A SIGNIFICANT AMOUNT OF PROFIT THAT EXISTED IN THAT

3     TIER, AND IT WAS SOMETHING THAT WE WERE CONSIDERING.

4     Q.   DID QUALCOMM EVER ENTER THE 2G GSM SPACE?

5     A.   WE DID NOT.

6     Q.   DID QUALCOMM MANAGE TO DETER MEDIATEK'S ENTRY INTO 3G?

7     A.   NO, WE DID NOT.

8     Q.   AND WHAT HAPPENED TO QUALCOMM'S SHARE IN THE 3G SPACE

9     FOLLOWING MEDIATEK'S ENTRY?

10    A.   SO WE, WE WERE THE LEADERS IN TERMS OF SHARE ON 3G, AND

11    ONCE MTK ENTERED, MTK WON AND OUR SHARE IN TERMS OF 3G AND OUR

12    SHARE HAS GONE DOWN TO VIRTUALLY ZERO ON THE 3G SIDE.

13    Q.   OKAY.  DO YOU NOW HAVE A COPY OF QX 9312 BEFORE YOU?

14    A.   I DO.

15    Q.   WHAT IS THIS DOCUMENT?

16    A.   SO THIS WAS A COMPETITIVE ANALYSIS WHICH WAS A DECK WHICH

17    WAS DONE IN 2015.

18    Q.   AND WHAT WAS YOUR ROLE IN -- WITH RESPECT TO THIS DECK?

19    A.   SO MY TEAM LED PUTTING THIS DECK TOGETHER.

20         MR. EVEN:  I'D LIKE TO OFFER THIS INTO EVIDENCE, YOUR

21    HONOR.

22         THE COURT:  DO YOU HAVE A COPY OF IT NOW?

23         MS. IKEDA:  YES, WE DO.

24         THE COURT:  OKAY.  ANY OBJECTION?

25         MS. IKEDA:  NO OBJECTION.

```
 1              THE COURT:  IT'S ADMITTED.

 2          (DEFENDANT'S EXHIBIT QX 9312 WAS ADMITTED IN EVIDENCE.)

 3              THE COURT:  GO AHEAD, PLEASE.

 4      BY MR. EVEN:

 5      Q.   MR. WYATT, GOING THROUGH THIS DECK VERY QUICKLY, THIS DECK

 6      COMPARES SPECIFIC QUALCOMM CHIPS WITH SPECIFIC COMPETITOR'S

 7      CHIPS; IS THAT FAIR?

 8      A.   THAT'S CORRECT.

 9      Q.   AND DOES IT LOOK AT THE RELATIVE SPECIFICATION OF THE

10      CHIP?

11      A.   IT DOES.

12      Q.   DOES IT LOOK AT THE RELATIVE PRICING OF THE CHIP?

13      A.   YES, WE LOOK AT BOTH OF THOSE.

14      Q.   DOES IT LOOK AT HANDSET USE?

15      A.   NO.  I'M NOT SEEING THAT.

16              MR. EVEN:  THANK YOU, MR. WYATT.

17          I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

18              THE COURT:  OKAY.  TIME IS 11:24.

19          DO YOU HAVE ANY REDIRECT?

20              MS. IKEDA:  YES, VERY BRIEFLY.

21              THE COURT:  OKAY.

22                      REDIRECT EXAMINATION

23      BY MS. IKEDA:

24      Q.   SIR, YOU MENTIONED A FEW MINUTES AGO THAT INTEL WAS ONE OF

25      THE COMPANIES THAT OFFERS A CDMA CAPABLE CHIP?
```

1          THE COURT:  11:25.

2          THE WITNESS:  YES.

3     BY MS. IKEDA:

4     Q.   AND IT'S A TRUE STATEMENT THAT AS OF YOUR SWORN DEPOSITION

5     IN JANUARY OF 2018 YOU DID NOT KNOW WHETHER INTEL HAD A CDMA

6     CHIP THAT HAD EVER BEEN COMMERCIALLY SHIPPED; CORRECT?

7     A.   THAT'S POSSIBLE.

8     Q.   THAT'S A TRUE STATEMENT; RIGHT?

9     A.   I -- I'D HAVE TO LOOK AT THE DEPOSITION.  BUT I'M

10    GUESSING --

11    Q.   TAKE A LOOK AT YOUR DEPOSITION, PAGE 64, LINE 23.  YOU

12    WERE ASKED, "DO YOU KNOW IF AN INTEL AS OPPOSED TO A VIA CDMA

13    CHIP HAS BEEN COMMERCIALLY SHIPPED?"

14         YOUR ANSWER WAS, "I DON'T KNOW."

15         DO YOU SEE THAT?

16    A.   YES, I SAID -- "I DON'T KNOW VIA HAS."

17    Q.   THAT WAS A TRUE STATEMENT AS OF JANUARY 2018; CORRECT?

18    A.   YES.

19          MS. IKEDA:  THANK YOU.  NO FURTHER QUESTIONS.

20          THE COURT:  OKAY.  TIME IS 11:26.  AND YOU STARTED AT

21    11:25.

22         ANY RECROSS?

23          MR. EVEN:  NO, YOUR HONOR.

24          THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

25    AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

```
1                    MS. IKEDA:  NOT SUBJECT TO RECALL.

2                    MR. EVEN:  NOT BY US, YOUR HONOR.

3                    THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

4        TESTIMONY, AND YOU'RE FREE TO LEAVE.

5                    THE WITNESS:  THANK YOU.

6                    THE COURT:  ALL RIGHT.  CALL YOUR NEXT WITNESS.

7                    MR. MATHESON:  YOUR HONOR, THE FTC CALLS

8        CRISTIANO AMON.

9                    THE COURT:  OKAY.

10               DO YOU HAVE A SMALLER BINDER?  THIS IS HUGE FOR NOT MUCH

11       PAPER.  I'M JUST CONSTRAINED ON SPACE, AS YOU CAN SEE.  IF NOT,

12       LATER.  BUT IF YOU HAVE ONE, IT WOULD BE APPRECIATED.  THANKS.

13                   MR. BORNSTEIN:  DAN, ARE YOU READY FOR HIM?

14                   MR. MATHESON:  YES.

15                   THE COURT:  IS THERE ANY DEPOSITION TRANSCRIPT FOR

16       THIS WITNESS?  OKAY.  THANKS.

17                   MS. SESSIONS:  YOU HAVE ONE FOR ME?

18                   THE COURT:  OKAY.  THANK YOU.  ALL RIGHT.  LET ME

19       KNOW WHEN YOU'RE READY.

20               OH, YOU WANT TO SEAL SOME THINGS.

21                   MS. SESSIONS:  I THINK WE HAVE SOME SEALING ISSUES.

22       I'M NOT SURE.

23                   THE COURT:  ALL RIGHT.  NO PROBLEM.

24               11:28.

25               GO AHEAD, PLEASE.
```

470

```
1              MS. SESSIONS:  DO YOU WANT US -- ARE YOU GOING TO

2       LIST THE ONES THAT --

3              MR. MATHESON:  THAT YOU SOUGHT TO SEAL?

4              MS. SESSIONS:  YES.

5              MR. MATHESON:  CX 5279.

6              MS. SESSIONS:  YOUR HONOR, WE ARE NOT GOING TO SEEK

7       TO SEAL THAT DOCUMENT.

8              THE COURT:  OKAY.

9              MR. MATHESON:  CX 6839.

10             MS. SESSIONS:  WE ARE NOT GOING TO SEEK TO SEAL THAT.

11             THE COURT:  OKAY.

12             MR. MATHESON:  CX 6840.

13             MS. SESSIONS:  WE'RE NOT GOING TO SEEK TO SEAL THAT.

14             MR. MATHESON:  CX 8276.

15             MS. SESSIONS:  WE ARE NOT GOING TO SEEK TO SEAL THAT,

16      YOUR HONOR.

17             MR. MATHESON:  JX 0086.

18             MS. SESSIONS:  YES, THERE ARE PORTIONS OF THAT THAT

19      QUALCOMM WILL SEEK TO SEAL.

20             THE COURT:  OKAY.  AND WHAT ARE THEY?

21             MS. SESSIONS:  FIRST PORTION IS ON PAGE 7, YOUR

22      HONOR.

23             THE COURT:  THAT'S FINE.

24             MS. SESSIONS:  OKAY.  THANK YOU, YOUR HONOR.

25          AND PAGE 8.
```

```
1              THE COURT:  THAT'S FINE.

2              MS. SESSIONS:  PAGE 9 AS WELL.

3              THE COURT:  OKAY.  THAT'S FINE.  ALL THREE PAGES ARE

4      SEALED, 7, 8, AND 9.

5              MR. MATHESON:  CX 5294.

6              THE COURT:  ARE YOU GOING TO SEEK TO SEAL ANYTHING IN

7      THAT DOCUMENT?

8              MS. SESSIONS:  YOUR HONOR, JUST GIVE ME A MOMENT AND

9      LET ME FIND IT.

10             THE COURT:  OKAY.

11             MS. SESSIONS:  NO, YOUR HONOR.

12             THE COURT:  OKAY.

13             MR. MATHESON:  I DON'T BELIEVE THEY HAVE SOUGHT TO

14     SEAL CX 7606 OR CX 7607.

15             THE COURT:  IT'S A MAY 24TH, 2011 --

16             MS. SESSIONS:  WE ARE NOT GOING TO SEEK TO SEAL THAT

17     ONE, YOUR HONOR.

18             THE COURT:  STRATEGIC PLANS.  IT'S QUITE AGED.

19        AND THE OTHER ONE IS FISCAL YEAR 2012.

20             MR. MATHESON:  CX 7644.

21             THE COURT:  WELL, LET ME JUST CONFIRM ON 7607, ARE

22     YOU GOING TO SEAL ANYTHING FROM THAT DOCUMENT?  IT IS FISCAL

23     YEAR '12, SO IT'S FAIRED AGED.  BUT --

24             MS. SESSIONS:  JUST GIVE ME ONE MOMENT, YOUR HONOR.

25             THE COURT:  OKAY.
```

```
 1           (PAUSE IN PROCEEDINGS.)

 2               MS. SESSIONS:  7607, NO SEALING, YOUR HONOR.

 3               THE COURT:  OKAY.  THANK YOU.

 4               MR. MATHESON:  THE NEXT ONE, YOUR HONOR, IS CX 7644.

 5               MS. SESSIONS:  AND WE HAVE TWO PAGES FROM THAT ONE,

 6     YOUR HONOR.

 7               THE COURT:  OKAY.  AND WHAT ARE THOSE?

 8               MS. SESSIONS:  PAGE 88, AND IT'S PAGE 88 OF THE

 9     EXHIBIT, NOT OF THE PDF.

10               THE COURT:  RIGHT.  THE PDF, IT'S PAGE 89, RIGHT.

11               MS. SESSIONS:  IT'S PAGE 87 OF THE PDF, PAGE 88 OF

12     THE EXHIBIT.

13               THE COURT:  MY PAGE 88 OF THE POWERPOINT IS 7644-089.

14     IT'S THE P&L COST VARIANCE.

15               MS. SESSIONS:  IT'S THE PAGE BEFORE THAT ONE, YOUR

16     HONOR.

17               THE COURT:  OKAY.

18               MS. SESSIONS:  THAT SAYS WAFER COSTS IS THE ONE THAT

19     WE'RE SEEKING TO SEAL.

20               THE COURT:  OKAY.  SO THAT IS PAGE 87 OF THE

21     DOCUMENT, BUT 88 OF THE BATES NUMBER.

22               MS. SESSIONS:  YES, YOUR HONOR.

23               THE COURT:  OKAY.  THAT'S FINE.

24               MS. SESSIONS:  AND THEN PAGE 93 OF THE EXHIBIT STAMP.

25               THE COURT:  THAT'S FINE.
```

```
 1              MS. SESSIONS:  THANK YOU, YOUR HONOR.

 2              THE COURT:  SO THAT IS BATES 93.

 3         OKAY.  THAT'S FINE.

 4              MR. MATHESON:  NEXT ONE, YOUR HONOR, IS JX 0096.

 5              MS. SESSIONS:  YES, YOUR HONOR, THERE ARE A FEW PAGES

 6    FROM THAT ONE AS WELL.

 7              THE COURT:  OKAY.

 8              MS. SESSIONS:  THE FIRST ONE IS PAGE 31.

 9              THE COURT:  OKAY.  AND THAT'S THE BATES NUMBER 31?

10              MS. SESSIONS:  LET ME --

11              THE COURT:  THAT'S THE DOCUMENT PAGE 30.

12              MS. SESSIONS:  LET ME TURN TO IT IN MY BINDER AND

13    I'LL CONFIRM.

14         THAT'S CORRECT.  PAGE 31 OF THE BATES NUMBER, PAGE 30 OF

15    THE POWERPOINT.

16              THE COURT:  THAT'S FINE.  THAT'S SEALED.

17              MS. SESSIONS:  THANK YOU, YOUR HONOR.

18         NEXT ONE IS PAGE 49 OF THE BATES NUMBER.

19              THE COURT:  THAT'S FINE.  49 IS SEALED.

20              MS. SESSIONS:  PAGE 66 OF THE BATES NUMBERS.

21              THE COURT:  THAT'S FINE, IT'S SEALED.

22              MS. SESSIONS:  PAGE 67.

23              THE COURT:  THAT'S FINE, THAT'S SEALED.

24              MS. SESSIONS:  68.

25              THE COURT:  WHY SHOULD THAT BE SEALED?  THAT'S
```

```
 1        PROJECTIONS FROM 2012/2013.

 2               MS. SESSIONS:  ON PAGE 68, YOUR HONOR?  PAGE 68 OF

 3        THE BATES STAMP I BELIEVE HAS SPECIFIC PRICING --

 4               THE COURT:  OH, OKAY.  I'M SORRY.  I WAS LOOKING AT

 5        THE WRONG DOCUMENT.

 6            OKAY, 68, THAT'S FINE.

 7               MS. SESSIONS:  PAGE 78.

 8               THE COURT:  THAT'S FINE.  78 IS FINE.  THAT'S SEALED.

 9               MS. SESSIONS:  PAGE 122.

10               THE COURT:  THAT'S FINE.  THAT'S SEALED.  122 IS

11        SEALED.

12               MS. SESSIONS:  THANK YOU, YOUR HONOR.

13            PAGE 124.  I'M SORRY.  PAGE 24 WAS WRITTEN IN ERROR.

14        WE'RE NOT SEEKING TO SEAL THAT.

15               THE COURT:  OKAY.

16               MS. SESSIONS:  PAGE -- IT'S 125, YOUR HONOR, 124 OF

17        THE POWERPOINT.

18               THE COURT:  THAT'S FINE.  125 IS FINE.  THAT'S

19        SEALED.

20               MS. SESSIONS:  PAGE 130 OF THE BATES NUMBERS.

21               THE COURT:  OKAY.  THAT'S SEALED.

22               MS. SESSIONS:  PAGE 136.

23               THE COURT:  OKAY.  THAT'S SEALED.

24               MS. SESSIONS:  PAGE 137.

25               THE COURT:  THAT'S SEALED.
```

```
 1              MS. SESSIONS:  AND THE LAST ONE IS PAGE 142.

 2              THE COURT:  THAT'S SEALED.

 3              MS. SESSIONS:  THANK YOU, YOUR HONOR.

 4              THE COURT:  OKAY.  ANY MORE, OR IS THAT THE LAST

 5      EXHIBIT?

 6              MR. MATHESON:  THAT IS NOT THE LAST EXHIBIT, YOUR

 7      HONOR.

 8          THE ONLY ONES I HAVE SEALING REQUESTS THAT I'VE BEEN

 9      INDICATED -- SO I BELIEVE CX 6055, THERE IS A SEALING REQUEST.

10          IS THAT A --

11              MS. SESSIONS:  THAT'S CORRECT.

12              MR. MATHESON:  CX 8257, THERE'S NO SEALING REQUEST,

13      THAT'S MY UNDERSTANDING.

14              MS. SESSIONS:  CORRECT.

15              MR. MATHESON:  I BELIEVE THERE IS A SEALING REQUEST

16      FOR CX 5321.

17              MS. SESSIONS:  WE ARE NOT GOING TO SEEK TO SEAL THAT,

18      YOUR HONOR.

19              THE COURT:  OKAY.

20              MR. MATHESON:  I BELIEVE THERE'S ONE FOR CX 7024.

21              MS. SESSIONS:  WE ARE NOT GOING TO SEEK TO SEAL THAT

22      DOCUMENT.

23              MR. MATHESON:  I BELIEVE THERE'S NO REQUEST FOR

24      CX 5393.

25              MS. SESSIONS:  CORRECT.
```

1          MR. MATHESON:  NO REQUEST FOR CX 8256.

2          MS. SESSIONS:  HOLD ON ONE MOMENT.

3          THE COURT:  YOU SAID 8257.  YOU'RE NOT GOING TO SEEK

4     SEALING, BUT I DON'T HAVE THAT IN MY BINDER.  CX 8257, I DON'T

5     HAVE THAT.

6          MR. MATHESON:  IT SHOULD BE TAB 12 -- OH, IT APPEARS

7     BEFORE THE FIRST TAB, YOUR HONOR.

8          THE COURT:  OH.

9          MR. MATHESON:  SORRY.  WE ACTUALLY --

10          THE COURT:  OKAY.  I HAVE IT.

11          MR. MATHESON:  IT'S THE FIRST DOCUMENT WE'RE GOING TO

12     USE.  SORRY ABOUT THAT.

13          THE COURT:  OKAY.  THAT'S FINE.  IS THAT IT?

14          MR. MATHESON:  I BELIEVE THERE IS NO SEALING REQUEST

15     FOR CX 8256, I WANT TO CLARIFY BECAUSE THAT'S A 2016 STRAT

16     PLAN.  I CAN TELL YOU THE ONLY SLIDE I'M GOING TO USE IF THAT

17     WOULD MAKE THINGS EASIER.

18          MS. SESSIONS:  THAT WOULD BE HELPFUL.

19          THE COURT:  WELL, BUT ARE YOU GOING TO SEEK TO ADMIT

20     THE WHOLE EXHIBIT?

21          MR. MATHESON:  I AM, YOUR HONOR.

22          THE COURT:  SO I THINK WE SHOULD WORK OUT THE SEALING

23     BECAUSE WE'VE HAD, WHEN CASES ARE ENDED, ANY PARTY CAN COME AND

24     ASK TO SEE THE EXHIBITS.  SO I RECOMMEND WE GET THE SEALING

25     RIGHT BECAUSE OTHERWISE THE CLERK'S OFFICE WILL GIVE ANY MEMBER

```
1        WHO REQUESTS AN EXHIBIT THE EXHIBIT UNLESS IT'S SEALED.

2              MR. MATHESON:  UNDERSTOOD, YOUR HONOR.

3        I'M 100 PERCENT CONFIDENT -- WELL, I'M NOT 100 PERCENT.

4   I'M HIGHLY CONFIDENT WE DISCLOSED THIS.

5              MS. SESSIONS:  I'M TRYING TO FIND IT IN MY BINDER AND

6   IT'S NOT ON MY LIST.

7              MR. MATHESON:  IT LOOKS LIKE THIS.  I MEAN, THIS IS A

8   BIG DOCUMENT.

9              MS. SESSIONS:  YOU DID, AND I RECOGNIZE IT.  SO --

10  JUST GIVE ME ONE MOMENT.

11             MR. MATHESON:  I CAN HAND YOU THIS COPY IF THAT WOULD

12  BE HELPFUL.

13        (PAUSE IN PROCEEDINGS.)

14             MS. SESSIONS:  NOTHING FROM 8256, YOUR HONOR.

15             THE COURT:  OKAY.  THANK YOU.

16             MR. MATHESON:  I BELIEVE THAT IS THE LAST DOCUMENT

17  WITH A SEALING REQUEST, YOUR HONOR.

18             THE COURT:  OKAY.

19        ALL RIGHT.  ARE WE SET?

20        OKAY.  11:39.

21             MR. MATHESON:  YES, YOUR HONOR.  THANK YOU.

22             THE COURT:  ARE YOU READY?

23             MR. MATHESON:  YES, YOUR HONOR.  THANK YOU.

24             THE COURT:  ALL RIGHT.  LET'S HAVE THE WITNESS SWORN

25  IN, PLEASE.
```

1              **(PLAINTIFF'S WITNESS, CRISTIANO AMON, WAS SWORN.)**

2                   THE WITNESS:  I DO.

3                   THE CLERK:  THANK YOU.  PLEASE BE SEATED.

4              PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

5     THE RECORD.

6                   THE WITNESS:  MY NAME IS CRISTIANO AMON.  LAST NAME

7     A-M-O-N.

8                   THE COURT:  ALL RIGHT.  11:40.  GO AHEAD, PLEASE.

9                          **DIRECT EXAMINATION**

10    BY MR. MATHESON:

11    Q.   GOOD MORNING, SIR.

12         YOU ARE THE PRESIDENT OF QUALCOMM AT THIS TIME; IS THAT

13    CORRECT?

14    A.   YES.

15    Q.   AND PRIOR TO THE PRESIDENT OF QUALCOMM -- BECOMING

16    PRESIDENT OF QUALCOMM, YOU WERE THE PRESIDENT OF QCT; IS THAT

17    CORRECT?

18    A.   YES, THAT'S CORRECT.

19    Q.   NOW, MR. AMON, WE'RE GOING TO BE DISCUSSING THE INDUSTRY

20    THROUGHOUT THE DAY.

21         PER THE COURT'S ORDER, THE INTRODUCTION OF EVIDENCE FROM

22    AFTER MARCH 2018 HAS BEEN EXCLUDED, SO I'D ASK, IF YOU COULD,

23    TO REFRAIN FROM REFERRING TO SPECIFIC EVENTS THAT MAY HAVE

24    OCCURRED SINCE THAT TIME.

25         WOULD THAT BE POSSIBLE?

AMON DIRECT BY MR. MATHESON

```
1     A.   UNDERSTOOD, YES.

2     Q.   THANK YOU, SIR.

3          QUALCOMM WAS THE FIRST BASE SUPPLIER OF LTE BASEBAND

4     PROCESSORS; IS THAT RIGHT?

5     A.   YES.

6     Q.   YOU'D AGREE THAT QUALCOMM'S PRICING FOR LTE CHIPSETS HAS

7     BEEN BASED ON QCT'S LEADERSHIP AND DIFFERENTIATION FROM ITS

8     COMPETITORS; RIGHT?

9     A.   I BELIEVE THAT'S CORRECT.

10    Q.   NOW, WITHIN LTE, QUALCOMM HAS BEEN HISTORICALLY VERY

11    SUCCESSFUL IN PROVIDING THE LATEST FEATURES AND BEING FIRST TO

12    MARKET WITH THOSE FEATURES; IS THAT RIGHT?

13    A.   YES, WE'RE BEING FIRST TO MARKET WITH EVERY TRANSITION OF

14    LTE.

15    Q.   AND WHEN YOU SAY "EVERY TRANSITION OF LTE," IS IT FAIR TO

16    SAY THAT INCLUDES EVERY NEW, HIGHER SPEED OF LTE?

17    A.   YES, EVERY NEW HIGHER SPEED OF LTE 4G, YES.

18    Q.   AND AS OF THE DATE OF YOUR DEPOSITION, IT'S ACCURATE TO

19    STATE THAT QUALCOMM WAS ABLE TO CHARGE A HIGHER PRICE FOR THE

20    LATEST MODEM FEATURE SETS IN WHICH IT WAS DIFFERENTIATED FROM

21    ITS COMPETITION; RIGHT?

22    A.   WE HAVE MANY PRODUCTS WITH LTE.  FOR THE ADVANCED ONES,

23    WHICH ARE THE FIRST TO MARKET, WE HAD A DIFFERENTIATED PRICE OF

24    OUR SOLUTIONS.  THERE WAS AN LTE PRICING FOR THE LATEST FEATURE

25    ON THE ADVANCED CHIPSETS, YES.
```

1      Q.   THANK YOU.

2           COULD YOU TURN TO YOUR BINDER, SIR, THERE'S ACTUALLY A

3      DOCUMENT THAT APPEARS JUST PRIOR TO THE TAB LABELED TAB 1.

4      THAT DOCUMENT IS MARKED QX 8257.

5      A.   YES, I HAVE IT.

6      Q.   CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL EXCHANGE

7      INVOLVING YOURSELF, MR. MOLLENKOPF, AND OTHER QUALCOMM

8      EXECUTIVES IN NOVEMBER 2008?

9      A.   I DON'T SEE MR. MOLLENKOPF ON THE FIRST PAGE.

10     Q.   YOURSELF AND MR. MEHTA?

11     A.   YES, I DO.

12     Q.   OCTOBER OF 2008; IS THAT RIGHT?

13     A.   YES.

14          MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 8257.

15          MS. SESSIONS:  NO OBJECTION.

16          THE COURT:  IT'S ADMITTED.

17     (PLAINTIFF'S EXHIBIT CX 8257 WAS ADMITTED IN EVIDENCE.)

18          THE COURT:  GO AHEAD, PLEASE.

19     BY MR. MATHESON:

20     Q.   FOCUSSING ON THE E-MAIL YOU WROTE ON OCTOBER 24TH, 2008 TO

21     MR. MEHTA AND MR. LEDERER, YOU WRITE, "HERE ARE SOME OF THE

22     ISSUES:  UMTS PRICES WERE HIGHER THAN CDMA DURING INTRODUCTION

23     DUE TO QC'S UMTS MODEM LEADERSHIP (= SOLE SUPPLIER)."

24          DO YOU SEE THAT?

25     A.   YES.

AMON DIRECT BY MR. MATHESON

1    Q.    AND YOU WOULD AGREE THAT QUALCOMM WAS THE FIRST TO PROVIDE

2    UMTS MODEM CHIPS TO THE MARKET; RIGHT?

3    A.    FOR THE UMTS, WE ENTERED THE MARKET LATE.  BUT WE WERE THE

4    FIRST TO PROVIDE TECHNOLOGIES, INCLUDING BROADBAND SPEEDS ON

5    THE UMTS.

6    Q.    COULD YOU TURN TO YOUR DEPOSITION, SIR, WHICH IS IN THE

7    BINDER THERE, PAGE 416.

8          MS. SESSIONS:  EXCUSE ME.  DID YOU GIVE A COPY OF HIS

9    DEPOSITION?

10         THANK YOU.

11   BY MR. MATHESON:

12   Q.    DO YOU RECALL SAYING AT YOUR DEPOSITION, SIR, "SO WE WERE

13   THE FIRST TO PROVIDE UMTS IN THE MARKET DURING THE TIME"?

14   A.    YES.

15   Q.    THAT WAS AN ACCURATE STATEMENT WHEN YOU MADE IT; CORRECT,

16   SIR?

17   A.    AND IT STILL IS.

18   Q.    ALL RIGHT.  CAN WE RETURN TO CX 8257.

19         NOW, YOU WRITE BELOW THAT, "UMTS PRICES ARE NOW LOWER THAN

20   CDMA NOT DUE TO COST OR VOLUME, BUT DUE TO COMPETITION."

21         DO YOU SEE THAT, SIR?

22   A.    YES.

23   Q.    THAT WAS A CORRECT STATEMENT WHEN YOU WROTE IT; IS THAT

24   TRUE?

25   A.    YES.

1      Q.    AND THAT'S ACCURATE; RIGHT?

2      A.    THAT'S ACCURATE.

3      Q.    COULD YOU SKIP AHEAD IN YOUR BINDER, SIR, TO TAB 17, WHICH

4      IS MARKED CX 5393.

5      A.    YES.

6      Q.    CAN YOU IDENTIFY THIS DOCUMENT, SIR, AS AN E-MAIL EXCHANGE

7      INVOLVING YOURSELF, MR. MOLLENKOPF, AND OTHER QUALCOMM

8      EXECUTIVES IN JUNE OF 2013?

9      A.    YES.

10             MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 5393.

11             MS. SESSIONS:  NO OBJECTION, YOUR HONOR.

12             THE COURT:  IT'S ADMITTED.

13          (PLAINTIFF'S EXHIBIT CX 5939 WAS ADMITTED IN EVIDENCE.)

14             THE COURT:  GO AHEAD, PLEASE.

15     BY MR. MATHESON:

16     Q.    TAKING A LOOK, THE SUBJECT OF THIS IS QUESTIONS FROM CT.

17     DO YOU SEE THAT?

18     A.    YES.

19     Q.    CT STANDS FOR CHINA TELECOM?

20     A.    THAT IS CORRECT.

21     Q.    TURNING TO PAGE 2, THIS E-MAIL IS ADDRESSED FROM QUALCOMM

22     EXECUTIVE TO YOURSELF.  THE FIRST -- SECOND SENTENCE STATES,

23     "HE WANTS US TO EXPLAIN WHY OUR CDMA CHIPSET IS MORE EXPENSIVE

24     THAN UMTS."

25             DO YOU SEE THAT, SIR?

AMON DIRECT BY MR. MATHESON

1    A.   YES, I DO.

2    Q.   THAT WAS AN INQUIRY FROM CHINA TELECOM REGARDING WHY

3    QUALCOMM'S CDMA CHIPSET IS MORE EXPENSIVE THAN COMPETING UMTS

4    CHIPSETS; IS THAT RIGHT?

5    A.   YES.

6    Q.   TURNING TO THE FIRST PAGE OF THE DOCUMENT, SIR, YOUR

7    RESPONSE TO THIS INQUIRY IS -- THERE'S THREE BULLETS.  LET'S

8    LOOK AT THE SECOND BULLET.

9         YOU WRITE, "OUR PRICE IS BASED -- IS NOT BASED ON COST BUT

10   ON VALUE."

11        DO YOU SEE THAT, SIR?

12   A.   YES.

13   Q.   IT'S AN ACCURATE STATEMENT THAT QUALCOMM HAS HISTORICALLY

14   PRICED CDMA BASED ON VALUE RATHER THAN COST; RIGHT?

15   A.   YES.

16   Q.   AND LOOKING JUST ABOVE THAT, THE FINAL TWO SENTENCES OF

17   THE FIRST BULLET STATE, "OUR PRICE IS COMPETITIVE WITH VIA.

18   OBVIOUSLY NOT COMPETITIVE WITH UMTS."

19        AT THIS TIME VIA WAS A COMPETING SUPPLIER OF CDMA CHIPS;

20   IS THAT RIGHT?

21   A.   THAT IS CORRECT.

22   Q.   THE THIRD BULLET STATES "DELTA IS VERY HIGH DUE TO UMTS

23   PRICING EROSION (MTK, SPREADTRUM).

24        DO YOU SEE THAT?

25   A.   YES.

1    Q.   WHEN YOU USED DELTA THERE, YOU MEAN THE DIFFERENCE BETWEEN

2    CDMA CHIP PRICE AND UMTS CHIP PRICE?

3    A.   YES.

4    Q.   PLEASE TURN TO TAB 6 IN YOUR BINDER, SIR, WHICH IS

5    CX 5294.

6         CAN YOU IDENTIFY THIS DOCUMENT, SIR, AS AN E-MAIL EXCHANGE

7    BETWEEN YOURSELF, MR. ABERLE, AND OTHER QUALCOMM EXECUTIVES IN

8    JUNE OF 2013.

9    A.   YES, I DO.

10   Q.   TURN YOUR ATTENTION TO THE --

11        OH, YOUR HONOR, MOVE TO ADMIT CX 5294.

12            THE COURT:  ANY OBJECTION.

13            MS. SESSIONS:  NO, YOUR HONOR.

14            THE COURT:  IT'S ADMITTED.

15        (PLAINTIFF'S EXHIBIT CX 5294 WAS ADMITTED IN EVIDENCE.)

16            THE COURT:  GO AHEAD, PLEASE.

17   BY MR. MATHESON:

18   Q.   TURNING YOUR ATTENTION TO THE SECOND PAGE OF THE DOCUMENT,

19   THERE'S A BULLET THAT STATES "OUR VIEW OF THE CT PROBLEM."

20        DO YOU SEE THAT, SIR?

21   A.   YES.

22   Q.   CT STANDS FOR CHINA TELECOM AGAIN?

23   A.   THAT IS CORRECT.

24   Q.   THE FIRST SENTENCE STATES "WHILE THERE'S AN OVERALL 4.50

25   TO $7 DOLLARS DELTA BETWEEN THE CHIPSET PRICE OF CDMA AND ITS

```
 1    EQUIVALENT UMTS."
 2         DO YOU SEE THAT, SIR?
 3    A.   YES.
 4    Q.   WHEN YOU SAY -- WHEN THIS E-MAIL STATES THERE AN OVERALL
 5    4.50 TO $7.00 DELTA, THAT MEANS THE CDMA CHIPSET PRICE IS
 6    HIGHER THAN THE UMTS CHIPSET PRICE; RIGHT?
 7    A.   THAT IS CORRECT.
 8    Q.   TURN YOUR ATTENTION, SIR, TO TAB 1 OF YOUR BINDER, WHICH
 9    IS CX 5279.
10    A.   I'M SORRY.  YOU SAID TAB 1?
11    Q.   YES.
12    A.   I HAVE IT.
13    Q.   WE'RE MOVING BACK IN TIME IN 2008.  CAN YOU IDENTIFY THIS,
14    SIR, AN E-MAIL EXCHANGE INVOLVING YOURSELF, MR. MOLLENKOPF, AND
15    OTHER QUALCOMM EXECUTIVES IN 2008?
16    A.   YES.
17              MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 5279.
18              MS. SESSIONS:  NO OBJECTION.
19              THE COURT:  IT'S ADMITTED.
20         (PLAINTIFF'S EXHIBIT CX 5279 WAS ADMITTED IN EVIDENCE.)
21              THE COURT:  GO AHEAD, PLEASE.
22    BY MR. MATHESON:
23    Q.   TURNING TO THE THIRD PAGE OF THE DOCUMENT, IF YOU LOOK AT
24    THE BOTTOM OF THE SECOND PAGE, YOU'LL SEE AN E-MAIL YOU WROTE
25    TO STEVE AND JIM.
```

AMON DIRECT BY MR. MATHESON

1              DO YOU SEE THAT, SIR?  THE BOTTOM OF THE SECOND PAGE,

2     THERE'S AN E-MAIL FROM YOURSELF TO STEVE AND JIM.

3     A.    YES.

4     Q.    AND THAT'S MR. MOLLENKOPF IS STEVE?

5     A.    THAT IS CORRECT.

6     Q.    OKAY.  THE NEXT PAGE, UNDER THE BOLDED TEXT, "MY

7     RECOMMENDATION."  THAT'S YOUR RECOMMENDATION YOU'RE MAKING TO

8     MR. MOLLENKOPF AT THIS TIME; RIGHT?

9     A.    YES, I BELIEVE SO.

10    Q.    YOUR FIRST BULLET IS "CONTINUE TO SUPPORT THE VIABILITY

11    AND GROWTH OF THE CDMA ECOSYSTEM."

12            NOW, CDMA ECOSYSTEM MEANS THE OPERATORS WHO HAD INSTALLED

13    INFRASTRUCTURE BASED ON CDMA; RIGHT?

14    A.    YES.

15    Q.    DIRECTING YOUR ATTENTION TO THE BOTTOM OF THE PAGE, YOU

16    WRITE, "IF THE DECISION IS MADE, I.E., MAINTENANCE OF CDMA

17    COMPETITIVENESS."

18            NOW, JUST TO PAUSE ON THAT, CDMA COMPETITIVENESS MEANS

19    COMPETITIVENESS VERSUS UMTS SOLUTIONS; RIGHT?

20    A.    IT MEANS THAT A CDMA OPERATOR WILL HAVE THE SAME DEVICE

21    THAT UMTS OPERATORS HAVE SO THEY COULD COMPETE AND HAVE THOSE

22    AT NOT THE SAME CAPABILITIES OR THE SAME PRICE, OR SIMILAR

23    PRICES.

24    Q.    GREAT.  THANK YOU.  MOVING FORWARD, THIS SENTENCE READS,

25    "WE BELIEVE THAT TACTICALLY WE COULD MAKE THE DIFFERENCE AROUND

1        10 PERCENT TO MANAGE THE REVENUE EROSION."

2             NOW, WHAT YOU MEANT THERE WAS QCT COULD PRICE ITS CHIPSETS

3        10 PERCENT HIGHER THAN COMPETING UMTS CHIPSETS; IS THAT RIGHT?

4        A.   THAT IS CORRECT.

5        Q.   AND THE FINAL SENTENCE STATES, "THERE IS NO JUSTIFICATION

6        FOR THE 10 PERCENT, BUT WE THINK THAT IT RESIDES WITHIN THE OEM

7        THRESHOLD OF TOLERANCES."

8             DO YOU SEE THAT, SIR?

9        A.   YES, I DO.

10       Q.   BY OEM THRESHOLD OF TOLERANCES, YOU MEANT OEM'S

11       WILLINGNESS TO PAY; RIGHT?

12       A.    IT MEANT AT THE TIME OEM WILLING TO PAY AND OFFER THE

13       DEVICE AT THE COMPETITIVE PRICE WITH UMTS.

14       Q.   OKAY.  AND MOVING UP TO THE CENTER OF THE E-MAIL YOU

15       WROTE, "THEREFORE," AND YOU HAVE THREE ARABIC NUMERALS.

16       TURNING YOUR ATTENTION TO THE SECOND ARABIC NUMERAL, YOU WROTE,

17       "QUALCOMM WILL NOT EXERCISE ITS CDMA MARKET SHARE DOMINANCE TO

18       PRACTICE UNCOMPETITIVE PRICES."

19            DO YOU SEE THAT?

20       A.   YES, I DO.

21       Q.   AND YOUR VIEW OF RECOMMENDATION OF MAINTAINING A 10

22       PERCENT PRICE DEFERENTIAL BETWEEN CDMA CHIPSETS AND COMPETING

23       UMTS CHIPSETS WAS CONSISTENT WITH THE RECOMMENDATION NOT TO

24       EXERCISE CDMA MARKET SHARE DOMINANCE; RIGHT?

25       A.    THAT IS CORRECT.

1    Q.  WHEN YOU WROTE, "MARKET SHARE DOMINANCE," WHAT YOU MEANT

2    WAS OEM'S PERCEPTION THAT THERE WERE NO OTHER SOLUTIONS

3    AVAILABLE; RIGHT?

4    A.  IF WE END UP BEING THE SOLE SUPPLIER OF CDMA FOR AN OEM,

5    THEN WE WILL BE IN THAT SITUATION.

6    Q.  TURNING YOUR ATTENTION, SIR, TO YOUR DEPOSITION

7    TRANSCRIPT, PAGE 366.  DIRECTING YOUR ATTENTION TO LINES 9

8    THROUGH 18, DOES THAT REFRESH YOUR RECOLLECTION THAT AT YOUR

9    DEPOSITION YOU TESTIFIED WHEN YOU USED THE PHRASE "MARKET

10   DOMINANCE," YOU MEANT AN OEM'S PERCEPTION THAT THERE WAS

11   DOMINANCE IN THE MARKET BECAUSE THERE'S NO OTHER SOLUTION

12   AVAILABLE?

13   A.  THAT IS CORRECT.

14   Q.  CAN WE MOVE, SIR, TO TAB 2 OF YOUR BINDER, THE NEXT TAB.

15   THIS IS CX 6839.  CAN YOU IDENTIFY THIS AS AN E-MAIL EXCHANGE

16   BETWEEN YOURSELF AND OTHER QUALCOMM EXECUTIVES IN MAY OF 2009?

17   A.  YES, I DO.

18            MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6839.

19            MS. SESSIONS:  NO OBJECTION.

20            THE COURT:  IT'S ADMITTED.

21       (PLAINTIFF'S EXHIBIT CX 6839 WAS ADMITTED IN EVIDENCE.)

22            THE COURT:  GO AHEAD, PLEASE.

23   BY MR. MATHESON:

24   Q.  NOW, MR. KOLIANDER, ERIC KOLIANDER, HIS COMMENTS ARE IN

25   RED ON THE FIRST PAGE OF THIS E-MAIL; IS THAT RIGHT?

1    A.   YES.

2    Q.   AND MR. ERIC KOLIANDER AT THE TIME WAS THE APPLE ACCOUNT

3    MANAGER?

4    A.   THAT IS CORRECT.

5    Q.   ARABIC NUMERAL 3 UNDER THE E-MAIL YOU SENT TO

6    MR. KOLIANDER READS "THIS ACCOUNT HAS STRATEGIC VALUE."

7         DO YOU SEE THAT?

8    A.   YES.

9    Q.   DIRECTING YOUR ATTENTION TO THE SECOND SENTENCE, YOU WRITE

10   "CONSEQUENTLY, I WOULD LIKE TO UNDERSTAND WHAT ELSE WE SHOULD

11   ASK TO FURTHER SECURE OUR POSITION AT APPLE/MAXIMIZE OUR

12   PRESENT LEVERAGE IF THEY GO CDMA."

13        NOW, BY "YOUR PRESENT LEVERAGE IF THEY GO CDMA," YOU WERE

14   REFERRING TO THE LEVERAGE THAT QUALCOMM POSSESSED BECAUSE NO

15   OTHER CHIP SUPPLIER COULD SATISFY APPLE'S CDMA REQUIREMENTS AT

16   THIS TIME; RIGHT?

17   A.   SPECIFICALLY AT THE TIME, THE APPLE REQUIREMENTS FOR THE

18   CHIPSETS, WE BELIEVED THAT WE WERE THE ONLY ONE TO MEET THEIR

19   REQUIREMENTS, THEREFORE, THEY WANTED OUR PRODUCTS.  SO I FELT

20   WE HAVE PRODUCT LEVERAGE BECAUSE THEY WANTED TO USE OUR PRODUCT

21   AS WE COULD MEET THEIR REQUIREMENTS.

22   Q.   THANK YOU.

23        TURN TO THE NEXT PAGE OF THE DOCUMENT, SIR.  AT THE TOP OF

24   THE PAGE THERE'S BRACKETED COMMENT FROM EK.

25        IS THAT MR. KOLIANDER?

1    A.   YES.

2    Q.   AND YOU RESPOND WITH YOUR INITIALS, CA, THAT'S YOURSELF;

3    CORRECT?

4    A.   I CAN'T READ THE PRECISE, LOOKING AT THIS IN COLOR WHETHER

5    IT'S HIS QUESTION TO ME OR IT IS MY COMMENT BACK TO HIM.

6    Q.   OKAY.  MR. KOLIANDER WRITES, "TRUTHFULLY, WE SHOULD TAKE A

7    HARDER LINE WITH THESE ISSUES FOR CDMA SINCE THEIR OPTIONS ARE

8    LIMITED."

9         THEIR OPTIONS REFERS TO APPLE'S OPTIONS; RIGHT?

10   A.   THAT IS CORRECT.

11   Q.   TURN YOUR ATTENTION, SIR, TO CX 6840, IT'S THE NEXT TAB

12   AND DOCUMENT?

13   A.   I HAVE IT.

14   Q.   CAN YOU IDENTIFY THIS, SIR, AS A -- EITHER AN INVITATION

15   OR E-MAIL ON WHICH YOU'RE INCLUDED IN JULY OF 2009 AND AUGUST

16   OF 2009?

17   A.   YES, I DO.

18        MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6840 INTO

19   EVIDENCE.

20        MS. SESSIONS:  NO OBJECTION.

21        THE COURT:  IT'S ADMITTED.

22   (PLAINTIFF'S EXHIBIT CX 6840 WAS ADMITTED IN EVIDENCE.)

23        THE COURT:  GO AHEAD, PLEASE.

24   BY MR. MATHESON:

25   Q.   TURNING YOUR ATTENTION TO THE QUESTION POSED ON THE BOTTOM

1      OF THE FIRST PAGE, THE QUESTION IS, "NOW THAT THE OPPORTUNITY

2      WITH MAVERICK IS CDMA ONLY, WHAT SHOULD OUR PRICING POSITION

3      BE?"

4           NOW, MAVERICK IN THAT CONTEXT REFERS TO APPLE; CORRECT?

5      A.   YES.

6      Q.   AND THE NEXT BULLET STATES, "RESULTED IN A VERY SPIRITED

7      DISCUSSION -- ALL ARE IN AGREEMENT THAT WE WOULD LIKE TO SEE A

8      CDMA PRICE PREMIUM OVER UMTS QUOTED PRICE."

9           DO YOU SEE THAT, SIR?

10     A.   YES.

11     Q.   AND THAT MEANS QUALCOMM INTENDED TO QUOTE APPLE A PRICE

12     THAT CHARGED A PREMIUM FOR A CDMA CAPABLE CHIP AS OPPOSED TO

13     THE PRICE IT QUOTED FOR A CHIP THAT COULD ONLY SUPPORT UMTS;

14     RIGHT?

15     A.   YES.  BECAUSE THE CDMA WOULD BE THE SUPER SET, IT WOULD

16     HAVE A HIGHER PRICE.

17     Q.   TURNING TO THE NEXT PAGE OF THE DOCUMENT, SIR,

18     CX 6840-002, UNDER OPPOSING POINTS, THE VERY FINAL BULLET READ,

19     "MAY MOTIVATE MAVERICK TO LIGHT UP A CDMA COMPETITOR."

20          NOW, "LIGHT UP" WOULD ENTAIL APPLE GIVING BUSINESS TO A

21     QUALCOMM CDMA COMPETITOR; RIGHT?

22     A.   I'M SORRY.  I CANNOT LOCATE THE PARAGRAPH.  WHAT'S --

23     Q.   IT'S HALFWAY DOWN THE PAGE?

24     A.   OH, I SEE.

25     Q.   OPPOSING POINTS, FINAL BULLET.

1              SO IN THAT CONTEXT, MAVERICK LIGHTING UP A CDMA COMPETITOR

2    WOULD MEAN MAVERICK GIVING BUSINESS TO A QUALCOMM COMPETITOR;

3    RIGHT?

4    A.   YES.  I THINK MY UNDERSTANDING IS AT THAT TIME IT COULD BE

5    APPLE WOULD USE A DIFFERENT SOLUTION.

6    Q.   AND THAT CONTINUES -- THAT WAS CONSIDERED UNLIKELY AT THE

7    TIME BY QUALCOMM, RIGHT, ACCORDING TO THAT BULLET?

8    A.   THAT IS CORRECT.

9    Q.   WOULD YOU MOVE, SIR, TO CX 8276.  IT SHOULD BE TAB 4 IN

10   YOUR BINDER.

11   A.   READY.

12   Q.   CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL EXCHANGE BETWEEN

13   YOURSELF, MR. MOLLENKOPF, AND OTHERS IN DECEMBER 2012?

14   A.   YES, I DO.

15              MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 8276.

16              MS. SESSIONS:  NO OBJECTION.

17              THE COURT:  IT'S ADMITTED.

18        (PLAINTIFF'S EXHIBIT CX 8276 WAS ADMITTED IN EVIDENCE.)

19              THE COURT:  GO AHEAD, PLEASE.

20   BY MR. MATHESON:

21   Q.   THIS E-MAIL RELATES TO PRICING DISCUSSIONS WITH APPLE; IS

22   THAT CORRECT?  WELL, MAVERICK IN THE SUBJECT LINE OF THE E-MAIL

23   IS APPLE; RIGHT?

24   A.   THAT IS CORRECT.  IT TALKS ABOUT PRICING AND SOME PRODUCT

25   SCHEDULES AS WELL.

AMON DIRECT BY MR. MATHESON

1    Q.   OKAY.  NOW, CAN YOU DIRECT YOUR ATTENTION TO THE BULLET IN

2    THE CENTER OF THE PAGE THAT BEGINS, "THE ABOVE MEANS THAT WE

3    REDUCE OUR ASP PREMIUM TO BUY EXCLUSIVITY AS DONE IN THE

4    ORIGINAL DEAL."

5         DO YOU SEE THAT, SIR?

6    A.   YES, I DO.

7    Q.   THE ORIGINAL DEAL REFERS TO THE ORIGINAL TRANSITION

8    AGREEMENT NEGOTIATED BETWEEN QUALCOMM AND APPLE IN 2011; RIGHT?

9    A.   I'M ASSUMING, YES.  I CAN'T RECALL IF THE NAME WAS

10   TRANSITION AGREEMENT FOR SURE, BUT, YES, I'M ASSUMING THAT'S

11   THE CASE.

12   Q.   THANK YOU.

13        CAN YOU PLEASE TURN TO TAB 7 IN YOUR BINDER, SIR, WHICH IS

14   CX 7606.

15   A.   READY.

16   Q.   CAN YOU IDENTIFY THIS AS A 2011 QCT STRATEGIC PLAN?

17   A.   YES.

18             MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7606.

19             MS. SESSIONS:  NO OBJECTION.

20             THE COURT:  IT'S ADMITTED.

21        (PLAINTIFF'S EXHIBIT CX 7606 WAS ADMITTED IN EVIDENCE.)

22             THE COURT:  GO AHEAD, PLEASE.

23   BY MR. MATHESON:

24   Q.   COULD YOU TURN TO CX 7606-029.  THAT REFERS TO THE BATES

25   NUMBERS IN THE LOWER RIGHT, NOT THE PAGE NUMBER.

1              THIS DISPLAYS QCT MARKET SHARE BY TECHNOLOGY; CORRECT.

2      A.   YES.

3      Q.   FOR FISCAL YEAR 2010, THE CDMA QCT MARKET SHARE IS 95

4      PERCENT; RIGHT?

5      A.   YES, THAT'S WHAT IT SAYS.

6      Q.   AND THIS SEPARATELY PRESENTS WCDMA MARKET SHARES AND LTE

7      MARKET SHARES; RIGHT?

8      A.   YES.

9      Q.   TURN TO THE NEXT PAGE OF THE DOCUMENT, SIR, IT ENDS IN

10     DASH 030.

11             I'D LIKE TO DIRECT OUR ATTENTION TO THE LITTLE RECTANGLES

12     IN BETWEEN THE TOP DRAFT AND THE BOTTOM CHART.

13             LOOKING AT THE BOTTOM CHART, THE TIERS ON THE LEFT ARE

14     TABLET/SMARTPHONE, SMARTPHONE HIGH, SMARTPHONE MID, AND THEN ON

15     DOWN.

16             DO YOU SEE THAT?

17     A.   YES.

18     Q.   ALL RIGHT.  DIRECTING YOUR ATTENTION TO THE RECTANGLES,

19     THE SECOND ONE FROM THE RIGHT IS SP HIGH, $300 AND UP.

20             DO YOU SEE THAT, SIR?

21     A.   YES.

22     Q.   THAT REFERS TO THE SMARTPHONE HIGH TIER; RIGHT?

23     A.   I THINK AT THAT TIME IT REFERS TO THE SMARTPHONE HIGH

24     TIER, YES.

25     Q.   TURN YOUR ATTENTION TO THE NEXT TAB IN THE DOCUMENT, SIR,

1        TAB 8.

2             CAN YOU IDENTIFY THIS, SIR, AS A 2012 QCT STRAT PLAN?

3    A.   YES.

4             MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7607.

5             MS. SESSIONS:  NO OBJECTION.

6             THE COURT:  IT'S ADMITTED.

7        (PLAINTIFF'S EXHIBIT CX 7607 WAS ADMITTED IN EVIDENCE.)

8             THE COURT:  AND I APOLOGIZE, BUT I'M GOING TO

9    INTERRUPT YOU HERE SO WE CAN TAKE OUR LUNCH BREAK.

10             MR. MATHESON:  THANK YOU, YOUR HONOR.

11             THE COURT:  OKAY.  THE TIME IS NOON.  SO WE WILL TAKE

12   A ONE HOUR BREAK.  I'LL SEE EVERYONE BACK AT 1:00 O'CLOCK.

13        THANK YOU VERY MUCH.

14        (THE LUNCH RECESS WAS TAKEN FROM 12:00 P.M. UNTIL 1:01

15   P.M.)

16

17

18

19

20

21

22

23

24

25

AMON DIRECT BY MR. MATHESON

| | |
|---|---|
| 1 | **AFTERNOON SESSION** |
| 2 | (COURT CONVENED AT 1:01 P.M.) |
| 3 | THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT. |
| 4 | TIME IS 1:01.  GO AHEAD EXAMINE CONTINUE, PLEASE. |
| 5 | MS. SESSIONS:  I'M SORRY, YOUR HONOR, BEFORE |
| 6 | MR. MATHESON BEGINS HIS EXAMINATION, I APOLOGIZE, BUT IN THE |
| 7 | CONFUSION ABOUT THE SEALING DOCUMENTS THIS MORNING, WE HAD |
| 8 | TALKED ABOUT CX 8256 -- |
| 9 | THE COURT:  OKAY. |
| 10 | MS. SESSIONS:  -- WHICH, IN FACT, QUALCOMM IS MOVING |
| 11 | TO SEAL. |
| 12 | THE COURT:  OKAY. |
| 13 | MS. SESSIONS:  QX 8256 IS A 2016 STRATEGIC PLAN, AND |
| 14 | THROUGHOUT THE DOCUMENT THERE'S DETAILED INFORMATION ABOUT |
| 15 | FINANCIAL PLANNING THROUGH 2021, AS WELL AS STRATEGIC BUSINESS |
| 16 | PLANS THROUGH 2021, AND DUE TO THE FACT THAT THIS STRATEGIC |
| 17 | INFORMATION IS THROUGHOUT THE DOCUMENT, QUALCOMM WOULD MOVE TO |
| 18 | SEAL THE ENTIRE DOCUMENT. |
| 19 | THE COURT:  THAT'S DENIED.  THERE'S NOTHING |
| 20 | CONFIDENTIAL IN PAGE 1. |
| 21 | MS. SESSIONS:  OKAY. |
| 22 | THE COURT:  2 IS A BLANK BLUE PAGE WITH ZERO TEXT.  3 |
| 23 | IS ALSO A BLANK PAGE WITH ONLY ATTORNEYS BATES NUMBER AND -- |
| 24 | MS. SESSIONS:  OKAY.  YOUR HONOR -- |
| 25 | THE COURT:  AND 4 IS A BLANK BLUE PAGE. |

AMON DIRECT BY MR. MATHESON

```
 1                MS. SESSIONS:  I CAN GO PAGE BY PAGE.

 2                THE COURT:  YES.

 3                MS. SESSIONS:  PAGE 10 IS THE FIRST PAGE THAT

 4      QUALCOMM WOULD SEEK TO SEAL.

 5                THE COURT:  THAT'S FINE.  THAT'S SEALED.

 6                MS. SESSIONS:  OKAY.  PAGE 18.

 7                THE COURT:  THAT'S FINE.

 8                MS. SESSIONS:  PAGE 20.

 9                THE COURT:  OKAY.  THAT'S FINE.

10                MS. SESSIONS:  PAGE 21.

11                THE COURT:  THAT'S FINE.

12                MS. SESSIONS:  PAGE 26.

13                THE COURT:  YES.

14                MS. SESSIONS:  28.

15                THE COURT:  SEALED.

16                MS. SESSIONS:  29.

17                THE COURT:  SEALED.

18                MS. SESSIONS:  30.

19                THE COURT:  SEALED.

20                MS. SESSIONS:  32.

21                THE COURT:  SEALED.

22                MS. SESSIONS:  33 THROUGH 37.

23                THE COURT:  THAT'S SEALED.

24                MS. SESSIONS:  39.

25                THE COURT:  YOU SAID 32 THROUGH 37; CORRECT?
```

```
 1              MS. SESSIONS:  I SAID 32 THROUGH 37, YES, YOUR HONOR.

 2              THE COURT:  THAT'S SEALED.

 3              MS. SESSIONS:  39.

 4              THE COURT:  THAT'S FINE.

 5              MS. SESSIONS:  41.

 6              THE COURT:  I'LL SEAL THAT.

 7              MS. SESSIONS:  55.

 8              THE COURT:  YES.

 9              MS. SESSIONS:  63.

10              THE COURT:  YES.

11              MS. SESSIONS:  64.

12              THE COURT:  YES.

13              MS. SESSIONS:  66.

14              THE COURT:  I THINK THAT ONE IS BORDERLINE.

15      WHAT'S -- WHAT'S NECESSARY ABOUT THIS?

16              MS. SESSIONS:  YOUR HONOR, I BELIEVE THAT IT INCLUDES

17      ANTICIPATED FEATURES OF A PRODUCT THAT HAS NOT BEEN RELEASED

18      PUBLICLY YET.

19              THE COURT:  ALL RIGHT.  THAT'S FINE.  THAT'S 66.

20              MS. SESSIONS:  THE NEXT ONE IS 69.

21              THE COURT:  THAT'S FINE.

22              MS. SESSIONS:  73.

23              THE COURT:  THAT'S FINE.

24              MS. SESSIONS:  74.

25              THE COURT:  YES.
```

AMON DIRECT BY MR. MATHESON

```
 1              MS. SESSIONS:  76.

 2              THE COURT:  YES.

 3              MS. SESSIONS:  78.

 4              THE COURT:  YES.

 5              MS. SESSIONS:  79.

 6              THE COURT:  YES.

 7              MS. SESSIONS:  84.

 8              THE COURT:  YES.

 9              MS. SESSIONS:  105.

10              THE COURT:  YES.

11              MS. SESSIONS:  106, 107, 10 -- I'M ACTUALLY GOING

12      THROUGH 110.  SO 105 THROUGH 110.

13              THE COURT:  THAT'S FINE.

14              MS. SESSIONS:  PAGE 112, ONLY THE RIGHT HALF OF THE

15      DOCUMENT.

16              THE COURT:  OKAY.

17              MS. SESSIONS:  PAGE 113.

18              THE COURT:  THIS IS PROSPECTIVE AS WELL -- OR IT'S

19      NOT CLEAR FROM THE PAGE ITSELF?

20              MS. SESSIONS:  YOUR HONOR, I BELIEVE IT'S

21      PROSPECTIVE.  BUT I -- I'M NOT POSITIVE.

22              THE COURT:  I'M GOING TO DENY ON THIS.

23              MS. SESSIONS:  OH, IT IS -- SORRY, YOUR HONOR.  I

24      JUST WAS TOLD THAT THIS IS -- SLIDE 113.

25              THE COURT:  IT'S 2016.
```

```
 1                  MS. SESSIONS:  IT IS A --

 2                  THE COURT:  PROSPECTIVE TO WHAT, 2018?

 3                  MS. SESSIONS:  -- PLANNING DOCUMENT FOR FUTURE

 4         PLANNED PRODUCTS THAT I DON'T THINK HAVE BEEN RELEASED YET.

 5                  THE COURT:  IT'S AN 18-MONTH SHELF LIFE.  THESE ARE

 6         ALL FROM JUNE OF 2018.

 7              WE'RE GOING ON MORE THAN TWO AND A HALF YEARS.

 8              I DON'T THINK IT'S SEALABLE.  BUT -- I'M GOING TO DENY ON

 9         113.

10              GO AHEAD, PLEASE.

11                  MS. SESSIONS:  OKAY.  114, PLEASE.

12                  THE COURT:  THAT'S DENIED.

13                  MS. SESSIONS:  115.

14                  THE COURT:  GRANTED.

15                  MS. SESSIONS:  128.

16                  THE COURT:  GRANTED.

17                  MS. SESSIONS:  129.

18                  THE COURT:  GRANTED.

19                  MS. SESSIONS:  132.

20                  THE COURT:  GRANTED.

21                  MS. SESSIONS:  133.

22                  THE COURT:  GRANTED.

23                  MS. SESSIONS:  135.

24                  THE COURT:  GRANTED.

25                  MS. SESSIONS:  136.
```

AMON DIRECT BY MR. MATHESON

```
1              THE COURT:  GRANTED.

2              MS. SESSIONS:  141.

3              THE COURT:  GRANTED.

4              MS. SESSIONS:  142.

5              THE COURT:  GRANTED.

6              MS. SESSIONS:  143.

7              THE COURT:  GRANTED.

8              MS. SESSIONS:  144.

9              THE COURT:  GRANTED.

10             MS. SESSIONS:  145.

11             THE COURT:  GRANTED.

12             MS. SESSIONS:  146.

13             THE COURT:  YES, GRANTED.

14             MS. SESSIONS:  149.

15             THE COURT:  OKAY.  GRANTED.

16             MS. SESSIONS:  150.

17             THE COURT:  GRANTED.

18             MS. SESSIONS:  152.

19             THE COURT:  GRANTED.

20             MS. SESSIONS:  156.

21             THE COURT:  GRANTED.

22             MS. SESSIONS:  157.

23             THE COURT:  OKAY.  GRANTED.

24             MS. SESSIONS:  158.

25             THE COURT:  THAT'S DENIED.
```

AMON DIRECT BY MR. MATHESON

```
1            MS. SESSIONS:  159.

2            THE COURT:  GRANTED.

3            MS. SESSIONS:  160.

4            THE COURT:  GRANTED.

5            MS. SESSIONS:  166.

6            THE COURT:  GRANTED.

7            MS. SESSIONS:  AND 167.

8            THE COURT:  GRANTED.

9            MS. SESSIONS:  THANK YOU, YOUR HONOR.

10           THE COURT:  OKAY.  THANK YOU.

11      OKAY.  TIME IS 1:10.

12      GO AHEAD, PLEASE.

13   BY MR. MATHESON:

14   Q.   THANKS FOR JOINING US, SIR.

15        COULD YOU TAKE A LOOK AT TAB 8 OF YOUR BINDER, CX 7607.

16   THIS IS THE 2012 COMMITMENT TO THE INDUSTRY STRAT PLAN WE WERE

17   DISCUSSING.

18        COULD YOU PLEASE TURN YOUR ATTENTION TO CX 2607.  IT'S TAB

19   8 IN YOUR BINDER.

20        TURNING YOUR ATTENTION TO THE TOP LEFT OF THE CHART.  WE

21   CAN BLOW THAT UP.

22   A.   I'M SORRY, WHICH PAGE?

23   Q.   061.  CX 7607-01?

24   A.   THANK YOU.

25   Q.   THIS REPRESENTS HANDSET PREMIUM TIER IN WHICH THE HANDSET
```

1    IS PRICED OVER $300; CORRECT?

2    A.   YES, THAT'S CORRECT.

3    Q.   AND IT INDICATES THAT QUALCOMM ASSOCIATES A $4 CDMA ADDER

4    WITH PHONES IN SUCH A TIER; IS THAT RIGHT?

5    A.   YES, THAT IS CORRECT.

6    Q.   TURN TO THE NEXT TAB IN YOUR BINDER, SIR, WHICH IS TAB 9.

7         THIS IS CX 7644.  CAN YOU IDENTIFY THIS AS THE QCT 2000 --

8    FISCAL YEAR 2014 STRAT PLAN?

9    A.   THAT IS CORRECT.

10        MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7644.

11        MS. SESSIONS:  NO OBJECTION.

12        THE COURT:  IT'S ADMITTED.

13   (PLAINTIFF'S EXHIBIT CX 7644 WAS ADMITTED IN EVIDENCE.)

14        THE COURT:  GO AHEAD, PLEASE.

15   BY MR. MATHESON:

16   Q.   NOW, TURNING YOUR ATTENTION TO THE SECOND PAGE OF THE

17   DOCUMENT, CX 7600-002, THIS IS DATED JUNE 10TH, 2013; RIGHT?

18   A.   THAT IS CORRECT.

19   Q.   AND TURN YOUR ATTENTION TO CX 7644-054, SIR.

20   A.   READY.

21   Q.   SO TURNING YOUR ATTENTION TO THIS TABLE IN THE TOP LEFT,

22   THE SMARTPHONE PREMIUM SEGMENT IS NOW ASSOCIATED WITH A HANDSET

23   PRICE OF $400 IN THERE; RIGHT?

24   A.   YES, THAT'S WHAT THE DOCUMENT SAYS.

25   Q.   AND LOOKING DOWN ONE TIER, THE SMARTPHONE HIGH TIER IS

1    ASSOCIATED WITH A PRICE OF $250 TO $400; RIGHT?

2    A.   THAT IS CORRECT.

3    Q.   TURN YOUR ATTENTION TO THE NEXT TAB IN YOUR BINDER, SIR,

4    WHICH IS TAB 10, JX 0096.  CAN YOU IDENTIFY THIS, SIR, AS THE

5    2015, FISCAL YEAR 2015, THAT IS, QCT STRAT PLAN?

6    A.   IT'S THE SECOND PAGE IS THE 2014 STRATEGIC PLAN FOR 2015.

7    Q.   THAT'S A TRUE STATEMENT.

8         TURN YOUR ATTENTION, SIR, TO THE DATE OF THE DOCUMENT,

9    THIS IS JUNE 2014; RIGHT?

10   A.   THAT IS CORRECT.

11   Q.   AND THE TITLE OF THE POWERPOINT, TURNING YOUR ATTENTION TO

12   THE FIRST PAGE, JX 0096-001, IS FY 15 STRAT PLAN DECK; RIGHT?

13   A.   THAT LOOKS TO ME IS THE FILE NAME.

14   Q.   OKAY.  TURN YOUR ATTENTION, SIR, TO PAGE DASH 0126.  IT'S

15   JX --

16        OH, YOUR HONOR, MOVE TO ADMIT INTO EVIDENCE JX 0096.

17           MS. SESSIONS:  NO OBJECTION.

18           THE COURT:  ALL RIGHT.  IT'S ADMITTED.

19        (JOINT EXHIBIT JX 0096 WAS ADMITTED IN EVIDENCE.)

20           THE COURT:  AND YOU'LL NOTE IN THE JOINT EXHIBIT LIST

21   THE SEALED PAGES OF THIS DOCUMENT?

22           MR. MATHESON:  YES, YOUR HONOR.

23   Q.   PAGE JX 0096-0126.

24   A.   YES.

25   Q.   NOW, THE PREMIUM HIGH TIER INDICATED IN THIS JUNE 2014

1       PRESENTATION COVERS HANDSETS ASSOCIATED WITH A PRICE OF $250 TO

2       $400 AND UP; IS THAT RIGHT?

3       A.   THAT IS CORRECT.

4       Q.   AND THE FORECAST IN JUNE 2014 WAS THAT BY THE FOURTH

5       QUARTER OF 2014, MEDIATEK WOULD HAVE A PRODUCT IN THE HIGH OR

6       PREMIUM TIER ACTION, IS THAT ACCURATE BASED ON THIS DOCUMENT?

7       A.   BASED ON THIS DOCUMENT, THIS IS WHAT IT'S SHOWING, THEY

8       WOULD HAVE A PRODUCT IN THAT CATEGORY.

9       Q.   NOW, MEDIATEK DID NOT ACTUALLY LAUNCH A PRODUCT IN THE

10      PREMIUM TIER IN 2014, DID IT?

11      A.   I DON'T KNOW IF THEY SPECIFICALLY LAUNCHED THIS PRODUCT

12      AND WHETHER IT WAS APPLIED TO THE PREMIUM TIER.  I DON'T KNOW.

13      Q.   AND YOU DON'T KNOW IF MEDIATEK LAUNCHED ANY PRODUCTS THAT

14      QUALCOMM CONSIDERED TO BE IN THE PREMIUM TIER IN 2015; IS THAT

15      CORRECT?

16      A.   IN 2015, WE DEFINE OUR PREMIUM TIER, WHICH IS THE

17      SNAPDRAGON 800, WE DO NOT BELIEVE MEDIATEK HAD A PRODUCT IN

18      THAT CATEGORY.

19      Q.   TURN YOUR ATTENTION TO THE NEXT TAB, TURN YOUR ATTENTION

20      TO TAB 16, WHICH IS CX 8256.

21           CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL YOU RECEIVED IN

22      JULY OF 2016 ATTACHING QCT STRAT PLAN DECKS?

23      A.   YES, I DO.

24           MR. MATHESON:  YOUR HONOR, SEEK TO ADMIT CX 8256.

25           MS. SESSIONS:  NO OBJECTION.

```
 1              THE COURT:  IT'S ADMITTED.

 2         (PLAINTIFF'S EXHIBIT CX 8256 WAS ADMITTED IN EVIDENCE.)

 3              THE COURT:  GO AHEAD, PLEASE.

 4    BY MR. MATHESON:

 5    Q.   TURN YOUR ATTENTION, SIR, TO CX 8256-112.

 6              MS. SESSIONS:  THIS IS A SLIDE WHERE PART OF IT HAS

 7    BEEN SEALED.

 8              MR. MATHESON:  CORRECT.  SO WE ARE BLOCKING THIS OFF

 9    FROM THE PUBLIC VIEW, YOUR HONOR, BUT YOU CAN SEE IT ON YOUR

10    SCREEN.

11    Q.   AND, SIR, YOU SHOULD BE ABLE TO SEE IT ON YOUR SCREEN AS

12    WELL.

13              THE COURT:  WHICH PAGE NUMBER?

14              MR. MATHESON:  CX 825-112.  THE RIGHT-HAND PORTION OF

15    THE DOCUMENT HAS BEEN SEALED.  I'LL REFER TO THE LEFT-HAND

16    PORTION OF THE DOCUMENT WHICH HAS NOT BEEN SEALED.

17              THE COURT:  OKAY.

18              THE WITNESS:  I HAVE IT.

19    BY MR. MATHESON:

20    Q.   IT'S ACCURATE, SIR, THAT IN 2016 QUALCOMM CONTINUED TO

21    VIEW PREMIUM TIER CHIPS AS ASSOCIATED WITH HANDSET PRICES OF

22    $400 AND UP; IS THAT RIGHT?

23    A.   IN -- THAT'S WHAT THIS SLIDE IS SAYING, THAT IS CORRECT.

24    Q.   CAN WE ADDRESS 5G BRIEFLY, SIR.

25              NOW, AGAIN, I DON'T WANT TO REFER TO ANY SPECIFIC EVENTS
```

1    THAT OCCURRED SINCE YOUR MARCH 2018 DEPOSITION.  IT'S ACCURATE

2    THAT AT YOUR MARCH 2018 DEPOSITION, YOU BELIEVED THAT

3    QUALCOMM'S 5G MODEM WAS SIGNIFICANTLY AHEAD OF THE COMPETITION

4    IN TERMS OF DEVELOPMENT; IS THAT RIGHT?

5    A.   THAT IS CORRECT.

6    Q.   AND YOU BELIEVE THAT QUALCOMM WILL HAVE A TIME TO MARKET

7    ADVANTAGE IN ITS 5G MODEM COMPARED TO THE COMPETITION; RIGHT?

8    A.   YEAH.  THAT HAS BEEN OUR GOAL, AND THAT'S WHAT WE'RE

9    AIMING FOR.

10   Q.   TURN TO CX 5321, WHICH IS TAB 13 IN YOUR BINDER, SIR.

11   A.   I HAVE 50 -- TAB 18 IS 5053.

12   Q.   TAB 13, I BELIEVE.

13   A.   OH, 13.  I'M SORRY.  READY.

14   Q.   CAN YOU IDENTIFY THIS, SIR, IN AN E-MAIL EXCHANGE IN WHICH

15   YOU WERE INVOLVED IN DECEMBER OF 2015?

16   A.   YES.

17            MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 5321.

18            MS. SESSIONS:  NO OBJECTION.

19            THE COURT:  IT'S ADMITTED.

20       (PLAINTIFF'S EXHIBIT CX 5321 WAS ADMITTED IN EVIDENCE.)

21            THE COURT:  GO AHEAD, PLEASE.

22   BY MR. MATHESON:

23   Q.   NOW, TURNING YOUR ATTENTION TO THE E-MAIL YOU RECEIVED

24   THAT, AT THE BOTTOM OF THIS PAGE, ADDRESSED TO DEREK,

25   CRISTIANO, AND ERIC, IN 2015 QUALCOMM WAS ENGAGED IN A LICENSE

1    DISPUTE WITH VIVO.  IS THAT ACCURATE?

2    A.   I CAN'T REALLY RECALL IF THERE WAS A LICENSE DISPUTE WITH

3    VIVO AT THE TIME.

4    Q.   TURN YOUR ATTENTION, SIR, TO THE SECOND PAGE OF THE

5    DOCUMENT.  THE BOLDED PORTION AT THE BOTTOM, IT BEGINS, "DURING

6    THE LAST 24 HOURS," AND THE FINAL LINES READ, THAT VIVO HAS

7    REQUESTED.  IS IT FAIR TO STATE THAT VIVO HAS REQUESTED THAT IF

8    QTL PROVIDES CONFIRMATION, THAT IF VIVO CONTINUES TO NEGOTIATE

9    WITH QTL IN GOOD FAITH, QCT WILL CONTINUE SHIPPING CHIPSETS?

10        DO YOU SEE THAT, SIR?

11   A.   YES, I DO.

12   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT QUALCOMM WAS

13   ENGAGED IN A LICENSE DISPUTE WITH VIVO AT THE TIME IN 2015?

14   A.   IT REFRESHED MY RECOLLECTION THAT A LICENSE WILL BE

15   REQUIRED FOR VIVO TO ENGAGE IN CHIPS WITH QCT, AND WE WERE AT

16   THAT POINT IN TIME WAITING THAT PROCESS.

17   Q.   NOW, ONE OF THE THINGS THAT VIVO OFFERED WAS TO REFRAIN

18   FROM LAUNCHING PHONES WITH MEDIATEK CHIPSETS; IS THAT RIGHT?

19   A.   THAT'S NOT WHAT THIS IS SAYING.

20   Q.   TURN YOUR ATTENTION, SIR, TO THE FIRST PAGE.  THE E-MAIL

21   ADDRESSED TO YOURSELF, DEREK, AND ERIC READS, "THE OBJECTIVE OF

22   THIS E-MAIL IS TO REQUEST CONFIRMATION FROM YOU SUCH THAT IF

23   VIVO NEGOTIATES ITS QTL LICENSE IN GOOD FAITH THAT QCT WILL

24   CONTINUE SHIPPING CHIPSETS."

25        AND THEN THERE'S A SUMMARY OF THE ADVANTAGES FOR QCT; IS

AMON DIRECT BY MR. MATHESON

1     THAT RIGHT?

2     A.   I'M SORRY.  WHAT'S YOUR SECOND QUESTION?  THERE IS A

3     SUMMARY, AND THEN WHAT?

4     Q.   THE NEXT SENTENCE STATES, THERE IS A SUMMARY OF ADVANTAGES

5     THAT THIS DEAL PRESENTS FOR QCT; RIGHT?

6     A.   THAT IS CORRECT.

7     Q.   AND ONE OF THE ADVANTAGES IS THAT QCT CAN ACHIEVE 100

8     PERCENT OF VIVO'S ROADMAP IN THE FACE OF, FIRST, MTK HAS PIN

9     FOR PIN AND SOFTWARE COMPATIBILITY.

10          THAT'S THE FIRST CONSIDERATION; CORRECT?

11     A.   GIVE ME A MOMENT TO READ.

12          (PAUSE IN PROCEEDINGS.)

13          THE WITNESS:  WHAT THIS IS SAYING IS THAT WE CAN

14     ACHIEVE 100 PERCENT OF VIVO ROADMAP, AND THEY SAID IN THE FACE

15     OF ONE DESCRIBING MEDIATEK COMPETITION ADVANTAGES THAT THEY

16     HAVE, PIN AND SOFTWARE COMPATIBILITY WITH WHATEVER THE

17     INCUMBENT CHIPSET IN VIVO WAS.

18     BY MR. MATHESON:

19     Q.   THANK YOU.  IF YOU TURN YOUR ATTENTION TO THE SECOND PAGE

20     OF THE DOCUMENT, SIR?

21     A.   YES.

22     Q.   THE SECOND MAJOR BULLET PORTION READS, "WHAT VIVO WILL

23     COMMIT TO PENDING QTL CONFIRMATION THAT IF VIVO CONTINUES TO

24     NEGOTIATE WITH QTL IN GOOD FAITH, QCT WILL CONTINUE SHIPPING

25     CHIPSETS."

AMON DIRECT BY MR. MATHESON

1            DO YOU SEE THAT, SIR?

2       A.   THAT IS CORRECT.

3       Q.   AND THE VERY FIRST BULLET READS "WILL NOT LAUNCH CS

4    6755/6750 BASED HANDSETS (WHICH MEANS QCT WILL WIN SIGNIFICANT

5    UPSIDE IN 2016)."

6            NOW, 6755/6750 REFERRED TO MEDIATEK CHIPS; RIGHT?

7       A.   I BELIEVE SO.

8       Q.   TURN YOUR ATTENTION, SIR, TO TAB 18 OF YOUR BINDER, WHICH

9    IS CX 5053.

10           CAN YOU IDENTIFY THIS DOCUMENT, SIR, AS AN E-MAIL EXCHANGE

11   IN WHICH YOU WERE INVOLVED IN 2012 WITH MR. MOLLENKOPF AND

12   OTHERS?

13      A.   YES, I DO.

14      Q.   TURN YOUR ATTENTION TO THE SECOND PAGE OF THE DOCUMENT,

15   SIR, CX 5053-002.

16           THIS IS AN E-MAIL EXCHANGE BETWEEN YOURSELF AND

17   MR. REIFSCHNEIDER; IS THAT CORRECT?

18      A.   THAT IS CORRECT.  THIS IS AN ERIC E-MAIL TO ME.

19      Q.   AND THE TOPIC YOU'RE ADDRESSING IS QCT'S ABILITY TO SHIP

20   CHIPSETS TO CUSTOMERS THAT WILL USE THEM IN TD-SCDMA/CSM

21   PRODUCTS; RIGHT?

22      A.   THAT IS CORRECT.  IT'S ADDRESSING QCT WOULD LIKE TO ENGAGE

23   IN BUSINESS WITH THOSE CUSTOMERS.

24           MR. MATHESON:  YOUR HONOR, I MOVE TO ADMIT CX 5053.

25           MS. SESSIONS:  NO OBJECTION.

1              THE COURT:  IT'S ADMITTED.

2         (PLAINTIFF'S EXHIBIT CX 5053 WAS ADMITTED IN EVIDENCE.)

3              THE COURT:  GO AHEAD, PLEASE.

4    BY MR. MATHESON:

5    Q.   NOW, ARABIC NUMERAL 3 READS, "IF ANY OF THESE CUSTOMERS

6    REFUSES OR FAILS TO PAY ROYALTIES ON ANY OTHER (I.E., C2K,

7    UMTS, LTE) DEVICE, WE WILL DISCONTINUE SUPPLY TO SUCH CUSTOMERS

8    IF NECESSARY."

9         RIGHT?

10   A.   YES, THAT'S WHAT IT'S SAYING.

11   Q.   NOW, "ANY OTHER DEVICES" MEANS DEVICES OTHER THAN

12   TD-SCDMA/GSM; RIGHT?

13   A.   YES, I'M ASSUMING THAT'S WHAT HE WAS REFERRING TO.

14   Q.   AND TURN YOUR ATTENTION, SIR, TO TAB 14 IN YOUR BINDER,

15   WHICH IS CX 7024.

16   A.   READY.

17   Q.   CAN YOU IDENTIFY THESE AS HANDWRITTEN NOTES THAT YOU

18   YOURSELF CREATED?

19   A.   YES.

20              MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7024.

21              MS. SESSIONS:  NO OBJECTION.

22              THE COURT:  IT'S ADMITTED.

23         (PLAINTIFF'S EXHIBIT CX 7024 WAS ADMITTED IN EVIDENCE.)

24              THE COURT:  GO AHEAD, PLEASE.

25

1    BY MR. MATHESON:

2    Q.   TURN YOUR ATTENTION ABOUT HALFWAY DOWN THE DOCUMENT,

3    THERE'S A DATE, 12-9-15, RICK AND TEAM, DASH MOTOROLA.  DO YOU

4    SEE THAT?

5    A.   YES, I DO.

6    Q.   RICH THERE REFERRED TO RICK OSTERLOH, THE PRESIDENT OF

7    MOTOROLA.  I BELIEVE IT'S O-S-T-E-R-L-O-H.

8         HE WAS THE PRESIDENT OF MOTOROLA; CORRECT?

9    A.   YES.

10   Q.   AND THIS REFLECTS NOTES YOU TOOK IN CONNECTION WITH THE

11   MEETING WITH MR. OSTERLOH; IS THAT RIGHT?

12   A.   THAT IS CORRECT.

13   Q.   THE FIRST BULLET READS, "ONE LICENSE.  ERIC CONSTANTLY

14   THREATENING TO CUT OFF SUPPLY."

15        DO YOU SEE THAT, SIR?

16   A.   YES, I DO.

17   Q.   ERIC THERE REFERS TO MR. ERIC REIFSCHNEIDER; RIGHT?

18   A.   I BELIEVE SO.

19             MR. MATHESON:  NO FURTHER QUESTIONS AT THIS TIME.

20             THE COURT:  ALL RIGHT.  TIME IS 1:25.

21        (PAUSE IN PROCEEDINGS.)

22             THE COURT:  THANK YOU.  ARE YOU READY?

23             MS. SESSIONS:  I AM, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  1:26.

25             MS. SESSIONS:  THANK YOU, YOUR HONOR.

1    JUSTINA SESSIONS FOR QUALCOMM.

2                        **CROSS-EXAMINATION**

3    BY MS. SESSIONS:

4    Q.   GOOD AFTERNOON, MR. AMON.

5    A.   GOOD AFTERNOON.

6    Q.   MR. AMON, WHERE ARE YOU FROM?

7    A.   I'M FROM BRAZIL.

8    Q.   WHAT'S YOUR EDUCATIONAL BACKGROUND?

9    A.   I'M AN ELECTRICAL ENGINEER.

10   Q.   WHERE DID YOU RECEIVE YOUR ENGINEERING DEGREE?

11   A.   I WENT TO UNIVERSITY IN BRAZIL.

12   Q.   HOW DID YOU COME TO THE U.S.?

13   A.   I WAS HIRED BY QUALCOMM.

14   Q.   APPROXIMATELY WHEN WERE YOU HIRED BY QUALCOMM?

15   A.   I WAS HIRED BY QUALCOMM IN AUGUST 1995.

16   Q.   AND WHEN DID YOU COME TO THE UNITED STATES?

17   A.   I CAME TO THE UNITED STATES IN THE LATE PART OF 2006.

18   Q.   COULD YOU BRIEFLY TAKE THE COURT THROUGH THE JOBS THAT

19   YOU'VE HAD AT QUALCOMM?

20   A.   YES.  I STARTED QUALCOMM AS AN ENGINEER.  THAT WAS PRIOR

21   TO THE FIRST CDMA TECHNOLOGY LAUNCH.

22        I HAD A NUMBER OF POSITIONS.  I WORKED MY WAY UP TO END UP

23   BECOMING RESPONSIBLE FOR ALL THE PRODUCT PLANNING OF THE CHIP

24   DIVISION.  THEN LATER BECAME CO-PRESIDENT OF THE CHIP DIVISION.

25        I BECAME PRESIDENT OF THE CHIP DIVISION, THAT IS, QCT, AND

1    IN THE BEGINNING OF 2008, I BECAME THE PRESIDENT OF THE

2    COMPANY.

3    Q.   MR. AMON, HAVE YOU EVER HAD ANY RESPONSIBILITY FOR

4    QUALCOMM'S LICENSING BUSINESS?

5    A.   NO.

6    Q.   EVEN AS THE PRESIDENT OF THE COMPANY?

7    A.   NO.  THE LICENSING BUSINESS, WHEN I CAME PRESIDENT OF THE

8    COMPANY, THE GM IS ALEX ROGERS, HE DOES NOT REPORT TO ME.

9    Q.   MR. AMON, WHAT IS QCT'S RELATIONSHIP WITH ITS MODEM

10   CUSTOMERS?

11   A.   IT'S, IT'S A PARTNERSHIP.  WE HAVE A UNIQUE PRODUCT

12   SOLUTION.  WE'VE BEEN VERY FOCUSSED IN BRINGING CHIPS THAT HAVE

13   ADVANCED TECHNOLOGIES, IN MANY CASES NEW TECHNOLOGIES.  AND IT

14   TAKES ABOUT TWO TO THREE YEARS FROM THE BEGINNING OF THE DESIGN

15   OF A PRODUCT TO COMMERCIALIZATION OF A PHONE.  THE RELATIONSHIP

16   INCLUDES ENGAGEMENT AT MULTIPLE ENGINEERING LEVELS THROUGH THE

17   DEVELOPMENT OF THE CHIP, DEVELOPMENT OF THE PHONE.

18       AND THEN WHEN THE PHONE IS DEVELOPED TO WORKING WITH THE

19   WIRELESS CARRIERS TO GET THE TECHNOLOGY TESTED IN THE FIELD AND

20   COMMERCIALIZED.

21       AND IT IS A RELATIONSHIP THAT REPEATS ITSELF.  WE HAVE TO

22   WIN OUR BUSINESS EVERY YEAR AS THE SMARTPHONE TECHNOLOGY,

23   ESPECIALLY IN ADVANCED PRODUCTS, YOU HAVE A NEW FLAGSHIP LAUNCH

24   EVERY YEAR.

25   Q.   AND YOU MENTIONED THE CARRIERS.  WHAT IS QCT'S

```
1    RELATIONSHIP WITH WIRELESS CARRIERS?

2    A.   I WOULD DESCRIBE IT AS A TECHNOLOGY ADVISER.  I THINK

3    THERE'S A ROLE THAT QUALCOMM HAS AS BEING THE LEADER OR THE

4    FIRST TO MARKET IN MANY OF THE WIRELESS STANDARDS.

5         SO IT HAS BEEN AN ADVISORY ROLE AS YOU PLAN, YOU KNOW, THE

6    MODEM TECHNOLOGY.

7         AND THEN IT EVOLVES INTO COMMERCIALIZING THE TECHNOLOGY

8    ACROSS THEIR NETWORKS AND THE CHIPSET, AND THEN LATER BRINGING

9    THE SMARTPHONE AND THE PHONE PRODUCTS TO THE MARKET.

10   Q.   WOULD CUTTING OFF A CUSTOMER'S CHIP SUPPLY AFFECT QCT'S

11   RELATIONSHIP WITH ITS CUSTOMERS?

12   A.   YES.  IT WOULD BE DEVASTATING TO OUR RELATIONSHIP WITH THE

13   CUSTOMER.

14   Q.   HOW SO?

15   A.   IF WE HAVE THAT LONG RELATIONSHIP WITH A CUSTOMER AND WE

16   STOP SHIPPING OF CHIPSETS IN THE PRODUCTION OF A PHONE, THAT --

17   IT WILL SIGNIFICANTLY IMPACT THAT RELATIONSHIP AND OUR STANDING

18   AS A SUPPLIER, RELIABLE SUPPLIER, ESPECIALLY AS WE ARE IN THE

19   CHIP BUSINESS FOR THE LONG TERM AND WE HAVE TO WIN THAT

20   CUSTOMER EVERY SINGLE PHONE.

21   Q.   WOULD CUTTING OFF A CUSTOMER'S CHIP SUPPLY AFFECT QCT'S

22   RELATIONSHIP WITH WIRELESS CARRIERS?

23   A.   ABSOLUTELY.

24   Q.   HOW SO?

25   A.   IF A WIRELESS CARRIER IS DEPENDING ON A PARTICULAR PHONE
```

1    TO MEET THEIR BUSINESS OBJECTIVES, WHICH IS THE ACTIVATION OF

2    NEW SUBSCRIBERS, THAT OEM WILL BE UNABLE TO DELIVER THE PHONE

3    TO THE CARRIER.

4    Q.   HAS QUALCOMM EVER STOPPED SHIPPING MODEM CHIPS TO A

5    CUSTOMER BECAUSE OF A LICENSING DISPUTE?

6    A.   NO, NEVER.

7    Q.   HAS QUALCOMM EVER SLOWED DOWN OR OTHERWISE DISRUPTED CHIP

8    SUPPLY TO A CUSTOMER BECAUSE OF AIR LICENSING DISPUTE?

9    A.   NO.

10   Q.   WOULD YOU KNOW ABOUT THAT IF IT HAD HAPPENED DURING YOUR

11   TIME IN THE CHIP BUSINESS?

12   A.   ABSOLUTELY.

13   Q.   HAVE YOU EVER TOLD ANYONE TO STOP SHIPPING CHIPS TO A

14   CUSTOMER BECAUSE OF A LICENSING DISPUTE?

15   A.   NO.

16   Q.   HAS ANYONE EVER TOLD YOU TO STOP SHIPPING CHIPS TO A

17   CUSTOMER BECAUSE OF A LICENSING DISPUTE?

18   A.   NO.

19   Q.   SLIGHTLY DIFFERENT QUESTION.  HAS QUALCOMM EVER STOPPED

20   SHIPPING CHIPS TO A CUSTOMER DURING LICENSING NEGOTIATIONS?

21   A.   NO.

22   Q.   HAS QUALCOMM SHIPPED CHIPS TO CUSTOMERS WHO AREN'T PAYING

23   ROYALTIES THAT ARE OWED UNDER LICENSE AGREEMENTS?

24   A.   YES.

25   Q.   CAN YOU GIVE ME AN EXAMPLE?

AMON CROSS BY MS. SESSIONS

1    A.   ONE EXAMPLE IS APPLE.

2    Q.   IS IT --

3    A.   APPLE CONTRACT MANUFACTURERS.

4    Q.   HAS QUALCOMM EVER STOPPED SHIPPING CHIPS TO A CUSTOMER FOR

5    ANY REASON?

6    A.   YES.

7    Q.   WHAT ARE SOME OF THOSE REASONS?

8    A.   IF THE CUSTOMER DOES NOT PAY FOR THE CHIPSET, THAT'S ONE

9    OF THE REASONS.

10        ANOTHER REASON IS IF WE HAVE A SUPPLY ISSUE.  IF WE DON'T

11   HAVE SUPPLY FROM OUR MANUFACTURER PARTNERS TO DELIVER TO THE

12   CUSTOMER.

13        THERE'S ALSO BEEN SOME RARE OCCASIONS THAT WE MAY HAVE A

14   DEFECT AND WE HAVE TO REPLACE THAT PRODUCT INTO A NEW VERSION

15   OF A PRODUCT.

16        THERE HAS BEEN REASONS TO STOP SHIPMENT FOR COURT ORDER.

17   EXAMPLES WOULD BE THE ZTE CASE.

18        AND THEN THERE IS THE NORMAL COURSE OF BUSINESS, WHICH IS

19   WHEN -- WHAT IS JOINTLY DONE WITH A CUSTOMER WHEN A PRODUCT

20   REACHES ITS END OF ITS LIFECYCLE, WHICH IS USUALLY A NUMBER OF

21   YEARS AFTER THE PRODUCT HAS BEEN LAUNCHED.

22   Q.   DRAWING YOUR ATTENTION SPECIFICALLY TO LENOVO.  HAS QCT

23   SHIPPED CHIPS TO LENOVO?

24   A.   YES.

25   Q.   WHEN DID QCT START SHIPPING CHIPS TO LENOVO?

AMON CROSS BY MS. SESSIONS

1    A.   I CAN'T PRECISE THE DATE.  IT WAS ABOUT THE TIME THAT THE

2    CHINA DOMESTIC MARKET MOVED FROM 2G TO 3G.

3    Q.   WAS THAT AROUND 2010?

4    A.   IT COULD BE.

5    Q.   WHAT KIND OF CHIPS DID QUALCOMM SHIP TO LENOVO AT THE

6    BEGINNING OF ITS RELATIONSHIP TO LENOVO?

7    A.   IT WAS ENTRY LEVEL CHIPSETS, SOME REGULAR 3G PHONES, LIKE

8    FLIP PHONES AND CANDY BAR CHIPSETS FOR THOSE SOLUTIONS, AND

9    THEN ENTRY LEVEL SMARTPHONE CHIPS AS WELL.

10   Q.   WHERE WERE THOSE CHIPSETS GOING TO BE USED?

11   A.   THE MAJORITY, IT WAS FOR PHONES THAT LENOVO WAS SELLING IN

12   DOMESTIC CHINA MARKET.

13   Q.   DID LENOVO BUY CHIPS FROM QUALCOMM IN THE 2013 TO 2014

14   TIMEFRAME?

15   A.   I BELIEVE SO.

16   Q.   WHAT TYPES OF CHIPS WAS QUALCOMM SHIPPING TO LENOVO IN

17   2013 TO 2014?

18   A.   THE MAJORITY WAS ENTRY LEVEL AND MID-TIER CHIPS.  THERE

19   WERE SOME FEW PREMIUM TIER SNAPDRAGON 800, BUT THE MAJORITY

20   WERE THE 600, 400, AND 200 SERIES.

21   Q.   IN 2013 TO 2014, WAS ANYONE ELSE SELLING MODEM CHIPS TO

22   LENOVO?

23   A.   YES.

24   Q.   WHO?

25   A.   THE MAIN SUPPLIER OF LENOVO AT THAT TIME WAS MEDIATEK.

AMON CROSS BY MS. SESSIONS

1    Q.    HAS QCT EVER BEEN LENOVO'S PRIMARY MODEM CHIP SUPPLIER?

2    A.    NO.

3    Q.    MR. AMON, IF YOU COULD TURN IN YOUR BINDER OF THE FTC'S

4    DOCUMENTS TO CX 7024, WHICH IS TAB 14.

5    A.    READY.

6    Q.    COUNSEL FOR THE FTC ASKED YOU SOME QUESTIONS ABOUT YOUR

7    NOTES AND A MEETING WITH MOTOROLA THAT YOU DESCRIBE.

8          WHO WAS AT THAT MEETING?

9    A.    IT WAS RICK OSTERLOH, THE PRESIDENT OF MOTOROLA, AND HIS

10   TEAM, AND I DON'T REMEMBER WHO WERE THE MEMBERS OF HIS TEAM.

11   AND THERE WAS ME AND SOME MEMBERS FROM THE QCT TEAM AS WELL,

12   WHICH IS QUALCOMM CHIPSET DIVISION.

13   Q.    WAS ERIC REIFSCHNEIDER AT THIS MEETING?

14   A.    NO, DEFINITELY DON'T RECALL ERIC IN THAT MEETING.

15   Q.    DO YOU THINK YOU WOULD RECALL IF ERIC HAD BEEN IN THE

16   MEETING?

17   A.    I WOULD BECAUSE MEETING WITH QCT CUSTOMERS ARE NOT, YOU

18   KNOW, ATTENDED BY QTL.

19   Q.    AND COUNSEL FOR THE FTC ASKED YOU ABOUT THE NOTE THAT SAID

20   "ERIC CONSTANTLY THREATENING TO CUT OFF SUPPLY."

21         WHAT WAS THAT NOTE REFERRING TO?

22   A.    MY, MY RECOLLECTION IS THAT MOTOROLA WAS REPRESENTING TO

23   ME THAT THEY WERE RECEIVING THREATS FROM ERIC TO CUT OFF

24   SUPPLY.  THAT'S WHAT I WROTE.

25   Q.    WAS THAT ISSUE A MAJOR PART OF THE DISCUSSION AT THIS

AMON CROSS BY MS. SESSIONS

```
1    MEETING?

2    A.   NO.

3    Q.   DID YOU RESPOND TO RICK?

4    A.   YES.

5    Q.   HOW DID YOU RESPOND?

6    A.   WHAT I BELIEVE FROM MEMORY IS, YOU KNOW, WE BASICALLY

7    SAID, IF YOU HAVEN'T HEARD THAT FROM QCT, THAT'S NOT AN ISSUE.

8         AND WE MOVED ON TO THE OTHER MATTERS OF THE MEETING.

9    Q.   WOULD ERIC REIFSCHNEIDER HAVE HAD THE ABILITY TO CUT OFF

10   CHIP SUPPLY TO MOTOROLA?

11   A.   HE WILL NOT.

12   Q.   IN DECEMBER OF 2015, WHO WOULD HAVE HAD THE AUTHORITY TO

13   CUT OFF CHIP SUPPLY TO MOTOROLA?

14   A.   IT WOULD HAVE TO BE THE PRESIDENT OF QCT OR THE CEO OF THE

15   COMPANY.

16   Q.   AFTER THIS MEETING, DID ANYONE FROM MOTOROLA TELL YOU THAT

17   THEY WERE WORRIED ABOUT THEIR CHIP SUPPLY?

18   A.   IF I -- IF I RECALL CORRECTLY, YOU KNOW, IN THE MEETING,

19   THEY WANTED TO UNDERSTAND QCT POSITION, AND WE MOVE ON TO OTHER

20   MATTERS.  AND AFTER THE MEETING, I DON'T BELIEVE THIS ISSUE

21   CAME BACK AGAIN TO THE BEST OF MY RECOLLECTION.

22   Q.   WHAT HAS QCT'S RELATIONSHIP WITH MOTOROLA BEEN SINCE THE

23   END OF 2015?

24   A.   IT -- THE RELATIONSHIP IMPROVED WITH MOTOROLA/LENOVO,

25   WHICH IS MOTOROLA HAS BEEN ACQUIRED BY LENOVO.  IT HAD EXPANDED
```

1    FROM ITS ORIGINAL RELATIONSHIP.

2    Q.   MR. AMON, DRAWING YOUR ATTENTION TO HUAWEI, DOES QCT SELL

3    MODEM CHIPS TO HUAWEI?

4    A.   YES, WE DO.

5    Q.   AS OF MARCH OF 2018, WAS HUAWEI BUYING PREMIUM TIER CHIPS

6    FROM QCT?

7    A.   BEFORE MARCH 2018?

8    Q.   AS OF MARCH -- IN MARCH 2018.

9    A.   I DON'T BELIEVE SO.

10   Q.   HAS QUALCOMM EVER STOPPED SHIPPING CHIPS TO HUAWEI?

11   A.   NO.

12   Q.   HAS ANYONE FROM HUAWEI TOLD YOU THAT THEY'RE WORRIED ABOUT

13   QUALCOMM CHIP SUPPLY?

14   A.   NO.

15   Q.   MR. AMON, HAS QUALCOMM SHIPPED CHIPS TO SONY MOBILE?

16   A.   YES.

17   Q.   TO YOUR KNOWLEDGE HAS QUALCOMM EVER CUT OFF SONY MOBILE'S

18   CHIP SUPPLY?

19   A.   NO.

20   Q.   ARE YOU AWARE THAT QUALCOMM AND SONY HAD A LICENSING

21   DISPUTE AT ONE POINT?

22   A.   I WAS AWARE THERE WAS A LICENSING NEGOTIATION WHEN SONY

23   ACQUIRED THE BUSINESS -- THE PORTION OF ERICSSON AND THEIR

24   BUSINESS.

25   Q.   DID ANYONE EVER INSTRUCT YOU TO WITHHOLD CHIP SHIPMENTS TO

1    SONY DURING THAT NEGOTIATION?

2    A.   NO.

3    Q.   MR. AMON, ARE YOU GENERALLY FAMILIAR WITH THE COMPETITION

4    THAT QUALCOMM'S CHIP BUSINESS FACES?

5    A.   YES.

6    Q.   AND WHAT'S THE BASIS FOR YOUR KNOWLEDGE OF THAT?

7    A.   IT COMES FROM COMPETITOR'S ANNOUNCEMENTS, IT COMES FROM

8    WHAT OUR CUSTOMERS REPRESENT THE COMPETITIVE LANDSCAPE IS, IT

9    COMES FROM WHAT WE SEE IN THE MARKETPLACE.

10   Q.   TURNING TO CDMA CHIPS, HAS QUALCOMM FACED COMPETITION IN

11   CDMA CAPABLE CHIPS?

12   A.   YES.

13   Q.   WHAT WERE SOME OF QUALCOMM'S EARLY COMPETITORS IN CDMA

14   CHIPS?

15   A.   EARLY COMPETITOR, MOTOROLA HAD THEIR OWN CHIP, THEY WERE A

16   VERTICAL PLAYER; NOKIA LICENSE AGREEMENT HAD THEIR OWN CHIP,

17   THEY WERE ALSO A VERTICAL PLAYER; I BELIEVE THERE'S A PORTION

18   OF SAMSUNG THAT SAMSUNG ALSO HAD THEIR OWN CHIP; AND VIA WAS

19   ALSO A COMPETITOR IN THE EARLY DAYS.

20   Q.   IN THE EARLY DAYS, HOW DID QUALCOMM'S CDMA CHIPS COMPARE

21   TO VIA'S CHIPS?

22   A.   IT WAS VERY DIFFERENT.

23   Q.   HOW WERE THEY DIFFERENT?

24   A.   IN ADDITION OF THE COMPANY FOCUS ON THE SEMICONDUCTOR SIDE

25   ON THE WIRELESS TECHNOLOGY, THEY WOULD ALSO HAVE BEEN AN

1    INNOVATOR ON THE CHIP SIDE.  SO WE WERE THE FIRST TO CREATE THE

2    CONCEPT OF A SINGLE CHIP FOR FEATURE PHONES THAT INCORPORATED

3    MULTIMEDIA CAPABILITIES, PLUS THE MODEM INTO A SINGLE CHIP.

4    AND THAT IS DIFFERENT THAN THE VIA PRODUCT AT THAT TIME.

5    Q.   YOU MENTIONED FEATURE PHONES.  WHAT'S A FEATURE PHONE?

6    A.   I'M SORRY.  A FEATURE PHONE WAS BEFORE SMARTPHONES, THE

7    FLIP PHONES OR THE CANDY BAR PHONES THAT ALSO HAD MULTIMEDIA

8    CAPABILITIES.

9    Q.   IS VIA STILL A COMPETITOR IN CDMA CHIPS?

10   A.   I DON'T KNOW HOW THEIR BUSINESS HAD EVOLVED OR HAD THEY

11   BEEN ACQUIRED.  I KNOW THE CDMA COMPETITORS TODAY ARE MEDIATEK,

12   SAMSUNG, HISILICON ARE EXAMPLES.  AND MAYBE SPREADTRUM, BUT I

13   DON'T KNOW FOR SURE.

14        AND ONE MORE, INTEL.  I FORGET INTEL AS WELL.

15   Q.   HAS QUALCOMM ENJOYED A LARGE SHARE OF CDMA CHIP SALES OVER

16   THE YEARS?

17   A.   YES, WE DID.

18   Q.   TO WHAT DO YOU ATTRIBUTE THAT?

19   A.   IN, IN PART IS, AS CDMA BECOME A SMALLER MARKET AND AS

20   GSM, WHICH IS THE LARGEST BASE OF PHONES EVOLVED TO WCDMA, CDMA

21   BECAME A SMALLER MARKET, BUT WE CONTINUED TO INVEST IN CDMA.

22        THAT'S ONE OF THE REASONS.  SO WE HAD MORE ADVANCED CHIPS

23   AND WERE WILLING TO INVEST R&D DOLLARS FOR A SMALLER MARKET

24   WHERE MANY OF OUR COMPETITORS WERE INVESTING FOR A LARGER

25   MARKET.  THAT'S ONE REASON.

1          THE OTHER REASON IS THAT WE CHOSE TO DEVELOP A MULTIMODE

2     PLATFORM.  SO ALL OF OUR CHIPS END UP BECOMING ONE INTEGRATED

3     CHIP THAT HAD CDMA PLUS UMTS PLUS EVERY OTHER CELLULAR MODE,

4     AND IT BECAME DIFFERENTIATED AS THE CDMA OPERATORS, WE PREFER A

5     MULTIMODE SOLUTION SO THAT THEIR SUBSCRIBERS COULD HAVE GLOBAL

6     ROAMING WHEN THEY WOULD TRAVEL TO A MARKET THAT THERE'S NO

7     CDMA, THEY WILL BE ABLE TO USE THE UMTS CAPABILITIES OF THAT

8     CHIP.

9     Q.   AND YOU MENTIONED UMTS A FEW TIMES.  WHAT IS UMTS?

10    A.   OH, I'M SORRY.  UMTS OR WCDMA ARE THE SAME THING.

11    Q.   AND WHAT ARE UMTS AND WCDMA?

12    A.   IT'S THE 3G STANDARD THAT EVOLVED FROM GSM.

13    Q.   WHY DID QUALCOMM KEEP INVESTING IN CDMA?

14    A.   CDMA IS A TECHNOLOGY THAT WAS INVENTED BY QUALCOMM, AND WE

15    FELT THAT WE WANTED TO KEEP THE CDMA OPERATORS COMPETITIVE, AND

16    WE WANTED TO MAINTAIN THAT ECOSYSTEM, COMPETITIVENESS, AND THAT

17    ECOSYSTEM TO GROW.  THAT'S WHY WE INVESTED IN CDMA EVEN BEFORE

18    WE INVESTED IN 3G WCDMA.

19    Q.   IN THE PAST FEW YEARS, WHAT HAS HAPPENED TO QUALCOMM'S

20    SHARE OF CDMA SALES?

21    A.   WE HAD GRADUALLY LOST SHARE AS MANY OF THE -- AS THE

22    INDUSTRY MOVED FROM 3G TO 4G, CDMA BECAME MORE OF AN OBSOLETE

23    TECHNOLOGY.  IT WAS NO LONGER REQUIRED BY A NUMBER OF

24    OPERATORS, VERIZON IS AN EXAMPLE.

25         AND I THINK OUR SHARE HAS, HAS DECLINED.  IT'S STILL HIGH,

1     BUT IT HAS DECLINED.

2     Q.   MR. AMON, DOES QUALCOMM PRICE ITS CDMA CAPABLE CHIPS

3     DIFFERENTLY FROM ITS UMTS OR WCDMA CAPABLE CHIPS?

4     A.   YES, WE DO.

5     Q.   WHY IS THAT?

6     A.   AS I JUST EXPLAINED EARLIER, THE QUALCOMM CHIPSET

7     SOLUTION, IT IS -- IT'S A MULTI MODE CHIPSET.  SO IF YOU THINK

8     OF A 3G PLUS 4G CHIPSET, THE CHIPSET HAS LTE, CDMA, WCDMA.

9          IF YOU ARE A UMTS MARKET OR OPERATOR, YOU BUY JUST THE

10    FUNCTIONALITY OF LTE PLUS UMTS IN THE CHIP.

11         IF YOU ARE A CDMA OPERATOR, THAT CDMA GET ADDED TO THE

12    CAPABILITY CHIP.  IT'S ACTIVE.  YOU HAVE THE SUPER SET.  SO

13    THERE IS A PRICE THAT THEY PAY TO ACTIVATE THE CDMA

14    FUNCTIONALITY.

15    Q.   MR. AMON, COULD YOU TURN TO TAB 1 OF THE -- YOUR BINDER OF

16    THE FTC'S DOCUMENTS, WHICH IS EXHIBIT CX 5279.

17    A.   TAB 1?

18    Q.   TAB NUMBER 1, YES.

19    A.   READY.

20    Q.   MR. AMON, TURNING TO PAGE 3 OF THE EXHIBIT, YOU HAD

21    DISCUSSED WITH COUNSEL FOR THE FTC A RECOMMENDATION THAT YOU

22    MADE IN THIS E-MAIL.

23    A.   YES.

24    Q.   COULD YOU PLEASE EXPLAIN THE RECOMMENDATION THAT YOU WERE

25    MAKING?

1    A.   YES.  THIS WAS AT A TIME THAT CDMA WAS STOPPED GROWING AND

2    THE LARGEST OPPORTUNITY WAS UMTS.  UMTS HAS A LOT MORE SCALE.

3    UMTS, OR WCDMA, HAS A LOT MORE SCALE.

4         SO I WAS RECOMMENDING, EVEN THOUGH FOR QUALCOMM IT WILL

5    HAVE A SMALLER RETURN ON INVESTMENT, TO INVEST ON CDMA

6    TECHNOLOGY.  I WAS RECOMMENDING THAT WE KEEP CDMA AND UMTS AS

7    EQUIVALENT OR SIMILAR PRICES BECAUSE I WOULD LIKE CDMA TO HAVE

8    THE -- CDMA OPERATORS TO HAVE THE ABILITY TO HAVE DEVICES FOR

9    THEIR SUBSCRIBERS AT PRICES THAT WERE SOMEWHAT CONSISTENT WITH

10   THE LARGER UMTS SCALE.

11   Q.   AND WHAT DID YOU MEAN WHEN YOU WROTE "QUALCOMM WILL NOT

12   EXERCISE ITS CDMA MARKET SHARE DOMINANCE TO PRACTICE

13   UNCOMPETITIVE PRICES"?

14   A.   IT MEANT THAT WE HAVE VERY HIGH SHARE AT THAT TIME AND

15   WE'RE PREPARED TO CONTINUE INVESTING IN NEW CHIPSETS TO KEEP

16   THE CDMA TECHNOLOGY, YOU KNOW, UP-TO-DATE.

17        AND IF WE BECOME THE ONLY PROVIDER OF CDMA, WE COULD NOT

18   HAVE CDMA AT UNCOMPETITIVE PRICES BECAUSE I WAS TRYING TO

19   MAINTAIN THE CDMA ECOSYSTEM AT PAR WITH UMTS.  THAT WAS THE

20   RECOMMENDATION.

21   Q.   SO WHEN YOU'RE REFERRING TO UNCOMPETITIVE PRICES,

22   UNCOMPETITIVE RELATIVE TO WHAT?

23   A.   UNCOMPETITIVE RELATIVE TO UMTS EQUIVALENT PHONES.

24   Q.   DO UMTS PRICES INFLUENCE CDMA PRICES?

25   A.   THEY DO.

1    Q.   MR. AMON, AT THE BOTTOM OF PAGE 3 OF THIS EXHIBIT YOU MADE

2    THE STATEMENT, "THERE IS NO JUSTIFICATION FOR THE 10 PERCENT."

3         DO YOU SEE THAT?

4    A.   YES, I DO.

5    Q.   WHAT DID YOU MEAN BY THAT?

6    A.   IT MEANS IF I HAD TO LOOK ON THE ROI, RETURN ON

7    INVESTMENT, WE PROBABLY HAVE -- WHAT I WANTED TO DO, IT

8    PROBABLY HAS TO BE HIGHER THAN 10 PERCENT.

9         I WANT TO TAKE A MOMENT TO EXPLAIN.  BY ENABLING A

10   MULTIMODE PLATFORM FOR EVERY SINGLE UMTS CHIP THAT WE WILL SELL

11   TO NON-CDMA OPERATORS, THE CDMA FUNCTIONALITY WILL BE THERE AND

12   WE'LL BE PAYING FOR THE COST OF THE SILICON.

13        AND IF I WERE TO HAVE THE RETURN ON THAT INVESTMENT, WE'D

14   HAVE TO CHARGE MORE.

15        BUT I WANTED TO KEEP AS LOW AS POSSIBLE WITHIN THE LEVEL

16   OF TOLERANCE OF AN OEM SO THAT HE COULD STILL OFFER THE PHONE,

17   ALBEIT AT A SMALLER SCALE, AT SIMILAR PRICES AS THE UMTS PHONE.

18   Q.   MR. AMON, IF YOU COULD TURN TO TAB 15 OF YOUR BINDER OF

19   THE FTC'S DOCUMENTS.

20   A.   READY.

21   Q.   YOU DISCUSSED WITH COUNSEL FOR THE FTC SOME STATEMENTS IN

22   THIS DOCUMENT, AND I'D LIKE TO DRAW YOUR ATTENTION TO THE

23   BULLET POINT IN THE JUNE 17TH, 2013, E-MAIL THAT YOU WROTE, THE

24   THIRD -- OR SECOND BULLET POINT THAT SAYS, "OUR PRICE IS NOT

25   BASED ON COST BUT ON VALUE."

AMON CROSS BY MS. SESSIONS

```
 1          DO YOU SEE THAT?

 2     A.   YES, I DO.

 3     Q.   WHAT DID YOU MEAN WHEN YOU SAID "PRICE IS NOT BASED ON

 4     COST BUT ON VALUE"?

 5     A.   IT MEANS THERE'S A VARIABLE COST ON THE CHIP AND THE

 6     VARIABLE COST ON THE CHIP, THIS IS WHAT I WAS REFERRING TO

 7     HERE, AND I WAS SAYING THAT OUR PRICE IS BASED ON THE VALUE

 8     THAT THE CHIP OFFER, NOT NECESSARILY THE SILICON COST.

 9     Q.   WHY DOESN'T QUALCOMM PRICE BASED ON THE SILICON COST?

10     A.   IN GENERAL, WE ARE -- WE DON'T BELIEVE TO BE A COMMODITY

11     PROVIDER OF CHIPSETS.  SO WE DESIGN OUR CHIPSETS WITH ADVANCED

12     AND NEW FUNCTIONALITY AND WE PRICE THEM TO MARKET.

13          SO IN GENERAL, I THINK THAT'S THE ANSWER.

14          SPECIFICALLY IN THIS CASE, IT WAS RELATED TO THE MARKET ON

15     CDMA AND THEN THE OTHER IMPLICATIONS THAT ARE OUTLINED ABOUT

16     THE MULTIMODE STRATEGY.

17     Q.   MR. AMON, COULD YOU TURN TO TAB 2 OF YOUR BINDER, WHICH IS

18     CX 6839.

19     A.   I'M READY.

20     Q.   TURNING TO PAGE 2 OF THE DOCUMENT, WHICH CONTAINS

21     MR. KOLIANDER'S E-MAIL TO YOU AND SOME OTHERS, WHAT WAS

22     MR. KOLIANDER CONVEYING IN HIS E-MAIL TO YOU?

23     A.   ON THE TOP OF PAGE 2?

24     Q.   IN THE CENTER OF PAGE 2, YES.

25     A.   HE'S CONVEYING THE REQUIREMENTS FROM APPLE, IN THIS CASE
```

1    MAVERICK IS USED TO REPRESENT APPLE -- THEIR REQUIREMENTS FOR A

2    CDMA CHIPSET THEY WERE INTERESTED, AND AS A RESULT OF A

3    CONFERENCE CALL HE HAD WITH APPLE ENGINEERING TEAM.

4    Q.   AND WHEN COUNSEL FOR THE FTC ASKED YOU ABOUT THIS

5    DOCUMENT, I BELIEVE THAT YOU SAID THAT YOU DID NOT BELIEVE THAT

6    ANOTHER SUPPLIER COULD MEET APPLE'S CHIPSET REQUIREMENTS.  IS

7    THAT RIGHT?

8    A.   THAT IS CORRECT.

9    Q.   AND WHAT -- WHAT DO YOU MEAN BY APPLE'S CHIPSET

10   REQUIREMENTS?

11   A.   THERE ARE TWO SPECIFIC REQUIREMENTS.  ONE IS THEY WANTED

12   THE CHIPSET TO FIT INTO LESS THAN 855 SQUARE MILLIMETERS IN

13   THEIR PRINTED CIRCUIT BOARD AREA.  SO THE AREA INTO THE PHONE.

14        THE OTHER ONE IS THE SCHEDULE, THEY WOULD LIKE THAT CHIP

15   TO BE AVAILABLE TO THEM.  I DID NOT BELIEVE THE COMPETITION

16   COULD MEET THOSE TWO REQUIREMENTS.

17   Q.   WERE THERE OTHER CDMA CAPABLE CHIPSETS AVAILABLE AT THE

18   TIME?

19   A.   YES.

20   Q.   SO WHY COULD THOSE OTHER CDMA CAPABLE CHIPSETS NOT MEET

21   APPLE'S REQUIREMENT?

22   A.   THEY COULD NOT FIT INTO THE AREA THAT APPLE DECIDED THEY

23   WANTED THE CHIPSET TO FIT BASED ON THE DESIGN, THE I.D. OF THE

24   APPLE PHONE.

25   Q.   MR. AMON, HAS QUALCOMM SOLD WCDMA OR UMTS CAPABLE

1        CHIPSETS?

2        A.    YES.

3        Q.    WHEN DID QUALCOMM FIRST START SELLING THOSE CHIPSETS?

4        A.    IN THE TRANSITION OF GSM TO WCDMA, WE WERE LATE TO DECIDE

5        TO DEVELOP THOSE CHIPSETS WHEN THE STANDARD WAS DONE.  I WOULD

6        SAY PROBABLY BEHIND A LOT OF THE GSM INCUMBENTS.

7              BUT AS THE WCDMA GOT COMMERCIALIZED, WE WERE THE FIRST TO

8        DELIVER THE CHIPSETS.  I CAN'T PRECISE THE DAYS.  I WOULD SAY

9        CIRCA, YOU KNOW, 1999, 2000.  BUT I CAN'T REALLY PRECISE.

10       Q.    HAS QUALCOMM ALSO SOLD LTE CAPABLE CHIPSETS?

11       A.    YES.

12       Q.    WHEN DID QUALCOMM START SELLING LTE CAPABLE CHIPSETS?

13       A.    AGAIN, I CAN'T HAVE THE EXACT DATE FROM MEMORY.  I'LL SAY

14       AROUND THE YEAR 2009, 2010 TIMEFRAME.  THAT'S WHERE LTE

15       STARTED.

16       Q.    HAS QUALCOMM EVER SOLD SINGLE MODE LTE CHIPS FOR USE IN

17       CELL PHONES?

18       A.    WE -- NOT FOR CELL PHONES, NO, I DON'T THINK SO.

19       Q.    WHAT'S A SINGLE MODE LTE CHIP?

20       A.    A SINGLE MODE LTE CHIP, THAT ONLY THE LTE FUNCTIONALITY IS

21       ENABLED.  IT DOES NOT HAVE ANY 3 -- 3G FUNCTIONALITY.  BY 3G I

22       MEAN CDMA OR WCDMA OR TD-SCDMA.  THOSE ARE THE DIFFERENT

23       VARIANTS.  ONLY 4G LTE IS ENABLED.

24       Q.    HAS QUALCOMM ENJOYED A LARGE PORTION OF LTE CHIP SALES

25       OVER THE YEARS?

1    A.    YES, WE DID.

2    Q.    AND WHY DO YOU BELIEVE THAT TO BE THE CASE?

3    A.    BECAUSE WE'RE FIRST TO MARKET WITH LTE, AND THEN

4    SUBSEQUENTLY FIRST TO MARKET WITH EVERY NEW GENERATION OF LTE.

5    Q.    WHY HAS QUALCOMM BEEN ABLE TO BE FIRST TO MARKET?

6    A.    ONE OF THEIR CORE COMPETENCES OF THE QUALCOMM CHIPSET

7    BUSINESS IS TO BE, YOU KNOW, A WIRELESS SYSTEM COMPANY.  I

8    WOULD SAY QUALCOMM IS PROBABLY MORE OF A CREATOR OF CELLULAR

9    STANDARDS THAN AN IMPLEMENTER OF STANDARDS AND BECAUSE OF THAT

10   WE STARTED DEVELOPMENT EARLY.

11        THE OTHER REASON IS WE, WE HAVE A SIGNIFICANT R&D BUDGET

12   DEDICATED TO WIRELESS TECHNOLOGY INVESTMENTS.

13   Q.    AS THE LTE STANDARD HAS MATURED, HAS QUALCOMM'S TIME TO

14   MARKET ADVANTAGE DIMINISHED?

15   A.    YES, IT DID.

16   Q.    WHO IS CATCHING UP IN LTE?

17   A.    TODAY WE HAVE A NUMBER OF COMPETITORS.  EXAMPLES ARE

18   INTEL, MEDIATEK, SAMSUNG'S OWN CHIPSET DIVISION, WHICH IS

19   CALLED EXYNOS, HUAWEI HISILICON, AND YOU HAVE ALSO THE CHINESE

20   SPECTRUM.  THIS IS SOME OF THE EXISTING LIST.

21        IT'S NOT -- IT'S NOT EXHAUSTIVE.  THERE ARE OTHER

22   COMPANIES AS WELL.

23   Q.    DID QUALCOMM LTE CHIPS HAVE FEATURES THAT DIFFERENTIATE

24   QUALCOMM CHIPS FROM ITS COMPETITORS?

25   A.    YES.

1    Q.    COULD YOU GIVE SOME EXAMPLES?

2    A.    ALL OF THE NEW -- OFTEN ALL OF THE NEW MODEM FEATURES ON A

3          PARTICULAR LTE 4G STANDARD GET COMMERCIALIZED AS PART OF OUR

4          SNAPDRAGON 800 PREMIUM TIER CHIPSET.

5                AND THE FEATURES ARE NOT ONLY UNIQUE TO LTE.  THE FEATURES

6          THAT DIFFERENTIATE THE CHIPSET IS PROBABLY THE, THE MOST

7          ADVANCED TRANSISTOR IN THE INDUSTRY, PROCESSOR FOR ARTIFICIAL

8          INTELLIGENCE MACHINE LEARNING, GRAPHICAL PROCESSORS, WI-FI

9          RADIOS, USUALLY WE ALSO HAVE THE LATEST STANDARDS ON WI-FI.

10         AND SO THE QUALCOMM PRODUCT IS WHAT WE CALL A SYSTEM ON A CHIP

11         THAT HAS A NUMBER OF DIFFERENTIATED FEATURES THAT MAKES A

12         SMARTPHONE WORK BEYOND LTE.

13   Q.    COULD YOU EXPLAIN A LITTLE BIT MORE WHAT YOU MEAN BY A

14         SYSTEM ON A CHIP?

15   A.    A SYSTEM ON A CHIP MEANS, YOU KNOW, EVERY SINGLE

16         FUNCTIONALITY THAT YOU NEED ON YOUR PHONE, WHETHER IT'S VIDEO

17         PLAYER, THE MUSIC PLAYER, THE GRAPHICS PROCESSOR FOR GAMES, THE

18         CPU TO RUN YOUR OPERATIONAL SYSTEMS, THE DIGITAL SIGNAL

19         PROCESSORS FOR ALL OF THE MULTIMEDIA.

20               THOSE ARE SOME EXAMPLES.  THEY'RE ALL INCLUDED INTO A

21         SINGLE CHIP.  IN MANY CASES THE SMARTPHONE, ALL OF THE

22         PROCESSOR IN THE QUALCOMM ARCHITECTURE IS DONE BY THE SINGLE

23         CHIP, INCLUDING THE CELLULAR MODEM.

24   Q.    MR. AMON, TURNING YOUR ATTENTION TO 5G.  HAS QUALCOMM BEEN

25         WORKING ON CHIPS THAT WILL WORK ON THE 5G STANDARD?

1    A.   YES, WE ARE.

2         MR. MATHESON:  OBJECTION, YOUR HONOR.  WE HAVE NO

3    OBJECTION TO ELICITING THIS SYSTEM, AS LONG AS WE'RE NOT

4    OPENING THE DOOR TO TESTIMONY ABOUT CURRENT EVENTS IN VIOLATION

5    OF THE COURT'S ORDER.

6         MS. SESSIONS:  I'M GOING TO LIMIT MY NEXT QUESTION TO

7    THE TIMEFRAME BEFORE MARCH OF 2018.

8         MR. MATHESON:  OKAY.

9    BY MS. SESSIONS:

10   Q.   MR. AMON, AS OF EARLY 2018, WHAT DID QUALCOMM EXPECT

11   COMPETITION IN 5G CHIPS TO LOOK LIKE?

12   A.   WE EXPECT TODAY, BASED ON A NUMBER OF PRODUCT

13   ANNOUNCEMENTS --

14   Q.   MR. AMON, I'M SORRY.  I'M GOING TO INTERRUPT YOU.

15        MY QUESTION WAS ABOUT EARLY 2018 AND NOT TODAY.

16   A.   I'M SORRY.  EARLY 2018.

17   Q.   WHAT WAS QUALCOMM'S VIEW OF EXPECTED COMPETITION IN 5G?

18   A.   YEAH.  AT THAT TIME, FOLLOWING THE ACTIVITY WE'VE SEEN IN

19   THE STANDARDS WHICH ACTUALLY GOT COMPLETED BY DECEMBER OF 2017,

20   THAT'S WHERE THE 5G STANDARD GOT COMPLETED, BASED ON THE

21   ACTIVITY WE SAW IN SUBSEQUENT, YOU KNOW, ANNOUNCEMENT, WE

22   EXPECT ALL OF OUR MAIN LTE COMPETITORS TO BE WORKING ON A 5G

23   PLAN.  THAT INCLUDES INTEL, SAMSUNG EXYNOS, HUAWEI, HISILICON,

24   AS WELL AS MEDIATEK.

25   Q.   MR. AMON, HAS QUALCOMM EVER SUPPLIED MODEM CHIPS TO APPLE?

AMON CROSS BY MS. SESSIONS

```
1    A.   YES.

2    Q.   WHAT KIND OF MODEM CHIPS HAS QUALCOMM --

3    A.   ONE CORRECTION.  WE DO NOT HAVE THE DIRECT SUPPLY

4    RELATIONSHIP WITH APPLE.  SO WE SUPPLY TO APPLE'S CONTRACT

5    MANUFACTURERS.

6    Q.   THANK YOU.

7         WHAT KIND OF CHIPS HAS QUALCOMM SUPPLIED TO APPLE'S

8    CONTRACT MANUFACTURERS.

9    A.   THE CHIPSET IS CALLED MDM, AND IT IS A MULTIMODE -- IT'S A

10   MULTIMODE CELLULAR MODEM CHIP.

11   Q.   WHAT DOES MDM STAND FOR?

12   A.   IT'S MOBILE DATA MODEM.

13   Q.   IS AN MDM DIFFERENT FROM A SYSTEM ON A CHIP?

14   A.   I'M -- I'M SORRY.  MOBILE DEVICE MODEM.  MY APOLOGIES.

15        IT IS VERY DIFFERENT THAN A SYSTEM ON A CHIP.

16   Q.   HOW SO?

17   A.   IT ONLY CONTAINS THE CELLULAR MODEM CAPABILITIES.  IN SOME

18   CASES IT MAY CONTAIN ALSO THE GPS CAPABILITIES.

19        IT DOES NOT CONTAIN ANY OF THE APPLICATION PROCESSORS IN

20   MULTIMEDIA CAPABILITIES OF THE SOC.

21   Q.   HAS QUALCOMM SUPPLIED CHIPS FOR THE NEWEST IPHONE

22   PRODUCTS?

23   A.   THE IPHONES THEY'RE LAUNCHING NOW?  WE DO NOT.

24   Q.   WHO IS SUPPLYING THE CHIPS FOR THE IPHONES THAT ARE

25   LAUNCHING NOW?
```

1    A.    INTEL.

2    Q.    DURING THE TIME THAT QUALCOMM WAS SUPPLYING APPLE'S

3    CONTRACT MANUFACTURERS WITH CHIPS FOR USE IN APPLE PHONES, DID

4    YOU BELIEVE THAT QUALCOMM HAD TO COMPETE FOR THE APPLE

5    BUSINESS?

6    A.    YES, I DID.

7    Q.    MR. AMON, IF YOU COULD TURN IN YOUR SECOND BINDER TO THE

8    TAB LABELED QX 9225.

9    A.    I'M READY.

10   Q.    OKAY.  MR. AMON, IF YOU COULD TURN TO THE LAST PAGE OF

11   QX 9225.  DO YOU SEE AN E-MAIL THERE ON THAT PAGE?

12   A.    YES.

13   Q.    COULD YOU IDENTIFY THAT FOR ME, PLEASE?

14   A.    IT'S AN E-MAIL I HAVE SENT ON DECEMBER 21ST, 2012, TO A

15   NUMBER OF INDIVIDUALS IN QCT.

16   Q.    AND WHAT IS THIS E-MAIL DESCRIBING?

17   A.    IT'S DESCRIBING A REPORT OF A MEETING I HAD WITH APPLE.

18   HERE MAVERICK IS ALSO BEING USED FOR APPLE.

19         AND IN THE MEETING, THEY HAD REPORTED THAT FOR THE PHONE

20   LAUNCHING IN 2010 THAT'S DEFINED AS MAV 10, THEY HAD A CLEAR

21   ALTERNATIVE USING INFINEON, AND THEY WERE GIVING SOME DETAILS

22   ABOUT WHAT THE INFINEON PRODUCT IS.

23         MS. SESSIONS:  YOUR HONOR, I'D MOVE QX 9225 INTO

24   EVIDENCE.

25         MR. MATHESON:  OBJECTION, YOUR HONOR.  THE DOCUMENT

1    CONTAINS HEARSAY.  IT'S NOT A BUSINESS RECORD.

2           MS. SESSIONS:  YOUR HONOR, I THINK THERE WAS A HIGH

3    PRIORITY OBJECTION THAT WAS OVERRULED ON THIS DOCUMENT.  WE'RE

4    NOT SEEKING TO ADMIT THIS E-MAIL FOR THE TRUTH OF THE MATTER,

5    BUT RATHER FOR ITS EFFECT ON MR. AMON, THE CONTENTS OF THIS

6    E-MAIL FOR THE EFFECT ON MR. AMON.

7           MR. MATHESON:  NO OBJECTION IF NOT FOR THE TRUTH,

8    YOUR HONOR.

9           THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE, IT'S

10   ADMITTED FOR THAT LIMITED PURPOSE, AND YOU'LL NOTE THAT IN THE

11   JOINT EXHIBIT LIST.

12       (DEFENDANT'S EXHIBIT QX 9225 WAS ADMITTED IN EVIDENCE.)

13          THE COURT:  GO AHEAD, PLEASE.  THANK YOU.

14   BY MS. SESSIONS:

15   Q.   MR. AMON, HOW DID YOU REACT TO THE MESSAGE FROM APPLE THAT

16   THERE WAS A CLEAR ALTERNATIVE WITH INTEL?

17   A.   I REACTED -- FIRST, I WAS ASKING SOME OF THE MEMBERS IN

18   QCT IF THEY HAD INFORMATION THAT VALIDATED THAT APPLE CLAIM.

19          AND MY REACTION IS THAT WE WILL HAVE TO COMPETE WITH THAT

20   SOLUTION TO MAINTAIN THE APPLE BUSINESS.

21   Q.   DID QUALCOMM OFFER BETTER TERMS TO APPLE AS A RESULT?

22   A.   YES, WE DID.

23          THE COURT:  THERE WASN'T A HIGH PRIORITY OBJECTION ON

24   THIS DOCUMENT.

25          MS. SESSIONS:  OH.  I APOLOGIZE, YOUR HONOR.

```
 1            THE COURT:  THAT'S OKAY.

 2            MS. SESSIONS:  IT WAS NOT MY INTENTION TO MISLEAD

 3     ANYBODY.

 4     Q.   MR. AMON, COULD YOU PLEASE TURN BACK TO THE BINDER OF THE

 5     DOCUMENTS THAT THE FTC PROVIDED TO YOU AND TURN TO TAB 4.

 6     A.   READY.

 7     Q.   MR. AMON, IN CX 8276, WHAT WERE YOU PROPOSING?

 8     A.   JUST GIVE ME A MOMENT.

 9     Q.   SURE.

10            (PAUSE IN PROCEEDINGS.)

11            THE WITNESS:  YES.  THIS IS TALKING ABOUT A

12     CONVERSATION ON HOW TO, YOU KNOW, PROPOSE AND WIN THE APPLE

13     BUSINESS.

14            SO WHAT I PROPOSE IN THIS E-MAIL IS WE FELT THAT WE WERE

15     WELL POSITIONED ON THE PRODUCT SIDE FOR 13 AND 14.  ON FEATURE,

16     TIMING AND ENGINEERING, I'M THINKING AT THAT TIME I'M

17     COMFORTABLE WITH OUR POSITION TO MEET THEIR NEEDS.

18            I ALSO SAID THAT WE CAN COMPETE IN 15 AND 16.

19            THE DISCUSSION WAS FOCUSSED ON 15, THAT WOULD BE THE FIRST

20     YEAR, AND BASICALLY PROPOSING AT THAT TIME THAT WE WANTED TO

21     HAVE ALL OF THEIR VOLUMES, AND I KNOW WE'RE COMING FROM AN

22     AGREEMENT IN THE PAST THAT WE HAD 100 PERCENT OF THE APPLE

23     VOLUME.

24            SO I WAS PROPOSING TO OFFER THEM AN INCENTIVE OF $2 PER

25     CHIPSET FOR CONSIDERATION TO GIVE US ALL THE VOLUME.  THAT
```

1     WOULD BE, YOU KNOW, WE WILL BE THE EXCLUSIVE PROVIDER OF

2     CHIPSETS TO APPLE.

3              THEY COULD -- THEY DIDN'T -- THEY COULD REFUSE THE $2, BUT

4     THEY WOULD NOT BE ENTITLED TO THAT $2 IF THEY DIDN'T GIVE ME

5     THAT VOLUME.

6              AND I WAS MAKING THAT PROPOSAL, WHICH BASICALLY WAS A

7     REDUCTION OF OUR PRICE OF OUR SOLUTION TO THEM BY $2 AS

8     CONSIDERATION FOR US TO BE THE EXCLUSIVE PROVIDER FOR THE

9     IPHONES.

10             AND I THOUGHT AT THIS E-MAIL THAT GIVEN THAT WE WERE THE

11    SUPPLIER FOR 13 AND 14, BECAUSE I SEE AT THAT TIME TO BE

12    COMFORTABLE IN OUR POSITION, YOU KNOW, THEY MAY BE MOTIVATED

13    GIVEN OUR INCOMING POSITION.

14             THIS IS, IN ESSENCE, THE PROPOSAL.

15    Q.   HAVE YOU BEEN INVOLVED WITH NEGOTIATIONS -- IN

16    NEGOTIATIONS WITH APPLE REGARDING CHIP SUPPLY BETWEEN 2014 AND

17    2016?

18    A.   I BELIEVE SO.

19    Q.   OKAY.  WHAT WAS THE CONTEXT OF THOSE NEGOTIATIONS?

20    A.   WHEN I WOULD BE INVOLVED, IT WILL BE IN THE FINAL

21    NEGOTIATION OF WHAT IS CALLED AN SOW.  IT'S THE SCOPE OF WORK.

22    IT DEFINES A PROJECT AND A CHIP AND IT TALKS ABOUT THE PRICING

23    AND THE TECHNICAL CAPABILITIES AND THE SCHEDULE.

24             I ALSO RECALL BEING IN PRODUCT PLANNING MEETINGS WITH

25    THEIR ENGINEERING TEAM AND RECALL BEING IN MEETINGS WHEN WE'D

```
 1    TALK ABOUT THE AMENDMENT OF THE STA.  THAT'S A DOCUMENT THAT

 2    GOVERNS THE -- IT'S THE STRATEGIC TECHNICAL AGREEMENT.  IT

 3    GOVERNS THE RELATIONSHIP BETWEEN APPLE AND QUALCOMM SINCE WE

 4    DON'T HAVE A DIRECT SUPPLY RELATIONSHIP TO THEM.

 5    Q.   OVER THE COURSE OF THESE NEGOTIATIONS, DID APPLE ASK FOR

 6    SUPPLY ASSURANCES FROM QUALCOMM?

 7    A.   YES, THEY DID.

 8    Q.   WHAT WERE THE NATURE OF THOSE DISCUSSIONS?

 9    A.   THE ONES THAT I'VE BEEN INVOLVED, THEY HAVE, IN THE

10    AGREEMENT BETWEEN QUALCOMM AND APPLE, THEY HAVE AN ASSURANCE OF

11    18 MONTHS OF SUPPLY, AND THEY WANTED TO EXTEND THAT INTO A

12    LONGER PERIOD OF TIME.

13    Q.   DID YOU HAVE ANY CONCERNS OVER EXTENDING THE PERIOD OF

14    SUPPLY?

15    A.   NO.  WE -- AS A RESULT OF THE NEGOTIATION, WE EXTENDED

16    BEYOND 18.

17    Q.   DOES QUALCOMM PROVIDE OPEN-ENDED SUPPLY COMMITMENTS TO ITS

18    CUSTOMERS?

19    A.   WE DO NOT.

20    Q.   WHY NOT?

21    A.   A NUMBER OF REASONS, BUT I WOULD SAY ONE OF THE MAIN ONES

22    IS WE ARE -- WE'RE A FABLESS COMPANY, WHICH MEANS WE DON'T HAVE

23    A HOME MANUFACTURING.  SO WE'RE RELYING ON FOUNDRIES TO BUILD

24    OUR CHIPS.  AND MANY OF OUR SUPPLY GUARANTEES IN MANY CASES,

25    THEY MATCH OUR AGREEMENTS OR EXPECTATIONS WITH OUR SUPPLIERS
```

1          ABOUT HOW LONG WILL THEY BE ABLE TO MAINTAIN THAT TECHNOLOGY IN

2          PRODUCTION.

3              THERE ARE OTHER CONSIDERATIONS AS WELL.  THE ECONOMICS

4      FROM OUR SUPPLIERS TO US THAT DEFINE HOW LONG WE CAN CONTINUE

5      TO PRODUCE THE PRODUCT AND THE PRICES THAT WE EXPECT TO PAY OUR

6      SUPPLIERS.

7      Q.   COULD YOU JUST ELABORATE A LITTLE BIT MORE ON WHAT YOU

8      MEAN BY THE ECONOMICS?

9      A.   IF -- IF -- IN ORDER TO MAINTAIN -- IF I WANT TO STAY, FOR

10     EXAMPLE, A GREAT EXAMPLE OF THAT IS A BUSINESS IN THE

11     AUTOMOTIVE INDUSTRY.  THE AUTOMOTIVE INDUSTRY, UNLIKE THE CELL

12     PHONE, THEY EXPECT LONGER SUPPLY COMMITMENTS.

13             IF MY SUPPLIER INTENDS TO OBSOLETE A CERTAIN TECHNOLOGY

14     USED TO PRODUCE MY CHIP BECAUSE THEY WANT TO CONVERT THAT LINE

15     INTO A MORE MODERN TECHNOLOGY, THE COST OF THAT TECHNOLOGY

16     COULD BE PROHIBITIVE IF I WANTED TO CONTINUE BEYOND THE

17     OBSOLESCENCE OF THE PRODUCT.

18             THAT'S WHAT I MEANT.

19     Q.   MR. AMON, COULD YOU PLEASE TURN TO, IN THE BINDER OF

20     DOCUMENTS FROM THE FTC, CX 5053, WHICH IS TAB 18.

21     A.   I'M READY.

22     Q.   MR. AMON, DO YOU SEE THE E-MAIL AUTHORED BY YOU ON

23     NOVEMBER 19TH, 2012, IN THE CENTER OF PAGE 1 OF CX 5053?

24     A.   YES.

25     Q.   ABOUT FOUR LINES DOWN YOU WRITE "JIM DOH, JONATHAN WEISER:

```
 1        CONSIDER THIS E-MAIL THE 'GO AHEAD.'"

 2            DO YOU SEE THAT?

 3        A.   YES, I DO.

 4        Q.   WHAT DID YOU MEAN BY THAT?

 5        A.   IT MEANT THAT JIM DOH, WHICH WAS THE HEAD OF SALES OF QCT,

 6        AND JONATHAN WEISER, WHICH IS LEGAL, I WAS INDICATING TO THEM

 7        THAT WAS THE GO AHEAD FOR US TO ENGAGE IN BUSINESS WITH THE

 8        OEM'S, THE MATTER OF THIS E-MAIL.

 9            I BELIEVE THIS IS RELATED TO THE SALES OF TD-SCDMA

10        CHIPSETS TO CHINESE CUSTOMERS.

11        Q.   AND ON THE NEXT LINE YOU SAY, ABOUT MID-WAY THROUGH, "3 IS

12        ALREADY INCLUDED IN THE CSA."

13            DO YOU SEE THAT?

14        A.   YES, I DO.

15        Q.   WHAT DID YOU MEAN BY THAT?

16        A.   GIVE ME A MOMENT TO REVIEW 3.

17        Q.   SURE.

18            (PAUSE IN PROCEEDINGS.)

19            THE WITNESS:   YES.  ERIC REIFSCHNEIDER, WHO WROTE THE

20        ORIGINAL E-MAIL TO ME, HE WAS RESPONSIBLE FOR QTL.  HE HAD

21        SUGGESTED THAT IF, IN 3, THAT IF THE CUSTOMERS REFUSES OR FAIL

22        TO PAY ROYALTY, HE WOULD LIKE TO DISCONTINUE SUPPLY TO THOSE

23        CUSTOMERS.

24            WHEN I WROTE MY E-MAIL, I WAS ADDRESSING ERIC BASICALLY

25        SAYING WHATEVER YOU WANT IN 3, WE ALREADY HAVE COVERED IN THE
```

```
 1      CSA.
 2              THE CSA IS THE CHIPSET SUPPLY AGREEMENT THAT QCT USES TO
 3      DO BUSINESS WITH ITS CUSTOMERS.  THE MAIN MATTER OF THIS E-MAIL
 4      IS THAT QCT WILL ONLY SELL PRODUCTS OR ENGAGE IN THE
 5      DEVELOPMENT OF PHONES WITH OUR CHIPSETS WITH CUSTOMERS THAT ARE
 6      A LICENSEE OF QUALCOMM ON QTL.
 7              AND THE CSA HAS A PROVISION THAT REQUIRES A CUSTOMER TO BE
 8      A LICENSEE, AND BASICALLY WHAT I WAS REFERRING TO ERIC IS
 9      WHATEVER HE WANTED IN 3, IF WE ALREADY HAVE A CSA, IT WAS
10      ALREADY COVERED.
11      Q.   DO YOU HAVE A DETAILED UNDERSTANDING OF THE TERM OF
12      QUALCOMM'S CSA'S?
13      A.   I DON'T HAVE A DETAILED UNDERSTANDING.  I HAVEN'T REVIEWED
14      IT PERSONALLY.  BUT I UNDERSTAND THAT IN GENERAL, IT REQUIRES
15      THE CUSTOMERS TO HAVE A LICENSING AGREEMENT AND TO BE IN GOOD
16      STANDING WITH QUALCOMM.  THAT'S MY GENERAL UNDERSTANDING.
17      Q.   AS A RESULT OF THIS E-MAIL, DID YOU EVER TELL A CUSTOMER
18      THAT YOU WOULD DISCONTINUE SUPPLY IF THEY WERE NOT PAYING
19      ROYALTIES?
20      A.   NO.  AS A RESULT OF THIS E-MAIL, WE ENGAGED IN BUSINESS
21      WITH THOSE CUSTOMERS FOR TD-SCDMA.
22      Q.   MR. AMON, WHAT'S A PREMIUM TIER CHIP AT QUALCOMM?
23      A.   A PREMIUM TIER CHIP IN QUALCOMM IS A SNAPDRAGON 800.  IT
24      IS USUALLY DEFINED AS THE MOST ADVANCED SOC CHIPSET, MODEM PLUS
25      THE APPLICATION PROCESSOR, THAT WE PROVIDE.
```

1    Q.   DOES QUALCOMM HAVE CUSTOMERS THAT USE A SNAPDRAGON 800 IN

2    A LOWER END HANDSET?

3    A.   YES, WE DO.

4    Q.   WOULD YOU PROVIDE SOME EXAMPLES?

5    A.   YES.  XIAOMI, FOR EXAMPLE, IN THE MARKET OF INDIA, HAVE A

6    DEVICE USING THE LATEST SNAPDRAGON 800.  BUT IT'S SOLD IN THE

7    MID-TIER PRICING, PRICING RANGE.

8    Q.   DOES QUALCOMM HAVE CUSTOMERS THAT USE NON-PREMIUM TIER

9    QUALCOMM CHIPS IN THEIR HIGHEST END PHONES?

10   A.   YES, WE DO.

11   Q.   WOULD YOU PROVIDE SOME EXAMPLES OF THOSE?

12   A.   ONE EXAMPLE IS COMPANIES LIKE VIVO AND OPPO IN CHINA.

13   THEY WILL HAVE A PRODUCT NOT USING A PREMIUM TIER CHIPSET,

14   MAYBE A SNAPDRAGON 600, FOR INSTANCE, AND THEY WILL SELL THOSE

15   AT PREMIUM DEVICE ASP'S.  THAT'S ONE EXAMPLE.

16        THE OTHER EXAMPLE IS APPLE PHONES THAT, YOU KNOW, EVEN

17   THOUGH WE DON'T PROVIDE A PREMIUM TIER CHIPSET, BUT WE'LL HAVE

18   FEATURES ON OUR MODEM WHEN WE ARE THE SUPPLIER OF APPLE THAT

19   ARE EQUIVALENT TO SOME OF OUR MID OR HIGH TIER CHIPSETS JUST

20   BECAUSE THEY'RE LATE TO MARKET WITH SOME OF THE MODEM FEATURES.

21   Q.   COULD YOU EXPLAIN WHAT YOU MEAN BY THEY'RE LATE TO MARKET?

22   A.   USUALLY THE, THE MODEM, THE MODEM THAT WAS GOING TO BE IN

23   OUR PREMIUM TIER WHEN WE LAUNCH END UP BEING AVAILABLE IN THEIR

24   PRODUCTS ABOUT ONE TO TWO YEARS LATER.  THAT'S -- AT THAT TIME,

25   THAT PRODUCT, FOR US, BECOMES LIKE A MID OR A HIGH TIER MODEM

1    CAPABILITIES.

2    Q.   MR. AMON, DOES QUALCOMM SELL CHIPS TO COMPANIES THAT DO

3    NOT SELL PHONES IN THE UNITED STATES?

4    A.   YES, WE DO.

5    Q.   WHAT ARE SOME EXAMPLES?

6    A.   EXAMPLES ARE VIVO, XIAOMI, GIONEE.  G-I-O-N-E-E.  TC --

7    I'LL SAY LENOVO BRANDED PHONES, NOT THE MOTOROLA PHONES.

8         I WOULD SAY HUAWEI, IF I DID NOT SAY THAT AS AN EXAMPLE.

9         THERE ARE MANY OTHERS.  THOSE ARE JUST SOME EXAMPLES OF

10   THEM.

11        MS. SESSIONS:  THANK YOU, MR. AMON.  I HAVE NO

12   FURTHER QUESTIONS.

13        THE COURT:  OKAY.  TIME IS 2:20.

14        MR. MATHESON:  MAY I PROCEED, YOUR HONOR.

15        THE COURT:  2:20.  GO AHEAD, PLEASE.

16                    **REDIRECT EXAMINATION**

17   BY MR. MATHESON:

18   Q.   MR. AMON, YOU REFERRED EARLIER TO THE PRICE THAT OEM'S PAY

19   TO ACTIVATE CDMA FUNCTIONALITY ON A CHIP.

20        DO YOU RECALL THAT?

21   A.   YES.

22   Q.   WHAT IS IT TO DIFFUSE CDMA FUNCTIONALITY FROM A CHIP MEAN?

23   A.   WHEN WE BUILD OUR CHIPS, WE HAVE ONE MULTIMODE PLATFORM,

24   AND WE HAVE DIFFERENT VARIATIONS OF THE CHIP.  SO WE'LL HAVE A

25   VARIATION THAT HAS ALL THE CAPABILITIES, THAT WILL HAVE, FOR

1        EXAMPLE, FEATURES LIKE LTE, UMTS, OR CDMA IN THE MODEM SIDE.

2             AND THEN WE WILL HAVE VERSIONS THAT SOME OF THOSE

3        CAPABILITIES WILL BE DISABLED.

4             WE FUSE THEM AT THE PRODUCTION TIME, AND, THEREFORE, THE

5        HARDWARE IS DISABLED.  SOMETIMES IT'S DISABLED BY SOFTWARE.

6        Q.   SO TO FUSE MEANS TO DISABLE CDMA FUNCTIONALITY; IS THAT

7        CORRECT?

8        A.   THAT IS CORRECT.

9        Q.   SO YOU'RE NOT ATTACHING AN EXTRA WIDGET TO A CHIP THAT

10       PROVIDES CDMA FUNCTIONALITY.  WHAT YOU'RE DOING IS TAKING IT

11       OUT OF THE CHIP UNLESS THE OEM WANTS TO PAY FOR IT; RIGHT?

12       A.   NOT NECESSARILY.  THE WAY THE SEMICONDUCTOR WORKS TODAY

13       ACROSS A NUMBER OF PRODUCTS, EVEN WHEN YOU BUY A PROCESSOR,

14       THEY HAVE DIFFERENT CLOCK SPEEDS.

15            SO TO CERTAIN PRODUCTS YOU HAVE A PRODUCT AT A HIGHER

16       PERFORMANCE OR A LOWER PERFORMANCE.

17            FOR EXAMPLE, IF YOU'RE NOT TALKING ABOUT MODEM, SOME OF

18       OUR CHIPS MAY HAVE HIGHER NUMBER OF CPU'S OR LESS NUMBER OF

19       CPU'S.

20            SO WE HAVE DIFFERENT VARIATIONS OF THE PRODUCT.  IN THE

21       CASE OF MODEM, YOU CAN BUY A LA CARTE THE MODEMS THAT YOU WANT,

22       OR YOU CAN HAVE THE SUPERSET.

23            THIS IS HOW IT IS DONE.  IT IS A COMPROMISE.

24       Q.   SIR, THE DIFFERENCE BETWEEN A SUPERSET AND A NON-SUPERSET

25       IS THAT YOU HAVE DEFUSED OR DISABLED THE CDMA FUNCTIONALITY IN

```
1      THE NON-SUPERSET; IS THAT RIGHT?

2      A.   THAT IS CORRECT.

3      Q.   THANK YOU.  CAN YOU TAKE A LOOK AT QX 9225 WHICH IS IN THE

4      BINDER THAT YOUR COUNSEL SHOWED YOU.

5      A.   I'M READY.

6      Q.   CAN YOU LOOK AT THE PAGE THAT ENDS DASH 742.

7           DO YOU SEE AN E-MAIL THERE THAT YOU RECEIVED, AMONG

8      OTHERS, FROM -- IN DECEMBER 2012?

9           THE LAST LINE OF THAT E-MAIL STATES "THE INTC/IFX PRICE

10     BELOW --" NOW, THAT REFERS TO INTEL; RIGHT?

11     A.   YES.

12     Q.   "THEIR PRICE BEING LOW IS NO SURPRISE AS THEY WOULD LIKELY

13     DO WHATEVER IT TOOK TO BUY THE DOCKET (TO MAKE UP FOR NO

14     COMMERCIAL TRACK RECORD ON LTE, LET ALONE CA."

15          NOW, IF INTEL HAD WON ON APPLE SOCKET TWO YEARS

16     PREVIOUSLY, THEY WOULD HAVE HAD A COMMERCIAL TRACK RECORD ON

17     LTE; RIGHT?

18     A.   THEY WOULD HAVE HAD COMMERCIAL TRACK RECORD AND SCALE.

19     Q.   NOW, SIR, YOU TESTIFIED IT WOULD BE DEVASTATING IF

20     COMMITMENT TO THE INDUSTRY CUT OFF CHIP SUPPLY TO A CUSTOMER;

21     RIGHT?

22     A.   YES.

23     Q.   AND YOU CERTAINLY DO NOT WANT TO THREATEN CUSTOMERS WITH

24     CUTTING OFF CHIP SUPPLY; RIGHT?

25     A.   ABSOLUTELY NOT.
```

1    Q.   NOW, SITTING HERE TODAY, YOU CAN'T RECALL HAVING EVER BEEN

2    INFORMED THAT QTL THREATENED TO CUT OFF CHIP SUPPLY TO SONY; IS

3    THAT TRUE?

4    A.   I -- YES, I DON'T RECALL THAT QCT HAS BEEN INFORMED TO CUT

5    OFF CHIP SUPPLY TO SONY.

6    Q.   I MEANT YOU PERSONALLY.  YOU PERSONALLY, SITTING HERE

7    TODAY, CANNOT RECALL HAVING EVER BEEN INFORMED THAT QTL

8    THREATENED TO CUT OFF CHIP SUPPLY TO SONY?

9    A.   SONY, I DON'T RECALL.

10   Q.   AND AT YOUR DEPOSITION, IN FACT, YOU COULD NOT RECALL

11   HAVING EVER BEEN INFORMED THAT QTL THREATENED TO STOP PROVIDING

12   CHIPSETS TO ANY CUSTOMER; IS THAT TRUE?

13   A.   YOU SHOWED ME EVIDENCE EARLIER.

14   Q.   MY QUESTION, SIR, IS WHAT YOU TESTIFIED AT YOUR

15   DEPOSITION.  ISN'T IT THE FACT THAT AT YOUR DEPOSITION YOU

16   COULD NOT RECALL HAVING EVER BEEN INFORMED THAT QTL HAD EVER

17   THREATENED TO STOP PROVIDING CHIPSETS TO A CUSTOMER?

18   A.   SO SPECIFICALLY THE QUESTION ON QTL, I HAD BEEN INFORMED

19   BY A CUSTOMER THAT WAS MOTOROLA.

20   Q.   CAN I DIRECT YOUR ATTENTION, SIR, TO PAGE 50, LINE 24, TO

21   51, LINES 20 -- LINE 2 OF YOUR DEPOSITION TRANSCRIPT.

22        MS. SESSIONS:  SORRY, COUNSEL.  WHAT PAGE ARE YOU ON?

23        MR. MATHESON:  50, LINE 24, TO 51, LINE 2.

24   Q.   YOU WERE ASKED, SIR --

25   A.   WHICH PAGE, I'M SORRY?

1    Q.   PAGE 50 OF YOUR DEPOSITION TRANSCRIPT, LINE 24 TO PAGE 51,

2    LINE 2.

3         YOU WERE ASKED AT YOUR DEPOSITION, SIR, "YOU HAVE NEVER

4    BEEN INFORMED THAT QTL THREATENED TO CEASE SUPPLYING CHIPSETS

5    TO A CUSTOMER BECAUSE OF A LICENSING DISPUTE; IS THAT RIGHT?"

6         AND YOU ANSWERED "THAT IS CORRECT."

7         YOU WERE ASKED THAT QUESTION AND YOU GAVE THAT ANSWER AT

8    YOUR DEPOSITION; RIGHT?

9    A.   GIVE ME A MOMENT.  PAGE 50, WHAT LINE?

10   Q.   LINE 24 THROUGH 51, LINE 2.  YOU CAN SEE IT RIGHT ON YOUR

11   SCREEN, SIR.

12        YOU WERE ASKED, "YOU HAVE NEVER BEEN INFORMED THAT QTL

13   THREATENED TO CEASE SUPPLYING CHIPSETS TO A CUSTOMER BECAUSE OF

14   A LICENSING DISPUTE; IS THAT RIGHT?"

15        YOU ANSWERED "THAT IS CORRECT."

16        THAT WAS A TRUE STATEMENT WHEN YOU SAID IT?

17   A.   THAT IS CORRECT.

18   Q.   NOW, BASED ON THE NOTES THAT WE LOOKED AT THAT YOU TOOK IN

19   DECEMBER 2015, YOU CAN NOW RECALL THAT, IN FACT, RICK OSTERLOH

20   DID TELL YOU THAT ERIC REIFSCHNEIDER WAS CONSTANTLY THREATENING

21   TO CUT OFF SUPPLY; RIGHT?

22   A.   YES, THAT'S WHAT I HEARD FROM MOTOROLA.

23   Q.   NOW, IF IT'S THE CASE THAT A HUAWEI EXECUTIVE TESTIFIED

24   UNDER OATH THAT ERIC REIFSCHNEIDER THREATENED TO CUT OFF CHIP

25   SUPPLY TO HUAWEI, NOW, EITHER SHE'S LYING OR YOU WERE JUST

AMON REDIRECT BY MR. MATHESON

```
 1    NEVER INFORMED OF THAT THREAT; RIGHT?

 2    A.   I WAS NOT INFORMED OF A THREAT TO CUT SUPPLY OFF HUAWEI.

 3    Q.   AND IF AN EXECUTIVE FROM LENOVO AND MOTOROLA TESTIFIED

 4    UNDER OATH THAT ERIC REIFSCHNEIDER THREATENED TO CUT OFF THEIR

 5    CHIP SUPPLY, EITHER THAT PERSON IS LYING OR YOU JUST WEREN'T

 6    INFORMED OF THE THREAT; RIGHT?

 7    A.   IN THE CASE OF MOTOROLA, I WAS INFORMED AT THAT TIME IN

 8    THE MEETING WITH RICK OSTERLOH THAT HE TOLD ME THAT ERIC HAD

 9    MADE THAT THREAT.

10    Q.   NOW, CAN WE LOOK AT CX 5321, WHICH IS TAB 13 OF THE BINDER

11    I GAVE YOU, AT PAGE 2.

12         LET ME DIRECT YOUR ATTENTION TO THE BOLDED TEXT AT THE

13    BOTTOM OF THE PAGE THAT BEGINS "DURING THE LAST 24 HOURS."

14    A.   YES.

15    Q.   NOW, IT'S FAIR TO SAY THAT WHAT VIVO WAS REQUESTING IS

16    THAT QTL PROVIDES CONFIRMATION THAT IF VIVO CONTINUES TO

17    NEGOTIATE IN GOOD FAITH, QCT WILL CONTINUE SHIPPING CHIPSETS;

18    RIGHT?

19    A.   WHAT IT'S BASICALLY SAYING HERE IS THAT IF THEY'RE

20    NEGOTIATING IN GOOD FAITH WITH QTL, QCT COULD ENGAGE --

21    Q.   MY QUESTION, SIR, IS THEY'RE ASKING FOR QTL'S ASSURANCE,

22    NOT FOR THE ASSURANCE OF THE PRESIDENT OF QCT; RIGHT?

23    A.   THAT'S NOT THE INTENT OF WHAT THIS WAS WRITTEN.

24    Q.   THE WORD STATES, SIR, "IF QTL PROVIDES CONFIRMATION THAT

25    IF VIVO CONTINUES TO NEGOTIATE WITH QTL IN GOOD FAITH, QCT WILL
```

AMON REDIRECT BY MR. MATHESON

```
 1        CONTINUE SHIPPING CHIPSETS."

 2            IT'S FAIR THAT WHAT VIVO SOUGHT WAS CONFIRMATION FROM QTL,

 3        NOT FROM THE PRESIDENT OF QCT; ISN'T THAT RIGHT?

 4        A.   WHAT -- THAT'S NOT CORRECT.

 5                MR. MATHESON:  NO FURTHER QUESTIONS.

 6                THE COURT:  OKAY.  TIME IS 2:28.

 7                MS. SESSIONS:  NO FURTHER QUESTIONS, YOUR HONOR.

 8                THE COURT:  OKAY.

 9                MS. SESSIONS:  BUT WE MAY RECALL MR. AMON, SUBJECT TO

10        THE REMAINDER OF THE FTC'S CASE.

11                THE COURT:  OKAY.  SO HE IS SUBJECT TO RECALL.  SO

12        YOU MAY STEP DOWN NOW, SIR, BUT YOU HAVE NOT COMPLETED YOUR

13        TRIAL TESTIMONY.  OKAY?  YOU ARE SUBJECT TO RECALL.

14                THE WITNESS:  THANK YOU VERY MUCH.

15                THE COURT:  ARE YOUR NEXT WITNESSES ALL BY VIDEO?

16                MR. CARSON:  NO, YOUR HONOR.  WE HAVE ONE MORE LIVE

17        WITNESS, MS. AICHA EVANS.

18                THE COURT:  ALL RIGHT.  I THINK FOR THE SAKE OF OUR

19        COURT REPORTERS, WE SHOULD TAKE A TEN MINUTE BREAK.

20                MR. CARSON:  YES, YOUR HONOR.

21                THE COURT:  OKAY.  THANK YOU.

22            (RECESS FROM 2:29 P.M. UNTIL 2:41 P.M.)

23                THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

24            CALL YOUR NEXT WITNESS.

25                MR. CARSON:  YOUR HONOR, WESLEY CARSON FOR THE FTC.
```

```
 1            AT THIS TIME WE CALL AICHA EVANS TO THE STAND.

 2            THE COURT:  OKAY.

 3            MR. CARSON:  MAY I APPROACH WITH BINDERS?

 4            THE COURT:  YES, PLEASE.

 5            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

 6       (PLAINTIFF'S WITNESS, AICHATOU EVANS, WAS SWORN.)

 7            THE WITNESS:  YES, I DO.

 8            THE CLERK:  THANK YOU.  PLEASE BE SEATED.

 9            THE WITNESS:  THANK YOU.

10            THE CLERK:  WOULD YOU PLEASE STATE YOUR FULL NAME AND

11       SPELL YOUR LAST NAME FOR THE RECORD.

12            THE WITNESS:  HELLO.  MY NAME IS AICHATOU, AICHA

13       EVANS.  LAST NAME E V A N S.

14            THE COURT:  WOULD YOU SPELL THE FIRST NAME, PLEASE.

15            THE WITNESS:  A-I-C-H-A-T-O-U.

16            THE COURT:  ALL RIGHT.

17       TIME IS 2:42.  GO AHEAD, PLEASE.

18            MR. CARSON:  THANK YOU, YOUR HONOR.

19                          DIRECT EXAMINATION

20       BY MR. CARSON:

21       Q.   HELLO.  COULD YOU INTRODUCE YOURSELF TO JUDGE KOH?

22       A.   HELLO, JUDGE KOH.  MY NAME IS AICHA EVANS FROM INTEL.

23       Q.   WHERE DID YOU GROW UP?

24       A.   I WAS BORN IN SENEGAL, S-E-N-E-G-A-L, WEST AFRICA, AND I

25       GREW UP BETWEEN PARIS AND SENEGAL.
```

1    Q.   COULD YOU BRIEFLY SUMMARIZE YOUR EDUCATION, STARTING WITH

2    COLLEGE?

3    A.   I WENT THROUGH SUPERIOR AND SPECIAL MATHEMATICS IN FRANCE,

4    AND THEN I GRADUATED FROM THE GEORGE WASHINGTON UNIVERSITY IN

5    D.C. IN COMPUTER ENGINEERING.

6    Q.   WHAT'S YOUR CURRENT POSITION AT INTEL?

7    A.   I AM THE, A SENIOR VICE PRESIDENT AND THE CHIEF STRATEGY

8    OFFICER FOR INTEL CORPORATION.

9    Q.   WHAT ARE YOUR RESPONSIBILITIES AS THE CHIEF STRATEGY

10   OFFICER AT INTEL?

11   A.   WE ARE UNDERGOING A TRANSFORMATION.  WE WERE VERY MUCH

12   BUILT AROUND THE PC, AND NOW WE'RE MOVING TO THE CLOUDS AND

13   DATA CENTRIC WORLD, AND THIS REQUIRES A LOT OF CHANGE ACROSS

14   THE DIFFERENT BUSINESSES AND IN TERMS OF OUR PROCESSES.  AND I

15   HELP MAKE THAT HAPPEN.

16   Q.   NOW, MS. EVANS, ARE YOU ON INTEL MANAGEMENT COMMITTEE?

17   A.   YES, I AM.

18   Q.   WHAT DO YOU DO ON THE MANAGEMENT COMMITTEE?

19   A.   WE MAKE, I HOPE, WE MAKE A LOT OF DECISIONS, ANYTHING

20   AROUND HR, AROUND BUSINESSES, P&L PLAN, STRATEGY.  WE

21   ESSENTIALLY MAKE MOST OF THE CORPORATE DECISIONS.

22   Q.   HOW MANY YEARS HAVE YOU WORKED IN THE WIRELESS

23   COMMUNICATIONS INDUSTRY IN TOTAL?

24   A.   OVER 20 YEARS.

25   Q.   LET'S TALK ABOUT THE BACKGROUND OF THAT INDUSTRY.  ARE YOU

```
1     FAMILIAR WITH THE TERM OEM?

2     A.   YES, I AM.

3     Q.   WHAT IS AN OEM?

4     A.   AN OEM, IT STANDS FOR ORIGINAL EQUIPMENT MANUFACTURER, AND

5     THESE ARE COMPANIES WORLDWIDE THAT BUILD DEVICES, AND THEY SELL

6     THEM TO CUSTOMERS.  AND BY DEVICES I MEAN ANYWHERE FROM A

7     HANDSET TO A CAR, ANYTHING THAT HAS COMPUTE AND/OR

8     COMMUNICATIONS.

9     Q.   COULD YOU GIVE US SOME EXAMPLES OF OEM'S?

10    A.   SAMSUNG, APPLE, TESLA, LENOVO.

11    Q.   NOW, ARE YOU FAMILIAR WITH THE WAY THAT OEM'S WORK WITH

12    THEIR COMPONENT SUPPLIERS?

13    A.   YES, I AM.

14    Q.   WHICH COMPONENT SUPPLIERS HAVE YOU WORKED FOR IN THE PAST?

15    A.   I WORKED FOR SKYWORKS AND ITS DIFFERENT INCARNATIONS.  IT

16    WAS CONEXANT, CONEXANT, C-O-N-E-X-A-N-T; AND ROCKWELL

17    SEMICONDUCTOR; AND BROOKTHREE, B-R-O-O-K-T-H-R-E-E.  SORRY, I'M

18    NOT A NATIVE SPEAKER.  SO THE SPELLING AND THE NUMBERS GET

19    COMPLICATED.

20    Q.   WHAT KIND OF PRODUCTS DID SKYWORKS PROVIDE?

21    A.   SKYWORKS, WELL, TODAY, THEY SPECIALIZE IN RADIOFREQUENCY

22    COMPONENTS, LIKE FILTER, SWITCHES, THAT TYPE OF STUFF.  BACK

23    WHEN I WORKED WITH THEM, THEY ALSO WERE IN THE BASEBAND

24    BUSINESS.

25    Q.   SO YOU SAID BASEBAND.  ARE BASEBANDS ANOTHER NAME FOR
```

1    MODEM CHIPS?

2    A.   YES, THEY ARE.

3    Q.   WHAT ARE SOME EXAMPLES OF POSITIONS THAT YOU'VE HELD AT

4    SKYWORKS AND INTEL?

5    A.   I STARTED AS A SILICON ENGINEER AND THEN I MOVED INTO

6    SYSTEM ENGINEERING FOR THE PHYSICAL LAYER.  AND THEN FROM

7    THERE, I MOVED INTO LEADERSHIP AND A MANAGEMENT POSITION AND UP

8    TO EXECUTIVE POSITIONS.

9         WHEN I STARTED INTO MANAGEMENT, IT WAS FIRST ENGINEERING,

10   AND THEN IT GREW INTO SORT OF ENGINEERING, BUSINESS, CUSTOMERS,

11   AND SO ON.  SO GM.

12   Q.   HAVE YOU PERSONALLY PARTICIPATED IN DISCUSSIONS WITH OEM'S

13   ABOUT COMPONENT SALES?

14   A.   YES, I HAVE.

15   Q.   AND IN YOUR EXPERIENCE HOW DO COMPONENT SUPPLIERS

16   TYPICALLY CHARGE FOR THEIR PRODUCTS?

17   A.   TYPICALLY WE -- BASICALLY THE CUSTOMER TELLS US, LIKE WE,

18   WE BUILD WHAT THEY REQUIRE, THE PRODUCTS THAT THEY WANT.

19        ONCE WE BUILD THEM ON THE SCHEDULE THAT'S AGREED UPON, WE

20   DELIVER TO THEM, AND OBVIOUSLY THERE'S ALSO A PRICING

21   NEGOTIATION.  SO WE AGREE ON THE PRICE, AND WE DELIVER, AND WE

22   GET PAID, AND THEN THEY ARE FREE TO USE.  AND THERE MAY BE

23   SUPPORT, ONGOING SUPPORT.

24   Q.   NOW, DO THE COMPONENT SUPPLIERS YOU WORKED FOR EVER CHARGE

25   FOR PATENT ROYALTIES?

1    A.    NO.

2    Q.    ARE YOU AWARE OF ANY COMPANY, ANY COMPONENT SUPPLIER THAT

3    CHARGES FOR PATENT ROYALTIES FOR THE USE OF THOSE COMPONENTS?

4    A.    NO, EXCEPT FOR ONE, QUALCOMM.

5    Q.    LET'S SET ASIDE QUALCOMM FOR A MOMENT.

6          FOR ALL THE OTHER SEMICONDUCTOR, OR ALL THE OTHER

7    COMPONENT SUPPLIERS, WHAT DOES THE ALL-IN PRICE OF THAT

8    COMPONENT SALE CONSIST OF?

9    A.    IT INCLUDES EVERYTHING, THE PHYSICAL PRODUCT AND ALL OF

10   THE VALUABLES AND I.P., INCLUDING SOFTWARE, HARDWARE, AND THE

11   SUPPORT THAT'S EMBEDDED, ESSENTIALLY.  THAT'S THE ALL-IN PRICE.

12   Q.    SO, FOR INSTANCE, DOES INTEL CHARGE SEPARATE ROYALTIES FOR

13   USING ITS MODEM CHIPS?

14   A.    NO, WE DO NOT.

15   Q.    LET'S MOVE ON TO QUALCOMM THEN.

16         WHAT'S YOUR PERSONAL EXPERIENCE IN COMPETING AGAINST

17   QUALCOMM?

18   A.    I'VE BEEN COMPETING WITH THEM FOR A LONG TIME AT DIFFERENT

19   COMPANIES, AS I SAID EARLIER.  AND THE DIFFERENCE IS THAT THEY

20   HAVE -- THEIR ALL-IN PRICE INCLUDES TWO COMPONENTS, THE, SORT

21   OF THE CHIP PRICE, WE CALL IT, PLUS THE ROYALTY ON TOP OF IT.

22   Q.    SO IN YOUR EXPERIENCE HOW DOES COMPETING AGAINST QUALCOMM

23   COMPARE WITH COMPETING AGAINST OTHER COMPONENT SUPPLIERS?

24   A.    IT'S TOUGH AND VERY DIFFERENT BECAUSE WITH OTHER, OTHER

25   COMPONENT SUPPLIERS OR COMPETITORS, IT'S ESSENTIALLY A BATTLE

1      OF FEATURES AND PRICE AND THAT'S IT AND YOU COMPETE BASED ON

2      THAT AND WHOEVER MAKES IT, MAKES IT.

3             WHEREAS WITH QUALCOMM, IT'S DIFFERENT BECAUSE OF THE

4      BUSINESS MODEL, WHICH MAKES IT A VERY DIFFICULT LEVEL PLAYING

5      FIELD.  IT'S PRETTY MUCH VERY TOUGH TO COMPETE IN THAT, VERY

6      UNFAIR.

7      Q.   LET'S BREAK DOWN THAT BUSINESS MODEL A LITTLE BIT.

8             SO TO YOUR KNOWLEDGE DOES QUALCOMM CHARGE CUSTOMERS FOR

9      THE PRICE OF THE MODEM CHIP ITSELF?

10     A.   YES, TO MY KNOWLEDGE, THEY DO.

11     Q.   AND TO YOUR KNOWLEDGE DOES QUALCOMM CHARGE A PATENT

12     ROYALTY FOR USING THOSE MODEM CHIPS?

13     A.   YES, THEY DO.

14     Q.   NOW, YOU'RE NOT A LAWYER, ARE YOU?

15     A.   NOPE.

16     Q.   ARE YOU AN EXPERT IN THE LAW OF PATENT EXHAUSTION?

17     A.   ABSOLUTELY NOT.

18     Q.   SO LET ME ASK YOU FROM A BUSINESS PERSPECTIVE, APART FROM

19     QUALCOMM, ARE YOU AWARE OF ANY OTHER COMPANIES THAT SELL A

20     MODEM CHIP AND THEN COLLECT ROYALTIES ON THAT SAME MODEM CHIP?

21     A.   NO, I AM NOT.

22     Q.   SO THEN WHAT IS THE ALL-IN COST OF A MODEM CHIP FROM

23     QUALCOMM CONSIST OF?

24     A.   IT'S THE, THE SINGLE BUCKET, WHICH IS THE SUM OF THE CHIP

25     PRICE, PLUS THE ROYALTY.

1    Q.   NOW, TO YOUR KNOWLEDGE DOES QUALCOMM ALSO SEEK TO COLLECT

2    ROYALTIES FOR THE USE OF OTHER COMPANIES' CHIPS BY OEM'S?

3    A.   YES, THEY DO.

4    Q.   WHAT ARE THE IMPLICATIONS OF THAT PRACTICE FOR THE ALL-IN

5    PRICE OF INTEL CHIPS?

6    A.   FOR THE INTEL CHIPS, OR INTEL PRODUCT, YOU -- WE BASICALLY

7    HAVE THE CHIP PRICE, AND THEN WE KNOW THAT WHAT HAPPENS

8    AFTERWARDS, WITHOUT US AT THE TABLE, IS THAT THERE'S A QUALCOMM

9    ROYALTY THAT IS ADDED TO THAT.

10       AND SO THE FINAL ALL-IN PRICE FOR THE CUSTOMER IS OUR

11   CHIPSET PRICE, PLUS THE QUALCOMM ROYALTY.

12   Q.   AND HOW DOES THAT AFFECT INTEL?

13   A.   IT'S, IT'S A VERY DIFFICULT SITUATION.  I MEAN, IT'S --

14   IT'S CREATED -- FIRST OF ALL, NOBODY ELSE DOES THAT IN THE

15   INDUSTRY.

16       SECOND OF ALL, YOU HAVE YOUR CUSTOMER THAT YOU'RE USED TO

17   A BUSINESS WHERE YOU BASICALLY BUILD THE PRODUCT THAT THEY WANT

18   ON THE SCHEDULE THAT THEY WANT AT THE PRICE YOU AGREED UPON AND

19   YOU GIVE THEM THE PRODUCT AND THEY PAY YOU FOR THE USE OF THAT

20   PRODUCT.

21       BUT NOW WHAT HAPPENS IS IT GETS BROKEN DOWN INTO TWO STEPS

22   BECAUSE YOU HAVE YOUR PRODUCT, YOUR SELLING PRICE, AND THEN YOU

23   KNOW THAT THERE'S SOME OTHER NEGOTIATION WITH A COMPETITOR THAT

24   IS TRYING TO DISLODGE YOU TO BEGIN WITH THAT CONTROLS A

25   SIGNIFICANT PORTION OF YOUR PRICING THROUGH THE ROYALTY.

1    Q.   IF QUALCOMM WERE ABLE TO SHIFT THE COST FROM ITS PATENT

2    ROYALTY TO ITS MODEM SHIP OR SHIFT THE COST OF THE MODEM CHIP

3    TO THE PATENT ROYALTY, WOULD THAT HAVE IMPLICATIONS FOR INTEL'S

4    COMPETITIVENESS WITH QUALCOMM?

5    A.   YEAH.  SO IF I MAY ELABORATE A LITTLE BIT?

6    Q.   SURE.

7    A.   I THINK THE BEST WAY TO GO THROUGH THIS IS SORT OF IT --

8    I'M GOING TO START ON THE QUALCOMM SIDE.

9         SO FIRST OF ALL, WE'RE BOTH COMPETING FOR THE SOCKET,

10   RIGHT?  THAT'S THE PREMISE, MEANING FOR THE CUSTOMER.

11        SO ON THE QUALCOMM SIDE, TO MY EXPERIENCE AND TO MY

12   KNOWLEDGE THERE IS AN ALL-IN PRICE AND YOU HAVE -- FIRST OF

13   ALL, THE CUSTOMER IS DEALING WITH THE SITUATION WHERE NOBODY

14   ELSE DOES THIS, ONLY QUALCOMM.

15        SO NOW THERE IS THIS CHIP PRICE, AND ON TOP OF IT THERE'S

16   THIS ROYALTY PRICE.  FOR THEM, QUALCOMM, IT DOESN'T REALLY

17   MATTER BECAUSE BOTH MONIES ARE THE ALL-IN PRICE AND GO TO THEM

18   AND THEY CAN SHIFT THE PRICE FROM CHIPSET TO ROYALTY, WHICH

19   THEN UNDERCUTS ME AS THE COMPETITOR.

20        AND BY THE WAY, IT'S NOT LIKE IT RESULTS INTO A LOWER

21   PRICE FOR THE CUSTOMER.

22        THEN YOU COME ON THE INTEL SIDE AND YOU HAVE THE CHIPSET

23   PRICE, AND THEN BEHIND, MEANING WE ARE NOT IN THE ROOM, YOU

24   HAVE BASICALLY THE CUSTOMER NEGOTIATING WITH QUALCOMM, WHO'S

25   TRYING TO UNDERCUT US TO BEGIN WITH, ON THE ROYALTY AND THAT

1    TACKS ON AND I HAVE NO CONTROL OVER THAT AND IN SOME CASES I

2    DON'T EVEN -- IN MOST CASES I DON'T EVEN KNOW.  WE, INTEL,

3    DON'T EVEN KNOW WHAT IT IS.

4         IT MAKES IT A VERY, VERY UNFAIR LEVEL PLAYING FIELD.

5    Q.   DOES IT SOLVE THE PROBLEM IF THE ROYALTY THAT QUALCOMM

6    CHARGES ON QUALCOMM CHIPS AND INTEL CHIPS WERE THE EXACT SAME?

7    A.   NO, IT DOESN'T SOLVE THE PROBLEM BECAUSE AT THE END OF THE

8    DAY THE ABILITY TO SHIFT FROM CHIPSET TO, TO ROYALTY DOESN'T

9    CHANGE.  THAT'S ONE.

10        IN MY -- IN OUR VIEW, WHAT SOLVES THE PROBLEM IS IF WE

11   HAVE THE ABILITY, LIKE WE DO IN ALL OTHER SECTORS OF THIS

12   INDUSTRY, TO BASICALLY SET OUR -- BUILD THE PRODUCT THAT THE

13   CUSTOMER WANTS ON THE SCHEDULE THAT THEY WANT, UNDER THE ALL-IN

14   PRICE THAT WE AGREED UPON, AND THEN WE GET PAID.

15        BUT OBVIOUSLY I DON'T HAVE -- WE DON'T HAVE TODAY THE

16   OPPORTUNITY TO DO THAT BECAUSE IT WOULD REQUIRE FOR US TO HAVE

17   A LICENSE WHICH, YOU KNOW, THEY DON'T OFFER.  "THEY" BEING

18   QUALCOMM.

19   Q.   SO WHY DOESN'T INTEL JUST ADOPT THE SAME BUSINESS MODEL

20   THAT QUALCOMM USES?

21   A.   WE WOULD NEVER DO THAT.  I MEAN, WE, WE BELIEVE IN THE

22   SYSTEM WHERE YOU AGREE ON THE PRODUCT, THE FEATURES, THE PRICE,

23   THE SCHEDULE, YOU DELIVER, THE CUSTOMER PAYS AND THEN THE

24   CUSTOMER USES IT.

25        WE -- WE'VE STUDIED THIS A LOT AND WE -- WE'RE NOT DOING

```
 1      IT, BUT THIS BUSINESS MODEL SINCE WE HAVE TO COMPETE DAY IN AND

 2      DAY OUT AND WE'RE IN SUCH A CONTINUOUS, FRAGILE SITUATION WITH

 3      THE MODEM BUSINESS AT INTEL THAT WE PAY A LOT OF ATTENTION TO

 4      THIS BUSINESS MODEL.

 5           AND, FRANKLY, WE REALLY CAN'T SEE ANY LOGICAL REASON TO

 6      HAVE SUCH A BUSINESS MODEL EXCEPT HAVING THE ABILITY TO CONTROL

 7      YOUR COMPETITORS AND KEEP THEM AT BAY.

 8      Q.   LET'S MOVE ON AND TALK A LITTLE BIT MORE ABOUT THE MODEM

 9      CHIP INDUSTRY ITSELF.

10           NOW, PER THIS COURT'S ORDER, EVENTS AFTER MARCH 2018 ARE

11      EXCLUDED, SO IF YOU COULD STOP FROM REFERRING -- I KNOW IT

12      MIGHT BE TOUGH -- TO EVENTS THAT HAPPENED AFTER MARCH 2018,

13      THAT WOULD BE GREAT.  COULD YOU DO THAT?

14      A.   I'M GOING TO TRY MY BEST.

15      Q.   GREAT.  NOW, YOU'VE HEARD OF THE TERM PREMIUM MODEM

16      BEFORE, HAVEN'T YOU?

17      A.   YES, I HAVE.

18      Q.   WHAT IS A PREMIUM MODEM?

19      A.   IT'S THE MOST ADVANCED FEATURES AND TECHNIQUES AND FORM

20      FACTORS ON -- THAT ARE ACTUALLY DEPLOYED ON THE MOST ADVANCED

21      LEADING NETWORK SUCH AS, FOR EXAMPLE, AN AT&T OR VERIZON.

22      Q.   DOES INTEL FOCUS ON PREMIUM MODEMS?

23      A.   YES, IT IS OUR FOCUS.

24      Q.   AND IN YOUR EXPERIENCE, WILL HANDSET OEM'S WHO ARE LOOKING

25      TO BUY A PREMIUM MODEM BE ABLE TO SUBSTITUTE NON-PREMIUM MODEMS
```

```
 1        IN THOSE HANDSETS?

 2     A.   OKAY.  SO I KNOW I'M WITH LAWYERS, SO I'M GOING TO TRY TO

 3     BE CRISP AND CLEAR.

 4          "BE ABLE" IS SORT OF AN INTERESTING WORD.  ARE THEY

 5     MATHEMATICALLY AND PHYSICALLY ABLE TO DO THAT?  YES.  IT WOULD

 6     NOT BE VERY WISE BECAUSE FROM A COMPETITIVE STANDPOINT, THEN

 7     THAT OEM IS PUTTING, IN A PREMIUM DEVICE, A LESS COMPETITIVE

 8     MODEM WHICH THE CUSTOMER WILL, WILL FEEL, FOR EXAMPLE, LIKE

 9     RIGHT NOW THERE ARE MILLIONS OF BITS, I'M SURE THERE ARE PHONES

10     AND PEOPLE TWEETING AND READING E-MAIL EVEN THOUGH WE'RE IN

11     COURT.

12          AND ESSENTIALLY IT'S GOING TO BE SLOW OR IT'S NOT GOING TO

13     BE RESPONSIVE OR THE THROUGHPUT IS GOING TO BE LOW.

14          SO, YES, THEY TECHNICALLY CAN DO THAT, PHYSICALLY AND

15     MATHEMATICALLY, BUT IT WOULDN'T BE A VERY WISE BUSINESS

16     DECISION.

17     Q.   SO WHAT ABOUT THE OPPOSITE SITUATION?  WILL HANDSET OEM

18     LOOKING FOR A NON-PREMIUM MODEM BE ABLE TO SUBSTITUTE A PREMIUM

19     MODEM IN THEIR HANDSET?

20     A.   SHORT ANSWER AT THIS TIME.  YES, MATHEMATICALLY AND

21     TECHNICALLY AND PHYSICALLY THAT IS POSSIBLE.

22          IT ALSO WOULD BE A VERY UNWISE DECISION BECAUSE THEN THAT

23     OEM IS BUILDING A LOWER TIER HANDSET THAT THEY WILL SELL FOR

24     LESS, AND THEN THE CUSTOMER WOULD BE VERY HAPPY BECAUSE THEY

25     WOULD GET AN ADVANCED MODEM FEATURE SET DEPLOYED ON THE
```

1   NETWORK.

2        BUT FROM A COST STANDPOINT, IT DOESN'T MAKE BUSINESS SENSE

3   BECAUSE ESSENTIALLY THE COST OF THE MODEM WOULD BE HIGHER AND

4   YOU WOULDN'T GET IT BACK ON THE ASP SIDE.

5   Q.   LET'S TALK ABOUT THE INDUSTRY ITSELF.  HOW MANY COMPANIES

6   CURRENTLY SUPPLY PREMIUM MODEMS?

7   A.   SO SORRY AGAIN, A LITTLE LONGER ANSWER BECAUSE IT -- I

8   WANT TO TALK ABOUT THE WHOLE INDUSTRY, RIGHT, TO BE PRECISE.

9        SO THERE IS A TERM THAT WE USE IN OUR INDUSTRY CALLED

10  MERCHANTS, WHICH MEANS THAT YOU SELL TO ANYBODY.  IT'S KIND OF

11  LIKE YOU'RE OPEN TO -- YOU CAN -- NOT YOU SELL.  YOU CAN CHOOSE

12  TO SELL TO ANYBODY.

13       FOR THAT, IT'S QUALCOMM AND INTEL, AND THAT'S SORT OF THE

14  MERCHANTS OR YOU ALSO HEAR THE TERM OPEN MARKET.

15       THEN YOU HAVE WHAT WE CALL THE CAPTIVE MARKET.  SO, FOR

16  EXAMPLE, HUAWEI IS AN OEM, MEANING THEY HAVE HANDSETS AND OTHER

17  TYPES OF DEVICES, AND THEN THEY HAVE THEIR OWN SILICON HOUSE,

18  HISILICON, THAT BUILDS FOR THEM.  SO THAT'S ONE.

19       AND BY THE WAY, IT'S ALSO MOSTLY CHINA OUTWARDS.

20       THEN YOU HAVE SAMSUNG, WHICH DOES THE SAME THING.  YOU

21  HAVE HANDSETS AND OTHER DEVICES FROM SAMSUNG AND THEY HAVE SLSI

22  THAT IS THEIR OWN SILICON HOUSE THAT MAINLY BUILDS SILICON FOR

23  THOSE SAMSUNG DEVICES AND USES KOREA AS THE ADVANCED NETWORKS

24  AS A LAUNCHING PAD.

25       THEN, TO BE FAIR, YOU HAVE A COUPLE OTHER COMPANIES,

```
 1    MEDIATEK OUT OF TAIWAN, AND SPREADTRUM OUT OF UNISOC OUT OF

 2    CHINA, BUT THOSE WE DON'T ACTUALLY CONSIDER PREMIUM BECAUSE

 3    THEY TEND TO BE ONE TO TWO GENERATIONS BEHIND ON THE MODEM

 4    SIDE.

 5    Q.   SO DOES INTEL CONSIDER ITS IN COMPETITION WITH THESE

 6    NON-MERCHANT SUPPLIERS YOU MENTIONED, THE HUAWEI AND SAMSUNG

 7    MODEM CHIP PRODUCERS?

 8    A.   NO.  WE CONSIDER THEM ACTUALLY TO BE CUSTOMERS OR

 9    POTENTIAL CUSTOMERS.

10    Q.   NOW, WHEN DID INTEL ENTER THE PREMIUM CHIP MARKET?

11    A.   "ENTER" IS A COMPLICATED TERM.  OUR FIRST BIG LAUNCH, LIKE

12    SIGNIFICANT LAUNCH, WAS SEPTEMBER 2016.  BUT IN TERMS OF

13    MODEMS, IT TAKE A LOT OF R&D, RESEARCH AND DEVELOPMENT, MONEY

14    AND INVESTMENT AND TIME AND ARE VERY COMPLEX.

15         SO IN -- WELL, IN 2011 WE ACQUIRED, MEANING THE

16    TRANSACTION CLOSED, INFINEON WIRELESS, AND THAT'S WHERE I WOULD

17    SAY WE STARTED IN EARNEST TO DEVELOP FOR THE PREMIUM BASEBAND

18    MARKET.

19    Q.   WHY DID INTEL ACQUIRE INFINEON WIRELESS?

20    A.   FOR THE LONGEST TIME WE HAD DIFFERENT FOLKS ON THE

21    MANAGEMENT COMMITTEE TEAM THAT WERE OF THE BELIEF THAT THERE

22    WOULD BE AN ACCELERATION OF A CONVERGENCE OF COMPUTE AND

23    COMMUNICATION, NOT JUST IN MOBILE HANDSETS, BUT ESPECIALLY IN

24    THE FUTURE OVER THE NEXT, DEPENDING ON WHO YOU BELIEVE, 10, 20,

25    30 YEARS.  BASICALLY EVERYTHING THAT COMPUTES OR DRAWS
```

1        ELECTRICITY WILL CONNECT AND ALSO NEED TO COMMUNICATE.

2             SINCE WE'RE IN SILICON VALLEY AND AUTONOMOUS DRIVING IS A

3     DARLING SEGMENT RIGHT NOW, THAT'S AN EASY EXAMPLE WHERE FOR THE

4     CARS TO BE ABLE TO DRIVE THEMSELVES AND DO IT RELIABLY AND

5     SAFELY, THEY NEED TO COMMUNICATE ON THE NETWORK BACK AND FORTH

6     AND THEY NEED TO BE RESPONSIVE AND SO ON AND SO FORTH.

7             SO ONCE WE CAME TO THAT CONCLUSION, HAVING ACCESS TO

8     COMMUNICATION TECHNOLOGY, PREMIUM COMMUNICATION TECHNOLOGY,

9     WE'RE NOT INTERESTED IN LOW END SEGMENTS, THERE ARE MANY OTHER

10    COMPANIES THAT DO THAT, AND THAT'S OKAY.

11            WE BASICALLY SAID, WHAT IS THE BEST WAY TO DO THAT?  SO WE

12    HAD A LOT OF DISCUSSIONS ABOUT COULD WE BUILD IT OURSELVES?

13    AND WE CAME TO THE CONCLUSION THAT THE RIGHT THING TO DO FOR

14    INTEL WAS TO ACQUIRE A COMPANY AND THEN BUILD UPON THAT.

15    Q.   SO YOU MENTIONED THAT ONCE INTEL ACQUIRED INFINEON, THEY

16    WANTED TO TAKE THAT TO A LEADERSHIP POSITION; IS THAT RIGHT?

17    A.   YES.  SO IN THE PROCESS OF DUE DILIGENCE, WE KNEW EXACTLY

18    WHAT INFINEON WIRELESS HAD AND DIDN'T HAVE AND WHERE THEY

19    STOOD.  AND AT THAT POINT IN TIME, THEY'RE -- REMEMBER, THEY

20    WERE AN INDEPENDENT COMPANY BASED OUT OF MUNICH -- I WAS GOING

21    TO SAY MUNCHANT (SIC) -- MUNICH, GERMANY.

22            AND THEIR STRATEGY WAS TO BE A FAST FOLLOWER, MEANING THEY

23    LET OTHERS SORT OF DRIVE THE LEADERSHIP OF THESE ADVANCED

24    FEATURES IN STANDARDS, WITH TERMINAL EQUIPMENT MANUFACTURERS,

25    TEMS, AND WITH OPERATORS, AND THEN THEY CAME IN LATER AND JUST

EVANS DIRECT BY MR. CARSON

1    WENT IN COST SCALE.  SO THEY DIDN'T CREATE, THEY FOLLOWED AND

2    JOINED THE WAVE.

3    Q.   SO WHAT KIND OF INVESTMENT DID IT TAKE FOR INTEL TO MOVE

4    INFINEON UP FROM A FAST FOLLOWER?

5    A.   OH.  LOTS OF MONEY, BILLIONS OF DOLLARS, AND AN ARMY OF

6    ENGINEERS WORLDWIDE.

7         AND THEN A LOT OF FOCUS.

8    Q.   YOU MENTIONED A BILLION DOLLARS.  WHERE DOES ALL THAT

9    MONEY GO?

10   A.   IT GOES TO PAY THE ENGINEERS.  THESE ARE VERY EXPENSIVE,

11   SPECIALIZED ENGINEERS.  HOPEFULLY THEY'LL FORGIVE ME FOR SAYING

12   THAT IF THEY KNOW THAT I'VE SAID THAT.

13        AND THE TEST EQUIPMENT AND THE EQUIPMENT ITSELF.  SO

14   BASICALLY THE MAJORITY, I WOULD SAY A GOOD 90 PERCENT OF IT,

15   GOES TO THE R&D.

16   Q.   SO THE TIME THAT INTEL ACQUIRED INFINEON, WAS INFINEON

17   SUPPLYING APPLE WITH MODEM CHIPS?

18   A.   YES, THEY WERE.

19   Q.   AND IMMEDIATELY AFTER INTEL PURCHASED INFINEON, DID INTEL

20   CONTINUE SUPPLYING APPLE WITH MODEM CHIPS?

21   A.   SO -- HMM.  WHEN WE ACQUIRED, THROUGH THE PROCESS OF DUE

22   DILIGENCE, WE KNEW THAT THEY WERE SUPPLYING TO APPLE.  BUT WE

23   ALSO KNEW THAT THEY WERE GOING TO LOSE THE SOCKET BECAUSE OF

24   THE LACK OF LTE.

25        SO, YES, THEY WERE SUPPLYING.  BUT IT WAS -- BY THE TIME

1    WE ACQUIRED, IT WAS MORE LEGACY DEVICES, MEANING BELOW LTE, SO

2    3G AND BELOW.  SO LET'S THINK IPHONE 1, 2, 3.  I BELIEVE THEY

3    HAD THE 4.

4        AND THEN AT 4S, IT SWITCHED TO LTE AND THIS IS WHEN

5    QUALCOMM GOT THE SOCKET.

6    Q.  SO AFTER APPLE SWITCHED OVER TO QUALCOMM, WHAT DID INTEL

7    DO?

8    A.  WELL, FIRST OF ALL, WE KNEW THIS WAS GOING TO HAPPEN, SO

9    NO SURPRISE.  WE HUNKERED DOWN, WE MADE COMMITMENTS TO THE

10   CORPORATION, TO OUR BOARD OF DIRECTORS ABOUT A MULTI YEAR PLAN

11   THAT WE WERE GOING TO EXECUTE TO WITH CLEAR MILESTONES AND

12   CLEAR SORT OF WHAT WE CALL INSIDE THE CORPORATION PUTTING

13   POINTS ON THE BOARD, SORT OF LIKE FOOTBALL YESTERDAY.

14       AND WE BASICALLY STARTED EXECUTING TO THAT.

15       WE ALSO MAINTAINED THE RELATIONSHIP WITH APPLE.  AND SO WE

16   WENT THROUGH -- LIKE WHEN YOU ENGAGE WITH THEM, YOU KNOW,

17   YOU'RE THERE EVERY DAY.  WELL, THE ENGINEERS ARE THERE EVERY

18   DAY AND THE EXEC TEAM, YOU'RE THERE ON A WEEKLY BASIS DOING

19   STATUS AND WHAT HAVE YOU.

20       SO WE -- IT WASN'T WEEKLY, BUT ABOUT EVERY COUPLE OF

21   MONTHS WE ENGAGED WITH THEM AND SORT OF SHOWED THEM OUR

22   PROGRESS, WHAT WE WERE TRYING TO DO.  AND OUR GOAL WAS VERY

23   SIMPLE, IT WAS TO TRY AND GET THE SOCKET BACK.

24   Q.  I WANT TO TALK TO YOU ABOUT A SPECIFIC PORTION IN TIME IN

25   2012 DISCUSSIONS BETWEEN INTEL AND APPLE.

1          DID THERE COME A POINT IN 2012 THAT INTEL AND APPLE BEGAN

2    DISCUSSING A POTENTIAL APPLE PRODUCT THAT INTEL COULD SUPPLY

3    TO.

4    A.    YEAH.  YOU FINALLY GET THAT PHONE CALL THAT YOU HAVE A

5    CHANCE, YOU GET INVITED FOR EVALUATION.

6          AND SO, YEAH, WE WERE DISCUSSING INTEL BEING A SUPPLIER

7    AGAIN.  AND THE WAY THEY WORK, YOU NEVER HAVE ANY -- YOU NEVER

8    KNOW EXACTLY ALL THE DETAILS, BUT YOU SORT OF GAUGE.  AND WE

9    MADE IT VERY CLEAR THAT WE HAD -- WELL, THEY MADE IT VERY CLEAR

10   THAT WE HAD A CHANCE ON THE IPAD.

11         AND WE ALSO MADE IT VERY CLEAR THAT OUR GOAL WAS TO GET

12   INTO THE IPHONE.

13         BUT YOU ALSO KNOW THAT YOU HAVE TO PASS THAT PIPE CLEANER

14   AND THEN GET THE CHANCE AT A VOICE AND GET INTO THE IPHONE, A

15   CIRCUIT SWITCH VOICE.

16   Q.    SO JUST SO WE'RE SPECIFIC, THIS DISCUSSION OF AN IPAD, DO

17   YOU HAVE ANY IDEA WHEN THAT IPAD WOULD LAUNCH?

18   A.    WE -- WE WENT BACK AND FORTH INSIDE OUR HEADS.  WE KNEW IT

19   WAS '14 OR '15.

20         BUT REALLY WHAT WE WERE DRIVING TOWARDS WAS '15 IN OUR

21   MINDS BECAUSE OF THE PHONE.  BUT WE THOUGHT IT WAS '14 OR '15.

22   Q.    '14 OR '15 FOR THE PHONE OR THE IPAD?

23   A.    WELL, YOU KNOW, YOU WERE TALKING ABOUT HOPE AS A STRATEGY,

24   RIGHT?  SO OF COURSE OUR HOPE AND WISH WAS '14 FOR BOTH.  BUT

25   WE KIND OF KNEW IT WOULD BE WORST CASE, PUT IT THAT WAY, WORST

1    CASE WOULD BE '14 FOR THE IPAD AND THEN THE PHONE LATER.

2    Q.   SO YOU MENTIONED THE INITIAL ENGAGEMENT WAS FOR THIS 2014

3    PRODUCT POTENTIALLY.

4    A.   UM-HUM.

5    Q.   HOW DID THE ENGAGEMENT BETWEEN APPLE AND INTEL PROCEED IN

6    THE 2012 PERIOD?

7    A.   IT'S LIKE THAT PAIN YOU ENJOY, KIND OF LIKE EXERCISE.

8    YOU -- IT'S GOOD, THE ENGINEERS ARE IN THERE, IN THE BUILDING,

9    YOU'RE GETTING -- I SHOULD BE NICE AND NOT SAY ABUSED, BUT

10   YOU'RE GETTING, YOU KNOW, LIKE THE INQUIRY AND WHAT'S THE

11   STATUS AND COME ON, YOU KNOW, YOU'RE FALLING BEHIND, OR, NO,

12   THIS IS GOOD, OR NO, YOU NEED TO ADD THIS.

13        SO DEEP TECHNOLOGY ENGAGEMENT, DEEP MANAGERIAL ENGAGEMENT,

14   REGULAR BASIS AND ENGINEERS AT BOTH PREMISES.  AND WE WERE

15   STARTING TO MAKE PROGRESS AND TO SEE SORT OF THEIR REACTION TO

16   THE FEATURES, AS WELL AS TO THE DASHBOARDS AND SO ON.

17   Q.   YOU MENTIONED ENGINEERS.  DID APPLE PROVIDE INTEL WITH ANY

18   ENGINEERING SUPPORT IN THIS 2012 PERIOD?

19   A.   YES.  THERE IS AN APPLE, WE CALL IT ICE TEAM THAT HAS

20   SYSTEM ENGINEERS AND WIRELESS ENGINEERS AND, YOU KNOW, DEVICE

21   ENGINEERS AND THEY ARE -- YOU'RE WORKING WITH THEM ON THE

22   PROJECT AND THEY ARE -- WELL, I CAN'T SAY THAT THEY'RE

23   DEDICATED BECAUSE I DON'T WORK THERE.  BUT THEY ARE --

24   BASICALLY YOU SEE THEM ON A CONTINUOUS BASIS AND YOU WORK WITH

25   THEM CLOSELY.

1    Q.   DID THIS ENGINEERING SUPPORT HELP APPLE -- EXCUSE ME.

2    STRIKE THAT.

3         DID THIS ENGINEERING SUPPORT HELP INTEL IN ITS MODEM

4    DEVELOPMENT EFFORTS.

5    A.   OH, YEAH.  I MEAN, THEY ARE -- YOU KNOW, ONE OF THE

6    EPICENTERS FOR, FOR THE PREMIUM HANDSET, WHICH MEANS FOR THE

7    PREMIUM MODEMS.

8         AND WHAT HAPPENS IS, FIRST OF ALL, YOU JUST EXECUTE, BUT

9    YOU START GAINING EXPERIENCE AND EXPOSURE.  YOU ALSO GET WHAT I

10   CALL THE HALO EFFECT OF BETTER PRESENCE IN THE STANDARDS, NOT

11   JUST PRESENCE, BUT BETTER WEIGHT IN TERMS OF YOUR

12   CONTRIBUTIONS, IN TERMS OF STARTING TO GET LEADERSHIP

13   POSITIONS.

14        SAME THING WITH THE OPERATORS, BECAUSE THESE DEVICES

15   EVENTUALLY END UP ON THEIR NETWORK.

16        SO DEFINITELY.

17   Q.   SO OVER THE COURSE OF THE 2012 ENGAGEMENT, DID APPLE EVER

18   RAISE ANY CONCERNS WITH INTEL ABOUT INTEL'S ABILITIES TO MEET

19   APPLE'S REQUIREMENTS?

20   A.   WELL, YEAH.  I MEAN, IN THE STATUS REPORTS AND THE

21   DISCUSSIONS, THEY WERE CONSTANTLY BEATING UP ON US.  BUT,

22   AGAIN, THAT'S A BEATING THAT YOU TAKE WITH JOY AND PRIDE.

23        BUT I THINK THEY KNEW THAT WE WERE COMMITTED, AND THIS IS

24   SOMETHING WE REALLY WANTED TO DO.

25        REMEMBER, I'M LEADING 7,000 ENGINEERS, BUT 3,000 OF THOSE

```
 1    ENGINEERS, THEY DO KNOW WHAT IT FEELS LIKE AND WHAT HAPPENS

 2    WHEN YOU SHIP IN THAT DEVICE.

 3         SO IF YOUR QUESTION IS DID THEY EXPRESS CONCERNS?  YES,

 4    BECAUSE YOU'RE IN EXECUTION AND THINGS ARE GOING BACK AND

 5    FORTH.

 6         BUT WERE THEY CONCERNED THAT WE DIDN'T WANT TO BE IN THIS

 7    BUSINESS OR WE WERE INCAPABLE OF EXECUTING?  NO.

 8    Q.   DID ANY OF THESE CONCERNS THAT APPLE RAISED GIVE YOU PAUSE

 9    AS TO WHETHER INTEL WOULD BE READY TO LAUNCH A 2014 DEVICE WITH

10    THEM?

11    A.   DO THE -- SIR.  SIR, I'M A GM, RIGHT?  I GO TO BED AT

12    NIGHT WORRYING ABOUT STUFF THAT'S NOT GOING TO HAPPEN.

13         BUT, NO, WE WERE DETERMINED.  WHEN THERE WERE PROBLEMS, WE

14    FIGURED IT OUT AND GOT THE TEAMS TOGETHER.

15         SO WE WERE ABSOLUTELY -- I MEAN, I TOOK THIS PERSONALLY.

16    I HAD THIS RESPONSIBILITY AND GETTING TO LAUNCH WAS SOMETHING

17    THAT I WAS NOT GOING TO LET NOT HAPPEN.

18    Q.   DOES INTEL CURRENTLY SUPPLY APPLE WITH CHIPSETS?

19    A.   YES.

20    Q.   AND --

21    A.   SORRY.  I HAD TO THINK ABOUT THE MARCH 2018 THING.

22    Q.   I'LL REFRAME MY QUESTION.  THAT'S A GOOD CATCH FOR ME.

23         SO IN 2016, DID APPLE -- OR DID INTEL SUPPLY APPLE WITH

24    CHIPSETS?

25    A.   YES.  WE -- GREAT DAY FOR INTEL.  WE LAUNCHED IN SEPTEMBER
```

1    '16 FOR THE IPHONE 7.

2    Q.   AND IN 2017, DID INTEL LAUNCH ANOTHER PRODUCT WITH APPLE?

3    A.   YES.

4    Q.   WERE THE CONCERNS THAT YOU DISCUSSED IN THIS 2012 PERIOD

5    ANY DIFFERENT FROM THE CONCERNS THAT APPLE MAY OR MAY NOT HAVE

6    RAISED IN THE 2016 AND 2017 LAUNCHES?

7    A.   NO.  THE BEATINGS, ONCE YOU'RE IN THE SOCKET, THE BEATINGS

8    ARE ACTUALLY MORE PROFOUND BECAUSE THE STAKES ARE A LOT HIGHER.

9    Q.   SO AS OF THE END OF 2012, WAS THERE ANY CONCERN IN YOUR

10   MIND THAT INTEL WOULDN'T BE READY TO LAUNCH A 2014 APPLE

11   PRODUCT?

12   A.   NO.  I KNEW THE TEAMS WOULD EXECUTE.  OCCASIONALLY,

13   THOUGH, I HAD A FAILURE OR TWO.  BUT THAT WASN'T GOING TO BE

14   ONE.

15   Q.   MS. EVANS, DID INTEL ULTIMATELY SUPPLY APPLE FOR A 2014,

16   2015 PRODUCT?

17   A.   NO, WE DID NOT.  PROBABLY ONE OF THE WORST DAYS IN MY

18   CAREER.  IT IS SOMETHING I WILL ALWAYS REMEMBER.

19       I GOT A PHONE CALL FROM ISABEL MA, WHO BACK THEN WAS

20   RUNNING WIRELESS FOR APPLE, AND SHE BASICALLY GAVE ME A HEADS

21   UP THAT WE HAD LOST THE SOCKET.

22       AND, YEAH.  SO I ASKED, OBVIOUSLY, YOU KNOW, OKAY, WHAT

23   HAPPENED?  LIKE, WHAT CAN WE DO BETTER?  WAS IT THE FEATURES OR

24   WAS IT OUR EXECUTION?  BECAUSE THIS -- I MEAN, IT WAS A TOTAL

25   SHOCK.

EVANS DIRECT BY MR. CARSON                                    572

1           AND SHE BASICALLY SAID, NO, THAT THAT WASN'T THE REASON.

2    THE REASON WAS THAT THEY HAD, THE COMPANY, APPLE, HAD SOME TYPE

3    OF BUSINESS AGREEMENT WITH QUALCOMM AND THAT WE WOULD GET A

4    CHANCE BACK FOR THE 2016 LAUNCH, WHICH MEANS AN ENGAGEMENT IN

5    2015.

6           AND SHE ENCOURAGED US TO KEEP GOING AND, YOU KNOW,

7    HOPEFULLY SEE EACH OTHER AGAIN IN '15.

8    Q.   SO TO YOUR KNOWLEDGE, WAS THERE ANYTHING ABOUT INTEL'S

9    TECHNICAL EXECUTION THAT CAUSED IT TO LOSE THE 2014 PRODUCT?

10   A.   NO.  I MEAN, I KNOW THERE'S A LOT OF SPECULATION OF THAT,

11   BUT THAT IS NOT THE INDICATION WE GOT FROM THE TEAM THAT WAS

12   DIRECTLY ENGAGED AND THAT WAS MAKING RECOMMENDATIONS TO THE

13   MANAGEMENT CHAIN AT APPLE THAT WAS DIRECTLY ENGAGED.

14   Q.   SO FOLLOWING THE LOSS OF THE 2014 APPLE PRODUCT, DID THE

15   LEVEL OF ENGINEERING ENGAGEMENT BETWEEN APPLE AND INTEL CHANGE

16   AT ALL?

17   A.   CAN YOU REPEAT THE QUESTION, PLEASE?

18   Q.   SURE.  SO FOLLOWING INTEL'S LOSS FOR THE 2014 APPLE

19   PRODUCT, DID THE LEVEL OF ENGINEERING SUPPORT THAT APPLE GAVE

20   TO INTEL CHANGE AT ALL?

21   A.   YEAH.  WE WENT BACK TO THE KID'S TABLE IN THE SENSE THAT

22   WE DIDN'T HAVE NOW THAT DEEP ENGAGEMENT WITH THEIR ENGINEERS

23   AND SO ON AND SO FORTH.

24          WE CONTINUED AS A LEADERSHIP TEAM TO GO BACK TO APPLE

25   EVERY COUPLE MONTHS OR SO TO, A, SHOW THEM OUR PROGRESS,

1     BECAUSE AT THIS POINT, RIGHT -- FIRST OF ALL, THERE'S A SHOCK

2     AT INTEL.  AND THIS IS THE FRAGILITY OF THIS THING, RIGHT?  WE

3     HAD A ROUND OF HAVING TO CONVINCE MCM, AS WELL AS OUR BOARD OF

4     DIRECTORS, THAT WE WERE GOING TO FIGURE OUT A WAY AGAIN AND TO

5     STAY ON COURSE FOR THE STRATEGY.

6          AND SO SINCE THEY HAD TOLD US THAT 2015 WAS GOING TO BE A

7     CHANCE AGAIN, WE CONTINUED AS BEST AS WE COULD TO KIND OF STAY

8     AFLOAT AND THEN WE CONTINUED OUR RELATIONSHIP IN TERMS OF GOING

9     IN AND SHOWING OUR STATUS, AND ALSO TRYING TO FIGURE OUT A WAY

10    TO STAY RELEVANT SO THAT WE COULD GET TO 2015 AND GET A CHANCE

11    AGAIN.

12    Q.   SO DID THE LACK OF ENGINEERING SUPPORT FROM APPLE AFFECT

13     INTEL'S ABILITY TO DEVELOP MODEM CHIPSETS?

14    A.   YEAH.  IT SET US -- IT DIDN'T KILL US BY THE GRACE OF I

15     DON'T KNOW WHO BECAUSE, FRANKLY, IT SHOULD HAVE.

16          BUT IT SLOWED US DOWN CONSIDERABLY.  FIRST OF ALL, YOU

17    KNOW, I HAVE TO GO AND JUSTIFY AND RE-EXPLAIN AND RESET BY TWO

18    YEARS.

19          IT ALSO SORT OF SLOWED US DOWN IN TERMS OF GETTING TO A

20    MORE CREDIBLE POSITION WITH THE OPERATORS, AS WELL AS WITH,

21    WITH STANDARDS AND TEMS.

22          SO, YEAH, IT SET US BACK TWO YEARS, AND, FRANKLY, IT WAS A

23    NEAR-DEATH EXPERIENCE.

24    Q.   SO AFTER THIS LOSS, IF INTEL HAD A CHANCE TO BID ON

25     ANOTHER APPLE PRODUCT IN 2014, WOULD IT HAVE DONE SO?

1    A.   WITH PLEASURE.

2    Q.   WHAT ABOUT A 2015 PRODUCT.  AFTER THIS LOSS, IF INTEL

3    COULD BID ON A 2015 APPLE PRODUCT, WOULD IT HAVE DONE SO?

4    A.   DEFINITELY.

5    Q.   I WANT TO TALK TO YOU NOW ABOUT INTEL'S CURRENT SUPPLY

6    WITH APPLE, TAKING INTO ACCOUNT THE MARCH 2018 CUTOFF.

7         HAS INTEL'S BASEBAND SUPPLY RELATIONSHIP WITH APPLE BEEN

8    BENEFICIAL TO INTEL IN ANY WAYS?

9    A.    IN MANY, MANY DIFFERENT WAYS.  I MEAN, LIKE I SAID, FOR

10   US, THIS IS A VERY FRAGILE BUSINESS.  BUT THE -- IT'S NOT JUST

11   THE BUSINESS IN TERMS OF WE'RE JUST TRYING TO MAKE -- I MEAN,

12   OBVIOUSLY WE DON'T WANT TO LOSE MONEY.

13        BUT THE -- THIS IS A FOUNDATIONAL CAPABILITY FOR INTEL IN

14   TERMS OF ITS GROWTH AND ITS TRANSFORMATION TO DATA CENTRIC.

15   LIKE I SAID, EVERYTHING THAT COMPUTES CONNECTS IN SOME WAY.

16        AND SO WHEN WE TALK ABOUT 5G, WHICH IS THAT TECHNOLOGY

17   THAT'S GOING TO ALLOW MORE THAN HUMAN BEINGS TO CONNECT, BUT

18   ALSO THE MACHINES TO READILY CONNECT EFFECTIVELY AND

19   EFFICIENTLY AND ALL OF THE TYPES OF DEVICES THAT WE ANTICIPATE

20   WILL COME ON TO THE NETWORKS IN THE NEXT DECADE OR TWO, THIS

21   REALLY GOT US TO THE TABLE IN TERMS OF STANDARDS, IN TERMS

22   OF -- MEANING 3GPP AND IEEE, IN TERMS OF THE OPERATORS, IN

23   TERMS OF THE TEMS, THE NOKIA'S AND ERICSSON'S AND COMPANY, AS

24   WELL AS IN TERMS OF HAVING AN END-TO-END STRATEGY WITHIN THE

25   COMPANY.

1          AND OBVIOUSLY WE LAUNCHED A FEW MODEMS NOW, SO WE'VE ALSO

2     LEARNED A LOT ABOUT THE TOPOLOGY AND THE TYPE OF TECHNOLOGIES

3     THAT WE WOULD BRING INTO 5G.  IT'S HELPED US INNOVATE.

4     SOMETHING LIKE MILLIMETER WAIVE, I KNOW THAT WE LIKE TO DO

5     REVISIONIST HISTORY AS AN INDUSTRY, BUT THE FACT THAT INTEL HAD

6     A CREDIBILITY POSITION WITH APPLE MADE IT WIN THE MILLIMETER

7     WAIVE ARGUMENT BECAUSE AT LEAST AT THE BEGINNING, QUALCOMM WAS

8     NOT INTERESTED IN THAT INNOVATION BECAUSE IT DIDN'T DIRECTLY

9     SERVE THEIR PURPOSE.

10         AND SO IT BROUGHT INNOVATION FOR THE WORLD AND FOR THE

11    CUSTOMERS.

12         SO AS A CREDIBILITY ANGLE, THERE'S US HAVING ACCESS TO THE

13    TECHNOLOGY THAT WE CONSIDERED TO BE ESSENTIAL GOING FORWARD AS

14    A COMPUTE COMPANY, EVEN IN THE HIGH PERFORMANCE SPACE; AND THEN

15    THERE'S INNOVATION FOR CUSTOMERS AND CONSUMERS.

16         AND I'M SURE THERE ARE ECONOMISTS WHO ARE MUCH BETTER

17    QUALIFIED TO TELL YOU ABOUT THE EFFECTS OF INNOVATION ON, ON

18    THE WORLD.

19    Q.   DOES THE POTENTIAL SCALE THAT APPLE CAN PROVIDE HELP INTEL

20    IN ANY WAY?

21    A.   OH, YES, IT DOES, BECAUSE ONE OF THE MISNOMERS IS THAT

22    SOME LIKE TO SAY WHAT'S THE BIG DEAL?  THERE'S A STANDARD, GO

23    BY THE STANDARD, WHICH IS THOUSANDS AND THOUSANDS OF PAGES, GET

24    SOME ENGINEERS, HOPEFULLY THEY ARE REASONABLY SMART, THEY READ

25    THE STANDARD, THEY'LL IMPLEMENT WHAT'S IN THE STANDARD AND

1        EVERYTHING WILL BE OKAY.

2            WELL, NO, NO, NO.  IF YOU IMPLEMENT WHAT'S IN THE

3    STANDARD, YOU MAY GET HAPPINESS IN THE LAB AND IN SOME VERY

4    CONSTRAINED ENVIRONMENT.  BUT BASICALLY IT WILL NOT WORK.

5            WHY WILL IT NOT WORK?  LIKE THERE ARE PLACES IN MANHATTAN

6    WHERE IT'S JUST HECTIC.  LOTS OF PEOPLE, ALL WITH HIGH-END

7    DEVICES, LOTS OF TRAFFIC.  THEY'RE ON THEIR DEVICES CONSTANTLY,

8    MEETING THROUGHPUT, LATENCY, SIGNAL NOISE RATIO.

9            I SEE IN SILICON VALLEY, THERE'S A SPOT ON 280, I'M SURE

10   MOST PEOPLE WHO LIVE AROUND HERE KNOW IT, IT'S BEEN A COUPLE OF

11   DECADES, WE STILL HAVEN'T FIGURED OUT WHAT'S GOING ON IN THAT

12   SPOT AND A CALL DROPS AND THEN YOU GET BACK ON.

13           SO THAT SCALE -- AND I'M ONLY TALKING ABOUT A COUPLE OF

14   CITIES IN THE UNITED STATES.

15           NOW THINK ABOUT WORLDWIDE.  THAT SCALE IS EXTREMELY

16   IMPORTANT.

17           AND FOR THE OPERATORS, TOO, TO GIVE YOU THAT CREDIBILITY,

18   THEY'RE NOT GOING TO GIVE YOU THAT CREDIBILITY BECAUSE YOU HAVE

19   ONE PHONE IN THE CORNER OF THE THIRD SHELF THAT NOBODY BUYS.

20   Q.   EARLIER YOU MENTIONED A HALO EFFECT THAT APPLE COULD

21   PROVIDE.  SO AFTER INTEL WON THE 2016 APPLE PRODUCT, DID ANY

22   COMPANIES REACH OUT TO INTEL ABOUT POTENTIAL SUPPLY?

23   A.   YES.

24   Q.   AND WERE THESE COMPANIES THAT HAD REACHED OUT TO INTEL

25   BEFORE THE 2016 APPLE LAUNCH?

EVANS DIRECT BY MR. CARSON

1     A.    NO.

2     Q.    CAN YOU GIVE US SOME EXAMPLES?

3     A.    LENOVO IS AN EXAMPLE, LG IS AN EXAMPLE, MOTOROLA IS AN

4     EXAMPLE, TESLA IS AN EXAMPLE.

5     Q.    SO IF INTEL HAD WON THE APPLE SOCKET TWO YEARS EARLIER,

6     WOULD IT HAVE BEEN INTERESTED IN PURSUING BUSINESS AT HANDSET

7     OEM'S, LIKE SOME OF THE OEM'S YOU NAMED?

8     A.    YEAH, WE WOULD HAVE BEEN.

9     Q.    AND IF INTEL HAD WON THE APPLE BUSINESS TWO YEARS EARLIER,

10    WOULD INTEL HAVE BEEN BETTER STATIONED TO PROVIDE MODEM CHIPS

11    TO THOSE OEM'S?

12    A.    YEAH.  WE BELIEVE -- WE BELIEVE THAT WE, WE WOULD HAVE A

13    BETTER OPPORTUNITY TO EVALUATE THAT.  WOULD WE HAVE PROVIDED

14    ALL OF THEM?  I CAN'T SAY THAT.  BUT WE DEFINITELY WOULD HAVE

15    BEEN IN A BETTER POSITION OR IN A BETTER -- IN LESS OF A

16    PREDICAMENT AS OPPOSED TO THE FRAGILITY WE HAVE RIGHT NOW THAT

17    IS REALLY FORCING US TO FOCUS, FOCUS, FOCUS.

18    Q.    MS. EVANS, YOU HAVE A BINDER IN FRONT OF YOU OF DOCUMENTS.

19    A.    YES, I DO.

20    Q.    IF YOU COULD TURN TO THE SECOND TAB, THIS IS CX 1599?

21    A.    YES.  GIVE ME A SECOND.

22    Q.    SURE.

23    A.    YES.

24    Q.    WHAT IS CX 1599?

25    A.    IT IS AN E-MAIL FROM STEFAN WOLFF, WHICH BACK THEN WAS

1    OUR -- LED THE BUSINESS LINE ON MY TEAM FOR THE PREMIUM

2    SEGMENT.

3    Q.   AND DID YOU RECEIVE A COPY OF THIS E-MAIL?

4    A.   YEAH.

5              MR. CARSON:  YOUR HONOR, AT THIS TIME I OFFER CX 1599

6    INTO EVIDENCE.

7              MR. RYAN:  NO OBJECTION, YOUR HONOR.

8              THE COURT:  IT'S ADMITTED.

9         (PLAINTIFF'S EXHIBIT CX 1599 WAS ADMITTED IN EVIDENCE.)

10             THE COURT:  GO AHEAD, PLEASE.

11   BY MR. CARSON:

12   Q.   MS. EVANS, I WANT YOU TO LOOK AT THE PARAGRAPH STARTING AT

13   THE BOTTOM OF PAGE 1 AND CONTINUING ON TO THE TOP OF PAGE 2.

14        DOES THAT PARAGRAPH LAY OUT SOME OF THE BENEFITS IN

15   MR. WOLFF'S OPINION OF THE APPLE 1?

16   A.   YES.  AS YOU CAN SEE, IT TALKS -- FIRST OF ALL, IT TALKS

17   ABOUT HOW IMPORTANT THEY ARE IN TERMS OF GETTING YOU THE

18   CREDIBILITY WITH OPERATORS.

19        WITH NETWORK VENDORS, WHICH IS THE SAME AS THE TEMS, THE

20   TERM IS INTERCHANGEABLE; WITH FIELD TESTING, WHICH GOES TO

21   SALE; IT HELPS YOU, WHAT WE CALL SPEED UP AND HARDEN, BECAUSE

22   AS I EXPLAINED EARLIER, JUST BECAUSE IT WORKS IN THE LAB

23   DOESN'T MEAN IT'S -- WELL, ACTUALLY, YOU KNOW IT'S NOT GOING TO

24   WORK IN THE FIELD.

25        AND REALLY GETTING THE I.P. READY, AND I CAN SEE THAT HE

1       WAS EVEN READY TO SAY, AND THEN LET'S GO TO CHINA, MEANING GET

2       THAT VOLUME, TOO, AT SOME POINT.  YEAH.

3       Q.   AND DO YOU AGREE WITH MR. WOLFF'S ASSESSMENT THAT THE

4       BENEFIT TO INTEL WORKING WITH THAT?

5       A.   YES, I DO.

6       Q.   THANK YOU, MS. EVANS.  YOU CAN PUT THAT DOCUMENT AWAY.

7            NOW, IS THERE ANY REASON THAT YOU CAN THINK OF THAT IF

8       INTEL HAD WON THE APPLE BUSINESS TWO YEARS EARLIER, THESE

9       BENEFITS WOULDN'T HAVE ACCRUED TO INTEL TWO YEARS EARLIER?

10      A.   NO.  I MEAN, "ANY" IS A VARIABLE, BUT, NO, NO REASONABLE

11      REASONS.

12      Q.   DID INTEL DEVELOP MODEM FEATURES IT OTHERWISE WOULD NOT

13      HAVE AS A RESULT OF WORKING WITH APPLE?

14      A.   CERTAINLY WE WOULD NOT HAVE IN THE TIMEFRAME.  THERE ARE

15      SEVERAL EXAMPLES WHERE WE WERE WORKING WITH THEM AND WE HAD A

16      POR, PLAN OF RECORD, OF CERTAIN FEATURES, AND THEY -- IN THEIR

17      KIND AND SPECIAL WAY, THEY EXPLAINED THAT THAT WAS NOT GOING TO

18      BE GOOD ENOUGH.

19           AND SO AN EXAMPLE WAS, FOR EXAMPLE, ON THE 2017 LAUNCH,

20      INITIALLY I HAD TO RUN FOR A PLAN OF RECORD OF 450 MEGABITS PER

21      SECOND, AND THEY GENTLY EXPLAINED TO ME THAT THAT WASN'T GOING

22      TO CUT IT, IT NEEDS TO BE 600.

23           SO EVENTUALLY I'M SURE WE WOULD HAVE DONE IT, BUT NOT IN

24      THAT TIMEFRAME.

25           ALSO, IN TERMS OF POWER CONSUMPTION.  ALSO IN TERMS OF

1     WHAT WE CALL BANDS COMBINATIONS.  YES, THOSE ARE EXAMPLES.

2     Q.   AND ARE ANY OF THESE FEATURES THAT YOU MENTIONED ABLE TO

3     MAKE INTEL'S MODEMS MORE COMPETITIVE FOR OTHER NON-APPLE

4     CUSTOMERS?

5     A.   YES.  I MEAN, YOU KNOW, APPLE AND THE U.S. NETWORKS, AND

6     HOPEFULLY THAT CONTINUES WITH 5G.  I THINK THIS IS IMPORTANT

7     FOR ALL OF US.  THEY SET THE BASE.  AND SO, YEAH, THE SIMPLE

8     ANSWER IS YES.

9     Q.   MS. EVANS, I WANT TO SHIFT A LITTLE BIT AND TALK ABOUT VIA

10    TECHNOLOGIES.

11         DID INTEL ACQUIRE A COMPANY CALLED VIA TECHNOLOGIES IN

12    2015?

13    A.   YES, WE DID.

14    Q.   AND WHAT IS VIA TECHNOLOGIES?

15    A.   VIA TECHNOLOGIES IS, OR WAS, I GUESS, A CDMA STANDARD ON

16    COMMUNICATION PRODUCT TECHNOLOGY -- SORRY -- PRODUCT TECHNOLOGY

17    COMPANY.

18         SORRY, YOUR HONOR.

19    Q.   WHY DID INTEL ACQUIRE VIA?

20    A.   WE ACQUIRED VIA BECAUSE FINALLY SOME OF US HAD BEEN --

21    THERE HAD BEEN A DEBATE FOR THE LONGEST TIME AT INTEL, EVEN

22    PRIOR TO THE INFINEON WIRELESS ACQUISITION, AND DEFINITELY

23    AFTER.  ALSO, THERE WAS A DEBATE IN THE INDUSTRY.  CDMA IS THIS

24    TECHNOLOGY THAT IT'S LIKE THE CAT WITH NINE LIVES.  IT'S

25    SUPPOSED TO BE DEAD ALL THE TIME, BUT IT DOESN'T DIE KIND OF

1      THING.

2           SO WE HAD A LOT OF DEBATE ABOUT WHETHER WE SHOULD ACQUIRE

3      IT OR NOT.  AND FINALLY, WHEN WE GOT THE RE-ENGAGEMENT WITH

4      APPLE, I FELT THAT WE HAD ENOUGH CREDIBILITY INTERNALLY AND HAD

5      DELIVERED ENOUGH OF OUR PROMISES, POINTS ON THE BOARD, WITH

6      RESPECT TO, TO OUR BOARD OF DIRECTORS AND OUR MCM AND CEO AND

7      CFO THAT I FELT COURAGEOUS ENOUGH, OR WE FELT COURAGEOUS ENOUGH

8      TO GO MAKE THE PITCH AGAIN.  SO WE ACQUIRED IT.

9           AND THERE ARE LOTS OF NETWORKS, BUT I'LL NAME VERY, LIKE

10     TWO VERY IMPORTANT NETWORKS.  VERIZON, WHICH HOPEFULLY

11     EVERYBODY IS FAMILIAR WITH IN THIS ROOM THAT USES CDMA, AND

12     ALSO CHINA TELECOM IN CHINA THAT USES CDMA.

13          SO THAT'S WHY WE WENT AND ACQUIRED THAT.

14     Q.   SO ULTIMATELY DID THE FACT THAT INTEL WON APPLE'S BUSINESS

15     AFFECT ITS DECISION TO ACQUIRE VIA?

16     A.   CAN YOU PLEASE REPEAT THE QUESTION?

17     Q.   SURE.  SO ULTIMATELY DID THE FACT THAT INTEL ACQUIRED, OR

18     WON APPLE'S BUSINESS AFFECT ITS DECISION TO ACQUIRE VIA?

19     A.   OH, YEAH.  THERE WOULDN'T HAVE BEEN A -- I WOULDN'T HAVE

20     BEEN -- YEAH, THERE WOULDN'T HAVE BEEN A DISCUSSION.

21     Q.   SO DID THE LACK OF APPLE'S BUSINESS AFFECT INTEL'S

22     DECISION NOT TO ACQUIRE CDMA TECHNOLOGY BEFORE 2015?

23     A.   WELL, I WANT TO BE MEASURED.  IT WAS ONE OF THE FACTORS,

24     OBVIOUSLY.  I MEAN, IF YOU DON'T HAVE A CUSTOMER, A BIG

25     CUSTOMER, YOU DON'T GET TO GO TELL THE COMPANY TO SPEND

1        MILLIONS OF DOLLARS ACQUIRING ANYTHING.

2            BUT TO BE FAIR, THERE WERE ALSO OTHER DISCUSSIONS THAT

3    WERE GOING ON.  SOME BELIEVED THAT CDMA WAS FINALLY GOING TO

4    DIE AND -- INCLUDING, BY THE WAY, OTHER PEOPLE WHO USED CDMA.

5    THEY HAD DEBATES BACK AND FORTH.

6            AND WHAT I WOULD SAY IS THAT WITH APPLE, WE GOT DEEP IN

7    THE CHANTER OF THOSE OPERATORS AND WERE ABLE TO HAVE A BETTER

8    VIEW AND ULTIMATELY MADE THE CALL THAT WE SHOULD ACQUIRE IT.

9    Q.   MS. EVANS, I WANT YOU TO TURN IN YOUR BINDER TO THE FIRST

10   TAB, CX 1598?

11   A.   OKAY.  JUST ONE SECOND, PLEASE.

12   Q.   SURE.  AND WHILE YOU'RE LOOKING, I WANT TO FOCUS ON THE

13   THIRD PAGE.  SO -- THE PRESENTATION, THAT SAYS VINE EXECUTIVE

14   OFFICE REVIEW?

15   A.   YES.

16   Q.   WHAT IS THAT PRESENTATION, MS. EVANS?

17   A.   SO FIRST, VINE -- AT INTEL, WHEN THEY'RE DOING AN M&A,

18   BECAUSE YOU'RE DEALING WITH CONFIDENTIAL INFORMATION AND SO ON,

19   YOU GET A CODE NAME.  SO WINE WAS THE CODE NAME FOR VIA.

20           AND THIS PRESENTATION IS ME AND MY TEAM GOING TO OUR

21   ESSENTIALLY CEO, BRIAN KRZANICH AT THE TIME; CFO, STACY SMITH;

22   AND HEAD OF M&A, WENDELL BROOKS, WHO STILL IS THE HEAD OF

23   M&A, AND DOING THE PITCH AND CLOSE ON GETTING APPROVAL TO

24   PROCEED TO ACQUIRE VIA TECHNOLOGIES.

25   Q.   DID YOU HELP PREPARE THIS PRESENTATION?

```
1     A.   YES.

2               MR. CARSON:  YOUR HONOR, AT THIS TIME THE FTC OFFERS

3     CX 1598 INTO EVIDENCE.

4               MR. RYAN:  NO OBJECTION, YOUR HONOR.

5               THE COURT:  IT'S ADMITTED.

6          (PLAINTIFF'S EXHIBIT CX 1598 WAS ADMITTED IN EVIDENCE.)

7               MR. CARSON:  YOUR HONOR, I'LL NOTE THIS IS ONE OF THE

8     DOCUMENTS THAT YOU SEALED OVER LUNCH.

9               THE COURT:  THAT'S FINE, AND I WANT YOUR JOINT

10    EXHIBIT LIST TO IDENTIFY THE PAGES THAT WILL BE SEALED IN EACH

11    DOCUMENT.

12              MR. CARSON:  YES, YOUR HONOR.

13              THE COURT:  BECAUSE RIGHT NOW IT SAYS PORTIONS

14    SEALED.  THAT'S NOT SPECIFIC ENOUGH.  THAT'S FOR BOTH PARTIES.

15              MR. CARSON:  YES, YOUR HONOR.

16              THE COURT:  THANK YOU.

17    BY MR. CARSON:

18    Q.   MS. EVANS, I WANT YOU TO TURN TO THE SECOND PAGE OF THE

19    PRESENTATION, SO AT DASH 004.  AND THERE'S A BULLET IN THE

20    MIDDLE THAT SAYS STRATEGIC RATIONALE.

21         DO YOU SEE THAT?

22    A.   YES, I DO.

23    Q.   AND THE SECOND BULLET UNDER THAT SAYS "ADD 6-MODE CDMA

24    SOLUTION TO WIN APPLE."

25         DO YOU SEE THAT?
```

1    A.    YES.

2    Q.    WHAT DOES THAT MEAN?

3    A.    THAT MEANS I AM FEELING, OR WE ARE FEELING CONFIDENT AS A

4    TEAM THAT WE WILL GET TO THE FIRST LAUNCH, AND WE HAVE NOW

5    ASPIRATIONS TO BE ABLE TO SUPPLY TO APPLE WORLDWIDE, WHICH

6    WOULD OBVIOUSLY REQUIRE CDMA THAT ESSENTIALLY ON TOP OF THE

7    OTHER RADIO ACCESS TECHNOLOGIES, RATS, AND CDMA WAS THE ONE

8    MISSING.  SO IT WAS SORT OF GETTING THE LAST PIECE OF THE

9    PUZZLE THAT WOULD ALLOW US TO HAVE THE PRIVILEGE AND

10   OPPORTUNITY TO SUPPLY WORLDWIDE, INCLUDING ON VERIZON.

11   Q.    MS. EVANS, ON THAT SAME PAGE, PAGE 4 OF CX 1598, AT THE

12   VERY BOTTOM, THERE IS A LINE, I DON'T WANT YOU TO READ IT ALOUD

13   BECAUSE PORTIONS HAVE BEEN SEALED, THAT BEGINNING REQUEST

14   APPROVAL.

15        DO YOU SEE THAT?

16   A.    YES, I DO.

17   Q.    IS THE DOLLAR FIGURE IN THAT LINE THE AMOUNT THAT INTEL

18   PAID FOR VIA TECHNOLOGIES?

19   A.    YES, IT IS.

20   Q.    MS. EVANS, I NOW WANT YOU TO TURN TO PAGE 9 OF THE

21   EXHIBIT.  IT'S PAGE 7 OF THE PRESENTATION.

22   A.    YES, I AM THERE.

23   Q.    AND YOU SEE IT SAYS VINE VALUATION AT THE TOP; IS THAT

24   RIGHT?

25   A.    THAT IS CORRECT.

1    Q.    SO THIS SLIDE HAS BEEN SEALED AS WELL, SO I'LL ASK SOME

2    VERY SPECIFIC QUESTIONS.    FIRST, THERE'S A SHADED BAR IN THE

3    GRAPH AT THE TOP OF THE PAGE THAT SAYS INCREMENTAL CDMA.

4         DO YOU SEE THAT?

5    A.    YES, I DO.

6    Q.    IS THE NUMBER ABOVE INCREMENTAL CDMA IN MILLIONS OF

7    DOLLARS, THE TWO DIGIT NUMBER, THE AMOUNT OF VALUE THAT INTEL

8    ATTRIBUTED TO NON-APPLE CDMA BUSINESS AS A RESULT OF THE VIA

9    TRANSACTION?

10   A.    THAT IS CORRECT.

11   Q.    AND THE SHADED BAR RIGHT NEXT TO INCREMENTAL CDMA THAT

12   SAYS APPLE INCREMENTAL CDMA, DO YOU SEE THAT?

13   A.    YES, I DO.

14   Q.    AND THERE'S A NUMBER RIGHT ABOVE THAT, A THREE DIGIT

15   NUMBER.    IS THAT THE VALUE IN MILLIONS OF DOLLARS THAT INTEL

16   ATTRIBUTED TO THE VIA ACQUISITION AS A RESULT OF THE APPLE

17   BUSINESS?

18   A.    YES, THAT IS CORRECT.

19   Q.    SO, MS. EVANS, WITHOUT THE APPLE BUSINESS, WOULD THE VIA

20   ACQUISITION HAVE BEEN ECONOMICALLY JUSTIFIED FOR INTEL?

21   A.    NO.

22   Q.    WHY DID INTEL DECIDE TO ACQUIRE VIA TECHNOLOGIES INSTEAD

23   OF DEVELOPING CDMA IN-HOUSE?

24   A.    BECAUSE THERE WAS -- I MEAN, YOU NEED EXPERIENCE, YOU NEED

25   TALENT, EXPERTISE, AND AT THIS POINT BASICALLY BUILDING IT FROM

1        SCRATCH WAS NEVER -- WE WERE NOT GOING TO MAKE IT.

2            AND SO WE ACQUIRED VIA TECHNOLOGY BECAUSE THAT WAS THE

3    ONLY WAY TO GET THE EXPERIENCE, THE EXPERTISE, AND THE CORE

4    THAT EVENTUALLY WE WOULD GET THE OPPORTUNITY AND PRIVILEGE TO

5    SUPPLY WITHIN OUR MODEM FOR APPLE.

6    Q.   SO IN INTEL'S CURRENT SUPPLY OF MODEMS TO APPLE, DOES

7        INTEL INCUR ANY COST IN DEVELOPING FEATURES SPECIFICALLY TO

8        APPLE'S SPECIFICATIONS?

9    A.   WHEN YOU SAY "CURRENT," ARE WE TALKING ABOUT THE

10   DEVELOPMENT WHICH IS BEFORE MARCH 18, OR WHAT ARE WE SAYING?

11   Q.   BEFORE MARCH 18?

12   A.   OKAY.  I'M -- IF YOU'RE ASKING COSTS THAT ARE SPECIFIC --

13   I MEAN, OBVIOUSLY A LOT -- OUR MODEM DEVELOPMENT IS FOCUSSED

14   AROUND APPLE.  THIS IS THE PREDICAMENT THAT WE FOUND OURSELVES

15   INTO FOR NOW.  HOPEFULLY THAT CHANGES BECAUSE HOPEFULLY THESE

16   BUSINESS PRACTICES WILL CHANGE.

17           BUT WE DON'T REALLY DO A LOT OF -- EVEN IF WE DO SOMETHING

18   THAT'S CUSTOM FOR THEM, IT USUALLY FINDS ITSELF IN THE BROADER,

19   IN THE BROADER MARKET.

20           SO I WOULD SAY THE MAJORITY OF THE DEVELOPMENT, THE R&D,

21   IS EVENTUALLY WILL APPLY TO SCALE.

22   Q.   MS. EVANS, AS OF MARCH 2018 HAD INTEL EVER REQUESTED ANY

23   SORT OF EXCLUSIVITY FROM APPLE FOR THE BUSINESS?

24   A.   NO.  WE DON'T -- NO.

25   Q.   I WANT TO TALK TO YOU A BIT ABOUT MARGINS, AND WITHOUT

1    GETTING INTO SPECIFIC MARGINS SO AS TO AVOID THE NEED FOR

2    SEALING THE COURTROOM, ARE THERE GENERALLY TARGET MARGINS IN

3    THE INDUSTRY THAT MODEM CHIP SUPPLIERS TRY TO REACH?

4    A.   GENERALLY, YEAH.  I MEAN, AS AN INDUSTRY, IF YOU'RE A GM

5    OR A CORPORATION, YOU KNOW, YOU'RE WANTING TO LAND SOMEWHERE --

6    WANTING TO LAND, BECAUSE THEN I'LL GET THE QUESTION THE OTHER

7    WAY.

8         YOU ARE SATISFIED WITH 45 TO -- 40 TO 50 PERCENT MARGIN,

9    UNDERSTANDING THAT SOMETIMES IT'S HIGHER.  THAT'S WHY I USED

10   THE WORD "SATISFIED."  SOMETIMES IT'S LOWER.  BUT THAT'S A GOOD

11   BALANCE.

12   Q.   SO WHEN INTEL FIRST WON APPLE'S BUSINESS FOR THE 2016

13   PRODUCT, WAS INTEL MEETING THOSE MARGIN TARGETS AT APPLE?

14   A.   NO.

15   Q.   AND WHAT ABOUT IN THE 2017 APPLE LAUNCH?

16   A.   NO.

17   Q.   HAS INTEL EVER ACHIEVED THESE TARGET MARGINS IN ITS SUPPLY

18   TO APPLE?

19   A.   NOT YET.

20   Q.   SO HAS INTEL'S SUPPLY OF MODEM CHIPS TO APPLE BEEN

21   PROFITABLE UP TO THIS POINT?

22   A.   NO.

23   Q.   SO AS OF MARGINS THAT INTEL WAS ACHIEVING IN MARCH 2018,

24   WOULD THOSE MARGINS BE SUSTAINABLE TO JUSTIFY INTEL'S

25   INVESTMENT IN THE INDUSTRY LONG TERM?

1    A.   NO.  I MEAN, YOU KNOW, THIS HAS BEEN -- LIKE I SAID, WHEN

2    WE TALKED TO OUR BODY IN 2010, '11, WE SAID THIS IS GOING TO BE

3    A LABOR OF LOVE AND A LONG JOURNEY, MULTI YEAR.  WE ARE MAKING

4    PROGRESS.  THERE'S NO QUESTION ABOUT IT.  WE'RE SURVIVING

5    COMPETING IN WHAT WE CONSIDER TO BE A PRETTY ROUGH ENVIRONMENT

6    WITH THESE BUSINESS MODEL PRACTICES.

7         THE STAKES ARE HIGHER.  WE'VE MADE PROMISES THAT WE NEED

8    TO MEET AND KEEP IMPROVING.  WE'RE FOCUSSED IN ORDER TO SORT OF

9    MAKE US DO THAT.  AND WE HOPE THAT AT SOME POINT IN TIME WE'LL

10   BE ABLE TO ACHIEVE THESE MARGINS.

11        AND WE'VE HAD TO DO SOME UNNATURAL THINGS, TOO.  WHEN I

12   SAID AT THE TIME IN 2011, LIKE I SAID, WE WERE BEHIND.  SO IF

13   YOU'RE IN A RACE AND YOU START THE RACE AND YOU'RE BEHIND,

14   YOU'VE GOT TO ROW FASTER, HARDER.  YOU'VE GOT TO DO SOMETHING

15   DIFFERENT.  SO THERE ARE SOME THINGS THAT ARE FUNDAMENTAL IN

16   THE BUSINESS THAT WE CONTINUED TO WORK ON OURSELVES.

17             THE COURT:  I'M SORRY TO INTERRUPT.  IT'S 3:34.

18   LET'S GO AHEAD AND TAKE A BRIEF BREAK.  WHY DON'T WE TAKE A TEN

19   MINUTE BREAK.  OKAY.  SORRY TO INTERRUPT.

20             MR. CARSON:  THANK YOU, YOUR HONOR.

21             THE WITNESS:  THANK YOU.  WHAT HAPPENS TO ME?  DO I

22   JUST --

23             THE COURT:  YOU CAN STEP DOWN, BUT YOU'LL HAVE TO

24   COME BACK IN TEN MINUTES, PLEASE.

25             THE WITNESS:  THANK YOU.

1              (RECESS FROM 3:35 P.M. UNTIL 3:44 P.M.)

2                  THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

3                  THE WITNESS:  THANK YOU.

4                  MR. CARSON:  MAY I PROCEED?

5                  THE COURT:  3:45.  GO AHEAD, PLEASE.

6        BY MR. CARSON:

7        Q.   MS. EVANS, WHAT WOULD BE THE EFFECT ON INTEL'S BUSINESS IF

8        IT LOST A SINGLE DEVICE CYCLE AT APPLE?

9        A.   WELL, SO LATER THAN 2012, BUT BEFORE MARCH '18?

10       Q.   YEAH.  SO BEFORE MARCH '18, YES.

11       A.   OKAY.  LET ME PUT IT THIS WAY.  ONCE YOU'RE IN THE CYCLE

12       AND YOU'VE SHIPPED MILLIONS OF UNITS AND YOU HAVE THE SCALE,

13       IT'S -- I CALL IT IT'S CHRISTMAS, THERE'S CHRISTMAS EVERY YEAR

14       AND YOU CAN'T MISS IT ESSENTIALLY.  SO IT'S A YEARLY CYCLE.

15       AND YOU HAVE TO MAKE IT EVERY SINGLE TIME.

16            I CAN'T THINK OF SOMEBODY IN THE INDUSTRY, EXCEPT FOR THIS

17       INFINEON WIRELESS, INTEL, THAT GOT INTO A PREMIUM HIGH VOLUME

18       CYCLE AND THEN MISSED A CYCLE AND CAME BACK.  THAT WOULD BE NOT

19       NEAR DEATH, THAT WOULD BE DEATH.

20                 MR. CARSON:  YOUR HONOR, NO FURTHER QUESTIONS AT THIS

21       TIME.

22                 THE COURT:  OKAY.  3:46.

23            (PAUSE IN PROCEEDINGS.)

24                 MR. RYAN:  MAY WE HAND OUT BINDER, YOUR HONOR?

25                 THE COURT:  YES, PLEASE.

1          MR. RYAN:  ANTONY RYAN FROM CRAVATH REPRESENTING

2    QUALCOMM.

3          THE COURT:  OKAY.  THANK YOU.

4          THE WITNESS:  HI, MR. RYAN.

5          MR. RYAN:  HOW ARE YOU?

6          THE WITNESS:  I'M DOING WELL.  HAPPY NEW YEAR.

7          MR. RYAN:  SAME TO YOU.

8          THE COURT:  OKAY.  LET ME KNOW WHEN YOU'RE READY.

9          MR. RYAN:  I'M READY, YOUR HONOR.

10          THE COURT:  OKAY.  3:46.  GO AHEAD, PLEASE.

11                          **CROSS-EXAMINATION**

12    BY MR. RYAN:

13    Q.   MS. EVANS, GOOD AFTERNOON.

14    A.   HI.  GOOD TO SEE YOU AGAIN.

15    Q.   SAME HERE.

16          IN 2011, INTEL ACQUIRED THE MOBILE WIRELESS BUSINESS OF A

17    COMPANY CALLED INFINEON; RIGHT?

18    A.   THAT IS CORRECT.

19    Q.   AND INTEL MADE THIS INFINEON ACQUISITION BECAUSE INTEL

20    DECIDED THAT HAVING CELLULAR CAPABILITY WAS ESSENTIAL TO

21    INTEL'S WIRELESS BUSINESS; ISN'T THAT RIGHT?

22    A.   NOT EXACTLY.  INTEL DECIDED THAT ACQUIRING CELLULAR AND

23    HAVING OTHER WIRELESS TECHNOLOGIES WAS ESSENTIAL TO INTEL'S

24    OVERALL STRATEGY, NOT A WIRELESS BUSINESS.

25    Q.   ALL RIGHT.  BUT HAVING A CELLULAR MODEM CAPABILITY WAS

1      ESSENTIAL TO INTEL'S OVERALL BUSINESS STRATEGY; RIGHT?

2      A.   THAT IS CORRECT.

3      Q.   AND INTEL DID DUE DILIGENCE INTO INFINEON'S MOBILE

4      WIRELESS GROUP BEFORE MAKING THAT ACQUISITION, DIDN'T IT?

5      A.   YES.

6      Q.   AND YOU WERE PART OF THE TEAM THAT RECEIVED BRIEFING ON

7      THAT DILIGENCE, WEREN'T YOU?

8      A.   YES.

9      Q.   AND AMONG OTHER THINGS, YOU WERE PRIVY TO STATUS REPORTS

10     ABOUT INFINEON'S MODEM DEVELOPMENT, WEREN'T YOU?

11     A.   YES.

12     Q.   AND AS OF THAT TIME, IN 2010 WHEN YOU WERE DOING THIS DUE

13     DILIGENCE INTO THE INFINEON MOBILE WIRELESS GROUP, YOU BELIEVED

14     THAT INFINEON WAS A COUPLE OF GENERATIONS BEHIND ON LTE, DIDN'T

15     YOU?

16     A.   YES, I'VE TESTIFIED EXTENSIVELY THAT THEY WERE BEHIND AND

17     MORE OF A -- NOT JUST BEHIND, BUT HAD A STRATEGY OF BEING A

18     FAST FOLLOWER.  SO HAD A STRATEGY OF BEING BEHIND.

19     Q.   ALL RIGHT.  SO RATHER THAN BEING AN INNOVATOR OR A LEADER,

20     INFINEON HAD A CONSCIOUS STRATEGY OF BEING A FAST FOLLOWER;

21     RIGHT?

22     A.   THAT IS TRUE.

23     Q.   AND YOU WERE AWARE -- INTEL WAS AWARE THAT INFINEON WAS A

24     COUPLE OF GENERATIONS BEHIND ON LTE; RIGHT?

25     A.   THAT IS TRUE.

1    Q.   AND AT THAT TIME IN 2010, INFINEON WAS SUPPLYING MODEM

2    CHIPS TO APPLE FOR IPHONES, WASN'T IT?

3    A.   YES.

4    Q.   AND FROM INTEL'S DUE DILIGENCE INTO INFINEON'S MOBILE

5    WIRELESS GROUP, YOU KNEW THAT THEY WERE GOING TO LOSE THE APPLE

6    SOCKET TO QUALCOMM, DIDN'T YOU?

7    A.   YES.

8    Q.   AND, IN FACT, AFTER INTEL MADE THAT ACQUISITION, INTEL

9    DID, IN FACT, LOSE THE APPLE BUSINESS, DIDN'T IT?

10   A.   WELL, IN ORDER TO LOSE SOMETHING, YOU HAVE TO HAVE IT.

11        AND SO WE -- WHEN WE ACQUIRED INFINEON WIRELESS, WE DIDN'T

12   HAVE THE APPLE BUSINESS.  WE KNEW THE APPLE BUSINESS, I.E.,

13   LTE, WAS GONE.

14   Q.   INFINEON HAD THE BUSINESS BEFORE THE INTEL ACQUISITION;

15   RIGHT?

16   A.   YES.

17   Q.   AND APPLE MOVED AWAY FROM INFINEON WHICH THEN BECAME

18   INTEL; RIGHT?

19   A.   YES.

20   Q.   AND YOU UNDERSTOOD THAT THE REASON WHY INTEL LOST THAT

21   APPLE BUSINESS WAS BECAUSE INFINEON WAS NOT IN A POSITION OF

22   LEADERSHIP AND IT WAS MISSING SOME KEY TECHNOLOGIES; ISN'T THAT

23   RIGHT?

24   A.   YES, WE UNDERSTOOD THAT.  SINCE I TESTIFIED THAT PART OF

25   WHAT WE HAD TO DO WAS TO SAY, OKAY, IF WE ARE GOING TO NOW

1     TRANSFORM THEM INTO LEADERSHIP WHAT WOULD BE REQUIRED.

2     Q.   OKAY.  SO LET ME MOVE TO LATE 2012.  SO THIS IS NOW ALMOST

3     TWO YEARS AFTER THE ACQUISITION OF INFINEON MOBILE WIRELESS

4     GROUP IN JANUARY 2011.  OKAY?

5     A.   YES.

6     Q.   ALL RIGHT.  SO IN LATE 2012, YOU KNEW THAT INTEL WAS STILL

7     TWO YEARS BEHIND QUALCOMM ON SHIPPING LTE; ISN'T THAT RIGHT?

8     A.   SHIPPING?  OH, DEFINITELY.  WE HAD NOT SHIPPED ANYTHING

9     AND QUALCOMM HAD.  SO YES.

10    Q.   OKAY.  BUT YOU WERE ESTIMATING WHEN INTEL WOULD SHIP, AND

11    YOU KNEW THAT THAT WOULD BE AT LEAST TWO YEARS BEHIND QUALCOMM

12    ON SHIPPING LTE; RIGHT?

13    A.   YES.

14    Q.   AND YOU BELIEVED THAT INTEL'S LTE GAP WAS ABOUT INTEL'S

15    OWN PRODUCT AND TECHNOLOGY CHOICES, DIDN'T YOU?

16    A.   NO.  I KNEW THAT I CONVINCED THE CORPORATION -- WELL, I

17    MAKE IT SOUND LIKE I DO EVERYTHING.  THERE'S A TEAM.

18        WE HAD AGREED THAT WE NEEDED LEADERSHIP CELLULAR

19    CAPABILITY.

20        I ALSO KNEW THAT I DON'T DO MIRACLES, SO WE HAD TALKED TO

21    THE BOARD AND MCM ABOUT WHAT IT WOULD TAKE, I.E., BILLIONS OF

22    DOLLARS, MULTIPLE GENERATIONS, AND FOCUS.

23        AND SO THAT'S WHAT I, I KNEW.  I KNEW THAT WE WERE DRIVING

24    TO GO TO THAT.

25    Q.   OKAY.  BUT DIDN'T YOU ALSO BELIEVE THAT INTEL'S LTE GAP

1      WAS ABOUT INTEL'S OWN PRODUCT AND TECHNOLOGY CHOICES?

2      A.   WELL, YEAH.  AT THAT POINT, INFINEON WIRELESS BELONGS TO

3      US, SO IF THAT'S WHAT YOU'RE GETTING AT, YES.  WE KNEW WHAT WE

4      HAD, AND WE KNEW WHAT WAS REQUIRED, I.E., THE BILLION DOLLARS

5      OF INVESTMENT, FIGURING OUT HOW TO GET TO A CREDIBILITY TABLE,

6      GETTING TO A 5G, GETTING IN A PREMIUM HANDSET SOCKETS.  I KNEW

7      ALL THAT, YES.

8      Q.   AND IT WAS PRODUCT AND TECHNOLOGY CHOICES THAT INFINEON

9      AND INTEL HAD MADE; RIGHT?

10     A.   NO.  IT WAS PRODUCT AND TECHNOLOGY CHOICES THAT INFINEON

11     HAD MADE AND THAT NOW INTEL WAS APPLYING, APPLYING WHAT I CALL

12     EXTRAORDINARY EFFORTS TO REMEDY.

13     Q.   BUT IT WAS INTEL THAT PICKED WIMAX AND THEN BOUGHT A

14     COMPANY THAT DIDN'T HAVE LTE; ISN'T THAT RIGHT?

15     A.   WOW.  I'M -- NO, THAT'S NOT RIGHT.

16     Q.   OKAY.  LET ME SHOW YOU A DOCUMENT.

17     A.   OKAY.

18     Q.   THIS IS QX 76, SO IF YOU COULD LOOK IN THE BINDER THAT I

19     HANDED UP, PLEASE, MS. EVANS.

20     A.   OKAY.

21     Q.   IT'S ABOUT A THIRD OF THE WAY IN.  THERE'S A TAB, AND THE

22     TAB IS AN EXHIBIT?

23     A.   SO, COUNSEL, FIRST OF ALL, WE'RE GOING TO HAVE TO AGREE ON

24     SOMETHING.  YOU'RE TALKING VERY FAST, AND ME, I'M A FRENCH

25     SPEAKER, SO WE'RE GOING TO HAVE TO SLOW DOWN, ESPECIALLY WHEN

1    IT COMES TO NUMBERS.

2    Q.   ABSOLUTELY.

3    A.   IF YOU CAN TELL ME --

4    Q.   NUMBERS ARE ALWAYS HARD.

5    A.   YES.

6    Q.   QX 76?

7    A.   QX.  OKAY.  I WAS SEEING CX.  OKAY.  NOW, I SEE IT.  YES,

8    YES, UM-HUM.  YEAH.

9    Q.   AND DO YOU SEE THAT STARTING DOWN AT THE BOTTOM OF THE

10   FIRST PAGE OF QX 76 AND CONTINUING IN TO THE END, THERE'S AN

11   E-MAIL EXCHANGE ON NOVEMBER 7TH, 2012, BETWEEN YOU AND

12   BOYD BANGERTER?

13   A.   YEAH, I KNOW THIS STRATEGY, YES.

14   Q.   OKAY.  AND YOU SENT THESE E-MAILS THAT ARE HERE IN QX 76

15   THAT ARE UNDER YOUR NAME, DIDN'T YOU?

16   A.   YEAH.

17        MR. RYAN:  YOUR HONOR, I OFFER QX 76 INTO EVIDENCE.

18        MR. CARSON:  NO OBJECTION, YOUR HONOR.

19        THE COURT:  IT'S ADMITTED.

20   (DEFENDANT'S EXHIBIT QX 76  WAS ADMITTED IN EVIDENCE.)

21        THE COURT:  GO AHEAD, PLEASE.

22   BY MR. RYAN:

23   Q.   ALL RIGHT.  AND ON THE SECOND PAGE OF QX 76, ABOUT

24   TWO-THIRDS OF THE WAY DOWN DO YOU SEE THAT YOU WROTE, "OUR LTE

25   GAP IS ABOUT PRODUCT AND TECHNOLOGY CHOICES"?

1         DO YOU SEE THAT?

2    A.   YES, I DO.

3    Q.   AND THEN DOWN AT THE BOTTOM OF THE FIRST PAGE OF QX 76,

4    THREE LINES FROM THE BOTTOM OF THE PAGE DO YOU SEE YOU WROTE,

5    "WE PICKED WIMAX AND THEN BOUGHT A COMPANY THAT DID NOT HAVE

6    LTE."

7         RIGHT?

8    A.   YES.

9    Q.   AND THOSE WERE ACCURATE STATEMENTS AT THE TIME YOU WROTE

10   THEM IN 2012; RIGHT?

11   A.   OKAY.  HOWEVER, COUNSELOR, WE HAVE TO PUT CONTEXT HERE.

12   Q.   NO, WERE THEY -- MA'AM?

13   A.   NO, NO, NO, NO, NO.

14        THERE'S A THREAD OF E-MAIL, SO YOU HAVE TO READ FROM THE

15   BOTTOM.  SOME RANDOM OTHER ORGANIZATION IN NOVEMBER, WHICH IS

16   BUDGET CYCLE, SENDS ME AN E-MAIL WITH ONE THING, HOW FAR BEHIND

17   ARE WE FROM SHIPPING LTE.  OBVIOUSLY, I KNOW WE HAVEN'T SHIPPED

18   ANYTHING BECAUSE WE ARE DEVELOPING IT.  I'M LIKE, OKAY, TWO

19   YEARS, WHAT'S THE CONTEXT.  BECAUSE BASICALLY I'VE BEEN AROUND

20   THE BLOCK AS A GM AND I KNOW ESSENTIALLY HE'S TRYING TO GET

21   SOME BUDGET, THIS IS INTEL LAB, THE RESEARCH PEOPLE.  AND SO --

22   Q.   I'M NOT ASKING ABOUT THAT.  I'M SIMPLY ASKING WERE THOSE

23   ACCURATE STATEMENTS?

24   A.   YEAH, BUT YOU TAKE THEM OUT OF CONTEXT, AND THEY ARE NOT

25   ACCURATE.  THAT'S WHY I'M GIVING YOU CONTEXT.

1    Q.   OKAY.  BUT THOSE ARE STATEMENTS THAT YOU MADE IN THE

2    E-MAILS TO BOYD BANGERTER AT INTEL LABS; RIGHT?

3    A.   YES.  AND REPRESENTING A 20 YEAR PERIOD, YES.

4    Q.   ALL RIGHT.  NOW, WAS XMM 7160 THE FIRST LTE MODEM CHIPSET

5    THAT INTEL SOLD?

6    A.   SOLD?  DID WE SELL -- HANG ON.  I HAVE TO THINK.  YEAH, WE

7    DID SELL IT TO SOMEBODY, YES.

8    Q.   OKAY.  AND DO YOU RECALL THAT IN 2013 SAMSUNG WAS GOING TO

9    USE THE INTEL XMM 7160 MODEM CHIP FOR A GALAXY S PHONE AND THEN

10   SWITCHED AWAY TO A QUALCOMM CHIP?

11   A.   YES, I DO RECALL THAT, UM-HUM.

12   Q.   AND THE REASON SAMSUNG GAVE WAS THAT INTEL COULD NOT MEET

13   THE SCHEDULE; ISN'T THAT RIGHT?

14   A.   THAT IS CORRECT.

15   Q.   ALL RIGHT.  AND AROUND THIS SAME TIME IN 2013, MOTOROLA

16   DID NOT BUY INTEL LTE MODEM CHIPS EITHER, DID THEY?

17   A.   THAT IS CORRECT.  I HAD ACTUALLY DIRECTED OUR SALES TEAM

18   TO STOP TAKING THOSE CALLS.  BUT, YES, THAT IS CORRECT.

19   Q.   AND DO YOU RECALL THAT INTEL'S CEO AT THE TIME,

20   BRIAN KRZANICH, SAID THAT IT WAS NOT -- SAID THAT IT WAS NOT A

21   GOOD DAY TO BE FROM INTEL?

22            MR. CARSON:  OBJECTION.  HEARSAY.

23            THE WITNESS:  UM, NO, I DON'T --

24            THE COURT:  SORRY.

25            THE WITNESS:  I'M SORRY.  WHAT AM I SUPPOSED TO DO?

```
1              THE COURT:  THAT'S SUSTAINED.  THE QUESTION IS

2    STRICKEN.

3              MR. CARSON:  MOVE TO STRIKE.

4    BY MR. RYAN:

5    Q.   LET ME SHOW YOU QX 85, MS. EVANS.

6    A.   YES.

7    Q.   IS THIS AN E-MAIL FROM BRIAN KRZANICH TO YOU AND OTHERS

8    WITHIN INTEL DATED SEPTEMBER 16, 2013?

9    A.   YES.

10   Q.   AND WERE YOU AT THIS TIME THE HEAD OF THE INTEL MOBILE

11   WIRELESS GROUP?

12   A.   YES.

13   Q.   AND DID YOU LEARN ABOUT A DECISION MOTOROLA MADE NOT TO

14   BUY INTEL MODEM CHIPSETS?

15   A.   YES.  IT WAS THE GREATEST DAY OF MY LIFE.

16   Q.   AND DID YOU LEARN ABOUT MOTOROLA'S DECISION NOT TO BUY

17   INTEL CHIPSETS FROM THIS E-MAIL FROM MR. KRZANICH?

18   A.   NO.  I KIND OF KNEW THEY WERE GOING TO.  IT CONFIRMED THAT

19   AND FINALLY SETTLED THE DEBATE AT INTEL.

20             MR. RYAN:  ALL RIGHT.  YOUR HONOR, I MOVE QX 85 INTO

21   EVIDENCE.

22             MR. CARSON:  OBJECTION.  HEARSAY.

23             MR. RYAN:  I'M NOT SEEKING TO ADMIT THIS AS A

24   STATEMENT FOR THE TRUTH, BUT RATHER THAT IS A VERBAL ACT, A

25   DECISION MOTOROLA MADE NOT TO BUY INTEL CHIPSETS.
```

```
1              MR. CARSON:  I'M NOT QUITE SURE WHAT --

2              THE COURT:  SUSTAINED.  IT'S NOT COMING IN.  GO

3    AHEAD.  GO TO YOUR NEXT EXHIBIT, PLEASE.

4    BY MR. RYAN:

5    Q.  ALL RIGHT.  SO YOU SAID THAT THIS WAS A GOOD THING; IS

6    THAT RIGHT?

7    A.  YES.

8    Q.  ISN'T IT TRUE THAT INTEL'S CEO SAID THAT THAT DAY WAS NOT

9    A GOOD DAY --

10             MR. CARSON:  OBJECTION, HEARSAY.

11             MR. RYAN:  THIS IS OBVIOUSLY IMPEACHING THE WITNESS,

12   YOUR HONOR.

13             THE COURT:  DIDN'T YOU ALREADY ASK THIS QUESTION AND

14   I ALREADY SUSTAINED THE OBJECTION?

15             MR. RYAN:  I WAS TRYING TO LAY A FOUNDATION, YOUR

16   HONOR, FOR MY QUESTION.

17             THE COURT:  I SUSTAINED THE OBJECTION.

18             MR. RYAN:  ALL RIGHT.  I'LL MOVE ON.

19             THE COURT:  THANK YOU.

20   BY MR. RYAN:

21   Q.  NOW, DID YOU WORK FROM TIME TO TIME WITH BAIN & COMPANY --

22   A.  EXCUSE ME.  AM I SUPPOSED TO DO SOMETHING WITH THIS

23   (INDICATING)?

24   Q.  NO.  WE'RE MOVING PAST QX 85.

25   A.  OKAY.  UM-HUM.
```

1    Q.   FROM TIME TO TIME YOU WORKED WITH BAIN & COMPANY

2    CONSULTANTS, DIDN'T YOU?

3    A.   MORE THAN TIME TO TIME, YES.

4    Q.   YOU WORKED FREQUENTLY WITH THEM?

5    A.   YES.

6    Q.   ALL RIGHT.  COULD I ASK YOU, PLEASE, TO TURN TO QX 92.

7    A.   QX 92.

8    Q.   IT'S JUST A COUPLE EXHIBITS BEYOND WHERE WE WERE BEFORE.

9    A.   OH, SORRY.  YES, AT THE BOTTOM.  YES, I'M HERE, UM-HUM.

10   Q.   ALL RIGHT.  AND IS THIS AN E-MAIL DATED JULY 7TH, 2015,

11   FROM KAYVAN ARDALAN AT BAIN TO VARIOUS INTEL EXECUTIVES,

12   INCLUDING YOURSELF?

13   A.   YES.

14   Q.   AND THEN BEGINNING ON THE FOURTH PAGE OF THE DOCUMENT, DO

15   YOU SEE A PRESENTATION BEGINS THAT IS CALLED MOBILE R&D

16   BENCHMARKING AND BEARS THE DATE JULY 2015?

17   A.   YES, I SEE THAT, COUNSELOR.

18   Q.   AND YOU PARTICIPATED WITH BAIN IN CREATING THIS

19   PRESENTATION, DIDN'T YOU?

20   A.   PARTICIPATED IN CREATING IS AN OVERSTATEMENT.  I WAS AN

21   INPUTTER INTO THE PRESENTATION SINCE THIS WAS BENCHMARKING MY

22   UNIT.

23   Q.   ALL RIGHT.

24        YOUR HONOR, I OFFER QX 92 INTO EVIDENCE.

25             MR. CARSON:  OBJECTION.  HEARSAY.

1          MR. RYAN:  THE WITNESS HAS SAID THAT SHE PROVIDED

2    INPUT, SO IT ALSO GOES TO HER STATE OF MIND IN TERMS OF MOBILE

3    R&D BENCHMARKING AT THIS OF THE STATE OF COMPETITION.

4          MR. CARSON:  YOUR HONOR, IF THEY'RE NOT OFFERING THIS

5    DOCUMENT FOR THE TRUTH OF THE MATTER ASSERTED, WE'LL WITHDRAW

6    THE OBJECTION.

7       IF IT'S OFFERED FOR THE TRUTH, WE'LL WITHDRAW THE HEARSAY.

8          THE COURT:  I'M ACTUALLY GOING TO TODAY, LATER TODAY,

9    DENY THE MOTION TO QUASH THE TRIAL SUBPOENA TO CHRIS JOHNSON OF

10   BAIN & COMPANY.

11      SO WOULDN'T THIS BE COMING IN THROUGH HIM?  THIS IS A BAIN

12   DOCUMENT; IS THAT RIGHT?

13         MR. RYAN:  SURE, YOUR HONOR.  THE WITNESS HAS

14   TESTIFIED IN THE PAST THAT SHE PARTICIPATED IN CREATING THIS

15   DOCUMENT.  AND I CAN -- I CAN --

16         THE COURT:  WELL, WE'LL HAVE IT ADMITTED NOT FOR ITS

17   TRUTH.

18         MR. RYAN:  OKAY.  THANK YOU, YOUR HONOR.

19         THE COURT:  OKAY.  GO AHEAD, PLEASE.

20      (DEFENDANT'S EXHIBIT QX 92 WAS ADMITTED IN EVIDENCE.)

21   BY MR. RYAN:

22   Q.  IF YOU COULD TURN, PLEASE, TO SLIDE 2.  THIS IS THE PAGE

23   ENDING IN BATES NUMBER 508.

24      AND YOU AGREED AT THE TIME IN 2015, MS. EVANS, WITH THE

25   STATEMENT THAT INTEL AND QUALCOMM INVESTMENT IN MOBILE SOC HAS

1    BEEN ON PAR, BUT QUALCOMM PRODUCT OUTPUT IS 2 TO 3 TIMES INTEL;

2    RIGHT?

3    A.   YEAH, I ACCEPTED THIS STATEMENT AS FACT GIVEN THE -- LIKE

4    THE NUMBERS, YES.

5    Q.   AND THAT ACTUALLY WAS A STATEMENT THAT YOU AGREED WITH AT

6    THE TIME, WASN'T IT?

7    A.   I AGREED WITH THE FACT.

8    Q.   OKAY.

9    A.   YES.

10   Q.   AND YOU ALSO AGREED AT THE TIME WITH THE FOURTH BULLET

11   POINT ON THE SAME PAGE THAT INTEL OVERALL MOBILE PRODUCT

12   ACTIVITY STILL LAGS QUALCOMM BY APPROXIMATELY 50 PERCENT?

13        YOU AGREED WITH THAT AS WELL, DIDN'T YOU?

14   A.   I AGREED WITH THE -- I DIDN'T -- WELL, I AGREED WITH THE

15   FACTS HERE, WHICH IS HOWEVER INTEL MOBILE PRODUCT ACTIVITY

16   STILL LAGS QUALCOMM BY 50 PERCENT, LARGELY DRIVEN, BECAUSE THAT

17   HAS NOTHING TO DO WITH THE MODEM, BY INTEL SUPPORTING MULTIPLE

18   ARCHITECTURES.

19   Q.   ALL RIGHT.  BUT YOU AGREE WITH THAT FOURTH BULLET POINT?

20   YOU AGREED WITH THAT STATEMENT, DIDN'T YOU?

21   A.   I AGREED WITH THE STATED FACTS.  I DON'T AGREE WITH THE

22   INFERENCE.

23   Q.   ALL RIGHT.  LET'S TURN TO THE NEXT PAGE, PLEASE, SLIDE 3.

24   THIS PAGE SHOWS MOBILE ENGINEERING HEAD COUNT.

25        NOW, INTEL'S MOBILE ENGINEERING HEAD COUNT IS ON THE LEFT;

1     RIGHT.

2     A.    UM-HUM.

3     Q.    AND AT THIS TIME IN 2011 TO 2015, INTEL WAS INVESTING

4     FURIOUSLY, WASN'T IT?

5     A.    YES, WHICH IS WHERE THAT COMES FROM.  WHEN YOU'RE FAR

6     BEHIND AND YOU'RE INVESTING FURIOUSLY WITH A COMPETITOR THAT

7     HAS THE BUSINESS PRACTICES THAT FOCUS ON KEEPING YOU OUT, YOU

8     TEND TO DO UNNATURAL THINGS, YES.

9     Q.    AND INTEL WAS INCREASING ITS MOBILE H & D HEAD COUNT;

10    RIGHT?

11    A.    OH, YES.  WE WERE -- WHAT WE NEED -- WHEN COMPARED TO THE

12    COMMITMENT WE MADE TO THE BOARD, WE HAD TO SAY WHAT WE NEEDED

13    AND WENT AND GOT IT.

14    Q.    AND THIS SLIDE SHOWS THAT INTEL'S MOBILE ENGINEERING HEAD

15    COUNT WAS ROUGHLY ON PAR WITH QUALCOMM'S, DOESN'T IT?

16    A.    YES, WE WERE STARTING TO SPEND ABOUT THE SAME, YES.

17    Q.    LET'S TURN, PLEASE, NEXT TO PAGE, SLIDE 4.

18         AND WE'RE HERE ON THE SLIDE ENTITLED INTEL LAGGING IN

19    PRODUCT OUTPUT.

20         AND DOES THIS SLIDE CONFIRM WHAT WE SAW PREVIOUSLY ON

21    SLIDE 2, THAT INTEL'S PRODUCT OUTPUT WAS LAGGING QUALCOMM'S?

22    A.    YES.  AND TO BE VERY, VERY CLEAR, BECAUSE SOMEBODY WHO

23    READS THIS WON'T UNDERSTAND THE CODE NAME, THIS REPRESENTS

24    APPLICATION PROCESSOR AND MODEM DEVELOPMENT THROUGHOUT THE

25    CORPORATION, YES.

1    Q.   OKAY.  AND INTEL WAS LAGGING QUALCOMM IN PRODUCT OUTPUT AT

2    THIS TIME; RIGHT?

3    A.   YES, WHEN IT COMES TO APPLICATION PROCESS PLUS MODEM

4    DEVELOPMENTS.  THIS IS NOT A COMPARISON OF THE MODEM ITSELF.

5    Q.   ALL RIGHT.  LET ME ASK YOU SOME MORE QUESTIONS ABOUT THAT.

6    WE'RE ALL SET WITH THIS DOCUMENT.

7    A.   OKAY.

8    Q.   APART FROM APPLE, MOST HANDSET MAKERS PURCHASE MODEMS WITH

9    INTEGRATED APPLICATION PROCESSOR, DON'T THEY?

10   A.   APART FROM QUALCOMM -- APART FROM APPLE, MOST HANDSET

11   MANUFACTURERS PURCHASE MODEMS FROM QUALCOMM, WHO MAINLY OFFERS

12   THEM, EXCEPT FOR SAMSUNG AND APPLE, AS INTEGRATED SOC'S.

13   Q.   SO APART FROM APPLE, MOST HANDSET MAKERS PURCHASE MODEMS

14   WITH INTEGRATED APPLICATION PROCESSOR; RIGHT?

15   A.   THE ONLY COMPANY THAT OFFERS THEM PREFERS TO SELL SOC'S,

16   I.E., QUALCOMM.

17   Q.   MEDIATEK ALSO SELLS SOC'S, DOESN'T IT?

18   A.   WE SELL PREMIUM.

19   Q.   I DIDN'T ASK ABOUT PREMIUM.  ISN'T IT THE CASE THAT APART

20   FROM APPLE, MOST HANDSET MAKERS, WHETHER THEY BUY FROM QUALCOMM

21   OR SOMEBODY ELSE, PURCHASE MODEMS WITH INTEGRATED APPLICATIONS

22   PROCESSORS, ISN'T THAT RIGHT, MS. EVANS?

23   A.   OKAY, THAT'S CORRECT.

24   Q.   AND THOSE ARE OFTEN KNOWN AS SYSTEMS ON A CHIP, OR SOC'S;

25   RIGHT?

1    A.   IN OUR INDUSTRY THEY ARE, THOUGH, THAT'S A MISNOMER

2    BECAUSE SOC REFERS TO SUM OF CONSENT, ACTUALLY.  SYSTEM ON A

3    CHIP OR SOME OF CONTENT.  FOR HANDSETS, THAT IS TRUE.

4    Q.   OKAY.  HOWEVER, THEY ARE GENERALLY KNOWN AS SOC'S; RIGHT?

5    A.   YES.  BUT I'M TRYING TO BE VERY PRECISE.  NOT ALL SOC'S

6    HAVE MODEMS.  INTEL SHIPS HUNDREDS OF MILLIONS OF SOC'S THAT

7    DON'T HAVE MODEMS IN THERE.

8    Q.   THANK YOU.  AND THESE SOC'S THAT HANDSET OEM'S BUY ARE

9    DISTINCT FROM THE THIN MODEMS THAT APPLE BUYS; RIGHT?

10   A.   YES.

11   Q.   AND INTEL USED TO HAVE A MOBILE SOC DEVELOPMENT PROGRAM,

12   DIDN'T THEY?

13   A.   YES, THEY DID OR WE DID.

14   Q.   AND INTEL'S MOBILE SOC PROGRAM FAILED, DIDN'T IT?

15   A.   YES, IT DID.

16   Q.   AND INTEL ABANDONS MOST OF ITS MOBILE SOC PROJECTS IN

17   2016; ISN'T THAT RIGHT?

18   A.   YES, THAT IS CORRECT.  WE WERE HAVING A HELL OF A TIME NOT

19   WITH THE INTEGRATION, WE DIDN'T HAVE A SUCCESSFUL APPLICATION

20   PROCESSOR FOR HANDSETS.  IT'S KIND OF HARD TO INTEGRATE

21   SOMETHING YOU DON'T HAVE.

22   Q.   AND INTEL DOES NOT CURRENTLY HAVE A MOBILE SOC DEVELOPMENT

23   PROGRAM, DOES IT?

24   A.   NO.  THAT IS NOT SOMETHING WE'RE CURRENTLY INTERESTED IN.

25   Q.   OKAY.  IN FACT, YOU BELIEVE INTEL SHOULDN'T BE BROADLY IN

1    THE HANDSET BUSINESS; ISN'T THAT RIGHT?

2    A.   WHOA.  REPEAT THE QUESTION, PLEASE.

3    Q.   ISN'T IT A FACT THAT YOU BELIEVE THAT INTEL SHOULDN'T

4    BROADLY BE IN THE HANDSET BUSINESS?

5    A.   THAT IS MY OPINION, MY PERSONAL OPINION, YES.

6    Q.   IN FACT, YOU'RE NOT INTERESTED IN THE SMARTPHONE MARKET AT

7    ALL, ARE YOU, MA'AM?

8    A.   I AM NOT INTERESTED -- WELL, MA'AM? -- I AM NOT INTERESTED

9    IN THE APPLICATION PROCESSOR SIDE OF THE SMARTPHONE MARKET,

10   ONE.

11        AND, TWO, I AM ONLY INTERESTED IN THE PREMIUM SEGMENT OF

12   SMARTPHONES FOR MODEMS.

13   Q.   OKAY.  AND SO YOU DISAGREE WITH THE VIEW THAT INTEL SHOULD

14   TRY TO SELL A BROADER RANGE OF CHIPS FOR USE IN SMARTPHONES; IS

15   THAT RIGHT?

16   A.   WHAT TYPE OF CHIPS?  CAN YOU BE PRECISE, PLEASE?  BECAUSE

17   OBVIOUSLY PREMIUM MODEM CHIPS I DON'T DISAGREE -- I AGREE WE

18   SHOULD DO.

19   Q.   WELL, FOR INSTANCE, HIGH TIER SOC'S.  YOU DISAGREE THAT

20   INTEL SHOULD BE TRYING TO SELL HIGH TIER SOC'S FOR USE IN

21   SMARTPHONES; ISN'T THAT RIGHT?

22   A.   NO, THAT'S NOT RIGHT BECAUSE I DON'T KNOW WHAT YOU MEAN BY

23   SOC.  SO I WILL BE PRECISE.  I DO NOT AGREE THAT INTEL SHOULD

24   SPEND ITS ENERGY AND TIME IN SOC'S THAT CONTAIN AN APPLICATION

25   PROCESSOR.

1    Q.   OKAY.  AND YOU HAVE TESTIFIED, HAVEN'T YOU, THAT YOU

2    DISAGREE WITH THE VIEW THAT INTEL SHOULD TRY TO SELL A BROADER

3    RANGE OF CHIPS FOR USE IN SMARTPHONES?

4    A.   THAT CONTAINS AN APPLICATION PROCESSOR, CORRECT.

5    Q.   OKAY.  NOW, LET ME ASK YOU TO LOOK IN YOUR BINDER AT

6    QX 89.  THIS IS A DOCUMENT THAT WE'RE NOT GOING TO BE

7    PROJECTING ON THE SCREEN AT ALL.  IT'S SUBJECT TO INTEL'S

8    SEALING MOTION?

9    A.   YES.

10   Q.   LET ME ASK YOU, MS. EVANS, ABOUT QX 89.

11   A.   UM-HUM.

12   Q.   DO YOU SEE THAT AFTER A COVER E-MAIL TO YOU, THIS IS A

13   WHITE PAPER CALLED MOBILE BEST IN CLASS 14 NANOMETER WHITE

14   PAPER?

15   A.   YES.

16   Q.   AND YOU ARE A PRIMARY AUTHOR OF THIS WHITE PAPER, ARE YOU

17   NOT?

18   A.   I WROTE IT, YES.  OR I LED WRITING IT.  THERE'S A TEAM,

19   YES.

20   Q.   ALL RIGHT.

21        YOUR HONOR, I OFFER QX 89 INTO EVIDENCE.

22            MR. CARSON:  NO OBJECTION.

23            THE COURT:  IT'S ADMITTED.

24        (DEFENDANT'S EXHIBIT QX 89 WAS ADMITTED IN EVIDENCE.)

25            THE COURT:  GO AHEAD, PLEASE.

1    BY MR. RYAN:

2    Q.   AND THIS WHITE PAPER DOCUMENTS WHY YOU BELIEVED THAT

3    INTEL'S PROGRAM FOR MOBILE SOC'S FOR HANDSETS DIDN'T WORK,

4    DOESN'T IT?

5    A.   I BELIEVED THAT WHEN IT CAME TO THE APPLICATION PROCESSOR

6    SIDE, AS WELL AS TO BUILDING FOR THIS TYPE OF SEGMENT OUTSIDE

7    OF THE MODEM, WE LACKED SOME FUNDAMENTAL -- WE HAD SOME

8    FUNDAMENTAL GAPS AND THAT THEY ALSO WERE NOT GOING TO ADVANCE

9    WHAT WE WERE TRYING TO DO ON THE MODEM SIDE.

10   Q.   OKAY.  AND DOES THE QX 89 WHITE PAPER DOCUMENT THE REASONS

11   WHY YOU BELIEVED THAT INTEL'S PROGRAM FOR MOBILE SOC'S FOR

12   HANDSETS FAILED?

13   A.   THIS DOCUMENT -- THIS WHITE PAPER I AND MY TEAM AUTHORED

14   DOCUMENTS WHY WE WERE HAVING TROUBLE BUILDING MOBILE

15   APPLICATION PROCESSORS AND ADDITIONAL CHIPS FOR HANDSET

16   SEGMENTS.

17   Q.   OKAY.  THANK YOU.

18   A.   MEANING IT HAD NOTHING TO DO WITH THE MODEM BASICALLY.

19   Q.   ON DIRECT, YOU TESTIFIED ABOUT LG AND MOTOROLA.

20        DO YOU RECALL THAT?

21   A.   I DO.

22   Q.   OKAY.  NOW, AS OF MARCH OF 2018 WHEN I ASKED YOU QUESTIONS

23   AT YOUR DEPOSITION, LG WAS NOT ON YOUR PRIORITY LIST; ISN'T

24   THAT RIGHT?

25   A.   OKAY.  SO I -- I HAVE A QUESTION.  WE'RE ABOUT TO GO INTO,

1    LIKE, CUSTOMERS AND, AND THERE ARE A LOT OF PEOPLE IN THIS

2    COURTROOM AND WE'RE ON THE CONFIDENTIAL RECORD.

3         SO I'M GOING TO TRUST THAT YOU KNOW WHERE YOU'RE GOING.

4              THE COURT:  ACTUALLY, WE'RE NOT ON A CONFIDENTIAL

5    RECORD.  THIS PART IS PUBLIC.

6              THE WITNESS:  OH, IT IS PUBLIC?

7              THE COURT:  YEAH.

8              THE WITNESS:  OKAY.  SO WHAT WAS YOUR QUESTION?

9    BY MR. RYAN:

10   Q.   AND SO I'M NOT ATTEMPTING TO GET INTO ANY SPECIFIC CHIPS,

11   ANY SPECIFIC PRICES, ANY SPECIFIC NEGOTIATIONS EVEN.

12        I'M JUST ASKING ISN'T IT THE CASE, MS. EVANS, THAT AS OF

13   MARCH 2018, LG WAS NOT ON YOUR PRIORITY LIST?

14   A.   THAT IS CORRECT.

15   Q.   AND AT THAT TIME, INTEL WAS NOT TRYING TO SELL BASEBAND

16   MODEM CHIPSETS TO LG FOR USE IN PREMIUM SMARTPHONES, WAS IT?

17   A.   THAT IS CORRECT.

18   Q.   AND SIMILARLY AT THAT TIME IN MARCH OF 2018, MOTOROLA WAS

19   NOT A PRIORITY FOR INTEL, WAS IT?

20   A.   THAT IS CORRECT.

21   Q.   ALL RIGHT.  LET ME ASK YOU SOME QUESTIONS, PLEASE, ABOUT

22   CDMA.

23   A.   OKAY.

24   Q.   SO IN 2011, AFTER INTEL ACQUIRED INFINEON MOBILE WIRELESS

25   GROUP, THERE WAS A DEBATE WITHIN INTEL, WASN'T THERE, REGARDING

1    WHETHER INTEL SHOULD EITHER ACQUIRE OR OTHERWISE DEVELOP CDMA

2    CAPABILITY; RIGHT?

3    A.   YES.  THAT WAS IN THE -- THERE WAS A DEBATE IN INTEL AND

4    IN THE INDUSTRY, AND INTEL, IN INTEL FOR SURE.

5    Q.   AND SOME PEOPLE THOUGHT CDMA CAPABILITY WAS UNNECESSARY

6    BECAUSE THE TECHNOLOGY WOULD BE PHASED OUT; ISN'T THAT RIGHT?

7    A.   MOST PEOPLE THOUGHT THAT, YES.

8    Q.   OKAY.  YOU BELIEVED THAT CDMA WOULD LAST AS A LEGACY

9    TECHNOLOGY AS PART OF A MULTIMODE CHIPSET, DIDN'T YOU?

10   A.   THAT WAS MY BELIEF, YES.

11   Q.   AND YOU CONCLUDED BACK IN 2011 THAT INTEL NEEDED TO HAVE

12   ACCESS TO CDMA; RIGHT?

13   A.   CONCLUDED?  I ARGUED THAT WE SHOULD, YES.

14   Q.   OKAY.  SO YOU ADVOCATED THE VIEW INTERNALLY WITHIN INTEL

15   THAT INTEL NEEDED TO HAVE ACCESS TO CDMA; RIGHT?

16   A.   YES.

17   Q.   AND, IN FACT, YOU RECOMMENDED IN 2011 THAT INTEL SHOULD

18   ACQUIRE CDMA CAPABILITY; RIGHT?

19   A.   YES.  I RECOMMENDED THAT BECAUSE AS I FELT MORE AND MORE

20   CONFIDENT THAT WE WERE GOING TO BE ABLE TO SHIP TO APPLE, WHICH

21   MOST PEOPLE DIDN'T THINK WE WOULD BE ABLE TO DO, I WANTED TO

22   LAY THE GROUND WORK AND FOUNDATION SO THAT WHEN WE PULLED THE

23   TRIGGER, I HAD ALREADY PREPARED THE COMPANY.

24   Q.   OKAY.

25   A.   SO YES.

1    Q.   BUT THIS WAS EVEN BACK IN 2011 OR 2012 THAT YOU

2    RECOMMENDED THAT INTEL ACQUIRE CDMA CAPABILITY FROM VIA

3    TELECOM; RIGHT?

4    A.   YES.  I'M A GM.  REMEMBER, I HAVE TO WORRY ABOUT THIS

5    YEAR, NEXT YEAR, THE FOLLOWING YEAR.

6    Q.   UM-HUM.

7    A.   AT ANY POINT IN TIME, YOU HAVE THE DEVICE THAT YOU ARE

8    WORKING ON, HOPEFULLY THE DEVICE THAT IS SHIPPING, AND THE

9    DEVICE YOU'RE PREPARING.

10        AND SINCE I WAS PLANNING FOR SUCCESS, AND I KNEW IT WAS

11   GOING TO BE HARD TO CONVINCE BECAUSE, AS YOU ASKED YOUR

12   QUESTION, MOST PEOPLE DIDN'T AGREE WITH ME, IN THIS THESE BIG

13   CORPORATIONS, YOU HAVE TO TAKE YOUR TIME AND MAKE SURE.  IF I

14   WAITED UNTIL I NEEDED IT TO ASK FOR IT, IT WOULD HAVE BEEN TOO

15   LATE.

16   Q.   AND INTEL'S THEN CEO, PAUL OTELLINI, WAS GENERALLY NOT

17   SUPPORTIVE; ISN'T THAT RIGHT?

18   A.   MAY HE REST IN PEACE, NO, HE WASN'T.  THOUGH I'M SURE HE

19   NOW IS.

20        (LAUGHTER.)

21   BY MR. RYAN:

22   Q.   AND INTEL MADE A BUSINESS DECISION, DIDN'T IT, NOT TO

23   ACQUIRE CDMA CAPABILITY FROM VIA TELECOM AT THIS TIME?

24   A.   YEAH.  YOU'RE AN EXECUTIVE.  YOU'VE GOT TO LEARN TO WIN

25   SOME AND LOSE SOME.  AT THAT POINT IN TIME, I DID NOT CONVINCE

1    HIM TO.  BUT EVENTUALLY, AS YOU KNOW, SINCE WE ACQUIRED VIA, IT

2    TOOK ME THREE YEARS, FOUR YEARS, YES, WE DID.  BUT FRANKLY, THE

3    TIMING WORKED OUT BECAUSE WE NEEDED TO SHIP FIRST.

4    Q.   YEAH.  NOW, IN OCTOBER OF 2014, INTEL SECURED A DESIGN WIN

5    TO SUPPLY MODEM CHIPS FOR THE 2016 IPHONES; ISN'T THAT RIGHT?

6    A.   THAT IS CORRECT.

7    Q.   AND AS A RESULT, INTEL SUPPLIED MODEM CHIPS FOR ROUGHLY

8    HALF OF THE IPHONES RELEASED IN THE FALL OF 2016, DIDN'T IT?

9    A.   THAT IS CORRECT.

10   Q.   AND THE INTEL CHIPSET THAT WON THE APPLE BUSINESS, THE XMM

11   7360 DID NOT HAVE CDMA CAPABILITY, DID IT?

12   A.   NO, IT DID NOT.

13   Q.   OKAY.  SO INTEL WON APPLE BUSINESS, APPLE IPHONE BUSINESS,

14   EVEN THOUGH IT DIDN'T HAVE CDMA CAPABILITY AT THAT TIME; RIGHT?

15   A.   YES.  WE WON SOME OF THE APPLE BUSINESS.  BUT WE COULD NOT

16   COMPETE YET FOR THE PART OF THE APPLE BUSINESS THAT REQUIRED

17   CDMA.

18        AND APPLE WAS ALSO HAVING ITS OWN DEBATES ABOUT, LIKE WE

19   ALL WERE IN THE INDUSTRY, ABOUT CDMA.

20   Q.   INTEL OBTAINED ROUGHLY HALF OF APPLE'S IPHONE BUSINESS

21   WITHOUT CDMA CAPABILITY; RIGHT?

22   A.   CORRECT, IN ABSOLUTE NUMBERS.  BUT YOU HAVE TO COMPUTE OUT

23   OF WHAT INTEL COULD COMPETE OUGHT OF, AND I WANT TO BE VERY

24   CRISP AND CONCISE AND PRECISE THAT WE COULD NOT COMPETE FOR

25   PARTS THAT CONTAINED CDMA SINCE WE DIDN'T HAVE IT.

1    Q.   AND THE REASON FOR THAT WAS THAT INTEL HAD MADE A BUSINESS

2    DECISION IN 2011 NOT TO ACQUIRE CDMA TECHNOLOGY; ISN'T THAT

3    RIGHT?

4    A.   THE REASON FOR THAT WAS THAT, A, I HAD NOT BEEN SUCCESSFUL

5    YET IN CONVINCING THAT WE HAD EARNED THE RIGHT -- NOT THE

6    RIGHT -- THE OPPORTUNITY TO GET CDMA.

7         AND ONCE WE SHIPPED IN THE IPHONE 7, THAT GAVE US A LOT OF

8    CREDIBILITY IN TERMS OF OUR COMMITMENTS AND POINTS ON THE BOARD

9    AND WE GOT CDMA.

10   Q.   AT THAT POINT, YOU WERE ABLE TO WIN OVER OTHER INTEL

11   SENIOR EXECUTIVES TO MAKE A DIFFERENT DECISION; RIGHT?

12   A.   YEAH.

13   Q.   NOW, INTEL ALSO WON THIS APPLE IPHONE BUSINESS WITHOUT

14   FIRST BEING IN AN APPLE IPAD; ISN'T THAT RIGHT?

15   A.   YEP, THAT IS CORRECT.

16   Q.   AND YOU WROTE AN E-MAIL WHICH YOU SENT TO YOUR TEAM AT THE

17   TIME STATING THAT INTEL DID WHAT NEEDED TO BE DONE TO GET THE

18   SOCKET AND START A FAIR AND SQUARE COMPETITION WITH QUALCOMM;

19   ISN'T THAT RIGHT?

20   A.   I WRITE THOUSANDS OF E-MAILS.  SO IF YOU'RE GOING TO TALK

21   ABOUT AN E-MAIL, YOU HAVE TO SHOW ME.  BECAUSE I WRITE A LOT OF

22   E-MAILS.

23   Q.   OKAY.  LET ME SHOW YOU QX 94, MS. EVANS.

24   A.   94, YEAH.

25   Q.   AND I'M NOT GOING TO ASK YOU ABOUT ANYTHING ON THE FIRST

```
1    THREE PAGES, WHICH WERE SUBJECT TO AN INTEL SEALING MOTION.

2    A.   WAIT, WAIT.  SO THIS IS -- OH, SEPTEMBER '16, YEAH,

3    UH-HUH.

4    Q.   DO YOU SEE AT THE VERY BOTTOM OF THE THIRD PAGE AN E-MAIL

5    BEGINS THAT'S FROM YOU, DATED WEDNESDAY, AUGUST 10TH, 2016.

6    A.   UM-HUM.

7    Q.   ALL RIGHT.  IF YOU COULD TURN TO THE NEXT PAGE, THE FOURTH

8    PAGE OF QX 94.

9    A.   YES.

10   Q.   THIS PAGE IS NOT SUBJECT TO A SEALING MOTION.

11       AND DO YOU SEE THERE IN THE THIRD PARAGRAPH OF YOUR

12   E-MAIL, THE PARAGRAPH THAT BEGINS I STAND BY THE STATED

13   STRATEGY, DO YOU SEE THAT YOU WROTE, WE HAVE DONE THIS,

14   INCLUDING WHAT NEEDED TO BE DONE TO GET THE SOCKET AND START A

15   FAIR AND SQUARE COMPETITION WITH Q.

16       DO YOU SEE THAT, MA'AM?

17   A.   I'M GOING TO READ THE WHOLE THING SINCE YOU ARE READING

18   ONLY PORTIONS OF IT.  I STAND BY THE STATED STRATEGY TO FIRST

19   EARN THE BUSINESS AS THE ONLY REALISTIC AND PROVEN ALTERNATIVE

20   TO QUALCOMM, THE INCUMBENT.  WE HAVE DONE THIS, INCLUDING WHAT

21   NEEDED TO BE DONE, TO GET THE SOCKET AND START A FAIR AND

22   SQUARE, START A FAIR AND SQUARE COMPETITION WITH QUALCOMM.

23   Q.   AND THAT IS WHAT YOU WROTE AND SENT TO YOUR TEAM IN AUGUST

24   OF 2016; RIGHT?

25   A.   YES.
```

1              MR. RYAN:  YOUR HONOR, I OFFER QX 94 INTO EVIDENCE.

2              MR. CARSON:  NO OBJECTION.

3              THE COURT:  IT'S ADMITTED.

4          (DEFENDANT'S EXHIBIT QX 94 WAS ADMITTED IN EVIDENCE.)

5              THE COURT:  GO AHEAD, PLEASE.

6     BY MR. RYAN:

7     Q.   INTEL ENDED UP ACQUIRING THE CDMA TECHNOLOGY FROM VIA

8     TELECOM IN 2015; ISN'T THAT RIGHT?

9     A.   YES.

10    Q.   AND INTEL RELEASED ITS FIRST MULTIMODE LTE AND CDMA

11    CHIPSET THIS YEAR, THE XMM 7560; ISN'T THAT RIGHT?

12    A.   THEY TOLD ME.

13             MR. CARSON:  YOUR HONOR.

14             THE WITNESS:  YOU ALL AGREED TO MARCH '18.  SO NOW

15    YOU'RE ASKING ME FOR SOMETHING THAT'S AFTER MARCH '18.  SO YOU

16    ALL HAVE TO DISCUSS AND TELL ME WHAT TO DO.

17    BY MR. RYAN:

18    Q.   AS OF MARCH OF 2018, YOU KNEW THAT INTEL WOULD BE

19    RELEASING ITS FIRST MULTIMODE LTE CDMA CHIPSET THIS YEAR,

20    DIDN'T YOU, MS. EVANS?

21    A.   YES.

22    Q.   AND AS A RESULT, INTEL IS NOW SUPPLYING 100 PERCENT OF THE

23    IPHONES WITH --

24    A.   I CAN'T TALK ABOUT WHAT'S HAPPENING NOW.

25             MR. CARSON:  OBJECTION, YOUR HONOR.

1          THE WITNESS:  I CAN ONLY TALK ABOUT MARCH OF '18 IS

2    WHAT THEY TOLD ME.

3          MR. RYAN:  WELL, THIS IS A FACT THAT I BELIEVE HAS

4    BEEN FREQUENTLY REFERRED TO IN THIS CASE.

5          MR. CARSON:  YOUR HONOR, I BELIEVE WE TALKED ABOUT

6    ANTICIPATION OF APPLE'S SUPPLY RELATIONSHIP WITH INTEL, BUT NOT

7    THE ACTUAL FACT ABOUT WHETHER INTEL WAS SUPPLYING 100 PERCENT

8    CHIPS NOW.

9          THE COURT:  OVERRULED.

10        GO AHEAD.  YOU CAN ASK THE QUESTION.

11   BY MR. RYAN:

12   Q.   ALL RIGHT.  ISN'T THE CASE THAT INTEL IS NOW SUPPLYING

13   MODEM CHIPSETS FOR 100 PERCENT OF THE IPHONES RELEASED IN 2018?

14   A.   "OVERRULED" MEANING I ANSWER?

15        THE COURT:  YOU KNOW WHAT?  ACTUALLY, I THINK THE

16   ONLY PERSON WHO RAISED IT WAS QUALCOMM IN ITS OPENING

17   PRESENTATION.  I THINK THAT MR. VAN NEST DID IT IN HIS OPENING

18   SLIDES.  THAT'S WHERE IT CAME IN; CORRECT?

19        MR. CARSON:  I BELIEVE SO, YOUR HONOR.  I HAVEN'T

20   READ THE ENTIRE --

21        THE COURT:  SO IF QUALCOMM IS DOING IT IN

22   CONTRAVENTION OF MY ORDER AND THEN RELYING ON ITS OWN ACTIVITY

23   IN CONTRAVENTION OF MY ORDER AS JUSTIFICATION, THEN I'M GOING

24   TO SUSTAIN THE OBJECTION.

25        MR. VAN NEST:  YOUR HONOR, JUST --

1              THE COURT:  MOVE ON TO SOMETHING ELSE.

2              MR. VAN NEST:  EXCUSE ME.  MR. RYAN HAS NOT BEEN HERE

3       THROUGHOUT.  BUT I UNDERSTOOD FROM THE GROUND RULES THAT THE

4       APPLE SITUATION WAS DIFFERENT.  MS. MILICI SAID REPEATEDLY

5       BEFORE TRIAL THAT THAT FACT, WHICH HAS BEEN PUBLICLY ANNOUNCED

6       AND EVERYBODY IN THE WORLD KNOWS, WOULD BE FAIR GAME.  SO

7       THAT'S WHY I STOOD UP IN THE OPENING AND SAID WHAT EVERYONE

8       KNOWS, AND I DIDN'T HEAR AN OBJECTION, AND I DON'T THINK IT'S

9       OBJECTIONABLE AT ALL.

10             THE COURT:  NO, THAT'S NOT WHAT I RECALL.  LET'S MET

11      MS. MILICI SPEAK FOR HERS.

12          AND THIS IS ALL COUNTS TOWARDS YOUR TIME.

13             MS. MILICI:  YOUR HONOR, WHAT I RECALL FROM OUR

14      DISCUSSIONS PRIOR TO TRIAL IS THAT WE SAID THAT THE DISCOVERY

15      RECORD CONTAINS THE FACT THAT APPLE HAD CHOSEN INTEL CHIPS FOR

16      ITS NEXT RELEASE.  THAT IS WHAT I REMEMBER SAYING WAS ON THE

17      PUBLIC RECORD AND WAS IN THE DISCOVERY RECORD, IN FACT.

18             MR. VAN NEST:  I'M SATISFIED WITH THAT.  THEY'VE

19      CHOSEN IT AND THAT'S -- WE DON'T NEED TO PROVE ANY MORE THAN

20      THAT.  I THINK WE HAVE PROVEN MORE, BUT...

21             MR. RYAN:  I'LL ASK THE QUESTION THAT WAY, YOUR

22      HONOR.

23             THE COURT:  OKAY.  GO AHEAD.  I'M GOING TO STRIKE THE

24      QUESTION.  AND PLEASE REPHRASE IT.

25      BY MR. RYAN:

1    Q.   ALL RIGHT.  AS OF MARCH OF 2018, MS. EVANS, YOU EXPECTED

2    THAT INTEL WOULD SUPPLY MODEM CHIPSETS FOR 100 PERCENT OF THE

3    IPHONES RELEASED IN THE FALL OF 2018; RIGHT?

4    A.   NOW YOU'RE USING WORDS THAT ARE CONFUSING LIKE "EXPECTED."

5         WHAT I KNEW IN MARCH 2018 IS THAT WE WERE STARTING TO PICK

6    UP INDICATION IN THE INDUSTRY THAT THERE WAS A STRONG

7    POSSIBILITY WE WERE GOING TO BE -- FIRST OF ALL, WE WERE SOLID

8    ON CDMA AND HAD THE CAPABILITY, MEANING WE HAD THE OFFERING,

9    AND IT WAS A REAL POSSIBILITY WE WERE GOING TO BE, YOU KNOW,

10   100 PERCENT.

11        FRANKLY, THIS IS NOW THE OPPOSITE SIDE OF THE GM BONE IN

12   ME.  I -- I WAS, LIKE, HOPING AND, YOU KNOW -- BUT DID I KNOW

13   FOR SURE?  NO.

14   Q.   YOUR UNDERSTANDING, THOUGH, WAS THAT AS OF MARCH OF 2018,

15   WAS THAT APPLE HAD CHOSEN INTEL FOR ALL OF ITS IPHONES FOR

16   RELEASE THAT YEAR; RIGHT?

17   A.   NOT MY UNDERSTANDING.  WHAT I PICKED UP AND HEARD AND

18   CORRELATED, TRIANGULATED, I MEAN, YOU KNOW, SAYING ANOTHER

19   COMPANY CHOSE US, YOU HAVE TO GO ASK THEM.

20        BUT THERE WERE STRONG INDICATIONS AND NOISE IN THE -- NOT

21   NOISE -- RIPPLES IN THE INDUSTRY THAT IT WAS A VERY STRONG

22   POSSIBILITY THAT WE WERE GOING TO BE SUPPLYING 100 PERCENT.

23   Q.   ALL RIGHT.  NOW, INTEL HAS BEEN VERY ACTIVE IN PUSHING THE

24   DEVELOPMENT OF 5G, HASN'T IT?

25   A.   YEAH.

1   Q.   AND AS OF MARCH OF 2018, INTEL WAS ALREADY IN THE PRODUCT

2   DEVELOPMENT PHASE OF 5G, WASN'T IT?

3   A.   YES.

4   Q.   AND INTEL ANNOUNCED ITS FIRST 5G MODEM IN 2017, DIDN'T IT?

5   A.   I'LL TAKE YOUR WORD FOR IT.  I DON'T KNOW WHEN WE

6   ANNOUNCED IT.  BUT YEAH.

7   Q.   OKAY.  DO YOU RECALL THAT YOU CALLED INTEL'S FIRST 5G

8   MODEM A MILESTONE FOR THE INDUSTRY?

9   A.   I SAY A LOT OF THINGS.  PROBABLY, YEAH.

10  Q.   OKAY.  DO YOU -- DO YOU, IN FACT, BELIEVE THAT INTEL'S

11  FIRST 5G MODEM, DID YOU, AS OF MARCH 2018, BELIEVE THAT INTEL'S

12  FIRST 5G MODEM IS A MILESTONE FOR THE INDUSTRY?

13  A.   YES.

14  Q.   OKAY.  AND AS OF THAT TIME INTEL PLANNED THE RELEASE OF

15  ITS FIRST 5G MODEM IN LATE 2019; RIGHT?

16  A.   YES.

17  Q.   AND AS OF THAT TIME INTEL HOPED TO SELL 5G MODEMS TO APPLE

18  FOR USE IN 2020 IPHONES, DIDN'T IT?

19  A.   YES.  ASSUMING WE MAKE IT, YES, UM-HUM.

20  Q.   OKAY.  NOW, LET ME TURN TO WHAT YOU WERE TALKING ABOUT THE

21  FALL OF 2012.

22  A.   UM-HUM.

23  Q.   ALL RIGHT.  SO IN THE FALL OF 2012, YOU UNDERSTOOD THAT

24  INTEL HAD AN OPPORTUNITY TO SUPPLY AN IPAD THAT WAS SCHEDULED

25  TO BE RELEASED IN THE EARLY PART OF 2014; RIGHT?

```
1        A.   AS A PIPE CLEANER, YES.

2        Q.   AND THAT WAS GOING TO BE THE XMM 7160 MODEM CHIPSET, INTEL

3    MODEM CHIPSET; RIGHT?

4        A.   NO.  THE XMM 7160 WAS -- HOW DO YOU SAY? -- THE PROOF

5    POINT, THE REVERSE PIPE CLEANER, MEANING OUR PIPE CLEANER.

6            WE WERE HOPING FOR THE 7260 TO SHIP.  BUT WE WERE GOING

7    BACK AND FORTH WITH APPLE.

8        Q.   AND YOU KNEW IN THE FALL OF 2012 THAT NO APPLE DECISION

9    HAD BEEN MADE YET, DIDN'T YOU?

10       A.   THAT'S NOT REALLY THE WAY THEY WORK, SO I DON'T KNOW WHAT

11   YOU'RE ASKING ME.

12           I CAN TELL YOU WHAT I KNEW.  WHAT I KNEW WAS --

13       Q.   I'M ASKING YOU -- WHAT I'M INTERESTED IN IS THIS VERY

14   SPECIFIC QUESTION:  YOU KNEW IN THE FALL OF 2012 THAT APPLE HAD

15   NOT MADE A DECISION TO USE AN INTEL MODEM IN AN IPAD?

16       A.   YEAH, BUT IT'S LIKE ASKING ME IF I'M GOING TO BE 6'4"

17   TOMORROW.  I ALREADY KNOW THE ANSWER TO THAT.  WE DON'T WORK

18   LIKE THAT IN A WAY WHERE THEY TELL US A DECISION HAS BEEN MADE

19   OR NOT MADE.

20           WHAT WE KNOW IS WE GET IN THE LAB, WE ENGAGE, THEY ARE

21   ACTIVE, AND THAT'S HOW WE INFER WE ARE IN.  NOT BECAUSE YOU GET

22   AN E-MAIL THAT SAYS YOU'RE IN.  USUALLY WHEN YOU GET AN E-MAIL

23   OR A PHONE CALL, IT'S THE OPPOSITE, YOU'RE OUT.

24       Q.   SO IN LATE JANUARY OR EARLY FEBRUARY OF 2013, DID APPLE

25   TELL YOU THAT INTEL WOULD NOT BE IN A 2014 IPAD?
```

EVANS CROSS BY MR. RYAN

1    A.   I RECEIVED THE PHONE CALL, I BELIEVE IT WAS EITHER LATE

2    DECEMBER OR EARLY JANUARY.  AND THEN THERE WAS A FLURRY OF

3    MEETINGS, ACTIVITIES FROM MANY DIFFERENT LEVELS, PEOPLE, SOME

4    INVOLVED, SOME LESS INVOLVED IN JANUARY, FEBRUARY, AND MARCH.

5    Q.   OKAY.  AND ISN'T IT THE CASE THAT THE REASON APPLE GAVE

6    WAS THAT ITS DECISION WAS PURELY BASED ON THEIR OWN INTERNAL

7    PRODUCT REALIGNMENT STRATEGY WHICH LEFT INTEL WITHOUT A PRODUCT

8    TO INTERSECT?

9    A.   THAT IS NOT CORRECT.  THE PEOPLE WHO WERE WORKING ON THE

10   DEVELOPMENT, THE PEOPLE WHO WERE BRIEFING THE MANAGEMENT OF

11   APPLE ALL WERE CONSISTENT IN WHAT THEY TOLD US, WHICH IS THAT

12   IT WASN'T AN EXECUTION ISSUE, IT WASN'T A FEATURE ISSUE.

13        IT WAS BECAUSE THEY HAD A NEW BUSINESS AGREEMENT WITH

14   QUALCOMM AND WE WOULD GET A CHANCE IN 2015.

15        THE ONLY TIME I HEARD SOMETHING SLIGHTLY DIFFERENT IN

16   WHERE THEY -- WHEN THERE WERE SOME OFFSHOOT EXECUTIVES THAT GOT

17   TOGETHER WHO WERE NOT DIRECTLY INVOLVED IN THE DAY-TO-DAY.

18        WHEN WE TALKED TO ALL OF THE PEOPLE, THE ISABELS, THE

19   AARONS, THE RUBENS, WE GOT A VERY CONSISTENT ANSWER.

20   Q.   LET ME ASK YOU, MS. EVANS, TO LOOK AT CX 1608.  IT'S

21   TOWARD THE FRONT OF THE BINDER?

22   A.   YES.  HANG ON.

23   Q.   ARE YOU WITH ME ON CX 1608?

24   A.   YEAH, UM-HUM.

25   Q.   IS THIS AN E-MAIL THAT KEVIN CONSTANTINE SENT TO YOU ON

EVANS CROSS BY MR. RYAN

```
1    FEBRUARY 2ND, 2013?

2    A.   YES.

3    Q.   AND MR. CONSTANTINE IS INTEL'S APPLE ACCOUNT

4    REPRESENTATIVE, AND WAS AT THAT TIME; RIGHT?

5    A.   FOR MODEMS, YES, UM-HUM.

6    Q.   ALL RIGHT.  AND DO YOU SEE IN THE SECOND PARAGRAPH, HE

7    WROTE TO YOU, "THE ICE DECISION TO NOT --

8            MR. CARSON:  YOUR HONOR, I WOULD ASK IF WE'RE GOING

9    TO READ FROM THE DOCUMENT, IT BE ADMITTED INTO EVIDENCE BEFORE

10   WE READ FROM THE DOCUMENT.

11           MR. RYAN:  I'M NOT SEEKING TO INTRODUCE THIS DOCUMENT

12   INTO EVIDENCE.  THIS IS AN FTC PROPOSED EXHIBIT.  I'M TRYING TO

13   USE THIS DOCUMENT TO REFRESH THE WITNESS'S RECOLLECTION ON THE

14   QUESTION I JUST ASKED, WHETHER SHE RECALLED THE BASIS FOR THE

15   APPLE DECISION.

16           MR. CARSON:  I DON'T BELIEVE THE WITNESS SAID SHE DID

17   NOT RECALL.

18           MR. RYAN:  THE WITNESS SAID SHE DID NOT RECALL THAT

19   APPLE'S DECISION WAS BASED PURELY ON ITS OWN INTERNAL PRODUCT

20   REALIGNMENT STRATEGY WHICH LEFT INTEL WITHOUT A PRODUCT TO

21   INTERSECT, AND I'M TRYING TO REFRESH THE WITNESS'S RECOLLECTION

22   ON THAT EXACT FACT.

23           THE COURT:  OKAY.  I'M SORRY.  JUST GIVE ME A MOMENT,

24   PLEASE.

25           (PAUSE IN PROCEEDINGS.)
```

1           MR. RYAN:  MAY I, YOUR HONOR?

2           THE COURT:  GO AHEAD, PLEASE.

3      (PAUSE IN PROCEEDINGS.)

4           THE COURT:  ALL RIGHT.  WELL, I MEAN, REFRESHING

5  RECOLLECTION -- IS THIS REFRESHING RECOLLECTION OR IS IT

6  IMPEACHMENT?

7           REFRESHING RECOLLECTION, YOU GIVE IT TO THEM, ASK THEM TO

8  READ IT, SEE IF IT REFRESHES THEIR RECOLLECTION AND THEN THEY

9  TESTIFY.  THAT'S NOT WHAT YOU'RE DOING.

10          IF IT'S JUST REFRESHING RECOLLECTION, THEN I AGREE IT

11 DOESN'T HAVE TO BE ADMITTED.  YOU CAN GIVE SOMEONE A BANANA, IF

12 IT REFRESHES THEIR RECOLLECTION, THEN THEY'LL TESTIFY ACCORDING

13 TO WHAT THEY RECALL.

14          MR. RYAN:  LET ME DO THAT, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

16 BY MR. RYAN:

17 Q.   HAVE YOU HAD A CHANCE, MS. EVANS, TO LOOK AT THE FIRST

18 SENTENCE OF THE SECOND PARAGRAPH OF CX 1608?

19 A.   MR. RYAN, YOU AND I HAVE DISCUSSED THAT WE HAVE TO DO

20 CONTEXT.  IF I'M GOING TO READ THE FIRST SENTENCE, I'M GOING TO

21 READ THE WHOLE THING.

22          FIRST OF ALL, IT'S AN ACCOUNT MANAGER, THIS IS AN OFFICIAL

23 INTEL E-MAIL.  WE DON'T DO ALL THE LITTLE E-MAILS.  WE KNOW HOW

24 TO WRITE AN E-MAIL.

25          THE ICE, ICE STANDS FOR APPLE, THE ICE DECISION TO NOT GO

1    FORWARD WITH US, BECAUSE I TOLD YOU, WHEN YOU ACTUALLY GET A

2    DECISION WITH THEM, IT'S BAD BECAUSE THAT MEANS YOU'RE OUT.

3    THE ICE DECISION IS NOT -- IS TO NOT GO FORWARD WITH US IN A

4    2014 PROJECT IS PURELY BASED ON THEIR OWN INTERNAL PRODUCT

5    REALIGNMENT STRATEGY, I.E., THE AGREEMENT WITH QUALCOMM, WHICH

6    UNFORTUNATELY LEFT US WITHOUT A PRODUCT TO INTERSECT.

7        LET ME BE CLEAR THAT ICE, I.E., APPLE, ACKNOWLEDGES THAT

8    OUR EXECUTION WAS EXEMPLARY.  FURTHERMORE, THEY ARE IMPRESSED

9    WITH THE WAY OUR ROADMAP DEVELOPED OVER THE COURSE OF OUR

10   ENGAGEMENT AND EXPECT US TO CONTINUE WITH OUR EXECUTION.  THOSE

11   OF YOU IN THE CUSTOMER FACING TEAM SHOULD EXPECT THAT ICE WILL

12   HAVE ANOTHER MEETING WITH US TO TIE OFF AND THANK US FOR OUR

13   EFFORT.  THIS HAS LEFT THEM DISAPPOINTED AS THEY WERE LOOKING

14   FORWARD TO WORKING WITH US AGAIN.

15   Q.   MS. EVANS, DOES CX 1608 REFRESH YOUR RECOLLECTION THAT THE

16   REASON APPLE GAVE FOR ITS DECISION WAS PURELY BASED ON THEIR

17   OWN INTERNAL PRODUCT REALIGNMENT STRATEGY, WHICH UNFORTUNATELY

18   LEFT INTEL WITHOUT A PRODUCT TO INTERSECT?

19   A.   COUNSELOR, CX 89 REFRESHES MY RECOLLECTION THAT MY ACCOUNT

20   MANAGER SENT US AN E-MAIL THAT SUMMARIZED THAT, ALONG WITH THE

21   STATEMENT YOU MADE IS THE FIRST SENTENCE, CONSISTENT WITH WHAT

22   I'VE TOLD YOU.

23   Q.   ALL RIGHT.  AND DID YOU LEARN AT THAT TIME, AROUND JANUARY

24   OF 2013, THAT THERE WAS A CHANGE IN APPLE PRODUCT RELEASE

25   PLANS?

1    A.   YES.

2    Q.   ALL RIGHT.  DO YOU RECALL -- WELL, LET ME ASK YOU THIS:

3    DO YOU KNOW, ONE WAY OR THE OTHER, WHETHER APPLE, IN FACT,

4    CHANGED ITS PRODUCT RELEASE SCHEDULE AT THIS TIME?

5    A.   I DON'T KNOW.  I MEAN, I -- IT WAS -- I DON'T RECALL.  IT

6    WAS GOING BACK AND FORTH.

7    Q.   YOU DON'T KNOW?

8    A.   ALL I KNEW WAS THAT, ONCE AGAIN, I HAD LOST TO QUALCOMM.

9    Q.   ALL RIGHT.  NOW, LET ME ASK YOU ABOUT SOMETHING CALLED

10   VOICE-OVER LTE.  IS THAT ALSO KNOWN AS VOLTE?

11   A.   YES.  HERE OR --

12   Q.   NO.  I'VE MOVED OFF THAT EXHIBIT.

13   A.   OKAY.

14   Q.   IS VOICE OVER LTE, OR VOLTE, A TECHNOLOGY THAT ALLOWS LTE

15   TO CARRY VOICE COMMUNICATIONS?

16   A.   YES.  IT'S A WONDERFUL TECHNOLOGY THAT IS SUPPOSED TO DO

17   THAT AND WE'VE BEEN WAITING AND PLANNING FOREVER TO HAVE IT

18   TAKE OVER THE WORLD, YES.

19   Q.   AND VOLTE WAS A MANDATORY REQUIREMENT FROM APPLE FOR THE

20   2014 IPHONE, WASN'T IT?

21   A.   I DON'T KNOW.  I MEAN -- I DON'T RECALL THAT.  IT'S --

22   IT'S A FEATURE THAT WENT IN AND OUT BECAUSE IN THE INDUSTRY IT

23   WAS -- SO THAT'S WHY I CAN'T TELL YOU.  SOMETIMES IT WAS

24   REQUIRED, SOMETIMES IT WASN'T.

25   Q.   ALL RIGHT.  WELL, LET ME ASK YOU TO LOOK, PLEASE, AT YOUR

1    DEPOSITION TRANSCRIPT.

2    A.    UM-HUM.

3    Q.    THIS IS TOWARD THE BACK OF THE BINDER IN THE TAB THAT SAYS

4    3-14-18 DEPOSITION TRANSCRIPT.

5    A.    OH.

6    Q.    MARCH 14TH OF 2018.  AND THIS IS ON PAGE --

7    A.    YEAH, MARCH 14, YEAH, UM-HUM.

8    Q.    THIS IS ON PAGE 215.  IT'S NEAR THE END OF THAT DAY'S

9    TRANSCRIPT.

10   A.    215, YES.

11   Q.    YES.

12   A.    YES, I'M THERE, UM-HUM.

13   Q.    AND DO YOU SEE THAT BEGINNING AT LINE 13 ON PAGE 215, I

14   ASKED YOU, "AND WAS VOICE-OVER LTE A MANDATORY REQUIREMENT FROM

15   APPLE FOR THE 2014 AND 2015 IPHONES"?

16        AND YOU ANSWERED, "YES, IT WAS."  AND YOUR ANSWER THEN

17   CONTINUES AS SHOWN HERE ON LINE 16 TO 22.

18   A.    OKAY.

19   Q.    DOES THIS REFRESH YOUR RECOLLECTION THAT VOICE-OVER LTE

20   WAS A MANDATORY REQUIREMENT FROM APPLE FOR THE 2014 IPHONE?

21   A.    YES.  SO, AGAIN, IF YOU'RE GOING TO DO, CAN YOU NOT JUST

22   SAY ONE SENTENCE BECAUSE I QUALIFIED IT, THE SAME WAY I

23   ATTEMPTED TO QUALIFY.

24        "YES, IT WAS, BUT NOT -- SO NOT DO YOU HAVE -- NOT ONLY DO

25   YOU HAVE TO WORRY ABOUT -- IN OUR INDUSTRY, ABOUT THE FEATURE,

1    BUT YOU ALSO HAVE TO WORRY ABOUT THE KPI, KEY PERFORMANCE

2    INDICATION, INDICATOR OF THE FEATURE.  SO, YES, IT WAS

3    MANDATORY, BUT IT WAS VERY MUCH A CONFIGURATION AND CAPABILITY

4    AS OPPOSED TO A LARGE SCALE FEATURE."

5    Q.   ALL RIGHT.  THANK YOU.

6         NOW, YOU UNDERSTOOD, DIDN'T YOU, FROM APPLE THAT CARRIER

7    AGGREGATION WOULD BE VERY IMPORTANT FOR THE 2014 TIMEFRAME?

8    A.   YES.

9    Q.   AND INTEL'S XMM 7160 MODEM CHIP DID NOT HAVE CARRIER

10   AGGREGATION, DID IT?

11   A.   NO.  BUT AS I TESTIFIED EARLIER, WE ALWAYS LOOKED AT 7160

12   AS OUR PIPE CLEANER SIDE, AND 7260 AS THE ONE WE WANTED TO LAND

13   ON, AND THAT ONE HAD CARRIER AGGREGATION.

14   Q.   QUALCOMM AT THIS TIME WAS AHEAD OF INTEL IN THE

15   DEVELOPMENT OF CARRIER AGGREGATION, WASN'T IT?

16   A.   YES.

17   Q.   NOW, IN 2014, A WIRELESS STANDARD CALLED TD-SCDMA WAS

18   ESSENTIAL TO SHIP IN CHINA, WASN'T IT?

19   A.   A CHINESE WIRELESS STANDARD, YES, UM-HUM.

20   Q.   OKAY.  AND THAT WAS ESSENTIAL IN 2014 TO SHIP HANDSETS IN

21   CHINA, WASN'T IT?

22   A.   YES, UM-HUM.

23   Q.   AND INTEL'S XMM 7160 MODEM CHIPSET DID NOT HAVE TD-SCDMA

24   CAPABILITY MONOLITHICALLY INTEGRATED SO THAT IT WAS ON THE SAME

25   CHIP AS THE LTE MODEM; ISN'T THAT RIGHT?

1    A.   THAT IS CORRECT.

2    Q.   OKAY.

3    A.   I THINK WE -- YES, SAME ANSWER AS -- I SEE THE PATTERN

4    HERE, VOLTE, CARRIER AGGREGATION, THOSE WERE ALL FEATURES THAT

5    WERE BEING DISCUSSED.  QUALCOMM HAD THEM.  NO QUESTION ABOUT

6    IT.

7         OUR PIPE CLEANER 7160 DID NOT, BUT 7260 DID.

8    Q.   OKAY.  BUT INTEL DIDN'T HAVE ANY OF THOSE THREE FEATURES

9    FOR THE XMM 7160, RIGHT?

10   A.   NO, FOR THE 7260, WHICH IT HOPED TO BE THE DEVICE THAT

11   SHIPPED, YES.

12   Q.   OKAY.  NOW, LET ME ASK YOU SOME QUESTIONS ABOUT INTEL'S

13   MARGINS, AND I'M GOING TO BE CAREFUL IN THE QUESTIONS I ASK --

14   A.   THANK YOU.

15   Q.   -- OBVIOUSLY GIVEN INTEL'S SEALING MOTION HERE, BUT I

16   THINK I'LL HAVE NO TROUBLE ASKING THESE QUESTIONS.

17   A.   UM-HUM.

18   Q.   ON DIRECT YOU GAVE TESTIMONY ABOUT INTEL'S LOW PRODUCT

19   MARGIN ON THE SALE OF MODEM CHIPSETS TO APPLE; RIGHT?

20   A.   YES, UM-HUM.

21   Q.   AND PRODUCT MARGIN FOR AN INTEL BASEBAND CHIPSET IS THE

22   AVERAGE SELLING PRICE MINUS THE PRODUCT COST OR MANUFACTURING

23   COST; RIGHT?

24   A.   ACTUALLY, I WANT TO CORRECT THE RECORD.  I GAVE TESTIMONY

25   ON GROSS MARGIN.

1      Q.   OKAY.

2      A.   NOT ON PRODUCT MARGIN.

3      Q.   OKAY.

4      A.   BUT IF YOU WANT TO TALK ABOUT PRODUCT MARGIN, THAT'S OKAY,

5      TOO.

6      Q.   OKAY.  GROSS MARGIN FOR AN INTEL BASEBAND CHIPSET IS THE

7      AVERAGE SELLING PRICE MINUS THE MANUFACTURING OR PRODUCTION

8      COST; RIGHT?

9      A.   YES.

10     Q.   ALL RIGHT.

11     A.   THE MANUFACTURING PART THREW ME BECAUSE WE'RE A

12     MANUFACTURING COMPANY.  SO WHY DON'T I DEFINE.  GROSS MARGIN IS

13     ASP, AVERAGE SELLING PRICE, MINUS THE, THE PRODUCT COST ITSELF.

14         WHEREAS PRODUCT MARGIN, OP MARGIN IS THE AVERAGE SELLING

15     PRICE, MINUS THE ACTUAL PHYSICAL PRODUCT COST, MINUS ALSO THE

16     DEVELOPMENT COST.

17              MR. RYAN:  OKAY.  THANK YOU.

18              THE COURT:  I'M SORRY TO INTERRUPT.  IT'S 4:36.

19     LET'S GO AHEAD AND END FOR THE DAY.  YOU WILL HAVE TO COME BACK

20     ON FRIDAY AT 9:00 A.M. TO CONTINUE THIS EXAMINATION.

21              THE WITNESS:  YES, YOUR HONOR.

22              THE COURT:  SO YOU'RE DONE FOR THE DAY.

23              THE WITNESS:  THANK YOU.

24              THE COURT:  YOU MAY STEP DOWN.

25              THE WITNESS:  THANK YOU.

```
 1              THE COURT:  OKAY.  ARE THERE ANY ISSUES FOR TODAY?

 2         OH, YOU'RE FREE TO STEP DOWN.

 3         THIS IS JUST HOUSEKEEPING WITH THE PARTIES.

 4              THE WITNESS:  THANK YOU.

 5              THE COURT:  WE'LL RESUME ON FRIDAY AT 9:00.  NO TRIAL

 6    TOMORROW.

 7         I'M HAVING A FULL CRIMINAL CALENDAR IN HERE TOMORROW, SO I

 8    RECOMMEND THAT YOU TAKE EVERYTHING OUT OF THE COURT --

 9         OH, YOU'RE FREE TO LEAVE.  YOU'RE FREE TO LEAVE.

10              THE WITNESS:  THANK YOU.

11              THE COURT:  -- THAT YOU TAKE EVERYTHING OUT.

12         AND -- SO A JOINT EXHIBIT LIST AND THE NEXT DAY'S LIST OF

13    WITNESSES, WHEN WILL YOU FILE THAT?  AND DO YOU KNOW OF ANY

14    MORE THIRD PARTIES THAT WILL BE FILING SEALING MOTIONS THIS

15    WEEK?

16              MS. MILICI:  I'M NOT AWARE OF ANY OTHER THIRD PARTIES

17    THAT WOULD BE FILING SEALING MOTIONS THIS WEEK, NO.

18              THE COURT:  OKAY.  AND FOR ANY OF THE PARTIES WHOM

19    THEIR MOTION FOR SEALING WAS DENIED WITHOUT PREJUDICE AND THEY

20    WERE ASKED TO REFILE, IF THEY DON'T FILE, THEN I'M ORDERING

21    THEM TO FILE IT UNREDACTED.  AND IF THEY DON'T DO IT, THEN I'M

22    GOING TO HOLD THEM IN CONTEMPT.

23         SO THERE ARE SEVERAL PARTIES THAT I'VE ASKED TO REFILE

24    THEIR SEALING MOTIONS AND THEY HAVEN'T.  SO I'VE JUST FILED

25    ORDERS ORDERING THEM TO FILE IT UNREDACTED AND IF THEY DON'T, I
```

```
 1       WILL HOLD THEM IN CONTEMPT.  SO YOU MAY WANT TO CONVEY THAT TO
 2       SOME OF THE PARTIES WHO HAVEN'T --
 3              MS. MILICI:  UNDERSTOOD, YOUR HONOR.
 4              THE COURT:  -- RENEWED THEIR MOTIONS TO SEAL.
 5         OKAY.  WHAT ELSE?
 6         SO YOU'RE GOING TO PUT ON YOUR JOINT EXHIBIT LIST THE
 7       PAGES TO BE SEALED.  I THINK THAT WOULD BE HELPFUL --
 8              MS. MILICI:  YES, YOUR HONOR.
 9              THE COURT:  -- GOING FORWARD.
10              MR. RYAN:  YES, YOUR HONOR.
11              THE COURT:  AND I DENIED, WITH ONE EXCEPTION,
12       QUALCOMM'S MOTION TO SEAL ITS EXHIBIT LIST.  SO I'M ASSUMING
13       NOW YOU CAN -- I MEAN, THE PARTIES HAVE UNSEALED A TON.  JUST
14       GOING THROUGH A LOT OF THE THINGS YOU'VE TRIED TO SEAL, WE'VE
15       HAD OPEN COURT TESTIMONY ABOUT IT.
16         SO I THINK YOU CAN START CREATING A JOINT EXHIBIT LIST
17       THAT ACTUALLY DESCRIBES THE EXHIBITS NOW BECAUSE I DON'T THINK
18       THERE SHOULD BE ANY UNNECESSARY SEALING MOTIONS BECAUSE MOST
19       THINGS HAVE BEEN UNSEALED.
20         WHAT ELSE?  ANYTHING ELSE?
21         WHEN ARE YOU GOING TO FILE THAT, AS WELL AS THE LIST OF
22       WITNESSES FOR FRIDAY?
23              MS. MILICI:  THE -- THE LIST OF WITNESSES FOR FRIDAY,
24       I THINK WE'RE SCHEDULED TO DO THAT ON WEDNESDAY.  SO TOMORROW.
25              THE COURT:  OKAY.  OKAY.
```

1          MS. MILICI:  AND THE EXHIBIT LIST, I'M NOT SURE HOW

2     LONG THAT WOULD TAKE.  BUT IT SHOULDN'T TAKE VERY LONG.

3          THE COURT:  IT DOESN'T MATTER TO ME WHETHER IT'S

4     WEDNESDAY OR THURSDAY.  WHAT WOULD YOU PREFER?

5          MS. MILICI:  LET'S SAY THURSDAY.

6          THE COURT:  THAT'S FINE.  BUT LET'S DO IT AT -- THE

7     THING THAT IS HELPFUL IS KNOWING WHICH WITNESSES ARE TESTIFYING

8     IS THAT WE PRIORITIZE THOSE SEALING MOTIONS FIRST, SO THAT

9     WOULD BE HELPFUL TO KNOW.  AND THE THIRD PARTIES ARE ALL JUST

10    FILING THE DAY BEFORE, SO IT'S PUTTING A LOT OF PRESSURE ON US

11    TO GET THIS DONE WITHIN 12 HOURS, WHICH IS NOT ALWAYS EASY

12    DEPENDING ON THE VOLUME OF THE DOCUMENTS THEY'RE ASKING US TO

13    REVIEW.

14         MS. MILICI:  UNDERSTOOD, YOUR HONOR.  I DO THINK THAT

15    THE SEALING MOTIONS HAVE -- I BELIEVE THAT THEY'VE ALL BEEN

16    FILED.

17         THE COURT:  OKAY.  SO THERE'S NO OTHER THIRD PARTIES

18    YOU THINK THAT --

19         MR. CARSON:  I MEAN, NONE THAT WE'RE AWARE OF, YOUR

20    HONOR.

21         THE COURT:  OKAY.

22         MR. CARSON:  IT'S POSSIBLE AS NOTIFICATIONS ARE

23    COMING THROUGH, YOU KNOW, WE'RE GIVING THIRD PARTIES

24    NOTIFICATIONS AS WE HAVE THEM AND RECEIVE THEM AS SOON AS

25    POSSIBLE.  BUT IT'S POSSIBLE MORE WILL COME IN.  WE HOPE NOT.

```
1                   THE COURT:  WELL, YOU'RE GIVING THEM 48 HOURS NOTICE;

2       RIGHT?

3                   MR. CARSON:  MORE THAN THAT IN MOST CASES, YOUR

4       HONOR.

5                   MS. MILICI:  MORE THAN THAT.

6                   THE COURT:  OKAY.  WELL, WHAT TIME ARE YOU GOING TO

7       FILE THE JOINT -- I LIKE DEADLINES.  SO WHAT TIME ARE YOU GOING

8       TO FILE THE EXHIBIT LIST AND WHAT TIME ARE YOU GOING TO FILE

9       THE WITNESS LIST?  GIVE ME A TIME FOR EACH DAY, PLEASE.

10                  MS. MILICI:  FOR THE WITNESS LIST, WE CAN FILE AT

11      NOON ON WEDNESDAY.

12                  THE COURT:  WHEN ARE YOU DOING YOUR EXCHANGE?  WHAT

13      TIME ARE YOU DOING YOUR EXCHANGE WITH QUALCOMM.  I THINK THAT'S

14      WHAT WE HAD AGREED WAS THE TIME.

15                  MS. MILICI:  I THINK WE'RE DOING IT AT, WHAT, 6:00

16      O'CLOCK TONIGHT?

17                  THE COURT:  6:00 IS FINE.

18                  MS. MILICI:  WE CAN FILE IT WITH YOUR HONOR TONIGHT.

19                  THE COURT:  ARE YOU DOING THE EXCHANGE TODAY?

20                  MS. MILICI:  YES.  SO WE CAN FILE IT TODAY IF YOU

21      WOULD LIKE.

22                  THE COURT:  OH, YOU'RE DOING THE EXCHANGE FOR FRIDAY

23      TODAY?

24                  MS. MILICI:  YES.

25                  THE COURT:  OKAY.  SO THEN WHEN WILL YOU FILE THE
```

```
 1        HIGH PRIORITY OBJECTIONS FOR FRIDAY.
 2                MS. MILICI:  SO WE'VE BEEN DOING IS EXCHANGING A LIST
 3        AT 6:00 P.M. SO WE CAN IDENTIFY THE EVIDENCE THAT WE EXCHANGE
 4        THE NEXT MORNING FOR THE HIGH PRIORITY OBJECTIONS.
 5                THE COURT:  OKAY.
 6                MS. MILICI:  BECAUSE THEY DON'T KNOW WHO TO IDENTIFY
 7        EVIDENCE FOR UNLESS WE'VE TOLD THEM WHO THE WITNESSES ARE.  SO
 8        WE GIVE THEM THE WITNESSES AT 6:00 P.M., WHICH WOULD BE
 9        6:00 P.M. TODAY, AND THEN WE EXCHANGE EXHIBITS THE NEXT
10        MORNING.
11                THE COURT:  OKAY.  SO YOU'RE GOING TO FILE THEM
12        THURSDAY MORNING, THEN?
13                MS. MILICI:  YES.
14                THE COURT:  OKAY.  I DIDN'T HAVE ANYTHING ELSE.  DID
15        YOU ALL HAVE ANYTHING ELSE?
16                MR. VAN NEST:  I HAD ONE THING.
17                THE COURT:  DO YOU WANT YOUR TIME?
18                MR. VAN NEST:  I HAD ONE ITEM ALSO.
19                THE COURT:  OKAY.  WHAT'S THAT?
20                MR. VAN NEST:  AND I WASN'T QUICK ENOUGH TO MENTION
21        IT.  BUT COULD WE, THROUGH COUNSEL, ADMONISH THE WITNESS THAT
22        SHE SHOULDN'T BE SPEAKING WITH HER LAWYERS OR THE FTC ABOUT THE
23        CASE?
24                THE COURT:  WE HAVEN'T ADMONISHED ANY OTHER
25        WITNESSES.
```

```
 1            MR. VAN NEST:  BUT SHE'S HANGING OVER TWO DAYS.

 2            THE COURT:  HAVE ANY OF THE WITNESSES TALKED TO THEIR

 3    LAWYERS DURING LUNCH BREAK?  DID MR. AMON TALK TO MS. SESSIONS?

 4            MR. VAN NEST:  OF COURSE NOT.  THE ONLY REASON I

 5    RAISE IT, YOUR HONOR, IS THAT AS YOU KNOW, INTEL IS IN VARIOUS

 6    COMMON INTERESTS AGREEMENTS AND THIS IS GOING TO BE A TWO DAY

 7    LAPSE.  I'M NOT -- IT'S NOT AS THOUGH IT'S JUST OVERNIGHT, BUT

 8    WE'VE GOT A COUPLE OF DAYS HERE, AND I THINK COUNSEL SHOULD BE

 9    ADMONISHED TO JUST LET HER KNOW THAT.

10            THE COURT:  ALL RIGHT.  WHAT'S YOUR POSITION?  I

11    HAVEN'T DONE THAT WITH ANYONE ELSE.  WHAT'S YOUR VIEW ON THAT?

12    I MEAN, I PROBABLY SHOULD HAVE DONE THAT AT THE VERY BEGINNING

13    WITH EVERY SINGLE WITNESS?

14            MS. MILICI:  OF ADMONISHING THE WITNESS?  WE DON'T

15    HAVE A PROBLEM WITH THE WITNESS BEING TOLD THAT.  I THINK WE

16    ALL UNDERSTAND THAT'S THE RULES.

17            MR. VAN NEST:  THANK YOU.

18            THE COURT:  ALL RIGHT.  GO AHEAD AND DO THAT.  AND

19    CAN EVERYONE AFFIRM FOR ME UNDER OATH THAT THEY HAVEN'T TALKED

20    TO ANY OF THEIR WITNESSES DURING A LUNCH BREAK, DURING A 20

21    MINUTE BREAK, DURING A 10 MINUTE BREAK?

22            MS. MILICI:  WE ABSOLUTELY CAN.

23            MR. VAN NEST:  WE CAN AS WELL.

24            THE COURT:  ALL RIGHT.  SO LET ME GIVE YOU YOUR

25    TIMES.
```

636

```
1              MS. MILICI:  AND, YOUR HONOR, JUST TO CLARIFY, I

2     UNDERSTAND FROM MY TEAM THAT THERE WILL BE A SEALING MOTION

3     FROM ERICSSON, BUT WE WEREN'T PLANNING TO PLAY THAT VIDEO ON

4     FRIDAY.  THERE'S A VIDEO THAT WE WILL PLAY NEXT WEEK THAT WE

5     WOULD EXPECT A SEALING MOTION FOR, BUT IT'S NOTHING THAT HAS TO

6     BE DECIDED BEFORE FRIDAY.

7              THE COURT:  WELL, IT'S NOT BETTER FOR US TO DO IT ON

8     SUNDAY.  SO, I MEAN, IF THEY DO IT THIS WEEK, IT'S BETTER FOR

9     US TO DO IT TOMORROW AND THURSDAY IF IT'S POSSIBLE.  SO --

10             MS. MILICI:  UNDERSTOOD.

11             THE COURT:  YEAH.  DOING THEM ALL ON SUNDAY NIGHT AS

12    WE DID LAST WEEK IS NOT BETTER FOR US.

13             MS. MILICI:  UNDERSTOOD.

14             THE COURT:  SO PLEASE DON'T --

15             MS. MILICI:  OKAY.

16             THE COURT:  OKAY.  SO HERE ARE THE TIMES.

17         FTC USED 3 HOURS AND 6 MINUTES; AND QUALCOMM USED 2 HOURS

18    AND 38 MINUTES.

19         OKAY.  ALL RIGHT.  ANYTHING ELSE FOR TODAY?

20             MS. MILICI:  NOT FROM THE FTC.

21             MR. VAN NEST:  NOTHING FROM QUALCOMM, YOUR HONOR.

22             THE COURT:  ALL RIGHT.  THANK YOU ALL VERY MUCH.

23    WE'LL SEE YOU ON FRIDAY.  THANK YOU.

24         (THE EVENING RECESS WAS TAKEN AT 4:44 P.M.)

25
```

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18         _____

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  JANUARY 8, 2019

22

23

24

25