<pre>
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                         SAN JOSE DIVISION

 4

 5
     FEDERAL TRADE COMMISSION,      )  C-17-00220 LHK
 6                                  )
                       PLAINTIFF,   )  SAN JOSE, CALIFORNIA
 7                                  )
                VS.                 )  JANUARY 11, 2019
 8                                  )
     QUALCOMM INCORPORATED, A       )  VOLUME 4
 9   DELAWARE CORPORATION,          )
                                    )  PAGES 637-857
10                     DEFENDANT.   )
     _____)  SEALED PAGES 739 - 740
11

12                     TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE LUCY H. KOH
13                  UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    FEDERAL TRADE COMMISSION
                           BY:  JENNIFER MILICI
16                              DANIEL J. MATHESON
                                WESLEY G. CARSON
17                              KENT COX
                                NATHANIEL M. HOPKIN
18                              PHILIP J. KEHL
                                MIKA IKEDA
19                              JOSEPH BAKER
                           600 PENNSYLVANIA AVENUE, NW
20                         WASHINGTON, D.C.  20580

21                 APPEARANCES CONTINUED ON NEXT PAGE

22   OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR, RMR
                                  CERTIFICATE NUMBER 8074
24
               PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                 TRANSCRIPT PRODUCED WITH COMPUTER
</pre>

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                              BY:  ROBERT A. VAN NEST
5                                  JUSTINA K. SESSIONS
                                   EUGENE M. PAIGE
6                                  CHRISTINA BLAIS
                                   MATAN SHACHAM
7                                  CODY HARRIS
                                   KRISTIN HUCEK
8                              633 BATTERY STREET
                              SAN FRANCISCO, CALIFORNIA  94111
9

10                             CRAVATH, SWAINE & MOORE
                              BY:  GARY A. BORNSTEIN
11                                 MICHAEL BRENT BYARS
                                   YONATAN EVEN
12                                 JORDAN D. PETERSON
                                   MING-TOY TAYLOR
13                                 DEREK SUTTON
                                   ANDREW HUYNH
14                                 ANTONY RYAN
                              825 EIGHTH AVENUE
15                             NEW YORK, NEW YORK  10019

16

17     ALSO PRESENT:          MARK SNYDER
                              JEFF DAHM
18                             KEN KOTARSKI

19

20

21

22

23

24

25

1

2                           INDEX OF WITNESSES

3       PLAINTIFF'S

4       **AICHATOU (AICHA) EVANS**
                CROSS-EXAM BY MR. RYAN (RES.)          P. 654
5               REDIRECT EXAM BY MR. CARSON            P. 662
                RECROSS-EXAM BY MR. RYAN               P. 664
6               FURTHER REDIRECT BY MR. CARSON         P. 665

7       **MARK DAVIS**
                VIDEOTAPED DEPOSITION                  P. 667
8

9       **TONY BLEVINS**
                DIRECT EXAM BY MR. BAKER               P. 669
10              CROSS-EXAM BY MS. SESSIONS             P. 715
                REDIRECT EXAM BY MR. BAKER             P. 733
11

12      **INJUNG LEE**
                VIDEOTAPED DEPOSITION                  P. 737
13

14      **TODD MADDEROM**
                VIDEOTAPED DEPOSITION                  P. 746
15

16      **STEVE MOLLENKOPF**
                DIRECT EXAM BY MS. MILICI              P. 755
17              CROSS-EXAM BY MR. VAN NEST             P. 802
                REDIRECT EXAM BY MS. MILICI            P. 842
18              RECROSS-EXAM BY MR. VAN NEST           P. 845

19

20

21

22

23

24

25

INDEX OF EXHIBITS

                                    MARKED      ADMITTED

PLAINTIFF'S

8295, 1770, 1771, 6552                          677
      1774 & 1785
0507                                            679
8261                                            686
0531                                            694
0853                                            699
0578                                            701
0856                                            702
0597                                            706
0534                                            710
2564A, 2568A, 2639A, 2641A,                     737
      2642A & 2643A
2018, 2060, 2065, 2123,                         746
      2124, 2125 & 2168
8287                                            756
5376                                            757
8190                                            758
8191                                            762
8198                                            765
8197                                            766
5913                                            767
6439                                            768
7559                                            770
6381                                            773
5348                                            774
5357                                            776
5360                                            777
5425                                            784
7668                                            785
7592                                            786
5378                                            787
5381                                            789
5739                                            791
7910                                            792
5389                                            795
5391                                            796
5527                                            799
7257                                            800
7824                                            811

641

```
 1                      INDEX OF EXHIBITS

 2                                    MARKED      ADMITTED

 3        DEFENDANT'S

 4        95                                      655
          9097                                    723
 5

 6        JOINT

 7        0007                                    667
          0032                                    676
 8        0040                                    681
          0052                                    681
 9        0057                                    682
          0078                                    683
10        0074                                    690
          0024                                    737
11        0055                                    779
          0086                                    870
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    SAN JOSE, CALIFORNIA                    JANUARY 11, 2019

 2                    P R O C E E D I N G S

 3        (COURT CONVENED AT 9:05 A.M.)

 4            THE COURT:  GOOD MORNING, WELCOME.

 5            MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

 6            THE COURT:  PLEASE TAKE A SEAT.  SO ON QUALCOMM'S

 7    ADMINISTRATIVE MOTION TO RECONCILE OVERLAPPING INTER PARTES

 8    COURT ORDERS, I HAD ASKED THE PARTIES TO FILE RESPONSES TO

 9    THIRD PARTY SEALING REQUESTS THAT'S WEEK.  I HAVE NOT GOTTEN A

10    SINGLE RESPONSE FROM EITHER PARTY TO ANY THIRD PARTY SEALING

11    REQUEST.  THAT WOULD TAKE CARE OF THIS ISSUE.

12        WHY HAVEN'T I GOTTEN ANY RESPONSES FROM EITHER PARTY AS TO

13    ANY THIRD PARTY SEALING REQUEST?  I SPECIFICALLY MADE THAT

14    REQUEST ON THE RECORD.

15            MR. MATHESON:  YOUR HONOR, IT'S -- DAN MATHESON FOR

16    THE FTC.

17        MY UNDERSTANDING IS WE HAVE EITHER OPPOSED THEM OR HAD THE

18    THIRD PARTIES STATE OUR POSITION IN THE FILING.

19            THE COURT:  NOT IN ALL FILINGS.  BUT GO AHEAD.  LET

20    ME HEAR FROM QUALCOMM.  MOST OF THIS IS YOUR -- A LOT OF YOUR

21    LICENSES WITH THESE THIRD PARTIES.  I HAVEN'T GOTTEN QUALCOMM'S

22    RESPONSES TO THESE REQUESTS.

23            MR. VAN NEST:  WHAT, WHAT I THOUGHT OUR PROTOCOL WAS

24    IF WE DIDN'T HAVE AN OBJECTION, WE WOULDN'T STATE IT AND FILE

25    MORE PAPERS.
```

```
 1          ON THE MOTION WE FILED LAST NIGHT, WE'VE WORKED THAT OUT.
 2    WE'VE REACHED OUT TO APPLE, AND WE'VE ALL AGREED WE'LL FILE THE
 3    EXHIBITS ON THE PUBLIC RECORD WITH EVERYTHING SEALED THAT YOUR
 4    HONOR ORDERED SEALED.
 5          THERE WAS A LITTLE CONFUSION BECAUSE THERE WERE TWO
 6    MOTIONS, ONE FROM QUALCOMM, ONE FROM APPLE.  YOU GRANTED THEM
 7    BOTH AND ADVISED US TO FILE WHAT HAD BEEN ALLOWED IN EACH OF
 8    OUR OWN SEALINGS.  WE'VE REACHED OUT TO APPLE TO RESOLVE IT,
 9    AND WE'LL CONTINUE TO DO THAT SO YOUR HONOR WON'T HAVE TO
10    WORRY.
11          THE COURT:  NO.  BUT WHY DON'T YOU RESPOND TO THESE
12    THIRD PARTY SEALING REQUESTS?  THAT'S WHAT I ASKED FOR.
13          MR. VAN NEST:  WE UNDERSTOOD THAT -- WHAT I
14    UNDERSTOOD WAS IF WE HAD AN OBJECTION TO IT, WE WOULD OPPOSE
15    IT, BUT OTHERWISE --
16          THE COURT:  NO.  BUT IF YOU'RE ASKING FOR DIFFERENT
17    INFORMATION OF THE SAME DOCUMENT TO BE SEALED, THAT WOULD BE
18    HELPFUL TO KNOW, RIGHT?
19          MR. VAN NEST:  TO KNOW WHETHER WE OPPOSE --
20          THE COURT:  YOU'RE SAYING TWO PARTIES, QUALCOMM AND
21    APPLE, FILED SEALING REQUESTS AS TO THE SAME DOCUMENT, BUT HAD
22    DIFFERENT PORTIONS SEALED.
23          MR. VAN NEST:  RIGHT.  RIGHT.
24          THE COURT:  SO IF YOU HAD GIVEN ME YOUR RESPONSE
25    SAYING, WELL, I WANT, IN ADDITION, X, Y, Z ALSO SEALED, THEN WE
```

1      WOULDN'T HAVE HAD THIS PROBLEM.

2              MR. VAN NEST:  OKAY.  OKAY.

3              THE COURT:  I HAVE BEEN ASKING FOR THE PARTIES TO BE

4      MORE ACTIVE IN THESE THIRD PARTY SEALING REQUESTS BECAUSE IT

5      DOESN'T MAKE SENSE FOR ME TO DO THE SAME DOCUMENTS WITH THE

6      THIRD PARTY AND THEN HAVE QUALCOMM, TWO DAYS LATER, FILE A

7      SEALING REQUEST FOR THE SAME DOCUMENT.

8              MR. VAN NEST:  I GOT IT.

9              THE COURT:  I AGREE, IT'S GOING TO CAUSE SOME

10     CONFUSION WHAT SHOULD BE SEALED OR NOT.

11             MR. VAN NEST:  I GOT IT.

12             THE COURT:  SO IF THERE COULD BE SOME COORDINATION SO

13     I COULD DO ONE ORDER THAT TAKES CARE OF YOUR CONCERNS, TAKES

14     CARE OF A THIRD PARTIES CONCERNS --

15             MR. VAN NEST:  I UNDERSTAND, WE'LL DO IT.

16             THE COURT:  -- YOU KNOW, TO TAKE CARE OF HAVING

17     SOMETHING UNSEALED THAT YOU DON'T WANT AND THAT YOU HAVE A

18     COMPELLING REASON TO SEAL.  SO IS THERE A WAY WE CAN COORDINATE

19     THAT?

20             MR. VAN NEST:  I THINK WE CAN.

21             THE COURT:  OKAY.

22             MR. VAN NEST:  WE'LL SIMPLY ACCELERATE, ONCE THE

23     THIRD PARTY FILES, IF IT'S A DOCUMENT WE'RE GOING TO SEEK TO

24     SEAL ALSO, WE'LL GET OUR MOTION IN QUICKLY.

25             THE COURT:  THAT WOULD HELP.

```
 1              MR. VAN NEST:  OKAY.

 2              THE COURT:  AND THEN I CAN HOPEFULLY AVOID -- I DON'T

 3    WANT TO CREATE ANY HEADACHES FOR ANYBODY OF FORCING, YOU KNOW,

 4    THE PUBLICIZING OF INFORMATION THAT YOU FEEL YOU NEED SEALED.

 5              MR. VAN NEST:  WE GOT IT.

 6              THE COURT:  TO AVOID MAKING THAT MISTAKE, THAT WOULD

 7    HELP.

 8              MR. VAN NEST:  WE'LL ACCELERATE -- WHERE A THIRD

 9    PARTY HAS FILED, WE'LL ACCELERATE OUR FILING AS WELL.

10              THE COURT:  OKAY.  SO I AM DENYING THIS MOTION, ECF

11    1242, BECAUSE I DON'T THINK WE NEED TO DELAY BY 48 HOURS --

12    WHAT I'M ASKING IS YOU DO THAT COORDINATION ON THE FRONT END --

13              MR. VAN NEST:  WE'LL DO IT.

14              THE COURT:  -- WHEN THE THIRD PARTY FILES ITS MOTION

15    RATHER THAN MAKING ME HAVE TO GO THROUGH TWO -- I DON'T

16    UNDERSTAND WHY I'M GOING THROUGH TWO SEPARATE MOTIONS ON THE

17    SAME DOCUMENT ANYWAY.  IF YOU COULD COORDINATE AND DO ONE

18    UNIFIED MOTION --

19              MR. VAN NEST:  WELL, THAT'S OFTEN --

20              THE COURT:  -- THAT WOULD HELP.  YOU KNOW, DURING

21    THESE BREAKS, YOU KNOW, I'M GRANTING MOTIONS TO COMPEL

22    ARBITRATION, DENYING MOTIONS TO REMAND, VACATING SOCIAL

23    SECURITY APPEALS, SENTENCING CRIMINAL DEFENDANTS.  THIS IS NOT

24    MY ONLY CASE.  SO, YOU KNOW, WE DID SEVEN SEALING ORDERS

25    YESTERDAY.
```

```
1          MR. VAN NEST:  YOU DID.

2          THE COURT:  SO IF THERE COULD BE COORDINATE -- AND

3     MAYBE THE TIME PERIOD ISN'T ALLOWING THAT MUCH COORDINATION.

4     BUT IT WOULD VERY MUCH HELP TO NOT HAVE THESE SERIAL SEALING

5     MOTIONS ON THE SAME DOCUMENT.

6          MR. VAN NEST:  WE'LL TRY TO DO THAT.  I THINK WITH

7     SOME THIRD PARTIES, IT'S EASIER THAN OTHERS.  THAT MOTION IS

8     MOOT BECAUSE WE REACHED OUT TO APPLE, WORKED IT OUT, AND THE

9     EXHIBIT WILL BE FILED WITH EVERYTHING SEALED.

10         THE COURT:  OKAY.  THANK YOU FOR DOING THAT.  BUT I'M

11    ASKING, AGAIN, AS SOON -- I MEAN, IF YOU CAN COORDINATE WITH

12    THE THIRD PARTY SO YOU FILE ONE UNIFIED MOTION AS TO THE SAME

13    DOCUMENT, THAT WOULD BE SO APPRECIATED.  IT WOULD REALLY BE

14    APPRECIATED.  RATHER THAN HAVING US --

15         MR. VAN NEST:  THAT'S MORE DIFFICULT, BUT WE'LL

16    CERTAINLY TRY.

17         MR. MATHESON:  YOUR HONOR, THERE'S ONE I WILL FLAG SO

18    WE'RE NOT SURPRISED.  ERICSSON I BELIEVE HAD FILED A MOTION TO

19    SEAL A PORTION OF OUR EXPERT, MR. LASINSKI'S, DEMONSTRATIVE,

20    WHICH WILL BE DISPLAYED ON MONDAY.  WE ANTICIPATE -- WE

21    COORDINATED WITH OTHER THIRD PARTIES.

22         THE COURT:  OKAY.

23         MR. MATHESON:  WE ANTICIPATE THAT THEY WILL ALSO FILE

24    MOTIONS BECAUSE THEY ONLY FILED A MOTION TO SEAL A SPECIFIC

25    LINE OF THE DEMONSTRATIVE.
```

1      SO IF WE JUST SEAL THE WHOLE SLIDE, THAT MIGHT OBVIATE THE

2   NEED FOR FURTHER FILING ON THE SAME DOCUMENT, WHICH WOULD

3   OBVIOUSLY BE GOOD FOR THE COURT.

4      THE COURT:  DID THEY FILE THAT THIS MORNING?  I DON'T

5   HAVE A RECORD OF THAT.  I KNOW I HAVE QUALCOMM'S FROM LAST

6   NIGHT -- I MEAN, I DID TWO QUALCOMM ORDERS YESTERDAY, BUT I

7   KNOW YOU HAVE ONE THAT YOU FILED LAST NIGHT THAT I STILL OWE

8   YOU A RULING ON.  THAT'S FOR MONDAY'S EVIDENCE.

9      MR. VAN NEST:  RIGHT.

10      THE COURT:  AND I FILED A SAMSUNG ORDER YESTERDAY,

11   BUT I GUESS THEY MUST HAVE FILED ANOTHER ONE LAST NIGHT.

12      MR. MATHESON:  THIS WAS ERICSSON I REFERRED TO, YOUR

13   HONOR, I BELIEVE YOU GRANTED THE ORDER.

14      THE COURT:  OKAY.  I GRANTED THE ORDER LAST NIGHT.

15   WELL, GRANTED IN PART, DENIED IN PART.  SO THEY FILED

16   ANOTHER -- I GET A PRINTOUT EVERY MORNING OF WHOSE MOTIONS ARE

17   STILL PENDING.  I DON'T HAVE ANYTHING FROM ERICSSON ON THIS.

18      MR. MATHESON:  THEY DO NOT.  MY POINT WAS YOU HAD

19   GRANTED THEIR MOTION AND SEALED A PORTION OF A SLIDE.  WE

20   EXPECT OTHER THIRD PARTIES WILL ATTEMPT TO SEAL OTHER PORTIONS

21   AFTER THAT SAME SLIDE.

22   WE HAD ASKED ERICSSON TO FILE THE MOTION AS SOON AS

23   POSSIBLE, AS WE ASKED THE OTHER THIRD PARTIES.  ERICSSON GOT

24   THEIRS ON FILE FIRST.

25      WE'RE IN DISCUSSIONS WITH THE OTHER THIRD PARTIES THAT ARE

```
1    IMPACTED BY THAT SLIDE.  I WANTED TO FLAG THE COURT, THAT WILL

2    BE ANOTHER INSTANCE ON WHICH THERE WILL BE MORE THAN ONE

3    SEALING MOTION ON THE SAME DOCUMENT FROM MORE THAN ONE PARTY.

4            THE COURT:  OKAY.  I'M GOING TO ASK YOU ALL, WE HAVE

5    A TINY TEAM HERE.  WE'RE KEEPING ALL OF OUR OTHER CIVIL AND

6    CRIMINAL ACES GOING.  THIS IS NOT THE ONLY CASE WE'RE WORKING

7    ON RIGHT NOW.

8        TO THE EXTENT WE CAN COORDINATE UPFRONT, IT WOULD BE

9    APPRECIATED.  I'M DOING SERIAL MOTIONS ON THE SAME DOCUMENT.

10   IT JUST TAKES A LOT MORE OF OUR TIME TO HAVE TO REVIEW -- YOU

11   KNOW, THESE SEALING MOTIONS ARE ON HUNDREDS AND HUNDREDS AND

12   HUNDREDS OF PAGES AND MAKING US HAVE TO LOOK THROUGH THE SAME

13   THING TWICE TO SEAL DIFFERENT PORTIONS -- ANYWAY.

14           MR. MATHESON:  WE UNDERSTAND, YOUR HONOR.

15           THE COURT:  WE'D REALLY APPRECIATE YOUR HELP IF YOU

16   COULD.

17           MR. VAN NEST:  UNDERSTOOD.

18           THE COURT:  ALL RIGHT.  WHERE IS YOUR ANSWER?

19           MR. VAN NEST:  YOUR HONOR, BEFORE WE BRING THE

20   WITNESS IN, I WANTED TO VISIT JUST BRIEFLY THE DISCUSSION WE

21   HAD LATE ON THE RECORD ON TUESDAY ABOUT WHAT WE COULD ELICIT

22   FROM WITNESSES ON THE SUBJECT OF APPLE'S USE OF INTEL MODEMS.

23           THE COURT:  UM-HUM.

24           MR. VAN NEST:  AND I WENT BACK TO THE TRANSCRIPT OF

25   THE RECORD, AND I JUST WANT TO MAKE SURE THAT I UNDERSTAND
```

```
 1      WHERE THE LINE IS.

 2            IF I COULD HAVE THE TRANSCRIPT.

 3                  THE COURT:  THIS IS GOING TO BE ON YOUR TIME.

 4                  MR. VAN NEST:  UNDERSTOOD.

 5                  THE COURT:  IT'S 9:12.

 6                  MR. VAN NEST:  WHEN WE WERE DISCUSSING THIS IN

 7      OCTOBER, THE FTC SAID THE FOLLOWING, WHICH I HAVE ON THE SCREEN

 8      THERE.

 9            "I THINK WE'RE RAISING AN ISSUE THAT'S A LITTLE BIT

10      DISINGENUOUS.  THERE IS EVIDENCE IN THE RECORD ABOUT THE CHIPS

11      THAT APPLE IS USING.  THAT IS A PUBLIC FACT.  THERE IS NO

12      DANGER THAT YOUR HONOR IS NOT GOING TO HAVE THE INFORMATION

13      ABOUT WHICH CHIPS APPLE IS USING."

14            THEN IN THE BRIEF THEY FILED ON THE SUBJECT OF POST-MARCH

15      EVIDENCE, THEY SAID, "QUALCOMM SPECIFICALLY STATES THAT APPLE

16      SOURCED MODEMS FROM INTEL FOR ITS 2018 MODELS, BUT THE DECISION

17      TO USE THE CHIPS WAS MADE BEFORE THE CLOSE OF DISCOVERY AND IS

18      THE SUBJECT OF EXISTING DISCOVERY."

19            YOUR HONOR THEN PICKED THAT UP IN HER ORDER, YOUR ORDER ON

20      THIS ISSUE --

21                  THE COURT:  WHAT'S YOUR REQUEST?

22                  MR. VAN NEST:  MY REQUEST IS -- I UNDERSTAND THAT WE

23      CAN ASK WITNESSES WHAT DECISION WAS MADE.

24                  THE COURT:  UM-HUM.

25                  MR. VAN NEST:  THAT'S CLEAR.
```

 1          I UNDERSTOOD, THOUGH, THAT GIVEN THAT THE ACTUAL USE WAS A

 2     PUBLIC FACT, THAT THE FTC WASN'T OBJECTING TO THAT, AND THAT

 3     SINCE THE DECISION WAS MADE BEFORE THE CUTOFF, WE COULD ALSO

 4     ESTABLISH THAT APPLE IS ACTUALLY USING EXCLUSIVELY INTEL MODEMS

 5     IN THE CHIPS.

 6          THE COURT:  OKAY.  WHAT'S THE FTC'S RESPONSE?

 7          MR. MATHESON:  WE'RE NOT REALLY SURE WHAT THE

 8     CONTROVERSY IS.  THERE WAS DISCOVERY ON THIS AS YOUR HONOR

 9     ORDERED AS DOCKET 997 ON THIS ISSUE DURING DISCOVERY.  WE DON'T

10     UNDERSTAND WHY THEY CAN'T JUST ASK THE QUESTION IN A WAY IN

11     WHICH THEY ASK A WITNESS, AS OF MARCH 30TH, HAD THE DECISION

12     BEEN MADE?  HAD IPODS BEEN LAUNCHED?  IPADS BEEN LAUNCHED?  OR

13     OUR CONCERN IS IT'S DISINGENUOUS TO SAY THAT ALL IPHONES

14     CONTAIN INTEL CHIPS.  I DON'T KNOW IF THAT'S TRUE OR NOT.  IT

15     MAY BE TRUE THAT ALL NEW MODELS LAUNCHED IN CALENDAR YEAR 2018

16     CONTAIN NEW CHIPS.  IF THAT'S THE CASE, THEY SHOULD BE ABLE TO

17     ELICIT THAT FROM FACT WITNESSES BASED ON WHAT WAS IN THE

18     DISCOVERY RECORD AS OF MARCH 30TH, 2018.

19          WE'RE NOT SURE WHY WE'RE BEING ASKED TO STIPULATE TO

20     SOMETHING INSTEAD OF GETTING THE TESTIMONY FROM FACT WITNESSES.

21     AND IF THIS HAD BEEN A STIPULATION THAT HAD BEEN SOUGHT, WE

22     COULD HAVE FILED IT WITH THE JOINT PRETRIAL STATEMENT.  EXHIBIT

23     A HAS A BUNCH OF STIPULATIONS.  WE OFFERED TO MAKE A

24     STIPULATION ON THIS ISSUE AS LONG AS THERE IS SOME PRECISION.

25     WE THINK THE EVIDENCE SHOULD COME FROM FACT WITNESSES, NOT

```
 1        IMPRECISE STATEMENTS ABOUT APPLE'S CURRENT SOURCING DECISIONS.

 2               MR. VAN NEST:  WE'RE ON BOARD WITH GETTING IT FROM

 3        THE WITNESSES.  I'M JUST TRYING TO ESTABLISH THE DIVIDING LINE.

 4             I UNDERSTAND WE CAN ASK ABOUT DECISIONS BEFORE 2018.

 5             WHAT I UNDERSTOOD, AND MAYBE I'M RIGHT, IF THEY'RE NOT

 6        OBJECTING TO OUR ASKING THE WITNESSES, WHAT ARE YOU ACTUALLY

 7        USING IN PHONES THAT WERE LAUNCHED IN 2018, THEN THAT'S FINE.

 8        THAT'S ALL I'M SEEKING, THE RIGHT TO BE ABLE TO DO THAT.

 9               THE COURT:  WHAT'S YOUR RESPONSE TO THAT?

10               MR. MATHESON:  I WOULD ASK A WITNESS, IS IT THE CASE

11        THAT BY MARCH 30TH OF 2018, YOU HAD MADE A DECISION WITH

12        RESPECT TO SOURCING OF ALL MODELS THAT WOULD BE LAUNCHED DURING

13        2018?  WHICH MODELS ARE THOSE?

14             THEN WE'RE DONE.

15             I DON'T UNDERSTAND WHY WE CAN'T DO THIS IN THREE QUESTIONS

16        INSTEAD OF TRYING TO GET SOME STIPULATION.  WE'RE NOT TRYING TO

17        PREVENT ANY INFORMATION FROM REACHING THE COURT.  WE JUST WANT

18        TO MAKE SURE THE INFORMATION THAT REACHES THE COURT COMES FROM

19        FACT WITNESSES SO WE KNOW IT'S ACCURATE.

20               THE COURT:  I'M SORRY TO INTERRUPT YOU.  I THOUGHT

21        YOU OBJECTED LAST FRIDAY, OR LAST TUESDAY.

22               MR. MATHESON:  YOUR HONOR, WE UNDERSTOOD YOUR ORDER

23        TO SAY THAT CURRENT ACTIVITY IS OUT OF BOUNDS AND THAT

24        QUESTIONS SHOULD RELATE TO THE INFORMATION THAT WAS REVEALED TO

25        THE DISCOVERY RECORD PRIOR TO MARCH 30TH, 2018.
```

```
 1              IT DOESN'T SEEM DIFFICULT TO ASK A WITNESS IF THEY HAD

 2     MADE DECISIONS AS OF MARCH 30TH THAT WOULD BE BINDING FOR ALL

 3     IPHONE MODELS RELEASED DURING CALENDAR YEAR 2018.

 4              MR. VAN NEST:  WE KNOW WE CAN DO THAT.  YOU'VE

 5     ALREADY RULED THAT.

 6              WHAT I'M SAYING IS, AND I DON'T WANT A STIPULATION, I JUST

 7     WANT TO BE ABLE TO ASK THE FOLLOW ON QUESTION:  AND, THEREFORE,

 8     IN THE MODELS THAT LAUNCHED IN 2018, ARE YOU USING EXCLUSIVELY

 9     INTEL CHIPS?

10              THE COURT:  WHAT'S YOUR RESPONSE TO THAT QUESTION.

11              MR. MATHESON:  I SUPPOSE, YOUR HONOR, IF THAT IS IT,

12     IF IT RELATES TO A DECISION MADE DURING THE DISCOVERY PERIOD,

13     THAT'S FINE.  I DON'T UNDERSTAND WHY WE NEED TO GO PAST THE

14     DISCOVERY PERIOD.  WE BROUGHT THE COURT TO A HARD LINE ON THAT.

15     WE'RE TRYING TO RESPECT THE COURT'S ORDER.

16              THE COURT:  IT SOUNDS LIKE YOU MIGHT BE IN AGREEMENT

17     ON THAT.

18              MR. VAN NEST:  I THINK WE ARE.  MY UNDERSTANDING IS I

19     CAN ASK WHAT, WHAT DECISION IS MADE, THAT'S CLEAR.  BUT I CAN

20     ALSO ASK FOR MODELS LAUNCHED IN 2018, ARE YOU USING IT 100

21     PERCENT INTEL MODEMS.  I CAN ASK THAT QUESTION AS WELL.

22              MR. MATHESON:  IF IT WAS INFORMATION IN THE DISCOVERY

23     RECORD AS OF MARCH 30TH, 2018, WE'RE IN COMPLETE AND VOCIFEROUS

24     AGREEMENT.

25              MR. VAN NEST:  WE'RE NOT BECAUSE THE LAUNCH MAY HAVE
```

```
 1        OCCURRED AFTER MARCH.  THE DECISION WAS MADE BEFORE.  SO ALL

 2        I'M SAYING IS I UNDERSTOOD FROM WHERE WE WERE THAT I COULD ASK

 3        THAT SECOND QUESTION, WHAT ARE YOU ACTUALLY ASKING FOR 2018

 4        LAUNCHES, WHETHER THEY'RE BEFORE MARCH OR NOT.

 5               THE COURT:  I THINK WHAT HE'S SAYING IS IF IT WAS

 6        INFORMATION THAT WAS AVAILABLE BEFORE MARCH, THAT'S FINE.

 7               MR. VAN NEST:  RIGHT.  BUT WHAT THEY'RE ACTUALLY

 8        USING IF THEY LAUNCHED IN SEPTEMBER OBVIOUSLY WASN'T AVAILABLE

 9        IN MARCH.

10               THE COURT:  I THINK YOU WOULD BE OBJECTING TO THAT.

11               MR. MATHESON:  WE JUST DON'T WANT TO OPEN THE DOOR TO

12        MORE FIGHTS ABOUT WHAT THE USE OF PAST DISCOVERY ANSWERS.  SO

13        IF WE CAN HAVE AGREEMENT THAT THIS WOULD NOT OPEN THE DOOR AND

14        THEY'RE GOING TO ASK ABOUT MODELS LAUNCHED IN 2018 AND WE'RE

15        NOT GOING TO HAVE ANOTHER SIDE FIGHT ABOUT WHETHER WE CAN

16        REOPEN DISCOVERY, I THINK THAT'S COMPLETELY FINE, AS LONG AS

17        IT'S OKAY WITH THE COURT.

18               THE COURT:  OKAY.  ARE WE IN AGREEMENT THEN?

19               MR. VAN NEST:  I THINK SO, YES.

20               THE COURT:  IF THERE'S A PROBLEM, MAKE AN OBJECTION,

21        AND WE'LL WORK IT OUT.

22               MR. VAN NEST:  GREAT.  THANK YOU.

23               THE COURT:  IT SOUNDS LIKE THERE'S AGREEMENT.

24               MR. MATHESON:  THANK YOU, YOUR HONOR.

25               THE COURT:  ALL RIGHT.  THANK YOU.  TIME IS 9:18.
```

1          CAN YOU PLEASE BRING IN YOUR WITNESS?

2          (PAUSE IN PROCEEDINGS.)

3               THE COURT:  COME FORWARD, PLEASE, ON THE WITNESS

4     STAND.

5          MA'AM, YOU'RE STILL UNDER OATH.

6          DO YOU UNDERSTAND THAT?

7               THE WITNESS:  YES, I DO.

8               THE COURT:  OKAY.  PLEASE TAKE THE WITNESS STAND.

9               THE WITNESS:  GOOD MORNING.

10              THE COURT:  OKAY.  GOOD MORNING.  WELCOME TO

11    EVERYONE.

12         **(PLAINTIFF'S WITNESS, AICHATOU EVANS, WAS PREVIOUSLY**

13    **SWORN.)**

14              THE COURT:  OKAY.  TIME IS 9:19.  GO AHEAD, PLEASE.

15              MR. RYAN:  GOOD MORNING, YOUR HONOR.  MAY I HAND UP

16    ANOTHER COPY OF THE WITNESS BINDER?

17              THE COURT:  YES, PLEASE.

18              THE WITNESS:  GOOD MORNING.

19              MR. RYAN:  GOOD MORNING.

20                    **CROSS-EXAMINATION (RESUMED)**

21    BY MR. RYAN:

22    Q.  MS. EVANS, WHEN WE BROKE ON TUESDAY WE WERE TALKING ABOUT

23    HOW THE GROSS MARGIN FOR AN INTEL BASEBAND CHIPSET IS THE

24    AVERAGE SELLING PRICE MINUS THE PRODUCT COST; RIGHT?

25    A.  YES.

1    Q.   NOW, INTEL HAS CONCLUDED THAT THE PRODUCT COST OF ITS

2    MODEM CHIPS IS HIGHER THAN QUALCOMM'S; RIGHT?

3    A.   YES.

4    Q.   NOW, IF YOU COULD TURN, PLEASE, IN YOUR BINDER, MS. EVANS,

5    TO QX 95.  IT'S A LITTLE BIT OVER HALFWAY THROUGH.

6    A.   THANK YOU.  I'M THERE, YES.

7    Q.   AND DO YOU SEE THAT THIS IS AN INTERNAL INTEL E-MAIL FROM

8    MAY 30TH, 2017, SENT BY SAMUEL SPANGLER ATTACHING A DECK CALLED

9    MULTI GENERATIONAL LTE PRICING PROPOSAL?

10   A.   YES.

11   Q.   AND ICE HERE IS A CODE NAME FOR APPLE, IS IT NOT?

12   A.   THAT'S CORRECT.

13   Q.   AND THE APPLE SALES TEAM AT INTEL E-MAILED YOU THIS

14   PRESENTATION; RIGHT?

15   A.   YES.

16            MR. RYAN:  YOUR HONOR, I OFFER QX 95 INTO EVIDENCE.

17            THE COURT:  ANY OBJECTION?

18            MR. CARSON:  NO OBJECTION.

19            THE COURT:  IT'S ADMITTED.

20        (DEFENDANT'S EXHIBIT QX 95 WAS ADMITTED IN EVIDENCE.)

21            THE COURT:  GO AHEAD, PLEASE.

22   BY MR. RYAN:

23   Q.   ALL RIGHT.  NOW, THIS IS A DOCUMENT SUBJECT -- CERTAIN

24   PORTIONS ARE SUBJECT TO AN INTEL SEALING ORDER, SO WE'LL PUT

25   THIS UP ON THE SCREEN, BUT IT WON'T BE ON THE PUBLIC MONITOR.

1           IF YOU COULD TURN, PLEASE, MS. EVANS, TO SLIDE 3 OF THIS

2    DOCUMENT.

3    A.   YES.

4    Q.   IT HAS THE BATES NUMBER ENDING IN 314.

5           AND DO YOU SEE ON THE RIGHT-HAND SIDE OF THIS SLIDE A

6    TABLE HEADED PRODUCT COST GAP WORSENING?

7    A.   YES.

8    Q.   AND DOES THE INTEL COLUMN ON THE LEFT OF THIS TABLE HAVE

9    PROJECTED PRODUCT COSTS FOR INTEL MODEM CHIPS FROM 2017 THROUGH

10   2019?

11   A.   YES.

12   Q.   AND DOES THE QUALCOMM COLUMN ON THE RIGHT HAVE INTEL'S

13   ESTIMATE OF QUALCOMM'S PRODUCT COST FOR ITS SLIM MODEMS DURING

14   THAT SAME TIME PERIOD?

15   A.   YEAH.  I MEAN, OUR BEST GUESSTIMATE; RIGHT?  WE DON'T WORK

16   AT QUALCOMM, SO --

17   Q.   SURE.

18   A.   UH-HUH.

19   Q.   BUT THESE ARE INTEL'S BEST ESTIMATES OF WHAT QUALCOMM'S

20   PRODUCT COSTS ARE; RIGHT?

21   A.   YES.

22   Q.   AND AS SHOWN IN QX 95, INTEL'S PRODUCT COSTS ARE HIGHER

23   THAN QUALCOMM'S; RIGHT?

24   A.   YEAH.  IT'S HARD TO COMPETE WITH YOU GUYS.  WITH QUALCOMM,

25   WE HAVE TO PICK OUR SPOTS, AND WE WERE VERY CLEAR THAT FIRST WE

1    GET THE SOCKET, SECOND WE GET THE SEAT AT THE TABLE WITH

2    RESPECT TO THE STRATEGY, AND THEN WE DRIVE TO PROFITABILITY.

3    Q.   AND THESE ARE CHIP PRODUCT COSTS WITHOUT ANY LICENSE

4    ROYALTIES INCLUDED; RIGHT?

5    A.   WE, WE NEVER KNOW WITH QUALCOMM.  WE ASSUME.  I MEAN, WE

6    DON'T WORK THERE AND WE DON'T KNOW HOW THE SHIFTING HAPPENS.

7    Q.   SO AS FAR AS YOU KNOW, ALL THE DATA SHOWN THERE ON QX 95,

8    SLIDE 3, ARE CHIP PRODUCT COSTS WITH NO LICENSE RIGHTS; RIGHT?

9    A.   WE ASSUME SO.

10   Q.   ALL RIGHT.  NOW, YOU TESTIFIED ON TUESDAY THAT QUALCOMM'S

11   LICENSING PRACTICES, IN YOUR VIEW, CREATE AN UNFAIR PLAYING

12   FIELD; RIGHT?

13   A.   THAT IS CORRECT.

14   Q.   AND YOU ALSO TESTIFIED THAT SOLVING THAT PROBLEM WOULD

15   REQUIRE INTEL, IN YOUR VIEW, TO HAVE A LICENSE FOR QUALCOMM;

16   RIGHT?

17   A.   ASSUMING IT'S FAIR AND REASONABLE.

18   Q.   OKAY.  NOW, DO YOU RECALL THAT YOU MET WITH THE FTC STAFF

19   IN SEPTEMBER OF 2016 WITHOUT ANY LAWYERS FROM QUALCOMM PRESENT

20   AND THAT YOU GAVE TESTIMONY UNDER OATH IN THE INVESTIGATION OF

21   THIS MATTER?

22   A.   IF YOU SAY SO, YEAH.  I'VE MET WITH A LOT OF YOU ALL,

23   YEAH.

24   Q.   DO YOU RECALL THAT THE FTC ASKED YOU IF HAVING A LICENSE

25   TO QUALCOMM'S STANDARD ESSENTIAL PATENTS WOULD BENEFIT INTEL

```
 1        AND YOU TESTIFIED THAT YOU COULDN'T ANSWER YES OR NO?

 2            DO YOU RECALL THAT?

 3    A.   I -- I DON'T RECALL.  THREE YEARS IS A LONG TIME IN MY

 4    LIFE.

 5    Q.   OKAY.

 6    A.   BUT I'M SURE YOU HAVE -- YOU NEED TO SHOW ME AS USUAL SO I

 7    CAN SEE THE FULL CONTEXT, PLEASE.

 8    Q.   ALL RIGHT.  SO IF YOU COULD LOOK, IT'S THE THIRD TAB FROM

 9    THE BACK OF THE BINDER.

10    A.   UH-HUH.

11    Q.   DO YOU SEE THAT THIS IS SEPTEMBER 15TH, 2016 --

12    A.   MR. RYAN, YOU'RE GOING VERY FAST AGAIN.  WHICH TAB,

13    PLEASE?

14    Q.   THE THIRD TAB FROM THE BACK.  DO YOU SEE THAT THIS IS A

15    SEPTEMBER 15TH, 2016 TRANSCRIPT?

16    A.   YES, SEPTEMBER 15.  YES, I SEE THAT ONE, YES.

17    Q.   AND IF WE COULD PUT UP, PLEASE, PAGE 134, LINES 1 TO 13.

18        AND DO YOU SEE YOU WERE ASKED BY THE FTC STAFF, "DOES

19    INTEL NOW HAVE A LICENSE TO QUALCOMM'S STANDARD ESSENTIAL

20    PATENTS?"

21        AND YOU REPLIED NO?

22    A.   UM-HUM.

23    Q.   AND DO YOU SEE THAT YOU WERE THEN ASKED, "WOULD HAVING

24    SUCH A LICENSE BENEFIT INTEL"?

25        AND YOU THEN GAVE THE ANSWER SHOWN HERE ON LINES 5 TO 13,
```

 1    AND AS PART OF THAT, ON LINE 8, YOU TESTIFIED, "RIGHT NOW I

 2    CAN'T -- I CAN'T ANSWER "YES" OR "NO."

 3         DO YOU SEE THAT?

 4    A.   MY FULL ANSWER WAS, "MAYBE AT THE BEGINNING OF OUR JOURNEY

 5    IT WOULD HAVE, BECAUSE CONDITIONS WOULD HAVE BEEN CLEAR AS

 6    WE'RE ESTABLISHING WHAT WE'RE NEEDING TO DO IN THIS SPACE."

 7         I.E., CLEAR, LEVEL PLAYING FIELD.

 8         "RIGHT NOW, I CAN'T ANSWER YES OR NO."

 9    Q.   AND THAT WAS A TRUTHFUL --

10    A.   "I WOULD TEND TO THINK, YOU KNOW -- I MEAN, I'M NOT IN

11    THAT MINDSET RIGHT NOW.  RIGHT NOW I'M IN THE MINDSET OF, YOU

12    KNOW, THE SITUATION IS WHAT IT IS, AND I THINK IF WE CAN GET

13    THROUGH THESE BUSINESS CONDITIONS AND EXECUTION AND SHINING A

14    LIGHT ON WHAT'S GOING ON OUT THERE," I.E., THE BUSINESS

15    PRACTICES.

16         SO, YES, MY ANSWER THAT I JUST READ IS TRUTHFUL IN

17    SEPTEMBER 15, 2016.

18    Q.   ALL RIGHT.  SO AS OF SEPTEMBER 2016, IT WAS THE CASE THAT

19    YOU COULD NOT ANSWER YES OR NO AS TO WHETHER HAVING A LICENSE

20    TO QUALCOMM'S CELLULAR STANDARD ESSENTIAL PATENTS WOULD BENEFIT

21    INTEL?  THAT WAS TRUTHFUL, RIGHT?

22    A.   AT THAT POINT IN TIME, WITH THE CONTEXT THAT I HAVE

23    ESTABLISHED.

24    Q.   NOW, YOU BELIEVE, DON'T YOU, THAT QUALCOMM REMAINED

25    LEADING MODEM SUPPLIER TODAY, DRIVING AGGRESSIVE ECOSYSTEM

```
 1     EVOLUTION, LEADING ON KEY PERFORMANCE INDICATORS AND FEATURES;

 2     RIGHT?

 3     A.   I DON'T KNOW WHAT THAT MEANS.

 4     Q.   WELL, DO YOU BELIEVE THAT QUALCOMM REMAINS THE LEADING

 5     MODEM SUPPLIER TODAY?

 6     A.   BY -- I DON'T KNOW.  THAT'S A VERY VAGUE STATEMENT.  IS

 7     THAT ON EARTH?  THROUGHOUT THE UNIVERSE?

 8          IN THE PREMIUM SEGMENT -- I MEAN, I'M NOT SURE.  YES, THEY

 9     ARE VERY GOOD IF THAT'S WHAT YOU'RE TRYING TO ESTABLISH.

10          BUT LEADING MODEM SUPPLIER, ARE WE TALKING THIN MODEMS?

11     ALL SEGMENTS?  WHAT ARE WE TALKING ABOUT?

12     Q.   OKAY.  DO YOU RECALL THAT IN SEPTEMBER OF 2018, YOU GAVE

13     TESTIMONY AT AN ITC HEARING ON BEHALF OF APPLE?

14     A.   YEAH.

15     Q.   OKAY.  SO IF WE CAN PUT UP, PLEASE, ON THE SCREEN PAGE

16     1495 OF THAT TESTIMONY, LINES 14 TO 19.

17          THE COURT:  DO YOU HAVE A COPY OF THAT?  IT'S NOT IN

18     MY BINDER.

19          MR. RYAN:  I DO.

20          THE COURT:  OKAY.  THANK YOU.

21          MR. RYAN:  LET ME HAND THIS UP.

22          MR. CARSON:  YOUR HONOR, I DON'T THINK I HAVE A COPY

23     OF THAT, EITHER.  IF I CAN JUST SEE IT.

24          THE WITNESS:  WHAT ABOUT ME?

25          MR. RYAN:  MAY I, YOUR HONOR?
```

1          THE COURT:  GO AHEAD, PLEASE.

2          THE WITNESS:  THANK YOU.

3    BY MR. RYAN:

4    Q.   AND DO YOU SEE THAT I ASKED YOU AT THAT HEARING, "AND YOU

5    BELIEVE, DON'T YOU --

6    A.   EXCUSE ME, SIR.  MAY I KNOW WHERE THIS IS IN THIS

7    DOCUMENT, PLEASE?

8    Q.   YES.  IT IS PAGE 1495, BEGINNING ON LINE 14.

9    A.   AH, 1495.

10   Q.   LINE 14.

11   A.   OKAY.  ONE SECOND, PLEASE.

12   Q.   AND DO YOU SEE THAT I ASKED YOU, "AND YOU BELIEVE, DON'T

13   YOU, THAT QUALCOMM REMAINS THE LEADING MODEM SUPPLIER TODAY

14   DRIVING AGGRESSIVE ECOSYSTEM EVOLUTION AND LEADING ON KEY

15   PERFORMANCE INDICATORS AND FEATURES; RIGHT?"

16         AND YOU TESTIFIED, "YEAH.  I MEAN, YOU CAN LOOK AT THE

17   BOARD OVER THERE.  YES."

18         THAT'S THE TESTIMONY THAT YOU GAVE IN SEPTEMBER 2018,

19   ISN'T IT?

20   A.   YES.

21   Q.   NOW, YOU HAVE A LOT OF RESPECT FOR QUALCOMM AS A COMPANY?

22   A.   AS A TECHNOLOGY COMPANY, YES.

23         AS A BUSINESS MODEL COMPANY, NO.

24   Q.   AND YOU HAVE SAID THAT THEY'VE EARNED WHAT THEY HAVE

25   ACHIEVED; ISN'T THAT RIGHT?

1    A.   FROM A TECHNICAL STANDPOINT, YES.

2    Q.   YOU SAID YOU'VE ALWAYS BEEN SUPER RESPECTFUL OF QUALCOMM

3    BECAUSE THEY'VE EARNED WHAT THEY'VE ACHIEVED; ISN'T THAT RIGHT?

4    A.   FROM A TECHNICAL STANDPOINT, YES.

5    Q.   AND YOU SAID THAT QUALCOMM IS NUMBER ONE -- YOU SAID,

6    MS. EVANS, THAT QUALCOMM IS NUMBER ONE AND THE UNDISPUTED

7    LEADER, THEY HAVE BLAZED THE TRAIL, YOU RESPECT THEM, THEY

8    DESERVE TO AND THEY'VE EARNED THAT POSITION.

9         THAT'S WHAT YOU'VE SAID BEFORE, RIGHT.

10   A.   YES.  I HAVE A LOT OF FRIENDS THERE.  WE ALL WORK IN THE

11   SAME INDUSTRY.  WE GREW UP TOGETHER.  THEY ARE EXCELLENT

12   TECHNICAL ENGINEERS.  THAT DOESN'T GIVE THEM THE GOD-GIVEN

13   RIGHT TO BE THE ONES USING UNFAIR BUSINESS PRACTICES.

14             MR. RYAN:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  THE TIME IS 9:29.

16             MR. CARSON:  BRIEF REDIRECT, YOUR HONOR.

17             THE COURT:  YES.  LET ME KNOW WHEN YOU'RE READY.

18             MR. CARSON:  I'M READY.

19             THE COURT:  OKAY.  ALL RIGHT.  GO AHEAD.  IT'S 9:29.

20                        **REDIRECT EXAMINATION**

21   BY MR. CARSON:

22   Q.   HELLO AGAIN, MS. EVANS.

23   A.   GOOD MORNING.

24   Q.   IF YOU REMEMBER ON TUESDAY, MR. RYAN ASKED YOU SOME

25   QUESTIONS ABOUT INDICATIONS INTEL HAD RECEIVED BY MARCH 2018

```
 1        THAT THEY'D BE GIVEN A LARGER SHARE OF APPLE'S MODEM BUSINESS?

 2            DO YOU REMEMBER THAT?

 3        A.   I REMEMBER THAT LINE OF QUESTIONING, YES.

 4        Q.   NOW, EVEN WITH THAT LARGER SHARE, WOULD INTEL'S MODEM

 5        BUSINESS STILL BE ON FRAGILE GROUND?

 6        A.   YES, IT IS ON FRAGILE GROUND BECAUSE WE'RE NOT COMPETING

 7        FAIR AND SQUARE IN THIS ELEMENT.

 8            NOW, IT'S TRUE THAT OBVIOUSLY WE STARTED BEHIND, AS I

 9        ESTABLISHED IN 2011, AS IT'S VERY PRECARIOUS.

10        Q.   AS OF MARCH 2018, ARE YOU AWARE OF ITC PROCEEDINGS BETWEEN

11        QUALCOMM AND APPLE WHICH I THINK MR. RYAN JUST REFERENCED?

12        A.   MARCH -- OKAY.  SO NOW -- I BELIEVE WE ARE -- WHERE ARE WE

13        NOW?  WE'RE IN JANUARY 2019.  YES, I AM.

14        Q.   SO UNDERSTANDING YOU'RE NOT A LAWYER, DO YOU UNDERSTAND

15        WHAT QUALCOMM WAS SEEKING IN THOSE ITC PROCEEDINGS?

16        A.   YEAH, CUT US OFF AT THE KNEES BEFORE WE'RE BORN AND ASK

17        FOR A BAN OF INTEL BASED IPHONES FROM THE UNITED STATES.

18        Q.   SO IF THERE WAS A BAN OF INTEL BASED IPHONES IN THE

19        UNITED STATES, WHAT EFFECT WOULD THAT HAVE ON INTEL'S MODEM

20        CHIP BUSINESS?

21        A.   I TESTIFIED MANY TIMES AND STATED MANY TIMES THAT THIS

22        WOULD -- I'M NEARLY CERTAIN THAT WE WOULD EXIST (SIC), THEREBY

23        LEAVING THEM AS THE SOLE SUPPLIER, WHICH IS WHAT I BELIEVE THEY

24        CONTINUOUSLY SEEK.

25        Q.   SO LAST TOPIC.  MR. RYAN, I THINK, ASKED YOU ON TUESDAY
```

1    ABOUT INTEL'S ABILITY TO PROVIDE CHIPSETS TO APPLE FOR A 2014

2    APPLE PRODUCT.

3        DO YOU REMEMBER THAT?

4    A.   I DO.

5    Q.   IF GIVEN THE OPPORTUNITY, COULD INTEL, FROM A TECHNICAL

6    AND SCHEDULE STANDPOINT, HAVE PROVIDED CHIPSETS FOR A 2014

7    APPLE PRODUCT?

8    A.   WE WOULD HAVE DONE WHATEVER IT TAKES TO DELIVER THAT

9    SOCKET AND WE'VE PROVEN THAT.  AND EVERY TIME WE'VE BEEN GIVEN

10   THAT OPPORTUNITY, NO MATTER WHAT IT TOOK, THAT'S WHAT WE DID.

11            MR. CARSON:  THANK YOU, MS. EVANS.

12       NO FURTHER QUESTIONS, YOUR HONOR.

13            THE COURT:  OKAY.  IT'S 9:31.  IS THERE ANY RECROSS,

14   I GUESS?

15            MR. RYAN:  YES, YOUR HONOR, I HAVE ONE QUESTION.

16            THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

17                   **RECROSS-EXAMINATION**

18   BY MR. RYAN:

19   Q.   IN THE ITC PROCEEDING THAT YOU JUST REFERRED TO, QUALCOMM

20   IS BRINGING CLAIMS BASED ON NONSTANDARD ESSENTIAL PATENTS;

21   ISN'T THAT RIGHT?

22   A.   IF YOU SAY SO.  I MEAN, WHEN WE START SAYING SEPS, NOT

23   SEPS, I'M NOT A LAWYER.  I DON'T LIVE IN THE FRAND SPACE.

24            MR. RYAN:  THAT'S IT, YOUR HONOR.

25            THE COURT:  OKAY.  9:31 TO 9:32.

1          MR. CARSON:  BEFORE THE WITNESS STEPPED DOWN, I THINK

2     THERE MIGHT HAVE BEEN A TRANSCRIPTION ERROR POTENTIALLY.  IF I

3     COULD CLARIFY?

4          THE COURT:  OKAY.

5                    **FURTHER REDIRECT EXAMINATION**

6     BY MR. CARSON:

7     Q.   SO, MS. EVANS, I ASKED YOU WHAT WOULD HAPPEN IF THE

8     EXCLUSION ORDER FROM QUALCOMM WAS GRANTED.

9          DID YOU SAY INTEL WOULD EXIT OR STILL EXIST?

10    A.   EXIT.

11    Q.   OKAY.

12    A.   SORRY, MY ENGLISH FRENCH.  EXIT, LIKE DIE, STEP OUT OF THE

13    BUSINESS.

14          MR. CARSON:  THANK YOU, MS. EVANS.

15         NO FURTHER QUESTIONS.

16          THE COURT:  OKAY.  9:32.  IS THERE A NEED TO HAVE

17    THIS WITNESS SUBJECT TO RECALL, OR IS SHE COMPLETELY EXCUSED?

18          MR. CARSON:  NOT FOR THE FTC, YOUR HONOR.

19          MR. RYAN:  NOT FOR US, EITHER.

20          THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

21    TESTIMONY AND YOU ARE FREE TO LEAVE.

22          THE WITNESS:  THANK YOU.

23         NICE TO MEET YOU.  BYE-BYE.

24          THE COURT:  OKAY.  IF YOU WOULD -- OH, YOUR NEXT

25    WITNESS IS BY VIDEO; CORRECT?

1          MR. ANSALDO:  YES, YOUR HONOR.

2          THE COURT:  OKAY.

3          MR. ANSALDO:  ALEX ANSALDO FOR THE FEDERAL TRADE

4    COMMISSION.

5          NEXT THE FEDERAL TRADE COMMISSION WILL OFFER BY DEPOSITION

6    THE TESTIMONY OF MARK DAVIS, THE CHIEF TECHNOLOGY OFFICER OF

7    VIA TELECOM UNTIL 2014.

8          THE COURT:  OKAY.

9          MR. ANSALDO:  MAY I APPROACH WITH BINDERS?

10         THE COURT:  YES.  THANK YOU.

11       OKAY.  DO YOU WANT TO ADMIT ANY EXHIBITS?

12         MR. ANSALDO:  YES, YOUR HONOR.

13         THE COURT:  OKAY.  TIME IS 9:33.  GO AHEAD, PLEASE.

14         MR. ANSALDO:  MOVE TO ADMIT JX 0007.

15         THE COURT:  OKAY.  I'M SORRY, GIVE ME ONE MINUTE.

16     SORRY.  IT'S 9:34.

17       OKAY.  GO AHEAD.  WHAT IS IT?

18         MR. ANSALDO:  JX 0007.

19         THE COURT:  JX 0007, OKAY.

20       ANY OBJECTION?

21         MR. BORNSTEIN:  NOT TO A JX, YOUR HONOR, NO.

22         THE COURT:  OKAY.  THAT'S ADMITTED.

23         MR. ANSALDO:  AND CX 8295.

24         THE COURT:  OKAY.  WHAT ARE YOUR OTHERS?

25         MR. ANSALDO:  1770, 1771.

```
 1                    THE COURT:  AND THESE ARE ALL CX'S?

 2                    MR. ANSALDO:  YES, YOUR HONOR.

 3                    THE COURT:  OKAY.

 4                    MR. ANSALDO:  6552, 1774, 1785.  THAT'S IT.

 5                    THE COURT:  ANY OBJECTION TO THESE EXHIBITS?

 6                    MR. BORNSTEIN:  NONE, YOUR HONOR.

 7                    THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

 8             (JOINT EXHIBIT JX 0007 AND CX 8295, 1770, 1771, 6552, 1774

 9      AND 1785 WERE ADMITTED IN EVIDENCE.)

10                    MR. ANSALDO:  MR. KOTARSKI, IF YOU WOULD PLEASE START

11      THE TAPE.

12               (THE VIDEOTAPED DEPOSITION OF MARK DAVIS WAS PLAYED IN

13        OPEN COURT OFF THE RECORD.)

14                    THE COURT:  OKAY.  TIME IS 9:35.  I'M SORRY.  9:58.

15      I'M LOOKING AT THE WRONG ONE.

16                    MR. BAKER:  GOOD MORNING, YOUR HONOR.  JOE BAKER FOR

17      THE FTC.

18                    THE COURT:  OKAY.

19                    MR. BAKER:  THE FTC CALLS TONY BLEVINS.

20                    THE COURT:  OKAY.

21            NOW, DID YOU THINK THAT A PORTION OF HIS TESTIMONY WILL

22      NEED TO BE IN A SEALED COURTROOM?

23                    MR. BAKER:  A NUMBER OF THESE DOCUMENTS HAVE BEEN

24      SEALED IN PART IN THE LAST 24 HOURS.

25            I BELIEVE THAT ON THE FTC'S SIDE, WE CAN WORK AROUND THAT,
```

```
 1        NOT DISPLAYING DOCUMENTS PUBLICLY AND ASKING THE WITNESS TO

 2        AVOID GIVING DOLLAR AMOUNTS IN HIS ANSWERS.

 3             I DON'T KNOW IF THE SAME IS TRUE ON CROSS.

 4             MS. SESSIONS:  WE'RE GOING TO TRY OUR BEST, YOUR

 5        HONOR, AND I BELIEVE IF THE FTC DOES NOT INTEND TO ELICIT AND

 6        THE WITNESS DOES NOT PROVIDE SPECIFIC DOLLAR AMOUNTS IN HIS

 7        ANSWERS, I THINK WE CAN PROBABLY DO MOST, IF NOT ALL OF THIS,

 8        ON THE PUBLIC RECORD.

 9             THE COURT:  OKAY.  ALL RIGHT.  LET ME KNOW IF AT ANY

10        POINT YOU THINK I NEED TO SEAL THE COURTROOM.  OKAY?

11             MR. BAKER:  OKAY.

12             THE COURT:  ALL RIGHT.  THANK YOU.  CAN YOU BRING

13        YOUR WITNESS FORWARD, PLEASE.

14             I ASSUME THAT DAVIS IS NOT SUBJECT TO RECALL; IS THAT

15        RIGHT?

16             MR. ANSALDO:  THAT'S CORRECT, YOUR HONOR.

17             THE COURT:  OKAY.  AND IS THAT --

18             MR. BORNSTEIN:  THAT'S CORRECT, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  THANK YOU.

20        (PAUSE IN PROCEEDINGS.)

21             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

22        (PLAINTIFF'S WITNESS, TONY BLEVINS, WAS SWORN.)

23             THE WITNESS:  YES.

24             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

25        PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR
```

```
 1      THE RECORD.

 2              THE WITNESS:  YES.  MY NAME IS TONY BLEVINS, AND THE

 3      LAST NAME IS SPELLED B-L-E-V-I-N-S.

 4              THE COURT:  ALL RIGHT.  TIME IS 10:01.  GO AHEAD,

 5      PLEASE.

 6                          DIRECT EXAMINATION

 7      BY MR. BAKER:

 8      Q.   GOOD MORNING, MR. BLEVINS.

 9      A.   GOOD MORNING, SIR.

10      Q.   WHERE DO YOU WORK?

11      A.   I WORK AT APPLE IN CUPERTINO, CALIFORNIA.

12      Q.   WHAT IS YOUR TITLE?

13      A.   MY TITLE IS VICE PRESIDENT OF PROCUREMENT.

14           I'M SORRY.  VICE PRESIDENT OF PROCUREMENT.

15      Q.   WHAT ARE YOUR RESPONSIBILITIES IN THAT ROLE?

16      A.   ESSENTIALLY MY TEAM IS RESPONSIBLE FOR ACQUIRING GOODS,

17      MATERIALS, LABOR, OTHER SERVICES THAT APPLE NEEDS TO ASSEMBLE

18      AND SHIP ITS FINAL PRODUCTS TO CONSUMERS.

19      Q.   WHEN DID APPLE LAUNCH ITS FIRST IPHONE?

20      A.   MY RECOLLECTION IS WE ANNOUNCED IT IN JANUARY OF 2007, AND

21      THEN WE SHIPPED IT IN JUNE OF THAT YEAR.

22      Q.   AND HOW MANY COMPONENTS ARE IN AN IPHONE?

23      A.   EACH IPHONE WOULD VARY.  BUT YOU CAN SAFELY SAY THAT THERE

24      ARE APPROXIMATELY, PLUS OR MINUS, 1,000 COMPONENTS PER IPHONE.

25      Q.   AND HAVE YOUR RESPONSIBILITIES SINCE 2007 INCLUDED
```

1       PURCHASING MODEM CHIPS FOR APPLE IPHONES?

2       A.   YES, THAT IS CORRECT, SIR.

3       Q.   WHAT SORT OF FACTORS DOES APPLE TAKE INTO CONSIDERATION

4       WHEN MAKING MODEM CHIP PROCUREMENT DECISIONS?

5       A.   THERE ARE MANY FACTORS.  WE STRIVE FOR OVERALL BEST VALUE.

6       SO WE'LL LOOK AT TECHNICAL ATTRIBUTES AND CHARACTERISTICS OF A

7       PARTICULAR OFFERING; WE WILL EXAMINE VARIOUS COST FACTORS,

8       TOTAL COST OF OWNERSHIP IS CERTAINLY IMPORTANT; WE'LL LOOK AT

9       THE QUALITY OF THE COMPONENTS.

10           SO WE TRY TO LOOK AT THE TOTAL OWNERSHIP EXPERIENCE AND

11      ACHIEVE OVERALL BEST VALUE IT WOULD BE SAFE TO SAY.

12      Q.   DO YOU TAKE INTO ACCOUNT ASSOCIATED I.P. LICENSING COSTS

13      IN MAKING MODEM CHIP PROCUREMENT DECISIONS?

14      A.   YES.  AS A MATTER OF FACT, WE LOOK AT WHAT WE TERM TOTAL

15      COST OF OWNERSHIP.

16      Q.   HOW OFTEN DOES APPLE CHOOSE TO BUY A SINGLE COMPONENT FROM

17      MULTIPLE SUPPLIERS?

18      A.   INFREQUENTLY.  I CAN TELL YOU THAT WE REALLY VALUE MARKET

19      COMPETITION AND LEVERAGE.  WE THINK THAT'S A VERY IMPORTANT

20      CONCEPT FOR US TO ACHIEVE OVERALL BEST VALUE.

21           SO AS WE SOURCE COMPONENTS, WE TYPICALLY STRIVE TO GET AT

22      LEAST TWO SOURCES, PROBABLY NOT MORE THAN SIX FOR EFFICIENCY

23      REASONS.  AND IT VARIES CIRCUMSTANTIALLY.  BUT WE ALWAYS TRY TO

24      GENERATE ENOUGH SOURCES TO ESTABLISH SOME COMPETITION.  IN SOME

25      CASES THAT'S NOT POSSIBLE AND WE WIND UP WITH ONE SOURCE, WHICH

1    IS CERTAINLY A LOT MORE CHALLENGING.

2    Q.  JUST TO BE CLEAR, IT'S INFREQUENT FOR APPLE TO HAVE A

3    SINGLE SOURCE FOR A GIVEN COMPONENT?

4    A.  YES, IT'S INFREQUENT.  IT DOES HAPPEN UNFORTUNATELY ON

5    OCCASION.

6    Q.  WHEN APPLE DOES SOLE SOURCE ON IPHONE COMPONENT, DOES

7    APPLE GENERALLY AGREE TO BUY THAT COMPONENT EXCLUSIVELY FROM

8    THAT SOLE SUPPLIER?

9    A.  NO.  MY EXPERIENCE OVER THE COURSE OF THE LAST 18 YEARS IS

10   WE HAVE ONLY AGREED TO DO THAT ONCE.

11   Q.  WHY IS IT UNCOMMON FOR APPLE TO AGREE TO EXCLUSIVITY?

12   A.  WELL, AS I MENTIONED EARLIER, THAT WE THINK MARKET

13   COMPETITION AND MARKET FORCES ARE VERY IMPORTANT FOR US TO

14   ACHIEVE OVERALL BEST LEVERAGE.  AND SO FOR THAT REASON, YOU

15   WOULDN'T WANT TO LIMIT YOURSELF TO ONE SOURCE BECAUSE YOU

16   ESSENTIALLY EVISCERATE THAT COMPETITION.

17        AND FOLLOWING THAT, YOU CERTAINLY WOULDN'T WANT TO ENTER

18   INTO AN EXCLUSIVITY AGREEMENT UNLESS YOU ABSOLUTELY HAD TO

19   BECAUSE THERE WOULD BE ABSOLUTELY NO COMPETITION AT THAT POINT.

20   Q.  DO YOU UNDERSTAND THE TERMS GSM, CDMA, UMTS, AND LTE?

21   A.  YES, I HEAR THOSE TERMS AS A PART OF MY WORK AT APPLE.

22   Q.  AND WHAT IS YOUR UNDERSTANDING OF WHAT THOSE TERMS REFER

23   TO?

24   A.  EACH OF THEM ARE DIFFERENT WIRELESS STANDARDS.

25   Q.  DOES APPLE SELL IPHONES THAT ARE COMPATIBLE WITH BOTH CDMA

BLEVINS DIRECT BY MR. BAKER

1     AND UMTS?

2     A.   YES, WE DO.

3     Q.   WERE THE EARLIEST IPHONES COMPATIBLE WITH CDMA?

4     A.   THE EARLIEST ONES WERE NOT.

5     Q.   WHAT STANDARDS DID THEY EMPLOY?

6     A.   THE VERY EARLIEST PHONES WERE GSM AND GSM EDGE.  THEN

7     LATER UMTS, AND IT WASN'T UNTIL MUCH LATER, I BELIEVE JANUARY

8     OF 2011, THAT WE MADE OUR FIRST CDMA OFFERING.

9     Q.   WHAT CAUSED APPLE TO START MAKING CDMA PHONES?

10    A.   WE DESIRED TO SELL PRODUCTS ON THE VERIZON NETWORK IN

11    PARTICULAR, AND THERE WERE SOME OTHERS AROUND THE WORLD, JAPAN,

12    FOR EXAMPLE.

13         SO THERE WERE SOME NETWORKS THAT WE DESIRED TO SELL

14    PRODUCTS ON, AND THE ONLY WAY THAT WE COULD DO THAT WAS TO

15    DESIGN CDMA CAPABLE OFFERING BECAUSE THAT'S WHAT THEIR NETWORKS

16    OVER THE INTERFACE WAS.

17    Q.   WHEN DID APPLE FIRST LAUNCH AN IPHONE THAT SUPPORTED 4G

18    LTE STANDARDS?

19    A.   MY RECOLLECTION IS OUR FIRST LTE PRODUCT OFFERING WOULD

20    HAVE BEEN FALL 2012.

21    Q.   SINCE LAUNCHING THE FIRST LTE BASED IPHONE, HAS APPLE

22    LAUNCHED ANY NEW CELLULAR DEVICES THAT DO NOT SUPPORT LTE?

23    A.   NO.  AFTER THAT LAUNCH, ALL SUCCESSFUL LAUNCHES HAVE ALSO

24    SUPPORTED LTE.

25    Q.   HAVE YOU HEARD THE TERM PREMIUM LTE USED IN RELATION TO

1    MODEM CHIPS?

2    A.   YES, I HAVE.

3    Q.   WHAT IS YOUR UNDERSTANDING OF WHAT PREMIUM MODEM LTE CHIPS

4    ARE?

5    A.   PREMIUM LTE CHIPS WOULD BE A SUPERIOR OFFERING AS COMPARED

6    TO STANDARD.

7    Q.   IN YOUR VIEW, WHAT CHARACTERISTICS DISTINGUISH PREMIUM LTE

8    CHIPS FROM NON-PREMIUM LTE CHIPS?

9    A.   THERE ARE MANY.  BUT IN ESSENCE, I WOULD SAY THAT THE

10   SPEED OF THE CHIPS, THE UPLINK AND DOWNLINK PERFORMANCE,

11   CERTAINLY THE CHARACTERISTICS, QUALITY IS VERY IMPORTANT, SIZE,

12   MINIATURIZATION BEING FAR PREFERABLE IS IMPORTANT, POWER

13   CONSUMPTION OF THE CHIP.  IN A MOBILE DEVICE, PEOPLE LIKE THEIR

14   BATTERIES TO LAST LONGER.

15        SO THOSE WOULD BE SOME OF THE HIGH LEVEL ATTRIBUTES THAT

16   WOULD DISTINGUISH A PREMIUM CHIP FROM SOMETHING WE WOULD

17   CONSIDER NON-PREMIUM.

18   Q.   IS THERE A PRICE DIFFERENCE BETWEEN PREMIUM AND

19   NON-PREMIUM LTE CHIPS?

20   A.   GENERALLY SPEAKING, THERE'S A PRICE DIFFERENCE.  IT WOULD

21   VARY BY QUARTER AND BY SUPPLIER, BUT A PREMIUM CHIP WOULD COST

22   ROUGHLY DOUBLE WHAT WE DETERMINE A NON-PREMIUM CHIP WOULD COST.

23   Q.   DOES APPLE BUY PREMIUM LTE CHIPS?

24   A.   YES.  WE FOCUS EXCLUSIVELY ON PREMIUM CHIPS.  OUR

25   PERCEPTION IS THAT THE IPHONE IS A PREMIUM SMARTPHONE, SO

BLEVINS DIRECT BY MR. BAKER

1       THEREFORE ALL OF ITS COMPONENTS NEED TO BE THE BEST THAT WE CAN

2       POSSIBLY DESIGN OR ACQUIRE.

3       Q.   WHEN APPLE FIRST BEGAN BUYING LTE CHIPS FOR THE 2012

4       IPHONE, WHICH COMPANIES WERE CAPABLE OF SUPPLYING CHIPS THAT

5       MET APPLE'S NEEDS?

6       A.   MY RECOLLECTION IS OUR ASSESSMENT WAS THAT QUALCOMM HAD A

7       SUPERIOR OFFERING, AND SO THEREFORE, WE NARROWED OUR CHOICE TO

8       QUALCOMM FOR THAT FIRST OFFERING.

9       Q.   DID THAT EVER CHANGE?

10      A.   IT CHANGED LATER.  I THINK AROUND 2016, WE SOURCED WITH

11      BOTH QUALCOMM AND INTEL.

12      Q.   AND IN BETWEEN 2012 AND 2016, WERE OTHER SUPPLIERS CAPABLE

13      OF SUPPLYING PREMIUM LTE CHIPS THAT MET APPLE'S NEEDS?

14      A.   YES.  IN PARTICULAR, WE FELT THAT INTEL HAD CAPABILITY IN

15      THAT INTERIM PERIOD.

16      Q.   FOR THE FIRST IPHONE LAUNCHED IN 2007, WHEN DID YOU START

17      COMMUNICATING WITH POTENTIAL MODEM CHIP SUPPLIERS?

18      A.   WE STARTED APPROXIMATELY TWO YEARS IN ADVANCE OF THE

19      LAUNCH.  AND SO AROUND SPRING TO SUMMER OF 2005 IS WHEN MOST OF

20      THAT WORK WAS GOING ON.

21      Q.   WHAT TYPE OF MODEM CHIPS WAS APPLE SEEKING AT THAT TIME?

22      A.   AT THAT POINT IN TIME, WE WERE LOOKING AT GSM EDGE FOR

23      WHAT WOULD BE THE FIRST IPHONE IN 2007; AND WE WERE ALSO

24      THINKING ABOUT WHAT WOULD BECOME ITS SUCCESSOR IN 2008, WHICH

25      WAS A 3G IPHONE.

1    Q.   AND WHOSE MODEM CHIPS DID YOU END UP USING IN THAT FIRST

2    IPHONE?

3    A.   IN THE FINAL ANALYSIS, WE SELECTED INFINEON OF MUNICH,

4    GERMANY.

5    Q.   DID APPLE CONSIDER QUALCOMM AT THAT TIME?

6    A.   WE ATTEMPTED TO CONSIDER THEM, YES.

7    Q.   WHAT WAS THE RESULT OF THAT?

8    A.   IT WAS UNSUCCESSFUL, THAT IN THIS CASE, AS IS STANDARD

9    PROTOCOL FOR US, WE WOULD GO OUT TO POTENTIAL SUPPLIERS, WE

10   WOULD ASK FOR SAMPLES, WE WOULD ASK FOR TECHNICAL

11   SPECIFICATIONS SO THAT WE CAN BEGIN TO DO THE VALUE ANALYSIS

12   THAT I MENTIONED.

13        WE DIDN'T HAVE ANY EXPERIENCE WITH QUALCOMM AT THAT POINT,

14   AND WE WERE SURPRISED THAT INSTEAD OF OFFERING US SAMPLES AND

15   SPECIFICATIONS, WE GOT A LETTER INDICATING THAT THEY HAD A

16   LICENSING AGREEMENT THAT HAD TO BE COMPLETED PRIOR TO THEM

17   SHIPPING US ANY SAMPLES OR HAVING ANY ENGAGEMENT.

18   Q.   I'D LIKE YOU TO LOOK IN THE BINDER OF EXHIBITS THAT YOU

19    HAVE AT TAB 2, PLEASE.  THAT'S JX 0032.

20        THIS IS AN E-MAIL FROM JEFF ALTMAN TO SOMEBODY NAMED

21   B.  CORLETT.

22        I WANT TO ASK YOU, YOU'RE NOT NAMED ON THIS E-MAIL, BUT

23   HAVE YOU EVER SEEN IT?

24   A.   YES, I RECALL THIS SPECIFICALLY.  B. CORLETT WAS BARRY

25    CORLETT.  HE WAS THE ENGINEER IN CHARGE OF DOING THE WORK THAT

1    I DESCRIBED.  HE RECEIVED THIS LETTER IN SUBSTITUTE OF SAMPLES

2    HE WAS EXPECTING, AND SO HE IMMEDIATELY BROUGHT IT TO ME AND

3    ASKED ME WHAT I THOUGHT ABOUT THIS AND REQUESTED SOME GUIDANCE.

4         AND I TOLD HIM THAT UNFORTUNATELY, I'D SPENT 20 YEARS IN

5    THE INDUSTRY, I HAD NEVER SEEN A LETTER LIKE THIS.  IT WAS

6    GOING TO TAKE ME SOME TIME TO EVALUATE, BUT IT LOOKED LIKE

7    THERE WAS A REQUIREMENT FOR AN AGREEMENT BEFORE WE GOT SAMPLE.

8              MR. BAKER:  YES.  YOUR HONOR, I MOVE THE ADMISSION OF

9    JX 0032.

10             MS. SESSIONS:  NO OBJECTION.

11             THE COURT:  IT'S ADMITTED.

12        (JOINT EXHIBIT JX 0032 WAS ADMITTED IN EVIDENCE.)

13             THE COURT:  GO AHEAD, PLEASE.

14   BY MR. BAKER:

15   Q.   MR. BLEVINS, IF YOU COULD FOCUS ON THE PARAGRAPH NEAR THE

16   BOTTOM OF THE PAGE THAT BEGINS "ONCE THIS PATENT LICENSE HAS

17   BEEN COMPLETED."

18        CAN YOU EXPLAIN WHAT YOU UNDERSTOOD QUALCOMM TO BE

19   COMMUNICATING TO APPLE IN THIS LETTER.

20   A.   OUR INTERPRETATION WAS THAT THIS ESSENTIALLY MEANT NO

21   LICENSE, NO CHIPS, THAT YOU COULDN'T BUY ANY CHIPS WITHOUT A

22   LICENSE.  IN FACT, YOU COULDN'T GET ANY SAMPLES OF CHIPS, YOU

23   COULDN'T GET ANY SPECIFICATIONS OF CHIPS.

24        THAT THE FIRST ORDER OF BUSINESS WAS TO COMPLETE A

25   LICENSE, AND WE LATER LEARNED THAT LICENSE ALSO REQUIRED APPLE

1       TO CROSS-LICENSE ITS I.P. BACK TO QUALCOMM, WHICH WE FOUND

2       UNSETTLING.

3       Q.   WHAT WAS YOUR REACTION TO THIS?

4       A.   WE WERE TAKEN ABACK.  WE DIDN'T EXACTLY KNOW WHAT TO MAKE

5       OF IT.

6            BUT WE KNEW THAT WE WEREN'T GOING TO CROSS-LICENSE ALL OF

7       OUR I.P. BACK TO QUALCOMM.  WE WERE SIMPLY TRYING TO BUY A

8       CHIP.

9            SO AT THIS POINT WE ESSENTIALLY ELIMINATED QUALCOMM FROM

10      FURTHER CONSIDERATION.  WE NEEDED TO MAKE A CHIP DECISION, AND

11      WE KNEW THIS WAS GOING TO TAKE TOO LONG TO UNRAVEL.

12      Q.   HAS ANY OTHER MODEM CHIP SUPPLIER DEMANDED THAT APPLE

13      ENTER INTO A LICENSE BEFORE SENDING ENGINEERING SAMPLES TO

14      APPLE?

15      A.   NO, NO NEVER.

16      Q.   HAVE YOU EVER HAD ANY COMPONENT SUPPLIER IN THE IPHONE

17      MAKE SUCH A DEMAND?

18      A.   ACTUALLY, YES.  I CAN THINK OF ONE INSTANCE A COUPLE OF

19      YEARS BACK, THE REASON I RECALL THIS ONE, I HAPPENED TO BE ON

20      VACATION DURING A DATE THAT NXP SEMICONDUCTOR HAD A MEETING

21      WITH MY TEAM AND CAME IN AND SAID THAT THEY HAD A LICENSING

22      REQUIREMENT FOR THEIR NFC CHIP.

23           SO I RECALL BEING REALLY TAKEN ABACK BY THAT, AND SO

24      DESPITE THE FACT THAT I WAS ON VACATION THAT DAY, I CALLED

25      THEIR CEO THAT VERY DAY AND WE QUASHED IT.  WE TOLD THEM THAT

1    IF THEY WANTED MORE MONIES FROM APPLE, THEY SHOULD PRICE IT

2    INTO THEIR HARDWARE.  AND IF THEIR HARDWARE WERE COMPETITIVE,

3    WE WOULD CONTINUE TO BUY IT.  IF WE WERE UNCOMPETITIVE, WE

4    WOULD GO TO SONY OR SOMEONE ELSE.  THEY WITHDREW THEIR LICENSE

5    THAT DAY.  WE QUASHED IT.  OTHER THAN THAT, I CAN'T THINK OF

6    ANOTHER INSTANCE.

7    Q.   HAVE YOU EVER HAD A SUPPLIER REQUEST A CROSS-LICENSE TO

8    APPLE'S I.P. BEFORE THEY WOULD AGREE TO SEND ENGINEERING

9    SAMPLES TO APPLE?

10   A.   THIS IS THE ONLY ONE THAT I'VE EVER PERSONALLY SEEN.

11   Q.   DID APPLE ENTER INTO A LICENSE AGREEMENT WITH QUALCOMM?

12   A.   NO.  TO THIS DATE, WE'VE NOT ENTERED INTO A LICENSE

13   AGREEMENT WITH THEM.

14   Q.   WHY NOT?

15   A.   THERE HAVE BEEN A NUMBER OF STUMBLING BLOCKS.  THE BIGGEST

16   ONE IS WE DON'T UNDERSTAND WHY, IN ORDER TO BUY A COMPONENT

17   FROM THEM, WE HAVE TO ENTER INTO A LICENSING AGREEMENT THAT

18   CROSS-LICENSES ALL OF APPLE'S I.P. BACK TO THEM.  WE SIMPLY

19   DON'T UNDERSTAND WHY THAT'S FAIR OR WHY IT'S IN ANYONE'S BEST

20   INTEREST, OTHER THAN QUALCOMM.

21   Q.   I'D LIKE YOU TO TURN TO TAB 3 IN YOUR BINDER, PLEASE.

22   THIS IS EXHIBIT CX 0507.

23   A.   YES.

24   Q.   THIS IS AN E-MAIL FROM QUALCOMM TO YOU DATED

25   SEPTEMBER 11TH, 2006.

```
 1              DO YOU RECOGNIZE THIS DOCUMENT?

 2      A.   YES, I RECALL SEEING THIS DOCUMENT.

 3      Q.   WHAT IS IT?

 4      A.   AT THAT POINT IN TIME, WE SENT OUT AN RFQ, OR REQUEST FOR

 5      QUOTATION.  WE WERE LOOKING FOR A PROPOSAL FROM VARIOUS

 6      SUPPLIERS TO PROVIDE APPLE BASEBAND MODEMS.  SO THIS WOULD

 7      APPEAR TO BE QUALCOMM'S RESPONSE TO THAT REQUEST.

 8              MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT CX 0507.

 9              MS. SESSIONS:  NO OBJECTION.

10              THE COURT:  IT'S ADMITTED.

11         (PLAINTIFF'S EXHIBIT CX 0507 WAS ADMITTED IN EVIDENCE.)

12              THE COURT:  GO AHEAD, PLEASE.

13      BY MR. BAKER:

14      Q.   MR. BLEVINS, TURNING TO PAGE 3 OF THIS EXHIBIT, IT LOOKS

15      LIKE THERE'S AN ATTACHMENT TO THE E-MAIL.  CAN YOU TELL ME WHAT

16      THIS ATTACHMENT IS?

17      A.   YES.  AS I RECALL, THIS IS WHAT QUALCOMM CALLED A SULA, OR

18      A SUBSCRIBER UNIT LICENSE AGREEMENT.  SO ONCE AGAIN, THEY WERE

19      REITERATING THAT YOU HAVE TO SIGN THIS LICENSE AGREEMENT IF YOU

20      WANT TO BUY CHIPS.

21          SO IT WAS A CONTINUATION OF THE POLICY THAT WE DETERMINED

22      NO LICENSE, NO CHIPS.

23      Q.   AND TURNING TO PAGE 49 OF THIS EXHIBIT, PLEASE, THERE'S

24      ANOTHER ATTACHMENT.  IT'S TITLED SUMMARY OF THIRD PARTY I.P.

25      RIGHTS BENEFITING CUSTOMERS OF QUALCOMM'S MSM'S AND SOFTWARE.
```

1          DO YOU SEE THAT?

2     A.   YES.

3     Q.   CAN YOU TELL ME WHAT THAT IS?

4     A.   YES.  APPLE'S PHILOSOPHY IS WHEN WE WANT TO BUY HARDWARE,

5     THAT AMONG OTHER THINGS WE WANT TO BUY IT EXHAUSTIVELY, AND WE

6     ALSO WANT INDEMNIFICATION, MEANING WE WANT FREEDOM OF USE ONCE

7     WE PURCHASE THE HARDWARE.

8          QUALCOMM SAID THAT INSTEAD OF PROVIDING US THE INDEMNITY

9     THAT WE THOUGHT WAS CRITICAL, THEY WOULD INSTEAD SUMMARIZE A

10    BUNDLE OF I.P. RIGHTS THAT MIGHT COME WITH USE OF THEIR CHIPS,

11    IMPLYING THAT OTHERS MAY HAVE SIGNED AGREEMENTS THAT WERE

12    SIMILAR OR SAME AS THE ONE THEY SENT US.

13    Q.   AND THIS DOCUMENT WAS SUBMITTED BY QUALCOMM IN CONNECTION

14    WITH ITS RESPONSE TO APPLE'S MODEM CHIP RFP; IS THAT RIGHT?

15    A.   YES, THAT'S CORRECT.

16    Q.   DID APPLE EVENTUALLY ENTER INTO AGREEMENTS WITH QUALCOMM?

17    A.   YES, WE DID ENTER INTO A DIRECT LICENSING AGREEMENT.  BUT

18    WE HAVE ENTERED INTO AGREEMENTS WITH THEM SINCE.

19    Q.   ARE YOU FAMILIAR WITH A 2007 AGREEMENT BETWEEN APPLE AND

20    QUALCOMM CALLED THE MARKETING INCENTIVE AGREEMENT?

21    A.   YES.  I WAS NOT THE SIGNATOR OF THAT AGREEMENT.  BUT SINCE

22    THAT POINT IN TIME, I HAVE BECOME FAMILIAR WITH IT.

23    Q.   IF YOU TURN TO TAB 4 IN YOUR EXHIBIT BINDER, PLEASE.

24    THAT'S EXHIBIT JX 0040.

25         IS THAT THE 2007 MARKETING INCENTIVE AGREEMENT?

1    A.   YES.  I'VE SEEN THIS DOCUMENT MANY TIMES.

2         MR. BAKER:  PORTIONS OF THIS DOCUMENT HAVE BEEN

3    SEALED, YOUR HONOR.  I MOVE ITS ADMISSION, JX 0040.

4         MS. SESSIONS:  NO OBJECTION.

5         THE COURT:  IT'S ADMITTED.

6        (JOINT EXHIBIT JX 0040 WAS ADMITTED IN EVIDENCE.)

7         THE COURT:  GO AHEAD, PLEASE.

8    BY MR. BAKER:

9    Q.   MR. BLEVINS, ARE YOU FAMILIAR WITH THE 2009 AGREEMENT

10   BETWEEN APPLE AND QUALCOMM CALLED THE STRATEGIC TERMS

11   AGREEMENT?

12   A.   YES.  I WAS NOT THE SIGNATOR OF THAT AGREEMENT.  BUT I'M

13   VERY FAMILIAR WITH THE AGREEMENT.

14   Q.   IF YOU TURN TO TAB 5 IN YOUR BINDER AND LOOK AT EXHIBIT

15   JX 0052.  IS THAT THE 2009 STRATEGIC TERMS AGREEMENT?

16   A.   PARDON, BUT I MAY BE MISSING TAB 5.

17        MR. BAKER:  YOUR HONOR, MAY I APPROACH?

18        THE COURT:  GO AHEAD, PLEASE.

19        THE WITNESS:  THANK YOU.

20      YES, I'M VERY FAMILIAR WITH THIS DOCUMENT.

21        MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT JX 0052.

22   PORTIONS OF THIS DOCUMENT ALSO HAVE BEEN SEALED.

23        MS. SESSIONS:  NO OBJECTION.

24        THE COURT:  OKAY.  IT'S ADMITTED.

25       (JOINT EXHIBIT JX 0052 WAS ADMITTED IN EVIDENCE.)

1    BY MR. BAKER:

2    Q.   MR. BLEVINS, ARE YOU FAMILIAR WITH THE 2011 AGREEMENT

3    BETWEEN APPLE AND QUALCOMM CALLED THE TRANSITION AGREEMENT?

4    A.   YES.  ONCE AGAIN, I WAS NOT THE SIGNATOR, BUT I HAVE

5    BECOME VERY FAMILIAR WITH THE AGREEMENT SINCE THAT TIME.

6    Q.   AND ARE YOU FAMILIAR WITH THE 2013 AGREEMENT BETWEEN APPLE

7    AND QUALCOMM CALLED THE FIRST AMENDMENT TO TRANSITION

8    AGREEMENT?

9    A.   YES, I AM.  ONCE AGAIN, I WAS NOT THE SIGNATOR, BUT I'M

10   VERY FAMILIAR WITH IT.

11   Q.   IS THERE A DOCUMENT CALLED JX 0057 BEHIND TAB 6 IN YOUR

12   BINDER?

13   A.   YES.

14   Q.   DOES THE 2011 TRANSITION AGREEMENT APPEAR AT PAGES 1

15   THROUGH 5 OF THIS EXHIBIT?

16   A.   YES, IT DOES.

17   Q.   AND DOES THE 2013 FIRST AMENDMENT TO TRANSITION AGREEMENT

18   APPEAR AT PAGES 6 THROUGH 13 OF THE AGREEMENT?  OF THE EXHIBIT?

19   A.   YES, IT DOES.

20        MR. BAKER:  YOUR HONOR, I MOVE THE ADMISSION OF

21   JX 0057.  PORTIONS OF THIS DOCUMENT ALSO HAVE BEEN SEALED.

22        MS. SESSIONS:  NO OBJECTION.

23        THE COURT:  IT'S ADMITTED.

24   (JOINT EXHIBIT JX 0057 WAS ADMITTED IN EVIDENCE.)

25        THE COURT:  GO AHEAD, PLEASE.

1    BY MR. BAKER:

2    Q.  MR. BLEVINS, ARE YOU FAMILIAR WITH THE 2013 AGREEMENT

3    BETWEEN APPLE AND QUALCOMM CALLED THE BUSINESS COOPERATION AND

4    PATENT AGREEMENT?

5    A.  YES, I'M FAMILIAR WITH THAT DOCUMENT.

6    Q.  IS THAT AGREEMENT SOMETIMES REFERRED TO AS THE BCPA?

7    A.  YES, IN FACT, IT IS.

8    Q.  IF YOU TURN TO TAB 7 IN YOUR BINDER, WHICH WOULD BE

9    EXHIBIT JX 0078.  IS THAT THE 2013 BCPA?

10    A.  YES, IT IS.

11         MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT JX 0078, ALSO

12    PARTIALLY REDACTED.

13         MS. SESSIONS:  NO OBJECTION.

14         THE COURT:  IT'S ADMITTED.

15       (JOINT EXHIBIT JX 0078 WAS ADMITTED IN EVIDENCE.)

16         THE COURT:  GO AHEAD, PLEASE.

17    BY MR. BAKER:

18    Q.  MR. BLEVINS, AS I'VE NOTED, EACH OF THOSE AGREEMENTS THAT

19    WE'VE JUST DISCUSSED HAS BEEN PARTIALLY SEALED BY THE COURT,

20    AND I WOULD ASK IN OUR DISCUSSIONS TODAY OF THIS AGREEMENTS, IF

21    YOU COULD AVOID PROVIDING ANY SPECIFIC PERCENTAGE AMOUNTS,

22    SPECIFIC DOLLAR AMOUNTS FROM THOSE AGREEMENTS AS WE DISCUSS

23    THEM?

24    A.  YES, I UNDERSTAND.

25    Q.  THANK YOU.

1          AS APPLE WAS PREPARING TO LAUNCH ITS FIRST CDMA IPHONE,

2     DID IT EVALUATE CDMA MODEM CHIP SUPPLIERS.

3     A.   WE ATTEMPTED TO, BUT WE VERY RAPIDLY CAME TO THE

4     CONCLUSION THAT OUR ONLY ALTERNATIVE WAS QUALCOMM.

5     Q.   WHAT DID APPLE DO AS A RESULT OF THAT CONCLUSION?

6     A.   AS A RESULT OF THAT, WE ENTERED INTO AN AGREEMENT WITH US

7     THAT WOULD GIVE OUR AUTHORIZED PURCHASERS THE ABILITY TO BUY

8     THOSE MODEMS.

9     Q.   DOES APPLE TYPICALLY SEEK TO PUT IN PLACE SUPPLY

10    AGREEMENTS WITH ITS COMPONENT SUPPLIERS?

11    A.   YES, OF COURSE.  WE DO THAT, AND IT'S VERY IMPORTANT TO

12    US.

13    Q.   WHAT ARE SOME OF THE IMPORTANT TERMS THAT APPLE TYPICALLY

14    INCLUDES IN THESE AGREEMENTS?

15    A.   THERE ARE MANY IMPORTANT TERMS THAT WE WANT TO MAKE

16    CERTAIN THE PERFORMANCE SPECIFICATIONS ARE WELL KNOWN, WE WANT

17    TO ENSURE THAT WE'RE GETTING VERY HIGH QUALITY PRODUCTS, WE

18    WANT TO BUY THE HARDWARE EXHAUSTIVELY, WE REQUIRE

19    INDEMNIFICATION, WE WANT VERY STRICT QUALITY STANDARDS TO BE

20    HONORED.

21          WE WANT THE PRICING TO BE COMPETITIVE, WE WANT SUPPLY

22    CONTINUITY ASSURANCES.

23          SO THERE ARE MANY THINGS THAT WE REQUEST IN THOSE

24    AGREEMENTS.

25    Q.   WHY IS SUPPLY CONTINUITY IMPORTANT TO APPLE?

BLEVINS DIRECT BY MR. BAKER

1    A.   SUPPLY CONTINUITY IS ABSOLUTELY CRITICAL TO US, THAT WE

2    DESIGN OUR PRODUCTS IN CUPERTINO, CALIFORNIA, BUT APPLE DOESN'T

3    OWN ITS OWN MANUFACTURING FACILITIES.  WE CAN'T MAKE THOSE

4    PARTS OR COMPONENTS.  THEREFORE, WE ARE VERY DEPENDENT ON A

5    SUPPLIER NETWORK TO MAKE THOSE COMPONENTS, SHIP THEM IN ORDER

6    FOR US TO HAVE CONTINUOUS SUPPLY TO CUSTOMERS AND TO RECEIVE

7    REVENUES THAT WE NEED TO FUEL FURTHER DEVELOPMENT.

8         AND SO IF THERE IS A DISRUPTION IN SUPPLY OF A SINGLE

9    COMPONENT, BEARING IN MIND THERE'S AROUND 1,000 COMPONENTS PER

10   IPHONE, WE DON'T SHIP IPHONE, WE DON'T COLLECT ANY REVENUE.  SO

11   THAT IS A HUGE PROBLEM FOR US.

12   Q.   DID APPLE EVENTUALLY ENTER INTO A SUPPLY AGREEMENT WITH

13   QUALCOMM PRIOR TO BEGINNING TO BUY MODEM CHIPS FROM QUALCOMM?

14   A.   YES, WE DID.

15   Q.   WAS THAT THE STRATEGIC TERMS AGREEMENT THAT WE LOOKED AT

16   EARLIER?

17   A.   THAT IS CORRECT, SIR.

18   Q.   GENERALLY SPEAKING, HOW DID THE BUSINESS TERMS OF THE 2009

19   STRATEGIC TERMS AGREEMENT COMPARE TO APPLE'S SUPPLY AGREEMENTS

20   WITH OTHER SUPPLIERS?

21   A.   THEY ARE VERY, VERY DISSIMILAR.  THEY'RE NOT WHAT WE

22   TYPICALLY WANT.  EXAMPLES I CAN GIVE YOU IS WE WANT TO BUY

23   PARTS EXHAUSTIVELY; THE AGREEMENT DOESN'T PROVIDE FOR THAT.  WE

24   WANT INDEMNIFICATION; THE AGREEMENT DOESN'T PROVIDE FOR THAT.

25   WE WANT VERY STRINGENT QUALITY STANDARDS; THE AGREEMENT DOESN'T

1        PROVIDE FOR THAT.  WE WANT VERY STRONG SUPPLY ASSURANCES, AS I

2        MENTIONED BEFORE FOR OBVIOUS REASONS; THE AGREEMENT DOESN'T

3        PROVIDE FOR THAT.

4             SO THE TWO ARE SO DISSIMILAR, IT WOULD BE DIFFICULT TO

5        COMPARE THEM BRIEFLY OTHER THAN TO SAY THAT THEY'RE VERY

6        DISSIMILAR, AND THEY DON'T MATCH THE OBJECTIVES THAT WE ACHIEVE

7        WITH OTHER SUPPLIERS.

8        Q.   IF YOU COULD TURN TO TAB 8 IN YOUR EXHIBIT BINDER, PLEASE.

9        A.   YES.

10       Q.   LOOKING AT THE -- THIS IS EXHIBIT CX 8261, AND THE SECOND

11       E-MAIL DOWN IS AN E-MAIL FROM ERIC KOLIANDER OF QUALCOMM TO YOU

12       DATED FEBRUARY 22ND, 2008.

13            DO YOU SEE THAT?

14       A.   YES, I SEE IT.

15       Q.   DO YOU RECOGNIZE THIS E-MAIL?

16       A.   YES, I RECOGNIZE AND RECALL THIS E-MAIL.

17       Q.   WAS THIS DOCUMENT RELATED TO THE NEGOTIATION OF THE 2009

18       STRATEGIC TERMS AGREEMENT?

19       A.   YES, IT IS.

20            MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT CX 8261.

21            MS. SESSIONS:  NO OBJECTION.

22            THE COURT:  IT'S ADMITTED.

23       (PLAINTIFF'S EXHIBIT CX 8261 WAS ADMITTED IN EVIDENCE.)

24            THE COURT:  GO AHEAD, PLEASE.

25       BY MR. BAKER:

BLEVINS DIRECT BY MR. BAKER

1    Q.   IF YOU COULD TURN TO PAGE 4 OF THIS EXHIBIT, PLEASE,

2    SECOND PAGE OF THE ATTACHMENT.

3            THE COURT:  IS ANY OF THIS SEALED?  ANY OF THE

4    DOCUMENT SEALED.

5            MR. BAKER:  THIS IS NOT SEALED TO MY KNOWLEDGE.

6            THE COURT:  OKAY.

7    BY MR. BAKER:

8    Q.   THERE'S A DIAGRAM WITH AN ARROW POINTING FROM QCT PRODUCTS

9    TO MAVERICK?

10   A.   YES, SIR.

11   Q.   WHAT IS MAVERICK?

12   A.   MAVERICK IN THIS CASE WAS A CODE NAME THAT QUALCOMM USED

13   TO REFER TO APPLE.

14   Q.   ARE YOU ABLE TO EXPLAIN THE DIAGRAM ON THE LEFT SIDE OF

15   THIS PAGE?

16   A.   YES.  WE HAD MANY MEETINGS ON THIS TOPIC.  THIS WAS A

17   QUALCOMM CHART THAT SUMMARIZED THEIR POSITION.  SO THEY WERE

18   MAKING A COUPLE OF POINTS HERE, THAT UNDERNEATH MAVERICK, YOU

19   CAN SEE A BOX CALLED WAN AND A BOX CALLED NON WAN.  ONE

20   REPRESENTED CELLULAR PRODUCTS, THINGS LIKE MODEMS.  NON WAN

21   REPRESENTED NON CELLULAR PRODUCTS, THINGS LIKE WI-FI, BECAUSE

22   THEY HAD A BROADER PORTFOLIO.

23       WHAT THEY WERE TRYING TO TELL US IN THIS CHART IS FOR NON

24   WAN, THINGS LIKE WI-FI, NO SEPARATE PRODUCTS WERE REQUIRED, THE

25   PRODUCTS WERE SOLD ON A SEPARATE BASIS, THEY WOULD GIVE US

BLEVINS DIRECT BY MR. BAKER

1    STRONG REPS AND WARRANTIES ON USE AND FREEDOM OF USE.

2        AND SO THEY WERE ESSENTIALLY SAYING THAT FOR THESE TYPES

3    OF PRODUCTS WHERE THERE WAS COMPETITIVE ALTERNATIVES, THEY

4    WOULD MATCH WHAT OTHER COMPETITORS WOULD PROVIDE AND THEY WOULD

5    MATCH APPLE'S OBJECTIVES.  SO THIS IS WHAT WE WANTED, THIS BOX

6    THAT SAID NON WAN.  AND I CONTRAST THAT WITH THE BOX ON THE

7    LEFT THAT SAYS WAN, WHICH IS CELLULAR, THEY SAID THIS IS AN

8    ENTIRELY DIFFERENT STORY.  WE DON'T OFFER YOU THOSE KINDS OF

9    ASSURANCES AND PROTECTIONS ON WAN, AND YOU START BY BEING A

10   LICENSEE IN GOOD STANDING.

11       SO THIS WAS REITERATION OF NO LICENSE, NO CHIPS.

12   Q.   AND THIS PRESENTATION WAS PROVIDED TO APPLE BY QUALCOMM;

13   IS THAT RIGHT?

14   A.   YES, THIS IS A QUALCOMM DOCUMENT.  THEY WERE SIMPLY

15   SUMMARIZING THEIR POSITION.

16   Q.   I'D LIKE TO ASK SOME QUESTIONS ABOUT THE 2011 TRANSITION

17   AGREEMENT AND THE 2013 FIRST AMENDMENT TO TRANSITION AGREEMENT

18   NOW.

19   A.   OKAY.

20   Q.   YOU TESTIFIED EARLIER THAT YOU'RE FAMILIAR WITH THESE TWO

21   TRANSITION AGREEMENTS.  HOW DID YOU GAIN THAT FAMILIARITY?

22   A.   I GAINED THAT FAMILIARITY OVER TIME AS WE EXECUTED AND

23   COMPLIED WITH THE AGREEMENTS, AND I SOUGHT THE ADVICE OF

24   COUNSEL WITHIN APPLE ON WHAT CERTAIN TERMS MAY MEAN AND HOW WE

25   COMPLIED WITH THOSE TERMS.

1    Q.   ARE YOU ABLE TO GIVE ME A VERY HIGH LEVEL DESCRIPTION OF

2    HOW THESE AGREEMENTS FUNCTION FROM THE BUSINESS PERSPECTIVE?

3    A.   YES.   THE TRANSITION AGREEMENT WAS INTENDED TO PROVIDE FOR

4    APPLE TO HAVE AN APPROPRIATE LICENSE AS WE WOULD NEED TO SHIP

5    CDMA CHIPS, AND THAT THE LATER FIRST AMENDED TRANSITION

6    AGREEMENT GAVE US SIMILAR ABILITY TO SHIP UMTS AND LTE CHIPS.

7         HOWEVER, AND IMPORTANTLY, THERE WOULD BE LARGE REBATES

8    ASSOCIATED WITH THE NOMINAL ROYALTY PAYMENTS IF WE WERE TO USE

9    QUALCOMM CHIPS EXCLUSIVELY.

10   Q.   SO THESE AGREEMENTS PROVIDED REBATES FROM QUALCOMM TO

11   APPLE IN CONNECTION WITH CHIP PURCHASES; IS THAT RIGHT?

12   A.   YES.   SPECIFICALLY WE WERE REQUIRED TO USE THEIR CHIPS

13   EXCLUSIVELY.   AT A POINT IN TIME WHERE WE USED ANYONE ELSE'S

14   CHIP, THEN WE WOULD FORFEIT THOSE REBATES THAT WERE OTHERWISE

15   EARNED WHICH WERE QUITE LARGE.

16   Q.   DO YOU HAVE AN UNDERSTANDING OF HOW THESE AGREEMENTS

17   IMPACTED APPLE'S MODEM CHIP PROCUREMENT DECISIONS?

18   A.   YES, I DO.   THEY MADE IT VERY UNATTRACTIVE FOR US TO

19   CHOOSE A DIFFERENT CHIPSET SUPPLIER.   I WON'T MENTION THE

20   NUMBERS, BUT THESE REBATES WERE VERY, VERY LARGE.

21        SO WHEN WE FACTORS IN THE REBATES THAT WE WOULD FORFEIT BY

22   USING A DIFFERENT CHIP SUPPLIER, IT SERVED AS A VERY STRONG

23   DISINCENTIVE FOR US TO DO SO.   IT WAS NO LONGER A LEVEL PLAYING

24   FIELD AS IT WAS BEFORE.

25   Q.   YOU MENTIONED EARLIER THAT AT SOME POINT BETWEEN 2012 AND

1     2016, APPLE CONSIDERED INTEL AS A POSSIBLE SUPPLIER OF MODEM

2     CHIPS.

3          DID APPLE EVER CONSIDER INTEL MODEM CHIPS FOR ANY 2014

4     APPLE CELLULAR DEVICES?

5     A.   YES, WE DID.  AS I RECALL, AT ONE POINT IN TIME WE HAD A

6     OFFICIAL PLAN OF RECORD WITHIN APPLE THAT WE WOULD IMPLEMENT

7     INTEL ON AN IPAD PRODUCT LAUNCH, AND THEN THAT WOULD GIVE US

8     CONFIDENCE TO EXTEND THEIR PRESENCE INTO AN IPHONE.  WE FELT

9     THAT IPAD WAS A SIMPLER TRANSITION BECAUSE IT WAS DATA ONLY,

10    AND THEN WE WOULD ADD VOICE AS WE MOVED TO PHONE.

11    Q.   CAN YOU PLEASE TURN TO TAB 10 IN YOUR EXHIBIT BINDER,

12    EXHIBIT JX 0074.

13    A.   YES, SIR.

14    Q.   THIS IS AN E-MAIL FROM OCTOBER 2, 2012.

15         DO YOU RECOGNIZE THIS DOCUMENT?

16    A.   YES, I RECALL SEEING THIS DOCUMENT.

17    Q.   WHAT IS THIS DOCUMENT?

18    A.   THIS WAS AN UPDATE ON A MEETING THAT WE HAD AT APPLE AND A

19    SUMMARY OF OUR DECISION TO PROCEED WITH INTEL ON THE IPAD THAT

20    I MENTIONED PREVIOUSLY.

21         MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT JX 0074.

22         MS. SESSIONS:  NO OBJECTION.

23         THE COURT:  IT'S ADMITTED.

24    (JOINT EXHIBIT JX 0074 WAS ADMITTED IN EVIDENCE.)

25         THE COURT:  GO AHEAD, PLEASE.

1          MR. BAKER:  THERE ARE PORTIONS OF THIS DOCUMENT THAT

2     ARE SEALED.  I DO NOT PLAN TO SHOW THEM TODAY OR TO ASK ABOUT

3     THEM.

4          THE COURT:  OKAY.

5     BY MR. BAKER:

6     Q.   ON THE THIRD LINE OF THIS E-MAIL, THERE ARE SOME NAMES

7     LISTED ON THE SIDE.

8          WHO IS JEFF?

9     A.   JEFF WOULD BE MY MANAGER, JEFF WILLIAMS, WHO WAS PREVIOUS

10    OPERATIONS OFFICER OF APPLE.

11    Q.   WHO'S TONY?

12    A.   THAT WOULD BE ME.

13    Q.   AND WHO'S ISABEL?

14    A.   ISABEL IS MY COLLEAGUE WHO WAS VICE PRESIDENT OF SOFTWARE

15    ENGINEERING.

16    Q.   WHAT PRODUCTS WAS APPLE CONSIDERING INTEL FOR AT THIS

17    POINT?

18    A.   IN THIS PARTICULAR E-MAIL CHAIN, THIS WAS A DECISION THAT

19    WE WERE MEMORIALIZING WHERE WE INTENDING TO GO WITH INTEL FOR

20    OUR NEXT IPAD LAUNCH IN SPRING 2014.

21    Q.   AND HOW WOULD AN IPAD SLOT HELP INTEL PROGRESS TOWARDS AN

22    IPHONE SLOT?

23    A.   WE FELT THAT WAS A LESS SEVERE LEARNING CURVE FOR THEM

24    BECAUSE THEY HAD BEEN OUT OF OUR PRODUCTS FOR A NUMBER OF

25    YEARS, THAT WE FELT TECHNICALLY AND OPERATIONALLY, IF WE COULD

1    USE THEIR PRODUCT IN AN IPAD, WHICH WAS DATA ONLY, NO VOICE,

2    THAT WE WOULD GET A GREAT DEAL OF LEARNING FROM THAT EXERCISE

3    AND THEN WE WOULD BE ABLE TO MUCH MORE SMOOTHLY AND WITH LESS

4    RISK IMPLEMENT THEM INTO AN IPHONE LATER.

5    Q.   TURN TO PAGE 2 OF THE EXHIBIT, PLEASE, ABOUT EIGHT LINES

6    DOWN.  THE E-MAIL READS, "ALL AGREED IN THE MEETING THAT IMC

7    FOR J86 WAS A GOOD PLAN."

8         CAN YOU TRANSLATE THAT STATEMENT FOR ME?

9    A.   YES.  J86 IS AN INTERNAL CODE NAME THAT REFERRED TO THE

10   IPAD MINI 2.  AND SO THIS ESSENTIALLY SAYS EVERYONE IN THE

11   MEETING, AND AS YOU'LL RECALL FROM THE DISTRIBUTION LIST, THAT

12   WAS HARDWARE ENGINEERING, SOFTWARE ENGINEERING, OPERATIONS, ALL

13   OF US AGREED WE WANTED TO USE THE INTEL MODEM IN THE IPAD MINI

14   2.  SO THIS WAS THE OFFICIAL PLAN OF RECORD FOR US.

15   Q.   AS OF OCTOBER 2012, WAS APPLE MOVING FORWARD WITH AN

16   ENGINEERING ENGAGEMENT WITH INTEL FOR THE IPAD MINI 2?

17   A.   YES, THAT IS CORRECT.

18   Q.   CAN YOU DESCRIBE WHAT LEVEL OF COMMITMENTS SUCH AN

19   ENGINEERING ENGAGEMENT ENTAILED BY APPLE?

20   A.   IT'S A LARGE COMMITMENT.  IT'S A LARGE COMMITMENT ON OUR

21   BEHALF, BOTH HARDWARE AND SOFTWARE ENGINEERING, AND IT'S A

22   LARGE COMMITMENT ON BEHALF OF THE SUPPLIER, WHICH IN THIS CASE

23   WAS IMC.

24   Q.   WAS THAT ENGAGEMENT SUCCESSFUL IN GETTING AN INTEL MODEM

25   CHIP INTO A 2014 IPAD?

1     A.   IN NET, NO, IT WAS NOT.  WE ABORTED THAT PLAN AFTER THIS

2     OCTOBER MEETING.

3     Q.   WHY DID YOU DO THAT?

4     A.   WE FOUND THAT IT WASN'T IN APPLE'S BEST OVERALL INTEREST.

5          AROUND MID-JANUARY OF THE FOLLOWING YEAR, 2013, WE REACHED

6     AN AGREEMENT WITH QUALCOMM WHEREBY THAT WE WOULD OBTAIN VERY,

7     VERY LARGE REBATES IF WE USED THEM EXCLUSIVELY.

8          AND SO IT WAS JUST NOT ECONOMICALLY VIABLE FOR US TO USE

9     INTEL IN AN IPAD MINI, EVEN THOUGH WE THOUGHT THEIR PERFORMANCE

10    WAS SIMILAR AND THEIR PRICE WAS MUCH LESS, WHICH OFFERED US

11    ADDITIONAL VALUE.

12         IT WOULD CAUSE US TO FORFEIT THOSE REBATES THAT WE HAD

13    OTHERWISE EARNED.  SO IT WAS A LOSING PROPOSITION FROM A

14    FINANCIAL STANDPOINT.  SO THE PLANS WERE CHANGED.

15    Q.   SO ARE THOSE THE 2013 AGREEMENTS THAT WE DISCUSSED

16    EARLIER?

17    A.   THAT IS CORRECT, SIR.

18    Q.   THE BCPA AND THE FIRST AMENDMENT TO THE TRANSITION

19    AGREEMENT?

20    A.   YES, I BELIEVE THEY WERE SIGNED AROUND FEBRUARY OF 2013.

21    Q.   WHEN DID THE NEGOTIATIONS OCCUR?

22    A.   THE NEGOTIATIONS HAD BEEN ONGOING FOR AT LEAST ABOUT SIX

23    MONTHS PRIOR TO SIGNATURE.

24         HOWEVER, A DATE THAT I DO SPECIFICALLY RECALL, BECAUSE IT

25    WAS IMPORTANT, WE HAD A BIG MEETING WITH THE TOP EXECUTIVES

1    BETWEEN APPLE AND QUALCOMM IN CUPERTINO IN MID-JANUARY.

2         I SPECIFICALLY RECALL THAT BECAUSE ALL OF THE MAJOR

3    BUSINESS PRINCIPLES WERE AGREED.  IT THEN TOOK THE ATTORNEYS

4    FROM BOTH SIDES A FEW WEEKS TO STRAIGHTEN OUT SOME OF THE

5    DETAILS.

6         BUT THE REASON I RECALL THAT MEETING, IT WAS ON A SUNDAY

7    AND I HAD PLANNED TO HAVE SOME FRIENDS OVER TO WATCH THE 49ERS

8    GAME, AND I MISSED THAT.  I WAS ABLE TO GO BACK THROUGH MY

9    NOTES AND DETERMINE THAT DATE WAS JANUARY 12TH.

10   Q.   WHAT WERE THE KEY TERMS THAT WERE HAMMERED OUT?

11   A.   THE KEY TERMS WERE, IN ESSENCE, THAT APPLE WOULD RECEIVE

12   VERY, VERY LARGE REBATES FROM THE LICENSE PAYMENTS IF WE AGREED

13   TO BUY OUR CHIPSETS EXCLUSIVELY FROM QUALCOMM.

14   Q.   IF YOU COULD TURN TO TAB 11, PLEASE, IN YOUR BINDER,

15   CX 0531.  THIS IS A JANUARY 29TH, 2013 E-MAIL FROM YOU,

16   MR. BLEVINS, TO JEFF WILLIAMS?

17   A.   YES, THAT IS CORRECT.

18             MR. BAKER:  YOUR HONOR, I NOVEMBER TO ADMIT CX 0531.

19             MS. SESSIONS:  NO OBJECTION, YOUR HONOR.

20             THE COURT:  OKAY.  IT'S ADMITTED.

21        (PLAINTIFF'S EXHIBIT CX 0531 WAS ADMITTED IN EVIDENCE.)

22             THE COURT:  GO AHEAD, PLEASE.

23   BY MR. BAKER:

24   Q.   WHAT WERE YOU COMMUNICATING WITH MR. WILLIAMS ABOUT?

25   A.   WELL, THE TIMELINE HERE WAS WE HAD REACHED AGREEMENT IN

1      PRINCIPLE WITH QUALCOMM ON OR ABOUT JANUARY THE 12TH.  THE

2      AGREEMENT WAS IN FINAL STAGES OF BEING SIGNED, AND THIS WOULD

3      CAUSE US TO CHANGE OUR PLANS FROM INTEL TO QUALCOMM.

4          AND OUR THOUGHTS WERE INTEL WERE CONTINUING TO USE

5      SIGNIFICANT ENGINEERING RESOURCES ON OUR PROJECT THAT WASN'T

6      GOING TO HAPPEN.  SIMILARLY, APPLE ENGINEERING TEAM WAS

7      EXERTING EFFORT THERE, THEY WANTED TO ABORT THOSE EFFORTS.  AND

8      SO THE TASK FELL TO ME TO GO BACK TO HERMANN EUL IN THIS CASE,

9      WHO AT THE TIME WAS PRESIDENT OF IMC, AND TELL HIM THAT THE

10     PROJECT WAS AWARDED, THAT HE SHOULD STOP, OUR PLANS HAD

11     CHANGED.

12         AND I WAS EXPRESSING HERE THAT HAD SOME MISGIVINGS ABOUT

13     THAT, WE HAD AWARDED THE BUSINESS TO THEM, THEY HAD WORKED VERY

14     HARD, THEY HADN'T DONE ANYTHING TO CAUSE THEM TO LOSE THE

15     BUSINESS SPECIFICALLY, IT WAS JUST THAT WE HAD AN AGREEMENT

16     WITH QUALCOMM NOW THAT MADE THIS VERY FINANCIALLY UNATTRACTIVE

17     FOR US.

18         SO THAT'S WHY I MADE THE COMMENT THAT WE HAVE ACCIDENTALLY

19     MISLED HERMANN.  IF WE KNEW WHERE WE WERE GOING TO LAND WITH

20     QUALCOMM, WE WOULD HAVE NEVER STARTED THEM ON THIS PROJECT.  IT

21     WASN'T THE RIGHT THING TO DO.

22     Q.   IN LINE 3, YOU REFER TO A NEW QC STRATEGY.  WHAT IS THAT

23     REFERRING TO?

24     A.   THAT'S THAT I KNEW WE HAD AN AGREEMENT IN PRINCIPLE WITH

25     QUALCOMM THAT MADE ALL THOSE REBATES CONTINGENT ON EXCLUSIVITY.

```
1    SO WE HAD A NEW PLAN.  WE WERE GOING TO ATTEMPT TO ACQUIRE

2    THOSE REBATES AND THAT REQUIRED THAT WE WORK EXCLUSIVELY WITH

3    QUALCOMM, WHICH LED TO DISENGAGEMENT WITH IMC.

4    Q.   FROM A TECHNICAL OR ENGINEERING STANDPOINT IN EARLY 2013,

5    HAD THERE BEEN CONCERNS ABOUT INTEL'S PERFORMANCE WITHIN APPLE?

6    A.   YES.  THERE ARE ALWAYS CONCERNS.  I SHOULD PROBABLY

7    DESCRIBE TO YOU THAT APPLE'S ENGINEERING TEAM ARE SOME OF THE

8    MOST DETAILED OBSESSED, INSANELY PASSIONATE PEOPLE ON THIS

9    PLANET.  THEY HOLD THEMSELVES TO HIGH STANDARDS.  THEY HOLD

10   THEIR SUPPLIERS TO HIGH STANDARDS.  NO ONE CAN MEET ALL OF

11   THEIR REQUIREMENTS EVER, AND THAT'S WHY I LOVE WORKING WITH

12   THOSE GUYS.  THEY'RE THE BEST IN THE WORLD IN MY VIEW.

13        SO IN EVERY SUPPLIER ENGAGEMENT I'VE EVER BEEN INVOLVED

14   IN, NO ONE EVER MEETS ALL OF THEIR REQUIREMENTS.  I'M NOT SURE

15   IT'S POSSIBLE.  SO I DO HAVE SOME SYMPATHY FOR OUR SUPPLIERS.

16        BUT CLEARLY INTEL WASN'T MEETING ALL OF OUR REQUIREMENTS.

17   I'M NOT CERTAIN THEY'VE EVER MET ALL OF OUR REQUIREMENTS ON ANY

18   PRODUCT, AND I'M NOT CERTAIN QUALCOMM HAS EITHER OR EVEN EVER

19   WILL.  THAT'S THE NATURE OF THE GAME FOR US.  WE THINK THAT'S

20   WHAT MAKES APPLE PRODUCTS GREAT.  IT'S WHERE A REASONABLE

21   PERSON MIGHT STOP AND SAY GOOD ENOUGH IS GOOD ENOUGH.  OUR

22   ENGINEERING TEAM CONTINUES.

23   Q.   WERE ANY OF THE TECHNICAL CONCERNS ABOUT INTEL CHIPSETS

24   DEAL BREAKERS FROM YOUR PERSPECTIVE?

25   A.   NOT FROM MY PERSPECTIVE.  I MONITORED THIS CLOSELY ON A
```

1    WEEKLY BASIS.  AGAIN, THERE WERE ALL SORTS OF CONCERNS WITH

2    INTEL, JUST AS THERE WERE ALL SORTS OF CONCERNS AT THAT STAGE

3    WITH LCD WE WOULD HAVE BEEN USING, WITH THE FLASH MEMORY.

4    THAT'S THE NATURE OF THE GAME FOR US.  THE ENGINEERING TEAM IS

5    JUST WORKING INSANELY PASSIONATELY TO IMPROVE EVERYBODY'S

6    PERFORMANCE, AND NOBODY IS EVER GOOD ENOUGH.

7    Q.   IN PARTICULAR, DID APPLE ENGINEERS RAISE ANY CONCERNS

8    ABOUT INTEL'S ABILITY TO SUPPORT A FEATURE AT THAT TIME CALLED

9    CARRIER AGGREGATION?

10   A.   I RECALL THAT WE WERE IN EARLY STAGES OF CARRIER

11   AGGREGATION DISCUSSIONS AT THAT POINT IN TIME.  THE IPAD MINI 2

12   ARCHITECTURE ITSELF DIDN'T SUPPORT CARRIER AGGREGATION.  SO

13   WHETHER THE CHIP WAS CAPABLE OR NOT WAS IRRELEVANT.  THE

14   ARCHITECTURE OF THE SYSTEM DIDN'T SUPPORT IT IN THAT PERIOD.

15   Q.   WHEN WAS THE IPAD MINI 2 ULTIMATELY RELEASED?

16   A.   AS I RECALL, WE WERE ORIGINALLY TARGETING IT FOR THE

17   MARCH/APRIL TIMEFRAME.

18       WE -- OUR PLANS, BY THE WAY, CHANGE VERY FREQUENTLY.

19   THEY'RE VERY FLUID, DYNAMIC DOCUMENTS.  SO I'LL TELL YOU THAT

20   THE MAJOR CHECKPOINTS THAT I RECALL, IT MOVED FROM THE

21   MARCH/APRIL OF 2013 TIMEFRAME TO THE SEPTEMBER 2012 TIMEFRAME.

22       IT LATER MOVED TO OCTOBER OF 2012, AND MY RECOLLECTION IS

23   WE FINALLY LANDED ON NOVEMBER OF 2012.

24   Q.   YOU MEAN 2013?

25   A.   YES, EXCUSE ME, 2013.

1    Q.   WHAT SUPPLIER PROVIDED THE MODEM FOR THAT DEVICE WHEN IT

2    WAS ULTIMATELY LAUNCHED?

3    A.   IT WAS QUALCOMM.

4    Q.   DID THE QUALCOMM MODEM IN THE IPAD MINI 2 SUPPORT CARRIER

5    AGGREGATION?

6    A.   NO.  THE SYSTEM ITSELF, THE ARCHITECTURE DIDN'T SUPPORT

7    CARRIER AGGREGATION, AND I DON'T BELIEVE THE QUALCOMM CHIP

8    ITSELF SUPPORTED CARRIER AGGREGATION, ALTHOUGH I'M NOT CERTAIN.

9    BUT I KNOW THAT THE SYSTEM WAS NOT CARRIER AGGREGATION ENABLED.

10   Q.   WERE ANY IPAD MINI MODELS RELEASED IN 2014?

11   A.   YES, WE RELEASED A NEW MODEL IN 2014.

12   Q.   WHO WAS THE MODEM SUPPLIER FOR THAT DEVICE?

13   A.   THAT WAS ALSO QUALCOMM.

14   Q.   DO YOU KNOW IF THE MODEM IN THAT DEVICE SUPPORTED CARRIER

15   AGGREGATION?

16   A.   I KNOW FOR A FACT THE SYSTEM DID NOT.  THE SYSTEM

17   ARCHITECTURE WAS NOT DESIGNED TO ENABLE CARRIER AGGREGATION.

18   Q.   MOVING FORWARD IN TIME FROM A PROCUREMENT STANDPOINT, DID

19   APPLE SERIOUSLY CONSIDER SUPPLIERS OTHER THAN QUALCOMM FOR ITS

20   2015 CELLULAR DEVICE MODELS?

21   A.   WE CONTINUED TO DO EVALUATIONS, BUT IT WAS VERY APPARENT

22   TO US THAT THE VERY, VERY LARGE REBATES THAT I MENTIONED

23   EARLIER WOULD MAKE IT A COMPLETE NONSTARTER TO WORK WITH

24   SOMEONE ELSE, THAT WE COULDN'T ACHIEVE THE VALUE THAT I CITED

25   EARLIER THAT FORFEITING THOSE REBATES THAT WOULD OTHERWISE BE

1    EARNED WOULD MAKE ANYONE ELSE JUST A FAR TOO EXPENSIVE

2    PROPOSITION TO SERIOUSLY CONSIDER.

3    Q.   IF YOU COULD TURN TO TAB 12 IN YOUR BINDER, PLEASE.  IT'S

4    EXHIBIT CX 0853.

5    A.   YES, I SEE IT.

6    Q.   THIS IS A FEBRUARY 20TH, 2014, E-MAIL EXCHANGE BETWEEN YOU

7    AND ISABEL MAHE?

8    A.   YES.

9    Q.   DO YOU RECOGNIZE THIS DOCUMENT?

10   A.   YES, I RECOGNIZE IT AND REMEMBER IT.

11          MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT CX 0853.

12          MS. SESSIONS:  NO OBJECTION.

13          THE COURT:  IT'S ADMITTED.

14      (PLAINTIFF'S EXHIBIT CX 0853 WAS ADMITTED IN EVIDENCE.)

15          THE COURT:  GO AHEAD, PLEASE.

16   BY MR. BAKER:

17   Q.   WHO IS MS. MAHE?

18   A.   MS.  MAHE WAS ONE OF MY COLLEAGUES THAT WAS SPECIFICALLY

19   RESPONSIBLE FOR SOFTWARE ENGINEERING.  IN FACT, SHE WAS VICE

20   PRESIDENT OF SOFTWARE ENGINEERING.

21   Q.   AT THE TOP OF PAGE 1 OF THIS EXHIBIT YOU WRITE, "IN NET,

22   THERE IS NO WAY THAT WE WOULD FOREGO OTHERWISE EARNED

23   INCENTIVES IN FAVOR OF LAUNCHES IPAD ONLY IN 15."

24      CAN YOU EXPLAIN WHAT YOU MEANT BY THAT?

25   A.   YES.  YOU SEE IN THIS E-MAIL EXCHANGE, ISABEL WAS POINTING

1       OUT THAT FROM AN ENGINEERING STANDPOINT, THE PRUDENT APPROACH

2       WAS TO LAUNCH IN AN IPAD FIRST AND THEN USE THAT LEARNING TO

3       CONTINUE ON TO AN IPHONE.

4           FROM A PURELY TECHNICAL PERSPECTIVE, SHE WAS ABSOLUTELY

5       RIGHT, THERE WAS NO QUESTION, EVERYONE AGREED WITH THAT

6       PERSPECTIVE, WITHIN APPLE AGREED WITH WHAT SHE SAID FROM A

7       TECHNICAL PERSPECTIVE.

8           SO MY E-MAIL IN RESPONSE TO HER WAS I DIDN'T DISAGREE WITH

9       HER, BUT THERE IS NO -- I USED THE TERM, THERE'S NO WAY WE

10      WOULD FORGO OTHERWISE EARNED INCENTIVES IN FAVOR OF LAUNCHING

11      AN IPAD IN 2015.  IT JUST SIMPLY WASN'T AN ECONOMIC PROPOSITION

12      FOR US.

13      Q.   AND THE OTHERWISE EARNED INCENTIVES YOU'RE REFERRING TO

14      ARE THE INCENTIVES UNDER THE AMENDED TRANSITION AGREEMENT?

15      A.   I WAS SPECIFICALLY REFERRING TO THE QUALCOMM REBATES THAT

16      WOULD BE DUE PER THAT AGREEMENT, YES.

17      Q.   COULD YOU TURN TO TAB 13 IN YOUR BINDER, PLEASE, EXHIBIT

18      CX 0578.

19          THIS IS ANOTHER E-MAIL FROM THIS PERIOD DATED

20      FEBRUARY 24TH, 2014.

21          DO YOU RECOGNIZE THIS DOCUMENT?

22      A.   YES, I DO.

23              MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT CX 0578.

24              MS. SESSIONS:  NO OBJECTION.

25              THE COURT:  IT'S ADMITTED.

1          (PLAINTIFF'S EXHIBIT CX 0578 WAS ADMITTED IN EVIDENCE.)

2              THE COURT:  GO AHEAD, PLEASE.

3     BY MR. BAKER:

4     Q.   AND THE PARAGRAPH THAT BEGINS "IN AN IDEAL WORLD," YOU

5     WRITE, "WE'D LIKE TO HAVE THE FREEDOM TO EITHER CHOOSE QUALCOMM

6     CHIPSETS OR NOT ON THE BASIS OF OUR OVERALL VALUE."

7              AND YOU END, "AND NOT ENTANGLE THE LICENSING ISSUES."

8              WHAT DO YOU MEAN BY THAT?

9     A.   WHAT I MEANT SPECIFICALLY IS AS WE PURCHASE HARDWARE, WE'D

10    LIKE TO EVALUATE EVERYONE ON A LEVEL PLAYING FIELD, AND WE

11    WOULD LIKE TO CHOOSE THE SUPPLIERS THAT OFFER US OVERALL BEST

12    VALUE.

13             AND TO BE SPECIFIC, I WAS EXPLAINING TO THAT THE VALUE

14    WOULD INCLUDE THE TECHNICAL SPECIFICATIONS, IT WOULD BE THEIR

15    SCHEDULE, IT WOULD BE THE KINDS OF TERMS WHICH WOULD INCLUDE

16    SUPPLY CONTINUITY PROTECTION, IT WOULD INCLUDE PRICE

17    SPECIFICALLY, AND I WAS SUGGESTING TO HER THAT IN AN IDEAL

18    WORLD THAT'S HOW I'D LIKE TO CHOOSE THESE CHIPSETS AND I DID

19    NOT WANT TO, QUOTE-UNQUOTE, "ENTANGLE THE LICENSING ISSUES."

20             BUT I WENT ON TO EXPLAIN TO HER, IN THIS CASE THE

21    LICENSING ISSUES WERE HOPELESSLY ENTANGLED, THAT WE'D ENTERED

22    INTO AGREEMENTS THAT OFFERED APPLE VERY SIGNIFICANT SUMS OF

23    MONEY FOR USING THEIR CHIPSETS EXCLUSIVELY.  SO IT WASN'T THE

24    KIND OF FREE MARKET THAT WOULD GIVE US FREEDOM TO CHOOSE

25    WHOMEVER WE MIGHT WANT BASED ON A LEVEL PLAYING FIELD.

1          SO THAT WAS THE ESSENCE OF MY E-MAIL.

2      Q.   HOW WERE THESE AGREEMENTS RELATED TO LICENSING?

3      A.   THE AGREEMENTS THAT WE DID WITH QUALCOMM, THERE WAS A

4      SERIES OF AGREEMENTS THAT WE REFERENCED EARLIER THAT OFFERED

5      APPLE VERY SUBSTANTIAL REBATES, BUT A CONDITION OF THAT IS WE

6      HAD TO USE THEIR CHIPSETS EXCLUSIVELY.

7          AND SO ON THE BASIS OF THAT, WHEN I WOULD EVALUATE THEIR

8      CHIPSET VERSUS INTEL, DESPITE HOW INTEL MIGHT LOOK BETTER IN

9      ANY OR ALL ASPECTS, I ALSO HAD TO FACTOR IN THE POTENTIAL OF

10     LOSING THOSE VERY LARGE REBATES, AND THAT SERVED AS A

11     DISINCENTIVE TO PURSUE INTEL OR ANYONE ELSE.

12         SO THESE LICENSING ISSUES WERE HOPELESSLY ENTANGLED FROM

13     OUR PERSPECTIVE.

14     Q.   SO YOU CONSIDERED THOSE REBATES TO BE ROYALTY REBATES?

15     A.   OH, THEY WERE ABSOLUTELY ROYALTY REBATES, YES.

16     Q.   TURN TO TAB 14 IN YOUR BINDER, PLEASE.  THIS IS A SEALED

17     DOCUMENT.

18         THIS IS CX 0856.  THIS IS A SEPTEMBER 10TH, 2014 E-MAIL

19     FROM YOU TO MR. WILLIAMS.

20         DO YOU RECOGNIZE THIS E-MAIL?

21     A.   YES, I RECOGNIZE IT AND RECALL IT.

22             MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT CX 0856.

23             MS. SESSIONS:  NO OBJECTION.

24             THE COURT:  IT'S ADMITTED.

25             (PLAINTIFF'S EXHIBIT CX 0856 WAS ADMITTED IN EVIDENCE.)

```
 1              THE COURT:  GO AHEAD, PLEASE.

 2      BY MR. BAKER:

 3      Q.   I'D LIKE TO LOOK AT THE FOURTH PARAGRAPH DOWN, THE ONE

 4      THAT BEGINS WITH DEREK'S ARGUMENT, AND I'D LIKE TO BE

 5      SENSITIVE, AGAIN, NOT TO MENTION ANY DOLLAR AMOUNTS.

 6      A.   OKAY.

 7      Q.   AND I'LL TRY TO READ IT WITHOUT MENTIONING THOSE DOLLAR

 8      AMOUNTS.

 9           YOU WRITE, "DEREK'S ARGUMENT IS THAT TODAY'S ACTUAL

10      ROYALTY IS, X AND THE CHIPSET PRICE IS CRISTIANO'S BUSINESS.

11      ONLY IF WE BRING TO THEM SOME ADDITIONAL VALUE (E.G., CHIPSET

12      EXCLUSIVITY), WOULD HE CONSIDER A REDUCTION OF THE X."

13      A.   YES.

14      Q.   CAN YOU GIVE ME JUST A YES OR NO ANSWER ON THIS ONE.  IS

15      THIS SOMETHING THAT DEREK ABERLE SAID TO YOU?

16      A.   IN THIS INSTANCE, BOTH DEREK AND CRISTIANO SAID IT TO ME.

17           BUT, YES.

18      Q.   CAN YOU DESCRIBE FOR ME THE CONTEXT OF THIS STATEMENT?

19      A.   THE CONTEXT WAS THAT IF WE WANTED ANY TYPE OF ROYALTY LESS

20      THAN $10, THE ONLY WAY HE COULD ENVISION DOING THAT, HE BEING

21      DEREK, WOULD BE IF WE BROUGHT SOME ADDITIONAL VALUE TO THE

22      TABLE.

23           AND HIS SPECIFIC EXAMPLE WAS EXCLUSIVITY, IF HE GAVE ME

24      EXCLUSIVE CHIPSET, THEN MAYBE I'LL THINK ABOUT DOING SOMETHING

25      LESSER.
```

1    Q.   WHY WERE YOU TALKING TO MR. ABERLE IN YOUR CAPACITY AS A

2    PROCUREMENT OFFICIAL SEEKING MODEM CHIPS?

3    A.   I GENERALLY DON'T.  I'M GENERALLY NOT INVOLVED IN SEPARATE

4    AND DISTINCT INTELLECTUAL PROPERTY LICENSING DISCUSSIONS.  WE

5    HAVE A SEPARATE TEAM AT APPLE THAT DOES THAT.

6         HOWEVER, IN THIS CASE, THESE TWO ISSUES, THEY WERE JUST

7    HOPELESSLY ENTANGLED.  THE CHIP PRICE WAS DEPENDENT ON THE

8    REBATE.

9         SO WHEN I MET WITH QUALCOMM, I VERY OFTEN MET WITH EACH AT

10   THE SAME TIME.  SO THEY WERE ENTANGLED TO THE DEGREE THAT I

11   SPENT A GREAT DEAL MORE TIME ON THIS TOPIC THAN I DID WITH ANY

12   OTHER SUPPLIER.

13         THE COURT:  I'M SORRY TO INTERRUPT, BUT IT'S 10:45.

14   SO LET'S GO AHEAD AND TAKE OUR BREAK NOW.  WE'LL TAKE A 15

15   MINUTE BREAK TO 11:00 O'CLOCK.

16         MR. BAKER:  THANK YOU.

17         THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP DOWN

18   DURING THE BREAK.

19         THE CLERK:  COURT IS IN RECESS.

20       (RECESS FROM 10:46 A.M. UNTIL 11:01 A.M.)

21         THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

22     ARE YOU READY?

23         MR. BAKER:  YES.

24         THE COURT:  OKAY.  11:01.  GO AHEAD, PLEASE.

25   BY MR. BAKER:

1    Q.   MR. BLEVINS, BEFORE THE BREAK WE WERE LOOKING AT CX 0756.

2    DO YOU REMEMBER THAT?

3    A.   YES, SIR.

4    Q.   IN YOUR PROCUREMENT ROLE, WAS IT COMMON FOR TO YOU DEAL

5    WITH QUALCOMM'S I.P. LICENSING EXECUTIVES FROM QTL?

6    A.   IT WAS UNCOMMON IN GENERAL FOR ME TO DEAL WITH ANY

7    COMPANY'S I.P. LICENSING.  THAT'S NOT MY DOMAIN.  BUT IN THE

8    CASE OF QUALCOMM, IT WOUND UP BEING VERY COMMON.

9    Q.   DID YOU EVER MEET TOGETHER WITH REPRESENTATIVES OF BOTH

10   QCT AND QTL?

11   A.   YES, OF COURSE, MANY, MANY TIMES.

12   Q.   WHAT DYNAMICS DID YOU OBSERVE BETWEEN QCT AND QTL IN THESE

13   MEETINGS?

14   A.   I CAN RECALL ONE INSTANCE IN PARTICULAR, I CAN'T RECALL

15   EVERY MEETING, BUT THERE WAS ONE INSTANCE THAT WAS QUITE

16   MEMORABLE TO ME.  I WAS IN SAN DIEGO AT THE TOP EXECUTIVE FLOOR

17   OF THEIR MAIN BUILDING.  I WAS MEETING WITH CRISTIANO AMON AND

18   HIS COUNTERPART WHO RAN QTL AT THAT TIME PERIOD, I BELIEVE THE

19   GENTLEMEN'S NAME WAS ERIC REIFSCHNEIDER, AND THE THING THAT

20   MADE THAT CONVERSATION MEMORABLE TO ME IS CRISTIANO WAS

21   SPEAKING DIRECTLY TO ME AND ERIC STOPPED HIM, CUT HIM OFF, GAVE

22   HIM THE HAND, AND SAID, "STOP TALKING.  I RUN THE DIVISION THAT

23   GENERATES TWO-THIRD'S OF THIS COMPANY'S PROFITS.  YOU RUN A

24   DIVISION THAT MAKES ONE-THIRD.  SO LET'S GET THAT STRAIGHT

25   WHO'S DOING THE TALKING."

```
 1              AND SO THE FACTS OF THAT CIRCUMSTANCE DIDN'T SURPRISE ME,

 2    I ALREADY KNEW THAT.

 3              WHAT DID SURPRISE ME, I THOUGHT IT WAS INAPPROPRIATE IN

 4    FRONT OF A CUSTOMER TO MAKE SUCH A STATEMENT; AND, SECONDLY, I

 5    ACTUALLY FELT SOME SYMPATHY FOR CRISTIANO.  I DIDN'T THINK IT

 6    WAS THE RIGHT WAY FOR TWO PEOPLE IN THE SAME COMPANY TO BEHAVE

 7    IN FRONT OF A CUSTOMER.  SO THAT'S MEMORABLE TO ME.

 8    Q.   CAN YOU TURN TO TAB 15, PLEASE, EXHIBIT CX 0597.

 9              THIS IS A SEALED DOCUMENT.  THE FIRST PAGE, I BELIEVE, HAS

10    NOT BEEN SEALED.

11              AND THAT'S THE ONLY PAGE WE'LL BE LOOKING AT.

12              THIS IS AN E-MAIL CHAIN BETWEEN YOU AND JEFF WILLIAMS WITH

13    THE TOP E-MAIL DATED DECEMBER 2, 2013.

14              DO YOU RECALL THIS E-MAIL.

15    A.   YES, I SPECIFICALLY RECALL THIS E-MAIL.

16              MR. BAKER:  YOUR HONOR, I MOVE TO ADMIT CX 0597.

17              MS. SESSIONS:  NO OBJECTION.

18              THE COURT:  IT'S ADMITTED.

19         (PLAINTIFF'S EXHIBIT CX 0597 WAS ADMITTED IN EVIDENCE.)

20              THE COURT:  GO AHEAD, PLEASE.

21    BY MR. BAKER:

22    Q.   IN THIS E-MAIL, YOU REFERENCE A CONVERSATION YOU HAD WITH

23    CRISTIANO AMON.  DO YOU RECALL THIS CONVERSATION?

24    A.   YES, I RECALL THIS CONVERSATION VERY WELL.  IT WAS A BIT

25    OF A WATERSHED MOMENT, IF YOU WILL.
```

1    Q.   CAN YOU RECOUNT THAT CONVERSATION FOR THE COURT AS WELL AS

2    YOU REMEMBER?

3    A.   YES, THERE'S A BIT OF BACKGROUND I SHOULD MENTION SO IT

4    MAKES SENSE.  THE POINT IN TIME WHERE APPLE ENTERED INTO OUR

5    RELATIONSHIP WITH QUALCOMM WHERE OUR REBATES WERE CONTINGENT ON

6    BUYING THE CHIPSETS EXCLUSIVELY, IT WAS NOT MY BELIEF THAT WE

7    WOULD GET THE BEST PRICING FROM THEM IN SUCH A CIRCUMSTANCE.  I

8    DIDN'T DELUDE MYSELF.

9         HOWEVER, I THOUGHT THAT OVER TIME WE COULD AVOID BEING

10   GOUGED, THAT THE THOUGHT BEING THAT QUALCOMM WOULD PROBABLY

11   WANT THIS RELATIONSHIP TO BE CORDIAL AND COPACETIC, AND SO THEY

12   WOULD CHARGE ME A HIGHER PRICE IN A NONCOMPETITIVE ENVIRONMENT

13   THEN THEY WOULD A COMPETITIVE ONE CLEARLY, BUT I THOUGHT I

14   COULD GET TO A NUMBER THAT WAS SOMETHING THAT APPLE COULD LIVE

15   WITH.

16        SO MY NEGOTIATION STRATEGY, GIVEN THESE CIRCUMSTANCES, WAS

17   THAT WITHIN APPLE WE WOULD DO VERY DETAILED COST MODELING OF

18   WHAT IT COST QUALCOMM TO HAVE THEIR CHIPSETS FABRICATED AT

19   TSMC, AND WE WERE ABLE TO DO THAT BECAUSE APPLE ALSO PURCHASES

20   SILICON DIRECTLY, DIRECTLY FROM TSMC, FROM THE SAME FOUNDRIES.

21   SO WE ALREADY HAD THE TEAMS, THE COST MODELS.

22        AND MY THOUGHTS WERE IF WE COULD AGREE UPON THE COST,

23   WHICH SHOULD BE A STRAIGHTFORWARD MATHEMATICAL EXERCISE, I

24   WOULD THEN APPROACH HIM AND SAY, WELL, I'D LIKE TO PAY YOU A

25   GROSS MARGIN SOMEWHERE AROUND THE AVERAGE OF WHAT YOU CHARGE

1    OTHERS.

2         AS I MENTIONED, I'M NOT GOING TO GIVE THE BEST PRICE,

3    OBVIOUSLY I'M NOT GOING TO GET AS AGGRESSIVE A PRICE AS I MIGHT

4    OTHERWISE GET, BUT I CAN AT LEAST AVOID GETTING GOUGED.  AND WE

5    HAD A NUMBER OF CONVERSATIONS, DOZENS.

6         FINALLY, OUT OF SOME DEGREE OF FRUSTRATION, CRISTIANO

7    LEVELED WITH ME, HE AND I HAD A FAIRLY OPEN AND DIRECT

8    CONVERSATION AT THAT POINT IN TIME AND HE SAID, LOOK, I'M JUST

9    COMING BACK FROM AN INVESTOR CONFERENCE IN NEW YORK.  I'M UNDER

10   INTENSE PRESSURE AND SCRUTINY TO MONETIZE THIS ADVANTAGE IN

11   LTE, THAT I'M GOING TO CHARGE ABSOLUTELY ANYTHING AND

12   EVERYTHING THE MARKET WILL BEAR.  I KNOW YOU HAVE THIS

13   EXCLUSIVE AGREEMENT WITH ME, AND BY THE WAY, APPLE CAN AFFORD

14   TO PAY THIS.  SO REALLY THE ONLY FACTORS WE NEED TO TALK ABOUT

15   ARE NOT COST AND NOT MARGINS.  I KNOW THAT I'M YOUR ONLY

16   CHOICE.  AND I ALSO KNOW APPLE CAN AFFORD TO PAY IT.

17        SO THAT WAS A WATERSHED MOMENT.  I SAID THIS RELATIONSHIP

18   IS GOING IN A VERY DIFFERENT DIRECTION THAN WE'D HOPED.  THAT

19   WAS MEMORABLE TO ME BECAUSE I RECALL CANCELLING THE REST OF THE

20   MEETINGS ON MY CALENDAR THAT DAY AND PULLING THE TEAM TOGETHER

21   AND SAYING WE NEED A DIFFERENT PLAN OR STRATEGY.  THERE'S A LOT

22   OF MONEY INVOLVED HERE, AND WE HAVE ALMOST NO LEVERAGE AT ALL.

23   WE NEED TO DO SOMETHING DIFFERENT OR THIS IS HEADED TOWARDS A

24   VERY, VERY BAD PLACE.  SO THAT WAS A MEMORABLE CONVERSATION FOR

25   ME.

1    Q.   SO WHAT DID APPLE DO NEXT?

2    A.   WE KICKED OFF A PROJECT WHERE WE WANTED TO FIND AN

3    ADDITIONAL SOURCE FOR MODEMS SO THAT WE COULD ADD SOME

4    COMPETITION TO THE MIX, THAT CRISTIANO HAD ALL BUT TOLD ME HE

5    KNEW I DIDN'T HAVE AN ALTERNATIVE, THEREFORE, COMPETITIVE

6    CIRCUMSTANCES DOESN'T EXIST, HE WOULD CHARGE ME EVERYTHING THAT

7    HE POSSIBLY COULD.

8         SO I REACTED BY SAYING I MUST HAVE A COMPETITIVE

9    ALTERNATIVE.  IT'S QUITE OBVIOUS.

10   Q.   TURN TO TAB 16 IN YOUR BINDER, PLEASE, IT'S EXHIBIT

11   CX 0534.

12        PORTIONS OF THIS DOCUMENT HAVE ALSO BEEN SEALED, YOUR

13   HONOR, AND WE'RE GOING TO STAY ON THE FIRST THREE PAGES, WHICH

14   HAVE NOT.

15        THIS IS A PRESENTATION DATED APRIL 24TH, 2014.

16        DO YOU RECOGNIZE THIS PRESENTATION, MR. BLEVINS.

17   A.   YES, I RECALL IT.

18   Q.   THE TITLE IS PROJECT ANTIQUE; IS THAT RIGHT?

19   A.   THAT'S CORRECT.

20        MR. BAKER:  YOUR HONOR, I MOVE THE ADMISSION OF

21   CX 0534.

22        MS. SESSIONS:  ARE YOU -- COUNSEL, ARE YOU SEEKING TO

23   ADMIT THIS DOCUMENT FOR THE TRUTH OF THE MATTER?  IF SO, I

24   WOULD ASK THAT YOU LAY A FOUNDATION.

25        THE COURT:  I'M SORRY.  CAN YOU REPEAT THAT?  I

1    COULDN'T HEAR YOU.

2              MS. SESSIONS:  SORRY, YOUR HONOR.  FOR WHAT PURPOSE

3    ARE YOU SEEKING TO ADMIT THIS DOCUMENT?

4              MR. BAKER:  I'LL LAY A BUSINESS RECORD FOUNDATION.

5    Q.   MR. BLEVINS, DOES APPLE ORDINARILY MAINTAIN SLIDE DECKS

6    REFLECTING ITS BUSINESS PLANNING ACTIVITY?

7    A.   YES.

8    Q.   WAS THIS SLIDE DECK CREATED IN THE COURSE OF APPLE'S

9    BUSINESS PLANNING ACTIVITIES?

10   A.   YES, IT WAS.

11   Q.   IT WAS CREATED AT THE TIME OF APPLE'S BUSINESS PLANNING

12   ACTIVITIES?

13   A.   YES.

14   Q.   WAS IT STORED AND KEPT BY APPLE IN ITS RECORDS?

15   A.   I WOULD ASSUME SO, YES.

16             MR. BAKER:  YOUR HONOR, I MOVE THE ADMISSION OF

17   CX 0534.

18             MS. SESSIONS:  NO OBJECTION, YOUR HONOR.

19             THE COURT:  IT'S ADMITTED.

20        (PLAINTIFF'S EXHIBIT CX 0534 WAS ADMITTED IN EVIDENCE.)

21             THE COURT:  GO AHEAD, PLEASE.

22   BY MR. BAKER:

23   Q.   WHAT WAS PROJECT ANTIQUE?

24   A.   AS I MENTIONED, WE IMMEDIATELY KICKED OFF A PROJECT TO

25   FIND A SUPPLEMENTAL SOURCE TO QUALCOMM FOR MODEMS, AND WE GAVE

1       THAT PROJECT AN INTERNAL CODE NAME TO PROTECT CONFIDENTIALITY

2       AND CALLED IT ANTIQUE.

3       Q.   TURN TO THE SECOND PAGE OF THE EXHIBIT, PLEASE.  I'LL ASK

4       YOU ABOUT THE BOTTOM BULLET POINT.

5            IT READS, "IMPROVE OUR ROYALTY LEVERAGE."

6            CAN YOU EXPLAIN WHAT THAT MEAN ITSELF.

7       A.   YES.  AS I TALKED ABOUT EARLIER, BY THIS POINT IN TIME IT

8       HAD BECOME OBVIOUS TO US THAT THE LICENSE ISSUES AND THE CHIP

9       ISSUES WERE HOPELESSLY ENTANGLED.  SO OUR VIEW WAS THAT IF WE

10      COULD ESTABLISH A SUPPLEMENTAL CHIP SOURCE, WE WOULD NOT ONLY

11      GIVE SOME LEVERAGE ON CHIPSET PRICING, BUT WE WOULD REDUCE THE

12      STRANGLEHOLD THAT QUALCOMM HAS ON US RELATIVE TO ROYALTY

13      LEVERAGE, THAT THE POINT IN TIME THEY KNEW WE HAD TO BUY THEIR

14      CHIP, WE FELT IT PUT US IN A VERY UNFAVORABLE POSITION ON

15      LICENSING.

16           SO WE THOUGHT THIS PROJECT HAD POTENTIALLY BROAD BENEFITS

17      TO APPLE.

18      Q.   I'D LIKE TO END WITH A FEW QUESTIONS ABOUT THE MORE RECENT

19      TIME PERIOD, MR. BLEVINS.

20           I'D LIKE TO CAUTION YOU, IF YOU WOULD, TO LIMIT YOUR

21      STATEMENTS TO KNOWLEDGE THAT YOU HELD AT OR BEFORE MARCH 30TH

22      OF 2018.

23           HAS APPLE BEEN ABLE TO CHALLENGE QUALCOMM'S ROYALTIES

24      SINCE INTRODUCING INTEL MODEM CHIPS INTO ITS IPHONES?

25      A.   YES, WE HAVE RECENTLY CHALLENGED THEM.

1    Q.   HOW DID APPLE DO THAT?

2    A.   THERE ARE COURT PROCEEDINGS WHERE WE'RE TRYING TO

3    ESTABLISH WHAT IS A FRAND RATE FOR ROYALTY.

4    Q.   FROM YOUR PERSPECTIVE AS VICE PRESIDENT OF PROCUREMENT FOR

5    APPLE, HAD THE BUSINESS RELATIONSHIP BETWEEN APPLE AND QUALCOMM

6    CHANGED AT ALL AS A RESULT OF THE ONGOING LITIGATION BETWEEN

7    THE COMPANIES?

8    A.   OH, YES, IT'S CHANGED IN A VERY PROFOUND AND NEGATIVE

9    MANNER, UNFORTUNATELY.

10    Q.   HOW SO?

11    A.   THERE ARE MANY, MANY REASONS.  THE TWO THAT I WOULD CITE,

12    IN THE INTERESTS OF BREVITY, AT THE TIME WE MADE THOSE

13    CHALLENGES, QUALCOMM WAS NO LONGER WILLING TO SELL US CHIPS.

14    THAT WAS VERY OBVIOUS, VERY APPARENT TO US.  AND SO WE WENT

15    RIGHT BACK TO THE NO LICENSE, NO CHIPS, THAT WE WERE FACING

16    BACK IN 2005.

17         AND THEN IN ADDITION TO THAT, I THINK THEY WERE TRYING TO

18    ESTABLISH ADDITIONAL LEVERAGE BECAUSE THEY HAD FILED

19    INJUNCTIONS AGAINST APPLE AND LAWSUITS ON NON SEP'S, AGAIN, TO

20    IMPROVE THEIR POSITION, IN MY POSITION, ON THE SEP'S.

21         AND SO IT'S LED TO VERY NEGATIVE CIRCUMSTANCES, AND WE

22    HAVE FACED REPERCUSSIONS FROM CHALLENGING THEIR LICENSING

23    MODEL.  BUT, AGAIN, IT FEELS LIKE WE'VE CIRCLED ALL THE WAY

24    BACK TO 2005.

25    Q.   SO FROM YOUR PERSPECTIVE, HAS QUALCOMM BEEN UNWILLING TO

1    PARTICIPATE IN SUPPLYING MODEM CHIPS TO APPLE?

2    A.   YES, ABSOLUTELY.

3    Q.   AS OF MARCH 2018, WAS APPLE SATISFIED WITH THE STATE OF

4    COMPETITION IN THE MODEM CHIP MARKET?

5    A.   NO, NOT AT ALL.  WE HAVEN'T IMPROVED OUR POSITION AT ALL.

6    THE ENTIRE CONCEPT OF PROJECT ANTIQUE WAS TO ADD A SECOND

7    SUPPLIER.  WE WANTED SOME COMPETITIVE LEVERAGE, AND WE WORKED

8    VERY HARD TO ADD A SECOND SUPPLIER, AND WE IMPLEMENTED THAT IN

9    2016, AND WE ENJOYED THE BENEFITS OF THAT COMPETITION.

10       HOWEVER, ONCE QUALCOMM ELECTED TO NOT PARTICIPATE ANY

11   FURTHER, WE WERE DOWN TO ONE SUPPLIER, WHICH IS IMC, AND NO

12   OFFENSE TO IMC, BUT WE DON'T WANT TO BE SO DEPENDENT ON THEM.

13   WE WANT MARKET COMPETITION.  WE WANT MULTIPLE SOURCES SO THAT

14   WE CAN GET BEST OVERALL VALUE.

15       SO WE VERY MUCH WANTED BOTH QUALCOMM AND IMC IN THE MIX.

16   COMPETITION LEADS TO VERY, VERY GOOD BEHAVIOR FROM OUR

17   STANDPOINT.  IT'S NOT JUST PRICING, WHICH IS SIGNIFICANT, BUT

18   PEOPLE PRODUCE BETTER QUALITY PRODUCT, THEY'RE MORE DILIGENT

19   ABOUT HITTING TECHNICAL SCHEDULES, THEY INNOVATE.  THE IDEA OF

20   COMPETITION IS JUST INVALUABLE TO US AS WE WORK THROUGH OUR

21   BUSINESS PLANS.  AND WITHOUT COMPETITION, WE JUST CAN'T BE

22   SUCCESSFUL ON A COMPONENT BASIS.

23   Q.   THANK YOU, MR. BLEVINS.  I JUST HAVE TWO QUICK

24   HOUSEKEEPING QUESTIONS AND THEN I THINK WE'RE DONE.

25       JUST TO MAKE -- THERE MAY BE SOME CONFUSION IN THE

1    TRANSCRIPT, AND I JUST WANT TO REPEAT A QUESTION I ASKED

2    EARLIER.

3         HAS APPLE EVER ENTERED INTO A DIRECT LICENSE WITH

4    QUALCOMM?

5    A.   NO.

6         THE COURT:  WHAT DOES THAT MEAN?  BECAUSE MY NOTES

7    ARE ALSO A LITTLE UNCLEAR ON THIS, THAT THERE WAS NO LICENSE IN

8    2005, BUT THEN THERE WAS A LICENSE IN 2007.  WHAT'S -- I DON'T

9    UNDERSTAND THE RELEVANCE OF THIS.

10   BY MR. BAKER:

11   Q.   MR. BLEVINS, CAN YOU DESCRIBE FOR THE COURT THE NATURE OF

12   THE AGREEMENT, THE MARKETING INCENTIVE AGREEMENT THAT WAS

13   ENTERED INTO IN 2007?

14   A.   YES, I CAN.  SO QUALCOMM PROPOSED A LICENSE AGREEMENT TO

15   APPLE BACK IN 2005.  WE HAVE YET TO EVER ENTER INTO A DIRECT

16   LICENSING AGREEMENT.

17        HOWEVER, WHAT HAS BEEN A SUBSTITUTE FOR THAT IS QUALCOMM

18   HAS TOLD US THEY HAVE DIRECT LICENSING AGREEMENTS WITH OUR

19   CONTRACT MANUFACTURERS.  AND SO THOSE CONTRACT MANUFACTURERS

20   WERE USING THE QUALCOMM LICENSE TO SHIP APPLE PRODUCTS.

21        THE SERIES OF AGREEMENTS I MENTIONED WOULD REBATE SOME OF

22   THOSE ROYALTIES BACK TO APPLE SO THAT THE NET ROYALTIES WE PAID

23   WERE STILL EXORBITANT, BUT THEY WEREN'T AS HIGH AS THEY WOULD

24   HAVE OTHERWISE BEEN.  SO WE DID GET SOME RELIEF, STILL LANDING

25   IN AN EXORBITANT PLACE, BUT THOSE AGREEMENTS WERE DESIGNED TO

1    GIVE US SOME RELIEF RELATIVE TO THE NOMINAL ROYALTIES OUR CM'S

2    WOULD OTHERWISE PAY.

3    Q.   AND THAT MARKETS INCENTIVE AGREEMENT, THAT EXPIRED AT THE

4    END OF 2012; IS THAT RIGHT?

5    A.   YES, THAT IS CORRECT.

6    Q.   AND THE TRANSITION AGREEMENTS, HAVE THEY EXPIRED?

7    A.   THEY EXPIRED AT THE END OF 2016.

8         MR. BAKER:  NO FURTHER QUESTIONS.  THANK YOU.

9         THE COURT:  OKAY.  TIME IS 11:15.

10        THE WITNESS:  THANK YOU, SIR.

11    (PAUSE IN PROCEEDINGS.)

12        THE COURT:  ARE YOU READY?

13        MS. SESSIONS:  I AM, YOUR HONOR.

14        THE COURT:  OKAY.  GO AHEAD, PLEASE.  GO AHEAD,

15    PLEASE.

16                        **CROSS-EXAMINATION**

17    BY MS. SESSIONS:

18    Q.   GOOD MORNING, MR. BLEVINS.  MY NAME IS JUSTINA SESSIONS,

19    AND I REPRESENT QUALCOMM.

20    A.   GOOD MORNING, MA'AM.

21    Q.   APPLE DESIGNED THE ORIGINAL IPHONE TO BE COMPATIBLE IN THE

22    UNITED STATES WITH AT&T'S NETWORK; CORRECT?

23    A.   YES, THAT IS MY RECOLLECTION.

24    Q.   AND AT&T'S NETWORK AT THE TIME USED THE UMTS AIR

25    INTERFACE?

1    A.   YES, THAT'S CORRECT.

2    Q.   THE FIRST DISCUSSIONS THAT YOU HAD WITH POTENTIAL BASEBAND

3    PROCESSOR SUPPLIERS WERE THE FIRST IPHONE WERE IN 2005?

4    A.   YES, THAT IS ALSO CORRECT.

5    Q.   AND IN 2005, YOU SPOKE TO AT LEAST QUALCOMM, SONY

6    ERICSSON, TEXAS INSTRUMENTS, AND INFINEON ABOUT SUPPLYING

7    BASEBAND PROCESSORS FOR THE FIRST IPHONE?

8    A.   YES, THAT IS CORRECT.

9    Q.   AND IN 2005, APPLE LEARNED THAT QUALCOMM HAD A POLICY OF

10   REQUIRING A LICENSE OR A LICENSE CONTRACT MANUFACTURER BEFORE

11   IT WOULD SELL MODEM CHIPS; CORRECT?

12   A.   YES, THAT IS ALSO CORRECT.

13   Q.   APPLE CHOSE INFINEON AS THE BASEBAND SUPPLIER FOR THE

14   FIRST IPHONE; CORRECT?

15   A.   YES.

16   Q.   AND APPLE CHOSE INFINEON EVEN THOUGH INFINEON DID NOT HAVE

17   THE LOWEST PRICED OFFERING?

18   A.   YES.  MY RECOLLECTION WAS WE THOUGHT INFINEON OFFERED US

19   OVERALL BEST VALUE, BUT NOT NECESSARILY ABSOLUTE LOWEST PRICE.

20   Q.   INFINEON WAS DECLARED TO BE THE BEST TECHNICAL ALTERNATIVE

21   AND IT HAD A COMPETITIVE PRICE?

22   A.   I THINK THAT'S A FAIR SUMMARY, YES.

23   Q.   APPLE DID NOT CONSIDER BUYING BASEBAND PROCESSORS FOR THE

24   FIRST IPHONE FROM MORE THAN ONE SUPPLIER; CORRECT?

25   A.   THAT IS ALSO CORRECT.

1    Q.   SO APPLE BOUGHT ITS BASEBAND PROCESSOR FOR THE FIRST

2    IPHONE SOLELY FROM INFINEON?

3    A.   AS PART OF A PLAN OF STRATEGY, YES.  IT WAS OUR FIRST

4    PHONE, WE WERE TECHNICALLY IMMATURE.  WE THOUGHT IT WAS TOO BIG

5    OF A CHALLENGE AT THAT POINT IN TIME TO TRY TO DO TWO.  THAT

6    WAS ALSO OUR PHILOSOPHY ON OTHER COMPONENTS IN THE FIRST

7    IPHONE.

8    Q.   AND FOR THE SECOND IPHONE RELEASED IN 2008, APPLE BOUGHT

9    ITS BASEBAND PROCESSORS SOLELY FROM INFINEON AS WELL; CORRECT?

10   A.   YES, THAT'S CORRECT.

11   Q.   AND APPLE DID NOT CONSIDER ANY SUPPLIERS OTHER THAN

12   INFINEON FOR THE IPHONE RELEASED IN 2008; CORRECT?

13   A.   ACTUALLY, I WOULD SAY WE DID CONSIDER OTHER, BUT IT WAS A

14   FAIRLY SHORT CONSIDERATION BECAUSE WE PRETTY MUCH KNEW IT

15   NEEDED TO BE INFINEON.  SO WE CONSIDERED, BUT NOT SERIOUSLY.

16   Q.   SO THERE WERE POSSIBLY INFORMAL CONSIDERATIONS OF OTHER

17   SUPPLIERS, BUT THE ONLY SUPPLIER SERIOUSLY CONSIDERED WAS

18   INFINEON?

19   A.   YES, THAT'S TRUE.

20   Q.   AND FOR THE IPHONES THAT WERE RELEASED IN 2009 AND 2010,

21   APPLE SOURCED ITS BASEBAND PROCESSORS FOR THOSE IPHONES SOLELY

22   FROM INFINEON AS WELL; CORRECT?

23   A.   THAT IS CORRECT.

24   Q.   AT THE TIME THAT APPLE ENTERED INTO THE MARKETING

25   INCENTIVE AGREEMENT WITH QUALCOMM IN 2007, IT WAS BUYING NO

1    CHIPS FROM QUALCOMM; CORRECT?

2    A.    CORRECT.  THEY WEREN'T EVEN OFFERED TO US.  WE WERE NOT

3    PROCURING ANY.

4    Q.    AND I BELIEVE THAT YOU'VE TESTIFIED THAT APPLE VIEWED

5    ITSELF AS PAYING SORT OF A NET ROYALTY PAYMENT, AND I DON'T

6    WANT YOU TO NAME THE AMOUNT, UNDER THE MARKETING INCENTIVE

7    AGREEMENT; IS THAT CORRECT?

8    A.    THAT IS CORRECT.

9    Q.    SO IN 2007, APPLE VIEWED ITSELF AS PAYING THAT CERTAIN NET

10   ROYALTY AMOUNT TO QUALCOMM WHILE IT WAS BUYING NO CHIPS FROM

11   QUALCOMM; CORRECT?

12   A.    YES, I WOULD AGREE WITH THAT.

13   Q.    OKAY.  AND IN 2008, APPLE WAS PAYING THAT SAME NET

14   EFFECTIVE ROYALTY RATE UNDER ITS VIEW TO QUALCOMM WHILE BUYING

15   NO CHIPS FROM QUALCOMM; CORRECT?

16   A.    YES, THAT'S CORRECT.

17   Q.    AND IN 2009, APPLE VIEWED ITSELF AS PAYING A CERTAIN NET

18   EFFECTIVE ROYALTY TO QUALCOMM, AND, AGAIN, APPLE WAS BUYING NO

19   CHIPS FROM QUALCOMM IN 2009; CORRECT?

20   A.    ALSO CORRECT, YES.

21   Q.    AT SOME POINT, APPLE DECIDED THAT IT WANTED TO OFFER AN

22   IPHONE THAT WOULD WORK ON VERIZON'S NETWORK?

23   A.    YES.

24   Q.    AND THAT ENDED UP BEING THE 2011 IPHONE, WHICH WAS THE

25   IPHONE 4?

1    A.   YES, THAT'S CORRECT.

2    Q.   WHEN APPLE DECIDED TO LAUNCH AN IPHONE ON VERIZON'S

3    NETWORK, APPLE BELIEVED THAT IT WOULD NEED TO WORK WITH

4    QUALCOMM; CORRECT?

5    A.   YES, THAT WAS OUR CONCLUSION.

6    Q.   FOR THE IPHONES RELEASED IN 2012, APPLE AWARDED ALL OF ITS

7    BASEBAND PROCESSOR BUSINESS TO QUALCOMM; CORRECT?

8    A.   YES, THAT'S CORRECT.

9    Q.   AND FOR THE IPHONES RELEASED IN 2012, APPLE WANTED LTE

10   CAPABILITY AND INFINEON DID NOT HAVE A GOOD SOLUTION FOR LTE;

11   CORRECT?

12   A.   YES, THAT'S MY RECOLLECTION.  WE THOUGHT QUALCOMM HAD A

13   LEAD.

14   Q.   OKAY.  AND INFINEON WAS NOT A LEADER IN LTE AT THAT TIME?

15   A.   AT THAT POINT WE TIME, WE FELT THAT THEY WERE NOT.

16   Q.   AND YOU FELT THAT THEY WERE NOT A LEADER BECAUSE THEIR

17   PERFORMANCE WAS NOT LEADING EDGE; CORRECT?

18   A.   GENERALLY, YES.

19   Q.   AND INFINEON'S PERFORMANCE WAS NOT LEADING EDGE AT THAT

20   TIME, DESPITE THE FACT THAT INFINEON HAD BEEN WORKING WITH

21   APPLE FOR SEVERAL YEARS SUPPLYING BASEBAND PROCESSORS FOR

22   IPHONES; CORRECT?

23   A.   TRUE.  AS I RECALL, INFINEON AS A CORPORATION WAS GOING

24   THROUGH UPHEAVAL.  THEY SOLD OFF THE DIVISIONS.  SO THERE WAS

25   PROBABLY A NUMBER OF INTERNAL FACTORS AND DISTRACTIONS THAT, IN

1    RETROSPECT, HURT THEIR INNOVATIVE PACE.

2    Q.   MR. BLEVINS, AS OF THE DATE OF YOUR DEPOSITION IN THIS

3    CASE, WHICH WAS MARCH 13TH AND 14TH OF 2018, APPLE HAD DECIDED

4    TO USE INTEL AS THE SOLE SUPPLIER OF BASEBANDS FOR THE 2018

5    IPHONES; CORRECT?

6    A.   THAT IS CORRECT.

7    Q.   AND, IN FACT, FOR THE MODELS THAT APPLE -- THE IPHONE

8    MODELS THAT APPLE DID LAUNCH IN 2018, APPLE USED INTEL MODEMS

9    IN THOSE IPHONES; CORRECT?

10   A.   YES.  THAT WASN'T OUR DESIRE, BUT THAT WAS THE RESULT.

11   Q.   AS OF THE DATE OF YOUR DEPOSITION, APPLE HAD DECIDED TO

12   USE INTEL AS THE SOLE PROVIDER OF BASEBANDS FOR WHATEVER THE

13   NEXT APPLE WATCH WAS GOING TO BE; CORRECT?

14   A.   THAT IS CORRECT, YES.

15   Q.   AND APPLE HAD ALSO DECIDED TO USE INTEL AS THE SOLE

16   PROVIDER OF BASEBANDS FOR WHATEVER THE NEXT IPAD WAS GOING TO

17   BE; CORRECT?

18   A.   THAT IS CORRECT AS WELL.

19   Q.   AS OF THE DATE OF YOUR DEPOSITION, APPLE WAS CONSIDERING

20   INTEL, MEDIATEK, AND SAMSUNG FOR BASEBAND PROCESSORS FOR 2019

21   IPHONES; CORRECT?

22   A.   THAT IS CORRECT, BECAUSE IN THAT PERIOD OF TIME WE KNEW

23   THAT QUALCOMM HAD ALREADY WITHDRAWN.  SO THEY WERE NO LONGER A

24   CANDIDATE.  YOUR STATEMENT IS CORRECT.

25   Q.   SO I THINK YOU ANTICIPATED MY NEXT QUESTION.  SO AS OF THE

1    DATE OF YOUR DEPOSITION IN THIS CASE, APPLE WAS NOT CONSIDERING

2    QUALCOMM TO PROVIDE BASEBAND PROCESSORS IN ANY 2019 APPLE

3    PRODUCTS; CORRECT?

4    A.   CORRECT.  WE ALREADY KNEW BY THAT POINT IN TIME THAT THE

5    PRODUCTS WEREN'T AVAILABLE TO US.

6    Q.   AS OF YOUR DEPOSITION IN MARCH 2018, APPLE HAD BEEN

7    COMMUNICATING FOR MANY YEARS WITH MEDIATEK WITH SOURCING

8    BASEBANDS; CORRECT?

9    A.   YES, THAT'S CORRECT.

10   Q.   AND APPLE HAD ALSO BEEN CONSIDERING SAMSUNG AS A BASEBAND

11   SUPPLIER FOR AT LEAST TWO TO THREE YEARS?

12   A.   WE HAD BEEN IN TALKS WITH THEM, YES.

13   Q.   THE FACT THAT SAMSUNG ALSO SELLS PHONES IN COMPETITION

14   WITH APPLE DOES NOT INHIBIT APPLE'S ABILITY TO PURCHASE

15   COMPONENTS FROM SAMSUNG?

16   A.   IT'S NOT AN IDEAL ENVIRONMENT FROM OUR PERSPECTIVE.  BUT I

17   WOULD AGREE WITH YOU, IT DOESN'T INHIBIT US FROM BUYING

18   COMPONENTS.  IN FACT, WE BUY A GREAT DEAL OF COMPONENTS FROM

19   THEM.

20   Q.   IN FACT, SAMSUNG IS CURRENTLY APPLE'S LARGEST SUPPLIER OF

21   COMPONENTS?

22   A.   THEY CURRENTLY ARE, THAT'S CORRECT.

23   Q.   MR. BLEVINS, IF -- OH, I NEED TO HAND OUT YOUR BINDERS.

24   EXCUSE ME ONE MOMENT.

25        (PAUSE IN PROCEEDINGS.)

1          MR. VAN NEST:  MAY I APPROACH, YOUR HONOR?

2          THE COURT:  YES.

3          THE WITNESS:  THANK YOU, SIR.

4     BY MS. SESSIONS:

5     Q.   MR. BLEVINS, DO YOU HAVE YOUR BINDER NOW?

6     A.   YES, MA'AM.

7     Q.   OKAY.  IN 2016, APPLE WAS CONSIDERING ENGAGING IN 5G

8     DISCUSSIONS WITH BASEBAND VENDORS; CORRECT?

9     A.   YES.

10    Q.   MR. BLEVINS, I'D ASK YOU TO TURN IN THE BINDER THAT I

11    JUST -- THAT WAS JUST HANDED TO YOU TO THE DOCUMENT LABELED

12    QX 9097.

13         AND PORTIONS OF THIS DOCUMENT HAVE BEEN SEALED, YOUR

14    HONOR.

15    A.   OKAY.  I BELIEVE I HAVE IT.

16    Q.   OKAY.  MR. BLEVINS, CAN YOU IDENTIFY QX 9097 AS AN E-MAIL

17    FROM AARON SCHAFER TO YOU DATED DECEMBER 9TH OF 2016?

18    A.   YES.

19    Q.   AND MR. SCHAFER REPORTS TO YOU?

20    A.   THAT IS CORRECT.

21    Q.   WHAT'S MR. SCHAFER'S ROLE?

22    A.   HIS ROLE IS SENIOR DIRECTOR OF WIRELESS PROCUREMENT.

23    Q.   AND DOES THIS E-MAIL CONCERN APPLE'S POTENTIAL DISCUSSIONS

24    WITH 5G VENDORS?

25    A.   YES.  SPECIFICALLY, AARON, AS A PART OF HIS DUTIES, WAS

```
1      PROPOSING A GO FORWARD LONG TERM STRATEGY TO ME FOR REVIEW AND

2      APPROVAL.

3             MS. SESSIONS:  OKAY.  YOUR HONOR, I'D LIKE TO OFFER

4      INTO EVIDENCE QX 9097.

5             MR. BAKER:  YOUR HONOR, THE FTC HAS RAISED AN HPO

6      HEARSAY OBJECTION WITH RESPECT TO THIS DOCUMENT, AND YOUR HONOR

7      OVERRULED THAT OBJECTION, BUT DIRECTED THAT IT NOT BE ADMITTED

8      FOR THE TRUTH OF THE MATTER.

9             THE COURT:  THAT'S FINE.  THIS IS ADMITTED, BUT IT'S

10     NOT ADMITTED FOR THE TRUTH OF THE MATTER ASSERTED.

11          (DEFENDANT'S EXHIBIT QX 9097 WAS ADMITTED IN EVIDENCE.)

12             MS. SESSIONS:  THANK YOU, YOUR HONOR.

13     Q.   MR. BLEVINS, IN THIS E-MAIL, MR. SCHAFER REPORTED TO YOU

14     THAT THE ENGINEERING TEAMS WANT TO ENGAGE IN 5G DISCUSSIONS

15     WITH ONE VENDOR; IS THAT CORRECT?

16     A.   YES.  HE WAS REPORTING TO ME THE RESULTS OF A COUPLE OF

17     MEETINGS HE HAD WITH ENGINEERING.

18     Q.   AND HE ALSO REPORTED TO YOU THAT THE ENGINEERS WERE

19     HESITANT TO TALK TO QUALCOMM; CORRECT?

20     A.   YES.

21     Q.   AND I'M NOT GOING TO GET INTO THE SPECIFICS OF FOLKS THAT

22     ARE NAMED OR ANYTHING ELSE THAT'S DISCUSSED IN THE BODY OF THIS

23     E-MAIL BECAUSE THAT'S UNDER SEAL.

24          BUT MR. SCHAFER PROPOSED USING A PARTICULAR VENDOR TO

25     ENGAGE -- MR. SCHAFER PROPOSED ENGAGING IN DISCUSSIONS WITH A
```

 1    PARTICULAR VENDOR; CORRECT?

 2    A.   YES, HE DID.

 3    Q.   AND MR. SCHAFER ALSO REPORTED TO YOU A TECHNICAL

 4    ASSESSMENT BETWEEN POTENTIAL VENDORS; CORRECT?

 5    A.   YES, HE DID.

 6    Q.   THANK YOU, SIR.

 7         MR. BLEVINS, DRAWING YOUR ATTENTION TO THE TRANSITION

 8    AGREEMENT, THE 2011 AGREEMENT.  WHEN APPLE WAS NEGOTIATING THIS

 9    AGREEMENT, IT WAS CONTEMPLATING TRANSITIONING ITS BASEBAND

10    PROCESSOR BUSINESS FROM INFINEON TO QUALCOMM; CORRECT?

11    A.   YES.  AS I RECALL, THAT WOULD HAVE BEEN THE FIRST CHIP

12    THAT WE PURCHASED FROM QUALCOMM WHICH WAS CDMA CAPABLE.  THAT'S

13    MY RECOLLECTION.

14    Q.   AND THE TRANSITION FROM ONE BASEBAND SUPPLIER TO ANOTHER

15    IS DIFFICULT?

16    A.   YES, I WOULD SAY SO.

17    Q.   YOU'VE ANALOGIZED IT TO A HEART TRANSPLANT?

18    A.   YES.

19    Q.   PART OF THE DISCUSSIONS SURROUNDING THE TRANSITION

20    AGREEMENT WAS QUALCOMM OFFERING INCENTIVES SO THAT APPLE WOULD

21    BE WILLING TO TAKE THE RISK OF TRANSITIONING BASEBAND

22    SUPPLIERS?

23    A.   THAT WAS A PART OF IT, YES.

24    Q.   APPLE WORKED WITH BASEBAND SUPPLIERS OTHER THAN QUALCOMM

25    SHORTLY AFTER IT SIGNED THE TRANSITION AGREEMENT; CORRECT?

1     A.    YES, WE CONTINUED TO WORK WITH OTHERS.

2     Q.    AND APPLE CONTINUED TO IDENTIFY POTENTIAL ALTERNATIVES TO

3     QUALCOMM AFTER IT SIGNED THE TRANSITION AGREEMENT?

4     A.    YES, THAT'S CORRECT.

5     Q.    SPECIFICALLY, APPLE WORKED WITH BOTH ST ERICSSON AND INTEL

6     AFTER SIGNING THE TRANSITION AGREEMENT?

7     A.    YES, CORRECT.

8     Q.    NOW DIRECTING YOUR ATTENTION TO THE 2013 AMENDED

9     TRANSITION AGREEMENT, SO THE AMENDMENT SO THE 2011 AGREEMENT.

10          YOU'D AGREE THAT LEVERAGE FROM QUALCOMM'S CHIP SUPPLY WAS

11    NOT A FACTOR INFLUENCING APPLE'S DECISION TO ENTER INTO THAT

12    AMENDED TRANSITION AGREEMENT; CORRECT?

13    A.    NO, I WOULDN'T AGREE WITH THAT STATEMENT.

14    Q.    YOU, YOU BELIEVED THAT LEVERAGE FROM QUALCOMM'S CHIP

15    SUPPLIER WAS A FACTOR INFLUENCING APPLE'S DECISION TO ENTER

16    INTO THE TRANSITION AGREEMENT?

17    A.    WELL, MY RECOLLECTION AT THAT POINT IN TIME WAS WE DESIRED

18    TO BUY QUALCOMM CHIPS AND WE DESIRED TO LESSEN THE ROYALTY FEE.

19          AND THAT AGREEMENT PROVIDED FOR EACH OF THOSE THINGS.  WE

20    GOT ACCESS TO QUALCOMM CHIPS AND WE LESSENED THE ROYALTY FEES.

21          THAT'S WHAT I RECALL.

22    Q.    SO, SIR, MY QUESTION WASN'T ABOUT YOUR GOALS IN ENTERING

23    INTO THE TRANSITION AGREEMENT.

24          BUT MY QUESTION WAS SPECIFICALLY WHETHER LEVERAGE

25    CONCERNING QUALCOMM'S CHIP SUPPLY WAS A FACTOR INFLUENCING

1    APPLE'S DECISION TO ENTER INTO THAT AGREEMENT.

2    A.   I DON'T RECALL ALL OF THE CONSIDERATIONS AT THAT POINT IN

3    TIME AS I SIT HERE TODAY.

4         I DO RECALL WE WANTED TO BUY QUALCOMM CHIPS AND WE WANTED

5    TO LESSEN OUR ROYALTY OBLIGATIONS.  THOSE TWO THINGS I

6    SPECIFICALLY REMEMBER.  THERE MAY HAVE BEEN OTHERS.

7    Q.   MR. --

8         YOUR HONOR, MAY I APPROACH?

9              THE COURT:  GO AHEAD, PLEASE.

10             MS. SESSIONS:  (HANDING.)

11             THE WITNESS:  THANK YOU, MA'AM.

12             THE COURT:  IS THAT A SEPARATE BINDER?

13             MS. SESSIONS:  THIS IS, YOUR HONOR.  THIS IS A BINDER

14   OF DEPOSITION AND HEARING TRANSCRIPTS OF MR. BLEVINS.

15             THE COURT:  ALL RIGHT.  THANK YOU.

16   BY MS. SESSIONS:

17   Q.   MR. BLEVINS, DO YOU RECALL GIVING TESTIMONY AT AN

18   INVESTIGATIONAL HEARING CONDUCTED BY THE FTC ON JANUARY 28TH,

19   2016?

20   A.   I DON'T REMEMBER THE EXACT DATES.  I'LL TAKE YOUR WORD FOR

21   IT, BUT I DO RECALL GIVING SOME TESTIMONY IN WASHINGTON D.C.

22   Q.   AND YOU WERE UNDER OATH AT THE TIME?

23   A.   YES.

24   Q.   MR. BLEVINS, I'D LIKE TO TURN YOUR ATTENTION TO PAGE 207

25   OF THE INVESTIGATIONAL HEARING TRANSCRIPT THAT SHOULD BE IN

1      YOUR BINDER.

2      A.   WHICH TAB WOULD THAT BE?  I'M NOT SURE HOW TO FIND IT.

3      Q.   IT'S THE FIRST TAB IN YOUR BINDER, SIR.

4      A.   OKAY.

5      Q.   AND I'M ACTUALLY GOING TO START ON PAGE 206, LINE 25,

6      FOLLOWING OVER TO PAGE 207, LINE 4.

7          MR. BLEVINS, AT YOUR INVESTIGATIONAL HEARING, WERE YOU

8      ASKED THE QUESTION, "WAS THIS SUPPLY LEVERAGE THAT YOU HAVE

9      BEEN DESCRIBING A FACTOR INFLUENCING APPLE'S DECISION TO ENTER

10     INTO THE AMENDED TRANSITION AGREEMENT AND THE OTHER AGREEMENTS

11     IN EARLY '13?"

12         AND YOU ANSWERED, "I WOULD SAY NO."

13         DO YOU SEE THAT?

14     A.   YES.

15     Q.   DID YOU GIVE THAT TESTIMONY?

16     A.   YES.

17     Q.   DO YOU STAND BY THAT TESTIMONY TODAY?

18     A.   WELL, I'M TRYING TO THINK WHAT MY STATE OF MIND WAS AT

19     THAT POINT IN TIME AND HOW I WAS REACTING TO THAT QUESTION.

20     THERE WAS A SERIES OF QUESTIONS BEFORE IT, AND I WOULD NEED TO

21     READ ALL OF THEM TO GET AN IDEA OF WHAT I WAS THINKING ABOUT.

22         BUT IF I READ ONLY THAT QUESTION, I'M TRYING TO THINK HOW

23     WOULD I HAVE INTERPRETED THE WORDS "SUPPLY LEVERAGE"?  IS THAT

24     SUPPLY LEVERAGE ON QUALCOMM'S SIDE OR APPLE'S SIDE?  BECAUSE IT

25     ACTUALLY DOESN'T SAY.

1              SO I'M NOT SURE IF I WAS ANSWERING ON QUALCOMM'S BEHALF OR

2      APPLE'S BEHALF AT THAT POINT IN TIME IN WASHINGTON D.C.

3              BUT AS I SIT HERE TODAY, I WOULD SAY THAT WE DEFINITELY

4      WANTED TO BUY CHIPS.  THAT WAS PART OF THE AGREEMENT.  WE

5      WANTED TO BUY CHIPS.  AND THE AGREEMENT GAVE US THE ABILITY TO

6      BUY CHIPS.

7      Q.   MR. BLEVINS, AT THE TIME THAT APPLE ENTERED INTO THE

8      AMENDED TRANSITION AGREEMENT, APPLE WAS CONFIDENT THAT IT WOULD

9      USE A QUALCOMM BASEBAND PROCESSOR IN THE NEAR TERM; CORRECT?

10     A.   YEAH.  MY RECOLLECTION WAS WE DESIRED TO USE IT IN THE

11     NEAR TERM, I WOULD AGREE WITH THAT.

12     Q.   SO APPLE MADE A CALCULATED GAMBLE THAT BE AVAILING ITSELF

13     OF THE REBATES UNDER THAT AGREEMENT IN THE NEAR TERM, YOU WOULD

14     NOT GIVE UP MORE ON COMPETITIVENESS IN THE OUT PERIOD?

15     A.   I THINK THAT'S GENERALLY RIGHT.  AS I TESTIFIED BEFORE, WE

16     THOUGHT THAT AT THE OUT PERIODS WE COULD LAND IN A PLACE THAT

17     BOTH SIDES COULD LIVE WITH.  SO, YES, I WOULD AGREE WITH THAT

18     STATEMENT.

19     Q.   SO IN OTHER WORDS, APPLE THOUGHT ITS NET EFFECTIVE COST OF

20     CHIPSETS WOULD BE COMPETITIVE AFTER FACTORING IN THE REBATES IN

21     THE TRANSITION AGREEMENT?

22     A.   WE DIDN'T NECESSARILY THINK THEY WOULD BE COMPETITIVE, AS

23     I TESTIFIED BEFORE.  BUT WE DIDN'T THINK WE WOULD GET GOUGED.

24     WE KNEW THEY WOULD BE HIGHER.  IN HINDSIGHT, THEY WERE MUCH

25     HIGHER THAN WE ANTICIPATED AT THAT POINT IN TIME.

1   Q.   AND UNDER THE TRANSITION AGREEMENT AND THE AMENDED

2   TRANSITION AGREEMENT AND THE BUSINESS COOPERATION AND PATENT

3   AGREEMENT, APPLE WAS ALLOWED TO USE ANY BASEBAND SUPPLIER THAT

4   IT WANTED, BUT THE FINANCIAL CONSEQUENCES OF USING A SECOND

5   BASEBAND SUPPLIER WOULD BE THAT APPLE WOULD HAVE TO RETURN

6   CERTAIN REBATES AND INCENTIVES; CORRECT?

7   A.   YES.   THERE WERE HUGE AMOUNTS OF MONEY AT STAKE THAT HAD

8   THE NET EFFECT OF DISSUADING US FROM USING ANYONE ELSE, I THINK

9   THAT'S CORRECT.

10  Q.   OKAY.  MR. BLEVINS, THERE WAS SOME TESTIMONY EARLIER ABOUT

11  A SPRING IPAD MINI.

12  A.   YES.

13  Q.   AND THE SCHEDULE WAS MOVED UP.

14       DO YOU RECALL THAT?

15  A.   YES.  AND I THINK I MISSPOKE AND GOT THE YEARS TANGLED.

16  SO I APOLOGIZE.

17  Q.   OKAY.  COULD YOU PLEASE LET US KNOW YOUR UNDERSTANDING OF

18  THE TIMEFRAME OF THE SPRING 2014 IPAD MINI AND WHEN -- WHAT

19  THAT SCHEDULE WAS MOVED UP TO.

20  A.   YES.  WHAT I RECALL IS AT AN EARLY STAGE, WE WERE PLANNING

21  TO SHIP THAT MINI IN APRIL, AND THEN LATER IN MARCH OF 2014.

22  BUT IT WAS KNOWN AS THE SPRING.

23       AND I'VE RECENTLY SEEN SOME DOCUMENTS, YOU KNOW,

24  MEMORIALIZING THAT THAT PRODUCT WOULD BE SPRING OF 2014.

25       LATER WE WERE PLEASED TO DETERMINE THAT WE FELT WE COULD

1    MOVE ALL OF THE COMPONENTS IN, "ALL" MEANING LCD'S, ENCLOSURES,

2    NAND FLASH, AND SO WE REVISED OUR PLAN AND WE SET THE SHIP DATE

3    FOR SEPTEMBER OF 2013.

4         BEFORE I THINK I USED THE WRONG YEAR, THE RIGHT MONTH AND

5    THE WRONG YEAR.

6         SO IT WAS SEPTEMBER 2013.  AS WE CONTINUED TO WORK ON THAT

7    PRODUCT, THE DATE MOVED FROM SEPTEMBER OF '13 TO OCTOBER OF

8    '13, AND THEN LATER IT FINALLY LANDED AND SHIPPED IN NOVEMBER

9    OF 2013.  THAT'S WHAT I RECALL, AND I THINK I MISSPOKE EARLIER.

10   SO MY APOLOGIES.

11   Q.   OKAY.  SO THAT IPAD WAS SHIFTED TO THE FALL OF 2013;

12   CORRECT?

13   A.   THAT IS CORRECT.

14   Q.   OKAY.  SO YOU ALSO TESTIFIED THAT THE APPLE IPAD MINI THAT

15   WAS RELEASED IN 2014 DID NOT HAVE CARRIER AGGREGATION; IS THAT

16   RIGHT?

17   A.   YES.

18   Q.   OKAY.  BUT THERE WERE OTHER APPLE IPAD MODELS RELEASED IN

19   2014 THAT DID HAVE CARRIER AGGREGATION; IS THAT RIGHT?

20   A.   I DON'T RECALL SPECIFICALLY.  I COULDN'T SAY FOR CERTAIN.

21   I BELIEVE THAT'S TRUE, BUT I WOULDN'T WANT TO SAY FOR CERTAIN

22   BECAUSE I DON'T KNOW.

23   Q.   IN EARLY 2018, SIR -- AND I'M NOT LOOKING FOR A SPECIFIC

24   NUMBER -- BUT APPLE'S GROSS MARGINS WERE GENERALLY IN THE LOW

25   40'S; IS THAT CORRECT?

1    A.   I THINK THAT'S GENERALLY CORRECT, YES.

2    Q.   AND AS OF THE DATE OF YOUR DEPOSITION, YOU BELIEVED THAT A

3    FAIR GROSS MARGIN FOR A BASEBAND PROCESSOR SUPPLIER WOULD ALSO

4    BE IN THE MID-40'S?

5    A.   YES, I BELIEVE THAT'S WHAT I TESTIFIED TO IN THE

6    DEPOSITION AT THAT POINT IN TIME.

7    Q.   SIR, IS IT YOUR TESTIMONY THAT THE BUSINESS COOPERATION

8    AND PATENT AGREEMENT IS -- THAT ANY PAYMENTS UNDER THAT

9    AGREEMENT ARE CONTINGENT ON CHIP SALES?

10   A.   MY UNDERSTANDING OF THE AGREEMENTS IN ORDER FOR US TO

11   OBTAIN THE REBATES THAT WE'RE ELIGIBLE FOR IN THE SUMMATION OF

12   THREE AGREEMENTS THAT WERE NEGOTIATED AT THE SAME POINT IN

13   TIME, THAT WE HAVE TO USE QUALCOMM EXCLUSIVELY AS A CHIPSET

14   SUPPLIER.

15        THAT'S MY UNDERSTANDING.

16   Q.   SO, SIR, MY QUESTION WAS SPECIFICALLY ABOUT THE BUSINESS

17   COOPERATION AND PATENT AGREEMENT.

18        IS IT YOUR TESTIMONY THAT THAT AGREEMENT IS CONTINGENT ON

19   CHIP SALES TO QUALCOMM?

20   A.   I'M NOT SURE IF I'M QUALIFIED TO ANSWER THAT, THE REASON

21   BEING I KNOW THAT THAT AGREEMENT IN WHAT WAS KNOWN AS THE FIRST

22   AMENDED TRANSITION AGREEMENT WERE NEGOTIATED EXACTLY AT THE

23   SAME POINT IN TIME AND THE TWO WERE VERY CLOSELY AND HEAVILY

24   LINKED AND THAT QUALCOMM WANTED THEM TO BE IN TWO SEPARATE

25   AGREEMENTS AS OPPOSED TO ONE.  APPLE REALLY DIDN'T HAVE A

1    PREFERENCE ONE WAY OR THE OTHER AS LONG AS THE RESULT WAS THAT

2    WE WOULD GET REBATES.

3         SO I DON'T THINK I'M QUALIFIED TO ANSWER YOUR QUESTION.  I

4    KNOW THE TWO WORK IN CONCERT AND IF WE'RE EXCLUSIVE THEN WE GET

5    THE REBATES AND IF WE'RE NOT, WE DON'T GET THE REBATES.  THAT

6    MUCH I KNOW.

7    Q.   YOU CAN'T SPEAK TO THE SPECIFIC TERMS OF THE BUSINESS

8    COOPERATION AND PATENT AGREEMENT; CORRECT?

9    A.   NO, MA'AM, I CAN'T.  I KNOW THEY WERE NEGOTIATED AT THE

10   SAME TIME, BUT FOR SOME REASON THEY WERE TWO SEPARATE

11   AGREEMENTS.

12   Q.   OKAY.  YOU ALSO TESTIFIED THAT APPLE AND QUALCOMM ARE NOW

13   ENGAGED IN A DISPUTE CONCERNING, AMONG OTHER THING, CERTAIN OF

14   QUALCOMM'S BUSINESS PRACTICES; CORRECT?

15   A.   YES, I THINK THAT'S TRUE.

16   Q.   OKAY.  QUALCOMM CONTINUED TO SHIP BASEBAND PROCESSOR

17   CHIPSETS TO APPLE AFTER THAT DISPUTE BEGAN; CORRECT?

18   A.   THAT'S TRUE.  WE HAD A SPECIFIC AGREEMENT THAT WE'D

19   NEGOTIATED PREVIOUSLY TO MAKE ABSOLUTELY CERTAIN THAT WAS THE

20   CASE BECAUSE WE HAD GRAVE CONCERNS THAT QUALCOMM WOULD STOP

21   SHIPPING TO US BASED ON RUMORS WE HEARD IN THE INDUSTRY.

22   Q.   SO YOU HAD NEGOTIATED WITH QUALCOMM FOR CONTINUITY OF

23   SUPPLY; CORRECT?

24   A.   I RECALL THAT VERY SPECIFICALLY.  IT WAS LABORIOUS.  I

25   THINK WE SPENT ABOUT 15 MONTHS TO COME TO THAT AGREEMENT.  SO I

1    DO RECALL IT.

2    Q.   AND QUALCOMM DID AGREE TO PROVIDE APPLE WITH CONTINUITY OF

3    SUPPLY?

4    A.   FINALLY IN THE FINAL ANALYSIS, THEY DID.

5    Q.   AND QUALCOMM HONORED ITS AGREEMENT TO PROVIDE APPLE WITH

6    CONTINUITY OF SUPPLY; CORRECT?

7    A.   YES, THEY DID.

8         MS. SESSIONS:  THANK YOU.  NO FURTHER QUESTIONS.

9         THE WITNESS:  THANK YOU, MA'AM.

10        THE COURT:  OKAY.  TIME IS 11:39.

11    DO YOU HAVE ANY REDIRECT?

12        MR. BAKER:  JUST A COUPLE QUESTION, YOUR HONOR.

13        THE COURT:  OKAY.  LET ME KNOW WHEN YOU'RE READY.

14        MR. BAKER:  I'M READY.

15        THE COURT:  OKAY.  11:39.  GO AHEAD, PLEASE.

16                    **REDIRECT EXAMINATION**

17    BY MR. BAKER:

18    Q.   MR. BLEVINS, BETWEEN 2011 AND THE SPRING OF 2016, DID

19    APPLE USE ANY NON-QUALCOMM MODEM CHIPS IN ANY OF ITS NEWLY

20    LAUNCHED DEVICES?

21    A.   NO, SIR.

22    Q.   MR. BLEVINS, YOU TESTIFIED JUST NOW ABOUT THE FACTORS

23    INFLUENCING APPLE'S DESIRE TO ENTER INTO THE 2013 AMENDED

24    TRANSITION AGREEMENT.

25        WAS A DESIRE TO OBTAIN ROYALTY RELIEF A FACTOR INFLUENCING

```
 1      APPLE TO ENTER INTO THAT AGREEMENT?

 2      A.   WELL, YES, OBVIOUSLY.  THOSE ROYALTY REBATES WERE HUGE AND

 3      THEY LESSENED WHAT THAT, THAT VIEW, WHICH WE CONSIDERED

 4      EXORBITANT, TO BE OTHERWISE.

 5      Q.   AND FINALLY, YOU JUST WERE TESTIFYING ABOUT THE

 6      SEPTEMBER 2015 SUPPLY CONTINUITY AGREEMENT BETWEEN APPLE AND

 7      QUALCOMM.  DO YOU RECALL THAT?

 8      A.   YES, I RECALL THAT.

 9      Q.   DOES THAT SUPPLY CONTINUITY AGREEMENT PROVIDE ASSURANCE TO

10      APPLE FOR FUTURE DEVICE MODELS?

11      A.   NO, IT SPECIFICALLY DID NOT.

12           WE DESIRED THAT IT WOULD.  BUT AS I MENTIONED, WE SPENT 15

13      MONTHS NEGOTIATING THIS AGREEMENT AND THE BEST THAT WE COULD DO

14      WAS SECURE A SUPPLY CONTINUITY FOR THINGS THAT HAD ALREADY BEEN

15      LAUNCHED AT THAT POINT IN TIME.

16           WE TRIED VERY AGGRESSIVELY TO GET THE SAME CONDITIONS IN

17      FUTURE CHIP, BUT WE WERE UNSUCCESSFUL IN NEGOTIATING SUCH A

18      CONDITION.

19                MR. BAKER:  THANK YOU.

20           NO FURTHER QUESTIONS, YOUR HONOR.

21                THE COURT:  OKAY.  TIME IS 11:41.

22           IS THERE ANY FURTHER --

23                MS. SESSIONS:  NO FURTHER QUESTIONS, YOUR HONOR.

24                THE COURT:  OKAY.  AND IS THIS WITNESS EXCUSED

25      SUBJECT TO RECALL, OR NOT SUBJECT TO RECALL?
```

1          MR. BAKER:  NOT SUBJECT TO RECALL.

2          MS. SESSIONS:  NOT SUBJECT TO RECALL, YOUR HONOR.

3          THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

4    TESTIMONY AND YOU ARE FREE TO LEAVE.

5          THE WITNESS:  THANK YOU, YOUR HONOR.

6          THE COURT:  YOUR NEXT WITNESS IS A VIDEO ONE.  IS

7    THAT RIGHT?

8          MR. MATHESON:  YES, YOUR HONOR.  WITH THE COURT'S

9    PERMISSION, WE'D LIKE TO BEGIN THE VIDEO OF MR. LEE.  YOUR

10   HONOR HAS SEALED A PORTION OF THAT VIDEO.

11         THE COURT:  OKAY.

12         MR. MATHESON:  IF IT'S CONVENIENT FOR THE COURT, OUR

13   PROPOSAL WOULD BE TO PLAY THE UNSEALED PORTION.

14         THE COURT:  OKAY.

15         MR. MATHESON:  WHICH IS ABOUT EIGHT MINUTES LONG AND

16   THEN IF YOUR HONOR WANTED TO SEAL THE ROOM AND DISMISS EVERYONE

17   EXCEPT FOR THE LAWYERS, WE CAN COMPLETE THE SEALED PORTION

18   BEFORE LUNCH AND THAT WOULD HOPEFULLY MINIMIZE THE DISRUPTION

19   ON THE AUDIENCE SHUFFLING IN AND OUT BECAUSE WE COULD COME BACK

20   AFTER LUNCH IN OPEN SESSION.

21         THE COURT:  OH, OKAY.

22         MR. MATHESON:  THAT WOULD END US RIGHT AROUND NOON IF

23   THAT'S CONVENIENT.

24         THE COURT:  THAT'S FINE WITH ME.

25      OKAY.  SO LET'S PLAY THE PUBLIC VERSION.  AND DO YOU WANT

```
 1        TO ADMIT ANY EXHIBITS THROUGH THIS WITNESS?

 2              MR. MATHESON:  YES, YOUR HONOR.  AND ONE POINT OF

 3        CLARIFICATION.

 4              THE COURT:  YES.

 5              MR. MATHESON:  WE HAD AGREED IN THE JOINT PRETRIAL

 6        STATEMENT THAT WE MIGHT PLAY SOME VIDEO WITH THE TRANSCRIPT, OR

 7        THE TRANSCRIBED ANSWERS IN ENGLISH.  THAT'S HOW WE HAVE

 8        PREPARED THIS ONE.

 9           THAT IS NOT THE CASE FOR FUTURE VIDEOS IN FOREIGN LANGUAGE

10        IN WHICH WE HAVE CAPTURED THE QUESTION IN ENGLISH, THE QUESTION

11        IN THE SPEAKER'S NATIVE LANGUAGE, AND THE ANSWER IN BOTH THE

12        SPEAKER'S NATIVE LANGUAGE AND ENGLISH.

13              THE COURT:  OKAY.

14              MR. MATHESON:  FOR THIS ONE, IT'S JUST THE QUESTION

15        IN ENGLISH, THE ANSWER IN THE NATIVE LANGUAGE AND THE

16        TRANSCRIPT.

17           IF YOUR HONOR DOESN'T LIKE THAT PRESENTATION, WE CAN

18        ADJUST THAT AND CHANGE IT.

19              THE COURT:  THAT'S -- I MEAN, YOU SAID THAT'S THE

20        ONLY CASE FOR THIS ONE; RIGHT?

21              MR. MATHESON:  CORRECT.

22              THE COURT:  THAT'S FINE.

23              MR. MATHESON:  THANK YOU VERY MUCH.

24              THE COURT:  ALL RIGHT.  SO YOU WANT TO INTRODUCE

25        EXHIBITS?
```

1           MR. KEHL:  YES, YOUR HONOR.

2           THE COURT:  OKAY.  TIME IS 11:43.  GO AHEAD, PLEASE.

3    WHAT ARE THE EXHIBITS?

4           MR. KEHL:  YOUR HONOR, THE FTC MOVES TO ADMIT

5    CX 2564A, CX 2568A, CX 2639A, CX 2641A, CX 2642A, CX 2643A, AND

6    JX 0024.

7           THE COURT:  ANY OBJECTION?

8           MR. BORNSTEIN:  NO, YOUR HONOR.

9           THE COURT:  ALL RIGHT.  THOSE ARE ADMITTED.

10          (PLAINTIFF'S EXHIBITS CX 2564A, CX 2568A, CX 2639A,

11   CX 2641A, CX 2642A, CX 2643A AND JOINT EXHIBIT JX 0024 WERE

12   ADMITTED IN EVIDENCE.)

13          MR. KEHL:  YOUR HONOR, AND WE'LL NOTE THAT THIS VIDEO

14   CONTAINS ONE MINUTE OF QUALCOMM COMPLETENESS DESIGNATIONS.

15          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  DO YOU

16   WANT TO GET IT STARTED.

17          MR. KEHL:  PLEASE PLAY THE VIDEO.

18          **(THE VIDEOTAPED DEPOSITION OF INJUNG LEE WAS PLAYED IN**

19   **OPEN COURT OFF THE RECORD.)**

20          THE COURT:  IS THAT IT?

21          MR. KOTARSKI:  I'M GOING TO THE NEXT PART.

22          **(THE VIDEOTAPED DEPOSITION OF INJUNG LEE WAS PLAYED IN**

23   **OPEN COURT OFF THE RECORD.)**

24          MR. KEHL:  YOUR HONOR, WE'VE NOW REACHED THE POINT IN

25   THE TRANSCRIPT WHERE THE SEALED INFORMATION WOULD --

LEE DEPOSITION

1          THE COURT:  OKAY.  IT'S 11:52.

2      ALL RIGHT.  HOW LONG IS THE SEALED PORTION?

3          MR. KEHL:  IT'S SEVEN MINUTES AND 34 SECONDS, YOUR

4   HONOR.

5          THE COURT:  OH, OKAY.  SO WE'LL DO IT BEFORE NOON.

6      ALL RIGHT.  THEN I'M GOING TO GO AHEAD AND ASK, AND I

7   GUESS I'LL LEAVE IT TO THE PARTIES TO MAKE SURE THAT WHOEVER

8   REMAINS SHOULD BE STAYING.

9      ALL RIGHT.  I'LL ASK EVERYONE ELSE IF YOU WOULD PLEASE

10  STEP OUTSIDE.  WE WILL BE IN LUNCH RECESS UNTIL 1:00 O'CLOCK.

11  AND WE'LL RESUME AT 1:00.  SO LET'S GIVE FOLKS A MINUTE TO

12  LEAVE.

13          MR. KEHL:  THANK YOU, YOUR HONOR.

14      (PAUSE IN PROCEEDINGS.)

15      **(PROCEEDINGS UNDER SEAL FROM PAGES 739 TO 740.)**

16

17

18

19

20

21

22

23

24

25

```
 1        (IN OPEN COURT.)

 2                        AFTERNOON SESSION

 3             THE COURT:  OKAY.  GOOD AFTERNOON AND WELCOME.

 4        PLEASE TAKE A SEAT.

 5             SO ON THE LASINSKI DEMONSTRATIVE, NUMBER 1, IT HAS NO PAGE

 6        NUMBERS.  CAN YOU PLEASE NUMBER YOUR DEMONSTRATIVES, BECAUSE

 7        WHEN EVERYONE SAYS PAGE 1, IT DOESN'T -- YOU KNOW, THE ECF

 8        PAGE 1 DOESN'T MATCH WHAT I THINK YOU'RE COUNTING AS PAGE 1 AS

 9        THE OPENING SLIDE.  IS THAT RIGHT?  SO I DON'T EVEN KNOW, WHEN

10        YOU SAY PAGE 1, WHAT NUMBER YOU'RE TALKING ABOUT.

11                  MR. MATHESON:  THAT'S RIGHT, YOUR HONOR.  WE DID

12        THAT -- WE WILL CHANGE THAT.

13                  THE COURT:  OKAY.  NOW, THE OTHER THING IS, YOU KNOW,

14        WE'VE ALREADY GOTTEN NOKIA'S MOTION TO SEAL THE SAME DOCUMENT,

15        SAMSUNG'S MOTION TO SEAL THE SAME DOCUMENT, QUALCOMM'S MOTION

16        TO SEAL THE SAME DOCUMENT, AND AVANCI'S MOTION TO SEAL.  SO

17        I'VE GOTTEN FOUR MOTIONS TO SEAL THIS ONE DOCUMENT.

18             THIS IS WHAT I'M TALKING ABOUT.  YOU ALL ARE MAKING US DO

19        THINGS FOUR, FIVE, SIX TIMES FOR THE SAME DOCUMENT.

20             IS THERE ANY COORDINATION --

21                  MR. MATHESON:  WE'RE TRYING, YOUR HONOR.

22                  THE COURT:  -- THAT CAN BE DONE?

23                  MR. MATHESON:  RIGHT NOW WE'RE WRITING AND FILING AT

24        THE MOMENT A RESPONSE TO ALL OF THESE THAT WE HOPE WILL ALLOW

25        YOU JUST TO RESPOND ONCE AND JUST ORDER ONE PAGE SEALED
```

1     BECAUSE, AS I PREVIEWED THIS MORNING, THERE ARE A NUMBER OF

2     FOLKS WHO MOVED TO SEAL DIFFERENT LINES OF THE SAME PAGE.  THEY

3     EACH MOVED TO SEAL THEIR OWN ROYALTY RATE.

4          AND WE ARE GOING TO FILE A RESPONSE TO THOSE MOTIONS THAT

5     WILL COLLECT ALL THE MOTIONS THAT RELATE TO MR. LASINSKI'S

6     SLIDES AND ASK THE COURT TO RESOLVE THEM ALL BY ORDERING US TO

7     SIMPLY NOT SHOW ONE PAGE OF ONE DOCUMENT.

8          THE COURT:  OKAY.

9          MR. MATHESON:  THAT SHOULD RESOLVE IT.

10         THE COURT:  BUT QUALCOMM ALSO MOVED TO FILE AN

11    ADDITIONAL ONE, TWO, THREE, FOUR PAGES OTHER THAN -- THE

12    COMPARABLE AGREEMENTS APPROACH I THINK IS THE PAGE YOU'RE

13    TALKING ABOUT.

14         MR. MATHESON:  YES, I BELIEVE SO.

15         THE COURT:  BUT THEN AVANCI MOVED TO SEAL AN

16    ADDITIONAL FOUR PAGES.

17         MR. MATHESON:  AND WE WILL PROVIDE A RESPONSE TO THAT

18    POSITION AS WELL, YOUR HONOR.

19         THE COURT:  WELL, I DON'T SEE HOW YOU'RE SAYING

20    YOU'RE SEALING WITH THIS ONE PAGE, 8 OR 9, HOWEVER YOU COUNT,

21    IS GOING TO DEAL WITH THE REST OF THE SEALING REQUESTS.

22         AND DO YOU KNOW IF ANYONE ELSE IS -- IS ERICSSON GOING TO

23    FILE ONE?  IS APPLE GOING TO FILE ONE?  IS HTC GOING TO FILE

24    ONE.  IS INTERDIGITAL GOING TO HAVE TO FILE ONE?

25         I DON'T WANT TO BE HERE ON SATURDAY WAITING FOR

```
 1         INTERDIGITAL, APPLE, AND ERICSSON'S MOTION.

 2              MR. MATHESON:  WE UNDERSTAND, YOUR HONOR.

 3              THE COURT:  WHAT'S THE PROCESS FOR THIS?

 4              MR. MATHESON:  ERICSSON HAD ALREADY FILED ONE, WHICH

 5    I BELIEVE YOUR HONOR GRANTED.

 6         WE THEN HAD ASKED THEM TO FILE EARLY, AND WE'VE REACHED

 7    OUT TO OTHER THE PARTIES.

 8         APPLE HAS COMMUNICATED -- I'LL LET THEM COMMUNICATE WITH

 9    THE COURT THEMSELVES.

10         BUT IF WE CAN SEAL THE ONE PAGE WE'RE TALKING ABOUT, I

11    THINK THAT WILL OBVIATE ALL OF APPLE'S CONCERNS.  WE'RE TALKING

12    TO THEM RIGHT NOW.

13         AND THE RESPONSE WE ENVISION WOULD DEAL WITH ALL THE

14    MOTIONS THAT RELATE TO MR. LASINSKI'S DEMONSTRATIVES, AND WE

15    WILL RESPOND TO ALL OF THEM AND TRY TO HAVE IT ALL IN ONE

16    PLACE.

17              THE COURT:  OKAY.

18              MR. MATHESON:  WE SHOULD HAVE THAT ON FILE SOON, YOUR

19    HONOR.  WE'RE READYING IT RIGHT NOW.

20              THE COURT:  OKAY.  WHAT ARE WE GOING TO DO ABOUT THE

21    PAGE NUMBERS?  IT'S REALLY UNHELPFUL THAT I EVEN DON'T KNOW

22    WHAT CONVENTION PEOPLE ARE USING FOR THE DIFFERENT PAGE

23    NUMBERS.

24              MR. MATHESON:  WE WILL CLARIFY THAT, YOUR HONOR.  WE

25    WILL POINT TO THE ECF NUMBER THAT MAKES IT CLEAR TO THE COURT
```

1    WHAT PAGE EACH PARTY IS TALKING ABOUT IN OUR FILING.

2            THE COURT:  OKAY.  NOW, IS THIS GOING TO COME UP WITH

3    YOUR OTHER EXPERTS AS WELL?

4            MR. MATHESON:  THE ONLY THING -- WELL, SO YOUR HONOR

5    GRANTED A REQUEST TO SEAL A LARGE PORTION OF MR. DONALDSON'S

6    REPORT, AND SINCE THEN, SOME OF THAT HAS BEEN ANNOUNCED ON THE

7    PUBLIC RECORD, SOME OF THE THINGS THAT WERE SEALED.

8        THE ONLY PARTY THAT HAS TOLD US THAT THEY INTEND TO FILE

9    ANYTHING REGARDING MR. DONALDSON IS TEXAS INSTRUMENTS, HIS

10   FORMER EMPLOYER, AND WE ARE TRYING TO TALK THEM OUT OF THAT

11   BECAUSE HIS EXPERIENCE WITH THEM SHOULD NOT CAUSE THEM TO NEED

12   TO FILE A -- TO FILE ANY SORT OF SEALING MOTION.  THAT'S THE

13   ONE WE ANTICIPATE.

14       AND THEN DR. SHAPIRO'S DEMONSTRATIVES HAVE BEEN PROVIDED

15   TO RELEVANT THIRD PARTIES.  AS FAR AS I KNOW, WE ARE NOT

16   ANTICIPATING FURTHER SEALING MOTIONS, BUT I WOULD HAVE TO CHECK

17   WITH THOSE THIRD PARTIES JUST TO BE SURE.

18           THE COURT:  ALL RIGHT.  I'D LIKE YOU TO REFILE, THEN,

19   DONALDSON'S EXPERT REPORT WITH THE INFORMATION THAT'S BEEN

20   PUBLICLY DISCLOSED DURING THE TRIAL UNREDACTED.

21           MR. MATHESON:  OKAY.

22           THE COURT:  WHEN CAN YOU DO THAT?

23           MR. MATHESON:  WE CAN DO THAT OVER THE WEEKEND, YOUR

24   HONOR.

25           THE COURT:  OKAY.  GIVE ME A DATE.

```
 1                    MR. MATHESON:  TOMORROW.

 2                    THE COURT:  ALL RIGHT.  DO THAT BY TOMORROW.

 3             OKAY.  WHAT'S THE TIME, MS. SHORTRIDGE?

 4                    THE REPORTER:  1:11.

 5                    THE COURT:  1:11.  GO AHEAD WITH YOUR DEPO.

 6                    MR. MATHESON:  THANK YOU.

 7             (THE VIDEOTAPED DEPOSITION OF INJUNG LEE WAS PLAYED IN

 8       OPEN COURT OFF THE RECORD.)

 9                    THE COURT:  OKAY.  TIME IS 1:27.

10                    MR. KEHL:  OUR NEXT WITNESS, YOUR HONOR, IS THE

11       VIDEOTAPED DEPOSITION OF TODD MADDEROM.

12                    THE COURT:  ALL RIGHT.  AND IS MR. LEE SUBJECT TO

13       RECALL OR NOT SUBJECT TO RECALL?

14                    MR. KEHL:  NOT SUBJECT TO RECALL, YOUR HONOR.

15                    THE COURT:  DO YOU AGREE WITH THAT?

16                    MR. BORNSTEIN:  YES, YOUR HONOR.

17                    THE COURT:  OKAY.  SO HE'S NOT SUBJECT TO RECALL.

18             ALL RIGHT.  WHO IS YOUR NEXT WITNESS?

19                    MR. KEHL:  TODD MADDEROM BY VIDEOTAPED DEPOSITION.

20                    THE COURT:  OKAY.  AND ARE YOU SEEKING TO ADMIT

21       EXHIBITS?

22                    MR. KEHL:  YES, YOUR HONOR.

23                    THE COURT:  OKAY.  GIVEN ME ONE MINUTE, PLEASE.

24             (PAUSE IN PROCEEDINGS.)

25                    THE COURT:  ALL RIGHT.  TIME IS STILL 1:27.
```

1          WHICH EXHIBITS ARE YOU SEEKING TO ADMIT?

2              MR. KEHL:  THE EXHIBITS ARE CX 2018, CX 2060,

3      CX 2065, CX 2123, CX 2124, CX 2125, AND CX 2168.

4              THE COURT:  ALL RIGHT.  ANY OBJECTION?

5              MR. BORNSTEIN:  NONE, YOUR HONOR.

6              THE COURT:  OKAY.  THOSE ARE ADMITTED.

7          (PLAINTIFF'S EXHIBITS CX 2018, 2060, 2065, 2123, 2124,

8      2125, AND 2168 WERE ADMITTED IN EVIDENCE.)

9              THE COURT:  GO AHEAD, PLEASE.

10             MR. KEHL:  AND, YOUR HONOR, THE VIDEO CONTAINS ONE

11     MINUTE OF QUALCOMM COMPLETENESS DESIGNATIONS.

12             THE COURT:  OKAY.  THANK YOU.

13             MR. KEHL:  PLEASE PLAY THE VIDEO.

14         **(THE VIDEOTAPED DEPOSITION OF TODD MADDEROM WAS PLAYED IN**

15     **OPEN COURT OFF THE RECORD.)**

16             THE COURT:  OKAY.  TIME IS 2:11.

17         IS THIS WITNESS EXCUSED SUBJECT TO RECALL OR NOT SUBJECT

18     TO RECALL?

19             MR. KEHL:  NOT SUBJECT TO RECALL, YOUR HONOR.

20             THE COURT:  DO YOU AGREE WITH THAT?

21             MR. BORNSTEIN:  YES, YOUR HONOR.

22             THE COURT:  OKAY.  SO THAT WITNESS IS EXCUSED.

23         WHO'S YOUR NEXT WITNESS, PLEASE?

24             MS. MILICI:  YOUR HONOR, THE FTC CALLS

25     STEVE MOLLENKOPF, AND I THINK THAT THERE ARE A COUPLE OF

```
1          SEALING ISSUES WE NEEDED TO RESOLVE INITIALLY.

2               THE COURT:  OKAY.  GIVE ME JUST ONE MINUTE TO ADD HIM

3     TO MY WITNESS LIST.

4               MR. SHACHAM:  GOOD AFTERNOON, YOUR HONOR.

5     MATAN SHACHAM FOR QUALCOMM.

6               MS. MILICI:  AND JENNIFER MILICI FOR THE FTC.

7               THE COURT:  OKAY.  DO YOU HAVE A BINDER OF EXHIBITS

8     FOR THIS WITNESS?

9               MS. MILICI:  WE DO.

10              THE COURT:  OKAY.  DOES THIS PERTAIN TO CX 8190 OR

11    NOT.

12              MS. MILICI:  YES, YOUR HONOR.  I BELIEVE THERE'S TWO

13    DOCUMENTS THAT YOU WANTED TO RESOLVE BEFOREHAND.

14              THE COURT:  ALL RIGHT.  SO I'M GOING TO CHARGE TIME

15    TO FTC TO IDENTIFY THE PAGES THAT YOU WANT TO USE, AND THEN

16    I'LL CHARGE TIME TO QUALCOMM FOR WHICH PAGES IT WANTS TO SEAL.

17              MS. MILICI:  SO --

18              THE COURT:  SO 2:13.  GO AHEAD, PLEASE.

19              MS. MILICI:  THANK YOU, YOUR HONOR.

20         FOR CX 8190, THE FTC WOULD LIKE TO ADMIT THE COVER E-MAIL,

21    ALONG WITH PAGES 66 TO 69 AND 259 TO 268.

22              THE COURT:  ALL RIGHT.  TIME IS 2:13.

23         SO WHICH OF THOSE DO YOU WANT TO SEAL?

24              MR. SHACHAM:  THANK YOU, YOUR HONOR.  WE DO NOT NEED

25    TO SEAL THE COVER E-MAIL.  WITHIN THE SECOND RANGE OF 66 TO 69,
```

```
 1         WE WOULD LIKE TO SEAL ALL OF THOSE.

 2              THE COURT:  WHEN YOU SAY 66 -- YOU MEAN 268 -- PARDON

 3         ME, 266 TO 269; IS THAT CORRECT?

 4              MR. SHACHAM:  NO, YOUR HONOR.  I BELIEVE -- AND

 5         COUNSEL CAN CORRECT ME, BUT WE'RE TALKING ABOUT 066 TO 069.

 6              MS. MILICI:  YES, YOUR HONOR.  THE FIRST RANGE WAS

 7         066 TO 069.

 8              THE COURT:  WHICH NUMBER ARE YOU REFERRING TO?  I'M

 9         LOOKING AT CX 8190.  I'M LOOKING AT TAB 4, CX 8190.

10         OH, I SEE.  YOU'RE LOOKING AT 66.

11         WHY ISN'T THIS PUBLIC INFORMATION?

12              MR. SHACHAM:  YOUR HONOR, THESE ARE DETAILED

13         FINANCIAL NUMBERS THAT ARE LESS THAN TWO YEARS OLD.  THEY'RE

14         ABOUT A YEAR AND A HALF OLD.  AND THEY ALSO --

15              THE COURT:  BUT WHOSE NUMBERS ARE THESE?  ARE THESE

16         THIRD PARTIES NUMBERS?

17              MR. SHACHAM:  THESE ARE QUALCOMM'S NUMBERS RELATING

18         TO POTENTIAL SALES TO THIRD PARTIES.  BUT THEY ARE QUALCOMM'S

19         NUMBERS, YOUR HONOR.

20         WE WOULD BE FINE IF THE COURT WOULD PREFER JUST SEALING

21         THE NUMBERS THEMSELVES.  WE DON'T HAVE ANY PROBLEM WITH THE

22         HEADINGS BEING UNSEALED.  BUT THE NUMBERS ARE HIGH LY

23         CONFIDENTIAL.

24              THE COURT:  ALL RIGHT.  LET'S SEAL THE NUMBERS IN 66,

25         67, 68, AND 69.  BUT NOT THE HEADINGS, EITHER THE HEADINGS ON
```

1    THE LEFT COLUMN OR THE HEADINGS ON THE TOP OF THE COLUMNS OR

2    THE HEADINGS ON EACH PAGE.

3            MR. SHACHAM:  THAT'S CORRECT, YOUR HONOR.

4            THE COURT:  OKAY.

5            MR. SHACHAM:  WITHIN THE SECOND RANGE OF 259 THROUGH

6    268, WE WOULD NOT SEEK TO SEAL 259, BUT WE WOULD SEEK, YOUR

7    HONOR, TO SEAL THE REMAINDER OF THAT RANGE.  SO 260 THROUGH

8    628.

9        AND THE REASON IS THE SAME.

10           THE COURT:  OKAY.  BUT WHY --

11           MS. MILICI:  YOUR HONOR --

12           THE COURT:  THIS WAS A PROBLEM I HAD LAST NIGHT.  IT

13   JUST SEEMS OVERLY BROAD.  YOU WANT TO SEAL CHIPSET TIERS, MID,

14   LOW, HIGH PREMIUM, DISCRETE MODEM.  I MEAN, THERE'S BEEN SO

15   MUCH TESTIMONY ABOUT THAT THROUGHOUT THE TRIAL.

16           MR. SHACHAM:  SO WE --

17           THE COURT:  KEY CAPABILITIES, TECHNOLOGY, EXECUTION,

18   CUSTOMER SUPPORT, SCALE VOLUME.  THAT JUST DOESN'T SEEM

19   CONFIDENTIAL TO ME.

20           MR. SHACHAM:  SO THE NUMBERS AT THE VERY LEAST WE

21   WOULD NEED TO SEAL.  WE WOULD NOT HAVE A PROBLEM WITH THE --

22           THE COURT:  THERE'S NO NUMBERS I'M LOOKING AT 261.

23   THERE'S NOT A SINGLE NUMBER IN THAT DOCUMENT.  I GUESS THERE'S

24   ONE IN THE FAR RIGHT CORNER THAT'S NOT EVEN IN THE CHART.

25           MR. SHACHAM:  IT IS REVEALING, THOUGH, CONNECTIONS

```
 1          BETWEEN THOSE SPECIFIC CUSTOMERS.  IT'S REVEALING CUSTOMER

 2          SPECIFIC INFORMATION.

 3                    THE COURT:  WHAT IF WE SEALED THE DOTS?

 4                    MR. SHACHAM:  WE WOULD BE --

 5                    THE COURT:  BUT DIDN'T SEAL EITHER THE LEFT COLUMN

 6          THAT SAYS THINGS LIKE PREMIUM TIER, HIGH CHIPSET TIERS, AND

 7          THEN THE MERCHANT SUPPLIERS.  I THINK THAT'S NOT ANY SURPRISE,

 8          OR VERTICAL OEM'S.  WHO THOSE ARE, THERE'S ALREADY BEEN

 9          TESTIMONY.

10                    MR. SHACHAM:  COULD YOU GIVE ME ONE MOMENT, YOUR

11          HONOR?

12                    THE COURT:  YES.

13              THIS WAS THE NARROW TAILORING THAT I WAS HOPING TO SEE AND

14          DIDN'T SEE WITH REGARD TO THIS DOCUMENT.  THAT'S WHY I DIDN'T

15          WANT TO SEAL THE WHOLE THING.

16                    MS. MILICI:  YOUR HONOR, WHILE THEY'RE CONFERRING, I

17          WOULD NOTE THAT THERE'S A VERY SIMILAR SLIDE IN 8191 THAT THEY

18          DID NOT SEEK TO SEAL AT ALL.

19                    THE COURT:  AND WHAT'S THAT ONE?

20                    MS. MILICI:  THAT'S 8191-089.

21                    MR. SHACHAM:  YOUR HONOR, MAY I PROPOSE A SOLUTION TO

22          THIS?  I THINK WHAT YOU PROPOSED IS EXACTLY RIGHT.  WE CAN SEAL

23          THE NUMBERS ON THE LEFT-HAND SIDE --

24                    THE COURT:  AND I WANT THIS REFILED WITH THE CORRECT

25          REDACTIONS, OKAY?  WE SHOULDN'T BE HAVING TO DO THIS ON THE
```

```
1    FLY.  THE NARROW, TAILORED SEALING REQUESTS SHOULD HAVE ALREADY

2    DONE THIS.

3              MR. SHACHAM:  SO WE ARE FINE WITH THE NAMES ON THE

4    LEFT AS YOUR HONOR PROPOSED BEING PUBLIC, AND WITH THE ICONS ON

5    THE TOP BEING PUBLIC AS WELL.  BUT THE GRID WITH THE DOTS WE

6    WOULD REQUEST TO SEAL.

7              THE COURT:  THAT'S FINE.  SO THAT'S ON 261.

8              MR. SHACHAM:  YES, YOUR HONOR.  AND ON THE SLIDE

9    BEFORE THAT, AGAIN, THE HEADING IS FINE.  BUT THOSE CHARTS ARE

10   SHOWING --

11             THE COURT:  THAT'S FINE, 262, THAT'S FINE.

12        ON 263 --

13             MR. SHACHAM:  AGAIN, WE COULD JUST DO THE INSIDE OF

14   THAT TABLE, YOUR HONOR.

15             THE COURT:  THAT'S FINE.

16             MR. SHACHAM:  IF THAT'S ACCEPTABLE.

17             THE COURT:  THAT'S FINE.  AND WHAT ABOUT 264?

18             MR. SHACHAM:  SIMILARLY, THE INSIDE OF THE TABLE

19   WOULD NEED TO BE SEALED.

20             THE COURT:  WHAT ABOUT SOME OF THE BULLETS BELOW IT?

21        IF YOU WANTED THE BULLETS BELOW IT SEALED, THAT WOULD BE

22   FINE.

23             MR. SHACHAM:  YEAH, WE WOULD LIKE TO SEAL THE BULLETS

24   AS WELL.

25             THE COURT:  THAT'S FINE.
```

```
 1                MR. SHACHAM:  AND SO 265, THOSE BULLETS; 266.

 2                THE COURT:  THAT'S FINE.  ON 265, THAT'S FINE, JUST

 3        SEAL THE BULLETS.

 4                MR. SHACHAM:  266, AGAIN, THE INSIDE OF THAT CHART.

 5                THE COURT:  THAT'S FINE.

 6                MR. SHACHAM:  267, SAME IDEA.  AND 268, SAME IDEA,

 7        YOUR HONOR.

 8                THE COURT:  THAT'S FINE.

 9                MR. SHACHAM:  AND I BELIEVE THAT WAS ALL.

10                THE COURT:  SO INSIDE OF THE CHART, BUT NOT ANY OF

11        THE FAR LEFT COLUMN THAT IS JUST DESCRIBING WHAT YOU'RE LOOKING

12        AT, OR THE TOP.

13                MR. SHACHAM:  THAT'S CORRECT, YOUR HONOR.

14                THE COURT:  TOP ROW.

15           OKAY.  ANYTHING ELSE ON THIS DOCUMENT, 8190?

16                MR. SHACHAM:  IF THAT'S ALL THE FTC IS GOING TO USE,

17        THAT'S ALL.

18                MS. MILICI:  THAT IS ALL WE'RE SEEKING TO INTRODUCE,

19        YOUR HONOR.

20                THE COURT:  OKAY.  ALL RIGHT.  ARE THERE ANY OTHER

21        DOCUMENTS FOR WHICH WE NEED TO GO THROUGH THIS PROCESS?

22                MR. SHACHAM:  I BELIEVE WE NEED TO GO THROUGH THE

23        PROCESS, YOUR HONOR, ON CX 5913.

24                THE COURT:  OKAY.  5 -- AND WHAT TAB NUMBER IS THAT?

25        IS IT NOT 591 -- YOU SAID 5913, SO TAB 8?
```

1          MS. MILICI:  TAB 8, YES, YOUR HONOR.

2          THE COURT:  OKAY.  GO AHEAD, PLEASE.

3          MR. SHACHAM:  WE MIGHT BE ABLE TO SHORTEN THIS IF THE

4    FTC HAS SPECIFIC SLIDES THEY'RE GOING TO USE.

5          MS. MILICI:  YOUR HONOR, WE WERE GOING TO USE THE

6    COVER E-MAIL.  BUT IF THE COURT WOULD LIKE US TO INTRODUCE --

7          THE COURT:  TIME IS 2:20.  THIS IS ON THE FTC'S TIME.

8     OKAY.  THE COVER E-MAIL AND WHAT ELSE?

9          MS. MILICI:  JUST THE COVER E-MAIL.

10          MR. SHACHAM:  OH.

11          THE COURT:  THAT'S IT.

12          MS. MILICI:  THE ATTACHMENT IS ALLOWED BECAUSE IT'S

13    ONE DOCUMENT.

14          MR. SHACHAM:  IF ALL THEY'RE USING IS THE COVER

15    E-MAIL, YOUR HONOR, WE DON'T HAVE ANY PROBLEM.  THE ATTACHMENT

16    IS WHAT WE HAVE A PROBLEM WITH.  SO IF THEY'RE LIMITING IT TO

17    THAT, WE CAN JUST INTRODUCE THE COVER E-MAIL AND NOT INTRODUCE

18    THE ATTACHMENT AND THERE'S NO SEALING ISSUE.

19          THE COURT:  OKAY.  THAT'S FINE.  2:20.

20     ALL RIGHT.  SO HAVE WE RESOLVED ALL THE SEALING?

21          MS. MILICI:  YES.

22          THE COURT:  YES?

23          MR. SHACHAM:  NOTHING FURTHER ON THIS.

24          THE COURT:  OKAY.  SO THANK YOU.  THANK YOU BOTH.

25     SO GOING FORWARD, YOU KNOW, IF IT'S ANOTHER 368 PAGE

```
1    DOCUMENT, IF WE COULD GO THROUGH THIS PROCESS, THE PARTIES DO
2    IT, AND THEN WHEN YOU MAKE YOUR SEALING REQUEST, IT COULD BE
3    MUCH MORE NARROW, BOTH AS TO WHAT YOU'RE ACTUALLY GOING TO USE,
4    AND ALSO I'D LIKE SOME NARROWING -- NARROW TAILORING ON
5    QUALCOMM'S PART, OBVIOUSLY SEALING WHETHER IT'S THE DIFFERENT
6    TIERS OF PHONES OR CHIPS.  I JUST THINK THAT'S UNNECESSARY.
7    OKAY.
8              MR. SHACHAM:  THANK YOU, YOUR HONOR.
9              MS. MILICI:  THANK YOU, YOUR HONOR.
10             THE COURT:  ALL RIGHT.  SO, MS. GARCIA, I DON'T THINK
11     YOU SWORE IN THE WITNESS.
12         IF YOU COULD PLEASE DO THAT.  THANK YOU.
13             THE CLERK:  PLEASE STAND.  PLEASE RAISE YOUR RIGHT
14     HAND.
15         (PLAINTIFF'S WITNESS, STEVE MOLLENKOPF, WAS SWORN.)
16             THE WITNESS:  YES.
17             THE CLERK:  THANK YOU.  PLEASE BE SEATED.
18         PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR
19     THE RECORD.
20             THE WITNESS:  STEVE MOLLENKOPF.  M-O-L-L-E-N-K-O-P-F.
21             THE COURT:  ALL RIGHT.  TIME IS 2:22.  GO AHEAD,
22     PLEASE.
23     ///
24     ///
25     ///
```

1              **DIRECT EXAMINATION**

2      BY MS. MILICI:

3      Q.   GOOD AFTERNOON, MR. MOLLENKOPF.  I'M JENNIFER MILICI FROM

4      THE FEDERAL TRADE COMMISSION.

5           YOU ARE THE CEO OF QUALCOMM; CORRECT?

6      A.   YES.

7      Q.   AND YOU BECAME THE CEO OF QUALCOMM IN 2014?

8      A.   YES, I DID.

9      Q.   AND BEFORE THAT, YOU WERE THE PRESIDENT OF CHIP DIVISION,

10     WHICH IS KNOWN, OTHERWISE KNOWN AS QCT; CORRECT?

11     A.   I WAS PROBABLY THE PRESIDENT AND THE CHIEF OPERATING

12     OFFICER BEFORE THAT EXACTLY.

13     Q.   THANK YOU.

14          SIR, DO YOU AGREE, SIR, THAT TO BUY CHIPS FROM QCT,

15     CUSTOMERS HAVE TO AGREE TO A LICENSE WITH QTL AND BE IN

16     COMPLIANCE WITH THAT LICENSE; CORRECT?

17     A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION AGAIN?

18     Q.   YOU WOULD AGREE, SIR, THAT TO BUY CHIPS FROM QCT,

19     CUSTOMERS HAVE TO AGREE TO A LICENSE WITH QTL AND BE IN

20     COMPLIANCE WITH THAT LICENSE?

21     A.   YES.

22     Q.   COULD YOU PLEASE TURN TO TAB 1 IN YOUR BINDER?

23          AND THIS DOCUMENT IS AN E-MAIL IN THE MIDDLE OF PAGE,

24     THERE IS AN E-MAIL FROM MARK BLECKER TO YOU DATED

25     SEPTEMBER 28TH, 2012, AND THEN YOUR RESPONSE; CORRECT?

1    A.   YES.

2              MS. MILICI:  YOUR HONOR, WE SEEK TO ADMIT CX 8287.

3              THE COURT:  ANY OBJECTION.

4              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

5              THE COURT:  IT'S ADMITTED.

6         (PLAINTIFF'S EXHIBIT CX 8287 WAS ADMITTED IN EVIDENCE.)

7              THE COURT:  GO AHEAD, PLEASE.

8    BY MS. MILICI:

9    Q.   IN THIS E-MAIL TO YOU MR. BLECKER WROTE, "ONCE WE START

10   SELLING THEM CHIP, WILL WE CUT THEM OFF IF WE DON'T PAY THE

11   ROYALTY.  PRIOR TO SELLING THEM CHIPS, WE SHOULD EXPLICITLY

12   REINFORCE THE MESSAGE THAT IF THEY DON'T PAY THE ROYALTY WE

13   CANNOT SELL THEM CHIPS."

14        AND YOU RESPONDED, "ISN'T THAT PART OF EVERY CSA?"

15        AND BY CSA YOU MEANT THE COMPONENT SUPPLY AGREEMENT;

16   CORRECT.

17   A.   I COMMENT THE COMPONENT SUPPLY AGREEMENT, YES.

18   Q.   AND MARK BLECKER RESPONDED TO YOU; CORRECT?

19   A.   YES, THAT'S WHAT'S WRITTEN HERE.

20   Q.   NOW, QUALCOMM ALSO SELLS WI-FI CHIPS, DOESN'T IT?

21   A.   IT DOES.

22   Q.   AND QUALCOMM DOES NOT APPLY THE SAME POLICY WHEN IT SELLS

23   WI-FI CHIPS, DOES IT?

24   A.   I'M NOT SURE OF ALL THE DETAILS FOR HOW WE SELL THE WI-FI

25   CHIPS.

1    Q.   WHEN YOU SELL WI-FI CHIPS, DO YOU NOT REQUIRE THE

2    PURCHASER TO HAVE A LICENSE TO A STANDALONE WI-FI PRODUCT;

3    CORRECT?

4    A.   AGAIN, I'M NOT -- I DON'T KNOW THE DETAILS OF HOW WE SELL

5    THE WI-FI CHIPS.

6    Q.   DO YOU KNOW WHETHER QUALCOMM REQUIRES THE PURCHASER TO

7    HAVE A LICENSE IN ORDER TO PURCHASE WI-FI CHIPS?

8    A.   I DON'T KNOW FOR SURE.

9    Q.   SIR, CAN YOU PLEASE TURN TO TAB 2 IN YOUR BINDER.

10        AND THIS IS AN E-MAIL EXCHANGE BETWEEN YOU AND

11   DEREK ABERLE IN THE FALL OF 2012, ISN'T IT?

12   A.   YES, IT IS.

13   Q.   AND THE E-MAILS CONCERN NEGOTIATIONS WITH SONY; CORRECT?

14   A.   YES.

15            MS. MILICI:  YOUR HONOR, WE SEEK TO ADMIT CX 5376.

16            MR. VAN NEST:  NO OBJECTION.

17            THE COURT:  IT'S ADMITTED.

18        (PLAINTIFF'S EXHIBIT CX 5376 WAS ADMITTED IN EVIDENCE.)

19            THE COURT:  GO AHEAD, PLEASE.

20   BY MS. MILICI:

21   Q.   AND IN THE MIDDLE OF PAGE 1 DEREK ABERLE WRITES, "THANKS

22   FOR YOUR INVOLVEMENT."

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   AND HE WAS SAYING THANK YOU FOR YOUR INVOLVEMENT IN THE

1    NEGOTIATIONS WITH SONY; CORRECT?

2    A.   YES.

3    Q.   AND YOU RESPONDED, "THANKS.  THE MDF HELPED MORE THAN ME."

4         AND BY MDF YOU MEANT MARKET DEVELOPMENT FUND; CORRECT?

5    A.   YES.

6    Q.   AND IS IT FAIR TO SAY, SIR, THAT QUALCOMM BEGINS WORKING

7    WITH SOME OEM'S SEVERAL YEARS IN ADVANCE OF SHIPPING THEM ANY

8    CHIPSETS?

9    A.   YES, THAT'S FAIR.

10   Q.   AND FOR SOME OEM'S, YOU MIGHT WORK WITH THEM SEVERAL YEARS

11   IN ADVANCE OF SHIPPING CHIPSETS AND FOR OTHERS JUST A PERIOD OF

12   SEVERAL MONTHS; IS THAT CORRECT?

13   A.   THAT'S CORRECT.

14   Q.   SIR, CAN YOU PLEASE TURN TO TAB 4 IN YOUR BINDER.  AND

15   THIS IS AN E-MAIL TO YOU ATTACHING BUDGET AND EARNINGS CALL

16   DECKS.

17   A.   YES, IT IS.

18        MS. MILICI:  YOUR HONOR, THE FTC MOVES TO ADMIT

19   CX 8190.

20        MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

21        THE COURT:  IT'S ADMITTED.

22    (PLAINTIFF'S EXHIBIT CX 8190 WAS ADMITTED IN EVIDENCE.)

23        THE COURT:  GO AHEAD, PLEASE.

24   BY MS. MILICI:

25   Q.   SIR, COULD YOU PLEASE TURN TO PAGE 67?  AND THAT PAGE WAS

1       JUST SEALED.

2            AND, SIR, ON PAGE 67, THERE'S A LIST OF HANDSETS ON THE

3       LEFT-HAND SIDE; CORRECT?  PAGE 067.

4       A.   OKAY.  I HAVE IT.

5       Q.   OKAY.  THERE'S A LIST OF HANDSETS ON THE LEFT-HAND SIDE;

6       CORRECT?

7       A.   YES.

8       Q.   AND THERE'S CDMA HANDSETS, AND THEN THERE'S A SEPARATE ROW

9       FOR WCDMA HANDSETS; CORRECT?

10      A.   YES.

11      Q.   AND THEN ACROSS THE TOP THERE IS INFORMATION, INCLUDING

12      THE TOTAL AVAILABLE MARKET IN QCT MARKET SHARE PERCENTAGE;

13      CORRECT?

14      A.   CORRECT.

15      Q.   AND THIS SLIDE REPORTS SEPARATE NUMBERS FOR CDMA MARKET

16      SHARE AND FOR WCDMA MARKET SHARE; CORRECT?

17      A.   YES.

18      Q.   OKAY.  COULD YOU PLEASE TURN TO PAGE 263.  DASH 263.  AND

19      THIS SLIDE WAS ALSO JUST SEALED.

20           SIR, THIS SLIDE IS TITLED COMPETITIVE POSITION IN PREMIUM

21      TIER.  DO YOU SEE THAT?

22      A.   I ACTUALLY DON'T HAVE THAT SLIDE.  263?

23      Q.   263.

24      A.   GOT IT.

25      Q.   AND THE SLIDE IS TITLED COMPETITIVE POSITION IN PREMIUM

1    TIER; CORRECT?

2    A.   YES, THAT'S THE TITLE.

3    Q.   AND IT HAS THE NAMES OF FOUR COMPANIES LISTED ACROSS THE

4    TOP; CORRECT?

5    A.   YES.

6    Q.   AND THERE'S A ROW, THE SECOND ROW FROM THE BOTTOM IS MODEM

7    LEADERSHIP; CORRECT?

8    A.   CORRECT.

9    Q.   AND ON THAT ROW THERE ARE INDICATIONS ABOUT THE MODEM

10   LEADERSHIP OF EACH OF THESE COMPANIES; CORRECT?

11   A.   YES.

12   Q.   THANK YOU.

13        SIR, COULD YOU PLEASE TURN BACK TO PAGE 261.  AND THIS

14   SLIDE WAS ALSO JUST SEALED.

15        AND THE TITLE OF THIS SLIDE IS COMPETITIVE LANDSCAPE.

16        AND IT LISTS THREE MERCHANT SUPPLIERS; CORRECT?

17   A.   LET ME LOOK AT IT HERE.  IT'S PRETTY SMALL TYPE.

18        YES.

19   Q.   AND SO THERE ARE THREE MERCHANT SUPPLIERS, QUALCOMM AND

20   SOME VERTICAL OEM'S ON THE TOP OF THE CHART; CORRECT?

21   A.   YES, THAT'S WHAT IT SHOWS.

22   Q.   AND ON THE LEFT-HAND SIDE OF THE CHART, THE FIRST FEW ROWS

23   ARE CHIPSET TIERS; CORRECT?

24   A.   YES.

25   Q.   AND THE CHIPSET TIERS LISTED HERE ARE DISCRETE MODEM,

1    PREMIUM, HIGH, AND MID/LOW; DO YOU SEE THAT?

2    A.   I DO.

3    Q.   AND THIS CHART IDENTIFIES THE MERCHANT SUPPLIERS THAT HAVE

4    EACH OF THESE KINDS OF CHIPS; CORRECT?

5    A.   SORRY.  I CAN'T ACTUALLY READ THE TYPE THAT IS IN THE BOX.

6         DO YOU MIND ON THE SCREEN JUST MAKING IT FULL SCREEN?

7    YEAH, THANK YOU.

8         (PAUSE IN PROCEEDINGS.)

9         THE WITNESS:  OKAY.  I'M SORRY.  COULD YOU REPEAT THE

10   QUESTION?

11   BY MS. MILICI:

12   Q.   SURE.  THIS SLIDE SHOWS WHICH OF THE SUPPLIERS LISTED AT

13   THE TOP OFFER CHIPSETS IN EACH OF THE TIERS IDENTIFIED;

14   CORRECT?

15   A.   I THINK SO.  I THINK IT'S TRYING TO SHOW -- MAKE A

16   PERFORMANCE EVALUATION.

17        I DON'T KNOW WHETHER IT SHOWS THAT THEY HAVE IT OR NOT.

18   Q.   WELL, ON THE LEGEND, AND I KNOW IT'S SMALL, IT SAYS A

19   BLANK REPRESENTS NO OFFERING, NOT RELEVANT; CORRECT?

20   A.   I SEE THAT.

21   Q.   SO ANY SUPPLIER WITH A BLANK ON A ROW FOR A CHIPSET TIER

22   DOESN'T HAVE A RELEVANT OFFERING IN THAT TIER; CORRECT?

23   A.   YES, I THINK THAT'S WHAT THIS SLIDE SAYS, YEAH.

24   Q.   THANK YOU.

25        COULD YOU PLEASE TURN TO TAB 5 IN YOUR BINDER.  AND THIS

1      IS -- AND THIS IS MATERIALS FROM A BOARD OF DIRECTORS MEETING

2      ON JULY 10TH, 2017; CORRECT?

3      A.   YES.

4      Q.   AND YOU WERE A DIRECTOR AT THE TIME?

5      A.   YES.

6              MS. MILICI:  YOUR HONOR, I MOVE TO ADMIT CX 8191.

7              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

8              THE COURT:  IT'S ADMITTED.

9          (PLAINTIFF'S EXHIBIT CX 8191 WAS ADMITTED IN EVIDENCE.)

10             THE COURT:  GO AHEAD, PLEASE.

11     BY MS. MILICI:

12     Q.   AND CAN WE TURN, PLEASE, TO PAGE 086.

13             AND AT THIS POINT OF THE BOARD PRESENTATION, THIS IS THE

14     QCT STRATEGIC PLAN; CORRECT?

15     A.   086?  086, YES.

16     Q.   OKAY.  AND NOW LET'S TURN TO PAGE 089, WHICH IS A SLIDE

17     WITHIN THE QCT STRATEGIC PLAN.

18             AND THE TITLE OF THIS SLIDE IS MOBILE COMPETITIVE

19     ENVIRONMENT, AND IT SAYS, "QCT IS NUMBER 1 CHIPSET SUPPLIER FOR

20     MOBILE HANDSETS, WITH STRONG PORTFOLIO ACROSS ALL TIERS."

21             DO YOU SEE THAT?

22     A.   I DO.

23     Q.   AND LOOKING AT THE CHART ON THE LEFT-LAND SIDE, THIS SHOWS

24     THAT QUALCOMM SOLD 42 PERCENT OF ALL MODEM CHIPS; CORRECT?

25     A.   I THINK IT MEANS BASEBAND, BASEBAND SHIPMENTS.

1     Q.   OKAY.  42 PERCENT OF ALL BASEBAND SHIPMENTS; CORRECT?

2     A.   YES.

3     Q.   AND MEDIATEK HAD 27 PERCENT OF THE SALES; CORRECT?

4     A.   YES.

5     Q.   AND IF WE LOOK AT THE CHART ON THE RIGHT, IT IDENTIFIES

6     FOUR MERCHANT SUPPLIERS.

7          DO YOU SEE THAT?

8     A.   I DO.

9     Q.   AND THE FOUR MERCHANT SUPPLIERS ARE QUALCOMM, MEDIATEK,

10    INTEL, AND SPREADTRUM; CORRECT?

11    A.   YES, THAT'S WHAT IT SHOWS.

12    Q.   AND THEN ON THE LEFT-HAND SIDE, THERE IS A CHIPSET PRICE

13    TIER.

14         DO YOU SEE THAT?

15    A.   I DO.

16    Q.   AND ACCORDING TO THIS SLIDE, QUALCOMM HAS LEADERSHIP IN

17    PREMIUM MDM CHIPS; CORRECT?

18    A.   YES.

19    Q.   AND INTEL IS THE ONLY OTHER MERCHANT SUPPLIER OFFERING A

20    PREMIUM MDM CHIP ACCORDING TO THIS SLIDE; CORRECT?

21    A.   YES.

22    Q.   AND ACCORDING TO THIS SLIDE, QUALCOMM HAS LEADERSHIP IN

23    THE PREMIUM TIER CHIPSET; CORRECT?

24    A.   YES.

25    Q.   AND ACCORDING TO THIS SLIDE, NO OTHER MERCHANT SUPPLIER

1    OFFERS A PREMIUM TIER CHIPSET; CORRECT?

2    A.   YES.

3    Q.   AND HERE ON THIS SLIDE IT SHOWS IN THE VERTICAL OEM'S THAT

4    HISILICON HAS A PREMIUM MDM; RIGHT?

5    A.   YES.

6    Q.   AND IT INDICATES THAT HISILICON'S PREMIUM MDM IS LAGGING;

7    CORRECT?

8    A.   YES, THAT'S WHAT IT SHOWS.

9    Q.   WE CAN -- WE'RE DONE WITH THAT DOCUMENT.

10       SIR --

11           THE COURT:  I'M SORRY TO INTERRUPT YOU.  COULD PEOPLE

12   PLEASE MAKE ROOM.  WE HAVE PEOPLE STANDING IN THE BACK.  CAN

13   YOU MAKE ROOM?

14       THANK YOU.

15       ALL RIGHT.  GO AHEAD.  SORRY FOR THE INTERRUPTION.

16   BY MS. MILICI:

17   Q.   SIR, QUALCOMM HAS DESCRIBED ITSELF AS THE LEADER IN 5G,

18   HASN'T IT?

19   A.   IT HAS.

20   Q.   AND YOU EXPECT TO HAVE A TIME TO MARKET ADVANTAGE FOR YOUR

21   5G MODEMS; CORRECT?

22   A.   WE EXPECT TO BE AMONG THE LEADERS.

23   Q.   OKAY.  SIR, COULD YOU PLEASE TURN TO TAB 6 IN YOUR BINDER?

24   THIS IS CX 8198.

25       AND, SIR, THIS IS A PRESS RELEASE ABOUT A LETTER TO

MOLLENKOPF DIRECT BY MS. MILICI

1    STOCKHOLDERS AND AN INVESTOR PRESENTATION; CORRECT?

2    A.   YES.

3              MS. MILICI:  YOUR HONOR, MOVE TO ADMIT CX 8198.

4              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

5              THE COURT:  IT'S ADMITTED.

6         (PLAINTIFF'S EXHIBIT CX 8198 WAS ADMITTED IN EVIDENCE.)

7              THE COURT:  GO AHEAD, PLEASE.

8    BY MS. MILICI:

9    Q.   SIR, IF WE LOOK TO PAGE 004 IN THE MIDDLE OF THE PAGE,

10   THERE'S A PARAGRAPH, AND IN THE -- ACTUALLY, IT'S AT THE BOTTOM

11   OF THE PAGE.  MY APOLOGIES.

12        AND IN THE MIDDLE OF THAT PARAGRAPH, IT SAYS "QUALCOMM IS

13   12 TO 24 MONTHS AHEAD OF OUR MERCHANT COMPETITORS IN THE

14   TRANSITION TO 5G."

15        DO YOU SEE THAT?

16   A.   I DO.

17   Q.   AND THAT WAS A TRUE STATEMENT WHEN YOU POLITICIZED IT;

18   CORRECT?

19   A.   YES.

20   Q.   WOULD YOU PLEASE TURN TO PAGE -- TO TAB 7 IN YOUR BINDER?

21   AND THIS IS CX 8197.

22        SIR, DO YOU RECOGNIZE THIS AS AN INVESTOR PRESENTATION?

23   A.   YES.

24              MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT CX 8197.

25              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

```
 1              THE COURT:  IT'S ADMITTED.

 2          (PLAINTIFF'S EXHIBIT CX 8197 WAS ADMITTED IN EVIDENCE.)

 3              THE COURT:  GO AHEAD, PLEASE.

 4      BY MS. MILICI:

 5      Q.  SIR, COULD WE PLEASE TURN TO PAGE 020.

 6          THIS SLIDE HAS THE TITLE, TECHNOLOGY TRANSITIONS CREATE

 7      SIGNIFICANT RETURNS FOR QUALCOMM.

 8          AND THAT'S A TRUE STATEMENT; CORRECT?

 9      A.  YES.

10      Q.  AND ON THE LEFT-HAND SIDE IT SAYS, "DURING 3G TO 4G

11      TRANSITION, QUALCOMM REVENUES MORE THAN DOUBLED."

12          AND THAT'S A TRUE STATEMENT; CORRECT?

13      A.  YES.

14      Q.  AND NEXT TO THAT, IT SAYS "CAPTURED 80 PERCENT SHARE OF

15      UNITS DURING FIRST THREE YEARS OF TECHNOLOGY TRANSITION FROM 3G

16      TO 4G."

17          AND THAT'S A TRUE STATEMENT; CORRECT?

18      A.  YES.

19      Q.  SIR, CAN WE PLEASE TURN TO TAB 8 IN YOUR BINDER.  AND AS

20      WE JUST DISCUSSED, WE ARE ONLY SEEKING -- WE'RE ONLY DISCUSSING

21      THE COVER E-MAIL.

22          SIR, DO YOU RECOGNIZE, ON PAGE 2 OF THIS DOCUMENT,

23      STARTING -- I'M SORRY, STARTING ON THE BOTTOM OF PAGE 1 AND

24      CONTINUING ON TO PAGE 2, THAT'S AN E-MAIL FROM YOU TO

25      MATT GROB, G-R-O-B; CORRECT?
```

```
 1              THE COURT:  B.

 2              MS. MILICI:  B.

 3   Q.   SIR, DO YOU AGREE THAT THIS IS AN E-MAIL THAT YOU WROTE ON

 4   APRIL 19TH, 2015?

 5   A.   I JUST WANT TO READ IT HERE REAL QUICK TO MAKE SURE.

 6        (PAUSE IN PROCEEDINGS.)

 7              THE WITNESS:  YES.

 8              MS. MILICI:  YOUR HONOR, THE FTC ASKS TO ADMIT THE

 9   FIRST TWO PAGES OF CX 5913.

10              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

11              THE COURT:  IT'S ADMITTED.

12        (PLAINTIFF'S EXHIBIT CX 5913 WAS ADMITTED IN EVIDENCE.)

13              THE COURT:  GO AHEAD, PLEASE.

14   BY MS. MILICI:

15   Q.   OKAY.  AND IN YOUR E-MAIL, YOU WROTE, "I HAVE BEEN

16   SPENDING THE LAST FEW HOURS ON THE BOARD DECK ON SPLIT."

17              AND YOU WROTE, "ONE OF THE ARGUMENTS FOR NOT SPLITTING IS

18   THAT WE NEED TO BE POSITIONED FOR 5G AND THEN WE SHOW THE

19   INVESTMENT LEVEL OF 19 MILLION FOR 5G AND 15 MILLION FOR 3G

20   (STILL)."

21              AND THAT'S WHAT YOU WROTE TO MATT GROB ON APRIL 19TH,

22   2015; CORRECT?

23   A.   YES.

24   Q.   AND THEN IF YOU LOOK AT THE E-MAIL ABOVE THAT ON THE FIRST

25   PAGE DAVID WISE RESPONDS TO YOU, "THE MAIN POINT ON 5G IS THAT
```

1     WE ARE IN A STRONGER POSITION TO EXTEND QTL LICENSING MODEL

2     TOGETHER THAN SEPARATE."

3          AND THAT'S WHAT DAVID WISE WROTE YOU IN APRIL 2015;

4     CORRECT?

5     A.   YES.

6     Q.   AND DAVID WISE WAS WORKING ON PROJECT PHOENIX AT THE TIME;

7     CORRECT?

8     A.   YES.

9     Q.   CAN WE PLEASE TURN TO TAB 9 IN YOUR BINDER.

10         AND, SIR, THIS APPEARS TO BE A TRANSCRIPT OF A NEW YORK

11    ANALYST'S MEETING.  AND IF YOU LOOK ON PAGE 2, YOU ARE LISTED

12    AS ONE OF THE CORPORATE PARTICIPANTS.

13         DO YOU SEE THAT?

14    A.   I DO.

15              MS. MILICI:  YOUR HONOR, THE FTC MOVES TO ADMIT

16    CX 6439.

17              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

18              THE COURT:  IT'S ADMITTED.

19         (PLAINTIFF'S EXHIBIT CX 6439 WAS ADMITTED IN EVIDENCE.)

20              THE COURT:  GO AHEAD, PLEASE.

21    BY MS. MILICI:

22    Q.   SIR, IF YOU COULD PLEASE TURN TO PAGE 035.  ON 035, THERE

23    BEGINS A PRESENTATION BY BILL KEITEL, AND BILL KEITEL WAS THE

24    CFO; CORRECT?

25    A.   THIS IS 035?

MOLLENKOPF DIRECT BY MS. MILICI

1    Q.   YES, SIR.

2    A.   YES.

3    Q.   LET'S TURN AHEAD A FEW PAGES IN HIS PRESENTATION TO SLIDE

4    039.

5         AND ABOUT HALFWAY DOWN THE PAGE, HE REFERS TO THE

6    APPROXIMATE 15 BILLION WE'VE RETURNED TO STOCKHOLDERS IN THE

7    LAST EIGHT YEARS.

8         DO YOU SEE THAT?

9    A.   I DO.

10   Q.   AND, SIR, IT'S TRUE, ISN'T IT, THAT QUALCOMM SPENT $15

11   BILLION ON STOCK REPURCHASES AND DIVIDENDS BETWEEN 2002 AND

12   2010?

13   A.   I COULDN'T -- I COULDN'T ATTEST TO THAT.  I'M SURE

14   WHATEVER IS WRITTEN HERE IS RIGHT, BUT I DIDN'T WRITE THIS.

15   Q.   OKAY.  BUT THIS IS WHAT BILL KEITEL SAID DURING THIS

16   ANALYST DAY PRESENTATION; CORRECT?

17   A.   YES.

18   Q.   AND HE WAS THE CFO?

19   A.   CORRECT.

20   Q.   OKAY.  CAN WE PLEASE TURN TO TAB 11 IN YOUR BINDER.  SIR,

21   THIS IS AN E-MAIL THAT -- THE COVER E-MAIL WENT TO E-MAIL

22   ADDRESS CALLED EXC.  AT THIS TIME IN 2008 YOU WOULD HAVE BEEN

23   ONE OF THE RECIPIENTS OF THIS E-MAIL; CORRECT?

24   A.   YES.

25   Q.   AND THE ATTACHMENT IS A QCT STRATEGIC PLAN FOR 2008?

1    A.   YES.

2                MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT CX 7559.

3                MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

4                THE COURT:  IT'S ADMITTED.

5           (PLAINTIFF'S EXHIBIT CX 7559 WAS ADMITTED IN EVIDENCE.)

6                THE COURT:  GO AHEAD, PLEASE.

7    BY MS. MILICI:

8    Q.   COULD YOU PLEASE TURN TO PAGE 010.

9         AND THIS PAGE HAS A QCT STRENGTHS, WEAKNESSES,

10   OPPORTUNITIES AND THREATS; CORRECT?

11   A.   YES.

12   Q.   AND UNDER STRENGTHS THE FIRST BULLET SAYS, "C2K LEADERSHIP

13   AND PROFITABILITY."

14        THE SECOND BULLET SAYS, "UMTS LEADERSHIP AMONG MERCHANT

15   SUPPLY."

16        DO YOU SEE THAT?

17   A.   I DO.

18   Q.   AND THOSE WERE TWO OF QCT'S STRENGTHS IN 2008; CORRECT?

19   A.   THAT'S WHAT ANDY, WHO WROTE THIS, PUT ON THE SLIDE, YES.

20   Q.   AND THIS SLIDE WAS PART OF A QCT STRATEGIC PLAN; CORRECT?

21   A.   YES.

22   Q.   AND, SIR, YOU WERE INVOLVED IN THE NEGOTIATION OF A 2011

23   AGREEMENT BETWEEN APPLE AND QUALCOMM THAT WAS CALLED THE

24   TRANSITION AGREEMENT; CORRECT?

25   A.   YES.

1    Q.   AND WHEN NEGOTIATING THAT AGREEMENT, YOU UNDERSTOOD THAT

2    APPLE WAS PLANNING TO RELEASE THE FIRST IPHONE THAT WOULD BE

3    COMPATIBLE WITH THE VERIZON NETWORK; CORRECT?

4    A.   I'M SORRY.  AT WHAT TIMEFRAME?

5    Q.   WHEN YOU WERE NEGOTIATING THE TRANSITION AGREEMENT.

6    A.   SAY IT AGAIN.  I'M JUST TRYING TO GET THE TIMEFRAME RIGHT.

7    SORRY.

8    Q.   WHEN YOU WERE NEGOTIATING THE TRANSITION AGREEMENT, THE

9    2011 TRANSITION AGREEMENT, YOU UNDERSTOOD THAT APPLE WAS

10   PLANNING TO RELEASE THE FIRST IPHONE THAT WOULD BE COMPATIBLE

11   WITH THE VERIZON NETWORK; CORRECT?

12   A.   I THOUGHT THEY HAD RELEASED THAT EARLIER.

13   Q.   SIR, COULD YOU PLEASE TURN TO PAGE 211 OF YOUR DEPOSITION.

14   THERE SHOULD BE A BINDER WITH YOUR DEPOSITION IN FRONT OF YOU.

15   A.   YES.  YOU SAID 211?

16   Q.   YES, SIR.

17        AT 211, LINE 15 YOU SAY -- THERE'S A QUESTION:  "BY THIS

18   DATE OF FEBRUARY 2011, DID YOU UNDERSTAND THAT APPLE WANTED TO

19   RELEASE THE FIRST IPHONE FOR VERIZON, WHICH REQUIRED

20   IMPLEMENTATION OF THE CDMA STANDARD?"

21        DO YOU SEE THAT?

22   A.   I'M SORRY.  CAN YOU GIVE ME THAT LINE AGAIN?

23   Q.   SURE.  IT'S ON THE SCREEN.

24        SO YOU WERE ASKED THAT QUESTION.  YOU ANSWERED, "IN 2011?"

25        AND THEN YOU SAID, "YES."

1       YOU WERE ASKED THOSE QUESTIONS AND YOU GAVE THOSE ANSWERS;

2  CORRECT.

3  A.   I'M SORRY.  WHICH QUESTIONS ARE YOU REFERRING TO.

4  Q.   THE QUESTION IS BY FEBRUARY OF 2011, DID YOU UNDERSTAND

5  THAT APPLE WANTED TO RELEASE THE FIRST IPHONE FOR VERIZON,

6  WHICH REQUIRED IMPLEMENTATION OF THE CDMA STANDARD?

7  A.   YES.

8  Q.   OKAY.  THANK YOU.

9       CAN YOU PLEASE TURN TO TAB 12 IN YOUR BINDER.  AND THE

10  COVER E-MAIL IS A -- IS AN E-MAIL FROM PETER CARSON.

11       WHO IS PETER CARSON?

12  A.   I DON'T REMEMBER WHAT HIS EXACT TITLE WOULD HAVE BEEN AT

13  THIS TIME.  THIS IS 2010.

14  Q.   PETER CARSON WORKED IN QCT?

15  A.   HE -- YEAH, EITHER THAT OR IN A STRATEGY ROLE.

16  Q.   AND THIS ATTACHMENT TO THIS E-MAIL IS A MODEM STRAT PLAN.

17       DO YOU SEE THAT?

18  A.   YES.

19  Q.   AND YOU WERE FAMILIAR WITH MODEM STRAT PLANS; IS THAT

20  CORRECT?

21  A.   I WOULD GET THEM SENT TO ME.

22       MS. MILICI:  YOUR HONOR, WE WOULD SEEK TO ADMIT

23  CX 6381.

24       MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

25       THE COURT:  IT'S ADMITTED.

1           (PLAINTIFF'S EXHIBIT CX 6381 WAS ADMITTED IN EVIDENCE.)

2              THE COURT:  GO AHEAD, PLEASE.

3        BY MS. MILICI:

4        Q.  SIR, COULD WE PLEASE TURN TO PAGE 008.

5           AND ON PAGE 008, IT REPRESENTS THE KEY THREATS TO THE

6        MODEM BUSINESS; CORRECT?

7        A.  YES.

8        Q.  AND THE SECOND BULLET SAYS, "COMPETITION IS LASER FOCUSSED

9        ON THIN MODEM WITH SIGNIFICANT COST ADVANTAGE ON SCALEABLE

10       ARCHITECTURES."

11          DO YOU SEE THAT?

12       A.  YES.

13       Q.  AND THIN MODEMS ARE THE TYPE OF MODEMS THAT QUALCOMM

14       SUPPLIED TO APPLE; IS THAT CORRECT?

15       A.  YES.

16       Q.  AND SO AT THIS TIME, AT THE TIME OF THIS 2010 STRAT PLAN,

17       QUALCOMM'S ANALYSIS WAS THAT ITS COMPETITORS WERE LASER

18       FOCUSSED ON MAKING THIN MODEMS; CORRECT?

19       A.  THAT'S WHAT IT SAYS.

20       Q.  COULD WE PLEASE TURN TO TAB 13 OF THE BINDER.

21          AND IF YOU LOOK AT TAB 13, WHICH IS CX 5348, THE SECOND

22       E-MAIL ON THE PAGE IS WRITTEN BY YOU; CORRECT?

23       A.  YES.

24       Q.  AND YOU WROTE THAT E-MAIL TO PAUL JACOBS, STEVE ALTMAN,

25       AND DEREK ABERLE; CORRECT?

1    A.   CORRECT.

2              MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT CX 5348.

3              THE COURT:  ANY OBJECTION?

4              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

6         (PLAINTIFF'S EXHIBIT CX 5348 WAS ADMITTED IN EVIDENCE.)

7              THE COURT:  I'D LIKE TO TAKE A BREAK AT 2:50, SO YOU

8    HAVE ABOUT THREE MORE MINUTES.  OKAY.

9              MS. MILICI:  OKAY.

10   Q.   SIR, IF YOU LOOK AT YOUR E-MAIL YOU WROTE, "ATTACHED IS

11   THE DECK SIZING IT FROM QCT SIDE."

12        AND BY "SIZING IT," YOU MEANT SIZING THE DEAL WITH APPLE;

13   CORRECT?

14   A.   LET ME READ THE E-MAIL.  I DON'T RECALL THIS E-MAIL.

15        (PAUSE IN PROCEEDINGS.)

16   BY MS. MILICI:

17   Q.   SIR, WE DISCUSSED THIS E-MAIL AT YOUR DEPOSITION; CORRECT?

18   A.   AGAIN, I DON'T REMEMBER THE E-MAIL.  BUT LET ME JUST

19   QUICKLY ORIENT MYSELF TO IT.

20        (PAUSE IN PROCEEDINGS.)

21              THE WITNESS:  YES, THAT'S WHAT "IT" REFERS TO.

22   BY MS. MILICI:

23   Q.   OKAY.  AND THEN IN THE SECOND PARAGRAPH OF YOUR E-MAIL YOU

24   WROTE, "THEY BECOME A SAMSUNG SIZED CUSTOMER IN 2012."

25        DO YOU SEE THAT?

1    A.   I DO.

2    Q.   AND BY "THEY" YOU MEANT APPLE; CORRECT?

3    A.   YES.

4    Q.   AND IN THE NEXT PARAGRAPH YOU WROTE, "THERE ARE

5    SIGNIFICANT STRATEGIC BENEFITS AS IT IS UNLIKELY THAT THERE

6    WILL BE ENOUGH STANDALONE MODEM VOLUME TO SUSTAIN A VIABLE

7    COMPETITOR WITHOUT THAT SLOT."

8         AND "THAT SLOT" REFERS TO APPLE'S MODEM CHIP BUSINESS;

9    CORRECT?

10   A.   YES.

11   Q.   IS IT NOW TIME FOR A BREAK?

12        THE COURT:  THAT'S FINE.  IT'S 2:49.  LET'S GO AHEAD

13   AND TAKE A BREAK UNTIL 3:00 O'CLOCK.  THANK YOU.

14        WE'RE IN RECESS GO AHEAD, PLEASE.

15        (RECESS FROM 2:49 P.M. UNTIL 3:02 P.M.)

16        THE COURT:  GOOD AFTERNOON.  WELCOME BACK.  PLEASE

17   TAKE A SEAT.

18        IF IT'S NECESSARY FROM THE RECORD, WHEN WE CAME BACK FROM

19   LUNCH, WE WERE IN OPEN COURT.  I THINK THAT WAS CLEAR FROM

20   BEFORE, BUT JUST IN CASE.

21        ALL RIGHT.  TIME IS 3:02.  GO AHEAD, PLEASE.

22   BY MS. MILICI:

23   Q.   SIR, COULD YOU PLEASE TURN TO TAB 15 IN YOUR BINDER.

24   A.   OKAY.

25   Q.   AND THIS IS AN E-MAIL SENT BY MARC MCCLOSKEY TO YOU

MOLLENKOPF DIRECT BY MS. MILICI

```
 1    NOVEMBER 29TH, 2010, ISN'T IT?

 2    A.   YES.

 3    Q.   AND MR. MCCLOSKEY WORKED FOR QUALCOMM?

 4    A.   HE DID.

 5    Q.   AND THE E-MAIL CHAIN RELATES TO QUALCOMM AND APPLE'S

 6    NEGOTIATION OF THE TRANSITION AGREEMENT; CORRECT?

 7    A.   YES.

 8         MS. MILICI:  YOUR HONOR, WE WOULD MOVE TO ADMIT

 9    CX 5357.

10         MR. VAN NEST:  NO OBJECTION.

11         THE COURT:  IT'S ADMITTED.

12    (PLAINTIFF'S EXHIBIT CX 5357 WAS ADMITTED IN EVIDENCE.)

13         THE COURT:  GO AHEAD, PLEASE.

14    BY MS. MILICI:

15    Q.   AND IN THIS E-MAIL AT THE TOP HERE, MR. MCCLOSKEY WAS

16    CONSIDERING WHETHER A 1 PERCENT -- WHAT A 1 PERCENT SHARE WOULD

17    BE WORTH TO QUALCOMM IF THE ALTERNATIVE WAS THAT APPLE WOULD

18    USE A COMPETITOR LIKE IFX AND SAMSUNG AND MAKE THEM MORE

19    COMPETITIVE IN THE MARKET; RIGHT?

20    A.   LET ME READ THE DOCUMENT.

21    (PAUSE IN PROCEEDINGS.)

22         THE WITNESS:  COULD YOU REPEAT THE QUESTION, PLEASE.

23    BY MS. MILICI:

24    Q.   SIR, I'M JUST ASKING YOU IF THE E-MAIL SAYS THAT

25    MR. MCCLOSKEY WAS CONSIDERING WHAT 1 PERCENT SHARE WOULD BE
```

```
 1         WORTH TO QUALCOMM IF THE ALTERNATIVE WAS THAT APPLE WOULD USE A

 2         COMPETITIVE LIKE IFX AND SAMSUNG?

 3              THAT'S WHAT HE'S WRITING; RIGHT?

 4    A.    YES.

 5    Q.    AND IFX REFERS TO INFINEON?

 6    A.    YES.

 7    Q.    AND INFINEON WAS PURCHASED BY INTEL; CORRECT?

 8    A.    YES.

 9    Q.    CAN WE PLEASE TURN TO TAB 16 IN YOUR BINDER.  AND A PART

10    OF THIS DOCUMENT IS UNDER SEAL.

11              LET'S LOOK NOW AT PAGE 3.  AND THIS IS AN E-MAIL -- ON

12    PAGE 3, THE MIDDLE OF THE PAGE IS AN E-MAIL FROM YOU DATED

13    DECEMBER 7TH, 2010; CORRECT?

14    A.    YES.

15              MS. MILICI:  YOUR HONOR, WE SEEK TO ADMIT CX 5360.

16              MR. VAN NEST:  NO OBJECTION.

17              THE COURT:  IT'S ADMITTED.

18         (PLAINTIFF'S EXHIBIT CX 5360 WAS ADMITTED IN EVIDENCE.)

19              THE COURT:  GO AHEAD, PLEASE.

20    BY MS. MILICI:

21    Q.    AND ON THIS E-MAIL YOU WROTE, "HERE IS WHAT I WROTE DOWN

22    AS NEXT STEPS FROM FRIDAY CALL."

23         DO YOU SEE THAT?  IT'S ON YOUR SCREEN.

24    A.    I'M SORRY.  WHICH PLACE IN THE DOCUMENT?

25    Q.    IN YOUR E-MAIL, THREE LINES DOWN, THREE PARAGRAPHS DOWN.
```

```
 1          "HERE IS WHAT I WROTE DOWN AS NEXT STEPS FROM FRIDAY CALL."

 2          DO YOU SEE THAT?

 3     A.   GOT IT.

 4     Q.   AND ONE OF THOSE NEXT STEPS WAS "NEED PAYMENT AND EARN-OUT

 5     MECHANISM THAT ALIGNS WITH GOAL OF DESIGN-INS AND EXCLUSIVITY."

 6          DO YOU SEE THAT?

 7     A.   I DO.

 8     Q.   AND IN THAT INTRODUCTORY SENTENCE THAT I JUST READ, IT

 9     SAYS THAT THESE NEXT STEPS ARE INTERNAL ONLY AND NOT AGREED

10     WITH JEFF.

11          AND THE JEFF THAT YOU'RE REFERRING TO THERE IS

12     JEFF WILLIAMS OF APPLE; CORRECT?

13     A.   YES.

14     Q.   THIS IS JX 55.  AND, AGAIN, THIS DOCUMENT IS PARTIALLY

15     SEALED, SO WE WON'T BE SHOWING IT ON THE SCREEN.

16          CAN YOU TURN TO PAGE 006.  THERE'S AN E-MAIL FROM YOU TO

17     JIM LEDERER DATED DECEMBER 19TH, 2010; CORRECT?

18     A.   YES.

19     Q.   AND YOU WROTE THAT E-MAIL ABOUT MAVERICK?

20     A.   YES.

21     Q.   AND MAVERICK IS APPLE; CORRECT?

22     A.   YES.

23          MS. MILICI:  YOUR HONOR, THE FTC MOVES TO ADMIT

24     JX 55.

25          MR. VAN NEST:  NO OBJECTION.
```

```
 1              THE COURT:  IT'S ADMITTED.

 2         (JOINT EXHIBIT JX 55 WAS ADMITTED IN EVIDENCE.)

 3              THE COURT:  GO AHEAD.  WHAT'S THE TAB NUMBER FOR

 4    THAT, PLEASE?

 5              MS. MILICI:  IT IS TAB 14.

 6              THE COURT:  OKAY.  THANK YOU.

 7              MS. MILICI:  AND WE ARE ON PAGE 006.

 8    Q.   SIR, IN THIS E-MAIL YOU WROTE ABOUT A CALL WITH JEFF ON

 9    FRIDAY NIGHT?

10    A.   I DID.

11    Q.   AND JEFF AGAIN WAS JEFF WILLIAMS OF APPLE?

12    A.   YES.

13    Q.   AND LATER IN THIS E-MAIL YOU SAY, "OVER THE LAST 20 HOURS,

14    I HAVE BEEN THINKING A LOT ABOUT HOW HARD WE SHOULD RISK TO

15    DE-RISK THIS ACCOUNT."

16         DO YOU SEE THAT?

17    A.   I DO.

18    Q.   AND YOU LIST A COUPLE OF SCENARIOS THAT MIGHT BE RISKY TO

19    QUALCOMM; CORRECT?

20    A.   YES.

21    Q.   AND THOSE SCENARIOS INCLUDED SAMSUNG GOES INCREASINGLY

22    VERTICAL AND HOSTILE, AND IT INCLUDES VIA IS ACQUIRED BY EITHER

23    INTEL OR BROADCOM.

24         DO YOU SEE THAT?

25    A.   I DO.
```

1    Q.   AND THEN IT INCLUDES MTK GETS OVER THE QUALITY THRESHOLD

2    AND STARTS TO UNDERCUT US AT THE BIG ACCOUNTS.

3         DO YOU SEE THAT?

4    A.   YES.

5    Q.   AND THESE WERE THREATS THAT YOU WERE CONSIDERING WHEN YOU

6    WERE NEGOTIATING WITH APPLE FOR THE AGREEMENT THAT BECAME THE

7    2011 TRANSITION AGREEMENT?

8    A.   YES.

9    Q.   COULD WE PLEASE TURN TO PAGE -- TO TAB 17 IN YOUR BINDER.

10   AND THIS IS JX 0086.

11        AND ON THE FIRST PAGE IS AN E-MAIL FROM SANJAY MEHTA TO

12   YOU AND MARC MCCLOSKEY, AND YOU RECEIVED THAT E-MAIL ON

13   APRIL 29TH, 2013, DIDN'T YOU?

14   A.   YES.

15             MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT JX 86.

16             MR. VAN NEST:  NO OBJECTION.

17             THE COURT:  IT'S ADMITTED.

18        (JOINT EXHIBIT JX 86 WAS ADMITTED IN EVIDENCE.)

19             THE COURT:  GO AHEAD, PLEASE.

20   BY MS. MILICI:

21   Q.   AND THIS COVER E-MAIL REFERS TO AN ENCLOSED UPDATE TO THE

22   SLIDES.

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   AND THE ATTACHED SLIDES ARE CONFIDENTIAL, SO WE'RE NOT

1    SHOWING IT TO THE COURT, TO THE COURTROOM.

2         BUT WE'D LIKE TO SEE -- BUT IF YOU COULD LOOK AT PAGE 009.

3         AND PAGE 009 IS A CHART THAT SHOWS TWO AGREEMENTS;

4    CORRECT?

5    A.   YES.

6    Q.   AND THE FIRST AGREEMENT IS THE ORIGINAL TRANSITION

7    AGREEMENT; CORRECT?

8    A.   YES.

9    Q.   AND UNDER -- AND THE ORIGINAL TRANSITION AGREEMENT

10   REFERRED TO ON THIS SLIDE IS THE 2011 AGREEMENT; RIGHT?

11   A.   YES.

12   Q.   AND THAT AGREEMENT INCLUDED THREE DIFFERENT KINDS OF

13   FUNDS?

14   A.   YES, THAT'S WHAT IT SHOWS.

15   Q.   AND THE FIRST AND THIRD FUNDS LISTED HERE WERE SUBJECT TO

16   CLAWBACK IF APPLE LAUNCHED ANY DEVICE WITH A NON-QUALCOMM

17   MODEM; CORRECT?

18   A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

19   Q.   THE FIRST AND THIRD FUNDS LISTED UNDER THE ORIGINAL

20   TRANSITION AGREEMENT WERE SUBJECT TO CLAWBACK IF APPLE LAUNCHED

21   ANY DEVICE WITH A NON-QUALCOMM MODEM CHIP; CORRECT?

22   A.   YES.

23   Q.   AND YOU WERE NOT AWARE OF ANY OTHER AGREEMENTS WITH ANY

24   OTHER OEM WHERE QUALCOMM HAS THE RIGHT TO CLAW BACK FUNDS IN

25   THE EVENT THAT THEY USE A NON -QUALCOMM CHIP; CORRECT?

MOLLENKOPF DIRECT BY MS. MILICI

```
1        A.    THAT IS CORRECT.

2        Q.    AND THE BOTTOM HALF OF THIS SLIDE CONCERNS THE NEW

3    ADDITIONAL TRANSITION AGREEMENT TERMS, FEBRUARY 2013.

4              DO YOU SEE THAT?

5        A.    YES.

6        Q.    AND THAT REFERS TO THE 2013 FIRST AMENDMENT TO THE

7    TRANSITION AGREEMENT; CORRECT?

8        A.    YES.

9        Q.    AND THIS ALSO LISTS TWO KINDS OF FUNDS UNDER THAT

10   AGREEMENT; CORRECT?

11       A.    YES.

12       Q.    AND FOR THE FIRST KIND OF FUND, THERE'S A CLAWBACK

13   PROVISION IF APPLE LAUNCHES A PHONE OR TABLET WITH NON-QC

14   MODEM; CORRECT?

15       A.    CORRECT.

16       Q.    AND FOR THE SECOND KIND OF FUND, THERE'S A CLAWBACK IF

17   APPLE LAUNCHES A PHONE OR TABLET WITH A NON-QC MODEM AS WELL;

18   RIGHT?

19       A.    I'M SORRY.  COULD YOU ASK THE QUESTION AGAIN.

20       Q.    FOR THE SECOND FUND, THERE'S ALSO A CLAWBACK IF APPLE

21   LAUNCHES A PHONE OR TABLET WITH A NON-QC MODEM?

22       A.    THERE IS.

23       Q.    AND IN ADDITION FOR THAT SECOND FUND, ALL OF THE FUND

24   MONIES PAID BY QUALCOMM ARE REIMBURSED TO APPLE AND THE

25   AGREEMENT WOULD TERMINATE, CORRECT, IF APPLE USED A
```

1      NON-QUALCOMM MODE; CORRECT?

2      A.   I'M SORRY.  COULD YOU REPEAT THAT?

3      Q.   SURE.

4      A.   I THINK YOU MAY HAVE MIXED IT UP OR I MISHEARD IT.

5      Q.   THE SECOND FUND ON THAT CHART, UNDER THAT FUND, IT REFERS

6      TO CLAWBACK AND THE CLAWBACK PROVISIONS INCLUDE IF MAVERICK

7      LAUNCHES A PHONE OR TABLET WITH NON-QC MODEM.

8           DO YOU SEE THAT?

9      A.   I DO.

10     Q.   AND THAT'S THE CLAWBACK FEATURE OF THE FIRST AMENDMENT

11     TRANSITION AGREEMENT?

12     A.   YES.

13     Q.   AND THIS ALSO SAYS THAT THE FUND MONIES PAID BY QC ARE

14     REIMBURSED AND THE AGREEMENT WOULD TERMINATE; CORRECT?

15     A.   CORRECT.

16     Q.   THANK YOU.

17          WILL YOU PLEASE TURN TO TAB 18.  THIS IS CX 5425.

18          SIR, IS IT FAIR TO SAY THAT EXCLUSIVITY WAS ONE OF THE

19     PRIMARY BENEFITS OF THE 2011 TRANSITION AGREEMENT?

20     A.   NO.

21     Q.   OKAY.  COULD YOU PLEASE LOOK AT THE DOCUMENT HERE,

22     CX 5425?  AND DO YOU RECOGNIZE THIS AS AN E-MAIL ATTACHING A

23     FINAL ACCOUNTING MEMO?

24     A.   YES.

25     Q.   AND ACCOUNTING MEMOS IS A STANDARD TYPE OF MEMO THAT YOUR

```
 1        ACCOUNTING DEPARTMENT WOULD WRITE AFTER AN AGREEMENT WAS

 2        CONCLUDED; CORRECT?

 3        A.   CORRECT.

 4             MS. MILICI:  AND, YOUR HONOR, WE MOVE TO ADMIT

 5        CX 5425.

 6             MR. VAN NEST:  NO OBJECTION.

 7             THE COURT:  IT'S ADMITTED.

 8        (PLAINTIFF'S EXHIBIT CX 5425 WAS ADMITTED IN EVIDENCE.)

 9             THE COURT:  GO AHEAD, PLEASE.

10   BY MS. MILICI:

11   Q.   AND THE DOCUMENT IS PARTIALLY SEALED, BUT WE'RE NOT GOING

12   TO BE LOOKING AT THE SEALED PORTION.

13        IF WE COULD TURN TO PAGE 002.  ACTUALLY, SORRY, THE PAGE

14   THAT WE WANT TO LOOK AT IS SEALED SO WE'RE GOING TO COVER IT

15   UP.  THANK YOU.

16        LET'S LOOK AT PAGE 004, PLEASE.  AND UNDER -- DO YOU SEE

17   THAT PAGE?  IT SAYS ACCOUNTING AGREEMENT IN BOLD AT THE TOP.

18   DO YOU SEE THAT?

19   A.   YES.

20   Q.   AND IT SAYS THERE, "THE PRIMARY BENEFITS OF THE TRANSITION

21   FUND TO QUALCOMM ARE THE VOLUME REQUIREMENTS AS WELL AS THE

22   EXCLUSIVITY PROVISION DESCRIBED ABOVE."

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   SO IS IT FAIR TO SAY THAT THE ACCOUNTING DEPARTMENT
```

```
 1        THOUGHT THAT ONE OF THE PRIMARY BENEFITS OF THE TRANSITION

 2        AGREEMENT TO QUALCOMM WAS THE EXCLUSIVITY PROVISION?

 3        A.   YES, THAT'S WHAT'S WRITTEN HERE.

 4        Q.   CAN WE PLEASE TURN TO TAB 19.  THIS IS CX 7968.

 5             AND, SIR, THIS IS AN E-MAIL, THE TOP E-MAIL IS AN E-MAIL

 6        THAT YOU WROTE DECEMBER 13TH, 2012?

 7        A.   YES.

 8        Q.   AND AT THIS TIME YOU WERE NEGOTIATING WITH APPLE THE

 9        POTENTIAL AMENDMENT TO THE TRANSITION AGREEMENT; CORRECT?

10        A.   CORRECT.

11        Q.   AND THIS E-MAIL IS ABOUT THAT?

12        A.   YES.

13                 MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT CX 7968.

14                 MR. VAN NEST:  NO OBJECTION.

15                 THE COURT:  IT'S ADMITTED.

16             (PLAINTIFF'S EXHIBIT CX 7968 WAS ADMITTED IN EVIDENCE.)

17                 THE COURT:  GO AHEAD, PLEASE.

18        BY MS. MILICI:

19        Q.   AND, SIR, ON THE E-MAIL THAT YOU WROTE ON THIS PAGE, YOU

20        WROTE, "I DO NOT SEE WHY WE WOULD MAKE A MOVE IN 2013 OR

21        PROVIDE ANY INCENTIVE IN THE WINDOW OF THE OLD AGREEMENT (WHICH

22        HAD AN OBJECTIVE OF EXCLUSIVITY UNTIL THE END OF 2015.)."

23             DO YOU SEE THAT?

24        A.   I DO.

25        Q.   AND SO WHAT YOU WERE SAYING THERE IS YOU DIDN'T SEE ANY
```

1    REASON TO, TO OFFER ANY PRICE INCENTIVES TO APPLE DURING THE

2    PERIOD OF EXCLUSIVITY FROM THE FIRST TRANSITION AGREEMENT;

3    CORRECT?

4    A.   YEAH.  WE'RE TRYING TO EVALUATE WHAT IS THE RIGHT PATH

5    FORWARD AND THAT'S ONE OF THE, ONE OF THE SCENARIOS WE'RE

6    THINKING OF, YES.

7    Q.   SIR, COULD YOU PLEASE TURN TO PAGE 20 IN YOUR BINDER.  AND

8    TAB 20 HAS AN E-MAIL EXCHANGE WITH YOU AND JIM LEDERER FROM

9    NOVEMBER 27TH, 2012.  AND THIS E-MAIL EXCHANGE CONCERNS

10   MAVERICK ASSUMPTIONS IN FISCAL YEAR 2013, DIDN'T IT?

11   A.   YES.

12        MS. MILICI:  YOUR HONOR, WE SEEK TO ADMIT CX 7592.

13        MR. VAN NEST:  NO OBJECTION.

14        THE COURT:  IT'S ADMITTED.

15        (PLAINTIFF'S EXHIBIT CX 7592 WAS ADMITTED IN EVIDENCE.)

16        THE COURT:  GO AHEAD, PLEASE.

17   BY MS. MILICI:

18   Q.   AND, SIR, IN THE E-MAIL IN THE MIDDLE OF THE PAGE FROM JIM

19   LEDERER HE WROTE, "ONE THOUGHT YOU MAY WANT TO CONSIDER ON THE

20   COMPETITIVE FRONT IN YOUR MEETING TODAY.  REGARDING THE IFX

21   THREAT, WHICH WE BELIEVE WOULD START IN THE TABLET SPACE, WE

22   SHOULD CONSIDER THIS MAKING A SIGNIFICANT MOVE IN TABLET

23   PRICING."

24        DO YOU SEE THAT?

25   A.   I DO.

1    Q.   AND IFX REFERS TO INFINEON, WHICH WAS PURCHASED BY INTEL;

2    CORRECT?

3    A.   YES.

4    Q.   AND SO MR. LEDERER IS REPORTING ON A POTENTIAL THREAT FROM

5    INFINEON, WHICH WOULD START IN THE TABLET SPACE; CORRECT?

6    A.   THAT'S WHAT HE WROTE.

7    Q.   AND DURING NEGOTIATION OF THE 2013 AGREEMENT, INCLUDING

8    THE FIRST AMENDMENT TO THE TRANSITION AGREEMENT, APPLE TOLD

9    QUALCOMM THAT IT WAS CONSIDERING USING ALTERNATIVE SUPPLIERS;

10   CORRECT?

11   A.   THEY DID.

12   Q.   AND THAT WAS ONE OF THE THINGS THAT YOU WERE CONSIDERING

13   IN THE NEGOTIATIONS FOR THE 2013 AGREEMENTS; CORRECT?

14   A.   YES.

15   Q.   CAN WE PLEASE TURN TO TAB 21 IN YOUR BINDER.  AND TAB 21

16   HAS CX 5378, AND THERE'S THE SECOND E-MAIL ON THE PAGE, THAT'S

17   AN E-MAIL THAT YOU WROTE ON DECEMBER 19TH, 2012; CORRECT?

18   A.   YES.

19   Q.   AND THE SUBJECT OF THE E-MAIL IS MAVERICK; CORRECT?

20   A.   CORRECT.

21           MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT CX 5378.

22           MR. VAN NEST:  NO OBJECTION.

23           THE COURT:  IT'S ADMITTED.

24       (PLAINTIFF'S EXHIBIT CX 5378 WAS ADMITTED IN EVIDENCE.)

25           THE COURT:  GO AHEAD, PLEASE.

1    BY MS. MILICI:

2    Q.   SIR, IF WE COULD START ON PAGE 003.  THERE'S AN E-MAIL

3    THERE FROM MR. KOLIANDER, AND MR. KOLIANDER WAS QUALCOMM'S LEAD

4    SALESPERSON FOR APPLE; CORRECT?

5    A.   YES.

6    Q.   AND MR. KOLIANDER REPORTED TO YOU THAT APPLE DID APPEAR TO

7    BE WORKING WITH INTEL, BUT WAS UNLIKELY TO LAUNCH AN

8    INTEL-BASED PRODUCT UNTIL LATE 2013.

9         DO YOU SEE THAT?

10   A.   I SEE THAT.

11   Q.   AND HE ALSO REPORTED THAT THE INTEL-BASED PRODUCT WAS

12   BELIEVED TO BE A DATA ONLY MODEM FOR AN IPAD.

13        DO YOU SEE THAT?

14   A.   YES.

15   Q.   AND THAT'S ONE OF THE THINGS THAT YOU WERE CONSIDERING

16   WHEN YOU NEGOTIATED THE 2013 AGREEMENTS; CORRECT?

17   A.   YES.

18   Q.   AND IF YOU TURN BACK TO PAGE 002, AT THE BOTTOM OF THE

19   PAGE, THERE'S AN E-MAIL THAT YOU WROTE ON DECEMBER 19TH, 2012.

20        AND YOU WROTE, "GIVEN THIS AND THE ANALYSIS THAT SANJAY

21   FORWARDED (WHICH RELIES ON OUR CONFIDENCE IN KEEPING THE

22   HIGH-END SKU ALWAYS), WHY NOT TRY TO MAXIMIZE PROFIT INSTEAD OF

23   KEEPING 100 PERCENT SHARE.  THAT LAST BIT OF SHARE IS

24   EXPENSIVE."

25        DO YOU SEE THAT?

MOLLENKOPF DIRECT BY MS. MILICI

1    A.   I DO.

2    Q.   AND THAT WAS ONE OF THE THINGS THAT YOU WERE CONSIDERING

3    WHEN NEGOTIATING THE 2013 AGREEMENT WAS WHETHER TO TRY TO

4    MAXIMIZE PROFIT INSTEAD OF KEEPING 100 PERCENT SHARE; CORRECT?

5    A.   I WROTE THAT, BUT I THINK IT'S A LITTLE, A LITTLE

6    DIFFERENT AS TO WHAT THAT MEANT.

7    Q.   BUT THAT IS WHAT YOU WROTE?

8    A.   I DID WRITE THAT.

9    Q.   THANK YOU.  CAN WE PLEASE TURN TO TAB 28.  THIS IS

10   CX 5381, AND THERE'S AN E-MAIL FROM YOU THAT YOU WROTE TO

11   DEREK ABERLE, AND THE SUBJECT IS "NOTE TO TIM."

12        DO YOU SEE THAT?

13   A.   I DO, I SEE THAT.

14   Q.   AND YOU WROTE THAT E-MAIL?

15   A.   I DID.

16   Q.   AND TIM IS TIM COOK?

17   A.   YES.

18             MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT CX 5381.

19             MR. VAN NEST:  NO OBJECTION.

20             THE COURT:  IT'S ADMITTED.

21        (PLAINTIFF'S EXHIBIT 5381 WAS ADMITTED IN EVIDENCE.)

22             THE COURT:  GO AHEAD, PLEASE.

23   BY MS. MILICI:

24   Q.   AND FOR -- THIS TOP E-MAIL HERE, YOU WROTE -- YOU INCLUDED

25   SOME CALCULATIONS.

```
 1              DO YOU SEE THAT?

 2    A.   I DO.

 3    Q.   AND WHAT YOU WERE DOING THERE IS YOU WERE PROJECTING WHAT

 4    YOU THOUGHT APPLE'S INTERNAL CALCULATION CONCERNING QUALCOMM'S

 5    OFFER WOULD BE; CORRECT?

 6    A.   I'M SORRY.  COULD YOU SAY THAT AGAIN.

 7    Q.   WHAT YOU WERE DOING HERE WAS PROJECTING WHAT YOU THOUGHT

 8    APPLE'S INTERNAL CALCULATION WOULD BE; CORRECT?

 9    A.   NOT EXACTLY.  I'M TRYING TO DO A HYPOTHETICAL CALCULATION

10    OF WHAT THEY MUST BE THINKING FOR THE DEAL.  I'M NOT SURE THAT

11    WE PROPOSED THESE.

12    Q.   SO YOU WERE PROJECTING WHAT YOU THOUGHT APPLE'S INTERNAL

13    CALCULATION WOULD BE OF A PROPOSAL THAT YOU WERE CONSIDERING;

14    CORRECT?

15    A.   I'M -- YES.  WHAT I'M TRYING TO DO IS FIGURE OUT WHAT THEY

16    MUST BE THINKING, AND I'M DOING A SCRATCH CALCULATION.  I'M NOT

17    SURE WE PROPOSED THESE NUMBERS.  THAT'S WHAT I'M TRYING TO

18    CLARIFY.

19    Q.   OKAY.  CAN WE TURN, PLEASE, TO TAB 23 IN YOUR BINDER.

20    IT'S CX 5739.

21              AND ON PAGE 2 OF THIS DOCUMENT, THERE'S AN E-MAIL FROM

22    SANJAY MEHTA TO YOU AND OTHERS DATED JANUARY 8TH, 2013.

23              AND YOU RECEIVED THAT E-MAIL; CORRECT?

24    A.   YES.

25              MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT CX 5739.
```

```
 1                 MR. VAN NEST:  NO OBJECTION.

 2                 THE COURT:  IT'S ADMITTED.

 3          (PLAINTIFF'S EXHIBIT CX 5739 WAS ADMITTED IN EVIDENCE.)

 4                 THE COURT:  GO AHEAD, PLEASE.

 5                 MS. MILICI:  THIS IS UNDER SEAL.

 6     Q.    SIR, MR. MEHTA WROTE TO YOU ON JANUARY 2013 THAT "RECALL

 7     THE COMPETITIVE THREAT WE VIEWED IS ON THE IPADS AND LOW TIER

 8     AS OUR TECHNOLOGY WOULD PREVAIL ON HIGH SKU."

 9           DO YOU SEE THAT?

10     A.    I'M SORRY.  COULD YOU SHOW ME WHERE THAT IS ON THE

11     DOCUMENT?

12     Q.    SURE.  IT'S THE FIRST FULL PARAGRAPH OF HIS E-MAIL.

13     A.    THIS IS IN 002?

14     Q.    YES, SIR.

15     A.    OKAY.  GOT IT.

16     Q.    THE QUESTION IS, WAS MR. MEHTA EXPRESSING TO YOU THAT

17     QUALCOMM PERCEIVED A THREAT THAT APPLE WOULD USE A COMPETITOR

18     CHIP IN AN IPAD OR LOW TIER PRODUCT, BUT THAT QUALCOMM WOULD

19     RETAIN THE HIGH TIER?

20     A.    YES.

21     Q.    THANK YOU.

22           CAN WE PLEASE TURN TO TAB 24 IN THE BINDER.  AND ON THE

23     SECOND PAGE OF THE DOCUMENT, WHICH IS CX 7910.

24           AND ON THE SECOND PAGE, THERE'S AN E-MAIL FROM JIM LEDERER

25     TO YOU ON MARCH 2ND, 2013.
```

1        AND THE SUBJECT LINE THERE IS "MAVERICK DEALS ARE DONE."

2        AND YOU RECEIVED THIS E-MAIL; CORRECT?

3   A.   YES.

4            MS. MILICI:  YOUR HONOR, WE MOVE TO ADMIT CX 7910.

5            MR. VAN NEST:  NO OBJECTION.

6            THE COURT:  IT'S ADMITTED.

7        (PLAINTIFF'S EXHIBIT 7910 WAS ADMITTED IN EVIDENCE.)

8            THE COURT:  GO AHEAD, PLEASE.

9   BY MS. MILICI:

10  Q.   AND MR. MEHTA -- I'M SORRY.  MR. LEDERER WROTE TO YOU, "I

11  UNDERSTAND FROM SANJAY THAT BILL K. WANTED A SUMMARY AND

12  COMPARISON OF THE OLD AND NEW MAV DEALS."

13       DO YOU SEE THAT?

14  A.   I DO.

15  Q.   AND THE OLD AND NEW MAV DEALS WERE THE 2011 DEAL AND THE

16  2013 DEALS WHICH HAD JUST BEEN SIGNED; CORRECT?

17  A.   YES.

18  Q.   AND HERE MR. LEDERER WRITES, "THE LARGE BENEFIT THAT QTL

19  ACCRUES IN THE NEW DEAL IS NOT REPRESENTED."

20       DO YOU SEE THAT?

21  A.   YES.

22  Q.   AND IT'S YOUR UNDERSTANDING THAT THE 2013 AGREEMENTS HAD A

23  LARGE BENEFIT THAT WOULD ACCRUE TO QTL; CORRECT?

24  A.   I DIDN'T WRITE THIS SO --

25  Q.   DO YOU AGREE WITH THE STATEMENT?

```
1     A.   WHICH STATEMENT?

2     Q.   THAT THERE IS A LARGE BENEFIT FROM THE 2013 AGREEMENTS

3     THAT ACCRUES TO QTL?

4     A.   WHICH AGREEMENT?

5     Q.   THE AGREEMENT THAT MR. LEDERER IS REFERRING TO IN THIS

6     E-MAIL WHERE IT SAYS MAVERICK DEALS ARE DONE, AND IT'S DATED

7     MARCH 2ND, 2013?

8     A.   YEAH.  I THINK HE'S REFERRING TO A NUMBER OF AGREEMENTS,

9     NOT JUST THE AGREEMENTS THAT YOU MENTIONED.  THAT'S WHY I

10    CLARIFIED.

11    Q.   AND IN MARCH OF 2013, THERE WERE FOUR DIFFERENT AGREEMENTS

12    THAT WERE ENTERED; CORRECT?

13    A.   CORRECT.

14    Q.   AND THOSE AGREEMENTS WERE ALL NEGOTIATED AT THE SAME TIME?

15    A.   YES.

16    Q.   AND PART OF THOSE AGREEMENTS GAVE A LARGE BENEFIT THAT

17    ACCRUED TO QTL; CORRECT?

18    A.   THAT'S WHAT JIM IS SAYING, YES.

19    Q.   AND IF WE TURN TO THE FIRST PAGE MR. LEDERER SAYS, "THE

20    PREVIOUS STRAT PLAN COMPARISON," AND AT THE BOTTOM OF THE PAGE,

21    AND HE'S REFERRING TO THE ATTACHMENT THERE; RIGHT?

22    A.   YES.

23    Q.   AND HE WRITES "THAT PLAN ASSUMED THAT WE STARTED LOSING

24    SHARE IN FISCAL Q4, 2014."

25         DO YOU SEE THAT?
```

1    A.   I DO.

2    Q.   AND THE PLAN THERE REFERS TO THE STRATEGIC PLAN; CORRECT?

3    A.   CORRECT.

4    Q.   AND THE STRATEGIC PLAN AT THAT POINT ASSUMED THAT QUALCOMM

5    WOULD START LOSING SHARE IN FISCAL Q4, 2014?

6    A.   YES.  THAT'S WHAT JIM WRITES.

7    Q.   THAT'S WHAT THE STRAT PLAN SAID; CORRECT?

8    A.   I ASSUME WHAT JIM SAID IS CORRECT, YES.

9    Q.   AND WHEN THAT'S REFERRING TO LOSING SHARE, THAT MEANS

10   LOSING SHARE WITH APPLE; CORRECT?

11   A.   CORRECT.

12   Q.   AND THEN THE E-MAIL FROM YOU AT THE TOP OF THIS CHAIN,

13   IT'S DATED MARCH 2ND, 2013, AND YOU WROTE, "I UNDERSTAND IT BUT

14   THE SCENARIO IS REALLY THAT THERE WOULD HAVE BEEN A LICENSE

15   FIGHT AS WELL AND A PUSH FOR ALTERNATIVE SOURCE."

16        DO YOU SEE THAT?

17   A.   YES.

18   Q.   AND THAT IS THE COMPARISON THAT YOU THOUGHT SHOULD BE

19   MADE, A COMPARISON BETWEEN THE DEALS AND A SCENARIO WHERE THERE

20   WOULD HAVE BEEN A LICENSE FIGHT AND A PUSH FOR AN ALTERNATIVE

21   SOURCE; CORRECT?

22   A.   CORRECT.

23   Q.   COULD WE PLEASE TURN TO TAB 25, AND THIS IS ANOTHER

24   DOCUMENT THAT'S PARTIALLY UNDER SEAL.  IT'S CX 5389.

25        AND, SIR, THIS TOP E-MAIL IS AN E-MAIL THAT YOU WROTE TO

1     PAUL JACOBS DATED MARCH 3RD, 2013; CORRECT?

2     A.   CORRECT.

3     Q.   AND THE SUBJECT OF THAT E-MAIL WAS "MAVERICK DEALS ARE

4     DONE"; CORRECT?

5     A.   CORRECT.

6     Q.   AND YOU ATTACHED A POWERPOINT OF THE KEY TERMS AND

7     FINANCIAL SUMMARY; CORRECT?

8     A.   YES.

9              MS. MILICI:  YOUR HONOR, I MOVE TO ADMIT CX 5389.

10             MR. VAN NEST:  NO OBJECTION.

11             THE COURT:  IT'S ADMITTED.

12        (PLAINTIFF'S EXHIBIT CX 5389 WAS ADMITTED IN EVIDENCE.)

13             THE COURT:  GO AHEAD, PLEASE.

14    BY MS. MILICI:

15    Q.   AND IN THIS E-MAIL AT THE -- YOUR LAST PARAGRAPH IN THIS

16    E-MAIL YOU AGAIN SAY, "THE MOST RELEVANT COMPARISONS HOWEVER

17    SHOULD HAVE BEEN MADE TO THE CASE WHERE THEY FIGHT ON I.P. AND

18    SPIN UP A SECOND SOURCE IN 2014 AND 2015."

19         DO YOU SEE THAT?

20    A.   YES.

21    Q.   AND YOU SAY THAT IT IS HUGE AND HAS A LARGE STRATEGIC

22    DOWNSIDE.

23         DO YOU SEE THAT?

24    A.   YES.

25    Q.   AND YOU'RE REFERRING TO THAT ALTERNATIVE SCENARIO WOULD

1     HAVE BEEN HUGE AND HAD A LARGE STRATEGIC DOWNSIDE; CORRECT?

2     A.   YES.

3     Q.   CAN WE TURN, PLEASE TURN TO TAB 26.  AND THIS IS AGAIN

4     PARTIALLY SEALED.

5          THIS IS CX 5391.

6          AND, SIR, DO YOU RECOGNIZE THIS AS AN E-MAIL THAT YOU

7     RECEIVED APRIL 16TH, 2013?

8     A.   YES, BUT I DON'T RECOGNIZE IT.

9     Q.   OKAY.  BUT YOU DID -- YOU AGREE THAT YOU RECEIVES IT?

10    A.   YES.

11         MS. MILICI:  OKAY.  YOUR HONOR, WE MOVE TO ADMIT

12    CX 5391.

13         MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

14         THE COURT:  IT'S ADMITTED.

15    (PLAINTIFF'S EXHIBIT CX 5391 WAS ADMITTED IN EVIDENCE.)

16         THE COURT:  GO AHEAD, PLEASE.

17    BY MS. MILICI:

18    Q.   OKAY.  AND THIS ATTACHES ANOTHER ACCOUNTING MEMO; CORRECT?

19    A.   YES.

20    Q.   AND WHILE PART OF THIS ACCOUNTING MEMO IS UNDER SEAL, THE

21    FIRST PAGE IS NOT, AND THAT'S THE PAGE I WANT TO LOOK AT.

22         CAN WE LOOK AT PAGE 002.

23         NOW, PAGE 002 IT SAYS, "ON FEBRUARY 28TH, 2013, QUALCOMM

24    AND APPLE EXECUTED THE FOLLOWING AGREEMENTS."

25         DO YOU SEE THAT?

MOLLENKOPF DIRECT BY MS. MILICI

1     A.   YES.

2     Q.   AND IT LISTS FOUR AGREEMENTS?

3     A.   YES.

4     Q.   AND THOSE ARE THE FOUR AGREEMENTS WE WERE JUST DISCUSSING

5     A MINUTE AGO?

6     A.   YES.

7     Q.   AND RIGHT BEFORE IT SAYS, "SUMMARY OF THE BCPA AGREEMENT,"

8     THERE'S A SENTENCE THAT SAYS, "SINCE THE AGREEMENTS WERE

9     NEGOTIATED AT THE SAME TIME AND THERE IS NOT SUFFICIENT

10    EVIDENCE TO SHOW THAT THEY ARE ACCEPTABLE, THE PRESUMPTION IN A

11    SC 605-25-25-3 HAS NOT BEEN OVERCOME, AND THE AGREEMENTS WILL

12    BE EVALUATED AS A SINGLE ARRANGEMENT."

13         DO YOU SEE THAT?

14    A.   I DO.

15    Q.   AND THAT'S CONSISTENT WITH WHAT YOU JUST TESTIFIED, WHICH

16    IS ALL THE AGREEMENTS WERE NEGOTIATED AT THE SAME TIME AND

17    CONSIDERED TOGETHER?

18    A.   I'M SORRY.

19    Q.   THAT'S CONSISTENT WITH THE TESTIMONY THAT YOU JUST GAVE,

20    THAT THE AGREEMENTS WERE NEGOTIATED AT THE SAME TIME AND

21    CONSIDERED TOGETHER?

22    A.   YES.

23              MR. VAN NEST:  OBJECTION.  MISSTATES THE PRIOR

24    TESTIMONY, YOUR HONOR.

25              THE COURT:  OVERRULED.

```
 1      BY MS. MILICI:

 2      Q.  SIR, WOULD YOU --

 3              THE COURT:  WHY DON'T YOU REPEAT THE QUESTION?  I

 4      THINK HE SAID YES.  HE TESTIFIED YES.  BUT GO AHEAD.

 5              MS. MILICI:  HE DID.

 6      Q.  SIR, WOULD YOU AGREE THAT THE AGREEMENTS WERE NEGOTIATED

 7      AT THE SAME TIME AND THAT THE AGREEMENTS WERE EVALUATED AS A

 8      SINGLE ARRANGEMENT?

 9      A.  I WOULD NOT AGREE WITH THAT.  I AGREE WITH THE FIRST PART

10      BUT NOT THE SECOND PART.

11      Q.  SIR, THE SENTENCE HERE SAYS "THE AGREEMENTS WILL BE

12      EVALUATED AS A SINGLE ARRANGEMENT."

13              DO YOU SEE THAT?

14      A.  I DO.

15      Q.  SO IT WAS AT LEAST THE VIEW OF THE ACCOUNTING DEPARTMENT

16      THAT THE AGREEMENTS WOULD BE EVALUATED AS A SINGLE ARRANGEMENT;

17      CORRECT?

18      A.  THAT'S WHAT THE ACCOUNTING MEMO SAYS.

19              THE COURT:  HE ORIGINALLY SAID "YES," AND THAT'S NOT

20      IN THE TRANSCRIPT.

21          SO DID YOU ALL HEAR THAT?

22              MR. VAN NEST:  I DIDN'T HEAR IT, YOUR HONOR.

23              MS. MILICI:  I DID HEAR IT.

24              THE COURT:  YOU DID OR DID NOT?

25              MS. MILICI:  I DID.
```

```
 1                    THE COURT:  I DID HEAR HIM SAY YES, AND THEN THERE

 2       WAS THE OBJECTION.

 3            SO I THINK THAT SHOULD BE REFLECTED IN THE TRANSCRIPT.

 4       BY MS. MILICI:

 5       Q.   SIR, CAN WE PLEASE TURN TO CX -- I'M SORRY, TAB 27 IN YOUR

 6       BINDER, WHICH IS CX 5527.

 7            AND, SIR, DO YOU -- THIS IS A, THE MAY 2013 BOARD BRIEFING

 8       MATERIALS; CORRECT?

 9       A.   YES.

10       Q.   AND YOU WERE ON THE BOARD AT THE TIME?

11       A.   YES.

12       Q.   OKAY.

13            YOUR HONOR, WE MOVE TO ADMIT CX 5527.

14                    THE COURT:  ANY OBJECTION?

15                    MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

16                    THE COURT:  ALL RIGHT.  IT'S ADMITTED.

17            (PLAINTIFF'S EXHIBIT CX 5527 WAS ADMITTED IN EVIDENCE.)

18                    THE COURT:  GO AHEAD, PLEASE.

19       BY MS. MILICI:

20       Q.   ALL RIGHT.  CAN WE TURN TO PAGE 026.

21            AND THIS IS A SECTION OF THE PRESENTATION TO THE BOARD

22       PROVIDING AN OVERVIEW OF THE APPLE AGREEMENTS; CORRECT?

23       A.   YES.

24       Q.   AND THIS IS THE 2013 APPLE AGREEMENTS; CORRECT?

25       A.   YES.
```

1    Q.   OKAY.  CAN WE PLEASE TURN TO THE NEXT PAGE, 027.

2         AND WHAT QUALCOMM TOLD THE BOARD IS THAT THE APPLE DEAL

3    WAS A GOOD DEAL FOR QUALCOMM; CORRECT?

4    A.   YES.

5    Q.   AND IT TOLD THE BOARD THAT THE APPLE DEAL PROTECTS QCT'S

6    POSITION AGAINST DOWNSIDE OF AN I.P. FIGHT; CORRECT?

7    A.   YES.

8    Q.   AND QUALCOMM TOLD ITS BOARD THAT QCT WAS WILL WELL

9    POSITIONED UNTIL 2016; CORRECT?

10   A.   CORRECT.

11   Q.   AND QUALCOMM ALSO TOLD ITS BOARD THAT PART OF THE REASON

12   IT WAS WELL POSITIONED IS BECAUSE OF THE STRATEGIC IMPORTANCE

13   OF APPLE MODEM DESIGN-WIN; CORRECT?

14   A.   CORRECT.

15   Q.   SIR, COULD WE PLEASE TURN TO TAB 29 IN THE BINDER.

16        THIS IS CX 7257.

17        AND, SIR, DO YOU RECOGNIZE THIS AS QUALCOMM'S 10-K WHICH

18   WAS FILED ON NOVEMBER 1ST, 2017?

19   A.   I'M SORRY.  I'M ON THE WRONG DOCUMENT.  COULD YOU SAY IT

20   AGAIN?

21   Q.   TAB 29.  IT'S CX 7257.

22   A.   GOT IT.  OKAY.

23   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT AS QUALCOMM'S 10-K

24   FILED NOVEMBER 1ST, 2017?

25   A.   YES.

1           MS. MILICI:  YOUR HONOR, MOVE TO ADMIT CX 7257.

2           MR. VAN NEST:  NO OBJECTION.

3           THE COURT:  IT'S ADMITTED.

4       (PLAINTIFF'S EXHIBIT CX 7257 WAS ADMITTED IN EVIDENCE.)

5           THE COURT:  GO AHEAD, PLEASE.

6    BY MS. MILICI:

7    Q.   NOW, YOU WOULD EXPECT ANY REPRESENTATIONS IN THIS DOCUMENT

8    TO BE ACCURATE; CORRECT?

9    A.   YES.

10   Q.   SO ANY REPRESENTATIONS ABOUT QUALCOMM'S R&D EXPENDITURES

11   WOULD BE ACCURATE; CORRECT?

12   A.   CORRECT.

13   Q.   AND ANY REPRESENTATIONS ABOUT THE SHARE REPURCHASES OR

14   BUYBACKS OR DIVIDENDS YOU WOULD EXPECT TO BE ACCURATE; CORRECT?

15   A.   CORRECT.

16   Q.   AND ANY STATEMENTS ABOUT PENDING LITIGATION AND REGULATORY

17   ACTION YOU WOULD EXPECT TO BE ACCURATE; CORRECT?

18   A.   CORRECT.

19           MS. MILICI:  THANK YOU.  NO MORE QUESTIONS.

20           THE COURT:  ALL RIGHT.  TIME IS 3:33.  GO AHEAD,

21   PLEASE.  OR LET ME KNOW WHEN YOU'RE READY.

22       (PAUSE IN PROCEEDINGS.)

23           MR. VAN NEST:  I'M READY TO GO, YOUR HONOR.

24           THE COURT:  ALL RIGHT.  3:34.

25       GO AHEAD, PLEASE.

```
 1              MR. VAN NEST:  THANK YOU, YOUR HONOR.

 2                       CROSS-EXAMINATION

 3    BY MR. VAN NEST:

 4    Q.   GOOD AFTERNOON, MR. MOLLENKOPF.

 5    A.   HI.

 6    Q.   HOW LONG HAVE YOU WORKED AT QUALCOMM?

 7    A.   SINCE 1994.

 8    Q.   DID YOU JOIN THE COMPANY AFTER GETTING OUT OF SCHOOL?

 9    A.   I DID.

10    Q.   WHAT'S YOUR EDUCATIONAL BACKGROUND?

11    A.   IT'S A MASTER'S DEGREE FROM UNIVERSITY OF MICHIGAN.

12    Q.   CAN YOU TAKE THE COURT THROUGH THE VARIOUS ROLES YOU

13    PLAYED WORKING YOUR WAY UP THROUGH QUALCOMM?

14    A.   SURE.  I STARTED IN '94 AS AN ENGINEER; SPENT PROBABLY A

15    LITTLE MORE THAN A DECADE IN VARIOUS ENGINEERING PROJECTS; WENT

16    INTO THE CHIP GROUP IN LATE '99; THEN EVENTUALLY IN 2007, I

17    WENT INTO THE BUSINESS GROUP AS HEAD OF PRODUCT MANAGEMENT; AND

18    THEN HEAD OF THE CHIP GROUP IN 2008, THROUGH A COUPLE OF

19    EXECUTIVE ROLES INCLUDING THE PRESIDENT AND COO; AND THEN

20    ULTIMATELY THE CEO IN 2015.

21    Q.   OKAY.  SO YOU'VE BEEN CEO NOW FOR JUST OVER THREE YEARS,

22    ALMOST FOUR YEARS; IS THAT RIGHT?

23    A.   I THINK IT'S CLOSER TO FIVE THESE DAYS.

24    Q.   CLOSER TO FIVE.  TIME FLIES.

25    A.   YEAH.
```

1     Q.   YOU TESTIFIED EARLIER THAT QUALCOMM HAS A PRACTICE OF

2     SELLING CHIPS ONLY TO FOLKS LICENSED ON ITS TECHNOLOGY.

3          HOW LONG HAS THAT BEEN, THAT PRACTICE BEEN IN EFFECT AT

4     QUALCOMM?

5     A.   AS LONG AS I CAN -- AS LONG AS I KNOW ABOUT IT.

6     Q.   WAS IT THERE WHEN YOU ARRIVED?

7     A.   AS FAR AS I KNOW.

8     Q.   AND IS THAT PRACTICE WELL KNOWN AMONG QUALCOMM'S

9     CUSTOMERS?

10    A.   IT IS.

11    Q.   ARE THERE BUSINESS REASONS FOR THE PRACTICE AT QUALCOMM?

12    A.   THERE ARE.

13    Q.   CAN YOU DESCRIBE THOSE FOR THE COURT, PLEASE.

14    A.   THIS IS THE PRACTICE OF SELLING TO LICENSED OEM'S?

15    Q.   THAT'S RIGHT.

16    A.   YEAH.  SO YOU HAVE TO THINK OF QUALCOMM AS A SYSTEMS

17    COMPANY.  ESSENTIALLY WE HAVE TWO, TWO BUSINESSES.

18         THE LICENSING BUSINESS TENDS TO INVEST IN KIND OF THE

19    FUNDAMENTAL R&D THAT MAKES THE CELLULAR SYSTEM HAPPEN,

20    GENERATES A LOT OF I.P., SOME OF THAT I.P. IS ON THE PHONE,

21    SOME OF THAT I.P. IS IN THE CHIPS, SOME OF THE I.P. COVERS --

22    Q.   SLOW DOWN JUST A LITTLE BIT, MR. MOLLENKOPF, IF YOU WILL,

23    PLEASE.

24    A.   SORRY.

25    Q.   THEY'RE TRYING TO TAKE DOWN EVERY WORD.  GO AHEAD.

1    A.   SO AS I SAID, TWO BUSINESSES.   THE LICENSING BUSINESS

2    TENDS TO INVEST IN THE FUNDAMENTAL R&D THAT MAKES THE ECOSYSTEM

3    HAPPEN, THAT DRIVES CELLULAR.   IT GENERATES A LOT OF I.P., IT

4    INVESTS VERY EARLY.

5         AND SOME OF THAT I.P. IS IN THE CHIP, SOME OF THAT I.P. IS

6    IN THE PHONE, SOME OF THAT I.P. COVERS THE OVERALL OPERATION OF

7    THE SYSTEM BETWEEN THE PHONE AND THE CORE NETWORK AND

8    TECHNOLOGIES LIKE THAT.

9         THAT'S THE, THAT'S THE LICENSING BUSINESS.

10        WE ALSO HAVE A CHIP BUSINESS AS WELL, AND WHAT WE DO IS WE

11   DON'T LICENSE THE -- OR WE ONLY SELL TO, TO COMPANIES WITH A

12   LICENSE BECAUSE NOT ALL OF THE I.P. IS ACTUALLY COVERED IN THE

13   CHIP.

14        AND SO WHAT WE WANT TO DO IS MAKE SURE THAT THE OEM'S ARE

15   COVERED.   WE SELL TO LICENSED OEM'S AND THEN WE SELL TO CHIP

16   COMPANIES.   WE WANT TO MAKE SURE IT'S A LEVEL PLAYING FIELD ON

17   THE CHIP SIDE AND WE WANT TO MAKE SURE THAT THE OEM IS COVERED

18   TOTALLY WITH THE I.P. THAT WE GENERATE, MUCH OF IT OUTSIDE THE

19   CHIP.

20   Q.   WHEN YOU SAY YOU WANT TO CREATE A LEVEL PLAYING FIELD ON

21   THE CHIP SIDE, CAN YOU DESCRIBE FOR US WHAT YOU MEAN?

22   A.   YEAH.   WE WANT TO -- SINCE A NUMBER OF OUR -- SOME OF OUR

23   I.P. IS IN THE CHIP AND SOME OF IT ISN'T.   THERE ARE

24   COMPETITORS WHO WOULD BE SELLING CHIPS THAT ARE USING OUR I.P.

25   THAT IF WE PUT THE PRICE IN THE CHIP, IT WOULD CREATE A

1      SITUATION WHERE PEOPLE COULD BE SELLING A PRODUCT WITHOUT

2      PAYING US FOR THE I.P.  THAT'S KIND OF THE -- ONE OF THE

3      REASONS WHY WE DO IT.

4      Q.   WHY DOESN'T QUALCOMM SIMPLY PRICE THE VALUE OF ITS

5      INTELLECTUAL PROPERTY INTO THE CHIPS AND SELL IT -- RECOVER IT

6      THAT WAY?

7      A.   WELL, I THINK IT'S -- I THINK IT'S, FIRST OF ALL, NOT THE

8      WAY THE INDUSTRY HAS BEEN ORGANIZED AND RUNNING.  IT'S BEEN

9      RUNNING FOR A LONG TIME SO THAT THE LICENSING IS ACTUALLY AT

10     THE DEVICE LEVEL.  THAT'S ONE.

11          AND ONE OF THE REASONS WHY THAT'S THERE IS I THINK IT'S

12     THE MOST EFFICIENT PLACE TO DO IT, OTHERWISE THE LICENSING

13     FRAMEWORK WOULD VERY, VERY, VERY CUMBERSOME.

14          SO OUR PRACTICE IS ACTUALLY VERY CONSISTENT WITH WHAT THE

15     INDUSTRY IS DOING, AND WE THINK IT'S VERY EFFICIENT.

16     Q.   IF YOU ATTEMPTED TO PRICE THE FULL VALUE OF I.P. INTO YOUR

17     CHIPS, WOULD YOU BE ABLE TO RECOVER ON THE PATENTED INVENTIONS

18     THAT ARE OUTSIDE THE CHIPS?

19     A.   NO, NOT UNLESS WE LICENSED TO OTHER PEOPLE AS WELL.

20     Q.   ALL RIGHT.  AND DOES QUALCOMM GENERATE AND CREATE PATENTED

21     INVENTIONS THAT ARE NOT EMBODIED IN THE CHIPS THEMSELVES?

22     A.   YES.

23     Q.   CAN YOU GIVE US SOME EXAMPLES OF THAT?

24     A.   SURE.  SO I'LL JUST -- I'LL GO BACK TO -- SO IF YOU THINK

25     OF QUALCOMM AS, YOU KNOW, THE COMPANY THAT WORKS ON THE

1    FUNDAMENTAL TECHNOLOGY THAT MAKES THE CELLULAR ECOSYSTEM

2    HAPPEN -- AND WE'VE DONE THAT FOR MANY GENERATIONS -- WHAT

3    WE'RE TRYING TO DO IS ANTICIPATE WHAT IS IT -- HOW -- WHAT DO

4    YOU NEED TO INVENT SO THAT CERTAIN ECOSYSTEM, CELLULAR

5    ECOSYSTEMS CAN HAPPEN.

6         SO ONE OF THE REASONS THAT WE CAN MAKE A CALL ANYWHERE IN

7    THE WORLD OR A DATA CALL ANYWHERE IN THE WORLD TO ANYWHERE ELSE

8    IN THE WORLD IS BECAUSE PEOPLE HAVE GOTTEN TOGETHER AND

9    BASICALLY FIGURED OUT HOW ALL THESE DEVICES WORK TOGETHER.  HOW

10   DOES A NETWORK WORK TOGETHER WITH A DEVICE?  HOW DOES A DEVICE

11   AUTHENTICATE?

12        SO IT'S AS IF THEY GOT TOGETHER AND DETERMINED WHAT TYPE

13   OF LANGUAGE THEY WANTED TO SPEAK.  AND WHAT WE DO IS WE DO A

14   BIG PORTION OF THE GRAMMAR OF THAT LANGUAGE AND WE ESSENTIALLY

15   LICENSE THAT TO PEOPLE AND SHARE IT WITH THE STANDARDS BODIES.

16        AND SO ULTIMATELY, YOU KNOW, IF YOU LOOK AT 5G, FOR

17   EXAMPLE, THERE'S A WHOLE CLASS OF TECHNOLOGY THAT DEFINES THE

18   SECURITY FRAMEWORK THAT ALLOWS, LET'S SAY, A DEVICE TO CONNECT

19   TO THE NETWORK SECURELY ONE WAY OR THE OTHER.  IT ACTUALLY

20   ISN'T EMBODIED IN THE CHIP, IT'S NOT EMBODIED IN THE PHONE.

21   IT'S ACTUALLY SOMETHING THAT'S IN BETWEEN ALL OF THOSE THINGS.

22        QUALCOMM DOES A LOT OF THAT WORK.  WE ACTUALLY DO ALL THAT

23   FUNDAMENTAL WORK.  THE SECURITY FRAMEWORK IN 5G IS A BIG

24   EXAMPLE OF A BIG CLASS OF I.P. THAT WE WORK ON.

25        SO IT'S PRETTY COMPLICATED.

 1          LIKEWISE, EVEN THE PORTIONS OF THOSE I.P., THAT CLASS OF

 2    I.P. THAT WE GENERATE, IT'S NOT EVEN IMPLEMENTED IN ONE PLACE

 3    WITHIN THE PHONE.  SO IF YOU LOOK WITHIN THE PHONE, IT MIGHT

 4    ACTUALLY BE IMPLEMENTED IN A PORTION OF THE PHONE THAT'S

 5    DIFFERENT FROM THE PRODUCT THAT QUALCOMM EVEN DELIVERS INTO

 6    THAT PRODUCT IF, IN FACT, THEY DELIVER A CHIP INTO THAT

 7    PRODUCT.

 8          SO THE POINT OF THAT IS THERE'S, THERE'S A TREMENDOUS

 9    AMOUNT OF I.P. THAT WE GENERATE THAT MAKES THE SYSTEM WORK THAT

10    IS EITHER IN THE PHONE, IN THE CHIP, OR NOT IN THE PHONE OR THE

11    CHIP, BUT JUST CONTROLS THE WAY THE NETWORK WORKS.

12    Q.   AND THE VALUE OF THAT INTELLECTUAL PROPERTY IS RECOVERED

13    WHERE?

14    A.   THAT'S RECOVERED THROUGH OUR LICENSING BUSINESS.

15    Q.   YOU WERE ASKED A COUPLE OF QUESTIONS ABOUT CHIP SUPPLY

16    DURING THE CROSS-EXAMINATION.

17          LET'S START WITH A GENERAL QUESTION.  WHAT, IN GENERAL, IS

18    THE NATURE OF THE RELATIONSHIPS BETWEEN YOUR CHIP BUSINESS,

19    QCT, AND YOUR CHIP CUSTOMERS, THE OEM'S?

20    A.   YEAH.  I THINK IT'S EVEN, MAYBE EVEN BROADER.  AT THE

21    QUALCOMM LEVEL, ONE OF THE THINGS WE DO, WE HAVE A FAIRLY CLOSE

22    RELATIONSHIP WITH OUR CUSTOMERS, PRIMARILY BECAUSE OF THE

23    NATURE OF OUR BUSINESS.  WE'RE -- AS I SAID, WE INVENT THE

24    FUNDAMENTAL TECHNOLOGIES THAT MAKE THE CELLULAR ECOSYSTEM

25    HAPPEN.  SO IT'S VERY IMPORTANT FOR US TO UNDERSTAND WHERE OUR

1    CUSTOMERS AND WHERE OUR CUSTOMER'S CUSTOMERS.  SO, FOR EXAMPLE,

2    WE WANT TO KNOW WHERE SAMSUNG OR HTC, OR ANY OF THE HANDSET

3    MANUFACTURERS, LENOVO, WHAT HAVE YOU, WE WANT TO KNOW WHAT THEY

4    WANT TO DO WITH THEIR BUSINESS.

5         BUT MORE IMPORTANTLY, WE ACTUALLY EVEN WANT TO KNOW WHAT

6    THE CARRIERS WANT TO DO WITH THEIR BUSINESS, AND THAT'S SO THAT

7    WE CAN CREATE CELLULAR TECHNOLOGIES THAT CAN CREATE THAT

8    ECOSYSTEM.

9         SO AS A RESULT, WE TEND TO HAVE A FAIRLY CLOSE

10   RELATIONSHIP AT A SENIOR LEVEL WITH OUR CUSTOMERS, WE ACTUALLY

11   CALL THEM PARTNERS, BECAUSE WE WANT TO MAKE SURE THAT WE KNOW

12   THEIR STRATEGY, THEY KNOW OUR STRATEGY, AND WHAT TECHNOLOGIES

13   WE'RE INVENTING AND IT CREATES A CLOSE BOND.

14        LIKEWISE, WHEN WE'RE DELIVERING CHIP PRODUCTS, WHICH IS

15   YOUR QUESTION, WE -- YOU KNOW, IT'S A VERY INVOLVED PROCESS.

16   THE PRODUCT IS -- YOU KNOW, THESE ARE VERY COMPLICATED PRODUCTS

17   AND WHAT HAPPENS IS THE ENGINEERING TEAMS TEND TO BE VERY CLOSE

18   AND IT MIGHT TAKE FIVE, TEN YEARS TO BUILD THESE RELATIONSHIP

19   S, AND WE THINK THAT'S A VERY IMPORTANT COMPONENT OF HOW WE RUN

20   OUR BUSINESS IS MAKING SURE THAT THESE RELATIONSHIPS ONLY WITH

21   OUR CUSTOMERS BUT WITH THE ECOSYSTEM IN GENERAL ARE MAINTAINED.

22   Q.   I'M GOING TO ASK YOU TO SLOW DOWN AGAIN, MR. MOLLENKOPF,

23   BECAUSE WE'RE TRYING TO GET EVERY WORD?

24   A.   SURE.

25   Q.   TO YOUR KNOWLEDGE, HAS QUALCOMM EVER STOPPED SHIPPING

1    CHIPS TO CUSTOMERS DURING OR BECAUSE OF A LICENSING DISPUTE?

2    A.    NO.

3    Q.    AND HAVE YOU EVER DIRECTED ANYONE AT QUALCOMM TO DISRUPT A

4    CURRENT CUSTOMER'S CHIP SUPPLY DUE TO A LICENSING DISPUTE?

5    A.    NO.

6    Q.    HAS ANYONE EVER ASKED YOU TO DISRUPT OR INTERFERE WITH A

7    CUSTOMER'S CHIP SUPPLY AS A RESULT OF A LICENSING DISPUTE?

8    A.    NO.

9    Q.    ARE THERE OCCASIONS WHEN LICENSEES STOP PAYING ROYALTIES

10   AND QUALCOMM CONTINUES TO SUPPLY CHIPS FOR PHONES?

11   A.    I'M SORRY.  CAN YOU SAY THAT AGAIN?

12   Q.    ARE THERE OCCASIONS WHEN LICENSEES STOP PAYING ROYALTIES

13   AS A RESULT OF A DISPUTE AND QUALCOMM CONTINUES TO SUPPLY

14   CHIPS?

15   A.    YES.

16   Q.    WHY DOESN'T QUALCOMM DISRUPT OR STOP OR INTERFERE WITH

17   CHIP SUPPLY IN THE CASE OF A DISPUTE WITH A LICENSEE?

18   A.    PRIMARILY IT'S BAD BUSINESS.  IT ACTUALLY CREATES AN

19   ENVIRONMENT THAT DOESN'T -- NUMBER ONE, IT ISN'T GOOD FOR THAT

20   CUSTOMER RELATIONSHIP I MENTIONED.

21        BUT IT ALSO TENDS NOT TO CREATE THE ENVIRONMENT TO RESOLVE

22   WHATEVER DISPUTE YOU'RE TRYING TO RESOLVE.

23   Q.    WOULD IT HAVE AN IMPACT ON QCT'S REPUTATION IN THE

24   BUSINESS COMMUNITY?

25   A.    YES.

MOLLENKOPF CROSS BY MR. VAN NEST

1    Q.   WHAT WOULD THAT BE?

2    A.   WELL, I THINK, YOU KNOW, AS I SAID, WE TEND TO -- IT TAKES

3    A LONG TIME TO BUILD THOSE RELATIONSHIPS.  WE'RE VERY CAREFUL

4    TO MAKE SURE THAT WE DON'T DISRUPT THEM, AND I THINK IT'S VERY

5    DIFFICULT TO CONTINUE TO BE A TOP TIER SUPPLIER, AS WE ALWAYS

6    ENDEAVOR TO BE, IF YOU'RE NOT A RELIABLE SUPPLIER, AND THAT'S

7    ONE OF THE KEY ELEMENTS IS TO MAKE SURE THEIR SUPPLY IS NOT

8    DISRUPTED.

9    Q.   YOU WERE ASKED A QUESTION OR TWO ABOUT SONY.  AT SOME

10   POINT IN 2012, DID YOU BECOME AWARE OF A LICENSING DISPUTE WITH

11   SONY?

12   A.   I DID.

13   Q.   AND DID YOU GET INVOLVED IN THOSE DISCUSSIONS AT SOME

14   LEVEL?

15   A.   I DID.

16   Q.   WHAT WAS THE BACKGROUND OR THE CONTEXT OF THE DISPUTE IN

17   THE FIRST PLACE?

18   A.   SONY WAS -- HAD A JOINT VENTURE WITH ERICSSON, AND THEY

19   WERE RELYING ON ERICSSON'S, I THINK IT WAS THE WCDMA LICENSE.

20        AND WHEN THAT JOINT VENTURE SEPARATED, THEY HAD TO GET A

21   LICENSE, SO THERE WAS A LICENSE NEGOTIATION THAT OCCURRED BACK

22   IN THAT TIMEFRAME.

23   Q.   OKAY.  AND AT SOME POINT DID THE CUSTOMER AT SONY REACH

24   OUT DIRECTLY TO YOU?

25   A.   HE DID.

1    Q.   WHO WAS THAT?

2    A.   IT WAS BOB ISHIDA.

3    Q.   COULD WE HAVE ON THE -- WOULD YOU OPEN UP THE NOTEBOOK

4    THAT WE GAVE YOU TO CX 7824.  IT'S IN THE ONE THAT WE PROVIDED.

5    A.   YES.

6    Q.   IS THAT AN E-MAIL CHAIN BETWEEN YOU AND MR. ISHIDA IN

7    CONNECTION WITH THIS DISPUTE WITH SONY?

8    A.   YES.

9         MR. VAN NEST:  I'D OFFER CX 7824 IN EVIDENCE, YOUR

10   HONOR.

11        THE COURT:  ANY OBJECTION?

12        MS. MILICI:  NO OBJECTION.

13        THE COURT:  IT'S ADMITTED.

14   (PLAINTIFF'S EXHIBIT CX 7824 WAS ADMITTED IN EVIDENCE.)

15        THE COURT:  GO AHEAD, PLEASE.

16        MR. VAN NEST:  COULD WE DISPLAY IT ON THE SCREEN, AND

17   GO TO THE VERY BOTTOM, THE LAST ENTRY, I THINK IT'S ON THE

18   SECOND PAGE.  THERE IT IS.

19   Q.   IS THIS AN E-MAIL THAT YOU RECEIVED FROM MR. ISHIDA

20   SOMETIME IN FEBRUARY OR SO OF 2012?

21   A.   YES.

22   Q.   WHAT WAS MR. ISHIDA EXPLAINING ABOUT?

23   A.   HE HAD -- OUR TEAM HAD MISTAKENLY REALLY PUT IN A STOP

24   SHIP FOR HIM, AND HE WAS CONCERNED ABOUT THAT.  HE CALLED ME,

25   AND THEN I INSTANTLY GOT INVOLVED AND TRIED TO WORK IT OUT FOR

1      HIM, KIND OF REALLY DE-ESCALATE THE SITUATION.

2      Q.   DID YOU RESPOND QUICKLY?

3      A.   I DID.

4      Q.   COULD WE GO UP ON THE E-MAIL TO A COUPLE OF E-MAILS ABOVE

5      FROM MR. MOLLENKOPF.  YEAH.

6           WHAT DID YOU TELL MR. ISHIDA?  THIS IS THE SAME DAY OR

7      LATER IN THE DAY?

8      A.   I TOLD HIM, THANKS FOR THE NOTE.  I WASN'T AWARE, I SPOKE

9      TO THE TEAM, THEY SENT YOU THE WRONG SIGNAL AND WILL MAKE SURE

10     THAT NOTHING HAPPENS TO YOUR CHIP SUPPLY.

11     Q.   WHAT DID YOU COMMUNICATE TO THE TEAM?

12     A.   I COMMUNICATED THE SAME THING, DON'T, DON'T -- MAKE SURE

13     THAT HIS CHIP SUPPLY IS NOT IMPACTED.

14          AND THEN I ALSO SENT THEM A NOTE AND SAID IF ANYTHING LIKE

15     THIS HAPPENS IN THE FUTURE, I WANT TO MAKE SURE I KNOW ABOUT

16     IT, AND I KIND OF TALKED TO THEM ABOUT THE PROCESS INVOLVED AND

17     I WANT TO MAKE SURE THAT, YOU KNOW, IT'S BROUGHT TO MY

18     ATTENTION.

19     Q.   WOULD YOU OPEN UP THE SAME BINDER, MR. MOLLENKOPF, TO

20     CX 6522.  AND TELL ME IF YOU RECOGNIZE THAT AS AN E-MAIL CHAIN

21     ON WHICH YOU WERE COPIED.  6522?

22     A.   6522.

23     Q.   YEAH.

24          I BELIEVE THIS IS IN EVIDENCE, YOUR HONOR.

25          IS IT IN EVIDENCE?  YEAH, IT'S IN EVIDENCE.  LET'S PUT IT

1        ON THE SCREEN.

2                    THE COURT:  IS IT ONE OF THE FTC'S EXHIBITS.

3                    MS. MILICI:  IT MUST BE, YOUR HONOR.

4                    THE COURT:  CAN YOU GIVE ME THE TAB NUMBER?

5             MS. MILICI, CAN YOU GIVE ME THE TAB NUMBER, PLEASE.

6                    MS. MILICI:  I THINK IT'S TAB 3, YOUR HONOR.

7                    MR. VAN NEST:  YEAH.

8                    THE COURT:  OKAY.  THANK YOU.  SORRY FOR THE

9         INTERRUPTION.

10                   MR. VAN NEST:  THAT'S OKAY, YOUR HONOR.  ON THE

11        SECOND PAGE, CAN.

12            WE HIGHLIGHT THE TOP OF THE PAGE.

13        Q.  IS THIS AN E-MAIL THAT YOU SENT ON OR ABOUT THE SAME DAY

14        YOU HEARD FROM MR. ISHIDA?

15        A.  YES.

16        Q.  AND TELL US WHAT YOU WERE TRYING TO COMMUNICATE TO YOUR

17        TEAM HERE.

18        A.  WHAT I WAS COMMUNICATING WAS ESSENTIALLY I'M NOT HAPPY AND

19        LET'S, LET'S MAKE SURE THAT IF SOMETHING LIKE THIS HAPPENS

20        AGAIN, BEFORE IT HAPPENS, MAKE SURE I KNOW ABOUT IT.

21        Q.  NOW, DID SUPPLY CONTINUE TO SONY?

22        A.  YES.

23        Q.  WHAT HAPPENED WITH RESPECT TO THE NEGOTIATIONS?  DID THEY

24        GO ON FOR SOME TIME?

25        A.  THEY DID.  I THINK THEY WENT ON THROUGH THE FALL.  WE GAVE

```
 1        THEM A COUPLE OF INTERIM AGREEMENTS TO TRY TO MAKE SURE THAT

 2        THERE WASN'T PRESSURE ON THE TEAMS.

 3             ULTIMATELY, WE ENDED UP RESOLVING IT I THINK IN THE

 4        SUMMER -- OR EXCUSE ME -- IN THE FALL, OCTOBER, NOVEMBER

 5        TIMEFRAME.

 6             AND THEN WE MOVED ON.  THEY REMAIN A CUSTOMER AND BOB

 7        REMAINS A FRIEND.

 8    Q.   HAS QUALCOMM CONSIDERED SPLITTING UP THE CHIP AND THE

 9        LICENSING BUSINESS IN THE PAST?

10    A.   WE HAVE.

11    Q.   WAS THERE A DISCUSSION ABOUT THAT BACK IN 2015?

12    A.   THERE WAS.

13    Q.   SOME EVALUATION WAS DONE BY THE COMPANY AND BY THE BOARD?

14    A.   YES.

15             THE COURT:  I'M SORRY TO INTERRUPT YOU.  THIS EXHIBIT

16        WAS NOT ADMITTED, 6522.

17             MR. VAN NEST:  I APOLOGIZE, YOUR HONOR.

18             THE COURT:  DO YOU WANT TO MOVE IT IN?

19             MR. VAN NEST:  I DO.

20             THE COURT:  OKAY.  I ASSUME THERE'S NO OBJECTION?

21             MS. MILICI:  THERE'S NO OBJECTION.  YOUR HONOR, I

22        BELIEVE THAT IT WAS ADMITTED, BUT WE CAN SORT THAT OUT LATER.

23        WE HAVE NO OBJECTION.

24             THE COURT:  OH, IT WAS ADMITTED UNDER MARK DAVIS?

25             MS. MILICI:  YES.
```

```
 1              THE COURT:  OKAY.  I APOLOGIZE.

 2              MS. MILICI:  I'M SORRY.  I'M BEING TOLD IT WAS WITH

 3     ERIC REIFSCHNEIDER, YOUR HONOR.

 4              THE COURT:  REIFSCHNEIDER, OKAY.  THANK YOU.  MY

 5     MISTAKE.  I APOLOGIZE.

 6              MR. VAN NEST:  OKAY.  6522 IS IN EVIDENCE JUST TO BE

 7     SURE.

 8     Q.   SO LET'S GO BACK TO 2015 TIMEFRAME.

 9          WHAT CONCLUSION OR RECOMMENDATION DID MANAGEMENT MAKE TO

10     THE BOARD IN CONNECTION WITH THIS DISCUSSION ABOUT SPLITTING UP

11     THE COMPANY?

12     A.   OUR RECOMMENDATION WAS TO NOT SPLIT THE COMPANY.

13          AND JUST TO BE PRECISE, WE ACTUALLY MADE THE

14     RECOMMENDATION TO THE SPECIAL COMMITTEE, THERE WAS A SPECIAL

15     COMMITTEE, AND THEN ULTIMATELY IT WENT TO THE FULL BOARD.  I

16     THINK THE RECOMMENDATION WENT TO THE COMMITTEE.

17     Q.   AND WAS THE RECOMMENDATION TO KEEP THE COMPANY TOGETHER

18     CONSISTENT WITH YOUR OWN PERSONAL VIEWS, MR. MOLLENKOPF?

19     A.   YES.

20     Q.   WERE YOU THE CEO OF THE COMPANY BY THIS TIME?

21     A.   YES.

22     Q.   AND CAN YOU EXPLAIN TO US WHAT WERE THE REASONS UPON WHICH

23     YOU BASED YOUR RECOMMENDATION THAT THE COMPANY STAY TOGETHER AS

24     ONE?

25     A.   AT A HIGH LEVEL, THE VIEW WAS, OR MY VIEW WAS THAT IT WAS
```

 1      REALLY THE BEST STRUCTURE THAT WE COULD CONTINUE TO DELIVER

 2      TECHNOLOGY BROADLY.  SO TO THE ECOSYSTEM, TO OUR CUSTOMERS, TO

 3      OUR PARTNERS, AND IT WOULD CONTINUE TO BE SUCCESSFUL MOVING

 4      FORWARD.

 5           THE LICENSING BUSINESS ALLOWS US TO INVEST IN TECHNOLOGY

 6      EARLY.  IT GENERATES A LOT OF I.P., AS I MENTIONED.

 7           THE CHIP BUSINESS ALLOWS US TO NOT ONLY INVENT

 8      TECHNOLOGIES THAT ARE RELEVANT, BUT IT REALLY HELPS US DELIVER

 9      THOSE TECHNOLOGIES TO MANY DIFFERENT CUSTOMERS AND TO THE

10      ECOSYSTEM.

11           LIKEWISE, IT ALSO GENERATES, THAT IS, THE CHIP BUSINESS

12      GENERATES I.P. THAT GOES BACK TO THE LICENSING BUSINESS AND IT

13      ENHANCES THE VALUE OF THE PORTFOLIO AND WHAT WE LICENSE OUT TO

14      OUR CUSTOMERS.

15           AND SO WE THOUGHT THAT CONTINUES TO BE THE RIGHT

16      TECHNOLOGY TO DRIVE VALUE FOR THE SHAREHOLDER, BUT ALSO THE

17      RIGHT TECHNOLOGY TO CONTINUE TO DRIVE TECHNOLOGY, YOU KNOW,

18      THINGS TO OUR PARTNERS AND TO OUR CUSTOMERS.

19      Q.   COULD YOU OPEN YOUR NOTEBOOK, THE ONE THAT THE FTC GAVE

20      YOU, TO FIVE 913.  THAT'S THE VERY BIG NOTEBOOK.

21           AND COULD WE HAVE IT ON THE SCREEN.

22           IT'S IN EVIDENCE, YOUR HONOR.  IT WAS ADMITTED.

23           I WANT TO CALL YOUR ATTENTION TO THE PARAGRAPH, OR A

24      PARAGRAPH THERE, THE SECOND HALF OF THE PAGE.

25      A.   THIS IS 5913.

1      Q.   5913, THAT'S RIGHT.

2      A.   YEAH.

3      Q.   THIS IS AN E-MAIL TO YOU FROM MR. WISE, AND I'VE

4      HIGHLIGHTED ON THE SCREEN THE LANGUAGE THERE.

5           FIRST OF ALL, IS THIS A DISCUSSION IN GENERAL ABOUT THIS

6      POTENTIAL SPLITTING UP OF THE COMPANY?

7      A.   YES.

8      Q.   AND IN THE PARAGRAPH CITED IT SAYS, "MUCH MORE ABOUT OUR

9      STRENGTH IN THE STANDARDS PROCESS AND REGULATORY.  IF SEPARATE,

10     QTL MAY BE ISOLATED AND INEFFECTIVE AT GETTING TECH INTO THE

11     STD," STANDARD.

12          WHAT WAS YOUR UNDERSTANDING OF MR. WISE'S COMMENT THERE?

13     A.   WHAT DAVE WAS SAYING, DAVE WISE WAS SAYING WAS THAT

14     WITHOUT THE ABILITY TO DELIVER THE TECHNOLOGY AND NOT JUST

15     INVENT IT, OUR ABILITY, OR THE RELEVANCE OF OUR INVENTIONS

16     MIGHT BE IMPACTED, AND, THEREFORE, THE LONG TERM POTENTIAL OF

17     THE COMPANY COULD BE IMPACTED.

18          SO, FOR EXAMPLE, YOU KNOW, A COMPANY THAT CANNOT ONLY HAS

19     A TRACK RECORD OF INVENTING TECHNOLOGY, BUT ALSO HAS A TRACK

20     RECORD OF DELIVERING THAT TECHNOLOGY IS IN A STRONGER POSITION

21     TO, TO, YOU KNOW, TO DELIVER TECHNOLOGY NOT ONLY TO THE

22     STANDARDS BODY, BUT OBVIOUSLY DOWNSTREAM, AND WE THOUGHT THAT

23     THAT WAS A GOOD COMBINATION TO MAINTAIN.

24     Q.   NOW, WE'VE SEEN SOME DISCUSSION, WE'VE SEEN SOME SLIDE

25     DECKS FROM BOSTON CONSULTING GROUP.

1          WHAT ROLE DID BOSTON CONSULTING GROUP HAVE IN THIS

2     DISCUSSION ABOUT SPLITTING THE COMPANY?

3     A.   THEY WERE ONE OF THE INDEPENDENT ADVISORS THAT THE SPECIAL

4     COMMITTEE HIRED.  THEY HIRED A NUMBER OF DIFFERENT ADVISORS,

5     STRATEGIC ADVISORS, AND THEY WERE ONE OF THEM.

6     Q.   DID YOU INTERACT WITH THEM AT ALL PRIOR TO MAKING YOUR

7     RECOMMENDATION THAT THE COMPANY BE KEPT TOGETHER AS ONE?

8     A.   I INTERACTED WITH THEM, BUT THEY WERE NOT ADVISING THE

9     MANAGEMENT TEAM.  THEY WERE ADVISING THE INDEPENDENT COMMITTEE.

10    Q.   LET'S TALK ABOUT APPLE AND THE TRANSITION AGREEMENT WHICH

11    CAME ABOUT IN EARLY 2011.

12          YOU WERE ASKED SOME QUESTIONS ABOUT THAT.

13          BUT I'D LIKE TO STEP BACK AND ASK YOU, HOW DID THE

14    AGREEMENT COME ABOUT IN THE FIRST PLACE?  WHOSE PROPOSAL WAS

15    IT?

16    A.   THIS IS IN 20 --

17    Q.   THIS IS IN 2010.

18    A.   OKAY.

19    Q.   WHAT WE'VE BEEN CALLING THE TRANSITION AGREEMENT.

20          TELL US, HOW DID IT COME ABOUT AND WHO PROPOSED IT.

21    A.   IT WAS APPLE CAME TO US AND THEY WANTED TO GO WITH US IN A

22    BIG WAY, MEANING THAT THEY WANTED TO USE US AS A SINGLE SKU.

23    Q.   WHAT'S A SKU?

24    A.   A SKU WOULD BE A, A -- ACTUALLY, QUITE FRANKLY, I ALWAYS

25    FORGET WHAT IT MEANS.  BUT IT ESSENTIALLY MEANS A PLATFORM.

1           SO THINK OF IT AS THE DESIGN PLATFORM THAT A PHONE IS

2    BASED OFF OF FOR -- SO THE DESIGN SKU IS -- I SHOULD KNOW, BUT

3    I DON'T.

4           SO ESSENTIALLY THEY WANTED TO USE OUR CHIP FOR 100 PERCENT

5    OF THEIR IPHONES, AND THEY WANTED TO SEE WHETHER WE WERE

6    INTERESTED IN IT.

7           BUT THEY WANTED US TO PAY THEM, I THINK IT WAS A BILLION

8    DOLLARS, IN ORDER TO GET THAT OPPORTUNITY.

9    Q.   HOW DID YOU FIRST LEARN ABOUT THE PROPOSAL?

10   A.   IT WAS AT A MEETING IN CUPERTINO.

11   Q.   WHO WAS THERE?

12   A.   ON OUR SIDE IT WAS PAUL JACOBS, STEVE ALTMAN, MYSELF.  I

13   CAN'T REMEMBER IF THERE WAS ANYBODY ELSE THERE FROM THE

14   QUALCOMM SIDE.

15          ON THE APPLE SIDE THERE WAS TIM COOK, JEFF WILLIAMS, AND I

16   THINK BRUCE SEWELL.

17   Q.   OKAY.  AND WHAT DID YOU UNDERSTAND THEM TO BE PROPOSING IN

18   CONNECTION WITH THE OVERALL -- LET ME BACK UP.

19          DID THEY HAVE A PRODUCT FOR THE EXISTING IPHONE, A MODEM

20   PRODUCT?

21   A.   THEY DID.

22   Q.   AND WHO WAS PROVIDING THAT?

23   A.   I THINK IT WAS INFINEON OR INTEL.  I DON'T REMEMBER WHEN

24   THEY WERE ACQUIRED.

25   Q.   OKAY.  WHAT WAS YOUR UNDERSTANDING OF WHY THEY WERE ASKING

1   YOU TO REPLACE THE INFINEON?

2   A.   I THINK WE HAD -- YOU KNOW, I THINK WE HAD THE BEST

3   PRODUCT, QUITE FRANKLY.  I THINK WE HAD THE BROADEST EXTENT OF

4   TECHNOLOGIES, THE ABILITY TO GO INTO MORE MARKETS.

5        AND I WOULD ALSO, YOU KNOW, SUGGEST AT THAT TIME WE LIKELY

6   HAD THE BEST ROADMAP, ROADMAP MEANING OUR PLANS FOR FUTURE

7   PRODUCTS WAS PROBABLY A LITTLE STRONGER THAN SOME OF THE

8   COMPETITION.

9        WHAT I DON'T REMEMBER WAS WHETHER THEY HAD A CDMA PHONE AT

10  THE SAME TIME AND HAD SOME EXPERIENCE WITH US, BUT WE CLEARLY

11  HAD A GOOD REPUTATION FOR SUPPLY.  I JUST DON'T REMEMBER THE

12  EXACT TIMING.

13  Q.   AND WHAT WAS THE BASIS FOR THE BILLION DOLLARS ASK FROM

14  APPLE TO QUALCOMM?

15  A.   IT WAS, IT WAS KIND OF A TRANSITION, KIND OF PRETTY

16  TYPICAL IN CERTAIN INDUSTRIES FOR SOMEONE TO ASK FOR FUNDS TO

17  OFFSET THE COST OF MOVING TO YOUR PLATFORM.  I WILL TELL YOU, A

18  BILLION DOLLARS IS NOT TYPICAL IN TERMS OF THE SIZE, IT'S A

19  LARGE NUMBER.

20       BUT THAT WAS WHAT IT WAS FOR.  IT WAS AN INCENTIVE IN

21  ORDER TO GET THAT DESIGN OPPORTUNITY.

22  Q.   THEY WERE ASKING YOU TO PAY THAT MONEY?

23  A.   THAT'S CORRECT.

24  Q.   AND WHAT DID THEY SAY ABOUT WANTING QUALCOMM AS THE SOLE

25  SUPPLIER FOR THE NEW IPHONE PLATFORM?

1    A.    THEY REQUESTED IT.

2    Q.    WHY?

3    A.    I -- I CAN ONLY GUESS, BUT I THINK IT'S BEST PRICE --

4    Q.    DON'T GUESS.  DON'T GUESS.

5    A.    YEAH.

6    Q.    DID THEY MAKE IT CLEAR THAT THEY WANTED TO USE EXCLUSIVELY

7    THE QUALCOMM PRODUCT?

8    A.    YES, FOR 100 PERCENT OF THEIR VOLUME.

9    Q.    NOW, FOLLOWING THAT, WAS THERE A SERIES OF NEGOTIATIONS

10   WITH THE FOLKS FROM APPLE?

11   A.    YES.

12   Q.    DID YOU PARTICIPATE IN THOSE NEGOTIATIONS?

13   A.    YES.

14   Q.    DID APPLE HAVE ANY LEVERAGE IN THESE DISCUSSIONS WITH

15   QUALCOMM?

16   A.    WE CERTAINLY FELT -- I CERTAINLY FELT IT, YES.

17   Q.    WHAT WAS IT?

18   A.    THEIR -- THEY'RE A HUGE OPPORTUNITY.  THERE'S A LOT OF

19   VOLUME, THERE'S A LOT OF BUSINESS AT STAKE.  AND, YOU KNOW, ANY

20   SITUATION LIKE THAT, YOU'RE TRYING TO GET IT DONE.

21   Q.    DID QUALCOMM HAVE ANY LEVERAGE IN THE DISCUSSIONS?

22   A.    OTHER -- OTHER THAN THE -- YOU KNOW, WE THOUGHT WE HAD THE

23   BEST PRODUCT, NOT MUCH.

24         THE COURT:  SORRY.  I'M GOING TO INTERRUPT.  IT'S

25   4:00 O'CLOCK NOW.  LET'S TAKE A TEN MINUTE BREAK.

1        MR. VAN NEST:  THANK YOU, YOUR HONOR.

2            THE COURT:  ALL RIGHT.  LET'S TAKE A BREAK.  THANK

3    YOU.

4        (RECESS FROM 4:00 P.M. UNTIL 4:10 P.M.)

5            THE COURT:  OKAY.  GOOD AFTERNOON.  WELCOME.  PLEASE

6    TAKE A SEAT.

7        I'LL GIVE EVERYONE A CHANCE TO SIT DOWN.  PEOPLE ARE STILL

8    MOVING.

9        ALL RIGHT.  MR. VAN NEST, PLEASE CONTINUE.  IT'S 4:11.

10           MR. VAN NEST:  THANK YOU, YOUR HONOR.

11   Q.   MR. MOLLENKOPF, WE WERE TALKING ABOUT YOUR NEGOTIATIONS

12   WITH APPLE FOR THE FIRST TRANSITION AGREEMENT BACK IN 2010.

13       WAS A DEAL EVENTUALLY ARRIVED AT?

14   A.   IT WAS.

15   Q.   AND CAN YOU EXPLAIN TO THE COURT WHAT THE BASIC STRUCTURE

16   OF THE AGREEMENT WAS?  WHAT WAS APPLE PROVIDING?  WHAT WAS

17   QUALCOMM PROVIDING?

18   A.   SURE.

19   Q.   JUST AT A HIGH LEVEL.

20   A.   YEAH.  WE -- WE -- ESSENTIALLY I THINK IT WAS ABOUT A

21   THREE YEAR DEAL.  IN THAT TIME PERIOD, WE WOULD SELL THEM CHIPS

22   FOR 100 PERCENT OF THEIR IPHONES.

23       THEY -- WE WOULD PAY THEM A BILLION DOLLARS IN INCENTIVE

24   FOR THAT; AND THEN WE WOULD -- THERE WAS A LOT OF NEGOTIATION

25   ABOUT THE SCHEDULE OF THAT, BUT ESSENTIALLY --

```
 1                THE COURT:  HAS THAT INFORMATION BEEN UNSEALED OR HAS

 2     IT BEEN SEALED?

 3                MR. VAN NEST:  I THINK THAT PART HAS BEEN KNOWN AND

 4     NOT SEALED.

 5                THE COURT:  OKAY.

 6                MR. VAN NEST:  THAT NUMBER.

 7                THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

 8                THE WITNESS:  AND ESSENTIALLY IT WORKED OUT.  WE GOT

 9     TO AN AGREEMENT, AND I THINK IT WORKED OUT FOR BOTH PARTIES.

10     BY MR. VAN NEST:

11     Q.  NOW, YOU SAID 100 PERCENT OF THE VOLUME.  WHAT DID YOU

12     MEAN BY THAT?

13     A.  IT -- WE WERE -- THEY WANTED TO GO TO ESSENTIALLY A SINGLE

14     SKU, OR A SINGLE PLATFORM BASED ON OUR CHIPSET THAT THEY COULD

15     USE EVERYWHERE IN THE WORLD FOR ALL THE MODELS.

16                THE COURT:  YOU KNOW, CAN I INTERRUPT YOU?  I THINK I

17     HAVE BEEN SEALING THAT IN THE APPLE SEALING MOTIONS, THE EXACT

18     INCENTIVE PAYMENT AMOUNT.

19                MR. VAN NEST:  THAT WASN'T MY UNDERSTANDING, YOUR

20     HONOR.

21                THE COURT:  WELL, I WOULD NEED TO GO BACK AND CHECK

22     IT.

23                MR. VAN NEST:  WE CAN CERTAINLY -- I'LL MOVE ALONG.

24     WE CAN CERTAINLY SEAL IT POST --

25                THE COURT:  WELL, HE'S NOW DONE IT TWICE.
```

1           IF IT TURNS OUT THAT I SEALED IT, I'M GOING TO BE REALLY

2      DISAPPOINTED THAT QUALCOMM IS JUST DOING THIS PERHAPS FOR THE

3      MEDIA, OR I DON'T KNOW WHO ELSE.

4           MR. VAN NEST:  NO, NO, NOT THE MEDIA.

5           THE COURT:  I'VE BEEN SEALING THE NUMBERS IN THAT

6      AGREEMENT.

7           MR. VAN NEST:  IT WAS MY UNDERSTANDING THAT NUMBER

8      WAS NOT CONFIDENTIAL.

9           THE COURT:  ALL RIGHT.  I'LL HAVE TO CHECK IT LATER.

10     GO AHEAD, PLEASE.  I APOLOGIZE IF IT'S MY MISTAKE.

11          MR. VAN NEST:  AND LIKEWISE IF IT WAS MINE.

12          THE WITNESS:  CAN I JUST MAKE SURE I DON'T DO

13     SOMETHING AGAIN.  WHAT --

14          MR. VAN NEST:  WE'RE NOT GOING TO TALK ABOUT THE --

15          THE COURT:  THE NUMBER THAT YOU'VE THROWN OUT TWICE,

16     I BELIEVE I'VE SEALED.  SO IF I HAVE, I PREFER THAT YOU NOT DO

17     THAT BECAUSE OTHER THIRD PARTIES CAN CERTAINLY DO THAT WITH

18     QUALCOMM'S INFORMATION, WHICH I ASSUME YOU WOULD NOT

19     APPRECIATE.  A LOT OF ROYALTY NUMBERS OF QUALCOMM'S IN THIS

20     CASE THAT I'VE BEEN SEALING.  SO --

21     BY MR. VAN NEST:

22     Q.   IN ANY EVENT --

23          THE COURT:  OKAY.

24     BY MR. VAN NEST:

25     Q.   -- MR. MOLLENKOPF, DID APPLE -- WERE YOU SEEKING A MINIMUM

```
 1        VOLUME COMMITMENT AS PART OF THIS TRANSACTION?

 2        A.   WE TRIED TO.  WE WERE TRYING TO GET EITHER VOLUME BASED

 3        PRICING OR SOME FORM OF OTHER INCENTIVE STRUCTURE, AND WE ENDED

 4        UP GETTING THE INCENTIVE STRUCTURE THAT WAS IN THE AGREEMENT.

 5        APPLE TENDS NOT TO DO, AT LEAST IN MY EXPERIENCE, DOESN'T DO

 6        VOLUME COMMITMENTS.

 7        Q.   THEN WHY DID YOU WANT A VOLUME COMMITMENT?  WHAT WERE YOU

 8        TRYING TO PROTECT?

 9        A.   WELL, IT'S A -- FIRST OF ALL, THERE'S A PRETTY BIG

10        INCENTIVE, IT'S A HUGE INCENTIVE, AND WE WANT TO MAKE SURE THAT

11        IF WE PAY THAT MONEY, WE DON'T -- YOU KNOW, WE GET VOLUME TO

12        OFFSET IT.  IT'S PRETTY RISKY, ACTUALLY.

13             LIKEWISE, IT WAS ALSO A PRETTY SUBSTANTIAL INVESTMENT IN

14        ORDER TO SERVICE APPLE BUT PRIMARILY WANT TO MAKE SURE THAT WE

15        DON'T PAY AN INCENTIVE AND DON'T GET VOLUME.

16        Q.   YOU MENTIONED THIS WAS RISKY.  WERE THERE DELIBERATIONS

17        WITHIN QUALCOMM OVER THE RISK OF ENTERING INTO THIS AGREEMENT?

18        A.   YES.

19        Q.   AND I'D LIKE YOU TO OPEN YOUR BINDER, THE FTC BINDER, TO

20        JX 55.

21             AND I'M GOING TO CLOSE IT OFF FROM THE SCREEN, YOUR HONOR.

22             JX 55 IS IN EVIDENCE, BUT I BELIEVE PORTIONS OF IT ARE

23        SEALED.

24             IF YOU COULD -- IT'LL BE ON YOUR SCREEN AS WELL, AND I'M

25        LOOKING AT THE BOTTOM OF PAGE 006.
```

1          DO WE HAVE IT ON THE INDIVIDUAL MONITORS?

2          SO THERE'S A SENTENCE I WANT YOU JUST TO LOOK AT YOURSELF.

3     "THIS OFFER HAS US PAY TOO MUCH," ET CETERA, ET CETERA.

4     A.   I'M SORRY.

5     Q.   DO YOU SEE THAT?

6     A.   I DON'T, ACTUALLY.

7     Q.   CAN WE HAVE IT HIGHLIGHTED AT THE BOTTOM OF THE PAGE?

8     A.   NOW I SEE IT, YEAH.

9     Q.   SO WITHOUT TALKING ABOUT ANY OF THE NUMBERS HERE, CAN YOU

10    JUST DESCRIBE WHAT THE DEBATE WAS WITHIN QUALCOMM ABOUT WHETHER

11    OR NOT TO ENTER INTO THE TRANSITION AGREEMENT?  WHAT WERE YOU

12    CONCERNED ABOUT?

13    A.   WE WERE REALLY TRYING TO FIGURE OUT DO WE -- YOU KNOW, ARE

14    WE GOING TO GET THE VOLUME THAT WE NEEDED TO GET IN ORDER TO

15    MAKE THE BUSINESS DEAL WORK?

16         SO WE'RE, WE'RE GOING THROUGH TRYING TO FIGURE OUT, YOU

17    KNOW, HOW MUCH INCENTIVE IS LESS -- IT'S REALLY A DISCUSSION

18    ABOUT HOW -- WHAT'S THE PAYMENT STRUCTURE OF THE INCENTIVE TO

19    MAKE SURE THAT IT'S GOING TO WORK, AND, YOU KNOW, SOMEONE

20    COULDN'T GAME THE, GAME THE STRUCTURE AND, THEREFORE, END UP

21    WITH, YOU KNOW, WE PAY THE INCENTIVE AND DON'T GET THE VOLUME.

22    Q.   OKAY.  AND DID APPLE RETAIN THE RIGHT, THROUGHOUT THE

23    FIRST TRANSITION AGREEMENT, TO BRING IN A SECOND SOURCE?

24    A.   THEY DID.

25    Q.   AND IS THAT SOMETHING THEY NEGOTIATED FOR?

1    A.    THEY DID.

2    Q.    AND IF THEY HAD BROUGHT IN A SECOND SOURCE, THEN WHAT

3    WOULD QUALCOMM'S RIGHTS HAVE BEEN?

4    A.    WE ESSENTIALLY WOULDN'T HAVE TO PAY CERTAIN INCENTIVES

5    DEPENDING ON THE SCHEDULE THAT CAME IN.  BUT THEY WERE ALLOWED

6    TO BRING IN A SOURCE.

7    Q.    OKAY.  WE SAW A COUPLE OF DOCUMENTS IN WHICH YOU REFER TO

8    EXCLUSIVITY AS AN OBJECTIVE OF THE AGREEMENT.

9          WHAT DID YOU MEAN BY THAT?

10   A.    WHAT I MEANT WAS, YOU KNOW, THE STRUCTURE OF 100 PERCENT

11   OF THE VOLUME, YOU KNOW, TYPICALLY IT WOULD BE OFFSET BY AN

12   INCENTIVE, BUT THAT'S REALLY WHAT WE'RE REFERRING TO, THAT

13   DISCUSSION THAT YOU JUST MENTIONED.

14   Q.    WHY WERE YOU SHOOTING FOR 100 PERCENT OF THE VOLUME?

15   A.    WELL, WE WANTED TO MAKE SURE THERE WAS ENOUGH VOLUME SO

16   THAT WE COULD OFFSET THE INCENTIVE.  IT WAS A VERY LARGE

17   INCENTIVE, SO WE WANTED TO MAKE SURE WE WEREN'T AT RISK,

18   THEREFORE, PAY THE INCENTIVE AND NOT GET THE VOLUME.

19   Q.    AND AS OF THE TIME THAT YOU WENT INTO THE FIRST TRANSITION

20   AGREEMENT, BASED ON YOUR PROJECTIONS, WERE YOU PROJECTING TO

21   MAKE A PROFIT?

22   A.    WE WERE.

23   Q.    AND DID YOU EARN A PROFIT UNDER THE FIRST TRANSITION

24   AGREEMENT?

25   A.    YES.  IT WAS A GOOD BUSINESS.

1    Q.   AND DID THAT TAKE INTO ACCOUNT THE INCENTIVE PAYMENTS THAT

2    YOU MADE?

3    A.   YES.

4    Q.   I TAKE IT YOU MADE THE INCENTIVE PAYMENTS AND THE FIRST

5    TRANSITION AGREEMENT WAS COMPLETED AND PERFORMED BY BOTH

6    PARTIES?

7    A.   CORRECT.

8    Q.   AND AS A RESULT OF THAT, DID QUALCOMM EARN A PROFIT ON THE

9    TRANSACTION?

10   A.   YES.

11   Q.   WAS THERE A SECOND TRANSITION AGREEMENT?

12   A.   THERE WAS.

13   Q.   DID YOU -- WERE YOU INVOLVED IN NEGOTIATING THAT?

14   A.   I WAS.

15   Q.   CAN YOU TELL THE COURT, WHAT WERE THE CIRCUMSTANCES THAT

16   BROUGHT THE SECOND TRANSITION AGREEMENT INTO PLAY?

17   A.   WE WERE -- THE FIRST AGREEMENT, IT EXPIRED AT THE END OF,

18   I THINK IT WAS 2012.

19        AND THEN WE HAD A DISCUSSION WITH APPLE, AND I THINK WE

20   BOTH AGREED THAT WE WOULD MOVE FORWARD WITH THE AGREEMENT.  WE

21   HAD A LOT OF DISCUSSION THEN ABOUT AN ADDITIONAL SET OF

22   INCENTIVES, IT WAS A DIFFERENT NUMBER.

23        AND WE MOVED FORWARD.

24   Q.   WAS THE STRUCTURE OF THE SECOND AGREEMENT SIMILAR TO THE

25   STRUCTURE OF THE FIRST AGREEMENT, EXCEPT POSSIBLY FOR THE, SOME

```
 1      OF THE FINANCIAL TERMS?

 2      A.    YEAH, YEAH IT WAS SIMILAR.

 3      Q.    AND IN THE NEGOTIATIONS OVER THE SECOND AGREEMENT, DID

 4      APPLE HAVE LEVERAGE OVER QUALCOMM AT THAT POINT?

 5      A.    IT DID.

 6      Q.    WHAT WAS THAT?

 7      A.    AGAIN, THEY HAD A LOT OF VOLUME.  IT'S A BIG BUSINESS.  I

 8      THINK ANYBODY WOULD WANT TO GET IT, AND THEY KNOW.

 9            AND SO, YOU KNOW, THEY REALLY -- THAT WAS REALLY THE KEY

10      LEVERAGE.

11      Q.    NOW, AT THE TIME YOU ENTERED INTO THE SECOND TRANSITION

12      AGREEMENT, DID YOU PROJECT FINANCIAL PERFORMANCE UNDER THE

13      SECOND TRANSITION AGREEMENT?

14      A.    WE DID.

15      Q.    COULD YOU TURN IN YOUR BINDER, THE LARGE BINDER, TO

16      CX 5389?

17            YOUR HONOR, THIS IS IN EVIDENCE, BUT IT'S BEEN SEALED.

18      A.    I'M SORRY.  CAN YOU SAY THE NUMBER AGAIN?

19      Q.    IT'S 5389 IN THE LARGE BINDER.

20            ACTUALLY, I'M NOT SURE IT'S IN EVIDENCE, SO LET'S LOOK AT

21      IT FIRST AND --

22                THE COURT:  I THINK IT IS.

23                MR. VAN NEST:  I THINK IT IS, TOO.

24                THE WITNESS:  WHEN IT'S ON THE SCREEN.

25      BY MR VAN NEST:
```

1    Q.   DO YOU HAVE IT ON THE SCREEN?

2    A.   WHEN IT'S THERE, I'LL LOOK.

3    Q.   IS THIS A CHART THAT YOU PARTICIPATED IN PREPARING AT OR

4    ABOUT THE TIME OF THE SECOND TRANSITION AGREEMENT?

5    A.   YES.

6    Q.   AND WHAT IS IT INTENDED TO REFLECT?  WHAT IS IT SHOWING

7    US?

8    A.   I DON'T SEE THE CHART ACTUALLY.

9    Q.   OH, CAN WE PUT THE CHART UP, MR. DAHN, FROM PAGE 11?

10        I'M SORRY.  THIS PAGE IS SEALED.

11   A.   I GOT IT.

12   Q.   PART OF IT IS SEALED, YOUR HONOR, I THINK.  SOME OF IT IS

13   SEALED.  BUT I'LL SEAL THE WHOLE THING.

14        WHAT DO THESE PROJECTIONS RELATE TO?

15   A.   THEY RELATE TO THE BUSINESS IN THE SECOND DEAL.

16   Q.   AND CALLING YOUR ATTENTION DOWN TOWARDS THE BOTTOM OF THE

17   PAGE, THERE'S A, A COLUMN IN BOLD, NET REVENUE M'S.  WHAT DOES

18   THAT REFER TO?

19   A.   THAT REFERS TO THE REVENUE NET OF THE INCENTIVE PAYMENTS

20   THAT WE MADE UNDER BOTH AGREEMENTS.

21   Q.   OKAY.  AND THE NUMBERS TO THE RIGHT THERE, THEY'RE

22   REFLECTED IN MILLIONS?

23   A.   YES.

24   Q.   AND THOSE ARE NET OF THE TOTAL INCENTIVE PAYMENTS UNDER

25   THE SECOND TRANSITION AGREEMENT?

MOLLENKOPF CROSS BY MR. VAN NEST

1    A.    YES.

2    Q.    AND THEN BELOW THAT, ASP, WHAT DOES THAT MEAN?

3    A.    THAT'S THE PRICE PER CHIP.  SO YOU COULD ESSENTIALLY

4    DIVIDE THAT REVENUE NUMBER BY THE TOTAL UNITS.

5    Q.    OKAY.  AND THEN THERE'S A DIRECT MARGIN M'S.  WHAT IS

6    THAT?

7    A.    THAT'S THE -- THAT'S THE AMOUNT OF DIRECT MARGINS, SO YOU

8    TAKE THE REVENUE AND SUBTRACT OUT THE COST OF THE PRODUCT.

9    THAT'S HOW MUCH MONEY WE WOULD MAKE ON THAT BUSINESS PER YEAR.

10   Q.    SO GOING ON THAT COLUMN, WITHOUT GETTING INTO THE NUMBERS,

11   GOING ALL THE WAY TO THE RIGHT, THERE'S A PROJECTION THERE FOR

12   THE TOTAL.

13         WHAT DOES THAT NUMBER REPRESENT?

14   A.    I'M SORRY.  COULD YOU TELL ME WHERE THAT IS.

15   Q.    ON DIRECT MARGIN M'S, IF YOU GO TO THE RIGHT ON THAT ROW?

16   A.    YEAH.

17   Q.    THERE'S A NUMBER AT THE FAR RIGHT THAT REFLECTS -- SAYS

18   TOTAL?

19   A.    YEAH.

20   Q.    I DON'T WANT THE NUMBER, BUT WHAT DOES IT REPRESENT?

21   A.    IT REPRESENTS THE OVERALL BUSINESS OVER THAT PERIOD OF

22   TIME THAT WE WOULD HAVE HAD IN DIRECT MARGIN, MEANING THE MONEY

23   THAT WE WOULD HAVE GOTTEN.

24   Q.    SO I TAKE IT FROM THIS YOU WEREN'T PROJECTING THIS

25   TRANSACTION, THIS AGREEMENT, TO BE SOME KIND OF A LOSS LEADER?

```
1       YOU WERE EXPECTING TO MAKE MONEY?

2       A.   YES.

3       Q.   AND QUITE A BIT OF IT FOR THAT MATTER?

4       A.   THAT'S CORRECT.

5       Q.   NOW, THIS IS A PROJECTION, SO IT'S AT THE TIME YOU WENT

6       INTO THE AGREEMENT.

7            HOW WAS THE ACTUAL PERFORMANCE UNDER THIS FIRST TRANSITION

8       AGREEMENT?  WAS IT -- I DON'T WANT THE NUMBER, BUT WAS IT

9       BETTER THAN YOU PROJECTED OR WORSE OR ABOUT THE SAME?

10      A.   I DON'T REMEMBER THE EXACT DELTAS, BUT I CAN TELL YOU IT

11      WAS -- IT WAS A GOOD AGREEMENT.  WE WERE VERY HAPPY WITH THE

12      WAY IT WORKED OUT.

13      Q.   HOW LONG WAS THE TERM OF THE FIRST TRANSITION AGREEMENT?

14      EXCUSE ME, THE AMENDED TRANSITION AGREEMENT?

15      A.   I THINK IT WAS THREE YEARS.

16      Q.   OKAY.  AND DURING THE TERM OF THE AMENDED TRANSITION

17      AGREEMENT, DID APPLE BRING ON A SECOND SUPPLIER?

18      A.   DURING THE SECOND AGREEMENT?

19      Q.   YES.

20      A.   YES.

21      Q.   WHO WAS THAT?

22      A.   IT WAS INTEL.

23      Q.   AND WHEN DID INTEL COME ON?

24      A.   IT CAME IN AT THE END OF 2016.

25      Q.   AND THAT WAS PURSUANT TO THE AGREEMENT?
```

1    A.    YES.

2    Q.    APPLE HAD THE RIGHT TO DO THAT?

3    A.    YES.

4    Q.    THEY HAD THE RIGHT TO DO THAT UNDER THE FIRST AGREEMENT?

5    A.    YES.

6    Q.    UNDER THE SECOND AGREEMENT, WHEN INTEL CAME ON BOARD, DID

7    APPLE FORFEIT SOME OF THE INCENTIVES?

8    A.    YES.

9    Q.    WHAT IMPACT DID INTEL BECOMING THE SECOND SOURCE HAVE ON

10   QUALCOMM'S VOLUMES UNDER THE SECOND AGREEMENT?

11   A.    THEY REDUCED THEM.

12   Q.    NEVERTHELESS, THE AGREEMENT ENDED UP AS A PROFITABLE ONE

13   FOR QUALCOMM; IS THAT RIGHT?

14   A.    THAT'S CORRECT.

15   Q.    NOW, DID YOU PERCEIVE RISK BOTH IN ENTERING THE FIRST

16   AGREEMENT AND THE SECOND AGREEMENT FOR QUALCOMM?

17   A.    YES.

18   Q.    WHAT WERE THE RISKS THAT YOU WERE FOCUSSED ON?

19   A.    THE RISK I WAS WORRIED ABOUT WAS, YOU KNOW, WHAT WOULD THE

20   VOLUME BE, BOTH FROM THE PERSPECTIVE OF JUST HOW BIG IS APPLE

21   GOING TO BE BY ITSELF, AND ALSO, WOULD WE GET WHAT WE WANTED IN

22   THE AGREEMENT GIVEN THAT WE PAID SO MUCH INCENTIVE?

23         SO IT WAS REALLY TWO TYPES OF VOLUME RISK, EFFECTIVELY.

24   Q.    WAS IT YOUR PURPOSE IN ENTERING EITHER OF THESE

25   AGREEMENTS, TO FORECLOSE INTEL OR ANYONE ELSE FROM RECEIVING

1    THE CONTRACT?

2    A.   NO.

3    Q.   WHAT WAS YOUR GOAL IN ENTERING INTO THESE AGREEMENTS

4    MR. MOLLENKOPF?

5    A.   I WANTED TO GET THE BUSINESS.

6    Q.   WHAT'S HAPPENED -- LET'S LIMIT OURSELVES TO UP THROUGH

7    SPRING OF THIS PAST YEAR, 2018.

8        HAVE YOU CONTINUED TO COMPETE FOR APPLE BUSINESS?

9    A.   YES.

10   Q.   HAVE YOU CONTINUED TO BID ON VARIOUS PROJECTS AVAILABLE AT

11   APPLE AS AN OEM?

12   A.   YES.

13   Q.   WHAT'S BEEN THE STATUS OF YOUR BUSINESS WITH APPLE WITH

14   RESPECT TO THE IPHONE AFTER THE TRANSITION AGREEMENTS EXPIRED

15   IN 2016?

16   A.   WE HAVEN'T HAD ANY NEW BUSINESS.

17   Q.   NO NEW BUSINESS?

18   A.   NO.

19   Q.   HAVE YOU BEEN COMPETING TO GET NEW BUSINESS FROM APPLE?

20   A.   YES.

21   Q.   WAS THERE EVER A TIME WHEN QUALCOMM WITHDREW FROM

22   COMPETITION FOR PROJECTS AT APPLE?

23        MS. MILICI:  YOUR HONOR, I OBJECT TO THE EXTENT HE'S

24   ASKING FOR INFORMATION THAT POST-DATES DISCOVERY IN THIS CASE.

25        MR. VAN NEST:  I'LL -- I THOUGHT I HAD LIMITED IT AT

1    THE TOP, YOUR HONOR, TO SPRING OF LAST YEAR.

2    Q.   LET'S KEEP THAT IN MIND MR. MOLLENKOPF.  I'M SORRY IF I

3    DIDN'T MAKE THAT CLEAR.

4         BUT UP THROUGH THE SPRING OF 2018.

5    A.   THAT'S HOW I HEARD IT.  THAT'S HOW I ANSWERED THE

6    QUESTION.

7    Q.   YEAH.  WAS THERE EVER A TIME WHEN QUALCOMM WITHDREW FROM

8    COMPETING FOR BUSINESS AT APPLE?

9    A.   NO.

10   Q.   AND UP THROUGH THAT TIME, DID YOU CONTINUE TO SELL MODEMS

11   FOR OLDER VERSIONS OF THE IPHONE?

12   A.   YES.

13   Q.   AND THAT CONTINUED RIGHT ON UP THROUGH THE SPRING OF 2018?

14   A.   YES.

15   Q.   NOW, I WANT TO ASK A QUESTION ABOUT APPLE'S CONTRACT

16   MANUFACTURERS.

17        WHO ARE THE CONTRACT -- WHAT'S A CONTRACT MANUFACTURER?

18   A.   A CONTRACT MANUFACTURER REFERS TO A COMPANY THAT

19   MANUFACTURES PRODUCTS FOR ANOTHER COMPANY.  SO, FOR EXAMPLE,

20   THEY MAY HAVE A NUMBER OF FACTORIES AND THEY MAY MANUFACTURE OR

21   DO A PORTION OF DESIGN AND MANUFACTURE FOR ANOTHER COMPANY.

22        APPLE TENDS TO USE THAT IN A BIG PORTION OF ITS SUPPLY

23   CHAIN, CERTAINLY IN THE HANDSET SPACE.

24   Q.   SO WHEN QUALCOMM PROVIDES CHIPSETS FOR APPLE IPHONES, WHO

25   ACTUALLY PURCHASES THE CHIPSETS FROM QUALCOMM?

1    A.   IT'S CONTRACT MANUFACTURERS.  THERE'S PROBABLY SOME

2    COMPLICATED STRUCTURE THAT I DON'T UNDERSTAND, BUT IT'S --

3    EFFECTIVELY IT GOES TO THE CONTRACT MANUFACTURERS.

4    Q.   AND ARE THEY THE ONES THAT HAVE THE LICENSE WITH QUALCOMM?

5    A.   YES.

6    Q.   AND THEY'RE LICENSED TO PURCHASE THE CHIPS AND THEN THEY

7    BUILD THE PHONES FOR APPLE; IS THAT RIGHT?

8    A.   THAT'S CORRECT.

9    Q.   NOW, DID THERE COME A TIME, AGAIN, BEFORE SPRING OF LAST

10   YEAR, WHEN THE CONTRACT MANUFACTURERS BUILDING PHONES FOR APPLE

11   STOPPED PAYING ANY QUALCOMM ROYALTIES AT ALL?

12   A.   I'M SORRY.  WOULD YOU SAY THE TIMEFRAME AGAIN.  I WANT TO

13   MAKE SURE.

14   Q.   YEAH, UP UNTIL THE SPRING OF LAST YEAR.  STARTING FROM THE

15   END OF THE TRANSITION AGREEMENTS IN 2016 UP UNTIL THE END OF

16   LAST YEAR, DID THERE COME A TIME IN 2016 OR 2017 WHEN THE

17   CONTRACT MANUFACTURERS FOR APPLE STOPPED PAYING ANY ROYALTIES

18   AT ALL?

19   A.   YES, IN THE SPRING OF 2017, 2017, THEY STOPPED PAYING.

20   Q.   NOW, DID THEY CONTINUE TO PAY ON CHIPS FOR OTHER HANDSET

21   MAKERS?

22   A.   THEY DID.

23   Q.   IT WAS -- THIS WAS LIMITED TO APPLE?

24   A.   CORRECT.  THIS WAS FOR VOLUME THAT WAS MANUFACTURED FOR

25   APPLE.

1    Q.   OKAY.  AND RATHER THAN REDUCE THE ROYALTIES, THEY WENT TO

2    ZERO; RIGHT?

3    A.   THAT'S CORRECT.

4    Q.   NOW, THROUGHOUT THE TIME, AGAIN, RIGHT UP UNTIL MARCH OF

5    THIS PAST YEAR, NOTWITHSTANDING THE QUALCOMM WASN'T BEING PAID

6    A DIME FOR THOSE CHIPSETS, DID YOU CONTINUE DELIVERING SUPPLY

7    TO APPLE?

8    A.   YES.

9    Q.   WAS THERE ANY DISRUPTION IN THAT SUPPLY?

10   A.   NO.

11   Q.   WAS THERE ANY DELAY IN THAT SUPPLY?

12   A.   I MEAN, I DON'T KNOW ALL THE DETAILS OF ALL OF IT.

13   ESSENTIALLY WE WERE A GOOD SUPPLIER.

14        WHAT I DON'T KNOW IS THE INDIVIDUAL DETAILS OF EVERY

15   SHIPMENT.  SO I WANT TO MAKE SURE I'M NOT SAYING THE WRONG

16   THING.

17   Q.   FAIR ENOUGH.

18        FROM A HIGH LEVEL, THOUGH, QUALCOMM HAS REMAINED A

19   SUPPLIER TO APPLE THROUGH THE SPRING OF LAST YEAR,

20   NOTWITHSTANDING THE NON-PAYMENT OF ROYALTIES BY APPLE'S

21   CONTRACT MANUFACTURERS?

22   A.   THAT'S CORRECT.

23   Q.   IS QUALCOMM CURRENTLY ENGAGED, MR. MOLLENKOPF, IN RESEARCH

24   RELATING TO THE 5G STANDARD?

25   A.   YES.

1    Q.   HOW WOULD YOU CHARACTERIZE THAT EFFORT AT QUALCOMM?

2    A.   IT'S A BIG FOCUS OF THE COMPANY.

3    Q.   WHEN DID YOU BEGIN RESEARCH AT QUALCOMM ON 5G?

4    A.   OH, A LONG TIME AGO.

5    Q.   HOW LONG AGO?

6    A.   OVER FIVE YEARS AGO.

7    Q.   OKAY.  AND ARE YOU STILL ENGAGED IN THE PROCESS OF

8    RESEARCH ON 5G?

9    A.   YES.

10   Q.   WERE YOU ONE OF THE PROPONENTS WITHIN QUALCOMM OF SPENDING

11   EVEN MORE MONEY ON 5G?

12   A.   YEAH.

13   Q.   TELL US ABOUT THAT.

14   A.   OH, I -- I BELIEVED THAT IT WAS IMPORTANT FOR US TO BE A

15   LEADER IN 5G, AND I THOUGHT WE NEEDED TO SPEND MONEY CONSISTENT

16   WITH THAT.

17   Q.   AND HAVE YOU BEEN SUCCESSFUL IN 5G SO FAR?

18   A.   WE THINK SO.  IT'S STILL VERY EARLY, BUT WE FEEL LIKE WE

19   HAVE A STRONG POSITION.

20        THERE ARE A LOT OF OTHER PEOPLE ALSO INVESTING HEAVILY IN

21   5G, BUT WE HOPE THAT WE'RE GOING TO BE THE LEADER.

22   Q.   WHAT IS THE COMPETITIVE LANDSCAPE TODAY?

23        LET ME BACK UP.  HAS THERE BEEN A STANDARD APPROVED FOR 5G

24   YET?

25   A.   THERE HAS.

MOLLENKOPF CROSS BY MR. VAN NEST

1    Q.   AND HOW RECENTLY WAS THAT?

2    A.   THERE ARE MULTIPLE STANDARDS OF 5G.  THERE ARE MULTIPLE

3    STANDARDS OF 5G.  THE FIRST STANDARD I THINK WENT INTO -- WAS

4    APPROVED END OF LAST YEAR.  EXCUSE ME, END OF '17.

5    Q.   AND WHAT -- HOW WOULD YOU DESCRIBE FOR THE COURT THE

6    COMPETITIVE LANDSCAPE AS OF, AGAIN, AS OF MARCH OF LAST YEAR,

7    HOW WOULD YOU DESCRIBE THE COMPETITIVE LANDSCAPE IN 5G?

8    A.   THIS IS ON THE PRODUCT SIDE OR ON THE --

9    Q.   ON THE PRODUCT SIDE.

10   A.   -- IN GENERAL?

11   Q.   ON THE PRODUCT SIDE.

12   A.   OKAY.  ON THE PRODUCT SIDE, THERE ARE MANY PEOPLE THAT

13   HAVE ANNOUNCED PRODUCTS.  THERE'S APPLE -- EXCUSE ME.

14        THERE'S INTEL, THERE'S SAMSUNG, THERE'S HUAWEI, THERE'S

15   QUALCOMM, MEDIATEK I THINK HAS AN ANNOUNCED PRODUCT.  SO

16   EVERYONE IS WORKING ON 5G.  THERE ARE MANY DIFFERENT COMPANIES,

17   AS IS TYPICAL.

18   Q.   AND WHERE DO YOU THINK QUALCOMM IS POSITIONED IN THAT

19   COMPETITION?

20   A.   WELL, I MEAN, I THINK WE'RE THE LEADER.  BUT IT'S STILL

21   EARLY AND EVERYBODY ELSE IS TRYING TO BE THE LEADER AS WELL.

22        MS. MILICI:  YOUR HONOR, I OBJECT TO THE EXTENT THAT

23   WE'RE EXTENDING BEYOND THE SPRING OF 2018, BEYOND DISCOVERY.

24        MR. VAN NEST:  I THOUGHT, AGAIN, I CLARIFIED THAT,

25   YOUR HONOR, AND GAVE THAT AS A PREDICATE.

```
1           BUT I'LL -- I'LL ASK AGAIN TO MAKE SURE THAT THE WITNESS

2    UNDERSTANDS THAT.

3                THE COURT:  THANK YOU.  GO AHEAD, PLEASE.

4    BY MR. VAN NEST:

5    Q.   WITH RESPECT TO -- AS OF LAST SPRING, BEFORE THE END OF

6    MARCH, WAS THE OUTCOME IN THE 5G MARKET A CERTAIN ONE THAT

7    COULD BE PREDICTED EASILY?

8    A.   NO.

9    Q.   IS THERE A LOT OF UNCERTAINTY IN WHAT'S GOING TO HAPPEN IN

10   5G?

11   A.   YES.

12   Q.   WHY IS THAT?

13   A.   WELL, IT HASN'T -- IT HASN'T HAPPENED YET AND -- I'M

14   TRYING TO ANSWER IT IN THE --

15   Q.   WELL, YOU MENTIONED -- AGAIN, AS OF MARCH OF LAST YEAR,

16   WERE THERE A NUMBER OF DIFFERENT FOLKS IN THE MARKET, OR HAVING

17   ANNOUNCED?

18   A.   YEAH.  THERE ARE -- I MEAN, EVERYONE -- ALL OF MY ANSWERS

19   PREVIOUSLY ASSUMED UP TO THAT POINT.

20   Q.   FAIR ENOUGH.  FAIR ENOUGH.

21           AND THOSE INCLUDE SOME OF THE BIGGEST COMPANIES IN THE

22   WORLD, HUAWEI, SAMSUNG, AND INTEL?

23   A.   CORRECT.  BIGGER COMPANIES THAN QUALCOMM TYPICALLY.

24                MR. VAN NEST:  I HAVE NO FURTHER QUESTIONS, YOUR

25   HONOR.
```

```
 1                  THE COURT:  OKAY.  THE TIME IS 4:33.

 2            I WONDER IF WE SHOULD JUST END FOR THE DAY AND CONTINUE.

 3                  MR. VAN NEST:  COULD I ASK, SO THE WITNESS --

 4                  THE COURT:  HOW LONG DO YOU HAVE?

 5                  MR. VAN NEST:  THAT'S WHAT I WAS HOPING.

 6                  MS. MILICI:  I PROBABLY HAVE AT LEAST TEN MINUTES.

 7                  THE COURT:  AND THEN DO YOU HAVE --

 8                  MR. VAN NEST:  I WON'T HAVE MUCH, IF ANYTHING.  IF

 9      SHE HAS TEN MINUTES, I THINK WE COULD --

10                  THE COURT:  OKAY.  JUST SO HE DOESN'T HAVE TO COME

11      BACK ON MONDAY?

12                  MR. VAN NEST:  THAT WOULD BE GREAT, YOUR HONOR.

13      THANK YOU.

14                  THE COURT:  SO, MS. MILICI, WHY DON'T YOU GO AHEAD.

15      OR ACTUALLY, I SHOULD ASK THE MOST IMPORTANT -- BECAUSE WE'VE

16      BEEN HAVING A LOT OF TRANSCRIPT TIME TODAY.

17                  THE REPORTER:  THAT'S FINE.

18                  THE COURT:  OKAY.  ALL RIGHT.  LET'S GO AHEAD THEN.

19      OKAY.  LET'S GO AHEAD.

20            ARE YOU READY OR DO YOU WANT A COUPLE OF MINUTES?

21                  MS. MILICI:  I JUST NEED TO GATHER UP SOME BINDERS.

22                  THE COURT:  THAT'S FINE.  LET ME KNOW WHEN YOU'RE

23      READY.

24            (PAUSE IN PROCEEDINGS.)

25                  THE COURT:  READY?
```

1          MS. MILICI:  YES.

2          THE COURT:  OKAY.  4:34.  GO AHEAD, PLEASE.

3                    **REDIRECT EXAMINATION**

4     BY MS. MILICI:

5     Q.   MR. MOLLENKOPF, YOU WOULD AGREE THAT QUALCOMM HAS HAD

6     EXHAUSTIVE LICENSES FOR ITS OWN CHIP BUSINESS FOR OTHER

7     STANDARD ESSENTIAL PATENT HOLDERS; CORRECT?

8     A.   WE HAVE.

9     Q.   AND YOU WOULD AGREE THAT OTHER COMPANIES LICENSE PATENTS

10    AT THE DEVICE LEVEL WITHOUT SELLING CHIPS AT ALL?

11    A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION.

12    Q.   YEAH.  ARE THERE OTHER LICENSORS THAT LICENSE AT THE

13    DEVICE LEVEL WHO DON'T SELL CHIPS AT ALL?

14    A.   I AM NOT SURE OF THE ANSWER TO THAT.

15    Q.   ARE YOU AWARE OF ANY OTHER COMPANY THAT HAS A POLICY OF

16    NOT SELLING CHIPS TO HANDSET MANUFACTURERS UNLESS THEY TAKE A

17    SEPARATE LICENSE?

18    A.   NO.

19    Q.   OKAY.  YOU REFERRED TO OEM'S AS YOUR PARTNERS; CORRECT?

20    A.   YES.

21    Q.   AND ARE YOU AWARE THAT MANY OEM'S HAVE TESTIFIED UNDER

22    OATH THAT QUALCOMM THREATENED CHIP SUPPLY DURING LICENSE

23    NEGOTIATIONS?

24    A.   I'M NOT AWARE OF THAT.

25    Q.   AND YOU WOULD AGREE, SIR, THAT IT IS QUALCOMM'S POLICY NOT

1     TO SELL CHIPS TO COMPANIES THAT ARE UNLICENSED OR NOT COMPLYING

2     WITH THEIR LICENSES; CORRECT?

3     A.   WE HAVE THAT POLICY, YES.

4     Q.   AND YOU AGREE THAT THAT POLICY IS WELL KNOWN IN THE

5     INDUSTRY; CORRECT?

6     A.   I AGREE.

7     Q.   AND YOU AGREE THAT IT IS PART OF EVERY CSA?

8     A.   I COULDN'T TESTIFY ABOUT ALL THE CSA'S, BUT GENERALLY IT'S

9     PART OF THE CSA, YES.

10    Q.   AND THAT'S A CONTRACT?

11    A.   CORRECT.

12    Q.   SO IF SOMEBODY STOPPED PAYING THEIR ROYALTIES, QUALCOMM

13    HAS A CONTRACTUAL RIGHT TO CUT OFF THEIR CHIP SUPPLY; CORRECT?

14    A.   WE HAVE THE RIGHT --

15    Q.   THANK YOU.

16    A.   -- TO DO IT.

17    Q.   THANK YOU.

18    A.   BUT WE DON'T DO IT.

19    Q.   NOW, YOU TESTIFIED ABOUT THE AGREEMENT WITH APPLE,

20    CORRECT?

21    A.   YES.

22    Q.   NOW, IT'S TRUE, ISN'T IT, THAT YOU DON'T KNOW WHO -- YOU

23    DON'T RECALL WHO RAISED THE CLAWBACK CONCEPT, DO YOU?

24    A.   I'M SORRY.  IN WHICH AGREEMENT?

25    Q.   IN THE 2013 AGREEMENT.  YOU DON'T RECALL WHO RAISED THE

1    CONCEPT OF A CLAWBACK, DO YOU?

2    A.   IN THE 2013 AGREEMENT, IT WAS EITHER ME OR JEFF.  I CAN'T

3    REMEMBER WHICH ONE.

4    Q.   OKAY.  AND YOU DON'T RECALL WHETHER THAT -- APPLE

5    SUGGESTED THAT OR QUALCOMM SUGGESTED THAT; CORRECT?

6    A.   I CAN'T REMEMBER WHICH ONE.

7    Q.   OKAY.  AND THE 2013 AGREEMENT WASN'T A SOLE SOURCE FOR A

8    SINGLE PRODUCT, WAS IT?

9    A.   I'M SORRY.  ASK THE QUESTION AGAIN.

10   Q.   IT WASN'T A SOLE SOURCE AGREEMENT, WAS IT?

11   A.   IT WAS A -- IT WAS AN AGREEMENT -- I'M NOT SURE WHAT YOU

12   MEAN BY "SOLE SOURCE."  THAT'S WHY I'M --

13   Q.   WELL, UNDER THAT AGREEMENT, IF APPLE USED ANOTHER CHIP IN

14   ANY PRODUCT, IT HAD TO PAY YOU BACK A LOT OF MONEY; CORRECT?

15   A.   IT DID, YES.

16   Q.   SO IT'S NOT JUST THAT THEY COMMITTED TO USING QUALCOMM'S

17   CHIP IN A SINGLE IPHONE.  IT'S THAT IF THEY LAUNCHED ANYTHING,

18   WITH ANYBODY ELSE'S CHIPSET, THEY WOULD HAVE TO PAY YOU BACK A

19   LOT OF MONEY; CORRECT?

20   A.   THAT'S CORRECT.  THEY HAD AN ABILITY TO --

21   Q.   THANK YOU.

22   A.   -- TO ESSENTIALLY GET BACK THE -- OR WE HAD THE ABILITY TO

23   GET BACK -- NOT PAY THE INCENTIVE, ESSENTIALLY, IF THEY DID

24   THAT.

25          MS. MILICI:  OKAY.  YOUR HONOR.  I WAS MUCH FASTER

 1      THAN I THOUGHT.  I HAVE NO MORE QUESTIONS.

 2          THE COURT:  OKAY.  TIME IS 4:38.

 3          ANY REDIRECT?  JEEZ.  OR RECROSS, I SHOULD SAY.

 4                    **RECROSS-EXAMINATION**

 5      BY MR. VAN NEST:

 6      Q.   NOTWITHSTANDING THE TERMS OF THE CHIP SUPPLY AGREEMENT,

 7      HAS QUALCOMM EVER EXERCISED THE RIGHT TO CUT OFF CHIP SUPPLY TO

 8      A CUSTOMER THAT WAS IN DISPUTE ABOUT LICENSING WITH QUALCOMM?

 9      A.   NOT THAT I'M AWARE OF.

10      Q.   NOT EVEN ONCE?

11      A.   NOT THAT I'M AWARE OF.

12          MR. VAN NEST:  I HAVE NOTHING FURTHER, YOUR HONOR.

13          THE COURT:  ALL RIGHT.  IS THERE ANY REDIRECT?  THAT

14      WAS 4:38?

15          MS. MILICI:  NO, YOUR HONOR.

16          THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED?  AND

17      IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

18          MS. MILICI:  IT IS SUBJECT TO RECALL, REBUTTAL.

19          THE COURT:  OKAY.  SO SUBJECT TO RECALL.

20          SO YOU'VE COMPLETED YOUR TESTIMONY FOR TODAY, BUT YOU MAY

21      BE RECALLED.

22          ALL RIGHT.  THANK YOU.

23          WE'LL BE IN RECESS AS FAR AS THE TRIAL IS CONCERNED, BUT I

24      DO HAVE SOME HOUSEKEEPING WITH THE PARTIES.  OKAY?

25          THANK YOU.

```
1              (PAUSE IN PROCEEDINGS.)

2              THE COURT:  OKAY.  SO THE TIME LIMITS, OR TIME USAGE,

3      I SHOULD SAY, FOR TODAY WAS 3 HOURS AND 59 MINUTES FOR FTC.

4      AND I'LL GIVE YOUR TIME TO DATE.

5              SO IF YOU'VE USED 3 HOURS AND 59 MINUTES TODAY, YOU'VE

6      USED A TOTAL OF 14 HOURS AND 25 MINUTES.

7              OKAY.  SO YOU HAVE ABOUT 10 HOURS AND 35 MINUTES LEFT.

8      OKAY?

9              AND AS FAR AS QUALCOMM TODAY, YOU USED 1 HOUR AND 46

10     MINUTES.  WITH YOUR TOTAL FROM BEFORE, THAT'S 7 HOURS AND 17

11     MINUTES.

12             LET ME JUST DOUBLE-CHECK THAT.

13             THAT'S RIGHT.  SO 7 HOURS AND 16 MINUTES.  SO YOU HAVE

14     ABOUT 17 HOURS AND, WHAT IS THAT, 43 MINUTES LEFT?

15             MR. VAN NEST:  YES.

16             THE COURT:  OKAY.  SO THOSE ARE YOUR TIMES.

17             SO YOU MAY HAVE SEEN WE FILED THE ORDER AS TO QUALCOMM,

18     AVANCI, NOKIA, AND SAMSUNG SEALING MOTIONS.

19             I HAVE A VERY SHORT APPLE SEALING MOTION THAT HAS TO DO

20     WITH INFORMATION THAT WAS IN A HIGH PRIORITY OBJECTION FILED

21     THIS MORNING.  I'LL FILE THAT SHORTLY.

22             DO YOU ANTICIPATE ANY OTHER SEALING MOTIONS COMING IN OVER

23     THE WEEKEND?  OR --

24             MR. MATHESON:  YOUR HONOR, IF YOU'VE ALREADY DEALT

25     WITH THE APPLE AND AVANCI, THEN THE ONLY OTHER ONE WOULD BE THE
```

1     TEXAS INSTRUMENTS ONE I MENTIONED WHICH WE WOULD OPPOSE, AND

2     WE'RE TRYING TO HEAD OFF AT THE PASS.

3          THE COURT:  BUT IT HASN'T BEEN FILED YET, I DON'T

4     THINK.  BUT IT'S FOR MONDAY EVIDENCE.

5          MR. MATHESON:  IT WOULD BE FOR MONDAY EVIDENCE.

6          THE COURT:  OKAY.  SO WE'LL HAVE TO WAIT FOR IT THEN.

7          MR. MATHESON:  WE DO ANTICIPATE BEING ABLE TO CONDUCT

8     THE EXAMINATION OF MR. DONALDSON ENTIRELY IN OPEN COURT,

9     DESPITE THE SEALING MOTIONS.

10          THE COURT:  OKAY.

11          MR. MATHESON:  THAT'S OUR GOAL.  WE THINK WE CAN DO

12     THAT BY JUST NOT REFERRING TO SPECIFIC THINGS.

13          THE COURT:  OKAY.  ALL RIGHT.  SO THEN WE HAVE TO

14     LOOK FOR TI.

15          MR. BORNSTEIN:  AND, YOUR HONOR, ON THE UNDERSTANDING

16     THAT THE FTC MAY REST ITS CASE ON TUESDAY, WE DISCLOSED

17     PROACTIVELY SOME DESIGNATIONS OF DEPOSITION VIDEO.  WE'VE

18     ADVISED THE THIRD PARTIES OF THE FACT THAT WE MAY HAVE SOME

19     DEPOSITION VIDEO OF THIRD PARTIES TO PLAY ON TUESDAY.  SO SOME

20     OF THOSE THIRD PARTIES MAY APPROACH THE COURT WITH SEALING

21     MOTIONS.

22          THE COURT:  OKAY.  BUT I -- I COULD WAIT UNTIL MONDAY

23     TO RULE ON THOSE?

24          MR. BORNSTEIN:  ABSOLUTELY, YOUR HONOR.  I JUST

25     WANTED THE COURT TO BE AWARE.

1        THE COURT:  I JUST WANT TO MAKE SURE, WHAT DO I NEED

2    TO RULE ON BY SUNDAY?  IT SOUNDS LIKE ONLY TI ONCE I GET THE

3    APPLE ONE DONE.

4        MR. MATHESON:  CORRECT.  AND I WANT TO MAKE SURE I

5    HAVE THE RIGHT APPLE ONE.  WE DO ANTICIPATE REGARDING THE SAME,

6    MR. LASINSKI'S MATERIAL.  I THOUGHT THAT'S THE ONE YOU WERE

7    REFERRING TO.

8        THE COURT:  NO, THEY FILED A SEPARATE ONE ABOUT THE

9    HIGH PRIORITY OBJECTION.

10       MR. MATHESON:  I'M SORRY, YOUR HONOR.  I WASN'T

11   FOLLOWING THAT.

12       THE COURT:  OKAY.  SO THERE'S GOING TO BE A SECOND

13   APPLE ONE, AND A TI ONE.

14       MR. MATHESON:  YES, WE BELIEVE WE CAN RESOLVE THE

15   APPLE ONE BY SEALING THE ENTIRE SLIDE THEY REFERRED TO, THE

16   COMPARATIVE AGREEMENT SLIDE IN THE LASINSKI DEMONSTRATIVES.

17   BUT --

18       THE COURT:  WELL, BUT I HAVE THE SAME ISSUE I HAD

19   WITH QUALCOMM'S.  WHY DO YOU SEAL THE HEADER AND THE CHART

20   AND -- I MEAN, YOU CAN SEAL THE NUMBERS.  BUT I DON'T SEE WHY

21   THE ENTIRE PAGE NEEDS TO BE SEALED.

22       MR. MATHESON:  WE COULD NOT AGREE MORE, YOUR HONOR.

23       THE COURT:  SO I'M NOT INTENDING TO SEAL THE LEFT

24   COLUMN THAT SAYS WHAT IT IS, THE RIGHT COLUMN AS TO WHICH

25   PARTIES ARE INVOLVED AND THE HEADING THAT IS JUST COMPARABLE

```
1          REASONABLE ROYALTY RATES OR WHATEVER IT'S CALLED.

2               MR. MATHESON:  OKAY.  THANK YOU, YOUR HONOR.

3               THE COURT:  ALL RIGHT.  SO I'LL HAVE THREE SEALING

4     MOTIONS THAT HAVE TO BE DECIDED BY SUNDAY.

5          OKAY.  ANYTHING ELSE BEFORE WE START ON MONDAY?

6          DO YOU ANTICIPATE MONDAY NEEDING THE COURTROOM SEALED FOR

7     ANYTHING?  I DON'T KNOW WHO YOU HAVE.  WHO DO WE NEED TO SEAL

8     THE COURTROOM FOR ON MONDAY?

9               MR. MATHESON:  YOUR HONOR, WE HAVE A VERY SHORT

10    PORTION OF THE LG TESTIMONY THAT AMOUNTS TO FOUR QUESTIONS THAT

11    WOULD NEED TO BE SEALED.

12              THE COURT:  OKAY.

13              MR. MATHESON:  AND --

14              THE COURT:  SHOULD WE DO THAT FIRST SO THEN WE DON'T

15    HAVE TO OPEN AND CLOSE THE COURTROOM JUST FOR A FEW MINUTES?

16              MR. MATHESON:  THAT MAKES A LOT OF SENSE.  WE'RE

17    HAPPY TO START THAT WAY.  OUR OTHER HOPE WAS TO MAYBE RUN IT

18    INTO A BREAK AT THE END OF THE DAY.

19              THE COURT:  THAT'S FINE.

20              MR. MATHESON:  WE'LL TRY AND MAKE THAT WORK.

21              THE COURT:  IS THAT THE ONLY ONE?  I DIDN'T SEE

22    ANYTHING ELSE THAT NEEDED --

23              MR. MATHESON:  WE'RE CONCERNED ABOUT THE LASINSKI

24    EXAMINATION.  THERE'S A SIGNIFICANT AMOUNT THAT'S SEALED,

25    PARTICULARLY REGARDING THE ELEMENTS THAT GO UNDER THE UNDER THE
```

```
1          AVANCI MODEL.

2                THE COURT:  A-V-A-N-C-I.

3                MR. MATHESON:  YEAH.  BECAUSE THE ELEMENTS

4     THEMSELVES, NOT JUST THE PARTICULAR WEIGHTING OF THEM, HAS BEEN

5     SEALED.  IT MAY BE DIFFICULT FOR MR. LASINSKI TO TESTIFY

6     WITHOUT EXPLAINING THAT.

7                THE COURT:  ALL RIGHT.  DO YOU THINK THERE WILL BE A

8     SEALED PORTION AND UNSEALED PORTION OF HIS TESTIMONY?

9                MR. MATHESON:  I DO, YOUR HONOR.

10               THE COURT:  AND YOU THINK WE'LL GET TO HIM ON MONDAY?

11               MR. MATHESON:  YES, YOUR HONOR.

12               THE COURT:  ALL RIGHT.  ANYTHING -- ANYONE ELSE THEN?

13    SO IT LOOKS LIKE ONLY MR. CHO AND MR. LASINSKI.

14        WHAT ABOUT DONALDSON?

15               MS. MILICI:  AS I SAID, YOUR HONOR, WE ANTICIPATE

16    THAT CERTAINLY HIS DIRECT WILL BE UNSEALED.

17               THE COURT:  THAT'S FINE.  OKAY.  SO THOSE ARE THE

18    ONLY TWO.

19               MR. MATHESON:  YES.

20               THE COURT:  OKAY.  ALL RIGHT.  WHAT ELSE?  ANYTHING

21    ELSE?

22               MR. VAN NEST:  YOUR HONOR, MS. MILICI AND I SPOKE

23    ABOUT YOUR PROPOSAL ON THE CLOSING.

24               THE COURT:  YES.

25               MR. VAN NEST:  AND WE THINK THAT SOUNDS GOOD.
```

```
 1              THE COURT:  OKAY.

 2              MR. VAN NEST:  WHICH, WHAT I UNDERSTOOD, WHAT WE

 3    UNDERSTOOD WAS THAT WE'D FINISH EVIDENCE, I THINK, ON THE 28TH.

 4    THAT'S MONDAY.

 5              THE COURT:  I THINK SO.  THERE WAS A POSSIBILITY THAT

 6    I WAS NOT GOING TO BE AVAILABLE ON THE 28TH, BUT I THINK THAT'S

 7    NOT LIKELY NOW BECAUSE OF THE SHUTDOWN.

 8              MR. VAN NEST:  OKAY.

 9              THE COURT:  SO WE'LL FINISH ON THE 28TH.

10              MR. VAN NEST:  RIGHT.  AND THEN WE WOULD PREPARE AND

11    SUBMIT THIS LIST OF CITATIONS BY FRIDAY MORNING, AND THEN

12    FRIDAY MORNING, THE 1ST, WE'D CONDUCT CLOSING ARGUMENTS AND

13    THAT --

14              THE COURT:  ONE HOUR PER SIDE.

15              MR. VAN NEST:  ONE HOUR PER SIDE, THAT'S FINE.

16              THE COURT:  UM-HUM.

17        NOW, CAN YOU ALL REACH AGREEMENT AS TO WHAT THAT CHART

18    WILL LOOK LIKE?

19              MR. VAN NEST:  YES.

20              THE COURT:  AND I'LL WANT PAGE LIMITS.

21              MR. VAN NEST:  YES.

22              THE COURT:  SO WHAT I WOULD PREFER IS IF YOU COULD

23    COME UP WITH A JOINT PROPOSED CHART THAT YOU WILL THEN POPULATE

24    WITH YOUR EVIDENCE.

25              MR. VAN NEST:  OKAY.
```

```
 1                THE COURT:  SO WE CAN GET AGREEMENT ON THE FORMAT.

 2                MR. VAN NEST:  OKAY.

 3                THE COURT:  SO --

 4                MR. VAN NEST:  OKAY.

 5                THE COURT:  I JUST WANT PAGE AND EXHIBIT CITES, AND

 6      THEN I JUST WANT DEPOSITION DATE, PAGE, AND LINE CITES.

 7                MR. VAN NEST:  OKAY.

 8                MS. MILICI:  AND YOU WANT THE --

 9                THE COURT:  OR TRIAL TESTIMONY CITES.

10                MS. MILICI:  AND YOU WANT THOSE ORGANIZED BY TOPIC.

11                THE COURT:  WELL, WHAT DO YOU THINK?  WILL THAT GET

12      TOO REDUNDANT?

13                MR. VAN NEST:  NO.  I MEAN, I THINK IT WOULD NOT BE

14      THAT USEFUL WITHOUT -- IT'LL JUST BE A JUMBLE.  I WOULD -- I'D

15      LIKE TO TRY TO WORK OUT -- I MEAN, WE'VE GOT SEVERAL ISSUES,

16      RIGHT, ANTICOMPETITIVE EFFECT AND MARKET DEFINITION, MARKET

17      POWER, AND THERE'S SOME SENSE AND SO ON.

18                THE COURT:  UM-HUM.

19                MR. VAN NEST:  BUT MY THOUGHT WAS WE'D JUST LIST THE

20      TOPIC, AND THEN HERE'S THE FTC'S CITES, AND HERE'S THE QUALCOMM

21      CITES, AND HERE'S THE NEXT TOPIC.

22          BECAUSE, I MEAN -- WE COULD KEY IF OFF THE FINDINGS OF

23      FACT BECAUSE WE'VE BOTH GOT COMPETING, YOU KNOW, POINTS IN

24      THERE.  YOU'RE GOING TO HAVE TO DO FINDINGS OF FACT.

25                THE COURT:  YEAH.
```

```
1              MR. VAN NEST:  SO WHAT I WAS GOING TO PROPOSE TO

2    THEM, AND WE CAN WORK ON OVER, YOU KNOW, GOING FORWARD HERE, IS

3    SOME CHART BASED ON THAT THAT MAKES IT EASY FOR YOU.  OKAY, NOW

4    I'M WORKING ON THIS ISSUE, HERE'S MY CITES, AND NOW I'M WORKING

5    ON THIS ISSUE, HERE'S MY CITES.

6              THE COURT:  UM-HUM.

7              MR. VAN NEST:  THAT SEEMS TO ME TO BE -- AND THEN THE

8    CLOSING ARGUMENTS CAN FRAME THAT UP FOR YOU AS WELL.

9              THE COURT:  OKAY.  SO, MS. MILICI, DID YOU DISAGREE

10   WITH THAT?

11             MS. MILICI:  NO.  I THINK THAT WE CAN PROCEED THAT

12   WAY.  I THINK WE CAN CONFER --

13             MR. VAN NEST:  WE HAVEN'T TALKED ABOUT THE

14   FORMATTING.

15             MS. MILICI:  YEAH, THE FORMATTING.

16             THE COURT:  SO YOU HAVE AT LEAST TWO WEEKS MAYBE TO

17   FIGURE OUT THE FORMAT.

18             MR. VAN NEST:  SURE.

19             THE COURT:  BUT I'D LIKE US TO GET AGREEMENT ON THE

20   FORMAT, AND I'LL APPROVE IT, AND THAT'S WHAT YOU'LL POPULATE,

21   AND WE'LL HAVE PAGE LIMITS.

22        SO YOU'VE ALREADY BRIEFED FINDINGS OF FACT AND CONCLUSIONS

23   OF LAW IN ABOUT 221 PAGES.  SO I FEEL LIKE I AM --

24             MS. MILICI:  OURS IS SHORTER.

25             THE COURT:  I'M SORRY?
```

```
 1              MS. MILICI:  OURS IS SHORTER.

 2              THE COURT:  WELL, YOU'RE STILL 68 PAGES.  I AGREE

 3      THEY'RE 153.  BUT I CAN'T TAKE ANY MORE BRIEFING ON FINDINGS OF

 4      FACT AND CONCLUSIONS OF LAW.  IT'S TOO LONG.  ALL RIGHT?  I

 5      WANT THIS TO BE TIGHT.

 6              MS. MILICI:  UNDERSTOOD.

 7              THE COURT:  I WANT THIS TO BE TIGHT.

 8              MR. VAN NEST:  WE UNDERSTOOD THIS TO BE MORE OF AN

 9      OUTLINE WITH TOPICS AND THEN THE STUFF POPULATED.  THAT'S WHAT

10      I UNDERSTOOD.

11              THE COURT:  THIS ONE I JUST WANT CITATIONS TO

12      EVERYTHING THAT CAME UP DURING THE TRIAL.  I MEAN, I AM TRYING

13      TO KEEP TRACK OF EVERYTHING AS WELL.

14              MR. VAN NEST:  YEAH.

15              THE COURT:  BUT I MAY HAVE MISSED SOMETHING, I MAY

16      NOT HAVE UNDERSTOOD THE RELEVANCE OR IMPORTANCE OF SOMETHING.

17              SO I'D LIKE TO KNOW FROM YOUR PERSPECTIVE WHAT IS

18      IMPORTANT TO LOOK AT AND THINK ABOUT FOR THIS PARTICULAR TOPIC.

19      SO THAT WOULD BE MOST HELPFUL, JUST A PAGE AND EXHIBIT CITE,

20      AND THEN A TRIAL TESTIMONY TRANSCRIPT CITE.

21              MR. VAN NEST:  GOT IT.

22              THE COURT:  OR DEPOSITION CITE.

23              MS. MILICI:  GREAT.

24              THE COURT:  OKAY.  SO WHEN DO YOU THINK YOU MIGHT BE

25      ABLE TO COME UP WITH THAT?
```

1          MS. MILICI:  WITH A PLAN FOR THAT OR WITH A FINAL --

2          MR. VAN NEST:  NO, WHAT THE FINAL IS ON THE 1ST.  HOW

3     ABOUT IN THE NEXT WEEK OR SO?

4          THE COURT:  OKAY.  SO YOU'RE GOING TO GIVE YOUR

5     CLOSING ARGUMENTS ON THE 1ST.  WE'LL FINISH EVIDENCE ON MONDAY,

6     THE 28TH.

7          MR. VAN NEST:  RIGHT.

8          THE COURT:  LET'S START 9:00 O'CLOCK ON FRIDAY, THE

9     1ST OF FEBRUARY, WITH CLOSING.

10          MR. VAN NEST:  GOOD.

11          THE COURT:  DO YOU THINK YOU'LL NEED UNTIL THE

12     MORNING OF THAT DATE TO FILE THIS CHART?

13          MR. VAN NEST:  YES.

14          THE COURT:  OKAY.  THAT'S FINE.  BUT FILE IT BY 8:00,

15     PLEASE, SO THAT WAY WE CAN START LOOKING AT IT BEFORE YOU GIVE

16     YOUR CLOSINGS.

17        WHAT ELSE?  ANYTHING ELSE?

18          MS. MILICI:  YOUR HONOR, I JUST HAD A NOTE FROM MY

19     TEAM THAT A PORTION OF THE PETERSON VIDEO THAT'S BEING PLAYED

20     ON MONDAY WILL BE SEALED.

21          THE COURT:  RIGHT.  SO I DON'T KNOW, ARE YOU GOING TO

22     BE ABLE TO SPLIT THAT UP SO WE'LL HAVE A SEALED PORTION AND

23     UNSEALED PORTION, OR IS IT THE WHOLE THING?

24          MS. MILICI:  IT'S NOT THE WHOLE THING.  BUT --

25          THE COURT:  WELL, YOU CAN --

```
 1                MS. MILICI:  I BELIEVE WE CAN SPLIT IT UP.

 2                THE COURT:  OKAY.  YOU CAN LET ME KNOW ON, YOU KNOW,

 3      BEFORE THE WITNESS TESTIFIES HOW IT SHOULD BE SPLIT UP.

 4                MS. MILICI:  OKAY.

 5                THE COURT:  NOW, IS IT RELEVANT AT ALL WHAT OTHER

 6      COMPETITION AGENCIES OF OTHER COUNTRIES HAVE DONE AND WHEN THEY

 7      STARTED INVESTIGATING AND HOW THAT MAY HAVE IMPACTED VARIOUS

 8      PARTIES' ACTIONS AND THE MARKET?  I MEAN, THERE'S BEEN

 9      REFERENCE TO IT IN A NUMBER OF THE EXHIBITS.

10                MS. MILICI:  YOUR HONOR, I THINK IT WOULD BE RELEVANT

11      TO REMEDY, FOR ONE THING.

12                THE COURT:  YEAH.

13                MS. MILICI:  AND I THINK THAT IT'S RELEVANT TO SOME

14      ANALYSIS THAT WAS CONDUCTED BY ONE OF THEIR EXPERTS, SORT OF

15      THE RELEVANCE OF THE CROSS-EXAMINATION THERE.  BUT I ALSO THINK

16      IT'S RELEVANT TO REMEDY QUESTIONS.

17                THE COURT:  YOU MEAN WHETHER AN INJUNCTION WOULD BE

18      NECESSARY IF THERE'S A VIOLATION?  IS THAT WHAT YOU'RE

19      REFERRING TO?

20                MS. MILICI:  THAT'S CORRECT, YOUR HONOR.

21                THE COURT:  OKAY.  SO IS THERE GOING TO BE EVIDENCE

22      OF THAT AS TO THE DATES OF WHEN INVESTIGATIONS STARTED IN

23      VARIOUS COUNTRIES?

24                MS. MILICI:  SO THE 10-K THAT I INTRODUCED TODAY I

25      THINK HAS MOST OF THAT INFORMATION.
```

1          THE COURT:  I SEE.  OKAY.

2          MR. VAN NEST:  I DISAGREE ABOUT WHAT IT'S RELEVANT

3   TO, YOUR HONOR, BUT I DON'T DISAGREE THAT THERE WILL BE SOME

4   TESTIMONY ABOUT IT BECAUSE IN SOME CASES, MANY OF THE LICENSES

5   HAVE BEEN ENTERED INTO PURSUANT TO AGREEMENTS WITH THOSE

6   COUNTRIES.

7       SO I THINK YOU'LL GET A LITTLE EVIDENCE ABOUT THAT FROM

8   THE QUALCOMM'S SIDE.

9          MS. MILICI:  AND FROM THE FTC'S SIDE, YOU'LL GET

10  EVIDENCE THAT THOSE SAME AGREEMENTS WERE FOUND TO BE COERCED.

11  SO WE'LL HAVE DUELING EVIDENCE.

12         THE COURT:  OKAY.  BUT THERE WILL BE EVIDENCE AS TO

13  WHAT'S HAPPENING IN OTHER COUNTRIES WITH THEIR COMPETITION

14  AGENCIES.

15         MS. MILICI:  YEAH.

16         THE COURT:  OKAY.  ALL RIGHT.

17      WHAT ELSE?  ANYTHING ELSE FOR TODAY?

18         MR. VAN NEST:  I DON'T THINK, SO YOUR HONOR.

19         THE COURT:  ALL RIGHT.  THANK YOU ALL VERY MUCH.

20         MR. VAN NEST:  THANK YOU.

21         MS. MILICI:  THANK YOU, YOUR HONOR.

22         THE COURT:  SEE YOU MONDAY.  SEE YOU MONDAY MORNING.

23     (THE EVENING RECESS WAS TAKEN AT 4:52 P.M.)

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16          IRENE RODRIGUEZ, CSR, CRR
            CERTIFICATE NUMBER 8076

17

18

19          LEE-ANNE SHORTRIDGE, CSR, CRR
            CERTIFICATE NUMBER 9595

20

21          DATED:  JANUARY 11, 2019

22

23

24

25