```
1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5
      FEDERAL TRADE COMMISSION,      )  C-17-00220 LHK
6                                    )
                  PLAINTIFF,         )  SAN JOSE, CALIFORNIA
7                                    )
                  VS.                )  JANUARY 14, 2019
8                                    )
      QUALCOMM INCORPORATED, A       )  VOLUME 5
9     DELAWARE CORPORATION,          )
                                     )  PAGES 858-1111
10                DEFENDANT.         )  SEALED PAGES 946-949, 1004,
                                     )   1024-1042, 1081-1083
11    _____)

12               TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE LUCY H. KOH
13               UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:    FEDERAL TRADE COMMISSION
                            BY:  JENNIFER MILICI
16                               DANIEL J. MATHESON
                                 WESLEY G. CARSON
17                               KENT COX
                                 NATHANIEL M. HOPKIN
18                               PHILIP J. KEHL
                                 MIKA IKEDA
19                          600 PENNSYLVANIA AVENUE, NW
                            WASHINGTON, D.C.  20580
20

21                APPEARANCES CONTINUED ON NEXT PAGE

22    OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR, RMR
                                  CERTIFICATE NUMBER 8074
24
               PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED WITH COMPUTER
```

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                               BY:  ROBERT A. VAN NEST
5                                   JUSTINA K. SESSIONS
                                    EUGENE M. PAIGE
6                                   CHRISTINA BLAIS
                                    MATAN SHACHAM
7                                   CODY HARRIS
                                    KRISTIN HUCEK
8                              633 BATTERY STREET
                               SAN FRANCISCO, CALIFORNIA  94111
9

10                             CRAVATH, SWAINE & MOORE
                               BY:  GARY A. BORNSTEIN
11                                  MICHAEL BRENT BYARS
                                    YONATAN EVEN
12                                  JORDAN D. PETERSON
                                    MING-TOY TAYLOR
13                                  DEREK SUTTON
                                    ANDREW HUYNH
14                                  ANTONY RYAN
                               825 EIGHTH AVENUE
15                             NEW YORK, NEW YORK  10019

16

17     ALSO PRESENT:          MARK SNYDER
                              JEFF DAHM
18                            KEN KOTARSKI

19

20

21

22

23

24

25

860

INDEX OF WITNESSES

PLAINTIFF'S

**JEFF WILLIAMS**
    DIRECT EXAM BY MR. BAKER         P. 864
    CROSS-EXAM BY MR. PAIGE         P. 893
    REDIRECT EXAM BY MR. BAKER      P. 917
    RECROSS-EXAM BY MR. PAIGE      P. 917

**HWI-JAE CHO**
    DEPOSITION READING           P. 922

**RICHARD DONALDSON**
    DIRECT EXAM BY MS. GILLEN      P. 959
    CROSS-EXAM BY MR. PAIGE        P. 978
    REDIRECT EXAM BY MS. GILLEN    P. 994

**CHRISTINA PETERSSON**
    VIDEOTAPED DEPOSITION        P. 1002

**BRIAN CHONG**
    VIDEOTAPED DEPOSITION        P. 1110

**MATTHEW LASINSKI**
    DIRECT EXAM BY MR. ROSS        P. 1006
    CROSS-EXAM BY MR. BORNSTEIN  P. 1041
    REDIRECT EXAM BY MR. ROSS    P. 1093
    RECROSS-EXAM BY MR. BORNSTEIN P. 1100
    FURTHER REDIRECT EXAM BY MR. ROSS  P. 1103
    FURTHER RECROSS-EXAM BY MR. BORNSTEIN P. 1106

```
 1

 2                         INDEX OF EXHIBITS

 3                                 MARKED      ADMITTED

 4      PLAINTIFF'S

 5      0617                                   873
        0599                                   876
 6      5363                                   878
        0526                                   882
 7      861                                    913
        0531, 0853, 6803,
 8           6816, 8117,
             6774, PAGES 5 THROUGH 9, AND
 9           6809, PAGES 2 THROUGH 24          921
        0853 (REMOVED FROM ADMISSION)          953
10      101                                    973
        4103, 4104, 4155                       1002
11      7218                                   1018
        7492                                   1073
12

13      DEFENDANT'S

14      9070                                   900
        9074                                   902
15      6457                                   1067
        2053                                   1109
16

17      JOINT

18      37                                     905
        59                                     907
19      0025, 0026, 0110 AND 0111              921
        0120                                   1002
20      116                                    1025
        0042                                   1110
21

22

23

24

25
```

```
1     SAN JOSE, CALIFORNIA                    JANUARY 14, 2019

2                     P R O C E E D I N G S

3        (COURT CONVENED AT 9:03 A.M.)

4              THE COURT:  GOOD AFTERNOON AND WELCOME.

5              MR. VAN NEST:  GOOD MORNING.

6              THE COURT:  GOOD MORNING, I SHOULD SAY.

7         OKAY.  CALL YOUR NEXT WITNESS, PLEASE.

8              MR. BAKER:  GOOD MORNING, YOUR HONOR.  JOE BAKER FOR

9     THE FTC.

10        BEFORE WE CALL OUR NEXT WITNESS, I JUST WANTED TO BRING TO

11    YOUR ATTENTION TO ONE SEALING MATTER RELATED TO THIS WITNESS.

12             THE COURT:  OKAY.  WHAT'S THAT?

13             MR. BAKER:  OVER THE WEEKEND, THE PARTIES HAVE

14    CONFERRED AND QUALCOMM HAS AGREED TO WITHDRAW ITS SEALING

15    REQUEST AS TO THE $7.50 AND $10 NUMBERS THAT ARE RELATED TO THE

16    APPLE AGREEMENTS WITH QUALCOMM.

17             THE COURT:  OKAY.

18             MR. BAKER:  SO WE INTEND TO ELICIT TESTIMONY ABOUT

19    THOSE NUMBERS AND THOSE NUMBERS WILL COME IN VARIOUS DOCUMENTS

20    TODAY.

21             THE COURT:  OKAY.  THEN ALL THOSE DOCUMENTS NEED TO

22    BE REFILED WITH ALL THAT INFORMATION UNREDACTED.  OKAY.  WHEN

23    IS THAT GOING TO HAPPEN?  GIVE ME A DEADLINE, PLEASE.

24             MR. BAKER:  WE CAN DO THAT LATER TODAY.

25             THE COURT:  OKAY.
```

1              THE FTC CALLS JEFF WILLIAMS.

2                   THE COURT:  ALL RIGHT.  THE $10 AND THE $7.50, WHAT

3       DO THEY REPRESENT?

4                   MR. BAKER:  THE $7 --

5                   THE COURT:  AND I'M CHARGING THIS ALL TO YOUR TIME.

6       9:03 IS WHEN THIS CONVERSATION STARTED.  GO AHEAD.

7             WHERE IS HE?  BRING THE WITNESS IN.  WHERE IS HE?  WHY HE

8       IS NOT COMING FORWARD.

9                   MS. MILICI:  I BELIEVE HE'S COMING IN.

10                  THE COURT:  OH, OKAY.

11            WHAT ARE THOSE NUMBERS?

12                  MR. BAKER:  THE $7.50 NUMBER IS THE MARKETING

13      INCENTIVE AGREEMENT FROM 2007.

14                  THE COURT:  OKAY.

15                  MR. BAKER:  THE $10 FIGURE IS IN THE BUSINESS

16      COOPERATION AND PATENT AGREEMENT FROM 2013.

17                  THE COURT:  OKAY.  AND THEN YOU SAW MY ORDER,

18      MR. VAN NEST HAD REPRESENTED THAT THE $1 BILLION NUMBER WAS

19      PUBLIC, WHICH WAS NOT TRUE, AND ALSO THAT IT HAD NOT BEEN

20      SEALED.

21            I HAD SEALED IT AT THE REQUEST OF QUALCOMM.  QUALCOMM HAD

22      REPRESENTED THAT THAT WAS COMPETITIVE PRICING INFORMATION.  I

23      TOOK THEIR REPRESENTATION AS CORRECT, AND I SEALED IT.

24            BUT THAT SHOULD ALL BE UNSEALED NOW.

25                  MR. BAKER:  OKAY.

1          THE COURT:  SO YOU'RE WELCOME TO GO INTO IT WITH THIS

2     WITNESS IF YOU WANT.

3          MR. BAKER:  OKAY.

4          THE COURT:  GO AHEAD, PLEASE.  IT'S 9:05.  LET'S GET

5     HIM SWORN IN, PLEASE.

6          **(PLAINTIFF'S WITNESS, JEFF WILLIAMS, WAS SWORN.)**

7          THE WITNESS:  YES.

8          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

9          WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

10    NAME FOR THE RECORD.

11         THE WITNESS:  JEFF WILLIAMS.

12         THE CLERK:  SPELL YOUR LAST NAME FOR THE RECORD.

13         THE WITNESS:  W-I-L-L-I-A-M-S.

14         THE COURT:  OKAY.  9:05.  GO AHEAD, PLEASE.

15                    **DIRECT EXAMINATION**

16    BY MR. BAKER:

17    Q.   GOOD MORNING, MR. WILLIAMS.

18    A.   GOOD MORNING.

19    Q.   WHERE ARE YOU CURRENTLY EMPLOYED?

20    A.   APPLE.

21    Q.   WHEN DID YOU JOIN APPLE?

22    A.   1998.

23    Q.   WHAT IS YOUR PRESENT POSITION?

24    A.   CHIEF OPERATING OFFICER.

25    Q.   WHAT OTHER POSITIONS HAVE YOU HELD THERE SINCE 2005?

1     A.   I WAS IN CHARGE OF COMMODITY PROCUREMENT, THEN VICE

2     PRESIDENT OF WORLDWIDE PROCUREMENT, VICE PRESIDENT OF IPOD

3     OPERATIONS, THEN IPHONE OPERATIONS, THEN SENIOR VICE PRESIDENT

4     OF OPERATIONS, AND THEN COO.

5     Q.   DOES TONY BLEVINS REPORT TO YOU?

6     A.   HE DOES.

7     Q.   AND TO WHOM DO YOU REPORT?

8     A.   TIM COOK.

9     Q.   WHEN DID APPLE LAUNCH ITS FIRST IPHONE?

10    A.   2007.

11    Q.   WHAT, IF ANY, WAS YOUR INVOLVEMENT IN THE DEVELOPMENT OF

12    THE ORIGINAL IPHONE?

13    A.   I WAS PART OF THE SMALL TEAM THAT WORKED ON THE IPHONE IN

14    THE BEGINNING.

15    Q.   PRIOR TO THE LAUNCH OF THE IPHONE, DID APPLE HAVE ANY

16    EXPERIENCE IN THE CELLULAR TELEPHONE SPACE?

17    A.   NONE.

18    Q.   AT A HIGH LEVEL, HOW DID APPLE ENVISION THE IPHONE

19    COMPARED TO OTHER CELLULAR PHONES THAT WERE ON THE MARKET AT

20    THE TIME?

21    A.   WE WERE, WE WERE SELLING THE IPOD AND CUSTOMERS LOVED IT,

22    AND THEY WERE CARRYING IPODS, AND THEY WERE ALSO CARRYING A

23    PHONE, BASICALLY A FEATURE PHONE AT THAT TIME.

24         AND WE SAW AN OPPORTUNITY TO NOT ONLY MERGE THOSE, BUT

25    OFFER SOMETHING EVEN, EVEN BIGGER AND DIFFERENT.

1              AND PEOPLE DIDN'T LOVE THE USER INTERFACE OF THEIR PHONES.

2      THEY -- IT WAS PRETTY FUNCTIONAL FOR MAKING PHONE CALLS, BUT WE

3      SAW A CHANCE TO COMPLETELY CHANGE THAT, AND THAT WAS THE

4      BEGINNING OF THE IPHONE.  IT WAS A REALLY EXCITING TIME.

5      Q.   HAVE YOU BEEN INVOLVED IN NEGOTIATING CONTRACTS WITH

6      QUALCOMM OVER THE YEARS?

7      A.   I HAVE.

8      Q.   I'D LIKE TO PUT UP A DEMONSTRATIVE ON THE SCREEN THAT'S

9      CDX 501.  THIS SLIDE LISTS FIVE AGREEMENTS BETWEEN APPLE AND

10     QUALCOMM THAT HAVE BEEN PREVIOUSLY ADMITTED INTO EVIDENCE.

11     THEY ARE THE 2007 MARKETING INCENTIVE AGREEMENT, JX 40; THE

12     2009 STRATEGIC TERMS AGREEMENT, JX 52; THE 2011 TRANSITION

13     AGREEMENT, JX 57; THE 2013 FIRST AMENDMENT TO TRANSITION

14     AGREEMENT, ALSO JX 57; AND THE 2013 BUSINESS COOPERATION AND

15     PATH AGREEMENT, JX 78.

16             YOU ALSO HAVE COPYING OF THESE IN YOUR EXHIBIT BINDER IN

17     CASE YOU NEED TO REFER TO THEM.

18             ARE YOU FAMILIAR WITH EACH OF THESE AGREEMENTS?

19     A.   I AM.

20     Q.   WERE YOU INVOLVED IN THE NEGOTIATION OF EACH OF THESE

21     AGREEMENTS?

22     A.   I WAS.

23     Q.   DID YOU SIGN EACH OF THESE AGREEMENTS ON BEHALF OF APPLE?

24     A.   I DID.

25     Q.   DOES THIS CHART LOOK ACCURATE TO YOU?

1    A.   IT DOES.

2         MR. BAKER:  YOUR HONOR, IF I MAY APPROACH WITH A

3    BINDER FOR THE WITNESS?

4         THE COURT:  GO AHEAD, PLEASE.

5         MR. BAKER:  HERE YOU GO (HANDING).

6         THE WITNESS:  THANKS.

7    BY MR. BAKER:

8    Q.   HOW DID APPLE FIRST COME TO HAVE DISCUSSIONS WITH QUALCOMM

9    ABOUT I.P. LICENSING?

10   A.   WE LEARNED THERE WERE I.P. HOLDERS IN THE SPACE THAT

11   CHARGED LICENSES AND QUALCOMM WAS ONE OF THOSE, AND WE ENGAGED

12   IN DISCUSSIONS WITH THEM.

13   Q.   DID APPLE TAKE A DIRECT LICENSE TO QUALCOMM'S CELLULAR

14   STANDARD ESSENTIAL PATENTS?

15   A.   WE DID NOT.

16   Q.   WHY NOT?

17   A.   QUALCOMM SAID THAT THE PRACTICE WAS WE HAD TO

18   CROSS-LICENSE ALL OF OUR I.P. TO THEM.  SO IN ESSENCE, THEY

19   WANTED US TO PAY THEM FOR THEIR SEPS AND, IN ADDITION, WE WOULD

20   CROSS-LICENSE ALL OF OUR I.P., SO ALL OF OUR MAC, IPOD, IPHONE,

21   ALL OF THE I.P. THEY WOULD HAVE A LICENSE TO AND THAT STRUCK US

22   AS PATENTLY UNFAIR, AND WE CHOSE NOT TO PURSUE THAT ROUTE.

23   Q.   WHEN YOU SAY "CROSS-LICENSE," APPLE WOULD BE GRANTING A

24   LICENSE TO QUALCOMM TO USE ALL OF APPLE'S I.P.; IS THAT RIGHT?

25   A.   RIGHT, AND AT THE SAME TIME WE PAY THEM.

1    Q.   RATHER THAN TAKE A DIRECT LICENSE TO QUALCOMM'S STANDARD

2    ESSENTIAL PATENTS, WHAT DID APPLE DO INSTEAD?

3    A.   INSTEAD WE REACHED AN AGREEMENT WHERE WE WOULD GET A NET

4    LICENSE THAT WAS LOWER THAN THE STANDARD CONTRACT RATE.  SO THE

5    WAY IT WORKED IS QUALCOMM HAD A STANDARD AGREEMENT WITH

6    CONTRACT MANUFACTURERS AND THE CONTRACT MANUFACTURERS PAID

7    QUALCOMM, AND WE REIMBURSE THE CONTRACT MANUFACTURERS, AND THEN

8    QUALCOMM GAVE US A REBATE DOWN TO A LOWER RATE.

9    Q.   SO WAS THAT ARRANGEMENT INITIALLY IMPLEMENTED UNDER THE

10   2007 MARKETING INCENTIVE AGREEMENT?

11   A.   IT WAS.

12   Q.   YOU MENTIONED CONTRACT MANUFACTURERS.  JUST TO BE SURE

13   IT'S CLEAR, CAN YOU BRIEFLY EXPLAIN APPLE'S CONTRACT

14   MANUFACTURING MODEL?

15   A.   SURE.  WE DESIGN OUR PRODUCTS, AND WE DESIGN THE PROCESSES

16   THAT MAKE OUR PRODUCTS, BUT THE FINAL ASSEMBLY FOR ALMOST ALL

17   OF OUR PRODUCTS ARE DONE BY OTHER COMPANIES WHO EMPLOY THE

18   LABOR AND DO THE ACTUAL FINAL ASSEMBLY.  WE CALL THEM CONTRACT

19   MANUFACTURERS.

20   Q.   DID APPLE'S CONTRACT MANUFACTURERS HAVE DIRECT LICENSE

21   AGREEMENTS WITH QUALCOMM BEFORE APPLE STARTED MAKING THE

22   IPHONE?

23   A.   THEY DID.

24   Q.   WHAT DID THESE EXISTING LICENSE REQUIREMENTS THE CONTRACT

25   MANUFACTURERS TO PAY?

1    A.   5 PERCENT OF THE COST OF THE PHONE IS WHAT WE WERE TOLD --

2    WE COULDN'T SEE THE AGREEMENTS DIRECTLY, BUT QUALCOMM TOLD US,

3    AND OTHERS, QUALCOMM TOLD US THAT IT WAS 5 PERCENT OF THE COST

4    OF THE PHONE, AND THAT'S ACTUALLY WHAT WE ENDED UP REIMBURSING

5    THE CONTRACT MANUFACTURERS FOR.

6    Q.   WHAT IS THAT IN DOLLARS?

7    A.   DEPENDS ON THE PHONE AT THE POINT IN TIME, BUT IT'S IN THE

8    TEENS.  SO ANYWHERE FROM, YOU KNOW, $12 TO $20 RANGE.

9    Q.   ASIDE FROM THE SHEER DOLLAR AMOUNT, DID APPLE HAVE ANY

10   VIEWS REGARDING THE STRUCTURE OF THE CM'S EXISTING LICENSES

11   WITH QUALCOMM?

12   A.   YES.

13   Q.   WHAT WERE THOSE?

14   A.   THE WHOLE IDEA OF A PERCENTAGE OF THE COST OF THE PHONE

15   DIDN'T MAKE SENSE TO US.  IT STRUCK AT OUR VERY CORE OF SENSE

16   OF FAIRNESS.

17        IT -- WE -- YOU KNOW, AT THE TIME WE WERE MAKING SOMETHING

18   REALLY, REALLY DIFFERENT.  WE WERE BRINGING SOME INNOVATION.

19   AND, FOR EXAMPLE, WE WERE ONE OF THE FIRST AND LED THE CHARGE

20   TO EMBED A LOT OF NAND MEMORY.  WE DID THIS ON OUR IPODS, AND

21   WE WERE GOING TO DO IT ON OUR IPHONES, AND IF WE PUT ANOTHER

22   $100 OF COST IN NAND MEMORY, PER THE QUALCOMM AGREEMENT, THEY

23   WOULD GET $5 OF THAT EVEN THOUGH THEIR I.P. HAD NOTHING TO DO

24   WITH THAT.

25        OR APPLE -- AS YOU KNOW, APPLE SPENDS A LOT OF TIME MAKING

1    ITS PRODUCTS REALLY BEAUTIFUL, SO WE'LL SPEND AN EXTRA $60 ON

2    THE STAINLESS STEEL AND ALUMINUM ENCLOSURES AND THINGS LIKE

3    THAT.  AND PER THE AGREEMENT, IF WE SPENT COST ON THAT, SAY

4    THAT EXTRA $60, IT HAS NOTHING TO DO WITH OUR I.P., THE

5    QUALCOMM ARRANGEMENT WOULD HAVE HAD THEM COLLECT $3.

6         SO THAT, THAT DIDN'T MAKE SENSE TO US, AND STILL DOESN'T

7    TODAY.

8    Q.   AND SO THE AGREEMENT YOU'VE BEEN DESCRIBING IS THE

9    CONTRACT MANUFACTURERS --

10   A.   CORRECT.

11   Q.   -- EXISTING LICENSE; IS THAT RIGHT?

12   A.   CORRECT.

13   Q.   SO BACK TO THE MARKETING INCENTIVE AGREEMENT.  UNDER THE

14   REBATE ARRANGEMENT THAT YOU ULTIMATELY PUT IN PLACE WITH

15   QUALCOMM IN 2007, WHAT WAS THE NET ROYALTY PAID TO QUALCOMM

16   THROUGH THIS ARRANGEMENT?

17   A.   7.50.  SO THE CONTRACT MANUFACTURERS PAID THE 5 PERCENT,

18   AND THEN QUALCOMM REBATED US DOWN TO THE 7.50.

19   Q.   AND HOW DID THE PARTIES ARRIVE AT THE $7.50 FIGURE?

20   A.   WE ORIGINALLY PROPOSED 5 PERCENT OF THE COST OF THE

21   BASEBAND CHIP, WHICH IS $30, SO WE ORIGINALLY PROPOSED A DOLLAR

22   50.  WE FLEW DOWN TO SAN DIEGO AND PROPOSED THAT.  THAT WAS

23   REJECTED.

24        AND WE ULTIMATELY LANDED ON 7.50.  QUALCOMM SAID THAT THAT

25   WAS THE AVERAGE PRICE THAT EVERYBODY ELSE WAS PAYING PER UNIT,

1      AND THAT'S WHERE WE LANDED.

2      Q.   WHAT DID YOU THINK OF THAT IN TERMS OF ITS FAIRNESS FOR

3      APPLE -- FOR QUALCOMM'S I.P.?

4      A.   I THOUGHT IT WAS TOO HIGH.  WE HAD STARTED TO LEARN ABOUT

5      OTHER RATES AND IT WAS EXCESSIVE.  QUALCOMM CHARGES US MORE

6      THAN EVERYBODY ELSE PUT TOGETHER.

7      Q.   WHY DID APPLE AGREE TO $7.50 IN 2007?

8      A.   WE DIDN'T HAVE A LOT OF ALTERNATIVES.  IF WE DIDN'T AGREE,

9      THEN WE WOULD BE PAYING THE CONTRACT MANUFACTURER RATE, WHICH

10     WAS IN THE HIGH TEENS; OR IF WE SOMEHOW CHALLENGED IT, WE STOOD

11     THE RISK OF OUR BRAND NEW IPHONE WE WERE WORKING ON GETTING

12     ENJOINED.

13          AND SO NOT A LOT OF GREAT OPTIONS.  AND QUALCOMM HAD

14     REPRESENTED IT WAS THE AVERAGE PRICE EVERYBODY WAS PAYING, AND

15     SO WE ENDED UP SETTLING ON THAT.

16     Q.   WE'RE GOING TO PUT ON THE SCREEN DEMONSTRATIVE CDX 502,

17     WHICH IS AN EXCERPT FROM SECTION 5 OF THE 2007 MARKETING

18     INCENTIVE AGREEMENT.

19          IS THIS THE PROVISION THAT PROVIDED REBATES OF ROYALTY

20     PAYMENTS OVER $7.50?

21     A.   IT IS.

22     Q.   THIS SECTION REFERS TO MARKETING INCENTIVES.  DID YOU VIEW

23     THIS AS A FUND TO BE USED FOR MARKETING?

24     A.   NO.

25     Q.   WHO DECIDED TO CALL IT A MARKETING INCENTIVE?

1       A.   QUALCOMM.

2       Q.   HOW DID YOU VIEW THIS?

3       A.   OH, IT WAS VERY SIMPLE.  WE NEGOTIATED A RATE DOWN TO

4    7.50, AND THIS WAS AN INSTRUMENT TO GET IT DOWN TO THE 7.50.

5    THIS WAS OUR LICENSING RATE.  THIS WAS THE REBATE THAT TOOK US

6    FROM THE CONTRACT MANUFACTURING RATE TO THE 7.50 WE DISCUSSED.

7       Q.   IN NEGOTIATING THE 2007 MARKETING INCENTIVE AGREEMENT, DID

8    QUALCOMM DEMAND ANYTHING FROM APPLE IN EXCHANGE FOR THE ROYALTY

9    REBATES DOWN TO $7.50?

10      A.   THEY DID.

11      Q.   WHAT DID THEY DEMAND?

12      A.   THAT WE NOT SHIP ANY WIMAX PRODUCTS.

13           THEY ALSO ASKED US TO MAKE A STATEMENT SAYING THAT WE WERE

14   SUING GSM AND NOT WIMAX FOR THE FUTURE.

15      Q.   I'D LIKE YOU TO TURN IN YOUR BINDER TO TAB 6, PLEASE.

16   THIS IS AN EXHIBIT CX 0617.

17           THIS IS AN E-MAIL EXCHANGE BETWEEN MARV BLECKER AND YOU.

18   WHO IS MARV BLECKER?

19      A.   MARV BLECKER WORKED FOR QUALCOMM, AND HE WAS IN THE

20   LICENSING GROUP, AND HE LED THE NEGOTIATIONS ON THE MARKETING

21   INCENTIVE AGREEMENT.

22      Q.   DOES THIS E-MAIL RELATE TO THOSE NEGOTIATIONS?

23      A.   YES, IT DOES.

24           MR. BAKER:  YOUR HONOR, THE FTC MOVES TO ADMIT

25   CX 0617.

1           MR. PAIGE:  NO OBJECTION.

2           THE COURT:  IT'S ADMITTED.

3       (PLAINTIFF'S EXHIBIT CX 0617 WAS ADMITTED IN EVIDENCE.)

4           THE COURT:  GO AHEAD, PLEASE.

5    BY MR. BAKER:

6    Q.   MR. WILLIAMS, IF YOU LOOK IN PARAGRAPH 2 MUCH THIS

7    EXHIBIT, MR. BLECKER WRITES TO YOU?

8    A.   "MOTIVATING APPLE TO SELECT WCDMA TO THE EXCLUSION OF

9    WIMAX IS OUR PRIMARY MOTIVATION FOR ENTERING INTO THIS

10   AGREEMENT.  OTHERWISE, WE WOULD NOT BE DOING IT."

11          WHAT WAS WIMAX?

12   A.   WIMAX WAS A COMPETING STANDARD TO CDMA AND GSM.  I DON'T

13   KNOW ALL THE DETAILS ABOUT IT.  IT WAS EMERGING AT THE TIME.

14          I KNOW INTEL WAS SUPPORTING IT.  I KNOW STEVE WAS

15   INTERESTED IN IT.  I DON'T KNOW A TON ABOUT IT.

16   Q.   DID QUALCOMM SAY IT WANTED APPLE TO RENOUNCE WIMAX?

17   A.   NO.

18   Q.   IN THE 2007 MARKETING INCENTIVE AGREEMENT, DID APPLE AGREE

19   TO QUALCOMM'S DEMAND RELATING TO WIMAX?

20   A.   WE DID.

21   Q.   AND FOLLOWING THE EXECUTION OF THAT AGREEMENT, DID APPLE

22   PURSUE WIMAX FURTHER?

23   A.   NO.  IN ESSENCE, IT WAS KILLED IN THE CRADLE FOR US.  WE

24   DID NOT.

25   Q.   FOR THE FIRST IPHONE IN 2007, WHAT TYPE OF MODEM CHIPS DID

1     APPLE USE?

2     A.    GSM.

3     Q.    AND WHO DID YOU PROCURE THOSE FROM?

4     A.    INFINEON.

5     Q.    DID THERE COME A TIME WHEN APPLE NEEDED TO PURCHASE CDMA

6     MODEM CHIPS?

7     A.    YES.

8     Q.    WHEN WAS THAT?

9     A.    WE SHIPPED OUR FIRST CDMA PHONE IN 2011.

10    Q.    WHY DID APPLE NEED TO CHIP CDMA PHONES?

11    A.    WELL, CUSTOMERS, CUSTOMERS LOVED THE IPHONE, AND WE WANTED

12    TO GET IPHONES INTO MORE CUSTOMERS' HANDS, AND THERE WERE

13    SEVERAL MARKETS IN THE WORLD WHERE THE INFRASTRUCTURE WORKED ON

14    CDMA, LIKE ABOUT HALF OF THE U.S., VERIZON, FOR EXAMPLE, AND

15    OTHER COUNTRIES AROUND THE WORLD.

16         AND WE FOUND OUT THAT CUSTOMERS WERE ACTUALLY REALLY

17    STICKING TO THEIR CARRIER, AND SO WE WANTED TO EXPAND INTO THE

18    CDMA OPPORTUNITIES.

19    Q.    WHAT VENDORS WERE AVAILABLE TO SUPPLY CDMA MODEM CHIPS FOR

20    APPLE'S 2011 IPHONE?

21    A.    QUALCOMM.  WE ALSO LOOKED -- THERE WAS ALSO A SMALL

22    COMPANY IN TAIWAN, VIA, THAT WE LOOKED AT, BUT CONCLUDED THEY

23    WEREN'T TECHNICALLY READY OR CAPABLE.  SO JUST QUALCOMM.

24    Q.    CAN YOU TELL US ABOUT THE ORIGIN OF THE 2011 TRANSITION

25    AGREEMENT BETWEEN APPLE AND QUALCOMM?

1      A.   YEAH.  YES, I CAN.

2           TWO THINGS:  ONE, WE DISCOVERED THAT THE 7.50 ROYALTY

3      AGREEMENT THAT WE HAD REACHED WAS NOT GOING TO APPLY TO CDMA

4      PHONES OR IPADS, AND THIS REALLY UPSET US.

5           WE FLEW DOWN TO SAN DIEGO AND HAD A HEATED DISCUSSION

6      ABOUT THIS BECAUSE THE RATES WERE GOING TO BE MUCH HIGHER FOR

7      THE CDMA PHONES, WHICH MADE NO SENSE TO US.

8           IF YOU SHIP A PHONE THAT'S GOT SOMEBODY ELSE'S CHIP IN IT,

9      YOU PAY 7.50.  IF YOU SHIP A PHONE THAT HAS QUALCOMM'S CDMA

10     CHIP IN IT, WE PAY FOR THE CHIP, PLUS MORE THAN THE 7.50.  SO

11     IT DIDN'T MAKE ANY SENSE TO US.  SO WE WERE TRYING TO GET

12     RELIEF FOR THAT.

13          AND THROUGH THE PROCESS, RELIEF WAS DISCUSSED IN THE FORM

14     OF A BROADER DEAL.  SO THAT WAS ONE PIECE.

15          THE OTHER PIECE IS WE WERE GOING TO MOVE OUR BUSINESS FROM

16     INFINEON TO QUALCOMM.  WE NEEDED THEIR CDMA AND LTE TECHNOLOGY.

17     WE WERE INTERESTED IN WORKING WITH THEM.  THEY HAD GOOD

18     ENGINEERING LEADERSHIP IN THAT SPACE, AND WE ASKED FOR

19     TRANSITION FUNDS ASSOCIATED WITH MOVING BUSINESS TO THEM.

20     Q.   I'D LIKE YOU TO LOOK AT TAB 7 IN YOUR BINDER, PLEASE,

21      EXHIBIT CX 0599.

22          IN THIS EXHIBIT, YOU ARE FORWARDING AN E-MAIL CHAIN

23     BETWEEN PAUL JACOBS OF QUALCOMM AND TIM COOK OF APPLE.

24          DID YOU SEND THIS E-MAIL?

25     A.   I DID.

1        MR. BAKER:  YOUR HONOR, THE FTC MOVES TO ADMIT

2  CX 0599.

3        MR. PAIGE:  NO OBJECTION.

4        THE COURT:  IT'S ADMITTED.

5     (PLAINTIFF'S EXHIBIT CX 0599 WAS ADMITTED IN EVIDENCE.)

6        THE COURT:  GO AHEAD, PLEASE.

7        MR. BAKER:  THERE'S SEALED MATERIAL ON PAGE 2 OF THIS

8  EXHIBIT, YOUR HONOR, BUT WE'RE ONLY GOING TO BE LOOKING AT PAGE

9  1 TODAY.

10       THE COURT:  OKAY.

11 BY MR. BAKER:

12 Q.  NEAR THE BOTTOM OF PAGE 1 MR. JACOBS WRITES, "WE DID

13 DISCUSS POTENTIALLY PROVIDING APPLE WITH A REBATE ON LARGER

14 SCREEN DEVICES LIKE THE IPAD, BUT AS PART OF A LARGER BUSINESS

15 RELATIONSHIP BETWEEN THE COMPANY, INCLUDING APPLE'S USE OF

16 QUALCOMM CHIPS IN ITS IPHONES AND DEVICES LIKE THE IPAD."

17       DOES THIS RELATE TO APPLE'S DESIRE TO HAVE THE MARKETING

18 INCENTIVE AGREEMENT ROYALTY REBATES APPLY TO IPADS THAT YOU

19 WERE JUST DISCUSSING?

20 A.  YES.

21 Q.  MR. JACOBS REFERS IN HIS E-MAIL TO A LARGER BUSINESS

22 RELATIONSHIP.  WHAT SORT OF LARGER BUSINESS RELATIONSHIP WAS

23 QUALCOMM SEEKING IN RETURN?

24 A.  CHIP BUSINESS.

25 Q.  IF YOU COULD TURN TO THE NEXT TAB IN YOUR BINDER, PLEASE,

1      TO TAB EXHIBIT, EXHIBIT CX 5363.

2      A.   OKAY.

3             MR. BAKER:  YOUR HONOR, PORTIONS OF THIS EXHIBIT AS

4      WELL HAVE BEEN SEALED, AND WE DO NOT INTEND TO LOOK AT THOSE

5      PORTIONS.

6             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

7      BY MR. BAKER:

8      Q.   IS THIS A DECEMBER 2010 E-MAIL EXCHANGE BETWEEN YOU AND

9      STEVE MOLLENKOPF OF QUALCOMM?

10     A.   YES.

11     Q.   AND IN PARTICULAR ON PAGE 17 OF THIS EXHIBIT, IS THIS

12     E-MAIL PART OF THE NEGOTIATION OF 2011 TRANSITION AGREEMENT?

13     A.   I SEE VERY LITTLE HERE.  IT LOOKS LIKE A, A LOT OF IT HAS

14     BEEN REDACTED.

15          BUT I SEE VERY LITTLE LANGUAGE HERE.

16            MR. BAKER:  YOUR HONOR, IF I MAY APPROACH THE WITNESS

17     AND PROVIDE A SEPARATE COPY?

18            THE COURT:  THAT'S FINE.  GO AHEAD, PLEASE.

19            MR. BAKER:  HERE IS PAGE 17 (HANDING).

20            THE WITNESS:  GOT IT.  THANK YOU.

21     BY MR. BAKER:

22     Q.   TURNING TO PAGE 17 OF EXHIBIT CX 5363, WAS THIS E-MAIL

23     PART OF THE NEGOTIATION OF THE 2011 TRANSITION AGREEMENT?

24     A.   YES.

25            MR. BAKER:  YOUR HONOR, THE FTC MOVES TO ADMIT

1          CX 5363.

2                    MR. PAIGE:  YOUR HONOR, THIS IS SUBJECT TO AN HPO.  I

3          BELIEVE IT'S ONLY PAGES 6 THROUGH 18 OF THE EXHIBIT BEING

4          ADMITTED; IS THAT CORRECT?

5                    MR. BAKER:  THAT'S CORRECT.

6                    MR. PAIGE:  NO OBJECTION.

7                    THE COURT:  OKAY.  6 THROUGH 18 IS WHAT YOU'RE

8          SEEKING TO ADMIT?

9                    MR. BAKER:  YES, YOUR HONOR.

10                   THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

11             (PLAINTIFF'S EXHIBIT 5363 WAS ADMITTED IN EVIDENCE.)

12                   THE COURT:  GO AHEAD, PLEASE.

13         BY MR. BAKER:

14         Q.  IN THE E-MAIL FROM STEVE MOLLENKOPF TO YOU AT THE TOP OF

15         PAGE 17 OF CX 5363 HE WRITES, "WE ARE UNWILLING TO HAVE THE

16         MARKETING AGREEMENT APPLY TO CDMA IPHONES AS PART OF THIS DEAL

17         BUT WE ARE WILLING TO PROVIDE A SEPARATE, SIGNIFICANT SUM OF

18         MONEY AS PART OF THE CHIP DEAL."

19             CAN YOU EXPLAIN THIS?

20         A.  WE HAD BEEN GOING BACK AND FORTH, THERE WERE A LOT OF BID

21         ASKS THROUGH THE PROCESS OF THE TRANSITION AGREEMENT.  WE WERE

22         LOOKING FOR THE CDMA RELIEF.

23             AT ONE POINT IN TIME, WE THOUGHT THAT WAS GOING TO COME

24         THROUGH THE QTL, THE LICENSING GROUP AT QUALCOMM, AND THIS IS

25         STEVE SAYING WE'RE NOT GOING TO DO THAT, EVERYTHING IS GOING TO

1    FLOW THROUGH THE CHIP SIDE.

2    Q.   SO LONG AS APPLE WAS GOING TO BE USING QUALCOMM CHIPS, DID

3    APPLE CARE WHETHER THE REBATE CAME AS A ROYALTY REBATE FOR A

4    CHIP DISCOUNT?

5    A.   NO, WE DID NOT.

6    Q.   WHAT WERE QUALCOMM'S MAIN ASKS AS PART OF THE CHIP DEAL IN

7    THE 2011 TRANSITION AGREEMENT?

8    A.   THEY WANTED OUR BUSINESS.  THEY WANTED EXCLUSIVITY.

9    Q.   IN 2010, DID APPLE PROPOSE TO QUALCOMM THAT IT WANTED TO

10   GIVE QUALCOMM 100 PERCENT OF ITS BUSINESS IN ANY EVENT?

11   A.   NO.  WHAT WE -- WE PROPOSED THAT WE WERE GOING TO GIVE

12   THEM 100 PERCENT OF THE BUSINESS IN THE SHORT TERM.  WE SAID WE

13   WOULD SOLE SOURCE IN THE SHORT TERM.  WE DIDN'T HAVE AN ISSUE

14   WITH THAT.

15        IN THE LONG TERM -- AND WE WANTED TO MOVE OUR BUSINESS TO

16   QUALCOMM IN THE SHORT TERM.

17        IN THE LONG TERM, THAT WASN'T OUR PLAN.  WE ULTIMATELY

18   WANTED TO BRING UP A SECOND SOURCE.

19   Q.   CAN YOU ELABORATE ON THE DIFFERENCE BETWEEN THIS SHORT

20   TERM SOLE SOURCE AND LONG TERM EXCLUSIVITY?

21   A.   YEAH.  IN 2010 WHEN WE WERE DISCUSSING THIS AGREEMENT THAT

22   WE SIGNED IN 2011, WE HAD PLANNED TO DO A MULTIMODE CHIP WITH

23   CDMA.  THEY WERE THE ONLY SUPPLIERS OF CDMA.  AND THEY HAD

24   LEADERSHIP IN LTE.

25        AND SO WHEN WE MET WITH THEM WE SAID, LOOK, WE'RE GOING TO

1    MOVE OUR BUSINESS TO YOU FROM INFINEON, AND INITIALLY YOU'LL BE

2    SOLE SOURCE.  WE'LL PUT OUR ENERGY IN ONE SUPPLIER.  AND YOU'RE

3    GOING TO GET A LOT OF BUSINESS FOR THAT.

4         AND THAT WAS THE BEGINNING OF THE TRANSITION.

5         THE EXCLUSIVITY, WHEN YOU'RE TALKING ABOUT THINGS LIKE

6    PENALTIES AND CLAWBACKS FOR BRINGING UP ANOTHER SOURCE, THAT'S

7    DIFFERENT.  AND THAT WAS FROM QUALCOMM.

8    Q.   DID APPLE PROPOSE THAT QUALCOMM PAY APPLE $1 MILLION IN

9    EXCLUSION FOR EXCLUSIVITY?

10   A.   NO.  WE -- WE PROPOSED -- AGAIN, THERE WERE TWO THINGS WE

11   WERE TRYING TO SOLVE.  ONE WAS RELIEF, FINANCIAL RELIEF

12   ASSOCIATED WITH THIS CDMA PRICE HIKE; AND THE OTHER IS

13   TRANSITION FUNDS FOR MOVING BUSINESS OVER.

14        WE DID SAY, SHORT TERM, THAT THEY WOULD BE THE ONLY

15   SUPPLIER SOLE SOURCE.  BUT LONG TERM EXCLUSIVITY WITH CLAWBACKS

16   AND THAT, NO.

17   Q.   AND DID THESE LONG TERM EXCLUSIVITY PROVISIONS END UP IN

18   THE AGREEMENT?

19   A.   THEY DID.

20   Q.   I'D LIKE TO PUT UP A DEMONSTRATIVE, CDX 505, PLEASE.  THIS

21   IS PARAGRAPH 1.5 OF THE 2011 TRANSITION AGREEMENT.

22        DOES THIS PROVISION RELATE TO THE EXCLUSIVITY THAT YOU'VE

23   BEEN REFERRING TO?

24   A.   CORRECT.

25   Q.   I'D LIKE YOU TO LOOK AT THE FIRST SENTENCE, THE ONE THAT

1    CONTAINS THE WORDS "AUTOMATICALLY TERMINATE."

2         CAN YOU EXPLAIN WHAT THAT SENTENCE PROVIDES?

3    A.   THAT JUST MEANS THAT IF WE SHIP A COMPETITOR'S BASEBAND

4    MODEM IN ANY OF OUR PRODUCTS, THE AGREEMENT IS TERMINATED.

5    Q.   NOW, THE SECOND SENTENCE OF THIS PROVISION CONTAINS THE

6    WORD "REIMBURSE."

7         WHAT DOES THIS SENTENCE STATE?

8    A.   THIS, IN ESSENCE, IS A CLAWBACK.  SO IN THE FIRST

9    INSTANCE, IF WE'RE DOING BUSINESS AND WE START SHIPPING

10   SOMEBODY ELSE'S MODEM, THE AGREEMENT STOPS.

11        IN THE SECOND INSTANCE, THE CLAWBACK IS EVEN IF WE WERE

12   COMPLIANT THE WHOLE TIME, IF WE ULTIMATELY SHIP SOMEBODY ELSE'S

13   MODEM, WE OWE THEM MONEY BACK IN TIME.  THAT'S THE CLAWBACK.

14   Q.   WITH WHOM DID YOU DISCUSS THESE PROVISIONS AT QUALCOMM?

15   A.   STEVE MOLLENKOPF.

16   Q.   WHO PROPOSED THE TERMINATION AND CLAWBACK PROVISIONS OF

17   THIS AGREEMENT?

18   A.   STEVE.

19   Q.   HOW DO YOU KNOW THAT?

20   A.   IT WOULD BE CONSTRAINING TO US, AND WE WOULD NOT WANT

21   CLAWBACK PROVISIONS.  IT'S NOT SOMETHING THAT WE'VE EVER DONE

22   THAT I'M AWARE OF.

23   Q.   IF YOU COULD TURN TO TAB 9 OF YOUR BINDER, PLEASE.  IT

24   SHOULD BE AN EXHIBIT LABELED CX 0526?

25        YOUR HONOR, THIS IS A PARTIALLY SEALED DOCUMENT.  WE'VE

 1    REDACTED SOME INFORMATION ON PAGE 2.  OTHERWISE WE WILL NOT BE

 2    REFERRING TO SEALED INFORMATION.

 3         ON PAGE 2 OF CX 0526, IS THIS AN E-MAIL THAT

 4    STEVE MOLLENKOPF SENT TO YOU IN WHICH HE WRITES, "ATTACHED IS A

 5    DECK EXPLAINING THE CHANGES WE WOULD LIKE TO MAKE TO THE MOST

 6    RECENT DRAFT"?

 7    A.   YES.

 8    Q.   WAS HE REFERRING TO THE DRAFT TRANSITION AGREEMENT?

 9    A.   YES.

10    Q.   DOES THE DECK ATTACHED BY MR. MOLLENKOPF TO HIS E-MAIL

11    APPEAR AT PAGE 8 OF THIS EXHIBIT?

12    A.   YES.

13              MR. BAKER:  YOUR HONOR, THE FTC MOVES TO ADMIT

14    CX 0526.

15              MR. PAIGE:  NO OBJECTION.

16              THE COURT:  IT'S ADMITTED.

17         (PLAINTIFF'S EXHIBIT CX 0526 WAS ADMITTED IN EVIDENCE.)

18              THE COURT:  GO AHEAD, PLEASE.

19    BY MR. BAKER:

20    Q.   WHAT WAS THE PURPOSE OF THE SLIDE DECK THAT APPEARS AT

21    PAGE 8 OF THIS EXHIBIT?

22    A.   IT LOOKS LIKE, OR IT IS, THE LATEST VOLLEY IN THE

23    DISCUSSIONS BACK AND FORTH IN TRYING TO REACH AGREEMENT ON THE

24    TRANSITION AGREEMENT.

25    Q.   AND WHO PREPARED THIS DECK?

1    A.   THIS WAS FROM QUALCOMM.

2    Q.   AT PAGE 14 OF EXHIBIT 0526 TOWARDS THE END OF THE DECK,

3    THERE'S A PAGE TITLED ADDITIONAL REQUIREMENTS.

4         DO YOU SEE THAT?

5    A.   I DO.

6    Q.   WHY IS SOME LANGUAGE UNDERLINED HERE?

7    A.   IT'S A RED LINE.  IT'S -- IT'S THE BACK AND FORTH.  SO

8    THIS IS THE LATEST CHANGES TO THE PREVIOUS VERSION.

9    Q.   SO THESE ARE CHANGES THAT QUALCOMM IS PROPOSING?

10   A.   CORRECT.

11   Q.   DO YOU SEE THE SECOND AND THIRD BULLET POINTS ON THIS

12   PAGE?

13   A.   I DO.

14   Q.   ARE THOSE DRAFT VERSIONS OF THE TRANSITION AGREEMENT

15   PROVISION, PARAGRAPH 1.5, THAT WE WERE JUST LOOKING AT?

16   A.   YES.

17   Q.   WERE THESE PROVISIONS BEING PROPOSED BY QUALCOMM AS

18   ADDITIONS TO THE DOCUMENT?

19   A.   THEY WERE.

20   Q.   AND JUST LOOKING AT THE BOTTOM LEFT CORNER OF THIS PAGE.

21   IT READS PAGE 7.

22        DO YOU SEE THAT?

23   A.   I DO.

24   Q.   TURN BACK TO PAGE 2 OF THIS EXHIBIT.  AT THE BOTTOM OF THE

25   PAGE AT END OF MR. MOLLENKOPF'S E-MAIL HE WRITES, "LASTLY, WE

1    ADDED BACK IN THE LANGUAGE ON GENERAL DESIGN COMMITMENTS (SEE

2    OUR PAGE 7) THAT FELL OUT OF THIS DRAFT.  THEY WERE IN EARLIER

3    ONES AND ARE IMPORTANT TO US."

4        WHAT DID YOU UNDERSTAND MR. MOLLENKOPF TO BE REFERRING TO

5    HERE?

6    A.   THOSE WERE THE RED LINES WE JUST LOOKED AT, THE

7    TERMINATION AND CLAWBACK PROVISIONS.

8    Q.   AND MR. MOLLENKOPF WAS TELLING YOU THAT THEY WERE

9    IMPORTANT TO QUALCOMM?

10   A.   HE WAS.

11   Q.   IS THAT CONSISTENT WITH YOUR DISCUSSIONS WITH

12   MR. MOLLENKOPF AT THAT TIME?

13   A.   IT WAS.  IT IS.

14   Q.   WAS THE CLAWBACK PROVISION ULTIMATELY INCORPORATED INTO

15   THE FINAL TRANSITION AGREEMENT?

16   A.   IT WAS.

17   Q.   ONE LAST THING ON THIS EXHIBIT.  ON PAGE 3 OF THE EXHIBIT,

18   MR. MOLLENKOPF HAD WRITTEN IN AN EARLIER JANUARY 21ST, 2011

19   E-MAIL, "I STILL REMAIN CONCERNED ABOUT THE LACK OF ANY TEETH

20   IN THE DEAL IN THE OUT-YEARS BUT UNDERSTAND YOUR CLAWBACK

21   CONCERNS."

22       DO YOU SEE THAT?

23   A.   I DO.

24   Q.   HAD YOU EXPRESSED CONCERNS TO QUALCOMM ABOUT THE CLAWBACK

25   PROVISION?

1    A.   I HAD.

2    Q.   WHEN DID THE $7.50 REBATE PROGRAM UNDER THE MARKETING

3    INCENTIVE AGREEMENT EXPIRE?

4    A.   2012.

5    Q.   DID APPLE NEGOTIATE ANY NEW AGREEMENTS WITH QUALCOMM AT

6    THAT TIME?

7    A.   WE DID.

8    Q.   WHAT AGREEMENTS WERE THOSE?

9    A.   WE NEGOTIATED AN AMENDMENT TO THE TRANSITION AGREEMENT AND

10   A BCPA.

11   Q.   LOOKING AT CDX 501 AGAIN BRIEFLY.  ARE YOU REFERRING TO

12   THE 2013 AGREEMENTS ON THIS SLIDE?

13   A.   I AM.

14   Q.   WERE THE BCPA AND THE FIRST AMENDMENT TO TRANSITION

15   AGREEMENT NEGOTIATED IN PARALLEL?

16   A.   THEY WERE.

17   Q.   WERE THEY SIGNED AT THE SAME TIME?

18   A.   THEY WERE.

19   Q.   WERE THEY PART OF A PACKAGE DEAL?

20   A.   THEY WERE.

21   Q.   WHAT WAS APPLE'S OBJECTIVE IN ENTERING INTO THESE

22   AGREEMENTS?

23   A.   WE WERE -- WHAT WE WERE STARING AT IS AT THE END OF 2012,

24   OUR 7.50 ARRANGEMENT WITH QUALCOMM WAS COMING TO AN END AND THE

25   DEFAULT WAS THAT OUR ROYALTY RATE WAS GOING TO GO UP TO THE

1      HIGH TEENS BECAUSE IT WAS JUST GOING TO FLOW THROUGH THIS, THIS

2      CRAZY CONTRACT MANUFACTURING ARRANGEMENT.

3           AND SO ON TOP OF THE CHIPS WE'RE BUYING, ON TOP OF THE

4      7.50 WE'RE ALREADY PAYING, THERE WAS GOING TO BE ANOTHER $8 OR

5      $10, WE WERE SELLING A HUNDRED MILLION PHONES, IT WOULD BE

6      ANOTHER BILLION DOLLARS A YEAR IN ROYALTY FOR, FOR NO EXTRA

7      VALUE FROM QUALCOMM.

8           AND SO WE WERE SEEKING RELIEF FOR THAT.  WE WERE TRYING TO

9      FIND A WAY TO GET OUR ROYALTY DOWN TO SOMETHING REASONABLE,

10     BELOW 7.50 IDEALLY.  BUT WE ENDED UP STRIKING A DEAL TO GET IT

11     DOWN TO 7.50.

12     Q.   SO APPLE WAS ABLE TO EFFECTIVELY ACHIEVE AN EXTENSION OF

13     ITS ROYALTY REBATES UNDER THE 2013 BCPA AND AMENDED TRANSITION

14     AGREEMENT?

15     A.   THROUGH SIGNING UP FOR CHIPS AND EXCLUSIVITY, YES.

16     Q.   DID THE 2013 AMENDED TRANSITION AGREEMENT CONTAIN

17     TERMINATION AND CLAWBACK PROVISIONS SIMILAR TO THOSE THAT WE

18     LOOKED AT EARLIER IN THE TRANSITION AGREEMENT?

19     A.   IT DID, EXCEPT THEY WERE MORE ONEROUS THIS TIME.  THEY

20     WERE LARGER VOLUMES, MORE MONEY AT STAKE.

21     Q.   AND WHO PROPOSED THE EXCLUSIVITY AT THIS STAGE OF THE

22     NEGOTIATION?

23     A.   QUALCOMM.

24     Q.   DID APPLE OBJECT?

25     A.   WE DID, BUT WE -- AGAIN, WE WERE STARING AT AN INCREASE OF

```
 1        OVER A BILLION DOLLARS A YEAR ON LICENSING.  SO WE -- WE HAD A

 2        GUN TO OUR HEAD.

 3   Q.   CAN YOU DESCRIBE THE DIFFERENCE BETWEEN THE BCPA AND THE

 4        FIRST AMENDMENT TO TRANSITION AGREEMENT?

 5   A.   THE BCPA WAS FROM THE LICENSING GROUP AND THE TRANSITION

 6        AGREEMENT WAS FROM THE CHIP GROUP.  IN OTHER WORDS, WE WERE

 7        TRYING TO GET TO A NET 7.50.

 8            IN DISCUSSIONS WITH QUALCOMM, THE LICENSING GROUP WAS

 9        GOING TO CONTRIBUTE SOME, THE CHIP GROUP WAS GOING TO

10        CONTRIBUTE SOME.

11            THE BCPA TOOK THE CONTRACT MANUFACTURING RATE DOWN TO $10

12        AND THEN THE CHIP SIDE PROVIDED THE REST TO GET TO 7.50.

13   Q.   IN ADDITION TO THE EXCLUSIVITY THAT YOU MENTIONED UNDER

14        THE TRANSITION AGREEMENT, DID QUALCOMM MAKE ANY DEMANDS OF

15        APPLE UNDER THE BCPA?

16   A.   YES.  WE -- WE HAD DEMANDS THAT WE WERE -- THE BCPA WOULD

17        TERMINATE IF WE PURSUED LEGAL ACTION AGAINST QUALCOMM, IF WE

18        CHALLENGED FRAND, IF WE -- IF WE BROUGHT UP EXHAUSTION, IF WE

19        INDUCED ANYBODY ELSE, THEN THE BCPA WOULD TERMINATE.

20   Q.   AND LET'S PUT ON THE SCREEN BRIEFLY CDX 0507, WHICH IS

21        SECTION 7 OF THE BCPA.

22            IS THIS THE PROVISION OF THE BCPA THAT YOU'RE REFERRING

23        TO?

24   A.   YES.

25   Q.   SO ONE OF THE CONDITIONS OF THIS PACKAGE SEAL IN 2013 WAS
```

1     THAT APPLE AGREE NOT TO CHALLENGE OR INDUCE OTHERS TO CHALLENGE

2     QUALCOMM'S ROYALTY RATES?

3     A.   CORRECT.

4     Q.   WHAT EFFECT, IF ANY, DID APPLE'S SIGNING OF THE TRANSITION

5     AGREEMENT AND THE AMENDED TRANSITION AGREEMENT HAVE ON APPLE'S

6     ONGOING WORK WITH OTHER MODEM CHIP SUPPLIERS?

7     A.   IN THE SHORT TERM, NO EFFECT BECAUSE WE WERE MOVING OUR

8     BUSINESS TO QUALCOMM.

9          IN THE LONG TERM, IT MADE IT PROHIBITIVELY EXPENSIVE TO

10    WORK WITH SOMEONE ELSE.  FOR EXAMPLE, WHEN WE SIGNED -- OR WHEN

11    WE WERE -- WE KNEW WE WERE GOING TO CLOSE THE 2013 AGREEMENT,

12    WE CUT OFF THE WORK WE WERE DOING WITH INTEL ON AN IPAD.

13    Q.   FOLLOWING EXECUTION OF THE ORIGINAL TRANSITION AGREEMENT

14    IN 2011, WHAT VENDORS SUPPLIED APPLE WITH MODEM CHIPS FOR NEW

15    PRODUCTS BETWEEN 2011 AND THE SPRING OF 2016?

16    A.   QUALCOMM.

17    Q.   ANYONE ELSE?

18    A.   NOT UNTIL '16.

19    Q.   YOU MENTIONED EARLIER THAT YOU CONSIDERED EVEN THE $7.50

20    ROYALTY LEVEL TOO HIGH; IS THAT RIGHT?

21    A.   YES.

22    Q.   WHY DID YOU THINK THAT?

23    A.   YOU KNOW, THROUGH TIME WE ENDED UP CLOSING AGREEMENTS WITH

24    ALL THE OTHER LICENSE HOLDERS AND QUALCOMM WAS CHARGING US MORE

25    THAN EVERYONE ELSE PUT TOGETHER.  AND 7.50 MAY NOT SOUND LIKE A

1      LOT, BUT WE'RE SELLING HUNDREDS OF MILLIONS OF PHONES AND IT'S

2      BILLIONS OF DOLLARS A YEAR AND IT'S -- IT'S JUST NOT FRAND, IN

3      OUR VIEW, COMPARED TO EVERYBODY ELSE.

4      Q.   YOU TESTIFIED EARLIER ABOUT THE REASONS THAT APPLE

5      ACCEPTED THAT 7.50 AMOUNT WHEN IT WAS FIRST LAUNCHING THE

6      IPHONE IN 2007.

7           WHY DID APPLE CONTINUE TO ACCEPT IT IN 2011, 2013?

8      A.   WELL, THE ALTERNATIVE WAS IF YOU DON'T ACCEPT IT, IT JUST

9      DEFAULTS TO THE CONTRACT MANUFACTURING RATE OF $18 OR $17.

10          AND WE NEEDED THEIR CHIP SUPPLY, AND IF WE TRIED TO PURSUE

11     THEM LEGALLY, THEN WE WOULDN'T HAVE ACCESS TO THE CHIPS.

12          AND SO WE DIDN'T HAVE A LOT OF OPTIONS, SO WE LIVED WITH

13     IT.

14     Q.   DID THERE COME A TIME WHEN APPLE DECIDED TO DUAL SOURCE

15     MODEM CHIPS IN THE IPHONE?

16     A.   YES.

17     Q.   WHEN IPHONE DID APPLE DUAL SOURCE MODEM CHIPS FOR?

18     A.   IPHONE 7 AND 7 PLUS, 2016.

19     Q.   AND WHAT FIRMS DID YOU DUAL SOURCE WITH?

20     A.   QUALCOMM AND INTEL.

21     Q.   HAS INTEL REQUIRED EXCLUSIVITY TO SUPPLY MODEM CHIPS TO

22     APPLE?

23     A.   THEY HAVE NOT.

24     Q.   HAVE THEY REQUIRED VOLUME COMMITMENTS?

25     A.   THEY HAVE NOT.

WILLIAMS DIRECT BY MR. BAKER

1    Q.   AS OF MARCH 2018 -- AND I'M GOING TO ASK YOU A COUPLE

2    QUESTIONS NOW ABOUT RELATIVELY RECENT TIME PERIODS AND I'D LIKE

3    YOU TO TRY TO LIMIT YOUR ANSWERS TO THE KNOWLEDGE YOU POSSESSED

4    IN MARCH OF 2018, IF POSSIBLE.

5         AS OF MARCH 2018, WAS IT APPLE'S STRATEGY TO LIMIT ITSELF

6    TO ONE SUPPLIER OF CHIPSETS GOING FORWARD, INCLUDING FOR 5G?

7    A.   ABSOLUTELY NOT.  OUR STRATEGY HAS BEEN TO DUAL SOURCE.

8    Q.   DID APPLE FILE A LAWSUIT AGAINST QUALCOMM IN JANUARY 2017?

9    A.   WE DID.

10   Q.   AND AGAIN, LIMITING YOURSELF TO MARCH 2018, IF YOU CAN,

11   WHAT HAPPENED TO THE APPLE/QUALCOMM CHIP SUPPLY RELATIONSHIP

12   WHEN APPLE FILED ITS LAWSUIT AGAINST QUALCOMM?

13   A.   QUALCOMM HAS CONTINUED TO SHIP US PRODUCT ON THE DESIGN

14   WINS THAT THEY HAVE AND HAD AT THE TIME.  AND SO THEY HAVE

15   CONTINUED TO SELL US CHIPS.

16        WE HAVE BEEN UNABLE TO GET THEM TO SUPPORT US ON NEW

17   DESIGN WINS PAST THAT TIME, AND THIS HAS BEEN A CHALLENGE.

18        FOR EXAMPLE, IN -- FOR 2018 -- WE WERE DUAL SOURCED IN

19   2016 AND 2017, AND OUR STRATEGY WAS TO DUAL SOURCE IN 2018 AS

20   WELL, AND WE WERE WORKING TOWARDS DOING THAT WITH QUALCOMM.

21        BUT IN THE END, THEY WOULD NOT SUPPORT US AND SELL US

22   CHIPS.  WE -- I CONTACTED QUALCOMM, I CONTACTED STEVE, I SENT

23   HIM E-MAILS, I CALLED.  WE TRIED TO GET THEM TO SELL US CHIPS,

24   AND THEY WOULD NOT.

25        AND I ENDED UP -- IN 2018, I ENDED UP ACTUALLY HAVING TO

 1    GO TO BRIAN KRZANICH, THE CEO OF INTEL AND SAY, KIND OF LAST

 2    MINUTE, HEY, SORRY, BUT INSTEAD OF 50 PERCENT OF OUR VOLUME, I

 3    NEED YOU TO SUPPORT 100 PERCENT.  AND HE HAD TO SCRAMBLE.  HE

 4    TOLD ME HE HAD TO GO TO THE BOARD AND GET APPROVAL FOR AN EXTRA

 5    ALMOST BILLION DOLLARS IN CAPITAL TO SUPPORT OUR VOLUMES.

 6         SO WE WERE LEFT, INSTEAD OF HAVING TWO SUPPLIERS, WITH

 7    ONE.

 8         AND SO WE WOULD LOVE TO CONTINUE TO HAVE ACCESS TO

 9    QUALCOMM'S TECHNOLOGY.

10    Q.   HAS QUALCOMM TAKEN ANY ADVERSE ACTIONS AGAINST APPLE SINCE

11    APPLE FILED ITS LAWSUIT?

12    A.   YEAH.  THEY'RE SUING US IN COURTS ALL OVER THE WORLD.

13    THEY'RE SUING US ON NON-ESSENTIAL PATENTS, NON-SEPS, NEPS.

14         THEY'RE SUING US AND WHAT THEY'RE TRYING TO DO IS GET A

15    HIT IN ANY ONE OF THOSE COURTS TO CAUSE AN INJUNCTION THAT WILL

16    CAUSE ENOUGH PAIN THAT WE'LL HAVE TO PAY THE TENS OF BILLIONS

17    OF DOLLARS RANSOM ON THEIR SEP PROGRAM.  TO USE THEIR LANGUAGE

18    THEY USED WITH ME, WE HAVE TO BASICALLY RUN THE TABLE.  WE HAVE

19    TO WIN IN EVERY ONE OF THESE COURTS OR ELSE WE'RE -- WHAT THEY

20    SAID IS YOU'RE AN IDEAL TARGET BECAUSE YOUR VOLUMES ARE SO BIG

21    THAT YOU LOSE SO MUCH MONEY THAT UNLESS YOU RUN THE TABLE, THEN

22    THEY KIND OF WIN.

23         AND WE'VE GOT NO CHOICE BUT TO PAY THE RANSOM.

24    Q.   ONE LAST QUESTION.  YOU MENTIONED THAT QUALCOMM IS

25    CONTINUING TO SUPPLY CHIPS FOR PRIOR PRODUCTS FOR WHICH IT HAD

1    DESIGN WINS?

2    A.   THEY ARE, YES.

3    Q.   HAS APPLE EVER STOPPED PAYING QUALCOMM FOR THOSE MODEM

4    CHIPS THAT APPLE HAS PURCHASED FROM QUALCOMM?

5    A.   WELL, THE CHIPS ARE ACTUALLY BOUGHT FROM THE CONTRACT --

6    BY THE CONTRACT MANUFACTURER.  SO THE CONTRACT MANUFACTURER

7    PAYS QUALCOMM, AND WE REIMBURSE THE CONTRACT MANUFACTURER FOR

8    THE CHIPS.  SO THEY'RE GETTING PAID FOR THOSE CHIPS, BUT WE

9    DON'T PAY THAT DIRECTLY.  IT'S INDIRECT.

10   Q.   AND APPLE HASN'T CEASED PAYMENTS TO THE CONTRACT

11   MANUFACTURERS FOR THOSE CHIPS; RIGHT?

12   A.   WE HAVE NOT.

13            MR. BAKER:  NO FURTHER QUESTIONS AT THIS TIME, YOUR

14   HONOR.

15            THE COURT:  ALL RIGHT.  IT'S 9:43.

16        AND WHEN ARE YOU GOING TO REFILE THOSE DOCUMENTS WITH THE

17   $10 AND 7.50 UNREDACTED?

18            MR. BAKER:  OUR GOAL WOULD BE TO DO SO TODAY, YOUR

19   HONOR.

20            THE COURT:  OKAY.  GREAT.

21            MR. BAKER:  WE WILL NEED TO COORDINATE WITH QUALCOMM,

22   SO WE'LL DO OUR BEST TO DO THAT TODAY.

23            THE COURT:  OKAY, GREAT.  THANKS.

24        (PAUSE IN PROCEEDINGS.)

25            THE COURT:  OKAY.  ARE YOU READY?

```
 1              MR. PAIGE:  YES, YOUR HONOR.  MAY I PROCEED?

 2              THE COURT:  9:44.  GO AHEAD, PLEASE.

 3                          CROSS-EXAMINATION

 4    BY MR. PAIGE:

 5    Q.   GOOD MORNING, MR. WILLIAMS.

 6    A.   GOOD MORNING.

 7    Q.   APPLE DECIDED TO START WITH ONE GEOGRAPHY WHEN IT LAUNCHED

 8    THE IPHONE; CORRECT?

 9    A.   YES.

10    Q.   AND APPLE CHOSE TO START WITH ONE NETWORK OPERATOR FOR THE

11    IPHONE?

12    A.   CORRECT.

13    Q.   AND THE CARRIER WAS AT&T; RIGHT?

14    A.   CORRECT.

15    Q.   STEVE JOBS MADE THE DECISION TO START WITH AT&T; RIGHT?

16    A.   CORRECT, ALONG WITH THE TEAM.  BUT YES.

17    Q.   APPLE FELT THAT IT HAD THE BANDWIDTH AND ENERGY TO GO WORK

18    WITH ONLY ONE CARRIER IN THE BEGINNING; RIGHT?

19    A.   CORRECT.

20    Q.   AT&T, THEY OPERATED A GSM, WCDMA NETWORK AT THAT TIME, DID

21    THEY NOT?

22    A.   CORRECT.

23    Q.   AND CDMA DEVICES WOULDN'T WORK ON AT&T'S NETWORK; RIGHT?

24    A.   CORRECT.

25    Q.   SO APPLE HAD NO NEED FOR CDMA CHIPS IN ORDER TO LAUNCH THE
```

```
1        IPHONE; RIGHT?

2        A.   CORRECT.

3        Q.   AND APPLE CHOSE WCDMA RATHER THAN CDMA TECHNOLOGY BECAUSE

4        APPLE THOUGHT THE CELLULAR TECHNOLOGY AT&T WAS USING WAS MUCH

5        MORE USEFUL IN TERMS OF EXPANDING AROUND THE WORLD; RIGHT?

6        A.   THAT'S CERTAINLY ONE REASON.

7        Q.   AND, IN FACT, APPLE FELT AT THE TIME THAT CDMA WAS A

8        LIMITED AND DIEING TECHNOLOGY; RIGHT?

9        A.   MAYBE.  YEAH, I -- I THINK SO.

10       Q.   OKAY.

11       A.   I DON'T --

12       Q.   INDEED, YOU'VE CHARACTERIZED CDMA TECHNOLOGY AS NOT WORTH

13       INVESTING IN; RIGHT?

14       A.   I MAY HAVE SAID SOMETHING LIKE THAT.  I DON'T REMEMBER

15       THAT.

16       Q.   IF YOU COULD OPEN YOUR BINDER, PLEASE, TO YOUR FIRST TAB

17       UNDER DEPOSITION TRANSCRIPTS.

18            MR. BAKER:  COUNSEL, DO YOU HAVE A BINDER?  OKAY.

19       BY MR. PAIGE:

20       Q.   THE FIRST ONE IS YOUR INVESTIGATIONAL HEARING THAT YOU

21       GAVE TO THE FTC ON SEPTEMBER 16TH, 2016?

22       A.   OKAY.

23       Q.   IF YOU COULD TURN TO PAGE 36 OF THAT, PLEASE, SIR.

24            AND YOU GAVE THIS TESTIMONY UNDER OATH; CORRECT?

25       A.   I DID.
```

```
 1     Q.   OKAY.  AND JUST RUNNING THROUGH PAGE 36, LINE 19 --

 2               THE COURT:  HOW IS THIS IMPEACHMENT.

 3               MR. PAIGE:  I'M SORRY, YOUR HONOR.

 4               THE COURT:  THAT'S NOT IMPEACHMENT.

 5               MR. PAIGE:  I'LL MOVE ON.

 6               THE COURT:  OKAY.

 7     BY MR. PAIGE:

 8     Q.   NOW, YOU'VE BEEN RESPONSIBLE FOR IPHONE PROCUREMENT SINCE

 9     APPLE BEGAN WORKING ON THE IPHONE; CORRECT?

10     A.   I HAVE.

11     Q.   SO YOU HAVE OVERSIGHT OVER ALL OF THE PARTS THAT APPLE

12     PURCHASES FOR THE IPHONE; CORRECT?

13     A.   ULTIMATELY.

14     Q.   AND THAT INCLUDES THE MODEM CHIPS USED BY THE IPHONE;

15     RIGHT?

16     A.   YES.

17     Q.   BUT AT YOUR MARCH 15TH, 2018, DEPOSITION, YOU WEREN'T

18     AWARE OF ANY REQUESTS TO INFINEON FOR A CDMA COMPLIANT CHIP AT

19     THE TIME APPLE FIRST DECIDED TO LAUNCH ON THE VERIZON NETWORK;

20     RIGHT?

21     A.   CORRECT.

22     Q.   AND YOU WEREN'T AWARE OF ANY DISCUSSIONS WITH ERICSSON

23     ABOUT A CDMA CHIP PRIOR TO LAUNCHING ON THE VERIZON NETWORK;

24     RIGHT?

25     A.   I'M NOT -- I'M NOT FAMILIAR WITH ANY OF THOSE.
```

1    Q.   OKAY.  AND YOU WEREN'T AWARE OF ANY DISCUSSIONS WITH TEXAS

2    INSTRUMENTS REGARDING A CDMA CHIP PRIOR TO LAUNCHING ON THE

3    VERIZON NETWORK; CORRECT?

4    A.   I'M NOT AWARE OF ANY OF THOSE.

5    Q.   AND YOU WEREN'T AWARE OF ANY REQUESTS BY SAMSUNG, OR

6    REQUESTS BY APPLE THAT SAMSUNG SUPPLY IT WITH CDMA MODEMS;

7    CORRECT?

8    A.   I'M NOT AWARE OF ANY OF THAT.

9    Q.   OKAY.  IN FACT, YOU WEREN'T AWARE OF ANY SPECIFIC REQUESTS

10   BY APPLE TO ANY MODEM SUPPLIER OTHER THAN QUALCOMM TO DEVELOP A

11   CDMA MODEM FOR APPLE BETWEEN 2005 AND 2013; RIGHT?

12   A.   I KNOW THERE WAS AN INVESTIGATION OF VIA, BUT I WASN'T

13   AWARE OF THE SPECIFIC REQUEST TO DEVELOP IT.

14   Q.   YOU WEREN'T LIKEWISE AWARE OF ANY ATTEMPT BY APPLE TO

15   DEVELOP ITS OWN CDMA MODEM BETWEEN 2005 AND 2013; RIGHT?

16   A.   I WAS NOT AWARE OF ANY WORK AT APPLE TO DEVELOP A CDMA

17   MODEM.

18   Q.   OKAY.  AND YOU WEREN'T AWARE OF ANY ATTEMPT BY APPLE TO

19   BUY A CDMA MODEM SUPPLIER BETWEEN 2005 AND 2013; CORRECT?

20   A.   CORRECT.

21   Q.   APPLE WAS THE INITIAL SUPPLIER OF BASEBAND PROCESSORS

22   FOR -- I'M SORRY.

23        INFINEON WAS THE INITIAL SUPPLIER OF BASEBAND PROCESSORS

24   FOR APPLE'S IPHONE; CORRECT?

25   A.   CORRECT.

1    Q.   AND INFINEON RECEIVED POOR TECHNICAL REVIEWS BEFORE APPLE

2    STOPPED USING IT AS A BASEBAND SUPPLIER; CORRECT?

3    A.   CORRECT.

4    Q.   AND THEREAFTER, APPLE DECIDED TO STOP USING INFINEON AS A

5    BASEBAND SUPPLIER BECAUSE INFINEON WAS BEHIND ON LTE; RIGHT?

6    A.   THAT'S ONE OF THE REASONS.

7    Q.   IN FACT, THE BIGGEST CONCERN THAT APPLE HAD WITH INFINEON

8    WAS THAT THEY FELL BEHIND TECHNICALLY; RIGHT?

9    A.   CORRECT.

10   Q.   AND WHEN APPLE DECIDED TO STOP USING INFINEON CHIP, APPLE

11   BELIEVED THAT QUALCOMM HAD A SIGNIFICANT LEAD IN LTE; RIGHT?

12   A.   THAT'S CORRECT.

13   Q.   NOW, AT YOUR INVESTIGATIONAL HEARING, YOU TESTIFIED THAT

14   QUALCOMM HAS NEVER DIRECTLY EXPRESSED A THREAT OF NOT SELLING

15   APPLE CHIPS; RIGHT?

16   A.   NOT EXPLICITLY.

17   Q.   OKAY.  AND YOU'RE AWARE THAT BY 2017, APPLE HAD STOPPED

18   REIMBURSING ITS CONTRACT MANUFACTURERS TO QUALCOMM ROYALTIES IN

19   APPLE PRODUCTS; CORRECT?

20   A.   CORRECT.

21   Q.   YOU'RE ALSO AWARE THAT APPLE'S CONTRACT MANUFACTURERS

22   STOPPED PAYING QUALCOMM ROYALTIES FOR APPLE PRODUCTS AS A

23   RESULT; RIGHT?

24   A.   I'M AWARE.

25   Q.   AND DESPITE THE FACT THAT APPLE STOPPED REIMBURSING THE

1    CONTRACT MANUFACTURERS FOR QUALCOMM ROYALTIES, QUALCOMM HAS

2    CONTINUED TO SHIP CHIPS FOR APPLE PRODUCTS; HASN'T IT?

3    A.   YES, PER THE AGREEMENT WE STRUCK WITH QUALCOMM.

4    Q.   YOU BELIEVE THAT QUALCOMM'S CHIP PRICING IS ALMOST ALWAYS

5    HIGHER THAN OTHER SUPPLIERS; CORRECT?

6    A.   CORRECT.

7    Q.   IN FACT, IN YOUR VIEW, YOU PAY QUALCOMM SUBSTANTIALLY MORE

8    THAN INTEL FOR WHAT YOU BELIEVE TO BE ESSENTIALLY THE SAME

9    SOLUTION; RIGHT?

10   A.   CORRECT.

11   Q.   YOU STATED IN RESPONSE TO QUESTIONS FROM THE FTC THAT

12   APPLE COULDN'T ENTER INTO A DIRECT LICENSING AGREEMENT WITH

13   QUALCOMM IN THE 2000'S BECAUSE QUALCOMM WOULD REQUIRE APPLE TO

14   CROSS-LICENSE ALL OF ITS I.P. TO QUALCOMM.

15        DO YOU RECALL THAT TESTIMONY?

16   A.   I DO.

17   Q.   BUT NOBODY FROM QUALCOMM TOLD YOU WHETHER AND TO WHAT

18   EXTENT THEY NEEDED A CROSS-LICENSE BACK FROM APPLE; RIGHT?

19   A.   NO, THAT'S NOT CORRECT.

20   Q.   OKAY.  COULD I PLEASE PLAY THE DEPO AT 311:23 THROUGH

21   312-4.

22        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

23            THE COURT:  HOW IS THAT IMPEACHMENT?  WHY DO YOU ALL

24   KEEP DOING THIS?  THESE ARE NOT REALLY IMPEACHMENT, BUT YOU --

25   ANYWAY, GO AHEAD, PLEASE.  THIS HAS BEEN GOING ON WITH MULTIPLE

1      QUALCOMM CROSS-EXAMINATIONS THAT THESE ARE NOT IMPEACHMENT.

2      BY MR. PAIGE:

3      Q.   I ASKED --

4           THE COURT:  CAN YOU ANSWER MY QUESTION?  WHY IS THAT

5      IMPEACHMENT?

6           MR. PAIGE:  I JUST ASKED HIM WHETHER ANYONE FROM

7      QUALCOMM TOLD HIM WHETHER AND TO WHAT EXTENT THEY NEED A

8      CROSS-LICENSE BACK FROM APPLE.

9           THE COURT:  WHAT WAS HIS ANSWER?

10          MR. PAIGE:  THAT SAME QUESTION WAS ASKED AND HE SAID

11     I DID NOT ENGAGE IN ANY DISCUSSIONS WITH QUALCOMM ON THE

12     CROSS-LICENSING.

13          THE COURT:  OKAY.  SO HOW IS THAT IMPEACHMENT?

14     ANYWAY, GO AHEAD, PLEASE.

15     BY MR. PAIGE:

16     Q.   WERE YOU ASKED THAT QUESTION AND DID YOU GIVE THAT ANSWER?

17     A.   I WAS.

18     Q.   DO YOU STAND BY THAT TESTIMONY TODAY?

19     A.   I DO.  I INTERPRETED YOUR QUESTION AS WE GOT VERY CLEAR

20     INFORMATION FROM QUALCOMM ON THE REQUIREMENTS OF THE

21     CROSS-LICENSE.  THAT WAS WHETHER I HAD THE DIRECT

22     CONVERSATIONS.  SO I MIGHT HAVE MISINTERPRETED YOUR QUESTION.

23     I WAS ANSWERING MORE BROADLY.  SO NOT AN ISSUE.

24     Q.   OKAY.  YOU DIDN'T HEAR FROM QUALCOMM ITSELF; RIGHT?  YOU

25     HEARD FROM THE LEGAL DEPARTMENT AT APPLE; IS THAT RIGHT?

1    A.    BOTH THE LEGAL AND THE CHIP TEAM.

2    Q.    OKAY.

3    A.    AND I -- AND I THINK I SAW A STANDARD AGREEMENT THAT WAS

4    GIVEN TO US OR THAT WAS WRITTEN IN IT.  SO KIND OF IN ALL THREE

5    PLACES.

6    Q.    IF YOU COULD TURN TO EXHIBIT 9070 IN THE BINDER THAT I'VE

7    GIVEN YOU.  IT'S THE THIRD FROM THE LAST DOCUMENT, SIR.

8          DO YOU HAVE THAT IN FRONT OF YOU?

9    A.    I DO.

10   Q.    OKAY.  THIS IS AN E-MAIL FROM MR. MOLLENKOPF TO YOU IN

11   JANUARY OF 2013?

12   A.    YES.

13              MR. PAIGE:  YOUR HONOR, MOVE THE ADMISSION OF

14   QX 9070.

15              THE COURT:  ANY OBJECTION?

16              MR. BAKER:  NO OBJECTION.

17              THE COURT:  IT'S ADMITTED.

18         (DEFENDANT'S EXHIBIT QX 9070 WAS ADMITTED IN EVIDENCE.)

19              THE COURT:  GO AHEAD, PLEASE.

20   BY MR. PAIGE:

21   Q.    TURNING TO PAGE 4 OF THE DOCUMENT, SIR, DO YOU SEE AN

22   E-MAIL THERE FROM MR. TIM COOK TO PAUL JACOBS?

23   A.    YES.

24   Q.    DO YOU SEE WHERE MR. TIM COOK SAID, "I'VE ASKED JEFF TO

25   MAKE ONE LAST ATTEMPT TO CLOSE WITH STEVE AND HAVE ASKED THE

1      TEAM TO HOLD A PLANNED AWARD TO AN ALTERNATE SOURCE FOR A

2      COUPLE OF DAYS WHILE THIS OCCURS."

3      A.   YES, I DO.

4      Q.   AND THAT WAS JUST A FEW WEEKS BEFORE APPLE AND QUALCOMM

5      ENTERED INTO THE FIRST AMENDMENT TRANCE -- FIRST AMENDMENT TO

6      THE TRANSITION AGREEMENT AND THE BCPA; CORRECT?

7      A.   YES.

8      Q.   APPLE DOESN'T HAVE AN AWARD PLAN TO ANOTHER COMPANY AT

9      THAT TIME, DID IT?

10     A.   NO, WE DID.  WE WERE WORKING WITH -- WE WERE DEFINITELY

11     WORKING WITH INTEL, AND WE HAD THE IPAD THAT WE WERE WORKING ON

12     FOR 2014.  AND IF WE WEREN'T ABLE TO CLOSE THIS TRANSITION

13     AGREEMENT, WHICH WE KNEW REQUIRED EXCLUSIVITY, WE WERE GOING TO

14     GO DOUBLE DOWN AND DO EVEN MORE WITH THEM.

15     Q.   STEVE JOBS WAS A HANDS-ON BOSS WHEN IT CAME TO THE IPHONE;

16     CORRECT?

17     A.   YES.

18     Q.   HE WASN'T SHY ABOUT SHARING HIS OPINIONS, WAS HE?

19     A.   NO.

20     Q.   HE WOULD INVOLVE HIMSELF IN DISCUSSING VARIOUS ISSUES

21     RELATING TO THE IPHONE'S DESIGN AND MANUFACTURE; RIGHT?

22     A.   YES, FROM TIME TO TIME.

23     Q.   AND WHEN APPLE WAS WORKING ON -- WELL, LET'S TURN TO THE

24     NEXT DOCUMENT IN YOUR EXHIBIT, PLEASE, 9074.

25          THAT'S AN E-MAIL FROM STEVE JOBS TO YOU, AMONG OTHERS?

1      DATED FEBRUARY 2008; CORRECT, SIR?

2      A.   CORRECT.

3           MR. PAIGE:  MOVE THE ADMISSION OF QX 9074, YOUR

4      HONOR.

5           MR. BAKER:  NO OBJECTION.

6           THE COURT:  IT'S ADMITTED.

7      (DEFENDANT'S EXHIBIT QX 9074 WAS ADMITTED IN EVIDENCE.)

8           THE COURT:  GO AHEAD, PLEASE.

9      BY MR. PAIGE:

10     Q.   WHEN APPLE WAS WORKING ON WHAT WOULD BECOME THE 3G VERSION

11     OF THE IPHONE, MR. JOBS EXPRESSED THE DESIRE TO HAVE ONLY ONE

12     HARDWARE LINE FOR THE IPHONE; CORRECT?

13     A.   YEAH.  I READ THIS -- LET ME MAKE SURE I READ THIS.  GIVE

14     ME A SECOND.

15          (PAUSE IN PROCEEDINGS.)

16          THE WITNESS:  YEAH, THIS IS STEVE SAYING WE WANT A

17     WORLD SKU.  WE DON'T WANT A BUNCH OF DIFFERENT PRODUCTS FOR

18     DIFFERENT COUNTRIES.  WE WANT A WORLD SKU THAT COVERS

19     EVERYTHING.

20     BY MR. PAIGE:

21     Q.   RIGHT.  MR. JOBS SAID HE WANTED TO HAVE THAT ONE HARDWARE

22     LINE BE THE SAME AROUND THE WORLD; CORRECT?

23     A.   YES.

24     Q.   AND WHEN APPLE FIRST RELEASED THE IPHONE, IT SOURCED THE

25     BASEBAND PROCESSORS FROM INFINEON ONLY; CORRECT?

1    A.   CORRECT.

2    Q.   THEN YEARS LATER, AFTER INTEL BOUGHT INFINEON, APPLE

3    SWITCHED OVER TO SOURCING BASEBAND PROCESSORS FOR NEW MODELS

4    FROM QUALCOMM ONLY; CORRECT?

5    A.   CORRECT, FOR A PERIOD OF TIME.

6    Q.   ALL RIGHT.  AND NOW APPLE IS SOURCING BASEBAND PROCESSORS

7    FOR THE IPHONE MODEL IT FIRST RELEASED IN 2018 FROM INTEL ONLY;

8    CORRECT?

9    A.   RELUCTANTLY BECAUSE QUALCOMM WILL NOT SELL US THEIR NEW

10   TECHNOLOGY.

11   Q.   APPLE SETS THE PRICE FOR IPHONES BASED ON WHAT IT

12   PERCEIVES IS THE VALUE OF THE IPHONE, NOT BASED ON A MARKUP OF

13   THE COST OF ITS COMPONENTS; RIGHTS?

14   A.   IT'S ACTUALLY A COMPLICATED PROCESS THAT WE USE.  WE HAVE

15   A PRICE COMMITTEE AND WE LOOK AT VARIOUS FACTORS.  BUT

16   ULTIMATELY WE SET A PRICE BASED ON A BALANCE OF WHAT WE THINK

17   WE CAN AFFORD FROM THE COST STANDPOINT, WHAT WE THINK THE

18   CUSTOMERS CAN AFFORD TO PAY BASED ON THE TECHNOLOGY, AND MANY

19   FACTORS.

20   Q.   OKAY.  AND IN 2017, APPLE'S PRICING POLICY LED THE IPHONE

21   10, BREAKING THE BARRIER OF $1,000 FOR A PHONE; RIGHT?

22   A.   I DON'T KNOW IF WE WERE THE FIRST TO SELL A PHONE OVER

23   $1,000 OR NOT.

24   Q.   AND WHEN IT --

25   A.   IN TERMS OF BREAKING THE BARRIER, I DON'T KNOW IF WE WERE

1    THE FIRST.

2    Q.   WHEN IT RELEASED THE IPHONE 10 AT THAT PRICE POINT, APPLE

3    WAS NOT REIMBURSING CM'S FOR QUALCOMM ROYALTIES; RIGHT?

4    A.   CORRECT.

5    Q.   AND YOU MENTIONED A LITTLE BIT ABOUT INCREASED PRICE

6    LEADING TO INCREASED ROYALTIES.  BUT YOU UNDERSTAND THAT

7    QUALCOMM HAS A CAP ON ROYALTIES IN ITS LICENSE AGREEMENTS;

8    RIGHT?

9    A.   I -- I UNDERSTAND THAT THEY DO NOW.

10   Q.   OKAY.  AND YOU UNDERSTAND THAT THE TRANSFER PRICE THAT

11   APPLE IS CHARGED ROYALTIES ON IS THE TRANSFER PRICE FROM THE

12   CM'S TO APPLE, NOT FROM APPLE TO THE END CONSUMER; RIGHT?

13   A.   I DO.

14   Q.   OKAY.  I THINK I HEARD YOU SAY IN RESPONSE TO YOUR

15   TESTIMONY TO THE FTC'S QUESTIONS THAT YOU ALWAYS THOUGHT 7.50

16   WAS TOO MUCH TO PAY.

17        DID I HEAR THAT CORRECTLY?

18   A.   CORRECT.

19   Q.   OKAY.  AND MR. JOBS NEVER TOLD YOU HE THOUGHT THAT NUMBER

20   WAS UNFAIR, DID HE?

21   A.   NO, HE DID NOT.

22   Q.   COULD I TURN YOU -- ASK YOU TO TURN TO JX 37 IN YOUR

23   BINDER, PLEASE.

24        SIR, IS JX 37 AN E-MAIL FROM YOU TO STEVE JOBS, AMONG

25   OTHERS, IN NOVEMBER OF 2006?

WILLIAMS CROSS BY MR. PAIGE

1      A.   IT IS.

2              MR. PAIGE:  I MOVE THE ADMISSION OF JX 37, YOUR

3      HONOR.

4              THE COURT:  ANY OBJECTION?

5              MR. BAKER:  NO OBJECTION.

6              THE COURT:  IT'S ADMITTED.

7          (JOINT EXHIBIT JX 37 WAS ADMITTED IN EVIDENCE.)

8              THE COURT:  GO AHEAD, PLEASE.

9      BY MR. PAIGE:

10     Q.   OKAY.  NOW, MR. JOBS WROTE TO YOU ABOUT THE PROPOSED 7.50;

11     RIGHT?  AND HE SAID, "THE GOOD PART IS THAT THEY ARE WILLING TO

12     REBATE US FOR ANY PAYMENTS ABOVE 7.50 PER PHONE THAT WE MAKE TO

13     ONE OF THEIR LICENSED ODM'S."

14          RIGHT?

15     A.   CORRECT.

16     Q.   MR. JOBS SAID THAT QUALCOMM HAD MET THEIR REQUEST; RIGHT?

17     A.   CORRECT.

18     Q.   AND MR. JOBS SAID, THE NOT-SO-GOOD PART IS THAT QUALCOMM

19     WANTED THIS TO EXPIRE AT THE END OF 2010 AND BE LIMITED TO 20

20     MILLION PHONES; RIGHT?

21     A.   CORRECT.

22     Q.   THEY SAW IT AS A LIMITED INCENTIVE OF $200 MILLION;

23     CORRECT?

24     A.   CORRECT.

25     Q.   AND MR. JOBS SAID HE'LL TRY TO PUSH THE EXPIRATION DATE TO

1    THE END OF 2012 AND GET QUALCOMM TO ELIMINATE THE CAP ON THE

2    NUMBER OF PHONES; RIGHT?

3    A.   CORRECT.

4    Q.   AND HE SAID THAT YOU SHOULD TAKE IT IF THEY TOOK THAT

5    DEAL; RIGHT?

6    A.   YES.

7    Q.   AND YOUR RESPONSE WAS, THIS WAS GREAT NEWS; RIGHT, SIR?

8    A.   CORRECT.

9    Q.   AND YOU SAID THAT YOU AGREE WE SHOULD TAKE IT?

10   A.   I DID.

11   Q.   OKAY.  AND, IN FACT, THE SIGNED VERSION OF THE MARKETING

12   INCENTIVE AGREEMENT, THAT ENDED AT THE END OF 2012; RIGHT?

13   A.   YES.

14   Q.   AND THE SIGNED VERSION OF THE MARKETING INCENTIVE

15   AGREEMENT, THAT HAD NO NUMERICAL CAP FOR THE NUMBER OF IPHONES

16   ON WHICH AN INCENTIVE WOULD BE PAID; RIGHT?

17   A.   CORRECT.

18   Q.   SO APPLE GOT THE TERMS THAT MR. JOBS WANTED IN THE

19   MARKETING INCENTIVE AGREEMENT, DIDN'T THEY?

20   A.   CORRECT.

21   Q.   AND APPLE DIDN'T ENTER INTO THE MARKETING INCENTIVE

22   AGREEMENT FOR ANY REASONS HAVING TO DO WITH WANTING TO BUY

23   CHIPS FROM QUALCOMM; RIGHT?

24   A.   CORRECT.  BUT, BY THE WAY, GREAT NEWS IS NOT GREAT NEWS ON

25   THE 7.50.  GREAT NEWS IS WE'RE MOVING ON.

```
 1              THE ALTERNATIVES, AS YOU KNOW, IS WE WOULD HAVE PAID $18.

 2      Q.   I'M SORRY?

 3      A.   OR POSSIBLY BEEN ENJOINED.  SO GREAT NEWS WAS GREAT NEWS

 4      WHERE WE'VE GOT SOME CLOSER.

 5      Q.   NOW, IN MARCH OF 2011, YOU ISSUED A CHALLENGE TO QUALCOMM

 6      RELATING TO THE DEVELOPMENT OF A NEW MODEM CHIP; RIGHT?

 7      A.   2011?  CORRECT.

 8      Q.   LET ME ASK YOU TO TURN TO JX 59 IN YOUR BINDER, SIR.

 9              IS THIS AN E-MAIL FROM YOU TO MR. MOLLENKOPF AND

10      MR. RENDUCHINTALA?

11      A.   IT IS.

12      Q.   OKAY.  AND DATED MARCH 23RD, 2011?

13      A.   CORRECT.

14              MR. PAIGE:  I MOVE THE ADMIT JX 59, YOUR HONOR.

15              MR. BAKER:  NO OBJECTION.

16              THE COURT:  IT'S ADMITTED.

17          (JOINT EXHIBIT JX 59 WAS ADMITTED IN EVIDENCE.)

18              THE COURT:  GEES.

19      BY MR. PAIGE:

20      Q.   AND THIS IS THE E-MAIL YOU SENT TO MR. MOLLENKOPF AND

21      MR. RENDUCHINTALA AT QUALCOMM; RIGHT?

22      A.   IT IS.

23      Q.   AND YOU CALLED IT THE MAN ON THE MOON CHALLENGE, DID YOU

24      NOT?

25      A.   I DID.
```

1    Q.   AND ONE OF THE THINGS THAT YOU WANTED TO DO WAS TO

2    EXPEDITE DEVELOPMENT OF THE QUALCOMM 9X15 MODEM PLATFORM;

3    CORRECT?

4    A.   CORRECT.

5    Q.   THE 9X15, THAT WAS AN LTE MODEM; RIGHT?

6    A.   CORRECT.

7    Q.   AND YOU DIDN'T ISSUE SUCH A CHALLENGE TO ANY OTHER CHIP

8    COMPANY, DID YOU?

9    A.   WE DID NOT.

10   Q.   OKAY.  AND YOU ISSUED THE MAN ON THE MOON CHALLENGE

11   BECAUSE STEVE JOBS HAD THOUGHT THAT THE VELCRO PATH FOR THE NEW

12   IPHONE WAS A MISTAKE; CORRECT?

13   A.   COLLECTIVELY, THE TEAM THOUGHT IT WAS A MISTAKE.

14   Q.   OKAY.  AND THAT VELCRO PATH, THAT WAS USING TWO CHIPSETS

15   RATHER THAN A SINGLE CHIP FOR THE CELLULAR MODEM; RIGHT?

16   A.   CORRECT.

17   Q.   AND MR. JOBS WANTED TO DISCUSS GOING STRAIGHT FOR THE 9X15

18   AT THE FASTEST POSSIBLE RATE; RIGHT?

19   A.   WE AS A TEAM DID.

20   Q.   OKAY.  AND QUALCOMM MET THAT CHALLENGE SUCH THAT APPLE WAS

21   ABLE TO SHIP IN ROUGHLY THE TIMEFRAME IT WANTED; CORRECT?

22   A.   CORRECT.

23   Q.   AND THE PHONE APPLE SHIPPED CONTAINED THE QUALCOMM 9X15

24   CHIP, THAT WAS THE IPHONE 5; RIGHT?

25   A.   I BELIEVE IT WAS THE IPHONE 5.

1    Q.   AND THE IPHONE 5 WAS THE FIRST IPHONE THAT APPLE PRODUCED

2    THAT HAD AN LTE CAPABILITY; RIGHT?

3    A.   I THINK THAT'S CORRECT.

4    Q.   OKAY.  NOW, APPLE DOES LAUNCH EVENTS FOR ITS NEW IPHONES,

5    DOESN'T IT?

6    A.   WE DO.

7    Q.   AND YOU SAW THE LAUNCH EVENT FOR THE IPHONE 5; RIGHT?

8    A.   I DID.

9    Q.   AND THE SINGLE CHIP LTE MODEM THAT QUALCOMM HAD PROVIDED

10   TO APPLE AS PART OF THE MAN ON THE MOON PROJECT, THAT WAS

11   FEATURED AS PART OF THE LAUNCH EVENT, WASN'T IT?

12   A.   I DON'T REMEMBER.

13   Q.   IN FACT, APPLE SAID THAT THE CONVENTIONAL APPROACH OF

14   DESIGNING LTE INTO A WORLD PHONE USES TWO CHIPS, WITH THE NEW

15   IPHONE, BOTH VOICE AND DATA TECHNOLOGY ARE COMBINED INTO A

16   SINGLE CHIP.  THIS IS ONE OF THE REAL BREAKTHROUGHS THAT

17   ENABLES IPHONE 5'S THIN DESIGN.

18        ISN'T THAT RIGHT?

19   A.   I DON'T REMEMBER THAT, BUT WE COULD HAVE SAID THAT.

20             MR. PAIGE:  MAY I REFRESH HIS RECOLLECTION, YOUR

21   HONOR.

22             THE COURT:  GO AHEAD, PLEASE.

23             MR. PAIGE:  PLAY 9200 FROM 53:37 THROUGH 54:14,

24   PLEASE.

25        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

```
 1              THE COURT:  WAIT, I'M SORRY.  STOP THIS A SECOND.  I

 2     HAVEN'T HAD REALTIME ALL MORNING.

 3          WHAT WAS THE QUESTION?  THIS IS NOT NORMAL REFRESHING

 4     RECOLLECTION IS THERE'S USUALLY A DOCUMENT, YOU HAVE THEM

 5     REVIEW IT QUITELY, THEY SAY MY MEMORY HAS BEEN REFRESH AND THEN

 6     THEY ANSWER.

 7              MR. PAIGE:  THAT WAS A STATEMENT I JUST QUOTED IN THE

 8     QUESTION COMING UP IN A MOMENT.

 9              THE COURT:  WHAT WAS THE QUESTION AGAIN, PLEASE?  I'M

10     SORRY, I DON'T HAVE REALTIME.

11              MR. PAIGE:  APPLE SAID THAT THE CONVENTIONAL APPROACH

12     OF DESIGNING LTE INTO A WORLD PHONE USES TWO CHIPS.  WITH THE

13     NEW IPHONE, BOTH VOICE AND DATA TECHNOLOGY ARE COMBINED ONTO A

14     SINGLE CHIP.  THIS IS ONE OF THE REAL BREAKTHROUGHS THAT

15     ENABLES IPHONE 5'S THIN DESIGN.

16              THE COURT:  OH.  YOU'RE ASKING IF ANYONE IN THE

17     COMPANY EVER MADE THAT REPRESENTATION.

18              MR. PAIGE:  I'M ASKING WHETHER HE RECALLS THAT BEING

19     MADE AT THE LAUNCH EVENT FOR THE IPHONE 5, YES, AND HE SAID HE

20     DIDN'T REMEMBER.  SO I'M GOING TO REFRESH HIS RECOLLECTION WITH

21     THE VIDEO OF THE LAUNCH EVENT.

22              THE COURT:  OKAY.  I'VE NOT SEEN THIS EVER DONE

23     BEFORE, BUT GO AHEAD.

24              THE WITNESS:  I --

25              THE COURT:  I'M SORRY.  DO YOU WANT TO STOP IT.  DID
```

1        YOU WANT TO SAY SOMETHING?

2               THE WITNESS:  I WAS GOING TO SAY I'LL STIPULATE IF

3        THAT'LL MOVE FORWARD THAT THAT WAS SAID.  I JUST DIDN'T

4        REMEMBER THOSE EXACT WORDS.

5               MR. PAIGE:  SURE.  LET'S JUST FINISH IT.

6               MR. BAKER:  OBJECTION, YOUR HONOR.

7               THE COURT:  OBJECTION.  TAKE IT DOWN.  I'VE NEVER

8        SEEN REFRESHING RECOLLECTION DONE WITH A VIDEO LIKE THIS

9        BEFORE.

10           ANYWAY, GO AHEAD, PLEASE.

11              MR. PAIGE:  OKAY.

12              THE COURT:  DO YOU HAVE A CASE WHERE IT'S DONE THIS

13       WAY?  I'VE NEVER SEEN IT DONE THIS WAY.

14              MR. PAIGE:  I -- I DIDN'T HAVE A TRANSCRIPT, YOUR

15       HONOR.

16              THE COURT:  WHERE IS IT EVER DONE THIS WAY?  IS THERE

17       A CASE YOU CAN CITE TO ME?

18              MR. PAIGE:  I'M NOT SURE I CAN.

19              MR. VAN NEST:  WE DID IT IN THIS DISTRICT IN ORACLE

20       VERSUS GOOGLE.  WE REFRESHED MR. ELLISON'S RECOLLECTION ABOUT

21       STATEMENTS HE'D MADE IN A PUBLIC EVENT AND PLAYED THE -- A VERY

22       SHORT CLIP FROM HIS APPEARANCE.  IT'S NOT -- I DOUBT IF THAT'S

23       REPORTED.

24              THE COURT:  IT'S NOT EXACTLY THE SAME.

25           ANYWAY, GO HEAD.  WHAT WERE YOU GOING TO SAY?

1           MR. BAKER:  I WAS GOING TO POINT OUT THAT THESE ARE

2     NOT MR. WILLIAMS'S STATEMENTS.

3           THE COURT:  I KNOW.  THIS IS VERY UNUSUAL.  WE CAN

4     PLAY EVERY SINGLE APPLE COMMERCIAL IF WE WANT TO, TO SEE IF HE

5     RECALLS THOSE REPRESENTATIONS BEING MADE BY THE COMPANY.  BUT

6     IT SEEMS LIKE AN ODD REFRESHING RECOLLECTION.

7        BUT GO AHEAD, PLEASE.

8     BY MR. PAIGE:

9     Q.   YOU SUGGESTED IN YOUR ANSWERS TO THE FTC'S COUNSEL THAT

10    THE TRANSITION AGREEMENT AND THE FIRST AMENDED TRANSITION

11    AGREEMENT WERE EXCLUSIVITY ARRANGEMENTS; RIGHT?

12    A.   EXCLUSIVITY WAS A PIECE OF THOSE.

13    Q.   BUT YOU AGREE THAT UNDER THE TRANSITION AGREEMENT APPLE

14    DID NOT HAVE AN OBLIGATION TO BUY QUALCOMM CHIPS; RIGHT?

15    A.   CORRECT.  AND, AND --

16    Q.   AND YOU AGREE THAT THE FIRST AMENDMENT TO THE TRANSITION

17    AGREEMENT DID NOT REQUIRE APPLE TO PURCHASE ANY QUALCOMM CHIPS;

18    RIGHT?

19    A.   CORRECT.

20    Q.   INSTEAD, YOUR POSITION IS THAT THE AGREEMENTS WOULD

21    REQUIRE APPLE TO PAY A LOT OF MONEY BACK TO QUALCOMM IF APPLE

22    CHOSE TO USE ANOTHER MODEM SUPPLIER; RIGHT?

23    A.   CORRECT.

24    Q.   BUT THAT WAS MONEY THAT QUALCOMM WAS PAYING TO APPLE UNDER

25    THE AGREEMENTS; RIGHT?

1    A.   CORRECT.

2    Q.   WITHOUT THE AGREEMENTS IN PLACE, APPLE WOULD NOT HAVE

3    RECEIVED THAT MONEY FROM QUALCOMM IN THE FIRST PLACE; RIGHT?

4    A.   CORRECT.

5    Q.   NOW, DURING THE NEGOTIATIONS OVER THE TRANSITION

6    AGREEMENT, APPLE PROPOSED TO HAVE A PORTION OF THE MONEY

7    DELIVERED UPFRONT AND A LARGER PORTION PAID IN FOUR EQUAL

8    ANNUAL PAYMENTS FROM 2011 THROUGH 2014; RIGHT?

9    A.   THERE WERE MANY PROPOSALS BACK AND FORTH.

10        I'M CERTAIN THAT'S ONE VERSION OF THEM.

11   Q.   COULD YOU TAKE A LOOK AT CX 861.  IT'S IN YOUR BINDER FROM

12   ME.  THIS APPEARS TO BE AN UNSENT E-MAIL FROM YOU; CORRECT?

13   A.   GIVE ME A MINUTE.

14        (PAUSE IN PROCEEDINGS.)

15            THE WITNESS:  YES, IT DOESN'T LOOK LIKE IT WAS SENT

16   TO ANYONE.

17            MR. PAIGE:  MOVE THE ADMISSION OF CX 861, YOUR HONOR.

18            MR. BAKER:  NO OBJECTION.

19            THE COURT:  IT'S ADMITTED.

20        (PLAINTIFF'S EXHIBIT CX 861 WAS ADMITTED IN EVIDENCE.)

21            THE COURT:  GO AHEAD, PLEASE.

22   BY MR. PAIGE:

23   Q.   DO YOU SEE THERE WHERE IT SAYS, "OUR PROPOSAL TO PAUL WAS

24   TO HAVE THE 250 MILLION DELIVERED IN 2011 AND 2012, AND A

25   TRANSITION FUND CONSISTING OF FOUR EQUAL ANNUAL PAYMENTS?"

1    A.   I DO.

2    Q.   NOW, QUALCOMM ARGUED IT WAS APPROPRIATE TO SPREAD THE FULL

3    AMOUNT OF THE MONEY ACROSS THE ENTIRE FIVE YEAR PERIOD WITH THE

4    INCENTIVES GROWING AS APPLE'S VOLUMES GREW; CORRECT?

5    A.   CORRECT.

6    Q.   THAT WAS BECAUSE STEVE MOLLENKOPF WAS CONCERNED THAT THE

7    IMPACT TO HIS QCT FINANCIALS FOR THE INCENTIVE PAYMENT WOULD BE

8    VERY MATERIAL IN 2011 AND 2012 WHEN OUR CHIP BUSINESS TOGETHER

9    IS JUST GETTING STARTED; RIGHT?

10   A.   RIGHT.

11   Q.   AND IN RESPONSE, APPLE PROPOSED A VOLUME BASED PLAN THAT

12   ALLOWS US TO EARN TRANSITION FUNDS IN 2011 AND 2012 IF APPLE'S

13   VOLUMES ARE STRONG AND SPREAD THINGS LATER IF NOT; RIGHT?

14   A.   CORRECT.

15   Q.   AND THAT ALLOWED QUALCOMM TO AVOID THE RISK OF A LARGE

16   LUMP SUM PAYMENT AGAINST SMALL INCREMENTAL REVENUE FROM APPLE;

17   RIGHT?

18   A.   CORRECT.

19   Q.   MR. MOLLENKOPF TOLD YOU, IN FACT, THAT THE $1 BILLION

20   VALUE OF THE DEAL WAS FAR BEYOND THE COMFORT ZONE WE ASSUMED

21   GOING INTO THE ORIGINAL DISCUSSIONS; RIGHT?

22   A.   CORRECT.

23   Q.   AND THAT'S IN CX 5363 THAT YOU LOOKED AT BEFORE WITH THE

24   FTC'S COUNSEL, CORRECT, PAGE 18 OF THAT DOCUMENT?

25   A.   PAGE 18.

1    Q.   THIS IS IN EVIDENCE, YOUR HONOR.

2    A.   CORRECT.

3    Q.   OKAY.  YOU SEE EARLIER ON PAGE 17, MR. MOLLENKOPF

4    EXPRESSED CONCERNS THAT THE EARLIER STRUCTURE THAT APPLE HAD

5    PROPOSED HAD ALMOST THE ENTIRE INCENTIVE PAID BEFORE THE END OF

6    2012; RIGHT?

7    A.   CORRECT.

8    Q.   AND DO YOU SEE THE TOP OF THAT E-MAIL WHERE MR. MOLLENKOPF

9    SAID THE $1 BILLION IS A HUGE NUMBER FROM QUALCOMM'S

10   PERSPECTIVE?

11   A.   YES, I DO SEE THAT.

12   Q.   OKAY.

13   A.   BUT THAT BILLION DOLLARS IS ASSOCIATED WITH WINNING MANY,

14   MANY, MANY BILLIONS OF DOLLARS OF BUSINESS.

15   Q.   IN OTHER WORDS, THE TRANSITION AGREEMENT ALLOWED QUALCOMM

16   TO PROTECT ITSELF FROM HAVING TO MAKE LARGE INCENTIVE PAYMENTS

17   TO APPLE IF APPLE DIDN'T BUY A LOT OF CHIPS; RIGHT?

18   A.   THAT'S CORRECT.  WHAT WE ACTUALLY PUT IN PLACE, THE VAST

19   MAJORITY OF THE FUNDS IN THE TRANSITION AGREEMENT WERE A PRICE

20   VOLUME REBATE, MEANING IF WE DID A LOT OF BUSINESS WITH

21   QUALCOMM, THEY GAVE US FUNDS.  IF WE DIDN'T DO A LOT OF

22   BUSINESS WITH QUALCOMM, THEY DIDN'T.  NO RISK TO QUALCOMM.

23   UPSIDE TO QUALCOMM.

24        THAT'S A STANDARD PRACTICE WE DO WITH LOTS OF SUPPLIERS.

25   IT ADDED UP TO A LOT OF MONEY, BUT IT WAS FOR BILLIONS AND

1     BILLIONS OF DOLLARS OF BUSINESS.  THAT'S STANDARD.

2     Q.   NOW, YOU SAID THAT APPLE NEEDED TO GET THE MONEY UNDER THE

3     TRANSITION AGREEMENT BECAUSE APPLE VIEWED QUALCOMM'S ROYALTY

4     RATES AS TOO HIGH; RIGHT?

5     A.   I SAID THERE WERE TWO PIECES, IF YOU REMEMBER.  A PIECE OF

6     IT WAS WE WERE TRYING TO GET RELIEF FOR THIS CDMA TAX, THIS

7     ROUGHLY $250 MILLION OR SO THAT WE WERE GOING TO GET CHARGED IN

8     ADDITION TO THE 7.50 ROYALTY IN ADDITION TO PAYING FOR THE

9     CHIPS.  SO THAT'S A PIECE.

10         AND THE OTHER IS QUALCOMM HAD HIGH PRICES, WE WERE MOVING

11    A BUNCH OF BUSINESS, AND WE WANTED TRANSITION FUNDS.

12    Q.   AND QUALCOMM CHARGED THAT 7.50 ROYALTY FROM THE BEGINNING

13    OF THE TIME YOU STARTED SELLING PHONES; RIGHT?

14    A.   THEY DID.

15    Q.   FOR YEARS BEFORE YOU BOUGHT CHIPS FROM QUALCOMM; RIGHT?

16    A.   CORRECT.

17    Q.   YOU NEVER CHOSE TO CHALLENGE THAT IN COURT, DID YOU, SIR,

18    BEFORE 2017?

19    A.   WE, WE CERTAINLY DID NOT.  WE CERTAINLY DID NOT,

20    BECAUSE --

21              MR. PAIGE:  NOTHING FURTHER AT THIS TIME, YOUR HONOR.

22              THE WITNESS:  -- BECAUSE WE --

23              THE COURT:  ALL RIGHT.  TIME IS 10:14.  ARE YOU

24    READY?

25              MR. BAKER:  YES.

```
 1              THE COURT:  OKAY.  10:14.  GO AHEAD, PLEASE.

 2                         REDIRECT EXAMINATION

 3    BY MR. BAKER:

 4    Q.   MR. WILLIAMS, WOULD YOU LIKE TO FINISH THE ANSWER YOU WERE

 5    JUST TRYING TO GIVE.  WHY DID YOU NOT CHALLENGE QUALCOMM'S

 6    ROYALTIES PRIOR TO 2017?

 7    A.   WELL, IF WE CHALLENGED THE ROYALTY -- WE NEEDED THEIR CDMA

 8    CHIPS.  THEY WERE THE ONLY SUPPLIER OF CHIPS, THEY HAD THE LEAD

 9    IN LTE MODEMS, WE NEEDED THEIR CHIPS.  AND IF WE CHALLENGED

10    THEM, THEN WE WERE -- THE AGREEMENT WOULD TERMINATE, AND WE

11    WOULD NOT HAVE SUPPLY, THEY WOULD SHUT OFF SUPPLY OF OUR

12    IPHONES, WHICH IS -- CARRIES MOST OF THE COMPANIES REVENUE AND

13    PROFIT.

14         WE WEREN'T IN A GOOD POSITION TO CHALLENGE THEM.

15              MR. BAKER:  NO FURTHER QUESTIONS, YOUR HONOR.

16              THE COURT:  OKAY.  ANY FURTHER RECROSS?  10:15?

17                        RECROSS-EXAMINATION

18    BY MR. PAIGE:

19    Q.   YOU WEREN'T BUYING CDMA CHIPS UNTIL 2011; RIGHT, SIR?

20    A.   CORRECT.

21    Q.   YOU HAD FOUR YEARS TO CHALLENGE THOSE AGREEMENTS BEFORE

22    THEN; CORRECT?

23    A.   CORRECT.

24              MR. PAIGE:  NO FURTHER QUESTIONS.

25              THE COURT:  ALL RIGHT.  10:15.
```

```
1              ANY FURTHER REDIRECT?

2                   MR. BAKER:  NOTHING FURTHER, YOUR HONOR.

3                   THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

4      AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?  WHAT DO

5      YOU BOTH THINK?

6                   MR. BAKER:  NOT SUBJECT TO RECALL.

7                   THE COURT:  I'M SORRY.  I DIDN'T HEAR.  YOU WHAT?

8                   MR. BAKER:  NOT SUBJECT TO RECALL.

9                   MR. PAIGE:  NOT SUBJECT TO RECALL.

10                  THE COURT:  NOT AS WELL?

11                  MR. PAIGE:  CORRECT.

12                  THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

13     TESTIMONY AND YOU'RE FREE TO LEAVE.

14          PLEASE CALL YOUR NEXT WITNESS.

15          I THINK YOUR NEXT WITNESS IS A VIDEO; IS THAT CORRECT?

16     OH, NO, IT'S A WRITTEN DEPOSITION.

17                  MR. MERBER:  YES, YOUR HONOR, THE NEXT WITNESS IS

18     HWI-JAE CHO.  WE PROVIDED WRITTEN TESTIMONY IN RESPONSE TO THE

19     HAGUE CONVENTION REQUEST.

20                  THE COURT:  OKAY.  HOW ARE YOU GOING TO DO THAT, JUST

21     HAVE TWO PEOPLE READ IT?

22                  MR. MERBER:  CORRECT.

23                  THE COURT:  GO AHEAD, PLEASE.

24                  MR. MERBER:  I WOULD NOTE THERE'S A PORTION THAT'S

25     BEEN SEALED THAT WE WOULD PROPOSE TO READ AFTER THE PUBLIC
```

```
 1    PORTION IN A CLOSED SESSION.

 2              THE COURT:  OKAY.  HOW LONG IS THE PORTION THAT YOU

 3    NEED TO READ?

 4              MR. MERBER:  THE TOTAL PORTION IS APPROXIMATELY 20

 5    MINUTES, OF WHICH APPROXIMATELY 1 MINUTE IS SEALED.

 6              THE COURT:  OH, OKAY.  SO WHY DON'T WE DO THIS:

 7    IT'S -- LET ME ASK LEE-ANNE, IS IT OKAY IF WE FINISH THIS OR DO

 8    YOU WANT TO TAKE A BREAK NOW?

 9              THE REPORTER:  LET'S FINISH IT.

10              THE COURT:  WHY DON'T YOU READ THE 20 MINUTES AND

11    THEN WE'LL SEAL THE COURTROOM, ASK EVERYONE TO LEAVE, WE'LL DO

12    THE 1 MINUTE, AND THEN WE'LL TAKE OUR 15 MINUTE BREAK.

13         DOES THAT SOUND OKAY?

14              MR. MERBER:  SOUNDS GREAT.

15              THE COURT:  ALL RIGHT.  ARE YOU GOING TO HAVE SOMEONE

16    SIT IN THE WITNESS STAND AND HAVE THEM ANSWER THE QUESTIONS?

17              MR. CARSON:  I'M HAPPY TO SIT IN THE WITNESS STAND,

18    OR I CAN STAND AT THE PODIUM, WHICHEVER IS YOUR PREFERENCE.

19              THE COURT:  I DON'T HAVE A PREFERENCE.

20              MR. CARSON:  I'LL SIT ON THE WITNESS STAND.

21              THE COURT:  I THINK THAT'S BETTER.  OKAY.  ARE YOU

22    READY, BECAUSE I'M GOING TO START CHARGING TIME?

23         ARE THERE -- OKAY.  LET ME KNOW WHEN YOU'RE READY, PLEASE.

24              MR. MERBER:  OKAY.  YOUR HONOR, I'M NOW GOING TO MOVE

25    TO ADMIT THE EXHIBITS.
```

```
 1                  THE COURT:  AH, OKAY.  WAIT ONE SECOND.  10:17.  GO

 2       AHEAD, PLEASE.

 3                  MR. MERBER:  CERTAINLY.  I MOVE TO ADMIT EXHIBITS

 4       JX 0025, JX 0026, JX 0110, JX 0111, CX 0531, CX 0853, CX 6803,

 5       CX 6816, CX 8117, CX 6774.

 6                  THE COURT:  OKAY.  GIVE ME ONE MINUTE, PLEASE.

 7                  MR. MERBER:  CERTAINLY.

 8                  THE COURT:  I'M OUT OF PAPER.  OKAY.  I HAD CX 8117.

 9       WHAT'S THE NEXT ONE, PLEASE.

10                  MR. MERBER:  THE NEXT ONE IS CX 6774, PAGES 5 THROUGH

11       9, AND CX 6809, PAGES 2 THROUGH 24.

12                  THE COURT:  ALL RIGHT.

13                  MR. MERBER:  AND I WOULD NOTE THAT PORTIONS OF TWO OF

14       THE EXHIBITS IN THIS BINDER, CX 6774 AND JX 0110, HAVE BEEN

15       SEALED BY THE COURT'S ORDER.

16                  THE COURT:  OKAY.  6774 IN ITS ENTIRETY, OR JUST

17       PARTS?

18                  MR. MERBER:  NO, JUST PORTIONS.

19                  THE COURT:  AND WHAT WAS THE OTHER DOCUMENT THAT'S

20       BEEN SEALED, PLEASE.

21                  MR. MERBER:  JX 0110, WHICH I BELIEVE IS ALSO

22       PORTIONS OF THE EXHIBIT.

23                  THE COURT:  OKAY.  ALL RIGHT.

24            ANY OBJECTION TO INTRODUCING THOSE EXHIBITS?

25                  MR. BORNSTEIN:  ONLY WITH RESPECT TO CX 6774 WITH
```

1    RESPECT TO WHICH YOUR HONOR GRANTED AN HPO IN PART, AND I THINK

2    I CAN CONFIRM THAT THE FTC IS INTRODUCING ONLY THE PORTION THAT

3    IS NOT SUBJECT TO THE GRANTED HPO.

4            MR. MERBER:  THAT IS CORRECT.

5            MR. BORNSTEIN:  SO ON THAT UNDERSTANDING, YOUR HONOR,

6    NO OBJECTION.

7            THE COURT:  OKAY.  WAS THAT THE ISSUE WITH THE KER

8    E-MAILS?  OR WHAT --

9            MR. BORNSTEIN:  NO, YOUR HONOR.  THAT'S A DIFFERENT

10   SET OF OBJECTIONS.

11           THE COURT:  OKAY.  OKAY.  WHAT'S THE RULING?  DO YOU

12   KNOW THE DAY?

13           MR. MERBER:  YES.

14           THE COURT:  OR WAS THE OBJECTION JUST TO EXCLUDE

15   PAGES 1 THROUGH 4?  IS THAT THE OBJECTION?

16           MR. BORNSTEIN:  THAT'S --

17           THE COURT:  YOU'RE SATISFIED WITH JUST ADMITTING 5

18   THROUGH 9.

19           MR. BORNSTEIN:  THAT'S CORRECT, AND I THINK THAT'S

20   CONSISTENT WITH THE COURT'S RULING.

21           THE COURT:  OKAY.  THAT'S FINE.  OKAY.  THEN THESE

22   ARE ALL ADMITTED.

23       (PLAINTIFF'S EXHIBITS CX 0531, CX 0853, CX 6803, CX 6816,

24   CX 8117, CX 6774, PAGES 5 THROUGH 9, CX 6809, PAGES 2 THROUGH

25   24 AND JOINT EXHIBITS JX 0025, JX 0026, JX 0110, JX 0111, WERE

1     ADMITTED IN EVIDENCE.)

2              THE COURT:  GO AHEAD, PLEASE.

3     BY MR. MERBER:

4     Q.   PLEASE STATE YOUR NAME.

5     A.   HWI-JAE CHO.

6     Q.   PLEASE STATE YOUR CURRENT TITLE AT LG ELECTRONICS, INC.,

7     (HEREINAFTER REFERRED TO AS "LGE")?

8     A.   DIRECTOR OF THE INTELLECTUAL PROPERTY CENTER IN LG

9     ELECTRONICS.

10    Q.   PLEASE DESCRIBE YOUR RESPONSIBILITIES IN YOUR CURRENT

11    POSITION?

12    A.   I MANAGE ALL OF THE INBOUND AND OUTBOUND PATENT LICENSING

13    MATTERS FOR LG ELECTRONICS.  I REPORT DIRECTLY TO THE HEAD OF

14    LGE'S INTELLECTUAL PROPERTY CENTER, EXECUTIVE VICE-PRESIDENT,

15    AND HELP TO DEVELOP STRATEGIES FOR LGE PATENT LICENSING.

16    Q.   PLEASE DESCRIBE YOUR EMPLOYMENT HISTORY AT LGE?

17    A.   I JOINED LGE IN 2000 AS A MEMBER OF LGE'S INTELLECTUAL

18    PROPERTY CENTER.  I WAS IN CHARGE OF MANY NEGOTIATIONS RELATED

19    TO THE MOBILE PHONE BUSINESS WITH COMPANIES SUCH AS QUALCOMM,

20    NOKIA, ERICSSON, SIEMENS, AND APPLE.  I WAS ALSO A TEAM LEADER

21    FOR LGE'S MOBILE PATENT PROSECUTION TEAM, 2008, LGE'S LICENSING

22    TEAM ACTION 2012, LGE'S LITIGATION TEAM, 2015, AND LGE'S

23    LICENSING OUT TEAM, 2016.  CURRENTLY, I AM A DIRECTOR IN LGE

24    AGENCY INTELLECTUAL PROPERTY CENTER, AND I AM IN CHARGE OF ALL

25    OF THE PATENT LICENSING CASES IN LGE.

1    Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 1.  EXHIBIT 1 IS

2    A DOCUMENT TITLED "ASICS SUPPLY AGREEMENT," ENTERED INTO

3    EFFECTIVE AS OF SEPTEMBER 1, 2000.  THE DOCUMENT BEARS THE

4    BATES NUMBER Q2017FTC00007738.

5         DO YOU RECOGNIZE THIS DOCUMENT (HEREINAFTER REFERRED TO AS

6    "THE SUPPLY AGREEMENT")?

7    A.   YES.

8    Q.   IS THE SUPPLY AGREEMENT A CONTRACT BETWEEN LGE AND

9    QUALCOMM FOR THE SUPPLY OF BASEBAND PROCESSORS?

10   A.   YES.

11   Q.   HAVE LGE AND QUALCOMM SUBSEQUENTLY AMENDED THIS SUPPLY

12   AGREEMENT?

13   A.   YES.

14   Q.   IF LGE AND QUALCOMM HAVE SUBSEQUENTLY AMENDED THE SUPPLY

15   AGREEMENT, DOES THE SUPPLY AGREEMENT, AS AMENDED, CONTINUE TO

16   GOVERN QUALCOMM'S SUPPLY OF BASEBAND PROCESSORS TO LGE?

17   A.   YES.

18   Q.   DOES THE SUPPLY AGREEMENT, AS AMENDED, REQUIRE LGE TO

19   ENTER INTO A SEPARATE PATENT LICENSE AGREEMENT WITH QUALCOMM?

20   A.   YES.

21   Q.   DOES THE SUPPLY AGREEMENT, AS AMENDED, PROHIBIT LGE FROM

22   USING QUALCOMM BASEBAND PROCESSORS IN UNLICENSED HANDSETS?

23   A.   YES.

24   Q.   DOES THE SUPPLY AGREEMENT, AS AMENDED, ALLOW QUALCOMM TO

25   TERMINATE THE AGREEMENT IF LGE IS IN DEFAULT UNDER ITS SEPARATE

1    LICENSE AGREEMENT?

2    A.   YES.

3    Q.   HAVE OTHER SUPPLIERS OF COMPONENTS TO LGE REQUIRED LGE TO

4    EXECUTE A SEPARATE LICENSE AGREEMENT IN ORDER TO OBTAIN ACCESS

5    TO THEIR COMPONENTS?

6    A.   NO.

7    Q.   DID QUALCOMM AND LGE AMEND THE 1993 CDMA LICENSE IN 2004?

8    A.   YES.

9    Q.   DO YOU HAVE KNOWLEDGE OF THE EVENTS AND NEGOTIATIONS THAT

10   LED TO THAT AMENDMENT?

11   A.   YES.

12   Q.   HOW DID YOU OBTAIN THAT KNOWLEDGE?

13   A.   ALTHOUGH THE LGE TEAM NEGOTIATING WITH QUALCOMM HAS

14   CHANGED OVER THE YEARS, I WAS INVOLVED IN THE DISCUSSIONS WITH

15   QUALCOMM AT THAT TIME.  I ALSO PARTICIPATED IN ALMOST ALL OF

16   THE INTERNAL COMMUNICATIONS AT LGE THROUGH IN-PERSON MEETINGS

17   AND REPORTS REGARDING THIS NEGOTIATION.

18   Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 6, WHICH BEARS

19   THE BATES NUMBER Q2014FTC01656705.

20        DO YOU RECOGNIZE THE DOCUMENT MARKED EXHIBIT 6?

21   A.   YES.

22   Q.   IS EXHIBIT 6 A LETTER FROM QUALCOMM'S SENIOR VICE

23   PRESIDENT AND GENERAL MANAGER, MARVIN BLECKER, TO LGE

24   INTELLECTUAL PROPERTY CENTER SENIOR MANAGER JUNGSHEEK JUHN

25   DATED OCTOBER 7, 2003?

1    A.    YES.

2    Q.    PLEASE TURN TO THE SECOND PAGE OF THE LETTER.  DID

3    MR. BLECKER ASSERT THAT UNLESS LGE BEGAN REPORTING AND PAYING

4    ROYALTIES TO QUALCOMM ON ITS SALES OF PRODUCTS SUPPORTING WCDMA

5    BASED STANDARDS, QUALCOMM WOULD BE ENTITLED TO TERMINATE THE

6    1983 CDMA LICENSE?

7    A.    YES.

8    Q.    PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 7.  EXHIBIT 7 IS

9    A DOCUMENT TITLED "CLAIMANT QUALCOMM INCORPORATE'S REQUEST FOR

10   ARBITRATION," DATED DECEMBER 11, 2003.  THE DOCUMENT BEARS THE

11   BATES NUMBER QNDCAL02123632.

12        DO YOU RECOGNIZE THIS DOCUMENT?

13   A.    YES.

14   Q.    PLEASE TURN TO PARAGRAPH 19 OF THE REQUEST FOR

15   ARBITRATION.  DID QUALCOMM ASSERT IN ITS REQUEST FOR

16   ARBITRATION THAT THE 1993 CDMA LICENSE REQUIRED LGE TO REPORT

17   AND PAY ROYALTIES TO QUALCOMM ON LGE SALES OF WCDMA PRODUCTS?

18   A.    YES.

19   Q.    ON OR ABOUT FEBRUARY 23RD, 2004, DID LGE FILE AN ANSWER TO

20   QUALCOMM'S REQUEST FOR ARBITRATION AND COUNTERCLAIMS?

21   A.    YES.

22   Q.    IF LGE DID FILE AN ANSWER AND COUNTERCLAIMS, IN ITS

23   ANSWER, DID LGE STATE THAT THE 1993 CDMA LICENSE DID NOT

24   REQUIRE LGE TO PAY ROYALTIES TO QUALCOMM ON HANDSETS

25   IMPLEMENTING WCDMA BASED STANDARDS?

1    A.   YES.

2    Q.   IF SO, WHAT WAS THE BASIS FOR LGE'S STATEMENT?

3    A.   THE 1993 CDMA LICENSE AGREEMENT ONLY COVERS CDMA

4    TECHNOLOGY THAT WAS DEVELOPED MAINLY BY QUALCOMM.  WCDMA AROSE

5    FROM A DIFFERENT TECHNOLOGY, GSM, WHICH IS DIFFERENT TECHNOLOGY

6    FROM CDMA.

7         ALSO, AT THE TIME OF THE 1993 AGREEMENT WAS EXECUTED,

8    THERE WAS NO MUTUAL UNDERSTANDING BY LGE AND QUALCOMM THAT THE

9    AGREEMENT COVERED WCDMA, WHICH HAD NOT EVEN STARTED TO BE

10   DEVELOPED YET.

11   Q.   WHEN IT FILED THE ANSWER, DID LGE STATE THAT COMPANIES

12   OTHER THAN QUALCOMM WERE PRIMARILY RESPONSIBLE FOR DEVELOPING

13   WCDMA BASED CELLULAR COMMUNICATION STANDARDS?

14   A.   YES.

15   Q.   IF SO, WHAT WAS THE BASIS FOR LGE'S STATEMENT?

16   A.   IT WAS WELL-KNOWN INFORMATION IN THE INDUSTRY BECAUSE, IN

17   CONTRAST TO CDMA THAT WAS MAINLY DEVELOPED BY QUALCOMM, MANY

18   COMPANIES, LIKE NOKIA, ERICSSON, AND NTT DOCOMO, AMONG OTHERS,

19   PARTICIPATED TO DEVELOP WCDMA.  THERE WERE NEWS ARTICLES

20   INDICATING THAT QUALM'S PORTION OF CONTRIBUTION TO THE WCDMA

21   STANDARD WAS ABOUT 20 PERCENT.  PLEASE REFER TO ATTACHMENT 1.

22   Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 8, WHICH BEARS

23   THE BATES NUMBER Q2014FTC03171263.

24        DO YOU RECOGNIZE THIS DOCUMENT?

25   A.   YES.

```
 1        Q.   IS EXHIBIT 8 A LETTER FROM QUALCOMM EXECUTIVE VICE

 2     PRESIDENT STEVEN ALTMAN TO LGE TELECOMMUNICATIONS AND HANDSET

 3     BUSINESS PRESIDENT AND CEO MUN-HWA PARK DATED APRIL 7, 2004?

 4        A.   YES.

 5        Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 9, WHICH BEARS

 6     THE BATES NUMBER Q2014FTC033708654.

 7             DO YOU RECOGNIZE THIS DOCUMENT?

 8        A.   YES.

 9        Q.   IS EXHIBIT 9 A LETTER FROM LGE VICE PRESIDENT OF

10     INTELLECTUAL PROPERTY, SU-YOUNG HAM, TO MR. ALTMAN DATED MAY 4,

11     2004?

12        A.   YES.

13        Q.   IN THE LETTER, DID MR. HAM INFORM QUALCOMM THAT THE

14     LICENSE TERMS OFFERED IN MR. ALTMAN'S APRIL 7, 2004 LETTER WERE

15     UNACCEPTABLE AND FAILED TO ADDRESS MANY IMPORTANT ISSUES?

16        A.   YES.

17        Q.   IF SO, WHAT IMPORTANT ISSUES DID MR. ALTMAN'S TERMS FAIL

18     TO ADDRESS?

19        A.   MOST OF THE KEY ISSUES IDENTIFIED DURING THE PENDING

20     ARBITRATION, INCLUDING MFRR, INAPPLICABILITY OF WCDMA TO OUR

21     LICENSE AGREEMENT, AND ANTITRUST ISSUES WERE NOT ADDRESSED BY

22     MR. ALTMAN.

23        Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 10, WHICH BEARS

24     THE BATES NUMBER Q2014FTC01656708.

25             DO YOU RECOGNIZE THIS DOCUMENT?
```

1      A.   YES.

2      Q.   IS EXHIBIT 10 A LETTER FROM QUALCOMM'S SENIOR VICE

3      PRESIDENT AND GENERAL COUNSEL LOUIS M. LUPIN TO MUN-HWA PARK

4      DATED MAY 6, 2004?

5      A.   YES.

6      Q.   IN THE LETTER, DID MR. LUPIN ASSERT THAT LGE HAD BREACHED

7      SECTION 12 OF THE SUPPLY AGREEMENT BY USING QUALCOMM CHIPS TO

8      DEVELOP, MANUFACTURE, AND SELL WCDMA HANDSETS?

9      A.   YES.

10     Q.   IN THE LETTER, DID MR. LUPIN PURPORT TO TERMINATE THE MOU

11     USED ON THIS ASSERTED BREACH?

12     A.   YES.

13     Q.   IN THE LETTER, DID MR. LUPIN ANNOUNCE THAT QUALCOMM WOULD

14     NO LONGER PAY AMOUNTS THAT IT WOULD OTHERWISE HAVE OWED LGE

15     UNDER THE MOU?

16     A.   YES.

17     Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 11, WHICH BEARS

18     THE BATES NUMBER Q 2014 FTC 03923087.

19          DO YOU RECOGNIZE THIS DOCUMENT?

20     A.   YES.

21     Q.   IS EXHIBIT 11 A LETTER FROM MR. HAM TO MR. LUPIN DATED

22     MAY 25, 2004?

23     A.   YES.

24     Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 12, WHICH BEARS

25     THE BATES NUMBER Q2014FTC03419779.

```
 1              DO YOU RECOGNIZE THIS DOCUMENT?

 2    A.   YES.

 3    Q.   IS EXHIBIT 12 A LETTER FROM MR. ALTMAN TO MR. HAM DATED

 4    MAY 12, 2004?

 5    A.   YES.

 6    Q.   IN THE LAST PARAGRAPH OF THE LETTER, DID MR. ALTMAN STATE

 7    THAT THE CLAIMS THAT LGE HAD ASSERTED IN THE ARBITRATION WERE

 8    HARDLY THE ACTIONS TAKEN BY A STRATEGIC PARTNER AND THAT

 9    QUALCOMM WOULD HAVE NO CHOICE BUT TO RESPOND ACCORDINGLY AND

10    RE-EVALUATE OTHER AREAS WHERE WE WOULD HAVE OTHERWISE TREATED

11    LG AS A STRATEGIC LICENSEE?

12              THE WITNESS:  YES.

13              THE COURT:  CAN I INTERRUPT A MOMENT, PLEASE.  I

14    DON'T THINK I HAVE EXHIBIT 11, AND YOU'RE GOING REALLY FAST, SO

15    I'M NOT REALLY KEEPING UP.

16         JUST TO BE FRANK WITH YOU, IT'S GOING VERY FAST AND SOME

17    EXHIBITS YOU HAVE INCLUDED, SOME YOU HAVEN'T.  I CAN'T TELL

18    WHICH ONES I HAVE, WHICH ONES I DON'T HAVE.  IT'S GOING VERY

19    FAST.

20              MR. MERBER:  I CAN SLOW DOWN FOR YOUR HONOR.

21              THE COURT:  SO WHAT NUMBER IS THIS?  THIS IS WHICH

22    NUMBER?  I DON'T HAVE EXHIBIT 11.  MINE GOES FROM EXHIBIT 10 TO

23    EXHIBIT 12.  IS THIS NUMBER 11?

24              MR. MERBER:  I BELIEVE --

25              MR. BAKER:  THIS IS 12.
```

```
 1                MR. MERBER:  THIS IS 12 NOW.

 2                THE COURT:  OH, THIS IS 12.  OKAY.

 3                MR. MERBER:  AND I THINK ANY DOCUMENT THAT'S

 4     REFERENCED THAT'S NOT IN THE BINDER IS ONE WE DIDN'T SEEK TO

 5     ADMIT.

 6                THE COURT:  WHICH IS FINE.  YOU'RE JUST GOING REALLY

 7     FAST, SO I'M HAVING DIFFICULTY FINDING OUT WHICH ONES YOU DID,

 8     WHICH ONES YOU DIDN'T.  SO IF YOU COULD SLOW DOWN, PLEASE.

 9                MR. MERBER:  CERTAINLY.

10                THE COURT:  THANK YOU.

11                MR. MERBER:  OKAY.

12                THE COURT:  SORRY FOR THE INTERRUPTION.  GO AHEAD,

13     PLEASE.

14                MR. MERBER:  CERTAINLY.

15     Q.   SO IS EXHIBIT 12 A LETTER FROM MR. ALTMAN TO MR. HAM DATED

16     MAY 25, 2004?

17     A.   YES.

18     Q.   IN THE LAST PARAGRAPH OF THE LETTER -- OH, I APOLOGIZE.  I

19     ALREADY READ THAT QUESTION.

20          HOW DID MR. -- HOW DID LGE INTERPRET MR. ALTMAN'S

21     STATEMENTS?

22     A.   ALTHOUGH I FEEL MOST CONFIDENT ABOUT MY PERSONAL

23     INTERPRETATION, MY RECOLLECTION WAS THAT WE INTERNALLY THOUGHT

24     IT WAS A THREAT BY QUALCOMM.  WE THOUGHT QUALCOMM WOULD USE

25     WHATEVER LEVERAGE IT HAD BECAUSE QUALCOMM OFTEN MENTIONED
```

```
1    TERMINATION OF THE SUPPLY AGREEMENT.  AS THREATENED IN THE

2    LETTER, WE THOUGHT QUALCOMM WOULD DO SOMETHING ABOUT LGE'S

3    BASEBAND CHIPSET SUPPLY.

4    Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 13, WHICH BEARS

5    THE BATES NUMBER Q2014FTC 01656714.

6         DO YOU RECOGNIZE THIS DOCUMENT?

7    A.   YES.

8    Q.   IS EXHIBIT 13 A LETTER FROM MR. LUPIN TO MR. HAM DATED

9    MAY 26TH, 2004?

10   A.   YES.

11   Q.   IN THE SECOND PARAGRAPH OF THE LETTER, DID MR. LUPIN STATE

12   THAT LGE WAS IN BREACH OF THE SUPPLY AGREEMENT BASED ON ITS

13   PURCHASE AND USE OF WCDMA BASEBAND PROCESSORS REGARDLESS OF THE

14   OUTCOME OF THE ARBITRATION?

15   A.   YES.

16   Q.   IN THE LAST PARAGRAPH OF THE LETTER, DID MR. LUPIN STATE

17   THAT WHILE QUALCOMM HAD, AT THE TIME, TERMINATED ONLY THE MOU,

18   IT RESERVED THE RIGHT TO TERMINATE THE SUPPLY AGREEMENT AS

19   WELL?

20   A.   YES.

21   Q.   HOW DID LGE INTERPRET MR. LUPIN'S STATEMENTS?

22   A.   ALTHOUGH I FEEL MOST CONFIDENT ABOUT MY PERSONAL

23   INTERPRETATION, MY RECOLLECTION IS THAT LGE REGARDED IT AS A

24   REAL THREAT TO LGE'S MOBILE BUSINESS.  ALL OF LGE'S CDMA

25   PRODUCTS USE QUALCOMM'S BASEBAND CHIPSETS AND LGE ALSO STARTED
```

CRO DEPOSITION READING

```
 1    TO USE QUALCOMM'S WCDMA BASEBAND CHIPS.  THEREFORE, THERE WOULD

 2    BE SIGNIFICANT NEGATIVE IMPACT TO LGE'S BUSINESS IF QUALCOMM

 3    HAD TERMINATED THE SUPPLY AGREEMENT AND STOPPED PROVIDING ITS

 4    CDMA BASEBAND CHIPS.  IF CHIPSET SUPPLY DISRUPTIONS DID HAPPEN,

 5    THERE WOULD HAVE BEEN IRREPARABLE HARM TO LGE'S MOBILE

 6    BUSINESS.

 7    Q.   PLEASE REVIEW THE DOCUMENT MARKED EXHIBIT 14.  EXHIBIT 14

 8    IS A DOCUMENT TITLED "AMENDMENT TO INFRASTRUCTURE AND

 9    SUBSCRIBER UNIT LICENSE AND TECHNICAL ASSISTANCE AGREEMENT,"

10    ENTERED INTO AS OF JULY 11, 2004.

11         THIS DOCUMENT BEARS THE BATES NUMBER Q2014FTC00004888.

12         DO YOU RECOGNIZE THIS DOCUMENT (HEREINAFTER REFERRED TO AS

13    THE "2004 CDMA AMENDMENT")?

14    A.   YES.

15    Q.   PLEASE REVIEW THE DOCUMENT MARKED AS EXHIBIT 15.  EXHIBIT

16    15 IS A DOCUMENT TITLED "CHIPSET PURCHASE AND INCENTIVE

17    AGREEMENT," ENTERED INTO EFFECTIVE AS OF JULY 11, 2004.

18         THE DOCUMENT BEARS THE BATES NUMBER Q2014FTC03370696.

19         DO YOU RECOGNIZE THIS DOCUMENT?

20    A.   YES.

21    Q.   PLEASE REVIEW THE DOCUMENT MARKED AS EXHIBIT 16.  EXHIBIT

22    16 IS A DOCUMENT TITLED "SETTLEMENT AND RELEASE," ENTERED INTO

23    EFFECTIVE AS OF JULY 11, 2004.  THE DOCUMENT BEARS THE BATES

24    NUMBER Q2014FTC03412964.

25         DO YOU RECOGNIZE THIS DOCUMENT (HEREINAFTER REFERRED TO AS
```

```
 1        THE "2004 SETTLEMENT AND RELEASE")?

 2        A.   YES.

 3        Q.   IN THE 2004 SETTLEMENT AND RELEASE, DID LGE RELEASE

 4        QUALCOMM OF ANY CLAIMS LGE HAD ASSERTED IN THE ARBITRATION AND

 5        AGREE TO DISMISS THE ARBITRATION?

 6        A.   YES.

 7        Q.   DID QUALCOMM AND LGE NEGOTIATE THE 2004 CDMA AMENDMENT,

 8        THE CHIP PURCHASE AND INCENTIVE AGREEMENT, AND THE 2004

 9        SETTLEMENT AND RELEASE (HEREINAFTER REFERRED TO AS THE "2004

10        AGREEMENTS"?

11        A.   YES.

12        Q.   ARE THE ROYALTY TERMS OF THE 2004 CDMA LICENSE AMENDMENT

13        SUBSTANTIALLY SIMILAR TO THOSE THAT MR. HAM DESCRIBED AS

14        UNACCEPTABLE IN THE MAY 4, 2004 LETTER MARKED AS EXHIBIT 9?

15        A.   YES.

16        Q.   IF SO, DID LGE'S ASSESSMENT OF THE FAIRNESS AND REASONABLE

17        ABILITY OF THOSE TERMS CHANGE BETWEEN MAY AND JULY OF 2004?

18        A.   NO.

19        Q.   IF NOT, WHY DID LGE ACCEPT A LICENSE ON THESE TERMS?

20        A.   IN SHORT, LGE ACCEPTED SUCH TERMS BECAUSE LGE HAD LITTLE

21        CHANCE TO EVALUATE QUALCOMM'S WCDMA PATENT PORTFOLIO.  AND MOST

22        IMPORTANTLY, LGE HAD TO CONSIDER THE BUSINESS RISKS.  WHEN

23        QUALCOMM THREATENED TO TERMINATE THE SUPPLY AGREEMENT, LGE HAD

24        NO OPTION BUT TO AGREE TO WHATEVER QUALCOMM DEMANDED.  LGE'S

25        TOP MANAGEMENT DID NOT WANT TO TAKE THE RISK OF ENDANGERING
```

1    LGE'S MOBILE BUSINESS.

2    Q.   WHEN NEGOTIATING THE 2004 AGREEMENTS, DID LGE REQUEST

3    CLAIM CHARTS OR OTHER INFORMATION FROM QUALCOMM CONCERNING THE

4    VALIDITY, SCOPE, OR VALUE OF QUALCOMM'S LICENSED PATENTED?

5    A.   NO.  BECAUSE THE DEAL WAS STRUCK SUDDENLY AFTER QUALCOMM

6    THREATENED TO TERMINATE THE SUPPLY AGREEMENT.  THEREFORE, LGE

7    DID NOT HAVE AN OPPORTUNITY TO CHALLENGE THE REASONABLENESS OF

8    THE ROYALTY RATE.

9    Q.   DID THE ROYALTY TERMS OF THE 2004 CDMA AMENDMENT

10   APPROPRIATELY ACCOUNT FOR ANY DIFFERENCES BETWEEN THE VALUES OF

11   QUALCOMM'S CONTRIBUTIONS TO CDMA BASE STANDARDS AND ITS

12   CONTRIBUTIONS TO WCDMA BASED STANDARDS?

13   A.   NO.

14   Q.   WHAT IS THE BASIS FOR YOUR ANSWER?

15   A.   FIRST, THE ROYALTY RATE FOR WCDMA, 5 PERCENT, WAS THE SAME

16   AS THE ROYALTY RATE FOR CDMA TECHNOLOGIES DEVELOPED MAINLY BY

17   QUALCOMM, WITHOUT AN EVALUATION PROCESS FOR QUALCOMM'S WCDMA

18   STANDARD ESSENTIAL PATENT PORTFOLIO.  AS THERE WAS ALMOST NO

19   OTHER COMPANIES BESIDES QUALCOMM HAVING A CDMA PATENT

20   PORTFOLIO, THE TOTAL ROYALTIES FOR CDMA REMAINED AT

21   APPROXIMATELY 5 PERCENT.

22        HOWEVER, THE TOTAL ROYALTIES SIGNIFICANTLY INCREASED FOR

23   WCDMA AS OTHER PATENT HOLDERS, SUCH AS ERICSSON, ALSO CHARGED

24   ROYALTIES ON TOP OF QUALCOMM'S ROYALTIES FOR WCDMA.

25   Q.   WHEN NEGOTIATING THE 2004 AGREEMENTS, DID LGE REGARD THE

1    NET SELLING PRICE OF LGE HANDSETS AS AN APPROPRIATE BASE ON

2    WHICH TO CALCULATE ROYALTIES OWED BY LGE FOR QUALCOMM'S

3    LICENSED PATENTS?

4    A.   NO.

5    Q.   IF NOT, WHY NOT?

6    A.   BECAUSE THERE WERE MANY COMPONENTS THAT WERE NOT RELATED

7    TO QUALCOMM'S STANDARD ESSENTIAL PATENTS.  IN FACT, LGE ARGUED

8    TO DEDUCT THE COST OF CAMERA MODULES AND DMB, WHICH THE KOREAN

9    VERSION OF MOBILE TV MODULES, BECAUSE, AT A MINIMUM, THOSE TWO

10   FEATURES WERE FUNCTIONALLY INDEPENDENT FROM QUALCOMM'S STANDARD

11   ESSENTIAL PATENTS AT THAT TIME.

12       HOWEVER, QUALCOMM REJECTED LGE'S ARGUMENT.  QUALCOMM NOTED

13   THAT LGE'S POSITION COULD NOT BE ACCEPTED BASED ON ITS COMPANY

14   POLICY.

15   Q.   WHAT KINDS OF BASEBAND PROCESSORS WAS LGE PURCHASING FROM

16   QUALCOMM WHILE NEGOTIATING THE 2004 CDMA AMENDMENT?

17   A.   CDMA BASEBAND PROCESSORS FOR ALL OF LGE'S CDMA HANDSETS,

18   AND SOME WCDMA BASEBAND PROCESSORS.

19   Q.   WHAT IMPACT WOULD LOSING ACCESS TO QUALCOMM'S BASEBAND

20   PROCESSORS HAVE HAD ON LGE'S BUSINESS?

21   A.   DURING THAT TIME PERIOD, ALMOST ALL OF THE PROFITS OF

22   LGE'S MOBILE BUSINESS WERE FROM ITS CDMA HANDSETS AND QUALCOMM

23   WAS THE ONLY CDMA CHIPSET SUPPLIER.  THEREFORE, IF QUALCOMM

24   WERE TO SUSPEND THE SUPPLY OF BASEBAND PROCESSORS, LGE WOULD

25   NOT HAVE BEEN ABLE TO DEVELOP OR MANUFACTURE ANY CDMA HANDSET

1    PRODUCTS AND MOST OF LGE'S EMPLOYEES IN THE MOBILE SECTOR WOULD

2    HAVE BEEN DORMANT.

3    Q.   DID THE RISK OF LOSING ACCESS TO QUALCOMM BASEBAND

4    PROCESSORS AFFECT LGE'S WILLINGNESS TO ENTER INTO THE 2004 CDMA

5    AMENDMENT?

6    A.   YES.

7    Q.   IF SO, WHAT EFFECT DID IT HAVE?

8    A.   WHEN QUALCOMM ESCALATED ITS THREAT BY STATING ITS

9    INTENTION TO TERMINATE THE SUPPLY AGREEMENT, LGE TOP MANAGEMENT

10   DECIDED TO SETTLE.

11   Q.   PLEASE REVIEW THE DOCUMENT MARKED AS EXHIBIT 22.  EXHIBIT

12   22 IS A DOCUMENT TITLED "CLAIMANT LG ELECTRONIC'S INC.'S

13   REQUEST FOR ARBITRATION," DATED DECEMBER 11, 2015.

14       THE DOCUMENT BEARS THE BATES NUMBER Q2014FTC 2179930.

15       DO YOU RECOGNIZE THIS DOCUMENT?

16   A.   YES.

17   Q.   DO YOU HAVE KNOWLEDGE OF THE EVENTS THAT LED LGE TO FILE A

18   REQUEST FOR ARBITRATION ON OR ABOUT DECEMBER 11, 2015?

19   A.   YES.

20   Q.   IF SO, HOW DID YOU OBTAIN THAT KNOWLEDGE?

21   A.   I WAS A MEMBER OF THE TEAM RESPONSIBLE FOR THE

22   DECISION-MAKING PROCESS IN LGE'S INTELLECTUAL PROPERTY'S CENTER

23   FOR THE 2016 NEGOTIATION.  I RECEIVED REPORTS AND PARTICIPATED

24   IN THE MEETINGS TO DECIDE WHETHER LGE SHOULD FILE A REQUEST FOR

25   ARBITRATION.

```
 1        Q.   PLEASE REVIEW THE DOCUMENT MARKED AS EXHIBIT 23.  EXHIBIT

 2   23 IS A DOCUMENT TITLED "SETTLEMENT AGREEMENT AND RELEASE,"

 3   EFFECTIVE AS OF APRIL 16, 2016.  THE DOCUMENT BEARS THE BATES

 4   NUMBER Q2014FTC 03980685.

 5        DO YOU RECOGNIZE THIS DOCUMENT?

 6   A.   YES.

 7        Q.   PLEASE REVIEW THE DOCUMENT MARKED AS EXHIBIT 24.  EXHIBIT

 8   24 IS A DOCUMENT TITLED "AMENDMENT TO LICENSE AGREEMENTS,"

 9   ENTERED INTO AS OF JANUARY 1, 2016.  THE DOCUMENT BEARS THE

10   BATES NUMBER Q2014FTC 03980678.

11        DO YOU RECOGNIZE THIS DOCUMENT?

12   A.   YES.

13        Q.   PLEASE REVIEW THE DOCUMENT MARKED AS EXHIBIT 25.  EXHIBIT

14   25 IS A DOCUMENT TITLED "STRATEGIC FUND AND INDEMNITY

15   AGREEMENT," EFFECTIVE AS OF JANUARY 1, 2016.  THE DOCUMENT

16   BEARS THE BATES NUMBER Q2014FTC 03980695.

17        DO YOU RECOGNIZE THIS DOCUMENT?

18   A.   YES.

19        Q.   DO YOU HAVE KNOWLEDGE OF THE EVENTS AND NEGOTIATIONS THAT

20   LED TO THE SETTLEMENT AGREEMENT AND RELEASE, THE AMENDMENT TO

21   LICENSE AGREEMENTS, AND THE STRATEGIC FUND AND INDEMNITY

22   AGREEMENT (HEREINAFTER REFERRED TO AS THE "2016 AGREEMENTS")?

23   A.   YES.

24        Q.   IF SO, HOW DID YOU OBTAIN THAT KNOWLEDGE?

25   A.   I WAS A MEMBER OF THE TEAM RESPONSIBLE FOR THE
```

1    DECISION-MAKING PROCESS IN LGE'S INTELLECTUAL PROPERTY CENTER

2    FOR THE 2016 NEGOTIATION.  I RECEIVED REPORTS AND PARTICIPATED

3    IN THE MEETINGS TO DECIDE WHETHER LGE SHOULD FILE A REQUEST FOR

4    ARBITRATION.

5    Q.   DID QUALCOMM AND LGE NEGOTIATE THE 2016 AGREEMENTS AS A

6    PACKAGE?

7    A.   YES.

8    Q.   DID THE 2016 AGREEMENTS MODIFY THE ROYALTIES OWED BY LGE

9    TO QUALCOMM UNDER THE CDMA LICENSE OR THE OFDM LICENSE?

10   A.   NO.

11   Q.   WHY DID LGE ENTER INTO THE 2016 AGREEMENTS?

12   A.   ALTHOUGH THERE WERE MANY FACTORS, OVERALL, IT WOULD

13   REDUCTION LGE'S EFFECTIVE ROYALTY RATE THROUGH THE STRATEGIC

14   FUND AND INDEMNIFICATION.

15        MR. MERBER:  YOUR HONOR, THAT CONCLUDES THE PUBLIC

16   PORTION PLAINTIFF CHO'S TESTIMONY.

17        THE COURT:  OKAY.  TIME IS NOW 10:41.

18   LET ME ASK, IS THERE ANY COUNSEL FOR AVANCI HERE?

19        ARE ANY PARTIES IN TOUCH WITH AVANCI?  BECAUSE THEY FILED

20   A MOTION TO SEAL ON SUNDAY NIGHT SAYING I HAD TO RULE ON IT

21   SUNDAY NIGHT SO THAT EVIDENCE COULD BE USED TODAY.  I DENIED

22   THAT.  THEN THEY REFILED THIS MORNING AND SAID I HAVE TO RULE

23   ON IT RIGHT NOW WHILE I'M IN TRIAL.

24        LIKE, WHY ARE THEY FILING SO LATE?  I'VE ALREADY RULED ON

25   AVANCI'S SEALING MOTION.  WHEN DID YOU -- I DON'T KNOW WHOSE --

```
 1     AND I DON'T KNOW WHICH WITNESS IT COMES IN, WHICH PARTY IS

 2     SEEKING TO INTRODUCE THE INFORMATION.

 3              MR. BORNSTEIN:  SO I CAN TAKE A SHOT AT THIS, YOUR

 4     HONOR?

 5              THE COURT:  UM-HUM.

 6              MR. BORNSTEIN:  THERE ARE TWO AVANCI DOCUMENTS, AS I

 7     UNDERSTAND IT.  ONE OF THEM IS AN AGREEMENT AND ONE OF THEM IS

 8     A DEMONSTRATIVE THAT THE FTC INTENDS TO USE WITH THEIR EXPERT

 9     THIS AFTERNOON, MR. LASINSKI.

10          WE DISCLOSED THE AGREEMENT TO AVANCI ON THURSDAY

11     CONSISTENT WITH THE SCHEDULE THAT THE PARTIES HAD WORKED OUT,

12     THAT IT WAS A DOCUMENT THAT WAS LIKELY TO BE INTRODUCED INTO

13     EVIDENCE.

14          AND WE FILED A MOTION TO SEAL ASPECTS AFTER THAT DOCUMENT

15     THAT WE BELIEVED CONTAINED CONFIDENTIAL INFORMATION.

16          THE -- AVANCI FILED A MOTION TO SEAL WITH RESPECT TO THE

17     DEMONSTRATIVE.  THEY NOTICED THAT THEY DID NOT SEAL CERTAIN

18     INFORMATION THAT WE WOULD HAVE EXPECTED THEM TO MAINTAIN AS

19     CONFIDENTIAL, AND SO YESTERDAY WE CONTACTED --

20              THE COURT:  OKAY.  I'M CHARGING THIS TIME TO YOU

21     BECAUSE THIS IS JUST NOT -- YOU CAN'T -- YOU KNOW, THIS IS WHAT

22     QUALCOMM DID LAST SUNDAY NIGHT AS WELL.  YOU CAN'T JUST FILE

23     SUNDAY NIGHT SAYING RULE ON IT SUNDAY NIGHT BECAUSE IT'S COMING

24     INTO EVIDENCE MONDAY MORNING.  THAT'S NOT REASONABLE.  THAT'S

25     NOT TIMELY.
```

1            MR. BORNSTEIN:  YOUR HONOR, I AGREE WITH THAT.  THE

2    ONLY REASON THE SUNDAY NIGHT FILING HAPPENED IS BECAUSE WE

3    REACHED OUT TO AVANCI BECAUSE WE DISCOVERED THE FTC HAD NOT

4    INFORMED AVANCI THAT IT WAS INTENDING TO USE THIS INFORMATION.

5            WE SPOTTED IT, WE THOUGHT IT WAS A PROBLEM FOR THEM, SO WE

6    TOLD THEM ABOUT IT, AND THAT'S WHY THEY FILED SO LATE, BECAUSE

7    WE CAUGHT THIS.  AND WE WERE SURPRISED THAT THEY HADN'T MOVED

8    TO SEAL THE INFORMATION.  WE DISCOVERED THEY HAD NOT BEEN

9    INFORMED BY THE FTC THAT THE FTC WAS PLANNING TO USE THE

10   INFORMATION.  AND THAT'S WHY IT CAME LATE.

11           THE COURT:  NOW, THE AVANCI, OR AVANCI LASINSKI

12   DEMONSTRATIVE, I RULED ON THAT ON JANUARY 11TH.

13           MR. BORNSTEIN:  CORRECT.

14           THE COURT:  SO YOU'RE SAYING THERE'S MORE OF THAT

15   DEMONSTRATIVE THAT QUALCOMM WANTS THEM TO SEAL?

16           MR. BORNSTEIN:  NO.  WE ARE NOT SEEKING TO SEAL THE

17   INFORMATION, YOUR HONOR.  WE MOVED ON THE INFORMATION THAT WE

18   BELIEVED WAS CONFIDENTIAL.

19       AVANCI HAD NOT BEEN INFORMED BY THE FTC --

20           THE COURT:  OKAY, WAIT.  I'M SORRY TO INTERRUPT YOU.

21   EARLIER YOU SAID THERE'S STILL LASINSKI DEMONSTRATIVES

22   OUTSTANDING.

23           MR. BORNSTEIN:  THERE IS INFORMATION THAT AVANCI

24   WOULD LIKE TO SEAL, YOUR HONOR, YES, NOT QUALCOMM.

25           THE COURT:  SO WHY DIDN'T THAT MAKE THAT PART OF THE

 1       MOTION THEY FILED LAST WEEK THAT I RULED ON LAST WEEK?  I

 2       GRANTED THEIR SEALING REQUESTS FOR PAGES 12 AND 13, FIGURES 31

 3       AND 32 FOR AVANCI FOR THE LASINSKI DEMONSTRATIVE.

 4               MR. BORNSTEIN:  AGAIN, YOUR HONOR, IT'S BECAUSE THEY

 5       WERE NOT TOLD BY THE FTC THAT THERE WAS THIS OTHER INFORMATION

 6       IN THE DEMONSTRATIVE.  THEY WERE DISCLOSED ONLY PORTIONS OF THE

 7       DEMONSTRATIVE BY THE FTC.  WE CAUGHT THE PROBLEM, WE THOUGHT

 8       THEY MIGHT HAVE AN ISSUE WITH IT, SO WE ADVISED THEM YESTERDAY

 9       BECAUSE WE DISCOVERED THAT THEY HADN'T BEEN TOLD BY THE FTC

10       THAT THIS INFORMATION WAS GOING TO BE USED.  SO THEY WERE

11       STUCK, AND THEY MOVED AS QUICKLY AS THEY COULD.

12               THE COURT:  NO.  BUT WHAT ABOUT THIS -- OKAY.  THAT'S

13       THE DEMONSTRATIVE.

14               MR. BORNSTEIN:  CORRECT.

15               THE COURT:  THEY'RE DEALING WITH A 143 PAGE LICENSE

16       AGREEMENT.

17               MR. BORNSTEIN:  YES.

18               THE COURT:  WHERE IS THAT?  WHOSE DOCUMENT IS THAT?

19       AND WHEN WERE THEY GIVEN NOTICE OF THAT DOCUMENT.

20               MR. BORNSTEIN:  THAT'S A DOCUMENT THAT WAS PRODUCED

21       FROM QUALCOMM'S FILES AND WE ADVISED THEM, CONSISTENT WITH THE

22       SCHEDULE THAT THE PARTIES HAVE BEEN USING TO DISCLOSING

23       INFORMATION TO THIRD PARTIES.  ONCE THE FTC TOLD US THEY

24       INTENDED TO USE THE DOCUMENT WITH MR. LASINSKI, WE PROVIDED THE

25       INFORMATION ABOUT THAT DIRECTLY TO AVANCI WITHIN TWO HOURS OF

```
 1              BEING TOLD BY THE FTC.

 2                       THE COURT:  AND WHEN WAS THAT?

 3                       MR. BORNSTEIN:  THAT WAS ON THURSDAY.

 4                       THE COURT:  SO WHY ARE THERE -- LIKE, YOU WANT TO

 5              FOCUS ON A LASINSKI DEMONSTRATIVE.  TO BE HONEST, RULING ON

 6              THAT IS FAIRLY SIMPLE.  AT MOST IT'S LIKE A FEW PAGES.  IT'S

 7              THIS LICENSE AGREEMENT THAT THEY FILE ON SUNDAY NIGHT SAYING

 8              I'VE GOT TO RULE ON IT ON SUNDAY NIGHT.  IT'S JUST

 9              UNREASONABLE.  SO YOU'RE SAYING YOU TOLD THEM ABOUT IT ON

10              THURSDAY?

11                       MR. BORNSTEIN:  CORRECT.

12                       THE COURT:  AND THEY WAITED UNTIL SUNDAY NIGHT TO

13              HAVE ME -- TO FILE AND ASK ME TO RULE ON A 143 PAGE LICENSE.

14              THIS HAS TO STOP.  THIS HAS TO STOP.

15                  SO I'M GOING TO SET A REQUIREMENT NOW THAT ANY SEALING

16              MOTION BY A THIRD PARTY MUST BE FILED THE PRIOR BUSINESS DAY

17              BEFORE THAT EVIDENCE WILL BE INTRODUCED NO LATER THAN

18              10:00 A.M.  AND IF YOU DON'T, I'M NOT GOING TO SEAL IT.  AND

19              THIS WILL BECOME PART OF THE PUBLIC DOMAIN.  THIS IS -- IT'S

20              UNREASONABLE.  IF THEY HAD THAT DOCUMENT SINCE THURSDAY -- AND

21              THEY FILED OTHER SEALING MOTIONS LAST WEEK.

22                       MR. BORNSTEIN:  I CAN'T ANSWER THAT, YOUR HONOR, AS

23              TO THEIR CHOICES.

24                       THE COURT:  SO THE FACT THAT THEY WAIT UNTIL SUNDAY

25              NIGHT TO MOVE IT, AND THEN THEY MOVE AGAIN THIS MORNING BECAUSE
```

1    I DENIED THE MOTION LAST NIGHT SAYING, WELL, YOU'VE STILL GOT

2    TO DECIDE.

3         IT'S UNREASONABLE.

4         SO WHO'S THE LAWYER?  THEY'RE BAKER BOTTS, OR --

5              MR. BORNSTEIN:  THAT'S CORRECT, YOUR HONOR.

6              THE COURT:  ARE THEY HERE?

7              MR. BORNSTEIN:  THE GENTLEMAN WE'VE BEEN DEALING WITH

8    IS BASED IN WASHINGTON.

9              THE COURT:  UH-HUH.  SO THIS IS WHAT I'M GOING TO DO.

10   IT IS NOT REASONABLE TO ASK ME TO BE HERE IN COURT, PRESIDING

11   OVER A TRIAL, AND SIMULTANEOUSLY RULING ON SEALING MOTIONS.

12        SO IT'LL JUST HAVE TO BE DONE ON TRIAL EVIDENCE TIME, JUST

13   LIKE EVERYTHING ELSE, WE'LL GO THROUGH A 143 PAGE LICENSE AND

14   YOU'LL HAVE TO SAY WHAT PAGES YOU WANT.  NOW, THEY'RE NOT HERE,

15   I GUESS, TO ASK WHAT THEY WANT SEALED.  SO TOO BAD.  IT'S TOO

16   BAD.  THEY'VE SLEPT ON THEIR RIGHTS.  I DON'T UNDERSTAND IT.

17     WHY WOULD THEY GO AHEAD AND FILE ON EVERYTHING ELSE, UNLESS

18   THEY DON'T THINK IT'S CONFIDENTIAL AND QUALCOMM WANTS THEM TO

19   SEAL IT.

20             MR. BORNSTEIN:  WELL, NO, YOUR HONOR.  WE FILED THE

21   MOTION WITH THE COURT AND THE COURT SEALED THE PORTIONS THAT WE

22   BELIEVED WERE CONFIDENTIAL, WHICH WE DID IN A TIMELY WAY.

23        I CAN'T SPEAK TO THE TIMING OF AVANCI'S MOTION, YOUR

24   HONOR.  IT'S NOT SOMETHING WE WERE INVOLVED IT OR HAD CONTROL

25   OVER.

```
 1              THE COURT:  OKAY.  SO WHO IS GOING TO USE THAT

 2    LICENSE?  I MEAN, YOU ALL DON'T EVEN TELL ME UNDER WHICH

 3    WITNESS IT COMES UNDER.  IT'S REALLY, LIKE, UNFORTUNATELY,

 4    OPERATING IN THE DARK.  I DON'T KNOW WHICH WITNESSES DIFFERENT

 5    PIECES OF INFORMATION -- IT'S REALLY CHALLENGING.  IT WAS THE

 6    SAME WAY FOR THE EVIDENTIARY OBJECTIONS.  BUT IT'S ALSO WITH

 7    THE SEALING.  I HAVE NO IDEA WHO'S TRYING TO INTRODUCE IT, AS

 8    TO WHICH WITNESS, WHAT THE TIMING IS, WHAT DAY IT IS.  I JUST

 9    GET THESE EMERGENCY MOTIONS ON SUNDAY NIGHT SAYING DO IT SUNDAY

10    NIGHT, WHICH I'M NOT GOING TO.  I REFUSE.

11              MS. MILICI:  ABSOLUTELY UNDERSTOOD.

12              THE COURT:  SO --

13              MS. MILICI:  THE AVANCI MATERIAL COMES IN THROUGH

14    MR. LASINSKI.

15              THE COURT:  OKAY.  SO HE IS, WHAT, YOU HAVE DONALDSON

16    NEXT?  WHO DO YOU HAVE AFTER DONALDSON?

17              MR. MILICI:  AFTER DONALDSON, I BELIEVE WE HAVE A

18    VIDEO, AND THEN WE HAVE MR. LASINSKI AFTER THAT.

19              THE COURT:  OKAY.  SO HE'S PROBABLY, WHAT, AFTER

20    LUNCH?  AFTER THE FIRST BREAK?  AFTER THE SECOND BREAK?

21              MS. MILICI:  YOUR HONOR, I WOULD EXPECT IT TO BE

22    AFTER LUNCH.

23              THE COURT:  OKAY.  ALL RIGHT.  WELL, BUT CAN YOU

24    CONVEY TO THIRD PARTIES, IF THEY DON'T FILE BY 10:00 A.M. THE

25    BUSINESS DAY BEFORE, IT WILL ALL AUTOMATICALLY BECOME PUBLIC
```

1    INFORMATION, AND I WILL FILE IT MYSELF PUBLICLY.  THIS IS

2    REALLY UNREASONABLE.

3           MR. BORNSTEIN:  WHEN WE DISCLOSE TO THEM THE

4    INFORMATION THAT'S GOING TO BE, TO BE USED, ONCE THE PARTIES

5    CONSULT WITH EACH OTHER, WE'LL INFORM THEM OF THAT AS WELL.

6           THE COURT:  WELL, I'M ALSO GOING TO FILE IT ON THE

7    DOCKET, AND I'M GOING TO PUT IT IN AVANCI'S ORDER.  THIS IS

8    UNREASONABLE.  THEY'VE HAD NOTICE OF THAT LICENSE SINCE

9    THURSDAY AND THEY WAIT UNTIL SUNDAY NIGHT TO FILE A MOTION TO

10   SEAL?  IT'S JUST NOT REASONABLE.

11       OKAY.  THE TIME IS 10:49.  WHAT I'D LIKE TO DO IS I THINK

12   WE SHOULD TAKE OUR BREAK AND WHEN WE COME BACK, WE'LL DO THE

13   ONE MINUTE OF SEALED TESTIMONY, AND THEN WE'LL HAVE -- OR MAYBE

14   WE SHOULD JUST EMPTY THE COURT -- IS IT OKAY NOW?  WE'VE BEEN

15   HAVING TRANSCRIPTION FOR AN HOUR AND 50 MINUTES ALMOST.

16       OKAY.  LET'S GO AHEAD AND DO THAT.  LET'S EMPTY THE

17   COURTROOM, PLEASE.

18          (PAUSE IN PROCEEDINGS.)

19          THE COURT:  OH, THE FIRM IS BAKER MCKENZIE AND NOT

20   BAKER BOTTS.

21       SO WE'LL TAKE A 15 MINUTE BREAK AFTER THIS ONE MINUTE OF

22   SEALED TESTIMONY.

23       **(PROCEEDINGS UNDER SEAL FROM PAGES 946 TO 949.)**

24

25

```
1        (IN OPEN COURT.)

2              THE COURT:  SO LET ME ASK IF, DURING THE BREAK COULD

3    WE HAVE JACKSON COME TO SEE -- I'M WONDERING IF WE'VE HAD THIS

4    PROBLEM WITH OTHER TRIALS WHERE I CAN'T GET REAL TIME BECAUSE

5    THERE'S TOO MANY PEOPLE IN THE SYSTEM?  THIS MIGHT BE THE SAME

6    PROBLEM I'VE HAD WITH OTHER TRIALS WHEN THERE HAVE BEEN TOO

7    MANY PHONES IN THE ROOM.  I CAN'T GET REALTIME.

8              MR. MERBER:  I BELIEVE WE HAVE THE SAME PROBLEM.

9              THE COURT:  ARE YOU NOT HAVING REAL TIME, EITHER?

10             MR. EVEN:  THIS IS A PROBLEM FOR EVERYONE, YOUR

11   HONOR.

12             THE COURT:  HAS IT JUST BEEN TODAY, OR ALWAYS?

13             MR. EVAN:  JUST TODAY, YOUR HONOR.

14             THE COURT:  IT WAS JUST AT THE BEGINNING AROUND

15   QUARTER TO 10:00 OR SOMETHING LIKE THAT.

16        OKAY.  I MEAN, IN THE PAST WE'VE HAD IT HARDWIRED AND THAT

17   HAS HELPED.  I DON'T KNOW IF WE HAVE TIME ENOUGH TO DO THAT.

18   MAYBE DURING LUNCH?  BUT WE'RE GOING TO HAVE TO ASK EVERYONE TO

19   TAKE THEIR PHONES OFF, WHICH -- I MEAN, I -- I WILL PROBABLY

20   NOT ASK THE MEDIA TO DO THAT, BUT EVERYONE ELSE WHO'S IN HERE,

21   I'M GOING TO ASK THEM.  I THOUGHT THE CSO'S TAKE THE PHONE

22   ANYWAY.  THEY DON'T?  OKAY.

23        ALL RIGHT.  WE'LL JUST HAVE TO ASK.  AND IF IT BECOMES A

24   PROBLEM, I'M JUST GOING TO ASK HALF OF THE PEOPLE IN THE

25   AUDIENCE TO STEP OUTSIDE UNTIL WE CAN GET REALTIME.  THAT'S THE
```

```
1    ONLY WAY I CAN ENFORCE THEM TURNING OFF THEIR PHONES.  I'VE HAD

2    ISSUES WITH PEOPLE NOT TURNING OFF THEIR PHONES IN OTHER

3    TRIALS, SO I'M GOING TO LET THEM KNOW, IF I LOSE MY REALTIME,

4    I'M GOING TO ASK HALF THE AUDIENCE TO STEP OUTSIDE.

5         OKAY.  THAT'S THE ONLY LEVERAGE WE HAVE.

6         OKAY.  THANK YOU.  LET'S TAKE A 15 MINUTE BREAK.

7         (RECESS FROM 10:58 A.M. UNTIL GOOD 11:14 A.M.)

8           THE COURT:  OKAY.  ALL RIGHT.  GOOD MORNING AND

9    WELCOME.

10        SO THERE WAS NO REALTIME THIS MORNING -- PLEASE TAKE A

11   SEAT -- FOR THE PARTIES AND FOR MYSELF, AND THAT'S BECAUSE

12   EVERYONE IS ON THE SAME WI-FI SYSTEM AND WHEN THERE ARE TOO

13   MANY PHONES IN HERE, THE SYSTEM WILL SHUT DOWN.

14        SO I'M GOING TO ASK YOU NOW TO PLEASE TURN OFF ALL YOUR

15   PHONES.  IN OTHER TRIALS, I'VE HAD DIFFICULTY WITH HAVING

16   PEOPLE COMPLY WITH THAT REQUEST.

17        SO IF MY MY WI-FI SHUTS DOWN AGAIN, I'M GOING TO ASK

18   EVERYONE EXCEPT THE MEDIA TO LEAVE, AND WE'LL JUST HAVE THIS IN

19   SEALED PROCEEDINGS.  SO I HOPE THAT'S ENOUGH INCENTIVE FOR

20   EVERYONE TO PLEASE TURN OFF THEIR PHONES.  THE MOMENT MY WI-FI

21   AND REALTIME GOES DOWN, I'M GOING TO SEAL THE COURTROOM.  ARE.

22        SO I'M MAKING THIS REQUEST TO PLEASE TURN OFF YOUR PHONE,

23   OTHERWISE I WILL LIMIT WHO MAY BE IN HERE.  IT MAY JUST BE THE

24   PARTIES IF I CAN'T GET THE REAL TIME.  SO PLEASE JUST DO THAT.

25        ALL RIGHT.  WHO'S YOUR NEXT WITNESS, PLEASE?
```

```
 1              MR. MERBER:  YOUR HONOR, ONE MINOR CORRECTION I

 2      MENTIONED BEFORE THE CHO TESTIMONY.

 3              THE COURT:  YES.

 4              MR. MERBER:  I MENTIONED TWO THAT I DID NOT MEAN TO.

 5      CX 05 --

 6              THE COURT:  OKAY.  I'M SORRY.  I HAVE TO CHARGE YOU

 7      TIME.  IT'S 11:15.  GO AHEAD, PLEASE.

 8              MR. MERBER:  CX 0531 AND 0853.  I DID NOT MEAN TO

 9      REFERENCE THOSE AND WE -- ONE OF THOSE HAS ALREADY BEEN

10      ADMITTED THROUGH A DIFFERENT WITNESS AND THE OTHER WE WERE NOT

11      SEEKING TO ADMIT THROUGH MR. CHO.

12              THE COURT:  OKAY.  WELL, THEY'VE BEEN ADMITTED.

13         DOES QUALCOMM WANT THEM ADMITTED?

14              MR. BORNSTEIN:  YOUR HONOR, ONE OF THEM IS EVIDENCE

15      ALREADY IN EVIDENCE.

16              THE COURT:  OKAY.

17              MR. BORNSTEIN:  AND 853 I UNDERSTAND THE FTC INTENDS

18      TO INTRODUCE THROUGH A DEPOSITION VIDEO WHICH WILL BE PLAYED

19      EITHER TODAY OR TOMORROW.  WE DON'T ACTUALLY INTEND TO OBJECT

20      TO THAT EXHIBIT WHEN IT IS INTRODUCED.

21              THE COURT:  SO DO YOU PLAN TO ADMIT IT LATER?

22              MS. MILICI:  POTENTIALLY, IF WE GET TO THAT VIDEO.

23              THE COURT:  SO IT'S ALREADY ADMITTED.  I DON'T

24      UNDERSTAND WHY WE WANT TO UNDO IT AND REDO LATER.

25              MS. MILICI:  WE'RE FINE WITH KEEPING IT ADMITTED.
```

1          MR. BORNSTEIN:  I WOULD PREFER THERE BE A FOUNDATION

2     LAID BEFORE IT'S ADMITTED, YOUR HONOR.  IF THEY'RE NOT GOING TO

3     PLAY THE TESTIMONY, I DON'T THINK THE DOCUMENT SHOULD COME IN

4     BECAUSE OF AN ERROR IN READING OFF THE EXHIBITS BEFORE THE CHO

5     TESTIMONY, WHICH WE CAUGHT AFTERWARDS AND RAISED AND DISCUSSED

6     WITH THE FTC AT THE BREAK.

7               THE COURT:  ALL RIGHT.  WELL, I'LL TAKE OFF 853 THEN.

8               MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

9          (PLAINTIFF'S EXHIBIT CX 0853 WAS REMOVED FROM ADMISSION.)

10              THE COURT:  BUT 531 HAS ALREADY BEEN ADMITTED, SO

11    THERE'S NO HARM IN --

12              MR. BORNSTEIN:  THERE'S NO OBJECTION TO 531.

13              THE COURT:  -- BELTS AND SUSPENDERS.  SO WHO'S YOUR

14    NEXT WITNESS?

15              MS. GILLEN:  ELIZABETH GILLEN FOR THE FEDERAL TRADE

16    COMMISSION.

17         THE FTC NOW CALLS RICHARD DONALDSON.

18              THE COURT:  OKAY.

19              MS. GILLEN:  MAY I APPROACH WITH BINDERS FOR THE

20    COURT?

21              THE COURT:  YES.  TIME WAS 11:16.

22         THIS IS AN UNRELATED QUESTION.  AVANCI CLAIMS THAT THEY

23    HAD NO IDEA OF QUALCOMM'S PROPOSED REDACTIONS TO THE LICENSE

24    AGREEMENT UNTIL MID-NIGHT ON FRIDAY, JANUARY 11TH.

25              NOW, I WOULD ASSUME THAT THEY COULD HAVE SEEN WHAT YOU

1      WANTED TO REDACT IN YOUR MOTION TO SEAL FILING THURSDAY

2      MORNING.

3              MR. BORNSTEIN:  I CAN'T SPEAK TO THAT.  THAT MAKES

4      SENSE TO ME, YOUR HONOR, WHAT YOU JUST SAID.

5              THE COURT:  YEAH.  DID YOU SEPARATELY GIVE THEM THE

6      REDACTIONS ON FRIDAY?

7              MR. BORNSTEIN:  I'M NOT --

8              THE COURT:  BECAUSE THEY'RE CLAIMING THEY DID NOT

9      RECEIVE QUALCOMM'S PROPOSED REDACTIONS TO THE LICENSE UNTIL

10     MIDNIGHT ON FRIDAY, JANUARY 11TH.  THIS IS THEIR DECLARATION,

11     ECF 1291.

12             MR. BORNSTEIN:  YOUR HONOR, MAY I ASK MR. HOLTZ TO

13     ADDRESS THIS?  HE'S BEEN IN DIRECT CONTRACT.

14             MR. HOLTZ:  SURE, YOUR HONOR.  HI.  THIS IS

15     JEFF HOLTZ, H-O-L-T-Z, COUNSEL FOR QUALCOMM.

16          WHAT WE BEEN DOING IS GIVING THE PARTIES NOTICE THAT THIS

17     DOCUMENT WILL BE USED AND THAT'S WHAT WAS DONE ON FRIDAY

18     MORNING.  TO -- IN OTHER WORDS, TO LET THEM KNOW THAT IF THEY

19     WANT TO SEEK TO SEAL IT, THEY HAVE NOTICE.  THIS WAS THURSDAY

20     MORNING.

21             THE COURT:  UM-HUM.

22             MR. HOLTZ:  FRANKLY, I DON'T THINK WE YET -- BECAUSE

23     WE HAD JUST BEEN GIVEN NOTICE THAT SAME MORNING FROM THE FTC

24     THAT THEY INTENDED TO USE THE DOCUMENT.  SO I DON'T THINK, WHEN

25     WE GAVE NOTICE ON THURSDAY MORNING, WE EVEN KNEW YET WHAT WE

```
1     WERE SEEKING TO REDACT.

2           ONCE AVANCI ASKED US, WELL, WHAT ARE YOU SEEKING TO

3     REDACT --

4                THE COURT:  NO, NO, I'M SORRY TO INTERRUPT.  YOU

5     FILED A MOTION TO REDACT JX 116 BEFORE 8:00 A.M. ON THURSDAY,

6     JANUARY 10TH.

7                MR. HOLTZ:  THAT'S WHEN WE FILED OUR MOTION TO

8     REDACT.

9                THE COURT:  YEAH.  AM I WRONG ON THAT?

10               MR. HOLTZ:  WELL, THAT -- NO, THAT WAS SOMEBODY.

11               MR. BORNSTEIN:  IS THAT THE DEMONSTRATIVE, OR IS THAT

12    THE --

13               THE COURT:  THAT'S JX 116.  I ASSUME THAT'S THE

14    LICENSE AGREEMENT.

15               MR. BORNSTEIN:  THAT'S THE AGREEMENT.

16               MR. HOLTZ:  THAT'S WHAT WE FILED THE MOTION.

17               THE COURT:  MAYBE YOU DIDN'T.  MAYBE I'M GETTING

18    THINGS MIXED UP.

19               MR. HOLTZ:  NOW I'M SORRY THAT THIS WAS NOT MY -- I

20    WASN'T THE ONE WHO ACTUALLY FILED THE MOTION, SO I DON'T KNOW

21    THE DETAILS ON THAT, WHICH I APOLOGIZE FOR.

22          BUT YOU ARE CORRECT, YOUR HONOR, THAT WE DID NOT GIVE

23    AVANCI NOTICE OF WHAT WE WERE SEEKING TO REDACT UNTIL THEY

24    ASKED US ON FRIDAY.

25               THE COURT:  AND YOU TOLD THEM THEN AT MIDNIGHT ON
```

1    FRIDAY, JANUARY 11TH IS WHAT THEY'RE SAYING IN THEIR

2    DECLARATION.

3                MR. HOLTZ:  IT WAS LATE.  WE DID SEND IT TO THEM

4    PROMPTLY AFTER THEY REQUESTED IT.  SOME PARTIES WANT TO KNOW

5    WHAT WE'RE SEEKING TO REDACT.  MOST DON'T.  SO AS A MATTER OF

6    COURSE, WE DON'T TELL PEOPLE WHAT WE'RE SEEKING TO REDACT

7    BECAUSE MOST JUST DON'T CARE.

8                THE COURT:  OKAY.  SO YOU TOLD THEM THE LICENSE MIGHT

9    BE COMING IN ON THURSDAY, BUT YOU DIDN'T GIVE YOUR PROPOSED

10   REDACTIONS TO THIS DOCUMENT UNTIL FRIDAY NIGHT?

11               MR. HOLTZ:  THAT IS CORRECT.

12               THE COURT:  SO THEN WHY WAS MR. BORNSTEIN SO FOCUSSED

13   ON THE LASINSKI SLIDES.  THAT'S NOT EVEN PART OF THE RENEWED

14   MOTION.  IT'S ONLY PART OF THIS DOCUMENT.  WHY ARE WE --

15               MR. BORNSTEIN:  BECAUSE, YOUR HONOR, BOTH OF THESE

16   THINGS WERE AT ISSUE IN THE MOTIONS THAT THEY FILED.

17               THE COURT:  THAT'S NOT AN ANSWER TO MY QUESTION.

18               MR. BORNSTEIN:  I WAS TRYING TO BE RESPONSIVE TO THE

19   QUESTION ABOUT THE SUBJECT OF THEIR SEALING MOTIONS.

20               THE COURT:  THE MOTION THEY FILED THIS MORNING IS

21   ONLY AS TO THIS LICENSE AGREEMENT.

22               MR. BORNSTEIN:  OKAY.

23               THE COURT:  AND THIS DECLARATION SAYS QUALCOMM DIDN'T

24   TELL US THEIR PROPOSED REDACTIONS UNTIL MIDNIGHT ON FRIDAY.

25               MR. BORNSTEIN:  YES, YOUR HONOR, WE'VE ADVISED THEM

1      OF THE DOCUMENT.  IT'S THEIR RESPONSIBILITY TO DECIDE WHAT IN

2      THE DOCUMENT WE WOULD LIKE TO SEAL.

3          YOUR HONOR MENTIONED IN COURT ON FRIDAY THAT YOU WANTED US

4      TO COORDINATE WITH THE THIRD PARTIES AND SINCE WE'VE HAD THAT

5      CONVERSATION ON FRIDAY, WE'VE BEEN DOING THIS.  WE ADDRESSED

6      THIS DOCUMENT PRIOR TO YOUR HONOR'S SUGGESTION ON FRIDAY TO

7      COORDINATE MORE CLOSELY WITH THE THIRD PARTIES.  WE'VE BEEN

8      DOING THAT NOW.

9          WE ADVISED THEM OF THE FILING OF -- EXCUSE ME.  WE ADVISED

10     THEM OF THE FACT THAT THE FTC HAD IDENTIFIED THIS CONTRACT AS

11     SOMETHING IT INTENDED TO USE, WE DID THAT PROMPTLY TWO HOURS

12     AFTER BEING TOLD.

13              THE COURT:  OKAY.

14              MR. BORNSTEIN:  AND WE -- WE PROCEEDED ACCORDINGLY.

15         THEY MOVED ON THE SPEED THEY MOVED.  WE RESPONDED VERY

16     PROMPTLY TO THEIR REQUEST TO US, TOO, ABOUT WHAT IT IS WE WERE

17     SEEKING TO REDACT.

18              THE COURT:  OH, I SEE.  SO YOUR MOTION TO SEAL WAS

19     FILED AT 6:44 P.M. ON THURSDAY, IT LOOKS LIKE.  I STILL DON'T

20     UNDERSTAND WHY THEY WOULDN'T KNOW WHAT YOUR PROPOSED REDACTIONS

21     WERE --

22              MR. BORNSTEIN:  I CAN'T SPEAK TO THAT, YOUR HONOR.

23              THE COURT:  -- UNTIL FRIDAY NIGHT.

24         ANYWAY.  OKAY.  I'M NOT GOING TO CHARGE TIME FOR THIS, BUT

25     THE EARLIER TIME I AM GOING TO CHARGE TO QUALCOMM.

1          ALL RIGHT.  LET'S SWEAR IN THE WITNESS, PLEASE.

2              MR. VAN NEST:  EXCUSE ME, YOUR HONOR.  COULD I

3     REQUEST THAT EARLIER TIME BE SHARED?  THIS IS NOT SOMETHING

4     THAT WE CAUSED OR CREATED.  WE'RE NOT THE ONES SPONSORING THE

5     DOCUMENT.  WE TRIED TO SOLVE IT AFTER YOUR COMMENTS ON FRIDAY.

6     I DON'T UNDERSTAND WHY WE WOULD BE CHARGED THE ENTIRETY OF

7     THAT.  THEY'RE OFFERING INFORMATION AND BOTH THE PARTIES ARE

8     PRESENTING STUFF WITH MR. LASINSKI.

9          I THINK IT WOULD BE MORE FAIR TO SHARE THAT TIME.

10             MS. MILICI:  YOUR HONOR, TO BE FAIR, THIS IS A

11    QUALCOMM PRODUCED DOCUMENT THAT WAS ON OUR EXHIBIT LIST WAY

12    BACK IN NOVEMBER.

13             MR. VAN NEST:  BUT THEY'RE THE ONES --

14             MR. BORNSTEIN:  IT'S A JOINT EXHIBIT.

15             MR. VAN NEST:  IT'S A JOINT EXHIBIT, YOUR HONOR.  IT

16    OUGHT TO BE JOINTLY SHARED.

17             THE COURT:  ALL RIGHT.  I THINK THAT'S FAIR.

18             MR. VAN NEST:  THANK YOU.

19             THE COURT:  YOU'LL EACH GET DOCKED FIVE MINUTES.

20             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

21         **(PLAINTIFF'S WITNESS, RICHARD DONALDSON, WAS SWORN.)**

22             THE WITNESS:  I DO.

23             THE CLERK:  THANK YOU.

24             THE COURT:  AND I HOPE YOU LET AVANCI KNOW YOUR

25    DISAPPOINTMENT AT HOW MUCH TIME YOU LOST BECAUSE OF THEIR LATE

1    FILING.

2         ALL RIGHT.  WOULD YOU PLEASE SPELL YOUR NAME FOR THE

3    RECORD.

4         THE CLERK:  WOULD YOU PLEASE STATE YOUR NAME AND

5    SPELL YOUR LAST NAME FOR THE RECORD.

6         THE WITNESS:  RICHARD DONALDSON.  D-O-N-A-L-D-S-O-N.

7                    **DIRECT EXAMINATION**

8    BY MS. GILLEN:

9    Q.   GOOD MORNING, MR. DONALDSON.  I'D LIKE TO START BY ASKING

10   YOU ABOUT YOUR QUALIFICATIONS?

11        THE COURT:  IT'S 11:23.  GO AHEAD, PLEASE.

12   BY MS. GILLEN:

13   Q.   I'D LIKE TO START BY ASKING ABOUT YOUR QUALIFICATIONS.

14   FIRST TO HELP PROVIDE SOME CONTEXT, COULD YOU PLEASE TELL THE

15   COURT ABOUT THE GENERAL TYPES OF QUESTIONS YOU'LL BE ADDRESSING

16   IN THIS CASE?

17   A.   YES.  I'M GOING TO ADDRESS THE DYNAMICS OF THE NEGOTIATION

18   PROCESS LOOKING AT WHAT NORMALLY HAPPENS DURING LICENSE

19   NEGOTIATIONS, LOOKING AT WHO HAS BARGAINING POSITION,

20   BARGAINING POWER AND HOW THAT CAME ABOUT, AND LOOKING AT THE

21   LICENSE TERMS, WHETHER THEY'RE TYPICAL OR NOT TYPICAL TAKING --

22   LOOKING AT NORMAL LICENSE NEGOTIATIONS.

23   Q.   AND WHAT EXPERIENCE DO YOU HAVE AS AN EXPERT ON THESE

24   TOPICS?

25   A.   I WORKED FOR 31 YEARS AT TEXAS INSTRUMENTS, AND MOST OF

1        THAT TIME I WAS DIRECTLY INVOLVED IN NEGOTIATING PATENT

2    LICENSES.

3    Q.   AND WHAT WAS YOUR TITLE AT TEXAS INSTRUMENTS?

4    A.   WELL, IT VARIED, OF COURSE, OVER MY CAREER.  I STARTED OFF

5    AS A PATENT ATTORNEY, AND THEN I WAS AN ASSISTANT TO THE

6    LICENSING MANAGER WHERE I PROVIDED THE LEGAL AND TECHNICAL

7    SUPPORT IN LICENSE NEGOTIATIONS.

8        I THEN WAS GIVEN RESPONSIBILITY FOR RESPONDING TO ALL

9    ADVERSE CLAIMS AGAINST TEXAS INSTRUMENTS AND NEGOTIATING

10   AGREEMENTS TO SETTLE THOSE DISPUTES.

11       I THEN BECAME A VICE PRESIDENT IN CHARGE OF LICENSING.  AS

12   LICENSING MANAGER, I NEGOTIATED LICENSES FOR ALL OF TI'S

13   PRODUCTS, AND I RETIRED AS THE SENIOR VICE PRESIDENT AND

14   GENERAL PATENT COUNSEL.

15   Q.   CAN YOU DESCRIBE YOUR EXPERIENCE NEGOTIATING LICENSE

16   AGREEMENTS FOR TEXAS INSTRUMENTS?

17   A.   YES.  I NEGOTIATED, DURING MY CAREER, HUNDREDS OF LICENSE

18   AGREEMENTS RELATED PRIMARILY TO THE SEMICONDUCTOR INDUSTRY AND

19   TO THE COMPUTER INDUSTRY.

20       AND DURING THAT PERIOD OF TIME, I NEGOTIATED AGREEMENTS

21   WITH I THINK ALL OF THE MAJOR SEMICONDUCTOR MANUFACTURERS

22   AROUND THE WORLD AND ALL THE COMPUTER MANUFACTURERS.

23       I WAS THE LEAD NEGOTIATOR IN THESE AGREEMENTS, I DRAFTED

24   THE AGREEMENTS, I HAD BUSINESS RESPONSIBILITY, SIGNATORY

25   AUTHORITY FOR ENTERING INTO AGREEMENTS ON BEHALF OF TI.

1    Q.   AND WHAT EXPERIENCE DO YOU HAVE NEGOTIATING LICENSING

2    RELATING TO WIRELESS CELLULAR TECHNOLOGY?

3    A.   DURING MY TENURE AT TI, WIRELESS AND CELLULAR BECAME MUCH

4    MORE POPULAR.  IN FACT, TI WAS ONE OF THE LEADING PROVIDERS OF

5    BASEBAND CONTROLLERS, SELLING THESE DEVICES TO NOKIA, ERICSSON,

6    MOTOROLA TO NAME SOME OF THE COMPANIES.

7         I NEGOTIATED A NUMBER OF PATENT LICENSE AGREEMENTS DURING

8    THAT TIME, AND THOSE LICENSE AGREEMENTS WERE STRUCTURED TO

9    INCLUDE PATENT -- TO INCLUDE LICENSES THAT RELATED TO OUR

10   MANUFACTURER OF THESE DEVICE, INCLUDING STANDARD ESSENTIAL

11   PATENTS.

12   Q.   ASIDE FROM YOUR EXPERIENCE AT TEXAS INSTRUMENTS, WHAT

13   OTHER RELEVANT EXPERIENCE DO YOU HAVE?

14   A.   UPON RETIRING, I BECAME A LICENSING CONSULTANT.  I

15   PARTICIPATED IN THAT CAPACITY IN A NUMBER OF PATENT LITIGATIONS

16   WHERE MY PRIMARY RESPONSIBILITY WAS TO EVALUATE PATENTS, TO

17   EVALUATE DAMAGES, DETERMINE WHAT REASONABLE ROYALTIES WERE,

18   THINGS OF THAT NATURE.  AND I'VE TESTIFIED IN COURT A NUMBER OF

19   TIMES CONCERNING THESE ISSUES.

20   Q.   AND CAN YOU DESCRIBE SOME OF THE CASES YOU'VE RECENTLY

21   TESTIFIED IN?

22   A.   WELL, I TESTIFIED IN CASES SUPPORTING ERICSSON IN SOME OF

23   THEIR LICENSING NEGOTIATIONS FOR STANDARD ESSENTIAL PATENTS;

24   INTERDIGITAL FOR SOME OF THEIR PATENT ESSENTIAL PATENTS IN THE

25   CELLULAR INDUSTRY; I WORKED WITH INTEL ON A NUMBER OF CASES.

1    THOSE WERE PRIMARILY RELATED TO THE WIRELESS TECHNOLOGY, BUT,

2    AGAIN, THERE WERE STANDARD ESSENTIAL PATENTS.

3         I'VE WORKED FOR APPLE, AND LARGELY IN THE SAMSUNG

4    LITIGATION THAT I THINK EVERYONE IS FAMILIAR WITH, AND I

5    PARTICIPATED IN THAT.

6    Q.   THANK YOU.

7         YOUR HONOR, AT THIS TIME THE FEDERAL TRADE COMMISSION

8    TENDERS RICHARD DONALDSON AS AN EXPERT WITNESS IN PATENT

9    LICENSING, INCLUDING PATENT LICENSE NEGOTIATIONS.

10             THE COURT:  WOULD YOU LIKE TO VOIR DIRE HIM YOURSELF?

11             MR. PAIGE:  NO, NO, YOUR HONOR.

12             THE COURT:  OR ANY OBJECTION.

13        OKAY.  SO YOU SAID THE SUBJECT MATTER IS PATENT LICENSING,

14   INCLUDING PATENT LICENSE NEGOTIATIONS.

15        OKAY.  SO CERTIFIED AS AN EXPERT.  GO AHEAD, PLEASE.

16   BY MS. GILLEN:

17   Q.   MR. DONALDSON, WHAT ARE THE CORE OPINIONS THAT YOU OFFER

18   IN THIS CASE?

19   A.    I THINK PRIMARILY I'VE LOOKED AT LICENSE NEGOTIATIONS THAT

20   QUALCOMM ENTERED INTO, CONSIDERED THE TYPE OF NEGOTIATIONS

21   THESE WERE, AND HAVE CONCLUDED THAT THEY WERE VERY ATYPICAL.

22   AND THEY WERE ATYPICAL FROM NORMAL PATENT LICENSE AGREEMENTS

23   BECAUSE QUALCOMM HAD A POLICY THAT THEY CALLED "NO LICENSE, NO

24   CHIPS," AND GIVING THE CRITICALITY OF THE CHIPS THAT QUALCOMM

25   POSSESSED, THIS GAVE THEM TREMENDOUS BARGAINING POWER IN THE

1       LICENSE NEGOTIATIONS AND RESULTED IN WHAT I BELIEVE ARE SOME

2       VERY ATYPICAL LICENSE TERMS THAT COMPANIES AGREED TO BECAUSE OF

3       THIS "NO LICENSE, NO CHIPS POLICY."

4            A SECOND OPINION I WOULD OFFER IS THAT CHIP LEVEL

5       LICENSING IS A VIABLE WAY OF LICENSING IN THIS INDUSTRY.  IT'S

6       SOMETHING THAT I DID DURING MY CAREER AT TEXAS INSTRUMENTS.  WE

7       LICENSED EXHAUSTIVELY CHIPS AT THE COMPONENT LEVEL AND SOLD

8       PRODUCTS EXHAUSTIVELY AT THAT LEVEL.

9            AND I HAD A SEPARATE LICENSING PROGRAM DIRECTED PURELY TO

10      THE END ITEMS, LIKE COMPUTERS, AND THESE WERE SUCCESSFUL AND

11      THEY WERE -- THEY WERE -- THOSE SPECIFIC ISSUES IN TRYING TO

12      IMPLEMENT THEM.

13      Q.   AND CAN YOU PLEASE EXPLAIN TO THE COURT THE PROCESS BY

14      WHICH YOU FORMED YOUR OPINIONS?

15      A.   I HAVE, OF COURSE, RELIED UPON MY EXPERIENCE IN

16      NEGOTIATING LICENSE AGREEMENTS IN THE INDUSTRY.

17           BUT I'VE ALSO LOOKED AT THE RECORD, SUBSTANTIAL RECORD, A

18      LOT OF DOCUMENTS PRODUCED IN THIS CASE.  I'VE LOOKED AT LICENSE

19      AGREEMENTS, I'VE LOOKED AT SUBMISSIONS TO THE FTC FROM VARIOUS

20      PARTIES, I'VE LOOKED AT DEPOSITION TESTIMONY.

21           AND, IMPORTANTLY, I'VE LOOKED AT TESTIMONY FROM WITNESSES

22      WHO ACTUALLY ENGAGED IN NEGOTIATIONS WITH QUALCOMM, HOW THEY

23      VIEWED THOSE NEGOTIATIONS AND THEIR -- THERE WAS A SIGNIFICANT

24      AMOUNT OF CONTEMPORANEOUS DOCUMENTS RELATING TO THOSE

25      NEGOTIATIONS THAT WERE AVAILABLE, SO I REVIEWED THOSE ALSO.

1      Q.   AND WHAT PARTICULAR NEGOTIATIONS DID YOU FOCUS ON?

2      A.   I THINK WHERE I HAVE FOCUSSED QUITE A BIT OF ATTENTION

3      WOULD BE NEGOTIATIONS WITH HUAWEI, WITH SAMSUNG AND LENOVO,

4      WITH LG, WITH BLACKBERRY, AND SONY.

5      Q.   AND WHY ARE THOSE OEM'S PARTICULARLY SIGNIFICANT TO YOU?

6      A.   THERE'S A COUPLE REASONS.  THEY'RE, I UNDERSTAND,

7      SIGNIFICANT PLAYERS IN THE CELLULAR BUSINESS.  THEY ARE

8      SOPHISTICATED COMPANIES.  THEY HAD AN INCENTIVE, BEING

9      SIGNIFICANT PLAYERS, TO NEGOTIATE AND TRY TO OBTAIN THE MOST

10     FAVORABLE RATES THAT THEY COULD.

11          AND ALSO IMPORTANTLY BECAUSE THERE WAS TESTIMONY FROM

12     THESE COMPANIES THAT, FROM PEOPLE WHO ACTUALLY PARTICIPATED IN

13     THOSE NEGOTIATIONS WITH CONTEMPORANEOUS DOCUMENTS, SO I COULD

14     SEE THE EBB AND FLOW AND THE LEVERAGE THAT WAS APPLIED IN THE

15     NEGOTIATIONS.

16     Q.   AND HAVE YOU SEEN ANY OF THE TRIAL TESTIMONY GIVEN IN THIS

17     CASE ABOUT THOSE OEM'S NEGOTIATIONS?

18     A.   YES, I HAVE.  I HAVE SEEN WHAT WAS PLAYED IN THIS COURT I

19     THINK WITH HUAWEI AND SAMSUNG AND LENOVO.

20     Q.   MR. DONALDSON, YOU FIRST DESCRIBED YOUR OPINION THAT

21     QUALCOMM'S LICENSE NEGOTIATIONS WERE ATYPICAL.

22          IN YOUR EXPERIENCE, HOW DOES A TYPICAL LICENSE NEGOTIATION

23     USUALLY PROCEED?

24     A.   WELL, IN A TYPICAL PATENT LICENSE NEGOTIATIONS THE PARTIES

25     WILL SIT DOWN TO NEGOTIATE THE BEST TERMS THAT THEY CAN GET.

1          THE PARTIES -- EACH OF THE PARTIES WILL HAVE SOME

2     BARGAINING POWER IN THE NEGOTIATIONS.  ONE OF THE THINGS THAT

3     GIVES BOTH PARTIES BARGAINING POWER IS THE FACT THAT THESE

4     LICENSING PROFESSIONALS KNOW THAT IF THEY ARE UNABLE TO REACH

5     AGREEMENT, THAT LITIGATION COULD OCCUR.

6          AND LICENSING PROFESSIONALS ARE AWARE OF DAMAGES LAW, OF

7     WHAT A COURT IS LIKELY TO DO IF IT GETS INTO A LITIGATION, WHAT

8     A COURT MIGHT LIKELY DETERMINE A REASONABLE ROYALTY TO BE, WHAT

9     PARAMETERS WOULD BE IMPORTANT IN THAT DECISION BY THE COURT.

10         AND SO THEY STRUCTURE THEIR NEGOTIATIONS TAKING THIS

11    POSSIBILITY INTO ACCOUNT, WHICH GENERALLY DRIVES THE PARTIES TO

12    MORE REASONABLE PRESENTATIONS, MORE REASONABLE EXPECTATIONS.

13    Q.   AND HOW DOES THE POSSIBLE ALTERNATIVE OF LITIGATION AFFECT

14    A PATENT OWNER DURING NEGOTIATIONS?

15    A.   WELL, A PATENT OWNER, THERE'S SOME BARGAINING LEVERAGE

16    THAT HE HAS.  IF HE GETS INTO A LITIGATION SCENARIO, IF THE

17    PATENTS ARE HELD VALID AND INFRINGED, THERE'S A PROSPECT OF AN

18    INJUNCTION, AND THAT IS PROBABLY THE MOST SEVERE REMEDY THAT

19    WOULD OCCUR, AND THAT COULD BE VERY DISASTROUS FOR A LICENSEE.

20         HE HAS SOME RISK THAT THE COURT WILL DETERMINE A

21    REASONABLE ROYALTY THAT IS LESS THAN WHAT HE WOULD LIKE.  SO

22    THAT COULD BE A POTENTIAL DOWNSIDE.

23    Q.   AND HOW DOES THE POSSIBLE ALTERNATIVE OF LITIGATION AFFECT

24    THE BARGAINING POWER OF A PROSPECTIVE LICENSEE?

25    A.   WELL, A LICENSEE ALSO HAS SUBSTANTIAL RISK, OF COURSE THE

1       INJUNCTION BEING ONE OF THEM.

2           BUT IF HE IS OF THE OPINION THAT WHAT IS BEING PROPOSED,

3       THE RATES BEING PROPOSED ARE UNREASONABLY HIGH, HE WOULD HAVE

4       AN EXPECTATION THAT A REASONABLE COURT WOULD LOWER WHAT A

5       REASONABLE -- HIS DETERMINATION OF A REASONABLE ROYALTY.

6           AND HE WOULD ALSO HAVE THE ABILITY, DURING THIS LITIGATION

7       PROCESS, TO INVESTIGATE AND PERHAPS COME UP WITH A DESIGN

8       ALTERNATIVE WHERE HE COULD AVOID THE PATENTS AND, IN MY

9       EXPERIENCE, THIS IS SOMETHING THAT IS VERY COMMONLY USED AND IN

10      MY EXPERIENCE AT TI WHEN WE WERE INVOLVED IN LICENSE

11      NEGOTIATIONS I BELIEVED MIGHT GO TO TRIAL, WE WOULD INSTITUTE A

12      DESIGN AROUND PROJECT WITHIN THE COMPANY TO SEE WHAT OUR

13      ALTERNATIVES WERE.

14          AND YOU COULD USE THAT WITH THE OTHER PARTY IN THE

15      NEGOTIATIONS, LOOK, I CAN DESIGN AROUND THIS FOR $500,000.  SO

16      THAT GIVES -- THAT WOULD HELP YOU RESOLVE THE DISPUTE.

17      Q.   AND HOW WOULD THE RELATIVE BARGAINING POWER OF THE PARTIES

18      CHANGE WHEN NEGOTIATING A LICENSE COVERING STANDARD ESSENTIAL

19      PATENTS?

20      A.   WELL, IN STANDARD ESSENTIAL PATENTS, I THINK IT'S LIKELY

21      WEAKER BARGAINING POWER FOR THE PATENT OWNER, DEPENDING ON WHAT

22      HIS DEMANDS HAVE BEEN, PARTICULARLY IN TODAY'S ENVIRONMENT

23      WHERE WE HAVE SEEN WHERE COURTS HAVE CONSIDERED FRAND RATES FOR

24      STANDARD ESSENTIAL PATENTS, THEY TYPICALLY HAVE BEEN

25      SIGNIFICANTLY LOWER THAN WHAT HAD BEEN DEMANDED BY THE PATENT

1       OWNER.

2            AND SO THAT WOULD BE A DOWNSIDE FOR A PATENT OWNER.

3       Q.   AND IN A TYPICAL NEGOTIATION COVERING STANDARD ESSENTIAL

4       PATENTS, WHAT EFFECT WOULD YOU EXPECT THIS TO HAVE ON THE RATE

5       THAT PARTIES MIGHT NEGOTIATE?

6       A.   I THINK THE RATE MOST LIKELY WOULD BE LOWER GIVEN THE

7       CHANGES AND APPLICATION OF DAMAGES LAW.

8       Q.   SO NOW THAT YOU'VE WALKED US THROUGH WHAT A TYPICAL

9       NEGOTIATION LOOKS LIKE, CAN YOU PLEASE EXPLAIN HOW QUALCOMM'S

10      NEGOTIATIONS ARE DIFFERENT?

11      A.   WELL, THE BOTTOM LINE IS IN THE NEGOTIATIONS THAT QUALCOMM

12      HAD WHERE THEY SUPPLIED CHIPS THAT WERE COMMERCIALLY NECESSARY

13      FOR THE LICENSEE TO CONTINUE IN BUSINESS, FOR THOSE SITUATIONS,

14      QUALCOMM ESSENTIALLY TOOK THE RISK OF LITIGATION OFF THE TABLE.

15      IT WAS NOT AN ALTERNATIVE TO THE LICENSEE.

16      Q.   AND WHAT EFFECT WOULD THE REMOVAL OF THAT ALTERNATIVE HAVE

17      ON THE NEGOTIATING PARTY'S BARGAINING POSITIONS?

18      A.   WELL, IT WOULD PUT THE LICENSEE AT A SEVERE DISADVANTAGE.

19      HE'S BASICALLY -- AND AS THE TESTIMONY REFLECTS -- HE'S

20      BASICALLY IN THE POSITION, I AGREE TO THE LICENSE OR BASICALLY

21      GO OUT OF BUSINESS.

22      Q.   AND WHAT EFFECT DOES THIS CHANGE IN THE BARGAINING POWER

23      HAVE ON THE ROYALTY RATES THAT MIGHT BE NEGOTIATED?

24      A.   WELL, I THINK IT RESULTS IN A DISPROPORTIONATELY HIGH

25      ROYALTY RATE.

1    Q.   ARE YOU AWARE OF ANY OTHER COMPANIES THAT HAVE A SIMILAR

2    POLICY TO QUALCOMM'S?

3    A.   THE NO LICENSE, NO CHIPS?  I AM NOT AWARE OF ANY OTHER

4    SITUATION LIKE THAT.

5    Q.   IN FORMING YOUR OPINIONS, DID YOU CONSIDER EVIDENCE FROM

6    OEM'S REGARDING THE PREVALENCE OF THE NO LICENSE, NO CHIPS

7    POLICY?

8    A.   YES, I DID.

9    Q.   AND WHAT DID THAT EVIDENCE REFLECT?

10   A.   I THINK THE EVIDENCE WERE THAT PEOPLE UNIFORMLY SAID THEY

11   WERE NOT AWARE OF ANY OTHER COMPANY WHO FOLLOWED THE SAME

12   POLICY THAT QUALCOMM HAD IN THIS NO LICENSE, NO CHIP.

13   Q.   SO HOW DID QUALCOMM'S ENHANCED NEGOTIATION LEVERAGE

14   MANIFEST ITSELF IN QUALCOMM'S LICENSE TERMS?

15   A.   I THINK QUALCOMM WAS ABLE TO ACHIEVE LICENSING TERMS THAT

16   WERE ATYPICAL IN THE INDUSTRY.

17   Q.   AND WHAT WERE SOME OF THOSE ATYPICAL TERMS?

18   A.   I BELIEVE THAT THE ROYALTY RATE THAT QUALCOMM ACHIEVED WAS

19   DISPROPORTIONATELY HIGH.  I BELIEVE THAT THE TERM OF THE

20   LICENSE THAT QUALCOMM WAS ABLE TO ACHIEVE -- YOU KNOW, MOST OF

21   THEM BEING TEN YEARS OR LONGER -- THESE LONG-TERM LICENSING

22   LOCKED IN THESE HIGH ROYALTIES, AND TO ME THAT IS VERY ATYPICAL

23   IN LICENSE NEGOTIATIONS.

24        I THINK THAT THEY WERE -- QUALCOMM, WITH THIS POLICY, WAS

25   LARGELY ABLE TO AVOID LITIGATION WITH THE NO LICENSE, NO CHIP

1    COMPANIES COULDN'T AFFORD TO GIVE UP THEIR SUPPLY OF CHIPS.

2         AND SO QUALCOMM HAS NOT HAD TO REALLY SUBJECT ITS

3    LICENSING PRACTICES TO A COURT DETERMINATION OF WHETHER THEIR

4    PRACTICES WERE PROPER OR WHETHER THOSE RATES WERE FRAND.

5    Q.   SO LET'S GO THROUGH THOSE ONE AT A TIME.

6         FIRST, HOW DID YOU FORM YOUR OPINION THAT THE ROYALTIES

7    OEM'S PAID TO QUALCOMM WERE DISPROPORTIONATELY HIGH?

8    A.   LARGELY THAT WAS BASED UPON EVIDENCE THAT I LOOKED AT IN

9    THE RECORD, PEOPLE WHO HAD -- OEM'S, SIGNIFICANT OEM'S WHO HAD

10   NEGOTIATIONS WITH QUALCOMM, THEY TESTIFIED THAT THE RATES

11   QUALCOMM WAS ACHIEVING WERE MUCH, MUCH LARGER THAN OTHER

12   COMPANIES IN THIS INDUSTRY WHO ALSO HAD SIGNIFICANT STANDARD

13   ESSENTIAL PATENT PORTFOLIOS.

14        I'VE LOOKED AT DOCUMENTS, I THINK SUPPLIED EVEN BY

15   QUALCOMM, COMPARING THE TOTAL ROYALTIES THAT QUALCOMM HAS

16   RECEIVED TO OTHER COMPANIES LIKE NOKIA, ERICSSON, INTERDIGITAL,

17   AND IT REFLECTS QUALCOMM'S RATES ARE MUCH, MUCH HIGHER THAN

18   ANYONE ELSE IN THE INDUSTRY.

19   Q.   AND DO YOU HAVE AN OPINION AS TO WHETHER THESE HIGHER

20   RATES WERE THE SAME ACROSS DIFFERENT LICENSEES?

21   A.   YES.  THAT IS ONE OF THE ANOMALIES THAT I HAVE RECOGNIZED,

22   AND I -- AND THAT IS AN ANOMALY TO ME BECAUSE MANY OF THE

23   QUALCOMM'S LICENSES WERE WITH OTHER COMPANIES WHO HAVE

24   SIGNIFICANT PORTFOLIOS OF STANDARD ESSENTIAL PATENTS.

25        AND THESE COMPANIES BASICALLY WERE REQUIRED TO GRANT

1    ROYALTY-FREE, EXHAUSTIVE ROYALTY-FREE CROSS-LICENSES BACK TO

2    QUALCOMM, INCLUDING LICENSES AT THE CHIP LEVEL.

3         AND IN MY EXPERIENCE AT TEXAS INSTRUMENTS, WE HAD PATENTS

4    THAT WE BELIEVED SHOULD COMMAND A CERTAIN ROYALTY RATE, BUT WE

5    NEGOTIATED WITH ALL THESE DIFFERENT COMPANIES AND EVERY LICENSE

6    WAS DIFFERENT.  EVERY LICENSE WAS DIFFERENT BECAUSE EACH

7    COMPANY HAD ITS OWN PATENT PORTFOLIO AND WE GAVE CREDIT AND

8    VALUE TO THOSE PATENT PORTFOLIOS AND THAT JUST RESULTED IN

9    DIFFERENT LICENSE RATES.

10        SO TO ME, THIS WAS A REAL ANOMALY.

11   Q.   I WANT TO ASK YOU ABOUT THE SECOND UNUSUAL FEATURE THAT

12   YOU MENTIONED.  WHAT IS YOUR OPINION REGARDING THE DURATION OF

13   QUALCOMM'S AGREEMENTS?

14   A.   I THINK THE -- FROM MY EXPERIENCE OF WHAT LICENSE

15   AGREEMENTS NORMALLY HAVE, A DURATION OF TEN YEARS OR LONGER IS

16   VERY UNUSUAL WHEN IT LOCKS IN A HIGH ROYALTY RATE.

17        A LICENSEE IN TYPICAL NEGOTIATIONS WOULD NOT WANT TO

18   COMMIT THEMSELVES TO A HIGH ROYALTY RATE OVER A LONG PERIOD OF

19   TIME, AND CERTAINLY IN MY EXPERIENCE IN LICENSING AT TI, WE

20   WERE USING SHORTER TERMS DURING MY TIME, MOSTLY, LIKE, FIVE

21   YEARS WHERE THE PARTIES HAD A CHANCE TO RE-EVALUATE ALL PATENTS

22   AFTER FIVE YEARS BECAUSE JUST IN THE RAPID CHANGE IN THE

23   TECHNOLOGY.

24        SO THESE LONG TERMS WITH LONG TERM ROYALTY RATES I THINK

25   REFLECT THE BARGAINING POWER THAT QUALCOMM HAD.

DONALDSON DIRECT BY MS. GILLEN

1    Q.   AND WHAT IS UNUSUAL GENERALLY ABOUT THINGS REMAINING

2    STAGNANT OVER TIME?

3    A.   WELL, ONE THING IS IN THE LICENSING PROFESSION, YOU

4    TYPICALLY SEE OVER TIME ROYALTY RATES DECREASING.

5    Q.   AND WHAT ARE SOME OF THE REASONS THAT ROYALTY RATES MIGHT

6    DECREASE OVER TIME?

7    A.   WELL, FOR EXAMPLE, IN THE CASE OF QUALCOMM WHEN RATES WERE

8    FIRST ESTABLISHED BACK WHEN CDMA WAS USED IN TELEPHONES WHERE

9    OUR CELL PHONES WERE -- IT WAS JUST A CELL PHONE.  NO OTHER

10   CAPABILITIES.

11       AND THOSE PRODUCTS HAVE CHANGED DRAMATICALLY OVER THE LIFE

12   SINCE THEN AND WE NOW HAVE SMARTPHONES WITH MANY, MANY FEATURES

13   THAT DO NOT INFRINGE THE CELLULAR PATENTS, THE SEPS.

14       SO I WOULD EXPECT THAT TO DRIVE A LOWER ROYALTY RATE.

15       AND ALSO, THE FACT THAT I THINK MANY PEOPLE HAVE

16   TESTIFIED, PEOPLE WHO ARE IN THIS INDUSTRY, THAT SAMSUNG'S

17   POSITION IN THE STANDARD ESSENTIAL PATENTS IS WEAKER, FOR

18   EXAMPLE, IN LTE THAN IT WAS IN THE ORIGINAL CDMA, WHICH WOULD

19   SUGGEST A LOWER ROYALTY RATE.

20       AND IN THAT SAME LINE, MANY OF SAMSUNG'S EARLY --

21   SAMSUNG'S, I'M SORRY.

22       MANY OF QUALCOMM'S EARLY PATENTS IN CDMA ARE EXPIRING

23   WHICH, IN MY EXPERIENCE IN LICENSE NEGOTIATIONS, WHEN YOUR

24   PORTFOLIO IS WEAKENED BY EXPIRING SIGNIFICANT PATENTS, THE

25   ROYALTY RATE WOULD TYPICALLY DECREASE.

1          AND I GUESS ANOTHER ISSUE IS OVER THIS PERIOD OF TIME THAT

2     THERE HAS BEEN A SIGNIFICANT CHANGE IN PATENT LAW DAMAGES AND

3     HOW PATENT LAW DAMAGES ARE ASSESSED, THE REQUIREMENT FOR

4     LOOKING AT THE SMALLEST SALEABLE PATENT UNIT, AND THINGS OF

5     THIS NATURE, SO I WOULD EXPECT THAT THE RATES WOULD HAVE

6     DECLINED BASED ALSO ON THAT.

7     Q.   AND THE FINAL UNUSUAL OBSERVATION YOU MENTIONED IS THAT

8     QUALCOMM RARELY ENGAGED IN LITIGATION.

9          WHAT IS YOUR OPINION REGARDING THE FREQUENCY WITH WHICH

10    OEM'S RESORTED TO LITIGATION WITH QUALCOMM?

11    A.   I THINK THAT LITIGATION WAS VERY UNUSUAL WITH QUALCOMM,

12    PARTICULARLY WITH THE COMPANIES WHO COULD PROBABLY MOST AFFORD

13    TO GET INTO THE COST OF LITIGATION.  THEY WERE THE ONES WHO

14    WERE LARGER MANUFACTURERS WHO WERE PURCHASING QUALCOMM CHIPS TO

15    WHICH THEY HAD NO REASONABLE ALTERNATIVE.

16         AND THE NO LICENSE, NO CHIP POLICY TOOK LITIGATION OFF THE

17    TABLE.

18         SO QUALCOMM HAS NOT REALLY HAD TO SUBJECT ITS PRACTICES

19    AND ROYALTY RATES TO COURT SCRUTINY BEFORE.

20    Q.   SIR, CAN YOU TURN TO THE FOURTH TAB IN YOUR BINDER LABELED

21    CX 101.

22    A.   YES.

23    Q.   AND DID YOU PREPARE THIS CHART?

24    A.   YES, I DID.

25    Q.   AND WHAT IS THE SOURCE OF THE INFORMATION YOU USED TO

```
 1      PREPARE THE CHART?

 2      A.   THIS WAS BASED ON INFORMATION THAT COMPANIES SUBMITTED TO

 3      THE FTC.

 4               MS. GILLEN:  YOUR HONOR, I MOVE TO ADMIT CX 101.

 5               MR. PAIGE:  YOUR HONOR, WE FILED A HIGH PRIORITY

 6      OBJECTION SAYING THIS WAS NOT A PROPER SUMMARY OF THOSE

 7      DOCUMENTS.

 8               THE COURT:  AND THAT WAS OVERRULED, SO THIS IS

 9      ADMITTED.

10          (PLAINTIFF'S EXHIBIT CX 101 WAS ADMITTED IN EVIDENCE.)

11               THE COURT:  GO AHEAD, PLEASE.

12      BY MS. GILLEN:

13      Q.   WHAT DOES THIS CHART DEPICT?

14      A.   THIS SHOWS PATENT LITIGATIONS FOR COMPANIES LIKE ERICSSON,

15      NOKIA, INTERDIGITAL, AND QUALCOMM DURING THE TEN YEAR PERIOD

16      FROM 2006 TO 2016.

17      Q.   AND CAN YOU DESCRIBE WHAT THE CHART SHOWS IN TERMS OF THE

18      RELATIVE AMOUNTS OF LITIGATION AMONG THOSE COMPANIES?

19      A.   YES.  IT SHOWS THAT ERICSSON, NOKIA, AND INTERDIGITAL HAVE

20      SIGNIFICANT NUMBER OF LITIGATIONS WHERE THEY'VE ACTUALLY HAD TO

21      GO TO COURT TO ENFORCE THEIR -- TO TRY AND ENFORCE THEIR PATENT

22      LICENSES.

23          WHERE QUALCOMM HAS ONLY TWO WHICH WERE SORT OF UNRELATED

24      TO TRYING TO ENFORCE THE SEP PATENTS.

25               BUT THIS JUST TELLS PART OF THE STORY BECAUSE ERICSSON,
```

1    NOKIA, AND INTERDIGITAL DID NOT HAVE A NO LICENSE, NO CHIP

2    POLICY, SO THEIR NEGOTIATIONS WOULD HAVE ALWAYS INCLUDED, OR

3    BEEN NEGOTIATED IN THE SHADOW OF WHAT POSSIBLE LEGAL REMEDIES

4    MIGHT EXIST, WHICH WOULD HAVE -- WHICH WOULD SUGGEST THAT THEY

5    WOULD HAVE BEEN MORE REASONABLE IN SETTING WHAT THEIR ROYALTY

6    DEMANDS WERE AND AVOIDING LITIGATION IN A NUMBER OF CASES THAT

7    AREN'T REFLECTED HERE.

8    Q.   AND WHAT WOULD BE THE RISKS FOR QUALCOMM OF ENGAGING IN

9    LITIGATION LIKE ERICSSON, NOKIA, AND INTERDIGITAL DID?

10   A.   WELL, THE RISK WOULD BE THAT THEIR LICENSING PRACTICES,

11   THEIR NO LICENSE, NO CHIP POLICY, AND THEIR HIGH, WHAT I

12   BELIEVE ARE DISPROPORTIONATELY HIGH, ROYALTIES WOULD BE CHANGED

13   BY A COURT DETERMINATION OF WHAT A FRAND RATE WOULD BE.

14   Q.   MR. DONALDSON, DO YOU HAVE AN UNDERSTANDING OF HOW

15   QUALCOMM JUSTIFIES ITS NO LICENSE, NO CHIPS POLICY?

16   A.   I THINK CERTAINLY ONE OF THEIR JUSTIFICATIONS IS THAT THE

17   CHIP PRICE DOES NOT ADEQUATELY REFLECT THE R&D EXPENSES THAT

18   THEY HAVE IN DEVELOPING THE CHIPS.

19        AND I THINK THEY ALSO ARGUE THAT THEY DO NOT WANT TO SELL

20   OR TO PROVIDE A CHIP TO ITS CUSTOMERS THAT WOULD ENCOURAGE THEM

21   TO INFRINGE QUALCOMM PATENTS.

22   Q.   AND WHAT ARE YOUR REACTIONS TO THE JUSTIFICATIONS QUALCOMM

23   HAS OFFERED?

24   A.   THEY'RE NOT VERY PERSUASIVE TO ME.

25   Q.   AND WHY IS THAT?

1     A.   WELL, BASED ON MY EXPERIENCE IN LICENSING AT TI, TI SOLD

2     ITS CHIPS ON AN EXHAUSTIVE BASIS.  TI LICENSED ITS CHIPS ON AN

3     EXHAUSTIVE BASIS, AS DID EVERYONE ELSE IN THE SEMICONDUCTOR

4     INDUSTRY.

5          AND THESE COMPANIES, YOU KNOW, TI, INTEL, OTHER COMPANIES

6     THAT PROVIDE CHIPS WERE ABLE TO RECOVER THEIR RESEARCH

7     INVESTMENTS IN A SUCCESSFUL BUSINESS.

8          SO IF -- SO I THINK IT IS VIABLE FROM THAT PERSPECTIVE.

9          AS FAR AS CAUSING A CUSTOMER TO INFRINGE, IF THEY WERE

10    LICENSING EXHAUSTIVELY AT THE CHIP LEVEL, WHEN THEY SOLD A CHIP

11    TO A CUSTOMER, THERE WOULD BE NO ISSUE OF THEM INFRINGING

12    QUALCOMM PATENTS THAT ARE IMPLEMENTED ON THAT PATENT -- ON THAT

13    PRODUCT.

14         NOW, QUALCOMM HAD PATENTS THAT APPLIED TO THE END DEVICE,

15    A CLEAR SYSTEM PATENT.  QUALCOMM WAS STILL FREE TO ASSERT

16    THOSE, JUST LIKE WHAT TI WAS ABLE TO DO IN SELLING ITS

17    SEMICONDUCTOR CHIPS AND STILL ASSERTING PATENTS AT THE SYSTEM

18    OR COMPUTER LEVEL.

19    Q.   SIR, IF YOU COULD TURN TO THE FINAL TAB IN YOUR BINDER

20    LABELED QUALCOMM OPENING SLIDES AND TURN TO PAGE 11.  AND I'LL

21    REPRESENT TO YOU THAT THIS IS A SLIDE QUALCOMM'S COUNSEL

22    PRESENTED TO THE COURT DURING ITS OPENING STATEMENT ON THE

23    FIRST DAY OF TRIAL.

24         IS THIS, TO THE BEST OF YOUR KNOWLEDGE, A QUOTE FROM THE

25    DEPOSITION TESTIMONY YOU GAVE IN THIS CASE?

DONALDSON DIRECT BY MS. GILLEN

1    A.   WELL, IT IS CERTAINLY PART OF A QUOTE.

2    Q.   CAN YOU EXPAND ON THAT?

3    A.   WELL, YES.  THE REST OF THE SENTENCE NOT SHOWN TALKS ABOUT

4    THIS IS THE WAY IT KIND OF GREW UP WHEN, IN THE EARLY PHONES

5    WHEN THE END PRODUCT WAS A CELL PHONE AND NOTHING MORE, AND

6    THERE HAVE BEEN TREMENDOUS CHANGES IN THE INDUSTRY SINCE THEN.

7    Q.   MR. DONALDSON, WHAT IS YOUR OPINION ON THE VIABILITY OF

8    CHIP LEVEL LICENSING IN THE CELLULAR INDUSTRY?

9    A.   WELL, I THINK IT IS A VIABLE APPROACH.  I THINK IT'S VERY

10   COMPARABLE TO THE TYPE OF PROGRAM THAT TI AND I THINK OTHER

11   COMPANIES ALSO HAVE, AND I THINK IT COULD HAVE BEEN USED, OR

12   COULD BE USED.

13   Q.   AND WHEN TI USED THIS TYPE OF LICENSING PROGRAM, HOW DID

14   YOU ACCOUNT FOR ANY EXHAUSTION CONCERNS THAT WERE RAISED?

15   A.   THEY WERE NOT A REAL PROBLEM.  OCCASIONALLY AN END USER,

16   FOR EXAMPLE, A COMPUTER MANUFACTURER, WOULD ARGUE THAT BY

17   PURCHASING A CHIP FROM TI OR FROM PURCHASING A CHIP BY SOMEONE

18   WHO TI HAD LICENSED, THAT, YOU KNOW, MAYBE THEY GOT SOME RIGHTS

19   BECAUSE OF THAT.  WE WERE ABLE TO SIT DOWN WITH THEM, WE HAD

20   VERY CAREFULLY SEGREGATED OUR CHIP PATENTS FROM SYSTEM LEVEL

21   PATENTS, AND I THINK REASONABLE PEOPLE WERE ABLE TO SIT DOWN

22   AND WORK OUT THE ISSUES AND WE WERE ABLE TO WORK OUT ALL OF

23   THOSE ISSUES TO BOTH PARTIES' SATISFACTION.

24   Q.   AND WHAT ARE THE ADVANTAGES OF LICENSING AT THE COMPONENT

25   LEVEL?

1    A.   WELL, ONE ADVANTAGE IS -- CERTAINLY WHEN WE SET IT UP AT

2    TI, ONE OF THE THINGS WE CONSIDERED WAS IT IS DIRECTLY

3    REFLECTIVE OF WHAT WE THOUGHT PATENT LAW REQUIRED, THAT THEY

4    WANTED TO LICENSE TO A -- THERE'S ALWAYS BEEN A REQUIREMENT TO

5    APPORTION, AND WE WERE LICENSING AT THE LEVEL THAT OUR CHIP

6    COVERED.

7         AND YOU DIDN'T HAVE THE ISSUES THAT SOMEONE MIGHT RAISE,

8    WELL, YOU'RE OVERREACHING, YOU'RE TRYING TO CHARGE A ROYALTY ON

9    SOMETHING THAT'S NOT COVERED BY YOUR PATENT.

10        SO I THINK THAT IS A PRIMARY ADVANTAGE.

11   Q.   IS IT YOUR OPINION THAT LICENSING AT THE CHIP OR COMPONENT

12   LEVEL IS THE ONLY WAY TO COMPLY WITH THE APPORTIONMENT

13   REQUIREMENT IN THE PATENT DAMAGES LAW?

14   A.   OH, NOT AT ALL.

15   Q.   CAN YOU EXPAND ON THAT?

16   A.   WELL, YES.  I THINK IT'S QUITE POSSIBLE, AND SOMETIMES

17   MAYBE MORE THAN EFFICIENT, TO LICENSE AT AN END PRODUCT LEVEL,

18   WHICH THERE WOULD BE NO PROBLEM IF YOU APPROPRIATELY TAKE INTO

19   CONSIDERATION HOW THE CALCULATION OF ROYALTY IS ACHIEVED.

20        IF YOU LOOK AT WHAT PATENTS APPLY AT THE CHIP LEVEL AND

21   APPLY AN APPROPRIATE ROYALTY AND THEN LOOK AT THE SYSTEM LEVEL

22   AND THEN COME UP WITH AN EFFECTIVE ROYALTY THAT WOULD APPLY TO

23   THE END DEVICE, THERE'S NOTHING WRONG WITH THAT AT ALL.  AND I

24   DID SOMETHING VERY SIMILAR TO THAT IN MANY AGREEMENTS THAT I

25   NEGOTIATED AT TI.

1    Q.   SIR, QUALCOMM HAS TAKEN THE POSITION THAT IT IS STANDARD

2    INDUSTRY PRACTICE TO LICENSE AT THE HANDSET OR END DEVICE

3    LEVEL.

4         DO YOU HAVE A REACTION TO THAT STATEMENT?

5    A.   I THINK THAT'S AN OVERSTATEMENT.  I THINK THERE ARE

6    CERTAINLY CIRCUMSTANCES THAT, IN THE CELLULAR INDUSTRY, PATENTS

7    ARE LICENSED AT THE CHIP LEVEL.  FOR EXAMPLE, I THINK, IN ALL

8    OF THE GRANT BACK LICENSES THAT QUALCOMM GETS IN ITS LICENSE

9    AGREEMENT, THEY GET CHIP LEVEL LICENSE EXHAUSTIVELY LICENSED

10   BACK TO THEM.

11        SO, YOU KNOW, IT TAKES PLACE IN THE INDUSTRY.

12        MS. GILLEN:  THANK YOU, SIR.  I HAVE NO FURTHER

13   QUESTIONS AT THIS TIME.

14        THE COURT:  OKAY.  TIME IS 11:54.

15        OKAY.  LET ME KNOW WHEN YOU'RE READY.  WE'LL JUST GO UNTIL

16   NOON.

17        MR. PAIGE:  SURE.  MAY I PROCEED, YOUR HONOR.

18        THE COURT:  GO AHEAD, PLEASE.  IT'S 11:55.

19        MR. PAIGE:  THANK YOU, YOUR HONOR.

20                      **CROSS-EXAMINATION**

21   BY MR. PAIGE:

22   Q.   GOOD MORNING, MR. DONALDSON.

23   A.   GOOD MORNING.

24   Q.   YOU USED TO WORK AT TEXAS INSTRUMENTS, WHICH I'LL CALL TI

25   FOR THE SAKE OF BREVITY.  CORRECT?

1    A.   THAT IS CORRECT.

2    Q.   AND WHEN YOU WERE AT TI, YOU ENTERED INTO LICENSES WITH

3    COMPUTER MANUFACTURERS WHO ALSO BOUGHT CHIPS FROM TI; CORRECT?

4    A.   THAT IS CORRECT.

5    Q.   AND IN THOSE SITUATIONS, THE COMPUTER MAKERS PAID A

6    ROYALTY TO TI; RIGHT?

7    A.   FOR THE COMPUTER, THAT IS CORRECT.

8    Q.   AND THE COMPUTER MAKERS, THEY ALSO PAID TI FOR THE CHIPS

9    THEY BOUGHT FROM TI; CORRECT?

10   A.   THAT IS CORRECT.

11   Q.   AND THERE WAS NOTHING WRONG WITH THE COMPUTER MAKERS

12   PAYING ROYALTIES TO TI AND ALSO PAYING TO BUY CHIPS; RIGHT?

13   A.   I THINK I WOULD AGREE WITH THAT.

14        I WOULD ALSO NOTE THAT SOME --

15   Q.   THANK YOU, MR. DONALDSON.

16        AND AT TI, YOU TREATED LICENSING AND CHIP SALES AS

17   SEPARATE BUSINESSES; RIGHT?

18   A.   I THINK THAT IS CORRECT.

19   Q.   AND TI, IT ALSO MADE AN INTENTIONAL EFFORT NOT TO LICENSE

20   COMPONENT MANUFACTURERS TO SYSTEM LEVEL PATENTS; RIGHT?

21   A.   I THINK THAT IS BASICALLY CORRECT.

22   Q.   NOW, IN YOUR REPORT YOU MENTIONED STUDIES OF CELLULAR SEPS

23   THAT HAVE BEEN CREATED BY NUMEROUS FIRMS THAT ATTEMPT TO

24   INDEPENDENTLY ASSESS, OR DEEM, WHICH PATENTS ARE ESSENTIAL;

25   RIGHT?

1    A.    I THINK MY REPORT MAKES REFERENCE TO THAT.

2    Q.    AND YOU UNDERSTAND THAT THOSE STUDIES GENERALLY AGREE THAT

3    QUALCOMM HAS ONE OF THE LEADING PORTFOLIOS OF DEEMED SEPS

4    RELATED TO CDMA, UMTS WCDMA, AND LTE; RIGHT?

5    A.    I'M NOT SURE I WOULD GO THAT FAR.  I DIDN'T REALLY STUDY

6    THAT.  I MADE REFERENCE TO IT, BUT THAT WASN'T PART OF MY JOB.

7         I WAS LOOKING AT THE LICENSING DYNAMICS AND NEGOTIATIONS,

8    NOT TRYING TO ASCERTAIN THE CORRECTNESS OF THESE OTHER

9    NEGOTIATIONS.

10   Q.    SIR, MY QUESTION WAS ABOUT THE STUDIES.  DO THEY GENERALLY

11   AGREE THAT QUALCOMM HAS ONE OF THE LEADING PORTFOLIOS OF DEEMED

12   SEPS RELATED TO CDMA, UMTS, AND LTE?

13   A.    I DON'T KNOW.  WHEN YOU ASK "DO I AGREE?" THE DOCUMENTS

14   SHOW WHAT THEY SHOW.

15   Q.    COULD I ASK YOU TO TURN TO PARAGRAPH 33 OF YOUR REPORT,

16   SIR.  AND -- ARE YOU THERE, SIR?

17   A.    I SEE THAT.

18   Q.    AND DO YOU SEE WHERE YOU WROTE, THESE STUDIES GENERALLY

19   AGREE THAT QUALCOMM HAS ONE OF THE LEADING PORTFOLIOS OF DEEMED

20   SEPS RELATED TO CDMA, UMTS WCDMA, AND LTE?

21   A.    YES, I SEE THAT SENTENCE.

22   Q.    OKAY.  AND THE UPSHOT OF THAT IS THAT QUALCOMM HAS

23   LITERALLY THOUSANDS AND THOUSANDS OF SEPS; RIGHT?

24   A.    I HAVEN'T STUDIED THAT, BUT I BELIEVE THAT'S PROBABLY

25   CORRECT.

1    Q.   OKAY.  NOW, YOU HAD RESPONSIBILITY FOR DEVELOPING CERTAIN

2    LICENSING PROGRAMS FOR TI; CORRECT?

3    A.   THAT IS CORRECT.

4    Q.   BUT DURING YOUR TIME AT TI, YOU DIDN'T HAVE DIRECT

5    RESPONSIBILITY FOR DEVELOPING ANY LICENSING PROGRAMS REGARDING

6    CELLULAR WIRELESS PATENTS; CORRECT?

7    A.   TI DID NOT HAVE A SEPARATE LICENSING PROGRAM FOR THAT

8    CATEGORY OF PATENTS.

9    Q.   AND YOU DIDN'T HAVE ANY DIRECT RESPONSIBILITY FOR

10   DEVELOPING ANY STRATEGIES RELATING TO CELLULAR WIRELESS

11   PATENTS; CORRECT?

12   A.   I DON'T THINK I WOULD AGREE WITH THAT.

13   Q.   CAN WE PLAY THE DEPO AT 9:25 THROUGH 10:5, PLEASE.

14        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

15           MS. GILLEN:  OBJECTION, YOUR HONOR.  THIS IS IMPROPER

16   IMPEACHMENT.  THERE'S AN EXPLANATION IN THIS AFTER THE

17   QUESTION.

18           THE COURT:  I CAN'T EVEN FIND IT IN THE DEPOSITION.

19   IS THIS PAGE 9?

20           MR. PAIGE:  IT'S PAGE 9, STARTING ON 25 THROUGH PAGE

21   10:5.

22           THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

23   BY MR. PAIGE:

24   Q.   SIR, WERE YOU ASKED THAT QUESTION AND DID YOU GIVE THAT

25   ANSWER?

1    A.   YES, I DID.  AND I THINK THE NEXT SENTENCE EXPLAINS THE

2    CONTEXT.

3    Q.   DO YOU STAND BY THAT TESTIMONY TODAY, SIR?

4    A.   YEAH, TOGETHER WITH THE NEXT SENTENCE, YES.

5    Q.   YOU DON'T KNOW IF A PERCENTAGE OF TI'S PATENTS WERE

6    STANDARD ESSENTIAL PATENTS; RIGHT?

7    A.   I DON'T, BECAUSE WE INTENTIONALLY DID NOT SEEK --

8    Q.   THANK YOU, MR. DONALDSON.

9         THE COURT:  YOU'VE GOT TO LET HIM ANSWER THE

10   QUESTION.  YOU'RE CUTTING HIM OFF ALL THE TIME.  SO YOU SHOULD

11   AT LEAST LET HIM FINISH.

12        IF HE GOES OFF, THEN I WOULD CUT HIM OFF, OKAY, IF WHAT HE

13   SAYS GOES INTO A NARRATIVE.

14        BUT YOU SHOULD AT LEAST LET HIM FINISH THE SENTENCE.

15        GO AHEAD, PLEASE.

16        MR. PAIGE:  THANK YOU, YOUR HONOR.

17        THE WITNESS:  AND MY POINT WAS WE INTENTIONALLY MADE

18   THE DECISION NOT TO SEEK STANDARD ESSENTIAL PATENTS BECAUSE OF

19   OUR UNDERSTANDING OF THEIR NOT BEING VALUABLE, AND WE

20   INTENTIONALLY PUBLISHED, LIKE, THE FANCY PUBLICATIONS INSTEAD

21   OF SEEKING PATENTS.

22   BY MR. PAIGE:

23   Q.   OKAY.  SO YOU HAVE NO REASON TO BELIEVE THAT TI HAD

24   THOUSANDS AND THOUSANDS OF STANDARD ESSENTIAL PATENTS LIKE

25   QUALCOMM HAS; RIGHT?

1      A.   NO.  I KNOW FOR A FACT THEY DID NOT AT THE TIME I WAS

2      THERE.

3      Q.   OKAY.

4              THE COURT:  I'M SORRY, I'M GOING TO INTERRUPT.

5          IT'S 12:01.  LET'S GO AHEAD, PLEASE, AND TAKE OUR ONE HOUR

6      LUNCH BREAK.

7              WE'RE IN RECESS.  GO AHEAD, PLEASE.

8              MR. PAIGE:  THANK YOU, YOUR HONOR.

9          (THE LUNCH RECESS WAS TAKEN FROM 12:02 P.M. UNTIL

10     1:03 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2         (COURT CONVENED AT 1:03 P.M.)

 3              THE COURT:  OKAY.  GOOD AFTERNOON AND WELCOME BACK.

 4    PLEASE TAKE A SEAT.

 5         FOR THE HIGH PRIORITY EVIDENTIARY OBJECTIONS FOR NEXT

 6    TUESDAY, PLEASE FILE THOSE BY THIS FRIDAY AT 8:00 A.M.  OKAY?

 7    MONDAY IS A COURT HOLIDAY, SO WE WILL NOT HAVE TRIAL ON MONDAY.

 8              AND I'D ASK THE PARTIES TO FILE YOUR SEALING MOTIONS WITH

 9    YOUR HIGH PRIORITY OBJECTIONS IF NOT THE DAY BEFORE.  OKAY.  I

10    DON'T WANT ANY SEALING -- YOUR SEALING MOTIONS SHOULD BE

11    TIMELY.  THEY SHOULD BE FILED A FULL BUSINESS DAY BEFORE YOU

12    PLAN TO USE IT.

13         OKAY.  I'D ALSO LIKE TO LIMIT THE NUMBER OF CLOSING

14    ARGUMENT SLIDES TO 50.

15              AND YOU HAVE TO USE THEM ALL, YOU CAN'T JUST USE THAT AS A

16    DE FACTO BRIEF AND STUFF A LOT OF ARGUMENT IN THERE.  YOU'VE

17    GOT TO USE EACH SLIDE, AND IT'LL BE 50 SLIDES.

18              MR. VAN NEST:  I'M SORRY.  YOU SAID 50, 5-0.

19              THE COURT:  5-0.

20         ALL RIGHT.  LET'S GO AHEAD AND RESUME THE

21    CROSS-EXAMINATION.

22         AND I'M GOING TO ASK -- YOU'VE BEEN CUTTING THE WITNESSES

23    OFF AFTER THEY SAY TWO OR THREE WORDS.  I FIND THAT REALLY

24    IMPROPER.  I'VE BEEN VERY TOLERANT AND HAVEN'T SAID ANYTHING

25    UNTIL THE END, BUT I THINK YOU SHOULD LET THEM FINISH THEIR
```

1    SENTENCE.  YOU DON'T GET TO CUT THEM OFF AFTER TWO WORDS OR

2    THREE WORDS, WHICH IS WHAT YOU'VE BEEN DOING WITH BOTH

3    WITNESSES.

4         SO IF YOU CONTINUE TO DO THAT, I WILL FIGURE OUT SOME

5    CONSEQUENCE, SO PLEASE DON'T.

6              MR. PAIGE:  UNDERSTOOD, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  IT'S 1:04.

8              MR. PAIGE:  THANK YOU, YOUR HONOR.

9    Q.   MR. DONALDSON, BEFORE LUNCH WE WERE TALKING ABOUT HOW

10   TEXAS INSTRUMENTS DIDN'T OWN THOUSANDS AND THOUSANDS OF SEP

11   PATENTS.  AND, IN FACT, IN YOUR DEPOSITION YOU DISCUSSED TEXAS

12   INSTRUMENTS LICENSING PRACTICES USUALLY INVOLVED LOOKING AT

13   ABOUT 50 PATENTS AT A TIME; CORRECT?

14   A.   THAT IS CORRECT.

15   Q.   NOW, YOU RETIRED FROM TI IN 2000; RIGHT?

16   A.   THAT IS CORRECT.

17   Q.   AND THAT WAS ABOUT THE TIME THAT 3G STANDARDS LIKE WCDMA

18   WERE BEING IMPLEMENTED; RIGHT?

19   A.   I'M NOT SURE ABOUT THE EXACT DATE.

20   Q.   OKAY.  AND IT WAS ALMOST A DECADE BEFORE THE 4G LTE

21   STANDARD WAS OBVIOUSLY ADOPTED; RIGHT?

22   A.   THAT TIME IS PROBABLY ABOUT CORRECT.

23   Q.   AND IT WAS MORE THAN A DECADE BEFORE THE COURT CASES ON

24   FRAND THAT YOU CITE IN YOUR EXPERT REPORT WERE DECIDED; RIGHT?

25   A.   I WOULD HAVE TO GO BACK AND LOOK AT WHAT THE EARLIEST

1    DATE, BUT IT WAS SOMETIME.

2    Q.   YOU'RE NOT AN ECONOMIST, SIR, ARE YOU?

3    A.   I AM NOT.

4    Q.   AND YOU HAVEN'T CONDUCTED ANY RESEARCH IN THE ECONOMIC

5    FIELD OF BARGAINING THEORY; CORRECT?

6    A.   PROBABLY NOT INTENTIONAL RESEARCH THAT YOU WOULD HAVE IN A

7    UNIVERSITY, FOR EXAMPLE.

8    Q.   OKAY.  AND YOU'VE NEVER PERSONALLY ATTENDED ANY MEETINGS

9    OF ANY STANDARD SETTING ORGANIZATIONS; RIGHT?

10   A.   I PERSONALLY HAVE NOT.

11   Q.   OKAY.  HOWEVER, YOU HAVE DONE WORK FOR PRIVATE PARTIES AND

12   AS AN EXPERT IN LITIGATION OVER THE PAST 18 YEARS; CORRECT?

13   A.   THAT IS CORRECT.

14   Q.   AND ONE OF THE PRIVATE PARTIES FOR WHOM YOU HAVE WORKED

15   REPEATEDLY IS APPLE; CORRECT?

16   A.   I HAVE HAD SEVERAL ENGAGEMENTS WITH APPLE.

17   Q.   IN FACT, SINCE 2012, YOU'VE GIVEN A DEPOSITION ON BEHALF

18   OF APPLE FOUR TIMES; RIGHT?

19   A.   THAT COULD BE POSSIBLE.  I DON'T RECALL THEM OFF THE TOP

20   OF MY HEAD.

21   Q.   AND SINCE 2012, YOU'VE TESTIFIED AT TRIAL TWICE FOR APPLE;

22   RIGHT?

23   A.   THAT'S PROBABLY CORRECT.

24   Q.   OKAY.  AND YOU'RE AWARE THAT APPLE HAS ENTERED INTO A

25   COMMON INTEREST AGREEMENT WITH THE FTC IN CONNECTION WITH THIS

1    LITIGATION, AREN'T YOU?

2    A.   I AM NOT.

3    Q.   YOU DIDN'T KNOW THAT?

4    A.   I DID NOT.

5    Q.   OKAY.  ARE YOU AWARE THAT APPLE HAS FILED SEPARATE

6    LITIGATION AGAINST QUALCOMM IN THE SOUTHERN DISTRICT OF

7    CALIFORNIA?

8    A.   NOT OF ANY PARTICULARS.

9    Q.   OKAY.  BUT YOU -- YOU UNDERSTOOD, WHEN YOU WROTE YOUR

10   REPORT, THAT THAT LITIGATION INCLUDES FRAND AND ANTITRUST

11   ISSUES; CORRECT?

12   A.   CAN YOU SHOW ME MY REPORT?

13   Q.   SURE.

14   A.   I DON'T RECALL THAT EXACT WILL HE.

15   Q.   IT'S THE END OF PARAGRAPH 60, SIR.

16   A.   YES, I SEE THAT.

17   Q.   OKAY.  AND YOU UNDERSTAND THAT APPLE, THEREFORE, HAS A

18   FINANCIAL INTEREST IN THE OUTCOME OF THIS CASE; RIGHT?

19   A.   IT SOUNDS REASONABLE.  I HAVE NO PERSONAL UNDERSTANDING OF

20   THAT.

21   Q.   MR. DONALDSON, TI HAD SOME PATENTS THAT YOU THOUGHT WERE

22   EXTREMELY VALUABLE; RIGHT?

23   A.   CERTAINLY DURING MY TENURE AT TI, THAT IS CORRECT.

24   Q.   AND ON THE OTHER HAND, DURING YOUR TENURE AT TI, TI HAD

25   SOME PATENTS THAT WERE NOT AS VALUABLE AS OTHERS; CORRECT?

DONALDSON CROSS BY MR. PAIGE

1    A.   THAT WOULD ALSO BE CORRECT.

2    Q.   SO YOU WOULD AGREE THAT NOT ALL PATENTS ARE CREATED EQUAL?

3    SOME PATENTS ARE MORE VALUABLE THAN OTHERS; RIGHT?

4    A.   WE ARE TALKING ABOUT PATENTS IN GENERAL, AND I WOULD AGREE

5    WITH THAT.

6    Q.   OKAY.  IN FACT, YOU'VE TESTIFIED THAT A SINGLE PATENT CAN

7    DOMINATE AN ENTIRE INDUSTRY; RIGHT?

8    A.   COULD YOU SHOW ME THE CONTEXT OF THAT?

9    Q.   IT WAS DURING YOUR DEPOSITION, SIR?

10   A.   DO YOU HAVE A PLACE?

11   Q.   I DO.  IT'S PAGE 236, LINE 10 THROUGH 237, LINE 2.

12   A.   236.  YES, THIS IS WITH REFERENCE TO THE KILBY BASIC

13   INTEGRATED CIRCUIT FOR WHICH HE RECEIVED A NOBEL PRIZE, AND

14   THAT WAS A VERY IMPORTANT PATENT.

15   Q.   YOU SAID IT DOMINATED THE ENTIRE INDUSTRY; RIGHT, SIR?

16   A.   YES.

17   Q.   THAT ONE PATENT?

18   A.   YOU COULD NOT BUILD AN INTEGRATED CIRCUIT WITHOUT USING

19   THAT PATENT.

20   Q.   OKAY.  BUT YOU DIDN'T INVESTIGATE ANY SPECIFIC QUALCOMM

21   PATENTS TO SEE WHETHER THEY, TOO, MIGHT BE THE KIND OF PATENT

22   THAT DOMINATES THE INDUSTRY, DID YOU?

23   A.   I DID NOT.  THAT WASN'T PART OF WHAT I WAS ASKED TO DO AND

24   I DID NOT DO THAT.

25   Q.   OKAY.  YOUR UNDERSTANDING IS THAT QUALCOMM HAS GENERALLY

1    BEEN ACKNOWLEDGED IN THE INDUSTRY TO HAVE A GOOD POSITION WITH

2    RESPECT TO 2G CDMA; RIGHT?

3    A.    PROBABLY AS A GENERAL UNDERSTANDING.  I HAVEN'T PERSONALLY

4    INVESTIGATED THAT.

5    Q.    WELL, YOU UNDERSTOOD THAT QUALCOMM IS ONE OF THE ORIGINAL

6    DEVELOPERS OF 2G CDMA TECHNOLOGY; RIGHT?

7    A.    YES, I UNDERSTOOD THAT.

8    Q.    OKAY.  AND YOU'VE SUGGESTED IN YOUR TESTIMONY THAT

9    QUALCOMM'S PORTFOLIO MAY HAVE CHANGED FOR THE WORSE OVER TIME

10   WITH QUALCOMM'S SEP POSITION IN LTE BEING WEAKER THAN IN

11   PREVIOUS STANDARDS; RIGHT?

12   A.    THAT TYPE OF A GENERAL STATEMENT, YES.

13   Q.    BUT YOU HAVEN'T DONE ANY INDEPENDENT ANALYSIS OF WHETHER

14   QUALCOMM'S POSITION, SEP POSITION IN LTE IS WEAKER THAN ITS

15   POSITION IN OTHER STANDARDS; RIGHT?

16   A.    I HAVE NOT DONE THAT.  I WAS NOT ASKED TO DO THAT.

17   Q.    OKAY.  AND YOU ALSO DIDN'T INQUIRE INTO THE PATENTS THAT

18   QUALCOMM HAS ADDED TO ITS PORTFOLIO IN 3G; RIGHT?

19   A.    NOT ANY SPECIFIC PATENT, THAT IS CORRECT.

20   Q.    NOR DID YOU UNDERTAKE ANY ANALYSIS THAT WOULD COMPARE

21   QUALCOMM'S NEW PATENTS WITH THOSE THAT WERE EXPIRING TO SEE

22   WHICH SET OF PATENTS WERE MORE VALUABLE, DID YOU?

23   A.    AGAIN, I WAS NOT ASKED TO DID THAT, AND I DID NOT DO THAT.

24   Q.    YOU SUGGESTED IN YOUR DIRECT TESTIMONY THAT QUALCOMM'S

25   ROYALTY RATES DISPLAYED AN ODD CONSISTENCY FROM LICENSE TO

DONALDSON CROSS BY MR. PAIGE

```
1    LICENSE; RIGHT?

2    A.   YES.

3    Q.   BUT YOU'RE AWARE THAT QUALCOMM NEGOTIATED ROYALTY RATES

4    THAT DIFFER FROM ITS STANDARD RATES WITH ERICSSON; RIGHT?

5    A.   ERICSSON WAS ONE OF THE ANOMALIES, THAT IS CORRECT.

6    Q.   AND QUALCOMM NEGOTIATED ROYALTY RATES THAT DIFFER FROM ITS

7    STANDARD RATES WITH SAMSUNG; CORRECT?

8    A.   THAT IS -- THEY HAD SOME ANOMALIES.  BUT I ALSO UNDERSTAND

9    FROM QUALCOMM'S OWN TESTIMONY THAT THEY CONSIDERED ALL OF THESE

10   ANOMALIES TO STILL CONFORM WITH THEIR STANDARD RATE.

11   Q.   OKAY.  AND I'M JUST TALKING ABOUT THE RATES.  IT

12   NEGOTIATED RATES THAT DIFFERED FROM ITS STANDARD RATES WITH

13   MOTOROLA AS WELL; RIGHT?

14   A.   THAT IS CORRECT.

15   Q.   AND IT NEGOTIATED RATES THAT DIFFERED FROM ITS STANDARD

16   RATES WITH NOKIA; RIGHT?

17   A.   I BELIEVE THAT IS ALSO CORRECT.

18   Q.   AND IT NEGOTIATED ROYALTY RATES THAT DIFFERED FROM ITS

19   STANDARD RATES WITH BLACKBERRY; CORRECT?

20   A.   THAT IS THE RATE THEMSELVES, IF YOU IGNORE THE UPFRONT

21   PAYMENTS OF BILLIONS OF DOLLARS AND THINGS LIKE THAT, I THINK

22   THAT IS CORRECT.

23   Q.   AND QUALCOMM HAS ENTERED INTO LICENSES THAT DIFFER IN THE

24   AMOUNT OF THE UPFRONT FEE PAID; RIGHT?

25   A.   I HAVEN'T REALLY ANALYZED THAT.
```

DONALDSON CROSS BY MR. PAIGE

```
1    Q.   OKAY.  NOW, YOU TALKED A BIT ABOUT LITIGATION FOR PATENTS

2    AND ENFORCEMENT OF PATENTS.

3         YOU DIDN'T INVESTIGATE WHAT ARBITRATIONS OVER RATES

4    QUALCOMM HAS ENGAGED IN; RIGHT?

5    A.   I DID NOT SPECIFICALLY LOOK AT THAT ASPECT, NO.

6    Q.   OKAY.  THAT'S NOWHERE IN YOUR REPORT, IS IT, SIR?

7    A.   I'M NOT SURE.

8    Q.   OKAY.  YOU AGREE THAT PATENT LITIGATION CAN BE RISKY;

9    RIGHT?

10   A.   IT CAN BE.

11   Q.   AND WHEN YOU WERE AT TI, THERE WAS A BIG RELUCTANCE TO

12   ACTUALLY TEST SOME OF THE TI'S MOST VALUABLE PATENTS IN COURT;

13   RIGHT?

14   A.   DURING THE PERIOD OF TIME BEFORE THE COURT OF APPEALS FOR

15   THE FEDERAL CIRCUIT, THAT WAS CORRECT.

16   Q.   OKAY.  AND, IN FACT, YOU'VE CHARACTERIZED TI'S LEERINESS

17   TO RISK ITS VALUABLE PATENTS IN LITIGATION AS COUNTER LEVERAGE

18   AGAINST TI AS A LICENSOR, HAVEN'T YOU?

19   A.   COULD YOU SHOW ME WHERE THAT IS?

20   Q.   THAT'S ON PAGE 107 OF YOUR DEPOSITION, SIR, STARTING AT

21   LINE 19.

22        (PAUSE IN PROCEEDINGS.)

23        THE WITNESS:  YES, THIS REFERENCE IS TO A TIME PERIOD

24   BEFORE THE CAFC WHERE SOME OF OUR COURTS WERE -- HAD A PERFECT

25   RECORD OF FINDING PATENTS INVALID.
```

```
1       BY MR. PAIGE:

2       Q.   BUT YOU AGREE THAT THE POSSIBILITY OF INVALIDITY IS

3       COUNTER LEVERAGE AGAINST A LICENSOR; RIGHT?

4       A.   IN THAT TYPE OF ENVIRONMENT, YES.

5            BUT AFTER THE COURT OF APPEALS FEDERAL CIRCUIT, TI DID

6       RESORT TO LITIGATION OF THE PATENTS IT CONSIDERED TO BE

7       VALUABLE.

8       Q.   NOW, YOU'RE NOT OFFERING ANY OPINION AS TO THE FRAND RATE

9       FOR QUALCOMM'S PATENT PORTFOLIO; RIGHT?

10      A.   I AM NOT.  I WAS NOT ASKED TO LOOK AT THAT.

11      Q.   NOR ARE YOU OFFERING ANY OPINION FOR THE ROYALTY RATE --

12      AS TO THE ROYALTY RATE THAT ANY OEM WOULD HAVE AGREED TO PAY TO

13      QUALCOMM IN THE ABSENCE OF WHAT YOU CALL CHIP LEVERAGE; RIGHT?

14      A.   AS TO AN ACTUAL ROYALTY RATE, I HAVE NO OPINION ON THAT.

15      Q.   OKAY.  NOW, EVEN IF CHIP LEVEL LICENSING WERE FEASIBLE,

16      YOU AGREE THAT THE PRACTICE THAT HAS GROWN UP IN THE CELLULAR

17      INDUSTRY IS THAT COMPANIES TAKE LICENSES AT THE DEVICE LEVEL;

18      RIGHT?

19      A.   THAT HAS BEEN THE COMMON APPROACH, I WOULD AGREE.

20      Q.   FOR PURPOSES OF REACHING THE OPINIONS YOU EXPRESSED IN

21      YOUR REPORT, YOU DIDN'T DO ANY RESEARCH INTO WHETHER THERE ARE

22      ANY OEM'S WHO HAVE NEVER USED QUALCOMM CHIPS; RIGHT?

23      A.   I DID NOT CONDUCT RESEARCH INTO THAT SUBJECT, NO.

24      Q.   OKAY.  AND LIKEWISE, YOU DIDN'T DO ANY RESEARCH INTO

25      WHETHER THERE ARE ANY OEM'S WHO HAVE NEVER INTENDED TO USE
```

1    QUALCOMM'S CHIPS; RIGHT?

2    A.   THAT IS ALSO CORRECT.

3    Q.   AND YOU HAVEN'T DONE ANY ANALYSIS AT ALL, OR RANDOM SAMPLE

4    OF, QUALCOMM LICENSEES TO DETERMINE IF AND TO WHAT EXTENT THE

5    LICENSEES WERE DEPENDENT ON QUALCOMM'S CHIP AT ANY POINT IN

6    TIME; RIGHT?

7    A.   CAN I HAVE THAT QUESTION AGAIN?

8    Q.   YOU HAVEN'T DONE ANY ANALYSIS AT ALL OF ALL OR A RANDOM

9    SAMPLE OF QUALCOMM'S LICENSEES TO DETERMINE IF, OR TO WHAT

10   EXTENT, THE LICENSEES WERE DEPENDENT ON QUALCOMM'S CHIPS AT ANY

11   POINT IN TIME; RIGHT?

12   A.   I DON'T THINK I CAN AGREE WITH THAT STATEMENT.

13   Q.   OKAY.  SO SINCE YOU DIDN'T RESEARCH OEM'S THAT DON'T USE,

14   OR DON'T INTEND TO USE QUALCOMM CHIPS, YOU CAN'T SAY WHETHER

15   NEGOTIATIONS FOR LICENSES BY SUCH OEM'S RESULT IN DIFFERENT

16   TERMS TO QUALCOMM; RIGHT?

17   A.   I HAVE NOT LOOKED AT THE ENTIRE UNIVERSE.  I LOOKED AT THE

18   RECORD THAT WAS DEVELOPED IN THIS CASE AND TESTIMONY FROM THOSE

19   COMPANIES THAT DID ENGAGE AND DID CONSIDER USE OF QUALCOMM

20   CHIPS TO BE ESSENTIAL TO THEIR FUTURE.

21   Q.   OKAY.  YOUR TESTIMONY COMES FROM YOUR REVIEW OF CERTAIN

22   DOCUMENTS IN THE RECORD IN THIS CASE; RIGHT?

23   A.   A VERY LARGE NUMBER OF DOCUMENTS IN THIS CASE, YES.

24   Q.   AND YOU WERE SUPPLIED WITH THOSE DOCUMENTS BY COUNSEL FOR

25   THE FTC; CORRECT?

```
 1      A.   YES.  I ASKED COUNSEL FOR FTC TO SUPPLY DOCUMENTS RELATING

 2   TO CERTAIN SUBJECT MATTER AND DEPENDED UPON THEM TO SEND ME

 3   THOSE DOCUMENTS.

 4      Q.   AND YOU DIDN'T DO ANY REVIEW OF THE DOCUMENT PRODUCTIONS

 5   IN THIS CASE OTHER THAN WHAT WAS PROVIDED TO YOU BY THE FTC

 6   COUNSEL; RIGHT?

 7      A.   THAT IS CORRECT.

 8           MR. PAIGE:  THANK YOU.  NO FURTHER QUESTION

 9   ATTENTION.

10           THE COURT:  ALL RIGHT.  TIME IS 1:18.

11           I FIGURED OUT WHAT THE PENALTY IS.  IF SOMEONE CUTS OFF A

12   WITNESS AFTER TWO OR THREE WORDS, I'M GOING TO START DEDUCTING

13   TWO MINUTES OF TRIAL TIME FOR EACH SUCH BEHAVIOR.

14           ALL RIGHT.  ARE YOU READY TO GO?

15           MS. GILLEN:  YES.

16           THE COURT:  OKAY.  1:18.  GO AHEAD, PLEASE.
```

**REDIRECT EXAMINATION**

```
18   BY MS. GILLEN:

19      Q.   MR. DONALDSON, YOU TESTIFIED EARLIER THAT RELATIVE

20   BARGAINING POWER OF THE PARTIES MAY CHANGE WHEN THE PARTIES ARE

21   NEGOTIATING A LICENSE FOR STANDARD ESSENTIAL PATENTS.

22           DO YOU RECALL THAT?

23      A.   YES.

24      Q.   AND AS A LICENSING PROFESSIONAL, HOW DOES THE ABILITY TO

25   DESIGN AROUND CHANGE FOR A PROSPECTIVE LICENSEE WHEN STANDARD
```

1    ESSENTIAL PATENTS ARE INVOLVED?

2    A.   WELL, FOR A STANDARD ESSENTIAL PATENT, IT COMPLETELY

3    ELIMINATES THAT ALTERNATIVE, WHICH, IN MY EXPERIENCE, HAS BEEN

4    A VERY VALUABLE ALTERNATIVE.

5         IF IT'S A STANDARD ESSENTIAL PATENT, THERE ARE NO DESIGN

6    AROUNDS AND IT WEAKENS HIS BARGAINING POSITION.

7    Q.   AND AS A LICENSING PROFESSIONAL, HOW DOES THE ABILITY TO

8    USE THE LEVERAGE OF A POTENTIAL INJUNCTION CHANGE WHEN STANDARD

9    ESSENTIAL PATENTS ARE INVOLVED?

10        MR. PAIGE:  SORRY, YOUR HONOR.  THIS APPEARS TO BE

11   OUTSIDE THE SCOPE OF CROSS-EXAMINATION.

12        THE COURT:  WHAT'S YOUR RESPONSE TO THAT?

13        MS. GILLEN:  THIS TOPIC RELATES TO THE BARGAINING

14   POWER TOPICS THAT MR. PAIGE ASKED MR. DONALDSON ABOUT.

15        THE COURT:  AND WHAT WERE THOSE?

16        MS. GILLEN:  HIS EXPERIENCE IN EXPLAINING THE

17   RELATIVE BARGAINING LEVERAGE DURING THE NEGOTIATIONS.

18        MR. PAIGE:  I BELIEVE THAT WAS ON DIRECT, NOT MY

19   CROSS.

20        THE COURT:  NO.  BUT YOU ASKED ABOUT THE LEVERAGE.

21     OVERRULED.

22     SIT DOWN, PLEASE.

23     GO AHEAD.

24   BY MS. GILLEN:

25   Q.   I'LL REPEAT THAT.

```
 1      A.    OKAY.

 2      Q.    AS A LICENSING PROFESSIONAL, HOW DOES THE ABILITY TO USE A

 3      LEVERAGE OF A POTENTIAL INJUNCTION CHANGE WHEN STANDARD

 4      ESSENTIAL PATENTS ARE INVOLVED?

 5      A.    I THINK THEY'RE -- IN THE REALM OF STANDARD ESSENTIAL

 6      PATENTS, MY UNDERSTANDING OF WHERE WE ARE IS THAT INJUNCTIONS

 7      ARE -- COULD BE PROBLEMATIC IF IT'S A STANDARD ESSENTIAL PATENT

 8      FOR WHICH SOMEONE HAS SAID THEY WOULD GRANT A LICENSE.

 9            AND THAT WAS MY UNDERSTANDING WHEN I NEGOTIATED LICENSES

10      AT TI, THAT, WORST CASE, YOU COULD ALWAYS PAY -- FOR TI'S

11      POSITION, WE COULD ALWAYS PAY WHAT A COURT AGREED WAS A FAIR

12      ROYALTY AND THERE WOULD BE NO INJUNCTION.

13      Q.    THANK YOU.

14            QUALCOMM'S COUNSEL ASKED YOU EARLIER WHETHER TI LICENSED

15      COMPONENT MAKERS TO SYSTEM LEVEL PATENTS.

16            DO YOU REMEMBER THAT?

17      A.    THAT IS CORRECT.

18      Q.    NOW, DID TI LICENSE ITS CHIP LEVEL PATENTS TO CHIP MAKERS?

19      A.    WE DID.

20            AND I SUSPECT THERE SHOULD BE ONE LITTLE CLARIFICATION.

21      WHEN THE LICENSEE WAS A VERTICALLY INTEGRATED COMPANY,

22      SOMETIMES ONE TRANSACTION WOULD LICENSE AN ENTIRE PORTFOLIO.

23      SO IT WOULD COVER BOTH A CHIP LEVEL AND SYSTEM LEVEL.

24      Q.    NOW, QUALCOMM'S COUNSEL ALSO ASKED YOU WHETHER TI HAD

25      SEPARATE GROUPS OR DIVISIONS FOR LICENSING AND CHIP SALES.
```

DONALDSON REDIRECT BY MS. GILLEN

1        DO YOU REMEMBER THAT?

2    A.    THAT IS CORRECT.

3    Q.    AND DID TI HAVE A POLICY OF REFUSING TO SELL CHIPS TO

4    CUSTOMERS UNLESS THEY TOOK A SEPARATE I.P. LICENSE --

5    A.    NEVER.

6    Q.    -- COVERING END DEVICES?

7    A.    NEVER.

8    Q.    QUALCOMM'S COUNSEL ALSO ASKED YOU ABOUT YOUR

9    RESPONSIBILITY FOR WIRELESS SEPS WHILE AT TI.

10        DO YOU REMEMBER THAT?

11   A.    YES.

12   Q.    CAN YOU EXPAND ON THE ANSWER YOU PROVIDED TO QUALCOMM'S

13   COUNSEL AND TELL ME WHAT RESPONSIBILITY YOU HAD FOR CELLULAR

14   WIRELESS STANDARD ESSENTIAL PATENTS?

15   A.    WELL, I THINK THE, THE DIRECT ANSWER, I DID NOT DEVELOP A

16   SEPARATE LICENSING PROGRAM TO AFFIRMATIVELY LICENSE STANDARD

17   ESSENTIAL PATENTS THAT TI OWNED.

18        BUT I DID DEVELOP A STRATEGY FOR HOW TO DEAL WITH STANDARD

19   ESSENTIAL PATENTS IN THE AGREEMENTS I NEGOTIATED TO ENSURE THAT

20   TI HAD ACCESS TO ALL PATENTS, INCLUDING STANDARD ESSENTIAL

21   PATENTS, THAT COULD BE USED IN OUR PRODUCTS.

22   Q.    QUALCOMM'S COUNSEL ALSO ASKED YOU ABOUT SITUATIONS IN

23   WHICH TI'S CUSTOMERS PAID TI FOR BOTH CHIPS IT WAS PURCHASING

24   AND ROYALTIES ON AN END DEVICE COMPUTER.

25        DO YOU RECALL THAT?

1    A.    I DO.

2    Q.    NOW, WHEN TI SOLD BOTH A CHIP AND CHARGED A ROYALTY FOR AN

3    END DEVICE TO A CUSTOMER, WHAT ADJUSTMENTS WOULD YOU MAKE TO

4    THE END DEVICE ROYALTY BASE?

5    A.    A COMMON APPROACH UNDER THOSE CIRCUMSTANCES, WHETHER THAT

6    END DEVICE MANUFACTURER PURCHASED CHIPS FROM TI FOR WHICH WE

7    MADE A PROFIT, OR WHETHER THEY PURCHASED CHIPS FROM A TI

8    LICENSEE FOR WHICH WE HAD RECEIVED A ROYALTY, WAS IF IT WAS

9    MORE THAN A DE MINIMIS AMOUNT, WE WOULD PERMIT THE SYSTEM LEVEL

10   MANUFACTURER TO DEDUCT THE PRICE OF THOSE CHIPS FROM THE SALES

11   PRICE SO THAT THERE COULD BE NO ARGUMENT THAT TI WAS COLLECTING

12   DOUBLE ROYALTIES.

13   Q.    SO THAT ADJUSTMENT OCCURRED REGARDLESS OF WHETHER THE

14   PRICE -- OR, I'M SORRY.

15        THAT ADJUSTMENT OCCURRED REGARDLESS OF WHETHER THE CHIP

16   PRICE DEDUCTED WAS A CHIP PURCHASED FROM TI OR ANOTHER CHIP

17   MAKER?

18   A.    YES.  BUT, AGAIN, IT WAS FOR SOMETHING MORE THAN

19   DE MINIMIS, AND TI HAD A LOT OF COMPETITORS.  AND THIS DID NOT

20   COME UP VERY FREQUENTLY, BUT WHEN IT DID, THAT'S THE WAY WE

21   HANDLED IT.

22   Q.    AND THAT WAS A VIABLE BUSINESS MODEL FOR TI?

23   A.    IT WAS.

24        MS. GILLEN:  THANK YOU.

25        I HAVE NO FURTHER QUESTIONS.

```
 1                 THE COURT:  OKAY.  TIME IS 1:24.

 2            IS THERE ANY RECROSS?

 3                 MR. PAIGE:  NO.  THANK YOU, YOUR HONOR.

 4                 THE COURT:  ALL RIGHT.  IS THIS WITNESS EXCUSED

 5       SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

 6                 MS. GILLEN:  NOT SUBJECT TO RECALL.

 7                 MR. PAIGE:  NOT SUBJECT TO RECALL, YOUR HONOR.

 8                 THE COURT:  OKAY.  THEN YOU HAVE CONCLUDED YOUR TRIAL

 9       TESTIMONY AND YOU ARE FREE TO LEAVE.

10                 THE WITNESS:  THANK YOU, YOUR HONOR.

11                 THE COURT:  OKAY.  I'M SORRY, I FORGOT TO ASK, WITH

12       HWI-JAE CHO, IS THAT A RECALL OR NOT SUBJECT TO RECALL WITNESS?

13                 MR. MERBER:  NOT SUBJECT TO RECALL.

14                 THE COURT:  DO YOU AGREE WITH THAT?

15                 MR. BORNSTEIN:  MR. CHO IS IN KOREA AND WON'T COME.

16       SO NOT SUBJECT TO RECALL, YOUR HONOR.

17                 THE COURT:  OKAY.  AND THAT'S THE SAME FOR

18       MR. DONALDSON, A NOT-SUBJECT-TO-RECALL WITNESS.

19            SO CALL YOUR NEXT WITNESS, PLEASE.

20                 MS. GILLEN:  YOUR HONOR, THE FTC CALLS

21       CHRISTINA PETERSSON, WHOSE TESTIMONY WILL BE PRESENTED BY

22       VIDEO.

23                 THE COURT:  OKAY.  AND DOES THIS NEED TO BE SEALED OR

24       NOT SEALED?

25                 MS. GILLEN:  YOUR HONOR, THE LAST THREE MINUTES OF
```

1000

```
 1    THIS 24 MINUTE VIDEO REQUIRE SEALING PURSUANT TO YOUR HONOR'S

 2    ORDER --

 3              THE COURT:  OKAY.

 4              MS. GILLEN:  -- ON JANUARY 10TH.  SO WE WILL PAUSE

 5    THE VIDEO AT THE APPROPRIATE TIME.

 6              THE COURT:  AND I'LL HAVE TO ASK EVERYONE TO LEAVE?

 7              MS. GILLEN:  YES.

 8              THE COURT:  OKAY.  NOW, IS YOUR WITNESS AFTER THAT,

 9    ARE YOU GOING TO DO AN UNSEALED PORTION AND THEN DO A SEALED

10    PORTION?  OR --

11              MS. GILLEN:  YES.

12              THE COURT:  OKAY.

13              MS. GILLEN:  AND, YOUR HONOR, JUST TO CLARIFY, THERE

14    ARE CERTAIN EXHIBITS INTRODUCED IN THIS DEPOSITION THAT ARE

15    ALSO SUBJECT TO YOUR HONOR'S SEALING ORDER.  THE CONTENTS OF

16    THOSE DOCUMENTS WILL BE UP ON THE SCREEN AND I WILL USE THE,

17    THE PROJECTOR HERE TO REMOVE THOSE FROM PUBLIC VIEW.

18              THE COURT:  OKAY.

19              MS. GILLEN:  BUT THE TESTIMONY, OTHER THAN THAT FINAL

20    PORTION, IS NOT SEALED.

21              THE COURT:  OKAY.  SO DO YOU NEED TO MOVE IN

22    EXHIBITS?

23              MS. GILLEN:  YES, I DO.

24              THE COURT:  OKAY.  LET ME CHARGE YOU TIME.

25         IT'S 1:26.  GO AHEAD, PLEASE.
```

1    MS. GILLEN:  JX 0120, WHICH IS PARTIALLY SEALED,

2    CX 4103, CX 4104, AND CX 4155, WHICH IS ALSO PARTIALLY SEALED.

3    THE COURT:  CX 41 -- AND WHICH ONES ARE PARTIALLY

4    SEALED AGAIN, PLEASE?

5    MS. GILLEN:  JX 0120 AND CX 4155.

6    THE COURT:  OKAY.  ANY OBJECTION TO THESE FOUR

7    EXHIBITS BEING ADMITTED?

8    MR. BORNSTEIN:  YES, YOUR HONOR, IN PART.

9    THE COURT:  ALL RIGHT.  AND WHAT ARE THOSE

10    OBJECTIONS?

11    MR. BORNSTEIN:  FOR BOTH CX 4103 --

12    THE COURT:  OKAY.

13    MR. BORNSTEIN:  -- AND 4104, THESE ARE PRESS RELEASES

14    AND WE WOULD OBJECT TO THEIR ADMISSION FOR THE TRUTH OF THE

15    MATTER ASSERTED.

16    THE COURT:  ALL RIGHT.

17    DO YOU HAVE ANY RESPONSE TO THAT?

18    MS. GILLEN:  YOUR HONOR, THESE EXHIBITS ARE NOT BEING

19    ADMITTED FOR THE TRUTH OF THE MATTER.

20    AND I'LL ALSO NOTE THAT QUALCOMM DID NOT RAISE A HIGH

21    PRIORITY OBJECTION TO THE INTRODUCTION OF THESE EXHIBITS.

22    THE COURT:  OKAY.  BUT IT SOUNDS LIKE YOU'RE IN

23    AGREEMENT THAT YOU'RE NOT ASSERTING THESE FOR THE TRUTH OF THE

24    MATTER ASSERTED; IS THAT CORRECT?

25    MS. GILLEN:  CORRECT.

```
 1            THE COURT:  OKAY.  SO THAT CONDITION SHOULD BE NOTED,

 2    PLEASE, ON YOUR JOINT ADMITTED EXHIBIT LIST FOR 4103 AND 4104.

 3    AND THESE ARE ALL ADMITTED.

 4            (JOINT EXHIBIT 0120 AND PLAINTIFF'S EXHIBITS 4103, 4104,

 5    AND 4155 WERE ADMITTED IN EVIDENCE.)

 6            MS. GILLEN:  THANK YOU, YOUR HONOR.

 7            THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE, AND PLAY

 8    YOUR TAPE.

 9            (THE VIDEOTAPED DEPOSITION OF CHRISTINA PETERSSON WAS

10    PLAYED IN OPEN COURT OFF THE RECORD.)

11            THE COURT:  I DON'T HAVE A PETERSON BINDER.  I HAVE A

12    BLECKER BINDER.

13            THE CLERK:  OH, HERE.

14            THE COURT:  OKAY.  THANKS.

15            (THE VIDEOTAPED DEPOSITION OF CHRISTINA PETERSSON WAS

16    PLAYED IN OPEN COURT OFF THE RECORD.)

17            MS. GILLEN:  YOUR HONOR, THE NEXT THREE MINUTES OF

18    THE VIDEO ARE UNDER SEAL SUBJECT TO YOUR HONOR'S ORDER.

19            THE COURT:  OKAY.  AND THEN AFTER THAT, YOU'LL HAVE A

20    PUBLIC WITNESS OR A SEALED WITNESS?

21            MS. GILLEN:  AFTER THAT THREE MINUTE CLIP, THERE'S

22    APPROXIMATELY ONE AND A HALF MORE MINUTES OF THIS VIDEO WHICH

23    IS PUBLIC.

24            THE COURT:  OKAY.

25            MS. GILLEN:  AND THEN ANOTHER WITNESS, WHICH WILL BE
```

1       IN PART UNDER SEAL AND IN PART PUBLIC.

2               THE COURT:  AND WHICH ONE ARE YOU GOING TO DO FIRST,

3       THE SEALED PART OR THE OPEN PART?

4               MS. GILLEN:  THE PUBLIC OPEN PART.

5               THE COURT:  OKAY.  THEN LET ME ASK EVERYONE TO PLEASE

6       STEP OUTSIDE, IT SOUNDS LIKE, FOR ABOUT FOUR MINUTES; IS THAT

7       RIGHT?

8               MS. GILLEN:  CORRECT.

9               THE COURT:  OKAY.  WOULD YOU PLEASE STEP OUTSIDE?

10      SORRY FOR THE INCONVENIENCE.

11          AND I'LL ASK THE PARTIES JUST TO MAKE SURE, ONCE THE ROOM

12      HAS EMPTIED OUT, THAT YOU ARE OKAY WITH EVERYONE WHO IS STILL

13      REMAINING IN THE COURTROOM.

14          **(PROCEEDINGS UNDER SEAL FROM PAGE 1004 TO 1004.)**

15

16

17

18

19

20

21

22

23

24

25

```
 1        (IN OPEN COURT.)

 2              THE COURT:  ALL RIGHT.  WE'RE BACK IN OPEN COURT.

 3    PLEASE GO AHEAD.

 4        (THE VIDEOTAPED DEPOSITION OF CHRISTINA PETERSSON WAS

 5    PLAYED IN OPEN COURT OFF THE RECORD.)

 6              THE COURT:  ALL RIGHT.  1:55.  AND WAS ANY OF THIS

 7    COMPLETENESS TIME THAT SHOULD BE ATTRIBUTED TO QUALCOMM?

 8              MS. GILLEN:  NO, I DO NOT BELIEVE TO.

 9              THE COURT:  OKAY.

10        ALL RIGHT.  CALL YOUR NEXT WITNESS, PLEASE.

11              MR. ROSS:  YOUR HONOR, AARON ROSS FOR THE FEDERAL

12    TRADE COMMISSION.

13        AT THIS TIME THE FTC CALLS MICHAEL LASINSKI.

14              THE COURT:  OKAY.

15              MR. ROSS:  MAY I APPROACH WITH A BINDER?

16              THE COURT:  OH, I'M SORRY, I FORGOT TO ASK.  IS

17    MS. PETERSSON SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

18              MS. GILLEN:  NOT RECALL TO RECALL FOR THE FTC.

19              MR. BORNSTEIN:  ASIDE FROM OUR COUNTER, NO, YOUR

20    HONOR.

21              THE COURT:  ALL RIGHT.  THANK YOU.

22              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

23        (PLAINTIFF'S WITNESS, MICHAEL LASINSKI, WAS SWORN.)

24              THE WITNESS:  YES.

25              THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL
```

1      NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

2             THE WITNESS:  MICHAEL JAMES LASINSKI.  MY LAST NAME

3      IS SPELLED L-A-S-I-N-S-K-I.

4             MR. ROSS:  GOOD AFTERNOON, MR. LASINSKI.

5             THE WITNESS:  GOOD AFTERNOON.

6             THE COURT:  WAIT, I'M SORRY.

7             TIME IS 1:57.  GO AHEAD, PLEASE.

8                         **DIRECT EXAMINATION**

9      BY MR. ROSS:

10     Q.   I'D LIKE YOU TO TELL US A LITTLE BIT ABOUT YOURSELF.  WHAT

11     IS YOUR CURRENT POSITION?

12     A.   I AM THE CEO AND MANAGING DIRECTOR OF 284 PARTNERS.

13     Q.   WHAT IS THE NATURE OF YOUR BUSINESS?

14     A.   WE ARE AN INTELLECTUAL PROPERTY CONSULTING FIRM.  WE HELP

15     COMPANIES IN LITIGATION MATTERS SURROUNDING INTELLECTUAL

16     PROPERTY, AS WELL AS DO LICENSING AND OTHER TYPES OF

17     INTELLECTUAL PROPERTY STRATEGY SUPPORT.

18     Q.   HOW MANY YEARS OF EXPERIENCE DO YOU HAVE IN THE FIELD?

19     A.   APPROXIMATELY 25.

20     Q.   WHAT IS YOUR EDUCATIONAL BACKGROUND?

21     A.   I HAVE A BACHELOR'S IN ELECTRICAL ENGINEERING, AS WELL AS

22     A MASTER'S IN BUSINESS ADMINISTRATION.

23     Q.   DO YOU HOLD ANY PROFESSIONAL CREDENTIALS?

24     A.   YES, I DO.  I'M A CERTIFIED LICENSING PROFESSIONAL; I'M

25     CERTIFIED IN FINANCIAL FORENSICS; AND I'M ALSO A CPA.

1    Q.   HAVE YOU HELD ANY LEADERSHIP ROLES IN PROFESSIONAL

2    ORGANIZATIONS?

3    A.   YES, I HAVE.  I WAS THE PAST PRESIDENT OF THE LICENSING

4    EXECUTIVE SOCIETY FOR U.S.A. AND CANADA.  I'VE ALSO BEEN A

5    DIVISION CHAIR FOR AN ABA I.P. SECTION.

6    Q.   HAVE YOU BEEN RECOGNIZED AS A LEADER IN YOUR FIELD?

7    A.   YES.  INTELLECTUAL ASSET MANAGEMENT PUBLISHES THE TOP 300

8    LICENSING PROFESSIONALS, AND I'VE BEEN ONE OF THOSE.

9    Q.   WE'LL GET TO YOUR SPECIFIC ASSIGNMENT IN A MOMENT, BUT ARE

10   YOU HERE TO TESTIFY AS AN EXPERT ABOUT MATTERS RELATED TO

11   LICENSING CELLULAR SEPS ON A FAIR, REASONABLE, AND

12   NON-DISCRIMINATORY BASIS?

13   A.   YES, I AM.

14   Q.   HAVE YOU EVER OFFERED EXPERT TESTIMONY IN OTHER MATTERS

15   RELATED TO LICENSING SEPS ON A FRAND BASIS?

16   A.   YES, I HAVE.

17   Q.   HAVE YOU EVER BEEN ADMITTED AS AN EXPERT ON MATTERS

18   RELATED TO LICENSING SEPS ON A FRAND BASIS BY U.S. COURTS?

19   A.   YES, AS WELL AS I HAVE, AS WELL AS A U.K. COURT AND

20   ARBITRATION.

21   Q.   HAVE YOU EVER BEEN ADMITTED BY COURT ON LICENSING MATTERS

22   AND ROYALTY RATE DETERMINATION IN CASES UNRELATED TO SEPS AND

23   FRAND?

24   A.   YES, I HAVE, MANY TIMES.

25   Q.   WHAT ARE THE GENERAL METHODOLOGIES USED IN THIS CASE?

1    A.   I USED THE, WHAT'S CALLED THE COMPARABLE AGREEMENTS

2    APPROACH, AND THE TOP-DOWN APPROACH IN MY ANALYSIS.

3    Q.   OKAY.  HAVE YOU USED THE SAME GENERAL METHODOLOGY IN OTHER

4    CASES?

5    A.   YES, I HAVE.

6    Q.   CAN YOU PROVIDE AN EXAMPLE?

7    A.   SURE.  IN A RECENT CASE IN THE NORTHERN DISTRICT OF

8    CALIFORNIA, HUAWEI V. SAMSUNG, I USED THOSE SAME METHODS.

9    Q.   WAS THE METHODOLOGY CHALLENGED IN THAT CASE?

10   A.   YES, IT WAS.  IT WAS THE SUBJECT OF A DAUBERT MOTION, BUT

11   THAT MOTION WAS DENIED BY JUDGE ORRICK.

12   Q.   CAN YOU THINK OF ANY OTHER PUBLIC EXAMPLES WHERE THE

13   TOP-DOWN APPROACH AND THE COMPARABLE AGREEMENTS APPROACH WERE

14   USED?

15   A.   YES.  WELL, IN -- FOR EXAMPLE, IN TCL V. ERICSSON, IT WAS

16   USED, AND IN UNWIRED PLANET V. HUAWEI IT WAS USED.  BUT THERE

17   ARE OTHERS.

18   Q.   NOW, IN MR. VAN NEST'S OPENING STATEMENT HE INDICATED THAT

19   YOUR GENERAL METHODOLOGY HAS NEVER BEEN USED OUTSIDE OF

20   LITIGATION; IS THAT ACCURATE?

21   A.   NO, THAT'S NOT ACCURATE.

22   Q.   HAVE YOU ASSISTED IN NEGOTIATIONS WHERE THESE

23   METHODOLOGIES HAVE BEEN USED?

24   A.   YES, I HAVE, MULTIPLE TIMES.

25   Q.   AND IN THE ORDINARY COURSE OF YOUR BUSINESS, HAVE YOU

1    ASSISTED CLIENTS IN NEGOTIATING LICENSING FOR A FRAND

2    ENCUMBERED SEP PORTFOLIOS?

3    A.   YES, I HAVE.

4    Q.   HAVE YOU ASSISTED BOTH LICENSORS AND LICENSEES?

5    A.   YES.

6    Q.   CAN YOU TELL ME A LITTLE BIT ABOUT THOSE NEGOTIATIONS?

7    A.   I CAN TELL YOU A LITTLE BIT ABOUT THEM.  I HAVE

8    CONFIDENTIALITY RESTRICTIONS.  I CAN TELL YOU ABOUT INDUSTRIES.

9        SO WITHIN THE MOBILE HANDSET INDUSTRY INFRASTRUCTURE, AS

10   WELL AS IN AUTOMOTIVE TYPE APPLICATIONS.

11   Q.   ARE THERE ANY OF YOUR CLIENTS IN THE CELLULAR SPACE THAT

12   YOU CAN NAME?

13   A.   YES.  THERE ARE THREE CLIENTS THAT I KNOW ARE PUBLICLY

14   AVAILABLE, NOKIA, HUAWEI, AND ZTE.

15   Q.   SO WHEN MR. VAN NEST SAID IN HIS OPENING STATEMENT THAT

16   YOU ARE BIASED IN FAVOR OF HUAWEI; IS THAT TRUE?

17   A.   THAT IS DEFINITELY NOT TRUE.  HUAWEI IS A CLIENT, BUT I

18   HAVE MANY OTHERS.

19        MR. ROSS:  YOUR HONOR, AT THIS TIME THE FTC TENDERS

20   MICHAEL JAMES LASINSKI AS AN EXPERT IN LICENSING AND ROYALTY

21   RATE DETERMINATION, INCLUDING IN RELATION TO FRAND ENCUMBERED

22   SEPS.

23        THE COURT:  WOULD YOU LIKE TO VOIR DIRE HIM YOURSELF,

24   OR ANY OBJECTION TO THE CERTIFICATION?

25        MR. BORNSTEIN:  ONLY TO THE EXTENT THAT HE'S GOING TO

1    BE ASKED TO TESTIFY ABOUT A LEGAL INTERPRETATION OF FRAND, FOR

2    WHICH I THINK HE'S NOT QUALIFIED.  BUT WITH THAT CAVEAT, WE

3    HAVE NO OBJECTION.

4              THE COURT:  DO YOU WANT TO RESPOND TO THAT?

5              MR. ROSS:  WE ARE NOT GOING TO ASK HIM TO TESTIFY TO

6    LEGAL MATTERS.

7              THE COURT:  ALL RIGHT.  SO HE IS CERTIFIED FOR

8    LICENSING, ROYALTY RATE DETERMINATIONS, INCLUDING RELATING TO

9    SEP FRAND.

10        OKAY.

11   BY MR. ROSS:

12   Q.   LET'S TURN TO WHAT YOU'RE HERE TO TESTIFY ABOUT TODAY.

13   WHAT WAS YOUR ASSIGNMENT IN THIS MATTER?

14   A.   MY ASSIGNMENT WAS THREE-FOLD:  FIRST, TO DETERMINE WHETHER

15   OR NOT QUALCOMM'S ROYALTY RATES THAT IT'S CHARGED HISTORICALLY

16   ARE FAIR AND REASONABLE; SECOND, TO DETERMINE WHETHER OR NOT

17   THEY'RE PROPORTIONAL, THOSE SAME ROYALTY RATES ARE PROPORTIONAL

18   TO OTHER LICENSOR'S ROYALTY RATES WHEN CONSIDERING PATENT

19   PORTFOLIO STRENGTH; AND AS WELL AS TO DETERMINE WHETHER OR NOT,

20   BASED ON MY UNDERSTANDING FROM A LICENSING PERSPECTIVE,

21   QUALCOMM HAS MET ITS FRAND COMMITMENT.

22   Q.   IS IT YOUR UNDERSTANDING THAT QUALCOMM COMMITTED TO

23   LICENSE ITS SEPS ON A FRAND BASIS?

24   A.   YES.

25   Q.   AND TO CLARIFY, ARE YOU OFFERING ANY OPINIONS ON THE

```
 1      PROPER LEGAL INTERPRETATION OF THE FRAND COMMITMENT?

 2      A.   I AM NOT.

 3      Q.   DO YOU HAVE AN UNDERSTANDING OF FRAND?

 4      A.   YES, I DO, FROM A LICENSING PERSPECTIVE.

 5      Q.   CAN YOU PLEASE BRIEFLY EXPLAIN QUALCOMM'S HISTORICAL

 6      LICENSING PRACTICES?

 7      A.   YES.  I MEAN, HISTORICALLY, THEY HAVE CHARGED 5 PERCENT

 8      FOR CDMA BASED DEVICES WITH -- WELL, THERE ARE CAPS ALSO.

 9      Q.   AND DO YOU HAVE AN OPINION AS TO WHETHER QUALCOMM'S

10      LICENSING RATES ARE CONSISTENT WITH ITS FRAND OBLIGATIONS?

11      A.   YES.  IN MY OPINION, THEY'RE FAR TOO HIGH TO BE CONSISTENT

12      WITH THEIR FRAND OBLIGATIONS.

13      Q.   WHAT METHODS DID YOU USE TO ASSESS QUALCOMM'S RATES?

14      A.   AS WE SAID BEFORE, I'VE USED BOTH THE TOP-DOWN APPROACH AS

15      WELL AS A COMPARABLE AGREEMENT APPROACH.

16      Q.   HOW MANY ITERATIONS OF EACH OF YOUR METHODOLOGIES DID YOU

17      RUN?

18      A.   SO BECAUSE I USED MY -- I RAN MY METHODOLOGY BASED ON A

19      NUMBER OF DIFFERENT PORTFOLIO STRENGTH INDICATORS, I RAN 189

20      PERMUTATIONS FOR EACH INDICATOR.

21      Q.   WHAT WERE THE DEVICE TYPES THAT YOU ANALYZED?

22      A.   I ANALYZED LTE MULTIMODE DEVICES; I ANALYZED WCDMA

23      MULTIMODE DEVICES; AS WELL AS CDMA 2000 DEVICES.

24      Q.   WHAT WERE THE RESULTS OF YOUR ANALYSIS?

25      A.   SO THE RESULTS OF MY ANALYSIS ARE SHOWN HERE.
```

1          AGAIN, I RAN MULTIPLE ITERATIONS FOR EACH ANALYSIS THAT I

2     PERFORMED.  BUT AS YOU CAN SEE, FOR SAMSUNG, THE HIGH

3     REASONABLE RATE WOULD BE 0.65 PERCENT; FOR APPLE, IT WOULD BE

4     0.72 PERCENT; FOR LG, 0.76 PERCENT; FOR MOTOROLA, 0.80 PERCENT,

5     AND FOR HTC, 0.65 PERCENT OF WHOLESALE PRICES.

6     Q.   AFTER YOU REACHED THESE CONCLUSIONS, DID YOU DO ANY

7     FURTHER WORK TO ASSESS THE REASONABLENESS OF YOUR RESULTS?

8     A.   YES.  I DID A NUMBER OF DIFFERENT THINGS.  ONE OF THEM IS

9     TO TEST THE RESULTS OF MY TOP-DOWN APPROACH THAT WE'VE TALKED

10    ABOUT WITH MY COMPARABLE AGREEMENTS APPROACH.

11          I DID ANOTHER TEST, BUT I UNDERSTAND THAT I CAN ONLY TALK

12    ABOUT THAT TEST IN THE SEALED SESSION.

13    Q.   HAS QUALCOMM OR HAVE ANY OF QUALCOMM'S EXPERTS ADVANCED

14    ANY QUANTITATIVE ANALYSIS THAT YOU'RE AWARE OF DEMONSTRATING

15    THAT QUALCOMM'S HISTORICAL RATES ARE FRAND?

16    A.   NO, NOT THAT I'M AWARE OF.

17    Q.   LET'S TALK ABOUT YOUR TOP-DOWN APPROACH SPECIFICALLY?

18    A.   OKAY.

19    Q.   WHAT DID YOU DO IN PERFORMING YOUR TOP-DOWN APPROACH?

20    A.   SO IN PERFORMING MY TOP-DOWN APPROACH, THERE'S TWO STEPS

21    EFFECTIVELY.  ONE IS TO DETERMINE WHAT THE APPROPRIATE

22    AGGREGATE RATE IS, IN THIS CASE I SHOW 6 PERCENT FOR LTE

23    MULTIMODE DEVICES; AND THEN I NEEDED TO DETERMINE WHAT

24    QUALCOMM'S SHARE OF THAT AGGREGATE RATE WOULD BE, IN THIS CASE

25    I PROVIDED AN EXAMPLE OF 10 PERCENT.

1              SO 0.6 PERCENT AGGREGATE RATE -- I'M SORRY -- ROYALTY

2     RATE.

3     Q.   AND WHAT WERE THE RESULTS OF YOUR ANALYSIS?

4     A.   SO FOR THE TOP DOWN ANALYSIS FOR LTE MULTIMODE, I HAD A

5     MINIMUM ROYALTY RATE OF 0.52 PERCENT, A MEDIAN ROYALTY RATE OF

6     0.58 PERCENT, AND A MAXIMUM ROYALTY RATE OF 0.67 PERCENT.

7     Q.   AND YOU MENTIONED MULTIMODE.  WHAT IS A MULTIMODE DEVICE?

8     A.   SO A MULTIMODE DEVICE IS A DEVICE THAT HAS MORE THAN JUST

9     ONE STANDARD ON IT, FOR EXAMPLE, IT MAY HAVE A PRIMARY STANDARD

10    LIKE LTE, BUT LTE MAY, MAY ALSO HAVE SECONDARY STANDARDS.

11             SO LTE, WCDMA, GSM, OR THERE ARE PHONES THAT ARE LTE

12    PRIMARY STANDARD, CDMA 2000 SECONDARY STANDARD.

13    Q.   HOW DID YOU ADDRESS MULTIMODE IN YOUR ANALYSIS?

14    A.   WHAT I DID WAS I DID AN ANALYSIS TO DETERMINE WHAT THE

15    APPORTIONED SHARE OR VALUE OF EACH OF THE MODES FOR THE PHONE

16    WOULD BE.

17    Q.   SO TAKING A STEP BACK, SO THE TOP-DOWN APPROACH USED IN

18    ARM'S LENGTH LICENSING?

19    A.   YES, IT IS.

20    Q.   CAN YOU GIVE SOME EXAMPLES?

21    A.   SURE.  WELL, I'M AWARE OF APPLE USING THE TOP-DOWN

22    APPROACH, HTC, CERTAINLY ERICSSON, WE JUST HEARD ABOUT THE

23    TOP-DOWN APPROACH.

24             THERE ARE OTHERS.  NOKIA.

25    Q.   IN WHAT CONTEXT -- YOU MENTIONED SAMSUNG.  IN WHAT CONTEXT

1    HAVE YOU SEEN SAMSUNG USE THE TOP-DOWN APPROACH?

2    A.   SO IN -- THIS IS AN EXAMPLE WHERE SAMSUNG WAS ACTUALLY

3    NEGOTIATING WITH QUALCOMM, AND THIS IS EXACTLY THE TYPE OF

4    ANALYSIS THAT I'M TALKING ABOUT HERE WHERE THEY'VE DETERMINED

5    WHAT A CUMULATIVE RATE IS FOR A WCDMA, IN THIS CASE IT'S

6    5 PERCENT.

7         AND THEN THEY'RE SAYING THAT ONE WOULD NEED TO CALCULATE

8    WHAT QUALCOMM'S PERCENTAGE OR TOTAL SHARE IS TO ALLOCATE TO

9    THAT SHARE.

10        NOW, THIS WAS GOING TO BE A CROSS-LICENSE, SO THEN ONE

11   WOULD HAVE TO CONSIDER SAMSUNG'S SHARE AS WELL OF THE TOTALITY

12   OF THE WCDMA PORTFOLIO.

13   Q.   YOU MENTIONED THAT THE TOP-DOWN APPROACH REQUIRES AN

14   AGGREGATE RATE.  HOW DID YOU COME UP WITH THE APPROPRIATE

15   REASONABLE AGGREGATE RATES?

16   A.   SURE.  I USED A NUMBER OF ANNOUNCEMENTS THAT WERE MADE BY

17   COMPANIES AROUND THE TIME OF THE LAUNCH OF THE LTE, FOR

18   EXAMPLE, STANDARD.

19        I ALSO LOOKED AT -- WELL, THERE ARE SOME RULINGS ON,

20   RECENT RULINGS ON WHAT AN APPROPRIATE TOP-DOWN APPROACH WOULD

21   BE.

22        AND THEN ANOTHER -- AGGREGATE RATE WOULD BE.

23        AND THEN ANOTHER METHOD IS I LOOKED AT WHAT MY TOP-DOWN

24   APPROACH RATE, AGGREGATE RATES THAT I SELECTED WERE AND

25   COMPARED THEM TO MY COMPARABLE AGREEMENTS APPROACH.

1    Q.    OKAY.  WE JUST HEARD MS. PETERSSON TESTIFY THAT ERICSSON

2    SUPPORTED A SINGLE DIGIT PERCENTAGE AGGREGATE RATE FOR LTE?

3    A.    YES.

4    Q.    DID ERICSSON ALSO ENDORSE A MORE SPECIFIC RATE OR RANGE OF

5    RATES?

6    A.    YES, THEY DID.  THEY ENDORSED AN AGGREGATE RATE OF 6 TO 8

7    PERCENT FOR LTE MOBILE DEVICES.

8    Q.    DID OTHER MAJOR LICENSORS AND LICENSEES MAKE STATEMENTS

9    CONCERNING REASONABLE AGGREGATE RATES?

10    A.    YES, OTHERS DID.  NOKIA, NTT, I THINK SIEMENS, HUAWEI, ZTE

11    AND OTHERS.

12    Q.    WHAT AGGREGATE RATE DID YOU CONCLUDE ON FOR LTE MULTIMODE

13    IN YOUR ANALYSIS?

14    A.    I CONCLUDED ON 6 PERCENT.

15    Q.    YOU JUST TESTIFIED THAT ERICSSON ENDORSED A 6 TO 8 PERCENT

16    RANGE FOR LTE AGGREGATE RATES?

17    A.    CORRECT.

18    Q.    SO WHY DID YOU CONCLUDE ON 6 PERCENT?

19    A.    I CONCLUDED ON 6 PERCENT FOR A NUMBER OF DIFFERENT

20    REASONS.

21         FIRST, WHEN YOU LOOK AT WHAT THE, THE WAY THE INDUSTRY HAS

22    DEVELOPED SINCE THOSE STATEMENTS WERE MADE, THERE'S A LOT MORE

23    APPLICATIONS GOING ON ON SMARTPHONES THAN AT THAT TIME.  FOR

24    EXAMPLE, THEY NOT ONLY HAVE MODEM CHIP, NOW THEY HAVE

25    APPLICATION PROCESSORS ON THEM.

1          ALSO, AT THAT TIME THERE WERE ESTIMATES ON HOW MUCH DATA

2     WOULD BE OFFLOADED TO WI-FI NETWORKS, AND IT TURNS OUT THAT

3     SIGNIFICANTLY MORE DATA IS BEING OFFLOADED TO WI-FI NETWORKS.

4          AND THEN FINALLY, AS I MENTIONED BEFORE, THERE ARE COURT

5     CASES WHERE THE TOP-DOWN APPROACH AND THE RESULTS OF THOSE

6     COURT CASES ARE CONSISTENT WITH 6 PERCENT, SPECIFICALLY TCL.

7     Q.   THAT'S THE TCL V. ERICSSON?

8     A.   THAT'S CORRECT.

9     Q.   MOVING ON.  YOU SAID THAT THE NEXT STEP OF YOUR TOP-DOWN

10    APPROACH INVOLVED ASSESSING PORTFOLIO STRENGTH; IS THAT

11    CORRECT?

12    A.   CORRECT.

13    Q.   CAN YOU SUMMARIZE THE PORTFOLIO STRENGTH METRICS THAT YOU

14    CONSIDERED?

15    A.   YES.  I CONSIDERED TWO PORTFOLIO STRENGTH METRICS.  ONE IS

16    DEEM SEPS, DEEM STANDARD ESSENTIAL PATENTS, AND THE OTHER IS

17    APPROVED CONTRIBUTIONS.

18    Q.   WHAT'S THE DIFFERENCE BETWEEN A DECLARED SEP AND A DEEMED

19    SEP?

20    A.   SO A DECLARED SEP IS A PATENT OR PATENT APPLICATION THAT

21    GETS DECLARED TO A STANDARD, OFTENTIMES AS THE STANDARD IS

22    BEING SET OR ADOPTED OR STRUCTURED.

23          AND A DEEMED SEP IS ACTUALLY A STANDARD ESSENTIAL PATENT

24    THAT HAS GONE THROUGH A PROCESS, FOR EXAMPLE, A TECHNICAL

25    EVALUATION, SOMETIMES THEY'RE DONE BY MECHANICAL MEANS, TO

1     DETERMINE WHETHER OR NOT IT IS BELIEVED TO BE ACTUALLY

2     ESSENTIAL TO THE STANDARD.

3     Q.   HOW DID YOU GO ABOUT CALCULATING THE PORTION OF DEEMED

4     SEPS OWNED BY THE VARIOUS SEP HOLDERS?

5     A.   THERE WERE NUMEROUS STUDIES THAT WERE AVAILABLE TO ME FROM

6     THE RECORD, AND I USED EVERY STUDY THAT I HAD AVAILABLE TO ME

7     THAT HAD A DEEMING PROCESS, OR SOME SORT OF A TECHNICAL

8     EVALUATION PROCESS.

9     Q.   HAVE YOU SEEN ANY EVIDENCE THAT QUALCOMM HAS RELIED ON ANY

10    OF THESE PUBLICLY AVAILABLE STUDIES?

11    A.   YES, I HAVE.

12    Q.   COULD YOU PLEASE TURN TO THE TAB IN YOUR BINDER LABELED

13    CX 7128.

14        IT MAY ALSO SHOW UP ON YOUR SCREEN.

15        WHAT IS THIS DOCUMENT?

16    A.   THIS DOCUMENT IS A -- I'M SORRY -- IS A PRESENTATION THAT

17    QUALCOMM PREPARED IN ITS NEGOTIATIONS WITH LG FOR A LICENSE.

18    Q.   AND DID YOU CONSIDER THIS PRESENTATION IN FORMING YOUR

19    OPINIONS?

20    A.   I DID, YES.

21        MR. ROSS:  YOUR HONOR, THE FTC MOVES TO ADMIT

22    CX 7218.

23        MR. BORNSTEIN:  YOUR HONOR, THIS IS NOT BEING

24    INTRODUCED WITH FOUNDATION THROUGH A FACT WITNESS.

25        I HAVE NO OBJECTION TO MR. LASINSKI RELYING ON THE

 1    DOCUMENT, BUT I DON'T THINK IT'S A PROPER METHOD TO INTRODUCE

 2    THE DOCUMENT INTO EVIDENCE.

 3              MR. ROSS:  YOUR HONOR, WE DON'T SEEK TO ADMIT THE

 4    DOCUMENT FOR THE TRUTH, ONLY TO SHOW MR. LASINSKI'S RELIANCE ON

 5    IT IN HIS ANALYSIS.

 6              THE COURT:  ALL RIGHT.  SO IT'S ADMITTED WITH THAT

 7    CONDITION, WHICH YOU'LL PUT IN THE JOINT ADMITTED EXHIBIT LIST.

 8    OKAY?

 9         (PLAINTIFF'S EXHIBIT CX 7218 WAS ADMITTED IN EVIDENCE.)

10              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  IT'S

11    ADMITTED.

12    BY MR. ROSS:

13    Q.   COULD YOU PLEASE TURN TO SLIDE 26, THIS IS CX 7128.

14              THE COURT:  IS ANY OF THIS SEALED?

15              MR. ROSS:  NO.

16              THE COURT:  OKAY.

17    BY MR. ROSS:

18    Q.   WHAT IS SHOWN ON THIS SLIDE?

19    A.   SO THIS SLIDE IS ACTUALLY SHOWING A COMPARISON OF

20    QUALCOMM'S POSITION TO LG'S POSITION BASED ON THE RESULTS OF

21    STANDARD ESSENTIAL PATENT STUDIES THAT ARE COMMISSIONED BY

22    DIFFERENT GROUPS.  FOR EXAMPLE, FAIRFIELD, ARTICLE ONE,

23    IRUNWAY, CYBER CREATIVE, SO A BUNCH OF DIFFERENT STUDIES THAT

24    DO SEP AND DEEMING OF SEPS.

25    Q.   AND THESE WERE STUDIES THAT QUALCOMM PRESENTED?

1    A.   YES.  THIS WAS PART OF THEIR PRESENTATION THAT THEY WERE

2    PREPARING FOR LG, NEGOTIATIONS WITH LG.

3    Q.   ARE ALL OF THE STUDIES ON THIS SLIDE DEEMED SEP STUDIES?

4    A.   NO, THEY'RE NOT.  IN FACT, THERE IS ONE STUDY HERE, ABI

5    RESEARCH, WHICH LOOKED AT RAND APPROVED CONTRIBUTIONS.

6    Q.   DID YOU USE ANY OF THESE STUDIES IN YOUR ANALYSIS?

7    A.   YES.  I MEAN, THOSE STUDIES THAT HAD A DEEMING PROCESS I

8    USED IN MY ANALYSIS, AND AS WELL THERE WERE ADDITIONAL STUDIES

9    IN THE RECORD THAT WEREN'T INCLUDED ON THIS SLIDE THAT HAD A

10   DEEMING PROCESS THAT I USED.

11   Q.   DID YOU SELECT ONE SEP STUDY AS BEING THE BEST OR MOST

12   PROBATIVE FOR YOUR ANALYSIS?

13   A.   NO, I DID NOT.  I USED ALL THE STUDIES THAT WERE AVAILABLE

14   TO ME THAT HAD A DEEMING PROCESS.

15   Q.   YOU SAID THAT IN ADDITION TO THE DEEMED SEPS, YOU ALSO

16   CONSIDERED APPROVED CONTRIBUTIONS?

17   A.   YES, I DID.

18   Q.   WHY?

19   A.   APPROVED CONTRIBUTIONS, ACTUALLY AS WE JUST HEARD BY THE

20   EARLIER TESTIMONY, ARE ACCEPTED AS AN INDICATOR OR A METRIC FOR

21   PORTFOLIO STRENGTH AS IT RELATES TO THE MATTER AT HAND.

22   Q.   DID YOU QUANTITATIVELY TEST YOUR UNDERSTANDING THAT

23   APPROVED CONTRIBUTIONS ARE CORRELATED WITH SEP PORTFOLIO

24   STRENGTH?

25   A.   YES, I DID.  I TESTED THEM VERSUS MY COMPARABLE

Case 5:17-cv-00220-LHK   Document 1513   Filed 07/02/19   Page 158 of 228

1    AGREEMENTS, AND IT SHOWS THAT COMPANIES THAT HAVE STRONGER

2    APPROVED CONTRIBUTIONS ARE ABLE TO NEGOTIATE HIGHER ROYALTY

3    RATES THAN THOSE WITH FEWER APPROVED CONTRIBUTIONS.

4    Q.   NOW, HAVE QUALCOMM OR ANY OF QUALCOMM'S EXPERTS PRESENTED

5    ANY QUANTITATIVE ANALYSIS THAT APPROVED CONTRIBUTIONS ARE NOT

6    CORRELATED WITH ROYALTIES RECEIVED IN ARM'S LENGTH

7    NEGOTIATIONS?

8    A.   NOT THAT I'M AWARE OF.

9            MR. BORNSTEIN:  YOUR HONOR, THERE WILL BE TESTIMONY

10   ON THIS, AND THERE'S AN EXPERT DISCLOSURE THAT WE'VE MADE.  SO

11   I'M NOT QUITE SURE WHAT THE TESTIMONY IS ON THAT POINT.

12           THE COURT:  I DON'T THINK THAT'S AN OBJECTION.  IS

13   THAT AN OBJECTION?

14           MR. BORNSTEIN:  IT IS ON OBJECTION.  BUT I'LL

15   WITHDRAW IT IF I'M OVERRULED.

16           THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

17   BY MR. ROSS:

18   Q.   ROUGHLY HOW MANY APPROVED CONTRIBUTIONS ARE THERE?

19   A.   WELL, IN THE CELLULAR STANDARDS SPACE, THERE'S THOUSANDS

20   OF APPROVED CONTRIBUTIONS, AND COMPANIES LIKE QUALCOMM, NOKIA,

21   AND ERICSSON EACH WILL HOLD THOUSANDS OF APPROVED

22   CONTRIBUTIONS.

23   Q.   IS EVERY APPROVED CONTRIBUTION AN EXTREMELY IMPORTANT

24   CONTRIBUTION?

25   A.   NO, IT'S MY UNDERSTANDING THAT THEY WOULD NOT BE.

1    Q.   WHEN LICENSEES AND LICENSORS CONSIDER APPROVED

2    CONTRIBUTIONS DURING NEGOTIATIONS, DO THEY ATTEMPT TO RANK OR

3    ASSESS THE RELATIVE VALUE OF SPECIFIC CONTRIBUTIONS?

4    A.   I HAVE NEVER WITNESSED A RANKING OF APPROVED

5    CONTRIBUTIONS.

6    Q.   WHAT DO THEY DO?

7    A.   THEY COUNT THE TOTAL NUMBER OF APPROVED CONTRIBUTIONS IN

8    THEIR -- WELL, THEY COUNT THE NUMBER OF TOTAL APPROVED

9    CONTRIBUTIONS BY MODE.

10   Q.   HAVE QUALCOMM'S EXPERTS TO DATE PUT FORTH AN ANALYSIS

11   MEASURING THE RELATIVE VALUE OF VARIOUS COMPANIES' APPROVED

12   CONTRIBUTIONS?

13   A.   NOT THAT I'M AWARE OF, NO.

14   Q.   DO BOTH LICENSORS AND LICENSEES CONSIDER APPROVED

15   CONTRIBUTIONS TO BE A PROXY FOR SEP, S-E-P, PORTFOLIO STRENGTH?

16   A.   YES, I'M AWARE OF THAT.

17   Q.   CAN YOU GIVE ME EXAMPLES?

18   A.   SURE, I CAN.  WELL, OBVIOUSLY WE JUST HEARD FROM ERICSSON,

19   APPLE, NOKIA, I'M AWARE OF HUAWEI AS WELL.

20   Q.   WHAT DOES THIS TESTIMONY DEMONSTRATE?  I BELIEVE THIS IS

21   TESTIMONY WE JUST HEARD?

22   A.   YES.  I MEAN, SO THIS IS MS. PETERSSON AND WHAT SHE'S

23   SAYING IS EXACTLY WHAT I'M TALKING ABOUT, THAT APPROVED

24   CONTRIBUTIONS ARE A GOOD PROXY FOR ESTABLISHING THE SHARE OF

25   THE I.P. THAT A COMPANY HOLDS, AND IT'S CONTRIBUTION TO THE

```
1    STANDARD ALSO FROM AN IPR PERSPECTIVE.

2    Q.   HAS QUALCOMM EVER USED APPROVED CONTRIBUTIONS?  WITH THAT

3    INSTRUCTION, HAS QUALCOMM EVER USED APPROVED CONTRIBUTIONS.

4    A.   YES.  WE JUST SAW AN EXAMPLE OF IT IN THE QUALCOMM LG

5    PRESENTATION THAT I JUST SHOWED.

6         MR. ROSS:  YOUR HONOR, AT THIS TIME WE'VE REACHED THE

7    PORTION OF MR. LASINSKI'S ANALYSIS THAT IS SUBJECT TO THE

8    COURT'S SEALING ORDER, SO I WOULD ASK THAT WE PROCEED IN A

9    SEALED SESSION.

10        THE COURT:  OKAY.  WHY DON'T WE GO AHEAD AND TAKE A

11   TEN MINUTE BREAK NOW SINCE IT'S 2:17.  WE'LL TAKE A TEN MINUTE

12   BREAK.  AND WHEN WE COME BACK, APPROXIMATELY HOW LONG IS YOUR

13   SEALED PORTION?

14        MR. ROSS:  APPROXIMATELY 20 TO 25 MINUTES.

15        THE COURT:  AND AFTER THAT, DO YOU HAVE ANOTHER

16   PUBLIC SESSION, OR DOES IT THEN GO TO CROSS?

17        MR. ROSS:  CROSS.

18        THE COURT:  IT GOES TO CROSS.  AND THEN THE CROSS

19   WILL BE SEALED OR NOT SEALED?

20        MR. BORNSTEIN:  I EXPECT I CAN DO ALMOST, IF NOT THE

21   ENTIRETY, OF THE CROSS IN A PUBLIC SESSION.  OBVIOUSLY I

22   HAVEN'T HEARD THE FULL DIRECT YET, SO I CAN'T COMMIT TO THAT.

23        THE COURT:  SURE.  THAT'S FAIR.

24        MR. ROSS:  I WOULD ANTICIPATE THAT FOR COMPLETENESS

25   OF THE WITNESSES'S ANSWERS, MANY OF THE ANSWERS IN CROSS WOULD
```

1    NEED TO BE UNDER SEAL, BUT I HAVE NOT HEARD THE CROSS.

2              THE COURT:  OKAY.  WELL, WE'LL DEAL WITH THAT LATER.

3         LET'S GO AHEAD AND TAKE A TEN MINUTE BREAK NOW AND THEN

4    WE'LL HAVE THE SEALED PORTION OF THE DIRECT, WHICH YOU SAID

5    WOULD BE ABOUT 25 MINUTES; IS THAT RIGHT?

6              MR. ROSS:  THAT'S CORRECT.

7              THE COURT:  ALL RIGHT.  THANK YOU.

8         WE'LL TAKE A BREAK NOW.  THANKS.

9         (RECESS FROM 2:18 P.M. UNTIL 2:32 P.M.)

10        **(PROCEEDINGS UNDER SEAL FROM PAGES 1024 TO 1042.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **(IN OPEN COURT.)**

2               THE WITNESS:  EXCUSE ME.  CAN I JUST GET UP AND GET

3     WATER WHILE THEY'RE COMING IN?

4               THE COURT:  THAT'S FINE.

5               THE WITNESS:  THANK YOU.

6          (PAUSE IN PROCEEDINGS.)

7               THE COURT:  OKAY.  WELCOME BACK.

8          ALL RIGHT.  2:56.  GO AHEAD, PLEASE.

9               MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

10    Q.   SO BEFORE WE OPENED THE COURTROOM, WE WERE TALKING ABOUT

11    THE FACT THAT 284 PARTNERS, YOUR FIRM, HAS DONE WORK FOR HUAWEI

12    IN CONNECTION WITH COMMERCIAL PATENT LICENSE NEGOTIATIONS WITH

13    QUALCOMM; IS THAT CORRECT?

14    A.   CORRECT.

15    Q.   OKAY.  AND THE 284 PARTNERS MANAGING DIRECTOR WHO LED THAT

16    ENGAGEMENT WAS A GENTLEMAN BY THE NAME OF PHILIP KLINE; IS THAT

17    ACCURATE?

18    A.   YES.

19    Q.   AND MR. KLINE, WHO LED THAT ENGAGEMENT FOR 284 PARTNERS

20    AGAINST QUALCOMM, HE WORKED WITH YOU IN THIS MATTER; ISN'T THAT

21    RIGHT?

22    A.   YES, HE DID.

23    Q.   AND MR. KLINE IS EVEN HERE IN THE COURTROOM TODAY, ISN'T

24    HE?

25    A.   HE IS, YES.

1    Q.   OKAY.  AND PERSONALLY, SIR, YOU'VE ACTED AS A WITNESS FOR

2    HUAWEI MULTIPLE TIMES?

3    A.   I HAVE, YES.

4    Q.   THERE WAS A CONFIDENTIAL ARBITRATION THAT YOU MENTIONED;

5    CORRECT?

6    A.   YES.

7    Q.   THERE WAS A MATTER IN THE U.K., UNWIRED PLANET VERSUS

8    HUAWEI; CORRECT?

9    A.   THAT IS RIGHT, YES.

10   Q.   AND YOU MENTIONED A CASE HERE IN THIS DISTRICT BEFORE

11   JUDGE ORRICK.  THAT'S HUAWEI AGAINST SAMSUNG; CORRECT?

12   A.   YES.

13   Q.   AND YOU'VE BEEN DISCLOSED AS AN EXPERT BY HUAWEI IN AT

14   LEAST ONE OTHER MATTER; IS THAT RIGHT?

15   A.   CORRECT.

16   Q.   THAT'S A CASE IN THE ITC AGAINST INTERDIGITAL; CORRECT?

17   A.   WHO -- NO, NOT IN -- I ACTUALLY WORK FOR ZTE IN THE ITC.

18   Q.   I UNDERSTAND YOU TESTIFIED FOR ZTE IN THAT MATTER.

19        BUT HUAWEI DISCLOSED YOU TO THE COURT AS AN EXPERT; ISN'T

20   THAT RIGHT?

21   A.   I DID NOT KNOW THAT.  I DID NOT ACTUALLY WORK FOR THEM IN

22   ANYTHING RELATED TO THAT, SO --

23   Q.   OKAY.  WELL, IN THE UNWIRED PLANET CASE --

24   A.   YES.

25   Q.   -- THERE WAS A WRITTEN DECISION ISSUED BY THE COURT IN MAY

1    OF 2017 IN WHICH THE JUDGE DISCUSSED YOUR TESTIMONY; IS THAT

2    RIGHT?

3    A.   YES, THAT IS RIGHT.

4    Q.   AND THE COURT IN THAT CASE WROTE, QUOTE, "I WAS CONCERNED

5    ABOUT MR. LASINSKI'S APPROACH.  OVERALL, HIS REPORTS AND ORAL

6    EVIDENCE LEFT ME WITH THE IMPRESSION THAT MR. LASINSKI HAS

7    TRIED TO AVOID MAKING WRITTEN STATEMENTS WHICH MIGHT BE

8    CONSTRUED AS ADVERSE TO HUAWEI."

9         DID THE COURT ISSUE THAT RULING?

10   A.   THE COURT WROTE THAT, YES, THEY DID.

11   Q.   OKAY.

12   A.   HOWEVER, I CAN TELL YOU THAT THEY WENT WITH MY NUMBERS,

13   SO --

14   Q.   WELL --

15   A.   THEY MIGHT HAVE WRITTEN THAT, BUT THEY WENT WITH MY

16   NUMBERS.

17   Q.   OKAY.  WELL, YOU UNDERSTAND, SIR, THAT A REPRESENTATIVE OF

18   HUAWEI TESTIFIED IN THIS CASE; CORRECT?

19   A.   YES, I -- I UNDERSTAND THAT, YES.

20   Q.   AND YOU UNDERSTAND THAT HUAWEI IS A LICENSEE OF QUALCOMM;

21   CORRECT?

22   A.   YES, IT IS A LICENSEE OF QUALCOMM.  THAT'S MY

23   UNDERSTANDING.

24   Q.   AND YOU UNDERSTAND THAT HUAWEI HAS IN THE PAST SOUGHT TO

25   REDUCE THE ROYALTIES THAT HUAWEI -- THAT HUAWEI HAS SOUGHT TO

1    REDUCE THE ROYALTIES IT PAYS TO QUALCOMM THROUGH NEGOTIATION;

2    CORRECT?

3    A.   YES.  MOST LICENSEES DO, SO I WOULD EXPECT THAT.

4    Q.   ALL RIGHT.  AND YOUR FIRM, 284 PARTNERS, HAS ASSISTED

5    HUAWEI IN THAT ENDEAVOR; CORRECT?

6    A.   WE RAN SOME ANALYSIS THAT THEY ASKED US TO RUN.

7    Q.   THAT HUAWEI ASKED YOU TO RUN FOR NEGOTIATIONS WITH

8    QUALCOMM?

9    A.   CORRECT.

10   Q.   NOW, YOU'RE NOT AN ECONOMIST; CORRECT, SIR?

11   A.   I'M NOT A PH.D. ECONOMIST, BUT I USE ECONOMICS EVERY DAY

12   AS IT RELATES TO UNPACKING LICENSE AGREEMENTS AND PRICING

13   LICENSE AGREEMENTS.

14   Q.   YOU DON'T HAVE ANY DEGREE IN ECONOMICS AT ALL; CORRECT?

15   A.   I DO NOT.

16   Q.   OKAY.

17   A.   THAT IS ACCURATE.

18        I SHOULD ALSO SAY I'VE TAKEN ECONOMIC CLASSES, BUT I DON'T

19   HAVE A DEGREE IN ECONOMICS.

20   Q.   AND YOU'RE NOT TESTIFYING TODAY AS AN ECONOMIST; RIGHT?

21   A.   NO, I'M NOT.

22   Q.   AND YOU'RE NOT PROVIDING AN OPINION IN THIS CASE FROM AN

23   ENGINEERING PERSPECTIVE EITHER; CORRECT?

24   A.   CORRECT, FROM A LICENSING PROFESSIONAL STANDPOINT.

25   Q.   RIGHT.  YOU HAVEN'T DONE ANY REVIEW OF QUALCOMM'S STANDARD

1    ESSENTIAL PATENTS THEMSELVES; RIGHT?

2    A.   WELL, I HAVE LOOKED AT THEM, BUT NOT FROM A TECHNICAL

3    PERSPECTIVE.

4    Q.   OKAY.  AND YOU'VE NOT DONE ANY TECHNICAL ANALYSIS OF

5    QUALCOMM'S NON-SEPS EITHER; RIGHT?

6    A.   THAT IS ACCURATE, NOT FROM A TECHNICAL PERSPECTIVE.

7    Q.   SO LET'S TALK ABOUT YOUR TOP-DOWN APPROACH.

8    A.   OKAY.

9    Q.   IN THE TOP-DOWN APPROACH, WHAT YOU DO IS YOU DETERMINE

10   WHAT YOU CONSIDER TO BE AN AGGREGATE ROYALTY RATE FOR CERTAIN

11   TYPES OF HANDSETS; RIGHT?

12   A.   THAT'S THE FIRST STEP, YES.

13   Q.   CORRECT.  AND WHAT YOU MEAN BY AN AGGREGATE ROYALTY RATE

14   IS THE TOTAL ROYALTY RATE THAT A HANDSET MAKER WOULD PAY FOR

15   THE ENTIRE STANDARD; CORRECT?

16   A.   WELL, THEY MAY NOT HAVE TO PAY THAT ROYALTY RATE.  BUT

17   THAT'S WHAT THE VALUE -- OR THAT'S WHAT THEY MIGHT HAVE TO PAY.

18   LIKE THEY'LL HAVE THEIR OWN SEPS, SO THEY DON'T HAVE TO PAY FOR

19   THEIR OWN SEPS.

20        SO, I MEAN, THEY DON'T HAVE TO PAY IT, BUT THAT'S WHAT --

21   WELL, I GUESS MAYBE IN A CASE WHERE THEY HAD NO SEPS WHATSOEVER

22   AND EVERYONE TRIED TO COLLECT FROM THEM, THEY MIGHT HAVE TO PAY

23   THAT.  BUT NOT GENERALLY.

24   Q.   RIGHT.  SO YOU WOULD USE THE AGGREGATE ROYALTY RATE TO SET

25    A LIMIT ABOVE WHICH A PARTICULAR LICENSOR, LIKE QUALCOMM, COULD

1    NOT PRICE WITHOUT VIOLATING ITS FRAND COMMITMENT; CORRECT?

2    A.   WELL, I DON'T USE IT TO SET A LIMIT.  I THINK THAT IT'S A

3    REASONABLE HIGH END OF WHAT SOMEONE SHOULD BE ABLE TO NEGOTIATE

4    FOR ALL ITS CELLULAR SEPS.

5    Q.   CAN YOU TAKE A LOOK AT PAGE 227 OF YOUR DEPOSITION, SIR,

6    LINES 6 THROUGH 10.

7    A.   YES.

8    Q.   AND YOU WERE ASKED THE QUESTION --

9    A.   I'M SORRY.  COULD YOU --

10   Q.   AND WE CAN PUT IT ON THE SCREEN IF IT'S HELPFUL.

11   A.   IF YOU COULD REPOINT ME TO THE PAGE YOU WERE TALKING

12   ABOUT.

13   Q.   SURE.  IT'S 227, LINE 6.

14        AND YOU WERE ASKED THE QUESTION, "YOU TESTIFIED THAT YOU

15   THINK IT'S APPROPRIATE TO USE A REASONABLE AGGREGATE RATE TO

16   SET A LIMIT ABOVE WHICH QUALCOMM MAY NOT PRICE WITHOUT

17   VIOLATING ITS FRAND COMMITMENT."

18   A.   YES.

19   Q.   YOU ANSWERED, "CORRECT."  YES?

20   A.   CORRECT.

21   Q.   AND YOU GAVE THAT TESTIMONY, SIR?

22   A.   I DID.

23   Q.   AND YOU STAND BY IT?

24   A.   OF COURSE.  I JUST VIEW IT AS A REASONABLE HIGH END.

25   Q.   ALL RIGHT.  BUT YOU TESTIFIED THAT IT'S SOMETHING YOU

1    COULD USE TO SET A LIMIT; CORRECT?

2    A.   CORRECT.

3    Q.   ALL RIGHT.  AND FOR WCDMA MULTIMODE DEVICES, THE AGGREGATE

4    RATE THAT YOU USE TO SET THAT LIMIT IS 5 PERCENT; RIGHT?

5    A.   FOR WCDMA DEVICES, YES.

6    Q.   YES, MULTIMODE WCDMA DEVICES.

7    A.   CORRECT.

8    Q.   AND YOU ESTIMATED THAT 5 PERCENT AGGREGATE ROYALTY RATE,

9    IN PART, BASED ON STATEMENTS MADE BY INDUSTRY PARTICIPANTS;

10   RIGHT?

11   A.   IN PART, YES.

12   Q.   AND YOU POINTED, FOR EXAMPLE, TO STATEMENTS BY ERICSSON

13   AND NOKIA IN NOVEMBER OF 2002?

14   A.   RIGHT.

15   Q.   AND THERE WERE OTHER COMPANIES AS WELL WHO SIGNED ON?

16   A.   SAMSUNG, WE JUST SAW A SIMILAR TYPE OF EXHIBIT THAT SHOWED

17   5 PERCENT.  SAME THING.

18   Q.   AND YOU BELIEVE IT'S APPROPRIATE TO RELY ON THOSE

19   STATEMENTS BECAUSE YOU THINK THAT THOSE STATEMENTS WERE, IN

20   TURN, RELIED ON BY INDUSTRY PARTICIPANTS WHEN CHOOSING WHETHER

21   TO ADOPT THE STANDARDS; RIGHT?

22   A.   THAT'S IN PART RIGHT, YES.

23        THAT'S NOT MY ONLY ANALYSIS THAT I DID.  AS I SAID, I

24   COMPARED IT TO MY COMPARABLES ANALYSIS.  BUT THAT'S IN PART.

25   Q.   ALL RIGHT.  SO IF YOU COULD -- I'M GOING TO TRY NOT TO

1    INTERRUPT YOU BECAUSE THAT'S NOT SOMETHING THAT WILL BE

2    PROFITABLE FOR ME OR FOR YOU.

3    A.   SURE.

4    Q.   BUT IF YOU COULD STICK TO THE QUESTION, I'D BE GRATEFUL.

5    A.   SURE.

6    Q.   SO YOU DON'T ACTUALLY KNOW, HOWEVER, WHETHER ANY

7    IMPLEMENTER OF CELLULAR STANDARDS ACTUALLY MADE ANY INVESTMENT

8    DECISION ON THE BASIS OF THE STATEMENTS THAT YOU IDENTIFY OR AN

9    AGGREGATE RATE OF 5 PERCENT FOR WCDMA; CORRECT?

10   A.   I GUESS I'M NOT SURE WHAT YOU'RE ASKING.

11   Q.   SURE.  I'LL DO IT AGAIN.

12   A.   THESE GUYS -- OKAY.

13   Q.   YOU TESTIFIED THAT YOU BELIEVE IT'S APPROPRIATE TO RELY ON

14   THOSE STATEMENTS BECAUSE THEY WERE RELIED ON BY INDUSTRY

15   PARTICIPANTS WHEN CHOOSING WHETHER TO ADOPT THE STANDARDS;

16   RIGHT?

17   A.   CORRECT.

18   Q.   ALL RIGHT.  BUT YOU DON'T ACTUALLY KNOW WHETHER ANY

19   INDUSTRY PARTICIPANT ACTUALLY MADE ANY INVESTMENT DECISION WITH

20   THE EXPECTATION OF PAYING 5 PERCENT FOR WCDMA; RIGHT?

21   A.   WELL, I DON'T HAVE ACTUAL EVIDENCE.  I MEAN, I KNOW THAT

22   NOKIA AND ERICSSON MADE THOSE STATEMENTS AND THEY WERE MAKING

23   INVESTMENTS IN THE INDUSTRY AT THAT TIME.

24        SO --

25   Q.   OKAY.  YOU DON'T KNOW ONE WAY OR THE OTHER IF ANYBODY

LASINSKI CROSS BY MR. BORNSTEIN

1    ACTUALLY MADE A DECISION TO INVEST IN A STANDARD ON THE BASIS

2    OF AN EXPECTATION THAT THEY'D PAY 5 PERCENT; RIGHT?

3    A.   I DON'T HAVE DEFINITIVE EVIDENCE OF THAT.  IT SEEMS

4    LOGICAL GIVEN THAT THE PARTICIPANTS WERE MAKING THOSE -- WERE

5    MAKING THOSE STATEMENTS.

6    Q.   ALL RIGHT.  SIR, LET'S TAKE A LOOK AT PAGE 241 OF YOUR

7    DEPOSITION, PLEASE --

8    A.   SURE.

9    Q.   -- BEGINNING AT LINE 19.  WE CAN PUT THAT ON THE SCREEN AS

10   WELL IF IT'S EASIER.

11   A.   SURE.

12   Q.   YOU WERE ASKED THE QUESTION, "DO YOU KNOW ONE WAY OR THE

13   OTHER WHETHER ANY IMPLEMENTER ACTUALLY MADE AN INVESTMENT

14   DECISION WITH THE EXPECTATION THAT IT WOULD PAY AN AGGREGATE

15   RATE OF 5 PERCENT ON WCDMA?"

16       AND YOU SAID YOU DON'T KNOW ONE WAY OR THE OTHER; IS THAT

17   CORRECT?

18   A.   I DON'T HAVE DEFINITIVE EVIDENCE OF IT.

19   Q.   OKAY.  AND YOU STAND BY THAT TESTIMONY?

20   A.   YES, I DO.

21   Q.   OKAY.  AND YOU ARE AWARE, HOWEVER, THAT QUALCOMM, AT THE

22   SAME TIME, MADE CLEAR THAT IT DISAGREED WITH THE STATEMENTS

23   MADE BY ERICSSON AND NOKIA AND OTHERS; CORRECT?

24   A.   I AM AWARE OF THAT, YES.

25   Q.   AND QUALCOMM AFFIRMATIVELY OPPOSED THE IMPOSITION OF A

1    SINGLE DIGIT AGGREGATE CAP AT THE TIME FOR WCDMA; CORRECT?

2    A.   I BELIEVE THAT THAT'S CORRECT.

3    Q.   AND THE 5 PERCENT RATE THAT QUALCOMM CHARGED FOR 3G

4    STANDARDS LIKE WCDMA WAS WELL KNOWN AT THE TIME OF THOSE

5    STATEMENTS ON WHICH YOU RELIED; CORRECT?

6    A.   I BELIEVE IT WAS WELL KNOWN.  I -- I DON'T KNOW FOR SURE,

7    BUT I DO BELIEVE IT WAS, YES.

8    Q.   OKAY.  DO YOU THINK YOU TESTIFIED AT YOUR DEPOSITION THAT

9    IT WAS WELL KNOWN?

10    A.   I PROBABLY DID, YES.

11    Q.   OKAY, GOOD.

12        SO COMPANIES MAKING INVESTMENT DECISIONS ALSO KNEW THAT

13    QUALCOMM WAS CHARGING 5 PERCENT FOR WCDMA WHEN THEY CHOSE

14    WHETHER OR NOT TO ADOPT THE STANDARD AS WELL; CORRECT?

15    A.   THAT'S A SAFE ASSUMPTION, YES.

16    Q.   ALL RIGHT.

17        SO FOR LTE MULTIMODE DEVICES, YOU SELECTED A 6 PERCENT

18    RATE; CORRECT?

19    A.   YES.

20    Q.   AND THAT WAS ALSO BASED ON STATEMENTS MADE BY ERICSSON AND

21    NOKIA AND OTHERS; YES?

22    A.   CAN I JUST SAY YES, IN PART.

23    Q.   IN PART?

24    A.   THERE WERE OTHER THINGS AS WELL.

25    Q.   FAIR CLARIFICATION THAT I ACCEPT.

1          AND THESE STATEMENTS ARE STATEMENTS THAT, AGAIN, QUALCOMM

2    DID NOT SIGN ON TO; CORRECT?

3    A.    THAT IS MY UNDERSTANDING.

4    Q.    ALL RIGHT.  AND WE WERE TALKING ABOUT UNWIRED PLANET WHERE

5    YOU SAID THE COURT ADOPTED YOUR NUMBERS.

6          BUT WHILE YOU'RE ARGUING FOR 6 PERCENT HERE, HUAWEI AND

7    UNWIRED PLANET ARGUED FOR AN 8 PERCENT AGGREGATE RATE FOR

8    MULTIMODE LTE HANDSETS; IS THAT RIGHT?

9    A.    I THINK THERE WAS DISCUSSION OF 8 PERCENT.

10   Q.    OKAY.  AND THE COURT ACTUALLY FOUND, IN THAT CASE, THAT

11   HUAWEI'S CASE DOES NOT SUPPORT AN AGGREGATE ROYALTY BURDEN OF

12   8 PERCENT.  QUOTE, "IT SUPPORTS A HIGHER TOTAL BURDEN THAN

13   THAT."

14         CORRECT?

15   A.    IT MAY HAVE SAID THAT.  I DON'T KNOW.

16   Q.    OKAY.  AND YOU'RE ALSO AWARE THAT IN UNWIRED PLANET, THE

17   COURT FOUND THAT PATENT OWNER'S STATEMENTS ABOUT THE REASONABLE

18   AGGREGATE RATE FOR LTE, QUOTE, "HAVE LITTLE VALUE IN ARRIVING

19   AT A BENCHMARK RATE TODAY FOR A NUMBER OF REASONS.  THE CLAIMS

20   ARE OBVIOUSLY SELF-SERVING."

21         ISN'T THAT WHAT THE COURT HELD IN THAT CASE, SIR?

22   A.    IN UNWIRED PLANET?

23   Q.    YES, SIR.

24   A.    IT MAY HAVE.  I DON'T HAVE IT MEMORIZED, BUT IT MAY HAVE

25   SAID THAT.

1    Q.   OKAY.  IS THAT CONSISTENT WITH YOUR RECOLLECTION, SIR?

2    A.   IT'S NOT INCONSISTENT.

3    Q.   OKAY.  LET'S TALK ABOUT THE COMPARABLE AGREEMENTS ANALYSIS

4    THAT YOU DID.

5    A.   OKAY.

6    Q.   AND YOU SELECTED -- AND I'M GOING TO DO THIS IN A WAY THAT

7    WE CAN DO IN OPEN COURT, SO I'D ASK YOU TO TRY TO DO THE SAME.

8    A.   I WILL DO MY VERY BEST.

9    Q.   OKAY.  YOU SELECTED EIGHT AGREEMENTS THAT YOU DETERMINED

10   TO BE COMPARABLE FOR THIS ANALYSIS; CORRECT?

11   A.   I DID, YES.

12   Q.   OKAY.  AND SIX OF THOSE AGREEMENTS WERE WITH EITHER APPLE

13   OR SAMSUNG; RIGHT?

14   A.   SIX OF THEM, YES.

15   Q.   AND ALL OF THE COMPARABLE AGREEMENTS WERE WITH ONE OF JUST

16   THREE NET LICENSORS, INTERDIGITAL, NOKIA, OR ERICSSON; RIGHT?

17   A.   CORRECT, YES.

18   Q.   AND IN SELECTING THOSE LICENSORS, YOU LOOKED AT THE NUMBER

19   OF DEEMED SEPS THAT THEY HAD AND THE NUMBER OF IMPROVED

20   CONTRIBUTIONS THAT THEY HAD; CORRECT?

21   A.   THAT WAS ONE FACTOR.

22   Q.   OKAY.

23   A.   ANOTHER FACTOR, AS I SAID, WAS WHETHER OR NOT THEY HAD A

24   SUCCESSFUL LICENSING PROGRAM.

25   Q.   THEY HAD ACTIVE LICENSING PROGRAMS; RIGHT?

1       A.   I CALL THEM SUCCESSFUL.

2       Q.   OKAY.  I'LL ACCEPT THAT.

3            BUT YOU DIDN'T LOOK AT THE ACTUAL CONTENT OF ANY OF THOSE

4       COMPANIES' PATENT PORTFOLIOS; CORRECT?

5       A.   WELL, I HAD INFORMATION ON IT FROM THE DEEMED SEP STUDIES

6       THAT I USED.  SO I DIDN'T READ THEIR PATENTS IF THAT'S WHAT

7       YOU'RE ASKING.

8       Q.   YOU DIDN'T FORM ANY OPINION, AS A TECHNICAL MATTER,

9       WHETHER THEY COVERED SIMILAR TECHNOLOGIES OR ASPECTS OF

10      CELLULAR STANDARDS; RIGHT?

11      A.   I GUESS I WOULD JUST CLARIFY.  WE'RE TALKING ABOUT 4G, 3G,

12      AND 2G.  SO THAT SIMILAR, I COULDN'T GO THROUGH IT FROM A

13      TECHNICAL PERSPECTIVE AND READ THEM AND SEE IF THAT'S A SIMILAR

14      PORTION OF 4G OR 3G IF THAT'S WHAT YOU'RE ASKING.

15      Q.   WELL, YOU DIDN'T FORM AN OPINION, FOR EXAMPLE, THAT ONE OF

16      THEM HAD A STRONG CARRIER AGGREGATION PORTFOLIO OR ONE OF THEM

17      HAD A STRONG HETNET PORTFOLIO; CORRECT?

18      A.   CORRECT.  SO THOSE ARE WHAT I WAS JUST SAYING, TECHNICAL

19      ASPECTS OF 4G.

20      Q.   VERY GOOD.  SO YOU EXCLUDED ALSO, AS YOU MENTIONED

21      EARLIER, FROM YOUR ANALYSIS EVERY SINGLE ONE OF QUALCOMM'S OWN

22      LICENSE AGREEMENTS AS A COMPARABLE; YES?

23      A.   I DID NOT USE THEM AS COMPARABLES, CORRECT.

24      Q.   AND ONE OF THE REASONS, AS YOU'VE SAID, THAT YOU DID THAT

25      WAS BECAUSE YOU UNDERSTOOD FROM COUNSEL THAT THOSE LICENSE

1    AGREEMENTS WERE AFFECTED BY THE CONDUCT THAT IS BEING

2    CHALLENGED IN THIS CASE; CORRECT?

3    A.   CORRECT.

4    Q.   SO YOU DIDN'T USE ANY QUALCOMM AGREEMENTS THAT WERE SIGNED

5    BEFORE QUALCOMM HAD A CHIP BUSINESS; RIGHT?

6    A.   CORRECT, I DID NOT.

7    Q.   AND YOU DIDN'T USE ANY QUALCOMM AGREEMENTS WITH LICENSEES

8    WHO NEVER BOUGHT A SINGLE CHIP FROM QUALCOMM; RIGHT?

9    A.   OH, QUALCOMM LICENSEES.

10   Q.   YES.

11   A.   I THOUGHT YOU WERE TALKING ABOUT MY LICENSEES.  THEY DID.

12        BUT, NO, NOT QUALCOMM LICENSEES.

13   Q.   AND I'M TALKING ABOUT QUALCOMM AGREEMENTS; RIGHT?

14   A.   CORRECT.

15   Q.   SO YOU DIDN'T USE ANY QUALCOMM WCDMA AGREEMENTS WHERE

16   QUALCOMM WAS NOT EVEN ALLEGED TO HAVE MARKET POWER; CORRECT?

17   A.   I DIDN'T USE ANY QUALCOMM AGREEMENTS.  I'M NOT SURE

18   WHETHER OR NOT THERE ARE QUALCOMM AGREEMENTS THAT ARE ALLEGED

19   NOT TO HAVE MARKET POWER OR NOT.

20   Q.   OKAY.  YOU DIDN'T INCLUDE QUALCOMM AGREEMENTS THAT WERE

21   EXECUTED UNDER THE SUPERVISION OF THE NDRC, THE CHINESE

22   ANTITRUST REGULATORY AGENCY; CORRECT?

23   A.   I DID NOT INCLUDE QUALCOMM AGREEMENTS IN MY ANALYSIS.

24   Q.   OKAY.  AND JUST TO ROUND IT OUT, YOU ALSO EXCLUDED A

25   QUALCOMM AGREEMENT WITH SAMSUNG EXECUTED A YEAR AGO IN JANUARY

1    2018 AFTER A DECISION BY THE KOREA FAIR TRADE COMMISSION AND

2    UNDER ITS SUPERVISION; CORRECT?

3    A.   I DID NOT INCLUDE -- I THINK YOU'RE TALKING ABOUT AN

4    AMENDMENT TO THEIR 2008 AGREEMENT OR SOMETHING LIKE THAT.  IS

5    THAT WHAT YOU'RE ASKING ABOUT?

6    Q.   THERE'S A SET OF AGREEMENTS, SIR.  SOME OF THEM ARE

7    AMENDMENTS AND SOME OF THEM ARE BRAND NEW.

8         YOU DID NOT INCLUDE THEM?

9    A.   I DID NOT INCLUDE THEM, YES, THAT'S CORRECT.

10   Q.   OKAY.  AND ONE OF THE CRITERIA YOU USED TO COLLECT YOUR

11   COMPARABLE AGREEMENTS, HOWEVER, AS YOU MENTIONED, IS THE DATE

12   ON WHICH THE AGREEMENT WAS EXECUTED; YES?

13   A.   YES, THAT IS CORRECT.

14   Q.   AND YOU PICKED AGREEMENTS THAT WERE EXECUTED AFTER THE

15   DECISION BY JUDGE ROBARTS IN THE MICROSOFT VERSUS MOTOROLA CASE

16   IN 2013?

17   A.   THAT TIMEFRAME, YES.

18   Q.   AND THAT'S BECAUSE, IN YOUR OPINION, THE INDUSTRY'S

19   UNDERSTANDING OF A FRAND COMMITMENT DEVELOPED SIGNIFICANTLY IN

20   THE YEARS FOLLOWING THAT DECISION?

21   A.   YES.  THE APPLICATIONS OF THE METHODS THAT PEOPLE USED

22   CHANGED.

23   Q.   WELL, YOU EXCLUDED AGREEMENTS PRIOR TO 2013 BECAUSE THIS

24   LESS DEVELOPED UNDERSTANDING OF FRAND COULD HAVE LED THOSE

25   AGREEMENTS TO BE HIGHER THAN WHAT YOU CONSIDERED TO BE A FAIR

1    AND REASONABLE RATE; CORRECT?

2    A.   I MEAN, THE REASON THAT I EXCLUDED THEM WAS BECAUSE PRIOR

3    TO THAT, PEOPLE WERE TRYING TO VALUE -- I KNOW PEOPLE THAT WERE

4    TRYING TO VALUE THE STANDARD AND THE LICENSE BASED ON THE VALUE

5    OF THE STANDARD, NOT THE VALUE OF THE PATENTS, AND THAT'S SORT

6    OF A DELINEATING FACTOR THAT I'M TRYING TO LOOK AT.

7    Q.   OKAY.  SO THERE WERE -- PRIOR TO 2013, YOUR VIEW IS THAT

8    THE ROYALTY RATES DERIVED IN LICENSE AGREEMENTS FOR CELLULAR

9    SEPS COULD VERY WELL HAVE BEEN ABOVE FRAND BECAUSE OF THESE

10   OTHER FACTORS; RIGHT?

11   A.   THAT IS ONE OF THEM, YES.

12   Q.   ALL RIGHT.  AND SO YOU'RE AWARE THAT QUALCOMM HAS SIGNED

13   LOTS OF LICENSE AGREEMENTS BEFORE 2013; RIGHT?

14   A.   I AM, YES.

15   Q.   AND TO THE EXTENT THAT A QUALCOMM LICENSE AGREEMENT

16   EXECUTED PRIOR TO 2013 EXCEEDS WHAT YOU CONSIDER TO BE A FRAND

17   RATE, YOU CAN'T SAY, ONE WAY OR THE OTHER, WHETHER THAT'S

18   BECAUSE OF CHIP LEVERAGE OR BECAUSE OF THIS LESS DEVELOPED

19   UNDERSTANDING OF FRAND THAT EXISTED AT THE TIME; CORRECT?

20   A.   I CAN'T -- I CANNOT SAY.  I HAVE AN OPINION THAT IT

21   SHOULDN'T BE ABLE TO CONTINUE TO CHARGE THAT, BUT I CAN'T SAY

22   FOR THOSE AGREEMENTS AT THAT TIME.

23   Q.   SO YOU CAN'T -- YOU, IN FACT, ARE NOT OFFERING ANY OPINION

24   AT ALL ON WHY QUALCOMM'S RATES ARE, AS YOU SAY, ABOVE A FAIR

25   AND REASONABLE RATE; CORRECT?

```
 1     A.    CORRECT.

 2     Q.    ALL RIGHT.

 3           YOUR ASSIGNMENT WAS NOT TO ISOLATE ANY KIND OF CHIP

 4     LEVERAGE; YES?

 5     A.    IT WAS NOT.

 6     Q.    ALL RIGHT.  AND IT'S ALSO TRUE THAT YOUR ANALYSIS DOESN'T

 7     GO BACK BEFORE 2011; RIGHT?

 8     A.    THAT'S CORRECT, YES.

 9     Q.    SO YOU HAVE NOT EXPRESSED AN OPINION IN THIS CASE AS TO

10     WHETHER ANY ROYALTIES PAID BY QUALCOMM LICENSEES PRIOR TO 2011

11     WERE FAIR AND REASONABLE AT THE TIME THEY WERE PAID; YES?

12     A.    THE ONLY THING I WILL SAY IS IT DOESN'T SEEM LOGICAL THAT

13     THEY WOULD NECESSARILY BE FRAND.

14           BUT I DON'T HAVE AN OPINION ON THAT.

15     Q.    AND YOU HAVEN'T DONE AN ANALYSIS THAT PREDATES 2011?

16     A.    I HAVE NOT DONE AN ANALYSIS THAT DOES THAT, NO.

17     Q.    OKAY.  SO YOU CANNOT EXPRESS A VIEW ONE WAY OR THE OTHER

18     ON WHETHER THE RATES IN ANY QUALCOMM LICENSE AGREEMENT BEFORE

19     2011 WERE OR WERE NOT ABOVE A FRAND RATE AT THE TIME THOSE

20     AGREEMENTS WERE SIGNED; RIGHT?

21     A.    I GUESS IT DOESN'T SEEM REASONABLE THAT THEY WOULD BE.

22           BUT I DON'T HAVE A -- I DIDN'T DO THE ANALYSIS TO HAVE AN

23     OPINION ON IT.

24     Q.    OKAY.  LET'S TALK A BIT ABOUT THE PORTFOLIO STRENGTH

25     METRICS THAT YOU USED.
```

1      AND TO DERIVE YOUR PORTFOLIO STRENGTH METRIC, ONE THING

2   THAT YOU DID IS YOU CONSIDERED WHAT YOU CALLED PORTFOLIO

3   STRENGTH INDICATORS; RIGHT?

4   A.   CORRECT.

5   Q.   AND THOSE ARE THE DEEMED SEPS AND THE APPROVED

6   CONTRIBUTIONS WE'VE BEEN TALKING ABOUT THIS AFTERNOON?

7   A.   CORRECT.

8   Q.   SO I'LL START WITH DEEMED SEPS.

9      YOU CALCULATE THE PORTION OF DEEMED SEPS FOR EACH LICENSOR

10  BY USING THE THIRD PARTY STUDIES THAT YOU REFERENCED EARLIER

11  TODAY; YES?

12  A.   YES, CORRECT.

13  Q.   AND WITHIN EACH CELLULAR STANDARD, YOU GIVE EACH OF THOSE

14  STUDIES THE EXACT SAME WEIGHT; RIGHT?

15  A.   NO, THAT'S NOT TRUE.

16  Q.   WELL, WITHIN EACH STANDARD, YOU DIDN'T DIFFERENTIATE ON

17  THE BASIS -- DO YOU HAVE A CORRECTION?

18  A.   I JUST WANT TO MAKE SURE THAT I UNDERSTAND.  SO IF YOU'RE

19  TALKING ABOUT LTE, I HAVE A HIGHER WEIGHTING FOR LTE FOR

20  MULTIMODE DEVICES THAN CDMA.

21  Q.   I UNDERSTAND.  THAT'S WHY I ASKED, WITHIN A GIVEN

22  STANDARD --

23  A.   OKAY.

24  Q.   WITHIN A GIVEN STANDARD, YOUR ANALYSIS GIVES ALL STUDIES

25  THE EXACT SAME WEIGHT; IS THAT RIGHT?

1    A.    THAT WOULD BE ACCURATE, YES.

2    Q.    AND YOU DID NOT --

3    A.    EACH PERMUTATION I RUN WOULD BE GIVEN THE SAME WEIGHT.

4    Q.    AND WHEN YOU RUN THE PERMUTATIONS, EACH ONE GETS THE SAME

5    WEIGHT; CORRECT?

6    A.    WITHIN A STANDARD.

7    Q.    RIGHT.  AND YOU DIDN'T DIFFERENTIATE IN ANY WAY ON THE

8    IDENTITY OF THE SPONSOR OF THE STANDARD; IS THAT RIGHT?

9    A.    COULD I CORRECT MY LAST ANSWER?

10         AGAIN, I'M RUNNING A BLEND HERE, AND SO IN CERTAIN CASES

11   THE -- IN CERTAIN CASES, IF THE OPTIMAL BLEND WERE THAT YOU

12   SHOULD PUT MORE WEIGHT ON THE APPROVED CONTRIBUTIONS THAN THE

13   DEEMED SEPS, I WOULD HAVE CONSIDERED THAT.

14         SO ONE STUDY MIGHT GET MORE WEIGHT VERSUS ANOTHER STUDY

15   BASED ON MY ALGORITHM AND MY COMPARISON TO THE AGREEMENTS THAT

16   I LOOKED AT, THE COMPARABLE AGREEMENTS.

17   Q.    ALL RIGHT.  WE'LL GET TO YOUR BLENDING.

18         LET'S FOCUS ON THE STUDIES THEMSELVES TO START.

19         YOU DIDN'T DIFFERENTIATE IN ANY WAY BASED ON THE IDENTITY

20   OF THE SPONSOR OF THE STUDY; RIGHT?

21   A.    PRE-BLENDING, NO.

22   Q.    OKAY.

23   A.    I WOULD NOT HAVE.

24   Q.    AND YOU DIDN'T DIFFERENTIATE AMONG ANY OF THE STUDIES

25   BASED ON WHETHER THEY WERE PREPARED IN LITIGATION OR REGULATORY

1    PROCEEDINGS ON ONE HAND, OR IN AN ACADEMIC CONTEXT IN ANOTHER;

2    CORRECT?

3    A.   I DID NOT, NO.

4    Q.   AND YOU DIDN'T FORM A VIEW ON WHETHER ANY OF THESE

5    PARTICULAR STUDIES IS MORE RELIABLE THAN ANOTHER; RIGHT?

6    A.   NO.  I MEAN, THAT'S WHY I RAN EVERY SINGLE PERMUTATION I

7    COULD.

8    Q.   OKAY.  AND EACH OF THESE STUDIES COUNTS THE NUMBER OF

9    DEEMED SEPS AND ACCORDS EACH AND EVERY DEEMED SEP THE EXACT

10   SAME WEIGHT; IS THAT RIGHT?

11   A.   NO, THAT'S NOT ACCURATE.

12   Q.   OKAY.  BECAUSE YOU'RE REFERRING TO THE IRUNWAY STUDY; IS

13   THAT RIGHT?

14   A.   I'M REFERRING TO THE IRUNWAY STUDY, YES.

15   Q.   THE IRUNWAY STUDY DISTINGUISHES BETWEEN SEMINAL PATENTS

16   AND OTHER PATENTS; IS THAT RIGHT?

17   A.   THAT IS CORRECT, YES.

18   Q.   BUT YOU IGNORED THAT DISTINCTION IN PERFORMING YOUR

19   ANALYSIS AND TREATED ALL CELLULAR DEEMED SEPS AS HAVING THE

20   EXACT SAME WEIGHT; CORRECT?

21   A.   I DIDN'T IGNORE IT.  I USED THE SEMINAL RANKING, OR THE

22   SEMINAL AMOUNTS, OR THE SEMINAL PATENTS IN MY ANALYSIS.

23   Q.   ALL RIGHT.  AND YOU TREATED EACH OF THEM THE EXACT SAME

24   WEIGHT; CORRECT?

25   A.   CORRECT.

1    Q.   BUT YOU AGREE THAT NOT ALL CELLULAR SEPS HAVE THE EXACT

2    SAME VALUE; CORRECT?

3    A.   THAT'S CORRECT.  THAT'S WHY I BLEND THEM WITH APPROVED

4    CONTRIBUTIONS.

5    Q.   ALL RIGHT.  SO THERE'S A WIDE DISPERSION AMONG THE VALUE

6    OF INDIVIDUAL CELLULAR SEPS; RIGHT?

7    A.   THAT WOULD BE MY EXPECTATION.

8    Q.   OKAY.  SO YOU TESTIFIED THAT YOU FIXED THAT PROBLEM

9    THROUGH YOUR BLENDING WITH APPROVED CONTRIBUTIONS; CORRECT?

10   A.   I DON'T WANT TO SAY I FIXED THAT PROBLEM.  I TESTED THE

11   OPTIMAL BLEND VERSUS THE COMPARABLE AGREEMENTS TO SEE WHAT

12   WOULD MOST REPLICATE WHAT WAS NEGOTIATED IN THE REAL WORLD.

13   Q.   OKAY.  SO LET'S BREAK THAT DOWN.

14        FOR WCDMA AND LTE, YOUR APPROVED CONTRIBUTION ANALYSIS

15   CAME FROM THE SIGNAL STUDY YOU MENTIONED TO MR. ROSS; CORRECT?

16   A.   YES, JUST WITH ONE CLARIFICATION.  IN ADDITION TO THE

17   SIGNAL STUDY, FOR CDMA 2000, I USED A STUDY THAT WAS USED BY --

18   DEVELOPED BY QUALCOMM.

19   Q.   OKAY.  AGAIN, SIR, JUST TRY AND FOCUS ON THE QUESTION.

20        I ASKED YOU, FOR WCDMA AND LTE, THAT WAS THE SOURCE, THE

21   SIGNAL STUDY WAS THE SOURCE OF YOUR APPROVED CONTRIBUTION

22   COUNT; CORRECT?

23   A.   YES, THAT IS CORRECT.

24   Q.   OKAY.  AND YOU USED A DIFFERENT DOCUMENT FOR CDMA 2000?

25   A.   CORRECT.

1    Q.   ALL RIGHT.  AND WITHIN -- LET'S DO SIGNALS FIRST.

2        WITHIN THE SIGNALS RESEARCH REPORT, EACH CONTRIBUTION GETS

3    THE EXACT SAME WEIGHT; CORRECT?

4    A.   YES.

5    Q.   OKAY.  AND YOU DIDN'T LOOK AT THE UNDERLYING CONTRIBUTIONS

6    THEMSELVES IN ORDER TO FORM YOUR OPINION?  YOU JUST USED THE

7    NUMERICAL COUNT OF CONTRIBUTIONS; CORRECT?

8    A.   THAT IS WHAT I DID, YES.

9    Q.   OKAY.  AND, IN FACT, IN FORMING YOUR OPINION, YOU DIDN'T

10   KNOW WHAT THE CRITERIA WERE THAT SIGNALS USED TO DEEM A

11   CONTRIBUTION APPROVED; CORRECT?

12   A.   THE ONE THING THAT I KNEW WAS THE WORKING GROUPS THAT THEY

13   HAD SELECTED.  SO I KNEW THAT.

14       BUT I DIDN'T KNOW ALL OF THE REASONS WHY THEY APPROVED --

15   SELECTED THEM FOR CONTRIBUTIONS.

16   Q.   AND YOU DIDN'T KNOW THE PROCEDURES THAT THE INDIVIDUAL

17   WORKING GROUPS USED TO DECIDE WHETHER A CONTRIBUTION WAS

18   APPROVED OR NOT?

19   A.   THAT IS ACCURATE, YES.

20   Q.   OKAY.  AND, IN FACT, YOU DIDN'T KNOW WHAT THE DISTINCTION

21   WAS BETWEEN A CONTRIBUTION THAT IS APPROVED AND A CONTRIBUTION

22   THAT IS NOTED BY A STANDARDS BODY; CORRECT?

23   A.   CORRECT.  THAT'S WHY I TESTED THE AVANCI STUDY VERSUS MY

24   COMPARABLE AGREEMENTS SO THAT I KNEW THAT IT WAS PROBATIVE OF

25   WHAT A PORTFOLIO STRENGTH RATIO SHOULD BE.

1    Q.   SIR, I'M RESTRAINING MYSELF FROM INTERRUPTING, BUT PLEASE

2    STICK TO THE QUESTION.  YOU'LL HAVE AN OPPORTUNITY TO ANSWER ON

3    REDIRECT.  OKAY?

4    A.   OKAY.

5    Q.   ALL RIGHT.  SO WHEN YOU FORMED YOUR OPINION, YOU ALSO

6    DIDN'T CONSIDER OTHER TYPES OF STANDARDS BODY SUBMISSIONS.  FOR

7    EXAMPLE, YOU DIDN'T KNOW WHAT A STUDY ITEM WAS; CORRECT?

8    A.   I -- I DO NOT KNOW WHAT A STUDY ITEM IS.  I'VE HEARD THE

9    TERM, BUT I CAN'T -- I DON'T -- I'M NOT A TECHNICAL EXPERT, SO

10   I DON'T KNOW.

11   Q.   AND YOU DIDN'T KNOW WHAT A WORK ITEM WAS; CORRECT?

12   A.   AGAIN, I'VE HEARD THE TERM.  I'VE BEEN AROUND THIS

13   INDUSTRY.  BUT I CAN'T DESCRIBE IT IN TECHNICAL DETAIL.

14   Q.   AND YOU DON'T KNOW ONE WAY OR THE OTHER WHETHER THE SIGNAL

15   STUDY COUNTED THOSE TYPES OF CONTRIBUTIONS; CORRECT?

16   A.   THAT IS ACCURATE.

17   Q.   ALL RIGHT.  SO I'D LIKE YOU TO LOOK AT TAB 6 IN YOUR

18   BINDER, PLEASE.

19   A.   YES.

20   Q.   THIS IS A PUBLIC DOCUMENT, YOUR HONOR.

21        AND THIS IS A STANDARDS CONTRIBUTION THAT WAS COUNTED BY

22   THE SIGNAL STUDY, AS WE DISCUSSED AT YOUR DEPOSITION; CORRECT?

23   A.   WELL, YOU -- YOU REPRESENTED THAT TO ME, THAT IT WAS --

24        MR. ROSS:  YOUR HONOR, I DON'T HAVE A TAB 6 IN MY

25   BINDER.

1      THE COURT:  I THINK IT'S QX 6457.  IS THAT RIGHT?

2      MR. BORNSTEIN:  YES, YOUR HONOR.  QX 6457.

3      THE COURT:  DO YOU HAVE THAT, OR NOT?

4   COULD YOU GET HIM ANOTHER BINDER?

5      MR. BORNSTEIN:  OF COURSE.

6   IT'S COMING.

7      THE COURT:  OKAY.  THANK YOU.

8      MR. BORNSTEIN:  YEP.  SORRY ABOUT THAT.

9   Q.  AND SO YOU SAID I MENTIONED THIS TO YOU AT THE DEPOSITION.

10     YOU DIDN'T GO BACK AFTER THE DEPOSITION TO FIND OUT ONE

11  WAY OR THE OTHER WHETHER THAT CONTRIBUTION WAS COUNTED BY THE

12  SIGNAL STUDY; IS THAT RIGHT?

13  A.  WELL, IT'S NOT POSSIBLE TO FIGURE THAT OUT BECAUSE I ONLY

14  HAVE THE SIGNAL STUDY WHICH HAS AGGREGATE NUMBERS, SO I DON'T

15  KNOW WHETHER OR NOT THIS WAS IN THERE OR NOT.

16  Q.  SIR, YOU HAVE THE SPREADSHEET THAT WAS PRODUCED BY AVANCI

17  AND RELIES ON THE SIGNAL STUDY AS WELL; CORRECT?

18  A.  I DON'T KNOW.  I -- I USED THE TOTALS, SO I DON'T KNOW IF

19  IT'S IN THERE.

20  Q.  YOU DIDN'T LOOK TO SEE EVEN WHAT THE UNDERLYING

21  CONTRIBUTIONS WERE IN THE SPREADSHEET THAT WAS PRODUCED BY

22  AVANCI IN THIS CASE?

23  A.  I DID NOT, NO.

24  Q.  OKAY.  LET'S LOOK AT THE CONTRIBUTION JUST TO HAVE AN

25  EXAMPLE OF ONE OF THE THINGS THAT WAS COUNTED.

1          THIS IS A DOCUMENT, YOU CAN SEE THE SOURCE OF QX 6457 --

2               THE COURT:  WOULD YOU LIKE TO ADMIT THIS?

3               MR. BORNSTEIN:  I DON'T THINK I NEED TO ADMIT IT,

4     YOUR HONOR.  I'M HAPPY TO.

5               THE COURT:  ARE YOU GOING TO BE PUTTING IT UP ON THE

6     MONITOR?

7               MR. BORNSTEIN:  IF IT MAKES THINGS EASIER, I'LL MOVE

8     TO ADMIT IT IN EVIDENCE.  IT'S A PUBLIC DOCUMENT, YOUR HONOR.

9               THE COURT:  NO OBJECTION?

10              MR. ROSS:  NO OBJECTION.

11              THE COURT:  IT'S ADMITTED.

12         (DEFENDANT'S EXHIBIT QX 6457 WAS ADMITTED IN EVIDENCE.)

13              THE COURT:  GO AHEAD, PLEASE.

14              MR. BORNSTEIN:  OKAY.  THANK YOU, YOUR HONOR.

15    Q.   SO THE SOURCE IDENTIFIED FOR QX 6457 IS NOKIA; RIGHT?

16    A.   YES.

17    Q.   ALL RIGHT.  AND THE DOCUMENT REFLECTS THAT THE REASON FOR

18    THE CHANGE BEING SUBMITTED TO THE STANDARDS BODY HERE WAS THAT

19    SOME OF THE REFERENCES TO 24.008 TO THE FORMER 03.22 ARE NOW

20    OUT OF DATE; CORRECT?

21    A.   CORRECT.

22    Q.   AND IT EVEN SAYS THAT THIS LATE R99 CR -- WHICH IS CHANGE

23    REQUEST -- HAS NO IMPACT ON THE IMPLEMENTATIONS; CORRECT?

24    A.   I SEE THAT IT SAYS THAT, YES.

25    Q.   AND IF YOU LOOK AT THE ACTUAL CHANGE REQUEST, JUST BY

1    TURNING THE PAGES, YOU CAN SEE THAT ALL THAT IT DOES HERE IS IT

2    RED LINES SOME OF THE CROSS REFERENCES TO CHANGE THEM FROM ONE

3    SECTION TO ANOTHER; CORRECT?

4    A.   YES, I SEE THAT.

5    Q.   ALL RIGHT.  AND YOU'RE NOT REPRESENTING THAT THESE REVISED

6    CROSS REFERENCES REFLECT SOME SUBSTANTIVE INNOVATION ON NOKIA'S

7    PART; IS THAT RIGHT?

8    A.   THAT'S RIGHT.  AS I TESTIFIED ON DIRECT, I THINK THAT

9    THERE WOULD BE ALL DIFFERENT TYPES OF APPROVED CONTRIBUTIONS.

10   Q.   LET'S LOOK AT ONE MORE.

11        TAKE A LOOK AT TAB 5, PLEASE.  AND TAB 5 IS A BIG

12   DOCUMENT.  IT'S QX 9144.

13        DO YOU HAVE TAB 5?

14             MR. ROSS:  YOUR HONOR, I OBJECT TO THIS DOCUMENT.  I

15   BELIEVE COUNSEL FOR QUALCOMM WITHDREW ALL DOCUMENTS EXCEPT FOR

16   WHAT'S ADMITTED AS QX 6457 THROUGH THE HPO PROCESS.

17             MR. BORNSTEIN:  THAT'S THE ONLY PORTION OF THE

18   DOCUMENT THAT I INTEND TO USE.

19             THE COURT:  BUT DID YOU WITHDRAW IT IN THE HPO

20   PROCESS?

21             MR. BORNSTEIN:  NO, YOUR HONOR.  WE INDICATED THAT

22   THAT WAS THE ONLY PORTION WE INTENDED TO ADMIT.

23        AND I HAVE A LITTLE RED STICKY --

24             THE COURT:  I'D LIKE THE PAPER, PLEASE.  WHAT IS

25   THAT?  IS THAT A --

1             MR. ROSS:  THIS IS AN E-MAIL.

2             THE COURT:  OKAY.  I'LL TAKE A LOOK AT IT.

3             MR. BORNSTEIN:  OKAY, SURE.  THERE'S A LITTLE RED

4    STICKY TAB ON THE PORTION WE INTEND TO USE IN YOUR BINDER.

5          (PAUSE IN PROCEEDINGS.)

6             THE COURT:  THIS IS 7472?

7             MR. BORNSTEIN:  7492, YOUR HONOR.  THERE SHOULD BE A

8    RED STICKY TAB AT THE TOP.

9             THE COURT:  I'M SORRY.  THIS IS QX 9144; IS THAT

10   RIGHT?

11            MR. BORNSTEIN:  THAT'S CORRECT, YES.

12            THE COURT:  OKAY.  WELL, ON THIS EXHIBIT TAG, IT SAYS

13   IT'S 7472.

14            MR. BORNSTEIN:  7472 IS ON THE FIRST PAGE, YOUR

15   HONOR.

16         THIS DOCUMENT IS A COMPILATION OF SEVERAL EXHIBITS THAT

17   WERE INTRODUCED AT DEPOSITION, AND WE'RE INTENDING TO USE --

18   THERE SHOULD BE, AT THE VERY TOP OF YOUR HONOR'S BINDER, A RED

19   STICKY FLAG THAT IDENTIFIES THE PAGE THAT WE'RE INTENDING TO

20   REFER TO.

21            THE COURT:  OKAY.  GIVE ME JUST ONE MINUTE, PLEASE.

22            MR. BORNSTEIN:  SURE.

23            THE COURT:  WHAT'S THE RELEVANT -- THIS IS AN E-MAIL

24   CHAIN, SO WHICH ONE SHOULD I BE READING?

25            MR. BORNSTEIN:  I DEFER TO COUNSEL FOR THE FTC ON

1    THAT.  I'M NOT QUITE SURE WHAT YOUR HONOR IS LOOKING AT.

2            MR. ROSS:  YOUR HONOR, I APOLOGIZE.

3        I UNDERSTOOD QX 6457, WHICH IS NOT ON QUALCOMM'S EXHIBIT

4    LIST, TO REPRESENT THIS DOCUMENT THAT QUALCOMM IS INTENDING TO

5    USE HERE.

6            THE COURT:  I'M SORRY.  SAY THAT AGAIN.

7            MR. ROSS:  I'M SORRY.  THIS DOCUMENT, QX 9144, IS A

8    COMPILATION OF MANY DOCUMENTS.

9            THE COURT:  YES.

10           MR. ROSS:  QUALCOMM AGREED TO WITHDRAW ALL BUT ONE OF

11   THESE DOCUMENTS --

12           THE COURT:  OKAY.

13           MR. ROSS:  -- AND WOULD USE ONE DOCUMENT.

14           THE COURT:  ALL RIGHT.

15           MR. ROSS:  I UNDERSTOOD WHAT I WAS JUST HANDED AS

16   TAB 6, QX 6457, WAS THAT DOCUMENT.

17           MR. BORNSTEIN:  NO.

18           MR. ROSS:  IF THAT'S NOT TRUE, THEN THE FTC OBJECTS

19   TO THE ADMISSION OF QX 6457 AS NOT ON QUALCOMM'S EXHIBIT LIST.

20           THE COURT:  OH, I SEE WHAT YOU'RE SAYING.  YOU

21   THOUGHT 6457 WAS THE PORTION OF 9144 THAT WAS GOING TO BE

22   USED --

23           MR. ROSS:  YES.

24           THE COURT:  -- DURING THE CROSS?

25           MR. ROSS:  YES, YOUR HONOR.

```
1              THE COURT:  AND THAT'S REPRESENTED IN THIS E-MAIL?

2     OR WHERE IS THAT REPRESENTED?

3              MR. ROSS:  NO, THAT'S NOT AN E-MAIL.

4              THE COURT:  OKAY.  BUT YOU'RE SAYING NOW THEY WANT TO

5     GET IN OTHER PARTS OF 9144 SEPARATE FROM QX 6457?

6              MR. BORNSTEIN:  YOUR HONOR, WE ONLY WANT TO GET IN

7     THAT ONE PART OF -- AND ONLY WANT TO USE WITH THE WITNESS THE

8     PART OF 9144 THAT WAS IDENTIFIED TO THE FTC AND HAS THE RED

9     FLAG AT THE TOP OF YOUR HONOR'S BINDER AND IT'S LABELED

10    CX 7492.

11             THE COURT:  OKAY.  WHAT'S YOUR POSITION ON THAT?

12             MR. ROSS:  YOUR HONOR, I'M NOT SURE WHERE THAT

13    DOCUMENT ENDS.

14         THE FTC HAS NO OBJECTION TO THAT IF QUALCOMM WILL WITHDRAW

15    QX 6457, WHICH WAS NOT ON QUALCOMM'S EXHIBIT LIST.

16             MR. BORNSTEIN:  QX 6457 WAS DISCLOSED TO THE FTC AS

17    PART OF THE HPO PROCESS, YOUR HONOR.  I'M NOT SURE WHERE THIS

18    OBJECTION IS COMING FROM.  WE HEARD NOTHING ABOUT IT UNTIL

19    RIGHT NOW.

20             MR. ROSS:  I WILL TAKE COUNSEL'S REPRESENTATION ON

21    THAT.  IF THAT IS TRUE, THEN WE WILL NOT OBJECT.

22             MR. BORNSTEIN:  I HAVE MY OWN E-MAIL.

23             THE COURT:  OKAY.  GIVE ME JUST ONE MINUTE.

24         THESE WOULD BE ON THE LASINSKI HPO'S?

25             MR. BORNSTEIN:  THERE WAS NO FILING ON IT, YOUR
```

1     HONOR, BUT YES.  WE DISCLOSED IT TO THE FTC AS PART OF THE HPO

2     PROCESS WHEN WE EXCHANGED EVIDENCE WITH EACH OTHER AND THEY DID

3     NOT FILE ANY OBJECTION TO IT WITH THE COURT.

4              THE COURT:  OKAY.  SO DO YOU HAVE ANY OBJECTION TO

5     6457 OR 7292?  CX 7492?

6              MR. ROSS:  IF COUNSEL FOR QUALCOMM COULD IDENTIFY

7     WHERE CX 7492 ENDS, WE WOULD NOT OBJECT TO ITS ADMISSION.

8              MR. BORNSTEIN:  CX 7492 ENDS, I BELIEVE, AT THE

9     VERY -- OH, NO.  IT ENDS -- THERE ARE FOUR PAGES, IT'S WHERE

10    7493 BEGINS.

11         THERE'S ACTUALLY SOMETHING AT THE --

12             THE COURT:  IT'S LONGER THAN FOUR PAGES.

13             MR. BORNSTEIN:  NO, NO.  THERE ARE FOUR PAGES LEFT IN

14    THE DOCUMENT, YOUR HONOR, AFTER 7492 ENDS.

15         I CAN SHOW COUNSEL FOR THE FTC.

16             THE COURT:  HOW MANY PAGES IS THIS DOCUMENT, BECAUSE

17    THERE'S NO PAGE NUMBERING, FOR 7492?

18             MR. BORNSTEIN:  7492 IS, IT LOOKS LIKE 17 PAGES, YOUR

19    HONOR.  HAPPILY, IT ENDS WITH SOMETHING THAT SAYS "END OF

20    MODIFIED SECTION" AFTER THE TABLE.

21             THE COURT:  OKAY.  I DON'T GET 17 PAGES, BUT THAT'S

22    FINE.

23         SO YOU JUST WANT 7492?

24             MR. BORNSTEIN:  THAT'S RIGHT.

25             MR. ROSS:  THE FTC HAS NO OBJECTION.

```
 1              THE COURT:  OKAY.  IT'S CONFUSING BECAUSE YOU HAVE

 2      ALL OF THIS AS ONE BIG DOCUMENT.

 3              MR. BORNSTEIN:  THAT WAS HOW IT WAS MARKED ON THE

 4      EXHIBIT LIST, YOUR HONOR.  IF IT WOULD BE HELPFUL --

 5              THE COURT:  ALL RIGHT.  BUT YOU'RE NOT INCLUDING

 6      7493, WHICH IS ON THE SAME PAGE?

 7              MR. BORNSTEIN:  CORRECT.

 8              THE COURT:  ALL RIGHT.

 9         DO YOU HAVE ANY OBJECTION TO 7492 ONLY?

10              MR. ROSS:  NO OBJECTION.

11              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

12         (PLAINTIFF'S EXHIBIT 7492 WAS ADMITTED IN EVIDENCE.)

13              THE COURT:  GO AHEAD.

14      BY MR. BORNSTEIN:

15      Q.  MAYBE YOU HAD SOME TIME TO LOOK AT THIS DOCUMENT WHILE WE

16      WERE HAVING THE DISCUSSION, MR. LASINSKI.

17              WHAT HAS NOW BEEN ADMITTED AS CX 7492 IS ANOTHER CHANGE

18      REQUEST WITH THE SOURCE IDENTIFIED AS ERICSSON; IS THAT RIGHT?

19      A.   I SEE THAT, YES.  I HAVEN'T BEEN ABLE TO FIND IT IN MY

20      BINDER, BUT I CAN SEE THAT ON THE SCREEN.

21              THE COURT:  WHY DON'T YOU GO UP THERE AND SHOW IT TO

22      HIM.

23              MR. BORNSTEIN:  IF I MAY JUST HAND THE WITNESS MY

24      BINDER.  (HANDING.)

25              THE WITNESS:  THANK YOU.
```

1           MR. BORNSTEIN:  AND I'LL TAKE YOURS.  WE'LL TRADE.

2           THE WITNESS:  OKAY.

3    BY MR. BORNSTEIN:

4    Q.   OKAY.  AND YOU CAN SEE IT ON THE SCREEN AS WELL, SIR.

5    A.   I CAN, YES.

6    Q.   AND DO YOU SEE WHERE IT SAYS, A LITTLE LOWER DOWN FROM

7    WHAT WE HAVE ON THE SCREEN, THAT THE REASON FOR THE CHANGE IS

8    THAT THE FORMATTING OF SOME OF THE UE CAPABILITIES IS

9    INCORRECT?

10          IS THAT RIGHT?

11   A.   THAT'S WHAT IT SAYS.

12   Q.   AND THEN THERE ARE SOME OTHER REASONS FOR THE CHANGE

13   IDENTIFIED, LIKE THE NAMING CAPABILITY IS NOT EXACTLY THE SAME

14   AS IN TS 25.331, AND CLOSE TO MY HEART, A HYPHEN IS MISSING IN

15   MULTI CELL.

16          DO YOU SEE THAT?

17   A.   I SEE THAT, YES.

18   Q.   AND IF YOU LOOK AT THE DOCUMENT ITSELF AS YOU TURN THE

19   PAGES, YOU WILL SEE THE ONLY CHANGES BEING MADE TO THE

20   SPECIFICATION ARE FORMATTING AND CHANGES AND THE ADDITION OF

21   HYPHEN AND THE LIKE; CORRECT?

22   A.   YES.

23   Q.   AND YOU'RE ALSO NOT REPRESENTING THAT THIS CHANGE REQUEST,

24   WHICH IS AN APPROVED CONTRIBUTION, REPRESENTS SOME KIND OF

25   SUBSTANTIVE CONTRIBUTION TO THE STANDARD MADE BY ERICSSON;

1    CORRECT?

2    A.   NO.   I MEAN, NO, I'M NOT A TECHNICAL PERSON, SO I CAN'T DO

3    THAT.

4    Q.   AND YOU'RE NOT REPRESENTING, EITHER, THAT THIS CORRELATES

5    IN SOME WAY TO A VALUABLE CELLULAR SEP THAT ERICSSON HOLDS;

6    RIGHT?

7    A.   NOT THIS INDIVIDUAL DOCUMENT.

8    Q.   ALL RIGHT.

9    A.   THE ENTIRE AVANCI STUDY, YES, I DO SAY THAT.   BUT NOT THIS

10   SPECIFIC DOCUMENT.

11   Q.   AND YOU HAVEN'T DONE A REVIEW TO ASSESS WHETHER THE TWO

12   CHANGE REQUESTS WE JUST LOOKED AT ARE ISOLATED EXAMPLES OR

13   WHETHER THERE ARE HUNDREDS OF SIMILAR SUBMISSIONS INCLUDED IN

14   THE AVANCI STUDY?   YOU HAVEN'T CHECKED THAT; RIGHT?

15   A.   NO, I HAVEN'T.   I DIDN'T NEED TO.

16   Q.   RIGHT.   BECAUSE YOUR ANALYSIS GIVES EACH AND EVERY ONE OF

17   THESE CONTRIBUTIONS THE EXACT SAME WEIGHT; CORRECT?

18   A.   WELL, FIRST OF ALL, IT'S NOT MY ANALYSIS.   IT'S AVANCI'S

19   COMMISSIONED STUDY.

20   Q.   THE STUDY ON WHICH YOU RELIED, SIR?

21   A.   I DID RELY ON IT, YES.

22   Q.   SORRY?

23   A.   IT'S AVANCI'S STUDY.

24   Q.   ALL RIGHT.   AND THAT STUDY ON WHICH YOU RELIED GIVES EACH

25   AND EVERY ONE OF THESE APPROVED CONTRIBUTIONS, INCLUDING THE

1    ONES WE LOOKED AT, THE EXACT SAME WEIGHT; CORRECT?

2    A.   THAT WOULD BE MY UNDERSTANDING, YES.

3    Q.   AND YOU HAVEN'T ANALYZED WHETHER STRONGER PATENTS ARE MORE

4    LIKELY TO HAVE MORE APPROVED CONTRIBUTIONS ASSOCIATED WITH

5    THEM; CORRECT?

6    A.   CORRECT, I HAVEN'T DONE THAT SPECIFIC ANALYSIS --

7    Q.   AND --

8    A.   -- FROM A PATENT-BY-PATENT-STANDPOINT.  CERTAINLY FROM A

9    PORTFOLIO STANDPOINT, YES, I HAVE DONE THAT.

10   Q.   SIR, YOU HAVEN'T ANALYZED WHETHER STRONGER PATENTS ARE

11   MORE LIKELY TO HAVE MORE APPROVED CONTRIBUTIONS ASSOCIATED WITH

12   THEM; ISN'T THAT RIGHT?

13   A.   NOT INDIVIDUAL PATENTS, THAT'S CORRECT.

14   Q.   OKAY.  AND THE COURT, IN TCL VERSUS ERICSSON, WHICH YOU'VE

15   MENTIONED A FEW TIMES, IT FOUND, QUOTE, "AN ABSENCE OF ANY

16   EVIDENCE THAT CONTRIBUTION COUNTING CORRESPONDS TO ACTUAL

17   INTELLECTUAL PROPERTY RIGHTS."

18        ISN'T THAT RIGHT?

19   A.   I THINK THAT THOSE ARE THE WORDS ON THE PAGE.  HOWEVER, I

20   WILL NOTE THAT IN TCL ERICSSON, THEY DID USE APPROVED

21   CONTRIBUTIONS TO UNPACK ONE OF THE AGREEMENTS.

22   Q.   WELL, THE TCL COURT ALSO SAID, AND I'LL QUOTE,

23   "CONTRIBUTIONS CAN BE MADE FOR IDEAS THAT ARE UNPATENTED,

24   UNPATENTABLE, PATENTED BY SOMEONE ELSE, OR SPLIT INTO MULTIPLE

25   CONTRIBUTIONS."

1          IS THAT RIGHT?

2     A.   THAT IS NOT INCONSISTENT WITH MY RECOLLECTION.

3     Q.   OKAY.  AND YOU ACTUALLY AGREE WITH THAT STATEMENT, DON'T

4     YOU?

5     A.   I AGREE THAT THAT'S POSSIBLE, YES.

6     Q.   YOU AGREE THAT CONTRIBUTIONS CAN BE MADE FOR IDEAS THAT

7     ARE UNPATENTED, UNPATENTABLE, PATENTED BY SOMEONE ELSE, OR

8     SPLIT INTO MULTIPLE CONTRIBUTIONS; RIGHT?

9     A.   YES.

10    Q.   OKAY.  NOW, YOU MENTIONED EARLIER IN CLARIFYING FOR ME

11    THAT YOU ALSO RELIED ON THE DOCUMENT FROM QUALCOMM THAT

12    IDENTIFIED CONTRIBUTIONS RELATING TO CDMA 2000; IS THAT RIGHT?

13    A.   CORRECT, YES.

14    Q.   AND THAT DOCUMENT ADDRESSED CONTRIBUTIONS ONLY BETWEEN

15    2003 AND 2005; RIGHT?

16    A.   THAT IS CORRECT.  BUT THERE WAS --

17    Q.   BUT THE CDMA 2000 STUDY, SIR, WAS PUBLISHED ORIGINALLY IN

18    THE YEAR 2000; RIGHT?

19    A.   THAT IS ACCURATE.  HOWEVER, THERE WAS ANOTHER STUDY IN THE

20    RECORD WHICH HAD A LONGER TIMEFRAME AND THE 2003 TO 2005

21    DOCUMENT HAD MORE -- A LARGER PERCENTAGE FOR QUALCOMM THAN THE

22    OTHER STUDY.

23    Q.   OKAY.  BUT YOU RELIED ON THAT ONE DOCUMENT, IS THAT RIGHT,

24    SIR, IN REACHING YOUR OPINIONS IN THIS CASE?

25    A.   YES, BECAUSE IT WAS CONSERVATIVE.

1    Q.   WELL, BUT IT RELATED TO CONTRIBUTIONS ONLY IN 2003 TO

2    2005; CORRECT?

3    A.   THAT IS CORRECT.  BUT WHAT I'M DOING IS CALCULATING

4    QUALCOMM'S SHARE, AND SO THAT HAD A HIGHER PROPORTION OF SHARE

5    FOR APPROVED CONTRIBUTIONS THAN THE OTHER INFORMATION IN THE

6    RECORD.

7         SO WHEN YOU CALCULATE -- WHEN YOU'RE USING IT FROM A

8    SHARING PERCENTAGE, THAT'S WHAT MATTERS, NOT THE TOTAL NUMBER

9    OF CONTRIBUTIONS.

10   Q.   EXCEPT YOU USED ONE OF TWO THINGS THAT ARE IN THE RECORD

11   WITHOUT PAYING ATTENTION TO THE FACT THAT NEITHER ONE COULD BE

12   GOOD; RIGHT?  JUST BECAUSE ONE IS BETTER DOESN'T MEAN YOU

13   SHOULD HAVE RELIED ON IT; AM I RIGHT?

14   A.   I -- ULTIMATELY -- ULTIMATELY, IT IS GOOD AND I KNOW IT'S

15   GOOD BECAUSE I TESTED IT, I TESTED THE USE OF THAT VERSUS THE

16   COMPARABLE AGREEMENTS.  SO --

17   Q.   SO LET'S JUST DO THE FACTS, OKAY?

18   A.   SURE.

19   Q.   THE FACT IS THE DOCUMENT ON WHICH YOU REPLIED COUNTS

20   CONTRIBUTIONS MADE BETWEEN 2003 AND 2005; CORRECT?

21   A.   THAT IS CORRECT, YES.

22   Q.   ALL RIGHT.  AND THE STUDY WAS PUBLISHED -- EXCUSE ME.

23        THE STANDARD WAS FIRST PUBLISHED IN THE YEAR 2000;

24   CORRECT?

25   A.   THAT'S MY UNDERSTANDING, YES.

1    Q.   ALL RIGHT.  AND YOU ALSO UNDERSTAND THAT MORE

2    CONTRIBUTIONS ARE MADE PRIOR TO THE INITIAL PUBLICATION OF THE

3    STANDARD THAN AFTER; RIGHT?

4    A.   CORRECT, YES.

5    Q.   OKAY.  SO YOUR CONTRIBUTION SHARE FOR CDMA 2000 DOESN'T

6    TAKE ACCOUNT OF THE MAJORITY OF THE CONTRIBUTIONS THAT WERE

7    MADE TO THAT STANDARD; CORRECT?

8    A.   THAT'S HIGHLY LIKELY.  I DON'T KNOW THE ANSWER TO THAT.

9    Q.   OKAY.

10             THE COURT:  COULD I INTERRUPT YOU?

11             MR. BORNSTEIN:  OF COURSE.

12             THE COURT:  COULD WE TAKE OUR BREAK?

13             MR. BORNSTEIN:  YES, OF COURSE.  MAY I MAKE ONE

14   SUGGESTION, YOUR HONOR?

15             THE COURT:  WHAT'S THAT?

16             MR. BORNSTEIN:  THERE IS A SHORT BIT OF

17   CROSS-EXAMINATION THAT I COULD PROBABLY DO MORE EASILY UNDER

18   SEAL.  MAYBE WE CAN DO THAT FOR A MINUTE WHEN WE GET BACK FROM

19   THE BREAK AND THEN OPEN THE COURTROOM.

20             THE COURT:  UM --

21             MR. BORNSTEIN:  OTHERWISE I CAN TRY AND DO IT WITHOUT

22   A SEALED COURTROOM.  THAT'S FINE WITH ME, TOO.

23             THE COURT:  IT'S ONE MINUTE?  IS THAT YOUR END, OR

24   YOU HAVE MORE TO DO?

25             MR. BORNSTEIN:  I DO HAVE MORE.  I JUST THOUGHT --

1           THE COURT:  THEN LET'S GO AHEAD AND TAKE A BREAK IF

2     THAT'S OKAY.

3           MR. BORNSTEIN:  YEAH, OF COURSE.

4           THE COURT:  LET'S TAKE A TEN MINUTE BREAK, AND WE CAN

5     DO THE SEALED FIRST.  THAT'S FINE.

6           MR. BORNSTEIN:  OKAY.  THANK YOU.

7           THE COURT:  ALL RIGHT.  WE'RE IN RECESS.  PLEASE GO

8     AHEAD.

9         (RECESS FROM 3:37 P.M. UNTIL 3:45 P.M.)

10        **(PROCEEDINGS UNDER SEAL FROM PAGES 1081 TO 1083.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **(IN OPEN COURT.)**

2                THE COURT:  ALL RIGHT.  ARE YOU READY TO PROCEED?

3                MR. BORNSTEIN:  YES, YOUR HONOR.

4                THE COURT:  3:48.  GO AHEAD, PLEASE.

5                MR. BORNSTEIN:  THANK YOU.

6    Q.  I'D LIKE TO TALK ABOUT NON-STANDARD ESSENTIAL PATENTS,

7    MR. LASINSKI.

8    A.  OKAY.

9    Q.  IN THE PORTFOLIO STRENGTH METRIC THAT YOU CONSTRUCTED IN

10   THIS MATTER, YOU ARE MEASURING THE RELATIVE VALUE OF QUALCOMM'S

11   SEP PORTFOLIO AND OTHER PATENT HOLDERS' SEP PORTFOLIO; CORRECT?

12   A.  YES.

13   Q.  ALL RIGHT.  YOU'RE NOT TAKING ACCOUNT OF THE VALUE OF

14   EITHER QUALCOMM'S OR ANY OTHER PATENT HOLDER'S NON-SEPS IN THAT

15   METRIC; RIGHT?

16   A.  I'M NOT MEASURING THAT, NO.

17   Q.  ALL RIGHT.  AND YOU -- YOU DON'T ACTUALLY KNOW HOW MANY

18   NON-SEPS QUALCOMM HAS; RIGHT?

19   A.  THAT'S CORRECT, YES.

20   Q.  AND YOU'RE NOT AWARE OF THE VARIOUS TECHNOLOGY AREAS THAT

21   ARE COVERED BY QUALCOMM'S NON-SEPS; RIGHT?

22   A.  WELL, THAT'S NOT TRUE.  I AM AWARE OF SOME OF THE

23   TECHNOLOGY AREAS.  I DON'T KNOW ALL OF THEM.

24   Q.  OKAY.  FAIR ENOUGH.

25       AND WE'RE TALKING HERE ABOUT CELLULAR SEPS AND NON-SEPS?

1    IS THAT RIGHT?  THAT'S YOUR UNDERSTANDING OF MY QUESTIONS?

2    A.   I THINK WHAT YOU'RE TALKING ABOUT IS WHAT I CALL

3    IMPLEMENTATION PATENTS IMPLEMENTING NON-CELLULAR TECHNOLOGY, OR

4    NON-STANDARD TECHNOLOGY.

5    Q.   LET'S HAVE COMMON TERMINOLOGY.  YOUR PORTFOLIO STRENGTH

6    METRIC MEASURES THE RELATIVE VALUE OF QUALCOMM'S CELLULAR SEPS

7    VERSUS OTHERS CELLULAR SEPS; CORRECT?

8    A.   CORRECT.

9    Q.   IT DOES NOT MEASURE WHAT I WAS CALLING NON-SEPS AND YOU

10   WERE CALLING IMPLEMENTATION PATENTS; RIGHT?

11   A.   CORRECT.

12   Q.   AND YOU UNDERSTAND THOSE TWO TO BE THE SAME THING BY A

13   DIFFERENT NAME?

14   A.   I THINK WE'RE ON THE SAME PAGE.

15   Q.   OKAY.  BUT YOU HAVE CONCLUDED THAT THE PORTION OF

16   QUALCOMM'S HISTORICAL LICENSING REVENUE THAT IS ATTRIBUTABLE TO

17   NON-STANDARD ESSENTIAL PATENTS IS DE MINIMIS; RIGHT?

18   A.   YES.  WELL, THE PORTION OF THEIR REVENUES THAT THEY'VE

19   RECEIVED IS DE -- WOULD BE DE MINIMIS FOR NON-STANDARD

20   ESSENTIAL PATENTS, YES.

21   Q.   CORRECT.  THAT WAS WHAT I ASKED YOU.

22   A.   OKAY.

23   Q.   NOW, I KNOW YOU CAME HERE AFTER THE LUNCH BREAK TODAY, BUT

24   WERE YOU AWARE THAT MR. DONALDSON THIS MORNING TESTIFIED THAT

25   HE WOULD EXPECT THE ROYALTY RATE FOR CELLULAR SEPS TO BE LOWER

1    THAN FOR NON-SEPS?

2    A.   I WAS NOT AWARE OF THAT, NO.

3    Q.   OKAY.  NOW, IN YOUR TOP-DOWN ANALYSIS, THE AGGREGATE RATES

4    THAT YOU'VE IDENTIFIED, THE 5 PERCENT, THE 6 PERCENT, THOSE ARE

5    FOR CELLULAR SEPS ONLY; RIGHT?

6    A.   THOSE ARE, YES.

7    Q.   AND THE RANGE OF RATES THAT YOU PUT ON THE SCREEN FOR

8    QUALCOMM'S PORTFOLIO, THAT'S ALSO JUST QUALCOMM'S CELLULAR

9    SEPS; CORRECT?

10   A.   THOSE ARE FOR, YEAH, WHAT WOULD BE APPROPRIATE TO

11   CALCULATE, TO COLLECT FOR THEIR SEPS.

12   Q.   AND IF QUALCOMM'S OTHER PATENTS, THE IMPLEMENTATION

13   PATENTS, THE NON-SEPS, HAVE MORE THAN A DE MINIMIS VALUE, THEN

14   QUALCOMM'S FULL PORTFOLIO RATE SHOULD BE HIGHER THAN THE

15   NUMBERS THAT YOU PUT ON THE SCREEN; CORRECT?

16   A.   FROM A MATHEMATICAL STANDPOINT, THAT WOULD BE ACCURATE,

17   YES.

18   Q.   OKAY.  AND YOU WOULD ALSO AGREE THAT IF A COURT IN GERMANY

19   OR CHINA OR SOMEWHERE DETERMINED THAT AN OEM, LIKE APPLE,

20   INFRINGED QUALCOMM'S NON-SEPS AND ENJOINED APPLE FROM SELLING

21   INFRINGING DEVICES, THAT COULD ALTER YOUR CONCLUSION ABOUT

22   WHETHER THOSE NON-SEPS HAD JUST A DE MINIMIS VALUE; RIGHT?

23   A.   NO, IT WOULDN'T.  I MEAN, WHAT I'M CALCULATING HERE IS

24   WHAT THE ROYALTY REVENUE SHOULD BE, AND I SAY THAT THE ROYALTY

25   REVENUE -- THE AMOUNT OF ROYALTY REVENUE THAT THEY'RE

 1      COLLECTING FROM THEIR NON-SEPS IS DE MINIMIS.

 2          AGAIN, I DIDN'T SAY THAT THEIR IMPLEMENTATION PATENT

 3      PORTFOLIO IS DE MINIMIS.

 4      Q.   OKAY.  SO LET'S TAKE A LOOK AT PAGE 92 OF YOUR DEPOSITION.

 5      A.   YEP.

 6      Q.   WE CAN CALL THAT UP ON THE SCREEN, TOO, FOR EASE,

 7      BEGINNING AT PAGE -- EXCUSE ME, LINE 11.

 8          YOU WERE ASKED THE QUESTION, "IF AN INJUNCTION WERE ISSUED

 9      BY A FOREIGN COURT ON A NON-STANDARD ESSENTIAL PATENT, BARRING

10      APPLE FROM SELLING INFRINGING DEVICES, WOULD THAT AFFECT YOUR

11      CONCLUSION AS TO WHETHER QUALCOMM'S NON-SEPS HAD ANY VALUE?"

12          AND THEN YOU FAIRLY CORRECTED ME TO SAY, NO, NO, I MEANT

13      DE MINIMIS VALUE, AND I TOOK YOUR CLARIFICATION AND YOU SAID

14      "IT MAY."

15          CORRECT?

16      A.   I -- YES, EXACTLY.

17      Q.   OKAY.  AND YOU STAND BY THAT TESTIMONY?

18      A.   YES, EXACTLY.  THAT'S WHAT I'M TRYING TO SAY.

19      Q.   ALL RIGHT.  YOUR PORTFOLIO STRENGTH METRIC, YOU DIDN'T, AS

20      YOU SAID, USE EITHER DEEMED SEPS OR APPROVED CONTRIBUTIONS

21      ALONE, YOU BLENDED THEM; RIGHT?

22      A.   I DID, YES.

23      Q.   ALL RIGHT.  AND YOU DID THAT BECAUSE NEITHER METRIC

24      PRODUCED WHAT YOU REFERRED TO AS CONSISTENT RESULTS WHEN USED

25      ALL BY ITSELF WITH YOUR COMPARABLE AGREEMENTS?

1    A.   HAS CONSISTENT RESULTS, YES.

2    Q.   OKAY.  AND SO YOU CREATED THE OPTIMAL BLENDING OF THE TWO,

3    THE TWO METRICS; CORRECT?

4    A.   I DETERMINED THE OPTIMAL BLENDING.

5    Q.   ALL RIGHT.  AND YOU DETERMINED A DIFFERENT OPTIMAL BLEND

6    FOR EACH OF YOUR 189 PERMUTATIONS OF DEEMED SEP STUDIES; RIGHT?

7    A.   YES.

8    Q.   ALL RIGHT.  SO THERE'S NOT ONE OPTIMAL BLEND, THERE ARE

9    189 BLENDS, EACH OF WHICH YOU HAVE SAID IS OPTIMAL UNDER THE

10   CIRCUMSTANCES; CORRECT?

11   A.   YES, FOR EACH INDIVIDUAL SET OF STUDIES THAT I USED IT

12   WOULD BE OPTIMAL.

13   Q.   AND FOR SOME OF THOSE BLENDS THAT YOU CALL OPTIMAL, YOU

14   GIVE MORE WEIGHT TO THE DEEMED SEPS, AND IN SOME OF THEM YOU

15   GIVE MORE WEIGHT TO THE APPROVED CONTRIBUTIONS; RIGHT?

16   A.   THAT IS CORRECT, YES.

17   Q.   OKAY.  AND THE WAY YOU DETERMINED, TO USE YOUR WORD, THE

18   OPTIMAL BLENDS IS WHAT YOU CALLED A STANDARD DEVIATION

19   ANALYSIS; RIGHT?

20   A.   IT'S COMMONLY REFERRED TO AS STANDARD DEVIATION, YES,

21   EXACTLY.

22   Q.   OKAY.  AND THE STANDARD DEVIATION THAT WE'RE TALKING ABOUT

23   HERE IS THE STANDARD DEVIATION OF THE AGGREGATE RATES THAT WERE

24   IMPLIED BY THE EIGHT COMPARABLE AGREEMENTS THAT YOU SELECTED;

25   RIGHT?

1      A.    WELL, THAT'S A MATHEMATICAL WAY THAT I LOOKED AT IT.

2            I'M BASICALLY CALCULATING THE STANDARD DEVIATION OF WHAT'S

3      MOST PREDICTIVE OF WHAT THE DIFFERENCE IN THE -- WHAT TWO

4      PATENT HOLDERS OR WHAT TWO COMPANIES CAN NEGOTIATE FOR THEIR

5      SEPS.

6      Q.    YOU CALCULATED THE STANDARD DEVIATION OF THE AGGREGATE

7      RATES THAT WERE IMPLIED BY THE EIGHT COMPARABLE AGREEMENTS THAT

8      YOU SELECTED; RIGHT?  THAT WAS THE METHODOLOGY THAT YOU

9      EMPLOYED?

10     A.    THAT'S THE MATH BEHIND IT.

11     Q.    OKAY.  SO IF YOU CHANGED THE COMPARABLE AGREEMENTS THAT

12     YOU RELIED ON, THAT COULD LEAD TO DIFFERENT OPTIMAL BLENDING OF

13     THE DEEMED SEPS AND THE APPROVED CONTRIBUTIONS; RIGHT?

14     A.    THAT'S POSSIBLE.

15     Q.    AND YOU BELIEVE THAT HAD THIS METHODOLOGY LEADING TO A

16     PORTFOLIO STRENGTH METRIC WOULD BE RELIABLE FOR THE COURT EVEN

17     IF DEEMED SEPS THEMSELVES ARE NOT A GOOD MEASURE OF THE

18     STRENGTH OF A CELLULAR SEP PORTFOLIO; CORRECT?

19     A.    I GUESS I'VE NEVER, I'VE NEVER RUN INTO A SITUATION WHERE

20     THEY'RE NOT A GOOD MEASURE.  BUT --

21     Q.    ALL RIGHT.  LET'S LOOK AT YOUR DEPOSITION, SIR.

22     A.    YES, SIR.  SURE.

23     Q.    PAGE 44 BEGINNING AT LINE 2, I ASKED YOU THE QUESTION, "DO

24     YOU BELIEVE THAT YOUR PORTFOLIO STRENGTH RATIO CAN BE RELIED ON

25     BY THE COURT IN THIS MATTER EVEN IF DEEMED SEPS ARE NOT A

1    RELIABLE METRIC OF THE STRENGTH OF THE CELLULAR SEP PORTFOLIO?"

2        AND YOU SAID "YES"; CORRECT?

3    A.   CORRECT.

4    Q.   AND YOU STAND BY THAT TESTIMONY?

5    A.   I DO, YES.

6    Q.   ALL RIGHT.  AND YOU ALSO BELIEVE THAT THE COURT CAN RELY

7    ON YOUR PORTFOLIO STRENGTH METRIC EVEN IF APPROVED

8    CONTRIBUTIONS ARE NOT A RELIABLE METRIC OF THE STRENGTH OF A

9    CELLULAR SEP PORTFOLIO?

10   A.   I DO, YES.

11   Q.   IN FACT, SIR, YOU BELIEVE THE COURT CAN RELY ON YOUR

12   METHODOLOGY EVEN IF NEITHER DEEMED SEPS NOR APPROVED

13   CONTRIBUTIONS IS ACTUALLY A GOOD INDICATOR OF THE STRENGTH OF A

14   CELLULAR SEP PORTFOLIO; RIGHT?

15   A.   YES.

16   Q.   OKAY.

17   A.   I CHOSE WHERE I DOUBLE-CHECKED IT, SO FOR SURE.

18   Q.   OKAY.  AND YOU DIDN'T ATTEMPT TO ESTABLISH ANY THRESHOLD

19   STANDARD DEVIATION LEVEL TO SHOW THAT YOUR PORTFOLIO STRENGTH

20   METRIC HAS EXPLANATORY VALUE, DID YOU?

21   A.   I DID NOT, NO.

22   Q.   AND YOU JUST PICKED THE STANDARD DEVIATION -- EXCUSE ME.

23       YOU JUST PICKED THE BLEND WHERE THE STANDARD DEVIATION WAS

24   THE LOWEST; RIGHT?

25   A.   I PICKED, YES, WHERE IT WAS LOWEST.

1    Q.   AND YOU'RE NOT AWARE OF ANYBODY, OTHER THAN YOURSELF, WHO

2    HAS APPLIED THIS KIND OF STANDARD DEVIATION ANALYSIS TO BLEND

3    APPROVED CONTRIBUTIONS AND DEEMED SEPS; RIGHT?

4    A.   THAT IS ACCURATE.

5    Q.   YOU'RE NOT AWARE OF ANY ACADEMIC METHODOLOGY, ACADEMIC

6    STUDY THAT USES THIS METHODOLOGY; RIGHT?

7    A.   WELL, AS I SAID, I DON'T THINK YOU COULD BECAUSE WHERE ARE

8    YOU GOING TO GET EIGHT AGREEMENTS THAT YOU CAN LOOK AT IN

9    ACADEMIA?  IT'S NOT POSSIBLE.  SO I'M NOT AWARE OF ONE.

10   Q.   YOU'RE NOT AWARE OF ANYBODY -- IN FACT, THIS IS A

11   METHODOLOGY THAT YOU DEVELOPED YOURSELF, CORRECT, ALONG WITH

12   YOUR TEAM AT 284 PARTNERS?

13   A.   WELL, USING THE STANDARD DEVIATION.  BLENDING IS NOT A

14   METHODOLOGY THAT I DEVELOPED MYSELF.

15   Q.   BLENDING APPROVED CONTRIBUTIONS AND DEEMED SEPS TO DERIVE

16   A PORTFOLIO STRENGTH METRIC IN THIS WAY IS SOMETHING THAT YOU

17   AND YOUR TEAM DEVELOPED YOURSELVES; CORRECT?

18   A.   WE, YES.

19   Q.   ALL RIGHT.  AND YOU DEVELOPED IT IN THE CONTEXT OF

20   LITIGATION; IS THAT RIGHT?

21   A.   YES.  I'M NOT SURE YOU COULD DO IT OUTSIDE OF LITIGATION

22   BECAUSE YOU'RE NOT GOING TO HAVE ALL THE AGREEMENTS THAT WE

23   HAVE HERE.

24   Q.   WELL, IT WASN'T THIS LITIGATION, WAS IT?  YOU DEVELOPED

25   THIS IN A DIFFERENT LITIGATION?  IT WAS THE HUAWEI AGAINST

```
 1        SAMSUNG LITIGATION WHERE YOU FIRST EMPLOYED THIS ANALYSIS?

 2        A.   THAT'S WHERE WE FIRST EMPLOYED IT, YES.

 3        Q.   ALL RIGHT.  AND IN THAT CASE, SIR, YOU TESTIFIED FOR WHOM?

 4        A.   FOR HUAWEI.  WELL, I WILL BE TESTIFYING IF IT GOES TO

 5        TRIAL.

 6        Q.   ALL RIGHT.  AND YOU WERE DEPOSED ON BEHALF OF HUAWEI; IS

 7        THAT RIGHT?

 8        A.   YES.

 9        Q.   OKAY.  AND THE METHODOLOGY THAT YOU DEVELOPED FOR HUAWEI

10        IN THAT CASE IS THE METHODOLOGY THAT YOU ARE NOW EMPLOYING HERE

11        FOR THE FTC; IS THAT RIGHT?

12        A.   I DEVELOPED THAT METHOD FOR MY OPINION, NOT FOR HUAWEI.

13        BUT I WAS WORKING FOR HUAWEI, CORRECT.

14        Q.   AND IT'S THE SAME METHODOLOGY THAT YOU'RE EMPLOYING HERE;

15        CORRECT?

16        A.   YES.

17             MR. BORNSTEIN:  OKAY.  THANK YOU.  I HAVE NO FURTHER

18        QUESTIONS, YOUR HONOR.

19             THE COURT:  OKAY.  IT'S 3:59.  AND THAT TIME STARTED

20        AT 3:49, NOT 3:48.

21        OKAY.  LET ME KNOW WHEN YOU'RE READY, AND I'LL START YOUR

22        TIME.

23             MR. ROSS:  YOUR HONOR.  I ANTICIPATE NEEDING TO ASK

24        ONE OR TWO QUESTIONS UNDER SEAL.  I CAN DO THAT EITHER AT THE

25        BEGINNING OR THE END AS YOU PREFER.
```

1       THE COURT:  OKAY.  WHY DON'T YOU DO THAT AT THE END,

2   PLEASE.

3       OKAY.  ARE YOU READY?

4       MR. ROSS:  YES.

5       THE COURT:  3:59.  GO AHEAD, PLEASE.

6                   **REDIRECT EXAMINATION**

7   BY MR. ROSS:

8   Q.   MR. LASINSKI, COUNSEL FOR QUALCOMM ASKED YOU A NUMBER OF

9   QUESTIONS ABOUT YOUR WORK FOR HUAWEI.  HOW MANY CLIENTS ROUGHLY

10  DOES 284 PARTNERS HAVE?

11  A.   I KNOW THAT WE HAVE MORE -- SINCE I STARTED, I KNOW WE

12  HAVE MORE THAN A HUNDRED, OR HAVE HAD MORE THAN A HUNDRED.

13  Q.   AND QUALCOMM IS GENERALLY A NET LICENSOR; IS THAT CORRECT?

14  A.   YES.

15  Q.   HAVE YOU DONE WORK FOR NET LICENSORS?

16  A.   YES.

17  Q.   COUNSEL FOR QUALCOMM ALSO ASKED YOU A SERIES OF QUESTIONS

18  ABOUT THE AGGREGATE RATES YOU PICKED.

19      DO YOU RECALL THAT?

20  A.   YES.

21  Q.   AND IN PARTICULAR, HE ASKED YOU ABOUT AN 8 PERCENT

22  AGGREGATE RATE?

23  A.   CORRECT.

24  Q.   IF YOU HAD USED AN 8 PERCENT AGGREGATE RATE, WOULD THAT

25  CHANGE YOUR CONCLUSIONS?

1    A.   NO, NOT AT ALL.  I MEAN, THE FRAND RATES THAT I CALCULATE

2    VERSUS WHAT QUALCOMM HAS HISTORICALLY CHARGED ARE WAY BEYOND

3    WHAT AN 8 PERCENT AGGREGATE RATE WOULD ALLOW EITHER.

4    Q.   SO THAT RATE WOULDN'T EVEN BE -- THE RESULTS YOU WOULD

5    DERIVE USING AN 8 PERCENT RATE WOULDN'T EVEN BE CLOSE TO A

6    FRAND RATE?

7    A.   CORRECT.

8    Q.   COUNSEL FOR QUALCOMM ASKED YOU ALSO ABOUT GIVING ALL OF

9    THE STUDIES YOU'VE USED IN YOUR ANALYSIS THE SAME WEIGHT.

10        DO YOU RECALL THAT TESTIMONY?

11   A.   YES.

12   Q.   WHEN HE SAYS THE SAME WEIGHT, COULD YOU CLARIFY WHAT THAT

13   MEANS?

14   A.   I -- I THINK WHAT HE MEANS IS THAT WE RAN 189 DIFFERENT

15   PERMUTATIONS, SO WE USED THEM, YOU KNOW, IN EACH OF OUR

16   DIFFERENT -- YOU KNOW, WE USED DIFFERENT STUDIES FOR EACH OF

17   OUR PERMUTATIONS.  SO I RAN 189 PERMUTATION, I DIDN'T REJECT

18   ANY.

19   Q.   DID YOU PICK ONE AS BEING THE BEST OR THE MOST PROBATIVE?

20   A.   NO, I DID NOT.

21   Q.   YOU ENDED UP WITH A RANGE OF RESULTS BASED ON THOSE 189

22   PERMUTATIONS; CORRECT?

23        MR. BORNSTEIN:  OBJECTION.  LEADING, YOUR HONOR.

24        THE WITNESS:  I DID, YES.

25        THE COURT:  EXCUSE ME.  IF I CAN GIVE ME ONE MINUTE.

1    SUSTAINED.  I'LL STRIKE THE QUESTION.  GO AHEAD AND REPHRASE

2    THAT LAST ONE, PLEASE.

3    BY MR. ROSS:

4    Q.   HOW DID YOU GET FROM THOSE 189 STUDIES TO YOUR

5    CONCLUSIONS?

6    A.   OKAY.  THERE WEREN'T 189 STUDIES, THERE WERE 10 STUDIES.

7    AND IF YOU LOOK AT EACH STUDY BY EACH MODE OF THE DEVICE,

8    DEVICES, FOR EXAMPLE, GSM, WCDMA, LTE, AND ALTER THE STUDIES IN

9    EVERY PERMUTATION POSSIBLE, YOU GET 189 PERMUTATIONS.

10            THE COURT:  WHAT DOES THAT MEAN?  I DON'T EVEN KNOW

11   WHAT THAT MEANS.

12   BY MR. ROSS:

13   Q.   MR. LASINSKI, WHAT DOES THAT MEAN?

14   A.   SO THERE ARE THREE STUDIES FOR -- THERE ARE TWO STUDIES

15   FOR GSM, PLUS THE AVERAGE; THERE ARE TWO STUDIES FOR WCDMA PLUS

16   AN AVERAGE; THERE ARE TWO STUDIES I BELIEVE, IF I'M CORRECT,

17   FOR CDMA 2000, AND THEN SIX STUDIES FOR LTE.

18        IF YOU HAVE TO VARY EACH STUDY EACH TIME, YOU WOULD END UP

19   WITH THREE TIMES, THREE TIMES, THREE TIMES SEVEN, WHICH WOULD

20   GET YOU 189 DIFFERENT PERMUTATIONS, VARYING ONLY ONE VARIABLE

21   AT A TIME.

22   Q.   DID YOU PICK ONE OF THESE PERMUTATIONS AS THE BEST STUDY

23   SET TO USE?

24   A.   NO, I DID NOT.

25   Q.   HOW DOES THE RANGE OF RATES YOU CALCULATED USING EACH OF

1    THOSE POSSIBLE PERMUTATIONS COMPARE TO THE RATES QUALCOMM HAS

2    HISTORICALLY CHARGED?

3    A.   THE RANGE IS SIGNIFICANTLY BELOW.

4    Q.   COUNSEL FOR QUALCOMM ASKED YOU A SERIES OF QUESTIONS ABOUT

5    IMPLEMENTATION PATENTS.

6         DO YOU RECALL THAT TESTIMONY?

7    A.   YES.

8    Q.   ARE YOU AWARE OF OTHER EXAMPLES BESIDES THE HUAWEI EXAMPLE

9    YOU MENTIONED WHICH SUPPORT YOUR CONCLUSIONS ON THE PORTION OF

10   QUALCOMM REVENUES ATTRIBUTABLE TO IMPLEMENTATION PATENTS?

11   A.   YES.  I CAN THINK OF A FEW THINGS.

12        I MENTIONED THE HUAWEI AGREEMENT WHERE HUAWEI IS CHARGED

13   THE SAME RATE WITH AND WITHOUT A LICENSE TO ITS IMPLEMENTATION

14   PATENTS.

15           MR. BORNSTEIN:  YOUR HONOR, I JUST WANT TO MAKE SURE

16   THE WITNESS IS NOT GOING TO GET INTO ANYTHING THAT MIGHT

17   REQUIRE SEALING THE COURTROOM.

18           THE WITNESS:  OH, I THINK IT COULD.

19           MR. ROSS:  I CAN MOVE ON AND RE-ASK THAT QUESTION

20   UNDER SEAL.

21           THE WITNESS:  OKAY.

22           THE COURT:  OKAY.  WHY DON'T WE DO THAT.

23   BY MR. ROSS:

24   Q.   COUNSEL FOR QUALCOMM ASKED YOU A SERIES OF QUESTIONS ABOUT

25   YOUR STANDARD DEVIATION PART OF YOUR ANALYSIS?

```
 1      A.   YES.

 2      Q.   DID COUNSEL FOR -- DID QUALCOMM PUT FORTH ANY EXPERT

 3      ANALYSIS CORRECTING YOUR ANALYSIS OR QUANTITATIVELY SHOWING

 4      WHAT WOULD HAPPEN IF YOU USED A DIFFERENT METHODOLOGY?

 5      A.   NO, THEY DID NOT.

 6      Q.   WHY DO YOU BELIEVE YOUR ANALYSIS IS RELIABLE EVEN IF ONE

 7      PIECE OR A COMPONENT OF YOUR ANALYSIS MAY NOT BE?

 8      A.   BECAUSE, AGAIN, I SHOWED 189 DIFFERENT PERMUTATIONS, SO

 9      189 DIFFERENT BLENDS.

10           SO IF ONE PIECE OF IT ISN'T RELIABLE, THERE'S ALL THE

11      OTHER ANALYSES THAT I PERFORMED.  AND SO IT WOULD, IT WOULD NOT

12      BE JUST -- IT'S NOT JUST ONE PERMUTATION.  IT'S 189 DIFFERENT

13      PERMUTATIONS.

14      Q.   JUST ONE THING BEFORE WE MOVE UNDER SEAL.

15           CAN I GET THE SECOND TO LAST SLIDE IN OUR DECK UP, PLEASE.

16              MR. KOTARSKI:  I BELIEVE THAT'S UNDER SEAL.

17              MR. ROSS:  I WILL SEAL IT.  THANK YOU.

18      Q.   WITHOUT READING THE NUMBERS FROM THIS SLIDE, CAN YOU

19      EXPLAIN WHAT THE BLUE BARS ON THIS SLIDE ARE?

20      A.   THE BLUE BARS SHOW WHAT -- THE RANGE OF RATES THAT I CAME

21      UP WITH FOR QUALCOMM'S FRAND RATE, AND THE RED BARS SHOW WHAT

22      THE ACTUAL CASH COLLECTIONS ARE.

23      Q.   AND HOW CLOSE ARE THE BLUE BARS TO THE RANGE THAT

24      QUALCOMM -- THE RATES THAT QUALCOMM ACTUALLY CHARGES?

25      A.   THEY'RE SIGNIFICANTLY BELOW.
```

1    Q.   SO IF YOU HAD MADE AN ADJUSTMENT TO SOME SMALL PIECE OF

2    YOUR METHODOLOGY, WOULD THAT HAVE AFFECTED THE CONCLUSION YOU

3    REACHED IN THIS MATTER?

4    A.   I DO NOT BELIEVE SO, NO.

5    Q.   WAS YOUR ASSIGNMENT IN THIS MATTER TO DETERMINE A SPECIFIC

6    FRAND RATE?

7    A.   NO, IT WAS NOT.

8    Q.   WHAT WAS IT?

9    A.   IT WAS TO DETERMINE ULTIMATELY WHAT I THOUGHT AN

10   APPROPRIATE FRAND RATE FROM AN OVERALL RANGE STANDPOINT WOULD

11   BE, AND THAT'S WHAT I DID TO SHOW THAT QUALCOMM'S RATES ARE NOT

12   CONSISTENT WITH WHAT I THINK A RANGE OF FRAND RATES WOULD BE.

13   Q.   AND ARE YOU CONFIDENT IN THOSE CONCLUSIONS EVEN AFTER THE

14   QUESTIONS YOU WERE ASKED BY QUALCOMM'S COUNSEL?

15   A.   YES, I AM.

16        MR. ROSS:  I HAVE TWO UNDER SEAL QUESTIONS, YOUR

17   HONOR.

18        THE COURT:  OKAY.  YOU LOOK LIKE YOU WERE JUMPING UP.

19        MR. BORNSTEIN:  WELL, I JUST WANT TO FIND OUT THE

20   COURT'S REFERENCE ON HOW TO HANDLE THIS.  I HAVE A COUPLE OF

21   QUESTIONS I CAN DO THAT ARE NOT GOING TO BE UNDER SEAL IF YOU

22   WANT TO DO THAT BEFORE EVERYONE GOES IN AND OUT, OR I CAN WAIT

23   UNTIL MR. ROSS DOES HIS SEALED QUESTIONS BEFORE I CONTINUE.

24        THE COURT:  I DON'T HAVE A PREFERENCE.  DO YOU HAVE A

25   PREFERENCE?

1              MR. ROSS:  I DO NOT.

2              MR. BORNSTEIN:  WHY DON'T WE FINISH UP AND THEN I CAN

3       DO MINE IF THAT'S OKAY.

4              MR. ROSS:  THAT'S FINE.  ARE YOU GOING TO ASK ANY

5       UNDER SEAL?

6              MR. BORNSTEIN:  THAT'S WHY I SUGGESTED YOU GO FIRST,

7       BECAUSE I DON'T KNOW THE ANSWER.

8              MR. ROSS:  THAT'S FINE.

9              THE COURT:  WAIT.  WHAT'S HAPPENING?  I THINK I

10      MISSED THAT.

11             MR. ROSS:  I THINK WE'RE GOING UNDER SEAL.

12             MR. BORNSTEIN:  YES.

13             THE COURT:  I THOUGHT YOU WERE ASKING TO DO YOUR

14      PUBLIC VERSION NOW.

15             MR. BORNSTEIN:  I WAS ASKING YOUR HONOR'S PREFERENCE,

16      BUT I THINK THIS MAKES SENSE TO LET MR. ROSS FINISH AND I CAN

17      FINISH UP AFTERWARDS.

18             MR. ROSS:  WHATEVER YOU PREFER IS FINE.

19             THE COURT:  I PREFER TO DO BOTH PUBLIC AND THEN BOTH

20      SEALED.  WHAT DO YOU THINK ABOUT THAT?

21             MR. ROSS:  THAT'S FINE WITH THE FTC.

22             THE COURT:  OKAY.  BECAUSE IT COULD BE IT'LL GET

23      CLOSE TO 4:30 AND THEN WE'LL JUST HAVE EVERYONE LEAVE FOR GOOD.

24             MR. BORNSTEIN:  I'LL BE VERY BRIEF, YOUR HONOR.

25             THE COURT:  OKAY.  GO AHEAD, PLEASE.  IT'S 4:07.

1              **RECROSS-EXAMINATION**

2    BY MR. BORNSTEIN:

3    Q.   MR. ROSS JUST ASKED YOU A QUESTION AS TO HOW IT IS THAT

4    THE COURT CAN RELY ON YOUR ANALYSIS IF ONE COMPONENT OF THE

5    PORTFOLIO STRENGTH METRIC IS UNRELIABLE.  DO YOU REMEMBER THAT

6    QUESTION?

7    A.   YES.

8    Q.   AND YOUR ANSWER WAS, WELL, I DID 189 DIFFERENT

9    PERMUTATIONS, SO IF ONE OF THEM TURNS OUT TO BE A STINGER,

10   THAT'S OKAY BECAUSE I HAVE 188 OTHERS; CORRECT?

11   A.   I DIDN'T SAY THAT.

12   Q.   BUT THAT'S A FAIR SUMMARY OF WHAT YOU SAID; RIGHT, SIR?

13   A.   I WOULD SAY THAT THERE ARE MANY DIFFERENT PERMUTATIONS AND

14   SOME MAY BE MORE RELIABLE THAN OTHERS.

15   Q.   OKAY.  BUT THE QUESTION I HAD ASKED YOU DURING MY

16   CROSS-EXAMINATION WASN'T ABOUT ONE PERMUTATION BEING

17   UNRELIABLE.

18        I ASKED YOU WHETHER YOUR PORTFOLIO STRENGTH RATIO COULD BE

19   RELIED ON BY THE COURT EVEN IF DEEMED SEPS THEMSELVES WERE NOT

20   A RELIABLE INDICATOR OF PORTFOLIO STRENGTH; RIGHT?

21   A.   YES.

22   Q.   OKAY.  AND SO YOUR ANSWER ABOUT, WELL, I HAVE 188 OTHER

23   PERMUTATIONS, THAT'S NOT REALLY RESPONSIVE TO THAT PROBLEM, IS

24   IT?

25   A.   I MEAN, I GUESS IF YOU TAKE ALL OF THE DEEMED SEP STUDIES

1    OUT OF THE EQUATION IT WOULDN'T BE RESPONSIVE.

2    Q.    RIGHT.

3    A.    BUT AGAIN, I SAID THAT THERE ARE OTHER ANALYSES THAT ONE

4    COULD LOOK AT.  FOR EXAMPLE, THE AVANCI PORTFOLIO STRENGTH

5    RATIO.

6    Q.    SURE.  YOU ALSO SAID, THOUGH, THAT IF WE TOOK APPROVED

7    CONTRIBUTIONS AND DETERMINED THAT THAT'S NOT RELIABLE, THE

8    COURT COULD STILL RELY ON YOUR ANALYSIS; RIGHT?

9    A.    CORRECT.

10   Q.    OKAY.

11   A.    BECAUSE MY ANALYSIS, AGAIN, IS CONSISTENT WITH WHAT AVANCI

12   IS COMING UP WITH.

13   Q.    AND WHAT YOU TESTIFIED, SIR, WAS EVEN IF DEEMED SEPS ARE A

14   BAD INDICATOR AND EVEN IF APPROVED CONTRIBUTIONS ARE A BAD

15   INDICATOR, YOU THINK THE COURT CAN STILL RELY ON THE PORTFOLIO

16   STRENGTH METRIC THAT YOU CONDUCTED AND CONSTRUCTED WITH THOSE

17   TWO VARIABLES; RIGHT?

18   A.    I THINK THAT IT CAN RELY ON MY RESULTS BECAUSE I CAN -- I

19   DOUBLE-CHECKED THOSE RESULTS VERSUS AVANCI.

20           MR. BORNSTEIN:  I HAVE NOTHING ELSE, YOUR HONOR.

21           MR. ROSS:  YOUR HONOR --

22           THE COURT:  WHAT WAS YOUR --

23           MR. ROSS:  THE COURT MAY NEED TO BE UNDER SEAL FOR

24   THE REST OF THAT ANSWER, BUT THAT'S FINE.

25           THE COURT:  OKAY.  ALL RIGHT.  SO YOU'VE CONCLUDED AT

1        4:09.

2              SO NOW WE'RE GOING TO ASK EVERYONE TO LEAVE.

3              HOW MUCH TIME DO YOU THINK EACH OF YOU HAS, OR WILL NEED?

4                   MR. ROSS:  TWO MINUTES, YOUR HONOR.

5                   THE COURT:  TWO MINUTES.  OKAY.

6              MR. BORNSTEIN, WHAT ABOUT YOU?  HOW MUCH TIME DO YOU THINK

7        YOU'LL NEED UNDER SEAL.  I'M WONDERING WHETHER I SHOULD TELL

8        PEOPLE TO COME BACK.

9                   MR. BORNSTEIN:  I HAVE NO IDEA, BUT IF HE HAS TWO

10       MINUTES, I EXPECT I CAN'T GO LONGER THAN THAT.

11                  THE COURT:  SO THEN I THINK FOLKS SHOULD WAIT OUTSIDE

12       BECAUSE I THINK WE'LL HAVE MORE TESTIMONY TODAY.

13             ALL RIGHT.  IF EVERYONE WILL PLEASE STEP OUTSIDE AGAIN.

14       SORRY FOR ANY INCONVENIENCE.

15             I'LL ASK THE PARTIES, ONCE EVERYONE IS OUT, TO CONFIRM

16       WITH ME THAT YOU ARE FINE WITH EVERYONE WHO REMAINS.

17             **(PROCEEDED UNDER SEAL FROM PAGES 1104 TO 1109.)**

18

19

20

21

22

23

24

25

1          **(SEALED PROCEEDINGS FROM PAGES 1104 TO 1109.)**

2               THE COURT:  ALL RIGHT.  LET ME ASK BOTH PARTIES --

3               MR. BORNSTEIN:  LOOKS GOOD, YOUR HONOR.

4               THE COURT:  -- IS EVERYONE OKAY?

5               MR. ROSS:  THE FTC IS OKAY.

6               THE COURT:  ALL RIGHT.  THE COURTROOM IS NOW SEALED.

7          LET'S GO BACK NOW TO FTC.  ARE YOU READY?  OR DO YOU WANT

8     A MINUTE?

9               MR. ROSS:  I'M READY, YOUR HONOR.

10              THE COURT:  OKAY.  4:10.  GO AHEAD, PLEASE.

11                     **FURTHER REDIRECT EXAMINATION**

12    BY MR. ROSS:

13    Q.   COUNSEL FOR QUALCOMM ASKED YOU A SERIES OF QUESTIONS ABOUT

14    THE SIGNAL STUDY AND THE COMPONENTS OF IT.

15         DO YOU RECALL THAT?

16    A.   YES.

17    Q.   DID YOU NEED TO KNOW THE DETAILS OF THAT STUDY?

18    A.   NO, NOT THE TECHNICAL DETAILS, I DID NOT.

19    Q.   WHY NOT?

20    A.   BECAUSE I TESTED WHETHER OR NOT THE RESULTS OF MY ANALYSIS

21    WERE CONSISTENT WITH ACTUAL NEGOTIATED AGREEMENTS.  SO I DID

22    NOT NEED TO KNOW THE DETAILS OF THE STUDY.

23    Q.   IN YOUR EXPERIENCE IN LICENSING NEGOTIATIONS, ARE THESE

24    STUDIES GENERALLY -- ARE THE DETAILS OF THESE STUDIES GENERALLY

25    ASSESSED?

1    A.   I MEAN, WHEN YOU'RE SHOWING NUMBERS AND YOU'RE LOOKING AT

2    WHAT THE NUMBERS ARE, NO, ONE IS NOT ASSESSING THE DETAILS OF

3    THE STUDY.

4    Q.   AND DID AVANCI USE THE SIGNAL STUDY THAT YOU USED?

5    A.   THAT IS MY UNDERSTANDING, YES, THEY DO USE IT.

6    Q.   AND QUALCOMM IS A MEMBER OF AVANCI; IS THAT CORRECT?

7    A.   CORRECT.

8    Q.   AND YOU WERE ASKED A COUPLE OF QUESTIONS ABOUT QUALCOMM'S

9    NEGOTIATIONS TO ENTER AVANCI; IS THAT CORRECT?

10   A.   YES.

11   Q.   SO QUALCOMM HAD TO NEGOTIATE TO ENTER AVANCI; IS THAT

12   CORRECT?

13   A.   I WOULD THINK THAT THEY WOULD HAVE TO NEGOTIATE WITH

14   ERICSSON IN ENTERING AVANCI, YES.

15   Q.   AND THEY AGREED TO USE APPROVED CONTRIBUTIONS AND DEEMED

16   SEPS AS PART OF THE ROYALTY DISTRIBUTION MODEL; IS THAT

17   CORRECT?

18   A.   YES, THEY CALL THEM EVALUATED SEPS, BUT THEY DO, YES.

19   Q.   I ASKED YOU A QUESTION EARLIER ABOUT IMPLEMENTATION

20   PATENTS?

21   A.   YES.

22   Q.   AND YOU COULDN'T FINISH YOUR ANSWER.

23        COULD YOU DESCRIBE SOME OF THE ANALYSIS YOU CONDUCTED THAT

24   HELPED YOU TO CONCLUDE THAT THE PORTION OF ROYALTY REVENUES

25   ATTRIBUTABLE TO IMPLEMENTATION PATENTS IS DE MINIMIS?

1    A.    SO ONE OF THE -- ONE OF THE THINGS I LOOKED AT WAS THE

2    HUAWEI AGREEMENT THAT WE DISCUSSED EARLIER.

3          I ALSO CONSIDERED THE FACT THAT THE CONTRACT MANUFACTURERS

4    FOR APPLE WERE PAYING THE SAME RATES EVEN THOUGH THEY DIDN'T

5    GET A LICENSE TO ALL OF THE IMPLEMENTATION PATENTS.

6          FINALLY, ANOTHER DATA POINT THAT I THINK IS USEFUL IS THE

7    FACT THAT QUALCOMM HAS BEEN CHANGING -- OR CHARGING THESE EXACT

8    SAME RATES FOR, YOU KNOW, THAT IT HAS BEEN CHARGING EVEN THOUGH

9    THERE WERE NOT A LOT OF IMPLEMENTATION PATENTS ON PHONES OVER

10   TIME.

11         THAT'S WHEN -- AND THEN ANOTHER THING THAT I KNOW IS WHEN

12   WE LOOKED AT THE AVANCI INFORMATION, QUALCOMM, WHEN IT LOOKS AT

13   ITS HISTORICAL REVENUE, INCLUDES WHAT I THINK IS ALL OF ITS

14   HISTORICAL LICENSING REVENUE WHEN DETERMINING WHETHER OR NOT --

15   OR WHAT PORTION OR SHARE IT SHOULD GET FOR ITS DISTRIBUTION.

16   Q.    WHY IS IT IMPORTANT THAT QUALCOMM DECLARE ALL OF ITS

17   REVENUE TO AVANCI?

18   A.    WELL, AVANCI SAYS THAT YOU NEED TO DECLARE REVENUE THAT'S

19   PREDOMINANTLY RELATED TO YOUR SEPS.

20   Q.    IF YOU HAD ASSIGNED SOME VALUE TO QUALCOMM'S

21   IMPLEMENTATION PATENTS, OR SOME PORTION OF QUALCOMM'S REVENUE

22   TO QUALCOMM IMPLEMENTATION PATENTS, WOULD THAT CHANGE YOUR

23   CONCLUSIONS?

24   A.    NO.   I'M AWARE OF SOME INFORMATION IN THE RECORD WHICH

25   INDICATES THAT THE IMPLEMENTATION PATENTS COULD BE AS MUCH AS

1    35 PERCENT.  I THINK IT'S A RATE CARD THAT WAS PUBLISHED -- OR

2    I DON'T THINK IT WAS PUBLISHED.  I THINK IT WAS A DRAFT RATE

3    CARD FROM 2017, AND THAT CERTAINLY WOULDN'T CHANGE MY

4    CONCLUSIONS.

5    Q.   ULTIMATELY, YOUR CONCLUSIONS ARE THAT QUALCOMM'S RATES ARE

6    FAR ABOVE WHAT'S FRAND?

7    A.   YES, THEY ARE.

8    Q.   AND IF YOU CHANGED ONE OR TWO OF THESE COMPONENTS OF YOUR

9    ANALYSIS, WOULD THAT CHANGE YOUR CONCLUSION?

10   A.   I WOULD NOT EXPECT SO.

11           MR. ROSS:  THANK YOU.  NO FURTHER QUESTIONS.

12           THE COURT:  ALL RIGHT.  IT'S 4:14.

13       LET ME KNOW WHEN YOU'RE READY.

14           MR. BORNSTEIN:  I AM READY, YOUR HONOR.

15           THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  4:14.

16           MR. BORNSTEIN:  THANK YOU.

17                    **FURTHER RECROSS-EXAMINATION**

18   BY MR. BORNSTEIN:

19   Q.   SO YOU TALKED ABOUT THE HUAWEI AGREEMENT BETWEEN QUALCOMM

20   AND HUAWEI THAT HAS -- THAT YOU RELIED ON FOR YOUR POINT ABOUT

21   IMPLEMENTATION PATENTS; CORRECT?

22   A.   CORRECT.

23   Q.   AND YOU'RE AWARE, SIR, THAT QUALCOMM HAS MULTIPLE

24   LICENSEES WHO PAY MORE FOR A FULL PORTFOLIO LICENSE THAT

25   INCLUDES NON-SEPS THAN THEY PAY FOR A CELLULAR SEP ONLY

LASINSKI FURTHER RECROSS BY MR. BORNSTEIN

1    LICENSE; CORRECT?

2    A.   YES, I WOULD EXPECT THAT, YES.

3    Q.   YES.  THE HUAWEI AGREEMENT ON WHICH YOU WERE RELYING, SIR,

4    ON OUTLIER, ISN'T IT?

5    A.   I WOULD NOT AGREE THAT IT'S AN OUTLIER.

6    Q.   WELL, YOU DID NOT IDENTIFY ANY OTHER AGREEMENT THAT

7    QUALCOMM HAS THAT IS LIKE THAT, DID YOU?

8    A.   THE APPLE AGREEMENT -- WELL, THE CONTRACT MANUFACTURER

9    APPLE AGREEMENT ALSO DOESN'T HAVE A LICENSE TO ALL OF THE

10   IMPLEMENTATION PATENTS.

11   Q.   BUT THERE IS, FOR THE CONTRACT MANUFACTURERS, THERE'S A

12   CAPTURE PERIOD THAT CUTS OFF THE NON-SEPS THAT THEY RECEIVE;

13   RIGHT?

14   A.   CORRECT, YES.

15   Q.   AND THEY RECEIVE A LARGE, LARGE NUMBER OF NON-SEPS IN

16   THEIR LICENSE, DON'T THEY?

17   A.   THEY DO.  THEY DO CAPTURE SOME.  I DON'T KNOW IF IT'S A

18   LARGE, LARGE NUMBER.

19   Q.   OKAY.  SO THE CONTRACT MANUFACTURER LICENSES ARE NOTHING

20   LIKE THE HUAWEI LICENSE BECAUSE THEY INCLUDE A LARGE PORTFOLIO

21   OF NON-SEPS, DON'T THEY?

22   A.   I DON'T KNOW EXACTLY HOW MANY THEY DO.

23   Q.   OKAY.  WELL, THE ONLY NON-SEPS THAT FALL OUTSIDE THOSE

24   LICENSES ARE THE ONES THAT POST-DATE THE CONTRACTUAL CAPTURE

25   PERIOD; ISN'T THAT RIGHT?

1108

```
 1         A.   THAT IS MY UNDERSTANDING, YES.

 2                   MR. BORNSTEIN:  OKAY.  THANK YOU, SIR.

 3              I HAVE NOTHING ELSE, YOUR HONOR.

 4                   THE COURT:  OKAY.  IT'S 4:16.

 5              DO YOU HAVE ANYTHING MORE?

 6                   MR. ROSS:  NO, YOUR HONOR.

 7                   THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

 8         AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

 9                   MR. BORNSTEIN:  NOT SUBJECT TO RECALL FROM OUR SIDE.

10                   MR. ROSS:  NOT SUBJECT TO RECALL FROM OUR SIDE AS

11         WELL.

12                   THE COURT:  OKAY.  THEN YOU ARE EXCUSED AND YOU'VE

13         COMPLETED YOUR TRIAL TESTIMONY.

14                   THE WITNESS:  THANK YOU.

15                   THE COURT:  CALL YOUR NEXT WITNESS.

16              IS THIS A -- NOTHING ELSE NEEDS TO BE SEALED TODAY; IS

17         THAT RIGHT?

18                   MR. BAKER:  THAT'S RIGHT.

19                   THE COURT:  OKAY.  THEN WOULD YOU PLEASE OPEN UP THE

20         COURTROOM.

21              AND ARE THE REST VIDEOS?  IS THAT RIGHT?

22                   MR. BAKER:  YES, YOUR HONOR.

23                   THE COURT:  OKAY.

24              **(END OF SEALED PROCEEDINGS.)**

25
```

```
1         (IN OPEN COURT.)

2              THE COURT:  OKAY.  IS THERE ANY DIVISION OF TIME ON

3    THIS VIDEO?

4              MR. BAKER:  THE VIDEO IS APPROXIMATELY NINE MINUTES,

5    AND QUALCOMM COUNTER-DESIGNATIONS ACCOUNT FOR APPROXIMATELY TWO

6    MINUTES OF IT.

7              THE COURT:  ALL RIGHT.  AND DO YOU WANT TO ADMIT

8    EXHIBITS?

9              MR. BAKER:  YES.

10             THE COURT:  ALL RIGHT.

11             MR. BAKER:  WE ARE CALLING BRIAN CHONG OF --

12             THE COURT:  GIVE ME ONE MINUTE, PLEASE.  I'VE GOT TO

13   CHARGE YOU TIME.

14        OKAY.  IT'S 4:19, GO AHEAD, PLEASE.

15             MR. BAKER:  THE FTC IS CALLING BRIAN CHONG OF WISTRON

16   CORPORATION.

17        AND WE'D LIKE TO ADMIT EXHIBIT QX 2053, AND THIS IS

18   SUBJECT TO A PARTIAL SEALING ORDER.

19             THE COURT:  IS THAT IT?

20             MR. BAKER:  YES.

21             THE COURT:  OKAY.  ANY OBJECTION?

22             MR. BORNSTEIN:  NO, YOUR HONOR.

23             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

24        (DEFENDANT'S EXHIBIT QX 2053 WAS ADMITTED IN EVIDENCE.)

25             THE COURT:  GO AHEAD, PLEASE.  PLEASE SHOW THE VIDEO.
```

```
 1          (THE VIDEOTAPED DEPOSITION OF BRIAN CHONG WAS PLAYED IN
 2     OPEN COURT OFF THE RECORD.)
 3               THE COURT:  IS THAT IT?
 4               MR. KOTARSKI:  LINE 2 IS NEXT.
 5               THE COURT:  OH, OKAY.  THANK YOU.
 6          (THE VIDEOTAPED DEPOSITION OF BRIAN CHONG WAS PLAYED IN
 7     OPEN COURT OFF THE RECORD.)
 8               THE COURT:  ALL RIGHT.  IT'S 4:27.
 9               MR. BAKER:  YOUR HONOR, IF I CAN MAKE ONE CORRECTION?
10               THE COURT:  WHAT'S THAT?
11               MR. BAKER:  I STATED THAT THE EXHIBIT WE WERE
12     ADMITTING WAS QX 2053.  THAT'S THE DEPOSITION EXHIBIT NUMBER.
13          THE TRIAL EXHIBIT NUMBER IS JX 0042.
14               THE COURT:  OKAY.  IT IS -- WHAT IS IT AGAIN, JX?
15               MR. BAKER:  0042.
16               THE COURT:  OKAY.  SO THAT'S ADMITTED.
17          (JOINT EXHIBIT JX 0042 WAS ADMITTED IN EVIDENCE.)
18               THE COURT:  ALL RIGHT.  SO THE TIME IS 4:28.
19          LET'S JUST GO AHEAD AND END FOR THE DAY SINCE IT'S ALREADY
20     4:28.
21          OKAY.  LET ME GIVE YOU YOUR TIME ESTIMATES.
22          QUALCOMM HAS USED 2 HOURS AND 5 MINUTES TODAY.  ALL RIGHT.
23     AND THE FTC HAS USED 3 HOURS AND 31 MINUTES TODAY.
24          DO YOU WANT YOUR TOTAL TOTALS, OR --
25               MR. VAN NEST:  PLEASE.
```

1111

```
 1              THE COURT:  OKAY.

 2          (PAUSE IN PROCEEDINGS.)

 3              THE COURT:  ALL RIGHT.  SO AS OF LAST WEEK, THE FTC

 4      HAD USED 14 HOURS AND 25 MINUTES.  TODAY, JANUARY 14TH, YOU'VE

 5      USED 3 HOURS AND 31 MINUTES.  YOUR TOTAL IS 17 HOURS AND 56

 6      MINUTES USED TOTAL.  OKAY?

 7              AND THEN QUALCOMM, LAST WEEK YOU HAD USED 7 HOURS AND 17

 8      MINUTES.  WITH TODAY'S 2 HOURS AND 5 MINUTES, YOU'VE USED A

 9      TOTAL OF 9 HOURS AND 22 MINUTES.

10          OKAY.  ANYTHING ELSE?

11              MR. VAN NEST:  NO, YOUR HONOR.

12              THE COURT:  OKAY.  THEN I WILL SEE YOU TOMORROW

13      MORNING AT 9:00 A.M.  THANK YOU ALL VERY MUCH.

14              MR. VAN NEST:  THANK YOU.

15              THE COURT:  THANK YOU.  WE'RE IN RECESS.

16          GO AHEAD, PLEASE.

17          (PAUSE IN PROCEEDINGS.)

18              THE COURT:  CAN WE DO THIS ON THE RECORD?

19          I APOLOGIZE, I FORGOT ONE THING.

20          IS MR. CHONG SUBJECT TO RECALL OR NOT?  I DON'T KNOW.

21              MR. VAN NEST:  NOT FROM US.

22              MR. BAKER:  NO.

23              THE COURT:  OKAY, NOT SUBJECT TO RECALL.

24          ALL RIGHT.  THANK YOU.  SORRY FOR THE INTERRUPTION.

25          (THE EVENING RECESS WAS TAKEN AT 4:32 P.M.)
```

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  JANUARY 14, 2019

22

23

24

25