1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3      SAN JOSE DIVISION

4

5

 FEDERAL TRADE COMMISSION,  ) C-17-00220 LHK

6           )

       PLAINTIFF,  ) SAN JOSE, CALIFORNIA

7           )

      VS.     ) JANUARY 15, 2019

8           )

 QUALCOMM INCORPORATED, A   ) VOLUME 6

9 DELAWARE CORPORATION,    )

           ) PAGES 1112-1342

10      DEFENDANT.  )

   _____)

11

12    TRANSCRIPT OF PROCEEDINGS

    BEFORE THE HONORABLE LUCY H. KOH

13    UNITED STATES DISTRICT JUDGE

14 A P P E A R A N C E S:

15 FOR THE PLAINTIFF:  FEDERAL TRADE COMMISSION

         BY: JENNIFER MILICI

16        DANIEL J. MATHESON

         WESLEY G. CARSON

17        KENT COX

         NATHANIEL M. HOPKIN

18        PHILIP J. KEHL

         MIKA IKEDA

19       600 PENNSYLVANIA AVENUE, NW

         WASHINGTON, D.C.  20580

20

21    APPEARANCES CONTINUED ON NEXT PAGE

22 OFFICIAL COURT REPORTERS:  LEE-ANNE SHORTRIDGE, CSR, CRR

          CERTIFICATE NUMBER 9595

23        IRENE RODRIGUEZ, CSR, CRR, RMR

          CERTIFICATE NUMBER 8074

24

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY

25    TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                              BY:  ROBERT A. VAN NEST
5                                  JUSTINA K. SESSIONS
                                   EUGENE M. PAIGE
6                                  CHRISTINA BLAIS
                                   MATAN SHACHAM
7                                  CODY HARRIS
                                   KRISTIN HUCEK
8                              633 BATTERY STREET
                              SAN FRANCISCO, CALIFORNIA  94111
9

10                             CRAVATH, SWAINE & MOORE
                              BY:  GARY A. BORNSTEIN
11                                 MICHAEL BRENT BYARS
                                   YONATAN EVEN
12                                 JORDAN D. PETERSON
                                   MING-TOY TAYLOR
13                                 DEREK SUTTON
                                   ANDREW HUYNH
14                                 ANTONY RYAN
                              825 EIGHTH AVENUE
15                             NEW YORK, NEW YORK  10019

16

17     ALSO PRESENT:          MARK SNYDER
                              JEFF DAHM
18                             KEN KOTARSKI

19

20

21

22

23

24

25

INDEX OF WITNESSES

PLAINTIFF'S

**CARL SHAPIRO**
        DIRECT EXAM BY MR. JAMES              P. 1117
        CROSS-EXAM BY MR. VAN NEST            P. 1176
        REDIRECT EXAM BY MR. JAMES            P. 1242
        RECROSS-EXAM BY MR. VAN NEST          P. 1250

**MONICA YANG**
        VIDEOTAPED DEPOSITION                 P. 1298


**MARVIN BLECKER**
        VIDEOTAPED DEPOSITION                 P. 1300


DEFENDANT'S

**IRWIN JACOBS**
        DIRECT EXAM BY MR. VAN NEST           P. 1252
        CROSS-EXAM BY MR. MATHESON            P. 1279

**DURGA MALLADI**
        DIRECT EXAM BY MS. SESSIONS           P. 1302
        CROSS-EXAM BY MR. HOPKIN              P. 1333
        REDIRECT EXAM BY MS. SESSIONS         P. 1338

1

2                          INDEX OF EXHIBITS

3                                    MARKED        ADMITTED

4        PLAINTIFF'S

5        6814                                      1275
         6719                                      1285
6        6722                                      1287
         8260, 8285, 8286                          1300
7

8        DEFENDANT'S

9        9276                                      1271
         9302                                      1314
10

11

12       JOINT

13       0014                                      1291
         0053                                      1298
14

15

16

17

18

19

20

21

22

23

24

25

```
1       SAN JOSE, CALIFORNIA                    JANUARY 15, 2019

2                          P R O C E E D I N G S

3            (COURT CONVENED AT 9:06 A.M.)

4                 THE COURT:  GOOD MORNING, WELCOME.

5                 MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

6                 THE CLERK:  PLEASE BE SEATED.

7                 THE COURT:  OKAY.  WELCOME.  LET'S HAVE YOUR NEXT

8        WITNESS, PLEASE.

9                 MR. JAMES:  RAJ JAMES ON BEHALF OF THE FTC.

10           THE PLAINTIFFS CALL AS THEIR NEXT WITNESS

11       PROFESSOR CARL SHAPIRO.

12           MAY WE APPROACH THE COURT WITH BINDERS?

13                THE COURT:  YES, PLEASE.

14                THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

15           (PLAINTIFF'S WITNESS, CARL SHAPIRO, WAS SWORN.)

16                THE WITNESS:  I DO.

17                THE CLERK:  THANK YOU.  PLEASE BE SEATED.

18           WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

19       NAME FOR THE RECORD.

20                THE WITNESS:  CARL SHAPIRO.  S-H-A-P-I-R-O.  CARL

21       WITH A "C."

22                THE COURT:  ALL RIGHT.  TIME IS 9:07.  GO AHEAD,

23        PLEASE.

24

25
```

1                    **DIRECT EXAMINATION**

2      BY MR. JAMES:

3      Q.   GOOD MORNING, PROFESSOR SHAPIRO.

4      A.   GOOD MORNING, MR. JAMES.

5      Q.   COULD YOU TELL US ABOUT YOUR ACADEMIC BACKGROUND?

6      A.   YES.  I'M A PROFESSOR OF THE GRADUATE SCHOOL AT THE

7      UNIVERSITY OF CALIFORNIA AT BERKELEY.  I'VE BEEN A PROFESSOR

8      THERE SINCE 1990.

9           I WAS A PROFESSOR AT PRINCETON FOR TEN YEARS BEFORE THAT.

10          MY AREA OF SPECIALTY IS THE FIELD OF INDUSTRIAL

11     ORGANIZATION WITHIN ECONOMICS, THE IMPLIED PART OF THAT FIELD

12     IS ANTITRUST ECONOMICS.

13          AND I'VE, DURING MY CAREER, I HAVE HAD EXTENSIVE

14     PUBLICATIONS IN THIS AREA AND BEEN IN ACADEMIA.

15     Q.   SO YOU'VE PUBLISHED ARTICLES ON INDUSTRIAL ORGANIZATION,

16     ECONOMICS, AND ANTITRUST ECONOMICS?

17     A.   YES, I HAVE, QUITE A FEW.

18     Q.   ROUGHLY HOW MANY?

19     A.   I WOULD SAY A HUNDRED OR SO.

20     Q.   PROFESSOR SHAPIRO, HAVE YOU HAD JOBS IN GOVERNMENT THAT

21     RELATE TO ANTITRUST LAW AND POLICY?

22     A.   YES, I HAVE.  AS INDICATED IN THE THIRD BULLET HERE, I

23     TWICE SERVED AS THE CHIEF ECONOMIST IN THE ANTITRUST DIVISION.

24     THE OFFICIAL TITLE IS DEPUTY ASSISTANT ATTORNEY GENERAL FOR

25     ECONOMICS AT THE DEPARTMENT OF JUSTICE.

1              AND MY ROLE THERE WAS TO SUPERVISE ALL THE ECONOMISTS

2       DOING ANALYSIS WITHIN THE ANTITRUST DIVISION AND TO ADVISE THE

3       ASSISTANT ATTORNEY GENERAL REGARDING ANTITRUST ENFORCEMENT AND

4       POLICY.

5       Q.   AND APART FROM YOUR TWO TENURES AS DEPUTY ASSISTANT

6       ATTORNEY GENERAL, HAVE YOU HAD OTHER JOBS IN GOVERNMENT THAT

7       RELATE MORE GENERALLY TO ECONOMIC POLICY?

8       A.   YES.  IT WOULD BE THE SECOND BULLET HERE.  RIGHT AFTER

9       SERVING THE SECOND TIME IN THE JUSTICE DEPARTMENT, I WAS ABLE

10      TO SERVE AS A MEMBER OF THE PRESIDENT'S COUNCIL OF ECONOMIC

11      ADVISORS, CEA.  THREE MEMBERS OF THE CEA.  IT'S A SENATE

12      CONFIRMED POSITION, AND THE COUNCIL ADVISES THE PRESIDENT OF

13      THE UNITED STATES ON A WIDE RANGE OF ECONOMIC POLICY ISSUES.

14      Q.   HAVE YOU PREVIOUSLY SERVED AS AN EXPERT WITNESS IN

15      ANTITRUST MATTERS?

16      A.   YES, I HAVE.  I WOULD SAY OVER MY CAREER OF ABOUT 30 YEARS

17      OF DOING THIS, I ESTIMATE I'VE GIVEN EXPERT TESTIMONY IN COURT

18      ABOUT 20 TO 25 TIMES.

19              MR. JAMES:  YOUR HONOR, AT THIS POINT I'D LIKE TO

20      TENDER PROFESSOR SHAPIRO AS AN EXPERT IN THE FIELD OF

21      INDUSTRIAL ORGANIZATION ECONOMICS AND ANTITRUST ECONOMICS.

22              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

23              THE COURT:  ALL RIGHT.  SO CERTIFIED.  GO AHEAD,

24      PLEASE.

25      BY MR. JAMES:

1     Q.   WHY DON'T WE BRING UP THE -- CAN YOU TAKE A LOOK AT THIS

2     DEMONSTRATIVE.  WHY DON'T WE START WITH A SUMMARY OF YOUR

3     CONCLUSIONS.

4          COULD YOU BRIEFLY DESCRIBE YOUR CONCLUSIONS THAT YOU

5     REACHED IN THIS CASE TO THE COURT?

6     A.   CERTAINLY.

7          SO FOLLOWING THE SLIDE, YOUR HONOR, THE FIRST BULLET, THE

8     OPINION THERE, THE CONCLUSION HAS TO DO WITH QUALCOMM'S MARKET

9     POWER, MONOPOLY POWER IN TWO MARKETS THAT WE'LL TALK ABOUT, THE

10    MARKET FOR CDMA MODEM CHIPS AND THE MARKET FOR PREMIUM LTE

11    MODEM CHIPS, AND IT'S MY VIEW THAT QUALCOMM HAD MONOPOLY POWER

12    IN THOSE MARKETS THROUGH 2016.

13              THE COURT:  BEGINNING WHEN?

14              THE WITNESS:  MY ANALYSIS STARTS AROUND 2006,

15    ALTHOUGH THE MORE INTENSIVE PART OF THE ANALYSIS WOULD REALLY

16    BE 2011 TO '16.

17              THE COURT:  OKAY.  SO YOU'RE SAYING THEY HAD MARKET

18    POWER IN THOSE TWO MARKETS STARTING IN 2006 OR REALLY STARTING

19    IN 2011?

20              THE WITNESS:  OKAY.  WELL, THE CDMA MARKET WOULD BE

21    STARTING IN 2006.  THE PREMIUM LTE MARKET DOESN'T REALLY START

22    UNTIL 2011.

23              THE COURT:  OKAY.  THANK YOU FOR THE CLARIFICATION.

24         GO AHEAD, PLEASE.

25              THE WITNESS:  SO THE, THE SECOND BULLET, THIS IS

1    REALLY THE HEART OF WHAT I'VE DONE HERE, IS ANALYZING THE

2    EFFECTS OF THREE DIFFERENT QUALCOMM POLICIES THAT OPERATE IN

3    CONCERT:  THE NO LICENSE, NO CHIPS POLICY, THE INCENTIVE

4    PAYMENTS THAT QUALCOMM MAKES TO OEM'S IN SOME OF ITS LICENSING

5    NEGOTIATIONS, AND ITS REFUSAL TO LICENSE ITS STANDARD ESSENTIAL

6    PATENTS TO ITS MODEM CHIP RIVALS.

7        SO LOOKING AT THESE THREE POLICIES WORKING TOGETHER, IT'S

8    MY VIEW AND CONCLUSION THAT THEY HARMED COMPETITION IN THE

9    MARKETS THAT I'VE JUST -- WE'VE JUST BEEN TALKING ABOUT IN

10   THOSE TWO MARKETS.

11       AND THE SUB BULLETS HERE I'LL EXPLAIN -- THIS IS WHAT I'LL

12   SPEND MOST OF MY TESTIMONY ON -- THE MECHANISM BY WHICH THAT

13   HARM TO COMPETITION OCCURRED.

14       AND SO, AGAIN, IN BRIEF SUMMARY, THE FIRST STEP OF THIS IS

15   THAT QUALCOMM, THROUGH THESE POLICIES, USED ITS MONOPOLY POWER

16   OVER MODEM CHIPS TO EXTRACT SUPRA-FRAND ROYALTIES FROM OEM'S,

17   AND I'M GOING TO USE THREE TERMS PROBABLY INTERCHANGEABLY,

18   SUPRA-FRAND ROYALTIES, UNREASONABLY HIGH ROYALTIES, OR GETTING

19   A ROYALTY SURCHARGE.

20       AND WHAT I MEAN BY ALL OF THOSE IS SIMPLY THAT QUALCOMM

21   WAS ABLE TO GET OEM'S TO PAY ROYALTIES FOR QUALCOMM STANDARD

22   ESSENTIAL PATENTS THAT WERE ABOVE THE LEVEL OF REASONABLE

23   ROYALTIES.

24       SO THAT, THAT'S THE FIRST STEP IN THE EFFECTS AND THE HARM

25   THAT I'VE IDENTIFIED TO COMPETITION.

1           AND THEN I'M GOING TO EXPLAIN HOW THE ROYALTY SURCHARGES

2    RAISE THE COST OF QUALCOMM'S RIVALS SELLING MODEM CHIPS AND

3    WEAKEN THEM AS COMPETITORS AND THAT, THEREFORE, FORTIFIED

4    QUALCOMM'S MONOPOLY POWER, LED TO HIGHER PRICES, ULTIMATELY

5    HARMING FINAL CONSUMERS.

6           AND AS THE LAST PIECE OF THAT, I HAVE CONSIDERED THE

7    BUSINESS JUSTIFICATIONS PUT FORWARD BY QUALCOMM AND I DON'T

8    BELIEVE THEY PROPERLY JUSTIFY THE CONDUCT THAT THEY ENGAGED IN,

9    THESE THREE PIECES OF CONDUCT.

10          SO THAT'S THE SECOND MAIN BULLET IN TERMS OF THE

11   CONCLUSIONS I'VE REACHED.

12          AND THE THIRD HAS TO DO WITH A SPECIFIC ARRANGEMENT THAT

13   QUALCOMM MADE WITH APPLE, PARTICULARLY IN 2013, WHERE THEY MADE

14   LARGE PAYMENTS TO APPLE IN EXCHANGE FOR APPLE USING QUALCOMM

15   CHIPS EXCLUSIVELY.

16          AND I ALSO BELIEVE THOSE HARMED COMPETITION AS WELL.

17   BY MR. JAMES:

18   Q.   PROFESSOR SHAPIRO, BEFORE WE DELVE INTO THE DETAILS OF

19   YOUR ANALYSIS, COULD YOU PROVIDE THE COURT WITH THE MARKET

20   CONTEXT IN WHICH YOUR ANALYSIS TAKES PLACE?

21   A.   SO THERE ARE, I BELIEVE, TWO ITEMS, I'LL SAY, THAT WE WANT

22   TO KEEP TRACK OF HERE:  THE MODEM CHIPS AND THE STANDARD

23   ESSENTIAL PATENTS AND REALLY HOW THEY INTERACT WITH EACH OTHER

24   IS AT THE HEART OF THIS CASE AND IS WHAT MAKES IT INTERESTING

25   TO ME, BUT ALSO MAKES THE ECONOMICS ANALYSIS, I DON'T KNOW, I

1          DON'T WANT TO SAY TRICKY, BUT THAT'S UNDERLYING WHAT'S GOING

2     ON.

3               AND THE MODEM CHIPS, I WOULD SAY THE KEY THING TO KEEP IN

4     MIND IS THIS IS A MARKET THAT THERE'S RAPID TECHNOLOGICAL

5     CHANGE, OF COURSE THAT'S COMMON IN THE WHOLE SEMICONDUCTOR

6     SECTOR, HIGH TECH SECTOR, WHICH MEANS IN ORDER FOR COMPANIES TO

7     PARTICIPATE AND BE EFFECTIVE COMPETITORS AT SELLING MODEM

8     CHIPS, THEY NEED TO ENGAGE IN VERY SUBSTANTIAL R&D

9     EXPENDITURES.

10              AND THAT MEANS THAT IN ORDER FOR THAT TO PAY, THEY HAVE TO

11    HAVE A REASONABLE PROSPECT OF EARNING MARGINS, SUFFICIENT

12    MARGINS AND SUFFICIENT VOLUMES TO RECOUP THOSE R&D INVESTMENTS.

13    NOW, IT'S RISKY.  NOT EVERYBODY WILL RECOUP.  BUT THAT'S THE

14    WAY THE INVESTMENT DECISIONS GET MADE.  SO THAT'S THE CONTEXT

15    OF MODEMS.

16              AND BECAUSE THE R&D EXPENSES ARE SO HIGH, THERE ARE VERY

17    SUBSTANTIAL SCALE ECONOMIES.  YOU REALLY CAN'T OPERATE ON A

18    VERY SMALL LEVEL AND BE IN THIS GAME BECAUSE YOU WOULDN'T BE

19    ABLE TO RECOUP YOUR R&D INVESTMENTS.

20              SO THAT'S THE SORT OF MARKET THAT -- I'M SORRY, I'LL SLOW

21    DOWN A LITTLE BIT.

22              THAT IS THE SORT OF MARKET WHERE INDUSTRIAL ORGANIZATION

23    ECONOMISTS EXPECT TO SEE A SMALL NUMBER OF FIRMS, A OLIGAPOLY,

24    NOT A LARGE NUMBER OF FIRMS, BUT WE'RE CONCERNED IN THAT CASE,

25    IF WE END UP WITH ONE FIRM OR A DOMINANT FIRM, THAT THEY COULD

```
 1    GAIN AND PERHAPS ABUSE MONOPOLY POWER.  SO THAT'S THE MODEM

 2    CHIP BUSINESS.

 3         AND THEN SIDE BY SIDE WE HAVE THE STANDARD ESSENTIAL

 4    PATENTS, THE CELLULAR SEPS, WHICH ARE CRITICAL FOR -- FOR A

 5    CHIP MAKER TO SELL A COMPLIANT CHIP, THEY NEED TO PRACTICE

 6    THESE PATENTS, THEY'RE ESSENTIAL.

 7         AND SO THE LICENSE TO THOSE PATENTS ARE THE OTHER KEY

 8    PIECE OF THIS, AND ALONG WITH THE COMMITMENTS TO LICENSE ON

 9    FAIR AND REASONABLE TERMS WHICH QUALCOMM AND OTHERS HAVE MADE.

10         SO THOSE ARE THE TWO PIECES, MODEMS WITH SCALE ECONOMIES

11    AND WHAT AN ECONOMIST WOULD CALL THE COMPLEMENTARY INPUT OF THE

12    STANDARD ESSENTIAL PATENTS, THAT THE OEM AND THE CHIP MAKER

13    NEED THE CHIPS AND THE LICENSES FOR THE PATENTS.  THAT'S THE

14    CONTEXT.

15    Q.   LET'S MOVE TO THE NEXT DEMONSTRATIVE.

16         SO WE'VE HEARD A LOT OF REFERENCES OVER THE PAST WEEK TO

17    QUALCOMM'S NO LICENSE, NO CHIPS POLICY.  WHAT DO YOU MEAN WHEN

18    YOU REFER -- WHEN YOU USE THOSE TERMS?

19    A.   I'M REFERRING TO THE QUALCOMM POLICY THAT IF AN OEM DOES

20    NOT HAVE A LICENSE TO QUALCOMM'S CELLULAR SEPS, THEN QUALCOMM

21    WILL NOT SELL THAT OEM THEIR MODEM CHIPS.

22    Q.   ARE THERE OTHER CHALLENGE PRACTICES RELATED TO QUALCOMM NO

23    LICENSE, NO CHIPS POLICY?  I BELIEVE YOU MENTIONED SOME ON THE

24    LAST SLIDE.

25    A.   YES.  SO THIS WORKS TOGETHER WITH QUALCOMM'S REFUSAL TO
```

1    LICENSE ITS CELLULAR STANDARD ESSENTIAL PATENTS TO ITS RIVALS,

2    AND THE INCENTIVE PAYMENTS THAT WERE USED IN SOME CASES TO

3    INDUCE OEM'S TO SIGN LICENSES.

4    Q.   AND AS AN ANTITRUST ECONOMIST, WHAT IS YOUR OVERALL

5    CONCERN REGARDING THIS COMPLEX OF POLICIES?

6    A.   SO THE FUNDAMENTAL CONCERN THAT ONE HAS HERE AND THAT I'VE

7    EXPLORED IN DETAIL IS THAT QUALCOMM IS USING ITS MARKET POWER,

8    ITS MONOPOLY POWER OVER THE CHIPS TO EXTRACT AN UNREASONABLY

9    HIGH ROYALTY FOR THE STANDARD ESSENTIAL PATENTS, AND THAT IN

10   DOING THAT, THAT IS EFFECTIVELY A TAX OR RAISES THE COST OF ITS

11   RIVALS AND THEREBY WEAKENS THEM AS COMPETITORS AND FORTIFIES

12   QUALCOMM'S MONOPOLY POWER.

13   Q.   COULD YOU ELABORATE ON THE SECOND HALF OF THAT, LIKE

14   ASSUMING THAT QUALCOMM WAS ABLE TO USE THIS COMPLEX OF POLICIES

15   TO RAISE ROYALTY RATES, YOU KNOW, HOW WOULD THAT BE A MATTER OF

16   COMPETITION CONCERN?

17   A.   SO I HOPE IT'S CLEAR, ACTUALLY, IF A MONOPOLIST FINDS A

18   WAY TO WEAKEN ITS RIVALS BY RAISING THEIR COST, THEN THAT'S

19   GOING TO BE A COMPETITION CONCERN.  THE RIVALS WILL BE

20   DISADVANTAGED AND THE MONOPOLY POWER WILL BE GREATER.

21        SO THIS TAX OR THIS ROYALTY SURCHARGE WILL HAVE

22   SIGNIFICANT ADVERSE, OR I'LL SAY ANTICOMPETITIVE EFFECTS IF

23   QUALCOMM IS ABLE TO ACHIEVE THAT, AND WE'RE GOING TO TALK ABOUT

24   HOW THEY DID THAT.

25   Q.   IN ANALYZING THESE PRACTICES, DID YOU CONSIDER WHAT THE

```
1    WORLD WOULD LOOK LIKE WITHOUT THE PRACTICES?

2    A.   YES.  SO FUNDAMENTAL TO DOING ANTITRUST ECONOMICS IN A

3    CASE WHERE YOU'RE LOOKING AT PRACTICES, WE NEED TO -- IF WE'RE

4    TRYING TO IDENTIFY WHAT ARE THE EFFECTS OF THE PRACTICES, WE

5    WOULD SAY WHAT WOULD THE WORLD LOOK LIKE WITHOUT THEM AND

6    COMPARE THAT TO WHAT WE ACTUALLY SAW.  SO WE NEED TO IDENTIFY

7    WHAT WE CALL A COUNTER FACTUAL, MAYBE YOU'VE HEARD THE TERM BUT

8    FOR WORLD, I'LL SAY COUNTER FACTUAL.

9         COUNTER FACTUAL, IF QUALCOMM HAD NOT ENGAGED IN THESE

10   PRACTICES, HOW WOULD THINGS HAVE PLAYED OUT?  AND THEN DO OUR

11   BEST TO COMPARE THAT OUTCOME TO THE ONE WE SAW.  THAT'S WHAT I

12   MEAN BY EVALUATING THE EFFECTS OF THE PRACTICES.

13   Q.   AND WHAT DOES THE COUNTER FACTUAL LOOK LIKE HERE?

14   A.   SO I THINK THE CLEANEST, MAYBE EASIEST WAY TO SEE THAT IS

15   TO FIRST SUPPOSE THAT QUALCOMM HONORED ITS FRAND COMMITMENTS

16   AND LICENSED ITS CELLULAR STANDARD ESSENTIAL PATENTS TO ITS

17   MODEM CHIP RIVALS, HOW WOULD THINGS HAVE PLAYED OUT IF THEY HAD

18   OFFERED THOSE LICENSES?

19        AND IN THAT CASE, I WOULD SAY THE, THE RIVALS AND QUALCOMM

20   WOULD NEGOTIATE A LICENSE AND, OF COURSE, IF THEY COULDN'T

21   AGREE ON THE TERMS, THEN QUALCOMM COULD SUE THE RIVAL FOR

22   PATENT INFRINGEMENT AND A COURT, OR MAYBE ARBITRATION,

23   ARBITRATORS WOULD ESTABLISH THE REASONABLE ROYALTY RATE.

24        SO BARGAINING IN THE SHADOW OF THAT COURT DETERMINED RATE,

25   I WOULD EXPECT -- AND THIS IS IN THE COUNTER FACTUAL -- WE
```

1      WOULD EXPECT AND HAVE THAT QUALCOMM WOULD, IN FACT, LICENSE ITS

2      PATENTS, THESE CELLULAR STANDARD ESSENTIAL PATENTS TO ITS

3      RIVALS ON REASONABLE TERMS.

4          SO THAT'S KIND OF THE CLEANEST FIRST WAY TO VIEW THE

5      COUNTER FACTUAL.

6          AND THEN THE RIVALS ARE ABLE TO COMPETE AGAINST QUALCOMM

7      IN SELLING TO OEM'S THE MODEM CHIPS, BEARING THE COST OF THE

8      REASONABLE ROYALTIES, BUT NOT BEARING ANY HIGHER COSTS, NOT

9      PAYING SOME ROYALTY SURCHARGE, JUST BEARING THAT REASONABLE

10     ROYALTY COST.

11         AND THAT IS THE COUNTER FACTUAL THAT WE WILL BE COMPARING

12     THE OUT -- THE REAL WORLD TO THAT.

13     Q.   YOU TALKED ABOUT A COUNTER FACTUAL IN WHICH QUALCOMM WOULD

14     BE LICENSING ITS MODEM CHIP RIVALS; RIGHT?

15     A.   YES, THAT'S WHAT I WAS JUST TALKING ABOUT.

16     Q.   WOULD THAT EXCLUDE THE POSSIBILITY OF QUALCOMM ENTERING

17     INTO LICENSING ARRANGEMENTS WITH OEM'S AS WELL?

18     A.   NO, NO.  SO IT SEEMS -- WE WOULD EITHER -- NO.

19         SO IF QUALCOMM CHOSE TO LICENSE TO OEM'S, PERHAPS THAT

20     WOULD BE MORE EFFICIENT, AND I UNDERSTAND THAT PARTICULARLY

21     FROM MR. MOLLENKOPF'S TESTIMONY, THAT QUALCOMM HAS SOME OF

22     THEIR CELLULAR STANDARD ESSENTIAL PATENTS READ ON THE DEVICE,

23     BUT NOT ON THE CHIP.

24         SO IF THEY FOUND IT MORE EFFICIENT TO LICENSE TO THE

25     OEM'S, THAT WOULD ABSOLUTELY BE, YOU KNOW, ALLOWED.  THERE'S

SHAPIRO DIRECT BY MR. JAMES

```
1     NOTHING PREVENTING THAT FROM HAPPENING.

2           BUT IN THAT SITUATION, THEN IN THE COUNTER FACTUAL,

3     QUALCOMM WOULD NOT BE ALLOWED TO, TO USE THE NO LICENSE, NO

4     CHIPS POLICY, MEANING WHEN AN OEM IS NEGOTIATING WITH -- EXCUSE

5     ME.

6           WHEN QUALCOMM IS NEGOTIATING WITH AN OEM, THEY WOULD NOT

7     BE ABLE TO THREATEN WITHHOLDING CHIPS AS PART OF THAT LICENSING

8     NEGOTIATION.

9     Q.   LET'S BRING UP THE NEXT DEMONSTRATIVE.

10          SO WHAT WOULD NEGOTIATIONS BETWEEN QUALCOMM AND OEM'S ON

11    LICENSING LOOK LIKE IN THE BUT FOR WORLD THAT -- OR COUNTER

12    FACTUAL THAT YOU DESCRIBED?

13    A.   SO THAT'S WHAT THIS SLIDE IS INTENDED TO DEPICT.

14          THE KEY IDEA, I THINK, IS THAT IF QUALCOMM'S -- IMAGINE

15    NOW QUALCOMM LICENSING ITS CELLULAR SEPS TO AN OEM.  THEY

16    CANNOT LINK THOSE NEGOTIATIONS WITH THEIR NEGOTIATIONS OF THEIR

17    OWN CHIPS.

18          AND THE WAY I THINK IS REALLY BEST INSTRUCTIVE TO THINK

19    ABOUT THIS WHOLE THING IS THE OEM IS TRYING TO FIGURE OUT AND

20    DETERMINE WHAT ROYALTY DO THEY HAVE TO PAY QUALCOMM WHEN THEY

21    BUILD A HANDSET THAT CONTAINS A NON-QUALCOMM CHIPSET?  THAT'S

22    THE PRICE THEY'RE NEGOTIATING OVER.

23          AND IN NEGOTIATING THAT PRICE, IF THEY CAN'T AGREE ON IT,

24    THEN QUALCOMM COULD SUE THE OEM FOR PATENT INFRINGEMENT, THEY

25    COULD GO TO COURT AND GET A REASONABLE ROYALTY DETERMINED.
```

1          SO -- BUT QUALCOMM IS NOT ALLOWED TO RETALIATE AGAINST

2    THAT OEM IF THEY HAVEN'T SIGNED A LICENSE OR HAVEN'T AGREED TO

3    QUALCOMM'S PREFERRED TERMS.  QUALCOMM IS NOT ALLOWED TO

4    RETALIATE BY WITHHOLDING CHIPS.

5          AND LIKEWISE, IN TERMS OF THE INCENTIVES, THEY'RE NOT

6    ALLOWED TO LINK THE INCENTIVES ON CHIP SUPPLY ARRANGEMENTS TO

7    THE LICENSING NEGOTIATIONS.

8          SO IT'S BASICALLY A DE-LINKING OF THE TWO NEGOTIATIONS

9    THAT QUALCOMM WOULD THEN BE HAVING WITH AN OEM.  THE LICENSING

10   NEGOTIATIONS, WHICH IS OVER HOW MUCH DOES THE OEM HAVE TO PAY

11   QUALCOMM WHEN THEY BUILD AND SELL A DEVICE CONTAINING A

12   NON-QUALCOMM CHIPSET, THAT'S ONE NEGOTIATION.  IT DOESN'T HAVE

13   ANYTHING TO DO WITH QUALCOMM CHIPS.

14         AND THEN THE OTHER NEGOTIATION IS WHEN QUALCOMM IS SELLING

15   ITS CHIPS TO THE OEM, AND IN THAT NEGOTIATION, QUALCOMM CAN

16   ABSOLUTELY WITHHOLD THE CHIPS IF THE, IF THE OEM WON'T PAY WHAT

17   QUALCOMM WANTS FOR THEIR CHIP, INCLUDING THE RIGHT TO USE THOSE

18   CHIPS; THAT IS TO SAY, THAT PRACTICE QUALCOMM'S CELLULAR

19   STANDARD ESSENTIAL PATENT, THEN QUALCOMM DOESN'T HAVE TO SELL

20   THEM THE CHIP.  THEY SAY NO.

21         THE TWO NEGOTIATIONS ARE DE-LINKED IN THE COUNTER FACTUAL.

22         AND THE OUTCOME OF THAT THEN, WHAT'S GOING TO HAPPEN IN

23   THAT WORLD IS THAT -- AND THESE ARE THE SUB BULLETS HERE.  IN

24   THE MIDDLE BULLET, FOR THE ROYALTIES, IF THEY CAN'T AGREE ON

25   THE ROYALTIES, THE COURT WILL SET THE RATE.  SO QUALCOMM CAN

1        OBTAIN REASONABLE ROYALTIES FOR ITS STANDARD ESSENTIAL PATENTS

2        FROM THE OEM, AND THAT'S WHAT THE OEM WOULD HAVE TO PAY

3        QUALCOMM WHEN THEY BUILD AND SELL A HANDSET THAT CONTAINS A

4        NON-QUALCOMM CHIPSET.

5              SO WE EXPECT, AGAIN, REASONABLE ROYALTIES IN THAT

6        SITUATION FOR THOSE HANDSETS.

7              AND THEN ON THE CHIP SIDE, QUALCOMM CAN EXTRACT WHATEVER

8        THE MARKET WILL BEAR FOR ITS CHIPS, AND IN MANY CASES THEY

9        HAVE -- YOU KNOW, THERE'S NO GOOD ALTERNATIVES, SO I EXPECT

10       QUALCOMM TO GET A NICE MARGIN AND QUALCOMM CAN CAPTURE THE FULL

11       MARKET VALUE OF CHIPS AT A MONOPOLY PRICE.

12             AND I'LL USE THE WORD "ALL-IN PRICE" TO REFER TO WHAT

13       QUALCOMM WOULD THEN CHARGE THE OEM FOR ITS CHIP, ALONG WITH THE

14       LICENSE, IF YOU WANT TO PUT IT THAT WAY, OR ANYHOW, RIGHTS TO

15       USE THE CHIP IN ITS DEVICE.

16             SO THAT'S THE COUNTER FACTUAL AS DESCRIBED WHEN QUALCOMM

17       AND THE OEM ARE NEGOTIATING.

18             AND IT LEADS TO THE SAME ECONOMIC OUTCOME AS THE COUNTER

19       FACTUAL WHERE QUALCOMM LICENSES TO THE RIVAL.  THE KEY THING IN

20       EITHER OF THESE -- AND THIS IS THE KEY ELEMENT OF THE COUNTER

21       FACTUAL THAT WE'LL BE COMPARING TO WHAT HAPPENED -- IS WHEN AN

22       OEM BUILDS AND SELLS A DEVICE CONTAINING THE NON-QUALCOMM

23       CHIPSET, QUALCOMM RECEIVES A REASONABLE ROYALTY FOR ITS SEPS ON

24       THAT.

25             AND WHETHER QUALCOMM RECEIVES THAT ROYALTY FROM THE OEM OR

1    FROM THE RIVAL IS ECONOMICALLY IMMATERIAL.  THAT'S A

2    FUNDAMENTAL ECONOMIC PRINCIPLE FROM THE TEXTBOOKS.  IT DOESN'T

3    MATTER AT ALL.

4         SO THE TAKE AWAY ON THE COUNTER FACTUAL IS QUALCOMM GETS

5    THOSE REASONABLE ROYALTIES WHEN THE OEM IS MAKING A DEVICE THAT

6    DOES NOT CONTAIN THEIR CHIPS.

7    Q.   DOES THAT CONCLUDE YOUR ANALYSIS OF THE COUNTER FACTUAL?

8    A.   HAPPILY, IT DOES.

9    Q.   LET'S MOVE ON TO THE REAL WORLD.

10        HOW ARE LICENSING NEGOTIATIONS IN THE REAL WORLD DIFFERENT

11   FROM THE LICENSING NEGOTIATIONS YOU JUST DESCRIBED?

12   A.   OKAY.  SO I HAVE A COUPLE SLIDES HERE, YOUR HONOR, THAT GO

13    THROUGH IN A CONCEPTUAL KIND OF NUMERICAL EXAMPLE TO EXPLAIN

14    HOW THE ROYALTY SURCHARGE AFFECTS -- THE EFFECTS OF A ROYALTY

15    SURCHARGE, OR UNREASONABLY HIGH ROYALTY.

16        SO WE'RE FOCUSSING ON A SITUATION WHERE THE OEM PURCHASES

17   A MODEM CHIP FROM A RIVAL MANUFACTURER, A NON-QUALCOMM MODEM

18   CHIP, AND I JUST WANT TO SET UP WHAT THE ECONOMICS OF THAT

19   TRANSACTION LOOK LIKE IF THE ROYALTY IS AT A REASONABLE LEVEL,

20   THAT'S THIS SLIDE, AND THEN THE NEXT SLIDE IS GOING TO BE ONE

21   IF THEY'RE AT AN UNREASONABLY HIGH LEVEL.

22        GO BACK, PLEASE, TO THE PREVIOUS SLIDE.

23        SO THE KEY CONCEPT HERE, STANDARD CONCEPT IN ECONOMICS IS

24   GAINS FROM TRADE, WHICH IS HOW -- WHEN THERE'S A BUYER AND A

25   SELLER, HOW MUCH VALUE IS ADDED BY BEING ABLE TO DO A DEAL?

1    HOW BIG IS THE PIE THAT THEY GET TO SPLIT BY HAVING A

2    TRANSACTION?

3         SO IN MY EXAMPLE -- AND THE NUMBERS ARE PURELY

4    ILLUSTRATIVE OR CONCEPTUAL TO GET THE CONCEPTS.  BUT SUPPOSE

5    THAT THE OEM IS WILLING TO PAY AS MUCH AS $40 FOR THE CHIP.  IN

6    ECONOMICS WE CALL THAT WILLINGNESS TO PAY.  I'LL USE THE TERM

7    VALUE.  $40.

8         AND THAT REFLECTS, YOU KNOW, HOW MUCH MONEY THEY CAN MAKE

9    WITH THE HANDSET WITH THAT CHIP IN IT.

10        SO THAT'S THE VALUE.

11        ON THE OTHER HAND, THERE ARE SOME COSTS THAT HAVE TO BE

12   INCURRED.  THE RIVAL, LET'S ASSUME THAT THE COST OF MAKING THE

13   CHIP IS $5.  AND THERE'S A ROYALTY THAT HAS TO BE PAID TO

14   QUALCOMM, THE REASONABLE ROYALTY, ASSUMED TO BE $10.  SO

15   THAT'S -- IF YOU LOOK ON THE BAR ON THE RIGHT-HAND SIDE HERE,

16   THOSE ARE THE BLUE, THE DARKER BLUE.  THOSE ARE COSTS THAT MUST

17   BE INCURRED IF THIS TRANSACTION GOES FORWARD.

18        THOSE COSTS IN TOTAL COME TO $15.  THAT LEAVES $25 GAINS

19   FROM TRADE.

20        AND BARGAINING, THEY WOULD BARGAIN OVER THAT, AND LET'S

21   JUST STICK WITH A NEUTRAL ASSUMPTION, THEY SPLIT THE GAINS FROM

22   TRADE EQUALLY.

23        IF THAT'S THE CASE, THERE'S $25 OF GAINS FROM TRADE, SO

24   THEY EACH GET 12.50 OF SURPLUS FROM THIS TRANSACTION.

25        FOR THE RIVAL, WHAT THAT MEANS IS SINCE -- LET'S SUPPOSE,

1    TO MAKE SIMPLE, THAT THE OEM IS WRITING THE CHECK TO QUALCOMM

2    FOR THE ROYALTY.  SO THE RIVAL, IF THEY'RE GOING TO GET 12.50

3    OF MARGIN, THEY HAVE A $5 CHIP, THEY'RE GOING TO SELL THE CHIP

4    FOR 17.50.  SO THAT'S GOING TO BE THE CHIP PRICE.

5         FROM THE OEM'S POINT OF VIEW, THEY'RE GOING TO HAVE TO PAY

6    17.50 FOR THE CHIP, THEY'RE GOING TO PAY $10 TO QUALCOMM, TO

7    THE ALL-IN PRICE TO THE OEM IS 27.50, AND THEY HAD A $40 VALUE,

8    THAT THEY HAD AN ALL-IN PRICE OF 27.50, SO THE BUYER GETS A

9    SURPLUS OF 12.50.

10        AND THE SAME SURPLUS AS THE SELLER SINCE WE'RE ASSUMING

11   THAT THEY SPLIT THE GAINS EQUALLY.

12        SO THIS IS THE BASELINE WITH A REASONABLE ROYALTY.  AND

13   I'M -- YOU KNOW, THE ASSUMPTION HERE WITH MY NUMBERS IS THIS IS

14   A PROFITABLE TRANSACTION FOR BOTH SIDES AND THEY -- AND

15   QUALCOMM GETS ITS REASONABLE ROYALTY OF $10.

16        SO THE WHOLE POINT HERE IS NOW TO COMPARE THIS TO WHAT

17   HAPPENS IF WE ADD AN ADDITIONAL ROYALTY SURCHARGE THAT QUALCOMM

18   GETS?  SO THAT'S THE NEXT SLIDE.  PAR.

19   Q.   BEFORE YOU --

20   A.   OH, A QUESTION?

21   Q.   YES.  BEFORE WE GET THERE, I WANTED TO INVESTIGATE EXACTLY

22   WHAT KIND OF LEVERAGE ARE WE TALKING ABOUT THAT'S BEING BROUGHT

23   TO BEAR IN THESE LICENSING NEGOTIATIONS IN THE REAL WORLD THAT

24   WASN'T PRESENT IN THE COUNTER FACTUAL YOU DESCRIBED EARLIER?

25   A.   OKAY.  THE -- THE -- OKAY.

1          IN THE REAL WORLD, THE LEVERAGE THAT WE'RE TALKING ABOUT

2     IS THAT QUALCOMM, WHEN NEGOTIATING THE LICENSE FOR ITS STANDARD

3     ESSENTIAL PATENTS, WOULD TELL THE OEM, IF YOU DON'T SIGN A

4     LICENSE, WE WILL NOT SELL YOU OUR CHIPS.

5     Q.   AND AS AN ECONOMIST, HOW WOULD YOU PREDICT THAT BRINGING

6     THAT MODEM CHIP LEVERAGE TO BEAR ON LICENSING NEGOTIATIONS

7     WOULD AFFECT ROYALTY RATES?

8     A.   SO THE BARGAINING THEORY, REALLY BASIC BARGAINING THEORY

9     WOULD TELL US THAT LEVERAGE MEANS FROM THE OEM'S POINT OF VIEW,

10    IF THEY DON'T SIGN A LICENSE, NOT ONLY WOULD THEY HAVE TO GO TO

11    COURT AND SORT IT OUT, WHICH IS FAIR ENOUGH, BUT THEY WOULD

12    LOSE ACCESS TO QUALCOMM'S MODEM CHIPS AND THAT IS GOING TO

13    IMPOSE A NUMBER OF COSTS ON THEM.

14         AND WE CAN TALK NOW OR LATER ABOUT THOSE COSTS AND WHAT

15    THE OEM'S HAVE SAID, BUT THAT'S A VERY HEAVY HAMMER THAT

16    QUALCOMM IS BRINGING DOWN, AT LEAST AS A THREAT, IN THOSE

17    NEGOTIATIONS BECAUSE THAT WOULD BE VERY COSTLY TO THE OEM'S TO

18    LOSE ACCESS TO QUALCOMM'S MODEM CHIPS.

19    Q.   YOU REFERRED TO IT BEING A VERY HEAVY HAMMER.  IS THERE

20    ANY EVIDENCE IN THIS CASE THAT SUPPORTS THAT CONCLUSION?

21    A.   YES, I THINK THERE'S BEEN A LOT OF EVIDENCE.  YOUR HONOR

22    HAS HEARD QUITE A BIT FROM A NUMBER OF OEM'S, BLACKBERRY,

23    LENOVO, HUAWEI, APPLE THAT HAVE THAT FEAR, I GUESS LET'S CALL

24    IT, OF NOT -- OF LOSING ACCESS TO QUALCOMM'S MODEM CHIPS REALLY

25    SUBSTANTIALLY SHIFTED THE NEGOTIATIONS OVER ROYALTIES AND THEY

1    FELT PRESSURED TO AGREE TO ROYALTIES HIGHER THAN THEY --

2    SIGNIFICANTLY HIGHER THAN THEY OTHERWISE WOULD HAVE.

3    Q.   THAT'S TESTIMONY IN EVIDENCE FROM OEM'S.

4        DO YOU SEE ANY EVIDENCE ON THE QUALCOMM SIDE THAT SUPPORTS

5    THAT CONCLUSION?

6    A.   YES.  QUALCOMM, I THINK THERE'S QUITE A LOT OF EVIDENCE ON

7    THE QUALCOMM SIDE THAT THEY WERE VERY WELL AWARE THAT QCT,

8    THEIR CHIP BUSINESS, WAS SUPPORTING QTL TO BE ABLE TO GET

9    HIGHER ROYALTIES BY BRINGING THIS LEVERAGE TO BEAR.

10       AND WE SEE ALSO THAT IDEA COMING UP PRETTY CLEARLY ON THE

11   TWO OCCASIONS WHEN QUALCOMM CONSIDERED SPLITTING THE COMPANY UP

12   INTO THE -- INTO A CHIP BUSINESS AND A LICENSING BUSINESS AND

13   IDENTIFIED AS A DRAWBACK TO THAT JUST, OF COURSE, ONE OF A

14   NUMBER OF FACTORS TO CONSIDER, BUT A DRAWBACK TO THAT THAT THE

15   LICENSING BUSINESS WOULD BE MUCH MORE VULNERABLE TO ATTACK IF

16   THEY DIDN'T HAVE THE CHIP BUSINESS TO HELP DEFEND THEM USING

17   THIS POLICY.

18   Q.   SO IS THE EVIDENCE YOU REVIEWED FROM OEM'S AND FROM

19   QUALCOMM CONSISTENT WITH THE PREDICTIONS THAT THE BARGAINING

20   THEORY LED YOU TO?

21   A.   YES.  SO I THINK THE EVIDENCE ACROSS THE BOARD IS

22   CONSISTENT WITH THAT.  AS I SAY, BOTH SIDES OF THE NEGOTIATIONS

23   HERE, THE OEM'S AND THE QUALCOMM -- AND QUALCOMM CLEARLY

24   EXPECTED, AND I WOULD SAY BELIEVED, THAT THIS BARGAINING --

25   THIS LEVERAGE THAT QUALCOMM BROUGHT TO BEAR ON THE CHIPS

1      SHIFTED THE LICENSING NEGOTIATIONS SUBSTANTIALLY IN QUALCOMM'S

2      FAVOR AND LED TO A SIGNIFICANTLY HIGHER ROYALTY THAN QUALCOMM

3      WOULD OTHERWISE HAVE BEEN ABLE TO ACHIEVE.

4      Q.   NOW WE'VE COVERED HOW THE LEVERAGE MIGHT LEAD TO A ROYALTY

5      SURCHARGE.

6           COULD YOU NOW EXPLAIN WHAT THE AFFECTS OF THAT ROYALTY

7      SURCHARGE WOULD BE ON TRANSACTIONS BETWEEN OEM'S AND QUALCOMM

8      RIVALS?

9      A.   OKAY.

10     Q.   WE'LL MOVE TO THE NEXT DEMONSTRATIVE?

11     A.   OKAY.  SO THAT'S WHAT THE SECOND SLIDE IS DESIGNED TO SHOW

12     YOUR HONOR, TO -- SO LET'S WALK THROUGH THE NUMBERS HERE, HOW

13     THE ECONOMICS OF THE TRANSACTION BETWEEN QUALCOMM AND -- EXCUSE

14     ME -- BETWEEN AN OEM AND A RIVAL MANUFACTURER CHANGE WHEN WE

15     ADD THE ROYALTY SURCHARGE.

16          SO IF YOU LOOK ON THE -- AT THE RIGHT-HAND SIDE HERE IN

17     RED WE'VE GOT THE ADDITIONAL ROYALTY SURCHARGE, THIS IS ON TOP

18     OF THE FRAND ROYALTY ITSELF.  SO THE -- NOW THE COSTS THAT ARE

19     ASSOCIATED WITH THIS TRANSACTION FOR THE TWO PARTIES ARE THE

20     PRODUCTION COSTS OF $5 FOR THE RIVAL, THE REASONABLE ROYALTY OF

21     $10, AND THE ROYALTY SURCHARGE ON TOP OF THAT OF $10.  SO

22     THAT'S $25 OF COSTS.  AND, THEREFORE, THE GAINS FROM TRADE

23     SHRINK DOWN TO $15.  THEY WERE PREVIOUSLY 25.

24          SO LET'S CONTINUE TO MAKE THIS SIMPLE IN THAT NEUTRAL

25     ASSUMPTION THAT THE GAINS FROM TRADE ARE SPLIT EQUALLY.  IN

1    THAT CASE, THE $15 OF GAINS FROM TRADE ARE SPLIT, EACH SIDE

2    GETS $7.50 OF SURPLUS.  AND BY THE SAME LOGIC WE HAD BEFORE,

3    WHAT THAT MEANS IS THAT THE PRICE OF THE MODEM CHIP IS GOING TO

4    BE 12.50, THAT IS, THE $5 PRODUCTION COST, I SAID THE RIVAL

5    GETS A 7.50 MARGIN, SO THE PRICE IS 12.50.

6        BUT THEN FROM THE OEM'S POINT OF VIEW, THE ALL-IN PRICE IS

7    THE 12.50 THEY HAVE TO PAY FOR THE CHIP, PLUS THE $20 OF

8    ROYALTIES THEY HAVE TO PAY QUALCOMM.  SO THE ALL-IN PRICE IS

9    32.50.

10       AND COMPARED WITH THE -- THE KEY POINT IS TO COMPARE THIS

11   TO THE PREVIOUS EXAMPLE WITH THE REASONABLE ROYALTY.  SO NOW

12   THE RIVAL IS HARMED BY $5 BECAUSE THEIR MARGIN WAS REDUCED FROM

13   7.50 TO 12.50.  THE OEM'S COSTS GO UP BY $5, THE ALL-IN PRICE

14   IS THEIR COST HERE, THEY HAVE TO PAY THE ROYALTIES AND THE CHIP

15   PRICE, THAT GOES UP BY $5.

16       SO BETWEEN THE TWO OF THEM, THE RIVAL IS HARMED BY $5, THE

17   OEM'S COST GOES UP BY $5, THAT SPLITS THE $10 SURCHARGE.

18   THEY'VE GOT TO COVER IT SOMEHOW IF THEY'RE GOING TO DO THIS

19   TRANSACTION.  IF THEY'RE SPLITTING THE GAINS FROM TRADE

20   EQUALLY, THAT'S HOW IT'S GOING TO GO, IT'S GOING TO BE SPLIT.

21       NOW, THE OEM WON'T NECESSARILY EAT THAT WHOLE $5 EXTRA

22   COST.  IN GENERAL, THEY WILL BE ABLE TO PASS SOME OF THAT ON TO

23   THEIR CUSTOMERS, PARTICULARLY IF ALL THE OTHER OEM'S ARE

24   EXPERIENCING THE SAME COST INCREASE.  PRETTY -- SO WE WOULD

25   EXPECT THAT $5 OF OEM COSTS TO BE SPLIT IN TERMS OF ULTIMATE

1        INCIDENTS BETWEEN THE OEM AND THE FINAL CONSUMERS.

2            OKAY.  SO NOW WE'VE PRETTY MUCH GOT THE PIECES.

3            THE EFFECT OF THE ROYALTY SURCHARGE IS TO REDUCE THE GAINS

4        FROM TRADE ON THIS TRANSACTION, CAUSE THE OEM'S COST TO GO UP,

5        CAUSE THE RIVAL TO GET A LOWER MARGIN, AND SOME OF THIS COST

6        INCREASE WILL BE PASSED ON TO FINAL CONSUMERS.

7            SO BASIC BARGAINING THEORY PREDICTS THESE CONSEQUENCES OF

8        THE ROYALTY SURCHARGE.

9    Q.   LET'S MOVE ON TO THE NEXT DEMONSTRATIVE.

10           SO YOU'VE BEEN FOCUSSING ON A SINGLE TRANSACTION BETWEEN

11       AN OEM AND A QUALCOMM RIVAL.

12           COULD YOU SUMMARIZE THE EFFECTS OF TRANSACTIONS BETWEEN

13       OEM'S AND QUALCOMM'S RIVALS MORE GENERALLY?

14   A.   YES.  SO WHAT I'D LIKE TO DO NOW IS PIVOT FROM THE

15       NUMERICAL EXAMPLE OF A SINGLE TRANSACTION TO REALLY TALK MORE

16        GENERALLY ABOUT THE IMPLICATIONS FOR THESE TRANSACTIONS AND THE

17        MARKET AS A WHOLE.

18           SO THE EFFECT OF THE SURCHARGE THAT QUALCOMM WAS ABLE TO

19       ACHIEVE IS TO -- HAS BEEN TO IMPOSE A BURDEN ON TRANSACTIONS

20       BETWEEN THE OEM'S AND QUALCOMM'S RIVALS.  AND TO AN ECONOMIST,

21       THESE ARE ECONOMICALLY EQUIVALENT TO A TAX ON THOSE

22       TRANSACTIONS.  AND I JUST MEAN BY THAT THERE'S A COST THAT

23       THOSE TRANSACTION PARTIES HAVE TO PAY, YOU KNOW, MUCH LIKE IF

24       THE GOVERNMENT HAS A TAX, THE BUYER AND SELLER HAVE TO --

25       TOGETHER, BETWEEN THEM, THEY HAVE TO WRITE A CHECK TO THE

1       GOVERNMENT.  AND THAT'S THE BURDEN ON THE TRANSACTION.

2              SO THAT'S THE EFFECT OF THE ROYALTY SURCHARGE.

3              AND THEN THE CONSEQUENCES, BOTH THE BUYERS AND SELLERS IN

4       THOSE TRANSACTIONS ARE HARMED.  THE OEM IS THE BUYER.  THEY'RE

5       HARMED.  THE ALL-IN PRICE GOES UP.  THE RIVALS ARE HARMED,

6       THEY'RE GETTING SMALLER MARGIN.

7              AND THE COMBINED HARM EQUALS THE ROYALTY SURCHARGE IF WE

8       ALSO INCLUDE THE CONSUMERS, OKAY?

9              SO THIS HARM IS SPLIT IN THE END BETWEEN THE RIVAL'S

10      MARGINS BEING REDUCED, THE OEM'S HAVING THEIR MARGINS REDUCED

11      SOMEWHAT, AND CONSUMERS PICKING UP SOME OF THE TAB.

12             SO THAT'S THE, THE ECONOMIC INCIDENTS OF THE ROYALTY

13      SURCHARGE.

14             AND THEN IF WE GO TO THE LAST BULLET, THERE'S AN

15      ADDITIONAL ECONOMIC EFFECT THAT I HAVEN'T IDENTIFIED.  I WAS

16      TALKING ABOUT TRANSACTIONS THAT TOOK PLACE AND HOW THEY WOULD

17      BE -- GAINS FROM TRADE WOULD BE REDUCED.

18             AS WITH ANY TAX, WHEN YOU TAX CERTAIN TRANSACTIONS, THE

19      QUANTITY WILL FALL.  THE NUMBER OF TRANSACTIONS WILL FALL

20      BECAUSE SOME TRANSACTIONS WILL NOT HAVE ENOUGH GAINS FROM TRADE

21      TO BEAR THE BURDEN OF THE TAX.

22             SO WE WILL ALSO EXPECT TO SEE A REDUCTION IN THE NUMBER OF

23      TRANSACTIONS TAKING PLACE, THAT IS, OEM'S PURCHASING MODEM

24      CHIPS FROM QUALCOMM'S RIVALS, AND THAT IS GOING TO CAUSE

25      FURTHER HARM TO THE RIVALS, OEM'S, AND CONSUMERS.  THE RIVALS

1        PERHAPS MOST CLEARLY BECAUSE THEY'RE SELLING FEWER CHIPS.

2        THEY'RE MAKING LOWER MARGINS ON THE CHIPS THEY SELL, AND

3        THEY'RE SELLING FEWER CHIPS.

4             OEM'S AND CONSUMERS, THERE WOULD BE SOME TRANSACTIONS, IF

5        QUANTITY GOES DOWN, THAT WOULD BE ASSOCIATED WITH PRICE GOING

6        UP AND SOME FURTHER HARMS.

7             SO THOSE ARE THE EFFECTS OF THE ROYALTY SURCHARGE ON

8        THINKING BROADLY ABOUT THE TRANSACTIONS TAKING PLACE BETWEEN

9        OEM'S AND QUALCOMM'S RIVALS.

10       Q.   YOU'VE READ THE FIRST DAY'S TRIAL TRANSCRIPT; RIGHT?

11       A.   YES, I HAVE.

12       Q.   AND DID YOU READ MR. VAN NEST'S STATEMENT ABOUT QUALCOMM'S

13       POLICY OF NOT LICENSING RIVAL CHIP MAKERS?

14       A.   I DID.

15       Q.   HE SAID, "IT ALLOWS CHIP MAKERS TO COMPETE WITHOUT PAYING

16       ANY MONEY TO QUALCOMM, SO THE CHIP MAKERS, ARE IN EFFECT, FREE

17       RIDING.  THEY'RE NOT TAKING A LICENSE.  THEY'RE ALSO NOT PAYING

18       ANY ROYALTIES."

19            HOW DO YOU RESPOND TO THAT?

20       A.   I RESPOND BADLY TO THAT.  THAT IS INCORRECT AS A MATTER OF

21       ECONOMICS.  I THINK YOU CAN SEE THAT I WORK THROUGH THE

22       ECONOMIC EFFECT OF THE REFUSAL TO LICENSE, QUALCOMM'S REFUSAL

23       TO LICENSE TO THE RIVALS.

24            AND THE PROBLEM -- THE REASON THIS IS INCORRECT IS THE

25       OEM -- EXCUSE ME.

1          WHEN THE RIVALS -- THEY'RE NOT PAYING THE LICENSE, THEY'RE

2     NOT PAYING THE ROYALTIES DIRECTLY TO QUALCOMM.  BUT WHEN THEY

3     SELL THE CHIPS, THEIR CUSTOMERS HAVE TO PAY AN UNREASONABLY

4     HIGH ROYALTY TO QUALCOMM.  THAT IS ECONOMICALLY EQUIVALENT TO

5     THE RIVALS THEMSELVES HAVING TO PAY THAT UNREASONABLY HIGH

6     ROYALTY.  IT DOESN'T MATTER WHICH SIDE OF THE TRANSACTION IS

7     PAYING THE TAX, THE ECONOMICS ARE EXACTLY THE SAME.

8          SO THIS IS JUST DEAD WRONG TO SAY THEY'RE FREE RIDING.

9     THEY ARE BEING HARMED, THE RIVALS ARE BEING HARMED BECAUSE OF

10    THE SURCHARGE THAT THEIR CUSTOMERS HAVE TO PAY.

11    Q.   LET'S MOVE TO THE NEXT DEMONSTRATIVE.

12         SO QUALCOMM HAS ALSO MADE AN ARGUMENT THAT EVEN IF THEY

13    GOT A ROYALTY SURCHARGE, IT WOULD NOT DISADVANTAGE THEIR RIVALS

14    RELATIVE TO THEM.

15         QUALCOMM'S EXPERT, PROFESSOR NEVO, HAS WRITTEN "PROFESSOR

16    SHAPIRO'S THEORY IS FLAWED BECAUSE ANY ALLEGED TAX WOULD NOT

17    DISPROPORTIONATELY AFFECT THE DEMAND FOR QUALCOMM'S RIVAL'S

18    CHIPS RELATIVE TO THE DEMAND FOR QUALCOMM'S CHIP.  THE TAX IS

19    CHIP-AGNOSTIC AND NON-DISCRIMINATORY.  ANY TAX WOULD APPLY

20    EQUALLY TO PURCHASES OF QUALCOMM'S CHIPS AND RIVALS' CHIPS."

21         AND HOW DO YOU RESPOND TO THAT ARGUMENT?

22    A.   WELL, I'M SORRY TO SAY THIS IS ALSO INCORRECT.

23         THE -- AND I THINK THE EASIEST WAY TO SEE THAT, YOUR

24    HONOR, IS TO GO BACK AND LOOK AT WHAT I JUST DID AND COMPARE IT

25    TO WHEN QUALCOMM SELLS ITS CHIPS.

1           SO WE JUST WENT THROUGH THE SURCHARGE IS A BURDEN ON

2     TRANSACTIONS BETWEEN QUALCOMM -- EXCUSE ME -- BETWEEN THE OEM

3     AND QUALCOMM'S RIVALS, AND IT REDUCES THE GAINS FROM TRADE BY

4     THE AMOUNT OF THE SURCHARGE.

5           LET'S THINK NOW ABOUT THE TRANSACTIONS BETWEEN QUALCOMM

6     AND AN OEM, OKAY?  BECAUSE PROFESSOR NEVO IS SAYING THAT THE

7     TAX IS CHIP-AGNOSTIC, NON-DISCRIMINATORY.

8           WELL, THE ROYALTY SURCHARGE DOES NOT REDUCE THE GAINS FROM

9     TRADE BETWEEN QUALCOMM AND THE OEM IN THE SAME MANNER BECAUSE

10    THEY'RE NOT PAYING -- BECAUSE QUALCOMM IS THE RECIPIENT OF THE

11    ROYALTIES, OKAY?  IT'S A FUNDAMENTAL DIFFERENCE.

12          WHEN AN OEM BUYS A CHIP FROM A RIVAL, THE TWO OF THEM

13    TOGETHER HAVE TO WRITE A CHECK TO QUALCOMM.

14          WHEN AN OEM BUYS A CHIP FROM QUALCOMM, THERE'S NO MONEY

15    GOING OUT TO THIRD PARTIES.

16          IF YOU WANT TO THINK ABOUT THIS AS QUALCOMM'S CHIP

17    DIVISION IS BEARING THE COST OF THOSE ROYALTIES LIKE ITS RIVALS

18    ARE, THAT'S OKAY.  BUT THEN THERE'S AN EQUAL OFFSETTING BENEFIT

19    OR REVENUE TO QUALCOMM'S LICENSING DIVISION BECAUSE THEY'RE THE

20    RECIPIENT OF THE ROYALTY.

21          SO THAT'S JUST FUNDAMENTALLY DIFFERENT BETWEEN THE TWO

22    TRANSACTIONS, AND THAT'S ACTUALLY CLEAREST WHEN WE THINK ABOUT

23    TRANSACTIONS THAT EXPAND THE MARKET FOR MODEM CHIPS.

24          SO IT'S JUST NOT CORRECT TO SAY THAT, THAT A ROYALTY

25    SURCHARGE IS -- AFFECTS THESE TWO TYPES OF TRANSACTIONS

1    EQUALLY.  IT'S A MISTAKE.

2    Q.   LET'S TURN TO THE NEXT DEMONSTRATIVE.  SO FAR WE'VE BEEN

3    FOCUSSING ON HOW THE ROYALTY SURCHARGE AFFECTS GAINS FROM

4    TRADE.

5         WHAT ARE THE COMPETITIVE EFFECTS OF THE ROYALTY SURCHARGE

6    ON THE MARKET AS A WHOLE, INCLUDING ON QUALCOMM?

7    A.   OKAY.  SO THIS IS REALLY THE BOTTOM LINE IN TERMS OF THE

8    COMPETITIVE EFFECTS, THE CONCERNS FOR ANTITRUST OF THIS SET OF

9    PRACTICES.

10        I THINK I'VE ALREADY ESTABLISHED OR EXPLAINED THAT THE

11   ROYALTY SURCHARGE RAISES THE COST OF QUALCOMM'S RIVALS, WEAKENS

12   THEM.  THAT'S, I GUESS, IMMEDIATE TO AN ANTITRUST ECONOMIST.

13   IF THESE RIVALS HAVE HIGHER COSTS, THEY'RE GOING TO BE LESS

14   EFFECTIVE COMPETITORS, MEANING THEY'RE GOING TO HAVE TO PASS ON

15   THOSE COSTS TO SOME DEGREE TO THEIR -- IN THEIR PRICES, AND

16   THAT MAKES THEM LESS EFFECTIVE COMPETITORS.

17        SO RIVALS ARE WEAKENED.  THIS INEVITABLY FORTIFIES

18   QUALCOMM'S MONOPOLY POWER.

19        AND THAT HAS ADVERSE EFFECTS ON COMPETITION IN THE SHORT

20   RUN AND THE LONG RUN.  THE SHORT RUN, WE'RE GOING TO END UP

21   WITH HIGHER ALL-IN PRICES FOR THE CHIPS, BASICALLY HIGHER COSTS

22   FOR THE OEM'S.

23        AND IN THE LONG RUN -- WE'RE STILL AT THE PREVIOUS RUN --

24   THE LONG RUN, I HAVEN'T TALKED ABOUT THAT, BUT IT'S INEVITABLE

25   THAT SINCE THE RIVALS ARE HAVING THEIR MARGINS SQUEEZED ON THE

```
1       CHIPS THEY'RE SELLING, THEIR MARGINS ARE BEING REDUCED AND

2       THEY'RE SELLING FEWER CHIPS, THAT THE OPERATING PROFITS THEY

3       CAN EARN FROM BEING IN THIS BUSINESS ARE REDUCED AND THAT IS

4       GOING TO INEVITABLY REDUCE THEIR INCENTIVES TO MAKE R&D

5       INVESTMENTS.

6            NOW, THERE'S A LOT OF OTHER FACTORS THAT AFFECT R&D

7       INVESTMENT, BUT THERE IS A MINUS, THIS IS KIND OF A HEADWIND,

8       IF YOU WILL, THAT THEY'LL BE FACING.

9            SO THAT'S THE SHORT RUN AND THE LONG RUN ADVERSE EFFECTS

10      ON COMPETITION.

11           AND THEN I WANT TO EMPHASIZE THAT THE HIGHER PRICES ARE

12      NOT JUST THE PRICES FOR THE RIVAL MODEM CHIPS, BUT QUALCOMM'S

13      PRICES ARE ALSO GOING TO GO UP, AND I HAVEN'T MADE THAT POINT

14      YET, SO LET ME EXPLAIN WHY.

15           AND IT'S THE ALL-IN PRICES THAT MATTER, BECAUSE THAT'S

16      WHAT AFFECTS THE OEM'S COSTS.

17           WHY WILL QUALCOMM'S ALL-IN PRICES GO UP?  WELL, THERE'S

18      TWO REASONS.  FIRST, THEY'VE GOT RIVALS WHO ARE WEAKENED AND

19      CHARGING HIGHER ALL-IN PRICES BECAUSE THEY'RE HAVING TO PAY THE

20      SURCHARGE.  SO AS A GENERAL RULE, WHEN YOUR COMPETITORS RAISE

21      THEIR PRICE, IT TENDS TO GIVE A FIRM INCENTIVE TO RAISE HIS

22      PRICE AS WELL IN OLIGOPOLIES, AND IN ADDITION TO THAT, QUALCOMM

23      IS LESS KEEN TO COMPETE TO WIN BUSINESS FROM ITS COMPETITORS

24      BECAUSE EVEN WHEN IT LOSES, IT GETS A ROYALTY SURCHARGE.

25           AND SO THAT'S ANOTHER REASON WHY QUALCOMM WILL NOT BE AS
```

1    AGGRESSIVE IN PRICING AND WILL TEND TO RAISE ITS ALL-IN PRICES

2    DUE TO THE ROYALTY SURCHARGE.

3         SO FROM THE POINT OF VIEW OF COMPETITION AND THE COST

4    HERS, THE OEM'S, I WOULD EXPECT THE PREDICTION HERE WOULD BE

5    THAT THE EFFECT OF THIS IS TO CAUSE ALL-IN MODEM PRICES TO GO

6    UP FOR THE QUALCOMM MODEMS AND THE RIVAL MODEMS.

7         AND THAT IN TURN IS GOING TO GET PASSED THROUGH TO

8    CONSUMERS BECAUSE THIS IS ACROSS THE BOARD, THIS IS ALL THE

9    OEM'S, AND SO WE'RE GOING TO HAVE PASS THROUGH SO THE FINAL

10   CONSUMERS WILL BE HARMED AS WELL.

11        SO WHEN YOU PUT ALL THIS TOGETHER, WE GET REALLY THE FULL

12   PANOPLY OF ANTICOMPETITIVE CONCERNS THAT ONE HAS IN

13   MONOPOLIZATION CASES, WEAKENED RIVAL, FORTIFIED MONOPOLY POWER,

14   TENDENCY TO DISCOURAGE RIVALS FROM INVESTING, EITHER PUSHING

15   THEM TO EXIT OR DISCOURAGE ENTRY, HIGHER PRICES FOR CONSUMERS,

16   FOR DIRECT CUSTOMERS, AND HARM PASSED DOWNSTREAM TO FINAL

17   CONSUMERS.  THOSE ARE THE EFFECTS OF THESE THREE POLICIES

18   WORKING TOGETHER.

19   Q.   SO YOU'VE BEEN ANALYZING QUALCOMM'S USE OF MODEM CHIP

20   LEVERAGE TO OBTAIN A ROYALTY SURCHARGE ON TRANSACTIONS BETWEEN

21   RIVALS AND OEM'S.

22        IS IT MATERIAL TO YOUR ANALYSIS THAT THE SURCHARGE TAKES

23   THE FORM OF A ROYALTY AS OPPOSED TO BEARING ANOTHER LABEL?

24   A.   NO, IT DOES NOT MATTER.  I THINK ONE WAY TO SEE THAT MOST

25   CLEARLY IS TO THINK OF A HYPOTHETICAL WHERE A MONOPOLIST TELLS

 1    ITS CUSTOMER, IF YOU WANT MY PRODUCT, THEN AS A CONDITION, YOU

 2    NEED TO PAY ME A FEE EVERY TIME YOU BUY A PRODUCT FROM MY

 3    COMPETITORS.

 4         THAT WOULD BE, I WOULD THINK, BLATANTLY ANTICOMPETITIVE BY

 5    RAISING THE COSTS OF THE RIVALS AND DISCOURAGING CUSTOMERS FROM

 6    PURCHASING FROM THE RIVALS.

 7         THAT IS ECONOMICALLY EQUIVALENT TO WHAT WE'VE GOT HERE

 8    WITH THE ROYALTY SURCHARGE BECAUSE THE REASONABLE ROYALTIES

 9    QUALCOMM IS ENTITLED TO BECAUSE OF THEIR PATENTS.

10         BUT THE ROYALTY SURCHARGE, THAT IS DISCONNECTED FROM THEIR

11    R&D AND INVENTIONS -- LET ME RESTATE THAT.

12         THAT IS DISCONNECTED FROM THE STANDARD ESSENTIAL PATENTS.

13    THAT'S AN EXTRA PIECE.  AND SO IT REALLY OPERATES JUST LIKE

14    THIS NAKED TAX IN MY HYPOTHETICAL TO RAISE RIVALS' COSTS AND

15    HARM COMPETITION.

16         AND THE FACT THAT IT'S CALLED A ROYALTY DOESN'T CHANGE

17    THOSE ECONOMICS.  BECAUSE I REALLY WANT TO EMPHASIZE, THE

18    REASONABLE ROYALTY, THEY'RE TOTALLY ENTITLED TO THOSE.  IT'S --

19    WE'RE TALKING ABOUT SOMETHING ABOVE AND BEYOND THAT, AND THAT

20    OPERATES LIKE THIS NAKED TAX.

21    Q.   HAVE YOU ENCOUNTERED ANY EXAMPLES OF A NAKED TAX?

22    A.   YES.  A CASE -- THERE WAS A CASE IN THE 1990S WHERE

23    MICROSOFT HAD A PRACTICE, THE MONOPOLY IN THAT CASE WAS

24    MICROSOFT'S MONOPOLY OVER THE WINDOWS OPERATING SYSTEM THAT

25    THEY WERE LICENSING TO COMPUTER OEM'S, AND THEY HAD A PRACTICE

1    WHERE THEY -- AN OEM HAD TO PAY MICROSOFT A LICENSE FEE ON

2    EVERY COMPUTER THEY SHIPPED, WHETHER IT HAD WINDOWS OR NOT.

3         AND SO THAT BASICALLY MEANT THEY HAD TO PAY ON A COMPUTER

4    THAT DIDN'T HAVE WINDOWS.

5         AND THE JUSTICE DEPARTMENT OBJECTED TO THAT AND THEY ENDED

6    UP WITH A SETTLEMENT, I GUESS A CONSENT DECREE, THIS IS AROUND

7    1994, '95, AND MICROSOFT STOPPED THAT PRACTICE.

8    Q.   YOU'VE DONE THIS WHOLE ANALYSIS.  YOU'RE AWARE THAT

9    QUALCOMM'S OFFERED VARIOUS BUSINESS JUSTIFICATIONS FOR ITS

10   PRACTICES?

11   A.   YES, I AM.

12   Q.   AS AN ANTITRUST ECONOMIST, JUST TAKING A STEP BACK, HOW DO

13   YOU THINK ABOUT BUSINESS JUSTIFICATIONS?

14   A.   WELL, WHEN EVALUATING BUSINESS JUSTIFICATION, WE ARE

15   LOOKING FOR A LEGITIMATE, PROCOMPETITIVE OBJECTIVE THAT THE

16   COMPANY IS TRYING TO ACHIEVE THAT CANNOT BE ACHIEVED BY LESS

17   RESTRICTIVE MEANS.

18   Q.   AND HAVE YOU CONSIDERED THE BUSINESS JUSTIFICATIONS THAT

19   QUALCOMM HAS PROFFERED?

20   A.   I HAVE.

21   Q.   AND WHAT CONCLUSION HAVE YOU REACHED REGARDING THOSE

22   BUSINESS JUSTIFICATIONS?

23   A.   I DON'T BELIEVE THEY MEET THE STANDARD; THAT IS, THEY

24   DON'T REALLY QUALIFY ACCORDING TO THE -- AS MEETS THE STANDARD

25   I JUST DESCRIBED.

1           AND WHAT I MEAN IS AS I UNDERSTAND THE GIST OF THEIR

2    BUSINESS JUSTIFICATIONS, IS THAT WITHOUT THESE PRACTICES, THEY

3    COULD NOT OBTAIN REASONABLE RETURNS ON EITHER THEIR MODEM CHIPS

4    OR THEIR STANDARD ESSENTIAL PATENTS.

5           AND SO THESE PRACTICES ARE JUSTIFIED ON THAT BASIS.

6    Q.   HAVE YOU READ THE TRANSCRIPT FROM LAST FRIDAY WHEN

7    MR. MOLLENKOPF WAS ON THE STAND?

8    A.   YES, I HAVE.

9    Q.   AND HE PROFFERED A BUSINESS JUSTIFICATION FOR QUALCOMM'S

10   NO LICENSE, NO CHIPS POLICY.  DID YOU FIND THAT CONVINCING?

11   A.   NO, I DID NOT.

12   Q.   HE SAID THAT, YOU KNOW, QUOTE -- OR RATHER, HE WAS ASKED,

13   "IF YOU ATTEMPTED TO PRICE THE FULL VALUE OF I.P. INTO YOUR

14   CHIPS, WOULD YOU BE ABLE TO RECOVER ON THE PATENTED INVENTIONS

15   THAT ARE OUTSIDE THE CHIPS?"

16          AND HE ANSWERED, "NO, NOT UNLESS WE LICENSED TO OTHER

17   PEOPLE AS WELL."

18          SO HOW DO YOU THINK ABOUT THIS?

19   A.   WELL, I GUESS I'M LOOKING TO SEE WHERE QUALCOMM'S PRACTICE

20   IS NECESSARY TO GET EITHER REASONABLE ROYALTIES ON THE STANDARD

21   ESSENTIAL PATENTS OR, YOU KNOW, A MARKET -- MARKET VALUE FOR

22   THEIR CHIPS, OKAY, WHATEVER THE MARKET WILL BEAR FOR THE CHIPS

23   BECAUSE THEY ARE A LEADER IN CHIPS, AND THEY HAVE VERY GOOD

24   ENGINEERS.

25          SO THE PROBLEM WITH WHAT HE SAID IS IF YOU LOOK AT THE

```
 1        COUNTER FACTUAL I'VE DESCRIBED, WITHOUT THESE POLICIES,

 2        QUALCOMM CAN GET EXACTLY THAT, WHICH IS IF THEIR CHIP IS GREAT,

 3        THEY CHARGE WHAT THEY WANT FOR THE CHIP.  NOTHING IS PREVENTING

 4        THEM FROM DOING THAT.  AND THEY GET REASONABLE ROYALTIES ON THE

 5        PATENTS.

 6             SO HE SEEMED TO SAY THAT WHEN THEY'RE SELLING THEIR CHIP

 7        TO AN OEM, JUST CHARGING FOR THE CHIP TOGETHER WITH THE RIGHT

 8        TO USE IT SOMEHOW WOULDN'T BE ENOUGH AND THEY'D HAVE TO LICENSE

 9        SOMEBODY ELSE.

10             WELL, I AGREE THEY DO NEED TO LICENSE THE OEM WHEN THE OEM

11        IS MAKING A DEVICE THAT CONTAINS A NON-QUALCOMM CHIP.

12             BUT THERE'S NO REASON -- THEIR POLICIES ARE NOT NECESSARY

13        TO ENTER INTO SUCH A LICENSE ON REASONABLE TERMS AND, IN FACT,

14        THEIR POLICIES ARE DESIGNED TO EXTRACT UNREASONABLE TERMS ON

15        THAT VERY -- ON THOSE VERY TRANSACTIONS.

16             SO I DON'T THINK IT HOLDS UP IN TERMS OF ECONOMICS, WHAT

17        HE SAID.

18        Q.   LET'S MOVE ON TO THE NEXT DEMONSTRATIVE.

19             AND LET'S TURN TO YOUR OPINIONS ON MARKET DEFINITION AND

20        MONOPOLY POWER.

21             ACTUALLY, JUST TO BE CLEAR, WHEN YOU AS AN ECONOMIST THINK

22        ABOUT MONOPOLY POWER, WHAT ARE YOU THINKING ABOUT?

23        A.   SO AS AN INDUSTRIAL ORGANIZATION ECONOMIST, WE TALK ABOUT

24        MARKET POWER, FIRST HAVING MARKET POWER, AND THEN IF THEY HAVE

25        A SUBSTANTIAL DEGREE OF MARKET POWER, WE WOULD TEND TO CALL IT
```

1    MONOPOLY POWER, AND IT REALLY MEANS THE COMPANY HAS SUFFICIENT

2    POWER THAT, THROUGH SOME UNILATERAL CONDUCT, THEY COULD

3    POTENTIALLY HARM COMPETITION.

4         AND THAT GOES ALONG WITH REALLY CUSTOMERS NOT HAVING GOOD

5    ALTERNATIVES TO WHAT THEY OFFER, OR LIMITED ALTERNATIVES.

6    Q.   AND HOW DO ANTITRUST ECONOMISTS EVALUATE THE PRESENCE OR

7    ABSENCE OF MONOPOLY POWER?

8    A.   SO THERE'S REALLY KIND OF TWO ROOTS.  ONE IS LOOKING FOR

9    DIRECT EVIDENCE OF THE POWER, OKAY?  AND SO DIRECT EVIDENCE.

10        AND THEN THE OTHER IS A STRUCTURAL APPROACH WHERE WE WOULD

11   DEFINE THE MARKET, MEASURE MARKET SHARES, AND HIGH MARKET

12   SHARES WOULD TEND TO BE MORE INDICATIVE OF MONOPOLY POWER, AND

13   THEN CHECK ENTRY CONDITIONS BECAUSE IN SOME CASES A HIGH MARKET

14   SHARE DOES NOT IMPLY MONOPOLY POWER BECAUSE IF IT'S A MARKET

15   THAT'S VERY EASY TO GET INTO.

16        SO THAT STRUCTURAL APPROACH HAS THOSE THREE STEPS, DIRECT

17   AND THEN STRUCTURAL.

18   Q.   AND WHICH OF THESE APPROACHES DID YOU USE IN THIS CASE?

19   A.   I USED BOTH APPROACHES TO EACH OF THE TWO MARKETS THAT

20   WE'RE GOING TO BE LOOKING AT, WHICH IS CDMA MODEM CHIPS AND

21   PREMIUM LTE MODEM CHIPS.

22   Q.   AND UNDER THE STRUCTURAL APPROACH THAT YOU DESCRIBED, WHAT

23   TOOLS DO ANTITRUST ECONOMISTS USE TO DEFINE RELEVANT MARKETS?

24   A.   SO THE IDEA OF THE RELEVANT MARKET IS TO IDENTIFY -- IS TO

25   FIND REASONABLE SUBSTITUTES FOR THE PRODUCTS OF THE FIRM IN

1       QUESTION.

2           AND WE CAN DO THAT BY EITHER LOOKING AT GENERALLY

3       QUALITATIVE EVIDENCE ABOUT WHAT CUSTOMERS SAY ABOUT

4       SUBSTITUTES, AND ALSO BY THIS TECHNIQUE CALLED THE HYPOTHETICAL

5       MONOPOLIST TEST, WHICH WE CAN PERFORM TO IDENTIFY A SET OF

6       REASONABLE SUBSTITUTES.

7       Q.   AND HOW DOES THE HYPOTHETICAL MONOPOLIST TEST DO THAT?

8       A.   THE HYPOTHETICAL MONOPOLIST TEST IDENTIFIES A SET OF

9       CANDIDATE PRODUCTS THAT WE'RE TESTING TO SEE IF IT'S A RELEVANT

10      MARKET.

11          SO IN OUR CASE, THIS WILL BE CDMA MODEM CHIPS, FOR

12      EXAMPLE, AND ASKS IF A MONOPOLIST CONTROLLED ALL OF THOSE

13      PRODUCTS, WAS THE ONLY ONE SUPPLYING IT -- THAT'S THE

14      HYPOTHETICAL MONOPOLIST -- WOULD THE PRICE BE SIGNIFICANTLY

15      HIGHER THAN WOULD RESULT IF WE HAD COMPETITION WITHIN THAT

16      PRODUCT CATEGORY?

17          AND IF THE PRICE BETWEEN -- IF THE PRICE DIFFERENCE

18      BETWEEN MONOPOLY AND COMPETITION IS SIGNIFICANT, THEN THAT

19      GROUP OF PRODUCTS PASSES THE TEST AND QUALIFIES AS A RELEVANT

20      PRODUCT MARKET UNDER THIS METHODOLOGY.

21      Q.   AND WHICH MARKETS HAVE YOU EXAMINED AS PART OF YOUR

22      ANALYSIS?

23      A.   CDMA MODEM CHIPS AND PREMIUM LTE MODEM CHIPS.

24      Q.   AND FOR THE PURPOSES OF YOUR ANALYSIS, HOW DID YOU DEFINE

25      CDMA MODEM CHIPS?

SHAPIRO DIRECT BY MR. JAMES

1    A.   ANY MODEM CHIP THAT IS COMPLIANT WITH THE 3G OR 2G CDMA

2    STANDARDS.

3    Q.   DOES THAT DEFINITION ENCOMPASS MODEM CHIPS THAT MAY COMPLY

4    WITH CDMA 2G OR 3G STANDARDS, BUT COMPLY WITH OTHER STANDARDS

5    AS WELL?

6    A.   YES.   THIS INCLUDES MULTIMODE CHIPS.

7    Q.   AND WHAT KINDS OF EVIDENCE DID YOU EXAMINE TO DETERMINE

8    WHETHER QUALCOMM HAD MONOPOLY POWER IN A MARKET FOR CDMA MODEM

9    CHIPS?

10   A.   WELL, THE DIRECT EVIDENCE APPROACH WOULD BE LOOKING AT

11   CUSTOMERS AND THEIR ALTERNATIVES FOR QUALCOMM'S CDMA MODEM

12   CHIPS AND WHETHER THEY HAD GOOD ALTERNATIVES, WHICH ONE WAY TO

13   FRAME THAT IS IF THEY WEREN'T ABLE TO BUY QUALCOMM'S CDMA MODEM

14   CHIPS, COULD THEY EASILY SUBSTITUTE OTHER CHIPS OR NOT?

15   Q.   AND WHAT KINDS OF DIRECT EVIDENCE DID YOU FIND IN THIS

16   CASE?

17   A.   WELL, THERE'S A LOT OF TESTIMONY FROM THE OEM'S ON EXACTLY

18   THIS POINT.   OF COURSE, IT COMES UP IN THE NO LICENSE, NO CHIPS

19   DISCUSSION BECAUSE ULTIMATELY IT'S THE SAME UNDERLYING

20   QUESTION, THAT ONE AFTER ANOTHER, THE OEM'S HAVE INDICATED THAT

21   THEY DID NOT HAVE GOOD OR ANY ALTERNATIVES IN SOME CASES TO

22   QUALCOMM'S MODEM CHIPS, CDMA MODEM CHIPS THAT THEY WANTED TO

23   BUY AND THEY NEEDED TO BUY TO BUILD CDMA COMPLIANT DEVICES.

24   Q.   AND APART FROM LOOKING AT DIRECT EVIDENCE, DID YOU

25   CONSIDER A STRUCTURAL APPROACH TOWARD THE MARKET FOR CDMA MODEM

1    CHIPS?

2    A.   YES.  I ALSO TOOK THE STRUCTURAL APPROACH WITH DEFINING

3    THE MARKET, MEASURING MARKET SHARES, AND CHECKING ENTRY

4    CONDITIONS.

5    Q.   AND WHAT WAS THE FIRST STEP OF THAT APPROACH WITH REGARD

6    TO CDMA MODEM CHIPS?

7    A.   SO DEFINING THE RELEVANT MARKET WOULD BE BASICALLY TAKING

8    THE SET OF, AS A CANDIDATE MARKET, THE CDMA MODEM CHIPS AND

9    ASKING WHETHER IT WOULD MAKE A DIFFERENCE WHETHER THERE WOULD

10   BE COMPETITION OR MONOPOLY WITHIN THOSE -- WITHIN THAT

11   CATEGORY, WHETHER THAT WOULD MATTER, WHETHER IT WOULD MAKE A

12   SIGNIFICANT DIFFERENCE FOR PRICES.  SO THAT WOULD APPLY IN THE

13   HYPOTHETICAL MONOPOLIST TEST TO THIS CANDIDATE MARKET.

14   Q.   AND WHAT KINDS OF QUALITATIVE EVIDENCE DID YOU FIND

15   REGARDING SUBSTITUTION BETWEEN CDMA MODEM CHIPS AND OTHER MODEM

16   CHIPS?

17   A.   SO THE -- AGAIN, THE -- I THINK THE EVIDENCE, OEM'S AND

18   THE QUALCOMM'S SIDE AS WELL, IS THAT AN OEM WANTS TO BUILD A

19   CDMA COMPLIANT DEVICE CANNOT SUBSTITUTE A NON-CDMA MODEM CHIP,

20   SO THEY'RE REALLY NOT A PRACTICAL SUBSTITUTE.

21        AND ANY DOWNSTREAM COMPETITION BETWEEN CDMA AND NON-CDMA

22   HANDSETS WOULD NOT LEAD TO SUBSTANTIAL SUBSTITUTION AT THE

23   UPSTREAM LEVEL.

24   Q.   DOES A CANDIDATE MARKET CONSISTING OF CDMA MODEM CHIPS

25   SATISFY THE HYPOTHETICAL MONOPOLY TEST?

1    A.   YES, IT DOES.  I PERFORMED THAT TEST.

2    Q.   AND HOW DID YOU PERFORM IT?

3         THE COURT:  I'M SORRY TO INTERRUPT.  WOULD ALL PLEASE

4    MAKE ROOM SO PEOPLE DON'T HAVE TO STAND IN THE BACK?  IF YOU

5    COULD SQUEEZE IN?  THANK YOU.

6         GO AHEAD, PLEASE.

7    BY MR. JAMES:

8    Q.   HOW DID YOU PERFORM THE HYPOTHETICAL MONOPOLIST TEST WITH

9    RESPECT TO THE MARKET FOR CDMA MODEM CHIPS?

10   A.   SO WE'RE TRYING TO LOOK FOR EVIDENCE THAT WOULD COMPARE

11   THE PRICE IF CDMA MODEM CHIPS WERE MONOPOLIZED VERSUS MORE

12   COMPETITIVE.

13        AND WE HAVE A NATURAL EXPERIMENT TO DO THAT.  WE HAVE

14   MEDIATEK ENTERED THE MARKET FOR CDMA MODEM CHIPS IN 2015 AND

15   THAT ALLOWS US TO SEE WHAT THE PRICE RESPONSE WAS TO THAT ENTRY

16   AND THAT GIVES SOME INDICATION OF THE GAP BETWEEN MONOPOLY

17   PRICES AND COMPETITIVE PRICES.

18        AND I WAS ABLE TO DETERMINE THAT IN THE AREAS WHERE

19   MEDIATEK WAS A COMPETITIVE THREAT TO QUALCOMM, WHICH WAS NOT

20   ACROSS THE BOARD BY ANY MEANS WITHIN CDMA MODEM CHIPS, QUALCOMM

21   VIEWED -- QUALCOMM HAD PRICE RESPONSES TO THAT THAT WERE

22   SIGNIFICANT, MORE THAN 5 PERCENT OF PRICE, AND THAT THAT'S

23   EXACTLY WHAT WE'RE LOOKING FOR IN TERMS OF THIS TEST.

24   Q.   EXACTLY HOW WERE THOSE PRICE RESPONSES RELEVANT TO THE

25   HYPOTHETICAL MONOPOLIST TEST?

1    A.   SO THE -- ADDING EVEN SOME COMPETITION TO THE MARKET IN

2    2015, WHICH MEDIATEK DID, CAUSED THE PRICES FOR SELECTED MODELS

3    TO GO DOWN BY AT LEAST 5 PERCENT.  THAT TELLS US THAT THE GAP

4    BETWEEN THE MONOPOLY PRICE, THE FULLY MONOPOLIZED PRICE AND A

5    TRULY COMPETITIVE PRICE WOULD BE MORE THAN 5 PERCENT, AND

6    THAT'S EXACTLY WHAT THE TEST IS LOOKING FOR TO DETERMINE

7    WHETHER THIS SET OF PRODUCTS IS A RELEVANT MARKET USING THIS

8    TEST.

9    Q.   DID YOU ALSO IMPLEMENT THE HYPOTHETICAL MONOPOLIST TEST IN

10   ANOTHER WAY?

11   A.   I ALSO -- YES, I DID, THROUGH SOMETHING CALLED THE CDMA

12   ADDER.

13       SO QUALCOMM'S PRICING WAS TO ADD THAT ADDER TO CDMA CHIPS

14   OVER EQUIVALENT UMTS MODEM CHIPS, AND THAT WAS ANOTHER

15   INDICATION THAT THE PRICE QUALCOMM WAS ABLE TO GET WAS

16   SIGNIFICANTLY HIGHER THAN A COMPETITIVE PRICE FOR CDMA MODEM

17   CHIPS, ESSENTIALLY PRICING BASED ON VALUE RATHER THAN MORE OF A

18   COST-BASED PRICE THAT COMPETITION WOULD TEND TO PUSH TOWARDS.

19       AND THAT ALSO, FOLLOWING THE HYPOTHETICAL MONOPOLIST TEST,

20   LED TO THE CONCLUSION THAT CDMA MODEM CHIPS IS A RELEVANT

21   PRODUCT MARKET.

22   Q.   LET'S BRING UP THE NEXT DEMONSTRATIVE.

23       UNDER THE STRUCTURAL APPROACH AFTER DEFINING A RELEVANT

24   MARKET, WHAT WAS THE NEXT STEP?

25   A.   SO THE NEXT STEP IS TO MEASURE MARKET SHARES, AND THAT'S

1    WHAT THE CHART SHOWS HERE CDMA UNITS AND SHARES FROM 2008 --

2    EXCUSE ME, 2008 TO 2016.

3         AND YOU CAN SEE HERE THAT QUALCOMM'S SHARE THROUGH 2014

4    WAS ABOVE 90 PERCENT, SOMETIMES WELL ABOVE 90 PERCENT.  AND

5    THEN IT DID FALL TO 83 PERCENT IN 2015 AND 61 PERCENT IN 2016.

6         THIS IS MEASURED BY UNITS.

7         AND THE REASON IT FELL, THE PRIMARY REASON, IS THAT WHEN

8    MEDIATEK DID GET IN AND START TO MAKE SIGNIFICANT SALES.

9    ALMOST ALL OF MEDIATEK'S SALES WERE IN CHINA.  IN 2015, I THINK

10   96 PERCENT OF THEIR SALES WERE IN CHINA, AND IN 2016, ABOUT 82

11   PERCENT OF THEIR SALES WERE IN CHINA.

12        AND I'M INCLUDING ALL THOSE HERE, IT'S A WORLDWIDE MARKET

13   I'M MEASURING, AND THAT'S -- SO THAT'S WHAT HAPPENED.

14        AND WE CAN SEE -- SO THIS SHOWS QUALCOMM'S SHARE OVER THIS

15   WHOLE PERIOD OF TIME.

16   Q.   DID YOU ALSO CONSIDER QUALCOMM'S INTERNAL ASSESSMENTS OF

17   ITS OWN SHARE IN THE MARKET FOR CDMA MODEM CHIPS?

18   A.   YES.  THEY HAD INTERNAL ASSESSMENTS.  THEY'RE IN MY

19   REPORT.  THEY'RE EVEN HIGHER THAN THE NUMBERS THAT I'VE GOT

20   HERE IN THE RECENT YEARS.

21        THE COURT:  I'M SORRY TO INTERRUPT.  WE HAVE MORE

22   PEOPLE STANDING IN THE BACK.  WOULD YOU PLEASE MAKE ROOM?  IF

23   YOU COULD PLEASE SQUEEZE IN TOWARDS THE WALLS.  THANK YOU.

24        THANK YOU.  GO AHEAD, PLEASE.

25   BY MR. JAMES:

1    Q.   THIS DEMONSTRATIVE SHOWS UNIT SHARES.  DID YOU ALSO

2    CALCULATE REVENUE SHARES?

3    A.   YES.  SO THAT'S ANOTHER WAY WE CAN MEASURE MARKET SHARES,

4    AND, AGAIN, THE SAME TIME PERIOD, 2008 TO 2016.

5         AGAIN, QUALCOMM'S SHARE THROUGH 2013 -- 2014 IS, YOU KNOW,

6    96 PERCENT OR HIGHER.

7         AND THEN IT DOES FALL IN 2015 AND 2016 AS MEDIATEK GETS

8    IN.  QUALCOMM'S SHARE STAYS UP, THOUGH, AT 89 PERCENT IN 2015

9    AND 74 PERCENT IN 2016 ON THE REVENUE BASIS.

10        AND ALMOST ALL OF THE REST IS, IS MEDIATEK IN THOSE YEARS.

11   Q.   AND AFTER CALCULATING SHARES, WHAT'S THE FINAL STEP IN THE

12   STRUCTURAL APPROACH?

13   A.   WELL, THESE SHARES ARE QUITE HIGH AND WOULD TEND TO

14   SUPPORT A CONCLUSION OF MONOPOLY POWER JUST ON A STRUCTURAL

15   BASIS.

16        SO ONE NEEDS TO CHECK, ARE THE SHARES SOMEHOW GIVING A

17   MISLEADING IMPRESSION, THAT SOMEHOW THE HIGH SHARE DOES NOT GO

18   ALONG WITH MONOPOLY POWER BECAUSE IT'S VERY EASY TO GET INTO

19   THIS MARKET AND ANY ATTEMPT TO CHARGE MONOPOLY PRICES OR

20   EXERCISE MONOPOLY POWER WOULD BE RAPIDLY MET WITH ENTRY AND,

21   THEREFORE, INEFFECTUAL.

22        AND THAT'S JUST NOT THE CASE IN THIS MARKET.  THIS IS NOT

23   AN EASY MARKET TO GET INTO, THE CDMA MODEM CHIPS.

24        IT TAKES A CONSIDERABLE AMOUNT OF TIME, LARGE R&D

25   INVESTMENT.  I THINK MR. MOLLENKOPF POINTED OUT, IT TAKES YEARS

1    OF RELATIONSHIP WORKING WITH CUSTOMERS CAN BE IMPORTANT,

2    GETTING YOUR MODEMS TESTED, WORKING WITH CARRIERS.

3         SO I'M NOT SAYING PEOPLE CAN'T DO THOSE THINGS.  PEOPLE

4    HAVE ENTERED THE MARKET.  BUT IT'S NOT SO EASY AND SO QUICK

5    THAT THE MARKET SHARES WOULD BE MISLEADING IN TERMS OF THE

6    STRUCTURAL APPROACH.

7    Q.   AND DOES THAT CONCLUDE OUR DISCUSSION OF YOUR CONCLUSION

8    THAT QUALCOMM HAD MONOPOLY POWER IN THE MARKET FOR CDMA MODEM

9    CHIPS?

10   A.   YES, IT DOES.

11   Q.   LET'S TURN TO THE MARKET FOR PREMIUM LTE MODEM CHIPS.

12        WHAT ARE PREMIUM LTE MODEM CHIPS?

13   A.   SO AS I'M USING THE TERM, PREMIUM LTE MODEM CHIPS ARE

14   MODEM CHIPS THAT WENT INTO PREMIUM HANDSETS, AND THEN, OF

15   COURSE, WHAT IS THAT?

16        PREMIUM HANDSETS I'M DEFINING TO BE HANDSETS THAT COST AT

17   LEAST $400 DOLLARS, EXCEPT IN THE EARLY YEARS OF LTE, 2011 AND

18   12, I'M USING A $300 CUTOFF.

19        AND THOSE -- THAT DEFINITION IS ONE THAT I'VE TAKEN FROM

20   QUALCOMM'S OWN INTERNAL USAGE.  I DID NOT JUST MAKE -- I DID

21   NOT CREATE THAT ONE ON MY OWN, THE DEFINITION.

22   Q.   DID YOU CONSIDER BOTH DIRECT EVIDENCE AND THE STRUCTURAL

23   APPROACH WHEN ASSESSING QUALCOMM'S MARKET POWER IN THE MARKET

24   FOR PREMIUM LTE MODEM CHIPS?

25   A.   YES, I DID.

1    Q.   WHAT DIRECT EVIDENCE OF MONOPOLY POWER DID YOU FIND?

2    A.   SO THE DIRECT EVIDENCE --

3         YOUR HONOR, THIS IS GOING TO REALLY PARALLEL WHAT WE JUST

4    DID ON CDMA MODEM CHIPS.

5         WE HAVE DIRECT EVIDENCE, WHICH IS THE OEM'S, YOU KNOW,

6    TESTIFYING THAT THEY -- IF THEY WERE NOT ABLE TO PURCHASE

7    QUALCOMM PREMIUM LTE MODEM CHIPS, THEY WOULD REALLY HAVE NO OR

8    FEW GOOD ALTERNATIVES, AND THAT, AGAIN, WE TALKED ABOUT THAT

9    WITH NO LICENSE, NO CHIPS, THAT IT WOULD BE VERY COSTLY FOR

10   THEM TO LOSE ACCESS TO QUALCOMM'S PREMIUM LTE MODEM CHIPS.

11        AND SO THAT'S A DIRECT MEASURE OF QUALCOMM'S POWER IN

12   SELLING THOSE CHIPS DURING THIS PERIOD OF TIME.

13   Q.   THEN TURNING TO THE STRUCTURAL APPROACH, WHAT WAS YOUR

14   FIRST STEP?

15   A.   SO, AGAIN, WE HAVE TO DEFINE THE RELEVANT MARKET, WHICH IN

16   THIS CASE MEANS TESTING TO SEE WHETHER PREMIUM LTE MODEM CHIPS

17   ARE A RELEVANT -- IS A RELEVANT -- CONSTITUTE A RELEVANT

18   PRODUCT MARKET.

19        AND THIS IS A LITTLE TRICKIER THAN THE CDMA MODEM CHIPS

20   BECAUSE WE REALLY HAVE TO CONSIDER WHETHER NON-PREMIUM LTE

21   MODEM CHIPS ARE A GOOD SUBSTITUTE FOR PREMIUM LTE MODEM CHIPS.

22   SO THAT'S -- THAT'S WHAT THE MARKET DEFINITION EXERCISE IS

23   ABOUT HERE.

24   Q.   AND DID YOU FIND QUALITATIVE EVIDENCE REGARDING

25   SUBSTITUTION BETWEEN PREMIUM LTE MODEM CHIPS AND OTHER MODEM

1    CHIPS?

2    A.   SO -- YES.  AGAIN, THE OEM TESTIMONY I THINK IS QUITE

3    CLEAR ON THIS, AND SOME DOCUMENTS FROM QUALCOMM, TOO, AS I

4    RECALL, INDICATING THAT IF AN OEM IS LOOKING TO MAKE A HIGH END

5    PHONE OR A DEVICE, THEY REALLY NEED A CHIP THAT GOES ALONG WITH

6    THAT AND HAS THE VARIOUS FEATURES THAT ARE NECESSARY, AND SOME

7    CHIPS WILL DO THAT AND SOME OF THE LOWER END CHIPS WILL NOT.

8         AND SO BY LOOKING AT THE PREMIUM CHIPS AS I'M DOING, I'M

9    INCLUDING THE MODEM CHIPS THAT THE OEM'S ACTUALLY FOUND TO BE

10   ACCEPTABLE IN THESE HIGHER END DEVICES, THE PREMIUM HANDSETS.

11        AND SO THE OEM'S ARE SAYING, NO, THEY COULD NOT EASILY

12   SUBSTITUTE.  IT WOULDN'T REALLY WORK TO SUBSTITUTE A

13   NON-PREMIUM MODEM CHIP IN A PREMIUM PHONE.

14   Q.   AND HOW DID YOU -- RATHER, DID YOU IMPLEMENT THE

15   HYPOTHETICAL MONOPOLIST TEST WITH RESPECT TO THE MARKET FOR

16   PREMIUM LTE MODEM CHIPS?

17   A.   SO I DID AGAIN IMPLEMENT THE HYPOTHETICAL MONOPOLIST TEST.

18   IT'S A VERY SIMILAR PARALLEL TO WHAT WE TALKED ABOUT FOR CDMA

19   MODEM CHIPS, WHICH IS LOOKING AT THE EVENT OF MEDIATEK ENTERING

20   WITH PREMIUM LTE MODEM CHIPS IN 2015 AND THE PRICE RESPONSE TO

21   THAT.

22   Q.   AND WHAT DID YOU FIND?

23   A.   AGAIN, I FOUND THAT THERE WAS A SIGNIFICANT PRICE RESPONSE

24   TO THAT ENTRY IN THE AREAS WHERE, WHERE MEDIATEK WAS

25   COMPETITIVE, AND FOR THE EXACT SAME REASONS AS FOR THE CDMA

1    MARKET DEFINITION EXERCISE, THIS IS THE SORT OF EVIDENCE ONE

2    LOOKS FOR IN PERFORMING THE HYPOTHETICAL MONOPOLIST TEST TO --

3    YOU'RE TRYING TO COMPARE MONOPOLY TO A COMPETITIVE PRICE, AND

4    HERE WE'VE GOT THE SIGNIFICANT PRICE REDUCTION WITH SOME

5    ADDITION OF COMPETITION THAT WILL UNDERESTIMATE THE GAP BETWEEN

6    MONOPOLY AND MORE COMPETITIVE, AND SINCE THE GAP WE SEE IS AT

7    LEAST 5 PERCENT AND IS SIGNIFICANT, THAT TELLS US THE TEST IS

8    SATISFIED AND THIS GROUP OF PRODUCTS QUALIFIES AS A RELEVANT

9    PRODUCT UNDER THE TEST.

10   Q.   AFTER DEFINING A RELEVANT MARKET, WHAT WAS THE NEXT STEP

11   UNDER THE STRUCTURAL APPROACH?

12   A.   SO THEN WE'RE GOING TO MEASURE MARKET SHARES IN THIS

13   MARKET, AND SO THIS ONLY STARTS IN 2011 BECAUSE THAT'S WHEN THE

14   PREMIUM LTE MODEM CHIPS FIRST GET SHIPPED.

15        AND WE CAN SEE HERE -- THIS IS UNITS AGAIN.  QUALCOMM'S

16   MARKET SHARE, THEY'RE THE -- THEY'RE THE SOLE SUPPLIER OF THESE

17   FOR A COUPLE YEARS, SO 2013.

18        AND THEN THEIR SHARE DOES DECLINE SOME, NOT MUCH IN 2014,

19   BUT MORE IN '15 AND '16.  IT DECLINED TO 81 PERCENT IN 2015,

20   AND THEN 57 PERCENT IN 2016.

21        AND THE REASON IS THERE'S A SIGNIFICANT PIECE THERE OF

22   MEDIATEK, AGAIN, PROBABLY PREDOMINANTLY IN CHINA.  BUT WE ALSO

23   SEE SAMSUNG AND INTEL COMING IN IN 2016, WHICH IS WHEN THEY'RE

24   WINNING SOME OF THE IPHONE SALES BY 2016.

25        SO -- OKAY.  SO, BUT, AGAIN, QUALCOMM'S SHARE IS NEARLY

1    100 PERCENT FOR THE FIRST SEVERAL YEARS, THEN 81 PERCENT, AND

2    THEN 57 PERCENT IN 2016.

3    Q.   APART FROM RUNNING YOUR OWN NUMBERS, DID YOU ALSO CONSIDER

4    QUALCOMM'S INTERNAL CALCULATIONS OF ITS OWN SHARE IN THE MARKET

5    FOR PREMIUM LTE MODEM CHIPS?

6    A.   YES, I DID.  AND THEIR ESTIMATE OF SHARE IS HIGHER THAN

7    MINE AS I RECALL.

8         IS THIS A CONFIDENTIAL NUMBER, I'M NOT SURE, THEIR

9    INTERNAL NUMBER?

10   Q.   I THINK WE CAN STOP WITH GENERAL CONSISTENCY FOR NOW.

11   A.   OKAY.  SO, YES, THEY HAVE -- THEY HAVE -- IT'S IN MY

12   REPORT, BUT I WON'T READ IT.

13        THE -- THEY HAVE AN INTERNAL ESTIMATE OF THEIR SHARE IN

14   PREMIUM LTE MODEM CHIPS.  THEY LOOK AT PREMIUM, THEY LOOK

15   SEPARATELY AT HIGH, WHICH I GUESS IS THE NEXT LEVEL IN THE

16   QUALITY BANDS.

17        AND SO I HAVE LOOKED AT THAT, AND THEIR NUMBERS ARE HIGHER

18   THAN MINE FOR 2016.

19   Q.   AND THESE ARE UNIT SHARES, BUT YOU ALSO RUN REVENUE SHARES

20   FOR THE MARKET FOR PREMIUM LTE MODEM CHIPS?

21   A.   YES, I USED THE SAME DATA TO CALCULATE REVENUE SHARES, AND

22   WE GET THE SAME PATTERN, WHICH IS QUALCOMM IS A SOLE SUPPLIER,

23   AND THEN WE SEE SOME ENTRY HERE, IT'S THE SAME COMPANIES.  THE

24   DIFFERENCE HERE IS THAT QUALCOMM'S SHARE STAYS UP A BIT HIGHER

25   IF WE USE THE REVENUE MEASURE.  81 PERCENT IN 2015 AND 63

SHAPIRO DIRECT BY MR. JAMES

```
 1     PERCENT IN 2016.
 2     Q.   AND UNDER THE STRUCTURAL APPROACH, WHAT WAS YOUR FINAL
 3     STEP WITH REGARD TO THE PREMIUM LTE MODEM CHIP MARKET?
 4     A.   SO THEN WE'RE ASKING -- THESE MARKET SHARES ARE QUITE HIGH
 5     AND WOULD TEND TO INDICATE SIGNIFICANT MARKET POWER.  ARE THEY
 6     SOMEHOW GIVING US A FALSE POSITIVE IN THAT RESPECT BECAUSE
 7     ENTRY IS SO EASY THAT THERE'S REALLY NO SIGNIFICANT POWER
 8     THERE?
 9          AND AGAIN, I THINK IT'S QUITE CLEAR THAT ENTRY IS NOT EASY
10     INTO THIS MARKET.  YOU KNOW, SAMSUNG AND INTEL HAVE GOTTEN IN,
11     AND MEDIATEK, BUT IT TAKES TIME.  IT'S NOT EASY TO DO.  AND
12     IT'S THE SORT OF MARKET WHERE THE MARKET SHARES ARE MEANINGFUL
13     FOLLOWING THE STRUCTURAL APPROACH, AND IT'S NOT THE CASE THAT
14     ENTRY IS SO EASY THAT WE SHOULD -- THAT WE WOULD BRUSH ASIDE
15     THESE TYPE OF MARKET SHARES IN THIS STRUCTURAL ANALYSIS.
16     Q.   DOES THAT CONCLUDE THE ANALYSIS UNDERLYING YOUR CONCLUSION
17     REGARDING QUALCOMM'S MONOPOLY POWER IN THE MARKET FOR PREMIUM
18     LTE MODEM CHIPS?
19     A.   YES, IT DOES.
20     Q.   LET'S BRING UP THE NEXT DEMONSTRATIVE.  AND AS A FINAL
21     TOPIC FOR PROFESSOR SHAPIRO, I'D LIKE TO DISCUSS QUALCOMM'S
22     AGREEMENTS WITH APPLE.
23          LET'S FOCUS ON THE 2013 AGREEMENTS.  YOU'RE FAMILIAR WITH
24     THESE; RIGHT?
25     A.   YES, I AM.
```

1    Q.   COULD YOU BRIEFLY DESCRIBE THE COMPETITIVE CONTEXT IN

2    WHICH YOU ANALYZED THE 2013 AGREEMENTS?

3    A.   CERTAINLY.

4        SO THE COMPETITIVE CONTEXT IS REALLY IN 2012 LEADING INTO

5    2013, SO IT'S STILL RELATIVELY EARLY DAYS FOR THE LTE 4G MODEM

6    CHIPS.  QUALCOMM WAS IN A DOMINANT POSITION IN THOSE CHIPS AND

7    WAS SUPPLYING APPLE ALL OF ITS MODEM CHIPS, THE PREMIUM LTE

8    MODEM CHIPS.

9        BUT INTEL WAS KNOCKING AT THE DOOR.  INTEL WAS TRYING TO

10   GET IN FOLLOWING THEIR ACQUISITION OF INFINEON.

11       AND THE ROUTE IN AT THE APPLE ACCOUNT LOOKED MOST LIKELY

12   TO BE THAT INTEL WOULD FIRST -- COULD GET DESIGN WINS AT THE

13   IPADS, WHICH WOULD BE DATA ONLY, AND THEN INTEL HOPED TO BUILD

14   THAT INTO THEN WINNING THE IPHONE BUSINESS, WHICH WAS A LOT

15   LARGER VOLUME.  THAT WOULD BE THE BIGGER PRIZE.

16       AND SO IN THE CONTEXT WHERE QUALCOMM IS CONCERNED ABOUT

17   INTEL'S INROADS HERE AT APPLE BECAUSE APPLE IS A LARGE AND

18   STRATEGIC CUSTOMER AND INTEL IS VERY KEEN TO GET IN THERE, AND

19   IT'S IN THAT CONTEXT THAT WE SEE THESE AGREEMENTS BEING SIGNED

20   BETWEEN QUALCOMM AND APPLE IN EARLY 2013.

21   Q.   YOU DESCRIBED THE AGREEMENTS IN YOUR SUMMARY OF

22   CONCLUSIONS AS INVOLVING EXCLUSIVITY.  WHAT DO YOU MEAN BY

23   THAT.

24   A.   I MEAN THE FOLLOWING VERY SPECIFIC THING:  THAT UNDER

25   THESE AGREEMENTS, IF APPLE HAD DECIDED TO LAUNCH DEVICES THAT

SHAPIRO DIRECT BY MR. JAMES

1    CONTAINED NON-QUALCOMM MODEM CHIPS, APPLE WOULD HAVE FACED A

2    VERY LARGE FINANCIAL PENALTY IN THE FORM OF HAVING TO FORFEIT

3    CERTAIN PAYMENTS THAT QUALCOMM WOULD OTHERWISE BE MAKING TO

4    APPLE.

5    Q.   BUT YOU'RE AWARE THAT THE AGREEMENTS DOESN'T -- OR RATHER

6    DON'T EXPRESSLY CONDITION QUALCOMM'S SALE OF CHIPS TO APPLE ON

7    APPLE REMAINING EXCLUSIVE; RIGHT?

8    A.   I'M AWARE OF THAT.  AND, IN FACT, IN 2016, APPLE DID PICK

9    INTEL CHIPS FOR THE IPHONE.

10        SO I'M NOT SAYING THE AGREEMENTS WERE DE JURE EXCLUSIVE.

11   I'M STUDYING THE ECONOMIC INCENTIVES THAT THE AGREEMENTS

12   CREATED IN THE FORM OF THIS LARGE PENALTY THAT APPLE WOULD BEAR

13   IF THEY CHOSE TO PICK INTEL FOR THE IPADS.

14   Q.   AND WHAT DO YOU MEAN BY VERY STRONG INCENTIVES?

15   A.   WELL, THE WAY THE AGREEMENTS WORKED WAS THAT -- AND

16   PARTICULARLY THE FIRST AMENDED TRANSITION AGREEMENT WHICH HAD

17   THESE PROVISIONS -- WAS THAT QUALCOMM WOULD MAKE CERTAIN

18   PAYMENTS TO APPLE OVER TIME, INCENTIVE PAYMENTS, AND SO LONG AS

19   APPLE REMAINED EXCLUSIVE WITH QUALCOMM, THOSE PAYMENTS WOULD BE

20   MADE FOLLOWING A CERTAIN SCHEDULE.

21        BUT IF THERE CAME A TIME WHEN APPLE BROKE FROM EXCLUSIVITY

22   AND LAUNCHED A DEVICE WITH A NON-QUALCOMM MODEM CHIP, THEN

23   THERE WOULD BE SIGNIFICANT CONSEQUENCES FINANCIALLY FOR APPLE,

24   REALLY IN TWO FORMS YOU COULD THINK ABOUT IT.

25        FIRST, SOME OF THE PAYMENTS THAT QUALCOMM HAD MADE BY THAT

1       TIME WOULD BE CLAWED BACK BY QUALCOMM FROM APPLE.

2           AND, SECOND, QUALCOMM -- PAYMENTS THAT WERE SCHEDULED TO

3       BE MADE FROM QUALCOMM TO APPLE IN THE FUTURE WOULD NOT BE MADE.

4           AND I USE THE TERM "PAYMENTS AT RISK" TO CAPTURE BOTH OF

5       THOSE CONCEPTS.  "PAYMENTS AT RISK" MEANING FROM APPLE'S POINT

6       OF VIEW, IF THEY LAUNCH A DEVICE WITH A NON-QUALCOMM CHIP IN

7       IT, THEY WILL LOSE THOSE PAYMENTS SO THEY ARE AT RISK.

8       Q.   LET'S BRING UP THE NEXT DEMONSTRATIVE.  PORTIONS OF THIS

9       DEMONSTRATIVE AND THE ONE THAT FOLLOW HAVE BEEN SEALED BY ORDER

10      OF THE COURT, AND SO I'LL CAUTION YOU, PROFESSOR SHAPIRO --

11          THE COURT:  I UNSEALED SOME OF THOSE NUMBERS BECAUSE

12      QUALCOMM PUBLICLY DISCLOSED THEM ON FRIDAY THROUGH THEIR CEO,

13      MOLLENKOPF.

14          MR. JAMES:  I THINK FOR NOW WE'LL PROCEED WITH A

15      GENERAL DISCUSSION AND --

16          THE WITNESS:  THE TRUTH IS, YOUR HONOR, YOU PUT THE

17      FEAR OF GOD INTO ME ON THAT ANYHOW, SO I'M VERY CAUTIOUS HERE.

18          THE COURT:  OKAY.  WELL, APPLE DIDN'T SEEK TO SEAL

19      THEM AND QUALCOMM REVEALED THEM PUBLICLY.  SO THE 640 MILLION

20      IN FATA INCENTIVES IS PUBLIC.

21          THE WITNESS:  OKAY.  THAT NUMBER.  OKAY.

22          THE COURT:  UM-HUM.

23          THE WITNESS:  OKAY.  THANK YOU.

24      BY MR. JAMES:

25      Q.   SO WHAT DOES THIS DEMONSTRATIVE SHOW?

1    A.    OKAY.  SO THIS -- SO THIS SHOWS THE MAGNITUDE OF THESE

2    PAYMENTS THAT QUALCOMM MADE TO APPLE THAT WERE CONDITIONED ON

3    EXCLUSIVITY, AND THE FIRST ROW SHOWS THE PAYMENTS UNDER THE

4    TRANSITION AGREEMENT SIGNED IN 2011, AND THOSE ARE RELEVANT FOR

5    ANY ANALYSIS BECAUSE SOME OF THOSE WERE STILL AT RISK AFTER THE

6    SECOND AGREEMENT WAS SIGNED IN FEBRUARY OF 2013, THE FATA, AS

7    I'LL CALL IT, FIRST AMENDED TRANSITION AGREEMENT, AND THE

8    SECOND ROW SHOWS THE MAGNITUDE OF THOSE.

9         THE REASON THERE ARE TWO COLUMNS, YOUR HONOR, IS THE FIRST

10   COLUMN OF THESE NUMBERS IS WHAT APPLE REPORTED.  THE SECOND

11   COLUMN IS WHAT QUALCOMM PROJECTED.

12        THEY'RE SOMEWHAT DIFFERENT.  MY ANALYSIS DOES NOT HINGE

13   ON -- IT APPLIES WHICHEVER SET OF NUMBERS YOU WOULD USE, I

14   WOULD REACH THE SAME CONCLUSION, AND THEN THERE'S JUST A TOTAL

15   THERE.

16        SO THESE ARE VERY LARGE SUMS OF MONEY.

17        BUT I DO NOTE, AS YOU MENTIONED, YOUR HONOR, THAT WHILE

18   THESE ARE THE TOTAL PAYMENTS AT RISK, NOT ALL THESE PAYMENTS

19   WERE ULTIMATELY MADE FROM QUALCOMM TO APPLE BECAUSE APPLE

20   SACRIFICED A GOOD CHUNK OF THEM IN 2016 WHEN THEY LAUNCHED THE

21   IPHONE 7 USING THE INTEL CHIPS IN SEPTEMBER 2016.

22   Q.    AND SO THOSE ARE THE PAYMENTS.

23        WHAT ARE THE CONSEQUENCES IN TERMS OF COMPETITION?

24   A.    SO THE CONCERN WITH THIS TYPE OF STRUCTURE, THESE LARGE

25   PAYMENTS CONDITIONED ON EXCLUSIVITY, IS THAT THEY WILL, AS A

1    PRACTICAL MATTER, BLOCKADE AN ENTRANT FROM GETTING INTO THE

2    MARKET.

3        SO WHEN EMPLOYED BY A MONOPOLIST IN A SITUATION WHERE

4    THERE'S AN ENTRANT WHO HAS -- WHO'S NOT IN THE MARKET REALLY

5    AND IS TRYING TO GET IN AND THIS CUSTOMER IS THE KEY ROUTE IN,

6    THEN THE CONCERN WOULD BE THAT THIS WOULD BLOCK THAT ENTRY AND

7    HARM COMPETITION BECAUSE THE ENTRANT, IN THIS CASE INTEL,

8    WOULD -- BY NOT GETTING THIS, THE BUSINESS THAT THEY HAVE A

9    SHOT AT, THAT IS CURRENTLY AVAILABLE, THE IPAD BUSINESS I'M

10   TALKING ABOUT HERE, THAT THEY WOULD BE THEN A WEAKER -- NOT --

11   LET ME PUT IT DIFFERENTLY.

12       IF INTEL IS ABLE TO GET THIS BUSINESS, THIS FOOTHOLD, THEY

13   WILL BECOME A STRONGER COMPETITOR IN THE FUTURE.  AND SO

14   BLOCKING THAT CAN HAVE COMPETITIVE EFFECTS.

15       THAT'S THE UNDERLYING CONCERN THAT I WOULD HAVE HERE WITH

16   THIS STRUCTURE AS AN ANTITRUST ECONOMIST.

17   Q.   IN THIS CONTEXT, IS THERE A SECOND CONCERN AS WELL?

18   A.   YES.  THERE'S AN ADDITIONAL CONCERN HERE THAT THAT'S NOT

19   THE STANDARD ONE THAT ANTITRUST ECONOMISTS LOOK AT, BUT IT'S IN

20   PLAY HERE, NAMELY, THAT THE CONCERN, LET'S SAY, FROM QUALCOMM'S

21   PERSPECTIVE THAT IF THEY -- IF APPLE BECOMES LESS RELIANT ON

22   QUALCOMM FOR THESE PREMIUM LTE MODEM CHIPS, THAT APPLE WILL BE

23   IN A BETTER POSITION OR MORE LIKELY TO CHALLENGE QUALCOMM'S

24   LICENSING PRACTICES AND THEIR -- ULTIMATELY THE ROYALTIES

25   THEY'VE BEEN COLLECTING FOR THEIR STANDARD ESSENTIAL PATENTS.

1           AND THAT IS A STRATEGIC BENEFIT TO QUALCOMM OF KEEPING

2     APPLE IN THEIR, IN THEIR CAMP, IF YOU WILL, OR HAVING APPLE

3     CONTINUE TO PURCHASE THE QUALCOMM CHIPS AND NOT MOVE TO INTEL.

4     Q.   WHAT ANALYSIS HAVE YOU DONE OF THE 2013 AGREEMENT?

5     A.   SO I'M ABLE TO LOOK AT THE 2013 AGREEMENT AND PERFORM WHAT

6     WE CALL A -- EXCUSE ME -- A PROFIT SACRIFICE TEST, ALSO KNOWN

7     AS AN EQUALLY EFFICIENT COMPETITOR TEST, REALLY TO SEE WHETHER

8     THE PENALTIES THAT APPLE FACED IF THEY HAD GONE WITH INTEL FOR

9     THE IPADS WERE DISPROPORTIONATE OR UNREASONABLY HIGH.

10    Q.   AND WHEN YOU SAY UNREASONABLY HIGH, WHAT DO YOU MEAN?

11    A.   SO I THINK THE EASIEST WAY TO SEE THAT IS TO TAKE IT FROM

12    THE PERSPECTIVE OF THE ENTRANT, INTEL -- THIS IS THE EQUALLY

13    EFFICIENT COMPETITOR TEST -- TO ASK, IMAGINE AN ENTRANT, AND

14    IT'S REALLY MORE ABSTRACT, IT DOESN'T HAVE TO BE INTEL, IMAGINE

15    AN ENTRANT WHO'S JUST AS EFFICIENT AS QUALCOMM AND THEIR ENTRY

16    ROUTE TO FIRST GET A CERTAIN QUANTITY OF SALES THAT IS

17    CURRENTLY AVAILABLE AT APPLE?  AND I'M GOING TO TALK ABOUT THE

18    IPADS AS THAT GROUP.

19          BUT WHATEVER THAT GROUP IS, IF THEY COULD MAKE THOSE SALES

20    AND EARN SOME MARGINS ON THOSE, JUST LIKE QUALCOMM IS, WOULD

21    THEY BE ABLE TO MAKE MONEY IN THE FACE OF THIS AGREEMENT?

22    WHICH MEANS THEY'D HAVE TO COMPENSATE APPLE FOR THE PENALTY

23    THAT APPLE WOULD BEAR FOR THE PAYMENTS THAT APPLE WOULD LOSE

24    FROM QUALCOMM.

25          SO YOU'RE ASKING IF AN EQUALLY EFFICIENT ENTRANT COULD

1    MAKE A PLAY FOR THESE CONTESTABLE UNITS, CONTESTABLE SALES,

2    WHICH ARE GOING TO BE IPADS, GIVEN THEY'D HAVE TO BUY APPLE OUT

3    OF THE CONTRACT?  AND THAT -- COULD THEY MAKE MONEY DOING THAT?

4         IF THAT WOULD BE PROFITABLE FOR AN ENTRANT, THEN THE

5    AGREEMENT PASSES MUSTER UNDER THE TEST.

6         IF THAT WOULD BE UNPROFITABLE FOR THE ENTRANT, THEN THE

7    AGREEMENT IS GOING TO FAIL THIS TEST.

8         IT'S VERY MUCH LIKE PRICE COST TEST IN PREDATORY PRICING,

9    BUT IT HAS THIS STRUCTURE OF WE'VE GOT THIS PENALTY PAYMENT AND

10   THAT -- WE'RE ATTRIBUTING THAT TO THESE SALES BECAUSE THE

11   ENTRANT UNDER THIS METHODOLOGY WOULD HAVE TO COMPENSATE THE

12   CUSTOMER FOR THE LOST INCENTIVE PAYMENTS.

13   Q.   WHAT ARE THE CONSEQUENCES OF A DEAL OF THIS KIND FOR

14   RELATIONSHIPS BETWEEN APPLE AND POTENTIAL ENTRANTS?

15   A.   SO -- I THINK THE RECORD SHOWS THAT IN THE PRESENCE OF

16   THIS DEAL, IT WAS NOT GOING TO BE -- APPLE'S VIEW WAS IT WAS

17   NOT GOING TO BE ECONOMICALLY PRACTICABLE TO GO TO INTEL -- WE

18   CAN TALK ABOUT POTENTIAL ENTRANTS GENERALLY, BUT INTEL WAS IN

19   THE FLESH, IF YOU WILL -- TO GO WITH THEM FOR IPADS OR FOR,

20   LET'S SAY, A MODERATE AMOUNT OF VOLUME.

21        IT REALLY MEANS FROM APPLE'S POINT OF VIEW, THEY'RE EITHER

22   GOING TO STAY WITH QUALCOMM EXCLUSIVELY OR THEY'RE GOING TO

23   HAVE TO GO QUITE BIG FOR AN ENTRANT TO MAKE IT WORTH PAYING THE

24   PENALTY, AND THE ENTRANT WOULD HAVE TO OFFER SIGNIFICANTLY

25   BETTER PRICES THAN QUALCOMM ON LARGE VOLUMES IN ORDER FOR IT TO

1     PAY FOR APPLE.

2          AND SO THAT'S, THAT WAS THE CONSEQUENCE ONCE THE

3     AGREEMENTS WERE SIGNED OF THE SITUATION AS BETWEEN APPLE AND

4     ANY POTENTIAL ALTERNATIVE SUPPLIER.

5     Q.   HOW DID YOU IMPLEMENT THE TEST IN THIS CASE?

6     A.   SO I IMPLEMENTED THE TEST BY IDENTIFYING WHAT WE CALL THE

7     CONTESTABLE UNITS, WHICH ARE THE SALES THAT WERE CURRENTLY

8     AVAILABLE TO INTEL, SEEING WHAT MARGIN THEY COULD EARN ON THOSE

9     IF THEY WERE AS EFFICIENT AS QUALCOMM, AND THEN SEEING WHETHER

10    THEY COULD STILL MAKE MONEY IF THEY HAD TO COVER THE PENALTY

11    LIKE I SAID.

12         ANOTHER WAY TO THINK ABOUT IT THAT'S ECONOMICALLY

13    EQUIVALENT, AND THIS WOULD BE THE PROFIT SACRIFICE LABEL, IS

14    FROM QUALCOMM'S POINT OF VIEW, THEY MADE SALES -- THEY MADE

15    PROFITS ON THE IPAD SALES, THE CONTESTABLE SALES, THROUGH SOME

16    MARGINS.  BUT THEY WOULD HAVE AVOIDED PAYING A LARGE AMOUNT OF

17    MONEY TO APPLE IF APPLE HAD NOT BOUGHT THOSE PRODUCTS.

18         SO IF WE ATTRIBUTE THOSE QUALCOMM PAYMENTS TO THESE

19    PRODUCTS AS A COST EFFECTIVELY, AS A PAYOUT FROM QUALCOMM, WAS

20    QUALCOMM SACRIFICING PROFITS TO MAKE THESE SALES?

21         AND SO IT'S EXACTLY THE SAME ARITHMETIC, WAS QUALCOMM

22    SACRIFICING PROFITS WITH THIS ATTRIBUTION OF THE PROFITS, OR

23    WOULD INTEL HAVE HAD TO LOSE MONEY IN THE FIRST ROUND AS PART

24    OF AN ENTRY STRATEGY?

25         SO I DID THAT BY MEASURING THE MARGIN ON THOSE PRODUCTS

 1    AND THE SIZE OF THE PENALTY PAYMENTS THAT WOULD HAVE APPLIED TO

 2    THE IPAD, TO THE IPAD SALES.

 3    Q.   LET'S BRING UP THE NEXT DEMONSTRATIVE.

 4         ARE THESE YOUR CALCULATIONS?

 5    A.   YES.  SO THIS IS -- THIS IS REALLY FROM THE PROFIT

 6    SACRIFICE PERSPECTIVE.  A COMPARISON OF QUALCOMM'S DIRECT

 7    MARGINS ON THE APPLE IPADS TO THE INCENTIVE PAYMENTS THAT WERE

 8    AT RISK.

 9         SO THE CONTESTABLE PRODUCTS HERE ARE A SERIES OF IPADS

10    THAT APPLE ENDED UP LAUNCHING STARTING IN OCTOBER 2014, AND

11    THERE'S -- THERE'S EVIDENCE IN THE RECORD THAT THIS WAS THE --

12    A LIKELY PLAN THAT APPLE WAS PURSUING BEFORE THEY SIGNED THE

13    AGREEMENTS WITH QUALCOMM, TO WORK WITH INTEL ON THIS BASIS

14    FIRST WITH THE IPADS, SEE HOW IT WOULD GO, AND THEN POSSIBLY

15    AWARD THEM IPHONES LATER.

16         SO THEY WERE IN VERY ACTIVE DISCUSSIONS WITH INTEL, AS YOU

17    HEARD FROM MS. EVANS.  I THINK YOU HEARD FROM MR. BLEVINS AND

18    WILLIAMS AS WELL ON THIS.

19         SO THESE ARE THE CONTESTABLE PRODUCTS.  THEN -- I'M GOING

20    TO ASSUME ALL THESE NUMBERS ARE CONFIDENTIAL.

21         SO THE INCENTIVE PAYMENTS AT RISK -- OH, AND YOU CAN SEE

22    HOW MANY UNITS WERE INVOLVED THROUGH THE PERIOD OF TIME I'M

23    ABLE TO MEASURE.

24         THEN YOU CAN SEE THE INCENTIVE PAYMENTS AT RISK, WHICH IS

25    TO SAY IF APPLE HAD GONE WITH INTEL FOR THESE PRODUCTS AND

1    LAUNCHED THEM IN OCTOBER 2014, AT THAT TIME, HOW MUCH -- WHAT

2    WOULD THE INCENTIVE PAYMENTS AT RISK UNDER THE FATA, AND THAT'S

3    THE NUMBER, THE LARGE NUMBER IN THE MIDDLE HERE UNDER A,

4    LABELED A.

5         AND THEN WE'RE COMPARING THAT TO THE DIRECT MARGINS THAT

6    QUALCOMM EARNED ON THESE PRODUCTS, WHICH IS B, A SMALLER

7    NUMBER.

8         AND SINCE THE INCENTIVE PAYMENTS AT RISK ARE FAR IN EXCESS

9    OF THE MARGINS, WE SEE THIS WAS PROFIT SACRIFICE WHEN WE DO

10   THIS ATTRIBUTION OF THE INCENTIVE PAYMENTS TO THESE SALES.

11        THE OTHER PERSPECTIVE WOULD BE FOR INTEL TO GET IN, IF

12   THEY COULD HAVE EARNED THESE SAME MARGINS SHOWN AS B, ASSUMING

13   THEY'RE EQUALLY EFFICIENT, THEY COULD MAKE THOSE MARGINS, BUT

14   THEY'D HAVE TO BUY APPLE OUT OF THE CONTRACT.  THAT WOULD COST

15   THE AMOUNT SHOWN IN A.  THAT WOULD BE A BIG LOSS.

16        AND, IN FACT, NEITHER APPLE NOR INTEL CONSIDERED THAT

17   BECAUSE IT WAS -- THAT WAS UNREALISTIC, WHICH IS AN INDICATION

18   OF HOW, HOW BADLY THE FATA FAILED THIS TEST ACTUALLY.

19        SO THAT'S THE FINDING, THAT'S THE RESULT OF THE TEST, THAT

20   THIS STRUCTURE OF THIS AGREEMENT INVOLVED A PROFIT SACRIFICE BY

21   QUALCOMM, OR WOULD BLOCK AN EQUALLY EFFICIENT COMPETITOR FROM

22   MAKING THESE CONTESTABLE SALES, OR WOULD REQUIRE THAT

23   COMPETITOR TO LOSE A SUBSTANTIAL AMOUNT OF MONEY TO GET THAT

24   FOOTHOLD IN THE MARKET.

25   Q.  AND YOU SAID THAT ONE OF THE INPUTS INTO YOUR TEST WAS HOW

1    MUCH BUSINESS WAS AT STAKE AT THE TIME; IS THAT RIGHT?

2    A.   YES, THOSE ARE THE IPADS HERE, THAT'S THE NOTION OF

3    CONTESTABLE PRODUCTS.

4    Q.   DID YOU ALSO CONSIDER MORE BUSINESS WAS AT STAKE AT THE

5    TIME THAN THE IPADS?

6    A.   YES, I DID.

7         SO THERE ARE -- THE RECORD IS NOT COMPLETELY CLEAR ON

8    THIS.  YOU KNOW, THERE'S A LOT OF NEGOTIATION BACK AND FORTH.

9         THIS, I THINK, IS THE, THE -- I THINK THIS IS THE BEST

10   GROUP OF PRODUCTS TO USE FOR THIS TEST.

11        BUT THERE ARE SOME INDICATIONS THAT AT LEAST QUALCOMM WAS

12   CONCERNED THAT INTEL MIGHT BE ABLE TO WIN MORE THAN THAT AT

13   THAT TIME.  YOU KNOW, WE'RE NOT TALKING ABOUT WHAT THEY MIGHT

14   LEARN LATER.  THE WHOLE IDEA IS THAT THIS IS THIS FOOTHOLD

15   THROUGH THE CONTESTABLE PRODUCTS.

16        AND PERHAPS EVEN INTEL COULD HAVE, AT THAT TIME, DISPLACED

17   SOME OF THE MAV 10 SALES.  THAT'S ONE OF THE QUALCOMM CHIPS AT

18   THE TIME, MAV 10 LOW, WHICH WOULD BE SOME OF THE IPHONES ALSO

19   FOR 2014, IN WHICH CASE THERE WOULD BE MORE CONTESTABLE

20   PRODUCTS.

21        SO I CONSIDERED THAT AS A SENSITIVITY ANALYSIS, OR

22   ROBUSTNESS CHECK.  IF ONE EXPANDED THE SET OF CONTESTABLE

23   PRODUCTS, WOULD THE TEST RESULTS CHANGE, AND THEY DID NOT.

24   Q.   AND THEN MOVING BACK, WHAT ARE THE IMPLICATIONS OF AN

25   UNREASONABLY HIGH PENALTY, AS YOU PUT IT, OR PROFIT SACRIFICE

1    FOR COMPETITION?

2    A.   WELL, THE -- THIS IS A TEST WE CAN PERFORM AS ANTITRUST

3    ECONOMISTS AND IT'S SIMILAR TO PREDATORY PRICING TEST.  I THINK

4    IT'S INFORMATIVE, I HOPE IT'S INFORMATIVE FOR THE COURT AS THE

5    CONCERN BEING IF THERE'S SUBSTANTIAL PROFIT SACRIFICE ON THE

6    CONTESTABLE PRODUCTS SO THAT AN EQUALLY EFFICIENT COMPETITOR

7    COULD NOT GAIN A FOOTHOLD WITHOUT HAVING TO LOSE A SIGNIFICANT

8    AMOUNT OF MONEY, THAT THAT CAN SLOW DOWN OR BLOCKADE ENTRY IN

9    THIS SITUATION, AND THAT'S A HARM TO COMPETITION.

10   Q.   SO NOW WE'RE DONE WITH APPLE.

11        I WAS WONDERING IF YOU COULD JUST GIVE A QUICK SUMMARY OF

12   YOUR OVERALL CONCLUSIONS.  JUST TO RECAP, YOU ANALYZED THREE OF

13   QUALCOMM'S PRACTICES:  THE NO LICENSE, NO CHIPS POLICY,

14   INCENTIVE PAYMENTS, AND THE REFUSAL TO LICENSE RIVALS

15   COLLECTIVELY, AND WHAT WERE THE CONCLUSIONS FLOWING FROM THAT?

16        THE COURT:  I'M SORRY, LET ME ASK YOU.  IT'S 10:38.

17   SHOULD WE GO AHEAD AND TAKE OUR BREAK NOW, OR ARE YOU ABOUT TO

18   FINISH?

19        MR. JAMES:  I'M ABOUT TO FINISH.

20        THE COURT:  OKAY.  GO AHEAD.  SORRY FOR THE

21   INTERRUPTION.

22        GO AHEAD, PLEASE.

23   BY MR. JAMES:

24   Q.   CAN YOU PROVIDE A BRIEF SUMMARY TO THE COURT SO THAT WE

25   CAN MOVE ON TO OUR BREAK.

1     A.   IT WILL BE VERY BRIEF INDEED.  THIS IS JUST A RECAP.

2          I THINK THE THREE POLICIES WORK TOGETHER, AND REALLY THE

3     NO LICENSE, NO CHIPS WORKING TOGETHER WITH THE REFUSAL TO

4     LICENSE RIVALS SET UP A SITUATION WHERE QUALCOMM WAS ABLE TO

5     USE ITS CHIP LEVERAGE TO BRING TO BEAR IN NEGOTIATIONS WITH

6     OEM'S TO GET UNREASONABLY HIGH ROYALTIES ON ITS CELLULAR SEPS,

7     AND CRITICALLY SO THAT WHEN AN OEM PURCHASED A MODEM CHIP FROM

8     A RIVAL OF QUALCOMM, THEY WOULD BE PAYING QUALCOMM MORE THAN A

9     REASONABLE AMOUNT.

10         AND THAT ULTIMATELY LEADS TO A VARIETY OF HARMS TO

11    COMPETITION.  THAT'S THE CENTRAL POINT ABOUT NO LICENSE, NO

12    CHIPS, AND THEN WE HAD THIS ADDITIONAL MUCH MORE SPECIFIC

13    CONDUCT, IN PARTICULAR THE CONTRACT SIGNED IN 2013 WITH APPLE,

14    THAT FURTHER HAD -- CAUSED SOME ADDITIONAL DANGER OF HARM TO

15    COMPETITION BECAUSE INTEL WAS TRYING TO GET IN AT THAT TIME.

16         MR. JAMES:  NO FURTHER QUESTIONS.

17         THE COURT:  OKAY.  IT'S 10:39.

18    LET'S GO AHEAD, PLEASE, AND TAKE A 15 MINUTE BREAK.

19    THANK YOU.  WE'LL SEE YOU IN 15 MINUTES.

20    (RECESS FROM 10:40 A.M. UNTIL 10:56 A.M.)

21         THE COURT:  GOOD MORNING.  WELCOME BACK.  PLEASE TAKE

22    A SEAT.

23    OKAY.  TIME IS 10:56.  GO AHEAD, PLEASE.

24         MR. VAN NEST:  THANK YOU, YOUR HONOR.  WE'VE PASSED

25    OUT THE NOTEBOOKS TO PROFESSOR SHAPIRO, AND THE COURT HAS ONE

1    AS WELL.

2              THE COURT:  OKAY.  THANK YOU.

3              MR. VAN NEST:  YOU'RE WELCOME.

4                    **CROSS-EXAMINATION**

5    BY MR. VAN NEST:

6    Q.   GOOD MORNING, PROFESSOR SHAPIRO.

7    A.   GOOD MORNING.

8    Q.   YOU TESTIFIED THAT QUALCOMM POSSESSED MONOPOLY POWER IN

9    CDMA MODEM CHIPS FROM 2006 THROUGH 2016; IS THAT RIGHT?

10   A.   YES, THAT'S CORRECT.

11   Q.   AND YOU ALSO TESTIFIED THAT QUALCOMM POSSESSED MONOPOLY

12   POWER, IN YOUR VIEW, IN THE PREMIUM LTE MARKET YOU DEFINE IN

13   2011 THROUGH 2016; CORRECT?

14   A.   YES.

15   Q.   BUT YOU'RE NOT OFFERING ANY OPINION THAT QUALCOMM HAS

16   MONOPOLY POWER IN ANY CHIP MARKET IN 2017; ISN'T THAT RIGHT?

17   A.   THAT IS CORRECT.

18   Q.   AND SIMILARLY, YOU'RE NOT OFFERING ANY OPINION THAT

19   QUALCOMM HAS MONOPOLY POWER IN ANY CHIP MARKET IN 2018, EITHER?

20   A.   THAT IS CORRECT.

21   Q.   IN FACT, AS YOU NOTED IN YOUR REPORT, QUALCOMM'S SHARE OF

22   WHAT YOU CALL PREMIUM LTE CHIPS FELL IN 2015 AND 2016 AS

23   SAMSUNG, INTEL, AND MEDIATEK CAME INTO THE MARKET; RIGHT?

24   A.   THAT IS CORRECT.

25   Q.   AND YOU ALSO NOTED THAT QUALCOMM'S MARKET SHARE IN WHAT

1     YOU CALL PREMIUM LTE FELL IN 2017 AS A RESULT OF INTEL GAINING

2     GROUND AT APPLE; CORRECT?

3     A.   I NOTED THAT FOR 2016 IN MY TESTIMONY.

4     Q.   YOU ALSO TESTIFIED THAT THERE WAS SOME DIMINISHMENT OF

5     QUALCOMM'S MARKET POWER IN 2017 RELATIVE TO 2016 AS A RESULT OF

6     INTEL GETTING IN AT APPLE?

7     A.   I DON'T -- ARE YOU USING THE DEPOSITION OR -- HERE NOW IN

8     COURT?

9     Q.   I'M JUST ASKING WHETHER YOU REMEMBER TESTIFYING TO THAT

10    DURING YOUR DEPOSITION?

11    A.   OH, YES.  I DIDN'T KNOW YOU WERE REFERRING TO MY

12    DEPOSITION.  I DO REMEMBER THAT.

13    Q.   OKAY.  AND YOU STAND BY THAT TESTIMONY TODAY?

14    A.   I DO.

15    Q.   OKAY.  AND QUALCOMM'S MARKET SHARE IN CDMA WENT DOWN IN

16    2017 AS A RESULT OF ADDITIONAL COMPETITION THERE, TOO.  YOU

17    TESTIFIED TO THAT?

18    A.   YES, I THINK THAT'S CORRECT.  THERE'S BEEN -- THEIR MARKET

19    SHARE DECLINED AS BEST WE COULD MEASURE IT, WHICH WAS IMPERFECT

20    DUE TO DATA LIMITATIONS.

21    Q.   AND ACCORDING TO YOUR CALCULATIONS, QUALCOMM'S MARKET

22    SHARE IN THE PREMIUM LTE MARKET YOU DEFINED HAS DECLINED QUITE

23    A BIT IN THE LAST COUPLE OF YEARS THAT YOU ANALYZED; RIGHT?

24    A.   I THINK THAT'S FAIR.

25    Q.   CAN WE HAVE PROFESSOR SHAPIRO'S SLIDE 16, PLEASE.

1        THIS IS FROM YOUR REPORT.  DO YOU SEE IT THERE, PROFESSOR

2   SHAPIRO?

3   A.   I DO.

4   Q.   YOU CAN SEE THAT IN, ACCORDING TO YOUR CALCULATIONS, IN

5   2014 IN THE PREMIUM LTE MARKET, YOU HAD QUALCOMM AT 96.7

6   PERCENT; 81 PERCENT IN 2015; 57 PERCENT IN 2016; CORRECT?

7   A.   57 PERCENT IN 2016, THAT'S RIGHT, AS SHOWN HERE, THAT'S

8   CORRECT.

9   Q.   THAT'S RIGHT.  SO AS YOU JUST SAID A MOMENT AGO,

10  QUALCOMM'S SHARES IN THIS MARKET FELL FAIRLY DRAMATICALLY IN

11  THOSE LAST COUPLE OF YEARS?

12  A.   THEY FELL FROM 97 PERCENT TO 81 TO 57.

13  Q.   OKAY.  AND DURING THAT SAME PERIOD, SAMSUNG AND MEDIATEK,

14  THEIR SHARES GREW QUICKLY; RIGHT?

15  A.   YES, THAT IS TRUE, ESPECIALLY MEDIATEK AS SHOWN IN THIS

16  DIAGRAM.

17  Q.   MEDIATEK CAME INTO THE MARKET IN LATE 2014, AND BY 2016

18  THEY HAD 27.4 PERCENT; CORRECT?

19  A.   THAT'S CORRECT, WE'RE MEASURING BY UNITS HERE, MOST IN

20  CHINA.

21  Q.   AND SAMSUNG SIMILARLY GREW QUICKLY.  THEY CAME IN AND BY

22  2016, THEY ALSO HAD 8 PERCENT OF THIS MARKET?

23  A.   THAT'S RIGHT, THEY'RE VERTICALLY INTEGRATED.

24  Q.   AND THESE FIGURES DON'T INCLUDE HUAWEI AND HISILICON

25  BECAUSE YOU WEREN'T ABLE TO GET AHOLD OF THAT DATA; IS THAT

1    RIGHT?

2    A.   THAT'S CORRECT.  IF YOU LOOK AT THE NOTE HERE, HISILICON

3    IS NOT SHOWN HERE.  IT -- A REASONABLE ESTIMATE IS THAT THEY

4    GAINED -- THEY ACTUALLY HAD A SHARE GOING UP FROM MAYBE HALF A

5    PERCENT TO 3 PERCENT DURING THAT PERIOD OF TIME, 2014, '15,

6    '16.

7    Q.   AND IT COULD BE HIGHER; CORRECT?

8    A.   WELL, THAT'S DR. CHIPTY'S NUMBER.  I THINK -- C-H-I-P-T-Y

9    SHOWN THERE.

10        I THINK -- WELL, I WOULD CERTAINLY SAY WE HAVE INCOMPLETE

11   DATA.  I THINK THIS WAS -- SHE CONSTRUCTED AN ESTIMATE.  IT

12   COULD BE TOO HIGH, IT COULD BE TOO LOW.  THAT'S THE ESTIMATE.

13   Q.   ACTUALLY, IN YOUR REPORT, YOU SAID IT COULD BE AS HIGH AS

14   10.9 PERCENT IN 2016 FOR HUAWEI; CORRECT?

15   A.   YES.  I THINK I HAD A -- I HAD A DIFFERENT METHOD THAT LED

16   TO A HIGHER UPPER END THERE.  THESE ARE HER NUMBERS.

17   Q.   OKAY.  AND IF WE INCLUDED A 10 PERCENT NUMBER FOR

18   HISILICON, THE SHARE FOR QUALCOMM AND OTHERS WOULD PROBABLY

19   FALL FURTHER; CORRECT?

20   A.   IT WOULD FALL FURTHER, YES.

21   Q.   I THINK YOU SAID DURING YOUR DIRECT TESTIMONY THAT THE

22   INDUSTRY WE'RE TALKING ABOUT HERE, MODEM CHIPS AND CELLULAR, IS

23   SUBJECT TO RAPID TECHNOLOGICAL CHANGE.

24        DID I GET THAT RIGHT?

25   A.   YOU DID.

1    Q.   IN YOUR REPORT, YOU CALLED THIS INDUSTRY DYNAMIC; CORRECT?

2    A.   YES, THAT -- I BELIEVE THAT.  I THINK OF IT THAT WAY.

3    Q.   OKAY.  AND YOU RECOGNIZE THAT WHEN ANALYZING A MARKET

4    THAT'S EXPERIENCING RAPID CHANGE, ONE'S ANALYSIS SHOULD ACCOUNT

5    FOR CHANGING INDUSTRY CONDITIONS; RIGHT?

6    A.   CERTAINLY.

7    Q.   AND ACCORDING TO YOU, PROFESSOR SHAPIRO, IT'S NOT POSSIBLE

8    TO CONDUCT A DETAILED ANALYSIS OF QUALCOMM'S MARKET POWER

9    BEYOND THE AVAILABLE RELEVANT DATA OR OTHER EVIDENCE; ISN'T

10   THAT RIGHT?

11   A.   I WOULD TAKE THAT AS A TOTALITY.  WE USE THE EVIDENCE WE

12   HAVE AND WE CAN'T REALLY GO BEYOND THAT.

13   Q.   OKAY.  AND AT THE TIME YOU FORMED YOUR OPINIONS AND

14   CREATED YOUR REPORT, IT WAS THE CASE THAT IT'S NOT REALLY

15   POSSIBLE TO RELIABLY ANALYZE THE MARKET FOR 5G CHIPS AT THIS

16   TIME?

17   A.   WELL, IF YOU MEAN BY ANALYZE THE MARKET, PREDICT MARKET

18   SHARES, FOR EXAMPLE, OR KNOW EXACTLY WHICH CHIPS OR DEVICES

19   WILL COME OUT AT WHAT TIME, I THINK THAT'S, THAT'S FAIR.

20        WE DO HAVE A PRETTY GOOD INDICATION THAT QUALCOMM'S GOT

21   SOME LEADERSHIP POSITION THERE, JUST AS THEY DID WITH 4G.

22        BUT THAT WOULD NOT BE A FULL ANALYSIS OF THE MARKET.

23   Q.   RIGHT.  AND YOU SAID IN YOUR REPORT, "IT IS THUS NOT

24   POSSIBLE RELIABLY TO ANALYZE THE MARKET FOR 5G CHIPS AT THIS

25   TIME."

1          RIGHT?

2     A.   COULD YOU SHOW ME WHERE THAT IS?  I WANT TO MAKE SURE I

3     UNDERSTAND THE CONTEXT.

4     Q.   SURE.  IT'S IN PARAGRAPH 113 OF YOUR REPORT.  YOUR REPORT

5     IS IN THE FIRST TAB OF THE NOTEBOOK.

6     A.   OKAY.

7     Q.   WE CAN PUT IT UP ON THE SCREEN IF THAT'S EASIER.

8     A.   NO.  WELL, ACTUALLY, IT'S NOT EASIER FOR ME.  BUT IT'S UP

9     TO YOU.

10    Q.   LET'S PUT IT UP ON THE SCREEN, PLEASE, PARAGRAPH 113.

11    A.   OF MY REPORT?

12    Q.   I'M SORRY.

13    A.   THAT DOESN'T SEEM RIGHT TO ME.

14    Q.   I APOLOGIZE.  IT'S YOUR REBUTTAL REPORT.  I APOLOGIZE.

15    WE'VE GOT A LOT OF REPORTS.

16    A.   THAT'S TRUE.

17    Q.   CAN WE HAVE IT UP?

18         IT'S THE PARAGRAPH THAT SAYS, 5G-COMPLIANT CHIPS ARE NOT

19    BEING INCORPORATED INTO HANDSETS UNTIL 2019.

20         NOW I HAVE IT.

21         "IT IS THUS NOT POSSIBLE RELIABLY TO ANALYZE THE MARKET

22    FOR 5D CHIPS AT THIS TIME."

23         YOU SAID THAT IN YOUR REBUTTAL REPORT; CORRECT?

24    A.   YES.  AND WHY DON'T WE READ THE NEXT SENTENCE THEN.

25    Q.   YOU'LL GET A CHANCE TO DO THAT, PROFESSOR SHAPIRO, WITH

```
 1        YOUR COUNSEL --

 2        A.   OKAY.  SO I STAND BY THAT.

 3        Q.   -- IF YOU THINK IT'S INCOMPLETE.

 4             BUT YOU STAND BY THE STATEMENT THAT IT'S NOT POSSIBLE TO

 5        ANALYZE IT RELIABLY AT THIS TIME; RIGHT?

 6        A.   I STAND BY THIS.  I JUST WANTED TO UNDERSTAND THE CONTEXT.

 7        Q.   OKAY.  NOW, I THINK YOU TESTIFIED THAT THIS WAS A MARKET,

 8        THE MODEM CHIP MARKET, THAT WAS DIFFICULT TO BREAK INTO,

 9        ALTHOUGH SOME FOLKS HAVE DONE SO.

10        A.   THAT'S FAIR.

11        Q.   OKAY.  AND, IN FACT, SEVERAL PEOPLE HAVE BROKEN INTO BOTH

12        THE CDMA AND THE PREMIUM LTE MARKETS; CORRECT?

13        A.   YES.

14        Q.   SAMSUNG HAS BROKEN IN?

15        A.   SAMSUNG IS NOW IN THIS MARKET.

16        Q.   MEDIATEK?

17        A.   YES.

18        Q.   HUAWEI?

19        A.   YES.

20        Q.   INTEL?

21        A.   AGREED.

22        Q.   AND I THINK YOU SAID AT THE START OF YOUR TESTIMONY, IN A

23        MARKET LIKE THIS WHERE R&D IS EXPENSIVE, YOU COULDN'T EXPECT

24        THERE TO BE MORE THAN A FEW FIRMS ANYWAY; RIGHT?

25        A.   I THINK THAT YOU WOULD -- YOU WOULD -- IT ALL DEPENDS ON
```

1    THE SCALE.  BUT YOU COULD END UP WITH A FEW FIRMS, THAT'S

2    RIGHT.  WHETHER A FEW IS THREE OR SIX, IT DEPENDS ON THE

3    PARTICULARS.  BUT THAT WAS THE IDEA.

4    Q.   BUT I GOT IT RIGHT, DIDN'T I?  YOU SAID RIGHT UPFRONT THAT

5    IN A MARKET LIKE THIS WHERE RESEARCH AND DEVELOPMENT IS

6    EXPENSIVE, YOU WOULDN'T EXPECT THERE TO BE MORE THAN A FEW

7    FIRMS IN IT ANYWAY.  DIDN'T YOU SAY THAT?

8    A.   I THINK SO.

9    Q.   AND NOW WE HAVE A FEW FIRMS IN THE MARKET, DON'T WE?

10   A.   WE DO HAVE A FEW FIRMS IN THE MARKET.

11   Q.   AND DIDN'T --

12   A.   AND DURING THE PERIOD OF TIME THAT I WAS ANALYZING, THAT

13   WAS REALLY BEFORE A LOT OF THIS ENTRY TOOK PLACE AND QUALCOMM

14   HAD A DOMINANT POSITION.  AND THAT WAS EXACTLY THE SET -- WHAT

15   I SAID WE WERE CONCERNED ABOUT, THAT WE WOULD HAVE ONE OR A

16   MONOPOLY RATHER THAN A FEW OR SEVERAL.

17   Q.   NOW, SOME OF THESE FOLKS GOT IN FAIRLY QUICKLY TO THE

18   MARKET; ISN'T THAT FAIR?

19   A.   I DON'T KNOW WHAT YOU MEAN BY THAT.  I TEND TO THINK THAT

20   IT TAKES TIME, QUITE A WHILE TO GET INTO THIS MARKET.

21   Q.   WELL, INTEL BOUGHT VIA IN 2015 ACCORDING TO YOUR REPORT;

22   ISN'T THAT RIGHT?

23   A.   I THINK THAT'S CORRECT.

24   Q.   AND BY 2016, INTEL WAS SELLING CDMA CHIPS IN THE MARKETS

25   WE'RE TALKING ABOUT AS YOU REFLECTED EARLIER THIS MORNING.

1    A.    OKAY.  WHEN WE TALK ABOUT ENTRY AND ENTRY BARRIERS --

2    Q.    EXCUSE ME JUST A MINUTE.

3    A.    -- WE'RE NOT TALKING ABOUT ACQUISITION.

4    Q.    -- PROFESSOR SHAPIRO.

5          WEREN'T THEY SELLING CHIPS WITHIN A YEAR OF PURCHASING

6    VIA?  THAT'S WHAT I ASKED.

7    A.    OKAY.  BUT THAT DOESN'T -- OKAY.  IT'S JUST MISLEADING

8    BECAUSE IF YOU ENTER BY ACQUISITION, THAT'S NOT THE RIGHT

9    QUESTION.  OF COURSE YOU CAN ENTER A MARKET BY ACQUIRING

10   SOMEBODY WHO'S ALREADY SELLING THAT PRODUCT.  THAT'S NOT THE

11   QUESTION FOR ENTRY ANALYSIS.

12   Q.    OKAY.  WELL, LET'S ASK A DIFFERENT QUESTION THEN.

13         MEDIATEK WAS ABLE TO QUICKLY GAIN MARKET SHARE WHEN IT

14   DECIDED TO ADD CDMA TO ITS LTE CHIPS; ISN'T THAT RIGHT?

15   A.    I DON'T KNOW HOW LONG IT TOOK THEM TO DEVELOP AND THEN

16   INTRODUCE THE CDMA FUNCTIONALITY.  I'D HAVE TO, I DON'T KNOW,

17   LOOK THAT UP.  I DON'T HAVE THAT MEMORIZED.

18   Q.    WELL, YOUR REPORT REFLECTS THAT THEY BEGAN PRODUCING

19   CHIPS, CDMA CHIPS WITH LTE IN 2014, AND THAT BY THE FIRST

20   QUARTER OF 2015, THEY WERE SELLING AND SHIPPING INTO THE

21   MARKET.

22         DOES THAT SOUND ABOUT RIGHT?

23   A.    YES.  I THINK THEY MADE A SMALL NUMBER OF SALES IN 2014

24   AND THEN MORE IN 2015.  THAT REFERS TO ESSENTIALLY THE LAUNCH

25   OF PRODUCTS CONTAINING THEIR CHIPS AND SALES.

```
 1              THAT'S NOT THE QUESTION OF HOW -- THAT'S NOT THE SAME

 2      ISSUE OF HOW LONG IT TAKES TO DEVELOP AND PLAN ENTRY.  THAT'S

 3      NOT THE SAME QUESTION.

 4      Q.   AND BY 2016, AS WE OBSERVED, MEDIATEK HAD 36 PERCENT OF

 5      THE CDMA MARKET ACCORDING TO YOUR SLIDES?

 6      A.   RIGHT.  I THINK I SAID THEY'VE MADE, I THINK, GOOD INROADS

 7      IN CHINA.  THAT'S BEEN THE HEART OF WHAT THEY'VE BEEN ABLE TO

 8      ACHIEVE, YES.

 9      Q.   NOW, IN YOUR REPORT, YOU DEFINE MONOPOLY POWER AS THE

10      POWER TO MAINTAIN A HIGH SHARE AND EARN SUPRA-NORMAL PROFITS

11      WITHOUT BEING BETTER.

12           DOES THAT SOUND FAMILIAR?

13      A.   COULD YOU SHOW ME THAT, PLEASE?

14      Q.   SURE.  IT'S IN YOUR REPORT, PARAGRAPH 202 AT FOOTNOTE 422.

15      IT'S IN THE FOOTNOTE AT THE BOTTOM.  AND I HAVE IT ON THE

16      SCREEN IF THAT'S EASIER, PROFESSOR SHAPIRO.

17      A.   OKAY.  THAT'S A QUOTE FROM AN ARTICLE BY FRANK FISHER AS

18      ONE OF THE WAYS IN WHICH ECONOMISTS, ANTITRUST ECONOMISTS CAN

19      DESCRIBE MONOPOLY POWER.  THAT'S NOT MY WORDS.

20      Q.   ALL RIGHT.  BUT YOU RELIED ON THEM.  YOU REFERENCE THEM IN

21      YOUR REPORT?

22      A.   I REFERENCED IT IN MY REPORT.  MY WORDS ARE IN THE

23      PARAGRAPH, NOT THE FOOTNOTE.  BUT I'M REFERENCING IT TO

24      INDICATE THERE'S A NUMBER OF DIFFERENT LANGUAGE THAT ANTITRUST

25      ECONOMISTS USE AND AROUND THIS CONCEPT OF MONOPOLY POWER.
```

1    Q.   OKAY.  THE CONCEPT IS THAT YOU'RE LOOKING FOR POWER THAT

2    COMES FROM SOMETHING WITHOUT ACTUALLY BEING BETTER; RIGHT?

3    THAT'S THE CONCEPT HE'S REFLECTING IN THE NOTE?

4    A.   NO, NO, NO, THAT'S NOT CORRECT, NO.

5         LOOK, MOST MONOPOLISTS GOT THERE BY BEING INNOVATIVE AND

6    HAVING REALLY GOOD PRODUCTS, OKAY?  AND WHEN YOU'RE TALKING

7    ABOUT A MAINTENANCE OF MONOPOLY QUESTION CASE, THE QUESTION IS,

8    THAT'S GOOD.  BUT THEN DID THEY THEN BLOCKADE OTHERS FROM

9    COMPETING?  SO I CAN'T THINK OF A MONOPOLIST WHO DIDN'T

10   INITIALLY -- WELL, THAT'S PROBABLY TOO STRONG A STATEMENT.

11        BUT, NO, THERE'S NO QUESTION THAT QUALCOMM, YOU KNOW, HAS

12   DONE IMPORTANT R&D AND, YOU KNOW, HAS GOOD ENGINEERING AND

13   SHOULD GET THE RETURN FOR ALL THAT.  THAT'S, THAT'S -- I'M NOT

14   BRINGING THAT INTO QUESTION.

15   Q.   OKAY.  SO YOU WOULD AGREE WITH ME THAT QUALCOMM EARNED ITS

16   POSITION INITIALLY AT LEAST, EVEN ACCORDING TO YOU, THROUGH

17   INNOVATION, SKILL, FORESIGHT, AND BETTER PRODUCTS; RIGHT?

18   A.   WELL, I THINK IF YOU GO BACK TO THE EARLY '90S WHEN

19   THEY'RE FIRST COMING OUT WITH THEIR CHIPS AND THEIR CDMA

20   INNOVATION, I THINK THEY SHOULD BE -- YOU KNOW, GET A LOT OF

21   CREDIT FOR THAT, AND I THINK THEY DO, ACTUALLY.

22        SO, YOU KNOW, IN TERMS OF THE COMPANY'S HERITAGE, YOU

23   KNOW, HEAR HEAR.

24   Q.   HEAR HEAR.  HEAR HEAR, THEY GOT THERE ON INNOVATION,

25   PERFORMANCE, BETTER PRODUCTS; RIGHT?

1    A.    I'M TALKING ABOUT THE EARLY '90S.  WE'RE SAYING INITIALLY

2    HOW DID THEY ACHIEVE REALLY THEIR INITIAL POSITION IN BOTH

3    CHIPS AND IN PATENT -- IN THE EARLY CELLULAR STANDARD ESSENTIAL

4    PATENTS.

5    Q.    NOW, YOU'RE --

6    A.    I'M NOT CALLING ANY OF THAT INTO QUESTION.  I'M TALKING

7    ABOUT, YOU KNOW, WE'RE STARTING IN 2006, SO THAT'S MANY YEARS

8    LATER AFTER THAT, 10, 15 YEARS LATER.

9    Q.    RIGHT.  NOW, OBVIOUSLY YOU DIDN'T MAKE A TECHNICAL

10   EVALUATION OF QUALCOMM'S MODEM PRODUCTS OR COMPARE THAT TO THE

11   PRODUCTS OF OTHERS IN YOUR REPORT; IS THAT RIGHT?

12   A.    THAT IS CORRECT.

13   Q.    OKAY.  BUT TO THE EXTENT YOU LOOKED AT EVIDENCE FROM THE

14   RELEVANT PERIOD ABOUT QUALCOMM'S PERFORMANCE, VIRTUALLY ALL OF

15   THAT EVIDENCE WAS THAT THEIR MODEMS WERE GENERALLY CONSIDERED

16   BETTER THAN THE REST; RIGHT?

17   A.    I DON'T KNOW THAT I WOULD, WOULD MAKE SUCH A SWEEPING

18   STATEMENT.  BUT LET'S TAKE PREMIUM LTE MODEMS.

19   Q.    WELL, EXCUSE ME, PROFESSOR.  I THINK YOU'VE ANSWERED MY

20   QUESTION.

21   A.    OKAY.

22   Q.    BUT YOU DID MAKE SUCH A STATEMENT.  YOU SAID, "THE

23   EVIDENCE INDICATES THAT OEM'S DID NOT REGARD OTHER SUPPLIERS'

24   CDMA MODEM CHIPS AS GOOD ALTERNATIVES TO QUALCOMM FOR MOST OF

25   THE RELEVANT TIME PERIOD, PARTICULARLY PRIOR TO 2015."

1          RIGHT?

2    A.   COULD YOU SHOW ME WHERE THAT IS, PLEASE?

3    Q.   SURE.  PARAGRAPH 209.

4    A.   YES.

5    Q.   IT'S THE VERY FIRST SENTENCE.

6    A.   SO -- THANK YOU.  THAT'S EXACTLY --

7    Q.   SO MY QUESTION IS, ISN'T THAT A STATEMENT THAT YOU MADE IN

8    YOUR REPORT?

9    A.   YES, IT IS.  AND THAT'S -- THAT WAS EXACTLY THE

10   QUALIFICATION I WAS, I WAS MAKING IN RESPONSE TO THE PREVIOUS

11   QUESTION, WHICH IS I DON'T WANT TO MAKE A BROAD, SWEEPING

12   STATEMENT ACROSS ALL MODEMS AND ALL TIME.

13        BUT, YES, I THINK QUALCOMM WAS -- YOU KNOW, I STAND BY

14   THIS STATEMENT REGARDING THE CDMA MODEM CHIPS DURING THAT

15   PERIOD OF TIME.

16   Q.   OKAY.  AND YOU OBSERVED ELSEWHERE THAT VIA DID NOT PRODUCE

17   MODEM CHIPS COMPATIBLE WITH 3G WCDMA STANDARDS, LTE, OR ANY

18   COMBINATION OF THESE NON-CDMA STANDARDS; CORRECT?

19   A.   THAT IS CORRECT DURING THAT PERIOD OF TIME.

20   Q.   AND YOU SAID VIA TRAILED QUALCOMM IN CDMA CAPABILITIES,

21   DEVELOPING CDMA 2000 -- THAT'S 3G -- YEARS AFTER QUALCOMM

22   BROUGHT CHIPS WITH THIS TECHNOLOGY TO THE MARKET; CORRECT?

23   A.   YES.  THESE ARE ALL PART OF THE REASONS WHY QUALCOMM HAD

24   MONOPOLY POWER OVER THOSE CHIPS.

25   Q.   AND AS A MATTER OF FACT, YOU DID AN ANALYSIS AND CONCLUDED

1    THAT QUALCOMM WAS THE FIRST TO RELEASE CHIPS IN NEARLY ALL

2    PREMIUM LTE CATEGORIES; RIGHT?

3    A.   YES.  AS I SHOWED, THEY WERE THE SOLE SUPPLIER FOR THE

4    FIRST COUPLE YEARS OF PREMIUM LTE MODEM CHIPS.

5    Q.   LET'S TAKE A LOOK AT SLIDE 18 FROM YOUR REPORT.  I'M

6    SORRY, SLIDE 18 FROM YOUR SLIDE DECK.

7    A.   OKAY.

8    Q.   THIS WAS NOT SHOWN THIS MORNING DURING YOUR DIRECT

9    EXAMINATION, BUT IT'S FROM YOUR REPORT.

10        THIS IS AN ANALYSIS THAT YOU PERFORMED; CORRECT?

11   A.   YES, THIS IS FROM MY REPORT, FIGURE 15.

12   Q.   AND FIGURE 15 ILLUSTRATES THAT QUALCOMM WAS THE FIRST TO

13   RELEASE CHIPS IN NEARLY ALL PREMIUM LTE CATEGORIES; CORRECT?

14   A.   I FIND THIS HARD TO READ.  BUT, YES, I THINK THAT'S

15   CORRECT.

16   Q.   OKAY.  AND JUST TO ILLUSTRATE IT, LET'S START ON THE LEFT

17   IS QUALCOMM, AND ON THE FAR LEFT, THOSE ARE PERIODS OF TIME,

18   QUARTERS IN EACH YEAR; CORRECT?

19   A.   YES, THAT'S CORRECT.

20   Q.   SO THE BIG BLUE BOX, THAT'S CATEGORY 3, DOWNLOAD, UPLOAD,

21   DOWNLINK, UPLINK FROM PREMIUM LTE.  QUALCOMM WAS A COUPLE YEARS

22   AHEAD OF THE NEXT COMPETITOR, SAMSUNG TWO YEARS LATER; CORRECT?

23        THE COURT:  I'M SORRY TO INTERRUPT.

24        CAN YOU ALL SCOOT IN SO WE CAN ACCOMMODATE SOMEONE

25   STANDING IN THE BACK?  THANK YOU.

1           THE WITNESS:  SO I THINK THAT'S CORRECT.  FOR

2     CATEGORY 3, IT'S SHOWING QUALCOMM SHIPPING IN FOURTH QUARTER OF

3     2010 AND SAMSUNG SHIPPING IN THE FOURTH QUARTER OF 2012.

4     BY MR. VAN NEST:

5     Q.   RIGHT.  AND TO THE SAME EFFECT, CATEGORY 4, QUALCOMM

6     SHIPPED IN THE SECOND QUARTER OF 2013, SAMSUNG DIDN'T SHIP

7     UNTIL A YEAR LATER.  SO THEY WERE ABOUT A YEAR AHEAD IN THAT

8     ONE; RIGHT?

9     A.   I AGREE.

10    Q.   AND GENERALLY THE CONCLUSION YOU DREW FROM THIS, WHICH IS

11    IN THE RELEVANT TIME PERIOD WE'RE TALKING ABOUT AND THE MARKET

12    YOU'RE ANALYZING IS THAT QUALCOMM WAS RELEASING CHIPS FASTER

13    THAN ANYONE ELSE IN NEARLY ALL PREMIUM LTE CATEGORIES; RIGHT?

14    A.   YES.  THEY WERE THE LEADER.  THIS IS ALL PART OF THE

15    REASONS WHY THEY HAD MONOPOLY POWER IN THAT MARKET.

16    Q.   YOU ALSO RELIED ON VARIOUS MARKET STATEMENTS TO THE EFFECT

17    THAT QUALCOMM REMAINS A CLEAR LEADER WITH ALL THE SOLUTIONS

18    FROM OTHERS LAGGING BEHIND IN TIMING AND BREADTH; RIGHT?

19    A.   I THINK THAT'S THE SAME GENERAL POINT.  IS THAT A QUOTE

20    FROM MY REPORT?

21    Q.   IT IS.

22    A.   OKAY.

23    Q.   YOU STAND BY THAT?

24    A.   THAT SOUNDS CORRECT TO ME.

25    Q.   OKAY.  AND THAT QUALCOMM STOOD OUT BY PROVIDING MULTIMODE

```
 1    SUPPORT BEFORE ANYONE ELSE DID; RIGHT?

 2    A.   OKAY.

 3    Q.   YOU NOTED IN THE REPORT THAT QUALCOMM CONTINUALLY RELEASES

 4    NEWER, FASTER LTE MODEM CHIPS THAN ANYONE ELSE; RIGHT?

 5    A.   WHY DON'T YOU SHOW ME THIS AGAIN?  I JUST WANT TO MAKE

 6    SURE WE'VE GOT THE RIGHT CONTEXT.  THIS ALL SOUNDS RIGHT TO ME,

 7    BUT --

 8    Q.   SURE.  THIS IS IN PARAGRAPH 446 OF YOUR REBUTTAL.

 9    A.   OKAY.

10    Q.   THE REBUTTAL?

11    A.   IT'S JUST IF YOU'RE GOING TO GET ME TO BE ON THE WITNESS

12    STAND AND SAY, "YES, I SAID THAT," I'D LIKE TO ACTUALLY CHECK

13    THAT THAT'S WHAT I SAID.

14    Q.   THERE'S NOTHING WRONG WITH THAT, PROFESSOR SHAPIRO.  WE

15    HAVE IT ALL RIGHT HERE?

16    A.   OKAY.  THANK YOU.

17         THE COURT:  THE REBUTTAL REPORT ENDS AT PARAGRAPH

18    430.  IS THERE A SECOND SECTION?  OH, YOU MEAN THE APPENDIX?

19         THE WITNESS:  MAYBE YOU HAVE -- I HAVE PARAGRAPH 446

20    AT PAGE C 11.  THERE'S SOME APPENDICES.

21         THE COURT:  GOT IT.

22         MR. VAN NEST:  DO YOU HAVE IT?  CAN WE DISPLAY IT?

23         THE COURT:  GO AHEAD, PLEASE.

24         MR. VAN NEST:  IT'S IN THE APPENDIX, YOUR HONOR.  I'M

25    SORRY.
```

```
 1                    THE WITNESS:  OKAY.  I SEE THAT.

 2      BY MR. VAN NEST:

 3      Q.   THAT'S WHAT YOU SAID, AND YOU STAND BY THAT?

 4      A.   OKAY.  I AGREE.

 5      Q.   AND I THINK IT SOUNDS LIKE YOU'VE BEEN READING TRIAL

 6      TESTIMONY AS WE GO ALONG; CORRECT?

 7      A.   YES, I HAVE.

 8      Q.   YOU READ A NUMBER OF THE OTHER OEM'S TESTIFYING THAT

 9      QUALCOMM WAS SIMPLY BETTER THAN ANYTHING ELSE; RIGHT?

10      A.   IN MANY CASES, YES, THAT'S WHY THEY WERE VERY CONCERNED

11      ABOUT LOSING ACCESS TO QUALCOMM CHIPS.  IT'S THE SAME IDEA.

12      Q.   SO, FOR EXAMPLE, MR. BLUMBERG, WHEN HE WAS HERE TESTIFIED

13      BY VIDEO THAT "QUALCOMM HAD THE BEST CHIPSET AVAILABLE AND IT

14      WOULD BE DIFFICULT TO CONVINCE CONSUMERS OR CARRIERS TO SPEND

15      FOR A HIGH END PHONE IF IT DID NOT HAVE THE FEATURES,

16      FUNCTIONS, AND PERFORMANCE THAT THE QUALCOMM CHIP PROVIDED";

17      RIGHT?

18      A.   THAT SOUNDS RIGHT.  THAT'S EXACTLY THE TYPE OF EVIDENCE I

19      CONSIDER RELEVANT FOR MARKET DEFINITION.

20      Q.   AND MS. EVANS, FROM INTEL, SHE SAID THAT INTEL WAS STILL

21      TWO YEARS BEHIND QUALCOMM ON SHIPPING LTE.

22           DO YOU RECALL REVIEWING THAT TESTIMONY?

23      A.   I DO REMEMBER, ALTHOUGH WHAT WAS THE -- I GUESS I WANT TO

24      GET THE TIMEFRAME ON THAT.  THAT WAS IN THE EARLIER LTE DAYS?

25      Q.   LATE 2012.  SO A COUPLE YEARS IN.
```

1    A.   OKAY.

2    Q.   RIGHT?

3    A.   I DO REMEMBER HER SAYING THEY WERE BEHIND AND THAT WAS

4    PART OF HER JOB WAS TO CATCH UP.

5    Q.   RIGHT.  AND BY LATE 2012, SHE FELT INTEL, WITH ALL OF ITS

6    EFFORT AND RESOURCES, WAS STILL TWO YEARS BEHIND?

7    A.   YES, AND I THINK THAT'S WHY INTEL HAD A SHOT AT CERTAIN

8    SALES AT APPLE, BUT THEY WEREN'T YET POSITIONED TO REALLY GO

9    FOR A MUCH LARGER VOLUME.

10   Q.   I'D LIKE TO BEGIN TALKING ABOUT THE TESTIMONY YOU GAVE ON

11   THE TAX THEORY OF ANTICOMPETITIVE HARM.

12   A.   OKAY.

13   Q.   DO YOU RECALL THAT TESTIMONY THIS MORNING?

14   A.   I DO.

15   Q.   ACTUALLY, I THINK IT WOULD BE EASIER IF WE COULD BREAK

16   THIS DOWN.

17        YOUR HONOR, I HAVE AN EASEL.  IF YOU COULD PULL IT UP?

18        CAN YOU SEE IT OVER HERE, PROFESSOR SHAPIRO, FROM THERE?

19   A.   I CAN SEE THE EASEL.  WHETHER I CAN SEE WHAT YOU WRITE ON

20   IT REMAINS TO BE SEEN.

21   Q.   WELL, YOU AND I MIGHT HAVE THE SAME PROBLEM.  BUT WE'LL

22   TRY.

23        I BELIEVE WHAT YOU SAID WAS THAT QUALCOMM -- THE STARTING

24   POINT FOR THIS WAS THAT QUALCOMM USED ITS MONOPOLY POWER OVER

25   MODEM CHIPS TO EXTRACT SUPRA-FRAND ROYALTIES FROM OEM'S;

```
 1     CORRECT?

 2     A.   YES.

 3     Q.   THAT'S KIND OF THE CORNERSTONE OF THE STARTING POINT OF

 4     THIS OPINION?

 5     A.   THAT'S THE KEY LEVERAGE THAT WAS APPLIED USING THE NO

 6     LICENSE, NO CHIPS IN CONJUNCTION WITH REFUSING TO LICENSE.

 7     Q.   OKAY.  ALL RIGHT.  I'M GOING TO WRITE "TAX THEORY" AT THE

 8     TOP.

 9          AND IT STARTS WITH, LET'S CALL IT -- YOU REFERRED TO IT AS

10     A TAX, SO I'LL CALL IT A SUPRA-FRAND TAX.

11          OKAY.  THAT'S THE EXCESS ROYALTIES THAT YOU SAY QUALCOMM

12     IS ABLE TO EXTRACT FROM OEM'S; CORRECT?

13     A.   OKAY.  SO THAT'S WHAT I'VE BEEN CALLING THE ROYALTY

14     SURCHARGE.

15     Q.   THAT'S RIGHT, THE ROYALTY SURCHARGE.

16     A.   OKAY.

17     Q.   AND UNDER YOUR THEORY, THAT ACTS LIKE A TAX THAT RAISES

18     THE COST OF RIVAL CHIP MAKERS; RIGHT?

19     A.   THAT'S THE CORRECT ECONOMICS, YES.

20     Q.   OKAY.  SO RIVALS' COST -- THESE ARE CHIP MAKERS -- THEY GO

21     UP UNDER THIS THEORY; RIGHT?

22     A.   THEY DO GO UP.  THAT'S THE CORRECT ECONOMICS.

23     Q.   THAT'S RIGHT.  EVEN THOUGH THE OEM IS PAYING THE PREMIUM,

24     ACCORDING TO YOU, THE TAX FALLS ON THE -- ECONOMICALLY UNDER

25     YOUR THEORY -- FALLS ON THE RIVAL; CORRECT?
```

1    A.   NO.  WHAT I'M SAYING IS THE TAX FALLS ON THE TRANSACTIONS

2    TAKING PLACE.

3    Q.   OH.

4    A.   THE TAX IS APPLIED TO A TRANSACTION, THAT'S ALL TAXES.

5    Q.   AND THEN --

6    A.   AND THEN I'M SAYING ECONOMICALLY, WHEN TREATED AS THOUGH

7    THE RIVAL IS PAYING THAT, EVEN THOUGH THE OEM IS, BUT THE

8    ECONOMICS IS THAT IT FALLS ON THE TRANSACTION.

9    Q.   OKAY.  BUT IT RAISES RIVALS' COST.  YOU SAID THAT THIS

10   MORNING?

11   A.   YES.

12   Q.   OKAY.

13   A.   AND I THINK A GOOD WAY TO THINK ABOUT IT IS TO THINK ABOUT

14   IT BEING A COST TO THE RIVAL, AND THEN WE TRACE -- INCREASED

15   COST TO THE RIVAL -- SORRY -- AND THEN WE TRACE THROUGH THE

16   ECONOMIC IMPLICATIONS OF THAT.

17   Q.   OKAY.  AND ONE IMPLICATION, AGAIN FROM YOUR TESTIMONY, IS

18   THAT THE RIVALS' INCOME, OPERATING INCOME, GOES DOWN BECAUSE

19   ITS COSTS WENT UP; RIGHT?

20   A.   RIGHT.  WELL, IN A GIVEN TRANSACTION, I EXPLAINED HOW THAT

21   WOULD HAPPEN.  AND MORE GENERALLY, IT WOULD HAPPEN BECAUSE

22   THE RIV -- TO THE EXTENT THE RIVAL COULD NOT FULLY PASS ON

23   THESE COSTS TO ITS CUSTOMERS.

24   Q.   OKAY.  IF THEY DON'T PASS ON THE COST, THEN IT'S THEIR

25   INCOME THAT WILL SHRINK; RIGHT?

SHAPIRO CROSS BY MR. VAN NEST

1    A.   NORMALLY, AS A GOOD RULE, WHEN A FIRM'S COSTS GO UP, THEY

2    HAVE TO EAT SOME OF IT AND THEY PASS SOME OF IT ON.

3         AND TO THE EXTENT THEY EAT IT, THEIR INCOME GOES DOWN --

4    Q.   OKAY.

5    A.   -- ON EXISTING TRANSACTIONS, AND, OF COURSE, AS I ALSO

6    SAID, THE NUMBER OF TRANSACTIONS FALLS.  SO THAT'S ANOTHER

7    REASON THAT INCOME GOES DOWN.

8    Q.   OKAY.  AND THEN YOU SAID THAT WHEN INCOME GOES DOWN, THAT

9    CAN BE EXPECTED TO REDUCE RIVALS' INVESTMENT IN R&D, RESEARCH

10   AND DEVELOPMENT; RIGHT?

11   A.   EVERYTHING ELSE EQUAL, THAT -- I MEAN, IT'S REALLY THE

12   EXPECTED FUTURE EARNINGS THAT DRIVE THE R&D INVESTMENT.

13        SO, YES, EVERYTHING ELSE EQUAL, I THINK THAT'S A

14   COMPLETELY UNCONTROVERSIAL ECONOMIC PROPOSITION.

15   Q.   AND YOU SAY THAT ULTIMATELY WILL LEAD TO HARM TO

16   COMPETITION BECAUSE INNOVATION WILL SLOW DOWN, AMONG OTHER

17   REASONS; RIGHT?

18   A.   WELL, THAT'S -- EXACTLY.  THAT'S THE MECHANISM, AND THAT

19   WOULD BE THE GENERAL -- I THINK THE CLEAR PREDICTION ALL ELSE

20   EQUAL.

21   Q.   OKAY.  NOW, ACCORDING TO YOU, SORT OF THE CENTRAL

22   COMPETITIVE PROBLEM HERE IS THE SUPRA-FRAND ROYALTY THAT YOU

23   START OFF WITH; CORRECT?

24   A.   YES.  THE USE OF THE CHIP MONOPOLY TO ACHIEVE THAT ON

25   QUALCOMM'S PART, YES.

1    Q.   OKAY.  AND YOU'RE NOT OFFERING ANY OPINION AS TO WHAT THE

2    FRAND RATE OR RANGE OF QUALCOMM'S SEP IS; ISN'T THAT RIGHT?

3    A.   THAT IS CORRECT.

4    Q.   RIGHT.  YOU'RE RELYING ON MR. LASINSKI FOR THAT?

5    A.   NO, I'M NOT RELYING ON HIM.

6    Q.   WELL, YOU UNDERSTOOD, WHEN YOUR DEPOSITION WAS TAKEN YOU

7    SAID, "MR. LASINSKI IS COVERING THAT"; RIGHT?

8    A.   YES.  HE'S THE ONE WHO'S OFFERING AN OPINION ABOUT THE

9    FRAND RATE.

10   Q.   RIGHT.  AND YOU ARE NOT OFFERING AN OPINION ABOUT EITHER

11   THE FRAND RATE OR THE FRAND RANGE AS PART OF YOUR ANALYSIS;

12   CORRECT?

13   A.   THAT'S CORRECT.

14   Q.   ALL RIGHT?

15   A.   I'M OFFERING AN OPINION ABOUT THE SUPRA -- THE ROYALTY

16   SURCHARGE, NOT THE LEVEL ON WHICH IT'S APPLIED.  NOT THE

17   REASONABLE ROYALTY BASE TO WHICH IT'S APPLIED.

18   Q.   YEAH.  YOU'RE ASSUMING THE SURCHARGE AND YOU'RE WORKING

19   THROUGH YOUR ANALYSIS HERE IN THE TAX THEORY; CORRECT?

20   A.   NO, I'M NOT ASSUMING THE SURCHARGE.  I EXPLAINED HOW IT

21   AROSE.

22   Q.   OKAY.  BUT YOU HAVEN'T DONE ANY QUANTITATIVE ANALYSIS OR

23   ECONOMIC QUANTITATIVE ANALYSIS TO COME UP WITH A FRAND RATE OR

24   A FRAND RANGE; RIGHT?

25   A.   LIKE I SAID, THAT'S WHAT MR. LASINSKI IS DOING.  I'M

1       TESTIFYING ABOUT THE ROYALTY SURCHARGE.

2       Q.   OKAY.  SO POINT ONE:  IF THE COURT WERE TO DETERMINE THAT

3       THE EVIDENCE DOESN'T SUPPORT THE EXISTENCE OF A SUPRA-FRAND

4       ROYALTY, THEN THE REST OF YOUR ANALYSIS CAN BE IGNORED; RIGHT?

5           IT DEPENDS ON THAT AS A STARTING POINT?

6       A.   SO IF THE COURT WERE TO DETERMINE THAT ALL THIS LEVERAGE

7       DIDN'T LEAD TO ANYTHING IN TERMS OF A SUPRA -- A ROYALTY

8       SURCHARGE --

9       Q.   THAT'S RIGHT?

10      A.   -- THEN THE ECONOMIC CONSEQUENCES OF THE SURCHARGE WOULD

11      NOT COME INTO PLAY.  I THINK THAT'S LOGICAL.

12      Q.   I THINK THAT'S WHAT I SAID.

13      A.   I JUST --

14      Q.   UNLESS THE EVIDENCE SUPPORTS THE EXISTENCE OF A

15      SUPRA-FRAND ROYALTY, THIS ANALYSIS IS IRRELEVANT; RIGHT?  I

16      THINK THAT'S WHAT YOU JUST SAID, BUT --

17      A.   I GUESS I -- I'M RESISTING, I ADMIT A LITTLE BIT, THAT

18      IRRELEVANT MAKES ME FEEL BAD.

19          (LAUGHTER.)

20      BY MR. VAN NEST:

21      Q.   DON'T FEEL BAD.

22      A.   BUT I THINK THAT, YES, THE BUILDING BLOCK FOR, FOR THIS

23      DISCUSSION OF EFFECTS IS THAT QUALCOMM WAS ABLE TO ACHIEVE A

24      ROYALTY SURCHARGE BY APPLYING THE CHIP LEVERAGE.

25          SO, YES, THAT IS CORRECT.

1    Q.   OKAY.  I'M NOT HERE TO MAKE YOU FEEL GOOD.  YOU KNOW THAT.

2         (LAUGHTER.)

3              THE WITNESS:  I WAS HOPING, BUT --

4    BY MR. VAN NEST:

5    Q.   OKAY.

6         SO COULD WE HAVE SLIDE 28 FROM -- SO HERE'S WHAT YOU --

7    HERE'S WHAT YOU SHOWED THIS MORNING.

8         I TAKE IT THIS IS PURELY ILLUSTRATIVE.  I THINK THAT'S

9    WHAT YOU SAID.

10   A.   YES.

11   Q.   THAT THE ROYALTY SURCHARGE THERE IS HYPOTHETICAL?

12   A.   THAT'S CORRECT.

13   Q.   RIGHT?  IT'S NOT BASED ON ANY QUANTITATIVE ANALYSIS THAT

14   YOU DID OR LASINSKI DID OR ANYBODY DID.  IT'S JUST A NUMBER

15   YOU'VE ASSUMED; RIGHT?

16   A.   IT'S ILLUSTRATIVE.  I THOUGHT I WAS CLEAR ON THAT.

17   Q.   OKAY, GOOD.  AND THE RIVALS' COST, THE CHIP MAKER'S COST,

18   THAT $5 NUMBER, THAT'S ILLUSTRATIVE, TOO?

19   A.   ALL THE NUMBERS HERE ARE.

20   Q.   OKAY.  AND YOU'RE NOT IMPLYING BY THIS THAT THE ROYALTIES

21   ARE ALWAYS NEGOTIATED ALONG WITH CHIP PRICING SALES; CORRECT?

22   A.   I DON'T UNDERSTAND THAT QUESTION.

23   Q.   IT'S NOT YOUR TESTIMONY THAT LICENSES ARE ALWAYS

24   NEGOTIATED IN CONJUNCTION WITH CHIP SALES?  THEY'RE OFTEN DONE

25   SEPARATELY; CORRECT?  LICENSE NEGOTIATIONS ARE SEPARATE FROM

```
1       CHIP SALES?

2       A.   OFTEN THEY ARE, YES.

3       Q.   OKAY.

4       A.   WE'RE TALKING ABOUT QUALCOMM; RIGHT?

5       Q.   YES, QUALCOMM.  SO YOU'RE NOT TRYING TO IMPLY ANYTHING

6       ABOUT TIMING WITH YOUR EXAMPLE HERE?

7       A.   I DON'T UNDERSTAND WHAT YOU'RE SAYING BECAUSE THIS IS NOT

8       ABOUT A CHIP SALE BY QUALCOMM.  THIS IS A CHIP SALE BY A RIVAL.

9       SO YOU'RE THROWING ME OFF.

10      Q.   FAIR ENOUGH.  FAIR ENOUGH.

11           AND ALSO THE RIVALS' COST, THAT HYPOTHETICAL NUMBER IS

12      SUBSTANTIALLY LOWER THAN WHAT YOUR REPORT SUGGESTS IS THE

13      RIVALS' COST ON AVERAGE; RIGHT?

14      A.   THESE ARE JUST ILLUSTRATIVE NUMBERS.  THEY'RE NOT MEANT

15      TO -- IT'S JUST A CONCEPT.

16      Q.   OKAY.  THE ACTUAL NUMBER FROM YOUR REPORT FOR RIVALS' COST

17      IS SOMEWHERE BETWEEN $16 AND $21, NOT $5; RIGHT?

18      A.   I DON'T KNOW.  THE COSTS CHANGE OVER TIME AND BY TYPE OF

19      CHIP.  SO IF YOU WANT TO SHOW ME WHAT THAT IS.

20      Q.   SURE.

21      A.   BUT, NO, YOU SHOULD NOT THINK THIS $5 HAS ANYTHING TO DO

22      WITH -- IT'S NOT MEANT TO BE AN ACTUAL CHIP COST.  IT'S MEANT

23      TO ILLUSTRATE THE CONCEPT.

24      Q.   FAIR ENOUGH.  BUT COULD WE HAVE DEMONSTRATIVE SLIDE 13 UP

25      TO BUTTON THIS UP.  THIS IS A SLIDE YOU PREPARED FOR TODAY, YOU
```

1    DIDN'T SHOW IT, BUT IT'S SOMETHING YOU PREPARED; RIGHT?

2    A.   CORRECT.

3    Q.   FROM YOUR REPORT?

4    A.   OKAY.

5    Q.   COULD WE HIGHLIGHT THE SECOND LINE, THE TOP BOX, PLEASE.

6    THIS IS THE SMARTPHONE HIGH WITH WLAN, AND AUC, THAT STANDS FOR

7    AVERAGE UNIT COST; CORRECT?

8    A.   OKAY.

9    Q.   SO YOU ACTUALLY HAD IN YOUR REPORT NUMBERS BETWEEN $16 AND

10   $21 THAT ARE SIGNIFICANTLY HIGHER THAN THE $5 THAT YOU PUT IN

11   YOUR ILLUSTRATION; CORRECT?

12   A.   WELL, YEAH.  IF YOU'RE GOING TO PICK THE TOP ROW.  BUT

13   THEN WHY DON'T YOU PICK ANOTHER ROW.  I CAN ALREADY SEE ANOTHER

14   ROW WHERE THE AVERAGE UNIT COST IS 2.50 OR 2.29 OR IN THE $2

15   RANGE.  SO THEY'RE ALL OVER THE PLACE.

16   Q.   OKAY.  WE'RE TALKING ABOUT PREMIUM LTE CHIP, AREN'T WE,

17   PROFESSOR SHAPIRO?

18   A.   YES.

19   Q.   AND IF WE'RE TALKING ABOUT PREMIUM LTE CHIP, I'VE GOT THE

20   RIGHT COLUMN UP ON THE BOARD; RIGHT?

21   A.   I THINK YOU MEAN THE RIGHT ROW.

22   Q.   YOU'RE RIGHT.  THE RIGHT ROW?

23   A.   WELL, MAYBE IF I -- CAN I LOOK AT THE WHOLE CHART AGAIN?

24   I MEAN, THERE'S -- HIGH, MID -- YEAH, I THINK THAT'S RIGHT FOR

25   THIS CHART.

1     Q.   OKAY.

2     A.   YEAH, I THINK YOU'RE RIGHT.

3     Q.   LET'S GO BACK TO 28.

4          AND YOU ALSO HAVE NOT DONE ANY QUANTITATIVE ANALYSIS TO

5     DETERMINE HOW MUCH OF THE SURCHARGE, IF ANY, WAS CAUSED BY CHIP

6     LEVERAGE WITH RESPECT TO ANY OEM; ISN'T THAT RIGHT?

7     A.   I'VE NOT DONE A QUANTITATIVE MEASUREMENT THERE.  BUT DID I

8     SAY -- I THINK I SAID IN TESTIMONY, AND CERTAINLY IN MY REPORT,

9     THAT THE KEY THING TO LOOK AT IS THE COST TO THE OEM OF LOSING

10    THE QUALCOMM CHIP SUPPLY BECAUSE THAT'S THE LEVERAGE THAT WAS

11    BROUGHT TO BEAR AND THAT'S SOMETHING, YOU KNOW, OEM'S HAVE

12    TESTIFIED ABOUT BEING VERY SUBSTANTIAL.

13    Q.   BUT, AGAIN, YOU HAVEN'T DONE ANY QUANTITATIVE ANALYSIS TO

14    DETERMINE HOW MUCH OF THE SURCHARGE YOU'RE OPINING ABOUT, IF

15    ANY, WAS CAUSED BY CHIP LEVERAGE AS OPPOSED TO THE THREAT OF

16    LITIGATION, THE FEAR OF LITIGATION, THE FEAR OF INJUNCTIONS AND

17    OTHER FACTORS; RIGHT?  YOU HAVEN'T DONE THAT?

18    A.   I HAVE NOT QUANTIFIED THE ROYALTY SURCHARGE.

19    Q.   OKAY.  NOW --

20    A.   BUT I BELIEVE IT'S SUBSTANTIAL.

21    Q.   LET'S GO BACK TO RAISING RIVALS' COSTS.

22         THIS IS PART OF YOUR THEORY, BUT, IN FACT, YOU HAVEN'T

23    DONE ANY ECONOMIC ANALYSIS OF THE ACTUAL COSTS IN THE REAL

24    WORLD OF ANY OTHER CHIP MAKER; RIGHT?

25    A.   ARE YOU REFERRING TO THE ROYALTY COSTS OR OTHER COSTS WHEN

1    YOU SAY THE COSTS?

2    Q.   OTHER COSTS IN THE REAL WORLD THAT RIVALS INCUR.

3    A.   I HAVE NOT DONE AN ANALYSIS OF THEIR PRODUCTION COSTS.  I

4    DON'T NEED TO DO THAT.

5    Q.   OKAY.  IN OTHER WORDS, THERE ARE LOTS OF THINGS THAT CAN

6    AFFECT RIVALS' COSTS IN THE REAL WORLD, INCLUDING PRODUCTION

7    COSTS; RIGHT?

8    A.   RIGHT.  AND I'M FOCUSSING ON HOW THE COSTS WERE RAISED,

9    NOT WHAT THE LEVEL WAS TO START WITH.

10   Q.   OKAY.  AND ENGINEERING COSTS CAN GO UP AND DOWN; RIGHT?

11   A.   CERTAINLY.

12   Q.   MARKETING COSTS CAN GO UP AND DOWN?

13   A.   OF COURSE.

14   Q.   HEAD COUNT CAN GO UP AND DOWN?

15   A.   AND VARY ACROSS RIVALS.

16   Q.   AND YOU KNEW, IN DOING YOUR WORK, THAT THE FTC HAD ACCESS,

17   IF THEY WANTED IT, TO FINANCIAL INFORMATION ABOUT COSTS FROM

18   ALL OF THESE OTHER RIVAL CHIP MAKERS; RIGHT?

19   A.   I'M NOT SURE EXACTLY WHAT THEY HAD ON THAT.

20   Q.   OKAY.

21   A.   SOMETIMES COMPANIES ARE NOT COMPLETELY -- DON'T GIVE ALL

22   THE INFORMATION IN A USABLE WAY.  I DON'T KNOW.

23   Q.   OKAY.  BUT IT'S CERTAINLY THE CASE THAT YOU HAVEN'T

24   QUANTIFIED THE EFFECT ON ANY OTHER CHIP MAKER OF THE QUALCOMM

25   SUPRA-FRAND ROYALTY YOU'RE ASSUMING, HAVE YOU?

1    A.   I'VE SAID ALREADY I HAVE NOT -- I HAVE NOT QUANTIFIED THE

2    MAGNITUDE OF THE ROYALTY SURCHARGE.

3         I POINTED OUT STRONG REASONS TO BELIEVE THAT IT WAS

4    SUBSTANTIAL.

5    Q.   YOU HAVEN'T QUANTIFIED THE EFFECT OF THIS ROYALTY ON ANY

6    OTHER CHIP MAKER; RIGHT?

7    A.   WELL, I HAVEN'T QUANTIFIED THE ROYALTY SURCHARGE, SO -- IN

8    GENERAL, SO I HAVEN'T QUANTIFIED IT REGARDING SPECIFIC CHIP

9    MAKERS, EITHER.  THAT FOLLOWS.

10   Q.   OKAY.  AND -- FAIR ENOUGH.

11        RIVALS' INCOME, I THINK YOU'D PROBABLY GIVE ME THE SAME

12   ANSWER, YOU DIDN'T DO ANYTHING FROM A QUANTITATIVE STANDPOINT

13   TO LOOK AT WHAT HAPPENED TO ANY OF THESE RIVALS' INCOMES DURING

14   THIS RELEVANT PERIOD; RIGHT?

15   A.   THAT'S RIGHT.  I'M NOT -- I'M NOT DOING THE DAMAGES

16   CALCULATION FOR THE RIVALS WHO WERE INJURED.

17   Q.   IN OTHER WORDS, RIVALS' INCOME, LIKE RIVALS' COSTS, CAN GO

18   UP AND DOWN BASED ON LOTS OF FACTORS; CORRECT?

19   A.   WE'RE TALKING AGAIN ABOUT THE NON-ROYALTY COSTS?

20   Q.   THAT'S RIGHT?

21   A.   CERTAINLY.  IT'S A DYNAMIC INDUSTRY.  THESE THINGS CHANGE.

22   Q.   THEY CHANGE, AND THEY CHANGE WEEKLY, MONTHLY, SOMETIMES

23   DAILY; RIGHT?

24   A.   RIGHT.  AND THAT'S EXACTLY WHY IT WOULD BE A COMPLETE

25   WASTE OF TIME TO LOOK AT ALL OF THAT, WHEN I CAN FOCUS ON THE

1       SURCHARGE, WHICH IS THE EXTRA COST THAT'S ASSOCIATED WITH THE

2       CONDUCT AT ISSUE.

3       Q.   OKAY.  AND I UNDERSTAND THAT YOU THINK IT'S A WASTE OF

4       TIME, BUT I JUST WANT TO FIND OUT WHAT YOU DID AND DIDN'T DO?

5       A.   FINE.

6       Q.   AND ONE THING THAT I GUESS YOU DIDN'T DO WAS ANY FINANCIAL

7       OR ECONOMIC ANALYSIS OF ANY RIVAL CHIP MAKER; CORRECT?

8       A.   YOU MEAN THEIR OVERALL OR THE EFFECTS OF THE PRACTICES?  I

9       WASN'T CLEAR THERE.

10      Q.   YOU DIDN'T ANALYZE THE DIRECTION UP OR DOWN OR SIDEWAYS OF

11      THE OPERATING INCOME OF ANY OF THE CHIP MAKER RIVALS THAT

12      YOU'RE HERE CLAIMING WERE HARMED; CORRECT?

13      A.   I'VE EXPLAINED WHY THE INCOME WOULD BE REDUCED

14      SUBSTANTIALLY BY A ROYALTY SURCHARGE, AND I -- BUT IF YOU'RE

15      SAYING DID I MEASURE THEIR INCOME AND HOW IT WENT UP AND DOWN

16      OVER TIME BECAUSE OF PROBLEMS THEY HAD IN THEIR OPERATIONS?

17      NO, I DIDN'T DO THAT.

18      Q.   OKAY.  NOW, SIMILARLY, YOU DID NOTHING WHATSOEVER TO

19      ANALYZE WHETHER RIVALS' R&D SPENDING, RESEARCH AND DEVELOPMENT,

20      WENT UP, DOWN, OR REMAINED THE SAME; RIGHT?

21      A.   AGAIN, YOU'RE JUST TALKING ABOUT WHAT HAPPENED OR THE

22      EFFECT -- HOW IT MOVED OVER TIME OR THE EFFECTS OF THE QUALCOMM

23      PRACTICES?

24      Q.   I'M TALKING ABOUT WHAT ACTUALLY HAPPENED IN THE REAL WORLD

25      DURING THE PERIOD OF TIME THAT YOU SAY QUALCOMM HARMED PEOPLE.

1    THAT'S WHAT I'M TALKING ABOUT.

2    A.   WELL, I LOOKED -- I LOOKED AT THE DIFFERENT SUPPLIERS AND

3    WHAT HAPPENED TO THEM.  THAT'S PART OF MY GENERAL BACKGROUND

4    EVALUATION I WOULD SAY.  YOU KNOW, PEOPLE WHO EXITED, LIKE

5    BROADCOM, PEOPLE WHO CAME IN, LIKE INTEL.  SURE, I LOOKED AT

6    THOSE THINGS.

7    Q.   OKAY.

8    A.   BUT I DIDN'T -- I'M NOT OFFERING AN OPINION ABOUT THEIR

9    FINANCIAL CIRCUMSTANCES.

10   Q.   AND YOU DID NOT PUT ANY NUMBER ON ANY DECLINE IN R&D

11   INVESTMENT BY ANY COMPETITOR; RIGHT?

12   A.   AGAIN, I JUST WANT THIS TO BE CLEAR.  DECLINE IN R&D

13   INVESTMENT BECAUSE -- FOR ANY REASONS?  OR BECAUSE OF

14   QUALCOMM'S CONDUCT?  I JUST DON'T KNOW WHAT YOU'RE ASKING ME.

15   Q.   YOUR PATH TO HARM INVOLVES A SITUATION -- I THOUGHT I

16   UNDERSTOOD, PROFESSOR SHAPIRO --

17   A.   YEP.

18   Q.   -- IN WHICH OVER OTHER TIME RIVALS' COMMITMENT TO RESEARCH

19   AND DEVELOPMENT WOULD TEND TO GO DOWN.  THAT'S WHAT WE

20   ESTABLISHED EARLIER WITH THIS ARROW; RIGHT?

21   A.   ALL OTHER THINGS EQUAL, THAT WOULD BE THE EFFECT OF THE

22   ROYALTY SURCHARGE AND THE REDUCED MARGINS AND VOLUMES.

23   Q.   BUT MY POINT IS -- MY QUESTION IS, EXCUSE ME, YOU DIDN'T

24   DO ANYTHING TO SEE WHETHER THEY ACTUALLY DID GO DOWN DURING THE

25   PERIOD YOU'RE TALKING ABOUT; RIGHT?  THAT'S ALL I WANT TO KNOW.

1      A.   I DON'T THINK -- I THINK YOU'RE STILL CONTINUING TO

2      CONFLATE TWO VERY DIFFERENT ISSUES.

3      Q.   EXCUSE ME?

4      A.   WHAT HAPPENED TO THE R&D?

5      Q.   UM-HUM.

6      A.   AND THE EFFECT OF QUALCOMM'S PRACTICES.  SO I THINK WE

7      NEED TO BE CLEAR ABOUT THE DIFFERENCE.  NO, I DIDN'T TRACK -- I

8      DIDN'T REPORT -- I DIDN'T REPORT AS PART OF MY ANALYSIS THE

9      MONTH, THE QUARTERLY OR ANNUAL R&D BY SAMSUNG IN THIS AREA, IF

10     THAT COULD BE BROKEN OUT.  NO, I'M NOT DOING THAT.

11          THAT IS NOT INFORMATIVE, AS FAR AS I'M CONCERNED, ABOUT

12     GIVEN ALL WHAT YOU'RE TALKING ABOUT, ABOUT THE EFFECTS OF THE

13     PRACTICES HERE, WHICH MY ANALYSIS IS LATER FOCUSSED ON THAT.

14     Q.   OKAY.  BUT JUST TO COMPLETE IT -- YOU DIDN'T CONDUCT ANY

15     ANALYSIS OF HUAWEI'S R&D SPENDING DURING THIS PERIOD AT ALL;

16     RIGHT?

17     A.   AGAIN, IF YOU MEAN BY ANALYSIS, DID I DO SOME CALCULATIONS

18     WITH THEIR FINANCIALS AND SAY SOMETHING ABOUT THAT IN MY

19     REPORT?  NO.

20     Q.   OKAY.  AND YOU DIDN'T DO THAT WITH INTEL?

21     A.   THAT IS NOT PART OF MY ANALYSIS OR METHODOLOGY OR ANYTHING

22     I NEED TO DO TO -- UNDER MY OPINIONS, NO.

23     Q.   YOU DIDN'T DO IT WITH SAMSUNG, BROADCOM, ERICSSON OR

24     MARVEL, OR ANY OTHER CHIP MAKER, THAT WAS OPERATING IN THIS

25     TIME PERIOD; RIGHT, PROFESSOR SHAPIRO?

1    A.   AGAIN, PERFORMING SOME TYPE OF ANALYSIS, YOU DON'T REALLY

2    EVEN KNOW WHAT YOU MEAN, WHAT THAT WOULD BE.  I'VE EXPLAINED

3    WHY IT'S NOT RELEVANT AS FAR AS I UNDERSTAND THE QUESTION.

4         I DID NOT PRESENT ANY OF THOSE ANALYSES AS PART OF MY

5    REPORT, NO.

6    Q.   OKAY.  IN FACT, YOU HAD A CHANCE TO REVIEW DR. CHIPTY'S

7    REPORT AND SHE ASSEMBLED SOME INFORMATION ABOUT RESEARCH AND

8    DEVELOPMENT EXPENSES BY COMPETITORS; CORRECT?

9    A.   YOU KNOW, I THINK PROFESSOR SNYDER, I THINK, HAD A LOT OF

10   MATERIAL ON THIS.  THAT'S WHAT'S IN MY MIND.

11        IF YOU WANT TO SHOW ME SOMETHING FROM DR. CHIPTY, I'M

12   HAPPY TO LOOK AT IT.

13   Q.   WELL, LET'S TAKE A LOOK AT PARAGRAPH 58 FROM DR. CHIPTY'S

14   REPORT.

15        ACTUALLY, YOUR HONOR, I HAVE THIS IN A SEPARATE WALLET

16   BECAUSE IT'S PRETTY BIG.  I CAN HAND IT OUT OR I CAN JUST SHOW

17   IT ON THE SLIDE.

18             THE COURT:  I'M TAKE ONE.  DO YOU HAVE ONE?

19             THE WITNESS:  I DON'T HAVE ONE.

20             MR. VAN NEST:  MAY I APPROACH THE WITNESS, YOUR

21   HONOR.

22             THE WITNESS:  I DON'T NEED A COPY OF THIS BIG REPORT

23   MYSELF.  I'M HAPPY TO LOOK AT THE PARAGRAPH.

24             THE COURT:  OKAY.  WELL, I'D LIKE A COPY, PLEASE.

25             MR. VAN NEST:  I HAVE ONE RIGHT HERE, YOUR HONOR

1      (HANDING).

2            THE WITNESS:  IT'S BEEN WEIGHING DOWN MY BACK ALREADY

3      FOR A WHILE, SO --

4      BY MR. VAN NEST:

5      Q.   IT'S GETTING FULL UP THERE?

6      A.   IF I FEEL LIKE I NEED IT, I'LL ASK.  HOW ABOUT THAT?

7      Q.   COULD WE GO TO EXHIBIT 11.

8            OKAY.  DR. CHIPTY LOOKED AT ACTUAL REAL WORLD RESEARCH AND

9      DEVELOPMENT SPENDING BY SEVERAL CHIP MAKERS, QUALCOMM, HUAWEI,

10     INTEL, MEDIATEK, SAMSUNG.

11           DO YOU SEE THAT IN EXHIBIT 11?

12     A.   I DO.  BUT THIS IS FIRM-WIDE INVESTMENT.  THIS ISN'T ABOUT

13     MODEM CHIPS.

14     Q.   AND YOU CERTAINLY HAD A CHANCE TO COMMENT ON THIS IN YOUR

15     REBUTTAL REPORT AFTER YOU HAD A CHANCE TO REVIEW IT IN HER

16     REPORT; CORRECT?

17     A.   CERTAINLY, YES, I DID HAVE A CHANCE.

18     Q.   AND YOU DIDN'T TAKE ISSUE WITH IT ONE WAY OR THE OTHER,

19     DID YOU?

20     A.   I DIDN'T FEEL IT WAS ANYTHING THAT I NEEDED TO RESPOND TO.

21     I GUESS I MAY HAVE HAD MY FOLKS LOOK AND SEE IF THIS WAS

22     ACCURATE.

23     Q.   OKAY.

24     A.   BUT I DON'T SEE WHY THE FIRM-WIDE R&D -- INTEL IS A VERY

25     BIG FIRM, THEY MAKE A LOT OF PRODUCTS.  THEY SPEND A LOT ON

1     R&D.  I DON'T SEE WHY THAT'S RELEVANT TO THE ANALYSIS OF THE

2     EFFECT OF THIS PRACTICE ON R&D INCENTIVE.

3     Q.   WELL, INTEL, IF THEY CHOSE TO SPEND THE MONEY, THEY COULD

4     DO IT.  THEY'VE GOT THE MONEY; RIGHT?

5     A.   THAT IS NOT HOW I, AS AN ECONOMIST, THINK ABOUT R&D

6     INVESTMENT.  IT'S NOT A MATTER OF HOW MUCH MONEY YOU HAVE.

7     IT'S A MATTER OF WHAT INVESTMENTS ARE PAYING GIVEN THE RISK AND

8     THE REWARD.

9     Q.   IN ANY EVENT, PROFESSOR SHAPIRO, IT'S CERTAINLY THE CASE

10    THAT YOU HAVE NOT QUANTIFIED THE EFFECTS OF QUALCOMM'S BUSINESS

11    PRACTICES ON ANY OTHER CHIP MAKER DURING THIS RELEVANT PERIOD;

12    CORRECT?

13    A.   I HAVE NOT QUANTIFIED THAT, THAT IS CORRECT.  I HAVE

14    REASON TO BELIEVE THE ROYALTY SURCHARGE WAS SUBSTANTIAL AND

15    THAT HAS INEVITABLE CONSEQUENCES.  BUT I HAVE NOT DONE THE TYPE

16    OF FINANCIAL ANALYSIS YOU'VE BEEN ASKING ME ABOUT.

17    Q.   NOW, YOU ALSO HAVEN'T CONDUCTED ANY ANALYSIS TO DETERMINE

18    HOW MARKET SHARES WOULD HAVE BEEN DIFFERENT BUT FOR QUALCOMM'S

19    CONDUCT IN THE BUT FOR WORLD; RIGHT?

20    A.   THAT IS TRUE.  I'M NOT OFFERING A BUT FOR SET OF, OR

21    COUNTER FACTUAL SET OF MARKET SHARES.

22    Q.   OKAY.  THAT'S TRUE FOR BOTH THE CDMA MARKET AND THE

23    PREMIUM LTE MARKET THAT YOU DEFINED AS WELL; CORRECT?

24    A.   THAT IS CORRECT.

25    Q.   THAT'S NOT SOMETHING THAT YOU UNDERTOOK AS PART OF YOUR

1    REPORT?

2    A.   CORRECT.

3    Q.   I WANT TO TALK FOR A FEW MINUTES ABOUT YOUR TAKE ON FRAND.

4         YOU'VE WRITTEN ABOUT FRAND?

5    A.   I HAVE.

6    Q.   OKAY.  AND YOU'VE WRITTEN BEFORE THAT A FRAND RATE WOULD

7    BE A REASONABLE RATE FOR A PARTY'S ENTIRE PORTFOLIO OF STANDARD

8    ESSENTIAL PATENTS; CORRECT?

9    A.   THAT'S HOW IT'S OFTEN DISCUSSED.

10   Q.   OKAY.

11   A.   AND I THINK I'VE WRITTEN THAT IN MY PAPERS, YES, THAT'S

12   CORRECT.

13   Q.   OKAY.  AND YOU'VE ALSO SAID THE CONSENSUS APPROACH TO

14   FRAND FOR SEPS ARE ROYALTIES THAT WOULD RESULT FROM

15   HYPOTHETICAL NEGOTIATIONS OVER LICENSING TERMS BEFORE THE

16   INTELLECTUAL PROPERTY IS INCORPORATED INTO A STANDARD; RIGHT?

17   A.   YES.

18   Q.   AND THAT'S SOMETHING, MAYBE THE ONLY THING, BUT SOMETHING

19   THAT YOU AND PROFESSOR NEVO BOTH AGREE ON; RIGHT?

20   A.   I THINK WE AGREE ON MORE THAN THAT.

21   Q.   OKAY.

22   A.   BUT I'M GLAD TO KNOW HE AGREES WITH THAT.

23   Q.   I HOPE THAT'S TRUE.

24        AND SO THE CONSENSUS VIEW, ACCORDING TO YOU AND TO

25   PROFESSOR NEVO, IS THAT THE ROYALTY REASONABLE WOULD BE ONE

1      NEGOTIATED AT ARM'S LENGTH BETWEEN A BUYER AND A SELLER BEFORE

2      THERE'S A STANDARD IN PLACE, OR BEFORE THE PROPERTY IS

3      INCORPORATED IN THE STANDARD; CORRECT?

4      A.   CONCEPTUALLY, THAT'S CORRECT, WITH THE IDEA BEING AT A

5      TIME WHEN THERE WOULD BE TECHNOLOGIC -- A CHOICE BETWEEN

6      DIFFERENT TECHNOLOGIES AND THEREFORE DIFFERENT PATENTS THAT

7      WOULD BECOME STANDARD ESSENTIAL.

8      Q.   OKAY.  AND THE REASONABLE FRAND RATE IS A RATE NEGOTIATED

9      BEFORE THE STANDARD IS ADOPTED, NOT A RATE THAT DIFFERS

10     DEPENDING ON WHEN EACH LICENSEE CHOOSES TO ENTER THE MARKET?

11     YOU'VE SAID THAT AS WELL?

12     A.   UM, IT'S GOING TO DEPEND ON THE PARTICULARS, BUT I'LL GO

13     WITH YOU ON THIS FOR A WHILE, FOR NOW.

14     Q.   OKAY.  IN FACT, YOU'VE WRITTEN THAT YOURSELF?

15     A.   I DON'T KNOW WHAT YOU'RE REFERRING TO.

16     Q.   YOU SAID THAT FOR PARTIES MAKING A FRAND COMMITMENT DURING

17     THE STANDARD SETTING PROCESS, THE REASONABLE PRICE IS THE PRICE

18     THEY WOULD NEGOTIATE AT THAT POINT, NOT A PRICE THAT DIFFERS

19     FOR EACH IMPLEMENTER DEPENDING ON THE HAPPENSTANCE OF WHEN THAT

20     PARTY BEGAN IMPLEMENTING THE STANDARD; RIGHT?

21     A.   YOU NEED TO SHOW ME WHERE THAT IS.

22     Q.   OKAY.  THAT'S IN YOUR ARTICLE -- THAT'S IN YOUR TAB THERE.

23     THERE'S AN ARTICLE THAT YOU AND PROFESSOR LEMLEY WROTE.  IT'S

24     TAB -- A SIMPLE APPROACH BY LEMLEY AND SHAPIRO.  IT'S BEHIND

25     YOUR REPORTS.

1             I AM READING FROM PAGE 1147.

2    A.    OKAY.

3    Q.    DO YOU HAVE IT?

4    A.    I'M LOOKING AT IT, YES.

5    Q.    OKAY.  FOR STANDARD ESSENTIAL PATENTS, A REASONABLE

6    ROYALTY SHOULD BE BASED ON A HYPOTHETICAL, ARM'S LENGTH

7    NEGOTIATION THAT TAKES PLACE AT THE TIME THE STANDARD SETTING

8    ORGANIZATION IS SETTING THE STANDARD.

9             WE ALREADY COVERED THAT AND YOU ACKNOWLEDGED THAT'S YOUR

10   VIEW.

11   A.    OKAY.

12   Q.    AND PROFESSOR NEVO'S VIEW AS WELL; CORRECT?

13   A.    OKAY.  AND I BELIEVE WHAT WE'RE SAYING HERE IS IF -- IF

14   A -- LET ME MAKE SURE I GET THE LANGUAGE HERE RIGHT.

15            IF AN IMPLEMENTER ENTERS THE MARKET LATER, AT WHICH TIME

16   THERE ARE FEWER CHOICES BECAUSE THE PATENT IS ALREADY IN THE

17   STANDARD, THEN WE DON'T TAKE THAT AS THE TIME AT WHICH A

18   NEGOTIATION OCCURS.

19            WE ASK ABOUT WHAT THAT IMPLEMENTER WOULD HAVE NEGOTIATED

20   EARLIER BEFORE THERE WAS THE LOCK IN TO THE STANDARD.

21   Q.    BUT THE --

22   A.    THAT'S THE POINT.

23   Q.    FAIR ENOUGH.  BUT THE IMPLEMENTER ALSO DOESN'T GET A BREAK

24   OFF THE FRAND RATE SIMPLY BECAUSE HE OR SHE ENTERED LATER?

25   THAT'S ALSO WHAT YOU'RE SAYING; CORRECT?

1    A.   WELL, NO, THAT IS NOT CORRECT ACTUALLY, BECAUSE IF

2    SOMEBODY ENTERS AT A POINT WHERE MAYBE, FOR EXAMPLE, SUPPOSE

3    THAT THE MOST OF THE PORTFOLIO OF ONE LICENSEE, STANDARD

4    ESSENTIAL PATENT HOLDER HAS EXPIRED, OKAY?  THEN THE SITUATION

5    IS GOING TO CHANGE BY THEN.

6    Q.   BUT WHAT I SAID -- WHAT YOU SAID IN THE ARTICLE WAS THE

7    REASONABLE PRICE IS THE PRICE THEY WOULD NEGOTIATE AT THAT

8    POINT -- THAT'S THE BEGINNING -- NOT A PRICE THAT DIFFERS FOR

9    EACH IMPLEMENTER DEPENDING ON THE HAPPENSTANCE OF WHEN THAT

10   PARTY BEGINS TO IMPLEMENT THE STANDARD.

11        THAT'S WHAT YOU WROTE; CORRECT?

12   A.   RIGHT.  AND WHAT I WAS SAYING IS IT'S VERY IMPORTANT, THE

13   WHOLE -- THE ESSENCE OF THIS IS TO AVOID PATENT HOLDUP, WHICH

14   IS A PREVIOUS ARTICLE THAT MARK AND I HAD WRITTEN, AND THE FACT

15   THAT SOMEBODY COMES IN LATER DOES NOT MEAN THEY SHOULD BE

16   SUBJECT TO HOLDUP.

17   Q.   NOW --

18   A.   THAT'S THE POINT.

19   Q.   PROFESSOR SHAPIRO, YOU KNOW THAT A NUMBER OF LICENSE

20   AGREEMENTS THAT QUALCOMM ENTERED INTO WITH OEM'S WERE ENTERED

21   INTO BEFORE QUALCOMM TECHNOLOGY WAS ADOPTED INTO A STANDARD?

22   YOU'RE AWARE OF THAT?

23   A.   I GUESS THERE ARE DIFFERENT STANDARDS OVER TIME.  MAYBE

24   YOU SHOULD TELL ME WHAT SPECIFIC LICENSE AGREEMENTS YOU MEAN.

25   I'M REALLY --

1      Q.   WELL --

2      A.   THERE ARE MANY DIFFERENT FACT PATTERNS.  I'M NOT SURE WHAT

3      YOU'RE REFERRING TO.

4      Q.   SURE.  YOU HAVEN'T EVEN ATTEMPTED TO FORM AN OPINION ON

5      WHETHER QUALCOMM'S EARLY CDMA LICENSES, FOR EXAMPLE, WITH

6      NOKIA, MOTOROLA, OR AT&T, ARE FRAND OR NOT; RIGHT?

7      A.   YOU KNOW, THIS HASN'T EVEN ATTEMPTED ALSO JUST -- IT

8      JUST -- OKAY.  I GUESS I DIDN'T ATTEMPT TO DO THAT, THAT IS

9      TRUE.

10     Q.   AND, THEREFORE, YOU ARE NOT IN A POSITION TO EXPRESS ANY

11     OPINION, YOU HAVEN'T EXPRESSED AN OPINION, ON WHETHER THOSE

12     LICENSE AGREEMENTS ARE FRAND OR NOT; RIGHT?

13     A.   SUCH AS A 1991 AGREEMENT BETWEEN QUALCOMM AND AT&T?

14     THAT'S THE SORT OF THING WE'RE TALKING ABOUT?

15     Q.   THAT'S ONE EXAMPLE.

16     A.   NO, I DON'T KNOW WHETHER THAT WAS FRAND OR NOT.  I HAVE NO

17     REASON TO THINK IT WASN'T.  I JUST -- THAT'S -- WHAT IS THAT,

18     28 YEARS AGO?  NO.

19     Q.   AND SIMILARLY, YOU BECAME AWARE THAT SAMSUNG AND QUALCOMM

20     ENTERED INTO A LICENSE AGREEMENT IN 1993; CORRECT?

21     A.    I DON'T HAVE THESE EARLY LICENSE AGREEMENTS MEMORIZED.  IF

22     YOU WANT TO SHOW ME SOMETHING IN MY REPORT OR SHOW ME THE

23     AGREEMENT.

24     Q.   WELL, LET'S TAKE A MORE RECENT ONE.  THEY ENTERED INTO A

25     SAMSUNG AGREEMENT IN 2018 AS WELL; RIGHT?

1    A.    YES, I AM AWARE OF THAT.

2    Q.    OKAY.  AND YOU'RE NOT AWARE OF ANYTHING RELATED TO CHIPS

3    OR CHIP POWER THAT AFFECTED THE 2018 AGREEMENT BETWEEN QUALCOMM

4    AND SAMSUNG, ARE YOU?

5    A.    I JUST DON'T THINK I KNOW THE PARTICULARS OF THAT.  THAT

6    WAS -- WAS THAT, WHAT, LIKE FEBRUARY OF 2018?

7    Q.    ACTUALLY, YES.  YOU TESTIFIED THAT YOU WERE NOT AWARE OF

8    ANYTHING RELATED TO CHIPS OR CHIP POWER THAT AFFECTED THE 2018

9    AGREEMENT BETWEEN QUALCOMM AND SAMSUNG; RIGHT?

10   A.    OKAY.  LIKE I SAID, I -- I DON'T KNOW THE SPECIFICS OF

11   THAT AGREEMENT, SO I JUST -- I DON'T THINK I ANALYZED THAT.  WE

12   COULD CHECK MY REPORT.

13   Q.    YOU TESTIFIED THAT ONE OF THE AFFECTS OF QUALCOMM'S

14   CONDUCT, AT LEAST IN YOUR VIEW BASED ON THE TAX THEORY, WAS

15   THAT CONSUMER PRICES HAVE GONE UP; RIGHT?

16   A.    WELL, AGAIN -- NO, NOT THAT THEY'VE GONE UP OVER TIME.

17   THAT'S NOT THE PREDICTION.

18         THESE ARE INDUSTRIES WHERE PRICES -- QUALITY DOES TEND TO

19   COME DOWN, OFTEN RAPIDLY.

20         THE POINT IS OTHER THINGS EQUAL, WHEN COSTS GO UP AND YOU

21   IMPOSE A TAX, PRICE WILL GO UP.  WHEN COSTS GO UP, PRICE WILL

22   GO UP.

23   Q.    OKAY.  SO, AGAIN, THAT'S PART OF YOUR THEORY THAT STARTS

24   WITH A CONCLUSION THAT THERE'S A SUPRA-FRAND TAX EXTRACTED BY

25   QUALCOMM'S CONDUCT; CORRECT?

1    A.    YES.   THE HARM TO CONSUMERS ARISING FROM HIGHER ALL-IN

2    MODEM PRICES FLOWS FROM THE ROYALTY SURCHARGE.

3    Q.    YEAH.   SO, AGAIN, IF THE COURT WERE TO FIND THAT THE

4    EVIDENCE DOESN'T SUPPORT THE EXISTENCE OF A SUPRA-FRAND TAX,

5    YOUR OPINION AS TO HARM TO CONSUMERS, THAT GOES AWAY, TOO?

6    A.    SO IF THE COURT WERE TO FIND THAT THE NO LICENSE, NO

7    CHIPS, THAT COMPLEX OF POLICIES WAS INEFFECTUAL, THEN -- AND

8    THERE WERE NO ROYALTY SURCHARGE, THEN THESE RESULTS WOULD NOT

9    FLOW BECAUSE THEY ARE EXPLAINING THE CONSEQUENCES OF SUCH A

10   SURCHARGE.

11   Q.    AND YOU HAVEN'T CONDUCTED ANY QUANTITATIVE ANALYSIS

12   COMPARING HOW PRICING WOULD HAVE BEEN IN THE BUT FOR WORLD;

13   RIGHT?

14   A.    THAT'S CORRECT, I HAVEN'T QUANTIFIED THE SURCHARGE WHICH I

15   THINK YOU WOULD NEED TO DO TO GO THEN TRY TO TRACK THE

16   PASSTHROUGH EFFECTS OF THE SURCHARGE.   SO, NO, I HAVE NOT

17   QUANTIFIED THOSE EFFECTS.

18   Q.    AND YOU HAVEN'T DONE THAT FOR EITHER THE CDMA MARKET OR

19   THE PREMIUM LTE MARKET; CORRECT?

20   A.    IT'S THE SAME ANSWER.   I DID NOT QUANTIFY THE ROYALTY

21   SURCHARGE, SO TRACING THROUGH THOSE EFFECTS IN EITHER OF THOSE

22   MARKETS AND QUANTIFYING THAT IN TERMS OF IMPACT ON CONSUMERS, I

23   HAVE NOT DONE THAT QUANTIFICATION.

24   Q.    SO YOU HAVEN'T QUANTIFIED THE EFFECTS OF QUALCOMM'S

25   CONDUCT ON HANDSET PRICES, EITHER; RIGHT?

1    A.   I THOUGHT THAT'S WHAT WE WERE TALKING ABOUT, BECAUSE

2    THAT'S WHAT LEADS TO CONSUMER HARM WOULD BE THE HIGHER HANDSET

3    PRICES RESULTING FROM THE HIGHER ALL-IN MODEM CHIP PRICES.

4    Q.   AND AGAIN, PROFESSOR SHAPIRO, THAT IS WHAT WE'RE TALKING

5    ABOUT, AND I JUST WANT TO BE CLEAR, YOU HAVEN'T QUANTIFIED THE

6    EFFECTS OF QUALCOMM'S CONDUCT ON HANDSET PRICES AT ALL; RIGHT?

7    A.   I THINK IT'S THE SAME THING I'VE ALREADY ANSWERED.  TO

8    QUANTIFY THAT WOULD FLOW FROM A QUANTIFICATION OF THE ROYALTY

9    SURCHARGE.  I SAID I HAVE REASON TO BELIEVE IT'S SIGNIFICANT,

10   BUT I'M NOT PUTTING A NUMBER ON IT.  SO THEN I DON'T QUANTIFY

11   THESE FOLLOW-ON AFFECTS.

12   Q.   CAN I GET A YES OR NO TO MY QUESTION, PLEASE?

13   A.   MAYBE YOU WANT TO -- I DON'T KNOW EXACTLY WHAT IT WAS,

14   SO...

15   Q.   YOU HAVE NOT QUANTIFIED THE EFFECTS OF QUALCOMM'S CONDUCT

16   ON HANDSET PRICES IN ANY MARKET; RIGHT?

17   A.   THAT IS CORRECT.

18   Q.   ON TOP OF THAT, YOU HAVEN'T CONDUCTED ANY ANALYSIS,

19   EMPIRICAL OR OTHERWISE, TO DETERMINE WHETHER THE OEM'S YOU'RE

20   TALKING ABOUT HERE WOULD HAVE PASSED THROUGH SOME, ALL, OR NONE

21   OF WHAT YOU CLAIM IS A SUPRA-FRAND ROYALTY; CORRECT?

22   A.   NO, THAT'S NOT CORRECT.

23   Q.   WELL, DO YOU TESTIFY -- DID YOU TESTIFY IN DEPOSITION THAT

24   YOU HAVEN'T CONDUCTED ANY EMPIRICAL ANALYSIS TO ASSESS THE

25   PASSTHROUGH RATES TO CONSUMERS OF ANY CHANGE IN QUALCOMM'S

1    ROYALTIES?  DID YOU GIVE THAT TESTIMONY, SIR?

2    A.   WELL, THAT -- WHY DON'T WE LOOK AT THAT.  THAT'S A

3    DIFFERENT QUESTION THAN THE ONE YOU JUST ASKED ME BECAUSE IT

4    WAS TALKING ABOUT EMPIRICAL ANALYSIS AND PASSTHROUGH RATES, AND

5    THAT WASN'T THE QUESTION YOU ASKED ME PRIOR TO CALLING OUT MY

6    DEPOSITION.

7    Q.   OKAY.  WELL, THEN, MAYBE WE MISUNDERSTOOD EACH OTHER.  BUT

8    I THINK THE FACT IS YOU HAVEN'T CONDUCTED ANY EMPIRICAL

9    ANALYSIS TO TRY AND ASSESS THE PASSTHROUGH RATES TO CONSUMERS

10   OF ANY CHANGE IN QUALCOMM'S ROYALTIES; RIGHT?

11   A.   SO WHEN YOU SAY EMPIRICAL ANALYSIS AND MEASURE -- I'M

12   TAKING YOU TO MEAN QUANTIFICATION AGAIN.  AND I, AGAIN, AM

13   SAYING I HAVE NOT QUANTIFIED THOSE EFFECTS WOULD BE PASSTHROUGH

14   OF THE ROYALTY SURCHARGE AND IMPACT ON CONSUMERS.

15       BUT I HAVE CONDUCTED --

16   Q.   YOU'VE ANSWERED MY QUESTION, PROFESSOR SHAPIRO.

17   A.   OKAY.

18   Q.   AND IF THERE'S MORE THAT YOU'VE DONE, I'M SURE THAT'LL

19   COME OUT THIS AFTERNOON.

20   A.   FAIR ENOUGH.

21   Q.   NOW, SEPARATE AND APART FROM THIS ANALYSIS WE'VE BEEN

22   DISCUSSING, YOU ANALYZED HARM YOU SAY FLOWS FROM -- FLOWED FROM

23   THE APPLE AGREEMENTS WITH QUALCOMM IN 2013; CORRECT?

24   A.   CORRECT.

25   Q.   NOW, APPLE ENTERED INTO THOSE AGREEMENTS VOLUNTARILY,

1    DIDN'T IT?

2    A.   YES.

3    Q.   IT'S A VERY SOPHISTICATED BUYER?

4    A.   I'M SURE.

5    Q.   IT'S A LARGE, STRATEGIC CUSTOMER?

6    A.   IT IS.

7    Q.   AND AS A LARGE, STRATEGIC CUSTOMER, APPLE HAS A LOT OF

8    ASSETS ON THEIR SIDE OF THE BARGAINING TABLE; FAIR?

9    A.   YES.

10   Q.   AND APPLE'S AWARE THAT THEY'RE AN IMPORTANT BUYER; RIGHT?

11   A.   ONE MIGHT SAY OVERLY SO.

12   Q.   APPLE WOULDN'T ENTER INTO ANY AGREEMENT THAT IS AGAINST

13   ITS OWN INTERESTS; RIGHT?  THAT'S WHAT YOUR THEORY REQUIRES?

14   A.   MY THEORY?

15   Q.   LET ME -- LET ME REASK IT.

16        APPLE WOULDN'T ENTER INTO ANY AGREEMENT THAT IS AGAINST

17   ITS OWN INTERESTS; RIGHT?

18   A.   SO AS AN ANTITRUST ECONOMIST, MY STANDING ASSUMPTION IS

19   COMPANIES ACT IN THEIR OWN INTERESTS AND TRY TO MAXIMIZE

20   PROFIT, AND THAT WOULD CERTAINLY APPLY TO APPLE.

21   Q.   ALL RIGHT.  AND YOU CERTAINLY WOULDN'T USE THE WORD

22   "COERCED" TO DESCRIBE THE AGREEMENTS THAT QUALCOMM SIGNED WITH

23   APPLE; RIGHT?

24   A.   I DON'T GENERALLY USE THE WORD "COERCED" AS AN ANTITRUST

25   ECONOMIST.  I KNOW PEOPLE USE IT, BUSINESS PEOPLE USE IT,

1        LAWYERS USE IT.  I JUST -- IT'S NOT A WORD THAT I TEND TO USE.

2        Q.   WELL, BUT IN FACT YOU TESTIFIED THAT IN PARTICULAR, YOU

3        WOULDN'T USE IT HERE; RIGHT?

4        A.   THAT IS TRUE.  I DON'T USE IT IN GENERAL, AND I DON'T USE

5        IT HERE.

6        Q.   AND YOU DIDN'T USE IT IN CONNECTION WITH THE APPLE

7        AGREEMENT WITH QUALCOMM; CORRECT?

8        A.   I DID NOT.

9        Q.   INSTEAD, YOU SAID THE APPLE REPRESENTATIVES NEGOTIATING

10       THE AGREEMENTS WERE BIG BOYS AND GIRLS; RIGHT?

11       A.   THAT SOUNDS LIKE ME.

12            (LAUGHTER.)

13       BY MR. VAN NEST:

14       Q.   AND INDEED IT WAS.

15            NOW, THE FIRST TRANSITION AGREEMENT -- EXCUSE ME.

16            THE FIRST AMENDMENT, THE 2013 AGREEMENT, IT EXPIRED AT THE

17       END OF 2016; CORRECT?

18       A.   I BELIEVE SO.

19       Q.   OKAY.  AND IN TERMS OF ANY EFFECT THAT IT HAD, YOU HAVEN'T

20       IDENTIFIED ANY OTHER CHIP MAKER BESIDES INTEL THAT YOU SAY WAS

21       FORECLOSED FROM APPLE'S BUSINESS AS A RESULT OF THE AGREEMENT;

22       RIGHT?

23       A.   THAT IS TRUE.

24       Q.   AND YOU'RE NOT OFFERING ANY OPINION ON WHETHER QUALCOMM

25       ENTERED INTO SO-CALLED EXCLUSIVE DEALS WITH ANYONE OTHER THAN

1    APPLE; RIGHT?

2    A.   THAT IS CORRECT.

3    Q.   YOU'RE FOCUSSING ON THIS AGREEMENT WITH APPLE WHICH THIS

4    MORNING YOU CALLED AN EXCLUSIVE DEALING ARRANGEMENT; CORRECT?

5    A.   YES.

6    Q.   NOW, I THINK YOU CONCEDED THIS, BUT THE AGREEMENT ISN'T

7    DE JURE EXCLUSIVE, THERE'S NO REQUIREMENT THAT APPLE REFRAIN

8    FROM BRINGING IN ANOTHER CHIP MAKER; RIGHT?

9    A.   CORRECT.

10   Q.   AND, IN FACT, APPLE RETAINED THE RIGHT TO DO THAT

11   THROUGHOUT THE TERM OF THE FIRST AMENDMENT; CORRECT?

12   A.   YES.  I THINK -- JUST TO BE PRECISE, THE RIGHT TO DO THAT,

13   THE AGREEMENT DID NOT -- WOULD NOT TREAT APPLE IN BREACH OF THE

14   AGREEMENT, FOR EXAMPLE, IF THEY DID THAT.

15   Q.   ALL RIGHT.

16   A.   IF THAT'S WHAT YOU MEAN BY THE RIGHT TO DO IT.

17   Q.   THEY HAD THE RIGHT TO DO IT?

18   A.   I JUST -- WHEN YOU TALK ABOUT THE RIGHT, I JUST WANT TO BE

19   PRECISE.  YOU'VE GOT A CONTRACT.  THE CONTRACT SAYS THINGS.  IF

20   THEY DID THAT, THAT WOULD BE CONSEQUENCES AND THEY WOULDN'T BE

21   IN BREACH.

22   Q.   RIGHT.

23   A.   I DON'T KNOW IF YOU MEAN ANYTHING OTHER THAN THAT.

24   Q.   AND YOU ARE FAMILIAR ENOUGH WITH THE AGREEMENTS TO KNOW

25   THERE WAS NO MINIMUM PURCHASE REQUIREMENT AS MR. WILLIAMS TOLD

SHAPIRO CROSS BY MR. VAN NEST

1    US THE OTHER DAY?

2    A.   OKAY, THAT'S RIGHT.

3    Q.   AND THEY WEREN'T REQUIRED -- APPLE WASN'T REQUIRED TO

4    PURCHASE ANY CHIPS FROM QUALCOMM AT ALL; RIGHT?

5    A.   WELL, NO.  THE EXCLUSIVITY ARRANGEMENTS COVER ALL OF THAT.

6    Q.   BUT THERE WAS NO MINIMUM PURCHASE REQUIREMENT, NO VOLUME

7    GUARANTEE?  THAT'S WHAT MR. WILLIAMS SAID WHEN HE WAS HERE THE

8    OTHER DAY.

9    A.   THAT SOUNDS RIGHT, YES, I AGREE.

10   Q.   AND, YET, APPLE WAS EXPECTING AND NEGOTIATING FOR AND

11   RECEIVED, UNDER THE AGREEMENT, SOME VERY LARGE UPFRONT

12   PAYMENTS; RIGHT?

13   A.   IN EXCHANGE FOR EXCLUSIVITY.  THAT'S THE POINT.

14   Q.   OKAY.  NOW, IN FACT, AS I THINK YOU SAID, APPLE DID BRING

15   IN A SECOND SUPPLIER IN 2016.  THAT WAS INTEL?

16   A.   CORRECT.

17   Q.   THAT HAPPENED BEFORE THE AGREEMENT EXPIRED?  THAT WAS IN

18   DECEMBER; CORRECT?

19   A.   I THINK IT WAS SEPTEMBER ACTUALLY.

20   Q.   BUT THE AGREEMENT EXPIRED IN DECEMBER; RIGHT?

21   A.   OH, I SEE.  YES, I THINK THAT'S RIGHT.  YOU'RE TELLING ME

22   THAT.  THAT SOUNDS RIGHT TO ME.

23   Q.   AND AS OF 2018, INTEL BEGAN SUPPLYING 100 PERCENT OF THE

24   MODEM CHIPS IN THE NEW IPHONE RELEASES; CORRECT?

25   A.   THAT'S MY UNDERSTANDING, YES.

1    Q.   AND AS A RESULT, I THINK WE ESTABLISHED EARLIER, OF INTEL

2    GAINING GROUND AT APPLE, QUALCOMM'S MARKET SHARE DECREASED FROM

3    2016 INTO 2017; CORRECT?

4    A.   INEVITABLY THAT WOULD RESULT, YES.

5              THE COURT:  I'M SORRY TO INTERRUPT, BUT I'D LIKE TO

6    TAKE OUR LUNCH BREAK NOW.  IT'S NOON.

7              MR. VAN NEST:  THAT'S FINE, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  SO WE WILL SEE EVERYONE BACK

9    AT 1:00 O'CLOCK.

10        THANK YOU.

11        (THE LUNCH RECESS WAS TAKEN FROM 12:00 P.M. UNTIL 1:05

12   P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2          (COURT CONVENED AT 1:05 P.M.)

3               THE CLERK:  COME TO ORDER, COURT IS NOW IN SESSION.

4               THE COURT:  OKAY.  GOOD AFTERNOON.  WELCOME BACK.

5               MR. VAN NEST:  GOOD AFTERNOON, YOUR HONOR.

6               THE COURT:  I HAVE A QUICK QUESTION.

7          PLEASE TAKE A SEAT.

8          YESTERDAY WAS THE DEADLINE FOR THE PARTIES TO FILE THEIR

9     REVISED MOTIONS TO FILE THEIR FINDINGS OF FACT AND CONCLUSIONS

10    OF LAW.  QUALCOMM DID THAT.  THE FTC DID NOT.  IS THAT BECAUSE

11    YOU'RE NOT SEEKING TO SEAL ANYTHING IN YOUR DOCUMENT?  OR DID

12    YOU MISS THE DEADLINE?

13              MS. MILICI:  YOUR HONOR, I'M SORRY, I'M NOT CERTAIN

14    WHAT THE STATUS OF THAT IS.  I THINK WE DID FILE THAT PRETRIAL

15    STATEMENT, BUT I'M NOT PRESENTLY CERTAIN.  BUT I CAN FIND OUT

16    IF WE'RE STILL SEEKING TO SEAL SOMETHING.

17              THE COURT:  OKAY.  IF YOU NEED AN EXTENSION OF THE

18    DEADLINE, YOU SHOULD LET ME KNOW.

19         WHAT I'D LIKE TO DO IS TO -- SO I JUST -- WE HAVE NO

20    PENDING SEALING MOTIONS IN THIS CASE, I JUST FILED THREE OF

21    THEM OVER LUNCH.

22         SO WHAT I'D LIKE TO DO IS TO HAVE YOU WAIT, UNLESS YOU

23    WANT TO DO YOURS SOONER, UNTIL THE TRIAL IS OVER BECAUSE

24    THROUGH THE DEPOSITIONS AND, YOU KNOW, CERTAIN THINGS ARE

25    BECOMING PART OF THE PUBLIC DOMAIN, AND SO THERE'S NO NEED FOR

1    US TO INTERIM SEAL IT AND THEN HAVE SOMEONE TESTIFY TO IT AND

2    THEN -- SO I WAS GOING TO HAVE YOU JUST -- YOU COULD DO WHAT I

3    ASKED QUALCOMM TO DO, IS WAIT UNTIL THE END OF THE TRIAL, UNTIL

4    FEBRUARY 8TH, A WEEK AFTER THE TRIAL IS OVER, AND THEN, YOU

5    KNOW, LOOK BACK AND FIGURE OUT WHAT NOW IS PUBLIC AND SO THEN

6    YOU CAN NARROWLY TAYLOR IT, INSTEAD OF MAKING YOU DO AN INTERIM

7    REQUEST.

8         AND THEN WHAT I WOULD LIKE YOU TO DO ALSO WITH THE

9    ADDITIONAL TIME IS GO TO THE THIRD PARTIES AND SAY, DO YOU CARE

10   ABOUT THIS ANYMORE?  DO YOU WANT THIS SEALED OR NOT?

11        AND I WOULD LIKE THE THIRD PARTY DECLARATIONS TO ACCOMPANY

12   YOUR MOTIONS SO THAT I KNOW -- BECAUSE IT'S A LITTLE BIT

13   COMPLICATED IF I GET AN INTERIM MOTION FROM THE PARTIES AND

14   THEN YOU ALL SAY, BUT YOU MIGHT BE GETTING DECLARATIONS FROM

15   OTHER PEOPLE, I DON'T KNOW WHO, WHEN, IF I'LL GET THEM.  IT

16   WOULD JUST BE EASIER IF I COULD HAVE ONE COORDINATED POSITION,

17   AND IT WOULD BE A LOT EASIER TO GRANT THEN KNOWING EVERYONE'S

18   POSITION IS COORDINATED.

19        MS. MILICI:  WE'RE VERY HAPPY TO DO THAT.  THANK YOU,

20   YOUR HONOR.

21        THE COURT:  OKAY.  SO WHY DON'T YOU SIMILARLY FILE

22   YOURSELF ON FEBRUARY 8TH, JUST LIKE QUALCOMM, WITH THE THIRD

23   PARTY DECLARATIONS.  AND DO NOT TRY TO SEAL ANYTHING THAT

24   BECOMES UNSEALED DURING THIS PROCESS.  OKAY?

25        MS. MILICI:  UNDERSTOOD, YOUR HONOR.  THANK YOU.

1          THE COURT:  ALL RIGHT.  I'M ALSO ASSUMING THAT YOU'LL

2     PROBABLY HAVE OBJECTIONS TO EACH OTHER'S CLOSING ARGUMENT

3     SLIDES.

4          MS. MILICI:  I THINK THAT'S SAFE.

5          THE COURT:  WELL, SURPRISE ME, OKAY, AND DON'T.

6      BUT IF YOU DO, CAN WE DO THE SAME HIGH PRIORITY OBJECTION

7     PROCESS AND HAVE YOU FILE THOSE THURSDAY MORNING AT 8:00 SO WE

8     CAN GIVE YOU RULINGS THAT DAY.  WE'LL TRY TO DO IT AS SOON AS

9     WE CAN SO YOU CAN INCORPORATE THEM INTO YOUR PREPARATION.

10          MR. VAN NEST:  WE HAD NONE TO THE OPENINGS, SO I'M

11     ANTICIPATING THE SAME FOR THE CLOSING.

12          THE COURT:  ALL RIGHT.  THAT WOULD BE GREAT.

13          MS. MILICI:  WE DID WORK OUT OBJECTIONS TO EACH OTHER

14     DIRECTLY BEFORE THE OPENINGS, SO WE MIGHT STILL SURPRISE YOU.

15          THE COURT:  OKAY.

16          MS. MILICI:  BUT IF WE DO HAVE OBJECTIONS, I THINK

17     THAT --

18          THE COURT:  IF YOU COULD DO IT ALONG THAT TIMEFRAME,

19     AND THE SAME PROCESS.

20          MR. VAN NEST:  WE'LL GET -- IF WE HAVE OBJECTIONS,

21     WE'LL GET THEM IN THAT MORNING, YOUR HONOR.

22          THE COURT:  PERFECT.

23          MR. VAN NEST:  BUT I'M NOT REALLY ANTICIPATING THAT.

24          THE COURT:  OKAY.  WELL, THAT -- THANK YOU.  IF YOU

25     DON'T, I REALLY APPRECIATE THAT.

1      OKAY.  AND THEN I'M ACTUALLY THINKING THAT MAYBE WE WILL

2   COME UP WITH A CHART AND ASK -- YOU KNOW, YOU CAN COMMENT ON IT

3   AND THEN ASK YOU TO POPULATE IT.

4          MR. VAN NEST:  YOU COULD DO THAT.  WE'VE BEEN TALKING

5   AND I SAID WE'D HAVE SOMETHING TO YOU BY THE END OF THE WEEK,

6   AND I THINK -- WELL, WE'VE BEEN TALKING ABOUT WHAT WE'RE GOING

7   TO PROPOSE.

8          THE COURT:  ALL RIGHT.

9          MR. VAN NEST:  GIVE US A CHANCE.

10          THE COURT:  ALL RIGHT.  THAT'S FINE.

11          MR. VAN NEST:  IF YOU DON'T LIKE IT, THEN YOU CAN --

12   SURE.  GIVE US A SHOT.

13          THE COURT:  THAT'S FINE.  THAT'S FINE.

14          MR. VAN NEST:  THANK YOU.

15          THE COURT:  ALL RIGHT.  NOW, LET'S GO BACK TO THE

16   CROSS-EXAMINATION.

17      TIME IS 1:09.  GO AHEAD, PLEASE.

18   BY MR. VAN NEST:

19   Q.   GOOD AFTERNOON, PROFESSOR SHAPIRO.  WELCOME BACK.

20   A.   THANK YOU.  GOOD AFTERNOON.

21   Q.   I WANT TO PUT UP ON THE SLIDE SOMETHING THAT MAY --

22      SOME OF THIS IS SEALED, YOUR HONOR, SO I'VE COVERED THE

23   CAP?

24          THE COURT:  OKAY.

25

1    BY MR. VAN NEST:

2    Q.   IT'S SLIDE 37, MR. DAHN.  IT'S A SLIDE THAT YOU SHOWED

3    THIS MORNING.

4         WHILE WE GET THAT UP, LET ME JUST ASK, THERE WERE TWO

5    TRANSITION AGREEMENTS AS YOU UNDERSTAND IT, PROFESSOR SHAPIRO,

6    ONE IN 2011 AND ONE IN 2013?

7    A.   YES, THAT'S RIGHT.

8    Q.   OKAY.  AND THE PRODUCTS, THE INTEL PRODUCTS YOU'RE

9    CLAIMING WERE FORECLOSED, THEY'RE LATER, 2014, 2016; CORRECT?

10   A.   CONTESTABLE PRODUCTS HERE THAT ARE USED FOR THIS TEST ARE

11   A LAUNCH BEGINNING IN 2014.

12   Q.   OKAY.  AND SO YOU'RE NOT IDENTIFYING ANY APPLE DEVICE THAT

13   INTEL WAS EXCLUDED FROM IN 2011, 2012 OR 2013; CORRECT?

14   A.   MY CONTESTABLE PRODUCTS DO NOT INCLUDE THOSE EARLIER APPLE

15   DEVICES.

16   Q.   OKAY.  AND IS THAT BECAUSE, AS MR. WILLIAMS SAID

17   YESTERDAY, APPLE WANTED TO HAVE A SOLE SOURCE WITH QUALCOMM

18   ANYWAY?  OR BECAUSE INTEL PRODUCTS WEREN'T READY?  OR BOTH?

19   A.   I AM SIMPLY LOOKING AT WHAT -- THE BUSINESS THAT WAS

20   CURRENTLY AVAILABLE, OR CONTESTABLE AT THE TIME LEADING UP TO

21   THE 2013 AGREEMENTS.

22   Q.   OKAY.

23   A.   SO THAT -- THAT'S HOW -- THAT'S HOW I PICKED THIS SET OF

24   PRODUCTS.

25   Q.   OKAY.  BUT IN OTHER WORDS -- IN OTHER WORDS, YOU'RE NOT

1    CONTENDING THAT THERE WAS ANY FORECLOSURE AT AN EARLIER TIME,

2    2011, 2012, 2013 AS A RESULT OF THESE AGREEMENTS?

3    A.   NO.  THE EFFECTS WOULD BE FELT HERE STARTING WITH THE

4    PRODUCTS LISTED ON THIS CHART --

5    Q.   OKAY.

6    A.   -- WHICH ARE STARTING IN 2014.

7    Q.   OKAY.  AND AS WE SEE ON THE CHART HERE, THE PRODUCTS

8    YOU'RE LISTING, THOSE ARE ALL LIMITED TO -- THOSE ARE IPADS,

9    NOT PHONES; RIGHT?

10   A.   YES.  THESE ARE THE CONTESTABLE PRODUCTS AT THE TIME THAT

11   I'M USING FOR THE TEST.

12       OF COURSE, TO THE EXTENT INTEL WAS KEPT OUT OF GETTING

13   INTO THE APPLE ACCOUNT AT THIS TIME, IT HAD SOME FOLLOW-ON

14   EFFECTS AS WELL.

15   Q.   WE'LL GET TO THAT IN A MINUTE.

16   A.   OKAY.

17   Q.   I JUST WANT TO BE SURE THE COURT'S CLEAR.

18       THE PRODUCTS THAT YOU'RE LISTING HERE AS CONTESTABLE, IN

19   OTHER WORDS, THAT INTEL HAD A SHOT TO GET, THOSE ARE ONLY

20   IPADS, NOT IPHONES; RIGHT?

21   A.   THAT'S CORRECT.  THESE -- THESE HERE ARE IPADS AS SHOWN,

22   CORRECT.

23   Q.   AND YOU'VE DONE YOUR ANALYSIS HERE ON PROFIT SACRIFICE, ET

24   CETERA, BASED ONLY ON THE IPADS, GIVING NO CONSIDERATION TO THE

25   IPHONES; RIGHT?

SHAPIRO CROSS BY MR. VAN NEST

1    A.   WELL, IN THIS PRIMARY SCENARIO HERE, THE CONTESTABLE

2    PRODUCTS DO NOT INCLUDE ANY IPHONE.

3    Q.   OKAY.  AND THAT'S BECAUSE AS OF THIS TIME, OCTOBER 2014,

4    INTEL WASN'T COMPETITIVE FOR IPHONES; RIGHT?

5    A.   NO, NO.  THAT'S -- YOU'VE GOT THE TIMING -- THAT'S NOT

6    CORRECT IN TERMS OF THE TIMING.

7    Q.   WELL, PUT IT THIS WAY:  YOU'RE NOT CONTENDING THAT AS OF

8    THIS DATE, THE DATE THAT THIS SLIDE PRESENTS, OCTOBER OF 2014,

9    THAT ANY OF THE IPHONE PRODUCTS WERE CONTESTABLE BY INTEL;

10   RIGHT?

11   A.   WHAT I'M SAYING IN MY PRIMARY SCENARIO THAT I PRESENTED TO

12   THE COURT WAS THAT THE BUSINESS THAT INTEL WAS -- HAD A REAL

13   PROSPECT OF WINNING FROM APPLE PRIOR TO THE SIGNING OF THE FATA

14   WAS THIS SET OF PRODUCTS AND NOT IPHONE PRODUCTS AT THAT TIME.

15   Q.   OKAY.

16   A.   THEY WOULD HAVE TO FIRST SELL THESE AND THEN GET INTO THE

17   IPHONE WAS THE LOGIC OF IT.

18   Q.   AND --

19            THE COURT:  I'M SORRY TO INTERRUPT YOU.

20        COULD YOU ALL PLEASE MAKE ROOM FOR PEOPLE STANDING IN THE

21   BACK?  THANK YOU.

22        SORRY TO INTERRUPT.

23        GO AHEAD, PLEASE.

24            MR. VAN NEST:  THAT'S QUITE ALL RIGHT, YOUR HONOR.

25   Q.   AND THAT'S BECAUSE INTEL DIDN'T HAVE A SHOT AT IPHONE AS

SHAPIRO CROSS BY MR. VAN NEST

1    OF THIS TIME; RIGHT?

2    A.   THE IPHONE THAT WOULD HAVE -- IN THAT FIRST -- AT THAT

3    FIRST INSTANCE, THERE'S A -- AGAIN, I THINK THERE'S SOME

4    AMBIGUITY.  THAT'S WHY MY SECOND SCENARIO DOES INCLUDE SOME

5    IPHONES.

6         BUT THE PRIMARY SCENARIO DOES NOT BECAUSE APPLE WAS

7    PURSUING THIS STRATEGY OF WORKING WITH INTEL FIRST ON THE IPADS

8    AS A STEPPING STONE, IF YOU WILL, TO DO THE IPHONES LATER.

9    Q.   RIGHT.  THEY DIDN'T ACTUALLY TRUST INTEL TO GO INTO THE

10   IPHONE STRAIGHT AWAY.  THEY WANTED THEM TO GO INTO THE IPAD

11   FIRST?

12   A.   YOU KNOW, TRUST IS A LITTLE BIT OF A LOADED TERM.  WHAT I

13   UNDERSTAND FROM MR. BLEVINS IS THAT THEY WERE PREPARED TO GO

14   FORWARD WITH INTEL ON THE IPADS.  AND THEN LATER THEY WOULD

15   HOPE THAT THAT WOULD BE A GOOD SECOND ALTERNATIVE TO QUALCOMM

16   FOR THE IPHONES.

17   Q.   RIGHT.  BUT THEY WERE PERFECTLY WILLING AND, OF COURSE,

18   HAD BEEN SINGLE SOURCING FROM QUALCOMM FOR ALL PRODUCTS,

19   IPHONES, AND IPADS; CORRECT?

20   A.   WELL, UNDER THE TRANSITION AGREEMENT, YES, THEY WERE

21   EXCLUSIVE WITH QUALCOMM.

22   Q.   AND THAT'S BECAUSE QUALCOMM HAD A SINGLE SKU, A SINGLE

23   UNIT THAT COULD MAKE DO FOR ALL OF THOSE PRODUCTS; RIGHT?

24   A.   WELL, I THINK THAT'S TRUE.  BUT I DON'T -- I WOULDN'T

25   ATTRIBUTE THAT FACT TO THE EXCLUSIVE ARRANGEMENT BETWEEN APPLE

1    AND QUALCOMM UNDER THE TRANSITION AGREEMENT.

2    Q.   NOW, UNDER YOUR VIEW OF THE WORLD, IF INTEL HAD GOTTEN

3    INTO THE IPAD FIRST EARLIER, THEY HAD A SHOT AT GETTING INTO

4    THE IPHONE EARLIER; RIGHT?

5    A.   THAT'S RIGHT.  IT WOULD HAVE IMPROVED THEIR PROSPECTS AND

6    PUT THEM IN A STRONGER POSITION TO GET INTO THE IPHONE EARLIER

7    THAN THEY ULTIMATELY DID, AND ALSO IT WOULD JUST MADE THEM MORE

8    GENERALLY A STRONGER COMPETITOR IN THE MARKET FOR PREMIUM LTE

9    MODEM CHIPS.

10   Q.   AND AS -- I THINK YOU TESTIFIED THAT THE EARLIEST, EVEN

11   UNDER YOUR SCENARIO, THAT INTEL WOULD HAVE QUALIFIED TO BE IN

12   AN IPHONE WAS AROUND 2015?

13   A.   YES, THAT WOULD BE THE PRIMARY SCENARIO HERE --

14   Q.   OKAY.

15   A.   -- IS THAT IT WOULD BE THE 2015 IPHONES THAT INTEL WOULD

16   HAVE BEEN IN A STRONGER POSITION TO COMPETE FOR IF THEY HAD

17   FIRST BEEN IN IPADS.

18   Q.   AND AS IT TURNED OUT, AS YOU'VE SAID, INTEL SKIPPED RIGHT

19   INTO THE IPHONE WITHOUT PRODUCING AN IPAD FIRST, AND THAT

20   HAPPENED IN SEPTEMBER OF 2016; RIGHT?

21   A.   SO -- YES, IF I CAN MAKE SURE WE'RE SAYING THE SAME THING.

22   APPLE ULTIMATELY PICKED INTEL CHIPS FOR THE IPHONE IN 2016

23   WITHOUT FIRST TESTING THEM OUT, IF YOU WILL, IN AN EARLIER IPAD

24   MODEL.

25   Q.   SO THE UPSHOT OF THAT IS THAT INTEL GOT INTO THE IPHONE

1    ONLY ABOUT A YEAR LATER THAN YOU WERE PREDICTING IN YOUR

2    SCENARIO; CORRECT?

3    A.   THAT IS CORRECT.

4    Q.   OKAY.  AND THAT WAS TWO YEARS AGO PLUS; RIGHT?

5    A.   THEY DID GET IN IN 2016, AND SO THAT'S ABOUT TWO YEARS OR

6    SO.

7         OH, YES -- THE PLUS THREW ME OFF.  I UNDERSTAND, YES.

8    Q.   NOW, AS IT TURNS OUT, BASED ON WHAT MS. EVANS SAID, INTEL

9    ABANDONED ITS SYSTEM ON A CHIP MOBILE DEVELOPMENT PROGRAM BACK

10   IN 2016; RIGHT?

11   A.   I CAN'T REMEMBER THE EXACT TIME, BUT SHE DID SAY THAT IT

12   HAD NOT -- I THINK SHE SAID IT FAILED, THAT DEVELOPMENT

13   PROGRAM.

14   Q.   RIGHT.  AND NOT ONLY DID IT FAIL, BUT THEY DON'T HAVE ANY

15   INTEREST IN REVIVING IT BECAUSE THEY'RE NOT INTERESTED IN BEING

16   IN THE HANDSET BUSINESS; RIGHT?

17   A.   I DON'T THINK INTEL IS INTERESTED IN BEING IN THE HANDSET

18   BUSINESS.

19   Q.   THEY'RE NOT INTERESTED IN SELLING SYSTEM ON A CHIP, WHICH

20   IS WHAT MOST OEM'S TODAY ARE DEMANDING; RIGHT?

21   A.   I THINK THEY ARE NOT OFFERING THE SOC BECAUSE THEY'VE

22   FOCUSSED ON THE THIN MODEMS AND THEY'RE HEADING INTO 5G AND THE

23   INTERNET OF THINGS AS I UNDERSTAND WHAT SHE SAID.

24   Q.   AND RIGHT NOW THE PRIMARY, PERHAPS ONLY, PURCHASER OF THIN

25   MODEMS IN THE HANDSET BUSINESS IS APPLE; RIGHT?

1    A.   I DON'T THINK THEY'RE THE ONLY CUSTOMER.

2    Q.   CERTAINLY THEY'RE THE VAST MAJORITY OF THIN MODEM SALES,

3    AREN'T THEY?

4    A.   FOR INTEL, YEAH.

5    Q.   FOR ANYBODY?

6    A.   I DON'T KNOW THE NUMBERS.  YOU MEAN LIKE IN 2018?

7    Q.   WELL, 2017, '16.  DURING THE PERIOD YOU EVALUATED, WAS

8    ANYBODY OTHER THAN APPLE BUYING THIN MODEMS?

9    A.   THEY WERE.  I'D HAVE TO CHECK.  IN MY HEAD, I THINK THAT

10   APPLE WAS BUYING MAYBE TWO-THIRDS OF THEM, SOMETHING LIKE THAT.

11   Q.   BUT IN ANY EVENT --

12   A.   I DON'T KNOW THE EXACT NUMBER.

13   Q.   IN ANY EVENT, IF WE TAKE MS. EVANS OF INTEL AT HER WORD,

14   APPLE'S AGREEMENTS WITH QUALCOMM HAVEN'T CAUSED HARM TO ANY

15   OTHER OEM FOR WHICH INTEL IS NOT A COMPETITOR ANYWAY; RIGHT?

16   A.   WELL, I THINK IF YOU POSTULATE THAT IF THERE'S AN OEM THAT

17   INTEL WOULD NOT HAVE POSSIBLY BEEN A COMPETITOR FOR, THEN THE

18   SLOW DOWN DELAY, IF YOU WILL, AT APPLE, BY DEFINITION WOULDN'T

19   AFFECT THAT OEM'S SOURCING THAT OPTION.

20   Q.   RIGHT.  AND SINCE INTEL IS NOT MAKING SYSTEM ON A CHIP,

21   THAT'S THE VAST, VAST MAJORITY OF ALL HANDSET MAKERS; RIGHT?

22   A.   WELL, IF YOU'RE COUNTING BY NUMBER OF MAKERS RATHER THAN,

23   SAY, UNITS OF VOLUME HERE?  IS THAT WHAT YOU MEAN BY MAJORITY?

24   Q.   ANYWAY YOU KNOW IT, PROFESSOR SHAPIRO.

25   A.   WELL, APPLE IS VERY LARGE, RIGHT?  SO YOU'RE SAYING APART

1    FROM APPLE, THOUGH?  IS THAT WHAT YOU'RE SAYING?

2    Q.   THAT'S RIGHT.  APART FROM APPLE, THERE'S VIRTUALLY NO

3    OTHER HANDSET MAKER THAT WOULDN'T PREFER, DOESN'T, IN FACT,

4    PREFER BY NOW SYSTEM ON A CHIP AS OPPOSED TO A THIN MODEM?

5    THAT'S MY POINT.

6    A.   RIGHT.  I THINK THEY ARE GENERALLY BUYING SOC'S, ALTHOUGH

7    I DON'T KNOW WHAT THE TECHNICAL SIDE OF IT WOULD BE ABOUT, YOU

8    KNOW, BASICALLY BUYING A THIN MODEM AND MARRYING IT WITH AN

9    APPLICATION PROCESSOR, IF THAT WAS ATTRACTIVE.

10   Q.   SO IF THAT'S THE CASE, AND IT IS, THE FACT THAT INTEL --

11   THE FACT THAT THERE WAS ANY DELAY AT ALL HAS NO EFFECT ON ANY

12   OTHER OEM BECAUSE THEY'RE NOT BUYING THOSE THIN MODEMS ANYWAY;

13   RIGHT?

14   A.   I THINK THE WAY THINGS HAVE PLAYED OUT IN FACT, GIVEN

15   INTEL'S FAILURE WITH THAT PROGRAM, THAT THESE AFFECTS HAVE

16   PROVEN TO BE MORE LIMITED, THE COMPETITIVE EFFECTS, THAN THEY

17   MIGHT HAVE BEEN IF INTEL HAD BEEN MORE SUCCESSFUL.  OF COURSE,

18   THAT WAS UNKNOWN AT THE TIME BACK IN 2012.

19   Q.   YEAH.  AND IN FACT, THE ONE MAJOR TARGET FOR INTEL, APPLE,

20   THEY HAVE 100 PERCENT OF THE BUSINESS NOW AS WE ESTABLISHED

21   EARLIER; RIGHT?

22   A.   YES.  THEY'VE ACHIEVED THAT AT APPLE.  THAT'S MY

23   UNDERSTANDING.

24   Q.   NOW, I WANT TO COME BACK HERE TO YOUR SLIDE 37 AND JUST

25   MAKE SURE THAT THE COURT UNDERSTANDS WHAT YOU'RE DOING HERE.

1    AS I UNDERSTAND IT, YOU'VE IDENTIFIED FIVE IPAD MODELS

2    THAT YOU SAY WERE THE THINGS THAT INTEL WAS QUALIFIED FOR IN

3    2014 AT APPLE; RIGHT?

4    A.   I WOULD PUT IT -- I DON'T WANT TO USE -- I DIDN'T USE THE

5    WORD "QUALIFIED."  I GUESS I WOULD SAY THAT APPLE WAS --

6    Q.   CONSIDERING?

7    A.   -- YOU KNOW, SERIOUSLY CONSIDERING GIVING TO INTEL

8    STARTING WITH THE 2014 MODELS, AND THAT WOULD BE BASICALLY AN

9    AWARD AND A PATH THAT APPLE WAS PREPARED TO GO DOWN.

10   Q.   AND THE NUMBER UNDER A, COLUMN A, INCENTIVE PAYMENTS AT

11   RISK, THOSE ARE ALL THE INCENTIVE PAYMENTS THAT WERE AT RISK

12   UNDER THE FIRST AMENDED TRANSITION AGREEMENT; RIGHT?

13   A.   AS OF OCTOBER 22ND, 2014.

14   Q.   YOU'RE COMPARING THAT TO B.  B IS NOTHING MORE THAN THE

15   REVENUES, OR THE MARGINS I GUESS, FROM JUST THE IPADS; RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   NOW, WHEN MR. MOLLENKOPF WAS HERE, HE TESTIFIED THAT HIS

18   GOAL WAS TO GET THE BUSINESS THAT WAS AVAILABLE AT APPLE;

19   RIGHT?

20   A.   THAT SOUNDS GENERALLY RIGHT, SURE.

21   Q.   AND HE PRESENTED PROJECTIONS OF WHAT QUALCOMM EXPECTED TO

22   EARN UNDER THIS AGREEMENT WITH APPLE IN 2013; CORRECT?

23   A.   HE PRESENTED -- ARE YOU REFERRING TO THE PROJECTIONS HE

24   PRESENTED TO THE BOARD OF DIRECTORS LATER IN 2013?

25   Q.   YES.  YES.

1    A.   I RECALL THAT, YES.

2    Q.   OKAY.  AND COULD WE HAVE UP -- AND WE'RE STILL CLOSED UP

3    HERE -- CAN WE HAVE UP, PLEASE, CX 5389.

4         DO YOU HAVE IT THERE, PROFESSOR SHAPIRO?

5    A.   I DO.

6    Q.   NOW, YOU'RE NOT SUGGESTING THAT THIS ANALYSIS THAT YOU

7    SHOWED THE COURT THIS MORNING WAS ANYTHING THAT WAS DONE AT

8    QUALCOMM?  THEY DIDN'T DO THIS ANALYSIS OF YOUR PROFIT

9    SACRIFICE PROGRAM; RIGHT?

10   A.   I DON'T THINK THEY DID THE SAME ANALYSIS I DID.  I'M NOT

11   SAYING THAT.

12   Q.   OKAY.  AND, IN FACT, WHAT WAS PRESENTED TO THE BOARD OF

13   DIRECTORS HERE IS IN 5389, AND IT SHOWS -- AND, AGAIN, THIS IS

14   PARTIALLY UNDER SEAL, PROFESSOR -- BUT IT SHOWS NET REVENUE

15   NUMBERS FAR IN EXCESS OF WHAT'S SHOWN ON YOUR SLIDE 37 BECAUSE

16   THEY'RE LOOKING AT THE ENTIRETY OF THE DEAL, NOT JUST THE

17   IPADS; RIGHT?

18   A.   OH, YES.  THE ENTIRE DEAL WAS PROFITABLE FOR QUALCOMM.

19   Q.   AS A MATTER OF FACT, IT WAS EXTREMELY PROFITABLE ACCORDING

20   TO THESE PROJECTIONS AND MR. MOLLENKOPF'S TESTIMONY; CORRECT?

21   A.   YES.  I SEE THAT THERE'S A LOT OF PROFITS HERE.  I THINK

22   THIS MEANS -- IT TOOK ME -- IT WOULD TAKE ME A WHILE TO PARSE

23   THROUGH WHAT THE ALTERNATIVE IS.  IF THEY DON'T SIGN THE DEAL,

24   THEY'RE LOSING A GREAT DEAL OF BUSINESS.

25        SO IS THAT THE ASSUMPTION, THAT THEY WOULD LOSE ALL THIS

1    BUSINESS WITHOUT THE DEAL?

2    Q.   WELL, MY QUESTION WAS MORE SIMPLE.  THIS IS THE ANALYSIS

3    THAT MR. MOLLENKOPF PRESENTED TO HIS BOARD AND IT SHOWS THE

4    DEAL AS BEING EXTREMELY PROFITABLE OVER THE ENTIRE PERIOD OF

5    THE DEAL, NET OF THE INCENTIVES; CORRECT?

6    A.   WELL, I SEE THE PROFITS.  BUT TO SAY IT'S EXTREMELY

7    PROFITABLE, FOR ME TO KNOW WHAT THAT MEANS, I HAVE TO KNOW IN

8    COMPARISON WITH WHAT.

9         AND I CAN'T TELL THAT RIGHT NOW.

10   Q.   WELL --

11   A.   IT WOULD TAKE ME LONGER READING THE NUMBERS.  THAT'S ALL.

12   Q.   IN COMPARISON WITH YOUR PROFIT SACRIFICE FORMULA, IT'S

13   CERTAINLY FAR MORE FAVORABLE THAN WHAT YOU SHOWED ON SLIDE 37;

14   CORRECT?

15   A.   WHAT DO YOU MEAN BY "FAVORABLE"?

16   Q.   BETTER BY A VERY, VERY LARGE NUMBER.

17   A.   BETTER FOR QUALCOMM?

18   Q.   YES.

19   A.   WELL, CERTAINLY.  IF YOU INCLUDE ALL OF THESE SALES THAT

20   WHATEVER IS BEING COUNTED AS GENERATED BY THIS DEAL AND WOULD

21   NOT OCCUR WITHOUT THE DEAL OVER THE WHOLE PERIOD OF TIME

22   THROUGH FISCAL '16, THAT'S NOT THE PROFITS SACRIFICE TEST THAT

23   AN ANTITRUST ECONOMIST RUNS.

24   Q.   UNDERSTOOD.

25   A.   THAT'S A DIFFERENT QUESTION.

1    Q.   BUT I GUESS MY QUESTION IS, IN THE REAL WORLD WHEN

2    QUALCOMM SIGNED THIS DEAL WITH APPLE, QUALCOMM WAS EXPECTING TO

3    EARN A SIGNIFICANT PROFIT OVERALL ON THE TRANSACTION; CORRECT?

4    A.   I BELIEVE THAT'S CORRECT, WITH WHATEVER COUNTER FACTUAL

5    THEY HAD IN MIND WITHOUT THE DEAL.  BUT THAT'S WHAT WAS

6    PRESENTED.

7         I'M NOT DISPUTING THAT.

8    Q.   THANK YOU.  THANK YOU.

9         NOW, WE TALKED EARLIER, AND YOU AND I TALKED EARLIER,

10   ABOUT THE POLICY AT QUALCOMM OF NOT SELLING CHIPS TO OEM'S WHO

11   DO NOT HAVE A LICENSE.

12        DO YOU RECALL THAT TESTIMONY?

13   A.   YES.

14   Q.   YEAH.  AND YOU UNDERSTOOD THAT THAT'S BEEN QUALCOMM'S

15   POLICY FOR MANY YEARS?

16   A.   I DO.

17   Q.   AND THAT'S QUALCOMM'S POLICY REGARDLESS OF WHAT PARTICULAR

18   CELLULAR STANDARD WE'RE TALKING ABOUT; RIGHT?

19   A.   YES, I UNDERSTAND THAT.

20   Q.   SO IT APPLIES TO CDMA, TO PREMIUM LTE AS YOU DEFINE IT, TO

21   WCDMA, ALL ACROSS ALL TECHNOLOGIES, QUALCOMM'S POLICY HAS BEEN

22   THE SAME; CORRECT?

23   A.   THAT'S MY UNDERSTANDING, YES.

24   Q.   AND YOU HAVE NOTED IN YOUR REPORT THAT IF OEM'S HAD ACCESS

25   TO CHIPS FROM OTHER PEOPLE AT A COMPARABLE PRICE AND WITH

1    SUFFICIENT VOLUME, THEN QUALCOMM'S POLICY OF SELLING CHIPS ONLY

2    TO FOLKS WITH A LICENSE COULD HAVE NO EFFECT IN ELEVATING THE

3    PER UNIT ROYALTY PRICE; RIGHT?

4    A.   CAN YOU SHOW ME WHAT PART OF MY REPORT YOU'RE REFERRING

5    TO, PLEASE?

6    Q.   WELL, LET ME ASK YOU FIRST.  DO YOU RECALL CONCLUDING THAT

7    IF OEM'S HAD SUFFICIENT ALTERNATIVES AND ENOUGH VOLUME AND AT A

8    COMPARABLE PRICE, THAT THE POLICY THAT YOU'VE BEEN SO CRITICAL

9    OF WOULD HAVE NO EFFECT IN ELEVATING ROYALTIES AT ALL?

10   A.   IF THE COST TO AN OEM OF LOSING ACCESS TO QUALCOMM'S CHIPS

11   WERE NIL, THEN THE NO LICENSE, NO CHIPS POLICY WOULD HAVE NO

12   BITE, AND, THEREFORE, IT WOULD NOT BE ABLE -- QUALCOMM WOULD

13   NOT BE ABLE TO ELEVATE ROYALTIES ABOVE REASONABLE LEVELS USING

14   THAT POLICY ALONE.

15   Q.   AND AS I THINK WE ESTABLISHED EARLIER TODAY, YOU DON'T

16   HAVE AN OPINION ON WHAT MARKET POWER QUALCOMM HAS TODAY;

17   CORRECT?

18   A.   I'M NOT OFFERING OPINIONS ABOUT THEIR MONOPOLY POWER IN

19   2019.

20            MR. VAN NEST:  THANK YOU.

21        I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

22            THE COURT:  OKAY.  TIME IS 1:28.  LET ME KNOW, ARE

23   YOU READY?

24            MR. JAMES:  YES.

25            THE COURT:  LET'S WAIT UNTIL MR. VAN NEST SITS DOWN.

```
 1              MR. JAMES:  SURE.

 2              MR. VAN NEST:  THANK YOU, YOUR HONOR.

 3              THE COURT:  OKAY.  GO AHEAD, PLEASE.  1:29.  NO,

 4    1:28.  ACTUALLY, YOU GOT A COUPLE SECONDS.  GO AHEAD.

 5              THE WITNESS:  YOU RUN A TIGHT SHIP AROUND HERE.

 6                         REDIRECT EXAMINATION

 7    BY MR. JAMES:

 8    Q.   HELLO AGAIN, PROFESSOR SHAPIRO.  YOU WERE ASKED ABOUT YOUR

 9    OPINION REGARDING QUALCOMM'S MONOPOLY POWER IN CDMA AND HOW

10    THAT OPINIONS COVERS THE PERIOD FROM 2006 TO 2016; RIGHT?

11    A.   YES.

12    Q.   AND DID YOU FORM AN OPINION THAT QUALCOMM DIDN'T HAVE

13    MONOPOLY POWER BEFORE THAT TIME?

14    A.   NO, I DID NOT ADDRESS THAT ONE WAY OR ANOTHER IN MY

15    OPINION.

16    Q.   MR. VAN NEST ASKED YOU IF YOU HAD QUANTIFIED THE ROYALTY

17    SURCHARGE.

18         IS THAT RIGHT?

19    A.   HE DID, A NUMBER OF TIMES.

20    Q.   AND YOU SAID YOU HADN'T?

21    A.   CORRECT.

22    Q.   BUT IT'S PART OF YOUR OPINION THAT THE SURCHARGE IS

23    SUBSTANTIAL; RIGHT?

24    A.   THAT IS CORRECT.

25    Q.   AND HOW DO YOU KNOW THAT?
```

1   A.   SO BASED ON THE BARGAINING PRINCIPLES, THE ABILITY OF

2   QUALCOMM TO ELEVATE THE ROYALTY ABOVE THE REASONABLE LEVEL BY

3   USING THE THREAT OF A -- OF NOT SELLING CHIPS TO AN OEM IS

4   PROPORTIONATE TO THE POWER OF THAT THREAT IN PARTICULAR, THE

5   COST TO THE OEM OF NOT BEING ABLE TO OBTAIN ACCESS TO THE

6   QUALCOMM CHIPS.

7        AND I THINK THERE'S -- I'M RELYING ON OEM TESTIMONY HERE,

8   AND BEYOND THAT, THAT THAT COST WAS VERY HIGH FOR OEM'S, AND SO

9   I WOULD EXPECT, USING BARGAINING THEORY, THAT THE ROYALTY

10  SURCHARGE THAT QUALCOMM WAS ABLE TO OBTAIN BY DEPLOYING THAT

11  THREAT WAS ALSO -- WAS SUBSTANTIAL.

12  Q.   AND MR. VAN NEST ASKED YOU ABOUT WHETHER YOU HAD EXAMINED

13  CHANGES IN RIVALS' R&D INVESTMENTS OVER TIME, I THINK ON A

14  COMPANY-WIDE BASIS.

15       DO YOU REMEMBER THAT?

16  A.   YES, I DO.

17  Q.   SO MR. VAN NEST WAS PROPOSING KIND OF A COMPARISON OF

18  BEFORE VERSUS AFTER.

19       WAS THAT YOUR UNDERSTANDING?

20  A.   I GUESS I FEEL LIKE HE WAS JUST SAYING, DID YOU TRACK THE

21  R&D OVER TIME, WITH A SUGGESTION THAT THE THEORY SAYS IT SHOULD

22  GO DOWN, AND IF IT DIDN'T GO DOWN, THERE WOULD BE A PROBLEM

23  WITH THE THEORY.

24  Q.   AND IN YOUR REPORT AND IN YOUR TESTIMONY TODAY YOU

25  REFERRED TO A DIFFERENT KIND OF COMPARISON BETWEEN THE WORLD WE

1      SEE TODAY AND THE WORLD IN A COUNTER FACTUAL WITHOUT QUALCOMM'S

2      CONDUCT; IS THAT RIGHT?

3      A.   YES, IT IS.

4      Q.   AND HOW ARE THE TWO KINDS OF COMPARISONS, THE ONE PROPOSED

5      BY MR. VAN NEST AND THE ONE THAT YOU TALKED ABOUT IN YOUR

6      TESTIMONY, HOW DO THEY DIFFER FROM ONE ANOTHER?

7      A.   WELL, IT'S A REALLY VERY DIFFERENT QUESTION.

8           SO WE MIGHT SEE A COMPANY THAT WAS HAVING, WAS HAVING

9      STABLE R&D BECAUSE THEIR MARKET SHARE -- THEY WERE NOT SELLING

10     AS MANY CHIPS AS THEY WERE HOPING TO AND THE MARGINS WERE BEING

11     TRIMMED, AND IF THE MARGINS HAD BEEN BIGGER, THEY WOULD HAVE

12     HAD RISING R&D, THEY WOULD HAVE HAD MORE INVESTMENT.

13          SO THE LEVEL -- THE PATH THAT WE SEE, WHICH WOULD REFLECT

14     THE R&D FOR A GIVEN COMPANY WHICH WOULD BE AFFECTED BY MANY

15     FACTORS, IT'S JUST THERE'S SO MANY VARIABLES THERE THAT LOOKING

16     AT THAT IS NOT VERY INFORMATIVE.

17          AND -- BUT SAYING THEY FACED HEADWINDS OR OBSTACLES OR HAD

18     THEIR INCENTIVES REDUCED BECAUSE THEIR SALES WERE TRIMMED AND

19     THEIR MARGINS WERE TRIMMED, THAT'S, I THINK, A VALID AND --

20     THAT'S WHAT WE CAN DO I THINK REALISTICALLY IN THIS TYPE OF

21     SITUATION.

22          THESE MARKETS ARE DYNAMIC, THEY'RE TURBULENT.  A LOT OF

23     THINGS ARE BUFFERING THEM, PLUS AND MINUS.  AND TO TRY TO TEASE

24     OUT THE EFFECT OF EVEN A SUBSTANTIAL ROYALTY SURCHARGE IN THAT

25     ENVIRONMENT BY TRACKING THEIR FINANCIALS, I JUST DON'T THINK

1    THAT WOULD WORK AS AN EMPIRICAL FORENSIC STRATEGY, AND SO THAT

2    WAS WHAT I WAS TRYING TO DO.

3    Q.   AND MR. VAN NEST ASKED YOU A NUMBER OF QUESTIONS ABOUT A

4    TECHNOLOGICAL GAP BETWEEN THE OFFERINGS OF QUALCOMM AND THOSE

5    OF ITS COMPETITORS; RIGHT?

6    A.   YES, HE DID.

7    Q.   IS THE FORTIFICATION AND PROLONGING OF THAT GAP A

8    PREDICTED CONSEQUENCE OF QUALCOMM'S ROYALTY SURCHARGE?

9               MR. VAN NEST:  OBJECTION.  IT'S LEADING.

10              MR. JAMES:  I'LL REPHRASE.

11              THE COURT:  OKAY.  GO AHEAD.  SUSTAINED.

12   BY MR. JAMES:

13   Q.   DO YOU HAVE A VIEW AS TO WHETHER QUALCOMM'S CONDUCT WOULD

14   AFFECT A TECHNOLOGICAL GAP BETWEEN ITS PRODUCTS AND THOSE OF

15   ITS COMPETITORS?

16   A.   SO I THINK OF IT THIS WAY:  QUALCOMM SHOULD BE COMMENDED

17   FOR ITS TECHNOLOGICAL ACHIEVEMENTS AND IN A NUMBER OF RESPECTS,

18   THEY WERE LEADERS AND HAD SUPERIOR PRODUCTS, AS CAME OUT IN THE

19   CROSS-EXAMINATION, AND THAT'S ONE OF THE REASONS THEY ACHIEVED

20   AND HAD MARKET POWER, MONOPOLY POWER, NOT THE ONLY ONE.

21              BUT IN THAT SITUATION, WHAT THE COMPETITIVE PROCESS,

22   WHAT'S REALLY IMPORTANT, PARTICULARLY IN THESE HIGH TECH

23   INDUSTRIES, IS THAT COMPANIES WHO AREN'T QUITE AS GOOD OR WHO

24   DON'T HAVE THE SCALE ARE NOT IMPEDED FROM TRYING TO CATCH AND

25   THREATEN AND CHALLENGE THE LEADER.

1          AND SO THAT'S MY FRAMING.

2          SO IN OTHER WORDS, IF A COMPANY'S AHEAD, IT DOESN'T MEAN

3    THEY'RE ALLOWED TO TRIP UP THE COMPANIES THAT ARE BEHIND THEM.

4    IT MEANS THEY CAN'T DO THAT, ACTUALLY, AND MAYBE THEY'LL STAY

5    AHEAD IN A FAIR RACE, MAYBE THEY WON'T.  BUT WE'RE LOOKING FOR

6    THE TRIPPING UP.

7          AND THESE ROYALTY SURCHARGES HAVE THAT FUNCTION BECAUSE

8    THEY RAISE THE COSTS OF QUALCOMM'S RIVALS.

9    Q.   AND YOU WERE ASKED SOME QUESTIONS ABOUT WHY YOU CHOSE

10   IPADS IN YOUR PROFIT SACRIFICE TEST INSTEAD OF ALL PRODUCTS

11   OVER THE LIFE OF THE AGREEMENT.

12         DO YOU REMEMBER THAT?

13   A.   I DO.

14   Q.   AND WHY DID YOU MAKE THAT CHOICE?

15   A.   SO, FIRST, THE IPADS WERE -- YOU KNOW, THE DOCUMENTS AT

16   THE TIME AND THE TESTIMONY INDICATES THAT'S WHAT APPLE WAS

17   REALLY, I THINK, ON THE VERGE OF AWARDING TO INTEL, THOSE IPADS

18   IN LATE 2012 AND INTO VERY EARLY -- EARLY TO LATE 2012.

19         THE WHOLE IDEA OF THIS TEST AND PROFIT SACRIFICE IS TO

20   FOCUS ON THAT, THE PRODUCTS THAT WERE AVAILABLE AND WHERE THE

21   ENTRANT HAD A SHOT AT, AND IF THE ENTRANT WOULD HAVE TO

22   SACRIFICE -- WOULD HAVE TO LOSE A LOT OF MONEY TO GET THOSE

23   PRODUCTS, EVEN IF THEY WERE JUST AS EFFICIENT AS THE INCUMBENT

24   MONOPOLIST, THEN THAT RAISES CONCERNS IN MY VIEW AS AN

25   ANTITRUST ECONOMIST.

1           AND IF QUALCOMM IS SAYING, WELL, WE'RE MAKING ALL SORTS OF

2     MONEY DOWN THE LINE, EVEN THOUGH WE'RE SACRIFICING PROFITS ON

3     THIS FIRST BATCH, WELL, THAT'S A LOT LIKE PREDATORY PRICING,

4     COMPANIES SAYING, OH, I'M SELLING ALL THIS STUFF BELOW COST

5     NOW, BUT I'LL MAKE IT UP LATER IN RECOUPMENT.

6           THAT'S EXACTLY WHAT WE WORRY ABOUT IN PREDATORY PRICING,

7     AND THIS IS A COUSIN OF THAT ANALYSIS WHERE WE'VE GOT

8     CONTESTABLE PRODUCTS AND THEN SUBSEQUENT PRODUCTS WITHIN THE

9     SAME RELATIONSHIP AND AGREEMENT.

10    Q.   AND MR. VAN NEST ASKED YOU ABOUT A HYPOTHETICAL IN WHICH

11    THE IMPACT OF LOSING QUALCOMM CHIPS WAS BASICALLY NIL.

12         DO YOU REMEMBER THAT?

13    A.   I'M SORRY.  COULD YOU BE MORE -- A LITTLE CLEARER ON THAT.

14    Q.   OH, SORRY.  I THINK YOU WERE ASKED ABOUT THE CONSEQUENCES

15    FOR LICENSE NEGOTIATIONS IN THE EVENT THAT THERE WASN'T MUCH

16    COST TO OEM'S TO LOSING ACCESS TO QUALCOMM'S PRODUCTS.

17         DO YOU REMEMBER THAT?

18    A.   I DO.

19    Q.   AND YOU QUALIFIED YOUR ANSWER BY SAYING THAT WHILE THE NO

20    LICENSE, NO CHIPS POLICY WOULD HAVE NO BITE, YOU KNOW, THERE

21    MAY BE OTHER FACTORS THAT WOULD INFLUENCE YOUR ANALYSIS OF

22    ROYALTY TERMS.

23         DO YOU REMEMBER THAT?

24    A.   WELL, I THINK I SAID -- I DON'T REMEMBER EXACTLY WHAT I

25    SAID.  BUT I WAS SAYING THAT WOULD TAKE AWAY THE STINK OF NO

1    LICENSE, NO CHIPS ALONE.

2         BUT THE OTHER POLICIES THAT WERE USED IN CONJUNCTION WITH

3    IT STILL, THE INCENTIVE PAYMENTS AND THE REFUSAL TO LICENSE

4    RIVALS, WOULD STILL HAVE SOME EFFECTS EVEN IN THAT SCENARIO.

5    Q.   HOW DO YOU SEE THE INCENTIVE PAYMENTS RELATING TO

6    QUALCOMM'S NO LICENSE, NO CHIPS POLICY?

7    A.   WELL, IT'S BASICALLY --

8         MR. VAN NEST:  EXCUSE ME.  OBJECTION, YOUR HONOR.

9    THIS IS OUTSIDE THE SCOPE OF THE CROSS.  I DIDN'T ASK A SINGLE

10   QUESTION ABOUT THIS.

11        MR. JAMES:  I'LL JUST LIMIT IT TO WHAT YOU MEANT BY

12   THE INCENTIVE PAYMENTS IN THIS PARTICULAR ANSWER THAT YOU JUST

13   GAVE.

14        MR. VAN NEST:  SAME ANSWER.  OR SAME OBJECTION,

15   EXCUSE ME.

16        THE COURT:  OVERRULED.

17        GO AHEAD.  YOU CAN ANSWER.

18        THE WITNESS:  I JUST -- I THINK OF IT AS CARROTS AND

19   STICKS, WHICH IS THE THREAT TO WITHDRAW SUPPLY OF CHIPS IS THE

20   STICK, AND THEN QUALCOMM ALSO USED A CARROT TO CLOSE THE GAP,

21   THAT IS, SOME INCENTIVE, SOME VALUE, SOME INCENTIVE PAYMENTS,

22   ESPECIALLY WITH THEIR CHIPS, TO GET THE OEM TO AGREE TO THE

23   ROYALTY RATE THAT THEY'RE SEEKING WHICH WOULD APPLY TO

24   TRANSACTIONS THAT DON'T INVOLVE THEIR CHIPS.

25   BY MR. JAMES:

1    Q.   AND THE FINAL QUESTION IS MR. VAN NEST ASKED YOU TO READ

2    THE FIRST SENTENCE OF PARAGRAPH 113 OF YOUR REBUTTAL REPORT.

3         COULD YOU TURN AGAIN TO THAT PARAGRAPH?

4    A.   113 PARAGRAPH?

5    Q.   YES, OF THE REBUTTAL REPORT I BELIEVE.

6    A.   YES, I'M THERE.

7    Q.   AND COULD YOU READ THE, THE FULL PARAGRAPH?

8    A.   OKAY.  "5G-COMPLIANT CHIPS ARE NOT BEING INCORPORATED INTO

9    COMMERCIAL HANDSETS UNTIL 2019.  IT IS THUS NOT POSSIBLE

10   RELIABLY TO ANALYZE THE MARKET FOR 5G CHIPS AT THIS TIME.  BUT

11   IF THE 5G LEAD THAT QUALCOMM EXPECTS MATERIALIZES, AND OEM'S

12   ARE AS RELIANT ON QUALCOMM FOR 5G CHIPS AS THEY HAVE BEEN IN

13   THE PAST FOR CDMA AND PREMIUM LTE CHIPS, THEN I WOULD EXPECT

14   THE ANTICOMPETITIVE EFFECTS OF THE QUALCOMM POLICIES AT ISSUE

15   IN THIS CASE TO CONTINUE INTO THE FUTURE."

16        MR. JAMES:  NO FURTHER QUESTIONS.

17        THE COURT:  OKAY.  TIME IS 1:39.

18       AND THAT ONE, YOUR REDIRECT STARTED AT 1:29.

19       ALL RIGHT.

20        MR. VAN NEST:  JUST A COUPLE QUESTIONS, YOUR HONOR.

21        THE COURT:  ALL RIGHT.  LET ME KNOW WHEN YOU'RE

22   READY.  YOU'RE READY?  1:39.

23       GO AHEAD, PLEASE.

24        MR. VAN NEST:  I'M READY, YOUR HONOR.

25

1                          **RECROSS-EXAMINATION**

2    BY MR. VAN NEST:

3    Q.   PROFESSOR SHAPIRO, JUST SO THE COURT IS CLEAR, YOU HAVE

4    MADE NO EFFORT TO QUANTIFY THE EFFECT OF QUALCOMM'S POLICIES ON

5    ANY OEM'S RESEARCH AND DEVELOPMENT EXPENSES OR THEIR PRICING OR

6    THEIR MARKET SHARE; RIGHT?

7    A.   I HAVE NOT PROVIDED A QUANTIFICATION OF THOSE EFFECTS.

8              MR. VAN NEST:  I HAVE NOTHING FURTHER, YOUR HONOR.

9              THE COURT:  OKAY.  TIME IS STILL 1:39.

10        DO YOU HAVE ANY RE, REDIRECT?

11             MR. JAMES:  NO, I DO NOT.

12             THE COURT:  ALL RIGHT.  IS THIS WITNESS EXCUSED,

13   SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

14             MR. JAMES:  SUBJECT TO RECALL.

15             THE COURT:  OKAY.  ALL RIGHT.

16        THEN YOU ARE DONE FOR TODAY, BUT YOU MAY BE RECALLED.

17             THE WITNESS:  THANK YOU, YOUR HONOR.

18             THE COURT:  ALL RIGHT.  AND ARE YOUR NEXT WITNESSES

19   VIDEOS?

20             MR. VAN NEST:  YOUR HONOR, ACTUALLY, WE HAD MADE AN

21   ARRANGEMENT WITH THE FTC.

22        I'LL LET MS. MILICI DESCRIBE IT.

23             MS. MILICI:  TO ACCOMMODATE ONE OF QUALCOMM'S

24   WITNESSES, WE'VE AGREED TO ALLOW THEM TO CALL ONE OF THEIR

25   WITNESSES NOW.  WE STILL HAVE A COUPLE OF VIDEOS LEFT TO PLAY,

```
1    BUT THEY HAVE A WITNESS WHO'S GOT LIMITED AVAILABILITY, SO

2    THEY'RE GOING TO CALL HIM BEFORE WE'VE RESTED.

3              THE COURT:  OKAY, THAT'S FINE.  THEN LET'S GO AHEAD

4    AND BRING THAT WITNESS IN, PLEASE.

5         WHAT'S THE NAME?

6              MR. VAN NEST:  YOUR HONOR, QUALCOMM CALLS

7    DR. IRWIN JACOBS.

8              THE CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT HAND.

9              THE WITNESS:  SIT DOWN?

10             THE CLERK:  NO.  PLEASE STAND.  PLEASE STAND.

11             THE WITNESS:  STAND?

12             THE CLERK:  YES.

13             THE WITNESS:  OKAY.  SORRY.

14             THE CLERK:  PLEASE RAISE YOUR RIGHT HAPPENED.

15        (DEFENDANT'S WITNESS, IRWIN JACOBS, WAS SWORN.)

16             THE WITNESS:  YES, I DO.

17             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

18             MR. VAN NEST:  WE HAVE SOME NOTEBOOKS, YOUR HONOR.

19             THE COURT:  OKAY.

20             THE CLERK:  WOULD YOU PLEASE STATE YOUR FULL NAME AND

21   SPELL YOUR LAST NAME FOR THE RECORD.

22             THE WITNESS:  FULL NAME, IRWIN MARK JACOBS.

23   I-R-W-I-N, M-A-R-K, J-A-C-O-B-S.

24             THE COURT:  OKAY.  TIME IS 1:41.  GO AHEAD, PLEASE.

25
```

1                    **DIRECT EXAMINATION**

2       BY MR. VAN NEST:

3       Q.   DR. JACOBS, WOULD YOU PLEASE INTRODUCE YOURSELF TO THE

4       COURT?

5       A.   YES.  I'M IRWIN JACOBS.  I'M THE FOUNDING CHAIRMAN AND CEO

6       EMERITUS OF QUALCOMM.

7       Q.   CAN YOU BRIEFLY EXPLAIN YOUR ROLES AT QUALCOMM OVER THE

8       YEARS, DR. JACOBS?

9       A.   WELL, I WAS ONE OF THE EIGHT FOUNDERS OF THE COMPANY, VERY

10      INSTRUMENTAL IN BEING ABLE TO SELECT WHICH PROJECTS WE WORKED

11      ON OVER THE YEARS, HAD GREAT EXCITEMENT IN GROWING THE COMPANY

12      FROM SOMETHING SMALL TO SOMETHING VERY SUBSTANTIAL, AND IN

13      PARTICULAR, COMING UP WITH SOME INITIAL IDEAS THAT BECAME VERY

14      USEFUL TO PEOPLE WORLDWIDE.

15           SO A VERY SATISFACTORY CAREER.

16      Q.   WAS THERE A POINT IN TIME WHEN YOU WERE THE CEO OF

17      QUALCOMM?

18      A.   YES, I WAS CEO FROM THE BEGINNING AND UP THROUGH 2000 --

19      THROUGH THE 20TH ANNIVERSARY IN 2005.

20      Q.   OKAY.  AND THEN DID YOU REMAIN ON THE BOARD FOR SOME

21      PERIOD AFTER THAT?

22      A.   I WAS CHAIRMAN FOR ANOTHER TWO AND A HALF YEARS, I

23      BELIEVE, AND THEN ON THE BOARD FOR ANOTHER COUPLE OF YEARS, AND

24      THEN I DID SERVE ALSO AS A GUEST FOR ANOTHER COUPLE OF YEARS.

25      Q.   OKAY.  SO YOU'VE BEEN GONE FROM THE BOARD NOW FOR SEVERAL

Case 5:17-cv-00220-LHK   Document 1514   Filed 07/02/19   Page 142 of 232

1    YEARS; IS THAT RIGHT?

2    A.    THAT IS CORRECT.

3    Q.    COULD YOU TELL THE COURT BRIEFLY WHAT YOUR EDUCATIONAL

4    BACKGROUND IS?

5    A.    I HAVE A BACHELOR'S IN ELECTRICAL ENGINEERING FROM CORNELL

6    UNIVERSITY; A MASTER'S IN SCIENCE AND A SCIENCE DOCTORATE FROM

7    M.I.T.

8    Q.    AND WHAT WAS YOUR PROFESSIONAL BACKGROUND BEFORE YOU

9    FOUNDED QUALCOMM?

10   A.    AFTER GETTING MY DOCTORATE, I REMAINED AT M.I.T. ON THE

11   FACULTY FOR SEVERAL YEARS, AND I WAS THE FIRST -- CO-AUTHORED

12   THE FIRST TEXTBOOK ON DIGITAL COMMUNICATIONS.

13        WE DECIDED TO MOVE TO CALIFORNIA, AND I JOINED AT THE

14   FACULTY AT THE UNIVERSITY OF CALIFORNIA SAN DIEGO, WAS ON THE

15   FACULTY THERE FOR SIX YEARS, AND THEN ENTERED BUSINESS.

16   Q.    WHEN WAS QUALCOMM FOUNDED?

17   A.    ON JULY 1ST, 1985.

18   Q.    AND WHERE DOES THE NAME QUALCOMM COME FROM?

19   A.    WELL, WE ALWAYS REFER TO QUALITY IN OUR COMMUNICATIONS, SO

20   WE PUT THE TWO TOGETHER FOR QUALCOMM.

21   Q.    AND CAN YOU TELL US, WHAT WAS THE COMPANY'S MISSION AT THE

22   OUTSET?  WHAT WAS YOUR BASIC GAME PLAN?

23   A.    WELL, FIRST OF ALL, WE KNEW THAT IT WOULD BE -- WE DIDN'T

24   HAVE A PRODUCT, WE DIDN'T HAVE A PARTICULAR BUSINESS PLAN, BUT

25   WE KNEW THERE WOULD BE A LOT OF EXCITEMENT IN THE WIRELESS

1    AREA, IN THE DIGITAL AREA, AND WE ALWAYS HAD THE IDEA THAT WE

2    DON'T WANT TO DO SOMETHING JUST A LITTLE BETTER THAN THINGS

3    THAT EXISTED.  WE WERE ALWAYS LOOKING FOR A MAJOR STEP, TAKE A

4    SYSTEMS APPROACH, LOOK FOR CAPABILITIES THAT WE MIGHT BE ABLE

5    TO BRING THROUGH, TAKE A RISK, AND IF SUCCESSFUL, HAVE

6    SOMETHING THAT COULD BE USEFUL.

7    Q.   AND WHEN YOU SAY "SYSTEMS APPROACH," "TAKE A SYSTEMS

8    APPROACH," WHAT ARE YOU TALKING ABOUT?

9    A.   WELL, TAKING A LITTLE BIT BROADER THAN LOOKING AT A SINGLE

10   COMPONENT OR A SINGLE CAPABILITY, BUT THERE'S USUALLY SOME

11   PROBLEMS, TAKE A STEP BACK, TAKE A LARGE LOOK AT THE PROBLEM,

12   HOW DO YOU APPROACH IT?

13        ONE OF OUR FIRST PRODUCTS, FOR EXAMPLE, WAS OMNI TRACKS,

14   WHICH WAS A COMMUNICATION SYSTEM FOR THE TRUCKING INDUSTRY, BUT

15   YOU JUST COULDN'T PROVIDE THE COMMUNICATIONS.  YOU HAD TO

16   PROVIDE POSITIONAL LOCATION.  BUT YOU HAD TO GET INTO THE

17   LOGISTICS.  YOU HAD TO LOOK AT THE WHOLE SYSTEM.

18   Q.   CAN YOU TELL US, WHAT WAS THE STATE OF THE CELLULAR

19   INDUSTRY BACK IN THE MID-'80S WHEN QUALCOMM WAS FOUNDED?

20   A.   I THINK IT WAS JUST GETTING OUT OF ITS INFANCY, REALIZING

21   THERE WAS GOING TO BE SOME SUBSTANTIAL GROWTH.  UNTIL THEN, HAD

22   LARGELY BEEN BASED, FIRST GENERATION, ON ANALOG RADIO

23   COMMUNICATION, FM RADIO BASICALLY.

24        BUT EVERYBODY WAS BEGINNING TO SEE THAT IT LOOKED LIKE

25   THERE WAS GOING TO BE SUBSTANTIAL SUBSCRIBER GROWTH, IT WAS

 1    TIME TO MOVE OVER TO DIGITAL, SO THERE WAS A LOT OF INTEREST AT

 2    THAT POINT, HOW DO YOU GO FROM FIRST TO A SECOND GENERATION,

 3    PROVIDING VOICE OVER DIGITAL TECHNOLOGY.

 4    Q.   AND WHAT WAS THE PREVAILING TECHNOLOGY IN USE FOR CELLULAR

 5    BACK THEN?

 6    A.   WELL, AGAIN ABOUT '85, IT WAS STILL FM.  BUT OVER THAT

 7    PERIOD, COMPANIES AROUND THE WORLD WERE LOOKING BASICALLY AT

 8    THREE CHOICES:  FREQUENCY DIVISION, MULTIPLE ACCESS, TIME

 9    DIVISION MULTIPLE ACCESS, CODE DIVISION MULTIPLE ACCESS.

10         MOST OF THE COMPANIES HAD LOOKED AT CODE DIVISION AT THAT

11    PERIOD DECIDED THERE WERE TOO MANY PROBLEMS, TOO MANY

12    COMPLICATIONS, MAY NEVER BE COMMERCIAL, MAY NOT PROVIDE

13    PROMISE.

14         SO I THINK THE FOCUS AT THAT POINT WAS ON TDMA, TIME

15    DIVISION OR FREQUENCY DIVISION, FDMA.

16    Q.   AT A VERY HIGH LEVEL, DR. JACOBS, CAN YOU DISTINGUISH FOR

17    US BETWEEN THOSE TWO, TIME DIVISION MULTIPLE ACCESS AND CODE

18    DIVISION?  WHAT'S THE PRINCIPLE DIFFERENCE?

19    A.   WELL, IN TIME DIVISION YOU HAVE A RADIOFREQUENCY CARRIER

20    AND YOU DIVIDE UP TIME INTO TIME SLOTS AND YOU PROVIDE

21    DIFFERENT USERS A DIFFERENT TIME SLOT REPETITIVELY.

22         SO YOU GOT A SLOT, SOMEBODY ELSE GETS A SLOT, AND THEN

23    EVENTUALLY IT COMES BACK TO YOU, AND YOU GET ANOTHER SLOT.  SO

24    YOU'RE PROVIDING A TIME DIVISION OF THAT FREQUENCY USE.

25         IN CODE DIVISION, EVERYBODY IS ON SIMULTANEOUSLY AND THEY

1     DISTINGUISH THEMSELVES BY HAVING A DIFFERENT CODE THEY'RE

2     LISTENING FOR.  IT'S LIKE BEING IN A CONVERSATION, PERHAPS,

3     WITH DIFFERENT LANGUAGES AND YOU'RE LISTENING TO ENGLISH, BUT

4     SOMEBODY ELSE MIGHT BE LISTENING TO FRENCH.  SO EVERYBODY COULD

5     BE TALKING, BUT IN A WAY OF DISTINGUISHING THE ONE THAT YOU

6     WANT TO LISTEN TO FROM THE OTHERS.

7     Q.   AND WHEN DID YOU COME UP, WHEN DID QUALCOMM, YOU AND YOUR

8      COLLEAGUES, COME UP WITH THE IDEA OF USING CDMA FOR CELLULAR

9      AND MAKING THAT WORK?

10    A.   IT ACTUALLY WAS INTERESTING.  WE DIDN'T HAVE THE IDEA WHEN

11     WE FIRST STARTED THE COMPANY.

12         BUT WE HAD A CONSULTING CONTRACT WITH HUGHES.  THEY HAD

13    SUBMITTED TO THE FCC A PROPOSAL TO BUILD A MOBILE SATELLITE

14    COMMUNICATION SYSTEM, SATELLITES THAT WOULD PROVIDE MOBILE

15    COMMUNICATION, AND THEY ASKED US TO REVIEW THE APPROACH, WERE

16    THERE ANY TECHNICAL ISSUES OR WHETHER THERE MIGHT BE SOMETHING

17    BETTER.

18         AND INTERESTINGLY, AFTER THE SECOND MEETING IN LOS ANGELES

19    AND DRIVING DOWN TO SAN DIEGO AND THINKING ABOUT IT, I REALIZED

20    IT WOULD BE PERHAPS ADVANTAGEOUS IF YOU COULD TAKE ADVANTAGE OF

21    THE TIMES WHEN SOMEONE STOPS SPEAKING TO LISTEN TO ANOTHER OR

22    STOPS SPEAKING TO THINK ABOUT WHAT THEY WANTED TO SAY NEXT,

23    TAKE ADVANTAGE OF THOSE GAPS TO LET SOMEBODY ELSE USE THE

24    CHANNEL.

25         THE TROUBLE WITH THE STANDARD TECHNOLOGIES IS YOU CAN'T

1      GIVE UP THE CHANNEL, YOU CAN'T GIVE UP YOUR TIME SLOT AND THEN

2      GET IT BACK, SO IT'S NOT PRACTICAL.

3          WITH CDMA, THE NUMBER OF USERS ARE LIMITED BY THE

4      INTERFERENCE OF ONLY THOSE WHO ARE ACTIVELY SPEAKING WITH

5      VOICE.  AND SO IF SOMEONE NOT SPEAKING AT ANY GIVEN TIME,

6      THERE'S LESS INTERFERENCE AND, THEREFORE, ON AVERAGE, YOU CAN

7      HAVE MORE CONVERSATIONS.

8      Q.  WHAT WERE THE MAIN PROBLEMS THAT YOU HAD TO OVERCOME IN

9       MAKING CDMA EFFECTIVE FOR CELLULAR COMMUNICATIONS?

10     A.  WELL, THERE WERE A LOT THAT PEOPLE HAD IDENTIFIED AND HAD

11      TRIED TO FIND SOLUTIONS.

12         ONE OF THE KEY ONES WAS CALLED POWER CONTROL.  AGAIN, IF

13     YOU'RE SPEAKING TO SOMEBODY AND YOU'RE YELLING TOO LOUD, THAT

14     WOULD REDUCE THE CAPABILITY TO HEAR OTHER CONVERSATIONS.  IT

15     WOULD REDUCE THE CAPACITY.

16         AND SO YOU HAD TO ADJUST IT SO YOU'RE JUST GETTING ENOUGH

17     POWER AT YOUR RECEIVER TO RELIABLY HEAR THAT, TO RELIABLY

18     RECEIVE THE DIGITAL DATA, BUT NOT SO MUCH THAT YOU'RE DROWNING

19     OUT OTHERS.

20         SO THE PROBLEM IS AS YOU DRIVE, YOU MAY BECOME INSIDE OF A

21     PARTICULAR BASE STATION, MOVE AWAY FROM IT, SO SIGNALS GO UP

22     AND DOWN FAIRLY RAPIDLY.

23         THE QUESTION IS, HOW DO YOU CONTROL THAT?  WE CAME UP WITH

24     A VERY POWERFUL APPROACH FOR DOING POWER CONTROL.

25         ANOTHER ISSUE WITH RADIO SIGNALS IS THEY BOUNCE OFF MANY

1    BUILDINGS, MANY OTHER AREAS, YOU DON'T GET JUST ONE COPY, YOU

2    GET MULTIPLE COPIES.  THAT REDUCES THE CAPACITY IN GENERAL.

3         BUT WITH CDMA, IT HAS AN ABILITY TO LIVE WITH THOSE

4    ADDITIONAL REFLECTIONS AND, IN FACT, WE CAME UP WITH A SCHEME

5    WHERE YOU COULD RECEIVE EACH ONE SEPARATELY AND COMBINE THEM

6    TOGETHER TO GET A BETTER RESULT.  SO THAT WAS ANOTHER MAJOR

7    STEP AHEAD.

8         ANOTHER WAS HOW DO YOU DO HANDOFFS AS YOU'RE MOVING FROM

9    CELL SITE TO CELL SITE, YOU HAVE TO HAND OFF YOUR SIGNAL.  THE

10   MORE TRADITIONAL APPROACHES, THE TDMA, YOU DROP ONE BASE

11   STATION AND LOOK FOR THE NEXT ONE AND CONNECT TO IT AND THERE'S

12   A LITTLE BIT OF A GAP AND YOU COULD HAVE A DROP.

13        WITH CDMA, YOU COULD LISTEN TO THE NEXT ONE WHILE YOU WERE

14   LISTENING TO THE FIRST ONE AND THEN GRADUALLY TRANSFER MORE AND

15   MORE ATTENTION TO THE SECOND ONE.

16        SO IT WAS NOT -- IT'S A SOFT HANDOFF.

17        AND AS PART OF THAT, IN THE -- AGAIN, TDMA SO THAT YOU

18   WOULD KEEP DOWN THE INTERFERENCE, YOU COULDN'T USE THE SAME

19   FREQUENCIES ON NEIGHBORING BASE STATIONS OR EVEN ON MULTIPLE

20   ANTENNAS ON THE SAME BASE STATIONS.

21        SO YOU HAD TO DIVIDE UP THE FREQUENCY SPECTRUM.  YOU

22   DIDN'T HAVE FOR ANY GIVEN USER THE FULL SPECTRUM, THEREFORE, SO

23   THAT REDUCED CAPACITY.

24        WITH CDMA, YOU COULD USE THE SAME FREQUENCIES EVERYWHERE.

25   Q.   ONCE QUALCOMM FLOATED THIS IDEA OF USING CDMA, WAS IT

1    WELCOMED BY THE INDUSTRY OVERALL?

2    A.   I DON'T THINK I'D PUT IT THAT WAY, NO.

3         (LAUGHTER.)

4         THE WITNESS:   THERE WAS A LOT OF NEGATIVE FEELINGS

5    ABOUT -- SOME PEOPLE HAD WORKED ON IT AND HAD PROBLEMS, SO THEY

6    DIDN'T BELIEVE WE HAD SOLUTIONS.

7         BUT THE INDUSTRY, IN JANUARY OF 19 -- I'LL HAVE TO KEEP

8    CAREFUL ON MY YEARS HERE -- IN JANUARY OF 1989 HAD ACTUALLY A

9    VOTE WHETHER TO GO WITH EITHER TDMA OR FDMA, AND IT WAS A VERY

10   BIG BATTLE UP TO THAT POINT.   TDMA WON BY A NARROW EDGE.

11   PEOPLE WERE TIRED OF FIGHTING ABOUT TECHNOLOGIES, SO PEOPLE HAD

12   SAID, OKAY, WE'RE GOING AHEAD WITH TDMA.

13   BY MR. VAN NEST:

14   Q.   DID YOU GIVE UP?

15   A.   WE, OURSELVES, HAD JUST BEGUN TO LOOK AT CDMA AGAIN.   WE

16   HAD TO TELL OUR OMNI TRACKS, THE TRUCK COMMUNICATION PRODUCT

17   FIRST, SO WE HAD ONLY STARTED LOOKING AT IT AGAIN IN ABOUT

18   NOVEMBER OF '88.

19        SO WE DIDN'T GO TO THE INDUSTRY UNTIL '89, AND NOBODY

20   WANTED TO HEAR ABOUT SOMETHING NEW.

21        OUR APPROACH THEN WAS WE HAD TO BUILD A DEMONSTRATION TO

22   SHOW THAT WE HAD SOLVED THE PROBLEMS, AND THAT YOU COULD GET

23   BOTH BETTER QUALITY, AS WELL AS MANY MORE USERS IN THE SAME

24   AMOUNT OF RADIO SPECTRUM.   SO WE PROCEEDED TO DO THAT.

25   Q.   I'M GOING TO ASK YOU, DR. JACOBS, TO SLOW DOWN JUST A

1    LITTLE BIT.  WE'RE TRYING TO TAKE DOWN EVERY WORD, AND I WANT

2    TO BE SURE WE DO THAT.

3    A.   I'M AFRAID MY NEW ENGLAND ACCENT DOESN'T HELP.

4    Q.   NO, YOU'RE COMING THROUGH FINE.

5         WERE THERE EXISTING HANDSET MAKERS OR INFRASTRUCTURE FOLKS

6    BACK THEN WILLING TO JUMP INTO THE CDMA MARKET AT THAT POINT?

7    A.   WELL, AT THAT POINT, NO.  NO MANUFACTURERS WERE

8    INTERESTED.

9         AFTER WE DID THE DEMONSTRATION, HOWEVER, THERE WAS MORE

10   INTEREST, AND IN PARTICULAR, THE CARRIERS, THE OPERATORS, SAW

11   THAT WITH THIS TECHNOLOGY, IF INDEED IT COULD WORK AND BECOME

12   AVAILABLE COMMERCIALLY, THAT THEY'D HAVE A -- THEY WOULD HAVE

13   MANY MORE SUBSCRIBERS, IT WOULD HAVE A POSITIVE ECONOMIC EFFECT

14   FOR THEM.

15   Q.   OKAY.

16   A.   AND SO THE CARRIERS WERE SUPPORTIVE.

17   Q.   LET ME PLACE ON THE SCREEN QX 9310.

18        THIS IS A PICTURE, YOUR HONOR.  IT'S A DEMONSTRATIVE.

19             THE COURT:  OKAY.

20             MR. VAN NEST:  IT'S BEEN DISCLOSED.

21   Q.   DR. JACOBS, YOU HAVE IT HERE AND YOU HAVE IT TO THE RIGHT.

22   WHAT IS DEPICTED IN THE PICTURE?  WHAT ARE WE SEEING HERE?

23   A.   THAT WAS -- WE HAD A MOBILE PHONE THAT WE WERE USING FOR

24   THIS DEMONSTRATION IN NOVEMBER OF 1989.  OF COURSE, THAT MOBILE

25   PHONE REQUIRED A VAN TO DRIVE IT AROUND, SO THAT WAS THE VAN.

1          WE ALSO HAD OTHER CAPABILITIES THAT WE COULD SHOW OFF IN

2    THE VAN AND HAVE OTHERS BE ABLE TO SEE WHERE THE HANDOFFS WERE

3    OCCURRING BETWEEN CELL SITES AND WHETHER THERE WAS A LOT OF

4    INTERFERENCE AND, YET, WE WERE HEARING A VERY GOOD TELEPHONE

5    CALL.

6    Q.   SO IS THAT YOU PICTURED ON THE RIGHT IN THE VAN?

7    A.   ON THE LEFT SIDE, MY LEFT SIDE.

8    Q.   OKAY.

9    A.   ON THE RIGHT PICTURE ON THE LEFT SIDE.

10   Q.   OKAY, VERY GOOD.

11         AND TELL THE COURT, WHAT -- WHY DID YOU HAVE THE PHONE OR

12   A PHONE IN A VAN?  WHAT WAS THE POINT OF THIS?

13   A.   WELL, AGAIN, THAT VERY FIRST DEMONSTRATION UNIT WAS A VERY

14   LARGE DEVICE.  WE HAD NOT MADE INTEGRATED CIRCUITS AT THAT

15   POINT, AND SO IT REQUIRED THE VAN TO DRIVE IT AROUND.

16   Q.   AND WHAT WERE YOU --

17   A.   ON THE OTHER HAND, THAT WAS A WAY TO FULLY DEMONSTRATE THE

18   QUALITY.

19   Q.   FAIR ENOUGH.

20         WAS ALL THIS DRIVING DONE IN SAN DIEGO?

21   A.   INITIALLY THE DEMONSTRATION WAS IN SAN DIEGO.

22   Q.   AND WHERE ELSE WERE YOU ABLE TO DEMONSTRATE THE PRODUCT?

23   A.   WELL, OF COURSE WE IMMEDIATELY HAD SKEPTICS WHO SAID THAT,

24   WELL, IT MIGHT WORK IN SAN DIEGO, THERE AREN'T VERY MANY HIGH

25   RISES AROUND, LET'S GO TRY MANHATTAN.

1    AND SO WITH THE HELP OF AN OPERATOR IN MANHATTAN, WE DID

2    GET SOME SPECTRUM WE COULD USE IN THE MIDDLE OF THE NIGHT AND

3    SET UP A DEMONSTRATION, AND WE CARRIED THAT OUT IN FEBRUARY OF

4    '90 --

5    Q.   1990?

6    A.   IN 1990.

7    Q.   OKAY.

8    A.   AND THAT WORKED VERY, VERY WELL.  AND, AGAIN, THAT HELPED

9    BUILD UP SUPPORT.

10   Q.   SO HOW DID -- WELL, WHEN DID QUALCOMM FIRST DEPLOY CDMA IN

11   A COMMERCIAL NETWORK?

12   A.   WELL, AFTER THAT DEMONSTRATION, WE HAD TO DEVELOP CHIPS.

13   WE THEN HAD TO GO THROUGH A STANDARDS PROCESS, AND THEN INTO

14   COMMERCIAL MANUFACTURING.

15        THE VERY FIRST COMMERCIAL NETWORK WAS IN HONG KONG IN

16   1995.  SO IT WAS SEVEN YEARS AFTER WE CAME BACK AND BEGAN TO

17   SERIOUSLY WORK ON CDMA TO GO TO THE VERY FIRST COMMERCIAL

18   NETWORK.

19   Q.   AND WHO BUILT --

20   A.   THE REASON IT WAS HONG KONG WAS THAT A LOT OF PEOPLE

21   WORKED ON THE STREETS THERE, THEY WOULDN'T AFFORD OFFICES, THEY

22   USED THE CELL PHONES FOR A LOT OF THEIR BUSINESS

23   COMMUNICATIONS.  THAT TIED UP THE SPECTRUM.

24        WITH CDMA, YOU COULD GET A LOT MORE USE IN THAT GIVEN

25   AMOUNT OF SPECTRUM.

1    Q.   WHO WAS BUILDING THE CHIPS AND THE HANDSETS AND THE

2    INFRASTRUCTURE TO MAKE SURE THAT CDMA COULD ACTUALLY WORK IN A

3    COMMERCIAL SETTING?

4    A.   ON THAT VERY FIRST DEMONSTRATION, THE INFRASTRUCTURE WAS

5    PROVIDED BY MOTOROLA.  THEY HAD HAD THE TDMA AND THEN THEY

6    CONVERTED TDMA OVER TO CDMA FOR THAT.

7         ALL THE HANDSETS WERE PROVIDED BY QUALCOMM, MANUFACTURED

8    IN SAN DIEGO, AND SHIPPED TO HONG KONG.

9         BY THE WAY, THE NEXT TWO NETWORKS TO COME UP WERE IN SOUTH

10   KOREA, AGAIN, BECAUSE NOBODY HAD ENOUGH CONFIDENCE AT THAT

11   POINT TO BUILD CDMA HANDSETS, NOBODY HAD ALREADY -- HAD

12   STARTED.

13        AND SO EVEN IN SOUTH KOREA, ALL THE HANDSETS WERE MADE IN

14   SAN DIEGO AND SHIPPED TO SOUTH KOREA.

15   Q.   SO DID CDMA EVENTUALLY CATCH ON WORLDWIDE?

16   A.   THERE WAS A LONG BATTLE IN WHAT'S CALLED THE SECOND

17   GENERATION, WHICH WAS MOSTLY FOCUSSED ON VOICE, AND THERE WAS

18   AN AGREEMENT AMONG GOVERNMENTS IN EUROPE THAT THEY WOULD ONLY

19   USE GSM, WHICH WAS A TDMA TECHNOLOGY.  SO THERE WAS NO OPENING

20   FOR CDMA IN EUROPE.

21        AND THERE WERE BATTLES IN OTHER PARTS OF THE WORLD OVER

22   CDMA.

23        HOWEVER, THE INDUSTRY BEGAN TO REALIZE THAT IT WOULD BE

24   IMPORTANT TO PROVIDE MOBILE INTERNET ACCESS, DATA

25   COMMUNICATIONS, AND SO A THIRD GENERATION WAS PROPOSED THAT

```
1    WOULD SUPPORT BOTH VOICE AND DATA.

2    Q.    OKAY.

3    A.    THE INDUSTRY LOOKED, HOW MIGHT THEY DO THAT WELL?  AND

4    BASICALLY ALL THIRD GENERATIONS ARE BASED ON CDMA.

5    Q.    OKAY.  LET'S -- WE'LL GET TO 3G IN JUST A MOMENT,

6    DR. JACOBS.

7          BUT LET'S GO BACK TO CDMA AND THE '90S.

8          WHAT HAPPENED WITH THE STANDARDS SETTING ORGANIZATIONS?

9    DID THEY IMMEDIATELY ADOPT CDMA?  OR WERE THERE DISCUSSIONS AND

10   DEBATES THERE BEFORE CDMA WAS ADOPTED AS A STANDARD?

11   A.    WELL, AFTER THE DEMONSTRATION REQUIRING THE VAN, WE HAD TO

12   DEVELOP THE CHIPS TO BUILD A COMMERCIAL HANDSET AND TO BUILD A

13   COMMERCIAL BASE STATION, AND THAT TOOK US TWO YEARS.

14         WE HAD ANOTHER DEMONSTRATION THEN IN NOVEMBER OF '91 --

15   LET ME GET MY DECADES STRAIGHT HERE --

16   Q.    THAT'S ALL RIGHT.

17   A.    -- WHERE WE DEMONSTRATED COMMERCIAL HANDSETS.

18         THAT CONVINCED A NUMBER OF THE OPERATORS, ALTHOUGH THERE

19   WAS STILL A LOT OF CONTROVERSY, TO SET UP A COMPETITION IN THE

20   SPRING OF '92 AMONG OTHERS THAT MIGHT WANT TO PROVIDE A WIDE

21   BAND SOLUTION RATHER THAN THE TDMA, WHICH IS A NARROW BAND

22   SOLUTION.

23         THERE WAS COMPETITION, QUALCOMM'S APPROACH WAS SELECTED,

24   ENTERED THE STANDARDS PROCESS WITH THE TIA, TELECOMMUNICATIONS

25   INDUSTRY OF AMERICA, I THINK IT IS, OR ASSOCIATION -- WITH THE
```

1    TIA IN ABOUT JUNE OF '91.  THAT TOOK A YEAR -- OF '92, EXCUSE

2    ME, I SKIPPED A YEAR THERE.

3         THAT TOOK A YEAR AND A HALF AND IN JULY OF '93, THE

4    STANDARD WAS COMPLETE.

5    Q.   AND WHAT ROLE, IF ANY, DID QUALCOMM PLAY IN THE DRAFTING

6    OF THE FIRST CDMA STANDARD?

7    A.   WELL, QUALCOMM HAD BEEN LOOKING AHEAD TO THE STANDARDS

8    PROCESS AND SO WE HAD DRAFTED THE TEXT FOR SOMETHING THAT COULD

9    PROVIDE THE BASIS FOR A STANDARD.

10        WE ALSO, BECAUSE OF ALL THE SKEPTICISM OF SO MANY

11   MANUFACTURERS, INVITED THEM TO COME TO SAN DIEGO.  THEY EACH

12   HAD ONE OR TWO OR THREE REASONS WHY CDMA WAS NOT GOING TO WORK.

13   WE SET UP EXPERIMENTS WITH THEM TO CHECK OUT WHETHER IT WOULD

14   WORK DESPITE THEIR CONCERNS.

15        AND SO WE BUILT UP A LARGE AMOUNT OF DATA THAT DID HELP US

16   THROUGH THE STANDARDS PROCESS.

17   Q.   NOW, HOW DID QUALCOMM FUND THIS EARLY RESEARCH TO

18   ESTABLISH THE VIABILITY OF CDMA?

19   A.   WELL, THE BIG PROBLEM WAS AFTER WE HAD DONE THE FIRST

20   DEMONSTRATION WITH THE VAN-SIZED UNIT, WE NEEDED TO THEN MOVE

21   ON AND DEVELOP THE THREE CHIPS FOR THE HANDSET AND TWO MORE

22   UNIQUE ONES FOR THE INFRASTRUCTURE.  THAT WAS A VERY EXPENSIVE

23   UNDERTAKING.

24        AND SO WE CAME UP WITH THE IDEA THAT, WITH SUPPORT FROM

25   THE OPERATORS, THAT WE WOULD LICENSE MANUFACTURERS WHO WERE

```
 1    INTERESTED IN THE POSSIBILITY OF CDMA -- IT STILL WASN'T
 2    OBVIOUSLY SURE THAT THIS WOULD EVER BECOME COMMERCIAL -- BUT
 3    THEY WOULD TAKE A LICENSE.  THAT WOULD PROVIDE US WITH SOME UP
 4    FRONT FUNDING AS PART OF THE LICENSE THAT WOULD GIVE US THE
 5    MONEY FOR CONTINUING THE R&D.
 6        AND THEN SHOULD IT BECOME COMMERCIAL, A ROYALTY ON UNITS
 7    SOLD IN THE FUTURE AS PART OF THAT LICENSE.  THE INITIAL
 8    LICENSE, AS I RECALL, WAS NEGOTIATED WITH AT&T, LUCENT HAD NOT
 9    YET SPLIT OUT FROM AT&T.  LONG NEGOTIATION DISCUSSION BACK AND
10    FORTH.
11        AND THEN OTHERS, MOTOROLA, NOKIA AND --
12    Q.   MOTOROLA?
13    A.   MOTOROLA, NOKIA, AND MANY OTHERS.
14    Q.   NOW, HOW WERE THE ROYALTIES -- YOU MENTIONED AN UPFRONT
15    PAYMENT.  I TAKE IT THAT WAS NEGOTIATED?
16    A.   YES.
17    Q.   AND THEN A RUNNING RATE ON SALES?
18    A.   YES.
19    Q.   HOW WAS THE ROYALTY RATE ARRIVED AT IN THESE EARLY
20    AGREEMENTS?
21    A.   WELL, EVERYTHING WAS NEGOTIATED, ALL THE TERMS, AND
22    CERTAINLY THE ROYALTY RATE WAS DISCUSSED QUITE A BIT.
23        WE HAD THE FEELING WE WANTED TO HAVE SOMETHING THAT WAS
24    LOW ENOUGH THAT WE WERE NOT GOING TO IMPEDE THE PROGRESS SHOULD
25    THIS BECOME A COMMERCIAL PRODUCT.  WE WANTED TO SEE IT BE USED
```

1    AS BROADLY AS POSSIBLE WORLDWIDE WITH AS MANY MANUFACTURERS.

2         SO WE LOOKED AT A -- WE CALLED IT LOW SINGLE DIGIT ROYALTY

3    RATE, NEGOTIATED THAT BACK AND FORTH WITH INITIALLY AT&T, AND

4    THEN WITH EACH OTHER MANUFACTURER.  BUT IT WAS ALWAYS A

5    BILATERAL, A COMPANY-BY-COMPANY NEGOTIATION.

6    Q.   NOW, WHEN DID QUALCOMM START SELLING CDMA CHIPS

7    COMMERCIALLY?

8    A.   I'M NOT SURE I HAVE THE EXACT DATE, BUT IT WAS PROBABLY A

9    YEAR AND A HALF OR SO AFTER THE -- MAYBE LESS THAN THAT --

10   AFTER THAT FIRST COMMERCIAL OPERATION IN HONG KONG.  OTHERS SAW

11   THERE WAS A COMMERCIAL NETWORK AND SAID PERHAPS WE SHOULD START

12   BUILDING HANDSETS.  AND WE HAD THE CHIPS AVAILABLE AT THAT TIME

13   AND SO SOME BEGAN TO BUY THOSE CHIPS FROM US.

14   Q.   NOW, WHAT IS CDMA 2000?

15   A.   CDMA 2000, WE BEGAN TO THINK AGAIN ABOUT THE NEED TO HAVE

16   HIGHER DATA RATES, AS WELL AS VOICE.  AND SO BECAUSE IN LOOKING

17   TO THE THIRD GENERATION, THE REST OF THE INDUSTRY WAS STILL

18   TRYING TO CATCH UP ON THE VOICE CDMA ASPECTS, WE FOCUSSED IN ON

19   AS WELL ON THE DATA.

20        AND CDMA 2000 WAS PROVIDING HIGHER DATA RATES, ALONG WITH

21   VOICE.

22   Q.   AND APPROXIMATELY WHEN WAS CDMA 2000 RELEASED

23   COMMERCIALLY, BALLPARK?

24   A.   I THINK IT WAS AROUND THE YEAR 2000.  I DON'T HAVE IT

25   EXACTLY.

1    Q.   OKAY.

2    A.   MAYBE AFTER.

3    Q.   AND WHAT ROLE DID QUALCOMM PLAY IN CDMA 2000, THE 3G

4    VERSION?

5    A.   WELL, WE PLAYED THE ROLE OF DEVELOPING THE TECHNOLOGY,

6    BRINGING IT TO THE STANDARDS GROUPS, OTHERS COULD THEN COMMENT

7    BACK AND FORTH, AND WENT THROUGH THE DEVELOPMENT CYCLE.

8         OF COURSE, IN THE STANDARDS PROCESS, YOU START WITH ONE

9    STANDARD AND THEN ADDITIONAL IMPROVEMENTS GET MADE OVER TIME AS

10   YOU GET MORE EXPERIENCE, SO IT'S REALLY NOT JUST ONE STANDARD,

11   BUT A SEQUENCE OF STANDARDS.

12   Q.   DOES QUALCOMM HAVE AN INFRASTRUCTURE BUSINESS TODAY?

13   A.   WE DO NOT.

14   Q.   DOES QUALCOMM HAVE A HANDSET BUSINESS TODAY?

15   A.   NOT TODAY, NO.

16   Q.   CAN YOU TELL THE COURT WHAT HAPPENED WITH THE

17   INFRASTRUCTURE AND THE HANDSET BUSINESSES THAT QUALCOMM

18   DEVELOPED?

19   A.   YES.  BECAUSE IN ORDER TO GET CDMA LAUNCHED AND IN THE

20   FIRST FEW COMMERCIAL NETWORKS, QUALCOMM HAD NO CHOICE BUT TO

21   BUILD BOTH INFRASTRUCTURE AND HANDSETS, AS WELL AS THE CHIPS

22   THAT WENT INTO THEM.

23         AND WE PROVIDED THE INITIAL STEPS OF GETTING THE INDUSTRY

24   ESTABLISHED.  BUT WE WANTED ALWAYS TO SEE MANY, MANY

25   MANUFACTURERS.  WE WANTED WHAT'S CALLED A HORIZONTAL BUSINESS

1    MODEL WITH NOT JUST A FEW VERTICALS THAT DID EVERYTHING, BUT

2    MANUFACTURERS THAT COULD PROVIDE THE PRODUCTS AND BE LOCATED IN

3    MANY PARTS OF THE WORLD.

4         AND SO INITIALLY WHEN WE SPOKE TO HANDSET MANUFACTURERS,

5    THEY SAID IF WE'RE DEPENDENT ON YOU FOR THE CHIPS, HOW DO WE

6    KNOW YOU'RE NOT GOING TO PROVIDE THEM TO YOUR OWN HANDSET

7    DIVISION BEFORE YOU PROVIDE THEM TO US?

8         SO EVEN THOUGH WE SAID WE WOULD NOT DO THAT, IT WAS HARD

9    TO CONVINCE ANYBODY.  SO WE DECIDED WE REALLY HAD TO SELL OFF

10   OUR HANDSET DIVISION.

11        AND A SIMILAR ISSUE WITH THE INFRASTRUCTURE DIVISION.  SO

12   WE DID THAT IN 1999.

13        WE DECIDED TO FOCUS IN ON THE TECHNOLOGY SIDE SO THAT WE

14   COULD DEVELOP TECHNOLOGY, BRING IT AS QUICKLY AS POSSIBLE TO

15   THE INDUSTRY, AND WE DID THAT PARTLY BY THEN ALSO PROVIDING

16   CHIPS FOR THOSE WHO WISHED TO BUY THEM.  WE VERY QUICKLY RAN

17   WITH TECHNOLOGY, GOT THEM INTO THE CHIP, GOT THEM INTO

18   SOFTWARE, AND MADE THOSE AVAILABLE TO MANY MANUFACTURERS.

19   Q.   I THINK WE HAVE -- OH, LET ME MOVE ON TO HDR.

20        WHAT'S HIGH DATA RATE TECHNOLOGY, DR. JACOBS?

21   A.   WELL, AGAIN, IN THE LATE '90S, WE HAD BEGUN TO FOCUS IN ON

22   DATA.  AND ONE DAY, I STILL REMEMBER IN MY OFFICE, ONE OF OUR

23   ENGINEERS, ROBERTO PADOVANI, CAME TO SEE ME AND SAID THAT HE

24   HAD A GREAT IDEA FOR IMPROVING EVEN FURTHER OVER CDMA 2000

25   IMPROVING EVEN FURTHER THE DATA CAPABILITIES AND CALLED IT HDR

1      FOR HIGH DATA RATE.

2          AND SO IT HAD A NUMBER OF UNIQUE FEATURES.  I GOT VERY

3      EXCITED WHEN I SAW IT.  WE SUPPORTED THAT AND MOVED ON TO

4      DEVELOPING HDR IN THE LATE '90S.

5      Q.   AND WHEN DID YOU DEBUT YOUR HDR TECHNOLOGY?

6      A.   I THINK IT WAS ABOUT '98.  WE CALLED IN A NUMBER OF PEOPLE

7      TO VIEW THE TECHNOLOGY, TO SEE THAT YOU COULD HAVE OFFICIALLY A

8      MOBILE HIGH DATA RATE.  INDEED, YOU COULD EVEN SHOW VIDEO OVER

9      THIS MOBILE CAPABILITY.

10     Q.   COULD WE HAVE QX 9324 ON THE SCREEN.

11         IT'S ANOTHER DEMONSTRATIVE, YOUR HONOR.

12         DR. JACOBS, CAN YOU TELL THE COURT WHAT IS DEPICTED HERE

13     IN 9324?

14     A.   I THINK THAT WAS A VAN DEMONSTRATION OF HDR BEING

15     DEMONSTRATED AND SHOWING THAT, ON THE LEFT SCREEN, THAT

16     DIFFERENT PAGES COULD BE PULLED UP SIMULTANEOUSLY WITH THIS ONE

17     DATA STREAM, AND THE CHARACTERISTICS I THINK WERE ON THE OTHER

18     SCREEN.  THAT WAS THE VAN WE WERE USING TO SHOW THAT YOU COULD

19     HAVE HIGH DATA RATES AT MOBILE SPEEDS.

20     Q.   AND AT THIS TIME IN THE LATE '90S, WAS ANYBODY SENDING

21     DATA BACK AND FORTH ON MOBILE PHONES LIKE WE DO SO MUCH TODAY?

22     A.   NOT AT ALL.

23     Q.   AND WHAT CONTRIBUTION DID DR. PADOVANI MAKE TO HDR?

24     A.   HE CAME UP WITH THE INITIAL IDEAS AND THEN LED A GROUP

25     THAT DEVELOPED THE HDR, THEN HELPED TRANSFER THAT TO OUR CHIPS

1    SO THAT WE COULD BEGIN TO SELL THIS TECHNOLOGY.

2    Q.   HAS HE BECOME KNOWN AS THE FATHER OF HDR, PADOVANI?

3    A.   I WOULD CERTAINLY VIEW HIM THAT WAY.

4    Q.   WOULD YOU TURN IN YOUR BINDER, THE ONE THAT IS IN FRONT OF

5    YOU, DR. JACOBS, TO QX 9276.  AND OPEN IT UP AND TELL US IF YOU

6    RECOGNIZE IT?

7    A.   9276.

8    Q.   YES, SIR.

9    A.   YES.  THAT LOOKS -- THAT IS THE WHITE PAPER THAT ROBERTO

10   USED TO DOCUMENT HIS -- THIS TECHNOLOGY AFTER IT HAD BEEN

11   WORKED ON FURTHER.

12        MR. VAN NEST:  ALL RIGHT.  YOUR HONOR, I'D OFFER

13   QX 9276 INTO EVIDENCE.

14        MR. MATHESON:  NO OBJECTION.

15        THE COURT:  IT'S ADMITTED.

16    (DEFENDANT'S EXHIBIT QX 9276 WAS ADMITTED IN EVIDENCE.)

17        THE COURT:  GO AHEAD, PLEASE.

18        MR. VAN NEST:  COULD I HAVE PAGE 9 ON THE SCREEN,

19   PLEASE.

20   Q.   AND I'M GOING TO HIGHLIGHT SOMETHING IN THE MIDDLE OF THE

21   PAGE.  CAN YOU JUST GIVE THE COURT A BRIEF KIND OF HIGH-LEVEL

22   DESCRIPTION OF WHAT WERE THE KEY FACTORS THAT MADE HDR SO

23   GREAT?

24   A.   RIGHT.  IN ALL OF THE VARIOUS MOBILE TECHNOLOGIES TO DATE,

25   ONE SHARED THE SPECTRUM AND HAD SEVERAL USERS TRANSMITTING

1       SIMULTANEOUSLY.

2            THE GREAT BREAKTHROUGH HERE WITH DATA IS THAT YOU COULD

3       SEND DATA A PACKET AT A TIME, AND THE IDEA HERE WAS TO PUT ALL

4       THE ENERGY IN THE TRANSMITTER INTO SENDING A SINGLE PACKET AT

5       THE HIGHEST DATA RATE.

6            AND THE IDEA ABOVE AND BEYOND THAT WAS TO JUDGE THE

7       CHANNEL AND PICK THAT USER WHO, TO WHOM -- ONE OF THE USERS TO

8       WHOM A PACKET WAS TO BE DELIVERED, PICK THE ONE WITH THE

9       HIGHEST POSSIBLE SIGNAL TO NOISE RATIO SO YOU COULD GET THAT

10      WITH THE LEAST AMOUNT OF ENERGY AND AT THE HIGHEST DATA RATE.

11           AND SO IT WAS COMPLETELY UNIQUE IN THE SENSE OF FOCUSSING

12      ON ONLY ONE USER AT A TIME AND GIVING THEM FULL POWER, BUT

13      PICKING THE ONES THAT WOULD ALLOW YOU TO GET BY WITH THE LEAST

14      TOTAL AMOUNT OF ENERGY TO BE USED.

15      Q.   AND WHY WAS THAT SO IMPORTANT?

16      A.   WELL, OF COURSE, WITH MOBILE COMMUNICATIONS -- FIRST OF

17      ALL, HIGH DATA RATES IN MOBILE.  IN MOBILE YOU CAN DOWNLOAD

18      DATA, YOU CAN WATCH VIDEOS, THAT ASPECT IS IMPORTANT.

19           BUT BEING ABLE TO DO IT WITH LOW ENERGY, LOW TOTAL ENERGY

20      IS ALSO VERY IMPORTANT.

21      Q.   AND DOES HDR TECHNOLOGY -- WELL, LET ME BACK UP.  WAS

22      QUALCOMM THE FIRST COMPANY TO MARKET HDR COMMERCIALLY?

23      A.   YES.  WE WERE WELL AHEAD OF OTHERS ON THIS TECHNOLOGY.

24      Q.   AND IS HDR LIMITED TO CDMA OR DOES IT APPLY TO OTHER

25      STANDARDS AS WELL?

1    A.   THE HDR WE INITIALLY USED WITH CDMA, BUT THEN AS WCDMA

2    BEGAN TO DEVELOP, THEN LATER VERSIONS OF THE STANDARD PICKED UP

3    THE SAME TECHNOLOGY THAT WE USED IN HDR.  QUALCOMM MADE

4    SUBMISSIONS, THEY WERE ACCEPTED, AND SO WCDMA USED THAT.

5         AND, INDEED, YOU COULD GO ON TO THE FOURTH GENERATION,

6    LTE, AND SOME OF THE SAME TECHNIQUES ARE NOW IN LTE.

7         AND I GUESS I COULD GO FURTHER.  WE'RE NOW LOOKING AT A

8    FIFTH GENERATION WHICH HAS MANY DIFFERENT FREQUENCY BANDS AND

9    TYPES OF MODELS.  THE SAME IDEAS ARE BEING CARRIED ON FURTHER.

10   Q.   SO DR. PADOVANI'S IDEA, QUALCOMM'S IDEAS, HAVE EXTENDED

11   ACROSS GENERATIONS?

12   A.   THAT'S CORRECT.

13   Q.   OKAY.  I WANT TO DISCUSS ONE LICENSING DISPUTE WITH YOU,

14   DR. JACOBS, AND IT OCCURRED BACK IN THE EARLY -- WELL, 2003,

15   2004.

16        DO YOU REMEMBER A LICENSING DISPUTE ARRIVING BETWEEN

17   QUALCOMM AND LG?

18   A.   I REMEMBER THERE WAS A -- THERE WERE A NUMBER OF DISPUTES

19   EACH TIME WE DID A NEGOTIATION.  THERE WAS ONE WITH LG, YES.

20   Q.   OKAY.  AND DO YOU REMEMBER WHAT THE GENESIS OR THE BASIS

21   OF THE DISPUTE WAS?

22   A.   I THINK AT THAT TIME, AGAIN, WE HAD BEEN WORKING WITH THEM

23   ON CDMA.  THEN THE QUESTION WAS OF GOING TO -- I THINK IT WAS

24   1X.  DO YOU --

25   Q.   WELL, LET ME ASK YOU, OPEN YOUR BINDER, IF YOU WOULD, TO

1          CX 6814.

2               DO YOU HAVE IT THERE?

3          A.   I DO.

4          Q.   AND IS THAT A SERIES OF CORRESPONDENCE BETWEEN YOU AND

5          OTHERS AT LG?

6          A.   YES.

7          Q.   COULD YOU TURN TO PAGE 21 IN THE DOCUMENT?  AND TELL US IF

8          THAT'S A LETTER THAT YOU SENT TO LG IN 2004.

9          A.   YES.  IT'S A LETTER I SENT TO S.S. KIM, WHO WAS VICE CHAIR

10         AND CEO OF LG ELECTRONICS AT THE TIME.

11              MR. VAN NEST:  YOUR HONOR, WE'D OFFER PAGES 21

12         THROUGH 23 OF CX 6814 IN EVIDENCE.

13              MR. MATHESON:  OBJECTION, YOUR HONOR.  WE SHOULD

14         ADMIT THE ENTIRE THING.  IT'S ONE EXHIBIT.

15              MR. VAN NEST:  WELL, THAT'S FINE.  THAT'S FINE.

16          THE PART -- SOME OF IT HAS BEEN ADMITTED PREVIOUSLY, I

17         THINK, AND IT'S PARTIALLY SEALED.  BUT I'M FINE WITH THAT AS

18         WELL, YOUR HONOR.

19              MR. MATHESON:  IT IS PARTIALLY SEALED, YOUR HONOR.

20              THE COURT:  SO JUST ADMIT THE WHOLE THING, CX 6814?

21              MR. VAN NEST:  6814, YEAH.

22              THE COURT:  ANY OBJECTION TO THAT?

23              MR. MATHESON:  THE ONLY OBJECTION THAT'S BEEN RAISED

24         WAS RAISED BY QUALCOMM, THIS IS ON OUR LIST, TO THE HEARSAY

25         STATEMENTS IN THIRD PARTY LETTERS, QUALCOMM'S STATEMENTS OR

1         STATEMENTS OF A PARTY OPPONENT FROM THE FTC'S POINT OF VIEW, SO

2    THEY'RE ADMISSIBLE FOR THE TRUTH.

3         QUALCOMM HAS OBJECTED TO THE HEARSAY STATEMENTS IN THIRD

4    PARTY CORRESPONDENCE.

5         I DON'T KNOW IF YOU WANT TO WAIVE THAT OBJECTION OR NOT?

6              MR. VAN NEST:  WE DO.

7              MR. MATHESON:  OKAY.  NO OBJECTION, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  SO THEY'RE ALL ADMITTED THEN,

9    THE WHOLE THING.

10             MR. VAN NEST:  THAT'S FINE.

11             THE COURT:  PARTS ARE SEALED.

12        (PLAINTIFF'S EXHIBIT CX 6814 WAS ADMITTED IN EVIDENCE.)

13             MR. VAN NEST:  AND WE'RE GOING TO BE DISCUSSING

14   PAGES, YOUR HONOR, THAT HAVE NOT BEEN SEALED, SO I'LL STAY ON

15   THE PUBLIC RECORD.

16   Q.   MR. JACOBS, WITH REFERENCE TO THIS LETTER -- LET'S BACK UP

17   A MINUTE.

18        WAS LG PURCHASING CDMA CHIPS IN COMMERCIAL QUANTITIES AT

19   THIS TIME FROM QUALCOMM?

20   A.   YES, THEY WERE.

21   Q.   OKAY.  WERE THEY SELLING PHONES WITH QUALCOMM CDMA CHIPS

22   IN THEM?

23   A.   YES, THEY WERE.

24   Q.   DID THIS DISPUTE WITH LG INVOLVE CDMA OR WCDMA?

25   A.   THIS WAS STRICTLY A DISPUTE OVER WCDMA.

1    Q.   AND WHAT WAS THE NATURE OF THE DISPUTE AS YOU UNDERSTOOD

2    IT?

3    A.   WELL, WE HAD RECEIVED A -- INFORMATION THAT ONE OF THEIR

4    ATTORNEYS CLAIMED THAT IF QUALCOMM SELLS WCDMA ASICS TO LG,

5    THAT WE WERE, JUST BY SELLING THEM ASICS, GRANTING ROYALTY FREE

6    RIGHTS TO LG AND WE WAIVED THE RIGHTS TO COLLECT ROYALTIES ON

7    ANY WCDMA SUBSCRIBER UNITS.

8    Q.   WAS THAT A PROBLEM?

9    A.   THAT WAS QUITE A PROBLEM, YES.

10   Q.   AND WHAT WAS THE NATURE OF WCDMA CHIPS YOU WERE SELLING TO

11   LG AT THE TIME?  WERE THEY COMMERCIAL CHIPS?

12   A.   AT THE TIME WE WERE JUST IN DISCUSSION OF PROVIDING THEM

13   WITH SOME EARLY CHIPS FOR THEM TO BE ABLE TO DEVELOP THEIR

14   WCDMA PHONES WITH OUR CHIPS.

15   Q.   SO THEY WEREN'T SELLING ANY WCDMA PHONES WITH QUALCOMM

16   CHIPS IN THEM AT THAT TIME?

17   A.   THAT'S CORRECT.

18   Q.   BUT WERE THEY SELLING WCDMA PHONES USING OTHER CHIPS?

19   A.   I BELIEVE THEY WERE.

20   Q.   OKAY.  AND DID YOU GIVE THEM SOME ASSURANCE THAT THERE

21   WOULD BE NO INTERRUPTION IN CDMA CHIP SUPPLY?

22   A.   THAT WAS ALWAYS OUR POLICY, THAT WE DON'T INTERRUPT OUR

23   DELIVERY OF CHIPS.

24   Q.   OKAY.

25   A.   AND CERTAINLY NOT WITH A WCDMA DISPUTE.

1    Q.   OKAY.  LET'S TAKE A LOOK AT PAGE 2, THE VERY BOTTOM

2    PARAGRAPH.  YOU CAN LOOK AT IT IN YOUR BINDER THERE,

3    MR. JACOBS.

4         IT'S ON PAGE 2.  I HAVE IT ON THE SCREEN.

5    A.   UM-HUM.

6    Q.   COULD WE HIGHLIGHT THE LAST SENTENCE.

7         AND CAN YOU READ THAT TO YOURSELF AND TELL US, WHAT WERE

8    YOU COMMUNICATING TO LG IN CONNECTION WITH THIS DISPUTE?

9    A.   WELL, I WAS HOPING THAT WE WOULD QUICKLY SETTLE THE

10   DISPUTE, RESUME A VERY CLOSE RELATIONSHIP, AND I MUST SAY GOING

11   BACK, THEY WERE JUST ENTERING THE CELLULAR BUSINESS WITH THE

12   HELP OF CDMA, THAT IT WOULD CONTINUE TO BE BENEFICIAL AND THAT

13   WE WOULD CERTAINLY CONTINUE TO SUPPLY THEM, DESPITE THE

14   DISPUTE, WITH CDMA 2000 PRODUCTS.

15   Q.   AND DID QUALCOMM CONTINUE TO SUPPLY LG WITH CDMA CHIPS,

16   NOTWITHSTANDING THE DISPUTE?

17   A.   THAT IS CORRECT.

18   Q.   WAS THERE ANY DISRUPTION IN CHIP SUPPLY AS FAR AS YOU'RE

19   AWARE?

20   A.   NOT THAT I'M AWARE.

21   Q.   OKAY.  LET'S GO BACK TO WHERE WE WERE VERY BRIEFLY.  YOU

22   MENTIONED THAT HDR HAS CONTINUED ON.

23        ARE THERE FEATURES TODAY THAT ARE STILL BENEFITING FROM

24   THE HDR TECHNOLOGY THAT DR. PADOVANI AND QUALCOMM CAME UP WITH

25   IN THE EARLY '90S?

1    A.   YES.  AS I MENTIONED, IT BECAME VERY IMPORTANT WITH CDMA

2    AND WCDMA IN THE THIRD GENERATION AND SOME OF THE TECHNOLOGY

3    HAS EXTENDED TO THE FOURTH AND NOW INTO THE FIFTH GENERATION.

4    Q.   DR. JACOBS, ARE YOU PROUD OF WHAT YOU'VE CREATED AT

5    QUALCOMM?

6    A.   IT'S ALWAYS EXCITING TO, IN THIS PARTICULAR CASE, SEE

7    SOMETHING GO FROM AN IDEA TO A PRODUCT THAT'S VERY USEFUL TO

8    PEOPLE EVERYWHERE AROUND THE WORLD.

9         AND I STILL MUST SAY, I GET A KICK WHEN I EVEN GO INTO A

10   RESTAURANT AND YOU LOOK AROUND AND EVERYBODY HAS THEIR CELL

11   PHONE OUT.

12        (LAUGHTER.)

13        MR. VAN NEST:  THANK YOU, DR. JACOBS.

14   I PASS THE WITNESS, YOUR HONOR.

15        THE COURT:  OKAY.  TIME IS 2:20.

16   LET'S TAKE A BREAK -- WE CAN TAKE A BREAK NOW OR TAKE IT

17   AT 2:30.  IT DOESN'T MATTER TO ME.

18        MR. MATHESON:  IT'S FINE TO TAKE IT NOW, YOUR HONOR,

19   IF THAT'S CONVENIENT TO THE COURT.

20        THE COURT:  ALL RIGHT.  LET'S TAKE JUST A TEN MINUTE

21   BREAK TO 2:30, PLEASE.

22        ALL RIGHT.  WE'RE IN RECESS.  THANK YOU.

23        (RECESS FROM 2:20 P.M. UNTIL 2:38 P.M.)

24        THE CLERK:  PLEASE COME TO ORDER.

25        THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

```
 1              SO I HAVE ACTUALLY RECONSIDERED.  I ACTUALLY DON'T WANT A

 2     CHART.  WE'LL ONLY DO CLOSING ARGUMENTS.  OKAY?  AND WE'LL

 3     STILL DO THAT ON FEBRUARY THE 1ST, ONE HOUR EACH SIDE.  THE FTC

 4     CAN SAVE REBUTTAL TIME.  OKAY?

 5              BUT NO NEED -- YOU KNOW, YOU ALL HAVE BRIEFED SO MUCH, I

 6     THINK IT'S FINE NOT TO HAVE THAT.

 7              OKAY.  GO AHEAD, PLEASE.  2:38.

 8                   MR. MATHESON:  THANK YOU, YOUR HONOR.

 9                             CROSS-EXAMINATION

10     BY MR. MATHESON:

11     Q.   GOOD AFTERNOON, SIR.

12     A.   GOOD AFTERNOON.

13     Q.   IT'S FAIR TO SAY THAT IN THE 1990S, QUALCOMM WANTED

14     WIRELESS NETWORK OPERATORS TO DEPLOY CDMA NETWORKS WORLDWIDE;

15     RIGHT?

16     A.   COULD YOU SPEAK JUST A LITTLE -- MY HEARING COULD BE

17     BETTER.

18     Q.   NO WORRIES.

19              IT'S FAIR TO SAY THAT IN THE 1990S, QUALCOMM WANTED CDMA

20     NETWORK OPERATORS TO DEPLOY CDMA NETWORKS WORLDWIDE; RIGHT?

21     A.   CDMA NETWORKS?  YES.

22     Q.   CORRECT, SIR.

23     A.   YES.

24     Q.   QUALCOMM BELIEVED THAT ENCOURAGING NUMEROUS MANUFACTURERS

25     OF CDMA PRODUCTS WOULD ENCOURAGE OPERATORS TO WIDELY DEPLOY
```

JACOBS CROSS BY MR. MATHESON

1     CDMA NETWORKS; RIGHT?

2     A.   WE BELIEVED THE MORE MANUFACTURERS, THAT'S CORRECT, MORE

3     PRODUCTS AVAILABLE, THE LOWER THE COST, THE BETTER THE PRODUCT.

4     Q.   AND IN ORDER TO ALLOW THAT TO HAPPEN WORLDWIDE, THERE HAD

5     TO BE A STANDARD; RIGHT?

6     A.   YES.

7     Q.   NOW, IT'S FAIR TO SAY THAT YOU CONSIDERED THE POSSIBILITY

8     OF RETAINING CDMA AS A PROPRIETARY STANDARD; RIGHT?

9     A.   WE THOUGHT ABOUT HAVING IT AS A, I DON'T KNOW IF YOU'D

10    CALL IT DE JURE, BUT NOT GO TO A STANDARDS BODY.  WE DID THINK

11    ABOUT THAT.

12    Q.   BUT QUALCOMM DETERMINED THAT THERE WAS A COMMERCIAL

13    BENEFIT IN GOING THROUGH A STANDARD SETTING ORGANIZATION, SUCH

14    AS THE TIA; RIGHT?

15    A.   WELL, A NUMBER OF THE OPERATORS ALSO URGED US TO GO

16    THROUGH THE STANDARDS PROCESS, AND SO, YES, WE DECIDED THAT

17    THAT WOULD BE APPROPRIATE.

18    Q.   WHEN YOU SAY APPROPRIATE, YOU BELIEVE THAT IT WAS

19    IMPORTANT, FROM A COMMERCIAL POINT OF VIEW, THAT QUALCOMM GO

20    THROUGH A PUBLIC STANDARD SETTING ORGANIZATION RATHER THAN

21    MAINTAIN CDMA AS A PROPRIETARY STANDARD; RIGHT?

22    A.   WE DID BELIEVE THAT IT WOULD BE BENEFICIAL TO HAVE AS MANY

23    MANUFACTURERS AS POSSIBLE, AND THAT REQUIRED GOING THROUGH A

24    STANDARDS PROCESS, YES.

25    Q.   AND IN ORDER TO DEVELOP A STANDARD CERTIFIED BY TIA,

JACOBS CROSS BY MR. MATHESON

1    QUALCOMM KNEW THAT IT HAD TO MAKE A FRAND COMMITMENT; RIGHT?

2    A.   THAT'S CORRECT.

3    Q.   AND THAT'S BECAUSE TIA WILL NOT ADOPT AN INDUSTRY STANDARD

4    UNLESS ALL PARTICIPANTS HOLDING ESSENTIAL PATENTS MAKE A FRAND

5    COMMITMENT; RIGHT?

6    A.   I BELIEVE THAT'S CORRECT.

7    Q.   NOW, ONE COMMERCIAL BENEFIT THAT QUALCOMM RECEIVED FROM

8    WIDESPREAD ADOPTION OF CDMA IS A LARGER BASE OF LICENSEES FROM

9    WHICH QUALCOMM --

10   A.   A LARGER BASE?

11   Q.   -- OF LICENSEES FROM WHICH QUALCOMM COULD POTENTIALLY

12   COLLECT ROYALTIES; RIGHT?

13   A.   THAT IS CORRECT.

14   Q.   AND ANOTHER BENEFIT QUALCOMM ANTICIPATED FROM WIDESPREAD

15   ADOPTION OF CDMA WERE A LARGER NUMBER OF HANDSET MAKERS WHO

16   WERE POTENTIAL CUSTOMERS FOR QUALCOMM'S CHIPS?  IS THAT FAIR?

17   A.   THEY COULD BE CUSTOMERS FOR OUR CHIPS.  THEY COULD BE

18   CUSTOMERS FOR OTHER CHIPS.

19       BUT, AGAIN, OUR INTENT WAS TO HAVE THIS AS WIDELY

20   AVAILABLE WORLDWIDE AS POSSIBLE TO GO TO A HORIZONTAL APPROACH

21   WHERE YOU HAD MANY MANUFACTURERS ABLE TO MANUFACTURE THE

22   PRODUCT RATHER THAN JUST A FEW.

23   Q.   AND QUALCOMM WANTED TO SELL AS MANY CHIPS AS IT COULD;

24   RIGHT?

25   A.   WE CERTAINLY DID WANT TO BUILD OUR CHIP BUSINESS, YES.

1    Q.   NOW, YOU RECALL THAT AT SOME POINT QUALCOMM AND CHINA

2    UNICOM REACHED A FRAMEWORK AGREEMENT?

3         DO YOU RECALL THAT, SIR?

4    A.   YES, I DO.

5    Q.   DO YOU RECALL THAT AS PART OF THE FRAMEWORK AGREEMENT,

6    CHINESE HANDSET MAKERS WERE PROVIDED WITH A REDUCED ROYALTY IF

7    THEY MADE A WORLDWIDE COMMITMENT TO PURCHASE QUALCOMM'S CDMA

8    CHIPS?

9    A.   I DON'T REMEMBER THE DETAILS, FULL DETAILS OF THE

10   AGREEMENT.

11        I WILL -- I DO RECALL IT TOOK US EIGHT YEARS TO GET TO

12   THAT POINT.  SO IT WAS A LONG PERIOD.

13        I REMEMBER THAT THEY HAD A REDUCED RATE WITHIN CHINA --

14   AGAIN, HOPEFULLY MY RECALL IS SOMEWHAT CORRECT -- AND A HIGHER

15   RATE OUTSIDE.

16        BUT THAT'S MY CURRENT RECALL.

17   Q.   COULD YOU DIRECT YOUR ATTENTION, SIR, I LEFT TWO WHITE

18   BINDERS UP THERE, TO YOUR DEPOSITION TRANSCRIPT AT PAGE 268.

19        NOW, THIS IS QUOTING A DOCUMENT, AND I JUST WANT TO KNOW,

20   DOES THIS REFRESH YOUR RECOLLECTION THAT THE CHINA FRAMEWORK

21   AGREEMENT -- THIS IS, I GUESS, 265, ACCORDING TO THIS, OR 266,

22   ACCORDING TO THIS, LINES 4 TO 6.

23        ONE OF THE CONDITIONS OF THE CHINA FRAMEWORK AGREEMENT WAS

24   THAT OEM'S, IN ORDER TO BENEFIT FROM A REDUCED ROYALTY RATE,

25   MADE A WORLDWIDE COMMITMENT TO PURCHASE QUALCOMM'S CDMA AND

1    RELATED COMPONENTS?

2    A.   YES, I DO SEE THAT.

3    Q.   DOES THAT REFRESH YOUR RECOLLECTION, SIR, THAT THAT WAS

4    ONE OF THE REQUIREMENTS OF THAT AGREEMENT?

5    A.   ASSUMING THIS IS A CORRECT TRANSCRIPT, IT DOES REFRESH MY

6    MEMORY.  I DON'T RECALL THAT DETAIL.

7    Q.   NOW, YOU RECALL THAT WIMAX WAS AT ONE POINT A PROPOSED

8    NEXT GENERATION STANDARD LED BY INTEL; RIGHT?

9    A.   THAT'S CORRECT.

10   Q.   AND IF WIMAX HAD ENDED UP AS THE STANDARD, QUALCOMM WOULD

11   HAVE BEEN FAR BEHIND IN ITS ABILITY TO PROVIDE CHIPS; IS THAT

12   RIGHT?

13   A.   WE DID NOT PURSUE WIMAX BECAUSE I THOUGHT IT WAS AN

14   INFERIOR TECHNOLOGY.  AND SO, YES, IF THAT BECAME THE WORLDWIDE

15   STANDARD, WE CERTAINLY WOULD HAVE PURSUED IT.  BUT WE COULD

16   HAVE BEEN LATER.

17   Q.   AND IF YOU WOULD TURN YOUR ATTENTION, SIR, TO YOUR

18   DEPOSITION TRANSCRIPT AT 124, LINES 17 TO 25.  YOU DID

19   PREVIOUSLY TESTIFY THAT QUALCOMM WOULD HAVE BEEN FAR BEHIND IN

20   ITS ABILITY TO PROVIDE CHIPS; IS THAT RIGHT?

21             MR. VAN NEST:  OBJECTION, YOUR HONOR.  THAT'S NOT

22   IMPEACHING.  THAT'S WHAT THE WITNESS JUST SAID.

23             MR. MATHESON:  I HEARD COULD HAVE RATHER THAN WOULD

24   HAVE, YOUR HONOR.  THAT'S THE DISTINCTION I WAS TRYING TO DRAW.

25             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

1    BY MR. MATHESON:

2    Q.   CAN YOU TURN YOUR ATTENTION --

3    A.   CAN YOU REPEAT THAT, PLEASE.

4    Q.   CAN YOU TURN YOUR ATTENTION TO THAT PAGE OF THE DEPOSITION

5    TRANSCRIPT?

6    A.   WHICH PAGE?

7    Q.   PAGE 124, LINES 17 TO 25.

8    A.   OH, IT'S HERE.

9         WIMAX --

10   Q.   IT'S ACCURATE TO STATE, SIR, THAT IF WIMAX HAD ENDED UP AS

11   THE STANDARD, QUALCOMM WOULD HAVE BEEN FAR BEHIND; IS THAT

12   RIGHT?

13   A.   THAT'S FINE.

14   Q.   AND IN LATE 2006, IT'S FAIR TO SAY THAT QUALCOMM WAS

15   INTERESTED IN GETTING APPLE TO MAKE A PUBLIC COMMITMENT TO NOT

16   PURSUE WIMAX IN ITS NEXT GENERATION OF PHONES; RIGHT?

17   A.   WHAT YEAR WAS THAT?

18   Q.   2006.

19   A.   I RETIRED IN 2005 AS CTO -- AS CEO.  IF THAT WAS 2006, I'M

20   NOT SURE I WAS IN THE MIDDLE OF THOSE DETAILS.  BUT I WOULD

21   IMAGINE THAT WE WOULD BE INTERESTED IN GAINING SUPPORT FOR LTE.

22   Q.   DO YOU RECALL ONE WAY OR THE OTHER WHETHER THE --

23   A.   I DO NOT RECALL.

24   Q.   DO YOU RECALL ONE WAY OR THE OTHER WHETHER THE ORIGINAL

25   2007 AGREEMENT BETWEEN QUALCOMM AND APPLE REQUIRED APPLE TO NOT

```
1     LAUNCH PRODUCTS CONTAINING WIMAX COMPATIBLE CHIPS?

2     A.   I DO NOT RECALL.

3     Q.   COULD YOU TURN, SIR, TO TAB 3 OF THE OTHER WHITE BINDER I

4     HANDED YOU.

5          CAN YOU IDENTIFY THIS, SIR, AS A -- LOOKING AT THE MIDDLE

6     OF THE PAGE -- AS A COMMUNICATION THAT YOU SENT TO MR. K.T. LEE

7     OF SAMSUNG IN OCTOBER OF 2003?

8     A.   YES.

9              MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6719,

10    CERTAIN MATERIAL IS SEALED ON THE SECOND PAGE OF THE DOCUMENT.

11    WE HAVE PUT IT IN YOUR HONOR'S BINDER IN UNREDACTED FORM.

12    WE'LL DISPLAY IT ON THE SCREEN IN REDACTED FORM.

13             MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

14             THE COURT:  IT'S ADMITTED.

15         (PLAINTIFF'S EXHIBIT CX 6719 WAS ADMITTED IN EVIDENCE.)

16             THE COURT:  GO AHEAD, PLEASE.

17    BY MR. MATHESON:

18    Q.   TURNING YOUR ATTENTION TO PAGE 2 OF THE DOCUMENT

19    CX 6719-002, THE SECOND FULL PARAGRAPH BEGINS, "YOU ALSO

20    REQUESTED THAT SAMSUNG'S ROYALTY RATE FOR WCDMA," AND I'M NOT

21    GOING TO READ THE EXACT NUMBERS THERE, SIR, THEY'VE BEEN

22    BLACKED OUT, "BE DECREASED SO THAT SAMSUNG IS NOT COMPETITIVELY

23    DISADVANTAGED."

24         NOW, IT'S A TRUE STATEMENT THAT IN OCTOBER OF 2003,

25    SAMSUNG ASKED QUALCOMM TO REDUCE THE RATES IT PAID ON WCDMA
```

1    HANDSET SALES; RIGHT?

2    A.   I BELIEVE THAT'S THE CASE.

3    Q.   NOW, QUALCOMM RESPONDED WITH A PROPOSAL LATER IN THE

4    PARAGRAPH, THAT IF SAMSUNG PURCHASED AT LEAST -- OR CONTINUED

5    TO PURCHASE AT LEAST BLANK PERCENT OF ITS ASICS FROM QUALCOMM,

6    THEN SAMSUNG WOULD RECEIVE THE BENEFITS OF A ROYALTY REDUCTION.

7         IS THAT FAIR?

8    A.   YES.

9    Q.   NOW, IT'S CLEAR THAT THE BUSINESS PURPOSE OF THIS PROPOSAL

10   WAS TO ENCOURAGE SAMSUNG TO CONTINUE PURCHASING A LARGE NUMBER

11   OF CHIPS FROM QUALCOMM; RIGHT?

12   A.   THEY WERE -- THEY HAD BEEN A GOOD CUSTOMER.  THEY WERE

13   PURCHASING A LARGE PERCENTAGE OF CHIPS AND, YES, WE CERTAINLY

14   WANTED TO ENCOURAGE THAT.

15   Q.   NOW, TURNING YOUR ATTENTION TO THE NEXT PARAGRAPH, IT

16   BEGINS, "IN YOUR E-MAIL, YOU ASKED WHETHER WE INTEND TO OFFER

17   THIS ROYALTY REDUCTION TO OTHERS," AND IT'S FAIR TO SAY THAT IN

18   SUBSTANCE, YOU COMMUNICATED TO MR. LEE THAT QUALCOMM INTENDED

19   TO OFFER THIS SAME PROPOSAL TO OTHERS BECAUSE, AS IT SAYS IN

20   THE SECOND TO LAST SENTENCE, "WE ARE ALSO COUNTING ON THEM TO

21   TAKE MARKET SHARE FROM MANUFACTURERS THAT DO NOT USE OUR

22   ASICS."

23        IS THAT FAIR?

24   A.   I SEE THE SENTENCE, YES.

25   Q.   TURNING YOUR ATTENTION, SIR, TO TAB 4 OF YOUR BINDER, THIS

```
1      IS CX 6722.  CAN YOU IDENTIFY THIS AS AN E-MAIL, LOOKING AT THE

2      SECOND E-MAIL IN THE CHAIN, THAT YOU RECEIVED FROM MR. ALTMAN,

3      SORRY, FROM MR. ALTMAN IN JANUARY OF 2007?

4      A.   JANUARY 2008.  LET'S SEE.

5      Q.   I SEE MONDAY, JANUARY 8TH, 2007?

6      A.   YES.

7      Q.   OKAY.  SO THIS WAS JANUARY 2007; IS THAT FAIR?

8      A.   RIGHT.  HE WROTE THAT, YES.

9      Q.   NOW, MR. ALTMAN SENT YOU THIS E-MAIL DURING NEGOTIATIONS

10     WITH LG?  IS THAT THE CONTEXT?

11     A.   YES.

12     Q.   NOW, LOOKING AT THE FIRST --

13          OH, YOUR HONOR, MOVE TO ADMIT CX 6722.

14              MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

15              THE COURT:  IT'S ADMITTED.

16          (PLAINTIFF'S EXHIBIT CX 6722 WAS ADMITTED IN EVIDENCE.)

17              THE COURT:  GO AHEAD, PLEASE.

18     BY MR. MATHESON:

19     Q.   LOOKING AT THE FIRST ARABIC NUMERAL, MR. ALTMAN STATES

20     "THEY CURRENTLY PAY 5 PERCENT WHEN THEY USE OUR CHIP AND 5.75

21     PERCENT WHEN THEY DON'T."

22          NOW, THAT ACCURATELY STATES THE ROYALTY RATE THAT IS LG

23     PAID QUALCOMM AT THIS TIME; RIGHT?

24     A.   I BELIEVE THAT'S THE CASE.

25     Q.   NOW, THIS ROYALTY RATE DIFFERENCE BASED ON WHETHER LG
```

1     PURCHASED QUALCOMM'S CHIPSETS OR A COMPETITOR'S CHIPSETS

2     PROVIDED LG WITH AN INCENTIVE TO PURCHASE QUALCOMM'S CHIPSETS;

3     IS THAT RIGHT?

4     A.   I DON'T KNOW WHAT ALL THE OTHER TERMS INVOLVED WERE, BUT

5     THAT BY ITSELF WOULD BE AN INCENTIVE.

6     Q.   SO ANYBODY WHO SAID THAT THIS PROVISION PROVIDED LG WITH

7     MORE FAVORABLE ROYALTY RATES WHEN THEY PURCHASED QUALCOMM

8     CHIPSETS WAS INTENDED TO MAKE SURE IT'S A LEVEL PLAYING FIELD

9     ON THE CHIP SIDE WOULD JUST BE WRONG?  IS THAT FAIR?

10    A.   I'M SORRY.  WHERE ARE YOU READING?

11    Q.   I'M JUST ASKING YOU.

12    A.   OH, GO AHEAD.

13    Q.   IF SOMEONE WALKED INTO THIS COURTROOM AND SAID THAT THAT

14    PROVISION WAS INTENDED TO MAKE SURE IT'S A LEVEL PLAYING FIELD

15    ON THE CHIP SIDE, THAT PERSON WOULD BE WRONG WITH RESPECT TO

16    THAT PROVISION; RIGHT?

17    A.   WELL, IT GOES ON TO SAY THAT WE ARE WILLING TO TAKE AND

18    PROVIDE THE SAME RATE, I BELIEVE HERE, THE 5 PERCENT REGARDLESS

19    OF WHOSE CHIP THAT THEY USE.

20         SO WE WERE WILLING TO GO AHEAD AND DO THAT AT THAT TIME.

21    Q.   WELL, THAT'S THE OFFER THAT WAS MADE -- PARDON ME, SIR?

22    A.   IT WAS BEING PROPOSED.

23    Q.   THAT WAS THE PROPOSAL.

24         BUT AT THIS TIME, IN JANUARY OF 2007, IT WAS THE CASE THAT

25    LG PAID A LOWER ROYALTY RATE WHEN THEY USED A QUALCOMM CHIP

```
 1     THAN WHEN THEY USED A COMPETITOR CHIP; RIGHT?

 2     A.   WELL, BASED ON THIS STATEMENT, I WOULD TAKE THAT TO BE

 3     CORRECT.

 4     Q.   CAN YOU TURN YOUR ATTENTION TO TAB 1 OF YOUR BINDER, SIR.

 5     A.   TAB 1?

 6     Q.   YES, TAB 1.  AND THIS HAS BEEN ADMITTED ALREADY.

 7          AND THIS IS AN E-MAIL -- OH, STRIKE THAT.

 8     A.   YES.

 9     Q.   DO YOU SEE THIS, SIR, IS AN E-MAIL THAT YOU SENT TO A

10     SAMSUNG EXECUTIVE ON AUGUST 24TH, 2001?

11     A.   YES, TO K.T. LEE, WHO WAS PRESIDENT OF THE INFORMATION

12     COMMUNICATIONS SECTION OF SAMSUNG.

13     Q.   CAN YOU TURN YOUR ATTENTION TO THE SECOND PAGE OF THE

14     DOCUMENT, SIR, THE FIRST FULL PARAGRAPH.

15          THIS HAS ALREADY BEEN ADMITTED, KEN.  YOU CAN CALL IT UP.

16             MR. KOTARSKI:  WHAT'S THE EXHIBIT NUMBER?  YOU JUST

17     SAID THE TAB.

18             MR. MATHESON:  6729.

19     Q.   THE FIRST FULL PARAGRAPH ON THE SECOND PAGE OF THE

20     DOCUMENT STATES "AS FOR SAMSUNG'S POSITION THAT 1X IS NOT

21     LICENSED," NOW, IN THE FINAL TWO SENTENCES OF THIS AGREEMENT,

22     YOU INFORMED MR. LEE THAT UNDER YOUR AGREEMENTS, QUALCOMM DID

23     NOT SHIP ASICS TO NON-LICENSEES OR TO LICENSEES WHO WERE NOT

24     PERFORMING THEIR OBLIGATIONS.

25          DO YOU SEE THAT, SIR?
```

1    A.   I DO SEE THAT.

2    Q.   AND THE REASON YOU INFORMED MR. LEE OF THAT IS THAT YOU

3    ASSUMED MR. LEE WAS CONCERNED ABOUT THE PROSPECT OF HAVING

4    SAMSUNG'S CHIP SUPPLY INTERRUPTED; RIGHT?

5    A.   I BELIEVE THAT WE HAD THIS DISPUTE OVER 1X WAS INCLUDED IN

6    AN AGREEMENT THAT HE HAD SIGNED AND THAT WE WERE TRYING TO

7    RESOLVE, AND THAT WE ALSO WERE AWARE THAT IN THAT AGREEMENT,

8    THAT WITHOUT THE AGREEMENT, WE DID NOT SHIP ASICS.

9    Q.   RIGHT.  BUT THE REASON YOU REMINDED HIM OF THAT WAS THAT

10   YOU ASSUMED HE WOULD BE CONCERNED WITH THE PROSPECT OF HAVING

11   HIS CHIP SUPPLY INTERRUPTED; RIGHT?

12   A.   THE MAIN ISSUE WAS A NEED TO REMIND HIM OF THAT AND ASK

13   HIM TO LET'S GO AHEAD AND GET THIS RESOLVED.

14   Q.   WELL, BUT YOU WERE DOING IT, YOU WERE TELLING HIM THAT

15   BECAUSE YOU ASSUMED HE WOULD BE CONCERNED WITH HAVING HIS CHIP

16   SUPPLY INTERRUPTED; RIGHT?

17   A.   I WASN'T SURE EXACTLY HOW FAMILIAR HE WAS WITH THE

18   DISPUTE, AND I WANTED TO AGAIN REMIND HIM OF THE CONTENT OF OUR

19   AGREEMENT THAT HE HAD SIGNED.

20   Q.   CAN YOU TURN YOUR ATTENTION, SIR, TO YOUR DEPOSITION

21   TRANSCRIPT, PAGES 206 AND 207.  AND IN PARTICULAR, PAGE 207,

22   LINES 7 TO 9.

23   A.   GO BACK TO THE OTHER BOOK.

24   Q.   YES.

25   A.   YOU WERE ASKED WHY YOU INFORMED HIM OF THIS PROVISION, AND

1       YOU SAID "BECAUSE I WOULD ASSUME THAT HE IS CONCERNED WITH NOT

2       INTERRUPTING HIS OWN SUPPLY OF CHIPS."

3            RIGHT?

4       A.   I'M SORRY, WHICH LINE ARE YOU LOOKING AT?

5       Q.   207, LINES 7 TO 9.

6            THAT WAS YOUR TESTIMONY AT YOUR DEPOSITION; RIGHT, SIR?

7       A.   YES, I SAID THAT.

8       Q.   TURN TO THE NEXT TAB IN YOUR BINDER, SIR.  CAN YOU

9       IDENTIFY THIS AS -- THIS IS JX 0014 -- AS AN E-MAIL SENT BY

10      MR. LEE OF SAMSUNG TO YOURSELF ON AUGUST 31ST?

11      A.   I'M SORRY.  WHICH TAB?

12      Q.   THE SECOND TAB OF YOUR BINDER, SIR, TAB 2.

13           AND THIS IS ONE WEEK AFTER THE E-MAIL WE JUST LOOKED AT ON

14      AUGUST 24TH; RIGHT?

15      A.   YES.

16                MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT JX 0014.

17                MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

18                THE COURT:  IT'S ADMITTED.

19           (JOINT EXHIBIT JX 0014 WAS ADMITTED IN EVIDENCE.)

20                THE COURT:  GO AHEAD, PLEASE.

21      BY MR. MATHESON:

22      Q.   TURNING YOUR ATTENTION TO THE PARAGRAPH THAT BEGINS,

23      "REGARDING THE 1X ROYALTY ISSUE," THE SECOND SENTENCE OF

24      MR. LEE'S E-MAIL TO YOU READS, "I WILL REMIT THE 1X ROYALTY

25      PAYMENT IMMEDIATELY UPON COMPLETION OF THE NECESSARY

1    CALCULATIONS."

2        NOW, THAT'S WHAT YOU ASKED HIM TO DO IN THE COMMUNICATION

3    YOU SENT HIM ONE WEEK BEFORE; RIGHT?

4    A.   YES, UM-HUM.

5    Q.   TURN TO TAB 5 IN THE BINDER YOU HAVE IN FRONT OF YOU.

6    THIS IS CX 6814 WHICH WE JUST ADMITTED.

7        NOW, TURNING TO CX 6814-022, THIS IS THE SAME LETTER THAT

8    YOU DISCUSSED WITH YOUR COUNSEL DURING YOUR DIRECT EXAM; RIGHT?

9    A.   I'M SORRY.  AGAIN, WHICH?

10   Q.   PAGE 022, CX 6814-022.

11   A.   OH, 022.  I'M THERE.  I HAVE 022.

12   Q.   AND AT THE TOP OF THE PAGE, THE SECOND SENTENCE, "REQUEST

13   THAT LG PROMPTLY," LITTLE I, "RETRACT AND WAIVE MR. HAM'S CLAIM

14   THAT QUALCOMM HAS WAIVED ITS RIGHTS UNDER OUR EXISTING SUPPLY

15   AGREEMENT," AND LITTLE II, "WITHOUT PREJUDICE TO EITHER PARTY'S

16   POSITION IN THE PRESENT ARBITRATION, AGREE TO REPORT AND PAY

17   ROYALTIES ON ALL OF ITS SALES OF PAST AND FUTURE WCDMA UNITS."

18       NOW, THOSE WERE THE TWO DEMANDS YOU WERE MAKING OF, OR

19   REQUESTS -- THOSE WERE THE TWO REQUESTS YOU WERE MAKING OF LG

20   IN THIS LETTER; RIGHT?

21   A.   TWO REQUESTS, YES.

22   Q.   AND CONTINUING DOWN, YOU STATE, "OTHERWISE, QUALCOMM IS

23   LEFT WITH NO CHOICE BUT TO TAKE THE FOLLOWING" TWO STEPS, OR

24   "THE FOLLOWING STEP," AND LET'S LOOK AT THE FIRST TWO.

25       FIRST, QUALCOMM WILL STOP ACCEPTING LGE PURCHASE ORDERS

1    FOR WCDMA ASICS; AND, 2, QUALCOMM WILL CEASE ALL SHIPMENTS OF

2    WCDMA ASICS TO LGE.

3         DO YOU SEE THOSE TWO PROVISIONS, SIR?

4    A.   I DO.

5    Q.   NOW, AFTER THIS COMMUNICATION, LG, IN FACT, RETRACTED AND

6    WAIVED THE CLAIM THAT IT HAD NO OBLIGATION TO PAY QUALCOMM

7    ROYALTIES ON WCDMA SUBSCRIBER UNITS; IS THAT RIGHT?

8    A.   I -- I KNOW THE ISSUE WAS RESOLVED.  I DON'T REMEMBER THE

9    EXACT DETAIL AND TIMING.

10   Q.   WELL, YOU CERTAINLY NEVER CUT OFF THEIR SUPPLY OF WCDMA

11   ASICS, DID YOU?

12   A.   THIS WAS ACTUALLY A SUPPLY OF 500 UNITS ON JUNE 30TH AND

13   6,000 UNITS.  IT WASN'T REALLY PRODUCTION QUANTITIES.  IT WAS

14   START-UP QUANTITIES OF WCDMA CHIPS.

15        THEY MIGHT HAVE BEEN DELAYED.  I'M NOT SURE WHEN THEY WERE

16   SHIPPED.

17   Q.   WELL, MY QUESTION, SIR, WAS YOU DID NOT CUT OFF -- YOU DID

18   NOT CEASE ALL SHIPMENTS OF WCDMA ASICS AS YOU TOLD THEM YOU

19   WOULD DO IN THIS LETTER; ISN'T THAT RIGHT?

20   A.   I -- AFTER MY FIRST LETTER, WE SAID WE COULD NOT SHIP THE

21   CHIPS, AND THEN AS FAR AS I KNOW, WE DIDN'T.

22        I'M NOT SURE NOW WHAT YOU'RE ASKING.

23   Q.   WELL, I'M ASKING YOU, SIR, DO YOU RECALL ONE WAY OR THE

24   OTHER, DID QUALCOMM CUT OFF LG'S SUPPLY OF WCDMA ASICS?

25   A.   WE DID NOT SHIP TO THEM THE CHIPS THAT WERE SPECIFIED

1    HERE, THE 500 AND THEN 6,000 CHIPS AS FAR AS I KNOW AT THIS

2    TIME.

3    Q.   SO ANYBODY WHO SAYS THAT QUALCOMM HAS NEVER CUT OFF CHIP

4    SHIPMENTS IS WRONG ACCORDING TO WHAT YOU JUST SAID; ISN'T THAT

5    RIGHT?

6    A.   THIS IS WCDMA CHIP SHIPMENTS, NOT CDMA CHIP SHIPMENTS, AND

7    IT WAS SMALL NUMBERS OF PARTS.

8         WE MAY HAVE CUT THEM OFF.  AGAIN, I DON'T KNOW.  I DON'T

9    RECALL THE DETAILS.

10   Q.   AND SOME WCDMA CHIPS AT THIS TIME WERE BACKWARDS

11   COMPATIBLE WITH 2G CDMA STANDARDS; RIGHT?

12   A.   THEY MIGHT HAVE BEEN DUAL CAPABILITY.

13   Q.   AND SO THAT MEANS, IF QUALCOMM CUT OFF THESE CHIPS LIKE

14   YOU JUST SAID, THEY CUT OFF 2G CDMA CHIPS TO LG IN THE CONTEXT

15   OF AN ARBITRATION DISPUTE IN 2004; RIGHT?

16   A.   I THINK YOU'RE CUTTING A VERY FINE POINT.

17        THE CHIPS FOR CDMA 2000 FOR LG CONTINUED TO BE SHIPPED

18   DURING THIS DISPUTE WITHOUT ANY INTERRUPTION.

19   Q.   OKAY, SIR.  I UNDERSTAND THAT.  AND I'M NOT ASKING --

20   A.   THESE WERE CHIPS THAT THEY WERE GOING TO BE USING IN

21   TESTING SOME PHONES, A VERY SMALL NUMBER, AND AS I SAY, I DON'T

22   KNOW IF THEY WERE CUT OFF OR NOT.

23        BUT THEIR CLAIM WAS THAT IF WE DID SHIP THEM, THEY WOULD

24   HAVE NO RESPONSIBILITY TO PAY ROYALTIES ON PHONES WITH OUR

25   CHIPS, THESE CHIPS OR FUTURE CHIPS.

1      Q.   AND YOU TESTIFIED THIS ARBITRATION WAS RESOLVED AT SOME

2      POINT; RIGHT?

3      A.   I BELIEVE IT WAS.

4      Q.   AND THERE WAS NO DETERMINATION BY THE ARBITRATOR ABOUT WHO

5      WAS RIGHT AND WHO WAS WRONG REGARDING WHETHER LG WAS REQUIRED

6      TO PAY ROYALTIES TO QUALCOMM ON WCDMA CHIPS; ISN'T THAT RIGHT?

7      A.   AT THIS TIME, I DON'T KNOW WHAT THE RESOLUTION WAS --

8      Q.   SO IF IT --

9      A.   -- OTHER THAN WE DID CONTINUE TO DO BUSINESS WITH LG.

10     Q.   OKAY.  AND SO IF YOU HAD NOT BEEN IN THE POSITION TO

11     THREATEN TO CUT OFF LG'S CHIP SUPPLY, YOU WOULD HAVE HAD TO

12     HAVE ALLOWED AN ARBITRATOR TO DETERMINE WHETHER OR NOT LG OWED

13     QUALCOMM ROYALTIES ON UNITS CONTAINING QUALCOMM'S CHIPS; RIGHT?

14     A.   WE DID NOT THREATEN ANYBODY WITH DOING ONE THING OR

15     ANOTHER.

16          WE DID NOTE THAT THEIR CLAIM WAS SOMETHING WE DID NOT

17     AGREE WITH AND, AS A RESULT OF THAT CLAIM, WE COULD NOT SHIP

18     THEM THOSE CHIPS.

19     Q.   SIR, WHEN -- I MEAN, I JUST WANT TO LOOK AT YOUR LANGUAGE

20     HERE.  YOU SAID, "WE DID NOT THREATEN ANYONE WITH ONE THING OR

21     ANOTHER."  RIGHT THERE YOU SAY "QUALCOMM IS LEFT WITH NO CHOICE

22     BUT TO TAKE THE FOLLOWING STEPS, UNLESS LG RETRACTS AND WAIVES

23     THE CLAIM THAT QUALCOMM IS NOT OWED ROYALTIES AND AGREES TO PAY

24     ROYALTIES."

25          IS THAT NOT A THREAT?

1    A.   AGAIN, IT WAS REMINDING THEM OF THE AGREEMENTS THAT THEY

2    HAD SIGNED WITH US AND THAT THEY SHOULD LIVE UP TO.

3    Q.   AND IF THEY DIDN'T LIVE UP TO THEM, QUALCOMM WAS GOING TO

4    CUT OFF THEIR CHIP SUPPLY RATHER THAN PURSUE ROYALTIES IN THE

5    ALREADY ONGOING ARBITRATION; ISN'T THAT RIGHT?

6    A.   THEY DIDN'T HAVE -- EXCUSE ME.  THEY DIDN'T HAVE A CHIP

7    SUPPLY ON WCDMA AT THAT POINT.  AGAIN, RECALL THAT THESE WERE

8    INITIAL QUANTITIES OF CHIPS THAT WERE BEING DISCUSSED.

9    Q.   WELL, THAT'S 6,000 UNITS OF THE MSM 6200 THAT WERE BEING

10   PLACED UNDER THE PURCHASE ORDER; RIGHT?

11   A.   THAT'S CORRECT.

12           MR. MATHESON:  OKAY.  NO FURTHER QUESTIONS.

13       THANK YOU VERY MUCH FOR YOUR TIME, SIR.

14           THE WITNESS:  THANK YOU.

15           THE COURT:  OKAY.  3:03.

16           MR. VAN NEST:  NO QUESTIONS, YOUR HONOR.

17           THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

18   AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

19           MR. MATHESON:  NOT SUBJECT TO RECALL, YOUR HONOR.

20           MR. VAN NEST:  NOT SUBJECT TO RECALL.

21           THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

22   TESTIMONY AND YOU'RE FREE TO LEAVE.

23           THE WITNESS:  THANK YOU.

24           THE COURT:  ALL RIGHT.  WE'LL GO TO 3:30 AND THEN

25   TAKE ANOTHER TEN MINUTE BREAK AT THAT TIME.

```
1              I ASSUME YOU HAVE VIDEOS TO SHOW.  IS THAT CORRECT?

2                   MR. BAKER:  THAT'S RIGHT, YOUR HONOR.

3                   THE COURT:  ALL RIGHT.  ARE ANY OF THEM SEALED, OR

4    NOT?

5                   MR. BAKER:  NO, YOUR HONOR.

6                   THE COURT:  THEY'RE NOT.  OKAY.  SO THOSE WILL ALL

7    REMAIN OPEN.

8           (PAUSE IN PROCEEDINGS.)

9                   THE COURT:  OKAY.  ALL RIGHT.  GIVE ME JUST A MOMENT,

10   PLEASE.

11        OKAY.  SO DO WE HAVE MONICA YANG?

12                  MR. BAKER:  THAT'S RIGHT.  THE FTC CALLS MONICA YANG

13   BY VIDEO DEPOSITION.

14                  THE COURT:  OKAY.  AND WHAT'S THE -- I MEAN, I'M

15   GOING TO CHARGE THE TIME, BUT WHAT'S THE TIME ALLOCATIONS?

16                  MR. BAKER:  IT'S APPROXIMATELY SEVEN MINUTES, AND I

17   BELIEVE ONE MINUTE OF THAT IS COUNTER-DESIGNATIONS FROM

18   QUALCOMM.

19                  THE COURT:  OKAY.  SO GIVE ME JUST ONE MINUTE,

20   PLEASE.

21          (PAUSE IN PROCEEDINGS.)

22                  THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

23                  MR. BAKER:  THE FTC WOULD LIKE TO ADMIT JX 0053.

24                  THE COURT:  OKAY, WAIT.  I'M SORRY.  I'VE GOT TO

25   CHARGE YOU TIME.
```

1      3:05.  GO AHEAD, PLEASE.

2          MR. BAKER:  THE FTC WOULD LIKE TO MOVE TO ADMIT

3   JX 0053.  IT IS SEALED IN PART.  WE DO NOT INTEND TO SHOW IT

4   DURING THE PLAYING OF THE VIDEO.

5          THE COURT:  THAT'S FINE.

6          MR. BORNSTEIN:  NO OBJECTION TO A JX, YOUR HONOR.

7          THE COURT:  IS THAT THE ONLY EXHIBIT?

8          MR. BAKER:  THAT'S THE ONLY ONE.

9          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

10         (JOINT EXHIBIT 0053 WAS ADMITTED IN EVIDENCE.)

11         THE COURT:  GO AHEAD, PLEASE.

12         **(THE VIDEOTAPED DEPOSITION OF MONICA YANG WAS PLAYED IN**

13   **OPEN COURT OFF THE RECORD.)**

14         THE COURT:  OKAY.  TIME IS 3:13.

15      NOW, IS THIS WITNESS EXCUSED SUBJECT TO RECALL OR NOT

16   SUBJECT TO RECALL?

17         MR. BAKER:  NOT SUBJECT TO RECALL, YOUR HONOR.

18         THE COURT:  DO YOU AGREE WITH THAT?

19         MR. BORNSTEIN:  MS. YANG IS IN TAIWAN, SO YES.

20         THE COURT:  OKAY.  SHE IS DONE.

21      WHO IS YOUR -- WHO IS YOUR NEXT WITNESS?

22         MR. CARSON:  THE FTC WILL PLAY THE DEPOSITION OF

23   FORMER QUALCOMM EMPLOYEE MARV BLECKER, YOUR HONOR.

24         THE COURT:  OKAY.  JUST GIVE ME ONE MINUTE TO UPDATE

25   MY NOTES, PLEASE.

```
1              AND HOW LONG IS THIS ONE?

2                   MR. CARSON:  IT'S APPROXIMATELY 11 MINUTES.

3                   THE COURT:  OKAY.  AND WHAT'S THE BREAKDOWN?

4                   MR. CARSON:  ALL FTC AND NO QUALCOMM.

5                   THE COURT:  OKAY.  ALL RIGHT.  ARE YOU GOING TO SEEK

6       TO ADMIT ANY EXHIBITS?

7                   MR. CARSON:  YES, YOUR HONOR, THREE EXHIBITS.

8                   THE COURT:  OKAY.  THEN GO AHEAD.  IT'S 3:14.

9                   MR. CARSON:  THE FTC SEEKS TO ADMIT CX 8260, WHICH IS

10      SEALED IN PART AND WE'LL COVER THE SCREEN WHEN IT'S SHOWN ON

11      THE SCREEN.

12                  THE COURT:  OKAY.

13                  MR. CARSON:  CX 8285, AND CX 8286.

14                  THE COURT:  ALL RIGHT.

15          ANY OBJECTION?

16                  MR. PETERSON:  JORDAN PETERSON ON BEHALF OF QUALCOMM.

17          WE HAVE NO OBJECTION SUBJECT TO PUTTING ON THE RECORD ONE

18      CLARIFICATION THAT THE PARTIES REACHED DURING THE HPO PROCESS.

19                  THE COURT:  WHAT IS THAT?

20                  MR. PETERSON:  THAT IS THAT CX 8260, WHICH CONTAINS

21      STATEMENTS --

22                  THE COURT:  OKAY.  I'M GOING TO CHARGE YOU YOUR TIME.

23                  MR. PETERSON:  CX 8260, WHICH INCLUDES STATEMENTS BY

24      MR. JEFF WILLIAMS, THOSE STATEMENTS WILL NOT BE ADMITTED FOR

25      THE TRUTH OF THE MATTER.
```

```
 1              MR. CARSON:  THAT'S CORRECT, YOUR HONOR, WE AGREE.

 2              MR. PETERSON:  SUBJECT TO THAT LIMITATION, NO OTHER

 3    OBJECTIONS.

 4              THE COURT:  IS THAT AN E-MAIL?

 5              MR. CARSON:  IT IS, YOUR HONOR.

 6              THE COURT:  OKAY.  SO FOR JEFF WILLIAMS, NOT FOR THE

 7    TRUTH ASSERTED.

 8              MR. CARSON:  YES.  BUT THE REST I BELIEVE IS A PARTY

 9    ADMISSION, SO THE REST OF THE E-MAIL WOULD COME INTO EVIDENCE

10    FOR THE TRUTH.

11              THE COURT:  OKAY.  THOSE ARE ADMITTED.

12         (PLAINTIFF'S EXHIBITS CX 8260, 8285 AND 8286 WERE ADMITTED

13    IN EVIDENCE.)

14              MR. CARSON:  THANK YOU, YOUR HONOR.

15              THE COURT:  GO AHEAD, PLEASE.  TIME IS 3:15.

16         (THE VIDEOTAPED DEPOSITION OF MARVIN BLECKER WAS PLAYED IN

17    OPEN COURT OFF THE RECORD.)

18              THE COURT:  OKAY.  TIME IS 3:26.

19    WHO DO YOU HAVE NEXT?

20              MS. MILICI:  YOUR HONOR, THE FTC RESTS ITS

21    CASE-IN-CHIEF.

22              THE COURT:  OH, YOU DO.  OKAY.

23         ALL RIGHT.  WE CAN TAKE -- IT'S 3:26.  WE CAN TAKE OUR TEN

24    MINUTE BREAK NOW IF YOU PREFER OR WE COULD GET STARTED A LITTLE

25    BIT.  WHAT'S YOUR PREFERENCE?
```

1      MR. VAN NEST:  THAT'S FINE.  IT'S WHATEVER THE COURT

2  PREFERS.  WE'LL BRING THE WITNESS IN -- TAKE A BREAK AND WE'LL

3  START AFTER THE BREAK.  THAT'S FINE.

4      THE COURT:  OKAY.  THAT'S FINE.  LET'S TAKE A TEN

5  MINUTE BREAK THEN.  WE'LL GO UNTIL 4:30.

6      OKAY.  THANK YOU.

7      OH, I'M SORRY, I FORGOT.  IS MARV BLECKER SUBJECT TO

8  RECALL?

9      MR. CARSON:  NOT FOR THE FTC, YOUR HONOR.

10      MR. EVEN:  NOT FOR QUALCOMM, YOUR HONOR.

11      THE COURT:  ALL RIGHT.  THANK YOU.

12  (RECESS FROM 3:27 P.M. UNTIL 3:40 P.M.)

13      THE COURT:  OKAY.  WELCOME BACK.  GOOD AFTERNOON.

14      ALL RIGHT.  PLEASE TAKE A SEAT.

15      SO PLEASE CALL YOUR FIRST WITNESS.

16      MR. VAN NEST:  OUR SECOND WITNESS, YOUR HONOR.

17      THE COURT:  OH, YOUR SECOND WITNESS, THAT'S RIGHT.

18  I'M SORRY.

19      FIRST WITNESS IN YOUR CASE OFFICIALLY.

20      MS. SESSIONS:  GOOD AFTERNOON, YOUR HONOR.

21  QUALCOMM CALLS DR. DURGA MALLADI.

22      THE CLERK:  PLEASE STAND.

23      THE WITNESS:  YES.

24      THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

25      **(DEFENDANT'S WITNESS, DURGA MALLADI, WAS SWORN.)**

1          THE WITNESS:  YES.

2          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

3          WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

4    NAME FOR THE RECORD.

5          THE WITNESS:  DURGA PRASAD, P-R-A-S-A-D, MALLADI.

6          THE COURT:  ALL RIGHT.  TIME IS 3:41.

7          GO AHEAD, PLEASE.

8          MS. SESSIONS:  THANK YOU, YOUR HONOR.

9          MAY I APPROACH WITH BINDERS?

10         THE COURT:  PLEASE.

11         AND CAN YOU SPELL YOUR LAST NAME FOR THE RECORD?

12         THE WITNESS:  MALLADI, M-A-L-L-A-D-I.

13         THE COURT:  THANK YOU.

14                      **DIRECT EXAMINATION**

15   BY MS. SESSIONS:

16   Q.   GOOD AFTERNOON.

17   A.   GOOD AFTERNOON.

18   Q.   PLEASE INTRODUCE YOURSELF.

19   A.   MY NAME IS DURGA MALLADI.  I'M AN EMPLOYEE AT QUALCOMM.

20   Q.   PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND.

21   A.   I HAVE A BACHELOR'S DEGREE FROM INDIAN INSTITUTE OF

22   TECHNOLOGY, MADRAS, THAT'S IN INDIA, M-A-D-R-A-S, IT'S A CITY

23   IN INDIA; I HAVE A MASTER'S AND PH.D. FROM UCLA; AND MY

24   DISSERTATION TOPIC WAS IN ADAPTIVE FILTERING TECHNIQUES.

25   Q.   HOW LONG HAVE YOU WORKED AT QUALCOMM?

MALLADI DIRECT BY MS. SESSIONS                                    1303

1    A.   JUST ABOUT 21 YEARS.

2    Q.   HOW DID YOU COME TO WORK AT QUALCOMM?

3    A.   BACK IN THE LATE '90S WHEN I WAS GRADUATING WIRELESS

4    RESEARCH, QUALCOMM WAS THE PLACE TO WORK AT THAT POINT IN TIME,

5    HIGHLY RECOMMENDED, AND THAT'S THE PLACE THAT I CHOSE.

6    Q.   WHAT IS YOUR CURRENT JOB TITLE?

7    A.   I'M A SENIOR VICE PRESIDENT AND GENERAL MANAGER OF 4G AND

8    5G IN QUALCOMM.

9    Q.   AND WHEN DID YOU TAKE THAT TITLE?

10   A.   JUST ABOUT SIX MONTHS BACK.

11   Q.   PRIOR TO TAKING THAT TITLE, WHAT WAS YOUR ROLE?

12   A.   I WAS THE SENIOR VICE PRESIDENT OF ENGINEERING AT

13   QUALCOMM, RESPONSIBLE FOR ALL OF OUR WIRELESS RESEARCH.  SO

14   THAT INCLUDES 4G, 5G, AND WI-FI TECHNOLOGIES.

15   Q.   AND FOR HOW LONG WERE YOU RESPONSIBLE FOR WIRELESS

16   RESEARCH AT QUALCOMM?

17   A.   I WAS RESPONSIBLE FOR THAT FOR A VERY LONG TIME.  I'VE

18   BEEN IN WIRELESS RESEARCH SINCE 2001, AND OVER THE COURSE OF

19   TIME I HAVE TAKEN MORE LEADERSHIP POSITIONS.

20   Q.   HAVE YOU PARTICIPATED IN WORK RELATED TO STANDARDS

21   SETTING?

22   A.   YES, I HAVE.

23   Q.   WHAT IS THAT WORK?

24   A.   FOR A LONG TIME I PERSONALLY USED TO ATTEND STANDARDS

25   MEETINGS, IN ADDITION TO DOING ALL THE DESIGN AND RESEARCH

1    ACTIVITIES.

2         AND AFTER 2007 OR SO, I STARTED NOT ATTENDING STANDARDS

3    MEETINGS, BUT MY TEAMS WERE GOING TO STANDARDS MEETINGS.

4         SO I WOULD BE RESPONSIBLE IN TERMS OF WHAT GOES INTO THE

5    MEETINGS, WHAT ARE THE INPUT THAT WE NEED TO PROVIDE, AND THEN

6    DEBRIEFING AFTER THE MEETINGS.

7    Q.   SO AS A PART OF YOUR WORK, DID YOU RECEIVE REPORTS FROM

8    THE STANDARDS MEETINGS?

9    A.   YES, I DID.

10   Q.   AS OF MARCH 2018, DID YOU HAVE ANY PATENTS?

11   A.   YES, I DID.

12   Q.   HOW MANY?

13   A.   CLOSE TO ABOUT 400 PATENTS.

14   Q.   IS THAT U.S. PATENTS?

15   A.   THESE ARE ALL U.S. PATENTS.

16   Q.   AND WHAT PROPORTION OF THOSE PATENTS BELONGED TO QUALCOMM?

17   A.   ALL OF THEM.

18   Q.   DR. MALLADI, COULD YOU BRIEFLY TELL THE COURT ABOUT

19   QUALCOMM'S APPROACH TO WIRELESS RESEARCH?

20   A.   SURE.  SO WIRELESS RESEARCH, WHEN YOU THINK ABOUT THE

21   OVERALL COMMUNICATION SYSTEM, IN QUALCOMM WE HAVE A DIVISION,

22   CORPORATE RESEARCH AND DEVELOPMENT, THIS IS ONE OF THE

23   DIVISIONS INSIDE QUALCOMM.

24        WE LOOK AT -- WE ARE INTERESTED IN MOVING THE NEEDLE QUITE

25   SIGNIFICANTLY WHEN IT COMES TO A LOT OF THE COMMUNICATION

1    PROBLEMS THAT WE WANT TO SOLVE.

2         SO WE LOOK AT IT FROM AN END-TO-END SYSTEMS PERSPECTIVE,

3    AND LET ME JUST BRIEFLY EXPLAIN WHAT THAT MEANS.

4         TYPICALLY WHEN WE THINK OF WIRELESS COMMUNICATIONS, WE

5    HAVE OUR CELL PHONES WITH US AND WE HAPPEN TO COMMUNICATE WITH

6    IT, WHETHER IT'S A FILE DOWNLOAD TODAY OR WATCHING A VIDEO OR

7    WE ARE TALKING TO SOMEONE.

8         BUT THE COMMUNICATION SYSTEM CONSISTS OF NOT JUST THE

9    DEVICE, BUT IN ADDITION TO THE DEVICE, THERE IS -- THERE ARE

10   BASE STATIONS, TYPICALLY THEY ARE PUT ON TOP OF CELL TOWERS --

11   FOR THE PURPOSE OF THIS CONVERSATION, WE JUST CALL THEM AS CELL

12   TOWERS -- AND THEN THESE IN TURN COMMUNICATE WITH WHAT IS KNOWN

13   AS A CORE NETWORK.  THAT'S THE NETWORK THAT EVENTUALLY

14   INTERFACES WITH THE REST OF THE INTERNET.

15        SO YOU HAVE MULTIPLE ELEMENTS OF AN OVERALL WIRELESS

16   COMMUNICATION SYSTEM, AND THAT'S WHAT WE MEAN BY AN END-TO-END

17   SYSTEM DESIGN.  THAT'S WHAT OUR R&D WORK ENTAILS.

18        AND SO WHENEVER WE TAKE A LOOK AT A SPECIFIC PROBLEM, WE

19   LOOK AT ALL THE SOLUTIONS THAT ARE NECESSARY IN EACH OF THESE

20   DIFFERENT ELEMENTS.

21   Q.   IS THERE A TARGET TIMEFRAME FOR QUALCOMM'S WIRELESS

22   RESEARCH?

23   A.   THERE'S NO SPECIFIC TIMEFRAME.  WE ARE INTERESTED IN

24   LONG-TERM PROBLEMS AND THERE IS NO SPECIFIC TIMEFRAME

25   ASSOCIATED WITH THAT.

1           THERE ARE PROBLEMS THAT WE WORKED ON FOR CLOSE TO A DECADE

2     SOMETIMES, AND SOMETIMES THERE ARE PROBLEMS THAT ARE PROBABLY

3     MAYBE THREE TO FIVE YEARS TIME HORIZON FROM THE TIME WE STARTED

4     WORKING ON IT TO THE TIME THAT THEY BECAME COMMERCIAL.

5           THERE'S NO FIXED TIMEFRAME, BUT IT'S CERTAINLY NOT WHAT I

6     WOULD CLASSIFY AS SHORT-TERM.

7     Q.    DOES QUALCOMM'S CORPORATE WIRELESS RESEARCH FOCUS ON MODEM

8     CHIPS?

9     A.    WE DO, BUT IT'S A SMALL PART OF THE ENTIRE SYSTEM DESIGN.

10    AS I EXPLAINED BEFORE, THERE ARE LOTS OF ELEMENTS IN THE WHOLE

11    SYSTEM AND, THEREFORE, WE WORK ON ALL THE PROTOCOLS AND SO ON.

12          BUT, YES, WE DO WORK ON THAT AS WELL.

13    Q.    WHAT HAPPENS AFTER SOMEONE COMES UP WITH A PROMISING IDEA

14    IN WIRELESS RESEARCH?

15    A.    OKAY.  SO USUALLY INSIDE OUR R&D ORGANIZATION, IT'S NOT

16    LIKE ONE SINGLE IDEA.  WE HAVE A PROBLEM STATEMENT, SOMETHING

17    THAT NEEDS TO BE SOLVED.  AND IT'S NOT ONE SINGLE IDEA, BUT

18    SEVERAL IDEAS COME IN.

19          AND THEN THERE IS AN EXTENSIVE VETTING PROCESS AT THAT

20    POINT IN TIME.  WE GO THROUGH IT, LOTS OF ANALYSIS, LOTS OF

21    DEBATES ON WHAT IS THE RIGHT WAY OF SOLVING THE PROBLEM.

22          EVENTUALLY WE REACH A POINT IN TIME WHEN WE THINK, OKAY,

23    WE THINK WE KNOW WHAT NEEDS TO BE DONE, BACKED UP BY ANALYSIS

24    AND SIMULATIONS, THE IDEA SEEMS TO HAVE MERIT AT THAT POINT IN

25    TIME.

MALLADI DIRECT BY MS. SESSIONS                                    1307

1          AND THAT'S THE POINT THAT WE DECIDE, OKAY, LOOK, THIS IS

2     SOMETHING THAT'S STILL ON PAPER, WE HAVE TO PROVE IT TO

3     OURSELVES.  WE HAVE TO PROVE IT BY BUILDING EQUIPMENT TOWARDS

4     IT.

5          AND THAT'S WHEN WE BEGIN WHAT IS KNOWN AS A PROTOTYPING

6     ACTIVITY.  THAT'S THE FIRST TIME WE ARE TRYING TO BUILD UP AN

7     ENTIRE SYSTEM TO PROVE UP THE CONCEPT FOR OURSELVES FIRST

8     BEFORE WE START AWARDING IT TO OTHERS.

9     Q.   MR. DAHM, COULD WE HAVE DEMONSTRATIVE 1 UP ON THE SCREEN,

10    PLEASE.

11         AND, DR. MALLADI, IT'S ALSO IN YOUR BINDER IF YOU NEED TO

12    LOOK AT IT.

13    A.   SURE.

14    Q.   AND THIS IS ACTUALLY PAGE 2 OF THE DEMONSTRATIVES.

15         THANK YOU, MR. DAHM.

16         DR. MALLADI, DO YOU RECOGNIZE WHAT'S BEING SHOWN IN THE

17    PHOTOS HERE?

18    A.   YES.

19    Q.   AND COULD YOU EXPLAIN TO THE COURT WHAT THESE PHOTOS ARE?

20    A.   SO OUTSIDE OF OUR R&D BUILDING, WE HAVE A CONCRETE PLAQUE

21    THAT WAS VERY RECENTLY INSTALLED, AND THIS IS WHAT IS -- THESE

22    TWO PICTURES ARE FROM THAT CONCRETE PLAQUE.

23         KLEIN WAS ONE OF OUR FOUNDERS, ALONG WITH OTHERS, FROM THE

24    MID-'80S, AND HE HAD A STATEMENT.  HE WAS PRETTY PRACTICAL, A

25    STRAIGHT SHOOTER WHEN IT CAME TO IT, AND HE SAID "IF IT'S NOT

```
1    TESTED, IT DOESN'T WORK."  YOU CAN TALK ABOUT IT ALL YOU WANT,

2    YOU CAN SIMULATE AND ANALYZE IT.

3         BUT THAT'S WHAT IT MEANS.

4    Q.   AND HOW, IF AT ALL, DOES THIS PHILOSOPHY FACTOR INTO

5    QUALCOMM'S RESEARCH AND DEVELOPMENT EFFORTS?

6    A.   THIS SPECIFIC STATEMENT IS INGRAINED INTO EVERY SINGLE R&D

7    ENGINEER.  I WENT THROUGH IT WHEN I JOINED QUALCOMM.  AND WHEN

8    IT WAS MY TURN, I STARTED EDUCATING PEOPLE, THIS IS HOW WE DO

9    THINGS HERE.  WE HAVE TO BUILD IT, WE HAVE TO TEST IT, AND ONLY

10   THEN WE CAN PROVE, OR NOT, THE VARIABLES.

11   Q.   AFTER YOU GO THROUGH THE TESTING PROCESS, WHAT HAPPENS

12   AFTER THAT?

13   A.   SO THERE COMES A POINT IN TIME WHEN WE THINK THAT THIS

14   IDEA INDEED HAS MERIT, WE HAVE GONE THROUGH THE VALIDATION OF

15   IT IN THE FIELD, AS IN WE NOW HAVE A PRETTY GOOD SENSE THAT

16   THIS WILL WORK EVENTUALLY IN THE COMMERCIAL DOMAIN.

17        THAT'S THE POINT IN TIME WHEN WE START TALKING ABOUT IT

18   EXTERNALLY AS WELL, ESPECIALLY IF THE IDEA IS REALLY BIG.

19        WE WORK WITH A LOT OF OUR PARTNERS IN THE OVERALL WIRELESS

20   ECOSYSTEM.  SOME OF THEM ARE EVENTUALLY CUSTOMERS, LIKE

21   WIRELESS OPERATORS.  THINK OF VERIZON OR T-MOBILE OR AT&T JUST

22   TO GIVE SOME EXAMPLES.

23        OF COURSE, THESE ARE GLOBAL OPERATORS THAT WE TALK TO, SO

24   IT'S AROUND THE WORLD.

25        OUR PARTNERS INCLUDE INFRASTRUCTURE VENDORS, THE LIKES OF
```

1    ERICSSON AND NOKIA AND OTHERS; DEVICE MANUFACTURERS, PHONE

2    MANUFACTURERS, BUT NOT JUST PHONES, ALL SORTS OF DEVICES;

3    REGULATORS, WE WORK VERY CLOSELY WITH GOVERNMENT REGULATORS.

4    THESE ARE USUALLY THE LIKES OF FCC IS ONE EXAMPLE.  THERE ARE

5    SEVERAL OTHER EXAMPLES OF THOSE ACROSS THE WORLD.

6         AND WHAT HAVE YOU.  SO THESE ARE, LIKE, JUST A -- AND IN

7    ADDITION TO THAT, ANALYSTS AND THE MEDIA WHO MIGHT BE CURIOUS

8    TO SEE, OKAY, HOW DOES THIS REALLY WORK?  THIS SEEMS LIKE

9    SOMETHING INTERESTING, HOW DOES IT WORK?

10   Q.   COULD WE PLEASE HAVE DEMONSTRATIVE 7 UP.

11        DR. MALLADI, DO YOU RECOGNIZE THE PHOTOGRAPHS HERE IN

12   DEMONSTRATIVE NUMBER 7?

13   A.   YES, I DO.

14   Q.   AND WHAT DO THESE PHOTOGRAPHS SHOW?

15   A.   SO THESE TWO PICTURES WERE TAKEN AT A TRADE SHOW, IT'S A

16   PREMIER TRADE SHOW THAT'S HELD IN EUROPE, IT'S CALLED MOBILE

17   WORLD CONGRESS, IT'S HELD ANNUALLY IN BARCELONA.

18        ON THE LEFT-HAND SIDE, MY LEFT-HAND SIDE, YOU SEE A

19   PICTURE IN WHICH WE ARE SHOWCASING A SPECIFIC TECHNOLOGY TO ONE

20   OF THE REGULATORS.  ACTUALLY, THIS IS ONE OF THE CHAIRMEN FROM

21   THE FCC, IF I REMEMBER, ONE OF THE COMMISSIONERS, ACTUALLY, OF

22   FCC.

23        AND ON THE RIGHT-HAND SIDE, THERE'S A PICTURE THAT DEPICTS

24   WHAT'S COMING UP NOW, IT'S GOING TO BE COMMERCIALLY DEPLOYED

25   THIS YEAR, BUT 5G TECHNOLOGY.

MALLADI DIRECT BY MS. SESSIONS

1    BUT THERE WERE A LOT OF QUESTIONS IN TERMS OF 5G

2    MILLIMETER WAVE, DOES IT EVEN WORK?  AND CAN IT WORK IN A

3    DENSE, URBAN AREA?

4    AND WE SAID, OKAY, WELL, WE'RE GOING TO PROVE A LOT OF THE

5    ANALYSIS IN THE CITY OF SAN FRANCISCO, AND THAT'S EXACTLY WHAT

6    THAT IS.  IT SHOWCASES ALL THE BENEFITS OF 5G MOBILE BROADBAND.

7    Q.  DOES QUALCOMM ATTEMPT TO HAVE ITS IDEAS INCORPORATED INTO

8    STANDARDS?

9    A.  YES.

10   Q.  ARE ALL OF QUALCOMM'S IDEAS INCORPORATED INTO STANDARDS?

11   A.  NOT NECESSARILY.  A LARGE FRACTION OF THEM DO END UP BEING

12   STANDARDIZED, BUT SOME OF THEM DON'T NECESSARILY HAVE TO GO

13   THROUGH ANY STANDARDIZATION PROCESS.  THIS IS JUST IMPROVEMENT

14   IN TECHNOLOGY ITSELF, BUT IT DOESN'T HAVE TO BE STANDARDIZED.

15   Q.  DOES QUALCOMM'S APPROACH TO RESEARCH AND DEVELOPMENT

16   DIFFER FROM OTHER COMPANIES THAT PARTICIPATE IN THE STANDARDS

17   PROCESSES?

18   A.  SO I'LL GIVE YOU MY PERSPECTIVE ON THINGS, AND, YOU KNOW,

19   JUST BEING IN THE STANDARDIZATION PROCESS FOR SUCH A LONG TIME,

20   I HAVE A CERTAIN VIEW.

21   I MENTIONED EARLIER THAT WE GO THROUGH A FULL-BLOWN

22   END-TO-END SYSTEM DESIGN, AND WHAT THAT MEANS IS THAT WE, WE

23   KNOW WHAT THE END GOAL IS.  WE KNOW WHAT THE SOLUTION -- WHAT

24   THE PROBLEM IS, WHAT ARE WE REALLY TRYING TO SOLVE?

25   AND WE HAVE A CONSISTENT AND COHERENT PICTURE OF

1    EVERYTHING, OF THIS IS THE SOLUTION THAT NEEDS TO BE ADOPTED IN

2    THIS ELEMENT IN THE NETWORK, AND SO ON.

3         IN STANDARDIZATION PROCESS, USUALLY WHAT HAPPENS IS THAT

4    THERE ARE DIFFERENT WORKING GROUPS AND IN EACH OF THESE WORKING

5    GROUPS THERE ARE DOMAIN EXPERTS THAT GO IN.

6         AND QUITE OFTEN, IN FACT, MORE OFTEN THAN NOT, WE SEE A

7    VERY PIECEMEAL WAY OF SOLVING THIS PROBLEM FROM OTHERS.

8         NOW, THIS IS MY PERSPECTIVE, BUT THIS IS WHAT I'VE SEEN.

9         AND THAT'S NOT A VERY COHERENT OR A CONSISTENT PICTURE.

10   WHEN YOU ASK QUESTIONS LIKE, OKAY, WHERE ARE YOU GOING WITH

11   THIS?  I KNOW YOU ARE TRYING TO SOLVE THIS PROBLEM HERE, BUT I

12   DON'T QUITE UNDERSTAND, BECAUSE YOU DO REALIZE IT CREATES A

13   PROBLEM ELSEWHERE?  IT MIGHT SOLVE THE PROBLEM HERE.

14        SO IN THAT SENSE, I WOULD SAY THAT OUR APPROACH TO IT IS

15   QUITE UNIQUE.  WE MIGHT NOT BE THE ONLY ONES, BUT IT'S

16   RATHER -- IT'S VERY FEW, IT'S QUITE RARE, ACTUALLY, TO SEE THAT

17   SORT OF AN END-TO-END SYSTEMS APPROACH TO SOLVING PROBLEMS.

18   Q.   IS QUALCOMM A LEADER IN THE STANDARDS BODIES?

19             MR. HOPKIN:  OBJECTION, YOUR HONOR.

20             THE WITNESS:  MY PERSPECTIVE, YES.

21             MR. HOPKIN:  NATE HOPKIN.

22        THIS QUESTION CALLS FOR EXPERT TESTIMONY AND DR. MALLADI

23   HAS NOT BEEN QUALIFIED AS AN EXPERT IN THIS CASE.

24             MS. SESSIONS:  YOUR HONOR, DR. MALLADI IS TESTIFYING

25   BASED ON HIS PERSONAL EXPERIENCE AND THE KNOWLEDGE THAT HE HAS

 1    GAINED DURING HIS YEARS WORKING AT QUALCOMM, AND SO HE'S GOING

 2    TO SPEAK BASED ON HIS PERSONAL KNOWLEDGE OF WHAT HAPPENS IN THE

 3    STANDARDS BODIES BASED ON HIS WORK.

 4         AND I BELIEVE THIS FALLS WITHIN YOUR HONOR'S RULING ON THE

 5    MOTION IN LIMINE CONCERNING LAY EXPERT -- LAY TESTIMONY ON

 6    TECHNICAL MATTERS.

 7              THE COURT:  SO LET ME UNDERSTAND MR. HOPKIN'S

 8    OBJECTION.  IS IT JUST TO THAT QUESTION, OR IS IT INTO -- AN

 9    OBJECTION AS TO ANY TESTIMONY ABOUT QUALCOMM'S PARTICIPATION IN

10    THE STANDARDS BODY?

11         I'M NOT SURE WHAT YOU'RE OBJECTING TO.

12              MR. HOPKIN:  YOUR HONOR, THE OBJECTION IS TO THE

13    QUESTION ABOUT -- ELICITING TESTIMONY REGARDING WHETHER

14    QUALCOMM IS A LEADING CONTRIBUTOR TO STANDARDS BODIES OR

15    TECHNOLOGIES.

16              THE COURT:  ALL RIGHT.  IF THAT'S THE OBJECTION, I'M

17    GOING TO OVERRULE IT.

18         AND YOU MAY ANSWER THE QUESTION.

19              MR. HOPKIN:  THANK YOU, YOUR HONOR.

20              THE WITNESS:  OKAY.  SO THE QUESTION WAS, DO I

21    CONSIDER QUALCOMM AS A LEADER IN STANDARDS?

22         MY ANSWER IS YES, I CONSIDER QUALCOMM AS A LEADER IN

23    STANDARDS.

24    BY MS. SESSIONS:

25    Q.   WHY IS THAT?

1     A.   AS I MENTIONED BEFORE, THIS SORT OF AN END-TO-END

2     SOLUTION, END-TO-END SYSTEM PERSPECTIVE IS SOMETHING THAT I

3     CONSIDER THAT, AND I'M QUITE PROUD OF THE FACT THAT WE BRING

4     THOSE SORTS OF SOLUTIONS INTO THE STANDARDS PICTURE.

5          AND WE -- THAT'S PRETTY MUCH WHAT I CAN SAY.  I MEAN,

6     THERE'S A LOT MORE TO THIS FROM A LEADERSHIP STANDPOINT, BUT

7     THAT'S ONE WAY OF PUTTING IT.

8     Q.   ARE THE STANDARDS A CONSENSUS-BASED PROCESS?

9     A.   YES, IT IS A CONSENSUS-BASED PROCESS.

10    Q.   DOES QUALCOMM ATTEMPT TO PATENT THE IDEAS THAT COME OUT OF

11    WIRELESS RESEARCH?

12    A.   YES, WE DO.

13    Q.   DR. MALLADI, COULD YOU PLEASE TURN TO THE FIRST PAGE,

14    FIRST TAB IN YOUR BINDER, WHICH HAS A DOCUMENT LABELED QX 9302.

15    A.   YEAH.

16    Q.   OKAY.  TURNING TO THE ATTACHMENT, DO YOU RECOGNIZE THIS

17    DOCUMENT?

18    A.   YES, I DO.

19    Q.   WHAT IS IT?

20    A.   THIS IS A DOCUMENT FROM JUST ABOUT TEN YEARS BACK.  IT'S

21    FROM 2009.  IT'S A SYSTEMS PLANNING DOCUMENT FOR A SPECIFIC

22    PROJECT INSIDE OUR R&D ORGANIZATION.  THE PROJECT NAME WAS

23    ESPRESSO.

24    Q.   WHAT WAS THE ESPRESSO PROJECT?

25    A.   ESPRESSO PROJECT WAS THE PROJECT RESPONSIBLE FOR THE 4G

1    AND 4G ADVANCED RESEARCH AND DEVELOPMENT.

2    Q.   WHEN DID PROJECT ESPRESSO START?

3    A.   THE SPECIFIC NAME ESPRESSO WAS DENOTED SOMETIME AROUND

4    2006.  THE ACTUAL WORK ON 4G BEGAN A LONG TIME BEFORE THAT.

5    Q.   WHAT WAS YOUR ROLE IN PROJECT ESPRESSO?

6    A.   I STARTED OFF AS THE SYSTEMS LEAD FOR THAT PROJECT, AND

7    THEN IN A SHORT COURSE OF TIME I BECAME THE OVERALL HEAD OF THE

8    ESPRESSO PROJECT.

9    Q.   DID QUALCOMM HAVE REGULAR STATUS OR PLANNING MEETINGS FOR

10   THE ESPRESSO PROJECT?

11   A.   YES, WE DID.

12   Q.   AND DID THIS POWERPOINT ACCURATELY REFLECT THE STATUS OF

13   THE ESPRESSO PROJECT AT THE TIME THAT IT WAS MADE?

14   A.   YES, IT DID.

15   Q.   DID THIS POWERPOINT COME FROM QUALCOMM'S FILES?

16   A.   YES.

17   Q.   AND DID THE AUTHORS OF THIS POWERPOINT KNOW OF THE STATUS

18   OF THE ESPRESSO PROJECT?

19   A.   YES.

20        MS. SESSIONS:  YOUR HONOR, I'D OFFER QX 9302 INTO

21   EVIDENCE, PLEASE.

22        MR. HOPKIN:  NO OBJECTION.

23        THE COURT:  IT'S ADMITTED.

24   (DEFENDANT'S EXHIBIT QX 9302 WAS ADMITTED IN EVIDENCE.)

25        THE COURT:  GO AHEAD, PLEASE.

1    BY MS. SESSIONS:

2    Q.   DR. MALLADI, PLEASE TURN TO PAGE 2 OF THE POWERPOINT.

3    A.   YES.

4    Q.   WHAT DOES THIS SLIDE SHOW?

5    A.   SO THIS SLIDE SHOWS THE OVERALL RESPONSIBILITIES FOR THE

6    ESPRESSO SYSTEMS TEAM, IN ADDITION TO THE DELIVERABLES TO

7    DIFFERENT STAKEHOLDERS INSIDE AND OUTSIDE OF QUALCOMM.

8    Q.   THE FIRST BULLET IS SYSTEM DESIGN.  WHAT DOES THAT MEAN?

9    A.   SYSTEM DESIGN IS WHAT I MENTIONED BRIEFLY EARLIER ABOUT

10   THE END-TO-END SYSTEM CONCEPT, ALL THE ELEMENTS, THE DEVICES,

11   THE BASE STATIONS, THE CORE NETWORK, ET CETERA.  SO THAT'S THE

12   END-TO-END SYSTEMS DESIGN.

13   Q.   AND THE SECOND BULLET IS PROTOTYPE.  WHAT DOES THAT MEAN?

14   A.   PROTOTYPING IS THE IDEA OF BUILDING EQUIPMENT TO PROVE

15   THAT IT WORKS, SO YOU'RE GOING BEYOND JUST SLIDEWARE AND

16   POWERPOINT.  YOU'RE GOING INTO ACTUAL EQUIPMENT THAT'S BEING

17   BUILT OUT.

18        SO IT'S NOT JUST THE SYSTEMS TEAM INVOLVED AT THAT POINT

19   IN TIME.  THERE'S A HARDWARE TEAM THAT BUILDS THE HARDWARE; THE

20   SOFTWARE TEAM THAT WRITES SOFTWARE ON TOP OF IT; THE

21   INTEGRATION AND TESTING THAT KIND OF PUT IT ALL TOGETHER,

22   INTEGRATE ALL THIS EQUIPMENT; AND WHAT IS KNOWN AS AN OTA TEAM,

23   AND THIS IS THE OVER THE AIR TEST TEAM.

24        THIS IS WIRELESS COMMUNICATIONS, SO IT IS DONE OVER THE

25   AIR, AND THAT'S THE TESTBED ACTIVITY.  SO THERE'S A TEAM

1    ASSOCIATED WITH THAT, TOO.

2    Q.   COULD WE PLEASE GO TO PAGE 8 OF THE POWERPOINT?

3    A.   YEAH.

4    Q.   DR. MALLADI, WHAT'S SHOWN ON PAGE 8?

5    A.   ON PAGE 8, BELIEVE IT OR NOT, THIS IS ACTUALLY WHAT ONE OF

6    OUR CELL PHONES WOULD LOOK LIKE BEFORE WE EVER SEE ANY

7    COMMERCIALIZATION.  THIS IS KNOWN AS A PROTOTYPE U.E.  U.E.

8    STANDS FOR USER EQUIPMENT.  SO IT'S NOTHING BUT THE -- IT'S

9    USER EQUIPMENT.

10        AND THIS IS SOMETHING THAT YOU SEE SQUARELY IN THE MIDDLE

11   THAT KIND OF LIKE A TOASTER OVEN, THAT BOX, THAT'S WHAT THAT

12   IS.

13        THE BASE STATION, WHAT WE USUALLY END UP PUTTING ON CELL

14   TOWERS OR SOMETHING BEHIND IT, THAT'S ALSO, IN FACT, EXACTLY

15   THE TOASTER OVEN IS ONE MORE ON TOP OF IT.

16        AND THERE'S A LOT OF OTHER EQUIPMENT THAT IS USED TO PUT

17   IT ALL TOGETHER, PROCESS IT, ET CETERA.

18        SO THIS IS OUR PROTOTYPE PLATFORM THAT WE USED.

19   Q.   DID IT HAVE A NAME?

20   A.   YES, IT DID.  WE CALLED IT A SLIMCAT PLATFORM.

21   Q.   COULD YOU PLEASE TURN TO PAGE 11 OF THE POWERPOINT?

22   A.   YEAH.

23   Q.   WHAT'S SHOWN ON PAGE 11?

24   A.   SO THIS IS -- SO WHEN WE DO A LOT OF TESTING, WE HAVE TO

25   PROVE THAT AS WE -- IF YOU JUST THINK ABOUT THE WAY WE USE OUR

1    PHONE, WE WALK AROUND, WE DRIVE AROUND WITH IT, WE EXPECT IT TO

2    WORK ALL THE TIME, WE DON'T WANT ANY DROPPED CALLS, WE WANT THE

3    VIDEO TO BE ALWAYS PICTURE PERFECT, NO GLITCHES, ET CETERA.

4         SO IN THAT SENSE, THIS IS A PLACE WHERE WE HAVE TO TEST IT

5    OUT THOROUGHLY, AND THIS IS A DRIVE ROUTE.  WE PUT THAT WHOLE

6    THING THAT YOU SAW BEFORE, THE USER EQUIPMENT AND SO ON, THAT

7    GETS PUT IN A VAN AND WE TAKE THE VAN AND WE DRIVE IT AROUND

8    AND WE HAVE -- THIS IS A MAP OF SORRENTO VALLEY IN SAN DIEGO.

9         THESE ARE SOME OF OUR BUILDINGS AND YOU SEE SOME NAMES

10   THERE.  IF YOU CAN SEE CAREFULLY, IT SAYS NWT AA.  THESE ARE

11   ALL OUR BUILDINGS, AND WE USUALLY PUT UP OUR BASE STATIONS ON

12   TOP OF THOSE, AND THEN WE DRIVE IT AROUND, BOTH ON REGULAR

13   STREETS AND OCCASIONALLY ON FREEWAYS.

14   Q.   COULD YOU PLEASE TURN TO PAGE 12?

15   A.   YEAH.

16   Q.   PAGE 12 MENTIONS VERIZON WIRELESS AND A LAB DEMO.  COULD

17   YOU EXPLAIN WHAT THAT WAS?

18   A.   YEAH.  SO THIS WAS BACK IN 2009 WHEN 4G -- THE VERY FIRST

19   RELEASE OF 4G STANDARDIZATIONS JUST WERE GETTING COMPLETE.  WE

20   HAD BUILT UP OUR OVERALL, YOU KNOW, TESTBED, THE ONES WITH BASE

21   STATIONS AND THE USER EQUIPMENT INSIDE A VAN.

22        AND VERIZON WAS INTERESTED IN DEPLOYING 4G, COMMERCIAL

23   DEPLOYMENTS, BUT THEY WANTED TO SEE IT WORK IN ACTION.  THEY

24   WANTED TO SEE, OKAY, CAN I ACTUALLY -- WE TAKE IT FOR GRANTED

25   TODAY, BUT BACK THEN IT WAS QUITE UNIQUE.

1          YOU WOULD SIT IN A VAN AND YOU HAD THIS GIGANTIC MONITOR

2     ON WHICH YOU'RE WATCHING VIDEO, OR YOU WANT TO MAKE SURE THAT

3     THERE'S NO GLITCHES ON IT WHATSOEVER.

4          AND THEY HADN'T SEEN ANYTHING OF THIS SORT.  SO THEY SAID,

5     HEY, WE WANT TO COME AND TAKE A LOOK.

6          WE SAY SAID, YEAH, SURE, COME ON IN.

7          AND THESE WERE A FEW MILESTONES THAT WE HAD ESTABLISHED

8     FOR VERIZON BACK THEN.  THIS WAS ABOUT A YEAR BEFORE THE ACTUAL

9     COMMERCIALIZATION BEGAN.

10    Q.   COULD YOU PLEASE TURN TO PAGE 26 OF THE POWERPOINT?

11    A.   YEAH.

12    Q.   THE HEADING HERE IS STANDARDS ATTENDANCE BY ESPRESSO

13    SYSTEMS.  DID ESPRESSO ENGINEERS GO TO STANDARDS MEETINGS?

14    A.   YES, THEY DID.

15    Q.   WAS THAT UNIQUE TO PROJECT ESPRESSO?

16    A.   NO.  MULTIPLE R&D PROJECTS HAD PEOPLE WHO WOULD ATTEND

17    STANDARDS MEETINGS.

18    Q.   COULD YOU PLEASE TURN BACK TO PAGE 14 OF THE POWERPOINT?

19    A.   YEAH.

20    Q.   PAGE 14 MENTIONS SOMETHING CALLED FRAPPUCCINO.  WHAT WAS

21    THAT?

22    A.   OKAY.  SO FRAPPUCCINO WAS A SUBPROJECT.  AN UMBRELLA

23    PROJECT WAS ESPRESSO, BUT FRAPPUCCINO WAS A SUB PROJECT WHICH

24    WE WANTED TO MAKE SURE THAT WHILE WE ARE GOING THROUGH IRONING

25    OUT ALL THE DETAILS OF 4G COMMERCIAL TECHNOLOGY, WE WANTED TO

1    MAKE SURE THAT WE HAVE A FAR MORE FORWARD-LOOKING DESIGN, AND

2    WHAT WE EVENTUALLY BECAME CALLED AS 4G ADVANCED.

3        THESE WERE A LARGE NUMBER OF THE TOPICS.  THIS IS A FEW OF

4    THE TOPICS THAT WE WERE WORKING ON AS A PART OF THAT PROJECT.

5        IT LASTED MAYBE JUST A FEW MONTHS AND THEN WE SUBSUMED IT

6    BOOK INTO ESPRESSO, INTO THE FORMER PROJECT.

7    Q.   ARE ANY OF THE RESEARCH AREAS FROM FRAPPUCCINO

8    PARTICULARLY RELEVANT TODAY?

9    A.   YES.  IN FACT, IF YOU -- I'M GOING TO JUST MAYBE SAY A FEW

10   TECHNICAL THINGS OVER HERE.

11       THE WORDS, IT SAYS ON SLIDE 14, PICO AND FEMTO.  THIS IS

12   WHAT WE CALL AS SMALL CELLS TODAY.  THESE ARE -- WHEN YOU THINK

13   OF -- MAYBE I SHOULD EXPLAIN WHAT A LARGE CELL IS.

14       A LARGE CELL IS SOMETHING THAT YOU ENVISION AS ON TOP OF A

15   BUILDING.  IT'S CALLED AS A MACRO CELL SITE.  IT'S KIND OF BIG

16   AND REASONABLY LARGE IN TERMS OF THE SIZE.

17       SMALL CELLS ARE REALLY, REALLY SMALL.  THINK OF MIGHT BE

18   WI-FI ACCESS POINTS.  IT'S JUST ABOUT THIS BIG OR SO

19   (INDICATING).

20       SO WE DID A LOT OF WORK BACK THEN TO SEE, HOW DO THESE 4G

21   SMALL CELLS, HOW CAN WE ACTUALLY DEPLOY THEM TO MAKE SURE THAT

22   WE GET REALLY HIGH DATA RATES IN THE HANDS OF USERS?

23       THIS WAS PRETTY NEW BACK THEN.  4G SMALL CELLS DIDN'T

24   EXIST.  THEY ARE MAINSTREAM TODAY, WE USE THEM ALL THE TIME,

25   BUT THEY DIDN'T EXIST BACK THEN.

1        AND SIMILARLY, THERE IS A LITTLE FURTHER, IF YOU TAKE A

2    LOOK AT -- I HAVE SLIDE 15 IN FRONT OF ME, PAGE 15.  ONE MORE

3    EXAMPLE OF THAT IS SOMETHING THAT'S IN A VERY ABBREVIATED

4    MANNER RECOGNIZED AS P2P.  IT ACTUALLY STANDS FOR PEER TO PEER.

5    AND THIS IS TWO DEVICES THAT ARE COMMUNICATING WITH EACH OTHER

6    WITH OR WITHOUT ANY NETWORK PRESENT AT ALL.  IT TOOK A LONG

7    TIME FOR THIS.  WE HAD TO SOLVE A LOT OF PROBLEMS TO GET TO

8    THIS POINT.

9        BUT TODAY, IF YOU TAKE A LOOK AROUND, WE TALK A LOT OF

10   CARS COMMUNICATING WITH EACH OTHER.  THIS IS FOR VEHICULAR

11   COMMUNICATIONS, TWO VEHICLES COMMUNICATING WITH EACH OTHER,

12   WHETHER IT'S CARS OR ANY OTHER VEHICLES.

13       SO THIS IS JUST A GLIMPSE OF SOME OF THE CUTTING EDGE WORK

14   THAT WAS GOING ON BACK THEN.

15   Q.   WHY WAS QUALCOMM STILL WORKING ON LTE IN 2009?

16   A.   SO THIS NEEDS A LITTLE BIT OF EXPLANATION IN TERMS OF HOW

17   ANY NEW GENERATION OF CELLULAR COMMUNICATION TECHNOLOGY IS

18   STANDARDIZED.

19       THERE'S NO SUCH THING AS A ONE AND DONE DEAL.  IT'S NOT

20   LIKE 4G WAS DONE OR LTE WAS DONE IN 2008 AND THAT'S PRETTY MUCH

21   IT.

22       EVERY 18 TO 24 MONTHS, GIVE OR TAKE, THERE'S USUALLY A NEW

23   RELEASE OF THE TECHNOLOGY, SO NEW FEATURES GET ADDED AND

24   WHETHER IT'S -- SOMETIMES THEY'RE BUG FIXES FROM A PREVIOUS

25   FEATURE, BUT NEW FEATURES KEEP GETTING ADDED.

1          2008 WAS THE VERY FIRST GENERATION OF LTE.  THERE ARE HAVE

2     BEEN SEVERAL RELEASES SINCE THEN.

3     Q.   WAS THAT TRUE OF 3G STANDARDS AS WELL?

4     A.   THAT IS TRUE OF 3G AS WELL.  FEWER RELEASES IN 3G, BUT

5     YEAH, IT STILL EXISTED.

6     Q.   DR. MALLADI, I'M GOING TO SHIFT GEARS A MINUTE AND TALK

7     ABOUT SOME SPECIFIC TECHNOLOGY AREAS.

8     A.   SURE.

9     Q.   HAS QUALCOMM DONE RESEARCH ON CARRIER AGGREGATION?

10    A.   YES, WE HAVE.

11    Q.   OKAY.  COULD WE PLEASE HAVE DEMONSTRATIVE NUMBER 4 UP ON

12    THE SCREEN?

13         DR. MALLADI, DOES DEMONSTRATIVE 4 ILLUSTRATE THE BASIC

14    CONCEPT OF CARRIER AGGREGATION.

15    A.   IT DOES AT A VERY HIGH LEVEL.

16    Q.   COULD YOU PLEASE EXPLAIN TO THE COURT WHAT CARRIER

17    AGGREGATION IS?

18    A.   SURE.  SO IT SAYS AGGREGATED DATA PIPE ON THE PICTURE.  SO

19    LET ME TRY TO KEEP IT AS SIMPLE -- THERE'S A LOT OF TECHNICAL

20    DETAIL, BUT I WANT TO KEEP IT AS SIMPLE AS POSSIBLE.

21         LET'S SAY THAT YOU HAVE A PIPE AND THAT'S HOW YOU'RE

22    GETTING ALL YOUR BITS, THAT'S HOW YOU'RE GETTING DATA, YOUR

23    FILE DOWNLOAD, YOU'RE WATCHING A VIDEO.  YOU WANT TO WATCH THE

24    VIDEO AT A MUCH HIGHER DATA RATE, A 4K VIDEO, SOMETHING WHICH

25    IS A HIGHER QUALITY WHICH NEEDS HIGHER DATA RATES.

1          THERE ARE TWO WAYS OF DOING IT.  EITHER YOU CAN INCREASE

2     THE SIZE OF THE PIPE OR YOU CAN ADD MORE PIPES.  EACH OF THEM

3     IS NARROW ENOUGH, BUT YOU'RE ACTUALLY KIND OF AGGREGATING THAT.

4          WE FELT THE NEED TO HAVE A SOLUTION WHEREIN WE WOULD START

5     AGGREGATING THESE PIPES NOW SWITCHING GEARS BACKWARDS IN

6     WIRELESS COMMUNICATIONS, EVERY WIRELESS OPERATOR, WHETHER IT'S

7     VERIZON OR AT&T, I'M GOING TO PICK THOSE NAMES JUST TO SIMPLIFY

8     THINGS, THEY ALL HAVE THE SPECTRUM HOLDINGS AND THEY'RE NOT ALL

9     CONTIGUOUS.  THEY ALL HAPPEN TO BE IN DIFFERENT PORTIONS OF THE

10    SPECTRUM.

11         SO YOU HAVE TO HAVE A WAY OF TRYING TO AGGREGATE THE

12    DIFFERENT PIPES.  THEY WEREN'T CONTIGUOUS TOGETHER.  THEREFORE,

13    IT WAS VERY IMPORTANT FOR US TO MAKE SURE THAT THAT HAPPENS IN

14    THE RIGHT WAY SO THAT ONE CAN GET TO VERY HIGH DATA RATES.

15    TODAY WE TALK OF GIGABIT DATA RATE DEVICES AS WE WALK AROUND.

16    WE GET GIGABIT SPEEDS ON OUR DEVICES.

17         BUT THIS WAS A STEPPING STONE IN THAT DIRECTION.  AND

18    THERE'S SO MANY DIFFERENT NUANCES ON TOP OF THAT.  SOME OF

19    THESE PIPES MAYBE YOU ONLY WANT TO DOWNLOAD, YOU DON'T WANT TO

20    UPLOAD ON THAT AT ALL, ONLY DOWNLOAD.  AND IN SOME OF THEM YOU

21    WANT TO DO BOTH.

22         IN SOME OF THEM, DEPENDING ON THE TIME FOR A CERTAIN

23    FRACTION OF THE TIME YOU DO DOWNLOAD AND A CERTAIN OTHER

24    FRACTION OF THE TIME YOU DO UPLOAD.  SO THERE ARE DIFFERENT

25    VARIANTS OF CARRIER AGGREGATION.

1     Q.    WHEN DID QUALCOMM START WORKING ON CARRIER AGGREGATION?

2     A.    CARRIER AGGREGATION, AS A VERY PRIMITIVE LEVEL, WAS A

3     CONCEPT THAT WAS INTRODUCED IN 3G.

4           BUT EVERY SINGLE GENERATION OF TECHNOLOGY, WHETHER IT IS

5     4G AND EVEN TODAY IN 5G, WE'VE HAD TO REINVENT IT IN A VERY

6     SIGNIFICANT MANNER, ADDING A LOT OF NEW ELEMENTS TO IT, A LOT

7     OF NEW TECHNOLOGY, BECAUSE THE GENERATIONAL TECHNOLOGY IS

8     ALWAYS CHANGING AND YOU WANT TO MAKE SURE THAT YOU TRACK THAT,

9     BUT ON TOP OF THAT, ADD NEW CAPABILITIES AS TECHNOLOGY MATURES.

10          AND TODAY, BY THE WAY, WE TALK OF 5G.  IN FACT, YOU CAN EVEN

11    THINK OF TWO PIPES, ONE PIPE IS 4G, THE OTHER PIPE IS 5G, AND

12    WE AGGREGATE BOTH OF THEM TOGETHER.  THAT IS WHAT WE ANTICIPATE

13    IS GOING TO COME UP NOW.

14    Q.    WERE QUALCOMM'S IDEAS ABOUT CARRIER AGGREGATION

15    INCORPORATED INTO STANDARDS?

16    A.    YES, THEY WERE.

17    Q.    WHICH ONES?

18    A.    IN 3G AND IN 4G.  NOW AS WE HEAD INTO 5G, THEY'VE BEEN

19    INCORPORATED THERE AS WELL.

20    Q.    IS THERE A PARTICULAR RELEASE OF THE LTE STANDARD THAT

21    QUALCOMM'S IDEAS WERE INCORPORATED INTO?

22    A.    THE VERY FIRST RELEASE IN WHICH LTE CARRIER AGGREGATION,

23    OR 4G CARRIER AGGREGATION WAS INTRODUCED WAS RELEASE 10.  THIS

24    WAS, I BELIEVE, IN THE 2011 TIMEFRAME GIVE OR TAKE.

25    Q.    AND WHAT WAS QUALCOMM'S ROLE IN CARRIER AGGREGATION IN

1    RELEASE 10 AS COMPARED TO OTHERS?

2    A.   FROM MY PERSPECTIVE, I THOUGHT THAT WE HAD FOUNDATIONAL

3    IDEAS, EVERY SINGLE RELEASE AFTER THAT, RELEASE 10, RELEASE 11,

4    RELEASE 12, THERE HAVE BEEN NEW VARIANTS OF CARRIER AGGREGATION

5    THAT WERE INTRODUCED, AND WE BROUGHT IN ALL THESE CONCEPTS

6    EARLY ON.

7    Q.   DR. MALLADI --

8         THE COURT:  CAN I ASK YOU, I DON'T THINK THIS IS AN

9    EXHIBIT THAT'S BEEN ADMITTED.

10        MS. SESSIONS:  IT'S NOT.  THESE ARE JUST

11   DEMONSTRATIVES, YOUR HONOR.

12        THE COURT:  OH, THAT'S A QDX.

13        MS. SESSIONS:  YES, I'M SORRY, THAT PARTICULAR SLIDE

14   DOESN'T SEEM TO HAVE THE QDX STAMPED ON IT, BUT THESE ARE ALL

15   DEMONSTRATIVES.

16        THE COURT:  ALL RIGHT.  THANK YOU.

17   BY MS. SESSIONS:

18   Q.   DR. MALLADI, HAS QUALCOMM DONE RESEARCH INTO USING

19   UNLICENSED SPECTRUM FOR CELLULAR?

20   A.   YES, WE HAVE.

21   Q.   WHAT IS UNLICENSED SPECTRUM?

22   A.   OKAY.  SO MAYBE I SHOULD FIRST EXPLAIN WHAT A LICENSED

23   SPECTRUM IS.

24   Q.   AND YOU SHOULD PLEASE SLOW DOWN.  THANK YOU.

25   A.   OKAY.  LICENSED SPECTRUM IS IF YOU ARE A WIRELESS CARRIER,

1     LIKE VERIZON, YOU PARTICIPATE IN OPTIONS, YOU GET SPECTRUM, YOU

2     GET IT, AND I PAID FOR IT.  NOW IT'S YOURS.  IT'S YOUR SANDBOX.

3     YOU GET TO SERVE USERS USING THAT.

4          UNLICENSED SPECTRUM, ON THE OTHER HAND, DOESN'T GO THROUGH

5     ANY AUCTION PROCESS.  IT'S ACTUALLY AVAILABLE FOR EVERYONE TO

6     USE.  THERE ARE CERTAIN NICETY RULES, BECAUSE EVERYONE GETS TO

7     USE IT, SO YOU HAVE TO PLAY NICE WITH EACH OTHER AND TAKE

8     TURNS, IF YOU WILL, AT A HIGH LEVEL.

9          AND IN ADDITION TO THOSE HIGH LEVEL RULES, THERE ARE NO

10    OTHER RULES AND REGULATIONS ASSOCIATED WITH THAT.  SO THIS IS

11    UNLICENSED SPECTRUM.

12    Q.   WHAT TYPES OF DEVICES TYPICALLY USE UNLICENSED SPECTRUM?

13    A.   HISTORICALLY THE DEVICES THAT HAVE USED UNLICENSED

14    SPECTRUM INCLUDE WI-FI DEVICES, BLUETOOTH DEVICES, AND EVEN

15    WIRELESS MICROPHONES, SOME OF THEM USE UNLICENSED SPECTRUM.

16    Q.   WHY HAVEN'T CELL PHONES TRADITIONALLY USED UNLICENSED

17    SPECTRUM?

18    A.   FOR A LONG TIME, FOR WIRELESS CARRIERS, THERE WERE --

19    THEY'VE BEEN VERY CONCERNED ABOUT A PREDICTABLE QUALITY OF

20    SERVICE FOR THEIR USERS.  IF I'M A WIRELESS OPERATOR AND I HAVE

21    A CUSTOMER, I WANT TO GUARANTEE A CERTAIN QUALITY OF SERVICE

22    FOR THE USER.  I WANT TO SAY, LOOK, WHEREVER YOU GO, YOU'RE

23    GOING TO GET THIS KIND OF A DOWNLOAD SPEED OR UPLOAD SPEED.

24         AND IT WASN'T CLEAR WHETHER YOU COULD DO SOMETHING OF THAT

25    SORT WHEN YOU USE UNLICENSED SPECTRUM, WHERE IT'S NOT JUST YOUR

1    SANDBOX.  EVERYONE GETS TO USE IT.  SO THERE'S A LOT MORE TO

2    IT.  BUT THERE'S PLENTY OF UNLICENSED SPECTRUM.

3         SO THERE HAVE BEEN -- THERE WERE HISTORICALLY NERVOUS

4    ABOUT USING IT.

5    Q.   WHEN DID QUALCOMM START WORKING ON UNLICENSED SPECTRUM

6    RESEARCH?

7    A.   WE STARTED WORKING ON IT SOMETIME AROUND 2007 TIMEFRAME,

8    AND AS WE STARTED WORKING ON IT, WE REALIZED THAT THERE WERE

9    OTHER PIECES OF THE PUZZLE THAT HAD TO BE PUT TOGETHER.

10        UNLICENSED SPECTRUM WAS GOING TO COMPLEMENT LICENSED

11   SPECTRUM, SO WE HAD TO MAKE SURE THAT, FIRST OF ALL, CARRIER

12   AGGREGATION COMES INTO THE PICTURE.  SO THAT WAS IMPORTANT.

13        AND THEN WE ALSO HAD TO MAKE SURE THAT SMALL CELLS WERE

14   INTRODUCED INTO 4G BECAUSE USUALLY WHEN YOU USE UNLICENSED

15   SPECTRUM, YOU HAVE TO TRANSMIT AT VERY LOW POWER, LIKE 1

16   MILLIWATTS, OR SOMETHING OF THAT SORT.  SO WE HAD TO WORK ON

17   OTHER THINGS.  SO WE WORKED ON THAT AND THEN WE CAME BACK TO IT

18   IN A MUCH MORE SIGNIFICANT MANNER SOMEWHERE AROUND 2010.

19   Q.   COULD WE PLEASE HAVE DEMONSTRATIVE NUMBER 5 UP ON THE

20   SCREEN, MR. DAHM.

21        DR. MALLADI, DO YOU RECOGNIZE THE PHOTOGRAPH IN

22   DEMONSTRATIVE NUMBER 5?

23   A.   YES.

24   Q.   WHAT'S SHOWN IN THIS PHOTOGRAPH?

25   A.   SO WE CALLED THIS AS OUR TORTURE CHAMBER.  THERE WAS A LOT

1    OF SKEPTICISM IN THE INDUSTRY SAYING THERE IS NO WAY LTE WILL

2    WORK IN UNLICENSED SPECTRUM.  IT'S GOING TO CREATE ALL SORTS OF

3    HAVOC WITH WI-FI DEVICES, AND THIS IS NEVER GOING TO WORK.

4         SO WE HAD TO NOT JUST BUILD IT, BUT WE HAD TO BUILD A

5    SPECIFIC CHAMBER WHEREIN, IT'S KIND OF HARD TO READ, BUT YOU

6    CAN SEE SOME WI-FI ACCESS PLANS, YOU SEE SOME DEVICES WHICH ARE

7    ON THE, ON THE BENCH THERE.  THOSE WERE ALL WI-FI DEVICES.

8         AND, IN FACT, SQUARELY OPPOSITE THEM, YOU COULD SEE SOME

9    DEVICES, THOSE ARE ALL LTE DEVICES, LTE IN UNLICENSED SPECTRUM.

10        WE HAD MADE A LOT OF MODIFICATIONS ON LTE IN UNLICENSED TO

11   MAKE SURE IT WORKS PROPERLY.

12        AND THERE IS AN ORANGE GLOW IN THE BACKGROUND.  IN

13   WIRELESS TERMINOLOGY, IT'S KNOWN AS A FARADAY CAGE, FARADAY IS

14   AFTER MICHAEL FARADAY, ONE OF THE SCIENTISTS.  IT MEANS IT'S

15   ISOLATED.  WHATEVER YOU DO INSIDE DOESN'T AFFECT OUTSIDE.

16   WHATEVER YOU DO OUTSIDE DOESN'T AFFECT INSIDE.

17        SO THIS WAS A PLACE WHERE WE DID A LOT OF THE TESTING TO

18   PROVE THAT EVEN THOUGH THERE ARE SO MANY OF THESE WI-FI DEVICES

19   ALONG WITH 4G LTE DEVICES, THEY WOULD ALL ACTUALLY COEXIST IN A

20   VERY REASONABLE MANNER, ALL IN THE SAME CHANNEL.  SO THEY'RE

21   ALL SHARING THE RESOURCE IN A REASONABLE MANNER.  THIS IS WHAT

22   WE TALKED ABOUT EARLIER AS A NICETY KIND OF THING.

23   Q.   ARE QUALCOMM'S IDEAS IN UNLICENSED SPECTRUM BEING

24    INCORPORATED INTO STANDARDS?

25   A.   YES.

1       Q.   WHICH STANDARDS?

2       A.   SO THE EARLIEST VERSION OF THAT WAS IN RELEASE 13 OF 4G

3       STANDARDS.  THIS WAS COMPLETED APPROXIMATELY AROUND 2015 GIVE

4       OR TAKE.

5       Q.   DID THAT HAVE A NAME?

6       A.   YES.  IT WAS CALLED LAA.  LAA STANDS FOR LICENSED ASSISTED

7       ACCESS.

8       Q.   HOW DID QUALCOMM'S CONTRIBUTIONS ON UNLICENSED SPECTRUM

9       COMPARE TO THOSE OF OTHER COMPANIES?

10      A.   FROM MY PERSPECTIVE, I THOUGHT WE HAD A PIONEERING ROLE ON

11      THIS.  THERE WERE A LOT OF SKEPTICISM IN THE INDUSTRY, NOT JUST

12      FROM THE CELLULAR INDUSTRY WHO HAVE BEEN TRADITIONALLY USING

13      4G, BUT THERE WAS CONCERN COMING IN FROM EVERYONE WHO HAS BEEN

14      USING WI-FI TECHNOLOGY.  OF COURSE WE, OURSELVES, HAVE OUR OWN

15      WI-FI RESEARCH, BUT THERE'S A LOT OF SKEPTICISM.

16           REGULATORS WERE ALSO QUESTIONING, OKAY, HOW WOULD IT WORK?

17      SO WE HAD TO SIT DOWN AND AS WE WERE PROVING UP THE TECHNOLOGY,

18      WE SHOWED THIS TO REGULATORS, WE SAT DOWN WITH THEM AND DEFINED

19      TEST CASES TO PROVE THAT, HEY, WHEN YOU DO THE CERTIFICATION OF

20      ANY DEVICE FOR LAA, THIS IS HOW YOU OUGHT TO BE DOING IT.  WE

21      WORKED WITH THEM ON THAT, IN ADDITIONAL TO MOBILE OPERATORS

22      LIKE VERIZON, AT&T, ET CETERA.  AND ALL THE OTHER VENDORS,

23      WHETHER IT'S INFRASTRUCTURE VENDORS LIKE ERICSSON OR WHETHER IT

24      IS DEVICE MANUFACTURERS, ALONG WITH ANALYSTS AND MEDIA WHO

25      WANTED TO SEE THIS IN ACTION.

```
 1            SO, YEAH, WE DID A LOT OF THAT.  I WOULD CATEGORIZE THAT

 2     ENTIRE THING AS THE EVANGELIZATION OF THE TECHNOLOGY.

 3     Q.   WHAT ARE THE BENEFITS OF USING UNLICENSED SPECTRUM FOR

 4     CELLULAR COMMUNICATIONS?

 5     A.   WELL, FIRST OF ALL, I WOULD ARGUE THAT THIS IS WHAT

 6     UNLEASHED GIGABIT LTE DATA RATES IN NORTH AMERICA.  SO WHEN YOU

 7     WALK INTO A STORE, YOU BUY YOURSELF A DEVICE AND IT SAYS, YEP,

 8     I CAN DO ONE GIGABIT PER SECOND ON MY PHONE.  THIS IS THE

 9     BACKBONE.  THIS IS THE TECHNOLOGY THAT'S THE BACKBONE FOR THAT.

10     Q.   IS THE USE OF UNLICENSED SPECTRUM IMPORTANT TO 5G?

11     A.   YES, IT IS.  JUST RECENTLY NOW, UNLICENSED SPECTRUM IN THE

12     SECOND RELEASE OF 5G, IT JUST GOT APPROVED AS A NEW WORK ITEM.

13     SO WORK IS GOING TO BE COMMENCING AS A PART OF 5G STANDARDS.

14     Q.   AND, DR. MALLADI, I'M SORRY, I SHOULD HAVE GIVEN YOU THIS

15     INSTRUCTION AT THE BEGINNING.  IF YOU COULD CONFINE YOUR

16     ANSWERS WITH RESPECT TO 5G TO ANYTHING THAT HAPPENED BEFORE

17     MARCH OF 2018.

18     A.   SURE.  BEFORE MARCH OF 2018, IT GOT APPROVED AS A STUDY AS

19     A PART OF 5G STUDIES.

20     Q.   OKAY.  IS QUALCOMM WORKING ON MILLIMETER WAVE TECHNOLOGY?

21     A.   YES, WE ARE.

22     Q.   WHAT IS MILLIMETER WAVE TECHNOLOGY?

23     A.   OKAY.  WITHOUT GETTING TOO TECHNICAL ABOUT IT, I'LL KEEP

24     IT AT A VERY HIGH LEVEL.  MILLIMETER WAVE TECHNOLOGY STANDS FOR

25     TECHNOLOGY WHEREIN WE USE FREQUENCIES WHERE THE WAVELENGTH IS
```

1     ONE MILLIMETER, OR IN THE ORDER OF A MILLIMETER.

2          THESE HAPPEN TO BE WHAT IS KNOWN AS VERY HIGH BANDS, THE

3     24 GIGAHERTZ BANDS, THE 28 GIGAHERTZ BANDS.

4          THERE'S PLENTY OF SPECTRUM THERE, LOTS OF BANDWIDTH.  SO

5     YOU CAN GET TO MULTIPLE GIGABIT SPEEDS WITH MOBILE BROAD BAND,

6     VERY HIGH DATA RATES.

7          BUT PHYSICS WORKS AGAINST YOU.  THE PROPAGATION IS NOT

8     VERY GOOD.  IF I HAVE SOMETHING THAT'S TRANSMITTING HERE, YOU

9     CAN'T EASILY PENETRATE THROUGH WALLS, AND IF YOU BLOCK YOUR

10    CELL PHONE WITH YOUR FINISHER, MAYBE THE COMMUNICATION WOULDN'T

11    WORK.  SO WE HAD TO WORK A LOT IN IT TO MAKE SURE THAT IT WORKS

12    PROPERLY.

13    Q.   HAD MILLIMETER WAVE TECHNOLOGY BEEN USED BEFORE?

14    A.   HISTORICALLY, IT'S BEEN USED FOR WHAT IS KNOWN AS A FIXED

15    WIRELESS BACKHAUL.  IMAGINE IF YOU HAVE, SAY, TWO BUILDINGS AND

16    INSTEAD OF LAYING A FIBER BETWEEN THE TWO BUILDINGS TO

17    COMMUNICATE BETWEEN THOSE TWO BUILDINGS, YOU ACTUALLY END UP

18    PUTTING UP TWO CELL SITES ON TOP OF THE BUILDINGS, REASONABLY

19    HIGH, AND THEY HAVE TO BE IN LINE OF SIGHT.

20         WHAT IT MEANS IS THEY'VE GOT TO BE ABLE TO SEE EACH OTHER,

21    AND THEN YOU CAN COMMUNICATE.  SO THAT'S WHAT IT'S BEEN

22    TRADITIONALLY USED FOR.

23         FOR US, WE WERE NOT INTERESTED IN THAT.  IN FACT, WE WERE

24    VERY SKEPTICAL ABOUT USING MILLIMETER WAVE IN GENERAL FOR A

25    WHILE BECAUSE WE HADN'T SOLVED HOW YOU AND I ACTUALLY USE

MALLADI DIRECT BY MS. SESSIONS

1    MILLIMETER WAVE OR WE USE OUR CELL PHONES.  WE WALK AROUND WITH

2    THEM.  WE PUT THEM ON ONE SIDE OF THE HEAD AND MAYBE WE USE

3    THEM ON THE OTHER SIDE OF THE HEAD.  SO MY HEAD COULD BE

4    BLOCKING THE COMMUNICATION AND THINGS WOULD FADE.  OR MAYBE MY

5    FINGER IS PROBABLY RIGHT ON TOP OF A SPECIFIC AREA ON THE CELL

6    PHONE AND THINGS WON'T WORK.  WE DRIVE AROUND WITH IT.  WE GO

7    IN AND OUT OF BUILDINGS.

8         A LOT OF CHALLENGES, AND MILLIMETER WAVE HAD NEVER BEEN

9    SHOWN TO WORK IN THIS SORT OF AN ENVIRONMENT.  FOR US, THAT WAS

10   IT.  IF WE COULD PROVE SOMEHOW, IF WE HAD, IF WE COULD CRACK

11   THE PROBLEM AND SAY THAT WE CAN MAKE IT WORK IN THAT

12   ENVIRONMENT, THAT WAS KEY FOR US.

13        SO THAT'S WHAT WE MEAN BY MOBILIZING MILLIMETER WAVE FOR

14   5G.

15   Q.  WHICH DID QUALCOMM START WORKING ON MILLIMETER WAVE

16   TECHNOLOGY?

17   A.  IT'S BEEN A FEW YEARS, BUT WE WERE STILL WORK LOOKING AT

18   SOME VERY CHALLENGING PROBLEMS WHEN IT CAME TO 5G MILLIMETER

19   WAVE.

20        SOMETIME AROUND 2014 IS WHEN WE STARTED SEEING THE RESULTS

21   THAT WE WANTED TO SEE.  UNTIL THEN WE WERE STILL TRYING TO

22   SOLVE THE PROBLEMS.  IT TOOK ONE AFTER THE OTHER, WE TOOK ONE

23   STEP AFTER THE OTHER, AND WE STARTED SOLVING THE PROBLEMS.

24        BY 2014, END OF BETWEEN 14, MAYBE BEGINNING OF 2015, IT

25   BECAME CLEAR, YEP, THIS MIGHT WORK ACTUALLY.  SO WE STARTED

1    BUILDING IT AND WE, WE CALLED A LOT OF OUR -- WE WENT THROUGH

2    THE SAME STEPS AGAIN, CALLING IN MOBILE OPERATORS, VENDORS AND

3    SO ON, AND PRIVATE DEMOS JUST TO SHOW, HEY, THIS IS HOW IT

4    WORKS AND THEN EVENTUALLY SHOWED IT PUBLICLY AS WELL.

5    Q.   TO YOUR KNOWLEDGE, AS OF MARCH 2018, HAD ANY OTHER COMPANY

6    DEMONSTRATED MILLIMETER WAVE FOR A MOBILE APPLICATION?

7    A.   IN A -- FROM A HANDSET, LIKE IN OUR CELL PHONE, IN A

8    HANDSET KIND OF A DEVICE WITH MILLIMETER WAVE EMBEDDED IN IT

9    AND MOBILE ENVIRONMENT, THE ANSWER IS, NO, I HAVE NOT SEEN IT.

10   Q.   AS OF MARCH 2018, WHAT ROLE WAS MILLIMETER WAVE GOING TO

11   BE PLAY IN 5G?

12   A.   I THINK 5G MILLIMETER WAVE IS GOING TO BE VERY IMPORTANT.

13   THE MULTIPLE GIGABIT DATA RATES THAT WE ARE TALKING OF AT 5G,

14   THERE'S GREAT ANTICIPATION FOR THAT, IT'S GOING TO BE ENABLED

15   USING MILLIMETER WAVE.  IN FACT, IN NORTH AMERICA RIGHT HERE IN

16   THE U.S., WE ARE LEADING THE WORLD IN THAT SENSE.

17        THE FIRST 5G MILLIMETER WAVE DEPLOYMENT ANYWHERE IN THE

18   WORLD ARE GOING TO COME UP RIGHT HERE IN NORTH AMERICA IN THE

19   U.S.  SO IT'S GOING TO BE A VERY IMPORTANT STEP FOR US.

20        MS. SESSIONS:  THANK YOU, DR. MALLADI.  I HAVE NO

21   FURTHER QUESTIONS.

22        THE WITNESS:  THANKS.

23        THE COURT:  OKAY.  TIME IS 4:21.

24   (PAUSE IN PROCEEDINGS.)

25        MR. HOPKIN:  YOUR HONOR, MAY I APPROACH.  I HAVE A

1      BINDER FOR THE WITNESS.

2              THE COURT:  YES, GO AHEAD, PLEASE.

3          ARE YOU READY?

4              MR. HOPKIN:  YES.

5              THE COURT:  OKAY.  4:22.  GO AHEAD, PLEASE.

6                          **CROSS-EXAMINATION**

7      BY MR. HOPKIN:

8      Q.    GOOD AFTERNOON, DR. MALLADI.  I'M NATE HOPKIN FOR THE

9      FEDERAL TRADE COMMISSION.

10         NOW, YOU'RE NOT PERSONALLY RESPONSIBLE FOR OR

11     KNOWLEDGEABLE ABOUT THE BUSINESS PRACTICES OF QCT; CORRECT?

12     A.    THAT'S CORRECT.

13     Q.    AND YOU'RE NOT PERSONALLY INVOLVED WITH DEVELOPING THE QCT

14     ROADMAP, FOR INSTANCE; RIGHT?

15     A.    WELL, MY VERY RECENT ROLE HAS ENTAILED THAT, BUT NOT

16     BEFORE MARCH OF 2018.

17     Q.    OKAY.  THANK YOU FOR THAT CLARIFICATION.

18         AND AS FAR AS YOU'RE AWARE, THE CORPORATE R&D GROUP HAS

19     NOT WORKED WITH QCT ON DESIGNING SPECIFIC CHIPS FOR SPECIFIC

20     OEM'S; IS THAT RIGHT?

21     A.    NOT FOR SPECIFIC CHIPS FOR SPECIFIC OEM'S.

22         BUT THERE IS, OF COURSE, SOME KNOWLEDGE TRANSFER THAT

23     HAPPENS AS THERE IS A HAND OVER OF ALL THE TECHNOLOGY THAT WE

24     HAVE DEVELOPED.

25     Q.    AND COMMERCIAL DEVELOPMENT OF QUALCOMM'S TECHNOLOGIES IS

1    DONE WITHIN QCT, NOT THE CORPORATE R&D GROUP; RIGHT?

2    A.   PRIMARILY, THAT'S CORRECT.

3    Q.   AND YOU DON'T HAVE ANY DIRECT ROLE IN ANALYZING QCT'S

4    COMPETITIVE POSITION IN MARKETS FOR QCT'S COMMERCIAL PRODUCTS;

5    RIGHT?

6    A.   NOT A DIRECT ROLE, THAT WAS THE QUESTION.  BUT I DO GET TO

7    REVIEW HOW THINGS ARE SHAPING UP BECAUSE WE KEEP DEVELOPING

8    ALGORITHMS ALL THE TIME.

9    Q.   SO IT'S FAIR TO SAY THAT THE R&D GROUP DEVELOPED WIRELESS

10   TECHNOLOGY AND SOME OF THAT TECHNOLOGY GETS COMMERCIALIZED IN

11   QCT PRODUCTS; RIGHT?

12   A.   THAT IS CORRECT.

13   Q.   AND AS FAR AS YOU'RE AWARE, NOBODY IN THE CORPORATE R&D

14   GROUP HAS ANY INVOLVEMENT INTO HOW QCT PRICES ITS COMMERCIAL

15   PRODUCTS THAT INCORPORATE TECHNOLOGY DEVELOPED BY R&D; RIGHT?

16   A.   YES, THAT'S CORRECT.

17   Q.   SO QUALCOMM'S R&D GROUP IS DOES NOT WORK WITH QCT ON

18   PRICING COMMERCIAL PRODUCTS THAT INCORPORATE TECHNOLOGIES

19   DEVELOPED WITHIN THE R&D GROUP; RIGHT?

20   A.   NOT FOR PRICING, NO.

21   Q.   YOU'RE NOT PERSONALLY RESPONSIBLE FOR OR KNOWLEDGEABLE

22   ABOUT QTL'S BUSINESS PRACTICES; RIGHT?

23   A.   NO.

24   Q.   YOU'RE NOT RESPONSIBLE FOR NEGOTIATING CELLULAR PATENT

25   LICENSES?

1    A.   NO, I'M NOT.

2    Q.   YOU'VE NEVER PERSONALLY OFFERED ADVICE TO QTL ON LICENSING

3    RATES; RIGHT?

4    A.   NO.

5    Q.   AND, IN FACT, QUALCOMM'S CORPORATE R&D GROUP IN GENERAL

6    DOES NOT ADVISE QTL ON LICENSING RATES FOR THE TECHNOLOGY THAT

7    THE R&D GROUP RESEARCHES; RIGHT?

8    A.   NO.  WE ARE IN THE BUSINESS OF EXPLAINING THE TECHNOLOGY,

9    BUT WE DON'T GO BEYOND THAT.

10   Q.   SO R&D RESEARCHES WIRELESS TECHNOLOGY AND SOME OF THAT

11   TECHNOLOGY BECOMES PATENTED AND LICENSED BY QTL; IS THAT FAIR?

12   A.   THAT'S A FAIR STATEMENT.  I WOULD SAY MORE THAN SOME OF

13   IT.  IT'S A GOOD FRACTION OF IT I WOULD SAY.

14   Q.   AND THAT WOULD INCLUDE, FOR EXAMPLE, 5G TECHNOLOGY?

15   A.   THAT IS CORRECT.

16   Q.   BUT YOU DON'T KNOW HOW ONE WOULD JUSTIFY THE VALUE OF 5G

17   TECHNOLOGY FOR PURPOSES OF A PATENT LICENSE ROYALTY RATE;

18   RIGHT?

19   A.   NOT, NOT FROM A ROYALTY RATE STANDPOINT.

20        BUT WE DO EXPLAIN THE TECHNOLOGY AND, LIKE, MAKING SURE

21   THAT THE LEGAL GROUP, QTL IN PARTICULAR, GETS TO KNOW EXACTLY

22   THE FULL BREADTH OF THE ENTIRE TECHNOLOGY.

23   Q.   OKAY.  BUT THE CORPORATE R&D GROUP DOES NOT WORK WITH QTL

24   TO DETERMINE LICENSING RATES FOR TECHNOLOGIES, THE TECHNOLOGIES

25   DEVELOPED WITHIN THE R&D GROUP; RIGHT?

1     A.   NO, WE DON'T WORK ON LICENSING RATES, NO.

2     Q.   AND IT'S NOT PART OF YOUR JOB TO DETERMINE A FINANCIAL

3     VALUE OF THE QUALCOMM INTELLECTUAL PROPERTY THAT HAS BEEN

4     CONTRIBUTED TO A STANDARD; RIGHT?

5     A.   THAT'S CORRECT.

6     Q.   YOU DON'T KNOW WHAT MAKES ONE QUALCOMM PATENT MORE OR LESS

7     VALUABLE THAN ANOTHER, DO YOU?

8     A.   I WOULDN'T GO THAT FAR.  I WOULD ACTUALLY SAY THAT GIVEN

9     THAT WE KNOW WHAT'S THE TECHNOLOGY THAT'S GOING INTO EACH OF

10    THE PATENTS, THERE IS, FROM A TECHNICAL PERSPECTIVE, YOU KNOW,

11    I WOULD HAVE MY PREFERENCE IN TERMS OF SAYING, HEY, THIS ONE IS

12    REALLY VALUABLE COMPARED TO THE OTHERS.

13         SO THE TECHNICAL VALUATION, I WOULD SAY, YEAH, THIS IDEA

14    REALLY IS GOOD.  THE OTHER ONE, NOT BAD, BUT THIS ONE IS

15    BETTER.

16    Q.   IF YOU COULD TAKE A LOOK AT YOUR DEPOSITION TRANSCRIPT,

17    DR. MALLADI, PAGE 402, LINES 9 THROUGH 15.

18         SO YOU WERE ASKED, "DO YOU KNOW WHAT MAKES ONE PATENT MORE

19    VALUABLE THAN ANOTHER?"

20         AND YOUR TESTIMONY AT YOUR DEPOSITION WAS, "NO."

21         DO YOU SEE THAT?

22    A.   YEAH, I SEE THAT.

23    Q.   THANK YOU.

24    A.   I --

25    Q.   SO YOU DON'T HAVE ANY PERSONAL KNOWLEDGE, BASED ON YOUR

1    OWN WORK, ABOUT THE STRENGTH OF QUALCOMM'S PATENT PORTFOLIO

2    RELATIVE TO OTHERS; CORRECT?

3    A.    RELATIVE TO OTHERS, NO.    JUST I CAN ONLY SPEAK FROM OUR

4    TECHNICAL CONTRIBUTIONS.

5    Q.    SO IT'S FAIR TO -- IT'S FAIR TO SAY THAT ANY KNOWLEDGE YOU

6    HAVE ABOUT THE STRENGTH OF QUALCOMM'S PATENT PORTFOLIO RELATIVE

7    TO OTHERS IS SECOND HAND INFORMATION?

8    A.    I DON'T ACTUALLY LOOK AT WHAT OTHERS ARE DOING.    I ONLY

9    LOOK AT WHAT WE ARE DOING.

10   Q.    AND YOU DON'T HAVE ANY PERSONAL KNOWLEDGE ABOUT WHAT

11   PERCENTAGE OF QUALCOMM'S PATENTS ARE ESSENTIAL TO A STANDARD;

12   RIGHT?

13   A.    NOT FROM A PERCENTAGE STANDPOINT.

14   Q.    THANK YOU.

15   A.    YEAH.

16   Q.    AND YOU'RE NOT RESPONSIBLE FOR DETERMINING WHETHER A

17   PATENT IS ESSENTIAL FOR COMMERCIAL DEPLOYMENT; CORRECT?

18   A.    I'M NOT RESPONSIBLE FOR THE FINAL DECISION.    BUT I DO GET

19   TO HAVE A SAY IN TERMS OF THE TECHNOLOGY THAT WENT INTO THE

20   STANDARDS PROCESS.    SO THERE IS INPUT THAT I PROVIDE TO THE

21   LEGAL DEPARTMENT.    BUT THEY MAKE THE FINAL CALL.

22   Q.    AND I THINK EARLIER YOU TESTIFIED THAT YOU'RE A NAMED

23   INVENTOR ON OVER 400 PATENTS; CORRECT?

24   A.    CLOSE TO 400 BEFORE MARCH 2018, THAT'S CORRECT.

25   Q.    AND YOU DON'T KNOW WHETHER ANY OF THOSE PATENTS IS

1    ESSENTIAL TO A WIRELESS STANDARD; RIGHT?

2    A.   I HAVE A FAIRLY GOOD UNDERSTANDING OF WHICH ONES ARE

3    LIKELY ESSENTIAL OR NOT.  I DON'T HAVE THE FINAL SAY ON IT, BUT

4    I HAVE A FAIRLY GOOD UNDERSTANDING OF THAT PART OF IT.

5              MR. HOPKIN:  OKAY.  THANK YOU.  NO FURTHER QUESTIONS.

6              THE COURT:  OKAY.  TIME IS 4:27.  IS THERE ANY

7    REDIRECT?

8              MS. SESSIONS:  VERY BRIEFLY, YOUR HONOR.

9              THE COURT:  OKAY.  GO AHEAD SO THIS WITNESS DOESN'T

10   HAVE TO FLY BACK ON FRIDAY.

11             MS. SESSIONS:  VERY.  I'M VERY MINDFUL OF THE TIME.

12                      **REDIRECT EXAMINATION**

13   BY MS. SESSIONS:

14   Q.   DR. MALLADI, COULD YOU PLEASE TURN BACK TO PAGE 402 OF

15   YOUR DEPOSITION.

16   A.   YEAH.

17             THE COURT:  IT'S 4:28.  GO AHEAD, PLEASE.

18   BY MS. SESSIONS:

19   Q.   AND YOU WERE ASKED A QUESTION ABOUT THE QUESTION THAT

20   APPEARS STARTING AT LINE 9 OF PAGE 402 OF YOUR DEPOSITION.

21   A.   YES.

22   Q.   ARE YOU THERE?

23   A.   YEAH.  YEAH.

24   Q.   OKAY.  COULD YOU PLEASE READ THE FULL ANSWER THAT YOU GAVE

25   TO THE QUESTION THAT COUNSEL FOR THE FTC ASKED YOU ABOUT?

1    A.    THAT'S WHAT I WAS TRYING TO SAY.  I MEAN, I KNOW THE

2    TECHNOLOGY THAT GOES INTO IT, SO IN THAT SENSE, DO I KNOW

3    WHETHER ONE PATENT IS MORE VALUABLE THAN THE OTHER?  I KNOW

4    FROM A TECHNOLOGY STANDPOINT WHICH ONE SEEMS LIKE A MORE

5    VALUABLE IDEA BECAUSE IT'S CENTRAL TO THE WHOLE CONCEPT.  TO

6    THAT EXTENT, YES.

7         BUT THE FULL ANSWER, IF I READ IT OUT, "I KNOW IT IS IDEAL

8    WITH THE TECHNOLOGY THAT GOES INTO THE PATENTS PER SE, BUT THAT

9    IS A QUESTION THAT IS REALLY MEANT FOR SOMEONE FROM OUR LEGAL

10    DEPARTMENT TO ANSWER."

11         MS. SESSIONS:  THANK YOU, DR. MALLADI.

12         NO FURTHER QUESTIONS.

13         THE COURT:  OKAY.  THE TIME IS 4:29.

14         IS THIS WITNESS SUBJECT TO RECALL OR NOT?

15         MS. SESSIONS:  NO, YOUR HONOR.

16         THE COURT:  DO YOU AGREE?

17         MR. HOPKIN:  NOT FROM US.

18         THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

19    TESTIMONY, AND YOU'RE FREE TO LEAVE.  I THINK THE TIME IS TOO

20    LATE TO CALL A NEW WITNESS, SO LET'S GO AHEAD AND END FOR THE

21    DAY.  IT'S 4:29.

22         YOU'RE FREE TO STEP DOWN.

23         LET ME GIVE YOU YOUR TIME TOTALS.  WE'LL BE BACK IN

24    SESSION ON FRIDAY MORNING AT 9:00 A.M.

25         WHAT THIRD PARTY SEALING MOTIONS DO YOU ANTICIPATE, IF

```
 1      ANY?  OR ARE WE THROUGH THAT NIGHTMARE PROCESS AT THIS POINT?

 2      ANYONE --

 3              MS. MILICI:  YOUR HONOR, THE FTC DOESN'T KNOW WHO

 4      QUALCOMM'S WITNESSES ARE, SO WE DON'T KNOW WHAT -- WE DON'T

 5      KNOW WHAT THIRD PARTY SEALING MOTIONS MIGHT BE COMING.

 6              THE COURT:  OH, OKAY.  WHEN WILL YOU GET THE LIST OF

 7      THEIR WITNESSES?

 8              MR. BYARS:  6:00 O'CLOCK TONIGHT IS WHEN WE DISCLOSE

 9      LIVE WITNESSES.

10              THE COURT:  OKAY.

11              MR. BYARS:  WE HAVE, HOWEVER, DISCLOSED A GOOD NUMBER

12      OF DEPOSITION VIDEOS.  WE'VE GIVEN NOTICE TO THIRD PARTIES.

13      YOUR HONOR HAS ALREADY DEALT WITH A LOT OF THE SEALING MOTIONS

14      WITH RESPECT TO THE DEPOSITIONS, SO THOSE WILL BE READY TO GO

15      IF WE NEED TO PLAY THOSE ON FRIDAY.

16              THE COURT:  OKAY.  SO YOU DON'T ANTICIPATE ANYONE

17      ELSE OTHER THAN THOSE VIDEOS THAT ELICIT.  I CAN'T IMAGINE

18      THAT'S GOING TO BE FIVE AND A HALF HOURS WORTH.

19              MR. BYARS:  WE ALSO HAVE LIVE WITNESSES WE'LL

20      DISCLOSE AT 6:00.  WE'LL THEN EXCHANGE THE EVIDENCE THAT WE'LL

21      USE WITH THOSE, AND WE'LL EVALUATE WHETHER THERE NEEDS TO BE

22      SEALING MOTIONS ON THAT.

23              THE COURT:  YOU DON'T KNOW WHETHER THOSE ARE THIRD

24      PARTIES, OR YOU DON'T WANT TO COMMIT AN HOUR AND A HALF EARLY.

25              MR. BYARS:  I DON'T BELIEVE IT'S THIRD PARTY -- IT'LL
```

1341

```
1    BE QUALCOMM -- ONE-THIRD PARTY.  ONE THIRD PARTY.
2              THE COURT:  OKAY.  SO THERE MIGHT BE.  THERE MIGHT
3    BE.
4              MR. BYARS:  MAYBE.
5              THE COURT:  OKAY.  WELL, IF YOU CAN LET EVERYONE KNOW
6    THAT THEY HAVE TO, FOR THE THIRD PARTIES, THEY HAVE TO FILE
7    THEIR SEALING MOTIONS BY 10:00 A.M. ON THURSDAY.
8              MR. BYARS:  OKAY.
9              THE COURT:  AND FOR THE PARTIES, IT'S 8:00 A.M. ON
10   THURSDAY FOR YOUR HIGH PRIORITY OBJECTIONS.  OKAY?
11             MR. BYARS:  WE'LL DO THAT.
12             THE COURT:  OKAY.  LET ME GIVE YOU YOUR TIME TOTALS.
13        (PAUSE IN PROCEEDINGS.)
14             THE COURT:  OKAY.  SO FOR QUALCOMM TODAY IT WAS 2
15   HOURS AND 50 MINUTES.  YOUR OVERALL TOTAL, WITH THE 9 HOURS AND
16   22 MINUTES FROM YESTERDAY, SO THAT'S 12 HOURS AND 12 MINUTES
17   USED.
18        YOU HAVE 12 HOURS AND, WHAT, 48 MINUTES LEFT?
19             MR. VAN NEST:  SOUNDS RIGHT, YOUR HONOR.
20             THE COURT:  OKAY.  AND THEN FOR FTC, AS OF YESTERDAY
21   THEY HAD USED 17 HOURS AND 56 MINUTES, AND TODAY -- TODAY THEY
22   USED 2 HOURS -- TODAY IS JANUARY 15.  THEY USED 2 HOURS AND 37
23   MINUTES -- BLESS YOU -- WHICH IS 20 HOURS AND 33 MINUTES, I
24   BELIEVE.  I'LL JUST DOUBLE-CHECK THAT.
25        YOU HAVE LESS THAN 4 AND A HALF HOURS LEFT.
```

1           OKAY.  WHAT ELSE?  ANYTHING ELSE FOR TODAY?

2           SO I WON'T NEED THE CHART.  I'LL JUST HAVE THE ONE HOUR OF

3    CLOSING ARGUMENTS.  I'VE, YOU KNOW, BEEN REVIEWING AND

4    RE-REVIEWING WHAT YOU'VE ALREADY FILED AND I THINK THAT'S -- I

5    THINK IT'S SUFFICIENT, YOUR FINDINGS OF FACT AND CONCLUSIONS OF

6    LAW.  IT PRETTY MUCH TRACKS A LOT OF -- IT PRETTY MUCH TRACKS

7    ALL THE EVIDENCE THAT'S BEEN COMING IN, SO I THINK THAT WILL BE

8    SUFFICIENT.

9           OKAY.  WHAT ELSE?  ANYTHING ELSE FOR TODAY?

10              MR. VAN NEST:  NOTHING QUALCOMM, YOUR HONOR.

11              THE COURT:  OKAY.

12              MS. MILICI:  NOTHING FOR THE FTC.

13              THE COURT:  OKAY.  THEN THANK YOU.

14         DO I HAVE A CALENDAR IN HERE?  SO I WOULD RECOMMEND YOU

15    PLEASE REMOVE EVERYTHING TODAY.

16         THANK YOU.

17              MR. VAN NEST:  THANK YOU, YOUR HONOR.

18              MS. MILICI:  THANK YOU, YOUR HONOR.

19         (THE EVENING RECESS WAS TAKEN AT 4:34 P.M.)

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18         _____

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  JANUARY 15, 2019

22

23

24

25