1        UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3          SAN JOSE DIVISION

4

5

FEDERAL TRADE COMMISSION,          )  C-17-00220 LHK
6                                   )
                    PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                   )
              VS.                   )  JANUARY 18, 2019
8                                   )
QUALCOMM INCORPORATED, A            )  VOLUME 7
9    DELAWARE CORPORATION,          )
                                    )  PAGES 1343-1584
10                  DEFENDANT.      )  **SEALED PAGES** 1473-1477,
                                    )  1570-1573
11   ───────────────────────────

12          TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
13           UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S :

15   FOR THE PLAINTIFF:    FEDERAL TRADE COMMISSION
                           BY:  JENNIFER MILICI
16                              DANIEL J. MATHESON
                                WESLEY G. CARSON
17                              KENT COX
                                NATHANIEL M. HOPKIN
18                              PHILIP J. KEHL
                                MIKA IKEDA
19                         600 PENNSYLVANIA AVENUE, NW
                           WASHINGTON, D.C.  20580
20

21           APPEARANCES CONTINUED ON NEXT PAGE

22   OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR, RMR
                                  CERTIFICATE NUMBER 8074
24
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25          TRANSCRIPT PRODUCED WITH COMPUTER

                                                                      1344

```
1

2       APPEARANCES (CONTINUED)

3

4       FOR THE DEFENDANT:     KEKER, VAN NEST & PETERS
                               BY:  ROBERT A. VAN NEST
5                                   JUSTINA K. SESSIONS
                                    EUGENE M. PAIGE
6                                   CHRISTINA BLAIS
                                    MATAN SHACHAM
7                                   CODY HARRIS
                                    KRISTIN HUCEK
8                              633 BATTERY STREET
                               SAN FRANCISCO, CALIFORNIA  94111
9

10                             CRAVATH, SWAINE & MOORE
                               BY:  GARY A. BORNSTEIN
11                                  MICHAEL BRENT BYARS
                                    YONATAN EVEN
12                                  JORDAN D. PETERSON
                                    MING-TOY TAYLOR
13                                  DEREK SUTTON
                                    ANDREW HUYNH
14                                  ANTONY RYAN
                               825 EIGHTH AVENUE
15                             NEW YORK, NEW YORK  10019

16                             NORTON, ROSE, FULBRIGHT
                               BY:  RICHARD S. ZEMBEK
17                             1301 MCKINNEY, SUITE 5100
                               HOUSTON, TEXAS  77010
18

19      ALSO PRESENT:          MARK SNYDER
                               JEFF DAHM
20                             KEN KOTARSKI

21

22

23

24

25
```

1345

```
1

2

3

4                    INDEX OF WITNESSES

5    DEFENDANT'S

6    JAMES THOMPSON
            DIRECT EXAM BY MR PAIGE              P. 1348
7           CROSS-EXAM BY MR. KEHL               P. 1382

8    ERIC REIFSCHNEIDER
            VIDEOTAPED DEPOSITION                P. 1389
9

10   FABIAN GONELL
            DIRECT EXAM BY MR. BORNSTEIN         P. 1393
11          CROSS-EXAM BY MR. MERBER             P. 1481
            REDIRECT EXAM BY MR. BORNSTEIN       P. 1499
12

13   MATTHIAS SAUER
            DIRECT EXAM BY MR. PAIGE             P. 1502
14          CROSS-EXAM BY MR. CARSON             P. 1522
            REDIRECT EXA BY MR. PAIGE            P. 1529
15

16   LIREN CHEN
            DIRECT EXAM BY MR. ZEMBEK            P. 1533
17

18   JOHN GRUBBS
            VIDEOTAPED DEPOSITION                P. 1564
19

20   IRA BLUMBERG
            VIDEOTAPED DEPOSITION                P. 1565
21

22   MARTIN ZANDER
            VIDEOTAPED DEPOSITION                P. 1569
23

24   TODD MADDEROM
            VIDEOTAPED DEPOSITION                P. 1570
25
```

```
1   NANFEN YU
          VIDEOTAPED DEPOSITION                    P. 1572
2

3

4                       INDEX OF EXHIBITS

5                                 MARKED        ADMITTED

6   PLAINTIFF'S

7   5402                                          1383
    6334                                          1386
8   6786R                                         1485
    7961                                          1497
9

10  DEFENDANT'S

11  9350                         1365
    9204                                          1368
12  1725                                          1410
    9223                                          1414
13  9242                                          1427
    2776                                          1445
14  9266                                          1457
    2259A                                         1463
15  1353                                          1506
    9084                                          1507
16  9088                                          1518
    9240                                          1536
17  2929                                          1569
    2454 AND 2459                                 1570
18

19  JOINT

20  0047                                          1403
    0105                                          1407
21

22

23

24

25
```

```
 1     SAN JOSE, CALIFORNIA                    JANUARY 18, 2019

 2                      P R O C E E D I N G S

 3          (COURT CONVENED AT 9:03 A.M.)

 4               THE COURT:  GOOD MORNING, WELCOME.

 5               MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

 6               MS. MILICI:  GOOD MORNING, YOUR HONOR.

 7               THE CLERK:  PLEASE BE SEATED.

 8               THE COURT:  PLEASE TAKE A SEAT.

 9          PLEASE CALL YOUR NEXT WITNESS.

10               MR. PAIGE:  GOOD MORNING, YOUR HONOR.  BEFORE WE

11     BEGIN, WE HAVE PHOTOS OF THE WITNESSES FOR TODAY AND OTHER

12     DAYS.  I'LL HAND THEM OUT.

13               THE COURT:  OH, THANK YOU.  THANK YOU VERY MUCH.

14               MR. PAIGE:  WOULD YOU LIKE TWO COPIES?

15               THE COURT:  SURE.  THANK YOU.

16               MR. PAIGE:  THANK YOU, YOUR HONOR.

17               THE COURT:  ACTUALLY, IF YOU HAVE MORE, I'LL TAKE

18     MORE.

19               MR. PAIGE:  WE HAVE TWO MORE.

20               THE COURT:  PERFECT.  I'LL TAKE THEM.  I'LL TAKE

21     THEM.  THANK YOU.

22               MR. PAIGE:  SURE.

23          YOUR HONOR, QUALCOMM CALLS DR. JAMES THOMPSON.

24               THE COURT:  OKAY.  IF HE COULD PLEASE COME FORWARD.

25               THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
```

1          (DEFENDANT'S WITNESS, JAMES THOMPSON, WAS SWORN.)

2               THE WITNESS:  I DO.

3               THE CLERK:  THANK YOU.  PLEASE BE SEATED.

4          WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

5     NAME FOR THE RECORD.

6               THE WITNESS:  JAMES HOWARD THOMPSON.  YOU SAID LAST

7     NAME?

8               THE CLERK:  YES.

9               THE WITNESS:  T-H-O-M-P-S-O-N.

10              THE COURT:  OKAY.  TIME IS 9:04.  GO AHEAD, PLEASE.

11              MR. PAIGE:  THANK YOU, YOUR HONOR.

12                        **DIRECT EXAMINATION**

13    BY MR. PAIGE:

14    Q.   GOOD MORNING, DR. THOMPSON.

15    A.   GOOD MORNING.

16    Q.   DR. THOMPSON, WHAT'S YOUR CURRENT POSITION WITH QUALCOMM?

17    A.   I'M THE EXECUTIVE VICE-PRESIDENT OF ENGINEERING AND THE

18    CHIEF TECHNICAL OFFICER.

19    Q.   AND WHAT ARE YOUR JOB RESPONSIBILITIES?

20    A.   SO YOU CAN THINK OF ME AS OVERSEEING ALL OF ENGINEERING AT

21    QUALCOMM.

22    Q.   AND WHAT PART OF QUALCOMM'S BUSINESS DO YOU WORK WITH?

23    A.   SO MOST OF MY CAREER AT QUALCOMM HAS BEEN WORKING WITH THE

24    CHIP GROUP.  SO I'M -- YOU CAN THINK OF ME AS THE CHIP GUY.

25    I'VE BEEN HEAD OF ENGINEERING FOR THE CHIP GROUP FOR A LONG

1     TIME.

2     Q.   HAVE YOU EVER HAD RESPONSIBILITY FOR THE LICENSING

3     BUSINESS AT QUALCOMM?

4     A.   NO.

5     Q.   TO WHOM DO YOU REPORT?

6     A.   STEVE MOLLENKOPF.

7     Q.   WHEN DID YOU START AT QUALCOMM?

8     A.   TWENTY-SEVEN YEARS AGO ALMOST TO THE DAY.

9     Q.   AND WHAT'S YOUR EDUCATIONAL BACKGROUND?

10    A.   I HAVE A PH.D. IN ELECTRICAL ENGINEERING FROM THE

11    UNIVERSITY OF WISCONSIN.  THAT'S WHERE I GREW UP.

12    Q.   OKAY.  AND WHAT DID YOU WORK ON WHEN YOU STARTED AT

13    QUALCOMM?

14    A.   SO WHEN I FIRST CAME TO QUALCOMM, I WAS WORKING ON THE

15    CDMA PROJECT.

16    Q.   AND WHAT DID QUALCOMM'S WORK ON CDMA INVOLVE AT THAT TIME?

17    A.   SO WE WERE PUTTING TOGETHER A SYSTEM -- WE WERE TRYING TO

18    PROMOTE THE TECHNOLOGY AND SO -- AND PROVE THAT IT WORKED.

19         SO WE BUILT A COMPLETE SYSTEM.  BE BUILT BASE STATIONS, WE

20    BUILT PHONES.  WE DEPLOYED THE SYSTEM IN SAN DIEGO AND OTHER

21    PLACES, SO THIS IS NOT JUST DONE IN A LAB.

22         WE DEPLOYED THE SYSTEM OUTDOORS WITH REAL BASE STATIONS.

23         AND THEN WE ALSO BUILT A SYSTEM WHERE WE BROUGHT THAT TO

24    OTHER CITIES, LIKE NEW YORK CITY, HONG KONG, OTHER PLACES TO

25    DEMONSTRATE THAT IT WORKED IN DIFFERENT ENVIRONMENTS.

1    Q.   AND WHAT WERE THE ADVANTAGES THAT QUALCOMM PERCEIVED OF

2    CDMA TECHNOLOGY?

3    A.   SO AT THE TIME THE CELLULAR SYSTEM WAS ANALOG AND THE

4    CAPACITY WAS VERY LIMITED AND BECAUSE OF THE LIMITED CAPACITY,

5    IT LED TO, YOU KNOW, VERY EXPENSIVE PHONE CALLS.  SO CELLULAR

6    WAS VERY EXPENSIVE AT THAT TIME.

7         SO WHAT CDMA PROMISED WAS A MUCH HIGHER VOICE CAPACITY,

8    AND ULTIMATELY IT LED TO, LIKE WITH CDMA, IT WAS, OUR ESTIMATE

9    IS ABOUT 60 TIMES THE CAPACITY FOR A GIVEN AMOUNT OF SPECTRUM.

10   AND THE KEY THERE IS THAT SPECTRUM THAT LIMITED.  SO THE AMOUNT

11   OF SPECTRUM IS LIMITED.  SO WHAT THIS DID IS IT JUST OPENED UP

12   THE AMOUNT OF CAPACITY IN THE SYSTEM.

13        ONE OTHER THING IS JUST FROM A QUALITY, VOICE QUALITY,

14   HAND-OFF QUALITY, RELIABILITY, THINGS LIKE THAT.  SO IT

15   IMPROVED PRETTY MUCH EVERYTHING.

16   Q.   AND WHAT VISION DID QUALCOMM HAVE FOR THE FUTURE OF CDMA?

17   A.   SO EVEN THOUGH CDMA WAS A VOICE SYSTEM, OUR FOCUS IN THE

18   COMPANY WAS DATA.

19        SO WE HAD KIND OF AN ODD COMPANY IN THAT IT WAS REALLY

20   FOUNDED BY PEOPLE, LIKE IRWIN JACOBS, WHO WERE COMMUNICATION

21   THEORY PEOPLE.  HE'S AN ICON.  SO IT ATTRACTED A LOT OF

22   COMMUNICATION THEORY PEOPLE.

23        BUT WE ALSO HAD A LOT OF INVOLVEMENT IN THE INTERNET, AND

24   THAT WAS VERY EARLY -- THE EARLY DAYS OF THE INTERNET.  SO, FOR

25   EXAMPLE, WE DEVELOPED AN E-MAIL CLIENT CALLED EUDORA THAT WE

1    USED INTERNAL TO QUALCOMM, AND IT ENDED UP BECOMING THE MOST

2    POPULAR E-MAIL CLIENT IN THE WORLD AT ONE POINT.

3         ANYWAY, THIS COMBINATION OF INTERNET PEOPLE AND

4    COMMUNICATION THEORY PEOPLE, IT -- WE UNDERSTOOD THAT INTERNET

5    WAS GOING TO BE HUGE AND THAT PROVIDING DATA SERVICES, YOU

6    KNOW, WAS REALLY IMPORTANT.  BECAUSE YOU THINK ABOUT AT THE

7    TIME, IT WAS THESE DIAL-UP MODEMS THAT WERE VERY SLOW AND SO

8    FORTH, AND WE KNEW THAT WE COULD DO SOMETHING MUCH BETTER OVER

9    THE AIR THAN WHAT WAS AVAILABLE AT THAT TIME IN YOUR HOME.

10   Q.   SO WHAT DID QUALCOMM DO TO HELP SEND DATA OVER THE ERR?

11   A.   SO WE, WE STARTED A PROGRAM IN 1995/'96, MID-'90S, AND IT

12   WAS CALLED HDR, HIGH DATA RATE.  ULTIMATELY THAT BECAME THE

13   STANDARD EV-DO, EVOLVED DATA OPTIMIZED, THAT'S WHAT IT STOOD

14   FOR.  IT'S NOT A VERY GOOD ACRONYM, BUT WE'RE ENGINEERING, NOT

15   MARKETING PEOPLE.

16        SO WE STARTED THAT PROGRAM, AND I WANT TO MAKE IT CLEAR

17   THAT THAT WAS A COMPLETELY DIFFERENT SYSTEM THAN WCDMA -- OR

18   CDMA.  SORRY.

19        SO WITH CDMA, WE DEVELOPED THAT, YOU KNOW, FROM THE

20   NETWORK PORTION OF IT, THE BASE STATION PORTION OF IT, PHONES,

21   EVERYTHING.  WE DEVELOPED THE WHOLE SYSTEM.

22        WE DID THE SAME THING WITH DATA AS WELL, AND THIS WAS A

23   BRAND NEW NETWORK, SO IT WAS I.P. BASED.

24        AND WE ALSO OPTIMIZED THE AIR LINK FOR DATA SERVICES AS

25   WELL.  SO IT WASN'T ABOUT VOICE, IT WAS ALL ABOUT DATA.

1    Q.    AND ONCE QUALCOMM CREATED EV-DO, WHAT DID IT DO WITH EVDO?

2    A.    WE BROUGHT IT TO THE STANDARDS TO OPEN IT UP SO THAT

3    OTHERS, YOU KNOW, COULD -- OUR GOAL WAS TO, TO PUSH THE

4    TECHNOLOGY AS FAR AS WE COULD AND GET AS MANY PEOPLE INTERESTED

5    IN THE TECHNOLOGY AS POSSIBLE.  SO WE OPENED IT UP.

6    Q.    WHY WAS QUALCOMM SUCCESSFUL IN CDMA?

7    A.    SO -- SO IN CDMA, WHEN WE ORIGINALLY WERE DOING CDMA, IT

8    WAS MET WITH A LOT OF SKEPTICISM, SO WE ENDED UP HAVING A LOT

9    OF EXPERIENCE, OBVIOUSLY, BECAUSE WE INVENTED IT.

10        BUT THEN ALSO, BECAUSE THERE WAS A LOT OF SKEPTICISM, WE

11   WENT THROUGH MULTIPLE GENERATIONS BEFORE OTHER PEOPLE REALIZED

12   THIS WAS SOMETHING THAT WAS GOING TO HAPPEN.

13        SAME THING HAPPENED WITH D.O.  SO THERE WAS A LOT OF

14   SKEPTICISM.  IT SEEMS CRAZY TODAY, BUT AT THE TIME, IT WASN'T

15   AS OBVIOUS TO PEOPLE THAT DATA WAS GOING TO BECOME IMPORTANT.

16   OR THAT EVEN A DATA ONLY SYSTEM WAS SOMETHING REASONABLE

17   BECAUSE IT WAS ALL ABOUT VOICE AND VOICE WAS CONSIDERED THE

18   KILLER APP AT THE TIME.

19        AND SO DATA IS SOMETHING THAT PEOPLE DIDN'T EMBRACE,

20   ESPECIALLY IN THE '90S.

21   Q.    AND WHAT'S A MULTIMODE CHIP, DR. THOMPSON?

22   A.    SO A MULTIMODE CHIP, SO THAT WOULD BE MULTIMODE MODEMS, SO

23   IT SUPPORTS MULTIPLE STANDARDS ON ONE PIECE OF SILICON.  SO

24   THAT'S -- WHEN WE TALK ABOUT MULTIMODE STANDARDS -- THE REASON

25   WHY THAT'S IMPORTANT IS THESE DIFFERENT STANDARDS, DIFFERENT

1    PARTS OF THE WORLD USE DIFFERENT STANDARDS, SO THAT'S WHY IT'S

2    IMPORTANT.

3    Q.   AND DID QUALCOMM COME TO MAKE MULTIMODE CHIPS AT SOME

4    POINT IN TIME?

5    A.   YEAH.  SO, SO --

6    Q.   WHY DID IT DO SO?

7    A.   OKAY.  SO IF YOU LOOK AT CDMA, IT WAS NOT DEPLOYED VERY

8    BROADLY AROUND THE WORLD, AND SO -- SO THERE WERE ONLY A

9    HANDFUL OF OPERATORS THAT DEPLOYED IT.

10        SO, FOR EXAMPLE, VERIZON, THEY DEPLOYED IT IN THE

11   UNITED STATES.  BUT -- AND THEY HAD A RELATIONSHIP VODAPHONE,

12   AND THEY WANTED TO BE ABLE TO HAVE THEIR CUSTOMERS BE ABLE TO

13   DO GLOBAL ROAMING.

14        WHAT THAT MEANS IS SO SOMEBODY GETS ON AN AIRPLANE, FLIES

15   TO EUROPE, AND THEN THEIR PHONE ACTUALLY WORKS.  IF IT JUST HAD

16   CDMA, IT WOULD NOT WORK.

17        SO WHAT WE START IS WE STARTED -- WE INTRODUCED, FOR

18   EXAMPLE, GSM INTO A CDMA CHIPSET SO THAT WE COULD PROVIDE

19   GLOBAL ROAMING.  AND THAT WAS OUR FIRST MULTIMODE CHIPSET WHERE

20   WE SUPPORTED MULTIPLE STANDARDS THAT YOU COULD GO ANYWHERE IN

21   THE WORLD.

22   Q.   WHAT WAS THE INDUSTRY VIEW OF CDMA IN THE 2000S?

23   A.   SO I WOULD SAY TWO THINGS.  ONE IS IN THE EARLY 2000S,

24   BECAUSE IT WAS NOT DEPLOYED BY THAT MANY OPERATORS, IT WAS --

25   AND IF YOU LOOK AT RELATIVE TO WCDMA, WHICH WAS THE EUROPEAN 3G

1       STANDARD, THERE WAS A LOT MORE OPPORTUNITY, MARKET OPPORTUNITY.

2       SO THE WCDMA ENDED UP BEING MORE, LET'S SAY, FINANCIALLY

3       ATTRACTIVE THAN CDMA BECAUSE JUST THE MARKET WAS LARGER.

4           AND THEN IN THE LATE 2000S, THAT'S WHEN PEOPLE WERE

5       STARTING TO THINK ABOUT EMBRACING DATA AND 4G WAS ON THE

6       HORIZON AND 4G, THAT'S LTE, THE VIEW WAS THAT WE WOULD MOVE

7       VERY RAPIDLY TO AN ALL DATA SYSTEM, KIND OF LIKE THE SAME

8       CONCEPT THAT WE HAD WITH DO BACK IN THE '90S.

9           BUT OUR VIEW AT THAT TIME WAS THAT, THAT THE TRANSITION --

10      THERE ARE A LOT OF TECHNICAL HURDLES TO GET OVER TO MAKE THAT

11      TRANSITION TO AN ALL DATA SYSTEM, AND SO OUR VIEW -- AND WE

12      MADE THIS BET IN, SAY, THE MID 2000S -- IS THAT MULTIMODE WAS

13      GOING TO BE IMPORTANT AND MULTIMODE WAS NOT GOING TO GO AWAY.

14          AND SO -- SO YOU HAD COMPANIES LIKE VERIZON, FOR EXAMPLE,

15      MAKING STATEMENTS, PUBLIC STATEMENTS SAYING WE'RE GOING TO

16      DISCONTINUE OUR CDMA NETWORK AND WE'RE GOING TO GO TO AN ALL

17      VOICE-OVER LTE --

18          MR. KEHL:  OBJECTION.  HEARSAY, YOUR HONOR.

19          THE COURT:  SUSTAINED.

20          THE WITNESS:  SO WHAT DOES THAT MEAN FOR ME?

21      BY MR. PAIGE:

22      Q.  I'LL JUST ASK YOU A NEW QUESTION.

23          WHY DID QUALCOMM CONTINUE TO INVEST IN CDMA IN THE LATE

24      2000S?

25      A.  WELL, OUR VIEW WAS THAT MULTIMODE, OR THAT THE DATA ONLY

1      SYSTEM, A SINGLE MODE SYSTEM, WAS NOT GOING TO GO AWAY FAST.

2          AND SO YOU REALLY NEEDED THIS MULTIMODE PRODUCT BECAUSE

3      THERE WOULD BE -- AS THE NUMBER OF STANDARDS -- AS THE

4      STANDARDS EVOLVED, THE OLD STANDARDS WERE NOT GOING TO GO AWAY

5      AS QUICKLY AS, AS THE INDUSTRY BELIEVED THEY WOULD GO AWAY.

6          SO OUR WHOLE STRATEGY WAS ABOUT MULTIMODE.

7      Q.    ARE YOU FAMILIAR WITH A COMPANY CALLED VIA?

8      A.    YES.

9      Q.    DID VIA MAKE CDMA CHIPS?

10     A.    YES.

11     Q.    HOW DID VIA'S PRODUCT DIFFER FROM QUALCOMM'S, IF AT ALL?

12     A.    YEAH.  SO VIA DID A CDMA MODEM.  THEY ALSO DID A DO MODEM.

13     SO THEY DID BOTH OF THOSE AND THEY, THEY DID A REASONABLE JOB.

14     SO THEY, THEY MET THE STANDARD AND THE -- FROM A MODEM

15     PERSPECTIVE, THAT WERE FINE.

16         THE ISSUE THAT THEY HAD, SAY, FROM A COMMERCIAL POINT OF

17     VIEW IS, ONE, REMEMBER I TALKED ABOUT GLOBAL ROAMING, SO THEY

18     DIDN'T DO A GSM MODEM OR A WCDMA MODEM, WHICH WERE REQUIREMENTS

19     FOR GLOBAL ROAMING.  SO THAT WAS AN ISSUE FOR THEIR PRODUCTS.

20         AND THEN ALSO MULTIMEDIA IS SOMETHING LIKE ANYBODY WHO HAS

21     A PHONE TODAY KNOWS THAT, YOU KNOW, IT'S ABOUT YOUR VIDEO

22     VISUAL EXPERIENCE AND -- TODAY.  AND THAT'S SOMETHING THAT THEY

23     DIDN'T PURSUE.  AND SO THEY DIDN'T -- I SHOULDN'T SAY THAT.

24         THEY DIDN'T PURSUE IT IN A WAY THAT MADE THEM, YOU KNOW --

25     WOULD LEAD TO ANY SUCCESS IN THE MARKET.  THEY DIDN'T HAVE, YOU

1   KNOW, THE KIND OF CAPABILITY THAT THEY REALLY NEEDED TO

2   INTEGRATE INTO THAT CHIPSET AND TO BE SUCCESSFUL IN THIS

3   BUSINESS, IT'S NOT JUST ABOUT HAVING A MODEM, IT'S ABOUT HAVING

4   ALL THIS MULTIMEDIA CAPABILITY AS WELL.

5   Q.   DID THERE COME A TIME THAT QUALCOMM BEGAN TO MAKE LTE

6   CHIPS?

7   A.   YES.  YEAH.

8   Q.   AND WHAT HAS MADE QUALCOMM'S LTE CHIPS SUCCESSFUL?

9   A.   WELL, I WOULD SAY TWO THINGS.  ONE IS WE TRY AND SUCCEED

10  TO BE THE FIRST TO COME OUT WITH THE LATEST FEATURE SET.  SO

11  EVERY YEAR WE'RE DEVELOPING, WE'RE IMPROVING OUR MODEM, COMING

12  OUT WITH WHAT IS THE LATEST FEATURE SET DEVELOPED BY THE

13  STANDARD.

14       AND ALSO, I THINK THE OTHER VERY KEY THING, JUST AS

15  IMPORTANT, IS THAT WE PROVIDE THIS MULTIMODE PRODUCT.

16  Q.   DR. THOMPSON, IF I COULD ASK YOU TO TURN TO THE

17  DEMONSTRATIVES YOU HAVE THERE IN YOUR BINDER AND TURN TO THE

18  THIRD ONE.  IT'S UP ON THE SCREEN NOW AS WELL?

19  A.   OKAY.

20  Q.   COULD YOU EXPLAIN TO THE COURT WHAT THIS SHOWS?

21  A.   YEAH.  SO IF YOU LOOK AT THE -- EXCUSE ME.

22       IF YOU LOOK AT THE BIG BOXES AT THE BOTTOM, THOSE ARE ALL

23  THE DIFFERENT STANDARDS THAT EXIST IN THE WORLD.  SO THERE'S A

24  LOT OF THEM.

25       AND NOW IF YOU DESIGN A MODEM, A MULTIMODE -- IF YOU WANT

1    TO SUPPORT ALL OF THOSE MODEMS, YOU COULD DESIGN EACH ONE OF

2    THESE THINGS INDIVIDUALLY AND JUST PUT THEM NEXT TO EACH OTHER.

3    BUT THAT WOULD BE VERY INEFFICIENT FROM A COST POINT OF VIEW.

4         SO WHAT WE, WE DID AND WE STARTED DOING THIS IN THE

5    MID-2S, IS WE WOULD DESIGN A PIECE OF HARDWARE THAT IS

6    CONFIGURABLE SO THAT IT CAN SUPPORT ALL OF THESE DIFFERENT

7    MODES OF THE MODEM.

8         SO -- AND THEN -- SO THAT MAKES IT VERY EFFICIENT FROM A

9    COST POINT OF VIEW.

10        AND THEN AFTER THAT -- OR ANOTHER THING THAT'S REALLY

11   IMPORTANT IS THAT THERE'S A LOT OF DIFFERENT COMBINATIONS OF

12   THESE MODEMS, EVEN IF A, ONE OPERATOR'S NETWORK, THERE MAY BE,

13   YOU KNOW, TWO OR THREE OR FOUR OF THESE MODES THAT NEED TO BE

14   SUPPORTED.

15        SO YOU HAVE TO BE ABLE TO SUPPORT HANDOFFS BETWEEN THEM.

16   SO IT ENDS UP BEING A VERY COMPLICATED -- YOU KNOW, YOU SEE ALL

17   THE SPAGHETTI AT THE BOTTOM THERE.  THAT'S JUST REPRESENTING

18   THE DIFFERENT COMBINATIONS OF THESE MODEMS THAT NEED TO OPERATE

19   AT THE SAME TIME.

20        AND THEN THE SMALL BOXES AT THE TOP, THE ONES WITH NUMBERS

21   IN THEM, THOSE ARE THE FREQUENCY BANDS THAT YOU NEED TO SUPPORT

22   AROUND THE WORLD.  SO, LIKE, THINK OF THEM AS LIKE RADIO

23   CHANNELS, YOU KNOW, LIKE YOU TURN YOUR TV OR YOUR RADIO OR

24   WHATEVER.

25        BUT ANYWAY, THERE'S ALSO A LOT OF DIFFERENT COMBINATIONS,

1    AND EVERY GOVERNMENT IN THE WORLD MAKES THEIR OWN DECISION

2    ABOUT WHAT FREQUENCIES THEY'RE GOING TO OFFER.

3         AND THEN EVEN WITHIN A COUNTRY, LIKE VERIZON USES

4    DIFFERENT FREQUENCIES THAN SPRINT OR AT&T.

5         AND SO IT ENDS UP BEING A VERY MULTI DIMENSIONAL PROBLEM,

6    AND SO IT'S A REAL ENGINEERING CHALLENGE TO DO THIS MULTIMODE

7    KIND OF ALL WORLD PRODUCT --

8    Q.   AND WHAT DOES QUALCOMM --

9    A.   -- THAT WE DO.

10   Q.   SORRY.  WHAT DOES QUALCOMM DO WITH CARRIERS AROUND THE

11   WORLD TO HELP WITH THIS SYSTEM?

12   A.   YEAH.  SO TO DO THIS MULTIMODE, ALL WORLD PRODUCT, WE HAVE

13   TEAMS ALL OVER THE WORLD THAT ACTUALLY DO TESTING.  SO WE DO

14   TESTING IN THE FIELD.  WE -- THERE'S TESTING THAT WE DO IN OUR

15   LABS WHERE WE TRY TO DUPLICATE THE VARIOUS NETWORKS AROUND THE

16   WORLD, SO WE DO THAT.

17        AND THEN ALSO CHALLENGING SPOTS, YOU KNOW, IN VARIOUS

18   NETWORKS, WE DO THAT IN OUR LABS.

19        BUT ULTIMATELY WE HAVE TEAMS AROUND THE WORLD AND WE TEST

20   IN THOSE NETWORKS TO PROVE THAT IT WORKS.  AND SO IT MAKES IT

21   EASY FOR OUR CUSTOMERS TO GO TO ANY OPERATOR THEY WANT.

22   Q.   I WANT TO DRAW YOUR ATTENTION BACK TO THE TIME THAT

23   QUALCOMM RELEASED ITS FIRST LTE MODEM CHIP.

24   A.   OKAY.

25   Q.   WHAT DID QUALCOMM THINK ABOUT WHERE IT WOULD BE AS

1    COMPARED TO THE COMPETITION AT THE TIME IT RELEASED ITS FIRST

2    LTE MODEM CHIP?

3    A.   YEAH.  SO WHEN WE WERE WORKING ON, ON LTE -- ACTUALLY, IT

4    WAS -- WE THOUGHT WE WERE BEHIND, AND IF YOU LOOKED AT --

5    BECAUSE THERE WAS A LOT OF EVIDENCE OF THAT.

6         IF YOU LOOK AT DEMOS THAT WERE BEING DONE, LIKE IN KOREA

7    WITH LG AND SAMSUNG, THEY WERE DOING DEMOS OF CHIPS BEFORE WE

8    HAD A CHIP.  SO WE THOUGHT WE WERE CLEARLY BEHIND.

9         WE WERE BEING TOLD BY OPERATORS, YOU KNOW, GIVING A LIST

10   OF OUR COMPETITORS THAT WERE AHEAD OF US.

11             MR. KEHL:  OBJECTION.  HEARSAY.

12             THE COURT:  SUSTAINED.

13             THE WITNESS:  SO WE WERE BEING TOLD -- OR THE

14   EVIDENCE --

15             MR. KEHL:  SAME OBJECTION, YOUR HONOR.

16             THE COURT:  SUSTAINED.

17             MR. PAIGE:  I'LL MOVE ON.

18             THE COURT:  ALL THE HEARSAY IS STRICKEN FROM THE

19   TRANSCRIPT.

20   BY MR. PAIGE:

21   Q.   WHAT DID QUALCOMM DO WHEN IT THOUGHT IT WAS GOING TO BE

22   BEHIND?

23   A.   OKAY.  SO THAT -- IT WAS LIKE A CALL TO ARMS IN THE

24   COMPANY WHERE WE, YOU KNOW, MARSHALLED THE RESOURCES THAT WE

25   COULD AROUND THE COMPANY TO TRY TO CATCH UP, AND CLEARLY WE HAD

1    THESE DEMOS THAT WE SAW, SO THERE WAS A LOT OF EVIDENCE THAT WE

2    WERE BEHIND.

3         AND SO WE, WE -- YOU KNOW, WE PULLED OUT ALL THE STOPS AND

4    THEN EVENTUALLY CAME OUT WITH A PRODUCT.

5    Q.   AND WHAT HAPPENED WHEN QUALCOMM'S LTE MODEM CHIP ACTUALLY

6    CAME OUT?

7    A.   TO OUR SURPRISE, WE WERE THE ONLY ONES WHEN WE CAME OUT

8    WITH THAT PRODUCT.  WE WERE THE ONLY ONES THERE THAT HAD A

9    COMMERCIAL PRODUCT.

10   Q.   SO WE'VE TALKED A BIT ABOUT THE FAST DATA RATES THAT MAKE

11   QUALCOMM'S CHIPS ATTRACTIVE, AND YOU MENTIONED SOMETHING ABOUT

12   MULTIMEDIA.

13        COULD YOU EXPLAIN WHAT MULTIMEDIA IS AND HOW IT MAKES

14   CELLULAR MODEMS ATTRACTIVE TO OEM'S?

15   A.   YEAH.  SO JUST -- I THINK EVERYBODY HAS EXPERIENCE WITH

16   THEIR PHONES TODAY, SO I'LL REFERENCE THAT.

17        LIKE, FOR EXAMPLE, A CAMERA WOULD BE AN EXAMPLE OF

18   MULTIMEDIA.  AND YOU'VE SEEN THE CAMERA GO FROM, LIKE, DIGITAL

19   CAMERA GO FROM, SAY, IN 19 -- IN 2000, SAY, IT WAS A TOY, YOU

20   KNOW, SORT OF THE QUALITY WAS TERRIBLE AND ALL THAT.

21        AND THEN NOW YOU SEE, LIKE, WITHIN A PHONE, THE IMAGE

22   PROCESSING THAT WE CAN DO, IT'S DIGITAL SIGNAL PROCESSING IS

23   WHAT IT IS, IT'S SO POWERFUL THAT WE CAN MAKE, YOU KNOW, THESE

24   PHONES HAVE THIS INCREDIBLE QUALITY PICTURES.  AND THE SAME

25   THING APPLIES TO VIDEOS.  IT'S THINGS LIKE GAMES AND

1    INTERESTING THINGS HAPPENING ON YOUR DISPLAY, IT'S AUDIO.

2    THOSE ARE THE KIND OF THINGS THAT, THAT WE THINK, YOU KNOW,

3    MAKE IT A COMPELLING EXPERIENCE.  THAT'S A PART OF IT THAT

4    MAKES IT A COMPELLING EXPERIENCE.

5    Q.   AND ARE THOSE FUNCTIONALITIES ON THE MODEM CHIP ITSELF?

6    A.   YEAH, AT LEAST THE CHIP THAT IS WE SELL -- MOST OF THE

7    CHIPS THAT WE SELL HAVE THIS ALL WORLD -- ALL MODE MODEM IN IT

8    INTEGRATED WITH AN APPLICATION PROCESSOR.  THAT APPLICATION

9    PROCESSOR HAS ALL THIS MULTIMEDIA CAPABILITY, CPU.  THINK OF IT

10   AS A COMPUTER WITH A LOT OF DEDICATED HARDWARE TO DO CERTAIN

11   FUNCTIONS LIKE VIDEO, CAMERA, GRAPHICS, ALL THOSE THINGS

12   EXTREMELY WELL AND EFFICIENT.

13        BUT THE KEY IS WE SELL THAT, PLUS A MODEM.  THAT'S OUR

14   MAIN BUSINESS.

15   Q.   WHAT DO YOU CALL CHIPS THAT HAVE THESE FUNCTIONALITIES

16   INTEGRATED ONTO THEM WITH THE MODEM?

17   A.   THE INDUSTRY CALLS IT SYSTEM ON A CHIP, OR SOC.

18   Q.   AND WHAT DO YOU CALL THE FUNCTIONALITIES THAT QUALCOMM

19   INTEGRATES ONTO THESE SOC'S?

20   A.   AT LEAST INTERNAL TO QUALCOMM, WE CALL THEM CORES, AND YOU

21   CAN THINK OF IT AS WE HAVE A CHASSIS, WHICH IS OUR KIND OF MAIN

22   DESIGN, AND THEN YOU, LIKE LEGO BLOCKS, YOU SNAP IN THESE, YOU

23   KNOW, GRAPHICS CORES OR CAMERA CORES OR VIDEO CORES INTO THAT

24   CHASSIS AND THAT'S HOW WE DESIGNED THINGS.

25   Q.   AND HOW DO THESE SOC'S WITH THE CORES CREATE VALUE FOR

1    OEM'S?

2    A.   YEAH.  SO IF AN OEM HAD TO COBBLE TOGETHER ALL OF THESE

3    THINGS, WHETHER IN DISCRETE FORM OR PUT THEM TOGETHER IN A

4    CHIP, IT'S VERY, VERY COMPLICATED AND EXPENSIVE.

5         SO WE DO ALL THOSE THINGS, ALL THE THINGS THAT YOU SEE IN

6    A PHONE, WE TRY TO PULL ALL THAT TOGETHER AND CREATE A SYSTEM.

7         AND THE FACT THAT WE DESIGN ALL OF THESE COMPONENTS

8    OURSELVES, WE DON'T GET THEM FROM OTHER PEOPLE, WE DESIGN THEM

9    ALL OURSELVES, MAKES FOR A VERY KIND OF TIGHT, EFFICIENT

10   SYSTEM.  AND THAT'S A BIG REASON WHY WE'RE SUCCESSFUL.

11   Q.   CAN YOU TELL US A LITTLE BIT ABOUT THE SIZE OF THE TEAMS

12   QUALCOMM HIRED FOR PUTTING THESE CORES ON SOC'S?

13   A.   YEAH.  SO WITH MULTIMEDIA -- SO MAYBE GO BACK IN HISTORY.

14        IN 2000, I THINK I MENTIONED THAT WE WERE DOING -- I DON'T

15   THINK IF I MENTIONED WE WERE DOING CAMERA, WE WERE DABBLING IN

16   CAMERA AND DABBLING IN MP3, WHICH IS AN AUDIO SYSTEM FOR MUSIC.

17        AND THEN IT BECAME VERY CLEAR TO ME AND SOME OTHER PEOPLE

18   THAT IF -- OUR COMPANY WAS ABOUT DATA, DRIVING INTERNET DATA,

19   WIRELESS.

20        AND WHAT WAS GOING TO DRIVE THAT IN A PHONE, YOU KNOW,

21   WHAT'S GOING TO USE IT, WHAT'S GOING TO CONSUME THE DATA AND

22   WHAT'S GOING TO GENERATE THE DATA IS REALLY MULTIMEDIA.

23        SO I HAD ASKED THE TEAM, OUR SYSTEMS ENGINEERING TEAM TO

24   COME BACK WITH KIND OF A GO BIG PLAN I CALLED IT.

25        AND THEN I REMEMBER THERE WAS SOME SKEPTICISM, SOME PEOPLE

1    AGREED, SOME PEOPLE DIDN'T AT THE TIME.  AND THEN THE LEAD CAME

2    BACK AND SAID I'VE GOT THIS PLAN FOR SEVEN PEOPLE.  AND I WAS

3    LIKE, NO, I WANT 70 PEOPLE.  AND EVEN -- I LOOK BACK TODAY AND

4    I GO I WANT 70 PEOPLE, AND IT SEEMS ALMOST RIDICULOUS BECAUSE

5    TODAY WE HAVE A COUPLE THOUSAND PEOPLE WORKING ON IT.

6         BUT AT THE TIME IT WAS A VERY KIND OF BIG DECISION THAT WE

7    MADE TO START RAMPING REALLY HARD ON MULTIMEDIA.

8    Q.   CAN YOU GIVE EXAMPLES OF SOME OF THE SIZES OF THE TEAMS IN

9    MULTIMEDIA AS OF MARCH 2018?

10   A.   YEAH.  SO OUR CAMERA TEAM, FOR EXAMPLE, WAS ABOUT 500

11   PEOPLE.  OUR GRAPHICS TEAM IS ABOUT 600 PEOPLE.  WE DO ALL, ALL

12   OF THAT OURSELVES INTERNALLY.

13   Q.   SO IT SOUNDS LIKE THESE ARE GENERALLY HIGH END CHIPS.

14   DOES QUALCOMM ALSO MAKE PRODUCTS FOR THE MORE BUDGET CONSCIOUS

15   END OF THE MARKET?

16   A.   YES.  SO WE HAVE A TIER OF PRODUCTS, SO WE DO WHAT WE

17   WOULD CALL PREMIUM TIER, AND THEN WE DO A NUMBER OF TIERS ALL

18   THE WAY DOWN TO WHAT WE CALL THE ENTRY LEVEL.

19        AND SO IF YOU LOOK AT OUR ENTRY LEVEL PART, IT'S DESIGNED

20   FOR A SMARTPHONE, SO IT DOES ALL THESE THINGS, BUT IT'S JUST

21   MUCH CHEAPER.  IT'S ABOUT ONE-TENTH THE COST.

22        MR. PAIGE:  YOUR HONOR, MAY I APPROACH THE WITNESS

23   WITH A DEMONSTRATIVE?

24        THE COURT:  GO AHEAD, PLEASE.

25        MR. PAIGE:  THANK YOU (HANDING).

1    Q.    DR. THOMPSON, WHAT'S A QRD?

2    A.    A QRD IS A QUALCOMM REFERENCE DESIGN, SO IT'S JUST A PHONE

3    (INDICATING).

4          AND I THINK THE KEY POINT HERE IS THAT IT IS A PHONE THAT

5    WE DESIGN OURSELVES, SO WE DO THE WHOLE THING, AND THEN WE

6    OFFER IT TO OUR CUSTOMERS.  GENERALLY THE CUSTOMERS THAT ARE

7    INTERESTED IN THIS ARE SMALL, A LOT OF TIMES IN THE DEVELOPING

8    WORLD.

9          AND WHAT -- AND THEY DON'T ALWAYS JUST TAKE THIS EXACTLY

10   HOW WE DESIGN IT AND BRING IT TO, YOU KNOW, A MANUFACTURING AND

11   RELEASE THAT.

12         THEY'LL MAKE CHANGES.  LIKE I WAS JUST SHOWN ONE FROM A

13   CUSTOMER IN BRAZIL, ACTUALLY, THEY'RE GOING TO DO PHONE

14   MANUFACTURING IN BRAZIL WHERE THEY JUST CHANGED THE CAMERA, FOR

15   EXAMPLE.  THEY TOOK OUR DESIGN AND CHANGED THE CAMERA.  THAT'S

16   AN EXAMPLE OF HOW IT MIGHT BE USED.

17   Q.    SO WHAT DOES THE QRD ENABLE A SMALL COMPANY TO DO?

18   A.    WELL, WHAT WE TRY TO DO IS WE, WE DO ALL OF THIS R&D ON

19   THE CHIPS, BUT THEN WE ALSO DESIGN THE ENTIRE PHONE AND WE TRY

20   TO MAKE IT VERY SIMPLE FOR SMALL COMPANIES THAT DON'T HAVE A

21   LOT OF RESOURCES TO BE ABLE TO COMPETE NOT JUST IN LOW TIER

22   PHONES, BUT EVEN IN PREMIUM TIER PHONES.

23              THE COURT:  CAN WE PUT A NUMBER ON THAT JUST FOR THE

24   RECORD?

25              MR. PAIGE:  SURE.

1    THE COURT:  DO YOU WANT THAT TO BE QDX WHATEVER THE

2    NEXT NUMBER IS?

3    MR. PAIGE:  3349, YOUR HONOR.  9350, YOUR HONOR.

4    THE COURT:  9350.  OKAY.

5    MR. PAIGE:  THANK YOU, YOUR HONOR.

6    (DEFENDANT'S EXHIBIT QDX 9350 WAS MARKED FOR

7    IDENTIFICATION.)

8    THE COURT:  AND THEN LET'S -- WE'LL TALK LATER ABOUT

9    PROBABLY WE SHOULD HAVE ALL OF THE DEMONSTRATIVES AT LEAST

10   LODGED, EVEN THOUGH THEY'RE NOT BEING ADMITTED, FOR THE RECORD

11   IT SHOULD BE COMPLETE.  AND WE'LL PROBABLY NEED THAT PHONE

12   THEN.

13   ALL RIGHT.  THANK YOU.  SORRY FOR THE INTERRUPTION.  GO

14   AHEAD, PLEASE.

15   BY MR. PAIGE:

16   Q.   WHY DOES SOMETHING LIKE QRD MAKE SENSE FOR QUALCOMM?

17   A.   WELL, OUR GOAL IS TO PUSH THE TECHNOLOGY AS FAR AS WE CAN

18   AND TO AS MANY PEOPLE AS WE CAN, AND I THINK ALSO IF YOU LOOK

19   AT THE HISTORY OF THE MOBILE INDUSTRY, YOU END UP WITH THESE

20   BIG PLAYERS -- THIS KIND OF HAS GONE THROUGH CYCLES, AND WE'VE

21   LIVED THROUGH THE CYCLES WHERE YOU HAVE THE BIG PLAYERS, PHONE

22   MANUFACTURERS IS WHAT I MEAN, THAT TEND TO CONTROL THE

23   INDUSTRY.

24   AND THEN LITTLE GUYS COME UP AND BECOME NEW BIG

25   COMPETITORS FOR THEM.  I'LL GIVE YOU AN EXAMPLE IS WE, LIKE

1       SAMSUNG, YOU GO BACK MANY YEARS AND WE STARTED WITH SAMSUNG IN

2       THIS SORT OF MANNER AND THEY BECAME A BIG GUY.

3             AND THEN YOU LOOK TODAY, WE HAVE SOME CUSTOMERS THAT

4       STARTED OFF BEING VERY SMALL.  I'LL GIVE YOU EXAMPLES WOULD BE

5       LIKE OPPO, VIVO, XIAOMI, ONEPLUS, VERY SMALL AT A TIME, BUT NOW

6       THEY'RE BECOMING VERY STRONG COMPANIES AND THEY'RE CHALLENGING,

7       STARTING TO CHALLENGE HUAWEI, THEY'RE STARTING TO CHALLENGE

8       SAMSUNG AND APPLE.  THEY'RE GOING TO BE GOING TO EUROPE.

9             AND SO WE TRY TO -- BASICALLY THE SMALL COMPANIES LOVE US,

10      AND THEN THE LARGE COMPANIES, IT'S KIND OF LIKE WE'RE

11      COMPETITION AND A SUPPLIER.  SO THEY LIKE US AND DON'T LIKE US

12      I GUESS.

13      Q.   AND WHAT DO YOU THINK ABOUT THE SPREAD OF COMMUNICATIONS

14      TECHNOLOGY AROUND THE WORLD THROUGH THINGS LIKE QRD?

15      A.   YEAH.  SO FOR ME -- LIKE WHEN I STARTED IN THIS BUSINESS,

16      OR WHEN I CAME TO QUALCOMM 27 YEARS AGO, YOU KNOW, I COULDN'T

17      AFFORD A PHONE.  YOU KNOW, SO PHONES WERE VERY EXPENSIVE.  THE

18      ANALOG PHONES WERE VERY, VERY EXPENSIVE.

19            SO YOU LOOK AT WHAT'S HAPPENED, QUALCOMM, OUR INDUSTRY,

20      YOU KNOW, NOW PHONES ARE, YOU KNOW, IT'S LIKE HALF THE

21      POPULATION OF THE WORLD OWNS A PHONE, WHICH I THINK IS PRETTY

22      INCREDIBLE.

23            BUT IT'S NOT JUST A PHONE.  IT'S ALSO A COMPUTING DEVICE.

24      IT'S A CONNECTION TO THE INTERNET.  AND SO YOU HAVE -- I THINK

25      THIS IS ESPECIALLY IMPORTANT FOR THE DEVELOPING WORLD, AND

1    THEN -- AND JUST -- YOU KNOW, GOING BACK TO QRD AND SOME OF

2    THESE SUPER LOW COST PARTS THAT WE DO IS THAT THAT'S -- I THINK

3    THAT THE COMMUNICATIONS AND INTERNET AND DATA ARE, YOU KNOW,

4    THE KEY TO KIND OF, I WOULD SAY, BOTH ECONOMIC SUCCESS AND

5    HUMAN SUCCESS AROUND THE WORLD.

6         SO IT'S SOMETHING THAT I'M ACTUALLY VERY PROUD OF THAT

7    I'VE BEEN PART OF.

8    Q.   DR. THOMPSON, IF I COULD ASK YOU TO TURN TO QX 9204 IN

9    YOUR BINDER.

10            THE COURT:  THIS IS A QX AND NOT A QDX; IS THAT

11   CORRECT?

12            MR. PAIGE:  THAT'S CORRECT, YOUR HONOR.

13   Q.   DR. THOMPSON, DO YOU RECOGNIZE QX 9204?

14   A.   YES.

15   Q.   AND WAS THIS MADE IN OR AROUND THE TIME OF THIS -- BY

16   SOMEONE WITH KNOWLEDGE OF THE DOCUMENT?

17   A.   YES.

18   Q.   WAS IT MADE IN OR AROUND THE TIME OF THE EVENTS RECORDED

19   IN THE DOCUMENT?

20   A.   YES.

21   Q.   IS IT KEPT BY QUALCOMM IN THE REGULAR COURSE OF ITS

22   BUSINESS?

23   A.   YES.

24   Q.   AND IS IT MAINTAINED BY QUALCOMM IN ITS RECORDS?

25   A.   YES.

1          MR. PAIGE:  I MOVE THE ADMISSION OF QX 9204, YOUR

2    HONOR.

3          MR. KEHL:  NO OBJECTION, YOUR HONOR.

4          THE COURT:  IT'S ADMITTED.

5      (DEFENDANT'S EXHIBIT 9204 WAS ADMITTED IN EVIDENCE.)

6          THE COURT:  GO AHEAD, PLEASE.

7    BY MR. PAIGE:

8    Q.  DR. THOMPSON, IF YOU WOULD TURN TO SLIDE 14 OF QX 9204.

9    A.  OKAY.  I'VE GOT IT.

10   Q.  WHAT DOES THIS TELL US -- THIS WAS FROM JUNE 2011; RIGHT?

11   A.  YES.

12   Q.  WHAT DOES THIS TELL US ABOUT QUALCOMM'S VIEW OF

13   COMPETITION IN JUNE OF 2011?

14   A.  WELL, SO THIS -- THIS IS -- YOU LOOK AT THE COMPANY LOGOS,

15   THIS IS SOME -- NOT ALL THE COMPETITION THAT WE HAD AT THAT

16   TIME, BUT A LOT OF THE COMPETITORS THAT WE THOUGHT WERE, YOU

17   KNOW, THAT WE WERE CONCERNED ABOUT, SAY.

18        AND IF YOU LOOK AT THIS, THE -- WHAT THIS IS SAYING IS

19   THAT, AT LEAST -- AND I MENTIONED THIS BEFORE IN MY

20   TESTIMONY -- THAT WHAT THE KEY IS HAVING APPLICATION PROCESSOR

21   WHICH INCLUDES ALL THIS MULTIMEDIA, AND A MODEM, INTEGRATE

22   THOSE TWO THINGS TOGETHER.

23        AND SO WHAT THIS IS DESCRIBING IS, LIKE, A BROADCOM,

24   MARVEL, ST-ERICSSON WERE ALREADY THERE, THEY WERE ALREADY DOING

25   THAT.

1           AND THEN WE HAD THE COMPANIES AT THE TIME, NVIDIA AND

2   SAMSUNG, INTEL WERE ALL PURSUING THAT.  SO WE WERE EXPECTING

3   THAT AT LEAST THOSE THREE COMPANIES WOULD SOON MOVE OVER INTO

4   THIS KIND OF TOTALLY INTEGRATED SOC PRODUCT.

5           AND SO OUR, OUR EXPECTATION WAS THAT THAT'S WHERE YOU

6   REALLY -- THAT'S WHERE THE BATTLEGROUND WAS, OR THAT'S WHERE

7   THE MOST EFFICIENT DESIGN WOULD BE, AND SO WHOEVER WAS THERE

8   WOULD BE THE KIND OF MOST DIFFICULT COMPETITION FOR US.

9   Q.   OKAY.  AND IF YOU COULD TURN TO SLIDE 44, PLEASE.

10  A.   YEAH, OKAY.

11  Q.   AND WHAT DOES THIS TELL YOU ABOUT QUALCOMM'S VIEW OF WHERE

12  IT WAS AND WHERE IT NEEDED TO BE IN 2011 IN TERMS OF THIS

13  INTEGRATION YOU'RE TALKING ABOUT?

14  A.   YEAH.  SO IF YOU REMEMBER, I TALKED A LITTLE -- THESE ARE

15  APPLICATION PROCESSOR TECHNOLOGIES, AND SO, LIKE CAMERA IS ONE

16  OF THE MULTIMEDIAS --

17  Q.   THE CORES THAT YOU TALKED ABOUT?

18  A.   YEAH, THE CORES, THAT'S RIGHT.

19          SO WE FELT PRETTY GOOD AT THAT TIME ABOUT THE CAMERA.  WE

20  PUT A LOT OF FOCUS ON THE CAMERA.

21          BUT THERE WERE SOME OF THESE TECHNOLOGIES THAT WE THINK --

22  WE THOUGHT THAT WE WERE BEHIND, AND I -- TO ME THE ONES THAT

23  STOOD OUT WERE REALLY GPU, THAT'S GRAPHICS, BY THE WAY, AND

24  ALSO VIDEO.

25          THERE'S OTHERS, BUT THOSE ARE THE ONES THAT I WAS VERY,

```
 1    VERY CONCERNED ABOUT.

 2         AND, OF COURSE, IF YOU LOOK ON THE RIGHT SIDE, OUR PLAN --

 3    SO THIS WASN'T -- BY THE WAY, THIS CHART ISN'T JUST US

 4    REALIZING, OH, MY GOD, WE'VE GOT TO DO THIS BECAUSE I SAW THIS

 5    CHART.  THIS WAS A CHART WHERE WE'RE TRYING TO REPRESENT WHAT

 6    OUR PLAN IS.

 7         SO OUR PLAN WAS TO GET -- IN THE 2013 TIMEFRAME, WE HAD A

 8    VERY SPECIFIC PART IN MIND, AND WE WANTED TO BECOME LEADERS IN

 9    THOSE TWO AREAS IN PARTICULAR.

10    Q.   AND TURNING TO THE NEXT SLIDE, SLIDE 45, WHAT DOES THIS

11    TELL YOU ABOUT THE THINGS THAT QUALCOMM THOUGHT IT NEEDED TO DO

12    WITH ITS CORES?

13    A.   YEAH.  SO ON THE LEFT, THOSE ARE JUST TECHNOLOGIES THAT

14    ARE PART OF THE APPLICATION PROCESSOR AND -- OR REPRESENT THE

15    MAIN TECHNOLOGIES.  SO THAT'S THE CAMERA, VIDEO, POSITION

16    LOCATION, YOU KNOW, A LOT OF THINGS LIKE THAT.

17         SO WE HAVE TEAMS ASSOCIATED WITH EACH ONE OF THESE

18    TECHNOLOGIES, AND THEN -- THIS IS JUST VERY SIMPLE TO SHOW WHAT

19    THESE TEAMS ARE -- WHAT THEY'RE CONCERNED ABOUT, WHAT THEY

20    BELIEVE THEY HAVE TO DO IN THE NEXT FEW YEARS, WHAT SOME OF THE

21    DISRUPTIONS MIGHT BE THAT THEY HAVE TO DEAL WITH.

22         SO THAT'S KIND OF WHAT THIS CHART REPRESENTS.

23    Q.   OKAY.  DR. THOMPSON, I'D LIKE YOU TO TURN TO SLIDE 2 IN

24    YOUR DEMONSTRATIVES, PLEASE.

25    A.   YEAH.  GOT IT.
```

1    Q.   DOES THIS SLIDE SHOW SOME EXAMPLES OF THINGS THAT QUALCOMM

2    HAS DONE FIRST?

3    A.   YEAH.  SO THE FIRST CHIP ON HERE IS THE MSM 5500.  THAT

4    WAS THE FIRST EV-DO CHIP.  IT ALSO INCLUDED CDMA AND HAD EV-DO

5    IN IT AS WELL.

6    Q.   AND THAT'S THE EV-DO WE SPOKE ABOUT EARLIER IN YOUR

7    TESTIMONY?

8    A.   YES.

9    Q.   AND THE CHIP NEXT TO THAT, THE MSM 6100, WHAT FIRST DOES

10   THAT REPRESENT?

11   A.   YEAH, SO 6100, THAT IS WHERE WE WERE TRYING TO PROVIDE

12   VERIZON GLOBAL ROAMING CAPABILITY SO THAT WE COULD USE THEIR

13   PARTNERSHIP WITH VODAPHONE.

14   Q.   I'M SORRY.  IS THAT THE 6100?

15   A.   60 -- MSM 6100.  I GOT IT.  I CAN SEE IT.  YEAH.

16        AND -- YEAH.  SO THAT WAS REALLY OUR FIRST MULTIMODE

17   PRODUCT THAT WE DID.

18   Q.   WAS THAT THE 6300 OR THE 6100 WAS THE MULTIMODE?

19   A.   YEAH, OKAY.  I -- I'M SORRY.  I WAS TALKING ABOUT THE

20   6300.  OKAY.

21        I'VE GOT TO START OVER AGAIN.  6100 WAS THE GLOBAL ROAMING

22   PRODUCT, THE FIRST MULTIMODE -- OKAY.  NOW I'M -- OKAY.  I'M

23   REALLY SCREWING THIS UP.

24        6100 WAS THE FIRST PART THAT WE INTEGRATED -- I

25   APOLOGIZE -- 6100 WAS THE FIRST PART THAT WE INTEGRATED CAMERA

1    AND MP3.  SO MP3 IS THAT AUDIO STANDARD THAT I TALKED ABOUT.

2    SO THAT WAS OUR FIRST, CALL IT, MULTIMEDIA CHIP.

3         OKAY.  6300 WAS THE FIRST GLOBAL ROAMING PART THAT WE DID

4    FOR VERIZON SO THAT THEY COULD -- THEIR CUSTOMERS COULD GO TO

5    EUROPE.

6    Q.   WITH VODAPHONE.  YOU TALKED ABOUT THAT EARLIER?

7    A.   WITH VODAPHONE.  SORRY ABOUT THE CONFUSION.

8    Q.   THAT'S OKAY.  MOVING OVER TO THE NEXT ONE, THE 7600, WHAT

9    WAS THAT CHIP THE FIRST OF?

10   A.   OKAY.  SO THAT'S -- SO I MENTIONED BEFORE THAT WE HAD MADE

11   A DECISION TO SUPPORT ALL MODES IN THE WORLD SO OUR MODEMS

12   COULD GO ANYWHERE IN THE WORLD, AND THAT WAS THE FIRST CHIP

13   THAT SUPPORTED THAT.

14        AND WHY -- LIKE FOR OUR CUSTOMERS, OUR CUSTOMERS ALL HAD

15   GLOBAL AMBITIONS.  SO THEY WANTED TO BE ABLE TO SELL ON ANY

16   NETWORK IN THE WORLD.  SO WHAT THEY WANTED AND WHAT WE THOUGHT

17   WOULD BE VALUABLE TO THEM WAS IF WE PROVIDED A PRODUCT THAT

18   THEY COULD TAKE ANYWHERE IN THE WORLD.

19   Q.   AND WHAT STANDARDS DID THE 7600 HAVE ON IT?

20   A.   IT WAS CDMA, D.O., WCDMA, GSM, GPRS, AND EDGE.

21   Q.   AND WAS THAT THE FIRST CHIP THAT QUALCOMM PRODUCED THAT

22   HAD BOTH WCDMA AND CDMA ON IT?

23   A.   YES.

24   Q.   WHAT YEAR WAS THAT RELEASED?

25   A.   THAT WAS 2007.  AND THEN AFTER THAT -- THAT WAS THE FIRST

1    CHIP WE DID THAT.

2         AND THEN AFTER THAT, EVERY PART THAT WE'VE DONE SINCE

3    THEN, WITH THE EXCEPTION OF ONE SUPER LOW END PART, HAS

4    MULTIMODE.  SO ALL -- WHAT I WOULD CALL ALL MODE.

5    Q.   OKAY.  NEXT TO THAT IS THE MDM 9X00.

6    A.   YEAH.

7    Q.   WHAT WAS THAT CHIP?

8    A.   THAT'S THE CHIP THAT WAS OUR FIRST LTE PART.  THAT WAS AN

9    MDM, SO IT WASN'T A FULL SOC WITH ALL THE MULTIMEDIA.  IT WAS

10   INTENDED ORIGINALLY FOR, LIKE, DATA CARTS AND DONGLES AND

11   THINGS LIKE THAT.

12   Q.   AND WAS THAT THE FIRST LTE MODEM RELEASE YOU REFERRED TO

13   EARLIER IN YOUR TESTIMONY?

14   A.   YES.

15   Q.   NEXT TO THAT IS THE MSM 8960.  WHAT WAS THAT CHIP?

16   A.   SO THAT WAS AN IMPORTANT CHIP, A VERY IMPORTANT CHIP FOR

17   US BECAUSE IT WAS WHEN WE WERE ABLE TO DO THIS ALL MODE LTE

18   MODEM AND WE WERE ABLE TO MAKE IT SMALL ENOUGH AND EFFICIENT

19   ENOUGH THAT WE COULD INTEGRATE IT WITH AN APPLICATION

20   PROCESSOR.  SO THEN IT HAD ALL THE MULTIMEDIA THAT WAS

21   REQUIRED.

22        AND ALSO, WHEN YOU DO THE INTEGRATED PRODUCT, IT ENDS UP

23   BEING BETTER IN POWER, BETTER IN PERFORMANCE, BETTER IN COST.

24   COST WAS ACTUALLY THE BIGGEST THING.

25        SO IT ALLOWED -- IN MY MIND, IT ALLOWED LTE GLOBALLY TO

1    SCALE UP BECAUSE OF THAT, THAT PRODUCT.

2    Q.   AND THEN NEXT TO IT IS THE MSM 8974.  WHAT'S THE FIRST

3    ABOUT THAT CHIP?

4    A.   YEAH.  SO THAT'S -- THAT WAS THE MOST SUCCESSFUL PREMIUM

5    TIER PART THAT WE'VE DONE, AND WHAT WAS SPECIAL ABOUT THAT PART

6    WAS -- REMEMBER, I WAS TALKING ABOUT MULTIMEDIA AND HOW WE

7    WANTED TO BE THE BEST AND WE WERE LAGGING IN SOME AREAS.

8         AND IN PARTICULAR, THAT PART CAME OUT AND WE HAD OUR BRAND

9    NEW GRAPHICS CORE INTERNALLY DESIGNED AND IT WAS HEAD AND

10   SHOULDERS ABOVE OUR COMPETITORS IN TERMS OF PERFORMANCE, POWER,

11   COST.

12        AND SO THERE WAS ALSO A VIDEO CAMERA.

13        AND SO WE LED ACROSS MULTIPLE DIMENSIONS OF MULTIMEDIA.

14   SO IT WAS A VERY, VERY SUCCESSFUL PRODUCT.

15        AND THEN ONE OTHER COMPONENT OF THAT PART WAS IT WAS OUR

16   FIRST CARRIER AGGREGATION PRODUCT, BECAUSE REMEMBER I WAS

17   SAYING WE IMPROVED THE MODEM, TRIED TO IMPROVE THE MODEM EVERY

18   YEAR TO ADD THE LATEST FEATURES.

19   Q.   WHAT YEAR WAS THAT THAT YOU RELEASED CARRIER AGGREGATION

20   FOR LTE?

21   A.   THAT WAS 2013.  THAT'S WHEN THE PRODUCT WAS RELEASED.

22   Q.   OKAY.  LOOKING OUT AT THE RIGHT, THE SDM 1835, WHAT'S THAT

23   CHIP'S FIRST?

24   A.   YEAH, SO THAT'S OUR GIGABIT LTE PART.  SO THAT WAS SORT OF

25   A MILESTONE, YOU KNOW, IN THE INDUSTRY WHERE WE COULD SUPPORT

1    UP TO A GIGABIT OF DATA THROUGHPUT ON A CHIP.  BUT THAT WAS A

2    FULL MSM.  THERE'S OTHER THINGS ABOUT IT.  IT WAS OUR FIRST

3    PART IN 10 NANOMETERS.

4         I THINK THE KEY POINT, THOUGH, IS THAT IT WAS, YOU KNOW --

5    IT SUPPORTED A GIGABIT OF THROUGHPUT.

6    Q.   WHAT'S A GIGABIT OF THROUGHPUT LIKE IN TERMS OF DATA RATE?

7    A.   SO YOU THINK OF IT AS LIKE EQUIVALENT OF THE DATA

8    THROUGHPUT YOU WOULD GET ON A FIBER OPTIC CABLE OR SOMETHING

9    LIKE THAT.

10   Q.   BUT THAT COMES OVER THE AIR?

11   A.   AND IT'S OVER THE AIR.  SO IT'S VERY, VERY HIGH DATA RATE.

12   Q.   LET ME LOOK AT ONE CHIP THAT ISN'T LABELED WITH A LINE

13   THERE.  IT'S THE MSM 8994.  WHAT CAN YOU TELL US ABOUT THAT

14   CHIP?

15   A.   YEAH.  SO THAT PART WAS NOT A SUCCESS.  THAT WAS A PREMIUM

16   TIER PART THAT WE WERE WORKING ON.  IT WAS IN A BRAND NEW

17   PROCESS TECHNOLOGY AND WE HAD SOME ISSUES WITH THAT, 20 SOC, WE

18   HAD SOME ISSUES WITH THE PROCESS TECHNOLOGY FROM A PERFORMANCE

19   AND YIELD POINT OF VIEW.  SO THAT -- BUT THAT WAS A MINOR

20   ISSUE.

21        THE BIG ISSUE WE HAD WITH THAT PART IS THAT THERE WAS A

22   BIG MARKETING CAMPAIGN THAT CAME OUT THAT SAID 64 BIT

23   PROCESSORS, WHICH WERE BETTER THAN 32 BIT PROCESSORS, AND IN

24   REALITY FOR THIS PART FROM A TECHNICAL POINT OF VIEW, THAT

25   WASN'T TRUE AT THAT TIMEFRAME.

1           BUT THE MARKETING CAMPAIGN WON, AND BASICALLY EVERY ONE OF

2    OUR CUSTOMERS CAME BACK AND SAID YOU MUST HAVE A 64 BIT

3    PROCESSOR IN THIS CHIP.

4           AND SO WE HAD HAD -- WE HAD A 32 BIT PROCESSOR IN THE

5    CHIP, SO VERY LATE IN THE GAME, WE HAD TO SWAP OUT THE CPU,

6    WHICH IS VERY DIFFICULT.  AND THE PROBLEM IS WE JUST DIDN'T

7    HAVE ENOUGH TIME TO OPTIMIZE THE DESIGN IN TERMS OF PERFORMANCE

8    AND POWER.  THAT WAS THE BIG ISSUE.

9           AND SO THE PART CAME OUT, AND IT DIDN'T PERFORM THAT WELL,

10   ESPECIALLY IN THE BEGINNING.  WE WENT THROUGH MULTIPLE

11   ITERATIONS TO TRY TO IMPROVE IT, BUT IT DIDN'T PERFORM VERY

12   WELL FROM AN APPLICATION PROCESSOR POINT OF VIEW.

13          AND SO WE HAD -- LIKE, FOR EXAMPLE, SAMSUNG WAS -- WE

14   HAD -- THEY -- THEY WERE A VERY LARGE CUSTOMER OF OURS IN THE

15   PREMIUM TIER.  THEY USED -- MOST OF THEIR GALAXY, FOR EXAMPLE,

16   USED OUR MSM, OUR SOC.

17          AND THEN THEY, THEY WORKED WITH THAT PART FOR A LITTLE

18   WHILE AND THEN ULTIMATELY DECIDED NOT TO USE IT.

19          AND SO THEY, THEY DROPPED US COMPLETELY FROM THEIR GALAXY

20   LINE, WHICH IS THEIR PREMIUM TIER PRODUCTS, AND THEY USED

21   EXYNOS, WHICH IS THEIR INTERNALLY DESIGNED CHIPSET.

22          AND THEN WE HAD OTHER CUSTOMERS, SOME OTHER CUSTOMERS USE

23   THE OLD CHIP, SOME CUSTOMERS USED A LOWER TIERED CHIP.

24          SO ANYWAY, IT CAUSED A LOT OF PAIN FOR US.

25   Q.   WHAT WAS WRONG WITH THE MODEM IN THE MSM 8994?

1    A.   THE MODEM, IT WAS THE BEST, IN MY VIEW, THE BEST MODEM ON

2    THE PLANET.  BUT, BUT IT -- THAT WAS NOT ENOUGH TO SAVE THAT

3    PART.

4         SO OUR -- IF YOU LOOK AND YOU JUST COMPARE IT TO 8974,

5    WHICH WAS OUR MOST SUCCESSFUL PREMIUM TIER PART WE EVER DID, WE

6    HAD ABOUT A TENTH OF THE LIFETIME SALES ON THAT PART.  SO VERY

7    SIGNIFICANT.

8    Q.   SO WHAT DOES THAT TELL YOU ABOUT WHAT QUALCOMM NEEDS TO DO

9    EVERY YEAR WITH ITS NEW PARTS?

10   A.   WELL, SO WE WIN OR LOSE EVERY SINGLE YEAR, AND IT'S NOT

11   ABOUT A SINGLE TECHNOLOGY.  IT'S ABOUT, YOU KNOW, A LOT -- A

12   WIDE RANGE OF TECHNOLOGIES, ALL THE THINGS THAT MAKE, YOU KNOW,

13   A PHONE INTERESTING.  SO IT'S NOT JUST ONE THING, IT'S MANY

14   THINGS.

15        IF YOU KIND OF HAVE A SPECTACULAR FAILURE ON ONE OF THOSE

16   TECHNOLOGIES, IT DOESN'T MATTER, YOU'RE GOING TO LOSE.

17   Q.   LET ME TURN YOUR ATTENTION TO QUALCOMM'S R&D.

18        HOW MUCH DID QUALCOMM SPEND ON R&D A YEAR FROM 2011

19   THROUGH 2016?

20   A.   WE SPENT ABOUT $5 BILLION A YEAR, ROUGHLY.

21   Q.   AND WHAT PERCENTAGE OF QUALCOMM'S REVENUE DOES THAT

22   $5 BILLION A YEAR REPRESENT APPROXIMATELY?

23   A.   THAT'S A LITTLE OVER 20 PERCENT.

24   Q.   OKAY.  NOW, I WANT TO TURN YOUR ATTENTION TO APPLE.

25        HAVE YOU WORKED WITH APPLE?

1    A.   YES.

2    Q.   DOES APPLE PURCHASE THE SAME SORTS OF CHIPS FROM QUALCOMM

3    AS OTHER OEM'S?

4    A.   NO.  MOST OF OUR CUSTOMERS, OR I SHOULD SAY ALL OF OUR

5    MOBILE CUSTOMERS, WITH THE EXCEPTION OF APPLE, USE THE SOC THAT

6    I DESCRIBED.

7         APPLE IS -- THEY HAVE A DIFFERENT ARCHITECTURE WHERE THEY

8    DO THEIR OWN APPLICATION PROCESSOR AND THEN THEY HAVE A MODEM

9    THAT CONNECTS TO IT.  WE CALL IT FUSION INTERNALLY, BUT IT'S

10   JUST, JUST A MODEM THAT'S SEPARATE.

11        AND IT'S JUST THE MODEM.

12   Q.   AND WHAT'S THE QUALCOMM DESIGNATION FOR THAT, FOR THE

13   MODEM?

14   A.   A THIN MODEM.  WE CALL IT A THIN MODEM.

15   Q.   OKAY.  AND DOES QUALCOMM DO R&D ON THE THIN MODEMS THAT IT

16   SELLS TO APPLE?

17   A.   YES.

18   Q.   WHAT SORT OF R&D DOES IT DO?

19   A.   WELL, SO WHAT WE DO IS WE TAKE -- WE INTRODUCE A BRAND NEW

20   MODEM IN THAT PREMIUM TIER MSM, THE SOC THAT WE DO, AND WE TAKE

21   THAT EXACT SAME MODEM AND THEN WE PUT IT INTO OUR PRODUCT FOR

22   APPLE.  BUT WE HAVE TO WRAP A COMPLETELY DIFFERENT CHIPSET

23   AROUND IT.

24        SO THE CHIP -- AND THEN THE OTHER COMPANION CHIPS, WE DO A

25   DIFFERENT SET OF CHIPS FOR IT.

1       Q.   AND IS THERE ANY DIFFERENT SOFTWARE THERE?

2       A.   YEAH.  THE SOFTWARE IS SIGNIFICANTLY DIFFERENT BECAUSE THE

3       REQUIREMENTS ARE JUST VERY DIFFERENT FOR APPLE.

4       Q.   HOW WOULD QUALCOMM'S MDM BUSINESS CHANGE IF APPLE WERE NO

5       LONGER BUYING MDM'S?

6       A.   WELL, WE WOULD DO FEWER MDM'S.  WE WOULD DO AN MDM EVERY

7       TWO YEARS.

8            OKAY.  SO MAYBE BACK UP.  APPLE REQUIRES THAT YOU COME OUT

9       WITH A NEW ONE EVERY YEAR.

10           BUT IF YOU LOOK AT THE OTHER CUSTOMERS THAT USE THESE

11      TYPES OF PRODUCTS, LIKE, FOR EXAMPLE, IN THIS DATA CARD

12      BUSINESS, THOSE CUSTOMERS DON'T EVEN WANT US TO DO A NEW CHIP

13      EVERY YEAR BECAUSE THEY WANT TO HAVE TO CHURN THEIR DESIGN

14      EVERY YEAR.  THE SMARTPHONE COMPANIES THAT COME OUT WITH

15      SOMETHING NEW EVERY YEAR.

16      Q.   SO WHAT WOULD THE CADENCE BE WITHOUT APPLE TELLING YOU TO

17      DO A NEW ONE EVERY YEAR?

18      A.   SO IT WOULD BE EVERY TWO YEARS, THREE YEARS, THAT KIND OF

19      TIMEFRAME.

20      Q.   AND WHY WOULD QUALCOMM MOVE TO GO INTO ONCE EVERY THREE

21      YEARS FOR A NEW MDM AT THAT POINT?

22      A.   WHY WOULD WE -- IF WE DIDN'T HAVE APPLE BUSINESS YOU'RE

23      SAYING?

24      Q.   YEAH.

25      A.   IF WE DIDN'T HAVE APPLE BUSINESS, THE CUSTOMERS THAT WE

1    HAVE FOR THOSE, LIKE I SAID, THE DATA CARD PEOPLE, CARS, THINGS

2    LIKE THAT, THEY DON'T DEMAND THAT YOU UPGRADE IT EVERY YEAR.

3    Q.   AND WHAT DOES IT COST -- LET'S JUST TAKE YOUR

4    ORGANIZATION.  WHAT DOES IT COST, THE COSTS YOU CAN CONTROL

5    PERSONALLY, EVERY YEAR TO DO A NEW MDM?

6    A.   YEAH.  SO I DID AN ANALYSIS ON THIS AT ONE POINT AND MY

7    GROUP -- AND -- WE SPENT, SAY, $250 MILLION A YEAR ON THE MDM

8    FOR APPLE.  AND THAT INCLUDES MATERIAL COSTS, SO THAT'S LIKE

9    MASKS AND WAFERS AND TEST PLATFORMS.  BUT IT'S ALSO PEOPLE'S

10   SALARIES AND THINGS LIKE THAT THAT ARE IN MY GROUP.

11   Q.   AND IS THAT ALL THE COST THAT WOULD BE SAVED IF YOU DID

12   FEWER MDM'S?

13   A.   NO.  THERE'S ADDITIONAL COST.  CLEARLY THE, YOU KNOW,

14   THERE'S OTHER PEOPLE IN THE COMPANY THAT ARE -- LIKE BUILDINGS,

15   FOR EXAMPLE.  SO I DON'T CONTROL BUILDINGS.  SO THERE'S

16   BUILDINGS, THERE'S I.T. EQUIPMENT, THERE'S I.T. PEOPLE, THERE'S

17   HR PEOPLE, THERE'S LAWYERS.  THERE'S ALL THESE OTHER PEOPLE

18   THAT ARE ASSOCIATED WITH THINGS.

19   Q.   AND I WANT TO DRAW YOUR ATTENTION TO A CHIP YOU DID CALLED

20   THE MDM 9X15.

21       HOW WOULD THE TIMING OF THE MDM 9X15 DEVELOPMENT HAD BEEN

22   DIFFERENT IF IT WEREN'T FOR APPLE BUSINESS?

23   A.   WELL, SO WHEN APPLE CAME TO US -- MAYBE BACK UP.

24       WE ORIGINALLY DEFINED THAT PART TO BE FOR MOBILE

25   BROADBAND, SO -- BUT THEN WHEN APPLE CAME TO US, THEY WERE --

```
 1    THEY HAD DECIDED THEY ORIGINALLY WERE GOING TO USE A 3G PART,

 2    AND SO WE WERE WORKING WITH THEM ON A 3G PART.

 3         AND THEN THEY CAME TO US AND SAID, NO, WE WANT TO SWITCH

 4    TO 4G, AND THEY WANTED TO USE THE 9X15.

 5         AND SO IF YOU LOOK AT THE SCHEDULES THAT WE HAD, OUR

 6    SCHEDULES WERE OFF BY ABOUT NINE MONTHS.  AND SO WE HAD TO, YOU

 7    KNOW, WORK WITH THEM TO TRY TO FIGURE OUT HOW -- AND ULTIMATELY

 8    WE FIGURED IT OUT, TO PULL THE SCHEDULES IN FOR THAT.

 9    Q.   AND AT THE R&D PLANNING STAGE FOR THE 9X15, WAS QUALCOMM

10    PLANNING TO SELL THE 9X15 AS A FUSION CHIPSET TO OTHER

11    CUSTOMERS?

12    A.   NO.  THAT'S GENERALLY NOT IN OUR PLAN.  WE -- THAT'S --

13    THAT TENDS TO BE OPPORTUNISTIC, OR -- FUSIONS TEND TO BE, WE

14    TRY NOT TO DO THEM.  WE ONLY DO THEM WHEN WE'RE KIND OF BACKED

15    INTO A CORNER AND WE DON'T HAVE A FEATURE THAT'S REQUIRED THAT

16    SOMEBODY IS ASKING FOR OR SOMETHING LIKE THAT.

17         MR. PAIGE:  THANK YOU, DR. THOMPSON.

18    I HAVE NO FURTHER QUESTIONS AT THIS TIME.

19         THE COURT:  OKAY.  THE TIME IS 9:48.

20    (PAUSE IN PROCEEDINGS.)

21         MR. KEHL:  MAY I APPROACH THE WITNESS, YOUR HONOR?

22         THE COURT:  GO AHEAD, PLEASE.

23    (PAUSE IN PROCEEDINGS.)

24         THE COURT:  READY?

25         MR. KEHL:  YES.
```

```
1          THE COURT:  GO AHEAD, PLEASE.  IT'S 9:14.

2                     CROSS-EXAMINATION

3     BY MR. KEHL:

4     Q.   GOOD MORNING, DR. THOMPSON.

5     A.   GOOD MORNING.

6     Q.   IT'S FAIR TO SAY THAT THE R&D INVESTMENTS THAT QUALCOMM

7     MAKES IN A GIVEN MARKET CORRESPOND TO THE AMOUNT OF OPPORTUNITY

8     THAT QUALCOMM RECEIVES IN THAT MARKET?

9     A.   YES.

10    Q.   AND QUALCOMM'S SCALE ADVANTAGE ALLOWS IT TO DEPLOY TEAMS

11    THAT WORK AROUND THE WORLD; ISN'T THAT FAIR TO SAY?

12    A.   YES.  YEAH.  YES.

13    Q.   AND YOU NEED A LOT OF MARGIN TO SUPPORT THAT, DON'T YOU?

14    A.   YES.

15    Q.   AND SAME, SAME QUESTION WITH RESPECT TO THE SIZE OF THE

16    TEAMS.  QUALCOMM'S SCALE ALLOWS IT TO HAVE LARGE TEAMS; ISN'T

17    THAT RIGHT?

18    A.   YES.

19    Q.   DR. THOMPSON, I'D LIKE TO REFER YOU TO AN EXHIBIT IN YOUR

20    BINDER THAT'S BEEN MARKED AS CX 5402.

21    A.   IS IT GOING TO COME UP HERE, OR AM I GOING TO --

22    Q.   IT WILL EVENTUALLY, BUT FOR NOW, THIS IS IN THE BINDER

23    LABELED "WITNESS BINDER."

24    A.   TELL ME WHERE I'M SUPPOSED TO LOOK FOR CX 54.

25    Q.   SURE.  SO YOU HAVE A DEPOSITION BINDER AND THEN A WITNESS
```

```
 1       BINDER?

 2       A.   OKAY.  I'VE GOT THE DEPOSITION.

 3       Q.   DO YOU HAVE THE WITNESS BINDER?

 4       A.   WHICH ONE DO YOU WANT ME TO LOOK AT?

 5       Q.   THE WITNESS BINDER.

 6       A.   OKAY.

 7       Q.   AND I'LL REFER YOU TO CX 5402.

 8       A.   OKAY.

 9       Q.   AND CX 5402 IS AN E-MAIL EXCHANGE BETWEEN YOURSELF AND

10       MR. MOLLENKOPF; IS THAT RIGHT?

11       A.   YES.

12            MR. KEHL:  YOUR HONOR, WE MOVE TO ADMIT CX 5402.

13            MR. PAIGE:  NO OBJECTION.

14            THE COURT:  IT'S ADMITTED.

15       (PLAINTIFF'S EXHIBIT CX 5402 WAS ADMITTED IN EVIDENCE.)

16            THE COURT:  GO AHEAD, PLEASE.

17       BY MR. KEHL:

18       Q.   DR. THOMPSON, I REFER YOU TO YOUR JUNE 29TH E-MAIL IN THIS

19       STRING, WHICH APPEARS ON PAGE 3.

20            DO YOU SEE THAT?

21       A.   I'M JUST ORIENTING MYSELF.  JUNE 29TH, OKAY.  I SENT --

22       PAGE 3.  OKAY.  GOT IT.

23       Q.   AND IN YOUR E-MAIL, YOU HAVE, IN THE SECOND PARAGRAPH, A

24       HEADER THAT READS, APPLE.

25            DO YOU SEE THAT?
```

1    A.   YES.

2    Q.   AND THE SECOND SENTENCE IN THAT E-MAIL READS, IN THAT

3    PARAGRAPH READS, "IF APPLE'S ULTIMATE GOAL IS TO TAKE DOWN OUR

4    LICENSING BUSINESS OR AT LEAST CHIP AWAY AT IT WITH A

5    NEGOTIATION EVERY FEW YEARS WE SHOULD FIGHT BACK WHILE WE ARE

6    STRONG."

7         DO YOU SEE THAT?

8    A.   YES.

9    Q.   AND A FEW SENTENCES LATER YOU CONTINUE.  "IN FACT, WITHOUT

10   US, WE WOULD LOSE BIG PARTS OF NORTH AMERICA, JAPAN AND CHINA."

11        DO YOU SEE THAT?

12   A.   YES.

13   Q.   AND THAT STATEMENT IN PART REFERENCES CDMA MARKETS?

14   A.   CDMA AND TD-SCDMA.  THAT'S A CHINESE STANDARD.

15   Q.   AND YOU CONTINUE, "THAT WOULD REALLY HURT THEM"?

16   A.   THAT'S CORRECT.

17   Q.   YOU CAN PUT CX 5402 AWAY.

18        DR. THOMPSON, QUALCOMM'S MSM 8655 MODEM CHIP --

19   A.   AM I LOOKING AT SOMETHING?

20   Q.   NO.

21   A.   OKAY.

22   Q.   DR. THOMPSON, QUALCOMM'S MSM 8655 MODEM CHIP IS A CDMA

23   CAPABLE MODEM CHIP?

24   A.   THAT -- THE MSM 8655, I'M TRYING TO REMEMBER.  I -- YOU

25   KNOW, OFF THE TOP OF MY HEAD, I'M TRYING TO REMEMBER WHICH ONE

1    THAT IS.  WE USE INTERNAL CODE NAME, AND SO --

2    Q.   DOES THE SECOND DIGIT BEING A 6 TELL YOU THAT THIS HAS

3    CDMA?

4    A.   HONESTLY, I DON'T -- I DON'T KNOW THE MARKETING CODES THAT

5    ARE USED.  I HAVE KIND OF -- I THINK 9 MEANS IT HAS LTE.

6    BUT -- BUT I'M NOT SURE.  I'M NOT 100 PERCENT SURE.  SORRY.

7    Q.   I'LL MOVE ON.

8         DR. THOMPSON, YOU TESTIFIED THAT QUALCOMM'S MDM AND MSM

9    PRODUCTS USE THE SAME MODEM; IS THAT RIGHT?

10   A.   YES.

11   Q.   AND, IN FACT, THE MDM PRODUCTS AT TIMES PIGGY BACK OFF

12   ENGINEERING EFFORTS THAT GO INTO THE MSM PRODUCTS; RIGHT?

13   A.   YES, WE TRY TO SHARE ENGINEER PRODUCTS, FOR SURE.

14   Q.   FOR INSTANCE, THE MSM -- LET ME REPHRASE.  FOR INSTANCE,

15   THE MDM 9625 PIGGY BACKED OFF THE ENGINEERING EFFORT THAT WENT

16   INTO THE MSM 8974?

17   A.   YES.

18   Q.   DR. THOMPSON, YOU'D ALSO AGREE THAT MODEM FEATURES THAT

19   WERE ONCE PREMIUM WATER FALL DOWN TO LOWER TIERS?

20   A.   THAT'S CORRECT.

21   Q.   DR. THOMPSON, I'D LIKE TO REFER YOU TO A DOCUMENT IN YOUR

22   BINDER LABELED CX 6334.  IT'S AT THE VERY END OF THE BINDER.

23   A.   OH.  6334.  OKAY.  I GOT IT.

24   Q.   AND CX 6334 IS A QCT COUNCIL PRODUCT TWO PRESENTATION FOR

25   THE ELAN MODEM CHIP; IS THAT RIGHT?

1    A.   YES.

2    Q.   AND YOU'RE LISTED AS A CC RECIPIENT OF THIS COUNCIL

3    PRESENTATION; CORRECT?

4    A.   I DON'T SEE THAT.  BUT I ALWAYS GET THESE.

5    Q.   YOU PARTICIPATED?

6    A.   I PARTICIPATED.

7         MR. KEHL:  YOUR HONOR, WE MOVE TO ADMIT 6334 AND NOTE

8    FOR THE RECORD THAT THIS IS A TRUNCATED VERSION OF THE EXHIBIT

9    FROM PAGES 1 TO 66.

10        MR. PAIGE:  NO OBJECTION TO THE ADMISSION OF PAGES 1

11   THROUGH 66, YOUR HONOR.

12        THE COURT:  IT'S ADMITTED.

13    (DEFENDANT'S EXHIBIT CX 6334 WAS ADMITTED IN EVIDENCE.)

14        THE COURT:  GO AHEAD, PLEASE.

15   BY MR. KEHL:

16   Q.   AND, DR. THOMPSON, THIS IS THE PRODUCT COUNCIL

17   PRESENTATION FOR THE ELAN CHIPSET?

18   A.   YES.

19   Q.   ELAN WAS A THIN MODEM?

20   A.   YES.

21   Q.   AND THE PRODUCT COUNCIL APPROVAL REPRESENTS FINAL APPROVAL

22   FOR A MODEM CHIP?

23   A.   IT'S THE APPROVAL OF THE PLAN.  SO THE AMOUNT OF SPENDING,

24   THE SCHEDULE, YOU KNOW, ALL OF THOSE KIND OF KEY ASPECTS OF THE

25   PRODUCT, YEAH.

1    Q.   IF I COULD REFER YOU TO PAGE 24 OF CX 6334, USING THE

2    NUMBERS AT THE BOTTOM.

3    A.   OKAY.  OH, THE CX -- I SHOULD LOOK AT THE CX NUMBERS?

4    Q.   LOOK AT THE CX NUMBERS.

5    A.   24 YOU SAID?

6    Q.   YES.  IT'S ALSO ON YOUR SCREEN.

7    A.   OH, OKAY.  THAT'S EASIER.

8    Q.   DO YOU SEE THIS?

9    A.   YES.

10   Q.   SO THIS SLIDE READS PORTFOLIO VOLUME?

11   A.   YES.

12   Q.   AND THIS SLIDE REFLECTS THE SALES FORECASTS THAT PRODUCT

13   COUNCIL USED TO GIVE APPROVAL TO THE ELAN CHIPSET?

14   A.   YES.

15   Q.   THANK YOU, DR. THOMPSON.  YOU CAN PUT CX 6334 AWAY.

16        DR. THOMPSON, QUALCOMM WILL NOT SELL MODEM CHIPS TO

17   UNLICENSED COMPANIES; CORRECT?

18   A.   THE -- THE -- IF A COMPANY HAS A LICENSE, WE SELL.  IF

19   THEY'VE NEVER HAD A LICENSE AND THEY'RE NOT IN ANY KIND OF

20   NEGOTIATIONS, MY UNDERSTANDING IS THAT WE DON'T.

21   Q.   AND THAT INCLUDES MULTIMODE MODEM CHIPS?

22   A.   YES.

23   Q.   AND THAT INCLUDES SYSTEMS ON A CHIP?

24   A.   YES.

25        MR. KEHL:  NO FURTHER QUESTIONS, YOUR HONOR.

```
 1                    THE COURT:  ALL RIGHT.  TIME IS 9:56.

 2           IS THERE ANY REDIRECT?

 3                    MR. PAIGE:  NO.  THANK YOU, YOUR HONOR.

 4                    THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

 5      SUBJECT TO RECALL OR NOT?  WHAT DO YOU BOTH THINK?

 6                    MR. PAIGE:  NOT SUBJECT, YOUR HONOR.

 7                    THE COURT:  DO YOU AGREE?

 8                    MR. KEHL:  NOT SUBJECT TO RECALL.

 9                    THE COURT:  OKAY.  THEN YOU'VE COMPLETED YOUR TRIAL

10      TESTIMONY, AND YOU'RE FREE TO LEAVE.

11                    THE WITNESS:  THANKS.  OH, WHAT SHOULD I DO WITH THIS

12      (INDICATING)?

13                    THE COURT:  LET'S LEAVE THAT HERE, PLEASE, AND WE'LL

14      ASK THAT YOU PUT A NUMBER ON IT, A QDX NUMBER.

15                    THE WITNESS:  SHOULD I GIVE IT TO MY LAWYER?

16                    THE COURT:  YOU CAN LEAVE IT HERE ON THE WITNESS

17      STAND.  WE'LL TAKE CARE OF EVERYTHING.  THANK YOU.

18           OKAY.  CALL YOUR NEXT WITNESS, PLEASE.

19                    MR. PETERSON:  JORDAN PETERSON FROM QUALCOMM.

20           WITH YOUR HONOR'S PERMISSION, QUALCOMM WILL NOW PLAY THE

21      VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER, FORMERLY OF

22      QUALCOMM.

23           YOUR HONOR PREVIOUSLY HEARD TESTIMONY FROM

24      MR. REIFSCHNEIDER VIA VIDEO IN THE FTC'S CASE ON JANUARY 4TH.

25                    THE VIDEO IS APPROXIMATELY 11 MINUTES IN LENGTH, AND THERE
```

1    ARE NO COMPLETENESS DESIGNATIONS FROM THE FTC AS PART OF THIS

2    VIDEO.

3              THE COURT:  OKAY.  ALL RIGHT.  IT'S 9:57.

4         GO AHEAD, PLEASE.

5              MR. PETERSON:  AT THIS TIME WE'RE NOT OFFERING ANY

6    ADDITIONAL EXHIBITS INTO EVIDENCE, BUT THERE ARE THREE EXHIBITS

7    THAT ARE MENTIONED THAT THE FTC PREVIOUSLY OFFERED INTO

8    EVIDENCE.  THOSE ARE CX 6528, CX 5219, AND CX 6491.

9              THE COURT:  OKAY.  GO AHEAD, PLEASE.

10             **(THE VIDEOTAPED DEPOSITION OF ERIC REIFSCHNEIDER WAS**

11        **PLAYED IN OPEN COURT OFF THE RECORD.)**

12             THE COURT:  OKAY.  THE TIME IS 10:09.

13        SO LET ME ASK, YOU WENT FROM YOUR FIRST WITNESS TO YOUR

14   12TH WITNESS IN YOUR LIST FOR TODAY.  WHAT'S THE ORDER OF

15   WITNESSES YOU'RE CALLING TODAY?  JUST FOR PLANNING PURPOSES, IT

16   WOULD BE HELPFUL.  WHO IS YOUR NEXT WITNESS?

17             MR. VAN NEST:  YOUR HONOR, OUR NEXT WITNESS WILL BE

18   FABIAN GONELL.

19             THE COURT:  OKAY.  AND THEN ARE YOU GOING TO PROCEED

20   ACCORDING TO YOUR LIST, OR ARE YOU JUMPING AROUND?

21             MR. VAN NEST:  I DON'T THINK SO.  I THINK WE'RE GOING

22   TO PROCEED ACCORDING TO THE LIST.

23        DO YOU HAVE MR. SAUER ON AFTER THAT?

24             THE COURT:  NO.  I HAVE MR. HARTOGS.

25             MR. VAN NEST:  I THINK -- MR. SAUER IS FROM APPLE, SO

```
 1       I THINK WE'LL FOLLOW AFTER LUNCH WITH HIM, AND THEN

 2   MR. HARTOGS.

 3             THE COURT:  OKAY.

 4             MR. VAN NEST:  AND THEN MR. CHEN.

 5             THE COURT:  OKAY.

 6             MR. VAN NEST:  AND WE HAVE SOME VIDEOS IF WE HAVE

 7   TIME IN THE LATE AFTERNOON.

 8             THE COURT:  OKAY.  AND ARE YOU -- I'M JUST WONDERING

 9   WHY YOU WENT FROM YOUR NUMBER 1 WITNESS TO YOUR 12TH WITNESS.

10   MR. REIFSCHNEIDER WAS NOT UNTIL NUMBER 12.

11             MR. VAN NEST:  I THINK WE -- I THOUGHT WE SENT IN THE

12   NEW LIST, BUT PERHAPS WE DIDN'T.  I THINK WE MOVED THE VIDEO UP

13   IN THE ORDER.

14             THE COURT:  I HAVE ECF 1332 FILED YESTERDAY.  THAT --

15   THEY SHOULD HAVE BEEN FILED YESTERDAY.  DID YOU FILE ONE THIS

16   MORNING?  MAYBE I DON'T HAVE THE LATEST LIST.

17             MR. VAN NEST:  I'M NOT SURE.

18        THE WITNESS PHOTOS WE HANDED UP WERE IN THE RIGHT ORDER.

19             THE COURT:  OKAY.  WELL, WHAT ABOUT YOUR WITNESS LIST

20   FILED YESTERDAY, 1332?

21             MR. VAN NEST:  IT MAY BE AN ERROR.

22             THE COURT:  OKAY.

23             MR. VAN NEST:  IT MAY BE THAT WE MOVED THE VIDEO UP.

24   BUT THE ORDER --

25             THE COURT:  ALL RIGHT.  MR. GONELL, MR. SAUER,
```

```
1        MR. HARTOGS.  BECAUSE IT'S NOT IN THIS ORDER.

2               MR. VAN NEST:  MR. CHEN.

3               THE COURT:  MR. CHEN.

4          AND THEN WHICH VIDEOS ARE YOU GOING TO DO?

5               MR. VAN NEST:  MR. PETERSON, WHICH VIDEOS WILL BE

6    PLAYED?

7               THE COURT:  WHO'S AFTER MR. CHEN?

8               MR. PETERSON:  WE'LL DO THE VIDEO OF MR. GRUBBS, THEN

9    MR. BLUMBERG.

10              THE COURT:  OKAY.  IT'S NOT IN THIS ORDER.  SO I

11   WOULD APPRECIATE IN THE FUTURE, IF YOU SEND ME A LIST, I DO

12   WANT IT TO BE A GOOD FAITH LIST OF YOUR WITNESSES IN THE RIGHT

13   ORDER.

14              MR. VAN NEST:  IT WAS, YOUR HONOR.

15              THE COURT:  OKAY?

16              MR. VAN NEST:  BUT WE'LL MAKE SURE WE GET IT RIGHT.

17   AND IF WE HAVE TO CHANGE IT --

18              THE COURT:  WELL, YOU'VE BEEN FILING THIS LIST SINCE

19   LAST WEEK.  IT'S ALWAYS BEEN IN THIS ORDER.  SO I DON'T KNOW

20   WHEN IT CHANGED.  BUT I'D LIKE ANY CHANGE TO BE REFLECTED.

21              MR. VAN NEST:  WE'LL DO THAT.

22              THE COURT:  IT'LL BE MR. GRUBBS, THEN MR. BLUMBERG.

23   THEN WHERE DOES IT GO FROM THERE?

24              MR. PETERSON:  MR. MADDEROM.

25              THE COURT:  OKAY.  SO ON YOUR LIST.  HE'S LAST.  SO
```

```
 1         HE IS NOW NUMBER 7.
 2              OKAY.  THEN WHO AFTER THAT?
 3                  MR. PETERSON:  TIME PERMITTING, MR. MCGREGOR.
 4                  THE COURT:  OKAY.  SO THAT WOULD BE NUMBER 8.  OKAY.
 5         YOU KNOW WHAT I'D LIKE?  I'D LIKE YOU TO FILE A NEW LIST
 6    THAT'S ACCURATE FOR TODAY.
 7                  MR. VAN NEST:  WE'LL DO THAT.
 8                  THE COURT:  WHEN CAN YOU DO THAT?  CAN YOU YOU HAVE
 9    SOMEONE BACK AT THE HOTEL DO THAT SO I CAN PRINT IT OUT DURING
10    THE BREAK AT 10:30?
11                  MR. VAN NEST:  SURE.
12                  THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.
13         ALL RIGHT.  LET'S GO AHEAD AND CALL YOUR NEXT WITNESS,
14    PLEASE.
15                  THE COURT:  WHO APPROVED THIS WITNESS LIST FROM
16    YESTERDAY?
17                  MR. VAN NEST:  YOUR HONOR, I APPROVED A WITNESS LIST.
18                  THE COURT:  YEAH.
19                  MR. VAN NEST:  I'M NOT SURE WHAT YOU'RE LOOKING AT.
20    BUT IF IT WAS FILED, I APPROVED IT.
21                  THE COURT:  I'M LOOKING AT THE ONLY WITNESS LIST THAT
22    QUALCOMM FILED YESTERDAY.
23                  MR. VAN NEST:  THEN I APPROVED IT.
24                  THE COURT:  OKAY.  OKAY.
25                  MR. BORNSTEIN:  YOUR HONOR, QUALCOMM CALLS
```

1    FABIAN GONELL.

2              THE COURT:  OKAY.  PLEASE COME FORWARD.

3              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

4         **(DEFENDANT'S WITNESS, FABIAN GONELL, WAS SWORN.)**

5              THE WITNESS:  I DO.

6              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

7              MR. BORNSTEIN:  MAY I APPROACH, YOUR HONOR, WITH A

8    BINDER?

9              THE COURT:  GO AHEAD, PLEASE.

10             MR. BORNSTEIN:  THANK YOU.

11             THE CLERK:  WOULD YOU PLEASE STATE YOUR FULL NAME AND

12   SPELL YOUR LAST NAME FOR THE RECORD.

13             THE WITNESS:  MY NAME IS FABIAN DENNIS GONELL.

14   G-O-N-E-L-L.

15             THE COURT:  OKAY.  TIME IS 10:13.  GO AHEAD, PLEASE.

16                      **DIRECT EXAMINATION**

17   BY MR. BORNSTEIN:

18   Q.   MR. GONELL, WHERE DO YOU WORK?

19   A.   I WORK AT QUALCOMM.

20   Q.   AND WHAT DO YOU DO AT QUALCOMM?

21   A.   I'M SENIOR VICE PRESIDENT OF LICENSING STRATEGY AND LEGAL

22   COUNSEL IN QUALCOMM'S LICENSING DIVISION, QTL.

23   Q.   HOW LONG HAVE YOU BEEN IN QTL?

24   A.   ABOUT TEN YEARS.  SINCE 2009.

25   Q.   COULD YOU WALK BRIEFLY THROUGH WHAT POSITIONS YOU'VE HELD

1    IN THOSE TEN YEARS?

2    A.   YES.  I'VE ALWAYS BEEN A MEMBER OF THE LEGAL TEAM AT QTL.

3    WHEN I FIRST ARRIVED AT QTL, I WAS A LAWYER ON THE LEGAL TEAM.

4    MY RESPONSIBILITIES WERE NEGOTIATING AGREEMENTS AND DRAFTING

5    AGREEMENTS.

6         THOSE RESPONSIBILITIES BASICALLY STAYED THE SAME THROUGH A

7    COUPLE OF PROMOTIONS UNTIL ABOUT 2016 -- NO, EXCUSE ME -- 2013

8    WHEN I BECAME DIVISION COUNSEL OF QTL, WHICH IS BASICALLY THE

9    CHIEF LICENSING LAWYER.  AND I HELD THAT POSITION FOR THREE

10   YEARS, UNTIL TAKING MY CURRENT POSITION.

11   Q.   AND WHAT IS QTL?

12   A.   QTL IS QUALCOMM TECHNOLOGY LICENSING, WHICH IS A BUSINESS

13   UNIT WITHIN QUALCOMM INCORPORATED, THE LEGAL ENTITY.

14        AND QTL OPERATES THE LICENSING BUSINESS OF QUALCOMM.

15   Q.   DOES IT ALSO HAVE THE CHIP BUSINESS IN QTL AS WELL?

16   A.   NO.  THE CHIP BUSINESS IS SEPARATE FROM QTL.  IT'S KNOWN

17   COLLOQUIALLY IN THE COMPANY AS QCT.  IT WAS A SEPARATE BUSINESS

18   UNIT AT ONE POINT.  IT'S NOW IN A DIFFERENT LEGAL ENTITY

19   ALTOGETHER AS WELL.

20   Q.   SO I WANT TO START BY TALKING ABOUT JUST THE BASIC

21   STRUCTURE OF QUALCOMM'S LICENSING PROGRAM.

22        CAN YOU EXPLAIN, JUST IN GENERAL TERMS, WHAT QUALCOMM

23   GIVES TO ITS LICENSEES AND WHAT QUALCOMM GETS IN RETURN IN A

24   TYPICAL LICENSE AGREEMENT?

25   A.   OKAY.  IN A TYPICAL LICENSE AGREEMENT, AT THE MOST BASIC

1    LEVEL, WHAT QUALCOMM GIVES IS A LICENSE, PERMISSION TO USE

2    QUALCOMM'S PATENTED INTELLECTUAL PROPERTY TO MAKE, USE, AND

3    SELL CERTAIN DEVICES WHICH ARE LICENSED PRODUCTS.

4         AND IT'S THAT PROMISE THAT'S THE CONSIDERATION FROM

5    QUALCOMM TO THE LICENSEE.

6    Q.   WHAT DOES QUALCOMM GET IN RETURN IN A TYPICAL AGREEMENT?

7    A.   IN A TYPICAL AGREEMENT, AGAIN, AT THE MOST BASIC LEVEL,

8    WHAT QUALCOMM GETS BACK FROM THE LICENSEE TO QUALCOMM IS MONEY.

9    AND IT'S IN THE FORM OF TYPICALLY RUNNING ROYALTIES, WHICH IS A

10   ROYALTY THAT'S PAID AS THE LICENSEE SELLS DEVICES THAT ARE

11   LICENSED.

12        THERE CAN ALSO BE, AND HISTORICALLY OFTEN WERE, UPFRONT

13   FEES THAT WERE PAID AS PART OF THE LICENSE AGREEMENTS.

14   Q.   OKAY.  IS THERE A ONE-SIZE-FITS-ALL LICENSE THAT QUALCOMM

15   HAS ALL OF ITS LICENSEES SIGN?

16   A.   NO.  ONE ADDITION TO MY PRIOR ANSWER, THERE'S ALSO

17   CROSS-LICENSES OFTEN IN LICENSE AGREEMENTS, ALTHOUGH THAT'S

18   LESS COMMON THESE DAYS.

19        BUT THERE'S NOT A ONE-SIZE-FITS-ALL AGREEMENT.  THEY'RE

20   ALL INDIVIDUALLY NEGOTIATED.

21   Q.   LET'S WALK THROUGH THE DIFFERENT ELEMENTS OF CONSIDERATION

22   THAT YOU JUST DESCRIBED.

23        FOR THE OUTBOUND LICENSES FROM QUALCOMM TO THE LICENSEES,

24   DO ALL OF THE AGREEMENTS GRANT THE SAME SET OF RIGHTS?

25   A.   NO, THEY DON'T.

1    Q.   SO WHAT ARE THE TYPICAL VARIATIONS IN THE TYPES OF RIGHTS

2    THAT QUALCOMM GRANTS TO LICENSEES?

3    A.   THE PATENTS -- THERE ARE ESSENTIAL PATENTS WHICH I'LL

4    THINK OF AS THE CELLULAR ESSENTIAL PATENTS, PATENTS THAT ARE

5    ESSENTIAL TO CELLULAR STANDARDS, AND THAT IS A CATEGORY.  AND

6    WITHIN THAT CATEGORY, THERE ARE -- WE DIFFERENTIATE BY THE

7    STANDARD.

8         SO THERE ARE CDMA PATENTS, WHICH ARE PATENT ESSENTIAL TO

9    CDMA STANDARDS; WCDMA PATENTS ESSENTIAL TO WCDMA STANDARDS; LTE

10   PATENTS, PATENTS ESSENTIAL TO LTE STANDARDS; AND NOW 5G PATENTS

11   ESSENTIAL TO 5G STANDARDS, FOR EXAMPLE.

12        THERE ARE ALSO OTHER PATENTS, NON-ESSENTIAL PATENTS AND

13   BASICALLY ALL OF THE OTHER PATENTS THAT ARE NOT CELLULAR

14   ESSENTIAL PATENTS THAT MAY BE LICENSED.

15   Q.   SO ALL OF THESE THINGS, ARE THEY LICENSED IN A PACKAGE OR

16   CAN LICENSEES PICK DIFFERENT PARTS OF THE MENU?

17   A.   SO THEY CAN PICK CATEGORIES OF ESSENTIAL PATENTS, SO

18   PATENTS, FOR EXAMPLE, ESSENTIAL TO A MENU OF STANDARDS, SO

19   CDMA, WCDMA, LTE, 5G, FOR EXAMPLE.

20        ONCE THEY HAVE AN ESSENTIAL PATENT LICENSE, THEY CAN

21   CHOOSE TO ALSO THEN INCLUDE THE OTHER PATENTS.

22   Q.   OKAY.  THE NON-ESSENTIALS?

23   A.   THE NON-ESSENTIAL PATENTS, YES.

24   Q.   DO THE LICENSES COVER ONLY THE PATENTS THAT ARE IN

25   EXISTENCE AS OF THE TIME OF THE AGREEMENT?

1    A.   TYPICALLY, NO.  USUALLY THE -- AND ALMOST ALWAYS WITH

2    RESPECT TO THE ESSENTIAL PATENTS, THEY COVER PATENTS THAT

3    QUALCOMM OWNS OR ACQUIRES OR INVENTS AT ANY TIME DURING THE

4    TERM OF THE AGREEMENT.

5         SO THE WAY THAT WOULD WORK IS YOU HAVE A SET OF PATENTS

6    THAT YOU HAVE WHEN YOU ENTER THE AGREEMENT; THE AGREEMENT LASTS

7    FOR, SAY, FIVE OR TEN YEARS; EVERYTHING YOU INVENT BETWEEN THE

8    TIME OF THE AGREEMENT AND THE END OF THE AGREEMENT IS INCLUDED.

9    Q.   IS THERE AN ADDITIONAL CHARGE FOR THOSE SUBSEQUENTLY

10   OBTAINED PATENTS?

11   A.   NO.  THE ROYALTY TERMS REMAIN THE SAME AND TAKEN INTO

12   ACCOUNT IN THE NEGOTIATIONS.  SO YOU GET THE ADDITIONAL

13   PATENTS.  THE ROYALTY TERMS STAY THE SAME.

14   Q.   LET'S TALK ABOUT WHAT QUALCOMM GETS FROM THE LICENSEES.

15   YOU MENTIONED AN UPFRONT FEE.  WHAT'S THAT FOR?

16   A.   SO THE UPFRONT FEE CAN BE THOUGHT OF AS A TECHNOLOGY

17   ACCESS FEE.  IT'S JUST A FEE THAT'S PAID AT THE OUTSET OF THE

18   AGREEMENT.  IT'S ANOTHER WAY FOR MONEY TO CHANGE HANDS, AND

19   IT'S A WAY THAT'S NOT DEPENDENT ON FUTURE SALES OR ANYTHING

20   LIKE THAT.  IT'S JUST AN AMOUNT THAT'S DUE AND THAT'S AGREED TO

21   BE PAID AT THE TIME, OR SHORTLY THEREAFTER, AN AGREEMENT IS

22   ENTERED INTO.

23   Q.   IS THE UPFRONT FEE USED AS A CREDIT AGAINST FUTURE

24   PURCHASES OF CHIPS OR OTHER PRODUCTS FROM QUALCOMM?

25   A.   NO.

1    Q.   SO IF THERE'S AN OEM WHO HAD SAID THAT THE OEM FELT

2    INCENTIVIZED, OR EVEN COMPELLED, TO PURCHASE QUALCOMM CHIPS AS

3    OPPOSED TO A COMPETITOR'S CHIPS, IN ORDER TO RECOUP THE UPFRONT

4    FEE, WOULD THAT MAKE SENSE TO YOU?

5    A.   NO, THAT DOESN'T MAKE SENSE TO ME.  THAT'S NOT THE WAY THE

6    UPFRONT FEES IN THE AGREEMENTS WORK.

7    Q.   YOU ALSO MENTIONED, AT THE END OF YOUR ANSWER, SOME CROSS

8    GRANTS THAT QUALCOMM GETS AT TIMES?

9    A.   YES.

10   Q.   WHY DOES QUALCOMM REQUEST CROSS GRANTS FROM LICENSEES?

11   A.   QUALCOMM TYPICALLY REQUESTS CROSS GRANTS FROM LICENSEES

12   WHEN IT IS GRANTING LICENSING TO ALL OF QUALCOMM'S PATENTS,

13   WHAT I'LL CALL THE PORTFOLIO LICENSE.

14       IN THAT SITUATION, IT'S A MATTER, YOU KNOW, OF COMMON

15   PRACTICE AND, FRANKLY, PRUDENCE FOR A COMPANY THAT IS GRANTING

16   ALL OF ITS RIGHTS TO SEEK SOME SET OF CROSS RIGHTS FROM THE

17   LICENSEE IN ORDER TO NOT LEAVE ITSELF EXPOSED TO THE LICENSEE'S

18   PATENTS AT A TIME WHEN IT HAS GRANTED RIGHTS TO ALL OF ITS

19   PATENTS.

20   Q.   IS THIS UNIQUE TO QUALCOMM?

21   A.   NO.  THAT'S -- THAT'S VERY COMMON IN PATENT LICENSING.

22   THAT'S WHAT PEOPLE DO.

23   Q.   SO OUTSIDE OF CIRCUMSTANCES WHERE YOU'RE GRANTING A, A

24   LICENSE TO YOUR PATENTS, DOES QUALCOMM SEEK INBOUND LICENSES OF

25   CELLULAR SEPS TO COVER ITS OWN MODEM CHIPS?

1    A.   NO.

2    Q.   AND WHY NOT?

3    A.   WELL, THEY -- THE PRACTICE IN THE INDUSTRY, HOW THE

4    INDUSTRY HAS GROWN UP IS THAT CELLULAR SEPS ARE LICENSED AT THE

5    DEVICE LEVEL.

6         SO IT IS THE PRACTICE FOR PEOPLE WHO ARE GOING OUT AND

7    LICENSING SEPS TO LICENSE THEM AT THE DEVICE LEVEL AND NOT AT

8    THE CHIP LEVEL.

9         SO IT'S -- IT'S NOT -- IT'S NOT NEEDED AS A COMMERCIAL

10   MATTER.

11   Q.   AND THE LAST THING YOU MENTIONED WAS RUNNING ROYALTIES AS

12   AN ELEMENT OF CONSIDERATION.  ARE THE RUNNING ROYALTIES ALWAYS

13   THE SAME IN LICENSE AGREEMENTS?

14   A.   NO.  THEY VARY.

15   Q.   ARE THERE TYPICAL RUNNING ROYALTY RATES FOR HANDSETS?

16   A.   FOR HANDSETS, THERE ARE TYPICAL ROYALTY RATES THAT -- THE

17   TYPICAL RATES HAVE CHANGED OVER TIME, BUT THERE ARE TYPICAL

18   RATES.

19   Q.   AND SO WHAT ARE THOSE TYPICAL RATES AND WHAT HAVE THEY

20   BEEN OVER TIME?

21   A.   OKAY.  SO THE ORIGINAL, ORIGINAL LICENSES WERE AT

22   5 PERCENT, THEY WERE CDMA ONLY LICENSES, THAT'S ALL THERE WAS

23   AT THE TIME.  AND IT WAS 5 PERCENT ON A FULL PORTFOLIO LEVEL

24   AND THOSE WERE WHAT THE LICENSES WERE.

25        AND THAT 5 PERCENT AT THE PORTFOLIO LEVEL HAS STAYED

1    CONSTANT THROUGHOUT UNTIL RELATIVELY RECENTLY FOR CERTAIN

2    PRODUCTS THAT I'LL GET INTO.

3         FOR CDMA PRODUCTS, IT HAS STAYED CONSTANT THROUGHOUT UNTIL

4    VERY RECENTLY.

5    Q.   AND JUST TO BE CLEAR, WHEN YOU SAY "VERY RECENTLY," ARE

6    YOU REFERRING TO SOMETHING BEFORE MARCH OF 2018?

7    A.   YES.  I'M REFERRING -- YES.

8    Q.   OKAY.  THANK YOU.

9    A.   YES, I AM.

10        SO BEFORE MARCH -- YES, BEFORE MARCH 2018, YES.

11        AND SO IN -- WHEN LTE CAME ALONG, WE ANNOUNCED RATES FOR

12   ESSENTIAL ONLY AT 3 AND A QUARTER FOR THE FIRST RELEASE; AND WE

13   OFFERED FULL PORTFOLIO FOR LTE AT 4 PERCENT, AND THAT WAS THE

14   TYPICAL RATE FOR A WHILE.

15        AS LTE ADDED FUNCTIONALITY, THE ESSENTIAL ONLY RATE BECAME

16   3 AND A HALF.

17        AS THE PROGRAM CONTINUED TO EVOLVE, THERE WAS A DECISION

18   AND RECTIFICATION PLAN IN CHINA BY THE NATIONAL DEVELOPMENT AND

19   THE FORM COMMISSION, THE NDRC, THAT PROVIDED FOR CERTAIN

20   ROYALTY TERMS FOR ESSENTIALS ONLY AGREEMENTS, AND THOSE ROYALTY

21   TERMS WERE 3.25 PERCENT, NORMALLY EXPRESSED AT 5 PERCENT TIMES

22   65 PERCENT OF THE PRICE FOR MULTIMODE PRODUCTS, 3G/4G PRODUCTS;

23   AND 2.275 PERCENT, NORMALLY EXPRESSED AT 3 AND A HALF PERCENT,

24   TIMES 65 PERCENT OF THE NET SELLING PRICE FOR SINGLE MODE LTE

25   PRODUCTS.

1          AND SINCE THEN, THAT SET OF TERMS HAVE BECOME OUR STANDARD

2     TERMS FOR ESSENTIALS ONLY RATES WORLDWIDE FOR MULTIMODE

3     ESSENTIALS ONLY LICENSES AND SINGLE MODE ESSENTIALS ONLY

4     LICENSES FOR ANY SET OF STANDARDS, INCLUDING 5G.

5     Q.   SO LET ME UNPACK ONE THING THAT I THINK PROBABLY IS CLEAR

6      FROM YOUR ANSWER, BUT DO LICENSEES PAY DIFFERENT RATES IF THEY

7      TAKE AN ESSENTIALS ONLY LICENSE VERSUS IF THEY TAKE A LICENSE

8      TO QUALCOMM'S FULL PORTFOLIO?

9     A.   YES, THEY DO.  FOR ESSENTIALS ONLY, IT IS FOR A MULTIMODE

10     DEVICE, WHICH IS A DEVICE THAT DOES MORE THAN ONE STANDARD,

11     3.25 PERCENT.

12          AND FOR THAT SAME DEVICE FOR A FULL PORTFOLIO LICENSE, IT

13     WOULD BE 5 PERCENT.

14          AND FOR SINGLE MODE, IT'S A LITTLE BIT LESS.

15     Q.   ALL RIGHT.  AND ASIDE FROM THESE PERCENTAGE AMOUNTS, ARE

16      THERE ANY NUMERICAL OR JUST HARD DOLLAR CAPS ON THE ROYALTIES

17      THAT LICENSEES OWE UNDER TYPICAL AGREEMENTS?

18     A.   YES.  FOR HANDSETS, THERE HAVE BEEN CAPS SINCE LONG BEFORE

19      I ARRIVED AT QUALCOMM THEY'RE A LONG STANDING FEATURE OF THE

20      LICENSING PROGRAM.  HISTORICALLY THE CAP ON A HANDSET FOR

21      ROYALTIES HAD BEEN $25.

22          THE CAPS TODAY, OR AS OF MARCH 2018, ARE $20 FOR A FULL

23      PORTFOLIO MULTIMODE, AND $13 FOR AN ESSENTIALS ONLY MULTIMODE,

24      AND LESS FOR SINGLE MODE.

25     Q.   ALL RIGHT.  SO TAKE A HYPOTHETICAL PHONE WITH $1,000 NET

1    SELLING PRICE.

2         WHAT WOULD THE CAP BE THAT WOULD APPLY TO THAT PHONE IF

3    IT'S AN ESSENTIALS ONLY LICENSE?

4    A.   WELL, $1,000 PHONE -- $1,000 PHONE THESE DAYS WILL BE A

5    MULTIMODE PHONE.  SO THE CAP WOULD BE $13 FOR AN ESSENTIALS

6    ONLY LICENSE ON THAT PHONE.

7    Q.   AND AT THE RISK OF DOING MATH IN COURT, WHAT WOULD THE

8    PERCENTAGE ROYALTY BE FOR THAT $1,000 PHONE GIVEN THE CAP AS AN

9    EFFECTIVE MATTER?

10   A.   WELL, $13 IS 1.3 PERCENT OF $1,000.

11   Q.   ARE THERE ANY TERMS IN LICENSE AGREEMENTS THAT QUALCOMM IS

12   JUST UNWILLING TO NEGOTIATE?

13   A.   NO.  AT ONE TIME I THOUGHT THERE WERE, BUT THAT'S NOT THE

14   CASE.

15   Q.   WHAT DO YOU -- WHAT ARE YOU REFERRING TO?

16   A.   WE HAD A PROVISION IN LICENSE AGREEMENTS FOR A VERY LONG

17   TIME THAT WAS -- HAD TO DO WITH EXPORT COMPLIANCE THAT WAS DONE

18   BY PEOPLE CHARGED WITH EXPORT COMPLIANCE RULES THAT WAS THE

19   LEGAL DEPARTMENT IN QTL CONSIDERED UNTOUCHABLE.  AND I THOUGHT

20   THAT FOR MANY YEARS, BUT AT ONE POINT SOMEBODY WANTED TO TOUCH

21   IT AND IT WAS TOUCHABLE AS IT TURNS OUT.

22   Q.   SO CAN YOU GIVE AN EXAMPLE OF SOME LICENSE AGREEMENTS THAT

23   YOU'VE BEEN INVOLVED IN NEGOTIATING THAT ARE DIFFERENT FROM

24   THESE TYPICAL TERMS THAT YOU DESCRIBED?

25   A.   SURE.  LIKE AGREEMENTS THAT ARE -- THAT VARIED FROM THE

1    TYPICAL?  SURE.

2    Q.   YES.

3    A.   SO NEGOTIATIONS THAT I'VE BEEN INVOLVED IN INCLUDED

4    SAMSUNG, INCLUDED SONY MOBILE.  THERE ARE OTHER AGREEMENTS THAT

5    I KNOW OF FROM MY RESPONSIBILITIES, THOUGH MAY NOT HAVE

6    NECESSARILY BEEN INVOLVED IN WITH BLACKBERRY THAT VARIED FROM

7    OUR TYPICAL TERMS.

8    Q.   WELL, LET ME DIRECT YOU TO A FEW OF THESE.

9         THE FIRST ONE IS AT TAB 1 IN YOUR BINDER.  IT'S JX 0047.

10        AND, YOUR HONOR, THIS IS SUBJECT TO A SEALING ORDER, SO

11   I'M NOT GOING TO PLACE IT ON THE SCREEN.

12        THE COURT:  OKAY.  WOULD YOU LIKE IT ADMITTED?

13        MR. BORNSTEIN:  I WILL.  I WAS GOING TO LAY A

14   FOUNDATION WITH THE WITNESS.

15        THE COURT:  OKAY.  GO AHEAD, PLEASE.

16   BY MR. BORNSTEIN:

17   Q.   WHAT IS THIS DOCUMENT, MR. GONELL?

18   A.   THIS DOCUMENT IS WHAT I THINK OF AS THE 2009 SAMSUNG

19   AGREEMENT.  AS A TECHNICAL MATTER, IT'S AN AMENDMENT TO AN

20   EARLIER AGREEMENT.  BUT IN ESSENCE, IT'S A LICENSE AGREEMENT

21   THAT WE NEGOTIATED WITH SAMSUNG THAT WAS ENTERED INTO IN 2009.

22        MR. BORNSTEIN:  OKAY.  YOUR HONOR, YES, I WOULD LIKE

23   TO HAVE THE DOCUMENT ADMITTED, PLEASE.

24        MR. MERBER:  NO OBJECTION.

25        THE COURT:  IT'S ADMITTED.  GO AHEAD, PLEASE.

1          (JOINT EXHIBIT JX 0047 WAS ADMITTED IN EVIDENCE.)

2     BY MR. BORNSTEIN:

3     Q.   NOW, YOU SAID YOU WERE PERSONALLY INVOLVED IN THESE

4     NEGOTIATIONS?

5     A.   I WAS PERSONALLY INVOLVED IN THE NEGOTIATIONS.

6     Q.   HOW LONG DID THE NEGOTIATION OF THE AGREEMENT TAKE?

7     A.   THE NEGOTIATION OF THE 2009 SAMSUNG AGREEMENT TOOK ABOUT

8     TWO YEARS.  MY INVOLVEMENT CAME IN THE MIDDLE, SO IT HAD BEEN

9     GOING ON FOR ABOUT A YEAR AT THE TIME THAT I JOINED IN 2009.

10    Q.   AND WITHOUT GOING INTO SPECIFIC DOLLAR AMOUNTS AND

11    PERCENTAGES AND NUMBERS, CAN YOU DESCRIBE AT A GENERAL LEVEL

12    WHAT IS UNIQUE ABOUT THE STRUCTURE OF THIS AGREEMENT?

13    A.   WELL, THERE ARE MANY THINGS THAT ARE, THAT ARE UNUSUAL AND

14    UNIQUE FEATURES OF THIS AGREEMENT COMPARED TO OUR TYPICAL

15    AGREEMENT.

16         SO SAMSUNG PAID AN UPFRONT FEE THAT WAS ORDERS OF

17    MAGNITUDE HIGHER THAN OUR TYPICAL UPFRONT FEES.

18         SAMSUNG TRANSFERRED TO QUALCOMM MANY PATENTS PURSUANT TO

19    THIS AGREEMENT.

20         SAMSUNG GAVE QUALCOMM A VERY ROBUST CROSS-LICENSE TO THEIR

21    PORTFOLIO, WHICH WE CONSIDER A COMMERCIALLY SIGNIFICANT

22    PORTFOLIO OF PATENTS IN THE INDUSTRY, AMONG OTHER THINGS.

23    Q.   ALL RIGHT.  SO YOU REFERRED TO A LARGE UPFRONT FEE.

24         LET ME DIRECT YOU TO THE PAGE THAT ENDS WITH 016 OF THE

25    AGREEMENT, AND DON'T SAY THE NUMBERS OUT LOUD.  BUT DOES THIS

1    PROVISION IN SECTION 2 ON PAGE 16 ACCURATELY REFLECT THE

2    UPFRONT FEE THAT WAS PAYABLE BY SAMSUNG UNDER THIS AGREEMENT?

3    A.   YES, SECTION 2 OF THE AGREEMENT IS THE LUMP SUM FEE

4    SECTION, YES.

5    Q.   AND LET ME THEN DIRECT YOU TO PAGE 20 OF THE AGREEMENT AND

6    LOOK AT A DIFFERENT PROVISION.

7         ON PAGE 20, DO YOU SEE SECTION 4.1.1.2?

8    A.   YES.  THIS IS ANOTHER FEATURE OF THE SAMSUNG AGREEMENT

9    THAT WAS VERY UNUSUAL.  IN EXCHANGE FOR ALL OF THE THINGS THAT

10   THEY HAD GRANTED TO US, THEY GOT VERY DIFFERENT ROYALTY TERMS.

11        AND IN THE ROYALTY TERMS, THERE WAS RISK SHARING IN THAT

12   THE ROYALTY TERMS COULD VARY DEPENDING ON HOW WELL SAMSUNG DID.

13   AND THERE WAS A RANGE IN WHICH THEY COULD VARY, AND THE PLACE

14   IN THE RANGE WAS DETERMINED EACH YEAR BY REFERENCE TO THIS

15   SPECIFIC FORMULA.

16   Q.   ARE YOU REFERRING TO THE MATHEMATICAL FORMULA THAT APPEARS

17   IN 4.1.1.2?

18   A.   YES.  THAT'S THE -- THAT STARTS OUT FINAL SPECIFIED RATE

19   EQUALS.

20   Q.   OKAY.  AND WHO CAME UP WITH THIS FORMULA?

21   A.   I DID.

22   Q.   DID THIS NEGOTIATION PROGRESS SMOOTHLY OR WAS IT MORE

23   CHALLENGING?

24   A.   WELL, THE NEGOTIATION TOOK TWO YEARS, SO IT WAS -- IT WAS

25   A CHALLENGING NEGOTIATION.  THIS WAS MY FIRST ONE, SO AT THE

1       TIME I DIDN'T HAVE A REFERENCE POINT TO JUDGE.

2           BUT SINCE NOW I'VE DONE THIS FOR TEN YEARS, I CAN STILL

3       SAY THIS WAS ONE OF THE MORE CHALLENGING NEGOTIATIONS THAT I'VE

4       EVER BEEN A PART OF.

5       Q.   WHAT WAS CHALLENGING ABOUT IT?

6       A.   EVERYTHING WAS UNUSUAL.  THIS IS AN INCREDIBLY CUSTOMIZED

7       AGREEMENT, AND SO, SO ALMOST EVERYTHING WAS AN ISSUE.  EVEN BY

8       THE TIME I GOT THERE -- AND BY THE TIME I GOT THERE THEY HAD

9       KIND OF CONCEPTUALLY AGREED TO THE ROYALTY CONCEPT, BUT EVEN

10      THAT WAS ONLY CONCEPTUAL.  LIKE I SAID, I CAME UP WITH THE

11      FORMULA.

12          SAMSUNG IS VERY SOPHISTICATED.  THEY ARE HARD NEGOTIATORS.

13      THEY WERE, AT THE TIME, AND ARE STILL, BUT AT THE TIME THEY

14      WERE AN IMPORTANT COMPANY IN THE INDUSTRY, AN IMPORTANT CHIP

15      CUSTOMER OF QUALCOMM, AND AN IMPORTANT LICENSEE OF QUALCOMM.

16          IT WAS A VERY IMPORTANT NEGOTIATION TO QUALCOMM AND IT WAS

17      DIFFICULT.

18      Q.   LET ME DIRECT YOU TO TAB 2 IN YOUR BINDER.  THIS IS

19      JX 10 -- 0105.

20          THIS IS ALSO SUBJECT TO A SEALING ORDER, YOUR HONOR.

21          CAN YOU TELL ME WHAT JX 0105 IS?

22      A.   THIS IS A LICENSE AGREEMENT THAT QUALCOMM AND SONY ENTERED

23      INTO IN 2015.

24      Q.   WERE YOU INVOLVED IN NEGOTIATING THIS ONE?

25      A.   YES, I WAS.

1           MR. BORNSTEIN:  OKAY.  YOUR HONOR, I'D OFFER JX 0105

2    INTO EVIDENCE.

3           MR. MERBER:  NO OBJECTION.

4           THE COURT:  IT'S ADMITTED.

5       (JOINT EXHIBIT JX 0105 WAS ADMITTED IN EVIDENCE.)

6           THE COURT:  GO AHEAD, PLEASE.

7    BY MR. BORNSTEIN:

8    Q.   DID THIS AGREEMENT ALSO DIFFER FROM THE TYPICAL QUALCOMM

9    LICENSE TERMS?

10   A.   YES, IT DID.

11   Q.   HOW SO?

12   A.   IN THIS AGREEMENT, SONY GRANTED QUALCOMM A VERY ROBUST

13   CROSS-LICENSE TO WHAT WE CONSIDERED A COMMERCIALLY VALUABLE

14   PORTFOLIO OF PATENTS.  THEY TRANSFERRED CERTAIN PATENTS TO US.

15           AND IN EXCHANGE, THE STANDARD -- WE DEVIATED FROM OUR

16   STANDARD ROYALTY TERMS AND THEY OBTAINED, FOR LACK OF A BETTER

17   TERM, A DISCOUNT FROM OUR STANDARD ROYALTY TERMS.

18   Q.   WAS THIS ONE AN EASY NEGOTIATION?

19   A.   WELL, THIS WAS NOT -- THIS WAS NOT AS HARD AS THE SAMSUNG

20   NEGOTIATION.  BUT IT WAS HARDER THAN AVERAGE FOR SURE.

21   Q.   HOW SO?  OR WHY SO?

22   A.   WELL, BECAUSE SONY CAME IN WHEN WE STARTED NEGOTIATING

23   THIS PARTICULAR AGREEMENT WITH WELL PREPARED, I MEAN, VERY WELL

24   PREPARED WITH A SET OF INFORMATION ABOUT THEIR PATENTS AND THE

25   APPLICABILITY OF THEIR PATENTS TO OUR PRODUCTS, THE

1        THOROUGHNESS OF WHICH WAS UNLIKE ANYTHING I HAD EVER SEEN

2        BEFORE.

3            IT WAS INCREDIBLY IMPRESSIVE AND MERITED A, YOU KNOW, A

4        VERY ROBUST RESPONSE, WHICH WE DID.  SO WE -- WE PRESENTED

5        EQUALLY COMPREHENSIVE INFORMATION ABOUT OUR PATENTS AND THEIR

6        APPLICABILITY TO SONY'S PRODUCTS.

7            AND THAT LEVEL OF TECHNICAL INFORMATION, THAT LEVEL OF

8        TECHNICAL INFORMATION WAS -- WAS EXTENSIVE, I MEAN, APPROPRIATE

9        FOR THIS AGREEMENT BECAUSE OF THE SIGNIFICANCE OF THE

10       CROSS-LICENSE IN THE AGREEMENT.  BUT THAT TAKES TIME AND IS

11       COMPLICATED.

12           THE COURT:  EXCUSE ME.  I'M SORRY TO INTERRUPT, BUT

13       IT'S 10:35.  SO I'D LIKE US TO TAKE OUR -- I APOLOGIZE FOR

14       INTERRUPTING.  I'D LIKE US TO TAKE OUR BREAK THIS MORNING.

15           MR. BORNSTEIN:  OF COURSE.

16           THE COURT:  WE'LL TAKE A 15 MINUTE BREAK.  AND I

17       FORGOT TO AS L -- YOU MAY STEP DOWN DURING THE BREAK.  I FORGOT

18       TO ASK THE PARTIES ABOUT MR. REIFSCHNEIDER, IS HE -- WOULD YOU

19       STILL LIKE HIM SUBJECT TO RECALL SO YOU HAVE THE AVAILABILITY

20       TO PLAY MORE VIDEO?

21           MS. MILICI:  YES, WE WOULD.

22           THE COURT:  OKAY.  SO HE'S A YES.  FINE.

23           ALL RIGHT.  LET'S TAKE A 15 MINUTE BREAK.  THANK YOU FOR

24       YOUR PATIENCE.  WE'LL BE BACK IN 15 MINUTES.  THANK YOU.

25           (RECESS FROM 10:36 A.M. UNTIL 10:55 A.M.)

 1                THE COURT:  OKAY.  GOOD AFTERNOON.  WELCOME BACK.

 2           OKAY.  LET'S CONTINUE.  PLEASE TAKE A SEAT.  TIME IS

 3      10:55.  GO AHEAD, PLEASE.

 4                MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

 5      Q.   BEFORE THE BREAK, WE WERE TALKING ABOUT NEGOTIATIONS THAT

 6      YOU HAD WITH SONY CORPORATION IN WHICH THERE WAS TECHNICAL

 7      INFORMATION EXCHANGED BETWEEN THE PARTIES.

 8           WAS THAT THE ONLY NEGOTIATION YOU'VE BEEN INVOLVED IN IN

 9      WHICH THERE'S BEEN TECHNICAL INFORMATION EXCHANGED ABOUT

10      QUALCOMM'S PATENTS?

11      A.   NO.  THERE -- THAT'S NOT UNCOMMON AT ALL AND, IN FACT,

12      IT'S MORE COMMON ALL THE TIME.  IT'S BEEN MORE COMMON RECENTLY

13      THAN EVER BEFORE.

14           BUT IT'S A FAIRLY COMMON OCCURRENCE.

15      Q.   DURING YOUR TIME AT QTL, HAVE THERE BEEN SITUATIONS IN

16      WHICH YOU JUST HAVEN'T BEEN ABLE TO REACH AGREEMENT WITH A

17      POTENTIAL LICENSEE?

18      A.   THAT HAPPENS FROM TIME TO TIME.

19      Q.   AND WHAT APPROACH DOES QUALCOMM TAKE TO TRY TO ADDRESS

20      THOSE SITUATIONS?

21      A.   WELL, THE NEGOTIATIONS THAT I'VE LED, THAT I'VE BEEN

22      INVOLVED IN, MY PRACTICE, OF COURSE, AUTHORIZED BY THE COMPANY,

23      IS TO OFFER ARBITRATION IN THOSE CIRCUMSTANCES.

24      Q.   AND IN THE EVENT OF A DISPUTE WITH AN OEM, OR A

25      DISAGREEMENT ON TERMS LIKE THIS, IS QUALCOMM WILLING TO HAVE

1    THE TERMS OF THE BINDING AGREEMENT SET THROUGH AN ARBITRATION

2    PROCESS?

3    A.    YES.  FOR CELLULAR ESSENTIAL PATENTS, YES, ABSOLUTELY.

4    Q.    INCLUDING THE ROYALTY TERMS?

5    A.    YES.  THAT'S THE MOST COMMON THING THAT YOU CAN'T AGREE

6    ON.

7    Q.    CAN YOU GIVE SOME EXAMPLES WHEN YOU HAVE OFFERED A BINDING

8    ARBITRATION LIKE THIS TO A POTENTIAL LICENSEE?

9    A.    YES.  I DID THAT IN NEGOTIATIONS WITH MEIZU.

10         I DID THAT IN NEGOTIATIONS WITH ASUSTEK, A-S-U-S-T-E-K.

11         I DID THAT IN NEGOTIATIONS WITH HUAWEI.

12         I'VE DONE THAT IN NEGOTIATIONS WITH APPLE.

13   Q.    LET ME ASK YOU TO TURN TO TAB 3 IN YOUR BINDER.  IT'S

14   QX 1725.

15         AND, YOUR HONOR, THIS, TOO, HAS BEEN SEALED IN PART BY A

16   PRIOR ORDER.

17         AND LET ME ASK YOU IF YOU RECOGNIZE THIS DOCUMENT.

18   A.    YES.  THIS IS AN E-MAIL ENCLOSING A LETTER THAT I WROTE TO

19   B.J. WATROUS, WHO'S A LAWYER AT APPLE.

20         MR. BORNSTEIN:  I MOVE THE ADMISSION OF QX 1725, YOUR

21   HONOR.

22         MR. MERBER:  NO OBJECTION.

23         THE COURT:  IT'S ADMITTED.

24   (DEFENDANT'S EXHIBIT QX 1725 WAS ADMITTED IN EVIDENCE.)

25         THE COURT:  GO AHEAD, PLEASE.

1    BY MR. BORNSTEIN:

2    Q.    AND WHAT WAS THE PURPOSE OF YOUR LETTER TO MR. WATROUS?

3    A.    THE PURPOSE OF THIS LETTER IS THAT QUALCOMM IS OFFERING

4    APPLE BINDING ARBITRATION OVER THE TERMS OF THE LICENSE TO 3G

5    AND 4G ESSENTIAL PATENTS.

6    Q.    AND SPECIFICALLY, WHAT TERMS OF THE AGREEMENT WAS QUALCOMM

7    WILLING TO, AND OFFERING TO, ARBITRATE WITH APPLE?

8    A.    ALL OF THEM.  THIS LETTER, THIS OFFER IS MODELED ON THE

9    CONSENT ORDER THE FTC ENTERED INTO WITH GOOGLE IN WHAT'S KNOWN

10   AS THE GOOGLE MMI CASE IN FRONT OF THE FTC.

11        AND IT IS DESIGNED TO, AND DOES, FOLLOW THAT PROCESS.  AND

12   THE PROCESS IS THAT WE, THE LICENSOR, SENDS OVER A LICENSE

13   AGREEMENT AND THE LETTER ATTACHES LICENSE AGREEMENTS.

14        THE OTHER SIDE MARKS WHATEVER PARTS OF THE LICENSE

15   AGREEMENT THEY WANT TO DISPUTE, AND THEN THE PROCESS GOES FROM

16   THERE AND ULTIMATELY THIS ARBITRATION TO DECIDE THE DISPUTED

17   TERMS.

18   Q.    WHY DID YOU MAKE THIS ARBITRATION OFFER TO APPLE?

19   A.    BECAUSE WE HAD A DISPUTE WITH THEM, AND WE WANTED TO

20   RESOLVE IT.

21   Q.    AND WHEN WAS THIS?  WHAT'S THE DATE ON THE LETTER?

22   A.    JULY 15TH, 2016.

23   Q.    WAS QUALCOMM WILLING AT THAT POINT TO HAVE THE TERMS OF A

24   LICENSE WITH APPLE SET BY AN ARBITRATION?

25   A.    YES.  WE WERE WILLING THEN, AND WE ARE WILLING TODAY.

1    Q.   AND DID APPLE AGREE TO THAT?

2    A.   NO, THEY HAVE NOT.

3    Q.   IF SOMEONE HAD SAID THAT APPLE WAS SEEKING TO HAVE THE

4    TERMS OF A BINDING LICENSE SET BY A COURT IN A DISPUTE WITH

5    QUALCOMM, WOULD YOU AGREE WITH THAT?

6    A.   NO, I WOULD NOT.

7    Q.   WHY NOT?

8    A.   BECAUSE I WAS IN THE COURTROOM IN THE SOUTHERN DISTRICT OF

9    CALIFORNIA WHEN APPLE TOLD THE COURT THAT NOT ONLY WAS IT NOT

10   SEEKING A FRAND DETERMINATION, BUT THAT IT WOULD BE UNLAWFUL

11   FOR THE JUDGE TO DO A FRAND DETERMINATION AT QUALCOMM'S

12   REQUEST.

13        SO, NO, THEY'RE NOT SEEKING THAT.  THEY'RE JUST NOT.

14   Q.   LET ME ASK YOU TO TURN TO THE NEXT TAB IN YOUR BINDER, TAB

15   4.  THIS IS QX 9223.

16   A.   YES.

17   Q.   CAN YOU TELL ME WHAT THIS DOCUMENT IS, PLEASE?

18   A.   THIS DOCUMENT IS AN E-MAIL CHAIN THAT IS MOSTLY E-MAILS

19   EXCHANGED BETWEEN ME AND A COUNTERPART AT MEIZU DURING THE

20   COURSE OF NEGOTIATIONS WITH MEIZU.

21        MR. BORNSTEIN:  YOUR HONOR, I OFFER QX 9223 INTO

22   EVIDENCE.

23        MR. MERBER:  YOUR HONOR, WE OBJECT THAT THE

24   STATEMENTS BY THE MEIZU INDIVIDUALS ON THE E-MAIL CHAIN ARE

25   HEARSAY.

1          MR. BORNSTEIN:  I BELIEVE THIS WAS ALREADY THE

2     SUBJECT OF AN HPO, YOUR HONOR, THAT WAS OVERRULED.

3          THE COURT:  GIVE ME JUST ONE QUICK MINUTE, PLEASE.

4        (PAUSE IN PROCEEDINGS.)

5          THE COURT:  DO YOU HAVE THE HPO ECF NUMBER FOR THAT

6     ORDER?

7          MR. BORNSTEIN:  I'M SORRY, YOUR HONOR.  I'M MISTAKEN

8     ABOUT THAT.  WE HAD REACHED AN AGREEMENT WITH THE FTC TO AVOID

9     AN HPO.

10         THE COURT:  OKAY.

11         MR. BORNSTEIN:  THE AGREEMENT WAS WE WOULD NOT OFFER

12    THIS FOR THE TRUTH OF THE MATTER ASSERTED, BUT WE WOULD OFFER

13    IT FOR THE FACT OF THE OFFER AND RESPONSE THAT WERE MADE BY

14    QUALCOMM AND MEIZU, VERBAL ACTS.

15         THE COURT:  ALL RIGHT.  I DON'T SEE QX 9223 AS

16    SUBJECT OF A HIGH PRIORITY EVIDENTIARY OBJECTION RULING IN ECF

17    NUMBER 1350 FILED YESTERDAY.

18       SO IS THE WHOLE DOCUMENT JUST NOT FOR THE TRUTH OF THE

19    MATTER ASSERTED, OR JUST CERTAIN PORTIONS?

20         MR. BORNSTEIN:  I BELIEVE, AS MR. MERBER SAID, THE

21    OBJECTION WAS LODGED ONLY WITH RESPECT TO STATEMENTS BY MEIZU.

22         THE COURT:  OKAY.

23         MR. BORNSTEIN:  AND SO THAT WAS THE SCOPE OF THE

24    AGREEMENT THAT WAS REACHED.

25         THE COURT:  DO YOU AGREE WITH THAT?

```
1              MR. MERBER:  YES, YOUR HONOR.

2              THE COURT:  OKAY.  SO IT'LL JUST SAY THE MEIZU, WHAT,

3    E-MAILS ARE NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED?

4              MR. BORNSTEIN:  I THINK THAT'S RIGHT, YOUR HONOR,

5    YES.

6              THE COURT:  OKAY.  WITH THAT CONDITION, IT'S

7    ADMITTED.

8         (DEFENDANT'S EXHIBIT QX 9223 WAS ADMITTED IN EVIDENCE.)

9              THE COURT:  GO AHEAD, PLEASE.

10             MR. BORNSTEIN:  THANK YOU.

11   Q.   LET ME DIRECT YOU TO THE FOURTH PAGE OF THE AGREEMENT.  IT

12   ENDS WITH THE BATES STAMP 9826 WHERE THERE IS AN E-MAIL THAT

13   APPEARS TO BE FROM YOU, MR. GONELL.

14        DO YOU SEE THAT?

15   A.   YES, THIS IS AN E-MAIL, NOT AN AGREEMENT.  BUT I SEE THAT.

16   Q.   DID I SAY "AGREEMENT"?  I'M SORRY.

17        WHAT WAS THE PURPOSE OF THIS E-MAIL THAT YOU SENT TO

18   MEIZU?

19   A.   OKAY.  THIS E-MAIL, THE ONE AT THE TOP OF THE PAGE THAT I

20   WROTE, IS AN E-MAIL IN WHICH I AM OFFERING MEIZU A WAY FORWARD

21   IN THE NEGOTIATIONS THAT INCLUDES ARBITRATION IF WE CANNOT

22   AGREE.

23   Q.   AND WERE YOU OFFERING TO ARBITRATE THE ROYALTY RATE OF AN

24   AGREEMENT WITH MEIZU?

25   A.   YES.
```

GONELL DIRECT BY MR. BORNSTEIN

1      Q.   DID MEIZU ACCEPT?

2      A.   NO, THEY DID NOT.

3      Q.   AND WHAT HAPPENED AFTER MEIZU DECLINED?

4      A.   WE CONTINUED TO NEGOTIATE AND WE -- THEY DIDN'T ACCEPT THE

5      ARBITRATION, BUT WE CONTINUED TO NEGOTIATE, JUST TO BE CLEAR.

6           WE WERE NOT ABLE TO REACH AGREEMENT FOR A TIME, AND

7      QUALCOMM FILED PATENT INFRINGEMENT LAWSUITS IN CHINA AGAINST

8      MEIZU.

9           THAT LITIGATION BEGAN AND WAS ONGOING.  THE PARTIES

10     CONTINUED NEGOTIATING, AND WE EVENTUALLY REACHED AN AGREEMENT.

11     Q.   SO YOU'VE DESCRIBED TWO SITUATIONS IN WHICH POTENTIAL

12     LICENSEES REFUSED TO AGREE TO ARBITRATION.

13          HAVE THERE BEEN SITUATIONS IN WHICH LICENSEES, OR

14     POTENTIAL LICENSEES, HAVE SAID YES AND AGREED TO ARBITRATE THE

15     TERMS OF AN AGREEMENT, INCLUDING THE ROYALTY RATE?

16     A.   YES.

17     Q.   LET ME DIRECT YOU TO TAB 5 IN THE BINDER.  THIS IS

18     JX 0098.

19          AND, YOUR HONOR, THIS DOCUMENT IS ALREADY IN EVIDENCE AND

20     IS SUBJECT TO A SEALING ORDER.

21          CAN YOU TELL ME WHAT JX 0098 IS?

22     A.   THIS IS A LICENSE AGREEMENT BETWEEN QUALCOMM AND HUAWEI

23     THAT WAS ENTERED INTO IN 2014.

24     Q.   AND DOES THIS AGREEMENT HAVE SOME KIND OF ARBITRATION

25     PROVISION OF THE SORT YOU WERE DESCRIBING?

1    A.   YES, IT DOES.

2    Q.   IS THAT WHAT WE CAN SEE ON PAGE 2 OF THE AGREEMENT,

3    SECTION 2?

4         AND I THINK THIS SECTION IS NOT UNDER SEAL, SO I'LL LIFT

5    THE --

6    A.   YES.  SO SECTION 2 IS THE TERM OF THE AGREEMENT SECTION,

7    AND HOW IT WORKS IS THAT THE AGREEMENT IS EFFECTIVE FOR AN

8    INITIAL TERM OF ABOUT FIVE YEARS, ENDING AT THE END OF 2019.

9    AND THIS PROVISION PROVIDES FOR THE PARTIES TO NEGOTIATE OVER

10   THE TERMS FOR A LICENSE STARTING IN 2020, AND THAT IF WE CANNOT

11   REACH AGREEMENT ON TERMS FOR THAT FUTURE LICENSE, THEN EITHER

12   SIDE MAY INITIATE BINDING ARBITRATION IN ACCORDANCE WITH THE

13   OTHER PROVISIONS OF THIS AGREEMENT TO DETERMINE THE TERMS.

14   Q.   IS THIS THE ONLY AGREEMENT THAT QUALCOMM HAS REACHED THAT

15   PROVIDES FOR ARBITRATION TO SET THE ROYALTY TERMS FOR A RENEWAL

16   OR SUBSEQUENT AGREEMENT?

17   A.   NO, IT'S NOT.

18   Q.   OKAY.  IS IT COMMON NOW ACROSS QUALCOMM'S LICENSING

19   PROGRAM?

20   A.   SINCE WE ENTERED INTO THIS AGREEMENT WITH HUAWEI, IT HAS

21   BECOME A VERY COMMON THING FOR US TO OFFER AND IT'S VERY

22   COMMONLY AGREED TO BY LICENSEES TO PROVIDE FOR A TERM IN THIS

23   MANNER.

24        SO THERE ARE MANY, MANY, MANY AGREEMENTS THAT HAVE THIS

25   PROVISION.

1    Q.   SO I'M GOING TO TURN NOW TO SOME OF THE PRACTICES THAT THE

2    FTC HAS CHALLENGED IN THIS CASE, AND I'LL START WITH SOMETHING

3    THAT THE FTC CALLS "NO LICENSE, NO CHIPS."

4         DO YOU KNOW WHAT POLICY OR PRACTICE THE FTC IS REFERRING

5    TO WHEN THEY USE THAT PHRASE?

6    A.   YES.

7    Q.   CAN YOU DESCRIBE IN YOUR OWN WORDS WHAT PRACTICE THE FTC

8    IS CALLING NO LICENSE, NO CHIPS?

9    A.   THE COMPANY HAS A POLICY OF SELLING CHIPS, MODEM CHIPS,

10   ONLY TO LICENSED OEM'S.

11   Q.   WHEN YOU SAY, "ONLY TO LICENSED OEM'S," DOES A LICENSE --

12   DOES AN OEM NEED TO BE LICENSED TO THE ENTIRETY OF QUALCOMM'S

13   PORTFOLIO BEFORE QCT WILL SELL CHIPS TO THAT OEM?

14   A.   NO.

15   Q.   SO EXPLAIN WHAT PORTION OF THE PORTFOLIO IS AT ISSUE HERE.

16   A.   OKAY.  SO IT'S ESSENTIAL PATENTS, OKAY, AND IT'S ESSENTIAL

17   PATENTS FOR A STANDARD THAT'S EMPLOYED IN THE PRODUCT, AND THE

18   TEST IS, DOES THE LICENSE COVER THE PRODUCT INTO WHICH THE CHIP

19   IS GOING TO GO?

20   Q.   OKAY.  SO LET'S SUPPOSE I'M AN OEM AND I REALLY, REALLY

21   WANT TO BUY QUALCOMM'S CDMA CHIPS BECAUSE I THINK THEY ARE THE

22   BEST AVAILABLE ALTERNATIVE.

23        DO I NEED ALSO TO HAVE A LICENSE TO WCDMA TECHNOLOGY FROM

24   QUALCOMM?

25   A.   NO.  YOU'D NEED A CDMA LICENSE.

1    Q.    OKAY.  LET'S SUPPOSE THE CHIPS THAT I WANT TO BUY ARE

2    MULTIMODE, THEY'RE CDMA, THEY ALSO CAN BE USED FOR WCDMA.

3         IN THAT CIRCUMSTANCE, DO I NEED TO HAVE A WCDMA LICENSE IN

4    ORDER TO BUY THOSE CHIPS FROM QCT?

5    A.    NO, BECAUSE THE -- THE PRODUCT YOU'D PUT THE CHIP INTO

6    WOULD BE A PRODUCT THAT DOES CDMA, IT WOULD BE LICENSED UNDER

7    THE CDMA AGREEMENT, AND SO IT WOULD BE A LICENSED PRODUCT.  AS

8    I SAID, THE TEST IS, IS IT A LICENSED PRODUCT?

9    Q.    IS SO THERE EVER ANY CIRCUMSTANCE IN WHICH I WOULD NEED A

10   WCDMA LICENSE IN ORDER TO PURCHASE CDMA CHIPS?

11   A.    NO.  IF YOU -- NO.  A CDMA LICENSE IS WHAT YOU WOULD NEED.

12   Q.    OKAY.  WHY DOES QUALCOMM HAVE THIS PRACTICE?

13   A.    SO WE HAVE THIS PRACTICE FOR TWO PRINCIPAL REASONS.

14   FIRST, THERE'S A FAIR VALUE, AN ESTABLISHED FAIR VALUE FOR OUR

15   I.P., AND WE DON'T WANT THE FACT THAT WE HAVE A LICENSING

16   BUSINESS TO PREJUDICE US, TO HURT OUR ABILITY TO OBTAIN THE

17   FAIR VALUE FOR OUR I.P.

18   Q.    YOU SAID "WE DON'T WANT THE FACT THAT WE HAVE A LICENSING

19   BUSINESS" --

20   A.    EXCUSE ME.  A CHIP BUSINESS.  A CHIP BUSINESS, THE FACT

21   THAT WE SELL CHIPS, WE DON'T WANT THE FACT THAT WE HAVE A CHIP

22   BUSINESS TO PREJUDICE OUR ABILITY TO OBTAIN THE FAIR VALUE

23   THAT'S BEEN ESTABLISHED FOR OUR I.P.

24   Q.    HOW WOULD HAVING A CHIP BUSINESS, OR SELLING CHIPS,

25   PREJUDICE QTL'S ABILITY TO GET FAIR VALUE FOR THE INTELLECTUAL

1    PROPERTY?

2    A.   WELL, SO TO UNDERSTAND, TO UNDERSTAND THAT, YOU NEED TO GO

3    BACK TO THE, KIND OF THE BEGINNINGS OF HOW THIS ALL STARTED,

4    RIGHT?

5        SO THE COMPANY DOES SYSTEMS INNOVATION AND LICENSES THAT

6    OUT; RIGHT?  THAT'S HOW -- THAT'S THE FOUNDATION OF THE

7    COMPANY.  THE LICENSING BUSINESS STARTS FIRST.

8        SO BY THE TIME THE CHIP BUSINESS STARTS, THERE'S AN

9    ESTABLISHED VALUE FOR THE I.P.  THAT'S FAIRLY NEGOTIATED,

10   THERE'S A BUNCH OF AGREEMENTS.

11       OKAY.  THE CHIP BUSINESS COMES ALONG.  WHEN THE CHIP

12   BUSINESS COMES ALONG, THEY PRICE THEIR CHIPS USING, OR WITH

13   JUST THE PRICE OF THE CHIP IN MIND, EXCLUDING THE VALUE OF THE

14   I.P. BECAUSE THE VALUE OF THE I.P. IS ALREADY TAKEN CARE OF IN

15   THE LICENSES.  OKAY?

16       SO WITH THAT SET UP, THE IMPORTANT POINT IS THE CHIPS ARE

17   SOLD FOR THE VALUE OF THE CHIPS, EXCLUDING THE VALUE OF THE

18   I.P.

19       SO --

20   Q.   AND WHY DOES THAT REQUIRE THIS PRACTICE WE'RE TALKING

21   ABOUT?

22   A.   OKAY.  SO WE THINK OF TWO SITUATIONS, YOU KNOW, SELLING TO

23   A LICENSEE OR SELLING TO A NON-LICENSEE.

24       IF YOU SELL TO A LICENSEE, THEN EVERYTHING IS FINE BECAUSE

25   YOU GET THE VALUE OF THE CHIP WHEN YOU SELL THE CHIP AND YOU

```
1    GET THE VALUE OF THE I.P., THE FAIR VALUE OF THE I.P. FROM THE

2    LICENSE.  OKAY?

3         IF YOU SELL TO A NON-LICENSEE, THEN YOU GET THE VALUE OF

4    THE CHIP FOR THE CHIP, BUT THERE'S NO AGREEMENT ABOUT THE VALUE

5    OF THE I.P., SO YOU NEED TO TALK WITH THEM ABOUT GETTING FAIR

6    VALUE FOR THE I.P.

7         AND THE PROBLEM THAT ARISES IS THAT BY VIRTUE OF HAVING

8    SOLD THEM THE CHIP, THEY NOW HAVE ARGUMENTS THAT ARISE UNDER

9    PATENT LAW AND PRINCIPLES OF PATENT EXHAUSTION THAT THEY DON'T

10   HAVE TO PAY YOU ANY MORE FOR THE FAIR VALUE OF THE I.P. BECAUSE

11   YOU'VE SOLD THEM THE CHIP, EVEN THOUGH THEY HAVEN'T PAID

12   ANYTHING FOR THAT YET.

13   Q.   AND HOW DOES THE AVAILABILITY OF THESE ARGUMENTS RELATING

14   TO PATENT EXHAUSTION HAVE THE POTENTIAL TO PREJUDICE THE

15   LICENSING BUSINESS?

16   A.   WELL, THE -- THOSE ARGUMENTS AND THE FACT -- THOSE ISSUES

17   WILL AFFECT THE NEGOTIATIONS, WILL AFFECT POTENTIAL LEGAL

18   CLAIMS WE CAN BRING IN CASE WE CAN'T REACH AGREEMENT, AND WILL

19   AFFECT THE POTENTIAL REMEDIES WE GET, OR THE EFFECT OF THOSE

20   REMEDIES IN CASE -- EVEN IF WE BRING A CASE AND WIN.

21        SO ALL OF THAT DRIVES DOWN THE ULTIMATE OUTCOME TO BELOW

22   THE FAIR VALUE.

23   Q.   AND HOW DOES THE PRACTICE THAT WE'RE TALKING ABOUT OF

24   SELLING ONLY TO LICENSED OEM'S ADDRESS THE PROBLEM YOU'VE

25   IDENTIFIED?
```

1    A.   WELL, AS I SAID, IF YOU GET -- IF YOU SELL TO SOMEONE THAT

2    HAS A LICENSE, THEN THE LICENSE PROVIDES THE CONTRACTUAL

3    AGREEMENT PROVIDING FOR THE FAIR VALUE.  AND SO THESE ISSUES

4    SIMPLY DON'T ARISE BECAUSE THERE IS ALREADY AN AGREEMENT FOR A

5    FAIR VALUE.

6    Q.   SO YOU REFERRED EARLIER TO SOME HISTORICAL REASONS FOR WHY

7    QUALCOMM DOESN'T PRICE THE I.P. INTO THE CHIP.

8        ARE THERE OTHER, OTHER BENEFITS THAT QUALCOMM BELIEVES

9    ARISE FROM THIS SEPARATE PRICING STRUCTURE?

10   A.   WELL, I THINK I -- I THINK I WAS TALKING EARLIER ABOUT WHY

11   WE HAVE THE POLICY OF SELLING ONLY TO LICENSED OEM'S.

12       IF WE -- IF YOU -- IF YOU'RE ASKING ABOUT WHY WE DON'T

13   JUST PRICE THE I.P. IN THE CHIPS?  IS THAT WHAT YOU'RE ASKING?

14   Q.   WELL, IS THERE A REASON FOR THAT?

15   A.   WELL, YES, THERE'S THE MATTER OF HISTORICAL PRACTICE, THE

16   LICENSING BUSINESS WAS FIRST AND THE CHIP BUSINESS CAME SECOND,

17   AND SO THAT'S HOW IT STARTED.

18       BUT, YOU KNOW, AS WE ARE NOW, PRICING -- TRYING TO PRICE

19   THE I.P. PRICE INTO THE CHIP PRICE WOULD NOT WORK AS A METHOD

20   TO GET YOU FAIR VALUE FOR THE I.P.

21   Q.   WHY IS THAT?

22   A.   WELL, BECAUSE -- WELL, YOU HAVE TO LOOK AT IT FROM THE

23   POINT OF VIEW OF THE CHIP CUSTOMER AND THE CHOICES THE CHIP

24   CUSTOMER IS FACING.  OKAY?

25       SO LET'S SAY THERE'S A CHIP PRICE X AND THAT THERE'S FAIR

1       VALUE FOR QUALCOMM'S I.P. Y THAT'S ESTABLISHED IN THE MARKET.

2       OKAY?

3               SO WHAT WE'RE -- WHAT YOU'RE ASKING ABOUT IS A SITUATION

4       WHERE QUALCOMM CHARGES FOR ITS CHIP X PLUS Y, AND FROM THE

5       CUSTOMER'S POINT OF VIEW, THEIR CHOICE IS, OKAY, HERE'S

6       QUALCOMM'S OFFERING, I HAVE TO PAY X PLUS Y.

7               WHEN THEY'RE CONSIDERING SOMEBODY ELSE'S CHIP, OKAY, THEY

8       HAVE TO PAY X, THE PRICE OF THE CHIP, OKAY, AND IF THEY HAVE A

9       LICENSE AGREEMENT, THEY HAVE TO PAY Y AND IT'S THE SAME AND

10      EVERYTHING IS FINE.

11              BUT WHAT IF THEY DON'T HAVE A LICENSE AGREEMENT?  SO IF

12      THEY DON'T HAVE A LICENSE AGREEMENT, OKAY, THEN WE HAVE -- WE

13      OBVIOUSLY HAVE TO TALK TO THEM ABOUT THAT AND MAYBE THEY'LL

14      ENTER INTO A LICENSE AGREEMENT OR MAYBE THEY WON'T.

15              BUT THE IMMEDIATE CHOICE THEY HAVE IS NOT PAYING X PLUS Y,

16      IT'S PAYING X NOW AND, AT ABSOLUTE WORST, Y LATER.  AND MAYBE

17      THEY'LL END UP PAYING LESS THAN Y.

18      Q.   WHY IS Y LATER THE ABSOLUTE WORST CASE SCENARIO FOR AN

19      UNLICENSED OEM IN THESE CIRCUMSTANCES?

20      A.   BECAUSE, AS I SAID, THERE'S AN ESTABLISHED VALUE FOR, FOR

21      QUALCOMM'S I.P., SO WE'LL JUST SAY THAT IS THE FRAND -- WE'LL

22      CALL THAT THE FRAND RATE AND SAY Y IS THE FRAND RATE.

23              IN A DISPUTE THEN WITH THE -- WITH THIS UNLICENSED

24      CUSTOMER, THEN WHEN WE GO TO COURT OR ARBITRATION TO RESOLVE

25      THAT DISPUTE, WE'RE SEEKING A FRAND RATE.  WE ARE SEEKING Y.

1    QUALCOMM IS ASKING FOR Y.

2         THE COURT OR ARBITRATOR IS NOT GOING TO GIVE US MORE THAN

3    Y.  THE COURT, IF WE WIN EVERYTHING, THEN THEY'RE GOING TO GIVE

4    US Y.

5         AND SO THAT'S WHY Y IS THE WORST CASE SCENARIO.

6    Q.   SO ARE THERE CONSEQUENCES THEN DOWN THE LINE FOR QUALCOMM

7    FROM THE FACT THAT THE OEM HAS THIS CHOICE THAT YOU'VE

8    DESCRIBED?

9    A.   OH, YES, RIGHT.  YES, FOR SURE, BECAUSE, LOOK, IF THEY'RE

10   FACING A CHOICE WHERE THE QUALCOMM -- THE QUALCOMM OFFERING IS

11   X PLUS Y, AND THE COMPETING OFFERING IS X PLUS Y LATER, OR

12   MAYBE LESS THAN Y LATER, THEN ALL OTHER THINGS BEING EQUAL, THE

13   OTHER OFFERING IS GOING TO BE MORE ATTRACTIVE.

14        SO QUALCOMM'S GOING TO HAVE TO ADJUST ITS PRICE TO PUT

15   THINGS ON A LEVEL PLAYING FIELD, AND THAT ADJUSTMENT IN PRICE

16   IS EXACTLY GETTING LESS THAN FAIR COMPENSATION.

17   Q.   AND ARE THERE ADDITIONAL BENEFITS THAT QUALCOMM HAS

18   IDENTIFIED FROM HAVING SEPARATE PRICING FOR I.P. AND FOR CHIPS?

19   A.   WELL, HAVING SEPARATE PRICING FOR I.P. AND CHIPS HELPS

20   AVOID PROBLEMS THAT WOULD ARISE IF YOU TRIED -- IF YOU COMBINE

21   THEM, COMBINE THE PRICE OF THE CHIPS AND THE LICENSE.

22   Q.   WHAT SORT OF PROBLEMS ARE YOU TALKING ABOUT?

23   A.   SO STANDARD ESSENTIAL PATENTS ARE SUBJECT TO FRAND

24   COMMITMENTS AND THERE ARE LOTS OF ISSUES THAT GET RAISED WHEN

25   I.P. IS SUBJECT TO FRAND COMMITMENTS.

1          ONE ISSUE THAT GETS RAISED, THAT HAS BEEN RAISED IN MY

2     EXPERIENCE, IS THE ISSUE OF FRAND MAY PROHIBIT YOU FROM

3     CHARGING FOR THE I.P. A DEVICE THAT USES YOUR COMPONENT LESS

4     THAN A DEVICE -- THE SAME DEVICE THAT USES A COMPETING

5     COMPONENT.  OKAY?

6          IN OTHER WORDS, YOU CAN'T CHARGE LESS FOR STUFF THAT USES

7     YOUR CHIPS THAN YOU CHARGE FOR STUFF THAT USES SOMEBODY ELSE'S

8     CHIPS, AT LEAST THAT'S HOW THE ARGUMENT GOES.

9          THERE'S ALSO ISSUES OF NON-DISCRIMINATION, WHICH GOES TO

10    SAY YOU HAVE TO TREAT SIMILARLY SITUATED PEOPLE SIMILARLY WHEN

11    YOU'RE PRICING I.P.

12    Q.   SO WHAT'S THE RELEVANCE OF ALL THIS TO SEPARATE PRICING OF

13    CHIPS AND LICENSING?

14    A.   SO IF YOU HAVE SEPARATE PRICES FOR I.P. AND CHIPS, THEN

15    YOU CAN TELL WHAT'S GOING ON, RIGHT?  YOU CAN TELL WHAT THE

16    I.P. PRICE IS, YOU CAN TELL WHAT THE I.P. PRICE IS YOU'RE

17    CHARGING DIFFERENT PEOPLE, YOU CAN TELL WHAT THE I.P. PRICE IS

18    THAT YOU'RE CHARGING FOR YOUR DEVICES COMPARED TO -- FOR

19    DEVICES THAT USE YOUR CHIPS COMPARED TO DEVICES THAT USE OTHER

20    CHIPS.  SO YOU CAN TELL, IS THERE -- ARE THESE ISSUES ARISING

21    OR ARE THEY NOT?

22         IF YOU COMBINE THE PRICES, THEN ANY CHANGE IN THE

23    COMBINATION -- AND CHIP PRICES VARY FAR MORE THAN I.P.

24    PRICES -- BUT ANY CHANGE THEN NOW BECOMES SUSPECT, NOW BECOMES

25    SUBJECT TO THESE ARGUMENTS.  IS THIS DISCRIMINATION?  IS THIS

1    CHARGING SEPARATE I.P. PRICE FOR YOUR STUFF VERSUS SOMEBODY

2    ELSE'S?

3         AND, YOU KNOW, AVOIDING THOSE, THOSE ARGUMENTS AND THOSE

4    ISSUES IS A GOOD THING.

5    Q.   NOW, WAY BACK EARLIER IN THIS DISCUSSION YOU MENTIONED

6    THAT THERE WERE TWO PRINCIPAL REASONS FOR THE PRACTICE WE'VE

7    BEEN DISCUSSING.  WHAT'S THE OTHER ONE YOU HAD IN MIND?

8    A.   SO THE OTHER ONE I HAD IN MIND IS WHAT I'LL CALL THE ISSUE

9    OF FAIRNESS, AND IT'S THE ISSUE OF ACTUAL FAIRNESS, ACTUALLY

10   BEING FAIR TO THE LICENSEES AND THE PERCEPTION OF FAIRNESS,

11   THEIR BELIEF, THEIR SUBJECTIVE BELIEF IN ARE YOU BEING FAIR?

12   ARE YOU TREATING THEM FAIR?

13   Q.   AND HOW DOES THE PRACTICE WE'RE TALKING ABOUT ADDRESS

14   FAIRNESS ISSUES?

15   A.   OKAY.  SO A FAIRNESS ISSUE WE HEAR ABOUT, WE HEAR ABOUT

16   FREQUENTLY IS LICENSEES DON'T LIKE IT, I'LL JUST SAY, FIND IT

17   UNFAIR IF THEY'RE DOING THE RIGHT THING AND THEY'RE PAYING

18   ROYALTIES AND SOMEBODY ELSE THAT THEY'RE COMPETING WITH IS OUT

19   THERE NOT DOING THE RIGHT THING AND NOT PAYING US ROYALTIES.

20        IF WE WERE ENABLING THAT BY SELLING CHIPS, THEN IT WOULD

21   BE MUCH, MUCH WORSE, IT WOULD BE 1,000 TIMES WORSE BECAUSE NOW

22   WE'RE ENABLING THAT BAD ACTOR AND GIVING THEM ARGUMENTS THAT

23   THEY DON'T HAVE TO PAY, AND THE LICENSEES THAT ARE DOING THE

24   RIGHT THING WILL FIND THAT UNFAIR AND, IN FACT, I BELIEVE THAT

25   IT WOULD BE UNFAIR.  IT'S NOT JUST THEIR PERCEPTION.  THE

1    REALITY WOULD BE THAT THAT'S NOT A FAIR SITUATION.

2    Q.   AND ARE THERE SITUATIONS WHERE YOU'VE HAD LICENSEES WHO

3    HAVE COMPLAINED ABOUT THE FACT THAT THERE ARE COMPETING OEM'S

4    THAT AREN'T PAYING ROYALTIES TO QUALCOMM?

5    A.   YES.  THAT HAPPENS NOT INFREQUENTLY.  AND, AGAIN, THIS IS

6    EVEN IN THE SITUATION WHERE WE'RE NOT ENABLING THE

7    INFRINGEMENT, BUT JUST THE MERE FACT OF US SUPPOSEDLY

8    TOLERATING THE INFRINGEMENT IS THE SOURCE OF COMPLAINT.

9    Q.   AND IS IT YOUR VIEW THAT ACTUALLY ENABLING THE

10   INFRINGEMENT WOULD MAKE IT WORSE?

11   A.   YES, FAR, FAR WORSE.

12   Q.   LET ME ASK YOU TO TAKE A LOOK AT TAB 6 IN THE BINDER.

13   THIS IS QX 9242.  AND I'LL ASK THAT YOU TELL ME WHAT THIS

14   DOCUMENT IS?

15   A.   QX 9242 IS AN E-MAIL CHAIN THAT ENDS IN AN E-MAIL FROM

16   BENSON LAM TO ME AND OTHERS AT QTL.

17          MR. BORNSTEIN:  YOUR HONOR, I'D OFFER QX 924 INTO

18   EVIDENCE.

19          MR. MERBER:  YOUR HONOR, THE FTC OBJECTS THAT THIS

20   DOCUMENT CONTAINS MULTIPLE LEVELS OF HEARSAY, FIRST, FROM THE

21   CUSTOMERS TO MR. LAM, AND, SECOND, FROM MR. LAM TO MR. GONELL.

22          MR. BORNSTEIN:  YOUR HONOR, WE'RE OFFERING THE

23   DOCUMENT FOR ITS EFFECT ON MR. GONELL AND ARE CONTENT TO NOT

24   HAVE IT IN FOR THE TRUTH OF THE STATEMENTS REPORTED BY

25   MR. LORBECK AND MR. LAM.

1              THE COURT:  WHAT'S YOUR VIEW ON THAT?

2              MR. MERBER:  WITH THAT QUALIFICATION, NO OBJECTION.

3              THE COURT:  OKAY.  SO HELP ME PHRASE, HOW IS THAT

4    GOING TO BE?  ANY --

5              MR. BORNSTEIN:  I THINK WE COULD SAY IT'S BEING

6    ADMITTED, BUT NOT FOR THE TRUTH OF THE STATEMENTS REPORTED BY

7    INDIVIDUALS OTHER THAN MR. GONELL.

8          DOES THAT WORK FOR YOU?

9              THE COURT:  WELL, THAT'S THE WHOLE THING.  NONE OF

10   THESE E-MAILS ARE ACTUALLY AUTHORED BY MR. GONELL.  SO THAT'S

11   THE WHOLE DOCUMENT; RIGHT?

12             MR. BORNSTEIN:  THE DOCUMENT --

13             THE COURT:  SO THE WHOLE DOCUMENT WILL NOT BE

14   ADMITTED FOR THE TRUTH OF THE MATTER ASSERTED.

15             MR. BORNSTEIN:  THAT'S FINE, YOUR HONOR.

16             THE COURT:  OKAY.  SO WITH THAT CONDITION, IT'S

17   ADMITTED.

18          (DEFENDANT'S EXHIBIT QX 9242 WAS ADMITTED IN EVIDENCE.)

19             THE COURT:  GO AHEAD, PLEASE.

20             MR. BORNSTEIN:  THANK YOU.

21   Q.   SO CAN YOU EXPLAIN TO ME WHAT THIS DOCUMENT IS AND WHY

22   IT'S SIGNIFICANT TO THE DISCUSSION WE'VE BEEN HAVING?

23   A.   THIS DOCUMENT IS AN EXAMPLE OF SOME OF THE INFORMATION

24   THAT'S COME TO ME OF -- ABOUT COMPLAINTS OF CUSTOMERS ABOUT

25   SITUATIONS WHERE THEY ARE COMPETING WITH OTHER COMPANIES THAT

1      ARE NOT LICENSED TO QUALCOMM'S PATENTS.

2      Q.   WHAT IS QUALCOMM'S PRACTICE WITH RESPECT TO SUPPLYING

3      CHIPS TO A LICENSEE WHO IS DISPUTING THE TERMS OF ITS LICENSE?

4      A.   IF THERE'S A LICENSEE THAT IS DISPUTING THE TERMS OF ITS

5      LICENSE, THEN WE CONTINUE TO SUPPLY CHIPS IF THEY WANT THEM.

6      Q.   WHY DO YOU CONTINUE TO SUPPLY CHIPS TO SOMEONE WHO'S

7      DISPUTING THE TERMS OF THE LICENSE?

8      A.   WHEN THEY'RE A LICENSEE -- SO THE ISSUES THAT I TALKED

9      ABOUT BEFORE THAT APPLY IN SITUATIONS WHERE YOU'RE SELLING TO

10     SOMEBODY THAT DOESN'T HAVE A LICENSE DON'T APPLY BECAUSE THEY

11     HAVE A LICENSE.

12         THE TERMS MIGHT BE IN DISPUTE AND THAT HAS TO BE DEALT

13     WITH IN ALL OF THAT.

14         BUT THE ISSUES THAT I WAS TALKING ABOUT THAT UNDERLIE THE

15     POLICY OF SELLING ONLY TO LICENSED OEM'S, THOSE ISSUES DON'T

16     ARISE WHEN THEY HAVE A LICENSE.  THEY ONLY ARISE WHEN SOMEONE

17     DOESN'T HAVE A LICENSE.

18     Q.   AND HAVE THERE BEEN SITUATIONS WHERE LICENSED OEM'S HAVE

19     STOPPED COMPLYING WITH THEIR AGREEMENTS, BUT QUALCOMM HAS

20     CONTINUED TO SHIP THEM CHIPS?

21     A.   YES.

22     Q.   CAN YOU GIVE SOME EXAMPLES OF THAT?

23     A.   SURE.  THERE HAVE BEEN MULTIPLE SITUATIONS LIKE THAT, JUST

24     IN THE PAST FEW YEARS, BUT EVEN BEFORE.

25         BUT OPPO, ONE OF THE TOP SIX IN THE WORLD, STOPPED PAYING

1      QUALCOMM FOR OVER A YEAR WHILE THEY WERE RENEGOTIATING THEIR

2      LICENSE, AND QUALCOMM CONTINUED TO SHIP.

3          VIVO, ANOTHER OF THE TOP SIX IN THE WORLD, STOPPED PAYING

4      WHILE THEY WERE RENEGOTIATING THEIR LICENSE.  FOR OVER A YEAR,

5      QUALCOMM CONTINUED TO SHIP.

6          HUAWEI, BACK IN THE 2013/'14 NEGOTIATIONS THAT ENDED WITH

7      THE AGREEMENT WE TALKED ABOUT EARLIER, THEY TOOK THE POSITION

8      THAT THEY HAD MOVED THEIR BUSINESS TO AN UNLICENSED ENTITY AND

9      STOPPED PAYING, AND WE CONTINUED TO SHIP THEM CHIPS THROUGHOUT

10     THAT TIME PERIOD.

11         APPLE HAS ORDERED ITS CONTRACT MANUFACTURERS NOT TO PAY US

12     AND THEY HAVE, IN FACT, NOT PAID US FOR GOING ON TWO YEARS NOW,

13     AND WE HAVE CONTINUED TO SHIP CHIPS.

14         YOU KNOW, BEFORE THAT, I'M AWARE THAT WE HAD A DISPUTE

15     WITH BLACKBERRY THAT -- WHERE BLACKBERRY WAS UNDERPAYING, THEY

16     WEREN'T NOT PAYING AT ALL, BUT THEY WERE UNDERPAYING, IN OUR

17     VIEW, WHAT THEY OWED AND WE CONTINUED TO SHIP THEM CHIPS DURING

18     THAT TIME AS WELL.

19     Q.   YOU PREVIOUSLY TALKED ABOUT A NEGOTIATION YOU HAD WITH

20     SAMSUNG IN 2009.

21         MR. MERBER:  YOUR HONOR, I DIDN'T HEAR ANY TESTIMONY

22     REGARDING THE EFFECT OF QX 9242 ON THE WITNESS IN ANY WAY, AND

23     THE FTC WOULD MOVE TO STRIKE THE TESTIMONY ABOUT THAT DOCUMENT.

24         MR. BORNSTEIN:  I BELIEVE I COVERED THIS, BUT I CAN

25     ASK THE QUESTION.

1    Q.   WHAT -- WHAT IS THE RELEVANCE, TO YOU, OF A DOCUMENT LIKE

2    QX 9242, THE E-MAIL YOU RECEIVED FROM MR. LAM IN TERMS OF THE

3    POLICY WE'VE BEEN DISCUSSING?

4    A.   SO IN TERMS OF THE -- IN TERMS OF THE POLICY I'M

5    DISCUSSING, TO ME -- TO ME WHEN I GET INFORMATION LIKE THIS

6    FROM PEOPLE THAT ARE OUT THERE IN THE FIELD ACTUALLY TALKING TO

7    CUSTOMERS, AND THIS IS -- THIS IS AN E-MAIL COMING FROM PEOPLE

8    IN CHINA TALKING ABOUT EVENTS IN CHINA, AND IT'S NOT THAT I

9    NEVER GO TO CHINA, BUT I SPEND MOST OF MY TIME HERE.  WELL, NOT

10   HERE, BUT IN THE U.S.

11        THIS, YOU KNOW, THIS IS, YOU KNOW, KIND OF VALUABLE

12   INFORMATION TO ME ABOUT, OKAY, WHAT'S GOING ON?  WHAT ARE THE

13   PERCEPTIONS THAT ARE BEING REPORTED TO US?  AND IT, TO ME, JUST

14   TELLS ME THAT THE PERCEPTION OF FAIRNESS AND ACTUAL FAIRNESS

15   ARE VERY IMPORTANT ISSUES AND TO ME -- FOR ME, IN MY JOB AS --

16   IN MY ROLE AS COMING UP WITH THE COMPANY'S LICENSING STRATEGY

17   AND HOW WE CONDUCT OUR LICENSING BUSINESS, THIS TYPE OF THING

18   REINFORCES MY BELIEF THAT FAIRNESS IS A VITAL, OF VITAL

19   IMPORTANCE ON THIS ISSUE.

20   Q.   NOW, BEFORE MR. MERBER'S OBJECTION, YOU WERE TALKING ABOUT

21   LICENSEES WHO HAD CEASED PAYING, BUT QUALCOMM CONTINUED TO SHIP

22   CHIPS.

23        AND I WAS TURNING TO ASK YOU ABOUT NEGOTIATION YOU HAD

24   WITH SAMSUNG IN 2009.

25             THE COURT:  LET ME JUST OVERRULE THE OBJECTION BEFORE

1    YOU DO THAT.

2         GO AHEAD, PLEASE.

3              MR. BORNSTEIN:  SORRY, YOUR HONOR.  THANK YOU.

4         AND WHILE WE'RE PAUSED, IT OCCURRED TO ME DURING THE

5    NEGOTIATION, I NEGLECTED TO MENTION, YOUR HONOR, THAT THERE

6    WILL BE A PORTION OF THIS THAT WE'LL NEED TO DO UNDER SEAL IN

7    LIGHT OF AN ORDER YOU ENTERED PREVIOUSLY ON THE REQUEST OF

8    AVANCI.  I'LL SAVE THAT UNTIL THE VERY END OF THE EXAMINATION.

9              THE COURT:  OKAY.  AND WE'LL DO THAT RIGHT BEFORE THE

10   LUNCH BREAK.  IS THAT OKAY?  WILL THAT WORK FOR YOUR FLOW?

11             MR. BORNSTEIN:  THAT'S FINE, UNLESS I FINISH SOONER.

12             THE COURT:  OKAY.  GO AHEAD, PLEASE.

13             MR. BORNSTEIN:  THANK YOU.

14   Q.   SO THE NEGOTIATION YOU HAD WITH SAMSUNG IN 2009, DID

15   ISSUES RELATING TO CHIP SUPPLY COME UP AT ALL IN THAT

16   NEGOTIATION?

17   A.   NO, NOT TO MY KNOWLEDGE.  AND CERTAINLY NOT WHILE I WAS A

18   PART OF IT.

19   Q.   AND WOULD IT HAVE MADE ANY SENSE FOR ISSUES RELATING TO

20   CONTINUED CHIP SUPPLY TO SAMSUNG TO HAVE ARISEN IN THAT

21   NEGOTIATION?

22   A.   NO, NOT TO MY MIND.

23   Q.   WHY NOT?

24   A.   BECAUSE THIS WAS NOT A SITUATION WHERE SAMSUNG WAS

25   BECOMING UNLICENSED, WAS ABOUT TO BECOME UNLICENSED, OR WAS

1    UNLICENSED.

2         SAMSUNG HAD A LICENSE.  WE WERE RENEGOTIATING THE LICENSE.

3    THEY WERE LICENSED UNDER -- IF THEY WERE -- SAY THEY WERE

4    LICENSED, SO THE ISSUES THAT ARISE FROM SELLING TO SOMEONE

5    THAT'S NOT LICENSED JUST DIDN'T COME INTO PLAY.

6    Q.   SO I'M GOING TO MOVE NOW TO TALK ABOUT A DIFFERENT

7    PRACTICE THAT HAS BEEN THE SUBJECT OF A CHALLENGE FROM THE FTC.

8         WHAT IS QUALCOMM'S PRACTICE WITH RESPECT TO GRANTING

9    EXHAUSTIVE LICENSES TO MODEM CHIP SUPPLIERS?

10   A.   IT IS OUR STRONG PREFERENCE NOT TO GRANT EXHAUSTIVE

11   LICENSES TO MODEM CHIP SUPPLIERS.

12   Q.   HAS QUALCOMM EVER GRANTED AN EXHAUSTIVE LICENSE FOR

13   CELLULAR SEPS TO A MODEM CHIP SUPPLIER?

14   A.   WE'VE NEVER ENTERED INTO AN AGREEMENT, TO MY KNOWLEDGE,

15   FOR CELLULAR SEPS THAT WAS INTENDED TO BE EXHAUSTIVE.

16   Q.   AND IS QUALCOMM UNIQUE AMONG HOLDERS OF CELLULAR SEPS IN

17   THIS REGARD?

18   A.   NO.  THAT'S THE COMMON INDUSTRY PRACTICE IS TO LICENSE AT

19   THE DEVICE LEVEL AND NOT TO LICENSE MODEM CHIP COMPANIES.

20   Q.   AND WHY DOES QUALCOMM HAVE THAT PRACTICE?

21   A.   WELL, QUALCOMM LICENSES AT THE DEVICE LEVEL.  IT'S, YOU

22   KNOW, INDUSTRY PRACTICE TO LICENSE AT THE DEVICE LEVEL.

23        AND THE LICENSING AT THE CHIP LEVEL IS UNNECESSARY IN THAT

24   REGIME.

25   Q.   WOULD THERE BE ANY NEGATIVE CONSEQUENCES TO THE INDUSTRY

GONELL DIRECT BY MR. BORNSTEIN

1    OR TO QUALCOMM IN LICENSING AT THE CHIP LEVEL?

2    A.    YES.   IT WOULD MAKE LICENSING A LOT MORE CUMBERSOME AND

3    MORE INEFFICIENT.

4    Q.    HOW SO?

5    A.    WELL, SO WE'RE TALKING ABOUT ESSENTIAL PATENTS, CELLULAR

6    ESSENTIAL PATENTS.   THE PATENTS ARE WRITTEN IN A WAY THAT

7    DESCRIBE USER EQUIPMENT, AND BASE STATIONS, BUT SET THAT ASIDE

8    BECAUSE REALLY WE'RE TALKING ABOUT HANDSETS, WE'RE TALKING

9    ABOUT USER EQUIPMENT.

10       SO THE STANDARDS ARE WRITTEN IN A WAY THAT DESCRIBE USER

11   EQUIPMENT, AND THE ESSENTIAL PATENTS READ ON USER EQUIPMENT.

12       NOW, SOME OF THEM MAY ALSO READ ON CHIPS, BUT THERE'S --

13   IT'S UNDOUBTEDLY THE CASE THAT THERE ARE SOME OF THEM THAT READ

14   ON USER EQUIPMENT AND DON'T READ ON CHIPS.

15   Q.    AND JUST FOR CLARITY, WHAT DO YOU MEAN BY "USER

16   EQUIPMENT"?

17   A.    USER EQUIPMENT IS AN END USER DEVICE, LIKE A HANDSET.

18   USER EQUIPMENT IS HOW IT'S TALKED ABOUT IN THE STANDARD.   SO I

19   APOLOGIZE IF I'M GETTING INTO TECHNICALITIES.

20       BUT THE POINT IS THAT THERE'S GOING TO BE SOME PATENTS

21   THAT READ ON THE DEVICE AND DON'T -- AND DON'T READ ON THE

22   CHIP, THAT YOU CAN'T HAVE AN INFRINGEMENT READ ON THE CHIP.

23   Q.    AND WHAT'S THE PRACTICAL CONSEQUENCE OF THAT?

24   A.    SO THE PRACTICAL CONSEQUENCE OF THAT IS IF YOU DO

25   LICENSING AT THE MODEM CHIP LEVEL, YOU'RE GOING TO ALSO HAVE TO

1      DO SOME LICENSING AT THE DEVICE LEVEL, OR I GUESS YOU COULD

2      FORGO VALUE, BUT THAT'S NOT THE GOAL EITHER; RIGHT?

3          SO YOU'RE GOING TO LICENSE EVERYTHING, YOU'RE GOING TO

4      HAVE TO DO LICENSING AT BOTH LEVELS.

5          AND ONCE YOU'RE IN A WORLD WHERE YOU HAVE TO LICENSE A

6      DEVICE ANYWAY, IT'S JUST MUCH MORE EFFICIENT TO DO ONE

7      NEGOTIATION RATHER THAN TWO, PARTICULARLY GIVEN ALL OF THE

8      UNCERTAINTIES INVOLVED AND THE POTENTIAL FOR DISPUTES.

9      Q.   WHAT KIND OF POTENTIAL FOR DISPUTE ARE YOU TALKING ABOUT?

10     A.   WELL, YOU COULD HAVE SITUATIONS -- THERE'S -- THIS MULTI

11     LEVEL STRUCTURE, YOU COULD HAVE SITUATIONS WHERE THE CHIP GUY

12     SAYS, WELL, HOLD ON A SECOND, I DON'T THINK I NEED TO TAKE A

13     LICENSE TO THIS.  YOU SHOULD LICENSE THE DEVICE GUY.

14         AND THE DEVICE GUY IS THEN TELLING YOU, WAIT, I DON'T

15     THINK I SHOULD TAKE A LICENSE TO THIS.  YOU SHOULD LICENSE THE

16     CHIP GUY.

17         AND NOW, INSTEAD OF BILATERAL NEGOTIATIONS OVER VALUE,

18     WE'RE HAVING, IN SOME WEIRD SENSE, SOME THREE-WAY NEGOTIATION

19     EVEN OVER THE ISSUE OF WHO SHOULD TAKE A LICENSE EVEN BEFORE WE

20     GET TO VALUE.

21         IT'S JUST MUCH MORE COMPLICATED.

22              THE COURT:  I DON'T UNDERSTAND THIS.  THE QUESTION

23     WAS, IS THE -- IS QUALCOMM NOT GRANTING AN EXHAUSTIVE LICENSE

24     FOR CELLULAR SEPS COMMON OR NOT, AND THEN YOU IMMEDIATELY

25     SWITCHED -- THIS WAS THE QUESTION.

1          THE ANSWER WAS, WE HAVE NEVER ENTERED INTO AN AGREEMENT TO

2     MY KNOWLEDGE FOR CELLULAR SEPS THAT WAS INTENDED TO BE

3     EXHAUSTIVE.

4          "QUESTION:  IS QUALCOMM UNIQUE AMONG HOLDERS OF CELLULAR

5     SEPS IN THIS REGARD?

6          NO, THAT'S THE COMMON INDUSTRY PRACTICE, TO LICENSE AT THE

7     DEVICE LEVEL AND NOT THE CHIP LEVEL.

8          I DIDN'T UNDERSTAND HOW THAT'S AN ANSWER TO THE EXHAUSTION

9     QUESTION.  I THINK I'M STILL UNCLEAR.

10          MR. BORNSTEIN:  WELL, MAYBE I CAN TRY AND ADDRESS IT.

11     Q.  SO THE -- THE FIRST QUESTION IS, IS QUALCOMM THE ONLY

12     LICENSOR THAT -- CELLULAR SEP LICENSOR THAT HAS THIS PRACTICE

13     OF LICENSING AT THE DEVICE LEVEL?

14          THE COURT:  NO.  THAT WASN'T THE QUESTION.  THE

15     QUESTION WAS, IS IT UNIQUE AMONG HOLDERS NOT TO DO EXHAUSTIVE

16     LICENSES FOR CELLULAR SEPS.  THAT WAS THE QUESTION.

17          MR. BORNSTEIN:  OKAY.

18          THE COURT:  AND THEN YOU FLIPPED IT TO LICENSING CHIP

19     VERSUS DEVICE.  I WANT TO KNOW WHAT'S THE QUESTION TO, IS IT

20     UNIQUE NOT TO DO EXHAUSTIVE LICENSES FOR CELLULAR SEPS?  THAT'S

21     A DIFFERENT QUESTION.

22     BY MR. BORNSTEIN:

23     Q.  WHAT IS THE ANSWER TO THAT QUESTION, MR. GONELL?

24     A.  OKAY.  IF WE'RE TALKING ABOUT LICENSES FOR CHIP MAKERS, IT

25     IS NOT UNIQUE.  IT'S COMMON THAT WE -- THAT ESSENTIAL PATENT

```
 1    HOLDERS DON'T GRANT LICENSES TO CHIPS EXHAUSTIVELY.  EVERYBODY

 2    DOES GRANT EXHAUSTIVE LICENSES TO DEVICES.

 3    Q.   AND I THEN MOVED TO WHAT'S THE REASON THAT QUALCOMM

 4    FOLLOWS THIS PRACTICE?

 5    A.   YES, IT'S BEEN -- QUALCOMM -- WELL, QUALCOMM LICENSES AT

 6    THE DEVICE LEVEL BECAUSE IT IS MORE EFFICIENT, IT'S INDUSTRY

 7    PRACTICE, IT'S THE WAY THE INDUSTRY HAS GROWN UP.  IT'S MORE

 8    ECONOMICALLY EFFICIENT.  IT GETS YOU CLOSER TO THE --

 9         THE COURT:  CAN I ASK A QUESTION?  I'M SORRY TO

10    INTERRUPT.  YOU'RE SAYING NO ONE LICENSES AT THE CHIP LEVEL, SO

11    YOU'RE SAYING ALL THE CHIP LICENSES ARE NOT EXHAUSTIVE.  BUT

12    ACCORDING TO YOU, THERE ARE NONE.

13         SO I GUESS I'M NOT WILLING FOLLOWING.  YOU'RE SAYING

14    DEVICE LEVEL LICENSES ARE EXHAUSTIVE.  CHIP LEVEL LICENSES ARE

15    NOT, NO ONE DOES.

16         BUT YOU'RE ALSO SAYING NO ONE LICENSES AT THE CHIP LEVEL

17    ANYWAY.  SO THEN THERE'S NOBODY THAT DOES A NONEXHAUSTIVE

18    LICENSE ACCORDING TO WHAT YOU'RE SAYING?  ISN'T THAT RIGHT?

19         THE WITNESS:  WELL, OKAY.  SO MAYBE -- SO I'M NOT

20    BEING PRECISE.

21         THE COURT:  SO WHO DOES THE CHIP LICENSES THEN?

22         THE WITNESS:  SO -- SO IF YOU'RE AN SEP HOLDER --

23         THE COURT:  YEAH.

24         THE WITNESS:  -- WHEN YOU GO OUT AND TRY TO LICENSE

25    FOR MONEY, YOU DON'T GO OUT AND LICENSE CHIP MAKERS.  THAT'S --
```

1    WE'RE TALKING ABOUT -- SO THAT'S EXHAUSTIVE LICENSING AT THE

2    CHIP LEVEL.  THAT DOESN'T HAPPEN.

3              THE COURT:  OKAY.  I'M LOOKING AT -- YOU SAID IT'S

4    COMMON THAT ESSENTIAL PATENT HOLDERS DON'T GRANT LICENSES TO

5    CHIPS EXHAUSTIVELY.

6        SO WHAT WERE YOU REFERRING TO?  ARE THERE LICENSES -- ARE

7    THERE SUCH LICENSES?  I'M JUST LOOKING AT YOUR TESTIMONY.

8              THE WITNESS:  YEAH, SO --

9              THE COURT:  YEAH.

10             THE WITNESS:  OKAY.  LET ME TRY TO --

11             THE COURT:  I THINK I MIGHT BE CONFUSED.

12             THE WITNESS:  LET ME TRY TO BACK UP.  I'M 100 PERCENT

13   SURE IT'S MY FAULT SO I APOLOGIZE.

14       LET ME TRY TO BACK UP AND SAY THIS.  IN THE INDUSTRY,

15   AMONG LICENSORS OF CELLULAR ESSENTIAL PATENTS, THE PEOPLE THAT

16   GO OUT AND HAVE LICENSING PROGRAMS AND DO LICENSING --

17             THE COURT:  OKAY.

18             THE WITNESS:  THAT'S ALL DONE AT THE DEVICE LEVEL.

19             THE COURT:  OKAY.

20             THE WITNESS:  PEOPLE DON'T DO IT AT THE CHIP LEVEL.

21   THEY DON'T LICENSE THEIR PATENTS FOR MONEY AT THE CHIP LEVEL.

22             THE COURT:  AND ALL THE DEVICE LEVEL LICENSES ARE

23   EXHAUSTIVE.

24             THE WITNESS:  DEVICE LEVEL LICENSES ARE EXHAUSTIVE

25   FOR SURE.

1        THE COURT:  OKAY.  RIGHT.

2        THE WITNESS:  NOW, THERE SOMETIMES ARE, AND THIS IS

3    MORE UNIQUE TO QUALCOMM THAN OTHER SEP LICENSORS.

4        MR. MERBER:  OBJECTION, YOUR HONOR.  I DON'T KNOW

5    WHAT HIS FOUNDATION IS FOR DESCRIBING THE TERMS OF OTHER

6    COMPANIES' LICENSES THAT DON'T INVOLVE QUALCOMM.

7        THE COURT:  WHAT IS YOUR KNOWLEDGE OF OTHER

8    COMPANIES' LICENSES, OTHER THAN QUALCOMM FOR SEPS?

9        THE WITNESS:  SO I'VE BEEN A MEMBER OF THIS INDUSTRY

10   FOR A VERY LONG TIME.  I'VE GONE TO -- I'VE DISCUSSED LICENSING

11   TOPICS GENERALLY AND HOW TO DO SEP LICENSING WITH COUNTER

12   PARTIES BOTH ON THE LICENSEE SIDE AND THE LICENSOR SIDE.

13       HOW LICENSING IS DONE IS A VERY COMMON TOPIC OF

14   DISCUSSION.  I HAVE, AT TIMES, REVIEWED LICENSES WITH -- THAT

15   OTHER PEOPLE HAVE WHEN IT'S BEEN APPROPRIATE UNDER

16   CONFIDENTIALITY RULES.

17       AND FROM MY BASICALLY TEN YEARS IN THE INDUSTRY, AND

18   UNDERSTANDING OF THE LICENSING BUSINESS AND HOW IT IS DONE,

19   THAT'S THE BASIS OF WHAT I'M SAYING.

20       MR. MERBER:  YOUR HONOR, IT SOUNDS LIKE HE'S PLANNING

21   TO OFFER AN EXPERT OPINION ABOUT LICENSING PRACTICE IN THIS

22   INDUSTRY, AND HE'S NOT BEEN OFFERED AS AN EXPERT.

23       MR. BORNSTEIN:  YOUR HONOR, I THINK HE'S JUST

24   DESCRIBING --

25       THE COURT:  I'M SORRY.  I MAY HAVE CAUSED MORE

1   CONFUSION.

2       CAN WE GO AHEAD WITH YOUR LINE OF QUESTIONING?  LET'S JUST

3   PICK UP WHERE YOU LEFT OFF.  I APOLOGIZE I MAY HAVE CAUSED MORE

4   PROBLEMS.

5           MR. BORNSTEIN:  THAT'S FINE, YOUR HONOR, ALTHOUGH

6   WE'RE ALL HERE TO MAKE SURE THAT YOUR HONOR GETS MR. GONELL'S

7   TESTIMONY.  SO IF THERE'S SOMETHING THAT IS UNCLEAR, I WANT TO

8   BE SURE THAT THAT DOES GET RESOLVED.

9           THE COURT:  I'M OKAY.  LET'S GO AHEAD AND GO ON.  I

10  APOLOGIZE FOR THE INTERRUPTION.

11          MR. BORNSTEIN:  SURE.

12  Q.  SO YOU HAD BEEN TALKING ABOUT SOME OF THE PRACTICAL

13  CONSEQUENCES OF LICENSING AT MULTIPLE LEVELS OF THE VALUE

14  CHAIN.

15      ARE THERE ANY OTHER REASONS BESIDES AVOIDING THOSE

16  PRACTICAL CONSEQUENCES, IN THE INDUSTRY PRACTICE YOU'VE

17  DESCRIBED, THAT QUALCOMM LICENSES DEVICE MAKERS RATHER THAN

18  CHIP MAKERS?

19  A.  WELL, IT'S MORE ECONOMICALLY EFFICIENT IN THAT YOU GET

20  CLOSER TO THE ACTUAL VALUE OF THE LICENSE, THE VALUE OF THE

21  TECHNOLOGY WHEN YOU'RE LICENSING AT THE DEVICE LEVEL THAN YOU

22  CAN AS A PRACTICAL MATTER WHEN YOU'RE DOING LICENSING AT AN

23  UPSTREAM, SAY, COMPONENT LEVEL.

24  Q.  SO IN YOUR TIME AT THE COMPANY, HAVE YOU NEGOTIATED ANY

25  KIND OF PATENT AGREEMENTS AT THE CHIP LEVEL?

1    A.   YES, I HAVE.

2    Q.   HOW COMMON OR UNCOMMON IS THAT?

3    A.   IT'S NOT VERY COMMON.  BUT IT ARISES FROM TIME TO TIME,

4    AND I'VE DONE IT FROM TIME TO TIME.

5    Q.   AND HAVE YOU HAD DISCUSSIONS WITH A COMPANY CALLED

6    MEDIATEK?

7    A.   YES, I'VE BEEN INVOLVED IN NEGOTIATIONS WITH MEDIATEK.

8    Q.   CAN YOU DESCRIBE WHAT KIND OF AGREEMENT YOU DISCUSSED WITH

9    MEDIATEK AND HOW THAT CAME TO BE?

10   A.   YES.  WHEN I ARRIVED AT QTL, MEDIATEK ALREADY HAD SOME SET

11   OF AGREEMENTS, TWO AGREEMENTS, WITH QUALCOMM THAT WERE PATENT

12   AGREEMENTS OF SOME KIND.

13        IT CAME TO PASS THAT THEY WROTE US A LETTER SAYING THAT

14   THEY WANTED TO DISCUSS THOSE AGREEMENTS AND LICENSING WITH US.

15        AFTER SOME CORRESPONDENCE, WE WENT TO MEET WITH THEM AND

16   DISCUSS WHAT THEY WANTED.

17   Q.   AND WHAT DID YOU LEARN FROM THAT MEETING?

18   A.   IT QUICKLY BECAME APPARENT TO ME AT THE MEETING THAT THEY

19   WERE NOT INTERESTED IN DISCUSSING WITH US A LICENSE UNDER WHICH

20   THEY WOULD PAY US ROYALTIES.

21        WHAT THEY REALLY WERE AFTER, WHAT THEY WANTED TO DO WAS IN

22   SOME WAY RENEGOTIATE AND GET OUT FROM UNDER THE AGREEMENTS THAT

23   WERE ALREADY -- THAT THEY HAD ALREADY ENTERED INTO WITH US.

24   Q.   AND WHAT HAPPENED?

25   A.   WELL, WE -- THE DISCUSSIONS TURNED TO THAT TOPIC, TO

1    RENEGOTIATING THOSE AGREEMENTS, AND WE EVENTUALLY REACHED

2    AGREEMENT ON AMENDMENTS THAT BASICALLY HAD THE EFFECT OF

3    REDUCING THE OBLIGATIONS ON BOTH SIDES PRETTY DRASTICALLY,

4    GIVING EACH SIDE AN OPTION TO REINSTATE THE OLD AGREEMENTS, BUT

5    IF NOBODY EXERCISED THAT OPTION IN THREE YEARS, THEN EVERYTHING

6    WOULD GO AWAY.

7    Q.   AND SO WHAT HAPPENED AT THE END OF THIS THREE YEAR PERIOD?

8    A.   EVERYTHING WENT AWAY.  NOBODY DID ANYTHING.  NOBODY

9    EXERCISED OPTIONS AND EVERYTHING WENT AWAY.

10   Q.   DID MEDIATEK HAVE THE RIGHT, ON ITS OWN, TO CONTINUE TO

11   RECEIVE RIGHTS OF SOME KIND FROM QUALCOMM UNDER THIS AGREEMENT?

12   A.   IF THEY HAD EXERCISED ITS OPTION TO REINSTATE THE OLD

13   AGREEMENTS, YES, THEY WOULD HAVE RETURNED TO FULL FORCE AND

14   EFFECT AND MEDIATEK WOULD HAVE HAD THE RIGHTS THAT IT HAD.

15   Q.   AND WAS THAT AN OPTION THAT THEY COULD EXERCISE

16   UNILATERALLY IF THEY WANTED TO?

17   A.   YES.

18   Q.   DID MEDIATEK EVER APPROACH QUALCOMM TO SAY, WE WANT TO

19   CONTINUE HAVING SOME KIND OF RIGHTS TO YOUR I.P. BEFORE THIS

20   AGREEMENT EXPIRED?

21   A.   NO, THEY DIDN'T.

22   Q.   DID YOU HAVE DISCUSSIONS WITH SAMSUNG ABOUT A CHIP LEVEL

23   AGREEMENT?

24   A.   YES.

25   Q.   AND HOW DID THOSE BEGIN?

GONELL DIRECT BY MR. BORNSTEIN

1   A.   SO SAMSUNG HAD COME TO BELIEVE, THROUGH REPORTS IN KOREAN

2   MEDIA ABOUT A STATEMENT THAT THE HEAD OF QUALCOMM KOREA HAD

3   MADE, THAT QUALCOMM HAD GRANTED LG SOME FORM OF PATENT RIGHTS

4   FOR CHIPS.

5        AND THEY CONTACTED US AND SAID, IN SUM AND SUBSTANCE, WE

6   UNDERSTAND FROM THIS REPORT THAT YOU'VE GRANTED CHIP RIGHTS TO

7   LG.  OUR MANAGEMENT IS UPSET THAT WE DON'T HAVE CHIP RIGHTS.

8   WE NEED TO TALK ABOUT THIS.

9   Q.   HAD QUALCOMM GRANTED ANY KIND OF CHIP RIGHTS TO LG?

10  A.   NO.

11  Q.   DID YOU EXPLAIN THAT TO SAMSUNG?

12  A.   YES, WE DID.

13  Q.   AND WHAT HAPPENED?

14  A.   WELL, SO THEY GOT IT, THEY UNDERSTOOD.  BUT THEY SAID,

15  WELL, LOOK, NOW THIS IS A MANAGEMENT ISSUE, MANAGEMENT WANTS US

16  TO HAVE SOME RIGHTS, WE NEED TO TALK ABOUT SOME THINGS.

17       SO WE STARTED TO TALK ABOUT SOME THINGS, AND WE STARTED TO

18  NEGOTIATE OVER THE TERMS OF A NON-EXHAUSTIVE PATENT AGREEMENT

19  BETWEEN QUALCOMM AND SAMSUNG.

20  Q.   DID YOU ULTIMATELY REACH A NON-EXHAUSTIVE AGREEMENT WITH

21  SAMSUNG AT THE CHIP LEVEL?

22  A.   NO, WE DID NOT -- IN THIS TIMEFRAME, NO, WE DID NOT.

23  Q.   WAS THERE -- DURING THESE DISCUSSIONS, WAS THERE ANYTHING

24  IN THE PROPOSED AGREEMENTS, OR THE AGREEMENTS UNDER DISCUSSION,

25  THAT RELATED TO THE FACT THAT SAMSUNG HAD A FOUNDRY BUSINESS

1    WHERE IT MANUFACTURED CHIPS FOR THIRD PARTIES?

2    A.   YES.

3    Q.   AND --

4    A.   THERE WERE -- THAT WAS AN ISSUE IN THE NEGOTIATIONS.

5    Q.   WHAT WAS THE ISSUE THAT WAS ADDRESSED BY THIS PROPOSED

6    PROVISION?

7    A.   OKAY.  SO FIRST LET ME EXPLAIN WHAT A FOUNDRY BUSINESS IS.

8         SO A FOUNDRY -- A FOUNDRY IS A BIG PLANT THAT BASICALLY

9    MAKES CHIPS, MAKES LITTLE ASIC CHIPS, AND THEY'RE VERY

10   EXPENSIVE AND VERY HIGH TECH.

11        AND PEOPLE THAT HAVE FOUNDRIES VERY OFTEN USE THEM TO NOT

12   ONLY MAKE CHIPS FOR THEMSELVES, MAKE THEIR OWN CHIPS, BUT ALSO

13   TO MAKE CHIPS FOR OTHER PEOPLE.

14        SO, FOR EXAMPLE, QUALCOMM DOESN'T ACTUALLY MANUFACTURE ANY

15   OF ITS OWN CHIPS.  IT CONTRACTS THE MANUFACTURER OF ITS CHIPS

16   OUT TO PEOPLE THAT HAVE FOUNDRIES AND THEY ACTUALLY PHYSICALLY

17   MAKE THE CHIPS.

18        AND SO SAMSUNG HAS FOUNDRIES AND HAS A FOUNDRY BUSINESS.

19        SO WHEN YOU'RE NEGOTIATING PATENT RIGHTS, OR SOME KIND OF

20   PATENT RIGHTS WITH A COMPANY THAT HAS A FOUNDRY BUSINESS, IT'S

21   COMMON, IT'S WHAT YOU DO, TO MAKE SURE THAT YOU'RE

22   DISTINGUISHING BETWEEN THE RIGHTS YOU'RE GRANTING THAT APPLY TO

23   THE COMPANY'S PRODUCTS, IN WHICH CASE IN THIS CASE IT'S

24   SAMSUNG'S PRODUCTS, AND THE RIGHTS THAT MAY OR MAY NOT APPLY TO

25   PRODUCTS THAT THEY ARE MAKING FOR OTHER PEOPLE AS PART OF THEIR

```
 1    FOUNDRY BUSINESS.

 2    Q.   WAS THERE A PROVISION IN THE PROPOSED AGREEMENTS EVER THAT

 3    WOULD HAVE PROHIBITED SAMSUNG FROM USING THIRD PARTY

 4    INTELLECTUAL PROPERTY IN THE DEVELOPMENT OF ITS OWN CHIPS?

 5    A.   NO.

 6    Q.   HAVE YOU EVER HEARD OF AN AGREEMENT LIKE THAT BEING

 7    PROPOSED TO A CHIP MAKER?

 8    A.   BY QUALCOMM?  NO.  THAT -- THAT'S -- NO.  NO, AND NO.

 9    Q.   WOULD THAT MAKE ANY SENSE TO YOU?

10    A.   NO.

11    Q.   WHEN YOU'VE HAD THESE NEGOTIATIONS WITH A CHIP MAKER, WITH

12    SAMSUNG, WITH MEDIATEK, WHAT HAS BEEN YOUR UNDERSTANDING, IF

13    ANY, ABOUT WHETHER QUALCOMM HAD AN OBLIGATION TO GRANT THE CHIP

14    MAKER AN EXHAUSTIVE LICENSE?

15    A.   SO MY UNDERSTANDING AT THE TIME THAT WE'VE BEEN DOING

16    THESE NEGOTIATIONS THAT WE'VE BEEN TALKING ABOUT WAS THAT WE

17    DID NOT HAVE THE OBLIGATION UNDER OUR FRAND COMMITMENTS TO

18    GRANT AN EXHAUSTIVE LICENSE AT THE CHIP LEVEL.

19    Q.   AND WHAT WAS, AT THE TIME, THE BASIS OF YOUR

20    UNDERSTANDING?

21    A.   WELL, AT THE TIME, THE BASIS OF MY UNDERSTANDING WAS MY

22    UNDERSTANDING OF THE ETSI IPR POLICY OF INDUSTRY PRACTICE,

23    THE -- AND WHAT I PERCEIVED AS THE COMMON UNDERSTANDING OF

24    FRAND OBLIGATIONS FOR CELLULAR PATENTS IN THE INDUSTRY.

25    Q.   SO YOU REFERENCED THE ETSI IPR POLICY.  WHAT'S ETSI?
```

1    A.   ETSI IS THE EUROPEAN TELECOMMUNICATIONS STANDARDS

2    INSTITUTE.

3    Q.   OKAY.  AND WHAT IS THE ETSI IPR POLICY?

4    A.   SO THE ETSI IPR POLICY IS THE SET OF RULES UNDER WHICH

5    PATENTS THAT GO INTO ETSI STANDARDS, WHICH INCLUDE CELLULAR

6    STANDARDS, ARE GOVERNED, AND THEY'RE THE RULES THAT -- THE

7    RULES OF THE ROAD THAT PEOPLE PLAY BY WITH RESPECT TO PATENTS

8    THAT GO INTO STANDARDS.

9    Q.   LET ME DIRECT YOU TO TAB 7 IN YOUR BINDER.  IT'S QX 2776.

10        AND I'LL ASK YOU TO IDENTIFY THIS DOCUMENT, PLEASE.

11   A.   2776 IS A COPY OF THE ETSI IPR POLICY.

12        MR. BORNSTEIN:  YOUR HONOR, I'D OFFER QX 2776 INTO

13   EVIDENCE.

14        MR. MERBER:  NO OBJECTION.

15        THE COURT:  IT'S ADMITTED.

16   (DEFENDANT'S EXHIBIT QX 2776 WAS ADMITTED IN EVIDENCE.)

17        THE COURT:  GO AHEAD, PLEASE.

18   BY MR. BORNSTEIN:

19   Q.   AND WHAT IS THE REASON WHY YOU CONSIDERED THE ETSI POLICY

20   IN PARTICULAR AS OPPOSED TO OTHER SDO IPR POLICIES?

21   A.   OKAY.  SO CELLULAR STANDARDS ARE DEVELOPED IN AN

22   ORGANIZATION CALLED 3GPP, WHICH IS THE THIRD GENERATION

23   PARTNERSHIP PROJECT.

24        AND 3GPP IS AN ORGANIZATION THAT WAS FORMED IN THE LATE

25   1990S, LED BY A GROUP OF SDO'S, LED BY ETSI, TO STANDARDIZE

1    CELLULAR TECHNOLOGY IN ONE PLACE.

2          AND THE MEMBERS, THE SDO, INDIVIDUAL SDO ORGANIZATIONS,

3    INCLUDING ETSI, THAT FORMED 3GPP AGREED, AS PART OF THE

4    FORMATION, THAT ALL OF THEIR IPR POLICIES ARE COMPATIBLE WITH

5    EACH OTHER.

6          MR. MERBER:  WAS THE WITNESS INVOLVED IN THIS

7    AGREEMENT IN THE LATE 1990S IN ANYWAY?  I DON'T UNDERSTAND HIS

8    FOUNDATION.

9          THE COURT:  LAY THE FOUNDATION, PLEASE.

10   BY MR. BORNSTEIN:

11   Q.   WHAT ARE YOU DESCRIBING AT THIS POINT?  LET ME ASK THE

12   QUESTION DIFFERENTLY.

13         WHAT WAS YOUR BASIS FOR RELYING ON ETSI AS A SOURCE OF

14   INFORMATION ABOUT YOUR UNDERSTANDING OF QUALCOMM'S OBLIGATIONS?

15   A.   OKAY.  SO, AGAIN, MY BASIS IS THESE FACTS THAT I'M

16   DESCRIBING, AND I'M -- I CAN TELL YOU HOW I'VE LEARNED THESE

17   FACTS OR BECOME AWARE OF THESE FACTS.

18         I WAS NOT THERE IN THE EARLY 1990S.  I WAS -- GRADUATED

19   FROM LAW SCHOOL IN '99, SO I WAS IN NEW YORK WHEN THIS WAS

20   HAPPENING.

21         BUT SINCE THEN, AS PART OF MY JOB, I'VE HAD TO LEARN ABOUT

22   THIS AND UNDERSTAND IT, AND I'M HAPPY TO DISCUSS HOW I DID

23   THAT.

24         BUT THIS INFORMATION IS WHAT'S FORMED THE BASIS OF MY

25   VIEW.

1    Q.   AND IN MAKING DECISIONS IN THE COURSE OF YOUR

2    RESPONSIBILITIES AT QUALCOMM, DID YOU ACTUALLY CONSIDER THESE

3    EVENTS THAT YOU'RE DESCRIBING NOW?

4    A.   YES.

5    Q.   OKAY.  AND DID THEY FORM A BASIS FOR THE ACTIONS THAT YOU

6    TOOK AND DIDN'T TAKE?

7    A.   YES.

8    Q.   WOULD IT BE IN QUALCOMM'S COMMERCIAL INTEREST TO ASSERT

9    ITS CELLULAR SEPS AGAINST ONE OF ITS COMPETITORS IN THE MODEM

10   CHIP BUSINESS?

11   A.   MAY I HAVE THAT QUESTION READ BACK, PLEASE?

12   Q.   I CAN ASK IT AGAIN?

13   A.   OKAY.

14   Q.   WOULD IT BE IN QUALCOMM'S COMMERCIAL INTEREST, IN YOUR

15   VIEW, FOR QUALCOMM TO ASSERT ITS CELLULAR SEPS AGAINST ONE OF

16   ITS COMPETITORS IN THE MODEM CHIP BUSINESS?

17   A.   NO.

18   Q.   WHY NOT?

19   A.   WELL, THERE'S A FEW REASONS.

20        FIRST OF ALL, IN MANY OF THE LICENSES, ESPECIALLY THOSE,

21   THOSE ENTERED INTO SINCE I WAS DIVISION COUNSEL BACK IN '13, WE

22   GRANTED RIGHTS IN THE LICENSES TO DEVICE MAKERS THAT PROVIDE

23   FOR PATENT COVERAGE UNDER QUALCOMM'S PATENTS FOR THE CHIPS THEY

24   PURCHASE FROM ANYONE, FROM OTHER -- FROM COMPETING CHIP MAKERS.

25        SO WITH RESPECT TO THOSE COMPETING CHIP MAKERS' SALES TO

```
 1        THOSE OEM'S, WE DON'T EVEN HAVE A LEGAL BASIS TO MAKE SUCH AN

 2        INFRINGEMENT CLAIM, AND OBVIOUSLY IT'S NOT IN YOUR COMMERCIAL

 3        INTEREST TO MAKE A BASELESS CLAIM.

 4               MR. MERBER:  OBJECTION.  HE'S OFFERING A LEGAL

 5        OPINION.

 6               THE COURT:  OKAY.  GIVE ME A MINUTE TO LOOK AT THIS

 7        MORE CLOSELY.

 8          (PAUSE IN PROCEEDINGS.)

 9               THE COURT:  WHAT'S YOUR RESPONSE?

10               MR. BORNSTEIN:  THE QUESTION IS TO ASK ABOUT HIS VIEW

11        OF THE COMPANY'S COMMERCIAL INTEREST, AND HE'S PROVIDING AN

12        ANSWER RELATING TO WHAT HAS INFORMED HIS VIEW REGARDING THE

13        COMPANY'S COMMERCIAL INTEREST.

14               MR. MERBER:  MY OBJECTION WAS TO THE PART OF THE

15        ANSWER IN WHICH HE DESCRIBED THE COMPANY'S LEGAL CLAIMS AND

16        WHICH LEGAL CLAIMS WOULD EXIST, NOT TO THAT ASPECT OF THE

17        QUESTION.

18               THE COURT:  WHAT'S YOUR RESPONSE TO THAT?

19               MR. BORNSTEIN:  SO HE'S REFERRING TO THE RIGHTS THAT

20        HE UNDERSTANDS THE COMPANY HAS AND DOESN'T HAVE UNDER

21        AGREEMENTS THAT HE'S BEEN RESPONSIBLE FOR PUTTING INTO PLACE.

22               THE COURT:  WHAT'S YOUR SPECIFIC OBJECTION?  TO WHICH

23        PORTION?

24               MR. MERBER:  HE WAS TESTIFYING ABOUT WHAT LEGAL CLAIM

25        WOULD OR WOULD NOT EXIST FOR THE COMPANY IN THE EVENT THAT
```

1    LICENSE A LICENSED OEM PURCHASED A CHIP FROM AN UNLICENSED CHIP

2    MAKER.  HE WAS TESTIFYING ABOUT WHETHER THERE WOULD BE A LEGAL

3    CLAIM FOR INFRINGEMENT AGAINST THAT CHIP MAKER.

4         MR. BORNSTEIN:  WELL, I CAN ASK THE QUESTION THIS

5    WAY.

6         THE COURT:  OKAY.  PLEASE GO AHEAD.  I'LL SUSTAIN IT.

7         MR. BORNSTEIN:  THANK YOU.

8    Q.  I'LL ASK THE QUESTION THIS WAY.  IN THE LICENSE AGREEMENTS

9    THAT YOU'RE --

10        MR. MERBER:  UNLESS QUALCOMM IS INTERESTED IN WAIVING

11   PRIVILEGE ON HIS OPINIONS IN THAT TIMEFRAME.

12   BY MR. BORNSTEIN:

13   Q.  IN THE LICENSE AGREEMENTS THAT YOU NEGOTIATED THAT YOU

14   WERE DESCRIBING, CAN YOU EXPLAIN WHAT THE LICENSE AGREEMENTS

15   PROVIDE WITH RESPECT TO THE RIGHTS THAT ARE GRANTED TO THE OEM

16   RELATING TO ITS ABILITY TO HAVE -- TO PURCHASE CHIPS FROM THIRD

17   PARTIES?

18   A.  THE LICENSES PROVIDE, IN THE LANGUAGE OF THE LICENSES, FOR

19   SOMETHING CALLED HAVE MADE RIGHTS.  AND WHEN THE TOPIC OF WHAT

20   THIS -- WHAT DOES THIS MEAN HAS COME UP IN DISCUSSIONS WITH

21   LICENSEES UNDER THE TYPES OF AGREEMENTS I'M TALKING ABOUT, WHAT

22   WE'VE TOLD THEM, WHAT I PERSONALLY HAVE TOLD THEM IS THAT THIS

23   IS -- THIS PROVISION PROVIDES HAVE MADE RIGHTS UNDER QUALCOMM'S

24   PATENTS FOR THE CHIPS --

25        THE COURT:  I'M SORRY TO INTERRUPT YOU.

```
 1              (PAUSE IN PROCEEDINGS.)

 2                  THE COURT:  OKAY.  GO AHEAD, PLEASE.  SORRY FOR THE

 3      INTERRUPTION.

 4                  THE WITNESS:  I'VE EXPLAINED TO THEM THAT THE PURPOSE

 5      OF THIS PROVISION IS TO PROVIDE RIGHTS UNDER QUALCOMM'S PATENTS

 6      THAT COVER THEIR PURCHASES OF CHIPS FROM PEOPLE OTHER THAN

 7      QUALCOMM.

 8      BY MR. BORNSTEIN:

 9      Q.   AND ARE THERE ANY OTHER REASONS WHY YOU BELIEVE IT WOULD

10      NOT BE IN QUALCOMM'S COMMERCIAL INTEREST TO ASSERT CELLULAR

11      SEPS AGAINST OTHER MODEM CHIP SUPPLIERS?

12      A.   YES.  BECAUSE IT'S COUNTER TO THE FOUNDATIONAL DEVICE

13      LEVEL LICENSING OF OUR LICENSING PROGRAM.

14              IF YOU ASSERT AGAINST A CHIP SUPPLIER A CELLULAR ESSENTIAL

15      PATENT, YOU NEED TO BE PREPARED TO LICENSE THOSE PATENTS TO THE

16      CHIP MAKER.

17              AND FOR ALL THE REASONS I EXPLAINED WHY MULTI LEVEL

18      LICENSING IS INEFFICIENT, WE DON'T WANT TO DO IT AND IF YOU

19      ASSERT, THAT'S WHAT YOU'RE SIGNING ON TO.  YOU'RE SIGNING ON TO

20      MULTI LEVEL LICENSING.

21      Q.   SO I'M GOING TO MOVE FROM THE SUBJECT OF GENERAL PRACTICES

22      TO A COUPLE OF SPECIFIC NEGOTIATIONS.

23              I'LL START WITH ASKING WHETHER YOU WERE INVOLVED IN

24      LICENSE NEGOTIATIONS WITH SONY MOBILE IN 2012?

25      A.   YES, I WAS.
```

1    Q.   OKAY.  AND JUST AT A VERY BRIEF LEVEL, WHAT WAS THE

2    PRECIPITATING EVENT FOR THOSE NEGOTIATIONS?

3    A.   SO VERY BRIEFLY, SONY MOBILE USED TO BE SONY ERICSSON.  IT

4    WAS A JOINT VENTURE BETWEEN ERICSSON AND SONY.  ERICSSON

5    DIVESTED ITS SHARE TO SONY, AND SO SONY ERICSSON BECAME SONY

6    MOBILE, WHICH IS JUST A SONY ENTITY.  AND THAT CAUSED

7    CONSEQUENCES IN THEIR AGREEMENTS, AND THAT'S WHY WE HAD

8    NEGOTIATIONS.

9    Q.   AND SPECIFICALLY WHY DID THAT PRECIPITATE NEGOTIATIONS?

10   A.   WELL, SPECIFICALLY BECAUSE SONY ERICSSON HAD BEEN

11   OPERATING UNDER ERICSSON'S AGREEMENT.

12        ONCE IT BECAME SONY MOBILE AND ERICSSON WAS NO LONGER

13   INVOLVED, THAT AGREEMENT NO LONGER APPLIED AND SO THEN WE HAD

14   TO LOOK ELSEWHERE FOR THEIR LICENSING -- FOR THEIR LICENSING

15   RIGHTS.

16   Q.   SO AT THAT POINT --

17   A.   AND THERE WERE OTHER -- THERE WERE OTHER AGREEMENTS THAT

18   APPLIED, BUT FOR WCDMA, THEY BECAME UNLICENSED AT THE TIME OF

19   THE DIVESTITURE.

20   Q.   SO AT THE TIME OF THE DIVESTITURE, WERE THEY STILL

21   LICENSED FOR CDMA?

22   A.   YES, BECAUSE THERE WAS A PREEXISTING SONY AGREEMENT THAT

23   WHEN THE DIVESTITURE HAPPENED, BEGAN TO APPLY TO THE NEW

24   ENTITY.  SO THEY HAD CDMA COVERAGE.

25   Q.   DURING THESE NEGOTIATIONS, DID SONY MOBILE EVER BECOME

1    UNLICENSED FOR CDMA?

2    A.    NO.

3    Q.    WAS SONY MOBILE, DURING THESE NEGOTIATIONS, ABLE TO

4    PURCHASE CDMA CHIPS FROM QUALCOMM THE ENTIRE TIME?

5    A.    YES.

6    Q.    WHEN THE DIVESTITURE CLOSED, DID THEY BECOME UNLICENSED TO

7    WCDMA?

8    A.    YES.

9    Q.    AND SO AT THAT POINT DID QUALCOMM STOP SHIPPING CHIPS TO

10   SONY MOBILE?

11   A.    NO.

12   Q.    WHY NOT?

13   A.    BECAUSE WE KNEW -- WE BELIEVED, AND WE DID, WE BELIEVED WE

14   COULD, AND WE DID, ENTER INTO INTERIM ARRANGEMENTS THAT WOULD

15   ALLOW THE PARTIES' BUSINESSES TO CONTINUE, WOULD PROTECT

16   QUALCOMM AGAINST THE ISSUES RAISED BY SELLING TO SOMEONE THAT'S

17   NOT LICENSED, AND ALLOW NEGOTIATIONS TO GO FORWARD UNTIL THEY

18   COULD EVENTUALLY GET TO A FAIR LICENSE.

19   Q.    WELL, WHAT WAS QUALCOMM'S USUAL PRACTICE WHEN A LICENSEE,

20   LIKE SONY MOBILE, SUDDENLY LOST ITS LICENSE AS A RESULT OF A

21   TRANSACTION LIKE THIS?

22   A.    THERE WAS NO USUAL PRACTICE.  THIS WAS A HIGHLY UNUSUAL,

23   UNPRECEDENTED IN MY EXPERIENCE, EVENT WHERE, BECAUSE OF

24   SOMETHING LIKE THIS, SOMEBODY SUDDENLY BECOMES UNLICENSED.  IT

25   JUST DOESN'T HAPPEN.  SO THERE WASN'T A POLICY IN PLACE.

1    Q.   WERE THE PARTIES ABLE TO ENTER INTO THE KIND OF TEMPORARY

2    OR INTERIM ARRANGEMENTS THAT YOU DESCRIBED?

3    A.   YES, WE WERE.

4    Q.   LET ME ASK YOU TO TAKE A LOOK AT TAB 9 IN YOUR BINDER.

5         YOUR HONOR, THIS IS ALREADY IN EVIDENCE.  IT'S JX 0063.

6         CAN YOU TELL ME WHAT THIS DOCUMENT IS?

7    A.   THIS DOCUMENT IS A LICENSE AGREEMENT BETWEEN QUALCOMM AND

8    SONY MOBILE THAT WAS INTENDED TO BE, AND WAS, AN INTERIM

9    AGREEMENT DURING THESE NEGOTIATIONS TO ALLOW THE PARTIES TO

10   CONTINUE THE NEGOTIATIONS WITHOUT PREJUDICING EITHER SIDE'S

11   POSITION.

12   Q.   HOW DID THE PARTIES HANDLE THE ROYALTY TERMS IN THIS

13   INTERIM AGREEMENT?

14   A.   SO THE -- THE ROYALTY TERMS IN THE INTERIM AGREEMENT --

15   Q.   AND YOU CAN DO IT WITHOUT SAYING THE SPECIFIC NUMBERS.

16   A.   OKAY.  SO WITHOUT SAYING SPECIFIC NUMBERS, IN THE

17   NEGOTIATIONS, THERE WAS A ROYALTY RATE THAT QUALCOMM WAS ASKING

18   FOR AND THERE WAS A ROYALTY RATE THAT SONY WAS OFFERING, AND

19   THERE WAS A DIFFERENCE BETWEEN THE TWO.  THOSE ARE NOT THE SAME

20   RATES.

21        AND HOW THAT SITUATION WAS HANDLED IN THIS AGREEMENT

22   WAS --

23   Q.   AND MAYBE WE CAN JUST PUT UP ON THE SCREEN SECTION -- ON

24   PAGE 15, SECTION 4.1, WHICH IS SUBJECT TO A SEALING ORDER.

25   A.   HOW THIS SITUATION WAS HANDLED IN THE AGREEMENT WAS SONY

1      RESPECTED QUALCOMM'S POSITION BY AGREEING TO PAY WHAT QUALCOMM

2      WAS ASKING DURING THIS INTERIM PERIOD.

3           QUALCOMM RESPECTED SONY'S POSITION BY AGREEING THAT ONLY

4      WHAT SONY WAS OFFERING WOULD BE NONREFUNDABLE, AND THE

5      DIFFERENCE BETWEEN WHAT SONY WAS OFFERING AND QUALCOMM WAS

6      ASKING WAS SUBJECT TO ADJUSTMENT AND TRUE UP WHEN THE PARTIES

7      COULD FINALLY REACH AGREEMENT.

8           AND IF WE COULDN'T AGREE, THEN THIS PROVIDES FOR

9      ARBITRATION.

10     Q.   AND WERE QUALCOMM AND SONY MOBILE ABLE TO REACH AGREEMENT

11     ON A LICENSE FOR A LONGER TERM BEFORE THIS INTERIM ARRANGEMENT

12     EXPIRED?

13     A.   NOT BEFORE THE INTERIM ARRANGEMENT EXPIRED, BUT ULTIMATELY

14     WE WERE ABLE TO REACH AGREEMENT.

15     Q.   WAS THERE ANY PERIOD BETWEEN THE END OF THE INTERIM

16     AGREEMENT AND THE ULTIMATE AGREEMENT WHEN SONY MOBILE BECAME

17     UNLICENSED AGAIN?

18     A.   YES.  SO WE DID ONE EXTENSION TO THIS AGREEMENT FOR A

19     COUPLE OF WEEKS, AND AT THAT POINT THE LICENSE AGREEMENT WAS

20     JUST ABOUT DONE, BUT THEY -- THEY WERE HESITATING ON ANSWERING.

21          WE ASKED THEM TO DO ANOTHER EXTENSION, BUT THEY WOULDN'T.

22          AND SO THEY BECAME UNLICENSED FOR A PERIOD OF TIME.

23     Q.   AND DID QUALCOMM SHIP CHIPS TO SONY MOBILE DURING THAT

24     PERIOD OF TIME?

25     A.   YES.

1    Q.   AND DID THE PARTIES -- YOU MENTIONED THE PARTIES

2    ULTIMATELY CAME TO AN AGREEMENT.  HOW DID THAT COME TO PASS?

3    A.   SO WHAT WAS GOING ON IN THIS TIME PERIOD WAS BASICALLY THE

4    LICENSE AGREEMENT WAS DONE.  SO WE HAD NEGOTIATED THE TERMS OF

5    THE LICENSE AGREEMENT, IT WAS -- WE HAD BASICALLY AGREED.

6         A MAJOR HOLDUP HAD BEEN THE TERM OF THE AGREEMENT, AND

7    ONCE QUALCOMM CAVED ON HOW LONG THE AGREEMENT WOULD BE, SONY

8    WAS CONTENT WITH THE ROYALTY TERMS AND THEN THE PARTIES CAME TO

9    AGREEMENT.

10        BUT SIMULTANEOUSLY, WHILE THIS WAS GOING ON, SONY WAS

11   NEGOTIATING SOMETHING ON THE CHIP SIDE, I DON'T KNOW THE

12   DETAILS OF THAT, BUT I KNOW THAT IT WAS HAPPENING, AND WHAT WAS

13   GOING ON IS THEY WERE HOLDING UP THE EXECUTION OF THE LICENSE

14   AGREEMENT UNTIL THEY FINISHED UP WHAT THEY WERE DOING ON THE

15   CHIP SIDE.

16   Q.   SO LET ME MOVE TO A DIFFERENT --

17             THE COURT:  I'M SORRY TO INTERRUPT YOU.  IT'S NOON

18   NOW.

19        HOW MUCH LONGER DO YOU HAVE OF THE UNSEALED PORTION?  I'M

20   WILLING TO GO A LITTLE BIT LONGER, OR SHOULD WE TAKE OUR BREAK,

21   OR DO YOU WANT TO DO THE SEALED PORTION NOW?  OR -- IT DOESN'T

22   MATTER TO ME WHETHER WE, YOU KNOW, JUST ASK PEOPLE TO STEP OUT

23   LATER.

24             MR. BORNSTEIN:  OKAY.  LET ME TELL YOU WHAT I THINK

25   WE'LL DO AND THEN WE CAN DECIDE WHAT WORKS BEST.

```
 1              THE COURT:  OKAY.

 2              MR. BORNSTEIN:  I THINK THERE'S PROBABLY MAYBE SIX OR

 3   SEVEN MINUTES OF UNSEALED TESTIMONY, FOLLOWED BY MAYBE THE SAME

 4   LENGTH OF SEALED TESTIMONY AT MOST.

 5              THE COURT:  OKAY.  THEN LET'S GO AHEAD AND FINISH

 6   THE -- SO YOU THINK TOTAL TEN MINUTES?

 7              MR. BORNSTEIN:  BETWEEN THE TWO, MAYBE CLOSER TO 15.

 8   BETWEEN 10 AND 15.

 9              THE COURT:  OKAY.  WHY DON'T WE JUST DO THIS:  LET'S

10   JUST DO THE PUBLIC PORTION, THEN TAKE OUR BREAK, THEN WE'LL DO

11   THE SEALED PORTION, AND THEN WE CAN OPEN UP THE COURTROOM.

12              MR. BORNSTEIN:  SURE.

13              THE COURT:  IS THAT OKAY?

14              MR. BORNSTEIN:  YES.

15              THE COURT:  ALL RIGHT.  LET'S GO AHEAD, PLEASE.

16   BY MR. BORNSTEIN:

17   Q.  SO I'M GOING TO TURN TO NEGOTIATIONS WITH LENOVO AND ASK

18   YOU TO TAKE A LOOK AT TAB 11 IN YOUR BINDER.

19              THIS IS SUBJECT TO A SEALING ORDER, YOUR HONOR.  IT'S

20   QX 9266.

21              THE COURT:  AND HAS THIS BEEN PREVIOUSLY ADMITTED, OR

22   NO?  NOT YET?

23              MR. BORNSTEIN:  NOT YET.

24              THE COURT:  OKAY.

25   BY MR. BORNSTEIN:
```

1    Q.   CAN YOU TELL US WHAT THIS DOCUMENT IS, MR. GONELL?

2    A.   THIS IS A LICENSE AGREEMENT ENTITLED CHINESE PATENT

3    LICENSE AGREEMENT, OR WHAT WE COLLOQUIALLY CALLED A CPLA,

4    BETWEEN QUALCOMM AND LENOVO ENTERED INTO IN 2016.

5              MR. BORNSTEIN:  AND I WOULD LIKE TO OFFER THIS INTO

6    EVIDENCE, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  ANY OBJECTION?

8              MR. MERBER:  NO OBJECTION, YOUR HONOR.

9              THE COURT:  IT'S ADMITTED.

10         (DEFENDANT'S EXHIBIT QX 9266 WAS ADMITTED IN EVIDENCE.)

11             THE COURT:  GO AHEAD, PLEASE.

12   BY MR. BORNSTEIN:

13   Q.   OKAY.  SO TELL US, WHAT IS A CPLA?

14   A.   A CPLA IS A CHINESE PATENT LICENSE AGREEMENT.  IT IS A

15   FORM OF AGREEMENT THAT QUALCOMM BEGAN OFFERING FOLLOWING A

16   RESOLUTION IN CHINA OF ANTITRUST CLAIMS BROUGHT BY CHINA'S

17   NDRC, WHICH IS THE NATIONAL DEVELOPMENT AND REFORM COMMISSION,

18   AND IT IS A LICENSE AGREEMENT THAT LICENSES ONLY CHINESE

19   PATENTS AND LICENSES PRODUCTS MADE AND SOLD FOR USE IN CHINA,

20   OR MADE IN CHINA AND SOLD IN PARTS OF THE WORLD WHERE QUALCOMM

21   DOESN'T HAVE OTHER PATENTS.

22   Q.   AND HOW MANY OF THESE CPLA AGREEMENTS HAS QUALCOMM SIGNED?

23   A.   OVER 200.

24   Q.   AND YOU REFERRED TO THIS, REFERRING ONLY -- GRANTING

25   RIGHTS ONLY TO CHINESE PATENTS.  IS IT LIMITED TO CELLULAR

1    SEPS, OR DOES IT COVER THE FULL PORTFOLIO?

2    A.   CPLA'S ARE SEP ONLY.  SO THEY'RE ONLY CELLULAR ESSENTIAL

3    PATENTS.

4    Q.   WERE THE CPLA'S SUBJECT TO APPROVAL BY THE NDRC IN CHINA?

5    A.   WELL, THE TERMS OF THE CPLA WERE -- HAD TO FOLLOW THE

6    RECTIFICATION PLAN THAT WE FILED WITH THE NDRC IN FEBRUARY OF

7    2015.

8    Q.   AND DOES THAT INCLUDE THE ROYALTY TERMS?

9    A.   YES, THE RECTIFICATION PLAN HAS PROVISIONS THAT GOVERN THE

10   ROYALTY TERMS THAT CAN BE CHARGED IN CPLA'S.

11        IN ADDITION, PART OF QUALCOMM'S COMPLIANCE WITH THAT ORDER

12   AND RECTIFICATION PLAN WAS ONGOING MONITORING OF THE NDRC OVER

13   LICENSING ACTIVITY, WHICH INCLUDED SUBMITTING AGREEMENTS,

14   CPLA'S, TO THE NDRC AS WE SIGNED.

15   Q.   WERE YOU INVOLVED --

16             THE COURT:  I'M SORRY.  WHAT'S THAT CALLED, A

17   RECTIFICATION PLAN?  IS THAT WHAT IT'S CALLED?

18             MR. BORNSTEIN:  YES, YOUR HONOR.

19             THE COURT:  OKAY.  GO AHEAD, PLEASE.

20   BY MR. BORNSTEIN:

21   Q.   WERE YOU INVOLVED IN THE NEGOTIATION OF THIS CPLA WITH

22   LENOVO?

23   A.   YES, I WAS, AT LEAST A LITTLE BIT, FOR SURE.

24   Q.   DURING THE NEGOTIATIONS WITH LENOVO, WAS LENOVO STILL

25   LICENSED TO QUALCOMM'S CELLULAR SEPS UNDER SOME OTHER

1    AGREEMENT?

2    A.   YES, LENOVO HAD A LICENSE.

3    Q.   WAS A QUESTION OF CHIP SUPPLY EVER RAISED AT ANY POINT

4    DURING THE NEGOTIATIONS OF THIS AGREEMENT, QX 9266?

5    A.   NO, NOT TO MY KNOWLEDGE.

6    Q.   WOULD IT HAVE BEEN CREDIBLE TO THREATEN LENOVO WITH A

7    CESSATION OF CHIP SUPPLY DURING THE NEGOTIATION OF THIS

8    AGREEMENT?

9    A.   NO, I DON'T BELIEVE SO.

10   Q.   WHY NOT?

11   A.   WELL, THEY HAD AN EXISTING AGREEMENT, FIRST OF ALL.  SO

12   THERE WASN'T -- THEY HAD EXISTING CHIP SUPPLY ARRANGEMENTS.

13        AND WE COULDN'T HAVE STOPPED SHIPPING THEM CHIPS WITHOUT

14   VIOLATING THOSE, THOSE ARRANGEMENTS.

15        SECOND OF ALL, BY THIS TIME, THEY HAD COMPLETED AN

16   ACQUISITION OF MOTOROLA MOBILITY.  QUALCOMM HAD AGREED THAT

17   THEY COULD CONTINUE TO OPERATE THE MOTOROLA MOBILITY BUSINESS

18   AS IF IT WERE UNLICENSED, AND THAT BUSINESS WAS OPERATING AS IF

19   IT WAS UNLICENSED, IN OTHER WORDS, THROUGH LICENSED OEM'S.  SO

20   THAT BUSINESS WAS GETTING CHIPS THROUGH LICENSED OEM'S THAT

21   THEMSELVES HAD LICENSE AGREEMENTS.

22        AND THAT WE COULDN'T STOP SHIPPING CHIPS WITHOUT VIOLATING

23   THOSE AGREEMENTS.

24        SO THIS IS NOT AN UNLICENSED SITUATION WHERE CHIP SUPPLY

25   WOULD EVER COME UP.

1460

1    Q.   LET ME ASK YOU ABOUT NEGOTIATION WITH HUAWEI.

2         WERE YOU INVOLVED IN NEGOTIATING HUAWEI IN 2013, 2014?

3    A.   YES.

4    Q.   AND WHAT WAS THE MAIN FOCUS OF THOSE NEGOTIATIONS?

5    A.   THE MAIN FOCUS OF THOSE NEGOTIATIONS WAS A RENEGOTIATION

6    OF THEIR EXISTING 3G AGREEMENTS AND THE NEGOTIATION OVER A NEW

7    4G AGREEMENT.

8    Q.   AND AT THAT TIME, DID THEY HAVE AN AGREEMENT THAT COVERED

9    CDMA SALES IN CHINA?

10   A.   YES.

11   Q.   AND WHAT WAS THAT AGREEMENT CALLED?

12   A.   WELL, I THINK IT WAS CALLED A SUBSCRIBER UNIT LICENSE

13   AGREEMENT, OR SULA.

14        BUT IT WAS OF THE TYPE OF AGREEMENT WE REFERRED TO AS A

15   RECTIFICATION -- AS A FRAMEWORK AGREEMENT.

16   Q.   AND WHAT'S A CHINESE FRAMEWORK AGREEMENT?

17   A.   SO A CHINESE FRAMEWORK AGREEMENT IS AN AGREEMENT WITH

18   TERMS THAT WERE NEGOTIATED WITH CHINA'S MIIT, WHICH IS A

19   GOVERNMENT ENTITY IN CHINA, THAT THE CHINESE GOVERNMENT

20   REQUIRED QUALCOMM TO OFFER TO A DESIGNATED SET OF CHINESE

21   COMPANIES AS PART OF THE ARRANGEMENTS BY WHICH CHINA AGREED TO

22   ALLOCATE CERTAIN SPECTRUM TO USE CDMA FOR CELLULAR

23   COMMUNICATIONS.

24   Q.   DID THE CHINESE MIIT FRAMEWORK AGREEMENT INCLUDE THE

25   ROYALTY RATES THAT QUALCOMM WAS REQUIRED TO CHARGE?

1    A.   YES, FOR CDMA PRODUCTS, IT DID.

2    Q.   SO GOING BACK TO THESE NEGOTIATIONS WITH HUAWEI, HOW LONG

3    DID THEY TAKE?

4    A.   THEY STARTED IN, IN 2013 AND ENDED AT THE END OF 2014, SO

5    MAYBE NOT QUITE TWO YEARS, BUT CERTAINLY MORE THAN A YEAR.

6    Q.   WAS IT A DIFFICULT NEGOTIATION?

7    A.   YES, IT WAS A DIFFICULT NEGOTIATION.

8    Q.   WHY?  OR HOW SO?

9    A.   WELL, HUAWEI EMPLOYED SOME VERY, YOU KNOW, I'LL SAY

10   AGGRESSIVE TACTICS DURING THE NEGOTIATIONS.  THEY TOOK THE

11   POSITION THAT THEY HAD OR WERE MOVING THEIR BUSINESS TO AN

12   UNLICENSED ENTITY SUBSIDIARY AND THAT, THEREFORE, THEY WERE

13   ABLE TO STOP PAYING ROYALTIES, AND THEY DID STOP PAYING

14   ROYALTIES.

15        IN THE MIDDLE OF THE NEGOTIATIONS, OR MAYBE A LITTLE BIT

16   TOWARDS THE BEGINNING, BUT AFTER NEGOTIATIONS HAD BEEN ONGOING

17   FOR A WHILE, THE NDRC INVESTIGATION STARTED, AND WHEN THAT

18   INVESTIGATION STARTED, HUAWEI BEGAN TO TAKE A, I'LL SAY HARSHER

19   NEGOTIATING POSITIONS, BACKTRACKING FROM SOME PREVIOUS

20   POSITIONS.

21        AND IT QUICKLY BECAME CLEAR THAT, YOU KNOW, HUAWEI WAS,

22   WAS VERY CLOSELY INVOLVED IN THE NDRC INVESTIGATION.

23        AND SO THOSE -- THE NEGOTIATIONS WITH HUAWEI AND THE NDRC

24   MATTER PROCEEDED IN PARALLEL FOR THE BETTER PART OF 2014, AND

25   THAT WAS A -- THAT WAS UNUSUAL AND DIFFICULT.

1    Q.   SO BEFORE WE WRAP UP FOR THE BREAK, LET ME ASK YOU TO TAKE

2    A LOOK AT TAB 12 OF YOUR BINDER, WHICH IS EXHIBIT 2259.

3    A.   YES.

4    Q.   AND CAN YOU TELL ME WHAT EXHIBIT QX 2259 IS?

5         THIS IS ALSO SEALED, YOUR HONOR, NOT YET ADMITTED.

6    A.   SO THIS IS 2259A?

7    Q.   YES.

8    A.   OKAY.  SO 2259A IS A PROPOSAL THAT HUAWEI MADE TO QUALCOMM

9    ON NOVEMBER 14TH, 2013, FOR TERMS FOR 3G AND 4G AND

10   INFRASTRUCTURE EQUIPMENT LICENSES.

11        MR. BORNSTEIN:  YOUR HONOR, I OFFER EXHIBIT QX 2259A

12   INTO EVIDENCE.

13        MR. MERBER:  WE HAD DISCUSSED BEFOREHAND THAT YOU

14   WERE NOT GOING TO OFFER THIS FOR THE TRUTH OF THE MATTER

15   ASSERTED, THAT QUALCOMM WAS NOT GOING TO OFFER THIS FOR THE

16   TRUTH OF THE MATTER ASSERTED.

17        BUT WITH THAT LIMITATION, WE WOULD NOT OBJECT.

18        MR. BORNSTEIN:  WE'RE OFFERING IT FOR THE CONTENT OF

19   THE TERMS THAT WERE PROPOSED BY HUAWEI TO QUALCOMM.  I'M NOT

20   SURE WHAT THE TRUTH OF THE MATTER ASSERTED WOULD BE.  THIS IS A

21   PROPOSAL OF CONTRACT TERMS.

22        THE COURT:  OKAY.  THIS WAS THE SUBJECT OF -- THIS

23   WAS THE SUBJECT OF THE HPO NUMBER 5, AND IT'S OVERRULED.  THE

24   OBJECTION'S OVERRULED.  THEY CITED THAT NINTH CIRCUIT LAW ABOUT

25   THE OFFER BEING AN ACT AND NOT BEING HEARSAY.

```
1              MR. MERBER:  WITHDRAWN THEN, YOUR HONOR.

2              THE COURT:  THAT'S ADMITTED.

3         (DEFENDANT'S EXHIBIT QX 2259A WAS ADMITTED IN EVIDENCE.)

4              THE COURT:  GO AHEAD, PLEASE.

5    BY MR. BORNSTEIN:

6    Q.   LET ME DIRECT YOU TO THE SECOND PAGE.  I WON'T HAVE IT ON

7    THE SCREEN BECAUSE IT'S UNDER SEAL, BUT ON THE BOTTOM OF THE

8    SECOND PAGE, THERE'S SOMETHING THAT SAYS OTHER TERMS AND

9    CONDITIONS FOR SUBSCRIBER UNITS AND MODEM CARDS.

10        DO YOU SEE THAT?

11   A.   YES.

12   Q.   AND DON'T READ THE NUMBER ALOUD, BUT IN THAT FIRST BULLET

13   POINT CAN YOU TELL ME WHAT THAT REFERS TO?

14   A.   THAT REFERS TO THE TERM, THE ROYALTY TERMS THAT THEY WERE

15   PROPOSING FOR THE LICENSE TO QUALCOMM'S LTE ESSENTIAL PATENTS.

16   Q.   WAS THIS BEFORE OR AFTER THE INITIATION OF THE NDRC

17   INVESTIGATION?

18   A.   THIS WAS BEFORE.

19   Q.   AND WHAT -- AGAIN, WITHOUT REVEALING THE NUMBER, WHAT DID

20   HUAWEI PROPOSE FOR AN LTE LICENSE AFTER THE NDRC INVESTIGATION

21   BEGAN?

22   A.   THEIR NEXT PROPOSAL WAS LESS THAN ONE-THIRD OF WHAT THEY

23   HAD PREVIOUSLY PROPOSED.

24   Q.   AND DURING THIS NEGOTIATION, DID QUALCOMM EVER CEASE THE

25   SUPPLY OF CHIPS TO HUAWEI?
```

1    A.   NO.

2    Q.   DID QUALCOMM EVER THREATEN TO CEASE THE SUPPLY OF CHIPS TO

3    HUAWEI DURING THIS NEGOTIATION?

4    A.   NO.

5    Q.   ONE VERY FINAL TOPIC.  I'LL ASK YOU TO TAKE A LOOK AT TAB

6    13 IN YOUR BINDER.  THIS IS ALREADY IN EVIDENCE.  IT'S JX 0078.

7         AND I'LL ASK YOU TO TELL ME WHAT THIS IS.

8    A.   THIS IS AN AGREEMENT ENTITLED BUSINESS COOPERATION AND

9    PATENT AGREEMENT BETWEEN QUALCOMM AND APPLE.

10   Q.   DID YOU HAVE ANY ROLE IN THE NEGOTIATION AND DRAFTING OF

11   THIS AGREEMENT?

12   A.   YES.  I WAS ONE OF THE PRIMARY DRAFTERS OF THIS AGREEMENT

13   AND A PERIPHERAL PLAYER IN THE NEGOTIATIONS.

14   Q.   OKAY.  DOES THE AGREEMENT PROVIDE FOR ANY PAYMENTS FROM

15   QUALCOMM TO APPLE?

16   A.   YES, IT DOES.

17   Q.   ARE THOSE PAYMENTS CONDITIONED IN ANY WAY ON APPLE'S

18   SELECTION OF MODEM CHIP SUPPLIER?

19   A.   NO, THEY'RE NOT.

20   Q.   IS APPLE, UNDER THIS -- OR WAS APPLE, UNDER THIS

21   AGREEMENT, ENTITLED TO RECEIVE THE FULL PAYMENTS UNDER THE BCPA

22   REGARDLESS OF WHETHER IT USED QUALCOMM'S CHIPS OR SOMEONE

23   ELSE'S CHIPS?

24   A.   YES, IT WAS.

25          MR. BORNSTEIN:  YOUR HONOR, I HAVE NO FURTHER

1    QUESTIONS FOR THE PUBLIC PORTION.  AND I APOLOGIZE FOR MISSING

2    MY ESTIMATE OF TIME.

3              THE COURT:  IT'S FINE.  IT'S ONLY 12:12.

4         ALL RIGHT.  LET'S GO AHEAD, PLEASE, AND TAKE OUR BREAK,

5    AND WHEN WE COME BACK, WE'LL DO THE SEALED PORTION FIRST.  BUT

6    YOU SAID THAT'S ABOUT FIVE MINUTES.

7              MR. BORNSTEIN:  THAT'S ABOUT RIGHT.

8              THE COURT:  OKAY.  AND THEN WE'LL REOPEN THE

9    COURTROOM FOR THE REST OF THE EXAMINATION.

10        OKAY.  ANYTHING ELSE?  OTHERWISE I'LL SEE EVERYONE BACK IN

11   ONE HOUR.  LET'S JUST SAY 1:15.  OKAY?

12             MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

13        (THE LUNCH RECESS WAS TAKEN FROM 12:13 P.M. UNTIL

14   1:18 P.M.)

15

16

17

18

19

20

21

22

23

24

25

```
1              AFTERNOON SESSION

2            THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

3       LET ME ASK THE PARTIES IF YOU'RE SATISFIED THAT ANYONE WHO

4   IS REMAINING IN THE COURTROOM SHOULD BE HERE.

5            MR. BORNSTEIN:  NOT YET, YOUR HONOR.  BUT IT OCCURS

6   TO ME, I'VE GOT A FEW QUESTIONS I COULD DO IN THE PUBLIC

7   SESSION IF YOU WANT TO LET PEOPLE STAY, AND THEN AFTER 90

8   SECONDS OF QUESTIONING WE CAN EXCUSE PEOPLE, OR I CAN DO IT THE

9   OTHER WAY.  IT'S COMPLETELY UP TO YOUR HONOR'S PREFERENCE.

10           THE COURT:  LET'S DO THE SEALED PORTION NOW BECAUSE I

11  THINK EVERYONE HAS NOT COME BACK.

12           MR. BORNSTEIN:  OKAY.  WE'VE GOT A FEW PEOPLE WHO I

13  THINK DO NEED TO EXIT.

14           THE COURT:  OH, OKAY.  OKAY.  ARE THE PARTIES

15  SATISFIED THAT ANYONE LEFT SHOULD REMAIN IN THE COURTROOM?

16           MR. BORNSTEIN:  I'M NOT CERTAIN OF THE TWO FOLKS ALL

17  THE WAY IN THE BACK RIGHT CORNER.

18           THE COURT:  COULD YOU IDENTIFY YOURSELVES, PLEASE.

19           MS. METSCH:  BIBEANE METSCH AND RAISA AHMAD.

20           THE COURT:  ARE YOU BOTH REPRESENTING APPLE?

21           MS. METSCH:  YES.

22           THE COURT:  OH, OKAY.  THAT'S FINE.

23       ANYONE ELSE?

24       OKAY.  I THINK EVERYONE ELSE IS APPROPRIATELY REMAINING

25  HERE.  ALL RIGHT.  TIME IS 1:19.  GO AHEAD, PLEASE.
```

1          MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

2     Q.   MR. GONELL, IN YOUR TIME AT QTL, HAVE YOU BEEN INVOLVED IN

3     ANY WAY WITH THE AVANCI LICENSING PLATFORM?

4     A.   I HAVE.

5     Q.   AND WHAT IS AVANCI?

6     A.   EXCUSE ME.  AVANCI IS A LICENSING PLATFORM, AN EFFORT AT

7     JOINT LICENSING OF CELLULAR ESSENTIAL PATENTS FOR CERTAIN

8     PRODUCTS.

9     Q.   FOR WHAT PRODUCTS?

10    A.   CURRENTLY FOR VEHICLES AND SMART METERS.

11    Q.   OKAY.  SO WHAT'S A SMART METER?

12    A.   A SMART METER IS A UTILITY METER, LIKE AN ELECTRIC METER

13    OR GAS METER, THAT HAS CELLULAR CONNECTIVITY SO THAT INSTEAD OF

14    HAVING TO HAVE SOMEONE COME OUT AND READ THE METER

15    PERIODICALLY, IT JUST SENDS THE READINGS OVER THE AIRWAVES.

16    Q.   OKAY.  SO IF I'M A SMART METER MANUFACTURER AND I TAKE A

17    LICENSE FROM AVANCI, WHOSE PATENTS DO I GET RIGHTS TO?

18    A.   YOU GET RIGHTS TO ALL OF THE PATENTS -- ALL OF THE

19    ESSENTIAL PATENTS, CELLULAR ESSENTIAL PATENTS, 3G AND 4G, THAT

20    ARE THE PATENTS OF THE AVANCI LICENSORS, THE PEOPLE THAT HAVE

21    SIGNED ON TO BE LICENSORS FOR AVANCI.

22    Q.   OKAY.  AND WHO DO I PAY ROYALTIES TO?

23    A.   YOU WOULD PAY ROYALTIES TO AVANCI AND AVANCI DISTRIBUTES

24    THOSE ROYALTIES ACCORDING TO AN AGREED TO METHODOLOGY.

25    Q.   HAS QUALCOMM CHOSEN TO PARTICIPATE IN THE AVANCI LICENSING

GONELL DIRECT BY MR. BORNSTEIN

1    PLATFORM?

2    A.   YES.

3    Q.   AND DOES QUALCOMM -- IN WHICH -- FOR WHICH PRODUCTS?

4    A.   FOR VEHICLES AND SMART METERS.

5    Q.   DOES QUALCOMM STILL RETAIN THE RIGHT TO LICENSE DIRECTLY

6    FOR VEHICLES OR SMART METERS ITS CELLULAR ESSENTIAL PATENTS?

7    A.   YES, ALL THE AVANCI LICENSORS RETAIN THAT RIGHT.

8    Q.   DOES AVANCI DO ANYTHING IN TERMS OF LICENSING OF HANDSETS?

9    A.   DOES AVANCI DO ANYTHING IN TERMS OF HANDSET LICENSING?

10   NO, IT DOES NOT.

11   Q.   WHAT'S BEEN YOUR ROLE IN CONNECTION WITH AVANCI?

12   A.   SO MY ROLE WAS THAT I WAS TASKED WITH EVALUATING THE

13   AVANCI OPPORTUNITY, NEGOTIATING THE AVANCI AGREEMENTS, AND

14   MAKING A RECOMMENDATION TO THE COMPANY AS TO WHETHER IT SHOULD

15   PROCEED OR NOT.

16   Q.   WHAT RECOMMENDATION DID YOU MAKE?

17   A.   I ULTIMATELY RECOMMENDED THAT THE COMPANY PROCEED.

18   Q.   AND WHAT FACTORS DID YOU CONSIDER IN REACHING YOUR

19   RECOMMENDATION?

20   A.   I SAW AVANCI AS AN OPPORTUNITY FOR THE COMPANY TO

21   EXPERIMENT WITH JOINT LICENSING, AND I THOUGHT IT WAS A

22   PARTICULARLY GOOD OPPORTUNITY FOR A FEW REASONS.

23        ONE WAS THE PEOPLE INVOLVED IN AVANCI WERE PEOPLE I HAD

24   CONFIDENCE IN.  OUR CO-INITIAL PARTNER WITH AVANCI WAS

25   ERICSSON, WHICH IS ANOTHER VERY PROMINENT LICENSOR OF PATENTS.

1          VERY PROMINENTLY IN MY DECISION MAKING WAS THAT THE

2     INITIAL AVANCI EFFORT WOULD BE LIMITED TO VEHICLES AND SMART

3     METERS, AND THOSE PRODUCTS WERE VERY IMPORTANT IN MY DECISION,

4     OR MY RECOMMENDATION, I SHOULD SAY.

5          AND THAT THE STANDARDS WOULD BE LIMITED TO 3G AND 4G.

6     Q.   SO LET'S --

7               THE COURT:  I'M SORRY TO INTERRUPT YOU.  NONE OF THIS

8     HAS BEEN SEALED.

9               MR. BORNSTEIN:  NO.

10              THE COURT:  I DENIED MOST OF THE AVANCI SEALING

11    REQUESTS THAT WENT BEYOND THE QUALCOMM SEALING REQUESTS.  SO

12    WHY ARE WE SEALING ALL OF THIS.

13              MR. BORNSTEIN:  I WAS ABOUT TO GET TO THE PART OF THE

14    CONTRACT THAT REFERS TO THE ALLOCATION OF THE ROYALTIES.  I

15    AGREE WITH WHAT YOUR HONOR HAS SAID FOR SURE AND I THOUGHT IT

16    MIGHT BE DISRUPTIVE TO GO IN AND OUT, BUT HOWEVER YOUR HONOR

17    WANTS TO HANDLE IT --

18              THE COURT:  OKAY.  WELL, THE TRANSCRIPT UP UNTIL NOW

19    SHOULD NOT BE SEALED.  IT SHOULD BE PUBLIC EVEN THOUGH WE'VE

20    EMPTIED THE COURTROOM.  NOTHING OF WHAT HAS BEEN TESTIFIED TO

21    SO FAR IS CONFIDENTIAL.

22              MR. BORNSTEIN:  I AGREE WITH THAT, YOUR HONOR.

23              THE COURT:  IS THIS NOW WHEN YOU WANT TO MOVE TO THE

24    SEALED PORTION OF THE TRANSCRIPT?

25              MR. BORNSTEIN:  I THINK MR. GONELL IS GOING TO FINISH

1    EXPLAINING HIS RATIONAL, AND THEN I'M GOING TO TURN TO THINGS

2    THAT HAVE BEEN SEALED.

3              THE COURT:  OKAY.

4              MR. BORNSTEIN:  SO IT'LL BE ANOTHER MINUTE OR TWO,

5    HOWEVER LONG IT TAKES MR. GONELL TO ANSWER THE QUESTION.

6              THE COURT:  NO, YOU WERE ASKING A QUESTION.  SO YOU

7    SAID "SO LET'S," AND THEN I INTERRUPTED YOU.  SO HE WASN'T

8    ANSWERING.

9              MR. BORNSTEIN:  I MEANT HOW LONG IT'LL TAKE HIM TO

10   ANSWER THE QUESTIONS I'M GETTING TO.  PROBABLY ABOUT TWO

11   MINUTES.

12             THE COURT:  OKAY.  THAT'S FINE.  JUST LET US KNOW

13   WHEN WE SHOULD START SEALING THE TRANSCRIPT.

14             MR. BORNSTEIN:  OKAY.  I WILL.  SORRY ABOUT THAT,

15   YOUR HONOR.

16             THE COURT:  OKAY.  THANK YOU.  NO PROBLEM.

17   BY MR. BORNSTEIN:

18   Q.  SO YOU HAD BEEN DESCRIBING THE FACTORS THAT YOU CONSIDERED

19   IN RECOMMENDING TO THE COMPANY THAT YOU PARTICIPATE IN THE

20   AVANCI PLATFORM.

21        ONE OF THE THINGS THAT YOU MENTIONED WAS THAT IT WAS

22   RELEVANT TO YOU THAT THE PRODUCTS AT ISSUE WERE VEHICLES AND

23   SMART METERS.  WHY WAS THAT RELEVANT?

24   A.  SO THAT WAS RELEVANT BECAUSE, FOR VARIOUS HISTORIC

25   FACTORS, THE ROYALTY RATES THAT QUALCOMM IS CURRENTLY CHARGING

1     FOR 3G/4G FOR THOSE PRODUCTS ARE ALREADY BELOW WHAT I WOULD

2     CONSIDER NORMAL FRAND RATES.

3          AND GIVEN THAT, AVANCI PROVIDED AN OPPORTUNITY TO

4     EXPERIMENT AT RELATIVELY LOW COST WITH JOINT LICENSING.

5     Q.   AND YOU ALSO REFERRED TO THE FACT THAT IT WAS A 3G AND 4G

6     PROGRAM.  WHY WAS THAT RELEVANT TO YOU?

7     A.   WELL, AGAIN, BECAUSE NOW WE'RE TALKING -- WE'RE TALKING

8     ABOUT -- IT RELATES TO WHAT I JUST SAID, WHICH IS FOR THESE

9     PRODUCTS AND THIS COMBINATION OF STANDARDS, WE'RE -- QUALCOMM

10    IS ALREADY LICENSING, AND FOR VARIOUS REASONS, WE'RE ALREADY

11    LICENSING AT BELOW -- WHAT I CONSIDERED BELOW FRAND RIGHTS.

12         AND SO LONG AS THE INITIAL AVANCI OFFERING WAS LIMITED TO

13    THIS COMBINATION OF PRODUCTS AND STANDARDS, AND WE WEREN'T

14    LOCKED INTO DOING ANYTHING ELSE, THEN THIS PROVIDED A GOOD

15    OPPORTUNITY TO EXPERIMENT.

16    Q.   AND HAS QUALCOMM AGREED TO LICENSE 5G PATENTS THROUGH THE

17    AVANCI PLATFORM?

18    A.   NO, WE HAVE NOT.

19    Q.   AND WHY NOT?

20    A.   WELL, SOME OF -- YOU'RE ASKING ME ABOUT EVENTS THAT TOOK

21    PLACE AFTER MARCH 13TH, 2018.

22    Q.   OKAY.  WELL, THEN, I'LL WITHDRAW THE QUESTION.

23    A.   OKAY.  THANK YOU.

24         MR. BORNSTEIN:  YOUR HONOR, I THINK I'M GOING TO GET

25    TO THE SEALED INFORMATION RIGHT NOW.

1                  THE COURT:  OKAY.  SO THE TRANSCRIPT SHOULD BE SEALED

2      FROM NOW ON.

3              **(PROCEEDINGS UNDER SEAL FROM PAGES 1473-1477.)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **(IN OPEN COURT.)**

2                    MR. BORNSTEIN:  WOULD YOU LIKE ME TO WAIT, YOUR

3          HONOR?

4                    THE COURT:  LET'S WAIT.  I DON'T WANT TO COUNT

5          TOWARDS YOUR TIME WAITING FOR PEOPLE TO COME BACK IN.

6                    MR. BORNSTEIN:  WE APPRECIATE THAT.

7               (PAUSE IN PROCEEDINGS.)

8                    THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

9          SEAT.  WE'RE BACK IN THE PUBLIC PORTION.

10              IT'S 1:33.  GO AHEAD, PLEASE.

11                   MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

12         Q.   WE TALKED A LITTLE BIT BEFORE THE BREAK, MR. GONELL, ABOUT

13         THE COMPANY'S PRACTICE OR PREFERENCE OF NOT GRANTING LICENSING

14         AT THE CHIP LEVEL.  DO YOU RECALL THAT?

15         A.   I DO.

16         Q.   HAS QUALCOMM ENTERED INTO NON-EXHAUSTIVE AGREEMENTS WITH

17         MODEM CHIP SUPPLIERS?

18         A.   WE HAVE.

19         Q.    IN WHAT CIRCUMSTANCES HAS QUALCOMM DONE THAT?

20         A.   WELL, WE'VE DONE THAT WITH SAMSUNG VERY RECENTLY IN

21         JANUARY OF 2018.  WE DID THAT WITH MEDIATEK IN ABOUT, I THINK,

22         2008 AND THERE WERE ARRANGEMENTS THAT I TESTIFIED ABOUT

23         PREVIOUSLY.

24

25         Q.   DID --

1    A.   THAT'S WHAT I CAN THINK OF AS I SIT HERE.  I KNOW THAT

2    THERE ARE MORE.  THERE ARE HISTORIC ONES.

3    Q.   DID THESE NON-EXHAUSTIVE AGREEMENTS POSE THE SAME KIND OF

4    PROBLEMS THAT YOU DESCRIBED EARLIER ABOUT MULTI LEVEL LICENSING

5    THAT ARISE FROM THE EXHAUSTIVE CHIP LEVEL AGREEMENTS?

6    A.   NO.

7    Q.   WHY NOT?

8    A.   BECAUSE THE, THE NON-EXHAUSTIVE AGREEMENTS ARE INTENDED TO

9    GIVE, PROVIDE IN SOME WAY SOME ASSURANCES TO THE CHIP COMPANY

10   THAT THE CHIP COMPANY WILL NOT BE SUBJECT TO A LAWSUIT, BUT IT

11   DOESN'T -- BUT THEY DON'T CONSTITUTE AN AUTHORIZATION TO SELL

12   UNDER QUALCOMM'S PATENTS.

13        AND SO WE DON'T NEED TO BE COMPENSATED, RIGHT, FOR THAT IN

14   TERMS OF MONEY.

15        AND, THEREFORE, WE CAN CONTINUE TO HAVE ALL OF THE VALUE

16   THAT WOULD BE IN THE DEVICE LEVEL LICENSE, AND THE PROBLEMS

17   ASSOCIATED WITH ALLOCATING VALUE BETWEEN THE CHIP LEVEL AND THE

18   DEVICE LEVEL DON'T ARISE IN THIS CONTEXT.

19   Q.   DOES QUALCOMM GO OUT AND AFFIRMATIVELY SEEK TO ENTER INTO

20   THESE NON-EXHAUSTIVE AGREEMENTS WITH CHIP SUPPLIERS?

21   A.   NO, WE DON'T.  IT'S SOMETHING WE DO AS AN ACCOMMODATION

22   WHEN PEOPLE SEEK THEM FROM US.

23        MR. BORNSTEIN:  I HAVE NO FURTHER QUESTIONS, YOUR

24   HONOR.

25        THE COURT:  ALL RIGHT.  TIME IS 1:35.

```
1              (PAUSE IN PROCEEDINGS.)

2                   MR. MATHESON:  MAY I APPROACH, YOUR HONOR (HANDING).

3              (PAUSE IN PROCEEDINGS.)

4                   THE COURT:  OKAY.  LET ME KNOW WHEN YOU'RE READY.

5                   MR. MERBER:  YOUR HONOR, JUST TO CONFIRM, DID I GIVE

6    YOU THE RIGHT DEPOSITION BINDER?

7                   THE COURT:  OH.  MR. GONELL'S?  YES.

8                   MR. MERBER:  GREAT.

9                   THE COURT:  OKAY.  LET ME KNOW WHEN YOU'RE READY.

10                  MR. MERBER:  I'M READY, YOUR HONOR.

11                  THE COURT:  OKAY.  1:37.  GO AHEAD, PLEASE.

12                  MR. MERBER:  KEN MERBER ON BEHALF OF THE FEDERAL

13   TRADE COMMISSION.

14                        CROSS-EXAMINATION

15   BY MR. MERBER:

16   Q.   GOOD AFTERNOON, MR. GONELL.

17   A.   GOOD AFTERNOON.

18   Q.   YOU'RE NOT RESPONSIBLE FOR PATENT VALUATION, ARE YOU?

19   A.   I AM NOT.

20   Q.   AND YOU'RE NOT AWARE OF ANY ANALYSIS AT QUALCOMM THAT

21   APPORTIONED THE VALUE OF ITS CELLULAR PATENTS BETWEEN STANDARD

22   ESSENTIAL PATENTS AND NON-STANDARD ESSENTIAL PATENTS, ARE YOU?

23   A.   MAY I HAVE THAT READ BACK?

24   Q.   I CAN REPEAT IT.

25   A.   OR CAN YOU REPEAT THE QUESTION.
```

1    Q.   YOU'RE NOT AWARE OF ANY ANALYSIS AT QUALCOMM THAT

2    APPORTIONED VALUE OF QUALCOMM'S CELLULAR PATENTS BETWEEN ITS

3    STANDARD ESSENTIAL PATENTS AND ITS NON-STANDARD ESSENTIAL

4    PATENTS; CORRECT?

5    A.   I'M NOT SURE WHAT YOU MEAN BY "CELLULAR PATENTS."  BUT I'M

6    NOT AWARE OF ANY STUDY OR APPORTIONMENT AT QUALCOMM AS BETWEEN

7    STANDARD ESSENTIAL PATENTS AND OTHER PATENTS.

8    Q.   OKAY.  AND QUALCOMM DOES NOT ASSIGN AN ACCOUNTING VALUE TO

9    THE PATENTS THAT IT DEVELOPS; CORRECT?

10   A.   NOT THAT I'M AWARE OF.

11   Q.   AND YOU BELIEVE THAT QUALCOMM'S CELLULAR STANDARD

12   ESSENTIAL PATENT PORTFOLIO HAS BEEN VALUED BASED ON THE LICENSE

13   AGREEMENTS THAT QUALCOMM HAS; RIGHT?

14   A.   THAT'S FAIR, YEAH.

15   Q.   OKAY.  AT YOUR DEPOSITION, YOU WERE ASKED WHETHER A FUTURE

16   LICENSE BETWEEN QUALCOMM AND APPLE WOULD BE FAIR.

17        DO YOU RECALL THAT?

18   A.   NOT SPECIFICALLY.

19   Q.   OKAY.

20   A.   I WAS DEPOSED FOR MANY HOURS.

21   Q.   AND I BELIEVE YOU TESTIFIED THAT SIMPLY KNOWING AN

22   AGREEMENT WAS REACHED WOULD NOT NECESSARILY MEAN THAT THE

23   AGREEMENT WAS FRAND.

24        MR. BORNSTEIN:  COUNSEL, WHAT PAGE ARE YOU READING

25   FROM?

1      MR. MERBER:  I AM READING FROM PAGE 471.

2      MR. BORNSTEIN:  THANK YOU.

3  BY MR. MERBER:

4  Q.   YOU TESTIFIED THAT SIMPLY KNOWING AN AGREEMENT WAS REACHED

5  WOULD NOT NECESSARILY MEAN THAT AN AGREEMENT WAS FRAND; RIGHT?

6  A.   THE MERE FACT OF AN AGREEMENT DOES NOT NECESSARILY MEAN AN

7  AGREEMENT IS FRAND.

8  Q.   AND WOULD YOU AGREE THAT IT IS POSSIBLE THAT APPLE BRINGS

9  ENOUGH ECONOMIC PRESSURE, FAIRLY OR UNFAIRLY, TO BEAR THAT THE

10  RESULTING AGREEMENT IS NOT FAIR?

11  A.   IN NEGOTIATIONS WITH QUALCOMM?

12  Q.   CORRECT.

13  A.   WELL, WOULD I AGREE THAT IT'S POSSIBLE?  YES, I PRESUME --

14  IT'S -- ANYTHING IS POSSIBLE, SURE.

15  Q.   WELL, IN FACT, AT YOUR DEPOSITION YOU STATED THAT IT IS

16  POSSIBLE THAT APPLE BRINGS ENOUGH ECONOMIC PRESSURE, FAIRLY OR

17  UNFAIRLY, TO BEAR THAT THE RESULTING AGREEMENT IS NOT FAIR;

18  CORRECT?

19  A.   WELL, IF YOU'LL DIRECT ME TO MY TESTIMONY --

20  Q.   SURE.

21  A.   THEN I'M HAPPY TO SAY WHETHER I SAID THAT OR NOT.  BUT

22  THAT'S BASICALLY WHAT I JUST SAID, SO SURE.

23  Q.   I WOULD DIRECT YOU TO PAGE 472 WHERE YOU STATED THAT.

24  A.   472?

25  Q.   UM-HUM, LINES 20 TO 25.

1    A.   PAGE 472, 20 TO 25.

2         IT'S POSSIBLE -- I SAID, IT IS POSSIBLE THAT APPLE BRINGS

3    ENOUGH ECONOMIC PRESSURE FAIRLY OR UNFAIRLY TO BEAR THAT THE

4    RESULTS AGREEMENT IS NOT FRONT -- FAIR, RATHER.  THAT IS

5    POSSIBLE I WOULD GUESS.  I WOULD HOPE NOT, BUT WE SHALL SEE.

6    Q.   SO I TAKE IT THAT YOU WOULD AGREE THAT A NEGOTIATED

7    AGREEMENT MAY NOT BE FAIR IF ENOUGH ECONOMIC PRESSURE IS

8    BROUGHT TO BEAR; CORRECT?

9    A.   IT IS POSSIBLE THAT A NEGOTIATED AGREEMENT IS NOT FAIR.

10   THAT'S POSSIBLE.  YOU HAVE TO LOOK AT THE CIRCUMSTANCES AND THE

11   TERMS.

12   Q.   OKAY.  YOU MENTIONED THAT QUALCOMM'S POLICY IS TO SELL

13   MODEM CHIPS ONLY TO COMPANIES THAT HAVE TAKEN A LICENSE TO

14   QUALCOMM'S STANDARD ESSENTIAL PATENTS RELATED TO THOSE CHIPS.

15        DO YOU RECALL THAT?

16   A.   YES.  THE TEST IS WHETHER THE PRODUCT AND CHIPS ARE GOING

17   TO BE USED AS LICENSED.

18   Q.   DO DEVICE MANUFACTURERS PURCHASING WI-FI COMPONENTS FROM

19   QUALCOMM HAVE TO FIRST TAKE A LICENSE TO QUALCOMM'S WI-FI

20   STANDARD ESSENTIAL PATENTS?

21   A.   NO.

22   Q.   A MOMENT AGO YOU TESTIFIED IN PART UNDER SEAL, SO I'LL BE

23   CAREFUL TO AVOID CONFIDENTIALITY ISSUES, ABOUT AN AGREEMENT

24   THAT QUALCOMM HAS ENTERED INTO WITH AVANCI.

25        DO YOU RECALL THAT?

GONELL CROSS BY MR. MERBER

1    A.    YES.

2    Q.    OKAY.  SO -- AND AGAIN, I WOULD ASK YOU TO KEEP YOUR

3    ANSWERS AT A HIGH LEVEL.

4          AVANCI IS A LICENSING PLATFORM THAT COLLECTS ROYALTIES ON

5    BEHALF OF ALL OF THE PARTICIPATING LICENSORS; IS THAT CORRECT?

6    A.    YES.  THEY ACT AS AN AGENT FOR THE PARTICIPATING

7    LICENSORS.

8    Q.    AND THEN AVANCI DISTRIBUTES THE ROYALTIES IT COLLECTS

9    ACCORDING TO A CONTRACTUALLY AGREED UPON MECHANISM, WHICH I'D

10   ASK YOU NOT TO DESCRIBE.

11   A.    THAT'S CORRECT.

12   Q.    AND AS I BELIEVE YOU JUST TESTIFIED, YOU WERE INVOLVED IN

13   NEGOTIATING THAT MECHANISM WITH ERICSSON AND AVANCI; CORRECT?

14   A.    I WAS, INDEED.

15   Q.    WAS THAT A VOLUNTARY, ARM'S LENGTH NEGOTIATION?

16   A.    YES.

17   Q.    IN JULY 2012, YOU HAD A CONVERSATION WITH THE INTERNAL

18   REVENUE SERVICE DISCUSSING QUALCOMM'S LICENSING PRACTICES.

19         DO YOU RECALL THAT?

20   A.    NO, BUT I'VE SEEN SOMETHING THAT PURPORTS TO BE A

21   TRANSCRIPT OF THAT CONVERSATION.  BUT I DON'T HAVE A DISTINCT

22   RECOLLECTION OF THAT.

23   Q.    OKAY.  AND I BELIEVE WHAT YOU SAID AT YOUR DEPOSITION WAS

24   THAT LOOKING AT THAT TRANSCRIPT -- AND THIS IS ON PAIGE 178 --

25   REFRESHES MY MEMORY THAT SUCH A MEETING HAPPENED.

1          WOULD YOU LIKE TO SEE THAT AGAIN TO REFRESH YOUR

2     RECOLLECTION, OR DOES -- DO YOU RECALL IT SUFFICIENTLY NOW?

3     A.    I'VE SEEN THE TRANSCRIPT.  I REALLY, AT THIS POINT, DON'T

4     HAVE A, A MEMORY OF THE MEETING.  BUT I HAVE NO REASON TO DOUBT

5     THAT IT HAPPENED.

6     Q.    OKAY.

7          YOUR HONOR, I MOVE TO ADMIT THE AUDIO RECORDING OF THAT

8     MEETING, WHICH IS CX 6786R.

9               MR. BORNSTEIN:  IT HASN'T BEEN SHARED WITH US, BUT AS

10    LONG AS WHAT WE'RE TALKING ABOUT --

11              THE COURT:  BUT YOU PRODUCED IT.  YOU PRODUCED IT IN

12    DISCOVERY.  I ASSUME YOU'VE HEARD IT.

13              MR. BORNSTEIN:  AS LONG AS WHAT WE'RE TALKING ABOUT

14    IS THE VERSION WE PRODUCED IN DISCOVERY, THEN THAT'S FINE.  IT

15    JUST HASN'T BEEN SHARED WITH US SUBSEQUENT SO WE KNOW WHAT'S

16    BEING ADMITTED IN EVIDENCE IS WHAT WE PRODUCED.  BUT IF COUNSEL

17    IS REPRESENTING THAT THAT'S WHAT IT IS, WE HAVE NO OBJECTION.

18              THE COURT:  IS THAT WHAT WAS PRODUCED IN DISCOVERY?

19              MR. MERBER:  CORRECT.  THIS IS A THUMB DRIVE

20    CONTAINING THE AUDIO FILE THAT WAS PRODUCED TO US IN DISCOVERY.

21              MR. BORNSTEIN:  THEN WE HAVE NO OBJECTION.

22              THE COURT:  ALL RIGHT.  THEN GO AHEAD.  IT'S

23    ADMITTED.

24         (PLAINTIFF'S EXHIBIT CX 6786R WAS ADMITTED IN EVIDENCE.)

25              MR. MERBER:  I WOULD OFFER A COPY TO THE COURT.  I

1        DON'T BELIEVE IT'S CURRENTLY BEEN LODGED.

2              THE CLERK:  DO YOU WANT IT?

3              THE COURT:  NO, BUT WE SHOULD PROBABLY PUT A CX 6786R

4        STAMP ON IT.  THAT'S THE NUMBER YOU GAVE; CORRECT?

5              MR. MERBER:  CORRECT.  AND THERE IS A STAMP ON THE

6        FLASH DRIVE.

7              THE COURT:  OH, THERE IS.  GREAT.

8        BY MR. MERBER:

9        Q.   NOW, MR. GONELL, AT THIS MEETING -- THE PURPOSE OF THE

10       MEETING WAS TO TALK ABOUT THE -- QUALCOMM'S ROYALTIES AND ALLOW

11       THE IRS TO ASK QUESTIONS OF QTL EXECUTIVES.

12            DO YOU RECALL THAT?

13       A.   NO, NOT SPECIFICALLY.  BUT I -- THAT IS CONSISTENT WITH

14       THE TRANSCRIPT, OR KIND OF TRANSCRIPT THAT I'VE SEEN.

15       Q.   OKAY.  AND WHEN THE IRS ASKED QUALCOMM TO EXPLAIN ITS

16       LICENSING OR ROYALTY PRICING POLICY FOR THIRD PARTY LICENSEES,

17       MR. BLECKER GAVE A RESPONSE.

18            DO YOU RECALL THAT?

19       A.   NO.

20       Q.   WHAT MR. BLECKER STATED WAS HE REFERENCED SEVERAL

21       DIFFERENT TYPES OF LICENSING CATEGORIES AND HE SAID THAT THE

22       FOURTH CATEGORY, WHICH HE BELIEVED THE IRS WAS MOST FAMILIAR

23       WITH, WAS THE ASIC LICENSE, AND HE SAID THAT WAS AN ASIC

24       PATENT --

25              MR. BORNSTEIN:  OBJECTION, YOUR HONOR.  WE -- THERE'S

1    NO FOUNDATION.  HE'S JUST TESTIFIED HE DOESN'T REMEMBER THIS,

2    AND COUNSEL IS NOW TELLING HIM WHAT WAS SAID.

3              MR. MERBER:  I'M HAPPY TO -- I'M HAPPY TO PLAY THE

4    TAPE FOR HIM IF YOU'D LIKE.

5              THE COURT:  GO AHEAD.  WHAT'S THE PORTION -- I WANT

6    TO HEAR PORTIONS OF THIS TAPE, SO --

7              MR. MERBER:  CERTAINLY.

8              THE COURT:  WHY DON'T YOU --

9              MR. MERBER:  CERTAINLY.

10         CAN YOU PLAY CLIP 5, OR ACTUALLY, CLIPS 3, 4, AND 5?

11             MR. BORNSTEIN:  SO IS THERE A PENDING QUESTION THAT

12   THIS RELATES TO?

13             MR. MERBER:  I WAS GOING TO ASK A QUESTION FOLLOWING

14   THE CLIP.

15   Q.  I WOULD LIKE TO KNOW IF THIS IS, IN FACT, A REPRESENTATION

16   THAT QUALCOMM MADE TO THE INTERNAL REVENUE SERVICE THAT

17   ACCURATELY REFLECTED ITS VIEWS OF ITS LICENSING PRACTICES.

18         BUT I WOULD LIKE MR. GONELL TO HEAR THAT STATEMENT BEFORE

19   HE ANSWERS THAT QUESTION.

20             MR. BORNSTEIN:  OKAY.

21         (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

22   BY MR. MERBER:

23   Q.  SO DO YOU AGREE WITH MR. BLECKER THAT THE ASIC PATENT

24   AGREEMENTS THAT HE WAS DESCRIBING THAT YOU'VE JUST TESTIFIED

25   ABOUT WERE NOT LICENSES?

1    A.   I DON'T KNOW WHAT MR. BLECKER IS REFERRING TO THERE FOR

2    SURE AND THERE WAS STUFF MISSING.  I MEAN, YOU WENT FROM A

3    DESCRIPTION TO A FOURTH.  HE SAID FOURTH.

4         I -- I DON'T -- I DON'T KNOW WHAT HE'S TALKING ABOUT

5    THERE.

6         THAT IS ABSOLUTELY 100 PERCENT MARV BLECKER'S VOICE.

7    THERE IS NO QUESTION IN MY MIND.  I DON'T KNOW WHO THE WOMAN ON

8    THE TAPE IS, BUT THAT IS ABSOLUTELY MARV BLECKER'S VOICE.

9         SO HE SAID THOSE THINGS, ABSOLUTELY.  I JUST DON'T KNOW

10   WHAT HE MEANS BY THOSE THINGS SO I CAN'T TELL YOU WHETHER I

11   AGREE WITH IT OR NOT.

12   Q.   OKAY.  BUT YOU AGREE THAT THAT IS SOMETHING HE SAID?

13   A.   THAT IS ABSOLUTELY MARV BLECKER'S VOICE.  I DON'T KNOW

14   WHAT ELSE IS SAID ON THE TAPE.  BUT THAT IS 1,000 PERCENT, TO

15   MY EARS, MARV BLECKER'S VOICE.

16   Q.   OKAY.  AND I'D LIKE TO PLAY ANOTHER STATEMENT FROM

17   MR. REIFSCHNEIDER.

18        ACTUALLY, EXCUSE ME.  IS IT A TRUE STATEMENT THAT QUALCOMM

19   TOLD THE IRS THAT ITS ASIC PATENT AGREEMENTS ARE NOT LICENSE

20   AGREEMENTS IN REALITY?

21   A.   WELL, I DON'T KNOW.  NO, I DON'T KNOW.  I MEAN, MARV

22   BLECKER SAID THAT.  I DON'T KNOW WHAT THE CONTEXT WAS, AND I

23   DON'T KNOW WHAT ELSE WAS SAID.  SO I DON'T KNOW THE ENTIRETY OF

24   WHAT WAS COMMUNICATED TO THE IRS.

25        BUT THOSE WORDS, WHATEVER THOSE WORDS JUST, WE JUST HEARD,

```
 1        MARV BLECKER SAID FOR SURE.

 2             BUT WHAT WAS COMMUNICATED AND WHAT WAS INTENDED TO BE

 3        COMMUNICATED, YOU KNOW, I'D HAVE TO LISTEN TO THE WHOLE THING

 4        OR READ THE TRANSCRIPT TO TRY TO UNDERSTAND.

 5        Q.   OKAY.  AND I'D LIKE TO PLAY YOU A CLIP TO SEE IF YOU CAN

 6        IDENTIFY WHO'S SPEAKING IN THIS ONE, THAT'S ALSO DESCRIBING

 7        QUALCOMM'S LICENSING PRACTICE.

 8             COULD YOU PLAY CLIP 6.

 9             (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

10        BY MR. MERBER:

11        Q.   IS THAT A STATEMENT FROM MR. ERIC REIFSCHNEIDER?

12        A.   THAT IS ERIC REIFSCHNEIDER'S VOICE, YES.

13        Q.   AND ERIC REIFSCHNEIDER WAS THE HEAD OF QTL; CORRECT?  AT

14        CERTAIN POINTS IN TIME?

15        A.   HE WAS THE GENERAL MANAGER OF QTL WHILE HE WAS AT QTL,

16        YES.

17        Q.   OKAY.  AND SO THAT WAS A STATEMENT THAT MR. REIFSCHNEIDER

18        MADE TO THE INTERNAL REVENUE SERVICE ON THIS PHONE -- IN THIS

19        MEETING; CORRECT?

20        A.   IF THIS IS -- IF THIS IS A MEETING OF SOMETHING WITH THE

21        INTERNAL REVENUE SERVICE, I -- AND HE'S SAYING THAT TO --

22        THAT'S WHO HE'S TALKING TO, THEN, YES.  IT WAS CLEARLY HIM

23        TALKING.

24        Q.   OKAY.  AND CAN WE PLAY THE CLIP 7, PLEASE.

25             (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)
```

```
1     BY MR. MERBER:

2     Q.   WAS THAT ALSO --

3              MR. BORNSTEIN:  YOUR HONOR, I HAVE A COMPLETENESS

4     OBJECTION.  CAN WE HAVE THAT KEEP PLAYING, PLEASE.  I THINK WE

5     CUT OFF FOR SOME IMPORTANT CONTEXT FOR MR. REIFSCHNEIDER'S

6     COMMENTS.

7              THE COURT:  WE'LL DO THIS IN YOUR TIME.  I MEAN, IT

8     WOULD HAVE BEEN EASIER WITH THE TRANSCRIPT.  QUALCOMM BLOCKED

9     THE TRANSCRIPT FROM COMING IN, AND HE'S SAYING, "OH, BUT IF I

10    HAD THE TRANSCRIPT, I WOULD BE ABLE TO TESTIFY X AND Z."

11          SO IT'S A LITTLE BIT FRUSTRATING FROM OUR PERSPECTIVE.

12    YOU'RE REQUIRING US TO GO BACK IN CHAMBERS AND LISTEN TO THE

13    WHOLE TAPE, WHICH IS I HOPE WHAT YOU WANTED BECAUSE THAT'S

14    WHAT'S GOING TO HAPPEN BECAUSE YOU WOULD NOT ALLOW THE

15    TRANSCRIPT IN.  SO YOU'LL DO YOUR COMPLETENESS OBJECTIONS ON

16    YOUR OWN TIME.

17          GO AHEAD, PLEASE.

18              MR. MERBER:  THANK YOU, YOUR HONOR.

19    Q.   THAT WAS ALSO A STATEMENT MR. REIFSCHNEIDER MADE IN THIS

20    MEETING; CORRECT?

21    A.   THAT WAS MR. REIFSCHNEIDER'S VOICE, YES.

22    Q.   AND THEN COULD YOU PLAY, PLEASE PLAY CLIPS 8 AND 9.  OH,

23    AND 10.

24          (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

25    BY MR. MERBER:
```

1    Q.   ARE THOSE STATEMENTS MADE BY MR. BLECKER AND YOURSELF ON

2    THIS CONVERSATION, IN THIS CONVERSATION WITH THE IRS?

3    A.   YES, ALTHOUGH THE CONVERSATION CONTINUED, AND I EXPRESSED

4    MY DISAGREEMENT WITH MR. BLECKER'S STATEMENT.

5    Q.   SO YOU RECALL THIS MEETING NOW?

6    A.   NO.  I REMEMBER -- I REMEMBER READING THAT.

7    Q.   SO YOU REMEMBER READING THE TRANSCRIPT THAT HAS NOT BEEN

8    ADMITTED?  AND THAT'S WHAT REMINDED YOU OF YOUR DISAGREEMENT

9    WITH THIS?

10        WHAT EXACTLY WAS YOUR DISAGREEMENT?

11   A.   I WAS -- IT WAS -- MY DISAGREEMENT WAS WITH HIS STATEMENT

12   THAT, THAT COURTS WOULD NOT, CATEGORICALLY WOULD NOT APPLY A

13   ROYALTY, WOULD FIND A ROYALTY NOT TO BE FRAND JUST BECAUSE IT

14   WAS LARGE COMPARED TO THE PRICE OF A CHIP.

15   Q.   SO MR. BLECKER TOLD THE INTERNAL REVENUE SERVICE THAT A

16   COURT WAS UNLIKELY TO FIND THAT SORT OF ROYALTY APPROACH TO BE

17   FRAND, AND YOU TOLD THE IRS THAT MR. BLECKER MIGHT BE INCORRECT

18   IN SO CHARACTERIZING QUALCOMM'S ROYALTIES; IS THAT CORRECT?

19   A.   NO.  I TOLD THE IRS -- I TOLD THE IRS THAT MR. BLECKER'S

20   SPECULATION ABOUT WHAT COURTS MIGHT DO WAS, IN MY VIEW, WRONG.

21   Q.   OKAY.  BUT YOU DID AGREE THAT AS A PRACTICAL MATTER, IT

22   WOULD BE CHALLENGING TO COLLECT THESE ROYALTIES, THE SAME

23   DOLLAR ROYALTY ON A CHIP THAT YOU -- THAT QUALCOMM COLLECTS ON

24   A HANDSET?  THAT WAS YOUR STATEMENT A MOMENT AGO, EARLIER IN

25   THE TRANSCRIPT; CORRECT?

1    A.    YES.

2    Q.    OKAY.  AND IF YOU WOULD PLAY CLIP 12, PLEASE.

3          (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

4    BY MR. MERBER:

5    Q.    AND WAS THAT A STATEMENT YOU MADE TO THE IRS?

6    A.    YES, THAT WAS A STATEMENT THAT I MADE.

7    Q.    AND THAT STATEMENT WAS THAT HAVING TO CHOOSE BETWEEN

8    LICENSING CHIPS AND LICENSING AT THE HANDSET, THE HANDSET WAS

9    HUMONGOUSLY MORE LUCRATIVE; CORRECT?

10   A.    YES.  IF WE'RE MAKING THE CHOICE AS TO WHAT WE WANT TO DO,

11   THAT'S ABSOLUTELY CORRECT.

12   Q.    EARLIER IN YOUR TESTIMONY, YOU WERE DISCUSSING AN NDRC

13   INVESTIGATION THAT CAME UP WHILE QUALCOMM WAS NEGOTIATING WITH

14   HUAWEI.

15         DO YOU RECALL THAT?

16   A.    I DO.

17   Q.    THE NDRC WAS INVESTIGATING WHETHER QUALCOMM HAD VIOLATED

18   CHINA'S ANTI-MONOPOLY LAW THROUGH ITS LICENSING PRACTICES;

19   CORRECT?

20   A.    YES.

21   Q.    YOU ALSO MENTIONED THAT THAT INVESTIGATION WAS RESOLVED

22   WITH SOMETHING CALLED A RECTIFICATION PLAN.

23         DO YOU RECALL THAT?

24   A.    I RECALL MENTIONING THE RECTIFICATION PLAN.  THE -- THE

25   INVESTIGATION WAS CONCLUDED WITH AN ADMINISTRATIVE SANCTION

1    DECISION AND THE RECTIFICATION PLAN FOLLOWED ACCORDING TO THE

2    PROCEDURES OF CHINESE LAW.

3    Q.    OKAY.  AND ONE OF THE PRACTICES THAT THE NDRC HAD

4    CHALLENGED WAS QUALCOMM'S ALLEGED REFUSAL TO OFFER SEP ONLY

5    LICENSES; CORRECT?

6    A.    I'M NOT SO SURE I WOULD CHARACTERIZE IT THAT WAY.  THEY --

7    THE NDRC HAD A LIST OF NINE ISSUES THAT WERE THE INITIAL

8    ISSUES.  I'D HAVE TO LOOK AT THE LIST OF INITIAL -- LOOK AT THE

9    ISSUES TO SEE EXACTLY WHAT THEY WERE.

10   Q.    OKAY.

11   A.    WHAT THEY IDENTIFIED.

12   Q.    OKAY.  AND YOU TESTIFIED THAT DURING YOUR NEGOTIATIONS

13   WITH HUAWEI, YOU CONTINUED TO SHIP THEM CHIPS EVEN WHEN THERE

14   WAS SOME DELAY IN ROYALTY PAYMENTS; IS THAT CORRECT?

15   A.    NO.  I SAID THAT THEY STOPPED PAYING, NOT THAT THEY

16   DELAYED.  THEY STOPPED.  AND, YES, WE CONTINUED TO SHIP THEM

17   CHIPS.

18   Q.    I TAKE YOUR CORRECTION ON THAT.  THANK YOU.

19        SO YOU CONTINUED TO SHIP HUAWEI CHIPS AFTER THEY HAD

20   STOPPED PAYING; CORRECT?  IS THAT WHAT YOU TESTIFIED?

21   A.    YES.

22   Q.    AND THIS WAS THE NDRC INVESTIGATION INTO WHETHER QUALCOMM

23   HAD VIOLATED THE CHINESE ANTI-MONOPOLY LAW?

24   A.    YES.

25   Q.    YOU ALSO TESTIFIED SOME EARLIER ABOUT INDUSTRY PRACTICES

1    RELATING TO LICENSING CELLULAR SEPS AT THE CHIP LEVEL.

2        DO YOU RECALL THAT?

3    A.   MORE ACRIDLY ABOUT NOT DOING THAT, BUT YES.

4    Q.   QUALCOMM HAS HAD EXHAUSTIVE CHIP LEVEL LICENSES COVERING

5    CELLULAR STANDARD ESSENTIAL PATENTS FROM OTHER COMPANIES;

6    RIGHT?

7    A.   INBOUND LICENSES?

8    Q.   CORRECT.

9    A.   YES.

10   Q.   AND QUALCOMM HAS HAD LICENSES TO OTHER COMPANIES CELLULAR

11   STANDARD ESSENTIAL PATENTS THAT APPLIED TO QUALCOMM'S CHIPS

12   FROM ERICSSON; CORRECT?

13   A.   YES, AS PART OF A 1999 SETTLEMENT, YES.

14   Q.   AND FROM INTERDIGITAL?

15   A.   I DON'T KNOW FOR SURE.  THE INTERDIGITAL AGREEMENT IS

16   REALLY OLD AND WAS ESSENTIALLY A DEAD LETTER BY THE TIME I

17   ARRIVED AT QTL.

18       THERE IS LANGUAGE ABOUT INTERDIGITAL PATENT RIGHTS IN SOME

19   OF OUR OLDER AGREEMENTS, BUT I DON'T RECALL WHAT THE EXACT

20   CONTRACTUAL ARRANGEMENTS WERE BETWEEN QUALCOMM AND

21   INTERDIGITAL.

22   Q.   BUT QUALCOMM HAD LICENSES TO CELLULAR STANDARD ESSENTIAL

23   PATENTS FROM SEVERAL COMPANIES THAT COVERED QUALCOMM'S CHIPS;

24   CORRECT?

25   A.   YES.

1    Q.   YOU TESTIFIED THAT -- REGARDING THE NEGOTIATIONS WITH SONY

2    IN THE 2012 TIMEFRAME.

3         DO YOU RECALL THAT?

4    A.   YES, I DO.

5    Q.   AND YOU TESTIFIED THAT SONY HAD A CDMA LICENSE -- SONY

6    CORPORATION HAD A CDMA LICENSE AND SO THERE WERE NO CONCERNS

7    ABOUT SONY MOBILE'S SUPPLY OF CDMA CHIPS FROM QUALCOMM.

8         DO YOU RECALL THAT?

9    A.   THERE WOULD NOT HAVE BEEN.  WE WOULD NOT HAVE BEEN

10   CONCERNED ABOUT WC -- ABOUT CDMA CHIPS.

11   Q.   COULD YOU TURN TO TAB 7 OF YOUR BINDER, WHICH IS CX 6522,

12   WHICH WAS PREVIOUSLY ADMITTED.

13   A.   I'M AT TAB 7.

14   Q.   OKAY.  AND TAB 7 IS AN E-MAIL FROM MR. REIFSCHNEIDER TO

15   YOU, AMONG OTHERS, WITH A LONG E-MAIL CHAIN.

16        AND IF YOU'D GO TO PAGE 5 USING THE CX NUMBER.

17   A.   CX 6522-005?

18   Q.   YES, THAT'S CORRECT.

19   A.   OKAY, I'M THERE.

20   Q.   OKAY.  AND AT THE VERY BOTTOM OF THE PAGE, THERE'S AN

21   E-MAIL FROM CAROL BLUBAUGH.

22        DO YOU SEE THAT?

23   A.   I DO.

24   Q.   AND SHE SAYS, "I BELIEVE YOU ARE AWARE THIS SITUATION

25   REGARDING THE RECENT DIVESTITURE OF SEMC AND THAT, AS A RESULT,

1    SEMC IS NOT CURRENTLY LICENSED FOR WCDMA."

2        DO YOU SEE THAT?

3    A.   I DO SEE THAT, YES.

4    Q.   AND THEN SHE SAYS THAT -- THIS IS SKIPPING A FEW LINES,

5    "QTL WILL ADVISE BY TOMORROW IF WE NEED TO HOLD OFF ON THE

6    PENDING SHIPMENTS FOR 6655 AND/OR OTHER ORDERS (SEE ATTACHED

7    E-MAIL)."

8        DO YOU SEE THAT?

9    A.   YES.

10   Q.   THE 8655 IS A CDMA 2000 ENABLED CHIP, IS IT NOT?

11   A.   I HAVE NO IDEA.

12   Q.   OKAY.  AND IF YOU WOULD TURN BACK ONE PAGE TO THE PAGE

13   ENDING DASH 003?

14   A.   OH, THE OTHER WAY.

15   Q.   YEAH, SORRY.

16   A.   003, YES.

17   Q.   YOU'LL NOTICE THAT THERE'S AN E-MAIL IN RED TEXT IN WHICH

18   MS. BLUBAUGH HAD COMMUNICATED TO SONY THAT, QUOTE, "OUR

19   OPERATIONS TEAM HAS BEEN ADVISED TO HOLD ALL COMPONENT

20   SHIPMENTS TO SEMC/SONY MOBILE."

21       DO YOU SEE THAT?

22   A.   I DO.

23   Q.   OKAY.  SO THAT STATED THAT AT THAT POINT, ALL CHIP

24   SHIPMENTS TO SONY MOBILE WERE IMPLICATED IN THESE DISCUSSIONS;

25   CORRECT?

GONELL CROSS BY MR. MERBER

```
 1     A.   THIS IS -- I MEAN, THIS SAYS WHAT IT SAYS.  AND IT SAYS,

 2     "OUR OPERATIONS TEAM HAS BEEN ADVISED TO HOLD ALL COMPONENT

 3     SHIPMENTS TO SEMC/SONY MOBILE."

 4          SO I AGREE THAT IT SAYS WHAT I JUST SAID.

 5     Q.   OKAY.

 6     A.   I DON'T UNDERSTAND WHAT YOU SAID.

 7     Q.   OKAY.  COULD YOU TURN TO TAB 15 IN YOUR BINDER, WHICH IS

 8     CX 7961.

 9     A.   YES.

10     Q.   AND PORTIONS OF THIS ARE UNDER SEAL.  WE SHOULDN'T PUT IT

11     UP YET ANYWAY.

12          AND YOU'LL SEE THAT THIS IS AN E-MAIL FROM

13     MR. REIFSCHNEIDER TO YOU, AMONG OTHER PEOPLE.

14          DO YOU SEE THAT?

15     A.   YES, I DO.

16               MR. MERBER:  YOUR HONOR, I MOVE TO ADMIT CX 7961,

17     PORTIONS OF WHICH ARE SEALED.

18               MR. BORNSTEIN:  THERE'S NO OBJECTION.

19               THE COURT:  IT'S ADMITTED.

20          (PLAINTIFF'S EXHIBIT 7961 WAS ADMITTED IN EVIDENCE.)

21               THE COURT:  GO AHEAD, PLEASE.  WHAT ABOUT THE LAST

22     DOCUMENT, WAS THAT ALREADY ADMITTED?

23               MR. MERBER:  YES, THE LAST DOCUMENT WAS ALREADY

24     ADMITTED.

25               THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.
```

```
 1        BY MR. MERBER:
 2        Q.   SO, MR. GONELL, THIS E-MAIL IS -- IS ADDRESSED -- EXCUSE
 3        ME.
 4             THIS E-MAIL SAYS, "IF I'M READING THIS SPREADSHEET
 5        CORRECTLY, IT LOOKS LIKE THERE ARE SHIPMENTS SCHEDULED TO GO
 6        OUT ON OCTOBER 24TH AND OCTOBER 25TH, CORRECT?"
 7             DO YOU SEE THAT?
 8        A.   YES, I SEE THAT TEXT, YES.
 9        Q.   AND THEN IT LISTS QUITE A FEW SHIPMENTS TO SONY MOBILE IN
10        A CHART.
11             DO YOU SEE THAT?
12        A.   IT -- YES, SIX, SIX -- I MEAN, I DON'T COMPLETELY
13        UNDERSTAND THIS CHART, BUT, YES, THERE'S SIX LISTINGS ON THIS
14        CHART THAT APPEAR TO BE THINGS THAT ARE QUANTITIES AND PRICE AT
15        THE END.
16        Q.   OKAY.  AND THEN IT SAYS, FROM MR. REIFSCHNEIDER, "IF SO,
17        AND IF THEY STILL HAVE NOT SIGNED THE LICENSE AGREEMENT, I
18        THINK WE NEED TO SERIOUSLY CONSIDER HOLDING THOSE SHIPMENTS
19        UNTIL THEY DO."
20             DO YOU SEE THAT?
21        A.   I DO.
22        Q.   AND THIS IS DATED OCTOBER 25TH, 2012; CORRECT?
23        A.   IT IS DATED THAT DATE, YES.
24        Q.   SO THIS IS RIGHT AROUND THE TIME THAT, IN BETWEEN THE
25        EXPIRATION OF THE INTERIM AGREEMENT AND THE EXECUTION OF THE
```

1    LONGER TERM AGREEMENT BETWEEN QUALCOMM AND SONY; CORRECT?

2    A.   YES.  THIS IS, TO MY MEMORY, DURING THE PERIOD WHERE --

3    THE INTERIM AGREEMENT HAD EXPIRED, EVEN THE TWO WEEK EXTENSION

4    HAD EXPIRED, AND THEY HAD REFUSED TO SIGN AN ADDITIONAL

5    EXTENSION, AND THEY WERE BASICALLY HOLDING UP THE LICENSE FOR

6    THE CHIP DEAL, BUT THE LICENSE WAS ESSENTIALLY DONE.

7    Q.   AND MR. REIFSCHNEIDER WAS THE HEAD OF QTL AT THIS TIME;

8    CORRECT?

9    A.   YES, HE WAS.

10        MR. MERBER:  YOUR HONOR, NO FURTHER QUESTIONS.

11        THE COURT:  ALL RIGHT.  TIME IS 2:05.

12   TIME IS 2:06.  GO AHEAD, PLEASE.

13        MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

14                     **REDIRECT EXAMINATION**

15   BY MR. BORNSTEIN:

16   Q.   IF YOU STILL HAVE TAB 15 IN FRONT OF YOU, CAN I ASK YOU TO

17   TAKE A LOOK AT IT.  THIS IS CX 7961.  IT'S TAB 15 IN THE WHITE

18   BINDER FROM THE FTC.

19   A.   YES.

20   Q.   GREAT.  WHAT'S THE DATE ON THIS E-MAIL?

21   A.   THE DATE ON THIS E-MAIL IS OCTOBER 25TH, 2012.

22   Q.   AND WAS -- DID QUALCOMM -- WHEN DID THE LICENSE AGREEMENT

23   ULTIMATELY GET SIGNED BETWEEN SONY MOBILE AND QUALCOMM IN THIS

24   TIMEFRAME?

25   A.   I'D HAVE TO GO LOOK TO SEE THE EXACT EXECUTION DATE, BUT

GONELL REDIRECT BY MR. BORNSTEIN

1    SHORTLY AFTER THIS, I THINK.

2    Q.   AND BETWEEN THE TIME OF THIS E-MAIL AND THE TIME THE

3    AGREEMENT WAS SIGNED, DID QUALCOMM CUT OFF THE SUPPLY OF ANY

4    CHIPS TO SONY MOBILE?

5    A.   NO, QUALCOMM NEVER CUT OFF THE CHIP SUPPLY TO SONY MOBILE.

6    Q.   LET ME ASK YOU TO TURN BACK TO TAB 7, PLEASE, ALSO IN THE

7    FTC'S BINDER.

8    A.   TAB 7, YES.

9    Q.   OKAY.  AND COUNSEL FOR THE FTC ASKED YOU SOME QUESTIONS

10   ABOUT TWO E-MAILS FROM CAROL BLUBAUGH.

11        DO YOU RECALL THAT?

12   A.   YES.

13   Q.   WHO IS MS. BLUBAUGH?

14   A.   MS. BLUBAUGH IS -- WORKS IN QCT.  SHE'S A CONTRACTS

15   ADMINISTRATOR.  SHE MIGHT NOT BE WITH THE COMPANY ANYMORE, BUT

16   THAT WAS HER ROLE AT THIS TIME FOR SURE.

17   Q.   DID QTL AUTHORIZE MS. BLUBAUGH, OR ANYONE AT QCT, TO ISSUE

18   THIS E-MAIL TO SONY MOBILE ABOUT CUTTING OFF CHIPS?

19             MR. MERBER:  OBJECTION.  FOUNDATION.

20             THE WITNESS:  NO.

21             THE COURT:  SUSTAINED.  LAY THE FOUNDATION, PLEASE.

22             MR. BORNSTEIN:  SURE.

23   Q.   DID YOU, MR. GONELL, TELL ANYONE AT QCT TO ISSUE A

24   STATEMENT ABOUT CEASING THE SUPPLY OF CHIPS TO SONY MOBILE AT

25   THIS TIME?

1    A.   NO, I DID NOT.

2    Q.   AND TO YOUR KNOWLEDGE, DID ANYBODY ELSE AT QTL AUTHORIZE

3    THE CUTTING OFF OF CHIPS TO SONY MOBILE?

4    A.   NO.

5    Q.   AND WHAT'S THE BASIS OF YOUR KNOWLEDGE?

6    A.   BECAUSE WHEN I SAW THIS LATER ON, I MEAN, I'M ADDED TO

7    THIS LATER AND I SEE THIS, YOU CAN SEE THAT THIS WHOLE E-MAIL

8    CHAIN STARTS WITH AN E-MAIL FROM ME, AND I SOUGHT TO FIND OUT,

9    DID YOU DO THIS BECAUSE OF ME OR BECAUSE OF SOME OTHER REASON?

10        BECAUSE IN MY E-MAIL, I'M NOT ASKING THEM TO STOP SHIPPING

11   CHIPS.

12        AND IT TURNS OUT THAT THEY MISUNDERSTOOD MY E-MAIL AND DID

13   IT BECAUSE OF MY E-MAIL AND NOT BECAUSE SOMEBODY ELSE AT QTL

14   SAID THAT THEY SHOULD DO IT.

15             MR. BORNSTEIN:  I HAVE NO FURTHER QUESTIONS.

16             THE COURT:  OKAY.  TIME IS 2:08.

17        DO YOU HAVE ANY MORE CROSS, OR NOT?

18             MR. MERBER:  NO, NO FURTHER QUESTIONS, YOUR HONOR.

19             THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED

20   SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

21             MR. BORNSTEIN:  NOT SUBJECT TO RECALL FROM US.

22             MR. MERBER:  SUBJECT TO RECALL FROM US.

23             THE COURT:  OH, OKAY.  ALL RIGHT.  THEN YOU'RE DONE

24   FOR THE DAY, BUT YOU MAY BE CALLED BACK.

25             AND YOU'RE FREE TO LEAVE FOR NOW.

SAUER DIRECT BY MR. PAIGE

1        THE WITNESS:  THANK YOU, YOUR HONOR.

2        THE COURT:  AND PLEASE HAVE YOUR NEXT WITNESS READY,

3    PLEASE.

4        MR. PAIGE:  YOUR HONOR, QUALCOMM CALLS MATTHIAS SAUER

5    TO THE STAND.

6        THE COURT:  OKAY.

7        (PAUSE IN PROCEEDINGS.)

8        MR. VAN NEST:  MR. SAUER.

9        THE WITNESS:  RIGHT HERE?

10       THE CLERK:  YES.  PLEASE RAISE YOUR RIGHT HAND.

11       **(DEFENDANT'S WITNESS, MATTHIAS SAUER, WAS SWORN.)**

12       THE WITNESS:  I DO.

13       THE CLERK:  THANK YOU.  PLEASE BE SEATED.

14    WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

15    NAME FOR THE RECORD.

16       THE WITNESS:  MATTHIAS SAUER.  LAST NAME IS

17    S-A-U-E-R.

18       THE COURT:  OKAY.  TIME IS NOW 2:10.  GO AHEAD,

19    PLEASE.

20       MR. PAIGE:  THANK YOU, YOUR HONOR.

21                      **DIRECT EXAMINATION**

22    BY MR. PAIGE:

23    Q.   GOOD AFTERNOON, MR. SAUER.

24    A.   GOOD AFTERNOON.

25    Q.   WE HAVEN'T MET.  MY NAME IS GENE PAIGE, AND I REPRESENT

```
 1          QUALCOMM.

 2     A.   NICE TO MEET YOU.

 3     Q.   NOW, YOU'RE AN ELECTRICAL ENGINEER; CORRECT?

 4     A.   THAT IS CORRECT.

 5     Q.   YOU USED TO WORK FOR A COMPANY CALLED INFINEON; RIGHT?

 6     A.   THAT IS CORRECT.

 7     Q.   AND YOU WORKED ON BASEBAND PROCESSORS FOR INFINEON; RIGHT?

 8     A.   THAT IS CORRECT.

 9     Q.   AND FOR SOME OF THE TIME YOU WORKED FOR INFINEON, INFINEON

10     WAS SUPPLYING BASEBAND PROCESSORS TO APPLE; CORRECT?

11     A.   THAT IS CORRECT.

12     Q.   AND AFTER APPLE PURCHASED -- I'M SORRY.

13          AFTER INTEL PURCHASED INFINEON WIRELESS BUSINESS, YOU

14     BECAME AN INTEL EMPLOYEE; CORRECT?

15     A.   THAT IS CORRECT.

16     Q.   YOU THEREAFTER JOINED APPLE'S WIRELESS ARCHITECTURE GROUP

17     IN OCTOBER OF 2011; RIGHT?

18     A.   THAT IS RIGHT.

19     Q.   AND YOU'RE CURRENTLY AN APPLE EMPLOYEE; CORRECT?

20     A.   THAT IS ALSO CORRECT.

21     Q.   NOW, PRIOR TO LEAVING INFINEON, YOU BELIEVED THAT INFINEON

22     SHOULD DEVOTE MORE RESOURCES TO LTE DEVELOPMENT; CORRECT?

23     A.   THAT WAS ONE OF THE OBSERVATIONS I MADE, YES.

24     Q.   BUT DURING THE --

25               THE COURT:  CAN YOU -- I'M SORRY TO INTERRUPT.  CAN
```

1        YOU BRING THE MICROPHONE CLOSER TO YOU.

2                 THE WITNESS:  SORRY, YOUR HONOR.

3                 THE COURT:  THANK YOU.  GO AHEAD, PLEASE.  SORRY FOR

4        THE INTERRUPT.

5        BY MR. PAIGE:

6        Q.   DURING THE TIME YOU WERE WITH INFINEON, THEY CONSIDERED

7        THEMSELVES TO BE A FAST FOLLOWER; CORRECT?

8        A.   THAT WAS ONE OF THE ANALYSIS WE DID, YES.

9        Q.   AND WHILE YOU WERE STILL WORKING AT INFINEON, YOUR VIEW

10       WAS THAT CDMA WOULD BE OF DECLINING IMPORTANCE AND MIGHT NOT BE

11       RELEVANT TO INVEST IN THAT TECHNOLOGY; RIGHT?

12       A.   THAT IS RIGHT.

13       Q.   BUT AS IT TURNS OUT, THE IMPORTANCE OF CDMA CAPABILITY HAS

14       LASTED FOR A LONGER TIME THAN YOU HAD EXPECTED; CORRECT?

15       A.   THAT IS CORRECT, AND STILL THE DECLINING IMPORTANCE, I

16       THINK, IS A VALID ASSESSMENT.

17       Q.   NOW, AS PART OF YOUR JOB RESPONSIBILITIES AT APPLE, YOU

18       HAVE EVALUATED PROPOSALS FROM VARIOUS BASEBAND PROCESSOR

19       SUPPLIERS; RIGHT?

20       A.   YES.

21       Q.   AND AROUND THE TIME YOU JOINED APPLE IN 2011, APPLE WAS

22       ACTIVELY WORKING WITH ST-ERICSSON AS A POTENTIAL SECOND SOURCE

23       OF BASEBAND PROCESSORS; RIGHT?

24       A.   YEAH.  WHEN I JOINED, WE STARTED TO ACTIVELY WORK WITH

25       ST-ERICSSON.

SAUER DIRECT BY MR. PAIGE

```
1      Q.   AND YOU WERE INVOLVED IN THAT WORK WITH ST-ERICSSON, WERE

2      YOU NOT?

3      A.   I WAS, YES.

4      Q.   AND THE CODE NAME FOR ST ERICSSON AT APPLE, THAT WAS

5      STEEL; RIGHT?

6      A.   THAT IS RIGHT.

7      Q.   AND WHEN APPLE TRACKED DELIVERABLES FROM ST ERICSSON,

8      ST ERICSSON WAS NOT MEETING THE DEVELOPMENT DATES, WAS IT?

9      A.   AS IT TURNED OUT IN THE COURSE OF THE PROJECT, IT TURNED

10     OUT THAT THEY WERE SLIPPING IN THEIR EXECUTION.

11     Q.   AND YOUR GROUP EVENTUALLY FOUND ST ERICSSON'S DELAYS WERE

12     NOT ACCEPTABLE; RIGHT?

13     A.   THAT WAS ONE OF THE ANALYSIS.

14     Q.   YOU CONCLUDED THESE DELAYS WOULD LIKELY CONTINUE INTO THE

15     FUTURE; RIGHT?

16     A.   THAT WAS OUR PREDICTION.

17     Q.   LET ME HAND YOU A BINDER OF DOCUMENTS, SIR.

18     A.   UM-HUM.

19          MR. PAIGE:  MAY I APPROACH THE WITNESS, YOUR HONOR?

20          THE COURT:  YES.

21          MR. PAIGE:  (HANDING.)

22     Q.   COULD YOU TURN TO TAB QX 1353, PLEASE, SIR.

23     A.   I HAVE THAT.

24     Q.   THIS IS AN E-MAIL THAT YOU SENT ON OR AROUND THE 8TH OF

25     MARCH 2012?
```

1    A.   YES.

2              MR. PAIGE:  I MOVE THIS INTO EVIDENCE, YOUR HONOR.

3              THE COURT:  OKAY.  ANY OBJECTION?

4              MR. CARSON:  NO OBJECTION.

5              THE COURT:  IT'S ADMITTED.

6         (DEFENDANT'S QX 1353 EXHIBIT  WAS ADMITTED IN EVIDENCE.)

7              THE COURT:  GO AHEAD, PLEASE.

8    BY MR. PAIGE:

9    Q.   IN THE TOP E-MAIL FROM YOU, YOU SAID "AS MUCH AS I LIKE

10   THE STEEL ARCHITECTURE APPROACH AS MUCH AS I HAVE TO CONFESS

11   HOW FRUSTRATING THE ATTEMPTS OF A MEANINGFUL SCHEDULE

12   DISCUSSION HAVE BEEN OVER THE LAST THREE MONTHS."

13        CORRECT?

14   A.   YES.

15   Q.   AND SO BASED ON THOSE FRUSTRATIONS, YOU RECOMMENDED TO

16   OTHERS AT APPLE THAT IT SHOULD STOP WORKING WITH ST ERICSSON

17   DUE TO THESE DELAYS; CORRECT?

18   A.   THAT WAS MY RECOMMENDATION, YES.

19   Q.   AND DO YOU SEE ON PAGE 2 OF THE DOCUMENT, THERE IS AN

20   E-MAIL FROM MR. SHELL WHERE MR. SHELL SAID THAT ST ERICSSON

21   COULD NEITHER EXECUTE NOR MANAGE THEIR WAY OUT OF A PAPER BAG?

22   A.   I SEE THAT.

23   Q.   AND YOU RECALL MR. SHELL EXPRESSING THOSE SENTIMENTS, DO

24   YOU NOT?

25   A.   I DO.

1    Q.   SO APPLE DECIDED, IN MARCH 2012, THAT IT WOULD DISCONTINUE

2    WORKING WITH ST ERICSSON AS A POTENTIAL BASEBAND PROCESSOR

3    SUPPLIER; CORRECT?

4    A.   AS I REMEMBER CORRECTLY, IT WAS AROUND THAT TIME.

5    Q.   IF YOU COULD TURN TO PAGE, OR DOCUMENT QX 9084, PLEASE,

6    MR. SAUER.

7    A.   I HAVE THAT.

8    Q.   AND THAT'S AN E-MAIL FROM YOU DATED ON THE 25TH OF MARCH

9    2012; CORRECT?

10   A.   THAT IS CORRECT.

11          MR. PAIGE:  YOUR HONOR, I OFFER IT INTO EVIDENCE.

12          THE COURT:  ANY OBJECTION?

13          MR. CARSON:  NO OBJECTION.

14          THE COURT:  IT'S ADMITTED.

15      (DEFENDANT'S EXHIBIT QX 9084 WAS ADMITTED IN EVIDENCE.)

16          THE COURT:  GO AHEAD, PLEASE.

17   BY MR. PAIGE:

18   Q.   MR. SAUER, DOES THIS E-MAIL MEMORIALIZE THE DECISION OF

19   YOUR TEAM TO RECOMMEND TO OTHERS TO TERMINATE THE ENGAGEMENT

20   WITH ST ERICSSON ON THE N6X?  IT'S LINE 1 DOWN BELOW THERE.

21   A.   THAT IS WHAT'S STATED HERE, YES.

22   Q.   AND THE N6X, THAT WAS A CODE NAME FOR AN IPHONE AT APPLE;

23   RIGHT?

24   A.   THAT WAS A CODE NAME FOR A DEVELOPMENT PROJECT IN THE

25   IPHONE FAMILY.

1    Q.   AND BECAUSE APPLE HAD ABANDONED ST ERICSSON AS A VIABLE

2    OPTION, IT ALSO ABANDONED THE IDEA OF USING ST ERICSSON IN AN

3    IPAD; RIGHT?

4    A.   THAT IS MY RECOLLECTION, YES.

5    Q.   AND BY THE TIME APPLE MADE THAT DECISION IN MARCH 2012,

6    YOU BELIEVED THAT IT WAS TOO LATE TO EVALUATE OTHER POTENTIAL

7    SECOND SOURCE SUPPLIERS FOR 2014 AND THAT YOU SHOULD START

8    LOOKING AT ALTERNATIVE VENDORS FOR 2015 OR 2016 APPLE PRODUCTS;

9    CORRECT?

10   A.   I NEED TO -- I DON'T EXACTLY REMEMBER WHAT -- IF THAT WAS

11   THE, THE BELIEF AT THE TIME.  BUT IF THERE'S SOMETHING IN THE

12   E-MAIL, THEN IT MIGHT BE CORRECT.

13   Q.   YOU RECALL GIVING A DEPOSITION IN APRIL OF 2018,

14   MR. SAUER?

15   A.   YES.

16   Q.   IF YOU COULD TURN TO THE DEPOSITION TRANSCRIPT FROM

17   THERE -- THAT WAS UNDER OATH; CORRECT?

18   A.   THAT IS CORRECT.

19   Q.   OKAY.  AND IF YOU LOOK AT PAGE 100 OF THAT DEPOSITION

20   TRANSCRIPT, STARTING AT LINE 18.

21   A.   PAGE 100, YOU SAID?

22   Q.   THAT'S RIGHT, STARTING AT LINE 18.

23   A.   YES.

24   Q.   AND DO YOU SEE WHERE YOU TESTIFIED, "I THINK WE HAD

25   CONCLUDED THAT FOR 2014, TIME HAS PASSED AND IT WOULD BE TOO

1    LATE TO EVALUATE OTHER OPTIONS FOR 2014 AND THAT WE SHOULD

2    START LOOKING AT ALTERNATE VENDORS FOR FUTURE PROGRAMS"?

3    A.   I SEE THAT.

4    Q.   AND BY "FUTURE PROGRAMS," YOU MEAN PROGRAMS AFTER 2014?

5    DO YOU SEE THAT?

6    A.   THAT IS WHAT I SEE, YES.

7    Q.   OKAY.  COULD YOU PLEASE TURN TO TAB QX 9090 IN YOUR

8    BINDER.

9    A.   I HAVE THAT.

10   Q.   AND THIS IS AN E-MAIL SENT TO YOU BY MR. STEVE SHELL;

11   CORRECT?

12   A.   THAT IS CORRECT.

13        MR. PAIGE:  YOUR HONOR, I OFFER QX 9090 INTO

14   EVIDENCE.

15        MR. CARSON:  OBJECTION.  HEARSAY.

16        THE COURT:  IS THAT AN OBJECTION TO THE COVER E-MAIL

17   OR TO THE ENTIRE -- TO THE POWERPOINT THAT'S ATTACHED?

18        MR. CARSON:  TO THE ENTIRETY OF THE DOCUMENT, YOUR

19   HONOR.

20        THE COURT:  ALL RIGHT.  WHAT'S THE RESPONSE?

21        MR. PAIGE:  WE'RE GOING TO SHOW THAT THE MATERIAL IN

22   THE E-MAIL WAS PART OF THEIR DECISION TO STOP WORKING WITH

23   BROADCOM.

24        MR. CARSON:  I'M CONFUSED WITH THE RESPONSE, YOUR

25   HONOR.

1          THE COURT:  THAT'S NOT A HEARSAY EXCEPTION, SO

2     SUSTAINED.

3          MR. PAIGE:  OKAY.

4     Q.   MR. SAUER, YOU RECALL THAT BROADCOM WAS HAVING, WAS HAVING

5     DISCUSSIONS WITH APPLE ABOUT A PART CALLED THE BCM 21890, DON'T

6     YOU?

7     A.   I RECALL THAT THERE WERE PRESENTATIONS ABOUT THAT PRODUCT

8     WITH APPLE.

9     Q.   AND YOU, YOURSELF, WERE CONCERNED THAT THERE WAS NO

10    LEGITIMATE PREDECESSOR PLATFORM FOR THE BCM 21890; CORRECT?

11    A.   I DON'T REMEMBER IF I PERSONALLY WAS CONCERNED WITH THAT.

12    BUT IT WAS ONE OF THE SENTIMENTS IN THE, IN THE DISCUSSION

13    ABOUT THIS PRODUCT.

14    Q.   AND THAT CONCERN WAS THAT THE BCM 21890 WAS A FIRST

15    GENERATION ARCHITECTURE THAT WAS NOT PROVEN IN THE MARKET;

16    RIGHT?

17    A.   THAT IS RIGHT.

18    Q.   AND YOU HAD CONCLUDED THAT BROADCOM'S LTE MODEM

19    DEVELOPMENT PROGRAM WAS TOO LATE FOR 2014 APPLE PRODUCTS;

20    RIGHT?

21    A.   I THINK THAT WAS CORRECT.

22    Q.   AND SO APPLE DECIDED NOT TO ENGAGE WITH BROADCOM AT THAT

23    TIME IN 2012; CORRECT?

24    A.   THAT WAS ONE OF THE REASONS.

25    Q.   OKAY.  AND THEN LATER IN 2014, YOU WERE INVOLVED IN DUE

SAUER DIRECT BY MR. PAIGE

1    DILIGENCE OF THE BROADCOM LTE MODEM PLATFORM THAT WAS BEING

2    CONSIDERED FOR USE IN 2016 APPLE PRODUCTS; RIGHT?

3    A.   THAT IS RIGHT.

4    Q.   AND YOU HAD CONCERN ABOUT THE MATURITY OF BROADCOM'S LTE

5    MODEM PLATFORM AT THAT TIME AS WELL, DIDN'T YOU?

6    A.   WE HAD DONE A DEEPER INVESTIGATION AND THAT WAS ONE OF THE

7    CRITERIA WE HAD AND, AND ONE OF THE RISK ITEMS THAT WAS

8    FLAGGED.

9    Q.   AND IN 2014, THE APPLE ENGINEERING TEAM MADE A UNANIMOUS

10   RECOMMENDATION TO SELECT INTEL OVER BROADCOM FOR ENGAGEMENT AS

11   A POTENTIAL SECOND SOURCE SUPPLIER OF BASEBAND MODEM CHIPS;

12   CORRECT?

13   A.   THAT IS CORRECT.

14   Q.   AND THE DECISION TO SELECT INTEL OVER BROADCOM, THAT WAS

15   BASED ON ENGINEERING CONSIDERATIONS AND NOT ON BUSINESS

16   CONSIDERATIONS; RIGHT?

17   A.   THAT WAS OVERALL ACROSS FUNCTIONAL DISCUSSION.  I WAS

18   RESPONSIBLE FOR THE ENGINEERING EVALUATION WHERE THE, THE

19   RECOMMENDATION YOU STATED CAME OUT OF.  BUSINESS CONSIDERATIONS

20   WERE CERTAINLY ALSO AMONGST THE CONSIDERATIONS.

21   Q.   BUT YOUR GROUP'S RECOMMENDATION NOT TO ENGAGE WAS BASED

22   STRICTLY ON ENGINEERING CONSIDERATIONS; RIGHT?

23   A.   THAT WAS BASED ON ENGINEERING CONSIDERATIONS.

24   Q.   OKAY.  AFTER APPLE ENDED THE INVESTIGATION OF ST ERICSSON

25   AS A POTENTIAL SECOND SOURCE SUPPLIER FOR 2014 IPADS, APPLE

SAUER DIRECT BY MR. PAIGE

1    CONSIDERED INTEL AS A SECOND SOURCE; RIGHT?

2    A.   THAT IS RIGHT.

3    Q.   AND APPLE WAS CONSIDERING INTEL AS A SUPPLIER FOR AN IPAD

4    MINI WITH RETINA DISPLAY; CORRECT?

5    A.   THAT IS CORRECT.

6    Q.   AND THE APPLE CODE NAME FOR THE IPAD, THAT WAS J86; RIGHT?

7    A.   AS FAR AS I REMEMBER, THAT IS CORRECT.

8    Q.   AND AT ONE POINT IN TIME, THE LAUNCH DATE FOR WHAT IS

9    CALLED THE J86 WAS THE SPRING OF 2014; RIGHT?

10   A.   AS FAR AS I REMEMBER, THAT IS CORRECT.

11   Q.   AND YOU RECALL THE INTEL XMM 7160 CHIP WAS THE INTEL MODEM

12   PLATFORM THAT MIGHT HAVE BEEN READY IN TIME FOR THE J86 IF THE

13   FDA HAD BEEN RELEASED AS ORIGINALLY PLANNED IN THE SPRING OF

14   2014; RIGHT?

15   A.   THAT WAS THE, THE ASSESSMENT AT THAT TIME, YES.

16   Q.   AND WHETHER APPLE WOULD CONSIDER INCLUDING AN INTEL MODEM

17   IN THE J86 IPAD DEPENDED ON WHAT THE APPLE PRODUCT DEVELOPMENT

18   TEAM DECIDED ON IN TERMS OF DATE OF PRODUCT RELEASE; RIGHT?

19   A.   SORRY.  CAN YOU REPEAT THAT?

20   Q.   SURE.  WHETHER APPLE WOULD CONSIDER INCLUDING AN INTEL

21   MODEM IN THE J86 IPAD DEPENDED ON WHAT THE APPLE PRODUCT

22   DEVELOPMENT TEAM DECIDED IN TERMS OF THE PRODUCT RELEASE;

23   RIGHT?

24   A.   THAT WAS ONE OF THE DEPENDENCIES, YES.

25   Q.   IF THE APPLE PRODUCT DEVELOPMENT TEAM DECIDED TO PULL IN

1    THE J86 IPAD IN THE FALL OF 2013, APPLE WOULD HAVE TO USE

2    QUALCOMM INSTEAD BECAUSE THE XMM 7160 WOULDN'T BE READY IN

3    TIME; RIGHT?

4    A.   THAT IS WHAT I REMEMBER BECAUSE OF THIS BEING A NEW

5    DEVELOPMENT, SO NOT A LOT OF REUSE FROM PRIOR DEVELOPMENT THAT

6    WE HAD.

7    Q.   BUT THE RELEASE DATE FOR THE J86 IPAD, THAT BECAME THE

8    FALL OF 2013; RIGHT?

9    A.   IF I REMEMBER, YES.

10   Q.   AND THE REASON FOR PULLING IT INTO THE FALL OF 2013 HAD

11   NOTHING TO DO WITH BASEBAND PROCESSOR SUPPLIERS; RIGHT?

12   A.   NOT TO MY RECOLLECTION.

13         MR. CARSON:  YOUR HONOR, I'M GOING TO OBJECT TO

14   FOUNDATION.  I DON'T KNOW THAT THEY'VE LAID A FOUNDATION THAT

15   THIS WITNESS CAN TESTIFY FOR THE REASONS THAT THE PULL IN FOR

16   THE IPAD HAPPENED.  FROM AN ENGINEERING SIDE, HE CAN TESTIFY

17   FROM THAT PERSPECTIVE.  BUT NOT FROM BUSINESS PERSPECTIVES OR

18   ANY OTHER PERSPECTIVES AT APPLE.

19         THE COURT:  OKAY.  CAN YOU JUST LAY THE FOUNDATION

20   FOR HIS KNOWLEDGE, PLEASE?

21   BY MR. PAIGE:

22   Q.   YOU'RE NOT AWARE OF ANY REASON, ON THE ENGINEERING SIDE,

23   THAT HAD ANYTHING TO DO WITH BASEBAND PROCESSOR SUPPLIERS;

24   RIGHT?

25   A.   NOT TO THE EXTENT THAT I WAS INVOLVED IN.

SAUER DIRECT BY MR. PAIGE

1    Q.    NOW, INTEL'S XMM 7160 MODEM CHIP, THAT DIDN'T SUPPORT A

2    FEATURE CALLED CARRIER AGGREGATION, DID IT?

3    A.    THAT IS CORRECT.

4    Q.    AND IN 2012, YOUR UNDERSTANDING WAS THAT CARRIER

5    AGGREGATION WOULD BE AN IMPORTANT FEATURE FOR CERTAIN NETWORKS

6    IN NORTH AMERICA IN 2014; RIGHT?

7    A.    WE ASSESSED THAT THIS WILL BE -- WOULD BE BECOMING AN

8    IMPORTANT FEATURE IN THIS TIMEFRAME.

9    Q.    AND YOU BELIEVE THE XMM 7160 WOULD NOT BE A GOOD CHOICE

10   FOR THE NORTH AMERICAN MARKET FOR 2014 APPLE PRODUCTS BECAUSE

11   IT LACKED CARRIER AGGREGATION; RIGHT?

12   A.    FOR CERTAIN PRODUCTS, THAT WAS CORRECT.

13   Q.    AND APPLE SET CARRIER AGGREGATION AS A REQUIREMENT IN THE

14   RFP FEATURE SET; RIGHT?

15   A.    YEAH.  WE GENERALLY SET A SET OF PRE-REQUIREMENTS IN THE

16   RFP'S.  THESE ARE THEN SOMETIMES DIRECTLY OR NOT DIRECTLY

17   RELATED TO THE PRODUCT LEVEL DECISIONS.

18   Q.    BUT CARRIER AGGREGATION WAS SET AS A REQUIREMENT IN THE

19   RFP, WAS IT NOT?

20   A.    IT WAS SET AS A REQUIREMENT IN THE RFP FOR THE 2014

21   TIMEFRAME.

22   Q.    OKAY.  NOW, INTEL'S XJJ 7160 MODEM CHIP, THAT LACKED

23   TD-SCDMA CAPABILITY ALSO; RIGHT?

24   A.    THAT IS CORRECT.

25   Q.    AND APPLE REQUIRED TD-SCDMA CAPABILITY FOR 2014 PRODUCTS;

1    RIGHT?

2    A.   FOR SPECIFIC, SPECIFICALLY ONE CARRIER IN CHINA, THAT WAS

3    REQUIRED.

4    Q.   OKAY.  THE XMM 7160 DIDN'T SUPPORT TDD LTE EITHER, DID IT?

5    A.   AT LEAST TO MY KNOWLEDGE, YES.

6    Q.   AND TDD LTE, THAT WAS AN IMPORTANT FEATURE ON THE ROADMAP

7    FOR APPLE PRODUCTS, TOO, WASN'T IT?

8    A.   IN GENERAL, THAT IS CORRECT FOR CERTAIN OPERATORS.

9    Q.   SO IN MARCH 2013, APPLE TOLD INTEL THAT THERE WAS NO MATCH

10   BETWEEN THE XMM 7160 AND APPLE'S PRODUCT NEEDS DUE TO THE

11   INCREASING IMPORTANCE OF LTE CARRIER AGGREGATION AND TDD LTE;

12   RIGHT?

13   A.   THAT IS --

14        MR. CARSON:  OBJECTION.  HEARSAY.

15        THE COURT:  SUSTAINED.

16   BY MR. PAIGE:

17   Q.   SO THE XMM 7160 ENDED UP BEING UNSUITABLE FOR 2014 IPADS;

18   CORRECT?

19   A.   THAT'S NOT WHAT I WOULD SAY BECAUSE WE SHIPPED IPADS --

20   THE IPAD MINI WITHOUT CARRIER AGGREGATION.  SO FROM THAT

21   PERSPECTIVE, IT WOULD HAVE BEEN SUITABLE.

22   Q.   COULD I TURN YOU TO PAGE 120 OF YOUR DEPOSITION, PLEASE,

23   MR. SAUER.  DO YOU SEE LINE 22?

24        YOU WERE ASKED THE QUESTION, "SO, THEREFORE, THE INTEL XMM

25   7160 ENDED UP BEING UNSUITABLE FOR APPLE 2014 FDAS.  RIGHT?"

1    A.   I SEE THAT.

2    Q.   YOUR ANSWER WAS YES?

3    A.   THAT IS CORRECT.

4    Q.   WERE YOU ASKED THAT QUESTION AND DID YOU GIVE THAT ANSWER?

5    A.   YES.

6    Q.   DO YOU STAND BY THAT TESTIMONY TODAY?

7    A.   I STAND BY THAT TESTIMONY, AND I THINK THAT WAS A GENERIC,

8    OR A BROADER QUESTION AND I TRIED TO BE MORE PRECISE IN MY

9    RESPONSE TODAY.

10   Q.   OKAY.  VOICE-OVER LTE, OR VOLTE, THAT WAS A REQUIREMENT

11   FOR 2014 IPHONES, WAS IT NOT?

12   A.   WE CONSIDERED IT AS A REQUIREMENT IN THE RFP, AND WE WERE

13   INVESTIGATING WHETHER IT WILL BE READY IN TIME FOR THAT.

14   Q.   WELL, IN OCTOBER 2012, APPLE LEARNED THAT INTEL WASN'T

15   READY FROM A VOICE PERSPECTIVE FOR 2014; RIGHT?

16   A.   THAT IS WHAT, WHAT WE HEARD FROM INTEL.

17   Q.   AND THAT WAS REFERRING TO THE FACT THAT INTEL WOULD NOT

18   HAVE VOICE-OVER LTE ON THE 7160 IN TIME FOR A 2014 IPHONE;

19   RIGHT?

20   A.   THAT IS OUR -- WAS OUR UNDERSTANDING AT THAT TIME.

21   Q.   AND SO THE XMM 7160 WAS ALSO NOT SUITABLE FOR USE IN A

22   2014 IPHONE, WAS IT?

23   A.   THAT IS MY UNDERSTANDING, YES.

24   Q.   NOW, INTEL'S S8 MILESTONE IS THE COMMERCIAL SAMPLE DATE OF

25   A MODEM CHIP PLATFORM WHERE THE SOFTWARE AND ALGORITHM FULLY

1    VALIDATED FOR COMMERCIAL RELEASE; RIGHT?

2    A.   THAT WAS OUR, OUR UNDERSTANDING.  WE HAVE HAD DIFFERENT

3    MAPPINGS OF THE MILESTONES ON WHAT WE CALL THE COMMERCIAL

4    SAMPLES.  BUT S8 IS COMMONLY USED.

5    Q.   AND APPLE TYPICALLY WANTS TO BE SURE THAT BASEBAND

6    PROCESSORS HAVE BEEN FULLY VALIDATED FOR COMMERCIAL RELEASE BY

7    A CERTAIN PERIOD OF TIME BEFORE THE APPLE PRODUCT IS SET FOR

8    RELEASE; RIGHT?

9    A.   THAT IS WHAT WE TYPICALLY STRIVE FOR, WITH EXCEPTIONS IF

10   NECESSARY.

11   Q.   AND THE TYPICAL TARGET DATE APPLE SETS FOR BASEBAND

12   PROCESSOR SUPPLIERS TO MEET WHAT APPLE CALLS THE S8 MILESTONE

13   IS JUNE OF THE YEAR BEFORE THE APPLE PRODUCT IS RELEASED;

14   RIGHT?

15   A.   THAT'S WHAT WE TYPICALLY SET IN THE RFP.  THE REAL MATCH

16   WOULD BE A SEPTEMBER COMMERCIAL SAMPLE DATE THAT WE MAYBE USE

17   TO SYNCHRONIZE OUR PROGRAMS.

18   Q.   SO FOR A PRODUCT TO BE RELEASED IN 2014, APPLE WOULD WANT

19   THE S8 MILESTONE TO BE MET BY JUNE OF 2013; RIGHT?

20   A.   THAT'S WHAT WE ASK FOR AND TYPICALLY IT'S SYNCHRONIZED FOR

21   SEPTEMBER.

22   Q.   PLEASE TURN TO TAB QX 0988 IN YOUR BINDER.

23   A.   I HAVE THAT.

24   Q.   IS THIS AN E-MAIL THAT YOU SENT TO MR. GERHARD MARTIN AT

25   INTEL?

```
1    A.   MY APOLOGIZE.  I HAVE THE WRONG ONE.  0988.

2    Q.   IT'S 9088.  I APOLOGIZE IF I HAD IT WRONG.

3    A.   ALL RIGHT.  YEAH, I HAVE IT.

4    Q.   IS THAT AN E-MAIL THAT YOU SAID TO MR. GERHARD MARTIN OF

5    INTEL?

6    A.   YES.

7    Q.   ON OCTOBER 17TH, 2012?

8    A.   YES.

9         MR. PAIGE:  YOUR HONOR, I OFFER QX 98 -- 9088 INTO

10   EVIDENCE.

11        MR. CARSON:  NO OBJECTION.

12        THE COURT:  IT'S ADMITTED.

13   (DEFENDANT'S EXHIBIT QX 9088 WAS ADMITTED IN EVIDENCE.)

14        THE COURT:  GO AHEAD, PLEASE.

15   BY MR. PAIGE:

16   Q.   DO YOU SEE THE PRESENTATION ATTACHED TO THE E-MAIL,

17   MR. SAUER?

18   A.   YES.

19   Q.   AND LOOKING AT PAGE 6 OF THAT PRESENTATION, IF YOU LOOK

20   DOWN ON THE LOWER RIGHT SIDE TOWARDS THE CENTER, IS THAT

21   TELLING YOU THAT THE XMM 7260 S8 DATE IS GOING TO BE JUNE OF

22   2014?

23   A.   YES.

24   Q.   AND THAT MEANT THE XMM 7260 WOULD NOT BE AVAILABLE IN TIME

25   FOR A 2014 APPLE PRODUCT; CORRECT?
```

SAUER DIRECT BY MR. PAIGE

1    A.   THAT WAS THE ROADMAP INFORMATION WE HAD AT THE TIME.

2    Q.   AND A VARIANT OF THE XMM 7260 CALLED THE XMM 7262, THAT

3    WAS TOO LATE FOR APPLE'S 2014 PRODUCTS AS WELL; CORRECT?

4    A.   BASED ON THE ROADMAP INFORMATION, THAT IS CORRECT.  AND I

5    THINK THAT WAS THE DISCUSSION IN THAT E-MAIL THAT I WANTED TO

6    HAVE CLARIFICATION ABOUT THE CONTENT OF WHAT WAS PRESENTED.

7    Q.   IT'S FAIR TO SAY THE MOBILE DEVICE INDUSTRY IS DYNAMIC AND

8    RAPIDLY CHANGING, ISN'T IT?

9    A.   AS A GENERAL STATEMENT, I WOULD AGREE.

10   Q.   FEATURES ARE CHANGING EVERY YEAR AND CUSTOMERS GENERALLY

11   WANT THE LATEST AND GREATEST FEATURES; RIGHT?

12   A.   THAT'S A VERY BROAD STATEMENT.  I THINK THE FEATURES ARE

13   TYPICALLY WELL, WELL DEFINED WHEN IT COMES TO THE STANDARD.

14   THE SELECTION OF WHAT WE THINK IS RELEVANT FOR A PRODUCT, THAT

15   CAN VARY.  SO -- IN THE BROAD TERM YOU'VE DESCRIBED IT, I WOULD

16   NOT WHOLEHEARTEDLY AGREE.  BUT IT'S GOING THE RIGHT DIRECTION.

17   Q.   LET'S NARROW IT A LITTLE BIT.  LAST YEAR'S BASEBAND

18   PROCESSOR WOULD GENERALLY NOT PROVIDE AS ATTRACTIVE A FEATURE

19   SET AS THE CURRENT YEAR'S MODEL; RIGHT?

20   A.   THAT WOULD BE TRUE, CORRECT.

21   Q.   OKAY.  AND IN THE FALL OF 2012, YOUR VIEW WAS THAT THE XMM

22   7260 MIGHT HAVE BEEN ATTRACTIVE IN TERMS OF FEATURES IF IT HAD

23   BEEN READY IN TIME FOR 2014 APPLE PRODUCTS; RIGHT?

24   A.   YES.  SO THE DISCUSSION WAS ABOUT, I THINK, IF I LOOK BACK

25   AT THE DATE OF THE E-MAIL, THE 22ND, THAT WAS ABOUT THE TIME WE

SAUER DIRECT BY MR. PAIGE

1    ALREADY HAD SOME ENGAGEMENT WITH INTEL ON THE 7160.  SO THIS

2    WAS A DISCUSSION ABOUT FUTURE GENERATIONS AND WE NEEDED TO

3    CLARIFY WHERE THE THOUGHTS OF INTEL ARE GOING IN TERMS OF HOW

4    THEY WOULD UPDATE THEIR ROADMAP FOR OUR NEEDS.

5    Q.   OKAY.  BUT BY THE SAME TOKEN, THE XMM 7260 WAS FAR LESS

6    ATTRACTIVE IF IT WAS ONLY READY IN TIME FOR 2015 APPLE

7    PRODUCTS; RIGHT?

8    A.   THAT IS RIGHT.  IF I REMEMBER, INTEL HAD CHANGED THEIR

9    ROADMAP SUBSEQUENTLY IN A WAY THAT THEY WERE SHIPPING THE 7260

10   OR A DERIVATIVE THEREOF WITH CUSTOMERS IN THE 2014 TIMEFRAME.

11   Q.   NOW, YOU RECALL THAT --

12   A.   20 --

13   Q.   I'M SORRY?

14   A.   SORRY.  IT WAS 2015.  I APOLOGIZE, 2015 TIMEFRAME.

15   Q.   YOU RECALL THAT TDD LTE CARRIER AGGREGATION WAS

16   PARTICULARLY IMPORTANT FOR USE ON THE CHINA MOBILE NETWORK;

17   RIGHT?

18   A.   YES.

19   Q.   AND YOU WOULD AGREE THAT IT WAS A REASONABLE ASSESSMENT TO

20   SAY THAT IN 2015, INTEL WAS STRUGGLING EVEN TO MATCH QUALCOMM;

21   RIGHT?

22   A.   YES.

23   Q.   NOW, ALL THE CELLULAR ENABLED IPADS RELEASED IN 2015 AND

24   SINCE HAVE BEEN WHAT THEY CALL UNLOCKED; RIGHT?

25   A.   I DON'T KNOW FOR SURE.

1    Q.   OKAY.  FINALLY, MR. SAUER, YOU WOULD AGREE THAT THE 2016

2    INTERCEPT OF THE XMM 7360 AND THE APPLE IPHONE 7 WAS THE FIRST

3    APPLE PRODUCT SINCE 2011 WHERE THE INTEL OFFERING MET APPLE'S

4    REQUIREMENTS; RIGHT?

5    A.   I WOULDN'T TOTALLY AGREE WITH THAT STATEMENT.  IF YOU LOOK

6    AT FROM A GENERAL CHIPSET ROADMAP PERSPECTIVE, THEN THIS WAS A

7    CORRECT STATEMENT IN THE SENSE THAT IT MET ALL OF THE

8    REQUIREMENTS THAT WE HAD.  WE HAD OTHER PRODUCTS SHIPPED WHERE

9    EARLIER PRODUCTS WOULD HAVE MET THE REQUIREMENTS.

10   Q.   MR. SAUER, IF I COULD ASK YOU TO TURN TO PAGE 256 OF YOUR

11   DEPOSITION?

12   A.   SURE.

13   Q.   STARTING ON LINE 6, RUNNING THROUGH LINE 16.

14        "QUESTION:  NOW, WE TALKED BEFORE ABOUT INTEL'S CHIPSET

15   PLATFORM OFFERING IN PARTICULAR 2014 AND 2015 APPLE PRODUCTS.

16   RIGHT?

17        "ANSWER:  YES.

18        "QUESTION:  WAS THE 2016 INTERCEPT OF THE XMM 7360 AND THE

19   APPLE IPHONE 7 THE FIRST APPLE PRODUCT WHERE THE INTEL OFFERING

20   MET APPLE'S REQUIREMENTS?"

21        "ANSWER:  WELL, THE FIRST AFTER RE-ENGAGING OR AFTER 2011,

22   WHEN THE -- APPLE CHOSE TO WORK WITH QUALCOMM ON THE IPHONES,

23   YES."

24        WERE YOU ASKED THAT QUESTION AND DID YOU GIVE THOSE

25   ANSWERS?

```
1    A.   YES.

2    Q.   DO YOU STAND BY THAT TESTIMONY TODAY, SIR?

3    A.   YES.

4         MR. PAIGE:  NO FURTHER QUESTIONS.

5         THE COURT:  ALL RIGHT.  IT'S 2:34.  LET'S GO AHEAD

6    AND TAKE A TEN MINUTE BREAK, PLEASE.  WE'LL TAKE ANOTHER BREAK

7    AT 3:30.

8         YOU CAN STEP DOWN DURING THE BREAK, BUT YOU WILL HAVE TO

9    COME BACK.

10        OKAY.  ALL RIGHT.  THANK YOU.  WE'LL TAKE A TEN MINUTE

11   BREAK.

12        (RECESS FROM 2:35 P.M. UNTIL 2:45 P.M.)

13        THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

14        TIME IS 2:45.

15        GO AHEAD, PLEASE.

16        MR. CARSON:  WESLEY CARSON FOR THE FTC.

17        THE COURT:  2:46.  GO AHEAD.

18                      CROSS-EXAMINATION

19   BY MR. CARSON:

20   Q.   HELLO, MR. SAUER.  HOW ARE YOU?

21   A.   WELL, THANK YOU.

22   Q.   NOW, WE TALKED A LOT ABOUT VALUATIONS FROM AN ENGINEERING

23   PERSPECTIVE?

24        DO YOU REMEMBER THAT?

25   A.   I DO, YES.
```

1    Q.   AND YOU'RE INVOLVED IN THE VALUATION FROM AN ENGINEERING

2    PERSPECTIVE; IS THAT RIGHT?

3    A.   THAT IS CORRECT.

4    Q.   YOU'RE NOT INVOLVED WITH THE VALUATIONS FROM A BUSINESS

5    PERSPECTIVE, ARE YOU?

6    A.   NOT DIRECTLY, NO.

7    Q.   WE ALSO TALKED ABOUT TWO TECHNOLOGIES, TD-SCDMA AND

8    TDD LTE.

9         DO YOU REMEMBER THAT?

10   A.   I DO, YES.

11   Q.   ARE THOSE TECHNOLOGIES REQUIRED WORLDWIDE?

12   A.   DEPENDS ON WHAT TIME YOU'RE TALKING ABOUT.  BUT TD-SCDMA

13   IS, TO MY KNOWLEDGE, SOLELY REQUIRED IN CHINA FOR A SINGLE

14   OPERATOR THERE.

15   Q.   AND WHEN APPLE HAS A WORLDWIDE DESIGN FOR A PRODUCT, DOES

16   THAT MEAN THAT THEY USE THE EXACT SAME COMPONENTS IN EVERY

17   PRODUCT WORLDWIDE?

18   A.   NO, TYPICALLY NOT.  SO WE HAVE DIFFERENT REGIONAL SKUS

19   DEVICES, WE STRIVE FOR HAVING AS FEW AS POSSIBLE AND STRIVE FOR

20   HAVING THE HARDWARE TO SUPPORT THAT.  BUT IT WOULD BE DIFFERENT

21   COMPONENTS, ELECTIONS FOR DIFFERENT REGIONS.

22   Q.   YOU TALKED ABOUT, ON YOUR DIRECT EXAMINATION, HOW YOU WERE

23   INVOLVED IN THE POTENTIAL SELECTION OF A CHIPSET FOR A 2014

24   IPAD, THE IPAD MINI 2.

25        DO YOU REMEMBER THAT?

```
1      A.   I DO, YES.

2      Q.   SO AS OF OCTOBER 2012, WAS APPLE MOVING FORWARD WITH AN

3    ENGINEERING ENGAGEMENT WITH INTEL FOR THAT IPAD MINI 2?

4      A.   YES, WE WERE.

5      Q.   AND IN 2012, DO YOU RECALL ANYTHING ABOUT WHY APPLE WANTED

6    A SECOND SUPPLIER FROM QUALCOMM FOR THOSE CHIPSETS?

7      A.   AS FAR AS I REMEMBER, THERE WAS A STRONG MOTIVATION FROM A

8    BUSINESS PERSPECTIVE TO GO FOR A SECOND SUPPLIER.

9      Q.   AND DID INTEL -- OR DID APPLE END UP SELECTING INTEL FOR

10   THE IPAD MINI 2 PROJECT?

11     A.   NO, WE DID NOT.

12     Q.   NOW, THE INTEL MODEM, I THINK AS WE'VE HEARD, DIDN'T

13   SUPPORT CARRIER AGGREGATION.

14          DO YOU REMEMBER THAT?

15     A.   I DO, YES.

16     Q.   AND WAS THE FACT THAT THE INTEL MODEM DIDN'T SUPPORT

17   CARRIER AGGREGATION A PROBLEM FOR APPLE'S PLANS FOR THE IPAD

18   MINI 2?

19     A.   NO, IT WAS NOT.

20     Q.   NOW, YOU SAID, I THINK, ON DIRECT EXAMINATION THAT CARRIER

21   AGGREGATION IN 2014 WAS MORE OF A REGION-BY-REGION REQUIREMENT;

22   IS THAT RIGHT?

23     A.   THAT IS MY --

24          MR. PAIGE:  OBJECTION.  MISSTATES THE TESTIMONY.

25          THE COURT:  OVERRULED.
```

1    BY MR. CARSON:

2    Q.   YOU CAN FINISH YOUR ANSWER.

3    A.   IT WAS A NASCENT TECHNOLOGY -- I DON'T KNOW IF I

4    PRONOUNCED IT CORRECT, EXCUSE ME, MY ACCENT -- AN EMERGING

5    TECHNOLOGY THAT WAS FIRST INTRODUCED IN SELECT MARKETS, LIKE

6    NORTH MESH.

7    Q.   SO WAS THE CHOICE NOT TO USE INTEL MODEMS FOR THE IPAD

8    MINI 2, DID THAT HAVE ANYTHING TO DO WITH TECHNICAL REASONS?

9             MR. PAIGE:  OBJECTION.  FOUNDATION.

10            THE COURT:  SUSTAINED.  LAY THE FOUNDATION.

11   BY MR. CARSON:

12   Q.   DID YOU EVALUATE THE INTEL MODEMS FROM A TECHNICAL

13   PERSPECTIVE?

14   A.   YES, WE DID.

15   Q.   FROM YOUR PERSPECTIVE, WERE THERE TECHNICAL REASONS NOT TO

16   USE THE INTEL MODEM, THE XMM 7160 FOR THE 2014 IPAD MINI 2?

17   A.   FOR THE REGIONAL SKUS THAT WE HAD PLANNED, THERE WAS NO

18   TECHNICAL REASON TO MY KNOWLEDGE.

19   Q.   NOW, DID THE QUALCOMM MODEM -- WAS A QUALCOMM MODEM

20   ULTIMATELY USED IN THE IPAD MINI 2?

21   A.   IT WAS A QUALCOMM MODEM USED, YES.

22   Q.   AND DID THE QUALCOMM MODEM THAT WAS USED IN THE IPAD MINI

23   2 ULTIMATE SUPPORT CARRIER AGGREGATION?

24   A.   NO, IT DID NOT.

25   Q.   ARE YOU FAMILIAR WITH A PRODUCT CALLED THE IPAD MINI 3?

1    A.   I THINK, YES, IF I MATCH THE CODE NAMES.  BUT, YES, I AM.

2    Q.   AND WAS THE IPAD MINI 3 LAUNCHED IN THE FALL OF 2014?

3    A.   IF I REMEMBER CORRECTLY, YES.

4    Q.   WAS A QUALCOMM MODEM USED IN THE IPAD MINI 3?

5    A.   YES.

6    Q.   AND DID THE QUALCOMM MODEM THAT WAS USED IN THE IPAD MINI

7    3 RELEASED IN THE FALL OF 2014 SUPPORT CARRIER AGGREGATION?

8    A.   NO, IT DID NOT.

9    Q.   NOW, DO YOU AGAIN RECALL APPLE CONSIDERING USING INTEL

10   MODEMS FOR 2016 APPLE PRODUCTS?

11   A.   YES, I DO.

12   Q.   AND DID THIS EVALUATION OCCUR IN THE 2014 TIMEFRAME?

13   A.   YES, BASICALLY.

14   Q.   SO IN 2014, WHAT DO YOU RECALL ABOUT WHY APPLE WANTED TO

15   BRING IN A SECOND SUPPLIER TO QUALCOMM?

16   A.   TO MY KNOWLEDGE, THIS WAS MAIN --

17        MR. PAIGE:  OBJECTION.  FOUNDATION.

18        MR. CARSON:  I'M ASKING WHAT HE RECALLS, YOUR HONOR.

19        THE COURT:  WELL, STILL SUSTAINED.  LAY THE

20   FOUNDATION FOR EVEN HIS RECOLLECTION.

21   BY MR. CARSON:

22   Q.   WERE YOU INVOLVED IN THE SELECTION OF CHIPSET SELECTIONS

23   FOR 2016 APPLE PRODUCTS?

24   A.   YES.

25   Q.   AND WHAT DO YOU RECALL ABOUT WHY APPLE WANTED TO BRING IN

1    A SECOND SUPPLIER TO QUALCOMM FOR 2016 APPLE PRODUCTS?

2    A.   MY RECOLLECTION, WE HAD DISCUSSIONS ABOUT BUSINESS

3    MOTIVATION, SOME TECHNICAL MOTIVATION, BUT PRIMARILY BUSINESS

4    MOTIVATIONS FOR BRINGING ON A SECOND SUPPLIER.

5    Q.   AND DID YOU EVALUATE AN INTEL MODEM FOR THESE POTENTIAL

6    2016 APPLE PRODUCTS?

7    A.   I DID EVALUATE THEM FROM A TECHNICAL PERSPECTIVE.

8    Q.   AND FROM YOUR TECHNICAL EVALUATION, DID YOU IDENTIFY ANY

9    RISK IN USING AN INTEL MODEM FOR 2016 APPLE PRODUCTS?

10   A.   CERTAINLY, YES, THERE'S ALWAYS RISK WITH A NEW PROJECT.

11   BUT WE THOUGHT THOSE RISKS ARE MANAGEABLE, AND WE THOUGHT

12   THERE'S A GOOD CHANCE OF SUCCESS OF COMPLETING SUCH A PROJECT.

13   Q.   SO YOU MENTIONED THAT THERE'S ALWAYS RISKS WITH NEW

14   PRODUCTS.  HAVE YOU EVER IDENTIFIED ANY RISK WITH USING

15   QUALCOMM MODEMS IN APPLE PRODUCTS?

16   A.   YES, WE DID.

17   Q.   COULD YOU ELABORATE A BIT?

18   A.   I CAN'T COME UP WITH SOME COMPLETE EXAMPLES.  BUT WE

19   TYPICALLY HAD SOME RISKS WITH COMPLETING CERTAIN TECHNICAL

20   QUALITY CRITERIA.  WE HAD DISCUSSED RISKS ON MEETING POWER

21   TARGETS IN A PROJECT WE HAD.  SUPPLY RISKS.  SO THERE'S A

22   MULTITUDE OF FACTORS THAT WE TYPICALLY TRIED TO MANAGE WITH OUR

23   CHIPSET PARTNERS DURING THE COURSE OF A PROJECT.

24   Q.   SO WHEN YOUR TEAM WAS EVALUATING INTEL MODEM FOR A 2016

25   PROJECT, WHAT WAS THE GENERAL ENGINEERING VIEW ABOUT WHETHER TO

1    BRING IN INTEL FOR THAT PROJECT?

2    A.   I THINK, IF I REMEMBER CORRECTLY, THE GENERAL ENGINEERING

3    VIEW WAS THAT, IF WE SELECT A SECOND SUPPLIER, WE HAVE A HIGH

4    CHANCE OF SUCCESS.  WE HAD A CROSS-FUNCTIONAL EVALUATION OF

5    DIFFERENT ASPECTS OF THE ENGINEERING WORK.

6         AND WE CONCLUDED THAT THE IDENTIFIED RISKS ARE MANAGEABLE.

7    Q.   DID THE ENGINEERING TEAM HAVE ANY RECOMMENDATIONS ABOUT

8    WHETHER TO STICK WITH SOLELY A QUALCOMM MODEM FOR A 2016

9    PROJECT?

10   A.   I DON'T REMEMBER A CONCRETE RECOMMENDATION OF THAT SORT.

11   Q.   SO AFTER THE SELECTION OF THE INTEL MODEM, WAS INTEL

12   RESPONSIVE TO THOSE RISKS THAT YOU IDENTIFIED?

13   A.   YES.  WE DEVELOPED A, A FAIRLY DEEP ENGINEERING

14   RELATIONSHIP WITH OUR COUNTERPARTS ON THE INTEL ENGINEERING

15   SIDE AND WERE WORKING THROUGH THE ISSUES AS THEY WERE EMERGING.

16   Q.   AND WERE THOSE ISSUES YOU IDENTIFIED, THOSE RISKS YOU

17   IDENTIFIED RESOLVED?

18   A.   THEY WERE RESOLVED IN THE END, AND WE SHIPPED A PRODUCT.

19        MR. CARSON:  NO FURTHER QUESTIONS AT THIS TIME, YOUR

20   HONOR.

21        THE COURT:  2:53.

22   OKAY.

23        MR. PAIGE:  BRIEFLY, YOUR HONOR.

24        THE COURT:  OKAY.  2:53.  GO AHEAD, PLEASE.

25

SAUER REDIRECT BY MR. PAIGE

1                        **REDIRECT EXAMINATION**

2    BY MR. PAIGE:

3    Q.   THE IPAD MINI 3, THAT WAS THE J86 M, WAS IT NOT?

4    A.   THAT SOUNDS CORRECT.

5    Q.   AND THE IPAD MINI 2, THAT WAS THE J86?

6    A.   YES.

7    Q.   AND APPLE WANTED TO HAVE THE J86 AND THE J86 M USE THE

8    SAME MODEM; CORRECT?

9    A.   I DON'T REMEMBER IF THAT WAS THE MOTIVATION, THAT SHE

10   SHOULD HAVE THE SAME MODEM.  IT MAY OR MAY NOT BE TRUE.  I

11   DON'T KNOW.

12   Q.   OKAY.  AND THE IPAD MINI 3, THAT SUPPORTED CDMA; CORRECT?

13   A.   THAT IS CORRECT, AT LEAST FOR SOME REGIONS.

14   Q.   AND NO INTEL MODEM AT THAT TIME SUPPORTED CDMA; RIGHT,

15   SIR?

16   A.   THAT IS RIGHT.

17            MR. PAIGE:  NOTHING FURTHER.

18            THE COURT:  ALL RIGHT.  TIME IS 2:54.

19            MR. CARSON:  NO RECROSS, YOUR HONOR.

20            THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED

21   SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?  WHAT DO YOU THINK?

22            MR. PAIGE:  NOT SUBJECT, YOUR HONOR.

23            THE COURT:  DO YOU AGREE?

24            MR. CARSON:  NOT SUBJECT.

25            THE COURT:  OKAY.  THEN YOU'VE COMPLETED YOUR TRIAL

```
 1              TESTIMONY, AND YOU ARE FREE TO LEAVE.

 2                   THE WITNESS:  THANK YOU, YOUR HONOR.

 3                   MR. VAN NEST:  YOUR HONOR, IN THE INTEREST OF TIME,

 4         WE'RE GOING TO SKIP -- PASS OVER MR. HARTOGS.

 5                   THE COURT:  OKAY.

 6                   MR. VAN NEST:  AND RELEASE HIM AND MOVE ON TO

 7         MR. CHEN.

 8                   THE COURT:  OKAY.  ARE YOU NOT GOING TO CALL

 9         MR. HARTOGS AT ALL?

10                   MR. VAN NEST:  WE ARE NOT GOING TO CALL MR. HARTOGS

11         AT ALL.

12                   THE COURT:  OKAY.  I THINK THAT'S A BIT ODD.

13                   MR. VAN NEST:  WE'RE ON A PRETTY STIFF TIME CLOCK AND

14         SOME OF OUR WITNESSES TODAY HAVE BEEN LONGER THAN WE

15         ANTICIPATED AND JUST IN THE INTERESTS OF TIME.  I HAVEN'T GOT

16         THE TIME BUDGET.

17              SO WE ADVISED THE FTC THAT WE WOULD NOT BE CALLING

18         MR. HARTOGS, AND WE'RE CALLING MR. CHEN.

19              I'M NOT TRYING TO MOVE HIM IN THE ORDER.  I'M DROPPING HIM

20         OUT.

21                   THE COURT:  ALL RIGHT.  IT'S JUST THAT I DO SEALING,

22         AND I DO HIGH PRIORITY OBJECTIONS AS TO THESE WITNESSES AND IF

23         YOU DECIDE NOT TO USE THEM SOONER, THEN -- I DON'T KNOW, WHEN

24         DID YOU TELL THE FTC YOU WEREN'T GOING TO CALL HIM?

25                   MR. VAN NEST:  JUST DURING THE BREAK.
```

1        MS. MILICI:  JUST TWO MINUTES AGO.

2        MR. VAN NEST:  JUST DURING THE BREAK.

3        THE COURT:  OKAY.  SO WE ALL DO ALL THIS PREPARATION.

4   ALL RIGHT.  WELL, I MEAN, YOU KNEW WHAT THE TIME LIMITS WERE.

5        HOW LONG WERE YOU GOING TO HAVE MR. HARTOGS'S DIRECT BE?

6        MR. VAN NEST:  WE WERE GOING TO HAVE HIM ON FOR

7   PROBABLY HALF AN HOUR.  AND I JUST DON'T HAVE THE BUDGET WITH

8   MY TIME, AND I DON'T THINK IT'S THAT CRITICAL.  SO I MADE A

9   DECISION, AND I'D LIKE TO MOVE ON TO MR. CHEN.

10       THE COURT:  OKAY.

11       MR. VAN NEST:  THANK YOU.

12       THE COURT:  IT'S A LITTLE UNUSUAL, BUT GO AHEAD.

13       MR. VAN NEST:  THANK YOU, YOUR HONOR.

14       THE COURT:  BRING HIM FORWARD, PLEASE.

15       THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

16       **(DEFENDANT'S WITNESS, LIREN CHEN, WAS SWORN.)**

17       THE WITNESS:  YES, I DO.

18       THE CLERK:  THANK YOU.  PLEASE BE SEATED.

19       THE COURT:  BEFORE WE MOVE ON, WOULD IT BE MORE

20   HELPFUL -- SO IN EACH OF -- YOU KNOW, THESE WITNESS DISCLOSURES

21   ARE SUPPOSED TO BE THE WITNESSES WHO WILL BE CALLED THE NEXT

22   DAY.

23       AND SO IF QUALCOMM HAS DISCLOSED 22 WITNESSES PER DAY, WE

24   END UP DOING A LOT OF EVIDENTIARY OBJECTIONS AND SEALING

25   MOTIONS FOR WITNESSES WHO ARE NOT GOING TO BE CALLED AT ALL, OR

```
 1        WHO ARE CERTAINLY NOT GOING TO BE CALLED THE NEXT DAY.

 2            IS THERE ANY MORE PRECISE WITNESS IDENTIFICATION THAT

 3    QUALCOMM CAN DO?  I THINK THE FTC SHOWED A LOT OF PROFESSIONAL

 4    COURTESY, THEIR WITNESS LIST WAS RIGHT ON, THEY CALLED THE

 5    WITNESSES THEY WERE GOING TO CALL, THEY FULLY DISCLOSED THEM,

 6    THEY CALLED THEM IN THE SAME ORDER.  THE ONLY VARIATION WAS THE

 7    VERY LAST DAY I THINK WHEN THEY RAN OUT OF TIME.

 8            AND, YOU KNOW, WE'RE GETTING WITNESS DISCLOSURES OF, WHAT,

 9    22, 23 WITNESSES A DAY, AND YOU'RE NOT CALLING THEM, AND WE'RE

10    ALL RUNNING AROUND DOING SEALING MOTIONS AND EVIDENTIARY

11    OBJECTIONS AS TO 22 WITNESSES.

12        SO I'M JUST WONDERING IF THERE COULD BE PERHAPS MORE

13    PRECISE AND PERHAPS MORE FOCUSSED -- THESE ARE SUPPOSED TO BE

14    DAILY, YOU KNOW, THE WITNESS LIST FOR THE FOLLOWING DAY.

15                MR. VAN NEST:  WE CAN --

16                THE COURT:  COULD WE DO THAT?

17                MR. VAN NEST:  WE SURE CAN, YOUR HONOR, PARTICULARLY

18    AS WE'RE GETTING CLOSER TO THE END OF THE TRIAL, THAT'LL BE

19    MUCH EASIER.  RECALL THAT BEFORE YOU WERE GETTING THE WITNESS

20    STATEMENTS, THE FTC WAS FOLLOWING A PROCEDURE THAT WE WERE,

21    TOO, WHICH WAS DISCLOSING A LOT MORE DEPOSITION THAN YOU COULD

22    ACTUALLY PLAY THAT DAY.  AND SO --

23                THE COURT:  OKAY.  BUT THEY HAD, WHAT, MAYBE TWO OR

24    THREE FORMER WITNESSES.  YOU'VE BEEN DISCLOSING 22 WITNESSES A

25    DAY SINCE YOUR DISCLOSURES LAST WEEK.  SO I WOULD JUST ASK,
```

1    GOING FORWARD, WE ONLY HAVE A FEW DAYS LEFT --

2              MR. VAN NEST:  THAT'S RIGHT.

3              THE COURT:  -- THAT IT BE A LITTLE BIT MORE FOCUSSED

4    AND MORE PRECISE SO WE DON'T END UP DOING ALL OF THESE

5    EVIDENTIARY OBJECTIONS, SEALING OBJECTIONS ON MR. HARTOGS WHO'S

6    NOT GOING TO BE CALLED.  SO I WOULD APPRECIATE.  I KNOW MY

7    CHAMBERS WOULD APPRECIATE IT.

8              MR. VAN NEST:  AND WE'LL DO THAT, YOUR HONOR.  THANK

9    YOU.

10             THE COURT:  OKAY.

11             THE CLERK:  WOULD YOU PLEASE STATE YOUR FULL NAME AND

12   SPELL YOUR LAST NAME FOR THE RECORD.

13             THE WITNESS:  YES.  MY NAME IS LIREN CHEN.  CHEN IS

14   SPELLED C-H-E-N.

15             MR. ZEMBEK:  RICHARD ZEMBEK OF NORTON, ROSE,

16   FULBRIGHT.

17        MAY I APPROACH THE WITNESS, YOUR HONOR?

18             THE COURT:  YES.  IT'S 2:59.  GO AHEAD, PLEASE.

19                       **DIRECT EXAMINATION**

20   BY MR. ZEMBEK:

21   Q.   GOOD AFTERNOON.

22   A.   GOOD AFTERNOON.

23   Q.   COULD YOU PLEASE INTRODUCE YOURSELF TO THE COURT?

24   A.   YES.  MY NAME IS LIREN CHEN.  I'M A SENIOR VICE PRESIDENT

25   OF ENGINEERING AND LEGAL COUNSEL WORKING FOR QUALCOMM IN

1    QUALCOMM TECHNOLOGY LICENSING DIVISION.

2    Q.   WOULD YOU PLEASE DESCRIBE YOUR RESPONSIBILITIES AS SENIOR

3    VICE PRESIDENT ENGINEERING AND LEGAL COUNSEL?

4    A.   YES.  AT QTL, I'M RESPONSIBLE FOR MANAGING QTL'S

5    TECHNOLOGY ROADMAP, AS WELL AS WORKING WITH CORPORATE LEGAL

6    I.P. DEPARTMENT TO MANAGE QUALCOMM I.P. PORTFOLIO, PATENT

7    PORTFOLIO, AS WELL AS PRESENTING PATENT RELATED INFORMATION

8    DURING LICENSING NEGOTIATION.

9    Q.   WHAT IS YOUR EDUCATIONAL BACK GROUND, MR. CHEN?

10   A.   I GREW UP IN CHINA IN THE CITY CALLED TSING TAO.  IF THE

11   NAME SOUNDS A LITTLE FAMILIAR, THERE'S A BEER NAMED AFTER THE

12   CITY.

13        AND THEN I WENT TO BEIJING TO COLLEGE BEFORE I CAME TO

14   U.S. FOR GRADUATE SCHOOL, THE UNIVERSITY OF MAINE.

15        I WENT TO SAN DIEGO AND HAD AN M.B.A. AND ALSO A J.D.

16   WHILE I WAS WORKING AT QUALCOMM.

17   Q.   HOW LONG HAVE YOU BEEN AT QUALCOMM?

18   A.   I STARTED QUALCOMM IN '96, SO THAT'S 22 SOME YEARS NOW.

19   Q.   COULD YOU PLEASE DESCRIBE YOUR WORK HISTORY AT QUALCOMM?

20   A.   YES.  SO I STARTED AS A SOFTWARE ENGINEER AND WORKING ON

21   PRODUCT DEVELOPMENT, SPENT ABOUT SEVEN YEARS WRITING SOFTWARE

22   FOR QUALCOMM PRODUCT.

23        AND THEN IN 2003, I TRANSFERRED TO WHAT'S CALLED OTCS,

24   OFFICE OF THE CHIEF SCIENTIST.  IT'S A RESEARCH BRANCH IN

25   QUALCOMM.  I WAS DOING WIRELESS SYSTEM RESEARCH FOR ABOUT FIVE

1        YEARS.

2            IN 2008, I TRANSFERRED TO WHAT HAD BECOME QUALCOMM I.P.

3        DEPARTMENT.  SO I SPENT ABOUT EIGHT YEARS IN I.P. DEPARTMENT

4        DOING PATENT ANALYSIS, LITIGATION SUPPORT, AND ALSO CREATING

5        LICENSING MATERIAL, INCLUDING PORTFOLIO INFORMATION AND PATENT

6        CLAIM CHARTS TO SUPPORT QTL LICENSE.

7        Q.   DO YOU HAVE ANY PATENTS?

8        A.   I DO.

9        Q.   HOW MANY?

10       A.   I HAVE ABOUT 130 PATENTS AND PENDING APPLICATIONS

11       WORLDWIDE.

12       Q.   AND WHO OWNS THEM?

13       A.   QUALCOMM.

14       Q.   AS PART OF YOUR RESPONSIBILITIES AT QUALCOMM, DO YOU MAKE

15       PRESENTATIONS REGARDING THE PORTFOLIO?

16       A.   I DO.

17       Q.   COULD YOU PLEASE TURN IN YOUR BINDER TO EXHIBIT CX 9240.

18       QX 9240.  EXCUSE ME?

19       A.   OKAY.

20       Q.   COULD YOU IDENTIFY THIS, PLEASE?

21       A.   YES, I CAN.

22       Q.   AND WHAT --

23       A.   THIS IS A PRINTOUT OF AN E-MAIL I SENT TO GINA AND

24       HEATHER, WHO WORK AT APPLE'S I.P. DEPARTMENT.  THIS IS AN

25       E-MAIL I SENT TO THEM AFTER WE HAD FACE-TO-FACE MEETING WITH --

1      AT APPLE AND WHERE WE PRESENTED THE PATENT INFORMATION.

2      Q.   AND WHAT'S ATTACHED TO THE E-MAIL?

3      A.   THERE'S A POWERPOINT ATTACHED TO THE E-MAIL.

4      Q.   AND DID YOU HAVE ANY ROLE IN CREATING THESE SLIDES?

5      A.   YES.  I WAS ONE OF THE FEW PEOPLE WHO WORKED ON CREATING

6      THE SLIDES.  YES, I WAS INVOLVED IN CREATING THEM.

7      Q.   DID YOU PRESENT THEM?

8      A.   I WAS THE MAIN PRESENTER OF THE DAY.

9      Q.   DO YOU HAVE PERSONAL KNOWLEDGE REGARDING THE INFORMATION

10     IN THESE SLIDES?

11     A.   YES, I DO.

12          MR. ZEMBEK:  YOUR HONOR, QX 9240 WAS THE SUBJECT OF A

13     HIGH PRIORITY OBJECTION WITH RESPECT TO THE POWERPOINT

14     PRESENTATION, IT'S NOT BEING ADMITTED FOR THE TRUTH OF THE

15     MATTER ASSERTED, BUT OTHERWISE QUALCOMM OFFERS QX 9240.

16          THE COURT:  ALL RIGHT.  ANY OBJECTION?

17          MR. HOPKIN:  NO OBJECTION SUBJECT TO THAT LIMITATION

18     IN THE HPO.

19          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

20     (DEFENDANT'S EXHIBIT QX 9240 WAS ADMITTED IN EVIDENCE.)

21          THE COURT:  GO AHEAD, PLEASE.

22     BY MR. ZEMBEK:

23     Q.   BEFORE WE GO INTO THIS DOCUMENT IN DETAIL, YOU MENTIONED

24     THESE SLIDES WERE PRESENTED TO APPLE.

25          IS THE INFORMATION IN THESE SLIDES SPECIFIC TO APPLE?

CHEN DIRECT BY MR. ZEMBEK

1      A.   NO, IT IS NOT.

2      Q.   WHAT, IF ANY, IS THE RELEVANCE OF THESE MATERIALS, OR

3      WHAT, IF ANYTHING, DO THESE MATERIALS MATTER TO OTHER POTENTIAL

4      LICENSEES?

5      A.   THE FOCUS OF THESE PRESENTATIONS ABOUT QUALCOMM'S

6      WORLDWIDE PATENT PORTFOLIO, SO WE BELIEVED THOSE PATENTS HAVE

7      WIDELY BEEN USED BY OUR LICENSEES, SO THEY'RE NOT SPECIFIC TO

8      APPLE.

9      Q.   COULD YOU PLEASE TURN TO THE SLIDE THAT ENDS IN BATES

10     NUMBER 235.

11     A.   YES.

12     Q.   AT THE TIME YOU GAVE THIS PRESENTATION TO APPLE, HOW MANY

13     PATENTS DID QUALCOMM HOLD?

14     A.   AT THE TIME, WE HAVE ABOUT 120,000 PATENTS, GRANTED

15     PATENTS, AS WELL AS PENDING APPLICATIONS WORLDWIDE.

16     Q.   DOES QUALCOMM BREAK THOSE PATENTS DOWN INTO ANY PARTICULAR

17     CATEGORIES?

18     A.   WE DO.

19     Q.   AND WHAT ARE THE CATEGORIES?

20     A.   SO AT THE HIGHEST LEVEL WE GROUPED THEM INTO THREE

21     DIFFERENT CATEGORIES.  THE FIRST CATEGORY IS CALLED CELLULAR

22     SEPS, AS MARKED ON THE CHART.  IT REALLY REPRESENTS CELLULAR

23     STANDARD ISSUES OR PATENTS.

24          THE SECOND CATEGORY IS A CATEGORY OF WHAT'S ON THE CHART

25     AS NON-CELLULAR SEPS.  WHAT THAT MEANS IS STANDARD ESSENTIAL

1    PATENTS FOR AREAS BEYOND CELLULAR STANDARD.

2         AND THE LAST CATEGORY HERE IS MARKET NON-SEPS, BASICALLY

3    IT'S NON-STANDARD ESSENTIAL PATENTS.  SOMETIMES PEOPLE ALSO

4    REFERRING TO IT AS IMPLEMENTATION PATENTS.

5    Q.   ABOUT HOW MANY PATENTS DID QUALCOMM HAVE AT THE TIME IN

6    THESE DIFFERENT CATEGORIES?

7    A.   SO AT THAT TIME, QUALCOMM HAVE ABOUT 20 PERCENT OF THE

8    PORTFOLIO, WHICH IS AROUND 23000-PLUS PATENTS AND PENDING

9    APPLICATIONS IN THE CELLULAR SEPS.

10        WE HAVE ABOUT 15 PERCENT, OR 14 PERCENT, WHICH IS ABOUT

11   16,000 PATENTS AND PENDING APPLICATIONS OF STANDARD ESSENTIAL

12   PATENTS IN OTHER STANDARD AREAS.

13        AND THEN WE HAVE ABOUT 230 OF THE PORTFOLIO, WHICH IS

14   ABOUT 80,000 PATENTS WORLDWIDE, IN THIS NON-STANDARD ESSENTIAL

15   AREAS.

16   Q.   COULD YOU PLEASE GIVE THE COURT AN EXAMPLE OF A

17   NON-CELLULAR SEP, OR A SEP STANDARD ESSENTIAL PATENT BEYOND

18   CELLULAR?

19   A.   YES.  SO WE HAVE PATENTS IN DIFFERENT STANDARD AREA OF

20   TECHNOLOGY.  FOR EXAMPLE, WE HAVE PATENTS THAT ARE COVERING

21   VIDEO KODAK, KODAK MEANS CODING AND DECODING, SO THAT IS A

22   STANDARD THAT'S NOT CELLULAR, THAT'S NOT CELLULAR.

23   Q.   AND WHICH OF THESE CATEGORIES OF PATENTS DOES QUALCOMM

24   PRESENT DURING LICENSING DISCUSSIONS?

25   A.   WE TYPICALLY PRESENT ALL OF THEM.

```
1    Q.   WHY IS THAT?

2    A.   BECAUSE QUALCOMM IS A SYSTEM INNOVATOR.  WE ARE VERY OFTEN

3    KNOWN FOR CREATING TECHNOLOGY IN CELLULAR SPACE.  WE ACTUALLY

4    CONDUCT VERY BROAD R&D AND TECHNOLOGY DEVELOPMENT IN MANY

5    DIFFERENT AREAS.

6         AND ALL THOSE TECHNOLOGY ARE RELEVANT, AND THEY'RE VERY

7    IMPORTANT FOR THE OVERALL WORKING TOGETHER OF THE SYSTEM FOR A

8    SMARTPHONE USER.  SO WE TRY TO PRESENT ALL THE INFORMATION

9    ABOUT OUR PATENTS BECAUSE THEY ARE DELIVERING VALUE TO OUR

10   LICENSEES TOGETHER.

11   Q.   AND WHEN YOU USE THE TERM "VALUE," DO YOU MEAN TECHNICAL

12   VALUE?

13   A.   YES, I DO.

14   Q.   COULD WE PLEASE TURN TO THE NEXT PAGE, WHICH IS BATES --

15   ENDING IN BATES 236?

16   A.   YES.

17   Q.   WHAT WERE YOU INTENDING TO CONVEY WHEN YOU CREATED THIS

18   SLIDE?

19   A.   THIS IS A CHART DEMONSTRATING QUALCOMM'S PATENT PORTFOLIO

20   GROWTH OVER TIME.  SO WE TRIED TO PURSUE A LONGER PERIOD OF

21   TIME OF PATENT GROWTH.

22        THE REASON WE SHOW THIS CHART IS WE ARE NOT LICENSED IN A

23   PATENT PORTFOLIO THAT EXPIRES OVER TIME.  WHAT WE ARE CREATING

24   HERE IS QUALCOMM HAS A LOT OF ONGOING R&D THAT KEEP GENERATING

25   NEW I.P. THAT KEEP GETTING ADDED TO OUR PORTFOLIO.
```

1          SO THAT'S SHOWN IN THE CHARTS TO SHOW HOW THE PATENT

2     PORTFOLIO KEEP GROWING OVER TIME.  THE REALLY IMPORTANT THING

3     IS WHEN WE NEGOTIATE WITH LICENSEE, WE ARE TRYING TO GENERALLY

4     NEGOTIATE A LONGER TERM DEAL THAT'S FIVE TO TEN YEARS LONG.

5          SO I WANTED THE LICENSEE TO HAVE A CLEAR UNDERSTANDING OF

6     HOW QUALCOMM KEEP ON GETTING INVENTIONS INTO THE PORTFOLIO AND,

7     THEREFORE, ACCESS TO THE TECHNOLOGY.

8     Q.   AND WHAT IS THE GROWTH RATE OF THE PORTFOLIO?

9     A.   AS INDICATED ON THIS CHART AND THROUGH THE LAST 20-PLUS

10    YEARS, WE HAVE BEEN GROWING THE PORTFOLIO AT 30-PLUS PERCENT OF

11    THE COMPOUND ANNUAL GROWTH.

12    Q.   DO YOU REFRESH THIS PRESENTATION FROM TIME TO TIME?

13    A.   YEAH, WE DO, YES.

14    Q.   AS OF MARCH OF 2018, APPROXIMATELY HOW MANY PATENTS DID

15    QUALCOMM HAVE IN ITS PORTFOLIO?

16    A.   WE -- ABOUT MARCH OF 2018, WE HAD ABOUT 140,000 GRANTED

17    PATENTS AND PENDING APPLICATIONS.

18         AND BY THE WAY, IT IS ALSO IMPORTANT THAT WHEN WE REFRESH

19    THE CHART, AS I REFERRED TO EARLIER, WE ALSO REMOVE EXPIRED

20    PATENTS FROM THE CHART.

21    Q.   ABOUT HOW QUICKLY IS QUALCOMM OBTAINING PATENTS?

22    A.   WE ACTUALLY OBTAINING A LOT OF PATENTS EVERY DAY.  FOR

23    EXAMPLE, ON AVERAGE, WE GET ABOUT 35 GRANTED PATENTS NET

24    ADDITION INTO OUR PORTFOLIO PER DAY WORLDWIDE.

25         THIS IS, AGAIN, IT'S COUNTING ON THE PATENTS WE ARE

 1        GETTING GRANTED RECENTLY, NEWLY GRANTED PATENTS, AND

 2        SUBTRACTING THE PATENT THAT HAS EXPIRED.

 3        Q.   COULD WE PLEASE TURN TO THE PAGE ENDING IN BATES 241.

 4            MR. CHEN, THIS SLIDE IS A LITTLE BIT BUSY.  WHAT WERE YOU

 5        PRESENTING IN CONNECTION WITH THIS SLIDE?

 6        A.   YES, I DO APOLOGIZE FOR THIS.  THIS IS A BUSY CHART.  HAD

 7        I KNOWN THIS CHART WOULD BE SHOWN IN COURT, I PROBABLY WOULD

 8        HAVE TRIED TO MAKE IT SIMPLER AND NICER AT THE TIME.

 9            BUT WHAT WE ARE TRYING TO SHOW ON THIS CHART IS

10        STRAIGHTFORWARD.  I WAS TRYING TO SHOW THREE POINTS ON THIS

11        CHART.

12            ONE, IT'S THE TIMING OF QUALCOMM'S R&D RESEARCH;

13            THE SECOND POINT I WAS TRYING TO SHOW ON THE CHART IS

14        REALLY HOW THE DIFFERENT GENERATION OF TECHNOLOGY, OF CELLULAR

15        TECHNOLOGY ARE BUILT ON TOP OF EACH OTHER;

16            THE THIRD POINT I'M TRYING TO SHOW IS WITHIN EACH

17        GENERATION, HOW THE TECHNOLOGY KEEP ON GETTING, EVOLVING,

18        GETTING NEW VALUE ADDED THROUGH EVERY RELEASE, R-E-L-E-A-S-E.

19        I DO APOLOGIZE.

20        Q.   ARE THERE ANY COMMON CHARACTERISTICS IN QUALCOMM'S

21        STANDARD ESSENTIAL PATENTS?

22        A.   YES.  THERE'S A -- AT THE HIGHEST LEVEL, QUALCOMM'S

23        STANDARD ESSENTIAL PATENT GENERALLY HAVE EARLIER PRIORITY DATES

24        AND THEY TEND TO COVER MORE, MANY DIFFERENT FOUNDATIONAL,

25        IMPORTANT FEATURES OF THE STANDARD.

1        AND OUR PATENTS ARE GENERALLY FILED FAIRLY EXTENSIVELY IN

2   TERMS OF JURISDICTIONS, AS WELL AS TECHNOLOGY AREAS.

3   Q.   NOW, WHEN YOU WERE TALKING ABOUT THIS CHART, YOU FIRST

4   TALKED ABOUT THE TIMING.

5        WHAT DID YOU MEAN WHEN YOU WERE ILLUSTRATING TIMING ON

6   THIS CHART?

7   A.   YEAH.  SO I TRIED TO PICK TWO DIFFERENT COLORS

8   REPRESENTING WHEN R&D HAPPENS AND WHEN THE TECHNOLOGY GETTING

9   ACCEPTED INTO THE STANDARD.

10       SO I USED THE GOLDEN COLOR REPRESENTS WHEN QUALCOMM R&D

11  STARTED, AND THE WHITE BOXES ON THE CHART REPRESENTS WHEN THOSE

12  TECHNOLOGIES GETTING ACCEPTED INTO STANDARD.

13       SO AS YOU CAN TELL, ALMOST IN EVERY CASE FOR 2G, 3G, 4G,

14  AND 5G TECHNOLOGY DEVELOPMENT GENERALLY, OUR R&D RESEARCH

15  STARTS FROM FIVE TO TEN YEARS BEFORE THOSE TECHNOLOGY GETTING

16  ADOPTED INTO THE STANDARD.

17  Q.   WHY DO THESE TIMELINES OVERLAP FOR THE STANDARDS?

18  A.   YEAH, THAT'S A -- SO SOMETIMES PEOPLE HAVE THE

19  MISPERCEPTION TO SAY YOU DEVELOP ONE GENERATION TECHNOLOGY AND

20  THEN YOU CLOSE THE DEVELOPMENT, YOU MOVE ON TO THE NEXT ONE.

21  THAT'S JUST NOT HOW IT WORKS, BECAUSE IN THE CELLULAR SPACE

22  HERE, THERE'S MULTIPLE GENERATIONAL TECHNOLOGY THAT ARE IN USE

23  AT THE SAME TIME.

24       SO THAT'S WHY A LOT OF PHONES SUPPORT MULTIPLE MODES OF

25  DIFFERENT GENERATIONAL TECHNOLOGY.

1              SO IN THIS CASE HERE, AS YOU CAN TELL, WITH THE 3G, 4G,

2     FOR EXAMPLE, THAT TIMELINE OVERLAPS BECAUSE QUALCOMM KEEP ON

3     CREATING NEW TECHNOLOGIES AND WE TRIED TO, TO ADD THOSE

4     TECHNOLOGIES INTO, YOU KNOW, DIFFERENT GENERATIONAL STANDARDS,

5     AND NOT ONLY THE NEXT GENERATION, BUT WE ALSO TRY TO IMPROVE

6     THE CURRENT GENERATIONAL TECHNOLOGY STANDARD BECAUSE IT'S VERY

7     IMPORTANT FOR THE CARRIER, THE CONSUMER WHO HAS SPENT -- THE

8     CARRIER SPENT A LOT OF MONEY DEPLOYING THE NETWORK, SO THEY

9     WANTED A LONGER RUNWAY OF THE NETWORK INVESTMENT BEFORE THEY

10    CAN IMPORT THE NEXT GENERATION.

11             SO WE KEEP ON INTRODUCING TECHNOLOGY IN PARALLEL INTO

12    EXISTING GENERATIONAL TECHNOLOGY, AS WELL AS INTO THE NEXT ONE,

13    AND THIS IS THE WAY FOR US TO DELIVER VALUE TO CUSTOMER.

14             I'M SORRY, FOR VALUE, I MEAN TECHNOLOGY PERFORMANCE.

15    Q.   YOU MENTIONED THAT THE STANDARDS BUILD ON EACH OTHER WHEN

16    DESCRIBING THE STACKING.  WHAT DID YOU MEAN BY THAT?

17             MR. HOPKIN:  OBJECTION, YOUR HONOR.  THIS IS BEYOND

18    THE SCOPE OF MR. CHEN'S 30(B)(6) DEPOSITION TESTIMONY.

19             THE COURT:  SUSTAINED.

20             MR. ZEMBEK:  YOUR HONOR, I DON'T BELIEVE IT IS BEYOND

21    THE SCOPE OF THE TESTIMONY.  HE ACTUALLY TESTIFIED AS TO --

22             THE COURT:  WELL, WHY DON'T YOU JUST POINT ME TO THE

23    DEPOSITION TRANSCRIPT.

24             MR. ZEMBEK:  I WILL, YOUR HONOR.

25             THE COURT:  AND I'D LIKE TO SEE THE 30(B)(6) NOTICE,

1    PLEASE.

2         DO YOU HAVE IT?

3              MR. ZEMBEK:  I DO NOT HAVE A COPY OF THE NOTICE.

4              THE COURT:  LET ME ASK IF THE PLAINTIFF DOES?  DO YOU

5    HAVE A COPY OF THE NOTICE?  WHAT TOPIC IS COVERED?

6              MR. ZEMBEK:  IF YOU TURN TO -- IF WE COULD, MR. DAHM,

7    PLEASE TURN TO --

8              THE COURT:  DO YOU HAVE A COPY OF THE NOTICE?  COULD

9    YOU PLEASE GIVE THAT TO MS. GARCIA?

10             MR. HOPKIN:  YES, I DO.  IT'S -- I ALSO HAVE -- I'VE

11   HIGHLIGHTED --

12             THE COURT:  IF IT'S HIGHLIGHTED, I DON'T WANT IT.

13   DOES ANYONE HAVE A CLEAN ONE?

14             MR. ZEMBEK:  I CAN MOVE ON, YOUR HONOR.

15             THE COURT:  OKAY.  ALL RIGHT.  GO AHEAD, PLEASE.

16   BY MR. ZEMBEK:

17   Q.   COULD WE PLEASE TURN FORWARD TO THE SLIDES THAT ARE ON

18   BATES 242 AND 243.

19        MR. CHEN, WHAT WERE YOU INTENDING TO CONVEY ON THESE

20   PARTICULAR SLIDES?

21   A.   YEAH.  THESE SLIDES ARE SOME OF THE EXAMPLE AREA OF

22   QUALCOMM'S FUNDAMENTAL ENGINEERING CREATIONS AND ALSO PATENTS

23   IN THOSE FUNDAMENTAL FEATURES IN THE 3G SYSTEM.

24        IN THIS CASE, WCDMA SYSTEM.

25   Q.   AND WHAT ARE CORE WCDMA FEATURES?

1     A.   THOSE ARE SOME OF THE EXAMPLES OF QUALCOMM'S CREATION, AND

2     ALSO QUALCOMM PATENTS IN, FOR EXAMPLE, CDMA CHANNELIZATION.

3     CDMA CHANNELIZATION BASICALLY MEANS THE WAVEFORM THAT USES IN

4     THOSE SYSTEMS, AS WELL AS MANY OF THE IMPORTANT FUNDAMENTAL

5     FEATURES FOR THE WIRELESS SYSTEM.

6     Q.   AND YOU USED THE WORD "CONTRIBUTION" ON THESE SLIDES.

7     WHAT DO YOU MEAN BY THAT?

8     A.   CONTRIBUTION ON THIS SLIDE JUST MEANS THE QUALCOMM

9     TECHNOLOGY CREATION, AS WELL AS OUR PATENTS COVERING THOSE

10    AREA, AND WE ARE SHARING THEM THROUGH OUR LICENSING PROGRAM

11    WITH OUR LICENSEES.

12    Q.   DO YOU PRESENT ON ANY 3G STANDARDS OTHER THAN WCDMA?

13    A.   YES, I DO.

14    Q.   WHICH ONES?

15    A.   FOR EXAMPLE, VERY OFTEN I PRESENT INFORMATION ON THE CDMA

16    2000, SOMETIMES IT'S ALSO REFERRED TO AS CDMA EV-DO STANDARD.

17    Q.   IS THERE ANY OVERLAP ON THE PATENTS THAT YOU PRESENT

18    REGARDING WCDMA AND EV-DO?

19    A.   THERE'S A LOT OF OVERLAPPING.  AS A MATTER OF FACT, ALMOST

20    ALL OF THESE AREAS THAT'S PRESENTED ON THE CHART APPLIES

21    EQUALLY TO WCDMA AND CDMA 2000 SYSTEMS, AND WE HAVE MANY

22    PATENTS COVERING BOTH OF THEM.

23    Q.   COULD YOU PLEASE TURN FORWARD TO THE SLIDES ENDING IN

24    BATES 258 AND 259.

25         MR. CHEN, WHAT WERE YOU PRESENTING ON THESE PARTICULAR

1    SLIDES?

2    A.   THOSE ARE THE QUALCOMM EXAMPLE CONTRIBUTION -- EXAMPLE

3    CREATIONS OF TECHNOLOGY AND PATENTS IN 4G, WHICH IS ALSO

4    REFERRED TO AS LTE SYSTEMS.

5    Q.   HAS QUALCOMM BEEN AWARDED PATENTS IN THESE AREAS?

6    A.   YES, WE HAVE, MANY, MANY PATENTS COVERING ALL THESE AREAS.

7    Q.   WHAT ARE THE CORE LTE FEATURES?

8    A.   SO UNDER THE CORE LTE FEATURES, I WAS GIVING A FEW

9    EXAMPLES.  FOR EXAMPLE, I WAS GIVING EXAMPLE OF UPLINK.

10   COMMUNICATION PROTOCOL BY UPLINKING THE CELLULAR SYSTEM, I MEAN

11   HOW THE CELL PHONES ARE SENDING DATA FROM THE PHONE TO THE

12   NETWORK.

13        THE NEXT ONE IS DOWNLINK COMMUNICATION, WHICH MEANS HOW

14   THE CELL PHONE IS DOWNLOADING TRAFFIC FROM THE NETWORK TO THE

15   HANDSET.

16        SO THOSE TWO, THINK OF CARRIER SINGLE CARRIER FDMA AND THE

17   OFDMA ARE, I'M SORRY FOR THE ACRONYMS, AND THEY ARE JUST THE

18   DEFINITION OF THE WAVEFORM IN THE 4G SYSTEM.  THEY'RE VERY

19   IMPORTANT.

20        AND THEN THE NEXT TWO ARE JUST THE NETWORK ARCHITECTURE OF

21   4G.  THAT'S VERY FUNDAMENTAL TO THE SYSTEM.

22   Q.   WHAT DID YOU MEAN BY HIGHER DATA RATE TECHNOLOGIES?

23   A.   SO WHAT DIFFERENTIATES 3G FROM 4G?  THEY ARE BOTH ABOUT

24   DATA.  BUT 4G IS REALLY ABOUT VERY FAST DATA.

25        SO QUALCOMM MADE MANY CONTRIBUTIONS IMPROVING THE DATA

1      SPEED OF HOW YOU UPLOAD TRAFFIC, AS WELL AS DOWNLOAD IN TRAFFIC

2      IN THE SYSTEM, AND THE FOLLOWING ARE SOME OF THE EXAMPLE AREAS.

3      Q.   LET'S PICK AN EXAMPLE, WHAT IS MIMO, M-I-M-O?

4      A.   OKAY.  MIMO STANDS FOR MULTI IN, MULTI OUT.  WHAT THAT

5      TECHNOLOGY DOES IS ALLOW THE HANDSET, AS WELL AS THE NETWORK,

6      TO BE ABLE TO SEND LARGE AMOUNT OF DATA, MULTIPLE PACKS AT THE

7      SAME TIME.

8           IF I MAY USE AN ANALOGY, IT'S BASICALLY LIKE A HIGHWAY

9      SYSTEM.  MIMO IS EQUIVALENT TO ALLOWING THE TRAFFIC TO GO

10     THROUGH MULTIPLE LANES AT THE SAME TIME.  SO THE BENEFIT IS

11     SIGNIFICANT INCREASE IN SPEED, AND IT ALLOWS A USER TO SEND A

12     LOT OF DATA IN A SHORT PERIOD OF TIME.

13     Q.   AND WHY DOES QUALCOMM HAVE PATENTS ON HIGHER SYSTEM

14     CAPACITY TECHNOLOGIES?

15     A.   BY HIGHER SYSTEM CAPACITY HERE, THAT MEANS AT THE NETWORK

16     LEVEL.  SO IT'S IMPORTANT TO KNOW THAT WHEN WE DESIGN THE

17     SYSTEM, WHEN QUALCOMM IS A SYSTEM INNOVATOR TO DESIGN THE

18     WIRELESS SYSTEM, WE ARE NOT DESIGNING THE SYSTEM JUST FOR ONE

19     USER OR FOR A SMALL AMOUNT, FEW USER.  WE DESIGNED THE SYSTEM

20     TO BE CAPABLE OF SUPPORTING MILLIONS OF USERS TO USE THE

21     NETWORK AT THE SAME TIME.

22          SO WE HAVE CREATED A LOT OF TECHNOLOGY TO ALLOW THE

23     CARRIER WHO HAVE SPENT A LOT OF MONEY, VERY OFTEN BILLIONS OF

24     DOLLARS, TO ACQUIRE THIS THING CALLED SPECTRUM, ESSENTIALLY THE

25     RIGHT TO USE CERTAIN FREQUENCY OR WAVEFORMS AT ANY GIVEN AREA.

1           SO WE INVENTED ALL THIS TECHNOLOGY FOR THE CARRIER TO BE

2      ABLE TO SUPPORT AS MANY USERS AS POSSIBLE ON THE NETWORK, WHILE

3      GIVING EVERY SINGLE USER A VERY GOOD USER EXPERIENCE.

4           SO THIS IS WHAT WE REFER TO AS INCREASING OUR --

5      INCREASING THE SYSTEM CAPACITY OR WHAT WE REFER TO ON THE CHART

6      AS HIGH SYSTEM CAPACITY TECHNOLOGY.

7      Q.   UNDER LOWER POWER CONSUMPTION TECHNOLOGY, WHAT IS THAT SUB

8      BULLET?

9      A.   OKAY.  SO, SO LOWER POWER CONSUMPTION, I APOLOGIZE ON THE

10     NEXT ONE IS REALLY THE -- IT'S DISCONTINUOUS TRANSMISSION AND

11     DISCONTINUOUS RECEPTION.

12          ENGINEERS ARE GOOD AT MANY THINGS, BUT SOMETIMES COMING UP

13     WITH THE RIGHT NAME IS NOT OUR STRENGTH.  SO IT'S A LONG NAME.

14      WHAT THIS MEANS IS WE INVENTED TECHNOLOGY TO SEND TRAFFIC

15     THROUGH A VERY SHORT SPURT OF TIME AT HIGH SPEED.

16          WHAT THIS TECHNOLOGY ALLOWS THE PHONE COMPANY TO DO IS TO

17     BE ABLE TO SEND THE DATA TRAFFIC AND THEN THE PHONE TO FALL

18     BACK TO SLEEP.

19          BY FALLING BACK TO SLEEP, THE PHONE IS ABLE TO CONSERVE A

20     LOT OF POWER.  BASICALLY THE BATTERY LASTS FOR A WHOLE DAY.

21      WITHOUT THIS TECHNOLOGY, THE PHONE WOULD BE STUCK IN ACTIVE

22     MODE AND NOT ABLE TO FALL BACK TO SLEEP AND THAT WILL DRAIN THE

23     POWER.

24     Q.   HAS QUALCOMM BEEN AWARDED PATENTS RELATED TO THESE

25     TECHNOLOGIES?

CHEN DIRECT BY MR. ZEMBEK

```
1    A.   YES, YES, WE HAVE PATENTS IN ALL THESE AREAS.

2    Q.   OKAY.  I'D LIKE TO TURN BACK TO THE CATEGORIES THAT WE

3    WERE DISCUSSING A LITTLE BIT EARLIER, AND I'D LIKE TO TURN TO

4    THE STANDARD ESSENTIAL PATENTS THAT ARE BEYOND CELLULAR.

5    A.   SURE.

6    Q.   DOES QUALCOMM PARTICIPATE IN ANY NON-CELLULAR STANDARD

7    SETTING ORGANIZATIONS?

8    A.   YES, WE DO.

9    Q.   ABOUT HOW MANY?

10   A.   WE -- WE ARE ACTIVE PARTICIPANTS IN ABOUT 200-PLUS

11   STANDARD SETTING ORGANIZATIONS, AS WELL AS INDUSTRY

12   ASSOCIATIONS THAT'S CREATING REALLY THE TECHNOLOGIES.

13   Q.   WHY?

14   A.   BECAUSE IF YOU LOOK AT -- EVEN THOUGH QUALCOMM IS KNOWN TO

15   BE A CELLULAR TECHNOLOGY COMPANY, WE TRY TO APPLY SYSTEM LEVEL

16   INNOVATION IN MANY DIFFERENT AREAS.  ALL OF THOSE TECHNOLOGIES

17   ARE REALLY IMPORTANT IN ENABLE THE BEST USER EXPERIENCE FOR

18   SMARTPHONE USERS.

19        SO SMARTPHONE IS REALLY COMPLEX.  IT HAS MANY DIFFERENT

20   TYPE OF TECHNOLOGY INVOLVED.  SO WE ARE ACTIVE PARTICIPANTS IN

21   MANY OF THEM.

22   Q.   COULD YOU GIVE THE COURT A FEW EXAMPLES?

23   A.   YES.  SO I ALREADY MENTIONED VIDEO CODEC, BUT THERE'S ALSO

24   AUDIO TECHNOLOGY AND AUDIO CODING, DECODING TECHNOLOGY.  THAT'S

25   CALLED AUDIO CODEC.
```

```
 1            WE ARE ALSO ACTIVE PARTICIPANTS IN STANDARDS THAT DEFINES

 2     MEMORY TECHNOLOGY, BECAUSE IT'S IMPORTANT TO HAVE VERY HIGH

 3     CAPACITY MEMORY THAT'S RELIABLE, THAT'S STABLE, THAT CONSUMES

 4     AS LITTLE POWER AS POSSIBLE ON THE DEVICE.

 5            AND WE HAVE TECHNOLOGIES, FOR EXAMPLE, COVERING THE

 6     TECHNOLOGY CALLED NFC, THAT'S NEAR FIELD COMMUNICATION, WHICH

 7     ENABLES USERS, SUCH AS MOBILE PAYMENT, SUCH AS USE YOUR PHONE

 8     FOR BUS TOKENS IN CERTAIN COUNTRIES.

 9            AND WE HAVE TECHNOLOGY THAT ENABLES MULTIMEDIA AREAS

10     BEYOND VIDEO AND AUDIO.  AND WE HAVE ALSO TECHNOLOGY THAT'S

11     COVERING WIRELESS CHARGING, FOR EXAMPLE, THAT YOU DON'T HAVE TO

12     PLUG IN YOUR PHONE.  THERE'S A STANDARD INVOLVED IN -- AND

13     THERE ARE MANY OTHER EXAMPLES.

14     Q.   SO DOES QUALCOMM HAVE STANDARD ESSENTIAL PATENTS RELATED

15     TO THE TECHNOLOGIES YOU DESCRIBED?

16     A.   YES, WE DO.

17     Q.   AND YOU MENTIONED VIDEO CODING A COUPLE OF TIMES.  COULD

18     YOU GIVE THE COURT AN EXAMPLE OF THE TYPE OF PATENTS QUALCOMM

19     HAS RELATED TO VIDEO CODING?

20     A.   YES, I CAN.  AND BEFORE I GET INTO THE EXAMPLE HERE, I DO

21     WANT TO EXPLAIN WHY VIDEO IS SO IMPORTANT, BECAUSE GENERALLY

22     THERE'S A LOT OF TRAFFIC ON THE INTERNET AND THERE'S OVER 90

23     PERCENT OF THE TRAFFIC TODAY ON THE INTERNET, INCLUDING MOBILE

24     INTERNET, ARE DRIVEN BY VIDEO SERVICES AND VIDEO APPLICATIONS.

25     SO IT'S REALLY, REALLY IMPORTANT TO BE ABLE TO TRANSFER A VIDEO
```

1        VERY HIGHLY EFFICIENTLY AND TO BE ABLE TO HAVE THE MOST

2        EFFICIENT VIDEO CODEC IS CRITICAL.

3             SO QUALCOMM PUT A LOT OF EFFORT IN INVENTING VIDEO RELATED

4        TECHNOLOGY, AND ONE OF THE REALLY IMPORTANT VIDEO STANDARDS IS

5        CALLED HEVC, IT'S HIGH EFFICIENCY VIDEO CODEC, THAT'S WHAT IT

6        REPRESENTS.

7             SO IT'S ABLE TO DO REALLY GOOD COMPRESSION AND

8        DECOMPRESSION OF THE SIGNAL WHILE CONSUME AS LITTLE POWER AS

9        POSSIBLE ON THE MOBILE DEVICE.

10            AND QUALCOMM IS A VERY ACTIVE PARTICIPANT, AND WE ARE A

11       LEADING CREATOR OF TECHNOLOGY THAT'S GETTING TO THE HEVC

12       STANDARD.

13       Q.   AND IS THE HEVC STANDARD, DO YOU MAKE THAT AVAILABLE TO

14       YOUR LICENSEES?

15       A.   YES, WE DO.

16       Q.   AND WHY ARE THEY INTERESTED IN IT?

17       A.   BECAUSE QUALCOMM TECHNOLOGY OFFERS REALLY SIGNIFICANT

18       PERFORMANCE IMPROVEMENT OVER THE COMPETING TECHNOLOGIES.

19            SO LET ME GIVE YOU ONE EXAMPLE.  IN THE HEVC, THERE'S A

20       QUALCOMM INVENTED TECHNOLOGY CALLED VARIABLE BLOCK ENCODING.

21       WHAT THAT MEANS IS WE WILL LOOK AT WHAT'S ON THE VIDEO, AND WE

22       WOULD ALSO LOOK AT HOW FREQUENT THE VIDEO CHANGES FRAME BY

23       FRAME AS THE VIDEO IS TRANSFERRED, AND WE WILL PICK THE MOST

24       OPTIMIZED SIZE OF THE BLOCK TO ENCODE IT.

25            AND OUR TECHNOLOGY IS AT LEAST 50 PERCENT, THAT'S 5-0,

 1    PERCENT BETTER THAN THE COMPETING TECHNOLOGY, AND THAT SAVES A

 2    LOT OF, IN BANDWIDTH, IF YOU WANT TO DELIVER THE SAME CONTENT

 3    OF MATERIAL, WHICH MEANS THE CARRIER CAN ADD AT LEAST TWICE AS

 4    MANY USERS ON THE NETWORK FOR THESE TYPE OF SERVICES, OR IF YOU

 5    WANT TO HAVE THE SAME AMOUNT OF USERS SUPPORTED ON THE NETWORK,

 6    YOU CAN GIVE THEM TWICE AS GOOD OF SERVICES FOR THE SAME AMOUNT

 7    OF USERS.

 8         AND THAT IS VERY, VERY SIGNIFICANT IF YOU ARE THE NETWORK

 9    OPERATOR OR IF YOU'RE THE CONSUMER.

10    Q.   I'D LIKE TO SWITCH TO THE NON-STANDARD ESSENTIAL PATENTS,

11     OR THE IMPLEMENTATION PATENTS.

12         CAN YOU GIVE THE COURT A FEW EXAMPLES OF AREAS OF WHICH

13    QUALCOMM HOLDS IMPLEMENTATION PATENTS?

14    A.   SURE.  QUALCOMM IMPLEMENTATION PATENT IS VERY, VERY LARGE.

15     AS I DESCRIBED EARLIER, IT'S ROUGHLY TWO-THIRD OF THE

16     PORTFOLIO.  IT HAS ABOUT 80,000 GRANTED AND PATENT PENDING

17     APPLICATIONS.  SO WE HAVE PATENTS COVERING THE CELLULAR AREA.

18         WE ALSO HAVE PATENTS THAT'S COVERING USER EXPERIENCE,

19    SOFTWARE AREA.

20         WE HAVE PATENTS THAT ARE COVERING THE COMPUTING PLATFORM,

21    SO KEEP IN MIND, A SMARTPHONE IS NOT JUST A PHONE, IT'S REALLY

22    A COMPUTER IN YOUR POCKET.  SO WE HAVE MANY PATENTS COVERING

23    THE COMPUTING ASPECTS.

24         WE HAVE PATENTS THAT COVER MULTIMEDIA AREAS THAT'S BEYOND

25    THE STANDARD AREAS.  WE HAVE PATENTS THAT'S COVERING ANTENNAS

 1     AND RF'S, VIDEO FREQUENCY DESIGNS OF THE PHONE, AND WE HAVE

 2     MANY OTHER PATENTS IN DIFFERENT AREAS.

 3     Q.   THE FIRST EXAMPLE YOU GAVE WAS CELLULAR.

 4     A.   YES.

 5     Q.   WHY DO YOU HAVE CELLULAR PATENTS IN YOUR IMPLEMENTATION

 6     CATEGORY?

 7     A.   OKAY.  IT'S IMPORTANT TO KNOW THAT WHEN YOU TALK ABOUT

 8     CELLULAR STANDARD, CELLULAR STANDARD PRIMARILY FOCUSSES ON

 9     INTERFACE BETWEEN THE DEVICE AND THE NETWORK.

10          CELLULAR STANDARD, HOWEVER, DOES NOT DEFINE HOW YOU

11     IMPLEMENT THE TECHNOLOGY.  SO QUALCOMM HAS PUT A LOT OF EFFORT

12     INTO IMPLEMENTING THE CELLULAR TECHNOLOGY TO MAKE IT EFFICIENT,

13     TO MAKE IT LOWER POWER CONSUMPTION, TO MAKE IT FASTER.

14          SO WE HAVE TO HAVE MANY, MANY PATENTS IN IMPROVING THE

15     PERFORMANCE OF THE CELLULAR TECHNOLOGY THAT ARE NOT STANDARD

16     DRIVEN.

17     Q.   AND DO YOU MAKE THOSE PATENTS AVAILABLE TO YOUR LICENSEES?

18     A.   WE DO.

19     Q.   YOU ALSO MENTIONED USER INTERFACE PATENTS?

20     A.   YES.

21     Q.   WHAT DID YOU MEAN BY THAT?

22     A.   SO BY USER INTERFACE, THAT IS A PRETTY BROAD AREA HERE.

23     SO IT'S WORTH -- IT'S IMPORTANT TO REMEMBER THAT QUALCOMM USED

24     TO MAKE CELL PHONES.  SO WE INNOVATE A LOT OF AREA BEYOND THE

25     CELLULAR SPACE IN TERMS OF OPERATING THE SYSTEM, APPLICATION

1    LAYERS AND THE USER INTERFACE LAYERS.

2         AND IT'S ALSO WORTH NOTING THAT EVEN UNTIL TODAY, WE KEEP

3    ON MAKING CELL PHONES NOT AS A COMMERCIAL DEVICE TO SELL TO

4    CUSTOMER, BUT AS A REFERENCE DESIGN TO GIVE IT TO OUR LICENSEES

5    AND TO GIVE IT TO OUR CUSTOMERS.

6         SO WE KEEP ON INNOVATING BY ADDING FEATURES INTO THE USER

7    EXPERIENCE BUCKETS, AND SOME OF THOSE AREAS CAN BE THE, THE

8    TOUCH SCREEN USER INTERFACE.  SOME OF THEM CAN BE OPERATING

9    SYSTEM PATENT THAT SHOW YOU HOW TO RUN MULTIPLE APPLICATIONS AT

10   THE SAME TIME.

11        AND SOME OF THEM CAN BE EVEN BASED ON THE NETWORK

12   SERVICES, HOW YOU INCORPORATE NETWORK SERVICES WITH THE MOBILE

13   PHONE, FOR EXAMPLE.  THERE'S A NEW AREA WE ALSO KEEP ON ADDING,

14   SUCH AS AR/VR, AND THAT REPRESENTS AUGMENTED REALITY AND

15   VIRTUAL REALITY.

16        AND ALSO SOME OF THE NEWER TECHNOLOGY WE ARE INTRODUCING

17   IN THESE AREAS, INCLUDING A.I., ARTIFICIAL INTELLIGENCE.

18   THAT'S REALLY HOW YOU MAKE THE PHONE SMARTER BY LEARNING YOUR

19   USER DAY-BY-DAY TO IMPROVE THE SERVICE.

20        SO ALL OF THOSE DIFFERENT CATEGORIES ARE WHAT WE DEFINE AS

21   USER EXPERIENCE TECHNOLOGY AND WE HAVE PATENTS ADDRESSING THOSE

22   TECHNOLOGIES IN OUR PORTFOLIO.

23   Q.   AND DOES QUALCOMM MAKE THE THREE CATEGORIES OF PATENTS

24   THAT WE'VE TALKED ABOUT, THE STANDARD ESSENTIAL, THE CELLULAR

25   STANDARD ESSENTIAL, THE NON-CELLULAR AND BEYOND CELLULAR

1      ESSENTIAL PATENTS AND THE IMPLEMENTATION PATENTS AVAILABLE TO

2      LICENSEES?

3      A.   YES, WE DO.

4           MR. ZEMBEK:  NO FURTHER QUESTIONS, YOUR HONOR.

5           THE COURT:  OKAY.  TIME IS NOW 3:28.  LET'S GO AHEAD

6      AND TAKE OUR TEN MINUTE BREAK NOW, AND WE'LL GO TODAY UNTIL

7      4:30.

8         YOU MAY STEP DOWN DURING THE BREAK.

9           THE WITNESS:  THANK YOU.

10          THE COURT:  OKAY.  THANK YOU ALL.

11       (RECESS FROM 3:28 P.M. UNTIL 3:39 P.M.)

12          THE COURT:  ALL RIGHT.  TIME IS 3:39.  GO AHEAD,

13     PLEASE.

14          MR. PAIGE:  YOUR HONOR, IF I MAY?  YOU HAD ASKED

15     EARLIER TODAY THAT WE MARK THIS WITH A DEMONSTRATIVE.

16          THE COURT:  YES.

17          MR. PAIGE:  AND LODGE IT.  HOW WOULD YOU LIKE US TO

18     DO THAT?

19          THE COURT:  SO YOU MARKED IT?

20          MR. PAIGE:  IT'S MARKED, YES.

21          THE COURT:  GREAT.  THANK YOU.  I GUESS I'LL JUST

22     HAVE MS. GARCIA HOLD ON TO IT, BECAUSE YOU'RE ALSO HOLDING ON

23     TO THE SEALED DEPOSITION TRANSCRIPT, RIGHT, MS. GARCIA, THE

24     ONES THAT ARE NOT PUBLICLY FILED?

25          THE CLERK:  YES.

1556

```
1            THE COURT:  ARE THE PARTIES GIVING YOU THOSE?

2            THE CLERK:  YOU GAVE ME DEPOSITION BINDERS.  IS

3   THAT --

4            THE COURT:  NO.  WHAT I WOULD LIKE, JUST SO THE

5   RECORD IS COMPLETE, I WOULD LIKE EVERYTHING THAT'S NOT

6   ADMITTED, WHETHER IT'S A DEMONSTRATIVE OR -- I GUESS IT

7   PRIMARILY WOULD BE THE DEMONSTRATIVES THAT HAVE BEEN SHOWN BUT

8   AREN'T ADMITTED, I WOULD JUST LIKE A COPY LODGED SO IT'LL BE

9   PART OF THE RECORD.  IT WON'T BE AN ADMITTED EXHIBIT.

10      I'D ALSO LIKE THE SEALED -- WELL, I GUESS IT WOULD HAVE TO

11  BE ALL DEPOSITION TRANSCRIPTS BECAUSE THEY'RE NOT BEING

12  TRANSCRIBED BY THE COURT REPORTERS.  WE NEED SOME RECORD OF

13  WHAT WAS SAID.  SO I THINK WE NEED AT LEAST A LODGED COPY OF

14  ALL THE TRANSCRIPTS.

15      DOES THAT MAKE SENSE?

16           MR. CARSON:  YOUR HONOR, I BELIEVE --

17           MR. VAN NEST:  WHICH TRANSCRIPTS, YOUR HONOR, ARE YOU

18  REFERRING TO?

19           THE COURT:  SO THE TRIAL TRANSCRIPT IS BLANK WHENEVER

20  A VIDEO IS PLAYED.

21           MR. VAN NEST:  RIGHT.

22           THE COURT:  SO SOME WHERE WE NEED A RECORD OF WHAT

23  WAS PLAYED DURING THE TRIAL, SO THOSE DEPOSITION TRANSCRIPTS

24  SHOULD BE LODGED WITH THE COURT SO FOR THE RECORD WE HAVE SOME

25  RECORD OF WHAT TESTIMONY WAS PLAYED.
```

```
1              MR. VAN NEST:  RIGHT.

2              THE COURT:  SO THAT DOESN'T MATTER WHETHER IT'S

3      SEALED OR PUBLIC.  I'D LIKE THE TRANSCRIPTS LODGED.

4              MR. VAN NEST:  I THINK WE'RE DOING THAT.

5              THE COURT:  OKAY.  GREAT.

6              MR. CARSON:  YES, WE ARE.

7              MR. VAN NEST:  MY UNDERSTANDING IS THAT WHEN --

8      THERE'S TWO THINGS, TWO FORMS OF IT.  IF IT'S PLAYED, THEN

9      YOU'RE GETTING THE CLIPS LODGED THAT SHOW EXACTLY WHAT WAS

10     PLAYED.

11         AND THEN IF IT'S -- IF IT'S SOMETHING THAT IS ADOPTED BY

12     THE WITNESS DURING THE EXAMINATION, WE'RE FILING THOSE, TOO.

13         SO, FOR EXAMPLE, IF A WITNESS IS SHOWN TESTIMONY, "DO YOU

14     STAND BY THAT TESTIMONY?"

15         "I DO."

16         WE'RE FILING THOSE FOR EACH WITNESS FOR WHOM THAT HAPPENS

17     FOR THE VERY REASON YOUR HONOR STATES, TO BE SURE THE RECORD IS

18     COMPLETE.

19         I THINK THOSE ARE THE ONLY FORMS OF DEPOSITION THAT YOU

20     WOULD NEED.

21             THE COURT:  WELL, NO.  SO YOU'RE GIVING US WITNESS

22     BINDERS; RIGHT?

23             MR. VAN NEST:  WE ARE.

24             THE COURT:  AND WHAT I'M TALKING ABOUT IS THAT THAT

25     ALREADY TAKES UP ALMOST A FULL WALL.
```

```
1              MR. VAN NEST:  RIGHT.

2              THE COURT:  ONE SECTION OF A WALL, AND THAT WILL BE

3     USED BY MY CHAMBERS TO PREPARE THE ORDER.

4          WHAT I'M ASKING FOR IS SOMETHING SEPARATE BECAUSE WE DON'T

5     HAVE ROOM IN THE CLERK'S OFFICE FOR ALL THOSE BINDERS.  I WOULD

6     LIKE EVEN JUST IN A RED WELL, "HERE ARE ALL THE DEPOSITION

7     TRANSCRIPTS THAT WERE PLAYED DURING THE TRIAL."

8              MR. CARSON:  AND, YOUR HONOR --

9              THE COURT:  PUBLIC AND SEALED.

10             MR. CARSON:  MAYBE I CAN CLEAR THAT UP.  I THINK THE

11    FTC, THROUGH THE END OF OUR CASE-IN-CHIEF, HAS BEEN PROVIDING

12    YOUR HONOR WITH BINDERS OF ALL THE DEPOSITION TRANSCRIPTS THAT

13    HAVE BEEN PLAYED, AS WELL AS FILING THE PUBLIC VERSIONS OF THE

14    DEPOSITION TRANSCRIPTS AND REDACTED VERSION OF THE SEALED

15    VERSIONS ON THE DOCKET.

16         SO I BELIEVE YOU HAVE THOSE DEPOSITION BINDERS UP THROUGH

17    THE END OF THE FTC'S CASE-IN-CHIEF.

18             THE COURT:  BUT I DON'T WANT THE BINDER OF THE WHOLE

19    DEPOSITION.

20             MR. CARSON:  IT'S ONLY WHAT HAS BEEN PLAYED, YOUR

21    HONOR.

22             THE COURT:  OKAY.

23             MR. CARSON:  IT'S THE CLIP REPORTS OF WHAT WAS

24    ACTUALLY PLAYED IN COURT THAT WE'VE BEEN LODGING EACH DAY.

25             THE COURT:  I APOLOGIZE, THEN.  MAYBE MS. GARCIA
```

1    ALREADY HAS IT.

2        DO YOU HAVE WHAT YOU NEED IN TERMS OF TRANSCRIPTS OF

3    DEPOSITIONS THAT HAVE BEEN PLAYED?  DO YOU HAVE THOSE FOR ALL

4    THE WITNESSES?

5            THE CLERK:  I CAN CLARIFY OFF LINE.

6            THE COURT:  OKAY.  ALL RIGHT.  ALL RIGHT.  WELL, IF

7    WE DON'T HAVE IT, THE CLERK'S OFFICE IS REALLY, REALLY -- HAS

8    VERY CONFINED SPACE, AND SO WE DON'T WANT YOUR WITNESS BINDERS

9    GOING DOWN THERE.  AND IT'S REALLY UNNECESSARY BECAUSE ALL OF

10   YOUR WITNESS BINDERS INCLUDE WAY MORE EXHIBITS THAN WHAT YOU

11   ACTUALLY INTRODUCED.

12       SO WE JUST DON'T NEED COPIES AND COPIES AND COPIES.  WE

13   JUST DON'T ARE ROOM, UNFORTUNATELY.

14           MR. CARSON:  YES, YOUR HONOR.  IF I'M THINKING OF THE

15   RIGHT THING, THE DEPOSITION BINDERS ARE VERY NARROW.

16           THE COURT:  I HOPE THERE'S NOT ONE FOR EVERY SINGLE

17   WITNESS.  ARE YOU GIVING US A SEPARATE BINDER FOR EVERY

18   WITNESS?  THAT ALREADY IS TOO MUCH SPACE.

19           MR. CARSON:  IT'S ONE FOR EACH DAY OR TWO OF THE

20   LODGES.  WE'RE HAPPY TO DO THAT IN A DIFFERENT FORM IF THAT'S

21   MORE CONVENIENT FOR THE COURT.  IF YOU WOULD LET US KNOW, THAT

22   WOULD BE GREAT, AND WE CAN ABSOLUTELY DO WHATEVER IS MORE

23   CONVENIENT FOR THE COURT.

24           THE COURT:  OKAY.  I MEAN, I THINK IN OTHER TRIALS

25   THEY'VE GIVEN IT IN A RED WELL BECAUSE THE BINDERS TAKE UP

1    SPACE, AND WE DON'T HAVE THE SPACE AND OTHERWISE THE CLERK'S

2    OFFICE WILL PAY FOR SPACE.  AND AS YOU KNOW, WE'RE RUNNING OUT

3    OF MONEY NEXT FRIDAY.  SO PLEASE DON'T KEEP BURDENING US WITH

4    MORE AND MORE BINDERS.

5         WHAT WE NEED IS AS LIGHT AS POSSIBLE AND TAKING UP AS

6    MINIMAL SPACE AS POSSIBLE.

7              MR. VAN NEST:  AND WHAT YOU WANT, YOUR HONOR, JUST SO

8    I'M CLEAR, YOU JUST WANT THE CLIPS THAT ARE PLAYED IN COURT,

9    NOT THE WHOLE DEPOSITION?

10              THE COURT:  THAT'S CORRECT.

11              MR. VAN NEST:  THAT'S RIGHT.  AND THAT'S WHAT WE'VE

12    BEEN DOING.

13              THE COURT:  PERFECT.

14              MR. VAN NEST:  AND THAT'S WHAT WE'RE PLANING TO DO.

15              THE COURT:  PERFECT.

16              MR. VAN NEST:  AND NOT GIVE YOU THE WHOLE DEPOSITION,

17    JUST WHAT WAS IN THE RECORD FROM BEING PLAYED IN COURT.

18              THE COURT:  RIGHT.  BECAUSE THE TRIAL TRANSCRIPT

19    DOESN'T REFLECT AT ALL ANYTHING THAT'S SAID ON THE VIDEOS.

20              MR. VAN NEST:  THAT'S RIGHT.

21              THE COURT:  AND WE'RE GOING TO NEED IT SOMEWHERE FOR

22    THE RECORD.

23              MR. VAN NEST:  WE ARE --

24              THE COURT:  YOU ALL MAY BE DOING IT, AND I'M WASTING

25    YOUR TIME.  I APOLOGIZE.  IF YOU ARE DOING IT, PERFECT.

1          MR. VAN NEST:  IT'S GOOD TO BE CLEAR.  SO WE

2     UNDERSTAND.

3          THE COURT:  AND I JUST WANT THE SAME FOR ALL

4     DEMONSTRATIVES, I JUST WANT THEM LODGED.  THEY WON'T BE FILED.

5     THEY WON'T BE PART OF THE ADMITTED EXHIBITS, BUT JUST SO WE

6     HAVE IT FOR THE RECORD, I THINK IT'S HELPFUL.

7          MR. VAN NEST:  WOULD THAT INCLUDE THE SLIDES WE

8     SHOWED IN THE OPENING, OR JUST THE DEMONSTRATIVES THAT WE'RE

9     USING DURING THE TESTIMONY OF THE WITNESSES?

10          THE COURT:  I WOULD SAY EVERYTHING, INCLUDING

11     CLOSING.

12          MR. VAN NEST:  AND OPENING AS WELL?

13          THE COURT:  YES, PLEASE.

14          MR. VAN NEST:  YOU HAVE -- YOU HAVE A SET, I THINK,

15     FROM BOTH PARTIES, BUT YOU WANT US TO LODGE THAT, WHICH WE CAN

16     EASILY DO WITH MS. GARCIA.  BODY SIDES WILL LODGE WHAT WE

17     SHOWED DURING THE OPENING.

18          THE COURT:  THAT WOULD BE HELPFUL BECAUSE WHAT YOU'RE

19     GIVING TO ME IS GETTING TAKEN BACK TO CHAMBERS AND IS GOING TO

20     GET USED FOR THE ORDER.

21          WHAT I'M ASKING IS JUST A SEPARATE CLEAN COPY IN A RED

22     WELL FOR MS. GARCIA.  SO THAT WILL PROBABLY END UP IN THE

23     CLERK'S OFFICE.

24          MR. VAN NEST:  OKAY.

25          THE COURT:  WHEREVER THE DUNGEON IS FOR THIS CASE,

1    WE'LL STORE ALL THE ADMITTED EXHIBITS AND DEMONSTRATIVES AND

2    TRANSCRIPTS OF DEPOSITIONS THAT WERE PLAYED DURING TRIAL.  SO

3    JUST -- I JUST WANT A COMPLETE RECORD.

4              MR. VAN NEST:  WE'LL DO IT?

5              THE COURT:  IN A SEPARATE PLACE, NOT WHAT WE'RE USING

6    BACK IN CHAMBERS.

7              MR. VAN NEST:  WE GOT IT.

8              THE COURT:  OKAY.

9              MR. VAN NEST:  WE'LL LODGE THOSE WITH MS. GARCIA.

10             THE COURT:  OKAY.  THANK YOU.  AND WHEN THE CASE IS

11   OVER, WE DO RETURN ALL THE PHONES, SO YOU'LL GET EVERYTHING

12   BACK.  IT'S JUST THAT IF THE CASE GOES ON FOR A LONG TIME,

13   WE'LL BE HOLDING ON TO IT.

14             MR. VAN NEST:  OUR CARTS, TOO.

15             THE COURT:  NO.  I'LL RETURN ALL OF THAT TO YOU.

16   WE'LL TALK ABOUT, AT THE END OF THE TRIAL -- NO, I MEAN THE

17   DEMONSTRATIVES.  MR. PAIGE WILL GET THAT PHONE BACK AT SOME

18   POINT.

19             MR. VAN NEST:  YEAH.

20             MR. PAIGE:  THANK YOU, YOUR HONOR.

21             THE COURT:  AND I'LL TALK TO YOU ABOUT WHAT WOULD

22   BE -- AND WE DON'T HAVE TO DO THIS NOW, I MAY NOT NEED ANY OF

23   THAT FOR THE ORDER BECAUSE I'M BASICALLY USING THE BINDERS --

24   THE WITNESS BINDERS ARE VERY HELPFUL BECAUSE THEY'RE FOCUSSED

25   BY WITNESS, SO I'M NOT SURE IF I'LL EVEN NEED THAT ULTIMATELY.

```
 1              BUT WE CAN DISCUSS THAT LATER.

 2              AND WE HAVE A SET OF ALL THE EXHIBITS BACK IN CHAMBERS

 3     ANYWAY THAT WE'RE USING FOR, YOU KNOW, THE HIGH PRIORITY

 4     OBJECTIONS.

 5                   MR. VAN NEST:  RIGHT.  GOOD.

 6                   THE COURT:  SO WE MAY NOT NEED IT.

 7                   MR. VAN NEST:  LET US KNOW.

 8                   THE COURT:  ALL RIGHT.  THANK YOU.

 9         ALL RIGHT.  SORRY, MR. CHEN.  JUST DOING HOUSEKEEPING.

10                   THE WITNESS:  NO PROBLEM.

11                   THE COURT:  LET'S GO -- WHERE ARE WE?  WE'RE ON THE

12     CROSS; IS THAT RIGHT?  DO YOU HAVE ANY?

13                   MR. HOPKIN:  YES, BUT THE FTC HAS NO QUESTIONS FOR

14     MR. CHEN.

15                   THE COURT:  OKAY.  LET ME ASK YOU, I GUESS YOU HAVE

16     NO REDIRECT?

17                   MR. ZEMBEK:  NO, YOUR HONOR.

18                   THE COURT:  OKAY.  IS MR. CHEN -- SORRY TO MAKE YOU

19     WAIT FOR ALL THAT.

20                   THE WITNESS:  OH, NO PROBLEM.

21                   THE COURT:  OKAY.  SO HE'S EXCUSED SUBJECT TO RECALL?

22     I ASSUME NOT.  IS THAT RIGHT?  NOT SUBJECT TO RECALL?

23                   MS. MILICI:  NOT SUBJECT TO RECALL BY THE FTC.

24                   THE COURT:  OKAY.  THEN YOU'VE COMPLETED YOUR TRIAL

25     TESTIMONY, AND YOU'RE FREE TO LEAVE.
```

```
 1              THE WITNESS:  THANK YOU SO MUCH.

 2              THE COURT:  OKAY.  CALL YOUR NEXT WITNESS, PLEASE.

 3              MR. PETERSON:  YOUR HONOR, JORDAN PETERSON ON BEHALF

 4    OF QUALCOMM.

 5         WITH YOUR HONOR'S PERMISSION, QUALCOMM WILL NOW PLAY THE

 6    VIDEOTAPED DEPOSITION OF JOHN GRUBBS OF BLACKBERRY, WHICH THE

 7    FTC PREVIOUSLY PLAYED PORTIONS OF ON JANUARY 8TH.

 8         NO PORTION OF THIS TESTIMONY IS SEALED.  YOUR HONOR DID

 9    SEAL OTHER PORTIONS OF MR. GRUBBS'S, BUT WE WILL NOT BE PLAYING

10    THOSE.

11              THE COURT:  OKAY.  ALL RIGHT.  AND ARE YOU SEEKING TO

12    ADMIT ANY EXHIBITS WITH HIM, OR NOT?

13              MR. PETERSON:  QUALCOMM IS NOT.

14              THE COURT:  OKAY.

15              MR. PETERSON:  AND THE VIDEO IS ABOUT 2.5 MINUTES IN

16    LENGTH, WITH NO COMPLETENESS DESIGNATIONS BY THE FTC.

17              THE COURT:  OKAY, GREAT.  3:47.  GO AHEAD, PLEASE.

18              **(THE VIDEOTAPED DEPOSITION OF JOHN GRUBBS WAS PLAYED IN**

19    **OPEN COURT OFF THE RECORD.)**

20              THE COURT:  OKAY.  TIME IS 3:50.  CALL YOUR NEXT

21    WITNESS, PLEASE.

22              MR. PETERSON:  YOUR HONOR, AT THIS TIME QUALCOMM

23    WOULD LIKE TO PLAY THE VIDEO DEPOSITION OF MR. IRA BLUMBERG OF

24    LENOVO.

25         YOUR HONOR PREVIOUSLY HEARD TESTIMONY FROM MR. BLUMBERG ON
```

1    JANUARY 4TH DURING THE FTC'S CASE.  NO PORTION OF THIS

2    TESTIMONY HAS BEEN SEALED, ALTHOUGH THERE IS A SEALED EXHIBIT,

3    AND SO WE WILL COVER THE PROJECTOR AT THAT POINT.  THAT EXHIBIT

4    IS CX 2079, WHICH YOUR HONOR SEALED IN ITS ENTIRETY.

5            THE COURT:  CAN WE GO BACK TO MR. GRUBBS?  DOES

6    ANYONE INTEND TO PLAY ANY MORE VIDEO OR IS HE NOW DONE?  IS HE

7    SUBJECT TO RECALL OR NOT?

8            MR. CARSON:  NOT FOR THE FTC.

9            MR. PETERSON:  NOT FOR QUALCOMM.

10            THE COURT:  OKAY.  SO NOW HE'S COMPLETED THEN.  OKAY.

11    ALL RIGHT.  I'LL WRITE A "NO" NEXT TO HIS NAME.

12        ALL RIGHT.  FOR MR. BLUMBERG, DO YOU WANT TO INTRODUCE ANY

13    EXHIBITS?

14            MR. PETERSON:  WE DO NOT, BUT I NOTE THAT THE FTC

15    PREVIOUSLY INTRODUCED TWO EXHIBITS THAT WILL BE USED DURING

16    THIS PORTION OF THE VIDEO.

17            THE COURT:  OKAY.

18            MR. PETERSON:  THOSE ARE JX 87 AND CX 2079.

19            THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  3:51.

20        **(THE VIDEOTAPED DEPOSITION OF IRA BLUMBERG WAS PLAYED IN**

21    **OPEN COURT OFF THE RECORD.)**

22            THE COURT:  OKAY.  IS THAT THE END?  3:54.  CALL YOUR

23    NEXT WITNESS, PLEASE.

24        FOR BLUMBERG, IS ANYONE GOING TO SHOW MORE VIDEO FOR HIM?

25            MS. MILICI:  IT'S POSSIBLE WE WILL.

```
1              THE COURT:  OKAY.  SO HE'S A YES.

2         GO AHEAD, PLEASE.  WHO'S THE NEXT WITNESS?

3              MR. PETERSON:  THE NEXT VIDEOS WE'D LIKE TO SHOW ALL

4    INVOLVE SEALED TESTIMONY.  TWO OF THEM A PORTION YOUR HONOR

5    SEALED AND THE OTHER THEY ARE SEALED TESTIMONY AND EXHIBITS

6    DISCUSSED THROUGHOUT.

7         WE'RE HAPPY TO PROCEED HOWEVER YOUR HONOR WOULD LIKE, IF

8    YOU'D LIKE US TO SEAL THE COURTROOM FOR THE WHOLE TIME OR WE

9    CAN FILE THE PUBLIC TRANSCRIPT.  IT'S THE PREFERENCE THAT YOUR

10   HONOR HAS.

11             THE COURT:  WHO ARE YOUR NEXT THREE WITNESSES?

12             MR. PETERSON:  MR. MADDEROM, MR. MCGREGOR, AND

13   MS. YU.

14             THE COURT:  AND YOU'RE SAYING ALL THREE OF THOSE ARE

15   SEALED WITNESSES; IS THAT RIGHT?

16             MR. PETERSON:  FOR MR. MCGREGOR, THERE'S SEALED

17   MATERIAL DISCUSSED THROUGHOUT, SO IT'S NOT POSSIBLE TO PLAY IT

18   WITHOUT SEALING THE COURTROOM.

19             THE COURT:  ALL RIGHT.

20             MR. PETERSON:  FOR THE OTHER TWO, UNFORTUNATELY THE

21   SEALED TESTIMONY IS SORT OF RIGHT IN THE MILD OF THEIR

22   TESTIMONY, SO WE CAN EITHER HAVE PEOPLE COME IN AND OUT OR WE

23   CAN, IF YOUR HONOR WOULD PREFER, WE CAN PLAY THE WHOLE THING

24   AND THEN MAKE SURE THE FILED TRANSCRIPT IS AVAILABLE TONIGHT.

25             THE COURT:  HOW IS EACH WITNESS'S DEPOSITION EXCERPT?
```

1          MR. PETERSON:  MR. MADDEROM IS ABOUT EIGHT MINUTES.

2          THE COURT:  OKAY.

3          MR. PETERSON:  MS. YU I BELIEVE IS ABOUT TWO AND A

4   HALF MINUTES, AND LET ME CHECK ON MR. MCGREGOR.

5          THE COURT:  OKAY.  I DON'T THINK IT MAKES SENSE TO

6   HAVE PEOPLE LEAVE FOR AN EIGHT MINUTE VIDEO.  THAT SEEMS TOO

7   SHORT.

8      WHAT ABOUT MR. MCGREGOR?

9          MR. PETERSON:  MR. MCGREGOR IS APPROXIMATELY SEVEN

10  MINUTES.

11         THE COURT:  OKAY.

12         MR. PETERSON:  SO IN TOTAL, IT'S ABOUT 20 MINUTES

13  ACROSS ALL THREE VIDEOS.

14         THE COURT:  I'VE GOT 17.5.

15     SO IS YOUR NEXT -- ZANDER IS YOUR NEXT WITNESS?

16         MR. PETERSON:  AFTER THOSE THREE, YES.

17         THE COURT:  BECAUSE I THINK YOU'LL GET ONE MORE.  HOW

18  LONG IS MR. ZANDER?

19         MR. PETERSON:  I BELIEVE THAT'S ABOUT EIGHT MINUTES,

20  BUT I CAN CHECK FOR YOUR HONOR.

21         THE COURT:  AND IS HE SEALED OR HE'S PUBLIC?

22         MR. PETERSON:  NO.  THE THREE FOLLOWING ZANDER, WOLF,

23  AND MR. LINDNER, NONE OF THOSE ARE SEALED.

24         THE COURT:  OH, OKAY.

25     YOU SAID ZANDER IS HOW LONG, EIGHT MINUTES?

1568

```
1              MR. PETERSON:  YES.

2              THE COURT:  WOULD YOU BE OPEN TO DOING ZANDER AND

3    THEN I'LL JUST ASK EVERYONE TO LEAVE AND THE REST OF THE DAY

4    WILL JUST BE THE THREE SEALED WITNESSES.

5              MR. PETERSON:  IF THAT'S YOUR HONOR'S PREFERENCE, WE

6    CAN DO THAT.

7              THE COURT:  CAN WE DO THAT?

8              MR. PETERSON:  SURE.  JUST GIVE US ONE SECOND TO GET

9    THE RIGHT MATERIALS.

10             THE COURT:  ALL RIGHT.  THANK YOU FOR YOUR

11   FLEXIBILITY.

12             MR. PETERSON:  WITH YOUR HONOR'S PERMISSION, QUALCOMM

13   WILL NOW PLAY THE VIDEO DEPOSITION OF MARTIN ZANDER OF

14   ERICSSON.  NO PORTION OF THIS IS SEALED.  THE VIDEO IS

15   APPROXIMATELY EIGHT MINUTES IN LENGTH THAT DOESN'T -- WITH NO

16   COMPLETENESS DESIGNATIONS FROM THE FTC.

17             THE COURT:  OKAY.

18             MR. PETERSON:  AT THIS TIME QUALCOMM WOULD OFFER TWO

19   EXHIBITS INTO EVIDENCE.

20             THE COURT:  OKAY.  I'VE GOT TO CHARGE YOU TIME.  ALL

21   RIGHT.  3:57.  GO AHEAD, PLEASE.

22       WHAT EXHIBITS WOULD YOU LIKE?

23             MR. PETERSON:  QX 2928.

24             THE COURT:  QX 2928.

25             MR. PETERSON:  AND QX 2929.
```

```
1              THE COURT:  QX 2929.  ANY OBJECTION?

2              MS. GILLEN:  NO OBJECTION, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  THOSE ARE ADMITTED.

4         (DEFENDANT'S EXHIBIT QX 1569 WAS ADMITTED IN EVIDENCE.)

5              THE COURT:  GO AHEAD, PLEASE.

6         (THE VIDEOTAPED DEPOSITION OF MARTIN ZANDER WAS PLAYED IN

7       OPEN COURT OFF THE RECORD.)

8              THE COURT:  OKAY.  TIME IS 4:06.

9         OKAY.  LET ME GO AHEAD THEN AND EMPTY THE COURTROOM.

10        IF FOLKS WHO ARE NOT ABLE TO SEE THE SEALED MATERIAL WOULD

11      PLEASE STEP OUTSIDE THE COURTROOM.

12        WE'LL RESUME ON TUESDAY MORNING AT 9:00.  THERE WILL BE NO

13      TRIAL ON MONDAY, IT'S MARTIN LUTHER KING DAY.

14        AND I'LL ASK THE PARTIES, ONCE EVERYONE HAS LEFT, TO

15      APPROVE EVERYONE WHO IS REMAINING.

16             MR. BORNSTEIN:  ALL CLEAR, YOUR HONOR.

17             THE COURT:  OKAY.  FTC IS OKAY WITH WHO'S LEFT?

18             MS. MILICI:  WE ARE.  THANK YOU.

19        (PROCEEDINGS UNDER SEAL FROM PAGES 1570-1573.)

20

21

22

23

24

25
```

```
1          (IN OPEN COURT.)

2               MR. BORNSTEIN:  I HAVE ONE BIT OF HOUSEKEEPING, YOUR

3     HONOR --

4               THE COURT:  YES.

5               MR. BORNSTEIN:  -- WHICH IS -- IT RELATES TO THE

6     AUDIOTAPE THAT WAS PLAYED DURING MR. GONELL'S TESTIMONY.

7               THE COURT:  YES.

8               MR. BORNSTEIN:  IT HAD NOT OCCURRED TO ME THAT IT

9     MIGHT IMPOSE A BURDEN ON THE COURT TO HAVE TO LISTEN TO THE

10    FULL TAPE, AND WHEN YOUR HONOR MENTIONED IT, THE LIGHT BULB

11    WENT OFF.

12         WE HAD OBJECTED TO THE TRANSCRIPT BECAUSE IT HAS

13    CORRECTIONS AND CROSS-OUTS AND ALL KINDS OF THINGS THAT LED US

14    TO HAVE A CONCERN.

15         SO WE HAD A PROPOSAL, WHICH WE MADE TO THE FTC AND WANTED

16    TO SHARE WITH THE COURT, AS A WAY TO ALLEVIATE THE BURDEN ON

17    THE COURT.

18         I'M HAPPY TO HAVE YOUR HONOR LISTEN TO AS MUCH OF THE

19    TRANSCRIPT AS YOU LIKE.  THERE'S NOTHING IN THERE WE'RE

20    CONCERNED ABOUT.

21               THE COURT:  UH-HUH.

22               MR. BORNSTEIN:  BUT IF IT WOULD BE HELPFUL, WE CAN,

23    AT QUALCOMM'S EXPENSE, HAVE A CERTIFIED TRANSCRIPT MADE TO

24    FACILITATE THE COURT'S REVIEW IF THAT WOULD BE USEFUL.

25               MS. MILICI:  YOUR HONOR, THE FTC WOULD HAVE BEEN VERY
```

1    HAPPY TO CONSIDER THIS PROPOSAL MONTHS AGO WHEN WE PUT THIS

2    EXHIBIT ON OUR EXHIBIT LIST, AND WE ARE HAPPY TO CONSIDER IT

3    NOW IF IT WOULD BE HELPFUL TO THE COURT.

4         BUT OBVIOUSLY THIS IS SOMETHING WE COULD HAVE DONE A LONG

5    TIME AGO AND NOT SPENT TIME TODAY PLAYING CLIPS OF THE AUDIO

6    TAPE.

7              THE COURT:  I'M GOING TO LISTEN TO IT ANYWAY.  NOW

8    YOU'VE PIQUED MY CURIOSITY.  I WANT TO KNOW WHO'S IN THERE,

9    WHAT ARE THEY SAYING TO THE IRS?

10        I MEAN, I THINK A TRANSCRIPT WOULD BE HELPFUL, THOUGH.

11             MS. MILICI:  SURE.

12             MR. BORNSTEIN:  SO WE'LL DO THAT, AND WE'LL SHARE IT

13   WITH THE FTC, OF COURSE, IF THEY'D LIKE TO SEE IT IN ADVANCE OF

14   GOING TO THE COURT, AND WE'LL ENDEAVOR TO GET THAT DONE.

15             THE COURT:  OH, WELL, YOU HAVE TO SHOW IT TO THEM.

16             MR. BORNSTEIN:  OH, OF COURSE.

17             THE COURT:  IF IT'S NOT A STIPULATED TRANSCRIPT, I'M

18   NOT GOING TO CONSIDER IT.

19             MR. BORNSTEIN:  THAT'S WHAT I SAID.

20             THE COURT:  THAT WAS THE WHOLE POINT OF THE HIGH

21   PRIORITY OBJECTION.

22             MR. BORNSTEIN:  YES, I SAID I WOULD SHARE IT WITH

23   THEM, OF COURSE.  AND SO WE'RE WILLING TO GET THAT DONE AS

24   QUICKLY AS WE CAN.  I'M HAPPY TO HAVE THE COURT LISTEN TO THE

25   TRANSCRIPTS.  I'LL JUST GIVE A WARNING, I THINK IT'S A COUPLE

1576

```
 1      OF HOURS.
 2              THE COURT:  OKAY.  WELL, I DRIVE LONG DISTANCE, SO --
 3              MR. BORNSTEIN:  GREAT.  ALL RIGHT.  IF THAT'S
 4      USEFUL --
 5              THE COURT:  BETTER THAN A PODCAST, I'M SURE.
 6              MR. BORNSTEIN:  IF THAT'S USEFUL, WE'LL GET IT DONE.
 7              THE COURT:  ACTUALLY, I -- YOU HAVE IT ON A THUMB
 8      DRIVE, RIGHT?  THAT'S HOW IT'S BEEN INTRODUCED?
 9              MS. MILICI:  THAT'S CORRECT, YOUR HONOR.
10              MR. BORNSTEIN:  YES.
11              THE COURT:  OH, MY CAR IS OLD SCHOOL.  I PREFER TO
12      HAVE A DVD.  COULD I HAVE THIS ON A DVD?  AND I COULD LISTEN TO
13      IT AS I'M DRIVING TO AND FROM WORK.
14              MS. MILICI:  WE DO NOT HAVE ONE WITH US IN COURT
15      TODAY, BUT WE CAN CERTAINLY HAVE ONE MADE.
16              THE COURT:  GREAT, THANK YOU.
17              MS. MILICI:  THE FTC HAS TWO MORE ISSUES FOR
18      HOUSEKEEPING.
19              THE COURT:  WHAT'S THAT?
20              MS. MILICI:  ONE IS JUST FOR NANCY YU, WHOSE
21      DEPOSITION WE JUST PLAYED, SHE IS SUBJECT TO RECALL BY THE FTC.
22              THE COURT:  OKAY.  SO SHE'S A YES.  GOT IT.
23              MS. MILICI:  YES.  AND THEN THE OTHER ISSUE IS JUST
24      ON THIS, ON THE REBUTTAL CASE IN TRYING TO PLAN OUT WHEN IT IS
25      THAT WE WOULD NEED TO HAVE REBUTTAL WITNESSES HERE, WE JUST
```

1577

```
1    HAVE SOME QUESTION ABOUT HOW THE COURT IS SEEING THE NEXT
2    COUPLE DAYS OF TRIAL PLAY OUT.  IT LOOKS LIKE WE MIGHT BE USING
3    UP ALL THE PARTIES' TIME AS OF FRIDAY, AND WE'RE JUST NOT CLEAR
4    ON WHEN WE SHOULD HAVE A REBUTTAL WITNESS AVAILABLE.
5               THE COURT:  OKAY.  DO YOU WANT ME TO GIVE YOU YOUR
6    TIME ESTIMATES?  WOULD THAT HELP?
7               MR. BORNSTEIN:  SURE.
8               MR. VAN NEST:  THAT WOULD HELP, YOUR HONOR.
9               THE COURT:  ALL RIGHT.  IT LOOKS LIKE FTC TODAY,
10   GIVING THEM THE 1 MINUTE FROM THE YU COMPLETENESS, YOU USED
11   TODAY 46 MINUTES.  SO WITH WHAT YOU ALREADY USED BEFORE, THAT'S
12   21 HOURS AND 19 MINUTES.  SO YOU HAD 20 HOURS AND 33 MINUTES
13   YESTERDAY, PLUS 46 TODAY, THAT'S 21 HOURS AND 19 MINUTES.
14   OKAY?
15       NOW, QUALCOMM, AS OF YESTERDAY, HAD USED 12 HOURS AND 12
16   MINUTES.  LET ME -- GIVE ME ONE MINUTE, PLEASE, TO DO THE
17   CALCULATION.
18       (PAUSE IN PROCEEDINGS.)
19               THE COURT:  SO I HAVE 4 HOURS AND 37 MINUTES TODAY.
20   SO THAT'S 16 HOURS AND 59 MINUTES.
21               MR. VAN NEST:  WOULD YOU -- WHAT'S THAT TOTAL?
22               THE COURT:  16 HOURS AND 59 MINUTES.  SO I HAVE 4
23   HOURS AND 37 MINUTES TODAY.  THE TOTAL AS OF -- I'M SAYING
24   YESTERDAY, BUT THAT'S WRONG -- AS OF TUESDAY WAS 12 HOURS AND
25   12 MINUTES.  SO ADDING THAT UP, IT'S 16 HOURS -- SO IT'S
```

```
 1    ROUGHLY A MINUTE SHY OF 17 HOURS.

 2              MR. BORNSTEIN:  YOUR HONOR, I HESITATE TO SUGGEST.  I

 3    THINK IT'S 16 HOURS AND 49 MINUTES.

 4              THE COURT:  OH, YOU'RE RIGHT.  MY MISTAKE.

 5              MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

 6              THE COURT:  YOU'RE RIGHT.  I APOLOGIZE.  SO IT'S 16

 7    HOURS AND 49 MINUTES.  SO YOU HAVE 11 MINUTES PLUS, WHAT, 9

 8    HOURS?  IS THAT ROUGHLY -- AND THEN -- SO WHAT WAS YOUR

 9    QUESTION?  I GUESS IF WE DO -- SO HOW MUCH TIME IS LEFT TOTAL?

10        SO IF YOU HAVE -- WHAT?  YOU HAVE, WHAT, 3 HOURS AND 41

11    MINUTES.  DOES THAT SOUND RIGHT, FTC?

12              MS. MILICI:  YES, THAT SOUNDS RIGHT.

13              THE COURT:  OKAY.  AND THEN QUALCOMM HAS, WHAT?

14              MR. BORNSTEIN:  I THINK IT'S 8 HOURS AND 11 MINUTES,

15    YOUR HONOR.

16              THE COURT:  8 HOURS AND 11 MINUTES.  SO WHAT IS THAT

17    TOTALING, 11 HOURS AND 52 MINUTES?

18              MS. MILICI:  11 HOURS AND 52 --

19              THE COURT:  YEAH, WE'RE DOING ABOUT 5 HOURS AND 37

20    MINUTES A DAY.  THAT'S BEEN OUR ROUGH AVERAGE, I THINK.

21        SO I THINK THEN WE'D BE FINISHING EARLY ON MONDAY.  DOES

22    THAT SOUND RIGHT?

23              MR. VAN NEST:  THAT SOUNDS RIGHT TO ME, YOUR HONOR.

24              MS. MILICI:  YES, YOUR HONOR.

25              MR. VAN NEST:  WHAT I WAS GOING TO SUGGEST, WE'LL
```

1579

```
1    TAKE IN THE NUMBERS, DO OUR PLANNING, LOOK AT OUR WITNESSES,
2    AND AS SOON AS WE HAVE A BETTER ESTIMATE OF WHEN WE'RE GOING TO
3    REST, WE'LL LET THE FTC KNOW IT AS SOON AS POSSIBLE.  BUT IF WE
4    FINISH EARLY MONDAY, IT'S CONCEIVABLE THAT THEY WOULD NEED A
5    WITNESS FRIDAY.  WE'LL -- BUT I'LL TRY TO BE MORE PRECISE THAN
6    THAT.
7              THE COURT:  OKAY.
8              MR. VAN NEST:  BECAUSE THAT TIME INCLUDES REBUTTAL
9    TIME, OUR TOTAL TIME, AND YOURS AS WELL.
10             THE COURT:  SO FOR YOUR CASE -- HOW MANY EXPERTS WILL
11   YOU HAVE TESTIFY?
12             MR. VAN NEST:  I THINK WE HAVE FOUR EXPERTS.
13             THE COURT:  OKAY.
14             MR. VAN NEST:  AND WE STILL HAVE A NUMBER OF
15   PERCIPIENT WITNESSES AS WELL.
16             THE COURT:  OKAY.  LIVE OR VIDEO?
17             MR. VAN NEST:  LIVE.
18             THE COURT:  OKAY.
19             MR. VAN NEST:  WE HAVE VIDEO AS WELL.
20             THE COURT:  OKAY.
21             MR. VAN NEST:  WE PROBABLY HAVE, I'M NOT SURE HOW
22   MANY, BUT WE HAVE A NUMBER OF ADDITIONAL VIDEO -- MOST OF THE
23   VIDEO WE'VE SHOWN SO FAR ARE COUNTERS, OR WITNESSES THAT YOUR
24   HONOR SAW DURING THE FTC CASE.
25             THE COURT:  OKAY.
```

```
1              MR. VAN NEST:  AND THEN WE HAVE A NUMBER -- A COUPLE
2     MORE OF THOSE, AND THEN A NUMBER OF OTHER VIDEOS OF PEOPLE THAT
3     YOU HAVEN'T MET YET.
4              THE COURT:  OKAY.
5              MR. VAN NEST:  AND WE HAVE SOME LIVE WITNESSES, AND
6     THEN WE HAVE THE FOUR EXPERTS.
7         I'LL TRY TO DO AN ESTIMATE AGAIN WITH THE TEAM THIS
8     WEEKEND, AND IF I THINK THAT WE'RE GOING TO FINISH FRIDAY, I
9     WILL TELL MS. MILICI THAT SO SHE CAN BE READY.
10             THE COURT:  OKAY.  BUT IT SOUNDS LIKE SHE DOESN'T
11    NEED TO HAVE ANY WITNESSES ON TUESDAY.  DOES THAT SOUND RIGHT?
12             MR. VAN NEST:  NEXT TUESDAY?  NO.  NO.
13             THE COURT:  YOU'LL NEED THE TIME.
14             MR. VAN NEST:  SHE WILL NOT NEED WITNESSES TUESDAY,
15    THAT'S FOR SURE.
16             THE COURT:  OKAY.  SO IT SOUNDS LIKE YOU PROBABLY MAY
17    NEED SOME WITNESSES ON FRIDAY.
18             MR. VAN NEST:  POSSIBLY SO.  I'LL TRY TO BE MORE
19    PRECISE, BUT I'LL LOOK AT MY LIST AND MY TIMES AND --
20             THE COURT:  OKAY.
21             MR. VAN NEST:  -- SEE WHAT WE HAVE.
22             THE COURT:  OKAY.  SO I WILL FILE THE SAMSUNG SEALING
23    MOTION IN A COUPLE MINUTES.  I ALMOST FINISHED IT DURING THE
24    FIRST BREAK.
25             BUT DO YOU ANTICIPATE -- I MEAN, I GUESS THERE'S --
```

```
1     NOTHING ELSE HAS BEEN FILED TODAY; CORRECT?
2               MR. VAN NEST:  I HAVEN'T BEEN ONLINE, YOUR HONOR.  I
3     DON'T KNOW.
4               THE COURT:  OKAY.
5               MR. EVEN:  I THINK, YOUR HONOR, ALL THIRD PARTIES HAD
6     TO FILE BY FRIDAY FOR TUESDAY, SO THE NEXT BATCH IS ONLY FOR --
7               THE COURT:  GOOD.  SO I CAN DENY ANYTHING ELSE THAT
8     COMES IN AS UNTIMELY.
9          (LAUGHTER.)
10              THE COURT:  OKAY.  AND I HAVE HIGH PRIORITY
11    OBJECTIONS.  I'LL TRY TO GET THAT DONE AS QUICKLY AS POSSIBLE
12    AS WELL.
13         BUT THEN I THINK THE NEXT BATCH WILL NOT BE UNTIL NEXT
14    THURSDAY FOR FRIDAY.
15              MR. VAN NEST:  THAT'S RIGHT.
16              MS. MILICI:  I THINK THAT'S RIGHT.
17              THE COURT:  OKAY.
18              MR. VAN NEST:  THAT'S RIGHT.
19              THE COURT:  ALL RIGHT.  GOOD.
20         WHAT -- NOW, LET'S SAY WE FINISH IN THE MORNING ON
21    TUESDAY, WHICH SOUNDS POSSIBLE NOW, RIGHT, IF WE GO --
22              MS. MILICI:  ON MONDAY.
23              THE COURT:  OR MONDAY, THE 28TH.
24              MS. MILICI:  YES.
25              THE COURT:  SO THAT SEEMS HIGHLY LIKELY BECAUSE IT
```

1    SOUNDS LIKE YOU MAY HAVE, LIKE, BASICALLY AN HOUR.

2         MS. MILICI:  I THINK THAT'S RIGHT, YOUR HONOR.

3         THE COURT:  RIGHT?

4         MR. VAN NEST:  I'D HAVE TO LOOK AT THE MATH.  IT

5    DEPENDS ON HOW MUCH TIME WE GET IN TUESDAY AND FRIDAY, OF

6    COURSE.

7         THE COURT:  OKAY.  WOULD YOU WANT TO DO YOUR CLOSINGS

8    ON TUESDAY AFTERNOON, OR DO YOU STILL WANT TO WAIT UNTIL FRIDAY

9    MORNING?

10        MR. VAN NEST:  I PREFER TO WAIT UNTIL FRIDAY, YOUR

11   HONOR, AS WE HAVE SCHEDULED.

12        THE COURT:  IT JUST MAKES EVERYONE HAVE TO BE HERE

13   FOR A FULL OTHER WEEK IS THE ONLY CONCERN.

14        MR. VAN NEST:  THAT'S WHAT I'D PREFER.  GIVE US A

15   LITTLE TIME TO MAKE IT CONCISE.  WE HAVE A LIMIT ON TIME.  WE

16   HAVE A LIMIT ON SLIDES.

17        THE COURT:  UM-HUM.  ALL RIGHT.  WELL, LET ME TAKE A

18   LOOK AT MY, MY SCHEDULE.  I GUESS ANOTHER POSSIBILITY MIGHT BE

19   THURSDAY MORNING DEPENDING ON WHAT MY LAW AND MOTION LOOKS LIKE

20   THURSDAY AFTERNOON, TO ADVANCE IT A DAY.

21        MS. MILICI:  THE FTC WOULD BE HAPPY TO ADVANCE IT A

22   DAY.  WE'D ALSO BE WILLING TO DO IT ON TUESDAY IF THAT'S BETTER

23   FOR THE COURT.  OF COURSE, THURSDAY MIGHT -- WE WOULD AGREE TO

24   THURSDAY FOR SURE.

25        THE COURT:  WOULD THURSDAY GIVE YOU ENOUGH TIME?

```
1              MR. VAN NEST:  I THINK SO.

2              THE COURT:  WHAT DO --

3              THE CLERK:  YOU HAVE THE SPECIAL SET HUNG HA CASE.

4              THE COURT:  OH, AT 10:00 RIGHT?

5              THE CLERK:  YES.

6              THE COURT:  AND WHAT DO WE HAVE IN THE AFTERNOON THAT

7      DAY?  I FORGOT.

8              THE CLERK:  MADANI, MOTION TO ENFORCE SETTLEMENT WITH

9      FURTHER CASE MANAGEMENT; REYNA, JOINT STATEMENT ON CLASS

10     NOTICE; RAQUEDAN, MOTION TO CERTIFY CLASS; AND MCGOVNEY, MOTION

11     TO DISMISS.

12             THE COURT:  I'M SORRY, WHAT WAS THE LAST ONE, MOTION

13     TO DISMISS?

14             THE CLERK:  MCGOVNEY.

15             THE COURT:  OH, THAT'S ARROW NETWORKS.  I THINK

16     THAT'S A SECURITIES CLASS ACTION.

17          OKAY.  I DO HAVE THIS CRIMINAL MATTER SPECIALLY AT 10:00.

18     I THINK IT WOULD HOPEFULLY BE SHORTER THAN HALF AN HOUR, MAYBE

19     20 MINUTES.

20          POSSIBLY THURSDAY WOULD BE OKAY.

21             MR. VAN NEST:  WHY DON'T YOUR HONOR CONSIDER THURSDAY

22     AFTERNOON OR FRIDAY, THEY'RE BOTH FINE.  EITHER ONE IS OKAY.

23     WHATEVER YOU PREFER.

24             THE COURT:  OKAY.  LET ME GO BACK AND TAKE A LOOK AT

25     MY SCHEDULE FURTHER, AND THEN I CAN LET YOU KNOW ON TUESDAY.
```

1       DOES THAT SOUND OKAY?

2                MR. VAN NEST:  THAT'S GREAT.  THAT'S FINE.

3                THE COURT:  ALL RIGHT.  SO WHAT ELSE DO WE HAVE TO DO

4       TODAY?  ANYTHING ELSE TODAY?

5                MR. VAN NEST:  NOTHING THAT I'M AWARE OF.

6                MS. MILICI:  NOTHING FROM THE FTC.

7                THE COURT:  ALL RIGHT.  THANK YOU.  SEE YOU TUESDAY.

8             (THE EVENING RECESS WAS TAKEN AT 4:41 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18         _____

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  JANUARY 18, 2019

22

23

24

25