1        UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3           SAN JOSE DIVISION

4

5

FEDERAL TRADE COMMISSION,          )  C-17-00220 LHK
6                                   )
                    PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                   )
            VS.                     )  JANUARY 22, 2019
8                                   )
QUALCOMM INCORPORATED, A            )  VOLUME 8
9   DELAWARE CORPORATION,           )
                                    )  PAGES 1585-1828
10              DEFENDANT.          )
    _____)

11

12           TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
13           UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:    FEDERAL TRADE COMMISSION
                          BY:  JENNIFER MILICI
16                             DANIEL J. MATHESON
                               WESLEY G. CARSON
17                             KENT COX
                               NATHANIEL M. HOPKIN
18                             PHILIP J. KEHL
                               MIKA IKEDA
19                        600 PENNSYLVANIA AVENUE, NW
                          WASHINGTON, D.C.  20580
20

21          APPEARANCES CONTINUED ON NEXT PAGE

22  OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, CRR, RMR
                                 CERTIFICATE NUMBER 8074
24
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25          TRANSCRIPT PRODUCED WITH COMPUTER

```
 1

 2      APPEARANCES (CONTINUED)

 3


 4      FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                                BY:  ROBERT A. VAN NEST
 5                                   JUSTINA K. SESSIONS
                                     EUGENE M. PAIGE
 6                                   CHRISTINA BLAIS
                                     MATAN SHACHAM
 7                                   CODY HARRIS
                                     KRISTIN HUCEK
 8                              633 BATTERY STREET
                                SAN FRANCISCO, CALIFORNIA  94111
 9

10                              CRAVATH, SWAINE & MOORE
                                BY:  GARY A. BORNSTEIN
11                                   MICHAEL BRENT BYARS
                                     YONATAN EVEN
12                                   JORDAN D. PETERSON
                                     MING-TOY TAYLOR
13                                   DEREK SUTTON
                                     ANDREW HUYNH
14                                   ANTONY RYAN
                                825 EIGHTH AVENUE
15                              NEW YORK, NEW YORK  10019

16
                                NORTON ROSE FULBRIGHT
17                              BY:  MARC COLLIER
                                     TALBOT HANSUM
18                              98 SAN JACINTO BOULEVARD, SUITE 1100
                                AUSTIN, TEXAS  78701
19
                                BY:  ERIC B. HALL
20                                   DANIEL LEVENTHAL
                                1301 MCKINNEY, SUITE 5100
21                              HOUSTON, TEXAS  77010

22

23      ALSO PRESENT:           MARK SNYDER
                                JEFF DAHM
24                              KEN KOTARSKI

25
```

1

2                          <u>INDEX OF WITNESSES</u>

3      <u>DEFENDANT'S</u>

4      **JEFFREY ANDREWS**
             DIRECT EXAM BY MR. HALL              P. 1589
5            CROSS-EXAM BY MR. ANSALDO            P. 1614

6      **LORENZO CASACCIA**
             DIRECT EXAM BY MR. COLLIER           P. 1620
7            CROSS-EXAM BY MR. MERBER             P. 1650
             REDIRECT EXAM BY MR. COLLIER         P. 1659
8

9      **DIRK WEILER**
             DIRECT EXAM BY MR. TAFFET            P. 1664
10           CROSS-EXAM BY MS. GILLEN             P. 1685

11     **MARVIN BLECKER**
             VIDEOTAPED DEPOSITION                P. 1691
12

13     **STEFAN WOLFF**
             VIDEOTAPED DEPOSITION                P. 1692
14

15     **TASNEEM CHIPTY**
             DIRECT EXAM BY MR. EVAN              P. 1693
16           CROSS-EXAM BY MR. MATHESON           P. 1738
             REDIRECT EXAM BY MR. EVEN            P. 1765
17           RECROSS-EXAM BY MR. MATHESON         P. 1770
             FURTHER REDIRECT BY MR. EVAN         P. 1773
18

19     **EDWARD SNYDER**
             DIRECT EXAM BY MR. SHACHAM           P. 1776
20           CROSS-EXAM BY MS. IKEDA              P. 1805

21     **THOMAS LINDNER**
             VIDEOTAPED DEPOSITION                P. 1815
22

23

24

25

1

2                              INDEX OF EXHIBITS

3                                      MARKED        ADMITTED

4        PLAINTIFF'S

5        8262                                        1654
         6336                                        1655
6        6138                                        1657

7

8

9        DEFENDANT'S

10

         7475                                        1638
11       22                                          1691
         110 AND 113                                 1814
12

13

14       JOINT

15       0107                                        1746

16

17

18

19

20

21

22

23

24

25

```
1    SAN JOSE, CALIFORNIA                    JANUARY 22, 2019

2                    P R O C E E D I N G S

3         (COURT CONVENED AT 9:02 A.M.)

4              THE COURT:  GOOD MORNING AND WELCOME.

5              MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

6              THE COURT:  PLEASE TAKE A SEAT, AND PLEASE CALL YOUR

7    FIRST WITNESS.

8              MR. HALL:  GOOD MORNING, YOUR HONOR.  ERIC HALL WITH

9    NORTON, ROSE, FULBRIGHT.

10        QUALCOMM CALLS DR. JEFFREY ANDREWS.

11             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

12        (DEFENDANT'S WITNESS, JEFFREY ANDREWS, WAS SWORN.)

13             THE WITNESS:  YES.

14             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

15        WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

16   NAME FOR THE RECORD.

17             THE WITNESS:  JEFFREY ANDREWS.  A-N-D-R-E-W-S.

18             THE COURT:  ALL RIGHT.  TIME IS 9:02.  GO AHEAD,

19   PLEASE.

20             MR. HALL:  YOUR HONOR, MAY I APPROACH THE WITNESS?

21             THE COURT:  YES, PLEASE.

22                      DIRECT EXAMINATION

23   BY MR. HALL:

24   Q.  GOOD MORNING, DR. ANDREWS.

25   A.  GOOD MORNING.
```

1      Q.   WOULD YOU PLEASE INTRODUCE YOURSELF TO THE COURT?

2      A.   YES.  MY NAME IS PROFESSOR JEFFREY ANDREWS.  I'M A

3      PROFESSOR AT THE UNIVERSITY OF TEXAS AT AUSTIN.

4      Q.   WHAT DO YOU TEACH?

5      A.   ELECTRICAL ENGINEERING BROADLY SPEAKING, ALSO SPECIFICALLY

6      WIRELESS COMMUNICATIONS.

7      Q.   PLEASE TELL US ABOUT YOUR EDUCATION.

8      A.   WELL, I DID MY BACHELOR'S AT HARVEY MUDD COLLEGE IN

9      SOUTHERN CALIFORNIA, AND THEN MY MASTER'S AND PH.D. AT

10     STANFORD.

11     Q.   DO YOU HAVE ANY INDUSTRY EXPERIENCE?

12     A.   YES.  I WORKED AS AN ENGINEER AT INTEL AND AT QUALCOMM IN

13     THE 1990S.

14     Q.   WHAT IS THE WIRELESS NETWORKING AND COMMUNICATIONS GROUP?

15     A.   THIS IS U.T. AUSTIN'S WIRELESS RESEARCH CENTER.  IT'S ONE

16     OF THE WORLD'S LARGEST, AND I HELPED FOUND IT IN 2002 WHEN I

17     JOINED U.T.

18     Q.   ARE YOU AN EDITOR OF ANY TECHNICAL JOURNALS?

19     A.   YES.  I WAS THE EDITOR-IN-CHIEF OF THE "IEEE TRANSACTIONS

20     WIRELESS COMMUNICATIONS" FOR SEVERAL YEARS UNTIL JUST RECENTLY,

21     WHICH IS THE -- GENERALLY CONSIDERED THE TOP TECHNICAL JOURNAL

22     FOR WIRELESS COMMUNICATIONS RESEARCH.

23     Q.   PLEASE TELL US ABOUT YOUR PUBLICATIONS?

24     A.   I HAVE NEARLY 400 PUBLICATIONS AT THIS POINT, MANY OF

25     WHICH ARE HIGHLY CITED AND HAVE WON BEST PAPER AWARDS.

1      Q.   HAVE YOU WRITTEN ANY BOOKS?

2      A.   YES, I'VE WRITTEN TWO TEXTBOOKS ON 4G CELLULAR STANDARDS,

3      AND ONE ON LTE, AND ONE ON WIMAX.

4      Q.   ARE YOU A MEMBER OF IEEE?

5      A.   I'M A FELLOW OF THE IEEE, WHICH IS THE LARGEST

6      PROFESSIONAL ORGANIZATION FOR ELECTRICAL ENGINEERS.

7      Q.   WHAT IS A FELLOW OF IEEE?

8      A.   IT'S THEIR HIGHEST GRADE OF MEMBERSHIP.  IT'S ACCORDED AS

9      AN HONOR TO ABOUT .1 PERCENT OF THE MEMBERSHIP IN ANY GIVEN

10     YEAR.

11     Q.   HAVE YOU WON ANY AWARDS?

12     A.   YEAH, I'VE WON SEVERAL AWARDS.

13     Q.   CAN YOU GIVE US SOME EXAMPLES?

14     A.   WELL, I WON THE AMERICAN SOCIETY OF ENGINEERING EDUCATORS,

15     THEIR FREDERICK TERMAN AWARD, WHICH IS SPONSORED BY

16     HEWLETT-PACKARD.  THAT RECOGNIZES SOMEONE UNDER THE AGE OF 45

17     WHO'S MADE EXTRAORDINARY CONTRIBUTIONS TO THE ENGINEERING

18     PROFESSION, PRIMARILY THROUGH EDUCATION.

19     Q.   ANY OTHER EXAMPLES?

20     A.   RECENTLY I JUST WON THE IEEE KIYO TOMIYASU AWARD, WHICH IS

21     GIVEN ONCE TO AN ELECTRICAL ENGINEER GLOBALLY WHO'S MADE

22     PARTICULARLY INNOVATIVE CONTRIBUTIONS TO ANY FIELD OF

23     ELECTRICAL ENGINEERING BEFORE THE AGE OF 45.

24     Q.   WHAT WAS YOUR CONTRIBUTION?

25     A.   I WAS HONORED FOR THEORETICAL CONTRIBUTIONS TO CELLULAR

```
 1    COMMUNICATION SYSTEMS.
 2              MR. HALL:  YOUR HONOR, QUALCOMM TENDERS
 3    DR. JEFFREY ANDREWS AS AN EXPERT IN WIRELESS COMMUNICATIONS AND
 4    CELLULAR NETWORKS.
 5              THE COURT:  ANY OBJECTION OR DO YOU WANT TO VOIR DIRE
 6    HIM YOURSELF?
 7              MR. ANSALDO:  NO OBJECTION.
 8              THE COURT:  ALL RIGHT.  AND LET ME JUST MAKE SURE I
 9    GOT THE TOPIC CORRECTLY.  IT'S ELECTRICAL ENGINEERING AND --
10    NO, IT'S WIRELESS COMMUNICATIONS IN CELLULAR NETWORKS.
11              MR. HALL:  YES, YOUR HONOR.
12              THE COURT:  OKAY.  SO CERTIFIED.  GO AHEAD, PLEASE.
13    BY MR. HALL:
14    Q.   DR. ANDREWS, WHAT HAVE YOU BEEN ASKED TO DO IN THIS CASE?
15    A.   I WAS ASKED TO EXAMINE SOME OF THE QUALCOMM'S PATENTS,
16    PARTICULARLY RELATED TO MY RESEARCH EXPERTISE, AND TO DETERMINE
17    IF THESE PATENTS ARE ESSENTIAL TO CELLULAR STANDARDS, IN
18    PARTICULAR THE LTE STANDARD, AND WHETHER THOSE PATENTS
19    CONTRIBUTED IN A FUNDAMENTAL AND IMPORTANT WAY TO THE
20    STANDARDS.
21    Q.   AND CAN YOU SUMMARIZE YOUR FINDINGS FOR THE COURT?
22    A.   YES.  I ANALYZED AND SHOWED THAT 34 PATENTS THAT QUALCOMM
23    HOLDS MADE VERY FUNDAMENTAL CONTRIBUTIONS TO CELLULAR
24    STANDARDS, 3G, 4G, WHICH IS LTE, AS WELL AS 5G, AND THAT THESE
25    PATENTS ARE OVER A WIDE RANGING AND VERY IMPORTANT SET OF
```

```
1     TOPICS THAT ENABLE DATA COMMUNICATION OVER CELLULAR NETWORKS.

2     Q.   WHY DID YOU ADDRESS 34 PATENTS, WHY THAT PARTICULAR

3     NUMBER?

4     A.   WELL, IT WAS A LOT TO DO.  IT WAS A -- THE LARGEST NUMBER

5     THAT I COULD DO THAT WAS MANAGEABLE, AND I FELL IT WAS

6     SUFFICIENT TO SUPPORT MY OPINION THAT THEY HAD A WIDE RANGING

7     PORTFOLIO OF FUNDAMENTAL PATENTS.

8     Q.   DID YOU PREPARE CLAIM CHARTS FOR EACH OF THOSE 34 PATENTS?

9     A.   I DID.

10    Q.   HOW MANY PAGES OF CHARTS TOTAL?

11    A.   I THINK BY THE END IT WAS ALMOST 400 PAGES.

12    Q.   WHAT DID YOU DO IN PREPARING THOSE CHARTS?

13    A.   WELL, EACH OF THESE CHARTS IS FOR PATENTS, AN INDEPENDENT

14    CLAIM OF A PATENT, AND I WOULD SHOW THAT THIS CLAIM WAS

15    REQUIRED TO BE PRACTICED BY ONE OF THE CELLULAR STANDARDS.

16         LIKE I SAID, MOST OF THEM WERE FOR LTE, SO I WOULD FIND

17    THE CORRESPONDING FEATURE IN THE LTE STANDARD AND THEN SHOW

18    THAT EACH AND EVERY CLAIM ELEMENT WAS REQUIRED IN ORDER TO

19    PRACTICE LTE.

20    Q.   WHAT OTHER STANDARDS DID YOU CONSIDER?

21    A.   A HANDFUL OF PATENTS THAT I CONSIDERED WERE FOR THE LATER

22    VERSIONS OF THE 3G WCDMA STANDARDS, AND THEN ANOTHER HANDFUL

23    FOR THE RECENTLY RELEASED 5G NR, OR NEW RADIO STANDARD.

24    Q.   MR. DAHM, WOULD YOU PLEASE PUT UP SLIDE NUMBER 4.

25         DR. ANDREWS, HAVE YOU PREPARED SOME SLIDES FOR YOUR
```

```
 1        TESTIMONY TODAY?

 2        A.   YES, THIS LOOKS LIKE ONE OF THOSE.

 3        Q.   AND IS THIS AT QDX 9347, THE NUMBER IN THE LEFT CORNER?

 4        ARE THESE THE SLIDES?

 5        A.   YES.

 6        Q.   BASED ON THE PATENTS THAT YOU'VE ANALYZED, DO YOU HAVE AN

 7        OPINION ON WHETHER OR NOT QUALCOMM'S PATENT PORTFOLIO IS

 8        STATIC?

 9        A.   NO.  TO THE CONTRARY, MY PATENTS -- THE PATENTS I ANALYZED

10        SHOW THAT THE PATENT PORTFOLIO IS CONTINUALLY GROWING AND

11        EXPANDING AND MAKING FUNDAMENTAL CONTRIBUTIONS TO CELLULAR

12        COMMUNICATION.

13             IN PARTICULAR, I CONSIDERED TWO MAIN CATEGORIES OF

14        PATENTS.  ONE IS FOR BASICALLY FUNDAMENTAL TOPICS THAT HAVE TO

15        BE IN ANY CELL STANDARD, SUCH AS THINGS LIKE HOW YOU DO CONTROL

16        CHANNELS OR WAVEFORMS OR ACQUIRE THE BASE STATION, VERY

17        FUNDAMENTAL AND IMPORTANT, BUT THINGS THAT HAVE TO BE DONE IN

18        ANY STANDARD.

19             AND THEN I ALSO CONSIDERED SEVERAL -- THREE CATEGORIES --

20        WELL, ANOTHER CATEGORY WITH THREE EXAMPLES WHERE QUALCOMM

21        PIONEERED A NEW AREA THAT'S HAD A MAJOR IMPACT ON DATA RATES IN

22        PARTICULAR FOR LATER VERSIONS OF LTE AND INTO 5G.

23        Q.   AND DO YOU HAVE SOME EXAMPLES OF THAT FIRST CATEGORY YOU

24        MENTIONED OF THE INNOVATION IN ESTABLISHED AREAS?

25        A.   YES.  AS I JUST MENTIONED, THE UPLINK WAVEFORM, SO THIS IS
```

1      THE PHONE TRANSMITTING TO THE BASE STATION, SO QUALCOMM

2      INVENTED THAT WAVEFORM.

3           SECONDLY, THE DATA, THE CONTROL INFORMATION THAT'S SENT

4      FROM THE PHONE TO THE BASE STATION FOLLOWS A PARTICULAR

5      PROCEDURE THAT QUALCOMM INVENTED.

6           AND THEN FINALLY, THE BASE STATION ACQUISITION PROCEDURE,

7      WHICH IS THE MECHANISM BY WHICH THE PHONE LOCKS ON AND CAN

8      BEGIN COMMUNICATING WITH THE BASE STATION.

9      Q.   AND ARE YOU GOING TO EXPLAIN SOME MORE ABOUT THOSE

10     CATEGORIES THIS MORNING?

11     A.   YES, I PREPARED A FEW SLIDES, AND I EXPECT TO TALK ABOUT

12     THAT.

13     Q.   DO YOU HAVE ANY EXAMPLES OF THAT SECOND CATEGORY OF BROAD

14     PATENT COVERAGE IN NEW AREAS?

15     A.   YEAH.  THESE ARE THE THREE LISTED HERE.  SO THE FIRST IS

16     CARRIER AGGREGATION, AND I'LL EXPLAIN A BIT MORE WITH THE HELP

17     OF SOME PICTURE WHAT THAT IS.

18          AND THEN ALSO THE USE OF UNLICENSED SPECTRUM TO FURTHER

19     INCREASE DATA RATES THAT CELLULAR USERS CAN EXPERIENCE.

20          AND THEN THE LAST ONE, WHICH IS A SUBJECT VERY NEAR AND

21     DEAR TO MY HEART BECAUSE I'VE DONE A LOT OF RESEARCH ON IT,

22     WHICH IS HETEROGENOUS NETWORKS.

23     Q.   BASED ON THE PATENTS THAT YOU'VE ANALYZED, DO YOU HAVE AN

24     OPINION ABOUT QUALCOMM'S ROLE IN 4G AND 5G?

25     A.   YES.

1    Q.    AND WHAT IS THAT?

2    A.    WELL, MY OPINION IS THAT THEY'VE MADE EXTREMELY IMPORTANT

3    CONTRIBUTIONS TO THOSE STANDARDS AND REALLY BEEN A PIONEER IN

4    LEADING NEW AREAS FOR THOSE STANDARDS.

5    Q.    MR. DAHM, WOULD YOU PLEASE GO TO SLIDE NUMBER 5.

6         DR. ANDREWS, I BELIEVE THIS IS THE FIRST CATEGORY OF THE

7    TWO CATEGORIES YOU JUST MENTIONED, AND SO I'LL ASK YOU, WHAT IS

8    SHOWN HERE ON THIS FIGURE IN SLIDE 5?

9    A.    WELL, THIS IS JUST THOSE THREE EXAMPLES, LIKE YOU SAID,

10   FROM THE FIRST CATEGORY.  IT'S JUST A RELATIVELY SIMPLE

11   SCHEMATIC HERE THAT JUST SHOWS THAT IN A CELLULAR SYSTEM,

12   THERE'S TWO DIFFERENT DIRECTIONS OF COMMUNICATION.

13        THE FIRST IS THE UPLINK, WHICH IS THE PHONE TRANSMITTING

14   TO THE BASE STATION, AND THEN THERE'S THE DOWNLINK, WHICH IS

15   BASE STATION TRANSMITTING TO THE PHONE, OR U.E.  AND SO OF

16   THESE EXAMPLES, TWO OF THEM ARE FOR THE UPLINK DIRECTION, SO

17   FOR EXAMPLE, THE UPLINK WAVEFORM, WHICH IS SHOWN AS SC-FDMA,

18   AND EVERYTHING THE PHONE SENDS USES THAT WAVEFORM.  THAT'S THE

19   MECHANISM FOR TRANSMISSION.

20        IN ADDITION TO THAT, ON THAT WAVEFORM, THE UPLINK CONTROL

21   CHANNEL IS ANOTHER EXAMPLE, AND I'LL EXPLAIN MORE ABOUT THAT IN

22   A MOMENT.

23        IN THE DOWNLINK DIRECTION, THE FIRST DOWNLINK THING THE

24   PHONE DOES IS IT HAS TO ACQUIRE THE BASE STATION, SYNCHRONIZE

25   TO IT, AND BE ABLE TO LOCK ON TO BEGIN COMMUNICATION, AND THIS

1    PROCESS IS CALLED BASE STATION ACQUISITION.

2    Q.   DR. ANDREWS, ARE WAVEFORMS IMPORTANT TO A USER OF A CELL

3    PHONE?

4    A.   YES.  I MEAN, THE WAVEFORM IS THE MECHANISM WHEREBY, IF

5    YOU HAVE DATA TO SEND, LIKE, YOU KNOW, BINARY DATA, WHETHER

6    IT'S A FILE OR VIDEO OR AN E-MAIL, TEXT MESSAGE, IT'S HOW IT

7    GETS TRANSLATED INTO A SIGNAL THAT CAN ACTUALLY GET RADIATED

8    FROM THE ANTENNA.  SO THIS IS A FUNDAMENTAL ASPECT OF A

9    WIRELESS COMMUNICATION SYSTEM.

10        AND THERE'S MANY -- THERE'S UNCOUNTABLE NUMBER OF WAYS TO

11   DO IT, AND YOU WANT THESE WAVEFORMS TO BE ROBUST, TO BE ABLE TO

12   BE SHARED BY MANY USERS, BECAUSE A CELLULAR SYSTEM HAS TO

13   SUPPORT THOUSANDS OF USERS, AND, YOU KNOW, FOR IT TO HAVE A

14   HIGH DATA RATE.  SO IT'S QUITE A SCIENCE, THE DESIGN OF THESE

15   WAVEFORMS.

16   Q.   DOES QUALCOMM HAVE ANY PATENTS THAT COVER LTE WAVEFORMS?

17   A.   YES.  I MEAN, THE UPLINK WAVEFORM, WHICH IS SHOWN AS

18   SC-FDMA, WAS INVENTED BY QUALCOMM.

19   Q.   LET ME -- LET'S TALK ABOUT THAT ONE.

20        MR. DAHM, WOULD YOU PLEASE PUT UP SLIDE NUMBER 6.

21        AND I BELIEVE THIS WAS THE FIRST EXAMPLE OF THE THREE YOU

22   GAVE EARLIER FOR INNOVATIONS IN ESTABLISHED AREAS; IS THAT

23   RIGHT?

24   A.   YES.

25   Q.   WHAT IS SC-FDMA?

1    A.    WELL, OTHER THAN A 6 LETTER ACRONYM, IT IS THE UPLINK

2    WAVEFORM, AS I MENTIONED.  AND TO UNDERSTAND HOW IT WORKS, IT'S

3    USEFUL TO CONTRAST IT TO THE DOWNLINK WAVEFORM, WHICH PREDATED

4    SC-FDMA AND IS CALLED OFDMA, OR ORTHOGONAL FREQUENCY DIVISION

5    MULTIPLE ACCESS.

6         AND THE IDEA HERE IS TO CREATE A ROBUST WAVEFORM THAT'S

7    ROBUST TO THE WIRELESS CHANNEL THAT CAN ALSO BE SHARED BETWEEN

8    MANY USERS SIMULTANEOUSLY FOR SENDING DATA, AND IT CAN BE

9    SHARED IN A VERY FLEXIBLE AND DYNAMIC WAY DEPENDING ON, FOR

10   EXAMPLE, HOW MUCH DATA THEY NEED, BECAUSE DATA SYSTEMS ARE VERY

11   DIFFERENT THAN VOICE SYSTEMS.  SO THIS IS A NEW THING FOR LTE.

12        AND OFDMA IS GREAT, BUT IT DOES HAVE A MAJOR PROBLEM

13   THAT'S PARTICULARLY A PROBLEM FOR THE PHONE, WHICH IS THAT IT

14   HAS WHAT'S CALLED A HIGH PEAK TO AVERAGE RATIO.

15        SO ALL THESE DIFFERENT FREQUENCY DOMAIN BOXES HERE WHICH

16   I'VE SHOWN, SO THIS IS A TIME FREQUENCY GRID IS WHAT I'VE SHOWN

17   ON THIS FIGURE, SO YOU CAN DIVIDE THIS UP.

18        BUT ALL THESE FREQUENCY COMPONENTS GET SENT AT THE SAME

19   TIME, THIS CREATES A VERY PEAKY SIGNAL.  SO IT CAN BE VERY

20   LARGE, VERY SMALL, VERY LARGE, AND THIS WREAKS HAVOC ON THE

21   PHONE AND THE POWER AND REQUIRES A LOT OF SACRIFICES TO BE

22   MADE.

23        SO SC-FDMA IS A CLEVER WAY TO AVOID THIS PROBLEM WHILE

24   STILL MAINTAINING ALL THE BENEFITS OF OFDMA.  IT REQUIRES EACH

25   U.E. PHONE TO TRANSMIT ONLY OVER A CONTIGUOUS SET OF SUB BANDS

1    AT A TIME, AND IT CAN STILL DO THIS DYNAMICALLY AND DIGITALLY,

2    AND THAT'S THE INVENTION OF SC-FDMA.

3    Q.   DR. ANDREWS, YOU MENTIONED U.E.  WHAT IS THAT?

4    A.   IT STANDS FOR USER EQUIPMENT, AND IT'S CELLULAR SPEED FOR

5    A PHONE, OR SIMILAR DEVICES.

6    Q.   DOES SC-FDMA MATTER TO A USER OF A CELL PHONE?

7    A.   YES.  I MEAN, THE -- THE DIFFERENCE TO THE USER IS MAINLY

8    TWO-FOLD.  IT REDUCES THE SIZE AND THE COST OF THE POWER

9    AMPLIFIER, WHICH THEN ALSO INCREASES BATTERY LIFE BECAUSE

10   YOU'RE BURNING LESS POWER.

11        SIMILARLY, FOR A GIVEN AMOUNT OF POWER, YOU CAN TRANSMIT

12   CLOSER TO THE MAXIMUM WITHOUT THIS PEAKY BEHAVIOR, AND THIS

13   ALLOWS YOU TO INCREASE THE TRANSMISSION RANGE.  IT CAN BE VERY

14   SIGNIFICANT, ON THE ORDER OF HUNDREDS OF METERS OF TRANSITION

15   RANGE, WHICH IS A BIG DIFFERENCE IN THE COVERAGE AREA FOR A

16   CELLULAR NETWORK.

17   Q.   DR. ANDREWS, I'LL ASK YOU TO SLOW DOWN JUST A TAD, PLEASE.

18   A.   YES.

19   Q.   BECAUSE THEY'RE TAKING EVERYTHING DOWN AS YOU SPEAK.

20   A.   OKAY.

21   Q.   DOES QUALCOMM HAVE ANY PATENTS ON SC-FDMA?

22   A.   YES.  AS I MENTIONED EARLIER, THEY HOLD THE PATENT ON

23   SC-FDMA AND IDENTIFY THESE CHALLENGES AND THEN PROVIDE A

24   SOLUTION TO THEM.

25   Q.   HOW OFTEN IS SC-FDMA USED?

1    A.   IT'S USED EVERY TIME THE PHONE TRANSMITS ANYTHING.  SO IT

2    COULD BE USED THOUSANDS OR EVEN MILLIONS OF TIMES A SECOND.

3    Q.   MR. DAHM, PLEASE GO TO SLIDE NUMBER 8.

4         AND, DR. ANDREWS, I BELIEVE THIS SLIDE SHOWS THE SECOND

5    EXAMPLE OF THE THREE YOU GAVE EARLIER OF INNOVATIONS IN

6    ESTABLISHED AREAS, AND I'LL ASK YOU, WHAT IS UPLINK -- WHAT IS

7    AN UPLINK CONTROL CHANNEL?

8    A.   SO BEFORE WE TALK ABOUT THE UPLINK CONTROL CHANNEL THAT'S

9    USED IN LTE, IT'S PERHAPS USEFUL TO TALK ABOUT UPLINK CONTROL

10   INFORMATION, WHICH IS WHAT THAT CHANNEL CARRIES.

11        AND SO THE PHONE TRANSMITS TWO MAIN CATEGORIES OF

12   INFORMATION BACK TO THE BASE STATION.  THE FIRST IS DATA, WHICH

13   WE'RE ALL FAMILIAR WITH, YOU WANT TO SEND A TEXT OR AN E-MAIL

14   OR A FILE.

15        BUT WHAT'S KIND OF INVISIBLE TO THE USERS, BUT CRUCIAL, IS

16   THE CONTROL INFORMATION.  AND THE CONTROL INFORMATION IS REALLY

17   THE GLUE THAT BRINGS THE WHOLE CELL TOGETHER AND ALLOWS THE

18   BASE STATION TO SEE WHAT'S GOING ON IN THE CELL.  WITHOUT THIS,

19   IT'S BLIND.

20        SO THE PHONES ARE CONTINUALLY FEEDING BACK CONTROL

21   INFORMATION, THINGS LIKE THE QUALITY OF THE CHANNELS IT'S

22   RECEIVING FROM THE BASE STATION, YOU KNOW, WHICH PACKETS HAVE

23   BEEN SUCCESSFULLY RECEIVED FROM THE BASE STATION.

24        AND SO EVEN IF YOU'RE JUST RECEIVING DOWNLINK DATA, SUCH

25   AS STREAMING A VIDEO, YOU NEED TO SEND THIS CONTROL INFORMATION

1    FOR THE BASE STATION TO BE ABLE TO DO THAT FOR ALL THE USERS.

2    SO THE CONTROL INFORMATION IS THIS CRUCIAL ASPECT, WITHOUT

3    WHICH IS CELLULAR COMMUNICATIONS DOESN'T WORK.

4    Q.   SO IS CONTROL INFORMATION IMPORTANT TO A USER OF A CELL

5    PHONE?

6    A.   WELL, YES.  I MEAN, THIS IS HOW THE BASE SUMMARY

7    ADJUDICATION SERVES IT, AND IT'S HOW IT'S ABLE TO GET ALLOCATED

8    RESOURCES.  SO IT'S CRITICAL.

9    Q.   IS THERE ANY RELATION BETWEEN DATA AND CONTROL

10   INFORMATION?

11   A.   YES.  IN A LIMITED AMOUNT OF BANDWIDTH IN A GIVEN CELL,

12   FOR EXAMPLE, EVERY BIT OF BANDWIDTH YOU USE FOR CONTROL

13   INFORMATION IS THAT MUCH LESS YOU CAN USE FOR DATA.

14       SO YOU WANT THE CONTROL INFORMATION TO BE EXTREMELY

15   EFFICIENT, AND GRANTED, YOU'RE SENDING CONTROL INFORMING FOR

16   ALL THESE PHONES MANY TIMES PER SECOND.  SO IT'S QUITE A LOT OF

17   INFORMATION THAT NEEDS TO BE SENT EFFICIENTLY.

18       FURTHERMORE, BECAUSE THIS INFORMATION IS CRITICAL, IT HAS

19   TO BE EXTREMELY ROBUST SO IT CAN BE RECEIVED WITH HIGH

20   RELIABILITY BY THE BASE STATION FROM ALL THESE DIFFERENT PHONES

21   THAT ARE, YOU KNOW, JUST SENDING IT BACK AND THE PHONES AREN'T

22   SYNCHRONIZED AND SO ON.

23   Q.   I NOTICE IN YOUR FIGURE THAT SOME OF THE, SOME OF THE

24   PHONES HAVE RED AND BLUE LINES AND SOME JUST HAVE RED LINES.

25   WHY IS THAT?

1      A.   YES.  AS I MENTIONED, EVEN IF THE PHONE DOESN'T HAVE DATA

2      TO SEND BACK TO THE BASE STATION, IT STILL SENDS CONTROL, YOU

3      KNOW, SEVERAL TIMES A SECOND SO THAT THE PHONE -- THE BASE

4      STATION CAN TRACK IT AND SERVE IT.

5      Q.   LET'S GO TO SLIDE NUMBER 9, PLEASE.

6           AND, DR. ANDREWS, WHAT'S SHOWN ON THIS SLIDE?

7      A.   THIS IS A SCHEMATIC, A BLOCK DIAGRAM OF HOW THE UPLINK

8      CONTROL INFORMATION IS ENCODED IN LTE.  SO THIS IS THE, THE

9      UPLINK CONTROL CHANNEL FOR LTE, AND GRANTED, IT'S EXTREMELY

10     COMPLICATED, AND I ONLY PUT IT UP HERE TO JUST SHOW THAT THIS

11     IS A VERY SOPHISTICATED PROCEDURE, AND THIS WAS ARRIVED AT, YOU

12     KNOW, I THINK AT -- IT'S A VERY NOVEL -- I DON'T KNOW EXACTLY

13     HOW THEY ARRIVED AT THIS, BUT IT'S WORKING INCREDIBLY WELL, AND

14     IT ALLOWS MANY USERS TO MULTIPLEX SIMULTANEOUSLY THEIR CONTROL

15     INFORMATION, EVEN IF THEY'RE UNSYNCHRONIZED.  IT'S VERY ROBUST,

16     VERY EFFICIENT, AND IT USES A LOT OF COMPLEX MATHEMATICS IN

17     ORDER TO DO THIS.

18     Q.   DR. ANDREWS, NEAR THE BOTTOM OF THAT FIGURE, I SEE PUCCH.

19          WHAT IS THAT?

20     A.   SO THAT IS THE LTE TERMINOLOGY, AND IT STANDS FOR PHYSICAL

21     UPLINK CONTROL CHANNEL.  SO PUCCH IS THE UPLINK CONTROL CHANNEL

22     IN LTE.

23     Q.   AND HOW IS THAT RELATED TO THE CONTROL INFORMATION YOU

24     TALKED ABOUT?

25     A.   IT'S WHAT CARRIES THE CONTROL INFORMATION.

1    Q.   LET'S GO TO SLIDE NUMBER 10, PLEASE.  AND, DR. ANDREWS,

2    WHAT IS SHOWN ON THIS SLIDE?

3    A.   WELL, BECAUSE THIS UPLINK CONTROL INFORMATION IS SO

4    CRITICAL AND, YOU KNOW, THERE'S DIFFERENT TYPES OF IT, THERE'S

5    ACTUALLY DIFFERENT FORMATS OF THIS PUCCH DEPENDING ON WHAT YOU

6    NEED TO DO, WHAT YOU NEED TO SEND.

7         SO IN FACT THERE'S THREE MAIN FORMATS WITH SEVERAL SUB

8    FORMATS THAT ARE POSSIBLE FOR THIS PUCCH THAT ARE OPTIMIZED FOR

9    THE CONDITIONS AND THE TYPE OF CONTROL INFORMATION.

10   Q.   WHO INVENTED THE PUCCH?

11   A.   EACH OF THESE FORMATS IS SLIGHTLY DIFFERENT AND QUALCOMM

12   HOLDS PATENTS ON ALL OF THEM.  QUALCOMM INVENTED THE FORMAT,

13   INVENTED THE PUCCH AND EVERY LAST FORMAT.

14   Q.   SO YOU'RE SAYING QUALCOMM INVENTED ALL THE FORMATS ON THIS

15   SLIDE?

16   A.   YES.

17   Q.   LET'S LOOK AT SLIDE NUMBER 11, PLEASE.

18        DR. ANDREWS, I BELIEVE THIS IS THE THIRD OF THE THREE

19   EXAMPLES YOU GAVE FOR QUALCOMM'S INNOVATION IN ESTABLISHED

20   AREAS.  SO I'LL ASK YOU, WHAT IS BASE STATION ACQUISITION?

21   A.   YEAH.  THAT'S RIGHT.  SO THIS IS NOW THE DOWNLINK EXAMPLE.

22   SO THE BASE STATION IS CONTINUALLY SENDING OUT WHAT'S KNOWN AS

23   THE PHYSICAL BROADCAST CHANNEL, OR PBCH, AND IT CARRIES A

24   PRIMARY SYNCHRONIZATION SEQUENCE, PSS, AS WELL AS A SECONDARY

25   SYNCHRONIZATION SEQUENCE, OR SSS.

1    AND SO THE U.E., WHEN IT FIRST COMES OUT OF IDLE MODE, IT

2    POWERS ON, IT LISTENS FOR THESE IN A SPECIFIED WAY AND RECEIVES

3    THE PSS, AND THEN THE SSS AND THIS PROCEDURE ALLOWS IT TO

4    ACQUIRE THE TIMING OF THE BASE STATION, LEARN THE BARE MINIMUM

5    INFORMATION IT NEEDS IN ORDER TO BEGIN COMMUNICATING WITH THE

6    BASE STATION, FOR EXAMPLE, SENDING UPLINK CONTROL INFORMATION.

7    SO IT'S A VERY IMPORTANT PROCEDURE.

8    Q.   WHAT IS THE PBCH?

9    A.   YEAH.  SO AS I SAID, THAT'S THE PHYSICAL BROADCAST

10   CHANNEL, AND THAT'S WHAT CARRIES THE PSS AND THE SSS.

11   Q.   IS BASE STATION ACQUISITION IMPORTANT TO A USER OF A CELL

12   PHONE?

13   A.   YES.  I MEAN, WHEN THE PHONE TURNS ON, YOU WANT -- IT'S

14   OBVIOUSLY VERY FRUSTRATING IF YOU HAVE TO WAIT A WHILE TO GET A

15   CONNECTION.  SO IT'S WHAT ALLOWS YOU TO CONNECT VERY QUICKLY,

16   AND IT'S ALMOST INSTANTANEOUS FROM A USER'S POINT OF VIEW DUE

17   TO THIS PROCEDURE.

18   Q.   DOES QUALCOMM HAVE ANY PATENTS THAT COVER BASE STATION

19   ACQUISITION?

20   A.   YES.  SO THEY INVENTED THIS TWO STEP PSS, SSS PROCEDURE AS

21   IT'S USED IN LTE, AND IN PARTICULAR THE WAY IT USES THE MIDDLE

22   OF THE BAND SO THAT IT'S EASY FOR THE U.E. TO FIND.

23   Q.   DR. ANDREWS, I'D LIKE TO SWITCH GEARS A LITTLE BIT AND NOW

24   LOOK AT THE SECOND CATEGORY YOU TALKED ABOUT, WHICH I BELIEVE

25   IS QUALCOMM'S INNOVATIONS IN NEW AREAS.

1    AND CAN WE PLEASE PUT UP SLIDE NUMBER 12.

2    DR. ANDREWS, WHAT IS CARRIER AGGREGATION?

3    A.   SO CARRIER AGGREGATION IS A VERY IMPORTANT PARADIGM FOR

4    NEWER CELLULAR COMMUNICATION SYSTEMS IN THAT IT ALLOWS YOU TO

5    TAKE DIFFERENT BANDS THAT ARE SCATTERED AROUND THE SPECTRUM.

6    AND SO BY HERE CARRIERS MEAN BANDS.  THEY MEAN A CERTAIN AMOUNT

7    OF BANDWIDTH.

8    SO, FOR EXAMPLE, AT&T OR VERIZON MIGHT HAVE A BAND OF, A 5

9    MEGAHERTZ BAND AND THAT CAN ONLY CARRY A CERTAIN AMOUNT OF DATA

10   AND THEY WANT MORE.  BUT THE OTHER BANDS THEY OWN ARE WAY UP IN

11   DIFFERENT PARTS OF THE SPECTRUM.

12   SO CARRIER AGGREGATION IS THE SCHEME WHEREBY YOU CAN GLUE

13   THESE TOGETHER TO CREATE WHAT LOOKS LIKE EFFECTIVELY A MUCH

14   LARGER CHANNEL.

15   SO ON THIS EXAMPLE IN THE SLIDE HERE, I'VE SHOWN WHERE YOU

16   TAKE A 5 MEGAHERTZ BAND AND THEN TWO 10 MEGAHERTZ BANDS THAT

17   ARE SCATTERED ANYWHERE, AND IT'S ABLE TO CREATE BASICALLY WHAT

18   LOOKS LIKE A BIG 25 MEGAHERTZ BAND, WHICH WOULD BE FIVE TIMES

19   THE DATA RATE OR FIVE TIMES THE BANDWIDTH OF A SINGLE MEGAHERTZ

20   BAND THAT YOU HAVE BEFORE.

21   Q.   DOES CARRIER AGGREGATION OFFER ANY ADVANTAGES TO A USER OF

22   A CELL PHONE?

23   A.   YEAH.  IT AMPLIFIES DATA RATE.  IT CAN RECEIVE VERY

24   SIGNIFICANTLY, IN THIS EXAMPLE BY A FACTOR OF 5, WHICH IS A

25   PRETTY REALISTIC EXAMPLE.

ANDREWS DIRECT BY MR. HALL

1        SO FROM A USER'S POINT OF VIEW, THE FILES WOULD BE

2    DOWNLOADED FIVE TIMES FASTER, DATA FIVE TIMES FASTER AND SO ON.

3    Q.   WERE THERE ANY DIFFICULTIES IN DESIGNING CARRIER

4    AGGREGATION?

5    A.   YES, A NUMBER.  I MEAN, EVERYTHING BECOMES A BIT MORE

6    COMPLICATED WHEN YOU START TRANSMITTING SIMULTANEOUSLY OVER

7    MULTIPLE BANDS THAT ARE SCATTERED AROUND THE FREQUENCY

8    SPECTRUM.  YOU NEED OVERHEAD SPECTRUM, MORE CONTROL SIGNALLING,

9    MORE OVERHEAD SIGNALLING TO SUPPORT THESE DIFFERENT BANDS.

10        AND ALSO, FOR EXAMPLE, FOR THE CASE OF UPLINK CARRIER

11    AGGREGATION WHERE THE PHONE IS TRANSMITTING OVER MULTIPLE

12    BANDS, IT NOW HAS TO DIVIDE ITS POWER BETWEEN THOSE BANDS

13    DYNAMICALLY DEPENDING ON THE CHANNEL CONDITIONS.  SO POWER

14    CONTROL BECOMES MUCH MORE COMPLICATED.

15        AND THEN FINALLY, AS THE USER MOVED AROUND THE SYSTEM,

16    WHICH IS CRUCIAL FOR A CELLULAR SYSTEM TO SUPPORT MOBILITY, AS

17    YOU HAND OFF FROM ONE BASE STATION TO ANOTHER, YOU HAVE TO HAND

18    OFF MULTIPLE BANDS.  SO HANDOFF BECOMES MORE COMPLICATED.

19    THERE'S A LOT OF COMPLICATIONS WHEN YOU GO TO CARRIER

20    AGGREGATION PARADIGM.

21    Q.   DOES QUALCOMM HAVE ANY PATENTS THAT COVER CARRIER

22    AGGREGATION?

23    A.    THEY DO.  IN FACT, ALMOST A THIRD OF MY REPORT IS

24    DEDICATED TO CARRIER AGGREGATION PATENTS, AND BASED ON MY

25    RESEARCH ON THIS, IT'S CLEAR TO ME THAT QUALCOMM PIONEERED THIS

1    AREA, REALLY INVENTED THE CONCEPT, AND SOLVED ALL THESE

2    PROBLEMS WHICH I'VE JUST LISTED, AND THEY HAVE PATENTS THAT

3    PRESENT THOSE SOLUTIONS.

4    Q.   BASED ON THE 34 PATENTS THAT YOU LOOKED AT AND ANALYZED,

5    DO YOU HAVE AN OPINION ON QUALCOMM'S PATENT PORTFOLIO IN THE

6    AREA OF CARRIER AGGREGATION?

7    A.   YES.  I MEAN, BASED ON THE PATENTS I LOOKED AT, THEY HAVE

8    A VERY BROAD AND DEEP PORTFOLIO AS FAR AS CARRIER AGGREGATION

9    IN PARTICULAR IS CONCERNED.

10   Q.   DOES CARRIER AGGREGATION PLAY ANY ROLE IN 5G?

11   A.   YES.  I MEAN, I THINK OF CARRIER AGGREGATION AS BEING EVEN

12   MORE IMPORTANT.  IT'S LIKE THE CENTRAL ORGANIZING PRINCIPLE OF

13   5G.  BECAUSE ONE OF THE MAIN POINTS OF 5G IS TO BRING IN MORE

14   SPECTRUM, INCLUDING SUBPRIME SPECTRUMS, SUCH AS MILLIMETER WAVE

15   SPECTRUM, WHICH IS TENS OF GIGAHERTZ.

16       AND SO CARRIER AGGREGATION IS EVEN MORE CRUCIAL TO 5G.

17   Q.   LET'S PUT UP SLIDE 15, PLEASE.

18       AND, DR. ANDREWS, I'D LIKE TO ASK YOU NOW ABOUT THE SECOND

19   EXAMPLE OF THE THREE THAT YOU GAVE FOR QUALCOMM'S INNOVATIONS

20   IN NEW AREAS, AND I BELIEVE THAT WAS CELLULAR IN UNLICENSED

21   SPECTRUM.

22       WHAT IS THAT?

23   A.   THIS IS CELLULAR IN UNLICENSED SPECTRUM IS SIMILAR TO

24   CARRIER AGGREGATION, BUT INSTEAD OF USING DIFFERENT LICENSED

25   SPECTRUM THAT THE OPERATORS OWN, INSTEAD YOU USE UNLICENSED

1    SPECTRUM.  THERE'S A LOT OF UNLICENSED SPECTRUM.  IT'S A PUBLIC

2    RESOURCE.  IT'S -- SPECIFICALLY IN THE 5 GIGAHERTZ BAND,

3    THERE'S HUNDREDS OF MEGAHERTZ.  IT'S USED BY WI-FI, BABY

4    MONITORS, BLUETOOTH, CORDLESS PHONES.  IT'S, AGAIN, SUB PRIME

5    SPECTRUM THAT IS CHALLENGING TO USE AND HISTORICALLY HAS NOT

6    BEEN USED BY THIS REASON FOR OPERATORS.

7        BUT QUALCOMM PIONEERED THE TECHNIQUES THAT ALLOW AN ANCHOR

8    CARRIER TO HELP NAVIGATE THE USE OF THIS SPECTRUM, WHICH REALLY

9    CAN REALLY INCREASE THE DATA RATES THAT A CELLULAR PHONE USER

10   EXPERIENCES.

11   Q.   SO WHAT, IF ANYTHING, DOES THIS HAVE IN THE WAY OF BENEFIT

12   FOR USERS AND OPERATORS?

13   A.   YEAH.  SO THIS IS ANOTHER WAY TO BRING MORE BANDWIDTH INTO

14   THE PICTURE AND INCREASE DATA RATES AND CAPACITY, SIMILAR TO

15   CARRIER AGGREGATION, IT CAN BE BY A SEVERAL-FOLD INCREASE.  SO

16   VERY SIGNIFICANT INCREASE.

17   Q.   DOES QUALCOMM HAVE ANY PATENTS THAT COVER CELLULAR IN

18   UNLICENSED SPECTRUM?

19   A.   YES.  I ANALYZED QUALCOMM PATENTS IN THIS AREA AND FOUND

20   THAT THEY'RE SPECIAL TO THE LTE STANDARD.

21   Q.   LET'S PUT UP SLIDE 16, PLEASE.

22       AND I BELIEVE, DR. ANDREWS, THIS WAS THE THIRD OF THE

23   THREE EXAMPLES YOU GAVE FOR INNOVATIONS IN NEW AREAS.

24       SO WHAT ARE HETEROGENEOUS NETWORKS?

25   A.   SO HETEROGENOUS NETWORKS, OR HETNETS, REFER TO CELLULAR

ANDREWS DIRECT BY MR. HALL

```
1        NETWORKS THAT ADD DIFFERENT TYPES OF BASE STATIONS TO THE

2        NETWORK TO SUPPLEMENT THE MACRO CELLS, WHICH ARE THE COMMON,

3        LARGE TOWERS THAT PROVIDE THE OVERALL COVERAGE IN THE NETWORK.

4             SO WHAT YOU DO IN A HETNET IS YOU ADD, YOU KNOW, MICRO

5        CELLS, PICOCELLS AND FEMTOCELLS, WHICH HAVE SMALLER TRANSIT

6        POWERS AND THUS SMALLER COVERAGE RANGES, AND THESE ARE DEPLOYED

7        AT HOT SPOTS TO PROVIDE CAPACITY IN SPECIFIC AREAS.

8        Q.   I BELIEVE YOU SAID EARLIER, WAS THIS THE CATEGORY YOU SAID

9        WAS NEAR AND DEAR TO YOUR HEART?

10       A.   YES.

11       Q.   CAN YOU TELL US WHY THAT IS?

12       A.   WELL, I'VE DONE A LOT OF RESEARCH ON THESE TYPE OF

13       NETWORKS AND THE INTERFERENCE ISSUES AND OTHER PERFORMANCE

14       ASPECTS OF THEM FOR OVER A DECADE, SO IT'S AN AREA I'M

15       CONSIDERED A LEADER IN.

16       Q.   DO YOU HAVE AN OPINION ABOUT QUALCOMM'S ROLE IN THE

17       DEVELOPMENT OF HETNETS?

18       A.   QUALCOMM PLAYED A PRETTY FORMATIVE ROLE.  I FOLLOWED THEIR

19       WORK, AND I THINK THEY FOLLOWED MINE, YOU KNOW, AND THEY DID A

20       LOT OF VERY FUNDAMENTAL WORK THAT MADE HETNETS POSSIBLE.

21       Q.   DO HETNETS PROVIDE ANY, ANY BENEFITS TO A USER OF A CELL

22       PHONE?

23       A.   YES.  I MEAN, HETNETS ARE A MECHANISM WHEREBY THE NETWORK

24       CAN DENSIFY.  SO YOU CAN ADD A LOT MORE BASE STATIONS IN A COST

25       EFFECTIVE WAY.  AND EACH BASE STATION YOU ADD CREATES A NEW
```

1    CELL WHERE YOU CAN REUSE THE SCARCE SPECTRUM.  SO IF YOU'RE A

2    USER ON ONE OF THESE SMALL CELLS, YOU CAN NOW USE ALL THE

3    NETWORK, ASSUMING YOU CAN HANDLE THE INTERFERENCE PROBLEMS.

4         JUST A SIMPLE EXAMPLE, IF I TOOK A CELL AND DIVIDED IT

5    INTO FOUR CELLS, EACH USER WOULD NOW GET ABOUT FOUR TIMES THE

6    DATA RATE IF YOU DO EVERYTHING CORRECTLY.

7         SO IT'S A VERY POWERFUL MECHANISM FOR INCREASING DATA

8    RATES WITHOUT ADDING MORE SPECTRUM, WHICH AS WE KNOW IS SCARCE.

9    Q.   ARE THERE ANY CHALLENGES TO USING HETNETS?

10   A.   YES.  THE MOST OBVIOUS ONE, WHICH I MENTIONED, IS THE

11   INTERFERENCE.  INTERFERENCE IN PARTICULAR TO THE SMALL CELLS IS

12   A BIG PROBLEM.

13        YOU HAVE THESE MACRO CELL TOWERS THAT ARE HIGH UP IN THE

14   AIR BLASTING AWAY AT 40 WATTS WITH DIRECTIONAL ANTENNAS, IT

15   CAUSES A LOT OF INTERFERENCE TO THE PICOCELLS.

16        IF YOU DON'T DO ANYTHING TO SOLVE THAT, THE PICOCELLS HAVE

17   A TINY COVERAGE AREA, AND DON'T SERVE ANYONE, WHICH DEFEATS THE

18   WHOLE POINT.

19        YOU NEED TO HAVE A VERY CLEVER WAY TO ALLOW THE PICOCELLS

20   TO SUPPRESS THIS INTERFERENCE FOR THE MACRO CELLS TO TURN OFF

21   BRIEFLY TO ALLOW THE PICOCELLS TO EXPAND, COVERAGE AREAS TO

22   EXPAND AND -- YEAH, I THINK THAT'S WHAT I SAID.

23   Q.   DR. ANDREWS, DID YOU ANALYZE ANY QUALCOMM PATENTS RELATED

24   TO HETNETS?

25   A.   YES, I DID.

1    Q.   AND WHAT DID YOU FIND?

2    A.   I FIND THEY HAD VERY FUNDAMENTAL AND IMPORTANT STANDARD

3    ESSENTIAL CONTRIBUTIONS TO SOLVING THESE INTERFERENCE PROBLEMS

4    IN PARTICULAR.

5    Q.   DO HETNETS PLAY A ROLE IN THE 5G STANDARD?

6    A.   YES.  HETNETS ARE THE KEY MECHANISM FOR CONTINUED

7    DENSIFICATION OF THE NETWORK, WHICH IS VERY IMPORTANT FOR 5G,

8    IN PARTICULAR, SINCE 5G WILL RELY A LOT ON MILLIMETER WAVE

9    COMMUNICATION, AND THIS IS SHORT RANGE -- THIS IS A SHORT RANGE

10   TYPE OF COMMUNICATION, THE NETWORK WILL HAVE TO BE MUCH MORE

11   DENSE, SO THE HETNET IDEAS I THINK WILL BE MORE IMPORTANT IN

12   5G.

13   Q.   DR. ANDREWS, I WANT TO ASK YOU NOW A FEW QUESTIONS ABOUT

14   ONE OF THE TWO BOOKS THAT YOU TOLD US ABOUT EARLIER.

15        WHAT ARE THE TOPICS OF THOSE TWO BOOKS?

16   A.   WELL, THE FIRST BOOK I WROTE WAS ON WIMAX, WHICH WAS AN

17   EARLY 4G STANDARD, AND THEN THE SECOND BOOK I WROTE WAS ON LTE

18   SHORTLY AFTER LTE CAME OUT.

19   Q.   WHAT IS WIMAX?

20   A.   SO WIMAX IS AN INDUSTRY FORUM THAT DEVELOPED A STANDARD

21   BASED ON THE IEEE 802 .16 SUITE OF STANDARDS, AND IT WAS

22   INTENDED INITIALLY TO PROVIDE FIXED BROADBAND ACCESS.

23        AND BY "FIXED" I MEAN THAT IT DIDN'T SUPPORT MOBILITY, SO

24   NOT A TRUE CELLULAR NETWORK.  BUT IT EVOLVED TO SUPPORT

25   MOBILITY AROUND 2005, AND THAT WAS KNOWN AS MOBILE WIMAX.

```
1    Q.   WHAT HAPPENED TO MOBILE WIMAX?

2    A.   WELL, IT DIDN'T -- YOU KNOW, IT CAUSED A LOT OF EXCITEMENT

3    AT THE TIME, BUT EVENTUALLY, YOU KNOW, EARLY DEPLOYMENTS DIDN'T

4    WORK ALL THAT GREAT, AND MOST OF THE CELLULAR OPERATORS AND

5    VENDORS WAITED FOR LTE, WHICH SOLVED A LOT OF THOSE PROBLEMS,

6    TO COME ALONG.

7    Q.   AS THE PERSON WHO I GUESS LITERALLY WROTE THE BOOK ON

8    WIMAX, CAN YOU GIVE US SOME TECHNICAL REASONS FOR WHY WIMAX,

9    WHY THAT HAPPENED TO WIMAX?

10   A.   YEAH.  I MEAN, ONE BIG ONE THAT WE SAW BACK THEN WAS THAT

11   THE OVERHEAD CHANNELS IN LTE -- IN WIMAX, RATHER, WERE NOT VERY

12   EFFICIENT.  THEY WERE REALLY OVERDESIGNED.  AND SO THEY

13   CONSUMED A LOT OF THE RESOURCES, SO THERE WAS A LOT LEFT -- A

14   LOT LESS LEFT FOR DATA.  IT WAS SO BAD, IN FACT, THAT MANY SO

15   OF THE PEOPLE I TALKED TO, YOU KNOW, THEY JUST TURNED OFF A LOT

16   OF THESE ADVANCED CONTROL FEATURES AND JUST DID A VERY SIMPLE

17   OPTION IN WIMAX.

18        SO THIS WAS A MAJOR DEFICIENCY, THE CONTROL CHANNELS AND

19   THE OVERHEAD PROCEDURE.

20        AND THEN, YOU KNOW, ANOTHER WAS IT USED OFDMA IN BOTH

21   DIRECTIONS, AND AS WE DISCUSSED EARLIER, THE SC-FDMA WHICH

22   QUALCOMM INVENTED HAD A BIG IMPACT ON THE UPLINK EFFICIENCY AND

23   RANGE FOR LTE.

24        AND THEN A THIRD IS THAT WIMAX WAS A CLEAN SLATE STANDARD,

25   FROM A TOTALLY NEW STANDARDS BODY, SO IT DIDN'T OFFER BACKWARDS
```

```
 1    COMPATIBILITY, LIKE LTE OFFERED CONSIDERABLY MORE BACKWARDS

 2    COMPATIBILITY WITH EARLIER STANDARDS.

 3    Q.   SO HOW THEN DID WIMAX COMPARE TO LTE?

 4    A.   I THINK, YOU KNOW, ONCE LTE CAME OUT, IT BECAME CLEAR THAT

 5    LTE WAS SUPERIOR TO WIMAX FOR CELLULAR TECHNOLOGY ON A

 6    TECHNICAL LEVEL IN BASICALLY EVERY WAY.

 7    Q.   IS THERE A RELATION BETWEEN THE PROBLEMS OF WIMAX THAT YOU

 8    JUST MENTIONED AND THE QUALCOMM PATENTS THAT YOU ANALYZED?

 9    A.   WELL --

10         MR. ANSALDO:  OBJECTION, YOUR HONOR.  BEYOND THE

11    SCOPE OF HIS REPORT.

12         THE COURT:  WHY DON'T YOU GIVE ME THE REPORT AND SHOW

13    ME WHERE HE COMMENTS ON THAT, PLEASE?

14         WHAT WAS THE QUESTION?  CAN YOU REPEAT THE QUESTION,

15    PLEASE.

16         UNFORTUNATELY, MY REALTIME HAS STOPPED.

17         HAS YOUR REALTIME STOPPED?

18         MR. VAN NEST:  YES, YOUR HONOR.

19         THE COURT:  DOES EVERYONE IN THE ROOM HAVE THEIR CELL

20    PHONES OFF?  IF YOU DON'T, I'M GOING TO JUST HAVE EVERYONE

21    LEAVE THE ROOM BECAUSE WE NEED THE REALTIME.

22         OKAY.  LET'S DO IT.  IT'S 9:35.

23         (PAUSE IN PROCEEDINGS.)

24         THE COURT:  I'M GOING TO HAVE EVERYONE LEAVE THE

25    ROOM, AND JUST HAVE THE PARTIES HERE.  WE NEED TO HAVE THE
```

```
1    WI-FI, AND IF THERE ARE TOO MANY PHONES ON THE SYSTEM, THEN WE
2    CAN'T HAVE REALTIME.
3         (PAUSE IN PROCEEDINGS.)
4         THE COURT:  OTHERWISE I GUESS WE COULD JUST TRY AT
5    THE 10:30.  THAT'S FINE, TOO.
6         ALL RIGHT.  LET'S GO AHEAD.  IT'S 9:38.  WE'LL GO AHEAD
7    WITHOUT THE TRANSCRIPT FOR AN HOUR.  IT'S UNFORTUNATE.
8         OKAY.  WHAT WAS THE QUESTION?
9         MR. HALL:  YOUR HONOR, IN THE INTEREST OF TIME, I'LL
10   WITHDRAW THAT QUESTION.  I BELIEVE IT'S SUPPORTED, BUT WE'LL
11   WITHDRAW THAT QUESTION.
12        THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.
13        MR. HALL:  AND WITH THAT, WE PASS THE WITNESS.
14        THE COURT:  ALL RIGHT.  TIME IS 9:38.
15        (PAUSE IN PROCEEDINGS.)
16        MR. ANSALDO:  MAY I APPROACH THE WITNESS WITH A
17   BINDER?
18        THE COURT:  GO AHEAD, PLEASE.
19        (PAUSE IN PROCEEDINGS.)
20        THE COURT:  ALL RIGHT.  TIME IS 9:39.  GO AHEAD,
21   PLEASE.
22                    CROSS-EXAMINATION
23   BY MR. ANSALDO:
24   Q.  PROFESSOR ANDREWS, YOU DISCUSSED FEATURES BEING IMPORTANT
25   TO USERS.  DO YOU REMEMBER THAT?
```

1    A.   YES.

2    Q.   ARE YOU OFFERING AN OPINION AS TO THE DOLLAR BENEFIT OF

3    ANY BENEFIT THAT MIGHT ACCRUE TO USERS?

4    A.   NO, SIR.

5    Q.   AND USERS THAT HAVE LTE ENABLED PHONES THAT ALSO HAVE

6    WI-FI CAN USE THE WI-FI FOR DATA TRANSMISSION; IS THAT CORRECT?

7    A.   ASSUMING THEY'RE CONNECTED TO A WI-FI ACCESS POINT THAT

8    WORKS, YES.

9    Q.   AND WHEN YOU SAY THAT QUALCOMM HAS VALUABLE PATENTS, ARE

10   YOU REFERRING TO YOUR OWN ASSESSMENT OF TECHNICAL VALUE; RIGHT?

11   A.   YES.

12   Q.   AND THAT'S BASED ON 34 QUALCOMM PATENTS THAT YOU

13   DISCUSSED?

14   A.   YES.

15   Q.   AND YOU'RE NOT ASCRIBING A DOLLAR VALUE TO THOSE PATENTS;

16   IS THAT CORRECT?

17   A.   YES.

18   Q.   YOU'RE NOT OFFERING ANY OPINION ABOUT WHAT A REASONABLE

19   ROYALTY WOULD BE FOR THOSE PATENTS?

20   A.   NO, SIR.

21   Q.   AND YOU'RE ALSO NOT OFFERING AN OPINION ABOUT WHAT A

22   REASONABLE ROYALTY WOULD BE FOR QUALCOMM'S PORTFOLIO AS A

23   WHOLE; IS THAT CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   NOR ARE YOU OFFERING AN OPINION AS TO HOW THE VALUE OF

1      QUALCOMM'S PATENTS HAS CHANGED OVER TIME?

2      A.   NO.  I MEAN, I -- NOT WITH REGARDS TO DOLLAR VALUE.  I DO

3      SPEAK WITH REGARDS TO THE TECHNICAL VALUE OF THE PATENTS OVER

4      TIME.

5      Q.   SO I'D LIKE TO DISCUSS HOW YOU CAME TO YOUR OPINIONS ABOUT

6      TECHNICAL VALUE, AND IT'S TRUE THAT YOU DID NOT USE A

7      METHODOLOGY TO DETERMINE WHETHER A PATENT IS OR IS NOT

8      VALUABLE?

9      A.   I MEAN, I USED MY OWN PERSONAL EXPERIENCE FOR DECADES IN

10     THE FIELD.

11     Q.   BUT YOU DID NOT USE A METHODOLOGY TO MAKE THAT

12     DETERMINATION?

13     A.   NOT LIKE A CHECKLIST OR ANYTHING LIKE THAT.

14     Q.   AND SO THE METHOD THAT YOU EMPLOYED WAS BASED ON YOUR

15     EXPERIENCE AND YOUR REACTION WHEN REVIEWING THE PATENTS; IS

16     THAT CORRECT?

17     A.   YEAH, MY ANALYSIS AND REACTION, YES.

18     Q.   AND YOU DESCRIBE THAT AS A GUT FEELING?

19     A.   WELL, IT'S BASED ON, YOU KNOW, 20-PLUS YEARS OF READING

20     PATENTS AND RESEARCH CONTRIBUTIONS.

21     Q.   BUT IT'S NOT BASED ON A METHODOLOGY?

22     A.   THAT'S CORRECT.

23     Q.   AND TURNING, I GUESS, TO THE SCOPE OF THE OPINIONS YOU'RE

24     OFFERING, YOU'RE NOT OFFERING AN OPINION ABOUT QUALCOMM'S

25     NON-ESSENTIAL PATENTS; IS THAT CORRECT?

1     A.    THAT'S CORRECT.

2     Q.    YOU'RE ALSO NOT OFFERING AN OPINION ABOUT ANY QUALCOMM

3     PATENTS RELATED TO TECHNOLOGIES OUTSIDE OF CELLULAR STANDARDS?

4     A.    THAT'S TRUE.

5     Q.    AND THERE ARE OTHER TECHNOLOGY AREAS THAT ARE IMPORTANT TO

6     QUALCOMM -- TO CELLULAR COMMUNICATIONS THAT YOU DO NOT OPINE

7     ON; RIGHT?

8     A.    I THINK THAT'S FAIR.

9     Q.    AND YOU'RE NOT OFFERING AN OPINION AS TO WHERE OTHER

10    COMPANIES HAVE VALUABLE PATENTS FOR THE CELLULAR TECHNOLOGIES

11    THAT YOU DID DISCUSS?

12    A.    THAT'S RIGHT.

13    Q.    YOU DID NOT RELY ON ASSESSMENT OF NOKIA PATENTS IN FORMING

14    YOUR OPINION?

15    A.    CORRECT.

16    Q.    AND SO YOU'RE NOT OFFERING AN OPINION THAT QUALCOMM

17    PATENTS ARE MORE VALUABLE THAN NOKIA'S?

18    A.    YEAH, THERE'S NO COMPARISON IN ANY OF MY REPORTS LIKE

19    THAT.

20    Q.    AND THERE'S NO COMPARISON THAT SAYS QUALCOMM'S PATENTS ARE

21    MORE VALUABLE THAN INTERDIGITAL'S?

22    A.    CORRECT.

23    Q.    AND THERE'S NO COMPARISON THAT SAYS QUALCOMM PATENTS ARE

24    MORE VALUABLE THAN ERICSSON'S PATENTS?

25    A.    CORRECT.

1    Q.   IN FACT, YOU'RE NOT OFFERING AN OPINION AS TO ANY OTHER

2    COMPANY; RIGHT?

3    A.   CORRECT.

4    Q.   AND THE OPINION THAT YOU'RE OFFERING IS ABOUT 34 PATENTS

5    OF QUALCOMM'S?

6    A.   YES.

7              MR. ANSALDO:  I HAVE NO FURTHER QUESTIONS.

8              THE COURT:  OKAY.  TIME IS 9:42.

9         ANY REDIRECT?

10             MR. HALL:  WE HAVE NO MORE QUESTIONS, YOUR HONOR.

11             THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED, AND

12   IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

13             MR. HALL:  NOT SUBJECT TO RECALL BY US.

14             THE COURT:  DO YOU AGREE?

15             MR. ANSALDO:  WE AGREE.

16             THE COURT:  OKAY.  THEN YOU'VE COMPLETED YOUR TRIAL

17   TESTIMONY, AND YOU ARE FREE TO GO.

18             THE WITNESS:  THANK YOU, YOUR HONOR.

19             THE COURT:  AND I'M GOING TO RETURN THE EXPERT REPORT

20   TO MR. HALL.

21        LET'S TAKE A COUPLE MINUTE BREAK TO SEE IF WE CAN GET THE

22   REALTIME RESTORED.  IF WE CAN GET IT RESTORED, I'LL INVITE

23   EVERYONE BACK.  BUT IF IT SHUTS DOWN AGAIN, I'M JUST GOING TO

24   EXCUSE EVERYONE FOR THE REST OF THE DAY, BECAUSE I'M SORRY, BUT

25   I NEED THE TRANSCRIPT.

1619

1        OKAY.  LET'S TAKE A COUPLE MINUTE BREAK JUST TO SEE IF WE

2   CAN GET THIS RESOLVED.

3        THANK YOU.

4        (RECESS FROM 9:43 A.M. UNTIL 9:49 A.M.)

5            THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

6   SEAT.

7        NOW, WE HAVE A COLLECTIVE ACTION PROBLEM WITH THIS ALL THE

8   TIME.  EVERYONE THINKS I NEED MY DEVICE, OTHER PEOPLE CAN TURN

9   THEIRS OFF.

10       SO THE WAY I'M GOING TO SOLVE THIS COLLECTIVE ACTION

11  PROBLEM IS THERE WILL BE COLLECTIVE CONSEQUENCES.  I'M GOING TO

12  ASK YOU ONE MORE TIME, IF YOU CAN, PLEASE TURN OFF YOUR

13  DEVICES.

14       IF THIS SHUTS DOWN AGAIN, THE REST OF THE DAY I'M JUST

15  GOING TO ASK EVERYONE TO STEP OUTSIDE AND I'M ONLY GOING TO

16  HAVE THE PARTIES CAN STAY.  SO THERE WILL BE COLLECTIVE

17  CONSEQUENCES IF YOU DON'T TURN OFF YOUR DEVICES.

18       I'M SORRY, BUT I NEED THE TRANSCRIPT.  ESPECIALLY WITH

19  SOMETHING TECHNICAL, I REALLY NEED THE TRANSCRIPT.  SO IT WAS A

20  REAL HANDICAP NOT TO HAVE THIS DURING THE LAST WITNESS, WHO WAS

21  SPEAKING VERY FAST.

22       SO I'M GOING TO ASK ONE LAST TIME, PLEASE TURN OFF YOUR

23  DEVICES.  I WILL ASK EVERYONE TO LEAVE IF THIS SHUTS DOWN

24  AGAIN.

25       SO CALL YOUR NEXT WITNESS, PLEASE.

1           MR. COLLIER:  YOUR HONOR, MARK COLLIER FROM NORTON,

2      ROSE, FULBRIGHT.  AT THIS TIME QUALCOMM CALLS LORENZO CASACCIA.

3           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

4      **(DEFENDANT'S WITNESS, LORENZO CASACCIA, WAS SWORN.)**

5           THE WITNESS:  YES.

6           THE CLERK:  THANK YOU.  PLEASE BE SEATED.

7           WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

8      NAME FOR THE RECORD.

9           THE WITNESS:  YES.  LORENZO CASACCIA.

10     C-A-S-A-C-C-I-A.

11          THE COURT:  ALL RIGHT.  THE TIME IS 9:51.  GO AHEAD,

12     PLEASE.

13                         **DIRECT EXAMINATION**

14     BY MR. COLLIER:

15     Q.   GOOD MORNING, MR. CASACCIA.  CAN YOU INTRODUCE YOURSELF?

16     A.   YES.  I'M LORENZO CASACCIA.  I WAS BORN IN ITALY.  I'M AN

17     ITALIAN NATIONAL.  I LIVE IN BARCELONA.  AND I'M A VICE

18     PRESIDENT OF TECHNICAL STANDARDS AT QUALCOMM.

19     Q.   AND WHAT ARE SOME OF YOUR RESPONSIBILITIES AS VICE

20     PRESIDENT OF TECHNICAL STANDARDS?

21     A.   I'M RESPONSIBLE FOR THE 3GPP STANDARDIZATION AT QUALCOMM,

22     AND I OVERSEE THE TEAM THAT ATTENDS 3GPP MEETINGS.  AT THIS

23     POINT IN TIME, WE HAVE ABOUT 90 ENGINEERS ATTENDING 3GPP

24     MEETINGS.

25     Q.   AND WHAT IS THE RELATIONSHIP BETWEEN THE STANDARDS TEAM

1       AND QUALCOMM'S R&D GROUP?

2       A.   WE WORK VERY MUCH HAND IN HAND.  SOME OF THE ENGINEERS

3       FROM R&D DO ATTEND 3GPP MEETINGS UNDER OUR SUPERVISION, AND

4       SOME OF THE ENGINEERS FROM MY TEAM ARE EMBEDDED IN RESEARCH

5       PROJECTS UNDER R&D SUPERVISION.

6       Q.   OKAY.  CAN YOU GIVE US A SUMMARY OF YOUR EDUCATIONAL

7       BACKGROUND?

8       A.   YES.  I HAVE COLLEGE DEGREES IN ELECTRICAL ENGINEERS AND

9       TELECOMMUNICATION ENGINEERS, B.S. AND M.S. EQUIVALENT WHICH I

10      GOT IN THE YEAR 2000.

11          AND THEN I HAD ALWAYS BEEN INTERESTED IN HUMANITIES AND

12      PHILOSOPHY, AND I WENT BACK TO COLLEGE AND I GOT A B.A.

13      EQUIVALENT IN PHILOSOPHY IN 2008 AND M.A. EQUIVALENT IN

14      PHILOSOPHY OF KNOWLEDGE IN 2015.

15      Q.   OKAY.  AND CAN YOU GIVE US A BRIEF HISTORY OF YOUR

16      PROFESSIONAL EMPLOYMENT?

17      A.   YES.  I JOINED QUALCOMM IN THE YEAR 2000 AS AN ENGINEERING

18      INTERN, AND I'VE BEEN WITH QUALCOMM EVER SINCE.  I HAD A NUMBER

19      OF ROLES THROUGHOUT THE YEARS RELATED TO RESEARCH AND

20      TECHNOLOGY STANDARDIZATION.

21          FROM 2005 TO 2008, I'VE BEEN LEADING THE TEAM ON LTE

22      SYSTEM ARCHITECTURE, AND FROM ABOUT 2009, I'VE BEEN RESPONSIBLE

23      FOR 3GPP STANDARDIZATION.

24      Q.   OKAY.  HAVE YOU GIVEN ANY PRESENTATIONS OUTSIDE OF

25      QUALCOMM ABOUT CELLULAR STANDARDS FOR 3GPP?

1    A.   YEAH.  I'VE BEEN GIVING NUMEROUS PRESENTATIONS.  THE VERY

2    FIRST TIME WAS IN 2002.  I WAS INVITED BACK BY MY ALMA MATER IN

3    ITALY TO GIVE A TWO-DAY SEMINAR TO UNDERGRAD STUDENTS ON CDMA

4    TECHNOLOGY.

5         MORE RECENTLY I'VE BEEN GIVING SEMINARS ON CELLULAR

6    COMMUNICATION IN 5G TO ITALIAN UNIVERSITIES.

7         LAST YEAR, I WAS A KEYNOTE SPEAKER AT IEEE CONFERENCE ON

8    WIRELESS AND NETWORKING, ONE OF THE MOST IMPORTANT ONES, AND

9    THERE'S ALSO OTHER SUCH EVENTS.

10   Q.   OKAY.  DO YOU HOLD ANY PATENTS?

11   A.   YES.  I HAVE ABOUT 50 PATENTS GRANTED IN THE U.S. AND A

12   FEW HUNDRED WORLDWIDE.

13   Q.   AND WHO OWNS THOSE PATENTS?

14   A.   QUALCOMM.

15   Q.   YOU MENTIONED EARLIER IN YOUR ANSWERS 3GPP.  CAN YOU TELL

16   US BRIEFLY, WHAT IS 3GPP?

17   A.   YES.  3GPP IS THE GLOBAL ORGANIZATION IN CHARGE OF

18   DEFINING CELLULAR STANDARDS.  THAT IS 3G, 4G, 5G.  PRETTY MUCH

19   EVERY COMPANY IN THE INDUSTRY IS A MEMBER OF 3GPP.  THERE ARE

20   ABOUT 500 MEMBER COMPANIES, WHICH ARE MEMBERS THROUGH THEIR

21   RESPECTIVE REGIONAL ORGANIZATIONS, SUCH AS ETSI FOR EUROPE,

22   CCSA FOR CHINA, AND SO ON.

23        THE INPUT OF 3GPP ARE CONTRIBUTIONS, WRITTEN CONTRIBUTIONS

24   MADE BY COMPANIES, AND THE OUTPUT OF 3GPP ARE THOSE STANDARDS

25   IN TECHNICAL SPECIFICATIONS.

1        THERE ARE A FEW THOUSANDS OF TECHNICAL SPECIFICATIONS

2    PRODUCED BY 3GPP.

3    Q.   AND IN YOUR ANSWER, YOU MENTIONED ETSI.  IS THAT E-T-S-I?

4    A.   YES.

5    Q.   AND WHAT IS THE RELATIONSHIP BETWEEN 3GPP AND ETSI?

6    A.   ETSI IS ONE OF THE SEVEN REGIONAL PARTNERS OF 3GPP AND IS

7    SORT OF LEADERS AMONG EQUALS.

8    Q.   DO YOU HAVE AN UNDERSTANDING OF HOW MUCH 3GPP MEETINGS

9    YOU'VE ATTENDED IN YOUR CAREER?

10   A.   YES.  A FEW HUNDRED.

11   Q.   AND YOU MENTIONED THAT THE -- AN INPUT TO 3GPP IS A

12   CONTRIBUTION.  WHAT IS A CONTRIBUTION?

13   A.   A CONTRIBUTION IS A WRITTEN DOCUMENT WHICH IS SUBMITTED TO

14   A 3GPP MEETING.  IN TECHNICAL TERMS, IT IS ALSO CALLED TDOC,

15   AND IT IS UNIQUELY IDENTIFIED BY A NUMBER, AND THEN IT IS

16   STORED ON THE INTERNET PUBLICLY AVAILABLE TO ANYONE.

17   Q.   AND DO YOU REVIEW QUALCOMM'S TDOCS AS PART OF YOUR WORK

18   WITH 3GPP?

19   A.   YES, OF COURSE I DO.  I ALSO DON'T REVIEW PERSONALLY ALL

20   OF THE WRITTEN CONTRIBUTIONS WE MAKE TO 3GPP.  WE HAVE

21   THOUSANDS OF THEM PER YEAR.  BUT PEOPLE FROM MY TEAM DO THAT.

22   Q.   DO YOU REVIEW TDOCS AND CONTRIBUTIONS FROM OTHER COMPANIES

23   TO 3GPP?

24   A.   YES, I DO.

25   Q.   OKAY.  AND DO YOU HAVE AN ESTIMATE AS TO HOW MANY TDOCS

```
 1      YOU'VE REVIEWED IN YOUR 18 YEARS OF WORKING WITH 3GPP?

 2      A.   TENS OF THOUSANDS.  MAYBE EVEN MORE.

 3      Q.   HAVE YOU PUBLISHED ANY PAPERS RELATED TO CELLULAR

 4      STANDARDS?

 5      A.   I HAVE.  ABOUT IN THE SUMMER OF 2017, I WANTED TO EXPLAIN

 6      TO THE GENERAL PUBLIC HOW 5G WOULD BE PUT TOGETHER, AND,

 7      THEREFORE, I PUBLISHED ON THE QUALCOMM WEBSITE A BLOG IN FOUR

 8      PARTS WHICH EXPLAINS WHAT 3GPP IS, HOW IT WORKS, HOW CELLULAR

 9      STANDARDS ARE PRACTICALLY PUT TOGETHER, HOW THEY ARE BORN.  AND

10      AS PART OF, AS PART OF THAT FOUR-PART BLOG, I EXPLAINED ALSO

11      WHY CONTRIBUTION COUNTING IS NOT A RELIABLE MEASURE FOR

12      ANYTHING.

13      Q.   OKAY.  WHEN YOU SAY, "CONTRIBUTION COUNTING," WHAT IS THAT

14      CONCEPT?

15      A.   CONTRIBUTION COUNTING IS THE NOTION ACCORDING TO WHICH YOU

16      COULD COUNT CONTRIBUTIONS MADE BY 3GPP, EITHER SUBMITTED

17      CONTRIBUTIONS OR APPROVED CONTRIBUTIONS, AND FROM THAT NUMBER,

18      FROM THOSE NUMBERS YOU COULD MAKE SOME INFERENCE ON THE VALUE

19      OF A COMPANY'S CONTRIBUTION TO 3GPP.  AND THAT NOTION IS

20      COMPLETELY FLAWED.  IT JUST DOESN'T WORK.

21      Q.   OKAY.  AND WHAT DOES IT MEAN FOR A TDOC OR A CONTRIBUTION

22      TO BE APPROVED FOR 3GPP PURPOSES?

23      A.   APPROVED IS A VERY SPECIFIC BUREAUCRATIC STATUS,

24      ADMINISTRATIVE STATUS WHICH IS GIVEN TO CERTAIN PROPOSALS THAT

25      MAKE CHANGES TO ALREADY EXISTING AND COMPLETED TECHNICAL
```

1    SPECIFICATIONS.

2         SO, FOR EXAMPLE, BUG FIXES OR EDITORIAL MODIFICATIONS MADE

3    TO SPECIFICATIONS THAT ARE ALREADY COMPLETED WHERE ALL OF THE

4    FUNDAMENTAL DEFINITION OF THE SPECIFICATION HAS TAKEN PLACE.

5    Q.   ARE 3GPP TECHNICAL STANDARDS BUILT OUT OF THOSE APPROVED

6    CONTRIBUTIONS?

7    A.   NO.   THAT IS WHAT IS VERY IMPORTANT TO UNDERSTAND.   THE

8    3GPP STANDARDS ARE NOT BUILT THROUGH THE ACCUMULATION OF

9    APPROVED CONTRIBUTIONS.   THE 3GPP STANDARDS ARE PRIMARILY PUT

10   TOGETHER BY EDITORS.

11   Q.   OKAY.   I'D ASK YOU TO TURN IN YOUR WITNESS BINDER TO A

12   DEMONSTRATIVE, QDX 9346.005.

13        MR. DAHM, CAN WE HAVE THAT ON THE SCREEN?

14        IS THIS A DEMONSTRATIVE YOU PREPARED?

15   A.   YES.

16   Q.   AND CAN YOU PLEASE EXPLAIN WHAT THIS SLIDE GENERALLY WILL

17   SHOW TO THE COURT?

18   A.   YES.   THIS SLIDE SHOWS THE LIFECYCLE, A TYPICAL LIFECYCLE

19   OF A TECHNICAL SPECIFICATION IN 3GPP.

20        MR. MERBER:   OBJECTION.   THIS LOOKS LIKE EXPERT

21   TESTIMONY, EXPERT OPINION WHICH HE'S NOT BEEN OFFERED AS AN

22   EXPERT.

23        MR. COLLIER:   YOUR HONOR, HE HAS BEEN OFFERED AS AN

24   EXPERT.   IN FACT, WE DISCLOSED HIM AS AN EXPERT.   IF YOU'D

25   LIKE, I'LL MAKE A FORMAL TENDER NOW.   I'M HAPPY TO DO THAT.

1      SO AT THIS TIME, YOUR HONOR --

2          THE COURT:  ALL RIGHT.  THAT'S FINE, GO AHEAD.

3          MR. COLLIER:  AT THIS TIME, YOUR HONOR, I'LL TENDER

4    MR. CASACCIA AS AN EXPERT IN THE FIELD OF 3GPP CELLULAR

5    STANDARDS, HOW THE STANDARDS ARE FORMED, AND CONTRIBUTIONS.

6          MR. MERBER:  I WOULD JUST NOTE HE WAS NOT IDENTIFIED

7    AS AN EXPERT ON THE WITNESS LIST THAT WAS FILED LAST NIGHT.  HE

8    DID SUBMIT AN EXPERT DISCLOSURE DURING DISCOVERY.  BUT --

9    THERE'S --

10          THE COURT:  I DON'T FEEL LIKE I'VE HEARD ENOUGH TO

11   CERTIFY HIM AS AN EXPERT ON THOSE TOPICS.  WHY DON'T YOU VOIR

12   DIRE HIM A LITTLE FURTHER.

13          MR. COLLIER:  OKAY.

14          THE COURT:  HE GOES TO MEETINGS.  IS THAT ENOUGH?

15          MR. COLLIER:  NO, YOUR HONOR.

16          THE COURT:  ALL RIGHT.  WHY DON'T YOU LAY MORE

17   FOUNDATION BECAUSE I'M NOT GOING TO CERTIFY HIM BASED ON WHAT

18   I'VE HEARD.

19   BY MR. COLLIER:

20   Q.   MR. CASACCIA, HOW MANY YEARS HAVE YOU BEEN INVOLVED WITH

21   3GPP?

22   A.   EIGHTEEN YEARS.

23   Q.   AND CAN YOU DESCRIBE FOR THE COURT, STARTING FROM WHERE

24   YOU STARTED AT QUALCOMM UNTIL THE END OF YOUR 18 YEARS, YOUR

25   RESPONSIBILITIES AS THEY RELATE TO 3GPP?

1      A.   YES.  I HAVE ATTENDED, FIRST, THE WORKING GROUPS IN CHARGE

2      OF 2G TECHNOLOGY, SO I WAS RESPONSIBLE FOR DECIDING THE

3      QUALCOMM INPUTS TO THOSE WORKING GROUPS, WRITING THEM,

4      PRESENTING THEM, AND THEN REPORTING BACK TO QUALCOMM.

5           THEN I MOVED TO THE WORKING GROUPS IN CHARGE OF SYSTEM

6      ARCHITECTURE WHERE I BUILT A TEAM OF QUALCOMM ENGINEERS AND I

7      DID THE SAME, I WAS RESPONSIBLE FOR PRODUCING OUR INPUT TO

8      THOSE MEETINGS, PRESENTING IT, AND THEN REPORTING THEM.

9      REPORTING IT BACK.

10          AND THEN I BECAME RESPONSIBLE FOR THE ENTIRE TEAM OF 3GPP

11     ENGINEERS AND EVERYTHING THAT WE DO IN 3GPP.

12          THE COURT:  THAT'S FOR QUALCOMM; CORRECT?  HE'S

13     QUALCOMM'S REPRESENTATIVE TO THE 3GPP?

14          MR. COLLIER:  EXACTLY, YOUR HONOR.

15          THE COURT:  OKAY.  SO WHAT IS IT THAT YOU'RE -- WHY

16     DON'T YOU FINISH WHATEVER YOU'RE GOING TO ASK HIM.

17     BY MR. COLLIER:

18     Q.   AS PART OF YOUR WORK, YOU SAID YOU SUBMIT INPUTS TO 3GPP.

19     CAN YOU GIVE THE COURT SORT OF A LIFECYCLE OF HOW AN IDEA IS

20     TURNED INTO AN INPUT AT 3GPP AND WHAT HAPPENS?

21     A.   YES.  SO WHEN YOU WANT TO PROPOSE SOMETHING TO 3GPP, YOU

22     PROPOSE, FOR EXAMPLE, FIRST A PROJECT.  YOU GO TO A PLANNING

23     MEETING, YOU PROPOSE A WORK ITEM OR A STUDY ITEM.  YOU HAVE TO

24     GIVE CONSENSUS EXPLAINING IT TO OTHER COMPANIES, YOU HAVE TO

25     COLLECT COMMENTS FROM OTHER COMPANIES, AND A VERY IMPORTANT

1        ASPECT OF 3GPP IS THAT ALL OF THE DECISIONS HAVE TO TAKE PLACE

2        BY CONSENSUS.

3              AND ONCE YOU HAVE ESTABLISHED CONSENSUS, YOU CAN START THE

4        PROJECT THAT YOU WANT.

5              AFTER THE PROJECT STARTS, THEN THE PROJECT DEVELOPS IN

6        SEVERAL WORKING GROUPS IN PARALLEL, AND THEN YOU HAVE TO MANAGE

7        THE DIFFERENT PARTS OF THE PROJECT IN THOSE WORKING GROUPS

8        THROUGH A LARGE NUMBER OF TECHNICAL CONTRIBUTIONS.

9              AT THE SAME TIME, ALL OTHER MEMBER COMPANIES ARE FREE TO

10       SUBMIT MEMBER CONTRIBUTIONS FOR THE SAME PROJECT THAT YOU

11       PROPOSED, AND YOU GO THROUGH THESE ITERATIVE PROCESS OF

12       REVIEWING OTHER COMPANIES' CONTRIBUTIONS AND BUILDING BRICK BY

13       BRICK THE VARIOUS STEPS TOWARDS THE COMPLETION OF THE PROJECT.

14       Q.   AND YOU'VE SAID THAT YOU HAVE TO CONSULT WITH OTHER

15       COMPANIES.

16             DOES THAT INVOLVE UNDERSTANDING WHAT OTHER COMPANIES ARE

17       SUBMITTING TO 3GPP?

18       A.   YES, OF COURSE.

19       Q.   AND YOU HAVE 90 PEOPLE UNDER YOU; IS THAT CORRECT?

20       A.   YES.

21       Q.   AND WHO, OVERALL AT QUALCOMM, IS RESPONSIBLE FOR

22       QUALCOMM'S CONTRIBUTIONS TO 3GPP?

23       A.   I AM.

24       Q.   AND HOW MANY, OVER THE LAST 18 YEARS, HOW MANY HOURS WOULD

25       YOU ESTIMATE THAT YOU'VE SPENT ON PREPARING INPUTS, REVIEWING

1    INPUTS, AND ATTENDING 3GPP MEETINGS?

2    A.   WE WOULD HAVE TO DO THE MATHEMATICS, BUT I WOULD SAY 80 OR

3    90 PERCENT OF MY WORKING TIME IN THE LAST 18 YEARS HAS BEEN

4    DEDICATED TO 3GPP.  SO I DON'T -- HUNDREDS OF THOUSANDS OF

5    HOURS PROBABLY.

6              MR. COLLIER:  YOUR HONOR, AT THIS POINT I BELIEVE

7    I'VE LAID A FOUNDATION, AND QUALCOMM WOULD TENDER MR. CASACCIA

8    AS AN EXPERT IN THE FIELD OF 3GPP CELLULAR STANDARDS, HOW THOSE

9    STANDARDS ARE FORMED, AND CONTRIBUTIONS.

10             THE COURT:  ALL RIGHT.  ANY OBJECTION?

11             MR. MERBER:  I'M SORRY.  I DIDN'T CATCH, DID YOU SAY

12   WITH RESPECT TO 3GPP OR STANDARDS GENERALLY?

13             MR. COLLIER:  I SAID WITH RESPECT TO 3GPP.

14             MR. MERBER:  NO OBJECTION, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  SO CERTIFIED.

16        SO IT'S THE STANDARDS, HOW THEY ARE FORMED, AND

17   CONTRIBUTIONS.

18             MR. COLLIER:  YES, YOUR HONOR.

19             THE COURT:  OKAY.  GO AHEAD, PLEASE.  SO CERTIFIED.

20             MR. MERBER:  AT 3GPP.

21             THE COURT:  3GPP CELLULAR STANDARDS, HOW THEY ARE

22   FORMED, AND CONTRIBUTIONS.

23        GO AHEAD, PLEASE.

24             MR. COLLIER:  THANK YOU.

25   Q.   ARE 3GPP TECHNICAL STANDARDS BUILT FROM APPROVED

1     CONTRIBUTIONS?

2     A.   NO, THEY ARE NOT.  AS I MENTIONED EARLIER, IT IS IMPORTANT

3     TO UNDERSTAND THAT 3GPP TECHNICAL STANDARDS ARE NOT BUILT FROM

4     THE ACCUMULATION OF APPROVED CONTRIBUTIONS.  THEY ARE PRIMARILY

5     PUT TOGETHER BY EDITORS.

6          IN THIS SLIDE --

7     Q.   AND YOU'RE POINTING TO THE DEMONSTRATIVE?

8     A.   YES.  IN THIS DEMONSTRATIVE, WE CAN SEE A TYPICAL

9     LIFECYCLE OF A TECHNICAL SPECIFICATION IN 3GPP, AND THE TWO

10    PARTS THAT IT CONSISTS OF.

11         THERE IS A SUBSTANTIVE WORK PHASE, AND THERE IS A CHANGE

12    CONTROL PHASE.

13         IT ALSO SHOWS THAT THE VAST MAJORITY OF FORMALLY APPROVED

14    DOCS TAKES PLACE IN THE CHANGE CONTROL PHASE.

15    Q.   OKAY.  AND WHY DID YOU PICK -- I SEE IT SAYS TS 36.211.

16    COULD YOU TELL THE COURT WHAT THAT REFERS TO?

17    A.   I PICKED THAT BECAUSE IT'S ONE OF THE MORE IMPORTANT

18    TECHNICAL SPECIFICATIONS.  IT'S THE SPECIFICATION THAT

19    DESCRIBES THE TRANSMISSION AND MODULATION FOR 4G LTE, WHICH IS

20    HOW A PHONE TALKS TO A CELL TOWER FOR THE RELEASE OF LTE.

21         THE EXACT SAME STRUCTURE AND LIFECYCLE WOULD APPLY TO ALL

22    OF THE OTHER THOUSANDS OF TECHNICAL SPECIFICATIONS OF 3GPP.

23    Q.   SO IS THIS REPRESENTATIVE OF THE LIFECYCLE FOR OTHER

24    TECHNICAL STANDARDS AT 3GPP?

25    A.   ABSOLUTELY.

1     Q.   AND LOOKING AT YOUR SLIDE, YOU FLAGGED ON THE LEFT-HAND

2     SIDE A DATE OF NOVEMBER 2004.

3          CAN YOU EXPLAIN WHAT THAT IS?

4     A.   YES.  NOVEMBER 2004 IS WHEN WORK ON 4G LTE STARTED.  THERE

5     WAS A VERY FIRST WORKSHOP ON 3GPP LONG TERM EVOLUTION, WHICH IS

6     WHAT LTE STANDS FOR, AND THE WORKSHOP TOOK PLACE IN TORONTO.  I

7     ATTENDED PERSONALLY THAT WORKSHOP.

8          AND THAT'S WHEN WORK ON 4G LTE STARTED.

9     Q.   AND AT THE OTHER END OF YOUR SUBSTANTIVE WORK PHASE, THERE

10    IS A LINE THAT SAYS SEPTEMBER OF 2007.

11         CAN YOU EXPLAIN WHAT THAT IS?

12    A.   SEPTEMBER 2007, THE FIRST DRAFT OF THE TECHNICAL

13    SPECIFICATION 36.211 WAS CONSIDERED STABLE AND APPROVED.

14         SO "STABLE" MEANS THAT 3GPP DECIDED THAT ALL OF THE

15    FUNDAMENTAL DECISIONS THAT WENT INTO THESE TECHNICAL

16    SPECIFICATIONS HAD BEEN TAKEN AND WOULD NO LONGER CHANGE, AND,

17    THEREFORE, THERE WAS CONFIDENCE THAT COMPANIES THAT WANTED TO

18    BUILD THE PRODUCTS AROUND THIS TECHNOLOGY COULD START THEIR

19    PRODUCT PLANNING.

20    Q.   OKAY.  AND LOOKING AT THE PHASE THAT YOU CALL SUBSTANTIVE

21    WORK BOUNDED BY THE 2004 AND 2007 DATES, WHAT WORK AT 3GPP IS

22    HAPPENING IN THAT PHASE?

23    A.   PRIMARILY THREE THINGS HAPPEN DURING THAT PHASE.

24         ONE, COMPANIES SUBMIT THEIR IDEAS THROUGH WRITTEN

25    CONTRIBUTIONS, WHICH IS TDOCS, INTO MEETINGS.

1          TWO, THOSE IDEAS ARE DISCUSSED BY COMPANIES AT THOSE

2     MEETINGS.  CERTAIN WINNING IDEAS DO EMERGE.  THE WINNING IDEAS

3     ARE THOSE AROUND WHICH THERE IS CONSENSUS.  AS I MENTIONED

4     EARLIER, ALL OF THE DECISIONS IN 3GPP TAKE PLACE BY CONSENSUS.

5          AND THIRD, THERE IS AN INDIVIDUAL WHICH IS APPOINTED BY

6     THE GROUP, AND THAT IS CALLED THE EDITOR, AND THE EDITOR

7     DISTILLS THE WINNING IDEAS AND ASSEMBLES A WORKING DOCUMENT.

8          THE WORKING DOCUMENT EVOLVES MONTH AFTER MONTH FROM -- AND

9     THE EDITOR MAKES IT BECOME, LITTLE BY LITTLE, THE FIRST STABLE

10    DRAFT THAT I MENTIONED WAS COMPLETED IN SEPTEMBER 2007.

11    Q.   IS THERE ANY WAY TO LOOK AT THE FIRST STABLE DRAFT IN THE

12    3GPP RECORDS AND DETERMINE WHICH WINNING IDEAS WERE TAKEN INTO

13    THE EDITOR'S DRAFT?

14    A.   NO, ABSOLUTELY NOT, BECAUSE THE SYSTEM IS NOT -- SO THE

15    3GPP ADMINISTRATIVE SYSTEM IS NOT SET UP TO DO THAT SORT OF

16    THING AT ALL.  THE 3GPP ADMINISTRATIVE SYSTEM IS SET UP TO

17    FACILITATE COLLABORATIVE WORK AMONG THE COMPANIES.

18    Q.   SO WHAT ADMINISTRATIVE STATUS WOULD BE GIVEN TO TDOCS

19    SUBMITTED BY COMPANIES DURING THE SUBSTANTIVE WORK PHASE THAT

20    WERE WINNING IDEAS?

21    A.   GENERALLY THEY GET THE ADMINISTRATIVE STATUS OF NOTED OR

22    TREATED, WHICH ARE JUST TERMINOLOGY IN 3GPP WHICH MEANS PUT

23    AWAY.

24    Q.   OKAY.

25    A.   THEY ARE NOT APPROVED.

1    Q.   SO IF A WINNING IDEA WAS GIVEN THE ADMINISTRATIVE STATUS

2    OF NOTED OR TREATED DURING THE SUBSTANTIVE PHASE, UNDER AN

3    APPROVED CONTRIBUTION COUNTING MODEL, HOW MUCH CREDIT WOULD BE

4    GIVEN TO THOSE WINNING IDEAS?

5    A.   ZERO.

6    Q.   NOW, WHAT IS THE PHASE AFTER THE SUBSTANTIVE WORK PHASE

7    AND THERE'S A FIRST STABLE DRAFT AT 3GPP?

8    A.   I CALL THAT THE CHANGE CONTROL PHASE, AND I MENTIONED

9    EARLIER, THIS IS WHEN THE TECHNICAL SPECIFICATION IS CONSIDERED

10   STABLE AND THE PEOPLE CAN START PLANNING FOR PRODUCTS AROUND

11   IT.

12        BECAUSE OF THAT REASON, FROM THAT POINT ONWARDS, THERE IS

13   A MORE RIGOROUS BUREAUCRATIC PROCESS TO MAKE FURTHER CHANGES TO

14   THE SPECIFICATIONS.

15        THE CHANGES TO THE SPECIFICATION FROM THIS POINT ONWARDS

16   ARE TYPICALLY BUG FIXES, CORRECTIONS TO ERRORS, VERY MUCH LIKE

17   WHEN YOU RELEASE A SOFTWARE, THEN YOU FIND SOME BUGS AND THEN

18   YOU RELEASE AN UPDATED VERSION OF THAT SOFTWARE.

19        AND DURING THAT PHASE, THOSE BUG FIXES OR EDITORIAL

20   CORRECTIONS THAT FIND CONSENSUS DO GET THE ADMINISTRATIVE

21   STATUS OF APPROVED.

22   Q.   AND SO THOSE BUG FIXES THAT ARE GIVEN THE ADMINISTRATIVE

23   STATUS OF APPROVED IN THE CHANGE CONTROL PHASE, WOULD AN

24   APPROVED CONTRIBUTION COUNTING MODEL GIVE CREDIT TO THOSE

25   IDEAS?

1    A.   YES.

2              MR. MERBER:  OBJECTION, YOUR HONOR.  HE HASN'T BEEN

3    OFFERED AS AN EXPERT ON MODELS FOR COUNTING OF GROUP

4    CONTRIBUTIONS.

5              MR. COLLIER:  THAT'S PART OF CONTRIBUTIONS, YOUR

6    HONOR, AND HE WAS DISCLOSED AND HAS BEEN DEPOSED AND GIVEN

7    TESTIMONY AS TO THE CONTRIBUTIONS, AND ALL WE'RE TALKING ABOUT

8    IS THE ADMINISTRATIVE STATUS THAT'S GIVEN TO EACH CONTRIBUTION

9    UNDER AN APPROVED CONTRIBUTION COUNTING MODEL, ONLY APPROVED

10   CONTRIBUTIONS COUNT AS MR. CASACCIA SAID.

11             THE COURT:  CAN I ASK YOU, WHY ON YOUR WITNESS LIST

12   DID YOU NOT LIST HIM AS AN EXPERT.  YOU LISTED MR. ANDREWS AS

13   AN EXPERT AND OTHERS.

14             MR. COLLIER:  HE'S AN EMPLOYEE WHO HAS EXPERTISE, SO

15   AS AN ABUNDANCE OF CAUTION, WE NOT ONLY DISCLOSED HIM AS AN

16   EXPERT, WE GAVE AN 11 PAGE DISCLOSURE.  HE WAS OFFERED UP FOR

17   YET A THIRD DEPOSITION SOLELY IN HIS EXPERT CAPACITY, YOUR

18   HONOR.

19        SO WHILE I BELIEVE MOST OF THESE THINGS ARE WITHIN HIS

20   EXPERIENCE, OUT OF AN ABUNDANCE OF CAUTION, WE DID DISCLOSE HIM

21   AS AN EXPERT.  IN FACT, IF YOUR HONOR MAY RECALL, WE FILED AN

22   HPO TO ONE OF THE EXHIBITS THEY WANTED TO USE TO CROSS HIM, AND

23   THEY SAID THAT THEY'RE ALLOWED TO USE THAT EXHIBIT BECAUSE HE

24   IS AN EXPERT AND THEY WANT TO TEST HIS EXPERT OPINION.

25             SO EVERYONE HAS KNOWN FOR MONTHS THAT HE'S AN EXPERT, YOUR

 1    HONOR.  HE'S BEEN FULLY DISCLOSED, AND, IN FACT, THEY'VE

 2    PREVAILED IN HAVING OBJECTIONS OVERRULED BECAUSE HE IS AN

 3    EXPERT.

 4              THE COURT:  OKAY.  SO THEN WHY DIDN'T YOU LIST HIM ON

 5    YOUR WITNESS LIST AS AN EXPERT?

 6              MR. VAN NEST:  THAT'S MY FAULT, YOUR HONOR.  HE'S A

 7    COMPANY EMPLOYEE, AND I APPROVED THE WITNESS LIST THAT WENT

 8    OUT.  I THINK VIRTUALLY ALL OF THIS IS WITHIN HIS PERSONAL

 9    KNOWLEDGE AND YOUR HONOR HAS RULED PRETRIAL THAT FOLKS COULD

10    TESTIFY WITHIN THEIR PERSONAL KNOWLEDGE.

11         SO THAT'S MY OMISSION.  I ASSUMED HE WAS A COMPANY

12    EMPLOYEE, HE IS A COMPANY EMPLOYEE, AND I SHOULD HAVE LISTED

13    HIM AS AN EXPERT, TOO, AND I FAILED TO DO THAT.  I APOLOGIZE.

14              THE COURT:  THAT'S ALL RIGHT.  THE OBJECTION'S

15    OVERRULED.

16         GO AHEAD, PLEASE.

17    BY MR. COLLIER:

18    Q.   MR. CASACCIA, I BELIEVE THE QUESTION BEFORE YOU WAS THESE

19    BUG FIXES THAT ARE GIVEN THE ADMINISTRATIVE STATUS OF APPROVED,

20    WOULD THEY BE COUNTED IN AN APPROVED CONTRIBUTION COUNTING

21    MODEL?

22    A.   YES.

23    Q.   LET'S ASSUME THAT WE'RE IN THE CHANGE CONTROL PERIOD AND

24    SOME COMPANY DOESN'T WANT TO PROPOSE A BUG FIX OR AN UPDATE TO

25    SOME CROSS-REFERENCES BUT WANTS TO HAVE A FUNDAMENTAL, NEW

1    TECHNOLOGY OR IDEA INCORPORATED INTO THE STANDARD, WHAT HAPPENS

2    THEN?

3    A.    THEN THAT COMPANY GOES BACK TO A PLANNING MEETING AND

4    PROPOSES A NEW PROJECT.  THAT WOULD TYPICALLY HAPPEN IN THE

5    NEXT RELEASE OF THE STANDARD.  AND IF THE CONSENSUS IS FOUND

6    AROUND THAT NEW PROJECT, A NEW LIFECYCLE, EXACTLY LIKE THIS

7    ONE, WOULD START FOR THE NEXT RELEASE OF THE STANDARD.

8         AND, THEREFORE, THAT CONTRIBUTION THAT WAS PROPOSING THAT

9    NEW FUNDAMENTAL IDEA WOULD AGAIN FALL UNDER THIS SUBSTANTIVE

10   WORK PHASE AND ALSO WOULD NOT BE ADMINISTRATIVELY MARKED AS

11   APPROVED.

12   Q.    AND BY NOT BEING ADMINISTRATIVELY MARKED AS APPROVED, WHAT

13   CREDIT WOULD BE GIVEN FOR THAT FUNDAMENTAL IDEA UNDER AN

14   APPROVED CONTRIBUTION COUNTING MODEL?

15   A.    AGAIN, ZERO.

16   Q.    NOW, OVER YOUR 18 YEARS OF WORK AT 3GPP, DO YOU HAVE AN

17   UNDERSTANDING AS TO WHETHER OR NOT QUALCOMM IS GENERALLY

18   SUCCESSFUL IN GETTING ITS IDEAS INTO THE DRAFT SPECIFICATIONS

19   FOR 3GPP?

20   A.    WE HAVE BEEN FAIRLY SUCCESSFUL.

21   Q.    AND WHY IS THAT?

22   A.    I BELIEVE BECAUSE OF OUR SYSTEM ENGINEERING APPROACH TO

23   WHAT WE DO IN 3GPP.

24        WE TRY TO SUBMIT OR PROPOSE THINGS IN 3GPP FOR WHICH WE

25   HAVE DONE EARLY R&D, IN SOME CASES WE'VE ALSO DONE PROTOTYPING

CASACCIA DIRECT BY MR. COLLIER

1    BEFORE PROPOSING THINGS TO 3GPP.

2         AND THEN IMPORTANTLY ALSO, WE TRY TO THINK OF THE RIPPLE

3    EFFECTS OF OUR PROPOSALS.  SO, FOR EXAMPLE, IF WE MAKE A

4    PROPOSAL TO OUR AIR INTERFACE COMPONENT, THEN WE TRY TO

5    UNDERSTAND WHETHER IT HAS AN IMPACT ON THE SECURITY PART.

6         AND IF IT DOES, WE SOLVE THAT PROBLEM AND THEN WE GO TO

7    THE WORKING GROUP IN CHARGE OF SECURITY TO MAKE THE

8    CORRESPONDING PROPOSAL ACCORDINGLY.

9         ONE THING THAT IS IMPORTANT TO UNDERSTAND IS THAT IN 3GPP,

10   THERE ARE 16 DIFFERENT WORKING GROUPS RIGHT NOW IN CHARGE OF 16

11   DIFFERENT TECHNOLOGY AREAS.

12   Q.   DOES EVERY OTHER COMPANY AT 3GPP HAVE SUCH BROAD SYSTEMS

13   ENGINEERING TYPE COVERAGE?

14   A.   NO.

15   Q.   I'D ASK YOU TO TURN TO CX 7475 IN YOUR BINDER, AND I'LL

16   ASK IF YOU CAN IDENTIFY THIS DOCUMENT FOR THE COURT?

17   A.   YES.  THIS IS A PROPOSAL THAT QUALCOMM -- IT'S A

18   CONTRIBUTION FROM QUALCOMM TO A MEETING IN FEBRUARY 2015 TO A

19   RAND ONE MEETING, RAN 1.

20        AND IT'S A PROPOSAL ON PHYSICAL LAYER OPTIONS FOR LAA.

21   Q.   AND IS THIS A TRUE AND CORRECT COPY OF THE TECHNICAL

22   DOCUMENT SUBMITTED TO 3GPP?

23   A.   YES.

24   Q.   IS IT PUBLICLY AVAILABLE ON YOUR WEBSITE?

25   A.   YES.  AS I MENTIONED, ALL DOCUMENTS ARE ON THE INTERNET.

1            MR. COLLIER:  AT THIS POINT, YOUR HONOR, WE'D MOVE TO

2       ADMIT QX 7475.

3            MR. MERBER:  NO OBJECTION, YOUR HONOR.

4            THE COURT:  IT'S ADMITTED.

5            (DEFENDANT'S EXHIBIT QX 7475 WAS ADMITTED IN EVIDENCE.)

6            THE COURT:  GO AHEAD, PLEASE.

7       BY MR. COLLIER:

8       Q.   AND, MR. CASACCIA, IN YOUR ANSWER, YOU MENTIONED THAT THIS

9       WAS A PROPOSAL RELATED TO LAA.

10           CAN YOU TELL THE COURT WHAT LAA IS?

11      A.   LAA IS THE TECHNICAL TERM FOR LTE IN UNLICENSED SPECTRUM,

12      WHICH IS THE ABILITY TO TRANSMIT AND RECEIVE LTE WAVEFORM IN

13      SPECTRUM THAT DOESN'T HAVE A LICENSE FROM THE GOVERNMENT OR THE

14      REGULATOR.

15      Q.   AND WHEN YOU SAY, "UNLICENSED SPECTRUM," DOES THAT HAVE

16      ANYTHING TO DO WITH PATENT LICENSING?

17      A.   NO.  IT'S JUST THE REGIME OF THE SPECTRUM, HOW IT IS

18      ALLOCATED BY, FOR EXAMPLE, THE FCC IN THE U.S.

19      Q.   WERE YOU PERSONALLY INVOLVED IN PRESENTING THE CONCEPTS OF

20      LAA TO 3GPP?

21      A.   YES.  THE ORIGINAL CONCEPT OF LTE IN UNLICENSED SPECTRUM

22      WAS PRESENTED IN DECEMBER 2013 AT A PLENARY MEETING.  I

23      REMEMBER THAT VERY WELL BECAUSE I MADE THE PRESENTATION MYSELF.

24      AND I RECALL VERY WELL THAT THE RECEPTION WAS FAIRLY SKEPTICAL

25      AND NEGATIVE AT THAT MEETING.  MANY COMPANIES DID NOT THINK THE

1    IDEA WOULD WORK.

2    Q.    AND DESPITE OTHER COMPANIES IN THE INDUSTRY BELIEVING THE

3    IDEA WOULDN'T WORK, DID QUALCOMM PERSIST IN THIS IDEA?

4    A.    YES.  WE WERE VERY CONFIDENT THAT THE IDEA INDEED COULD

5    WORK, AND THEN WE CONTINUED TO WORK WITHIN THE 3GPP PROCESS TO

6    PURSUE THE PROPOSAL.

7    Q.    WELL, SO WHAT WAS THE OUTCOME?

8    A.    WELL, THE OUTCOME EVENTUALLY WAS VERY POSITIVE BECAUSE THE

9    TECHNOLOGY HAS BEEN STANDARDIZED, HAS BECOME PART OF THE LTE

10   STANDARD, AND ALSO HAS BEEN BUILT INTO PRODUCTS.  IT HAS BEEN

11   DEPLOYED, AND IT IS A VERY KEY ELEMENT THAT ALLOWS, FOR

12   EXAMPLE, TO HAVE GIGABIT LTE CONNECTIONS IN YOUR SMARTPHONE.

13   Q.    WELL, WHAT DOES IT MEAN TO NON-ENGINEERS TO HAVE GIGABIT

14   ACCESS TO SMARTPHONE?

15   A.    WELL, IT MEANS THAT YOU CAN TRANSMIT AND RECEIVE DATA MUCH

16   FASTER.  SO IT BECOMES EASIER TO WATCH NETFLIX, WATCH YOUTUBE

17   ON YOUR SMARTPHONE, OR FOR ME, IT'S EASIER TO SEND VIDEOS OF MY

18   SON TO MY FATHER.

19   Q.    AND DURING WHICH OF THE TWO PHASES, THE SUBSTANTIVE PHASE

20   OR THE CHANGE CONTROL PHASE, WAS CX 7475 SUBMITTED BY QUALCOMM?

21   A.    THIS IS THE SUBSTANTIVE WORK PHASE.

22   Q.    AND WHAT ADMINISTRATIVE STATUS WAS GIVEN TO THE TDOC

23   CX 7475 BY 3GPP?

24   A.    THE ADMINISTRATIVE STATUS IS AVAILABLE, WHICH BASICALLY

25   MEANS IT HAS BEEN REVIEWED, DISCUSSED, AND THEN PUT AWAY.

1   Q.   OKAY.  WELL, UNDER AN APPROVED CONTRIBUTION COUNTING

2   METHODOLOGY, DOES QUALCOMM GET ANY CREDIT FOR THE FUNDAMENTAL

3   IDEAS CONTAINED IN THIS TDOC?

4   A.   NO.  QUALCOMM GETS NO CREDIT FOR THOSE IDEAS.  AND IT

5   IS -- IT'S WORTH MENTIONING THAT IN THIS DOCUMENT, THERE ARE

6   SIX FUNDAMENTAL IDEAS.  IN SECTION 2, THERE ARE SIX

7   SUBSECTIONS, FROM 2.1 TO 2.6, AND THEN IN THE CONCLUSIONS,

8   THERE ARE SIX PROPOSALS ACCORDINGLY, AND THESE ARE SIX

9   DIFFERENT TECHNICAL AREAS OF LAA WITH SIX DIFFERENT

10   CORRESPONDING PROPOSALS.

11   Q.   AND --

12   A.   ALSO, IN FACT, THIS WAS A VERY FUNDAMENTAL DOCUMENT

13   PROPOSING HOW LAA WAS SUPPOSED TO WORK.

14   Q.   AND HOW MANY OF THE SIX FUNDAMENTAL IDEAS FOUND THEIR WAY

15   INTO THE FINAL 4G LTE SPECIFICATIONS?

16   A.   ALL OF THEM.

17   Q.   NOW, IS THIS TDOC THE ONLY EXAMPLE OF QUALCOMM'S

18   FUNDAMENTAL CONTRIBUTIONS TO 4G LTE?

19   A.   NO.  OF COURSE THERE WOULD BE MANY, MANY MORE EXACTLY

20   LOOKING LIKE THIS ONE.

21   Q.   CAN YOU NAME A COUPLE?

22   A.   YES, OF COURSE.  SO, FOR EXAMPLE, THERE IS THE DEFINITION

23   OF THE LTE SYNCHRONIZATION CHANNEL.  THAT IS VERY IMPORTANT

24   BECAUSE CELL PHONES AND CELL TOWERS HAVE TO BE ON THE SAME

25   CLOCK, SO TO SAY, WITH THE PRECISION OF A VERY SMALL FRACTION

1        OF A SECOND.  AND A SYNCHRONIZATION CHANNEL IS HOW THAT IS

2        ACHIEVED.

3             ANOTHER EXAMPLE IS THE UPLINK SINGLE CARRIER FDM WAVEFORM.

4        THAT IS VERY CRITICAL BECAUSE IT'S HOW YOU CAN TRANSMIT FROM

5        YOUR PHONE, KEEPING THE BATTERY SIZE OF YOUR PHONE REASONABLE.

6             OTHER ONES ARE HOW CARRIER AGGREGATION IS DEFINED.

7        CARRIER AGGREGATION WAS PIONEERED BY QUALCOMM IN 3G AND THEN IT

8        EVOLVED IN 4G, AND THEN IT IS ALSO FROM THAT EVOLVING INTO 5G.

9             AND THOSE ARE JUST THREE EXAMPLES, BUT THERE COULD BE

10       MORE.

11       Q.   SO YOU MENTIONED 5G.  HAS QUALCOMM ALSO SUBMITTED TDOCS

12       CONTAINING FUNDAMENTAL IDEAS FOR 5G AS OF MARCH 2018?

13       A.   YES.  THERE ARE ALSO SEVERAL DOCUMENTS LIKE THIS ONE

14       SUBMITTED TO 5G THAT HAVE BEEN SUCCESSFUL IN DEFINING THE 5G

15       STANDARD.

16            FOR EXAMPLE, TECHNIQUES TO MAKE MILLIMETER WAVE TO WORK

17       FOR CELLULAR SYSTEMS.  MILLIMETER WAVE ARE HIGH FREQUENCY BANDS

18       WHICH WERE NOT ACCESSIBLE TO ANY OF THE PREVIOUS GENERATIONS OF

19       CELLULAR STANDARDS, 3G OR 4G, AND THOSE ARE ONE NOVELTY OF 5G.

20            THERE ARE SOME VERY SPECIFIC PROBLEMS ASSOCIATED WITH THOSE

21       BANDS WHICH WE SOLVED AND NOW OUR TECHNOLOGIES HAVE BEEN

22       PROPOSED IN DOCUMENTS LIKE THIS AND HAVE BECOME PART OF THE

23       STANDARD.

24            SECURITY FOR 5G IS ANOTHER ONE.  5G HAS A DIFFERENT

25       SECURITY ARCHITECTURE.  IT IS MORE SECURE THAN 4G AND 3G.

1          ALSO, THAT IS BECAUSE OF SOME VERY SPECIFIC TECHNICAL

2     SOLUTIONS PROPOSED IN DOCUMENTS LIKE THIS ONE BY QUALCOMM AND

3     THAT ALSO HAVE BECOME PART OF THE 5G STANDARD.

4     Q.   AND WOULD QUALCOMM, UNDER AN APPROVED CONTRIBUTION

5     COUNTING SCHEME, GET CREDIT FOR ANY OF THOSE FUNDAMENTAL

6     SUBMISSIONS?

7     A.   NO, ABSOLUTELY ZERO BECAUSE IN ALL THOSE CASES, IT'S

8     SIMILAR, AS I MENTIONED EARLIER.  IN ALL THOSE CASES, THE

9     SPECIFICATION IS PHYSICALLY BUILT, ASSEMBLED BY AN EDITOR, AND

10    ALL OF THE DOCUMENTS WITH THE WINNING IDEAS GET NOTED OR PUT

11    AWAY OR MARKED AS TREATED BY THE SECRETARY.  THEY ARE NOT

12    GETTING THE STATUS OF APPROVED, EVEN THOUGH THE IDEAS CONTAINED

13    IN THEM DO MOVE FORWARD.

14    Q.   DID YOU -- I'D LIKE TO GO BACK TO YOUR DEMONSTRATIVE, IF I

15    COULD.

16         LOOKING AT THE CHANGE CONTROL PERIOD AGAIN, DID YOU HAVE

17    AN OPPORTUNITY TO REVIEW THE TWO TECHNICAL DOCUMENTS QX 6457

18    AND CX 7492 -- ALREADY ADMITTED, YOUR HONOR -- THAT

19    MR. LASINSKI TESTIFIED ABOUT AT TRIAL?

20    A.   YES.

21    Q.   AND DO YOU RECALL BRIEFLY WHAT THOSE TWO T DOCUMENTS

22    CONTAINED?

23    A.   YES.  ONE WAS MAKING SOME EDITORIAL CLEANUPS OF THE

24    SPECIFICATION, SUCH AS ADDING HYPHENS ;AND ANOTHER ONE WAS

25    UPDATING CERTAIN REFERENCES TO OTHER DOCUMENTS.

1    Q.   AND DO YOU KNOW WHAT PHASE THESE TWO T DOCUMENTS CAME

2    FROM?

3    A.   YES.   THEY ARE FROM THE CHANGE CONTROL PHASE.   THAT CAN BE

4    VERY EASILY SEEN BY THE FACT THAT THERE IS A VERY SPECIFIC

5    COVER PAGE, WHICH IS THE ONE THAT WE SEE ON THE SCREEN, THAT IS

6    EMPLOYED, AND THAT IS THE COVER PAGE THAT MUST BE USED IN THE

7    CHANGE CONTROL PHASE.

8    Q.   AND WHAT ADMINISTRATIVE STATUS DID 3GPP ASSIGN TO THESE

9    TWO TDOCS?

10   A.   APPROVED BECAUSE, AS I SAID, IN THAT PHASE THERE IS A MORE

11   ADMINISTRATIVE PROCESS TO MAKE THOSE CHANGES.   THERE WAS

12   CONSENSUS TO MAKE THOSE CLEANUPS, AND, THEREFORE, THE DOCUMENTS

13   WERE APPROVED.

14   Q.   AND SO UNDER AN APPROVED CONTRIBUTION COUNTING

15   METHODOLOGY, WOULD THE AUTHORS OF THESE TWO BUG FIX AND

16   TYPOGRAPHICAL ERROR UPDATING CONTRIBUTIONS GET CREDIT?

17   A.   YES.

18   Q.   AND ARE THESE THE ONLY APPROVED TDOCS YOU'RE AWARE OF THAT

19   CONTAIN TYPOGRAPHICAL UPDATES OR BUG FIXES?

20   A.   NO.   WE COULD FIND HUNDREDS, THOUSANDS OF THEM.

21   Q.   WELL, WE'VE DISCUSSED ISSUES IN THE SUBSTANTIVE PHASE AND

22   THE CHANGE CONTROL PHASE WITH THE CONCEPT OF APPROVED

23   CONTRIBUTION COUNTING.

24        ARE THERE OTHER FLAWS?

25   A.   THERE ARE SEVERAL OTHER FLAWS.   THE MOST IMPORTANT OTHER

1    FLAW IS THAT APPROVED CONTRIBUTION COUNTING IS SUBJECT TO

2    MANIPULATION BY COMPANIES AND, IN FACT, IN MY EXPERIENCE OF

3    SEVERAL YEARS IT HAS BEEN MANIPULATED BY COMPANIES.

4         WITH THIS, IT MEANS THAT COMPANIES HAVE BEEN ARTIFICIALLY

5    TRYING TO INFLATE THEIR NUMBERS OF EITHER SUBMITTED

6    CONTRIBUTIONS OR APPROVED CONTRIBUTIONS.

7         AN EXAMPLE OF HOW A COMPANY WOULD DO THAT IS VERY SIMPLE.

8    SUPPOSE THAT THERE IS A BUG FIX THAT HAS TO BE DONE IN FOUR

9    DIFFERENT SECTIONS OF THE SPECIFICATION.  THEN YOU CAN SPLIT

10   THAT IN FOUR DIFFERENT PROPOSALS, ONE PER SECTION OF THE

11   SPECIFICATION, EVEN THOUGH IT IS EXACTLY THE SAME THING.

12        AND THEN YOU WOULD GET, INSTEAD OF ONE, FOUR FORMALLY

13   APPROVED DOCUMENTS.

14        IT IS KNOWN THAT COMPANIES, CERTAIN COMPANIES, HAVE BEEN

15   GIVEN DIRECTIVES TO THEIR ENGINEERS, OR IN SOME CASES EVEN

16   INCENTIVES TO THEIR ENGINEERS, TO DO THAT.

17             MR. MERBER:  OBJECTION.  HE'S TESTIFYING TO

18   SOMETHING --

19             THE WITNESS:  AND --

20             MR. MERBER:  I'M JUST OBJECTING TO THE FACT THAT

21   SOMETHING IS KNOWN WITHOUT STATING BY WHOM OR FROM WHERE HE

22   OBTAINED THIS INFORMATION.

23             THE WITNESS:  I KNOW.  I KNOW THAT CERTAIN --

24             THE COURT:  WELL, THE OBJECTION IS OVERRULED.  BUT IT

25   WOULD BE -- IT WOULD BE HEARSAY, RIGHT?  HE'S SAYING WHAT OTHER

```
 1    COMPANIES TOLD THEIR EMPLOYEES.  JUST LAY THE FOUNDATION FOR

 2    HOW HE KNOWS THAT, PLEASE.

 3              MR. COLLIER:  YES, YOUR HONOR.  AND OF COURSE HE'S AN

 4    EXPERT.

 5    Q.  BUT, MR. CASACCIA, LET ME --

 6    A.  I --

 7    Q.  I UNDERSTAND THAT YOU KNOW, AND NOW THE COURT WOULD LIKE

 8    TO KNOW HOW YOU KNOW THAT OTHER COMPANIES INCENTIVIZE THEIR

 9    DELEGATES TO INCREASE CONTRIBUTIONS?

10    A.  I KNOW FROM DIRECT EXPERIENCE FROM HAVING SEEN MYSELF

11    THOSE DOCUMENTS AND THOSE PRACTICES BEING MADE.

12         AND, FOR EXAMPLE, TWO COMPANIES THAT HAVE HAD THIS

13    PRACTICE OF ARTIFICIALLY INFLATING THE NUMBER OF CONTRIBUTIONS,

14    BE IT SUBMITTED CONTRIBUTIONS OR APPROVED CONTRIBUTIONS,

15    SYSTEMATICALLY THROUGHOUT THE YEARS TWO OF THOSE COMPANIES HAVE

16    BEN ERICSSON AND HUAWEI.

17    Q.  ARE YOU OR OTHER MEMBERS OF QUALCOMM COMPENSATED IN ANY

18    WAY FOR THE AMOUNT OF CONTRIBUTIONS OR APPROVED CONTRIBUTIONS

19    WE HAVE?

20    A.  NO.  WE DON'T HAVE ANY QUOTAS THAT WE NEED TO REACH OR ANY

21    NUMERIC TARGETS OF CONTRIBUTIONS THAT WE NEED TO REACH, UNLIKE

22    SOME OTHER COMPANIES.

23              MR. MERBER:  OBJECTION, YOUR HONOR.  I DON'T KNOW OF

24    HIS BASIS FOR DESCRIBING THE COMPENSATION SYSTEMS OF OTHER

25    COMPANIES.
```

```
 1              MR. COLLIER:  I'LL LAY THAT FOUNDATION, YOUR HONOR.

 2              THE COURT:  I DON'T EVEN KNOW WHAT DOCUMENTS HAS HE

 3      SEEN.  HE SAID, "I'VE SEEN MYSELF THOSE DOCUMENTS."

 4              MR. COLLIER:  OKAY.

 5              THE COURT:  WHO'S HE REFERRING TO, PLEASE ?

 6              MR. COLLIER:  I CAN DO BOTH, YOUR HONOR.

 7              THE COURT:  OKAY.

 8      BY MR. COLLIER:

 9      Q.  CAN YOU GIVE THE COURT A DESCRIPTION OF THE TYPE OF

10      DOCUMENTS THAT YOU HAVE SEEN THAT ARTIFICIALLY SPLIT

11      CONTRIBUTIONS IN THE APPROVED PHASE.

12      A.  YES.  FOR EXAMPLE, AS I MENTIONED EARLIER, YOU CAN FIND

13      THE DOCUMENTS THAT DO A CERTAIN BUG FIX OR EDITORIAL

14      CORRECTIONS, AND THEY HAVE TO DO THAT THROUGHOUT A

15      SPECIFICATION.

16          A SPECIFICATION, A TECHNICAL SPECIFICATION IS A DOCUMENT

17      TYPICALLY OF A COUPLE OF HUNDRED PAGES.  SO YOU CAN DO THAT,

18      CORRECTING THOSE ERRORS, IN A SINGLE PROPOSAL, IN A SINGLE

19      DOCUMENT, THAT THEN WOULD GET APPROVED, OR YOU CAN DECIDE TO

20      SPLIT THOSE EDITORIAL CORRECTIONS INTO ONE DOCUMENT PER SECTION

21      OF THE SPECIFICATION.

22          SO OUT OF ONE BUG FIX, YOU CAN GENERATE 5, 10, 20 APPROVED

23      CONTRIBUTIONS THAT EFFECTIVELY -- THAT ARE EFFECTIVELY JUST

24      PURSUING ONE SINGLE BUG FIX.

25          AND I HAVE SEEN THOSE DOCUMENTS FIRSTHAND THROUGHOUT MY
```

1    EXPERIENCE IN MANY WORKING GROUPS.

2    Q.   THANK YOU.

3          MR. MERBER:  YOUR HONOR, I DON'T BELIEVE THAT

4    ADDRESSED THE POINT ABOUT THE COMPENSATION SCHEME AT THIRD

5    PARTIES.  THAT DID ADDRESS HIS VIEW OF DOCUMENTS HE'S REVIEWED,

6    BUT NOT THIRD PARTY COMPENSATION PLANS.

7          MR. COLLIER:  YOUR HONOR, I'LL RESPECTFULLY SUGGEST

8    THIS SOUNDS MORE LIKE CROSS, BUT I'LL ASK HIM THAT QUESTION.

9          THE COURT:  NO.  YOU SAID YOU WERE GOING TO ADDRESS

10   BOTH ISSUES.  SO GO AHEAD, PLEASE.

11         MR. COLLIER:  ALL RIGHT.

12   Q.   HAVE YOU BEEN PERSONALLY MADE AWARE BY PEOPLE WHO WOULD

13   KNOW WHETHER OR NOT DELEGATES AT CERTAIN OTHER COMPANIES ARE

14   FULLY FINANCIALLY INCENTIVIZED TO SUBMIT CONTRIBUTIONS?

15   A.   YES, I'VE BEEN PERSONALLY MADE AWARE BY THOSE DELEGATES

16   THEMSELVES IN SOME CASES.

17   Q.   DELEGATES OF THE COMPANIES THAT HAVE BEEN INCENTIVIZING

18   OR --

19   A.   YES, DELEGATES OF COMPANIES THAT HAD A CERTAIN INCENTIVE

20   THAT WOULD, FOR EXAMPLE, ASK US, CAN YOU PLEASE LET ME, LET ME

21   ADD MY NAME TO THIS DOCUMENT BECAUSE I NEED TO REACH A CERTAIN

22   QUOTA OF APPROVED CONTRIBUTIONS TO SHOW MY BOSS.

23   Q.   OKAY.  SO TO PULL BACK A LITTLE BIT, DO ALL TDOCS HAVE A

24   SOURCE OR AUTHOR LINE?

25   A.   YES.  ALL TDOCS MUST HAVE A SOURCE BECAUSE THEY HAVE TO

1      COME FROM SOMEONE, AND THE SOURCE IS NOT SUPPOSED TO IDENTIFY

2      THE DIRECT AUTHOR OF THE CONTENT.  THIS IS YET ANOTHER PROBLEM

3      OF COUNTING APPROVED CONTRIBUTIONS THAT I DIDN'T MENTION UP TO

4      NOW.

5          SO IN SOME CASES, FOR EXAMPLE, PEOPLE ADD THEMSELVES TO

6      THE SOURCE BECAUSE THEY WANT TO EXPRESS SUPPORT.  SO, FOR

7      EXAMPLE, LET'S SAY QUALCOMM COULD SUBMIT A DOCUMENT AND THEN

8      LET'S SUPPOSE THAT AT&T WANTS TO, WANTS TO SHOW THAT THEY

9      SUPPORTED THE DOCUMENT, AND THEN THEY ASK THEMSELVES TO BE

10     ADDED AS A CO-SOURCE OF THE DOCUMENT.

11         THIS IS A VERY COMMON PRACTICE IN 3GPP.  SO USING THE

12     SOURCE OF THE DOCUMENT TO EXPRESS SUPPORT.

13         IN ADDITION TO THAT, AS I MENTIONED, THERE HAS BEEN

14     NUMEROUS CASES WHERE COMPANIES HAVE ASKED TO BE ADDED TO

15     DOCUMENTS FOR WHICH THEY DIDN'T REALLY AUTHOR THE CONTENT SO

16     THAT LATER THEY COULD REPORT HOME THAT THEY HAD REACHED A

17     CERTAIN QUOTA TO THEIR BOSS.

18         THIS HAS BEEN A DIRECT REQUEST AS A SORT OF FAVOR AMONG,

19     YOU KNOW, FELLOW ENGINEERS THAT HAS BEEN MADE TO US.

20     Q.   CAN YOU NAME THE COMPANY OR COMPANIES THAT YOU HAVE

21     FIRSTHAND KNOWLEDGE THAT THEIR ENGINEERS HAVE ASKED TO BE ADDED

22     TO OUR CONTRIBUTIONS BECAUSE THEY'RE INCENTIVIZED BY THEIR

23     COMPANIES TO DO SO?

24     A.   HUAWEI.

25     Q.   IS 3GPP, AS AN ORGANIZATION, AWARE OF THIS PROBLEM OF

1    CONTRIBUTION MANIPULATION?

2    A.   YES.  IT IS, IT IS A FACT THAT IS VERY VISIBLE, AND I

3    BELIEVE EVERYBODY WITH SOME EXPERIENCE IN ATTENDING 3GPP

4    MEETINGS WOULD SAY THE SAME THINGS THAT I JUST SAID.

5         ONE THING TO MENTION IS THAT, AS I MENTIONED, THERE ARE 16

6    WORKING GROUPS.  EACH WORKING GROUP HAS A CHAIRMAN OR CHAIR

7    WOMAN THAT IS ELECTED AND THIS PRACTICE OF ARTIFICIALLY

8    INFLATING THE NUMBER OF CONTRIBUTIONS DOES CREATE SOME

9    ADMINISTRATIVE BURDEN BECAUSE IT JUST CREATES MORE CONFUSION OR

10   MORE, MORE BURDEN TO RUN THE MEETING.

11        SO IN ONE OF THE WORKING GROUPS, RAN 1, THE CHAIRMAN SOME

12   TIME AGO HAS INSTITUTED A POLICY WITH A CAP FOR THE NUMBER OF

13   CONTRIBUTIONS THAT A COMPANY WOULD BE ABLE TO SUBMIT FOR

14   CERTAIN AGENDA ITEMS.

15        THIS, OF COURSE, IS -- WAS ONLY CERTAIN AGENDA ITEMS OF A

16   WORKING GROUP, NOT -- IT DOESN'T APPLY TO ALL THE OTHER 15

17   WORKING GROUPS WHERE THE PROBLEM IS STILL VERY MUCH PRESENT.

18   Q.   OKAY.  AND THAT CHAIRMAN THAT INSTITUTED THIS CAP, IS HE A

19   QUALCOMM EMPLOYEE OR SOME OTHER COMPANY?

20   A.   NO.  HE WAS FROM DOCOMO, THE JAPANESE OPERATOR.

21   Q.   SO, MR. CASACCIA, IS APPROVED CONTRIBUTION COUNTING A

22   RELIABLE METRIC TO MEASURE A COMPANY'S PATENT PORTFOLIO

23   STRENGTH?

24   A.   NO.  APPROVED CONTRIBUTION COUNTING IS NOT A RELIABLE

25   MEASURE -- METHOD TO MEASURE ANYTHING AND THAT IS BECAUSE IT

1    DOES NOT COUNT THE FUNDAMENTAL CONTRIBUTIONS THAT ARE MADE

2    DURING THE SUBSTANTIVE WORK PHASE.

3        IT DOES COUNT THE SMALL BUG FIXES AND EDITORIAL

4    CORRECTIONS THAT ARE MADE DURING THE CHANGE CONTROL PHASE, AND

5    ALSO IT HAS BEEN REGULARLY MANIPULATED BY CERTAIN COMPANIES FOR

6    SEVERAL YEARS.

7        THERE WOULD ALSO BE OTHER REASONS, AS I ALLUDED TO

8    EARLIER, BUT THOSE ARE THE THREE MAIN ONES.

9        MR. COLLIER:  THANK YOU, YOUR HONOR.  I'LL PASS THE

10   WITNESS.

11       THE COURT:  OKAY.  IT'S 10:34.

12   LET'S GO AHEAD AND TAKE OUR BREAK THIS MORNING.  LET'S

13   TAKE A 15 MINUTE BREAK, AND THEN WE'LL CONCLUDE FOR LUNCH AT

14   NOON.

15       OKAY.  THANK YOU.

16       (RECESS FROM 10:35 A.M. UNTIL 10:48 A.M.)

17       THE COURT:  OKAY.  ALL RIGHT.  WELCOME BACK.  PLEASE

18   TAKE A SEAT.

19       10:49.  GO AHEAD, PLEASE.

20                        **CROSS-EXAMINATION**

21   BY MR. MERBER:

22   Q.   GOOD MORNING, MR. CASACCIA.

23   A.   GOOD MORNING.

24   Q.   MR. CASACCIA, YOU'RE NOT INVOLVED IN QUALCOMM'S LICENSING

25   BUSINESS, ARE YOU?

CASACCIA CROSS BY MR. MERBER

1    A.   NO, I'M NOT.

2    Q.   AND YOU'RE NOT AWARE OF WHETHER QUALCOMM HAS EVER SIGNED A

3    CONTRACT AGREEING TO BASE ITS ROYALTY REVENUE ON A MEASURE OF

4    APPROVED CONTRIBUTIONS; RIGHT?

5    A.   NO, I'VE NEVER SEEN QUALCOMM -- I HAVE NEVER SEEN ANY

6    QUALCOMM LICENSING CONTRACT.

7    Q.   AND YOU'RE NOT OFFERING ANY OPINION ABOUT THE PROPER

8    METHOD OF VALUING A STANDARD ESSENTIAL PATENT PORTFOLIO;

9    CORRECT?

10   A.   CORRECT.

11   Q.   AND YOU'RE NOT AN EXPERT IN PATENT VALUATION; RIGHT?

12   A.   CORRECT.

13   Q.   AND YOU'RE ALSO NOT INVOLVED IN VALUING QUALCOMM'S

14   CELLULAR STANDARD ESSENTIAL PATENT PORTFOLIO; RIGHT?

15   A.   CORRECT.

16   Q.   AND YOU DON'T KNOW HOW QUALCOMM'S CELLULAR STANDARD

17   ESSENTIAL PATENT PORTFOLIO COMPARES TO ANYONE ELSE'S, DO YOU?

18   A.   CORRECT.

19   Q.   YOU TESTIFIED THAT YOU THINK CONTRIBUTION COUNTING IS A

20   FLAWED IDEA BECAUSE SOME CONTRIBUTIONS DON'T REFLECT INNOVATIVE

21   IDEAS.  IS THAT RIGHT, IN PART?

22   A.   I GAVE SEVERAL REASONS.

23   Q.   THAT WAS ONE OF THEM?

24   A.   I WAS TALKING ABOUT APPROVED CONTRIBUTION COUNTING.

25        YOUR QUESTION WAS ABOUT CONTRIBUTION COUNTING, SO --

1    Q.   SO IF LIMITED TO APPROVED CONTRIBUTIONS, THAT WAS ONE OF

2    THE REASONS; CORRECT?

3    A.   ONE OF THE REASONS IS THAT IT DOES NOT COUNT FOR

4    FUNDAMENTAL IDEAS THAT ARE ADDED TO THE STANDARD BECAUSE THEY

5    NEVER GET THE ADMINISTRATIVE STATUS OF APPROVED BECAUSE THE

6    3GPP ADMINISTRATIVE SYSTEM WAS NEVER SET UP TO DO ANY SORT OF

7    COUNTING OF ANYTHING.

8    Q.   YOU WOULD AGREE THAT PARTICIPANTS OTHER THAN QUALCOMM MAKE

9    QUALITY CONTRIBUTIONS TO 3GPP; CORRECT?

10   A.   CORRECT.

11   Q.   AND YOU DIDN'T CONDUCT ANY STUDIES IN FORMING YOUR

12   OPINIONS IN THIS CASE, DID YOU?

13   A.   MY OPINION IS BASED ON MY EXPERIENCE OF ALMOST 20 YEARS

14   ATTENDING 3GPP MEETINGS AND MANAGING 3GPP ENGINEERING WORK.

15   Q.   SO I'M NOT SURE YOU ANSWERED MY QUESTION.  I WAS ASKING IF

16   YOU, IN ADDITION, APART FROM YOUR EXPERIENCE, CONDUCTED ANY

17   STUDIES IN FORMING YOUR OPINIONS IN THIS CASE?

18   A.   NO, I DID NOT BECAUSE ANYWAY I DON'T THINK ANYTHING WOULD

19   CHANGE --

20   Q.   OKAY.

21   A.   -- THE CONCLUSION.

22   Q.   SO, FOR EXAMPLE, YOU HAVEN'T DONE AN ANALYSIS SHOWING

23   THAT, FOR EXAMPLE, NOKIA'S APPROVED CONTRIBUTIONS ARE LOWER

24   QUALITY THAN QUALCOMM'S ON AVERAGE; RIGHT?

25   A.   I HAVE NOT DONE ANY SUCH STUDY BECAUSE ANY STUDY OF

1    APPROVED CONTRIBUTION WOULD NOT, WOULD NOT MEAN ANYTHING IN MY

2    OPINION.  SO IT'S COUNTING APPROVED CONTRIBUTIONS HAS

3    ABSOLUTELY NO MEANING WHATSOEVER COMPARING APPROVED

4    CONTRIBUTION OF A VERSUS APPROVED CONTRIBUTION OF B IS

5    COMPARING A USELESS FIGURE.  WITH A USELESS FIGURE, IT'S NOT

6    GOING TO BE A USEFUL WAY TO SPEND TIME.

7    Q.   SO I TAKE IT YOU'VE ALSO NEVER CONDUCTED A STUDY OF ANY

8    RELATIONSHIP BETWEEN A COMPANY'S APPROVED 3GPP CONTRIBUTIONS

9    WITH ITS STANDARD ESSENTIAL PATENT PORTFOLIO; CORRECT?

10   A.   DO YOU ASK WHETHER I DID IT?

11   Q.   YES.

12   A.   NO, I'VE NEVER DONE IT FOR REASONS I MENTIONED EARLIER.

13   Q.   AND SO BASED ON YOUR EXPERIENCE, YOU DON'T BELIEVE THERE

14   IS ANY RELATIONSHIP BETWEEN A COMPANY'S APPROVED CONTRIBUTIONS

15   AND ITS CELLULAR STANDARD ESSENTIAL PATENTS; RIGHT?

16   A.   CORRECT.

17   Q.   OKAY.  COULD YOU TURN IN THE BINDER I GAVE YOU TO CX 8262.

18   THE TITLE OF THE DOCUMENT IS --

19   A.   HOLD ON.  SAY IT AGAIN.

20   Q.   OF COURSE.  IT'S CX 8262.

21   A.   OKAY.

22   Q.   THE TITLE OF THE DOCUMENT IS STANDARDS, SEPS, LICENSING

23   AND LITIGATION IN THE ICT INDUSTRY PREPARED FOR A MEETING WITH

24   THE EUROPEAN COMMISSION; RIGHT?

25   A.   YES.  THAT'S WHAT THE TITLE SAYS, YES.

1    Q.   BY QUALCOMM EMPLOYEES, REPRESENTATIVES I MEAN?

2    A.   YES.

3    Q.   OKAY.  AND YOU DON'T HAVE ANY REASON TO DOUBT THIS WAS

4    PRESENTED TO THE EUROPEAN COMMISSION, DO YOU?

5    A.   WELL, I WAS NOT AT THIS MEETING.  MAYBE IT WAS JUST

6    PREPARED FOR BACKGROUND, SO I DON'T KNOW FOR SURE THAT IT WAS

7    PREPARED FOR THIS MEETING.

8            MR. MERBER:  OKAY.  YOUR HONOR, I MOVE TO ADMIT

9    CX 8262.

10           MR. COLLIER:  NO OBJECTION, YOUR HONOR.

11           THE COURT:  IT'S ADMITTED.

12       (PLAINTIFF'S EXHIBIT CX 8262 WAS ADMITTED IN EVIDENCE.)

13           THE COURT:  GO AHEAD, PLEASE.

14   BY MR. MERBER:

15   Q.   CAN YOU TURN TO PAGE 035 OF THE DOCUMENT?  AND I'M

16   REFERRING TO THE NUMBER AT THE BOTTOM THAT FOLLOWS THE CX 8262

17   NUMBER.

18   A.   OKAY.

19   Q.   THIS SLIDE IS TITLED THE HANDFUL OF ACTIVE CONTRIBUTORS

20   ARE THE MAJOR SEP OWNERS; AT ANY TIME?

21   A.   THAT'S THE TITLE.

22   Q.   AND THE NUMBERS SHOWN IN THE WHITE BUBBLES ARE LABELED

23   NUMBER OF CUMULATIVE CONTRIBUTIONS; CORRECT?

24   A.   YEAH, THAT'S WHAT IT SAYS.

25   Q.   AND THE LIST OF COMPANIES IN THE TABLE ON THE LEFT IS

1    TITLED TOP 10 PATENT HOLDERS; RIGHT?

2    A.   YEAH.

3    Q.   SO THIS SLIDE COMBINES INFORMATION ABOUT SEP OWNERSHIP AND

4    CONTRIBUTIONS TO STANDARDS; CORRECT?

5    A.   IT PUTS TWO PIECES OF INFORMATION ON THE SAME SLIDE.

6    Q.   OKAY.  YOU CAN PUT THAT ASIDE.

7         COULD YOU TURN TO TAB 6336 OF YOUR BINDER.

8    A.   YEAH.

9    Q.   AND THIS IS A 2009 E-MAIL THAT YOU SENT ATTACHING A SLIDE

10   DECK; CORRECT?

11   A.   YES.

12   Q.   AND YOU PREPARED THESE SLIDES TITLED STANDARDS ASK FOR

13   3GPP INPUT; RIGHT?

14   A.   YES.

15            MR. MERBER:  YOUR HONOR, I MOVE TO ADMIT CX 6336.

16            MR. COLLIER:  NO OBJECTION.

17            THE COURT:  IT'S ADMITTED.

18       (PLAINTIFF'S EXHIBIT CX 6336 WAS ADMITTED IN EVIDENCE.)

19            THE COURT:  GO AHEAD, PLEASE.

20   BY MR. MERBER:

21   Q.   ONE OF THE RECIPIENTS OF THIS E-MAIL WAS EDWARD TIEDEMANN;

22   RIGHT?

23   A.   YES.

24   Q.   AND MR. TIEDEMANN WAS YOUR BOSS IN 2009; CORRECT?

25   A.   YES.

1       Q.   CAN YOU PLEASE TURN TO PAGE 8, AGAIN REFERRING TO THE

2       CX PAGINATION.

3       A.   YES.

4       Q.   AND ON THIS SLIDE, YOU ASKED THE QUESTION -- YOU WROTE THE

5       QUESTION, TO WHICH LEVEL IS QUALCOMM A PLAYER IN 3GPP?  RIGHT?

6       A.   YES.

7       Q.   AND YOU WROTE UNDERNEATH THAT, ONE METRIC IS THE SHARE OF

8       INPUT CONTRIBUTIONS; RIGHT?

9       A.   THAT'S WHAT THE SLIDE SAYS, YES.

10      Q.   OKAY.  AND THE TABLES UNDERNEATH THAT COUNT CONTRIBUTIONS

11      AND SHARES OF CONTRIBUTIONS TO WORKING GROUPS WITHIN 3GPP;

12      CORRECT?

13      A.   CORRECT.

14      Q.   AND THIS WAS A SLIDE THAT YOU WROTE AND PRESENTED TO YOUR

15      BOSS?

16      A.   YES, I PRESENTED THIS SLIDE TO MY BOSS.

17           I SHOULD NOTE, BY THE WAY, THAT THIS WAS A PERCENTAGE OF

18      CONTRIBUTIONS IN GENERAL, NOT APPROVED CONTRIBUTIONS.  IF WE

19      LOOK AT THE OVERALL SLIDE, THIS WAS ABOUT MANPOWER.

20           SO THE SLIDE WAS NOT PRESENTED ONLY TO MY BOSS, JUST TO BE

21      CLEAR.  THE STANDARD TASK FORCE INCLUDED OTHER ELEMENTS OF

22      QUALCOMM MANAGEMENT TEAM THAT REALLY DID NOT HAVE MUCH

23      EXPERIENCE IN STANDARDS, AND AS PART OF THIS SLIDE DECK, AS ONE

24      CAN SEE FROM ACTUALLY GOING THROUGH THE SLIDE DECK ITSELF, I

25      WAS TRYING TO GET MORE RESOURCES AND SOME CHANGES IN

1    MANAGEMENT, AND I WANTED TO PROVIDE SOME BACKGROUND TO EXPLAIN

2    HOW MUCH WORK WAS ACTUALLY GOING INTO STANDARDS BECAUSE FOR

3    SOME PEOPLE IN THE QUALCOMM MANAGEMENT TEAM, IT WAS NOT REALLY

4    CLEAR HOW MUCH WORK STANDARDS WAS.

5    Q.   SO YOU PRESENTED THIS TO MORE PEOPLE THAN JUST YOUR BOSS,

6    ALSO TO ADDITIONAL QUALCOMM MANAGEMENT?

7    A.   YES.

8    Q.   OKAY.  COULD YOU TURN TO PAGE -- SORRY -- TO TAB CX 6138.

9         AND I WOULD JUST -- WELL, ARE YOU THERE?

10   A.   I HAVE IT.

11   Q.   DO YOU HAVE IT?

12   A.   YEAH.

13   Q.   OKAY, GREAT.

14        THE FIRST PAGE HAS AN E-MAIL AT THE BOTTOM THAT YOU

15   DRAFTED ATTACHING SOME SLIDES; CORRECT?

16   A.   YES.

17            MR. MERBER:  YOUR HONOR, I MOVE TO ADMIT CX 6138,

18   SUBJECT TO THE TOP E-MAIL BEING REDACTED AS IT IS IN THE

19   WITNESS'S BINDER AT THE MOMENT PER YOUR RULING ON THE HPO.

20            MR. COLLIER:  NO OBJECTION, YOUR HONOR.

21            THE COURT:  IT'S ADMITTED.

22        (PLAINTIFF'S EXHIBIT CX 6138 WAS ADMITTED IN EVIDENCE.)

23            THE COURT:  GO AHEAD, PLEASE.

24   BY MR. MERBER:

25   Q.   YOU ALSO SENT THESE SLIDES TO A NUMBER OF QUALCOMM

CASACCIA CROSS BY MR. MERBER

```
 1     EMPLOYEES, INCLUDING YOUR BOSS, ED TIEDEMANN; CORRECT?

 2     A.   EXCUSE ME, COUNSEL.  WHEN YOU SAY THESE SLIDES, TO WHAT

 3     ARE YOU REFERRING TO?

 4     Q.   CERTAINLY.  I'M REFERRING TO THE SLIDES BEGINNING AT PAGE

 5     29 OF THE DECK.

 6     A.   YES.

 7     Q.   OKAY.

 8     A.   I DON'T REMEMBER IF I SENT THESE SLIDES TO MY BOSS

 9     SPECIFICALLY, BUT I SENT IT TO SOME COLLEAGUES.

10     Q.   AND YOUR BOSS IS CC'D IN THE E-MAIL CHAIN THAT WAS AT THE

11     BEGINNING OF THE DOCUMENT; RIGHT?

12     A.   YES.  EVENTUALLY HE GOT THEM BECAUSE THEY WERE ADDED TO

13     ANOTHER DECK AND EVENTUALLY HE GOT THEM.

14     Q.   OKAY.  SO YOU DRAFTED THIS SECTION OF THE SLIDES, CORRECT,

15     BEGINNING AT PAGE 29?

16     A.   YES, I DID.

17     Q.   OKAY.  AND IF YOU'LL TURN TO PAGE 32, YOU'LL SEE -- WELL,

18     YOU WROTE A SLIDE TITLED CURRENT 3GPP LANDSCAPE; CORRECT?

19     A.   YES.

20     Q.   OKAY.  AND UNDER THE PARTICIPATION BULLET YOU WROTE, "IT

21     IS TEMPTING TO ASSUME THAT THE TOP 5 TECHNICAL CONTRIBUTORS TO

22     3GPP COULD SPIN OFF IN A SEPARATE CONSORTIUM AND BE

23     SUCCESSFUL."

24          RIGHT?

25     A.   THAT'S WHAT IT SAYS.
```

```
 1    Q.   AND THEN FOCUSSING ON THE NEXT MAJOR BULLET, YOU ALSO

 2    POINTED OUT, "HOWEVER, THE NEXT 10 WOULD BE CAPABLE TO FILL IN

 3    THE GAPS AND TAKE OVER."

 4         RIGHT?

 5    A.   YES, THAT'S WHAT IT SAYS.

 6    Q.   AND IN RED AT THE BOTTOM YOU ALSO WROTE, "IF THE BIG BOYS

 7    LEAVE 3GPP, THERE'S A LINE AT THE DOOR TO TAKE THEIR PLACE."

 8         RIGHT?

 9    A.   YES, THAT'S WHAT IT SAYS.

10    Q.   OKAY.

11         YOUR HONOR, NO FURTHER QUESTIONS.

12              THE COURT:  ALL RIGHT.  TIME IS 11:00 O'CLOCK.

13                      REDIRECT EXAMINATION

14    BY MR. COLLIER:

15    Q.   MR. CASACCIA, COULD YOU TURN BACK TO CX 8262.

16              THE COURT:  TIME IS 11:00 O'CLOCK.

17         GO AHEAD, PLEASE.

18              MR. COLLIER:  SORRY, YOUR HONOR.  I APOLOGIZE.

19    Q.   CX 6282, PAGE 35.

20    A.   YES.

21    Q.   WHEN IT TALKS ABOUT CONTRIBUTIONS ON THIS PAGE, ARE THESE

22    APPROVED CONTRIBUTIONS?

23    A.   NO, THIS DOESN'T SEEM TO BE APPROVED CONTRIBUTIONS.  IN

24    FACT, IT'S NOT CLEAR WHAT IT IS.  IT'S NOT CLEAR WHICH WORKING

25    GROUPS HAVE BEEN COUNTED.
```

1          HE CAN -- AS I MENTIONED EARLIER IN MY TESTIMONY, THERE

2     ARE 16 WORKING GROUPS IN 3GPP.  SOME OF THEM ARE IMPORTANT, BUT

3     DEAL WITH ASPECTS THAT ARE UNRELATED TO THE AIR INTERFACE.  FOR

4     EXAMPLE, THEY DEAL WITH BILLING OR CHARGING, SO HOW MUCH MONEY

5     YOU HAD TO PAY ON YOUR PHONE BILL, AND CORE NETWORK ASPECTS.

6          SO WE DON'T KNOW EXACTLY WHAT, WHAT IS BEING COUNTED HERE.

7     IT SEEMS THAT IT IS NOT UPLOAD CONTRIBUTIONS INDEED.

8     Q.   AND DO YOU SEE ON THE LEFT-HAND SIDE WHERE IT SAYS

9     INTERDIGITAL COMMUNICATIONS AS A PATENT HOLDER?

10    A.   I DO.

11    Q.   DOES IT HAVE A STAR THAT INDICATES THAT IT'S A TOP 10

12    CONTRIBUTOR TO 3GPP?

13    A.   IT DOES NOT.  IN FACT, IT DOES NOT APPEAR ON THE

14    RIGHT-HAND SIDE IN THOSE BUBBLES.

15    Q.   WHAT ABOUT LG CORP. LISTED AS A PATENT HOLDER?

16    A.   ALSO THERE IS NO STAR, AND IT DOES NOT APPEAR IN THE

17    BUBBLES.

18    Q.   WHAT ABOUT PANASONIC CORPORATION?

19    A.   ALSO THERE IS NO STAR, AND IT DOES NOT APPEAR IN THE

20    BUBBLES.

21    Q.   IS THERE ANYTHING ON THIS SLIDE OR ANY OTHER SLIDE IN THE

22    DECK OF CX 8262 THAT SHOWS ANY LINKAGE BETWEEN APPROVED

23    CONTRIBUTIONS AND THE VALUE OF A PATENT PORTFOLIO?

24    A.   NO, NOTHING AT ALL.

25    Q.   OKAY.  NOW, I'D ASK YOU TO TURN WITH ME TO CX 6336, AND

1    WE'LL START AT PAGE 7.

2         WHAT IS PAGE 7 TRYING TO TELL YOUR MANAGEMENT?

3    A.   THIS IS TRYING TO SHOW WHERE THE ENGINEERS THAT WE WERE

4    SENDING TO THE 3GPP TEAM AT THAT TIME, SO IN 2009, WERE COMING

5    FROM, FROM THE PERSPECTIVE OF INTERNAL DEPARTMENTS.

6         SO FTE MEANS FULL-TIME EQUIVALENT.  IT'S JUST A WAY OF

7    MEASURING WORK FORCE AND WORK ALLOCATION.

8         AND SO THIS WAS SHOWING THAT AT THE TIME WE WERE SENDING

9    62 PEOPLE, HERE IT SAYS HEADS, WHICH IS ANOTHER TERM TO

10   INDICATE HUMAN BEINGS, 62 PEOPLE.

11        AND THEN IT SAYS WHERE ARE THESE PEOPLE COMING FROM -- SO

12   32 WERE COMING FROM CORPORATE R&D; 15 WERE COMING FROM QAC,

13   WHICH IS THE PREDECESSOR NAME OF THE SAME DEPARTMENT I AM IN

14   RIGHT NOW, THERE'S BEEN A SLIGHT CHANGE OF NAME; 12 FROM QCT;

15   AND THEN 1 FROM SOME OTHER INTERNAL DEPARTMENTS THAT NOW

16   DOESN'T EXIST OR CHANGED THE NAME AS WELL.

17   Q.   SO WHAT WAS YOUR PURPOSE IN SENDING THIS SLIDE DECK TO

18   YOUR MANAGEMENT?  WHAT WERE YOU TRYING TO TELL THEM AND

19   ACCOMPLISH?

20   A.   WELL, OVERALL THE PURPOSE OF THIS SLIDE DECK WAS TO GET

21   SOME MORE ALLOCATION OF RESOURCES TO 3GPP IN 2009, AND ALSO TO

22   PROPOSE SOME LINE MANAGEMENT CHANGES AS CAN BE SEEN FROM, I

23   BELIEVE, THE SLIDE IN THE CONCLUSIONS WHERE I'M PROPOSING THAT

24   CERTAIN INDIVIDUALS HOLDING CERTAIN ROLES IN THE 3GPP TEAM

25   WOULD NOW REPORT DIRECTLY TO ME.

1           AND THIS WAS BACKGROUND INFORMATION TO TELL MANAGEMENT

2      JUST HOW MANY PEOPLE DID WE HAVE AT THAT POINT IN TIME, WHERE

3      THEY WERE COMING FROM, AND SO ON.

4      Q.   SO DOES THIS SLIDE DECK HAVE ANYTHING TO DO WITH USING

5      APPROVED CONTRIBUTIONS TO VALUE A PATENT PORTFOLIO?

6      A.   NOTHING WHATSOEVER.

7      Q.   OKAY.  AND AT THE END OF YOUR CROSS-EXAMINATION, THERE WAS

8      A TALK ABOUT IF VARIOUS TECHNICAL CONTRIBUTORS LEFT 3GPP,

9      WHETHER OTHERS COULD FILL IN THE GAPS.

10          DO YOU RECALL THAT?

11     A.   I DO.

12     Q.   IF QUALCOMM'S LEADERSHIP ON 3GPP ON THINGS SUCH AS 5G IS

13     ERODED, ARE THERE COMPANIES WHO ARE POISED TO STEP IN AND FILL

14     THAT LEADERSHIP VACUUM?

15     A.   YES.

16     Q.   CAN YOU NAME ONE?

17     A.   THE MAIN ONE WOULD BE HUAWEI.

18               MR. COLLIER:  I'LL PASS THE WITNESS, YOUR HONOR.

19               THE COURT:  OKAY.  TIME IS 11:05.  DO YOU HAVE ANY

20     FURTHER CROSS?

21               MR. MERBER:  NO FURTHER QUESTIONS, YOUR HONOR.

22               THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED, AND

23     IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

24               MR. COLLIER:  I WOULD SAY NOT, YOUR HONOR.

25               THE COURT:  ALL RIGHT.  DO YOU AGREE WITH THAT?

1           MR. MERBER:  NOT FOR THE FTC, YOUR HONOR.

2           THE COURT:  ALL RIGHT.  THEN YOU HAVE COMPLETED YOUR

3      TRIAL TESTIMONY AND YOU'RE FREE TO LEAVE.

4           THE WITNESS:  THANK YOU, YOUR HONOR.

5           THE COURT:  SO IF YOU WOULD, PLEASE CALL YOUR NEXT

6      WITNESS.

7           MR. TAFFET:  YOUR HONOR, RICHARD TAFFET FROM MORGAN

8      LEWIS FROM QUALCOMM.

9         OUR NEXT WITNESS IS DIRK WEILER.

10          THE COURT:  OKAY.  IF HE COULD PLEASE COME FORWARD.

11          MR. TAFFET:  YOUR HONOR, WE'LL HAVE SOME SMALL

12     BINDERS.  IF WE MAY APPROACH TO HAND THEM UP?

13          THE COURT:  YES, PLEASE.

14        (PAUSE IN PROCEEDINGS.)

15          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

16        **(DEFENDANT'S WITNESS, DIRK WEILER, WAS SWORN.)**

17          THE WITNESS:  YES, I DO.

18          THE CLERK:  THANK YOU.

19          MR. TAFFET:  MAY WE PRESENT ONE TO THE WITNESS?

20          THE COURT:  YES, PLEASE.

21          THE CLERK:  WOULD YOU PLEASE STATE JURY FULL NAME AND

22     SPELL YOUR LAST NAME FOR THE RECORD?

23          THE WITNESS:  MY NAME IS DIRK WEILER.  W-E-I-L-E-R.

24          MR. TAFFET:  ARE WE READY TO PROCEED?

25          THE COURT:  WE'RE GOOD.  ALL RIGHT.  IT'S 11:06.  GO

1     AHEAD, PLEASE.

2                         **DIRECT EXAMINATION**

3     BY MR. TAFFET:

4     Q.   MR. WEILER, GOOD MORNING.

5     A.   GOOD MORNING.

6     Q.   WOULD YOU KINDLY TELL THE COURT BY WHOM YOU ARE EMPLOYED?

7     A.   I'M EMPLOYED BY NOKIA.

8     Q.   WHAT IS YOUR CURRENT POSITION?

9     A.   I'M THE HEAD OF STANDARDS POLICY AT NOKIA.

10    Q.   WHERE DO YOU MAINTAIN YOUR PRIMARY OFFICE?

11    A.   I'M BASED IN MUNICH IN GERMANY.

12    Q.   AS HEAD OF NOKIA'S STANDARDS POLICY, WHAT ARE YOUR JOB

13    RESPONSIBILITIES?

14    A.   IN THIS FUNCTION, I'M RESPONSIBLE FOR ALL OF MEMBERSHIPS

15    IN STANDARDS ORGANIZATIONS WORLDWIDE AND THE RELATED POLICY

16    TOPICS TO THESE MEMBERSHIPS.

17    Q.   HOW LONG HAVE YOU BEEN EMPLOYED BY NOKIA?

18    A.   I HAVE BEEN EMPLOYED BY NOKIA SINCE 2013.

19    Q.   AND BEFORE THAT, HOW LONG WERE YOU -- HAVE YOU BEEN

20    INVOLVED IN THE STANDARDS DEVELOPMENT ACTIVITIES?

21    A.   I'VE BEEN INVOLVED THERE FOR NEARLY THE WHOLE OF MY

22    BUSINESS LIFE, STARTING BACK 30 YEARS.

23    Q.   SO THAT WOULD BE APPROXIMATELY 1988?

24    A.   THIS IS CORRECT.

25    Q.   COULD YOU BRIEFLY DESCRIBE YOUR EXPERIENCE IN THE

WEILER DIRECT BY MR. TAFFET

```
 1      STANDARDS DEVELOPMENT WORLD SINCE 1988?

 2      A.   YES.  IN SHORT, I STARTED IN 1988 WRITING TECHNICAL

 3      STANDARDS IN ETSI FOR THE SECOND GENERATION MOBILE SYSTEM, GSM.

 4           I CONTINUED THEN BEING RESPONSIBLE FOR SIEMENS, THE

 5      COMPANY SIEMENS STANDARDIZATION, THE ACTIVITIES IN ETSI AND

 6      OTHER STANDARDS ORGANIZATIONS.

 7           AND I WAS RESPONSIBLE FOR THESE ACTIVITIES WHEN THE THIRD

 8      GENERATION PARTNERSHIP, 3GPP, WAS CREATED IN 1998.

 9           AND I CONTINUED THE RESPONSIBILITY AND ACTIVE

10      PARTICIPATION UNTIL NOW, BUT CHANGING FROM TECHNICAL

11      STANDARDIZATION ACTIVITIES TO THE GOVERNANCE ACTIVITIES OF

12      STANDARDIZATION.

13      Q.   NOW, AS HEAD OF NOKIA'S STANDARDS POLICY, YOU SAID YOU

14      DIRECTED -- YOU DIRECT NOKIA'S PARTICIPATION IN STANDARDS

15      DEVELOPMENT ORGANIZATIONS, OR IF I CAN CALL THEM SDO'S, IF

16      THAT'S OKAY?

17      A.   YES.

18      Q.   AND YOU DO THAT WORLDWIDE; CORRECT?

19      A.   THIS IS CORRECT.

20      Q.   IN WHICH SDO'S IS NOKIA A MEMBER?

21      A.   NOKIA IS A MEMBER IN MORE THAN 100 SDO'S.  SOME PROMINENT

22      EXAMPLES ARE ETSI, 3GPP, ITU, AND MANY OTHERS.

23      Q.   COULD YOU BRIEFLY DESCRIBE WHAT 3GPP IS?

24      A.   YES, SURE.  WHEN WE DECIDED THAT GSM, WHICH WAS THE

25      EUROPEAN SYSTEM, SHOULD DEVELOP TO THE NEXT LEVEL ON A GLOBAL
```

1    BASIS, SIX REGIONAL SDO'S CREATED A PARTNERSHIP PROJECT CALLED

2    THIRD GENERATION PARTNERSHIP PROJECT, AND THE ORGANIZATIONAL

3    PARTNERS ARE THEN REGIONAL SDO'S FROM JAPAN, FROM KOREA, CHINA,

4    INDIA, AND FROM THE U.S., WHERE ATIS IS THE SDO RELEVANT HERE.

5    Q.   AND DOES ETSI PLAY A PARTICULAR ROLE IN 3GPP?

6    A.   YES.  BESIDES THE FACT THAT ETSI WAS THE ORIGINAL SOURCE

7    OF CREATING THE PROPOSAL OF CREATING 3GPP, ETSI ALSO HOLDS THE

8    SECRETARIAT FOR 3GPP, A MAJORITY OF ALL COMPANIES WORKING IN

9    3GPP IS COMING INTO 3GPP VIA THE ETSI MEMBERSHIP.

10       AND ALSO, ETSI PROVIDES A REPOSITORY OF DECLARED STANDARD

11   ESSENTIAL PATENTS FOR ALL OF 3GPP.

12   Q.   AND JUST TO BE CLEAR, DOES 3GPP PROVIDE A FORUM FOR

13   DEVELOPING CELLULAR STANDARDS?

14   A.   YES.  THIS IS THE PLACE IN THE WORLD IN THE MEANTIME, THE

15   ONLY PLACE IN THE WORLD WHERE THE VAST MAJORITY OF CELLULAR

16   STANDARDS IS DEVELOPED.

17   Q.   NOW, DOES NOKIA IMPLEMENT THE IPR POLICIES OF THE SPECIFIC

18   3GPP SDO'S DIFFERENTLY?

19   A.   NO.  NOKIA IMPLEMENTS THESE POLICIES IN A UNIFORM WAY AS

20   THE WHOLE BUSINESS IS GLOBAL, 3GPP IS GLOBAL, AND, THEREFORE,

21   ALSO THE IMPLEMENTATION OF THESE POLICIES HAS BEEN GLOBAL AND

22   UNIFORM.

23   Q.   AND HAS THIS PRACTICE BEEN FOLLOWED DURING THE ENTIRE TIME

24   YOU HAVE BEEN EMPLOYED BY NOKIA OR INVOLVED IN STANDARDS?

25   A.   YES.

1    Q.   NOW, IS IT IMPORTANT FOR NOKIA'S BUSINESS TO HAVE

2    CONSISTENT PRACTICES UNDER ALL OF THE 3GPP SDO'S IPR POLICIES?

3    A.   YES.

4    Q.   WHY IS THAT?

5    A.   AS I HAVE SAID, THE -- WHEN WE -- WHEN NOKIA GIVES A --

6    THE LICENSING PROGRAM UNDER THESE SDO'S, THAT CAN ONLY BE ON A

7    GLOBAL BASIS, SO THEREFORE, ADOPTING AND CHANGING THIS

8    DEPENDING ON THE SDO IS NOT A SOLUTION AND NOT SOMETHING THE

9    INDUSTRY IN GENERAL DOES.

10   Q.   NOW, YOU MENTIONED ETSI A NUMBER OF TIMES.

11        HAVE YOU PARTICIPATED OR PLAYED A ROLE IN ETSI AT ALL?

12   A.   YES, I STARTED PARTICIPATING IN ETSI IN 1988.

13   Q.   COULD YOU BRIEFLY DESCRIBE WHAT YOUR HISTORY WITH ETSI HAS

14   BEEN SINCE 1988?

15   A.   YEAH.  AFTER A LONG TIME OF WRITING MYSELF TECHNICAL

16   STANDARDS IN TECHNICAL WORKING GROUPS AND THEN DIRECTING MY

17   DEPARTMENT'S PARTICIPATING TO THESE ACTIVITIES, I BECAME

18   STRONGER INVOLVED IN ETSI GOVERNANCE STRUCTURE WITH THE

19   PARTICIPATION IN THE GENERAL ASSEMBLY OF ETSI IN 2007.

20        I BECAME THEN AN ETSI BOARD MEMBER IN 2008.  I HAVE

21   CHAIRED THE ETSI GENERAL ASSEMBLY FROM 2010 TO 2014.

22        AND SINCE THEN, I'M THE CHAIRMAN OF THE ETSI BOARD.

23   Q.   COULD YOU BRIEFLY DESCRIBE WHAT THE RELATIONSHIP IS

24   BETWEEN THE ETSI GENERAL ASSEMBLY AND THE ETSI BOARD?

25   A.   YES.  THE ETSI GENERAL ASSEMBLY IS THE HIGHEST BODY IN

1    ETSI, THE GATHERING OF THE MORE THAN 850 MEMBERS, AND THE

2    GENERAL ASSEMBLY ALSO TAKES THE FUNDAMENTAL DECISIONS FOR THE

3    ORGANIZATION, INCLUDING RESPONSIBILITY FOR THE STATUTES, ROUTES

4    OF PROCEDURES, INCLUDING THE IPR POLICY.

5         THE BOARD IS -- HAS A DELEGATED RESPONSIBILITIES FROM THE

6    GENERAL ASSEMBLY TAKING CARE OF OVERSIGHT OF THE TECHNICAL

7    ORGANIZATION, AS WELL AS THE STRATEGY DEVELOPMENT FOR ETSI AND

8    VARIOUS OTHER TOPICS.

9    Q.   AND YOU'RE CURRENTLY THE CHAIRMAN OF THE ETSI BOARD?

10   A.   CORRECT.

11   Q.   IS THERE A COMMITTEE WITHIN ETSI THAT IS RESPONSIBLE FOR

12   THE INTELLECTUAL PROPERTY POLICY?

13   A.   YES.  THE RESPONSIBILITY FOR THE POLICY IS WITHIN THE

14   GENERAL ASSEMBLY.

15        BUT AS THE GENERAL ASSEMBLY PARTICIPANTS ARE MORE FROM,

16   START COMING FROM A STANDARD ORGANIZATION ONLY PERSPECTIVE,

17   ETSI HAS CREATED A SPECIAL IPR SPECIAL COMMITTEE WHERE THE,

18   MANY OF THE LAWYERS OF OUR MEMBERS AND OTHERS ARE COMING

19   TOGETHER TO DISCUSS POTENTIAL CHANGES NEEDED FOR THE POLICY OF

20   ETSI, FOR THE IPR POLICY.

21   Q.   THAT COMMITTEE IS THE IPR SPECIAL COMMITTEE?

22   A.   THIS IS CORRECT.

23   Q.   HAVE YOU PARTICIPATED IN THE IPR SC AT ALL?

24   A.   YES, I HAVE PARTICIPATED IN THAT COMMITTEE FROM ITS

25   INCEPTION IN 2007, AND I BECAME THE CHAIRMAN OF THAT COMMITTEE

1    IN 2008, AND I HAVE CHAIRED THAT COMMITTEE NOW FOR TEN YEARS

2    UNTIL THE END OF LAST YEAR.

3    Q.   SO AS OF THIS TIME, YOU'RE NO LONGER THE CHAIR, BUT YOU

4    DID CHAIR THE IPR SPECIAL COMMITTEE FOR THOSE TEN YEARS?

5    A.   YES.

6    Q.   NOW, DURING THE TIME THAT YOU WERE INVOLVED WITH THE IPR

7    SPECIAL COMMITTEE, HOW WERE DECISIONS MADE IN THE COMMITTEE?

8    A.   THIS COMMITTEE IS AN ADVISORY COMMITTEE TO THE GENERAL

9    ASSEMBLY BECAUSE THE GENERAL ASSEMBLY WANTS TO UNDERSTAND AND

10   KNOW HOW THE MEMBERSHIP VIEW ON THIS TOPIC IS.

11        THEREFORE, I HAVE DECIDED AND HAVE DONE THIS OVER THESE

12   TEN YEARS, THAT ALL DECISIONS IN THIS COMMITTEE HAVE TO BE MADE

13   BY CONSENSUS.

14   Q.   AND WHEN YOU USE THE WORD "CONSENSUS," WHAT DO YOU MEAN?

15   A.   CONSENSUS MEANS THE DECISION IS BACKED BY ALL STAKEHOLDER

16   GROUPS IN THE MEMBERSHIP, SO IT'S ABSENT ANY SUSTAINED

17   OPPOSITION OF ANY STAKEHOLDER GROUP IN ORDER TO MAKE SURE THAT

18   EVERYBODY WHO'S CONCERNED OF SUCH DECISIONS HAVE A FAIR SAY AND

19   IS ALSO AGREEABLE TO THOSE DECISIONS.

20   Q.   DOES CONSENSUS REQUIRE UNANIMITY OF USE?

21   A.   NO, IT DOES NOT.  SO IT CAN'T BE BLOCKED, ANY DECISION, BY

22   A SINGLE COMPANY.

23   Q.   IS IT THE SAME AS A MAJORITY VOTE, CONSENSUS?

24   A.   NO, NOT AT ALL, BECAUSE WHEN YOU USE MAJORITY, SO IF YOU

25   HAVE 50 PERCENT, THERE IS A VERY HIGH LIKELIHOOD THAT YOU MISS

1     OUT COMPLETE STAKEHOLDER GROUPS.

2          ETSI HAS A VERY DIVERSE MEMBERSHIP WITH VERY DIVERSE

3     INTERESTS.  WE HAVE ALL THE BIG TECHNOLOGY COMPANIES IN THERE.

4          SO MAKING SUCH DECISIONS BY A SIMPLE MAJORITY WOULD LEAVE

5     OUT IMPORTANT PARTS OF OUR MEMBERS.

6     Q.   I'D LIKE TO NOW DIRECT YOUR ATTENTION TO THE BINDER THAT'S

7     IN FRONT OF YOU, MR. WEILER.

8          THERE SHOULD BE ONLY ONE DOCUMENT THERE.

9          YOUR HONOR, THIS IS QX 2776, AND IT'S ALREADY ADMITTED

10    INTO EVIDENCE.

11         MR. WEILER, DO YOU RECOGNIZE THIS DOCUMENT?

12    A.   YES, I DO.  THIS IS ETSI'S INTELLECTUAL PROPERTY RIGHTS

13    POLICY IN ITS CURRENT VERSION.

14    Q.   AND HAS -- IS THERE A SPECIFIC PROVISION IN THE IPR POLICY

15    THAT MOST DIRECTLY ADDRESSES FRAND LICENSING?

16    A.   YES.  IF YOU TURN TO CLAUSE 6.1 OF THE ETSI IPR POLICY,

17    THIS DESCRIBES THE PROVISIONS OF FRAND LICENSING.

18    Q.   AND HAS CLAUSE 6.1 REMAINED ESSENTIALLY THE SAME DURING

19    THE ENTIRE TIME THAT YOU HAVE BEEN INVOLVED WITH ETSI'S

20    ACTIVITIES?

21         MS. GILLEN:  OBJECTION, YOUR HONOR.  MR. WEILER IS A

22    FACT WITNESS.  HE'S BEING ASKED HERE TO TESTIFY ABOUT HIS

23    INTERPRETATION OF A CONTRACT PROVISION.

24         MR. TAFFET:  YOUR HONOR, I DID NOT ASK HIM TO

25    INTERPRET IT.  I ASKED HIM WHETHER IT HAS REMAINED ESSENTIALLY

1    THE SAME, WHAT IS WRITTEN IN THE POLICY, SINCE HE'S BEEN

2    INVOLVED WITH ETSI, AND SPECIFICALLY THE IPR POLICY.

3         THE COURT:  WHAT'S YOUR RESPONSE TO THAT?

4         MS. GILLEN:  I BELIEVE THE PRIOR QUESTION ASKED

5    MR. WEILER WHETHER, OR WHAT PROVISION, RATHER, ADDRESSED FRAND

6    COMMITMENTS IN THE AGREEMENT.

7         THE COURT:  THE FIRST QUESTION WAS, IS THERE A

8    SPECIFIC PROVISION IN THE IPR POLICY THAT MOST DIRECTLY

9    ADDRESSES FRAND LICENSING?

10        AND THEN MR. WEILER SAID, 6.1.

11        AND THEN THE QUESTION WAS, HAS 6.1 REMAINED ESSENTIALLY

12   THE SAME DURING THE ENTIRE TIME THAT YOU HAVE BEEN INVOLVED

13   WITH ETSI'S ACTIVITIES?

14        SO YOU'RE CONCERNED THAT INTERPRETING WHAT "ESSENTIALLY

15   THE SAME MEANS"?  IS THAT YOUR OBJECTION?

16        MS. GILLEN:  YES.

17        THE COURT:  WELL, I ASSUME THERE'S NO OBJECTION IF IT

18   JUST HAS THE LANGUAGE ITSELF, HAS THE TEXT ITSELF CHANGED,

19   VERSUS AN INTERPRETATION OF -- IF THE LANGUAGE ITSELF HAS

20   CHANGED, THEN HIS INTERPRETATION OF WHETHER IT'S REMAINED

21   ESSENTIALLY THE SAME, I WOULD SUSTAIN THAT OBJECTION.

22        SO MAYBE YOU CAN REPHRASE.

23        MR. TAFFET:  I CAN REPHRASE, YOUR HONOR.

24        THE COURT:  THANK YOU.

25   BY MR. TAFFET:

1    Q.   MR. WEILER, HAS THE LANGUAGE OF CLAUSE 6.1 CHANGED SINCE

2    THE TIME YOU HAVE BEEN INVOLVED WITH ETSI ACTIVITIES?

3    A.   NO.

4    Q.   NOW, HOW DOES NOKIA IMPLEMENT SECTION 6.1?

5    A.   NOKIA IS IMPLEMENTING ITS OBLIGATION UNDER 6.1 BY

6    LICENSING ITS PATENTS ON THE DEVICE LEVEL.

7    Q.   AND HAS THIS BEEN THE PRACTICE DURING THE ENTIRE TIME

8    YOU'VE BEEN EMPLOYED BY NOKIA?

9    A.   YES.

10   Q.   WAS IT ALSO THE CASE DURING THE TIME THAT YOU WERE

11   EMPLOYED BY SIEMENS, THAT THEY DID THE SAME PRACTICE?

12   A.   YES.

13   Q.   AND DID THAT PRACTICE CONTINUE DURING THE TIME YOU WERE

14   EMPLOYED BY THE NOKIA/SIEMENS ENTITY THAT WAS FORMED?

15   A.   ALSO IN -- ALSO YES.

16   Q.   NOW, BASED ON YOUR INVOLVEMENT IN THE ETSI IPR SPECIAL

17   COMMITTEE, HOW DO THE MEMBERS OF ETSI IMPLEMENT CLAUSE 6.1.

18        MS. GILLEN:  OBJECTION.  HEARSAY TO THE EXTENT HE'S

19   ASKING ABOUT THE OTHER MEMBERS OF ETSI'S IMPLEMENTATION OF THE

20   POLICY.

21        MR. TAFFET:  YOUR HONOR, WITH RESPECT, THIS IS NOT

22   HEARSAY.  THIS IS KNOWLEDGE, PARTICULARIZED KNOWLEDGE THAT THIS

23   WITNESS HAS BY VIRTUE OF HIS INVOLVEMENT IN THE BUSINESS OF

24   NOKIA, HIS PARTICIPATION IN CHAIRING THE ETSI IPR SPECIAL

25   COMMITTEE, AND --

```
 1                 THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.  WHY

 2      DON'T YOU LAY THE FOUNDATION OF HIS KNOWLEDGE.

 3                 MR. TAFFET:  OKAY.  FAIR ENOUGH.

 4                 THE COURT:  UM-HUM.

 5      BY MR. TAFFET:

 6      Q.   DO YOU HAVE AN UNDERSTANDING, MR. WEILER, OF HOW OTHER

 7      MEMBERS OF ETSI IMPLEMENT CLAUSE 6.1?

 8      A.   DURING MY TIME AS CHAIRMAN OF THIS COMMITTEE, WE HAVE

 9      DISCUSSED THE VARIOUS ELEMENTS OF FRAND AND, AS I HAVE SAID, IN

10      THIS COMMITTEE, ALL MEMBERS OF ETSI WITH ANY INTEREST IN

11      LICENSING HAVE BEEN THERE AND IN DETAIL EXPLAINED OVER THESE

12      TEN YEARS ALSO HOW THEY DO THE LICENSING.

13                 AND AS WELL DURING THIS TIME, I HAVE BEEN PARTICIPATING TO

14      NUMEROUS CONFERENCES WHERE MANY MEMBER COMPANIES IN DETAIL HAVE

15      EXPLAINED THEIR LICENSING PRACTICE.

16                 SO I'M VERY WELL AWARE OF HOW MEMBERS, ETSI MEMBERS ARE

17      IMPLEMENTING THEIR LICENSING OBLIGATION.

18      Q.   AND HOW DO THE ETSI MEMBERS IMPLEMENT 6.1?

19      A.   THEY ALL --

20                 MS. GILLEN:  EXCUSE ME.  OBJECTION, YOUR HONOR.  TO

21      THE EXTENT MR. WEILER IS SPEAKING ABOUT HOW OTHER COMPANIES

22      IMPLEMENT THEIR ETSI OBLIGATIONS, THAT'S HEARSAY.

23                 THE COURT:  SUSTAINED.

24      BY MR. TAFFET:

25      Q.   WELL, DO YOU HAVE AN UNDERSTANDING, SIR, OF HOW THE OTHER
```

1    ETSI MEMBERS IMPLEMENT 6.1 BASED UPON THE FOUNDATION THAT YOU

2    HAVE JUST LAID?

3    A.   IT IS MY UNDERSTANDING FROM ALL THIS DISCUSSION AT

4    PRESENTATIONS THAT I HAVE HEARD THAT THEY ALL IMPLEMENT THE

5    POLICY BY LICENSING ON THE DEVICE LEVEL.

6    Q.   AND LET ME ASK YOU TO JUST CLARIFY.  WHEN YOU SAY "DEVICE

7    LEVEL," WHAT DO YOU MEAN?

8    A.   THE ETSI IPR POLICY REQUIRES YOU IN 6.1 TO GIVE LICENSES

9    FOR EQUIPMENT, AND EQUIPMENT IS DEFINED IN ETSI'S IPR POLICY

10   UNDER CLAUSE 15, AND IN THIS CLAUSE 15, YOU'LL FIND THE

11   DEFINITION OF EQUIPMENT UNDER NUMBER 4.  AND THAT SAYS,

12   "'EQUIPMENT' SHALL MEAN ANY SYSTEM OR DEVICE FULLY CONFORMING

13   TO A STANDARD."

14        AND WHAT -- WHAT IS MY UNDERSTANDING OF THE INDUSTRY

15   PRACTICE IS THAT IN THE CASE OF THE CELLULAR BUSINESS, THIS

16   MEANS THAT THESE COMPANIES LICENSE, FOR EXAMPLE, THE HANDSET

17   AND NOT ANY SUBPART OF THIS HANDSET.

18   Q.   OKAY.  NOW, BASED ON YOUR KNOWLEDGE AND EXPERIENCE IN

19   WORKING IN STANDARDS, CHAIRING AND PARTICIPATING IN THE ETSI

20   IPR SPECIAL COMMITTEE, DO YOU HAVE AN UNDERSTANDING WHETHER

21   WHAT YOU DESCRIBED AS DEVICE LEVEL LICENSING IS CONSISTENT WITH

22   THE OBJECTIVES OF THE ETSI POLICY?

23        MS. GILLEN:  OBJECTION, YOUR HONOR.  MR. WEILER HAS

24   NOT BEEN DISCLOSED AS AN EXPERT.  QUALCOMM HAS DISCLOSED TWO

25   OTHER EXPERTS ON THIS TOPIC.  HE IS A FACT WITNESS AND SHOULD

1    NOT BE TESTIFYING ABOUT HIS INTERPRETATION OF THE ETSI IPR

2    POLICY.

3            MR. TAFFET:  YOUR HONOR, AGAIN, CONSISTENT WITH YOUR

4    RULING, IT'S DOCKET NUMBER 973, THE KNOWLEDGE THAT MR. WEILER

5    IS PROVIDING RIGHT NOW IS SIMPLY BY VIRTUE OF HIS ACTIVITIES

6    WITHIN ETSI, WITHIN HIS EMPLOYMENT BY NOKIA, AND BEFORE THAT

7    NOKIA SIEMENS, AND BEFORE THAT SIEMENS FOR THE PAST 30 YEARS.

8        AND AS YOUR HONOR HELD IN DENYING THE FTC'S MOTION IN

9    LIMINE NUMBER 1, THAT THAT IS PROPER LAY TESTIMONY.

10           THE COURT:  I DON'T THINK THE RULING WAS SPECIFIC TO

11   HIM, RIGHT?

12           MR. TAFFET:  NO, NO.

13           THE COURT:  IT WAS MORE ABOUT PATENT VALUATION, IF I

14   REMEMBER CORRECTLY.

15           MR. TAFFET:  THAT CONCERNED PATENT VALUATION, BUT

16   YOUR HONOR CITED THE AUTHORITY THAT IS IN THE NORTHERN

17   DISTRICT, THIS COURT, THAT SPECIFICALLY ADOPTS THE POSITION

18   THAT SUCH OPINION TESTIMONY IS ADMITTED NOT BECAUSE OF

19   EXPERIENCE, TRAINING, OR SPECIALIZED KNOWLEDGE WITHIN THE REALM

20   OF AN EXPERT, BUT BECAUSE THE PARTICULARIZED KNOWLEDGE THAT THE

21   WITNESS HAS BY VIRTUE OF HIS OR HER POSITION IN THE BUSINESS.

22       AND PERHAPS I COULD LAY THE FOUNDATION BETTER, BUT I

23   THOUGHT I LAID IT OUT, THAT IT WAS PURELY BASED UPON HIS

24   EXPERIENCE IN THE BUSINESS THAT WE'RE SEEKING MR. WEILER'S

25   UNDERSTANDING.

1          THE COURT:  OKAY.  JUST GIVE ME ONE MINUTE, PLEASE.

2          MR. TAFFET:  CERTAINLY.

3      (PAUSE IN PROCEEDINGS.)

4          THE COURT:  WHO ARE THE EXPERTS WHO ARE GOING TO

5  TESTIFY ON THIS TOPIC?

6          MS. GILLEN:  YOUR HONOR, I BELIEVE COUNSEL FOR

7  QUALCOMM HAD PREVIOUSLY DISCLOSED DR. HUBER TO TESTIFY ON THIS

8  TOPIC, AND WE HEARD FROM THEM ON JANUARY 14TH THAT HE WOULD NO

9  LONGER BE TESTIFYING ON THE TOPIC.

10         THE COURT:  BUT YOU SAID THERE WERE TWO EXPERTS.

11         MS. GILLEN:  I BELIEVE THE OTHER WAS QUALCOMM'S

12  EXPERT ON FRENCH LAW, DR. FAVARQUE-COSSOS.  I'LL SPELL IT.

13  F-A-V-A-R-Q-U-E - C-O-S-S-O-S.

14         THE COURT:  THE ONE WHO BECAME A JUDGE?

15         MS. GILLEN:  CORRECT.

16         THE COURT:  AND SHE'S NO LONG TESTIFYING?

17         MR. TAFFET:  SHE'S NOT ABLE TO, YOUR HONOR.

18         THE COURT:  I SEE.  SO NOW THIS HAS TO COME IN

19  THROUGH THIS WITNESS.  IS THAT THE POINT?

20         MR. TAFFET:  WELL, WE'RE OFFERING IT THROUGH THIS

21  WITNESS AS A PERCIPIENT WITNESS, NOT AS AN EXPERT, BASED UPON

22  HIS PARTICULARIZED KNOWLEDGE BY VIRTUE OF HIS BUSINESS

23  ACTIVITIES.

24         MS. GILLEN:  MAY I RESPOND, YOUR HONOR?

25         THE COURT:  GO AHEAD, PLEASE.

1          MS. GILLEN:  THE FTC WOULD NOT OBJECT TO MR. WEILER

2    TESTIFYING ABOUT HIS PERSONAL EXPERIENCE.  BUT IT APPEARS HIS

3    TESTIMONY, AT LEAST SO FAR, HAS BEEN PRIMARILY BASED ON HIS

4    DISCUSSIONS WITH OTHERS AND WHAT HE'S HEARD FROM OTHER INDUSTRY

5    PARTICIPANTS.

6          MR. TAFFET:  WELL, THAT'S HIS PERSONAL EXPERIENCE,

7    YOUR HONOR.  I DON'T KNOW HOW YOU TAKE THAT AWAY FROM WHAT A

8    HUMAN BEING DOES.

9          MS. GILLEN:  AND OUR POSITION IS THAT'S HEARSAY.

10         THE COURT:  WELL, I SUSTAINED THE OBJECTION.

11   EVERYTHING HE SAID WAS, I HEARD IN DISCUSSIONS WHERE THEY TOLD

12   ME AND PRESENTATIONS AND THEY TOLD ME, THEY TOLD ME.  THAT WAS

13   THE BASIS OF HIS KNOWLEDGE OF WHAT OTHER COMPANIES ARE DOING IN

14   TERMS OF THEIR LICENSING PRACTICES.

15         MR. TAFFET:  MY QUESTION, THOUGH, IS WHAT IS HIS

16   UNDERSTANDING, YOUR HONOR, AND WHETHER -- YOU KNOW, THAT WOULD

17   NOT BE HEARSAY.  WE DON'T HAVE TO -- WE ARE NOT OFFERING IT FOR

18   THE TRUTH OF WHAT THE OTHER COMPANIES ARE ACTUALLY DOING, BUT

19   IT'S HIS UNDERSTANDING AS THE CHAIR, OR THE FORMER CHAIR AT

20   THIS POINT, OF THE SPECIAL COMMITTEE AND AS A MEMBER OF THE

21   INDUSTRY IN THE STANDARDS DEVELOPMENT WORLD.

22         THE COURT:  WELL, I GUESS I'M JUST -- YOU PREVIOUSLY

23   HAD TWO EXPERTS TO OPINE ON WHETHER DEVICE LEVEL LICENSING IS

24   CONSISTENT WITH THE OBJECTIVES OF THE ETSI POLICY.  THAT'S THE

25   QUESTION THAT'S PENDING.

```
 1           SO YOU PREVIOUSLY HAD TWO EXPERTS TO TESTIFY ON THAT

 2      QUESTION.  THOSE TWO WILL NOT TESTIFY.  SO NOW YOU WANT THIS

 3      FACT WITNESS TO PROVIDE THIS INFORMATION?

 4           MR. TAFFET:  FROM HIS UNDERSTANDING, YES.

 5           THE COURT:  ALL RIGHT.  I'LL OVERRULE THE OBJECTION

 6      AND ALLOW THE TESTIMONY.

 7           GO AHEAD, PLEASE.

 8      BY MR. TAFFET:

 9      Q.   LET ME RESTATE THE QUESTION.

10      A.   THANK YOU.

11      Q.   BASED UPON YOUR UNDERSTANDING, WHICH IS BECAUSE OF YOUR

12      EXPERIENCE, ET CETERA, DOES DEVICE LEVEL LICENSING -- IS DEVICE

13      LEVEL LICENSING CONSISTENT WITH THE OBJECTIVES OF 6.1?

14           THE COURT:  CAN I ASK YOU A QUESTION?  I'M NOT CLEAR

15      ON WHAT THE BASIS OF HIS UNDERSTANDING IS.  IS IT JUST WHAT

16      HE'S HEARD OTHER COMPANIES SAY AT THESE MEETINGS AND DURING

17      THEIR PRESENTATIONS?  IS THAT THE -- THAT'S THE BASIS OF HIS

18      UNDERSTANDING OF WHAT THEY DO.  SO WHAT'S THE BASIS OF HIS

19      UNDERSTANDING OF WHETHER DEVICE LEVEL LICENSING IS CONSISTENT

20      WITH THE OBJECTIVES OF THE ETSI POLICY?  BECAUSE THAT MIGHT BE

21      DIFFERENT THAN JUST WHAT HE'S HEARD --

22           MR. TAFFET:  IT --

23           THE COURT:  -- OTHER COMPANY'S PRACTICES ARE.

24           MR. TAFFET:  SORRY TO INTERRUPT, YOUR HONOR.  BUT I

25      BELIEVE IT IS, BECAUSE I THINK IT'S ALSO BASED UPON HIS 30-PLUS
```

```
 1      YEARS OF EXPERIENCE IN THE INDUSTRY, THE FACT THAT HE WAS

 2      CHAIRING --

 3              THE COURT:  WELL, I DON'T WANT YOU TO TESTIFY.  WHY

 4      DON'T YOU ASK HIM WHAT IS THE BASIS OF HIS UNDERSTANDING --

 5              MR. TAFFET:  SURE.

 6              THE COURT:  -- OF WHETHER DEVICE LEVEL LICENSING IS

 7      CONSISTENT WITH THE OBJECTIVES OF THE ETSI POLICY.

 8          IF IT'S JUST THAT HE'S HEARD OTHER COMPANIES SAY THAT,

 9      THEN I'D JUST LIKE TO KNOW WHAT THE BASIS OF HIS UNDERSTANDING

10      IS.

11              MR. TAFFET:  SURE, ABSOLUTELY.

12      Q.  MR. WEILER, WHAT IS THE BASIS OF YOUR UNDERSTANDING

13      WHETHER DEVICE LEVEL LICENSING IS CONSISTENT WITH THE

14      OBJECTIVES OF CLAUSE 6.1?

15      A.   MAY I TURN FIRST TO THE OBJECTIVES?  ETSI IS IN THE

16      COMFORTABLE POSITION TO HAVE A POLICY WHICH IS NOT ONLY THE

17      LEGAL TEXT, BUT ALSO GIVING THE REASON WHY, WHAT ARE THESE

18      POLICY OBJECTIVES.

19          AND THIS IS CONTAINED IN CLAUSE 3 OF THE ETSI IPR POLICY.

20          AND THESE OBJECTIVES SAY THAT ETSI WANTS THE MOST SUITABLE

21      TECHNOLOGY TO BE IMPLEMENTED IN THIS CONDUCT.  THEY WANT THESE

22      TECHNOLOGIES TO BE, AND THESE STANDARDS TO BE ABLE TO BE

23      IMPLEMENTED BY EVERYBODY AND NOT BE BLOCKED BY ANY PATENT WHICH

24      IS NOT AVAILABLE.

25          BUT AT THE SAME TIME, ETSI'S OBJECTIVES IN 3.2 ALSO VERY
```

1    EXPLICITLY SAY THAT THE IPR HOLDERS SHOULD BE FAIRLY REWARDED

2    FOR THEIR WILLINGNESS TO CONTRIBUTE THEIR TECHNOLOGY INTO THE

3    STANDARD.

4         AND THESE THREE ELEMENTS -- SO BEST TECHNOLOGY,

5    AVAILABILITY TO EVERYBODY FOR IMPLEMENTATION OF THIS, AND

6    THIRDLY, THE FAIR REWARD -- IS THEN IMPLEMENTED IN CLAUSE 6.1

7    WHERE YOU ARE ASKED TO GIVE LICENSES ON FRAND TERMS TO AT LEAST

8    TO THE EQUIPMENT DEVICE LEVEL.

9         AND, THEREFORE, IN ORDER TO ACHIEVE THE OBJECTIVE TO GET A

10   FAIR REWARD TO OBLIGE THE PATENT HOLDER TO LICENSE ON FAIR AND

11   NON-DISCRIMINATORY TERMS, YOU HAVE TO DESIGN A LICENSING

12   PROGRAM WHICH FULFILLS THIS OBLIGATION, AND IT IS OBVIOUS THAT

13   EVERYBODY CAN IMPLEMENT A STANDARD AND CONTRIBUTE COMPONENTS OF

14   THE STANDARD INTO A DEVICE AND YOU THEN LICENSE THE DEVICE

15   LEVEL ONLY, AND, THEREFORE, ALL THE IMPLEMENTATION GOING INTO

16   THIS DEVICE IS LICENSED.

17        AND THIS IS WHY THIS IS FULLY IN LINE WITH THE POLICY

18   OBJECTIVES OF ETSI.

19   Q.   HAS THAT BEEN NOKIA'S UNDERSTANDING SINCE YOU'VE BEEN

20   EMPLOYED BY NOKIA?

21   A.   YES.

22   Q.   AND WAS IT THE UNDERSTANDING OF SIEMENS WHEN YOU WERE

23   EMPLOYED BY SIEMENS?

24   A.   YES.

25   Q.   AND IN THE ETSI IPR SPECIAL COMMITTEE, HAS ANYONE OBJECTED

1    THAT DEVICE LEVEL LICENSING IS CONTRARY TO 6.1?

2    A.   THERE WAS NO SINGLE CONTRIBUTION COMING INTO THE ETSI IPR

3    COMMITTEE ASKING, ARGUING THAT THIS WOULD BE INCONSISTENT.

4    Q.   NOW, HAVE PROPOSALS BEEN MADE TO ETSI'S IPR SPECIAL

5    COMMITTEE TO MODIFY CLAUSE 6.1 TO REQUIRE COMPONENT LEVEL

6    LICENSING?

7    A.   NO.

8    Q.   AND HAS ANYONE STATED IN THE SPECIAL COMMITTEE THAT BY

9    LICENSING AT THE DEVICE LEVEL, THAT A FRAND COMMITMENT IS

10   VIOLATED?

11   A.   NO.

12   Q.   NOW, CLAUSE 6.1 ALSO STATES THAT THE FRAND UNDERTAKING,

13   QUOTE, "MAY BE SUBJECT TO THE CONDITION THAT THOSE WHO SEEK

14   LICENSES AGREE TO RECIPROCATE."

15        DO YOU SEE THAT?

16   A.   YES.

17   Q.   WHAT DOES THAT MEAN?

18   A.   THIS MEANS WHEN YOU ARE LICENSING YOUR PATENTS, YOU CAN

19   REQUIRE THE LICENSOR IN THAT CASE TO ALSO LICENSE THEIR PATENTS

20   BACK TO YOU.

21        AND THIS IS TYPICALLY IMPLEMENTED BY CROSS-LICENSING.

22   Q.   NOW, LET ME ASK YOU, MR. WEILER, HAVE PROPOSALS BEEN MADE

23   IN THE IPR SPECIAL COMMITTEE TO CHANGE CLAUSE 6 .1 SO FRAND IS

24   MORE SPECIFICALLY DEFINED?

25   A.   YES.

1    Q.   WHEN WERE SUCH PROPOSALS MADE AND WHAT WERE THE

2    CIRCUMSTANCES?

3    A.   IN THE END OF 2011, ETSI RECEIVED TWO LETTERS FROM APPLE

4    AND BROADCOM REQUESTING ETSI TO DISCUSS A CHANGE OF ITS IPR

5    POLICY TO BETTER DEFINE FRAND.

6    Q.   AND AS CHAIR OF THIS COMMITTEE, IT IS MY OBLIGATION TO SEE

7    WHETHER I CALL FOR MEETING OF THIS COMMITTEE AND DISCUSS SUCH

8    TOPICS, AND BASED ON MY KNOWLEDGE OF THE INDUSTRY DISCUSSIONS,

9    I AGREED TO CALL THE COMMITTEE AND -- WITH THE QUESTION, SHOULD

10   ETSI DISCUSS POTENTIAL CLARIFICATIONS, WHAT FRAND MEANS?

11        AND SO WE HAVE DISCUSSED THIS IN ETSI DURING THE COURSE OF

12   THREE YEARS.

13   Q.   NOW, WAS ONE OF THE PROPOSALS THAT WAS MADE TO DEFINE A

14   COMMON ROYALTY BASE FOR CALCULATING A FRAND ROYALTY?

15   A.   YES.

16   Q.   WHAT WAS THAT PROPOSAL?

17   A.   THE PROPOSAL WHICH WAS SUBMITTED BY VARIOUS COMPANIES,

18   INCLUDING APPLE, BROADCOM, CISCO, INTEL AND MAYBE OTHERS, THIS

19   PROPOSAL -- SO THIS CONTRIBUTION PROPOSED TO DEFINE THE ROYALTY

20   BASE BASED ON THE SMALLEST SALEABLE PATENT PRACTICING UNIT, OR

21   SSPPU.

22   Q.   AND WHAT WAS THE OUTCOME OF THAT PROPOSAL?

23   A.   THIS PROPOSAL HAS BEEN EXTENSIVELY DISCUSSED IN THAT

24   COMMITTEE, AND THERE WAS NO CONSENSUS TO CHANGE THE ETSI IPR

25   POLICY TO INCLUDE ANY SUCH PROVISION.

1    Q.   WERE OTHER PROPOSALS MADE TO THE IPR SPECIAL COMMITTEE TO

2    DEFINE FRAND AS BEING BASED ON AN AGGREGATE ROYALTY OR

3    PRINCIPLES OF PROPORTIONALITY?

4    A.   ALSO SUCH A PROPOSAL HAS BEEN MADE TO ETSI AND, AGAIN,

5    THIS PROPOSAL WAS INTENSIVELY DISCUSSED.

6         BUT FINALLY, THERE WAS NO CONCLUSION AND NO CONSENSUS

7    AGREEMENT TO IMPLEMENT ANY OF SUCH PROPOSAL INTO THE ETSI IPR

8    POLICY.

9    Q.   OKAY.  NOW, HAVE REPRESENTATIVES OF THE UNITED STATES

10   ANTITRUST AGENCIES PARTICIPATED IN ETSI'S IPR SPECIAL

11   COMMITTEE?

12   A.   I HAVE TRIED TO HAVE AN ALL INCLUSIVE DISCUSSION IN THIS

13   COMMITTEE, SO WHEN -- ESPECIALLY WHEN WE STARTED DISCUSSING

14   WHETHER FRAND NEEDS TO BE FURTHER DEFINED, I HAD INVITED

15   REGULATORS FROM JAPAN, FROM KOREA AND CHINA, AND THEY ALL WERE

16   COMING AT TIMES.

17        AND I ALSO HAVE INVITED REPRESENTATIVES FROM THE U.S.

18   FEDERAL TRADE COMMISSION AND THE DEPARTMENT OF JUSTICE, AND

19   BOTH -- SO THE FEDERAL TRADE COMMISSION, WITH PAT ROACH, AND

20   THE DEPARTMENT OF JUSTICE WITH PAUL O'DONNELL, HAVE REGULARLY

21   PARTICIPATED TO THESE MEETINGS.

22   Q.   AND WERE THESE REPRESENTATIVES FREE TO MAKE COMMENTS OR

23   PROPOSALS TO MODIFY THE ETSI IPR POLICY?

24   A.   YES.

25   Q.   AND DID THEY COMMENT ON THE PROPOSALS YOU HAD JUST

WEILER DIRECT BY MR. TAFFET

```
 1      DESCRIBED?

 2              MS. GILLEN:  OBJECTION.  HEARSAY.

 3              THE COURT:  SUSTAINED.

 4              MR. TAFFET:  WELL, YOUR HONOR, I WOULD SUGGEST THE

 5      FACT OF THEM MAKING THE COMMENT IS A VERBAL ACT.  IT IS NOT

 6      HEARSAY, THAT THE SIGNIFICANCE OF THE STATEMENT LIES SOLELY OF

 7      THE FACT THAT THE STATEMENT WAS MADE OR WAS NOT MADE, AND,

 8      THEREFORE, IT DOES NOT FALL WITHIN THE HEARSAY EXCEPTION.  IT'S

 9      NOT HEARSAY.

10              THE COURT:  ALL RIGHT.  AS LONG AS YOU DON'T SAY WHAT

11      THEY COMMENTED, YOU CAN ANSWER THE QUESTION.

12          GO AHEAD.  OVERRULED.

13              THE WITNESS:  OKAY.

14      BY MR. TAFFET:

15      Q.   DID THEY COMMENT ON THE PROPOSALS YOU JUST DESCRIBED?

16      A.   YES, THEY COMMENTED ON THE PROPOSALS DESCRIBED, AND THOSE

17      COMMENTS HAVE BEEN CAPTURED IN THE RELEVANT MEETING REPORTS OF

18      THESE COMMITTEES.

19      Q.   AND HAVE THE MEETING REPORTS THAT YOU JUST IDENTIFIED

20      RECORDED ANY COMMENTS, WHETHER BY THE U.S. ANTITRUST AGENCIES

21      OR ANYONE ELSE, CONCERNING A REQUEST OR A PROPOSAL TO DEFINE

22      FRAND AS REQUIRING COMPONENT LEVEL LICENSING?

23      A.   THIS TOPIC HAS NOT BEEN DISCUSSED IN ETSI.

24              MR. TAFFET:  THANK YOU, MR. WEILER.

25          I PASS THE WITNESS, YOUR HONOR.
```

```
 1                 THE COURT:  OKAY.  TIME IS 11:41.

 2           (PAUSE IN PROCEEDINGS.)

 3                 THE COURT:  ARE YOU READY?

 4           MS. GILLEN:  YES.

 5                 THE COURT:  OKAY.  11:41.  GO AHEAD, PLEASE.

 6                          CROSS-EXAMINATION

 7     BY MS. GILLEN:

 8     Q.   MR. WEILER, YOU TESTIFIED EARLIER THAT YOU'RE EMPLOYED BY

 9     NOKIA; CORRECT?

10     A.   YES.

11     Q.   AND YOU WERE DESIGNATED AS NOKIA'S CORPORATE

12     REPRESENTATIVE TO TESTIFY AT A DEPOSITION IN THIS CASE ON

13     TOPICS RELATING TO NOKIA'S UNDERSTANDING OF THE ETSI IPR

14     POLICY; IS THAT RIGHT?

15     A.   THIS IS CORRECT.

16     Q.   AND NOKIA IS A LICENSOR; RIGHT?

17     A.   NOKIA IS BOTH LICENSEE AND A LICENSOR.

18     Q.   BUT YOU'D CONSIDER NOKIA A NET LICENSOR; CORRECT?

19     A.   I DON'T KNOW BECAUSE I'M NOT INVOLVED IN THE DETAILS OF

20     LICENSING ACTIVITIES OF NOKIA.

21     Q.   ARE YOU AWARE THAT NOKIA LICENSES ITS STANDARD ESSENTIAL

22     PATENTS TO OTHERS?

23     A.   I'M AWARE THAT NOKIA LICENSES STANDARD ESSENTIAL PATENTS

24     TO OTHERS, YES.

25     Q.   AND IS IT MORE PROFITABLE FOR NOKIA TO LICENSE DEVICE
```

1    MAKERS THAN COMPONENT MANUFACTURERS?

2           MR. TAFFET:  OBJECTION.  LACKS FOUNDATION, YOUR

3    HONOR.

4           THE COURT:  IF YOU KNOW, YOU MAY ANSWER.  GO AHEAD.

5       OVERRULED.

6           THE WITNESS:  AS I'M NOT INVOLVED IN THE LICENSING

7    ACTIVITIES OF MY COMPANY, I CANNOT ANSWER THE SPECIFIC QUESTION

8    ABOUT LICENSING ACTIVITIES AS SUCH.

9    BY MS. GILLEN:

10   Q.  YOU WOULD AGREE THAT UNDER THE OBJECTIVES OF THE ETSI IPR

11   POLICY, IT WOULD NOT MAKE SENSE FOR ONE PATENT HOLDER TO CHARGE

12   SUBSTANTIALLY MORE ROYALTIES THAN ANOTHER PATENT HOLDER WHO'S

13   MADE A SIMILAR AMOUNT OF CONTRIBUTIONS; IS THAT RIGHT?

14   A.  WELL, THESE ARE VERY SPECIFIC COMMERCIAL TERMS BETWEEN THE

15   PARTIES, AND ETSI STATES VERY CLEARLY THAT ETSI STAYS OUT OF

16   THESE DETAILED COMMERCIAL TERMS.

17          AND AS MY BASIS OF KNOWLEDGE IS WITH REGARD TO STANDARDS

18   AND THE INTERFACE, BUT NOT TO THE SPECIFIC ECONOMIC QUESTIONS

19   AND COMMERCIAL TERMS OF SPECIFIC PATENT LICENSES.

20          I DON'T HAVE A RELEVANT OPINION ON THAT.

21   Q.  SO AT YOUR DEPOSITION, ON PAGE 145, LINES 9 THROUGH 19,

22   YOU TESTIFIED THAT THE ETSI IPR POLICY OBJECTIVES SAY THERE

23   SHOULD BE FAIR REWARD TO THE CONTRIBUTOR OF TECHNOLOGY.  IF

24   THERE'S A GENERAL AGREEMENT THAT THE OVERALL COSTS FOR PATENTS

25   CANNOT BE INCREASED UNLIMITED, AND FOR EACH OF THE PATENT

```
1     HOLDERS, THIS POLICY OBJECTIVE IS TRUE, IN A CONTEXT WHERE YOU

2     HAVE MANY PATENTS, THERE CANNOT BE ONE PATENT HOLDER WHO

3     CHARGES WAY MORE THAN ANYBODY ELSE WHO HAS A SIMILAR AMOUNT OF

4     CONTRIBUTION GIVEN.

5          DO YOU STAND BY THAT TESTIMONY?

6     A.   YES.

7     Q.   DOES NOKIA OFFER ITS 3GPP REPRESENTATIVES FINANCIAL

8     INCENTIVES DESIGNED TO INCREASE THE NUMBER OF APPROVED

9     CONTRIBUTIONS?

10    A.   TO THE BEST OF MY KNOWLEDGE, WE ARE NOT OFFERING FINANCIAL

11    INCENTIVES FOR INCREASING THE NUMBER OF CONTRIBUTIONS.

12    Q.   YOU TESTIFIED EARLIER THAT WITH RESPECT TO MAKING

13    DECISIONS WITHIN ETSI, ALL DECISIONS ARE USUALLY MADE BY

14    CONSENSUS; IS THAT RIGHT?

15    A.   THIS IS CORRECT.

16    Q.   AND YOU TESTIFIED THAT CONSENSUS IS THE ABSENCE OF A

17    SUSTAINED OBJECTION OF A MATERIALLY INVOLVED STAKEHOLDER GROUP;

18    IS THAT RIGHT?

19    A.   YES.

20    Q.   AND NOKIA IS A MATERIALLY INVOLVED STAKEHOLDER GROUP;

21    RIGHT?

22    A.   NO.  NOKIA IS A PART OF A STAKEHOLDER GROUP.  BUT NOKIA

23    ALONE IS A SINGLE COMPANY AND NOT A COMPLETE STAKEHOLDER GROUP.

24    Q.   AND IS QUALCOMM A MATERIALLY INVOLVED STAKEHOLDER GROUP?

25    A.   AGAIN, QUALCOMM IS ONE COMPANY.  AND SO THIS IS THE
```

WEILER CROSS BY MS. GILLEN

1    DIFFERENCE BETWEEN UNANIMITY AND TALKING ABOUT MATERIALLY

2    INVOLVED STAKEHOLDER GROUPS.

3         SO YOU CAN SAY, FOR EXAMPLE, NOKIA AND ERICSSON AND HUAWEI

4    ARE SIMILAR COMPANIES WHO HAVE SIMILAR INTERESTS, AND IF ALL

5    THREE COMPANIES IN THIS EXAMPLE WOULD STRONGLY OBJECT TO

6    SOMETHING, THEN I WOULD SAY I CANNOT DEFINE HERE CONSENSUS

7    BECAUSE THIS IS A CLEAR GROUP OF STAKEHOLDERS WHO WOULD NOT

8    AGREE TO THAT.

9    Q.   AND YOU TESTIFIED THAT YOU'VE NEVER BEEN INVOLVED IN ANY

10   LICENSING DISCUSSIONS AT NOKIA; RIGHT?

11   A.   THIS IS CORRECT, YES.

12   Q.   ARE YOU AWARE THAT SIEMENS HAD A CHIP LEVEL LICENSE FROM

13   QUALCOMM IN 2000?

14   A.   NO.

15   Q.   AND SO YOU'RE NOT AWARE WHETHER NOKIA HAS EVER GRANTED ANY

16   EXHAUSTIVE CHIP LEVEL LICENSES TO QUALCOMM?

17   A.   I'M NOT AWARE OF SPECIFIC LICENSES FROM -- INSIDE OF

18   NOKIA, NO.

19   Q.   YOU TESTIFIED EARLIER THAT NOKIA IMPLEMENTS LICENSING

20   PRACTICES CONSISTENTLY WORLDWIDE; RIGHT?

21   A.   THIS IS AT LEAST FROM WHAT I HEAR, MY UNDERSTANDING.

22   Q.   AND ATIS AND TIA HAVE DIFFERENT IPR POLICIES THAN ETSI;

23   ISN'T THAT RIGHT?

24   A.   WELL, ETSI, TIA, AND ATIS ARE ALL MEMBERS OF -- SO ATIS

25   AND ETSI ARE FROM 3GPP, AND ATIS, TIA, AND ETSI ARE MEMBERS OF

1    ONEM2M.

2         AND THOSE ORGANIZATIONS HAVE PROVISIONS WHICH SAY THAT THE

3    PATENT POLICIES OF THE ORGANIZATIONAL PARTNERS, SO IN THIS CASE

4    IN 3GPP CASE ATIS AND ETSI, NEED TO BE COMPATIBLE.

5         AND SO ON A LEVEL WHICH GOES NOT MAYBE INTO VERY SPECIFIC

6    LEGAL DETAILS, WHICH I'M NOT QUALIFIED TO ANSWER HERE, BUT

7    THERE IS -- IT IS CLEAR THAT AS THEY ARE BOTH MEMBERS AND IT

8    HAS BEEN ANALYZED THAT THEY ARE COMPATIBLE.

9    Q.   AND IS IT YOUR POSITION THAT THE ETSI IPR POLICY SHOULD

10   TRUMP TIA'S POLICY IF THOSE POLICIES ARE DIFFERENT?

11   A.   IF THERE WOULD BE AN IDENTIFICATION OF DIFFERENCES OF

12   THESE POLICIES, THEN IT WOULD NEED A DISCUSSION IN 3GPP TO SEE

13   WHAT -- WHETHER THOSE DIFFERENCES ARE SO MATERIAL THAT EITHER

14   OF THE ORGANIZATIONS, OR THOSE WHO ARE CHANGING SOMETHING IN

15   COMPARISON TO THE OTHERS WOULD HAVE TO LEAVE.

16   Q.   AND YOU'VE NEVER HELD ANY POSITIONS WITH TIA OR ATIS, HAVE

17   YOU?

18   A.   I'VE NEVER HELD ANY POSITION IN ATIS OR TIA.

19        MS. GILLEN:  I HAVE NO FURTHER QUESTIONS.

20        THE COURT:  OKAY.  TIME IS 11:48.

21   ANY REDIRECT?

22        MR. TAFFET:  NO, YOUR HONOR.

23        THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED

24   SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

25        MS. GILLEN:  NOT SUBJECT TO RECALL FROM OUR

```
 1         PERSPECTIVE.
 2                  MR. TAFFET:  NOT SUBJECT TO RECALL.
 3                  THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL
 4         TESTIMONY, AND YOU'RE FREE TO LEAVE.
 5            ALL RIGHT.  YOUR NEXT WITNESS IS A VIDEO; IS THAT CORRECT?
 6                  MR. VAN NEST:  THAT'S RIGHT, YOUR HONOR.  WE JUST
 7         HAVE A FEW MINUTES, A SHORT VIDEO THAT MR. PETERSON WILL
 8         INTRODUCE.
 9                  THE COURT:  OKAY.
10                  MR. PETERSON:  YOUR HONOR, QUALCOMM WILL NOW PLAY THE
11         VIDEO DEPOSITION OF MARVIN BLECKER FORMERLY OF QUALCOMM.
12                  THE COURT:  YOU KNOW, TO BE FAIR, WHEN FTC WAS DOING
13         ITS LONG INTRODUCTIONS OF VIDEOS ON THE FIRST DAY, I COUNTED
14         ALL OF THAT TIME.
15            SO IF YOU'RE GOING TO DO A LONG EXPLANATION OF WHICH
16         EXHIBITS ARE GOING TO COME UP AND NOT BE INTRODUCED, THEN I'M
17         GOING TO HAVE TO CHARGE YOU TIME.
18            SO --
19                  MR. PETERSON:  YOUR HONOR, I WAS JUST MERELY GOING TO
20         HIGHLIGHT WHETHER THE TESTIMONY WAS SEALED OR NOT, AND QUALCOMM
21         IS NOT OFFERING ANY EXHIBITS INTO EVIDENCE WITH THIS WITNESS.
22                  THE COURT:  ALL RIGHT.  LET'S GO.  11:49.
23                  MR. PETERSON:  NO PORTION OF MR. BLECKER'S TESTIMONY
24         IS SEALED, AND QUALCOMM IS NOT OFFERING ANY EXHIBITS, ALTHOUGH
25         CX 8286, WHICH WAS PREVIOUSLY INTRODUCED BY THE FTC, IS
```

```
1      MENTIONED IN THE TESTIMONY.

2              THE COURT:  ALL RIGHT.  ALL THAT WAS CHARGED TO YOUR

3      TIME.

4          GO AHEAD, PLEASE.

5          (THE VIDEOTAPED DEPOSITION OF MARVIN BLECKER WAS PLAYED IN

6      OPEN COURT OFF THE RECORD.)

7              THE COURT:  TIME IS 11:54.

8          ALL RIGHT.  CALL YOUR NEXT WITNESS, PLEASE.

9              MR. VAN NEST:  YOUR HONOR, WE HAD SCHEDULED

10     DR. CHIPTY TO COME RIGHT AT 1:00.  WE HAVE ANOTHER SHORT VIDEO

11     THAT'S ON TODAY'S LIST FROM INTEL.  IT'S ABOUT FIVE MINUTES.

12     WE CAN PLAY IT NOW.

13             THE COURT:  LET'S DO IT.

14             MR. VAN NEST:  THANK YOU.

15             THE COURT:  OKAY.

16             MR. PETERSON:  YOUR HONOR, QUALCOMM WILL NOW PLAY THE

17     VIDEOTAPED DEPOSITION OF STEFAN WOLFF.  QUALCOMM OFFERS INTO

18     EVIDENCE QX 22.

19             THE COURT:  ALL RIGHT.  11:55.  GO AHEAD, PLEASE.

20             MR. PETERSON:  QUALCOMM OFFERS INTO EVIDENCE QX 22.

21             THE COURT:  ALL RIGHT.  ANY OBJECTION TO QX 22?

22             MR. ANSALDO:  NO OBJECTION.

23             THE COURT:  YOU SAID NO OBJECTION?

24             MR. ANSALDO:  NO OBJECTION.

25             THE COURT:  IT'S ADMITTED.
```

1         (DEFENDANT'S EXHIBIT QX 22 WAS ADMITTED IN EVIDENCE.)

2             THE COURT:  GO AHEAD, PLEASE.

3         **(THE VIDEOTAPED DEPOSITION OF STEFAN WOLFF WAS PLAYED IN**

4   **OPEN COURT OFF THE RECORD.)**

5             THE COURT:  TIME IS 12:00 NOON.

6         LET'S GO AHEAD AND TAKE OUR ONE HOUR LUNCH BREAK UNTIL

7   1:00 O'CLOCK.

8         THANK YOU.  WE'LL SEE YOU BACK IN AN HOUR.

9         (THE LUNCH RECESS WAS TAKEN FROM 12:00 P.M. UNTIL

10   1:05 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **AFTERNOON SESSION**

2          (COURT CONVENED AT 1:05 P.M.)

3              THE COURT:  GOOD AFTERNOON.  WELCOME BACK.  PLEASE

4      TAKE A SEAT.

5          CALL YOUR NEXT WITNESS, PLEASE.

6              MR. EVEN:  THANK YOU, YOUR HONOR.  AT THIS TIME

7      QUALCOMM CALLS DR. TASNEEM CHIPTY.

8              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

9          **(DEFENDANT'S WITNESS, TASNEEM CHIPTY, WAS SWORN.)**

10             THE WITNESS:  YES, I DO.

11             THE CLERK:  THANK YOU.

12             MR. EVEN:  YOUR HONOR, MAY WE APPROACH WITH A BOOK?

13             THE COURT:  YES.  GO AHEAD AND SPELL YOUR LAST NAME,

14     PLEASE, FOR THE RECORD.

15             THE WITNESS:  SURE.  IT'S CHIPTY.  C-H-I-P-T-Y.

16             THE COURT:  TIME IS 1:05.  GO AHEAD, PLEASE.

17                      **DIRECT EXAMINATION**

18     BY MR. EVEN:

19     Q.   THANK YOU.  DR. CHIPTY, GOOD AFTERNOON.  WHAT IS YOUR AREA

20     OF EXPERTISE?

21     A.   GOOD AFTERNOON.  MY AREAS OF EXPERTISE ARE INDUSTRIAL

22     ORGANIZATION, ANTITRUST POLICY, AND ECONOMETRICS.

23     Q.   AND WHAT IS YOUR EDUCATIONAL BACKGROUND.

24     A.   WELL, I HAVE BACHELOR'S DEGREES IN MATHEMATICS AND

25     ECONOMICS FROM WELLESLEY COLLEGE, AND I HAVE A PH.D. IN

1      ECONOMICS FROM THE MASSACHUSETTS INSTITUTE OF TECHNOLOGY.

2      Q.   WHERE DO YOU WORK, DR. CHIPTY?

3      A.   I'M THE FOUNDER AND MANAGING PRINCIPAL OF MATRIX

4      ECONOMICS, A CONSULTING FIRM IN BOSTON.

5      Q.   AND HOW LONG HAVE YOU BEEN CONSULTING ON ISSUES RELATED TO

6      ANTITRUST AND ECONOMICS?

7      A.   ON THE ORDER OF 20 YEARS.

8      Q.   HAVE YOU EVER CONSULTED THE U.S. GOVERNMENT ON MATTERS

9      RELATED TO ANTITRUST?

10     A.   YES, I HAVE, ON NUMEROUS OCCASIONS OVER THE PAST 20 YEARS,

11     AS BOTH A TESTIFYING AND CONSULTING EXPERT FOR THE ANTITRUST

12     DIVISION OF THE DEPARTMENT OF JUSTICE.

13     Q.   HAVE YOU EVER TAUGHT COURSES IN ANTITRUST?

14     A.   YES, I HAVE.  I'VE TAUGHT INDUSTRIAL ORGANIZATION,

15     REGULATORY POLICY, AND ECONOMETRICS.

16     Q.   HAVE YOU PUBLISHED OR SPOKEN ON MATTERS RELATED TO

17     COMPETITION MATTERS?

18     A.   YES, I HAVE.  I HAVE WRITTEN SEVERAL ARTICLES THAT HAVE

19     APPEARED IN ACADEMIC JOURNALS AND BOOKS, AND I'M ALSO A

20     FREQUENT SPEAKER ON ISSUES OF COMPETITION POLICY.  FOR EXAMPLE,

21     IN OCTOBER OF 2018, I PARTICIPATED AT THE REQUEST OF THE FTC IN

22     THE FTC'S HEARINGS ON COMPETITION AND CONSUMER PROTECTION IN

23     THE 21ST CENTURY ON A PANEL SPECIFICALLY FOCUSSED ON MARKET

24     DEFINITION AND MARKET POWER.

25          MR. EVEN:  YOUR HONOR, AT THIS TIME QUALCOMM OFFERS

```
 1        DR. TASNEEM CHIPTY AS AN EXPERT IN INDUSTRIAL ORGANIZATION AND
 2    ANTITRUST ECONOMICS.
 3             MR. MATHESON:  NO OBJECTION, YOUR HONOR.
 4             THE COURT:  ALL RIGHT.  SO CERTIFIED AS AN EXPERT IN
 5    INDUSTRIAL ORGANIZATION AND --
 6             MR. EVEN:  ANTITRUST ECONOMICS.
 7             THE COURT:  -- ANTITRUST ECONOMICS.  GO AHEAD,
 8    PLEASE.
 9             MR. EVEN:  THANK YOU, YOUR HONOR.
10    Q.   DR. CHIPTY, IF YOU'D TURN TO SLIDE ONE BEHIND TAB 1 IN
11    YOUR WITNESS BOOK.
12        WHAT WAS YOUR ASSIGNMENT IN THIS CASE?
13    A.   WELL, I WAS ASKED TO EVALUATE AND RESPOND TO
14    PROFESSOR SHAPIRO'S ANALYSES AND OPINIONS WITH RESPECT TO
15    MARKET DEFINITION, MARKET POWER, AND THE APPLE AGREEMENTS.
16        WITH RESPECT TO THE APPLE AGREEMENTS, I EVALUATED WHETHER
17    THEY HAD LEGITIMATE BUSINESS JUSTIFICATIONS AND WHETHER, IN
18    FACT, THEY RESULTED IN HARM TO COMPETITION IN HIS ASSERTED
19    MARKETS.
20    Q.   AT A VERY HIGH LEVEL, WHAT IS YOUR VIEW OF THE NATURE OF
21    COMPETITION IN THE BASEBAND PROCESSORS INDUSTRY?
22    A.   IN MY VIEW, THE MODEM CHIP INDUSTRY IS CHARACTERIZED BY
23    DYNAMIC COMPETITION IN A RAPIDLY CHANGING MARKETPLACE.
24    Q.   AND WHAT IS DYNAMIC COMPETITION?
25    A.   WELL, THE TERM "DYNAMIC COMPETITION" IN THIS CASE REFERS
```

CHIPTY DIRECT BY MR. EVEN

1    TO THE WAYS IN WHICH COMPETITION PLAYS OUT IN INNOVATIVE

2    MARKETS WHERE FIRMS ENGAGED IN REPEATED INNOVATION RACES.

3    Q.   AND WHAT WOULD YOU EXPECT TO SEE IN MARKETS THAT ARE

4    CHARACTERIZED BY DYNAMIC COMPETITION?

5    A.   SO IN A DYNAMICALLY COMPETITIVE ENVIRONMENT, I WOULD

6    EXPECT TO SEE FIRMS ENGAGING IN CONTINUAL INNOVATION AND NEW

7    PRODUCT DESIGN.

8        I WOULD EXPECT THAT IN THIS TYPE OF ENVIRONMENT THERE

9    WOULD BE WINNER TAKE ALL OR WINNER TAKE MOST OUTCOMES.  THE

10   WINNER COULD WIN LARGE MARKET SHARE.  I WOULD EXPECT THAT TO BE

11   ESPECIALLY TRUE IN THE CHIP INDUSTRY WHERE A HANDFUL OF LARGE

12   BUYERS ACCOUNT FOR THE VAST MAJORITY OF PURCHASES.

13       LOSERS CAN BE COMPETITIVELY SIGNIFICANT.  LOSERS CAN HELP

14   PUSH THE WINNER TO INNOVATE MORE AND LOWER PRICE TO COMPETE FOR

15   BUSINESS.  LOSERS CAN PLAY THIS ROLE, EVEN THOUGH THEY MAY WIN

16   NO SHARE IN ANY GIVEN PERIOD.

17       AND THEN THE CYCLE WOULD REPEAT.  IN ESSENCE, A FIRM IS

18   ONLY AS GOOD AS ITS LAST CHIP.

19   Q.   WHAT KIND OF EVIDENCE HAVE YOU SEEN SHOWING THAT THE MODEM

20   CHIP INDUSTRY IS CHARACTERIZED BY DYNAMIC COMPETITION?

21   A.   WELL, I HAVE LOOKED AT A VARIETY OF DIFFERENT INDICATORS,

22   AND FOR STARERS, I LOOKED AT R&D SPENT.

23   Q.   SO TURN TO SLIDE 2, PLEASE.  AND WHAT ARE YOU SHOWING US

24   ON THIS SLIDE?

25   A.   YES.  THIS IS A CHART THAT I PREPARED THAT DESCRIBES QCT'S

1    R&D SPEND ON MODEM CHIP DEVELOPMENT.  WHAT IT DESCRIBES IS

2    INVESTMENTS BY YEAR FROM 2003 TO 2017, AND WHAT YOU CAN SEE

3    OVER THIS PERIOD IS THAT QUALCOMM HAS INVESTED SIGNIFICANTLY

4    LARGER AMS IN MODEM CHIP DEVELOPMENT OVER THIS PERIOD,

5    INCLUDING OVER THE YEARS OF THE APPLE AGREEMENTS.

6        YOU CAN SEE THAT IN 2003, QUALCOMM SPENT ON THE ORDER OF

7    $500 MILLION IN CHIP DEVELOPMENT, AND BY 2017, THAT AMOUNT IS

8    APPROXIMATELY $4 BILLION.

9    Q.   LET'S TURN TO SLIDE 3.

10        AND THIS SLIDE HAS BEEN SEALED, YOUR HONOR.

11        SO, DR. CHIPTY, PLEASE DON'T MENTION ANY OF THE NUMBERS ON

12   THIS SLIDE, BUT IF YOU CAN DESCRIBE, WHAT IS THIS SLIDE SHOWING

13   US?

14   A.   SURE.  THIS SLIDE GIVES US A DIFFERENT WINDOW INTO THE

15   SAME MECHANISM, THE R&D SPENT.  THIS IS A COMPARISON PREPARED

16   BY BAIN FOR INTEL.  IT'S A SIDE-BY-SIDE COMPARISON OF QUALCOMM,

17   MEDIATEK, AND INTEL CHIP MODEMS SPENT IN 2014.  AND WHAT YOU

18   CAN SEE IS THAT EACH OF THE CHIP MAKERS INVESTS SIGNIFICANTLY

19   LARGER AMOUNTS -- EXCUSE ME.  EACH OF THE CHIP MAKERS INVEST

20   LARGE AMOUNTS.  THIS IS A STATIC PICTURE.  THOUGH NOT ALL ARE

21   AS EQUALLY PRODUCTIVE.

22           MR. MATHESON:  YOUR HONOR, I OBJECT.  SHE'S OBVIOUSLY

23   INTENDING TO EXPLAIN THE HEARSAY EVIDENCE UPON WHICH SHE HAS

24   RELIED.  THIS DOCUMENT IS HEARSAY, AND SHE'S JUST RELAYING ITS

25   CONTENTS INTO THE RECORD.  SHE'S NOT OFFERING AN ANALYSIS OF

1     THE INFORMATION THAT APPEARS HERE.  THIS DOCUMENT HAS BEEN

2     ADMITTED, BUT NOT FOR THE TRUTH OF THE MATTERS ASSERTED.

3            THE COURT:  GIVE ME A MINUTE, PLEASE.

4         (PAUSE IN PROCEEDINGS.)

5            THE COURT:  WHAT'S YOUR RESPONSE?

6            MR. EVEN:  YOUR HONOR, I BELIEVE THE QUESTION WAS

7     WHAT TYPE OF EVIDENCE SHE HAS CONSIDERED THAT AN EXPERT CAN

8     RELY ON, CAN RELY ON HEARSAY TO REACH THE CONCLUSION THAT SHE

9     EXPLAINED.  HER CONCLUSION IS THAT THIS MARKET IS CHARACTERIZED

10    BY DYNAMIC COMPETITION, AND SHE'S GOING THROUGH A FEW PIECES,

11    EXAMPLES OF THIS KIND OF EVIDENCE THAT SHE'S CONSIDERED.

12           THE COURT:  YOUR QUESTION WAS, WHAT IS THE SLIDE

13    SHOWING US?

14           MR. EVEN:  I THINK MY --

15           THE COURT:  THAT WAS YOUR QUESTION.

16           MR. EVEN:  I THINK, YOUR HONOR, MY INITIAL QUESTION

17    WAS WHAT KIND OF EVIDENCE HAVE YOU CONSIDERED TO REACH THE

18    CONCLUSION ABOUT DYNAMIC COMPETITION, AND DR. CHIPTY TESTIFIED

19    THAT SHE'S LOOKED AT R&D, AND THIS IS ONE OF THREE SLIDES THAT

20    GO TO THAT.  THAT IS THE KIND OF EVIDENCE THAT SHE HAS

21    CONSIDERED.

22           THE COURT:  WELL, THIS WAS YOUR QUESTION.  "LET'S

23    TURN TO SLIDE 3.  AND THIS SLIDE HAS BEEN SEALED, YOUR HONOR.

24    SO, DR. CHIPTY, PLEASE DON'T MENTION ANY OF THE NUMBERS ON THIS

25    SLIDE, BUT IF YOU CAN DESCRIBE WHAT THIS SLIDE IS SHOWING US."

1         THAT WAS THE QUESTION.  HER ANSWER WAS, "SURE, THIS SLIDE

2    GIVES US A DIFFERENT WINDOW," ET CETERA.

3         MR. EVEN:  YOUR HONOR, THIS IS A SLIDE THAT

4    DR. CHIPTY HAS PREPARED TO SHOW THIS, AND I CAN LAY A

5    FOUNDATION IF YOUR HONOR WOULD LIKE TO.

6         THE COURT:  WELL, I GUESS I'M UNCLEAR.  WHAT'S YOUR

7    RESPONSE?  YOU'RE JUST SAYING THAT THIS WAS ADMITTED NOT FOR

8    ITS TRUTH, AND THEN SHE'S JUST READING IT NOW INTO THE RECORD.

9         MR. MATHESON:  THAT'S CORRECT.  AND THE QUESTION IS

10   NOT OBJECTIONABLE IF IT'S WHAT CONCLUSIONS HAVE YOU DRAWN.  IF

11   SHE SIMPLY SAYS HERE'S WHAT'S WRITTEN ON THE SLIDE, I THINK

12   THAT'S AN ATTEMPT TO ACT AS A CONDUIT FOR HEARSAY.

13        THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.  THE

14   QUESTION IS, "WHAT IS THE SLIDE SHOWING US?"  SO WHY DON'T YOU

15   ASK A DIFFERENT QUESTION, PLEASE.  THANK YOU.

16        MR. EVEN:  SURE, YOUR HONOR.

17   Q.   DR. CHIPTY, IS THIS SLIDE ONE OF THE PIECES OF EVIDENCE

18   THAT YOU HAVE CONSIDERED IN FORMING YOUR OPINION WITH RESPECT

19   TO DYNAMIC COMPETITION?

20   A.   YES, IT IS.  THIS SLIDE PRESENTS, LIKE I SAID, A

21   SIDE-BY-SIDE COMPARISON OF THREE OF THE CHIP MAKERS IN THIS

22   MARKETPLACE, AND IT VERY MUCH CORROBORATES SOME OF THE OTHER

23   EVIDENCE THAT I'VE SEEN ON R&D SPEND BY THE MAJOR CHIP MAKERS.

24   Q.   AND WHAT ABOUT THIS SLIDE SUPPORTS YOUR CONCLUSION THAT

25   THIS MARKET IS CHARACTERIZED BY DYNAMIC COMPETITION?

1    A.   WELL, IT SHOWS THAT, IN FACT, TWO OF THE THREE CHIP

2    MAKERS, WHICH WOULD BE INTEL AND MEDIATEK -- AND THIS DOCUMENT

3    IS FROM 2014 -- THIS IS A TIME PERIOD WHEN TWO OF THE THREE

4    CHIP MAKERS WEREN'T ACTIVELY SELLING CHIPS IN

5    PROFESSOR SHAPIRO'S ASSERTED MARKETS.

6         AND, IN FACT, WE SEE THEM ENGAGING IN R&D AT THE LEVEL OF

7    QUALCOMM BY THIS COMPARISON, AND I FIND THAT TO BE

8    COMPETITIVELY SIGNIFICANT.

9    Q.   HAVE YOU LOOKED AT OTHER ASPECTS OF R&D TO REACH YOUR

10   CONCLUSION ABOUT DYNAMIC COMPETITION?

11   A.   YES, I HAVE.  IN FACT, IF WE TURN TO THE NEXT SLIDE --

12   Q.   LET'S TURN TO THAT SLIDE.

13   A.   THIS SLIDE DESCRIBES FIRM-WIDE R&D SPENT, AGAIN, BY

14   QUALCOMM, INTEL, AND MEDIATEK.  BUT NOW IT ALSO SHOWS SAMSUNG

15   AND HUAWEI.

16        AND WHAT WE SEE IN THIS SLIDE IS THAT ALL FIVE MAJOR CHIP

17   MAKERS ARE ENGAGED IN A VARIETY OF R&D INITIATIVES, AND THEY

18   ALL HAVE ACCESS TO THAT CAPITAL TO LET THEM ENGAGE.

19   Q.   OTHER THAN LOOKING AT THE R&D SPENT, HAVE YOU LOOKED AT

20   OTHER INDICATORS THAT LED YOU TO THE CONCLUSION THAT THIS

21   INDUSTRY IS CHARACTERIZED BY DYNAMIC COMPETITION?

22   A.   YES, I HAVE.  I'VE ALSO LOOKED AT THE OUTPUT OF THIS

23   INNOVATION SPEND.

24   Q.   AND HAVE YOU PREPARED A SLIDE ON THAT?

25   A.   YES, I HAVE.  THE NEXT SLIDE PRESENTS A SUMMARY OF SOME OF

1        THAT EVIDENCE.

2            SO WHAT THIS SLIDE SHOWS, IN FACT, I'VE SELECTED A HANDFUL

3        OF TECHNOLOGICAL FEATURES THAT ARE EMBODIED IN SOME OF THE,

4        WHAT I'LL CALL, LATEST AND GREATEST CHIPS RELEASED BY QUALCOMM

5        AND ITS RIVALS OVER THE PERIOD 2013 TO 2018.

6            AND WHAT YOU CAN SEE, IF YOU LOOK AT THE DIFFERENT

7        DIMENSIONS, IS THAT, IN FACT, EACH OF THESE CHIP MAKERS IS

8        RELEASING INCREASINGLY ADVANCED CHIPS OVER THE TIME PERIOD.  SO

9        I'LL GIVE YOU A COUPLE OF EXAMPLES.

10           FOR EXAMPLE, IF YOU LOOK AT LTE'S CDMA MULTIMODE

11       CAPABILITY, YOU'LL SEE THAT BEGINNING IN 2015 MEDIATEK RELEASED

12       ITS FIRST LTE CDMA MULTIMODE CHIP, AND THEN SOON THEREAFTER WE

13       SEE HISILICON, SAMSUNG, INTEL DOING THE SAME.  THAT'S ONE

14       DIMENSION.

15           ANOTHER DIMENSION, IF YOU LOOK AT THE MAXIMUM DOWNLINK

16       SPEED ACROSS THE DIFFERENT CHIP MAKERS OVER TIME, WHAT YOU SEE

17       IS AN ACROSS-THE-BOARD INCREASE IN MAXIMUM DOWNLINK SPEED.

18           SO, IN FACT, THE NEXT SLIDE --

19       Q.   LET'S GO TO THE NEXT SLIDE.

20       A.   THIS SLIDE HERE SHOWS THAT SAME INFORMATION IN I THINK A

21       MORE DIGESTIVE WAY.  WHAT IT SHOWS YOU IS THE PERCENT INCREASE

22       IN MAXIMUM DOWNLINK SPEED FROM THE FIRST TO THE LAST CHIP

23       AVAILABLE FOR EACH OF THE CHIP MAKERS OVER THIS TIME PERIOD.

24       AND WHAT YOU CAN SEE IS THAT, AS I SAID, THERE'S BEEN AN

25       ACROSS-THE-BOARD INCREASE IN MAXIMUM DOWNLINK SPEED.

1    Q.   HAVE YOU SEEN EVIDENCE THAT QUALCOMM RESPONDS TO

2    COMPETITION INNOVATION?

3    A.   YES, I HAVE.   IN FACT, I'VE SEEN EVIDENCE IN THE ORDINARY

4    COURSE, AND I'VE ALSO HEARD IT IN THE TESTIMONY, THAT QUALCOMM

5    RESPONDS IN PART TO COMPETITION BY ADAPTING AND INTENSIFYING

6    ITS R&D EFFORTS.

7    Q.   SO LET'S GO TO SLIDE 7.

8         AND WHAT ABOUT THIS SLIDE INFORMS YOUR JUDGMENT THAT

9    YOU'RE LOOKING AT AN INDUSTRY THAT'S CHARACTERIZED BY DYNAMIC

10   COMPETITION?

11   A.   WELL, THIS IS AN ORDINARY COURSE DOCUMENT FROM QUALCOMM.

12   IT'S A 2011 DOCUMENT IN THE EARLY DAYS OF LTE, AND WHAT IT'S

13   DESCRIBING IS, IN FACT, HOW QUALCOMM RESPONDS TO COMPETITION ON

14   THE R&D FRONT.

15        SO THE LEFT PAGE OF THIS SLIDE SUMMARIZES SOME OF THE

16   COMPETITIVE THREATS THAT QUALCOMM FACED AT THE TIME, AT LEAST

17   IT BELIEVED THAT IT FACED AT THE TIME.

18        AND THE RIGHT SLIDE DESCRIBES THE STRATEGIC RESPONSES IT

19   FORMULATED IN THE FACE OF THIS COMPETITION.

20        AND AS YOU CAN SEE FROM THIS SLIDE, QUALCOMM RESPONDED BY

21   TAILORING ITS R&D IN AREAS WHERE IT THOUGHT THAT IT WAS

22   TRAILING ITS COMPETITION.

23   Q.   LET'S TURN TO TALK ABOUT THE MARKETS THAT

24   PROFESSOR SHAPIRO HAS IDENTIFIED HERE.

25        WHAT CONCLUSION -- LET'S START WITH PREMIUM LTE.   WHAT

```
 1    CONCLUSION HAVE YOU REACHED WITH RESPECT TO THE ASSERTED

 2    PREMIUM LTE BASEBAND MARKET?

 3    A.   WELL, TO BEGIN, I THINK THAT PROFESSOR SHAPIRO HAS NOT

 4    APPROPRIATELY ACCOUNTED FOR THIS DYNAMIC COMPETITION THAT WE'VE

 5    JUST TALKED ABOUT.

 6         AND AS A RESULT, HE'S INCORRECTLY EXCLUDED FROM HIS MARKET

 7    CHIPS THAT COMPETE WITH OTHER CHIPS THAT HE HAS INCLUDED IN HIS

 8    MARKET.

 9    Q.   WHAT IS INCLUDED IN PROFESSOR SHAPIRO'S ASSERTED PREMIUM

10    LTE MODEM CHIP MARKET?

11    A.   SO PROFESSOR SHAPIRO INCLUDES IN HIS MARKET LTE CHIPS THAT

12    APPEAR IN OEM HANDSETS THAT COST MORE THAN $300 BEFORE 2013 AND

13    MORE THAN $400 AFTER 2013.

14    Q.   AND TO YOUR UNDERSTANDING, WHY DOES PROFESSOR SHAPIRO

15    FOCUS ON HANDSET SALES AS OPPOSED TO CHIPSET PERFORMANCE OR

16    CHIPSET PRICE?

17    A.   WELL, I THINK PROFESSOR SHAPIRO IS TRYING TO TAKE A

18    SHORTCUT.  HE'S USING THE PRICE OF THE HANDSETS AS A PROXY FOR

19    THE QUALITY AND PRICE OF THE CHIP.  SO IT'S HIS VIEW IF A CHIP

20    SHOWS UP IN AN EXPENSIVE PHONE, IT'S LIKELY TO BE AN EXPENSIVE,

21    HIGH QUALITY CHIP THAT CONTAINS THE LATEST AND GREATEST

22    TECHNOLOGY.

23    Q.   LET'S LOOK AT THE NEXT SLIDE.  AND WHAT ARE YOU SHOWING

24    ABOUT DYNAMIC COMPETITION AND MARKET DEFINITION IN THIS SLIDE?

25    A.   WELL, SO THIS IS AN ATTEMPT TO ILLUSTRATE THE WAY
```

1          COMPETITION PLAYS OUT, WITH THE SPECIFIC EXAMPLE IN THE CONTEXT

2     OF THE WAYS IN WHICH COMPETITION WOULD HAVE PLAYED OUT IN THE

3     RACE FOR THE 2015 SOCKETS.

4          SO FOR A CHIP TO APPEAR IN THE 2015 SOCKETS, THE R&D FOR

5     THOSE PRODUCTS WOULD HAVE BEGUN YEARS IN ADVANCE.  SO ON THE

6     ORDER OF 2012, 2013, 2014, THAT'S WHEN THE R&D WOULD HAVE TAKEN

7     PLACE.

8          SO THINK OF THE ARROWS AS DEPICTING THAT RACE.

9          AND THEN ON THE ORDER OF ONE TO TWO YEARS BEFORE HANDSET

10    LAUNCH, THE OEM WOULD HAVE THEN SELECTED THE CHIP TO

11    INCORPORATE INTO THEIR PHONES.  SO I DESCRIBE THAT AS THE CHIP

12    SELECTION PERIOD.  ALL OF THIS HAPPENS BEFORE HANDSETS ARE

13    LAUNCHED.

14         AND THEN HANDSETS ARE LAUNCHED AND SALES REALIZED.

15         PROFESSOR SHAPIRO WOULD FOCUS HIS EXERCISE OF MARKET

16    DEFINITION BY LOOKING AT THE PHONES THAT ARE ACTUALLY LAUNCHED

17    INSTEAD OF ON THE COMPETITION THAT PLAYED OUT BEFORE THAT.

18    Q.   CAN YOU GIVE ME AN EXAMPLE OF COMPETITION IN THE CHIP

19    SELECTION PERIOD THAT'S MARKED YELLOW HERE ON THE SLIDE THAT IS

20    NOT REFLECTED IN THE MARKET SHARES AND THEN THE MARKET

21    DEFINITION?

22    A.   YES, I'LL GIVE YOU AN EXAMPLE INVOLVING MEDIATEK.  IN

23    FACT, IT'S AN EXAMPLE THAT PROFESSOR SHAPIRO HIMSELF

24    HIGHLIGHTED AT ONE POINT, AND WHAT THIS IS IS AN INSTANCE IN

25    WHICH QUALCOMM, DURING THE CHIP SELECTION PERIOD, LOWERED PRICE

1    BY A SIGNIFICANT AMOUNT IN RESPONSE TO A SPECIFIC MEDIATEK

2    CHIP.  BUT THAT CHIP WAS NOT INCLUDED IN PROFESSOR SHAPIRO'S

3    MARKET.

4    Q.   SO IF YOU TURN TO TAB 8, AND THAT'S CX 7591-11.

5         AND THIS DOCUMENT WAS PREVIOUSLY ADMITTED, YOUR HONOR.

6    A.   OKAY.

7    Q.   AND WHAT DO YOU SEE ON THIS SLIDE THAT IS RELATED TO YOUR

8    ASSESSMENT THAT PROFESSOR SHAPIRO DOES NOT INCLUDE ALL THE

9    RELEVANT COMPETITIVE CHIPS IN THE MARKET?

10   A.   WELL, THIS IS, IN FACT, THE ILLUSTRATION OF THAT MEDIATEK

11   CHIP I WAS JUST DESCRIBING.

12        IF YOU SEE IN THE MIDDLE OF THE PAGE, THERE'S THE MSM

13   8916.  THIS IS A QUALCOMM CHIP THAT PROFESSOR SHAPIRO INCLUDES

14   IN HIS PREMIUM MARKET.

15        AND WHAT THIS CHART IS SHOWING YOU IS THAT QUALCOMM

16   PLANNED TO LOWER ITS PRICE IN RESPONSE TO COMPETITION FROM A

17   MEDIATEK CHIP, THE MTK 6735.  BUT IT'S THIS MEDIATEK CHIP THAT

18   DOESN'T APPEAR IN PROFESSOR SHAPIRO'S MARKET.

19   Q.   HAVE YOU SEEN OTHER EXAMPLES LIKE THIS ONE IN THE RECORD?

20   A.   YES, I HAVE.  IN FACT, I JUST SHOWED YOU THE QUALCOMM 2011

21   DOCUMENT THAT DESCRIBED THE COMPETITIVE THREATS QUALCOMM FACED

22   AS OF -- IN THE EARLY DAYS OF LTE.

23        AND WHAT I SHOWED YOU THERE IS QUALCOMM FELT COMPETITIVE

24   PRESSURE FROM SEVERAL CHIP MAKERS, SOME OF WHOM NEVER APPEARED

25   IN HANDSETS IN PROFESSOR SHAPIRO'S ANALYSIS.

1     Q.   IS YOUR CRITIQUE JUST QUIBBLING AROUND THE EDGES THAT

2     PROFESSOR SHAPIRO LEFT OUT ONE OR TWO CHIPS OR THAT HIS

3     THRESHOLD SHOULD HAVE BEEN AT $380 INSTEAD OF $400?  OR IS

4     THERE SOMETHING MORE FUNDAMENTAL GOING ON HERE?

5               MR. MATHESON:  OBJECTION.  LEADING, YOUR HONOR.

6               THE COURT:  SUSTAINED.

7               THE WITNESS:  I'M NOT --

8               THE COURT:  YOU CAN'T ANSWER THE QUESTION IF I

9     SUSTAIN THE OBJECTION.  PLEASE WAIT FOR THE NEXT QUESTION.

10    THANK YOU.

11              MR. EVEN:  DR. CHIPTY -- I'LL REPHRASE THE QUESTION,

12    YOUR HONOR.

13    Q.   DR. CHIPTY, WHAT IS THE GIST OF YOUR CRITIQUE OF

14    PROFESSOR SHAPIRO'S APPROACH?

15    A.   WELL, IN MY VIEW, A CENTRAL ASPECT OF THE ANTITRUST

16    ANALYSIS IS IDENTIFYING THE COMPETITIVELY RELEVANT PRODUCTS.

17         I'VE JUST EXPLAINED TO YOU THAT IN A NUMBER OF INSTANCES

18    THAT ARE VISIBLE AND LIKELY SOME THAT ARE NOT VISIBLE,

19    PROFESSOR SHAPIRO'S APPROACH HAS HAD THE EFFECT OF EXCLUDING

20    COMPETITIVELY RELEVANT CHIPS FROM HIS ANALYSIS.

21         SO IN MY VIEW, HE HAS NOT DONE THE WORK TO IDENTIFY AN

22    ECONOMICALLY COHERENT ANTITRUST MARKET.

23    Q.   WHAT WORK WOULD YOU HAVE EXPECTED PROFESSOR SHAPIRO TO DO

24    TO COME UP WITH A COHERENT MARKET IN A DYNAMICALLY COMPETITIVE

25    MARKET?

1    A.   I WOULD HAVE EXPECTED HIM TO LOOK AT WHAT ACTUALLY

2    HAPPENED DURING THE INNOVATION RACE AND THE CHIP SELECTION

3    PERIOD, AND I WOULD HAVE EXPECTED HIM TO INCORPORATE THOSE

4    INSIGHTS INTO HIS MARKET DEFINITION ANALYSIS.

5         INSTEAD HE RELIES ON, LIKE I SAID, THE SHORTCUT OF

6    IDENTIFYING RELEVANT PRODUCTS BY LOOKING AT HANDSET PRICES.

7    Q.   HAVE YOU SEEN AN ECONOMIST EVER DO THIS KIND OF WORK?

8    A.   I, MYSELF, HAVE DONE IT.  OTHERS HAVE DONE IT.  WE ADAPT

9    OUR METHODS TO THE STYLIZED CIRCUMSTANCES OF THE INDUSTRY WE'RE

10   ANALYZING.

11        I, MYSELF, HAVE RECENTLY DONE THIS ON A CASE FOR THE

12   DEPARTMENT OF JUSTICE IN THE ANTITRUST DIVISION.

13   Q.   AND WHAT KIND OF WORK HAVE YOU DONE IN THIS CASE FOR THE

14   D.O.J.?

15   A.   WELL, IN THE CASE THAT I HAVE IN MIND, I WAS LOOKING AT

16   COMPETITIVE EFFECTS IN THE INNOVATION MARKET, AND TO STUDY

17   THOSE EFFECTS, I LOOKED AT THE BACK AND FORTH BETWEEN THE

18   INNOVATORS TO SEE IF, IN FACT, THERE WAS A COMPETITIVE

19   INTERACTION BETWEEN THEM AND HOW THAT PROCESS WOULD PLAY OUT.

20        I DID NOT LOOK AT WHAT HAPPENED AFTER THE FACT, OR AT

21   LEAST I DID -- THAT WASN'T THE PRINCIPAL APPROACH THAT I TOOK.

22             MR. MATHESON:  I OBJECT, YOUR HONOR.  I'M NOT SURE IF

23   THIS HAS BEEN DISCLOSED, THIS ANALYSIS THAT SHE'S DISCUSSING,

24   BUT I DID NOT LOCATE IT IN THE MATERIALS RELIED UPON.  I THINK

25   IF IT'S OUTSIDE THE SCOPE OF THE REPORT, SHE SHOULD NOT BE

```
 1        DRAWING ANALOGIES TO NON-DISCLOSED ANALYSIS.

 2            WAS THIS DISCLOSED IN THE REPORT ANYWHERE?

 3                MR. EVEN:  THE EXAMPLE ITSELF WAS NOT DISCLOSED, YOUR

 4    HONOR, BUT THIS IS AN EXAMPLE OF THE TYPE OF WORK.  I THINK THE

 5    TYPE OF WORK CERTAINLY HAS BEEN DISCLOSED IN THE REPORT, AND

 6    WHAT THE FLAWS SHE BELIEVES ARE IN PROFESSOR SHAPIRO'S WORK.

 7                MR. MATHESON:  SHE'S CERTAINLY ALLOWED TO CRITIQUE

 8    DR. SHAPIRO.  BUT I CAN'T RESPOND TO HER CLAIM THAT SHE HAS

 9    DONE A DIFFERENT ANALYSIS IF I'VE NEVER SEEN IT AND IT'S NEVER

10    BEEN DISCLOSED.

11            THE COURT:  WHAT'S YOUR RESPONSE TO THAT?

12                MR. EVEN:  I THINK THAT AN EXPERT IS ALLOWED TO TALK

13    ABOUT THE KIND OF WORK THAT SHOULD BE DONE AND CAN TALK AS TO

14    HER EXPERIENCE.  I THINK THE CRITIQUE ITSELF, THAT'S THE

15    OPINION OF WHAT SHOULD HAVE BEEN DONE, WAS DISCLOSED.

16            THE COURT:  CAN I SEE THE RELEVANT PARAGRAPH IN HER

17    EXPERT REPORT THAT DISCLOSES ANYTHING ALONG THESE LINES?

18    WHAT'S THE PARAGRAPH?

19        (PAUSE IN PROCEEDINGS.)

20                MR. EVEN:  SO, YOUR HONOR, THE MOST RELEVANT ONE I

21    CAN COME UP WITH RIGHT NOW IS AT 140.

22            THE COURT:  OKAY.

23        (PAUSE IN PROCEEDINGS.)

24            THE COURT:  WHAT'S YOUR VIEW ON THAT?  I DON'T THINK

25    IT DISCLOSES THIS, BUT YOU ALL ARE MORE FAMILIAR WITH THIS
```

1        TOPIC THAN I AM.

2              MR. MATHESON:  YOUR HONOR, THIS DOES NOT DISCUSS

3        ANYTHING OTHER THAN THE HORIZONTAL MERGER GUIDELINES.  IT DOES

4        NOT DISCUSS THE APPROACH AN ECONOMIST SHOULD TAKE WHEN

5        ANALYZING A DYNAMIC MARKET SUCH AS SHE'S DESCRIBED, AND IT DOES

6        NOT DISCLOSE ANY ANALYSIS THAT SHE HAS EVER DONE.  THESE ARE

7        GENERIC STATEMENTS ABOUT WHAT THE HORIZONTAL MERGER GUIDELINES

8        SAY.

9              MR. EVEN:  I THINK 140 THROUGH 142 DISCLOSES THE KIND

10        OF THINGS THAT SHE WOULD EXPECT AN EXPERT TO DO, YOUR HONOR.

11        BUT THE SPECIFIC EXAMPLE IS NOT DISCLOSED.

12              THE COURT:  WHAT IS THE SPECIFIC -- I DON'T SEE IT IN

13        HERE, 140 TO 142.  BUT WHAT IS THE SPECIFIC THING THAT YOU'RE

14        OBJECTING TO, MR. MATHESON?

15              MR. MATHESON:  THE FACT THAT SHE HAS STATED THAT

16        DR. SHAPIRO SHOULD HAVE DONE AN ANALYSIS LIKE THE ONE THAT SHE

17        HAS DONE.

18        IF WE DON'T KNOW THE ONE SHE'S DONE, WE'VE NEVER BEEN ABLE

19        TO INVESTIGATE IT OR ASK HER ANY QUESTIONS ABOUT IT AT HER

20        DEPOSITION, HOW CAN WE POSSIBLY DEMONSTRATE ANY SHORTCOMINGS IN

21        THE ANALYSIS THAT SHE CLAIMED TO HAVE PERFORMED AT SOME POINT

22        IN TIME AND ANY SIMILARITIES BETWEEN THAT ANALYSIS AND

23        DR. SHAPIRO'S?

24        FOR ALL WE KNOW, THE ANALYSES ARE REMARKABLY SIMILAR, AND

25        WE'D BE ABLE TO DEMONSTRATE THAT ON CROSS-EXAMINATION IF THEY

1    HAD BEEN DISCLOSED.

2           MR. EVEN:  YOUR HONOR, I THINK WHAT SHE TESTIFIED TO

3    WAS SPECIFICALLY WHAT 140 TO 142 BUILDS UP TO, AND THEN IN 143

4    AND BELOW, SHE TESTIFIED THAT WHAT PROFESSOR SHAPIRO SHOULD

5    HAVE DONE WAS LOOK AT THE EX ANTE COMPETITION BEFORE HE REACHES

6    HIS MARKET SHARES, LOOKS AT THAT, THAT THAT IS THE KIND OF WORK

7    THAT AN ECONOMIST SHOULD HAVE DONE, AND THAT IS WHAT SHE WOULD

8    HAVE EXPECTED.

9         THE ONLY EXTENSION BEYOND THAT IS TO SAY I'VE DONE IT IN

10   THIS PARTICULAR CASE.  I DON'T SEE HOW THAT GOES BEYOND THE

11   SCOPE.

12          THE COURT:  THE OBJECTION IS SUSTAINED.  THAT'S

13   STRICKEN.

14   BY MR. EVEN:

15   Q.  PROFESSOR SHAPIRO TESTIFIED THAT HE JUST FOLLOWED WHAT

16   QUALCOMM DOES IN ITS INTERNAL DOCUMENTS BY LOOKING AT HANDSET

17   PRICES.

18        WHAT'S YOUR VIEW OF THAT?

19   A.  I DON'T AGREE WITH THAT.  I THINK THAT QUALCOMM, WHEN I

20   LOOK AT THE RECORD, QUALCOMM ACTUALLY ASSESSES ITS COMPETITORS'

21   CAPABILITIES IN A VARIETY OF DIFFERENT WAYS, NOT SIMPLY BY

22   LOOKING AT HANDSET PRICES, WHEN BIDDING ON SOCKETS FOR THE

23   FUTURE, IN ADDITION TO ASSESSING COMPETITOR CAPABILITIES,

24   QUALCOMM ALSO FACTORS IN CUSTOMER REQUIREMENTS AND THEN

25   ASSESSES ITS OWN VALUE PROPOSITION IN THE FACE OF THE

CHIPTY DIRECT BY MR. EVEN

1    COMPETITION AND BELIEVES IT FACES.  SO I THINK QUALCOMM DOES A

2    LOT MORE THAN LOOK AT HANDSET PRICES.

3    Q.   ARE YOU AWARE OF TESTIMONY BY OEM'S THAT THEY NEED

4    QUALCOMM'S PREMIUM CHIPS FOR THEIR PREMIUM PHONES?

5    A.   I UNDERSTAND THAT THEY'VE SAID THAT AND THAT

6    PROFESSOR SHAPIRO RELIES ON THAT.

7         BUT HERE'S WHAT I SEE WHEN I LOOK AT THAT TESTIMONY AND

8    SOME OF THE UNDERLYING EVIDENCE.

9         THE FIRST IS THAT I FIND THAT THE DIFFERENT OEM'S USE THE

10   TERM "PREMIUM" TO MEAN DIFFERENT THINGS, AND ONE HAS TO

11   RECONCILE THOSE DIFFERENCES IN ORDER TO RELY ON THAT TERM.

12        AND THE SECOND THING IS THAT WHEN I LOOK AT THE ACTUAL

13   HANDSETS THAT PROFESSOR SHAPIRO FLAGS USING HIS METHOD BASED ON

14   HANDSET PRICES, WHAT I SEE IS THAT EXPENSIVE HANDSETS OFTEN

15   CONTAIN A VARIETY OF CHIPSETS.  IN PARTICULAR, I SEE SOME OF

16   THE EXPENSIVE HANDSETS IN PROFESSOR SHAPIRO'S MARKET ACTUALLY

17   CONTAIN WHAT QUALCOMM WOULD DESCRIBE AS NON-PREMIUM HANDSETS.

18    SO ALL OF THIS LEADS ME TO BE CAUTIOUS TO USE THE KIND OF

19   EVIDENCE THAT RELIES ON THE USE OF THE TERM "PREMIUM."

20   Q.   LET'S TURN TO MARKET POWER IN THE ASSERTED PREMIUM LTE

21   MARKET.

22        WHAT ARE YOUR MAIN CONCLUSIONS WITH RESPECT TO QUALCOMM'S

23   MARKET POWER?

24   A.   SO IT'S MY VIEW THAT PROFESSOR SHAPIRO HAS OVERSTATED

25   QUALCOMM'S MARKET POWER.  QUALCOMM HAS CERTAINLY BEEN THE

1     WINNER OF MANY INNOVATION RACES OVER TIME.

2          BUT I HAVE NOT SEEN THE EVIDENCE THAT WOULD BE REQUIRED IN

3     THAT I HAVE NOT SEEN EVIDENCE OF CONSISTENT AND UNCONSTRAINED

4     MARKET POWER OF THE TYPE THAT WOULD BE REQUIRED TO SUSTAIN THE

5     ALLEGED CONDUCT IN THIS CASE.

6          IN OTHER WORDS, IT'S MY VIEW THAT QUALCOMM DOESN'T HAVE

7     SUFFICIENT MARKET POWER TO COERCE OEM'S INTO ONEROUS BUSINESS

8     TERMS THAT WOULD ROB THEM OF BILLIONS OF DOLLARS.

9     Q.   LET'S TURN BACK TO SLIDE 8, IF WE MAY.

10         AND WHAT ARE YOU SHOWING IN THIS SLIDE WITH RESPECT TO

11    DYNAMIC COMPETITION THAT SHOWS YOUR DISAGREEMENT WITH

12    PROFESSOR SHAPIRO'S APPROACH TO ANALYZING MARKET POWER?

13    A.   SURE.  THIS SLIDE WAS THE SLIDE THAT I USED TO JUST

14    DESCRIBE HOW COMPETITION PLAYS OUT BEFORE HANDSET LAUNCH

15    ACTUALLY OCCURS.

16         NOW, PROFESSOR SHAPIRO'S METHOD OF ASSESSING MARKET POWER

17    BEGINS WITH MARKET SHARE.  SO HE'S TRYING TO INFER MARKET POWER

18    FROM MARKET SHARES, BUT THE FACT IS THAT COMPETITION PLAYS OUT

19    BEFORE HANDSETS ARE EVER LAUNCHED.

20         IN FACT, DURING THE CHIP SELECTION PROCESS, QUALCOMM FACES

21    COMPETITION FROM RIVALS, AS WELL AS FROM ITS LARGE STRATEGIC

22    BUYERS.  IT FACES COMPETITIVE PRESSURE FROM ITS BUYERS.

23         SO PROFESSOR SHAPIRO WOULD INFER MARKET POWER FROM MARKET

24    SHARES, AND YET A LOT OF THE ACTION TAKES PLACE BEFOREHAND AND

25    NEVER APPEARS IN HANDSETS AND IN THE SHARES.

1    Q.   CAN YOU GIVE US AN EXAMPLE OF A COMPETITIVE SITUATION THAT

2    IS NOT APPROPRIATELY CAPTURED BY THE MARKET SHARES THAT

3    PROFESSOR SHAPIRO LOOKED AT?

4    A.   SURE.  I'LL GIVE YOU A PROMINENT EXAMPLE.  THE EXAMPLE IS

5    OF INTEL.

6         THE EVIDENCE SHOWS THAT INTEL PLAYED A COMPETITIVELY

7    SIGNIFICANT ROLE FROM 2012 TO 2015 BY CAUSING QUALCOMM TO GIVE

8    APPLE HUNDREDS OF MILLIONS IN DISCOUNTS IN RESPONSE TO AN INTEL

9    CHIP.

10        YET, THAT CHIP, IF YOU LOOK AT THE 2015 SHARE CHART, HAS A

11   DE MINIMIS PRESENCE.

12   Q.   SO IT DOES HAVE A DE MINIMIS PRESENCE, BUT IT IS ON THE

13   SHARE CHART.  SO WHAT'S WRONG WITH THAT APPROACH?

14   A.   WELL, IF YOU -- IF YOU WERE TO JUST LOOK AT THE SHARES IN

15   2015, THE SHARES WOULD GIVE THE IMPRESSION THAT INTEL DID NOT

16   HAVE A SIGNIFICANT COMPETITIVE PRESENCE IN THIS MARKETPLACE,

17   AND YET, WE KNOW FROM THE DIRECT EVIDENCE THAT, IN FACT,

18   QUALCOMM GAVE APPLE SIGNIFICANT DISCOUNTS BECAUSE OF AN INTEL

19   CHIP.

20        SO I THINK THIS HIGHLIGHTS THE PROBLEM WITH RELYING ON

21   EX-POST SHARES TO UNDERSTAND HOW COMPETITION PLAYED OUT

22   BEFOREHAND.

23   Q.   YOU MENTIONED A COUPLE OF TIMES THAT INTEL WAS

24   COMPETITIVELY SIGNIFICANT.  DOES THAT MEAN THAT INTEL COULD

25   HAVE WON THE INNOVATION RACE FOR THE 2015 SOCKET IN APPLE?

1    A.   WELL, WHAT I MEAN BY THAT IS THAT QUALCOMM FELT

2    COMPETITIVE PRESSURE FROM INTEL DURING THIS TIME PERIOD, AND

3    FOR THAT REASON, IT INNOVATED MORE AND IT GAVE PRICE DISCOUNTS.

4         THAT'S NOT TO SAY THAT INTEL WOULD HAVE ACTUALLY WON THE

5    SOCKET FOR 2015.  THOSE ARE TWO SEPARATE THINGS.

6    Q.   I SEE THAT THIS SLIDE ENDS IN 2016.  WHAT'S HAPPENED IN

7    THE MARKETPLACE SINCE 2016?

8         AND I URGE YOU TO STOP AT MARCH OF 2018, PLEASE.

9    A.   SO, IN FACT, PROFESSOR SHAPIRO'S ANALYSIS OF MARKET POWER

10   ENDS IN 2016.  BUT THE FACT IS THAT THERE HAVE BEEN SOME

11   SIGNIFICANT COMPETITIVE EVENTS THAT HAVE TAKEN PLACE SINCE AND

12   HAVE AFFECTED COMPETITIVE DYNAMICS OUT THROUGH EARLY 2018.

13        ONE OF THESE EVENTS IS SIMPLY THAT QUALCOMM LOST THE APPLE

14   ACCOUNT.  THAT'S A SIGNIFICANT EVENT IN MY VIEW.

15   Q.   HAVE YOU PREPARED A SLIDE ABOUT THAT?

16   A.   I HAVE.

17   Q.   SO LET'S TURN TO THAT SLIDE, AND THAT'S SLIDE 10.

18   A.   SO WHAT THIS CHART SHOWS IS QUALCOMM'S SHARE OF THE BIG

19   THREE, MEANING APPLE, SAMSUNG, AND HUAWEI, AS OF EARLY 2018.

20        IT'S SHOWING YOU SOMETHING ABOUT WHERE EACH OF THESE OEM'S

21   SOURCES THEIR PREMIUM SOCKETS IN 2018.

22        SO WHAT I JUST DESCRIBED, APPLE -- EXCUSE ME, QUALCOMM

23   LOST THE APPLE ACCOUNT AS OF EARLY 2018.  THAT MEANS AS OF

24   EARLY 2018, QUALCOMM WOULD HAVE EXPECTED TO HAVE ZERO SHARE OF

25   APPLE'S 2018 SOCKETS.

1           THE SECOND SIGNIFICANT EVENT THAT THIS CHART HIGHLIGHTS IS

2    THE FACT THAT SAMSUNG AND HUAWEI HAVE MOVED INCREASINGLY TO

3    SELF-SUPPLY, AND WHAT THAT MEANS IS THAT AS OF 2018, QUALCOMM

4    HAD ONLY ABOUT A 35 PERCENT SHARE OF THE SAMSUNG SOCKETS AND,

5    IN FACT, QUALCOMM HAD NO PIECE OF THE HUAWEI PREMIUM SOCKETS.

6           NOW, THESE THREE OEM'S, APPLE, SAMSUNG, AND HUAWEI,

7    TOGETHER ACCOUNT FOR ABOUT 90 PERCENT OF PREMIUM SOCKETS.

8             THE COURT:  I'M SORRY TO INTERRUPT YOU, BUT CAN WE

9    ASSIGN A QDX NUMBER TO DR. CHIPTY'S DEMONSTRATIVES?  AND I'D

10   LIKE THESE LODGED FOR PURPOSES OF THE RECORD WITH THE OTHER

11   DEMONSTRATIVES.

12            MR. EVEN:  YES, YOUR HONOR.

13            THE COURT:  WHAT'S YOUR NEXT QDX NUMBER?

14            MR. EVEN:  I BELIEVE, YOUR HONOR, THAT IT HAS BEEN

15   ASSIGNED QDX 9349, AND WE WILL OR HAVE LODGED THEM.  WE WILL

16   LODGE IT.

17            THE COURT:  OKAY, GREAT.  THANK YOU.  GO AHEAD.

18   SORRY FOR THE INTERRUPTION.

19            MR. MATHESON:  YOUR HONOR, I OBJECT.  THERE'S BEEN NO

20   ANALYSIS DISCLOSED OF WHAT CONSTITUTES A PREMIUM SOCKET AND

21   WHAT DOES NOT.  I DO NOT THINK IT'S APPROPRIATE FOR HER TO SAY

22   THAT THESE THREE ACCOUNT FOR 90 PERCENT OF PREMIUM SOCKS WHEN

23   HER OPINION ON WHAT IS A PREMIUM SOCKET AND WHAT IS NOT IS NOT

24   DISCLOSED IN HER REPORT.

25            THE COURT:  WHAT'S YOUR RESPONSE TO THAT?  IS THERE A

1    DISCLOSURE OF THAT IN THE REPORT?

2              MR. EVEN:  I THINK, YOUR HONOR, THAT -- I THINK, YOUR

3    HONOR, THAT WHAT DR. CHIPTY'S RELYING HERE IS ON TESTIMONY AND

4    ON THE MARKETS DISCLOSED BY PROFESSOR SHAPIRO.  BUT I CAN ASK

5    HER AND SHE CAN ANSWER THAT, IF THAT'S HELPFUL.

6              THE COURT:  PLEASE, GO AHEAD.  THANK YOU.

7    BY MR. EVEN:

8    Q.  DR. CHIPTY, YOU MENTIONED THE PERCENTAGE OF THE, OF

9    PREMIUM HANDSETS.  WHAT ARE YOU REFERRING TO WHEN YOU SAY

10   PREMIUM HANDSETS IN THIS SLIDE?

11   A.  WELL, IN THIS PARTICULAR SLIDE, THE NUMBERS THEMSELVES ARE

12   CALCULATED -- THE NUMBERS SHOWN WERE TESTIFIED TO BY MR. WYATT

13   OF QUALCOMM IN HIS TRIAL TESTIMONY.

14         THERE ARE -- THERE ARE SIMILAR PIECES OF INFORMATION

15   THROUGHOUT MY REPORT WHICH ARE NOT PRESENTED IN SLIDES LIKE

16   THIS.

17         THANK YOU.  REGARDING --

18              THE COURT:  THE OBJECTION'S OVERRULED.

19   BY MR. EVEN:

20   Q.  -- YOUR LAST POINT ABOUT SELF-SUPPLY, WE HEARD TESTIMONY

21   FROM MS. EVANS WHERE SHE SUGGESTED THAT MAYBE SAMSUNG AND

22   HUAWEI ARE NOT VERY IMPORTANT BECAUSE QUALCOMM AND INTEL ARE

23   THE ONLY TRUE COMPETITORS IN THE MERCHANT MARKET FOR PREMIUM

24   CHIPS.

25         WHAT'S YOUR VIEW ON THAT?

1    A.   WELL, I DON'T AGREE WITH THAT CHARACTERIZATION FOR A FEW

2    REASONS.

3         FIRST OF ALL, IF WE LOOK AT MEDIATEK, MEDIATEK, BY

4    PROFESSOR SHAPIRO'S OWN CALCULATION, HAS ABOUT A 25 PERCENT

5    SHARE BY 2016 IN HIS PREMIUM LTE MARKET.

6         SO CERTAINLY HE AND I AGREE THAT MEDIATEK IS AN IMPORTANT

7    PLAYER TODAY IN, OR AS OF 2018, IN THE PREMIUM MARKET AS HE

8    WOULD DEFINE IT.

9         IN ADDITION, I'VE ALSO SEEN EVIDENCE IN THE RECORD THAT

10   SAMSUNG IS COMPETING FOR THIRD PARTY BUSINESS, AND I AGAIN

11   THINK THAT PROFESSOR SHAPIRO WOULD AGREE WITH ME ON THAT.

12        AND THEN FINALLY, EVEN IF SAMSUNG AND HUAWEI DON'T COMPETE

13   IN THE MERCHANT MARKET -- WHICH I DON'T BELIEVE TO BE TRUE FOR

14   SAMSUNG AT LEAST -- I WOULD STILL SAY THAT THEIR SELF-SUPPLY IS

15   COMPETITIVELY SIGNIFICANT BECAUSE, IN FACT, THE TWO ARE TWO OF

16   THE THREE BIG BUYERS IN PROFESSOR SHAPIRO'S PREMIUM MARKET.

17   Q.   WHAT IMPLICATION DOES ALL OF THIS HAVE FOR

18   PROFESSOR SHAPIRO'S INTERPRETATION OF MARKET SHARES AND AN

19   INFERENCE OF MARKET POWER?

20   A.   I THINK THAT PROFESSOR SHAPIRO'S RELIANCE ON

21   CONTEMPORANEOUS MARKET SHARES, AS AN INDICATOR FOR MARKET POWER

22   IN A PARTICULAR YEAR, IS CHALLENGING FOR HIM BECAUSE, IN FACT,

23   THE SHARES THEMSELVES REFLECT THE COMPETITIVE EVENTS AND EVEN

24   THEN ONLY THE WINNERS, THE IMPORTANCE OF THE WINNERS OF

25   COMPETITIVE EVENTS FROM PRIOR YEARS.

CHIPTY DIRECT BY MR. EVEN

1        SO, FOR EXAMPLE, THE 2016 SHARES WOULD LIKELY REFLECT

2    WINNERS FROM INNOVATION RACES IN THE CHIP SELECTION PERIOD FROM

3    SOMETHING EVEN AS FAR BACK AS 2013 AND 2014.

4        IN MY VIEW, THESE SHARES DO NOT PROVIDE A COMPLETE PICTURE

5    OF COMPETITIVE SIGNIFICANCE AND MARKET POWER IN 2016.

6    Q.   LET'S TRY AND SEE WHAT WE CAN LEARN FROM MARKET SHARES

7    NONETHELESS.

8        SO IF YOU TURN TO SLIDE 11.

9        AND WHAT DOES SLIDE 11 REPRESENT?

10   A.   SO SLIDE 11, THIS DESCRIBES MARKET SHARES, OR SHARES IN

11   PROFESSOR SHAPIRO'S PREMIUM MARKET.  THESE ARE ESSENTIALLY

12   PROFESSOR SHAPIRO'S CALCULATIONS WITH TWO CHANGES.

13       FIRST, I'VE ADDED HISILICON.  ITS PRESENCE IS SHOWN WITH

14   THE YELLOW SLICE BEGINNING IN 2015.  PROFESSOR SHAPIRO DID NOT

15   ILLUSTRATE HISILICON IN HIS SHARE CHART, SO I'VE ADDED THIS ON.

16       AND ALSO, HE STOPS HIS ANALYSIS IN 2016, AND I'VE EXTENDED

17   IT FURTHER OUT TO 2017 TO CAPTURE SOME OF THE EFFECTS OF THE

18   COMPETITIVE EVENTS I'VE DESCRIBED.

19   Q.   WHAT, IF ANYTHING, CAN WE LEARN FROM THE TREND IN

20   QUALCOMM'S SHARES DEPICTED ON THIS SLIDE?

21   A.   WELL, WHAT I SEE WHEN I LOOK AT THE TRENDS IS THAT

22   QUALCOMM IS LOSING SHARE.  I SEE ENTRANTS, I SEE INTEL,

23   MEDIATEK, SAMSUNG, HUAWEI GAINING SHARE, AND THE SHARE GAIN IS

24   COMING AT QUALCOMM'S EXPENSE.

25       FROM 2014 TO 2017, I SEE QUALCOMM HAS LOST 50 SHARE

1    POINTS.

2              THE COURT:  CAN I ASK YOU A QUESTION?  THIS 2014, IS

3    THE TOP ORANGE OR IS THAT YELLOW?  I COULDN'T TELL.

4              THE WITNESS:  GIVE ME ONE SECOND, YOUR HONOR.

5         THANK YOU.  IT'S YELLOW.  IT'S ACTUALLY A SLIVER OF

6    HISILICON COMING IN.

7              MR. EVEN:  MAY I PROCEED, YOUR HONOR?

8              THE COURT:  GO AHEAD.  I THOUGHT SHE SAID HISILICON

9    CAME IN IN 2015.

10             THE WITNESS:  I DID, YOUR HONOR, FROM LOOKING AT THE

11   CHART QUICKLY.  BUT MY EYE WAS NOT PICKING UP THE YELLOW SLIVER

12   UNTIL WE ZOOMED IN.

13             THE COURT:  OKAY.  GO AHEAD, PLEASE.

14   BY MR. EVEN:

15   Q.   LET'S TURN TO CDMA.  WHAT IS YOUR MAIN OBSERVATION ABOUT

16   THE CDMA MARKET?

17   A.   WELL, I THINK THAT THE CDMA MARKET UP UNTIL 2016 WAS

18   RELATIVELY STAGNANT, AND SINCE 2016, WE'VE SEEN SOME

19   SIGNIFICANT CHANGES IN THE COMPETITIVE LANDSCAPE.

20   Q.   AND WHAT CHANGES HAVE YOU IDENTIFIED IN THE COMPETITIVE

21   LANDSCAPE SINCE 2016?

22   A.   PROBABLY THE MOST SIGNIFICANT CHANGE BEGINS WITH THE

23   INCREASED DEMAND FOR CDMA BECAUSE OF THE RISE OF SIX MODE IN

24   CHINA.

25   Q.   AND WHAT DO YOU MEAN BY THE RISE OF SIX MODE?

1    A.   WELL, IN 2016 THE CHINESE GOVERNMENT IMPLEMENTED A

2    NATIONAL STANDARD FOR HANDSETS TO EMBODY SIX COMMUNICATION

3    STANDARDS, INCLUDING CDMA.

4    Q.   AND HAVE YOU STUDIED THE EFFECTS OF THIS RISE OF SIX MODE?

5    A.   YES, I HAVE.

6    Q.   SO LET'S GO TO THE NEXT SLIDE.

7         AND WHAT ARE YOU SHOWING ON THIS SLIDE?

8    A.   WELL, THIS SLIDE IS SHOWING WHAT'S ACTUALLY HAPPENING ON

9    THE GROUND, OR IN CHINA.  IT'S DESCRIBING THE PERIOD OF TIME OF

10   PHONES SOLD IN CHINA THAT ARE CDMA ENABLED.

11        IT SHOWS YOU THIS NUMBER FOR 2004 TO 2017, AND AS YOU CAN

12   SEE, FROM 2004 TO ABOUT 2014, THAT NUMBER, THAT PERIOD OF TIME

13   OF PHONES THAT ARE CDMA ENABLED IN CHINA REMAINS RELATIVELY

14   STABLE.

15        IT BEGINS TO SPIKE IN 2015, AND BY 2017, 90 PERCENT OF THE

16   PHONES SOLD IN CHINA ARE CDMA ENABLED.

17   Q.   IF YOU TURN TO TAB 2, THAT'S QX 9331, AND THIS IS A

18   DOCUMENT THAT'S BEEN SEALED, YOUR HONOR.  I'M ONLY GOING TO

19   SPEAK TO DR. CHIPTY ABOUT PORTIONS THAT HAVE NOT BEEN SEALED.

20        AND IF YOU TURN TO PAGES 1 AND 2 OF THE ENGLISH

21   TRANSLATION, WHAT IS THAT DOCUMENT SHOWING YOU RELATED TO YOUR

22   OPINION ABOUT THE ENTRY INTO THE CDMA MARKET?

23   A.   WELL, SO THIS IS A MEMORANDUM, AN INTERNAL MEMORANDUM AT

24   SAMSUNG CIRCA MARCH 2016.

25        AND I SEE SEVERAL PIECES OF INFORMATION HERE THAT ARE

1    RELEVANT TO MY OPINION ON CDMA.

2          FIRST OF ALL, I SEE THAT --

3                THE COURT:  CAN I INTERRUPT YOU A SECOND?  HAS THIS

4    BEEN ADMITTED?

5                MR. EVEN:  THIS HAS NOT BEEN ADMITTED, YOUR HONOR.

6                THE COURT:  OKAY.  I PREFER THAT DOCUMENTS BE

7    ADMITTED BEFORE THERE'S TESTIMONY ABOUT THEIR CONTENTS.  SO

8    WOULD YOU LIKE TO ADMIT THIS ONE?

9                MR. EVEN:  I'M HAPPY TO ADMIT IT FOR THE PURPOSES OF

10   DR. CHIPTY'S RELIANCE ON IT.

11               THE COURT:  OKAY.  ANY OBJECTION?

12               MR. MATHESON:  I'M NOT SURE WHAT THAT MEANS, YOUR

13   HONOR.  FOR PURPOSES OF DR. CHIPTY'S RELIANCE UPON IT?  THIS

14   WAS DONE WITH DR. LASINSKI, OR MR. LASINSKI WHEN IT WAS A

15   STATEMENT OF A PARTY OPPONENT, WHICH IS NOT HEARSAY.

16         THIS DOCUMENT IS HEARSAY, AND IT'S NOT CLEAR WHY WE WOULD

17   NEED TO ADMIT THIS DOCUMENT IN ORDER TO DEMONSTRATE SHE RELIED

18   ON THIS PARTICULAR DOCUMENT.  IT DOES NOT SEEM TO BE RELEVANT.

19   SHE SHOULD BE ABLE TO EXPLAIN THE CONCLUSIONS SHE HAS DRAWN

20   FROM THE EVIDENCE THAT SHE HAS REVIEWED WITHOUT SIMPLY RELAYING

21   HEARSAY INTO THE RECORD.

22               THE COURT:  THIS IS THE SAME PROBLEM WE HAD BEFORE.

23               MR. EVEN:  I'M HAPPY TO JUST ADMIT IT.

24               THE COURT:  WHY CAN'T SHE JUST SAY WHAT HER

25   CONCLUSION IS WITHOUT READING IT INTO THE RECORD?  OR WE CAN

1    JUST ADMIT IT.  I -- YOU'RE SAYING IT'S HEARSAY?

2              MR. EVEN:  I'M HAPPY TO ADMIT IT INTO THE RECORD SO

3    IT'S ON THE RECORD THAT THIS IS A DOCUMENT SHE HAS LOOKED AT.

4              THE COURT:  BUT YOU WERE PLANNING TO HAVE HER READ IT

5    INTO THE TRANSCRIPT WHEN IT HASN'T BEEN ADMITTED.  I HAVE A

6    PROBLEM WITH THAT.

7              MR. EVEN:  SHE'S NOT READING IT.  SHE'S EXPLAINING

8    WHAT IT IS AND HOW IT SUPPORTS HER OPINION AS TO WHAT HAPPENED

9    IN -- WHAT'S SPURRED THE ENTRY IN 2015 AND 2016 INTO CDMA.

10             THE COURT:  BUT IF IT'S HEARSAY, I MEAN, I GUESS

11   EXPERTS CAN RELY ON HEARSAY.  SO WHAT'S THE PROBLEM WITH THAT,

12   MR. MATHESON?

13             MR. MATHESON:  THERE'S ABSOLUTELY NO PROBLEM WITH HER

14   OFFERING TESTIMONY ABOUT THE CONCLUSIONS SHE DREW OR EXPLAINING

15   WHAT SHE REVIEWED.  I JUST DON'T KNOW WHY SHE NEEDS TO EXPLAIN

16   THE WORDS, OR WHY WE NEED THE WORDS OF THIS DOCUMENT IN THE

17   RECORD IN ORDER FOR HER TO EXPLAIN HER CONCLUSIONS.  IF SHE'S

18   GOING TO EXPLAIN HER CONCLUSIONS, WHY DO WE NEED THE DOCUMENT

19   IN THE RECORD?

20             MR. EVEN:  SO I'M PERFECTLY HAPPY TO DO WHATEVER YOUR

21   HONOR PREFERS.  I THINK IT MAY BE HELPFUL FOR SOMEBODY LATER ON

22   TO SEE WHAT IT IS EXACTLY THAT WAS SHOWN TO DR. CHIPTY SO THAT

23   SHE -- THAT PEOPLE UNDERSTAND WHAT IT IS THAT SHE RELIED ON.

24             THE COURT:  SO WHAT'S THE BASIS FOR THIS BEING

25   ADMITTED?  IT'S NOT AN ADMISSION OF A PARTY OPPONENT.  IT'S NOT

1      A BUSINESS RECORD.  YOU HAVEN'T ESTABLISHED IT'S A BUSINESS

2      RECORD.  SO WHAT'S THE HEARSAY EXCEPTION THEN TO GET IT IN?

3                 MR. EVEN:  I'M NOT OFFERING IT AS A HEARSAY

4      EXCEPTION.  AS YOUR HONOR STATED, DR. CHIPTY IS PERFECTLY

5      ENTITLED TO RELY ON HEARSAY TO FORM HER OPINIONS.  SHE'S

6      EXPLAINING HOW THIS DOCUMENT IS RELEVANT TO HER OPINIONS.  SHE

7      CAN DO THAT WITH THE DOCUMENT BEING ADMITTED OR NOT BEING

8      ADMITTED, EITHER WAY IS FINE.

9          I DO THINK THAT THERE IS SOME HOUSEKEEPING ADVANTAGE IN

10     HAVING THE DOCUMENT IN THE RECORD SO IF SOMEBODY EVER LOOKS AT

11     IT, THEY CAN UNDERSTAND WHAT IT IS THAT SHE LOOKED AT.  BUT I'M

12     PERFECTLY HAPPY NOT TO DO IT IF YOUR HONOR THINKS THAT'S

13     IMPROPER.

14         WE HAVE DONE IT WITH, WITH MR. LASINSKI, AS MR. MATHESON

15     MENTIONED.  I DON'T THINK THAT IT WAS ENTERED INTO EVIDENCE AT

16     THE TIME AS AN EXCEPTION TO HEARSAY OR ANYTHING LIKE THAT.

17         I THINK IT WAS ENTERED FOR THE VERY SAME HOUSEKEEPING

18     PROCESS THAT I'M TALKING ABOUT, JUST SHOWING WHAT IT IS THAT

19     THE EXPERT ACTUALLY LOOKED AT OR DESCRIBED IN HIS TESTIMONY.

20     MR. BORNSTEIN IS HERE AND HE CAN CORRECT ME IF I'M WRONG.

21                 THE COURT:  I'M SORRY.  YOU'RE SAYING WE ADMITTED

22     INADMISSIBLE DOCUMENTS DURING MR. LASINSKI'S TESTIMONY?  WHAT

23     EXHIBIT WAS THAT?

24                 MR. EVEN:  I'M SAYING -- I DON'T HAVE THE NUMBER WITH

25     ME, BUT I DO BELIEVE THAT YOUR HONOR SUGGESTED AT THE TIME, AND

1    I THINK BOTH PARTIES SAID THAT IT'S FINE TO ADMIT IT FOR THE

2    LIMITED PURPOSE OF SHOWING WHAT IS THE DOCUMENT THAT THE EXPERT

3    RELIED UPON.

4         THE COURT:  AND WHAT WAS THE NUMBER FOR THAT?

5         MR. EVEN:  WE'LL TRY AND FIND THAT OUT.

6         MR. MATHESON:  YOUR HONOR, I DON'T WANT TO WASTE

7    TIME.  THE ONE WE LIMITED WITH MR. LASINSKI WAS ADMITTED FOR A

8    SPECIFIC PURPOSE, WHICH WAS TO DEMONSTRATE THAT THE STUDIES ON

9    WHICH HE RELIED WERE THE SAME STUDIES THAT QUALCOMM HAD ITSELF

10   STUDIED OF OTHER PARTIES, AND IT WAS A STATEMENT OF A PARTY

11   OPPONENT.  WE DID NOT SEEK TO ADMIT IT FOR THE TRUTH.

12        BUT IF WE'RE NOT GOING TO ADMIT IT NOT FOR THE TRUTH, I

13   SUPPOSE WE CAN MOVE PAST IT.  I WANT IT TO BE CLEAR THIS IS

14   HEARSAY, SHE SHOULD NOT READ IT INTO THE RECORD.  BUT I WILL

15   WITHDRAW THE OBJECTION, YOUR HONOR.

16        MR. EVEN:  I'M HAPPY TO MOVE ON, YOUR HONOR.

17        THE COURT:  ALL RIGHT.  WHY DON'T YOU MOVE ON.  I'M

18   NOT GOING TO ADMIT THIS DOCUMENT.

19        GO AHEAD, PLEASE.

20        MR. EVEN:  OKAY.

21   Q.   DR. CHIPTY, CAN YOU JUST EXPLAIN HOW THIS DOCUMENT IS

22   RELEVANT TO YOUR OPINION ABOUT ENTRY IN CHINA?

23   A.   SURE.  I CAN DO THAT, I THINK, VERY EASILY.

24        SO I ALREADY JUST DESCRIBED TO YOU THAT EMPIRICALLY WHAT I

25   SEE IS AN INCREASE IN THE PERCENT OF PHONES SOLD IN CHINA THAT

1    ARE CDMA.  SO I WAS LOOKING AT THE RECORD FOR EVIDENCE, AND I

2    HAVE ADDITIONAL EVIDENCE THAT I RELIED ON, SOME OF WHICH I'M

3    PREPARED TO SHARE TODAY.

4         BUT IN THIS PARTICULAR INSTANCE, I FOUND IT INSTRUCTIVE

5    THAT THERE WAS AN INTERNAL MEMORANDUM AT SAMSUNG DISCUSSING

6    EXACTLY THE STRATEGY TO ENTER CDMA, AND I FOUND THAT TO BE

7    RELEVANT.

8         AND WHEN I LOOK AT THIS DOCUMENT, I SEE THE ECONOMICS THAT

9    I WOULD HAVE EXPECTED PLAYING OUT BECAUSE THE RECOGNITION THAT,

10   IN FACT, DEMAND IN CHINA FOR CDMA IS INCREASING, THAT WAS

11   CONSISTENT WITH WHAT I SAW EMPIRICALLY.

12        I ALSO SAW THAT SAMSUNG HAD RECOGNIZED THAT ITS

13   COMPETITORS WERE PUTTING INTO PLAN STRATEGIES TO MEET THAT

14   CHINA MARKET DEMAND.

15        AND THEN FINALLY, I SEE IN THIS PIECE OF EVIDENCE, AS WELL

16   AS OTHERS, THAT, IN FACT, SAMSUNG ITSELF IS GEARING UP TO ENTER

17   CDMA TO MEET THE CHINA DEMAND.

18   Q.   WHAT DO YOU LEARN FROM ALL THIS ABOUT ENTRY, ABOUT ENTRY

19    INTO THE CDMA MARKET?

20   A.   WELL, I SEE THAT RAPID ENTRY IS POSSIBLE.  NOT ONLY IS IT

21    POSSIBLE, IT ACTUALLY HAPPENED.

22        I SEE THE DIFFERENT WAYS IN WHICH COMPETITORS ENTERED.

23   FOR EXAMPLE, I SEE THAT INTEL BOUGHT VIA FOR A FRACTION OF WHAT

24   IT SPENDS ANNUALLY ON CHIP DEVELOPMENT.

25        I SEE THAT MEDIATEK PURCHASED DESIGN FOR CDMA FROM VIA.

```
 1          AND I ALSO SEE THAT SAMSUNG AND HUAWEI ENTERED WITH THEIR

 2   OWN INTERNAL SOLUTION WITHIN TWO YEARS OF THE CHINA

 3   ANNOUNCEMENT.

 4   Q.   AND WHAT DOES THIS TEACH YOU ABOUT, OR WHAT CONCLUSIONS DO

 5   YOU DRAW FROM THAT, ABOUT THE LEVEL OF QUALCOMM'S MARKET POWER

 6   IN CDMA PRIOR TO 2015?

 7   A.   WELL, I DRAW -- I DRAW TWO DIFFERENT RELATED CONCLUSIONS.

 8   THE FIRST IS THAT PRIOR TO 2015, QUALCOMM WAS DISCIPLINED BY

 9   THE THREAT OF ENTRY.  IN SOME SENSE, ITS POWER WAS CONSTRAINED

10   BY THE THREAT OF ENTRY IN CDMA, THOUGH THERE WAS NOT ACTUALLY

11   ENTRY UNTIL 2015.

12          AND I ALSO -- I ALSO CONCLUDE FROM THIS THAT, IN FACT, THE

13   REASON THERE WAS NO ENTRY PRIOR TO 2015 WAS BECAUSE OF THE

14   DECLINE OR THE STAGNATION, IF YOU WILL, IN DEMAND FOR CDMA.

15          AND, IN FACT, THE REASON FOR A LACK OF ENTRY PRIOR TO 2015

16   WAS NOT THE BARRIERS TO ENTRY THAT PROFESSOR SHAPIRO DESCRIBES.

17   Q.   PUTTING ASIDE THE THREAT OF ENTRY, WERE THERE OTHER WAYS

18   THAT QUALCOMM'S MARKET POWER IN CDMA WAS CONSTRAINED?

19   A.   YES.  THERE'S ALSO THE FACT THAT QUALCOMM'S LARGE BUYERS

20   PURCHASED MORE THAN CDMA.  IN FACT, MANY OF QUALCOMM'S

21   CUSTOMERS PURCHASED WCDMA CHIPS, WHICH THEY THEN USED AS PART

22   OF A LARGER NEGOTIATION STRATEGY TO DISCIPLINE QUALCOMM'S CDMA

23   PRICES.

24   Q.   SO IF YOU TURN TO TAB 5, AND SLIDE 9, THIS IS A SLIDE

25   PREPARED BY PROFESSOR SHAPIRO.
```

```
 1            WHAT DOES THIS SLIDE SHOW YOU --

 2       A.   WELL, THIS IS --

 3       Q.   -- ABOUT THE ABILITY OF LARGE BUYERS TO CONSTRAIN

 4   QUALCOMM?

 5       A.   SO THIS IS FIGURE 6 FROM PROFESSOR SHAPIRO'S REBUTTAL

 6   REPORT, AND WHAT IT'S DESCRIBING IS THE LEVEL AND THE

 7   COMPOSITION OF HANDSETS SOLD WORLDWIDE, AND IT'S DESCRIBING THE

 8   COMPETITION BETWEEN CDMA AND NON-CDMA.  OF COURSE, WCDMA IS

 9   INCLUDED IN NON-CDMA.

10            AND WHAT YOU SEE IS THAT THE BULK OF PURCHASES, OR

11   HANDSETS, IN THE WORLD ARE OF NON-CDMA HANDSETS, AND THAT CDMA

12   CONSTITUTES A RELATIVELY STABLE NICHE MARKET.

13       Q.   AND HAVE YOU SEEN EVIDENCE OF THIS ABILITY TO LEVERAGE

14   NON-CDMA TO CONSTRAIN CDMA PRICES PLAY OUT IN THE EVIDENCE?

15       A.   YES, I HAVE.  IN FACT, I'VE LOOKED BOTH FOR EVIDENCE IN

16   THE RECORD THAT QUALCOMM'S BUYERS USE THEIR PURCHASES OF

17   NON-CDMA CHIPS TO CONSTRAIN CDMA, AND I'VE ALSO EVALUATED FOR

18   EACH OF QUALCOMM'S LARGE CUSTOMERS, FOR NINE OF THEIR TOP TEN,

19   APPLE BEING THE TENTH AND WE'LL DISCUSS APPLE SEPARATELY, BUT

20   I'VE LOOKED AT EVIDENCE AS TO WHETHER QUALCOMM'S BIG CUSTOMERS

21   ACTUALLY HAVE SIGNIFICANT PURCHASES OF NON-CDMA TO ENGAGE IN

22   THIS TYPE OF STRATEGY.

23            AND I -- SO THIS IS WHAT I EXPLORED, AND I FOUND EVIDENCE

24   TO SUPPORT THE THEORY.

25       Q.   LET'S MOVE ON TO THE APPLE AGREEMENTS.
```

CHIPTY DIRECT BY MR. EVEN

1          AND IF YOU'LL GO TO SLIDE 14, WHICH DESCRIBES THE APPLE

2     AGREEMENTS AT ISSUE.

3          BEFORE WE GO INTO THIS SLIDE, AT A HIGH LEVEL, WHAT

4     CONCLUSIONS HAVE YOU REACHED REGARDING THE APPLE AGREEMENTS?

5     A.   SO IT'S MY OPINION THAT THE APPLE AGREEMENTS HAD

6     LEGITIMATE BUSINESS JUSTIFICATIONS, AND ALSO THAT THEY DID NOT

7     CONSTITUTE ANTICOMPETITIVE EXCLUSIVE CONTRACTS.

8     Q.   TURNING TO THE SLIDE -- AND THIS SLIDE HAS BEEN SEALED,

9     YOUR HONOR -- CAN YOU BRIEFLY EXPLAIN TO THE COURT HOW THE

10    PAYMENTS UNDER THE AMENDED TRANSITION AGREEMENTS WORKED?

11    A.   SURE.  THE AMENDED TRANSITION AGREEMENT IS DESCRIBED IN

12    THE MIDDLE PANEL OF THIS SLIDE, AND WHAT YOU CAN SEE IS THAT,

13    IN FACT, THERE WERE TWO PAYMENT STREAMS.  ONE IS CALLED THE

14    MARKETING FUND, AND ONE IS CALLED THE VARIABLE INCENTIVE FUND.

15         THE PAYMENTS UNDER THIS AGREEMENT BEGAN TO ACCRUE FROM

16    QUALCOMM TO APPLE BEGINNING IN JANUARY 2013, AND THE PAYMENTS

17    CONTINUED UNTIL THE END OF 2016.

18         YOU CAN SEE JUST FROM THE, THE NUMBERS AND THE WAY THEY

19    APPEAR THAT THE MARKETING FUND WAS TIED TO A FORMULA.  IN FACT,

20    IT WAS TIED TO THE SALE OF CHIPS, INCLUDING CHIPS USED IN

21    LEGACY DEVICES.

22         AND THE VARIABLE INCENTIVE FUND WAS PRESENTED AS A LUMP

23    SUM, WHICH IS WHY IT SHOWS UP IN THESE ROUND NUMBERS.

24    Q.   HOW WOULD YOU CHARACTERIZE THIS AGREEMENT?

25    A.   I HAVE DESCRIBED THESE AGREEMENTS AS INCENTIVE AGREEMENTS

1    BECAUSE THESE PAYMENTS WERE MADE TO INCENT APPLE TO BRING TO

2    QUALCOMM THE BUSINESS FOR ITS 2014, 2015, AND 2016 SOCKETS.

3    Q.    TURNING TO YOUR CONCLUSIONS, WHAT WERE THE BUSINESS

4    JUSTIFICATIONS FOR THE STRUCTURE OF THE ATA, AMENDED TRANSITION

5    AGREEMENT?

6    A.    SO I HAVE REVIEWED THE EVIDENCE I'VE DESCRIBED.  THE

7    BUSINESS JUSTIFICATIONS FALL INTO TWO BROAD CATEGORIES.

8         THE FIRST HAS TO DO WITH THE FACT THAT APPLE DEMANDED, AND

9    QUALCOMM AGREED TO PAY, LARGE SUMS UPFRONT IN ADVANCE OF

10   RECEIVING THE SOCKETS THAT THESE PAYMENTS WERE DESIGNED TO WIN,

11   THE '14, '15, AND '16 SOCKETS.  I THINK THAT PRESENTED A

12   BUSINESS RISK.

13        AND, SECOND, THE FACT IS THAT APPLE BUYS THIN MODEMS, AND

14   IN ORDER FOR QUALCOMM TO SERVE APPLE'S DEMAND, IT WOULD HAVE

15   HAD TO, AND IN FACT IT DID, ENGAGE IN SIGNIFICANTLY MORE R&D

16   AND DEVELOPMENT OF THIN MODEMS THAN IT WOULD HAVE OTHERWISE.

17   Q.    SO LET'S TAKE THOSE QUICKLY ONE AT A TIME.

18        FIRST OF ALL, IF YOU CAN LOOK AT THE SLIDE AND EXPLAIN WHY

19   YOU BELIEVE THAT QUALCOMM FACED A BUSINESS RISK OF HAVING

20   PAYMENTS THAT ARE FRONT LOADED?

21   A.    SURE.  I THINK YOU CAN SEE THE FRONT LOADED NATURE OF THIS

22   STRUCTURE BY LOOKING AT THE FIRST OF THE TWO COLUMNS, THE

23   MARKETING FUND COLUMN.

24        LIKE I SAID, THE PAYMENTS BEGAN TO ACCRUE IN JANUARY OF

25   2013.  BUT THE PAYMENTS WERE DESIGNED TO INCENT SALES FOR '14,

1    '15, AND '16 SOCKETS.

2         SO BY THE TIME JANUARY 1ST CAME AROUND, APPLE BEGAN TO

3    ACCRUE, AND, IN FACT, THE FIRST NUMBER IN THAT MARKETING FUND

4    COLUMN DESCRIBES THE MONIES THAT WERE OWED BY QUALCOMM TO APPLE

5    UNDER THE TERMS OF THE AGREEMENT, AND YET, AT THAT TIME

6    QUALCOMM WOULD NOT HAVE KNOWN AND DID NOT KNOW WHETHER OR NOT

7    IT WOULD HAVE WON THE 2014 SOCKETS.

8         BY THE TIME 2013 AND 2014 ARE OVER, QUALCOMM'S PAID TO

9    APPLE, OR OWES APPLE, IT HAS ACCRUED TO APPLE, SUBSTANTIALLY

10   LARGER SUM IN TOTAL.  AND, IN FACT, AT THE TIME THESE PAYMENTS

11   HAD ALREADY ACCRUED, QUALCOMM WOULD NOT HAVE KNOWN WHETHER AND

12   IF IT WOULD WIN THE '15 SOCKETS WHICH, AGAIN, THE MONIES WERE

13   DESIGNED TO INCENT.

14   Q.   TURNING TO THE SECOND BUSINESS RISK YOU MENTIONED, AND IF

15   YOU CAN TURN TO SLIDE 15, AND HOW DOES THIS SLIDE INFORM YOUR

16   ASSESSMENT ABOUT THE BUSINESS RISK RELATED TO INVESTMENT IN

17   APPLE CHIPS?

18   A.   WELL, AS I SAID, APPLE BUYS THIN MODEMS FROM QUALCOMM.

19   AND SO WHAT THIS SLIDE DESCRIBES IS THE, IS THE PURCHASING OF

20   CHIPS BY QUALCOMM'S HANDSET OEM'S OVER TIME FROM 2010 TO 2017.

21        SO IT SHOWS YOU BY CUSTOMER WHAT THEY'RE BUYING FROM

22   QUALCOMM, AND THE GREEN IS DESCRIBING SOC'S, AND THE ORANGE IS

23   DESCRIBING THIN MODEMS.  AND AS I SAID, UNLIKE OTHER OEM'S,

24   APPLE BUYS THIN MODEMS.

25        AND, IN FACT, QUALCOMM'S SALES OF THIN MODEMS ARE HIGHLY

1    CONCENTRATED IN APPLE.

2    Q.   TURNING TO THE COMPETITIVE EFFECTS OF THE ATA.  IN YOUR

3    VIEW, DID QUALCOMM SACRIFICE PROFITS UNDER THE ATA?

4    A.   NO, I DON'T THINK QUALCOMM SACRIFICED PROFITS.

5    Q.   SO IF YOU TURN TO TAB 6, THAT'S JX 0086 AT DASH 007 -- AND

6    THIS SLIDE HAS BEEN -- THIS DOCUMENT HAS BEEN PREVIOUSLY

7    SEALED, YOUR HONOR.

8         THIS SLIDE WAS SHOWN TO PROFESSOR SHAPIRO.

9         CAN YOU EXPLAIN WHY PROFESSOR SHAPIRO CONCLUDED THAT

10   QUALCOMM DID SACRIFICE PROFITS?

11   A.   YES.  WHAT THIS SLIDE SHOWS YOU IS AN INTERNAL QUALCOMM

12   CALCULATION VALUING THE ATA.  IN FACT, IT'S VALUING WHAT IT'S

13   CALLING THE MAVERICK DEAL.

14        AND WHAT IT COMPARES THE VALUE OF THE DEAL TO IS WHAT

15   THEY'RE CALLING THE NO DEAL SCENARIO.

16        AND IF YOU LOOK, BY QUALCOMM'S OWN CALCULATION, WHAT IT

17   DID TO ASSESS THE PROFITABILITY OF THE DEAL WAS TO COMPARE THE

18   INCENTIVES THAT IT WOULD PAY TO APPLE UNDER THE DEAL TO ALL OF

19   THE MARGINS THAT WOULD -- THAT IT WOULD EARN ACROSS THE FOUR

20   YEARS OF THE AGREEMENT, OR AT LEAST FOR THE ATA, BUT THIS IS A

21   LONGER PERIOD, IT'S LOOKING AT BOTH DEALS.

22        IT COMPARED THE INCENTIVE PAYMENTS TO THE MARGINS AT PLAY,

23   AND WHAT IT FOUND IS THAT, IN FACT, THE DEAL WAS PROFITABLE.

24        YOU CAN SEE HOW PROFITABLE BY LOOKING AT THE NUMBER IN THE

25   DIRECT MARGIN ROW IN THE TOTALS COLUMN.  SO THAT'S, THAT'S WHAT

1    QUALCOMM THOUGHT THE DEAL WOULD BE WORTH BASED ON ITS PROFIT

2    ANALYSIS.

3         AND CONTRAST THAT WITH WHAT QUALCOMM THOUGHT THEY WOULD

4    EARN FROM THE APPLE RELATIONSHIP WITHOUT THE DEAL.

5         NOW, WITHOUT THE DEAL, THEY WOULD STILL MAKE SOME SALES,

6    BUT THEY WOULD MAKE FEWER SALES.  SO YOU CAN SEE THE DIRECT

7    MARGINS IN THE NO DEAL SCENARIO, ALSO A BIG NUMBER, BUT

8    NONETHELESS, A SUBSTANTIALLY SMALLER NUMBER THAN THE DEAL

9    SCENARIO.

10        SO THIS IS WHAT QUALCOMM THOUGHT.  QUALCOMM THOUGHT THAT

11   THE DEAL WAS PROFITABLE.

12        NOW, WHAT PROFESSOR SHAPIRO DOES, BY LOOKING AT THIS SAME

13   SET OF FACTS, IS HE DOES HIS OWN PROFIT MATH.  AND WHAT HE DOES

14   IS HE COMPARES THE -- OR HE SIDE BY SIDES, HE DOES, IN HIS

15   PROFIT ANALYSIS, HE LOADS FOUR YEARS OF INCENTIVE PAYMENTS THAT

16   WERE DESIGNED TO WIN PRODUCT OVER MULTIPLE YEARS AGAINST A

17   HANDFUL OF APPLE PRODUCTS.  IN FACT, HE PUTS FOUR YEARS OF

18   PAYMENTS AGAINST MARGINS EARNED ON JUST THE APPLE IPADS.

19   Q.   AND WHY WOULD AN ANTITRUST ECONOMIST LOAD FOUR YEARS OF

20   INCENTIVES PAID ON MULTIPLE PRODUCTS ONTO THE FOUR IPADS AT

21   ISSUE, OR FIVE IPADS?

22   A.   WELL, THE QUESTION BECOMES -- ONE WOULD DO THAT, AN

23   ANTITRUST ECONOMIST WOULD DO THAT IF ONE WERE TO THINK THAT IT

24   WAS ONLY THOSE PRODUCTS THAT WERE CONTESTABLE.

25   Q.   AND WHAT DO YOU MEAN BY "CONTESTABLE"?

1      A.   SO WHAT I MEAN BY CONTESTABLE IN THIS CASE ARE THE

2      PRODUCTS THAT QUALCOMM THOUGHT THAT INTEL MIGHT WIN AT THE TIME

3      FROM THE PERSPECTIVE OF SORT OF THE EVE OF THE NEGOTIATION, OR

4      THE SIGNING OF THE AGREEMENT ITSELF.

5      Q.   HAVE YOU RUN A PROFIT SACRIFICE TEST OF YOUR OWN?

6      A.   YES, I HAVE.

7      Q.   AND HOW DID YOU GO ABOUT IT?

8      A.   WELL, I WENT ABOUT IT IN THE SPIRIT, IN A VERY SIMILAR

9      WAY.  I DID MY OWN PROFIT MATH.  I COMPARED THE FOUR YEARS OF

10     INCENTIVE PAYMENTS AGAINST THE MARGINS THAT QUALCOMM EXPECTED

11     TO WIN, OR HOPED TO WIN BECAUSE OF THE TERMS THE AGREEMENT,

12     IN THE FACE OF THE COMPETITION IT FACED AT THE TIME.

13          SO IN MANY WAYS IT'S VERY SIMILAR TO PROFESSOR SHAPIRO'S.

14     THE DIFFERENCE IN OUR ANALYSES REALLY HINGES ON WHAT'S

15     CONTESTABLE.

16     Q.   AND WHAT IN YOUR VIEW IS CONTESTABLE HERE?

17     A.   SO IN MY VIEW, THERE WAS MORE THAN IPAD VOLUME AT PLAY.

18     IN MY VIEW, THE IPHONES, SEVERAL OF THE IPHONES WERE ALSO

19     CONTESTABLE.

20          SO I GO THROUGH THEM ONE AT A TIME.  THE FACT IS THAT MOST

21     OF THE IPADS IN 2014 AND MOST OF THE IPHONES IN 2014 WERE

22     CONTESTABLE, AND I SAY THIS BECAUSE THERE'S EVIDENCE IN THE

23     RECORD THAT QUALCOMM THOUGHT THAT INTEL WAS PREPARED TO COMPETE

24     FOR THE MAV 10 LOW, AND THAT'S WHAT ACCOUNTS FOR MOST OF THE

25     2014 SOCKETS.

1    Q.   SO CAN YOU SHOW US, PLEASE, WHERE ON THIS SLIDE THAT YOU

2    SAID WAS PRESENTED TO THE BOARD, YOU CAN SEE THAT QUALCOMM

3    BELIEVED THAT INTEL COULD WIN LARGER VOLUMES THAN JUST THE

4    IPAD?

5    A.   YEAH.

6              MR. MATHESON:  OBJECTION.  LEADING, YOUR HONOR.

7              THE COURT:  SUSTAINED.

8    BY MR. EVEN:

9    Q.   YOU'VE MENTIONED YOUR CONCLUSION OF CONTESTABILITY.  CAN

10   YOU SHOW US WHAT ON THIS SLIDE, IF ANYTHING, SUPPORTS THAT

11   CONCLUSION?

12   A.   YES.  I THINK THERE ARE A NUMBER OF SORT OF SUPPORTING

13   PIECES OF FACTS ON THESE SLIDES TO SUPPORT MY OPINIONS ON

14   CONTESTABILITY FOR 2014, BUT ALSO FOR '15 AND '16.

15        SO I JUST DESCRIBED TO YOU SOME QUALITATIVE EVIDENCE ON

16   THE MAV 10 LOW, AND I THINK YOU CAN SEE THAT DIRECTLY ON THIS,

17   ON THIS SLIDE THAT DESCRIBES THESE INTERNAL QUALCOMM

18   CALCULATIONS.

19        SO FOR 2014, I FOUND IT INSTRUCTIVE TO LOOK AT THE TOTAL

20   UNITS ROW IN THE FISCAL YEAR 2014 COLUMN.

21        IF YOU LOOK AT THE DEAL SCENARIO, YOU SEE EXACTLY HOW MANY

22   UNITS QUALCOMM EXPECTED IT WOULD WIN UNDER THE DEAL.

23        AND THEN YOU CAN CONTRAST THAT WITH THE NUMBER OF UNITS IT

24   THOUGHT IT WOULD WIN WITH NO DEAL.

25        SO SAME 2014, 2014 COMPARISON, DEAL, NO DEAL.

1           THE DIFFERENCE IS QUITE SIGNIFICANT, AND THAT DIFFERENCE

2      CANNOT BE ACCOUNTED FOR BY IPADS ALONE.  THAT'S IPHONE VOLUME

3      THEY THOUGHT THEY WOULD LOSE IN 2014.

4      Q.   HAVE YOU SEEN ANY EVIDENCE THAT LED YOU TO -- OR THAT LED

5      SUPPORT TO THE NOTION THAT ONLY IPADS WERE CONTESTABLE?

6      A.   NO.  I'VE SEEN SIGNIFICANT EVIDENCE THAT, IN FACT, IPHONES

7      WERE AT RISK.  QUALCOMM FEARED THAT IF THEY GAVE THE INCENTIVE

8      PAYMENTS, THEY BELIEVED THAT, IN FACT, INTEL HAD A GOOD SHOT AT

9      WINNING IPHONE VOLUME.

10     Q.   WHAT WERE THE RESULTS OF YOUR PROFIT SACRIFICE TEST?

11     A.   I FOUND THAT GIVEN THE SET OF CONTESTABLE PRODUCTS THAT

12     I'VE LAID OUT IN MY REPORT, THAT, IN FACT, THE AMENDED

13     TRANSITION AGREEMENT DID NOT REQUIRE PROFIT SACRIFICE.

14     Q.   AND WHAT DOES THAT MEAN, THAT IT DID NOT REQUIRE PROFIT

15     SACRIFICE?

16     A.   WELL, WHAT I MEAN BY THAT TERM IS THAT AN EQUALLY

17     EFFICIENT RIVAL, THAT IS, A FIRM THAT HAD THE COST STRUCTURE

18     AND THE CAPABILITY OF QUALCOMM, WOULD BE ABLE TO COME IN AND

19     COMPETE FOR APPLE'S BUSINESS UNDER THE SAME TERMS OF THE

20     AMENDED TRANSITION AGREEMENT.  THEY WOULD -- THAT AN EQUALLY

21     EFFICIENT RIVAL, I SHOULD SAY, WOULD FIND IT PROFITABLE TO DO

22     SO.

23     Q.   CAN YOU EXPLAIN WHY YOU'RE FOCUSSING ON WHAT QUALCOMM

24     BELIEVED IS CONTESTABLE BACK IN 2013 AND NOT WHAT WE KNOW TODAY

25     THAT INTEL COULD OR COULD NOT HAVE WON?

1    A.   YES.  I FOCUSSED ON WHAT I CALL THE EXPECTATIONS ON THE

2    EVE OF THE AGREEMENT BECAUSE THAT'S THE RELEVANT TIMEFRAME.

3    ALTHOUGH THE WAY ECONOMISTS GO ABOUT THINKING ABOUT

4    CONTESTABILITY IS FROM THE PERSPECTIVE OF WHAT WAS EXPECTED

5    WHEN THE DEAL TERMS WERE DESIGNED, NOT WHAT ACTUALLY HAPPENED,

6    BECAUSE SOMETIMES WHAT ACTUALLY HAPPENS, IT HAS NOTHING TO DO

7    WITH WHAT WAS KNOWN AND KNOWABLE AT THE TIME.

8    Q.   WHAT PORTION OF MARKET WAS FORECLOSED IN ORDER TO ACCEPT

9    PROFESSOR SHAPIRO'S CLAIM THAT ONLY IPADS WERE CONTESTABLE?

10   A.   WELL, THE APPLE IPADS ACCOUNT FOR ABOUT 5 PERCENT OF APPLE

11   VOLUME, SO THAT WOULD BE ABOUT 5 PERCENT MEASURED THAT WAY.

12   BUT THE APPLE IPADS CONSTITUTED A MUCH SMALLER SHARE OF SOCKETS

13   IN PROFESSOR SHAPIRO'S LARGER MARKET.

14   Q.   THANK YOU.  IF WE CAN TURN TO SLIDE 17.

15        AND, DR. CHIPTY, CAN YOU BRIEFLY EXPLAIN THE SUMMARY OF

16   YOUR CONCLUSIONS?

17   A.   SURE.  AS I HAVE DESCRIBED ALONG THE WAY, I'VE REACHED A

18   SERIES OF RELATED CONCLUSIONS.

19        THE FIRST OF THESE IS THAT THE MODEM CHIP INDUSTRY IS

20   CHARACTERIZED BY DYNAMIC COMPETITION.

21        IT'S MY VIEW THAT PROFESSOR SHAPIRO HAS NOT APPROPRIATELY

22   INCORPORATED THIS FACT INTO HIS ANALYSIS OF MARKET DEFINITION

23   OR MARKET POWER.

24        AS A RESULT, HE'S FAILED TO ESTABLISH HIS PREMIUM LTE

25   MARKET.

CHIPTY DIRECT BY MR. EVEN

1              IN MY VIEW, PROFESSOR SHAPIRO HAS OVERSTATED QUALCOMM'S

2     MARKET POWER.  I, IN FACT, DON'T THINK THE EVIDENCE SUPPORTS A

3     CONCLUSION THAT IT HAS SUSTAINED MARKET POWER SUFFICIENT FOR

4     QUALCOMM TO HAVE ENGAGED IN THE ALLEGED CONDUCT.

5              IT'S ALSO MY VIEW THAT THE APPLE AGREEMENTS WERE SUPPORTED

6     BY LEGITIMATE BUSINESS JUSTIFICATIONS AND THAT THEY ARE NOT

7     ANTICOMPETITIVE EXCLUSIVE CONTRACTS.

8                  MR. EVEN:  THANK YOU.  NO FURTHER QUESTIONS.

9                  THE COURT:  OKAY.  TIME IS 2:10.

10             WE NORMALLY TAKE OUR BREAK AT 2:15, BUT WHY DON'T WE GO

11    FOR TEN MINUTES, AND WE'LL TAKE A BREAK FROM 2:20 TO 2:30.

12    OKAY?

13                 MR. MATHESON:  THANK YOU, YOUR HONOR.

14                 THE COURT:  GO AHEAD, PLEASE -- OR TELL ME WHEN

15     YOU'RE READY.

16             (PAUSE IN PROCEEDINGS.)

17                 MR. MATHESON:  MAY HE APPROACH, YOUR HONOR?

18                 THE COURT:  YES, PLEASE.

19                 MR. MATHESON:  WITNESS BINDER, DEPOSITION, AND HER

20    EXPERT REPORT AS WELL IN SEPARATE BINDERS (HANDING).  I'M READY

21    ANY TIME, YOUR HONOR.

22                 THE COURT:  ALL RIGHT.  2:11.  GO AHEAD, PLEASE.

23     / / /

24     / / /

25     / / /

1                           **CROSS-EXAMINATION**

2       BY MR. MATHESON:

3       Q.   DR. CHIPTY, YOU WERE NOT ASKED TO OPINE ON QUALCOMM'S

4       LICENSING CONDUCT; IS THAT RIGHT?

5       A.   THAT'S CORRECT.  I -- AND I HAVE NOT, EXCEPT TO THE EXTENT

6       THE CHIP INDUSTRY TOUCHES SOME OF THE LICENSING ISSUES.

7       Q.   WELL, YOU WERE ASKED THE QUESTION AT YOUR DEPOSITION, SO

8       YOU WERE NOT ASKED TO OPINE ON QUALCOMM'S LICENSING CONDUCT; IS

9       THAT CORRECT?

10           AND YOUR RESPONSE WAS, THAT'S CORRECT.

11           RIGHT?

12      A.   THAT IS CORRECT.

13      Q.   THANK YOU.

14      A.   AND I GAVE THE SAME ANSWER BEFORE.

15      Q.   YOU ARE NOT OFFERING ANY OPINION REGARDING WHETHER

16      QUALCOMM'S REFUSAL TO LICENSE COMPETITORS HAS IMPACTED THOSE

17      COMPETITORS' ABILITY TO SELL MODEM CHIPS; CORRECT?

18      A.   AGAIN, SAME ANSWER.  YES, TO THE EXTENT I HAVE STUDIED HOW

19      COMPETITION HAS PLAYED OUT IN GENERAL.

20      Q.   BUT YOU HAVE NOT CONDUCTED ANY ANALYSIS REGARDING WHETHER

21      QUALCOMM'S REFUSAL TO LICENSE COMPETITORS SPECIFICALLY HAS

22      IMPACTED THOSE COMPETITORS' ABILITY TO SELL MODEM CHIPS; RIGHT?

23      A.   THAT'S CORRECT.

24      Q.   YOU DID NOT DO ANY ANALYSIS OF QUALCOMM'S NO LICENSE, NO

25      CHIPS POLICIES IMPACT ON OEM'S; RIGHT?

1    A.   WELL, AGAIN, EXCEPT -- WITH THE EXCEPTION THAT I HAVE

2    STUDIED EXTENSIVELY HOW COMPETITION HAS PLAYED OUT IN THE CHIP

3    MARKET.

4    Q.   NOW, YOU WOULD AGREE THAT A FIRM CAN HAVE MARKET POWER,

5    WHETHER THAT POWER WAS ACQUIRED THROUGH ANTICOMPETITIVE MEANS

6    OR PROCEED COMPETITIVE MEANS; RIGHT?

7    A.   YES, I DO.  I AGREE WITH THAT.

8    Q.   AND YOU WOULD AGREE THAT ONCE A FIRM HAS MARKET POWER, THE

9    ASSESSMENT OF THE COMPETITIVE EFFECTS OF THAT FIRM'S CONDUCT

10   DOESN'T DEPEND ON WHETHER THAT FIRM'S MARKET POWER WAS

11   INITIALLY ACQUIRED THROUGH ANTICOMPETITIVE MEANS OR

12   PROCOMPETITIVE MEANS; RIGHT?

13   A.   THAT'S CORRECT.  THAT'S CORRECT.  I WOULD SAY THE QUESTION

14   IS, DO THEY HAVE SUFFICIENT POWER.  BUT OTHERWISE I AGREE WITH

15   YOU.

16   Q.   NOW, YOU WOULD AGREE THAT THERE HAVE BEEN INSTANCES IN

17   WHICH QUALCOMM HAD SOME DEGREE OF WHAT YOU HAVE REFERRED TO AS

18   EARNED MARKET POWER; IS THAT RIGHT?

19   A.   YES, YES.  I AGREE.  I THINK FROM TIME TO TIME QUALCOMM

20   WAS FIRST TO MARKET, SO IT DID.

21   Q.   THEY WERE FIRST TO MARKET IN CDMA CAPABLE CHIPSETS?

22   A.   YES.

23   Q.   THEY WERE ALSO FIRST TO MARKET WITH LTE CHIPSETS AT SOME

24   POINT; RIGHT?

25   A.   YES, I BELIEVE SO.

CHIPTY CROSS BY MR. MATHESON

1    Q.   AND YOU WOULD AGREE THAT THEY HAD SOME DEGREE OF EARNED

2    MARKET POWER IN LTE CHIPS AT VARIOUS POINTS IN TIME; RIGHT?

3    A.   YES.  I AGREE WITH THAT.  BUT, AGAIN, I -- MY QUESTION IS

4    NOT WHETHER THEY HAD POWER, BUT WHETHER THEY HAD SUFFICIENT

5    POWER FOR THE PURPOSES AT HAND.

6    Q.   NOW, YOU WOULD AGREE WITH DR. SHAPIRO THAT THE

7    HYPOTHETICAL MONOPOLIST TEST IS AN APPROPRIATE METHOD FOR

8    IDENTIFYING A RELEVANT PRODUCT MARKET; RIGHT?

9    A.   YES, I DO BELIEVE THAT THE HYPOTHETICAL MONOPOLIST TEST SO

10   REASONABLE FRAMEWORK WITHIN WHICH TO GO ABOUT DEFINING A

11   MARKET.

12   Q.   AND YOU DID NOT RUN ANY FORMAL IMPLEMENTATION OF THE

13   HYPOTHETICAL MONOPOLIST TEST ON WHAT YOU TESTIFIED EARLIER WERE

14   PREMIUM SOCKETS; RIGHT?

15   A.   SO I DID NOT RUN A FORMAL TEST.  HOWEVER, I DID LOOK AT

16   PROFESSOR SHAPIRO'S WORK AND ASSESS IT UNDER THE QUESTIONS THAT

17   WE WOULD ASK TO ASSESS THE VALIDITY OF AN ANTITRUST MARKET.

18   Q.   THANK YOU, DR. CHIPTY.  WE ARE ON A CLOCK.  I'D APPRECIATE

19   IT IF YOU'D FOCUS ON MY QUESTION.

20        MY QUESTION WAS, YOU DID NOT IMPLEMENT THE HYPOTHETICAL

21   MONOPOLIST TEST ON WHAT YOU REFER TO AS PREMIUM SOCKETS DURING

22   YOUR TESTIMONY EARLIER; IS THAT CORRECT?

23   A.   I DID NOT IMPLEMENT THAT TEST.  I'M USING THE TERM --

24   Q.   YOU SAID THAT APPLE, HUAWEI, AND SAMSUNG HAVE 90 PERCENT

25   OF THE PREMIUM SOCKETS DURING YOUR DIRECT EXAM; RIGHT?

1    A.   THAT'S CORRECT.

2    Q.   YOU DID NOT DISCLOSE ANY DEFINITION OF PREMIUM SOCKETS IN

3    YOUR EXPERT REPORT, DID YOU?

4    A.   WELL, IN MY EXPERT REPORT, I WAS EVALUATING

5    PROFESSOR SHAPIRO'S, AND IN THE DEMONSTRATIVE I WAS DESCRIBING

6    IT THE WAY MR. WYATT DID IN HIS TESTIMONY.

7    Q.   AND MY QUESTION AGAIN, DR. CHIPTY, WHICH I'D APPRECIATE IT

8    IF YOU'D ANSWER, YOU DID NOT DISCLOSE ANY DEFINITION OF PREMIUM

9    SOCKETS ANYWHERE IN YOUR EXPERT REPORT; ISN'T THAT RIGHT?

10   A.   I DID NOT DO AN AFFIRMATIVE DEFINITION, YOU'RE RIGHT.

11   Q.   YOU DID NOT ACTUALLY IMPLEMENT THE HYPOTHETICAL MONOPOLIST

12   TEST ON THE SALES DATA AVAILABLE TO YOU IN AN EFFORT TO

13   DETERMINE WHETHER MARKET POWER EXISTED IN WHAT YOU REFER TO AS

14   PREMIUM SOCKETS; RIGHT?

15   A.   I DID NOT TAKE ON AN AFFIRMATIVE EXERCISE OF THAT.

16   Q.   AND YOU DIDN'T IMPLEMENT THE HYPOTHETICAL MONOPOLIST TEST

17   ON THE SALES DATA AVAILABLE TO YOU IN AN EFFORT TO DETERMINE

18   WHETHER OR NOT A MARKET FOR CDMA CHIPSETS ACTUALLY EXISTS;

19   RIGHT?

20   A.   WELL, BECAUSE I DIDN'T THINK THAT WAS THE RIGHT WAY TO

21   ASSESS COMPETITIVE EFFECTS IN THIS MARKET LOOKING AT THE SALES

22   DATA.

23   Q.   OKAY.  SO THE ANSWER TO MY QUESTION IS, IS IT A TRUE

24   STATEMENT THAT YOU DID NOT ACTUALLY IMPLEMENT THE HYPOTHETICAL

25   MONOPOLIST TEST ON THE SALES DATA YOU HAD AVAILABLE IN ORDER TO

1    DETERMINE WHETHER A MARKET EXISTS FOR CDMA CHIPSETS; RIGHT?

2    A.   THAT'S CORRECT, FOR THE ZONES I'VE EXPLAINED.

3    Q.   AND, IN FACT, YOU'RE NOT OFFERING THE COURT ANY OPINION,

4    ONE WAY OR THE OTHER, AS TO WHETHER OR NOT THERE IS A MARKET

5    FOR CDMA CHIPSETS; IS THAT RIGHT?

6    A.   THAT'S CORRECT.

7    Q.   AND YOU'RE NOT OFFERING THE COURT ANY OPINION, ONE WAY OR

8    THE OTHER, AS TO WHETHER THERE IS A MARKET FOR PREMIUM LTE

9    CHIPSETS; RIGHT?

10   A.   WELL, WHAT I'VE SAID IS THAT I DON'T AGREE WITH

11   PROFESSOR SHAPIRO'S MARKET.  BUT I HAVE NOT OFFERED AN

12   AFFIRMATIVE ALTERNATIVE.

13   Q.   IN FACT, YOU AGREE THERE MAY BE A MARKET FOR PREMIUM LTE

14   CHIPSETS; RIGHT?

15   A.   THAT'S CORRECT.  NOTIONALLY.  I DON'T KNOW WHERE THE LINE

16   IS.  BUT I THINK IT'S BROADER THAN PROFESSOR SHAPIRO HAS DRAWN

17   IT.

18   Q.   NOW, YOU'VE SEEN RECORD EVIDENCE THAT QUALCOMM SOLD A VERY

19   HIGH PROPORTION OF ALL THE CDMA CAPABLE MODEM CHIPS THAT WERE

20   SOLD WORLDWIDE BETWEEN 2006 AND 2016; RIGHT?

21   A.   IT DID SELL A HIGH SHARE, THOUGH THE SHARE HAS BEEN

22   DECLINING OVER TIME.

23   Q.   OKAY.  WELL, YOU'VE SEEN BETWEEN 2006 AND 2016 EVIDENCE

24   THAT QUALCOMM SOLD 95 PERCENT OF THE CDMA CAPABLE MODEM

25   CHIPSETS SOLD DURING THAT PERIOD OF TIME; IS THAT RIGHT?

1     A.   I'M NOT SURE WHAT YOU'RE REFERRING TO.  I -- I'M NOT --

2     I'M NOT AWARE OF THAT NUMBER.

3     Q.   KEN, CAN WE GET DR. SHAPIRO'S EXPERT REPORT, NUMBER 13.

4          MR. KOTARSKI:  IS THIS ONE UNDER SEAL?  I'M NOT SURE.

5          MR. MATHESON:  THIS IS NOT UNDER SEAL AS FAR AS I

6     KNOW.  EXPERT REPORT, EXHIBIT 13.

7          MR. KOTARSKI:  I'M SORRY?

8          MR. MATHESON:  I THINK IT'S THE EXPERT REPORT,

9     EXHIBIT 13.  OH, DIFFERENT ONE.  WE CAN USE THAT ONE.

10    Q.   LET'S LOOK AT CDMA REVENUES AND SHARES THAT DR. SHAPIRO

11    PRESENTED.

12         THIS IS WHAT I HAD IN MIND.

13         SO THIS IS DR. SHAPIRO'S PRESENTATION CALLED MARKET SHARES

14    IN CDMA CAPABLE MODEM CHIPS BETWEEN 2006 AND 2016; RIGHT?

15    A.   IT'S ACTUALLY ONE OF HIS CALCULATIONS.  HIS OTHER ONE IS

16    QUITE DIFFERENT FROM THIS ONE.

17    Q.   THIS ONE IS BASED ON QUALCOMM'S OWN INTERNAL DATA; RIGHT?

18    A.   YES, IT IS.

19    Q.   NOW, HE ALSO CALCULATED QUALCOMM'S SHARE BETWEEN 2006 AND

20    2016 BY REVENUE; RIGHT?  AND THOSE NUMBERS ARE LOWER AS YOU

21    JUST REFERRED TO?

22    A.   THAT'S CORRECT.

23    Q.   OKAY.  SO QUALCOMM'S INTERNAL DATA SHOWS THAT IT HAD A

24    SHARE OF 92 PERCENT OR MORE IN EVERY YEAR BETWEEN 2006 AND

25    2016; RIGHT?

1        A.    THAT IS WHAT THIS DATA SHOWS.  BUT AS I'VE EXPLAINED,

2        THERE ARE SOME ISSUES WITH THE USE OF THESE DATA.

3        Q.    OKAY.  CAN WE HAVE SHAPIRO REPORT, FIGURE 27, WHICH I

4        THINK YOU PUT UP EARLIER, KEN, WITH THE REVENUE DATA.

5              NOW, LET'S FOCUS ON CALENDAR YEAR 2008.  THIS IS

6        DR. SHAPIRO'S PRESENTATION OF CDMA REVENUE AND SHARES BETWEEN

7        2008 AND 2016; RIGHT?

8        A.    THAT'S CORRECT.

9        Q.    YOU DID NOT RUN A CALCULATION YOURSELF OF CDMA REVENUES

10       AND SHARES AND DISCLOSE IT IN YOUR REPORT THAT'S DIFFERENT THAN

11       THIS; RIGHT?

12       A.    THAT'S CORRECT.

13       Q.    NOW, ARE YOU OFFERING THE OPINION THAT IN CALENDAR YEAR

14       2008, IF QUALCOMM HAD REFUSED TO SUPPLY MODEM CHIPS TO AN OEM

15       WHO WANTED TO MAKE A CDMA COMPLIANT HANDSET, THAT THAT OEM

16       COULD HAVE EASILY SOURCED ITS CDMA COMPLIANT CHIPS FROM A

17       SUPPLIER OTHER THAN QUALCOMM?

18       A.    NO.  NO, I'M NOT SAYING THAT.

19             WHAT I HAVE SAID, BASED ON THE CHINA EXPERIMENT, IS THAT

20       RAPID ENTRY WAS POSSIBLE AND, IN FACT, COULD HAVE HAPPENED.

21       Q.    WELL, RAPID ENTRY IN THE YEAR 2016 DIDN'T DO MUCH GOOD TO

22       AN OEM WHO, IN 2008, WANTED TO LAUNCH A CDMA COMPATIBLE

23       HANDSET; RIGHT?

24       A.    WELL --

25       Q.    SO IN 2008, IT WOULD BE TRUE THAT IF THAT OEM COULD NOT

```
1    EASILY SUBSTITUTE AWAY FROM QUALCOMM'S CHIPS, QUALCOMM HAD A

2    LOT OF LEVERAGE OVER THAT OEM; ISN'T THAT RIGHT?

3    A.   WELL, CERTAINLY AT THAT TIME THERE WAS NO OTHER

4    SUBSTITUTE.  BUT MY POINT IS THAT THERE WERE -- THE BARRIERS TO

5    ENTRY ARE NOT NECESSARILY AS HIGH AS MIGHT SEEM.

6         THE COURT:  I'M SORRY TO INTERRUPT.  IT'S 2:20.  I'D

7    LIKE US TO TAKE A TEN MINUTE BREAK TO 2:30.

8         MR. MATHESON:  THANK YOU, YOUR HONOR.

9         THE COURT:  YOU MAY STEP DOWN DURING THE BREAK.

10        THE WITNESS:  THANK YOU.

11   (RECESS FROM 2:20 P.M. UNTIL 2:31 P.M.)

12        THE COURT:  WELCOME COME BACK.  PLEASE TAKE A SEAT.

13   TIME IS 2:31.  GO AHEAD, PLEASE.

14        MR. MATHESON:  THANK YOU, YOUR HONOR.

15   Q.   DR. CHIPTY, YOU WOULD AGREE THAT QUALCOMM HAS HISTORICALLY

16   CHARGED HIGHER PRICES FOR ITS CHIPS THAT PROVIDE CDMA

17   CAPABILITY AS OPPOSED TO ITS CHIPS THAT PROVIDE UMTS

18   CAPABILITY, BUT NOT CDMA CAPABILITY; RIGHT?

19   A.   YES, I'D AGREE WITH THAT.

20   Q.   AND TO SOME OEM'S, QUALCOMM CHARGED PRICES THAT WERE 30

21   PERCENT HIGHER FOR CDMA CAPABLE CHIPS THAN IT CHARGED FOR

22   EQUIVALENT CHIPS THAT PROVIDED UMTS CAPABILITY, BUT NOT CDMA

23   CAPABILITY; RIGHT?

24   A.   SO I'M NOT -- I'M NOT EXACTLY SURE OF THAT EXAMPLE, SO I

25   DON'T KNOW SPECIFICALLY.
```

```
 1              I DO KNOW QUALITATIVELY THEY HAVE CHARGED HIGHER.

 2      Q.   SO YOUR NOT FAMILIAR WITH EVIDENCE IN THE RECORD THAT

 3      DEMONSTRATES THAT QUALCOMM CHARGED PRICES TO OEM'S THAT WERE 30

 4      PERCENT HIGHER FOR CDMA CAPABLE CHIPS AS OPPOSED TO CHIPS THAT

 5      PROVIDE UMTS CAPABILITY, BUT NOT CDMA CAPABILITY; IS THAT

 6      RIGHT?

 7      A.   I'M NOT -- I'M SAYING I DON'T RECALL THE NUMBER 30 PERCENT

 8      RIGHT NOW.

 9      Q.   TURN IN YOUR BINDER, IT SAYS WITNESS BINDER ON IT, THERE'S

10      A TAB LABELED JX 0107.

11      A.   OKAY.

12      Q.   PORTIONS OF THIS DOCUMENT HAVE BEEN SEALED.

13              YOUR HONOR, I'D LIKE TO MOVE TO ADMIT JX 0107.

14              THE COURT:  ANY OBJECTION?

15              MR. EVEN:  NOT WITH JX, YOUR HONOR.

16              THE COURT:  IT'S ADMITTED.

17          (JOINT EXHIBIT JX 0107 WAS ADMITTED IN EVIDENCE.)

18              THE COURT:  GO AHEAD, PLEASE.

19      BY MR. MATHESON:

20      Q.   CAN YOU DIRECT YOUR ATTENTION, DR. CHIPTY -- AND WE'LL PUT

21      IT UP ON THE MONITOR, JX 0107-013.

22          DO YOU SEE THAT, DR. CHIPTY?

23      A.   YES, I DO.

24      Q.   NOW, IT'S FAIR TO STATE THAT THIS DEMONSTRATES THAT

25      QUALCOMM CHARGED PRICES TO AN OEM THAT WERE 30 PERCENT HIGHER
```

1    WITH RESPECT TO THE SKUS INDICATED ON THIS PAGE FOR CDMA

2    CAPABLE CHIPS THAN FOR EQUIVALENT NON-CDMA CAPABLE CHIPS THAT

3    PROVIDED UMTS FUNCTIONALITY; RIGHT?

4         I MEAN, JUST AT A GLANCE YOU CAN COMPARE THE NUMBERS IN

5    THE CENTER COLUMN AND THE NUMBERS IN THE RIGHT COLUMN, AND THE

6    CDMA ENABLED ONES ARE 30 PERCENT HIGHER THAN THE NON-CDMA;

7    RIGHT?

8    A.   YES, THAT'S WHAT I SEE AT A GLANCE.  I JUST DON'T KNOW

9    WHAT THE REST OF THE PAGES SAY AND IF THERE ARE OTHER FINANCIAL

10   TERMS GOING BACK AND FORTH.

11        I CAN'T SPEAK TO THAT.

12   Q.   OKAY.  THANK YOU.

13        NOW, WHEN A FIRM SELLS TWO PRODUCTS AND IT INCURS SIMILAR

14   COSTS, THE ABILITY TO CHARGE A MEANINGFULLY HIGHER PRICE FOR

15   ONE PRODUCT IS CONSISTENT WITH THE EXISTENCE OF SUBSTANTIAL

16   MARKET POWER.  WOULDN'T YOU AGREE WITH THAT?

17   A.   WELL, I DON'T KNOW THAT I WOULD DESCRIBE IT AS

18   SUBSTANTIAL.  YOU'D HAVE TO SHOW ME SPECIFIC PRICE DIFFERENCES

19   FOR EXACTLY THE SAME COSTS, I SHOULD SAY.

20   Q.   LET'S LOOK AT THIS PAGE OF JX 0107.  THIS PRICE DIFFERENCE

21   OF 30 PERCENT, IF THERE IS NO MEANINGFUL COST DIFFERENCE,

22   BETWEEN ENABLED AND NON-CDMA ENABLED, IS CONSISTENT WITH THE

23   EXISTENCE OF SUBSTANTIAL MARKET POWER; ISN'T THAT RIGHT?

24   A.   WELL, I'M HAVING A HARD TIME AGREEING WITH YOU BECAUSE I

25   THINK THERE ARE COSTS TO CREATING CDMA CAPABILITY, AND THOSE

1    COSTS ARE LOADED ON TO CDMA PRICES.  SO I DON'T ACCEPT THE

2    PREMISE THAT THE COSTS ARE THE SAME.

3    Q.   WELL, YOU WOULD AGREE THAT QUALCOMM'S HISTORICAL PREMIUMS

4    FOR CDMA HAS NOT BEEN BASED ON THE COST OF CDMA, BUT INSTEAD ON

5    THE VALUE QUALCOMM'S CUSTOMERS PLACE ON CDMA CAPABILITY; RIGHT?

6    A.   SO I AGREE THERE ARE VALUE DIFFERENCES BUT THERE ARE ALSO

7    COST DIFFERENCES.  AS AN ECONOMIST, I LOOK AT BOTH.

8    Q.   YOU WERE HERE IN THE COURTROOM WHEN MR. AMON TESTIFIED;

9    RIGHT?

10   A.   I WAS.

11   Q.   AND YOU WERE HERE IN THE COURTROOM WHEN MR. AMON CONFIRMED

12   THAT QUALCOMM HISTORICALLY BASED CDMA CHIPS BASED NOT ON THE

13   COST, BUT INSTEAD BASED ON THE VALUE THAT CUSTOMERS PLACE ON

14   THOSE CHIPS.  YOU WERE HERE WHEN HE SAID THAT; RIGHT?

15   A.   I WAS HERE WHEN HE SAID THAT.

16   Q.   SO IF MR. AMON, THE PRESIDENT OF QCT, IS RIGHT, THEN THERE

17   IS NOT -- THEN THE PRICE PREMIUM FOR CDMA IS NOT DRIVEN BY

18   COST, IT'S DRIVEN BY THE VALUE THAT CUSTOMERS PLACE ON

19   QUALCOMM'S CDMA CAPABILITY; RIGHT?

20   A.   I KNOW HE SAID THAT.  I'M JUST SAYING THERE'S ALSO A COST

21   DIFFERENCE, AND I WOULD FACTOR THAT IN.

22   Q.   YOU'D AGREE THAT A FIRM'S ABILITY TO INFLUENCE THE PRICE

23   AT WHICH IT SELLS ITS PRODUCTS CAN BE AN INDICATION OF MARKET

24   POWER; RIGHT?

25   A.   IT CAN BE.

1    Q.   NOW, YOU DISCUSSED EARLIER RECORD EVIDENCE THAT

2    DR. SHAPIRO RELIED ON REGARDING THE DEFINITION OF PREMIUM LTE

3    CHIPS, AND HE REFERRED TO CERTAIN INTERNAL QUALCOMM PRICE

4    CUTOFFS FOR PREMIUM.

5    A.   YES, HE DID.

6    Q.   AND SLIDE 11 OF YOUR DEMONSTRATIVES INDICATES HIS

7    CALCULATIONS OF MARKET SHARE USING THE PRICE CUTOFFS THAT

8    DEFINE PREMIUM AT VARIOUS POINTS IN TIME; RIGHT?

9    A.   THAT'S CORRECT.

10   Q.   NOW, YOU'D AGREE THAT IN 2012, THESE ARE YOUR CORRECTIONS

11   TO DR. SHAPIRO'S CALCULATIONS; RIGHT?

12   A.   YES, THAT'S CORRECT.

13   Q.   AND YOU'D AGREE THAT IN 2012, QUALCOMM SOLD A VERY HIGH

14   PROPORTION OF ALL THE LTE CAPABLE MODEM CHIPS THAT ARE USED IN

15   HANDSETS THAT COST MORE THAN $300; RIGHT?

16   A.   YES, THAT'S WHAT HE CALCULATED.

17   Q.   WELL, DO YOU AGREE THAT STATEMENT IS TRUE?  IT'S A TRUE

18   STATEMENT THAT IN 2012 QUALCOMM SOLD A VERY HIGH PROPORTION OF

19   ALL LTE CAPABLE MODEM CHIPS USED IN HANDSETS THAT COST MORE

20   THAN $300?

21   A.   YES, I, I THINK THE NUMBERS ARE PROBABLY ACCURATE FOR THAT

22   PURPOSE, YEAH.

23   Q.   NOW, LET'S FOCUS ON CALENDAR YEAR 2013.  AT THAT POINT IN

24   TIME, PROFESSOR SHAPIRO USES A CUTOFF OF A $400 SELLING PRICE

25   FOR HANDSETS TO DEFINE PREMIUM LTE; RIGHT?

1    A.   THAT'S CORRECT.

2    Q.   ARE YOU OFFERING THE OPINION THAT IN CALENDAR YEAR -- THAT

3    AN OEM WHO WANTED TO LAUNCH IN CALENDAR YEAR 2014 AN LTE

4    CAPABLE PHONE COULD HAVE EASILY SWITCHED FROM QUALCOMM TO AN

5    ALTERNATIVE SUPPLIER OF LTE MODEM CHIPS FOR A HIGH-END HANDSET

6    THAT COST MORE THAN $400?

7    A.   SO I DO THINK THERE'S EVIDENCE IN THE RECORD THAT SOME

8    HIGH-END OEM'S LOOKED AT OTHER ALTERNATIVES DURING THIS TIME

9    PERIOD AND THAT THOSE ALTERNATIVES HAD COMPETITIVE SIGNIFICANCE

10   ON QUALCOMM'S PRICING.

11   Q.   SO THE COMPETITIVE ALTERNATIVES HAD SIGNIFICANCE.  MY

12   QUESTION WAS, COULD THE OEM EASILY SWITCH TO A PROVIDER OTHER

13   THAN QUALCOMM IN CALENDAR YEAR 2013?

14   A.   SO I'M NOT SURE HOW TO ANSWER THAT QUESTION BECAUSE IF, IN

15   FACT, THE OEM HAD SELECTED A DIFFERENT SUPPLIER, THEY MIGHT

16   HAVE BEEN READY BY 2014 TO DO SO.

17   Q.   OKAY.  SO YOU'RE NOT OFFERING THE OPINION -- IT'S FAIR TO

18   SAY THAT IF YOU'RE HAVING TROUBLE ANSWERING THE QUESTION,

19   YOU'RE NOT TELLING THE COURT THAT AN OEM WHO WANTED TO LAUNCH

20   AN LTE CAPABLE HANDSET IN CALENDAR YEAR 2013 COULD HAVE EASILY

21   SELECTED A SUPPLIER OTHER THAN QUALCOMM?  IS THAT FAIR?

22   A.   I THINK THAT'S FAIR.

23   Q.   WE CAN TAKE THAT ONE DOWN, KEN.

24        CAN WE TAKE A LOOK AT SLIDE 17 IN QUALCOMM'S OPENING

25   SLIDES?  KEN, 17.

1            AND THIS SHOWS THE ANNUAL FIRM-WIDE INVESTMENT R&D.

2            THAT'S 18.  THERE WE GO.

3            THE ANNUAL FIRM-WIDE INVESTMENT R&D THAT YOU DISCUSSED

4       WITH THE COURT TODAY?

5       A.   THAT'S RIGHT.

6       Q.   YOU DID NOT ISOLATE THE PORTION OF THE R&D FIGURE FOR

7       SAMSUNG THAT WAS UNDERTAKEN SPECIFICALLY FOR MODEM DEVELOPMENT,

8       DID YOU?

9       A.   NO, I DIDN'T BECAUSE ALL OF THAT WAS AVAILABLE FOR THE R&D

10      DOLLARS FOR SAMSUNG WAS FIRM WIDE.

11      Q.   SAMSUNG MAKES A LOT OF WASHING MACHINES; RIGHT?

12      A.   I -- I DON'T KNOW.  I KNOW IT DOES OTHER R&D OTHER THAN

13      CHIP DEVELOPMENT, AND THAT'S WHY I ALSO LOOKED AT THE OUTPUT OF

14      THEIR R&D.

15      Q.   BUT YOU DIDN'T INVESTIGATE HOW MUCH OF THE SAMSUNG BARS

16      WENT FOR WASHING MACHINES OR REFRIGERATORS OR ICE MAKERS AND

17      HOW MUCH WENT FOR MODEM R&D DEVELOPMENT IN ANY OF THESE YEARS,

18      DID YOU?

19      A.   NO, I DIDN'T DO THAT HERE.  BUT I DID GO ON TO STUDY THE

20      OUTPUT OF THE R&D SPENT ON CHIP DEVELOPMENT.

21      Q.   BUT THE ONLY -- YOU WERE HERE WHEN DR. THOMPSON TESTIFIED

22      THAT QUALCOMM MAKES R&D INVESTMENTS BASED ON THE SIZE OF THE

23      OPPORTUNITY THEY PERCEIVE; RIGHT?

24      A.   THAT'S CORRECT.

25      Q.   YOU CAN TAKE THAT DOWN, KEN.

```
 1           NOW, AS AN ECONOMIST IT MAKES SENSE THAT FIRMS MAKE R&D

 2   INVESTMENTS BASED ON THE SIZE OF THE PROFIT OPPORTUNITY THEY

 3   PERCEIVE; RIGHT?

 4   A.   YES, GENERALLY SPEAKING, THAT MAKES SENSE.

 5   Q.   NOW, YOUR REPORT STATES THAT QUALCOMM USES A PAYBACK RATIO

 6   THAT COMPARES THE ANTICIPATED GROSS MARGIN OF A PRODUCT TO THE

 7   PRODUCT'S R&D COST WHEN IT'S DECIDING WHETHER IT'S GOING TO

 8   MAKE AN R&D INVESTMENT; RIGHT?

 9   A.   YES, THAT'S GENERALLY MY UNDERSTANDING.

10   Q.   AND YOUR REPORT STATES THAT QUALCOMM HAS A TARGET PAYBACK

11   RATIO OF 3?

12   A.   YES.  I UNDERSTAND THAT'S THE TARGET AND CAN SOMETIMES BE

13   HIGHER AND SOMETIMES LOWER.  BUT THAT'S THE TARGET.

14   Q.   CAN WE PUT UP EXHIBIT 35 OF DR. CHIPTY'S REPORT.  YOU CAN

15   REFER TO IT, MA'AM.  IT'S IN YOUR -- YOU HAVE A BINDER WITH

16   YOUR REPORT IN IT.  IT'S AT PAGE 167 IF YOU WOULD LIKE TO LOOK.

17   A.   OKAY.  THANK YOU.

18   Q.   NOW, THIS DISPLAYS THE PAYBACK RATIO ON THE Y AXIS THAT

19   QUALCOMM ACTUALLY RECEIVED FOR THREE THIN MODEM PRODUCTS THAT

20   IT SOLD; RIGHT?

21   A.   THAT'S CORRECT.

22   Q.   AND LOOKING AT THE BAR ON THE LEFT, QUALCOMM WOULD HAVE

23   HIT ITS TARGET PAYBACK RATIO OF 3 FOR THE MDM 9X15, WHAT'S

24   REFERRED TO AS SHELBY, WITHOUT MAKING ANY SALES OF THIN MODEMS

25   TO APPLE; RIGHT?
```

1    A.   THAT'S CORRECT.

2    Q.   IN FACT, QUALCOMM SOLD ENOUGH OF THE SHELBY THIN MODEMS TO

3    CUSTOMERS OTHER THAN APPLE TO RECOGNIZE A PAYBACK RATIO OF 8.2;

4    RIGHT?

5    A.   THAT'S CORRECT.

6    Q.   AND FOR THE ELAN PRODUCT THAT'S DISPLAYED IN THE MIDDLE

7    BAR, THAT INCLUDED THE MDM 9X25; RIGHT?

8    A.   YES, THAT'S WHAT IT'S FOR.

9    Q.   AND QUALCOMM'S SALES OF THIN MODEMS TO CUSTOMERS OTHER

10   THAN APPLE WOULD HAVE RESULTED IN A PAYBACK RATIO OF A LITTLE

11   BIT MORE THAN 1; RIGHT?

12   A.   YES, THAT'S WHAT I CALCULATED.

13   Q.   SO QUALCOMM NEEDED TO SELL SOME 9X25 CHIPSETS TO APPLE TO

14   MEET ITS TARGET PAYBACK RATIO OF 3, BUT QUALCOMM DIDN'T NEED TO

15   SELL ALL OF THE CHIPS IT ACTUALLY SOLD TO APPLE IN ORDER TO

16   RECOGNIZE THAT PAYBACK RATIO; ISN'T THAT TRUE?

17   A.   YES.  THAT'S HOW THE MATH WORKING OUT AFTER THE FACT.

18   Q.   AND THE SAME IS TRUE FOR THE MDM 9X35.  QUALCOMM WOULD

19   HAVE HIT ITS PAYBACK RATIO OF 3 EVEN IF APPLE HAD ONLY SOURCED

20   HALF OF THE CHIPSETS FROM QUALCOMM THAT APPLE ACTUALLY ENDED UP

21   PURCHASING; RIGHT?

22   A.   THAT'S CORRECT.  THAT'S HOW IT WORKED OUT AFTER THE FACT.

23   Q.   NOW, ONE OF THE REASONS THAT YOU UNDERTOOK THE PAYBACK

24   RATIO ANALYSIS WAS TO REPLICATE THE ANALYSIS THAT QUALCOMM

25   PERFORMS IN THE ORDINARY COURSE OF MAKING INVESTMENT DECISIONS;

1    RIGHT?

2    A.    THAT'S CORRECT.

3    Q.    AND IT'S BEST PRACTICE TO REPLICATE QUALCOMM'S ORDINARY

4    COURSE ANALYSIS; RIGHT?

5    A.    WELL, YES.  I TRIED TO REPLICATE THE SPIRIT OF THEIR

6    CALCULATION, THOUGH THIS WAS MY CALCULATION.

7    Q.    BECAUSE YOUR CALCULATION LOOKS AT THE ACTUAL TOTAL DIRECT

8    MARGIN QUALCOMM RECEIVED, BUT IN THE ORDINARY COURSE, WHEN

9    QUALCOMM IS MAKING AN R&D INVESTMENT DECISION, THEY HAVE TO

10   LOOK AT THEIR PROJECTED MARGINS BEFORE THE DECISION IS MADE;

11   RIGHT?

12   A.    YES.  SOMETIMES THEY DO THAT, AND SOMETIMES THEY DO ASSESS

13   AFTER THE FACT.  BUT YES, THEY DO BOTH I THINK.

14   Q.    NOW, YOU WOULD AGREE THAT EXCLUSIVE DEALING ARRANGEMENTS

15   CAN BE ANTICOMPETITIVE IN SOME CIRCUMSTANCES; RIGHT?

16   A.    I WOULD AGREE WITH THAT.

17   Q.    AND IN SOME CIRCUMSTANCES, AN EXCLUSIVE DEALING

18   ARRANGEMENT CAN PRODUCE ANTICOMPETITIVE EFFECTS BY DENYING

19   RIVALS SUFFICIENT SCALE TO SUSTAIN THEMSELVES IN THE

20   MARKETPLACE; IS THAT RIGHT?

21   A.    IT'S POSSIBLE IN PRINCIPLE, YES.

22   Q.    NOW, ON PAGE 224 OF YOUR REPORT YOU STATE THAT APPLE IS

23   THE ONLY PURCHASER OF THIN MODEMS FOR HANDSET USE; RIGHT?

24   A.    THAT'S -- LET ME JUST MAKE SURE I SAY THAT.  WOULD YOU

25   POINT ME TO SOMETHING.

1    Q.   IT'S PAGE 224, MA'AM, RIGHT AFTER ARABIC NUMERAL 3 IN THE

2    MIDDLE OF PAGE IN ITALICS.  IT READS, "AS APPLE IS THE ONLY

3    PURCHASER OF THIN MODEMS FOR HANDSET USE, THEN BY

4    PROFESSOR SHAPIRO'S OWN LOGIC, THE AT-ISSUE AGREEMENTS COULD

5    NOT HAVE HARMED COMPETITION IN THE RELEVANT MARKET."

6    A.   YES, I SEE THAT.

7    Q.   IT'S AN INCORRECT STATEMENT TO SAY THAT APPLE IS THE ONLY

8    PURCHASER OF THIN MODEMS FOR HANDSET USE, ISN'T IT?

9    A.   WELL, APPLE WAS THE PRIMARY PURCHASER FOR HANDSET USE, AND

10   IN FACT THERE WAS SOME SAMSUNG USE OF THIN MODES.  BUT AS I

11   UNDERSTAND IT, THAT WAS NOT ANTICIPATED.  THAT WAS

12   OPPORTUNISTIC.

13   Q.   OKAY.  SO IT'S INCORRECT IF ANYBODY WERE TO SAY THAT APPLE

14   WAS THE ONLY PURCHASER OF THIN MODEMS.  THAT PERSON WOULD BE

15   WRONG?  IS THAT A FAIR STATEMENT?

16   A.   SO AS IT HAPPENS, SAMSUNG PURCHASED SOME THIN MODEMS FOR

17   ONE OF THE CHIPS AND THAT DID HAPPEN.

18        BUT IN SUBSEQUENT YEARS, IN FACT, APPLE WAS THE ONLY

19   PURCHASER BY AND LARGE, AND IT WAS PRIMARILY THE PURCHASER

20   THROUGHOUT THE PERIOD.

21   Q.   OKAY.  SO THEY WERE THE PRIMARY PURCHASER, BUT THEY

22   CERTAINLY WERE NOT THE ONLY PURCHASER OF THIN MODEMS FOR

23   HANDSET USE.  WE CAN AGREE ON THAT; RIGHT?

24   A.   YES, AS IT HAPPENED AFTER THE FACT, THAT'S CORRECT.

25   Q.   NOW, IN FACT, YOU'VE SEEN COMPETITIVELY SIGNIFICANT

1      INSTANCES IN WHICH QUALCOMM'S RIVALS HAVE OFFERED THIN MODEMS

2      IN COMPETITION WITH QUALCOMM TO CUSTOMERS OTHER THAN APPLE;

3      ISN'T THAT RIGHT?

4      A.    I THINK THAT'S RIGHT IN RECENT YEARS, YES.

5      Q.    WELL, CERTAINLY AS FAR BACK AS 2013 AND 2014 THIS WAS

6      HAPPENING; RIGHT?

7      A.    I'M NOT SURE WHAT YOU HAVE IN MIND.  COULD YOU DESCRIBE TO

8      ME WHICH CHIP MAKER YOU'RE THINKING OF.

9      Q.    MY QUESTION IS WHAT YOU KNOW ABOUT THIN MODEM COMPETITION

10     FOR OEM BUSINESS OTHER THAN APPLE.  IS IT A TRUE STATEMENT THAT

11     YOU HAVE OBSERVED COMPETITIVELY SIGNIFICANT INSTANCES IN WHICH

12     QUALCOMM HAS BEEN FORCED TO COMPETE WITH RIVAL THIN MODEM

13     SOLUTIONS AT OEM'S OTHER THAN APPLE?

14     A.    SO I, I AM AWARE OF, JUST SITTING HERE, AN EXAMPLE WHERE

15     QUALCOMM LOWERED PRICE AT SAMSUNG BECAUSE OF INTEL.  SO, YES,

16     I'M AWARE OF THAT.  SO IT HAS HAPPENED.

17     Q.    AND THAT WAS A THIN MODEM PRODUCT IN 2013 AND 2014; RIGHT?

18     A.    I'M NOT SURE OF THE TIMEFRAME, BUT IT MAY WELL HAVE BEEN.

19     Q.    PLEASE TAKE A LOOK AT SLIDE 9 OF THE DEMONSTRATIVES.

20     A.    UM-HUM.

21     Q.    THE TOP LEFT BOX, WHICH YOU DID NOT DISPLAY TO THE COURT

22     TODAY, BUT WAS IN THE DISCLOSED DEMONSTRATIVES, DISCUSSES IN

23     THE 2013, 2014 TIMEFRAME, SAMSUNG PLANNED TO USE MULTI SOURCING

24     FROM INTEL, BROADCOM, AND SAMSUNG'S INTERNAL MODEM CHIP

25     BUSINESS TO SECURE PRICE COMPETITIVENESS.

1          NOW, THE INTEL MODEM AT ISSUE WAS A THIN MODEM; RIGHT?

2     A.   YES, I BELIEVE SO.

3     Q.   THAT WAS THE XMM 7260; RIGHT?

4     A.   IT MAY HAVE BEEN.

5     Q.   AND SAMSUNG ACTUALLY LAUNCHED A PRODUCT WITH THE XMM 7260

6     IN IT; RIGHT?

7     A.   IT MAY HAVE.  I DON'T RECALL EXACTLY.  BUT I KNOW THAT

8     IT'S POSSIBLE.

9     Q.   NOW, LET'S PUT UP SLIDE 15 FROM YOUR DEMONSTRATIVES.

10         NOW, THIS DISPLAYS THIN MODEM PURCHASES FROM QUALCOMM;

11    RIGHT?

12    A.   THAT'S CORRECT.

13    Q.   AND THIS SHOWS THAT SOME COMPANIES, OTHER THAN APPLE,

14    PURCHASED THIN MODEMS FROM QUALCOMM FOR USE IN HANDSETS; RIGHT?

15    A.   THAT'S CORRECT.

16    Q.   YOU'RE NOT DISPLAYING ANY INFORMATION REGARDING ANY OEM'S

17    PURCHASES OF THIN MODEMS FROM ANYONE OTHER THAN QUALCOMM ON

18    THIS SLIDE; RIGHT?

19    A.   THIS IS CORRECT.  THIS IS FROM QUALCOMM'S PERSPECTIVE.

20    Q.   YOU HAD THAT INFORMATION AVAILABLE TO YOU AND YOU DID NOT

21    ANALYZE IT; IS THAT RIGHT?

22    A.   I THOUGHT THIS WAS SUFFICIENT FOR MY ANALYSIS OF WHETHER

23    QUALCOMM WOULD HAVE ENGAGED IN THE R&D.  SO, NO, I DIDN'T LOOK

24    ANY FURTHER.

25    Q.   HOW MANY THIN MODEMS DID SAMSUNG PURCHASE FROM ANYONE

1    OTHER THAN QUALCOMM DURING THE PERIOD YOU'VE DISPLAYED ON THIS

2    SLIDE?

3    A.   I, I DON'T KNOW THE ANSWER TO THAT QUESTION.

4    Q.   IS IT MORE THAN 200 MILLION?

5    A.   I WOULDN'T KNOW THAT SITTING HERE.

6    Q.   THAT WAS NOT INFORMATION YOU NEEDED IN ORDER TO PRESENT

7    THIS SLIDE AND DRAW A CONCLUSION REGARDING THE AVAILABLE MARKET

8    OPPORTUNITY IN THIN MODEMS?  IS THAT YOUR TESTIMONY?

9    A.   NO.  WHAT I'M EXPLAINING TO YOU IS THAT I WAS LOOKING AT

10   THE DISTRIBUTION OF PURCHASES FOR QUALCOMM AS PART OF MY WORK

11   TO SEE IF, IN FACT, THEY WOULD BE ABLE TO RECOVER THEIR

12   INVESTMENTS ON THE SALE OF THIN MODEMS FROM OTHER CUSTOMERS.

13        AND, IN FACT, QUALCOMM'S CUSTOMERS PRIMARILY BUY SOC'S AND

14   THAT'S WHAT THIS SLIDE TELLS ME.

15   Q.   BUT YOUR VIEW THAT APPLE IS EITHER THE DOMINANT OR THE

16   SOLE PURCHASER OF THIN MODEMS IS ALSO ONE REASON YOU SAID

17   PROFESSOR SHAPIRO WAS WRONG ABOUT THE ANTICOMPETITIVE EFFECTS

18   OF THE EXCLUSIVE DEALING ARRANGEMENT BETWEEN QUALCOMM AND

19   APPLE; RIGHT?

20   A.   YES, AND I REACHED THAT NOT FROM A DATA EXERCISE ANALYSIS,

21   BUT FROM OTHER QUALITATIVE EVIDENCE IN THE RECORD AND

22   TESTIMONY.

23   Q.   SO YOU WERE ABLE TO REACH THAT CONCLUSION, THAT THE THIN

24   MODEM MARKET OPPORTUNITY WAS SO CONCENTRATED IN APPLE THAT

25   QUALCOMM'S EXCLUSIVE DEALING ARRANGEMENT WITH APPLE COULD NOT

```
 1    HAVE HAD ANTICOMPETITIVE EFFECTS WITHOUT EVER LOOKING AT HOW

 2    MANY MODEMS SAMSUNG PURCHASED FROM COMPANIES OTHER THAN

 3    QUALCOMM; RIGHT?

 4    A.   YES, I BELIEVE THE EVIDENCE IS THAT APPLE IS UNLIKE OTHER

 5    OEM'S AND USES THIN MODEMS FOR ITS HANDSETS AND THAT'S WHAT I

 6    BELIEVE THE RECORD SHOWS.

 7    Q.   OKAY.  CAN WE TAKE A LOOK AT SLIDE -- YOUR

 8    DEMONSTRATIVE -- WHICH ONE IS IT, 5? -- WHICH IS THE TABLE IN

 9    WHICH YOU DISPLAYED VARIOUS CHIPSETS.

10    A.   YES.

11    Q.   NOW, YOU SAID EARLIER TODAY THAT INTEL HAD A COMPETITIVELY

12    SIGNIFICANT ROLE FROM 2012 TO 2015; RIGHT?

13    A.   THAT'S CORRECT.

14    Q.   IN 2014 IT OFFERS AN XMM 7260 AS WHAT YOU CALL THE LATEST

15    AND GREATEST CHIP THAT WAS SHIPPED IN A HANDSET THAT YEAR;

16    RIGHT?

17    A.   THAT'S CORRECT.

18    Q.   AND THAT'S A THIN MODEM?

19    A.   THAT'S CORRECT.

20    Q.   LOOKING DOWN AT THE SAMSUNG ROW, IN 2015, AN EXYNOS MODEM

21    333 MUST HAVE BEEN SHIPPED IN A HANDSET IN 2015; RIGHT?

22    A.   THAT'S CORRECT.  IT WAS PROBABLY USED BY SAMSUNG FOR ITS

23    OWN PURPOSES.

24    Q.   AND THAT'S ALSO A THIN MODEM, ISN'T IT?

25    A.   I'M NOT ENTIRELY CERTAIN SITTING HERE RIGHT NOW, BUT IT
```

1    MAYBE.  I'M NOT SURE.  COULD YOU SHOW ME SOMETHING THAT

2    DESCRIBES IT?

3    Q.   YOU HAVE NO IDEA HOW MANY EXYNOS MODEM 333 THIN MODEMS

4    WERE SOLD IN 2015 FOR THE SAMSUNG GALAXY S6 AND THE GALAXY S6

5    EDGE, DO YOU?

6    A.   NO, I DON'T KNOW SPECIFICALLY.

7    Q.   AND THE EXYNOS MODEM 303, WHICH SAMSUNG SHIPPED IN A

8    HANDSET IN 2014, IS ALSO A THIN MODEM; RIGHT?

9    A.   I'M SORRY, WHICH ONE?

10   Q.   THE EXYNOS MODEM 303 INDICATED ON YOUR CHART AS THE LATEST

11   AND GREATEST SHIPPED IN A HANDSET IN 2014, THAT'S A THIN MODEM,

12   TOO, ISN'T IT?

13   A.   I'M NOT CERTAIN, BUT I DO KNOW AND I SHOWED YOU THAT

14   SAMSUNG HAS USED A FUSION SOLUTION, WHICH INVOLVES A THIN

15   MODEM, AND YOU CAN SEE IT EVEN FROM THEIR PURCHASES FROM

16   QUALCOMM.

17   Q.   WELL, LET'S TAKE A LOOK AT THE SLIDE YOU PUT UP FOR THE

18   INNOVATION RACE FOR THE 2015 SOCKETS.  IT'S SLIDE 8 OF YOUR

19   DEMONSTRATIVE.

20        WHEN YOU'RE DESCRIBING THIS INNOVATION RACE, THE SAMSUNG

21   PRODUCT AT ISSUE IS A THIN MODEM, ISN'T IT?  THAT'S THE EXYNOS

22   333; RIGHT?

23   A.   I CAN'T SAY SITTING HERE THAT THAT'S THE ONLY PRODUCT THAT

24   SHOWS UP IN THE SAMSUNG SALES OF 6.8 PERCENT THAT YEAR.

25   Q.   WELL, IT WAS THE LATEST AND GREATEST THAT SAMSUNG SHIPPED

1    IN 2015, RIGHT, ACCORDING TO THE DEMONSTRATIVE WE JUST LOOKED

2    AT, DEMONSTRATIVE 15?

3    A.   UM --

4    Q.   DEMONSTRATIVE 5?

5    A.   NO, I DON'T THINK THAT'S ACCURATE.  WHAT THE 2015 BAR

6    SHOWS YOU ARE PROFESSOR SHAPIRO'S SHARE CALCULATIONS, AND AS WE

7    KNOW, EXPENSIVE HANDSETS THAT HE FLAGS DON'T ALWAYS HAVE THE

8    LATEST AND GREATEST CHIPS IN THEM.  SO I CAN'T BE CERTAIN

9    THAT --

10   Q.   WELL, THE SAMSUNG GALAXY S6 LAUNCHED IN 2015; RIGHT?

11   A.   RIGHT.

12   Q.   AND IT HAD THE EXYNOS MODEM 333 IN IT, AND IT WAS

13   SAMSUNG'S PREMIER FLAGSHIP PHONE; RIGHT?

14   A.   I UNDERSTAND ALL OF THAT, EXCEPT WHAT I'M TELLING YOU IS

15   THAT THE 2015 PHONES CONTAIN A VARIETY OF CHIPSETS, NOT ALL

16   RELEASED IN 2015, AND THEY ALSO REFLECT THE SALES OF LEGACY

17   PHONES.

18       SO I CAN'T -- I CAN'T TELL YOU WHAT SHARE OF THAT 6.8 IS

19   FROM THE THEN NEW SAMSUNG CHIP.

20   Q.   SO YOU HAVE NO IDEA WHAT SHARE IS FROM THE SAMSUNG THIN

21   MODEM, AND YET YOU WERE ABLE TO EXPRESS THE VIEW, IN YOUR

22   REPORT, THAT ONE OF THE REASONS PROFESSOR SHAPIRO WAS WRONG

23   ABOUT THE EFFECTS OF APPLE'S EXCLUSIVE DEALING ARRANGEMENT WITH

24   QUALCOMM IS THE LIMITED SIZE OF THE THIN MODEM MARKET

25   OPPORTUNITY OUTSIDE OF APPLE; ISN'T THAT RIGHT?

CHIPTY CROSS BY MR. MATHESON

```
1    A.   I THINK THERE'S A LOT OF QUALITATIVE EVIDENCE THAT GOES TO

2    THAT.

3    Q.   CAN WE PUT UP SLIDE 18 FROM MR. VAN NEST'S OPENING.

4         NOW, THIS DOESN'T DISPLAY MARKET SHARES -- STRIKE THAT.

5         YOU NEVER DISCLOSED ANY CALCULATION IN YOUR REPORT THAT

6    INTEL HAD 100 PERCENT MARKET SHARE AT APPLE AT ANY POINT IN

7    TIME, DID YOU?

8    A.   WHAT I DO KNOW IS THAT AS OF EARLY 2018, QUALCOMM LOST THE

9    APPLE ACCOUNT.  SO WHAT THIS SLIDE IS TRYING TO DEPICT, BASED

10   ON THAT INFORMATION, IS THAT TODAY, OR AT LEAST AS OF EARLY

11   2018, QUALCOMM'S EXPECTATION WAS ZERO SHARE OF THOSE DEVICES.

12   Q.   WELL, QUALCOMM HAS CHIPS THAT GO IN THE IPHONE 7; RIGHT?

13   A.   THAT'S CORRECT.

14   Q.   APPLE SOLD A LOT OF IPHONE 7S IN CALENDAR YEAR 2018,

15   DIDN'T IT?

16   A.   I DON'T KNOW HOW MANY.  BUT, YES, IT SOLD IPHONE 7'S IN

17   '18.

18   Q.   QUALCOMM CHIPS ALSO GO INTO VARIATIONS OF THE IPHONE 8;

19   RIGHT?

20   A.   I'M SORRY.  COULD YOU ASK IT AGAIN?  GOOD.

21   Q.   QUALCOMM'S MODEM CHIPS ALSO SHIP IN CDMA CAPABLE VERSIONS

22   OF THE IPHONE 8; RIGHT?

23   A.   THAT'S CORRECT.

24   Q.   AND APPLE SOLD THE IPHONE 8 THROUGHOUT CALENDAR YEAR 2018;

25   RIGHT?
```

CHIPTY CROSS BY MR. MATHESON

1    A.   THAT'S CORRECT.

2    Q.   AND, IN FACT, THEY DIDN'T LAUNCH -- OR THE IPHONE 8 AS

3    APPLE'S LATEST AND GREATEST HANDSET UP UNTIL THE END OF

4    SEPTEMBER OF 2018; RIGHT?

5    A.   THAT'S CORRECT.

6    Q.   NOW, LET'S TAKE A LOOK AT THE SAMSUNG -- SO THE BOTTOM OF

7    THIS SLIDE SAYS THIS IS -- ADDRESSES INFORMATION IN THE

8    REBUTTAL REPORT OF DR. TASNEEM CHIPTY JUNE 28TH, BETWEEN 18,

9    EXHIBITS 31 A AND B.

10        THOSE EXHIBITS DON'T CONTAIN ANY INFORMATION WHATSOEVER

11   ABOUT APPLE'S PURCHASES FROM INTEL OR FROM QUALCOMM, DO THEY?

12   A.   I'M SORRY.  COULD I JUST GO TO THOSE EXHIBITS?

13   Q.   SURE THING.  YOU CAN FIND EXHIBIT 31A AT PAGE 144 AND

14   EXHIBIT 31B AT PAGE 146 OF YOUR REPORT.

15        IT'S UP THERE ON THE SCREEN IF YOU NEED TO TAKE A LOOK.

16   ONE RELATES TO SAMSUNG, AND THE OTHER RELATES TO HUAWEI.  THESE

17   DON'T CONTAIN ANY INFORMATION ABOUT APPLE PURCHASES, DO THEY?

18   A.   NO.  THIS, THIS SLIDE HERE IS SHOWING YOU SAMSUNG, SO YOU

19   SEE THE 38 PERCENT.  THAT SHOWS UP ON THE SLIDE THAT WE WERE

20   JUST LOOKING AT.

21   Q.   AND IN THIS SLIDE, THIS INDICATES THAT SAMSUNG PURCHASED

22   79 PERCENT, OR MORE, OF ITS LTE MODEM CHIPSETS FROM QUALCOMM IN

23   2012 AND IN 2013 AND IN 2014; RIGHT?

24   A.   I'M SORRY.  COULD YOU SAY THAT AGAIN?

25   Q.   THIS SLIDE SHOWS THAT SAMSUNG PURCHASED 79 PERCENT OR MORE

1     OF ITS LTE ENABLING MODEM CHIPSETS FROM QUALCOMM FOR USE IN

2     HANDSETS IN EACH OF THE YEARS 2012, 2013, AND 2014; RIGHT?

3     A.   YES, THAT'S WHAT IT SHOWS.

4     Q.   AND IT SHOWS THAT IN 2015 AND 2016, QUALCOMM -- I MEAN

5     SAMSUNG PURCHASED FROM QUALCOMM MORE THAN HALF OF ITS LTE

6     ENABLING MODEM CHIPSETS FOR HANDSETS; RIGHT?

7     A.   YES.

8     Q.   CAN WE TAKE A LOOK AT THE SLIDE THAT WAS SHOWN IN OPENING

9     AGAIN, PLEASE, KEN.

10         SO THE SLIDE THAT WAS SHOWN IN OPENING ONLY DEPICTS

11    INFORMATION RELATED TO 2017; RIGHT?  IT COMPLETELY IGNORES

12    SAMSUNG'S PURCHASES FROM QUALCOMM IN 2012 AND 2013 AND 2014 AND

13    2015 AND 2016; RIGHT?

14    A.   THAT'S CORRECT.  IT WAS A SNAPSHOT AS OF THE BEST

15    AVAILABLE INFORMATION GOING INTO EARLY 2018.

16    Q.   AND YOU'VE SEEN RECORD EVIDENCE THAT IN 2017 QUALCOMM

17    BELIEVED THAT ONLY INTEL WAS ABLE TO PROVIDE ANY PRODUCT

18    SUITABLE FOR THE PREMIUM TIER; RIGHT?

19    A.   I'M SORRY.  ASK IT AGAIN.

20    Q.   YOU HAVE SEEN RECORD EVIDENCE THAT AS OF 2017, QUALCOMM

21    HAD CONCLUDED THAT NO RIVAL MERCHANT SUPPLIERS OF CHIPS COULD

22    PROVIDE PRODUCTS FOR THE PREMIUM TIER; RIGHT?

23    A.   NO, I'M NOT SURE WHAT YOU'RE REFERRING TO.  IF YOU COULD

24    SHOW IT TO ME.

25    Q.   COULD WE HAVE CX 8191-089, KEN.

1           MR. KOTARSKI:  IS THAT IN EVIDENCE?

2           MR. MATHESON:  IT IS.

3    Q.   YOU WERE IN THE COURTROOM WHEN MR. MOLLENKOPF TESTIFIED;

4    RIGHT?

5    A.   NO, I WASN'T.

6    Q.   WELL, THIS SLIDE WAS SHOWN DURING MR. MOLLENKOPF'S

7    TESTIMONY.  THIS SLIDE INDICATES THAT WHEN THIS PRESENTATION

8    WAS CREATED, WHICH WAS JULY 2017, QUALCOMM HAD CONCLUDED THAT

9    THE ONLY MERCHANT SUPPLIER OF CHIPSETS ABLE TO SATISFY THE

10   PREMIUM TIER, OTHER THAN QUALCOMM, WAS INTEL; RIGHT?

11   A.   I'M SORRY.  I CAN'T SPEAK TO THIS, THIS QUICKLY.  I WOULD

12   NEED TO LOOK AT IT A LITTLE MORE CAREFULLY.

13          MR. MATHESON:  THANK YOU VERY MUCH.  NO FURTHER

14   QUESTIONS.

15          THE COURT:  OKAY.  TIME IS 3:00 O'CLOCK.

16          MR. EVEN:  MAY I, YOUR HONOR.

17          THE COURT:  YES, YOU MAY.  IT'S 3:01.

18                    **REDIRECT EXAMINATION**

19   BY MR. EVEN:

20   Q.   THANK YOU.  DR. CHIPTY, THE LATEST AND GREATEST CHIPS

21   SHIPPED TODAY BY MEDIATEK, ARE THOSE SOC'S OR THIN MODEMS?

22   A.   I THINK THEY'RE SOC'S.

23   Q.   AND BY SAMSUNG?

24   A.   I THINK THEY'RE SOC'S.

25   Q.   AND BY HUAWEI?

1    A.   SOC'S.

2    Q.   AND BY QUALCOMM?

3    A.   WELL, TO MY KNOWLEDGE, EXCEPT FOR THE APPLE ACCOUNT AND,

4    YOU KNOW, A HANDFUL OF OTHER NON-HANDSET USES, SOC'S.

5    Q.   AND HAS INTEL BEEN ABLE TO GAIN A FOOTHOLD IN ANY OTHER

6    OEM WITH ITS THIN MODEMS OTHER THAN APPLE?

7    A.   NO, TO MY KNOWLEDGE NOT.  INTEL HAS BEEN SUPPLYING APPLE

8    FOR TWO AND A HALF YEARS, AND TO MY KNOWLEDGE, IT HAS NOT

9    SUCCEEDED AT WINNING ANOTHER HANDSET, SIGNIFICANT HANDSET OEM

10   ACCOUNT.

11   Q.   MR. MATHESON SHOWED YOU SOME SLIDES ABOUT PAYBACK RATIO,

12   AND YOU SAID THAT THAT REFLECTS SOMETHING AFTER THE FACT.

13        WHAT WAS THE PAYBACK ANALYSIS BEFORE THE FACT, BEFORE

14   QUALCOMM, IN FACT, DECIDED TO ENGAGE WITH APPLE?

15   A.   WELL, THE FACT IS THAT SAMSUNG ENDED UP PURCHASING THIN

16   MODEMS FOR ONE OF THE CHIPSETS THAT I WAS SHOWING ON THE SLIDE,

17   AND THOSE ARE CHIPSETS THAT, IN FACT, I UNDERSTAND FROM

18   DR. THOMPSON'S TESTIMONY THAT QUALCOMM DIDN'T ANTICIPATE

19   SHIPPING.

20        SO, IN FACT, IF WE TOOK THOSE THIN MODEMS FOR SAMSUNG

21   FUSION SALES OUT OF THE EQUATION, YOU'D GET A LOWER PAYBACK

22   RATIO.

23        AND IN FACT, THE FIRST OF THE THREE CHIPS THAT I

24   EVALUATED, THE 9X15, THAT IS THE CHIP THAT WOULD HAVE LIKELY

25   LIVED FOR MULTIPLE CYCLES BECAUSE, IN FACT, WHAT I UNDERSTAND

1    FROM MR. THOMPSON, DR. THOMPSON, IS THAT WHAT QUALCOMM WOULD

2    HAVE DONE IS SLOWED ITS CADENCE FROM ONE A YEAR TO ONE EVERY

3    THREE YEARS.

4         SO IT'S NOT THAT THEY WOULD HAVE FOUND THE LINE

5    UNPROFITABLE.  IT'S JUST THEY WOULD HAVE INVESTED LESS, AND

6    THAT'S WHAT I THINK THE CHART SHOWS.

7    Q.   MR. MATHESON ASKED YOU ABOUT FIRM-WIDE R&D AND WHY YOU

8    HAVEN'T LOOKED AT SAMSUNG AND HUAWEI.  YOU SAID YOU LOOKED AT

9    THE OUTPUT.

10        WHAT HAVE YOU SEEN ABOUT THE OUTPUT OF R&D AT SAMSUNG AND

11   HUAWEI?

12   A.   WELL, I THINK I SHOWED YOU THAT, IN FACT, EACH OF THEM HAS

13   BEEN RELEASING INCREASINGLY ADVANCED CHIPS AND BOTH HAVE COME

14   OUT IN RECENT YEARS WITH AN LTE CDMA MULTIMODE CHIP.

15   Q.   THANK YOU.  IF YOU TURN TO PARAGRAPH 290 OF YOUR REPORT.

16   DO YOU SEE IT?

17   A.   OKAY.  I DO ON THE SCREEN.

18   Q.   OKAY.  WHAT DOES THIS PARAGRAPH, IN THE THIRD SENTENCE,

19   TELL YOU ABOUT APPLE'S PLANS FOR 2018 IPHONE?

20   A.   YES.  SO THANK YOU.  I COULDN'T FIND IT WHEN WE WERE

21   LOOKING AT THE SHARE CHARTS.  BUT THIS IS SOMETHING THAT I KNEW

22   AT THE TIME THAT I WROTE MY REPORT THAT, IN FACT, APPLE

23   EXPECTED, AND I KNOW THIS FROM, FROM TESTIMONY FROM APPLE'S

24   MR. SCHAFER THAT, IN FACT, APPLE INTENDED TO SINGLE SOURCE IN

25   2018.

1          MR. EVEN:  THANK YOU, DR. CHIPTY.

2      NO FURTHER QUESTIONS, YOUR HONOR.

3          THE COURT:  WAIT.  I HAD A QUESTION.  I WANT TO

4  KNOW -- CAN YOU PUT UP THE VAN NEST OPENING SLIDE.  HOW DOES

5  THAT COME FROM EXHIBIT 31A AND B OF DR. CHIPTY'S REBUTTAL

6  REPORT?  I DON'T SEE THAT.

7          MR. EVEN:  YOUR HONOR, I BELIEVE THAT --

8          THE COURT:  CAN WE PULL THAT UP, PLEASE.

9          MR. EVEN:  SURE.

10         THE COURT:  YEAH.  I -- 31A AND 31B.

11         MR. EVEN:  YES, I BELIEVE 31A AND 31B SPEAK TO THE

12 TWO SAMSUNG AND HUAWEI PIE CHARTS, NOT TO THE APPLE ONE.

13         THE COURT:  OKAY.  BUT YOU'RE -- I THINK HE TESTIFIED

14 THAT -- OR DURING THE OPENING, HE SAID THAT WAS 2018.

15 OTHERWISE -- I GUESS I'M JUST UNCLEAR BECAUSE THESE CHARTS ARE

16 2013 TO 2017, OR 2012 THROUGH 2017.

17         MR. EVEN:  I DON'T KNOW --

18         MR. VAN NEST:  I'LL HAVE TO CHECK THE TRANSCRIPT,

19 YOUR HONOR, BUT IT WAS INTENDED TO REFLECT THE CURRENT STATE OF

20 PLAY.

21     AND IF YOU LOOK AT DR. CHIPTY'S REPORT, THE SAMSUNG AND

22 HUAWEI NUMBERS ARE FROM 2017, WHICH WAS, I THINK, THE MOST

23 CURRENT WE HAD, AND THE INTEL NUMBER I WAS ANTICIPATING WHAT

24 WE'VE PROVEN, WHICH IS THAT THEY -- THEY'RE SHIPPING ALL NEW

25 PRODUCTS WITH 100 PERCENT NOW.

1          I CAN GO BACK AND CHECK THE OPENING, BUT --

2               THE COURT:  I AM GOING TO CHECK IT MYSELF, BECAUSE

3     I'M PRETTY SURE YOU SAID THAT WAS 2018, AND THESE CHARTS ONLY

4     GO THROUGH 2017.  SO I'M WONDERING WHY THAT'S THE CITATION FOR

5     THAT.

6               MR. EVEN:  I THINK THE TREND IS PRETTY CLEAR IN THE

7     CHARTS, YOUR HONOR.  SO I THINK IF WE MISREPRESENTED IT, IT WAS

8     2017, 2018 BY MISTAKE, WE PROBABLY SHOT OUR OWN FOOT.

9               THE COURT:  ALL RIGHT.  IT'S 3:06.

10              MR. VAN NEST:  THE NUMBERS ARE CORRECT.

11              THE COURT:  WELL, THEY DON'T TAKE INTO ACCOUNT THE

12    LEGACY QUALCOMM CHIPS THAT QUALCOMM IS STILL SELLING TO INTEL.

13    THERE'S BEEN A LOT OF TESTIMONY AS TO THAT.  SO IT'S NOT 100

14    PERCENT, RIGHT.

15              MR. VAN NEST:  I THINK THEY DO, YOUR HONOR.  FOR

16    SAMSUNG AND HUAWEI THEY DO AS OF 2017.

17              THE COURT:  BUT NOT FOR APPLE.

18              MR. VAN NEST:  FOR APPLE, THOSE REFLECT --

19              THE COURT:  SO IT'S MISLEADING IN THAT REGARD AND I

20    AM SAYING THAT THERE'S ZERO QUALCOMM SHARE EVEN IN 2018.

21              MR. VAN NEST:  I DON'T KNOW -- SO I'LL GO BACK AND

22    CHECK, BUT I THINK WE WERE PRETTY CLEAR AS TO WHAT IS THE

23    INTENT ABOUT THE 100 PERCENT ON APPLE, THAT THAT IS MEANING

24    THAT WE LOST THE SOCKET FOR 2018 SPECIFICALLY.

25              THE COURT:  WELL, I DON'T LIKE IT WHEN DEMONSTRATIVES

1    ARE BEING SHOWN TO ME CITING EXHIBITS AND THE EXHIBITS DON'T

2    REALLY BACK THAT UP.  IT MAKES ME THEN FEEL, WHAT ELSE IS BEING

3    SAID THAT MAY NOT BE BACKED UP BY UNCITED SOURCES?

4            MR. VAN NEST:  I'LL TAKE A LOOK, YOUR HONOR, WHAT I

5    SAID IN THE OPENING.

6            THE COURT:  WELL, I SEE WHAT IT SAYS.  IT SAYS 31A

7    EXAMINE 31B.

8          ANYWAY.  ALL RIGHT.  DO YOU HAVE ANY RECROSS OR NOT?

9            MR. MATHESON:  I DO, YOUR HONOR.

10           THE COURT:  YOU DO.

11           MR. MATHESON:  I DO, YOUR HONOR.

12           THE COURT:  ALL RIGHT.  GO AHEAD.  IT'S 3:07.

13                        **RECROSS-EXAMINATION**

14   BY MR. MATHESON:

15   Q.   YOU WERE ASKED ABOUT THE ANALYSIS OF THE ELAN MODEM, OR

16   YOU WERE ASKED ABOUT THE PAYBACK RATIO ANALYSIS THAT OCCURRED

17   PRIOR RATHER THAN MOST HOC; RIGHT?  MR. EVEN JUST ASKED YOU

18   ABOUT WHAT ANALYSIS DID QUALCOMM DO OF THE APPLE OPPORTUNITY

19   BEFORE THEY ACTUALLY INVESTED?

20   A.   I DON'T THINK THAT WAS THE EXACT QUESTION.  BUT HE DID ASK

21   ME WHAT SALES DID QUALCOMM MAKE THAT IT WOULD NOT HAVE EXPECTED

22   TO MAKE.

23   Q.   I THINK HE ASKED YOU IF YOU HAD ANALYZED THE PAYBACK RATIO

24   ANALYSIS UNDERTAKEN PRIOR TO THE INVESTMENT IN THE PRODUCTS FOR

25   APPLE.  IS THAT A FAIR CHARACTERIZATION?

1    A.   IT'S NOT HOW I TOOK HIS QUESTION.  BUT I -- I CAN TRY TO

2    ANSWER YOUR QUESTION NONETHELESS.

3    Q.   OKAY.  WELL, MY QUESTION IS, ISN'T IT THE CASE THAT PRIOR

4    TO THE ELAN MDM 9X25, QUALCOMM PROJECTED IT WOULD SELL MORE

5    UNITS OF THE MDM 9X25 TO PURCHASERS OTHER THAN APPLE THAN IT

6    WOULD SELL TO APPLE?

7    A.   SO I HAVE SEEN SOME EVIDENCE THAT, IN FACT, PRIOR TO THAT

8    YEAR, QUALCOMM HAD SOME PROJECTIONS FOR USE OF THIN MODEMS IN

9    DATA CARDS, BUT THAT THOSE PROJECTIONS DID NOT MATERIALIZE AND,

10   IN FACT, DID NOT MATERIALIZE AS QUICKLY AS BEFORE THOSE

11   SIGNIFICANT INVESTMENTS WERE MADE.

12        THAT'S MY UNDERSTANDING.

13   Q.   OKAY.  BUT YOU AGREE THAT PRIOR TO INVESTING IN THE ELAN

14   MDM 9X25 MODEM PROJECT THAT WAS ULTIMATELY SOLD TO APPLE,

15   QUALCOMM PROJECTED THAT IT WOULD SELL MORE UNITS OF THE MDM

16   9X25 TO PURCHASERS OTHER THAN APPLE THAN IT WOULD SELL TO APPLE

17   ITSELF; ISN'T THAT RIGHT?

18   A.   NO, I'M NOT CERTAIN THAT THAT'S RIGHT.  I DON'T RECALL THE

19   TIMING OF THOSE PROJECTIONS.

20   Q.   COULD YOU TAKE A LOOK AT CX 6334 IN YOUR BINDER, PAGE DASH

21   024.

22   A.   I'M SORRY.  THE WITNESS BINDER, IS THAT THE ONE?

23   Q.   YES, THE WITNESS BINDER.

24   A.   OKAY.  AND COULD YOU SAY THE NUMBER AGAIN?

25   Q.   CX 6334-024.

1     NOW, DR. THOMPSON TESTIFIED THAT THIS PRESENTATION --

2     A.   I'M SORRY.  CX --

3     Q.   -- WAS THE APPROVAL OF THE PLAN FOR THE ELAN PROJECT;

4     RIGHT?

5     A.   GIVE ME ONE SECOND, PLEASE.

6     Q.   CAN WE BLOW THAT UP, KEN, THE DATACARD MARKET PART.

7          NOW, THE TURQUOISE BARS ON THE PAGE CX 334-024, INDICATE

8     APPLE'S PROJECTIONS FOR HOW MANY MDM 9X25 MODEMS THEY WERE

9     GOING TO SELL TO THE DATACARD MARKET AND HOW MANY THEY WERE

10    GOING TO SELL TO THE HANDSET MARKET; RIGHT?

11    A.   YES, I SEE THAT.

12    Q.   AND IN EACH OF THE YEARS -- WELL, IN 2013 THEY THOUGHT

13    THEY WOULD SELL 10 MILLION; 2014, THEY THOUGHT THEY WOULD SELL

14    64 MILLION; AND 2015, THEY THOUGHT THEY WOULD SELL 28 MILLION

15    MDM 9X25 MODEMS TO THE DATACARD MARKET; RIGHT?

16    A.   THAT'S WHAT THIS CHART SAYS.  BUT IF I LOOK AT THE FRONT

17    OF THE DOCUMENT, IT LOOKS TO BE FROM 2011, THE PROJECTION.

18    Q.   WELL, THIS IS THE PROJECTION THAT -- YOU WERE IN THE

19    COURTROOM WHEN DR. THOMPSON TESTIFIED THAT THIS IS THE DOCUMENT

20    THAT IS THE APPROVAL OF THE PLAN FOR THE ELAN PROJECT.  DON'T

21    YOU REMEMBER THAT?

22    A.   I DO RECALL YOU SHOWING HIM THIS DOCUMENT, AND ALL I'M

23    SAYING IS IT'S FROM 2011 AND THIS 9X25 CHIP WENT -- CAME OUT IN

24    2014 AND IT'S UNCLEAR --

25    Q.   CAN YOU PUT UP THE TRANSCRIPT, 1386 TO 1387.  THERE'S A

1    QUESTION AND ANSWER IN THE TRANSCRIPT ADDRESSED TO DR. THOMPSON

2    WHILE YOU WERE IN THE COURTROOM.

3         "AND, DR. THOMPSON, THIS IS THE PRODUCT COUNCIL

4    PRESENTATION FOR THE ELAN CHIPSET?

5         "YES.

6         "ELAN WAS A THIN MODEM?

7         "YES.

8         "AND THE PRODUCT COUNCIL APPROVAL REPRESENTS FINAL

9    APPROVAL FOR A MODEM CHIP?

10        "IT'S THE APPROVAL OF THE PLAN."

11        THIS IS THE DOCUMENT THAT APPROVED THE ELAN MDM 9X25 MODEM

12   CHIP; RIGHT?

13   A.   YES, I SEE ALL OF THAT, AND I'M -- WHAT I'M TRYING TO

14   EXPLAIN TO YOU IS THAT THIS IS A 2011 EVENT WHICH WOULD HAVE

15   PRE-DATED WHEN SIGNIFICANT WORK ON THE 9X25 ACTUALLY TOOK

16   PLACE.

17             MR. MATHESON:  THANK YOU VERY MUCH.

18             THE COURT:  OKAY.  TIME IS 3:12.

19             MR. EVEN:  ONE MORE QUESTION, IF I MAY, YOUR HONOR.

20             THE COURT:  GO AHEAD, PLEASE.

21                    **FURTHER REDIRECT EXAMINATION**

22   BY MR. EVEN:

23   Q.   DR. CHIPTY, ARE YOU AWARE OF A QUALCOMM ANALYSIS SHOWING

24   HOW MUCH INCREMENTAL SALES TO DONGLES AND OTHER USERS IN 9X25

25   WOULD BRING QUALCOMM OVER THE 9X15 THAT QUALCOMM ALREADY WAS

CHIPTY FURTHER REDIRECT BY MR. EVEN

1    WORKING ON?

2    A.   YES, I HAVE SEEN NUMBERS LIKE THAT.

3    Q.   AND WHAT DID THOSE SHOW?

4    A.   FROM MEMORY, WHAT I RECALL, AND IT'S CONSISTENT WITH MY

5    UNDERSTANDING OF THE BUSINESS MODEL, IS THAT IF THEY HAD NOT

6    MADE THE 9X25, THEY WOULD HAVE CONTINUED TO SELL THE 9X15 AND,

7    IN FACT, THE PROJECTIONS SHOW THAT THE BULK OF THE SALES WERE

8    FOR THE OLDER CHIP FOR THE DATACARD USE.

9            MR. EVEN:  THANK YOU.  NO FURTHER QUESTIONS.

10           THE COURT:  OKAY.  TIME IS 3:13.  IS THERE ANY

11   FURTHER QUESTIONS FOR DR. CHIPTY?

12           MR. MATHESON:  NONE, YOUR HONOR.

13           THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

14   SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?  AND I FORGOT TO

15   ASK THAT ABOUT MR. BLECKER AND MR. WOLFF.  WHAT'S YOUR VIEW AS

16   TO ALL THREE WITNESSES?

17           MR. EVEN:  I THINK I CAN SAY FOR ALL THREE, NOT

18   SUBJECT TO RECALL.

19           THE COURT:  OKAY.  WHAT DO YOU THINK?

20           MR. MATHESON:  FOR DR. CHIPTY, NOT SUBJECT TO RECALL.

21       FOR MR. BLECKER, IT'S POSSIBLE WE'LL PLAY MORE IN

22   REBUTTAL CASE.  SO I SUPPOSE THAT'S TECHNICALLY SUBJECT TO

23   RECALL.

24           THE COURT:  OKAY.  WHAT ABOUT MR. WOLFF?

25           MR. MATHESON:  SAME.

```
 1              THE COURT:  OKAY.  SO THEY'RE BOTH YESES AND
 2    DR. CHIPTY IS A NO.
 3         ALL RIGHT.  THEN YOU HAVE COMPLETED YOUR TRIAL TESTIMONY
 4    AND YOU ARE FREE TO LEAVE.
 5         CALL YOUR NEXT WITNESS, PLEASE.
 6              MR. SHACHAM:  GOOD AFTERNOON, YOUR HONOR.
 7    MATAN SHACHAM FOR QUALCOMM.  AND QUALCOMM CALLS DR. TED SNYDER.
 8         MAY I APPROACH, YOUR HONOR?
 9              THE COURT:  PLEASE.
10              MR. SHACHAM:  THESE ARE COPIES OF THE DEMONSTRATIVES
11    FOR YOUR HONOR.
12              THE COURT:  OKAY.  THANK YOU.
13              THE CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT HAND.
14         (DEFENDANT'S WITNESS, EDWARD SNYDER, WAS SWORN.)
15              THE WITNESS:  I DO.
16              THE CLERK:  THANK YOU.  PLEASE BE SEATED.
17              MR. SHACHAM:  YOUR HONOR, I ALSO HAVE A COPY OF
18    PROFESSOR SNYDER'S EXPERT REPORT IF YOU WOULD LIKE.
19              THE COURT:  YES, PLEASE.
20              MR. SHACHAM:  MAY I APPROACH, YOUR HONOR?
21              THE COURT:  THANK YOU.  YES, PLEASE.
22              THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL
23    YOUR LAST NAME FOR THE RECORD.
24              THE WITNESS:  MY NAME IS EDWARD ADAMS SNYDER.
25    S-N-Y-D-E-R.
```

```
 1              THE COURT:  ALL RIGHT.  ARE YOU READY?

 2              MR. SHACHAM:  YES, YOUR HONOR.

 3              THE COURT:  OKAY.  GO AHEAD, PLEASE.  WE'LL TAKE A

 4      BREAK AT 3:30 FOR TEN MINUTES.  IT'S NOW 3:15, SO YOU'VE GOT

 5      ABOUT 15 MINUTES.  GO AHEAD, PLEASE.

 6                          DIRECT EXAMINATION

 7      BY MR. SHACHAM:

 8      Q.   GOOD AFTERNOON, PROFESSOR SNYDER.

 9      A.   GOOD AFTERNOON.

10      Q.   WHAT IS YOUR CURRENT POSITION?

11      A.   I AM DEAN OF THE YALE SCHOOL OF MANAGEMENT WHERE I'M A

12      PROFESSOR OF ECONOMICS AND MANAGEMENT.

13      Q.   HOW LONG HAVE YOU BEEN AT YALE?

14      A.   SINCE 2011.

15      Q.   WHAT POSITION DID YOU HOLD BEFORE THAT?

16      A.   I WAS DEAN OF THE UNIVERSITY OF CHICAGO'S BOOTH SCHOOL OF

17      BUSINESS WHERE I WAS ALSO A PROFESSOR OF ECONOMICS.

18      Q.   WHERE DID YOU START YOUR PROFESSIONAL CAREER?

19      A.   AT THE U.S. DEPARTMENT OF JUSTICE AT THE ANTITRUST

20      DIVISION WHERE I WORKED FOR SEVEN YEARS.

21      Q.   WHERE DID YOU DO YOUR GRADUATE STUDIES?

22      A.   AT THE UNIVERSITY OF CHICAGO WHERE I EARNED BY PH.D. IN

23      ECONOMICS AND A MASTER'S DEGREE IN PUBLIC POLICY.

24      Q.   WHAT IS YOUR AREA OF EXPERTISE AS AN ECONOMIST?

25      A.   MY AREA OF EXPERTISE IS INDUSTRIAL ORGANIZATION, OR IO.
```

```
 1     Q.   WHAT IS INDUSTRIAL ORGANIZATION?

 2     A.   THAT'S THE SUBFIELD OF ECONOMICS THAT DEALS MOST DIRECTLY

 3     WITH COMPETITION AMONG VARIOUS FIRMS AND ALSO EVALUATES

 4     OUTCOMES IN VARIOUS MARKETS AND INDUSTRIES.

 5     Q.   CAN YOU GIVE US A SENSE FOR WHAT SORT OF PROBLEMS PEOPLE

 6     IN YOUR FIELD TRY TO SOLVE?

 7     A.   WELL, OUTCOMES IN MARKETS ARE DIFFERENT ACROSS INDUSTRIES,

 8     AND THE PURPOSE OF IO IN MANY RESPECTS IS TO UNDERSTAND THOSE

 9     REAL WORLD OUTCOMES AND DIFFERENCES ACROSS THE INDUSTRIES.

10     Q.   AND WHAT TOOLS DO PEOPLE IN YOUR FIELD USE IN THIS SORT OF

11     WORK?

12     A.   WELL, THE IO TOOLBOX INCLUDES CONCEPTS LIKE THE CONCEPT OF

13     ECONOMIES OF SCALE.  IT ALSO INCLUDES SO-CALLED NEOCLASSICAL

14     CONCEPTS, LIKE THE IMPORTANCE OF, WELL, WHEN FIRMS INVEST,

15     THOSE INVESTMENTS MAY BE SPECIFIC TO CERTAIN USES.  THAT'S

16     CALLED AS SET SPECIFICITY.

17          IO ECONOMISTS ALSO CONDUCT EMPIRICAL ANALYSES,

18     REGRESSIONS, ECONOMETRICS AND SO FORTH.  THEY ALSO DO CASE

19     STUDIES, LIKE THE KIND OF WORK THAT I'VE DONE HERE.

20     Q.   HAVE YOU PUBLISHED IN THE FIELD?

21     A.   YES, I'VE PUBLISHED EXTENSIVELY IN IO AND IN ANTITRUST.

22     Q.   HAVE YOU TESTIFIED BEFORE AS AN EXPERT?

23     A.   YES, I HAVE, ABOUT 12 TIMES IN COURT.

24          MR. SHACHAM:  YOUR HONOR, QUALCOMM OFFERS PROFESSOR

25     SNYDER AS AN EXPERT IN INDUSTRIAL ORGANIZATION AND ANTITRUST
```

1    ECONOMICS.

2              MS. IKEDA:  NO OBJECTION.

3              THE COURT:  ALL RIGHT.  SO CERTIFIED.  GO AHEAD,

4    PLEASE.

5    BY MR. SHACHAM:

6    Q.    PROFESSOR SNYDER, WHAT WERE YOU ASKED TO DO IN THIS CASE?

7    A.    I WAS ASKED TO ASSESS THE FTC'S CLAIM THAT QUALCOMM'S

8    ALLEGED CONDUCT CAUSED ANTICOMPETITIVE HARMS IN THE MODEM CHIP

9    INDUSTRY.

10   Q.    WERE YOU ALSO ASKED TO EVALUATE THE OPINION OF ANY OF THE

11   FTC'S EXPERTS AS PART OF YOUR ASSIGNMENT?

12   A.    YES.  I WAS ASKED TO EVALUATE PROFESSOR SHAPIRO'S OPINIONS

13   TO THE EFFECT THAT QUALCOMM'S ALLEGED CONDUCT DID CAUSE

14   ANTICOMPETITIVE HARMS IN THE INDUSTRY.

15   Q.    AT A HIGH LEVEL, WHAT CONCLUSIONS DID YOU REACH?

16   A.    I CONCLUDED THAT THE EVIDENCE DOES NOT SUPPORT THE CLAIM

17   THAT QUALCOMM'S ALLEGED CONDUCT CAUSED ANTICOMPETITIVE HARMS IN

18   THE INDUSTRY.

19        CONTRARY TO THE FTC'S CLAIM, REAL WORLD OUTCOMES IN THE

20   INDUSTRY ARE FULLY AND CONSISTENTLY EXPLAINED BY INDEPENDENT

21   FACTORS.

22        MOREOVER, WHEN YOU LOOK AT THE OVERALL PERFORMANCE OF

23   INDUSTRY, YOU SEE CONFIRMING EVIDENCE OF THE LACK OF

24   ANTICOMPETITIVE HARM.

25   Q.    WHAT DO YOU MEAN WHEN YOU SAY THAT THERE ARE INDEPENDENT

1    INDUSTRY FACTORS?

2    A.   I MEAN THAT THERE ARE INDUSTRY-WIDE FACTORS AND FIRM LEVEL

3    FACTORS THAT ARE INDEPENDENT OF THE ALLEGED CONDUCT BY

4    QUALCOMM, AND THOSE EXERT A STRONG INFLUENCE ON THE OVERALL

5    INDUSTRY, AS WELL AS THE SUCCESS AND FAILURE OF INDIVIDUAL

6    FIRMS.

7    Q.   HOW DID YOU IDENTIFY THOSE FACTORS?

8    A.   BY APPLYING IO PRINCIPLES TO THE INDUSTRY.

9    Q.   WHAT DO YOU MEAN WHEN YOU SAY THAT THESE INDEPENDENT

10   INDUSTRY FACTORS EXPLAIN INDUSTRY OUTCOMES?

11   A.   WELL, FIRST OF ALL, OUTCOMES.  THIS IS AN INDUSTRY THAT

12   FEATURES A LOT OF REAL WORLD OUTCOMES.  IF YOU LOOK AT WHO'S IN

13   THE TOP 5 AMONG SUPPLIERS OF MODEM CHIPS, THAT CHANGES YEAR TO

14   YEAR.

15        YOU ALSO SEE OUTCOMES IN TERMS OF GAINING BUSINESS AND

16   LOSING BUSINESS.

17        SO THERE ARE -- I'M TALKING ABOUT REAL WORLD OUTCOMES,

18   WHAT ACTUALLY IS HAPPENING AT THE FIRM LEVEL.

19        AND THEN IN TERMS OF EXPLAINING THESE INDEPENDENT INDUSTRY

20   FACTORS EXPLAIN THOSE OUTCOMES FULLY AND CONSISTENTLY.

21   Q.   WHY IS THAT IMPORTANT?

22   A.   WELL, IT'S IMPORTANT IF -- IF THE CONCLUSION IS RIGHT,

23   THEN INDEPENDENT FACTORS EXPLAIN WHAT'S HAPPENING IN THE REAL

24   WORLD, AS OPPOSED TO THE FTC'S CLAIMS ABOUT QUALCOMM'S ALLEGED

25   CONDUCT.

1    Q.   YOU ALSO MENTIONED THAT INDUSTRY PERFORMANCE CONTRADICTS

2    THE FTC'S CLAIM OF ANTICOMPETITIVE EFFECT.  WHAT DO YOU MEAN BY

3    THAT AT A HIGH LEVEL?

4    A.   WELL, AT A HIGH LEVEL, THE FTC'S CLAIM WOULD PREDICT THAT

5    OVERALL INDUSTRY PERFORMANCE WOULD BE IMPAIRED OVER TIME, THAT

6    THERE WOULD BE CERTAIN HALL MARKS OF IMPAIRED COMPETITION.

7         I DIDN'T FIND THAT.  TO THE CONTRARY.  WHEN I LOOK AT KEY

8    FACTORS IN THE INDUSTRY, THEY SHOW IMPRESSIVE PERFORMANCE.

9    Q.   WERE YOU HERE LAST WEEK WHEN PROFESSOR SHAPIRO TESTIFIED

10   FOR THE FTC?

11   A.   YES.

12   Q.   AND BASED ON THE WORK THAT YOU DID, DO YOU AGREE WITH

13   PROFESSOR SHAPIRO'S OPINION THAT QUALCOMM'S ALLEGED CONDUCT

14   CAUSED ANTICOMPETITIVE EFFECTS IN THE MODEM CHIP INDUSTRY?

15   A.   NO.  I DISAGREE WITH HIS CONCLUSION, AND, MOREOVER, HIS

16   METHODOLOGY IS FUNDAMENTALLY FLAWED.

17   Q.   AT A HIGH LEVEL, WHY DO YOU BELIEVE THAT

18   PROFESSOR SHAPIRO'S METHODOLOGY IS FUNDAMENTALLY FLAWED?

19   A.   WELL, PROFESSOR SHAPIRO WAS ABOUT THEORY.  HE EXPLAINED,

20   FOR EXAMPLE, AT A CONCEPTUAL LEVEL THE IDEA OF A COUNTER

21   FACTUAL, A WORLD WITHOUT THE ALLEGED CONDUCT.

22        BUT HE DIDN'T THEN GO TO THE NEXT STEP OF DEVELOPING THAT

23   COUNTER FACTUAL IN WHICH INDEPENDENT FACTORS WOULD HAVE EXERTED

24   INFLUENCE ON OUTCOMES.

25        RELATED, HE DIDN'T IDENTIFY ANY REAL WORLD OUTCOMES THAT

1    WOULD BE DIFFERENT IN THE COUNTER FACTUAL.

2         SO WITH THAT APPROACH, HE'S LEFT WITH SIMPLY THE CLAIM

3    THAT, FROM HIS THEORY, THAT INEVITABLE COMPETITIVE HARMS MUST

4    FOLLOW.

5    Q.   LET'S START WITH THE FIRST PART OF YOUR ANALYSIS.

6         HOW DID YOU START THE PROCESS OF IDENTIFYING INDUSTRY

7    FACTORS?

8    A.   I CAN GO INTO MORE DETAIL, BUT WHEN AN IO ECONOMIST LOOKS

9    AT AN INDUSTRY, YOU LOOK TO APPLY IO PRINCIPLES TO IDENTIFY

10   WHAT INFLUENCE THEY HAVE ON THE INDUSTRY AS A WHOLE AND ON

11   INDIVIDUAL FIRMS.  THAT'S WHAT I DID.

12   Q.   WHAT --

13   A.   AGAIN, I -- PARDON ME.

14        AGAIN, I FOCUSSED ON OUTCOMES WHEN I STARTED THE ANALYSIS,

15   AS I MENTIONED EARLIER, THESE ARE REAL WORLD OUTCOMES.  THERE

16   ARE ADVERSE OUTCOMES FOR FIRMS, SUCH AS LOSS OF BUSINESS AND

17   EXIT, AND THERE ARE POSITIVE OUTCOMES IN TERMS OF GAINING

18   BUSINESS AND ENTRY IN PRODUCT DEVELOPMENT.

19   Q.   WHAT ARE SOME EXAMPLES OF THE IO PRINCIPLES THAT YOU

20   LOOKED AT FOR STARTERS?

21   A.   I MENTIONED EARLIER ECONOMIES OF SCALE.  THAT'S CLOSELY

22   RELATED TO R&D INTENSITY.

23        ANOTHER ONE IS ECONOMIES OF SCOPE IN TERMS OF PRODUCTION.

24   Q.   AND WHAT INSIGHTS DID YOU DRAW FROM YOUR REVIEW OF THOSE

25   PRINCIPLES?

1       A.   WELL, IN THIS INDUSTRY, WE EXPECT TO SEE A RELATIVELY

2       SMALL NUMBER OF FIRMS OPERATING, ESPECIALLY AT THE LEADING EDGE

3       WHERE R&D INTENSITY IS GREATER.

4            IN ADDITION, BECAUSE OF THE FACT THAT MANY OF THOSE

5       EFFORTS ARE SPECIFIC TO PARTICULAR USES, ASSET SPECIFIC

6       INVESTMENTS, WE'LL ALSO SEE CONSIDERABLE VERTICAL INTEGRATION

7       IN THIS INDUSTRY.

8       Q.   IS THAT SOMETHING THAT YOU AND PROFESSOR SHAPIRO AGREE ON?

9       A.   I -- I THINK SO IN TERMS OF THE OVERALL NUMBER OF FIRMS AT

10      LEAST.

11      Q.   AS PART OF THIS INDUSTRY WIDE ANALYSIS, DID YOU ALSO LOOK

12      AT THE RELATIONSHIP BETWEEN MODEM CHIP SUPPLIERS AND OEM'S?

13      A.   YES.  I STUDIED THE MATCHINGS BETWEEN OEM'S AND THEIR

14      SUPPLIERS, HOW THEY COLLABORATE, AND WHETHER OEM'S DECIDE TO

15      SOURCE THEIR CHIPS INTERNALLY, AND IF EXTERNALLY, WHETHER THEY

16      DO MULTI SOURCING, MEANING SOURCE FROM MORE THAN ONE SUPPLIER.

17      Q.   WHAT ARE SOME OF THE INSIGHTS YOU DREW FROM THAT?

18      A.   WHAT WE WOULD EXPECT TO SEE, GIVEN THE INTENSITY OF THE

19      R&D EFFORTS, WE'D SEE -- WE EXPECT TO SEE OEM'S CHOOSING A

20      RELATIVELY SMALL NUMBER OF SUPPLIERS, ESPECIALLY FOR LEADING

21      EDGE PRODUCTS.

22           APPLE IS A GOOD EXAMPLE OF THAT.  THEY TEND TO RELY ON ONE

23      OR TWO OEM'S, MODEM CHIP SUPPLIERS, AND WHEN IT COMES TO THEIR

24      APPLICATION PROCESSORS, THEY SOURCE THAT INTERNALLY.

25      Q.   WHAT DID YOU FIND THERE WAS DISTINCTIVE ABOUT HOW THE

1      MODEM CHIP INDUSTRY IS ORGANIZED?

2      A.    THIS IS A DISTINCTIVE INDUSTRY IN THAT WE HAVE WHAT I CALL

3      OVERLAPPING PRODUCT GENERATIONS.  EACH GENERATION OF PRODUCTS

4      REPRESENTS A MAJOR ADVANCE IN TERMS OF TECHNOLOGY AND

5      PERFORMANCE, AND THE GENERATIONS OVERLAP SO THAT OEM CUSTOMERS

6      HAVE TO DECIDE, FOR EXAMPLE, WHAT PRODUCTS TO OFFER AND ON WHAT

7      TIMELINES.

8      Q.    HOW ARE THESE DISTINCT FEATURES IMPORTANT?

9      A.    WELL, THEY'RE VERY IMPORTANT ON THE SUPPLY SLIDE FOR

10     QUALCOMM AND THEIR RIVALS.  THEY HAVE TO DECIDE NOT ONLY TO

11     INVEST, THEY HAVE TO DECIDE WHETHER TO INVEST AT THE LEADING

12     EDGE, AND IF SO, WHERE -- WHAT TECHNOLOGIES SHOULD THEY TARGET.

13            THEY HAVE TO DECIDE HOW MUCH WEIGHT TO GIVE TO WHAT'S

14     REFERRED TO AS BACKWARD COMPATIBILITY, WHICH IMPLICATES WHETHER

15     THEY OFFER PRODUCTS THAT ARE MULTIMODE AND THEREBY CARRY

16     FORWARD VARIOUS TECHNOLOGIES FOR THEIR CONSUMERS.

17            THEY HAVE TO OPTIMIZE AMONG PERFORMANCE FEATURES LIKE

18     SIZE, SPEED, POWER CONSUMPTION.

19            THEY ALSO HAVE TO DECIDE HOW THEIR PRODUCTS WILL INTEGRATE

20     INTO THE OEM'S DEVICES.  WILL THEY BE, FOR EXAMPLE, THIN MODEM?

21     WILL THEY BE SYSTEM ON A CHIP?

22     Q.    GIVEN THESE DECISIONS, DID YOU LOOK FOR THE FIRM LEVEL

23     FACTORS THAT INFLUENCE SUCCESSES AND FAILURES?

24     A.    I DID.

25     Q.    WHAT FIRM LEVEL FACTORS DID YOU DETERMINE TO BE MOST

SNYDER DIRECT BY MR. SHACHAM

1    IMPORTANT IN EXPLAINING WHY MODEM CHIP SUPPLIERS SUCCEED OR

2    FAIL?

3    A.   FORESIGHT, INVESTMENT, AND EXECUTION.

4    Q.   LET'S START WITH THE FIRST OF THOSE FACTORS YOU

5    IDENTIFIED.

6         WHAT IS FORESIGHT?

7    A.   WELL, IN THE CONTEXT OF AN INNOVATIVE INDUSTRY ESPECIALLY,

8    FORESIGHT REFERS SIMPLY TO THE IMPORTANCE OF MATCHING FUTURE

9    CUSTOMERS WITH PRODUCTS.

10   Q.   WHY IS FORESIGHT IMPORTANT IN THIS INDUSTRY?

11   A.   IT'S IMPORTANT BECAUSE THE DEVELOPMENT PROCESS FOR MODEM

12   CHIPS IS LENGTHY.  THOSE EFFORTS ARE MADE IN THE CONTEXT OF

13   UNCERTAINTY ABOUT TECHNOLOGY AND IN THE CONTEXT OF ADVANCED,

14   SUBSTANTIAL ADVANCES IN TECHNOLOGY.

15   Q.   CAN YOU GIVE US AN EXAMPLE OF FORESIGHT BEING IMPORTANT?

16   A.   I CAN.  I CAN GIVE A POSITIVE EXAMPLE.  QUALCOMM HAD GOOD

17   FORESIGHT ABOUT THE LONGEVITY AND IMPORTANCE OF CDMA.  ON THE

18   NOT-POSITIVE FRONT, INFINEON, DESPITE HAVING THE INCUMBENCY

19   ADVANTAGES OF SOURCING TO APPLE, DIDN'T EXERCISE GOOD FORESIGHT

20   ABOUT THE NEED TO KEEP UP WITH THEIR DEMANDS.

21   Q.   WHAT ABOUT INVESTMENT?  WHAT DOES THAT MEAN IN THIS

22   CONTEXT AND WHY IS IT IMPORTANT?

23   A.   IT'S IMPORTANT IN THIS CONTEXT BECAUSE THE INVESTMENT, AS

24   IS WELL KNOWN, IS INTENSIVE.  BUT IT GOES BEYOND THAT.  IT GOES

25   INTO THE QUESTION OF WHETHER FIRMS INVEST EFFICIENTLY.

1    Q.   WHY DO YOU EMPHASIZE MAKING INVESTMENTS EFFICIENTLY RATHER

2    THAN JUST THE AMOUNT INVESTED?

3    A.   WELL, YOU CAN LOOK AT THE NUMBERS, WHICH I'VE DONE.  YOU

4    SEE THE INTENSITY OF R&D EFFORTS AS A PERCENT OF REVENUE.  YOU

5    SEE THE ABSOLUTE AMOUNTS.

6         BUT THOSE NUMBERS DON'T TELL THE WHOLE STORY.  FIRMS

7    DIFFER IN HOW EFFICIENT THEY ARE IN TERMS OF THEIR INVESTMENTS.

8    THOSE DIFFERENCES ARE RELATED TO HOW THEY ORGANIZATION THOSE

9    INVESTMENTS AND WHETHER, FOR EXAMPLE, WHEN THEY'RE OFF PATH,

10   THEY CORRECT QUICKLY AND PIVOT.

11   Q.   WHAT'S AN EXAMPLE OF AN INVESTMENT EFFICIENCY BEING

12   IMPORTANT?

13   A.   INTEL.  THEY INVESTED HEAVILY, BUT INEFFICIENTLY.

14   Q.   DOES STRATEGY ALSO AFFECT A FIRM'S INVESTMENTS?

15   A.   YES.  SOME FIRMS DECIDE TO INVEST AWAY FROM THE LEADING

16   EDGE.  THEY'RE SO-CALLED FAST FOLLOWERS.

17   Q.   WHAT'S AN EXAMPLE OF THAT SORT OF INVESTMENT STRATEGY

18   CHOICE?

19   A.   WELL, INFINEON I MENTIONED EARLIER.  ANOTHER IS VIA

20   TELECOM.  BOTH HAD FAST FOLLOWER STRATEGIES.  BOTH HAD

21   ENTERPRISE POLICIES THAT LIMITED THEIR R&D INVESTMENTS.

22   Q.   WHAT DOES EXECUTION MEAN?

23   A.   EXECUTION MEANS THAT IN THIS CONTEXT, WE HAVE THE PROCESS

24   OF FIRMS DEVELOPING THEIR PRODUCTS, AND ALONG THE WAY THEY

25   ENCOUNTER ISSUES, AND THEY HAVE TO IDENTIFY THOSE ISSUES THAT

1    ARE TECHNICAL AND DESIGN RELATED AND THEY HAVE TO RESOLVE THEM.

2         SOME FIRMS SIMPLY ARE BETTER AT THAT THAN OTHERS.

3         AND THEN EXECUTION ALSO GETS TO THE ISSUE OF ACTUALLY

4    SUPPLYING THE PRODUCT IN VOLUMES AND IN TERMS OF QUALITY.

5    Q.   WHAT IS AN EXAMPLE OF THE IMPORTANCE OF EXECUTION IN THIS

6    INDUSTRY?

7    A.   A GOOD EXAMPLE, A NEGATIVE EXAMPLE, IS ST-ERICSSON.  THEY

8    WERE PLAGUED BY EXECUTION PROBLEMS.

9         AND YOU ALSO SEE THE IMPORTANCE OF EXECUTION FROM THE

10   POINT OF VIEW OF OEM'S.  OEM'S NEED TO PROTECT THEMSELVES

11   AGAINST EXECUTION PROBLEMS, AND YOU SEE THAT WITH APPLE,

12   ESPECIALLY WITH THEIR HIGH STAKES ROLLOUTS OF LIMITED NUMBER OF

13   PRODUCTS, THEY HAVE VERY STRICT REQUIREMENTS AND TIMELINES TO

14   PROTECT AGAINST EXECUTION PROBLEMS.

15   Q.   DO YOU BELIEVE THAT THESE THREE INDUSTRY FACTORS THAT

16   YOU'VE IDENTIFIED, INVESTMENT, EXECUTION, AND FORESIGHT, ARE

17   INDEPENDENT OF THE ALLEGED CONDUCT IN THIS CASE?

18   A.   I DO.  WHEN YOU LOOK AT THE, AT THE INDUSTRY FROM THE

19   ONSET, OVER TIME, ACROSS FIRMS, YOU SEE THAT THESE FACTORS

20   EXERT A STRONG INFLUENCE.

21        THEY ALSO EXERT A STRONG INFLUENCE IN OTHER INNOVATIVE

22   INDUSTRIES.  SO INVESTMENT, FORESIGHT, EXECUTION ARE IMPORTANT

23   THERE AS WELL.

24        AND MOREOVER, I HAVEN'T SEEN ANY EVIDENCE THAT WOULD

25   INDICATE THAT THESE FACTORS ARE NOT INDEPENDENT IN THIS

1    CONTEXT.

2    Q.   PROFESSOR SNYDER, LET'S TURN NOW TO THE NEXT STEP OF YOUR

3    ANALYSIS.

4         WHAT DID YOU DO AFTER YOU IDENTIFIED THE RELEVANT INDUSTRY

5    FACTORS?

6    A.   WELL, THEN I, I CONDUCTED IN-DEPTH STUDIES OF ALL THE

7    MAJOR MODEM CHIP SUPPLIERS SINCE 2002.  I MENTIONED THE

8    TURNOVER IN THE TOP 5.  SO THAT ENDED UP INVOLVING 14 DIFFERENT

9    CASE STUDIES.

10        AGAIN, I FOCUSSED ON REAL WORLD OUTCOMES, POSITIVE AND

11   NEGATIVE.

12   Q.   WHY DID YOU PERFORM THESE IN-DEPTH CASE STUDIES?

13   A.   WELL, ONE PURPOSE WAS TO SEE WHETHER THERE WERE THESE REAL

14   WORLD OUTCOMES INVOLVING THE FIRMS THAT WERE EXPLAINED BY

15   INDEPENDENT FACTORS.

16        A RELATED PURPOSE WAS TO IDENTIFY OUTCOMES THAT

17   POTENTIALLY WERE NOT EXPLAINED BY THESE INDEPENDENT, REAL WORLD

18   FACTORS.

19   Q.   IN PERFORMING THIS ANALYSIS, DID YOU IGNORE THE ALLEGED

20   CONDUCT?

21   A.   NO, I DID NOT IGNORE THE ALLEGED CONDUCT.  IT WASN'T MY

22   ASSIGNMENT TO EVALUATE WHETHER THE CONDUCT OCCURRED.  BUT I

23   FOCUSSED ON CAUSALITY IN TERMS OF WHETHER THE ALLEGED CONDUCT

24   AFFECTED OUTCOMES.

25   Q.   AND SO HOW DID YOU ACCOUNT FOR THE ALLEGED CONDUCT IN YOUR

1    ANALYSIS?

2    A.   WELL, AS I JUST EXPLAINED, WHEN I WENT THROUGH THE

3    SYSTEMATIC RECORD INVOLVING THESE 14 FIRMS, I FOCUSSED ON WERE

4    THERE OUTCOMES THAT WERE NOT EXPLAINED BY INDEPENDENT INDUSTRY

5    FACTORS?

6         IF I HAD ENCOUNTERED THOSE, THEN I WOULD HAVE GONE TO THE

7    NEXT STEP TO EVALUATE WHETHER THE FTC'S CLAIMS ABOUT QUALCOMM'S

8    CONDUCT EXPLAINED THOSE DISCREPANCIES, IF YOU WILL.

9         BUT IMPORTANTLY, I DIDN'T FIND ANY REAL WORLD OUTCOMES OF

10   THAT TYPE.

11   Q.   DID YOU STUDY INTEL AS ONE OF YOUR CASE STUDIES?

12   A.   I DID.

13   Q.   WHAT DID YOU UNDERSTAND INTEL'S EXPERIENCE IN THE MODEM

14   CHIP INDUSTRY TO BE, AT A HIGH LEVEL?

15   A.   AT A HIGH LEVEL, OF COURSE, INTEL IS AN ICONIC, LARGE

16   FIRM, SUCCESSFUL IN MANY INDUSTRIES.

17        BUT WHEN IT COMES TO THE MODEM CHIP INDUSTRY, IT'S BEEN IN

18   AND OUT OF THE INDUSTRY.  IT LEFT THE INDUSTRY WITH ITS SALE OF

19   ITS SYSTEM ON A CHIP BUSINESS TO MARVEL.  I THINK IT WAS IN

20   2006.

21        IT RE-ENTERED THE BUSINESS WITH ITS ACQUISITION OF

22   INFINEON'S WIRELESS DIVISION IN 2011.

23        IT MADE ANOTHER MAJOR ACQUISITION OF CAPABILITIES IN 2015

24   WITH RESPECT TO CDMA.

25        AND IT -- IT'S HAD THAT APPROACH TO THE INDUSTRY.

```
 1              OF COURSE RECENTLY, AT A HIGH LEVEL, INTEL HAS

 2     SUCCESSFULLY INVESTED AND APPROVED THEIR EXECUTION AND THEY'VE

 3     HAD SUCCESS WITH APPLE.

 4     Q.   WITH THAT HISTORY IN MIND, DID YOU ANALYZE HOW INTEL

 5     PERFORMED WITH RESPECT TO THE THREE INDUSTRY FACTORS THAT YOU

 6     IDENTIFIED?

 7     A.   YES.  MY EVALUATION OF INTEL IS THAT THEY EXHIBITED, I

 8     WOULD SAY, POOR FORESIGHT ABOUT THE INDUSTRY, THEY INVESTED

 9     INEFFICIENTLY, AND THEY ENCOUNTERED EXECUTION PROBLEMS.

10              THE COURT:  I'M SORRY TO INTERRUPT.  IT'S 3:35.

11     LET'S GO AHEAD AND TAKE OUR TEN MINUTE BREAK NOW, PLEASE.

12              AND YOU CAN STEP DOWN DURING THE BREAK.

13              THE WITNESS:  THANK YOU.

14              MR. SHACHAM:  THANK YOU, YOUR HONOR.

15              THE COURT:  WE'RE IN RECESS, SO GO AHEAD, PLEASE.

16     (RECESS FROM 3:36 P.M. UNTIL 3:45 P.M.)

17              THE COURT:  OKAY.  GOOD AFTERNOON.  WELCOME BACK.

18     PLEASE TAKE A SEAT.

19              OKAY.  TIME IS 3:46.  GO AHEAD, PLEASE.

20     BY MR. SHACHAM:

21     Q.   WELCOME BACK, PROFESSOR SNYDER.

22     A.   THANK YOU.

23     Q.   BEFORE THE BREAK, WE WERE TALKING ABOUT INTEL'S

24     PERFORMANCE UNDER THE THREE INDUSTRY FACTORS THAT YOU

25     IDENTIFIED.
```

1        LET'S START WITH THAT FIRST FACTOR NOW.  WHAT DO YOU MEAN

2    WHEN YOU SAID THAT INTEL HAD POOR FORESIGHT?

3    A.   THEY EXERCISED POOR FORESIGHT.  I CAN GIVE AN EXAMPLE.

4        INTEL WAS ON PATH IN TERMS OF HOW THE INDUSTRY WAS

5    APPROACHING DEVELOPMENT OF APPLICATION PROCESSORS.  THEY WERE

6    USING THE SO-CALLED ARM ARCHITECTURE.

7        BUT THEY DECIDED TO DITCH THAT EFFORT AND GO WITH AN

8    APPROACH THAT WOULD INVOLVE MIGRATING THEIR X86 ARCHITECTURE,

9    VERY SUCCESSFUL IN PERSONAL COMPUTERS, TO THE SPACE.

10       THAT WAS ENCOUNTERED BY A LOT OF NEGATIVE RESPONSE FROM

11   OEM'S, BUT THEY CONTINUED ON THE PATH AND EVENTUALLY THE WHOLE

12   ENTERPRISE OF INTEGRATION OF THE X86 APPLICATION PROCESSOR WITH

13   MODEMS, THEY JUST DROPPED THAT.

14   Q.   ARE THERE OTHER EXAMPLES OF FLAWED FORESIGHT BY INTEL?

15   A.   YES, WITH RESPECT TO CDMA.

16       AS EARLY AS 2011, INDIVIDUALS INSIDE INTEL'S SENIOR RANKS

17   RECOGNIZED THE NEED FOR CDMA, BUT THEY DIDN'T ACQUIRE CDMA

18   CAPABILITY UNTIL 2015.

19       I SHOULD MENTION THAT THEY WEREN'T THE ONLY ONE TO MAKE

20   THIS FORESIGHT MISTAKE, BUT THEIRS WAS WORSE WITH, FOR EXAMPLE,

21   MEDIATEK, WHICH ACTED EARLIER.

22   Q.   HOW ABOUT THE INVESTMENT FACTOR?

23   A.   IN TERMS OF INVESTMENT, AS I SAID, INTEL INVESTED VERY

24   HEAVILY, BUT INEFFICIENTLY.  A GOOD EXAMPLE IS THEIR

25   ACQUISITION OF INFINEON.  IT WAS AN EXPENSIVE ACQUISITION, BUT

1    EVEN AFTER THEY MADE THE ACQUISITION, GIVEN THAT INFINEON WAS

2    TWO YEARS BEHIND QUALCOMM, THEY HAD TO INVEST A LOT MORE

3    INTERNALLY.

4    Q.   WHERE ELSE DO YOU SEE EVIDENCE OF INTEL'S INVESTMENT

5    INEFFICIENCY?

6    A.   WELL, YOU SEE IT IN TERMS OF HOW MUCH PRODUCT DEVELOPMENT

7    THEY'RE SUCCESSFUL WITH, THE NUMBER, SO-CALLED, OF SKU'S.  THEY

8    HAVE FEWER THAN OTHER FIRMS WHO INVEST COMPARABLY.

9        THEY ALSO ARE NOT AS EFFICIENT IN REUSING THEIR SO-CALLED

10   I.P. ACROSS PRODUCTS.

11   Q.   HOW ABOUT THAT FINAL FACTOR, WHAT DO YOU MEAN WHEN YOU

12   SAID INTEL HAD EXECUTION PROBLEMS?

13   A.   WELL, I GO BACK TO THE X86 ARCHITECTURE EXAMPLE.  AFTER

14   THEY DEVELOPED THE APPLICATION PROCESSOR USING THAT TECHNOLOGY,

15   THEY HAD TROUBLE INTEGRATING IT WITH THE THIN MODEMS TO PRODUCE

16   A SYSTEM ON A CHIP.

17       WHY?  BECAUSE THE TWO PRODUCTS WERE A DIFFERENT DESIGN.

18   Q.   IS IT YOUR OPINION THAT THE OUTCOMES YOU OBSERVED FOR

19   INTEL ARE FULLY EXPLAINED BY THESE INDUSTRY FACTORS?

20   A.   YES.

21   Q.   WHY IS THAT?

22   A.   WELL, WHEN YOU LOOK AT THE OVERALL PERFORMANCE OF INTEL,

23   THEY HAD THEIR FLAWED EXECUTION, INEFFICIENT INVESTMENT, THEIR

24   LACK OF GOOD FORESIGHT MATCHES UP VERY WELL WITH THE FIRM THAT

25   DIDN'T DO WELL VERY -- DIDN'T DO, EXCUSE ME, VERY WELL IN THE

1    INDUSTRY UNTIL RECENTLY WHEN THEY CONTINUED WITH THEIR

2    INVESTMENTS AND IMPROVED THEIR ACQUISITION STRATEGIES AND THEN

3    GOT TO IMPROVED PERFORMANCE.

4    Q.   CAN YOU REVIEW THE TESTIMONY THAT MS. EVANS FROM INTEL

5    GAVE IN THIS TRIAL?

6    A.   I DID.

7    Q.   AND DID THAT TESTIMONY CHANGE YOUR OPINION IN ANY WAY?

8    A.   NO.  IT MATCHES UP VERY WELL.  SHE TESTIFIED THAT POST

9    ACQUISITION OF INFINEON, INTEL WAS TWO YEARS BEHIND.

10        SHE TESTIFIED THAT WHILE THERE WAS THE DEBATE THAT STARTED

11   IN 2011 ABOUT CDMA, THEY DIDN'T ACQUIRE THE CAPABILITY UNTIL

12   2015.

13        AND SHE CONFIRMED THAT INTEL ABANDONED THEIR SYSTEM ON A

14   CHIP APPROACH INVOLVING THE X86 ARCHITECTURE AND THAT THEY'RE

15   NO LONGER INTERESTED IN THE MOBILE PHONE BUSINESS, EXCEPT FOR

16   APPLE.

17   Q.   IS MEDIATEK ANOTHER ONE OF THE COMPANIES THAT YOU ANALYZED

18   AS PART OF YOUR CASE STUDY?

19   A.   YES.

20   Q.   AND CAN YOU SUMMARIZE AT A HIGH LEVEL WHAT YOU UNDERSTAND

21   MEDIATEK'S EXPERIENCE TO BE IN THE MODEM CHIP INDUSTRY?

22   A.   THE BIG PICTURE ON MEDIATEK IS THEY ARE A VERY SUCCESSFUL

23   FIRM.  THEY GOT IN RELATIVELY LATE WITH WCDMA CHIPS.  THEY'VE

24   PURSUED EFFICIENTLY A SO-CALLED FAST FOLLOWER STRATEGY.

25        OVER TIME, THEY'VE MOVED CLOSER TO THE LEADING EDGE.

1    THEY'VE INVESTED WELL.  THEY'VE EXECUTED WELL, AND NOW THEY'RE

2    THE NUMBER TWO SUPPLIER IN THE WORLD.

3    Q.   WHAT DID YOU OBSERVE WITH RESPECT TO MEDIATEK'S FORESIGHT?

4    A.   THEY'VE HAD GOOD FORESIGHT.  ONE EXAMPLE IS THAT THEY

5    RECOGNIZED THAT THERE WERE POTENTIAL OEM'S WHOM THEY COULD

6    DEVELOP AND GROW THOSE CUSTOMERS' BUSINESSES BY OFFERING THEM

7    SOFTWARE SUPPORT AND SO-CALLED REFERENCE DESIGNS.

8         THEY ALSO APPRECIATED THE INTEREST IN HAVING HIGHER END

9    FEATURES MOVE QUICKLY TO LOWER END DEVICES.

10        SO THOSE ARE EXAMPLES OF MEDIATEK'S GOOD FORESIGHT.

11   Q.   WHAT DID YOU OBSERVE WITH RESPECT TO MEDIATEK'S

12   INVESTMENT?

13   A.   THEY'VE INVESTED CONSISTENTLY.  IN FACT, THE RECORD SHOWS

14   THAT THEY INCREASED THEIR R&D SPEND OVER TIME AS A PERCENT OF

15   REVENUE, AND THEY'VE TARGETED ACQUISITIONS CAREFULLY TO BOLSTER

16   THEIR TECHNOLOGY.  OVERALL, THEY'VE INVESTED EFFICIENTLY.

17   Q.   WHAT DID YOU OBSERVE WITH RESPECT TO MEDIATEK'S EXECUTION?

18   A.   THEY, THEY HAD PROBLEMS, NOT SURPRISING GIVEN A RELATIVELY

19   LATE ENTRANT, WHEN THEY FIRST ATTEMPTED TO DEVELOP WCDMA CHIPS.

20        BUT SINCE THEN, THEY'VE HAD VERY GOOD EXECUTION AS THEY'VE

21   DEVELOPED NEW PRODUCTS.

22   Q.   AND SO WHAT IS YOUR CONCLUSION ABOUT THE RELATIONSHIP

23   BETWEEN THESE INDUSTRY FACTORS AND THE OUTCOME THAT YOU

24   OBSERVED FOR MEDIATEK?

25   A.   MEDIATEK'S STRONG PERFORMANCE IS FULLY EXPLAINED BY WHAT

1    THEY'VE DONE IN TERMS OF FORESIGHT, INVESTMENT, AND EXECUTION.

2    Q.   DID YOU REVIEW THE TRIAL TESTIMONY OFFERED BY MR. MOYNIHAN

3    FROM MEDIATEK?

4    A.   I DID.

5    Q.   AND DID MR. MOYNIHAN'S TESTIMONY AT THIS TRIAL CHANGE YOUR

6    OPINION IN ANY WAY?

7    A.   NO.  HE TESTIFIED ABOUT THE EXECUTION ISSUES WITH RESPECT

8    TO THAT SPECIFIC WCDMA PRODUCT, THE SO-CALLED 6268 CHIP.

9        HE ALSO TESTIFIED THAT MEDIATEK IS INDEED THE NUMBER TWO

10   SUPPLIER IN THE WORLD.

11   Q.   IS BROADCOM ONE OF THE COMPANIES THAT YOU LOOKED AT IN

12   YOUR CASE STUDIES?

13   A.   YES.

14   Q.   AND WHAT IS THE OUTCOME THAT YOU OBSERVED FOR BROADCOM?

15   A.   THE OUTCOME FOR BROADCOM IS EXIT.  THEY HAD SUCCESS EARLY

16   IN THE -- IN THE EARLY PART OF THE CENTURY.  THEY HAD SALES

17   THAT CONTINUED RELATIVELY WELL.

18       BUT IN AROUND 2011, THEIR SALES STARTED TO DROP OFF

19   DRAMATICALLY.  IN 2014, THEY HAD SALES OF LESS THAN 1 MILLION

20   CHIPS ANNUALLY.  THEY BECAME NOT ECONOMICALLY VIABLE AND THEN

21   EXITED.

22   Q.   DO YOU BELIEVE THAT BROADCOM'S EXIT FROM THE MODEM CHIP

23   INDUSTRY IS EXPLAINED BY THE INDUSTRY FACTORS?

24   A.   NO QUESTION.  BROADCOM HAD POOR FORESIGHT, THEY INVESTED

25   INEFFICIENTLY, AND THEY HAD EXECUTION PROBLEMS.

1    Q.   SO LET'S TAKE THOSE STEP BY STEP.

2         STARTING WITH FORESIGHT, WHAT DO YOU MEAN THAT BROADCOM

3    HAD POOR FORESIGHT?

4    A.   BROADCOM HAD A GOOD POSITION IN THE INDUSTRY IN THE FIRST

5    PART OF THE CENTURY.  BUT THEY SIMPLY DIDN'T APPRECIATE HOW

6    FAST THE INDUSTRY WAS MOVING AND WAS GOING TO MOVE.

7         SO, FOR EXAMPLE, THEY DECIDED TO FOCUS ON A TECHNOLOGY

8    STANDARD CALLED 2G EDGE, AND THAT WAS SORT OF A 2 AND A HALF G,

9    BUT THE INDUSTRY HAD ALREADY MOVED TO 3G AND WAS GETTING READY

10   TO MAKE MOVES TOWARDS 4G.

11        SO THEIR FORESIGHT ON THE PACE OF CHANGE IN THE INDUSTRY

12   WAS NOT GOOD.

13   Q.   HOW ABOUT INVESTMENT?

14   A.   BROADCOM, AS I RECALL, HAD FOUR MAJOR ACQUISITIONS, SO

15   THEY FOCUSSED MORE ON EXTERNAL INVESTMENTS.

16        THEY DIDN'T DO WELL WITH THOSE.  THEY MADE TWO INVESTMENTS

17   JUST FOR LTE, TWO ACQUISITIONS THAT IS, AND DESPITE THAT, THEY

18   WERE STILL BEHIND WITH LTE.

19   Q.   AND THEN HOW ABOUT EXECUTION FOR BROADCOM?

20   A.   BROADCOM WAS NOT GOOD AT EXECUTION STARTING AROUND 2009.

21   THEIR PRODUCTS WERE DEFICIENT IN TERMS OF VARIOUS IMPORTANT

22   TECHNICAL FEATURES, THEY LACKED FUNCTIONS ALTOGETHER, SUCH AS

23   CARRIER AGGREGATION.  THEY WERE SLOW.

24        WHEN THEY DID BRING THEIR PRODUCTS TO MARKET, THEY WERE

25   RELATIVELY EXPENSIVE.

1          MY READING OF THE MARKET WAS THAT THEY EXPECTED PRICES TO

2     BE HIGHER THAN THEY WERE WHEN THEY ACTUALLY GOT THE PRODUCTS

3     EXECUTED AND READY FOR MARKET.

4     Q.   HAVE YOU REVIEWED THE TESTIMONY OFFERED BY VIDEO IN THIS

5     TRIAL FROM MR. MCGREGOR OF BROADCOM?

6     A.   YES.

7     Q.   AND DID THAT TESTIMONY CHANGE YOUR CONCLUSIONS REGARDING

8     BROADCOM IN ANY WAY?

9     A.   NO.  HE EXPLAINED THAT BROADCOM'S BUSINESS HAD BECOME NOT

10    ECONOMICALLY VIABLE, AND CONSISTENT WITH MY ANALYSIS, THERE

11    WERE A HOST OF REASONS, INDEPENDENT OF QUALCOMM'S CONDUCT, FOR

12    THAT STATUS OF THEIR BUSINESS BEING NOT ECONOMICALLY VIABLE.

13    Q.   LET ME TURN YOUR ATTENTION NOW TO THE OTHER 11 CASE

14    STUDIES THAT YOU DID BEYOND THE 3 THAT WE JUST DISCUSSED NOW.

15         IN ANY OF THESE CASE STUDIES, DID YOU FIND THAT INDUSTRY

16    FACTORS FAILED TO EXPLAIN THE OUTCOMES THAT YOU OBSERVED?

17    A.   NO.  TO THE CONTRARY.  WHEN YOU LOOK OVER TIME ACROSS

18    FIRMS, INDEPENDENT INDUSTRY FACTORS EXPLAIN WHAT HAPPENED AT

19    THE FIRM LEVEL.

20    Q.   AND WHAT DOES THAT RESULT TELL YOU AS AN IO ECONOMIST?

21    A.   IT'S VERY IMPORTANT.  IT'S SIMPLY THAT INDEPENDENT FACTORS

22    EXPLAIN THE REAL WORLD, THEY EXPLAIN WHAT HAPPENED IN THE

23    INDUSTRY.

24    Q.   AND WHAT DOES THAT TELL YOU WITH RESPECT TO THE FTC'S

25    CLAIM OF ANTICOMPETITIVE EFFECT?

1    A.   IT'S THAT THESE INDEPENDENT FACTORS ARE THE THINGS THAT

2    INFLUENCE REAL WORLD OUTCOMES, NOT THE FTC'S ALLEGATIONS WITH

3    RESPECT TO QUALCOMM'S CONDUCT.

4    Q.   LET'S DISCUSS NOW THE FINAL PART OF YOUR ANALYSIS, WHICH

5    WAS TO EXAMINE INDUSTRY PERFORMANCE.

6         WHAT WERE THE MEASURES OF INDUSTRY PERFORMANCE THAT YOU

7    LOOKED AT?

8    A.   I LOOKED AT PACE OF INNOVATION AND R&D, PRICES, AND

9    CONSUMER SURPLUS.

10   Q.   SO STARTING WITH THAT FIRST MEASURE, WHAT DID YOU OBSERVE

11   WITH RESPECT TO THE PACE OF INNOVATION IN THIS INDUSTRY?

12   A.   WELL, VERY SIMPLY, IT'S RAPID.

13   Q.   IN EVALUATING THE PACE OF INNOVATION, DID YOU EXAMINE R&D

14   EXPENDITURE IN THE INDUSTRY?

15   A.   I DID.  I EVALUATED R&D EXPENDITURES OF FIRMS IN THE

16   INDUSTRY OVER TIME.

17   Q.   AND WHAT DID YOU OBSERVE ABOUT THAT R&D SPENT?

18   A.   WELL, IF YOU LOOK AT FIRMS IN THE INDUSTRY AS A WHOLE,

19   THEY AVERAGE 23 PERCENT R&D RELATIVE TO REVENUE.  JUST BY

20   COMPARISON, PHARMA IS BELOW THAT.  THE ONLY INDUSTRY THAT I'M

21   AWARE OF THAT IS ABOVE THAT IS BIOTECH.

22        SO THIS IS AN INDUSTRY THAT INVESTS HEAVILY IN R&D.

23   Q.   AND IS THAT HIGH R&D SPENDING DRIVEN BY JUST ONE OR TWO

24   COMPANIES?

25   A.   NO, IT'S NOT.  IT'S -- IT'S INDUSTRY WIDE.

1    Q.   LET'S TAKE A LOOK AT THE FIRST SLIDE IN YOUR

2    DEMONSTRATIVES.

3         AND, YOUR HONOR, THESE HAVE BEEN STAMPED QDX 9348 AND

4    THEY'RE IN YOUR BINDER.

5         PROFESSOR SNYDER, DOES THIS SLIDE ILLUSTRATE THE POINT YOU

6    WERE JUST MAKING ABOUT R&D SPENDING IN THE INDUSTRY?

7    A.   YES.  THIS IS A CHART FROM MY REPORT THAT SHOWS FIRM-WIDE

8    R&D SPENDING AS A PERCENT OF REVENUE FOR TEN FIRMS, AND THE

9    FIRMS DIFFER, BUT MOST OF THE FIRMS ARE SPENDING BETWEEN 10 AND

10   30 PERCENT OF REVENUE ON R&D.

11        YOU CAN ALSO IDENTIFY INDIVIDUAL FIRMS.  FOR EXAMPLE,

12   MEDIATEK IS IN ORANGE.  IN 2005, THEY STARTED OUT AT SLIGHTLY

13   BELOW 15 PERCENT OF R&D SPENDING AS RELATIVE TO REVENUE.  AND

14   THEN AT THE END OF THE TIME SERIES IN 2017, THEY WERE UP TO

15   NEARLY 25 PERCENT.

16   Q.   ARE THE COMPANIES THAT ARE LOWER DOWN ON THIS CHART, SO

17   SAMSUNG AND HUAWEI AND INTEL, ARE THOSE COMPANIES SPENDING LESS

18   MONEY OVERALL THAN THE ONES THAT ARE HIGHER UP ON THE CHART?

19   A.   NO, NOT OVERALL, BECAUSE THIS IS A SPEND AS A PERCENT OF

20   REVENUE.  THEIR REVENUES ARE HUGE.  SO WHEN YOU ACTUALLY LOOK

21   AT THE DATA IN TOTAL SPEND, THEIR NUMBERS PUT THEM AT THE VERY

22   TOP OF THE INDUSTRY, NUMBER 1, 2, AND 3.

23   Q.   IN EVALUATING THE PACE OF INNOVATION IN THE INDUSTRY, DID

24   YOU ALSO LOOK AT IMPROVEMENTS IN MODEM CHIP QUALITY?

25   A.   I DID.

1    Q.    AND WHAT DID YOU SEE ABOUT MODEM CHIP QUALITY?  WHAT DID

2    YOU OBSERVE ABOUT THAT?

3    A.    WELL, ONE IMPORTANT PERFORMANCE INDICATOR IS THE INCREASE

4    IN SPEEDS FOR MODEM CHIPS, BOTH UPLINK AND DOWNLINK SPEEDS.

5    Q.    AND WHAT DID YOU OBSERVE ABOUT THOSE UPLINK AND DOWNLINK

6    SPEEDS?

7    A.    THAT THEY'VE, THEY'VE INCREASED DRAMATICALLY.

8    Q.    AND IS THAT A MEASURE OF MODEM CHIP QUALITY?

9    A.    IT IS BECAUSE THE FASTER SPEEDS MEAN THAT YOU CAN DO MORE

10   WITH THE DEVICES IN TERMS OF VIDEO STREAMING, REALTIME MAPS, ET

11   CETERA.

12   Q.    SO LET'S LOOK AT THE NEXT SLIDE IN YOUR DEMONSTRATIVES.

13   PROFESSOR SNYDER, DOES THIS SLIDE ILLUSTRATE THE POINT THAT YOU

14   WERE JUST MAKING ABOUT INCREASING TRANSMISSION SPEEDS?

15   A.    YES.  THIS IS ANOTHER CHART FROM MY REPORT.  IT SHOWS THE

16   DRAMATIC INCREASE IN THE SPEEDS OVER TIME.

17         IO ECONOMISTS DON'T OFTENTIMES SEE CHARTS THAT LOOK LIKE

18   THIS IN TERMS OF PERFORMANCE.

19   Q.    DID YOU ALSO OBSERVE IMPROVEMENTS TO AP FUNCTIONALITY?

20   A.    YES.  AP FUNCTION DOUBLED IN TERMS OF SPEED OVER THE LAST,

21   AS I RECALL, SIX YEARS.

22   Q.    WHAT HAS BEEN THE RESULT OF THESE IMPROVEMENTS IN MODEM

23   AND AP TECHNOLOGY?

24   A.    WELL, IT'S MADE THE DEVICES MORE USEFUL AND AS A RESULT,

25   USAGE HAS GONE UP.

1    Q.   LET'S LOOK AT NOW THE NEXT SLIDE IN YOUR DEMONSTRATIVES.

2    DOES THIS SLIDE ILLUSTRATE THE INCREASED USAGE THAT YOU WERE

3    REFERRING TO?

4    A.   YES.   THIS IS, AS THE TITLE INDICATES, ANNUAL MOBILE DATA

5    TRAFFIC, AND FROM THE TIME PERIOD 2011 TO 2016, THAT'S

6    INCREASED BY A FACTOR OF 14.

7    Q.   CAN YOU TELL US NOW ABOUT THE SECOND MEASURE OF INDUSTRY

8    WIDE PERFORMANCE YOU LOOKED AT, WHICH IS PRICING?

9    A.   YES.   PRICES FALL ONCE YOU LOOK AT WHAT'S HAPPENING WITH

10   PRODUCTS FOR A GIVEN GENERATION OVER TIME.

11   Q.   AND WHEN YOU'RE REFERRING TO PRICES HERE, ARE YOU

12   REFERRING TO THE MODEM CHIP PRICES OR THE END USER DEVICE

13   PRICES?

14   A.   THE MODEM CHIP PRICES.

15   Q.   SO LET'S TAKE A LOOK NOW AT THE LAST SLIDE IN YOUR

16   DEMONSTRATIVES.   DOES THIS SLIDE ILLUSTRATE YOUR POINT ABOUT

17   FALLING MODEM CHIP PRICES?

18   A.   YES.   THESE ARE PRICES FOR DIFFERENT GENERATIONS OF MODEM

19   CHIPS, BUT YOU CAN SEE THAT AFTER THEIR INTRODUCTION, AVERAGE

20   PRICES TEND TO FALL.

21        IF YOU LOOK AT LTE AT THE END, THEIR AVERAGE -- THE

22   AVERAGE PRICES FOR THOSE CHIPS ARE ABOUT AT THE SAME LEVEL AS 3

23   CHIP -- EXCUSE ME -- 3G CHIPS BACK IN 2008.

24   Q.   YOU SAID THAT THE THIRD MEASURE OF INDUSTRY PERFORMANCE

25   THAT YOU LOOKED AT IS CONSUMER SURPLUS.

SNYDER DIRECT BY MR. SHACHAM

1      WHAT IS CONSUMER SURPLUS?

2    A.   THAT'S A STANDARD ECONOMICS CONCEPT.  IT'S THE DIFFERENCE

3    BETWEEN WHAT CONSUMERS ARE WILLING TO PAY FOR A PRODUCT OR

4    SERVICE AND WHAT THEY ACTUALLY PAY.

5    Q.   WHAT DID YOU OBSERVE ABOUT CONSUMER SURPLUS FOR CELLULAR

6    DEVICES?

7    A.   IT'S STAGGERING.  IT'S GROWN.  IF YOU JUST LOOK AT THE

8    U.S., RECENT ESTIMATES PUT U.S. CONSUMER SURPLUS AT 1.5

9    TRILLION.

10   Q.   THAT'S TRILLION WITH A "T"?

11   A.   TRILLION DOLLARS WITH A "T."

12   Q.   SO HOW DO THESE HIGH MEASURES OF INDUSTRY PERFORMANCE --

13   WHAT DO THESE HIGH MEASURES OF INDUSTRY PERFORMANCE TELL YOU IN

14   THE CONTEXT OF YOUR STUDY?

15   A.   WELL, I LOOKED AT INDUSTRY PERFORMANCE TO CONFIRM MY

16   CONCLUSION ABOUT THE LACK OF REAL WORLD EFFECTS ON PARTICULAR

17   FIRMS.  AND WHEN YOU LOOK AT INDUSTRY PERFORMANCE AND YOU THINK

18   ABOUT THE ALLEGED CONDUCT, WHICH I UNDERSTAND THEIR CLAIMS THAT

19   IT'S BEEN IN PLACE FOR A LONG PERIOD OF TIME, THEN IF YOU

20   FOLLOW THE LOGIC OF THE FTC'S CLAIM, THEN YOU WOULD SEE OVERALL

21   IMPAIRED PERFORMANCE IN THE INDUSTRY.

22       I FOUND JUST THE OPPOSITE.  IT'S AN UNDERSTATEMENT TO SAY

23   THAT THIS IS AN INDUSTRY THAT DOESN'T SHOW THOSE SIGNS OF

24   IMPAIRMENT.

25   Q.   PROFESSOR SNYDER, HOW DO YOU CHARACTERIZE THE DIFFERENCES

1    BETWEEN THE APPROACH THAT YOU TOOK AND THE APPROACH THAT

2    PROFESSOR SHAPIRO TOOK?

3    A.   THE APPROACHES ARE VERY DIFFERENT.  MY APPROACH IS TO

4    CONDUCT AN EMPIRICAL ANALYSIS INFORMED BY INDUSTRIAL

5    ORGANIZATION PRINCIPLES, INFORMED BY AN UNDERSTANDING OF WHAT

6    FACTORS INFLUENCE FIRM LEVEL SUCCESS, OR FAILURE, IN THESE

7    KINDS OF INDUSTRIES, AND IN THIS INDUSTRY IN PARTICULAR, AND

8    ALSO GROUNDED IN SOCIAL SCIENCE PRINCIPLES WHERE THE OBJECTIVE

9    IS TO DETERMINE CAUSALITY, TO ESTABLISH CAUSALITY.

10       PROFESSOR SHAPIRO'S APPROACH IS PURELY THEORETICAL.

11   Q.   WHAT DO YOU MEAN BY THAT?

12   A.   LET ME GO BACK TO THE POINT ABOUT THE COUNTER FACTUAL

13   WORLD.

14       HE EXPLAINED THE CONCEPT OF A COUNTER FACTUAL WORLD, BUT

15   HE DIDN'T DEVELOP WHAT INDUSTRY FACTORS WOULD BE PRESENT IN

16   THAT COUNSELLOR FACTUAL WORLD.  HE DIDN'T IDENTIFY OUTCOMES

17   THAT WOULD BE DIFFERENT FROM THE REAL WORLD OUTCOMES THAT WE

18   OBSERVE.

19       IN THE END, WHAT HE'S GOT IS SIMPLY A THEORETICAL CLAIM

20   THAT ANTICOMPETITIVE HARMS MUST INEVITABLY FOLLOW FROM THE

21   ALLEGED CONDUCT.

22   Q.   AND WHAT'S YOUR REACTION TO THAT?

23   A.   I AM -- I AM TAKEN ABACK.  THIS IS -- THIS IS AN INDUSTRY

24   SETTING WHERE AN IO ECONOMIST CAN APPLY IO PRINCIPLES TO

25   EVALUATE WHAT'S HAPPENING IN THE INDUSTRY.

1          IN THIS INDUSTRY, WE HAVE A LOT OF REAL WORLD OUTCOMES TO

2     OBSERVE.  AS I MENTIONED, THE TOP 5 CHANGE WITH GREAT

3     FREQUENCY.

4          SO HERE'S A SITUATION WHERE YOU CAN APPLY IO PRINCIPLES,

5     YOU HAVE A LOT OF DATA.  MOST ECONOMISTS WOULD SAY, THIS IS

6     GREAT, LET'S ENGAGE THE DATA.

7          BUT PROFESSOR SHAPIRO SAID, IN EFFECT, IT'S TOO

8     COMPLICATED.

9     Q.   DO YOU THINK THAT THE DIFFERENCES IN APPROACH EXPLAIN THE

10    DIFFERENT CONCLUSIONS THAT YOU AND PROFESSOR SHAPIRO REACHED?

11    A.   YES.  IF YOU JUST RELY ON THEORY, OFTENTIMES YOU GET THE

12    WRONG ANSWER WITH RESPECT TO THE REAL WORLD.

13    Q.   CAN YOU PROVIDE AN EXAMPLE TO ILLUSTRATE THIS PROBLEM IN

14    PROFESSOR SHAPIRO'S METHODOLOGY?

15    A.   YES.  I MEAN, HIS THEORY IS THAT QUALCOMM'S CONDUCT

16    REDUCED INVESTMENT BY VARIOUS FIRMS.  BUT HE DIDN'T IDENTIFY

17    ANY OUTCOMES THAT WOULD ESTABLISH THAT AS A RESULT.

18    Q.   AND HAVE YOU IDENTIFIED ANY ALTERNATIVE EXPLANATIONS FOR

19    WHY A COMPANY IN THIS INDUSTRY MAY HAVE SPENT LESS ON R&D THAN

20    ANOTHER COMPANY?

21    A.   YES.  AS I INDICATED, SOME FIRMS ARE FAST FOLLOWERS AND

22    THEY HAVE POLICIES THAT LIMIT THEIR INVESTMENTS AWAY FROM THE

23    SO-CALLED LEADING EDGE.  THAT'S INDEPENDENT OF ALLEGED CONDUCT.

24    Q.   DO YOU SEE A SIMILAR FLAW WITH PROFESSOR SHAPIRO'S CLAIMS

25    ABOUT REDUCED MARGINS?

1   A.   I DO.  MARGINS ARE IMPORTANT IN BUSINESS, OF COURSE.  BUT

2   MARGINS VARY ACROSS PRODUCTS, ACROSS FIRMS, ACROSS TIME.

3        SO THERE ARE A LOT OF INDEPENDENT FACTORS THAT INFLUENCE

4   MARGINS.

5        PROFESSOR SHAPIRO HASN'T IDENTIFIED ANYTHING THAT WOULD BE

6   DIFFERENT SPECIFICALLY IN THIS COUNTER FACTUAL WORLD FROM

7   WHAT'S OBSERVED IN THE REAL WORLD.

8   Q.   AND DID YOU IDENTIFY ANY EXPLANATIONS FOR WHY ONE CHIP

9   MAKER'S MARGINS MIGHT BE LOWER THAN ANOTHER'S?

10  A.   WELL, GO BACK TO ONE OF THE IMPORTANT FACTORS THAT I

11  IDENTIFIED, INVESTMENT AND INVESTMENT EFFICIENCY.

12       IF FIRMS ARE MORE EFFICIENT WITH INVESTMENT, THEN THEY'RE

13  GOING TO HAVE GREATER MARGINS.  IF THEY'RE LESS EFFICIENT WITH

14  INVESTMENT, THEY'RE GOING TO HAVE LOWER MARGINS.

15            MR. SHACHAM:  THANK YOU, PROFESSOR SNYDER.

16            THE COURT:  OKAY.  TIME IS 4:09.

17       (PAUSE IN PROCEEDINGS.)

18            MS. IKEDA:  YOUR HONOR, MAY WE APPROACH WITH SOME

19  BINDERS?

20            THE COURT:  YES.  DOES SOMEBODY NEED ANY WATER, THE

21  PERSON WHO'S COUGHING?  DO YOU NEED ANY WATER?  WOULD YOU LIKE

22  WATER?

23            MR. KOTARSKI:  NO, I'M OKAY.  THANK YOU.

24            THE COURT:  OKAY.  BECAUSE WE CAN GIVE YOU SOME WATER

25  OR ACTUALLY, GIVE HIM COUGH DROPS.

1        (PAUSE IN PROCEEDINGS.)

2            THE COURT:  OKAY.  LET ME KNOW WHEN YOU'RE READY.

3            MS. IKEDA:  I'M READY.

4            THE COURT:  OKAY.  4:10.  GO AHEAD, PLEASE.

5                        **CROSS-EXAMINATION**

6    BY MS. IKEDA:

7    Q.   GOOD AFTERNOON, SIR.

8    A.   GOOD AFTERNOON.

9    Q.   YOU'RE NOT AN EXPERT IN CELLULAR TECHNOLOGY, ARE YOU?

10   A.   I'M NOT.

11   Q.   AND YOU'RE NOT AN EXPERT IN THE MODEM CHIP INDUSTRY;

12   CORRECT?

13   A.   I'M NOT.  I APPLIED IO PRINCIPLES TO THE INDUSTRY, BUT I'M

14   NOT AN EXPERT.

15   Q.   AND YOU APPROACHED YOUR ASSIGNMENT IN THIS CASE BY

16   INTRODUCING TWO HYPOTHESES; IS THAT RIGHT?

17   A.   YES.

18   Q.   AND ONE OF THOSE IS CALLED WHAT YOU TERMED THE PLAINTIFF'S

19   HYPOTHESIS?

20   A.   YES, THAT'S --

21   Q.   AND THE OTHER -- OH, SORRY.

22   A.   THAT'S THE HYPOTHESIS THAT QUALCOMM'S ALLEGED CONDUCT

23   CAUSED INDUSTRY OUTCOMES.

24   Q.   AND THE OTHER HYPOTHESIS IS WHAT YOU CALLED THE INDUSTRY

25   FACTORS HYPOTHESIS; CORRECT?

1    A.   YES, THAT'S THE OBSERVED REAL WORLD OUTCOMES ARE EXPLAINED

2    FULLY BY INDEPENDENT FACTORS.

3    Q.   AND MORE SPECIFICALLY, UNDER THE INDUSTRY FACTORS

4    HYPOTHESIS, THE SUCCESS AND FAILURE OF MODEM CHIP SUPPLIERS

5    DEPENDS ON THREE FIRM LEVEL FACTORS; RIGHT?

6    A.   YES.

7    Q.   AND THAT'S FORESIGHT, INVESTMENT EFFICIENCY, AND

8    EXECUTION; RIGHT?

9    A.   YES.

10   Q.   NOW, YOUR INDUSTRY FACTORS HYPOTHESIS AND THE PLAINTIFF'S

11   HYPOTHESIS ARE NOT MUTUALLY EXCLUSIVE; CORRECT?

12   A.   NOT AT THE OUTSET, NO.

13   Q.   SO THE CONCLUSION THAT AN INDUSTRY SHOWED SIGNS OF MARKET

14   PARTICIPANT'S POOR FORESIGHT ISN'T INCOMPATIBLE WITH A

15   CONCLUSION THAT THE INDUSTRY ALSO SHOWED SIGNS OF A DOMINANT

16   FIRM'S ANTICOMPETITIVE CONDUCT; CORRECT?

17   A.   THAT'S CORRECT.  AS I APPROACHED MY WORK, I EXPLAINED THAT

18   I EVALUATED REAL WORLD INCOMES -- EXCUSE ME -- OUTCOMES TO SEE

19   IF, IN FACT, THOSE OUTCOMES WERE EXPLAINED BY INDUSTRY FACTORS

20   OR WERE NOT EXPLAINED BY INDUSTRY FACTORS, IN WHICH CASE THEN I

21   WOULD TURN TO THE ALLEGED CONDUCT FOR A POTENTIAL EXPLANATION.

22   Q.   OKAY.  AND THE CONCLUSION THAT THE INDUSTRY SHOWED SIGNS

23   OF POOR INVESTMENT DECISIONS ISN'T INCOMPATIBLE WITH THE

24   CONCLUSION THAT THE INDUSTRY ALSO SHOWED SIGNS OF A DOMINANT

25   FIRM'S ANTICOMPETITIVE CONDUCT; CORRECT?

SNYDER CROSS BY MS. IKEDA

1   A.   I JUST WANT TO MAKE SURE.  I'M NOT SAYING THAT THE

2   INDUSTRY SHOWED POOR INVESTMENT DECISIONS.  I'M SAYING IT

3   DIFFERED ACROSS FIRMS.

4   Q.   SURE.  I'M JUST SPEAKING THEORETICALLY RIGHT NOW JUST TO

5   UNDERSTAND YOUR POSITION.

6        SO THE CONCLUSION THAT AN INDUSTRY SHOWED SIGNS OF POOR

7   INVESTMENT DECISIONS ISN'T COMPATIBLE WITH A CONCLUSION THAT

8   THE INDUSTRY ALSO SHOWED SIGNS OF A DOMINANT FIRM'S

9   ANTICOMPETITIVE CONDUCT; RIGHT?

10  A.   I'M NOT SURE WHAT ELSE TO ADD.  I -- I DIDN'T CHARACTERIZE

11  OVERALL INDUSTRY INVESTMENT DECISIONS.  I DID IT FIRM BY FIRM.

12  Q.   I'M NOT ASKING WHAT YOU DID RIGHT NOW.  I'M ASKING SIMPLY

13  WHETHER THESE TWO CONCLUSIONS ARE INCOMPATIBLE?

14  A.   I WOULD SAY THEY'RE NOT WITHOUT, YOU KNOW --

15  Q.   THANK YOU?

16  A.   -- DOING THE ANALYSIS.

17  Q.   AND THE CONCLUSION THAT THE INDUSTRY SHOWED SIGNS OF POOR

18  EXECUTION BY FIRMS ISN'T INCOMPATIBLE WITH THE CONCLUSION THAT

19  THE INDUSTRY ALSO SHOWED SIGNS OF A DOMINANT FIRM'S

20  ANTICOMPETITIVE CONDUCT; CORRECT?

21  A.   IT'S BASICALLY THE SAME ANSWER.  I DIDN'T ANALYZE THIS ON

22  AVERAGE.  I DID IT BY FIRM.

23  Q.   SURE.  SO THAT ANSWER IS NO?

24  A.   EXCUSE ME.  I'M JUST GOING TO GET TO THE BOTTOM LINE.  AND

25  IT'S NOT THE CASE THAT SOMEHOW OVERALL OR AGGREGATE EXECUTION

1    COULD BE DIFFERENT.

2    Q.   NOW, YOUR CONCLUSION IN THIS CASE IS THAT EVERY MODEM CHIP

3    SUPPLIER'S OUTCOME THAT YOU LOOKED AT WAS EXPLAINED BY THE

4    INDUSTRY FACTORS; CORRECT?

5    A.   YES.  I FOUND A CLEAR, COMPELLING EXPLANATION FOR REAL

6    WORLD OUTCOMES BASED ON THESE FACTORS.

7    Q.   AND YOU DIDN'T GET TO THAT STEP OF EVALUATING PLAINTIFF'S

8    HYPOTHESIS AND LOOKING AT IF I REMEMBER OUTCOMES IN THE ABSENCE

9    OF QUALCOMM'S CONDUCT; CORRECT?

10   A.   I THINK I TESTIFIED, IF I HAD FOUND OUTCOMES THAT WERE

11   INCONSISTENT WITH THE EXPLANATIONS THAT WERE POTENTIALLY

12   AVAILABLE BY INDEPENDENT FACTORS, THAT I WOULD HAVE GOTTEN TO

13   THAT STEP.

14        BUT I DIDN'T SEE SUCH REAL WORLD OUTCOMES.

15   Q.   SO YOU DIDN'T GET TO THAT STEP OF EVALUATING PLAINTIFF'S

16   HYPOTHESIS; CORRECT?

17   A.   WELL, IF PROFESSOR SHAPIRO HAD ESTABLISHED THAT THE

18   OUTCOMES IN THE REAL WORLD WERE DIFFERENT, OR IF I HAD FOUND

19   THEM, THEN I WOULD HAVE GOTTEN TO THAT STEP.

20   Q.   SO YOU DIDN'T GET TO THAT STEP?

21   A.   I DIDN'T GET TO THAT STEP BECAUSE I DID NOT FIND REAL

22   WORLD OUTCOMES THAT WERE NOT FULLY EXPLAINED, COMPELLINGLY

23   EXPLAINED BY INDEPENDENT FACTORS.

24   Q.   AND YOU'D AGREE THAT ANTICOMPETITIVE CONDUCT BY A DOMINANT

25   FIRM CAN AFFECT ITS RIVALS' INVESTMENT DECISIONS; RIGHT?

1    A.   YES, AT A THEORETICAL LEVEL, THAT'S CERTAINLY TRUE.

2    Q.   AND YOU'D ALSO AGREE THAT ANTICOMPETITIVE CONDUCT BY A

3    DOMINANT FIRM CAN AFFECT ITS RIVALS' FORESIGHT?

4    A.   WELL, I THINK YOU'RE ASKING ME IF THE FACTORS, SUCH AS

5    FORESIGHT, ARE INDEPENDENT, AND I EXPLAINED WHY I FOUND THAT

6    NOT TO BE AN ISSUE IN MY ANALYSIS.

7         I EVALUATED THE INDUSTRY OVER A LONG HISTORY ACROSS FIRMS,

8    AND I FOUND THIS TO BE INDEPENDENT.

9         YOU'RE ASKING ME IF IT'S THEORETICALLY POSSIBLE, YES.

10   Q.   OKAY.  AND YOU'D ALSO AGREE, THEORETICALLY, THAT

11   ANTICOMPETITIVE CONDUCT BY A DOMINANT FIRM CAN AFFECT ITS

12   RIVALS' EXECUTION; CORRECT?

13   A.   BASICALLY THE SAME ANSWER.  THEORETICALLY IT'S POSSIBLE.

14   I DIDN'T FIND THAT HERE.  THERE WERE CLEAR EXECUTION,

15   FORESIGHT, INVESTMENT INEFFICIENCIES INDEPENDENT OF THE

16   CONDUCT.

17   Q.   OKAY.  SO, IN FACT, THERE'S A BODY OF ECONOMIC LITERATURE

18   THAT DISCUSSES THE ANTICOMPETITIVE EFFECTS THAT A DOMINANT

19   FIRM'S CONDUCT CAN HAVE ON ITS RIVALS' INVESTMENT DECISIONS;

20   RIGHT?

21   A.   THERE IS SOME LITERATURE ON THIS.  I DON'T KNOW THAT I

22   WOULD CHARACTERIZE IT AS A BODY, BUT I AGREE THERE'S LITERATURE

23   ON THESE QUESTIONS.

24   Q.   AND THE LITERATURE ALSO DISCUSSES THE POTENTIAL

25   ANTICOMPETITIVE EFFECTS THAT A DOMINANT FIRM'S CONDUCT CAN HAVE

1    ON ITS RIVALS' ABILITY TO REACH SCALE; CORRECT?

2    A.   YES, THERE ARE THESE KINDS OF THEORETICAL PAPERS THAT

3    INVESTIGATE -- EXCUSE ME, THAT INVESTIGATE THOSE ISSUES.

4    Q.   YOU'D AGREE THERE'S ALSO ECONOMIC LITERATURE DESCRIBING

5    HOW ANTICOMPETITIVE CONDUCT CAN CAUSE ITS RIVALS TO FAIL;

6    CORRECT?

7    A.   YES, THERE'S A LOT OF THEORY ABOUT THIS.

8    Q.   NOW, YOU STATED EARLIER THAT YOU BELIEVED THAT THE

9    FORESIGHT, INVESTMENT EFFICIENCY, AND EXECUTION OF QUALCOMM'S

10   RIVALS WOULD NOT BE INFLUENCED BY QUALCOMM'S CONDUCT; IS THAT

11   RIGHT?

12   A.   BASED ON THE ANALYSIS THAT I DID, THAT'S CORRECT.  I - I

13   EVALUATED THAT ISSUE AND FOUND THAT THESE ARE INDEPENDENT

14   FACTORS.

15   Q.   AND YOU HAVE NO OPINION ON HOW YOUR ANALYSIS WOULD CHANGE

16   IF QUALCOMM'S CONDUCT DID, IN FACT, AFFECT ITS RIVALS'

17   FORESIGHT, INVESTMENT EFFICIENCY, AND EXECUTION; CORRECT?

18   A.   WELL, I DON'T HAVE AN OPINION BECAUSE I DON'T THINK ANYONE

19   HAS IDENTIFIED HOW THESE FACTORS ARE SO-CALLED TAINTED.

20   Q.   YOU DON'T HAVE AN OPINION ON HOW YOUR ANALYSIS WOULD

21   CHANGE IF QUALCOMM'S CONDUCT AFFECTED ITS RIVALS' FORESIGHT,

22   INVESTMENT EFFICIENCY, AND EXECUTION; CORRECT?

23   A.   WELL, ESSENTIALLY IT'S TWO PARTS.  ONE, MY ANALYSIS SHOWS

24   THAT THEY WERE INDEPENDENT; AND, SECONDLY, I HAVEN'T FOUND ANY

25   EVIDENCE TO THE CONTRARY.

1            SO OF COURSE -- THIS IS NOT RELEVANT TO MY ANALYSIS GIVEN

2     THOSE TWO THINGS.

3     Q.   I'M SIMPLY ASKING WHETHER YOU HAVE AN OPINION ON THIS.

4     A.   I DON'T WANT TO DELAY THINGS.  I DIDN'T FIND THESE FACTORS

5     TO BE ANYTHING BUT INDEPENDENT.  I'M NOT AWARE THAT ANYONE HAS

6     EXPLAINED HOW THEY'RE TAINTED OR NOT INDEPENDENT.

7            IF I HAD, I WOULD HAVE EVALUATED THAT AS PART OF MY

8     ANALYSIS.

9     Q.   SO COULD YOU PLEASE TURN TO YOUR DEPOSITION, PAGE 70, LINE

10    23.  IT'S ALSO UP ON THE SCREEN IF THAT'S HELPFUL.

11    A.   OH, THANK YOU.

12    Q.   SIR, YOU WERE ASKED AT LINE 23, "IF IT WERE THE CASE THAT

13    JUST TAKE AS A GIVEN THAT QUALCOMM'S CONDUCT DID EFFECT MODEM

14    CHIP SUPPLIERS, FORESIGHT, THEIR OWN VESTMENT DECISIONS AND

15    THEIR EXECUTION, HOW, IF AT ALL, WOULD THAT CHANGE YOUR

16    ANALYSIS.

17            AND YOU ANSWERED, "I DON'T HAVE AN OPINION ABOUT THAT."

18            CORRECT?

19    A.   YES, GIVEN THAT I HAVEN'T SEEN ANY EVIDENCE THAT WOULD

20    INDICATE --

21    Q.   RIGHT?

22    A.   -- THE NATURE OF THAT RELATIONSHIP.

23    Q.   SURE.  AND YOU DIDN'T ANALYZE THAT POSSIBILITY BECAUSE YOU

24    HAVEN'T SEEN ANY CLAIM BY THE FTC, OR TESTIMONY FROM

25    PROFESSOR SHAPIRO, ABOUT THAT RELATIONSHIP, OR POTENTIAL

1    RELATIONSHIP; CORRECT?

2    A.   THAT'S WHAT I STATED AND I STAND BY IT, YES.

3    Q.   YOU ALSO STATED THAT YOU WOULDN'T RULE OUT THE POSSIBILITY

4    THAT QUALCOMM'S CONDUCT AFFECTED ITS RIVALS' FORESIGHT,

5    INVESTMENTS, AND EXECUTION; CORRECT?

6    A.   THAT'S CORRECT.  I WOULDN'T RULE THAT OUT.  IT'S A

7    THEORETICAL POSSIBILITY.  I DIDN'T FIND IT.

8    Q.   NOW, IN ADDITION TO ANALYZING INDIVIDUAL MODEM CHIP

9    SUPPLIER PERFORMANCE, YOU ALSO ANALYZED OVERALL INDUSTRY

10   PERFORMANCE; CORRECT?

11   A.   YES.

12   Q.   AND WHAT YOUR ANALYSIS SHOWS THERE IS THAT THERE'S NO

13   OBVIOUS BASIS FOR SAYING THAT INDUSTRY PERFORMANCE WAS

14   IMPAIRED; CORRECT?

15   A.   CORRECT.

16   Q.   AND YOUR ANALYSIS DOESN'T ADDRESS WHETHER INDUSTRY

17   PERFORMANCE COULD HAVE BEEN BETTER; CORRECT?

18   A.   THAT'S RIGHT.  IT'S HARD TO IMAGINE IT COULD BE BETTER.

19   BUT ANYTHING IS POSSIBLE.

20   Q.   SO, FOR EXAMPLE, YOU POINTED EARLIER TO INCREASING

21   DOWNLINK AND UPLINK SPEEDS OVER TIME AND YOU POINTED TO THAT AS

22   EVIDENCE AGAINST THE IMPLICATION THAT QUALCOMM'S ALLEGED

23   EXCLUSIONARY CONDUCT HAS IMPAIRED INDUSTRY PERFORMANCE;

24   CORRECT?

25   A.   YES.

1    Q.   BUT YOU DIDN'T ANALYZE WHETHER DOWNLINK AND UPLINK SPEEDS

2    COULD HAVE BEEN BETTER IN THE ABSENCE OF QUALCOMM'S CONDUCT,

3    DID YOU?

4    A.   THAT'S CORRECT, NOR DID, OF COURSE, PROFESSOR SHAPIRO.

5    Q.   SURE.

6    A.   THIS WAS A CONFIRMING TEST.

7    Q.   OKAY.  AND YOU ALSO POINT TO THE FACT THAT CHIP PRICES

8    HAVE CONTINUED TO DECLINE AS EVIDENCE AGAINST THE IMPLICATION

9    THAT QUALCOMM'S CONDUCT IMPAIRED INDUSTRY PERFORMANCE; CORRECT?

10   A.   CORRECT.

11   Q.   BUT YOU DIDN'T ANALYZE WHETHER PRICES WOULD HAVE COME DOWN

12   EVEN MORE IN THE ABSENCE OF QUALCOMM'S CONDUCT; CORRECT?

13   A.   ANYTHING IS POSSIBLE.  I DIDN'T ANALYZE THAT.  THIS WAS A

14   CONFIRMING TEST.

15           MS. IKEDA:  NO FURTHER QUESTIONS.  THANK YOU.

16           THE COURT:  ALL RIGHT.  THE TIME IS 4:20.

17           MR. SHACHAM:  NO FURTHER QUESTIONS, YOUR HONOR.

18           THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

19   SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

20           MR. SHACHAM:  NOT SUBJECT TO RECALL, YOUR HONOR.

21           THE COURT:  WHAT DO YOU THINK?

22           MS. IKEDA:  NO.

23           MS. MILICI:  NOT FOR THE FTC.

24           THE COURT:  ALL RIGHT.  THEN YOU HAVE COMPLETED YOUR

25   TRIAL TESTIMONY, AND YOU ARE FREE TO LEAVE.

```
1                THE WITNESS:  THANK YOU, YOUR HONOR.

2                THE COURT:  CALL YOUR NEXT WITNESS, PLEASE.  YOU HAVE

3      TEN MINUTES.

4                MR. BYARS:  BRENT BYARS FOR QUALCOMM.  WE HAVE AN

5      EIGHT MINUTE DEPOSITION VIDEO BY THOMAS LINDNER, AND I'D LIKE

6      TO OFFER DOCUMENTS INTO EVIDENCE IF YOU COULD START MY TIME.

7                THE COURT:  OKAY.  TIME IS 4:21.  GO AHEAD, PLEASE.

8                MR. BYARS:  I OFFER QX 110 AND QX 113.

9                THE COURT:  ALL RIGHT.  ANY OBJECTION?  WAS THERE ANY

10     OBJECTION?  WHOSE WITNESS IS THIS?

11               MS. MILICI:  WE DON'T KNOW HE WAS COMING UP NEXT.

12     WE'RE JUST -- I DON'T THINK WE HAVE ANY OBJECTION.

13               MR. MATHESON:  NO OBJECTION.

14               MS. MILICI:  NO OBJECTION.

15               THE COURT:  OKAY.  THEN THOSE ARE ADMITTED.  ARE YOU

16     GUYS GOING OUT OF ORDER AGAIN?  WHO'S YOUR NEXT WITNESS?

17               MR. BYARS:  THIS IS NEXT ON THE LIST.

18               MR. VAN NEST:  THIS IS THE LIST WE PUBLISHED AND YOUR

19     HONOR HAS.

20               THE COURT:  OKAY.  SO IT WAS ONLY MR. WOLFF THAT WAS

21     OUT OF ORDER AND THAT'S BECAUSE OF TIME SITUATION.

22          ALL RIGHT.  LET'S GO AHEAD, PLEASE.  THEY'RE BOTH

23     ADMITTED.

24          (DEFENDANT'S EXHIBITS QX 110 AND QX 113 WERE ADMITTED IN

25     EVIDENCE.)
```

1          **(THE VIDEOTAPED DEPOSITION OF THOMAS LINDNER WAS PLAYED IN**

2      **OPEN COURT OFF THE RECORD.)**

3              THE COURT:  OKAY.  TIME IS 4:30.

4          OKAY.  SO I THINK THIS IS THE END FOR TODAY.

5          LET ME GIVE YOU YOUR TIME, PLEASE.

6          (PAUSE IN PROCEEDINGS.)

7              THE COURT:  OKAY.  SO FOR QUALCOMM TODAY HAS USED 4

8      HOURS AND 22 MINUTES.  SO WITH THE TIME THAT WAS PREVIOUSLY

9      USED, THAT WILL BE 21 HOURS AND 11 MINUTES.

10          ANYONE WANT TO JUST DOUBLE-CHECK THAT?  IF IT WAS 16 HOURS

11      AND 49 MINUTES ON FRIDAY, 21 AND 11.

12          AND THEN TODAY FTC USED 1 HOUR AND 21 MINUTES.  SO YOU

13      WERE AT 21 AND 19 MINUTES ON FRIDAY, SO THAT WOULD BE 22 HOURS

14      AND 40 MINUTES.  LET ME JUST DOUBLE-CHECK THAT.  I THINK THAT'S

15      RIGHT, 22 HOURS AND 40 MINUTES.

16          OKAY.  SO IN TOTAL, WHAT, FTC HAS 2 HOURS AND 20 MINUTES?

17      DOES THAT SOUND RIGHT?  AND QUALCOMM HAS 3 HOURS AND 49

18      MINUTES.

19          DOES THAT SOUND RIGHT?

20              MR. VAN NEST:  YES, YOUR HONOR.

21              THE COURT:  OKAY.  WOW.  SO WE HAVE BASICALLY NOT

22      VERY MUCH TIME.  THAT'S EFFECTIVELY A DAY AND CHANGE.  WHAT IS

23      THAT, 6 HOURS AND 9 MINUTES?  ALL RIGHT.  WELL, WE WOULDN'T BE

24      ABLE TO FINISH ON FRIDAY.

25          WE HAVE SO LITTLE TIME LEFT.  YOU CAN'T GET STARTED ON

```
 1    FRIDAY?  I KNOW I HAD APPROVED IT WITH THOSE CONDITIONS, THAT

 2    WE DO THE HPO'S ON FRIDAY, AND THE PARTIES FILE THEIR CLOSING

 3    ARGUMENT SLIDE OBJECTIONS ON TUESDAY MORNING.

 4              MS. MILICI:  YOUR HONOR, I THINK THE ISSUE IS THAT

 5    THE WITNESSES THAT THEY HAVE COMING ON FRIDAY IS THEIR CURRENT

 6    HEAD OF LICENSING AND THEIR MAIN ECONOMIC EXPERT, AND SO IT'S

 7    HARD TO MAKE A, FOR US TO MAKE A FINAL CALL ON HOW TO USE A

 8    VERY LIMITED NUMBER OF MINUTES UNTIL WE'VE HEARD WHAT THAT

 9    TESTIMONY IS.

10              THE COURT:  ALL RIGHT.  BUT I WOULD LIKE TO FINISH AS

11    EARLY AS POSSIBLE ON MONDAY.

12              MS. MILICI:  UNDERSTOOD.

13              THE COURT:  THAT WOULD ALSO ENABLE THE PARTIES TO

14    PREPARE YOUR CLOSING ARGUMENTS AND GIVE YOU MORE LEAD TIME ON

15    THAT.  SO DO WHAT YOU CAN SO THAT WE CONCLUDE AS EARLY AS

16    POSSIBLE ON MONDAY.

17              MS. MILICI:  WE ABSOLUTELY WILL.

18              THE COURT:  OKAY.  THEN I WILL NOT SEE YOU AGAIN

19    UNTIL FRIDAY MORNING AT 9:00.

20              MR. VAN NEST:  YOUR HONOR?

21              THE COURT:  YES.

22              MR. VAN NEST:  I JUST HAVE ONE HEADS UP FOR THE COURT

23    SO YOU WON'T BE SURPRISED.

24              THE COURT:  OKAY.

25              MR. VAN NEST:  YOUR HONOR RULED EARLIER THAT EVENTS
```

1817

```
 1      OCCURRING AFTER MARCH OF 2018 WOULD BE EXCLUDED AND THE

 2      WITNESSES HAVE STUCK TO THAT.

 3          WE DID HAVE THE ONE EXCEPTION FOR APPLE IPHONES LAUNCHED

 4      IN 2018.

 5          WE NEED TO FILE A PROFFER OF WHAT EVIDENCE WE WOULD HAVE

 6      ELICITED.  WE INTEND TO DO THAT TONIGHT.  IT'S RATHER SHORT.

 7      NONE OF IT IS UNDER SEAL.

 8          SO WE INTEND TO FILE THAT.  IT'S SIMPLY A RECITATION OF

 9      EVIDENCE.  WE'RE NOT ASKING FOR A RULING OR ANYTHING OF THAT

10      NATURE.

11          AND I DON'T BELIEVE IT'S SUBJECT TO ANY SEALING.  BUT I

12      DIDN'T WANT TO JUST FILE IT WITHOUT JUST ALERTING THE COURT

13      THAT IT'S COMING.

14              THE COURT:  OKAY.

15              MR. VAN NEST:  IT'S SIMPLY TO MAKE SURE OUR RECORD IS

16      COMPLETE.

17              THE COURT:  SURE.  THANK YOU.

18              MR. VAN NEST:  THANK YOU.

19              THE COURT:  ALL RIGHT.  IS FTC GOING TO FILE A

20      RESPONSE TO THAT?

21              MS. MILICI:  YOUR HONOR, THIS IS LITERALLY THE FIRST

22      WE'VE EVER HEARD OF THIS.

23              THE COURT:  OH.

24              MS. MILICI:  SO I DON'T KNOW WHAT THEY'RE PLANNING TO

25      FILE, I DON'T KNOW HOW LONG IT IS.  I DON'T KNOW WHAT IT'S
```

1    BASED UPON.  THIS IS THE FIRST TIME WE'VE HEARD ABOUT IT

2    STANDING RIGHT HERE.

3              THE COURT:  WHAT IS IT BASED ON SINCE THERE WASN'T

4    ANY DISCOVERY?

5              MR. VAN NEST:  EVERYTHING HAS BEEN PRODUCED.  IT'S

6    PRIMARILY LICENSE AGREEMENTS THAT WERE ENTERED INTO FOR 5G

7    AFTER MARCH OF 2018.  THEY'VE ALL BEEN PRODUCED.  IT'S SOME

8    ANNOUNCEMENTS BY THE FTC AND OTHERS, OR MAYBE THE FCC.

9              THE COURT:  YOU KNOW WHAT?  ACTUALLY, I'M NOT GOING

10   TO ALLOW YOU TO FILE IT.

11             MR. VAN NEST:  I THINK I HAVE TO FILE IT, YOUR HONOR,

12   UNDER RULE 103.  I HAVE TO MAKE A RECORD OF WHAT I WOULD HAVE

13   PRESENTED.  YOUR HONOR EXCLUDED EVIDENCE --

14             THE COURT:  NO.  I THINK AS A MATTER OF LAW YOU CAN

15   JUST GET ME REVERSED ON WHETHER THAT -- ANY DISCOVERY POST THE

16   DISCOVERY CUTOFF SHOULD HAVE BEEN ALLOWED.

17             MR. VAN NEST:  WELL, NO.  ACTUALLY, UNDER THE RULES

18   OF EVIDENCE, YOUR HONOR, AND WE'RE HAPPY TO BRIEF THIS, BUT

19   UNDER RULE 103, TO PRESERVE A CLAIM OF ERROR WHERE WE CLAIM THE

20   ERROR IS EXCLUDING EVIDENCE, A PARTY MUST INFORM THE COURT OF

21   ITS SUBSTANCE BY AN OFFER OF PROOF UNLESS THE SUBSTANCE WAS

22   APPARENT FROM THE CONTEXT.

23        SO I THINK WE HAVE TO PROVIDE AN OFFER OF PROOF.  YOUR

24   HONOR CAN TELL US TO DO IT IN A DIFFERENT FORM, OF COURSE.  BUT

25   I THINK YOU'LL SEE IT'S A VERY SHORT STATEMENT OF THE LICENSE

```
 1      AGREEMENTS --

 2                THE COURT:  I'M SORRY.  YOU'RE CITING FEDERAL RULE OF

 3      EVIDENCE 1003?

 4                MR. VAN NEST:  NO, RULE 103.  FEDERAL RULE OF

 5      EVIDENCE 103.

 6                THE COURT:  OH, SORRY.  I MISHEARD YOU.

 7           THE LICENSES WERE ALREADY PART OF THE MOTION.  THEY'RE

 8      ALREADY PART OF THE RECORD.  I'VE ALREADY RULED ON SEALING AS

 9      TO THOSE DOCUMENTS.  THEY'RE ALSO PART OF THE RECORD.  YOU

10      ATTACHED THOSE TO THE MOTION REGARDING NEVO, AND THE MOTION IN

11      LIMINE.  SO THOSE ARE ALREADY IN THE RECORD.

12                MR. VAN NEST:  THERE WERE TWO OF THOSE.

13                THE COURT:  THAT'S CORRECT.

14                MR. VAN NEST:  BUT THERE ARE MANY, MANY, MANY MORE

15      THAT HAVE BEEN ENTERED INTO BETWEEN THEN AND NOW.  SO THE

16      PRIMARY MATERIAL IN THE PROFFER IS THE ADDITIONAL LICENSE

17      AGREEMENTS THAT HAVE BEEN ENTERED INTO SINCE THAT TIME.

18           THERE ARE ALSO SOME ANNOUNCEMENTS ABOUT 5G --

19                THE COURT:  WAIT.  BUT THAT WAS BRIEFED IN THE FALL.

20      SO YOU'RE SAYING ADDITIONAL AGREEMENTS SINCE THE FALL WHEN THE

21      DAUBERTS AND THE MOTIONS IN LIMINE WERE BRIEFED?

22                MR. VAN NEST:  I THINK THESE -- I THINK THERE ARE

23      SOME THAT FALL BEFORE THAT AND SOME THAT FALL AFTER THAT.

24           BUT THEY ARE -- THEY ARE LICENSE AGREEMENTS, ALL OF WHICH

25      WERE ENTERED INTO BEFORE -- EXCUSE ME -- AFTER MARCH OF 2018.
```

1820

```
 1          ALL THAT WAS BRIEFED IN THE FALL WERE TWO AGREEMENTS THAT

 2     WERE RELIED ON BY PROFESSOR NEVO, AND THOSE WERE THE SUBJECT OF

 3     YOUR HONOR'S ORDER.

 4          THESE ARE ADDITIONAL LICENSE AGREEMENTS, AND MARKET --

 5               THE COURT:  SO THESE ARE AGREEMENTS THAT YOUR EXPERTS

 6     DIDN'T EVEN RELY ON?

 7               MR. VAN NEST:  THESE ARE --

 8               THE COURT:  CORRECT?

 9               MR. VAN NEST:  BECAUSE THE REPORTS WERE FILED --

10     WELL, TWO OF THEM WERE RELIED ON BY PROFESSOR NEVO AND YOUR

11     HONOR EXCLUDED THOSE.

12               THE COURT:  RIGHT.  BUT THOSE ARE ALREADY IN THE

13     RECORD.

14               MR. VAN NEST:  CORRECT.

15               THE COURT:  I THINK YOU CAN MAKE YOUR APPEAL ON THAT

16     ISSUE.  IT'S ALREADY PART OF THE RECORD.  YOU CAN CITE THE ECF.

17     I'VE ALREADY RULED ON SEALING ON THOSE TWO AGREEMENTS.

18               MR. VAN NEST:  THAT'S RIGHT.  BUT --

19               THE COURT:  I WAS EVEN SEALING THAT THERE WERE TWO,

20     BUT YOU'VE MADE THAT PUBLIC, SO, OKAY, THERE WERE TWO

21     AGREEMENTS THAT PROFESSOR NEVO RELIED ON, ON 5G.

22               MR. VAN NEST:  THAT'S RIGHT.

23               THE COURT:  UM-HUM.

24               MR. VAN NEST:  BUT I HAVE EXTENSIVE EVIDENCE OF

25     LICENSING ACTIVITY IN 5G THAT HAS OCCURRED SINCE MARCH OF 2018,
```

1      AND IN ORDER TO PERFECT MY CLAIM OF ERROR AND PERFECT MY

2      APPEAL, I HAVE TO MAKE AN OFFER OF PROOF.

3          I CAN MAKE IT ORALLY, I CAN DO IT SOME OTHER WAY.  BUT I

4      WANTED TO GIVE THE COURT A HEADS UP.  THE MOST EFFICIENT WAY TO

5      DO IT IS TO FILE IT, AND, AGAIN, WE'RE NOT ASKING THE COURT TO

6      MAKE ANY RULING.  THE FTC CAN MAKE WHATEVER RESPONSE THEY WISH.

7          BUT IT DOES CONSIST OF SOME ANNOUNCEMENTS BY COMPETITORS

8      ABOUT 5G AND SOME STATEMENTS BY THE FCC ABOUT 5G.

9              MS. MILICI:  YOUR HONOR, THIS --

10             MR. VAN NEST:  THAT'S WHAT'S IN THE PROFFER.

11             MS. MILICI:  THIS IS THE FIRST I'M HEARING ABOUT SOME

12     OF THIS EVIDENCE AT ALL.  THIS HAS BEEN BRIEFED MULTIPLE TIMES.

13     THE ISSUE IS THAT THE FTC HAS NEVER HAD DISCOVERY ABOUT THESE

14     MARCH 2018 FACTS.  AND I THINK IT'S IMPROPER FOR THEM TO MAKE

15     YET ANOTHER FILING ABOUT FACTS THAT NOW ARE FACTS THAT I'VE

16     NEVER EVEN HEARD OF BEFORE.

17             MR. VAN NEST:  WELL, THESE LICENSE AGREEMENTS HAVE

18     ALL BEEN PRODUCED, YOUR HONOR, TO THE FTC.  THAT WAS OUR POINT

19     EARLIER WAS THAT THEY HAVE HAD THESE, WE'VE BEEN PRODUCING THEM

20     RIGHT ALONG, EVEN AFTER THE CLOSE OF DISCOVERY.

21         YOU KNOW, I DON'T WANT TO REARGUE THE MOTION, BUT THEY

22     HAVE BEEN ALL PRODUCED.  THEY'VE HAD ALL THESE LICENSE

23     AGREEMENTS.  AND THE OTHER MATERIAL THAT IS IN THE PROFFER IS

24     PUBLIC.

25             SO I THINK -- I THINK UNDER 103, I HAVE TO MAKE A PROFFER

1822

```
 1        OF SOME KIND.  AND IF YOUR HONOR WANTS ME TO DO IT IN A

 2        DIFFERENT WAY, I WILL.

 3             BUT WHAT I WOULD PROPOSE DOING IS FILING IT AND --

 4                  THE COURT:  I GUESS I DON'T UNDERSTAND WHY IT'S NOT

 5        APPARENT FROM THE CONTEXT.

 6                  MR. VAN NEST:  IT'S NOT APPARENT FROM THE CONTEXT

 7        BECAUSE MANY OF THESE LICENSE AGREEMENTS HAVE BEEN ENTERED INTO

 8        SINCE THAT TIME.

 9             AND THE ANNOUNCEMENTS BY OTHER PARTICIPANTS IN 5G WERE NOT

10        THE SUBJECT OF THE MOTION, AND THE ANNOUNCEMENTS BY THE FCC

11        CONCERNING 5G WERE ALSO NOT RULED UPON.

12             SO I DON'T THINK THAT THE MOTION FRAMED THESE ISSUES TO

13        THAT DEGREE, AND I'M WORRIED THAT IF I CAN'T FILE A PROFFER,

14        SOMEONE WILL ARGUE THAT I'VE WAIVED THAT CLAIM OF ERROR BECAUSE

15        THE RULE REQUIRES ME TO MAKE A PROFFER.

16                  THE COURT:  YOU KNOW WHAT?  I WANT THIS BRIEFED

17        BEFORE YOU FILE IT.  OKAY?

18                  MR. VAN NEST:  WE CAN DO THAT.

19                  THE COURT:  SO WHY DON'T YOU FILE A BRIEF AND THEN

20        THE FTC CAN FILE A RESPONSE.  WHEN CAN YOU FILE THAT?

21                  MR. VAN NEST:  WE'LL FILE IT THURSDAY.

22                  THE COURT:  I'D LIKE IT SOONER BECAUSE I'D LIKE THE

23        RESPONSE SOONER.  WEREN'T YOU GOING TO FILE THE PROFFER

24        TONIGHT?

25                  MR. VAN NEST:  WE WERE GOING TO FILE THE PROFFER.
```

1823

1    THE PROFFER IS READY TO GO.  DO YOU WANT IT CLOSE OF BUSINESS

2    TOMORROW?  IT'S TUESDAY NIGHT.

3            THE COURT:  OKAY.

4            MR. VAN NEST:  I WAS OFFERING THURSDAY MORNING, BUT I

5    THINK WE COULD GET IT IN TOMORROW EVENING BY 6:00.

6            THE COURT:  OKAY.  THEN WHEN CAN THE FTC RESPOND?

7            MS. MILICI:  YOUR HONOR, WE WOULD LIKE TO HAVE UNTIL

8    THE, UNTIL FRIDAY OR THE WEEKEND.  THIS IS, LIKE I SAID, THIS

9    IS THE FIRST TIME THEY'VE RAISED THIS.  WE HAVEN'T MET AND

10   CONFERRED ABOUT THIS.  THEY ARE RAISING EVIDENCE THAT WAS NEVER

11   ON THEIR EXHIBIT LIST, AND I DON'T KNOW WHAT IT IS.  AND I

12   THINK WE DESERVE A COUPLE DAYS TO RESPOND TO IT.

13           MR. VAN NEST:  IT ISN'T ACTUALLY --

14           THE COURT:  WHY DON'T WE DO THIS?  DO I HAVE TO RULE

15   ON THIS BEFORE CLOSING?

16           MR. VAN NEST:  NO.  NO.

17           THE COURT:  OKAY.  THEN WHY DON'T WE DO THIS, YOU

18   TAKE UNTIL THURSDAY?  YOU WANTED UNTIL THURSDAY?

19           MR. VAN NEST:  I DID.

20           THE COURT:  WHAT IS THAT?  THE 24TH?

21           MR. VAN NEST:  THAT'S THE 24TH.

22           THE COURT:  OKAY.

23       AND YOU'RE GOING TO BE BRIEFING THE ISSUE OF WHETHER YOU

24   NEED TO MAKE ANY FURTHER OFFER OF PROOF THAN WHAT'S ALREADY IN

25   THE RECORD.

```
 1              MR. VAN NEST:  YES, WHETHER WE HAVE A RIGHT TO DO
 2     THAT AND WHETHER WE NEED TO DO IT, THAT'S RIGHT.
 3              THE COURT:  OKAY.  NOW, WHAT DO YOU NEED?  I WOULD
 4     LIKE -- I WOULD PREFER THAT YOU MET AND CONFERRED ON THIS.
 5              MS. MILICI:  I WOULD HAVE AS WELL.
 6              THE COURT:  CAN YOU MEET AND CONFER TODAY?  I WANT
 7     LEAD TRIAL COUNSEL TO MEET AND CONFER TODAY.
 8              MR. VAN NEST:  WE CAN PROVIDE THE PROFFER AFTER COURT
 9     AND MS. MILICI AND I CAN MEET AND CONFER.
10              THE COURT:  OKAY.  DO YOU WANT UNTIL TOMORROW?  WE
11     HAVE -- DO YOU WANT UNTIL TOMORROW FOR THE MEET AND CONFER?
12              MR. VAN NEST:  SURE.
13              THE COURT:  WHY DON'T YOU PROVIDE THE PROFFER TODAY.
14              MR. VAN NEST:  WE'LL DO THAT.
15              THE COURT:  THIS IS THE 22ND.  WOULD YOU PLEASE MEET
16     AND CONFER TOMORROW, OR DO YOU NEED TO SEE THEIR -- WHY DON'T
17     YOU MEET AND CONFER TOMORROW.
18              MR. VAN NEST:  THAT'S FINE.
19              THE COURT:  AND THEN QUALCOMM FILES ITS BRIEF ON THIS
20     ISSUE, OR MAYBE YOU'LL REACH AN AGREEMENT, I DON'T KNOW, ON
21     THURSDAY.
22          AND THEN WHEN DOES THE FTC WANT TO FILE ITS RESPONSE?  OR,
23     I MEAN, FRANKLY, IF THIS DOESN'T HAVE TO BE FILED ON UNTIL --
24     IF THIS DOESN'T HAVE TO BE RULED ON UNTIL CLOSING, WE COULD
25     EVEN DO THIS NEXT WEEK.
```

1        IS THERE -- I MEAN, NO ONE IS GOING TO FILE AN APPEAL.

2   IT'S GOING TO TAKE ME SOME TIME TO ISSUE A RULING ON THIS.  AND

3   YOU MAY EVEN WIN, SO THIS MAY BE MOOTED.

4        MR. VAN NEST:  THAT'S RIGHT.  YOUR HONOR, IT DOESN'T

5   HAVE TO BE DECIDED BEFORE CLOSING.  I'VE PUT THE ISSUE OUT

6   THERE.  WE JUST NEED TO HAVE IT DONE BEFORE THE CASE GOES UP

7   FROM THE DISTRICT COURT.  THAT'S ALL.

8        THE COURT:  OKAY.

9        MR. VAN NEST:  SO IT'S NOT A HOT RUSH.

10        THE COURT:  AND SADLY, THIS OPINION IS GOING TO TAKE

11   SOME TIME.

12        MR. VAN NEST:  UNDERSTOOD.  UNDERSTOOD.  AND I

13   THINK -- WHY DON'T YOU LET US MEET AND CONFER, AND WE'LL

14   PROPOSE SOMETHING.  IT MAY BE WE CAN REACH AGREEMENT.  IT'S

15   ONLY A PROFFER TO COMPLETE THE RECORD.  THAT'S ALL IT IS.  AND

16   AS YOU POINT OUT, WE MAY NOT NEED TO DO IT AT ALL.

17        THE COURT:  WELL, I JUST THINK THAT YOU ALL SHOULD

18   FOCUS ON THE TRIAL AND ON CLOSINGS AND NOT HAVE TO DEAL WITH

19   THIS SIMULTANEOUSLY.

20        MR. VAN NEST:  I AGREE WITH YOU.

21        THE COURT:  BECAUSE IT'S GOING TO BE A LOT OF WORK

22   JUST TO GET THE CLOSINGS PREPARED.

23        MR. VAN NEST:  AGREED.

24        THE COURT:  SO I'D RATHER YOU NOT HAVE TO GET

25   DISTRACTED BY ALL THIS.

```
 1              MR. VAN NEST:  THAT'S FINE WITH US, YOUR HONOR.

 2   THANK YOU.

 3              MS. MILICI:  YOUR HONOR --

 4              MR. VAN NEST:  WE'LL PROVIDE THE PROFFER TONIGHT.

 5              THE COURT:  WHY DON'T YOU MEET AND CONFER AND COME UP

 6   WITH A SCHEDULE.  IT SOUNDS LIKE I DON'T HAVE TO DECIDE IT BY

 7   TUESDAY, WHICH IS GOOD.  AND THEN WHY DON'T YOU COME UP WITH A

 8   SCHEDULE FOR BRIEFING.

 9              MS. MILICI:  YOUR HONOR, WE WOULD LIKE TO SEE WHAT

10   THEY HAVE, BUT I AM CONCERNED THAT THEY'RE TRYING TO ADD TO THE

11   TRIAL RECORD WITHOUT USING THEIR TRIAL TIME.  SO I DO WANT THE

12   CHANCE TO MEET AND CONFER AND TO, AND TO DECIDE A PATH FORWARD.

13   BUT, YOU KNOW, I'M NOT SURE THAT WHAT THEY'RE PROPOSING IS

14   APPROPRIATE.

15              MR. VAN NEST:  THAT'S WHAT WE'RE GOING TO DO, MEET

16   AND CONFER.

17              THE COURT:  SO WHAT'S YOUR PROPOSAL?

18              MS. MILICI:  I WOULD JUST LIKE THE OPPORTUNITY TO

19   MEET AND CONFER TO FURTHER UNDERSTAND WHAT THEIR PROPOSAL IS,

20   WHAT KIND OF PROFFER THEY'RE GOING TO MAKE.

21          AGAIN, IF THE DISCOVERY CUTOFF ISN'T, ISN'T BEING

22   ENFORCED, THEN IT WOULDN'T HAVE BEEN ENFORCED FOR THE FTC,

23   EITHER, AND THERE'S A WHOLE LOT OF EVIDENCE ON BOTH SIDES THAT

24   COULD HAVE COME IN.

25          I'M NOT SURE THAT I UNDERSTAND WHAT IT IS THAT THEY'RE
```

1    DOING OR WHETHER IT'S SUPPORTED BY THE RULES, AND I WOULD LIKE

2    THE CHANCE TO MEET AND CONFER.

3              MR. VAN NEST:  WE'LL DO WHAT YOUR HONOR SUGGESTED.

4              THE COURT:  OKAY.

5              MR. VAN NEST:  WE'LL MEET AND CONFER AND PROPOSE A

6    SCHEDULE AND WE SHOULDN'T NEED TO INTERFERE WITH THE CLOSINGS

7    AT ALL.

8              THE COURT:  WOULD YOU PREFER TO TAKE CARE OF THIS

9    AFTER CLOSING OR DO YOU WANT TO TAKE CARE OF IT THIS WEEK?

10              MS. MILICI:  I -- I'D PREFER TO TAKE CARE OF IT AFTER

11    CLOSING AND IF THERE'S SOMETHING TO TAKE CARE OF, AND I WOULD

12    LIKE TO MEET AND CONFER WITH IT.

13              THE COURT:  OKAY.  WHY DON'T YOU ALL MEET AND CONFER,

14    YOU ALL COME UP WITH A TIME SCHEDULE THAT WORKS FOR BOTH OF

15    YOU.  I WOULD PREFER THAT YOU FOCUS ON THE TRIAL AND THE

16    CLOSINGS FOR NOW.  I'D LIKE THAT FOR THE SAME FOR MY OWN TEAM

17    AND MYSELF.  AND THEN WE CAN DEAL WITH THIS LATER.  IT SOUNDS

18    LIKE --

19              MR. VAN NEST:  THAT'S FINE.

20              THE COURT:  YOU'RE NOT GOING TO GET AN ORDER NEXT

21    WEEK, SO DON'T WORRY ABOUT THAT.

22              MR. VAN NEST:  I'M NOT WORRIED.

23              THE COURT:  IT'S GOING TO TAKE SOME TIME.  THERE'S A

24    TREMENDOUS AMOUNT OF EVIDENCE TO GO THROUGH, AND SO --

25              MR. VAN NEST:  UNDERSTOOD.

1          THE COURT:  -- AND THE LAW IS COMPLEX.  SO --

2   ALTHOUGH I LOVE TO GIVE SPEEDY ORDERS, THIS WILL NOT BE AS

3   SPEEDY AS MY USUAL.  SO JUST UNDERSTAND YOU'LL HAVE SOME TIME.

4          MR. VAN NEST:  WE UNDERSTAND.  THANK YOU, YOUR HONOR.

5          MS. MILICI:  THANK YOU.

6          MR. VAN NEST:  THAT'S ALL WE HAD.

7          THE COURT:  ANYTHING ELSE FOR TODAY.

8          MS. MILICI:  ONE OTHER THING IS WE BROUGHT THE COPIES

9   OF THE CD OF THE AUDIO FILE.

10          THE COURT:  OKAY.  HAVE YOU SHOWN THEM TO --

11          MS. MILICI:  I HAVE A COPY FOR THE COURT AND FOR

12   OPPOSING COUNSEL.

13          THE COURT:  ALL RIGHT.  THANK YOU.

14        ALL RIGHT.  THANK YOU.  I WILL SEE YOU ON FRIDAY AT 9:00

15   O'CLOCK.  THANK YOU VERY MUCH.

16          (THE EVENING RECESS WAS TAKEN AT 4:46 P.M.)

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7           WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16                        IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8076
17

18

19                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
20

21                        DATED:  JANUARY 22, 2019

22

23

24

25