1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

   FEDERAL TRADE COMMISSION,        )  C-17-00220 LHK
6                                    )
                   PLAINTIFF,        )  SAN JOSE, CALIFORNIA
7                                    )
           VS.                       )  JANUARY 25, 2019
8                                    )
   QUALCOMM INCORPORATED, A          )  VOLUME 9
9  DELAWARE CORPORATION,             )
                                     )  PAGES 1829-2026
10                 DEFENDANT.        )  SEALED PAGES 2021-2021
   _____   )

11

12            TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE LUCY H. KOH
13            UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:    FEDERAL TRADE COMMISSION
                          BY:  JENNIFER MILICI
16                             DANIEL J. MATHESON
                               WESLEY G. CARSON
17                             KENT COX
                               NATHANIEL M. HOPKIN
18                             PHILIP J. KEHL
                               MIKA IKEDA
19                        600 PENNSYLVANIA AVENUE, NW
                          WASHINGTON, D.C.  20580
20

21            APPEARANCES CONTINUED ON NEXT PAGE

22  OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, CRR, RMR
                                CERTIFICATE NUMBER 8074
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

```
1

2        APPEARANCES (CONTINUED)

3

4        FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                                 BY:  ROBERT A. VAN NEST
5                                     JUSTINA K. SESSIONS
                                      EUGENE M. PAIGE
6                                     CHRISTINA BLAIS
                                      MATAN SHACHAM
7                                     CODY HARRIS
                                      KRISTIN HUCEK
8                                633 BATTERY STREET
                                 SAN FRANCISCO, CALIFORNIA  94111
9

10                               CRAVATH, SWAINE & MOORE
                                 BY:  GARY A. BORNSTEIN
11                                    MICHAEL BRENT BYARS
                                      YONATAN EVEN
12                                    JORDAN D. PETERSON
                                      MING-TOY TAYLOR
13                                    DEREK SUTTON
                                      ANDREW HUYNH
14                                    ANTONY RYAN
                                 825 EIGHTH AVENUE
15                               NEW YORK, NEW YORK  10019

16                               NORTON ROSE FULBRIGHT
17                               BY:  MARC COLLIER
                                      TALBOT HANSUM
18                               98 SAN JACINTO BOULEVARD, SUITE 1100
                                 AUSTIN, TEXAS  78701
19
                                 BY:  ERIC B. HALL
20                                    DANIEL LEVENTHAL
                                 1301 MCKINNEY, SUITE 5100
21                               HOUSTON, TEXAS  77010

22

23       ALSO PRESENT:           MARK SNYDER
                                 JEFF DAHM
24                               KEN KOTARSKI

25
```

1

2                          INDEX OF WITNESSES

3       DEFENDANT'S

4       CHRISTOPHER JOHNSON

              DIRECT EXAM BY MR. PETERSON          P. 1834
5             CROSS-EXAM BY MR. HOPKIN             P. 1853
              REDIRECT EXAM BY MR. PETERSON        P. 1856
6

7       AVIV NEVO

              DIRECT EXAM BY MR. BORNSTEIN         P. 1860
8             CROSS-EXAM BY MS. MILICI             P. 1925
              REDIRECT EXAM BY MR. BORNSTEIN       P. 1954
9             RECROSS-EXAM BY MS. MILICI           P. 1963

10      CHRISTINA PETERSSON

              VIDEOTAPED DEPOSITION               P. 1967
11

12      RANAE MCELVAINE

              VIDEOTAPED DEPOSITION               P. 1968
13

14      ILKKA RAHNASTO

              VIDEOTAPED DEPOSITION               P. 1969
15

16      ALEX ROGERS

              DIRECT EXAM BY MR. VAN NEST          P. 1970
17            CROSS-EXAM BY MR. MATHESON           P. 1991
              REDIRECT EXAM BY MR. VAN NEST        P. 2015
18

19      SEUNGHO AHN

              VIDEOTAPED DEPOSITION               P. 2019
20

21      INJUNG LEE

              VIDEOTAPED DEPOSITION               P. 2021
22

23

24

25

1

2                              INDEX OF EXHIBITS

3                                      MARKED      ADMITTED

4          PLAINTIFF'S

5          8195                                    1993
           8196                                    1997
6          7122                                    1998
           6594                                    2002
7          7618                                    2005
           7629                                    2006
8          5185                                    2010

9

10

11         DEFENDANT'S

12         122                                     1841
           123A                                    1846
13         124                                     1850
           121A                                    1853
14         9148                                    1915
           9180                                    1919
15         9166                                    1924
           3502                                    1966
16         2778                                    1969
           0551                                    2021

17

18

19         JOINT

20         9                                       1935

21

22

23

24

25

```
 1      SAN JOSE, CALIFORNIA                    JANUARY 26, 2019

 2                      P R O C E E D I N G S

 3          (COURT CONVENED AT 9:02 A.M.)

 4              THE COURT:  GOOD MORNING AND WELCOME.

 5              MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

 6              THE COURT:  PLEASE TAKE A SEAT, AND PLEASE CALL YOUR

 7      FIRST WITNESS.

 8              MR. PETERSON:  GOOD MORNING, YOUR HONOR.

 9      JORDAN PETERSON ON BEHALF OF QUALCOMM.

10          QUALCOMM CALLS CHRISTOPHER JOHNSON.

11              THE CLERK:  RAISE YOUR RIGHT HAND.

12          (DEFENDANT'S WITNESS, CHRISTOPHER JOHNSON, WAS SWORN.)

13              THE WITNESS:  I DO.

14              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

15              MR. PETERSON:  YOUR HONOR, MAY WE APPROACH WITH

16      BINDERS?

17              THE COURT:  YES, PLEASE.

18              THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

19      YOUR LAST NAME FOR THE RECORD.

20              THE WITNESS:  CHRISTOPHER CHARLES JOHNSON.

21      J-O-H-N-S-O-N.

22              THE COURT:  ALL RIGHT.  TIME IS 9:04.  GO AHEAD,

23      PLEASE.

24      ///

25      ///
```

1                        **DIRECT EXAMINATION**

2       BY MR. PETERSON:

3       Q.   GOOD MORNING, MR. JOHNSON.  YOU'RE A PARTNER OF

4       BAIN & COMPANY; IS THAT CORRECT?

5       A.   CORRECT.

6       Q.   AND BAIN PROVIDES MANAGEMENT CONSULTING SERVICES; CORRECT?

7       A.   THAT'S CORRECT.

8       Q.   AND YOU'VE WORKED FOR BAIN SINCE EARLY 2010; CORRECT?

9       A.   I WAS A SUMMER INTERN IN 2008, AND I'VE BEEN AT BAIN FULL

10      TIME SINCE JANUARY 2010.

11      Q.   AND AT BAIN YOU PERSONALLY HAVE A FOCUS ON THE TECH

12      INDUSTRY; CORRECT?

13      A.   THAT'S CORRECT.

14      Q.   AND DURING YOUR TENURE AT BAIN, YOU'VE AUTHORED NUMEROUS

15      STUDIES ON TOPICS SUCH AS SEMICONDUCTORS, MOBILE HANDSETS, AND

16      TECH INDUSTRY CONSOLIDATION; CORRECT?

17      A.   THAT'S CORRECT.

18      Q.   AND YOU WERE DEPOSED IN THIS ACTION ON MARCH 28TH, 2018;

19      CORRECT?

20      A.   I DON'T REMEMBER THE EXACT DATE, BUT THAT SOUNDS RIGHT.

21      Q.   AND AS OF THE DATE OF YOUR DEPOSITION, INTEL HAD BEEN A

22      BAIN CLIENT FOR ABOUT 11 YEARS; IS THAT CORRECT?

23      A.   CORRECT.

24      Q.   AND YOU PERSONALLY PROVIDED CONSULTING SERVICES TO INTEL

25      FROM EARLY 2010 UNTIL MID-2011; CORRECT?

1    A.   CORRECT.

2    Q.   AND THEN AGAIN YOU PROVIDED CONSULTING SERVICES TO INTEL

3    FROM THE SUMMER OF 2014 UNTIL AT LEAST THE DATE OF YOUR

4    DEPOSITION; CORRECT?

5    A.   CORRECT.

6    Q.   NOW, BAIN PROVIDES OUTSIDE ADVICE FOR MANAGEMENT TEAMS;

7    CORRECT?

8    A.   COULD YOU BE MORE SPECIFIC FOR "OUTSIDE ADVICE"?

9    Q.   AN OUT -- BAIN PROVIDES AN OUTSIDE PERSPECTIVE, AN

10   UNCOLORED POSITION ON TOPICS FOR MANAGEMENT TEAMS; CORRECT?

11   A.   THAT'S THE GOAL, YES.

12   Q.   AND IN THE REGULAR COURSE OF PROVIDING CONSULTING SERVICES

13   TO ITS CLIENTS, BAIN USES A DATA DRIVEN APPROACH; CORRECT?

14   A.   CORRECT.

15   Q.   AND BAIN'S WRITTEN WORK PRODUCT REFLECTS THE FACTS THAT

16   BAIN COLLECTED AND THE OPINIONS THAT BAIN FORMED IN THE COURSE

17   OF ITS WORK; CORRECT?

18   A.   IT DOES WITHIN THE SCOPE OF WHAT THE PROJECT IS AND THE

19   DATA AVAILABLE TO US, YES.

20   Q.   AND BAIN STORES THIS WRITTEN WORK PRODUCT ON AN INTERNAL

21   FILE SYSTEM, SOME OF WHICH BAIN TURNED OVER AS PART OF THIS

22   LITIGATION; CORRECT?

23             MR. HOPKIN:  OBJECTION, LEADING.

24             THE COURT:  SUSTAINED.

25             MR. PETERSON:  YOUR HONOR, PERMISSION TO TREAT THE

1    WITNESS AS HOSTILE.  HE JUST TESTIFIED THAT HE HAS DONE

2    CONSULTING WORK FOR INTEL, WHICH IS A COMPETITOR OF QUALCOMM.

3              THE COURT:  WHAT'S YOUR RESPONSE?

4              MR. HOPKIN:  YOUR HONOR, BAIN & COMPANY ISN'T A PARTY

5    OPPONENT.  THEY'RE NOT A PARTY IN THIS CASE.  THEY'RE NOT

6    ADVERSE.  AND MR. JOHNSON HAS NEVER WORKED FOR INTEL AS FAR AS

7    WE KNOW.

8              THE COURT:  ALL RIGHT.  WELL --

9              MR. HOPKIN:  AND INTEL IS ALSO --

10             THE COURT:  DO YOU HAVE TO USE LEADING QUESTIONS?

11             MR. PETERSON:  TO BE CLEAR, YOUR HONOR, THE WITNESS

12   ALSO MOVED TO QUASH THE SUBPOENA, SO HE'S NOT HERE VOLUNTARILY.

13             MR. HOPKIN:  YOUR HONOR, I BELIEVE THE BASIS FOR THE

14   MOTION TO QUASH WAS BURDEN.  THEY'RE A NON-PARTY IN THIS

15   MATTER.

16             THE COURT:  ASK NON-LEADING QUESTIONS, PLEASE.

17   BY MR. PETERSON:

18   Q.  NOW, MR. JOHNSON, THE DOCUMENTS THAT WERE PRODUCED IN THIS

19   LITIGATION, WERE YOU A PART OF COLLECTING THOSE?

20   A.  I WAS A PART OF COLLECTING SOME DOCUMENTS BEFORE MY

21   DEPOSITION.  BUT THERE WERE OTHER PEOPLE COLLECTING THEM.  A

22   LOT OF THE DOCUMENTS THAT I ENDED UP SEEING WERE NOT ONES THAT

23   I FOUND.

24   Q.  BUT YOU WERE INVOLVED IN THE COLLECTION PROCESS; CORRECT?

25   A.  I WAS.

1    Q.   NOW, AT VARIOUS TIMES DURING THE COURSE OF BAIN'S

2    ENGAGEMENT WITH INTEL, IT'S CORRECT THAT BAIN HAS DONE

3    BENCHMARKING COMPARING INTEL'S MOBILE WIRELESS BUSINESS WITH

4    ITS COMPETITORS?

5            MR. HOPKIN:  OBJECTION.  LEADING.

6            THE COURT:  SUSTAINED.

7    BY MR. PETERSON:

8    Q.   HAS BAIN DONE BENCHMARKING BETWEEN INTEL'S MOBILE WIRELESS

9    BUSINESS AND ITS COMPETITORS?

10   A.   WE HAVE.

11   Q.   DID THAT BENCHMARKING INCLUDE MOBILE WIRELESS HEAD COUNTS?

12   A.   YES.

13   Q.   AND DO YOU UNDERSTAND "HEAD COUNT" TO MEAN THE NUMBER OF

14   FULL-TIME EMPLOYEES AND PART-TIME EMPLOYEES AT THE INTEL MOBILE

15   WIRELESS BUSINESS UNIT?

16   A.   IT'LL DEPEND ON THE SPECIFIC EXERCISE.  BUT THAT COULD BE

17   ONE WAY WE'D DO IT, AND THAT WOULD PROBABLY BE THE MOST USUAL

18   CASE.

19       MOST USUALLY THAT'S HOW WE WOULD LOOK AT IT, FULL-TIME

20   EMPLOYEES AND IF YOU HAD TWO PART-TIME EMPLOYEES, THAT WOULD

21   COUNT AS ONE FULL-TIME EMPLOYEE POTENTIALLY.

22   Q.   AND HAS BAIN ALSO LOOKED AT INTEL MOBILE WIRELESS'S R&D

23   SPENDING?

24   A.   IN CONJUNCTION WITH OUR CLIENT, YES.

25   Q.   AND FOR BOTH OF THOSE, BAIN ADVISED INTEL THAT INTEL WAS

1    TYPICALLY RIGHT AROUND THE RIGHT LEVEL OR SIMILAR LEVEL TO ITS

2    PEERS; CORRECT?

3              MR. HOPKIN:  OBJECTION.  LEADING.

4              MR. PETERSON:  I'LL REPHRASE, YOUR HONOR.

5              THE COURT:  THANK YOU.  GO AHEAD, PLEASE.

6    BY MR. PETERSON:

7    Q.   WHAT DID BAIN CONCLUDE ABOUT INTEL'S MOBILE WIRELESS R&D

8    SPENDING WITH RESPECT TO ITS PEERS?

9    A.   THERE WERE PROBABLY MULTIPLE CONCLUSIONS.  ARE YOU ASKING

10   ABOUT THE SIZE OR THE AMOUNT OR -- I'M SORRY.

11   Q.   SURE.  I'LL REPHRASE THAT.  WHAT DID BAIN CONCLUDE AS WITH

12   RESPECT TO INTEL'S WIRELESS R&D SPENDING WITH RESPECT TO THE

13   TOTAL VOLUME OF SPENDING?

14   A.   WITH RESPECT TO THE TOTAL VOLUME OF SPENDING?

15   Q.   CORRECT.

16   A.   VOLUME OF WHAT?

17   Q.   OF DOLLARS SPENT.

18   A.   I THINK WE -- IF I UNDERSTAND THE QUESTION CORRECTLY, I

19   THINK WE LOOKED AT THEIR TOTAL SPEND, WE UNDERSTOOD THE DOLLAR

20   AMOUNT AND THE HEAD COUNT, AND WE COMPARED THAT TO OTHER

21   COMPANIES, AND WE FOUND THEM TO BE AT ROUGHLY SIMILAR LEVELS.

22   I'M NOT SURE WE DREW A CONCLUSION AS TO WHETHER THAT WAS RIGHT

23   OR WRONG.

24   Q.   NOW, WE GAVE YOU A BINDER, MR. JOHNSON.  IF YOU COULD TURN

25   IN THAT BINDER TO QX 122.  AND THE DOCUMENT NUMBERS ARE ON THE

JOHNSON DIRECT BY MR. PETERSON

```
1    TABS THERE.

2    A.   ING OKAY.

3    Q.   DO YOU RECOGNIZE THIS DOCUMENT?

4    A.   I RECOGNIZE IT FROM MY PREPARATION.

5    Q.   IT'S A DOCUMENT BAIN PREPARED?

6    A.   BAIN, IN CONJUNCTION WITH OUR CLIENT.  THERE WAS PROBABLY

7    INPUT FROM BOTH PARTIES.  INTEL, THAT WOULD BE.

8    Q.   AND THIS REFLECTS THE FACTS THAT BAIN COLLECTED AND

9    OPINIONS THAT BAIN FORMED IN THE REGULAR COURSE OF PROVIDING

10   CONSULTING SERVICES TO INTEL; CORRECT?

11             MR. HOPKIN:  OBJECTION, LEADING.

12             MR. PETERSON:  YOUR HONOR, FOR THE PURPOSES OF

13   ESTABLISHING FOUNDATION, I THINK A LEADING QUESTION IS

14   APPROPRIATE HERE.

15             THE COURT:  THAT'S FINE.  OVERRULED.

16             MR. PETERSON:  THANK YOU.

17             THE COURT:  CAN I ASK YOU A QUICK QUESTION.  IS THIS

18   122A OR WHAT'S 122?  WHAT'S THE DIFFERENCE?  I THOUGHT A'S WERE

19   ENGLISH TRANSLATIONS OF FOREIGN DOCUMENTS.

20             MR. PETERSON:  IT'S 122A, YOUR HONOR.  THIS WAS A

21   SUBSET OF WHAT WAS USED IN MR. JOHNSON'S DEPOSITION.

22             THE COURT:  SO I'LL USE 122A AS THE NUMBER ON THE

23   EXHIBIT LIST.  OKAY.  GO AHEAD, PLEASE.

24             MR. PETERSON:  THANK YOU, YOUR HONOR.

25   Q.   AND THIS PRESENTATION IS TITLED QCOMM BENCHMARK
```

```
1     PRESENTATION 2012; CORRECT?

2     A.   ARE THAT'S CORRECT.

3     Q.   AND IT'S DATED DECEMBER 20TH, 2012; CORRECT?

4     A.   CORRECT.

5     Q.   THIS DOCUMENT WAS CONSTRUCTED OVER A PERIOD OF TIME

6     LEADING UP TO THAT DATE AS BAIN COLLECTED THESE FACTS AND

7     FORMED THESE OPINIONS; CORRECT?

8     A.   AGAIN, AS BAIN DID, IN CONJUNCTION WITH OUR CLIENT.  I

9     THINK THE CLIENT HAD INPUT HERE.

10    Q.   OKAY.  AND BAIN PRODUCED THIS FROM ITS INTERNAL FILE

11    SYSTEM; CORRECT?

12    A.   I DON'T KNOW.

13    Q.   DO YOU -- YOU RECOGNIZE THIS DOCUMENT FROM YOUR DEPOSITION

14    THOUGH?

15    A.   I DO.

16    Q.   AND THIS IS WHAT DOCUMENT YOU TESTIFIED ABOUT AT YOUR

17    DEPOSITION?

18    A.   THERE WERE A LOT OF DOCUMENTS.  I BELIEVE SO.  BUT THERE

19    WERE A LOT OF DOCUMENTS, SO I'M NOT 100 PERCENT CERTAIN.

20    Q.   WOULD IT REFRESH YOUR RECOLLECTION IF I SHOWED YOU YOUR

21    DEPOSITION WHERE YOU TESTIFY ABOUT THIS DOCUMENT?

22    A.   SURE.

23    Q.   IN THE BINDER, THERE'S A TAB SAYS THAT DEPOSITION

24    TRANSCRIPT, AND IF YOU'LL TURN TO PAGE 70.

25    A.   OKAY.
```

1    Q.   I'M SORRY.  ACTUALLY, IF YOU LOOK AT PAGE 84 TO 85.

2    YOU'LL SEE THAT BEGINNING ON LINE 20, YOU TESTIFIED ABOUT THIS

3    DOCUMENT.

4    A.   YES.  IT LOOKS LIKE THE SAME DOCUMENT.  THANK YOU.

5    Q.   OKAY.  SO YOU AGREE THAT YOU TESTIFIED ABOUT THIS DOCUMENT

6    AT YOUR DEPOSITION?

7    A.   I DO.

8    Q.   AND THE DOCUMENT YOU TESTIFIED ABOUT AT YOUR DEPOSITION

9    WERE PRODUCED BY BAIN; CORRECT?

10   A.   AGAIN, I'M NOT CERTAIN IF THEY WERE PRODUCED BY BAIN OR BY

11   INTEL.  I JUST KNOW THAT THEY WERE PRODUCED.

12        MR. PETERSON:  OKAY.  YOUR HONOR, QUALCOMM OFFERS

13   INTO EVIDENCE QX 122.

14        MR. HOPKIN:  OBJECTION.  HEARSAY.

15        MR. PETERSON:  YOUR HONOR, THE FOUNDATION THAT WE'VE

16   LAID IS THAT THIS IS A BUSINESS RECORD.

17        THE COURT:  IT'S ADMITTED.

18        (DEFENDANT'S EXHIBIT QX 122 WAS ADMITTED IN EVIDENCE.)

19        THE COURT:  GO AHEAD, PLEASE.

20        MR. PETERSON:  THANK YOU, YOUR HONOR.

21   Q.   NOW, PARTS OF THIS DECK HAVE BEEN SEALED, SO I'LL PUT THE

22   FLAP DOWN OVER THE PROJECTOR.  I'M NOT GOING TO ASK YOU

23   QUESTIONS THAT REQUIRE YOU TO REVEAL SPECIFIC SEALED

24   INFORMATION, BUT WE'LL GO SLOW TO MAKE SURE THAT THE QUESTION

25   AND ANSWER DON'T REVEAL ANYTHING THAT THE COURT HAS DETERMINED

1    ARE CONFIDENTIAL?

2    A.   UNDERSTOOD.

3    Q.   MR. JOHNSON, DO YOU RECOGNIZE THE TERM "SYSTEM" ON A CHIP?

4    A.   I DO.

5    Q.   IS THAT ALSO SOMETIMES REFERRED AS TO SOC?

6    A.   IT IS.

7    Q.   AND IN THE MOBILE WIRELESS INDUSTRY, WHAT DOES THAT MOST

8    COMMONLY REFER TO?

9    A.   A CHIP THAT'S BEING USED IN CELL PHONES WHERE THE

10   APPLICATIONS PROCESSOR, WHICH DOES THE COMPUTING, IS INTEGRATED

11   WITH THE BASEBAND, WHICH DOES THE CELLULAR CONNECTIVITY.  SO

12   THEY'RE ON THE SAME DIE.

13   Q.   AND ON SLIDE 3, BASED ON YOUR KNOWLEDGE, WHAT WAS THE --

14   WHAT WAS THE CONCLUSION THAT INTEL REACHED ABOUT INTEL'S

15   OVERALL SOC R&D INVESTMENT COMPARABLE TO QUALCOMM?

16        MR. HOPKIN:  OBJECTION.  FOUNDATION.

17        MR. PETERSON:  YOUR HONOR, THE QUESTION SPECIFICALLY

18   ASKED FOR HIS KNOWLEDGE.

19        MR. HOPKIN:  THE QUESTION WAS ABOUT INTEL'S

20   CONCLUSIONS, YOUR HONOR.

21        MR. PETERSON:  I CAN REPHRASE TO MAKE SURE.

22        THE COURT:  WHY DON'T YOU DO THAT.  THANK YOU.  GO

23   AHEAD, PLEASE.

24   BY MR. PETERSON:

25   Q.   MR. JOHNSON, WHAT WAS BAIN'S CONCLUSION REGARDING INTEL'S

JOHNSON DIRECT BY MR. PETERSON

1    OVERALL SOC R&D INVESTMENT COMPARABLE TO QUALCOMM?

2    A.   SPECIFICALLY ON PAGE 3?

3    Q.   YES.  AND JUST TO BE CLEAR, SPEAKING AT A HIGH LEVEL ABOUT

4    THE MAIN CONCLUSION SO WE DON'T GET INTO SEALED INFORMATION.

5    A.   WHAT'S WRITTEN ON THE PAGE, INTEL OVERALL SOC R&D

6    INVESTMENT COMPARABLE TO QUALCOMM.

7    Q.   AND WHAT WAS THE CONCLUSION REGARDING HOW MANY MORE TIMES

8    OUTPUT QUALCOMM HAD FROM -- THAN INTEL?

9    A.   THREE TIMES MORE OUTPUT.

10   Q.   AND THAT'S WHAT'S ILLUSTRATED ON THE SLIDES WITH THE

11   ADDITIONAL FIGURES; CORRECT?

12   A.   YES.  THE DATA IS SHOWING THAT -- IT'S SHOWING THE SPEND

13   LEVELS BEING SIMILAR AND THE NUMBER OF SKUS, QUALCOMM HAVING

14   ABOUT THREE TIMES AS MANY.  IT'S A LITTLE BIT DIFFERENT IF YOU

15   LOOK AT FIRST BASE DIE, BUT INCLUDING ALL DERIVATIVES, ABOUT

16   THREE TIMES AS MANY SKUS ON THE QUALCOMM SIDE.

17   Q.   THANK YOU.

18        NOW, IF YOU COULD TURN TO SLIDE 8, PLEASE.  AND THAT SLIDE

19   IS ALSO SEALED, SO WE'LL AGAIN GO SLOWLY TO MAKE SURE WE DON'T

20   REVEAL ANYTHING CONFIDENTIAL.

21        AT THE TOP OF THE SLIDE, IT REFERS TO WWAN.  CAN YOU TELL

22   ME WHAT WWAN IS?

23   A.   IT'S THE MODEM, THE BASEBAND FOR CELLULAR CONNECTIONS.

24   Q.   AND WHAT WAS BAIN'S CONCLUSION AS TO INTEL'S R&D SPEND IN

25   WWAN COMPARED TO QUALCOMM?  AND AGAIN, JUST SO WE DON'T GET

1    INTO SPECIFIC NUMBERS, IF YOU COULD JUST SAY THE HIGH LEVEL

2    CONCLUSION.

3    A.   YOU'RE ASKING ABOUT THE -- IN TERMS OF DOLLARS SPENT?

4    Q.   LET'S NOT REVEAL SPECIFIC DOLLAR NUMBERS, BUT IF YOU COULD

5    SAY IN TERMS OF RELATIVE PROPORTIONS, THAT MIGHT BE THE EASIEST

6    WAY TO AVOID THE SEALED INFORMATION.

7    A.   R&D SPEND LOWER THAN QUALCOMM FOR WWAN.

8    Q.   AND THE SLIDE REFERS TO EM DRIVEN.  WHAT DOES EM REFER TO?

9    A.   I BELIEVE IT REFERS TO EMERGING MARKETS.

10   Q.   AND THEN DESPITE LOWER SPEND, WHAT DID BAIN CONCLUDE

11   REGARDING THE HEAD COUNT THAT INTEL HAD?

12   A.   WHAT'S WRITTEN HERE IS 25 PERCENT HIGHER TOTAL HEAD COUNT,

13   BLUE BADGE AND GREEN BADGE.

14   Q.   AND WAS THAT DRIVEN BY THE LOWER COST OF INTEL'S R&D IN

15   EMERGING MARKETS?

16   A.   THAT'S A FAIR INTERPRETATION, I THINK.

17   Q.   THANK YOU.

18        NOW, IF YOU COULD TURN IN YOUR BINDER TO QX 123.

19        DO YOU RECOGNIZE THIS DOCUMENT?

20   A.   FROM MY PREPARATION.  I WASN'T -- I DIDN'T AUTHOR IT, BUT

21   FROM MY PREPARATION, I DO.

22   Q.   BUT THIS IS A PRESENTATION PREPARED BY BAIN FOR INTEL;

23   CORRECT?

24   A.   AGAIN, PROBABLY PREPARED BY BAIN AND MEMBERS OF THE INTEL

25   TEAM.

1    Q.   AND THIS DOCUMENT REFLECTS THE FACTS THAT BAIN COLLECTED

2    AND THE OPINIONS THAT BAIN FORMED IN THE REGULAR COURSE OF

3    PROVIDING CONSULTING SERVICES TO INTEL; CORRECT?

4    A.   WITHIN THE SCOPE OF THE PROJECT AND THE INFORMATION

5    AVAILABLE TO US, YES.

6    Q.   AND THIS IS TITLED MOBILE R&D BENCHMARKING; CORRECT?

7    A.   CORRECT.

8    Q.   AND DATED JULY 2015?

9    A.   CORRECT.

10   Q.   AND SO THE DOCUMENT WOULD HAVE BEEN CONSTRUCTED OVER A

11   PERIOD OF TIME LEADING UP TO THAT DATE AS BAIN COLLECTED ITS

12   FACTS AND FORMED ITS OPINIONS; CORRECT?

13   A.   ARE THAT'S CORRECT.

14   Q.   AND AT YOUR DEPOSITION, YOU TESTIFIED CONCERNING THIS

15   DOCUMENT; CORRECT?

16   A.   I BELIEVE SO.

17        MR. PETERSON:  YOUR HONOR, QUALCOMM MOVES TO ADMIT

18   QX 123 INTO EVIDENCE.

19        THE COURT:  AND IT'S 123A THAT YOU'RE MOVING TO

20   ADMIT?

21        MR. PETERSON:  I'M SORRY.

22        THE COURT:  LET'S KEEP THAT CLEAR, BECAUSE I DON'T

23   WANT THE TRANSCRIPT TO LOOK LIKE WE ADMITTED THE WHOLE THING.

24   A IS A SUBSET OF 123; CORRECT?

25        MR. PETERSON:  I APOLOGIZE.  THAT'S CORRECT, YOUR

1    HONOR.  WE MOVE TO ADMIT QX 123A.

2              MR. HOPKIN:  NO OBJECTION.

3              THE COURT:  IT'S ADMITTED.

4         (DEFENDANT'S EXHIBIT QX 123A WAS ADMITTED IN EVIDENCE.)

5              THE COURT:  GO AHEAD, PLEASE.

6    BY MR. PETERSON:

7    Q.   IF YOU COULD TURN TO SLIDE 2.

8    A.   YES.

9    Q.   THIS SLIDE CORRECTLY SHOWS THE FINDINGS THAT YOU REACHED

10   AS A PART OF THIS STUDY; CORRECT?

11   A.   TO THE BEST OF KNOWLEDGE, IT'S A SUMMARY OF THE FINDINGS

12   OF THE STUDY.

13   Q.   AND WHAT WAS THE CONCLUSION BAIN REACHED REGARDING INTEL

14   OVER ALL MOBILE PRODUCTIVITY?

15   A.   PRODUCTIVITY IN TERMS OF PRODUCT'S OUTPUT, YOU NEED SKU

16   OUTPUT.  I THINK HERE WE'RE SAYING THAT QUALCOMM WAS PRODUCING

17   TWO TO THREE TIMES AS MANY SKUS AS INTEL.

18   Q.   AND THE SLIDE CONTAINS OTHER CONCLUSIONS THAT BAIN

19   REACHED; CORRECT?  FOR EXAMPLE, I'M LOOKING AT THE SECOND TO

20   LAST BULLET, THERE'S ADDITIONAL CONCLUSIONS THERE THAT BAIN

21   REACHED, CORRECT, REGARDING PRODUCTIVITY?  WHAT WAS THAT

22   CONCLUSION?

23   A.   I BELIEVE IT'S THE SAME CONCLUSION, JUST INVERTING THE 2

24   TO 3X AND SAYING THAT INTEL PRODUCT ACTIVITY LAGGED QUALCOMM BY

25   50 PERCENT.

1    Q.   AND IF YOU COULD TURN TO SLIDE 4 IN THAT SAME DECK.

2    A.   OKAY.

3    Q.   AND THIS SLIDE ALSO ILLUSTRATES THE SAME PRINCIPLE WE WERE

4    JUST TALKING ABOUT, THAT INTEL WAS LAGGING IN PRODUCT OUTPUT;

5    CORRECT?

6    A.   THAT INTEL WAS PRODUCING FEWER SKUS THAN QUALCOMM.

7    Q.   THANKS.  YOU CAN SET THAT DOCUMENT ASIDE.  WE'RE DONE WITH

8    THAT FOR NOW.  THANK YOU.

9         NOW, JUST TO LAY A FOUNDATION, IN THE 2010 TO 2011

10   TIMEFRAME, BAIN OBSERVED THAT INTEL -- BAIN OBSERVED, IN THE

11   COURSE OF ITS ENGAGEMENT WITH INTEL, THAT THERE WAS LIKELY TO

12   BE CONSOLIDATION IN THE BASEBAND PROCESSOR INDUSTRY; CORRECT?

13              MR. HOPKIN:  LEADING.  OBJECTION.

14              THE COURT:  SUSTAINED.

15   BY MR. PETERSON:

16   Q.   IN THE 2010 -- I'LL REPHRASE.  IN THE 2010 TO 2011

17   TIMEFRAME, DID BAIN MAKE ANY OBSERVATIONS REGARDING

18   CONSOLIDATION IN THE BASEBAND PROCESSOR INDUSTRY?

19   A.   YES, I BELIEVE WE DID MAKE OBSERVATIONS, AT LEAST

20   INTERNALLY.  I DON'T RECALL TO WHAT EXTENT THAT WAS SHARED WITH

21   THE CLIENT.

22   Q.   WAS THAT OBSERVATION THAT THERE WOULD BE CONSOLIDATION IN

23   THE INDUSTRY, THAT THAT WAS LIKELY?

24   A.   MOVING AFTER 2011?  OR WHAT TIME PERIOD ARE WE TALKING

25   ABOUT HERE?

1    Q.   YOU MADE THE OBSERVATION AROUND 2010 OR 2011 LOOKING

2    FORWARD?

3    A.   LOOKING FORWARD THAT THERE WOULD BE MORE CONSOLIDATION?

4    FROM -- PERSONALLY, NO.  FROM MY PREPARATION, I DID SEE AN

5    ANALYSIS THAT SUGGESTED THAT, WITH SOME ASSUMPTIONS AROUND THE

6    PROFIT AVAILABLE IN THE INDUSTRY AND THE COSTS FOR PLAYERS TO

7    PARTICIPATE IN IT, THAT THERE COULD BE OR WOULD BE

8    CONSOLIDATION GOING FORWARD.

9    Q.   AND BAIN OBSERVED THAT THAT WAS ACTUALLY, IN FACT,

10   HAPPENING IN THE INDUSTRY; CORRECT?

11            MR. HOPKIN:  OBJECTION.  LEADING.

12            THE COURT:  SUSTAINED.

13            MR. PETERSON:  I'LL REPHRASE, YOUR HONOR.

14   Q.   HAD BAIN OBSERVED THAT THAT WAS ACTUALLY HAPPENING IN THE

15   INDUSTRY?

16   A.   WE'RE NOW SPEAKING RETROACTIVELY BEFORE 2010?

17   Q.   BEGINNING IN 2010 TO 2011.

18   A.   I'M SORRY.  SO DID WE SEE EVIDENCE THAT THERE WAS ACTUALLY

19   CONSOLIDATION AFTER 2010 IN THE INDUSTRY?

20   Q.   CORRECT.

21   A.   I DON'T THINK I CAME ACROSS DATA ON THAT IN MY

22   PREPARATION.  I BELIEVE IT TO BE TRUE.

23   Q.   IF YOU COULD TURN IN YOUR BINDER TO QX 124.  DO YOU

24   RECOGNIZE THIS DOCUMENT?

25   A.   FROM MY PREPARATION, YES.

1    Q.   AND THIS IS AN OCTOBER 2010 PRESENTATION THAT WAS GIVEN

2    INTERNALLY AT BAIN; CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   AND THE INTERNAL KNOWLEDGE FROM THIS PRESENTATION WAS

5    SHARED AT BAIN; CORRECT?

6    A.   IT WAS SHARED WITH A SUBSET OF PEOPLE WHO WERE AT THIS

7    MEETING.

8    Q.   AND THE DOCUMENT REFLECTS THE FACTS BAIN COLLECTED AND THE

9    OPINIONS BAIN FORMED IN THE COURSE OF ITS BUSINESS ADVISING ITS

10   CLIENTS?

11   A.   THERE'S A SINGLE AUTHOR LISTED ON THE DOCUMENT, SO IT

12   REFLECTS HIS KNOWLEDGE EITHER FROM WORKING WITH THE CLIENTS OR

13   FROM WHAT HE FOUND INDIVIDUALLY ON HIS OWN TIME.

14   Q.   OKAY.  AND IT IS DATED OCTOBER 1ST, 2010; CORRECT?

15   A.   IT IS.

16   Q.   SO THE WORK ON THIS DOCUMENT WOULD HAVE BEEN DONE IN THE

17   TIME PERIOD LEADING UP TO THAT DATE; CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   AND YOU TESTIFIED ABOUT THIS DOCUMENT AT YOUR DEPOSITION;

20   CORRECT?

21   A.   I BELIEVE SO.

22        MR. PETERSON:  YOUR HONOR, QUALCOMM OFFERS QX 124

23   INTO EVIDENCE.

24        MR. HOPKIN:  NO OBJECTION.

25        THE COURT:  IT'S ADMITTED.

1         (DEFENDANT'S EXHIBIT QX 124 WAS ADMITTED IN EVIDENCE.)

2              THE COURT:  GO AHEAD, PLEASE.

3    BY MR. PETERSON:

4    Q.   NOW, IF YOU TURN TO PAGE 6 OF THIS DOCUMENT.  AND I'M

5    NAVIGATING BY THE NUMBERS ON THE BOTTOM RIGHT CORNER THERE.

6         WHAT WAS THE MAIN CONCLUSION THAT QUALCOMM -- THAT BAIN

7    REACHED AS REFLECTED ON THIS SLIDE?

8    A.   THIS IS A -- I SEE.  AGAIN, IT'S BASED ON THE AUTHORSHIP,

9    IT'S THE CONCLUSION THAT A SPECIFIC PERSON AT BAIN REACHED.  HE

10   WAS A NEW MANAGER AT THE TIME.

11        AND IT SAYS PROFIT POOL UNLIKELY TO SUPPORT TODAY'S SOC

12   VENDORS, ONLY A FEW WILL SURVIVE BASED ON SOME -- BASED ON R&D

13   INVESTMENT AND SOME ASSUMPTIONS AROUND THE PROFITS THAT WOULD

14   BE AVAILABLE TO SUPPORT THAT.

15   Q.   OKAY.  THE CONCLUSION WAS ALSO REACHED THAT THE

16   CONTRIBUTION ROI WAS LIKELY TO BE NEGATIVE; CORRECT?

17             MR. HOPKIN:  OBJECTION, FOUNDATION.  AND ALSO

18   LEADING.  I BELIEVE THAT MR. JOHNSON TESTIFIED THAT WASN'T A

19   CONCLUSION THAT BAIN REACHED.  THIS WAS A CONCLUSION BY A

20   SEPARATE BAIN EMPLOYEE WHO'S NOT HERE TODAY.

21             MR. PETERSON:  I'LL WITHDRAW THE QUESTION, YOUR

22   HONOR.

23             THE COURT:  SUSTAINED.

24   BY MR. PETERSON:

25   Q.   MR. JOHNSON, IF YOU COULD TURN IN YOUR BINDER TO QX 121.

1          COULD YOU TELL ME WHAT A CSD IS?

2          I APOLOGIZE, YOUR HONOR.  JUST FOR THE SAKE OF THE RECORD,

3     THIS IS 121A TO BE CLEAR.

4               THE COURT:  OKAY.  THANK YOU.  AND 124 WAS THE WHOLE

5     124.  IT WASN'T A SUBSET; RIGHT?

6               MR. PETERSON:  THAT'S CORRECT.

7               THE COURT:  OKAY.  THANK YOU.

8               THE WITNESS:  I DON'T REMEMBER EXACTLY WHAT THE

9     ACRONYM STANDS FOR.  BUT IT'S EFFECTIVELY AN INTERNAL PROJECT

10    TO LOOK AT A SPECIFIC TOPIC AND THEN PRESENT IT OUT TO MEMBERS

11    OF THE INTEL LEADERSHIP TEAM.

12    BY MR. PETERSON:

13    Q.   AND THE ONE THAT WE'RE LOOKING AT HERE AT 121A, THIS IS

14    ONE OF THOSE PRESENTATIONS; CORRECT?

15    A.   I CAN'T GUARANTEE THAT IT'S THE VERSION THAT WAS ACTUALLY

16    PRESENTED AT THE END.  BUT IT'S THE WORK INVOLVED IN THAT

17    PRESENTATION, YES.

18    Q.   AND BAIN PREPARED THIS DECK, POTENTIALLY WITH SOME INPUT

19    FROM INTEL; CORRECT?

20    A.   ALMOST CERTAINLY WITH SOME INPUT FROM INTEL, YES.

21    Q.   AND THE DOCUMENT REFLECTS THE FACTS THAT BAIN COLLECTED

22    AND THE OPINIONS THAT BAIN FORMED IN THE COURSE OF PROVIDING

23    CONSULTING SERVICES TO INTEL; CORRECT?

24    A.   WITHIN THE SCOPE OF THE PROJECT AND THE INFORMATION THAT

25    WAS AVAILABLE TO US.

1    Q.   AND IT'S DATED AUGUST 7TH, 2012; CORRECT?

2    A.   CORRECT.

3    Q.   SO IT WOULD HAVE BEEN PREPARED IN THE COURSE OF TIME

4    LEADING UP TO THAT DATE?

5    A.   CORRECT.

6    Q.   AND YOU TESTIFIED ABOUT THIS DOCUMENT AT YOUR DEPOSITION;

7    CORRECT?

8    A.   I BELIEVE I DID.

9            MR. PETERSON:  YOUR HONOR, QUALCOMM MOVES QX 121A

10   INTO EVIDENCE.

11           MR. HOPKIN:  NO OBJECTION.

12           THE COURT:  IT'S ADMITTED.

13       (DEFENDANT'S EXHIBIT QX 121A WAS ADMITTED IN EVIDENCE.)

14           THE COURT:  GO AHEAD, PLEASE.

15           MR. PETERSON:  YOUR HONOR, WE HAVE NO FURTHER

16   QUESTIONS AT THIS TIME.  THANK YOU.

17           THE COURT:  OKAY.  THE TIME IS 9:29.

18       THANK YOU FOR THE THIN BINDER AS WELL.

19       (LAUGHTER.)

20           THE COURT:  OKAY.  LET ME KNOW WHEN YOU'RE READY,

21   PLEASE.

22           MR. HOPKIN:  ALL SET, YOUR HONOR.

23           THE COURT:  OKAY.  9:30.  GO AHEAD, PLEASE.

24   ///

25   ///

**CROSS-EXAMINATION**

BY MR. HOPKIN:

Q.   GOOD MORNING, MR. JOHNSON.

A.   GOOD MORNING.

Q.   ARE YOU FAMILIAR WITH THE TERM "DISCRETE" OR "THIN MODEM"

AS USED IN THE WIRELESS INDUSTRY?

A.   I AM.

Q.   AND BASED ON YOUR EXPERIENCE, WHO ARE THE CUSTOMERS FOR

DISCRETE MODEMS?  WHAT CATEGORIES OF COMPANIES?

A.   IN THE SMARTPHONE SPACE, IT TENDS TO BE THE PREMIUM

SEGMENT.  SOME IPHONE USES A DISCRETE MODEM.  I BELIEVE SOME OR

ALL OF THE SAMSUNG GALAXY FLAGSHIPS USE IT.

     AND THEN THERE ARE APPLICATIONS IN AUTONOMOUS DRIVING AND

INTERNET OF THINGS WHERE YOU DON'T NECESSARILY NEED THE APPS

PROCESS PART OF AN SOC.  YOU JUST WANT THE CONNECTIVITY.

Q.   IN YOUR EXPERIENCE, MR. JOHNSON, HOW DOES A CHIP MAKER

LIKE INTEL BENEFIT FROM HAVING AN ONGOING ENGAGEMENT WITH AN

OEM CUSTOMER?

A.   IN A COUPLE WAYS.  ONE, AROUND JUST ACCELERATING PRODUCT

DEVELOPMENT BY WORKING WITH A CUSTOMER AND HAVING ACCESS TO

THEIR PRODUCTS AND THEIR ENGINEERING TEAMS, YOU CAN CUSTOMIZE

YOUR PRODUCTS AND BASICALLY IMPROVE YOUR PACE OF INNOVATION IN

THE FEATURES YOU'RE BRINGING OUT.

     THE SECOND WOULD BE FROM A MARKET PERSPECTIVE.  ASSUMING

IT'S A BIG, WELL-KNOWN CUSTOMER, THAT CAN HAVE SOME SPILLOVER

1    EFFECTS OR HALO EFFECTS THAT OTHER, OTHER OEM'S WOULD, FOR

2    EXAMPLE, SEE THAT YOU HAVE -- YOU'RE WORKING WITH APPLE AND

3    THEN THINK, OKAY, WE'LL BUY THAT CHIP, TOO.  SO IT CAN HELP

4    EXPAND YOUR MARKET POSITION.

5    Q.   AND NOW IF YOU COULD PLEASE TURN IN THE BINDER THAT

6    COUNSEL FOR QUALCOMM HANDED YOU TO TAB FOR QX 0121A.

7    A.   OKAY.

8    Q.   THIS IS THE AUGUST 12, QUALCOMM CSD PRESENTATION; IS THAT

9    RIGHT?

10   A.   THAT'S RIGHT.

11   Q.   COULD YOU FLIP TO SLIDE 9 USING THE INTERNAL PAGINATION.

12   A.   SO ALSO THIS IS A SLIDE ENTITLED QUALCOMM SUCCESSFULLY

13   EMPLOYS MULTIPLE IPR VALUATION STRATEGIES.

14       DO YOU SEE THAT?

15   A.   VALUE GENERATION STRATEGIES, YES.

16   Q.   SO WHAT IS THE CHART ON THE LEFT-HAND SIDE OF THE SLIDE

17   REGARDING GLOBAL PATENT LICENSING REVENUE DEPICTING?

18   A.   IT'S DEPICTING THAT BY THESE ESTIMATES, IN 2011, THERE WAS

19   ABOUT $21 BILLION IN PATENT LICENSING WITHIN THE SCOPE, AND IT

20   SHOWS FOR VARIOUS I.P. BLOCKS, BASEBAND, WI-FI, BLUETOOTH, WHO

21   WERE THE PLAYERS IN THE INDUSTRY WHO WERE COLLECTING THAT

22   REVENUE.

23   Q.   AND WHAT WAS THE PERCENTAGE OF REVENUE THAT QUALCOMM

24   ACCOUNTED FOR ACCORDING TO THIS CHART FOR WWAN LICENSING

25   REVENUE?

1    A.    THAT WOULD BE THE COLUMN, THE BOX IN RED ON THE BOTTOM

2    LEFT CORNER.  IT LOOKS LIKE 50 TO 55 PERCENT.

3    Q.    AND IF I COULD DIRECT YOUR ATTENTION TO THE RIGHT-HAND

4    SIDE OF THE SLIDE UNDER THE BLUE BOX LABELED QUALCOMM WWAN IPR

5    STRATEGIES?

6    A.    UM-HUM.

7    Q.    WHAT WAS BAIN INTENDING TO CONVEY HERE ABOUT QUALCOMM'S

8    LICENSING PRACTICES?

9    A.    I THINK WE DREW A FEW CONCLUSIONS AT THE TIME.  THIS

10   PROBABLY WASN'T SOMETHING THAT WE LOOKED AT IN DEPTH OR HAD THE

11   EXPERTISE TO FULLY UNDERSTAND.

12        THAT SAID, THE CONCLUSIONS WE WERE DRAWING WERE, FIRST,

13   THAT AT THE TIME WE WERE OBSERVING A TWO-TIERED LICENSING

14   SCHEME, MEANING THAT THEY WERE COLLECTING LICENSING REVENUE

15   BOTH FROM OTHER CHIP PROVIDERS, AS WELL AS FROM THE END OEM

16   CUSTOMERS.

17        ANOTHER OBSERVATION HERE IS THAT ROYALTIES WERE BEING

18   NEGOTIATED OUT OF COURT TO MAINTAIN AN UNDEFINED NATURE OF FAIR

19   AND REASONABLE WITHIN THE FRAND CONSTRUCT.

20        THERE'S A POINT AROUND AGGRESSIVELY LITIGATING WHEN

21   NECESSARY, AND A POINT AROUND PRO-ACTIVITY AND DEFENSE

22   LICENSING TO PROTECT AGAINST COMPETITOR ACTIONS.

23   Q.    AND MORE GENERALLY, BASED ON YOUR EXPERIENCE, ARE YOU

24   AWARE OF ANOTHER COMPANY THAT USES A LICENSING MODEL LIKE

25   QUALCOMM'S IN THE WIRELESS INDUSTRY?

1          MR. PETERSON:  OBJECTION, YOUR HONOR.  FOUNDATION.

2   HE HASN'T TESTIFIED THAT HE KNOWS ANYTHING ABOUT ANYBODY ELSE'S

3   LICENSING PRACTICES.

4          THE COURT:  LAY THE FOUNDATION, PLEASE.

5   BY MR. HOPKIN:

6   Q.   MR. YONATAN, YOU WORKED ON CONSULTING FOR COMPANIES IN THE

7   WIRELESS TECHNOLOGY SPACE; IS THAT CORRECT?

8   A.   I'VE WORKED WITH INTEL, YES.

9   Q.   I'LL MOVE ON.

10       TO THE EXTENT YOU KNOW, WHAT WAS THE INTENDED

11  SIGNIFICANCE -- MOVING BACK TO QX 121A, SLIDE 9 -- OF THE FACT

12  FROM BAIN'S PERSPECTIVE THAT ROYALTIES WERE NEGOTIATED OUT OF

13  COURT AS MENTIONED IN THE SECOND BULLET POINT?

14  A.   FRANKLY, IT SEEMED STRANGE TO ME, THE FACT THAT -- IF THE

15  INTENT WAS TO MAINTAIN UNDEFINED NATURE.

16       I DIDN'T AUTHOR THIS, BUT THE INTENT SEEMED STRANGE.

17  Q.   FAIR ENOUGH.  NO FURTHER QUESTIONS.

18          THE COURT:  OKAY.  TIME IS 9:36.  ANY REDIRECT?

19          MR. PETERSON:  YES, YOUR HONOR.  BRIEFLY.

20          THE COURT:  OKAY.  9:36.  GO AHEAD, PLEASE.

21                      **REDIRECT EXAMINATION**

22  BY MR. PETERSON:

23  Q.   MR. JOHNSON, AS OF MARCH 2018, HAS INTEL ONE ANY MAJOR OEM

24  BUSINESS OUTSIDE OF APPLE?

25          MR. HOPKIN:  OBJECTION.  FOUNDATION.

1            THE COURT:  LAY THE FOUNDATION, PLEASE.

2    BY MR. PETERSON:

3    Q.  YOU CONTINUE TO DO WORK FOR INTEL, IS THAT CORRECT, IN

4    YOUR ROLE AT BAIN?

5    A.  I HAVE.

6    Q.  AND AS PART OF THAT, YOU'VE CONTINUED TO CONSULT ON

7    INTEL'S MOBILE WIRELESS BUSINESS; IS THAT CORRECT?

8    A.  I PERSONALLY HAVE NOT.

9    Q.  BUT BAIN HAS CONTINUED TO?  LET ME REPHRASE THAT.

10       AS OF THE TIME OF YOUR DEPOSITION IN MARCH 2018, YOU WERE

11   WORKING ON THE INTEL ACCOUNT; CORRECT?

12   A.  I WAS WORKING ON THE INTEL ACCOUNT, YES.

13   Q.  SO AS OF THAT TIME IN MARCH 2018, HAD INTEL WON ANY MAJOR

14   OEM BUSINESS OUTSIDE OF APPLE?

15           MR. HOPKIN:  OBJECTION.  FOUNDATION.

16           THE COURT:  LAY THE FOUNDATION, PLEASE.  I DON'T

17   THINK IT'S BEEN SUFFICIENTLY LAID.

18   BY MR. PETERSON:

19   Q.  YOU -- AS PART OF YOUR WORK WITH INTEL AS OF MARCH 2018,

20   YOU WERE FAMILIAR WITH THE CUSTOM -- WITH INTEL'S CUSTOMERS;

21   CORRECT?

22           MR. HOPKIN:  OBJECTION.  LEADING.

23           THE COURT:  SUSTAINED.

24   BY MR. PETERSON:

25   Q.  DID PART OF INTEL WORK, BAIN'S WORK FOR INTEL INVOLVE

1        LOOKING AT INTEL'S CUSTOMERS?

2        A.   IN VARIOUS PARTS OF THEIR BUSINESS, YES.

3        Q.   AND WHO WERE INTEL'S CUSTOMERS FOR THIN MODEMS AS OF MARCH

4        2018?

5                 MR. HOPKIN:  OBJECTION.  FOUNDATION.

6                 THE COURT:  OVERRULED.

7                 THE WITNESS:  I KNOW APPLE WAS A MAJOR CUSTOMER.  I

8        KNOW THAT AT LEAST BACK IN 2014 THEY HAD A DESIGN WIN WITH

9        SAMSUNG.

10            BEYOND THAT, I WOULD DEFER TO INTEL FOR THEIR CUSTOMER

11       LIST.

12       BY MR. PETERSON:

13       Q.   WAS THE DESIGN WIN WITH SAMSUNG A THIN MODEM?

14       A.   I BELIEVE SO FOR THEIR GALAXY NOTE 5, IF I RECALL

15       CORRECTLY.

16       Q.   MR. JOHNSON, DO YOU HOLD YOURSELF OUT AS AN EXPERT ON

17       FRAND OBLIGATIONS?

18       A.   I DO NOT.

19       Q.   AND DO YOU KNOW IF INTEL AND OTHER CHIP MAKERS PAY

20       ROYALTIES TO QUALCOMM?

21       A.   TODAY OR IN THE PAST?

22       Q.   AS OF MARCH 2018.

23       A.   AT MARCH 2018 --

24       Q.   LOOKING BACKWARDS, YEAH.

25       A.   MY UNDERSTANDING, AND AGAIN, WE'RE AT THE EDGE OF MY

1    KNOWLEDGE, WAS THAT AT THE TIME SOME OF THESE DOCUMENTS WERE

2    AUTHORED IN THE 2010, 2012 TIMEFRAME, SOC PROVIDERS WERE PAYING

3    ROYALTIES TO QUALCOMM.

4        MY UNDERSTANDING IS THAT IS NOT THE CASE TODAY.

5    Q.   AND WHAT'S YOUR BASIS FOR THAT KNOWLEDGE?

6    A.   GOOD QUESTION.  IT'S KIND OF A BLUR.  I DON'T THINK I CAME

7    ACROSS THAT -- WELL, ONE IS THE TWO-TIERED LICENSING SCHEME

8    THAT WE SPOKE ABOUT A MOMENT AGO FROM BOTH OEM'S AND SOC

9    VENDORS, SO THAT MADE IT SOUND LIKE THEY'RE CHARGING SOC

10   VENDORS.

11       MY PERSONAL UNDERSTANDING OF QUALCOMM'S LICENSING

12   STRUCTURE IS A BIT DIFFERENT JUST FROM WHAT I'VE READ AND WHAT

13   I'VE BEEN TOLD IN CONVERSATIONS.

14           MR. PETERSON:  THANK YOU.  NO FURTHER QUESTIONS.

15           THE COURT:  ALL RIGHT.  TIME IS 9:40.

16       IS THERE ANY RECROSS?

17           MR. HOPKIN:  NO, YOUR HONOR.

18           THE COURT:  OKAY.  IS THIS WITNESS SUBJECT TO RECALL

19   OR HAS HE COMPLETED HIS TRIAL TESTIMONY?

20           MR. HOPKIN:  NOT SUBJECT TO RECALL BY THE FTC.

21           MR. PETERSON:  NOT FROM QUALCOMM, YOUR HONOR.

22           THE COURT:  OKAY.  THEN YOU'VE COMPLETED YOUR TRIAL

23   TESTIMONY AND YOU'RE FREE TO LEAVE.

24       NOW, WHAT ABOUT MR. THOMAS LINDNER?  I FAILED TO ASK THAT

25   ON TUESDAY?  IS HE SUBJECT TO RECALL OR NOT?

```
 1              MR. VAN NEST:  NO, YOUR HONOR.

 2              MS. MILICI:  NO, YOUR HONOR.

 3              THE COURT:  OKAY.  SO HE'S DONE AS WELL.

 4              THE WITNESS:  THANK YOU.

 5              THE COURT:  ALL RIGHT.  CALL YOUR NEXT WITNESS,

 6      PLEASE.

 7              MR. BORNSTEIN:  YOUR HONOR, QUALCOMM CALLS PROFESSOR

 8      AVIV NEVO.

 9              THE COURT:  OKAY.

10              MR. BORNSTEIN:  AND WE'LL BRING UP SOME BINDERS IF WE

11      MAY.

12              THE COURT:  OKAY.  THANK YOU.

13          (PAUSE IN PROCEEDINGS.)

14              THE COURT:  PLEASE RAISE YOUR RIGHT HAND.

15          (DEFENDANT'S WITNESS, AVIV NEVO, WAS SWORN.)

16              THE WITNESS:  I DO.

17              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

18          WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

19      NAME FOR THE RECORD.

20              THE WITNESS:  AVIV NEVO.  LAST NAME NEVO, N-E-V-O.

21              THE COURT:  OKAY.  TIME IS 9:41.  GO AHEAD, PLEASE.

22              MR. BORNSTEIN:  YOUR HONOR, THAT --

23                        DIRECT EXAMINATION

24      BY MR. BORNSTEIN:

25      Q.   PROFESSOR NEVO, CAN YOU PLEASE TELL THE COURT YOUR AREA OF
```

1    ACADEMIC EXPERTISE?

2    A.   INDUSTRIAL ORGANIZATION, ANTITRUST ECONOMICS, AND

3    ECONOMETRICS.

4    Q.   WHAT IS ECONOMETRICS?

5    A.   ECONOMETRICS IS THE APPLICATION OF STATISTICAL METHODS TO

6    ECONOMIC MODELS, SPECIFICALLY TESTING THOSE MODELS AND

7    ESTIMATING THE RELEVANT PARAMETERS.

8    Q.   AND WHAT'S YOUR EDUCATIONAL BACKGROUND, PROFESSOR?

9    A.   I HAVE A BACHELOR'S DEGREE IN MATH AND ECONOMICS FROM

10   TEL AVIV UNIVERSITY.  I CONTINUED MY GRADUATE STUDIES AT

11   HARVARD WHERE I GOT A MASTER AND A PH.D. IN ECONOMICS.

12   Q.   WHERE DO YOU WORK NOW?

13   A.   SINCE 2016, I'VE BEEN AT UNIVERSITY OF PENNSYLVANIA.  I'M

14   A PENN INTEGRATED TECHNOLOGY PROFESSOR, UNIVERSITY PROFESSOR.

15   THAT'S THE HIGHEST PROFESSORSHIP PENN HAS.

16       I HAVE APPOINTMENTS AT THE DEPARTMENT OF ECONOMICS AT THE

17   SCHOOL OF ARTS AND SCIENCES AND AT THE MARKETING DEPARTMENT AT

18   WHARTON BUSINESS SCHOOL.

19   Q.   WHERE WERE YOU BEFORE PENN?

20   A.   I TAUGHT FOR 12 YEARS AT NORTHWESTERN AND BEFORE THAT I

21   TAUGHT FOR 7 YEARS AT UNIVERSITY OF CALIFORNIA BERKELEY.

22   Q.   IT MIGHT HELP IF YOU STAY A LITTLE CLOSER TO THE

23   MICROPHONE.

24   A.   THANK YOU.  SURE.

25   Q.   THANK YOU.  DO YOU HAVE OTHER PROFESSIONAL AFFILIATIONS

1       BESIDES YOUR TEACHING POSITIONS?

2       A.   I DO.  I'M A CO-EDITOR ECONOMETRICA, WHICH IS ONE OF THE

3       TOP TWO ECONOMIC JOURNALS.  SPECIFICALLY, I'M THE CO-EDITOR IN

4       CHARGE OF THE APPLIED MICROECONOMICS AREA, WHICH IS THE AREA OF

5       EMPIRICAL PROJECTS OR EMPIRICAL PAPERS THAT TEST ECONOMIC

6       MODELING.

7            IN ADDITION TO THAT, I'M ALSO A RESEARCH ASSOCIATE AT THE

8       NATIONAL BUREAU OF ECONOMIC RESEARCH.

9       Q.   HAVE YOU PUBLISHED ANY ARTICLES IN YOUR FIELD IN PEER

10      REVIEWED JOURNALS?

11      A.   YES, I HAVE, QUITE A FEW.

12      Q.   HAVE YOU HAD ANY GOVERNMENT SERVICE POSITIONS?

13      A.   YES.  WHILE I WAS AT NORTHWESTERN, I WAS ON LEAVE FOR A

14      YEAR, THAT WAS 2013 AND 2014.  I WAS ON LEAVE AND SERVED AS THE

15      CHIEF ECONOMIST AT THE ANTITRUST DIVISION OF THE DEPARTMENT OF

16      JUSTICE.  THE OFFICIAL TITLE WAS DEPUTY ASSISTANT ATTORNEY

17      GENERAL FOR ECONOMIC ANALYSIS.

18      Q.   HAVE YOU PREVIOUSLY BEEN ACCEPTED AS AN EXPERT WITNESS IN

19      FEDERAL COURT ON THESE SUBJECT MATTERS?

20      A.   YES.

21      Q.   CAN YOU GIVE EXAMPLES OF CASES IN WHICH YOU'VE PREVIOUSLY

22      TESTIFIED?

23      A.   YES.  SO IN MY PREVIOUS TWO TESTIMONIES WAS -- ABOUT SEVEN

24      OR EIGHT MONTHS AGO, I TESTIFIED ON BEHALF OF THE FTC IN A

25      PROPOSED MERGER BETWEEN TWO CHEMICAL SUPPLIERS TO SHIPS.

1          I TESTIFIED IN COURT.  THE MERGER WAS BLOCKED IN PART

2     BASED ON MY TESTIMONY.

3          PRIOR TO THAT, ROUGHLY TWO YEARS AGO, I TESTIFIED ON

4     BEHALF OF THE D.O.J. IN AN ATTEMPTED MERGER BY TWO HEALTH

5     INSURANCE COMPANIES, AETNA AND HUMANA.  ONCE AGAIN, I TESTIFIED

6     IN COURT.  THE MERGER WAS BLOCKED IN PART BASED ON MY

7     TESTIMONY.

8          MR. BORNSTEIN:  YOUR HONOR, QUALCOMM OFFERS

9      PROFESSOR NEVO AS AN EXPERT IN INDUSTRIAL ORGANIZATION,

10     ANTITRUST ECONOMICS, AND ECONOMETRICS.

11          MS. MILICI:  NO OBJECTION.

12          THE COURT:  OKAY.  SO CERTIFIED AS AN EXPERT IN THOSE

13     AREAS.

14          MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

15     Q.  PROFESSOR NEVO, WOULD YOU PLEASE EXPLAIN THE ASSIGNMENT

16     YOU WERE ASKED TO CONDUCT IN THIS CASE?

17     A.  YES, I'D BE HAPPY TO DO SO.  SO I WAS ACTUALLY ASKED TO

18     PROVIDE -- MY ASSIGNMENT CONSISTED OF THREE PARTS.

19          THE FIRST PART WAS TO EVALUATE THE FTC'S ALLEGATIONS THAT

20     QUALCOMM USES ITS MARKET POWER IN CERTAIN CHIP MARKETS TO

21     OBTAIN SUPRA-FRAND ROYALTY RATES.  THAT WAS THE FIRST PART.

22          THE SECOND PART WAS TO EVALUATE THE FTC'S CLAIM THAT

23     QUALCOMM'S ALLEGED SUPRA-FRAND RATES ACTS AS A TAX THAT HARMS

24     COMPETITION.

25          AND THEN FINALLY, I WAS ASKED TO ASSESS THE

1    PRO-COMPETITIVE AND BUSINESS JUSTIFICATIONS FOR QUALCOMM'S

2    PRACTICES.

3    Q.   LET'S START WITH THE FIRST ONE.

4        WHAT CONCLUSION DID YOU REACH ABOUT WHETHER QUALCOMM HAS

5    USED MARKET POWER TO OBTAIN SUPRA-FRAND ROYALTY RATES?

6    A.   SO MY CONCLUSION IS THAT THE FTC'S THEORY IS JUST NOT

7    BORNE OUT IN ACTUAL MARKET DATA.  SO THERE'S NO SUPPORT FOR THE

8    THEORY.

9    Q.   HOW DID YOU REACH THAT CONCLUSION?

10   A.   SO WHAT I DID IS THE SAME THING I DO IN MUCH OF MY

11   ACADEMIC WORK, I TOOK THE THEORY AS GIVEN AND LOOKED AT ITS

12   IMPLICATIONS, AND THERE'S VERY CLEAR IMPLICATIONS FROM THE

13   THEORY.

14       AND THEN I TOOK THOSE IMPLICATIONS AND TESTED THEM IN THE

15   REAL, USING REAL WORLD DATA, REAL WORLD ECONOMIC DATA AND

16   CHECKED WHETHER THE PREDICTIONS OF THE THEORY ARE BORNE OUT IN

17   THE DATA.

18   Q.   SO WHY DID YOU DO THAT SORT OF TESTING?

19   A.   AGAIN, IT'S A STANDARD THING THAT I DO IN MY ACADEMIC

20   RESEARCH.  AND THE REASON WE DO THAT IS ECONOMIC MODELS ARE

21   SUPPOSED TO BE SIMPLIFICATIONS OF THE WORLD.  THEY'RE USEFUL

22   WHEN THEY'RE, WHEN THEY'RE GOOD SIMPLIFICATIONS AND GIVE GOOD

23   PREDICTIONS.

24       SO BEFORE WE CAN MAKE ANY POLICY OR OTHER RECOMMENDATIONS

25   BASED ON THESE MODELS, WE WANT TO ACTUALLY KNOW THAT THEY HAVE

1    SOME VALIDITY AND THEY ACTUALLY MATCH WHAT WE SEE IN THE REAL

2    WORLD, AND THAT WAS THE GOAL OF WHAT I DID.

3    Q.   SO WHAT WERE YOU LOOKING FOR IN THE TESTS THAT YOU

4    PERFORMED?

5    A.   SO SPECIFICALLY WHAT I LOOKED AT WAS THE PREDICTIONS FROM

6    THE THEORY TO SEE IF THEY'RE ACTUALLY BORNE IN THE DATA.

7         SO MAYBE I CAN BEST DEMONSTRATE THAT WITH AN EXAMPLE.  SO

8    ONE OF THE CLEAR PREDICTIONS FROM THE THEORY IS THAT DURING

9    PERIODS OF ALLEGED MARKET POWER, THE THEORY PREDICTS THAT WE

10   SHOULD SEE HIGHER ROYALTY RATES.

11        SO THAT'S A VERY CLEAR PREDICTION THAT YOU CAN TAKE TO

12   DATA.  YOU CAN LOOK AT THE ALLEGED MARKET POWER PERIOD, YOU CAN

13   LOOK AT THE ROYALTY RATES AND THE AGREEMENTS THAT WERE SIGNED

14   DURING THAT PERIOD AND COMPARE TO OTHER PERIODS TO SEE WHETHER

15   WHETHER WE ACTUALLY SEE A DIFFERENCE IN THE RATES.

16   Q.   AND IN PERFORMING THOSE TESTS, DID YOU MAKE ANY

17   ASSUMPTIONS ABOUT WHETHER QUALCOMM ACTUALLY HAS OR DOES NOT

18   HAVE MARKET POWER?

19   A.   I BASICALLY TOOK THE THEORY AS GIVEN AND THE THEORY

20   ASSUMES THAT QUALCOMM HAS MARKET POWER DURING CERTAIN PERIODS,

21   AND I TOOK THAT AS GIVEN AND THEN TESTED THE IMPLICATIONS.

22   Q.   ALL RIGHT.  WHAT WAS THE FIRST STEP THAT YOU DID?

23   A.   SO THE FIRST STEP THAT I DID WAS PRETTY MUCH LIKE THIS

24   EXAMPLE.  I FOCUSSED ON THE RATES, THE ACTUAL CONTRACTUAL RATES

25   AND LOOKED AT HOW THEY, IF THERE WAS ANY VARIATION OVER TIME

1    THAT'S CONSISTENT WITH WHAT, WHAT THE THEORY PREDICTS.

2    Q.   WHAT WAS YOUR CONCLUSION?

3    A.   MY CONCLUSION WAS THAT THE DATA DO NOT SUPPORT THE

4    PREDICTIONS OF THE THEORY.  THE DATA SAYS THAT THE PREDICTION

5    OF THE THEORY IS JUST NOT BORNE OUT.

6    Q.   DID YOU PUT TOGETHER A SLIDE THAT SUMMARIZES THESE

7    CONCLUSIONS?

8    A.   YES, I DID.

9    Q.   LET'S TAKE A LOOK, PLEASE, AT SLIDE NUMBER 4.  THANK YOU.

10       AND, YOUR HONOR, THESE HAVE BEEN MARKED WITH A QDX NUMBER.

11           THE COURT:  OKAY.  IS THAT UNDER TAB 4, OR NOT?

12           MR. BORNSTEIN:  IT IS UNDER TAB NUMBER 1 IN THE

13   BINDER WHICH YOUR HONOR HAS.

14           THE COURT:  ALL RIGHT.  THANK YOU.

15   BY MR. BORNSTEIN:

16   Q.   ALL RIGHT.  PROFESSOR, CAN YOU EXPLAIN WHAT THIS SLIDE

17   SHOWS ABOUT YOUR CONCLUSIONS?

18   A.   YES.  BASICALLY THIS SLIDE DEMONSTRATES THE DATA, SO LET

19   ME GO THROUGH IT CAREFULLY.

20       ON THE X AXIS WE HAVE TIME, WE HAVE YEARS STARTING FROM

21   1990 GOING ALL THE WAY TO 2017.

22       ON THE Y AXIS, WE HAVE THE ROYALTY RATE.  IN THIS

23   PARTICULAR CASE, IT'S THE CONTRACTUAL ROYALTY RATE FOR CDMA.

24       EACH DOT REPRESENTS AN AGREEMENT, IN SOME CASES IT'S

25   MULTIPLE AGREEMENTS THAT FALL RIGHT ON THE SAME DAY.  BUT THESE

1    DOTS REPRESENT ROYALTY AGREEMENTS.

2        THE BLUE DOTS ARE THE TYPICAL, IF YOU WANT, AGREEMENTS,

3    CONTRACTS.

4        AND THEN THE PURPLE, GREEN, AND I THINK IT LOOKS LIKE HERE

5    RED ARE OTHER TYPES OF AGREEMENTS.  IN THIS CASE THESE ARE

6    AGREEMENTS THAT WERE SIGNED SUBJECT TO GOVERNMENT, GOVERNMENT

7    SUPERVISION.

8    Q.   AND WHY DID YOU SEPARATE OUT THE DIFFERENT COLORS?

9    A.   BECAUSE THE GOVERNMENT, OR THE AGREEMENTS THAT WERE SIGNED

10   SUBJECT TO GOVERNMENT SUPERVISION ARE REALLY DIFFERENT IN

11   NATURE, AND INDEED IN SOME OF THE ANALYSIS THAT FOLLOWS, I'M

12   ACTUALLY GOING TO EXCLUDE THEM SIMPLY BECAUSE THE FTC'S THEORY

13   REALLY DOESN'T APPLY TO THEM.  THE TERMS OF THESE AGREEMENTS

14   WERE NEGOTIATED WITH GOVERNMENT REGULATORS AND THEY'RE REALLY

15   NOT SUBJECT TO THE FTC'S THEORY.

16   Q.   DID YOU EXCLUDE ANY OTHER AGREEMENTS FROM THIS ANALYSIS?

17   A.   SO FROM ALL THE ANALYSIS, I ALSO EXCLUDED A NOKIA 2008

18   AGREEMENT THAT JUST IS VERY DIFFERENT IN NATURE.

19   Q.   AND FOR THE RECORD, YOU MAY HAVE SAID INCLUDED, DID YOU

20   MEAN INCLUDED OR EXCLUDED?

21   A.   EXCLUDED.  I APOLOGIZE.  EXCLUDED.

22   Q.   AND DID YOU INCLUDE OR EXCLUDE FROM THIS ANALYSIS THE TWO

23   5G AGREEMENTS THAT WERE THE SUBJECT OF THE COURT'S MOTION IN

24   LIMINE RULING?

25   A.   THOSE ARE NOT ANYWHERE IN MY, IN MY DATA.

NEVO DIRECT BY MR. BORNSTEIN

1    Q.   SO WHAT IS THE SHADED BOX ON THE RIGHT SIDE OF THE SLIDE?

2    A.   SO WHAT WE HAVE HERE IN SHADED BOX, THAT'S THE ALLEGED

3    MARKET POWER PERIOD BETWEEN 2006 AND 2016.  SO THAT'S THE AREA

4    THAT'S THE ALLEGATION OF MARKET POWER.  AND WHAT I'M DOING HERE

5    IS LOOKING AS TO WHETHER THE RATES DURING THAT TIME, SO INSIDE

6    THAT SHADED BOX, ARE DIFFERENT FROM RATES OUTSIDE THAT BOX.

7    Q.   AND WHAT CONCLUSION DID YOU DRAW?

8    A.   SO FIRST WE CAN JUST INSPECT THIS VISUALLY, AND VISUALLY

9    YOU CAN SEE THAT THERE'S ACTUALLY -- - THERE ISN'T MUCH

10   VARIATION, AT LEAST NOT ON AVERAGE.

11        AND AGAIN, THE THEORY WOULD PREDICT THAT DURING THE THEORY

12   OF THE ALLEGED MARKET POWER, DOTS SHOULD BE HIGHER, THE RATES

13   SHOULD BE HIGHER, AND VISUALLY YOU CAN SEE THAT THAT PATTERN IS

14   NOT THERE.

15        I ALSO TESTED IT STATISTICALLY, NOT JUST EYEBALL IT.  I

16   TESTED IT STATISTICALLY AND THE STATISTICAL TEST CONFIRMS THAT

17   THERE'S NO ECONOMIC AND MEANINGFUL DIFFERENCE BETWEEN THE RATES

18   DURING THAT PERIOD INSIDE THE BOX AND OUTSIDE.

19   Q.   DID YOU PERFORM THIS TEST FOR ANY CONTRACTUAL TERMS OTHER

20   THAN THE RUNNING ROYALTY RATE?

21   A.   YES.  I PERFORMED THE EXACT SAME TEST ALSO FOR THE UPFRONT

22   RATES.  IT'S IN MY -- IT'S AN EXHIBIT IN MY EXPERT REPORT.

23   EXACTLY THE SAME THING, JUST INSTEAD OF ROYALTY RATES, I LOOKED

24   AT UPFRONT RATES, COMPARED BETWEEN THE SHADED AREA AND THE

25   NON-SHADED AREA, AND BASICALLY CONCLUDED THE EXACT SAME THING,

1    THAT THERE'S NO DIFFERENCE BETWEEN THE TWO GROUPS.

2    Q.   DID YOU ASSESS THAT UPFRONT FEE COMPARISON STATISTICALLY

3    AS WELL?

4    A.   YES, I DID.

5    Q.   THERE ARE SOME OTHER VERTICAL LINES ON THE LEFT SIDE OF

6    THE SLIDE.  CAN YOU EXPLAIN THE SIGNIFICANCE OF THOSE?

7    A.   YEAH.  THESE ARE LINES THAT DENOTE VARIOUS DATES IN THE

8    PROGRESSION OF THE INDUSTRY.  SO THE FIRST LINE, KIND OF MOVING

9    FROM THE END TO THE BEGINNING, IS OCTOBER '99.  THAT'S THE

10   FIRST COMMERCIAL RELEASE OF CDMA 2000.

11        THEN IN '95, ROUGHLY SAME TIME, THERE'S THE FIRST CDMA

12   NETWORK COMMERCIAL LAUNCH.  AND THAT'S ROUGHLY AROUND THAT TIME

13   IS WHEN QUALCOMM STARTED SELLING CDMA CHIPS.

14        AND THEN IN JULY '93 IS ACTUALLY IN THE ADOPTION OF THE 2G

15   CDMA STANDARD.

16        MS. MILICI:  OBJECTION, YOUR HONOR.  HIS REPORT

17   DOESN'T HAVE ANYTHING ABOUT THE DATE THAT QUALCOMM STARTED

18   SELLING CHIPS, AND THIS DOESN'T APPEAR ON THE EXHIBIT TO HIS

19   REPORT.

20        MR. BORNSTEIN:  YOUR HONOR, HIS --

21        THE COURT:  ALL RIGHT.  CAN I HAVE A COPY OF HIS

22   REPORT?  AND WHY DON'T YOU SHOW ME THE PARAGRAPH WHERE -- OR

23   THE EXHIBIT.

24        MR. BORNSTEIN:  SURE.

25        THE COURT:  OKAY.  THANK YOU.

1           MR. BORNSTEIN:  YOUR HONOR, THIS INFORMATION IS IN

2      EXHIBIT 2 TO PROFESSOR NEVO'S REPORT.  AND IF SOMEBODY CAN TELL

3      ME WHAT PAGE THAT'S ON.  IT'S ON PAGE 61 OF THE REPORT, YOUR

4      HONOR, EXHIBIT 2.

5           THE COURT:  OKAY.

6           MR. BORNSTEIN:  IT INDICATES FIRST CDMA NETWORK

7      COMMERCIAL LAUNCH ON OCTOBER 1995.

8           MS. MILICI:  YOUR HONOR, WHAT'S NOT THERE IS THIS BIG

9      BLUE FLAG SAYING THAT QUALCOMM STARTED SELLING CDMA CHIPS ON A

10     PARTICULAR DATE.

11          MR. BORNSTEIN:  AND THAT'S REFLECTED IN PARAGRAPH 68

12     OF THE REPORT, AS REFLECTED ON THE SLIDE.

13          MS. MILICI:  YOUR HONOR, I DON'T HAVE PARAGRAPH 68 IN

14     FRONT OF ME, BUT MY RECOLLECTION OF PARAGRAPH 68 IS THAT IT

15     GIVES A DATE.  IT DOES NOT GIVE THE DATE THAT QUALCOMM STARTED

16     SELLING CDMA CHIPS.  IT'S NOT CLEAR FROM THIS SLIDE WHAT THEY

17     MEAN BY SELLING, WHETHER THAT'S THE DATE THAT QUALCOMM STARTED

18     SHIPPING CHIPS, WHETHER THAT'S THE DATE THEY STARTED ENTERING

19     INTO SUPPLY AGREEMENTS.

20          I DON'T BELIEVE THAT'S IN THE RECORD AND I DON'T BELIEVE

21     IT'S IN THE EXHIBIT.

22          THE COURT:  68 SAYS, "AS MENTIONED ABOVE, QUALCOMM

23     STARTED SELLING CHIPS AND HANDSETS IN ORDER TO FACILITATE THE

24     COMMERCIALIZATION OF THE CDMA TECHNOLOGY THAT IT DEVELOPED.

25     QUALCOMM FORMED ITS CHIPSET DIVISION IN OCTOBER 1995 AS THE

 1    CDMA ASIC PRODUCTS UNIT WHICH EVOLVED INTO QUALCOMM'S CDMA

 2    TECHNOLOGIES QCT IN 1999."

 3              MR. BORNSTEIN:  CORRECT, YOUR HONOR.  COULDN'T HAVE

 4    BEEN SELLING CHIPS BEFORE IT HAD A CHIPSET DIVISION.

 5              MS. MILICI:  YOUR HONOR, THAT'S INCORRECT.  THE

 6    REPORT ALSO SAID THAT QTL WASN'T FORMED UNTIL 1995, BUT QTL WAS

 7    OBVIOUSLY ENTERING LICENSES BEFORE 1995.  I THINK THAT'S

 8    CORRECT.

 9              MR. BORNSTEIN:  I'M NOT SURE WHERE IT SAYS QTL WASN'T

10    FORMED UNTIL 1995.  FIRST OF ALL, I'M HAPPY TO MOVE ON.  I

11    THINK THE FTC HAS DECIDED THAT OBJECTING AND WASTING TIME AND

12    SLOWING THINGS DOWN IS A GOOD STRATEGY FOR THEM.  THERE'S NO

13    REASON TO THINK THIS IS IMPORTANT OR RELEVANT.

14       I'LL MOVE ON FROM THAT ONE SPECIFIC POINT OF WHEN THEY

15    STARTED SELLING CHIPS IF IT'LL MAKE THE FTC HAPPY.

16              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

17              MR. BORNSTEIN:  OKAY.  AND AS I'VE BEEN REMINDED,

18    THIS IS IN PARAGRAPH 62 ANYWAY.

19              THE COURT:  GO AHEAD, PLEASE.

20              MR. BORNSTEIN:  OKAY.

21              THE COURT:  OVERRULED.

22              MR. BORNSTEIN:  THANK YOU.

23    Q.   SO YOU WERE EXPLAINING YOUR SLIDE, PROFESSOR.  WHAT IS THE

24    SIGNIFICANCE TO YOUR ANALYSIS OF THE DATES THAT YOU'VE

25    IDENTIFIED ON THE LEFT SIDE OF THE SLIDE?

1    A.   SO THE SIGNIFICANCE REALLY VARIES BY THESE THREE DATES,

2    AND MAYBE WE CAN MOVE ON TO THE NEXT SLIDE THAT KIND OF ZOOMS

3    IN ON THIS PERIOD.

4    Q.   SURE.  LET'S DO THAT.

5    A.   SO I PREPARED A SLIDE THAT ZOOMS IN ON THIS SPECIFIC

6    PERIOD, KIND OF PRE2000, AND WHAT WE SEE HERE IS IF WE FOCUS ON

7    THE PRE-JULY '93 IS WE SEE THAT THERE'S ACTUALLY FIVE LICENSES

8    THAT WERE SIGNED THERE.  AND THESE ARE LICENSES THAT SATISFY

9    WHAT WE WOULD CALL THE EX ANTE FRAMEWORK FOR DETERMINATION OF

10   FRAND.

11   Q.   WHAT DO YOU MEAN BY "THE EX ANTE FRAMEWORK"?

12   A.   SO IN THE ECONOMICS LITERATURE, THERE IS SOME DISCUSSION

13   OF HOW TO DETERMINE FRAND.  BUT ONE THING THAT'S IN PRETTY

14   CONSENSUS AGREEMENT IS THE FACT THAT WE SHOULD BE LOOKING AT,

15   AT NEGOTIATIONS THAT HAPPENED EX ANTE.  EX ANTE MEANS BEFORE

16   THE STANDARD WAS ADOPTED.  THAT'S THE REFERENCE HERE.

17        AND USUALLY THAT'S A HYPOTHETICAL SITUATION.  THIS IS A

18   CASE WHERE WE ACTUALLY HAVE FIVE CONTRACTS THAT ACTUALLY

19   SATISFY LITERALLY THAT DEFINITION OF EX ANTE.

20   Q.   AND WHY IS THAT RELEVANT TO YOUR ANALYSIS?

21   A.   AGAIN, THAT JUST GIVES US FIVE LICENSES THAT SATISFY WHAT

22   THE ECONOMICS LITERATURE WOULD ACTUALLY CALL THE FRAND RATE.

23        SO, AGAIN, INSTEAD OF HAVING A HYPOTHETICAL SITUATION, WE

24   HAVE TO THINK, WHAT WOULD THE NEGOTIATION RATE WOULD HAVE BEEN

25   HAD THEY HAPPENED BEFORE THE STANDARD.

1           HERE WE ACTUALLY HAVE FIVE AGREEMENTS THAT WERE SIGNED

2     BEFORE THE STANDARD.

3     Q.   OKAY.  AND YOU TALKED ABOUT 1993.  WHAT IS THE RELEVANCE

4     OF THE OTHER TWO DATES?

5     A.   SO 1995, THAT'S AFTER THE STANDARD.  SO THERE'S TEN

6     ADDITIONAL LICENSES, SOME OF WHICH ARE DEPICTED HERE.  THERE'S

7     TEN ADDITIONAL LICENSES.

8           AND THESE LICENSES ARE AFTER THE STANDARD, BUT THEY'RE

9     REALLY BEFORE THERE'S ANY CDMA NETWORK AND BEFORE QUALCOMM

10    STARTED SELLING CDMA CHIPS.

11          SO IN TERMS OF THINKING OF ANY TYPE OF REQUIREMENT FOR

12    CHIPS, THESE ARE KIND OF BEFORE THAT REQUIREMENT EXISTED.

13    Q.   OKAY.  HAVE YOU DONE A SIMILAR TEST FOR PREMIUM LTE?

14    A.   YES, I HAVE.

15    Q.   OKAY.  AND WHAT DID YOU DO THERE?

16    A.   SO I BASICALLY DID A VERY SIMILAR EXERCISE, WHICH IS TO

17    LOOK AT CONTRACTUAL RATES AND COMPARE THEM BETWEEN PERIODS OF

18    ALLEGED MARKET POWER AND PERIODS OUTSIDE THE ALLEGED MARKET

19    POWER PERIOD.

20    Q.   WHICH AGREEMENTS DID YOU LOOK AT?

21    A.   SO IN THAT CASE, I FOCUSSED ON WCDMA ONLY RATES.

22    Q.   HOW COME?

23    A.   SO IN ORDER TO USE LTE PREMIUM CHIPS, AN OEM WOULD NEED

24    ONE OF TWO LICENSES.  IT WOULD EITHER NEED A CDMA LICENSE, AND

25    THEN IT WOULD BE COVERED IN THE PREVIOUS ANALYSIS THAT WE

1    LOOKED AT OR THEY WOULD NEED A WCDMA LICENSE.

2         SO WHAT I'M DOING HERE IS I'M LOOKING AT THE ADDITIONAL

3    LICENSES, THOSE THAT ARE ONLY FOR WCDMA AND THAT COULD HAVE

4    POTENTIALLY BEEN AFFECTED BY A REQUIREMENT FOR LTE PREMIUM

5    CHIPS.

6    Q.   SO WHAT WAS THE TEST THAT YOU RAN FOR PREMIUM LTE?

7    A.   SO, AGAIN, VERY SIMILAR TO THE TEST THAT I RAN BEFORE

8    LOOKING BETWEEN THE ALLEGED MARKET POWER PERIOD, HERE'S A

9    DIFFERENT PERIOD OF 2011 TO 2016, SO IT'S A DIFFERENT PERIOD.

10        AND LOOKING AT THE CONTRACTUAL RATE FOR WCDMA ONLY

11   CONTRACTS.

12   Q.   WHAT DID YOU FIND?

13   A.   I PREPARED A SLIDE TO SHOW YOU US THAT.  MAYBE WE CAN --

14   Q.   TAKE A LOOK AT SLIDE 6, PLEASE.

15   A.   SO THIS SLIDE FOLLOWS ESSENTIALLY THE SAME FORMAT AS THE

16   PREVIOUS SLIDE.  AGAIN, THE TIME ON THE X AXIS, ROYALTY ON THE

17   Y AXIS.  CONTRACTUAL RATES ARE DOTS.  AGAIN, DIFFERENT COLORS

18   DENOTE DIFFERENT TYPES OF AGREEMENTS.

19        SHADED AREA IS THE ALLEGED MARKET POWER PERIOD, AND I'M

20   TESTING THE DIFFERENCE BETWEEN THE AGREEMENTS IN THE SHADED

21   AREA TO THOSE OUTSIDE.

22   Q.   AND WHAT DO YOU CONCLUDE?

23   A.   WHAT I CONCLUDE, AGAIN VERY SIMILAR TO BEFORE, IS VISUALLY

24   IT'S VERY CLEAR.  WE DO NOT SEE WHAT THE THEORY WOULD PREDICT,

25   WHICH WOULD BE HIGHER RATES DURING THE ALLEGED MARKET POWER

1    PERIOD.

2         I ALSO TESTED IT STATISTICALLY AND AGAIN IT CONFIRMS

3    THERE'S NO ECONOMIC AND MEANINGFUL DIFFERENCE BETWEEN THE

4    AGREEMENTS IN THE TWO PERIODS.

5    Q.   SO WHAT CONCLUSIONS CAN YOU DREW FROM THESE TWO TESTS

6    ABOUT THE FTC'S THEORY?

7    A.   SO JUST FOCUSSING ON THESE TWO TESTS, THEIR PREDICTIONS

8    THAT -- THE FTC'S THEORY PREDICTION THAT THERE WOULD BE

9    DIFFERENT RATES DURING PERIODS OF HIGH MARKET POWER IS JUST NOT

10   BORNE OUT IN THE DATA.

11   Q.   DOES YOUR CONCLUSION YOU JUST DESCRIBED DEPEND ON ASSUMING

12   THAT NOTHING RELEVANT HAS CHANGED IN THE INDUSTRY FROM THE

13   BEGINNING OF THE PERIOD THAT YOU LOOKED AT UNTIL THE END?

14   A.   NO.  FUNDAMENTALLY THE CHANGE -- THE BASIC IDEA OF THE

15   TEST IS TO REALLY COMPARE WITHIN THE SHADED AREA AND OUTSIDE

16   THE SHADED AREA.

17        OUTSIDE THE SHADED AREA DOES INCLUDE SOME OF THE EARLIER

18   AGREEMENTS, ESSENTIALLY CDMA GOING BACK TO THE EARLY 90S, BUT

19   IT INCLUDES THE WHOLE RANGE.

20        THE EARLY AGREEMENTS THAT WERE THEN VALIDATED BY SIMILAR

21   RATES IN KIND OF THE MID-90S AND THEN A SIMILAR RATE FOR LATE

22   90S AND 2000S AND AFTERWARDS.  SO I'M COMPARING THE WHOLE AREA.

23   Q.   WHAT DO YOU MEAN WHEN YOU SAY THAT THE RATES WERE

24   VALIDATED?

25   A.   I MEAN, THERE'S THE INITIAL RATES THAT WERE SIGNED PRE-93,

1    AND THEN THERE WERE ADDITIONAL RATES THAT WERE SIGNED, AND AS

2    WE LOOKED AT THE GRAPH BEFORE, YOU COULD REALLY SEE THAT WE SEE

3    CONSISTENTLY THE 5 PERCENT APPEARING OVER AND OVER AGAIN.  WE

4    CAN SEE THIS HERE LOOKING FROM 99 ONWARDS.  WE CAN SEE KIND OF

5    THE REVALIDATION IN THIS CASE FOR WCDMA, AND THE PREVIOUS GRAPH

6    FOR CDMA.

7    Q.   AND DOES THE FACT THAT QUALCOMM HAS MOST FAVORED ROYALTY

8    RATE PROVISIONS IN SOME OF ITS AGREEMENTS AFFECT YOUR

9    CONCLUSION IN ANY WAY?

10   A.   NO, IT DOESN'T.  THE MOST FAVORED ROYALTY RATES

11   PROVISIONS, IF THEY INDEED HAVE BITE, WOULD EXPLAIN CONSISTENCY

12   OF THE RATE, BUT THEY WON'T EXPLAIN THE LEVEL.

13       AND IN PARTICULAR, WHAT THEY WOULD IMPLY IS IF YOU ARE

14   GOING TO LINE UP ALL THE RATES, SO I'M ASSUMING THAT THEY HAVE

15   BITE, YOU WOULD LINE UP BASICALLY AT THE, THE LOWEST RATE THAT,

16   YOU KNOW, ANY LEVERAGE THAT YOU CAN GET.  IT WOULD BE WHAT I

17   CALL A RATCHETING DOWN EFFECT, NOT RATCHETING UP.  IT WOULD NOT

18   EXPLAIN WHY YOU WOULD RATCHET UP EVERYONE TO A SUPRA-FRAND RATE

19   AND EXPLAIN WHY YOU WOULD GO DOWN TO THE LOWEST, SOME SAY THE

20   LOWEST COMMON DENOMINATOR IN TERMS OF YOUR BUILT TO LEVERAGE.

21       SO YOU COULD NOT GET ANY MORE THAN YOUR LOWEST LEVERAGE

22   ACCORDING TO THE THEORY.

23   Q.   AND DOES QUALCOMM'S NONDISCRIMINATION OBLIGATIONS UNDER

24   ITS FRAND COMMITMENTS AFFECT YOUR CONCLUSION?

25   A.   AGAIN, TO THE EXTENT THAT THEY BITE, AND NOT TAKING A

1     STAND ON THE SIMILARLY SITUATED PART OF THAT CONDITION, THEY

2     WOULD EXPLAIN CONSISTENTLY, BUT NOT THE LEVELS.  SO THE SAME

3     ANSWER.

4     Q.   DID YOU PERFORM ANY OTHER TESTS?

5     A.   YES, I DID.

6     Q.   OKAY.  WHAT WAS THE NEXT ONE THAT YOU DID?

7     A.   SO THE NEXT THING THAT I DID WAS I ACTUALLY COMPARED THE

8     RATES BETWEEN THE CDMA AGREEMENTS AND THE WCDMA ONLY

9     AGREEMENTS.

10    Q.

11    +WHY DID YOU DO THAT?

12    A.   BECAUSE HERE AGAIN IT GIVES US A WAY TO TEST THE THEORY,

13    OR THE PREDICTIONS OF THE THEORY BY COMPARING TWO DIFFERENT

14    TECHNOLOGIES WHERE THERE'S DIFFERENT ALLEGATIONS OF MARKET

15    POWER.

16    Q.   AND CAN YOU EXPLAIN WHAT, WHAT THE CONCLUSION WAS FROM

17    YOUR TEST?

18    A.   SO THE CONCLUSION BASICALLY IS THE SAME AS THE PREVIOUS

19    TWO TESTS.  THE THEORY WOULD PREDICT THAT WE SHOULD SEE HIGH

20    RATES IN CDMA BECAUSE THERE'S AN ALLEGATION OF MARKET POWER,

21    ESPECIALLY IN A PARTICULAR TIME PERIOD WHERE THERE IS NO

22    ALLEGATION FOR THAT IN WCDMA, IN THE WCDMA ONLY AGREEMENTS.

23         SO THE THEORY PREDICTS WE SHOULD SEE HIGHER RATES IN THE

24    CDMA, AND THAT'S NOT WHAT WE SEE.

25    Q.   AND DID YOU PUT A SLIDE TOGETHER THAT SHOWS THE RESULTS OF

1      YOUR TESTS?

2      A.   YES, I DID.

3      Q.   CAN WE TAKE A LOOK AT THAT, PLEASE.  IT'S SLIDE 7.

4      A.   SO WHAT I DID HERE IS REALLY A COMBINATION OF THE PREVIOUS

5      TWO SLIDES.  THE RED DOTS HERE ARE THE CDMA AGREEMENTS THAT WE

6      PREVIOUSLY SAW, AND THE BLUE DOTS ARE THE WCDMA ONLY

7      AGREEMENTS.  AND JUST PUTTING THEM NOW IN ONE TIMELINE.

8           AND VISUALLY, AGAIN, WE CAN SEE WHAT I ALLUDED TO BEFORE,

9      IS THE FACT THAT WE DON'T SEE A JUMP IN THE RATES IN WCDMA,

10     WHETHER IT'S DURING THE 2006 TO 2011 PERIOD, OR WHETHER IT'S

11     ANY OTHER -- DURING ANY OTHER PERIOD.

12     Q.   AND DID YOU TEST THIS STATISTICALLY?

13     A.   I ALSO CONFIRMED THAT RESULT WITH A STATISTICAL TEST.

14     Q.   DID YOU CONSIDER THE POSSIBILITY THAT QUALCOMM COULD HAVE

15     USED MARKET POWER IN CDMA TO OBTAIN HIGHER RATES IN WCDMA?

16     A.   I CONSIDERED -- I CONSIDERED THAT POSSIBILITY.

17          AS A MATTER OF POLICY, I THINK WE HAVE PRETTY -- A LOT OF

18     TESTIMONY ON THE RECORD SAYING THAT THE POLICY IS STANDARD

19     SPECIFIC.  SO THE THEORY BEHIND THAT DOESN'T MATCH WHAT THE

20     ACTUAL POLICY IS.

21          BUT FOR THE SAKE OF THIS TEST, I ACTUALLY PUT THAT ASIDE

22     AND ASKED MYSELF, WOULD THAT ADD UP AS A POSSIBILITY, AS A

23     THREAT, EVEN THOUGH THAT'S NOT THE ACTUAL POLICY?

24     Q.   WHAT DID YOU CONCLUDE?

25     A.   WHAT I CONCLUDED WAS THAT MATH DOESN'T JUST -- DOESN'T ADD

1    UP.

2    Q.    WHY IS THAT?

3    A.    BECAUSE WE CAN LOOK AND SEE WHAT IS THE THREAT, RIGHT?  BY

4    THREATENING TO WITHHOLD WCDMA, YOU CAN SEE WHAT'S THE COST TO

5    THE OEM OF THAT HAPPENING, OR IT'S A MEASURE OF THAT COST, AND

6    I HAVE A VERY CONSERVATIVE MEASURE OF THAT, WHICH WOULD BE THE

7    REVENUES OVER A CERTAIN NUMBER OF YEARS.

8         AND I COMPARED THAT TO THE ACTUAL EXTRA ROYALTIES THAT ARE

9    BEING ALLEGEDLY PAID.

10   Q.    LET'S DISCUSS THIS IN THE CONTEXT OF SOME CONCRETE

11   NUMBERS.  DID YOU PUT A SLIDE TOGETHER ON THIS?

12   A.    YES, I PUT A SLIDE TOGETHER.

13   Q.    OKAY.  I'M JUST GOING TO FLIP THE CARDBOARD, YOUR HONOR,

14   BECAUSE YOU'VE SEALED THIS PARTICULAR SLIDE, WHICH IS SLIDE 8.

15        IF WE CAN PUT THAT UP, THOUGH, FOR THE PROFESSOR AND THE

16   COURT, PLEASE.

17   A.    SO WHAT THIS SLIDE IS, IS VISUAL REPRESENTATION OF MY

18   EXHIBIT 1.  EXHIBIT 1 IS A TABLE.  THIS IS A VISUAL

19   REPRESENTATION, BUT I HAVE THE EXACT SAME NUMBERS IN IT.

20        WHAT WE SEE HERE ARE SEVEN OEM'S, AND FOR EACH OF THEM, IN

21   THE RED BAR -- AND I'LL TRY TO MAKE SURE I AVOID SAYING

22   NUMBERS -- IN THE RED BAR WE SEE THIS IS THE ALLEGED

23   SUPRA-FRAND RATE THAT THEY'RE PAYING, SURCHARGE THAT THEY'RE

24   PAYING USING MR. LASINSKI'S NUMBERS OF HOW MUCH THE

25   OVERESTIMATE IS.  AND THIS IS FOR WCDMA.

1    Q.    SO TO BE CLEAR, DO RED NUMBERS, WHERE DO THEY COME FROM?

2    A.    THEY'RE BASICALLY BASED ON THE, THE ESTIMATES OF SURCHARGE

3    FROM MR. LASINSKI MULTIPLIED BY THE NUMBER OF UNITS THAT WE

4    ACTUALLY SEE IN THE DATA THAT ARE ACTUALLY SOLD.

5    Q.    OKAY.  SO WHAT ARE GREY BARS?

6    A.    THE GREY BARS, THAT IS THE TOTAL REVENUE THAT THE OEM GOT

7    FROM SELLING CDMA.  AND THAT'S SUPPOSED TO BE A PROXY -- CDMA

8    DEVICES.

9          THAT'S SUPPOSED TO BE A PROXY FOR THE PROFITS, AND IT'S

10   OBVIOUSLY VERY CONSERVATIVE FROM THE POINT OF THIS GRAPH.  AND

11   THE REASON I USE REVENUE IS I DON'T ACTUALLY KNOW THE PROFIT.

12   I SAY LET'S ASSUME THAT THEY HAVE NO COST AND THE WHOLE REVENUE

13   IS PROFIT, THAT THEY WOULD LOSE THAT WHOLE REVENUE.

14         AND I COMPARED THAT TO THE OVERCHARGE THAT THEY PAID, AND

15   THIS REVENUE, AS I SAID, IT'S ACTUALLY MEASURED FOR TWO YEARS

16   FOLLOWING THE LICENSE AGREEMENT.

17   Q.    OKAY.  SO JUST TO TAKE A SPECIFIC EXAMPLE, LEST NOT SAY A

18   NAME, BUT THE SECOND OEM THAT'S LISTED THERE, HOW WOULD YOU

19   ANALYZE WHAT YOU FOUND HERE?

20   A.    SO I COMPARED THE NUMBER IN THE GREY AREA, WHICH I'M NOT

21   GOING TO SAY WHAT IT IS, AND COMPARED TO THE RED, AND THE

22   NUMBER IN RED IS ALMOST, NOT QUITE, ALMOST 40 TIMES BIGGER THAN

23   THE NUMBER IN GREY.

24   Q.    AND WHAT DO YOU CONCLUDE BASED ON THAT?

25   A.    WELL, FROM THAT YOU CAN CONCLUDE THAT THE MATH DOESN'T

1    JUST ADD UP OF SAYING, IF THERE WAS A THREAT TO WITHHOLD THE

2    GREY, THIS IS A VERY CONSERVATIVE ESTIMATE OF HOW MUCH WOULD BE

3    LOST IN ORDER TO GET THAT RED AREA.  IT JUST DOESN'T LINE UP.

4    Q.   WHAT WAS THE NEXT TEST THAT YOU DID?

5    A.   SO THE NEXT TEST THAT I DID WAS ESSENTIALLY TRYING TO USE

6    THAT SAME IDEAS THAT WE LOOKED AT BEFORE AND NOW COMPARING

7    ACROSS OEM'S AND LOOKING AT THE RATES THAT THEY PAID AS A

8    FUNCTION OF HOW DEPENDENT, OR HOW MUCH NEAR TERM DEMAND THEY

9    MIGHT ACTUALLY HAVE FOR QUALCOMM CHIPS.

10   Q.   WHAT DO YOU MEAN BY "NEAR TERM DEMAND"?

11   A.   SO THE FTC'S THEORY IS THAT QUALCOMM HAD MARKET POWER AND

12   THEN USED THAT AS A BARGAINING CHIP.

13        NOW -- OR BARGAINING LEVERAGE, I SHOULD SAY.

14        FOR THAT TO HOLD, IT MEANS THAT THE OEM NEEDS TO HAVE A

15   NEAR TERM REQUIREMENT, OR REALLY A NEED FOR CHIPS, YOU KNOW,

16   RIGHT NOW, RIGHT AWAY, AND, THEREFORE, BE DEPENDENT ON

17   QUALCOMM.

18        IF THE OEM DOES NOT HAVE THAT NEED, THEY CAN ACTUALLY

19   WAIT, THEY CAN ACTUALLY GET A FRAND DETERMINATION IF THEY

20   BELIEVE THAT THE RATE THAT THEY'RE OFFERED IS NOT FRAND.

21   Q.   WELL, IF QUALCOMM HAS MARKET POWER, WHICH IS THE

22   ASSUMPTION YOU'RE USING HERE, DOESN'T EVERY OEM WHO WANTS TO

23   MAKE A CDMA PHONE HAVE A NEAR TERM DEMAND FROM QUALCOMM?

24   A.   NO, NOT IF THEY ARE -- IF THEY DON'T NEED TO MAKE -- DON'T

25   NEED THE QUALCOMM CHIPS RIGHT AWAY.  IF THEY ACTUALLY HAVE

1    SUFFICIENT TIME, THEY CAN, THEY CAN SEEK A FRAND DETERMINATION.

2    Q.   SO CAN YOU GIVE A REAL WORLD EXAMPLE OF AN OEM THAT DID

3    NOT HAVE A NEAR TERM DEMAND FOR QUALCOMM CHIPS?

4    A.   I THINK APPLE IS A GOOD EXAMPLE.  IN 2005, I BELIEVE IT

5    DECIDED TO ENTER THE IPHONE MARKET AND INTRODUCE ITS FIRST

6    PHONE TWO YEARS LATER IN 2007, NOT USING QUALCOMM CHIPS.

7         IT ONLY USED QUALCOMM CHIPS IN 2011, SO SIX YEARS AFTER

8    THE DECISION.  SO DURING THAT TIME PERIOD, IT REALLY DID NOT

9    HAVE A NEAR TERM DEMAND.  IT HAD A LONG ENOUGH TIME TO

10   NEGOTIATE AN AGREEMENT AND SEEK FRAND DETERMINATION IF IT

11   THOUGHT IT WASN'T BEING OFFERED A FRAND RATE.

12   Q.   SO IN THIS TEST THAT YOU DID, HOW DID YOU DECIDE WHICH

13   OEM'S HAD A NEAR TERM DEMAND AND WHICH ONES DIDN'T?

14   A.   SO I NEEDED TO COME UP WITH A PROXY FOR THAT, AND WHAT I

15   LOOKED AT IS I LOOKED AT THE TWO YEARS FOLLOWING THE SIGNING OF

16   AN AGREEMENT AND LOOKED AT THE ACTUAL DATA TO SEE WHAT FRACTION

17   OF THE RELEVANT CHIPS WERE BOUGHT FROM QUALCOMM.

18   Q.   OKAY.  AND WHAT DID YOU DO THEN WITH THAT DATA?

19   A.   SO WHAT I DID IS I THEN LOOKED IF THAT RELIANCE MEASURE

20   THAT I'M LOOKING AT IS CORRELATED WITH ROYALTY RATES, HERE THE

21   ROYALTY RATES I'M LOOKING AT ARE A SLIGHTLY DIFFERENT MEASURE

22   OF ROYALTY RATES, I'M ACTUALLY LOOKING AT WHAT I CALL THE

23   EFFECTIVE ROYALTY RATE, SO HOW MUCH THEY ACTUALLY PAID IN

24   PRACTICE AS OPPOSED TO WHAT THE CONTRACT SAID.

25   Q.   WHAT DID YOU FIND?

1      A.    SO I HAVE A SLIDE DEPICTING THAT.

2      Q.    LET'S LOOK AT SLIDE 9, PLEASE.

3      A.    SO WHAT WE HAVE HERE ON THE X AXIS IS THIS MEASURE OF

4      RELIANCE, WHICH IS THE SHARE OF CDMA CHIPS PURCHASED FROM

5      QUALCOMM.

6            AND ON THE Y AXIS WE HAVE THE EFFECTIVE OF ROYALTY RATE.

7      AND WHAT THE THEORY PREDICTS IS THAT WE SHOULD SEE AN UPWARD

8      SLOPING LINE.

9            AS THE RELIANCE GETS HIGHER, THE EFFECTIVE RATES WOULD BE

10     HIGHER.  IF THERE'S MORE OF A NEAR TERM DEMAND, QUALCOMM HAS

11     MORE LEVERAGE, AND, THEREFORE, THE RATES SHOULD BE HIGHER.

12     THAT'S THE PREDICTION.

13           LOOKING AT THIS PREDICTION, YOU DON'T SEE ANY UPWARD TREND

14     IN THIS GROUP.

15     Q.    DID YOU EXCLUDE ANY AGREEMENTS FROM THIS TEST?

16     A.    YES.  I EXCLUDED, JUST LIKE BEFORE, THE GOVERNMENT

17     AGREEMENT FOR THE REASONS THAT I MENTIONED BEFORE.

18           I ALSO EXCLUDED FOUR, FOUR OTHER AGREEMENTS WITH SAMSUNG,

19     WITH BLACKBERRY, WITH NOKIA, AND WITH SONY-ERICSSON.

20     Q.    AND WHY DID YOU EXCLUDE THOSE?

21     A.    THOSE AGREEMENTS ARE VERY DIFFERENT IN THEIR NATURE AND

22     INCLUDE A LOT OF KIND OF NON-STANDARD COMPONENTS THAT MAKES

23     IT -- FOR EXAMPLE, THEY HAVE -- SEVERAL OF THESE HAVE VERY

24     DIFFERENT RISK SPLITTING OR RISK SHARING AGREEMENTS, AND AS A

25     RESULT, IT MAKES THIS A NOT AN APPLES-TO-APPLES COMPARISON.

1    THEY'RE NOT REALLY COMPARABLE TO WHAT WE SEE.

2    Q.   YOU SAID YOU HAD DETERMINED WHICH OEM'S HAD NEAR TERM

3    DEMAND BASED ON A TWO YEAR WINDOW.  WHY DID YOU PICK TWO YEARS?

4    A.   I PICKED TWO YEARS BECAUSE MY READING OF THE RECORD SEEMED

5    LIKE THAT'S A REASONABLE TIME TO ALLOW THE OEM TO SEEK A FRAND

6    DETERMINATION IF IT THOUGHT THAT IT NEEDED ONE.

7    Q.   DID YOU TRY IT WITH ANY OTHER PERIODS?

8    A.   I DID.  I ALSO TRIED IT WITH THREE AND FOUR YEAR RELIANCE.

9    Q.   WHAT DID YOU FIND WITH THOSE OTHER PERIODS?

10   A.   BASICALLY THE SAME RESULT THAT I DID HERE.  YOU KNOW,

11   VISUALLY THERE'S REALLY NO EFFECT, AND THE STATISTICAL TEST

12   THAT I RAN FOR ALL OF THESE THREE CONFIRMED THAT THERE IS NO

13   UPWARD SLOPE OR UPWARD -- THERE'S NO CORRELATION BETWEEN THE

14   EFFECTIVE RATE AND THIS RELIANCE MEASURE.

15   Q.   ARE YOU AWARE OF ANY CRITICISMS THAT PROFESSOR SHAPIRO HAS

16   LEVELED AGAINST THIS ANALYSIS?

17   A.   YES, I AM.

18   Q.   CAN YOU TELL ME WHAT THOSE ARE AND WHAT YOU THINK OF THEM?

19   A.   YES.  SO HE BASICALLY HAD TWO CRITICISMS OF THIS ANALYSIS.

20   THE FIRST ONE IS OF MY RELIANCE MEASURE.  HE LOOKED AT THESE

21   ARE THE SHARE OF CDMA CHIPS PURCHASED FROM QUALCOMM.

22        PROFESSOR SHAPIRO ALLUDED TO AN AGREEMENT BETWEEN VIA AND

23   QUALCOMM THAT RESTRICTED -- AT LEAST, THAT'S HIS DESCRIPTION --

24   RESTRICTED VIA FROM SELLING TO UNLICENSED OEM'S.

25        AND THEN ACCORDING TO HIM, WHAT I SHOULD BE LOOKING AT

1    HERE IS THAT THE SHARES ARE NOT JUST SHIFTING FROM QUALCOMM,

2    BUT QUALCOMM AND VIA JOINTLY.

3    Q.   AND IF YOU ACCEPT HIS VIEW OF WHAT SHOULD BE DONE, DOES IT

4    CHANGE YOUR ANALYSIS IN ANY WAY?

5    A.   I MEAN, IT CHANGES THE NUMBERS HERE, SO A LOT OF THE

6    POINTS, THEY'RE KIND OF IN THE MIDDLE, NOT 0 OR 100, WOULD

7    INCREASE.  A LOT OF THEM WOULD ACTUALLY GO TO 100, AND MAYBE

8    SOME OF THE 0'S WOULD MOVE TO 100 AS WELL.  BUT THE CHANGE IS

9    OF THE NUMBERS HERE, BUT NOT THE FUNDAMENTAL CONCLUSION.  THAT

10   STAYS THE SAME.

11   Q.   WAS WHAT THE OTHER CRITICISM THAT PROFESSOR SHAPIRO HAD?

12   A.   THE OTHER CRITICISM WAS PROFESSOR SHAPIRO THOUGHT THAT I

13   INCLUDED TOO MANY AGREEMENTS THAT WERE TOO OLD AND, THEREFORE,

14   HE EXCLUDED ANYTHING, I THINK, THAT WAS BEFORE 2002, IF I HAVE

15   THE DATE RIGHT.

16   Q.   AND WHAT'S YOUR RESPONSE TO THAT CRITICISM?

17   A.   WELL, TWO THINGS.  FIRST, EVEN TAKING HIS ANALYSIS AS

18   GIVEN, IT DID NOT FUNDAMENTALLY CHANGE THE RESULT.

19        THE MAIN THING THAT HE DID WAS IT LEFT VERY FEW AGREEMENTS

20   AT THE 0 PERCENT.  I BELIEVE IT WAS JUST TWO OF THEM.

21        SO FUNDAMENTALLY, IT MAKES THIS TEST WEAKER BECAUSE

22   THERE'S ONLY TWO.  BUT IT STILL DOESN'T FUNDAMENTALLY CHANGE

23   THE RESULT.  SO THAT'S THE FIRST PART.

24        THE OTHER IS THAT THE RESTRICTION OF JUST THE PRE-2002 IS

25   TOTALLY ARBITRARY.  I MEAN, I DON'T REALLY KNOW WHAT THE

1    JUSTIFICATION IS FOR THAT PARTICULAR DATE, AND AS A RESULT, WE

2    LOSE AT LEAST ABOUT A DOZEN AGREEMENTS OR SO JUST BASED ON

3    THAT, BASED ON THAT RESTRICTION.  AND THERE'S REALLY NO, NO

4    REASON TO CUT IT THAT PARTICULAR DATE.

5    Q.   SO WHAT WE SEE ON THE SLIDE RELATES TO CDMA.  DID YOU DO

6    THIS ANALYSIS FOR LTE AS WELL?

7    A.   YES, I DID.

8    Q.   OKAY.  AND WHAT DID YOU FIND THERE?

9    A.   BASICALLY SIMILAR RESULTS.  THERE'S NO CORRELATION BETWEEN

10   THE EFFECTIVE ROYALTY RATES PAID ON WCDMA ONLY LICENSES AND THE

11   RELEVANT SHARE.  THERE THE RELEVANT SHARE THAT I MEASURED ARE

12   THE RELEVANT SHARE OF QUALCOMM OF -- RELEVANT SHARE OF CHIPS

13   PURCHASED FROM QUALCOMM OF LTE CHIPS.

14   Q.   DO WE HAVE A SLIDE FOR THIS, TOO?

15   A.   YES, WE DO.

16   Q.   LET'S TAKE A LOOK AT SLIDE 10 PLEASE.  CAN YOU EXPLAIN

17   WHAT WE SEE?

18   A.   OKAY.  SO VERY SIMILAR STRUCTURE TO THE PREVIOUS SLIDE.

19   WHAT WE HAVE HERE IS THE SHARE OF LTE CHIPS PURCHASED FROM

20   QUALCOMM.  THAT'S ON THE X AXIS.

21       THE Y AXIS IS THE EFFECTIVE ROYALTY RATE, AND, AGAIN,

22   WE -- WE'RE LOOKING FOR SOME SORT OF A POSITIVE CORRELATION AND

23   STATISTICAL TESTS THAT THERE IS NO POSITIVE CORRELATION.

24   Q.   OKAY.  WERE THERE CRITIQUES THAT PROFESSOR SHAPIRO LEVELED

25   AGAINST THE LTE VERSION OF THE ANALYSIS?

1    A.    YES.

2    Q.    WHAT WERE THEY?

3    A.    HERE AGAIN YOU HAVE TWO CRITIQUES.  ONE OF THEM WAS ABOUT

4    THE EXCLUSION OF CERTAIN AGREEMENTS.  SO AS I SAID BEFORE, I

5    EXCLUDED SOME AGREEMENTS FROM THIS ANALYSIS.  SO HE CRITICIZED

6    THAT.

7         BUT AT THE END, ONCE YOU DO HIS CORRECTIONS, REALLY WHAT

8    THAT ADDS UP IS ADDING ONE MORE AGREEMENT INTO HERE, WHICH IS

9    THE SONY AGREEMENT, WHICH IS AT 5 PERCENT.

10        SO THAT REALLY HAS NO MATERIAL EFFECT.

11   Q.    OKAY.  WHAT WAS HIS OTHER CRITICISM?

12   A.    THE OTHER CRITICISM AGAIN WAS ABOUT CUTOFF DATE.  AND HE

13   CLAIMED THAT, AGAIN, WE SHOULDN'T INCLUDE AGREEMENTS THAT WERE

14   TOO OLD, AND HE USED A CUTOFF DATE OF THE THIRD QUARTER OF

15   2011.  SO HE SAID WE SHOULD ONLY INCLUDE AGREEMENTS AFTER THAT

16   PERIOD.  I THINK BEFORE THAT, IT SHOULD BE THROWN OUT.

17   Q.    WHAT'S YOUR VIEW OF THAT CUTOFF DATE?

18   A.    SO TWO THINGS.  FIRST, ON A CONCEPTUAL LEVEL, I JUST DON'T

19   AGREE WITH THE IDEA THAT WE SHOULD IGNORE THE PREVIOUS

20   AGREEMENTS.  HIS ARGUMENT FOR TAKING THAT DATE WAS TO FOCUS ON

21   THE PERIOD WHERE THERE WERE SALES OF LTE CHIPS.  OKAY?

22        SO FIRST, ON A FUNDAMENTAL LEVEL, I THINK THERE'S

23   INFORMATION CONTAINED IN THE EARLIER WCDMA ONLY AGREEMENTS EVEN

24   BEFORE THE LTE PERIOD BECAUSE THEY DO GIVE US SOME INFORMATION.

25   SO JUST AS A MATTER OF PRINCIPLE, I DON'T AGREE THAT THOSE

1    SHOULD BE THROWN OUT.

2         BUT EVEN TAKING HIS ARGUMENT AS GIVEN, SAYING WE SHOULD

3    REALLY FOCUS ON THE PERIOD WHERE THE RELEVANT WAS FOCUSSING ON

4    LTE, HIS CUTOFF DOESN'T MAKE ANY SENSE.

5         FOR ONE THING, IF WE'RE LOOKING AT RELIANCE IN TERMS OF A

6    TIME PERIOD, RIGHT, IF WE THINK THAT CUTOFF DATE WAS, LET'S

7    SAY, 2011 -- LET ME EVEN SAY THE BEGINNING OF 2011, NOT THE

8    THIRD QUARTER, THE BEGINNING OF 2011 -- THEN YOU SHOULD HAVE

9    THE CUTOFF TWO YEARS BEFORE THAT, BECAUSE THAT'S WHEN THE

10   AGREEMENTS, THAT'S WHEN THE FORWARD LOOK IN TERMS OF WHEN THE

11   NEED WILL BE IF YOU LOOK AT TWO YEARS RELIANCE.

12        IF YOU LOOK AT THREE YEARS RELIANCE, IT'S THREE YEARS

13   BEFORE THAT, 2008.  FOUR YEAR RELIANCE, 2007.  THOSE ARE THE

14   AGREEMENTS YOU WANT TO LOOK AT.

15        AND THEN IN ADDITION, THE CUTOFF DATE HE TOOK IN THE THIRD

16   QUARTER OF 2011 IS NOT THE RELEVANT ONE.  QUALCOMM ACTUALLY

17   STARTED SELLING CHIPS IN THE THIRD QUARTER OF 2010.  SO HE

18   ACTUALLY SHOULD PUSH THAT EVEN EARLIER IN TERMS OF THE DATES.

19             THE COURT:  CAN I ASK YOU A QUESTION?  I'M SORRY.

20   I'M TRYING TO TAKE NOTES HERE.

21        WHAT WERE THE AGREEMENTS THAT WERE EXCLUDED FROM THIS LTE

22   CHART?  WAS IT ALSO THE GOVERNMENT AGREEMENTS, THE SAMSUNG,

23   BLACKBERRY, NOKIA, SONY-ERICSSON AGREEMENTS?

24             THE WITNESS:  THAT'S CORRECT, YOUR HONOR.

25             THE COURT:  OKAY.  THANK YOU.

1           GO AHEAD, PLEASE.

2      BY MR. BORNSTEIN:

3      Q.   SO TAKING ALL OF THESE TESTS THAT WE'VE LOOKED AT

4      TOGETHER, WHAT CONCLUSION HAVE YOU DRAWN ABOUT THE FTC'S THEORY

5      OF MARKET POWER LEADING TO SUPRA-FRAND ROYALTY RATES?

6      A.   SO TAKING THESE BATTERY OF TESTS TOGETHER AS A SEQUENCE

7      AND ALL OF THEM AS A GROUP, I CONCLUDED THAT THE DATA JUST DOES

8      NOT SUPPORT THE THEORETICAL CLAIMS MADE BY THE THEORY.

9      Q.   ALL RIGHT.  LET'S TURN TO THE NEXT PART OF YOUR ASSIGNMENT

10     THEN, WHICH RELATED TO THE FTC'S TAX THEORY.

11          CAN YOU EXPLAIN WHAT YOU EVALUATED THERE?

12     A.   YEAH.  SO WHAT I EVALUATED THERE IS I TOOK THE ARGUMENTS

13     OF A SUPRA-FRAND TAX, A SURCHARGE, AS GIVEN, EVEN THOUGH I JUST

14     SUMMARIZED ALL THE EVIDENCE WHY I DON'T BELIEVE THAT'S THE

15     CASE.  BUT I SAID LET'S PUT THAT ASIDE AND LET'S TAKE THAT AS

16     GIVEN, THAT PART OF THE THEORY AS GIVEN, AND ASK, ARE THERE --

17     AS THE FTC, OR AS PROFESSOR SHAPIRO CLAIMS, HAVE THEY PROVEN

18     THE CLAIMS OF ANTICOMPETITIVE BEHAVIOR?

19     Q.   AND YOU WERE LOOKING AT ANTICOMPETITIVE EFFECTS WHERE?

20     A.   SO THE ANTICOMPETITIVE BEHAVIOR I WAS LOOKING FOR IS WHERE

21     THEY ALLEGED, WHICH IS IN THE CHIP MARKET.  SO I WAS LOOKING AT

22     THE COMPETITION OF THE ANTICOMPETITIVE BEHAVIOR IN THE CHIP

23     MARKET.

24     Q.   HAVE YOU IDENTIFIED ANY FLAWS IN THE THEORY?

25     A.   YES.  SO I'VE IDENTIFIED SEVERAL FLAWS, AND I WOULD BUNCH

1    THEM INTO TWO GROUPS.  ONE IS I WOULD SAY SEVERAL THEORETICAL

2    FLAWS IN TERMS OF THE MODEL.  AND KIND OF AT A HIGH LEVEL, THE

3    MODEL REALLY IS OVERSIMPLISTIC, IGNORES SOME OF THE MARKET

4    REALITIES OF HOW THINGS ACTUALLY HAPPEN, AND REALLY DOESN'T

5    GIVE SHARP PREDICTIONS AS TO WHAT WOULD HAPPEN.  SO I WOULD

6    CALL THOSE ALL THEORETICAL.

7         AND THEN THE OTHER GROUP WOULD BE MORE ON THE PRACTICAL,

8    EMPIRICAL, AND THERE WHAT I DID WAS I LOOKED AT JUST GENERALLY

9    INDUSTRY MARKET LEVEL OUTCOMES TO SEE IF THEY'RE ACTUALLY

10   CONSISTENT WITH SOME OF THE ALLEGATIONS.

11   Q.   OKAY.  LET'S START WITH THE THEORY SINCE YOU STARTED WITH

12   THE THEORY.

13        YOU REFERENCED HOW THINGS TYPICALLY OPERATE IN THE MARKET.

14   WHAT'S YOUR STARTING POINT FOR HOW A ROYALTY WOULD AFFECT

15   COMPETITION AMONG CHIP SUPPLIERS?

16   A.   SO TO UNDERSTAND HOW A ROYALTY AFFECTS COMPETITION, I

17   THINK WE HAVE TO GO BACK AND LOOK AT THE SOURCING OF CHIPS, THE

18   DECISION THAT THE OEM IS MAKING AND THE TIMING OF IT.

19        SO A TYPICAL DECISION IS MADE WHEN THE OEM WILL HAVE

20   SEVERAL OPTIONS, OKAY?  FOR SIMPLICITY, LET ME ASSUME IT HAS

21   TWO, IT HAS A RIVAL CHIP MAKER AND IT HAS QUALCOMM.  OKAY?

22        AND THAT DECISION IS BEING MADE IN THE CONTEXT OF A

23   ROYALTY THAT HAS ALREADY BEEN SET EARLIER, SOME EARLIER

24   LICENSING STAGE OR TIME, RIGHT, BECAUSE THE LICENSES AGREEMENTS

25   ARE ACTUALLY TYPICALLY MADE EARLIER IN MOST OF THESE SOURCING

1    DECISIONS.

2         AND THE LICENSE TERMS AND THE ROYALTY RATE IS FIXED AT

3    THAT POINT, AT A FIXED AMOUNT, WHATEVER IT IS.  AND THE WAY

4    IT'S SET IN THIS INDUSTRY, IT'S ACTUALLY -- IT'S NOT CHIP

5    SPECIFIC.  SO IT'S ACTUALLY THE SAME ROYALTY RATE REGARDLESS OF

6    WHICH CHIP THE OEM DECIDES TO USE.

7    Q.   SO TO BE CLEAR, WHY DO YOU SAY IN THIS TYPICAL

8    CIRCUMSTANCE A ROYALTY HAS ALREADY BEEN DETERMINED WHEN THE OEM

9    IS MAKING ITS CHOICE OF CHIP?

10   A.   JUST BECAUSE OF THE TIMING.  SO WE HAVE EVIDENCE ON THE

11   RECORD THAT THE CHIP PRICES ARE TYPICALLY NEGOTIATED AND SET AT

12   A MUCH HIGHER FREQUENCY, ANNUAL SEEMS TO BE SOMETHING THAT'S

13   BEEN DISCUSSED A LOT, A HIGHER FREQUENCY THAN LICENSE

14   AGREEMENTS THAT ARE TYPICALLY FOR LONGER TERMS, 10, 15 YEARS,

15   SOMETIMES EVEN LONGER.  BUT DEFINITELY LONGER.  THEY'RE NOT

16   NEGOTIATED ANNUALLY.

17   Q.   WHY IS IT IMPORTANT TO YOU THAT THAT ROYALTY IS, I THINK

18   YOU SAID, CHIP NEUTRAL?

19   A.   YEAH.  SO THE ROYALTY IS THE SAME ROYALTY REGARDLESS OF

20   WHICH CHIP THE OEM USES, AND IN THAT SENSE, IT CANCELS OUT, IF

21   YOU WILL, THE DECISION OF WHICH CHIP TO USE BECAUSE REGARDLESS

22   OF -- YOU KNOW, IF I'M AN OEM, I'M THINKING I'M GOING TO USE

23   CHIP A OR CHIP B, EITHER WAY, THE ROYALTY IS BEING PAID.  SO IT

24   SHOULD NOT AFFECT THE DECISION OF WHICH CHIP TO USE.  SO IN

25   THAT SENSE I CALL IT CHIP NEUTRAL.

1    Q.   SO LET'S SUPPOSE THAT THE ROYALTY IS ABOVE FRAND.  DOES

2    THAT CHANGE THE ANALYSIS THAT YOU JUST ARTICULATED?

3    A.   NO.  EITHER WAY, FROM AN OEM'S PERSPECTIVE, THEY'RE GOING

4    TO PAY THE ROYALTY, IF IT'S FRAND, SUPRA-FRAND, SUBFRAND,

5    WHATEVER IT IS.  IT'S JUST A NUMBER, WHATEVER THAT IS, AND THE

6    OEM IS GOING TO HAVE TO PAY IT REGARDLESS OF WHICH CHIP IT

7    USES, AND IN THAT SENSE IT DOESN'T MATTER IF IT'S SUPRA-FRAND

8    OR NOT SUPRA-FRAND.

9    Q.   SO DOES IT HAVE ANY EFFECT ON THE CHOICE OF CHIP BY THE

10   OEM?

11   A.   SO THE CHOICE OF CHIP BY THE OEM SHOULD BE BASED ON THE

12   PRICE OF THE CHIP AND QUALITY, WHICH INCLUDES ALL THE VARIOUS

13   CHARACTERISTICS AND ATTRIBUTES.  THAT'S WHAT IT SHOULD BE BASED

14   ON.

15        AND FROM THE OEM'S PERSPECTIVE, THEY'RE SAYING EITHER WAY,

16   THEY ARE GOING TO PAY THE ROYALTY, AND THAT DOESN'T AFFECT THE

17   CHOICE BETWEEN THE TWO.

18   Q.   SO HOW WAS PROFESSOR SHAPIRO'S VIEW DIFFERENT?

19   A.   SO PROFESSOR SHAPIRO'S VIEW IS HE STARTS FROM A MODEL THAT

20   REALLY IS NOT BASED IN THE REALITIES OF HOW DECISIONS ARE

21   ACTUALLY, ARE ACTUALLY MADE IN THIS MARKET.

22   Q.   HOW SO?

23   A.   IN TWO, I THINK, PRINCIPLE WAYS.  ONE IS HE DOESN'T TREAT

24   THE ROYALTY AS FIXED, AND I THINK HE KIND OF WENT ON A VERY

25   LONG TIME IN HIS TESTIMONY TO KIND OF EXPLICITLY SEPARATE THAT

1    HE DOES NOT BELIEVE THE CHIP AGNOSTIC, SO HE DOES NOT BELIEVE

2    THIS LOGIC THAT I JUST EXPLAINED THAT ONCE THE ROYALTY IS

3    FIXED, YOU'RE GOING TO PAY IT EITHER WAY.  THAT'S ONE.

4         THE OTHER IS WHEN HE ARTICULATED HIS VIEWS, HE REALLY

5    LOOKED AT EACH TRANSACTION IN ISOLATION, IGNORING THE FACT THAT

6    THERE'S COMPETITION.  IF WE WANT TO SEE OR WANT TO STUDY THE

7    ANTICOMPETITIVE EFFECT, WE HAVE TO HAVE A MODEL OF COMPETITION,

8    WHICH HE REALLY DID NOT DO.

9    Q.   OKAY.  WE'LL WALK THROUGH THEN IN A MINUTE HOW YOU GET TO

10   THIS CONCLUSION.  BUT BASED ON THOSE TWO FLAWS, WHAT CONCLUSION

11   DO YOU REACH ABOUT PROFESSOR SHAPIRO'S THEORY?

12   A.   SO FUNDAMENTALLY, HIS THEORY IS JUST NOT THERE TO SUPPORT

13   HIS CONCLUSIONS.  A, IT'S NOT BASED IN MARKET REALITY, IT

14   DOESN'T FIT HOW THINGS ACTUALLY HAPPEN IN THIS INDUSTRY.

15        AND AS A RESULT, ITS PREDICTIONS, THE PREDICTIONS THAT HE

16   GAVE REALLY CAN'T BE TRUSTED.

17   Q.   IS IT ABLE TO DISTINGUISH BETWEEN ROYALTIES THAT HAVE

18   ANTICOMPETITIVE EFFECTS AND ROYALTIES THAT DON'T?

19   A.   NO.  IN HIS -- IN HIS SETUP, BASICALLY ANY ROYALTY,

20   WHETHER IT'S FRAND, ARE SUPRA-FRAND OR EVEN SUBFRAND YOU WILL

21   ACTUALLY HAS THIS KIND OF WHAT HE CALLED THE TAX EFFECT ON THE

22   TRANSACTION OF RIVALS.

23   Q.   OKAY.  LET'S SEE HOW YOU GET THERE.

24        YOUR HONOR, WE'RE GOING TO TAKE A LOOK AT SOME SLIDES THAT

25   WERE PROFESSOR SHAPIRO'S AND PUT THOSE UP.  THESE ARE SLIDES 6

1    AND 21 FROM THE VERSION OF PROFESSOR SHAPIRO'S DEMONSTRATIVES

2    THAT WERE IN THE BINDER PROVIDED TO THE COURT, AND THEY'RE ALSO

3    IN TAB 2 OF THE BINDER THAT WE GAVE YOU TODAY.

4        SO, PROFESSOR, CAN YOU, USING PROFESSOR SHAPIRO'S SLIDES,

5    EXPLAIN WHAT YOU WERE JUST DESCRIBING?

6    A.   YES.  SO WHAT WE HAVE HERE IS WE HAVE TWO OF

7    PROFESSOR SHAPIRO'S SLIDES.  ON THE LEFT WE KIND OF ZOOMED IN

8    ON THE PARTICULAR, THE VERTICALS HE HAD.  ON HIS LEFT WAS THE

9    SITUATION THAT HE DEPICTED WHEN THE ROYALTY IS FRAND.

10       ON THE RIGHT SLIDE WE HAVE THERE AND SLIDE THAT NOW WE'RE

11   ZOOMING IN ON IS FROM A SLIDE THAT WAS IN HIS DECK BUT HE

12   DIDN'T PRESENT.  THIS IS SUPPOSEDLY WHAT THE NEGOTIABLE -- WHAT

13   THE PROCESS LOOKS LIKE FOR NEGOTIATION BETWEEN AN OEM AND

14   QUALCOMM.

15   Q.   AND SO ON LEFT IS NEGOTIATION BETWEEN WHO?

16   A.   SORRY, THE OEM AND THE RIVAL.  AND ON THE RIGHT IS THE OEM

17   AND QUALCOMM.

18   Q.   OKAY.  AND DO YOU AGREE WITH THESE DEPICTIONS?

19   A.   SO, I MEAN, I AGREE IN THE SENSE THAT THESE ARE DEPICTIONS

20   UNDER HIS THEORY.  BUT I DON'T AGREE WITH HIS THEORY.

21       SO WHAT THESE DEPICTIONS SHOW, AND I THINK THEY SHOW THE

22   PROBLEMS IN HIS ANALYSIS, SO FIRST THEY SHOW THAT ON THE ONE ON

23   THE RIGHT, EVEN THOUGH THE ROYALTY HAS BEEN FIXED PREVIOUSLY

24   AND APPLIES SORT OF EITHER WAY REGARDLESS OF THE CHOICE THAT'S

25   BEING MADE, IT'S NOT PART OF THE ANALYSIS.  HE KIND OF TAKES

1    THAT OUT OF THE ANALYSIS.  IN SOME SENSE, THE WAY THAT HE LOOKS

2    AT IT IS PART OF WHAT'S BEING NEGOTIATED EACH AND EVERY PERIOD.

3    Q.   WITH QUALCOMM?

4    A.   WITH QUALCOMM.

5    Q.   WHAT'S THE PROBLEM WITH THAT?

6    A.   THE PROBLEM WITH THAT IS, AGAIN, THAT'S EXACTLY NOT HOW

7    THINGS HAPPEN AND NOT -- AGAIN, WE HAVE EVIDENCE IN THE RECORD

8    THAT WHEN PRICING HAPPENS, THE ROYALTIES -- I MEAN, FOLKS FROM

9    QUALCOMM MIGHT NOT EVEN KNOW THE ROYALTIES AND WE HAVE

10   EVIDENCE -- WE HAVE TESTIMONY SAYING THAT DOES NOT AFFECT THEIR

11   PRICING DECISIONS.

12        SO THE PRICING IN THAT POINT IS NOT PART OF WHAT'S BEING

13   TRIED TO BE NEGOTIATED.  IT'S BEEN FIXED AND DETERMINED AT AN

14   EARLIER DATE WHEN THE LICENSE WAS SIGNED.

15   Q.   AND HOW DOES THIS MISTAKE AFFECT HIS CONCLUSIONS?

16   A.   SO IT AFFECTS HIS CONCLUSIONS IN A COUPLE OF WAYS.  THE

17   OTHER THING, BY THE WAY, BEFORE WE GO ON, THE OTHER THING WE

18   CAN SEE IN THE SLIDE, IT'S THE SECOND MISTAKE I'LL REFER TO,

19   PROFESSOR SHAPIRO WHEN HE ANALYZED HIS SLIDES, HE PUT EACH OF

20   THESE UP INDIVIDUALLY, IN ISOLATION.

21        SO HE LOOKED AT THE QUALCOMM AND RIVAL IN ISOLATION, NOT

22   TAKING INTO ACCOUNT THAT THESE IN SOME SENSE HAPPEN

23   SIMULTANEOUSLY, AND THAT'S THE ESSENCE OF COMPETITION.  WHAT

24   HAPPENS ON THE RIGHT EFFECTS WHAT HAPPENS ON THE LEFT AND

25   VICE-VERSA.  THESE ARE NOT TWO THINGS THAT HANDED INDEPENDENT

1     IN TWO PLACES.  ONE HAS TO TAKE INTO ACCOUNT THE INTERACTION

2     BETWEEN THEM.

3     Q.   WHY DOES THAT MATTER?

4     A.   WELL, THAT MATTERS BECAUSE IF WE WANT TO HAVE A MODEL

5     EXPLAINING AN ANTITRUST OR ANTICOMPETITIVE EFFECT, WE HAVE TO

6     HAVE A MODEL OF COMPETITION.

7          INSTEAD, WHAT PROFESSOR SHAPIRO HAD WAS LET'S LOOK AT

8     ISOLATION IN THIS TRANSACTION, AND I'M GOING TO SORT OF LAND

9     SOMETHING IN THIS TRANSACTION AND SAY THERE'S A WEDGE, RIGHT,

10    THAT CREATES THAT WEDGE, AND THAT WEDGE CREATES HARM TO THAT

11    TRANSACTION, INSTEAD OF LOOKING WHERE IS THE MODEL OF

12    COMPETITION WHICH WE NEED TO ESTABLISH ANY ANTICOMPETITIVE

13    HARM.

14    Q.   AND WHAT DO YOU MEAN BY A WEDGE?

15    A.   SO YOU CAN SEE HERE, FOCUSSING ON THE LEFT, FOCUSSING ON

16    THE NEGOTIATION BETWEEN THE RIVAL, THERE'S THAT BLUE AREA, THE

17    FRAND ROYALTY.

18         PROFESSOR SHAPIRO, WHEN EXPLAINING HIS ROYALTY, HAD A

19    SIMILAR PICTURE WITH A RED AREA OF THE SUPRA-FRAND, AND HE

20    TALKED ABOUT HOW THAT RED AREA, THE SUPRA-FRAND, TAKES AWAY

21    MANY SO OF THE GAINS FROM TRADE.  IT REDUCES THE GAINS FROM

22    TRADE AND THAT ACTS AS A TAX.

23         BUT THAT SAME LOGIC WOULD ALSO APPLY HERE FOR THE FRAND

24    ROYALTY IF YOU TAKE HIS THEORY AS GIVEN.  IT WOULD BASICALLY

25    SAY THAT EVEN A FRAND ROYALTY -- HE DEPICTED IT WITH THE RED,

1    BUT THAT SAME LOGIC HOLDS HERE EVEN WITH BLUE.  THE FRAND

2    ROYALTY, ACCORDING TO HIS THEORY, IS ALSO A TAX.

3    Q.   AND SO WHAT CONCLUSIONS DO YOU DRAW FROM THAT ABOUT HIS

4    THEORY?

5    A.   WELL, SO TO ME, A, AS I SAID BEFORE, THE THEORY IS BASED

6    ON UNREALISTIC ASSUMPTIONS OF HOW THE MARKET WORKS.  IT GIVES

7    THIS COUNTERINTUITIVE, MAYBE AN ABSURD PREDICTION THAT A FRAND

8    RATE ITSELF IS ANTICOMPETITIVE, AND AS A RESULT, I DON'T

9    BELIEVE THAT WE SHOULD -- THAT IT SHOULD BE TRUSTED AND

10   ESTABLISHES THE CONCLUSIONS THAT HE WOULD LIKE TO REACH.

11   Q.   WERE YOU IN THE COURTROOM WHEN PROFESSOR SHAPIRO TESTIFIED

12   LAST WEEK?

13   A.   YES, I WAS.

14   Q.   DID YOU HEAR HIS TESTIMONY ABOUT THE MICROSOFT CASE?

15   A.   YES, I DID.

16   Q.   AND DO YOU AGREE WITH HIM THAT THE ECONOMICS OF THE

17   SITUATION IN MICROSOFT ARE SIMILAR TO THE ECONOMICS THAT ARE

18   PRESENT HERE?

19   A.   NO, I DON'T.  ON A SUPERFICIAL LEVEL, IT MIGHT SEEM LIKE

20   THEY ARE, BUT THEY REALLY AREN'T.

21       IN MICROSOFT, WHAT HAPPENED IS MICROSOFT WAS CHARGING AN

22   ACCESS FEE FROM OEM'S FROM EACH AND EVERY COMPUTER THEY

23   PRODUCED REGARDLESS OF WHICH OPERATING SYSTEM WAS USED.  YOU

24   MIGHT THINK THAT'S KIND OF LIKE A LICENSE.

25       BUT THE BIG DIFFERENCE IS MICROSOFT WAS GIVING AWAY ITS

1    OPERATING SYSTEM FOR FREE.  OKAY?  AND THAT'S CLEARLY NOT THE

2    CASE HERE.  CHIPS ARE NOT GIVEN AWAY FOR FREE.

3         ACTUALLY, THERE'S PLENTY OF EVIDENCE IN THE RECORD

4    SUPPORTING THAT QUALCOMM'S CHIPS ACTUALLY HAVE A PRETTY NICE

5    MARGIN, AND THEY'RE DEFINITELY NOT GIVEN OUT FOR FREE.  I

6    HAVEN'T HEARD ANY ALLEGATION OF THEM BEING GIVEN OUT FOR FREE.

7    Q.   ALL RIGHT.  LET'S TURN TO ANOTHER THEORETICAL PROBLEM.

8         WERE THERE OTHER THEORETICAL ISSUES THAT YOU IDENTIFIED

9    WITH PROFESSOR SHAPIRO'S APPROACH?

10   A.   YES.  SO UP TO NOW, IN MY DISCUSSION I'VE REALLY FOCUSSED

11   ON LET'S TAKE THE ROYALTY AS GIVEN, NOT DISCUSSING OF HOW IT

12   WAS DETERMINED.

13        SO NOW WE CAN TALK A LITTLE BIT ABOUT HOW THAT ROYALTY WAS

14   DETERMINED AND WHETHER OR NOT THERE REALLY IS, ACCORDING TO

15   PROFESSOR SHAPIRO'S OWN THEORY, THERE REALLY IS AN ABILITY TO

16   CREATE A SIGNIFICANT SURCHARGE OR SIGNIFICANT TAX AS HE WOULD

17   CALL IT.

18        AND MY CONCLUSION IS THAT HIS OWN THEORY, ONCE APPLIED

19   REALISTICALLY TO THE MARKET, DOES NOT SUPPORT A SIGNIFICANT

20   SURCHARGE.

21   Q.   WOULD YOU EXPLAIN HOW YOU REACHED THAT CONCLUSION?

22   A.   YES.  SO IN ORDER TO ESTABLISH A SURCHARGE, QUALCOMM IS

23   NEGOTIATING WITH SOPHISTICATED OEM'S.  EVEN IF IT'S TRYING TO

24   USE ITS LEVERAGE AND MARKET POWER IN CHIPS, THERE'S A GIVE AND

25   TAKE.

1        SO IF IT IS GOING TO ASK FOR A HIGHER ROYALTY RATE THAN

2    WHAT THEY BELIEVE QUALCOMM SHOULD GET, IT HAS TO GIVE

3    SOMETHING.

4        AND ACCORDING TO PROFESSOR SHAPIRO, THE WAY THEY GIVE THAT

5    IS THROUGH THE PRICE OF THE CHIP.  OKAY?

6        BUT HERE'S WHERE THE PROBLEM IS.  THE PROBLEM IS THE

7    LICENSES, THE ROYALTY NEGOTIATION IS FOR A LONG TERM, LET'S

8    SAY, FOR EXAMPLE, TEN YEARS.  OKAY?  SO IT'S FOR A LONG TERM.

9        THE PRICING, THOUGH, IS DONE AT MUCH HIGHER FREQUENCY,

10    AGAIN, LET'S ASSUME IT'S DONE ANNUALLY.

11        SO FOR EVERY, LET'S SAY, DOLLAR IN REDUCTION IN CHIP

12    PRICE, AT MOST WHAT YOU'RE GOING TO GET IS A 0.10 INCREASE IN

13    SURCHARGE THAT BASICALLY KEEP THE OEM WHOLE, AND JUST THAT --

14    YOU KNOW, THE MATH OF THAT JUST DOESN'T ADD UP TO HAVING AN

15    ABILITY TO GET OEM'S TO AGREE TO A VERY HIGH SURCHARGE OVER A

16    LONG TIME PERIOD OF THE CONTRACT.

17    Q.   WHY COULDN'T QUALCOMM JUST PROMISE A LOWER PRICE FOR THE

18    FULL DURATION OF THE LICENSE AGREEMENT AND MAKE IT MORE ONE FOR

19    ONE?

20    A.   THESE NEGOTIATIONS HAPPEN QUITE FREQUENTLY.  THESE ARE

21    HIGHLY SOPHISTICATED FIRMS AND REALLY ONCE THE AGREEMENT IS

22    SIGNED, THERE'S REALLY NO WAY FOR QUALCOMM TO COMMIT, RIGHT?

23        SO THIS WOULD BE BASICALLY A CEO OF A VERY LARGE, LARGE

24    OEM, OR WHOEVER IS NEGOTIATING, BASICALLY SAYING, OKAY,

25    QUALCOMM, I WILL TAKE YOU AT YOUR WORD THAT YOU'RE GOING TO

1    GIVE ME THESE VERY LARGE NUMBERS, YOU KNOW, MILLIONS AND

2    BILLIONS, IN THE FUTURE JUST BASED ON A HAND SHAKE.

3        THAT JUST SEEMS, YOU KNOW, NOT SOMETHING THAT, YOU KNOW, A

4    CEO OF A SOPHISTICATED COMPANY WOULD ACTUALLY AGREE TO.

5    Q.   SO WHAT DOES THIS ANALYSIS LEAD YOU TO BELIEVE ABOUT

6    PROFESSOR SHAPIRO'S THEORY?

7    A.   SO WHAT THAT LEADS ME TO BELIEVE IS EVEN IF YOU BELIEVE

8    HIS THEORY, AND EVEN IF YOU BELIEVE THE CLAIMS HE SUPPORTED,

9    THE REASON HE BELIEVES IT WAS SIGNIFICANT HARM IS BECAUSE HE'S

10   READ ALL THIS TESTIMONY AND THAT SUGGESTS TO HIM THAT THERE'S

11   SIGNIFICANT LEVERAGE.

12       EVEN IF YOU TAKE THAT AS GIVEN, EVEN IF YOU TAKE HIS

13   THEORY AS GIVEN, THE ABILITY TO HAVE A -- TRANSLATE THE

14   SIGNIFICANT LEVERAGE INTO A SIGNIFICANT SURCHARGE IS EXTREMELY

15   LIMITED.

16   Q.   AND WHAT ARE THE IMPLICATIONS OF THE FACT THAT THE

17   POTENTIAL SURCHARGE IS LIMITED?

18   A.   THE IMPLICATIONS OF THAT IS YOU REALLY NEED, WELL, FIRST

19   TO HAVE A COMPLETE MODEL OF THE COMPETITIVE PROCESS.  BUT YOU

20   ALSO HAVE TO HAVE WHAT I CALL A QUANTITATIVE MODEL.  YOU HAVE

21   TO ACTUALLY QUANTIFY THE EFFECTS BASED ON NOT JUST THEORETICAL

22   ARGUMENTS, BUT ACTUALLY GO AND LOOK AT WHAT ACTUALLY HAPPENS IN

23   THIS INDUSTRY GIVEN ACTUAL DATA, ACTUAL ESTIMATES, AND THE

24   PARAMETERS.

25       YOU NEED SOMETHING THAT FITS THE MARKET REALITIES IN TERMS

1    OF THE PROCESS, BUT THEN THE MODEL ITSELF IS BASED ON DATA AND

2    INFORMATION FROM THE INDUSTRY, REAL, REAL MARKET OUTCOMES, REAL

3    INFORMATION, AND THEN USE THAT FOR QUANTIFICATION OF THE

4    EXERCISE.

5    Q.   CAN YOU TELL ANYTHING FROM PROFESSOR SHAPIRO'S THEORY

6    ABOUT WHAT THE EFFECT OF HIS SURCHARGE, IF IT EXISTS, WOULD BE

7    ON CONSUMER PRICES?

8    A.   NOT BASED ON PROFESSOR SHAPIRO'S -- PROFESSOR SHAPIRO'S

9    NOT REALLY PROVIDED EITHER COMPLETE THEORETICAL ANALYSIS OR ANY

10   EMPIRICAL ANALYSIS, BECAUSE THE THEORY ITSELF, TO A VERY SMALL

11   SURCHARGE, IT'S NOT CLEAR, AGAIN, IF YOU BELIEVE THAT THEORY

12   AND YOU BELIEVE THE IMPLICATIONS, I HAVE PLENTY OF EVIDENCE

13   THAT IS INCORRECT, BUT EVEN IF YOU BELIEVE, VERY SMALL

14   SURCHARGE, NOT CLEAR AT ALL WHERE THAT SURCHARGE WOULD END UP

15   AND IF ANY OF IT WOULD BE PASSED ON TO MANY CONSUMERS.

16        THE COURT:  I'M REALLY SORRY, THIS IS VERY

17   INTERESTING TESTIMONY, BUT WE SHOULD PROBABLY TAKE OUR BREAK

18   NOW.

19        MR. BORNSTEIN:  OF COURSE, YOUR HONOR.

20        THE COURT:  SO IT'S 10:40 RIGHT NOW.  LET'S TAKE OUR

21   MORNING 15 MINUTE BREAK AND WE'LL BE BACK.  OKAY?

22   THANK YOU.

23   (RECESS FROM 10:40 A.M. UNTIL 10:56 A.M.)

24        THE COURT:  OKAY.  WELCOME BACK.  GOOD MORNING.

25   PLEASE TAKE A SEAT.

1          FOR THE HIGH PRIORITY OBJECTIONS, THE DEPOSITION BINDERS

2     DID NOT INCLUDE THE DEPOSITION TRANSCRIPT FOR MR. AHN, SO IF

3     THAT COULD BE PROVIDED SO I COULD RULE ON QUALCOMM'S HIGH

4     PRIORITY OBJECTION NUMBER 2.

5          THERE'S ALSO A LETTER REFERENCED IN THAT TESTIMONY TO

6     DEREK ABERLE, AND WE DON'T HAVE THE LETTER.  I DON'T KNOW IF

7     IT'S NECESSARY FOR US TO HAVE THE LETTER TO RULE ON THE HIGH

8     PRIORITY OBJECTION.  BUT --

9               MR. EVEN:  WE WILL PROVIDE THEM, YOUR HONOR.

10              THE COURT:  OKAY.  PERFECT.  THANK YOU.

11         OKAY.  TIME IS 10:57.  GO AHEAD, PLEASE.

12              MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

13    Q.   SO WE HAD A DISCUSSION OF THEORY BEFORE THE BREAK,

14    PROFESSOR.  YOU HAD SAID THAT YOU HAD ALSO SOME EMPIRICAL AND

15    PRACTICAL ASSESSMENTS OF PROFESSOR SHAPIRO'S THEORY.  LET'S DO

16    THAT NOW.

17         WHAT ASSESSMENTS DID YOU DO OF INDUSTRY PERFORMANCE AS IT

18    RELATES TO THIS THEORY.

19    A.   SO WHAT I LOOKED AT WAS I LOOKED AT OVERALL THE INDUSTRY

20    AND MARKET PERFORMANCE.  I DID THAT IN A VARIETY OF WAYS AND I

21    PRESENTED -- I PREPARED A FEW EXHIBITS HERE TO TALK ABOUT SOME

22    OF THE EFFECT, BUT THERE'S ACTUALLY A LOT MORE IN MY REPORT.

23    Q.   OKAY.  FIRST, JUST WHY DID YOU LOOK AT THIS INFORMATION?

24    A.   SO AT A HIGH LEVEL, WHAT WE WANT TO LOOK AT IS IF WE HAVE

25    AN ALLEGATION OF A CONDUCT THAT'S BEEN GOING ON FOR A VERY LONG

1        TIME, YOU WANT TO SEE HOW IS THE INDUSTRY PERFORMING?

2            SO WE WANT TO LOOK TO SEE, IS THIS SOMETHING THAT LOOKS

3        LIKE IT'S REALLY SLOWING DOWN IN THE INDUSTRY, AND THERE'S KIND

4        OF CLEAR EVIDENCE OF HARM AND SLOW DOWN IN THE INDUSTRY?  THAT

5        WAS REALLY MY, ONE OF MY MAIN GOALS, ALTHOUGH THERE WAS OTHERS

6        THAT I CAN TALK ABOUT LATER.

7        Q.   WELL, WHAT DID YOU FIND?

8        A.   WHAT I FOUND IS THAT, AT A HIGH LEVEL, THIS IS A THRIVING

9        INDUSTRY.  PRICES ARE DECLINING, QUANTITIES ARE SKYROCKETING.

10       QUALITY OF PRODUCT IS MEASURED BY SPEED AND OTHER MEASURES ARE

11       JUST THRIVING.  YOU CAN LOOK AT THE ECONOMIC DATA, BUT JUST OUR

12       DAY-TO-DAY EXPERIENCE I THINK TELLS US THAT.

13       Q.   WELL, CAN YOU GIVE SOME EXAMPLES OF THE INDICATORS THAT

14       YOU REVIEWED?

15       A.   SO IF WE MOVE ON TO THE NEXT, I PREPARED A SLIDE.

16       Q.   SURE.  LET'S LOOK AT SLIDE 11?

17       A.   SO THIS IS A SLIDE LOOKING AT THE NOMINAL SMARTPHONE

18       PRICES BETWEEN 2010 AND 2017.

19       Q.   AND FOR CLARITY, WHAT DO YOU MEAN BY "NOMINAL PRICES"?

20       A.   SO THESE ARE THE ACTUAL, YOU KNOW, AVERAGE PRICES, DOLLAR

21       AMOUNTS THAT WERE PAID.

22           IF WE LOOK AT 2010, WE CAN SEE THAT THE AVERAGE PRICE WAS

23       427, AND IT DROPPED DOWN TO 283 IN 2016.  IT WENT UP ACTUALLY A

24       LITTLE BIT IN 2017, MOSTLY DRIVEN BY AN INCREASE IN APPLE'S

25       PHONES.  INTERESTING, AT A TIME WHEN THEY WEREN'T PAYING

1    ROYALTIES.

2    Q.   DID YOU LOOK AT ANY OTHER INDICATORS OF PERFORMANCE?

3    A.   YES.  SO LOOKING AT THE NOMINAL PRICES GIVES US A CLEAR

4    PICTURE, BUT IT UNDERESTIMATES HOW MUCH BETTER CONSUMERS ARE

5    BECAUSE IT DOESN'T ACCOUNT FOR THE FACT THAT PHONES ARE GETTING

6    BETTER.

7        SO THE NEXT SLIDE PRESENTS WHAT I CALL QUALITY ADJUSTED

8    SMARTPHONE PRICES, AND HERE WE'RE TALKING NOW IN AN INDEX.  SO

9    WE INDEXED 2010 TO BE 100, AND WE CAN SEE THAT THE DECLINE IN A

10   QUALITY ADJUSTED PRICE -- I'M NOT GOING TO GO INTO THE

11   TECHNICAL DETAILS, BUT THIS IS A MEASURE -- THIS IS A

12   STATISTICAL APPROACH TAKEN BY THE BUREAU OF LABOR STATISTICS TO

13   MEASURE QUALITY ADJUSTED PRICES.

14       AND WHAT WE SEE HERE IS A DECLINE, WE START AT AN INDEX OF

15   100 IN 2010, IT DECLINED TO ALMOST 20 IN 2017.  SO REALLY A, A

16   DECLINE OF, YOU KNOW, A HUGE AMOUNT, 80 PERCENT DECLINE, ALMOST

17   80 PERCENT DECLINE.

18   Q.   WHAT OTHER INDICATORS DID YOU REVIEW?

19   A.   THE NEXT THING THAT I PRESENTED A SLIDE HERE IS I LOOKED

20   AT THE COST OF DATA, THE COST OF USING DATA.

21       SO THIS SLIDE DEPICTS THE PRICES GOING FROM 2006 NOW TO

22   2016 AND DECLINE IN THE PRICE, THIS IS DOLLARS PER MEGABYTE OF

23   CELLULAR PHONE DATA, WENT DOWN FROM JUST UNDER $8 TO LESS THAN

24   0.01.  OR AT 0.01, I SHOULD SAY, NOT LESS.  IT WENT DOWN TO

25   0.01.  A VERY LARGE DECLINE OVER THIS PERIOD.

1    Q.   DID YOU LOOK AT OTHER INDICATORS?

2    A.   I LOOKED AT A VARIETY OF OTHER INDICATORS IN MY REPORT,

3    LOOKING IN TERMS OF ENTRY, EXIT, MARKET SHARES, QUANTITY USES,

4    ALL OF THEM REALLY INDICATORS OF A THRIVING INDUSTRY.

5    Q.   WELL, CAN YOU RULE OUT THE POSSIBILITY THAT THINGS WOULD

6    HAVE BEEN BETTER WERE IT NOT FOR CONDUCT THAT'S BEEN ALLEGED?

7    A.   NO, I CAN'T RULE THAT OUT, AND THAT'S NOT WHAT I'M

8    CLAIMING HERE.

9         SO, FOR EXAMPLE, IF WE LOOK AND WE SAY, I BELIEVE IT'S A

10   NUMBER IN MY REPORT, THAT ANNUAL PRICE, QUALITY ADJUSTED PRICE

11   DECLINE WAS SOMETHING LIKE 17 PERCENT, I CAN'T RULE OUT THAT

12   BUT FOR THE CONDUCT, IT MIGHT HAVE BEEN EVEN HIGHER.

13        BUT WHAT I'M SAYING HERE IS TWO THINGS.  THE FIRST IS WE

14   HAVE A VERY HIGH DECLINE.  YES, IT MIGHT HAVE THEORETICALLY

15   BEEN HIGHER, BUT WE HAVE TO AT SOME POINT ASK OURS, HOW MUCH

16   HIGHER?  HOW MUCH OF AN UPSIDE POTENTIAL IS THERE TO HAVE BEEN

17   EVEN BETTER PERFORMANCE THAN WHAT WE SEE, AND I CAN'T RULE OUT

18   THE POSSIBILITY THAT THERE MIGHT HAVE BEEN EVEN BETTER

19   PERFORMANCE.  THAT'S NOT WHAT I'M CLAIMING.

20        ON THE OTHER HAND, BECAUSE THE INDUSTRY IS THRIVING, IT

21   ALSO MEANS THAT THERE'S A HUGE DOWNSIDE RISK.  AND I THINK

22   THERE'S MORE OF A DOWNSIDE RISK THAN POTENTIAL FOR UPSIDE, AND

23   DOWNSIDE RISK WOULD BE TAKING AN INDUSTRY THAT'S ROLLING ALONG,

24   FUNCTIONING WELL BY ANY POSSIBLE INDICATOR, AND REALLY THROWING

25   IT INTO CHAOS AND REALLY COMPLETELY DISRUPTING IT.  SO THERE'S

1    A REAL DOWNSIDE RISK IN TERMS OF ANY INTERVENTION IN THIS

2    INDUSTRY.

3    Q.   LET ME SWITCH TOPICS AND ASK WHETHER YOU DID ANYTHING TO

4    ASSESS THE FTC'S THEORY REGARDING STRATEGIC FUNDS?

5    A.   YES, I DID.

6    Q.   WHAT DID YOU DO?

7    A.   SO VERY MUCH LIKE WHAT I DID BEFORE TO LOOK AT THE

8    SUPRA-FRAND COMPONENT.  I LOOKED AT THE THEORY, ASKED WHAT ARE

9    THE IMPLICATIONS OF THE THEORY, AND THEN TOOK THOSE

10   IMPLICATIONS TO DATA AND ASKED, ARE THE IMPLICATIONS BORNE OUT

11   IN THE DATA?

12   Q.   HOW DID YOU DO THAT TEST FOR STRAT FUNDS?

13   A.   SO THE STRAT FUNDS, THE THEORY IS AS FOLLOWS:  THE THEORY

14   IS THAT THE STRAT FUNDS ARE USED TO, YOU KNOW, CLOSE THE GAP OR

15   OFFER CARROTS TO OEM'S OVER WHICH QUALCOMM DOES NOT HAVE ENOUGH

16   LEVERAGE TO GET THEM TO AGREE TO THE ALLEGED SUPRA-FRAND RATE.

17        SO THE IDEA IS THAT THERE ISN'T ENOUGH LEVERAGE, YOU HAVE

18   TO SOMEHOW CLOSE THE GAP, OFFER A CARROT, OR SWEETEN THE DEAL,

19   ANY OF THE ABOVE.  CALL IT WHATEVER YOU WANT.  THAT'S THE

20   THEORY.

21        SO THAT'S SOMETHING WE CAN TEST IN THE DATA.  WE CAN GO

22   AND LOOK AT ACTUAL SITUATIONS WHERE A STRAT FUND WAS OFFERED

23   AND ASK, ARE THESE CASES WHERE THESE PARTICULAR OEM'S, QUALCOMM

24   HAD LESS LEVERAGE OVER THEM?  AND THAT'S WHAT I'M TESTING.

25   Q.   OKAY.  WHAT DID YOU FIND?

1    A.   I FOUND THAT THAT'S NOT THE CASE.

2    Q.   DID YOU PREPARE A SLIDE THAT SHOWS THIS?

3    A.   YES, I DID.

4         MR. BORNSTEIN:  YOUR HONOR, I'M CLOSING THE

5    PROJECTOR, THIS PARTICULAR SLIDE HAS BEEN SEALED.  WE CAN PUT

6    IT UP ON THE SCREEN FOR THE COURT AND FOR PROFESSOR NEVO.

7         THE WITNESS:  SO WHAT I DID HERE IS I STARTED WITH 13

8    AGREEMENTS THAT WERE MENTIONED BY THE FTC OR BY

9    PROFESSOR SHAPIRO -- SORRY, I SHOULDN'T SAY AGREEMENTS -- 13

10   OEM'S THAT HAD AGREEMENTS, OR STRAT FUNDS THAT WERE MENTIONED.

11        OUT OF THE 13, ONE OF THEM WAS APPLE, WHICH I DID NOT

12   STUDY HERE.  PROFESSOR -- SORRY, DR. CHIPTY STUDIED THAT

13   SEPARATELY, SO I DID NOT STUDY APPLE.

14        OUT OF THE REMAINING 12, I LOOKED FOR STRAT FUNDS THAT

15   WERE SIGNED DURING THE SAME TIME AS A LICENSE NEGOTIATION.

16   BY MR. BORNSTEIN:

17   Q.   OKAY.  ARE THESE 12 DIFFERENT OEM'S OR 12 DIFFERENT STRAT

18   FUND AGREEMENTS?

19   A.   SO THESE ARE 12 DIFFERENT AGREEMENTS.  SO I FOUND NINE

20   OEM'S THAT HAD AN AGREEMENT, A STRAT FUND AGREEMENT THAT WAS

21   SIGNED AT THE SAME TIME AS A LICENSING AGREEMENT.

22        AND SOME OF THEM HAD MULTIPLE ONES, SO I ENDED UP WITH 12

23   AGREEMENTS FROM 9 OEM'S.

24   Q.   AND WHAT DO THESE BLUE AND ORANGE BARS HERE SHOW?

25   A.   SO WHAT I LOOKED AT IS IN EACH OF THESE CASES, WHAT SORT

1      OF RELIANCE DID THE OEM'S HAVE ON QUALCOMM CHIPS?

2          AND WHAT I FOUND HERE, WHAT THE BARS DEPICT -- AND AGAIN,

3      THIS IS A GRAPHICAL REPRESENTATION OF A TABLE THAT I HAVE IN MY

4      REPORT -- WHAT THEY SHOW IS THE RELIANCE AS MEASURED BY THE

5      CHIP SHARE IN THE YEAR JUST BEFORE THE AGREEMENT, AND THE BLUE

6      BARS ARE CDMA CHIP SHARES AND THE ORANGE BARS ARE LTE CHIP

7      SHARES.

8          AND WHAT YOU SEE IS THAT IN ALL BUT ONE OF THEM, ALL BUT

9      PANASONIC -- I GUESS I SHOULDN'T SAY THAT, ALL BUT ONE, THE

10     FOURTH, THE SHARES WERE HIGH.

11     Q.   AND WHAT CONCLUSION DO YOU DRAW FROM THAT?

12     A.   THAT'S EXACTLY IN CONTRADICTION TO THE FTC'S THEORY WHERE

13     THESE, THESE STRAT FUNDS SHOULD BE HIGHER, IT SHOULD BE OFFERED

14     TO THOSE OEM'S THAT HAVE A LOW RELIANCE, OR OVER WHICH QUALCOMM

15     WOULD NOT HAVE LEVERAGE.  SO THIS CONTRADICTS THE THEORY.

16     Q.   OKAY.  LET'S MOVE TO THE THIRD PART OF YOUR ASSIGNMENT,

17     WHICH IS WHETHER THERE WERE LEGITIMATE BUSINESS JUSTIFICATIONS

18     OR PROCOMPETITIVE BENEFITS.

19         DID YOU LOOK INTO THAT QUESTION?

20     A.   I DID.

21     Q.   AND WHAT DO YOU MEAN, OR WHAT DOES AN ECONOMIST MEAN WHEN

22     AN ECONOMIST TALKS ABOUT LEGITIMATE BUSINESS JUSTIFICATIONS FOR

23     CONDUCT?

24     A.   SO ONE OF THE WAYS IN WHICH YOU LOOK AT WHETHER THERE'S

25     LEGITIMATE BUSINESS JUSTIFICATION IS TO ASK, DO WE SEE THAT

1        SAME CONDUCT, OR ARE THERE JUSTIFICATION -- LET ME STEP BACK.

2        ARE THERE JUSTIFICATIONS FOR THAT CONDUCT THAT HAVE NOTHING TO

3        DO WITH ANY OF THE EXCLUSIONARY MOTIVES?

4            AND THE WAY WE LOOK AT IS THAT WE ASK, DO WE SEE THAT SAME

5        CONDUCT TAKING PLACE EITHER AT A TIME WHERE THE FIRM IN

6        QUESTION USED THE CONDUCT AND DID NOT HAVE MARKET POWER, OR IF

7        WE LOOK AT OTHER FIRMS THAT DON'T HAVE MARKET POWER, DO THEY

8        ACTUALLY USE THAT SAME, THE SAME CONDUCT?

9            AND IN BOTH CASES, IF THAT'S THE CASE, YOU COULD, YOU

10       KNOW, CONCLUDE FROM THAT, OR DEDUCT FROM THAT THAT THERE'S

11       OTHER JUSTIFICATION THAT HAVE NOTHING TO DO WITH EXCLUSIONARY

12       MOTIVES THAT JUSTIFY THE CONDUCT.

13       Q.   SO WHAT TWO -- OR WHICH PRACTICES OF QUALCOMM'S DID YOU

14       CONSIDER IN THIS PART OF YOUR ANALYSIS?

15       A.   SO I LOOKED AT TWO, I LOOKED AT DEVICE LEVEL LICENSING AND

16       I LOOKED AT THE PRACTICE OF SELLING ONLY TO LICENSED OEM'S, AND

17       I REFERRED TO IT AS SOLO.

18       Q.   SO WITH RESPECT TO DEVICE LEVEL LICENSING, WHAT CONCLUSION

19       DID YOU REACH?

20       A.   SO IN TERMS OF DEVICE LEVEL LICENSING, USING THE TWO

21       CRITERIA THAT I USED BEFORE, THAT I LISTED BEFORE, I CONCLUDE

22       THAT THERE'S, THERE'S EVIDENCE, OR THERE'S BUSINESS

23       JUSTIFICATIONS FOR DOING THAT THAT HAVE NOTHING TO DO WITH

24       EXCLUSIONARY MOTIVES.

25       Q.   HOW DID YOU REACH THAT CONCLUSION?

1    A.   SO DEVICE LEVEL LICENSING, THERE'S EVIDENCE IN THE RECORD

2    THAT IT'S AN INDUSTRY WIDE PRACTICE, WHICH MEANS THAT IT IS

3    USED BY FIRMS THAT DO NOT HAVE MARKET POWER.  SO IT'S

4    CONSISTENT WITH THAT CRITERIA.

5         ALSO, IT'S MY UNDERSTANDING THAT DEVICE LEVEL LICENSING

6    WAS USED BY QUALCOMM LONG BEFORE IT HAD ANY, BEFORE IT EVEN

7    PRODUCED CHIPS AND HAD ANY MARKET POWER IN CHIPS.

8         SO, AGAIN, THAT'S CONSISTENT WITH THE OTHER CRITERIA THAT

9    I TALKED ABOUT.

10   Q.   DID YOU IDENTIFY ANY PROCOMPETITIVE EFFICIENCIES FROM

11   LICENSING ONLY AT THE DEVICE LEVEL?

12   A.   YES, TWO OF THEM.  ONE IS A REDUCTION IN TRANSACTION COST.

13   THE OTHER IS ALLOWING RIVAL CHIP MAKERS TO OPERATE FREELY WITH

14   ACCESS TO THE TECHNOLOGY WITHOUT A NEED FOR A LICENSE.

15   Q.   HOW DOES THIS PRACTICE REDUCE TRANSACTION COSTS?

16   A.   SO IF WE THINK OF DEVICE LEVEL LICENSING, OFTEN THE

17   ALTERNATIVE THAT PEOPLE DISCUSS IS COMPONENT LEVEL LICENSING,

18    IN THIS CASE LICENSING AT CHIP LEVEL.

19        IT'S NOT REALLY AN EITHER/OR.  IF WE SWITCH AWAY FROM

20   DEVICE LEVEL LICENSING, IT WOULD PROBABLY HAVE TO SWITCH INTO

21   MULTI LEVEL LICENSING WHERE SOME OF QUALCOMM'S PORTFOLIO WOULD

22   BE LICENSED AT THE CHIP LEVEL AND SOME WOULD STILL HAVE TO BE

23   LICENSED AT THE DEVICE LEVEL, BECAUSE MY UNDERSTANDING IS THAT

24   THE PORTFOLIO, OR SOME OF THE PATENTS THAT PRACTICE IT AT

25   DIFFERENT LEVELS.

NEVO DIRECT BY MR. BORNSTEIN

1          WHAT THAT WOULD MEAN IS TWO THINGS.  FIRST, THE NUMBER OF

2     LICENSE AGREEMENTS WOULD BE LARGER BECAUSE WE STILL HAVE TO

3     HAVE IT WITH ALL OEM'S, BUT ALSO WITH RIVAL CHIP MAKERS.

4          BUT THAT'S NOT REALLY A BIG ISSUE.  THAT'S JUST A SLIGHTLY

5     HIGHER NUMBER.

6          THE REAL ISSUE IS THE FACT THAT EACH OF THE NEGOTIATIONS

7     NOW WILL BECOME A LOT MORE COMPLEX BECAUSE EACH OF THE PARTIES,

8     NAMELY, THE CHIP MAKERS AND THE OEM'S, WOULD HAVE INCENTIVES TO

9     POINT TOWARDS THE OTHER PARTY AS THE ONE THAT ACTUALLY IS

10    PRACTICING ON THE LICENSE.  THERE WOULD HAVE TO BE A SPLIT OF

11    THE PORTFOLIO AND THE DECISION WHICH IS PRACTICED BY WHICH

12    ENTITY, AND THAT'S GOING TO CREATE, I SUSPECT, QUITE A HECTIC

13    SITUATION.

14          AND THIS IS NOT SOMETHING THAT HAS TO BE DONE ONE TIME.

15    IT'S AN ONGOING DYNAMIC AS THE PORTFOLIO EVOLVES, AND MAYBE --

16    THIS WOULD HAVE TO BE REDONE --

17    Q.   I THINK YOU SAID AS THE PRODUCTS EVOLVE.

18    A.   AS THE PRODUCTS EVOLVE, AS THE PORTFOLIO EVOLVES, THIS

19    WOULD HAVE THE -- THE SPLIT WOULD HAVE TO BE REDONE, AN

20    ALLOCATION BETWEEN CHIPS AND OEM'S WOULD HAVE TO BE REDONE.

21    AND IT MIGHT ALSO BE VERY PRODUCT OR CASE SPECIFIC.  SOME OEM'S

22    WOULD HAVE DIFFERENT PRACTICES THAN OTHERS.

23    Q.   WHAT WAS THE OTHER PROCOMPETITIVE EFFICIENCY THAT YOU

24    IDENTIFIED?

25    A.   SO THE OTHER EFFICIENCY I MENTIONED IS CURRENTLY CHIP

1    MAKERS ARE FREE TO OPERATE, THEY HAVE ACCESS TO THE TECHNOLOGY

2    AND THEY DON'T NEED A LICENSE.

3        SO TO PUT IT KIND OF, MAYBE BLUNTLY, IF WE'RE WORRIED

4    ABOUT RAISING RIVALS' COSTS, IT SEEMS VERY COUNTERINTUITIVE TO

5    ME TO SOLVE THAT BY SAYING, WE WANT TO HAVE LICENSING DIRECTLY

6    TO RIVALS.

7        SO INSTEAD OF HAVING KIND OF A BACKWARD CHANNEL IN WHICH

8    MAYBE, OR MAYBE NOT, THERE'S RAISING RIVALS' COSTS, WE'RE

9    CREATING A DIRECT CHANNEL WHERE QUALCOMM WOULD BE SETTING THE

10   PRICE DIRECTLY TO ITS RIVALS.  THAT, TO ME, IS COUNTERINTUITIVE

11   AS A WAY TO SOLVE A CONCERN OF RAISING RIVALS' COST.

12   Q.   ASSUME WITH ME FOR A MOMENT THAT COMPONENT LEVEL LICENSING

13   WERE REQUIRED BY THE LAW OR BY CONTRACT.  WOULD THAT CHANGE ANY

14   OF THE ECONOMIC ANALYSIS THAT YOU JUST DESCRIBED?

15   A.   NO.  I'M NOT OFFERING A LEGAL OPINION AS TO WHAT IS

16   REQUIRED BY THE LAW.  I'M JUST LOOKING AT THE ECONOMICS OF THE

17   ISSUE.

18   Q.   OKAY.  LET'S TURN TO THE OTHER PRACTICE THAT YOU

19   MENTIONED, SELLING ONLY TO LICENSING OEM'S.

20       DID YOU IDENTIFY ANY LEGITIMATE BUSINESS JUSTIFICATION FOR

21   THAT, USING THE TESTS YOU DESCRIBED?

22   A.   YES.  SO THE TESTS THAT I DESCRIBED HERE, WE JUST LOOK

23   OVER TIME AT QUALCOMM, AND THIS HAS BEEN QUALCOMM'S PRACTICE

24   LONG BEFORE THERE'S BEEN ANY ALLEGED MARKET POWER.  AND AGAIN,

25   THAT'S CONSISTENT WITH THE CRITERIA THAT I MENTIONED BEFORE.

1    Q.   AND HAVE YOU ALSO LOOKED TO SEE WHETHER THERE ARE

2    PROCOMPETITIVE EFFICIENCIES FOR THE PRACTICE?

3    A.   YES, I HAVE.  IN THIS CASE, THE PROCOMPETITIVE

4    JUSTIFICATIONS ARE REALLY THE FACT THAT CURRENTLY, AS WE

5    TALKED, I TALKED EARLIER ABOUT AN HOUR AGO, CURRENT PRACTICE

6    REALLY HAS THE -- THE ROYALTY IS CHIP AGNOSTIC AND APPLIES

7    EQUALLY TO QUALCOMM AND TO RIVALS.

8        UNDER THE ALTERNATIVES THAT HAVE BEEN PROPOSED WHERE

9    EITHER THE ROYALTY IS BAKED INTO THE -- INCLUDED IN THE PRICE

10   OF THE CHIP, OR THERE'S A SEPARATE ROYALTY FOR QUALCOMM CHIPS

11   AND NON-QUALCOMM CHIPS, ONE WAY OR THE OTHER WOULD CREATE,

12   BASICALLY WOULD TAKE AWAY FROM THIS IDEA THAT THE ROYALTY IS

13   CHIP NEUTRAL OR CHIP AGNOSTIC AND EXACTLY WOULD CREATE THE

14   SITUATION THAT PROFESSOR SHAPIRO WAS WORRIED ABOUT.

15       SO RATHER THAN SOLVE IT, IT WOULD ACTUALLY CREATE, CREATE

16   EXACTLY THE SITUATION THAT HE WAS WORRIED ABOUT.

17   Q.   OKAY.  HAVE YOU PUT TOGETHER A SLIDE THAT SUMMARIZES YOUR

18   CONCLUSIONS IN THIS CASE?

19   A.   YES, I HAVE.

20   Q.   LET'S TAKE A LOOK AT IT.

21   A.   OKAY.

22   Q.   CAN YOU JUST QUICKLY RECAP SLIDE 15?

23   A.   YEP.  WHEN I STARTED I SAID THERE WERE THREE TASKS.  THE

24   FIRST, WAS TO TEST THE FTC'S THEORY ABOUT THE USE OF ALLEGED

25   MARKET POWER AS LEVERAGED AGAINST SUPRA-FRAND.  WHAT I DID

1    THERE IS I TESTED IT.  I BASICALLY CONFRONTED THE THEORY WITH

2    THE DATA, AND I FOUND THAT THE DATA DO NOT SUPPORT THE CLAIMS

3    OF THE THEORY.

4         THEN I WENT AND EVALUATED THE SECOND PART OF THE FTC'S

5    THEORY, WHICH IS WHAT I CALL THE TAX THEORY, THE FACT THAT THIS

6    ALLEGED SUPER CHARGE, SUPRA-FRAND RATE CREATES ANTICOMPETITIVE

7    HARM.  AND WHAT I CONCLUDE THERE IS THAT THE MODEL AND THE

8    THEORY OFFERED BY PROFESSOR SHAPIRO AND THE FTC IS

9    OVERSIMPLISTIC, DOES NOT MATCH UP WITH MARKET REALITIES, AND

10   REALLY DOES NOT ESTABLISH THE CONCLUSIONS THAT HE CLAIMS.

11        AND FURTHERMORE, LOOKING AT OVERALL PERFORMANCE, I FIND

12   THAT IT'S ACTUALLY -- THE INDUSTRY IS DOING WELL.

13        AND FINALLY, AS WE JUST DISCUSSED, THERE ARE

14   PROCOMPETITIVE JUSTIFICATIONS FOR QUALCOMM'S CONDUCT.

15   Q.   ALL RIGHT.  PROFESSOR, BEFORE I LET YOU OFF THE STAND, WE

16   HAVE A LITTLE BIT OF HOUSEKEEPING TO DO.

17        CAN I ASK YOU TO TAKE A LOOK AT TAB 3 IN YOUR BINDER AND

18   TELL US WHAT THIS IS.  IT'S QX 9148.

19   A.   YES.  SO THIS IS A SUMMARY OF DATA OR ANALYSIS THAT WAS

20   PUT TOGETHER BY MY TEAM AT MY SUPERVISION.  THIS IS BASICALLY A

21   LIST OF CDMA AND WCDMA LICENSE AGREEMENTS SIGNED BETWEEN OEM'S

22   AND QUALCOMM.  IT LISTS THE COMPANY NAME AND VARIOUS

23   CHARACTERISTICS AND DATES OF EACH AGREEMENT.

24   Q.   OKAY.

25        AND, YOUR HONOR, THE REDACTIONS THAT YOU CAN SEE ON THE

1    EXHIBIT ARE ONES THAT WE'VE DONE PURSUANT TO AGREEMENT WITH THE

2    FTC IN ORDER TO OVERCOME SOME OBJECTIONS THAT THEY'VE

3    IDENTIFIED, AND ALSO TO COMPLY WITH THE COWER'S ORDER REGARDING

4    THE MARCH 2018 CUTOFF.

5         AND SO WITH THAT, I'D OFFER QX 9148 INTO EVIDENCE, YOUR

6    HONOR.

7              THE COURT:  ANY OBJECTION?

8              MS. MILICI:  YOUR HONOR, WE DON'T OBJECT.

9              THE COURT:  OKAY.  IT'S ADMITTED.

10         (DEFENDANT'S EXHIBIT QX 9148 WAS ADMITTED IN EVIDENCE.)

11              THE COURT:  GO AHEAD, PLEASE.

12   BY MR. BORNSTEIN:

13   Q.   PROFESSOR, CAN YOU TURN TO TAB 4 IN THE BINDER, PLEASE.

14   THIS IS QX 9180.  AND TELL US WHAT THIS EXHIBIT IS, PLEASE.

15   A.   THIS IS A SIMILAR EXHIBIT, BUT NOW IT'S, IT'S BEEN BLACKED

16   OUT FOR LICENSING AGREEMENTS FOR DIFFERENT TECHNOLOGY.

17   Q.   OKAY.  AND WAS THIS SOMETHING THAT WAS PREPARED BY YOU AND

18   YOUR TEAM?

19   A.   YES, JUST LIKE THE PREVIOUS ONE.

20              MR. BORNSTEIN:  YOUR HONOR, WE'D OFFER EXHIBIT QX

21   9180 INTO EVIDENCE.

22              MS. MILICI:  YOUR HONOR, THE FTC OBJECTS.  WE JUST

23   HEARD TESTIMONY THAT THIS WAS DONE AS A RESULT OF ANALYSIS BY

24   HIS TEAM.  BUT THIS WASN'T SOMETHING THAT WAS DISCLOSED WITH

25   HIS REPORT.

1          MR. BORNSTEIN:  YOUR HONOR, WE'RE NOT OFFERING THIS

2     AS PART OF PROFESSOR NEVO'S ANALYSIS IN ANY WAY.  WE'RE

3     OFFERING THIS AS A FACTUAL SUMMARY OF THE CONTRACTS.  HE'S NOT

4     TESTIFYING TO THE SUBSTANCE, AND IT'S NOT SOMETHING THAT

5     RELATES TO HIS OPINIONS.  WE'RE JUST OFFERING IT BECAUSE WE HAD

6     THE SUMMARY PERFORMED, AND WE HAVE SOME SUMMARIES OF THE

7     CONTRACT THAT WE WANT TO PUT INTO EVIDENCE.  IT'S A SUMMARY

8     UNDER RULE 1006.

9          THE COURT:  WHAT IS THE FTC'S OBJECTION?  YOU'RE

10    SAYING IT WASN'T PART OF HIS EXPERT REPORT?

11         MS. MILICI:  IT WASN'T PART OF HIS EXPERT REPORT, AND

12    HE JUST SAID THIS WAS DONE AS A RESULT OF ANALYSIS.  I WOULD

13    JUST SAY THAT THEY ARE VERY COMPLICATED CONTRACTS WITH LOTS OF

14    TERMS, AND THIS IS AN EXTRACT OF A VERY SMALL NUMBER OF THOSE

15    TERMS, AND HE JUST TESTIFIED THAT HE DID AN ANALYSIS TO DO

16    THIS, AND WE SHOULD HAVE BEEN ABLE TO DEPOSE HIM ABOUT THAT

17    ANALYSIS.

18         MR. BORNSTEIN:  YOUR HONOR, WE HAD A BACK AND FORTH

19    ABOUT AN HPO.  WE RESOLVED THE OBJECTIONS.  THE FTC WITHDREW

20    THEIR OBJECTION.  WE DID REDACTIONS AT THEIR REQUEST.  I DON'T

21    UNDERSTAND WHY THIS IS COMING UP NOW OTHER THAN TRYING TO USE

22    UP OUR TIME.

23         MS. MILICI:  YOUR HONOR, WE DID NOT WITHDRAW OUR

24    OBJECTIONS.  WE MAINTAINED THE ABILITY TO INSIST ON A

25    FOUNDATION AND THE FOUNDATION THAT HE JUST LAID WAS THAT THIS

 1    WAS DONE THROUGH ANALYSIS BY HIS EXPERT TEAM.

 2              MR. BORNSTEIN:  AND THE RULE DOES NOT REQUIRE AN

 3    OPPORTUNITY FOR DISCLOSURE, FOR DEPOSITION WITH RESPECT TO A

 4    RULE 106 -- RULE 1006 SUMMARIES.  IT REQUIRES THE DATA TO HAVE

 5    BEEN MADE AVAILABLE, AND THAT'S WHAT WE DID.  THERE'S NOTHING

 6    THAT REQUIRES A DEPOSITION FOR A RULE 1006 SUMMARY.  THAT'S

 7    JUST NOT THE LAW.

 8              THE COURT:  WHEN WAS THIS DISCLOSED?  I MEAN, I HAVE

 9    TO SAY, WE'VE BEEN REVIEWING A LOT OF THESE AGREEMENTS FOR ALL

10    THE SEALING, AND THEY ARE MUCH MORE COMPLICATED THAN WHAT'S

11    BEEN REDUCED IN THESE CHARTS.

12              MR. BORNSTEIN:  THIS WAS DISCLOSED IN CONNECTION WITH

13    THE EXHIBIT LIST IN NOVEMBER, YOUR HONOR, PURSUANT TO THE

14    SCHEDULE THAT THE PARTIES HAD AGREED ON AND THE COURT ORDERED.

15              THE COURT:  ALL RIGHT.  SO WHAT'S YOUR OBJECTION,

16    THAT IT WASN'T DISCLOSED IN HIS EXPERT REPORT AND YOU THINK

17    THAT THE REPRESENTATION OF WHAT'S IN THESE CONTRACTS SHOULD BE

18    MORE COMPLETE?  IS THAT YOUR OBJECTION?

19              MS. MILICI:  YES, YOUR HONOR.  AND TO BE CLEAR, THE

20    LAST EXHIBIT THAT WE JUST ENTERED WHERE WE HAVE THE SAME VIEW

21    OF AND I HAVE SOME QUESTIONS FOR PROFESSOR NEVO ABOUT THAT.

22    BUT FOR THIS ONE, THIS WASN'T DISCLOSED AS PART OF HIS REPORT,

23    IT'S NOT IN HIS BACKUP MATERIAL.  IN FACT, HIS REPORT SAYS THAT

24    HE DID NOT CONDUCT ANY ANALYSIS FOR LTE ONLY LICENSES.

25              MR. BORNSTEIN:  YOUR HONOR, IT'S JUST A SUMMARY OF

1    THE LICENSES.  IT HAS NOTHING TO DO WITH PROFESSOR NEVO'S

2    OPINIONS, SO I DON'T UNDERSTAND THAT OBJECTION.

3         IF YOU'RE OBJECTING TO THE SCOPE OF HIS TESTIMONY, I WOULD

4    SAY FINE.  BUT WE'RE NOT OFFERING THIS AS PART OF

5    PROFESSOR NEVO'S SUBSTANTIVE OPINIONS IN THE CASE.  WE'RE JUST

6    SUBMITTING A SUMMARY UNDER RULE 1006.  THAT'S ALL THIS IS.

7         THE COURT:  OKAY.  WHAT WAS THE ANALYSIS THAT HE SAID

8    RESULTED IN THIS CHART?  WHAT ANALYSIS WAS THAT?

9         MR. BORNSTEIN:  WELL, IT'S -- IT'S A MECHANICAL

10   PICKING OF THE INFORMATION FROM A DATABASE.  BUT I CAN LET

11   PROFESSOR NEVO ANSWER THAT RATHER THAN TESTIFY MYSELF.

12        THE COURT:  I WOULD PREFER THAT.

13        MR. BORNSTEIN:  I FIGURED.

14        THE COURT:  THANK YOU.

15        THE WITNESS:  SO SHOULD I --

16   BY MR. BORNSTEIN:

17   Q.   PLEASE, CAN YOU ANSWER THE JUDGE'S QUESTION?

18   A.   I PROBABLY MISSPOKE AND SAID ANALYSIS.  WHAT I MEANT WAS

19   THIS WAS PUT TOGETHER BY MY TEAM, SO THIS WAS COLLECTED BY MY

20   TEAM AND PUT TOGETHER.  THERE WASN'T ANY ANALYSIS IN THE SENSE

21   OF ANYTHING BEYOND THAT.

22        THE COURT:  ALL RIGHT.  GO AHEAD.

23   BY MR. BORNSTEIN:

24   Q.   I WAS JUST GOING TO ASK, WHERE DID THE INFORMATION COME

25   FROM, PROFESSOR?

1    A.   I'D HAVE TO LOOK SPECIFICALLY HERE, BUT IT WAS FROM EITHER

2    THE CONTRACTS THEMSELVES OR A COMBINATION OF OTHER DATA SETS

3    THAT WERE AVAILABLE.

4         THE COURT:  WHAT WERE THOSE COMBINATIONS OF DATA SETS

5    THAT WERE AVAILABLE, OTHER THAN THE CONTRACTS THEMSELVES?

6         THE WITNESS:  I'D HAVE TO LOOK SPECIFICALLY.  I MEAN,

7    THE DETAILS --

8    BY MR. BORNSTEIN:

9    Q.   PROFESSOR, ARE YOU FAMILIAR WITH SOMETHING CALLED THE LMS,

10   OR LICENSE MANAGEMENT SYSTEM, AT QUALCOMM?

11   A.   YES, I AM.

12   Q.   DO YOU KNOW WHETHER THAT WAS A SOURCE OF THIS INFORMATION?

13   A.   I KNOW FOR A LOT OF THE DATA SETS THAT WE CONSTRUCTED, WE

14   STARTED FROM THE LMS.  BUT I WASN'T SURE IF THIS DIRECTLY FITS

15   INTO IT.  IT PROBABLY DOES, BECAUSE IT HAS THE CONTRACT NUMBER,

16   WHICH I BELIEVE WE TYPICALLY GOT FROM THE LMS.

17        MR. BORNSTEIN:  THANK YOU, PROFESSOR.

18        THE COURT:  ALL RIGHT.  THE OBJECTION'S OVERRULED.

19   IT'S ADMITTED.

20       (DEFENDANT'S EXHIBIT 9180 WAS ADMITTED IN EVIDENCE.)

21        THE COURT:  GO AHEAD.  DO YOU HAVE ANY OTHER

22   EXHIBITS.

23        MR. BORNSTEIN:  I'VE GOT ONE MORE, YOUR HONOR.

24        THE COURT:  OKAY.

25        MR. BORNSTEIN:  APOLOGIES.  THIS IS TAB 4 IN THE

1    BINDER.

2    Q.   THIS IS QX 9166.  CAN YOU TELL US WHAT THIS IS, PROFESSOR?

3    A.   SO THIS IS ALSO A SUMMARY THAT WAS PREPARED BY MY TEAM.

4         MR. BORNSTEIN:  YOUR HONOR, I'D MOVE QX 9166 INTO

5    EVIDENCE AS A SUMMARY UNDER RULE 1006.

6         MS. MILICI:  YOUR HONOR, THE FTC AGAIN OBJECTS.  WE

7    HAVE NOT HEARD ANY TESTIMONY ABOUT HOW THIS WAS CREATED.  THIS

8    NOW INCLUDES INFORMATION FROM MULTIPLE SOURCES.  THERE ARE --

9    THERE IS, IN OUR VIEW, THIS INFORMATION IS INCOMPLETE.  AND

10   I -- I DON'T THINK THEY'VE LAID A PROPER FOUNDATION FOR IT.

11   AND THIS IS NOT PART OF PROFESSOR NEVO'S REPORT.

12        THE COURT:  MAY WE PLEASE JUST HAVE SOME TESTIMONY

13   ABOUT WHO CREATED THIS AND HOW IT WAS CREATED.

14        MR. BORNSTEIN:  SURE, OF COURSE.

15        THE COURT:  THANK YOU.

16   BY MR. BORNSTEIN:

17   Q.   I'LL START.  PROFESSOR NEVO, CAN YOU TURN TO THE LAST PAGE

18   OF THE EXHIBIT, PLEASE?

19   A.   YES.

20   Q.   DO YOU SEE WHERE IT SAYS "SOURCES"?

21   A.   YES, I DO.  AT THE VERY BOTTOM.

22   Q.   AND WERE THESE THE SOURCES OF THE INFORMATION APPEARING IN

23   THIS SUMMARY?

24   A.   I BELIEVE THAT'S CORRECT, YES.

25   Q.   OKAY.  DO THE NOTES EXPLAIN HOW PORTIONS OF THE SUMMARY

```
1      WERE CREATED?

2      A.   YES, THEY DO.

3      Q.   AND WHO DID THE WORK TO CREATE THE SUMMARY?

4      A.   THIS WOULD BE MEMBERS OF, MEMBERS OF MY TEAM FROM THESE

5      SOURCES.

6           MR. BORNSTEIN:  OKAY.  AGAIN, WE'D MOVE THIS INTO

7      EVIDENCE, YOUR HONOR.

8           MS. MILICI:  YOUR HONOR, DOES HE KNOW WHETHER THERE

9      ARE -- WHETHER THIS INCLUDES ALL OF THE CONTRACTS?  DOES IT

10     INCLUDE AMENDMENTS TO THE CONTRACTS?  WHAT ARE THE LIMITATIONS

11     OF THIS DATA SET?

12          THE COURT:  THAT'S A FAIR QUESTION.

13       WHAT'S THE ANSWER?

14          THE WITNESS:  I WOULD HAVE --

15     BY MR. BORNSTEIN:

16     Q.   IN DOING THE WORK THAT YOU DID, PROFESSOR, DID YOU

17     GENERALLY INCLUDE AMENDMENTS, OR NOT?  OR DID IT DEPEND ON THE

18     CIRCUMSTANCE?

19     A.   SO IN THESE STATISTICAL ANALYSIS THAT WE DID, WE

20     DEFINITELY -- WE GENERALLY DID NOT LOOK AT AMENDMENTS.  WE JUST

21     LOOKED AT ORIGINAL CONTRACTS.

22          THE COURT:  IS THAT TRUE FOR ALL OF YOUR EXHIBITS

23     TODAY?

24          THE WITNESS:  YES.  WE FOCUSSED ON THE ORIGINAL

25     CONTRACTS.
```

1           MS. MILICI:  YOUR HONOR, THIS ISN'T PART OF HIS

2    STATISTICAL ANALYSIS.  THAT'S THE POINT.

3           THE COURT:  I'M SORRY.  SAY THAT AGAIN.

4           MS. MILICI:  THIS ISN'T PART OF HIS -- HE'S

5    TESTIFYING ABOUT AND HE'S BEING ASKED QUESTIONS ABOUT WHAT HE

6    DID FOR HIS STATISTICAL ANALYSIS.  THIS IS NOT PART OF HIS

7    STATISTICAL ANALYSIS.  THIS WAS A DOCUMENT THAT WAS CREATED

8    AFTER THE CLOSE OF DISCOVERY THAT DOESN'T APPEAR IN HIS REPORT,

9    AND IT'S NOT CLEAR TO ME WHAT IT INCLUDES OR DOESN'T INCLUDE.

10          THE COURT:  WELL, HE SAID IT JUST DOESN'T INCLUDE ANY

11   AMENDMENTS.  NONE OF HIS ANALYSIS TODAY INCLUDES ANY

12   AMENDMENTS.

13          MS. MILICI:  I'M SORRY, YOUR HONOR.  I GUESS MY POINT

14   IS THIS IS NOT PART OF HIS ANALYSIS.  SO WHEN THE TESTIMONY IS

15   THAT NONE OF MY ANALYSIS INCLUDES AMENDMENTS, IS THIS A SUMMARY

16   OR IS THIS HIS ANALYSIS?

17          THE COURT:  OKAY.  I'M SORRY.  CAN YOU CLEAR THIS UP,

18   MR. BORNSTEIN, PLEASE?

19          MR. BORNSTEIN:  I WILL TRY ONE MORE TIME, YOUR HONOR.

20          THE COURT:  YEAH.

21   BY MR. BORNSTEIN:

22   Q.   PROFESSOR, HOW WAS THIS DOCUMENT PUT TOGETHER?  AND WHAT

23   DOES IT PURPORT TO SHOW?

24   A.   SO MEMBERS OF MY TEAM TOOK THE INFORMATION FROM THE

25   SOURCES THAT ARE LISTED AT THE VERY END, AND WHAT IT SHOWS, AS

1    THE TITLE SAYS, THE FIRST QUARTERS OF ROYALTIES REPORTED FOR

2    HANDSETS BY OEM'S AND CONTRACT NUMBERS.

3    Q.   AND WHAT ARE THE CONTRACT NUMBERS?

4    A.   SO THE CONTRACT NUMBERS ARE THE INFORMATION THAT'S, THAT'S

5    IN SOME OF QUALCOMM'S DATABASE, SO IT BASICALLY TALKS ABOUT AN

6    ORIGINAL CONTRACT NUMBER, AND UNDER THIS CONTRACT NUMBER, THERE

7    ARE THE VARIOUS CHARACTERISTICS OF THE CONTRACT AND THEN

8    VARIOUS, VARIOUS OTHER MEASURES, INCLUDING THE ROYALTIES

9    REPORTED.

10   Q.   AND DID ALL THE INFORMATION APPEARING ON THIS CHART COME

11   FROM THE SOURCES IDENTIFIED ON THE BOTTOM OF THE LAST PAGE?

12   A.   I BELIEVE THAT'S THE CASE, YES.

13        MR. BORNSTEIN:  YOUR HONOR, I'LL TRY ONCE MORE TO

14   MOVE IT INTO EVIDENCE AGAIN.

15        THE COURT:  OKAY.  THE OBJECTION WAS OVERRULED

16   WITHOUT PREJUDICE YESTERDAY AS TO WHETHER THE ANALYSIS WAS

17   DISCLOSED IN PROFESSOR NEVO'S EXPERT REPORT BECAUSE I DIDN'T

18   KNOW WHAT OPINION WOULD BE OFFERED AS TO QX 9166.

19        IS THERE ACTUALLY AN ANNE OPINION OFFERED WITH REGARD TO

20   THIS DOCUMENT?

21        MR. BORNSTEIN:  NO, YOUR HONOR.  IT'S JUST A FACTUAL

22   SUMMARY.

23        THE COURT:  ALL RIGHT.  I DO WANT TO CLARIFY, FOR THE

24   DEMONSTRATIVES, QDX 9155, WHICH YOU USED FOR YOUR ANALYSIS,

25   YOU'RE SAYING NO AMENDMENTS WERE CONSIDERED FOR THIS QDX 9251;

1    IS THAT CORRECT?

2           THE WITNESS:  I'M NOT SURE, BUT THE SLIDES THAT I

3    SHOWED, IF THAT'S -- I'M SORRY, I'M NOT SURE.  FOR THOSE

4    SLIDES, IT WAS ALL ORIGINAL CONTRACTS, NO AMENDMENTS.

5           THE COURT:  GOT IT.

6    BY MR. BORNSTEIN:

7    Q.   PROFESSOR, CAN YOU EXPLAIN WHY YOU DID IT THAT WAY?

8    A.   YES.  THE REASON I DID IT THAT WAY IS BECAUSE THE --

9    THAT'S BASICALLY THE HEART OF THE FTC'S THEORY AND THAT'S THE

10   WAY THAT I, THAT I TESTED IT.  IT WAS A DELIBERATE CHOICE TO

11   FOCUS ON THAT IMPLICATION OF THE FTC'S THEORY.  IT WAS JUST TO

12   CHECK THE, THE PREDICTIONS REGARDING THE ORIGINAL CONTRACT.

13          THE COURT:  OKAY.  9166 IS ADMITTED.

14      (DEFENDANT'S EXHIBIT QX 9166 WAS ADMITTED IN EVIDENCE.)

15          MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

16   I HAVE NO FURTHER QUESTIONS.

17          THE COURT:  OKAY.  TIME IS 11:27.

18          MR. MATHESON:  MAY I APPROACH, YOUR HONOR?

19          THE COURT:  GO AHEAD, PLEASE.

20      (PAUSE IN PROCEEDINGS.)

21          THE COURT:  DOES THE FTC WANT TO JUST TAKE A QUICK

22   LOOK AT THIS?  I'M GOING TO USE THAT TO RULE ON HPO NUMBER 2.

23          MR. MATHESON:  SIR, HERE'S YOUR DEPOSITION TRANSCRIPT

24   BINDER AND YOUR REPORT.

25      (PAUSE IN PROCEEDINGS.)

```
1              THE COURT:  IS THAT FINE?

2              MS. IKEDA:  I DON'T THINK WE HAVE THE CX NUMBER ON

3     THIS DOCUMENT.

4              THE COURT:  YOU KNOW, YOU ALL CAN LOOK AT THAT.  AND

5     THEN I JUST WANT TO MAKE SURE THAT ANYTHING I TAKE BACK HAS

6     BEEN APPROVED BY BOTH PARTIES.

7         I WOULD LIKE IT BEFORE LUNCH BECAUSE I'M HOPING TO RULE ON

8     THE HIGH PRIORITY OBJECTIONS OVER LUNCH.  I RULED ON THE TWO

9     SEALING MOTIONS ON THE LAST BREAK.  I'M HOPING TO GET THINGS

10    OUT QUICKLY.

11        IF YOU COULD JUST GIVE THAT TO ME BEFORE LUNCH, THAT WOULD

12    BE GREAT.

13        ALL RIGHT.  WHAT ELSE IS THERE TO DISTRIBUTE?  THIS IS IT?

14             THE CLERK:  YES.

15        (PAUSE IN PROCEEDINGS.)

16             THE COURT:  OKAY.  ARE YOU READY?

17             MS. MILICI:  I AM.

18             THE COURT:  11:29.  GO AHEAD, PLEASE.

19                       CROSS-EXAMINATION

20    BY MS. MILICI:

21    Q.   GOOD MORNING.

22    A.   GOOD MORNING.

23    Q.   YOU HAVE NOT DONE ANY ANALYSIS OF MARKET DEFINITION OR

24    MARKET POWER IN THIS CASE, HAVE YOU?

25    A.   I AM NOT OFFERING THAT OPINION, NO.
```

1    Q.   YOU HAVE NOT DONE ANY ANALYSIS FOR MARKET DEFINITION OR

2    MARKET POWER, HAVE YOU?

3    A.   NO.

4    Q.   AND YOU AGREE THAT QUALCOMM BEGAN SELLING CDMA MODEM CHIPS

5    FIVE YEARS BEFORE COMPETING CHIPS WERE COMMERCIALIZED; RIGHT?

6    A.   I'D HAVE TO LOOK AT THE EXACT DATE, BUT THAT SOUNDS ABOUT

7    RIGHT.

8    Q.   AND YOU AGREE THAT QUALCOMM WAS ALSO THE FIRST SUPPLIER OF

9    3G CDMA CHIPS; RIGHT?

10   A.   AGAIN, THAT SOUNDS RIGHT.

11   Q.   AND YOU AGREE THAT QUALCOMM HAD A TIME ADVANTAGE IN LTE;

12   CORRECT?

13   A.   THAT SOUNDS RIGHT.  I'M TRYING TO REMEMBER IF I USED

14   SPECIFICALLY THE TIME ADVANTAGE.  I ASSUME, SINCE YOU'RE USING

15   IT, I PROBABLY HAVE IT IN MY REPORT, SO THAT'S FINE.

16   Q.   AND YOU AGREE THAT QUALCOMM HAD MORE THAN AN 80 PERCENT

17   SHARE OF THE ENTIRE LTE MARKET FOR AT LEAST THREE YEARS;

18   CORRECT?  THIS IS AN EXHIBIT TO YOUR REPORT; RIGHT?

19   A.   AGAIN, I'LL TAKE YOUR REPRESENTATION AS GIVEN.  I DON'T

20   REMEMBER THE MARKET SHARES.

21   Q.   AND IN ONE OF THOSE LAST SLIDES THAT YOU WERE SHOWN ABOUT

22   THE STRATEGIC FUNDS, THAT SHOWS THAT SOME OEM'S, SOME VERY

23   LARGE OEM'S, HAVE RELIED UPON QUALCOMM FOR 100 PERCENT OF CDMA

24   AND/OR LTE CHIPSETS AT THE TIME THAT THEY NEGOTIATED THEIR

25   LICENSES; RIGHT?

1    A.    THAT WAS DEFINITELY IN THE SLIDE, YES.

2    Q.    AND YOU HAVE BEEN HERE IN COURT THROUGH -- FOR PARTS OF

3    THIS TRIAL; CORRECT?

4    A.    YES, I HAVE, YES.

5    Q.    AND YOU'VE HEARD TESTIMONY FROM OEM'S THAT THEY PAID

6    HIGHER ROYALTIES BECAUSE OF THE CHIP LEVERAGE EXERTED BY

7    QUALCOMM, HAVE YOU NOT?

8    A.    I MIGHT NOT HAVE BEEN HERE FOR THAT.  I MIGHT HAVE READ IT

9    IN THE TRANSCRIPT.  BUT, YES, I KNOW THAT I READ IT, YES.

10   Q.    AND YOU'RE AWARE THAT MULTIPLE OEM'S HAVE OFFERED THAT

11   TESTIMONY UNDER OATH, AREN'T YOU?

12   A.    SEVERAL, I BELIEVE, HAVE, YES.

13   Q.    AND IT'S YOUR TESTIMONY THAT THE EMPIRICAL TESTS THAT YOU

14   DID DOES PROVE THAT TESTIMONY; CORRECT?

15   A.    IT IS MY TESTIMONY THAT THE DATA SHOWS WHAT THEY SHOW.

16   Q.    AND IT'S YOUR TESTIMONY THAT THE DATA SHOWS THAT THE

17   PARTICIPANTS IN THE NEGOTIATIONS WHO SAY THAT THEY PAID MORE

18   BECAUSE OF CHIP LEVERAGE ARE WRONG; CORRECT?

19   A.    WELL, IT'S MY TESTIMONY THAT THE DATA SHOWS WHAT THEY

20   SHOW, AND YOU CAN DRAW THE IMPLICATIONS FROM THAT.  BUT I'M

21   STANDING BY MY ANALYSIS.

22   Q.    OKAY.  WELL, LET'S LOOK AT THE DATA THAT YOU LOOKED AT.

23         CAN YOU PLEASE LOOK AT APPENDIX D1 TO YOUR REPORT.

24   A.    I HAVE A LOT OF FOLDERS HERE.  I'M GOING TO BE A LITTLE

25   BIT SLOWER.

1    Q.   I THINK WE TRIED TO PUT A TAB ON WHERE D1 IS SO THAT WE

2    COULD HELP YOU.

3    A.   OKAY.  I HAVE APPENDIX D IN FRONT OF ME.

4    Q.   AND APPENDIX D SAYS WHAT YOU DID TO CREATE THE DATA SET

5    THAT YOU USED IN YOUR CONTRACTUAL RATE ANALYSIS; CORRECT?

6    A.   THAT'S CORRECT, YES.

7    Q.   AND THIS SAYS THAT WHAT YOUR TEAM DID WAS TO LOOK AT

8    LICENSES, CATEGORIZE THEM AS FRAMEWORK AGREEMENT, KOREAN

9    AGREEMENTS, CHINESE PATENT LICENSE AGREEMENTS, OR

10   NON-GOVERNMENT, AND THEN TO RECORD THE ROYALTY RATE.  AND YOU

11   SAID -- IN THIS IT SAYS THAT NOTED THE HIGHEST AND LOWEST

12   ROYALTY RATES IDENTIFIED IN A REVIEW OF THE CONTRACT ROYALTY

13   SECTION, ACROSS ALL GEOGRAPHIES, FOR ALL POSSIBLE QUANTITIES

14   SOLD, AND AT ANY TIME DURING THE LIFE OF THE CONTRACT.

15        DO YOU SEE?

16   A.   YES.

17   Q.   IS THAT YOUR UNDERSTANDING OF WHAT YOUR TEAM DID?

18   A.   YES, I BELIEVE SO.

19   Q.   AND THAT'S YOUR UNDERSTANDING OF WHAT THE BACK UP DATA IN

20   YOUR REPORT AND THE SUMMARY EXHIBIT WE'VE JUST SEEN SAY?

21   A.   I BELIEVE THAT THAT'S A DESCRIPTION OF THE PROCESS THAT WE

22   FOLLOWED, YES.

23   Q.   AND THEN FURTHER DOWN, IT SAYS AMENDMENT INFORMATION.

24        DO YOU SEE?

25   A.   YES.

1    Q.   AND WHAT YOU DID WHEN YOU WERE CREATING THIS DATABASE WAS

2    TO RECORD ONLY THE EFFECTIVE DATE OF THE FIRST AMENDMENT THAT

3    CHANGES THE ROYALTY RATES IN THE INITIAL AGREEMENT, BUT YOU

4    DON'T RECORD THE ACTUAL NEW RATE; CORRECT?

5    A.   I BELIEVE THAT'S CORRECT, WE DIDN'T USE THAT IN THE

6    ANALYSIS.

7    Q.   AND YOU DIDN'T EVEN IDENTIFY THE EXISTENCE OF SECOND AND

8    THIRD AND FOURTH AMENDMENTS; CORRECT?

9    A.   IN THE DATA SET THAT WE USED, WE DIDN'T IDENTIFY THAT.

10   Q.   AND IN YOUR DATA SET, YOU DON'T INCLUDE TERMS RELATING TO

11   CROSS-LICENSES, DO YOU --

12   A.   WE DID NOT INCLUDE THOSE TERMS, NO.

13   Q.   -- AND YOU DON'T INCLUDE ANYTHING ABOUT THE VALUE OF THE

14   CROSS-LICENSES TO QUALCOMM; RIGHT?

15   A.   WE DID NOT INCLUDE CROSS-LICENSES.

16   Q.   AND YOUR DATA SET DOESN'T INCLUDE ANY INFORMATION ABOUT

17   THE ROYALTY BASE, DOES IT?

18   A.   I DO NOT BELIEVE THAT WE COLLECTED THAT, NO.

19   Q.   SO YOU CAN'T TELL FROM LOOKING AT YOUR DATA SET HOW THE

20   ROYALTY IN A CONTRACT WOULD BE CALCULATED; RIGHT?

21   A.   WE WITH -- WELL, THIS IS THE DATA THAT WE COLLECTED AND

22   WHAT WE HAVE HERE, YES.

23   Q.   AND THE DATA THAT YOU COLLECTED WOULDN'T ALLOW YOU TO

24   FIGURE OUT HOW THE RATE WAS CALCULATED; RIGHT?

25   A.   IT WOULD ALLOW US TO CALCULATE THE RATE THAT WE NEEDED FOR

1    ANALYSIS.

2    Q.   WHICH WASN'T -- WHICH DIDN'T INCLUDE THE RATE BASE?  IT

3    DIDN'T INCLUDE ADJUSTMENTS TO THE NET SELLING PRICE; CORRECT?

4    A.   WELL, IT INCLUDED THE ROYALTY, WHAT WE CALLED IT THE

5    CONTRACTUAL ROYALTY RATE IS WHAT IT HAS HERE.

6    Q.   BUT IT DOESN'T INCLUDE THE ROYALTY BASE, DOES IT?

7    A.   NO.  IT INCLUDES A CONTRACTUAL ROYALTY RATE.

8    Q.   AND A LOT OF THE LICENSES THAT WERE REVIEWED, THERE ARE A

9    LOT OF OTHER TERMS; CORRECT?

10   A.   THEY'RE GENERALLY LONG LICENSES, YES.

11   Q.   AND YOU DON'T TAKE ACCOUNT FOR IN ANY OF THOSE TERMS IN

12   YOUR DATA SET, DO YOU?

13   A.   I FOCUSSED, AS I THINK I WAS VERY CLEAR, ON THE

14   CONTRACTUAL ROYALTY RATES.

15   Q.   OKAY.  CAN YOU PLEASE LOOK AT CDX 0204, WHICH IS TAB 1 IN

16   YOUR BINDER.  AND I BELIEVE PARTS OF THIS ARE UNDER SEAL, SO

17   I'M GOING TO JUST NOT SHOW IT TO THE COURTROOM RIGHT NOW.

18   A.   OKAY.  SO TAB 1?

19   Q.   UM-HUM.  AND THIS IS THE BACKUP MATERIAL TO YOUR EXHIBIT

20   13, WHICH IS SOMETHING THAT WE LOOKED AT EARLIER TODAY.

21        AND IF YOU LOOK ON THIS LIST, AND I THINK WE HAVE IT ON

22   THE SCREEN, THERE'S A LICENSE, THERE'S AN ERICSSON LICENSE

23   THERE.

24        MR. BORNSTEIN:  EXCUSE ME, YOUR HONOR.  I DIDN'T GET

25   A BINDER.

1          MS. MILICI:  OH.

2          THE COURT:  PLEASE GIVE MR. BORNSTEIN ALL THE

3    BINDERS.  I THINK THERE ARE MULTIPLE.

4          MR. BORNSTEIN:  THANK YOU.  YOUR HONOR, I HAVE THE

5    DEPOSITION TRANSCRIPT AND THE EXPERT REPORT.

6          MS. MILICI:  AND MY APOLOGIES TO EVERYONE FOR THE

7    SIZE OF THE BINDERS.

8    Q.   THERE'S A LICENSE LISTED FOR ERICSSON.

9         DO YOU SEE THAT?

10   A.   SORRY.  I'M JUST --

11   Q.   IT'S UNDER T.

12   A.   UNDER T?

13   Q.   UM-HUM.

14   A.   SORRY.  I APOLOGIZE.  IT'S SMALL FONT, HARD TO SEE HERE.

15   Q.   IT'S ON YOUR SCREEN, SIR?

16   A.   OKAY.

17   Q.   AND THIS DATA SET PURPORTS TO IDENTIFY THE LOWEST RATE AT

18   ANY TIME DURING THE LIFE OF THE CONTRACT; RIGHT?  THAT'S WHAT

19   WE JUST LOOKED AT IN APPENDIX D?

20   A.   I BELIEVE THAT'S CORRECT.  I CAN'T QUITE SEE THE COLUMNS

21   THAT THIS CORRESPONDS TO, BUT THAT SHOULD BE.

22   Q.   THAT'S WHAT THIS IS SUPPOSED TO REPRESENT; RIGHT?

23   A.   YES.

24   Q.   OKAY.  CAN YOU PLEASE TURN TO TAB 2 IN YOUR BINDER.  AND

25   THIS IS, AGAIN, PARTIALLY SEALED.

1          THIS IS THE MARCH 1999 LICENSE WITH ERICSSON THAT'S

2     REFERENCED IN YOUR DATA; CORRECT?

3     A.   IT'S A MARCH '99 AGREEMENT WITH ERICSSON.  YES, THAT LOOKS

4     RIGHT, YES.

5     Q.   OKAY.  AND IF WE LOOK ON PAGE 9 IN SECTION 3.2, THERE'S A

6     SECTION ON ROYALTIES.

7          DO YOU SEE?

8     A.   PAGE 9, ROYALTIES, YES, 3.2.

9     Q.   AND IN 3.2, IT PROVIDES FOR ONE ROYALTY RATE FOR SALES

10    PRIOR TO 2004, AND THEN A SIGNIFICANTLY LOWER RATE FOR AFTER

11    2004, DOESN'T IT?

12    A.   I'D HAVE TO READ IT, BUT I'LL TAKE YOUR REPRESENTATION AS

13    GIVEN JUST TO SAVE TIME.

14    Q.   WELL, IT DOES SAY THAT ON THE SCREEN THERE?

15    A.   I'D HAVE TO READ IT TO UNDERSTAND IT, BUT I'LL TAKE YOUR

16    REPRESENTATION OF THAT.

17    Q.   AND THAT LOWER ROYALTY RATE, IT DOESN'T APPEAR ANYWHERE IN

18    YOUR DATA, DOES IT?

19    A.   THAT -- YOU MEAN THE 2 AND A HALF PERCENT UNDER 2?

20    Q.   SIR, I BELIEVE THAT'S CONFIDENTIAL INFORMATION.

21    A.   I'M SORRY.

22    Q.   YOU'RE NOT SUPPOSED TO READ THE NUMBERS OUT LOUD.

23    A.   I APOLOGIZE.  YEAH, I BELIEVE THAT'S DIFFERENT FROM THE

24    NUMBER YOU SHOWED ME BEFORE.

25    Q.   OKAY.  AND THAT DOESN'T APPEAR IN YOUR DATA; RIGHT?

1     A.   IT DIDN'T APPEAR ON THAT SPREADSHEET THAT YOU SHOWED ME.

2     Q.   AND IF WE LOOK AT THE SUMMARY EXHIBIT THAT WAS JUST

3     ADMITTED, IT WOULDN'T APPEAR THERE, EITHER, WOULD IT?

4     A.   THE SUMMARY EXHIBIT WAS, IT WAS WHAT IT WAS, YES.

5     Q.   OKAY.  AND YOU CREATED THEM BOTH THE SAME WAY.  SO IF IT'S

6     NOT IN YOUR BACKUP MATERIAL, IT'S ALSO NOT IN THE SUMMARY

7     EXHIBIT; CORRECT?

8     A.   I'D HAVE TO VERIFY, BUT THAT SOUNDS RIGHT, YES.

9     Q.   SO THAT SUMMARY EXHIBIT AND YOUR BACKUP MATERIALS DON'T

10    CONTAIN ALL OF THE ROYALTY INFORMATION, EVEN FROM THE INITIAL

11    CONTRACTS; CORRECT?

12    A.   IT CREATES AN ADDITIONAL -- THERE'S AN ADDITIONAL NUMBER

13    HERE THAT'S NOT INCLUDED IN THAT.

14    Q.   OKAY.  THANK YOU.

15         AND YOU UNDERSTAND THAT AT THE TIME OF THIS 1999 LICENSE

16    AGREEMENT, ERICSSON ENTERED INTO A SERIES OF AGREEMENTS WITH

17    QUALCOMM THAT INVOLVED THE EXCHANGE OF AN INFRASTRUCTURE

18    BUSINESS AND PATENT LICENSE RIGHTS, A LOT OF TERMS; RIGHT?

19    A.   I AGREE.  AND I THINK FOR THAT REASON I EXCLUDED IT FOR

20    MUCH OF MY ANALYSIS.

21    Q.   YOU DID EXCLUDE ERICSSON FROM YOUR ANALYSIS, DIDN'T YOU?

22    A.   YES.

23    Q.   AND NOWHERE IN YOUR DATA DID YOU ACCOUNT FOR THESE VARIOUS

24    OTHER TERMS, IN THE ERICSSON CONTRACT OR IN ANY OTHER CONTRACT;

25    RIGHT?

1    A.   I'M NOT SURE WHAT YOU MEAN BY "ACCOUNT."  WE DIDN'T RECORD

2    IT IN A CONSISTENT MANNER, NO.

3    Q.   AND HOW YOU RAN YOUR ANALYSIS, THE SLIDE THAT WE SAW

4    EARLIER, WAS BASED ON THIS DATA; CORRECT?

5    A.   WAS BASED ON THE CONTRACTUAL DATA, YES.

6    Q.   BUT ONLY PARTS OF THE CONTRACTUAL INFORMATION; RIGHT?

7    A.   WELL, IT WAS BASED ON THE DATA WE HAD, WHICH WAS THE

8    CONTRACTUAL DATA.

9    Q.   WELL, YOU HAD OTHER DATA AVAILABLE, DIDN'T YOU?  I MEAN,

10   YOU HAD THE WHOLE CONTRACT?

11   A.   I FOCUSSED ON THE CONTRACTUAL DATA, YES.

12   Q.   OKAY.  IF WE COULD LOOK BACK AT YOUR BACKUP DATA THERE,

13   THE CDX 0204?

14   A.   SO BACK TO TAB 1?

15   Q.   YES.  AND THIS LINE IS NOT SEALED, AND WE'RE LOOKING AT

16   MOTOROLA RIGHT NOW.

17       DO YOU SEE THERE'S AN ENTRY THERE FOR MOTOROLA, AND THE

18   NUMBER ON THE RIGHT-HAND SIDE, THE .04, THAT'S THE LOWER BOUND

19   CDMA RATE; CORRECT?

20   A.   THAT'S CORRECT, YES.

21   Q.   AND IF YOU READ ACROSS, THIS IS SAYING THAT THERE WAS A

22   LOWER BOUND RATE OF 4 PERCENT FOR MOTOROLA FROM A 1990 LICENSE;

23   CORRECT?

24   A.   THAT LOOKS CORRECT, YES.

25   Q.   AND THERE'S NO OTHER CDMA RATE INDICATED HERE; RIGHT?

1      A.   NOT THAT I CAN SEE.

2      Q.   AND THERE'S NO OTHER CDMA RATE INDICATED IN THE SUMMARY

3      EXHIBIT THAT WAS JUST INTRODUCED; RIGHT?

4      A.   I'LL TAKE YOUR REPRESENTATION FOR IT.  I HAVEN'T CHECKED.

5      Q.   CAN WE PLEASE LOOK AT JX 4, PLEASE, WHICH IS TAB 5.

6           AND, YOUR HONOR, IT JUST OCCURRED TO ME THAT I DID NOT

7      MOVE TO ADMIT THE PRIOR ERICSSON CONTRACT.

8               THE COURT:  YOU MEAN JX 9?

9               MS. MILICI:  YES.  I MOVE TO ADMIT JX 9.

10              MR. BORNSTEIN:  THERE'S NO OBJECTION, YOUR HONOR.

11              THE COURT:  IT'S ADMITTED.

12         (JOINT EXHIBIT JX 9 WAS ADMITTED IN EVIDENCE.)

13              THE COURT:  GO AHEAD, PLEASE.

14     BY MS. MILICI:

15     Q.   SO LET'S LOOK AT JX 004, WHICH IS TAB 5.  AND THIS HAS

16     BEEN PREVIOUSLY ADMITTED AND IS NOT SEALED.

17          AND LET'S LOOK AT PAGE, I BELIEVE IT'S PAGE 20.  NOW, PAGE

18     20 HERE, THIS IS THE PROVISION OF THE AGREEMENT HAVING TO DO

19     WITH ROYALTIES.

20          AND IT SAYS HERE THAT MOTOROLA'S ROYALTY RATE SHALL NOT

21     EXCEED 80 PERCENT OF THE LOWEST ROYALTY RATE THAT'S PAID BY

22     OTHER COMPANIES TO QUALCOMM; RIGHT?

23     A.   THAT'S CORRECT, YES, THAT'S WHAT IT SAYS.

24     Q.   AND THAT DOESN'T -- THAT INFORMATION DOESN'T APPEAR

25     ANYWHERE IN YOUR CONTRACTUAL SUMMARY, DOES IT?

1     A.    I BELIEVE IT ACTUALLY APPEARS IN MY REPORT.

2     Q.    BUT IT'S NOT ANYWHERE IN YOUR ANALYSIS, IS IT?

3     A.    I'M NOT SURE WHAT YOU MEAN "IN MY ANALYSIS."  I MEAN --

4     Q.    WELL, YOU RAN TESTS, RIGHT, USING THE BACKUP DATA THAT WE

5     JUST LOOKED AT AND YOU USED A 4 PERCENT ROYALTY IN THOSE TESTS,

6     DIDN'T YOU?

7     A.    YES, I DID.

8     Q.    AND THIS -- THAT'S NOT THE LOWEST ROYALTY THAT CAN BE PAID

9     UNDER THIS CONTRACT.  THAT'S THE HIGHEST ROYALTY, ISN'T IT?

10    A.    SO FOR THE CONTRACTUAL RATE, WE LOOKED AT THIS.

11          FOR THE EFFECTIVE RATE, THAT'S PART OF THE REASON WHY WE

12    LOOKED AT THE EFFECTIVE RATE WOULD HAVE BEEN DIFFERENT.  BUT

13    THE CONTRACTUAL RATE WE FOCUSSED ON IS THE 4 PERCENT HERE.

14    Q.    OKAY.  AND YOU WOULD AGREE THAT THE MOTOROLA CONTRACT WAS

15    A VERY COMPLICATED AGREEMENT; RIGHT?

16    A.    I THINK GENERALLY THESE CONTRACTS ARE COMPLICATED.  FOR

17    ME, AS AN ECONOMIST, ALL CONTRACTS ARE COMPLICATED.

18    Q.    BUT GENERALLY THESE LICENSES ARE VERY COMPLEX?

19    A.    YES.

20    Q.    AND IN THIS CASE IN PARTICULAR, THERE WERE -- THERE WERE

21    CROSS-RIGHTS BEING GRANTED; RIGHT?

22    A.    SOUNDS REASONABLE.  I DON'T REMEMBER SPECIFICALLY IN THIS

23    CONTEXT, BUT IT SOUNDS VERY REASONABLE, YES.

24    Q.    AND QUALCOMM AGREED IN THESE CONTRACTS TO PAY ROYALTIES TO

25    MOTOROLA; RIGHT?

1    A.   AGAIN, THAT SOUNDS RIGHT.  OUT OF MEMORY, I CAN'T REMEMBER

2    THE EXACT DETAILS.  BUT IT SOUNDS RIGHT, YES.

3    Q.   AND THIS CONTRACT HAD A ROYALTY SHARING PROVISION.

4    QUALCOMM WAS AGREEING TO SHARE WITH MOTOROLA ROYALTIES THAT IT

5    RECEIVED FROM THIRD PARTIES; CORRECT?

6    A.   AGAIN, I CAN'T CONFIRM EXACTLY, BUT THAT SOUNDS ABOUT

7    RIGHT.

8    Q.   AND YOU DON'T ACCOUNT FOR THAT ANYWHERE IN YOUR

9    CONTRACTUAL RATE ANALYSIS, DO YOU?

10   A.   THAT'S CORRECT.  I FOCUSSED ON THE CONTRACTUAL RATE.

11   Q.   YOU FOCUSSED JUST ON THE HEAD LINE ROYALTY RATE; RIGHT?

12   A.   I FOCUSSED ON WHAT I CALL THE CONTRACTUAL RATE.  WE'RE

13   HAPPY TO -- NAME IT WHATEVER YOU LIKE.  IT'S THE CONTRACTUAL

14   RATE.

15   Q.   AND WHEN YOU DID YOUR ANALYSIS, YOU WEREN'T SURE WHETHER

16   THE OTHER TERMS OF THIS AGREEMENT AND THE AT&T AGREEMENT THAT

17   WAS SIGNED AT THE SAME TIME, WHETHER THOSE OTHER TERMS WERE

18   RELEVANT TO WHETHER THERE WERE APPROPRIATE BENCHMARKS FOR LATER

19   AGREEMENTS, DID YOU?

20   A.   IN -- DEPENDS A LITTLE BIT ON THE CONTEXT OF -- I ASSUME

21   YOU'RE REFERRING TO SOMETHING THAT I SAID SOMEWHERE.  IT

22   DEPENDS ON THE CONTEXT, SO I'D LIKE TO SEE THE CONTEXT.

23   Q.   WELL, LET ME ASK YOU FIRST THEN.  DO YOU THINK THAT THESE

24   OTHER TERMS ARE RELEVANT TO WHETHER THESE ARE APPROPRIATE

25   BENCHMARKS FOR LATER CONTRACTS THAT DON'T CONTAIN THESE TERMS?

1    A.   NOT IN THE CONTEXT OF THE ANALYSIS IN WHICH I USED THEM.

2    I FOCUSSED ON THE CONTRACTUAL RATES, AND I COMPARED THE

3    CONTRACTUAL RATES, AS I EXPLAINED, BETWEEN DIFFERENT PERIODS.

4    AND THAT'S WHAT I FOCUSSED ON.

5    Q.   SO YOU COMPARED THE CONTRACTUAL RATE IN A CONTRACT THAT

6    INCLUDES ROYALTY SHARING, A GUARANTEED 20 PERCENT DISCOUNT OFF

7    OF THE RATES PAID BY COMPETITORS, AND OTHER ITEMS OF VALUE AND

8    YOU COMPARED JUST THE 4 PERCENT RATE TO LATER CONTRACTS THAT

9    DIDN'T HAVE THOSE OTHER TERMS; RIGHT?

10   A.   I COMPARED THE CONTRACTUAL RATES ACROSS TERMS.  THOSE

11   OTHER CONTRACTS ALSO HAD TERMS.  I JUST FOCUSSED ON ONE

12   PARTICULAR RATE AND THAT'S WHAT I COMPARED, YES.

13   Q.   SO THE OTHER CONTRACTS, SOME OF THE OTHER CONTRACTS MIGHT

14   HAVE ALSO HAD COMPLEX TERMS THAT INVOLVED EXCHANGES OF VALUES

15   BETWEEN THE PARTIES; RIGHT?

16   A.   THEY MIGHT HAVE.  I FOCUSSED, AS I SAID, ON THE

17   CONTRACTUAL RATE.

18   Q.   AND YOU DIDN'T THINK ANY OF THOSE OTHER EXCHANGES OF VALUE

19   WERE RELEVANT TO YOUR ANALYSIS; RIGHT?

20   A.   WHAT I FOCUSSED ON IS ON ONE IMPLICATION OF THEORY, AND

21   THAT'S WHAT I TESTED.  I COULD HAVE LOOKED AT OTHER THINGS, BUT

22   I LOOKED AT THAT PARTICULAR CONTRACTUAL RATE.  I THINK I WAS

23   VERY CLEAR ABOUT THAT.  I APOLOGIZE IF NOT.

24   Q.   OKAY.  AND ISN'T IT TRUE THAT MOTOROLA'S RUNNING ROYALTY

25   RATE FOR CDMA INCREASED TO 5 PERCENT IN THE YEAR 2000?

1     A.   I CAN'T EXACTLY RECALL AS I SIT HERE TODAY, BUT I ASSUME

2     YOU HAVE A BASIS FOR THAT.

3     Q.   WELL, YOU CAN LOOK IN YOUR REPORT, PAGE 63, NOTE 223.

4     A.   OKAY.

5     Q.   AND THERE YOU WROTE, "MOTOROLA'S ROYALTY RATE WAS

6     SUBSEQUENTLY INCREASED TO 5 PERCENT IN A 2000 AMENDMENT TO THE

7     LICENSE AGREEMENT."

8          DO YOU SEE THAT?

9     A.   YES.   SORRY.   WHICH -- I SEE IT ON THE SCREEN.

10         YES, YOU READ THAT CORRECTLY.

11    Q.   AND THAT'S WHAT YOU WROTE IN YOUR REPORT?

12    A.   YES.

13    Q.   AND YOU DIDN'T INCLUDE THAT 5 PERCENT ROYALTY RATE IN YOUR

14    ANALYSIS, DID YOU?

15    A.   BECAUSE AS I EXPLAINED, I FOCUSSED ON THE ORIGINAL

16    CONTRACTS, NOT ON THE AMENDMENTS.

17    Q.   SO YOU LOOKED ONLY AT MOTOROLA'S 1990 CONTRACT AND YOU

18    COMPARED -- THAT HAD ALL OF THESE COMPLEX TERMS -- AND YOU

19    COMPARED THAT TO OTHER LICENSES ENTERED IN 2006 AND LATER WITH

20    OTHER OEM'S, BUT YOU DIDN'T INCLUDE THIS; RIGHT?

21    A.   WHAT I DID WAS I TOOK THE CONTRACTUAL RATE AND THAT'S WHAT

22    I COMPARED.   I THINK YOU MISCHARACTERIZED A LITTLE BIT MY

23    ANALYSIS.

24         WHAT I DID WAS I TOOK THE CONTRACTUAL RATE, I DID IT

25    CONSISTENTLY ACROSS ALL THE CONTRACTS, AND THAT'S WHAT I

```
 1    COMPARED.

 2    Q.   WHY DIDN'T YOU COMPARE THESE OTHER TERMS?

 3    A.   BECAUSE I FOCUSSED ON THE CONTRACTUAL RATES.  I COULD HAVE

 4    DONE OTHER THINGS.  BUT I FOCUSSED ON THE CONTRACTUAL RATES.

 5    THAT'S WHAT I DID.

 6    Q.   WOULD IT HAVE BEEN MORE COMPLICATED TO DO THE OTHER

 7    THINGS?

 8    A.   I DON'T KNOW.  I'D HAVE TO LOOK AT WHAT THE OTHER THINGS

 9    ARE.  BUT I FOCUSSED ON THE CONTRACTUAL RATE.

10    Q.   DID YOU CONSIDER DOING OTHER THINGS?

11    A.   EVEN WHAT WE DID WAS AN AMOUNT, SIGNIFICANT AMOUNT OF

12    ANALYSIS, AND THAT'S WHAT WE DID, AND IT'S ACTUALLY MUCH MORE

13    THAN ANYONE ELSE HAS DONE IN THIS CASE.

14    Q.   LET'S LOOK AT YOUR DEMONSTRATIVES HERE.  IF WE LOOK AT

15    PAGE 4?

16    A.   ARE YOU GOING TO PUT IT ON THE SCREEN?

17    Q.   IT'S THERE.  PAGE 4.

18         MR. KOTARSKI:  OF HIS DEMONSTRATIVES?

19         THE WITNESS:  I CAN LOOK HERE IF YOU'LL JUST SHOW ME.

20         MS. MILICI:  IT'S QDX 9354.  YOU MIGHT HAVE RECEIVED

21    IT DIFFERENTLY PAGINATED.

22    Q.   NOW, IN THIS TEST, YOU SAID THAT YOU WERE COMPARING THE

23    ROYALTY RATES IN SOME AGREEMENTS TO THE ROYALTY RATES IN OTHER

24    AGREEMENTS; RIGHT?

25    A.   YES.
```

1    Q.   AND THE TEST THAT YOU DID WAS TO COMPARE ROYALTY RATES IN

2    AGREEMENTS BEFORE OCTOBER 1995 TO ROYALTY RATES AFTER; RIGHT?

3    A.   THAT WAS ONE OF THE TESTS I DID.  THAT WAS NOT THE ONE I

4    FOCUSSED ON IN THE TESTIMONY.

5    I MEAN, I DID DO THAT.  THAT WAS PART OF THE ANALYSIS THAT I

6    DID.

7    Q.   THAT WAS ONE OF YOUR REGRESSIONS; RIGHT?

8    A.   THAT IS DEFINITELY ONE OF MY REGRESSIONS, NOT THE ONE THAT

9    I FOCUSSED ON IN THE LIVE TESTIMONY.

10   Q.   YOU ALSO DID ONE ON 1993?

11   A.   IN THE ANALYSIS THAT I LOOKED AT, I FOCUSSED, I BELIEVE --

12   I'D HAVE TO REFRESH MYSELF, PRE-'95 AND POST-'95.

13   Q.   PRE-'95 AND POST-'95.  THAT IS WHAT I JUST SAID.  SO

14   PRE-'95, YOU WERE COMPARING PRE-'95 LICENSES TO ALL POST-'95

15   LICENSES; RIGHT?

16   A.   I DID THAT IN THE REPORT.  BUT THAT WAS NOT THE ONE I

17   FOCUSSED ON IN MY LIVE TESTIMONY.  THAT WAS MY ONLY POINT.

18   Q.   OKAY.  AND YOU WERE DOING THAT TO COMPARE ROYALTY RATES

19   BEFORE THERE WAS MARKET POWER UNTIL AFTER THERE WAS -- IT WAS A

20   PERIOD IN WHICH THERE MIGHT HAVE BEEN MARKET POWER; CORRECT?

21   A.   I TOOK THAT AS A VERY CONSERVATIVE MEASURE OF A PERIOD

22   WHERE BEFORE THERE WAS CDMA NETWORK OR QUALCOMM SELLING CHIPS,

23   IT COULD NOT PROCEED -- COULD NOT CONCEIVABLY HAVE HAD MARKET

24   POWER.  SO THAT WAS THE CONSERVATIVE APPROACH.

25   Q.   WELL, WERE YOU HERE WHEN DR. CHIPTY TESTIFIED?

```
1    A.   YES, I WAS.

2    Q.   AND SHE TESTIFIED, DIDN'T SHE, THAT COMPETITION FOR CHIPS

3    HAPPENS YEARS BEFORE CHIPS ARE SHIPPED; RIGHT?

4    A.   THAT SOUNDS ABOUT RIGHT.  I DON'T REMEMBER SPECIFICALLY

5    WHAT SHE SAID, BUT YOU THAT SOUNDS RIGHT.

6    Q.   AND IN YOUR DEPOSITION, YOU TESTIFIED THAT OEM'S MAKE CHIP

7    PURCHASING DECISIONS UP TO TWO YEARS BEFORE A CHIP IS SHIPPED;

8    CORRECT?

9    A.   IT -- THE CURRENT STATE, THAT SOUNDS ABOUT RIGHT, YES.

10   Q.   AND THESE EARLY LICENSE AGREEMENTS THAT WE'RE TALKING

11   ABOUT, THE MOTOROLA AND THE AT&T, THOSE ALL CAME WITH SUPPLY

12   AGREEMENTS; CORRECT?

13   A.   THEY DID HAVE SOME COMPONENT SUPPLY AGREEMENTS, YES.

14   Q.   AND YOU AGREED THAT QUALCOMM WAS THE ONLY COMPANY THAT

15   SOLD CDMA CHIPS WHEN IT BEGAN SELLING THEM AND FOR ANOTHER FIVE

16   YEARS; CORRECT?

17   A.   AGAIN, THAT SOUNDS ABOUT RIGHT.  I CAN'T TELL YOU FOR

18   SURE, BUT THAT SOUNDS ABOUT RIGHT.

19   Q.   AND YOU HAVE DONE NO ANALYSIS ABOUT WHETHER THEY HAD

20   MARKET POWER PRIOR TO THAT DATE; RIGHT?

21   A.   FOR EVERYTHING I DID IN TERMS OF MARKET POWER, AND I THINK

22   I WAS CLEAR ABOUT THAT IN THE BEGINNING OF MY TESTIMONY, I TOOK

23   AS GIVEN WHAT WAS OFFERED.

24   Q.   SO YOU TOOK AS GIVEN THAT THEY DIDN'T HAVE MARKET POWER?

25   A.   PRE-'95, YEAH, THAT'S WHAT I LOOKED AT.  IT WASN'T
```

1     SOMETHING THAT I STUDIED.

2     Q.   AND IN YOUR TESTS, YOUR REGRESSIONS, YOU DON'T CONTROL AT

3     ALL FOR CHANGES IN HANDSETS, CHANGES IN PORTFOLIOS, DIFFERENCES

4     AMONG THE OEM'S?  YOU DON'T CONTROL FOR ANY OF THAT, DO YOU?

5     A.   LESS WHAT I LOOK AT IS I LOOK AT THE CONTRACTUAL RATES AND

6     COMPARE BETWEEN THE TWO GROUPS, I EXPLAINED BETWEEN THE TWO

7     DIFFERENT PERIODS.

8     Q.   AND YOUR REGRESSION IS A BEFORE AND AFTER WHERE YOU ASSIGN

9     A 0 TO CONTRACTS BEFORE A CERTAIN DATE, A 1 AFTERWARDS, AND

10    THEN JUST THE CONTRACTUAL ROYALTY RATE; RIGHT?

11    A.   THE CONTRACTUAL ROYALTY RATE IS WHAT I WOULD CALL THE

12    DEPENDENT VARIABLE, AND THEN THERE IS A VARIABLE THAT INDICATES

13    WHETHER IT'S A PERIOD OF MARKET POWER OR NOT, AND THAT'S WHAT

14    WE CALLED A DUMMY VARIABLE.  THAT'S WHAT YOU REFER TO AS 01.

15    Q.   AND THOSE ARE THE ONLY TWO VARIABLES IN YOUR TEST;

16    CORRECT?

17    A.   THAT'S A WAY TO TEST THE DIFFERENCE BETWEEN THE AVERAGE IN

18    AND THE ROYALTY RATES, YES.

19    Q.   SO YOU'RE AVERAGING EVERYTHING AFTER 1995 AND EVERYTHING

20    BEFORE JUST ON THE CONTRACTUAL ROYALTY RATE?

21    A.   AS I EXPLAINED, I'M LOOKING AT THE DIFFERENCE IN THE

22    ROYALTY RATE BETWEEN THESE TWO GROUPS, YES.

23    Q.   SO YOU WOULD AGREE THAT LICENSE NEGOTIATIONS ARE MESSY;

24    RIGHT?

25    A.   I BELIEVE THAT'S SOMETHING THAT I SAID, YES.

1      Q.   THAT IS SOMETHING THAT YOU SAID.

2           AND THAT OUTCOMES CAN DEPEND ON A VARIETY OF FACTORS;

3      RIGHT?

4      A.   AGAIN, I'M PRETTY SURE THAT'S SOMETHING I'VE SAID, YES.

5      Q.   AND YET, THESE ROYALTY RATES ARE CONSISTENT ACROSS, WHAT,

6      A 25 YEAR PERIOD?

7      A.   YES.

8      Q.   AND DURING THAT TIME, THE PRODUCT CHANGED, DIDN'T IT?

9      A.   I'M NOT SURE WHAT I MEAN BY "THE PRODUCT."  I MEAN, IT'S A

10     LICENSE.  BUT --

11     Q.   THE HANDSET CHANGED; CORRECT?

12     A.   OKAY.  I'M NOT SURE IF THAT'S THE PRODUCT, BECAUSE WE'RE

13     TALKING HERE ABOUT LICENSES.

14     Q.   THE PRODUCT IN WHICH THE I.P. WAS GOING TO BE USED CHANGED

15     DRAMATICALLY OVER THAT TIME; CORRECT?

16     A.   CELL PHONES DID, YEAH, THEY CLEARLY CHANGED.

17     Q.   AND QUALCOMM'S PATENT PORTFOLIO CHANGED OVER TIME?

18     A.   I THINK WE'VE HEARD TESTIMONY TO THAT.

19     Q.   AND THE BARGAINING LEVERAGE OF DIFFERENT OEM'S CHANGED

20     OVER TIME; RIGHT?

21     A.   THAT'S -- AGAIN, I HAVEN'T STUDIED THAT, BUT THAT SEEMS

22     REASONABLE.

23     Q.   AND YET THIS RATE IS CONSISTENT FOR THE PAST 25 YEARS?

24     A.   YEAH, IT SEEMS LIKE IT'S CONSISTENTLY AT THE FRAND RATE.

25     Q.   AND YOU TESTIFIED AT YOUR DEPOSITION THAT YOU WERE NOT

```
 1     SURPRISED BY THE LACK OF VARIATION IN THE ROYALTY RATES BECAUSE

 2     THEY ALL HAVE ONE -- ALL THESE LICENSE NEGOTIATIONS HAD ONE

 3     THING IN COMMON, AND THAT WAS THAT QUALCOMM WAS A PARTY TO

 4     THEM; CORRECT?

 5     A.   THAT SOUNDS LIKE SOMETHING I SAID, YES.

 6     Q.   OKAY.  LET'S LOOK NOW TWO PAGES LATER AT PAGE 6.

 7          NOW, YOU CALL THIS A WCDMA ONLY CONTRACTUAL RATES; RIGHT?

 8     A.   THAT'S DEFINITELY WHAT I CALLED IT.  IT'S IN THE TITLE,

 9     YES.

10     Q.   AND WHEN YOU'RE CALLING SOMETHING WCDMA ONLY, THAT DOESN'T

11     MEAN THAT WCDMA IS THE ONLY TECHNOLOGY IN THE CONTRACT, DOES

12     IT?

13     A.   AGAIN, DEPENDING ON THE SPECIFICS.  BUT I THINK I WAS

14     CLEAR AS TO HOW, HOW WE DEFINE IT.  IT'S DEFINED IN THE REPORT.

15     Q.   IN FACT, MOST OF THESE LICENSES ALSO CONTAIN TERMS FOR

16     CDMA, DON'T THEY?

17     A.   I'D HAVE TO LOOK AT THE SPECIFICS.  BUT WE DEFINE THIS

18     AS -- THOSE PARTICULAR NEGOTIATIONS -- THERE'S A PARTICULAR

19     PROCESS THAT WE WENT IN TERMS OF WHAT'S A FINDING AS WCDMA

20     ONLY.

21     Q.   AND THAT PROCESS DIDN'T EXCLUDE CONTRACTS THAT ALSO

22     CONTAINED TERMS FOR CDMA; CORRECT?

23     A.   AGAIN, WE CAN GO THROUGH THE PROCESS, BUT IF THAT PROCESS

24     LED TO SOMETHING ALSO HAVING CDMA, YES.

25     Q.   SO YOU CAN'T -- SITTING HERE RIGHT NOW, YOU CAN'T TELL US
```

1     HOW MANY OF THESE CONTRACTS APPEARING HERE ACTUALLY CONTAIN

2     TERMS FOR CDMA, CAN YOU?

3     A.   I CAN TELL YOU THE PROCESS BY WHICH WE WENT, BUT I CAN'T

4     TELL YOU INDIVIDUAL CONTRACTS AND WHAT THEY HAVE IN THEM.

5     Q.   OKAY.  AND SO IF WE LOOK AT THE NEXT SLIDE WHERE IT SAYS

6     WCDMA ONLY VERSUS CDMA --

7          I THINK YOU HAVE THE OLD SET THAT THEY GAVE US.

8     A.   I HAVE THE HARD COPY IN FRONT OF ME, IF THAT HELPS.

9     Q.   SO WHEN YOU'RE COMPARING WCDMA ONLY VERSUS CDMA, A LOT OF

10    THE CDMA LICENSES ACTUALLY HAVE WCDMA TERMS IN THEM, DON'T

11    THEY?

12    A.   SOME OF THEM WERE SIGNED AT A POINT THAT COVERED BOTH CDMA

13    AND WCDMA, YES.

14    Q.   SO THE RED DOTS THAT YOU CALLED CDMA, THOSE -- A LOT OF

15    THOSE LICENSES CONTAIN WCDMA TERMS; RIGHT?

16    A.   THAT'S DEFINITELY A POSSIBILITY.

17    Q.   AND THE BLUE DOTS THAT YOU HAVE THERE THAT YOU'RE CALLING

18    WCDMA ONLY, THOSE CONTRACTS, A LOT OF THEM HAVE CDMA TERMS;

19    RIGHT?

20    A.   AGAIN, IT DEPENDS WHAT YOU MEAN BY "TERMS."  BUT WE WENT

21    THROUGH A PROCESS WHERE WE LOOKED AT WCDMA.

22    Q.   AND WHEN YOU WENT THROUGH THAT PROCESS, YOU INCLUDED

23    CONTRACTS AS WCDMA ONLY THAT INCLUDED CDMA TERMS; RIGHT?

24    A.   YEAH.  BUT THE FOCUS WAS ON THE ADDITION, SO IF WCDMA WAS

25    ADDED, THAT WAS WHY IT WAS WCDMA ONLY.

1    Q.   AND THOSE CONTRACTS CONTAINED TERMS FOR CDMA THAT MIGHT

2    HAVE BEEN DIFFERENT THAN PREVIOUS TERMS; RIGHT?

3    A.   DEPENDS ON THE CONTEXT, YES.  BUT THAT COULD BE A

4    POSSIBILITY.

5    Q.   AND WHEN YOU WERE COMPARING WCDMA TO CDMA, I BELIEVE YOUR

6    TESTIMONY WAS THAT QUALCOMM COULDN'T HAVE HAD MARKET POWER IN

7    WCDMA; IS THAT RIGHT?

8    A.   I BELIEVE THAT THAT HASN'T BEEN ALLEGED.

9    Q.   BUT YOU HAVEN'T DONE ANY ANALYSIS OF WHETHER QUALCOMM

10   ACTUALLY HAD MARKET POWER IN WCDMA, HAVE YOU?

11   A.   NO.  I'M NOT OFFERING THAT OPINION, NO.

12   Q.   AND CAN YOU OFFER THE OPINION THAT THERE WAS NO COST TO

13   THESE COMPANIES FROM LOSING ACCESS TO WCDMA FROM QUALCOMM?

14   A.   I DID NOT ANALYZE ALL THESE COMPANIES.  I JUST LOOKED AT

15   THE SPECIFIC CASES THAT WE HAD IN THE ANALYSIS.

16   Q.   AND IF WE LOOK AT YOUR WCDMA REGRESSION, CAN WE LOOK AT

17   THAT FOR A SECOND?  I DON'T KNOW WHAT NUMBER IT IS IN THE

18   EXHIBIT YOU HAVE.

19       SORRY, YOUR HONOR.  WE WERE GIVEN A DIFFERENT SET OF

20   SLIDES WITH DIFFERENT NUMBERING, SO WE'RE HAVING A LITTLE HARD

21   TIME.

22           THE COURT:  WHEN WERE YOU GIVEN THAT?

23           MS. MILICI:  YESTERDAY .

24   Q.   OKAY.  LET'S LOOK AT PAGE --

25           THE COURT:  CAN YOU GIVE A NEW -- WHATEVER YOU

1       DISTRIBUTED TODAY, CAN WE GIVE THAT TO THEIR --

2               MR. BORNSTEIN:  THEY HAVE IT, YOUR HONOR.

3               MS. MILICI:  IT'S DIFFERENTLY PAGINATED.

4               MR. BORNSTEIN:  WE GAVE YOU THE CORRECT PAGINATION IN

5       THE BOOK THIS MORNING.

6               MS. MILICI:  HE DOESN'T HAVE THEM.

7               THE COURT:  HOW MANY COPIES DID YOU HAND THEM?  JUST

8       ONE?  DO YOU HAVE A SECOND ONE?

9               MR. BORNSTEIN:  IF WE DON'T HAVE A SECOND ONE, YOU

10      CAN HAVE MINE.

11              MS. MILICI:  LET'S LOOK AT WHAT'S PAGE 10.  IT'S A

12      WCDMA ONLY EFFECTIVE ROYALTY RATE.

13      Q.   WHEN YOU WERE COMPARING THE WCDMA EFFECTIVE ROYALTY RATES

14      TO THE LTE COMPATIBLE CHIP PURCHASES FROM QUALCOMM, YOU WERE

15      LOOKING AT ALL LTE; RIGHT?

16      A.   THAT'S CORRECT, YES.

17      Q.   YOU DIDN'T LIMIT IT TO PREMIUM LTE?

18      A.   I DID NOT HAVE THE ABILITY TO DO THAT.

19      Q.   AND WHEN WE LOOKED AT YOUR EARLIER SLIDES ABOUT WCDMA, YOU

20      HAD IDENTIFIED CLOSE TO 200 WCDMA CONTRACTS; RIGHT?

21      A.   THAT SOUNDS RIGHT.  I CAN GO AND COUNT.

22      Q.   AND IN THIS REGRESSION, YOU ONLY HAVE 83 CONTRACTS.

23      A.   THAT SOUNDS RIGHT.

24      Q.   SO YOU DROPPED MORE THAN HALF OF THE CONTRACTS THAT YOU

25      IDENTIFIED AS WCDMA ONLY WHEN YOU WERE DOING YOUR REGRESSION?

1    A.   WE APPLIED A CERTAIN CRITERIA, WHICH WAS DROPPED ANY OEM

2    THAT NEVER, BASICALLY NEVER REPORTED ROYALTIES ON LTE.

3    Q.   SO IS IT YOUR TESTIMONY THAT A SIGNIFICANT NUMBER OF THE

4    COMPANIES IN THE SUMMARY EXHIBIT THAT WAS JUST ADMITTED NEVER

5    PAID ROYALTIES?

6    A.   I MEAN, THAT WOULD BE THE WAY TO KIND OF PUT THESE TWO

7    TOGETHER, BUT THAT WAS THE CRITERIA FOR LOOKING.

8    Q.   AND YOU ALSO EXCLUDED FROM YOUR ANALYSIS SONY, BLACKBERRY,

9    SAMSUNG, LG, CERTAIN CONTRACTS FROM HUAWEI; IS THAT CORRECT?

10   A.   THAT SOUNDS RIGHT, YES.

11   Q.   DO YOU HAVE ANY IDEA HOW -- WHAT SHARE OF THE HANDSET

12   MARKET WAS EVEN LEFT IN YOUR ANALYSIS?

13   A.   IN THIS SPECIFIC ONE, I CAN'T TELL YOU AS I SIT HERE

14   TODAY.

15   Q.   BUT YOU WOULD AGREE THAT YOU EXCLUDED A LOT OF MAJOR

16   PLAYERS, INCLUDING NOKIA AND ERICSSON; CORRECT?

17   A.   YES.  I WAS VERY CLEAR ABOUT THAT.  I INCLUDED -- EXCLUDED

18   THEM.

19   Q.   RIGHT.  SO EXCLUDED A LOT OF MAJOR OEM'S; CORRECT?

20   A.   I EXCLUDED THOSE FOUR, YES, AND THEY'RE ALL.

21   Q.   WELL, IT WAS MORE THAN FOUR.  SONY, BLACKBERRY, YOU

22   EXCLUDED SAMSUNG BECAUSE IT WAS AN AMENDMENT, YOU EXCLUDED LG;

23   CORRECT?

24   A.   YES, BECAUSE THEY WERE UNDER THE GOVERNMENT AGREEMENTS.

25   Q.   BUT -- WELL, WHEN YOU SAY THAT THEY'RE UNDER THE

1    GOVERNMENT AGREEMENTS, DID YOU DO ANY INVESTIGATION OF THAT?

2    A.    WHEN YOU SAY, "INVESTIGATION," ONE OF THE -- I THINK WE

3    WENT OVER IT BEFORE.  THE WAY WE BUILT THE DATA SET WAS STARTED

4    FROM THE LMS, AND THEN WE INDICATED WHICH OF THE CONTRACTS WERE

5    SUBJECT TO THE VARIOUS GOVERNMENT AGREEMENT.

6    Q.    BUT WHEN YOU SAY THAT THEY WERE SUBJECT TO THE AGREEMENT,

7    TO SOME AGREEMENT WITH THE GOVERNMENT, YOU DIDN'T INVESTIGATE

8    THAT, DID YOU?

9    A.    I'M SORRY.  I'M NOT SURE I UNDERSTAND WHAT YOU MEAN BY

10   "INVESTIGATE THAT."

11   Q.    WELL, WHEN YOU SAY THAT THE LG AGREEMENT WAS RELATED TO

12   SOME AGREEMENT WITH THE KOREAN GOVERNMENT, YOU DIDN'T LOOK AT

13   THAT, DID YOU?

14   A.    MY TEAM CLASSIFIED THAT AS PART OF A -- PART OF THE

15   ANALYSIS THAT WAS DONE.

16   Q.    DO YOU KNOW WHAT INSTRUCTIONS YOU GAVE THEM ABOUT HOW TO

17   CLASSIFY THAT?

18   A.    JUST GENERALLY TO, TO GO THROUGH THE CONTRACTS AND SEE IF

19   THEY WERE SUBJECT TO THESE TERMS.

20   Q.    DO THE CONTRACTS SAY ON THEIR FACE THAT THEY FALL INTO ONE

21   OF THE CATEGORIES THAT YOU JUST GAVE?

22   A.    I'D HAVE TO GO BACK AND LOOK TO SEE EXACTLY THE PROCESS.

23   Q.    SO ARE YOU AWARE THAT THE KOREAN AGREEMENT THAT YOU'RE

24   TALKING ABOUT APPLIED TO JUST A COUPLE OF, OF DESIGNATED OEM'S?

25   A.    I'D HAVE TO GO BACK AND LOOK AT THE SPECIFICS OF IT.  BUT

1    THAT SOUNDS ABOUT RIGHT.

2    Q.   AND IN YOUR ANALYSIS, YOU IDENTIFIED A LOT MORE THAN THAT

3    AS BEING KOREAN AGREEMENTS THAT WERE DROPPED FROM YOUR

4    ANALYSIS; CORRECT?

5    A.   AGAIN, I'D HAVE TO GO LOOK AT THE SPECIFICS.

6    Q.   BUT YOU DON'T KNOW RIGHT NOW?

7    A.   I MEAN, DIVING INTO THAT SPECIFIC DETAIL, I CAN'T TELL YOU

8    AS I SIT HERE TODAY.

9    Q.   OKAY.  BUT YOU DO AGREE THAT YOU DROPPED MOST OF THE WCDMA

10   ONLY CONTRACTS?

11   A.   I DON'T KNOW IF IT'S MOST.  BUT, YES, THERE WERE A

12   SIGNIFICANT NUMBER DROPPED, YES.

13   Q.   AND IN CDMA, YOU DID THE SAME THING; RIGHT?  WE SAW ONE

14   SLIDE WHERE YOU IDENTIFIED 300 AGREEMENTS, AND THEN THIS WHEN

15   YOU DID YOUR REGRESSION, THERE WAS ONLY 75.  SO YOU DROPPED

16   THREE-QUARTERS OF THE LICENSES THAT YOU IDENTIFIED FOR CDMA

17   WHEN YOU DID YOUR REGRESSION, DID YOU NOT?

18   A.   AGAIN, I CAN'T CONFIRM THE EXACT NUMBERS, BUT, YES,

19   SIGNIFICANT NUMBERS WERE DROPPED.

20   Q.   AND YOU ARE AWARE, ARE YOU NOT, THAT THE KOREAN GOVERNMENT

21   DOES NOT AGREE WITH THE POSITION THAT THOSE AGREEMENTS WERE

22   FREELY -- WERE NOT NEGOTIATED?

23   A.   I'M NOT EXACTLY SURE WHAT THE KOREAN GOVERNMENT'S POSITION

24   IS.

25   Q.   OKAY.  IN FACT, IN YOUR REPORT, THE ONLY THING THAT YOU

1     CITE FOR THE PROPOSITION THAT THOSE AGREEMENTS SHOULD NOT BE

2     PART OF THE ANALYSIS IS A PAPER THAT QUALCOMM WROTE; RIGHT?

3     A.   I'D HAVE TO GO BACK AND SEE EXACTLY WHAT WAS CITED.  BUT I

4     ASSUMED THAT -- YOU LOOKED AT IT MORE RECENTLY THAN I HAVE.

5     Q.   AND WHEN YOU DO YOUR REGRESSIONS WITH THE EFFECTIVE

6     ROYALTY RATE, YOU'RE NOT USING THAT TERM IN THE WAY IT'S

7     USUALLY USED; RIGHT?

8     A.   I'M NOT SURE WHAT THE WAY THAT IT'S USUALLY USED, BUT --

9     Q.   YOU'RE NOT DIVIDING ROYALS BY THE GROSS REVENUE; RIGHT?

10    A.   I'M DIVIDING ROYALTIES BY THE, WHAT'S CALLED NET REVENUE

11    IN THE DATABASE.

12    Q.   SO WHAT YOU DID IS YOU TOOK THE GROSS REVENUES AND YOU

13    MADE SOME SUBTRACTIONS FOR DEDUCTIONS, AND THEN YOU CALCULATED

14    AN EFFECTIVE ROYALTY RATE; RIGHT?

15    A.   SORT OF, WITH ONE CORRECTION.  I DIDN'T ACTUALLY MAKE THE

16    SUBTRACTION.  THE NET REVENUE IS SOMETHING THAT'S IN THE

17    QUALCOMM DOCUMENT THAT'S USED IN THE NORMAL COURSE OF BUSINESS.

18    I DIDN'T CREATE THAT VARIABLE.  I JUST TOOK THAT VARIABLE FROM

19    THE DATA SET.  BUT THAT'S THE ONE THAT I USED.

20    Q.   AND THAT VARIABLE DOES NOT INCLUDE THE GROSS REVENUE FOR

21    THE LICENSES; RIGHT?

22    A.   WELL, IT INCLUDES THE GROSS REVENUE.  BUT THEN DEDUCTS

23    FROM IT.

24    Q.   AND THE AMOUNT OF THAT DEDUCTION IS A NEGOTIATED TERM IN

25    THESE AGREEMENTS, IS IT NOT?

1     A.   MY UNDERSTANDING, THAT'S PART OF WHAT THEY WERE

2     NEGOTIATING OVER, YES.

3              MS. MILICI:  OKAY.  NO MORE QUESTIONS.

4              THE COURT:  OKAY.  TIME IS 12:06.

5         LET'S TAKE OUR LUNCH BREAK NOW.  WE'LL TAKE AN HOUR LONG

6     BREAK AND WE'LL BE BACK AT, LET'S SAY -- LET'S BE BACK AT 1:10.

7     OKAY?

8         THANK YOU.

9          (THE LUNCH RECESS WAS TAKEN FROM 12:07 P.M. UNTIL

10    1:12 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2          (COURT CONVENED AT 1:12 P.M.)

3                THE COURT:  GOOD AFTERNOON.  WELCOME BACK.  PLEASE

4     TAKE A SEAT.

5          OKAY.  GO AHEAD, PLEASE.  I'LL WAIT UNTIL -- LET ME KNOW

6     WHEN YOU'RE READY, PLEASE.

7                MR. BORNSTEIN:  I AM READY, YOUR HONOR.

8                THE COURT:  OKAY.  1:12.  GO AHEAD, PLEASE.

9                      **REDIRECT EXAMINATION**

10    BY MR. BORNSTEIN:

11    Q.   OKAY.  LET'S CALL UP SLIDE 4 FROM YOUR DEMONSTRATIVES,

12    PLEASE, PROFESSOR.

13         THIS IS THE -- DO WE HAVE SLIDE 4?

14         GREAT.  THIS WAS THE REGRESSION THAT YOU DISCUSSED

15    REGARDING CDMA; IS THAT RIGHT?

16    A.   YES, THAT'S THE ANALYSIS OF CDMA.

17    Q.   OKAY.  NOW, YOU WERE ASKED A COUPLE OF QUESTIONS ABOUT

18    COMPARISONS BETWEEN BEFORE 1995 AND AFTER 1995.

19         DO YOU REMEMBER THAT?

20    A.   YES, I DO.

21    Q.   WERE THERE OTHER ANALYSES AND OTHER COMPARISONS THAT YOU

22    PERFORMED WITH THIS DATA?

23    A.   YES, THERE WAS THE BEFORE AND AFTER '95 THAT I PERFORMED.

24    I ALSO PERFORMED THE ANALYSIS THAT I FOCUSSED ON IN MY DIRECT,

25    WHICH IS THE FOCUS ON THE ALLEGED MARKET POWER PERIOD, AND THEN

1      I RAN A THIRD REGRESSION THAT I BELIEVE WAS LOOKING FROM.  I

2      THINK IT WAS 2006 ONWARD.  I'M ACTUALLY BLANKING.  THERE WAS A

3      THIRD ONE THAT WAS IN MY APPENDIX.

4      Q.  COULD YOU PULL THE MICROPHONE A LITTLE CLOSER?

5      A.  I'M NOT SURE IF IT'S WORKING.  I'M PRETTY CLOSE.

6           THE COURT:  UH-HUH.  COULD WE -- I'LL STOP THE TIME.

7      IT'S 1:13.

8           MR. BORNSTEIN:  OH, I HERE IT.

9           THE WITNESS:  IS THAT BETTER NOW?

10           THE COURT:  YES.  1:13.  GO AHEAD, PLEASE.

11     BY MR. BORNSTEIN:

12     Q.  YOU WERE HERE IN COURT WHEN PROFESSOR SHAPIRO TESTIFIED;

13     RIGHT?

14     A.  YES, I WAS.

15     Q.  DO YOU REMEMBER THAT THE JUDGE ASKED PROFESSOR SHAPIRO

16     SOME QUESTIONS ABOUT THE PERIOD IN WHICH HE ALLEGES MARKET

17     POWER EXISTED?

18     A.  YES, I DO.

19     Q.  AND WHAT DID PROFESSOR SHAPIRO SAY ABOUT HIS ALLEGATION OF

20     MARKET POWER IN CDMA?

21     A.  I BELIEVE IT WAS 2006 TO 2016.

22     Q.  OKAY.  AND DID YOU USE THAT FOR YOUR REGRESSION?

23     A.  YES.

24     Q.  LET'S TAKE A LOOK AT SLIDE 6, PLEASE.  THIS IS WCDMA AND

25     LTE.

```
 1            WHAT REGRESSION PERIODS DID YOU USE FOR THIS SLIDE?

 2    A.   SO THE MAIN REGRESSION THAT I USED IS THE ONE THAT I

 3    DESCRIBED LOOKING AT THE SHADED AREA VERSUS EVERYTHING OUTSIDE.

 4    Q.   AND WHAT DID PROFESSOR SHAPIRO TESTIFY LAST WEEK WAS

 5    PERIOD OF MARKET POWER THAT HE WAS ALLEGING FOR PREMIUM LTE

 6    CHIPS?

 7    A.   I BELIEVE IT WAS 2001 TO 2016.

 8    Q.   SO 2001?

 9    A.   SORRY.  2011, SORRY.

10    Q.   AND DID YOU USE THAT IN ANY WAY IN CONSTRUCTING YOUR TEST?

11    A.   THAT'S EXACTLY HOW I CONSTRUCTED WHAT I CALL THE SHADED

12    AREA.

13    Q.   OKAY.  AND THERE WERE SOME QUESTIONS ABOUT CHANGES IN THE

14    PRODUCTS ON WHICH -- THAT WERE LICENSED.

15            DO YOU REMEMBER THOSE QUESTIONS?

16    A.   I DO.

17    Q.   WHERE ON THIS CHART DID SMARTPHONES FIRST START BEING

18    SOLD?

19    A.   I BELIEVE THAT, YOU KNOW, TYPICALLY PEOPLE START THINKING

20    OF THE FIRST IPHONE AS BEING THE FIRST SMARTPHONE, AND I

21    BELIEVE THAT WAS 2007.

22    Q.   AND WHAT ROYALTY RATES WERE OEM'S AGREEING TO, PER YOUR

23    CHART, ONCE SMARTPHONES WERE ALREADY ON THE MARKET?

24    A.   WELL, BASICALLY EVERYTHING.  I MEAN, YOU CAN DRAW A LINE

25    FROM 2007 AND UP AND LOOK TO RIGHT OF THAT.
```

1    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT WHETHER YOU INCLUDED

2    AMENDMENTS TO AGREEMENTS IN YOUR ANALYSIS.

3        DO YOU RECALL THAT?

4    A.   YES.

5    Q.   OKAY.  CAN YOU EXPLAIN WHY YOU FOCUSSED ON THE INITIAL

6    AGREEMENTS RATHER THAN AMENDMENTS IN THE STATISTICAL TESTS YOU

7    RAN?

8    A.   SO WHAT WE FOCUSSED ON, AND JUST TO BE 100 PERCENT

9    PRECISE, IS WHAT WE FOCUSSED ON ARE CONTRACT NUMBERS.  SO

10   WHATEVER WAS ASSIGNED A NEW CONTRACT NUMBER WAS WHAT WE LOOKED

11   AT.  AND IF THERE WAS -- THERE IS AN AMENDMENT THAT DID NOT

12   CHANGE THE CONTRACT NUMBER, WE DIDN'T LOOK AT THAT.

13       THE REASON WE FOCUSSED ON THE INITIAL CONTRACT NUMBER AND

14   NOT ON AMENDMENTS TO IT WAS BECAUSE THAT WAS MY INTERPRETATION,

15   OR THAT'S WHAT THE FTC'S THEORY PREDICTS IS TO THE EFFECTS OF

16   THOSE PARTICULAR CONTRACTS OR PARTICULAR NEGOTIATIONS.

17       AMENDMENTS ARE VERY DIFFERENT IN THEIR NATURE AND THEY CAN

18   REALLY VARY EITHER BECAUSE THERE'S AN AMENDMENT, YOU KNOW,

19   MID-TERM WITH NO EXPIRATION IN SIGHT.  IT COULD BE THAT THERE'S

20   MAYBE AN EXPIRATION COMING UP OR THERE'S SOME -- THAT NEEDS TO

21   BE ADDED.

22       AND THEY'RE VERY DIFFERENT BECAUSE DURING THE AMENDMENT

23   NEGOTIATIONS, THE OEM CAN STILL OPERATE UNDER THE ORIGINAL

24   CONTRACT.

25       SO ANY AMENDMENT THAT WOULD OPERATE WOULD BE UNDER THE

1    UMBRELLA OF THE ORIGINAL CONTRACT, SO IT REALLY KIND OF CREATES

2    A VERY DIFFERENT DYNAMIC THAN THE ONE THAT WAS DISCUSSED UNDER

3    THE FTC'S COMPLAINT.

4    Q.   AND YOU WERE ASKED SOME QUESTIONS ABOUT THE CONTRACTS THAT

5    WERE NOT INCLUDED IN YOUR STATISTICAL ANALYSES.

6         DO YOU RECALL THOSE QUESTIONS?

7    A.   YES.

8    Q.   SO CAN YOU EXPLAIN WHY YOU DID NOT INCLUDE WHAT YOU CALLED

9    THE GOVERNMENTAL AGREEMENTS IN YOUR STATISTICAL TEST?

10   A.   SO THE GOVERNMENTAL AGREEMENTS ARE, THESE ARE AGREEMENTS

11   THAT WERE SUBJECT TO THE TERMS THAT ARE NEGOTIATED OR SET -- I

12   DON'T KNOW IF NEGOTIATED IS THE RIGHT TERM -- SET AFTER

13   DISCUSSIONS, I'D SAY, WITH THE RELEVANT GOVERNMENT.

14        AND, AGAIN, THAT'S A VERY DIFFERENT TYPE OF DYNAMIC THAN

15   THE NEGOTIATIONS OR AGREEMENTS THAT ARE SET SUBJECT TO THE FTC

16   COMPLAINT.

17        SO, FOR EXAMPLE, CHIP LEVERAGE, I CAN'T SEE HOW THAT WOULD

18   ACTUALLY PLAY A ROLE IN THOSE NEGOTIATIONS.

19   Q.   AND WITH RESPECT TO SONY, SAMSUNG, BLACKBERRY, AND NOKIA,

20   PARTICULAR AGREEMENTS WITH THOSE COMPANIES, WHY DID YOU EXCLUDE

21   THOSE, THOSE AGREEMENTS?

22   A.   SO THOSE WERE EXCLUDED FROM, MOSTLY FROM THE EFFECTIVE

23   RATE REGRESSIONS, NOT THE ONES THAT WE JUST LOOKED AT.

24        AND THE REASON THAT I EXCLUDED THOSE IS THAT IN THREE OF

25   THOSE FOUR CASES, I BELIEVE, THERE WAS VERY LARGE UPFRONT FEES

1       THAT WERE BASICALLY SHIFTING KIND OF RISK SHARING.  SO THERE

2       WAS AN IDEA OF PAYING A LARGE AMOUNT OF UPFRONT FEE TO COVER

3       CERTAIN QUANTITY, AND IT BASICALLY AT THAT POINT SHIFTS THE

4       RISK OF WHAT HAPPENS IF YOU REACH THAT QUANTITY OR NOT FROM,

5       LET'S SAY, FROM QUALCOMM TO THE OEM.

6            AND, THEREFORE, THEY'RE REALLY A DIFFERENT ANIMAL AND IT'S

7       NOT REALLY CLEAR HOW TO COMPUTE AN EFFECTIVE ROYALTY RATE

8       THAT'S COMPARABLE TO THE OTHER AGREEMENTS.

9       Q.   NOW, YOU SAID YOU EXCLUDED THOSE FROM YOUR STATISTICAL

10      ANALYSIS.  DID YOU IGNORE THEM ENTIRELY IN FORMING YOUR

11      OPINION, THOSE AGREEMENTS?

12      A.   NO.  I LOOKED AT THOSE, AT SAMSUNG, AT THE SONY AND THE

13      BLACKBERRY AGREEMENTS, I LOOKED AT THEM AND ANALYZED THEM IN A

14      QUALITATIVE WAY IN MY REPORT.

15      Q.   AND CONCLUDED WHAT?

16      A.   THAT THEY'RE NOT CONSISTENT WITH THE FTC CLAIMS.

17      Q.   OKAY.  THERE WERE SOME QUESTIONS ABOUT WHAT YOU MEANT BY

18      WCDMA ONLY AGREEMENTS AND YOU HAD SAID A COUPLE TIMES THERE WAS

19      A PROCESS FOR IDENTIFYING THEM.

20           CAN YOU PLEASE TELL US WHAT THAT PROCESS WAS?

21      A.   SO THE EXACT PROCESS IS DESCRIBED IN THE APPENDIX IN MY

22      REPORT.

23           BUT KIND OF AT A HIGH LEVEL, WITHOUT GOING INTO THE

24      VERY -- INTO THE WEEDS, IT WAS EITHER ADDING A, A WCDMA -- SO

25      IF AN OEM ALREADY HAD A CDMA AGREEMENT, BUT WAS ADDING A WCDMA

1    LICENSE, THAT WAS CONSIDERED A WCDMA ONLY,

2        OR IF THEY DID NOT HAVE A CDMA LICENSE, SO IT WAS

3    BASICALLY THEIR FIRST LICENSE, THAT WAS KIND OF AT A HIGH

4    LEVEL, THOSE WERE ARE CONSIDERED WCDMA ONLY.

5    Q.   WHY DID YOU DO IT THAT WAY?

6    A.   BECAUSE WE WANTED TO FOCUS ON AGREEMENTS THAT WERE ABOUT

7    WCDMA.

8    Q.   OKAY.  AND HOW DOES DOING THAT -- DOING THE ANALYSIS THAT

9    WAY ACHIEVE THAT GOAL?

10   A.   SO IF -- I THINK IT'S EASIEST TO SEE IF YOU JUST LOOK AT A

11   WCDMA AGREEMENT THAT DID NOT HAVE, OR AN OEM THAT DID NOT HAVE

12   A CDMA BEFORE, THAT'S CLEAR IT'S ONLY WCDMA.  SO THAT'S KIND OF

13   A CLEAR ONE.

14       SIMILARLY, IF IT WAS A, ADDING A WCDMA TO AN OEM THAT

15   ALREADY HAD A CDMA, AGAIN, IT WAS JUST WHAT THE NEW COMPONENT

16   WAS, THE ADDITION OF THE WCDMA.

17   Q.   YOU SAID A NUMBER OF TIMES IN THE EARLIER PART OF THE

18   CROSS-EXAMINATION THAT YOU FOCUSSED ON THE CONTRACTUAL RATE IN

19   THE AGREEMENTS THAT YOU ANALYZED FOR SOME OF YOUR ANALYSIS.

20       WHY DID YOU FOCUS ON THAT PARTICULAR ASPECT OF THE

21   AGREEMENTS?

22   A.   INITIALLY WE FOCUSSED ON THAT BECAUSE THAT IS WHAT THE,

23   THE COMPLAINT AND PROFESSOR SHAPIRO'S INITIAL REPORT WAS REALLY

24   ABOUT, AND THAT'S SOMETHING THAT WE COULD CONSISTENTLY GET FROM

25   THE CONTRACTS, AND THAT'S WHAT WE LOOKED AT.

1          WE ALSO LOOKED -- AND I THINK WE DISCUSSED THIS IN THE

2     UPFRONT FEES -- THAT WAS ANOTHER DIMENSION OF THE CONTRACT THAT

3     WE LOOKED AT.

4     Q.   AND WHAT ASPECT OF QUALCOMM'S CONTRACTS DOES

5     PROFESSOR SHAPIRO ALLEGE IMPOSES A TAX ON QUALCOMM'S RIVALS?

6     A.   I BELIEVE IT IS THE CONTRACTUAL RATE.

7     Q.   YOU WERE ASKED, WITH RESPECT TO YOUR NEAR TERM LTE DEMAND

8     ANALYSIS, YOU WERE ASKED WHETHER YOU LOOKED AT PREMIUM LTE OR

9     NOT.

10         AND I BELIEVE YOU TESTIFIED THAT YOU WEREN'T ABLE TO DO IT

11    ON A PREMIUM LTE BASIS; IS THAT CORRECT?

12    A.   THAT'S -- I THINK THAT'S EXACTLY WHAT I SAID, YES.

13    Q.   OKAY.  CAN YOU EXPLAIN WHY YOU WERE NOT ABLE TO DO IT ON A

14    PREMIUM LTE BASIS AS OPPOSED TO LTE MORE GENERALLY?

15    A.   SO REALLY TWO, TWO REASONS.  ONE IS THAT THE DATA THAT WE

16    USED, THE TRANS LOG DATA, WHICH CONTAINS THE SALES --

17    Q.   WHAT ARE TRANS LOGS?

18    A.   THAT'S, THAT'S THE DATA THAT CONTAINS THE SALES AND THE

19    REPORTING OF THE ROYALTY, THE ACTUAL -- BUT THAT'S ONE OF THE

20    DATA SETS THAT WE USED.

21    Q.   DOES IT STAND FOR TRANSACTION LOG?

22    A.   THAT SOUNDS RIGHT.

23    Q.   OKAY.

24    A.   SORRY.  I'VE BEEN WORKING WITH THAT SO LONG.

25         THAT DATA I BELIEVE DOES NOT, AT LEAST NOT CONSISTENTLY,

1    GO DOWN TO THE EXACT CHIP LEVEL, SO WE CAN'T REALLY BREAK DOWN

2    AS TO THE SALES AT THE CHIP, AT THE CHIP LEVEL AND THEN SEE

3    WHETHER THEY'RE PREMIUMS OR NOT.  SO THAT'S ONE.

4         ANOTHER ISSUE THAT, YOU KNOW, MAYBE IF WE HAD MORE TIME,

5    WE COULD HAVE OVERCOME THE FIRST ONE, MAYBE, I'M NOT SURE.

6         BUT ANOTHER ISSUE THAT WE HAD IS REALLY ONLY ONCE WE GOT

7    PROFESSOR SHAPIRO'S REPORT DID WE ACTUALLY KNOW EXACTLY WHICH

8    CHIPS WERE INCLUDED IN HIS ANALYSIS AND THERE WAS JUST NOT

9    ENOUGH TIME, EVEN IF WE SOMEHOW WERE ABLE TO GET THE DATA, TO

10   REALLY COMPUTE THIS ON A PREMIUM LTE.

11   Q.   THERE WERE ALSO SOME QUESTIONS FROM FTC COUNSEL ABOUT

12    PARTICULAR AGREEMENTS, AND I THINK THIS IS THAT MAYBE DIDN'T

13    MATCH UP IN THE FTC'S VIEW IN TERMS OF THE TEXT OF THE

14    AGREEMENTS AND THE WAY THEY WERE TREATED IN THE DATA.

15        DO YOU RECALL THOSE?

16   A.   YES, I DO.

17   Q.   DID PROFESSOR SHAPIRO, IN HIS OPENING REPORT, DO ANY

18    EMPIRICAL TESTING TO ASSESS WHETHER THE PREDICTIONS OF HIS TAX

19    THEORY ARE BORNE OUT BY THE DATA AT ALL?

20   A.   NOT THAT I CAN RECALL.

21        MR. BORNSTEIN:  NO FURTHER QUESTIONS.

22        THE COURT:  OKAY.  TIME IS 1:24.

23        MR. MATHESON:  JUST A COUPLE.

24        THE COURT:  OKAY.  STILL 1:24.  GO AHEAD, PLEASE.

25   ///

1                      **RECROSS-EXAMINATION**

2    BY MS. MILICI:

3    Q.   SIR, YOU JUST TESTIFIED THAT YOU EXCLUDED AMENDMENTS IF

4    THEY DIDN'T HAVE A NEW CONTRACT NUMBER; CORRECT?

5    A.   WE FOCUSSED THE UNIT OF ANALYSIS AS A CONTRACT NUMBER.

6    Q.   OKAY.  SO THE UNIT OF ANALYSIS IS A CONTRACT NUMBER.  SO

7    YOU DID INCLUDE AMENDMENTS IF THERE WAS A NEW CONTRACT NUMBER,

8    AND YOU DIDN'T INCLUDE AMENDMENTS IF IT DIDN'T HAVE A NEW

9    CONTRACT NUMBER.  IS THAT FAIR?

10   A.   OUR DEFINITION OF A NEW AGREEMENT WAS WE WENT BY THE

11   CONTRACT NUMBER.

12   Q.   OKAY.  DID YOU INVESTIGATE WHAT THE POLICY WAS FOR

13   ASSIGNING A NEW CONTRACT NUMBER?

14   A.   I DID AT SOME POINT, BUT I CAN'T RECALL IT RIGHT NOW.

15   Q.   OKAY.  AND YOU JUST TESTIFIED ABOUT HOW YOU DECIDED ABOUT

16   WHAT THE CATEGORY WCDMA ONLY MEANT IN YOUR CHARTS; IS THAT

17   RIGHT?

18   A.   YES.

19   Q.   AND TO BE CLEAR, IF AN OEM SIGNED AN AGREEMENT THAT

20   CHANGED ITS CDMA RATE AND ADDED WCDMA, YOU WOULD CALL THAT

21   WCDMA ONLY; CORRECT?

22   A.   GENERALLY, YES.  I'D HAVE TO LOOK AT THE SPECIFICS, BUT

23   GENERALLY, YES.

24   Q.   AND YOU DON'T KNOW HOW MANY OF THE CONTRACTS IN YOUR

25   ANALYSIS ACTUALLY DID JUST, JUST ADDRESS WCDMA; RIGHT?

1      A.   AS I SIT HERE TODAY, I CAN'T -- I CAN'T POINT TO THAT.

2      THAT IS A KNOWABLE FACT, BUT I CAN'T POINT TO IT.

3      Q.   IS IT FAIR TO SAY THAT MOST OF THE LICENSES THAT YOU HAVE

4      LOOKED AT INCLUDE BOTH CDMA AND WCDMA IN THE SAME CONTRACT?

5      A.   AS I SIT HERE TODAY, I CAN'T SAY ONE WAY OR THE OTHER.

6      Q.   AND WHEN YOU DID YOUR REGRESSION OF COMPARING WCDMA

7      EFFECTIVE RATES TO LTE PURCHASES, YOU DID NOT LOOK AT WCDMA

8      PURCHASES, DID YOU?

9      A.   I LOOKED FOR THE REASON I EXPLAINED AT LTE PURCHASES.

10     Q.   BUT YOU JUST ASSUMED THAT QUALCOMM DID NOT HAVE MARKET

11     POWER IN WCDMA AND DID NOT TEST THAT; CORRECT?

12     A.   I WENT BY THE ALLEGATIONS.  BUT, YES, BASED ON THE

13     ALLEGATIONS -- I TOOK THE ALLEGATIONS AS GIVEN, YES.

14     Q.   OKAY.  AND YOU DID NOT DO ANY INVESTIGATION AS TO WHETHER

15     THERE WAS MARKET POWER AT ANY TIME; CORRECT?

16     A.   I TOOK THE ALLEGATIONS AS GIVEN AND DID NOT DO ANY

17     ADDITIONAL ANALYSIS.

18              MS. MILICI:  OKAY.  THANK YOU.

19              THE COURT:  OKAY.  TIME IS 1:26.

20              MR. BORNSTEIN:  NOTHING FURTHER, YOUR HONOR.

21              THE COURT:  OKAY.

22              MR. BORNSTEIN:  PROFESSOR NEVO IS --

23              THE COURT:  CAN I JUST ASK -- I WON'T CHARGE ANYONE

24     TIME.  MUCH THESE GOVERNMENT AGREEMENTS, WHICH GOVERNMENT IS

25     THESE?  IS THIS THE NCKRD?

1          MR. BORNSTEIN:  SHOULD WE LET PROFESSOR NEVO ANSWER

2     THAT QUESTION, YOUR HONOR?

3          THE COURT:  IF HE KNOWS THE ANSWER.

4       DO YOU KNOW THE ANSWER?  HE'S KIND OF ACTING LIKE HE

5     DIDN'T KNOW WHICH KOREAN LICENSES, BUT IF YOU DO, GO AHEAD.

6          THE WITNESS:  OH.  SO THERE'S THE KOREAN GOVERNMENT

7     AGREEMENT, AND THERE'S TWO SEPARATE AGREEMENTS WITH THE CHINESE

8     GOVERNMENT.

9          THE COURT:  OKAY.  AND HOW MANY LICENSES ARE UNDER

10    EACH GOVERNMENT?

11         THE WITNESS:  I'M NOT SURE.  I CAN'T RECALL AS I SIT

12    HERE TODAY, AND I'M TRYING TO REMEMBER IF -- IT'S PROBABLY

13    DENOTED WHERE SOMEWHERE IN MY REPORT, BUT IT WOULD TAKE ME TIME

14    TO PULL THAT UP.

15         THE COURT:  OKAY.

16         MR. BORNSTEIN:  IF THE COURT IS INTERESTED, WE CAN

17    PROVIDE THAT SEPARATELY LATER.

18         THE COURT:  NO, IT'S OKAY.  I JUST DIDN'T UNDERSTAND

19    WHAT THE UNIVERSE OF THIS WAS.

20       OKAY.  WHEN YOU SAY THERE'S TWO CHINESE GOVERNMENT

21    GROUPINGS, WHAT DOES THAT MEAN?

22         THE WITNESS:  SO IF I MAY, IF WE CAN JUST PULL UP --

23    THERE'S MORE DESCRIPTION.  THERE'S TWO SEPARATE TIME PERIODS IN

24    WHICH THE AGREEMENTS WERE REACHED.

25         AND I THINK THE -- SO IF WE LOOK AT THE CDMA AT EXHIBIT 4,

1       OR SORRY, PAGE 4, THE CDMA CONTRACTUAL RATES, THERE'S ONE I

2       REFER TO AS CPLA, MEANING THERE'S A CHINESE FRAMEWORK

3       AGREEMENT.

4                   THE COURT:  OKAY.

5                   MR. BORNSTEIN:  AND TO ANSWER YOUR HONOR'S QUESTION,

6       CPLA'S ARE THE ONES THAT RELATE TO THE NDRC PROCEEDINGS IN

7       CHINA.

8                   THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

9            ALL RIGHT.  IS THIS WITNESS SUBJECT TO RECALL OR NOT

10      SUBJECT TO RECALL?

11                  MR. BORNSTEIN:  NOT SUBJECT TO RECALL BY QUALCOMM.

12                  MS. MILICI:  NOT BY THE FTC.

13                  THE COURT:  OKAY.  THEN YOU HAVE COMPLETED YOUR TRIAL

14      TESTIMONY, AND YOU ARE FREE TO STEP DOWN.

15                  THE WITNESS:  THANK YOU.

16                  THE COURT:  PLEASE CALL YOUR NEXT WITNESS.

17           OH, IS THIS GOING TO BE A DEPOSITION?

18                  MR. BYARS:  IT IS, YOUR HONOR.

19                  THE COURT:  OKAY.  AND IT'S NOT SEALED, SO WE'RE

20      GOOD.

21                  MR. BYARS:  NOT SEALED.  THIS IS CHRISTINA PETERSSON

22      OF ERICSSON.  IT'S ABOUT SEVEN MINUTES LONG.  THE EXHIBITS THAT

23      WILL BE IN YOUR HONOR'S BINDER ARE ALREADY ADMITTED.

24                  THE COURT:  OKAY.  1:29.  GO AHEAD, PLEASE.

25      ///

```
 1          (THE VIDEOTAPED DEPOSITION OF CHRISTINA PETERSSON WAS

 2     PLAYED IN OPEN COURT OFF THE RECORD.)

 3               THE COURT:  OKAY.  TIME IS 1:36.  OKAY.  WHO'S YOUR

 4     NEXT WITNESS?

 5               MR. BYARS:  YOUR HONOR, NEXT IS RENEE MCELVAINE OF

 6     INTERDIGITAL.

 7               THE COURT:  OKAY.  DO YOU WANT TO INTRODUCE EXHIBITS

 8     WITH HER?

 9               MR. BYARS:  I DO, YOUR HONOR.

10               THE COURT:  OKAY.  THEN JUST GIVE ME ONE MINUTE.

11          ALL RIGHT.  GO AHEAD, PLEASE.  TIME IS 1:36.

12               MR. BYARS:  I OFFER INTO EVIDENCE QX 3502.

13               MR. CARSON:  NO OBJECTION.

14               THE COURT:  ANY OBJECTION?

15               MR. CARSON:  NO OBJECTION.

16               THE COURT:  DID YOU SAY NO OBJECTION?

17               MR. CARSON:  NO OBJECTION.

18               THE COURT:  OKAY.  IT'S ADMITTED.

19          (DEFENDANT'S EXHIBIT QX 3502 WAS ADMITTED IN EVIDENCE.)

20               MR. BYARS:  THANK YOU, YOUR HONOR.

21               THE COURT:  OKAY.  I DON'T WANT TO CHARGE YOU FOR THE

22     SAME MINUTE TWICE, SO ARE YOU READY TO START YOUR VIDEO?

23               MR. BYARS:  WE ARE.

24               THE COURT:  OKAY.  1:37.

25     ///
```

1          **(THE VIDEOTAPED DEPOSITION OF RANAE MCELVAINE WAS PLAYED**

2     **IN OPEN COURT OFF THE RECORD.)**

3                    THE COURT:  OKAY.  TIME IS 1:39.  I FORGOT TO ASK,

4     FOR MS. PETERSSON, IS SHE SUBJECT TO RECALL OR NOT?

5                    MR. BYARS:  NOT SUBJECT TO RECALL BY QUALCOMM.

6                    MS. MILICI:  NOT BY THE FTC.

7                    THE COURT:  ALL RIGHT.  AND THEN WHAT ABOUT

8     MS. MCELVAINE, IS SHE --

9                    MR. BYARS:  NOT SUBJECT TO RECALL.

10                   MS. MILICI:  NOT BY THE FTC.

11                   THE COURT:  OKAY.  SO BOTH OF THOSE ARE NO.

12         ALL RIGHT.  GO AHEAD AND CALL YOUR NEXT WITNESS, PLEASE.

13    IS THIS A SEALED ONE.

14                   MR. BYARS:  THE TESTIMONY IS NOT SEALED, BUT THE

15    DOCUMENT IS SEALED, SO I'LL COVER THE PROJECTOR.

16                   THE COURT:  THAT WORKS.  ALL RIGHT.

17                   MR. BYARS:  THIS IS ILKKA RAHNASTO OF NOKIA, YOUR

18    HONOR.

19                   THE COURT:  DO YOU HAVE A SEPARATE BINDER FOR HER?

20    OKAY.  THANK YOU.  AND ARE YOU SEEKING TO ADMIT ANY EXHIBITS

21    WITH HER?

22                   MR. BYARS:  I AM, YOUR HONOR.

23                   THE COURT:  OKAY.  TIME IS 1:40.  GO AHEAD, PLEASE.

24                   MR. BYARS:  I OFFER INTO EVIDENCE QX 2778.

25                   THE COURT:  ALL RIGHT.  ANY OBJECTION?

ILKKA DEPOSITION                                                    1969

```
 1              MR. CARSON:  NO OBJECTION, YOUR HONOR.

 2              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

 3         (DEFENDANT'S EXHIBIT QX 2778 WAS ADMITTED IN EVIDENCE.)

 4              THE COURT:  GO AHEAD, PLEASE.

 5         (THE VIDEOTAPED DEPOSITION ILKKA RAHNASTO WAS PLAYED IN

 6    OPEN COURT OFF THE RECORD.)

 7              THE COURT:  OKAY.  TIME IS 1:42.

 8              MR. VAN NEST:  YOUR HONOR, QUALCOMM CALLS

 9    MR. ALEX ROGERS.

10              THE COURT:  OH, LET ME ASK, WITH REGARD TO

11    MR. RAHNASTO, IS HE SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

12              MR. BYARS:  NOT SUBJECT, YOUR HONOR.

13              MS. MILICI:  NOT SUBJECT.

14              THE COURT:  OKAY.  THANK YOU.

15              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

16         (DEFENDANT'S WITNESS, ALEX ROGERS, WAS SWORN.)

17              THE WITNESS:  YES, I DO.

18              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

19         WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

20    NAME FOR THE RECORD.

21              THE WITNESS:  ALEX ROGERS.  R-O-G-E-R-S.

22              THE COURT:  ALL RIGHT.  TIME IS 1:43.  GO AHEAD,

23     PLEASE.

24              MR. VAN NEST:  THANK YOU, YOUR HONOR.

25     ///
```

1                        **DIRECT EXAMINATION**

2       BY MR. VAN NEST:

3       Q.   MR. ROGERS, PLEASE INTRODUCE YOURSELF TO THE COURT.

4       A.   YOUR HONOR, MY NAME IS ALEX ROGERS.

5       Q.   WHERE DO YOU WORK?

6       A.   I WORK AT QUALCOMM.

7       Q.   WHAT DO YOU DO THERE?

8       A.   I AM THE PRESIDENT OF QUALCOMM TECHNOLOGY LICENSING.

9       Q.   HOW LONG HAVE YOU HAD THAT ROLE?

10      A.   SINCE THE END OF 2016.

11      Q.   WHO DO YOU REPORT TO?

12      A.   I REPORT TO STEVE MOLLENKOPF.  HE'S THE CEO.

13      Q.   CAN YOU GIVE US A BRIEF SUMMARY OF YOUR EDUCATIONAL

14      BACKGROUND, MR. ROGERS?

15      A.   YES.  I GRADUATED FROM GEORGETOWN UNIVERSITY,

16      UNDERGRADUATE DEGREE IN LITERATURE OF THEOLOGY.  GOT A MASTER'S

17      DEGREE FROM GEORGETOWN UNIVERSITY, AND THEN FINISHED UP AT

18      GEORGETOWN UNIVERSITY LAW SCHOOL.

19      Q.   HOW LONG HAVE YOU WORKED AT QUALCOMM?

20      A.   SINCE JANUARY OF 2001.

21      Q.   AND CAN YOU BRIEFLY OUTLINE FOR THE COURT YOUR CAREER AT

22      QUALCOMM PRIOR TO TAKING OVER QTL?

23      A.   YES.  I STARTED AS SENIOR LEGAL COUNSEL MANAGING

24      LITIGATION MATTERS, WAS PROMOTED A FEW TIMES, AND THEN

25      EVENTUALLY TOOK THE ROLE AS INTERIM GENERAL MANAGER OF THE

1        LICENSING GROUP IN MARCH OF 2016.

2             AND THEN AT THE END OF 2016, THE OCTOBER/NOVEMBER

3        TIMEFRAME, I TOOK THE ROLE AS PRESIDENT OF QTL.

4        Q.   AND WHAT RESPONSIBILITIES DO YOU HAVE AS THE PRESIDENT OF

5        QTL?

6        A.   WELL, I HAVE GENERAL SUPERVISORY RESPONSIBILITIES OVER THE

7        MANAGEMENT OF THE ENTIRE BUSINESS, THE LICENSE AGREEMENTS, THE

8        P&L OF THE BUSINESS.

9        Q.   AND DOES THAT ALSO INVOLVE PARTICIPATING IN DEVELOPING NEW

10       LICENSING PROGRAMS?

11       A.   YES, IT DOES.

12       Q.   ARE YOU RESPONSIBLE FOR MANAGING EXISTING LICENSE PROGRAMS

13       AS WELL?

14       A.   YES, I AM.

15       Q.   CAN YOU TELL US HOW QTL IS RELATED TO QCT, THE CHIP

16       BUSINESS?

17       A.   SO QTL IS THE TECHNOLOGY LICENSING ARM OF QUALCOMM, AND

18       IT'S A SEPARATE BUSINESS THAT'S RUN WITH SEPARATE MANAGERS FROM

19       QCT.  WE HAVE SEPARATE ACCOUNTING, SEPARATE P&L.

20            AND SO QCT HAS ITS OWN SET OF MANAGEMENT.  QTL HAS ITS OWN

21       SET OF MANAGEMENT.  WE'RE TWO SEPARATE BUSINESSES WITHIN THE

22       SAME CORPORATE STRUCTURE.

23       Q.   AND, MR. ROGERS, DO YOU PERSONALLY HAVE ANY RESPONSIBILITY

24       FOR QCT OR THE CHIP BUSINESS?

25       A.   I DO NOT.

1    Q.   AT A HIGH LEVEL, HOW WOULD YOU DESCRIBE THE BUSINESS OF

2    QTL?

3    A.   SO QTL IS THE COMMERCIALIZATION ARM OF QUALCOMM'S RESEARCH

4    AND DEVELOPMENT ACTIVITIES.  AND THE WAY I WOULD DESCRIBE IT IS

5    THAT QUALCOMM IS ESSENTIALLY A TECHNOLOGY DEVELOPMENT COMPANY,

6    AND WE DEVELOP ESSENTIAL TECHNOLOGIES FOR CELLULAR SYSTEMS.  WE

7    CONDUCT RESEARCH AND DEVELOPMENT THAT LEADS TO THE INNOVATIONS

8    THAT LEAD TO THE DEVELOPMENT OF THE CELLULAR SYSTEMS.

9         WE TAKE THIS TECHNOLOGY DEVELOPMENT, THIS R&D, AND WE PUSH

10   IT INTO THE INDUSTRY PRIMARILY THROUGH STANDARDS ORGANIZATIONS.

11        AND THEN WE ALSO PATENT THE INNOVATIONS ASSOCIATED WITH

12   THAT SYSTEMWIDE DEVELOPMENT ACTIVITY AND OTHER ACTIVITIES.

13        AND THEN QTL TAKES THE OUTPUT OF THAT, THE INTELLECTUAL

14   PROPERTY, THE PATENT PORTFOLIO, AND WE LICENSE THAT FOR

15   LICENSING REVENUE, AND THEN WE PUT THAT REVENUE BACK INTO

16   RESEARCH AND DEVELOPMENT AND TECHNOLOGY AND INNOVATION.

17   Q.   AND AS OF MARCH OF 2018, CAN YOU DESCRIBE FOR US, JUST IN

18   GENERAL, THE TYPES OF LICENSES THAT QTL OFFERED TO LICENSEES?

19   A.   SO GENERALLY WE OFFER PORTFOLIO WIDE LICENSES THAT INCLUDE

20   CELLULAR STANDARD ESSENTIAL PATENT LICENSES, AS WELL AS PATENTS

21   RELATED TO OTHER STANDARDS OUTSIDE OF CELLULAR, AS WELL AS

22   NON-ESSENTIAL PATENTS.

23        SO OUR PORTFOLIO WIDE LICENSING PROGRAM IS AT A CERTAIN

24   RATE, 5 PERCENT.

25        AND THEN IN ADDITION TO THAT, WE ALSO OFFER CELLULAR

1    STANDARD ESSENTIAL PORTFOLIO LICENSES, THAT IS, SEP ONLY

2    LICENSES AS WELL.

3    Q.   AND ARE THOSE SEP LICENSES RELEVANT TO MORE THAN ONE

4    GENERATION OF THE CELLULAR STANDARDS?

5    A.   YES.  THOSE LICENSES WILL COVER 2G, 3G, 4G, AND NOW 5G.

6    Q.   NOW, DOES QTL OFFER ANY OTHER SERVICES TO LICENSEES?

7    A.   YES, WE DO.  WE FUND A GROUP WITHIN QUALCOMM CALLED ESG,

8    ENGINEERING SERVICES GROUP, AND THAT GROUP ACTUALLY OFFERS

9    SERVICES TO CARRIERS, INFRASTRUCTURE EQUIPMENT MANUFACTURERS,

10   HANDSET AND DEVICE MANUFACTURERS TO HELP THEM IMPLEMENT NEW

11   TECHNOLOGIES.

12       BUT IN ADDITION, QTL ALSO HAS A SMALL GROUP OF ENGINEERS

13   AND WE WORK WITH, WITH LICENSEES TO HELP THEM UNDERSTAND NEW

14   TECHNOLOGIES, TO HELP THEM IMPROVE ASPECTS OF THEIR PRODUCTS

15   AND BRING THEM TO MARKET.

16       AND WE ALSO FUND DIFFERENT LABS IN DIFFERENT PLACES AROUND

17   THE WORLD, INCLUDING THE U.S., CHINA, TAIWAN, INDIA, WHERE WE

18   HELP LICENSEES ESSENTIALLY DEVELOP TECHNOLOGIES FOR THEIR

19   PRODUCTS AND HELP THEM BRING THEM TO MARKET.

20   Q.   AND THESE ENGINEERING SERVICES, ARE THEY AVAILABLE TO

21   LICENSEES WHO DON'T PURCHASE ANY QUALCOMM CHIPS?

22   A.   YES.  YOU JUST NEED TO BE A LICENSEE.

23   Q.   AND WHAT IS THE BENEFIT OF THIS PROGRAM TO QTL?

24   A.   WELL, THE MORE THAT WE CAN HELP LICENSEES BRING PRODUCT TO

25   MARKET, PARTICULARLY MORE QUICKLY, AND PRODUCTS THAT WILL BE

1      SUCCESSFUL, THE BETTER OFF WE ARE AS A LICENSING BUSINESS.

2          IN ADDITION, WE WANT TO BRING NEW COMPANIES TO MARKET.  WE

3      WANT TO BRING SMALLER, STARTUP COMPANIES THAT WANT TO GET INTO

4      THE MARKET.  WE WANT TO HELP THEM SUCCEED IN GETTING THEIR

5      PRODUCTS INTO THE MARKET SUCCESSFULLY.

6      Q.   MR. ROGERS, HAVE YOU PERSONALLY PARTICIPATED IN LICENSING

7      NEGOTIATIONS ON BEHALF OF QTL?

8      A.   YES, I HAVE.

9      Q.   IN GENERAL TERMS, CAN YOU DESCRIBE HOW QTL APPROACHES

10     LICENSING NEGOTIATIONS?

11     A.   SO NEGOTIATIONS ARE DIFFERENT DEPENDING ON THE LICENSEE.

12     WE HAVE CERTAIN TERMS THAT WE OFFER.

13         BUT ONCE YOU GET INTO A LICENSING NEGOTIATION, A LOT

14     DEPENDS ON WHAT THE LICENSEE IS INTERESTED IN, AND THE GIVE AND

15     TAKE BETWEEN QUALCOMM AND THE LICENSEE.

16         SO IT DEPENDS ON THE PRODUCT THAT THEY'RE INTERESTED IN,

17     THE SCOPE OF THE LICENSE THAT THEY MAY BE INTERESTED IN, AND

18     OTHER FACTORS THAT AFFECT THEIR BUSINESS.

19     Q.   DOES QTL TYPICALLY NEGOTIATE IN TEAMS?

20     A.   YES.  WE HAVE LICENSING MANAGERS, AND THAT SET OF FOLKS IS

21     LED BY OUR GENERAL MANAGER, JOHN HAN -- H-A-N, YES -- AND WE

22     ALSO HAVE LAWYERS WITHIN QTL THAT GET INVOLVED IN THE LICENSING

23     DISCUSSIONS, AND SOMETIMES SOME OF OUR ENGINEERS WITHIN QTL

24     WILL GET INVOLVED IN THE LICENSING DISCUSSIONS AS WELL.

25     Q.   AND HOW ABOUT ON THE LICENSEE'S SIDE?  HOW ARE THEIR TEAMS

1    TYPICALLY FORMED?

2    A.   SO THEY'RE TYPICALLY REPRESENTED BY THE SAME TYPES OF

3    FOLKS WITH THE SAME TYPES OF EXPERTISE.  THEY'LL HAVE BUSINESS

4    PEOPLE INVOLVED, THEY'LL HAVE INHOUSE LAWYERS INVOLVED, THEY

5    MAY HAVE ENGINEERING FOLKS INVOLVED AS WELL.  AND SOMETIMES

6    THEY MAY ALSO HAVE OUTSIDE COUNSEL INVOLVED.

7    Q.   HOW LONG DO NEGOTIATIONS FOR LICENSING AGREEMENTS

8    TYPICALLY LAST?

9    A.   SO THEY CAN LAST, IT'S VERY -- IT'S VARIED.  THEY CAN BE

10   WEEKS, WHICH WOULD BE VERY QUICK.  BUT THEY CAN LAST FOR

11   MONTHS, AND SOME CAN EVEN LAST FOR YEARS.

12   Q.   NOW, FROM TIME TO TIME DO LICENSEES ASK QTL TO RENEGOTIATE

13   EXISTING LICENSES?

14   A.   YES, THEY DO.

15   Q.   WHAT CIRCUMSTANCES WOULD OCCASION THAT?

16   A.   SO THEY MAY HAVE A CHANGE IN THEIR BUSINESS, THEY MAY HAVE

17   STOPPED SELLING PRODUCTS, THEY MAY WANT TO ADD CERTAIN PRODUCTS

18   THAT ARE UNLICENSED, THEY MAY WANT TO RENEGOTIATE THE SCOPE OF

19   A PARTICULAR LICENSE.

20       THERE ARE ANY VARIETY OF FACTORS THAT CAN CAUSE A LICENSEE

21   TO WANT TO RENEGOTIATE A LICENSE.

22   Q.   WHAT LEVERAGE, IF ANY, ARE LICENSEES ABLE TO EXERT OVER

23   QUALCOMM IN THESE LICENSING NEGOTIATIONS.

24   A.   I THINK THE MOST TYPICAL WOULD BE EITHER TO STOP PAYING OR

25   TO THREATEN TO STOP PAYING.

1    Q.   AND IN YOUR TIME AS THE PRESIDENT OF QTL, HAVE LICENSEES

2    DONE EXACTLY THAT?

3    A.   YES, THEY HAVE.  WHEN I FIRST TOOK OVER AS INTERIM GENERAL

4    MANAGER IN THE 2016 TIMEFRAME, THERE WERE A NUMBER OF LICENSEES

5    IN CHINA, FOR EXAMPLE, THAT HAD STOPPED PAYING UNDER THEIR

6    EXISTING AGREEMENTS.

7         AND IN ADDITION, APPLE HAS RECENTLY CAUSED ITS CONTRACT

8    MANUFACTURERS TO STOP PAYING.

9         AND WE HAVE ANOTHER LICENSEE THAT IS A FAIRLY SIGNIFICANT

10   LICENSEE THAT HAS STOPPED PAYING FOR SOME PERIOD OF TIME AND IS

11   NOW IN A PARTIAL PAY SITUATION.

12   Q.   AND WHEN THAT HAPPENS, DO NEGOTIATIONS TYPICALLY CONTINUE?

13   A.   YES.  WHEN THAT HAPPENS, NEGOTIATIONS DO CONTINUE.

14   Q.   AND IN ANY OF THESE INSTANCES THAT YOU MENTIONED, DID

15   QUALCOMM INTERRUPT CHIP SUPPLY OR THREATEN TO INTERRUPT CHIP

16   SUPPLY TO THE LICENSEES?

17   A.   NO.

18   Q.   MR. ROGERS, HOW OFTEN ARE LICENSING AGREEMENTS AND CHIP

19   SALE AGREEMENTS NEGOTIATED AT THE SAME TIME?

20   A.   SO THESE AGREEMENTS ARE NEGOTIATED ACCORDING TO WHAT I

21   WOULD CALL A DIFFERENT PACE OF PLAY.  SO IT'S ACTUALLY PRETTY

22   RARE THAT THAT WOULD OVERLAP.

23        ON THE LICENSING SIDE, WE NEGOTIATE AGREEMENTS THAT ARE

24   GOING TO LAST FOR YEARS.

25        ON THE CHIP SIDE, THEY HAVE A VERY FAST PACE OF PLAY WHERE

1        THEY GO THROUGH THEIR PURCHASE ORDER AND THEIR PRICING AT A

2        MUCH MORE RAPID PACE.

3               SO THESE DON'T TYPICALLY OVERLAP.

4        Q.   I WANT TO TALK WITH YOU FOR JUST A MINUTE ABOUT FRAND.

5               HAS QUALCOMM MADE FRAND COMMITMENTS TO VARIOUS STANDARD

6        SETTING ORGANIZATIONS?

7        A.   YES, WE HAVE.

8        Q.   AND WHEN YOU CONSIDER QTL'S FRAND OBLIGATIONS IN THE

9        CONTEXT OF THE CELLULAR STANDARD SETTING, DO YOU HAVE A

10       PARTICULAR I.P. POLICY IN MIND?

11       A.   YES.  I TYPICALLY LOOK TO THE ETSI IPR POLICY.

12       Q.   AND WHY IS THAT?

13       A.   WELL, FROM MY PERSPECTIVE, AND I THINK FROM QUALCOMM'S

14       PERSPECTIVE, THE ETSI STANDARD SETTING ORGANIZATION IS THE

15       PRIMARY ORGANIZATION FOR CELLULAR STANDARDS ACTIVITIES WITHIN

16       3GPP.

17              AND IN ADDITION, THE ETSI IPR POLICY IS, FROM MY

18       PERSPECTIVE, KIND OF THE CENTRAL IPR POLICY FOR FRAND

19       COMMITMENTS FOR CELLULAR STANDARD ESSENTIAL PATENTS.

20       Q.   AND BASED ON YOUR UNDERSTANDING OF ETSI'S POLICIES, ARE

21       QTL'S LICENSING PRACTICES CONSISTENT WITH THOSE OBLIGATIONS?

22       A.   YES, THEY ARE.

23       Q.   HOW SO?

24       A.   WELL, WE LICENSE AT THE EQUIPMENT LEVEL, SO, FOR EXAMPLE,

25       THAT WOULD BE A SMARTPHONE OR A HANDSET.

1     AND WE LICENSE ON FAIR AND REASONABLE TERMS, AND WE

2     LICENSE ON NON-DISCRIMINATORY TERMS.

3     AND SO IN OUR VIEW, OUR LICENSING PRACTICES ARE CONSISTENT

4     WITH ETSI'S IPR POLICY.

5     Q.   HOW DOES QUALCOMM MAKE ITS STANDARD ESSENTIAL PATENTED

6     TECHNOLOGY AVAILABLE TO OTHER CHIP MAKERS?

7     A.   SO WE DON'T LICENSE AT THE COMPONENT LEVEL, WHICH IS NOT

8     REQUIRED UNDER THE ETSI IPR POLICY.  BUT THE WAY THE TECHNOLOGY

9     IS MADE AVAILABLE IS WE WORK ON UNDERLYING TECHNOLOGY, THAT

10    FINDS ITS WAY INTO THE SPECIFICATIONS THAT THEN BECOME

11    STANDARDIZED.

12    AND THEN BASICALLY EVERYBODY IN THE INDUSTRY HAS ACCESS TO

13    THAT.  THOSE STANDARDS ARE PUBLISHED, ANYBODY CAN ACCESS THOSE

14    SPECIFICATIONS.

15    AND QUALCOMM DOESN'T DO ANYTHING WITH RESPECT TO COMPONENT

16    MANUFACTURERS TO IN ANY WAY PRECLUDE THAT ACCESS.

17    Q.   MR. ROGERS, IN LATE 2017, DID QTL ANNOUNCE A NEW STANDARD

18    LICENSING PROGRAM FOR 5G CELLULAR PATENTS?

19    A.   YES, WE DID.

20    Q.   AND CAN YOU DESCRIBE FOR THE COURT WHAT THE PUBLISHED

21    ROYALTY RATES ARE UNDER THAT PROGRAM?

22    A.   YES.  SO WHAT WE ANNOUNCED IN NOVEMBER OF 2017 WAS A

23    LICENSING FRAMEWORK THAT WOULD INCLUDE 5G, AND OF COURSE WE

24    STILL HAVE OUR FULL PORTFOLIO AGREEMENT AT 5 PERCENT, WHICH

25    WOULD INCLUDE STANDARD ESSENTIAL PATENTS AND THE REST OF OUR

1        PORTFOLIO, INCLUDING NON-ESSENTIAL PATENTS.

2             BUT WITH RESPECT TO SEP ONLY LICENSE AGREEMENTS, FOR 5G

3        MULTIMODE DEVICES, THE RATE WAS 3.25 PERCENT, AND FOR SINGLE

4        MODE DEVICES, RATE WAS 2.275 PERCENT.

5             THAT WAS THE RATE THAT WAS ANNOUNCED -- THOSE WERE THE

6        RATES THAT WERE ANNOUNCED IN NOVEMBER AND THOSE WERE THE RATES

7        THAT CONTINUED THROUGH -- THAT CONTINUED.

8        Q.   ALL RIGHT.  AND EXPLAIN TO THE COURT THE DIFFERENCE

9        BETWEEN THE MULTIMODE STANDARD ESSENTIAL PROGRAM AND THE SINGLE

10       MODE PROGRAM.  WHAT'S THE DIFFERENCE BETWEEN THOSE TWO?

11       A.   SO THE BASIC DIFFERENCE IS THAT WHEN WE SAY MULTIMODE,

12       THAT MEANS THAT FOR A DEVICE THAT PRACTICES 3G STANDARDS AND 4G

13       STANDARDS AND IN THIS CASE THE FIRST RELEASE OF 5G, THAT DEVICE

14       WOULD BE FULLY LICENSED UNDER THE SEP ONLY LICENSE AGREEMENT AT

15       3.25 PERCENT.

16       Q.   ARE THESE RATES ALL SUBJECT TO A CAP?

17       A.   YES, THEY ARE.

18       Q.   WHAT IS THE CAP?

19       A.   SO AT THE TIME, THE RATES WOULD BE APPLIED TO THE NET

20       SELLING PRICE OF A DEVICE.  AT THE TIME THE CAP FOR THE DEVICE

21       WAS $500.  THAT WAS IN NOVEMBER OF 2017.

22            BUT AT THE PRESENT TIME, AS OF JANUARY 2018, THE CAP WAS

23       REDUCED FROM $500 TO $400.

24            AND TO EXPLAIN THAT VERY BRIEFLY, VERY SIMPLY, YOUR HONOR,

25       IF A DEVICE WAS ACTUALLY SOLD ON THE MARKET FOR $800, THE

1    ROYALTY RATE WOULD ONLY BE APPLIED UP TO $400.  THAT WOULD CAP

2    THE NET SELLING PRICE OF THE DEVICE.

3    Q.   AND IN A TYPICAL LICENSE FOR A HANDSET PRODUCT, WHAT

4    ROYALTY BASE IS APPLIED?

5    A.   SO IT'S THE NET SELLING PRICE OF THE HANDSET ITSELF, SO

6    THE SMARTPHONE ITSELF WHEN IT'S SOLD BY, YOU KNOW, FOR EXAMPLE,

7    SAMSUNG TO A THIRD PARTY.

8    Q.   AND IS THAT TYPICAL ACROSS MOST OF YOUR LICENSES?

9    A.   YES.

10   Q.   NOW, HOW DID YOU ARRIVE AT THIS OFFER IN LATE 2017?  WHAT

11   WAS THE GENESIS OF IT?

12   A.   SO WE DEVELOPED THIS LICENSING FRAMEWORK IN CHINA

13   FOLLOWING THE RESOLUTION OF THE NDRC ACTION IN CHINA IN

14   FEBRUARY OF 2015.

15        IN FEBRUARY OF 2015 WHEN WE RESOLVED THE NDRC ACTION,

16   THERE WAS A RECTIFICATION PLAN THAT WAS PUT IN PLACE WHEREBY

17   CHINA'S -- QUALCOMM'S LICENSING PROGRAM IN CHINA WOULD PROCEED

18   UNDER CERTAIN TERMS AND CONDITIONS.

19        AND THE PROGRAM THAT WE DEVELOPED IN CHINA WAS ESSENTIALLY

20   ACCORDING TO THE SAME LICENSING FRAMEWORK I JUST DESCRIBED.  IT

21   WAS 3 AND A QUARTER PERCENT FOR MULTIMODE DEVICES, 3G, 4G

22   BRANDED DEVICES, THROUGH A PARTICULAR RELEASE OF 4G AT THAT

23   POINT IN TIME, RELEASE 11.

24        AND THEN WE BUILT A LICENSING PROGRAM IN CHINA BASED ON

25   THOSE TERMS, AND AS OF NOVEMBER 2017 WHEN WE ANNOUNCED OUR 5G

1    RATE, WE HAD BUILT THAT LICENSING PROGRAM UP TO ABOUT 150

2    AGREEMENTS BY THAT POINT IN TIME.

3        AND SO WE TOOK THAT SAME LICENSING PROGRAM AND SIMPLY

4    EXTENDED IT TO APPLY THE SAME RATES INSIDE OF CHINA AND OUTSIDE

5    OF CHINA, AND ALSO INCLUDED ADDITIONAL TECHNOLOGIES, THAT IS,

6    THE LATER RELEASES OF 4G AND THE FIRST RELEASE OF 5G.

7    Q.   OKAY.  LET'S BACK UP JUST A LITTLE BIT, MR. ROGERS.

8        TELL THE COURT, WHAT IS THE NDRC?

9    A.   SO THE NDRC IS THE AGENCY IN CHINA THAT IS RESPONSIBLE, AT

10   LEAST WAS AT THAT TIME, RESPONSIBLE FOR CERTAIN -- ESSENTIALLY

11   MANAGING THE ANTI MONOPOLY LAW IN CHINA, AT LEAST THE PARTS OF

12   IT THAT APPLIED.

13       SO THE NDRC WAS THE AGENCY THAT ESSENTIALLY CONDUCTED THE

14   INVESTIGATION OF QUALCOMM'S LICENSING PROGRAM IN CHINA.

15   Q.   NOW, YOU MENTIONED THE RECTIFICATION PLAN CAME INTO BEING

16   IN 2015.  WHAT IS THE RECTIFICATION PLAN?

17   A.   SO WHEN THAT INVESTIGATION CONCLUDED, IT CONCLUDED WITH A

18   PLAN THAT ESSENTIALLY WAS THE PLAN UNDER WHICH QUALCOMM'S

19   LICENSING PROGRAM WOULD PROCEED IN CHINA.

20       AND THE RECTIFICATION PLAN IS THE NAME OF THAT PLAN.

21       AND ESSENTIALLY THE RECTIFICATION PLAN SET THE TERMS AND

22   THE RESTRICTIONS UNDER WHICH CHINA -- EXCUSE ME -- UNDER WHICH

23   QUALCOMM COULD LICENSE IN CHINA, AND IT APPLIED TO OUR CHINESE

24   CELLULAR ESSENTIAL, CELL STANDARD ESSENTIAL PATENTS, AND IT

25   APPLIED TO DEVICES MADE AND USED -- EXCUSE ME -- MADE AND SOLD

ROGERS DIRECT BY MR. VAN NEST

1   FOR USE IN CHINA.

2   Q.   DID THE PLAN APPLY OUTSIDE OF CHINA?

3   A.   NO, IT DID NOT.

4        BUT THE -- THE LICENSES THAT WERE AVAILABLE UNDER THAT

5   PLAN, WHICH WE CALL CHINESE PATENT LICENSE AGREEMENTS, CPLA'S,

6   WERE MADE AVAILABLE TO EVERYBODY IN THE WORLD FOR DEVICES MADE

7   AND SOLD FOR USE IN CHINA.

8   Q.   NOW, YOU MAY HAVE TOLD US THIS, BUT AS OF MARCH OF 2018,

9   HOW MANY LICENSEES HAD SIGNED UP FOR THE CPLA AS YOU DESCRIBED?

10  A.   WELL, AS OF NOVEMBER OF 2017, IT WAS -- WE HAD AT LEAST

11  150 AGREEMENTS.  AND SO BY MARCH OF 2018, WE HAD A SIGNIFICANT

12  ADDITIONAL NUMBER.  I COULDN'T TELL YOU IF IT'S OVER 200 BY

13  THAT POINT IN TIME.

14  Q.   NOW, DID ANY COMPANY THAT WAS ELIGIBLE FOR A CPLA SEP

15  LICENSE ELECT TO KEEP THEIR EXISTING FULL PORTFOLIO LICENSE IN

16  PLACE?

17  A.   YES.

18  Q.   HOW MANY COMPANIES DID THAT?

19  A.   I DON'T KNOW THE EXACT NUMBER, BUT THERE WERE A

20  SIGNIFICANT NUMBER OF COMPANIES THAT DID ELECT TO KEEP THEIR

21  FULL PORTFOLIO LICENSE.  THERE WERE COMPANIES FROM KOREA,

22  JAPAN, TAIWAN THAT CHOSE TO KEEP THEIR FULL PORTFOLIO LICENSES.

23  Q.   NOW, UNDER THE RECTIFICATION PLAN, DOES THE PLAN REQUIRE

24  QUALCOMM TO LICENSE AT THE COMPONENT LEVEL?

25  A.   NO, IT DOES NOT.

1    Q.   DOES THE PLAN ALLOW QUALCOMM TO LICENSE AT THE HANDSET

2    LEVEL?

3    A.   YES, IT DOES.

4    Q.   AND WITH RESPECT TO QUALCOMM'S POLICY OF SELLING CHIPS

5    ONLY TO LICENSED OEM'S, DOES THE PLAN ALLOW FOR THAT?

6    A.   YES, IT DOES.  THE PLAN EXPRESSLY STATES THAT QUALCOMM CAN

7    SELL CHIPS ONLY TO LICENSED OEM'S CONSISTENT WITH THE TERMS SET

8    FORTH IN THE RECTIFICATION PLAN.

9    Q.   WHAT DOES THAT MEAN?

10   A.   SO IN OTHER WORDS, WE WERE PERMITTED UNDER THIS PLAN TO

11   ESSENTIALLY OFFER THE LICENSING TERMS UNDER THE RECTIFICATION

12   PLAN AND SELL ONLY TO LICENSE -- TO CUSTOMERS WHO WERE LICENSED

13   UNDER THOSE TERMS.

14   Q.   NOW, WERE THE LICENSE NEGOTIATIONS THAT YOU HAD PURSUANT

15   TO THE RECTIFICATION PLAN, WERE THEY CONDUCTED UNDER THE

16   SUPERVISION OF THE NDRC IN CHINA?

17   A.   YES, THEY WERE.

18   Q.   AND DID YOU HAVE REPORTING OBLIGATIONS AS WELL?

19   A.   YES, WE DID.

20   Q.   CAN YOU DESCRIBE TO THE COURT WHAT ACTION YOU TOOK IN THAT

21   REGARD?

22   A.   SO I WOULD REGULARLY VISIT WITH THE NDRC FOLLOWING THE

23   RECTIFICATION PLAN TO BRIEF THE NDRC CASE TEAM ON THE STATUS OF

24   THE LICENSING PROGRAM AS IT ROLLED OUT AFTER FEBRUARY OF 2015.

25        AND IN ADDITION, WE WOULD REGULARLY PROVIDE THE NDRC WITH

1    COPIES OF THE LICENSE AGREEMENTS THAT WERE SIGNED UNDER THE

2    RECTIFICATION PLAN.

3         THE NDRC WOULD ALSO INDEPENDENTLY TALK TO LICENSEES AND

4    TALK TO US ABOUT THEIR CONVERSATIONS WITH LICENSEES, AND IN ONE

5    MEETING IN SHENZHEN, THE NDRC CALLED A LARGE MEETING WITH

6    QUALCOMM AND PROBABLY ABOUT 30 OR SO MANUFACTURERS TO TALK

7    ABOUT THE RECTIFICATION PLAN AND THE LICENSING THAT WOULD OCCUR

8    AFTER THE RECTIFICATION PLAN.

9    Q.   NOW, DID THE PLAN REQUIRE QUALCOMM TO MAKE THIS OFFER

10   AVAILABLE GLOBALLY OR WORLDWIDE?

11   A.   NO.  THE -- THE RECTIFICATION PLAN AND THE LICENSING TERMS

12   THAT WERE SET FORTH UNDER THE RECTIFICATION PLAN, YOU CAN THINK

13   OF IT AS JURISDICTIONALLY LIMITED TO CHINA.

14        AGAIN, THE OFFER WAS MADE TO EVERYBODY, ANY LICENSEE

15   AROUND THE WORLD, BUT IT WAS MADE WITH RESPECT TO QUALCOMM'S

16   CHINESE STANDARD ESSENTIAL PATENTS AND TO DEVICES MADE AND SOLD

17   FOR US IN CHINA.

18   Q.   NOW, AT THE TIME THAT THE 5G PROGRAM WAS ANNOUNCED IN

19   NOVEMBER OF 2017, HAD THE TECHNICAL SPECIFICATION FOR 5G BEEN

20   FINALIZED?

21   A.   NO, NOT YET.

22   Q.   WHEN DID THAT HAPPEN?

23   A.   THAT HAPPENED IN DECEMBER OF 2017.

24   Q.   AND HAD THE STANDARD BEEN ADOPTED BY 3GPP BY THAT TIME?

25   A.   NOT BY THAT TIME.

1    Q.   DID THAT HAPPEN SOMETIME AFTER MARCH OF 2018?

2    A.   IT HAPPENED AFTER THE BEGINNING OF 2018.  I'M NOT SURE IF

3    IT WAS BEFORE OR AFTER MARCH.

4    Q.   LET'S TURN TO TALK BRIEFLY ABOUT SAMSUNG.  DID SAMSUNG

5    HAVE A LICENSE AGREEMENT WITH QUALCOMM WHEN YOU WERE PROMOTED

6    INTO YOUR CURRENT ROLE?

7    A.   YES, IT DID.

8    Q.   AND DID YOU BECOME FAMILIAR WITH THAT LICENSE AGREEMENT?

9    A.   GENERALLY, YES.

10   Q.   HAVE THERE BEEN DISCUSSIONS WITH SAMSUNG REGARDING

11   AMENDING THAT AGREEMENT SINCE YOU TOOK OVER AT QTL?

12   A.   YES.

13   Q.   WHEN DID YOU GET INVOLVED IN THOSE?

14   A.   SO I WOULD HAVE BEEN INVOLVED IN THE SAMSUNG DISCUSSIONS

15   PROBABLY GOING BACK TO 2016, BUT CERTAINLY INVOLVED IN 2017

16   INTO THE BEGINNING OF 2018.

17   Q.   AND DID YOU PERSONALLY PARTICIPATE IN THE DISCUSSIONS?

18   A.   YES, I DID.

19   Q.   WHO REPRESENTED QTL?

20   A.   SO MYSELF, DEREK ABERLE WHEN HE WAS THERE WAS INVOLVED,

21   JOHN HAN, THE GENERAL MANAGER OF QTL, WAS VERY MUCH INVOLVED.

22        WE ALSO HAD SOME ATTORNEYS WITHIN QTL AND LICENSING

23   MANAGERS INVOLVED IN THOSE DISCUSSIONS AS WELL, AND ALSO FOLKS

24   FROM THE ENGINEERING SIDE WITHIN QTL AS WELL.

25   Q.   SO IT SOUNDS LIKE THIS WAS A PRETTY BIG GROUP?

1     A.   YES.

2     Q.   WHO WAS REPRESENTING SAMSUNG?

3     A.   SO SAMSUNG WAS REPRESENTED PRIMARILY BY DR. AHN, WHO'S THE

4     EVP, EXECUTIVE VICE-PRESIDENT, OF THEIR LICENSING GROUP.  HIS

5     NAME IS A-H-N.

6          AND ALSO BY INJUNG LEE, WHO WAS SECOND IN CHARGE.

7          SAMSUNG ALSO HAD A NUMBER OF INHOUSE ATTORNEYS INVOLVED,

8     AND I THINK ALSO SOME, SOME ENGINEERS AS WELL.

9     Q.   AND OVER WHAT PERIOD OF TIME DID THESE NEGOTIATIONS TAKE

10    PLACE?

11    A.   AS I SAID, I THINK THESE NEGOTIATIONS WERE ONGOING

12    BEGINNING AT LEAST IN 2016, ALL THROUGH 2017, AND THEN INTO THE

13    BEGINNING OF 2018.

14    Q.   AND WAS THIS TO AMEND AN EXISTING SAMSUNG AGREEMENT?

15    A.   YES.  IT WAS AN AMENDMENT TO AN AGREEMENT THAT WAS FIRST

16    ENTERED INTO IN 1993, AND THEN AMENDED AGAIN AT LEAST AS OF

17    2009, AND THEN THIS WAS AN AMENDMENT TO THAT EXISTING

18    AGREEMENT.

19    Q.   AND I TAKE IT THESE NEGOTIATIONS ARRIVED ULTIMATELY AT AN

20    AGREEMENT, OR A SERIES OF AGREEMENTS?

21    A.   YES, IT DID.

22    Q.   AND DID YOU AMEND THE EXISTING PATENT LICENSE AGREEMENT?

23    A.   YES.  WE AMENDED THE AGREEMENT BETWEEN QUALCOMM AND

24    SAMSUNG.  THE FUNDAMENTAL TERMS OF THE AGREEMENT REMAINED IN

25    PLACE, THE ROYALTY RATE, FOR EXAMPLE, THE LICENSE FROM QUALCOMM

1       TO SAMSUNG REMAINED IN PLACE.

2            BUT WE AMENDED OTHER ASPECTS OF THE AGREEMENT.  ONE OF THE

3       THINGS THAT WE DID WAS WE REDUCED THE CAP ASSOCIATED WITH THE

4       LICENSE FROM $500 TO $400 FOR HANDSETS.  WE ALSO INCREASED THE

5       SCOPE OF THE RIGHTS THAT WE GOT BACK FROM SAMSUNG TO THEIR

6       INTELLECTUAL PROPERTY FOR OUR PRODUCTS.

7       Q.   AND HAD THERE BEEN AN EXISTING CROSS-LICENSE IN THE

8       ORIGINAL -- THE AGREEMENT THAT WAS BEING AMENDED?

9       A.   YES.  WE ALREADY HAD A CROSS-LICENSE FROM SAMSUNG, AND WE

10      INCREASED THE SCOPE OF THAT CROSS-LICENSE THROUGH A

11      PARTICULARLY COMPLICATED MECHANISM THAT ESSENTIALLY GAVE US

12      RIGHTS TO SIGNIFICANT NEW NUMBER OF PATENTS THAT THEY HAD.

13      Q.   AND DID QUALCOMM PAY SEPARATE CONSIDERATION FOR THAT

14      EXPANDED SCOPE OF RIGHTS?

15      A.   YES, WE DID.

16      Q.   NOW, AS PART OF THE DISCUSSION YOU HAD WITH SAMSUNG, WERE

17      THERE OTHER DISPUTES ADDRESSED?

18      A.   YES.  THERE WERE A NUMBER OF OTHER DISPUTES BETWEEN

19      QUALCOMM AND SAMSUNG THAT WERE ADDRESSED AND RESOLVED AS PART

20      OF THIS OVERALL NEGOTIATION.

21      Q.   AND WHAT CLAIMS DID QUALCOMM HAVE VIS-À-VIS SAMSUNG?

22      A.   SO SAMSUNG WAS A -- HAS A LARGE FAB AND SAMSUNG WAS MAKING

23      QUALCOMM CHIPSET PRODUCTS, AND WE HAD SOME CONCERNS BECAUSE

24      SAMSUNG ALSO HAS A COMPETING CHIPSET BUSINESS.  AND WE HAD SOME

25      CONCERNS ABOUT INFORMATION EXCHANGE BETWEEN THE FAB AND THE

1    CHIPSET BUSINESS AND BETWEEN THE FAB AND SOME OF OUR CUSTOMERS.

2    WE RAISED THOSE CONCERNS, AND THOSE CONCERNS WERE

3    ADDRESSED AS PART OF THE OVERALL RESOLUTION.

4    Q.   AND DID SAMSUNG --

5    A.   THERE WAS ALSO SOME, I THINK, OVERDUE PAYMENT CONCERNS, OR

6    UNDER DUE PAYMENT CONCERNS THAT WERE ADDRESSED.

7    Q.   ALL RIGHT.  AND DID SAMSUNG HAVE DISPUTES OF ITS OWN

8    RELATED TO QUALCOMM?

9    A.   YEAH, SAMSUNG HAD DISPUTES RELATING TO QUALCOMM'S LICENSE

10   AGREEMENTS THAT WERE PART OF THE MATTERS ASSOCIATED WITH THE

11   KFTC, AND SAMSUNG HAD SOME CONCERNS ABOUT WHETHER IT WAS BEING

12   TREATED FAIRLY WITH RESPECT TO APPLE.

13   Q.   WITH RESPECT TO APPLE?

14   A.   YES.

15   Q.   NOW, HOW WERE THESE DISPUTES RESOLVED?

16   A.   SO EVERYTHING WAS RESOLVED IN A MUTUAL SETTLEMENT AND

17   RELEASE AGREEMENT THAT WAS ENTERED INTO AT THE SAME TIME AS THE

18   AMENDED LICENSE AGREEMENT.

19   Q.   AND DID QUALCOMM PAY SAMSUNG SEPARATE CONSIDERATION AS

20   PART OF THAT AGREEMENT?

21   A.   WE DID.

22   Q.   NOW, DID THE AGREEMENT OR SERIES OF AGREEMENTS ADDRESS

23   COMPONENT LEVEL LICENSING AS WELL?

24   A.   YES, THERE WAS A PARTICULAR AGREEMENT THAT WE ENTERED INTO

25   THAT ADDRESSED THE QUESTION OF COMPONENT LEVEL LICENSING, BUT

1    IT WASN'T ITSELF A COMPONENT LEVEL LICENSE.  IT WAS ESSENTIALLY

2    A CONTRACTUAL ASSURANCE WITH RESPECT TO QUALCOMM -- SAMSUNG'S

3    COMPONENT BUSINESS.

4    Q.   AND WHAT WAS THE ASSURANCE THAT QUALCOMM GAVE?

5    A.   SO SAMSUNG HAS A CELLULAR BASEBAND BUSINESS THAT THEY MAKE

6    PRIMARILY FOR THEIR OWN USE, AND QUALCOMM GAVE SAMSUNG AN

7    ASSURANCE THAT SHOULD QUALCOMM EVER SEEK TO ASSERT ITS CELLULAR

8    SEPS AGAINST THAT COMPONENT BUSINESS, AGAINST THOSE COMPONENTS,

9    WE WOULD FIRST MAKE SAMSUNG AN OFFER ON FAIR, REASONABLE, AND

10   NON-DISCRIMINATORY TERMS.

11   Q.   NOW, DID YOU PRESENT THIS BODY OF AGREEMENTS TO THE KOREAN

12   FAIR TRADE COMMISSION?

13   A.   YES, WE DID.

14   Q.   WHY DID YOU DO THAT?

15   A.   WELL, THE KFTC MATTER HAD CONCLUDED, IT WAS ON APPEAL, AND

16   WE WANTED TO MAKE SURE THAT THE KFTC WAS AWARE THAT WE HAD

17   REACHED THIS SET OF AGREEMENTS AND THAT THEY WERE FULLY

18   INFORMED.

19   Q.   SO WAS THE ENTIRE SERIES OF AGREEMENTS PROVIDED TO THE

20   GOVERNMENT?

21   A.   YES, AND WE BASICALLY GAVE THEM AN OVERVIEW.

22   Q.   AND DID THE KFTC EXPRESS AN OBJECTION TO ANY PROVISION OF

23   THE AGREEMENTS?

24   A.   NO.

25        MR. VAN NEST:  PASS THE WITNESS, YOUR HONOR.

```
 1              THE COURT:  OKAY.  TIME IS 2:12.  WE NORMALLY TAKE
 2    OUR BREAK AT 2:15.
 3              WE COULD GO TO 2:20 AND TAKE OUR BREAK AT 2:20.  WHY DON'T
 4    WE DO THAT.
 5              MR. MATHESON:  WHATEVER THE COURT PREFERS, YOUR
 6    HONOR.
 7              THE COURT:  I'M SORRY, WHAT DID YOU SAY?
 8              MR. MATHESON:  WHATEVER YOU PREFER, YOUR HONOR.  I
 9    HAVE TO PASS OUT A FEW BINDERS.
10              THE COURT:  OKAY.  LET'S TAKE THE BINDERS.
11         (PAUSE IN PROCEEDINGS.)
12              MR. CARSON:  MAY I APPROACH, YOUR HONOR?
13              THE COURT:  YES, PLEASE.
14         (PAUSE IN PROCEEDINGS.)
15              THE COURT:  YOU KNOW, WHY DON'T WE GO AHEAD AND TAKE
16    OUR TEN MINUTE BREAK NOW AND YOU CAN SORT THIS OUT.
17              MR. MATHESON:  GOOD IDEA.  THANK YOU, YOUR HONOR.
18              THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN DURING THE
19    TEN MINUTE BREAK.
20              THE WITNESS:  THANK YOU, YOUR HONOR.
21              THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS FOR TEN
22    MINUTES.  THANK YOU.
23         (RECESS FROM 2:14 P.M. UNTIL 2:23 P.M.)
24              THE CLERK:  PLEASE BE SEATED.
25              THE COURT:  ALL RIGHT.  GOOD AFTERNOON.  WELCOME
```

1    BACK.

2         OKAY.  ARE YOU READY?

3              MR. MATHESON:  YES, MA'AM.

4              THE COURT:  2:23.  GO AHEAD, PLEASE.

5              MR. MATHESON:  THANK YOU, YOUR HONOR.

6                        **CROSS-EXAMINATION**

7    BY MR. MATHESON:

8    Q.   YOU DISCUSSED THE STANDARD ESSENTIAL PATENT ONLY LICENSE

9    ARRANGEMENT THAT QUALCOMM WAS OFFERING TO THE WORLD IN MARCH OF

10   2018.

11        QUALCOMM DID NOT BEGIN OFFERING THAT TO OEM'S WORLDWIDE

12   UNTIL NOVEMBER OF 2017; RIGHT?

13   A.   SO THAT PROGRAM WAS ANNOUNCED IN NOVEMBER OF 2017.  BUT WE

14   OFFERED SEP ONLY LICENSES PRIOR TO THAT.

15   Q.   YOU DID NOT OFFER THE -- OKAY.  PRIOR TO YOUR DEPOSITION,

16   YOU COULD ONLY IDENTIFY THREE OEM'S WHO -- LEAVING ASIDE CPLA

17   LICENSES, WHO HAD AN SEP ONLY LICENSE FROM QUALCOMM; RIGHT?

18   A.   CORRECT.

19   Q.   SO IT WAS POSSIBLE TO NEGOTIATE AN SEP LICENSE ONLY WITH

20   QUALCOMM, BUT QUALCOMM DID NOT OFFER TO THE WORLD THE 3.25

21   PERCENT SEP ONLY LICENSE YOU DESCRIBED UNTIL NOVEMBER OF 2017;

22   IS THAT RIGHT?

23   A.   WELL, THE PROGRAM THAT WE DESCRIBED WAS CREATED FOR THAT

24   NOVEMBER ANNOUNCEMENT.  BUT WE OFFERED LTE SEP ONLY LICENSES AT

25   I BELIEVE 3 .25 OR 3.5 PERCENT PRIOR TO 4G.

1    Q.   AND THOSE WERE NOT MULTIMODE; CORRECT?  SO THE MULTIMODE

2    3.25 PERCENT SEP ONLY LICENSE THAT YOU DESCRIBED WAS NOT

3    AVAILABLE TO THE WORLD UNTIL NOVEMBER 2017; RIGHT?

4    A.   A SLIGHT CORRECTION.  IT WAS NOT AVAILABLE -- LET ME PUT

5    IT THIS WAY.  IT WAS AVAILABLE TO THE WORLD INSIDE OF CHINA

6    UNDER THE CPLA PROGRAM.  AND THEN IT WAS MADE AVAILABLE

7    WORLDWIDE, INCLUDING OUTSIDE OF CHINA, IN NOVEMBER.

8    Q.   THANK YOU.

9         SO YOU ALSO TESTIFIED ON DIRECT THAT AFTER THE CPLA WAS

10   ANNOUNCED, OEM'S, INCLUDING THOSE IN KOREA AND TAIWAN, ELECTED

11   TO KEEP THEIR FULL PORTFOLIO LICENSE RATHER THAN TAKE THE CPLA

12   LICENSE; RIGHT?

13   A.   CORRECT.

14   Q.   AND THE CPLA LICENSE, AS YOU JUST SAID, IS ONLY GOOD FOR

15   SALES MADE INTO CHINA, SO OEM'S WHO WERE NOT MAKING SALES IN

16   CHINA WOULDN'T REALLY HAVE ANY INTEREST IN THAT LICENSE; RIGHT?

17   THAT'S ONE REASON THEY MIGHT NOT HAVE TAKEN ADVANTAGE OF IT?

18   A.   WELL, HYPOTHETICALLY, YOU'RE CORRECT THAT IF THEY'RE NOT

19   MAKING SALES INTO CHINA, AND THEY HAVE NO INTENT TO MAKE SALES

20   INTO CHINA, THEN THEY WOULD NOT BE INTERESTED IN TAKING

21   ADVANTAGE OF THE CPLA AGREEMENT.

22   Q.   CAN YOU TURN IN THE LARGE BINDER I GAVE YOU, SIR -- YOU

23   HAVE THREE BINDERS, I'M AFRAID.  THE BIG ONE IS CALLED BINDER

24   NUMBER 1.  CAN YOU TURN TO TAB 6, WHICH IS CX 8195.

25        CAN YOU IDENTIFY THIS, SIR, AS AN E-MAIL YOU RECEIVED IN

1    JANUARY OF 2018, ATTACHING MATERIALS RELATED TO AN EARNINGS

2    CALL?

3    A.   I SEE THAT.

4            MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 8195.

5            THE COURT:  ANY OBJECTION?

6            MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

7            THE COURT:  IT'S ADMITTED.

8        (PLAINTIFF'S EXHIBIT CX 8195 WAS ADMITTED IN EVIDENCE.)

9            THE COURT:  GO AHEAD, PLEASE.

10   BY MR. MATHESON:

11   Q.   COULD YOU TURN TO CX 8195-007, SIR.

12       DIRECTING YOUR ATTENTION TO THE SECOND QUESTION FROM THE

13   BOTTOM IT READS, "WHY DOES QUALCOMM PRACTICE NO LICENSE, NO

14   CHIPS?  IS THIS JUST A WAY TO PRESSURE COMPANIES INTO SIGNING

15   LICENSE AGREEMENTS?"

16       NOW, THE FIRST BULLET INDICATES THE MANNER IN WHICH

17   QUALCOMM EXECUTIVES MIGHT RESPOND TO THIS QUESTION DURING THE

18   INVESTOR CALL; IS THAT FAIR?

19   A.   I THINK THAT'S FAIR.

20   Q.   AND IT READS, "WE HAVE LEGITIMATE REASONS FOR THIS

21   PRACTICE AND THE RECENT LEXMARK DECISION ON EXHAUSTION

22   VALIDATES THAT THIS PRACTICE IS NECESSARY."

23       NOW, THE LEXMARK DECISION IS A DECISION BY THE

24   UNITED STATES SUPREME COURT; IS THAT RIGHT?

25   A.   CORRECT.

1    Q.   TURNING YOUR ATTENTION TO THE THIRD BULLET IT READS, "WE

2    HAVE NEVER THREATENED," IT SAID THREADED, BUT I ASSUME THAT

3    MEANS THREATENED, "WE HAVE NEVER THREATENED TO CUT YOU HAVE OR

4    CUT OFF CHIP SUPPLY TO GET A LICENSEE/CUSTOMER TO ACCEPT OUR

5    LICENSE TERMS."

6         DO YOU SEE?

7    A.   I SEE THAT.

8    Q.   ARE YOU AWARE THAT IN DECEMBER OF 2015, RICK *OSELOW, THE

9    PRESIDENT OF MOTOROLA, TOLD QUALCOMM THAT ERIC REIFSCHNEIDER

10   WAS CONSTANTLY THREATENING TO CUT OFF CHIP SUPPLY?

11   A.   NO.

12   Q.   SO AS FAR AS YOU ARE CONCERNED, IT WAS A TRUE STATEMENT,

13   TO THE BEST OF YOUR KNOWLEDGE IN JANUARY OF 2018, THAT QUALCOMM

14   HAD NEVER THREATENED TO CUT OFF CHIP SUPPLY TO GET A LICENSEE

15   TO ACCEPT LICENSE TERMS; RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   WOULD YOU TURN TO CX 8195-083.

18        UNDER 5G IT READS, "ANOTHER IMPORTANT AREA IS 5G AND WE

19   ESTIMATE THAT WE HAVE A 12 TO 24 MONTH LEAD AHEAD OF OUR KEY

20   COMPETITORS IN THE TRANSITION TO 5G."

21        NOW, IN THE CONTEXT OF THIS BULLET, ARE THE KEY

22   COMPETITORS REFERRED TO COMPETING MAKERS OF MODEM CHIPS?

23   A.   IT COULD BE COMPETING MAKERS OF MODEM CHIPS, YES.

24   Q.   WOULD YOU TURN TO TAB 5 IN YOUR BINDER, SIR, WHICH IS

25   CX 8196.

1    A.   TAB 5.  I'M SORRY, DID YOU SAY TAB 5?

2    Q.   TAB 5, SIR, CX 8196.

3    A.   OKAY.

4    Q.   CAN YOU IDENTIFY THIS AS MATERIALS PREPARED IN CONNECTION

5    WITH A BOARD OF DIRECTORS MEETING IN DECEMBER OF 2017?

6    A.   THAT'S CORRECT.

7         MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 8196.

8         MR. VAN NEST:  YOUR HONOR, WE DON'T HAVE OBJECTION,

9    BUT I THINK THIS EXHIBIT AND THE PRIOR EXHIBIT ARE SUBJECT TO

10   SEALING MOTIONS WHICH WE'VE AGREED TO FILE AFTER THE WITNESS'S

11   TESTIMONY IS COMPLETED.

12        THEY'RE VERY LARGE DOCUMENTS, AND THE FTC IDENTIFIED WHICH

13   PAGES THEY WOULD USE, SO WE DON'T HAVE ANY DISAGREEMENT IN

14   COURT TODAY.

15        BUT IF THE ENTIRE AGREEMENT IS GOING TO BE FILED AS

16   OPPOSED TO JUST THESE PAGES, WE WOULD NEED TO MOVE TO SEAL 8195

17   AND 8196.  ALTERNATIVELY, WE COULD JUST ADMIT THE PAGES THAT

18   ARE USED.

19        THE COURT:  I'D LIKE THE WHOLE DOCUMENT TO BE

20   ADMITTED.  SO JUST GO AHEAD AND FILE THAT.  CAN YOU FILE IT

21   TODAY, THE SEALING MOTION?

22        MR. VAN NEST:  I -- WE WILL TRY TO DO THAT, YOUR

23   HONOR.

24        THE COURT:  OKAY.  IT'S ADMITTED.

25        (PLAINTIFF'S EXHIBIT CX 8196 WAS ADMITTED IN EVIDENCE.)

```
 1              THE COURT:  GO AHEAD, PLEASE.

 2     BY MR. MATHESON:

 3     Q.   COULD YOU TURN, SIR, TO CX 8196-129.

 4              MR. KOTARSKI:  I BELIEVE THIS PAGE IS SEALED.

 5              MR. MATHESON:  129?

 6              MR. KOTARSKI:  ACCORDING TO THE LIST I HAVE, YES.

 7              MR. MATHESON:  OKAY.  LET'S PUT IT UP THERE.  I DID

 8     NOT THINK IT WAS.  THANK YOU, KEN.

 9     Q.   COULD I TURN YOUR ATTENTION, SIR, TO THE PORTION OF THIS

10     SLIDE THAT READS, "GLOBAL 5G MOMENTUM."

11              IT'S FAIR TO SAY THIS SLIDE IDENTIFIES VARIOUS CARRIERS

12     WHO HAVE COMMITTED TO COMMERCIAL LAUNCH OF 5G; CORRECT?

13     A.   THERE ARE CARRIERS IDENTIFIED HERE, YES.

14     Q.   AND TAKING A LOOK AT THE PORTION OF THE SLIDE THAT DEALS

15     WITH ACTIVE SDX 50 DESIGN ENGAGEMENTS, THE SDX 50/55 REFERS TO

16     THE SNAPDRAGON X 505G MODEM THAT QUALCOMM CLAIMS TO RELEASE TO

17     SUPPORT 5G NETWORKS?

18     A.   YES.

19     Q.   NOW, THE DESIGN ENGAGEMENTS REFERRED TO WITH THE OEM'S

20     IDENTIFIED, WHO I WILL NOT SAY OUT LOUD IF THIS IS SEALED,

21     THOSE DESIGN ENGAGEMENTS OCCUR WELL IN ADVANCE OF SHIPPING

22     CHIPS IN COMMERCIAL QUANTITIES TO OEM'S; RIGHT?

23     A.   WELL, YOU'RE ASKING SOMETHING THAT'S ON THE PRODUCT SIDE.

24     I DON'T KNOW HOW FAR IN ADVANCE OF COMMERCIAL CHIP SHIPMENTS,

25     BUT CERTAINLY IN ADVANCE OF COMMERCIAL SHIPMENTS IF THERE'S A
```

1     DESIGN ENGAGEMENT WITH A PARTICULAR OEM.

2     Q.   THANK YOU.  COULD YOU TURN TWO SLIDES PREVIOUSLY TO

3     CX 8196-127.

4          MR. KOTARSKI:  I BELIEVE THIS ONE IS NOT SEALED.

5     BY MR. MATHESON:

6     Q.   IN THE RED AT THE TOP -- WELL, IT READS, "SUBSTANTIAL

7     DEVELOPMENT OF I.P. FOR 5G REFLECTING SIGNIFICANT TECHNOLOGY

8     LEADERSHIP, 75 PERCENT OF 4G PATENTS AND APPLICATIONS HAVE

9     POTENTIAL APPLICABILITY TO 5G."

10         DO YOU SEE THAT, SIR?

11    A.   I DO.

12    Q.   NOW, IT'S QUALCOMM'S POSITION THAT 4G AND 5G ARE BOTH

13    BASED ON OFDM; RIGHT?

14    A.   THAT'S A TRUE STATEMENT.

15    Q.   COULD YOU TURN TO --

16         THE COURT:  LET ME ASK A QUESTION.  QUALCOMM MOVED TO

17    SEAL THIS DOCUMENT, AND I ALREADY RULED ON YOUR SEALING REQUEST

18    YESTERDAY.  SO I'M NOT SURE, MR. VAN NEST, WHAT YOU'RE TALKING

19    ABOUT.  I'M LOOKING AT ECF 1430 FILED JANUARY 24TH, 2019.

20         MR. MATHESON:  YOUR HONOR, IN ORDER TO ACCOMMODATE

21    THEIR CONCERN ABOUT GETTING DECLARATIONS, WE TOLD THEM WHICH

22    SPECIFIC SLIDES OF THIS DOCUMENT WE WOULD BE DISPLAYING IN

23    COURT.

24         THE COURT:  I SEE.  OKAY.

25

1      BY MR. MATHESON:

2      Q.   CAN YOU TURN TO TAB 4 IN YOUR BINDER, SIR, WHICH IS

3      CX 7122.

4           CAN YOU IDENTIFY THIS AS A DRAFT STRAT PLAN AND BOARD

5      PRESENTATION YOU RECEIVED IN JUNE OF 2017?

6      A.   THAT IS CORRECT.

7              MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7122.

8              MR. VAN NEST:  NO OBJECTION, ARE YOUR HONOR.

9              THE COURT:  IT'S ADMITTED.

10          (PLAINTIFF'S EXHIBIT CX 7122 WAS ADMITTED IN EVIDENCE.)

11             THE COURT:  GO AHEAD, PLEASE.

12     BY MR. MATHESON:

13     Q.   COULD YOU TURN, SIR, TO CX 7122-016.  PORTIONS OF THIS

14     SLIDE HAVE BEEN SEALED, SO I'VE OBSCURED THE MONITOR.

15          SIR, JUST SO YOU KNOW WHICH PORTIONS HAVE BEEN SEALED, WE

16     SHOULD NOT IDENTIFY THE SPECIFIC OEM'S OR THE PARTICULAR

17     CATEGORIES OF SQUARES NEXT TO THE OEM'S.

18          BUT THE TITLES IN EACH BOX ARE PUBLICLY AVAILABLE, JUST SO

19     YOU DON'T ACCIDENTALLY SAY THE NAME OF AN OEM.

20     A.   THANK YOU, COUNSEL.

21     Q.   SO IT'S FAIR TO SAY, THEN, THIS SHOWS QTL'S TOP 20

22     ACCOUNTS BY REVENUE IN THE FIRST THREE-QUARTERS OF 2016, JUST

23     LOOKING AT THE TITLE; RIGHT?

24     A.   THAT'S CORRECT.

25     Q.   AND THE BOX AT THE TOP THAT'S EITHER BLUE OR PURPLE

```
1     DEPENDING HOW IT'S PRINTED WITH A TIMELINE INDICATES WHICH

2     OEM'S LICENSE AGREEMENTS ARE UP FOR RENEGOTIATION OR EXPIRATION

3     AS TIME GOES ON; RIGHT?

4     A.   THAT IS CORRECT.

5     Q.   AND THEN THE ORANGE BOX UNDERNEATH IT, THE TITLE IS NOT

6     SEALED, IT READS, NO FIXED EXPIRATION DATE, NO RIGHT TO

7     TERMINATE DATE.

8          DO YOU SEE THAT, SIR?

9     A.   I DO.

10    Q.   AND THERE ARE 12 OF QUALCOMM'S TOP 20 OEM'S BY LICENSE

11    REVENUE IDENTIFIED IN THAT BOX; RIGHT?

12    A.   THERE ARE 12 IDENTIFIED IN THAT BOX.

13    Q.   AND LOOKING AT THE LOWER RIGHT-HAND CORNER, WHICH IS ALSO

14    NOT SEALED, THERE ARE THREE KINDS OF COLORED SQUARES; RIGHT?

15    AND THE BLUE, OR THE TURQUOISE, INDICATE AN OEM'S LICENSE

16    PROVIDES LIKELY COVERAGE OF 5G I.P., (BASED ON OFDM DEF)."

17         DO YOU SEE THAT?

18    A.   I DO.

19    Q.   NOW, THAT RELATES -- THAT REFERS TO THE DEFINITION OF OFDM

20    IN AN OEM'S SUBSCRIBER UNIT LICENSE AGREEMENT; RIGHT?

21    A.   THAT WOULD REFER TO WHATEVER PARTICULAR DEFINITION IS IN

22    THE SUBSCRIBER UNIT AGREEMENT RELATING TO THE OFDM.

23    Q.   THANK YOU.  NOW, IN 2016, 2017 TIMEFRAME, YOU WERE

24    INVOLVED IN DISCUSSIONS WITH APPLE ABOUT A POTENTIAL LICENSE

25    AGREEMENT WITH QUALCOMM; RIGHT?
```

1    A.   THAT IS CORRECT.

2    Q.   NOW, IN THE COURSE OF THOSE DISCUSSIONS, APPLE SENT

3    QUALCOMM AN ARBITRATION PROPOSAL; RIGHT?

4    A.   AT SOME POINT, ARBITRATION WAS DISCUSSED AND PROPOSALS

5    WERE EXCHANGED I BELIEVE BY BOTH SIDES.

6    Q.   WELL, APPLE SENT QUALCOMM AN ARBITRATION PROPOSAL; RIGHT?

7    A.   I -- I'M NOT 100 PERCENT SURE.  TO THE BEST OF MY

8    RECOLLECTION, ARBITRATION PROPOSALS WERE EXCHANGED BY BOTH

9    SIDES.

10   Q.   IT'S A TRUE STATEMENT THAT ON APRIL 18TH, 2016, APPLE SENT

11   QUALCOMM AN ARBITRATION PROPOSAL THAT WANTED TO ARBITRATE,

12   AMONG OTHER ISSUES, WHETHER EACH PARTY'S CELLULAR SEPS ARE

13   ESSENTIAL AND INFRINGED, AND NOT OTHERWISE INVALID,

14   UNENFORCEABLE LICENSE EXHAUSTED; RIGHT?

15   A.   IF YOU'RE READING FROM A DOCUMENT WITH THAT DATE, I'LL

16   TAKE YOUR WORD FOR IT.  BUT I DON'T KNOW -- I DON'T RECALL A

17   DOCUMENT OF THAT DATE WITH THAT PARTICULAR STATEMENT.

18   Q.   NOW, THE PARTIES NEVER ENDED UP ARBITRATING; RIGHT?

19   A.   WE DID NOT ARBITRATE.

20   Q.   QUALCOMM DID NOT ACCEPT THE TERMS ON WHICH APPLE PROPOSED

21   ARBITRATION TO QUALCOMM; CORRECT?

22   A.   QUALCOMM PROPOSED TERMS FOR AN ARBITRATION UNDER GOOGLE

23   MMI GENERALLY, AND APPLE DIDN'T ACCEPT THOSE, SO WE COULDN'T

24   COME TO A MUTUAL AGREEMENT ON TERMS FOR AN ARBITRATION.

25   Q.   OKAY.  MY QUESTION WAS ABOUT THE TERMS THAT APPLE PROPOSED

1          TO QUALCOMM.

2                NOW, APPLE WANTED TO ARBITRATE WHETHER QUALCOMM'S PATENTS

3     ARE ACTUALLY VALID AND ACTUALLY INFRINGED BY THE DEVICES APPLE

4     SELLS, AND QUALCOMM WOULD NOT ARBITRATE UNDER THOSE CONDITIONS;

5     RIGHT?

6     A.   THAT'S CORRECT.  THAT'S FALSE.

7     Q.   WELL, SIR, COULD I SHOW A DOCUMENT THAT MIGHT REFRESH YOUR

8     RECOLLECTION.

9                IF I CAN APPROACH, YOUR HONOR?

10               THE COURT:  GO AHEAD, PLEASE.

11               MR. MATHESON:  (HANDING.)

12               MR. VAN NEST:  CAN I HAVE A COPY, COUNSEL?  IS IT IN

13    THE BINDER?

14               MR. MATHESON:  IT'S NOT (HANDING).

15    Q.   SIR, LOOKING AT THIS DOCUMENT, DOES THIS REFRESH YOUR

16    RECOLLECTION THAT YOU WROTE A LETTER TO MR. B.J. WATROUS OF

17    APPLE IN MARCH 2017?

18    A.   YES.

19    Q.   TURNING YOUR ATTENTION TO THE PAGE OF THE DOCUMENT THAT IS

20    NUMBERED NUMBER 4 AT THE TOP, BATES NUMBER ENDS IN DASH 94.

21               THE FIRST BULLET -- DOES THIS REFRESH YOUR RECOLLECTION,

22    SIR, THAT ON APRIL 18TH, 2016, QUALCOMM SENT -- OR APPLE SENT

23    TO QUALCOMM AN ARBITRATION PROPOSAL PROPOSING TO ARBITRATE THE

24    ISSUE OF, QUOTE, "WHETHER EACH PARTY'S CELLULAR SEPS ARE

25    ESSENTIAL AND INFRINGED AND NOT OTHERWISE INVALID,

ROGERS CROSS BY MR. MATHESON

1      UNENFORCEABLE, LICENSED, EXHAUSTIVE, ET CETERA."

2          DID APPLE SEND THAT PROPOSAL TO QUALCOMM ON APRIL 18TH,

3      2016, SIR?

4      A.   YES.  AND IT GOES ON.

5      Q.   IT DOES, INDEED.

6          COULD YOU TAKE A LOOK AT TAB 11 OF THE SMALL BINDER THAT I

7      SENT YOU, SIR -- THAT I GAVE TO YOU, SIR.  IT'S TITLED WITNESS

8      BINDER 2.

9      A.   THE WITNESS BINDER 2?

10     Q.   YES, THERE'S A SMALLER ONE.

11     A.   TAB 11?

12     Q.   TAB 11, SIR.  IT SHOULD BE CX 6594.

13     A.   OKAY.

14     Q.   CAN YOU IDENTIFY THIS AS AN E-MAIL ATTACHING A

15     PRESENTATION YOU RECEIVED IN MARCH 2016?

16     A.   YES, THAT'S CORRECT.

17         I'M SORRY.  I'M LOST ON THE EXHIBITS.  THIS IS 594.

18     Q.   YEAH, O'CLOCK IT SHOULD BE CX 6594?

19     A.   YES, THAT'S CORRECT.

20             MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 6594.

21             MR. VAN NEST:  NO OBJECTION, YOUR HONOR.  BUT I

22     BELIEVE IT'S SUBJECT TO THE SAME SEALING ISSUE --

23             THE COURT:  OKAY.

24             MR. VAN NEST:  -- THAT WE DISCUSSED.

25             THE COURT:  IT'S ADMITTED.

1       (PLAINTIFF'S EXHIBIT CX 6594 WAS ADMITTED IN EVIDENCE.)

2            THE COURT:  GO AHEAD, PLEASE.

3    BY MR. MATHESON:

4    Q.   COULD YOU YOUR HONOR TURN TO THE NEXT TAB IN YOUR BINDER,

5    SIR, WHICH IS TAB 12, CX 7571.

6    A.   OKAY.

7    Q.   CAN YOU IDENTIFY THIS AS AN ACCOUNTING MEMO THAT WAS SENT

8    TO YOU IN JULY 2016?

9    A.   THAT IS CORRECT.

10   Q.   NOW, PORTIONS OF THIS DOCUMENT HAVE BEEN SEALED, BUT NOT

11   THE FIRST PAGE.

12        CAN WE TAKE A LOOK AT -- OR NOT ALL OF IT.  CAN WE TAKE A

13   LOOK AT CX 7571-002.  KEN, YOU CAN PUT IT UP ON THE SCREEN IF I

14   LET YOU.

15        UNDER BACKGROUND IT READS, "QUALCOMM AND YULONG ARE

16   PARTIES TO A 'COMPLETE TERMINAL CHINESE PATENT LICENSE

17   AGREEMENT,' CPLA, AND A 'STRATEGIC FUNDING AGREEMENT,' SFA,

18   BOTH DATED APRIL 13, 2016."

19        DO YOU SEE THAT, SIR?

20   A.   I DO.

21   Q.   NOW, THE COMPLETE TERMINAL CHINESE PATENT LICENSE

22   AGREEMENT ARE WHAT WE'VE BEEN DISCUSSING THAT QUALCOMM AGREED

23   TO WITH A NUMBER OF CHINESE OEM'S FOLLOWING THE RESOLUTION OF

24   THE NDRC ISSUE; RIGHT?

25   A.   YES, EXCEPT IT WAS MADE AVAILABLE TO ANYBODY, NOT JUST

1    CHINESE OEM'S.

2    Q.   TAKING A LOOK AT DASH 006, WHICH IS UNDER SEAL, THE THIRD

3    PARAGRAPH UNDER SFA MATTERS -- NOW, THIS REFERS TO THE

4    STRATEGIC FUNDING AGREEMENT; RIGHT?  SFA?

5    A.   CORRECT.

6    Q.   OKAY.  NOW, IT READS QUOTE, "THE SFA WAS ENTERED INTO BY

7    QCTAP BUT WAS NEGOTIATED PRIMARILY BY QTL IN CONNECTION WITH

8    THE EXECUTION OF THE CPLA AND THE TRANSACTIONS WILL THEREFORE

9    ULTIMATELY BE REFLECTED IN THE QTL SEGMENT."

10        NOW, WHEN IT SAYS, "ULTIMATELY REFLECTED IN THE QTL

11   SEGMENT," THAT ENEMAS THAT QTL WILL BEAR THE COST OF THE

12   STRATEGIC FUNDING AGREEMENT; RIGHT?

13   A.   QTL WILL RECOGNIZE THAT AS CONTRA REVENUE.

14   Q.   AND BY RECOGNIZING IT AS CONTRA REVENUE, THAT REDUCES

15   QTL'S REVENUES; RIGHT?

16   A.   CORRECT.

17   Q.   TURN TO THE NEXT TAB IN THAT SAME BINDER, SIR.  IT SHOULD

18   BE CX 7618.

19   A.   UM-HUM.

20   Q.   AGAIN, PORTIONS OF THIS ARE SEALED, BUT WE WILL NOT SHOW

21   THE SEALED PORTIONS.

22        CAN YOU IDENTIFY THIS, SIR, AS A PRESENTATION ON WHICH YOU

23   WERE THE -- ON THE DISTRIBUTION LIST FOR THIS PRESENTATION IN

24   JULY 2016?

25   A.   THAT'S CORRECT.

1    Q.   COULD YOU PLEASE TURN TO THE PAGE THAT ENDS DASH 025.

2         YOU CAN SHOW THAT, KEN.

3              MR. KOTARSKI:  IT'S NOT ADMITTED YET I DON'T BELIEVE.

4              MR. MATHESON:  SORRY.  YOUR HONOR, MOVE TO ADMIT

5    CX 7618.

6              THE COURT:  ANY OBJECTION?

7              MR. VAN NEST:  NO OBJECTION, YOUR HONOR, OTHER THAN

8    SEALING.

9              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

10        (PLAINTIFF'S EXHIBIT CX 7618 WAS ADMITTED IN EVIDENCE.)

11             THE COURT:  GO AHEAD, PLEASE.

12   BY MR. MATHESON:

13   Q.   DO THE NUMBERS IN THE TABLE REPORTING QCT CDMA ASIC MARKET

14   SHARE RELATE TO QUALCOMM'S CDMA CAPABLE MODEM CHIPS?

15   A.   YES, THEY RELATE TO CDMA CAPABLE MODEM CHIPS.

16   Q.   CAN YOU TURN TO THE NEXT TAB IN YOUR BINDER, SIR, WHICH IS

17   CX 7629.  NOW, THIS IS THE SAME REPORT SENT TO YOU IN JULY OF

18   2017; RIGHT?

19   A.   YEAH.  BUT I -- ACTUALLY, LET ME CLARIFY THAT LAST

20   QUESTION.  I BELIEVE -- YOU WERE ON PAGE 25.

21   Q.   THAT'S CORRECT, SIR.

22   A.   SO THE CDMA ASIC MARKET SHARE RELATES TO CDMA CHIPS, BUT

23   NOT WCDMA CHIPS.

24   Q.   OKAY.  LET'S STICK WITH THE TAB WE'RE ON.

25        YOU CAN IDENTIFY THE TAB WE'RE CURRENTLY ON, WHICH SHOULD

1     BE TAB 14 IN YOUR BINDER, CX 7629, AS THE SAME MARKET TRENDS

2     TECHNOLOGY LICENSING PROGRAM FOR JULY OF 2017; RIGHT?

3     A.   THAT'S CORRECT.

4            MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 7629.

5            MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

6            THE COURT:  IT'S ADMITTED.

7         (PLAINTIFF'S EXHIBIT CX 7629 WAS ADMITTED IN EVIDENCE.)

8            THE COURT:  GO AHEAD, PLEASE.

9     BY MR. MATHESON:

10    Q.   TURN TO THE PAGE LABELED DASH 026 IN THIS PRESENTATION.

11           AGAIN, THE -- I'LL ASK YOU THE SAME QUESTION.  THE NUMBERS

12    IN THE BOX LABELED QCT CDMA ASIC MARKET SHARE RELATE TO

13    QUALCOMM'S SALES OF CDMA CAPABLE MODEM CHIPS; RIGHT?

14    A.   AS DISTINGUISHED FROM WCDMA.

15    Q.   OKAY.  NOW, IN THE WORLDWIDE ROW, ALL OF THOSE NUMBERS ARE

16    OVER 92 PERCENT; IS THAT RIGHT?  OR 92 PERCENT OR MORE; IS THAT

17    RIGHT?

18    A.   AGAIN, WE'RE STILL REFERRING TO THE SAME TABLE?  THAT IS

19    CORRECT.

20    Q.   YOU TESTIFIED EARLIER ABOUT THE AGREEMENT NEGOTIATED

21    WITH -- YOU CAN TAKE THAT DOWN, KEN -- WITH SAMSUNG IN EARLY

22    2018, OR SIGNED WITH SAMSUNG IN EARLY 2018; RIGHT?

23    A.   YES.

24    Q.   NOW -- AND YOU TESTIFIED WHEN YOU PRESENTED THE AGREEMENT

25    TO THE KFTC, YOU DID SO AS A BODY OF AGREEMENTS; RIGHT?

1      A.   THAT'S MY UNDERSTANDING.

2      Q.   AND THAT ALSO INCLUDED A FOUNDRY AGREEMENT THAT QUALCOMM

3      AND SAMSUNG REACHED; RIGHT?

4      A.   I DON'T KNOW.

5      Q.   WELL, YOU WERE INVOLVED IN DISCUSSING THE FOUNDRY

6      AGREEMENT, THE PROPOSED FOUNDRY AGREEMENT BETWEEN QUALCOMM AND

7      SAMSUNG IN THE FALL OF 2017; RIGHT?

8      A.   I HAD SOME AWARENESS OF THE -- OF A PROPOSED FOUNDRY

9      AGREEMENT.

10     Q.   AND THAT AGREEMENT WAS FOR A SUBSTANTIAL AMOUNT OF MONEY,

11     RIGHT?  OR THE PROPOSAL INVOLVED A SUBSTANTIAL AMOUNT OF MONEY?

12     A.   IF THERE WERE TO BE A FOUNDRY AGREEMENT, I THINK IT WOULD

13     HAVE BEEN.  BUT I DON'T KNOW THAT ONE EVER ACTUALLY HAPPENED.

14     Q.   WELL, QUALCOMM PUBLICLY ANNOUNCED A FOUNDRY AGREEMENT WITH

15     SAMSUNG THREE WEEKS AFTER IT PUBLICLY ANNOUNCED THE AGREEMENT

16     THAT YOU PRESENTED TO THE -- THE BODY OF AGREEMENTS YOU

17     PRESENTED TO THE KFTC; RIGHT?

18     A.   THAT COULD BE.

19     Q.   WERE YOU AWARE OF THIS AT ONE TIME?

20     A.   I DIDN'T REALLY PAY ATTENTION TO THE FOUNDRY ISSUES ONCE

21     WE GOT INTO KIND OF THE LICENSING DISCUSSIONS.  I WAS AWARE THE

22     FOUNDRY ISSUES EXISTED, OR SOME SORT OF FOUNDRY DISCUSSION

23     EXISTED.

24          BUT THEN MY INVOLVEMENT IN THAT WAS VERY LIMITED, AND IT

25     DIDN'T CONTINUE.  SO I ACTUALLY DON'T REMEMBER A FOUNDRY

1    ANNOUNCEMENT.

2    Q.   YOU DON'T RECALL ONE WAY OR THE OTHER IF QUALCOMM PUBLICLY

3    ANNOUNCED ON FEBRUARY 21ST, 2018, THAT IT REACHED AN AGREEMENT

4    WITH SAMSUNG TO USE SAMSUNG'S FOUNDRY CAPABILITIES; IS THAT

5    RIGHT?

6    A.   I ACTUALLY DON'T RECALL ONE WAY OR THE OTHER.

7    Q.   NOW, YOU TESTIFIED TO SEVERAL FEES THAT QUALCOMM PAID TO

8    MANY SAMSUNG UNDER THE BODY OF AGREEMENTS; IS THAT RIGHT?

9    A.   YES.

10   Q.   IT'S FAIR TO SAY THAT QUALCOMM NEGOTIATED AT LEAST SIX

11   SEPARATE PAYMENTS MADE TO SAMSUNG UNDER THAT BODY OF

12   AGREEMENTS?

13   A.   I DON'T KNOW IF THAT'S THE RIGHT NUMBER.

14   Q.   WELL, I HAVE A DOCUMENT UP THERE ON YOUR STAND, SIR, WITH

15   A BINDER CLIP ON IT.  IT'S PREVIOUSLY BEEN ADMITTED AS JX 0122.

16        UNFORTUNATELY, AN AWFUL LOT OF THIS -- NOT UNFORTUNATELY.

17   IT IS A FACT THAT A LOT OF THIS DOCUMENT IS SEALED, SO I'LL

18   HAVE TO CONCEAL IT FROM THE PUBLIC.

19        BUT CAN YOU TAKE A LOOK AT -- I HAVE IT ON YOUR STAND AS

20   WELL, YOUR HONOR, WITH A BINDER CLIP.

21           THE COURT:  I HAVE IT.

22   BY MR. MATHESON:

23   Q.   CAN YOU TAKE A LOOK AT 0122-008.

24        NOW, YOU CAN IDENTIFY THIS AS THE BODY OF AGREEMENTS, IT

25   CERTAINLY APPEARS TO BE THE BODY OF AGREEMENTS NEGOTIATED

1    BETWEEN QUALCOMM AND SAMSUNG IN JANUARY AND SIGNED IN JANUARY

2    OF 2018; RIGHT?

3    A.   YES, THESE ARE SAMSUNG/QUALCOMM AGREEMENTS FROM THAT TIME.

4    Q.   AND TAKING A LOOK AT 008, DO YOU SEE THE 2018 AMENDMENT

5    FEE IN SECTION 2.1?

6    A.   YES, I DO.

7    Q.   AND THAT'S A QUARTERLY FEE PAYABLE BY QUALCOMM TO SAMSUNG

8    IN THE FORM OF A CREDIT; RIGHT?

9    A.   YES, THAT'S A FEE THAT RELATES, AS I SAID, TO THAT

10   COMPLICATED PART OF THE AGREEMENT THAT ESSENTIALLY WAS THE

11   CROSS-LICENSE ELEMENT.

12   Q.   IF YOU TAKE A LOOK AT JX -- SO WE'LL COUNT THAT AS ONE.

13        NOW, JX 0122-037, ARABIC NUMERAL 2, A REFERS TO A MONTHLY

14   REBATE, AND THAT IS GOING TO BE ISSUED BY QUALCOMM TO SAMSUNG

15   IN THE FORM OF A MONTHLY REBATE; RIGHT?

16   A.   I DON'T KNOW.  I'VE NEVER -- I'VE NEVER -- I DON'T THINK

17   I'VE EVER SEEN THIS DOCUMENT BEFORE.

18   Q.   SO YOU WEREN'T EVEN AWARE OF --

19   A.   GIVE ME A CHANCE TO LOOK AT IT.

20   Q.   -- OF THIS PAYMENT THAT FLOWS FROM QUALCOMM TO SAMSUNG AS

21   A PART OF THE BODY OF AGREEMENTS NEGOTIATED BETWEEN QUALCOMM

22   AND SAMSUNG IN JANUARY OF 2018?  IS THAT A FAIR STATEMENT?

23   A.   YEAH.  THIS LOOKS LIKE AN AGREEMENT ON THE CHIP SIDE.

24   Q.   OKAY.  AND LOOKING DOWN AT LETTER B, IT HAS A PREMIUM TIER

25   CORE CHIPSETS, AND AGAIN, YOU WERE NOT AWARE OF THAT PAYMENT

1    RELATED TO PREMIUM CORE CHIPSETS; RIGHT?

2    A.   I'M NOT FAMILIAR WITH THE TERMS OF THIS AGREEMENT.

3    Q.   NOW, EARLIER, SIR, YOU SAID THAT QUALCOMM NEVER THREATENED

4    TO CUT OFF CHIP SUPPLY TO OEM'S IN THE CONTEXT OF LICENSE

5    NEGOTIATIONS; RIGHT?

6    A.   I BELIEVE SO, YES.

7    Q.   BUT YOU'VE PERSONALLY OBSERVED INSTANCES IN WHICH QUALCOMM

8    TOLD CUSTOMERS WHOSE LICENSES HAD LAPSED THAT THE OEM NEEDED TO

9    SIGN A LICENSE OR QUALCOMM WOULD TERMINATE CHIP SHIPMENTS;

10   ISN'T THAT RIGHT?

11   A.   I PERSONALLY OBSERVED THAT?  I DON'T RECALL THAT.

12   Q.   CAN YOU TAKE A LOOK AT TAB 10 OF YOUR FIRST BIG, THICK

13   BINDER AND IDENTIFY THIS AS AN E-MAIL YOU RECEIVED ON

14   OCTOBER 31ST, 2012.

15   A.   WHERE IS THIS?

16   Q.   TAB 10 OF BINDER NUMBER 1.

17        THIS IS CX 5185.  IS THIS AN E-MAIL, SIR, YOU RECEIVED IN

18   OCTOBER OF 2012?

19   A.   YES, I'M LISTED THERE.

20        MR. MATHESON:  YOUR HONOR, MOVE TO ADMIT CX 5185.

21        MR. VAN NEST:  NO OBJECTION, YOUR HONOR.

22        THE COURT:  IT'S ADMITTED.

23        (PLAINTIFF'S EXHIBIT CX 5185 WAS ADMITTED IN EVIDENCE.)

24   BY MR. MATHESON:

25   Q.   SO THE FIRST PAGE, THERE'S A LOT REDACTED FOR PRIVILEGE,

1       OBVIOUSLY.  BUT YOU ULTIMATELY RECEIVED THIS E-MAIL CHAIN.

2               AND CAN WE LOOK AT CX 5185 AT 04.  THE SECOND FULL

3       PARAGRAPH BEGINNING "ACCORDINGLY."

4               CAN YOU IDENTIFY THIS, THE MATERIAL ON THIS PAGE, AS AN

5       E-MAIL THAT ERIC REIFSCHNEIDER SENT TO JONATHAN PEARL OF SONY

6       MOBILE, WHICH WAS ULTIMATELY FORWARDED TO YOU?

7       A.   SO THIS CHAIN WAS FORWARDED TO ME, AND THERE ARE E-MAILS

8       BACK AND FORTH BETWEEN MR. REIFSCHNEIDER AND MR. PEARL.

9       Q.   OKAY.  BUT THE CONTENT OF -- IF YOU LOOK AT 003, SIR,

10      YOU'LL SEE IT'S FROM ERIC REIFSCHNEIDER TO PEARL, JONATHAN, AND

11      THAT IS THE E-MAIL THAT CONTINUES ON TO PAGE 4; RIGHT?

12      A.   YES, THAT'S CORRECT.

13      Q.   THE PARAGRAPH BEGINS, "ACCORDINGLY," AND ENDS "QCT HAS

14      BEEN SHIPPING CHIPS TO SMC FOR ALMOST THREE WEEKS NOW WITHOUT A

15      LICENSE IN PLACE.  IT WILL NOT BE POSSIBLE FOR THAT TO

16      CONTINUE."

17              THAT'S A THREAT TO CUT OFF CHIP SUPPLY, ISN'T IT?

18      A.   THERE WAS BACK AND FORTH BETWEEN MR. REIFSCHNEIDER AND

19      MR. PEARL.  BUT I DON'T RECALL -- I THINK THE SONY MATTER

20      RESOLVED ACTUALLY QUITE AMICABLY.

21      Q.   I DIDN'T ASK YOU IF IT RESOLVED AMICABLY.  I ASKED, THIS

22      RIGHT HERE ON THE SCREEN, "QCT HAS BEEN SHIPPING CHIPS TO SMC

23      FOR ALMOST THREE WEEKS NOW WITHOUT A LICENSE IN PLACE.  IT WILL

24      NOT BE POSSIBLE FOR THAT TO CONTINUE. "

25              THAT'S A THREAT TO CUT OFF CHIP SUPPLY, ISN'T IT?

```
1     A.   YOU KNOW, I DON'T KNOW THE CONTEXT OF THIS.

2               MR. MATHESON:  NO FURTHER QUESTIONS.

3               THE WITNESS:  YOU READ IT CORRECTLY.

4               THE COURT:  ALL RIGHT.  THE TIME IS 2:52.

5          ANY REDIRECT?

6               MR. VAN NEST:  YES, JUST BRIEFLY, YOUR HONOR.

7               MR. MATHESON:  YOUR HONOR, I BELIEVE I MOVED TO ADMIT

8     CX 7571.  I DISPLAYED IT ON THE SCREEN AND I DID NOT --

9               THE COURT:  7571 WAS ADMITTED.  WHAT WAS ADMITTED WAS

10    8195, 8196 -- IT'S OKAY.

11         HOW MANY DID YOU HAVE TOTAL?  ONE, TWO, THREE, FOUR, FIVE,

12    SIX, SEVEN -- EIGHT.  I HAVE EIGHT.  EIGHT IS RIGHT?

13              MR. MATHESON:  I BELIEVE THAT'S CORRECT.  SORRY, YOUR

14    HONOR.

15              MR. VAN NEST:  EXCUSE ME, YOUR HONOR.  IS THAT THE

16    DOCUMENT FOR REFRESHING RECOLLECTION?

17              MR. MATHESON:  NO.  THAT ONE WAS NEVER ADMITTED.

18              THE COURT:  NO.  THAT -- THAT BINDER CLIP WAS NOT

19    ADMITTED.

20              MR. VAN NEST:  I'M SORRY.

21              MR. MATHESON:  SORRY ABOUT THAT.

22              MR. VAN NEST:  YOUR HONOR, BEFORE I BEGIN --

23              THE COURT:  YES.

24              MR. VAN NEST:  -- MY STAFF IS ASKING YOUR INDULGENCE

25    TO FILE THE SEALING MOTION BY NOON TOMORROW.
```

1          THE COURT:  YES.

2          MR. VAN NEST:  IT'S 832 PAGES SO FAR JUST WITH THOSE

3     EXHIBITS THAT WE ALLOWED.  YOU'VE ALREADY SEALED THE ONES THAT

4     WERE, YOU KNOW, SUBJECT TO TODAY'S CROSS.  BUT COULD THEY HAVE

5     UNTIL NOON?  IT'S SUCH A HUGE AMOUNT.

6          THE COURT:  IF THIS DOESN'T HAVE TO BE DONE FOR THE

7     CLOSING.

8          MR. VAN NEST:  IT DOESN'T.

9          THE COURT:  WE CAN DO IT EVEN LATER.

10        NOW, WHAT ARE ALL THE DOCUMENTS?  HOW MANY OF THESE DO YOU

11    NEED TO MOVE TO SEAL?

12         MR. VAN NEST:  I THINK WE MENTIONED THEM AS WE WENT

13    ALONG.

14         THE COURT:  SO I GOT 8196 AND 7122.

15         MR. VAN NEST:  I THINK 8196, 8195.

16         THE COURT:  OKAY.

17         MR. VAN NEST:  7629, 7618, 65 -- OH, I'M SORRY.

18    THAT'S IT.

19         THE COURT:  OKAY.  WHAT ABOUT 7571?

20         MR. VAN NEST:  I DON'T THINK THERE'S ANY SEALING

21    REQUEST ASSOCIATED WITH THAT.

22         MR. MATHESON:  YOUR HONOR, I BELIEVE THAT HAS BEEN

23    FULLY RESOLVED.

24         MR. VAN NEST:  ONE MORE.  6594.

25         THE COURT:  OKAY.  WAIT.  SO 7571, THERE'S NO NEED

```
1     FOR SEALING.  IS THAT RIGHT?

2            MR. VAN NEST:  THAT'S CORRECT.  NO NEED FOR SEALING.

3         6594, WE NEED TO MOVE TO SEAL.

4            THE COURT:  ALL RIGHT.  WELL, DO YOU -- WHAT DO YOU

5     WANT TO MOVE IN?  JUST -- I'M NOT EVEN CLEAR FROM YOUR BINDER.

6         IS THIS THE ENTIRE DOCUMENT OR THESE ARE JUST THE PAGES

7     THAT YOU SAID YOU WANTED TO USE?

8            MR. MATHESON:  YOUR HONOR, WE ARE MOVING IN THE

9     ENTIRE DOCUMENT IN EACH CASE.

10           THE COURT:  OKAY.  SO THEN THE SEALING WOULD BE 8195,

11    8196, 7122, 6594, 7618, AND 7629?  IS THAT CORRECT?

12           MR. ADLER:  GARY ADLER, MORGAN LEWIS.

13        I'M SORRY, YOUR HONOR.  THE DOCS THAT WE WOULD NEED TO

14    MOVE TO SEAL ON ARE CX 8195, CX 8196, CX 6594, CX 7618.

15           THE COURT:  OKAY.  WHAT ABOUT 7122?

16           MR ADLER:  NO, THAT'S BEEN DEALT WITH, YOUR HONOR.

17    AND 7629 IS THE LAST OF THE GROUP.

18           THE COURT:  OKAY.  WAIT A MINUTE.  I'M SORRY.  I WANT

19    TO DO IT IN THE ORDER ADMITTED BECAUSE THAT'S THE ORDER IN MY

20    NOTES.  SO 8195 AND 8196 I GOT.

21           MR. ADLER:  YES, MA'AM.

22           THE COURT:  6594?

23           MR. ADLER:  CORRECT.

24           THE COURT:  AND THEN IS IT 7618?

25           MR. ADLER:  YES.
```

```
 1                 THE COURT:  AND THEN 7629?

 2                 MR. ADLER:  THAT'S CORRECT, YOUR HONOR.

 3                 THE COURT:  SO YOU NEED TO MOVE TO SEAL ALL FIVE OF

 4     THOSE?

 5                 MR. ADLER:  YES.

 6                 THE COURT:  OKAY.  AND THIS DOES NOT HAVE TO BE DONE

 7     BEFORE CLOSING; IS THAT RIGHT?

 8                 MR. VAN NEST:  NO, AS LONG AS WE'RE NOT FILING THE

 9     EXHIBITS ON THE PUBLIC RECORD, OF COURSE NOT.

10                 THE COURT:  OKAY.  WELL, THEN DO YOU WANT TO FILE

11     THIS ON MONDAY?

12                 MR. VAN NEST:  SURE.

13                 MR. ADLER:  THAT WOULD BE FINE, YOUR HONOR.

14                 MR. VAN NEST:  THAT'S BETTER.

15                 THE COURT:  WHY DON'T YOU FILE IT MONDAY?

16                 MR. ADLER:  THANK YOU, YOUR HONOR.

17                 THE COURT:  OKAY.  LET'S MOVE TO THE REDIRECT,

18     PLEASE.  IT'S 2:55.

19                         REDIRECT EXAMINATION

20     BY MR. VAN NEST:

21     Q.   MR. ROGERS, AS OF MARCH OF 2018 WERE YOU EXPECTING

22     COMPETITION IN 5G?

23     A.   YES, SIR.

24     Q.   WHAT COMPANIES DID QUALCOMM BELIEVE WOULD BE COMPETING FOR

25     5G?
```

1    A.    HUAWEI HAD ALREADY ANNOUNCED A 5G CHIP I THINK IN THE

2    PRIOR MONTH AT MOBILE WORLD CONGRESS; SAMSUNG HAD ANNOUNCED A

3    5G CHIP; INTEL HAD A 5G PROJECT; MEDIATEK HAD A 5G CHIP PROJECT

4    AS WELL.

5    Q.    DID YOU ACTUALLY ATTEND THE 2018 MOBILE WORLD CONGRESS IN

6    JANUARY?

7    A.    I THINK IT WAS IN FEBRUARY.

8    Q.    DID YOU ATTEND?

9    A.    YES, I DID.

10   Q.    WHAT DID YOU SEE THERE?

11   A.    I SAW THE HEAD OF THE MOBILE DEPARTMENT OF HUAWEI HOLDING

12   UP A 5G CHIP AND TALKING ABOUT THE 5G CHIP CAPABILITIES OF

13   HUAWEI.

14   Q.    COULD WE HAVE CX 8196 ON THE SCREEN, AND PAGE 121.  IT'S

15   IN YOUR BINDER, BUT WE HAVE IT HERE.

16         COULD WE GO TO THE BOTTOM OF THE PAGE.  ACTUALLY, YEAH, DO

17   WE HAVE -- OKAY.  WITH REFERENCE TO THE BOTTOM RESULT, 5G

18   CHIPSET COMPETITIVE LANDSCAPE, CAN YOU TELL US WHAT IS RECORDED

19   THERE?

20   A.    YEAH.  IT'S SAMSUNG AND HISILICON, THAT'S THE DIVISION OR

21   THE COMPANY THAT BELONGS TO HUAWEI THAT MAKES CHIPS, IS

22   EXPECTED TO COMPETE WITH QCT.

23         AND THEN IT REFERS TO INTEL AND MEDIATEK LAGGING ON TIME

24   TO MARKET, BUT OBVIOUSLY THEY'RE PREPARING 5G CHIPS AS WELL.

25   Q.    THANK YOU, MR. ROGERS.

1          WHY DIDN'T QUALCOMM ACCEPT APPLE'S ARBITRATION PROPOSAL?

2     A.   SO IT'S REALLY SIMPLE.  APPLE HAD AN ARBITRATION PROPOSAL

3     THAT NO HUMAN BEING COULD ACTUALLY COMPLETE, OR NO SETS OF

4     ARBITRATORS COULD ACTUALLY COMPLETE WITHIN A REASONABLE

5     TIMEFRAME.  THEY INSISTED THAT EVERY SEP, A CLAIM FROM EVERY

6     SEP BE EVALUATED FOR ESSENTIALITY VALIDITY, INFRINGEMENT, ON A

7     DETAILED BASIS FOR THOUSANDS UPON THOUSANDS OF SEPS.  FOR

8     EXAMPLE, IN THIS CASE BOTH SIDES ARE ALLOTTED 50 HOURS.  THAT

9     ARBITRATION WOULD TAKE BOTH SIDES TO HAVE 1,000 HOURS.  IT JUST

10    SIMPLY WASN'T PRACTICAL.

11         SO WHAT WE SAID TO APPLE WAS, LOOK, WE'RE HAPPY TO DO

12    PATENT-BY-PATENT ANALYSIS, BUT LET'S PUT IT TO THE ARBITRATORS

13    AS TO WHAT ACTUALLY MAKES SENSE BECAUSE WE DON'T THINK AN

14    ARBITRATION PANEL WILL AGREE TO YOUR PROPOSAL.  SO WE'LL

15    PRESENT TO THE ARBITRATORS THE WAY A PATENT PORTFOLIO LICENSE

16    OUGHT TO BE ARBITRATED, AND YOU PRESENT IT TO THE ARBITRATORS

17    THE WAY YOU THINK A PORTFOLIO LICENSE WILL BE ARBITRATED,

18    NEITHER SIDE WILL TELL THE OTHER SIDE WHAT TO DO, AND THE

19    ARBITRATOR WILL DECIDE WHAT TO DO.  THAT'S REFLECTED LATER IN

20    THE LETTER AS I INFORMED COUNSEL.

21    Q.   AND NOW THE PARTIES ARE LITIGATING IN COURT AROUND THE

22    WORLD, APPLE AND QUALCOMM?

23    A.   YES, WE ARE.

24    Q.   COULD I HAVE CX 7629 UP AND PAGE 026.  I THINK YOU WERE

25    SHOWN THIS DURING YOUR EXAMINATION.

1          MR. MATHESON ASKED YOU ABOUT THE CDMA MARKET.  COULD WE

2     HIGHLIGHT THE WCDMA MARKET AT THE BOTTOM.  AND IN PARTICULAR,

3     THE VERY BOTTOM LINE.

4          WHAT HAPPENED TO QUALCOMM'S SHARE OF THE WCDMA MARKET,

5     MR. ROGERS, BETWEEN 2015 AND THE END OF 2017?

6     A.   WELL, YOU'LL SEE A PRETTY STEADY DECLINE IN THE WCDMA

7      MARKET FROM 2015 DOWN THROUGH 2017 DOWN TO 45 PERCENT, 44 AND

8      45 PERCENT IN THE LAST COUPLE OF QUARTERS LISTED THERE.

9          BUT THAT'S Q1 OF 2017.  THAT DECLINE CONTINUED, IS MY

10    UNDERSTANDING, INTO 2018 AS WELL.

11              MR. VAN NEST:  I HAVE NOTHING FURTHER, YOUR HONOR.

12              THE COURT:  OKAY.  THE TIME IS 2:59.

13         IS THERE ANY RECROSS?

14              MR. MATHESON:  NONE, YOUR HONOR.

15              THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

16    SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

17              MR. MATHESON:  NOT FOR US, YOUR HONOR.

18              MR. VAN NEST:  NO, NOT SUBJECT TO RECALL, YOUR HONOR.

19              THE COURT:  OKAY.  THEN YOU'VE COMPLETED YOUR TRIAL

20    TESTIMONY, AND YOU ARE FREE TO LEAVE.

21              THE WITNESS:  THANK YOU VERY MUCH, YOUR HONOR.

22              THE COURT:  AND QUALCOMM MAY CALL ITS NEXT WITNESS.

23              MR. BYARS:  YOUR HONOR, IN THE INTERESTS OF TIME,

24    WE'RE GOING TO BE CALLING THE NEXT TWO DEPOSITIONS ON THE LIST

25    ONLY.  THE NEXT ONE, MR. LEE OF SAMSUNG, IS SEALED.

```
1              THE COURT:  OKAY.

2              MR. BYARS:  THE ONE FOLLOWING THAT IS ONLY ABOUT TWO

3        AND A HALF MINUTES, AND IT'S NOT SEALED.  WE'RE HAPPY TO TAKE

4        THOSE OUT OF ORDER AND DO THE SECOND ONE FIRST.

5              THE COURT:  WHY DON'T WE DO THAT, BECAUSE WE'LL HAVE

6        TO CLEAR THE COURTROOM FOR THE LEE VIDEO.

7              MR. BYARS:  SURE, YOUR HONOR.

8              THE COURT:  OKAY.  SO LET'S GO AHEAD, THEN, AND START

9        WITH MR. AHN.  YOU SAID THAT'S VERY SHORT.  DO YOU WANT TO

10       ADMIT ANY EXHIBITS WITH HIM?

11             MR. BYARS:  NO, YOUR HONOR.

12             THE COURT:  OKAY.  ARE YOU READY TO SHOW IT?

13             MR. BYARS:  WE ARE, YOUR HONOR.

14             THE COURT:  OKAY.  THEN IT'S 3:00 O'CLOCK.

15         GO AHEAD, PLEASE.

16         (THE VIDEOTAPED DEPOSITION OF SEUNGHO AHN WAS PLAYED IN

17    OPEN COURT OFF THE RECORD.)

18             THE COURT:  OKAY.  TIME IS 3:03.

19             MR. BYARS:  YOUR HONOR, THE NEXT DEPOSITION IS

20       SEALED, MR. INJUNG LEE OF SAMSUNG.

21             THE COURT:  OKAY.  IS THAT GOING TO BE YOUR LAST

22       WITNESS?

23             MR. BYARS:  IT WILL BE, YOUR HONOR.

24             THE COURT:  MR. LEE?

25         OKAY.  SO AFTER THIS LAST WITNESS, THEN I BELIEVE WE'RE
```

2020

1    DONE FOR THE DAY; IS THAT CORRECT?

2           MR. VAN NEST:  YES, YOUR HONOR, I BELIEVE THAT'S

3    CORRECT.

4           THE COURT:  OKAY.  AND THEN WE START UP AT 9:00

5    O'CLOCK ON MONDAY?

6           MR. VAN NEST:  THAT'S RIGHT.

7           THE COURT:  OKAY.  THEN I'LL GO AHEAD AND CLEAR THE

8    COURTROOM.

9        HOW LONG IS THIS DEPOSITION?

10          MR. BYARS:  IT'S JUST SHY OF SEVEN MINUTES.

11          THE COURT:  OKAY.  SO WE'LL BE CONCLUDING FAIRLY

12   EARLY THEN TODAY.  LET'S GO AHEAD AND DO THIS, AND THEN WE'LL

13   JUST ADJOURN RATHER THAN TAKING ANY BREAKS.

14       ALL RIGHT.  I'M GOING TO ASK THAT EVERYONE WHO IS NOT

15   AUTHORIZED TO REMAIN IN THE COURTROOM, IF YOU WOULD PLEASE STEP

16   OUTSIDE.  WE'RE DONE FOR THE DAY AS FAR AS WHAT YOU CAN

17   OBSERVE.

18       **(PROCEEDINGS SEALED FROM PAGES 2021 TO 2021.)**

19

20

21

22

23

24

25

2022

1      **(IN OPEN COURT.)**

2              THE COURT:  OKAY.  TIME IS 3:12.

3          ALL RIGHT.  DOES QUALCOMM REST THEN?

4              MR. VAN NEST:  I WOULD SAY, YOUR HONOR, SUBJECT TO

5      WHAT I'LL CALL HOUSEKEEPING, REPLACING EXHIBITS WITH REDACTED

6      VERSIONS AND SEALING AND THE LIKE, YES, WE REST.

7              THE COURT:  OKAY.

8              MR. VAN NEST:  THERE MAY BE SOME HOUSEKEEPING WITH

9      THE EXHIBIT LIST THAT I JUST WANT TO BE SURE WE CHECK.  BUT

10     APART FROM THAT, YES, QUALCOMM RESTS.

11             THE COURT:  OKAY.  WELL, THE PARTIES WILL SUBMIT A

12     JOINT EXHIBIT LIST WITH EVERYTHING ADMITTED UP TO NOW, SO I

13     HOPE THAT WILL BE YOUR WAY OF RESOLVING ANY ISSUES.

14             MR. VAN NEST:  THAT'S MY EXPECTATION AND HOPE, AND I

15     THINK THAT'S RIGHT.

16             THE COURT:  IS THIS PUBLIC?  YES, AFTER THE VIDEO.  I

17     MEAN, ARE THERE PEOPLE STILL WAITING OUTSIDE?  MY GOSH, I THINK

18     THERE ARE STILL PEOPLE WAITING OUTSIDE.  I GUESS WE COULD OPEN

19     THE DOOR NOW.

20         RIGHT.  SO AFTER THE VIDEO ENDED, I THINK THE SEALED

21     PORTION ENDED.

22             MR. VAN NEST:  THAT'S RIGHT.

23             THE COURT:  I GUESS SOME PEOPLE ARE STILL WAITING.

24         OKAY.  QUALCOMM RESTED.

25         I THINK WE ARE THEN DONE FOR THE DAY.

2023

```
1          I'D LIKE TO GIVE YOU YOUR TIME ESTIMATES, PLEASE.

2          (PAUSE IN PROCEEDINGS.)

3              THE COURT:  OKAY.  SO QUALCOMM TODAY USED 3 HOURS AND

4    16 MINUTES.  SO YOUR TOTAL IS NOW, THAT YOU'VE USED, IS 24

5    HOURS AND 27 MINUTES.  SO WHAT DOES THAT LEAVE YOU WITH, 33

6    MINUTES LEFT?

7              MR. VAN NEST:  THAT'S WHAT I COUNT, YOUR HONOR.

8              THE COURT:  OKAY.  AND THEN AS FAR AS FTC, YOU USED

9    TODAY 1 HOUR AND 18 MINUTES, SO YOUR TOTAL IS NOW 23 HOURS AND

10   58 MINUTES.  SO I BELIEVE YOU HAVE 1 HOUR AND 2 MINUTES LEFT.

11         SO WE HAVE BASICALLY AN HOUR AND 35 MINUTES LEFT, AND

12   WE'LL START MONDAY AT 9:00.

13         AND THEN YOU'LL HAVE THE REST OF THE DAY AND HALF OF THE

14   DAY ON TUESDAY TO PREPARE YOUR CLOSINGS.

15             OKAY.  WHAT IS --

16             MR. VAN NEST:  CAN I HAVE JUST A MINUTE, YOUR

17   HONOR --

18             THE COURT:  YES.

19             MR. VAN NEST:  -- ON THE TIME?

20             THE COURT:  OKAY.  UM-HUM.  DID I CALCULATE IT WRONG?

21             MR. VAN NEST:  I JUST WANT TO CHECK.

22             THE COURT:  OKAY.  PLEASE DO.

23         (PAUSE IN PROCEEDINGS.)

24             MR. VAN NEST:  NO, I THINK YOU'RE CORRECT.  I MAY BE

25   OFF BY A MINUTE OR TWO, BUT I THINK YOU'RE ESSENTIALLY -- I
```

2024

```
1      HAVE US AT 35 MINUTES, BUT --

2             THE COURT:  OH, LET ME JUST --

3             MR. VAN NEST:  I HAD US AT 3:14 TODAY.  I'M NOT SURE

4      WHERE THE --

5             THE COURT:  OKAY.  WELL, I CAN TELL YOU WHAT MY TIMES

6      WERE AND YOU CAN TELL ME.

7         THE JOHNSON DIRECT WAS 26 MINUTES FROM 9:04 TO 9:29.  THE

8      REDIRECT WAS 5 MINUTES FROM 9:36 TO 9:40.

9         THE NEVO DIRECT WAS AN HOUR, 9:41 TO 10:40.  THE NEVO

10     CONTINUATION OF THE DIRECT WAS 10:57 TO 11:27, 31 MINUTES.  THE

11     NEVO REDIRECT WAS 13 MINUTES, 1:12 TO 1:24.

12        PETERSSON VIDEO WAS 8 MINUTES, 1:29 TO 1:36.

13        MCELVAINE VIDEO WAS 3 MINUTES, 1:37 TO 1:39.

14        RAHNASTO VIDEO WAS 3 MINUTES, 1:40 TO 1:42.

15        THE ROGERS DIRECT WAS 30 MINUTES, 1:43 TO 2:12.  THE

16     ROGERS REDIRECT WAS 5 MINUTES, 2:55 TO 2:59.

17        THE AHN VIDEO WAS 4 MINUTES, 3:00 O'CLOCK TO 3:03.

18        AND THE LEE VIDEO WAS 8 MINUTES, 3:05 TO 3:12.

19             MR. VAN NEST:  I HAD 28 MINUTES, I'M SORRY, FOR

20     ROGERS'S DIRECT.  THAT'S WHERE THE TWO MINUTES ARE.

21             THE COURT:  OH, OKAY.  I HAD RECORDED THAT AS 1:43 TO

22     2:12.

23             MR. VAN NEST:  I DON'T THINK WE STARTED UNTIL 1:45,

24     BUT IT'S TWO MINUTES.  IT'S UP TO THE COURT.

25             THE COURT:  OKAY.  I WAS LOOKING AT THE TRANSCRIPT.
```

2025

```
 1        I'M DOING THIS ALL OFF OF THE REALTIME TRANSCRIPT, SO I THINK
 2       THAT WAS CORRECT.
 3            OKAY.  WHAT ELSE?
 4            SO BASICALLY WE HAVE AN HOUR AND A HALF, ROUGHLY, LEFT ON
 5       MONDAY.
 6            I'VE ISSUED THE RULING ON HIGH PRIORITY OBJECTIONS.  I'VE
 7       DONE THE SEALING MOTIONS.
 8            I THINK THE NEXT WOULD BE THE HIGH PRIORITY OBJECTIONS ON
 9       CLOSING SLIDES, WHICH WILL COME IN ON TUESDAY MORNING.
10       HOPEFULLY YOU WON'T HAVE ANY.
11            AND THEN I GUESS WE'LL HAVE THE ADDITIONAL SEALING MOTION.
12                 MR. VAN NEST:  THAT'S RIGHT.
13                 THE COURT:  ANYTHING ELSE?
14                 MR. VAN NEST:  I THINK YOU GAVE US UNTIL MONDAY TO DO
15       THAT.
16                 THE COURT:  THAT'S FINE.  THAT'S FINE.  IT SOUNDS
17       LIKE THAT ONE IS NOT AS TIME PRESSURED.
18                 MR. VAN NEST:  NO.
19                 THE COURT:  SO IF YOU NEEDED UNTIL TUESDAY, THAT'S
20       FINE, TOO.
21                 MR. VAN NEST:  THANK YOU.
22                 THE COURT:  WHICH DAY ARE YOU GOING TO DO IT, JUST SO
23       WE'LL KNOW TO LOOK FOR IT?  IS MONDAY OKAY?
24                 MR. VAN NEST:  MONDAY IS FINE.
25                 THE COURT:  OKAY.  ALL RIGHT.
```

```
 1              THEN I THINK THAT IS IT.  AS I SAID BEFORE, YOU EACH HAVE

 2       AN HOUR FOR CLOSING.

 3              WHAT ELSE?  ANYTHING ELSE?

 4              I THINK THE ORDER IS GOING TO TAKE SOME TIME JUST BECAUSE

 5       THE QUANTITY OF EVIDENCE THAT'S BEEN INTRODUCED IS VOLUMINOUS

 6       AND THE LEGAL ISSUES ARE COMPLEX.

 7              ANYTHING ELSE?

 8              MR. VAN NEST:  I DON'T THINK SO, YOUR HONOR.

 9              THE COURT:  THANK YOU ALL FOR BEING CAMPED OUT IN

10       SAN JOSE FOR SO LONG.  I APOLOGIZE TO YOUR FAMILIES AND YOUR

11       FRIENDS.

12              OKAY.  ANYTHING ELSE FOR TODAY?

13              MR. VAN NEST:  WE'LL SEE YOU MONDAY MORNING.

14              THE COURT:  WE'LL SEE YOU MONDAY MORNING AT 9:00.

15       THANK YOU.

16              MR. VAN NEST:  THANK YOU, YOUR HONOR.

17              MS. MILICI:  THANK YOU, YOUR HONOR.

18         (THE EVENING RECESS WAS TAKEN AT 3:19 P.M.)

19

20

21

22

23

24

25
```

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, CRR
         CERTIFICATE NUMBER 8076
17

18       _____

19       LEE-ANNE SHORTRIDGE, CSR, CRR
         CERTIFICATE NUMBER 9595
20

21       DATED:  JANUARY 25, 2019

22

23

24

25