```
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3                        SAN JOSE DIVISION

 4

 5
      FEDERAL TRADE COMMISSION,        )  C-17-00220 LHK
 6                                     )
                     PLAINTIFF,        )  SAN JOSE, CALIFORNIA
 7                                     )
                VS.                    )  JANUARY 28, 2019
 8                                     )
      QUALCOMM INCORPORATED, A         )  VOLUME 10
 9    DELAWARE CORPORATION,            )
                                       )  PAGES 2027-2094
10                   DEFENDANT.        )
      _____)
11

12                  TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE LUCY H. KOH
13                 UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:     FEDERAL TRADE COMMISSION
                             BY:  JENNIFER MILICI
16                               DANIEL J. MATHESON
                                 WESLEY G. CARSON
17                               RAJESH JAMES
                                 NATHANIEL M. HOPKIN
18                               PHILIP J. KEHL
                                 MIKA IKEDA
19                             600 PENNSYLVANIA AVENUE, NW
                             WASHINGTON, D.C.  20580
20

21                  APPEARANCES CONTINUED ON NEXT PAGE

22    OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR, RMR
                                  CERTIFICATE NUMBER 8074
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1

 2        APPEARANCES (CONTINUED)

 3

 4        FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                                  BY:  ROBERT A. VAN NEST
 5                                     JUSTINA K. SESSIONS
                                       EUGENE M. PAIGE
 6                                     CHRISTINA BLAIS
                                       MATAN SHACHAM
 7                                     CODY HARRIS
                                       KRISTIN HUCEK
 8                                640 BATTERY STREET
                                  SAN FRANCISCO, CALIFORNIA  94111
 9

10                                CRAVATH, SWAINE & MOORE
                                  BY:  GARY A. BORNSTEIN
11                                     MICHAEL BRENT BYARS
                                       YONATAN EVEN
12                                     JORDAN D. PETERSON
                                       MING-TOY TAYLOR
13                                     DEREK SUTTON
                                       ANDREW HUYNH
14                                     ANTONY RYAN
                                  825 EIGHTH AVENUE
15                                NEW YORK, NEW YORK  10019

16
                                  NORTON ROSE FULBRIGHT
17                                BY:  MARC COLLIER
                                       TALBOT HANSUM
18                                98 SAN JACINTO BOULEVARD, SUITE 1100
                                  AUSTIN, TEXAS  78701
19
                                  BY:  ERIC B. HALL
20                                     DANIEL LEVENTHAL
                                  1301 MCKINNEY, SUITE 5100
21                                HOUSTON, TEXAS  77010

22

23        ALSO PRESENT:          MARK SNYDER
                                  JEFF DAHM
24                                KEN KOTARSKI

25
```

1

2                          INDEX OF WITNESSES

3     PLAINTIFF'S REBUTTAL

4     **CARL SHAPIRO**
          DIRECT EXAM BY MR. JAMES              P. 2031
5         CROSS-EXAM BY MR. VAN NEST            P. 2062
          REDIRECT EXAM BY MR. JAMES            P. 2083
6         RECROSS-EXAM BY MR. VAN NEST          P. 2087

7     **INJUNG LEE**
          VIDEOTAPED DEPOSITION                 P. 2090
8
      **YOOSEOK KIM**
9         VIDEOTAPED DEPOSITION                 P. 2090

10    **SEUNGHO AHN**
          VIDEOTAPED DEPOSITION                 P. 2090
11
      **JOHN GRUBBS**
12        VIDEOTAPED DEPOSITION                 P. 2091

13

14

15

16

17

18

19

20

21

22

23

24

25

2030

```
1     SAN JOSE, CALIFORNIA                    JANUARY 28, 2019

2                      P R O C E E D I N G S

3          (COURT CONVENED AT 9:02 A.M.)

4              THE COURT:  GOOD MORNING AND WELCOME.

5              MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

6              MS. MILICI:  GOOD MORNING.

7              THE COURT:  PLEASE TAKE A SEAT.

8          AND CALL YOUR FIRST WITNESS.

9              MR. JAMES:  RAJ JAMES FOR THE FTC.

10         THE FTC CALLS AS ITS NEXT WITNESS PROFESSOR CARL SHAPIRO.

11       MAY WE APPROACH WITH THE BINDERS?

12             THE COURT:  YES, PLEASE.  PAR.

13             THE CLERK:  HE'S STILL UNDER OATH; CORRECT?

14             THE COURT:  YES, YOU'RE STILL UNDER OATH, SIR.

15             MR. CARSON:  MAY I APPROACH?

16             THE COURT:  YES.  AND I FAILED TO ASK,

17     MR. SUNG HOE AHN, WHO WAS A WITNESS AT THE END OF THE DAY LAST

18     FRIDAY BY VIDEO, IS HE SUBJECT TO RECALL OR NOT SUBJECT TO

19     RECALL?

20             MR. BYARS:  NOT SUBJECT BY QUALCOMM, YOUR HONOR.

21             THE COURT:  HE IS?

22             MR. BYARS:  HE'S NOT.

23             THE COURT:  I'M SORRY.  I MISHEARD YOU.  WHAT ABOUT

24     FOR THE PLAINTIFF.

25             MS. IKEDA:  WE INTEND TO CALL HIM AS A REBUTTAL
```

1     WITNESS.

2               THE COURT:   OKAY.  ARE YOU READY?

3          **(PLAINTIFF'S WITNESS, CARL SHAPIRO, WAS PREVIOUSLY SWORN.)**

4                        **DIRECT EXAMINATION**

5     BY MR. JAMES:

6     Q.   WELCOME BACK, PROFESSOR SHAPIRO.

7     A.   GOOD MORNING, MR. JAMES.

8     Q.   HAVE YOU HEARD THE TESTIMONY PROVIDED HERE BY QUALCOMM'S

9     ECONOMIC EXPERTS, DR. CHIPTY, PROFESSOR SNYDER, AND

10    PROFESSOR NEVO?

11    A.   YES, I HAVE.

12    Q.   AND HAS THAT TESTIMONY CAUSED YOU TO SUBSTANTIALLY CHANGE

13    ANY OF THE OPINIONS YOU OFFERED TO THIS COURT WHEN YOU

14    TESTIFIED HERE TWO WEEKS AGO?

15    A.   NO, BUT I APPRECIATE THE OPPORTUNITY TO RESPOND.

16    Q.   LET'S START WITH THE TESTIMONY GIVEN BY QUALCOMM'S

17    ECONOMIC EXPERTS REGARDING THE OVERALL CHARACTERISTICS AND

18    PERFORMANCE OF THE MODEM CHIP INDUSTRY.

19         WHAT'S YOUR REACTION TO THAT TESTIMONY?

20    A.   I THINK WE ALL AGREE THE INDUSTRY IS DYNAMIC.  IT'S LIKE

21    MANY OTHER HIGH TECH INDUSTRIES, PRODUCTS IMPROVE SIGNIFICANTLY

22    OVER TIME, THERE ARE SUBSTANTIAL ECONOMIES OF SCALE, AND IT'S

23    IMPORTANT FOR FIRMS TO MAKE SIGNIFICANT R&D INVESTMENTS IN

24    ORDER TO REMAIN COMPETITIVE.

25    Q.   AND YOUR CONCLUSIONS REGARDING THE COMPETITIVE EFFECTS OF

1    QUALCOMM'S CHALLENGED PRACTICES DIVERT QUITE SHARPLY FROM THOSE

2    OF PROFESSOR SNYDER.  WHY DO YOU REACH SUCH DIFFERENT

3    CONCLUSIONS?

4    A.   BECAUSE WE USE VERY DIFFERENT METHODOLOGIES.

5    Q.   HOW WOULD YOU DESCRIBE YOUR METHODOLOGY FOR EVALUATING THE

6    COMPETITIVE EFFECTS OF QUALCOMM'S CHALLENGED PRACTICES?

7    A.   SO MY METHODOLOGY HAS TWO STEPS.  FIRST, I ASSESS THE

8    EVIDENCE REGARDING WHETHER QUALCOMM USED ITS CHIP LEVERAGE TO

9    OBTAIN SUPRA-FRAND ROYALTIES, OR WHAT I'M CALLING A ROYALTY

10   SURCHARGE.

11        AND THEN SECOND, I TRACED THROUGH THE EFFECTS OF THAT

12   ROYALTY SURCHARGE ON THE MARKET GENERALLY, ON COMPETITION, AND

13   ON CONSUMERS.

14        SO THE KEY TO THE METHODOLOGY, IT'S VERY FOCUSSED ON THE

15   PRACTICES AT HAND AND TRACING THROUGH THEIR EFFECTS.

16   Q.   HOW DO YOU RESPOND TO CHARGES FROM ALL THREE OF QUALCOMM'S

17   ECONOMIC EXPERTS THAT YOUR APPROACH IS PURELY THEORETICAL?

18   A.   I DISAGREE.  I DON'T THINK THAT'S TRUE OR FAIR.

19        THE FIRST STAGE OF THE ANALYSIS IS VERY MUCH FOCUSSED ON

20   THE EVIDENCE REGARDING QUALCOMM'S USE OF ITS CHIP LEVERAGE TO

21   OBTAIN ROYALTY SURCHARGES.

22        I THINK THE -- WITH REGARDS TO NEVO IN PARTICULAR, REALLY

23   HE DOES NOT WANT TO ENGAGE WITH THAT EVIDENCE.

24        AND THE SECOND STAGE OF THE ANALYSIS IS VERY MUCH ROOTED

25   IN THE REALITY OF HOW THE BUSINESS WORKS, HOW OEM'S NEGOTIATE

1       ROYALTY ARRANGEMENTS AND CHIP SUPPLY AGREEMENTS WITH QUALCOMM,

2       THE TIMING OF THOSE ARRANGEMENTS, AND THEN HOW COMPETITION

3       OCCURS AT THE CHIP AND OEM LEVEL.

4       Q.   PROFESSOR SNYDER TESTIFIED THAT YOUR, QUOTE, "METHODOLOGY

5       IS FUNDAMENTALLY FLAWED," UNQUOTE.

6            HOW DO YOU RESPOND TO THAT?

7       A.   WELL, HE'S ENTITLED TO HIS OPINION.

8            BUT THE METHODOLOGY I'VE DESCRIBED, YOUR HONOR, WHICH I

9       WOULD CHARACTERIZE AS FOCUSSING ON THE CHALLENGED CONDUCT AND

10      LOOKING CAREFULLY AT HOW THE INDUSTRY WORKS AND THEN APPLYING

11      ECONOMIC ANALYSIS TO, IN THAT FOCUSSED WAY, TRY TO ASSESS THE

12      EFFECTS OF THE CONDUCT.

13           THIS IS THE STANDARD METHODOLOGY THAT'S USED BY ANTITRUST

14      ECONOMISTS IN CONDUCT CASES.  IT'S VERY SIMILAR IN MERGER CASES

15      AS WELL.

16           AND I HAVE TO SAY, I'VE BEEN CHIEF ECONOMIST AT THE D.O.J.

17      TWICE.  I'M INVOLVED IN A GOOD NUMBER OF ANTITRUST CASES, SOME

18      FOR THE GOVERNMENT, SOME FOR PRIVATE PARTIES.  AND I'VE BEEN

19      TRAINING ANTITRUST ECONOMISTS AND IO ECONOMISTS FOR MANY YEARS

20      AND THIS IS THE METHODOLOGY THAT'S WIDELY ADOPTED.

21           SO I JUST DON'T THINK HIS STATEMENT THERE IS ACCURATE OR

22      FAIR.

23      Q.   YOU'VE DESCRIBED YOUR METHODOLOGY.  HOW WOULD YOU DESCRIBE

24      PROFESSOR SNYDER'S METHODOLOGY?

25      A.   WELL, HE LOOKED CLOSELY AT A GOOD NUMBER OF QUALCOMM'S

1    COMPETITORS OVER A PERIOD OF TIME, AND HE THEN EVALUATED HOW

2    THEY DID BASED ON HIS THREE FACTORS, WHICH WERE FORESIGHT,

3    INVESTMENT, AND EXECUTION.

4         AND THEN HE -- HE -- IN HIS VIEW, HE WAS ABLE TO EXPLAIN

5    THE SUCCESS OR FAILURE OF THE DIFFERENT RIVALS BASED ON THOSE

6    THREE FACTORS WITHOUT REFERENCE TO QUALCOMM'S CONDUCT, THE

7    CHALLENGED CONDUCT.

8         AND SINCE HE, IN HIS VIEW, CAN SATISFACTORILY EXPLAIN WHAT

9    HAPPENED, THEN HE CONCLUDED THAT QUALCOMM'S CONDUCT DID NOT

10   AFFECT THE MARKET OUTCOMES.

11   Q.   HOW DO YOU EVALUATE PROFESSOR SNYDER'S METHODOLOGY?

12   A.   WELL, LET ME DO THIS BY WAY OF AN ANALOGY.

13        I THINK THE PROBLEM IS IT'S --

14        MR. VAN NEST:  OBJECTION, YOUR HONOR.  THIS IS

15   OUTSIDE THE SCOPE OF THE REBUTTAL REPORT.  HIS DISCUSSION OF

16   PROFESSOR SNYDER IS AT 326, 327, 328.

17        THE COURT:  OKAY.  GIVE ME ONE SECOND, PLEASE.

18        YOU SAID 327, 328 --

19        MR. VAN NEST:  320 --

20        THE COURT:  ARE THOSE PARAGRAPHS OR PAGES?

21        MR. VAN NEST:  THEY'RE PARAGRAPHS, YOUR HONOR.  THE

22   PAGES IN THE REBUTTAL REPORT ARE 112 AND 113.

23        THE COURT:  OKAY.  WHAT'S YOUR RESPONSE?

24        MR. JAMES:  MY RESPONSE IS THAT THE ISSUES RELATING

25   TO THE DYNAMISM OF THE INDUSTRY AND THE HAZARDS OF ATTEMPTING

1    TO ASCERTAIN AFTER THE FACT HOW SPECIFIC COMPETITORS WOULD HAVE

2    FARED ABSENT QUALCOMM'S CHALLENGED PRACTICES HAVE BEEN

3    ADDRESSED BY PROFESSOR SHAPIRO, INCLUDING IN PARAGRAPHS 38 TO

4    48 OF HIS REBUTTAL, PARAGRAPHS 254 TO 258, AND 294.

