2095

1        UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3           SAN JOSE DIVISION

4

5

   FEDERAL TRADE COMMISSION,        )  C-17-00220 LHK
6                                    )
                    PLAINTIFF,       )  SAN JOSE, CALIFORNIA
7                                    )
             VS.                     )  JANUARY 29, 2019
8                                    )
   QUALCOMM INCORPORATED, A          )  VOLUME 11
9  DELAWARE CORPORATION,             )
                                     )  PAGES 2095-2183
10                  DEFENDANT.       )
   _____   )

11

12        TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
13           UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:    FEDERAL TRADE COMMISSION
                          BY:  JENNIFER MILICI
16                             DANIEL J. MATHESON
                               WESLEY G. CARSON
17                             KENT COX
                               NATHANIEL M. HOPKIN
18                             PHILIP J. KEHL
                               MIKA IKEDA
19                        600 PENNSYLVANIA AVENUE, NW
                          WASHINGTON, D.C.  20580
20

21        APPEARANCES CONTINUED ON NEXT PAGE

22  OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, CRR, RMR
                                 CERTIFICATE NUMBER 8074
24
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25         TRANSCRIPT PRODUCED WITH COMPUTER

```
 1

 2      APPEARANCES (CONTINUED)

 3

 4      FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                                BY:  ROBERT A. VAN NEST
 5                                   JUSTINA K. SESSIONS
                                     EUGENE M. PAIGE
 6                                   CHRISTINA BLAIS
                                     MATAN SHACHAM
 7                                   CODY HARRIS
                                     KRISTIN HUCEK
 8                              633 BATTERY STREET
                                SAN FRANCISCO, CALIFORNIA  94111
 9

10                              CRAVATH, SWAINE & MOORE
                                BY:  GARY A. BORNSTEIN
11                                   MICHAEL BRENT BYARS
                                     YONATAN EVEN
12                                   JORDAN D. PETERSON
                                     MING-TOY TAYLOR
13                                   DEREK SUTTON
                                     ANDREW HUYNH
14                                   ANTONY RYAN
                                825 EIGHTH AVENUE
15                              NEW YORK, NEW YORK  10019

16                              NORTON ROSE FULBRIGHT
17                              BY:  MARC COLLIER
                                     TALBOT HANSUM
18                              98 SAN JACINTO BOULEVARD, SUITE 1100
                                AUSTIN, TEXAS  78701
19
                                BY:  ERIC B. HALL
20                                   DANIEL LEVENTHAL
                                1301 MCKINNEY, SUITE 5100
21                              HOUSTON, TEXAS  77010

22

23      ALSO PRESENT:          MARK SNYDER
                                JEFF DAHM
24                              KEN KOTARSKI

25
```

<u>INDEX OF PROCEEDINGS</u>

CLOSING ARGUMENT BY MS. MILICI                P. 2102

CLOSING ARGUMENT BY MR. VAN NEST              P. 2135

REBUTTAL CLOSING ARGUMENT BY MS. MILICI       P. 2173

```
 1      SAN JOSE, CALIFORNIA                    JANUARY 29, 2019

 2                      P R O C E E D I N G S

 3          (COURT CONVENED AT 1:27 P.M.)

 4              THE COURT:  OKAY.  GOOD AFTERNOON AND WELCOME.

 5          COULD WE PLEASE HAVE EVERYONE SQUEEZE IN ALL THE WAY TO

 6      THE WALL SO WE CAN ACCOMMODATE MORE PEOPLE, PLEASE.

 7              MR. VAN NEST:  GOOD AFTERNOON, YOUR HONOR.

 8              THE COURT:  GOOD AFTERNOON AND WELCOME.

 9          COULD WE GET ANY, MAYBE FOLDING CHAIRS?  OR BRING IN MORE

10      CHAIRS?

11          HOW MANY MORE -- HOW MANY PEOPLE ARE OUTSIDE?

12              THE MARSHAL:  ABOUT EIGHT, INCLUDING THE PEOPLE --

13              THE COURT:  WE CAN FIT ONE MORE PERSON UP HERE, AND

14      ONE MORE PERSON UP THERE ON THE FRONT ROW.  I DON'T THINK

15      ANYONE SHOULD SIT IN FRONT OF THE SCREEN, RIGHT, BECAUSE WE'LL

16      BE USING THAT?  SO THERE ARE TWO SEATS UP HERE.

17          HOW MANY MORE SEATS DO WE NEED?  SO GO AHEAD AND TAKE A

18      SEAT.  CAN EVERYONE PLEASE SQUEEZE IN.  PLEASE TAKE A SEAT.

19      LET'S SEE HOW MUCH ROOM WE HAVE.

20          HOW MANY MORE SEATS DO WE NEED?

21              THE MARSHAL:  EIGHT.

22              THE COURT:  EIGHT.

23          (PAUSE IN PROCEEDINGS.)

24              THE COURT:  IS IT A PROBLEM IF WE ADD MORE CHAIRS

25      HERE?  I'M GOING TO ASK THE CSO?  IS THAT OKAY?  IT'S OKAY?
```

```
 1          MAYBE WE CAN ADD A COUPLE MORE CHAIRS.

 2               THE CLERK:  SNOOKI IS GOING TO BRING UP SOME CHAIRS.

 3          (PAUSE IN PROCEEDINGS.)

 4               THE COURT:  THAT WOULD HELP, IF WE COULD HAVE MORE

 5     PEOPLE AT COUNSEL TABLE, IF YOUR TEAM WANTS TO JOIN YOU, IF

 6     THAT'S ALL RIGHT.

 7               MR. EVEN:  YOUR HONOR, THE PEOPLE WHO JOINED THE JURY

 8     BOX CAN SWITCH WITH PEOPLE FROM EITHER THE FTC OR OUR TEAM,

 9     BECAUSE WE NEED PEOPLE UNDER THE PO ON THIS SIDE OF THE

10     MONITORS.

11               THE COURT:  OH, OKAY.  ALL RIGHT.  COULD WE HAVE YOU

12     SWITCH, PLEASE.

13          HOW MANY MORE SEATS DO WE NEED?

14          THANK YOU FOR CATCHING THAT.  I DIDN'T EVEN THINK OF THAT.

15     HOW MANY MORE SEATS DO WE NEED?  HOW MANY MORE PEOPLE ARE OUT

16     THERE?  ANYONE ELSE?

17               THE MARSHAL:  ONE, TWO.

18               THE COURT:  TWO.  OKAY.

19          I DON'T WANT TO INTERFERE WITH THE PEOPLE WHO ARE

20     PRESENTING.  IS THIS ENOUGH SPACE FOR WHOEVER IS PRESENTING?

21               MR. VAN NEST:  YES, YOUR HONOR, IT'S FINE.

22               THE COURT:  IS THAT OKAY?

23               MR. VAN NEST:  FINE.

24               THE COURT:  ALL RIGHT.  BECAUSE WE COULD PUT ANOTHER

25     TWO CHAIRS OVER HERE, IF IT'S GETTING TOO TIGHT OVER THERE.
```

```
 1        HOW MANY MORE?  LET'S BRING IN TWO MORE CHAIRS.  IT LOOKS LIKE

 2    WE ONLY NEED TWO MORE.  LET'S BRING IN THREE, JUST IN CASE.

 3           (PAUSE IN PROCEEDINGS.)

 4              THE COURT:  HOW MANY MORE SEATS COULD YOUR TEAM USE?

 5              THE MARSHAL:  THERE'S NOBODY OUTSIDE.

 6              MR. VAN NEST:  EVERYONE IS IN, YOUR HONOR.

 7              THE COURT:  OKAY.  IS EVERYONE -- IT'S -- IT'S ONLY,

 8    WHAT, 1:33.  WE MAY GET MORE PEOPLE.  SO LET'S GO AHEAD AND

 9    BRING THAT CHAIR IN, PLEASE.

10        COULD WE HAVE MORE OF YOUR TEAM COME INTO THE WELL SO THAT

11    IF SOMEONE COMES IN LATE, THEY CAN SQUEEZE INTO A SEAT?

12              MR. VAN NEST:  SURE.

13           (PAUSE IN PROCEEDINGS.)

14              THE COURT:  IT LOOKS LIKE THERE'S ROOM ON THE FRONT

15    ROW, SO IF WE COULD SLIDE IN, PLEASE.

16           (PAUSE IN PROCEEDINGS.)

17              THE COURT:  WE HAVE TWO EXTRA SEATS HERE IN THE WELL

18    IF SOMEBODY FROM THE QUALCOMM TEAM WANTS TO COME UP.  COULD

19    ANOTHER PERSON FROM THE QUALCOMM TEAM PLEASE COME UP?

20        SO WHAT I'D LIKE TO DO IS TO HAVE ONE OR TWO EMPTY SEATS

21    IN THE BACK SO THAT IF PEOPLE COME IN LATE, THEY CAN JUST

22    QUIETLY TAKE THOSE WITHOUT DISRUPTING ANYTHING.

23        IT LOOKS LIKE WE HAVE QUITE A BIT OF ROOM NOW ON THE FRONT

24    ROW.

25           (PAUSE IN PROCEEDINGS.)
```

1          THE COURT:  SO DO WE HAVE ANY EMPTY SEATS IN THE

2     BACK?  WE HAVE TWO?

3          THE MARSHAL:  ONE, TWO, THREE, FOUR -- FIVE TOTAL.

4          THE COURT:  PERFECT.  OKAY.  THANK YOU.

5        SO IF YOU'RE ON THE END, IF YOU WOULD SCOOT DOWN TO THE

6     END TOWARDS THE WALL IN CASE ANYONE COMES IN LATE, THEY CAN

7     TAKE THE SEATS ON THE END, ON THE AISLE.

8        THANK YOU.

9        OKAY.  GOOD AFTERNOON AND WELCOME.

10       EACH SIDE HAS ONE HOUR.

11       HOW MUCH TIME WOULD THE FTC LIKE TO RESERVE FOR REBUTTAL?

12         MS. MILICI:  I THINK WHATEVER I HAVE LEFT AT THE END

13    OF THIS PRESENTATION, WHICH PROBABLY WON'T BE VERY MUCH.

14         THE COURT:  OKAY.  AND THEN DO YOU HAVE

15    DEMONSTRATIVES TO HAND OUT?

16         MS. MILICI:  I DO HAVE DEMONSTRATIVES.  DOES SOMEBODY

17    HAVE A COPY TO HAND OUT, PLEASE.

18       (HANDING.)

19       (PAUSE IN PROCEEDINGS.)

20         THE COURT:  DO YOU HAVE EXTRAS?  DO YOU HAVE TWO

21    EXTRAS?

22         MR. ANSALDO:  YES.

23         THE COURT:  OKAY.  CAN YOU PASS THEM BACK, PLEASE?

24         MR. ANSALDO:  (HANDING.)

25         THE COURT:  THANK YOU.

1    ALL RIGHT.  LET ME KNOW WHEN YOU'RE READY TO BEGIN.

2         MS. MILICI:  I'M READY.

3         THE COURT:  ARE WE ALL SET?  OKAY.

4    LET ME JUST MAKE SURE.  ALL RIGHT.  TIME IS 1:36.  GO

5    AHEAD, PLEASE.

6         **(MS. MILICI GAVE HER CLOSING ARGUMENT ON BEHALF OF THE**

7    **FTC.)**

8         MS. MILICI:  GOOD AFTERNOON, YOUR HONOR.  WE ARE HERE

9    TODAY BECAUSE QUALCOMM VIOLATED THE FTC ACT.  IT ACQUIRED

10   MONOPOLY POWER IN MODEM CHIP MARKETS AND RATHER THAN SIMPLY

11   COMPETING ON THE MERITS, QUALCOMM USED ITS POWER TO THROW UP

12   ROADBLOCKS THAT MADE IT HARD FOR RIVALS TO CATCH UP.

13        QUALCOMM SHOULD BE ENJOINED FROM CONTINUING THE CORPORATE

14   POLICY THAT HARMED COMPETITION IN 3G AND 4G AND ARE LIKELY TO

15   HARM COMPETITION IN 5G.

16        AT THE BEGINNING OF THIS TRIAL I SAID THAT THE CONDUCT AT

17   ISSUE WOULD BE UNDISPUTED, AND IT HAS BEEN.  THAT CONDUCT

18   INCLUDES REFUSING TO SELL MODEM CHIPS UNLESS THE BUYER SIGNS A

19   LICENSE THAT REQUIRES, OFTEN OVER MANY, MANY YEARS, PAYMENTS ON

20   PHONES THAT USE RIVAL CHIPS.

21        THOSE PAYMENTS ARE NOT A FAIR REFLECTION OF THE VALUE OF

22   QUALCOMM'S PATENTS.  THEY CAN'T BE BECAUSE THE NEGOTIATIONS

23   WERE UNFAIR.

24        AND THE CONDUCT INCLUDES THE USE OF STRATEGIC FUNDS, NOT

25   SIMPLY TO SERVE A MARKETING OR OTHER LEGITIMATE BUSINESS

Case 5:17-cv-00220-LHK   Document 1519   Filed 07/02/19   Page 9 of 90   2103
CLOSING ARGUMENT BY MS. MILICI