5            THE COURT:  WHAT WERE THE OTHER NUMBERS OTHER THAN 38

6    THROUGH 40, WHICH SEEM TO ADDRESS DR. CHIPTY AND

7    PROFESSOR NEVO?

8            MR. JAMES:  I THINK THESE ARE CRITICISMS THAT ARE

9    COMMON TO ALL THREE OF QUALCOMM'S EXPERTS.  THE ADDITIONAL

10   PARAGRAPHS ARE 254 TO 258, AND 294.  294 TALKS ABOUT THE

11   DIFFICULTIES OF ASCERTAINING THE EFFECTS ON PARTICULAR

12   COMPETITORS.

13           MR. VAN NEST:  NONE OF THESE ADDRESS DR. SNYDER.

14           THE COURT:  IT LOOKS LIKE THE ONLY ONES THAT ADDRESS

15   DR. SNYDER ARE 326 THROUGH 328.

16           MR. VAN NEST:  THAT'S RIGHT.

17           MR. JAMES:  I THINK THAT'S ILLUSTRATIVE OF THE

18   DIFFICULTIES OF THE APPROACH WITH REGARD TO THE REFUSAL TO

19   LICENSE RIVALS ASPECT OF THE CONDUCT.

20       I WOULD ALSO SAY THAT MORE GENERALLY, THE LAST -- TWO

21   WEEKS AGO, PROFESSOR SHAPIRO DESCRIBED HIS METHODOLOGY.

22       LAST WEEK PROFESSOR SNYDER ATTACKED IT AND PRESENTED AN

23   ALTERNATIVE HERE.

24       PROFESSOR SHAPIRO IS SIMPLY USING AN ANALOGY TO ILLUSTRATE

25   THE DIFFERENCES BETWEEN THE TWO APPROACHES.

1          THE COURT:  I'LL OVERRULE THE OBJECTION.

2      GO AHEAD, PLEASE.

3          THE WITNESS:  THANK YOU, YOUR HONOR.

4      MY CONCERN IS THAT HIS METHODOLOGY IS REALLY NOT RELIABLE

5    BECAUSE IT'S JUST VERY EASY, WILL REALLY TEND TO EXONERATE

6    DEFENDANTS IN THESE TYPES OF CASES PRETTY MUCH REGARDLESS -- IN

7    WAY TOO MANY CASES.  I'LL PUT IT THAT WAY.

8          SO MY ANALOGY IS WE'VE GOT A DYNAMIC MARKET.  THINK OF THE

9    MARKET AS A FLOWING RIVER AND THE FIRMS AS KAYAKS WHO ARE

10   TRYING TO NAVIGATE AND RACE DOWN THE RIVER.

11         AND IT'S TRUE, YOU CAN LOOK AT EACH KAYAK AND SEE WHAT DO

12   THEY DO IN TERMS OF FORESIGHT?  DID THEY PLAN AHEAD ABOUT THE

13   KAYAKING?  WHAT WAS THE INVESTMENT?  DO THEY HAVE A GOOD

14   QUALITY KAYAK?  AND DID THEY DO THEIR TRAINING AND HOW DID THEY

15   EXECUTE.

16         BUT NOW SUPPOSE I TOLD YOU IN THIS RACE, ONE OF THE TEAMS

17   WAS ACCUSED OF HIDING ROCKS IN THE OTHER TEAM'S BOATS.  IT

18   REALLY WOULDN'T MAKE A LOT OF SENSE TO LOOK AT THE BOATS GO

19   DOWN THE RIVER AND SEE, OH, I CAN EXPLAIN THIS BOAT DIDN'T TURN

20   RIGHT HERE, AND THIS BOAT WASN'T QUITE AS GOOD AS THE OTHER,

21   AND THIS BOAT, THEY DIDN'T KNOW THIS LOG WAS COMING.

22         NO.  THE MORE DIRECT APPROACH WOULD BE TO SAY, WAIT A

23   MINUTE.  THE ROCKS -- WHICH ARE ANALOGOUS TO THE ROYALTY

24   SURCHARGE -- WE KNOW ROCKS WEIGH DOWN CANOES AND MAKE THEM

25   SLOWER -- KAYAKS, MAKE THEM SLOWER AND MORE LIKELY TO CAPSIZE.

1        AND I'VE EXPLAINED HOW THE ROYALTY SURCHARGE ACTS LIKE A

2    TAX ON THE COMPETITORS.

3        SO THE MORE SENSIBLE APPROACH AND THE ANALOGY WOULD BE TO

4    SAY, LET'S LOOK AND INVESTIGATE AND SEE IF THE TEAM ACCUSED OF

5    PLACING THE ROCKS DID SO AND WHETHER THEY WERE SUFFICIENTLY

6    HEAVY TO MAKE ANY DIFFERENCE.

7        WELL, THE ANALOGY WOULD BE, LET'S LOOK AND SEE WHETHER THE

8    CONDUCT CREATED A ROYALTY SURCHARGE, AND WAS IT SIGNIFICANT?  I

9    DID THAT FIRST.

10       AND THEN WE CAN THEN TRACE THROUGH THE EFFECTS, HOW DID

11   THAT AFFECT THE MARKET?  IN THE CASE OF THE ANALOGY, I

12   CERTAINLY WOULD NOT THINK IT WOULD BE VERY GOOD FOR THE RACE

13   OFFICIALS TO SAY, OH, WELL, THEY PUT THE ROCKS IN THE BOATS,

14   BUT, YOU KNOW, THIS BOAT REALLY WASN'T VERY GOOD AND THEY MADE

15   A MISTAKE ON THAT RAPID, SO WE DON'T CARE ABOUT THE ROCKS.

16   THAT WOULD AMOUNT TO BLAMING THE VICTIMS.

17       I JUST DON'T THINK THAT METHODOLOGY IS RELIABLE.

18   BY MR. JAMES:

19   Q.   QUALCOMM'S ECONOMIC EXPERTS ALL ASSERT THAT THE OVERALL

20   PERFORMANCE OF THE MODEM CHIP INDUSTRY IS INCONSISTENT WITH

21   YOUR CONCLUSION THAT QUALCOMM'S CONDUCT HARMED COMPETITION.

22       WHAT'S YOUR REACTION TO THAT TESTIMONY?

23   A.   AS I SAID AT THE BEGINNING, WE AGREE THAT THERE'S BEEN A

24   GREAT IMPROVEMENT IN MODEM CHIPS, AS IN MANY OTHER HIGH TECH

25   MARKETS.

SHAPIRO DIRECT BY MR. JAMES

1      IF ONE WERE TO LOOK AT THAT FACT ALONE AND SAY, OH, THERE

2   CAN'T BE ANY ANTITRUST PROBLEM HERE, THERE COULDN'T BE ANY

3   ABUSE OF MONOPOLY POSITION, THAT WOULD AMOUNT TO BASICALLY NOT

4   HAVING ANTITRUST ENFORCEMENT IN THE HIGH TECH SECTOR.

5      AND AS AN ANTITRUST ECONOMIST, I THINK THAT WOULD BE A

6   TERRIBLE MISTAKE BECAUSE IN THESE TYPES OF DYNAMIC INDUSTRIES,

7   IT'S VERY IMPORTANT THAT THE FIRMS THAT ARE LEADERS, WHO VERY

8   OFTEN TYPICALLY GOT THERE ON THE MERITS, THAT THEY DON'T THEN

9   ENGAGE IN CONDUCT THAT BASICALLY TRIPS UP OR STIFF ARMS

10   COMPETITORS WHO ARE TRYING TO CATCH AND OVERTAKE THEM.

11   Q.   OKAY.  LET'S SHIFT GEARS NOW AND TURN TO DR. CHIPTY'S

12   TESTIMONY RELATING TO MONOPOLY POWER.

13      HOW DO YOU RESPOND TO DR. CHIPTY'S TESTIMONY REGARDING

14   QUALCOMM'S MONOPOLY POWER OVER CDMA MODEM CHIPS AND PREMIUM LTE

15   MODEM CHIPS?

16   A.   MY MAIN RESPONSE IS THAT SHE DID NOT ENGAGE REALLY WITH

17   THE DIRECT EVIDENCE OF MONOPOLY POWER, THAT IS TO SAY, THE

18   EXTENSIVE EVIDENCE THAT THE OEM'S HAD POOR ALTERNATIVES TO

19   QUALCOMM'S MODEM CHIPS, AND THAT GAVE QUALCOMM A GREAT DEAL OF

20   LEVERAGE WHEN IT WAS THREATENING TO NOT SUPPLY THEM WITH MODEM

21   CHIPS.  THAT'S THE QUESTION, OR THE POWER THAT WE'RE TALKING

22   ABOUT HERE, AND SHE DID NOT REALLY ADDRESS THAT.

23      SHE JUMPED RIGHT TO THE STRUCTURAL APPROACH TO EVALUATING

24   MONOPOLY POWER AND DID NOT ADDRESS THE DIRECT EVIDENCE WHICH IS

25   SO STRONG HERE.

1    Q.   REGARDING THE MARKET FOR PREMIUM LTE MODEM CHIPS,

2    DR. CHIPTY TESTIFIED THAT YOU, QUOTE, "HAVE NOT DONE THE WORK

3    TO IDENTIFY AN ECONOMICALLY COHERENT ANTITRUST MARKET,"

4    UNQUOTE.

5         HOW DO YOU RESPOND TO THAT TESTIMONY?

6    A.   WELL, IT'S PRETTY STRONG LANGUAGE.

7         LET ME REVIEW WHAT I DID.  I PERFORMED THE HYPOTHETICAL

8    MONOPOLIST TEST ON A CANDIDATE MARKET OF PREMIUM LTE MODEM

9    CHIPS.  THIS IS THE STANDARD TEST THAT ANTITRUST ECONOMISTS USE

10   TO DEFINE RELEVANT PRODUCT MARKETS.  DR. CHIPTY ACKNOWLEDGED

11   THAT IN HER REPORT.

12        SHE DID NOT MAKE ANY ASSERTION, AS FAR AS I COULD TELL,

13   THAT I HAD MADE AN ERROR IN PERFORMING THE TEST.

14        SO I AM LEFT RATHER BAFFLED WITH -- SHE SEEMS UNHAPPY OR

15   DISSATISFIED WITH THE RESULTS OF THE TEST, BUT IT WAS PERFORMED

16   PROPERLY, AND SHE AGREES IT'S THE RIGHT TEST.  SO I DON'T KNOW

17   WHAT TO MAKE OF THAT.

18   Q.   IS THE PRECISE BOUNDARY BETWEEN PREMIUM AND NON-PREMIUM

19   LTE MODEM CHIPS CRITICAL TO YOUR CONCLUSIONS ABOUT QUALCOMM'S

20   MONOPOLY POWER?

21   A.   NO, IT'S NOT.  FOR ONE THING, THE DIRECT EVIDENCE ABOUT

22   MONOPOLY POWER IS NOT AT ALL BASED ON THAT BOUNDARY OR THE

23   SPECIFIC WAY IN WHICH THE MARKET'S DEFINED.

24        SECOND, IT'S ALWAYS THE CASE -- WELL, VIRTUALLY ALWAYS THE

25   CASE THAT -- LET ME SAY IT'S OFTEN THE CASE THAT PRODUCTS

1    OUTSIDE A RELEVANT MARKET COMPETE TO SOME DEGREE WITH PRODUCTS

2    INSIDE THE RELEVANT MARKET.  SHE'S POINTED OUT SOME OF THAT,

3    BUT THAT DOES NOT UNDERCUT MY CONCLUSIONS.

4         IF A FIRM HAD A MONOPOLY IN FLYING AN AIRLINE FLIGHT FROM

5    SAN FRANCISCO AREA TO THE L.A. AREA, THEY WOULD FACE SOME

6    COMPETITION FROM BUS OR TRAIN.

7         BUT THEY WOULD STILL HAVE A MONOPOLY AND THAT WOULD ALMOST

8    CERTAINLY BE A RELEVANT PRODUCT MARKET, NOTWITHSTANDING SOME

9    COMPETITION TO THINGS THAT ARE MORE DISTANT SUBSTITUTES OUTSIDE

10   THAT MARKET.

11        SO THAT DOESN'T, DOESN'T DISTURB THE RESULTS.  AND AS I

12   SAID, I PERFORMED THE TEST.

13        SO, NO, THIS DOESN'T REALLY -- I DON'T THINK THAT THIS

14   GOES ANYWHERE.

15        AND IN THE END, EVEN IF ONE INCLUDED -- MOVED THE

16   BOUNDARY, IT WOULD NOT AFFECT QUALCOMM'S MARKET SHARE VERY

17   MUCH.

18        IN MY REPORT, I SHOW THAT EVEN IF YOU INCLUDED ALL LTE

19   MODEM CHIPS RATHER THAN JUST PREMIUM, THEN QUALCOMM'S SHARE OF

20   THAT BROADER GROUP WOULD BE SOMEWHAT SMALLER THAN, AS I MEASURE

21   IT, BUT THE DIFFERENCE WOULD BE IN THE SINGLE DIGITS AS A

22   PERCENTAGE POINT.

23   Q.   DR. CHIPTY TESTIFIED THAT YOU, QUOTE, "OVERSTATED

24   QUALCOMM'S MARKET POWER," UNQUOTE, AND THAT SHE, QUOTE, "HAS

25   NOT SEEN EVIDENCE OF CONSISTENT AND UNCONSTRAINED MARKET POWER

1        OF A TYPE THAT WOULD BE REQUIRED TO SUSTAIN THE ALLEGED CONDUCT

2        IN THIS CASE," UNQUOTE.

3             HOW DO YOU RESPOND TO THAT?

4        A.   WELL, I THINK THIS IS ACTUALLY A REVEALING STATEMENT ON

5        HER PART BECAUSE SHE USED THE TERM "UNCONSTRAINED MARKET

6        POWER," AND THAT'S NOT WHAT WE SHOULD BE LOOKING FOR, OKAY?

7             EVEN -- FOR INSTANCE, A GREAT DEAL OF MARKET POWER FACE

8        SOME CONSTRAINTS.  IT'S VERY HARD TO THINK OF A FIRM THAT

9        DOESN'T FACE ANY CONSTRAINTS.

10            THERE'S ALWAYS A REASON, IF THEY PRICE HIGH ENOUGH, THEY

11       WILL START TO LOSE BUSINESS.  THIS IS THE WELL-KNOWN CELLOPHANE

12       FALLACY IN ANTITRUST LAW AND ECONOMICS.

13            IN MY AIRLINE EXAMPLE, CERTAINLY THE AIRLINE, THE MONOPOLY

14       AIRLINE, WHEN THEY'RE CHARGING A MONOPOLY PRICE FOR AIR TRAVEL

15       BETWEEN SAN FRANCISCO AND LOS ANGELES, THEY WOULD FACE SOME

16       CONSTRAINTS.

17            SO ASKING FOR UNCONSTRAINED MARKET POWER IS THE WRONG

18       QUESTION.  AND SO I THINK SHE'S PUT A BAR WAY HIGH FOR WHAT IT

19       WOULD TAKE TO FIND MONOPOLY POWER.  NOT SO SURPRISING, SHE DOES

20       NOT THINK THAT THAT HAS BEEN SHOWN.

21       Q.   I WANT TO MOVE ON FROM DR. CHIPTY'S TESTIMONY REGARDING

22       MARKET POWER TO HER OPINIONS RELATING TO QUALCOMM'S AGREEMENTS

23       WITH APPLE, AND I'D SPECIFICALLY LIKE TO ASK YOU ABOUT THE

24       BUSINESS JUSTIFICATIONS THAT SHE OFFERED FOR THOSE AGREEMENTS.

25            AS AN ANTITRUST ECONOMIST, HOW DO YOU EVALUATE POSSIBLE

1    BUSINESS JUSTIFICATIONS FOR THESE KINDS OF PAYMENTS IN EXCHANGE

2    FOR EXCLUSIVITY?

3    A.   AS AN ANTITRUST ECONOMIST, I ASK WHETHER THERE ARE

4    PROCOMPETITIVE BUSINESS OBJECTIVES THAT ARE ACHIEVED BY THESE

5    PAYMENTS THAT COULD NOT BE ACHIEVED THROUGH A LESS RESTRICTIVE

6    ALTERNATIVE CONTRACTUAL ARRANGEMENT.

7    Q.   DID DR. CHIPTY PERFORM THAT KIND OF ANALYSIS?

8    A.   NO, SHE DID NOT, SO FAR AS I CAN DETERMINE, PERFORM ANY

9    LESS RESTRICTIVE ALTERNATIVE ANALYSIS TO THE AGREEMENTS BETWEEN

10   QUALCOMM AND APPLE.

11        AS AN EXAMPLE, SHE POINTED OUT THAT QUALCOMM NEEDED TO

12   INCUR SOME SUBSTANTIAL COSTS IN ORDER TO SERVE APPLE.  THAT'S

13   TRUE, AND THAT PRESENTS A BUSINESS ISSUE FOR QUALCOMM, HOW DO

14   THEY MAKE SURE THE INVESTMENTS ARE GOING TO BE PROFITABLE?

15        NOW, IN FACT, THE RELATIONSHIP WAS HIGHLY PROFITABLE.

16        BUT IN THAT SITUATION, ONE NATURAL BUSINESS RESPONSE --

17   WAY OF DEALING WITH THAT PROBLEM IS FOR APPLE TO HELP DEFRAY

18   THE COSTS SO THAT QUALCOMM'S RISK IS REDUCED.

19        BUT INSTEAD, WHAT WE SAW IN THE FIRST AMENDMENT

20   TRANSITION -- FIRST AMENDED TRANSITION AGREEMENT WAS VERY LARGE

21   PAYMENTS GOING FROM QUALCOMM TO APPLE, IN EXACTLY THE OPPOSITE

22   DIRECTION THAT ONE WOULD EXPECT IN TERMS OF AT LEAST ONE WAY OF

23   THE TWO COMPANIES SOLVING THIS RISK SHARING QUESTION.

24   Q.   I'M GOING TO MOVE ON FROM DR. CHIPTY'S OPINIONS TO

25    PROFESSOR NEVO'S.

1           DID YOU REVIEW PROFESSOR NEVO'S EMPIRICAL TEST OF THE NO

2      LICENSE, NO CHIPS POLICY AS PRESENTED IN HIS REPORT?

3      A.   YES.  I -- MY REBUTTAL REPORT HAS AN EXTENSIVE RESPONSE TO

4      HIS EMPIRICAL TESTS.

5      Q.   CAN YOU SUMMARIZE YOUR CONCLUSIONS WITH REGARD TO THE

6      TESTS THAT PROFESSOR NEVO PRESENTED TO THIS COURT ON FRIDAY?

7      A.   I DON'T THINK THEY WERE AT ALL RELIABLE OR INFORMATIVE.

8      THERE ARE TWO FUNDAMENTAL PROBLEMS WITH HIS TESTS.

9           FIRST ARE MEASUREMENT PROBLEMS.  HIS DATA IS NOT -- THE

10     DATA HE PULLED TOGETHER IS -- THE MEASUREMENT IS ALL MESSED UP.

11          AND THEN SECOND, THE TESTS ARE JUST POORLY CONCEIVED.  HE

12     CLAIMS THEY TEST THE THEORY OF HARM IN THIS CASE, BUT THEY

13     DON'T PROPERLY DO SO.

14     Q.   WHAT IS THE FUNDAMENTAL MEASUREMENT PROBLEM THAT YOU REFER

15     TO?

16     A.   WELL, I THINK THIS, THIS -- THERE WAS A LOT OF TIME SPENT

17     ON THIS ON FRIDAY WHEN HE TESTIFIED HERE.  HE LOOKED AT THE

18     CONTRACTUAL RATE -- LET ME BACK UP.

19          HE HAD HUNDREDS OF LICENSE AGREEMENTS BETWEEN QUALCOMM AND

20     VARIOUS OEM'S, AND FROM THOSE HE HAD HIS STAFF EXTRACT, FOR

21     EACH AGREEMENT, A NUMBER, WHICH WAS THE CONTRACTUAL ROYALTY

22     RATE.

23          AND IN SOME OTHER CASES, HE USED A SLIGHTLY DIFFERENT

24     MEASURE, BUT MOST OF HIS ANALYSIS WAS BASED ON THE CONTRACTUAL

25     ROYALTY RATE.

1        BUT THAT'S NOT AN ECONOMICALLY MEANINGFUL MEASURE.  IT

2   DOESN'T MEASURE EVEN WHAT THE OEM'S WERE ACTUALLY PAYING TO

3   QUALCOMM UNDER THESE AGREEMENTS IN TERMS OF RUNNING ROYALTIES.

4   Q.   PROFESSOR NEVO ALSO SAID THAT HE LOOKED AT THE EFFECTIVE

5   ROYALTY RATE FOR AT LEAST SOME OF HIS ANALYSES; RIGHT?

6   A.   YES.  SO FOR SOME, WHAT HE CALLED AN EFFECTIVE ROYALTY

7   RATE, BUT THAT IS NOT ACTUALLY -- HE WASN'T PROPERLY MEASURING

8   THE ROYALTIES THAT AN OEM WOULD PAY TO QUALCOMM AS A PERCENTAGE

9   OF THE REVENUE ON THE LICENSED DEVICES, AND IN ALMOST ALL

10  CASES, THIS CALCULATED RATE THAT HE USED WAS IDENTICAL TO THE

11  CONTRACTUAL RATE.

12       SO THIS -- AND THAT DIDN'T REALLY SOLVE THE PROBLEM, THE

13  MEASUREMENT PROBLEM AT ALL.

14  Q.   WHEN CROSSED, PROFESSOR NEVO DEFENDED HIS USE OF THE

15  CONTRACTUAL ROYALTY RATE THIS WAY:

16       "QUESTION:  AND WHAT ASPECT OF QUALCOMM'S CONTRACTS DOES

17  PROFESSOR SHAPIRO ALLEGE IMPOSES A TAX ON QUALCOMM'S RIVALS?

18       "ANSWER:  I BELIEVE IT IS THE CONTRACTUAL RATE."