1    PURPOSE, BUT INSTEAD TO SHORE UP THE HIGH ROYALTY THAT IS PAID

2    ON HANDSETS USING RIVAL CHIPS.

3         AND THE UNDISPUTED CONDUCT AT ISSUE IN THIS CASE INCLUDES

4    REFUSING TO MAKE LICENSES AVAILABLE TO RIVAL CHIP MAKERS.

5         QUALCOMM DOES NOT DENY THIS POLICY, AND IT DOES NOT DENY

6    THAT IT RECEIVED VALUABLE LICENSES FOR ITS OWN CHIP BUSINESS.

7         AND WITH APPLE, QUALCOMM AGREED TO MAKE PAYMENTS

8    OFFSETTING SOME OF THE BURDEN OF THE HIGH ROYALTIES PAID BY

9    APPLE'S CONTRACT MANUFACTURERS IN EXCHANGE FOR EXCLUSIVITY.

10        THAT FORECLOSED AN IMPORTANT POINT OF ENTRY FOR

11   COMPETITORS.

12        SO MOST OF THE FACTS ARE UNDISPUTED.

13        WHERE THERE ARE DISPUTES, THE COURT WILL HAVE THAT MAKE

14   CREDIBILITY DETERMINATIONS.  ON ONE SIDE IS THE CONSISTENT

15   TESTIMONY OF WITNESSES FROM LENOVO, MOTOROLA, SAMSUNG,

16   BLACKBERRY, PEGATRON, HUAWEI, WISTRON, APPLE, AND LG THAT

17   QUALCOMM USED ITS CHIP MONOPOLY POWER TO OBTAIN LICENSING TERMS

18   THAT THE OEM'S CONSIDER HORRIBLE, EXCESSIVE, AND UNFAIR.

19        THAT TESTIMONY IS SUPPORTED BY CONTEMPORANEOUS DOCUMENTS

20   PRODUCED BY THIRD PARTIES AND BY QUALCOMM'S OWN INTERNAL

21   DOCUMENTS.

22        ON THE OTHER HAND, THERE IS THE SELF-SERVING TESTIMONY OF

23   QUALCOMM'S EXECUTIVES WHO INCREDIBLY CLAIM THAT TYING CHIPS AND

24   LICENSES ALLOWS QUALCOMM TO CREATE CLOSE PARTNERSHIPS WITH ITS

25   CUSTOMERS.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MS. MILICI

1          NEEDLESS TO SAY, THOSE CUSTOMERS DISAGREE.  NOT A SINGLE

2     THIRD PARTY HAS COME TO COURT AND TESTIFIED IN FAVOR OF

3     QUALCOMM'S NO LICENSE, NO CHIPS POLICY, THE FAIRNESS OF ITS

4     ROYALTY RATES, OR THE PROCOMPETITIVE EFFECTS OF ITS BUSINESS

5     MODEL.

6          AND DESPITE ARGUING TO THE COURT REPEATEDLY ABOUT EXHIBIT

7     LIMITS, QUALCOMM INTRODUCED FROM ITS LIST ONLY 53 EXHIBITS, 7

8     OF WHICH WERE NOT ADMITTED FOR THEIR TRUTH.

9          QUALCOMM'S ARGUMENTS IN THIS CASE SIMPLY LACK EVIDENTIARY

10    SUPPORT.

11         QUALCOMM'S DEFENSE THAT THE FTC HAS NOT PRECISELY

12    QUANTIFIED THE IMPACT OF ITS CONDUCT WIDELY MISSES THE MARK AND

13    IT MISREPRESENTS THE SUPREME COURT'S HOLDING IN THE

14    AMERICAN EXPRESS CASE, WHICH WAS A SECTION 1 CASE IN WHICH

15    THERE WAS NO PROOF OF MONOPOLY POWER.

16         AND NO GOVERNMENT ANTITRUST CASE REQUIRES THE TYPE OF

17    PROOF THAT QUALCOMM DEMANDS HERE, NOR SHOULD IT.

18         TO THE CONTRARY.  THE EVIDENCE IN THIS CASE IS MORE THAN

19    ENOUGH TO ESTABLISH THE ANTICOMPETITIVE EFFECTS OF QUALCOMM'S

20    CONDUCT.

21         NOW, QUALCOMM SPENT A LOT OF ITS TRIAL TIME ESTABLISHING

22    THAT IT IS AN INNOVATIVE COMPANY THAT HAS MADE SOME GREAT

23    PRODUCTS.  MANY MONOPOLISTS COULD SAY THE SAME.

24         AS I SAID IN THE OPENING, NO ONE EVER CLAIMED THAT

25    MICROSOFT HAD BAD TECHNOLOGY.

1          QUALCOMM WORKED HARD TO DEVELOP THE USE OF CDMA TECHNOLOGY

2     IN CELLULAR COMMUNICATIONS.  THAT'S CERTAINLY ADMIRABLE.

3          BUT THAT DOESN'T GIVE QUALCOMM THE RIGHT TO IMPEDE

4     COMPETITORS.

5          AND AS DR. JACOBS TESTIFIED, QUALCOMM CHOSE TO STANDARDIZE

6     CDMA TECHNOLOGY THROUGH TIA IN ORDER TO MONETIZE ITS PRODUCTS.

7          STANDARDIZATION BROUGHT IT A WIDER CUSTOMER BASE FOR ITS

8     PRODUCTS AND MORE LICENSED UNITS.

9          BUT IN EXCHANGE FOR THAT WIDER CUSTOMER BASE, QUALCOMM

10    MADE A FRAND COMMITMENT, FIRST TO TIA AND THEN TO OTHERS.  AND

11    THAT WAS THE BARGAIN THAT QUALCOMM VOLUNTARILY STRUCK.  MORE

12    CHIP CUSTOMERS AND MORE LICENSED UNITS, BUT CONSTRAINED

13    LICENSING TERMS.

14         NOW, OVER THE YEARS, QUALCOMM CONTINUED TO CONTRIBUTE

15    TECHNOLOGY TO STANDARDIZATION.  AND IT'S STRONG PRESENCE IN THE

16    STANDARD SETTING PROCESS HAS GIVEN ITS CHIP BUSINESS A

17    SIGNIFICANT TIME TO MARKET ADVANTAGE, AS YOU CAN SEE ON THIS

18    SLIDE.

19         QUALCOMM HAS ENJOYED AN ESPECIALLY STRONG CHIP POSITION AT

20    THE EARLY STAGE OF THE NEW STANDARDS, AND THIS IS THE EVIDENCE

21    THAT WE ARE SEEING AGAIN IN 5G.

22         BUT OVER THE PAST 25 YEARS, AS QUALCOMM HAS CONTINUED

23    PARTICIPATING IN STANDARDIZATION, ITS SHARE OF STANDARD

24    ESSENTIAL PATENTS HAS DECLINED.

25         AS YOU CAN SEE IN THIS INTERNAL DOCUMENT, ITS SHARE OF 2G

1       CDMA STANDARD ESSENTIAL PATENTS WAS FAR HIGHER THAN ITS SHARE

2       OF 3G STANDARD ESSENTIAL PATENTS, OR LTE.

3               UNLIKE THE EARLY DAYS OF CDMA, OTHER FIRMS HAVE COMPARABLE

4       SET PORTFOLIOS OF LTE.

5               AT THE SAME TIME, CELLULAR HANDSETS HAVE CHANGED AS WELL.

6       THE FEATURE PHONES SOLD 20 YEARS AGO DID LITTLE MORE THAN

7       PROVIDE CELLULAR CONNECTIVITY.

8               SMARTPHONES TODAY PROVIDE A HOST OF OUR STATE OF THE ART

9       FEATURES, MANY OF WHICH DON'T REQUIRE CELLULAR CONNECTIVITY AT

10      ALL.

11              AND SMARTPHONE USERS HAVE BEGUN RELYING MORE HEAVILY ON

12      WI-FI TO TRANSMIT DATA, DIMINISHING THE RELATIVE IMPORTANCE OF

13      CELLULAR TECHNOLOGY OVERALL.

14              AND SEVERAL EXPERTS IN THIS CASE TESTIFIED ABOUT THIS,

15      INCLUDING SEVERAL OF QUALCOMM'S EXPERTS.

16              BUT QUALCOMM'S ROYALTIES DO NOT REFLECT THESE CHANGES AND

17      QUALCOMM'S ROYALTIES DO NOT REFLECT CHANGES IN PATENT LAW OVER

18      THE SAME PERIOD OF TIME.

19              INSTEAD, THROUGHOUT ALL OF THESE CHANGES IN THE INDUSTRY,

20      IN ITS PORTFOLIO, AND IN THE LAW, QUALCOMM HAS MAINTAINED HIGH

21      RATES.  INDEED, ACCORDING TO THEIR OWN EXPERT, THEIR RATES

22      HAVEN'T CHANGED AT ALL IN MORE THAN 25 YEARS.

23              THIS DEMONSTRATES ITS CHIP MARKET POWER.

24              NOW, PROFESSOR SHAPIRO PERFORMED A REASONED ANALYSIS OF

25      QUALCOMM'S CHIP MARKET POWER.  HE USED A HYPOTHETICAL

1    MONOPOLIST TEST, A STANDARD TOOL USED BY ANTITRUST ECONOMISTS

2    TO DEFINE MARKETS, AND PROFESSOR SHAPIRO EXPLAINED THAT THESE

3    MARKETS, GLOBAL MARKETS FOR CDMA AND PREMIUM LTE CHIPS SATISFY

4    THAT TEST.

5         DR. CHIPTY AGREES THAT THE HYPOTHETICAL MONOPOLIST TEST IS

6    A REASONABLE APPROACH TO DEFINING A MARKET, BUT SHE DIDN'T

7    APPLY IT AND SHE DIDN'T ARGUE WITH THE WAY PROFESSOR SHAPIRO

8    APPLIED IT.

9         DR. CHIPTY QUIBBLED AT THE MARGINS.  SHE ARGUED THAT

10   PREMIUM LTE COULD BE DEFINED TO INCLUDE MORE OR DIFFERENT

11   CHIPS.

12        BUT DR. CHIPTY AGREES THAT THERE IS COMPETITION FOR

13   PREMIUM SOCKETS THAT IS DISTINCT FROM COMPETITION FOR LOWER

14   TIER SOCKETS.  SHE AFFIRMATIVELY TESTIFIED ABOUT THAT MARKET.

15   SHE JUST DIDN'T DEFINE IT.

16        AND THE OTHER SET OF TOOLS USED TO DEFINE RELEVANT MARKETS

17   ARE THE SO-CALLED BROWN SHOE FACTORS TAKEN FROM THE SUPREME

18   COURT CASE.  HERE THESE FACTORS CONFIRM THAT THERE ARE RELEVANT

19   GLOBAL MARKETS FOR CDMA MODEM CHIPS AND PREMIUM LTE MODEM

20   CHIPS.  INDUSTRY PARTICIPANTS, INCLUDING QUALCOMM, RECOGNIZED

21   DISTINCT CDMA AND PREMIUM LTE MODEM CHIP MARKETS AND DISTINCT

22   PRICING, COMPETITORS AND COMPETITIVE CONDITIONS FOR THESE

23   MARKETS.

24        UNDER THE CASE LAW, MARKET POWER CAN BE SHOWN EITHER

25   THROUGH THE DIRECT EVIDENCE OR INDIRECTLY THROUGH HIGH MARKET

CLOSING ARGUMENT BY MS. MILICI

1    SHARES AND DEFINED MARKETS.  HERE BOTH KINDS OF EVIDENCE PROVE

2    MARKET POWER.

3         AS TO BOTH PREMIUM LTE AND CDMA MODEM CHIPS, THERE IS A

4    VERY LARGE VOLUME OF ADMITTED EVIDENCE THAT CUSTOMERS DID NOT

5    HAVE GOOD ALTERNATIVES TO QUALCOMM, INCLUDING MOTOROLA AND

6    BLACKBERRY WHO ARE QUOTED ON THIS SLIDE.

7         CUSTOMERS RECOGNIZED QUALCOMM'S MARKET POWER AND TESTIFIED

8    ABOUT IT IN THIS CASE.  QUALCOMM RECOGNIZED IT AND COMPETITORS

9    RECOGNIZED IT, AND THERE'S SIGNIFICANT EVIDENCE OF THIS IN THE

10   RECORD.

11        HIGH MARKET SHARES IN THE CDMA AND PREMIUM LTE MARKETS

12   ALSO SUPPORT A FINDING OF MONOPOLY POWER.  PROFESSOR SHAPIRO

13   CALCULATED MARKET SHARES AND QUALCOMM CALCULATED EQUALLY HIGH

14   OR HIGHER SHARES IN ITS ORDINARY COURSE DOCUMENTS.

15        THE SHARES ON THIS SLIDE ARE QUALCOMM'S OWN CALCULATIONS,

16   AND THESE SHARES, AS CALCULATED BY QUALCOMM, SUPPORT A FINDING

17   OF MONOPOLY POWER.

18        NOW, QUALCOMM HAS POINTED OUT THAT ITS MARKET SHARE HAS

19   BEEN DECREASING AND THAT ITS SHARE IN 2016 WAS LOWER THAN IT

20   WAS IN PREVIOUS YEARS.

21        BUT EVEN QUALCOMM'S LOWER SHARE IS VERY HIGH.  THAT SHARE

22   IS SUFFICIENT TO SUPPORT A FINDING OF MONOPOLY POWER IN LIGHT

23   OF NINTH CIRCUIT PRECEDENCE AND THE FACTUAL EVIDENCE IN THIS

24   CASE.

25        AND WHILE QUALCOMM CLAIMS THAT ITS SHARE HAS DROPPED EVEN

1    MORE AFTER THIS LITIGATION WAS FILED IN JANUARY OF 2017, ITS

2    INTERNAL -- IN ITS INTERNAL DOCUMENTS, QUALCOMM SHOWS THAT IT

3    REMAINS THE DOMINANT PRODUCER OF PREMIUM CHIPS AND IS, IN FACT,

4    THE ONLY MERCHANT SUPPLIER OF PREMIUM SOC'S, AND THIS IS IN

5    CX 8191 AND CX 8190, WHICH WERE INTRODUCED THROUGH THE

6    TESTIMONY OF MR. MOLLENKOPF.

7        NOW, UNDER THE CASE LAW, MONOPOLIZATION REQUIRES TWO

8    ELEMENTS:  FIRST, THE POSSESSION OF MONOPOLY POWER IN A

9    RELEVANT MARKET; AND, SECOND, ANTICOMPETITIVE CONDUCT.

10       DIRECT EVIDENCE THAT OEM'S LACKED GOOD ALTERNATIVES TO

11   QUALCOMM'S CDMA AND PREMIUM LTE MODEM CHIPS AND QUALCOMM'S HIGH

12   MARKET SHARES IN THESE MARKETS SATISFY THE FIRST ELEMENT.

13       BUT NOW LET'S TURN TO THE SECOND ELEMENT.  THAT'S

14   ANTICOMPETITIVE CONDUCT.

15       WHILE THERE'S NOTHING WRONG WITH A COMPANY GAINING

16   MONOPOLY POWER BY HAVING BETTER PRODUCTS, AND THE FTC DOES NOT

17   ALLEGE THAT QUALCOMM CAME BY ITS MONOPOLY POWER IN CDMA

18   UNLAWFULLY.  IT PRODUCED THE FIRST CDMA MODEM CHIP, AND THAT'S

19   EARNED MONOPOLY POWER, AND QUALCOMM WAS ENTITLED TO USE THAT

20   POWER TO CHARGE A MONOPOLY PRICE FOR ITS CHIPS.

21       WHAT QUALCOMM WAS NOT ENTITLED TO DO WAS TO USE ITS

22   MONOPOLY POWER TO PUT UP ROADBLOCKS THAT INHIBITED THE ABILITY

23   OF OTHERS TO CATCH UP AND CHALLENGE QUALCOMM'S DOMINANCE.

24       AND THAT'S WHAT QUALCOMM DID WITH NO LICENSE, NO CHIPS,

25   REFUSING TO LICENSE ITS RIVALS AND ENTERING EXCLUSIVE DEALS.

1        IT PUT UP ROADBLOCKS FOR COMPETITORS.

2             NOW, THIS COURT HAS HEARD A LOT ABOUT NO LICENSE, NO CHIPS

3        OVER THE COURSE OF THIS TRIAL AND THE FACTS ABOUT IT ARE

4        LARGELY UNDISPUTED.

5             IT IS UNDISPUTED THAT QUALCOMM WOULD NOT SELL MODEM CHIPS

6        TO AN OEM BEFORE IT ENTERED A LICENSE.  AND IT IS ALSO

7        UNDISPUTED THAT THE POLICY WAS LONGSTANDING AND WIDELY KNOWN IN

8        THE INDUSTRY.

9             IT WAS WIDELY KNOWN, IN PART BECAUSE QUALCOMM TOLD

10       POTENTIAL CUSTOMERS THAT THEY NEEDED A LICENSE BEFORE ENGAGING

11       ON CHIP SUPPLY.

12            WHEN CUSTOMERS ASKED FOR CHIPS, THEY GOT LETTERS LIKE THE

13       ONE ON THIS SLIDE, EXPLAINING THAT THEY NEEDED A LICENSE BEFORE

14       THEY WOULD, QUOTE, "HAVE THE RIGHT TO PURCHASE CHIPS."

15            NOW, QUALCOMM WOULD NOT ENTER INTO SUPPLY AGREEMENTS WITH

16       CUSTOMERS UNTIL THEY SIGNED A LICENSE, AND ONCE THEY BECAME

17       LICENSED, QUALCOMM REQUIRED AGREEMENT TO SUPPLY CONTRACTS THAT

18       INCORPORATED NO LICENSE, NO CHIPS.

19            AND YOU CAN SEE THAT IN THIS EXAMPLE.  THE CONTRACT STATES

20       QUALCOMM'S CUSTOMERS CANNOT USE A MODEM CHIP WITHOUT A SEPARATE

21       PATENT LICENSE.

22            AND THE COURT HEARD SUBSTANTIAL TESTIMONY ABOUT THAT

23       REQUIREMENT.  AND, AGAIN, THIS IS UNDISPUTED.

24            AND IT IS THESE CONTRACTS AND THE LICENSE AGREEMENTS THAT

25       THE FTC ALLEGES ARE UNLAWFUL.

1       THERE IS ALSO NO DISPUTE IN THIS CASE THAT QUALCOMM

2   REMINDED EXISTING CUSTOMERS THAT THEY WOULD NO LONGER BE ABLE

3   TO PURCHASE CHIPS IF THEY FAILED TO REACH AGREEMENT ON LICENSE

4   RENEWAL OR EXPANSION TERMS OR IF THEY EXERCISED CONTRACTUAL

5   RIGHTS TO TERMINATE EXISTING LICENSES.

6       THE EXAMPLE ON THIS SLIDE IS FROM QUALCOMM'S NEGOTIATIONS

7   WITH ZTE, BUT THERE ARE MANY, MANY EXAMPLES IN THE RECORD.

8       NOW, QUALCOMM HAS STATED UNAMBIGUOUSLY THAT IT NEVER

9   THREATENED CHIP SUPPLY.

10      ALEX ROGERS TESTIFIED ABOUT THAT LAST WEEK.

11      BUT THIS IS JUST A SEMANTIC TRICK.  IN EXAMPLE AFTER

12  EXAMPLE, WE SAW THAT QUALCOMM DEMANDED CERTAIN ROYALTY TERMS

13  FROM A CUSTOMER, THE CUSTOMER RELISTED, AND QUALCOMM, WHICH WAS

14  THE ONLY COMMERCIALLY VIABLE SUPPLIER OF CDMA AND/OR PREMIUM

15  LTE MODEM CHIPS, SAID, "IF WE DON'T REACH AGREEMENT, THEN YOU

16  WON'T BE ABLE TO BUY CHIPS ANYMORE."

17      THE CUSTOMERS WHO HEARD THESE STATEMENTS CERTAINLY VIEWED

18  THEM AS THREATS.  SONY, LENOVO, AND OTHERS ALL CALLED THEM

19  THREATS.  THIS LABEL WAS NOT MANUFACTURED FOR LITIGATION.

20      AS YOU CAN SEE HERE ON THE SLIDE, WHICH IS SEALED AND NOT

21  IN THE COURTROOM, BUT IN THE DEMONSTRATIVES, THAT VERY PHRASE

22  WAS USED IN CONTEMPORANEOUS COMMUNICATIONS.

23      AND CONTRARY TO ITS SUGGESTIONS IN COURT AND TO INVESTORS,

24  INTERNAL QUALCOMM DOCUMENTS SHOW THAT QUALCOMM EXECUTIVES KNEW

25  THAT THEIR COMMENTS WOULD BE TAKEN AS THREATS AND INTENDED THAT

1    THEY BE TAKEN THAT WAY.

2         QUALCOMM KNEW THAT THE THREAT OF CUTTING OFF CHIP SUPPLY

3    MAY BE WHAT IS NEEDED TO RESOLVE LICENSING DISPUTE AS

4    STEVE ALTMAN WROTE IN THE E-MAIL IN THE MIDDLE HERE, WHICH IS

5    CX 8281.

6         NOW, QUALCOMM WITNESSES ALSO REPEATEDLY TESTIFIED THAT

7    QUALCOMM HASN'T CUT OFF CHIP SUPPLY IN ANY NEGOTIATION, AND WE

8    THINK THAT THAT'S NOT ACCURATE AND THAT THE RECORD CONTAINS

9    EVIDENCE OF ACTUAL CHIP SUPPLY CUTOFFS.

10        BUT WHETHER QUALCOMM ACTUALLY CUT OFF CHIP SUPPLY IS ALSO

11   JUST BESIDE THE POINT.  NO PART OF THE FTC'S CASE DEPENDS ON AN

12   ACTUAL CUTOFF OF CHIP SUPPLY.  QUALCOMM REFUSED TO SELL CHIPS

13   TO A COMPANY BEFORE IT SIGNED A LICENSE AND ITS POLICY THAT WAS

14   WRITTEN INTO ITS CONTRACT AND COMMUNICATED TO CUSTOMERS WAS TO

15   CUT OFF SUPPLY IF THE CUSTOMER BREACHED OR BECAME UNLICENSED.

16        THE FACT THAT IT GENERALLY DID NOT HAVE TO CUT OFF CHIP

17   SUPPLY IS PROOF OF ITS MARKET POWER.  NO CUSTOMER WAS WILLING

18   TO RISK LOSING QUALCOMM'S CHIPS.  THEY GAVE IN INSTEAD, AS THE

19   SAMSUNG EXAMPLE SHOWN HERE REFLECTS.

20        NOW, QUALCOMM HAS POINTED TO A COUPLE OF EXAMPLES OF TIMES

21   WHERE THEY CONTINUED SHIPPING CHIPS TO CUSTOMERS THAT HAD

22   STOPPED PAYING ROYALTIES.  BUT QUALCOMM HAS RECOGNIZED,

23   INCLUDING IN THIS INTERNAL DOCUMENT, THAT CUTTING OFF CHIP

24   SUPPLY COULD CREATE ANTITRUST PROBLEMS FOR IT.  AND IN EACH OF

25   THE EXAMPLES THAT QUALCOMM HAS PROVIDED TO THE COURT, IT WAS

CLOSING ARGUMENT BY MS. MILICI

1    UNDER ACTIVE ANTITRUST INVESTIGATION WHEN THE CUSTOMER

2    SUSPENDED PAYMENTS.

3         THAT QUALCOMM CONTINUED SHIPPING UNDER THOSE CIRCUMSTANCES

4    IS NOT SURPRISING.  NOR DOES IT CHANGE THE FACT THAT DESPITE

5    THE RECOGNIZED ANTITRUST RISK, QUALCOMM AFFIRMATIVELY CHOSE, AS

6    A CORPORATE STRATEGY, TO KEEP THE OPTION OF CEASING SUPPLY ON

7    THE TABLE AND TO USE IT WHEN NECESSARY TO PROTECT ITS LICENSING

8    BUSINESS.

9         SO THE POLICY'S UNDISPUTED AND CUSTOMER AFTER CUSTOMER HAS

10   TESTIFIED UNDER OATH THAT THE POLICY GAVE QUALCOMM ADDITIONAL

11   LEVERAGE IN NEGOTIATIONS.

12        THIS SLIDE HIGHLIGHTS SOME OF THAT TESTIMONY.

13        AND THIS WAS CONSISTENT TESTIMONY ACROSS MAJOR OEM'S.

14        AND IMPORTANTLY, IT IS THE POLICY ALONE THAT CREATES THIS

15   LEVERAGE.  CUSTOMERS KNEW THAT QUALCOMM COULD CUT OFF CHIP

16   SUPPLY, THAT IT HAD A POLICY OF DOING SO, AND THE CONTRACTUAL

17   RIGHT TO BACK IT UP.  WHETHER QUALCOMM MADE AN EXPLICIT THREAT

18   OR NOT, THAT LEVERAGE EXISTS.

19        IN DOCUMENT AFTER DOCUMENT ADMITTED DURING TRIAL, QUALCOMM

20   ACKNOWLEDGED THAT ITS CHIP LEVERAGE ALLOWS IT TO CHARGE HIGHER