19       IS THAT CORRECT?

20  A.   NO.  THIS IS -- THIS IS JUST OUTRAGEOUS TESTIMONY.  I

21  MEAN, HE WAS ASKED OVER AND OVER AGAIN, "WHY DID YOU USE THE

22  CONTRACTUAL RATE?  IT'S GOT ALL THESE PROBLEMS.  IT'S GOT ALL

23  THESE PROBLEMS."

24       AND OVER AND OVER AGAIN HE SAID, "WELL, I DID IT BECAUSE I

25  DID IT.  THIS IS WHAT I DID," AND HE GAVE NO REASON FOR IT.

1           AND THEN, AFTER ALL OF THAT, EVENTUALLY HIS REASON WAS

2      THIS:  THAT I AM SUPPOSEDLY MAKING CLAIMS ABOUT THIS

3      CONTRACTUAL RATE.

4           THIS IS AN ECONOMICALLY MEANINGLESS RATE.  WHY WOULD I DO

5      THAT?  THERE'S NOTHING IN MY REPORTS OR TESTIMONY TO SUGGEST

6      THAT AT ALL.  THIS IS COMPLETELY FABRICATED.

7      Q.   ARE THERE OTHER FUNDAMENTAL PROBLEMS WITH PROFESSOR NEVO'S

8       APPROACH?

9      A.   I THOUGHT THAT WAS ENOUGH.

10          BUT THE OTHER PROBLEMS, AS I MENTIONED, ARE MORE

11     CONCEPTUAL, WHICH IS HE CONSISTENTLY SAYS HE'S TESTING

12     IMPLICATIONS OF THE THEORY OF HARM, AND I DON'T BELIEVE HE'S

13     DOING THAT.  OKAY?

14          IN OTHER WORDS, HE'S TESTING -- THESE TESTS DON'T

15     ACCURATELY REFLECT -- THEY DON'T REFLECT PREDICTIONS.  IN OTHER

16     WORDS, THERE ARE CERTAIN PREDICTIONS FROM THE THEORY OF HARM,

17     AND HE CLAIMS HE'S TESTING THOSE AND SHOWING THEY'RE NOT TRUE,

18     BUT HE'S GOT THE LOGIC WRONG.

19          BUT TO SEE THAT IN DETAIL, WE HAVE TO LOOK AT THE SPECIFIC

20     TESTS.

21     Q.   LET'S GO THROUGH SOME OF THOSE SLIDES PRESENTED BY

22      PROFESSOR NEVO.

23          MR. KOTARSKI, CAN YOU BRING UP PROFESSOR NEVO'S SLIDE

24     NUMBER 4, CDMA CONTRACTUAL RATES.

25          WHAT'S YOUR REACTION TO PROFESSOR NEVO'S TESTIMONY

```
1    REGARDING HIS SLIDE NUMBER 4?

2    A.   OKAY.  SO, YOUR HONOR, JUST TO REMIND YOU, WHAT HE WAS

3    DOING HERE IS YOU SEE THE GREY AREA TOWARDS THE RIGHT WHERE IT

4    SAYS SHAPIRO ALLEGES CDMA MARKET POWER, THAT'S STARTING IN

5    2006.

6         HE'S COMPARING THAT ERA -- EXCUSE ME -- THAT TIME PERIOD

7    TO PRIOR YEARS WHEN THERE WAS NO ALLEGATION IN THE CASE OF CDMA

8    MARKET POWER.

9         SO NOW -- HE THEN ASSUMES THAT QUALCOMM HAD NO MARKET

10   POWER OVER CDMA CHIPS PRIOR TO 2006 SO HE CAN DO A BEFORE AND

11   AFTER.

12        OKAY.  BUT THAT DOESN'T MAKE ANY SENSE -- WELL, LET ME --

13   THAT'S NOT WHAT I MEAN.

14        THAT ASSUMPTION IS NOT JUSTIFIED.  THE WHOLE TEST IS BASED

15   ON AN ASSUMPTION THAT THERE'S A BEFORE AND AFTER, QUALCOMM

16   DIDN'T HAVE POWER AND THEN THEY DID.

17        BUT HE DIDN'T TEST THAT.  HE JUST ASSUMED THEY DIDN'T HAVE

18   POWER, MARKET POWER BEFORE 2006.  AND HE'S -- THAT JUST -- THAT

19   ASSUMPTION IS UNJUSTIFIED, AND HE'S GOING TO HAVE A VERY

20   DIFFICULT TIME TRYING TO DEFEND THAT -- WELL, HE DIDN'T DEFEND

21   IT.

22        THERE'S EVIDENCE TO THE CONTRARY, AND HE ACKNOWLEDGED THAT

23   QUALCOMM WAS, FOR YEARS, THE SOLE SUPPLIER OF CDMA CHIPS AND

24   WAS, YOU KNOW, WAS THE PIONEER AND OUT AHEAD.

25        SO HE'S GOT A COMPLETELY UNJUSTIFIED ASSUMPTION THAT IS
```

1    THE BASIS FOR THE ENTIRE TEST.  THAT'S WHY I'M SAYING IT'S NOT

2    A VALID TEST.

3    Q.   YOU DEALT WITH THE ASSUMPTION THAT QUALCOMM DIDN'T HAVE

4    MARKET POWER IN CDMA MODEM CHIPS PRIOR TO 2006.

5         BUT WHAT ABOUT PRIOR TO 1995 BEFORE PROFESSOR NEVO SAYS

6    QUALCOMM WAS EVEN SELLING CDMA MODEM CHIPS?

7    A.   WELL, I THINK THERE'S TWO POINTS ON THAT.  FIRST, THOSE --

8    THE EARLY ROYALTY AGREEMENTS WERE ALSO RELATED TO CHIP SUPPLY

9    AGREEMENTS, OKAY?  SO PEOPLE PLAN AHEAD.  AT&T IS PLANNING

10   AHEAD.

11        SO I THINK TRYING TO DISCONNECT THE ROYALTIES FROM THE

12   CHIPS BACK THEN IS NOT CORRECT BASED ON WHEN THE CHIPS STARTED

13   TO BE SELLING.

14        AND SECOND, THIS BRINGS IN ANOTHER FUNDAMENTAL ASSUMPTION

15   HE'S MAKING.  LET'S SUPPOSE THE 5 PERCENT ROYALTY WAS

16   REASONABLE IN 1992 OR 1991.  HE'S NOW ASSUMING EFFECTIVELY THAT

17   THE REASONABLE RATE IS UNCHANGING.  SO IF A -- AND THERE ARE NO

18   OTHER FACTORS THAT CAUSE IT TO CHANGE.

19        BUT THAT, TOO, IS DISCONNECTED FROM REALITY.  WE HAVE GOOD

20   REASONS TO SUSPECT AND EXPECT THAT THE REASONABLE RATE WOULD

21   DECLINE OVER THIS 20, 25 YEAR PERIOD.  QUALCOMM'S FUNDAMENTAL

22   PATENTS HAVE EXPIRED DURING THIS PERIOD OF TIME.  THE HANDSETS

23   HAVE BECOME COMPLETELY DIFFERENT AND, YOU KNOW, THERE'S A WHOLE

24   DIFFERENT SET OF FUNCTIONS IN THEM.  AND QUALCOMM'S SHARE OF

25   THE CELLULAR STANDARD ESSENTIAL PATENTS HAS DECLINED.

1      SO HE NEEDS TO DO THAT TEST, GOING WAY BACK THERE, HE

2   NEEDS TO SOMEHOW ESTABLISH THAT THE REASONABLE RATE HASN'T

3   CHANGED IF HE'S GOING TO DO THIS LONG TIME SERIES, AND HE

4   DIDN'T DO THAT, EITHER.

5   Q.   PROFESSOR SHAPIRO, HOW DO YOU EXPLAIN THE DATA SHOWN IN

6   THIS SLIDE?

7   A.   SO, LOOK, FIRST OFF, REMEMBER, THESE ARE THESE CONTRACTUAL

8   ROYALTY RATES.

9      SO FIRST, WHAT ARE WE LOOKING AT HERE?  WE'RE LOOKING AT

10  BASICALLY A BUNCH OF 5 PERCENTS IN A LOT OF CONTRACTS OVER A

11  LONG PERIOD OF TIME.

12     SO LOOKING AT THIS, THE FIRST QUESTION IS, WHY IS IT

13  5 PERCENT?  WHY IS IT SO STEADY?