21   ROYALTY RATES, AND THAT'S IN THE TESTIMONY OF DAVID WISE,

22   DR. PAUL JACOBS, STEVE ALTMAN, AND OTHERS.

23        AND THE EVIDENCE HERE ABOUT PROJECT BERLIN AND

24   PROJECT PHOENIX IS JUST A SMALL SAMPLE OF THE EVIDENCE THAT

25   PROVES THIS POINT.

CLOSING ARGUMENT BY MS. MILICI

1        NOW, DR. JACOBS AND MR. MOLLENKOPF BOTH TESTIFIED,

2   INCREDIBLY, THAT QCT HELPS QTL IN LICENSING NEGOTIATIONS

3   BECAUSE THE CHIP SUPPLY RELATIONSHIP CREATES SUCH GREAT

4   PARTNERSHIPS BETWEEN QUALCOMM AND ITS CUSTOMERS.

5        BUT THAT IS NOT HOW THE CUSTOMERS SEE IT.  AND WHEN THE

6   COURT CONSIDERS CREDIBILITY, TO THE EXTENT THAT IT HAS TO AT

7   ALL, IT SHOULD CONSIDER THE VAST GULF BETWEEN HOW QUALCOMM

8   EXECUTIVES SAY THAT YOU SHOULD VIEW ITS RELATIONSHIP WITH ITS

9   CUSTOMERS AND HOW THOSE CUSTOMERS ACTUALLY VIEW IT.

10        NOW, IN ITS PROPOSED FINDINGS OF FACT, QUALCOMM OFFERED

11   SEVERAL BUSINESS JUSTIFICATIONS FOR ITS NO LICENSE, NO CHIPS

12   POLICY.  QUALCOMM SUGGESTS THAT THE POLICY IS NECESSARY TO EARN

13   A FAIR RETURN ON ITS INVESTMENTS OR TO PROTECT ITS INTELLECTUAL

14   PROPERTY RIGHTS.

15        BUT IT BEARS REPEATING THAT THIS POLICY IS UNIQUE.  THERE

16   ARE MANY SUCCESSFUL TECHNOLOGY FIRMS, INCLUDING SEMICONDUCTOR

17   FIRMS, THAT INVENT GREAT THINGS AND ARE PROFITABLE.

18        THOSE COMPANIES SELL PRODUCTS EXHAUSTIVELY OR THEY LICENSE

19   PORTFOLIOS WITHOUT EXERCISING PRODUCT LEVERAGE TO DRIVE UP THE

20   RATES.

21        ONLY QUALCOMM HAS THIS POLICY, AS NUMEROUS WITNESSES HAVE

22   TESTIFIED.

23        AND EVEN WITHIN QUALCOMM, THE POLICY IS UNIQUE.  QUALCOMM

24   SELLS LOTS OF PRODUCTS, INCLUDING WI-FI CHIPS, EXHAUSTIVELY AS

25   THIS SLIDE SHOWS.

1        NOW, QUALCOMM HAS SPENT A LOT OF TRIAL TIME DISCUSSING THE

2   SCOPE OF ITS PATENT PORTFOLIO WITHOUT PROVIDING ANY VALUATION

3   OR VALUATION METHODOLOGY TO JUSTIFY ITS ROYALTIES.

4        INSTEAD, ITS EXECUTIVES TESTIFIED THAT IT KNOWS THAT ITS

5   ROYALTY RATES ARE FAIR BECAUSE LICENSEES AGREED TO THEM.

6        BUT THAT ARGUMENT DOESN'T HOLD UP.  EVEN QUALCOMM'S

7   EXECUTIVES ADMIT THAT WHETHER THE RESULT OF A NEGOTIATION IS

8   FAIR OR UNFAIR DEPENDS ON THE CIRCUMSTANCES OF THE NEGOTIATIONS

9   AND THE TERMS OF THE AGREEMENT.

10       MR. GONELL'S TESTIMONY HIGHLIGHTED ON THIS SLIDE

11   CONTRADICTS OTHER ASPECTS OF HIS TESTIMONY IN THIS CASE.  IN

12   THE TESTIMONY PRODUCED HERE, HE SAID THAT THE TERMS IN

13   QUALCOMM'S HANDSET LICENSES MUST REFLECT A FAIR VALUE BECAUSE

14   OF THE LICENSEES AGREED TO IT.

15       BUT MR. GONELL ALSO SAID THAT THE AVANCI AGREEMENT DOES

16   NOT REFLECT THE FAIR VALUE FOR QUALCOMM'S PATENTS, EVEN THOUGH

17   IT WAS A NEGOTIATED AGREEMENT.  AND THAT'S AT PAGE 1471 OF THE

18   TRIAL TRANSCRIPT.

19       BUT MR. GONELL HAS IT BACKWARDS.  THERE'S NO SUGGESTION

20   THAT THE AVANCI AGREEMENT WAS THE RESULT OF AN UNFAIR PROCESS

21   OR WAS TAINTED BY ANTICOMPETITIVE CONDUCT.

22       QUALCOMM'S LICENSES WITH HANDSET MANUFACTURERS, HOWEVER,

23   REFLECT QUALCOMM'S EXPERT OF ITS CHIP MONOPOLY POWER AS A

24   TREMENDOUS AMOUNT OF EVIDENCE SHOWS.

25       AND ALSO, THE ROYALTY RATES WE'RE TALKING ABOUT HERE HAVE

CLOSING ARGUMENT BY MS. MILICI

1    BEEN LARGELY NONNEGOTIABLE.  ACCORDING TO DR. NEVO, LOOKING AT

2    JUST THE CONTRACT RATES, QUALCOMM'S ROYALTY RATES HAVE BEEN

3    CONSISTENT FOR DECADES.  AND AS THE EVIDENCE SHOWS, THAT'S

4    BECAUSE QUALCOMM REFUSED TO NEGOTIATE ROYALTIES.  THERE'S

5    SUBSTANTIAL EVIDENCE REGARDING QUALCOMM'S INFLEXIBILITY ON

6    ROYALTIES, INCLUDING THE EVIDENCE CITED HERE.

7         AND ONE WAY QUALCOMM HAS FOUND TO AVOID REDUCING ROYALTIES

8    HAS BEEN TO COMBINE THE STICK OF ITS NO LICENSE, NO CHIPS

9    POLICY WITH THE CARROTS OF INCENTIVE FUNDS.

10        THROUGH INCENTIVE FUNDS, QUALCOMM EFFECTIVELY OFFERS A

11   CHIP DISCOUNT TO CUSTOMERS WHEN THEY BUY QUALCOMM CHIPS, BUT

12   ONLY IF THEY AGREE TO PAY THE ELEVATED FEE TO QUALCOMM WHEN

13   THEY PURCHASE FROM OTHER CHIP MAKERS.

14        AND THAT CARROTS AND STICKS STRATEGY IS LAID OUT ON THIS

15   SLIDE AND IN MR. REIFSCHNEIDER'S TESTIMONY.

16        NOW, THE ADMITTED EVIDENCE SHOWS THAT QUALCOMM PROVIDED

17   THESE INCENTIVE FUNDS, TIED TO LICENSING AGREEMENTS AND

18   ACCRUING ON CHIP PURCHASES, TO MULTIPLE CUSTOMERS.

19        NOW, THAT QUALCOMM HAS HAD TO USE -- HAS USED CARROTS, AS

20   WELL AS STICKS, TO ACHIEVE SUPRA-FRAND ROYALTIES IS ENTIRELY

21   CONSISTENT.  MONOPOLISTS OFTEN COMBINE THREATS WITH INCENTIVES

22   IN ORDER TO EXCLUDE COMPETITION, AND THIS COURT RECOGNIZED THAT

23   IN ITS MOTION TO DISMISS DECISION.

24        AND QUALCOMM'S INTERNAL DOCUMENTS INDICATE THAT INCENTIVE

25   FUNDS ARE JUST ANOTHER END RUN AROUND FRAND.

1         QUALCOMM ITSELF RECOGNIZED THAT IT WOULD VIOLATE FRAND TO

2    DIRECTLY PROVIDE LICENSING DISCOUNTS TO ITS CUSTOMERS WHO BUY

3    THEIR CHIPS.

4         BUT IT COULD, AND DOES, ACHIEVE THE SAME RESULT BY

5    CREATING INCENTIVE FUNDS THAT IT OFFERS TO LICENSEES IN

6    EXCHANGE FOR AGREEMENT TO LICENSE TERMS.

7         AS THIS DOCUMENT SHOWS, QUALCOMM CONSIDERED FRAND

8    COMPLIANCE, QUOTE, "NOT AN OBSTACLE TO THIS PRACTICE IF THE

9    FUNDS ARE KEPT SEPARATE FROM LICENSING AGREEMENTS."

10        BUT AS THE EVIDENCE SHOWS, THESE INCENTIVE FUND AGREEMENTS

11   ARE NOT SEPARATE FROM LICENSE AGREEMENTS.  THEY WORK TOGETHER

12   WITH QUALCOMM'S OTHER ANTICOMPETITIVE CONDUCT TO RAISE RIVALS'

13   COSTS AND HARM COMPETITION.

14        AS WITH OTHER POINTS IN THIS CASE, THE PROOF ON INCENTIVE

15   FUNDS IS IN QUALCOMM'S INTERNAL DOCUMENTS.  THIS IS ONE OF

16   THOSE DOCUMENTS.  IT'S AN INTERNAL ACCOUNTING MEMO.

17        IN THESE MEMOS, IT SHOWS THAT QUALCOMM HAS CONSISTENTLY

18   ATTRIBUTED THE COST OF THE INCENTIVE FUNDS TO QTL, AND THIS IS

19   THE CASE EVEN WHERE THE FUNDS HAVE BEEN DESIGNATED AS MARKETING

20   OR OTHER BUSINESS DEVELOPMENT FUNDS, AND EVEN WHERE THE FUNDS

21   ARE PAID ON PURCHASES OF QUALCOMM CHIPS.

22        NOW, EVEN QUALCOMM RECOGNIZES THAT THE CORE PURPOSE OF

23   THESE FUNDS IS TO MAINTAIN ITS ROYALTY RATES.

24        AS WITH OTHER ALLEGED CONDUCT, QUALCOMM HAS CARRIED THIS

25   PRACTICE ON EVEN AFTER THIS LAWSUIT WAS FILED.

CLOSING ARGUMENT BY MS. MILICI

1    IN JANUARY OF 2018, JUST BEFORE THE CLOSE OF DISCOVERY,

2    QUALCOMM ENTERED INTO AN AMENDED LICENSE AGREEMENT WITH

3    SAMSUNG.  QUALCOMM HAS SUGGESTED THAT THE EVIDENCE SHOWS THAT

4    THIS AGREEMENT WAS UNAFFECTED BY QUALCOMM'S CHIP MARKET POWER.

5    BUT THE EVIDENCE IS CLEAR THAT THE AGREEMENT INVOLVED

6    SUBSTANTIAL INCENTIVE FUNDS PAID BY QUALCOMM TO SAMSUNG,

7    INCLUDING FUNDS TIED TO SAMSUNG'S USE OF QUALCOMM'S MODEM

8    CHIPS.

9    NOW, QUALCOMM'S ALEX ROGERS, WHO WAS HERE LAST WEEK,

10   CLAIMED NOT TO KNOW ANYTHING ABOUT A NUMBER OF THE

11   QUALCOMM/SAMSUNG AGREEMENTS THAT WERE ENTERED AT THE SAME TIME.

12   BUT WHETHER HE REMEMBERS THEM OR NOT, THESE AGREEMENTS

13   EXIST.  SOME ARE ADMITTED INTO EVIDENCE IN THIS CASE AND

14   THEY'VE BEEN ANNOUNCED PUBLICLY.

15   SO QUALCOMM RAISES RIVALS' COST THROUGH NO LICENSE, NO

16   CHIPS AND IT BUTTRESSES THAT THROUGH THE USE OF INCENTIVE

17   FUNDS.

18   AND QUALCOMM HAS ALSO REFUSED TO LICENSE ITS STANDARD

19   ESSENTIAL PATENTS TO ITS COMPETITORS, AND IT IS UNDISPUTED THAT

20   RIVALS HAVE ASKED FOR LICENSES AND THAT QUALCOMM HAS REFUSED.

21   AS YOUR HONOR RULED ON SUMMARY JUDGMENT, QUALCOMM'S FRAND

22   COMMITMENTS TO TIA AND ATIS REQUIRE LICENSING RIVAL MODEM CHIP

23   SUPPLIERS, AND THAT REQUIREMENT WAS PART OF THE BARGAIN THAT

24   QUALCOMM MADE TO EXPAND THE MARKET FOR ITS TECHNOLOGY AND FOR

25   ITS PRODUCTS.

CLOSING ARGUMENT BY MS. MILICI

1          NOW, QUALCOMM'S REFUSAL TO LICENSE RIVALS IS NOT REQUIRED

2     BY FRAND OR COMMON IN THE INDUSTRY.  INSTEAD, QUALCOMM CHOSE

3     THIS BUSINESS MODEL BECAUSE IT DETERMINED THAT LICENSING ONLY

4     AT THE HANDSET LEVEL LED TO ROYALTIES THAT WERE HUMONGOUSLY

5     MORE LUCRATIVE THAN LICENSING CHIP MAKERS, AND THAT'S WHAT THEY

6     SAID TO THE IRS.

7          AND QUALCOMM'S POSITION ON COMPONENT LEVEL LICENSING HAS

8     NOT BEEN CONSISTENT OVER TIME.  QUALCOMM USED TO CALL, OFFER

9     WHAT IT CALLED LICENSES TO CHIP MAKERS AND COLLECT THE

10    ROYALTIES UNDER THOSE AGREEMENTS.

11         BUT AS MR. BLECKER ALSO EXPLAINED DURING THE IRS MEETING

12    SHOWN HERE IN THE MIDDLE OF THE SLIDE, THE AGREEMENTS THAT

13    QUALCOMM ENTERED WITH OTHER CHIP MANUFACTURERS GENERALLY

14    CONTAINED AUTHORIZED PURCHASER REQUIREMENTS.

15         UNDER AN AUTHORIZED PURCHASER REQUIREMENT, QUALCOMM

16    PROMISED NOT TO SUE THE COMPETITOR FOR PATENT INFRINGEMENT IN

17    EXCHANGE FOR A PROMISE FROM THE COMPETITOR THAT IT WOULD ONLY

18    SELL CHIPS TO QUALCOMM'S LICENSEES.

19         IN FACT, WHAT THAT MEANT WAS THAT WHEN THESE AGREEMENTS

20    WERE IN EFFECT, QUALCOMM SENT TO ITS CUSTOMERS -- TO ITS

21    COMPETITORS LISTS OF THE CUSTOMERS THAT THEY COULD SELL TO.

22         AND QUALCOMM'S STORY THAT THE INDUSTRY HAS HAD A UNIFORM

23    PRACTICE OF NOT LICENSING AT THE CHIP LEVEL IS SIMPLY NOT

24    SUPPORTED BY THE RECORD.  QUALCOMM'S INTERNAL DOCUMENTS, LIKE

25    THE ONE CITED ON THIS SLIDE, REVEAL QUALCOMM'S OWN

1    LONG-STANDING PRACTICE OF PROACTIVELY SEEKING LICENSES FOR THE

2    BENEFIT OF ITS CHIP BUSINESS FROM ITS LICENSEES AND FROM

3    OTHERS.  AND THAT'S WHAT IT SAYS IN THE LOWER RIGHT CORNER

4    THERE.

5        QUALCOMM RECOGNIZED THAT SUCH LICENSES HELP QCT GAIN

6    MARKET SHARE, AND THAT'S WHAT DR. PAUL JACOBS TESTIFIED.  YOU

7    CAN SEE THAT IN THE LOWER LEFT.

8        AND QUALCOMM OBTAINED RIGHTS FOR ITS OWN CHIPS FROM EVERY

9    MAJOR LICENSOR, INCLUDING ERICSSON, SIEMENS, INTERDIGITAL,

10   MOTOROLA, PHILIPS, SAMSUNG, LG.

11       AND IT USED THOSE RIGHTS TO MARKET ITS CHIPS TO CUSTOMERS.

12   AND THAT'S IN THE DOCUMENT IN THE UPPER RIGHT CORNER HERE.

13       QUALCOMM'S REFUSAL TO LICENSE NOT ONLY SUPPORTED ITS NO

14   LICENSE, NO CHIPS STRATEGY, IT HURT COMPETITORS IN OTHER WAYS,

15   TOO.  FOR EXAMPLE, SAMSUNG AND OTHERS TRIED TO FORM A MODEM

16   CHIP JOINT VENTURE CALLED DRAGONFLY, BUT ONE OF THE CONDITIONS

17   OF THAT JOINT VENTURE WAS A LICENSE FROM QUALCOMM.  WHEN THE

18   JOINT VENTURE COULDN'T GET ONE, IT NEVER GOT OFF THE GROUND.

19       AND THERE'S ALSO EVIDENCE THAT HANDSET MANUFACTURERS

20   WANTED TO BUY LICENSED CHIPS, AND MEDIATEK'S FINBARR MOYNIHAN

21   TESTIFIED THAT CUSTOMERS REPEATEDLY ASKED ABOUT WHETHER IT HAD

22   A LICENSE TO QUALCOMM'S PATENTS, BUT WHEN MEDIATEK TRIED TO GET

23   A LICENSE TO ADDRESS THOSE CUSTOMER CONCERNS, IT COULDN'T GET

24   ONE.

25       NOW, QUALCOMM'S AGREEMENTS WITH APPLE BOTH GREW OUT OF AND

1    PERPETUATED ITS DOMINANT CHIP POSITION, IT'S UNREASONABLE

2    ROYALTIES, AND ITS REFUSAL TO LICENSE RIVALS.  THERE ARE THREE

3    KEY DEALS BETWEEN THE COMPANIES, THE 2007 MARKETING INCENTIVE

4    AGREEMENT, THE 2011 TRANSITION AGREEMENT, AND THE 2013 AMENDED

5    TRANSITION AGREEMENT.

6         IN THESE AGREEMENTS, QUALCOMM TRADED ROYALTY RELIEF FOR

7    COMPETITIVE ADVANTAGES FOR ITS CHIP BUSINESS.  THE AGREEMENTS

8    ALLOWED QUALCOMM TO PRESERVE AND STRENGTHEN ITS BUSINESS MODEL

9    FOR OVER TEN YEARS.

10        AND THE EVIDENCE ON THIS SLIDE DEMONSTRATES HOW IN THE

11   CASE OF APPLE, QUALCOMM SET ABOUT CONVERTING ITS ESTABLISHED

12   SUPRA-FRAND ROYALTIES DIRECTLY INTO THE EXCLUSION OF

13   COMPETITORS.  EACH TIME APPLE SOUGHT RELIEF FROM ITS QUALCOMM

14   ROYALTY BURDEN, QUALCOMM RESPONDED BY DEMANDING CHIP BUSINESS

15   CONCESSIONS IN EXCHANGE.

16        AS SHOWN ON THIS SLIDE, QUALCOMM EXECUTIVES REPEATEDLY

17   OFFERED ROYALTY RELIEF ONLY IN THE CONTEXT OF A LARGER BUSINESS

18   DEAL AND ONLY IF APPLE BROUGHT ADDITIONAL VALUE IN TERMS OF

19   CHIP BUSINESS TO QUALCOMM.

20        NOW, PROFESSOR CHIPTY ARGUES THAT THE COURT MUST EVALUATE

21   THE EXCLUSIVE DEAL FROM QUALCOMM'S PERSPECTIVE ON THE EVE OF

22   THE NEGOTIATION.

23        PROFESSOR SHAPIRO EMPLOYED THIS TEST AND THE EVIDENCE

24   SHOWS THAT QUALCOMM ENTERED INTO THE 2013 TRANSITION AGREEMENTS

25   FOR THE PURPOSE OF EXCLUDING COMPETITORS.

CLOSING ARGUMENT BY MS. MILICI

1    STEVE MOLLENKOPF PERCEIVED COMPETITIVE THREATS AND HE

2    SPECIFICALLY RECOGNIZED APPLE'S ABILITY TO MAKE COMPETITORS

3    STRONGER.  AVOIDING THAT OUTCOME WAS HIGHLIGHTED AS ONE OF THE

4    STRATEGIC BENEFITS OF THE EXCLUSIVITY DEAL.

5    AND TO BE CLEAR, THE EVIDENCE ESTABLISHES THAT QUALCOMM

6    DID CONSIDER THE TRANSITION AGREEMENT TO BE AN EXCLUSIVITY

7    AGREEMENT.  AND IF IT MATTERS AT ALL, THE EVIDENCE ESTABLISHES

8    THAT QUALCOMM IS THE ONE THAT SOUGHT OUT THE EXCLUSIVITY TERM.

9    THE TRANSITION AGREEMENT HAD THE INTENDED EFFECT.  AS

10   APPLE WITNESSES TESTIFIED AT TRIAL, EVEN THOUGH THEY HAD AN

11   INTEREST IN DEVELOPING AND MAINTAINING ADDITIONAL SOURCE

12   SUPPLIERS, THE AGREEMENTS PROVIDED STRONG INCENTIVES NOT TO

13   WORK WITH ANYONE BUT QUALCOMM.

14   WHEN THE 2013 AGREEMENT WAS SIGNED, APPLE WAS INTENSIVELY

15   ENGAGED WITH INTEL AND POISED TO BEGIN USING INTEL IN LESS

16   RISKY IPAD MODELS.

17   THE RENEWAL OF THE TRANSITION AGREEMENT CAUSED APPLE TO

18   TERMINATE THAT ENGAGEMENT.  AS APPLE AND INTEL WITNESSES MADE

19   CLEAR, INTEL'S LOSS AT APPLE WAS NOT DUE TO ITS OWN TECHNICAL

20   DEFICIENCY, BUT RATHER WAS A DIRECT RESULT OF APPLE'S 2013

21   AGREEMENTS WITH QUALCOMM.

22   QUALCOMM'S INTENDED ANTICOMPETITIVE EFFECTS CAME TO

23   FRUITION.  THE EXCLUSIVE CONTRACTS DEPRIVED INTEL OF THE

24   BENEFITS OF ENGAGEMENT WITH APPLE, DELAYED INTEL'S DEVELOPMENT,

25   AND HARMED INTEL'S ABILITY TO WIN BUSINESS BOTH AT APPLE AND

CLOSING ARGUMENT BY MS. MILICI

1    ELSEWHERE.

2         THE RECORD DOES NOT CONTAIN ANY SUPPORT FOR ANY

3    PROCOMPETITIVE JUSTIFICATION FOR QUALCOMM'S 100 PERCENT

4    EXCLUSIVE DEALS.

5         QUALCOMM'S THIN MODEM BUSINESS INVOLVES RESEARCH AND

6    DEVELOPMENT COSTS THAT ARE LARGELY SHARED ACROSS PRODUCTS, SO

7    INVESTMENTS WERE NOT TRULY CUSTOMER SPECIFIC TO APPLE.

8         MR. THOMPSON'S TESTIMONY, CITED HERE, SHOWS THAT.

9         AND ADDITIONALLY, THE THIN MODEMS RETURN ON R&D IS

10   SUBSTANTIALLY HIGHER THAN QUALCOMM'S OTHER SOC'S AND EXCEEDS

11   THE BENCHMARKS THAT WERE PROPOSED BY DR. CHIPTY IN HER REPORT,

12   WHICH IS REPRODUCED HERE ON THE RIGHT.

13        AND SINCE INTEL'S ENTRY AT APPLE IN 2016, INTEL HAS NOT

14   REQUIRED ANY, MUCH LESS 100 PERCENT, VOLUME OR EXCLUSIVITY

15   COMMITMENTS TO RECOUP ITS INVESTMENT.

16        ALL RIGHT.  THE NEXT SLIDE IS SEALED.

17        NOW, LOOKING AT THE EFFECT OF ALL OF THIS CONDUCT,

18   QUALCOMM'S OWN DOCUMENTS SHOW THAT IT EARNED MANY TIMES THE

19   LICENSING REVENUE OF OTHER MAJOR LICENSORS, LIKE ERICSSON.

20        QUALCOMM HAS NOT EXPLAINED HOW THIS CAN BE SQUARED WITH

21   THE TESTIMONY CONCERNING ROYALTY DISTRIBUTIONS IN THE AVANCI

22   POOL, THE DETAILS OF WHICH ARE UNDER SEAL.

23        MR. LASINSKI ANALYZED WHETHER THIS ENORMOUS DIFFERENCE IN

24   ROYALTIES COULD BE EXPLAINED BY THE RELATIVE QUALITY AND SIZE

25   OF QUALCOMM'S PORTFOLIO, BUT THAT MASSIVE DISPARITY WAS NOT

CLOSING ARGUMENT BY MS. MILICI

1    EXPLAINED.

2         QUALCOMM'S ROYALTIES ARE DISPROPORTIONATE TO THOSE OF

3    OTHER SEP LICENSORS AND MANY TIMES HIGHER THAN ANY PLAUSIBLE

4    CALCULATION OF A FRAND RATE.

5         NOW, MR. LASINSKI EMPLOYED WELL ACCEPTED PORTFOLIO

6    VALUATION METHODS.  IN HIS INPUTS INTO THESE ANALYSES, HE

7    RELIED ON PORTFOLIO STRENGTH METRICS COMMONLY USED IN THE

8    INDUSTRY, INCLUDING BY QUALCOMM.

9         HE LOOKED AT DEEMED SEP STUDIES, INCLUDING DEEMED SEP

10   STUDIES THAT WERE ACTUALLY CITED BY QUALCOMM IN ITS OWN

11   LICENSING NEGOTIATIONS, INCLUDING A DOCUMENT THAT WAS

12   INTRODUCED AS CX 7128.

13        AND MR. LASINSKI ALSO LOOKED AT APPROVED CONTRIBUTIONS,