14     AND IF YOU LOOK IN THE RECORD AND THE EVIDENCE, YOU LEARN

15  PRETTY QUICKLY, QUALCOMM HAD AN EXPLICIT STRATEGY OF TRYING AT

16  LEAST TO KEEP THE, THE HEADLINE RATE AT 5 PERCENT AND

17  NEGOTIATING ON OTHER TERMS AND CONDITIONS, DISCOUNTS IN THE

18  ROYALTY BASE, CROSS-LICENSING ARRANGEMENTS, FIXED FEES, IN SOME

19  CASES THERE'S PATENT TRANSFERS, THERE'S EQUITY INVESTMENTS,

20  THERE'S THINGS THAT STEP DOWN THE RATE OVER TIME THAT HE DIDN'T

21  INCLUDE BECAUSE HE DIDN'T DO AMENDMENTS HERE.

22     SO THERE'S -- BASICALLY THESE DATA ARE ALMOST, BY DESIGN,

23  PICKING THE ONE VARIABLE THAT DOESN'T CHANGE.  SO YOU CAN'T DO

24  ECONOMIC ANALYSIS WITH THAT.

25     BUT WE DO UNDERSTAND WHAT'S CAUSED IT, WHICH IS QUALCOMM'S

1       STRATEGY TO KEEP THE HEADLINE RATE THE SAME AND NEGOTIATE ON

2       OTHER, LARGELY ON OTHER TERMS AND CONDITIONS.

3            AND ACTUALLY, I THINK THAT'S A BIG PART OF THE CONCERN

4       HERE IS NOT THE HEADLINE RATE BECAUSE THAT'S NOT ECONOMICALLY

5       MEANINGFUL, BUT THAT QUALCOMM'S STRATEGY HAS BEEN TO KEEP THE

6       EFFECT OF THE REAL ROYALTIES PAID BY OEM'S FROM FALLING AND

7       THEY'VE USED CHIP LEVERAGE AND OTHER TACTICS TO DO THAT.

8       Q.   LET'S MOVE TO A DIFFERENT SLIDE THAT PROFESSOR NEVO

9        PRESENTED, SLIDE NUMBER 6, WCDMA CONTRACTUAL RATES.

10           WHAT'S YOUR REACTION TO PROFESSOR NEVO'S TESTIMONY

11      REGARDING THIS SLIDE?

12      A.   WELL, WE HAVE PRETTY MUCH THE SAME PROBLEM AS THE PREVIOUS

13       ONE, YOUR HONOR.  HERE HE'S LOOKING AT 2011 AND AFTER WHERE

14       THERE'S, AS HE PUTS THERE, SHAPIRO ALLEGES PREMIUM LTE MARKET

15       POWER, AND THEN SAYING BEFORE THAT THERE'S NO -- THERE IS NO

16       PREMIUM LTE MARKET.  SO HE'S TRYING TO DO A BEFORE AND AFTER.

17           BUT NOW HE HAS TO MAKE THE ASSUMPTION THAT QUALCOMM HAD NO

18      CHIP LEVERAGE PRIOR TO 2011, OKAY, AND REGARDING WCDMA AND IN

19       SOME CASES CDMA CHIPS.

20           AND HIS ASSUMPTION THAT QUALCOMM HAD NO CHIP LEVERAGE

21      BASED ON WCDMA CHIPS, HE HASN'T ANALYZED THAT.  IT'S AN

22      ASSUMPTION.

23           AND, AGAIN, THAT'S INCONSISTENT WITH THE EVIDENCE.  LET ME

24      PUT IT THIS WAY.  HE WOULD HAVE A DIFFICULT TIME SUSTAINING

25      THAT, HE DIDN'T DO THE ANALYSIS, SO THE TEST IS NOT VALID.

1          BUT THERE'S EVIDENCE -- I'VE SEEN EVIDENCE FROM QUALCOMM'S

2     OWN RECORDS THAT THEY VIEWED THAT THEY HAD A LEADERSHIP

3     POSITION, PARTICULARLY SELLING IN THE MERCHANT MARKET, AND A

4     HIGH SHARE IN THAT MARKET, IN THAT GROUP OF SALES AS WELL.

5          SO, AGAIN, THE TEST JUST, APART FROM THE DATA BEING NO

6     GOOD, IS NOT WELL CONCEIVED.  THERE'S A CRITICAL ASSUMPTION

7     THAT'S NOT JUSTIFIED AND SEEMS INCONSISTENT WITH THE EVIDENCE.

8     Q.   HAVE YOU ALSO SEEN EVIDENCE THAT OEM'S THAT WERE LESS

9     DEPENDENT ON QUALCOMM FOR WCDMA MODEM CHIPS PAID LESS THAN

10    WCDMA ROYALTIES TO QUALCOMM?

11    A.   YES.  THIS IS PART OF THE ISSUE THAT HE EXCLUDED A LOT OF

12    AGREEMENTS HERE.

13         NOKIA AND ERICSSON IN PARTICULAR, I UNDERSTAND THAT THE

14    SPECIFIC NUMBERS ARE CONFIDENTIAL, THEY'RE IN MY REPORT, BUT

15    THEY PAID SUBSTANTIALLY LOWER -- WELL, IN HIS OWN DATABASE, THE

16    RATES THAT ARE RECORDED ARE SIGNIFICANTLY LOWER, AND THEY WERE

17    NOT DEPENDENT ON QUALCOMM FOR THE WCDMA MODEM CHIPS.

18    Q.   I'M GOING TO MOVE TO ANOTHER DEMONSTRATIVE.

19         YOUR HONOR, PORTIONS OF THIS DEMONSTRATIVE ARE UNDER SEAL,

20    BUT PROFESSOR SHAPIRO SHOULD BE ABLE TO TESTIFY WITHOUT

21    REVEALING ANY CONFIDENTIAL INFORMATION.

22         I WANT TO MOVE IN PARTICULAR TO PROFESSOR NEVO'S SLIDE

23    NUMBER 8, ALLEGED SUPRA-FRAND WCDMA ROYALTIES VERSUS CDMA

24    REVENUES.

25         WHAT IS YOUR RESPONSE TO PROFESSOR NEVO'S TESTIMONY

SHAPIRO DIRECT BY MR. JAMES

1    REGARDING HIS SLIDE NUMBER 8?

2    A.   OKAY.  WE'RE NOT GOING TO GET INTO ALL THE NUMBERS, IT

3    WOULD TAKE TOO LONG.  BUT HE WAS USING THIS SLIDE TO SAY HERE'S

4    A BUNCH OF PEOPLE WHO PAID, IF YOU USE MR. LASINSKI'S NUMBERS,

5    PAID SUBSTANTIAL OVERCHARGES FOR WCDMA ROYALTIES, AND HE'S

6    SAYING THEY WEREN'T DEPENDENT ON QUALCOMM FOR CDMA, SO THE

7    THEORY IS A PROBLEM.  THAT'S WHAT HE'S SAYING.

8         BUT THIS IS REALLY MESSED UP, I HAVE TO SAY, AND SLOPPY

9    WORK.

10        IN THE HUNDREDS OF CONTRACTS HE HAD TO LOOK AT, HE PICKED

11   THESE SEVEN TO HIGHLIGHT.  AND WHEN WE LOOK IN DETAIL AT EACH

12   OF THESE SEVEN LICENSING AGREEMENTS AND OEM'S, WE FOUND THAT HE

13   HAD MISSED JUST REALLY IMPORTANT ASPECTS OF THE RELATIONSHIP.

14        FIVE OF THESE ARE JAPANESE OEM'S:  SHARP, NEC, PANASONIC,

15   FUJITSU, AND MITSUBISHI, AND IN ALL OF THOSE CASES, THE JFTC,

16   JAPANESE FAIR TRADE COMMISSION, FOUND THAT QUALCOMM HAD, USING

17   THEIR WORD, COERCED THESE OEM'S TO PAY, I DON'T KNOW EXACTLY

18   WHAT THEIR LANGUAGE WAS, UNREASONABLY HIGH RATES THROUGH

19   VARIOUS TACTICS.

20        SO THAT SEEMS LIKE A REALLY BAD SET OF AGREEMENTS TO LOOK

21   AT TO CLAIM WHAT'S GOING ON, TO CLAIM THERE'S NO UNDUE LEVERAGE

22   BEING BROUGHT BY QUALCOMM IN THOSE CASES.  SO PUT THOSE FIVE

23   ASIDE.

24        THEN FOXCONN, WHICH IS THE FIRST ONE HERE WITH THE LARGEST

25   BAR, THAT'S COMPLETELY MESSED UP AS WELL FOR TWO REASONS.

1          FIRST, AT THE TIME, FOXCONN DIDN'T EXPECT TO PAY MUCH UNDER

2     THE AGREEMENT THEY SIGNED WITH QUALCOMM BECAUSE -- BASICALLY

3     BECAUSE OF THE AGREEMENTS BETWEEN THEIR CUSTOMERS -- FOXCONN

4     BEING A CONTRACT MANUFACTURER, BECAUSE OF THE AGREEMENTS

5     BETWEEN THEIR CUSTOMER'S OEM AND QUALCOMM THAT WOULD GOVERN A

6     LOT OF THE ROYALTIES.

7          AND, SECOND, THE WAY HE TREATED APPLE HERE JUST DID NOT

8     REFLECT THE REALITY OF THE BUSINESS ARRANGEMENTS.  APPLE HAD

9     ITS OWN ARRANGEMENT WITH QUALCOMM THAT YOU HEARD ABOUT.

10          AND SO THIS IS JUST A MISLEADING CHART REGARDING FOXCONN.

11          THEN THE LAST ONE IS HTC, AND AGAIN, HE'S SUGGESTING, WITH

12     HIS 0 HERE FOR HTC, THAT THEY DIDN'T DEPEND ON -- THAT THEY

13     DIDN'T DEPEND ON QUALCOMM FOR CDMA CHIPS BECAUSE HE'S ONLY

14     LOOKING OUT TWO YEARS.

15          THE REALITY WAS HTC WANTED TO BUILD CDMA COMPLIANT

16     HANDSETS AND THEY WENT TO QUALCOMM AND THEY NEEDED QUALCOMM FOR

17     THAT, AND THIS WAS A CONDITION -- SIGNING THIS LICENSE WAS A

18     CONDITION OF GETTING THE SUPPORT AND ULTIMATELY THE CHIPS FROM

19     QUALCOMM.

20          SO ALL OF THESE EXAMPLES EVAPORATE ONCE YOU LOOK AT WHAT'S

21     ACTUALLY GOING ON IN THE SPECIFIC NEGOTIATIONS.

22     Q.   LET'S MOVE ON TO PROFESSOR NEVO'S TESTIMONY REGARDING HIS

23     SLIDE 9.

24          AND WHAT'S YOUR RESPONSE TO THAT TESTIMONY REGARDING THIS

25     SLIDE?

1    A.   SO THIS ONE, YOUR HONOR, IF YOU LOOK ON THE HORIZONTAL

2    AXIS, HE'S MEASURING SHARE OF CDMA CHIPS PURCHASED FROM

3    QUALCOMM, AND HE'S POINTING OUT THERE'S A BUNCH OF PEOPLE AT 0,

4    MEANING THEY DIDN'T PURCHASE ANY OF THEIR CDMA CHIPS FROM

5    QUALCOMM, AND THEY PAID THE SAME, PRETTY MUCH THE SAME RATES AS

6    THE PEOPLE WHO BOUGHT ALL THEIR CHIPS FROM QUALCOMM.  SO HE'S

7    SAYING THE CHIP LEVERAGE DOESN'T MATTER AND CLAIMS THAT REJECTS

8    THE THEORY.

9         BUT THERE'S A REALLY BIG ERROR HERE.  I WAS -- I LOOKED AT

10   THIS AND WAS, LIKE, WHAT'S GOING ON?  WHERE WERE THEY GETTING

11   THE CHIPS?

12        IT TURNS OUT WHAT PROFESSOR NEVO NEGLECTED TO ACCOUNT FOR

13   IS THAT THE OTHER PLACE PEOPLE WERE GETTING THE CHIPS WAS VIA,

14   AND VIA'S ARRANGEMENT WITH QUALCOMM MEANT THAT IF AN OEM WASN'T

15   LICENSED WITH QUALCOMM, FOR QUALCOMM SEPS, THAT QUALCOMM COULD

16   BASICALLY INSTRUCT VIA, AS I UNDERSTAND IT, TO STOP SUPPLYING

17   THAT OEM WITH MODEM CHIPS.

18        SO WHAT YOU REALLY WANT TO MEASURE IN TERMS OF THE OEM'S

19   RELIANCE ON QUALCOMM, I SHOULD SAY THE BITE BEHIND THE NO

20   LICENSE, NO CHIPS POLICY IS WHAT SHARE OF THESE OEM'S PURCHASES

21   ARE FROM QUALCOMM AND VIA COMBINED?  BECAUSE QUALCOMM

22   EFFECTIVELY COULD PULL BACK THE VIA CHIPS AS WELL.

23        SO WE HAVE THE NEXT DEMONSTRATIVE WHERE WE CORRECTED FOR

24   THIS ERROR, AND ALSO GOT RID OF LICENSES THAT WERE MORE THAN 15

25   YEARS OLD BECAUSE THOSE RATES ARE -- THOSE RATES ARE EITHER

1    STALE AND, IN ANY EVENT, THOSE PEOPLE WERE ALL RELIANT ON

2    QUALCOMM AND VIA FOR CHIPS, AND YOU SEE ALMOST EVERYBODY HAS

3    GOT 100 PERCENT.

4         BUT THERE ARE TWO DIAMONDS THERE THAT STILL HAVE 0

5    PERCENT.  WHAT'S GOING ON WITH THEM?

6         IT TURNS OUT THESE ARE TWO COMPANIES, GIONEE GROUP AND

7    LIME-I, THAT, WHY ARE THEY SHOWN AS 0?  THEY DIDN'T GET CDMA

8    CHIPS FROM ANYWHERE ELSE.

9         BUT THIS IS ANOTHER GLITCH WITH HIS METHOD.  UNDER HIS

10   METHOD, SINCE THEY DIDN'T BUY ANY CDMA CHIPS FOR TWO YEARS

11   AFTER THEY SIGNED THE AGREEMENT, OR AT LEAST THEY DIDN'T SELL

12   THE PHONES, HE COUNTS THEM AS 0.

13        BUT THAT JUST MEANS THEY WERE TAKING LONGER, THERE WAS A

14   LONGER LAG BETWEEN WHEN THEY SIGNED THE AGREEMENT AND WHEN THEY

15   ACTUALLY STARTED SHIPPING THE PHONES.

16        WHEN THEY DID START SHIPPING THE PHONES, THESE TWO

17   COMPANIES ALSO WERE COMPLETELY RELIANT ON QUALCOMM AND VIA, SO

18   YOU PUT THEM IN THE 100 PERCENT CATEGORY.  SO THERE'S NO

19   VARIATION TO LOOK AT HERE AT ALL IN TERMS OF ACTUAL RELIANCE ON

20   QUALCOMM AND VIA.

21        TO MY AMAZEMENT, WHEN PROFESSOR NEVO WAS PRESENTED WITH

22   THE FACT THAT HE MADE THIS MAJOR ERROR REGARDING VIA, HE SAID

23   IT DIDN'T MATTER, HE STILL STOOD BY HIS RESULTS.  I DON'T

24   UNDERSTAND THAT.

25   Q.   DURING HIS TESTIMONY, PROFESSOR NEVO CRITICIZED YOU FOR

1     NOT ATTEMPTING EMPIRICAL ANALYSES ALONG THE LINES OF THOSE THAT

2     HE PRESENTED.

3          WHY DIDN'T YOU TRY THOSE KIND OF ANALYSES?

4     A.   LOOK, I WOULDN'T WANT TO DO THESE TYPE OF ANALYSES.  I'VE

5     JUST EXPLAINED WHY THEY'RE NOT RELIABLE AND THEY'RE POORLY

6     DONE.

7          ANOTHER WAY TO PUT IT IS PRESENTED WITH HUNDREDS OF

8     LICENSES, COMPLICATED LICENSES, MAYBE ONE COULD TEASE THROUGH

9     THAT, LOOK THROUGH THAT AND CONSTRUCT A DATA SET BASED ON THOSE

10    LICENSES.  I DON'T SEE A WAY TO DO THAT RELIABLY.

11    PROFESSOR NEVO CERTAINLY DID NOT DO SO.

12    Q.   I WANT TO MOVE ON TO OUR NEXT AND FINAL TOPIC, IN

13    PARTICULAR PROFESSOR NEVO'S TESTIMONY RELATED TO THE EFFECTS OF

14    QUALCOMM'S ROYALTY SURCHARGE.

15         PROFESSOR NEVO SAYS YOUR ANALYSIS OF TRANSACTIONS BETWEEN

16    AN OEM AND QUALCOMM IS INCORRECT BECAUSE YOU FAILED TO ACCOUNT

17    FOR THE FACT THAT WHEN AN OEM NEGOTIATES WITH QUALCOMM OVER THE

18    PURCHASE OF MODEM CHIPS, THE ROYALTY'S ALREADY BEEN SET.

19         WHAT DO YOU SAY?

20    A.   THAT'S A FALSE STATEMENT.  MY ANALYSIS I THINK ABSOLUTELY

21    INCORPORATED THE FACT THAT MOST CHIP SUPPLY AGREEMENTS ARE

22    NEGOTIATED REGULARLY, EVERY YEAR OR TWO, AND THE LICENSE

23    AGREEMENTS TEND TO LAST A LONG TIME.  SO WHEN THEY'RE

24    NEGOTIATING OVER CHIP SUPPLY, THE ROYALTY HAS BEEN SET.

25         I ACCOUNTED FOR THAT.  TO CLAIM OTHERWISE IS FALSE.

1    Q.   PROFESSOR NEVO ALSO SAID THAT YOUR ANALYSIS OF THE EFFECTS

2    OF A ROYALTY SURCHARGE WERE OVERLY SIMPLISTIC BECAUSE YOU

3    IGNORED COMPETITION.

4         HOW DO YOU RESPOND?

5    A.   THAT'S ALSO INCORRECT.  I ACCOUNTED FOR COMPETITION AMONG

6    THE, AMONG MODEM CHIP SUPPLIERS.  I EXPLAINED THAT THE ROYALTY

7    SURCHARGE RAISED THE COSTS OF QUALCOMM'S RIVALS, AND THEN IN

8    RESPONSE -- AND THEN THE WAY CHIP COMPETITION WOULD WORK,

9    QUALCOMM WOULD, IN RESPONSE TO THAT, RAISE THE ALL-IN PRICE OF

10   THEIR CHIPS AS WELL.  SO I ACCOUNTED FOR COMPETITION AT THE

11   CHIP LEVEL.

12        ALSO AT THE OEM LEVEL IN DISCUSSING HOW OEM'S WOULD

13   COMPETE AND PASS THROUGH MANY OF THESE ROYALTY SURCHARGE, MUCH

14   OF THE ROYALTY SURCHARGE TO FINAL CONSUMERS.

15   Q.   PROFESSOR NEVO TESTIFIED THAT, QUOTE, "IF WE'RE WORRIED

16   ABOUT RAISING RIVALS' COSTS, IT SEEMS COUNTERINTUITIVE TO ME

17   THAT WE WANT TO SOLVE THAT BY SAYING WE WANT TO HAVE LICENSING

18   DIRECTLY TO RIVALS," UNQUOTE.

19   A.   THIS IS NOT -- YOU HAVE THE WRONG THING UP HERE.

20        RIGHT.

21   Q.   HOW DO YOU RESPOND TO THE TESTIMONY REGARDING LICENSING

22   DIRECTLY TO RIVALS?

23   A.   SO, YOUR HONOR, WHEN I WAS HERE LAST TIME, I EXPLAINED HOW

24   A ROYALTY SURCHARGE ACTS AS A TAX ON -- RAISES RIVALS' COSTS

25   BECAUSE IT IS A BURDEN ON THE TRANSACTIONS BETWEEN THE RIVAL

SHAPIRO DIRECT BY MR. JAMES

1      AND THE OEM AND CUTS INTO THE GAINS FROM TRADE.

2          THAT ANALYSIS IS CORRECT.  WHETHER THE ROYALTY SURCHARGE

3      IS PAID TO QUALCOMM BY THE OEM OR THE RIVAL IS IMMATERIAL.

4      THAT'S A STANDARD TEXTBOOK RESULT IN ECONOMICS.  I CITED THE

5      TEXTBOOK IN MY REPORT.  I THINK I MENTIONED THIS LAST TIME.

6      THAT IS JUST NOT A MATTER OF DEBATE, IT'S A MATTER OF

7      ECONOMICS.

8          NOW, PROFESSOR NEVO DID NOT SAY THAT I GOT IT WRONG.  HE

9      JUST SAID IT SEEMS VERY COUNTERINTUITIVE.

10         WELL, I DON'T KNOW ABOUT HIS INTUITION.  I'M HERE TO

11     TESTIFY ABOUT ECONOMICS.  IT SEEMS TO ME MAYBE HE'S TESTIFYING

12     AS A PSYCHOLOGIST.

13     Q.   PROFESSOR NEVO TESTIFIED THAT ANY ROYALTY SURCHARGE WOULD

14     BE CHIP NEUTRAL AS BETWEEN QUALCOMM AND ITS RIVALS BECAUSE THE

15     OEM PAYS A SURCHARGE REGARDLESS OF THE MODEM CHIP THAT IT USES.

16         WHAT'S YOUR REACTION TO THAT TESTIMONY?

17     A.   SO, YOUR HONOR, THIS IS A CRITICAL POINT HERE SO I'M GOING

18     TO DWELL ON IT A LITTLE BIT.

19         FIRST, OF COURSE THE RIVAL -- OF COURSE THE OEM PAYS THE

20     ROYALTY AND THE SURCHARGE REGARDLESS OF WHICH CHIP THEY BUY.