14   AND THAT'S A METRIC THAT IS FREQUENTLY USED BY LICENSORS AND

15   CHRISTINA PETERSSON OF ERICSSON TESTIFIED ABOUT THAT IN THE

16   DEPOSITION PLAYED IN TRIAL.

17        NOW, MR. LASINSKI EXPLAINED HOW THE METRICS HE RELIED ON

18   RELATE TO QUALCOMM'S OWN LICENSING PRACTICES AND INTERNAL

19   DOCUMENTS AND USING THOSE METRICS, QUALCOMM'S HUMONGOUS

20   ROYALTIES ARE NOWHERE CLOSE TO JUSTIFIED BY ITS PORTFOLIO

21   STRENGTH.

22        NOW, PROFESSOR SHAPIRO REACHED THE SAME CONCLUSION, THAT

23   QUALCOMM'S ROYALTIES ARE SIGNIFICANTLY HIGHER THAN ANY MEASURE

24   OF REASONABLE ROYALTIES BY LOOKING AT THE SUBSTANTIAL DIRECT

25   EVIDENCE IN THIS CASE OF QUALCOMM'S CONDUCT AND HOW THAT

CLOSING ARGUMENT BY MS. MILICI

1    CONDUCT AFFECTED NEGOTIATIONS.

2         THE OVERWHELMING DIRECT EVIDENCE, SOME OF WHICH IS CITED

3    HERE, SHOWS THAT QUALCOMM'S CONDUCT LED LICENSEES TO PAY HIGHER

4    ROYALTIES THAN THEY WOULD HAVE IN FAIR NEGOTIATIONS.

5         THE DOCUMENTS OFFERED BY QUALCOMM IN THIS CASE SHOW THAT

6    IT EARNS 25 PERCENT OF GLOBAL PATENT LICENSING REVENUE.  THAT

7    IS NOT A REFERENCE TO THE MODEM CHIP INDUSTRY.  THAT IS A

8    REFERENCE TO ALL OF THE PATENTS IN THE WORLD.

9         NOW, QUALCOMM SPENT A LOT OF TIME TOUTING ITS RESEARCH AND

10   DEVELOPMENT ACTIVITIES AND STATING THAT IT OWNS IMPORTANT

11   PATENTS.

12        BUT NOT ONE OF ITS WITNESSES, SOME OF WHOSE TESTIMONY IS

13   SHOWN ON THIS SLIDE, COMPARED QUALCOMM TO OTHER MAJOR PLAYERS

14   IN THE CELLULAR INDUSTRY WHO ALSO ENGAGE IN EXTENSIVE RESEARCH

15   AND DEVELOPMENT.  NOT ONE OF QUALCOMM'S WITNESSES TESTIFIED

16   ABOUT HOW MUCH QUALCOMM'S PATENTS ARE WORTH.  NO QUALCOMM

17   EXPERT ATTEMPTED TO VALUE QUALCOMM'S PORTFOLIO OR PROPOSED A

18   METHODOLOGY FOR DOING SO.

19        DR. ANDREWS TESTIFIED THAT QUALCOMM'S PORTFOLIO INCLUDED

20   SOME FUNDAMENTAL PATENTS, BUT HE DID NOT COMPARE THEM TO ANYONE

21   ELSE'S PATENTS.

22        DR. ANDREWS'S OPINION WAS BASED ON SIMPLY READING 34 OF

23   QUALCOMM'S PATENTS AND REPORTING ABOUT HIS GUT FEELING, AND

24   THAT'S AT TRANSCRIPT PAGE 1616.

25        AND AS SHOWN ON THE BOTTOM OF THIS SLIDE, DR. ANDREWS WAS

1    QUITE CLEAR THAT HE WAS NOT OFFERING ANY OPINION ON WHAT A

2    REASONABLE ROYALTY WOULD BE OR WHETHER THE MONETARY VALUE OF

3    QUALCOMM'S PATENT PORTFOLIO CHANGED OVER TIME.

4         AND THERE HAS BEEN NO TESTIMONY, NO PROOF IN THIS CASE

5    THAT ANY OF THE PATENTS THAT LIREN CHEN TESTIFIED ABOUT, IN HIS

6    PATENT COUNTING EXERCISE, ARE VALID OR ARE ACTUALLY USED OR

7    INFRINGED BY ANYONE.

8         QUALCOMM'S ONLY ARGUMENT IN SUPPORT OF ITS ROYALTIES IS

9    THAT ITS RATES WERE NEGOTIATED IN THE MARKET, BUT AS I

10   MENTIONED BEFORE, EVEN MR. GONELL AGREES THAT NEGOTIATIONS CAN

11   BE UNFAIR AND LEAD TO UNFAIR OUTCOMES IF SUFFICIENT ECONOMIC

12   PRESSURE IS BROUGHT TO BEAR, AS QUALCOMM DID WITH ITS HANDSET

13   CUSTOMERS.

14        NOW, THE FTC EXPERT, RICHARD DONALDSON, EXPLAINED HOW

15   QUALCOMM GOT THESE HIGH ROYALTIES BE EXERTING TREMENDOUS

16   BARGAINING POWER USING NO LICENSE, NO CHIPS.  IN A TYPICAL

17   NEGOTIATION, THE PARTIES HAVE TO CONSIDER WHAT WOULD HAPPEN IF

18   NEGOTIATIONS FAIL, AND THAT'S PATENT LITIGATION WHERE A COURT

19   WOULD DETERMINE WHETHER THE PATENTS AT ISSUE ARE VALID AND

20   INFRINGED AND WHAT A REASONABLE ROYALTY RATE WOULD BE.

21        THE RISK OF THAT LITIGATION INFORMS NEGOTIATIONS, AND

22   MR. DONALDSON EXPLAINED THIS, AS DID MR. BLUMBERG OF LENOVO

23   WHOSE TESTIMONY IS CITED HERE.

24        BUT IN NEGOTIATIONS WITH QUALCOMM, ABILITY TO WITHHOLD

25   CHIP SUPPLY PROTECTED QUALCOMM FROM LEGAL CHALLENGES.  BECAUSE

1    OF THEIR NEED FOR CHIPS, LICENSEES COULD NOT AFFORD TO RISK

2    SUPPLY BY FORCING LITIGATION WITH QUALCOMM.  THAT'S WHAT

3    QUALCOMM SAID IN ITS OWN DOCUMENTS, INCLUDING DOCUMENTS WE

4    LOOKED AT EARLIER IN CONNECTION WITH PROJECT BERLIN.

5         SO IT IS NOT SURPRISING TO SEE, AS MR. DONALDSON OBSERVES

6    HERE, THAT QUALCOMM HAS BEEN INVOLVED IN MUCH LESS PATENT

7    LITIGATION THAN OTHER SEP HOLDERS OVER TIME.

8         THE FACT THAT QUALCOMM HAS RARELY HAD TO GO TO COURT AND

9    SUBJECT ITS PORTFOLIO TO COURT DETERMINATION OF VALIDITY,

10   INFRINGEMENT, OR REASONABLE ROYALTY HAS LED TO SNOWBALLING

11   EFFECTS OVER TIME.  QUALCOMM USES CHIP LEVERAGE TO OBTAIN

12   LICENSE TERMS AND THEN ASSERTS THAT THE RESULTING TERMS PROVE

13   THE VALUE OF ITS PORTFOLIO.

14        AND ALL THIS LEADS, OF COURSE, TO THE TAX THAT WE'VE BEEN

15   TALKING ABOUT AND THE INCREASE IN RIVALS' COSTS, AND

16   PROFESSOR SHAPIRO, IN HIS TESTIMONY, EXPLAINED HOW QUALCOMM'S

17   ROYALTY SURCHARGE HARMS COMPETITION AND CONSUMERS.

18        THE ROYALTY SURCHARGE OPERATES AS A TAX, AND THAT TAX

19   REDUCES WHAT QUALCOMM'S RIVALS AND THEIR CUSTOMERS CAN GAIN BY

20   TRADING WITH ONE ANOTHER.

21        AS A MATTER OF TEXTBOOK ECONOMICS, IT DOESN'T MATTER

22   WHETHER THE OEM OR THE RIVAL PAYS THE TAX.  NO MATTER WHO

23   WRITES THE CHECK, THE TAX REDUCES THE GAINS FROM TRADE AND

24   MAKES RIVALS' CHIPS LESS ATTRACTIVE.

25        AND AS DR. SHAPIRO EXPLAINS ON RIGHT PART OF THIS SLIDE,

CLOSING ARGUMENT BY MS. MILICI

1    QUALCOMM'S ROYALTY SURCHARGE IS NOT CHIP NEUTRAL.  THIS IS

2    BECAUSE WHEN AN OEM BUYS QUALCOMM CHIPS, THE GAINS FROM TRADE

3    ARE NOT REDUCED BECAUSE THE ROYALTY IS PAID TO QUALCOMM.

4    QUALCOMM IS THE TAX COLLECTOR.

5         NOW, PROFESSOR NEVO CLAIMED THAT THIS IS -- THAT THIS

6    ISN'T ANY DIFFERENT FROM THE EFFECT THAT A REASONABLE ROYALTY

7    RATE WOULD HAVE.  BUT HE MISSED THE POINT ENTIRELY.

8         IT IS TRUE THAT EVEN A REASONABLE ROYALTY GIVES QUALCOMM A

9    COST ADVANTAGE OVER ITS RIVALS.  BUT THAT COST ADVANTAGE IS

10   JUSTIFIED.  IT'S THE REWARD THAT QUALCOMM IS ENTITLED TO FOR

11   ITS PATENTED INNOVATION.

12        BUT WHEN QUALCOMM USES ITS CHIP MONOPOLY POWER TO IMPOSE A

13   ROYALTY SURCHARGE, THAT IMPOSES AN ADDITIONAL COST DISADVANTAGE

14   THAT HAS NOTHING TO DO WITH QUALCOMM'S PATENTS AND THAT CANNOT

15   BE JUSTIFIED.

16        AS PROFESSOR SHAPIRO EXPLAINED, THE EFFECTS OF QUALCOMM'S

17   CONDUCT IS TO RAISE RIVALS' COSTS, REDUCE RIVALS' MARGINS, AND

18   RAISE THE ALL-IN PRICES OF MODEM CHIPS AND HANDSETS.

19        BUT YOU DON'T HAVE TO TAKE PROFESSOR SHAPIRO'S WORD FOR

20   IT.  THE BUSINESS JUSTIFICATIONS THAT QUALCOMM HAS OFFERED ARE

21   SIMPLY ANTICOMPETITIVE HARM BY ANOTHER NAME.

22        ASKED TO EXPLAIN THE BUSINESS RATIONAL FOR QUALCOMM'S NO

23   LICENSE, NO CHIPS POLICY, FABIAN GONELL BASICALLY LAID OUT

24   PROFESSOR SHAPIRO'S THEORY.  AS MR. GONELL EXPLAINED IN THE

25   TESTIMONY REPRODUCED ON THE RIGHT SIDE OF THIS SLIDE, QUALCOMM

CLOSING ARGUMENT BY MS. MILICI

1    CHARGES FOR ITS CHIPS AN AMOUNT THAT IS X PLUS Y WHERE X IS THE

2    CHIP PRICE AND Y IS THE ROYALTY.

3         THANKS TO QUALCOMM'S NO LICENSE, NO CHIPS POLICY, OEM'S

4    HAVE TO ACCEPT LICENSES THAT REQUIRE THEM TO PAY THAT SAME

5    ROYALTY, Y, WHEN THEY USE SOMEBODY ELSE'S CHIP.

6         BUT WHAT IF AN OEM DIDN'T HAVE TO ACCEPT A LICENSE TO BUY

7    QUALCOMM'S CHIPS?  THEN, AS MR. GONELL TESTIFIES, THEY COULD GO

8    TO A COURT WHICH WOULD NOT MAKE THEM PAY QUALCOMM MORE THAN Y

9    AND MIGHT WELL MAKE THE OEM PAY LESS THAN Y.

10        AS A RESULT, QUALCOMM'S MODEM CHIP RIVALS WOULD BENEFIT,

11   AND AS MR. GONELL PUT IT, ALL OTHER THINGS BEING EQUAL, THE

12   OTHER OFFERING IS GOING TO BE MORE ATTRACTIVE AND SO QUALCOMM'S

13   GOING TO HAVE TO ADJUST ITS PRICE.

14        NOW, QUALCOMM HAS ATTACKED PROFESSOR SHAPIRO FOR NOT DOING

15   SOME KIND OF LARGE DATA ANALYSIS.

16        BUT PROFESSOR SHAPIRO CONDUCTED A THOROUGH AND EXACTING

17   ANALYSIS OF THE CONDUCT ALLEGED OF QUALCOMM'S MARKET POWER AND

18   THE EFFECT ON COMPETITION.  NONE OF QUALCOMM'S EXPERTS DID

19   THAT.  DR. CHIPTY ATTACKED DR. SHAPIRO'S MARKET DEFINITION, BUT

20   DID NOT REACH HER OWN OPINION AND DID NOT CONSIDER QUALCOMM'S

21   CONDUCT.

22        DR. SNYDER PURPORTED TO LOOK AT MARKET OUTCOMES, BUT HE

23   DIDN'T CONSIDER QUALCOMM'S CONDUCT AT ALL.  HE NEVER REACHED

24   THAT POINT IN HIS ANALYSIS.

25        AND DR. NEVO PURPORTED TO TEST THE EFFECTS OF THE CONDUCT,

 1        BUT HE MADE UNSUPPORTABLE ASSUMPTIONS ABOUT MARKET POWER.  HE

 2   ASSUMES THAT IF THE FTC DID NOT BRING A LAWSUIT ABOUT A

 3   PARTICULAR PRODUCT OR A PARTICULAR TIME PERIOD, THAT THAT MEANS

 4   THAT CONDITIONS MUST HAVE BEEN COMPETITIVE.

 5        THERE'S NO BASIS FOR THAT ASSUMPTION.

 6        HE ALSO USED FAULTY AND INCOMPLETE DATA, EXCLUDED A

 7   SIGNIFICANT PORTION OF THE MARKET FROM HIS ANALYSIS, AND DID

 8   REGRESSIONS THAT DIDN'T EVEN TRY TO CONTROL FOR OBVIOUS

 9   VARIABLES.

10        AND THAT'S WHAT THE COURT SHOULD CONSIDER, THE FULL

11   PICTURE.  THAT'S WHAT DR. SHAPIRO CONSIDERED, NOT

12   COMPARTMENTALIZED PIECES AND UNINFORMATIVE REGRESSIONS.

13        AND THE DIRECT EVIDENCE SUPPORTS ANTICOMPETITIVE EFFECTS

14   IN THIS CASE.  QUALCOMM'S RIVALS, INCLUDING INTEL AND MEDIATEK

15   AND BROADCOM, ALL TESTIFIED THAT QUALCOMM'S LICENSING PRACTICES

16   AFFECT THEM PRECISELY AS DR. SHAPIRO PREDICTED.

17        AND IF YOU LOOK AT THE TOP RIGHT OF THIS SLIDE, QUALCOMM'S

18   OWN DOCUMENTS SHOW THAT IT UNDERSTOOD HOW ITS PRACTICES WOULD

19   AFFECT RIVALS.  ITS STRATEGY DOCUMENTS REVEAL A PLAN TO DESTROY

20   MEDIATEK'S MARGIN AND PROFIT TO LIMIT ITS ABILITY TO INVEST IN

21   3G.

22        QUALCOMM'S ROYALTY SURCHARGE IMPLEMENTS EXACTLY THIS TYPE

23   OF STRATEGY ACROSS THE ENTIRE INDUSTRY.

24        AND QUALCOMM'S CONDUCT HAS HARMED COMPETITION EXACTLY AS

25   ONE WOULD EXPECT.  RIVALS HAVE OBTAINED THIN MARGINS, AND

CLOSING ARGUMENT BY MS. MILICI

1    DESPITE INTEL'S GROWING BUSINESS AT APPLE, IT HAS NOT YET BEEN

2    PROFITABLE.

3          BROADCOM SHUT DOWN ITS BUSINESS DUE TO ITS LACK OF SCALE

4    AND THIN MARGINS.

5          COMPANIES LIKE NVIDIA, TEXAS INSTRUMENTS, ST-ERICSSON AND

6    FREE SCALE HAVE ALL EXITED THE MODEM CHIP BUSINESS ENTIRELY.

7    EVEN MEDIATEK, WHICH HAS BEEN DESCRIBED AS ONE OF THE SUCCESS

8    STORIES, PAUSED ITS DEVELOPMENT OF PREMIUM TIER CHIPS.

9          SO WHEN CONSIDERED TOGETHER, I THINK THE EVIDENCE IS

10   OVERWHELMING THAT QUALCOMM ENGAGED IN EXCLUSIONARY CONDUCT AND

11   THAT THE EFFECTS OF QUALCOMM'S CONDUCT, WHEN CONSIDERED

12   TOGETHER, ARE ANTICOMPETITIVE.  QUALCOMM'S POLICIES HAVE HARMED

13   COMPETITION AND COMPETITIVE PROCESS.

14         UNDER THE ANTITRUST RULE OF REASON, WHICH APPLIES IN THIS

15   CASE, QUALCOMM HAS THE OPPORTUNITY TO PROVIDE VALID BUSINESS

16   JUSTIFICATIONS FOR ITS CONDUCT.  BUT QUALCOMM HAS NOT

17   ESTABLISHED THESE JUSTIFICATIONS THROUGH EVIDENCE.

18         FIRST, WE HEARD A LOT FROM QUALCOMM WITNESSES ABOUT PATENT

19   EXHAUSTION, THAT IF QUALCOMM HAD TO ABANDON ITS POLICY, IT

20   WOULD FACE THE RISK THAT ITS PATENTS WOULD BE FOUND TO BE

21   EXHAUSTED, AND WE SEE THAT IN CONTEMPORANEOUS BUSINESS

22   DOCUMENTS, AS WELL AS IN THE IRS AUDIO.

23         BUT AVOIDING EXHAUSTION IS NOT A VALID BUSINESS

24   JUSTIFICATION.  PATENT EXHAUSTION IS A DOCTRINE RECOGNIZED BY

25   THE SUPREME COURT.  IT PROMOTES IMPORTANT PUBLIC POLICIES,

CLOSING ARGUMENT BY MS. MILICI

1    INCLUDING THE FREE MOVEMENT OF GOODS THROUGH THE ECONOMY.

2         AND QUALCOMM CASE, ITS EXHAUSTION DEFENSE BOILS DOWN TO A

3    DESIRE TO AVOID THE RISK OF NEGOTIATING IN THE SHADOW OF THE

4    LAW.  IN AVOIDANCE OF ARM'S LENGTH NEGOTIATIONS WITH THE

5    POSSIBILITY OF PATENT SCRUTINY IS NOT COGNIZABLE AS AN

6    ANTITRUST DEFENSE.

7         QUALCOMM HAS ALSO TALKED A LOT IN THIS TRIAL ABOUT ITS

8    RESEARCH AND DEVELOPMENT EFFORTS, AND IT IS IMPORTANT THAT

9    PARTICIPANTS IN THIS INDUSTRY, NOT JUST QUALCOMM, BUT OTHERS,

10   TOO, INVEST IN RESEARCH AND DEVELOPMENT TO IDENTIFY AND DEVELOP

11   TOMORROW'S TECHNOLOGIES.  THE FTC IS NOT INTERESTED IN

12   DISCOURAGING OR DETERRING INNOVATION.

13        BUT FAIR MARKET BASED RETURNS OF QUALCOMM'S PATENT

14   PORTFOLIO AND MODEM CHIP SALES WOULD INCENTIVIZE INNOVATION.

15   AS EVIDENCE IN THIS CASE HAS SHOWN, MANY COMPANIES INVEST IN

16   R&D WITHOUT EMPLOYING THE ANTICOMPETITIVE SALES AND LICENSING

17   PRACTICES THAT QUALCOMM RELIES ON.

18        AND COLLECTING A SURCHARGE ON COMPETITORS' PRODUCTS DOES

19   NOT PROMOTE INNOVATION.  IT DETERS INNOVATION BY INHIBITING

20   COMPETITION.

21        AND IT IS WORTH LOOKING AT QUALCOMM'S R&D EXPENDITURES IN

22   THE BROADER CONTEXT OF ITS BUSINESS.  QUALCOMM MAKES

23   SUBSTANTIAL R&D EXPENDITURES, BUT AS YOU CAN SEE ON THIS SLIDE,

24   QUALCOMM HISTORICALLY HAS SPENT EVEN MORE ON STOCK BUYBACKS AND

25   DIVIDENDS.

1     NOW, THERE'S NOTHING WRONG WITH THAT.  BUT QUALCOMM'S

2   ASSERTED JUSTIFICATIONS OF NEEDING TO FUND R&D SHOULD BE

3   EVALUATED IN THAT CONTEXT.

4     FINALLY, QUALCOMM HAS ASSERTED THAT IF IT HAD TO LICENSE

5   ITS COMPETITORS, IT WOULD STILL HAVE TO LICENSE TO OEM'S.

6     FIRST, IT ISN'T OBVIOUS THAT THIS IS TRUE.  IN THE IRS

7   AUDIO, MR. BLECKER CONFIRMED THAT ALL OF QUALCOMM'S STANDARD

8   ESSENTIAL PATENTS WERE PRACTICED BY CHIPS.  AND QUALCOMM HAS

9   NOT INTRODUCED ANY EVIDENCE THAT ITS DEVICE LEVEL PATENTS ARE

10  VALID AND INFRINGED BY ANY HANDSETS.

11    BUT ASSUMING THAT QUALCOMM HAS VALID PATENTS THAT WOULD

12  NOT BE EXHAUSTED BY THE CHIP SALE, THAT DOESN'T MEAN THAT THERE

13  WOULD HAVE TO BE MULTI LEVEL LICENSING.  YOU CAN SEE

14  PROFESSOR SHAPIRO'S TESTIMONY ON THIS POINT AT THE TOP OF THE

15  SLIDE.

16    IT COULD BE THAT THE MARKET BASED OUTCOME WOULD BE MULTI

17  LEVEL LICENSING, AND IF THAT'S THE CASE, QUALCOMM HAS NOT

18  ESTABLISHED THAT IT WOULD BE INEFFICIENT.

19    BUT IF TURNED OUT THAT IT WAS MORE EFFICIENT FOR OEM'S AND

20  QUALCOMM TO LICENSE AT THE DEVICE LEVEL WITHOUT ANY SUPPLY

21  LEVERAGE INVOLVED, THEN THAT'S WHAT WOULD HAPPEN.  THE FTC

22  WOULD NOT STAND IN THE WAY OF THAT.

23    THIS CASE IS ALL ABOUT PROMOTING FAIR MARKET BASED

24  NEGOTIATIONS.

25    NOW, BECAUSE QUALCOMM'S CONDUCT VIOLATES THE FTC ACT,

CLOSING ARGUMENT BY MS. MILICI

1    COURT SHOULD FIND FOR THE FTC ON LIABILITY, AND IT SHOULD GRANT

2    INJUNCTIVE RELIEF.  AS YOUR HONOR RECOGNIZED IN A PRETRIAL

3    ORDER, THE LEGAL STANDARD FOR IMPOSING EQUITABLE RELIEF IN THIS

4    CASE REQUIRES THE FTC TO SHOW THAT THE ANTICOMPETITIVE CONDUCT

5    IS ONGOING OR LIKELY TO RECUR.

6         THE EVIDENCE EASILY MEETS THIS STANDARD.  IT IS BEYOND

7    DISPUTE THAT THE CONDUCT IS ONGOING.

8         AND QUALCOMM'S CONDUCT HAS BEEN ONGOING DESPITE RECENT LAW

9    ENFORCEMENT ACTIONS BY FOREIGN ANTITRUST AGENCIES THAT LED TO

10   BILLIONS OF DOLLARS IN FINES.  THOSE ACTIONS ARE DETAILED IN

11   THE QUALCOMM ANNUAL REPORT THAT ARE CITED HERE ON THE RIGHT,

12   CX 7257.

13        AND WHILE THAT'S ENOUGH TO JUSTIFY A REMEDY, THE EVIDENCE

14   ALSO SHOWS A RISK OF RECURRENCE.  EVIDENCE FROM QUALCOMM AND

15   THIRD PARTIES ALIKE SHOW QUALCOMM'S LEAD IN 5G CHIP

16   DEVELOPMENT.

17        AND AS YOU CAN SEE IN CX 8197, CITED HERE ON THE RIGHT,

18   QUALCOMM EXPECTS TECHNOLOGY TRANSITION TO AGAIN CREATE

19   SIGNIFICANT RETURNS FOR QUALCOMM AS IN THE TRANSITION FROM 3G

20   TO 4G WHEN IT CAPTURED 80 PERCENT SHARE OF THE UNITS.

21        IN OTHER WORDS, THERE'S A SIGNIFICANT RISK THAT THE STORY

22   THAT THE INDUSTRY SAW PLAY OUT FIRST IN 3G AND THEN IN 4G WILL

23   RUN AGAIN IN 5G.  QUALCOMM WILL HAVE A TIME TO MARKET ADVANTAGE

24   AND WILL USE THAT ADVANTAGE AND THE CORPORATE POLICIES

25   CHALLENGED HERE TO PUT UP ROADBLOCKS THAT SLOWS ITS COMPETITORS

1    DOWN.  THE COURT SHOULD PREVENT THAT FROM HAPPENING BY ORDERING

2    QUALCOMM TO ABANDON ITS ANTICOMPETITIVE POLICIES AND PRACTICES.

3         THANK YOU, YOUR HONOR.

4         THE COURT:  OKAY.  TIME IS 2:26.

5         ALL RIGHT.  LET'S GO AHEAD AND TAKE A TEN MINUTE BREAK

6    NOW.  THANK YOU.

7         (RECESS FROM 2:26 P.M. UNTIL 2:38 P.M.)