21     THAT'S NOT IN DISPUTE.

22         BUT THAT'S NOT THE ANSWER TO THE ECONOMICS, SO LET'S GO

23     BACK THROUGH THIS.

24         FIRST, I WENT THROUGH THE GAINS FROM TRADE ANALYSIS LAST

25     TIME AND EXPLAINED THAT WHEN THE -- WHEN QUALCOMM COLLECTS THIS

1     ROYALTY SURCHARGE ON A TRANSACTION WHERE AN OEM PURCHASES A

2     CHIP FROM A RIVAL, THAT'S -- THAT RAISES THE COST THERE,

3     BURDENS THAT TRANSACTION, AND WEAKENS THE RIVAL AS A

4     COMPETITOR.

5          NOW, I ALSO POINTED OUT THAT THE IMPACT IS NOT AT ALL THE

6     SAME ON A TRANSACTION BETWEEN QUALCOMM AND THE OEM BECAUSE,

7     YES, SURE, THE OEM PAYS THE ROYALTY SURCHARGE TO QUALCOMM, BUT

8     THAT'S -- QUALCOMM'S THE RECIPIENT OF THAT.  IT'S IN ONE POCKET

9     AND OUT THE OTHER.

10         SO THE GAINS FROM TRADE BETWEEN THE OEM AND QUALCOMM ARE

11    NOT REDUCED IN THE SAME WAY BY THE SURCHARGE.  IT'S NOT GOING

12    OUT TO THIRD PARTIES.  SO THAT BASIC ANALYSIS STANDS.

13         I JUST WANT TO REMIND THE COURT OF THAT BECAUSE HE DID

14    NOT -- HE DID NOT SHOW THAT THERE'S ANYTHING WRONG WITH THAT.

15    OKAY?

16         ANOTHER WAY TO SEE THIS -- THIS IS SUCH A KEY POINT IN THE

17    CASE -- IS THINK ABOUT THE ROYALTY SURCHARGE.  SUPPOSE WE HAVE

18    A $10 ROYALTY SURCHARGE.

19         NOW, INTEL IS TRYING TO SELL A CHIP TO AN OEM.  THEY'RE

20    LIKE, WELL, LOOK, THE ONLY WAY TO NEUTRALIZE THE EFFECT OF THAT

21    ROYALTY SURCHARGE SO THE OEM'S COSTS AREN'T GOING UP, THEY'D

22    HAVE TO CUT THEIR CHIP PRICE BY $10.  THEY COULD MATHEMATICALLY

23    DO THAT.  OKAY?  SO THEY HAVE TO CUT THE CHIP PRICE BY $10,

24    THAT WOULD CUT THEIR MARGIN BY $10.  OKAY.

25         NOW, THINK ABOUT QUALCOMM -- BECAUSE PROFESSOR NEVO IS

1    SAYING THIS IS CHIP NEUTRAL -- WHAT WOULD HAPPEN -- THINK ABOUT

2    A TRANSACTION BETWEEN THE OEM AND QUALCOMM.  NOW THE OEM IS

3    PAYING THE EXTRA $10.  QUALCOMM COULD ALSO NEUTRALIZE THAT SO

4    THE OEM'S TOTAL ALL-IN PRICE WOULDN'T BE -- THEY WOULD REDUCE

5    THEIR CHIP PRICE BY $10.  OKAY.  THAT WOULD BE THE SAME.

6         BUT WHAT'S THE EFFECT ON QUALCOMM?  THE EFFECT ON QUALCOMM

7    IS NO CHANGE.  THEIR ALL-IN PRICE HAS NOT CHANGED.

8         ALL WE'VE DONE IS RAISED THE ROYALTY PART BY $10 AND

9    REDUCE THE CHIP PART BY $10.  SO THE ALL-IN PRICE IS THE SAME.

10        SO QUALCOMM CAN NEUTRALIZE THIS WITH NO HARM TO THEIR

11   BOTTOM LINE AT ALL, THEIR MARGIN BASICALLY, WHEN YOU LOOK AT

12   THE ALL-IN PRICE, WHILE INTEL HAD TO TAKE THE FULL HIT OF THE

13   ROYALTY SURCHARGE TO NEUTRALIZE.

14        THIS IS JUST ARITHMETIC, BY THE WAY.  THIS ISN'T EVEN

15   ECONOMICS.

16        SO JUST BY ARITHMETIC YOU CAN SEE THAT THE EFFECT OF THE

17   ROYALTY SURCHARGE IS NOT SYMMETRIC AS BETWEEN INTEL AND

18   QUALCOMM IN MY EXAMPLE.

19        OKAY.  NOW, TO GO BACK CORRECTLY TO THINK ABOUT THIS, NOT

20   WHAT PROFESSOR NEVO HAS SAID, IS THAT THE ROYALTY SURCHARGE

21   RAISES INTEL'S COSTS, AND OTHER RIVALS, THAT'S GOING TO RAISE

22   THE ALL-IN PRICE OF THEIR MODEM CHIPS AS THAT COST IS PASSED

23   THROUGH.

24        QUALCOMM WILL RESPOND TO THAT -- I SAID THIS ALL LAST

25   TIME -- BY RAISING THE ALL-IN PRICE OF THEIR CHIPS AS WELL.

SHAPIRO DIRECT BY MR. JAMES

1    NORMALLY IT WOULD BE BY LESS THAN THE FULL AMOUNT OF THE

2    ROYALTY SURCHARGE.

3         AND SO THE RIVAL IS DISADVANTAGED, THE PRICE OF CHIPS GOES

4    UP, THE ALL-IN PRICE, WHICH IS WHAT MATTERS FOR OEM'S COSTS,

5    AND A LOT OF THAT WILL BE PASSED ON TO FINAL CONSUMERS WHO ARE

6    HARMED.  OKAY?

7         SO ALL OF THAT ANALYSIS ABSOLUTELY STANDS.  THERE'S

8    NOTHING THAT'S BEEN SAID THAT INDICATES THERE WAS ANYTHING

9    WRONG WITH THAT ANALYSIS, AND MY ARITHMETIC EXAMPLES IN GAINS

10   FROM TRADE SHOW THAT PROFESSOR NEVO IS SIMPLY MISTAKEN IN WHAT

11   HE SAID.

12        A FINAL WAY TO LOOK AT THIS IS TO THINK ABOUT --

13   PROFESSOR NEVO SEEMS TO BE SAYING, YOU IMPOSE THIS ROYALTY

14   SURCHARGE, IT'S AGNOSTIC, IT DOESN'T REALLY HURT THE RIVALS.  I

15   GUESS THAT'S WHAT CHIP AGNOSTIC MEANS BECAUSE IT'S NEUTRAL.

16        WELL, WHERE'S THE MONEY COMING FROM?  THE ROYALTY

17   SURCHARGE IS GOING TO GET -- SOMEBODY HAS GOT TO BE PAYING IT.

18   QUALCOMM IS PICKING UP THE MONEY.

19        AND I'M SAYING THE RIVAL IS GOING TO EAT PART OF THAT.

20   WHAT I SAID WAS THE RIVAL ATE PART OF IT, THE OEM EATS PART OF

21   IT, AND PART OF IT IS PASSED ON TO CONSUMERS.  THEY'RE GOING TO

22   SPLIT THE PAIN.

23        PROFESSOR NEVO SEEMS TO BE SUGGESTING, WELL, THE RIVAL

24   ISN'T GOING TO GET HURT.

25        I DON'T THINK THAT'S RIGHT.  BUT IF YOU JUST FOLLOW HIS

1    OWN LOGIC, IF THAT WERE TRUE AND THE RIVALS' MARGINS AREN'T

2    CUT, WHO'S PAYING THE SURCHARGE?  IT WOULD HAVE TO BE ENTIRELY

3    THE OEM'S, WHICH MEANS BASICALLY THE FINAL CONSUMERS.

4         SO AS FAR AS I CAN TELL, HIS DEFENSE OF THIS IS IT WOULD

5    HURT CONSUMERS EVEN WORSE THAN I HAVE SAID.  THAT DOES NOT

6    STRIKE ME AS A VERY STRONG DEFENSE IN AN ANTITRUST CASE.

7    Q.   AND PROFESSOR NEVO TESTIFIED THAT THE ECONOMICS OF A

8    ROYALTY SURCHARGE HERE ARE VERY DIFFERENT FROM THOSE IN THE

9    MICROSOFT PER PROCESSOR CASE FROM THE '90S.  AND HE SAID THAT,

10   QUOTE, "THE BIG DIFFERENCE IS MICROSOFT WAS GIVING AWAY ITS

11   OPERATING SYSTEM FOR FREE," UNQUOTE, AND HE CONTRASTED THAT TO

12   THE SITUATION HERE WHERE QUALCOMM'S CHIPS, QUOTE, "ACTUALLY

13   HAVE A PRETTY NICE MARGIN," UNQUOTE.

14        HOW DO YOU RESPOND?

15   A.   YOUR HONOR, THE MICROSOFT CASE WAS CLEARLY ABOUT THE --

16   ABOUT MICROSOFT CHARGING OEM'S A FEE WHEN THEY SHIPPED A

17   PERSONAL COMPUTER THAT DID NOT CONTAIN A MICROSOFT OPERATING --

18   THE WINDOWS OPERATING SYSTEM.  OKAY?

19        IF YOU LOOK AT THE COMPLAINT THE D.O.J. FILED, I THINK

20   IT'S 1994, IT ACTUALLY TALKS ABOUT A PENALTY, OR TAX -- THAT'S

21   THEIR WORDS -- ON THESE COMPUTERS THAT DON'T CONTAIN THE

22   MICROSOFT OPERATING SYSTEM.  OKAY?

23        NOW, PROFESSOR NEVO HAS NOT ADDRESSED THAT AT ALL, OKAY?

24   I GUESS MY CHARITABLE INTERPRETATION OF THIS IS THAT HE

25   COMPLETELY FAILS TO UNDERSTAND WHAT THE MICROSOFT PER PROCESSOR

1     CASE WAS ABOUT.  IT WASN'T ABOUT MICROSOFT GIVING AWAY WINDOWS

2     FOR FREE.  IT WAS ABOUT THIS PENALTY OR TAX, EXACTLY THE SAME

3     AS WE HAVE HERE.

4          SO THE FACT THAT HE ANSWERS THIS WAY I THINK IS VERY

5     REVEALING ABOUT THE INTELLECTUAL BANKRUPTCY, HIS ARGUMENT HERE

6     ON THE EFFECTS OF THE ROYALTY SURCHARGE.

7               MR. JAMES:  NO FURTHER QUESTIONS, YOUR HONOR.

8               THE COURT:  OKAY.  TIME IS 9:47.

9               MR. VAN NEST:  GIVE ME JUST A MINUTE, YOUR HONOR.

10              THE COURT:  TAKE YOUR TIME.

11         (PAUSE IN PROCEEDINGS.)

12              MR. VAN NEST:  YOUR HONOR, I'M ALL READY.

13              THE COURT:  OKAY.  TIME IS 9:49.  GO AHEAD, PLEASE.

14                        **CROSS-EXAMINATION**

15    BY MR. VAN NEST:

16    Q.   GOOD MORNING, PROFESSOR SHAPIRO.

17    A.   GOOD MORNING.

18    Q.   AND WELCOME BACK.

19    A.   THANK YOU.

20    Q.   YOU TALKED A LITTLE BIT ABOUT THE INDUSTRY IN YOUR

21    TESTIMONY.

22         YOU DON'T DISPUTE THAT THE TECHNOLOGY INVOLVED IN MOBILE

23    DEVICES HAS IMPROVED AT AN IMPRESSIVE PACE OVER THE PAST 10 TO

24    20 YEARS; CORRECT?

25    A.   THAT IS CORRECT.

1    Q.   OR THAT THE TECHNOLOGICAL PROGRESS IN MODEM CHIPS AND

2    MOBILE TELECOMMUNICATIONS IS ONGOING; RIGHT?

3    A.   I AGREE WITH THAT.

4    Q.   AND THAT WORLDWIDE SALES OF HANDSETS HAVE GROWN

5    DRAMATICALLY OVER THE PAST 10 TO 20 YEARS?  THAT'S ALSO TRUE?

6    A.   I AGREE.

7    Q.   AND THAT PRICES OF MOBILE PHONES HAVE BEEN FALLING THROUGH

8    THAT PERIOD; RIGHT?

9    A.   QUALITY ADJUSTED, I BELIEVE THAT IS TRUE.

10   Q.   AND THAT GLOBAL PENETRATION OF MOBILE PHONES HAS INCREASED

11   DURING THIS PERIOD?

12   A.   CERTAINLY.

13   Q.   AND THE TECHNOLOGICAL CAPABILITIES OF SMARTPHONES HAS

14   IMPROVED DRAMATICALLY?

15   A.   I AGREE.

16   Q.   CORRECT?

17        NOW, YOUR TAX THEORY PREDICTS THAT AS THE ALL-IN PRICE OF

18   RIVAL CHIPS GOES UP, QUALCOMM WILL GAIN MARKET SHARE AT THE

19   EXPENSE OF ITS RIVALS; ISN'T THAT RIGHT?

20   A.   YES, EVERYTHING ELSE EQUAL, THAT IS CORRECT.

21   Q.   SO USING INTEL AS AN EXAMPLE, YOU ACTUALLY PREDICTED IN

22   YOUR REBUTTAL REPORT THAT QUALCOMM WILL GAIN MARKET SHARE AT

23   THE EXPENSE OF INTEL; RIGHT?

24   A.   AGAIN, EVERYTHING ELSE EQUAL, THAT IS THE NATURAL AND

25   INEVITABLE ECONOMIC CONSEQUENCE OF THE RAISING RIVALS' COSTS.

1    I STAND BY THAT.

2    Q.   BUT, IN FACT, AS YOU ACKNOWLEDGED TWO WEEKS AGO HERE IN

3    THIS COURTROOM, QUALCOMM'S MARKET SHARE IN WHAT YOU CALL THE

4    LTE PREMIUM MARKET HAS BEEN DECLINING SINCE 2014; RIGHT?

5    A.   IT HAS.

6    Q.   AND IT'S BEEN DECLINING AS THE SHARES OF COMPETITORS, LIKE

7    SAMSUNG AND MEDIATEK, HAVE BEEN GROWING; RIGHT?

8    A.   I THINK THAT FOLLOWS ARITHMETICALLY, YES.

9    Q.   AND, INDEED, WHEN YOU AND I SPOKE ABOUT THIS TWO WEEKS

10   AGO, YOU SAID THAT IN 2017, QUALCOMM'S MARKET SHARE FELL AND

11   INTEL'S MARKET SHARE ROSE WHEN INTEL GOT IN AT APPLE; CORRECT?

12   A.   THAT IS TRUE.

13   Q.   NOW, YOUR TAX THEORY ALSO PREDICTS THAT TOTAL DEMAND FOR

14   MODEM CHIPS WILL TEND TO FALL AS THE ALL-IN PRICES TEND TO

15   RISE; ISN'T THAT CORRECT?

16   A.   YES, OTHER THINGS EQUAL, THAT'S THE NORMAL LAW OF DEMAND,

17   THAT'S CORRECT.

18   Q.   BUT, IN FACT, AS YOUR OWN STUDIES SHOW US, THE NUMBER OF

19   PREMIUM LTE MODEMS SOLD HAS INCREASED DRAMATICALLY DURING THE

20   PERIOD WHEN YOU ALLEGE QUALCOMM HAD MARKET POWER; RIGHT?

21   A.   THAT'S CORRECT.  THE QUALITY ADJUSTED PRICE OF THESE

22   DEVICES HAS COME DOWN A LOT.  THE OPERATING SYSTEMS, THERE'S SO

23   MANY FEATURES THAT HAVE LED TO THAT.  TO SUGGEST THAT THAT

24   IS -- THAT CONTRADICTS THE THEORY, THE LAW OF DEMAND REGARDING

25   PRICE OF MODEM CHIPS IS INCORRECT.

1    Q.   EXCUSE ME.  BUT IT IS THE CASE, AS YOU ESTABLISHED LAST

2    TIME, THAT THE NUMBER OF PREMIUM LTE MODEMS SOLD DURING THE

3    PERIOD YOU CLAIM QUALCOMM HAD MONOPOLY POWER HAS INCREASED

4    DRAMATICALLY; RIGHT?

5    A.   YES, I'VE SAID THE, THIS IS A --

6    Q.   THANK YOU, PROFESSOR SHAPIRO.

7         COULD I HAVE SLIDE 14 UP FROM PROFESSOR SHAPIRO'S EARLIER

8    PRESENTATION.

9         THIS IS THE PREMIUM LTE UNITS AND SHARE CHART YOU PREPARED

10   BASED ON YOUR REPORT; CORRECT?

11   A.   YES, THAT LOOKS RIGHT.

12   Q.   AND IT SHOWS THAT DURING THE PERIOD IN WHICH YOU CLAIM

13   QUALCOMM HAD MARKET POWER, THE NUMBER OF UNITS SOLD SKYROCKETED

14   FROM ABOUT 15 MILLION IN 2011 TO ALMOST 600 MILLION IN 2016;

15   CORRECT?

16   A.   YOU'RE JUST LOOKING AT LTE.  WELL, IT WAS 0 BEFORE THAT.

17   I MEAN, SO OF COURSE IT WENT UP BECAUSE IT'S A NEW GENERATION

18   OF DEVICES.

19   Q.   AND IT WENT UP YEAR AFTER YEAR AFTER YEAR DURING THIS

20   PERIOD; CORRECT?

21   A.   UNTIL 2016 WHEN IT LOOKS LIKE IT WENT DOWN.

22   Q.   AND THE SAME IS TRUE FOR CDMA.  THE NUMBER OF CDMA MODEMS

23   SOLD DURING THE PERIOD YOU CLAIM QUALCOMM HAD MONOPOLY POWER,

24   THAT'S RISEN SHARPLY AS WELL; RIGHT?

25   A.   IT'S GENERALLY RISEN A LOT DURING THE 3G ERA.  WE CAN LOOK

1    AT THE DATA.

2    Q.   WELL, LET'S LOOK AT SLIDE 12 FROM PROFESSOR SHAPIRO'S

3    OPENING.  THE CDMA TREND IS JUST THE SAME, DEMAND AND SALES

4    HAVE RISEN DRAMATICALLY DURING THIS PERIOD WHEN YOU CONTEND

5    QUALCOMM WAS ENGAGED IN ANTICOMPETITIVE CONDUCT; RIGHT?

6    A.   I AGREE, OUTPUT HAS GONE UP SUBSTANTIALLY.

7    Q.   NOW, YOU TOLD US THAT THIS IS MEANINGLESS BECAUSE YOU NEED

8    TO KNOW HOW HEAVY THE ROCKS ARE IN THE KAYAK; RIGHT?

9    A.   I DIDN'T SAY THIS IS MEANINGLESS.

10   Q.   BUT YOU TOLD US LAST TIME THAT YOU'VE DONE NO EMPIRICAL

11   WORK WHATSOEVER TO DETERMINE THE SIZE OF ANY SUPRA-FRAND

12   ROYALTY YOU'RE ASSUMING EXISTED; CORRECT?

13   A.   WHAT I SAID IS I HAVE NOT QUANTIFIED IT.  I EXPLAINED WHY

14   WE HAVE GOOD REASON TO BELIEVE THAT IT WAS SUBSTANTIAL.

15   Q.   NOW, YOU HAVEN'T OFFERED ANY OPINION THAT QUALCOMM HAS

16   MONOPOLY POWER IN THE MARKET FOR WCDMA; ISN'T THAT RIGHT?

17   A.   THAT IS CORRECT.

18   Q.   IN CONNECTION WITH YOUR EVALUATION OF THE CDMA MARKET, YOU

19   PERFORMED A HYPOTHETICAL MONOPOLIST TEST; CORRECT?

20   A.   I DID.

21   Q.   AND YOU DID THAT IN ADDITION TO -- IN CONNECTION WITH YOUR

22   WORK ON PREMIUM LTE; RIGHT?

23   A.   I DID.

24   Q.   YOU PERFORMED NO SUCH TEST ON THE WCDMA MARKET AND,

25   THEREFORE, YOU HAVEN'T EXPRESSED AN OPINION AS TO WHETHER THAT

1    MARKET -- WHETHER QUALCOMM HAD MONOPOLY POWER IN THAT MARKET;

2    CORRECT?

3    A.   THAT IS CORRECT.

4    Q.   AND WHEN WE WERE HERE LAST TIME, YOU TOLD JUDGE KOH

5    POINTBLANK THAT YOUR OPINION OF QUALCOMM'S MARKET POWER BEGAN

6    IN 2006 FOR CDMA AND IN 2011 FOR LTE; CORRECT?

7    A.   THAT IS CORRECT.

8    Q.   YOU GAVE SOME TESTIMONY ABOUT A JAPAN FAIR TRADE

9    COMMISSION CEASE AND DESIST ORDER.

10       DO YOU RECALL THAT?

11   A.   I DO.

12   Q.   NOW, THAT ORDER ISSUED IN 2009; RIGHT?

13   A.   I AM CHECKING.  I BELIEVE THAT'S CORRECT.

14   Q.   AND THE ORDER HAS BEEN STAYED BY ORDER OF THE TOKYO HIGH

15   COURT PENDING AN EVIDENTIARY HEARING; ISN'T THAT RIGHT?

16   A.   IT'S BEEN A LONG, ENTANGLED PROCESS THERE.  THAT SOUNDS

17   RIGHT.

18   Q.   AND AS OF SEPTEMBER 2017, AS YOU SAID IN YOUR REPORT, THE

19   JAPAN FAIR TRADE COMMISSION HAD HELD HEARINGS ON 37 DIFFERENT

20   DATES, BUT HAD NOT YET ISSUED A FINAL DECISION; RIGHT?

21   A.   I'M LOOKING FOR THAT PART HERE.  IT'S AROUND PAGE 74.  DO

22   YOU HAVE --

23   Q.   IT'S ACTUALLY IN -- IT'S YOUR REBUTTAL REPORT, FOOTNOTE

24   175.