8         THE COURT:  OKAY.  WELCOME BACK.  GOOD AFTERNOON.

9     PLEASE TAKE A SEAT.

10        OKAY.  DO WE HAVE ROOM FOR EVERYONE?  IF EVERYONE COULD

11   PLEASE SQUEEZE IN AND SIT AS CLOSE TO THE WALL AS POSSIBLE?

12   THANK YOU.

13        ALL RIGHT.  LET ME KNOW WHEN YOU'RE READY.

14        THE FTC HAS 9 MINUTES.

15        OKAY.  LET ME KNOW WHEN YOU'RE READY, MR. VAN NEST.

16        MR. VAN NEST:  I WILL, YOUR HONOR.  I THINK WE PASSED

17   UP BINDERS.

18        THE COURT:  I HAVE IT.

19        MR. VAN NEST:  THERE IT IS.  I'M READY TO GO.

20        THE COURT:  ALL RIGHT.  2:38.  GO AHEAD, PLEASE.

21        **(MR. VAN NEST GAVE HIS CLOSING ARGUMENT ON BEHALF OF**

22   **QUALCOMM.)**

23        MR. VAN NEST:  GOOD AFTERNOON, YOUR HONOR.

24        THE EVIDENCE YOU'VE HEARD DURING TRIAL ABOUT WHAT ACTUALLY

25   TOOK PLACE IN THE MARKET SIMPLY WILL NOT SUPPORT A FINDING OF

CLOSING ARGUMENT BY MR. VAN NEST

1    ANY VIOLATION.

2         THE FTC FAILED TO SHOW ACTUAL HARM TO COMPETITION.  THEY

3    FAILED TO SHOW THAT QUALCOMM'S LICENSING PRACTICES HAVE BEEN

4    ANTICOMPETITIVE, AND THE EVIDENCE IS SIMPLY OVERWHELMING THAT

5    QUALCOMM EARNED ITS POSITION AND SUCCESS THROUGH SUPERIOR

6    INNOVATION AND BETTER PRODUCTS.

7         TO ESTABLISH A VIOLATION, IT WAS THEIR BURDEN TO SHOW

8    SUBSTANTIAL HARM TO COMPETITION RESULTING FROM QUALCOMM'S

9    CONDUCT.

10        THEY HAVE ABSOLUTELY FAILED TO DO THAT.  THE MARKET IS

11   THRIVING.  EVERYONE AGREES THIS IS A DYNAMIC AND HIGHLY

12   INNOVATIVE MARKET.

13        PARTICIPANTS ARE THRIVING.  COMPETITION IS GROWING AND

14   INTENSE.

15        INTEL IS NOW THE SOLE SUPPLIER FOR NEW IPHONES FROM APPLE.

16        MEDIATEK IS THE NUMBER 2 SUPPLIER IN THE WORLD.

17        SAMSUNG AND HUAWEI ARE NOW SUPPLYING MANY OF THEIR OWN

18   CHIPS.

19        AND CONSUMERS ARE BENEFITING, TOO, YOUR HONOR.  AS YOU

20   HEARD YESTERDAY FROM PROFESSOR SHAPIRO, QUALITY IS UP,

21   PERFORMANCE IS UP, AVERAGE SMARTPHONE PRICES ARE DOWN, AND ALL

22   THE EXPERTS AGREE.

23        THE FTC HAS PRESENTED EVIDENCE OF A HANDFUL OF OEM'S

24   CLAIMING THEY FELT THREATENED DURING LICENSING NEGOTIATIONS.  I

25   WANT TO PUT THAT IN CONTEXT, AND I WILL.

1          THESE ARE ALL LARGE, SOPHISTICATED COMPANIES, ALL WITH

2     THEIR OWN LEVERAGE, WHO NO DOUBT WANT TO PAY LESS FOR

3     QUALCOMM'S TECHNOLOGY.  THE WITNESSES WERE LAWYERS.  THE

4     TESTIMONY WAS COMPLETELY SELF-SERVING.

5          THE FULL PICTURE IS THAT QUALCOMM HAS NEVER CUT OFF

6     COMMERCIAL CHIP SUPPLY TO ANY CUSTOMER DURING ANY LICENSING

7     NEGOTIATION, EVER.  AND THEY MADE NO ATTEMPT, THE FTC DID, TO

8     SHOW THAT EVEN IN THIS HANDFUL OF EXAMPLES, THE NEGOTIATED

9     OUTCOMES, WHICH OFTEN TOOK MONTHS, WOULD HAVE BEEN ANY

10    DIFFERENT IN A BUT FOR WORLD.

11         THE EXPERT TESTIMONY THEY PRESENTED WAS WEAK.

12    MR. LASINSKI CAME IN HERE WITH A MADE-FOR-LITIGATION MODEL THAT

13    NO COURT HAS ACCEPTED OR ENDORSED.

14         HIS TOP-DOWN APPROACH IS ARBITRARY AND CONTRADICTED BY

15    EMPIRICAL ANALYSIS OF HUNDREDS OF LICENSES SIGNED BY QUALCOMM

16    AND INDUSTRY PLAYERS FOR MORE THAN 25 YEARS.

17         AND AS I SAID REPEATEDLY, PROFESSOR SHAPIRO IS ALL ABOUT

18    THEORY, BUT NO EMPIRICAL FACTS TO BACK IT UP.  HE SIMPLY

19    IGNORES WHAT HAPPENED IN THE MARKET.  HE PREDICTS INEVITABLE

20    HARM, BUT HE DIDN'T LOOK AT ANY ACTUAL OUTCOME OR CONSIDER ANY

21    ALTERNATIVE EXPLANATION.

22         A THEORY OF HARM IS NOT ACTUAL HARM, AND IT'S NOT ENOUGH

23    TO CARRY THEIR BURDEN.

24         QUALCOMM'S ROYALTY RATES CAME INTO EXISTENCE, AS YOUR

25    HONOR KNOWS, BEFORE ITS TECHNOLOGY WAS IN ANY STANDARD AND

CLOSING ARGUMENT BY MR. VAN NEST

1     BEFORE IT HAD A CHIP BUSINESS OF ANY KIND.

2          AND QUALCOMM'S COMPETITORS HAVE COME AND GONE AND

3     SUCCEEDED AND FAILED FOR A HOST OF REASONS THAT HAVE ABSOLUTELY

4     NOTHING TO DO WITH QUALCOMM.

5          NOR ARE QUALCOMM'S LICENSING PRACTICES ANTICOMPETITIVE.

6     DEVICE LEVEL LICENSING IS ABSOLUTELY INDUSTRY STANDARD.

7     WITNESS AFTER WITNESS, INCLUDING FROM OUR COMPETITORS AND FROM

8     THE FTC, AGREED THAT DEVICE LEVEL LICENSING IS INDUSTRY

9     STANDARD AND HAS BEEN AROUND FOREVER.

10         THEY ALSO AGREE TO THE COROLLARY OF THAT.  IT FLOWS JUST

11    LIKE ANYTHING ELSE.  CHIP LEVEL LICENSING IS NOT CUSTOMARY WHEN

12    DEVICE LEVEL LICENSING IS PREVALENT.  THAT'S THE WAY THE

13    INDUSTRY HAS OPERATED FOR YEARS AND QUALCOMM IS WITHIN THAT

14    TRADITION.

15         NOW, QUALCOMM'S PRACTICE OF SELLING CHIPS ONLY TO LICENSED

16    OEM'S, THAT IS UNIQUE, BUT THAT'S BECAUSE QUALCOMM'S BUSINESS

17    IS UNIQUE.  IT HAS CREATED END-TO-END SYSTEM TECHNOLOGY, AND

18    POPULAR CHIPS, AND IT'S ENTITLED TO A FAIR RETURN ON BOTH.

19         AND FINALLY, YOUR HONOR, IT'S NOW UNDISPUTED THAT QUALCOMM

20    ACHIEVED ITS SUCCESS THROUGH INNOVATION, BETTER ENGINEERING,

21    AND BETTER PRODUCTS.  QUALCOMM'S TECHNOLOGY HAS DRIVEN THE

22    INDUSTRY FORWARD FROM 3G, 4G, AND 5G.

23         AND I WELCOME THE FTC'S ADMISSION, NOW FOR THE FIRST TIME

24    AFTER TWO YEARS OF LITIGATION, THAT QUALCOMM EARNED ITS MARKET

25    SHARE THROUGH INNOVATION.

1          THEY CAN'T HAVE IT BOTH WAYS.  IT CAN'T BE TRUE THAT OUR

2     TECHNOLOGY IS WASHED UP AND NOT WORTH THE ROYALTY RATES, AND

3     YET SO STRONG AND POWERFUL IN 5G THAT QUALCOMM MUST BE STOPPED.

4          ITS PRODUCTS ARE SIMPLY BETTER THAN ANYBODY ELSE'S, AS ALL

5     THE CUSTOMERS AND CHIP MAKERS ADMITTED, AND YEAR AFTER YEAR

6     THEY'RE WINNING BASED ON THAT TECHNOLOGY.

7          NOW, I APPRECIATE THE OPPORTUNITY, YOUR HONOR, TO

8     SUMMARIZE THE EVIDENCE IN MORE DETAIL, AND I WANT TO START WITH

9     THE FTC'S FAILURE OF PROOF OF ANTICOMPETITIVE HARM.

10          THEY HAVE THE BURDEN TO PROVE THAT THE CHALLENGED

11     RESTRAINT -- THAT'S THE CONDUCT OF QUALCOMM -- HAS A

12     SUBSTANTIAL ANTICOMPETITIVE EFFECT.

13          TO ESTABLISH A VIOLATION OF EITHER THE SHERMAN ACT OR

14     SECTION 5 OF THE FTC ACT, THEY MUST PROVE THAT QUALCOMM'S

15     PRACTICES HAD A SUBSTANTIAL ANTICOMPETITIVE EFFECT.

16          POTENTIAL HARM, CAPABILITY OF HARM, A THEORY OF HARM,

17     THOSE AREN'T ENOUGH, YOUR HONOR.  THEY HAVE TO SHOW ACTUAL

18     HARM.

19          THEY HAVEN'T DONE IT.

20          THE INDUSTRY IS THRIVING, AS YOU HEARD FROM EVERY EXPERT

21     THAT APPEARED BEFORE YOU.  THESE CHARTS WERE PRESENTED BY

22     PROFESSOR SNYDER AND NEVO.

23          CHIP PRICES ARE FALLING.  HANDSET PRICES ARE FALLING.

24     DATA SPEEDS ARE ROCKETING UP.  AND COST OF DATA HAS DROPPED TO

25     ALMOST NOTHING FOR CONSUMERS.

CLOSING ARGUMENT BY MR. VAN NEST

1    WHEN PROFESSOR SHAPIRO WAS HERE YESTERDAY, HE CALLED THIS

2    AN IMPRESSIVE PACE OF INNOVATION, AND IT'S A CRITICAL SIGN,

3    YOUR HONOR, OF A HEALTHY, COMPETITIVE MARKET.

4    AND THE MARKET IS DYNAMIC, AS THE EXPERTS ALSO AGREED,

5    INCLUDING PROFESSOR SHAPIRO.

6    MR. MOYNIHAN FROM MEDIATEK SAYS, COMPETITION WAS VERY,

7    VERY HIGH.

8    MR. MCGREGOR, WHOSE FACE I COULDN'T FIT ON THE SLIDE,

9    TESTIFIED THAT BROADCOM LEFT BECAUSE THE MARKET WAS INTENSELY

10   COMPETITIVE.

11   ALL THE EXPERTS AGREE, THIS IS FAST MOVING, HIGHLY

12   COMPETITIVE, DYNAMIC MARKET.

13   AND COMPETITION IS INCREASING, NOT DECREASING.  QUALCOMM'S

14   SHARE, ACCORDING TO PROFESSOR SHAPIRO, OF WHAT HE CALLS THE

15   PREMIUM LTE MARKET FELL IN 2015 AND 2016 AS SAMSUNG, INTEL, AND

16   MEDIATEK CAME INTO THE MARKET.

17   BY DEFINITION, IF QUALCOMM'S MARKET SHARE IS FALLING,

18   COMPETITION FROM OTHERS IS ON THE RISE, ANOTHER KEY ELEMENT OF

19   A HEALTHY MARKET.

20   NOW, BOTH DR. SNYDER AND PROFESSOR SHAPIRO TESTIFIED THAT

21   IN A MARKET LIKE THIS WHERE RESEARCH AND DEVELOPMENT IS KEY,

22   YOU'D ONLY EXPECT TO HAVE A FEW COMPETITORS, EXACTLY WHAT WE

23   HAVE TODAY.

24   NOW, COMPETITION IS ESPECIALLY STRONG IN THE PREMIUM

25   MARKET.  MR. WYATT TESTIFIED THAT 90 PERCENT OF THE PREMIUM

1     HANDSET TIER -- HANDSET TIER IS PROVIDED BY THREE OEM'S,

2     SAMSUNG, HUAWEI, AND APPLE.

3          TAKE A LOOK, YOUR HONOR, AT WHERE QUALCOMM SITS AS OF THE

4     END OF 2017, EARLY 2018.  THEIR SHARE OF PREMIUM TIER SHIPS AT

5     SAMSUNG IS DOWN TO 35 PERCENT BECAUSE SAMSUNG CAN NOW

6     SELF-SUPPLY.

7          HUAWEI IS SELF-SUPPLYING AND BUYING FROM OTHERS ENTIRELY

8     FOR PREMIUM DEVICES.

9          AND AT APPLE, AS YOUR HONOR HAS HEARD, INTEL HAS 100

10    PERCENT OF THE NEW DESIGN.

11         FOLKS ARE MOVING AWAY FROM QUALCOMM IN THE PREMIUM TIER.

12         I HEARD THE FTC CLAIM THAT PROFESSOR SNYDER DIDN'T DO

13    ANYTHING EMPIRICAL.  THAT'S CERTAINLY NOT WHAT I HEARD.

14         HE EXPLAINED THAT INDEPENDENT FACTORS EXPLAIN WHAT

15    HAPPENED IN THE MARKET, AND HE IDENTIFIED THREE:  FORESIGHT,

16    INVESTMENT, AND EXECUTION.

17         AND YOUR HONOR WILL RECALL THAT HE DID 14 CASE STUDIES,

18    THAT'S 14 MORE THAN SHAPIRO DID, AND HE LOOKED AT EVERY

19    COMPETITOR IN THE MARKET FOR THE LAST DECADE OR SO.

20         HE TESTIFIED HERE ABOUT TWO OR THREE OF THEM.  INTEL WAS

21    LATE.  THEY DIDN'T TAKE MS. EVANS'S ADVICE TO GET INTO CDMA.

22         MEDIATEK DID FINE FOLLOWING A FAST FOLLOWER STRATEGY.

23         BROADCOM LACKED FORESIGHT AND MISSED THE CDMA MARKET.

24         AND THAT'S WHAT TOOK PLACE.

25         THEY HAVE MADE NO EFFORT, NONE, TO SHOW THAT QUALCOMM'S

1    CONDUCT CAUSED THE RESULTS FOR ANY OF THE CHIP MAKER

2    COMPETITORS.  NOT ONE.

3         AND IT'S ALSO TRUE THAT THESE COMPETITORS MADE THEIR OWN

4    BUSINESS DECISIONS.  YOUR HONOR HEARD FROM A NUMBER OF THEM.

5         MR. MOYNIHAN TESTIFIED THAT MEDIATEK CHOSE TO ENTER THE

6    WCDMA MARKET, WHICH IS MUCH BIGGER, AND THEY DECIDED NOT TO

7    ENTER CDMA BECAUSE CDMA WAS PERCEIVED BY MANY TO BE A NICHE

8    MARKET WITH A LIMITED FUTURE.

9         THAT'S WHY, ALTHOUGH MS. EVANS WAS PRESSING INTEL TO GET

10   CDMA TECHNOLOGY, IT TOOK HER FOUR YEARS TO DO IT.  PEOPLE

11   DIDN'T PERCEIVE IT AS A LUCRATIVE MARKET, AND ONLY QUALCOMM

12   INVESTED, WHICH, AS THE FTC ADMITTED THIS THEIR CLOSING,

13   QUALCOMM IS THE ONE RESPONSIBLE FOR CDMA, AND THEY EARNED THEIR

14   POSITION THROUGH HARD WORK AND INVESTMENT.

15        AND PROFESSOR NEVO IS THE ONLY ONE TO HAVE PERFORMED ANY

16   EMPIRICAL TESTS ON RATES.  WHAT HE SHOWED US WAS THAT

17   QUALCOMM'S ROYALTY RATES HAVE REMAINED CONSISTENT ACROSS TIME,

18   ACROSS STANDARDS, AND ACROSS MARKETS.

19        THAT MEANS WHETHER YOU'RE IN A MARKET WHERE THEY CLAIM

20   MARKET POWER OR NOT, RATES ARE THE SAME.  THEY DON'T GO UP WHEN

21   QUALCOMM'S ALLEGED TO HAVE MARKET POWER, THEY DON'T GO DOWN

22   WHEN QUALCOMM IS ALLEGED TO HAVE NO MARKET POWER.

23        NOW, HE LOOKED AT RATES, UPFRONT PAYMENTS, PERIODS BEFORE

24   THE STANDARDS, PERIODS BEFORE CHIPS EXISTED, AND I THINK, YOUR

25   HONOR, THE MOST IMPORTANT THING HE LOOKED AT IS THIS THAT'S ON

1    THE SCREEN NOW.

2         THIS IS A BUT FOR WORLD.  NOBODY IS CONTENDING THAT

3    QUALCOMM HAS MARKET POWER.  THEY'VE GOT THE BURDEN OF PROOF.

4    IF PROFESSOR SHAPIRO THOUGHT QUALCOMM HAD MARKET POWER IN

5    WCDMA, HE HAD EVERY CHANCE TO PROVE IT.

6         THEY DON'T, AND NOT A SINGLE WITNESS HAS SAID SO.

7         AND IN THAT MARKET, WHICH IS THE BUT FOR WORLD WE OFTEN

8    LOOK FOR IN CASES LIKE THIS, QUALCOMM'S RATES ARE CONSISTENT

9    AND THE SAME, WHICH DEMONSTRATES THAT THOSE RATES ARE BASED ON

10   THE QUALITY OF QUALCOMM'S TECHNOLOGY AND THE QUALITY OF ITS

11   PATENTS AND NOT ANYTHING ELSE.

12        NOW, PROFESSOR SHAPIRO CAME IN FOR THE FIRST TIME

13   YESTERDAY AND LOBBIED SOME CRITIQUES AT PROFESSOR NEVO.  HE

14   CRITICIZED HIM FOR LOOKING AT THE 5 PERCENT CONTRACT RATE.

15        WELL, YOUR HONOR, THAT'S BEEN THEIR CASE THEORY FROM DAY

16   ONE.  THE COMPLAINT, PARAGRAPH 58, ALLEGES THAT OUR 5 PERCENT

17   RATE IS ABOVE FRAND.  THAT'S WHAT THEY'RE RELYING ON.  THAT'S

18   WHAT THEY'VE BASED THEIR CLAIM ON.

19        AND PROFESSOR SHAPIRO HASN'T SHOWN THAT LOOKING AT THE

20   CONTRACT RATE IS ANY DIFFERENT THAN LOOKING AT EFFECTIVE RATES

21   OR ANYTHING ELSE.  HE'S DONE NO EMPIRICAL WORK WHATSOEVER.

22        NOW, PROFESSOR NEVO TESTIFIED THAT SOME LICENSES WERE

23   REMOVED FROM HIS ANALYSIS BECAUSE THEY JUST DON'T FIT THE

24   CLAIM.

25        LICENSES NEGOTIATED UNDER THE EYE OF FOREIGN GOVERNMENTS

1    CAN'T POSSIBLY BE INFLUENCED BY CHIP LEVERAGE.  HE TOOK THOSE

2    OUT.

3         AND PROFESSOR SHAPIRO DOESN'T CLAIM THEY SHOULD COME BACK

4    IN.

5         AND THE ONLY OTHER LICENSES THAT HE REMOVED WERE LICENSES

6    WHERE EVERYTHING WAS PAID UPFRONT AND THERE'S VIRTUALLY NO WAY

7    TO DETERMINE AN EFFECTIVE RATE UNTIL YEARS LATER WHEN YOUR

8    SALES ARE DONE.

9         YOUR HONOR HAS AN EXHIBIT, I THINK IT'S A DEMONSTRATIVE,

10   CDX 204.  CDX 204 HAS ALL THE COMPANIES THAT ARE IN NEVO'S

11   ANALYSIS AND A LOT OF THEM ARE THERE, HUAWEI, ALL THE CONTRACT

12   MANUFACTURERS, THE BIG PLAYERS IN CHINA, THEY'RE ALL THERE.

13   THERE ARE DOZENS OF THEM.  AND THEY'RE -- AND THIS ANALYSIS

14   SHOWS, AND IT'S THE ONLY EMPIRICAL ANALYSIS IN THE CASE, THAT

15   MARKET POWER PLAYS NO ROLE IN QUALCOMM'S ROYALTY RATES.

16        NOW, WHAT DID THEY BRING YOU?

17        MICHAEL LASINSKI.  NO FINDING OF A ROYALTY OVERCHARGE

18   COULD POSSIBLY REST ON THIS TESTIMONY.

19        BY HIS OWN ADMISSION ON THE SCREEN, HE'S NOT AWARE OF

20   ANYBODY ELSE WHO APPROACHES IT THIS WAY AND NO ONE ELSE HAS

21   APPROVED IT.

22        HE TOOK TWO FLAWED INPUTS, SO-CALLED DEEMED SEPS, AND

23   APPROVED CONTRIBUTIONS, HE BLENDS THEM IN A FORMULA THAT EVEN

24   HE COULDN'T EXPLAIN TO US, AND HE CLAIMED HERE, RIGHT IN FRONT

25   OF YOUR HONOR, THAT EVEN IF BOTH INPUTS WERE WRONG AND

1    INCORRECT, THE OUTPUT WAS JUST FINE.

2         LET'S CONSIDER HIS INPUTS.

3         APPROVED CONTRIBUTIONS DON'T MEASURE VALUE OF ANYTHING, AS

4    MR. CASACCIA EXPLAINED IN GREAT DETAIL.  THE HARD WORK IN

5    STANDARD SETTING HAPPENS, YOUR HONOR, IN THE SUBSTANTIVE WORK

6    PHASE.  THE DOCUMENTS SUBMITTED THERE ARE ACTUAL INVENTIONS.

7    THAT'S WHERE THE VALUE IS.

8         ONCE THE SPECIFICATION IS STABLE, THOSE DOCUMENTS ARE PUT

9    AWAY, IN MR. CASACCIA'S WORDS.  THEY'RE GONE.  AND WE'RE

10   LOOKING AT APPROVED T DOCS WHICH CAN BE ANYTHING FROM CHANGING

11   A HYPHEN OR A PERIOD TO CHANGING AN EDITORIAL COMMENT TO MAKING

12   A MINOR REVISION.  THAT'S WHAT IS BEING, QUOTE, "COUNTED" IN

13   APPROVED DOCS.  NOBODY BELIEVES THAT CREATES VALUE AND IT

14   IGNORES THE KEY DOCUMENTS THAT CREATED THE INVENTIONS IN THE

15   FIRST PLACE.

16        WHAT'S HIS OTHER INPUT?  PATENT COUNTING.

17        WELL, EVEN MR. DONALDSON ADMITTED THAT NOT ALL PATENTS ARE

18   CREATED EQUAL, AND A SINGLE PATENT CAN DOMINATE AN INDUSTRY,

19   AND THAT'S WHAT MR. LASINSKI AGREED TO AS WELL.

20        AND MR. LASINSKI GAVE ABSOLUTELY NO WEIGHT, NONE, ZERO, TO

21   QUALCOMM'S PORTFOLIO OF NON-STANDARD ESSENTIAL PATENTS, WHICH

22   IS VERY, VERY SIGNIFICANT.

23        AND HIS TOP-DOWN APPROACH IS SIMPLY, "I PICKED OUT A

24   STATEMENT MADE BY INDUSTRY REPRESENTATIVES WITH AN ARBITRARY

25   CAP, AN ARBITRARY CAP ON ALL ROYALTIES, AND I WENT FROM THERE."

CLOSING ARGUMENT BY MR. VAN NEST

1            WELL, THAT'S BEEN REJECTED BY COURTS.  IT'S BEEN REJECTED

2    BY ETSI.  THERE'S NO EMPIRICAL BASIS FOR IT.

3            BUT THAT'S THE WAY HE ARRIVES AT WHAT HE SAYS IS A

4    SUPRA-FRAND ROYALTY.  IT'S ABSOLUTE NONSENSE.