25   A.   THANK YOU.  GOOD.

SHAPIRO CROSS BY MR. VAN NEST

1    Q.   DO YOU HAVE IT?

2    A.   I DO.

3    Q.   I HAVE IT UP.

4    A.   YES.

5    Q.   THE ORDER HAS BEEN STAYED; CORRECT?

6    A.   LET ME JUST CATCH UP WITH YOU HERE.

7    Q.   I HAVE IT ON THE MONITOR, PROFESSOR SHAPIRO.

8    A.   OH, OKAY.

9    Q.   IN FEBRUARY, THE TOKYO HIGH COURT STAYED IT; RIGHT?

10   A.   OKAY, THANK YOU.  YES, I SEE THAT NOW.

11   Q.   AND THEN YOU INDICATE IN THE FINAL SENTENCE THAT AS OF

12   SEPTEMBER, THE JFTC HELD HEARINGS ON 37 DIFFERENT DATES, BUT

13   HAD NOT YET ISSUED A FINAL DECISION.

14        THAT'S CORRECT, TOO, ISN'T IT?

15   A.   AS FAR AS I KNOW.

16   Q.   I THOUGHT I HEARD YOU SAY DURING EXAMINATION THAT THIS

17   ORDER HAD SOMETHING TO DO WITH CHIP LEVERAGE AND ROYALTY RATES.

18        DID I HEAR THAT RIGHT?

19   A.   I'M NOT SURE I -- I THINK THIS HAD MORE TO DO WITH -- I

20   THOUGHT THERE WAS ISSUES ABOUT THE INFRASTRUCTURE EQUIPMENT

21   MORE THAN THE CHIPS.  SO I MAY HAVE MISS -- I'M NOT SURE WHAT I

22   SAID.

23   Q.   THIS ORDER HAS NOTHING TO DO WHATSOEVER WITH USING CHIP

24   LEVERAGE TO INFLUENCE ROYALTY RATES, DOES IT?

25   A.   I BELIEVE THAT -- I DON'T KNOW -- I DO NOT KNOW, WITHOUT

1    CHECKING MY REPORT MORE CAREFULLY, WHICH I CAN DO, EXACTLY WHAT

2    THE NATURE OF THE COERCION WAS.

3         I THOUGHT THIS -- IN MY MIND, I'M REMEMBERING SOMETHING

4    ABOUT INFRASTRUCTURE, BUT YOU'LL HAVE TO HELP ME WITH THAT

5    BECAUSE I -- I AM NOT CERTAIN ABOUT THAT POINT.

6              MR. VAN NEST:  YOUR HONOR, I'D LIKE TO PUT QX --

7    CX 8243 UP TO REFRESH THE WITNESS'S RECOLLECTION.  I DON'T

8    THINK IT'S IN EVIDENCE, BUT IT IS THE ORDER.

9              THE COURT:  WHY CAN'T YOU JUST HAND IT TO HIM TO

10   REFRESH HIS RECOLLECTION?  DO YOU NEED TO PUBLISH IT?

11             MR. VAN NEST:  I CAN.

12   Q.  IT'S ACTUALLY IN YOUR BINDER.  IT'S IN YOUR BINDER,

13   PROFESSOR SHAPIRO.  IT'S QX 8243.

14        DO YOU HAVE IT?

15   A.  I'M GETTING THERE.  I'M SORRY.

16   Q.  OH, I'M SORRY, CX.  CX.

17   A.  CX.

18   Q.  IT'S THE VERY BACK, AT THE VERY BACK.

19   A.  8243?

20   Q.  YEP.

21   A.  OKAY.

22   Q.  OKAY.  THAT'S THE -- THAT'S THE ORDER THAT YOU DISCUSSED

23   IN YOUR REBUTTAL REPORT AT PARAGRAPH 461; CORRECT?

24   A.  IT LOOKS LIKE THAT, YES.

25   Q.  COULD WE PUT UP THE SECOND PART OF THE PAGE THERE NEAR THE

1    BOTTOM, OUTLINE OF THE VIOLATION.

2        WELL, PROFESSOR SHAPIRO, THIS ORDER DEALS WITH

3    CROSS-LICENSES FROM JAPANESE MANUFACTURERS, NOT WITH CHIP

4    LEVERAGE; ISN'T THAT RIGHT?

5    A.   WELL, THIS IS A PRESS RELEASE.  THIS IS NOT THE ORDER

6    ITSELF.  THIS IS A PRESS RELEASE ABOUT THE ORDER.

7    Q.   THAT'S RIGHT.

8    A.   OKAY.  I THOUGHT YOU SAID IT WAS THE ORDER.

9        I'LL HAVE TO READ IT TO ANSWER THAT.

10   Q.   WELL, LET ME ASK YOU THIS, PROFESSOR SHAPIRO:  ARE YOU

11   FAMILIAR AT ALL WITH THE TERMS OF THIS ORDER?

12   A.   NO.  I LOOKED AT IT A WHILE AGO.  I'M NOT FAMILIAR AS I

13   SIT HERE, NO.

14   Q.   LET'S MOVE ON BECAUSE, AS YOU KNOW, MY TIME IS LIMITED.

15   A.   OKAY.  BUT I WOULD ALSO POINT OUT THAT IN APPENDIX E TO MY

16   REBUTTAL REPORT, I HAVE FURTHER DISCUSSION ABOUT THE LEVERAGE

17   THAT WAS BROUGHT TO BEAR HERE.

18   Q.   ALL RIGHT.  LET'S -- CAN WE PUT UP PROFESSOR SHAPIRO'S

19   REBUTTAL DEMONSTRATIVE SLIDE 8?

20       YOU TALKED ABOUT PROFESSOR NEVO'S CALCULATION CONCERNING

21   ROYALTY RATES IN CONNECTION WITH THE DEGREE OF DEPENDENCE OF AN

22   OEM ON QUALCOMM'S CHIPS; CORRECT?

23   A.   YES.

24   Q.   AND YOU MADE SOME CORRECTIONS, SOME CHANGES TO

25   PROFESSOR NEVO'S ANALYSIS?

1    A.   I DID, YES.

2    Q.   RIGHT?  YOU TOOK COMPANIES WHO BOUGHT FROM VIA AND TREATED

3    THOSE AS DEPENDENT ON QUALCOMM?

4    A.   BECAUSE OF THE ARRANGEMENT BETWEEN QUALCOMM AND VIA.

5    Q.   AND YOU MOVED FOLKS OVER?

6    A.   I DIDN'T MOVE FOLKS OVER.  I ENCODED THE DATA CORRECTLY.

7    Q.   AND YOU ALSO EXCLUDED ALL LICENSES SIGNED BEFORE 2002;

8    CORRECT?

9    A.   THAT'S CORRECT.

10   Q.   NOW, FOR EXAMPLE, IF YOU HAD CHOSEN 1999 AS A CUTOFF DATE,

11   THAT'S THE DATE AT WHICH WCDMA WAS FIRST COMMERCIALIZED, YOU

12   WOULD HAVE PICKED UP A NUMBER OF LICENSES ON THE LEFT SIDE OF

13   THE CHART; CORRECT?

14   A.   YES, AND THEY WOULD HAVE ALL HAD THE SAME FLAW THAT I

15   POINTED OUT FOR THE TWO THAT ARE SHOWN HERE.  SO THE EFFECT

16   WOULD BE MORE DIAMONDS ON THE LEFT THAT WOULD INCORRECTLY

17   SUGGEST A LACK OF RELIANCE ON QUALCOMM AND VIA.

18   Q.   NOW, IN FACT, THOSE TWO DIAMONDS ON THE LEFT, THEY'RE BOTH

19   IN THE 5 PERCENT RANGE; RIGHT?

20   A.   IT LOOKS THAT WAY, YES.

21   Q.   AND ONE OF THOSE IS GIONEE GROUP; CORRECT?

22   A.   YES.

23   Q.   AND GIONEE GROUP ENDED UP SELLING A VERY SIGNIFICANT

24   NUMBER OF CDMA HANDSETS OVER THE YEARS; CORRECT?

25   A.   I THINK THEY SOLD AROUND 650,000 IS WHAT I REMEMBER.

1    Q.   ACTUALLY, YOUR REPORT REFLECTS 697,000 CDMA CAPABLE

2    HANDSETS; RIGHT?

3    A.   OKAY, I STAND CORRECTED, 697, NOT 650.

4    Q.   AND THEY PURCHASED NO CDMA CHIPS FROM EITHER QUALCOMM OR

5    VIA IN THE TWO YEARS AFTER SIGNING THE LICENSE; CORRECT?

6    A.   THAT'S CORRECT, BECAUSE THEY DIDN'T COME OUT WITH THE

7    HANDSETS UNTIL MORE THAN TWO YEARS LATER.

8    Q.   SO FOR THE TWO YEAR PERIOD IN WHICH -- FOLLOWING EXECUTION

9    OF THE LICENSE, THEY HAD NO RELIANCE WHATSOEVER ON QUALCOMM OR

10   VIA?

11   A.   I THINK THAT IS FALSE.

12   Q.   NOW, YOU GAVE SOME TESTIMONY ABOUT PROFESSOR NEVO'S

13   EMPIRICAL TESTS.

14        I TAKE IT YOU'VE DONE NO TESTING WHATSOEVER, EMPIRICAL OR

15   OTHERWISE, TO DETERMINE WHETHER THE CONTRACT RATE OR SOME OTHER

16   RATE IS ECONOMICALLY MEANINGFUL; CORRECT?

17   A.   I DON'T UNDERSTAND THE QUESTION.

18        I CAN TELL YOU WHETHER A RATE IS ECONOMICALLY MEANINGFUL

19   ONCE I UNDERSTAND WHAT IT MEASURES.  THAT'S NOT AN EMPIRICAL

20   QUESTION.

21   Q.   MY QUESTION, PROFESSOR SHAPIRO, IS YOU DID NO RETESTING OF

22   PROFESSOR NEVO'S NUMBERS USING SOME RATE OTHER THAN THE

23   CONTRACT RATE?  AS YOU TOLD US IN YOUR TESTIMONY, YOU HAVEN'T

24   DONE THESE SORTS OF TESTS AT ALL; RIGHT?

25   A.   I HAVE NOT GONE BACK TO HIS SET OF CONTRACTS AND TRIED TO

1    CONSTRUCT AN ECONOMICALLY MEANINGFUL VARIABLE.  LIKE I SAID, I

2    THINK THAT WOULD BE VERY DIFFICULT, IF NOT IMPOSSIBLE.

3    Q.   AND YOU HAVEN'T DONE IT; RIGHT?

4    A.   THAT'S CORRECT.

5    Q.   YOU'RE LIMITED TO CRITICIZING THE EMPIRICAL WORK THAT

6    PROFESSOR NEVO DID BECAUSE YOU HAVEN'T DONE ANY EMPIRICAL WORK

7    OF YOUR OWN; RIGHT?

8    A.   I'VE DONE -- MY ANALYSIS STANDS ON ITS OWN.  YOU'RE

9    REFERRING TO SPECIFIC REBUTTAL TESTIMONY, SO, YEAH, I'M

10   RESPONDING TO WHAT HE DID AND EXPLAINING WHY IT'S GOT ALL THESE

11   PROBLEMS.

12   Q.   AND YOU'VE DONE NO EMPIRICAL STUDY OF QUALCOMM'S LICENSE

13   RATES, ROYALTY RATES, OR UPFRONT PAYMENTS OVER THE YEARS AT

14   ALL; CORRECT?

15   A.   AGAIN, I LOOKED AT THE LICENSES.  BUT IF YOU MEAN BY

16   EMPIRICAL STUDY TRYING TO TAKE ALL OF THESE HUNDREDS OF

17   LICENSES AND DISTILL THEM INTO SIMPLE DATA, I DON'T THINK YOU

18   CAN DO THAT.  SO, NO, I DIDN'T DO IT.

19   Q.   AND YOU HAVE NOT DONE IT?

20   A.   I JUST SAID I DIDN'T DO IT.

21   Q.   SIMILARLY, WITH RESPECT TO YOUR TAX THEORY, YOU'VE DONE

22   NOTHING TO ANALYZE THE R&D SPENDING OF ANY PARTICULAR CHIP

23   MAKING RIVAL TO QUALCOMM; CORRECT?

24   A.   I HAVE NOT ANALYZED -- I THINK IF YOU MEAN BY ANALYZED,

25   LOOK AT EXACTLY WHY THEY SPENT THIS AMOUNT OF MONEY OR WHEN

1    THEY DID IT, I HAVE NOT GOT INTO THAT, THAT IS CORRECT.

2    Q.   YOUR TAX THEORY PREDICTS THAT SPENDING WILL GO DOWN, BUT

3    YOU DID NO TESTING TO DETERMINE WHETHER OR NOT THAT WAS THE

4    CASE; CORRECT?

5    A.   I DID NOT -- LOOK, I STAND BY THE THEORY THAT IF YOU HAVE

6    A -- IF YOUR MARGINS ARE CUT AND YOUR QUANTITIES OF UNITS ARE

7    CUT, YOU'RE GOING TO HAVE SMALLER OPERATING INCOME AND THAT'S

8    GOING TO BE A DRAG ON POSSIBLE INVESTMENTS.

9        I DID NOT EMPIRICALLY TEST HOW THAT PLAYED OUT WITH

10   DIFFERENT MODEM CHIP SUPPLIERS.

11   Q.   IN OTHER WORDS, YOU DIDN'T ACTUALLY LOOK AT ANYBODY'S

12   MARGINS OR ANYBODY'S SPENDING OR ANYBODY'S RESEARCH AND

13   DEVELOPMENT, YOU SIMPLY ASSUMED THERE WOULD BE AN IMPACT

14   BECAUSE THAT'S WHAT YOUR TAX THEORY PREDICTS; CORRECT?

15   A.   I DID NOT LOOK AT -- I DID NOT DO THE TYPE OF ANALYSIS

16   PROFESSOR SNYDER DID REGARDING LOOKING AT RIVAL BY RIVAL AND I

17   EXPLAINED, I BELIEVE, ACCORDING TO MY ANALOGY, WHY I DON'T

18   THINK THAT'S A GOOD METHODOLOGY.  THAT IS NOT AN ACCURATE WAY

19   OF DETERMINING THE EFFECTS OF QUALCOMM'S CONDUCT.

20   Q.   AND YOU KNOW THAT PROFESSOR SNYDER ACTUALLY ANALYZED

21   FIRM-WIDE R&D SPENDING OVER THE PERIOD WHEN YOU SAY QUALCOMM

22   HAD MARKET POWER; RIGHT?

23   A.   HE ANALYZED A NUMBER OF THE FIRMS AND LOOKED AT THEIR

24   SPENDING, YES.

25   Q.   COULD I HAVE QDX 9348 UP, PLEASE.  THIS WAS ONE OF THE

1      DEMONSTRATIVES THAT PROFESSOR SNYDER PRESENTED.

2           NOW, YOU HAD A CHANCE, IN YOUR REBUTTAL REPORT, TO ADDRESS

3      THIS, BUT YOU DIDN'T SAY ANYTHING ABOUT IT; CORRECT?

4      A.   I THINK THAT'S CORRECT.

5      Q.   AND -- EXCUSE ME.  THIS IS -- LET'S GO TO .001, THE R&D

6      SPENDING.  QDX 9348.001.  THERE WE GO.

7           NOW, THIS SHOWS THAT DURING THE PERIOD WHEN YOU SAY YOUR

8      TAX THEORY PREDICTS THAT R&D SPENDING WILL GO DOWN, FIRM-WIDE

9      R&D SPENDING FROM THESE CHIP MAKING RIVALS EITHER WENT UP OR

10     REMAINED CONSTANT?

11     A.   WELL, I DON'T KNOW WHAT YOU'RE SEEING IN THESE LINES

12     SAYING UP OR CONSTANT.

13          I COMPLETELY REJECT THE NOTION THAT LOOKING AT INTEL AND

14     SAMSUNG'S FIRM-WIDE R&D IS A WAY OF TELLING YOU ANYTHING ABOUT

15     THEIR MODEM CHIP BUSINESSES.

16     Q.   WELL, LET'S TAKE A LOOK AT MEDIATEK.  MEDIATEK, IN 2005,

17     WAS SPENDING ABOUT 15 PERCENT OF ITS FIRM-WIDE R&D ON

18     REVENUE -- ON -- OF ITS FIRM-WIDE REVENUE ON R&D; CORRECT?

19     A.   I SEE THAT.

20     Q.   LOOK AT MEDIATEK.

21     A.   I SEE THAT.

22     Q.   AND THAT WENT UP THROUGH THE PERIOD SO THAT BY 2017, THEY

23     WERE SPENDING NEARLY 25 PERCENT OF THEIR REVENUE ON R&D; ISN'T

24     THAT RIGHT?

25     A.   I SEE THAT.

1    Q.   AND THEY'RE ONE OF THE SUCCESS STORIES IN THIS MARKET?

2    A.   I THINK THEY ARE, YES.

3    Q.   OKAY.  AND THAT TRACKS CLOSELY TO SPENDING R&D, WHICH YOU

4    SAID IS VERY IMPORTANT IN A MARKET LIKE THIS WHERE INNOVATION

5    IS CRITICAL; RIGHT?

6    A.   YES.  THEY'RE A SUCCESS STORY AND BROADCOM IS A -- IS NOT

7    A SUCCESS STORY.  WE'VE GOT BOTH HERE.

8    Q.   RIGHT.  AND PROFESSOR SNYDER WENT THROUGH THOSE

9    CASE-BY-CASE, AND THAT'S SOMETHING THAT YOU REJECT AND HAVEN'T

10   DONE; RIGHT?

11   A.   I HAVE NOT DONE THAT.  I EXPLAINED WHY I DON'T THINK THAT

12   THAT IS INFORMATIVE FOR EVALUATING THE EFFECTS OF QUALCOMM'S

13   CONDUCT.

14   Q.   NOW, YOU'VE ALSO HEARD OR READ TESTIMONY DURING OUR TRIAL

15   THAT SOME OF THE RIVALS SPENT R&D MONEY INEFFICIENTLY; RIGHT?

16   A.   I HAVE HEARD THAT.

17   Q.   FOR EXAMPLE, INTEL COMMISSIONED A STUDY FROM BAIN, WHICH

18   WAS PRESENTED IN COURT FRIDAY, WHICH CONCLUDED THAT ALTHOUGH

19   INTEL'S SPENDING WAS ON PAR, THEIR OUTPUT OF R&D LAGGED

20   QUALCOMM VERY SIGNIFICANTLY; RIGHT?

21   A.   I REMEMBER THAT.

22   Q.   AND MS. EVANS FROM INTEL TESTIFIED THAT INTEL ELECTED NOT

23   TO ENGAGE IN THE CDMA MARKET AT AN EARLY POINT IN TIME AND ONLY

24   CAME IN LATER; RIGHT?

25   A.   WITH THE ACQUISITION OF VIA THAT YOU'RE REFERRING TO, YES.

1    I THINK SHE WOULD HAVE FAVORED DOING THAT EARLIER AS I RECALL.