5            AND THEIR ONLY ANSWER TO THIS THAT I HEARD WAS AVANCI.

6    AVANCI.

7            WELL, YOU KNOW FROM THE TESTIMONY OF MR. GONELL THAT

8    AVANCI IS AN EXPERIMENTAL PROGRAM THAT DOESN'T AFFECT HANDSETS,

9    THAT COVERS SMART METERS AND AUTOMOTIVE USE, AND THAT QUALCOMM

10   HAS NOT ADOPTED IT IN ANY OTHER AREA OF ITS BUSINESS.

11           NOW, LET'S LOOK AT PROFESSOR SHAPIRO.

12           IT'S NOT JUST, YOUR HONOR, THAT HE HASN'T QUANTIFIED

13   THINGS.  IT'S THAT HE IGNORES COMPLETELY WHAT'S OUT THERE IN

14   THE MARKET STARING HIM IN THE FACE.

15           HE'S NOW CONCEDED, AND THEY'VE CONCEDED, THAT HIS

16   SO-CALLED TAX APPLIES WHETHER THE FRAND IS REASONABLE, THE

17   ROYALTY IS REASONABLE OR NOT.

18           WELL, IF THAT'S TRUE, YOU'D HAVE TO MAKE SOME EFFORT TO

19   MEASURE THE THING TO KNOW WHERE THE IMPACT IS COMING FROM

20   BECAUSE IF THE IMPACT IS COMING FROM A LEGITIMATE FRAND

21   ROYALTY, ACCORDING TO SHAPIRO AND WHAT I HEARD MS. MILICI SAY,

22   YOU HAVE THE SAME IMPACT ON CHIP MAKERS.

23           WHAT HAPPENED HERE?

24           HE HASN'T QUANTIFIED THE EFFECTS OF QUALCOMM'S PRACTICES

25   ON ANY OTHER CHIP MAKER.

1        AND REMEMBER, YOUR HONOR, IT'S NOT HIGH PRICES THEY'RE

2   COMPLAINING ABOUT.  THEIR THEORY OF HARM IS THAT THE CHIP

3   MAKERS WERE HARMED THROUGH THE TAX THEORY.

4        SO IF YOU HAVEN'T QUANTIFIED THE EFFECTS OF QUALCOMM'S

5   BUSINESS PRACTICES ON THE CHIP MAKERS, YOU HAVEN'T EVEN STARTED

6   THE EVALUATION.

7        HE DID NOTHING TO ANALYZE WHETHER RIVALS' R&D SPENDING AND

8   RESEARCH WERE UP, DOWN, OR SIDEWAYS.  AND MY POINT IS THIS IS

9   NOTHING MORE THAN A THEORY.

10       FURTHERMORE, HE JUST ASSUMES THERE'S AN OVERCHARGE WITHOUT

11  HAVING MADE ANY EFFORT TO QUANTIFY IT.

12       WELL, IF THE -- IF THE FRAND ROYALTY IS A TAX, TOO, THEN

13  YOU'VE GOT TO FIGURE OUT WHAT AMOUNT OF THAT, WHAT AMOUNT OF

14  THE ROYALTY IS ACTUALLY AN OVERCHARGE?

15       HE MADE NO EFFORT TO DO THAT OR TO QUANTIFY THE EFFECTS OF

16  CONDUCT ON HANDSET PRICES.

17       YOU CANNOT ESTABLISH ACTUAL HARM UNDER THE LAW WITH A

18  THEORY OF HARM THAT IGNORES WHAT HAPPENED IN THE MARKET.

19       THE ONLY PERSON TO DO THE KIND OF EMPIRICAL WORK THAT IS

20  NECESSARY ON MARKET PARTICIPANTS WAS PROFESSOR SNYDER.  HE USED

21  INDUSTRIAL ORGANIZATION TECHNIQUES, HE DISCERNED THAT

22  INVESTMENT, EXECUTION AND FORESIGHT ARE THE FACTORS IMPORTANT

23  TO THIS INDUSTRY, AND HE LOOKED AT THAT AND APPLIED IT ACROSS

24  ALL OF THE COMPETITORS AND TESTIFIED THAT IN EVERY CASE,

25  INDEPENDENT FACTORS THAT HAVE NOTHING TO DO WITH QUALCOMM,

1    EXPLAINED OUTCOMES.

2        AND NO ONE ON THE FTC SIDE HAS EVEN LOOKED AT THIS ISSUE

3    WHERE THEIR MAIN CLAIM IS HARM TO CHIP MAKERS.

4        NOW, LET'S PUT ASIDE THAT PROFESSOR SHAPIRO DIDN'T

5    ACTUALLY DO THE WORK.

6        EVEN HIS THEORY WAS UNABLE TO PREDICT WHAT'S HAPPENED IN

7    THE MARKET.  HE PREDICTED THAT THROUGH THE EXERCISE OF MONOPOLY

8    POWER, QUALCOMM'S MARKET SHARE WOULD RISE AND INTEL'S WOULD

9    FALL.

10       WELL, WE KNOW THAT THE OPPOSITE HAS OCCURRED.  QUALCOMM'S

11   MARKET SHARE IS FALLING AND INTEL'S IS RISING.

12       HE ALSO PREDICTED THAT PRICES WOULD RISE AND OUTPUT WOULD

13   FALL.

14       AGAIN, THE OPPOSITE'S HAPPENED.  PRICES HAVE FALLEN AND

15   OUTPUT HAS SOARED.

16       HE HASN'T BEEN ABLE TO PREDICT WHAT HAPPENED.  HIS THEORY

17   IS SIMPLY DIVORCED FROM WHAT'S GOING ON IN THE REAL WORLD.

18       ANOTHER KEY FLAW IS THAT HE ASSUMES SOME SORT OF A

19   NEGOTIATION BETWEEN QUALCOMM, CHIP MAKERS, AND OEM'S THAT NEVER

20   TAKES PLACE.  LICENSE AGREEMENTS ARE NEGOTIATED FOR A PERIOD OF

21   YEARS AND CHIP PRICES, THEY'RE NEGOTIATED OVER A PERIOD OF

22   MONTHS.

23       THE ROYALTY THAT QUALCOMM SEEKS FOR ITS I.P. IS CHIP

24   AGNOSTIC.  EVERYBODY PAYS THE SAME AMOUNT.  IT'S TRANSPARENT.

25       AND THEN THE OEM'S HAVE A CHOICE.  THEY CAN BUY A QUALCOMM

1    CHIP OR A COMPETITOR CHIP.  AND AS MR. MADDEROM FROM MOTOROLA

2    SAYS, WE DON'T LOOK AT THE ROYALTY.  WE LOOK AT THE CHIP PRICE,

3    THE AVAILABILITY, AND THE PERFORMANCE, WHICH IS WHAT YOU'D

4    EXPECT.

5         AND PROFESSOR NEVO STUDIED WHAT'S GOING ON IN THIS MARKET

6    AND HOW IT PLAYS OUT, AND, AGAIN, SINCE THE ROYALTY IS CHIP

7    AGNOSTIC, IT DOESN'T AFFECT PURCHASE DECISIONS ON CHIPS.

8         SIMILARLY, THEY MAKE A BIG DEAL OUT OF THE FACT THAT CHIP

9    MAKERS DON'T HAVE EXHAUSTIVE LICENSES FROM QUALCOMM.

10        THAT HASN'T MADE ANY DIFFERENCE AT ALL.  SAMSUNG, HUAWEI,

11   SPREADTRUM, MEDIATEK, THEY'RE ALL DOING WELL.  THEY'RE THRIVING

12   WITHOUT ANY LICENSE AT ALL FROM QUALCOMM.

13        AND HERE WAS TESTIMONY FROM MR. MOYNIHAN.  THEY DID IT ONE

14   TIME, MEDIATEK HAD A NON-EXHAUSTIVE, NON-ASSERTION AGREEMENT.

15   THEY CAME TO QUALCOMM, THEY SAID, WE'RE WORRIED YOU MAY SUE US,

16   SO QUALCOMM ENTERED INTO A NON-EXHAUSTIVE AGREEMENT.  WHAT

17   MOYNIHAN SAID WAS IT DIDN'T MAKE ANY DIFFERENCE.  ONCE IT

18   EXPIRED, OUR BUSINESS DIDN'T CHANGE.  WE DIDN'T DO BETTER WITH

19   IT THAN WE DID WITHOUT IT.

20        AND, AGAIN, THEY HAVEN'T SHOWN ANY EVIDENCE THAT THIS

21   MATTERS TO ANYONE.

22        DRAGONFLY, VERY BRIEFLY, YOUR HONOR, MR. ABERLE TESTIFIED

23   ABOUT THIS.  AT THE TRANSCRIPT AT PAGES 302 AND 303, HE WAS

24   TOLD BY DRAGONFLY THAT THEY COULDN'T AGREE AMONGST THEMSELVES

25   ON HOW TO SET UP THE GROUP OR WHAT TERMS WERE GOING TO BE.

1    THEY ABANDON THE NEGOTIATION WITH QUALCOMM, NOT THE OTHER WAY

2    AROUND.

3         THE TESTIMONY THAT MS. MILICI CITED FROM MR. HONG WAS THAT

4    HE WASN'T SURE WHAT THE REASONS WERE, AND HE WASN'T INVOLVED

5    DIRECTLY.

6         MR. ABERLE TESTIFIED THAT HE SPOKE TO THE DRAGONFLY PEOPLE

7    AND THAT WAS IT.

8         NOW, EVIDENCE AT TRIAL WAS OVERWHELMING THAT RIVAL CHIP

9    MAKERS EXPERIENCED A WIDE RANGE OF RESULTS BASED ON FACTORS

10   THAT HAVE NOTHING TO DO WITH QUALCOMM'S LICENSING PRACTICES.

11        HERE'S MR. ZANDER, WHICH YOU SAW ON VIDEO LAST WEEK.  WHAT

12   HAPPENED AT ST-ERICSSON?  LACK OF PROCESS, ORGANIZATIONAL

13   STRUCTURE, MANAGEMENT TEAM, DECISION MAKING.

14        HE'S TALKING ABOUT HIS OWN COMPANY HERE.

15        THEY FAILED ON EXECUTION.

16        THAT HAS NOTHING TO DO WITH ANYTHING THAT QUALCOMM DID.

17        INTEL'S TO THE SAME EFFECT.  INTEL AND BAIN TOGETHER PUT

18   THIS SLIDE DECK TOGETHER THAT YOUR HONOR SAW FRIDAY WITH

19   MR. JOHNSON, AND THEY CONCLUDED THAT ALTHOUGH INTEL WAS

20   SPENDING JUST AS MUCH MONEY AS QUALCOMM, THEIR OUTPUT WAS

21   LOUSY, LESS THAN A THIRD OF WHAT QUALCOMM GENERATED.  AND THAT

22   THEY WERE BEHIND NOT BECAUSE OF ANYTHING QUALCOMM DID, BUT

23   BECAUSE THEY MADE A DECISION TO SUPPORT MULTIPLE ARCHITECTURES.

24        THAT'S WHAT'S HAPPENING IN THE REAL WORLD.  THERE IS

25   SIMPLY NO EVIDENCE FROM ANY MARKET PARTICIPANT OF ANY HARM TO

1    COMPETITION.

2            NOW, LET'S TALK ABOUT THREATS.

3            THE FTC PRESENTED A HANDFUL OF WITNESSES AND E-MAILS TO

4    SUPPORT THEIR CLAIM THAT QUALCOMM THREATENED CHIP SUPPLY TO

5    COERCE HIGH ROYALTIES.

6            EVERY ONE OF THESE LICENSEES, HUAWEI, SONY, LENOVO,

7    SAMSUNG, THEY'RE ALL BIG, SOPHISTICATED COMPANIES WITH THEIR

8    OWN LEVERAGE.  EVERYONE WAS A BIG CUSTOMER OF QUALCOMM.

9            ALL THE WITNESSES YOU SAW, YOUR HONOR, WERE LAWYERS.  NOT

10   EVERY ONE, BUT MOST OF THEM.  GRUBBS, YU, BLUMBERG, THEY WERE

11   LAWYERS, AND THEIR TESTIMONY WAS, OH, YEAH, WE FELT THREATENED

12   AND WE HAD TO DO WHAT WE DID.

13           I WILL SAY THAT THIS TESTIMONY WAS PRESENTED TO THIS COURT

14   IN A VERY MISLEADING FASHION.  THE FTC INSISTED THAT WE SAVE

15   OUR RESPONSES FOR OUR OWN CASE.

16           SO, FOR EXAMPLE, MR. GRUBBS TESTIFIED FOR 25 MINUTES ON

17   VIDEO.  "I FELT LIKE I HAD TO DO IT, I WAS DESPERATE FOR CHIPS,

18   I WAS WORRIED THAT IF I COMPLAINED, MY CHIP SUPPLY WOULD BE CUT

19   OFF."

20           AND THEN, YOUR HONOR, THERE WAS THIS A WEEK LATER WHEN WE

21   GOT TO OUR CASE.

22           **(THE VIDEOTAPED OF JOHN GRUBBS WAS PLAYED IN OPEN COURT**

23   **OFF THE RECORD.)**

24           MR. VAN NEST:  YOUR HONOR, TO THE SAME EFFECT WAS

25    MR. BLUMBERG FROM LENOVO.  THE MR. BLUMBERG CAME IN AND SAID HE

CLOSING ARGUMENT BY MR. VAN NEST

```
 1        WAS THREATENED BY MR. REIFSCHNEIDER, THAT HE WAS FEARFUL FOR
 2        HIS CHIP SUPPLY.
 3             HE COULDN'T IDENTIFY WHERE THE CHIPS CAME FROM, WHAT CHIPS
 4        HE NEEDED OR WHAT CHIPS THEY WERE BUYING.
 5             HE'S ALSO A LAWYER.  WE LISTENED TO HIM FOR AN HOUR.
 6             AND THEN DURING OUR CASE, WE PLAYED THE TESTIMONY FROM
 7        MR. MADDEROM WHO WAS ACTUALLY IN THE MEETING WHERE HIS BOSS
 8        COMPLAINED TO QUALCOMM ABOUT CHIP SUPPLY, AND HERE'S WHAT HE
 9        SAID.
10             **(THE VIDEOTAPED DEPOSITION OF TODD MADDEROM WAS PLAYED IN**
11        **OPEN COURT OFF THE RECORD.)**
12             MR. VAN NEST:  YOUR HONOR, WITNESS AFTER WITNESS
13        PRESENTED BY THE FTC CONCEDED WHAT'S ON THIS NEXT SLIDE:  THAT
14        QUALCOMM NEVER STOPPED SUPPLYING CHIPS DURING A LICENSING
15        NEGOTIATION WHEN THERE WERE COMMERCIAL QUANTITIES; THAT IN MANY
16        CASES, PEOPLE WHO FTC CLAIMED WERE THREATENED SAID NO.  MR. LEE
17        IS TALKING ABOUT A NEGOTIATION HE HAD.  MS. YANG FROM PEGATRON
18        IS TALKING ABOUT NEGOTIATIONS SHE HAD.
19             THEIR BIG EMPHASIS WAS ON SONY.
20             WELL, YOUR HONOR HAS HEARD THE SONY STORY, AND I'LL POINT
21        OUT THAT THERE WAS A PRODUCT HOLD.  BUT MR. MOLLENKOPF
22        TESTIFIED THAT WITHIN HOURS OF THAT, HE REVERSED IT AND HE
23        COMMUNICATED IMMEDIATELY TO SONY THAT THIS IS NOT GOING TO
24        HAPPEN, I'M SORRY THAT IT HAPPENED, MY TEAM IS REVERSING IT.
25             AND YOU HEARD NO TESTIMONY FROM ANYONE WHATSOEVER FROM
```

1    ANYONE FROM SONY, NOT ON VIDEO, NOT IN COURT.  NO ONE FROM SONY

2    CAME TO BACK THIS UP.  THIS IS ALL SOMETHING THAT THE FTC HAS

3    PUT TOGETHER WITH SNIPPETS FROM THIS E-MAIL AND THAT.

4        BUT THE TESTIMONY IS CRYSTAL CLEAR AND THE DOCUMENTS AND

5    THE E-MAILS BACK IT UP 100 PERCENT.

6        ANOTHER POINT IS THAT WHENEVER A LICENSEE ASKED FOR

7    ASSURANCE, THEY GOT IT.  MR. MADDEROM TESTIFIED THAT THEY ASKED

8    AND GOT ON ASSURANCE.

9        MR. WILLIAMS SAID THEY HAD A CONTRACT ASSURANCE.

10       MR. LEE FROM SAMSUNG SAID THEY ASKED FOR IT AND IT WAS

11   GIVEN.

12       TIME AND TIME AGAIN, THE FOLKS IN THESE LICENSE

13   NEGOTIATIONS CONFIRM WHAT I'VE BEEN SAYING, THAT CHIP SUPPLIES

14   FOR COMMERCIAL PRODUCTS WERE NEVER CUT OFF AND THESE THREATS

15   ARE HIGHLY EXAGGERATED WHEN YOU'RE TALKING ABOUT LAWYERS.

16       NOW, THIS NEXT SLIDE SHOWS THAT THERE'S ABSOLUTELY NO

17   EVIDENCE THAT THE OUTCOMES OF ANY OF THESE WOULD HAVE BEEN

18   DIFFERENT.  THEY PRESENTED NO EVIDENCE TO SHOW THAT ANY OF

19   THESE OUTCOMES WOULD HAVE BEEN DIFFERENT IN THE REAL WORLD.

20       AND TAKE A LOOK, YOUR HONOR.  WE'VE GOT THE TRIAL CITES

21   AND THE EXHIBIT CITES.  WHAT ACTUALLY HAPPENED IN THESE IS NOW

22   IN THE RECORD.

23       SO SONY, FOR EXAMPLE, NEGOTIATED FOR TEN MORE MONTHS AFTER

24   THE EVIDENCE YOU SAW.  THERE WAS NO DISRUPTION, THEY AGREED ON

25   RATES AND A THREE YEAR TERM.

1          AND EVEN THOUGH THE AGREEMENT EXPIRED IN THE INTERIM,

2     SUPPLY CONTINUED.

3          HUAWEI'S TO THE SAME EFFECT.  THEY NEGOTIATED ON AN LTE

4     LICENSE FOR TWO YEARS AND WON AN ARBITRATION CLAUSE FOR A NEW

5     AGREEMENT IF THE PARTIES DIDN'T RENEW.  BY THEN THEY WERE

6     PRODUCING THEIR OWN CHIPS ANYWAY.

7          SAMSUNG NEGOTIATED FOR TWO YEARS AND GOT A LOWER ROYALTY

8     RATE.

9          LENOVO TO THE SAME EFFECT.

10          MOST OF THESE EXAMPLES THEY PRESENTED ARE OLD.  I NOTICED

11    ONE IN THE CLOSING OF THE FTC FROM 2001, A SAMSUNG EXAMPLE.

12    2001.  NOBODY IS CLAIMING THAT QUALCOMM HAD ANY MARKET POWER

13    THEN, AND THAT NEGOTIATION HAPPENED BECAUSE SAMSUNG STOPPED

14    PAYING ROYALTIES AT ALL AND THEY REALIZED THEY WERE WRONG AND

15    PAID UP.

16          NOW, I WANT TO MAKE A KEY POINT HERE, YOUR HONOR, WHICH IS

17    HIGH ROYALTIES ALONE IS NOT THE BASIS FOR THEIR CLAIM OF HARM

18    BECAUSE HIGH ROYALTIES ALONE ARE NOT ANTICOMPETITIVE EFFECT OR

19    ANTITRUST INJURY.

20          THEY HAVE TO SHOW HARM TO COMPETITION, AND WHAT THEY'VE

21    CHOSEN TO TRY TO PROVE IS HARM TO THE RIVAL CHIP MAKERS.

22          THAT'S WHY THEY'RE PRESENTING THIS TAX THEORY FROM

23    SHAPIRO.

24          SO EVEN IF YOUR HONOR WERE TO FIND THAT LASINSKI IS

25    CREDIBLE, WHICH I DON'T THINK YOU COULD, AND EVEN IF YOU WERE

1    TO FIND THAT THESE NEGOTIATIONS RESULTED IN HIGHER ROYALTIES,

2    THAT'S NOT THE ANTICOMPETITIVE EFFECT THEY'RE TRYING TO PROVE.

3         THEY'RE TRYING TO PROVE THIS TAX THEORY, AND THAT'S WHY

4    THIS IS IMPORTANT, WHAT WE TALKED ABOUT WITH PROFESSOR SHAPIRO.

5         THEY'RE SAYING THAT THERE WAS A SUPRA-FRAND TAX THAT HE

6    PREDICTS WOULD RAISE RIVALS' COST -- THOSE ARE CHIP MAKERS --

7    HE PREDICTS WOULD REDUCE RIVALS' INCOME, HE PREDICTS WOULD

8    REDUCE RIVALS' SPENDING IN R&D, HE PREDICTS WOULD CAUSE HARM.

9         THE PROBLEM FOR HIM IS THAT THE TIME FOR THEORIES AND

10   PREDICTIONS IS PRETRIAL, NOT TRIAL.  YOU HAVE TO PROVE IT.  YOU

11   HAVE TO HAVE EVIDENCE.

12        HE ADMITTED NOT LOOKING AT ANY ONE OF THESE FACTORS, YOUR

13   HONOR, FOR ANY PARTICIPANT IN THIS MARKET.

14        I DIDN'T LOOK AT ANYONE'S ACTUAL COST AND ANYONE'S ACTUAL

15   INCOME.

16        AND YOUR HONOR KNOWS WHAT HAPPENED WITH RIVALS' R&D.

17   INTEL HAD PLENTY OF MONEY, BUT THE RESEARCH EFFORTS WERE

18   FUTILE.

19        ST-ERICSSON HAD MORE THAN ENOUGH MONEY, BUT THEIR RESEARCH

20   EFFORTS WERE BUNGLED.

21        BROADCOM HAD PLENTY OF MONEY, BUT THEY CHOSE TO LEAVE AN

22   INTENSELY COMPETITIVE MARKET.

23        MY POINT ON PROFESSOR SHAPIRO IS YOU DON'T GET PAST THE

24   BURDEN BY JUST TELLING ME WHAT YOUR THEORY IS, AND HE

25   REPEATEDLY TREATED US LIKE IDIOTS BECAUSE WE COULDN'T

CLOSING ARGUMENT BY MR. VAN NEST

1    UNDERSTAND THAT.

2         NOW, I HEARD SOMETHING ABOUT STRAT FUNDS, WHICH MS. MILICI

3    REFERRED TO AS A CHIP DISCOUNT.

4         THEIR THEORY OF HARM FROM STRAT FUNDS IS BAFFLING.  THESE

5    ARE MONIES, EVEN THEIR UNDER THEORY, PAID FROM QUALCOMM BACK TO

6    LICENSEES.

7         IF QUALCOMM HAS THE MARKET POWER TO DEMAND A SUPRA-FRAND

8    ROYALTY, WHY IN THE WORLD WOULD THEY SPEND MILLIONS OF DOLLARS

9    ON STRAT FUNDS?

10        NOW, MR. ABERLE EXPLAINED THESE AT PAGE 297 OF THE

11   TRANSCRIPT, YOUR HONOR.  I'M SORRY, I DON'T HAVE A SLIDE ON IT.

12        BUT WHAT HE SAID WAS WE CONTRIBUTE TO A STRAT FUND AND THE

13   LICENSEE CONTRIBUTES, AND WE DO DEVELOPMENT WORK TOGETHER TO

14   PROMOTE OUR TECHNOLOGY AND THEIR PRODUCTS.

15        NOW, THEIR THEORY IS THAT THESE STRAT FUNDS ARE ONLY USED

16   WITH RECALCITRANT LICENSEES WHO WEREN'T DEPENDENT ON QUALCOMM.

17        THAT'S BALONEY.  PROFESSOR NEVO LOOKED AT THOSE STRAT

18   FUNDS THAT WERE NEGOTIATED, ALONG WITH LICENSING AGREEMENTS,

19   AND THEY'RE ALL GIVEN TO PEOPLE WHO ARE BUYING MOST OR ALL OF

20   THEIR CHIPS FROM QUALCOMM.

21        SUGGESTING THAT THESE PEOPLE ARE USING THEIR OWN LEVERAGE

22   TO SAY, HEY, I'M A HUGE CUSTOMER, YOU BETTER TAKE CARE OF ME

23   AND HELP ME OR I'M NOT GOING TO BUY YOUR CHIPS ANYMORE.

24        PROFESSOR NEVO DISCUSSED THIS TEST AT TRANSCRIPT PAGE

25   1907.