2    Q.   ALL RIGHT.  AND THE REPORT THAT SHE SAID SHE AGREED WITH

3    SHOWED THAT, OVERALL, INTEL MOBILE PRODUCTIVITY LAGS QUALCOMM

4    BY 50 PERCENT BASED ON THE SAME SPENDING OF RESOURCES; RIGHT?

5    A.   I DON'T REMEMBER THAT SPECIFIC NUMBER.

6    Q.   BUT CERTAINLY THE REPORT WAS NOT COMPLIMENTARY OF INTEL'S

7    R&D EFFORTS; RIGHT?

8    A.   AS I RECALL, THAT'S CORRECT.  AND SHE VIEWED HER JOB WAS

9    TO TRY TO TURN THAT AROUND AND IMPROVE THINGS.

10   Q.   RIGHT.  AND EVENTUALLY THEY DID AND NOW THEY HAVE 100

11   PERCENT SHARE OF THE MODEMS AT APPLE FROM 2018 ON; RIGHT?

12   A.   I THINK THEY MADE SIGNIFICANT PROGRESS AND, YOU KNOW, ARE

13   TO BE CREDITED FOR THAT.

14   Q.   NOW, DID YOU READ THE TESTIMONY OF MR. ZANDER FROM

15   ST-ERICSSON WHO SAID THAT ERICSSON'S PROBLEM WAS THEY HAD TOO

16   MANY RESOURCES COMMITTED TO RESEARCH AND DEVELOPMENT?

17   A.   NO, I DID NOT.

18   Q.   HAVE YOU READ MR. ZANDER'S VIDEO TESTIMONY FROM LAST WEEK?

19   A.   NO, I HAVE NOT.

20   Q.   FAIR ENOUGH.

21       NOW, WITH RESPECT TO APPLE, I THOUGHT I HEARD YOU SAY THAT

22   A BETTER WAY FOR THAT TRANSACTION TO HAVE OCCURRED WOULD HAVE

23   BEEN FOR APPLE TO PAY INTEL -- TO PAY QUALCOMM MONEY.  DID I

24   HEAR THAT RIGHT?

25   A.   YES, THEY COULD HAVE HELPED DEFRAY THE COSTS OF R&D IN

1    EXCHANGE FOR CHIP DISCOUNTS.

2    Q.   IS THERE ANY EVIDENCE IN THE RECORD THAT APPLE WOULD HAVE

3    AGREED TO DO THAT?

4    A.   I THINK THEY DID NOT WANT TO HELP -- THEY DID NOT WANT TO

5    PAY MONEY TO QUALCOMM.  THEY WERE MORE INTERESTED IN GETTING

6    MONEY FROM QUALCOMM.

7    Q.   RIGHT.  AND THAT SEEMS LOGICAL; RIGHT?  THEY'RE A BIG BOY

8    AND A BIG GIRL, AND THEY WANT THE BEST DEAL THEY CAN GET;

9    RIGHT?

10   A.   ABSOLUTELY.

11   Q.   SO AS AN ECONOMIST, IS IT YOUR VIEW THAT IT'S REALISTIC,

12   IN LOOKING AT ALL THE FACTS AND EVIDENCE SURROUNDING APPLE,

13   THAT, IN FACT, IN THE REAL WORLD WHERE PEOPLE ARE NEGOTIATING

14   AND THEY HAVE LEVERAGE, APPLE WOULD HAVE AGREED TO PAY QUALCOMM

15   HUNDREDS OF MILLIONS OF DOLLARS TO MAKE THIS TRANSITION?

16   A.   WHAT I'M SAYING IS THE FACT -- IF QUALCOMM -- QUALCOMM

17   DEFENDED ITS MONOPOLY WITH THIS AND QUALCOMM'S SHARING THOSE

18   MONOPOLY PROFITS WITH APPLE DOES NOT CONSTITUTE A LEGITIMATE

19   BUSINESS JUSTIFICATION.

20   Q.   I THINK YOU SAID DURING YOUR DIRECT TESTIMONY THAT THE

21   TRANSACTION WAS HIGHLY PROFITABLE.  THAT'S CERTAINLY TRUE,

22   ISN'T IT?

23   A.   I THINK THE OVERALL BUSINESS AT APPLE OVER THE YEARS TO

24   COME FOLLOWING THE, THE FATA WAS PROFITABLE FOR QUALCOMM.

25   Q.   VERY PROFITABLE, IN FACT?

1    A.   THAT'S MY UNDERSTANDING AND THAT'S WHAT THE EVIDENCE --

2    THAT'S WHAT THE EVIDENCE HAS SHOWN.

3    Q.   AND IT WAS NEGOTIATED AT ARM'S LENGTH BETWEEN TWO LARGE

4    AND SOPHISTICATED COMPANIES, APPLE AND QUALCOMM; RIGHT?

5    A.   YES.

6    Q.   BOTH OF WHOM HAD LEVERAGE IN THE NEGOTIATION; RIGHT?

7    A.   OF COURSE.  OF COURSE.

8    Q.   NEITHER OF WHOM WOULD DO ANYTHING THAT WASN'T TO ITS

9    ADVANTAGE; RIGHT?

10   A.   THAT'S MY WORKING ASSUMPTION AS AN ANTITRUST ECONOMIST.

11   Q.   BOTH OF WHOM HAD SOPHISTICATED BUSINESS PEOPLE, LAWYERS

12   AND OTHERS, INVOLVED IN NEGOTIATING THIS TRANSACTION?

13   A.   CERTAINLY.

14   Q.   AND IN THE REAL WORLD, WHAT HAPPENED WAS BOTH COMPANIES

15   MADE A GREAT DEAL OF MONEY; RIGHT?

16   A.   WELL, WE'VE TALKED ABOUT QUALCOMM'S PROFITS.  I HAVE -- I

17   DON'T KNOW THAT I'VE SEEN A FINANCIAL ANALYSIS ON THE APPLE

18   SIDE, AT LEAST I DON'T HAVE ONE MEMORIZED.

19   Q.   CERTAINLY, THOUGH, YOU WOULD AGREE, APPLE'S NOT GOING TO

20   ENTER INTO AN AGREEMENT THAT'S NOT TO ITS ADVANTAGE; CORRECT?

21   A.   OF COURSE I WOULD AGREE WITH THAT.  AGAIN, THAT WOULD BE

22   MY WORKING ASSUMPTION AS AN ANTITRUST ECONOMIST.

23   Q.   NOW, PROFESSOR SHAPIRO, THIS IS NOT THE FIRST TIME YOU'VE

24   BEEN CRITICIZED IN PUBLIC FOR IGNORING REAL-WORLD EVIDENCE, IS

25   IT?

SHAPIRO CROSS BY MR. VAN NEST

1    A.   OH, PROBABLY NOT.  I'VE BEEN DOING THIS A LONG TIME.

2    Q.   AS A MATTER OF FACT, YOU RECENTLY TESTIFIED ON BEHALF OF

3    THE GOVERNMENT AS THEIR CHIEF ECONOMIC EXPERT IN THE

4    GOVERNMENT'S CHALLENGE TO THE AT&T/TIME WARNER MERGER; RIGHT?

5         MR. JAMES:  OBJECTION.  THIS IS OUTSIDE THE SCOPE OF

6    THE REBUTTAL TESTIMONY.

7         MR. VAN NEST:  YOUR HONOR, THIS IS IMPEACHMENT.  IT

8    GOES TO HIS RELIABILITY AND CREDIBILITY AS AN EXPERT.  AND HE

9    RAISED, HIMSELF, IN HIS TESTIMONY, THAT HE'S DONE THIS A LOT,

10   INCLUDING FOR THE D.O.J., INCLUDING IN MERGER CONTEXTS, AND

11   THAT'S WHAT I WANT TO ASK HIM ABOUT.

12        THE COURT:  IT'S OVERRULED.

13   GO AHEAD.  YOU MAY CONTINUE.

14        MR. VAN NEST:  THANK YOU.

15   Q.   YOU WERE THE GOVERNMENT'S CHIEF ECONOMIC EXPERT IN THE

16   GOVERNMENT'S CHALLENGE TO THE AT&T/TIME WARNER MERGER; CORRECT?

17   A.   CORRECT.

18   Q.   AND YOU TESTIFIED JUST LAST YEAR, IN MARCH OR APRIL, IN

19   THAT PROCEEDING; RIGHT?

20   A.   THAT IS CORRECT.

21   Q.   AND YOU PRESENTED A THEORY OF BARGAINING LEVERAGE BASED ON

22   BARGAINING THEORY.  YOU SAID THE MERGER WOULD ALLOW AT&T TO

23   EXERCISE TOO MUCH LEVERAGE OVER CONTENT PROVIDERS IN FUTURE

24   NEGOTIATIONS; RIGHT?  CORRECT?

25   A.   THAT SOUNDS CORRECT.

1    Q.   UM-HUM.  AND THE COURT THERE COMPLETELY REJECTED YOUR

2    OPINION AS UNRELIABLE, NOT CREDIBLE, AND COMPLETELY

3    INCONSISTENT WITH THE REAL-WORLD EVIDENCE; RIGHT?

4    A.   I DON'T -- THAT SOUNDS VERY STRONG.  JUDGE LEON HAD A

5    NUMBER OF CRITICISMS OF MINE.  IF YOU WANT TO REFER TO HIS

6    SPECIFIC CRITICISMS, LET'S LOOK AT HIS OPINION.

7    Q.   LET'S DO IT.  IT'S IN YOUR BINDER, UNITED STATES VERSUS

8    AT&T IS WHAT THE HEADING SAYS, AND IT'S JUDGE LEON'S OPINION OF

9    JUNE 12TH, 2018.

10        AND I'LL CALL YOUR ATTENTION TO PAGE 113 OF THAT OPINION

11   WHERE JUDGE LEON SAID, "UNFORTUNATELY FOR PROFESSOR SHAPIRO,

12   THE FACTS ADDUCED AT TRIAL REGARDING THE REAL-WORLD OPERATION

13   OF AFFILIATE NEGOTIATIONS DEMONSTRATED THAT HIS TESTIMONY

14   'RESTS ON ASSUMPTIONS' THAT ARE 'IMPLAUSIBLE AND INCONSISTENT

15   WITH RECORD EVIDENCE.'"

16        HE SAID THAT; CORRECT?

17   A.   I SEE THAT.

18   Q.   HE WENT ON TO SAY, "INDEED, THIS OPINION BY

19   PROFESSOR SHAPIRO RUNS CONTRARY TO ALL OF THE REAL-WORLD

20   TESTIMONY DURING THE TRIAL FROM THOSE WHO HAVE ACTUALLY

21   NEGOTIATED ON BEHALF OF VERTICALLY INTEGRATED COMPANIES."

22        HE SAID THAT AS WELL?

23   A.   WHERE IS THAT?

24   Q.   THAT'S JUST A LITTLE BIT BELOW WHAT I JUST READ, SAME

25   PAGE, 113.  "INDEED, THIS OPINION BY PROFESSOR SHAPIRO RUNS

1    CONTRARY TO ALL OF THE REAL-WORLD TESTIMONY DURING THE TRIAL

2    FROM THOSE WHO HAVE ACTUALLY NEGOTIATED ON BEHALF OF VERTICALLY

3    INTEGRATED COMPANIES."

4        HE SAID THAT; RIGHT?

5    A.   I SEE THAT, YES.

6    Q.   AND ON THE NEXT PAGE HE SAID, PAGE 114, "ONE WAS LEFT TO

7    WONDER WHY PROFESSOR SHAPIRO TURNED A BLIND EYE TO SUCH

8    EXTENSIVE REAL-WORLD EXPERIENCE."

9        HE SAID THAT AS WELL; RIGHT?

10   A.   I SEE THAT.

11   Q.   AND AT THE END OF THE DAY, WHAT HE CONCLUDED WAS THAT YOUR

12   MODEL, YOUR BARGAINING MODEL, YOUR LEVERAGE MODEL, "LACKED BOTH

13   'RELIABILITY AND FACTUAL CREDIBILITY,' AND, THUS, FAILED TO

14   GENERATE PROBATIVE PREDICTIONS OF FUTURE HARM."

15       THAT'S AT PAGE 149.  HE SAYS THAT AS WELL; RIGHT?

16       THAT'S WHAT HE SAID?

17   A.   149.

18   Q.   149.  MIDDLE OF THE PAGE, "BY CONTRAST, THE EVIDENCE AT

19   TRIAL SHOWED THAT PROFESSOR SHAPIRO'S MODEL LACKS BOTH

20   'RELIABILITY AND FACTUAL CREDIBILITY' AND THUS FAILS TO

21   GENERATE PROBATIVE PREDICTIONS OF FUTURE HARM ASSOCIATED WITH

22   THE GOVERNMENT'S INCREASED-LEVERAGE THEORY."

23       THAT'S WHAT THE JUDGE CONCLUDED IN YOUR OPINION REGARDING

24   THE MODEL; CORRECT?

25   A.   I SEE THAT.

1        MR. VAN NEST:  YOUR HONOR, I HAVE NO FURTHER

2    QUESTIONS, BUT WOULD LIKE TO RESERVE TIME FOR RECROSS.

3        THE COURT:  OKAY.  IT'S 10:18, SO I THINK YOU WOULD

4    HAVE, LIKE, 3 MINUTES.

5        MR. VAN NEST:  EXCUSE ME?

6        THE COURT:  IT'S 10:18.  YOU WOULD HAVE 3 MINUTES --

7        MR. VAN NEST:  THANK YOU.

8        THE COURT:  -- TO RECROSS.

9        MR. VAN NEST:  THANK YOU.

10        THE COURT:  ALL RIGHT.  THE GOVERNMENT HAS 17 MINUTES

11    LEFT, QUALCOMM HAS 3 MINUTES LEFT.

12        GO AHEAD, PLEASE.

13        OH, WAIT A MINUTE.  HANG ON.  LET ME JUST DOUBLE-CHECK

14    THAT.

15        YEAH, THAT'S RIGHT.  SO QUALCOMM HAS 3 MINUTES LEFT;

16    GOVERNMENT HAS 17 MINUTES LEFT.

17        IT'S 10:18.  ARE YOU READY?

18        MR. JAMES:  YES.

19        THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

20                    **REDIRECT EXAMINATION**

21    BY MR. JAMES:

22    Q.   PROFESSOR SHAPIRO, HAVE YOU TESTIFIED IN COURT APART FROM

23    THE AT&T CASE THAT MR. VAN NEST TALKED ABOUT?

24    A.   YES.  OVER MY CAREER, I THINK I SAID ABOUT 20 OR 25 TIMES.

25    Q.   HOW DOES THE AT&T CASE COMPARE TO THE OTHER EXPERIENCES

1      YOU'VE HAD?

2      A.   IT'S JUST AN OUTLIER.  I HAVE TO SAY, I -- YOU KNOW, I CAN

3      EXPLAIN WHAT I THINK HAPPENED.  BUT I -- IN MY VIEW, MY

4      OPINIONS AND TESTIMONY HAS BEEN GENERALLY VERY WELL RECEIVED BY

5      JUDGES AND RELIED UPON MANY TIMES.

6      Q.   IS THERE ANYTHING FURTHER YOU WANTED TO ADD TO YOUR

7      QUESTIONING BY MR. VAN NEST ABOUT THE AT&T MATTER?

8      A.   YES, THANK YOU.

9           YOUR HONOR, IF YOU WANT TO GO DOWN THAT ROAD, I WOULD JUST

10     SUGGEST YOU LOOK AT THE D.O.J.'S APPEAL BRIEFS, AND WE'LL SEE

11     WHAT THE D.C. CIRCUIT DOES WITH THIS.

12          JUDGE LEON DID REJECT THE BASICS OF BARGAINING THEORY AS

13     APPLIED HERE, WHICH WOULD, IF HIS OPINION IS -- IF THAT IS

14     ACCEPTED, IT WOULD BE CONTRARY I THINK BASICALLY TO WHAT ALL

15     ECONOMISTS WOULD SAY ABOUT BARGAINING THEORY, AND IN PARTICULAR

16     HOW IT WOULD APPLY IN VERTICAL MERGERS.

17          SOME OF THE TESTIMONY HE WAS RELYING ON WAS FROM, FOR

18     EXAMPLE, COMCAST, WHICH WAS A VERTICALLY INTEGRATED SUPPLIER

19     AND HAD ITS OWN ISSUES REGARDING ITS OWN DEAL WITH NBC.

20          SO I -- YOU KNOW, I VERY MUCH DISAGREE WITH WHAT HE SAID.

21          BUT, AGAIN, I WOULD POINT YOU TO THE D.O.J.'S APPEAL.  IT

22     EXPLAINS WHERE HE WENT WRONG.

23     Q.   TURNING FROM AT&T TO THIS CASE, DOES YOUR OPINION IN THIS

24     CASE RUN COUNTER TO THE REAL-WORLD TESTIMONY THAT'S BEEN

25     PRESENTED HERE?

1    A.   NO.  I THINK WHAT -- MY TESTIMONY ABOUT THE, ABOUT

2    QUALCOMM'S ABILITY TO OBTAIN A ROYALTY SURCHARGE, I'M LISTENING

3    CAREFULLY AND RELYING ON THE REAL-WORLD TESTIMONY ABOUT THE

4    CHIP LEVERAGE AND HOW IT OPERATED.

5         I THINK THE PERSON WHO'S NOT PAYING ATTENTION TO THAT IS

6    PROFESSOR NEVO.

7    Q.   MR. VAN NEST ASKED YOU ABOUT DIFFERENT CHANGES OVER TIME

8    IN MARKET SHARES AND R&D AND IN PRICES.

9         DO THOSE QUESTIONS CAUSE YOU TO DOUBT YOUR, QUOTE-UNQUOTE,

10   TAX THEORY AS MR. VAN NEST CALLED IT?

11   A.   NO, AND HE'S NOT REALLY EVEN CHALLENGING THE TAX THEORY AS

12   SUCH.  HE'S -- THIS WHOLE LINE THAT HE WAS ASKING, AND ALL OF

13   THEIR EXPERTS HAVE DEVELOPED, THAT THE MARKETS -- YOU KNOW, THE

14   PRODUCTS ARE GETTING BETTER, EVERYTHING HAS GOT TO BE FINE, YOU

15   KNOW, IT'S -- IT'S NOT AN ACCURATE WAY TO LOOK AT WHAT'S GOING

16   ON.

17        THE ROYALTY SURCHARGE -- LOOK, IF WE'RE TALKING ABOUT --

18   LOOK, I'M JUST GOING TO -- I DON'T KNOW EXACTLY WHAT THE NUMBER

19   IS, BUT IF IT'S DOLLARS PER PHONE, OF COURSE THE MARKET IS

20   GOING TO STILL GROW AND WORLDWIDE ADOPTION IS GOING TO GROW.