1          LET'S TALK ABOUT APPLE BRIEFLY.

2          THIS IS A SEPARATE, INDEPENDENT CLAIM, YOUR HONOR, ASIDE

3     FROM THE WHOLE TAX THEORY.  THEY'RE CLAIMING THIS CAUSED HARM

4     BY EXCLUDING PEOPLE.

5          BUT LET'S BE CLEAR.  PROFESSOR SHAPIRO IS ONLY TALKING

6     ABOUT INTEL, AND HE'S ONLY TALKING ABOUT A ONE YEAR DELAY, AND

7     HE'S ONLY TALKING ABOUT THIS ONE CONTRACT, AND HE'S NOT TALKING

8     ABOUT ANYTHING ELSE.

9          AND WE NOW KNOW, JUST LIKE MR. MOLLENKOPF SAID, THIS WHOLE

10    TRANSACTION WAS INITIATED BY APPLE.

11         MR. WILLIAMS SAID THE OTHER PIECE IS WE WERE GOING TO MOVE

12    OUR BUSINESS FROM INFINEON TO QUALCOMM BECAUSE WE NEEDED

13    QUALCOMM TECHNOLOGY.  WE ASKED FOR TRANSITION FUNDS.

14         THIS IS COMING FROM APPLE.  THEY WERE DEMANDING BIG

15    UPFRONT PAYMENTS IN EXCHANGE FOR MOVING THE BUSINESS, AND THEY

16    GOT THAT.

17         BUT ALONG WITH IT, THEY HAD TO MAKE A COMMITMENT THAT IF

18    THEY DIDN'T BUY CHIPS, THEY WOULDN'T GET THE MONEY.

19         AND THAT'S WHAT MR. WILLIAMS CALLED IT.  THIS IS

20    ABSOLUTELY CONSISTENT WITH WHAT MR. MOLLENKOPF SAID.  THE

21    TRANSITION AGREEMENT ALLOWED QUALCOMM TO PROTECT ITSELF FROM

22    MAKING THESE LARGE INCENTIVE PAYMENTS IF APPLE DIDN'T BUY

23    CHIPS.

24         THAT'S RIGHT.

25         THE FUNDS WERE A PRICE VOLUME REBATE THAT'S A STANDARD

1    PRACTICE.

2         REMEMBER, YOUR HONOR, WE'RE CALLING THIS AN EXCLUSIVE

3    DEAL.  BUT IN REALITY, THERE WAS NO MINIMUM GUARANTEED PURCHASE

4    FROM QUALCOMM.  THEY DIDN'T HAVE TO BUY A SINGLE CHIP.  AND

5    THEY HAD THE RIGHT TO SELECT A SECOND SOURCE, AND THEY DID,

6    INTEL IN 2016.

7         NOW, THE IDEA THAT THIS WAS SOMEHOW EXCLUSIONARY,

8    MR. MOLLENKOPF TESTIFIED, AND IT'S PRETTY OBVIOUS FROM

9    MR. WILLIAMS, IT'S A WINNER TAKE ALL DEAL, AND IF IT'S A WINNER

10   TAKE ALL DEAL, THERE'S GOING TO BE ONE WINNER AND ONE LOSER,

11   AND QUALCOMM WANTED TO BE THE WINNER.  THAT'S WHY THEY BID ON

12   IT, AND THAT'S WHY MR. MOLLENKOPF TOOK THIS NEXT SLIDE TO THE

13   BOARD.

14        THIS ONE IS UNDER SEAL, YOUR HONOR.  IT'S JX 86.

15        TAKE A LOOK.  THIS IS WHAT HE WAS PREDICTING UNDER THIS

16   DEAL.  ON THE TOP, THAT'S MAVERICK DEAL.  ON THE BOTTOM, THAT'S

17   NO DEAL.  THERE'S A HUGE DIFFERENCE IN UNITS AND A HUGE

18   DIFFERENCE IN DOLLARS.  BUT IT'S ALL PROFITABLE.  THIS WAS NOT

19   A LOSS LEADER.  THIS WAS NOT SOME SORT OF A SUNKEN FUND.  THIS

20   WAS NOT ANYTHING LIKE WHAT THE FTC OR PROFESSOR SHAPIRO CLAIMS.

21        THIS WAS A STRAIGHT-UP PROFIT DEAL WITH A LOT OF OPPORTUNITY

22   FOR QUALCOMM, AND THEY MADE PROFIT, AND LOTS OF IT ACCORDING TO

23   MR. MOLLENKOPF.

24        NOW, THERE'S ANOTHER REASON WHY THIS IS ALL MUCH ADO ABOUT

25   NOTHING, AND THAT IS EVEN THE ONE YEAR PERIOD THAT SHAPIRO

1    CLAIMS WAS A PERIOD OF DELAY IS NOT SUPPORTED BY THE EVIDENCE

2    BECAUSE INTEL WASN'T READY TO PROVIDE A PRODUCT UNTIL 2016, AS

3    THIS SLIDE SHOWS.

4        HERE'S MR. SAUER, WHOM WE CALLED FROM APPLE.  HE WAS

5    RUNNING THE PROJECT FROM THE APPLE SIDE.  INTEL WAS STRUGGLING

6    TO MATCH QUALCOMM IN 2015.  THEY WEREN'T ABLE TO DO IT.  THEY

7    DIDN'T HAVE WHAT APPLE WANTED ON THE SCHEDULE APPLE WANTED,

8    WHICH IS WHY APPLE STAYED WITH QUALCOMM.

9        SO THERE IS NOTHING WHATSOEVER EXCLUSIONARY ABOUT THESE

10   SERIES OF TRANSACTIONS BECAUSE THERE WAS NOBODY ELSE TO DO IT.

11       AND GUESS WHAT?  INTEL GOT THE BUSINESS IN 2016, BUT

12   THAT'S ALL THEY EVER WANTED.  AS MS. EVANS SAYS, THEY DON'T

13   HAVE A PROGRAM TO BE IN HANDSETS MORE BROADLY.  YOU'VE GOT TO

14   BE MAKING SYSTEM ON A CHIP TO BE A REAL COMPETITOR, AS

15   MS. CHIPTY'S CHART ON THE RIGHT SHOWS.

16       THEY'RE NOT THERE.  THEY'RE NOT EVEN INTERESTED IN IT.

17       SO THE ONE YEAR DELAY WAS NO DELAY AT ALL.  THEY GOT THE

18   BUSINESS THEY WANTED.  THEY NOW HAVE THE BUSINESS THEY WANT.

19       AND THE FTC HAS MADE NO EFFORT TO SHOW WHAT PORTION OF ANY

20   MARKET WAS FORECLOSED BY THIS SINGLE TRANSACTION.

21       SO THERE'S BEEN ABSOLUTELY NO SHOWING UNDER THE TAX

22   THEORY, UNDER THIS THEORY, OR ANY OTHER THEORY, THAT THERE'S

23   BEEN ANY HARM TO COMPETITION.

24       AND, YOUR HONOR, UNDER THE LAW, THAT'S WHERE THE ANALYSIS

25   STOPS.  YOU DON'T EVEN GET TO PROCOMPETITIVE REASONS OR ANY OF

1    THE REST OF IT.  THEY'VE GOT TO SHOW BURDEN -- THEY'VE GOT TO

2    SHOW HARM TO COMPETITION.

3         BUT LET ME TALK ABOUT QUALCOMM'S LICENSING PRACTICES

4    BECAUSE THAT'S THEIR OTHER BEEF.

5         YOUR HONOR, LICENSING AT THE HANDSET LEVEL IS INDUSTRY

6    STANDARD AND ALWAYS HAS BEEN.  THIS IS IMPORTANT TO THE DUTY TO

7    DEAL THAT WE TALKED ABOUT PRETRIAL.

8         EVERY ONE OF THESE WITNESSES -- AND I GOT SIX ON THE

9    CHART -- INCLUDING MR. DONALDSON FROM THE FTC, MR. MOYNIHAN

10   FROM MEDIATEK, MR. WEILER FROM ETSI, PETERSSON, MCELVAINE, AND

11   RAHNASTO FROM NOKIA, INTERDIGITAL, ERICSSON, THEY ALL SAID THE

12   SAME THING.  WE LICENSE AT THE HANDSET LEVEL BECAUSE IT'S MORE

13   EFFICIENT, YOU HAVE A SINGLE TRANSACTION, EVERYBODY IS

14   PROTECTED, AND THE VALUE OF OUR PATENTS IS PRACTICED AT THE

15   HANDSET.

16        NOW, THERE'S A COROLLARY TO THAT.  IT'S THE OTHER SIDE OF

17   THE SAME COIN.  IF YOU LICENSE AT THE HANDSET LEVEL, YOU DON'T

18   LICENSE AT THE COMPONENT LEVEL, AND THE WITNESSES ALL SAID

19   THAT, TOO.

20        MR. MOYNIHAN SAID, IPR HOLDERS GO OUT OF THEIR WAY TO MAKE

21   IT CLEAR THEY'RE NOT LICENSING THE CHIPSET COMPANY.

22        INTERDIGITAL DOES NOT ENTER INTO STANDALONE PATENT LICENSE

23   AGREEMENTS.

24        PETERSSON, ST-ERICSSON COULD RELY ON THE INDUSTRY PRACTICE

25   AND WAS NEVER APPROACHED BY THE PATENT HOLDERS.

CLOSING ARGUMENT BY MR. VAN NEST

1       THE COROLLARY IS THAT CHIPSET LEVEL LICENSING IS NOT

2  CUSTOMARY.

3       AND BY THE WAY, THE FTC DIDN'T INTRODUCE A SINGLE CHIP

4  LEVEL LICENSE IN THIS CASE TO BACK UP ITS CLAIM THAT QUALCOMM

5  IS SOMEHOW OUT OF THE MAIN STREAM.  THEY'RE NOT.

6       THESE WITNESSES ALL EXPLAINED WHY HANDSET LEVEL LICENSING

7  IS IMPORTANT AND WHY QUALCOMM'S PRACTICES ARE IN LINE.  THEY

8  ALL EXPLAIN THAT WHY WOULD YOU WANT TO HAVE TEN NEGOTIATIONS

9  WITH EACH OF THE COMPONENT SUPPLIERS IF YOU CAN HAVE ONE WITH

10  THE DEVICE LEVEL OEM AND COVER EVERYBODY?  THAT'S WHAT EVERYONE

11  HAS DONE.  THAT'S BEEN INDUSTRY PRACTICE FOR YEARS.  WE'RE NOT

12  AN OUTLIER IN ANY RESPECT.

13       AND YOU HEARD FROM ETSI, YOUR HONOR.  MR. WEILER CAME IN

14  AND TESTIFIED THAT ETSI CONSIDERS HANDSET LEVEL LICENSING

15  CONSISTENT WITH INDUSTRY PRACTICE AND FULLY IN LINE WITH THE

16  POLICY OBJECTIVES.

17       NOW, MR. ROGERS, AND MR. GONELL, AND MR. WEILER TESTIFIED

18  THAT ETSI POLICY IS THE POLICY THAT PEOPLE IN 3GPP, WHICH IS

19  THE CELLULAR STANDARDS ORGANIZATION, LOOK TO FOR IPR POLICY.

20       NO ONE MAKING A FRAND COMMITMENT IN THE PAST, YOUR HONOR,

21  HAS CONSIDERED IT THEIR OBLIGATION TO LICENSE A CHIP MAKER.

22  THAT'S NOT BEEN THE WAY PEOPLE HAVE BEHAVED IN THE INDUSTRY.

23  IT'S NOT BEEN THE WAY THE INDUSTRY HAS OPERATED.

24       THE WAY THE INDUSTRY HAS OPERATED IS THE WAY QUALCOMM HAS

25  OPERATED, HANDSET LEVEL LICENSING.

CLOSING ARGUMENT BY MR. VAN NEST

1          AS MR. GONELL HAS SAID, QUALCOMM HAS NEVER GRANTED AN

2     EXHAUSTIVE LICENSE TO A CHIP MAKER.  IT'S NOT A SITUATION WHERE

3     QUALCOMM HAD A PRACTICE THAT CHANGED OR QUALCOMM MADE A

4     COMMITMENT THAT THEY UNDERSTOOD REQUIRED LICENSING AT THE

5     COMPONENT LEVEL.

6          GOOD REASONS EXIST FOR DOING IT THE WAY THEY DO, AND

7     THAT'S THE WAY THEY'VE ALWAYS DONE IT.

8          SO YOU COULDN'T FIND ANTICOMPETITIVE MALICE FROM THIS IF

9     IT'S WHAT THE INDUSTRY DOES, AND THERE'S TESTIMONY THAT IT'S

10    ABSOLUTELY CONSISTENT WITH ETSI.

11         I UNDERSTAND THE FUTURE MAY BE DIFFERENT, MAY BE.  BUT THE

12    PAST IS CRYSTAL CLEAR THAT THIS IS HOW FOLKS HAVE OPERATED.

13         AND, YOUR HONOR, THE ONLY THING I HEARD TO COUNTER THIS

14    WAS CROSS-LICENSING, CROSS-LICENSING.

15         YOU HEARD ABOUT CROSS-LICENSING FROM MR. GONELL AND

16    MR. WEILER, TOO.  CROSS-LICENSING IS ABSOLUTELY INDUSTRY

17    STANDARD, BUT IT'S FUNDAMENTALLY DIFFERENT FROM COMPONENT LEVEL

18    LICENSING.

19         IF YOU ARE GIVING A PORTFOLIO LICENSE TO A LICENSEE, IT

20    MAKES NO SENSE NOT TO HAVE A COMPREHENSIVE AGREEMENT.

21    OTHERWISE YOU SIGN YOUR LICENSE WITH THE LICENSEE, YOU GIVE

22    THEM YOUR RIGHTS TO ALL YOUR PATENTS, AND THE NEXT DAY THEY SUE

23    YOU ON THEIR PORTFOLIO.

24         THAT MAKES ABSOLUTELY NO SENSE AND NOBODY OPERATES THAT

25    WAY.

1          MR. GONELL TESTIFIED THAT'S COMMON, AND MR. WEILER SAID

2     THAT'S HOW ETSI OPERATES, TOO.  YOU'RE ALLOWED TO, IN A FRAND

3     WORLD, YOU ARE ABSOLUTELY ALLOWED TO ASK FOR A CROSS-LICENSE IF

4     YOU'RE PROVIDING A FRAND LICENSE.

5          NOW, THAT MEANS THAT THERE IS NO ANTITRUST DUTY TO DEAL

6     BASED ON THE ROADMAP THAT YOUR HONOR LAID OUT IN THE MOTION TO

7     DISMISS.  YOU LAID IT OUT.  YOU GAVE THEM A CLEAR ROADMAP, AND

8     IT WAS CORRECT.  YOU SAID THERE HAS TO BE A CHANGE OR

9     ABANDONMENT OF A PROFITABLE COURSE OF DEALING, AND

10    ANTICOMPETITIVE MALICE, NAMELY, SOMETHING NOT RATIONAL DONE FOR

11    AN ANTICOMPETITIVE PURPOSE.

12         THERE'S NO EVIDENCE OF THAT HERE.  THEY FAILED TO PROVE

13    IT.  THEY HAD THE ROADMAP, BUT THEY DIDN'T GET ON THE ROAD.

14         OUR REFUSAL TO LICENSE CHIP MAKERS IS INDUSTRY STANDARD,

15    IT'S NEVER CHANGED, IT'S BEEN CONSISTENT WITH ETSI POLICY

16    THROUGHOUT, AND THERE IS NOW ABSOLUTELY NO BASIS FOR A FINDING

17    OF A DUTY TO DEAL WITH COMPETITORS.

18         NOW, SOMETHING THAT IS NOT INDUSTRY STANDARD IS QUALCOMM'S

19    POLICY OF SELLING ONLY TO LICENSED OEM'S.  I THINK IN THAT

20    RESPECT QUALCOMM IS UNIQUE, AND WE SAID THAT RIGHT UPFRONT.

21         YOU HEARD TESTIMONY ABOUT THIS FROM MR. MOLLENKOPF,

22    MR. GONELL, MR. NEVO, PROFESSOR NEVO.

23         AND THE ANSWER IS QUALCOMM'S UNIQUE.  IT STARTED OFF AS A

24    LICENSING BUSINESS WITH SYSTEM END-TO-END TECHNOLOGY.  IT NEVER

25    INTENDED TO GET PAID BASED ON PRODUCT SALES.  FROM THE VERY

1    BEGINNING, THE VALUE IN ITS I.P. WAS RECOVERED FROM LICENSING.

2         SO IN EFFECT, THEY HAVE TWO BUSINESSES.  THERE'S A

3    LICENSING BUSINESS WITH THE SYSTEM END-TO-END TECHNOLOGY THAT

4    READS ALL OVER THE HANDSET; AND THERE'S A CHIP BUSINESS.  THE

5    I.P. FOR THE SYSTEM IS NOT PRICED INTO THE CHIP.

6         AND QUALCOMM SHOULDN'T BE AT A DISADVANTAGE JUST BECAUSE

7    THEY HAVE A CHIP BUSINESS.  IT SHOULDN'T BE THE CASE THAT THEY

8    SHOULD PUT THEMSELVES AT RISK OF SOMEBODY CLAIMING, I DON'T

9    HAVE TO PAY FOR YOUR I.P. BECAUSE I BOUGHT A CHIP.  THAT'S NOT

10   BEEN THE WAY THE BUSINESS HAS DEVELOPED.  THAT'S NOT BEEN THE

11   WAY QUALCOMM HAS DEALT WITH ITS LICENSEES FOR THE LAST 30

12   YEARS.

13        IT'S ABSOLUTELY FAIR, AS PROFESSOR NEVO SAID, BECAUSE IT'S

14   TRANSPARENT.  ALL LICENSEES PAY THE RATE.  THEY KNOW THE STATED

15   RATE.  THEY NEGOTIATE A DEAL, AND THEN EVERYBODY COMPETES ON

16   THE CHIPS.

17        THERE'S NO OVERLAP BETWEEN THOSE.  FOLKS ARE COMPETING ON

18   CHIPS.  IT DOESN'T MATTER, ONCE YOU HAVE A LICENSE, WHOSE CHIPS

19   YOU BUY.  YOU COMPETE ON THE MERITS OF THE CHIPS.

20        PERFORMANCE, PRICE, AVAILABILITY.

21        AND PROFESSOR NEVO SAID THAT'S A FAIR WAY TO DO IT, AND I

22   DIDN'T HEAR ONE WORD FROM PROFESSOR SHAPIRO IN RESPONSE.

23        AND ALL THIS TESTIMONY THAT YOU HEARD ABOUT THE DOCUMENTS

24   THAT GOOD OLD BCG PREPARED WAS ABSOLUTELY CONSISTENT WITH THIS.

25        BCG PROVIDED A SLIDE DECK NOT TO MR. MOLLENKOPF AND NOT TO

CLOSING ARGUMENT BY MR. VAN NEST

1    MANAGEMENT AND NOT TO MR. JACOBS, THEY PRESENTED IT TO AN

2    INDEPENDENT COMMITTEE OF THE BOARD.

3         MR. MOLLENKOPF SAID CLEARLY, THE REASON WE KEPT THE

4    BUSINESS TOGETHER WAS BECAUSE HAVING A CHIP BUSINESS HELPS US

5    WITH CREDIBILITY WITH THE STANDARDS ORGANIZATIONS, IT HELPS

6    WITH THEIR CONFIDENCE THAT A STANDARD THAT WE'RE PROPOSING CAN

7    ACTUALLY BE TURNED INTO A PRODUCT, AND ON THE OTHER SIDE, THE

8    CHIP BUSINESS IS BETTER OFF BECAUSE WE'VE GOT AN INVENTION

9    MACHINE OVER HERE IN OUR CORPORATE R&D THAT ALLOWS US TO GET

10   PRODUCTS TO MARKET SOONER.

11        THERE ARE ABSOLUTELY GOOD, FAIR, LEGITIMATE REASONS TO

12   KEEP THE BUSINESS TOGETHER, AND THERE'S NOBODY IN MANAGEMENT OR

13   ANYWHERE ELSE AT QUALCOMM THAT SAYS USING STICKS AND CARROTS IS

14   A GREAT THING.

15        NOW, MY FINAL POINT MAYBE HAS BEEN CONCEDED, AND THAT IS

16   THAT QUALCOMM EARNED ITS PLACE THROUGH SUPERIOR INNOVATION AND

17   BETTER PRODUCTS.

18        WHY IS THAT IMPORTANT?

19        THIS QUOTE, YOUR HONOR, IS FROM THE FTC'S PROPOSED

20   CONCLUSIONS OF LAW, AND THE GIST OF IT IS THEY'VE GOT THE

21   BURDEN TO SHOW THAT QUALCOMM MAINTAINED ITS MARKET POSITION

22   THROUGH ILLEGAL CONDUCT RATHER THAN GROWTH OR DEVELOPMENT AS A

23   CONSEQUENCE OF A BETTER PRODUCT, BUSINESS ACUMEN, ET CETERA.

24        WELL, WE HAVE PROVED TO A TEE THAT QUALCOMM GOT HERE AND

25   STAYED HERE BASED ON THE SUCCESS OF ITS ENGINEERING PROGRAM.

1          AND THE EVIDENCE IS ESSENTIALLY UNDISPUTED ON THAT.

2          LET'S LOOK AT WHAT YOU HEARD FROM MR. JACOBS.  WE'RE

3     LOOKING FOR A WAY TO MAKE A MAJOR STEP AND TAKE A SYSTEMS

4     APPROACH.  WE DON'T WANT TO IMPROVE THINGS JUST A LITTLE.  WE

5     WANT TO IMPROVE THEM A LOT.

6          AND THE FTC NOW ADMITS THAT CDMA IN MOBILE WAS AN

7     INVENTION OF QUALCOMM AND THAT WAS A HUGE STEP FORWARD FOR

8     VOICE COMMUNICATIONS IN THE EARLY DAYS.

9          BUT THAT'S NOT THE END OF IT.  THAT'S NOT THE END OF IT.

10    YOU HEARD FROM MR. MALLADI AND FROM DR. JACOBS THAT QUALCOMM

11    HAS KEPT PUSHING THE INDUSTRY FORWARD.

12         WHAT WAS THE NEXT BIG THING?  HDR, HIGH DATA RATES.

13    THAT'S A BREAKTHROUGH TECHNOLOGY.

14         WHY DO WE HAVE CELL PHONES AND SMARTPHONES NOW THAT CAN

15    CARRY ALL THIS DATA AND YOUTUBE AND VIDEO AND EVERYTHING ELSE?

16    IT'S BECAUSE OF HDR.  THAT WAS A BREAKTHROUGH THAT'S MADE

17    BILLIONS OF DOLLARS FOR THE INDUSTRY, INCLUDING ALL OF OUR OEM

18    LICENSEES.  THAT HAS PUSHED THE INDUSTRY FROM 2G TO 3G TO 4G.

19         AND PROFESSOR ANDREWS PUT A FINE POINT ON IT.  HE SAID

20    QUALCOMM HAS BEEN INSTRUMENTAL IN TWO AREAS, FUNDAMENTAL

21    ESTABLISHMENT OF THE WAVEFORMS AND CONTROL THAT AFFECTS

22    SMARTPHONE OPERATION.  THAT'S WHERE QUALCOMM HAS FOCUSSED ITS

23    WORK.

24         AND BROAD PATENT COVERAGE IN THESE NEW AREAS THAT ARE

25    TAKING US TO 4G AND 5G, CARRIER AGGREGATION, CELLULAR IN

CLOSING ARGUMENT BY MR. VAN NEST

1    UNLICENSED SPECTRUM, HETEROGENOUS NETWORKS.

2         HE TESTIFIED THAT THE PORTFOLIO WAS BROAD AND DEEP AND

3    THAT THESE WERE ALL FUNDAMENTAL TECHNOLOGIES WITHOUT WHICH THE

4    INDUSTRY WOULDN'T BE ABLE TO MOVE FORWARD.

5         AND MR. CHEN FROM QUALCOMM EXPLAINED THAT RESEARCH GIVES

6    US A LOT OF PATENTS, INCLUDING IN THE NON-STANDARD ESSENTIAL

7    PATENT AREAS THAT READ ALL OVER THE PHONE, AREAS OUTSIDE OF

8    CELLULAR, AREAS THAT ARE NOT CELLULAR, AREAS THAT ARE

9    FUNDAMENTAL FEATURES ON YOUR SMARTPHONE THAT DON'T HAVE

10   ANYTHING TO DO WITH CELLULAR.

11        NOT ONLY HAS MR. LASINSKI IGNORED THOSE, BUT THE FTC

12   HASN'T PROVEN ANYTHING ABOUT ANY OTHER COMPETING PORTFOLIO,

13   NOTHING.  THERE'S NO EVIDENCE IN THE RECORD ABOUT ANYBODY

14   ELSE'S PORTFOLIO.

15        AND I WOULD SUGGEST TO YOUR HONOR THERE'S A REASON FOR

16   THAT.  THE REASON QUALCOMM LEADS IN ROYALTIES, AND THE REASON

17   QUALCOMM'S ROYALTY RATES HAVE REMAINED THE SAME, AND THE REASON

18   THOSE RATES HAVE BEEN THE SAME NO MATTER WHAT THEIR MARKET

19   SHARE IS, IS THIS, IT'S THEIR TECHNOLOGY, THEIR PORTFOLIO.

20   IT'S SIMPLY BETTER THAN EVERYBODY ELSE'S.

21        AND NO WITNESS CAME ON THE FTC SIDE TO CONTRADICT THAT.

22   NOTHING IN THE RECORD.

23        AND IT'S BACKED UP BY OUR COMPETITORS AND OUR CUSTOMERS,

24   TOO.  HERE'S WHAT BAIN AND INTEL CAME UP WITH.  THEY'RE TALKING

25   NOW NOT ABOUT THE FUNDAMENTAL SYSTEM TECHNOLOGY, BUT OUR CHIP

1    BUSINESS.  INTEL RECOGNIZES QUALCOMM R&D DRIVES THE PACE OF

2    INNOVATION.

3         IT'S QUALCOMM THAT'S OUT FRONT BUILDING THE BETTER

4    PRODUCTS.

5         AND YOU MAY REMEMBER, YOUR HONOR, MR. MOYNIHAN FROM

6    MEDIATEK SAID WE BENCHMARK AGAINST QUALCOMM.  THEY'RE THE

7    LEADER.  THAT'S AT PAGES 325 EXAMINE 326.  AGAIN, FORGIVE ME, I

8    DON'T HAVE A SLIDE.  BUT IT'S TRANSCRIPT 325 AND 326.  MOYNIHAN

9    SAID, FROM MEDIATEK, WE BENCHMARK.

10        THE CUSTOMERS ALL AGREED.  THIS TESTIMONY WAS FEATURED BY

11   THEM.  QUALCOMM HAD THE BEST CHIPSET AVAILABLE.

12        NOBODY ELSE WAS THERE.  QUALCOMM WAS AHEAD IN LTE.

13   QUALCOMM'S PERFORMANCE WAS A YEAR AHEAD OF INTEL.  QUALCOMM HAD

14   A SUPERIOR OFFERING.

15        OVER AND OVER AND OVER.

16        AND NOT ONLY THAT, YOUR HONOR, THIS IS ALL TESTIMONY THAT

17   WAS ELICITED BY THE FTC.  PROFESSOR SHAPIRO CHIMED IN AND GAVE

18   US THIS HELPFUL CHART.

19        THIS CHART SHOWS, IN PROFESSOR SHAPIRO'S VIEW, THAT

20   QUALCOMM HAS BEEN FIRST TO MARKET IN EVERY SINGLE ADVANCED LTE

21   TECHNOLOGY CATEGORY.  EVERY ONE.

22        THE BOXES ON THE LEFT WITH THE NICE COLORS ARE QUALCOMM,

23   AND THE BOXES ON THE RIGHT ARE THE REST OF THE INDUSTRY TRYING

24   TO CATCH UP.

25        SO CATEGORY 3, THEY'RE TWO YEARS AHEAD.  CATEGORY 4,

1    THEY'RE A YEAR AHEAD.  ET CETERA, ET CETERA, ET CETERA, ET

2    CETERA.

3         SO, YOUR HONOR, IF THE TASK IS TO DECIDE WHETHER QUALCOMM

4    MAINTAINED ITS POSITION THROUGH INNOVATION, SKILL, TECHNOLOGY,

5    OR THROUGH ITS LICENSING PRACTICES, IT'S A LAY DOWN HAND.  THEY

6    HAVEN'T PROVEN ANYTHING WITH RESPECT TO OUR LICENSING PRACTICES

7    THAT HAD ANY IMPACT ON THE ADVANCEMENT OF THIS TECHNOLOGY.

8         AND SO FOR THOSE REASONS, I THINK THE EVIDENCE IS CRYSTAL

9    CLEAR, THERE CAN'T BE ANY VIOLATION BASED ON WHAT THEY

10   PRESENTED.  EVEN THOUGH YOUR HONOR GAVE THEM A ROADMAP, THEY

11   WERE UNABLE TO PRESENT EVIDENCE TO MEET THE BURDEN.

12        BUT NOW I WANT TO TALK FOR JUST A FEW MINUTES ABOUT

13   REMEDIES, AND I WANT TO START WITH A SLIDE FROM

14   PROFESSOR SHAPIRO BECAUSE THEY SAID THAT THE PRESENCE OF

15   EXISTING CONDUCT IS ENOUGH FOR INJUNCTIVE RELIEF, AND THAT'S

16   JUST NOT THE LAW.

17        AND PROFESSOR SHAPIRO SAID WAS IF THE COST TO AN OEM OF

18   LOSING ACCESS TO CHIPS WERE NIL, THEN THE NO LICENSE, NO CHIPS

19   POLICY WOULD HAVE NO BITE, AND, THEREFORE, QUALCOMM WOULD NOT

20   BE ABLE TO ELEVATE ROYALTIES AND THE REST OF THE PROGRAM FALLS

21   APART.

22        WELL, THAT MEANS IF QUALCOMM LACKS MARKET POWER, THEN ITS

23   PRACTICES ARE NOT CAPABLE OF ANY HARM.

24        AND THE LAW ISN'T THAT IT'S ENOUGH TO SHOW CONDUCT

25   CONTINUING.  YOU HAVE TO SHOW A CONTINUING VIOLATION.  A

1    VIOLATION REQUIRES MARKET POWER.

2         AND THE FTC HASN'T PRODUCED ANY EVIDENCE OF MARKET POWER

3    AFTER 2016, AS THIS NEXT SLIDE SHOWS.

4         PROFESSOR SHAPIRO WAS CRYSTAL CLEAR.  NOTHING IN 2017,

5    NOTHING IN 2018.

6         AND I'M NOT JUST QUIBBLING HERE, YOUR HONOR.  IT'S NOT AS

7    THOUGH HE WAS SHOWING A STRAIGHT LINE UP FOR QUALCOMM WITHIN A

8    YEAR OF TRIAL.  THAT'S NOT IT.

9         HE WAS SHOWING A STRAIGHT LINE DOWN, DIMINISHING MARKET

10   SHARE IN 2014, 2015, 2016.

11        AND HIS ANALYSIS STOPS COMPLETELY IN 2016.

12        SO THERE'S CURRENTLY NO BASIS IN THE RECORD, OR THE

13   EVIDENCE, FOR ANY FORM OF INJUNCTIVE RELIEF, YOUR HONOR, IF YOU

14   CAN'T SHOW SOME EVIDENCE OF MARKET POWER NOW OR WITHIN MONTHS

15   OF NOW, WHICH THEY HAVEN'T SHOWN.

16        AND WE KNOW THAT 5G IS GOING TO BE COMPETITIVE.  YOU HEARD

17   A LOT OF TESTIMONY ABOUT THAT.  MR. MOYNIHAN SAYS MEDIATEK HAS

18   A CHIP, AND IT'LL BE OUT.

19        MS. EVANS SAYS INTEL HAS A CHIP, AND IT'LL BE OUT.

20        MR. ROGERS SAW A HUAWEI CHIP DISPLAYED LAST JANUARY, A

21   YEAR AGO, AT THE MOBILE WORLD CONGRESS.

22        SO WE KNOW THAT THERE'S GOING TO BE STIFF COMPETITION FROM

23   WELL FUNDED ADVERSARIES, LIKE HUAWEI, IN THIS FIELD NO MATTER

24   WHAT.

25        ANOTHER POINT.  THEY ARE ASKING YOUR HONOR TO THROW OUT

1    HUNDREDS OF LICENSE AGREEMENTS, RENDER THEM UNENFORCEABLE, THAT

2    HAVE BEEN NEGOTIATED WITH THIRD PARTIES OVER THE PAST 10 TO 15

3    YEARS.

4         THERE IS NO EVIDENCE OF ANY PLAUSIBLE CHIP LEVERAGE AS TO

5    ANY OF THE FOLLOWING CATEGORIES I'VE GOT ON THE BOARD.  THEY'RE

6    NOT CLAIMING ANY MARKET POWER IN WCDMA.

7         MANY OF THE LICENSE AGREEMENTS THAT YOUR HONOR HAS BEFORE

8    HER ARE WCDMA.

9         NO CLAIM OF MARKET POWER IN LTE BEFORE 2011.

10         NO CLAIM OF MARKET POWER IN CDMA BEFORE 2006.

11         YOUR HONOR CLARIFIED THAT WHEN PROFESSOR SHAPIRO WAS HERE.

12         NO CLAIM OF MARKET POWER NOW OR ANY TIME AFTER 2016.

13         AND ALL TRENDS ARE SHOWING MARKET SHARE DIMINISHING.

14         THE CPLA LICENSES, YOUR HONOR, ARE THE ONES MR. ROGERS

15    ADDRESSED FRIDAY.  THEY WERE EXECUTED UNDER THE NDRC

16    RECTIFICATION PLAN AND APPROVED BY THE NDRC.

17         THE SAMSUNG AGREEMENT IS TO THE SAME EFFECT.  IT WAS

18    NEGOTIATED IN 2018.  I'VE GOT A SLIDE ON THAT IN A MINUTE.

19         BUT MY POINT IS THAT EVEN IF YOUR HONOR WERE TO FIND SOME

20    VIOLATION OUT OF ALL THIS, WHICH I DON'T THINK YOU CAN, THERE

21    CLEARLY IS NO EVIDENCE AS TO ANY OF THE LICENSE AGREEMENTS IN

22    THESE CATEGORIES TO SUPPORT ANYTHING.

23         AND NOW MY SAMSUNG SLIDE, LET'S GO TO SAMSUNG, IS SIMPLY

24    THIS:  THE TWO TOP PEOPLE, MR. AHN'S A LAWYER, MR. LEE IS NOT,

25    THE TWO TOP PEOPLE THAT NEGOTIATED THE SAMSUNG AGREEMENT THAT

CLOSING ARGUMENT BY MR. VAN NEST

1    WAS LATER PROVIDED TO THE KOREAN GOVERNMENT SAID THERE WAS

2    NOTHING WRONG WITH OUR NEGOTIATION, NO PRESSURE, NO NOTHING.  I

3    WASN'T COERCED, THERE WAS NO TALK OF CHIP SUPPLY.

4         AND I THINK IMPORTANT I THINK HERE TO RECOGNIZE, YOUR

5    HONOR, AS PROFESSOR NEVO SAID, IN A MARKET LIKE THIS THAT'S

6    RAPIDLY CHANGING AND THAT'S BEEN HIGHLY SUCCESSFUL, COURT

7    INTERVENTION -- GOD BLESS YOU --

8              THE COURT:  THANK YOU.

9              MR. VAN NEST:  -- COURT INTERVENTION, IF IT'S GOING

10   TO HAPPEN AT ALL, HAS TO BE MEASURED.  IT MUST BE MEASURED.

11        THEY'VE PROVIDED NO EVIDENCE THAT WHAT THEY WANT WILL HAVE

12   ANY EFFECT ON THE MARKET THAT'S POSITIVE.

13        AND YOU KNOW NOW THAT SINCE THE HANDSET LEVEL LICENSING

14   AND COMPONENT LICENSING, THE WAY IT'S DONE NOW -- BLESS YOU

15   AGAIN --

16             THE COURT:  THANK YOU.

17             MR. VAN NEST:  -- HAS BEEN SUCCESSFUL, THAT I WOULD

18   URGE THE COURT TO REVIEW THE TESTIMONY OF PROFESSOR NEVO ON

19   THIS ISSUE BECAUSE THE FTC HAS PRESENTED ABSOLUTELY NOTHING TO

20   JUSTIFY THE SWEEPING ALMOST BREATHTAKING REMEDY THEY WANT BASED

21   ON THE PALTRY EVIDENCE THEY PROVIDED.

22        AND SO NOW, YOUR HONOR, FOR ALL THE REASONS I PROVIDED IN

23   MY DISCUSSION THIS AFTERNOON, AS WELL AS OUR PRETRIAL BRIEF,

24   OUR PROPOSED FINDINGS OF FACT AND CONCLUSIONS, I THINK IT'S

25   PRETTY CLEAR, THE FTC FAILED TO MEET ITS BURDEN ON EVERY

1    ELEMENT OF THE CLAIMS AND HASN'T SHOWN THAT ANY OF THE REMEDIES

2    IT SEEKS ARE NECESSARY, TAILORED, OR IN THE PUBLIC INTEREST AT

3    ALL.

4         AND SO FOR THOSE REASONS, WE MOVE FOR THE JUDGMENT OF

5    DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 52(C).

6         AND I THANK YOUR HONOR FOR YOUR ATTENTION THIS AFTERNOON

7    AND THROUGHOUT THE TRIAL.  I HOPE I'VE BEEN HELPFUL.

8         THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU VERY

9    MUCH.

10        IT'S 3:35.

11        (PAUSE IN PROCEEDINGS.)