21        BUT IT WOULD HAVE GROWN A BIT FASTER, IT WOULD HAVE BEEN

22   CHEAPER IF YOU TAKE AWAY THAT TAX.

23        SO I JUST -- I JUST THINK IT'S THE SAME -- IT'S NOT A

24   RELIABLE WAY TO LOOK AT THE PROBLEM.  AND I THINK THAT NEITHER

25   DR. CHIPTY OR PROFESSOR NEVO ACKNOWLEDGED THAT THEY CAN'T

1    SAY -- I THINK PROFESSOR NEVO -- HE CAN'T SAY THE MARKET

2    WOULDN'T HAVE DONE BETTER WITHOUT QUALCOMM'S CONDUCT OR WITHOUT

3    THE SURCHARGE.  BUT HE THEN SAID, BUT IT DID VERY WELL.

4         SO I JUST DON'T THINK THEY'RE ENGAGING ON THE QUESTION,

5    WHAT ARE THE EFFECTS OF THE CONDUCT?

6    Q.   MR. VAN NEST ASKED YOU QUESTIONS ABOUT THE JFTC ORDER AND

7    THE JAPANESE OEM'S.  WAS THE ANALYSIS THAT YOU CONDUCTED

8    CONFINED TO THE FOUR CORNERS OF THE JFTC ORDER?

9    A.   NO.  SO APPENDIX E OF MY -- THIS IS THE REBUTTAL REPORT,

10   IT HAS A SECTION, IT'S CALLED DETAILS OF QUALCOMM'S LICENSING

11   NEGOTIATIONS.

12        AND WHAT I DID -- THIS IS IN REBUTTAL.  SO I WAS LOOKING

13   AT PROFESSOR NEVO'S EXAMPLES, HIS DATA POINTS, AND I'M, LIKE,

14   WHAT'S GOING ON BEHIND THESE NEGOTIATIONS?  AND IN PARTICULAR,

15   THIS SECTION HERE, THESE WCDMA LICENSE NEGOTIATIONS.

16        SO THIS SECTION THAT RUNS FOR THREE PAGES IS -- DISCUSSES

17   A NUMBER OF THE JAPANESE OEM'S AND WHAT WAS GOING ON IN THEIR

18   NEGOTIATIONS AND THE LEVERAGE QUALCOMM BROUGHT TO BEAR.  AND

19   PART OF THAT IS THIS JAPAN FAIR TRADE COMMISSION CHALLENGE,

20   WHATEVER IT IS, THEIR ACTION AGAINST QUALCOMM.

21        BUT THERE'S MORE THAN THAT HERE THAT'S DESCRIBED.  I DON'T

22   HAVE IT ALL MEMORIZED, BUT IT IS HERE.

23   Q.   MR. VAN NEST ALSO ASKED YOU WHETHER YOU HAD FORMED AN

24   OPINION AN QUALCOMM'S MARKET POWER IN WCDMA OR IN CDMA PRIOR TO

25   2006.

```
1           DID YOU NEED TO FORM THOSE OPINIONS TO REACH THE

2     CONCLUSIONS YOU REACHED IN THIS CASE?

3     A.   NO.  NO.  THE -- MY ANALYSIS OF THE MARKET -- THE CDMA

4     MARKET STARTS IN 2006 AND THE LTE MARKET STARTS IN 2011.  WHAT

5     HAPPENED YEARS BEFORE IS JUST NOT PART OF MY ANALYSIS.

6           AS I SAID BEFORE, IF PROFESSOR NEVO IS GOING TO MAKE AN

7     ASSUMPTION ABOUT SOMETHING THAT HAPPENED YEARS BEFORE, HE

8     SHOULD JUSTIFY THAT ASSUMPTION, AND HE DID NOT.

9           AND AS I SAID, IT'S CONTRARY TO A BUNCH OF EVIDENCE,

10    INCLUDING SOME THINGS HE ACKNOWLEDGED, FOR EXAMPLE, OF

11    QUALCOMM'S CDMA LEADERSHIP.

12              MR. JAMES:  NO FURTHER QUESTIONS.

13              THE COURT:  OKAY.  IT'S 10:24.

14    ANY RECROSS?

15    ARE YOU READY?

16              MR. VAN NEST:  I'M READY, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  10:25.  GO AHEAD, PLEASE.

18                        RECROSS-EXAMINATION

19    BY MR. VAN NEST:

20    Q.   I DON'T WANT TO BEAT A DEAD HORSE, PROFESSOR SHAPIRO, BUT

21    IN YOUR APPENDIX E CONCERNING THE JAPANESE FAIR TRADE

22    COMMISSION ORDER, THERE'S NOT A WORD ABOUT ROYALTIES OR CHIP

23    LEVERAGE ANYWHERE, IS THERE?

24    A.   THERE'S -- I SEE SOMETHING HERE ABOUT ROYALTIES.  I SEE

25    INFRASTRUCTURE ISSUES THAT I BROUGHT UP BEFORE.  I CAN READ
```

1    DIFFERENT PARAGRAPHS.

2    Q.   THE FACT OF THE MATTER IS THAT THE ORDER AFFECTED

3    CROSS-LICENSING, NOT CHIP LEVERAGE OR ELEVATED ROYALTIES AT

4    ALL; RIGHT?

5    A.   LOOK, I'D HAVE TO READ THE ORDER TO BE SURE ABOUT THAT.

6         THE POINT -- LOOK, MY POINT IS THAT THERE WAS VARIOUS

7    LEVERAGE THAT QUALCOMM BROUGHT TO BEAR ON THOSE LICENSES AND

8    THAT WAS VIEWED TO BE COERCIVE BY THE JAPANESE -- BY THE JFTC.

9    AND SO THESE ARE BAD BENCHMARKS TO USE TO TALK ABOUT WHAT WOULD

10   HAPPEN WITHOUT SUCH LEVERAGE.

11        THE PARTICULAR TYPE OF LEVERAGE IS IRRELEVANT FOR THAT

12   ARGUMENT.

13   Q.   ALL RIGHT.  BUT THAT WAS FOUR OR FIVE LICENSES OUT OF THE

14   HUNDREDS THAT PROFESSOR NEVO ANALYZED; RIGHT?

15   A.   THIS WAS FIVE OUT OF THE SEVEN THAT HE SHOWED ON THAT

16   EXHIBIT.

17   Q.   NOW, PROFESSOR SHAPIRO, YOU TOLD US THAT THERE'S NO WAY TO

18   KNOW HOW MUCH BETTER THINGS WOULD HAVE BEEN IN THIS DYNAMIC,

19   GROWING MARKET BUT FOR QUALCOMM'S CONDUCT; CORRECT?

20   A.   I THINK IT'S VERY DIFFICULT TO KNOW THAT, AND I HAVE NOT

21   QUANTIFIED THAT.

22   Q.   AND THAT'S WHAT I WANTED TO FIND OUT.

23        YOU'VE DONE NOTHING WHATSOEVER TO QUANTIFY HOW PRICES,

24   MARKET SHARES, SPENDING, OR ANYTHING ELSE WOULD HAVE DIFFERED

25   IN YOUR BUT FOR WORLD; RIGHT?

SHAPIRO RECROSS BY MR. VAN NEST

1    A.   I HAVE NOT CALCULATED DAMAGES HERE.

2    Q.   ISN'T THE ANSWER TO MY QUESTION NO?

3    A.   I HAVE NOT QUANTIFIED THOSE EFFECTS SUCH AS ONE WOULD WANT

4    TO DO FOR DAMAGES.  I'M TALKING ABOUT THE HARM TO COMPETITION

5    THAT WAS A RESULT OF QUALCOMM'S CONDUCT.

6    Q.   IN PRESENTING YOUR OPINIONS THAT THE WORLD COULD HAVE BEEN

7    BETTER, YOU'VE DONE NOTHING EMPIRICAL TO SUPPORT THAT VIEW;

8    RIGHT?

9    A.   I'VE EXPLAINED HOW QUALCOMM'S CONDUCT HARMED

10   COMPETITION --

11   Q.   EXCUSE ME, PROFESSOR SHAPIRO.

12   A.   -- TO COMPETITION, AND --

13   Q.   MY QUESTION WAS DIFFERENT.  YOU'VE DONE NOTHING EMPIRICAL

14   TO SUPPORT THAT VIEW; RIGHT?

15   A.   THAT IS INCORRECT.

16        MR. VAN NEST:  I HAVE NOTHING FURTHER, YOUR HONOR.

17        THE COURT:  OKAY.  TIME IS 10:27.  SO QUALCOMM HAS NO

18   MORE TIME.

19   FTC, YOU HAVE 10 MINUTES LEFT.  WHAT ARE YOU GOING TO DO

20   WITH YOUR TIME?

21        MR. JAMES:  NO FURTHER QUESTIONS FOR THIS WITNESS.

22        THE COURT:  OKAY.  I ASSUME, THEN, THAT HE IS

23   EXCUSED, NOT SUBJECT TO RECALL; IS THAT RIGHT?

24        (LAUGHTER.)

25        THE COURT:  ALL RIGHT.  SO YOU HAVE COMPLETED YOUR

1    TRIAL TESTIMONY, AND YOU'RE FREE TO LEAVE.

2              THE WITNESS:  THANK YOU, YOUR HONOR.

3              THE COURT:  YOU HAVE 10 MINUTES LEFT.  WHAT ARE YOU

4    GOING TO DO WITH IT?

5              MS. IKEDA:  WE HAVE A FEW SHORT VIDEO CLIPS.

6              THE COURT:  OKAY.

7              MS. IKEDA:  OUR FIRST REBUTTAL WITNESS IS GOING TO BE

8    INJUNG LEE, AND WE HAVE NO DOCUMENTS.

9              THE COURT:  10:28.

10         **(THE VIDEOTAPED DEPOSITION OF INJUNG LEE WAS PLAYED IN**

11    **OPEN COURT OFF THE RECORD.)**

12             THE COURT:  10:30.

13             MS. IKEDA:  OUR NEXT WITNESS IS YOOSEOK KIM FROM

14    SAMSUNG.

15             THE COURT:  OKAY.

16         **(THE VIDEOTAPED DEPOSITION OF YOOSEOK KIM WAS PLAYED IN**

17    **OPEN COURT OFF THE RECORD.)**

18             THE COURT:  10:32.

19             MS. IKEDA:  OUR NEXT WITNESS IS SEUNGHO AHN OF

20    SAMSUNG.

21         **(THE VIDEOTAPED DEPOSITION OF SEUNGHO AHN WAS PLAYED IN**

22    **OPEN COURT OFF THE RECORD.)**

23             THE COURT:  OKAY.  10:35.

24             MS. IKEDA:  OUR NEXT WITNESS IS JOHN GRUBBS OF

25    BLACKBERRY.

GRUBBS DEPOSITION

```
1              THE COURT:  IS THAT THE ONE THAT NEEDS SEALING?

2              MS. IKEDA:  NO.

3              THE COURT:  NO, OKAY.

4              MR. EVEN:  THAT'S NOT THE ORDER THAT I BELIEVE WE

5      HAVE.

6              MS. IKEDA:  GIVEN THE TIME CONSTRAINTS, WE'VE HAD TO

7      GO A LITTLE BIT OUT OF ORDER.

8          SO WITH THE COURT'S PERMISSION, WE'D LIKE TO --

9              THE COURT:  LET ME SEE HOW MUCH TIME YOU HAVE.

10         HOW LONG IS THAT?

11             MS. IKEDA:  THE GRUBBS IS 1 MINUTE AND 10 SECONDS.

12     WE HAD TO SKIP OVER BLAYLOCK.

13             THE COURT:  OKAY.  BECAUSE YOU HAVE 2 MINUTES LEFT.

14     YEAH, YOU HAVE 2 MINUTES LEFT.

15             MS. IKEDA:  SO WE'LL PLAY GRUBBS.

16             THE COURT:  OKAY.  ARE YOU READY TO PLAY IT?

17             MS. IKEDA:  YES.

18             THE COURT:  GO AHEAD, PLEASE.

19         (THE VIDEOTAPED DEPOSITION OF JOHN GRUBBS WAS PLAYED IN

20     OPEN COURT OFF THE RECORD.)

21             THE COURT:  OKAY.  10:36.

22             MS. IKEDA:  AND OUR NEXT WITNESS IS --

23             THE COURT:  I THINK YOU'RE OUT OF TIME.

24             MS. IKEDA:  OH, IS THAT RIGHT?

25             THE COURT:  I THINK SO.  I'LL DOUBLE-CHECK.
```

1        MS. IKEDA:  IT'S 45 SECONDS.  OH, 33, SORRY.

2        THE COURT:  WELL, I THINK YOU'RE OUT OF TIME.

3        MS. IKEDA:  OKAY.

4        MS. MILICI:  THANK YOU.

5        THE COURT:  ALL RIGHT.  SO WE'RE DONE FOR THE DAY.

6     AND TOMORROW WE'LL HAVE CLOSINGS, ONE HOUR EACH, STARTING

7     AT 1:30.

8     I THINK WHAT I'D LIKE TO DO -- I DON'T WANT TO BREAK UP

9     ANYONE'S CLOSINGS, SO WHAT WE'LL PROBABLY DO IS DO FTC'S AND

10    THEN TAKE A TEN MINUTE BREAK AND THEN DO QUALCOMM'S AND THEN DO

11    FTC'S.  OKAY?

12    ANYTHING MORE FOR TODAY?

13    YOUR HIGH PRIORITY OBJECTIONS ARE DUE TOMORROW MORNING AT

14    8:00.  WE'LL TRY TO GET THE RULING OUT AS QUICKLY AS POSSIBLE

15    SO YOU CAN INCORPORATE IT INTO YOUR PREPARATION.

16    ANYTHING ELSE FOR TODAY?

17        MR. BYARS:  YOUR HONOR, ONE HOUSEKEEPING.

18        THE COURT:  YES.

19        MR. BYARS:  IN THE AHN DEPOSITION, THERE WERE LINES

20    THAT, PURSUANT TO YOUR HONOR'S HPO RULING, WERE NOT TO BE

21    ADMITTED FOR THE TRUTH OF THE MATTER ASSERTED.

22        THE COURT:  OKAY.  AND I'M ASSUMING ALL THESE

23    WITNESSES ARE NOT SUBJECT TO RECALL.

24    (LAUGHTER.)

25        MS. MILICI:  THAT'S CORRECT.

1           MR. BYARS:  THAT'S CORRECT, YOUR HONOR.

2           THE COURT:  OKAY.  WHAT LINES WERE THOSE?

3           MR. BYARS:  THOSE WERE PAGE 103:19, AND PAGE 103:22

4    THROUGH PAGE 104:18.

5           THE COURT:  I'M SORRY.  CAN YOU PLEASE REPEAT THAT?

6           MR. BYARS:  SURE.  PAGE 103:19.

7           THE COURT:  OKAY.

8           MR. BYARS:  PAGE 103:22 THROUGH PAGE 104:18.

9           THE COURT:  OH, JUST THE ONE LINE, 103:19?

10          MR. BYARS:  YEAH.  I THINK THAT WAS PART OF A

11   QUESTION AND THEN THERE WAS AN ANSWER.

12          THE COURT:  AND THEN 103, YOU SAID 22?

13          MR. BYARS:  YES, THROUGH 104:18, AND THIS IS DOCKET

14   1445.

15          THE COURT:  OKAY.

16      YOU AGREE WITH THAT?

17          MS. IKEDA:  YES, YOUR HONOR.

18          THE COURT:  ALL RIGHT.  ANYTHING ELSE?

19      SO WHAT I WOULD LIKE IS IF YOU WOULD PLEASE FILE THE FINAL

20   JOINT ADMITTED EXHIBIT LIST, CAN YOU DO THAT TOMORROW MORNING?

21          MR. BYARS:  WE CAN.

22          MS. IKEDA:  YES.

23          THE COURT:  ALL RIGHT.  THANK YOU.

24      ANYTHING ELSE THAT WE NEED TO TAKE CARE OF?

25          MR. VAN NEST:  NOT FROM QUALCOMM, YOUR HONOR.

2094

```
1              MS. MILICI:  NOT FROM THE FTC.

2              THE COURT:  OKAY.  SO TOMORROW, THE SECOND ROW ON

3    BOTH SIDES OF THE COURTROOM WILL BE FOR MEDIA, SO I'M GOING TO

4    ASK IF YOU WOULD PLEASE NOT HAVE YOUR TEAMS SIT THERE.  OKAY?

5    THEY'LL HAVE TO MOVE BACK.

6              THE SECOND ROW -- THE FIRST ROW IS FOR THE PARTIES AND

7    YOUR COUNSEL.  THE SECOND ROW IS FOR MEDIA, AND THEN EVERYTHING

8    AFTER THAT IS A FREE-FOR-ALL, SO SIT WHEREVER YOU'D LIKE.

9              ANYTHING ELSE THEN FOR TODAY?

10             MR. VAN NEST:  I DON'T BELIEVE SO, YOUR HONOR.

11             MS. MILICI:  NOT FROM THE FTC.

12             THE COURT:  NO?  ALL RIGHT.  THANK YOU.  WE'LL SEE

13   YOU TOMORROW AFTERNOON.

14             (THE EVENING RECESS WAS TAKEN AT 10:39 A.M.)

15

16

17

18

19

20

21

22

23

24

25
```

1
2
3                     CERTIFICATE OF REPORTERS
4
5
6
7         WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10   HEREBY CERTIFY:
11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13   ABOVE-ENTITLED MATTER.
14
15
16        _____
          IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076
17
18        _____
19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20
21        DATED:  JANUARY 28, 2019
22
23
24
25