12        THE COURT:  ALL RIGHT.  YOU HAVE 9 MINUTES.  LET ME

13   KNOW WHEN YOU'RE READY TO START.

14        MS. MILICI:  OKAY.  I'M READY.

15        THE COURT:  OKAY.  3:35.  GO AHEAD, PLEASE.

16   REBUTTAL.

17        **(MS. MILICI GAVE HER REBUTTAL CLOSING ARGUMENT ON BEHALF**

18   **OF THE FTC.)**

19        MS. MILICI:  THANK YOU, YOUR HONOR.

20        I WANT TO JUST TAKE A FEW MINUTES TO CLARIFY SOME OF THE

21   THINGS THAT MY OPPONENT JUST SAID.

22        FIRST, MR. VAN NEST SAID THAT THERE HAS BEEN NO EVIDENCE

23   OF ANTICOMPETITIVE EFFECT, AND THAT'S JUST WRONG.

24        THE EVIDENCE IS -- THE RECORD IS FULL OF SUCH EVIDENCE,

25   AND I SAID SO IN CLOSING.  AND THESE INCLUDE DELAYED ENTRY BY

REBUTTAL CLOSING ARGUMENT BY MS. MILICI

1    INTEL AND MEDIATEK, FORECLOSURE OF INTEL AND RIVALS BY

2    EXCLUSIVE DEALS, THE EXITS OF RIVALS BECAUSE THE PROFITS IN

3    SCALE ARE SUCKED OUT OF THE INDUSTRY BY A QUALCOMM TAX, REDUCED

4    INDUSTRY PROFITS TO INVEST R&D, HIGHER PRICES IN THE FORM OF

5    PREMIUM PRICES FOR QUALCOMM CHIPS THAT ARE PAID FOR BY

6    CUSTOMERS, AND THEN BY HANDSET CONSUMERS.  CHIP PRICE ADDERS

7    FOR CDMA CHIPS, WE SAW THAT EVIDENCE DURING TRIAL.

8         DENIAL OF LEARNING OPPORTUNITIES FOR RIVALS LEADING TO

9    INEFFICIENT INNOVATION, AND SUPER COMPETITIVE QUALCOMM CHIPSET

10   MARGINS.  THESE ARE ALL ANTICOMPETITIVE EFFECTS, AND THE RECORD

11   IS FULL OF THEM.

12        NOW, THERE ARE A COUPLE OF OTHER THINGS THAT MY COLLEAGUE

13   SAID THAT ARE A LITTLE BAFFLING TO ME.  HE ATTACKS THE

14   WITNESSES WHO APPEARED ON BEHALF OF THIRD PARTIES AS BEING

15   LAWYERS.

16        I WOULD NOTE THAT WE ARE TALKING ABOUT LICENSING

17   NEGOTIATIONS.  LICENSING NEGOTIATIONS ARE TYPICALLY CONDUCTED

18   BY LAWYERS.  AND, IN FACT, THE WITNESSES THAT QUALCOMM

19   PRESENTED TO TALK ABOUT LICENSING NEGOTIATIONS ARE LAWYERS.

20   MR. REIFSCHNEIDER IS A LAWYER.  MR. ALTMAN IS A LAWYER.

21   MR. ABERLE IS A LAWYER.  FRANKLY, WE'RE ALL LAWYERS.  I THINK

22   THAT TRYING TO PAINT WITNESSES AS DISHONEST BECAUSE THEY HAPPEN

23   TO BE LAWYERS IS ABSURD.

24        I ALSO THINK THAT SOME OF THE -- I WOULD POINT OUT THAT

25   SOME OF THE THINGS THAT MR. VAN NEST WAS SAYING ABOUT THE

1    RECORD ARE ALSO, I BELIEVE, CONFUSING.

2        FIRST, THE IDEA THAT THE FTC WAS TRYING TO PRESENT

3    EVIDENCE IN A MISLEADING FASHION IS JUST WRONG.  WE REACHED A

4    COMPROMISE DEAL WITH QUALCOMM BECAUSE THEY DIDN'T WANT THEIR

5    WITNESSES TO COME TWICE, AND THAT'S WHY THE EVIDENCE WAS

6    PRESENTED IN THE MANNER THAT IT WAS AND THERE WAS NOTHING

7    MISLEADING ABOUT IT.

8        IN THE WAY THAT THE EVIDENCE WAS JUST PRESENTED HERE,

9    HOWEVER, I THINK THAT THERE WERE SOME THINGS THAT WERE

10   MISLEADING.

11       MR. BLUMBERG FROM LENOVO, HE PROVIDED TESTIMONY ABOUT

12   THREATS MADE IN 2013.  THE INTERNAL DOCUMENTS OF QUALCOMM

13   CONFIRM THAT IT WAS PART OF THEIR STRATEGY AT VARIOUS POINTS IN

14   THEIR NEGOTIATIONS WITH LENOVO TO MAKE THREATS.

15       THAT'S THE CARROTS AND STICKS SLIDE THAT WE SAW.  THAT'S

16   ABOUT MAKING THREATS TO LENOVO.

17       THEN MR. VAN NEST PLAYED A SNIPPET OF TESTIMONY FROM

18   MR. MADDEROM, WHO DOES NOT, WHO WAS NOT INVOLVED IN LICENSING

19   NEGOTIATIONS, ABOUT A CONVERSATION THAT HE HAD IN 2015.

20       SO I THINK -- I WOULD ASK THE COURT THAT WHEN YOU'RE

21   REVIEWING THE RECORD, TO KEEP IN MIND THAT THESE ARE SNIPPETS

22   THAT ARE TAKEN OUT OF CONTEXT AND THAT IF YOU LOOK AT THE WHOLE

23   STORY, THE STORY PROCEEDS EXACTLY AS THE WITNESSES SAID THAT IT

24   DID.

25       AND I WOULD POINT OUT THE SAME THING ABOUT THE SONY

1    DISCUSSION.  ACCORDING TO QUALCOMM, THERE WAS A THREAT MADE TO

2    SONY AND THEN IMMEDIATELY THAT WAS CORRECTED.

3         THAT'S ABSOLUTELY NOT TRUE, AND THERE ARE A NUMBER OF

4    DOCUMENTS IN THE RECORD THAT SHOW CONTINUING THREATS MADE TO

5    SONY AFTER THAT INITIAL THREAT IN FEBRUARY OF 2012.

6    NEGOTIATIONS WENT ON THROUGH THE END OF OCTOBER OF 2012, AND

7    THERE WERE MULTIPLE THREATS MADE THROUGHOUT THOSE NEGOTIATIONS,

8    AND THEY'RE EVIDENT IN THE DOCUMENTS THAT ARE ADMITTED IN THIS

9    CASE.

10        IN ADDITION, ON THE CHIP LEVEL LICENSING POINT, IT IS

11   UNDISPUTED THAT QUALCOMM HAS CHIP LEVEL LICENSES.  IT IS

12   UNDISPUTED -- IN FACT, WE SHOWED A DOCUMENT IN WHICH QUALCOMM

13   SAID THAT IT PROACTIVELY SOUGHT THOSE LICENSES, NOT JUST FROM

14   ITS LICENSEES, BUT FROM OTHERS IN THE INDUSTRY.

15        AND WE PUT -- I POINTED OUT IN A SLIDE EARLIER TODAY THAT

16   QUALCOMM MARKETED THOSE RIGHTS WHEN IT WAS SELLING ITS CHIPS,

17   AND IF YOU JUST LOOK AT THE LIST OF LICENSES ATTACHED TO THAT

18   MARKETING DOCUMENT, THERE ARE FOLKS ON THAT LIST THAT WERE NOT

19   QUALCOMM LICENSEES.

20        THIS IS NOT A SIMPLE MATTER OF CROSS-LICENSES.

21        BUT EVEN IF IT WAS, I WOULD SAY THAT SAMSUNG SOUGHT TO

22   NEGOTIATE A CROSS-LICENSE THAT WOULD APPLY TO ITS CHIP

23   BUSINESS.  AND QUALCOMM SAID NO.  AND THAT'S PART OF THE

24   EVIDENCE IN THIS CASE.

25        AND IN ADDITION, SAMSUNG WAS ABLE TO OBTAIN CHIP LEVEL

1    CROSS-LICENSES AS WE HEARD -- FROM OTHERS AS WE HEARD YESTERDAY

2    FROM MR. KIM.

3        IN ADDITION, THERE WAS ARGUMENT THAT THE FTC WAS UNABLE TO

4    MEET ITS BURDEN ABOUT ANTITRUST DUTIES TO DEAL, AND, AGAIN, I

5    DISAGREE WITH THAT.

6        I STARTED MY PRESENTATION TODAY WITH A SLIDE THAT SHOWED

7    THAT AT THE BEGINNING OF ITS CDMA TECHNOLOGY, QUALCOMM MADE A

8    CHOICE.  IT MADE A CHOICE THAT IT THOUGHT WOULD BE PROFITABLE,

9    TO CONTRIBUTE ITS TECHNOLOGY TO A STANDARD IN ORDER TO EXPAND

10   ITS MARKET AND TO EXPAND THE NUMBER OF UNITS -- OF LICENSED

11   UNITS.

12       THAT WAS THE VOLUNTARY CONDUCT THAT IT THOUGHT WOULD BE

13   PROFITABLE AND THAT REQUIRED IT TO LICENSE ITS RIVALS.

14       SO IT'S ABSOLUTELY UNTRUE THAT WE HAVEN'T MET THAT BURDEN.

15       IN ADDITION, I -- THERE WAS SOME CONFUSION MADE, I THINK,

16   ABOUT THE WORK THAT DR. -- PROFESSOR NEVO DID.  WHAT

17   PROFESSOR NEVO DID WAS ASSUME THAT THERE WAS NO MARKET POWER IF

18   THE FTC DIDN'T BRING A LAWSUIT ABOUT A CERTAIN MARKET.

19       OF COURSE THERE'S NO REQUIREMENT FOR THE FTC TO BRING A

20   LAWSUIT ABOUT EVERY SINGLE MARKET THAT'S AFFECTED BY

21   ANTICOMPETITIVE CONDUCT.  JUST BECAUSE WE DIDN'T BRING A

22   LAWSUIT ABOUT WCDMA DOESN'T MEAN THAT'S A PERFECTLY COMPETITIVE

23   MARKET.

24       IN FACT, I THINK THERE'S SUFFICIENT, AND A SIGNIFICANT

25   AMOUNT OF EVIDENCE IN THE RECORD THAT SHOWS THAT THAT'S NOT

1    TRUE.  THERE'S AT LEAST ONE DOCUMENT THAT I RECALL ADMITTING

2    THROUGH MR. MOLLENKOPF IN WHICH QUALCOMM ITSELF RECOGNIZED THAT

3    IT HAD A DOMINANT POSITION IN WCDMA.

4         PROFESSOR NEVO'S ASSUMPTION ON THAT WAS UNWARRANTED.

5         IN ADDITION, I'D LIKE TO CLARIFY, WE CERTAINLY DO GIVE

6    CREDIT TO QUALCOMM FOR BEING FIRST TO MARKET WITH CDMA BACK IN

7    THE 1990S.

8         THE ISSUE, THE ANTITRUST ISSUE IN THIS CASE IS THAT ONCE

9    IT HAD THAT DOMINANT POSITION, IT THREW UP ROADBLOCKS THAT

10   PREVENTED OTHER FOLKS FROM CATCHING UP.

11        WE DON'T KNOW, AND WE CAN'T KNOW, WHAT THE MARKET WOULD

12   HAVE LOOKED LIKE WITHOUT THAT, WHETHER IN THESE LATER PERIODS

13   IN LTE, QUALCOMM WOULD HAVE BEEN FIRST TO MARKET OR NOT.  WE

14   JUST DON'T KNOW.

15        AND WE DON'T KNOW BECAUSE THE MARKET, THE ENTIRE

16   MARKETPLACE WAS INFECTED BY THESE ROADBLOCKS.  WE DON'T KNOW

17   WHAT R&D INVESTMENT BY COMPETITORS WOULD HAVE BEEN IN THAT

18   HYPOTHETICAL MARKET, AND WE DON'T KNOW HOW SUCCESSFUL THEY

19   WOULD HAVE BEEN.

20        AND TO BE CLEAR, THAT IS NOT THE FTC'S BURDEN TO SHOW, AND

21   THAT IS VERY CLEAR IN THE MICROSOFT CASE, AND THAT IS CLEAR IN

22   THE AMERICAN EXPRESS CASE.

23        WHERE THERE'S ANTICOMPETITIVE CONDUCT BY A MONOPOLIST, AS

24   THERE IS HERE, THE FTC IS NOT REQUIRED TO CONSTRUCT A

25   HYPOTHETICAL MARKETPLACE THAT WOULD HAVE EXISTED WITHOUT THESE

REBUTTAL CLOSING ARGUMENT BY MS. MILICI

1    YEARS OF CONDUCT.  THAT WOULD BE IMPOSSIBLE.  AND I'M AWARE OF

2    NO CASE THAT HAS EVER SUGGESTED THAT THAT'S A BURDEN THAT

3    SHOULD BE PLACED ON THE GOVERNMENT AS -- BEFORE ANTICOMPETITIVE

4    CONDUCT CAN BE ENJOINED.

5           AND I THINK I'M OUT OF TIME.  THANK YOU, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  THANK YOU TO EVERYONE.  I

7    APPRECIATE YOUR PRESENTATION OF THE CASE.  I'D ALSO LIKE TO

8    THANK JUDGE COUSINS AND HIS CHAMBERS FOR WORKING ON THIS CASE

9    SO DILIGENTLY OVER THE YEARS.

10          I WANT TO APOLOGIZE TO YOUR FAMILIES THAT YOU HAVE BEEN

11   LIVING IN SAN JOSE FOR SO LONG DURING THE HOLIDAYS.

12          BUT THANK YOU ALL VERY MUCH.  YOU'VE COMPLETED YOUR HARD

13   JOB NOW, AND NOW IT IS UP TO THE COURT TO NOW SORT OF GO

14   THROUGH ALL OF THE EVIDENCE THAT YOU HAVE PRESENTED.

15          SO THANK YOU.

16          OKAY.  SAFE TRAVELS EVERYONE.

17              MR. BORNSTEIN:  THANK YOU, YOUR HONOR.

18              MS. MILICI:  THANK YOU, YOUR HONOR.

19              MR. MATHESON:  YOUR HONOR, I REALLY APOLOGIZE TO THE

20   COURT.

21              THE COURT:  OKAY.

22              MR. MATHESON:  WE ARE ABSOLUTELY COMPELLED TO ASK,

23   DUE TO FTC INTERNAL CONSTRAINTS REGARDING RESOURCE ALLOCATION,

24   WE HAVE HEARD YOU SAY AND WE UNDERSTAND IT'S A VOLUMINOUS

25   RECORD AND WILL TAKE TIME, DUE TO RESOURCE ALLOCATION ISSUES,

```
 1        WE ARE COMPELLED TO REPEAT OUR REQUEST TO UNDERSTAND THE

 2        PARAMETERS OF YOUR POTENTIAL TIMING OF A DECISION, EVEN THOUGH

 3        I KNOW YOU'VE TOLD US TWICE THAT YOU DON'T KNOW.

 4             (LAUGHTER.)

 5                 THE COURT:  OKAY.  LET'S TAKE A SEAT.  I'M SORRY.

 6                 MR. MATHESON:  I APOLOGIZE.

 7                 THE COURT:  IS THIS BECAUSE THE SHUTDOWN IS ONLY FOR

 8        THREE WEEKS?

 9                 MR. MATHESON:  THAT HAS A LOT TO DO WITH IT.

10                 THE COURT:  OH, OKAY.  IS THERE SOME OTHER WAY THAT

11        WE CAN DEAL WITH THIS OTHER THAN ME GIVING YOU A VERY

12        UNINFORMED ESTIMATE OF HOW LONG THE ORDER IS GOING TO TAKE,

13        WHICH IS BASICALLY ALL I COULD GIVE YOU TODAY?

14             BEFORE THE HOLIDAYS, I HAD ISSUED A PROSPECTIVE RULING

15        BASICALLY ORDERING THE FTC TO CONTINUE PREPARING FOR TRIAL.

16             WOULD THAT TAKE CARE OF THE ISSUE IF THERE'S ANOTHER

17        SHUTDOWN?

18                 MR. MATHESON:  I DON'T THINK SO, YOUR HONOR.  I THINK

19        THAT WE NEED TO -- UNFORTUNATELY, I DON'T THINK THAT WOULD WORK

20        UNLESS YOU CAN TELL US AT WHAT POINT WE CAN STOP OR GIVE US AN

21        ESTIMATE SO WE CAN SAY THESE PEOPLE NEED TO BE DOING THIS FOR

22        THIS PERIOD -- YOU KNOW, WE ANTICIPATE IT WILL TAKE AT LEAST

23        THIS PERIOD OF TIME FOR THESE PEOPLE TO COMPLETE THEIR

24        ASSIGNMENT ON THIS CASE, EVEN THOUGH WE'RE NOT DOING MUCH RIGHT

25        NOW.
```

1          THE COURT:  OKAY.  SO ARE YOU TALKING ABOUT ANY

2    APPEAL OF MY RULING AND THE WORK THAT WOULD BE REQUIRED FOR

3    THAT?

4          MR. MATHESON:  NO.  SIMPLY HOW LONG WE NEED TO KEEP

5    RESOURCES AVAILABLE IN THE EVENT THERE IS A SHUTDOWN.  IF THERE

6    IS ZERO CHANCE ANYTHING HAPPENS BEFORE X TIME, THAT IS A DATA

7    POINT THAT WE WOULD APPRECIATE.  AND IF THERE IS ZERO CHANCE

8    ANYTHING HAPPENS UNTIL X TIME, THAT IS A DATA POINT WE WOULD

9    APPRECIATE.

10          THE COURT:  ALL RIGHT.  I THINK THE FUNDING ONLY GOES

11    UNTIL FEBRUARY 15TH; IS THAT CORRECT?

12          MR. MATHESON:  THAT'S MY UNDERSTANDING, YOUR HONOR.

13          THE COURT:  SO YOU'RE BASICALLY ASKING ME, WHAT IS

14    THE LIKELIHOOD THAT A RULING WOULD BE ISSUED IN THE NEXT THREE

15    WEEKS?

16          MR. MATHESON:  JUST ANY GENERAL GUIDANCE, YOUR HONOR.

17          THE COURT:  IS THAT THE QUESTION?

18          MR. MATHESON:  JUST ANY VERY GENERAL GUIDANCE.

19    SEPTEMBER?  NOVEMBER?

20        (LAUGHTER.)

21          THE COURT:  OKAY.  I REALLY HOPE IT DOESN'T GO THAT

22    LONG.

23        NO, IT WOULDN'T.  I MEAN, I DON'T KNOW HOW MANY CASES

24    YOU'VE HAD WITH ME, BUT I'M GENERALLY FAIRLY FAST.  I MEAN,

25    RELATIVELY FAST.  SOMETHING OF THIS MAGNITUDE OBVIOUSLY IS

1    GOING TO TAKE LONGER THAN YOUR AVERAGE LAW AND MOTION MATTER.

2         SO I WAS JUST WONDERING IF THERE'S SOME WAY THAT I

3    COULD -- YOU NEED THE INFORMATION NOW, IT'S NOT SOMETHING THAT

4    I COULD DEAL WITH ON FEBRUARY 13TH, FOR EXAMPLE?

5              MR. MATHESON:  IT ABSOLUTELY IS, YOUR HONOR.  WE WERE

6    JUST ASKED -- WE HAVE TO MAKE THE REQUEST NOW.

7              THE COURT:  OH, I SEE.  OKAY.  WHY DON'T WE DO THIS.

8    CAN YOU FILE A REQUEST ON FEBRUARY 13TH, AND LET ME KNOW WHAT I

9    NEED TO DO, ANY KIND OF GUIDANCE OR RULING THAT I CAN GIVE THAT

10   MIGHT BE USEFUL IN THIS SITUATION?

11             MR. MATHESON:  THAT SOUNDS WONDERFUL.  THANK YOU.

12             THE COURT:  I MEAN, I AM ASSUMING THAT IF YOU APPEAL

13   THIS, IF EITHER SIDE APPEALS THIS, YOU PROBABLY WILL NOT BE

14   DOING SIGNIFICANT BRIEFING ON THAT FOR SOME TIME, I WOULD

15   SUSPECT.

16        OR WHAT ARE YOU ENVISIONING POST THE RULING?  OR I SHOULD

17   ASK?

18             MR. MATHESON:  I WOULD HESITATE TO PRESUME WHAT WE

19   ENVISION AFTER A RULING, YOUR HONOR.

20             THE COURT:  OKAY.

21        (LAUGHTER.)

22             THE COURT:  ALL RIGHT.  WELL, WHY DON'T WE JUST LEAVE

23   IT THAT ON WEDNESDAY, FEBRUARY 13TH, OR SOMETIME THAT WEEK, IF

24   IT LOOKS LIKE THERE'S NOT GOING TO BE ANY MORE FUNDING FOR THE

25   GOVERNMENT -- AND, FRANKLY, THERE MAY NOT EVEN BE ANY FUNDING

1    FOR THE COURT BECAUSE I THINK WE'VE EXHAUSTED THE FUNDS THAT WE

2    HAVE TO CONTINUE OPERATING WITHOUT A CONTINUING RESOLUTION --

3    THAT YOU WOULD LET ME KNOW AND THEN I WOULD TRY TO PROVIDE

4    WHATEVER GUIDANCE I CAN.

5              MR. MATHESON:  THANK YOU, YOUR HONOR.  WE APPRECIATE

6    IT.

7              THE COURT:  OKAY.  THANK YOU.

8         ALL RIGHT.  THANK YOU EVERYBODY.

9              MR. VAN NEST:  THANK YOU, YOUR HONOR.

10             MS. MILICI:  THANK YOU, YOUR HONOR.

11        (THE PROCEEDINGS WERE CONCLUDED AT 3:48 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, CRR
         CERTIFICATE NUMBER 8076
17

18       _____
19       LEE-ANNE SHORTRIDGE, CSR, CRR
         CERTIFICATE NUMBER 9595
20

21       DATED:  JANUARY 29, 2019

22

23

24

25